UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

WALTER W. THIEMANN, On Behalf of Himself And of All Others Similarly Situated, :

Plaintiff, :

vs. : CASE NO. C-1-00-793

OHSL FINANCIAL CORPORATION, et al., :

Defendants. :

- - -

Deposition of JOHN WINSTEAD, ESQ., a witness herein, called by the plaintiff for cross-examination pursuant to the Federal Rules of Civil Procedure, taken before me, Lee Ann Williams, a Registered Professional Reporter and Notary Public in and for the State of Ohio, at the offices of Gene Mesh & Associates, 2605 Burnet Avenue, Cincinnati, Ohio 45219, on Tuesday, August 19, 2003, at 10:58 a.m.

APPEARANCES:

On behalf of the Plaintiff:
Gene L Mesh, Esq.
and
Michael G. Brautigam, Esq.
Gene Mesh & Associates
2605 Burnet Avenue
Cincinnati, Ohio 45219

On behalf of the Defendant:
Rachael A. Rowe, Esq.
Keating, Muething & Klekamp
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202

On behalf of the Defendant:
Dennis Buckley, Esq.
Schroeder, Maundrell, Barbiere & Powers
110 Governor's Knoll
11935 Mason Road
Cincinnati, Ohio 45249

On behalf of the Witness:
Patrick F. Fischer, Esq.
Keating, Muething & Klekamp
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202

---



INDEX


| Examination of JOHN WINSTEAD, ESQ. | Page |
|---|---|
| By Mr. Brautigam: | 4 |

---

| Defendant's Exhibit | Page Identified |
|---|---|
| No. 40 | 19 |
| No. 41 | 52 |
| No. 42 | 160 |


---



MR. BRAUTIGAM: Good morning, Mr. Winstead. My name is Michael G. Brautigam and I represent Walter Thiemann and a class of OHSL shareholders. Counsel, would you give your appearance, please.
MR. FISCHER: Patrick Fischer.
MR. BRAUTIGAM: And you represent?
MR. FISCHER: Mr. Winstead.
MS. ROWE: Rachel Rowe, I'm here on behalf of Provident and the OHSL defendants.
MR. BUCKLEY: Dennis Buckley, Dinsmore & Shohl.

* * *

JOHN WINSTEAD, ESQ.
having been first duly sworn, testified as follows:

CROSS-EXAMINATION

BY MR. BRAUTIGAM:
Q. Mr. Winstead, are you represented by counsel today?
A. Yes.
Q. Who is your counsel?
A. Pat Fischer.
Q. And how did Mr. Fischer come to represent you?



A. He is counsel for KMK.
Q. Are you paying Mr. Fischer?
A. Personally I'm not paying Mr. Fischer.
Q. Okay. Are you billing your time for today's appearance?
A. No.
Q. Do you consider today's deposition important?
A. In the sense that it's a legal obligation to appear, yes, it's important.
Q. What, if anything, did you do to prepare for this deposition?
A. I had conversations with my counsel, Mr. Fischer.
Q. Okay. Did you ever talk to anyone else at KMK about the fact of the litigation arising from the OHSL-Provident merger?
MR. FISCHER: Objection, asking for communications that are privileged. Don't answer that question.
MR. BRAUTIGAM: Excuse me, how are these communications privileged? Apparently you're his attorney, therefore Mr. Burke, Ms. Rowe, et cetera, are not his attorneys.

MR. FISCHER: Yes, same law firm.
BY MR. BRAUTIGAM:
Q. Do you consider Mr. Burke to be your attorney in this matter?
A. No.
Q. Do you consider Ms. Rowe to be your attorney in this matter?
A. No.
Q. Do you consider anyone other than Mr. Fischer to be your attorney in this matter?
A. Mr. Fischer is representing me in this deposition.
Q. Okay. Did you ever talk to Mr. Burke at any time about the OHSL-Provident merger and the litigation that arose therefrom?
MR. FISCHER: Same instruction. Do not answer that question. You're asking for contents of communications.
MR. BRAUTIGAM: What's the basis for the instruction?
MR. FISCHER: Privilege.
MR. BRAUTIGAM: What type of privilege?
MR. FISCHER: Privilege. Both attorney-client privilege and the work product



doctrine.
MR. BRAUTIGAM: I believe he can answer as to whether or not he spoke to Mr. Burke and others about -- without getting into the content. Do you agree with that?
MR. FISCHER: You can ask him if he ever spoke with Mr. Burke.
MR. BRAUTIGAM: I think that was my question.
MR. FISCHER: No, it was not. You gave what content he had discussed with him.
MR. BRAUTIGAM: Can we have the question read back?
(Record read by Reporter.)
MR. FISCHER: Exactly.
BY MR. BRAUTIGAM:
Q. Can you answer that question?
MR. FISCHER: Don't answer.
A. On counsel's instruction --
MR. BRAUTIGAM: You're instructing him not to answer yes or no?
MR. FISCHER: That question. You can rephrase it and make it so you can get an answer.
BY MR. BRAUTIGAM:



Q. Have you ever spoken with Mr. Burke at all ever?
A. Yes.
Q. Have you ever spoken to Mr. Burke about the OHSL-Provident litigation? Can you answer that question yes or no?
MR. FISCHER: You can answer it only to the extent that you do not disclose the actual communications between you and Mr. Burke. The generalized subject matter that you discussed you can mention, but you cannot discuss any direct communication.
A. The answer is yes.
Q. Okay. Have you spoken to Ms. Rowe about the generalized subject matter of this litigation?
A. Yes.
Q. Have you spoken to Mr. Ramsey about the generalized subject matter of this litigation?
A. No.
Q. Okay. Have you spoken to anyone else about the generalized subject matter of this litigation?
A. Yes.



Q. Who else have you spoken with?
A. I have spoken with my department chairman, Tim Matthews.
Q. Okay. What did you say to Mr. Matthews?
MR. FISCHER: Objection. Don't answer that question.
MR. BRAUTIGAM: What's the basis?
MR. FISCHER: You're going to ask for communications between lawyers who were giving rendition of legal services. It's not going to happen.
MR. BRAUTIGAM: The fact that Mr. Matthews happens to be a lawyer is irrelevant. This is an improper attempt to use the privilege.
MR. FISCHER: He's the same law firm.
BY MR. BRAUTIGAM:
Q. When you spoke to Mr. Matthews, were you giving or seeking legal advice with respect to this litigation?
MR. FISCHER: Objection. Don't answer that question.
MR. BRAUTIGAM: Don't answer that?

What's the basis for that?

MR. FISCHER: You're trying to get around the privilege, Mr. Brautigam.

MR. BRAUTIGAM: There's no privilege here.

MR. FISCHER: Yes, there is.

BY MR. BRAUTIGAM:

Q. Do you consider Mr. Matthews to be your attorney?

A. My attorney today at the deposition is Mr. Fischer.

Q. Did you ever consider Mr. Matthews to be your attorney?

A. In the context of this deposition, Mr. Fischer is my attorney.

Q. Did you ever consider Mr. Matthews to be your attorney with respect to this litigation?

MR. FISCHER: Objection. Go ahead. You can answer that.

A. With respect to this litigation, no.

Q. Okay. Did you ever seek or -- seek legal advice from Mr. Matthews?

MS. ROWE: Objection.



MR. FISCHER: Repeat the question. Repeat the question.

A. On the advice of my counsel, I'm careful not to go too far in the conversation, but with respect to the subject matter of this litigation, I did not speak with Mr. Matthews regarding any answers to questions I would be giving.

Q. Mr. Winstead, I'm afraid my question was a little different. When you spoke to Mr. Matthews, were you giving or seeking legal advice?

A. No.

Q. Okay. Please tell me what you said and what Mr. Matthews said.

MR. FISCHER: Objection. Don't answer that question.

MR. BRAUTIGAM: It seems to me that the various KMK lawyers here are making a mockery of the privilege. This is improper. Your representation is improper. He should answer that question.

What's the basis? Please state the basis once again.

MR. FISCHER: Privilege and/or



work product.

MR. BRAUTIGAM: What's the privilege? He just said that he did not consider Mr. Matthews ever to be his attorney. He was not giving or seeking legal advice. Therefore, there's no privilege.

MR. FISCHER: Discussions between two attorneys at a law firm for rendition of legal services to a client are privileged communications.

BY MR. BRAUTIGAM:

Q. When you spoke to Mr. Matthews, were you contemplating the rendering of legal services to a client?

A. Yes.

Q. Who was that client?

A. Provident Bank.

Q. Did you bill for this time?

A. No.

Q. Is that atypical?

A. I'm not sure I understand that question.

Q. When you consult with another attorney for the purposes of rendering legal advice to a client, you bill for your time,



correct?

A. No.

Q. You don't?

A. Not always.

Q. Okay. In what circumstances do you bill and in what circumstances do you not bill?

A. There are various instances where time would not be billed.

Q. Okay. Why did you not bill time with respect to this particular communication?

MS. ROWE: Objection.

MR. FISCHER: If you can answer that question without revealing communications in regard to the rendition of legal services, you can answer. If you can't, then don't answer the question. Can you read back the question, please?

(Record read by Reporter.)

MR. FISCHER: Same instruction.

THE WITNESS: Instruction not to answer or only answer --

MR. FISCHER: If you can answer without revealing communications that were used in the rendition of legal services.

