Page 110

1  scenario? It's not a hypothetical. You have a
2  company with a CEO who opposes the transaction,
3  votes his shares against the transaction, and
4  does not believe that the transaction is in the
5  best interest of shareholders. Do you believe
6  that with those facts, which are the facts in
7  this case, that that information should be
8  disclosed to the OHSL shareholders?
9         MS. ROWE: Objection.
10        MR. FISCHER: Objection.
11        MR. BUCKLEY: Objection.
12        MS. ROWE: Misstates the record.
13        A.  I have no basis to say that should
14  be disclosed or not disclosed. It would -- in
15  any particular context.
16        Q.  What do you mean, you have no
17  basis?
18        A.  I have no, no specific legal
19  knowledge or basis that would tell me that in
20  those circumstances a CEO would have to
21  disclose certain information or withhold
22  certain information.
23        Q.  Now, you hold a JD from the
24  University of Kentucky, correct?
25        A.  Yes.

Page 111

1         Q.  And you were the editor of the
2  Kentucky Law Journal, correct?
3         A.  Articles editor, yes.
4         Q.  And you are a lieutenant commander
5  in the United States Naval Reserve, correct?
6         A.  Yes.
7         Q.  And you've been doing this work
8  for about five years, with the KMK firm,
9  correct?
10        MS. ROWE: Objection.
11        A.  Yes.
12        Q.  And it's your testimony under oath
13  that you have no basis for assessing whether or
14  not the opposition of the CEO, the largest
15  shareholder, and a Board member who is the only
16  member of management, whether his opposition to
17  the transaction is material information and
18  should be disclosed?
19        MR. FISCHER: Objection.
20        Q.  Is that your testimony?
21        MR. FISCHER: Objection.
22        A.  Yes. In the context of any
23  securities filing, any specific requirements.
24  The requirements are specific to what the law
25  requires. That's not my area of practice. I

Page 112

1  don't know what in this particular instance or
2  a similar circumstance a CEO would or would not
3  be required to disclose. I simply don't know
4  what that standard would be.
5         Q.  Do you think it's fair not to
6  disclose that?
7         MR. FISCHER: Objection.
8         MR. BUCKLEY: Objection.
9         MS. ROWE: Objection.
10        A.  It would depend upon the
11  circumstances of the transaction, whether it
12  was fair or unfair. That's in my mind a matter
13  of opinion.
14        Q.  And what's your opinion?
15        MS. ROWE: Objection.
16        MR. FISCHER: Objection,
17  relevance.
18        A.  With respect to the transaction --
19        MR. FISCHER: Form.
20        A.  -- I don't know enough about the
21  details of the transaction as far as the
22  business points, whether that would be a fair
23  or unfair disclosure in the overall context of
24  the transaction -- of this transaction.
25        Q.  What factors would you need to

Page 113

1  consider to make a determination?
2         MS. ROWE: Objection.
3         MR. FISCHER: Objection.
4         A.  As a general statement, and not
5  specific to this transaction, one would
6  evaluate the, the extent of whether the
7  shareholders of the company are better or worse
8  before and after the transaction.
9         Q.  Really? Why would you do that?
10        A.  Again, I think you're asking me
11  with respect to a specific opinion regarding
12  matters with respect to public companies and
13  what's required and not required. And I'm
14  really not in a position, don't have the
15  background to give you answers to these
16  questions.
17        Q.  Okay. You talked earlier in your
18  previous answer about you'd have to evaluate
19  whether the shareholders were better or worse
20  after the transaction. Do you remember that
21  testimony generally?
22        A.  As a general statement, yes.
23        Q.  Okay. Now, my question to you is,
24  isn't the purpose of a proxy material and
25  registration statement, such as Defendant's

29 (Pages 110 to 113)

Page 114

1  Exhibit 1, to provide information to the
2  shareholders and let them make their own
3  decisions? Correct?
4           MR. FISCHER: Objection.
5           MR. BUCKLEY: Objection.
6           MS. ROWE: Objection. Asked and
7  answered.
8           MR. FISCHER: And form.
9      A.  Again, I'm not an expert in what
10 the specific purposes of a proxy statement are
11 or are not for.
12     Q.  Okay. Let me ask you a slightly
13 different question. If Mr. Burke's statement
14 to the Cincinnati Business Courier is true,
15 that Hanauer opposed the transaction because he
16 wanted Oak Hills to remain independent, is it
17 your opinion as you sit here today, under oath,
18 that that information should have been
19 disclosed to the OHSL shareholders?
20          MS. ROWE: Objection.
21          MR. FISCHER: Objection.
22          MR. BUCKLEY: Objection.
23          MR. FISCHER: Hypothetical, form.
24          MS. ROWE: Misstates the testimony
25 and the exhibit.

Page 115

1      A.  No. I have no basis to say that
2  information should or should not -- whatever
3  his position was, whether this statement is
4  accurate or inaccurate. I don't know. I don't
5  have a basis to judge whether that should be
6  disclosed, whether it was disclosed. I don't
7  know.
8      Q.  Okay. Who on the KMK team would
9  make such a decision with respect to this
10 document, Defendant's Exhibit 1?
11          MS. ROWE: Objection. What
12 decision?
13          MR. FISCHER: I was going to say,
14 what are you referring to, Mr. Brautigam? What
15 decision?
16          MR. BRAUTIGAM: We're doing fine,
17 Pat.
18          MR. FISCHER: What decision?
19          MR. BRAUTIGAM: The witness knows
20 what I'm talking about.
21          MR. FISCHER: Objection to form.
22      A.  Could you repeat the question,
23 please?
24 BY MR. BRAUTIGAM:
25     Q.  Certainly. Who on the KMK team

Page 116

1  was in charge of deciding whether or not Mr.
2  Hanauer's opposition to the transaction was
3  disclosed?
4           MS. ROWE: Objection to form.
5           MR. FISCHER: Objection.
6      A.  I have no basis -- I don't know
7  Mr. Hanauer's position then or now. During the
8  transaction I was not aware of his position or
9  any opposition. I don't know who at KMK would
10 evaluate the materiality, the requirements for
11 disclosing that information.
12     Q.  Was there someone who was tasked
13 with evaluating the overall materiality for the
14 document?
15     A.  I don't know.
16     Q.  And as you sit here today, you
17 have no opinion as to whether or not the
18 opposition of the largest shareholder, the CEO
19 of the company, and the only member of
20 management to serve on the Board, is material
21 or not?
22          MR. FISCHER: Objection.
23          MS. ROWE: Objection.
24     A.  No, I don't have an opinion
25 whether the totality of the circumstances and

Page 117

1  facts, that that would be material or
2  immaterial.
3      Q.  Okay. During the time you worked
4  on the OHSL-Provident merger, did you ever
5  learn that Mr. Hanauer was opposed to the
6  merger transaction?
7      A.  No.
8      Q.  Did you ever learn that Mr.
9  Hanauer was not fully cooperating in making the
10 merger happen?
11     A.  To my recollection, no.
12     Q.  After the merger closed, aside
13 from today, did you ever learn that Mr. Hanauer
14 had been opposed to the merger transaction?
15          MR. FISCHER: To the extent you
16 can answer that without revealing
17 communications with counsel, go ahead and
18 answer.
19     A.  Before you presented Defendant's
20 Exhibit today, I don't have any specific
21 recollection of Kenneth Hanauer by name being
22 opposed to the merger transaction.
23     Q.  Okay. Did you have an
24 understanding that a Board member or more than
25 one Board member on the OHSL Board was opposed

Page 118

1  to the merger?
2        MR. FISCHER: At what time?
3        Q. At any time.
4        MR. FISCHER: Same instruction.
5  Don't disclose anything you and I have talked
6  about.
7        MR. BRAUTIGAM: I just want to make
8  it clear that when you say don't disclose
9  anything that Mr. Winstead and you have talked
10  about, that includes, in your mind, the meeting
11  with many KMK attorneys who were also in the
12  room where he was not giving or seeking legal
13  advice. Is that correct?
14        MR. FISCHER: No. You didn't hear
15  what I said when we opened up this afternoon's
16  session.
17        MR. BRAUTIGAM: No, I listened to
18  every word very carefully.
19        MR. FISCHER: Go ahead. You can
20  answer the question.
21        A. As a general statement, in
22  anticipation of this deposition I became aware
23  that there was a pending lawsuit, obviously, or
24  I wouldn't be here today. I had very general
25  understanding that there was alleged

Page 119

1  shareholder opposition to the transaction.
2  Beyond that, I did not have any detailed
3  understanding or had not reviewed any --
4  anything related to this lawsuit.
5        Q. You said "shareholder opposition"
6  in your previous answer. Is that what you
7  meant to say?
8        A. Opposition of anyone.
9        Q. Okay. Well, there was opposition,
10  because not all of the shareholders voted in
11  favor of the transaction, correct?
12        A. By opposition -- let me be
13  specific. Opposition to the extent that there
14  was a party to file a lawsuit contesting -- and
15  I'm not even sure what the lawsuit contests and
16  claims in the lawsuit, but there was an
17  aggrieved party -- an alleged aggrieved party.
18        Q. Okay. How about opposition from
19  within the OHSL Board? Before today, did you
20  ever learn of any opposition from within the
21  OHSL Board?
22        MR. FISCHER: Same instruction.
23        A. Again, my recollection in
24  anticipation of coming to this deposition is a
25  general awareness of a lawsuit. I don't recall

Page 120

1  any specific knowledge governing director
2  opposition.
3        Q. Okay. At this point I'm not
4  interested in general awareness of a lawsuit.
5  I'm not interested in a lawsuit at all. Before
6  this lawsuit, in the summer of 1999, were you
7  ever aware that there was any opposition by any
8  member of management or any member of OHSL's
9  Board to the merger with Provident?
10        A. No.
11        Q. Okay. Did KMK have access to the
12  OHSL Board minutes?
13        MS. ROWE: When?
14        MR. FISCHER: When?
15        Q. In the summer of 1999, during the
16  due diligence phase of the merger transaction.
17        A. I don't know.
18        Q. Isn't that typical for a merger
19  transaction?
20        MS. ROWE: Objection.
21        MR. FISCHER: Objection.
22        MR. BUCKLEY: Objection.
23        A. Specifically which Board minutes
24  are you asking about?
25        Q. Okay. KMK represented Provident

Page 121

1  in this transaction, correct?
2        A. Yes.
3        Q. And Provident was the buyer,
4  correct?
5        MR. FISCHER: Objection to the
6  term "buyer."
7        A. My recollection is that it was a
8  merger transaction. Provident Bank was the
9  acquiring party, roughly equivalent to buyer,
10  yes.
11        Q. Okay. And did KMK represent the
12  institution PFGI, Inc., or the Provident Board
13  members, or something else?
14        MR. FISCHER: Objection.
15        MS. ROWE: Objection.
16        A. I don't know the specific
17  definition of which Provident parties KMK
18  represented.
19        Q. Okay. Who did you represent when
20  you worked on the transaction?
21        A. Again, I billed my time to a
22  specific matter. I don't recall whether it was
23  a Provident Bank or Provident Financial Corp
24  matter.
25        Q. Did you ever represent the

31 (Pages 118 to 121)

**Page 122**

1   Provident directors?
2       A.   Not -- I don't know.
3       Q.   You don't know who your client
4   was?
5       MR. FISCHER:  Objection.
6       A.   My answer is, I don't know if our
7   representation encompassed the Provident
8   directors.
9       Q.   So you don't know who your client
10  was?
11      MS. ROWE:  Objection.
12      MR. FISCHER:  Objection. Arguing.
13      A.   Again, my answer is, I don't
14  recall which client matter code this was billed
15  to.  My recollection, it was a Provident Bank
16  matter or a Provident Financial Group matter.
17  Beyond that, I'm not sure who the client -- who
18  the client encompassed.
19      Q.   What is your understanding of the
20  role of the attorneys for the acquiring entity?
21      MR. FISCHER:  Objection,
22  overbroad.
23      A.   I'm not sure I understand.  As a
24  general question, the role of the parties for
25  the acquiring entity is to represent the

**Page 123**

1   acquiring entity.
2       Q.   Okay.  And did KMK do that?
3       MS. ROWE:  Objection.
4       A.   My understanding and my knowledge
5   is that KMK represented Provident in this
6   transaction.
7       Q.   Okay.  What did KMK do in terms of
8   its representation of Provident in this
9   transaction?
10      MR. FISCHER:  Objection. Broad.
11      MS. ROWE:  Same objection.
12      A.   In the transaction there were
13  multiple documents, multiple matters to be
14  attended to.  In the negotiation, the firm
15  represented Provident in many of those matters.
16  I don't know the extent or the specifics beyond
17  the areas that I participated with.
18      Q.   Okay.  You talked about multiple
19  documents.  What documents are you talking
20  about?
21      MS. ROWE:  Objection.
22      MR. FISCHER:  The same objection.
23      A.   I don't recall the specific
24  documents that were unique to this transaction.
25  The Agreement and Plan of Merger presented

**Page 124**

1   earlier as an exhibit document was one document
2   that KMK worked on.  My understanding is that
3   KMK participated in the mutual preparation of
4   the proxy statement.
5       Q.   Okay.  What did KMK do as it
6   assisted in the mutual preparation of the proxy
7   statement?
8       MR. FISCHER:  Objection.
9       MS. ROWE:  Objection.
10      A.   I don't know.
11      Q.   Did KMK have to rely on
12  information it received from Oak Hills?
13      MS. ROWE:  Objection.
14      MR. FISCHER:  Same objection.
15      A.   Based on my role in this
16  transaction, I don't know what information was
17  provided to KMK, but he -- and generally it
18  would be a mutual effort of the attorneys
19  representing both parties.  Information would
20  be provided from both clients, so their
21  attorneys and documents would be produced from
22  that -- those multiple sources.
23      Q.   And what, if anything, did KMK do
24  to check the veracity of the information that
25  was received from the multiple sources you

**Page 125**

1   talked about?
2       MS. ROWE:  Objection.
3       MR. FISCHER:  Objection.
4       A.   I don't know.
5       Q.   Do you know if KMK did anything to
6   check the veracity of this information?
7       MS. ROWE:  Objection.
8       MR. FISCHER:  Same objection.
9       A.   And my testimony is I did not
10  participate in the preparation of the proxy
11  statement, beyond my recollection of preparing
12  a one paragraph long summary of the terms of
13  the merger.
14      Q.   Okay.  Do you think you could look
15  through Defendant's Exhibit 1 and find that,
16  please?
17      A.   What I -- I prepared an initial
18  draft of a summary.  To my recollection, I
19  provided that to Mark Reuter for incorporation
20  in the proxy statement.  I have no recollection
21  of actually working within the proxy statement
22  or any point, any involvement in manipulation
23  of this document.  So to look to the document,
24  what I produced was not an identifiable
25  paragraph, to the extent of my memory.