Page 14

A. Mr. Matthews is the chairman of my practice group. I have to make him aware of when I'm in the office and out of the office. I've had a conversation with Mr. Matthews regarding my appearance today and the context of my availability to work on other transactions, my availability or lack of availability in the office.
Q. Okay. Mr. Winstead, you worked on the OHSL-Provident merger, correct?
A. Yes.
Q. And when you worked on the merger, you billed for your time, correct?
A. Yes.
Q. And at some point in 1999, did you learn that there had been a lawsuit filed in state court in an attempt to stop the merger?
A. I don't recall knowledge of any lawsuit in 1999.
Q. Okay. Did you subsequently learn of the Thiemann litigation, the subject matter that brings us here today?
A. Yes.
Q. When did you learn of the Thiemann action?

Page 15

A. I don't recall.
Q. Would it be fair to say that it was in the fall of 2000?
MS. ROWE: Objection.
A. I don't recall.
Q. Okay. When you learned of the Thiemann action, what was your reaction to it?
MR. FISCHER: Objection.
A. I don't recall having any specific reaction.
Q. How did you learn of the Thiemann action?
MR. FISCHER: To the extent you can answer that without revealing communications that were giving a rendition of legal services, you can answer to the extent you recall. For communications in the rendition of legal services, do not answer that question.
A. I recall seeing mention of this litigation in perhaps the Cincinnati Enquirer or the Business Courier, but I don't recall which publication.
Q. Did you read this on your own or did someone bring it to your attention?

Page 16

A. I don't recall anyone bringing this to my attention.
Q. Okay. After you read this article in the Cincinnati Business Courier, what was your reaction to it?
MR. FISCHER: Objection. Wasting time on an irrelevant question.
A. As I stated before, I don't recall any specific reaction to the presence of this litigation.
Q. Okay. After you learned of the fact of the litigation, did you ever speak to Mr. Burke about the fact of the litigation?
MR. FISCHER: Objection. If you can answer that question without revealing communications giving the rendition of legal services, you can answer. If it's -- if you can only answer concerning communications involved in the rendition of legal services, do not answer.
A. I recall a conversation with Mr. Burke regarding that I may be called as a witness in the litigation.
Q. When did that conversation take place?

Page 17

A. I don't recall.
Q. Was it in 2003?
MS. ROWE: Object.
MR. FISCHER: Objection.
A. Yes.
Q. Did you ever speak to Mr. Burke earlier about the litigation?
A. To my --
MR. FISCHER: Objection. Same instruction.
A. To my knowledge, no.
Q. Okay. Did you ever speak to Mr. Matthews about the litigation in 2000?
MR. FISCHER: Same instruction.
A. It's my recollection no.
Q. In 2001?
MR. FISCHER: Same instruction.
A. To my recollection, no.
Q. In 2002?
MR. FISCHER: Same instruction.
A. To my recollection, no.
Q. Was there ever a time where you were told to preserve any documents that you may have had related to the Oak Hills-Provident merger?

MR. FISCHER: Objection. Same instruction.
A. To my recollection, no.
Q. Did you create documents during your work on the OHSL-Provident merger?
A. I don't recall any specific documents.
Q. Did you ever take notes regarding the OHSL-Provident merger?
A. I don't recall any specific notes.
Q. Did you ever send an e-mail?
A. Yes.
Q. Okay. Where are those e-mails?
A. I don't know.
Q. Were you ever asked to produce them?
MR. FISCHER: Objection.
A. No.
Q. Okay. You mentioned that you don't recall any specific documents that you created or any specific notes that you took. Is that your testimony?
A. I don't recall creating any specific documents or any specific notes that I took, that is correct.



Q. Okay. Generally, do you recall taking notes?
A. I don't recall taking any specific notes regarding this transaction. I worked on the transaction, it would be my expectation that I would have taken notes.
Q. Where are those notes?
A. I don't know.
Q. Were you ever asked to produce those notes?
MR. FISCHER: Objection.
A. No.
Q. Did you ever learn that KMK had been sued in any related litigation?
A. No.
MR. FISCHER: Objection.
Q. As you sit here today, are you unaware that KMK is a defendant in what's known as the Meier action?
MR. FISCHER: Don't answer that question. The only way he knows -- would know is from communications from counsel.
(Plaintiff's Exhibit Number 40 was marked for identification.)
Q. Mr. Winstead, I'm handing you what



has been marked as Plaintiff's Deposition Exhibit 40 and I ask you to take a look at it. Mr. Winstead, with this document or any other document, please take as much time as you need to look at the document to your satisfaction. In most cases I think I can successfully direct your attention to what I'm interested in doing. Mr. Winstead, have you seen Plaintiff's Deposition Exhibit 40 before?
A. No.
Q. Were you aware, generally speaking, of its existence?
MR. FISCHER: Same instruction. If you know from outside communications with counsel, you can answer that question. If you know just from communications with counsel, do not answer that question.
A. I have no recollection of any knowledge of this lawsuit.
Q. So it would be fair to say that you were never asked to preserve any documents that may be relevant to the lawsuit; is that correct?
MR. FISCHER: Objection.
A. I have no recollection of being



asked to produce or preserve any documents with respect to the matter placed in front of me, Gary and Lisa Meier, and Gary Meier C-F Lindsey Meier versus OHSL Financial Corp and various other defendants.
MR. FISCHER: Just for the record, the documents handed to us were not the same as the exhibit shown to Mr. Winstead. Mr. Winstead has a different document in front of him than what's been handed out, just for the record.
Q. Thank you. All right. Do you see the caption there, sir?
A. Which caption, sir?
Q. The caption in the complaint.
A. Plaintiffs versus defendants caption?
Q. Yes.
A. Yes. I see that in front of me.
Q. Okay. Do you see that KMK is listed there as a defendant?
A. Reading through the caption for the first time, I see on the second to the last line, Keating, Muething & Klekamp.
Q. And they're listed as defendants,



Page 22

correct?
A. That appears to be correct.
Q. You're an attorney, correct?
A. Yes.
Q. Does it strike you as unusual that you were not asked to retain documents that related to litigation where KMK was a defendant?
MR. FISCHER: Objection.
A. I have no opinion whether it's unusual or usual. I'm -- I have no recollection of being asked to preserve or produce any documents.
Q. Okay. Do you understand that when an entity is sued in litigation, that they have an obligation to preserve and produce documents as requested? Correct?
MR. FISCHER: Are you asking him for his legal opinion? Objection. Are you going to ask him for his legal opinion?
MR. BRAUTIGAM: You've made your objection. I think he understands the question, that's fine.
MR. FISCHER: No, because if you're asking for his legal opinion, Mr.

Page 23

Brautigam, you should have to pay him. He's not named as an expert. He's here as a fact witness.
BY MR. BRAUTIGAM:
Q. Can you answer my question, sir?
MR. FISCHER: Objection, hypothetical.
A. Would you repeat your question, please?
Q. Yes. Is it your understanding as an attorney that when an entity is named as a defendant in litigation, that that entity has an obligation to preserve and produce documents when requested?
MR. FISCHER: Same objection.
A. My area of practice is corporate transactional law. Is it -- my response to your question would be that I'm sure that the Rules of Civil Procedure govern when and to what extent documents are to be produced and not produced.
I'm not an expert in that area. I have no real knowledge in that area, so I can't say whether any -- in any particular circumstance documents should or should not be

Page 24

produced, should or should not be preserved. It would depend upon the circumstances of any particular litigation.
Q. Is it really your testimony that you're unaware that documents should be preserved when an entity is named as a defendant in a lawsuit?
MR. FISCHER: Same objection, badgering the witness.
A. My understanding of the Rules of Civil Procedure on this matter is that in certain circumstances documents should be preserved. In certain circumstances documents should be produced.
Q. Okay. I'm --
A. Beyond that very limited, basic knowledge, I'm not an expert on when and where documents should be preserved or the rules governing that.
Q. Okay. But as an attorney, it would stand to reason that documents should be preserved when an entity such as KMK is named in litigation, correct?
MR. FISCHER: Same objection.
A. I think there are hypothetical

Page 25

circumstances when documents would be required to be produced. There are circumstances when documents would not be required to be produced. Again, this is not my area of practice. I don't have any specialized knowledge of these rules.
Q. Okay. Mr. Winstead, I'm not asking for specialized knowledge. I'm asking the situation like this where KMK has been named as a defendant, do you believe that KMK should preserve documents relative to the litigation?
MR. FISCHER: Same objection.
MS. ROWE: Objection.
MR. FISCHER: We're going over the same stuff over and over. This is ridiculous, waste of time.
A. Again, my answer is in any particular litigation, what would and would not be required to be produced I believe would vary. I have no knowledge of this particular litigation or the circumstances or what documents should or should not be produced.
Q. Right. And to summarize, you believe that you sent e-mails related to the

OHSL-Provident merger, correct?
A. My testimony is that with respect to this transaction, I do not have any recollection of any specific e-mails, but I do believe that sending e-mails was a part of what I did on this transaction.
Q. And without any specific recollection of taking notes, you believe that you took notes, correct?
MR. FISCHER: Same objection. That wasn't his testimony.
A. My recollection is that in working on this transaction, I took or would have taken notes. I have no knowledge of any specific notes that I took when working on this transaction.
Q. Right. And you don't know where those notes are today, correct?
A. I have no knowledge of where any of those notes are today.
MS. ROWE: Objection.
MR. FISCHER: Objection, I was going to say, he hasn't testified to any.
Q. And you don't know where the e-mails are today, correct?