**Page 126**

1   Q.  How would you know that if you
2   didn't look at every page of the document?
3       A.  I can certainly look to see if
4   anything looks familiar.  Again, it was an
5   initial draft prepared for inclusion in the
6   proxy statement.
7       MR. FISCHER:  If you want him to
8   look through every page, we'll be glad to do
9   that.
10      Q.  Well, maybe between now and the
11  time he comes back.  Approximately how long was
12  this summary?
13      A.  To the best of my recollection, no
14  more than a paragraph.
15      Q.  And how many sentences were
16  contained in that paragraph, roughly?
17      A.  I don't remember it being a
18  paragraph, taking up maybe a third or a half of
19  a page.
20      Q.  And what was the general subject
21  matter of that paragraph?
22      MS. ROWE:  Objection.  Asked and
23  answered.
24      A.  My recollection is that it was a
25  very general summary of the terms of the merger

**Page 127**

1   agreement.
2       Q.  When you say the terms, the fact
3   that it was a stock for stock transaction?
4       A.  My recollection would be the most
5   basic of the transaction, the parties involved,
6   consideration -- again, I don't remember the
7   specifics of what was in the summary.
8       Q.  What was the consideration?
9       A.  I don't remember.
10      Q.  Well, it was Provident stock,
11  correct?
12      A.  My recollection is that it was a
13  stock transaction.
14      Q.  Okay.  Are you familiar with the
15  term materially misstated as accountants
16  sometimes use it?
17      A.  No.
18      Q.  Okay.  Are you familiar with
19  Provident's restatement on or about March 5th,
20  2003?
21      MS. ROWE:  Objection.  Relevance.
22      A.  Only to the extent of having read
23  or heard about it in general publications,
24  local papers, that type of source.
25      Q.  What is your understanding of what

**Page 128**

1   happened with respect to the Provident
2   restatement?
3       MR. FISCHER:  Objection.
4       MS. ROWE:  Objection.
5       A.  My recollection is that there was
6   a restatement regarding certain securitization
7   transactions.  I think there may have been two
8   separate disclosures from Provident perhaps
9   regarding two separate restatements, or maybe
10  the same restatement and it's simply additional
11  information.
12      I don't recall the specifics of
13  the restatements beyond that they had to do
14  with how certain securitization transactions
15  were transpired for accounting purposes.
16      Q.  What does it mean to restate the
17  financial statements of a public company?
18      MR. FISCHER:  Objection.
19      A.  I'm not an accountant, but as a
20  layman, my understanding is it's simply what is
21  a restatement or a redocumentation of the
22  financial statements, the numbers in those
23  financial statements.
24      Q.  Now, in your answer you said as a
25  layman.  Isn't it necessary for you to have a

**Page 129**

1   working knowledge of restatements as someone
2   who has a broad range of experience in complex
3   financial transactions, including asset based
4   lending, workouts, secured party sales, and
5   mergers and acquisitions involving financial
6   institutions?
7       MS. ROWE:  Objection.
8       MR. FISCHER:  Same objection.
9       A.  Can you repeat your question,
10  please?
11      Q.  Certainly.  In your previous
12  answer you indicated that you were giving the
13  answer as a layman.  Do you remember that
14  testimony in general?
15      A.  Yes, I recall that was my general
16  preface.
17      Q.  Right.  And my question is, isn't
18  it necessary for you to have a working
19  understanding of what a restatement is as
20  someone who practices in the area of complex
21  financial transactions, including asset based
22  lending, workouts, secured party sales, and
23  mergers and acquisitions involving financial
24  institutions?
25      MS. ROWE:  Objection.

33 (Pages 126 to 129)

Page 130

```
 1          MR. FISCHER:  Same objection.
 2       A.  A restatement is an accounting
 3  term.  I'm not an accountant.  I'm not a CPA.
 4  My work doesn't require me to have a detailed
 5  understanding of principles of restatements.
 6       Q.  Okay.  Do you have a general
 7  understanding of principles of restatements?
 8       A.  Not beyond the general conception
 9  that I hold that I answered --
10       Q.  Okay.
11       A.  -- to the previous question.
12       Q.  Is it your understanding that by
13  restating Provident's financials from '97 to
14  2002, that Provident has conceded that the
15  financials were materially misstated during
16  those years?
17          MS. ROWE:  Objection.
18          MR. BUCKLEY:  Objection.
19          MR. FISCHER:  Objection.
20       A.  No, that's not my understanding.
21       Q.  Okay.  What is your understanding?
22       A.  I don't have an understanding as
23  to what the -- what the specific legal or, or
24  general context of Provident's statings may or
25  may not mean.
```

Page 131

```
 1       Q.  Under what circumstances does a
 2  public company restate its financials?
 3          MS. ROWE:  Objection.
 4          MR. FISCHER:  Objection.
 5          MR. BUCKLEY:  Objection.
 6       A.  Again, this is an accounting
 7  question that I'm not an expert in.  I don't
 8  have any knowledge of accounting standards of
 9  when restatements are required and when they
10  are not.
11       Q.  Why do you say that that's an
12  accounting question?
13       A.  My understanding of your question
14  was, when is a restatement of financials
15  required.  What does it imply.
16       Q.  And you don't believe that there
17  is any legal components to that question?
18       A.  There may be general requirements
19  regarding SEC filings, but I don't practice in
20  the area of securities so I don't know what the
21  threshold standards are to restate or not
22  restate accounting information.
23       Q.  Okay.  Are you familiar with the
24  word unanimous?
25       A.  Yes.
```

Page 132

```
 1       Q.  What does the word unanimous mean?
 2       A.  As a general statement, everyone
 3  in favor.
 4       Q.  Okay.  Let's take a look at the
 5  first page of Defendant's Exhibit 1.  Do you
 6  see that?  Do you see the paragraph, it's the
 7  third one from the bottom, and the first
 8  sentence says, Your Board of Directors
 9  unanimously approved the acquisition and
10  believes that it is in the best interest of
11  OHSL stockholders.  Do you see that?
12       A.  Yes, I see that sentence.
13       Q.  Okay.  Did I read it correctly?
14       A.  Yes.
15       Q.  How many directors did OHSL have
16  in 1999?
17       A.  I don't know.
18       Q.  Who would know?
19       A.  Who would know that?
20       Q.  Yes.
21          MS. ROWE:  Objection.
22          MR. FISCHER:  Objection.
23       Q.  Let me ask it a little
24  differently.  Who at KMK would know the number
25  of directors OHSL had in 1999?
```

Page 133

```
 1       A.  I don't know who at KMK would know
 2  the number of directors of OHSL in 1999.
 3       Q.  Who was the attorney at KMK who
 4  was most responsible for liaisoning with the
 5  Dinsmore firm?
 6          MR. FISCHER:  Objection.
 7       A.  I don't know of any attorney at
 8  KMK that was most responsible for liaison with
 9  Dinsmore.
10       Q.  Okay.  Which attorneys worked with
11  Dinsmore on the merger?
12       A.  My recollection is that Tim
13  Matthews worked with the Dinsmore attorneys in
14  the negotiation of the merger agreement.
15  Beyond that, I don't have any specific
16  knowledge of any specific contact between --
17  that was or was not made between KMK attorneys
18  and Dinsmore attorneys.
19       Q.  How did documents get exchanged
20  between KMK and Dinsmore?
21          MS. ROWE:  Objection.
22       A.  With respect to documents I did
23  not provide to Dinsmore, I don't know.
24  Documents I was involved with could have been
25  sent via letter, via fax, via e-mail
```

34 (Pages 130 to 133)

Page 134

1  transmission.
2      Q.  So you received faxes and e-mails
3  from Dinsmore; is that correct?
4          MS. ROWE:  Objection.
5          MR. FISCHER:  Objection. That
6  wasn't his testimony.
7      A.  I don't have any specific
8  recollection of any particular fax or document
9  or e-mail with regard to this transaction from
10  Dinsmore.  As a general statement, in this type
11  of transaction those would be the methods of
12  transmitting documents.
13      Q.  Okay.  Where are these documents
14  today?
15      A.  Which documents?
16      Q.  Documents that you may have
17  received from Dinsmore or others and/or sent to
18  Dinsmore or others?
19      A.  I don't know.
20      Q.  Do you believe that they're within
21  the custody and control of KMK?
22      A.  I don't know.
23      Q.  Where were they when you last saw
24  them?
25      A.  I don't recall specifically the

Page 135

1  final positioning of the documents in this
2  transaction.  Normal course would have been
3  that they would have been put in the read well
4  files, labeled with this matter and would have
5  been sent to the files.
6      Q.  Okay.  So at some point you
7  maintained a read well file, you put the
8  documents in it.  And then at some point after
9  that, they were sent off to the files and
10  that's the last you've seen of them, correct?
11          MR. FISCHER:  Objection.
12          MS. ROWE:  Objection.
13      A.  I don't have a specific
14  recollection of this transaction, but for
15  transactions in general, that would be the
16  procedure.  I don't recall anything unusual or
17  different about this transaction.
18      Q.  Okay.  Getting back to this
19  sentence here, Your Board of Directors
20  unanimously approved the acquisition and
21  believes that it is in the best interest of
22  OHSL stockholders.  Are you able to interpret
23  that sentence?  You have an understanding of
24  what that sentence means, correct?
25          MR. FISCHER:  Objection. Three

Page 136

1  questions.
2      A.  Yes.  I can read the sentence and
3  from reading the sentence have a basis of what
4  the sentence is trying to convey.
5      Q.  Okay.  And do you believe that
6  that sentence is trying to convey that the
7  entire OHSL Board unanimously voted as
8  directors to approve the acquisition, and also
9  unanimously believes that the transaction is in
10  the best interest of OHSL stockholders?
11          MR. FISCHER:  Objection.
12          MS. ROWE:  Objection.
13      A.  The sentence is what it is, Your
14  Board of Directors unanimously approved the
15  acquisition and believes it is in the best
16  interest of OHSL stockholders, period.  Beyond
17  that, I don't have any opinion or
18  interpretation of the sentence.
19      Q.  Okay.  And when you interpret it
20  in the way you just did, that would refer to
21  the entire Board of Directors, correct?
22          MS. ROWE:  Objection.
23          MR. FISCHER:  Objection.
24          MR. BUCKLEY:  Objection.
25      A.  I'm not sure what you mean by

Page 137

1  "entire."
2      Q.  All.
3          MR. FISCHER:  Same objection.
4          MS. ROWE:  Objection, if there's a
5  question pending.
6          MR. FISCHER:  There isn't, but --
7      A.  Again, I think the sentence says
8  what the sentence says.
9      Q.  Okay.  And you believe that that
10  sentence connotes no opposition to the
11  transaction whatsoever, correct?
12          MS. ROWE:  Objection.
13          MR. FISCHER:  Objection.
14      A.  I don't have any feeling or
15  connotation about what the sentence does or
16  does not imply beyond what it says.
17      Q.  Okay.  Let's look at the next
18  sentence, The Board unanimously recommends and
19  advises that you approve the acquisition at the
20  special meeting so that the transaction may be
21  completed.  Do you see that?
22      A.  Yes.
23      Q.  Did I read that correctly?
24      A.  Yes.
25      Q.  From reading that sentence, would

35 (Pages 134 to 137)

Page 138

1  it be fair to infer that all of the Board
2  members would vote their shares in favor of the
3  merger transaction?
4      MS. ROWE: Objection.
5      MR. FISCHER: Objection.
6      MR. BUCKLEY: Objection.
7      A.  I don't have any opinion or answer
8  as to whether it's fair to infer beyond what
9  the sentence says.  It says, The Board
10 unanimously recommends and advises that you
11 approve the acquisition at the special meeting
12 so that the transaction may be contemplated,
13 period.
14     Q.  Completed.
15     A.  I'm sorry, you're correct,
16 completed.
17     Q.  So would it be fair to say that a
18 logical extension of that sentence is that all
19 of the OHSL directors voted their shares in
20 favor of the merger?  Correct?
21     MR. FISCHER: Objection.
22     MR. BUCKLEY: Objection.
23     MS. ROWE: Objection.
24     A.  I don't have any, any reason what
25 would be and what would not be a logical

Page 140

1      Q.  Are you familiar with the term
2  voting agreements as it's sometimes used by
3  transactional attorneys?
4      A.  As a general statement, yes.
5      Q.  Okay.  What do you understand
6  voting agreements to be?
7      A.  As a general statement, voting
8  agreements are agreements between some or all
9  of the shareholders of a company agreeing to
10 vote their shares in a certain way.
11     Q.  Did this transaction include
12 voting agreements with any members of OHSL's
13 management and/or Board?
14     A.  I don't know.
15     Q.  Were there attempts made to get
16 OHSL's management and/or Board to sign voting
17 agreements?
18     A.  I don't know.
19     Q.  Are voting agreements common in
20 the mergers and acquisitions business?
21     MR. FISCHER: Objection.
22     MS. ROWE: Objection.
23     A.  I don't have a definitive answer
24 whether they are common or uncommon.  They may
25 be a part of a particular transaction, they may

Page 139

1  extension from that sentence.  The sentence is
2  what it is.
3      Q.  Well, the sentence is giving
4  investment advice from the OHSL Board to the
5  OHSL shareholders, correct?
6      MR. FISCHER: Objection.
7      MS. ROWE: Objection.
8      A.  I don't know that that sentence is
9  giving investment advice to shareholders.
10     Q.  Well, it's making a recommendation
11 as to how they vote on the transaction,
12 correct?
13     A.  The second sentence in the
14 paragraph you referenced says, Advises you to
15 approve the action, which is, I guess, at the
16 special meeting, so that the transaction may be
17 completed.
18     Q.  Okay.  Would it surprise you if
19 Ken Hanauer, the CEO and Board member of OHSL,
20 did not follow the advice that he's telling
21 others to follow in this sentence?
22     MR. FISCHER: Objection.
23     MR. BUCKLEY: Objection.
24     A.  I have no reason to be surprised
25 or not surprised.