MS. ROWE: Objection, form.
MR. FISCHER: He didn't testify about any specific e-mails.
A. I have no knowledge of where any e-mails, if any e-mails, are at.
Q. And to the best of your recollection, no one asked you to produce or preserve these notes in e-mails, correct?
MR. FISCHER: Same objection. We're repeating ourselves again, Mr. Brautigam.
MS. ROWE: Objection.
A. To the best of my recollection, I don't recall any request to preserve or produce any e-mails.
Q. Okay. Did you ever speak to Gary Kreider about the fact of this litigation?
MR. FISCHER: Don't answer that question.
MR. BRAUTIGAM: And what's the basis for that instruction?
MR. FISCHER: Same instruction.
BY MR. BRAUTIGAM:
Q. Okay. Let me ask it a different way. Did you ever speak to Mr. Kreider about the OHSL-Provident merger where you were



seeking or receiving legal advice?
MR. FISCHER: Same instruction. If you can answer that question without revealing communications for the rendition of legal services, you can answer. If you can't, then don't answer the question.
A. No.
Q. Okay. Please tell me what you said to Mr. Kreider about the OHSL-Provident merger and what he said to you about --
MR. FISCHER: Objection. If you can answer the question without discussing communications for the rendition of legal services, you can answer. If you can't, don't answer the question.
A. Could you repeat your question?
Q. Certainly. You have testified that you spoke with Mr. Kreider about the OHSL-Provident merger. You further testified that it was not giving or seeking legal advice. So what did you talk about? What did Mr. Kreider say and what did you say?
MR. FISCHER: Objection, multiple questions. Improper form.
A. Perhaps you could start it back at



your original series of questions. I believe you misunderstood my "no" when you asked me if I had spoken to Mr. Kreider regarding -- I don't want to give your question back in the wrong form, but --
Q. Certainly. You spoke to Mr. Kreider about the OHSL-Provident merger, correct?
MR. FISCHER: Objection. To the extent you can answer that question without revealing communications for the rendition of legal services, you can answer. If you can't, don't answer the question.
A. My response to your -- that question is no. That was my intended no before.
Q. Did you ever talk to Mr. Kreider about the fact of this litigation?
MR. FISCHER: Don't answer that question. Same instruction.
MR. BRAUTIGAM: I believe he can answer it yes or no.
MR. FISCHER: Answer -- so what?
BY MR. BRAUTIGAM:
Q. Can you answer that question yes

or no? Did you ever speak to Mr. Kreider about the fact of this litigation?

MR. FISCHER: If you can reveal -- answer that question without revealing communications for the rendition of legal services, go ahead. If you can't, don't.

A. No.

Q. Okay. Did you ever speak to J. David Rosenberg about the fact of this litigation?

MR. FISCHER: Same instruction.

A. No.

Q. Did you ever speak to Mark Reuter about the fact of this litigation?

MR. FISCHER: Same instruction.

A. Yes.

Q. Okay. When you spoke to Mr. Reuter about the fact of this litigation, was it for the purpose of giving or seeking legal advice?

MR. FISCHER: I instruct you if these discussions were held with counsel, don't answer that question.

A. I've been instructed by my counsel not to answer that question.



Q. Is that because these discussions were held with counsel?

A. I've been instructed by my counsel not to answer --

MR. FISCHER: You can answer that question.

A. I'm sorry, could you repeat the question?

Q. Is that because these discussions were held with counsel?

A. Yes.

Q. Who was in the room when these discussions took place?

MR. FISCHER: Yeah. You can answer that.

A. Mark Reuter.

Q. Okay.

A. Pat Fischer.

Q. Okay.

A. And myself.

Q. Okay. Did you ever have any discussions where Dan Donnellon was in the room with Mr. Fischer?

A. No.

Q. When Jim Burke was in the room



with Mr. Fischer?

A. Yes.

Q. Okay. Please tell me what was said in those discussions.

MR. FISCHER: Don't answer that question. Instruction, privileged, and work product.

MR. BRAUTIGAM: Can you please explain to me the basis of the privilege?

MR. FISCHER: Yes. For the rendition of legal services.

MR. BRAUTIGAM: Okay.

MR. FISCHER: And also work product.

MR. BRAUTIGAM: Fine.

MR. FISCHER: Don't answer it.

BY MR. BRAUTIGAM:

Q. Mr. Winstead, when you were in the room with Jim Burke, Mr. Fischer and Mark Reuter, did you consider Mr. Burke to be your attorney?

A. I don't think that's an accurate rendition of what I -- my testimony was.

Q. Okay. Please correct it.

MR. FISCHER: Objection. It's not



his question.

A. I did not testify that I was ever in a meeting with Mr. Burke, Mr. Fischer, Mr. Reuter and myself.

Q. Okay. Were you ever in a meeting with Mr. Fischer, Mr. Burke and yourself?

A. Yes.

Q. Was there anyone else in the meeting?

A. Yes.

Q. Who was in the meeting?

A. Mr. Fischer, Mr. Burke, Mr. Matthews, Mr. Tim Matthews, Mr. Mark Reuter, Mr. Mark Weiss, Ms. Rachael Rowe.

Q. Okay. In this meeting, did you consider Ms. Rowe to be your counsel?

A. No.

Q. Okay. Please tell me what was said at this meeting.

MR. FISCHER: Objection. Don't answer that question.

MR. BRAUTIGAM: And the basis for that?

MR. FISCHER: Privilege and work product.

BY MR. BRAUTIGAM:
Q. Okay. Were you seeking legal advice from Ms. Rowe?
A. No.
Q. Were you billing for your time?
A. No.
Q. Was this meeting in conjunction with rendering legal services to your clients?
A. I'm not sure I understand the question.
Q. Was the purpose of the meeting to provide knowledge to you so that you could better serve your clients?
MR. FISCHER: Objection. That's not the rendition of legal services.
A. Again, I'm not clear what rendition of legal services does or does not mean.
Q. Well, sir, you're in the business of rendering legal services, correct?
A. Yes.
Q. So you know what it means, correct?
A. I believe it could mean different things in different contexts. The meeting in



which Ms. Rowe was present was not a social occasion, if that's what you mean by rendering legal services.
Q. It was a business meeting, correct?
MR. FISCHER: Objection.
A. It was a meeting for professional purposes.
Q. Okay. And what were the professional purposes for the meeting?
A. I was meeting with my counsel --
MR. FISCHER: Don't discuss what was discussed at the meeting.
MR. BRAUTIGAM: Look, if he's meeting with someone he considers to be his counsel, and there are others who are not his counsel, that destroys the privilege.
MR. FISCHER: No, it does not.
MR. BRAUTIGAM: The fact that it happened to be KMK attorneys is irrelevant.
MR. FISCHER: No, it does not destroy the privilege.
MR. BRAUTIGAM: Why does it not destroy the privilege? Please educate me.
MR. FISCHER: Because the



privilege goes with the law firm.
MR. BRAUTIGAM: Okay. We'll see about that.
BY MR. BRAUTIGAM:
Q. During this meeting, did you consider Mr. Burke to be your counsel?
A. No.
Q. Okay. You were not seeking legal advice from Mr. Burke, correct?
MR. FISCHER: If you can answer without revealing communications.
A. Could you repeat the question, please?
Q. You were not seeking legal advice from Mr. Burke at this meeting, correct?
A. No.
Q. Okay. You were not billing for your time at this meeting, correct?
A. That is correct. I was not billing for my time.
Q. How long did this meeting last?
A. I don't recall.
Q. Okay. You testified that Mr. Matthews was at the meeting as well, correct?
A. Yes.



Q. He was not representing you at the meeting, correct?
A. That is correct.
Q. You were not seeking legal advice from Mr. Matthews at this point, correct?
A. No.
Q. Okay. You testified that Mr. Reuter was at this meeting, correct? You did not consider him to be your attorney, correct?
A. That is correct.
Q. And you were not seeking legal advice from Mr. Reuter, correct?
A. That is correct.
Q. Okay. You were not seeking legal advice from Mr. Weiss at this meeting, correct?
A. That is correct.
Q. And you did not consider Mr. Weiss to be your attorney, correct?
A. That is correct.
Q. Did you ever learn from any source that Mr. Weiss had been named a defendant in litigation arising from the OHSL-Provident merger?
MR. FISCHER: Objection. Outside of conversations with counsel. If you learned

from -- only from counsel, then don't answer that question.
A. I don't recall any knowledge of Mr. Weiss being made a party to any lawsuit outside of conversations with my counsel.
Q. Okay. Since February 4th of 2001, have you spoken to Mr. Weiss in the hallways and things?
A. Yes.
Q. Did he ever mention to you that he personally had been sued with respect to the OHSL-Provident merger?
A. Not to my recollection.
Q. Okay. Did you ever talk to anyone about the OHSL-Provident merger after February 4th of 2001?
MR. FISCHER: Same --
Q. Excuse me, 2002.
MR. FISCHER: Don't answer anything about communications with counsel.
A. I don't recall.
Q. Okay. Mr. Winstead, is it your position that if you saw Mark Reuter in the hall and you talked to him about the OHSL litigation, that that's a privileged



communication? Is that your position?
A. That's the -- I would defer on that question to any preference my counsel has or the position of my counsel. Mr. Fischer is representing me with respect to those matters.
Q. Is that your understanding with respect to the official KMK party line?
MR. FISCHER: Objection.
MS. ROWE: I object to that question also.
A. I'm unaware of any official or unofficial KMK party line.
Q. Okay. But is it your understanding from today's deposition that if you spoke to Mr. Reuter over the water cooler about the OHSL litigation, that that would be a privileged communication? Is that your understanding of the position your counsel is asserting?
MR. FISCHER: That's not the position I'm asserting, so I object to the question.
A. Can you repeat the question, please?
Q. Certainly. If you spoke to Mr.