Page 141

1  not be a part of another transaction.  I think
2  they're unique to the circumstances of the
3  transaction.
4      Q.  What's the purposes of voting
5  agreements?
6      MS. ROWE: Objection.
7      MR. FISCHER: Objection.
8      A.  Voting agreements can have
9  different meanings and different purposes,
10 depending upon context.
11     Q.  Okay.  What are some of the
12 meanings and some of the purposes?
13     A.  Shareholder -- I'm sorry,
14 shareholder voting agreements can arise in as
15 many hypothetical situations as you can imagine
16 with a company, depending on what the
17 circumstances and situations are of the
18 company, whether it's a large or small company.
19     There are numerous, numerous
20 examples and ways they could be appropriate for
21 a certain company in certain circumstances.
22 I'm not sure voting agreements have any
23 general, general use.  I think they're unique
24 to the circumstances that they're implemented.
25     They're unique to the shareholders

36 (Pages 138 to 141)

**Page 142**

1 and to what the shareholders are trying to
2 accomplish, meaning contracts. There is not a
3 general definition of what a contract does or
4 doesn't do. It's uniquely created for a
5 specific purpose. By analogy, I think that's
6 what voting agreements are used for.
7     Q. Well, in the context of mergers
8 and acquisitions, aren't voting agreements
9 sometimes used to lock in members of the Board
10 and members of management to vote in a certain
11 way?
12     A. I'm not sure I understand your
13 term "lock in." Voting agreements generically
14 can be used to establish the positions of
15 different shareholders during or prior to a
16 merger transaction.
17     Q. And in this particular merger
18 transaction, the amount of shares owned by
19 insiders was disclosed to the investing public
20 in this document, correct?
21     MS. ROWE: Objection.
22     MR. FISCHER: Object.
23     A. I don't know that.
24     Q. Could you please take a look at
25 page 63 of that document?

**Page 143**

1     MR. FISCHER: Defendant's Exhibit
2 1?
3     Q. Yes. Mr. Winstead, have you ever
4 seen this table before?
5     A. To my recollection, no.
6     Q. Okay. The table is entitled
7 Security Ownership of Certain Beneficial Owners
8 and Management. Do you see that?
9     A. Yes, I see that caption at the top
10 of the page.
11     Q. Okay. Who created this table?
12     A. I don't know.
13     Q. Do you know what computer system
14 it came off, the KMK computer system, the
15 Dinsmore computer system, or some other
16 computer system?
17     MR. FISCHER: Objection to form.
18     MS. ROWE: Objection.
19     A. I don't know.
20     Q. Do you know if this page was KMK's
21 responsibility, Dinsmore's responsibility, or
22 something else?
23     A. I don't know.
24     Q. What does it mean to be a
25 beneficial owner of stock?

**Page 144**

1     MS. ROWE: Objection.
2     MR. FISCHER: Same objection.
3     A. As a general statement, it means
4 to either be the actual named owner or to be
5 entitled to receive tangible or intangible
6 benefits of a stock ownership, say through a
7 trust arrangement.
8     Q. Why is this table included in the
9 proxy material?
10     MS. ROWE: Objection.
11     MR. FISCHER: Objection.
12     A. I'll go back to the statements I
13 have made before. I'm not a security lawyer, I
14 don't practice in this area of the law. I
15 don't know their specific requirements for
16 proxy statements, why or why not this
17 particular type of table would be included in a
18 proxy statement.
19     Q. Now, you've said repeatedly you're
20 not a securities lawyer and you don't practice
21 in this area of the law. What do you mean when
22 you say you're not a securities lawyer?
23     MS. ROWE: Objection.
24     MR. FISCHER: Same objection,
25 waste of time.

**Page 145**

1     A. Securities law is governed by a
2 specific set of federal and state laws, rules
3 and regulations. It's a very specialized
4 knowledge. Very specialized requirements.
5 When I say I don't practice in securities law,
6 I don't have a working or detailed knowledge of
7 that law, those rules, those regulations. I
8 don't prepare these kinds of documents.
9     Q. How do you describe yourself as an
10 attorney?
11     MS. ROWE: Objection.
12     MR. FISCHER: Objection.
13     A. Could you be more specific?
14     MR. FISCHER: Are you speaking
15 metaphysically?
16     Q. No, I'm not. You say you're not a
17 securities lawyer. Would you call yourself a
18 corporate lawyer? Would you call yourself a
19 litigator? How would you describe yourself as
20 an attorney?
21     MR. FISCHER: Same objection.
22     MS. ROWE: Same objection.
23     A. I would describe myself as a
24 corporate associate with a general corporate
25 practice.

37 (Pages 142 to 145)

Page 146

1    Q.  What does the general corporate
2  practice include?
3    A.  Includes the asset based lending
4  transactions, mergers and acquisitions,
5  organization of entities, review and drafting
6  of contracts.
7    Q.  Okay.  You testified that mergers
8  and acquisitions are within your practice; is
9  that correct?
10    A.  As a general statement, yes.
11    Q.  And mergers and acquisitions have
12  a securities component, correct?
13    MR. FISCHER:  Objection.
14    MS. ROWE:  Objection.
15    A.  Not all mergers and acquisitions
16  have a securities component.
17    Q.  Okay.  This merger and acquisition
18  had a securities component, correct?
19    A.  Yes.
20    Q.  And this merger and acquisition
21  required you as an attorney working on the
22  transaction to be familiar with certain
23  securities terms, correct?
24    MS. ROWE:  Objection.
25    MR. FISCHER:  Objection.

Page 147

1    A.  I don't have any recollection of
2  any specific securities terms I was required to
3  be familiar with when working on this
4  transaction.
5    Q.  Okay.  Do you believe that you
6  were required to be familiar with the
7  Securities Act of 1933?
8    A.  For this transaction --
9    MR. FISCHER:  Objection.
10    A.  -- no.
11    Q.  Okay.  How about in general as
12  someone with a merger and acquisition practice?
13    MS. ROWE:  Objection.
14    MR. FISCHER:  Same objection.
15    A.  I would repeat that the practice
16  of securities law, '33 Act, '34 Act, is a
17  specialized area of the law that beyond a
18  superficial knowledge of securities law,
19  involves practice by specific practitioners --
20  specialized practitioners.
21    Q.  Okay.  Do you have an
22  understanding of the Securities Act of 1933?
23    MS. ROWE:  Objection.
24    MR. FISCHER:  Object.
25    A.  Only to a general and rather

Page 148

1  superficial extent.
2    Q.  Okay.  What is your understanding
3  of the Securities Act of 1933?
4    MR. FISCHER:  Objection.
5    MS. ROWE:  Objection.
6    MR. FISCHER:  Total waste of time.
7    A.  Securities Act -- I'm sorry, the
8  Securities Act of 1933 relates to certain
9  public disclosures that are required of
10  publicly-traded companies.  There is an entire
11  body of law that's based upon and relates to
12  what those disclosures are, how and when they
13  should be made.  It is a very complicated,
14  involved area of the law with many subsets of
15  requirements and knowledge.
16    Q.  Okay.  Out of all the KMK
17  attorneys working on this merger and
18  acquisition, who was the person most
19  knowledgeable about the Securities Act of 1933?
20    MS. ROWE:  Objection.
21    MR. FISCHER:  Objection.
22    A.  I don't know.
23    Q.  Okay.  Is there any attorney at
24  KMK who worked on this merger who you consider
25  to be a securities lawyer?

Page 149

1    A.  Yes.
2    Q.  Who?
3    A.  My understanding was that Mark
4  Weiss and Mark Reuter worked on this
5  transaction.  My understanding is that Mr.
6  Weiss and Mr. Reuter both practice in the
7  securities law area.  I don't have any specific
8  knowledge or opinion as to the degree to which
9  they practice in securities law beyond the fact
10  that -- beyond a general understanding that
11  they do practice in that area.  I don't know
12  their specific background or levels of
13  knowledge with respect to any particular sub
14  area of securities law.
15    Q.  Okay.  Do you believe that Mark
16  Weiss is an expert in the field of securities
17  law?
18    MR. FISCHER:  Objection.
19    MS. ROWE:  Objection.
20    MR. BUCKLEY:  Objection.
21    A.  I don't know what you mean by
22  "expert."
23    Q.  I thought we covered that this
24  morning.
25    MS. ROWE:  Objection.  Is there a

38 (Pages 146 to 149)

Page 150

1 question?
2       MR. FISCHER: Same objection.
3       Q. Is that your answer? That's the
4 best you can do?
5       A. I think my answer earlier was --
6 with regard to expert is I don't know what an
7 expert is.
8       Q. Okay.
9       A. With respect to --
10      Q. If Mark Weiss were called as a
11 witness in an unrelated case and he went to
12 federal court and raised his right hand and
13 swore to tell the truth, do you think he would
14 be recognized as an expert in the field of
15 securities law?
16      MR. FISCHER: Objection.
17      MS. ROWE: Objection. Calls for a
18 legal conclusion.
19      MR. FISCHER: Calling for ruling
20 by a judge.
21      A. In your earlier expert -- or your
22 earlier question to me, previous questions and
23 answers was, did I consider myself an expert, I
24 said only practicing five years, I did not
25 consider myself an expert.

Page 151

1       With respect to Mr. Weiss, I don't
2 know exactly how long he's practiced securities
3 law. I don't know what the threshold would be
4 for the determination of whether he is an
5 expert or not an expert in securities law.
6       Q. Okay. How about Mr. Reuter?
7       A. I would give the same answer.
8       MR. FISCHER: Same objection.
9       A. Regarding Mr. Reuter, I don't know
10 the extent or length of his practice in the
11 securities law.
12      Q. Do you believe that Mr. Weiss or
13 Mr. Reuter hold themselves out as experts in
14 the field of securities law?
15      A. I don't know.
16      Q. Are you familiar with the
17 Securities Act of 1934?
18      MS. ROWE: Objection.
19      A. Only in a very general sense.
20      Q. Okay. What is your sense of the
21 Securities Act of 1934?
22      A. '34 Act is related to disclosures
23 that public companies are required to make. I
24 may have misspoke before when I answered your
25 previous question about the Securities Act of

Page 152

1 1933. Part of the '33 -- I believe the '33 Act
2 may involve the sale and registration of
3 companies in a public market.
4       Certain rules and regulations
5 regarding disclosures that must be made,
6 documents that must be provided. I believe the
7 '34 Act goes more to once a company is sold --
8 once the shares of a company are sold on a
9 public market, that there are certain rules and
10 regulations regarding periodic disclosures.
11      I believe the '34 Act also
12 encompasses certain regulation of securities
13 market, requirements for securities dealers,
14 registration and licensing requirements for
15 securities dealers. So I believe some of the
16 answer I gave regarding what the '33 Act was
17 previously is actually the '34 Act.
18      Q. And you work with both of these
19 Acts to a certain extent in your corporate
20 practice, correct?
21      MR. FISCHER: Objection.
22      MS. ROWE: Objection.
23      A. Only to a very limited extent.
24      Q. Do you understand the history of
25 the Securities Act, both the '33 and '34?