Reuter in the hallway at KMK, is it your understanding that your counsel is taking the position that that is a privileged communication if you spoke about the OHSL-Provident merger?
MR. FISCHER: Same objection. Haven't taken that position at this deposition.
A. Beyond my testimony here, what my counsel has provided on the record, I don't have any position or knowledge with respect to which conversations are privileged and which are not privileged. I rely on my counsel to tell me what he considers the proper legal interpretation.
Q. Well, Mr. Fischer, with respect to that scenario, he talked to Mr. Reuter, let's say, about the litigation, about the merger in the hallway?
MR. FISCHER: Without me present?
Q. Right. Without you present. Is that a privileged communication?
MR. FISCHER: Probably not.
Q. Okay. Did you ever have conversations like that with Mr. Reuter?
MR. FISCHER: And let me --



there's one other qualification. If it was not during the time of -- that they were working on the transaction itself.
Q. Okay. Since --
MR. FISCHER: Do you understand what I'm saying?
Q. Okay. Since December 3rd, 1999, have you ever had any conversations with Mr. Reuter about the fact of the merger or about the fact of litigation arising from the merger?
MR. FISCHER: As long as it was not for the rendition of legal services for Provident, you can answer that question. If it was for the rendition of legal services to Provident, don't answer that question.
A. The way I understand your question, sir, it seems there are two separate questions there. Are you asking if I had conversations regarding the merger transaction with Mr. Reuter?
Q. I'm asking --
A. Or are you asking specifically regarding the litigation?
Q. I'm asking about both, but I'm phrasing it since December 3rd, 1999, have you

ever had any conversations with Mr. Reuter about the litigation or about the merger?

MR. FISCHER: Outside the presence of counsel.

Q. Well, that's fine. I'll adopt your edition of my question.

A. I have no recollection in the December of '99 time frame regarding conversations I may or may not have had with Mr. Reuter regarding the transaction itself.

Q. Okay. I said since December 1999, bring us all the way up through today.

MR. FISCHER: Let me instruct you this way. If you had a conversation with Mr. Reuter that was not for the rendition of legal services to Provident, and was not with me present in connection with -- or with any lawyer at KMK dealing with the litigation -- in other words, Mr. Brautigam, I believe, is talking about social or water cooler conversations about -- I guess about this litigation, you can answer the question.

But if it was in the context of the rendition of legal services to Provident or defending Provident in this litigation, or in



preparation for your deposition with me present, you cannot answer the question.

A. The answer to your question whether I had any conversations with Mr. Reuter since December of '99 regarding in the broadest terms this litigation, is yes.

Q. Okay. What did you say and what did he say?

MR. FISCHER: Again, only discussions that were not for the rendition of legal services to Provident and were not for the defense of Provident and were not in regard to this deposition.

A. I have a recollection of a conversation earlier this week where Mr. Reuter asked what date I would be giving my deposition. My recollection is that I replied Tuesday and that Mr. Reuter replied that he would be giving a deposition either Wednesday or Thursday of this week.

Q. And in the last three and a half years since this has -- since the merger, this is the only conversation that you had with Mr. Reuter about the merger or about the litigation, other than with Patrick Fischer



present. Is that correct?

A. No. Again, I -- my understanding is you're asking about two separate areas. There may be conversations regarding the merger transaction itself while the transaction was still being completed. And then there's a separate set of discussions regarding litigation.

Q. Okay. Well, I thought I had clarified that by saying after December 3rd of 1999. The merger was completed on December 3rd, 1999, correct?

A. I don't recall what date the merger was completed.

Q. Does that sound right, December of 1999?

A. I would be guessing, but my recollection is that is a correct time frame.

Q. Okay. Well, thank you for clarifying. I think I can focus in on this now. Since the merger took place, I believe it was December 3rd of 1999, but whenever it took place, have you had any conversations, other than the one you mentioned about the fact and date of the deposition, with Mark Reuter about



either of two topics, either the merger or the litigation?

MR. FISCHER: Again, I instruct you if it was for the rendition of legal services to Provident -- as you know, merger activities also occur after the merger date -- or in regard to this deposition and litigation, don't answer it.

To the extent it's water cooler talk, not for the rendition of legal services, not in defense of Provident, not with me about your deposition, go ahead and answer the question.

A. I don't recall any conversations with Mr. Reuter in a casual context regarding this litigation.

Q. Okay. How about in a noncasual context without Mr. Fischer present?

MR. FISCHER: Same instruction.

A. I don't recall any conversations regarding this litigation in a noncasual context that were not in the presence of Mr. Fisher.

Q. Okay. Are you assisting in the defense of Provident in this litigation, or the

Meier litigation?
MR. FISCHER: Objection.
A. No.
Q. Are you -- since December 3rd of 1999, have you provided additional legal services to Provident?
A. Yes.
Q. Other than services that may have taken place after December 3rd of 1999 related to the merger, what additional services have you provided to Provident generally?
MR. FISCHER: Objection. Don't discuss any communications with Provident. Don't discuss any research you've done for Provident. Don't discuss any documentation you've done for Provident.
MS. ROWE: I'd like to make that objection to relevance.
MR. FISCHER: And certainly do not disclose anything about legal services that you provided to Provident, except in the most generic sense.
A. Since December of 1999, I have worked on numerous transactions where the client was the Provident Bank.



Q. Were any of these related to mergers and acquisitions?
A. Yes.
Q. Did you provide similar services to the services you provided with respect to the OHSL-Provident merger?
MR. FISCHER: Objection, relevance. And it's not -- it's not clear what he provided, but go ahead if you can answer it. He's asking you did you provide the exact same work for both.
A. I'm not sure of the undefined term similar services. I have provided transactional attorney services to Provident Bank in numerous transactions since 1999.
Q. Do you consider Provident and PFGI to be the premier client of KMK?
MR. FISCHER: Objection.
MS. ROWE: Objection.
MR. FISCHER: Relevance, waste of time.
A. I'm not sure I understand your definition of premier.
Q. Do you have an understanding of what a premier client means?



A. No.
Q. Okay. Since December 3rd, 1999, have you had any conversations with Timothy Matthews outside the presence of Pat Fischer with respect to either the OHSL-Provident merger or any pending litigation arising from that merger?
MR. FISCHER: Same instruction. If it involves the rendition of legal services to Provident, work product for Provident or with regard to conversations about your deposition here, don't answer. Otherwise, you can answer.
A. I don't recall any conversations with Mr. Matthews other than to make Mr. Matthews aware that I would not be present in the office today.
Q. So you don't recall any conversations with Mr. Matthews at or about the time of the filing of the lawsuit in September of 2000?
MR. FISCHER: Any conversations with Mr. Matthews at all?
Q. Yes, about the time of the filing of the lawsuit on September 20th of 2000.



A. I don't recall any specific conversations with Mr. Matthews in that time frame in the year 2000.
Q. Okay. Do you recall any general conversations with Mr. Matthews at about that time?
A. No.
MR. FISCHER: Same objection.
Q. Okay. Did you ever speak to J. David Rosenberg since December 3rd, 1999 about either the fact of litigation or the OHSL-Provident merger?
MR. FISCHER: Same instructions as before.
A. I don't recall any conversations with J. David Rosenberg.
Q. Okay. Did you ever have any conversations with Gary Kreider about the fact of the litigation or about the OHSL merger since December 3rd, 1999?
MR. FISCHER: Same instructions.
A. I don't recall any conversations with Mr. Kreider.
Q. Okay. Did you ever have any conversations with Mark Weiss since December





3rd, 1999, about the fact of the litigation or merger related?
MR. FISCHER: Same instructions.
A. Yes.
Q. Okay. When did these conversations take place?
A. In a meeting with my counsel, Mr. Fischer present.
MR. FISCHER: Don't discuss what was discussed then.
Q. Okay. How long did this meeting last?
A. I don't recall.
Q. Can you give me an order of magnitude, one hour or ten hours?
MR. FISCHER: Objection. His answer was he didn't recall.
A. Less than five.
Q. Hours?
A. Yes.
Q. Okay. And you were not billing for your time, correct?
A. That is correct.
Q. And you were not giving or seeking legal advice, correct?



MR. FISCHER: Objection. That's not accurate. If you can answer without revealing communications, because I was there and it was the rendition of legal services to you.
A. My counsel was present, so I would assume I was seeking legal advice.
Q. But you're not sure?
A. At the presence of counsel, I was relying upon his advice.
Q. In addition to the presence of counsel, you were in the presence of others who were not your counsel, correct?
A. My understanding was Mr. Fischer was my counsel.
Q. I think you made that clear, but that has nothing to do with my question. Can you answer my question, please?
MR. FISCHER: Objection. What's your question?
A. I understand your question was Mr. Fischer was present at the meeting, were there others at the meeting seeking to give me legal advice?
Q. Yes.