Page 153

1       A. Only to a very general extent.
2       MS. ROWE: Objection to relevance.
3       MR. FISCHER: Objection. Waste of
4 time.
5       Q. What is your understanding?
6       A. The Securities Acts of 1933 and
7 '34 were early legislative efforts of the New
8 Deal in response to, obviously, the impact of
9 the Great Depression, public opinion regarding
10 the need for regulation of certain aspects of
11 the public market for securities -- for
12 securities buying and selling.
13      Q. And do you believe these Acts came
14 about due to a perceived need to protect the
15 public?
16      MS. ROWE: Objection.
17      MR. FISCHER: Objection.
18      A. Again, I'm not an expert on or
19 particularly knowledgeable about the origins or
20 history of the Securities Act of 1933 or of
21 1934.
22      Q. Do you think they fall under the
23 general rubric of investor protection?
24      A. My understanding in the aspects of
25 both as Acts falls under the general rubric of

39 (Pages 150 to 153)

Page 154

1  investor protection.
2      Q.  And in order to comply with the
3  Securities Acts of '33 and '34, don't you have
4  to have a working knowledge of certain terms
5  such as materiality?
6          MR. FISCHER: Objection.
7          MS. ROWE: Objection.
8      A.  I don't know that.
9      Q.  Okay.
10         MS. ROWE: Mike, is now a good
11 time to take a break?  We've been going for
12 another hour.
13         MR. BRAUTIGAM: Sure, that's fine.
14         (Brief recess.)
15 BY MR. BRAUTIGAM:
16     Q.  Can I have the last question and
17 answer read back, please?
18         (Record read by Reporter.)
19     Q.  Well, Mr. Winstead, in creating a
20 proxy material and registration statement, you
21 would agree with me, would you not, that
22 certain decisions have to be made as to what to
23 include in the document and what not to include
24 in the document?  Correct?
25     A.  Yes.  At a general statement, some

Page 155

1  information goes in a proxy statement, some
2  information does not go in a proxy statement.
3  But I think that's true with any agreement or
4  any document, obviously.
5      Q.  Okay.  And with respect to
6  documents that get filed with the SEC and get
7  sent to shareholders to solicit their votes,
8  one would want to include material information
9  and in some circumstances exclude immaterial
10 information so as not to clutter the proxy
11 materials, correct?
12         MS. ROWE: Objection.
13         MR. FISCHER: Objection.
14         MR. BUCKLEY: Objection.
15     A.  Again, what goes into what is
16 included, what is not included in securities
17 material -- materials filed with the Securities
18 & Exchange Commission, is a determination that
19 attorneys in this area are specifically hired
20 to make.
21         I don't practice in that area, I
22 don't prepare these documents, so I don't have
23 an answer as to what material or immaterial
24 means in the context of proxy statements or
25 other SEC type materials.

Page 156

1      Q.  Okay.  Who made that decision for
2  KMK?
3          MR. FISCHER: Objection.
4          MS. ROWE: Objection.
5      A.  With respect to the proxy
6  statement marked as Defendant's Exhibit Number
7  1, I don't know.
8      Q.  Who did you work for on this
9  transaction?
10         MR. FISCHER: Objection.  We
11 already went through this.
12     A.  My recollection is the attorney
13 that requested that I work on this transaction
14 was Tim Matthews.
15     Q.  Did you work closely with Mark
16 Reuter and Mark Weiss?
17     A.  My recollection is being asked to
18 prepare the paragraph summary of the
19 transaction we discussed in previous testimony.
20 I don't recall any other relationship or
21 working with respect to this transaction with
22 respect to Mr. Weiss and Mr. Reuter.
23     Q.  Okay.  Could you look at page
24 three of Defendant's Exhibit 1, please?  It's
25 not the third page, but it is marked three at

Page 157

1  the bottom.
2          MS. ROWE: Would you have a copy
3  for us to share maybe?  Do you mind?
4      Q.  No, not at all.
5      A.  This page?
6      Q.  Yes, that page.
7      A.  Marked three.
8      Q.  And at the top it says summary.
9  Do you see that?
10     A.  Yes.
11     Q.  Okay.  Did you write anything on
12 that page?
13     A.  I don't recall having drafted
14 anything I'm reading on this page three.
15     Q.  Okay.  I believe the summary
16 continues for the next two pages.  Would you
17 look at those, please?
18     A.  Looking at pages four and five of
19 the materials provided, I don't see any of the
20 text that I recall having drafted.
21     Q.  Okay.  And do you know how this
22 summary was created?
23     A.  No.
24     Q.  Do you know who wrote this
25 summary?

Page 158

1    A.  No.
2    Q.  Do you know what computer the
3  summary came off?
4    A.  No.
5    Q.  Do you know who was responsible
6  for finalizing this summary?
7        MS. ROWE:  Objection.
8    A.  No, I do not.
9    Q.  Do you know who was responsible
10  for finalizing the overall document?
11        MR. FISCHER:  Objection.
12    A.  No.
13    Q.  Okay.  Could you take a look at
14  the Plan of Merger and look through that and
15  see if you can find the specific sections that
16  you may have written?
17    A.  With respect to the actual
18  Agreement and Plan of Merger?
19    Q.  Yes.
20        MR. FISCHER:  Annex A?
21    Q.  Yes.
22    A.  I did not draft any of the
23  provisions of the merger agreement.
24    Q.  I thought earlier you had
25  testified that you did write something that was

Page 159

1  included in Annex A, but that's not correct?
2        MR. FISCHER:  Objection.  I don't
3  think that was his testimony.
4    A.  My testimony or intended testimony
5  was that my recollection is that I prepared a
6  paragraph summary of some of the terms and
7  conditions of the Agreement and Plan of Merger
8  for use in preparation of the proxy.  My
9  recollection is providing that to Mr. Reuter.
10    I don't recall any other
11  involvement in the preparation of the proxy
12  statement.  My recollection is having no
13  involvement in the drafting of the Agreement
14  and Plan of Merger itself.
15    Q.  Okay.  Which terms did you
16  summarize?
17    A.  As I said before, it was a very
18  general summary, which I recall being a
19  paragraph.  I don't recall the specific content
20  of that paragraph, however.
21    Q.  You don't recall any of the terms
22  within the paragraph, either?
23    A.  No.
24    Q.  What's an S-4?
25    A.  I don't know.

Page 160

1    Q.  So you don't know what the purpose
2  of an S-4 is?
3        MR. FISCHER:  Objection.
4    A.  No.
5    Q.  Let's mark this as the next
6  exhibit.
7        (Plaintiff's Exhibit Number 42
8        was marked for identification.)
9    Q.  Mr. Winstead, the court reporter
10  has handed you what has now been marked as
11  Plaintiff's Deposition Exhibit 42 and I ask you
12  to take a look at that.
13        MS. ROWE:  Mike, this copy appears
14  to be missing a page, KMK 4025.
15        MR. FISCHER:  Yes, and 23, if it
16  matters.
17        MR. BRAUTIGAM:  23?
18        MS. ROWE:  23 and 25.
19        MR. BRAUTIGAM:  I have both of
20  them.  Why don't I go make copies for you?
21        MR. MESH:  Here, let me have it.
22  23 and 25?
23        MR. FISCHER:  Yes, at the end or
24  near the end.
25        MR. MESH:  Is that all?

Page 161

1        MR. FISCHER:  Well, I don't know,
2  but that's all I could see.
3    A.  Okay.  I have taken a very
4  preliminary look at the document.
5    Q.  Have you seen that document
6  before?
7    A.  No.
8    Q.  Okay.  Have you seen the
9  distribution list on the second and third pages
10  before?
11        MS. ROWE:  Objection.
12    A.  To my recollection, no.
13    Q.  Okay.  But you're aware that
14  distribution list exists when you're creating
15  documents having to do with the merger and
16  acquisition, correct?
17        MS. ROWE:  Objection.
18        MR. FISCHER:  Objection.
19    A.  As a general statement,
20  distribution lists are not uncommon.
21    Q.  Okay.  What's the purpose of a
22  distribution list?
23        MS. ROWE:  Objection.
24        MR. FISCHER:  Waste of time.
25    A.  Distribution list is an attachment

Williams & Oliver
(513)683-9626

**Page 162**

1 to a letter simply allowing numerous parties to
2 be included on distribution of a document.
3      Q. Okay. And what's the purpose of
4 including numerous parties on distribution of a
5 document in the merger and acquisitions
6 context?
7      MS. ROWE: Objection.
8      MR. FISCHER: Same objection.
9      A. Those parties have some interest
10 or some curiosity in seeing the document that's
11 being distributed.
12      Q. Okay. And I see Mr. Chris Carey
13 is on the distribution list. What, if
14 anything, did you expect him to do upon receipt
15 of this document?
16      MR. FISCHER: Objection. He
17 didn't send the document --
18      MS. ROWE: Objection.
19      MR. FISCHER: -- so I don't know
20 how he could know what he would be expected to
21 do.
22      A. I don't know -- have any specific
23 information what Mr. Carey would do with
24 respect to this draft document.
25      Q. Okay. Well, do you think it's

**Page 163**

1 reasonable for him to look the draft over and
2 make any changes or directions?
3      MS. ROWE: I'm going to object.
4 And to the extent that it calls for
5 attorney-client information between KMK and
6 Provident, Provident asserts the privilege. Go
7 ahead.
8      A. I don't have any opinion as to
9 what Mr. Carey in his role would do with a
10 draft of this document.
11      Q. Well, if he saw something that was
12 inaccurate, you would expect him to bring it to
13 Mr. Weiss' attention, correct?
14      MR. FISCHER: Objection.
15      MS. ROWE: Objection.
16      A. Again, I would only be guessing as
17 to what Mr. Carey would do in the event he did
18 or did not see any inaccuracy in any particular
19 document, what his procedure would be, who he
20 would call, what actions he would take.
21      Q. Well, Mr. Weiss' letter says, We
22 would appreciate receiving your comments to the
23 form S-4 by Friday, August 20th. Do you see
24 that?
25      A. Yes, I see that.

**Page 164**

1      Q. So if the people react to the
2 document in a way consistent with Mr. Weiss'
3 instruction, you would expect them to make
4 comments, changes, corrections, things like
5 that, and get it back to Mr. Weiss, correct?
6      MS. ROWE: Objection.
7      MR. BUCKLEY: Objection.
8      MR. FISCHER: Objection.
9      A. Again, I don't have any specific
10 knowledge as to what any party on the
11 distribution list would or would not do.
12 Whether these were simply courtesy copies,
13 whether there was specific involvement in any
14 of these parties in the document, I just don't
15 know what -- why these parties are on this
16 distribution list, why this document was
17 distributed to those specific individuals. I
18 just have no knowledge.
19      Q. Do you see the Bates number in the
20 lower right?
21      A. This number?
22      Q. Ending 60?
23      A. KMK 03960?
24      Q. Right.
25      A. Yes.

**Page 165**

1      Q. And does the fact that this has a
2 prefix KMK indicate to you that it came from
3 the files and records of the law firm of
4 Keating, Muething & Klekamp PLL?
5      A. I'm not aware of how documentation
6 for litigation purposes is correlated and
7 stamped. That seems a logical statement on
8 your part, but I don't know that to be a fact.
9      Q. Okay. Does it appear to you from
10 reading this document that Mark Weiss is in
11 charge of finalizing the S-4?
12      MS. ROWE: Objection.
13      MR. FISCHER: Objection.
14      A. Do you mean reading this cover
15 letter or the entire document?
16      Q. The cover letter.
17      A. Based on the two paragraphs of
18 this cover letter -- really two sentences -- I
19 don't have any basis to say whether or --
20 whether or not Mr. Weiss is in charge of
21 finalizing completion of the document.
22      Q. Okay. With respect to Defendant's
23 Exhibit 1, the overall document, okay, could
24 you estimate what role KMK had in the
25 production and completion and finalizing of the

Williams & Oliver
(513)683-9626

Page 166

1  document vis-a-vis the Dinsmore firm? For
2  example, was KMK 50 percent responsible, 80
3  percent?
4        MR. FISCHER: Objection.
5        MS. ROWE: Objection.
6        MR. BUCKLEY: Objection.
7        A.  I have no knowledge beyond what
8  I've testified earlier about the preparation of
9  the proxy statement or whose involvement was
10 required or the extent of any one or more
11 parties' involvement.
12       Q.  Okay. Now, looking at the
13 distribution list on the other document --
14       MR. FISCHER: Are we talking about
15 on Exhibit 42?
16       Q.  Yes.
17       A.  Okay.
18       Q.  Okay. It lists two attorneys for
19 Dinsmore; is that correct?
20       A.  On the second page of the
21 distribution list I see two attorneys listed
22 under the heading Dinsmore & Shohl.
23       Q.  And how many attorneys are listed
24 under the KMK firm?
25       A.  I see five attorneys listed under

Page 167

1  the KMK heading.
2        Q.  Okay. Who is the most senior
3  attorney of those five?
4        A.  By senior, do you mean the person
5  who's been at the firm the longest?
6        Q.  Yes.
7        A.  I believe Mr. Gary Kreider has
8  been at the firm the longest of those attorneys
9  listed.
10       Q.  Do you believe that he was in
11 charge of or had the most responsibility for
12 this M&A?
13       A.  I don't know.
14       MS. ROWE: Objection.
15       Q.  Okay. How about J. David
16 Rosenberg? How long has he been with the firm?
17       A.  I don't know particulars. I
18 believe since the early seventies.
19       Q.  Okay. Was he next in order of
20 seniority?
21       A.  To my knowledge, that's correct.
22       Q.  And I believe Mr. Matthews has
23 been a partner with KMK since 1987; is that
24 correct?
25       A.  To my knowledge, that's correct.