A. From whom I was seeking to obtain legal advice? Again, for purposes --
MR. FISCHER: Same instruction.
A. For purposes of this series of questions, all I can say is Mr. Fischer is my counsel, representing me regarding my testimony here today.
Q. Okay. Let's mark this as the next exhibit, please.
(Plaintiff's Exhibit Number 41 was marked for identification.)
Q. Mr. Winstead, I'm handing you what has been marked as Plaintiff's Deposition Exhibit 41 and I ask you to take a look at it. Have you seen it before?
A. It appears to be a paper printout of the KMK web site profile of one John Winstead. Yes, I have seen it on the web site. I have not seen it in paper form.
Q. Okay. Are you familiar with it?
A. Yes.
Q. Do you recognize it?
A. Yes.
Q. And this is the printout from the web site that lists your professional



accomplishments, correct?
MR. FISCHER: Objection.
A. It appears to be a printout of the web site profile.
Q. And it mentions that you're an associate in commercial finance; is that correct?
A. Yes.
Q. And Mr. Matthews is the chairman of that department, correct?
A. Mr. Matthews is the head of that practice group, correct.
Q. Okay. And please describe the role of the commerce finance arm of KMK.
MR. FISCHER: Objection to the term arm.
Q. Practice group.
A. The practice group concentrates in providing services related to lending, mergers and acquisitions, financial workout arrangements, and other general corporate matters.
Q. And how long have you been in that practice group?
A. The practice group was

and there's another KMK attorney representing various defendants?
MR. FISCHER: Same objection. If you can answer.
MS. ROWE: Objection to form.
A. No. I don't have any basis to believe that would be a conflict of interest.
Q. Have you thought about it?
A. No.
Q. Do you have any basis to believe it would not be a conflict of interest?
MR. FISCHER: Objection.
MS. ROWE: Objection. And to the extent that it --
MR. FISCHER: Form.
MS. ROWE: -- calls for attorney-client privilege about Provident, Provident Financial asserts the privilege.
MR. FISCHER: Right.
A. Could you repeat your question?
(Record read by Reporter.)
MR. FISCHER: Other -- you can answer that if you can answer it without revealing communications with your counsel.
A. Again, I have not given thought or



conducted research regarding whether there is a conflict of interest or not, so I don't have any basis for or for not giving an answer to that.
Q. Okay. We'll come back to that. What was the purpose of the commercial finance group with respect to the OHSL-Provident merger?
MR. FISCHER: Objection.
MS. ROWE: Objection to form.
MR. FISCHER: Objection. Also flies in the face of the entire testimony. The commercial finance group didn't exist until the fall of 2002.
Q. Actually that's a good point, let me withdraw that question. What practice group, if any, were you affiliated with in the summer of 1999 when you were working on the OHSL-Provident merger?
A. In 1999, I was assigned as a corporate associate. At that time we did not have formalized practice groups, as came into existence in the fall of 2002.
Q. Okay. And who were you working for at that time?



MR. FISCHER: Objection. He was working -- he's already said he was working for Keating, Muething & Klekamp.
A. At that time I don't recall the specific people I was working with, but I worked with a variety of the corporate partners at Keating.
Q. Okay. What was your assignment with respect to the OHSL-Provident merger?
MR. FISCHER: Objection. To the extent it calls for communications for the rendition of legal services, don't answer that question. If you can answer it without revealing those, go ahead.
A. My recollection of my assignment with respect to this transaction was the completion of the transaction to closing.
Q. What do you mean by that?
MR. FISCHER: Again, same instruction. If you can answer it without revealing attorney-client communications or the rendition of legal services.
A. Again, in a general -- as a general statement, my role was to perform those tasks that were necessary to complete the



merger transaction.
Q. What tasks did you perform?
A. I don't recall the specific tasks.
Q. What tasks did you perform generally?
MR. FISCHER: Objection, form. Again, do not reveal communications for the rendition of legal services.
A. Again, I don't have a recollection of specific tasking with respect to this transaction. As a general statement, my role as an associate is to complete such matters and such documents as are necessary to accomplish the terms in, for instance, a merger agreement.
Q. Okay. And what matters and what documents were you asked to complete or have input into?
MR. FISCHER: Same instruction. Do not reveal communications from clients or from other attorneys at Keating, Muething & Klekamp involved in the rendition of legal services for Provident in this matter.
A. Would you repeat the question?
(Record read by Reporter.)
MR. FISCHER: Same instruction.

A. I don't recall the specific documents I was tasked with working on in this transaction.
Q. Okay. Tell me generally what you did in this transaction.
MR. FISCHER: To the extent you can answer it without revealing communications for rendition of legal services to Provident, you can answer, but otherwise, if it's communications for the rendition of legal services, do not answer the question.
A. I would repeat the answer I gave you to your previous questions. Generally it was my tasking to attend to such matters and to complete such documents that were generally required -- in the several steps required to complete a transaction of this nature.
Q. Okay. Proxy materials and registration statements had to be created to complete the transaction, correct?
A. That is my understanding, yes.
Q. And did you work on these proxy materials and registration statements?
MR. FISCHER: If --
A. We're getting into areas where --



MR. FISCHER: Okay. If you can tell him without revealing communications about the rendition of legal services, you can answer. If you can't, then don't answer the question.
A. And your question was whether I worked on registration and proxy materials?
Q. Yes.
A. Indirectly, yes.
Q. Okay. What did you do?
MR. FISCHER: Same instruction.
A. I recall preparing a summary of the merger transaction for including in certain of the SEC materials.
Q. Okay. What else did you do?
MR. FISCHER: Same instruction.
A. I don't recall any other specific activity with respect to the registration materials.
Q. Okay. You were billing for your time at this point, correct?
A. To my recollection, I would have been billing.
Q. And your billing records would be reflected in the books and records of KMK,



correct?
MR. FISCHER: Objection. Do you know?
A. I don't know.
Q. Okay. What happens when you submit billing records?
A. I don't know how long those records are retained and in what form or format.
Q. Okay. But you did submit these billing records to KMK, correct?
A. I don't have any specific recollection of the bills I submitted for this transaction, but as a general statement, I would submit time for matters I worked on.
Q. And would these time records have a more detailed breakdown of what you did and when you did it?
A. As a general statement, my billing records would reflect the specific matters and the specific amount of time spent.
Q. And do you think that these billing records would assist your recollection in testifying today?
A. With respect to specific matters



worked on on specific dates, I don't know what those billing records contain, but as a general statement, billing records are going to have more specific information regarding what I accomplished on any particular day.
Q. And this specific recollection would assist you as you sit here today and give testimony under oath, correct?
MS. ROWE: Objection to form.
MR. FISCHER: Objection.
A. I can't say whether any particular billing record would or would not refresh my memory.
Q. Okay. Would you --
A. It would depend on what the billing record said.
Q. Okay. And you wouldn't be able to make a definitive conclusion unless and until you had those billing records in front of you, correct?
MS. ROWE: Objection.
MR. FISCHER: Objection.
A. Again, a definitive -- a billing record could or could not recollect a memory of a particular transaction or a particular matter

I worked on. It would depend on what the billing records said or didn't say.

Q. Okay. For the purposes of this deposition, would it be of assistance to you to have those billing records in front of you so you could refer to them if needed?

MR. FISCHER: Objection.

A. Assistance in what matter?

MR. FISCHER: Exactly.

Q. Would it be of assistance in helping you recall specifically what you did on a specific day?

MR. FISCHER: Objection. He's already answered that question.

A. A billing record put in front of me would merely be a billing record that I would read at this table. I don't recall any particular item that I would have recorded for my billing purposes that would -- would elicit any specific response to anything in particular I worked on this in this transaction or any particular circumstance. Another way of saying that, a billing record would be a billing record. I would -- you would put it in front of me and I would read.



Q. Okay.

MS. ROWE: Mike, can we take a brief break? We've been going for about an hour.

MR. BRAUTIGAM: Sure, that's fine.

(Brief recess.)

BY MR. BRAUTIGAM:

Q. Good afternoon, Mr. Winstead. Mr. Winstead, do you consider yourself to be an expert in mergers and acquisitions?

A. I'm not sure what your definition of expert would be, but in my definition, no.

Q. Okay. Do you consider yourself to be an expert in complex financial transactions?

A. Again, I'm not sure what definition of expert you would use, but the definition I would use, my answer would be no.

Q. Okay. What is your definition of an expert?

A. In the context of professional skill and experience, I would -- my understanding of expert would be someone with more -- with many, many years of experience. I've been practicing law in this area for five years.



Q. In preparation for this deposition, did you look at documents?

A. Yes.

Q. What documents did you look at?

A. I don't recall the specific documents.

Q. Do you recall generally what documents you looked at?

A. I recall reviewing a time line of the merger transaction. I recall that document had a cover letter from me to various parties.

Q. And which parties did you send them out to?

A. My recollection is that one of the parties was Cliff Roe at Dinsmore & Shohl.

Q. Okay. Any other parties that you recall?

A. I don't recall any other parties.

Q. Okay. Please take a look at what has been previously marked as Defendant's Exhibit 1. I have some extra copies for you guys. Have you seen that document before?

MR. FISCHER: It's a long document. Feel free to look through it to the extent you need.



Q. Right, right, consistent with my previous instruction.

A. Would you repeat your question, please?

Q. Have you seen this document before?

A. It's my recollection I have not seen this document before.

Q. You're not familiar with that document?

A. This is -- appears to be an executed copy of a notice of shareholders meeting and accompanying cover letter, and the final form of a proxy statement regarding the OHSL matter. To my recollection, I have not reviewed any of these documents in this form or previously seen these documents in this form.