Page 168

1        Q.  Okay. And then Mark Weiss is the
2  next most senior person; is that right?
3        A.  To my knowledge, that's correct.
4        Q.  So Mark Reuter would be the most
5  junior person on this service list?
6        A.  Yes.
7        Q.  Okay. What was Mr. Kreider's role
8  as you understood it with respect to the
9  overall merger and acquisition?
10       MR. FISCHER: Objection.
11       MS. ROWE: Objection.
12       A.  I don't know.
13       Q.  Okay. What was Mr. Rosenberg's
14 role with respect to the overall merger and
15 acquisition?
16       MS. ROWE: Objection.
17       MR. FISCHER: Objection.
18       A.  I don't know.
19       Q.  What was Mr. Matthews' role with
20 respect to the overall merger and acquisition?
21       MR. FISCHER: Same objection.
22       A.  My understanding is Mr. Matthews
23 was working on the Agreement and Plan of
24 Merger.
25       Q.  And aside from you, whose name

Page 169

1  does not appear on the service list, were there
2  any other KMK attorneys who worked with you
3  under Mr. Matthews or anyone else who performed
4  work on this transaction?
5        MR. FISCHER: Objection to form.
6        A.  I don't recall any other attorneys
7  working with me and Mr. Matthews on this
8  transaction.
9        Q.  Okay. Do you recall any other
10 attorneys working on the transaction, even if
11 they didn't work with you or Mr. Matthews, who
12 are not listed here?
13       A.  Based on what I remember from
14 those dates, I don't recall any other attorneys
15 working on this -- on this matter. That
16 doesn't mean other attorneys may not have had a
17 role, I just don't remember working with any
18 other attorneys on this transaction.
19       Q.  But that would be reflected in the
20 billing records of KMK, correct?
21       A.  It would be my assumption that if
22 another attorney had worked on this
23 transaction, they would have billed their time
24 and that would be reflected in the normal
25 course of billing records.

43 (Pages 166 to 169)

Page 170

1  Q. Roughly how many hours did you
2  bill in this merger and acquisition?
3      A. I don't recall --
4          MS. ROWE: Objection to relevance,
5  I don't recall.
6          MR. FISCHER: Objection.
7          MS. ROWE: Sorry, go ahead.
8      Q. Order of magnitude, 50, a hundred?
9          MR. FISCHER: Objection.
10         MS. ROWE: Same objection.
11     A. Again, I don't recall specifics.
12 Order of magnitude would be more or less a
13 guess. More than 25. More than 50.
14     Q. More than 50?
15     A. As -- as I said, I don't recall
16 how many hours I billed in this transaction.
17     Q. Okay. But you think it's likely
18 to be more than 50, correct?
19         MS. ROWE: Objection.
20         MR. FISCHER: Objection.
21     A. No. As a general statement, in
22 the range of 50 would seem reasonable.
23 However, I don't recall the number of hours I
24 worked on this transaction.
25     Q. Okay. Now, aside from writing

Page 171

1  this one-third to one-half page paragraph, what
2  else did you do that encompassed the
3  approximately 50 hours that you worked on this
4  transaction?
5      A. I don't recall specific documents
6  and specific tasking I was requested beyond I
7  do recall the summary of merger agreement that
8  we had discussed before. I don't have specific
9  recollections of any other documents or matters
10 that I attended to in working on this
11 transaction.
12     Q. Who, if anyone, did you consult
13 with as you were writing this summary of merger
14 agreement?
15         MS. ROWE: Objection. To the
16 extent that it calls for revealing
17 attorney-client information between KMK and
18 Provident, Provident asserts the privilege.
19         MR. FISCHER: You can tell him --
20 I think his question was whom. You can discuss
21 with whom you spoke, but you can't discuss what
22 you discussed. Subject to those objections.
23     A. As I stated before, the only
24 recollection I have with respect to this
25 specific document is providing the document to

Page 172

1  Mr. Reuter. However, I don't have any specific
2  recollection of any specific conversations with
3  Mr. Reuter or anyone else regarding preparation
4  of the document.
5      Q. How long did it take you to write
6  your portion of the summary of the merger
7  agreement?
8      A. I don't recall.
9      Q. More than an hour?
10     A. I don't recall.
11     Q. Okay. But the mystery of how you
12 spent your time would be solved by the
13 production of your billing records, correct?
14         MR. FISCHER: Objection.
15         MS. ROWE: Objection.
16     A. I think we discussed before the
17 billing records would normally indicate the
18 day-to-day activities on any particular
19 transaction. I have no recollection of why the
20 billing records for this transaction would be
21 any different.
22     Q. Where did you get the underlying
23 information that you used to write your
24 summary?
25         MR. FISCHER: To the extent that

Page 173

1  you got it from documents and things, you can
2  disclose that. To the extent it's from
3  communications with clients or from
4  conversations with the lawyers at KMK, don't
5  disclose that.
6      A. To the best of my recollection,
7  that information came from the Agreement and
8  Plan of Merger.
9      Q. And where did that come from, KM?
10         MR. FISCHER: Same instruction.
11     A. I don't recall what -- how
12 physically -- what source, whether it was off a
13 computer source, whether it was a hard copy of
14 a signed copy of the merger agreement. I
15 simply don't recall what form of -- form of the
16 agreement I used.
17     Q. Did you ever talk to anyone at
18 Dinsmore during your work on this merger?
19     A. Yes.
20     Q. With whom did you speak?
21     A. I recall a telephone conversation
22 with Cliff Roe.
23     Q. Okay. What did you say to Mr. Roe
24 and what did he say to you?
25     A. I don't recall.

44 (Pages 170 to 173)

Page 174

```
1       Q.  What was the general subject
2   matter of the conversation?
3       A.  I don't recall.
4       Q.  Who did Mr. Roe represent in the
5   merger?
6       A.  I understood Mr. Roe represented
7   Oak Hills.
8       Q.  Do you further understand that he
9   represented the Oak Hills directors or Oak
10  Hills as an entity or OHSL?  Could you be more
11  specific?
12          MR. FISCHER:  Objection to form.
13          MR. BUCKLEY:  Objection.
14          MS. ROWE:  Objection.
15      A.  I don't know the technical extent
16  and the specific, quote, unquote, Oak Hill
17  parties that Mr. Roe represented.
18      Q.  When did you have this
19  conversation with Mr. Roe?
20      A.  I don't recall.
21      Q.  Did you call him or did he call
22  you?
23      A.  I don't remember.
24      Q.  Did you ever talk to anyone at
25  OHSL?
```

Page 175

```
1       A.  I don't recall ever speaking to
2   anyone at OHSL directly.
3       Q.  Okay.
4       A.  However, I don't -- the answer is,
5   I don't recall.
6       Q.  Did you have access to OHSL's
7   Board minutes?
8       A.  I don't recall having access to
9   OHSL's Board minutes.
10      Q.  When you say "having access to
11  OHSL Board minutes," do you mean you personally
12  or do you mean the KMK firm?
13          MR. FISCHER:  Objection.
14          MS. ROWE:  Objection.
15          MR. FISCHER:  He's answered your
16  question word for word.
17      A.  Again, I don't have any
18  recollection of having any access or having
19  seen OHSL Board minutes.
20      Q.  Do you know if anyone at KMK was
21  assigned to read OHSL's Board minutes and major
22  committee minutes for let's say the last five
23  years?
24      A.  No.
25      Q.  Is that common in merger and
```

Page 176

```
1   acquisition transactions?
2          MR. FISCHER:  Objection.
3          MR. BUCKLEY:  Objection.
4          MS. ROWE:  Objection.
5       A.  My answer is that it would depend
6   on the circumstances of the particular merger
7   transaction, the extent and what Board minutes
8   would be reviewed.
9       Q.  Isn't it routine that the buyer
10  typically reviews the seller's Board minutes
11  and major committee minutes for the last five
12  years or so?
13          MR. FISCHER:  Objection.
14          MS. ROWE:  Objection.
15      A.  Repeat the question.
16          (Record read by Reporter.)
17          MS. ROWE:  Objection.
18          MR. FISCHER:  Same objection.
19      A.  I'm not aware of any rule of thumb
20  that in a major transaction committee and Board
21  minutes are reviewed for the previous five
22  years in an acquisition.
23      Q.  Are you familiar with the phrase
24  due diligence?
25      A.  Yes.
```

Page 177

```
1       Q.  Briefly describe your view of the
2   due diligence obligations of the buyer in a
3   merger and acquisition such as this.
4          MR. FISCHER:  Objection.
5       A.  The duties with respect to what
6   due diligence is conducted in any particular
7   transaction relate to the nature and
8   circumstances of that transaction.  Whether
9   certain documents are reviewed or not reviewed
10  depends on the intent of the parties ultimately
11  as to the company being acquired.  There are
12  any number of factors that relate to the extent
13  of due diligence.  It can be very variable
14  depending on the nature of the deal or the
15  transaction.
16      Q.  Okay.  What factors were
17  considered in determining the nature of due
18  diligence in this case?
19          MR. FISCHER:  Objection.
20          MS. ROWE:  Objection.
21      A.  I don't know.
22      Q.  Who would know?
23      A.  I don't know.
24      Q.  Do you think Timothy Reuter would
25  be the -- excuse me, Timothy Matthews would be
```

45 (Pages 174 to 177)

Page 178

1  the person most knowledgeable with respect to
2  the parameters of due diligence in this case?
3          MS. ROWE: Objection.
4          MR. FISCHER: Same objection.
5      A. I don't know that.
6      Q. Do you have an opinion on any of
7  the KMK attorneys who might be most
8  knowledgeable with respect to due diligence?
9          MR. FISCHER: Objection to form.
10     A. I don't know the extent of the
11 knowledge of any of the KMK attorneys on this
12 distribution list -- their role or knowledge
13 regarding due diligence.
14     Q. From your approximately 50 hours
15 working on the case, did you form an opinion as
16 to who was in charge of the overall transaction
17 from KMK's point of view?
18         MR. FISCHER: Same objection.
19         MR. BUCKLEY: Objection.
20         MS. ROWE: Objection.
21         MR. FISCHER: Asked about three
22 times now.
23     A. And let me say again, I don't --
24 my testimony here is not that I billed
25 approximately 50 hours on this transaction.

Page 179

1  With regard to your question whether that was a
2  correct order of magnitude, my answer is I
3  believe that's in the correct magnitude, more
4  than say five hours, but I'm not testifying
5  here that I billed in the neighborhood of 50
6  hours on this transaction.
7          I don't recall how much time I
8  billed on this transaction. With respect to
9  your question as to -- I'm not -- I don't know
10 who was overall in charge of this transaction
11 from the point of view of the law firm KMK.
12     Q. During the time you worked on the
13 transaction, did you ever speak to anyone at
14 Provident?
15         MR. FISCHER: Again, don't
16 disclose what you discussed. He's asking the
17 question, did you speak with anyone at
18 Provident.
19     A. I recall that I may have had
20 conversations with Mark Magee. However, I
21 don't recall any specific conversations.
22     Q. When you spoke to Mr. Magee, were
23 you providing him with legal advice?
24     A. Again, I don't recall the specific
25 context of the conversation with Mark Magee.

Page 180

1  Even as to the extent as regarding this
2  transaction. I do recall having conversations
3  with Mr. Magee in this time period.
4          MR. FISCHER: Again, don't
5  disclose the content of those discussions,
6  unless it was for social reasons.
7      A. And none of those conversations to
8  my recollection were for social or other
9  purposes -- casual purposes.
10     Q. Okay. Can I direct your attention
11 to Exhibit 42, page five?
12     A. It would be the heading Summary?
13     Q. Right. And in the right-hand
14 column, it says Reasons for the Acquisition.
15 Do you see that?
16     A. Yes.
17     Q. And it says in brackets, To be
18 provided by OHSL. Do you see that?
19     A. I see that on the page.
20     Q. Okay. Now, does that suggest to
21 you that KMK has this document on its computer
22 system and will receive this information from
23 OHSL?
24         MS. ROWE: Objection.
25         MR. FISCHER: Objection.

Page 181

1      A. The fact that this has in brackets
2  To be provided by OHSL doesn't allow me -- give
3  me enough basis to make an assumption as to
4  whose computer system this document was on.
5      Q. Okay. This is a draft of an S-4,
6  correct?
7      A. It appears to be a draft of an
8  S-4.
9      Q. And the date is August 17th, 1999,
10 correct?
11     A. I'm sorry, where are you seeing
12 that date at?
13     Q. The next page.
14     A. Yes. The document in front of me
15 says draft, dated August 17th, 1999.
16     Q. And it appears to have come from
17 the books and records of KMK, correct?
18     A. The document you provided to me
19 has a cover letter from Mark Weiss labeled re:
20 form S-4. Attached is the draft form S-4.
21     Q. And the S-4 is a document that's
22 known as a public document that is filed with
23 the SEC, correct?
24         MS. ROWE: Objection.
25         MR. FISCHER: Objection.

46 (Pages 178 to 181)

Page 182

1      A.  My understanding is that this
2  document would be filed with the SEC.
3      Q.  And once it's filed with the SEC,
4  it becomes a public document, correct?
5      A.  I'm not sure what you mean by the
6  term "public document."
7      Q.  You don't know what a public
8  document is in this context?
9      A.  In the context that it's available
10 on the public record?
11     Q.  Yes.
12     A.  Yes.  In that context I would
13 understand this to be a public document.
14     Q.  Okay.  Now, let's look at the
15 Recommendation to Stockholders on page five of
16 the draft S-4.  Do you see that?  It's right
17 under the Reasons for the Acquisition.
18     A.  You said Recommendation to
19 Stockholders?
20     Q.  Yes.
21     A.  Yes, I see that on the document in
22 front of me.
23     Q.  Right.  And that single sentence
24 refers to the OHSL Board of Directors
25 unanimously recommending that OHSL stockholders

Page 183

1  approve the merger, correct?
2      A.  The sentence under that heading
3  says, The OHSL Board of Directors unanimously
4  recommends that the OHSL stockholders approve
5  and adopt the agreement at the special
6  stockholders meeting so that the acquisition
7  can be completed, period.
8      Q.  Where did the phrase "unanimously
9  recommends" come from in that sentence?
10         MR. FISCHER:  Objection.
11         MS. ROWE:  Objection.
12     A.  I don't know.
13     Q.  Did KMK do anything to check the
14 veracity of that statement?
15         MS. ROWE:  Objection.
16         MR. FISCHER:  Same objection.
17     A.  I don't know.
18     Q.  Do you have an opinion as to which
19 KMK attorney was tasked with checking the
20 veracity of information that came from OHSL?
21         MR. FISCHER:  Objection.
22     A.  I do not have knowledge or an
23 opinion as to which attorney was checking the
24 veracity of information provided by OHSL's
25 counsel.