Q. And what form are you talking about?

A. In the form presented here before me as Defendant's Exhibit Number 1.

Q. Okay. Are you saying that you never saw it on paper? Did you perhaps see it in electronic form or something else?

MR. FISCHER: Objection to the

form of the question.
A. The document presented as Defendant's Exhibit Number 1 appears to be the proxy statement in its final form with attachments. Again, I have not seen the document in this form with these documents as attachments.
Q. Okay. Did you see some or all of this document in some form?
A. Yes.
Q. Okay. What did you see?
A. It appears that an executed copy of an Agreement and Plan of Merger is attached. I recall in a general sense having seen this document before.
MR. FISCHER: When you say this document --
A. The Agreement and Plan of Merger.
Q. Okay. Where did the executed Agreement and Plan of Merger come from? In other words, what computer system did it come off?
MR. FISCHER: Objection. Two questions.
A. Your question is, where the



Agreement and Plan of Merger came from?
Q. Yes.
A. I don't know.
Q. Okay. Do you believe that it came from computers at KMK?
A. I believe a form of the document was on computers at KMK, although I don't have any specific recollection of the document on computers at KMK.
Q. Okay. You're familiar with the OHSL-Provident merger, correct?
A. I worked on the transaction. I don't have any specific knowledge of any specific matters regarding the merger.
Q. Okay. Did you understand the transaction when you worked on it?
A. I'm not sure I understand your question.
Q. Okay.
A. What do you mean by understand the transaction?
Q. Did you understand how the transaction worked?
MR. FISCHER: Objection.
A. Again, I'm not sure what you mean



by understanding how the transaction worked.
Q. Okay. What was your hourly rate when you were working on this merger?
A. I don't recall.
Q. Was it in the nature of $200 an hour?
A. I don't recall, but that sounds very high.
Q. What's your hourly rate now?
A. I believe my current hourly rate is $160 an hour.
Q. Now, Mr. Winstead, how did the transaction work?
MR. FISCHER: Objection. Unclear, bad form. If you understand the question, answer it. If you don't, ask him to rephrase it.
A. Again, I'm not trying to be obtuse, but I'm not sure what you mean by how the transaction worked. I don't have any specific recollection of the details of this merger and acquisition.
There -- there is no general mechanism -- series of mechanisms beyond some very general outlines of a merger or along



those lines that I could give you.
Q. Okay. You're familiar with the phrase mergers and acquisitions, correct?
A. Yes.
Q. What does that phrase mean?
A. It means --
MR. FISCHER: Objection. Broad.
A. It means where one or more companies combine their operations of their businesses.
Q. Is that what happened here?
A. In a general sense, yes.
Q. What were the terms of the combination?
MR. FISCHER: Objection. The document says what the terms were. You're asking him to repeat a document that's 50 pages long? Is that what you want?
MS. ROWE: I'll object to form.
A. Would you repeat the question?
Q. What were the terms of the merger?
MR. FISCHER: Same objection.
Q. Generally speaking.
MR. FISCHER: Objection to form.
A. Again, as a general statement,

this was a merger and acquisition involving the Provident Bank and Oak Hills. The definitive terms of the transaction are in the document -- the merger agreement itself. As to the specific terms, I would have to refer to the merger agreement. I don't have any independent knowledge what's beyond the merger agreement. I don't have any independent recollection of the facts and figures of this specific merger.

Q. With respect to the merger, OHSL shareholders were to surrender their stock, correct?

MR. FISCHER: Objection.

A. Based on my recollection of the transaction, that is correct.

Q. And what were they to receive in exchange for their stock?

A. I don't recall.

Q. Does Provident stock ring a bell?

MR. FISCHER: Objection to "ring a bell."

A. My understanding was this was a stock transaction. My recollection, I should say, was that this was a stock transaction.

Q. And what does that mean?



A. The shareholders of one company exchanged their shares in the company for the shares of another company.

Q. And in this case, upon certain conditions precedent being met, shareholders of OHSL would receive Provident stock, correct?

MS. ROWE: Object to form.

MR. FISCHER: Objection.

A. Again, as a very general statement, that's my recollection of this transaction, but any specific terms would be in the merger agreement.

Q. Okay. We're not there yet, we're just on the general stuff, okay? What's on the proxy material?

A. As a very general statement, a proxy is a technical document that asks shareholders of a company to be aware of, understand and consent to company matters.

Q. When you say consent, you actually mean to vote on company matters, correct?

A. My area of practice is not securities law. I'm giving you very close to layman term understanding of what proxy statement is and is not. In fact, I'm pushing



the line of conjecturing. But in general terms, proxy statements, my understanding, solicits the votes of shareholders, although I don't know that to be always true with every proxy statement produced.

Q. In a general sense, did you understand the OHSL-Provident merger that you were working on?

MR. FISCHER: Objection. When? Form of the question, too broad.

A. At the time I was working on the transaction, I don't have any recollection of either understanding or not understanding any particular point in the -- in the merger agreement or with respect to the transaction. Any specific questions I would have had, I would have asked other people involved in the transaction.

Q. Okay. My question is a little different. During the time you were working on the OHSL-Provident merger, did you generally understand the merger and its terms?

MR. FISCHER: Same objection. I believe he's already answered. Go ahead.

A. Again, as a general statement, I



was aware that there was a merger transaction going on. I don't recall the specific extent of the detailed knowledge with respect to the transaction at that time.

Q. Mr. Winstead, once again my question is a little different. During the time you were working on the transaction in the summer of 1999, did you understand it? I'm not asking about detailed knowledge. I'm not asking for complex ratios. I'm asking generally speaking if you understand the transaction.

MR. FISCHER: Same objection, harassing now.

MS. ROWE: Objection.

A. Again, my question is, what do you mean by understand the transaction? Was I aware a transaction was going on? Yes.

Q. Well, Mr. Winstead, the way it works in this procedure is I get to ask the questions. If you can answer the question, you should. If you can't, tell me and I'll move on to a different area.

MR. FISCHER: Objection. Don't lecture the witness, ask a question.

A. Again, beyond I don't understand the "understand," I was aware the transaction was going on in the summer of 1999.
Q. Okay. So it's your understanding that you do not understand the word, quote, understand, unquote, correct?
MR. FISCHER: Objection.
MS. ROWE: Objection.
MR. FISCHER: That's not what he said.
A. Again, I don't understand when you ask me did I understand the transaction in the summer of 1999, what that means.
Q. You can explain to me in general the terms of the merger?
MR. FISCHER: Same objection.
A. No. I don't have a recollection of -- of the terms of this transaction.
Q. Okay. Even in general terms?
A. In the general terms.
MR. FISCHER: Same objection.
A. In general terms it was a merger of the two entities, Provident Bank and OHSL.
Q. And it was a stock for stock transaction, correct?



A. My recollection, it was a stock transaction, yes.
Q. And it was based on a certain formula based on a certain ten-day, two-day average, correct?
MS. ROWE: Object to form.
MR. FISCHER: Objection.
A. I don't recall that level detail.
Q. Well, you do understand that OHSL shareholders, if the merger was approved, would receive Provident stock, correct?
A. That is my recollection.
Q. Okay. You gave a working deposition -- definition of proxy materials before. Do you remember that definition?
MR. FISCHER: Objection.
A. In a general sense, yes.
Q. Okay. What is the purpose of proxy materials?
A. My understanding in a general sense, a proxy statement is provided to the shareholders to solicit their knowledge regarding any number of purposes, including transactions, approval of transactions, election of board of directors, approval of



accounting firms, other parties that are put before the shareholders for their consent.
Q. So they're being asked to vote when they receive proxy materials in most cases, correct?
MR. FISCHER: Objection.
A. Again, as a general statement and not as particularly knowledgeable about when -- where proxy statements can be used, proxy statements are used to solicit the votes of shareholders.
Q. What was the purpose of this proxy material?
MR. FISCHER: Same objection.
A. I don't have a detailed knowledge of the specific purposes and the specific consents that this proxy statement was used for. My general recollection is this proxy statement would have been and was used to gather the consent of the shareholders to approve the merger transaction with the Provident Bank.
Q. Okay. Is it important that the proxy materials be accurate?
MR. FISCHER: Objection.



A. Again, I think that's a question that in the context of preparation of proxy materials, accurate may have a specific legal definition that I'm not knowledgeable enough to provide.
Q. So it's your testimony as you sit here under oath that you're not aware one way or another whether it's important for the proxy materials to be accurate. Is that your testimony?
MR. FISCHER: Objection. That's not what he said. Form.
A. Again, in the context of a proxy statement, accurate may have a specific legal definition that I'm not in a position to give a specific legal definition to.
Q. Okay. Well, Mr. Winstead, you've worked on a number of mergers and acquisitions. You've worked on a number of complex financial situations -- transactions. Are you aware of any legal, term of art definition of accurate?
A. Well, to answer your question, I've never seen a defined term in any document for accurate. There is certainly conceptual provisions regarding materiality, which is in

some ways related to accurate.
Accurate and precise are not the same word. There can be some questions as to precision, but as a legal concept, I don't recall ever dealing with accurate or inaccurate.
Q. Okay. As a general concept, not a legal concept, do you believe that it's important for the proxy materials to be accurate?
A. As a general statement, factual information presented as factual information, there wouldn't seem to be many contexts where it would be required to be inaccurate.
Q. Let me try that a different way. Do you think you can answer this question yes or no? Is it important that proxy materials be accurate?
MR. FISCHER: Objection.
MR. BUCKLEY: Objection.
MR. FISCHER: You can answer it yes or no, but you're not limited to that. You can always give an explanation.
A. As a general statement, you know, all documentation that any -- especially any



public company produces, you know, there are various standards as to what is required to be disclosed, the level of disclosure. But of course as a general statement, information provided should be accurate.
Q. Thank you. Is it important that the information provided in the proxy materials be truthful?
MR. FISCHER: Same objection.
A. Again, in the context of specific SEC filings, the concept of truthful, accurate, material may have specific legal definitions that I'm not in a position, don't have the background to give you a specific answer to. Obviously there are very few occasions, if any, where any legal documents should be untruthful.
Q. Okay. Can you think of such an occasion where legal documents should be untruthful?
A. Again, I think we are discussing --
MR. FISCHER: Objection.
A. -- what some parties might consider to be truthful, some parties might consider untruthful. Some parties might