Page 184

1      Q.  Was it important that information
2  provided by OHSL's counsel be checked?
3         MS. ROWE:  Objection.
4         MR. FISCHER:  Objection.
5      A.  I don't recall any specific
6  discussions or considerations regarding
7  confirming the accuracy of information provided
8  in this transaction.
9      Q.  That wasn't my question.  Was it
10 important that the information provided by OHSL
11 and/or their counsel be checked for its
12 truthfulness?
13         MR. FISCHER:  Objection.
14         MS. ROWE:  Objection.
15     A.  I'm sorry.  I'm a little unclear
16 as to -- you're asking was it important that
17 the information be confirmed?
18     Q.  Well, yeah.  My phrase was checked
19 for its truthfulness, but yeah, that's the
20 idea.  And do you have an answer to that
21 question?
22         MR. FISCHER:  Same objection.
23         MS. ROWE:  Same objection.
24     A.  Again, I don't know why there
25 would be any particular reason to feel

Page 185

1  important -- or feel the information needed to
2  be confirmed or not confirmed.
3      Q.  So as you sit here today, you
4  don't believe that it was important to check
5  the information that was provided by OHSL
6  and/or their counsel?
7         MR. FISCHER:  Objection.  That's
8  not what he said.
9         MS. ROWE:  Objection.  Misstates
10 testimony.
11         MR. FISCHER:  Misstates testimony,
12 and you're arguing with the witness.
13     Q.  Mr. Winstead, I don't want to
14 misstate your testimony and I certainly don't
15 mean to argue with you, so if I have misstated
16 your testimony, please correct it at this time.
17         MR. FISCHER:  Objection.  I
18 don't -- I don't know what the question is.
19     A.  Again, I'm not trying to dance
20 around your question, I just don't -- in the
21 context of your asking me is it important to
22 verify the information given, I need more
23 specifics as to what information would be
24 confirmed, what -- how that would be confirmed,
25 the specific context.  You're talking about if

47 (Pages 182 to 185)

**Page 186**

1 someone gave a fax number that was to be
2 included in the document, would that -- would
3 two attorneys check that. I don't know, it
4 would depend on the circumstances. So I can't
5 give you a general answer whether it was
6 important to confirm the information provided.
7    Q.  Okay.  Let me see if I can back
8 up.  Defendant's Exhibit 1, the proxy materials
9 and registration statement.  I think we've
10 established earlier that I believe it's a joint
11 document and you're not sure, correct?
12       MR. FISCHER:  Objection.  It's
13 irrelevant what you believe.
14    A.  I recall my testimony was I don't
15 know if that was a joint document.
16    Q.  Okay.  But you would agree with
17 me, would you not, that the information
18 contained in Defendant's Exhibit 1 came in part
19 from Provident and came in part from OHSL
20 and/or their counsel?  Correct?
21    A.  That would be my understanding as
22 to how this document -- this type of document
23 would be prepared.
24    Q.  Right.  And we talked earlier
25 about whether the document should be truthful,

**Page 187**

1 complete and accurate.  You remember that
2 testimony generally, correct?
3       MR. FISCHER:  Objection.
4    A.  I remember general questions and
5 answers regarding materiality, truthfulness,
6 completeness, yes.
7    Q.  Okay.  And Provident, because of
8 its -- well, KMK, because of its continuing
9 ongoing relationship with Provident, knows a
10 lot about Provident, correct?
11       MR. FISCHER:  Objection.
12       MS. ROWE:  Objection.
13       MR. FISCHER:  Knows a lot?
14    A.  Provident is a client of the bank.
15 Obviously attorneys know a great deal about
16 their clients.
17    Q.  Right.  And you probably have
18 templates on your computer systems about
19 Provident taking over smaller institutions
20 because Provident has done that in the past
21 couple of years, correct?
22       MS. ROWE:  Objection.
23       MR. FISCHER:  Objection.
24       THE WITNESS:  Again, I don't know
25 if --

**Page 188**

1       MR. FISCHER:  You don't --
2       THE WITNESS:  -- you really want
3 to go down that road or not.
4       MR. FISCHER:  Don't discuss the
5 names of other customers, clients.  Do not
6 discuss any specifics about the representation
7 or communications with Provident.  Do you need
8 to confer on an issue of privilege to respond
9 to that question?  Don't discuss it out loud,
10 but just tell me yes or no if it's a question
11 of privilege.  If it's not --
12       THE WITNESS:  I just had a quick
13 question.
14       MR. FISCHER:  Okay.
15       MR. BRAUTIGAM:  I'll leave the
16 room.
17       (Brief recess.)
18 BY MR. BRAUTIGAM:
19    Q.  Mr. Winstead, we took a short
20 break from this deposition so you could confer
21 with your counsel on the issue of privilege.
22 Is that correct?
23    A.  Yes.
24    Q.  And do you have an answer for the
25 question now?

**Page 189**

1       MR. FISCHER:  I'm instructing him
2 not to answer that question.
3       MR. BRAUTIGAM:  Okay.  And the
4 grounds?
5       MR. FISCHER:  Privilege.
6       MR. BRAUTIGAM:  What type of
7 privilege?
8       MR. FISCHER:  What type?
9 Communications with clients.
10       MR. BRAUTIGAM:  Okay.  I have
11 no --
12       MS. ROWE:  I have the same
13 instruction to the extent it calls for --
14       MR. FISCHER:  And there's work
15 product, both.
16       MS. ROWE:  Yes.  At least to the
17 extent it calls for attorney-client information
18 between KMK and Provident, then Provident
19 asserts the privilege.  To the extent that the
20 question calls for information about other
21 clients --
22       MR. FISCHER:  I'm objecting to
23 that.
24       MR. BRAUTIGAM:  Just so we're
25 clear, Mr. Fischer is objecting and instructing

Page 190

```
 1   the witness not to answer on one basis and Ms.
 2   Rowe is instructing the witness not to answer
 3   on another basis?
 4          MS. ROWE:  No.  I have no
 5   authority to instruct the witness not to
 6   answer.  What I am doing is asserting
 7   attorney-client privilege on behalf of
 8   Provident.  If I said instructing not to
 9   answer, I misspoke.
10          I simply am asserting
11   attorney-client privilege on behalf of
12   Provident to the extent that the question
13   called for Mr. Winstead to reveal
14   attorney-client information about Provident
15   Bank.
16   BY MR. BRAUTIGAM:
17       Q.  Mr. Winstead, during the time you
18   conferred with Mr. Fischer, the other attorneys
19   left the room; is that correct?
20       A.  Yes.
21       Q.  And that included Ms. Rowe; is
22   that correct?
23       A.  Yes.
24       Q.  And did Ms. Rowe leave the room so
25   as not to destroy the privilege that you claim
```

Page 191

```
 1   to have with Mr. Fischer as your counsel?
 2          MR. FISCHER:  Objection.
 3          MS. ROWE:  Objection.
 4       A.  I don't know why Ms. Rowe left the
 5   room.
 6       Q.  Okay.  Is that your impression
 7   that Ms. Rowe left the room for that reason?
 8          MR. FISCHER:  Objection.
 9       A.  I don't have any impression or
10   information why Ms. Rowe would need to leave
11   the room or not leave the room.
12       Q.  Okay.  Well, this gentleman left
13   the room as well, representing the Dinsmore
14   defendants, correct?
15       A.  He left the room.
16       Q.  Okay.  And do you have any reason
17   why he left the room?
18       A.  I have no reason to know that --
19   who needed to leave the room or who needed to
20   stay in the room to preserve the
21   attorney-client privilege.
22       Q.  Well, as a general matter, isn't
23   the attorney-client privilege destroyed by the
24   presence of outsiders?
25          MR. FISCHER:  Objection.
```

Page 192

```
 1       A.  I don't know that to be the rule.
 2       Q.  Okay.  What is your understanding
 3   of the attorney-client privilege?
 4          MS. ROWE:  Objection.
 5          MR. FISCHER:  Objection.  Waste of
 6   time.
 7       A.  My understanding is a technical
 8   rule of which I'm not knowledgeable of specific
 9   -- for lack of a better term -- sub rules or
10   subcategories of when the attorney-client
11   privilege applies, what parties may or may not
12   be present, the general ruling of most
13   information communicated between an attorney
14   and their clients is privileged, not subject to
15   discovery.
16          Beyond that, I don't have
17   specifics as to when or under any particular
18   set of civil rules of procedure, what acts are
19   required, what formalities are required, what
20   mechanics are required to preserve or implement
21   the attorney-client privilege.
22       Q.  Well, don't you have to have more
23   of an understanding than that in order to do
24   your job as an attorney?
25          MR. FISCHER:  Objection.
```

Page 193

```
 1          MS. ROWE:  Objection.
 2       A.  I've never had to --
 3          MR. FISCHER:  Again, arguing with
 4   the witness.  If this continues -- it needs to
 5   stop.
 6       A.  Beyond the general answer I gave
 7   you, I've not had a requirement in my practice
 8   to use or have available with knowledge of the
 9   attorney-client privilege.
10       Q.  Mr. Winstead, do you think I was
11   arguing with you earlier?
12          MR. FISCHER:  Objection.
13          MS. ROWE:  Objection.
14       A.  What do you -- when was earlier?
15       Q.  Do you think I was arguing with
16   you at any time during your deposition?
17          MS. ROWE:  Objection.
18          MR. FISCHER:  Objection.
19       A.  Yes.
20       Q.  Okay.  When?
21          MR. FISCHER:  Objection.  Arguing
22   with the witness.
23          MS. ROWE:  Same objection.
24          MR. FISCHER:  Spending time
25   arguing with the witness.  Let's move on.
```

49 (Pages 190 to 193)

Page 194

1     A.  My specific recollection of your
2  arguing with me regarding certain questions, I
3  believe you were trying to elicit a different
4  answer or more information from me. I would
5  have to review the transcript to pinpoint
6  specific instances.
7     Q.  Okay. We were talking earlier
8  about how the proxy materials, registration
9  statement was a joint document. Do you
10  remember that?
11     MR. BUCKLEY: Objection.
12     MS. ROWE: Objection.
13     MR. FISCHER: Objection.
14     A.  I remember a discussion regarding
15  you considered it a joint document. My answer
16  was that I did not know that it would be a
17  joint document.
18     Q.  Okay. And my question was then,
19  how did you verify information from Provident?
20     MS. ROWE: Objection.
21     MR. FISCHER: Objection. Again,
22  don't --
23     A.  I don't understand that --
24     MR. FISCHER: -- disclose
25  communications with the client.

Page 195

1     A.  I don't understand the question to
2  the extent I don't know what information you're
3  talking about verifying.
4     Q.  Let's talk about Provident
5  approving the transaction. Presumably the
6  Provident Board voted to acquire Oak Hills; is
7  that correct?
8     MR. FISCHER: Objection.
9     MS. ROWE: Objection.
10     A.  Again, I don't have any specific
11  knowledge of the vote of the Provident Board
12  beyond the information presented in the proxy
13  statements and drafts of proxy statements
14  before me.
15     Q.  Right. And how is the information
16  presented in the proxy statements and in the
17  draft of proxy statements verified?
18     MR. FISCHER: Objection.
19     MS. ROWE: Objection.
20     MR. FISCHER: He's already
21  testified he didn't work on it. You're asking
22  him to speculate and guess and we've been doing
23  this for hours. I object to this continued
24  harassment.
25     A.  Again, I do not know how this

Page 196

1  proxy statement or proxy statements in general,
2  the information is collected, correlated and
3  the final proxy statement produced. I don't
4  know that with respect to the proxy statement
5  in this matter or proxy statements in general.
6  Any answer I would give would just be
7  conjecture on my part and assumptions on my
8  part.
9     Q.  Are you familiar with something
10  known as the Unitog transaction?
11     A.  No.
12     Q.  Did KMK ever work on a transaction
13  involving the Bank of Leipzig?
14     A.  I don't know.
15     Q.  Did any attorneys from KMK ever
16  attend Provident Board meetings with respect to
17  this merger?
18     A.  With respect to the Unitog merger?
19     Q.  No. With respect to this merger
20  between Oak Hills and Provident?
21     A.  I don't know.
22     MR. BRAUTIGAM: Okay. Let's take
23  a short break. I want to review my notes and
24  documents.
25     (Brief recess.)