consider it material, some parties immaterial.
Q. Are you done?
A. Yes, sir.
Q. You don't have any problem in understanding truthful, correct?
A. In a general definition of the word, I don't believe so, no.
Q. And, in fact, you swore to tell the truth when you were administered the oath earlier today, correct?
A. Yes.
Q. So you've never seen a legal definition of truthful that's other than the commonly accepted definition, correct?
A. That's correct. To the extent though that concepts of materiality play into many legal documents, many matters subject to litigation come down to both sides believing their, their position is true and accurate.
Again, I'm not trying to dispute the concepts in general layman's terms understanding of accurate and truthful. My only point is in certain legal contexts, those terms may have a different meaning.
Q. Okay. Do you believe it's



important that the proxy materials be complete?
MR. BUCKLEY: Objection.
MR. FISCHER: Objection.
MS. ROWE: Objection.
A. My answer is -- parallels my answer before in the context of the proxy or other type materials, complete can have a different definition than what a general layman's term would mean.
Q. Okay. With respect to these proxy materials and your definition of what complete means, do you believe that these proxy materials were complete?
MR. FISCHER: Objection.
MR. BUCKLEY: Objection.
MS. ROWE: Objection.
MR. FISCHER: He's never read them, he just said that. How can he answer that question?
A. I don't have any knowledge of these specific proxy materials that would allow me to give an answer to that, whether they were -- I believe your question was, complete and truthful.
Q. All right. You referred to the

word materiality previously. Do you have a working definition of that word?

A. I do not have a working definition of materiality.

Q. Isn't it necessary for your job to have a working definition of materiality?

MR. FISCHER: Objection.

A. No.

Q. Was the word materiality ever used by anyone during the summer of 1999 when you were working on the OHSL-Provident merger?

MR. FISCHER: Objection.

MS. ROWE: Objection to form.

MR. FISCHER: To the extent it calls for rendition -- or telling of communications between lawyers rendering legal services to Fifth Third, don't answer that question.

MS. ROWE: Provident?

MR. BRAUTIGAM: Fifth Third?

MR. FISCHER: I'm sorry, Provident.

A. I don't have any recollection of discussions of materiality in the summer of 1999.



Q. Did you have an understanding of materiality in the summer of 1999?

A. I don't recall what my conception of materiality was in the summer of 1999.

Q. What's your conception of materiality now?

A. Materiality can be in the context of transactional documents, a defined term, defined to specific transactions in -- transactions in which I work, that definition of material can be specified as a more general legal concept.

I don't have a specific working definition of what any particular Court has considered material or not material. I believe the definition of material can vary, depending on the circumstances of a particular litigation matter, the circumstances of a particular transaction.

Q. And what would you consider material to this transaction?

MR. FISCHER: Objection.

MR. BUCKLEY: Objection.

MS. ROWE: Objection.

A. I don't have any conceptual idea



of what would be material or not material to this transaction.

Q. Okay. How about if a director resigned in part in protest of the transaction, would you think that that's material?

MR. BUCKLEY: Objection.

MS. ROWE: Objection.

MR. FISCHER: The same objection.

A. Again, these are concepts and questions that have very highly technical and highly litigated definitions over lots of case law in many years, so I have absolutely no basis to give you an answer as to whether that would be material or immaterial in any circumstances.

Q. Okay. What's so highly technical about a director resigning in part in protest because he disagrees with the OHSL-Provident merger?

MR. FISCHER: Objection.

MS. ROWE: Objection.

A. And you -- could you repeat the question?

Q. Sure. What's so highly technical about a director resigning in part in protest



shortly before the OHSL-Provident merger was finalized?

MR. FISCHER: Same objection.

MS. ROWE: Same objection.

MR. BUCKLEY: Objection.

A. Well, I believe the question is -- it's not whether that is a technical matter, it's whether that is a material matter. Am I stating your question correctly?

Q. No, you're not. Please answer my question.

MR. FISCHER: Objection.

MS. ROWE: Objection.

A. Again, I don't see what --

MR. FISCHER: Do you understand the question?

A. I don't understand the question.

Q. Okay. You testified that in some cases materiality could be a highly technical and highly litigated concept. Do you remember that testimony generally?

MR. FISCHER: Objection.

A. Yes.

Q. Okay. Did you ever learn that one of the directors of Oak Hills resigned shortly

Page 90

before the OHSL directors gave the final vote in favor of the merger because in part he disagreed with the transaction?

MR. FISCHER: Don't -- I instruct you not to answer that to the extent you've learned that from counsel. If you can answer the question, go ahead. If you can't, don't.

And if you learned it from other lawyers with Keating, Muething & Klekamp during the rendition of legal services to Provident, don't answer it. If you learned it from third parties or something, go ahead, assuming it's true.

A. I have no third-party information as to any resignations or the context in which they occurred.

Q. What do you mean by third-party resignations?

A. The only knowledge I would have --

MR. FISCHER: Again, don't discuss communications with me.

A. -- would be conversations with Mr. Fischer.

Q. Did anyone on the KMK team ever learn that an OHSL director had resigned in

Page 91

part in protest?

MR. FISCHER: Objection.

MS. ROWE: Objection to form.

MR. FISCHER: Again, don't disclose communications with counsel.

MR. BRAUTIGAM: When you say "communications with counsel," are you saying that if he spoke to Mark Reuter or Tim Matthews or somebody like that, that that's a privileged communication?

MR. FISCHER: If it was for the rendition of legal services to Provident in the summer and fall of '99, yes.

MR. BRAUTIGAM: Well --

MR. FISCHER: Because lawyers representing somebody have to communicate with each other.

MR. BRAUTIGAM: That's an improper instruction.

MR. FISCHER: No, it's not. It's privileged.

MR. BRAUTIGAM: I believe that you know -- can I finish, please? Please don't interrupt me.

MR. FISCHER: You were

Page 92

interrupting me, sir.

MR. BRAUTIGAM: Well, finish.

MR. FISCHER: As privileged communication for the rendition of legal services, just like your discussions with Mr. Mesh would be privileged, just like your discussions with a paralegal would be privileged. You're asking him for those. He's not going to answer those questions.

MR. BRAUTIGAM: I disagree with your instruction. I'll be showing him documents later that that's a completely improper instruction.

BY MR. BRAUTIGAM:

Q. Did you have discussions with Tim Matthews about the resignation of an OHSL director during the time you were working on the merger?

MR. FISCHER: Instruct you not to answer that question.

A. My counsel has instructed me not to answer that question.

Q. Did this document come from the computers at KMK?

MR. FISCHER: Which document?

Page 93

Q. Defendant's Exhibit 1.

A. By Defendant's Exhibit 1, you mean this entire document?

Q. Did any part of the document come from the computers at KMK?

MR. FISCHER: That's a different question.

A. I don't know what you mean by, "come from the computers at KMK."

Q. Let me see if I can explain it to you. The data, information or words are in the computer, someone hits print and it comes out in paper form. That's what I mean by from the computers at KMK. Do you understand the question?

A. As I believe I testified to earlier, I recall that the Agreement and Plan of Merger, which is one of the documents which is part of Defendant's Exhibit Number 1, was at some point on the computer system, the word processing system at KMK. I don't have any specific knowledge regarding any of the other documents as to their status on the computers of KMK.

Q. Okay. Let's look at the first

page. Who wrote the first page of Defendant's Exhibit 1?

MR. FISCHER: Objection.

A. I don't know.

Q. Okay. What computer system did it come off?

A. I don't know.

Q. Okay. What are the choices? It could have come off KMK's computer system, correct?

A. I don't know that that's a choice. I could -- conceivably it could have come off any computer in the world.

Q. Okay. Do you think that this document just fell from the sky somewhere?

MR. FISCHER: Objection.

MS. ROWE: Objection to form.

A. No.

MR. FISCHER: He said he didn't know.

MS. ROWE: He said he didn't know where it came from.

MR. FISCHER: Badgering the witness.

Q. Do you believe that Defendant's



Exhibit 1 -- at least the first page of Defendant's Exhibit 1 could have been written by someone at the Dinsmore law firm?

MR. FISCHER: Objection.

MR. BUCKLEY: Objection.

MR. FISCHER: "Could have been" calls for speculation.

A. The document could have been written by anyone.

Q. Who would know who wrote the first page of this document?

A. The first page of the document is signed by a Norbert Brinker. I would assume Mr. Brinker would have specific knowledge as to who prepared this document for his signature.

Q. Really? Why would you assume that?

A. Because Mr. Brinker signed the document, I would assume he would know who handed him the document for signature.

Q. Okay. Do you know if Mr. Brinker actually signed the document or if his signature was somehow electronically affixed to it?

A. I do not know that.



Q. Okay. Based on your experience in mergers and acquisitions and transactions of this sort, do you believe that the chairman of the Board typically writes the letter to the shareholders?

MR. FISCHER: Objection.

A. I don't have experience in drafting these type of letters. I don't know what the standard procedure would be.

Q. Who was in charge of this transaction from KMK's viewpoint?

MR. FISCHER: Objection to the form of the question.

A. I don't know.

Q. Who was the lead lawyer working on the transaction?

A. My recollection is there was no particular lead lawyer -- quote, unquote, lead lawyer. Different lawyers at KMK worked on different aspects of the transaction, to my knowledge.

Q. Okay. What did Gary Kreider work on?

A. I don't know.

Q. What did J. David Rosenberg work



on?