Page 197

1  BY MR. BRAUTIGAM:
2     Q.  Mr. Winstead, was it necessary for
3  someone at KMK to form an opinion with respect
4  to OHSL's directors?
5     MR. FISCHER: Objection to the
6  form.
7     MS. ROWE: Objection. Opinions
8  about what?
9     A.  I don't understand the question.
10     Q.  Okay. As part of the due
11  diligence process, was someone at KMK or KMK
12  collectively required to form an opinion as to
13  the competence, expertise, sophistication of
14  OHSL's directors?
15     MS. ROWE: Objection.
16     MR. FISCHER: Objection.
17     A.  I don't know.
18     MR. BRAUTIGAM: Okay. I'd like to
19  inquire with respect to what Mr. Fischer said I
20  could inquire into earlier when we got back
21  from lunch.
22     MR. FISCHER: Right.
23     MR. BRAUTIGAM: And I have to say
24  frankly, I didn't understand what you said. So
25  I'm interested in the content of discussions in

Williams & Oliver
(513) 683-9626

Page 198

1  this five hour meeting that --
2      MR. FISCHER: Objection. He did
3  not say five hour meeting. He said less than
4  five hours.
5      MR. BRAUTIGAM: Okay.
6      MR. FISCHER: And he said yes.
7      MR. BRAUTIGAM: Well, that's the
8  meeting that I'm interested in talking about.
9      MR. FISCHER: Yes.
10     MR. BRAUTIGAM: Is it now your
11 position that I can inquire as to what happened
12 at that meeting?
13     MR. FISCHER: I think the problem
14 may have been a miscommunication, based upon
15 the fact I think your questions were to Mr.
16 Winstead whether or not I represented him and
17 he answered yes, which was correct. As he also
18 has testified, I'm counsel to the firm.
19     This was a meeting because, I
20 believe, you or somebody asked for a deposition
21 of people of the firm and thus the privilege
22 would apply to KMK for that meeting and not to
23 Provident. Provident's privilege would be in
24 regard to rendition of legal services to them.
25     I was conducting that meeting as

Page 199

1  counsel to the firm. In that context, and
2  without waiving any other privilege, I'm
3  willing to let you ask him questions about that
4  meeting.
5  BY MR. BRAUTIGAM:
6      Q. Okay. Great. Do you have this
7  meeting in mind?
8      A. Presently, yes.
9      Q. Okay. And if I remember
10 correctly, you were at the meeting along with
11 Mr. Matthews, Mr. Reuter, Mr. Weiss, Mr.
12 Fischer, Mr. Burke and Ms. Rowe. Is that
13 correct?
14     A. That's my recollection.
15     Q. Okay. Who called the meeting?
16     A. My recollection is that Mr.
17 Fischer called the meeting.
18     Q. Okay. And what was the purpose of
19 the meeting?
20     MR. FISCHER: To your knowledge.
21     A. My understanding and knowledge was
22 it was to inform certain attorneys at KMK that
23 the request had been made that we give
24 depositions as witnesses in the matter -- this
25 matter.

Page 200

1      Q. How did you first learn that your
2  testimony was sought in this case?
3      A. At that meeting. Or it may have
4  been an e-mail from Mr. Fischer regarding the
5  meeting that referenced the purpose of the
6  meeting.
7      Q. You did not know that this was the
8  subject of motion practice?
9      MR. FISCHER: Objection. Do you
10 understand what motion practice is?
11     A. No.
12     Q. Okay. You did not know before
13 this meeting that this was the subject of a
14 discovery dispute, a fight between KMK firm and
15 me with respect to whether or not we get your
16 deposition and depositions of other KMK
17 attorneys?
18     MR. FISCHER: Objection to the
19 form. Go ahead.
20     A. No. I didn't have any knowledge
21 regarding the dispute or the ongoing nature of
22 when or -- the disputed nature of our testimony
23 here -- my testimony here today.
24     Q. Okay. Until today you've never
25 seen any filings in the Thiemann or the Meier

Page 201

1  case. Is that correct?
2      MR. FISCHER: When you -- just to
3  clarify, when you say filings, you're talking
4  about pleadings filed in the court?
5      Q. Yes.
6      A. Other than the subpoena that was
7  delivered regarding my appearance here today, I
8  don't recall seeing any, any filings or motions
9  or any documents regarding this ongoing
10 litigation matter.
11     Q. Well, you did get the witness fee,
12 right?
13     A. Yes.
14     MR. FISCHER: That's not a filing.
15     Q. Okay. Well, he said other
16 documents as well. Neither is a subpoena.
17     Okay. When did this meeting take
18 place?
19     A. I don't recall specifics. To the
20 best of my recollection, July of 2003.
21     Q. Was this during a weekday?
22     A. Yes.
23     Q. And who said what at the meeting?
24     A. My recollection is that Mr.
25 Fischer introduced himself as -- in his role as

Page 202

1  counsel with KMK, counsel to the firm. Again,
2  just some general statements as to this
3  litigation that we were -- that certain
4  attorneys were being asked to appear as
5  witnesses in this -- in this matter.
6      I seem to recall we -- giving very
7  brief around the table as to what we were --
8  what we -- what our involvement was in the
9  transaction. And then Mr. Fischer and I left
10 for a separate meeting just between us.
11     Q.  Okay. During this meeting, you --
12     MR. FISCHER:  Again, we're talking
13 about the meeting with everybody.
14     MR. BRAUTIGAM:  Yes.
15     MR. FISCHER:  Not the separate
16 one.
17     MR. BRAUTIGAM:  Not the separate
18 one. We're not there yet.
19     MR. FISCHER:  Okay.
20 BY MR. BRAUTIGAM:
21     Q.  During the meeting, you said that
22 Mr. Fischer essentially introduced himself as
23 counsel for KMK; is that right?
24     A.  Yes. The meeting was held under
25 the auspices of Mr. Fischer in his role -- as

Page 203

1  opposed to his role as a litigation partner in
2  the firm, and his role as counsel to the firm.
3      Q.  Did Mr. Burke and Ms. Rowe
4  introduce themselves and state what their role
5  was vis-a-vis Mr. Fischer?
6      A.  I don't recall any specific
7  introductions or characterizations by either
8  Mr. Burke or Mr. Rowe.
9      MR. FISCHER:  Ms. Rowe.
10     A.  Ms. Rowe, I'm sorry, it's the
11 second time I've said that -- regarding their
12 role.
13     Q.  Did you have an understanding as
14 to -- about the time of this meeting, as to
15 what their role is in this litigation?
16     A.  Yes.
17     Q.  What is your understanding of
18 their role?
19     A.  They represent Provident in this
20 litigation matter.
21     Q.  Okay. Is it your understanding
22 that they represent anyone else in the
23 litigation?
24     MS. ROWE:  Objection.
25     A.  I don't know the extent of their

Page 204

1  representation.
2      Q.  Have they ever represented KMK in
3  the litigation?
4      A.  I don't know. To my knowledge,
5  no, but I don't know the answer to that.
6      Q.  Okay. You also said that Mr.
7  Fischer made some general statements regarding
8  the litigation. With as much specificity as
9  you can recall, please tell me what Mr. Fischer
10 said.
11     A.  I have -- I don't recall specific
12 language or specific comments. It was
13 generally a discussion, presentation regarding
14 your request that we appear as witnesses,
15 certain discussion about, in a very general
16 nature, as to the reasons that we would be
17 required to testify as witnesses.
18     I seem to recall some discussion
19 that -- regarding when that would be, requests
20 for when our availability would be to come in.
21 There was some discussion, as I recall, as to
22 when -- whether it would be at KMK's office or
23 whether we would come to your office, maybe
24 some discussion as to whether we would be
25 subpoenaed or not. That may have been a

Page 205

1  separate conversation.
2      MR. FISCHER:  Don't discuss any
3  separate conversations, just the one that we're
4  talking about.
5      A.  That's the extent of that -- of
6  the general meeting with all of the parties
7  that I referenced before.
8      Q.  Okay. What did Mr. Fischer say
9  with respect to why you might be called to
10 testify?
11     A.  My recollection is that we are
12 providing testimony as factual witnesses as to
13 what we -- the tasking that we did with respect
14 to the merger.
15     Q.  And the only way that the
16 plaintiffs would be able to get testimony of
17 what KMK did regarding the merger would be
18 through the testimony of KMK attorneys,
19 correct?
20     MR. FISCHER:  Objection.
21     MS. ROWE:  Objection.
22     A.  I don't know.
23     MR. FISCHER:  Do you know the
24 answer to that?
25     A.  I don't know that.

52 (Pages 202 to 205)

**Page 206**

1    MR. FISCHER: Okay.
2    Q. Can you think of any other way the
3    plaintiffs and the Dinsmore defendants could
4    get information with respect to what KMK
5    attorneys did during the merger, other than by
6    asking KMK attorneys at depositions and later
7    at trial?
8    MR. FISCHER: Objection.
9    Relevance, waste of time. There's no proof
10   that we'll be testifying at trial.
11   A. I'm not sure I understand your
12   question, but if your question is what specific
13   acts KMK attorneys did or -- did during this
14   transaction, it would appear through the
15   process of discovery of documents KMK
16   attorneys' names appear on certain documents.
17   That would seem to be a way to gather
18   information regarding what role specific KMK
19   attorneys provided. I'm not sure of the
20   specific tools available to you through the
21   civil rules to obtain additional information --
22   additional discovery information.
23   Q. Right. And does it seem logical
24   to you that the plaintiffs would seek the
25   testimony of KMK attorneys to explain what they

**Page 207**

1    did with respect to various documents?
2    MR. FISCHER: Objection.
3    MS. ROWE: Objection. This is a
4    fact witness.
5    MR. FISCHER: This is supposedly a
6    fact witness, according to your own motions.
7    And you're asking him for opinions, logical --
8    or in my mind, illogical conclusions, baseless
9    questions. If you understand what he's asking,
10   go ahead. Otherwise we're going to call for
11   the magistrate, because this is ridiculous.
12   MR. BRAUTIGAM: Pat, we're doing
13   fine without your speaking objections.
14   MR. FISCHER: No, it's not a
15   speaking objection. I need to make a record so
16   that when we go to the magistrate we can put an
17   end to this.
18   MR. BRAUTIGAM: We're doing fine
19   without speaking objections. If you say the
20   word objection, that suffices. Now, I know
21   it's getting towards the end of the day, you're
22   obviously angry, but please --
23   MR. FISCHER: I'm not angry.
24   We're wasting time. Very inefficient, very
25   poor questions.

**Page 208**

1    MR. BRAUTIGAM: I do the best I
2    can, Pat.
3    MR. FISCHER: Still wasting time.
4    THE WITNESS: Can you repeat the
5    question, please?
6    (Record read by Reporter.)
7    MS. ROWE: Objection.
8    MR. FISCHER: Objection. He
9    doesn't represent the plaintiffs.
10   A. I don't know if it's logical or
11   illogical. I don't have an answer.
12   BY MR. BRAUTIGAM:
13   Q. Okay. Getting back to this
14   meeting, the initial meeting with everyone
15   present, can you remember anything else that
16   Mr. Fischer said to begin the meeting?
17   MR. FISCHER: Objection. Asked
18   and answered.
19   A. I don't remember his specific
20   comments or any specific opening remarks.
21   Q. Okay. Did Mr. Burke say anything
22   at this point in the meeting?
23   A. I don't recall any specific
24   comments Mr. Burke made at this meeting.
25   Q. Do you recall -- did he say

**Page 209**

1    anything generally?
2    A. I don't recall any comments from
3    Mr. Burke at this meeting.
4    Q. Did Ms. Rowe say anything at the
5    meeting?
6    A. I don't recall any specific
7    conversation directed to me or with me. She
8    may have made comments through the meeting or
9    at the end of the meeting.
10   Q. Okay. What do you remember Ms.
11   Rowe saying at this meeting?
12   A. I don't recall Miss Rowe's
13   specific comments. I do recall they weren't
14   specifically directed to me.
15   Q. Okay. Do you recall generally
16   what Ms. Rowe said?
17   A. No.
18   Q. Do you recall who her comments
19   were directed to?
20   A. No.
21   Q. Was Ms. Rowe taking notes during
22   the meeting?
23   A. I don't recall.
24   Q. Was Mr. Burke taking notes during
25   the meeting?

53 (Pages 206 to 209)

Page 210

1      A.  I don't recall.
2      Q.  Were you taking notes during the
3  meeting?
4      A.  I recall having a notepad.  I
5  don't recall taking any notes, however.
6      Q.  Did Mr. Kreider take any notes
7  during the meeting?
8      MR. FISCHER:  Objection.  No proof
9  he was there.
10      Q.  Was Mr. Kreider at the meeting?
11      A.  To my recollection, no, Mr.
12  Kreider was not.
13      Q.  Okay.  Was Mr. Matthews taking
14  notes at the meeting?
15      A.  I don't recall.
16      Q.  Was Mr. Reuter taking notes at the
17  meeting?
18      A.  I don't recall.
19      Q.  Was Mr. Weiss taking notes at the
20  meeting?
21      A.  I don't recall.
22      Q.  Okay.  You mentioned that the
23  meeting shifted from Mr. Fischer's introductory
24  remarks to the four KMK attorneys who I
25  mentioned, yourself, Mr. Matthews, Mr. Reuter

Page 211

1  and Mr. Weiss, going around the table and
2  talking about their involvement in the
3  transaction.  Is that a fair summary of your
4  testimony?
5      MR. FISCHER:  Objection.
6      A.  I'm not sure that's a fair
7  chronological description, but as a general
8  statement, my recollection is the attorneys you
9  mentioned, Mr. Matthews, Mr. Weiss, Mr. Reuter
10  and myself, gave a brief summary of what our
11  involvement was with the transaction, to the
12  best of our recollection.
13      Q.  Okay.  What did you say in your
14  brief summary?
15      A.  My recollection is that I stated
16  that after four years, I had very little memory
17  or recollection of any specifics of the
18  transaction.  I recall that I may have
19  mentioned that Tim Matthews had asked me to
20  help him with this transaction.  The only thing
21  that sticks in my mind from this meeting was my
22  statement that I just simply didn't remember
23  very much from the transaction four years ago,
24  specifically events and details of this
25  specific transaction.