A. I don't know.

Q. What did Tim Matthews work on?

A. My understanding is that Tim Matthews worked on the actual agreement -- merger agreement.

Q. Are you referring to Exhibit A of the document?

A. I'm looking at Annex A, Agreement and Plan of Merger.

Q. And Timothy Matthews worked on that, correct?

A. That is my understanding, yes.

Q. And when you say "worked on that," what exactly does that mean? Did he write it?

A. I don't know what Mr. Matthews' specific role was.

Q. Did you work on Annex A?

A. I don't recall working on Annex A.

Q. Okay. How did Annex A get finalized?

A. I don't know.

Q. How did the entire document get finalized?

MR. FISCHER: Are you saying all

of Exhibit 1 or the annex?
Q. All of Exhibit 1.
MR. FISCHER: Okay.
A. I don't understand what you mean by finalized.
Q. Well, I'm going to show you drafts later and drafts circulated between Dinsmore and KMK and other parties at Oak Hills and Provident. Is that correct?
A. My recollection is that drafts of various documents were circulated among KMK and Dinsmore with respect to this transaction. I don't have any specific recollection of specific documents and specific back and forth between KMK or Dinsmore or anyone else.
Q. Okay. Now, in addition to drafts circulating between KMK and Dinsmore, they went to other parties, such as people at Provident and people at Oak Hills, correct?
A. I don't have any specific recollections of any other parties the documents went to.
Q. What was the purpose of circulating drafts among and between counsel?
A. As a general statement, the



purpose of lawyers circulating transaction documents is to collect, incorporate and negotiate comments, revisions to those documents.
Q. Have you ever read every word and looked at every number in Defendant's Exhibit 1?
A. No.
Q. Have you ever read the first page of Defendant's Exhibit 1?
A. Word for word, no.
Q. Has anyone at Keating been given the responsibility to look at every word and look at every number at some point during the merger transaction?
MS. ROWE: Objection.
A. I don't know.
Q. Is that typical in the way these things work?
MR. FISCHER: Objection.
A. I don't know what you mean by "these things."
Q. Mergers and acquisitions of financial institutions.
A. As a general answer to your



question, lawyers review the documents, finalize the documents. That's generally what would occur for any type of transaction, including mergers and acquisitions.
Q. Okay. What lawyer at KMK was responsible for finalizing all or part of Defendant's Exhibit 1?
A. I don't know.
Q. Who would know?
A. I don't know.
Q. Was there a lawyer who you felt was in charge of the overall transaction?
MR. FISCHER: Objection. Asked and answered.
A. Again, my understanding in this transaction is that various lawyers were working on various aspects of the transaction. I have no knowledge of one attorney who was the lead -- quote, unquote, lead for the transaction.
Q. Aside from Tim Matthews, who did what at KMK?
MR. FISCHER: Objection to the form.
A. With respect to my knowledge and



recollection of this transaction, Mr. Weiss and Mr. Reuter worked on the proxy statement and related materials.
Q. This is a joint document, correct?
A. I don't know what you mean by joint.
Q. It's put out by both Provident and OHSL, correct?
A. I don't know that.
Q. Could you look at the third page of this document? Could you read these two headings to yourself, please?
MR. FISCHER: Feel free to read whatever you need to read, John.
A. Can you repeat your question, please?
Q. My question is, was this a joint document put out jointly by both Provident and OHSL?
A. I don't know.
Q. And reading those headings does not refresh your recollection as to whether it was a joint document?
A. I have read --
MR. FISCHER: Objection. Go

ahead.

A. -- the third page of Defendant's Exhibit Number 1, and in that reading, I don't see any indication that this is a quote, unquote, joint document.

Q. Okay. On the top left, do you see it says, Proxy Statement for the Special Meeting of Stockholders of OHSL Financial Corporation? Do you see that?

A. Yes.

Q. And we talked about what a proxy statement is, correct?

A. Yes.

Q. And on the right it says, Prospectus of Provident Financial Group, Inc., common stock. Do you see that?

A. Yes.

Q. What is a prospectus of Provident Financial Group, Inc. for common stock?

MR. FISCHER: Objection.

MS. ROWE: Objection.

A. Again, as a general statement and without having a detailed knowledge in this area of the law or working in this area of the law, a prospectus gives a potential purchaser



or acquirer of stock certain descriptions of the company for that stock. That's my general understanding of what a prospectus is and does.

Q. Okay. And that would include the financial statements of the company, correct?

A. I don't know that.

Q. Do you believe that the financial statements of Provident were included or incorporated by reference in Defendant's Exhibit 1?

MS. ROWE: Objection.

MR. FISCHER: Objection.

MR. MESH: Excuse me a moment. Off the record

(Recess for lunch.)

MR. BRAUTIGAM: Okay. Back on the record.

MR. FISCHER: Before we start, I think Mr. Winstead needs to correct something. I think we were a little confused about one of your questions during the questioning about meetings. Mr. Winstead answered about a meeting in which Mr. Reuter, Mr. Burke, Ms. Rowe, Mr. Matthews, and I forget who else, Mr. Weiss, maybe, were at.



And without waiving -- going to waive privilege, I'm going to let you ask him questions because I think -- I may be wrong -- from the record, unless we want to go back and reread the whole thing, you asked him who was representing him, and I think he correctly answered that I was.

I don't think you ever asked who was representing all of the other people in the room. And to start off, so you can ask him questions, this was at my insistence as counsel to the firm, because somebody, I believe you, Mr. Brautigam, had asked for the deposition of witnesses that were lawyers in the law firm.

And this was to determine various issues involving conflicts and disqualification or not. And so I'll let you ask him about that meeting because that is not Provident's privilege, that would be KMK's privilege.

MR. BRAUTIGAM: Okay. Well, I'll come back to that.

BY MR. BRAUTIGAM:

Q. Good afternoon, Mr. Winstead. Do you consider yourself to be a fair man?

MR. FISCHER: Objection.



A. Yes.

Q. Do you think that the proxy materials that are giving investment advice to the shareholders should be fair?

MS. ROWE: Objection.

A. As a general and nonlegal statement, yes.

Q. Do you think there's a distinction between legal fairness and fairness as it's commonly understood?

A. In the context of fairness, I'm not personally aware of any specific legal standard where fair is different than a generally understood concept of fair. Or that doesn't mean that fairness is a term that a court at some point hasn't made a specific determination to as to specific litigation, what is fair and what is unfair.

Q. Let me hand you what is --

A. That is a lawyer's way of saying there may be circumstances where what is fair and unfair does have a different legal meaning than what would be commonly understood by the term.

Q. Okay. Let me hand you what has

been previously marked as Plaintiff's Deposition Exhibit Number 1. I ask you to take a look at it. You testified that you had seen an article that perhaps had come from the Cincinnati Business Courier about this litigation. Is this the article that you referred to earlier?

A. No. I don't recall having seen this article.

Q. Okay. You can take a minute and read it to yourself, at least the sections on this litigation, please? Mr. Winstead, as far as you know, you've never seen or read this article before today; is that correct?

A. That is correct.

Q. Who is Ken Hanauer with respect to this transaction?

A. The information provided in the article you handed me, Ken Hanauer was Oak Hills' CEO.

Q. Was he also a director of OHSL?

A. I don't recall.

Q. Was Mr. Hanauer's opposition to the merger disclosed in Defendant's Exhibit 1, the proxy material and registration statement?



MS. ROWE: Objection.

MR. FISCHER: Objection.

A. I don't know.

Q. Okay. Let me direct your attention to the right-hand column. And it says, Burke's response, quote, Hanauer opposed the Provident takeover because he wanted Oak Hills to remain independent. Do you see that?

MR. FISCHER: Objection. There's no quotation mark. Do you see that?

MR. FISCHER: I see that --

MS. ROWE: I also object because it omits the final sentence of that paragraph.

MR. FISCHER: Yes, but also there's no quotation mark. Do you see that?

A. I see that language in the article.

Q. Is that a true statement?

MS. ROWE: Objection.

MR. BUCKLEY: Objection.

MR. FISCHER: Is what a true statement? Objection.

Q. Are the words, quote, Hanauer opposed the provident takeover because he wanted Oak Hills to remain independent,



unquote, true?

MS. ROWE: Objection.

MR. FISCHER: Objection.

A. I have no knowledge as to any opposition or any position that Mr. Hanauer took with respect to this merger.

Q. Now, you talked earlier about materiality. Do you remember that testimony generally?

A. Generally, yes.

Q. Do you believe that the opposition of the CEO of the company, who's the largest shareholder, who is the only member of management to be on the Board, the opposition to a merger transaction would be potentially material information?

MS. ROWE: Objection.

MR. BUCKLEY: Objection.

MR. FISCHER: Objection.

MS. ROWE: Objection to form.

A. Again, in a hypothetical question, anything is going to be related to the facts of a specific transaction, but whether it's material or immaterial would depend upon the transaction. It could be material, it may not



be material in certain circumstances.

Q. Why did you say hypothetical situation?

A. Hypothetical in the sense as to whether a CEO's opposition -- to an opposition or in support of is material or immaterial.

Q. What about in this case? You worked on the transaction. I think we've established that, correct?

MR. FISCHER: Objection.

Q. Correct?

A. Yes.

MR. FISCHER: That's not his testimony.

A. I have worked on this transaction.

Q. Thank you. And as an attorney working on the transaction, you would be expected to know what materiality is, correct?

MR. FISCHER: Objection.

MS. ROWE: Objection.

A. Materiality would go to specific circumstances, specific legal questions, specific matters. There's not a general materiality concept I would be working with.

Q. Okay. How about this specific