Page 212

1      Q.  Okay.  Who spoke next?
2      MR. FISCHER: Objection.
3      A.  I don't recall.
4      Q.  Okay.  What did Mr. Matthews say?
5      A.  I don't remember the specific
6  content of Mr. Matthews' statements.  I recall
7  Mr. Matthews mentioning his involvement was
8  focused on the merger agreements.
9      Q.  Okay.  Was Mr. Burke writing any
10  of this stuff down?
11      A.  I don't recall.
12      Q.  Did he have a legal pad in front
13  of him?
14      A.  I don't recall.
15      Q.  Okay.  Who spoke after Mr.
16  Matthews?
17      A.  I don't recall.
18      Q.  Okay.  What did Mr. Reuter say?
19      A.  I don't recall Mr. Reuter's
20  specific comments.
21      Q.  Do you recall it generally?
22      A.  I don't recall Mr. Reuter's
23  general or specific comments.
24      Q.  Okay.  What did Mr. Weiss say at
25  this meeting?

Page 213

1      A.  I don't recall Mr. Weiss' specific
2  comments.  Again, I don't recall his specific
3  comments.  At some point one of the KMK
4  attorneys, and I don't remember who it was, may
5  have mentioned -- may have asked how much time
6  the depositions would take as far as whether
7  two hours or four hours or those kind of
8  questions.  I don't remember which KMK
9  attorneys made those comments.
10      Q.  What happened next in this
11  meeting?
12      A.  The -- I think one of the final
13  comments was that I would be -- was tagged to
14  be the initial attorney to provide testimony
15  Then Mr. Fischer and I went separately to
16  discuss some specifics.
17      Q.  Did the general meeting reconvene
18  at some point?
19      A.  No.
20      Q.  Was there any mention of the fact
21  that KMK itself had been sued based on its
22  representation in the OHSL-Provident merger?
23      MR. FISCHER:  Objection.  I don't
24  recall any specific comments regarding KMK
25  being a party to any lawsuit.



**Page 214**

1    Q. You didn't know that until today.
2  Is that your testimony?
3    A. I don't have any recollection of
4  KMK being named a party to the lawsuit you
5  presented to me earlier, or KMK being a party
6  to any litigation -- being a party to any court
7  proceeding related to this matter.
8    Q. Did the other attorneys at the
9  meeting appear to understand that KMK had, in
10  fact, been named as a defendant in the Meier
11  action?
12    MR. FISCHER: Objection.
13    MS. ROWE: Objection.
14    MR. FISCHER: Objection. Silly
15  question.
16    A. I don't have any recollection of
17  discussions or acknowledgments of what -- what
18  the various roles of parties were or were not.
19    Q. So you never spoke to the attorney
20  that's representing KMK in the Meier action; is
21  that correct?
22    MR. FISCHER: Objection.
23    A. To my knowledge, no.
24    Q. Okay. Since November of 1999,
25  have you ever spoken to Mr. Burke about any

**Page 215**

1  litigation arising from the OHSL-Provident
2  merger?
3    MR. FISCHER: Objection.
4    A. Read the question again.
5    (Record read by Reporter.)
6    MR. FISCHER: Objection. Calls
7  for privileged, work product doctrine protected
8  information. Don't answer that question.
9    Q. Since November of 1999, have you
10  ever spoken with Ms. Rowe about anything
11  related to the OHSL-Provident litigation?
12    MR. FISCHER: Same instruction.
13    Q. Did you ever consider Mr. Burke or
14  Ms. Rowe or anyone at KMK, other than Mr.
15  Fischer and Mr. Gilligan, to be your attorneys
16  in litigation or potential litigation involving
17  the OHSL-Provident merger?
18    A. I have a very limited factual
19  understanding and knowledge of the -- of the
20  litigation, KMK's involvement in the
21  litigation. As a general statement, Mr.
22  Fischer and Mr. Gilligan as a general course of
23  business at KMK are the attorneys when there is
24  a question as to an attorney -- an attorney and
25  his role as an attorney at KMK perhaps needing

**Page 216**

1  legal representation.
2    However, I don't have any specific
3  knowledge regarding this specific litigation to
4  know whether Mr. Burke or Ms. Rowe would be
5  considered my attorneys or not my attorneys.
6    Q. So you never considered them to be
7  your attorneys at any point up to and including
8  today?
9    MR. FISCHER: Objection.
10    A. No. I think the answer is, I
11  didn't know if they could be construed as my
12  attorneys or not my attorneys.
13    Q. So you thought that they might
14  possibly be your attorneys, correct?
15    MR. FISCHER: Objection.
16    A. Again my answer is, I don't know
17  under any -- under what particular context they
18  could be construed as my attorneys or not my
19  attorneys.
20    Q. Did you ever consider Mr. Burke,
21  Ms. Rowe or Mr. Ramsey or anyone on the KMK
22  litigation defense team to be your attorneys?
23    A. Mr. Fischer identified himself as
24  the attorney who would be representing me at
25  this deposition. And I've never had any

**Page 217**

1  discussion with Mr. Burke or Ms. Rowe as to --
2  as to any role they would play regarding
3  representation of me or any other party. I'm
4  trying to be specific, so I had no -- no basis
5  to think whether they were my attorneys or not
6  my attorneys at any point going forward.
7    MR. BRAUTIGAM: Pat, I'd like you
8  to reconsider your previous instructions along
9  the following lines. I'd like to ask him about
10  conversations that he may or may not have had
11  with Mr. Burke, Ms. Rowe and Mr. Ramsey. And I
12  think it would be appropriate for me to say
13  have you had a conversation, he can answer yes
14  or no.
15    How many times, how long did these
16  conversations take, not getting into the
17  substance. I want to make it clear that I
18  disagree with your assertion for purposes, but
19  for the purposes of what remains of this
20  deposition, I think that those are appropriate
21  questions.
22    MR. FISCHER: You all stay, it's
23  just the two of us, we'll leave the documents.
24    MS. ROWE: Since that's on the
25  record, are you going to respond to the record,

Williams & Oliver
(513)683-9626

Page 218

1  because on behalf of Provident, I guess I would
2  like to respond.
3       MR. FISCHER: Go ahead.
4       MS. ROWE: The position of
5  privilege vis-a-vis KMK and Provident I think
6  is clear and undisputed. I'd like the record
7  to reflect that Mr. Brautigam is laughing at my
8  statement.
9       MR. BRAUTIGAM: That's not true at
10  all. In fact, I wrote it down because I
11  vehemently disagree, but I'm not laughing at
12  your statement at all.
13       MS. ROWE: Did you not laugh?
14       MR. BRAUTIGAM: I did not laugh.
15       MR. FISCHER: He laughed.
16       MS. ROWE: In any event, I think
17  there's no dispute that there's attorney-client
18  privilege between KMK and Provident. To the
19  extent that Mr. Brautigam's forthcoming
20  questions are going to seek information that
21  asks Mr. Winstead to reveal privileged
22  information relating to KMK's representation of
23  Provident Bank during the transaction,
24  Provident is going to assert the privilege.
25       MR. FISCHER: I understand.

Page 219

1       MR. BRAUTIGAM: I want to respond
2  to one thing with Mr. Fischer and Mr. Winstead
3  still in the room. Ms. Rowe's statement that
4  anything with respect to Provident's -- excuse
5  me, KMK's representation in this case is
6  anything but clear and undisputed.
7       MR. FISCHER: It's absolutely
8  clear. Thank you.
9       (Brief recess.)
10       MR. FISCHER: What was the
11  question?
12  BY MR. BRAUTIGAM:
13       Q. Okay. Well, it was a question of
14  you. The questions I'd like to ask are, did
15  you ever talk to Mr. Burke about the OHSL-
16  Provident merger since November of 1999?
17       MR. FISCHER: Other -- objection.
18  Other than the fact he has to appear as a
19  witness?
20       MR. BRAUTIGAM: No, at all. And
21  we'll start November of 1999. I think he can
22  answer the questions yes or no.
23       MR. FISCHER: I'm going to object.
24  You can answer the question, have you ever
25  spoken with Mr. Burke.

Page 220

1       MR. BRAUTIGAM: About the
2  OHSL-Provident merger?
3       MR. FISCHER: No.
4       MS. ROWE: Without revealing the
5  substance.
6       MR. FISCHER: Without revealing
7  any substance, yes, you can answer that
8  question.
9  BY MR. BRAUTIGAM:
10       Q. You can answer that yes or no,
11  right?
12       A. And the question is?
13       Q. Have you ever spoken to Mr. Burke
14  since November of 1999 about the OHSL-Provident
15  merger and/or the litigation arising therefrom?
16       A. Yes.
17       Q. Okay. How many times have you
18  spoken to Mr. Burke on this general topic?
19       A. To my recollection, once.
20       Q. When was that?
21       A. The summer of 2003. I don't
22  recall a specific date.
23       Q. How long did that conversation
24  last?
25       A. Not more than 15 or 30 seconds.

Page 221

1       Q. Okay. Now, I'm going to ask a
2  question and your attorney will probably
3  instruct you not to answer it.
4       What was the subject matter of
5  this conversation?
6       MR. FISCHER: Objection. Don't
7  answer that question.
8       Q. Okay. Have you ever spoken with
9  Ms. Rowe since November of 1999 about the
10  OHSL-Provident merger or the litigation that
11  arose therefrom?
12       A. Except to the extent that Mrs. --
13  Ms. Rowe was in the meeting we've discussed,
14  along with Mr. Burke present, I don't recall
15  any specific conversations with Ms. Rowe
16  regarding the OHSL litigation.
17       Q. Okay. Do you recall generally
18  having conversations with her, even if you
19  can't recall the specifics?
20       A. Is your question have I had a
21  conversation since November of 1999 with Ms.
22  Rowe?
23       Q. On this topic, yes.
24       MR. FISCHER: On this topic?
25       Q. Yes.

56 (Pages 218 to 221)

Page 222

1      MR. FISCHER: Same instruction.
2      A. To my recollection, no.
3      Q. Okay. Since November of 1999,
4 have you had conversations with Mr. Donnellon
5 on this topic?
6      A. To my recollection, no.
7      Q. Same question for Mr. Ramsey.
8      MR. FISCHER: Same instructions.
9      A. To my recollection, no.
10      MR. BRAUTIGAM: Well, it's about
11 5:00 and I have agreed to stop at 5:00.
12 However, the deposition is not finished, there
13 seems to be significant questions of documents
14 that we have requested and not produced. Also,
15 the assertion of privilege that we believe is
16 not well-taken.
17      MS. ROWE: What documents were
18 requested and not produced?
19      MR. BRAUTIGAM: His notes, his
20 e-mails.
21      MS. ROWE: He said he didn't know
22 if he had notes or e-mails.
23      MR. FISCHER: You've never said
24 they've not been produced. You just asked him
25 if he knew where they were.

Page 223

1      MR. BRAUTIGAM: I disagree with
2 that, but --
3      MS. ROWE: And you do have a
4 privileged log as I understand it with respect
5 to any documents that were not produced on the
6 basis of privilege.
7      MR. BRAUTIGAM: Well --
8      MS. ROWE: Is that correct?
9      MR. BRAUTIGAM: I've said what I
10 have to say and I do not believe the deposition
11 is over. Plus --
12      MR. FISCHER: The court reporter
13 is willing to stay. Mr. Buckley is willing to
14 stay. Ms. Rowe is willing to stay. Mr.
15 Winstead is willing to stay. I'm willing to
16 stay. Let's finish it. Any other questions?
17      MR. BRAUTIGAM: Pat, we had an
18 agreement. You sent out a letter giving these
19 limited parameters and I want to abide by the
20 agreement. You seem to be driving this and I
21 want to accommodate you and I want that to be
22 clear on the record.
23      MR. FISCHER: Okay. If you want
24 to accommodate me, let's continue.
25      MR. BRAUTIGAM: Well, no, I think

Page 224

1 we're done for today. Thank you very much for
2 your time, Mr. Winstead.
3      MR. FISCHER: We don't agree that
4 there will be any further questions of Mr.
5 Winstead.
6
7
8      _____
9      JOHN WINSTEAD, ESQ.
10
11      - - -
12      (Deposition concluded at 4:56 p.m.)
13      - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 225

1          C E R T I F I C A T E
2 STATE  OF  OHIO:
                    SS:
3 COUNTY OF HAMILTON:
4      I, Lee Ann Williams, a duly qualified
5 and commissioned notary public in and for the
6 State of Ohio, do hereby certify that prior to
7 the giving of his deposition, the within named
8 JOHN WINSTEAD, ESQ. was by me first duly sworn
9 to testify the truth, the whole truth and
10 nothing but the truth; that the foregoing pages
11 constitute a true and correct transcript of
12 testimony given at said time and place by said
13 deponent; that said deposition was taken by me
14 in stenotypy and transcribed under my
15 supervision; that I am neither a relative of
16 nor attorney for any of the parties to this
17 litigation, nor relative of nor employee of any
18 of their counsel, and have no interest
19 whatsoever in the result of this litigation.
20      IN WITNESS WHEREOF, I hereunto set
21 my hand and official seal of office at
22 Cincinnati, Ohio this ___ day of
23 _____, 2003.
24 MY COMMISSION EXPIRES: _____
   AUGUST 26, 2004   LEE ANN WILLIAMS, RPR/CRR
25          NOTARY PUBLIC-STATE OF OHIO

57 (Pages 222 to 225)