Page 1

1

2                UNITED STATES DISTRICT COURT

3                SOUTHERN DISTRICT OF OHIO

4                     WESTERN DIVISION

5

6                          - - -

7    WALTER W. THIEMANN,      :
     On Behalf of Himself  :
     And of All Others      :
8    Similarly Situated,     :

9                            :

          Plaintiff,         :
10                           :

     VS.                     : CASE NO. C-1-00-793
11                           :

     OHSL FINANCIAL          :
12   CORPORATION, et al.,  :
                             :
13        Defendants.        :

14                        - - -

15        Deposition of F. MARK REUTER, ESQ., a
16   witness herein, called by the plaintiff for
17   cross-examination pursuant to the Federal Rules
18   of Civil Procedure, taken before me, Lee Ann
19   Williams, a Registered Professional Reporter
20   and Notary Public in and for the State of Ohio,
21   at the offices of Gene Mesh & Associates, 2605
22   Burnet Avenue, Cincinnati, Ohio 45219, on
23   Wednesday, August 20, 2003, at 9:35 a.m.
24

25



**Page 2**

1  APPEARANCES:
2    On behalf of the Plaintiff:
3      Gene I. Mesh, Esq.
          and
4      Michael G. Brautigam, Esq.
       Gene Mesh & Associates
5      2605 Burnet Avenue
       Cincinnati, Ohio 45219
6
7    On behalf of the Defendant:
8      Rachael A. Rowe, Esq.
       Keating, Muething & Klekamp
       1400 Provident Tower
9      One East Fourth Street
       Cincinnati, Ohio 45202
10
11   On behalf of the Defendant:
12     Dennis Buckley, Esq.
          and
       Dennis Deters, Esq.
13     Schroeder, Maundrell, Barbere
       & Powers
14     110 Governor's Knoll
       11935 Mason Road
15     Cincinnati, Ohio 45249
16   On behalf of the Witness:
17     Patrick F. Fischer, Esq.
       Keating, Muething & Klekamp
18     1400 Provident Tower
       One East Fourth Street
19     Cincinnati, Ohio 45202
20          - - -
21
22
23
24
25

**Page 3**

1              I N D E X
2   Examination of F. MARK REUTER, ESQ.    Page
3   By Mr. Brautigam:                  4
4            - - -
5   Defendant's Exhibit   Page Identified
6     No. 43              26
      No. 44              133
7     No. 45              182
      No. 46              210
8
9            - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1         F. MARK REUTER, ESQ.
2   having been first duly sworn, testified as
3   follows:
4            CROSS-EXAMINATION
5   BY MR. BRAUTIGAM:
6       Q.  Good morning, Mr. Reuter.  My name
7   is Michael G. Brautigam.  I represent Walter
8   Thiemann and a class of OHSL shareholders in
9   this litigation.  To my left is Gene Mesh.
10          Mr. Reuter, let me hand you what
11  has previously been marked as Plaintiff's
12  Deposition Exhibit 1.  And I would ask you to
13  take a look at that.  With this document or any
14  other, please take as much time as you need to
15  review it.  In most cases I think I can direct
16  your attention to the appropriate sections.
17  Have you seen this document before?
18      A.  No, not until now.
19      Q.  Okay.  Let me direct your
20  attention to the extreme right column.  There's
21  a paragraph there and a sentence within the
22  paragraph, Burke's response, Hanauer opposed
23  the Provident takeover because he wanted Oak
24  Hills to remain independent.  Do you see that?
25      A.  Yes.

**Page 5**

1       Q.  Is that a true statement?
2          MS. ROWE:  Objection.
3          MR. FISCHER:  Objection.  No
4   foundation.
5       A.  I don't know.
6       Q.  Who would know?
7          MR. FISCHER:  Objection.
8       A.  I don't know.
9       Q.  Did you ever learn from any source
10  that Mr. Ken Hanauer, the CEO and a Board
11  member of OHSL, was opposed to a merger with
12  Provident?
13          MR. FISCHER:  Objection.  To the
14  extent it calls for revealing communications
15  between you and me, don't do that.  Other than
16  that, answer the question.
17      A.  I can't say.
18      Q.  You can't say because you don't
19  remember?
20          MR. FISCHER:  Objection.
21      Q.  During the time you were working
22  on the merger, did you ever learn from any
23  source that Ken Hanauer opposed the merger with
24  Provident?
25      A.  No.

**Page 6**

```
1        Q.  During the time you were working
2   on the merger, did you ever learn that Mr.
3   Herron, a Board member of OHSL and the chairman
4   of the audit committee, had resigned in part in
5   protest of the merger with Provident?
6        A.  Not that I recall.
7        Q.  If you had known of that, do you
8   think that's something that you would want to
9   have shared with the OHSL shareholders?
10       MR. FISCHER:  Objection to the
11   form.
12       MS. ROWE:  Objection.
13       MR. FISCHER:  Hypothetical.  Basis
14   also
15       A.  That would be a decision for OHSL
16   and its counsel to have made.
17       Q.  And Provident would have no role
18   in that; is that correct?
19       A.  I said that would be a decision
20   for OHSL and its counsel.  That is not a
21   decision primarily for Provident, no.
22       Q.  Okay.  Is it a decision for
23   Provident to some extent?
24       A.  No.  It's primarily a decision for
25   OHSL and its counsel.
```

**Page 8**

```
1   these materials was a collective effort, the
2   responsibility for which was shared by a number
3   of parties.
4        Q.  Okay.  Which --
5        A.  Primarily OHSL, its counsel,
6   Provident, KMK.
7        Q.  Okay.  And how would you divide up
8   the responsibilities?  Would you say that the
9   proxy materials and registration statement
10   before you as Defendant's Exhibit 1 were 50
11   percent the responsibility of OHSL and the
12   Dinsmore firm and 50 percent the responsibility
13   of Provident and the KMK firm?  How would you
14   divide it up?
15       MR. FISCHER:  Objection.
16       MS. ROWE:  Objection.
17       MR. FISCHER:  Three questions.  It
18   makes no sense.  Go ahead if you can answer.
19       A.  I don't understand the question.
20       Q.  Okay.  Approximately what
21   percentage of the work involved did KMK have in
22   the production and dissemination of this proxy
23   material and registration statement?
24       MR. FISCHER:  Objection.
25       MS. ROWE:  Object to form.
```

**Page 7**

```
1        Q.  Okay.  Let's take a look at
2   Defendant's Exhibit 1.  Have you seen that
3   document before?
4        A.  Is this the proxy statement/
5   prospectus that was -- was this document mailed
6   to OHSL shareholders?
7        Q   Yes
8        A.  Yes, I have.
9        Q.  Have you read every word and
10   looked at every number in that document?
11       A.  No.
12       Q.  Did someone from KMK read every
13   word and look at every number in that document?
14       A.  I don't know.
15       Q.  You don't know if anyone was
16   assigned that task?
17       A.  I don't understand.  Your question
18   asks if any one person; is that right?
19       Q.  Right.  Was any one person at KMK
20   assigned to read the entire proxy materials and
21   registration statement?
22       MS. ROWE:  Objection.
23       MR. FISCHER:  Objection.  If you
24   know.
25       A.  The preparation and review of
```

**Page 9**

```
1        A.  There's no way I can tell you what
2   percentage.
3        Q.  Okay.  Was it a substantial
4   amount?
5        MR. FISCHER:  Objection.
6        A.  I don't understand what you mean
7   by "substantial amount."
8        Q.  Did you personally put a lot of
9   work in on this document?
10       A.  What do you mean by "a lot of
11   work"?
12       Q.  How many hours did you bill with
13   respect to the OHSL-Provident merger?
14       A.  I don't know
15       Q.  Approximately how many?
16       MR. FISCHER:  If you can answer
17       A.  I don't know.
18       Q.  Order of magnitude, a hundred, a
19   thousand, 10,000?
20       MR. FISCHER:  Objection to form.
21       A.  It was less than a thousand.
22   It --
23       MR. FISCHER:  If you --
24       A.  I don't know.
25       MR. FISCHER:  You have to be
```



**Page 10**

1 able --
2    A.  I don't know the --
3    MR. FISCHER:  -- to give a
4 reasonable approximation.  If you're guessing,
5 you don't have to answer the question.
6    A.  I would be guessing.  I would say
7 it was less than a thousand, but I'd be
8 guessing beyond that.
9    Q.  Is it between 500 and a thousand?
10    MS. ROWE:  Objection.
11    MR. FISCHER:  Objection.  He
12 already said he didn't know.  Badgering the
13 witness.  If you can answer.
14    A.  I doubt it was more than 500,
15 although I -- I doubt it was more than 500.
16    Q.  Okay.  What did you do with
17 respect to the OHSL-Provident merger?
18    A.  I assisted in the representation
19 of Provident in connection with the filing of
20 the S-4.
21    Q.  Okay.  And who was your client?
22    A.  Provident Financial Group.
23    Q.  Okay.  Did you represent the
24 directors at all?
25    A.  No, I represented the company.

**Page 11**

1    Q.  What can you tell me about the
2 litigation that brings us here today?
3    MR. FISCHER:  Objection.  Don't
4 discuss anything we've discussed.
5    Q.  What do you know about the
6 litigation, Thiemann versus OHSL, et al.?
7    A.  I know what I've read in this
8 article that you've just set in front of me.
9    MR. FISCHER:  Other than what I've
10 told you.  Don't discuss anything that we've
11 talked about.
12    A.  That's what I know.
13    Q.  Okay.  Have you ever read any
14 pleadings in the OHSL case?
15    A.  No.
16    Q.  Have you ever read any press
17 articles other than this one that relate to the
18 OHSL-Provident merger?
19    MR. FISCHER:  Other than the one
20 that you gave him today?
21    MR. BRAUTIGAM:  Yes, that's what I
22 said.
23    MR. FISCHER:  Well, you said
24 "this." I just wanted to make sure we're
25 talking about the same one.

**Page 12**

1    A.  Is your question related to the
2 litigation?
3    Q.  Yes.
4    A.  No, I have not.
5    Q.  Are you represented by counsel
6 today?
7    MR. FISCHER:  You can answer that.
8    A.  Yes, I am.
9    Q.  Okay.  Who is your counsel?
10    A.  Pat Fischer.
11    Q.  Okay.  How did Mr. Fischer come to
12 represent you?
13    A.  He approached me and -- he
14 approached me.
15    Q.  And did what?  And how did that
16 work?
17    MR. FISCHER:  Objection.  Don't
18 discuss any discussions between us.
19    A.  I can't answer that question.
20    Q.  Are you paying for Mr. Fischer's
21 representation?
22    MR. FISCHER:  You can answer the
23 question.  In some ways he is, but go ahead.
24    A.  I have no intention of receiving
25 an invoice from Mr. Fischer or writing him a

**Page 13**

1 check to compensate him for his services.
2    Q.  Okay.  Is Mr. Fischer representing
3 anyone else?
4    A.  In connection with what?
5    MS. ROWE:  Object to the form.
6    MR. FISCHER:  Objection.
7    Q.  To the litigation.
8    MR. FISCHER:  I represent a lot of
9 people.  Do you know?
10    A.  In connection with this
11 litigation, is that your question?
12    Q.  Yes.
13    MR. FISCHER:  Do you know other
14 than from our discussions?  Don't reveal to him
15 our --
16    A.  I don't know other than from our
17 discussions.
18    Q.  Okay.  Who does Ms. Rowe represent
19 in this litigation?
20    MR. FISCHER:  Do you know?
21    A.  I can't say.
22    Q.  Do you know if KMK has ever been
23 sued in any litigation arising out of the
24 OHSL-Provident merger?
25    MR. FISCHER:  Now, to the extent

**Page 14**

1  you know from other sources you can answer.
2  But if you know only from me, then don't answer
3  the question.
4        A.  I learned about this --
5           MR. FISCHER:  Don't answer the
6  question.
7        A.  I can't say.
8        Q.  Have you ever talked to Mr. Burke
9  about the OHSL-Provident litigation?
10       A.  No, I have not.
11       Q.  Were you in a meeting with Mr.
12  Fischer, Mr. Burke, Ms. Rowe, Mr. Weiss, Mr.
13  Matthews and Mr. Winstead?
14       A.  Yes.
15       Q   Was the --
16          MR. FISCHER:  Same as our previous
17  objection, but I'm going to let him answer to
18  the extent -- just get over this, but we're
19  not waiving any other rights.
20       A.  Yes, I was in that meeting.
21       Q.  What was the purpose of that
22  meeting?
23       A.  To inform us that we were being
24  deposed in connection with this litigation and
25  to discuss mechanics and scheduling of the

**Page 15**

1  depositions.
2        Q.  And that was in July of 2003; is
3  that correct?
4        A.  I don't recall the exact date, but
5  I'd -- I'm pretty sure it was July, yes.
6        Q.  And is that the first time you
7  learned of any litigation with respect to the
8  OHSL-Provident merger?
9           MR. FISCHER:  Don't discuss
10  anything we've discussed.  If you can't answer
11  the question, tell him that.
12       A.  Can you repeat the question?
13       Q.  Yes.  Was that meeting in July of
14  2003 the first time you learned of any
15  litigation arising out of the OHSL-Provident
16  merger?
17       A.  No, not the first time.
18       Q.  Okay.  When did you learn about
19  litigation arising out of the OHSL-Provident
20  merger?
21          MR. FISCHER:  Objection.  If it
22  calls for you to tell him about our discussions
23  in any way, don't answer that question.
24       A.  I can't answer that.
25       Q.  It just calls for when?

**Page 16**

1        A.  I can't answer that.
2           MR. FISCHER:  But you're asking
3  for the content of the conversation as the
4  question is asked.  Objection.  Don't answer
5  that question.
6        Q.  Did you learn about the
7  OHSL-Provident litigation in 2003?
8           MR. FISCHER:  Objection.  Don't
9  answer that question.  You can ask him when
10  he's talked with me, but you can't ask him
11  about the content of the conversation.
12       Q.  Mr. Reuter, let me direct your
13  attention to Defendant's Exhibit 1.  Do you see
14  that in front of you?
15       A.  Yes, I do.
16       Q.  Okay.  Who was ultimately
17  responsible for finalizing Defendant's Exhibit
18  1?
19          MR. FISCHER:  Objection.
20       A.  This document represents a
21  collaborative effort of a number of parties.
22  Parties primarily responsible for this document
23  are OHSL and Provident.  Your question, I'm --
24  is your question with respect to the entire
25  document?

**Page 17**

1        Q.  Yes.
2        A.  All -- however many pages here?
3           MR. FISCHER:  Go through each page
4  then if he wants, Mr. Reuter.
5        Q.  Yes.
6        A.  This page right here?  Are you
7  asking about this page right here?
8        Q.  My first question is, who is
9  responsible for the overall document, the
10  entire document?
11       A.  I answered.  I said it was a
12  collaborative effort.
13       Q.  Isn't there someone who is
14  responsible for saying that this document is in
15  final form and can go out to the shareholders?
16          MR. FISCHER:  Objection.
17          MS. ROWE:  Objection.  Asked and
18  answered.
19          MR. FISCHER:  We've gone through
20  it.  We're repeating ourselves, Mr. Brautigam.
21       A.  I repeat my prior answer.
22       Q.  Can you find his prior answer and
23  have it read back, please?
24          (Record read by Reporter.)
25       Q.  Okay.  Which individuals at OHSL

Page 18

1  were primarily responsible for the document?
2      A.  I --
3          MR. FISCHER:  Objection. I don't
4  know.  We didn't represent OHSL.
5      Q.  Okay.  Which individuals at
6  Provident were primarily responsible for the
7  document?
8          MR. FISCHER:  Objection.
9      A.  That would involve
10 communication --
11         MR. FISCHER:  Well, no, you can
12 answer who, you just can't tell about your
13 discussions with them.  Okay?
14     A.  Employees of Provident?
15     Q.  Yes.
16         MR. FISCHER:  If you know, you can
17 answer that.
18     Q.  Employees or directors of
19 Provident.
20     A.  I can't -- I can't say.  I can't
21 name one specific person.
22     Q.  Okay.  Well, name everyone you can
23 who was involved in this at Provident.
24         MR. FISCHER:  Who was involved in
25 what?

Page 19

1          MR. BRAUTIGAM:  Defendant's
2  Exhibit 1.
3          MR. FISCHER:  Objection.  Go
4  ahead, but don't reveal any communications.
5  Who you spoke to.
6      A.  I spoke to Mark Magee about this
7  document.
8      Q.  Okay.
9      A.  And I may -- I don't recall, I may
10 have spoken to Tony Stollings about this
11 document.
12     Q.  Anyone else?
13     A.  At Provident?
14     Q.  Yes.
15     A.  No.
16     Q.  Okay.  Who was responsible at KMK
17 for finalizing this document?
18         MR. FISCHER:  Objection.
19     A.  KMK's not responsible for
20 finalizing this document in its entirety.  That
21 question is not -- I can't respond to your
22 question.  KMK is not solely responsible for
23 this document.
24     Q.  Who wrote the first page of this
25 document?

Page 20

1          MR. FISCHER:  Objection.
2      A.  It looks like Norbert Brinker of
3  OHSL.
4      Q.  Why do you say that?
5      A.  Because it's a letter signed by
6  him.
7      Q.  Does that automatically imply to
8  you that he wrote it?
9      A.  Yes, it does.
10     Q.  Okay.  What computer system did
11 this come off --
12         MR. FISCHER:  Do you know or are
13 you guessing?
14     A.  I'm -- OHSL is responsible for
15 this.
16         MR. FISCHER:  But he asked who
17 wrote it.  Do you know?
18     A.  Specifically I don't.  I assume --
19         MR. FISCHER:  Well, then tell him
20 that.  Tell him.
21     A.  I assume it was Norbert Brinker.
22         MR. FISCHER:  Don't guess.  You
23 don't have to guess.
24     Q.  Okay.  What computer system did
25 the first page of this document come off?

Page 21

1          MS. ROWE:  Objection.
2          MR. FISCHER:  Objection.
3      A.  I don't know.
4      Q.  Okay.  Is it possible that it came
5  off the KMK computer system?
6          MR. FISCHER:  Objection, form.
7  Anything is possible.  Answer his question.
8      A.  It's possible that it came off of
9  Dinsmore & Shohl's or KMK's.  I -- I can't say.
10     Q.  Okay.  Are there any other
11 possibilities as to where the first page of
12 this document came from?
13         MS. ROWE:  Objection.
14         MR. FISCHER:  Objection.
15     A.  Yes, there are.
16     Q.  Okay.  What are those
17 possibilities?
18     A.  The financial printer.  I'm sorry,
19 I -- I don't recall who the financial printer
20 was.  The financial printer.
21     Q.  Okay.  And where did the financial
22 printer get the information?
23         MS. ROWE:  Objection.
24         MR. FISCHER:  Objection.  Assumes
25 he knows.  You've laid no foundation for any of

Williams & Oliver
(513)683-9626

**Page 22**

1  these questions. Objection. Wasting time.
2      A.  Well, can you repeat the question,
3  please?
4          (Record read by Reporter.)
5          MS. ROWE:  Objection.
6          MR. FISCHER:  Same objection.
7      A.  I -- I'm not -- I'm not certain.
8  I don't recall.
9      Q.  How did the financial printer get
10  the information that KMK had produced?
11          MR. FISCHER:  Objection.
12          MS. ROWE:  Object to form. What
13  information are we talking about?
14          MR. FISCHER:  I don't even know
15  what we're talking about. Are we talking about
16  an exhibit?
17      A.  I don't know what information
18  you're talking about KMK producing.
19      Q.  Do you see Defendant's Exhibit 1
20  in front of you?
21      A.  I have already told you that I
22  have -- do, yes.
23      Q.  Okay. Did KMK produce parts of
24  this document?
25          MR. FISCHER:  Objection.

**Page 23**

1      A.  What do you mean by produce?
2      Q.  Write.
3      A.  KMK facilitated in the preparation
4  of disclosures relating to Provident in this
5  document."
6      Q.  Did KMK write any sections of this
7  document?
8          MR. FISCHER:  If you can answer.
9      A.  What do you mean by "write"?
10      Q.  You don't know what the word write
11  means?
12      A.  I'm asking you. I don't
13  understand what its context is in the context
14  of your question.
15      Q.  Well, the way this works is I get
16  to ask the questions. If you don't understand
17  what the word write means, that's fine. You
18  can just say I don't understand what the word
19  write means and I'll go on with the deposition.
20          MS. ROWE:  Objection.
21          MR. FISCHER:  Objection. Don't
22  argue with the witness. If you continue to
23  argue with the witness, we'll leave and go to
24  the magistrate. You did it yesterday, it's
25  going to stop.

**Page 24**

1      A.  I told you that KMK facilitated in
2  the preparation of certain disclosures in this
3  document relating to Provident.
4      Q.  What do you mean by "facilitated"?
5      A.  We, in collaboration with
6  Provident, helped to prepare some of the
7  disclosures in the document relating to
8  Provident.
9      Q.  Did KMK have any obligation to
10  check information that was provided by OHSL and
11  their counsel?
12      A.  No.
13          MR. FISCHER:  Objection.
14          MS. ROWE:  Objection. Calls for
15  legal conclusion.
16      Q.  Why not?
17      A.  No. Provident was KMK's client in
18  this transaction. OHSL was not KMK's client in
19  this transaction.
20      Q.  So if OHSL submitted information
21  that later turned out to be incorrect, that
22  would be OHSL's problem, correct?
23          MS. ROWE:  Objection.
24          MR. FISCHER:  Objection. Do you
25  know?

**Page 25**

1      A.  It -- I don't know.
2      Q.  Okay. Is this a joint document in
3  any sense?
4      A.  Again, I'm not clear what you mean
5  by "joint."
6      Q.  Was it filed jointly on behalf of
7  OHSL and Provident with the SEC?
8      A.  This document was filed with the
9  SEC by both parties, OHSL and Provident.
10      Q.  And is there a disclaimer in there
11  that Provident makes where it says, Look, we're
12  only responsible for the Provident parts of the
13  document, we're not responsible for the whole
14  thing?
15          MR. FISCHER:  Objection. Do you
16  want to read the whole document and find out?
17      A.  I'd have to review the document to
18  determine whether or not there's a disclaimer
19  like that in there.
20      Q.  Okay. Well, maybe you can do that
21  over the luncheon recess.
22          MR. FISCHER:  No, he's not doing
23  work over lunch.
24          (Plaintiff's Exhibit Number 43
25          was marked for identification.)

Williams & Oliver
(513)683-9626

Page 26

1    Q.  Let me hand you what has been
2  marked as Deposition Exhibit 43 and ask you to
3  take a look at it.  Have you seen that document
4  before?
5    A.  Yes.
6    Q.  What is that document?
7    A.  It appears to be the description
8  of me on our firm's web site.
9    Q.  Okay.  And it talks about your
10 practice group being business representation in
11 transactions.  Do you see that?
12   A.  Can you point that out to me?
13   Q.  Yes, right next to your --
14   A.  Yes.
15   Q.  And that's the practice group that
16 you currently work in, correct?
17   A.  The official name of our practice
18 group is the public business group.  I believe
19 that's the official name of our practice group.
20   Q.  And who's the chairman of that
21 practice group?
22      MR. FISCHER:  Objection.
23   A.  Right now?
24   Q.  Yes.
25   A.  Ed Steiner.

Page 27

1    Q.  Who did you work with in 1999?
2      MS. ROWE:  Objection.
3      MR. FISCHER:  Objection.
4      MS. ROWE:  Ever or related to this
5  transaction?
6      MR. FISCHER:  He asked for
7  everybody.
8    A.  A lot of people.
9    Q.  Okay.  I understand that this
10 practice group did not exist in 1999; is that
11 correct?
12      MR. FISCHER:  Which practice
13 group?
14   Q.  The business representation and
15 transactions, whatever he said, the public
16 business.
17   A.  That specific practice group did
18 not exist in 1999.
19   Q.  Okay.  What practice group were
20 you associated with, if any, during the summer
21 of 1999 when you worked on the OHSL-Provident
22 merger?
23   A.  KMK's corporate practice group.
24   Q.  Okay.  What's the function of the
25 corporate practice group?

Page 28

1      MR. FISCHER:  Objection.
2    A.  The representation of clients in
3  connection with a variety of business
4  transactions and general corporate
5  representation.
6    Q.  Okay.  Now, it says that you have
7  overseen more than 300 acquisitions and
8  divestiture transactions in the past five years
9  with an aggregate transaction value of over
10 billions of dollars?
11      MR. FISCHER:  Objection.
12   A.  No.
13      MR. FISCHER:  That's not what that
14 says, misreading the document again.
15   Q.  Okay.  Could you read that
16 section, please?
17   A.  Which section?
18   Q.  Starts, "He is part of the
19 transactions team."
20   A.  "He is part of the transactions
21 team at KMK that has overseen more than 300
22 acquisition and divestiture transactions in the
23 past five years with an aggregate transaction
24 value in the billions of dollars."
25   Q.  Okay  Is that true?

Page 29

1    A.  Yes.
2    Q.  Okay.  Are you a securities
3  lawyer?
4    A.  I practice securities law  And
5  it's one of -- securities regulation is a
6  practice area that I work in.
7    Q.  Okay.  Are you an expert in
8  business planning and formation?
9      MR. FISCHER:  Objection.
10   A.  I've never been qualified by a
11 court as an expert in that, although I practice
12 in those areas.
13   Q.  Do you hold yourself out as an
14 expert in that area?
15      MR. FISCHER:  Which area?
16   Q.  Business planning and formation.
17   A.  I believe my practice area has
18 been concentrated in those areas, but I do
19 not -- again, I have never been qualified by a
20 court as an expert.  I don't understand what
21 you mean by expert, I guess.
22   Q.  Okay.  Do you consider yourself to
23 be an expert in business planning and
24 formation?
25      MS. ROWE:  Objection.  Asked and

Williams & Oliver
(513)683-9626

**Page 30**

1 answered.
2       MR. FISCHER: Same objection.
3 Going over this again, wasting time.
4       A. I'd like to repeat my prior
5 answer.
6       Q. Well, it's nonresponsive to the
7 question. Do you consider yourself to be an
8 expert in mergers and acquisitions?
9       MR. FISCHER: Same objection.
10       A. I have a concentration in that
11 area. I do not -- I have not been qualified as
12 an expert in that area.
13       Q. Do you consider yourself to be an
14 expert in mergers and acquisitions?
15       MS. ROWE: Objection.
16       MR. FISCHER: Objection. Totally
17 irrelevant.
18       A. I don't -- it's not clear to me
19 what you mean by expert. Again, I have a
20 concentration in those areas.
21       Q. Have you used the term expert in
22 your professional life?
23       A. Yes.
24       Q. Okay. Do you have an
25 understanding of what it means?

**Page 31**

1       A. In certain circumstances, yes.
2       Q. Okay. In the context of a lawyer
3 who holds himself out to be an expert, do you
4 have an understanding of what that would mean?
5       A. It depends on the area and the
6 circumstances.
7       Q. Okay. Are you an expert in
8 mergers and acquisitions?
9       A. I have a concentration in those
10 areas. I have never been qualified by a court
11 as an expert in those areas. A large part of
12 my practice is in those areas. I don't -- I'm
13 not qualified -- I've never been qualified by a
14 court as one.
15       Q. Okay. Approximately how much
16 experience do you have in mergers and
17 acquisitions?
18       A. Are you asking for a time?
19       MR. FISCHER: Objection to the
20 form.
21       MS. ROWE: Objection to relevance.
22       A. A period of time in which I
23 practiced?
24       Q. Any way that you want to describe
25 it.

**Page 32**

1       MR. FISCHER: We're wasting time.
2       A. I've practiced corporate law for
3 almost seven years now. And a part of that
4 practice has been in connection with the
5 representation of clients in merger and
6 acquisition transactions.
7       Q. And approximately how many mergers
8 and acquisitions transactions have you been
9 involved in?
10       A. Over the past seven years?
11       Q. Yes.
12       MS. ROWE: Objection.
13       A. At least a hundred. I, I -- I'm
14 guessing.
15       MR. FISCHER: Don't guess.
16       A. I'm guessing.
17       Q. How many of those transactions
18 resulted in litigation?
19       A. Excuse me?
20       MR. FISCHER: Objection.
21       Q. How many of those transactions
22 resulted in litigation?
23       MR. FISCHER: Do you know?
24       A. This is the only one that I'm
25 aware of.

**Page 33**

1       Q. Okay. Are you familiar with the
2 term conflict of interest?
3       A. I've heard the term.
4       Q. Have you ever used that term as a
5 securities lawyer?
6       A. Are you saying in connection with
7 my practice of securities law?
8       Q. Yes.
9       A. In a securities regulation type of
10 context?
11       Q. Yes.
12       A. Have I used that term?
13       Q. Yes.
14       A. I don't recall that.
15       Q. Okay. Has anyone used it in your
16 presence?
17       MR. FISCHER: Objection. Don't
18 discuss anything that you and I have discussed.
19       A. I don't recall.
20       Q. Okay. Do you have a working
21 understanding of what a conflict of interest
22 is?
23       MR. FISCHER: Objection.
24       MS. ROWE: Objection.
25       A. The term conflict of interest, it

9 (Pages 30 to 33)

**Page 34**

1  depends on the circumstances in which it is
2  used, so I -- it's hard to say.
3      Q.  Do you have an understanding of
4  what a conflict of interest might be with
5  respect to attorney representation?
6      MR. FISCHER:  Objection.
7      A.  It would depend on the
8  circumstances in which you're talking about.
9      Q.  Okay.  In this transaction you
10  represented Provident; is that correct?
11      A.  KMK represented Provident, that is
12  correct.
13      Q.  And KMK could not have represented
14  both Provident and Oak Hills at the same time;
15  is that correct?
16      MS. ROWE:  Objection.
17      MR. FISCHER:  Objection.
18      MR. FISCHER:  If you know.
19      A.  I want to discuss this --
20      MR. FISCHER:  Well, if you -- do
21  you know?  If you know, answer the question.
22  If you don't --
23      A.  Can you repeat the question?
24      Q.  Could KMK have represented both
25  Provident and Oak Hills in this merger

**Page 35**

1  transaction?
2      MR. FISCHER:  Objection,
3  hypothetical also.
4      A.  Depending on the circumstances,
5  likely not.
6      Q.  Okay.  Why not?
7      A.  I -- I can't articulate the exact
8  reasons why, but depending on the
9  circumstances, I would think that the interests
10  of the parties would be so adverse to one
11  another as to result in a conflict or a
12  potential conflict.
13      Q.  What circumstances did you refer
14  to in your previous answer?
15      A.  There is a variety of
16  circumstances that can be cited in potential
17  conflict situations.  I don't -- I can't
18  enumerate them.
19      Q.  Well, with respect to this
20  particular merger, what circumstances would
21  have prevented KMK from representing both
22  Provident Financial and OHSL?
23      MS. ROWE:  Object to the form.
24      MR. FISCHER:  Objection.
25      MS. ROWE:  That wasn't your prior

**Page 36**

1  question.
2      MR. FISCHER:  That wasn't the
3  prior question, badgering the witness.
4      THE WITNESS:  Can I have the
5  question repeated to me, please?
6      (Record read by Reporter.)
7      MS. ROWE:  Same objection.
8      MR. FISCHER:  Same objection.
9      A.  I don't know how I can provide an
10  -- an answer to that.
11  BY MR. BRAUTIGAM:
12      Q.  You said something about their
13  interests may be adverse.  What did you mean by
14  that?
15      A.  In -- that's a -- I hoped I used
16  the word potentially, did I not?
17      (Record read by Reporter.)
18      A.  I didn't say they were adverse, I
19  said they were potentially.
20      Q.  Okay.  Is there a situation where
21  they would not be adverse when you're
22  negotiating a merger transaction with a buyer
23  and a seller?
24      MR. FISCHER.  In any instance?
25      Q.  In this case.

**Page 37**

1      MR. FISCHER:  Objection.
2      MS. ROWE:  Objection.
3      A.  I can't answer these questions.
4  They're so speculative and hypothetical and
5  dependent upon circumstances that it's very
6  difficult for me to provide answers to this --
7  to this line of questions.
8      Q.  Are you familiar with the term
9  materiality?
10      A.  In the context of when?
11      Q.  Securities law.
12      A.  Yes, I am.
13      Q.  Okay.  What is your understanding
14  of the term materiality?
15      MR. FISCHER:  Objection.
16      A.  Materiality is another term that
17  is highly contingent upon the facts and
18  circumstances of a particular scenario.
19      Q.  What facts and circumstances is
20  materiality contingent upon, as you used those
21  words in your previous answer?
22      MR. FISCHER:  Objection.  Broad.
23      A.  I don't know how to answer that
24  question.  There are so many different
25  considerations that are to be considered in

Page 38

1 connection with that that I don't know how to
2 answer that.
3      Q.   Okay.  Are you familiar with the
4 term material misrepresentation?
5      A.   In connection with what?
6      Q.   The securities laws.
7      A.   I've -- I've heard it used before,
8 yes.
9      Q.   Okay.  What do you understand that
10 term to mean?
11     A.   It depends on the situation in
12 which that term is applied.
13     Q.   In the context of the securities
14 laws, what do you understand a material
15 misrepresentation to be?
16          MR. FISCHER:  Objection.
17          MS. ROWE:  Objection.  Asked and
18 answered.
19          MR. FISCHER:  Badgering the
20 witness.
21     A.   I'd like to repeat my prior
22 answer.
23     Q.   Can you give me an example of
24 material misrepresentation?
25     A.   I cannot think of one off the top

Page 39

1 of my head.
2      Q.   Okay.  Are you familiar with the
3 phrase material omission?
4      A.   I've heard that term before.
5      Q.   Okay.  What do you understand that
6 term to be?
7      A.   A term whose meaning -- that has a
8 meaning that is, again, dependent upon the
9 facts and circumstances of a particular
10 scenario.
11     Q.   Can you think of an example of a
12 material omission?
13          MS. ROWE:  Objection.
14          MR. FISCHER:  Same.
15     A.   Not at this moment.
16     Q.   Okay.  Are you familiar with the
17 phrase proxy materials?
18     A.   Yes.
19     Q.   What are proxy materials?
20     A.   Materials prepared by an issuer
21 and its counsel to the issuer's shareholders in
22 connection with an action to be voted upon or
23 acted upon at a meeting.
24     Q.   Is it important that the proxy
25 materials be truthful?

Page 40

1          MR. FISCHER:  Objection.
2      A.   What do you mean by "truthful"?
3      Q.   Well, you swore to tell the truth
4 today.  Did you understand what you meant when
5 you swore to tell the truth?
6      A.   I did, yes.
7      Q.   Good.  Well, I mean it in the same
8 way.
9      A.   Well, the thing about truths is --
10 truthfulness in the context of your question is
11 difficult for me to understand.  You know, two
12 people can see the same event, have the same
13 description of -- or different descriptions of
14 the exact same event and each person can
15 believe the event to be true and they're
16 providing a truthful description of the event,
17 even though the descriptions are different.  So
18 I'm not certain how you're trying to use that
19 term here.
20     Q.   I'm trying to use it as it's
21 commonly used in the English language.
22          MR. FISCHER:  There's no question
23 pending.
24     A.   I don't know what the question is.
25     Q.   The question is.  Do you believe

Page 41

1 it's important for the proxy materials to be
2 truthful?
3      A.   I believe that the law requires
4 that the proxy materials provide accurate
5 information in compliance with securities laws
6 and the, you know, provisions against anti
7 fraud, including 10(B)5 and the other
8 regulations.  To the extent that equates with
9 your definition of truthful, that it is -- but
10 in the context of the question in which you're
11 asking it, it's so difficult for me to
12 understand and provide a reasonable answer,
13 that I -- I can't say.
14     Q.   Okay.  What is your understanding
15 of the 10(B)5 and other securities regulations
16 as you mentioned it in your previous answer?
17          MR. FISCHER:  Objection.
18          MS. ROWE:  Objection.
19          MR. FISCHER:  Books are written on
20 10(B)5.  You want him to answer that question?
21          MR. BRAUTIGAM:  Yes.  That's why I
22 asked it.
23          MR. FISCHER:  Okay.  We'll be here
24 all day.  Wasting time.  Are you going to pay
25 him for his time so you can learn what 10(B)5

11 (Pages 38 to 41)

Page 42

1  is? Just wasting time, Mr. Brautigam.
2      A.  In a nutshell, Rule 10(B)5
3  prevents misrepresentations and material
4  omissions.
5      Q.  And what other securities
6  regulations are you familiar with?
7          MR. FISCHER:  Objection.
8      A.  I -- are you asking me to cite
9  regulations?
10     Q.  I'm asking you to cite what you
11 referred to in your previous answer.  The --
12         MR. FISCHER:  Name them all.
13     A.  The 1933 Act and the 1934 Act.
14     Q.  Okay.  What's your understanding
15 of the 1933 Act?
16         MS. ROWE:  Objection.
17         MR. FISCHER:  Objection.
18 Harassment.
19     A.  Where would you like me to begin?
20 It has a number of sections.
21     Q.  Just a general working
22 knowledge -- general working definition.
23         MR. FISCHER:  Objection.
24         MS. ROWE:  Objection.
25     A.  Of the '33 Act?

Page 43

1      Q.  Yes.
2      A.  I'm sorry, I still don't
3  understand the question.  You're asking me for
4  what my general understanding of the 1933 Act
5  is?  Is that what your question is?
6      Q.  Yes.
7          MR. FISCHER:  Same objection.
8      A.  I don't know how to answer that
9  question.  It's a -- it's very broad and
10 comprehensive.  The set of laws and the
11 regulations promulgated pursuant to the Act are
12 too extensive for us to discuss even over the
13 course of the next month.
14     Q.  Okay.  What's your understanding
15 of the '34 Act?
16     A.  I have the same response that I
17 just gave with respect to the '33 Act in terms
18 of its breadth.
19     Q.  Okay.  Now, with respect to
20 Section 10(B), you said in substance that it
21 was designed to prevent misrepresentations and
22 material omissions; is that correct?
23     A.  Prevent isn't the right word.  I
24 should rephrase that and say make unlawful.
25     Q.  Make unlawful, okay.

Page 44

1      A.  Material misrepresentations and
2  material omissions, yes.
3      Q.  And in the course of your work as
4  a securities lawyer, you are required to make
5  judgments with respect to materiality all the
6  time, correct?
7          MR. FISCHER:  Objection.
8      A.  No, not all the time, no.
9      Q.  Okay.  Well, you're required to
10 make judgments on materiality from time to
11 time, correct?
12         MR. FISCHER:  Objection.
13     A.  In collaboration with clients and
14 other members of our firm, we provide advice on
15 whether disclosure of certain items is required
16 pursuant to the definition of materiality.
17     Q.  Right.  And that advice requires
18 you to have an understanding and a definition
19 of materiality in certain circumstances,
20 correct?
21         MS. ROWE:  Objection.  Asked and
22 answered.
23         MR. FISCHER:  Objection.  We've
24 gone through this.
25         MS. ROWE:  He already said it

Page 45

1  depends on the circumstances.  This is supposed
2  to be a deposition of a fact witness, not --
3          MR. FISCHER:  In fact, that's what
4  you represented to the Court, he was a fact
5  witness.  You haven't asked a fact question
6  yet.
7          THE WITNESS:  Can the question be
8  repeated, please?
9          (Record read by Reporter.)
10     A.  It -- it requires us -- it
11 requires us to try to discern what materiality
12 is.
13     Q.  And what factors do you consider
14 in making a materiality assessment?
15         MS. ROWE:  Objection.
16         MR. FISCHER:  Objection.
17     A.  I, I can't begin to answer that
18 question.  There -- it's such a fact specific
19 and circumstances based determination.
20     Q.  Okay.  We'll get to that.  Are you
21 familiar with the term S-4?
22     A.  Yes.
23     Q.  What is an S-4?
24     A.  Do you mean a form S-4?
25     Q.  Yes.

12 (Pages 42 to 45)

**Page 46**

1    A.   A form S-4 is a registration
2  statement required by the Securities --
3  contemplated by the Securities & Exchange
4  Commission in connection with business
5  combinations.
6    Q.   And did this business combination
7  between OHSL and Provident have a registration
8  statement?
9    A.   Yes, it did.
10    Q.   Did you work on that registration
11  statement?
12    A.   I, I represented Provident in
13  connection with the preparation of it, yes.
14    Q.   What was being registered?
15    A.   Our -- Provident common stock.
16    Q.   And that was being created and
17  thus the need for a registration statement,
18  correct?
19        MR. FISCHER:  Objection.
20    A.   Provident common stock has been in
21  existence for many years.
22    Q.   Well, the shares that went to the
23  OHSL shareholders, okay?  Were they being
24  created or were they coming from another
25  source?

**Page 47**

1        MR. FISCHER:  Objection.
2    A.   Provident Financial Group was
3  issuing shares.
4    Q.   Okay.  When you say was issuing,
5  what does that mean?
6    A.   Providing shares to OHSL's
7  shareholders as consideration for the merger.
8    Q.   And these were shares that
9  previously did not exist, correct?
10        MR. FISCHER:  Objection.
11    A.   No, that's not right.
12    Q.   Where did these shares come from?
13    A.   These shares were authored by
14  Provident's articles of incorporation.
15    Q.   Were they outstanding in the
16  summer of 1999?
17    A.   I don't recall.
18    Q.   Okay.  Are you familiar with the
19  term restatement?
20    A.   In connection with what?
21    Q.   Companies' financial statements.
22    A.   I've heard that term, yes.
23    Q.   Okay.  What do you understand the
24  term restatement to mean? ·
25    A.   The preparation of financials --

**Page 48**

1  the preparation or correction of financial
2  statements that have previously been released.
3    Q.   When you say the preparation, what
4  did you mean in your previous answer?
5    A.   The providing of financial
6  statements that update or correct or clarify
7  previously prepared financial statements.
8    Q.   Is it your understanding that a
9  restatement is only issued where the prior
10  financial statements were materially false and
11  misleading?
12        MR. FISCHER:  Objection.
13        MS. ROWE:  Objection.
14        THE WITNESS:  Can that question be
15  repeated, please?
16        (Record read by Reporter.)
17    A.   I don't know.
18    Q.   Are you familiar with Provident's
19  restatements from March 5th of this year?
20    A.   I understand that there was a
21  restatement of financials at or about that
22  time, yes
23    Q.   Okay.  And what is your an
24  understanding of what that restatement meant
25  with respect to the earlier financials?

**Page 49**

1        MR. FISCHER:  Objection.
2        MS. ROWE:  Objection.
3    A.   I don't know
4    Q.   Okay.  Doesn't it mean that
5  Provident's earlier financials were materially
6  misstated from 1997 to 2002?
7        MR. FISCHER:  Objection.
8        MS. ROWE:  Objection.
9    A.   I don't know
10    Q.   You don't know how to interpret
11  Provident's press release, for example?
12        MR. FISCHER:  Objection.
13        MS. ROWE:  Objection.
14    A.   I don't understand the question
15  and I don't -- and I don't know.
16    Q.   Okay.  You don't understand what
17  aspect of the question?  The question is thus:
18  Does Provident's restatement on March 5th of
19  2003 mean that its financials for the years
20  1997 to 2002 were materially false and
21  misleading?
22        MR. FISCHER:  Objection.  Asked
23  and answered.
24        MS. ROWE:  Objection.  Asked and
25  answered, and that wasn't the last question.

13 (Pages 46 to 49)

**Page 50**

1    MR. FISCHER: That wasn't the last
2  question.
3    A. I already told you this. I don't
4  know and I find your lines of questions
5  abusive.
6    Q. Okay. Are you familiar with the
7  form 8-K?
8    A. Yes, I am.
9    Q. What is a form 8-K?
10   A. It is a form promulgated pursuant
11 to the 1934 Act that is a vehicle for a variety
12 of disclosures to be made by issuers on a
13 current basis as opposed to a periodic basis.
14   Q. If the chairman of the audit
15 committee of a public company resigned, is that
16 something that you would want to consider
17 filing an 8-K on?
18   MR. FISCHER: Objection.
19   MS. ROWE: Objection to form.
20   MR. FISCHER: Hypothetical.
21   A. It depends on the circumstances.
22   Q. What circumstances would it depend
23 upon?
24   A. The form 8-K requirements.
25   Q. Okay. What is your understanding

**Page 51**

1  of the form 8-K requirements for a director's
2  resignation?
3    MR. FISCHER: Same objection.
4    A. I understand that the form 8-K
5  requires that the director must submit a
6  written resignation that provides a description
7  of the basis for his resignation and with a
8  detailing of the disagreement and also requests
9  that the letter be disclosed to the public by
10 means of form 8-K filing.
11   Q. And is that the only circumstance
12 under which a form 8-K can be issued when a
13 director resigns?
14   MR. FISCHER: Objection.
15   A. To my knowledge, yes.
16   Q. Okay. Did you ever have any
17 discussions about whether or not to disclose in
18 Defendant's Exhibit 1, the director of -- the
19 resignation of OHSL director Thomas Herron?
20   MR. FISCHER: Objection.
21   MS. ROWE: Objection.
22   MR. BUCKLEY: Objection.
23   MR. FISCHER: To the extent it
24 calls for disclosure of any communication with
25 a client, don't disclose that. If you know

**Page 52**

1  that from outside sources or anything else, you
2  can disclose it.
3    A. Sure. I don't recall discussing
4  with anyone a resignation or whether or not it
5  was to be disclosed in this document.
6    Q. Okay. Let's talk about
7  Defendant's Exhibit 1. What is the purpose of
8  Defendant's Exhibit 1?
9    MR. FISCHER: Objection.
10   A. Of the entire document?
11   Q. Yes.
12   A. To give notice to OHSL's
13 shareholders of a special meeting at which
14 shareholders can consider the adoption of the
15 merger agreement.
16   Q. So the purpose of the document is
17 to give advice with respect to the transaction,
18 correct?
19   MS. ROWE: Objection --
20   MR. FISCHER: Objection.
21   MS. ROWE: -- to the form. He
22 said notice.
23   A. No.
24   Q. It's not? Do you expect
25 shareholders to rely on this document?

**Page 53**

1    MR. FISCHER: Objection.
2    A. OHSL's shareholders?
3    Q. Yes.
4    A. I'm not -- we're not counsel for
5  OHSL, so I don't know how to answer that
6  question.
7    Q. Well, you knew that the document
8  would be sent to OHSL's shareholders, correct?
9    A. The first page of it indicates
10 that it's being sent to all shareholders.
11   Q. And you knew that in the summer of
12 1999, correct?
13   A. That's correct.
14   Q. And didn't you expect OHSL
15 shareholders to reasonably rely on the contents
16 of the document?
17   A. I think that's a fair statement,
18 yes.
19   Q. Okay. Are you familiar with the
20 word unanimous?
21   A. I've heard it used before.
22   Q. Okay. What is your understanding
23 of the word unanimous?
24   A. In the context of what?
25   Q. As it's commonly used in the

Page 54

1  English language.
2       MR. FISCHER:  Objection.
3       MS. ROWE:  Objection.
4       MR. FISCHER:  There's many
5  definitions of unanimous if you look in the
6  dictionary.
7       A.  That's interesting.  I was reading
8  a -- I can't remember what I read, but there
9  was a senate vote not too long ago, it was 98
10  to nothing.  And I understand there's a hundred
11  senators, two of whom were unable to
12  participate in the vote.  And the article
13  published, you know, indicated that the vote
14  was unanimous, 98 to nothing with two people
15  not voting being unanimous.  So you know, if --
16  recently that is consistent with my
17  understanding of unanimous, where you have no
18  dissent of record.
19       Q.  You said "recently."  Did you have
20  a different understanding before recently?
21       A.  No, I did not.  I use that as a
22  way of helping you to understand what I
23  understand unanimous means.
24       Q.  Now, with the example you used
25  about the 98 senators voting in favor of

Page 55

1  something, the nonvote of two senators was
2  clearly disclosed, correct?
3       A.  In this news -- in this news, I
4  don't -- it was in the news, yes.  It was clear
5  that there were two people out there or two
6  potential people out there who didn't vote, but
7  the vote was still characterized as unanimous,
8  right.
9       Q.  Right.  But it was characterized
10  as unanimous.  Also it was characterized as
11  there were two senators that didn't vote; is
12  that correct?
13       A.  That was included in the
14  definition of unanimous from the news article I
15  saw
16       Q.  So what do you mean by that?
17  Could you repeat the lead, if you will, of the
18  article that you're talking about?
19       MR. FISCHER:  Objection.
20       A.  Are you asking me to repeat my
21  answer?
22       Q.  Excuse me?
23       A.  Are you asking me to repeat my
24  answer?
25       Q.  No, I'm asking you if you remember

Page 56

1  the lead of the article you're referring to.
2       A.  No, I don't recall.
3       Q.  Okay.  Did it say something like
4  the United States Senate voted unanimously with
5  98 senators voting in favor of and two senators
6  not participating to approve XYZ?
7       A.  No.  I recall that the word
8  unanimous was used to include the concept of
9  two senators did not vote.
10       Q.  I see.  Do you think in terms of
11  understanding that that it was important that
12  the concept that the two senators did not vote
13  be included?
14       A.  I think it doesn't change the
15  meaning of unanimous.
16       Q.  Okay.
17       A.  I'd also like to say that the, you
18  know, that's consistent with this document.
19  And unanimous here is, from my understanding,
20  properly used.  You know, there were no -- to
21  my knowledge, there were no dissents of record
22  of any sort, no OHSL indicated any, any dissent
23  at the time of the meeting or, on the
24  records or minutes of the company.  And as a
25  result, based on that understanding, the use of

Page 57

1  the word unanimously here is -- is accurate.
2       Q.  Okay.  How many directors did OHSL
3  have in the summer of 1999?
4       A.  I don't recall.
5       Q.  Okay  Did that ever change?
6       MR. FISCHER:  Objection.  Do you
7  know?
8       MS. ROWE:  You mean ever over
9  time?
10       MR. FISCHER:  Ever?  I mean, these
11  questions --
12       A.  I don't understand the question.
13       Q.  Okay.  OHSL had a certain number
14  of directors in the beginning of 1999  Do you
15  accept that?
16       A.  I assume that's correct.
17       Q.  Okay.  Did that number ever change
18  on or about July 30th of 1999?
19       A.  I don't know.
20       Q.  Okay.  Did KMK have access to
21  OHSL's Board minutes?
22       A.  Which ones?
23       Q.  All of the Board minutes for the
24  last five years.
25       A.  From today to five years back?

**Page 58**

```
 1      Q.  From 1999 to five years back.
 2      A.  What date in 1999?
 3      Q.  July of 1999.
 4      A.  I don't know.
 5      Q.  Okay.  Did anyone at KMK ever
 6  review OHSL's Board minutes?
 7      A.  I don't know.
 8      Q.  Did anyone at KMK ever review
 9  KMK -- OHSL's committee minutes?
10      A.  I don't know.
11      Q.  Isn't that common in a merger and
12  acquisition, that the acquiring entity review
13  the seller's Board minutes?
14          MR. FISCHER:  Objection.
15      A.  The acquiring entity here is
16  Provident.  Provident could have reviewed
17  those, not necessarily KMK.
18      Q.  Do you know if anyone at Provident
19  reviewed those Board minutes?
20      A.  I don't know.
21      Q.  Who at Provident might have
22  reviewed those Board minutes?
23          MR. FISCHER:  Objection to the
24  form.
25      A.  I don't know.
```

**Page 59**

```
 1      Q.  Okay.  You said that you believe
 2  the word unanimously was properly used in this
 3  document, is that correct?
 4      A.  Based on my understanding of the
 5  facts, yes.
 6      Q.  Okay.  What is your understanding
 7  of the facts with respect to the vote
 8  referenced in this sentence, it's on the first
 9  page of Defendant's Exhibit 1.  Your Board of
10  Directors unanimously approved the acquisition
11  and believes that it is in the best interest of
12  OHSL stockholders.  What is your understanding
13  of the facts referencing that vote that you
14  said you believe was correct?
15      A.  First of all, this document is an
16  OHSL document -- this page -- this notice is an
17  OHSL notice, not a Provident notice.
18      Q.  Let me interrupt you.
19      A.  Are you going to let me finish?
20          MR. FISCHER:  Let him finish his
21  answer, don't interrupt him.
22      Q.  Finish your answer.
23      A.  This is an OHSL letter, it's not a
24  Provident letter, it's not a KMK letter.  This
25  letter was -- OHSL is ultimately responsible
```

**Page 60**

```
 1  for the contents of this letter, OHSL and/or
 2  its counsel.
 3          Your question is about, as I
 4  understand it, the accuracy of this statement,
 5  The directors unanimously approved the
 6  acquisition and believe it is fair, in the best
 7  interest of OHSL shareholders.  And your
 8  question to me, as I understand it, is whether
 9  or not I think that's correct, given the facts
10  and the circumstances that I know.  Is that --
11  am I understanding the question correctly?
12      Q.  I'm going to let you talk, and
13  when you're done I'll have an additional
14  question, so please speak until you're
15  finished.
16      A.  I want to make sure I understand
17  the question.
18      Q.  I'm not answering the questions.
19      A.  I'm not -- I'm telling you that I
20  need to understand your questions in order to
21  answer them.
22      Q.  Are you done with your answer?
23          MS. ROWE:  He just said he
24  couldn't give an answer until he understood the
25  question.
```

**Page 61**

```
 1      A.  I'm trying to understand your
 2  question.
 3      Q.  Okay.  Are you done with what you
 4  had to say?
 5      A.  Yes.
 6      Q.  Okay, good.  I'm going to ask a
 7  new question then.  You said you believe that
 8  this document is a responsibility of OHSL and
 9  its counsel exclusively, correct?  Only the
10  first page of Defendant's Exhibit 1, correct?
11      A.  Among other sections and
12  disclosures in the document, that's correct.
13  With respect to this notice, that's correct.
14      Q.  Okay.  Let's talk about the first
15  page of the document only for a moment.
16      A.  Okay.
17      Q.  Do you believe that the first page
18  of the document is part of the proxy materials?
19      A.  It's a notice that accompanies the
20  proxy materials.  If -- yes, yes.
21      Q.  Okay.  Do you believe that the
22  proxy materials are joint proxy materials?
23      A.  No.
24          MS. ROWE:  Objection to form.
25          MR. FISCHER:  Objection.
```

16 (Pages 58 to 61)

**Page 62**

1  A. No. Proxy materials are proxy
2 materials.
3  Q. Okay. So you believe that the
4 proxy materials come from OHSL exclusively; is
5 that correct?
6  MR. FISCHER: Objection.
7  MS. ROWE: Objection.
8  MR. FISCHER: That was not his
9 testimony.
10  A. The proxy materials and prospectus
11 parts are interwoven. The disclosures from the
12 proxy materials are primarily OHSL words and
13 responsibility. OHSL is the ultimate author of
14 those materials relating to OHSL and the proxy
15 materials. Interwoven into that is the
16 prospectus part, for which Provident is
17 responsible.
18  Q. Do you believe that there's any
19 joint responsibility for the overall document?
20  MS. ROWE: Objection. Calls for a
21 legal conclusion.
22  MR. FISCHER: Objection.
23  A. The document is a collaborative
24 effort that is the result of the work of a
25 number of parties, including Provident and

**Page 63**

1 OHSL.
2  Q. Do you believe that there's any
3 joint responsibility for the first page of
4 Defendant's Exhibit 1?
5  A. No.
6  MS. ROWE: Objection.
7  MR. FISCHER: Same objection.
8  MS. ROWE: Calls for a legal
9 conclusion.
10  A. The first page is the sole
11 responsibility of OHSL and its counsel.
12  Q. Okay. So if there were material
13 misstatements on the first page of that
14 document -- are you with me so far?
15  A. Um-hmm.
16  Q. -- that would be the exclusive
17 responsibility of OHSL and their counsel? Is
18 that your testimony?
19  MR. BUCKLEY: Objection.
20  MR. FISCHER: Objection.
21  MS. ROWE: Objection.
22  Q. Is that your testimony?
23  MR. FISCHER: Speculative.
24  MS. ROWE: Calls for a legal
25 conclusion.

**Page 64**

1  MR. FISCHER: Improper form.
2  A. I don't know how to answer that.
3  Q. I thought that was what you just
4 said. I wanted to summarize and see if it was
5 accurate.
6  A. You can repeat my --
7  Q. My question is this: You have the
8 first page of the proxy materials and you said
9 that this is not the responsibility of KMK or
10 Provident; is that correct?
11  A. This first page?
12  Q. Yes.
13  A. This first page is a notice from
14 OHSL to OHSL's shareholders. As a result, it
15 is not a document for which Provident is -- for
16 which Provident is responsible. It was
17 prepared by OHSL and its counsel.
18  Q. Okay. So given that scenario,
19 given your understanding, would it be difficult
20 then for Ms. Rowe to represent both Provident
21 and OHSL?
22  MR. FISCHER: Objection.
23  MS. ROWE: Objection.
24  MR. FISCHER: Irrelevant.
25  A. I don't know.

**Page 65**

1  Q. Well, based on your understanding
2 of the first page of the document, how can Ms.
3 Rowe and the KMK firm represent Provident,
4 that's not responsible for what may be a
5 material misstatement, and OHSL, which
6 according to your testimony may be responsible
7 if there's a material misstatement on the first
8 page of that document?
9  MR. FISCHER: Objection.
10  MS. ROWE: Objection. Calls for a
11 legal conclusion.
12  MR. FISCHER: Calls for
13 speculation.
14  MS. ROWE: This is supposed to be
15 a fact deposition. That's the permission that
16 you were granted by the Court under the
17 auspices of you claiming that these are fact
18 witnesses, not a legal opinion deposition that
19 this gentleman has no experience with.
20  MR. FISCHER: Not just that --
21  MS. ROWE: I mean, I, I --
22  MR. FISCHER: -- this is so far
23 off base, has no relevance. You've been
24 wasting time, you've been badgering the
25 witness. I object. If you know the answer to

**Page 66**

1  the question, answer it. If you don't --
2      A. I don't know the answer to the
3  question.
4      Q. Okay. What understanding do you
5  have of who voted -- what OHSL directors voted
6  with respect to the vote referenced on the
7  first page of Defendant's Exhibit 1?
8      MR. FISCHER: Objection.
9      THE WITNESS: Any I learned with
10  you?
11      MR. FISCHER: Anything that we
12  discussed, you can't talk to him about.
13      A. I can't say.
14      MR. BRAUTIGAM: So I want to get
15  your position straight, Pat. Your position is
16  he's allowed to say that this is entirely
17  unanimous and everything is fine, but when I
18  ask him for the basis of that statement,
19  because it came from you, he's not going to
20  testify about that? Is that correct?
21      MS. ROWE: No. We objected to
22  your questions.
23      MR. FISCHER: No, I objected then,
24  and that's not correct.
25      MR. BRAUTIGAM: Okay. Please

**Page 67**

1  clarify.
2      MR. FISCHER: He can answer what
3  he knows from the facts other than from me.
4  BY MR. BRAUTIGAM:
5      Q. What do you know about the OHSL
6  vote that's referenced on the first page of
7  Defendant's Exhibit 1?
8      MR. FISCHER: Other than anything
9  I've told you.
10      A. What do I -- what do I know? Your
11  question is what do I know about the OHSL
12  directors' vote?
13      Q. That's referenced --
14      A. On that page?
15      Q. -- in that sentence on the first
16  page of Defendant's Exhibit 1.
17      A. Other than what was privileged?
18      MR. FISCHER: Other than what I've
19  told you.
20      A. I -- I can't recall.
21      Q. Okay. Let's take a look at this
22  document here.
23      MS. ROWE: Before we get started,
24  can we take a break? We've been going more
25  than an hour.

**Page 68**

1      MR. BRAUTIGAM: Certainly. This
2  is the next document, so if you want to look at
3  that during the break.
4      (Brief recess.)
5  BY MR. BRAUTIGAM:
6      Q. Mr. Reuter, I have handed you what
7  has been previously marked as Plaintiff's
8  Deposition Exhibit 42 and I ask you to take a
9  look at this.
10      A. This document?
11      Q. Yes.
12      A. I don't see an exhibit on it, but
13  you're telling me it is Exhibit 42?
14      Q. Yes. Have you seen that document
15  before?
16      A. Are you referring to the cover
17  letter or the attachment?
18      Q. I'm referring to everything you
19  have in your hand.
20      A. I'm -- I'm pretty sure I've seen
21  it before, yes.
22      Q. What is Plaintiff's Deposition
23  Exhibit 42?
24      A. Well, do you want me to start with
25  the first page?

**Page 69**

1      Q. Sure.
2      MR. FISCHER: Let's do this.
3  Let's give him the one that's marked.
4      A. Oh, thank you. First page is a
5  cover letter from Mark Weiss to members of a
6  distribution list that's attached that
7  includes -- that indicates that attached are
8  marked and unmarked drafts of the S-4, which
9  has been revised to reflect recent changes and
10  requesting that comments should be given by
11  August 20th in contemplation of filing during
12  the week of 20 -- the 23rd. And then attached
13  to that is a distribution group list. And
14  attached to that is a draft of the S-4.
15      Q. Okay. What was Mark Weiss' role
16  in the OHSL-Provident merger?
17      MR. FISCHER: Objection.
18      A. Mark Weiss represented Provident
19  in connection with the S-4.
20      Q. Okay. When you say Provident, do
21  you mean Provident Bank, PFGI?
22      A. Provident Financial Group, Inc.
23      Q. Okay. Did he represent the
24  Provident directors as well?
25      A. Not to my knowledge.

Page 70

1  Q. Okay. Did you represent the
2  Provident directors at all?
3      MS. ROWE: Objection. Asked and
4  answered.
5      MR. FISCHER: Objection. Going
6  over this again.
7      A. I've answered it, this question,
8  before and my answer is the same. No, I did
9  not represent the directors.
10     Q. Okay. In representing Provident,
11 PFGI, what did Mr. Weiss do in the
12 OHSL-Provident merger?
13     MR. FISCHER: Objection.
14     A. He assisted in the preparation and
15 filing of the S-4.
16     Q. Okay. And what was --
17     A. With respect --
18     Q. What specifically did he do?
19     MR. FISCHER: Objection.
20     A. This could take a while to
21 explain. In general, Mark interacted with
22 Provident to facilitate the preparation of
23 Provident's disclosures in this document.
24     Q. Okay. And in interacting with
25 Provident, did he draft text that's included in

Page 71

1  your hand?
2      MR. FISCHER: Objection.
3  Including the letter?
4      A. Mark Weiss drafted this cover
5  letter. He signed this cover letter. And I
6  don't understand what you mean by draft with
7  respect to the rest of the document.
8      Q. Okay. Do you see the S-4, fourth
9  page in?
10     A. (Witness nodded head.)
11     MR. FISCHER: Bates number 63?
12     Q. Yes. That has words and numbers,
13 correct, through the rest of the document?
14     A. That's correct.
15     Q. Did Mark Weiss write or review or
16 approve any of those words and numbers?
17     MR. FISCHER: Objection to the
18 form of the question. Multiple questions.
19     A. Along with OHSL, its counsel, and
20 Provident, Mark Weiss reviewed this cover page,
21 yes.
22     Q. So it's your testimony that Mark
23 Weiss reviewed only the cover page, which is
24 Bates number KMK 03963; is that right?
25     MR. FISCHER: Objection. That's

Page 72

1  all the question was about was that page.
2      MS. ROWE: Objection.
3      A. That's not what you asked me. I
4  recalled your question to be with respect to
5  this cover page.
6      Q. No, it was with the rest of the
7  document, so if we're confused, I apologize.
8      Q. Okay. With respect to the rest of
9  the document, okay, from Bates number 963 to
10 Bates number 024, did Mark Weiss write, review
11 and/or approve words and numbers in the
12 document?
13     MR. FISCHER. Objection.
14 Different document, but go ahead.
15     A. Along with OHSL, its counsel, and
16 Provident, Mark Weiss -- I understand Mark
17 Weiss reviewed certain sections scattered
18 throughout this document.
19     Q. Okay. Were you finished?
20     A. Perhaps not -- perhaps not every
21 single word. I'm finished.
22     Q. Okay. Did you write, review or
23 approve parts of this document, Plaintiff's
24 Exhibit 42?
25     MR. FISCHER. Objection to the

Page 73

1  form, multiple questions.
2      A. Write, review or approve. I
3  didn't approve anything in here. I prepared an
4  initial draft of a section -- to the best of my
5  recollection, I recall preparing an initial
6  draft of the Description of Provident Financial
7  Stock beginning on page 46.
8      I prepared an initial draft of
9  that section and an initial draft of Comparison
10 of Stockholder Rights. With respect to the
11 disclosures in there on Provident, relating to
12 Provident, Comparison of Stockholder Rights
13 begins on page 47 and I believe ends on -- ends
14 on page 52 --
15     Q. Okay
16     A. -- I prepared an initial draft of
17 those sections.
18     Q. Okay
19     A. When I --
20     Q. Please continue.
21     A. When I say I prepared an initial
22 draft, with respect to the disclosures about
23 Provident in there, I reviewed the disclosures
24 about Provident in there, but I did not review
25 or author or take any responsibility for the

19 (Pages 70 to 73)

**Page 74**

1 accuracy of -- for the OHSL provisions in there
2 on the Comparison of Stockholder Rights.
3     Q.  Where did you get that information
4 from?
5         MR. FISCHER:  Objection.  What
6 information?  He described a whole lot of
7 information.
8     Q.  The information that you just
9 referenced about OHSL.
10     A.  From OHSL's publicly available
11 documents, the code of regulations and its
12 articles of incorporation.
13     Q.  Okay.  And in preparing these
14 drafts, did you do that on a computer system at
15 KMK?
16     A.  The initial words that I used to
17 summarize the, these provisions, I did.  I'm
18 certain that I used our computer system, yes.
19     Q.  Okay.  And when you were done with
20 your draft, to whom did you give it or send it?
21         MR. FISCHER:  Objection.
22     A.  I'm -- my initial draft?
23     Q.  Yes.
24     A.  Mark Weiss or, or Provident.  I
25 can say one of the two, I can't say which one

**Page 75**

1 specifically.
2     Q.  Okay.  And did you talk to Mr.
3 Weiss about your initial draft after you sent
4 it to him?
5         MR. FISCHER:  To the extent you
6 can answer who you talked with --
7     A.  Yes
8         MR. FISCHER:  -- but you can't
9 discuss what was discussed.
10     A.  I, I discussed -- yes, I talked
11 with Mark about this.  I should
12         MR. FISCHER:  Don't discuss what
13 you talked to him about.
14     A.  I won't.  I should also add that
15 this was a piece of what you know is a document
16 that's a collaborative effort, that was a piece
17 of a document that was reviewed and changed in
18 many, many ways and revised by OHSL, its
19 counsel, and Provident.
20     Q.  Okay.  When you talked to Mr.
21 Weiss about your draft of the sections that
22 you've just referenced, what did you say and
23 what did he say?
24         MR. FISCHER:  Don't -- instruct
25 you not to -- instruct you not to answer that

**Page 76**

1 question.
2         MS. ROWE:  To the extent that your
3 question, Mr. Brautigam, elicits information
4 from Mr. Reuter about a discussion between he
5 and Mr. Weiss relating to legal advice that KMK
6 was giving to the Provident Bank, Provident
7 asserts the privilege.
8         MR. BRAUTIGAM:  Well, we believe
9 that that's not an appropriate assertion of the
10 privilege by both KMK representing KMK and the
11 witness, and by KMK representing Provident, Oak
12 Hills, the directors, KMK.  And we'll deal with
13 that at the appropriate time in the appropriate
14 forum.
15         MS. ROWE:  Well, just so I
16 understand, is it your position that
17 discussions between lawyers about legal advice
18 given to their clients is not protected by the
19 attorney-client privilege?
20         MR. BRAUTIGAM:  You'll see our
21 papers when we file them.
22 BY MR. BRAUTIGAM:
23     Q.  Okay.  Let's turn to page 48 of
24 the document.  Do you see where it says the
25 number of directors?

**Page 77**

1     A.  You're talking about this topic
2 line right here?
3     Q.  Yes.
4     A.  Yes, I do
5     Q.  And the first two sentences deal
6 with Provident, correct?
7     A.  That's correct.
8     Q.  And you obtained that information
9 from Provident's publicly available
10 information, correct?
11     A.  That's correct.
12     Q.  And what, if anything, did you do
13 to assure yourself that that was accurate as of
14 August 17th, 1999?
15         MR. FISCHER:  Objection.
16     A.  We sent this document to the
17 parties to review and confirm its accuracy
18 I -- with respect to that sentence on Provident
19 and the code, we -- like I said, I reviewed the
20 -- reviewed Provident's code and sent the --
21 well, first of all, I'm not even sure that I --
22 your question assumes that I wrote every single
23 word here.  That's not true.  I mean, I can't
24 say whether I did or didn't.
25     Q.  Did someone else possibly write

20 (Pages 74 to 77)

Page 78

1  words on this page?
2       MR. FISCHER: Well -- he already
3  testified -- go ahead.
4       A.  This document was a collaborative
5  effort that we got comments from OHSL, its
6  counsel and Provident on throughout the
7  process. And I can't tell you that -- I don't
8  remember what I initially drafted in -- with
9  respect to this draft. I don't recall
10  specifically what I, you know, which specific
11  words I initially drafted.
12       Q.  Now, when you got these comments
13  back, how did the process of making a change
14  take place?
15       A.  Parties provided changes to one
16  another and the -- and discussed the changes.
17  And if the parties agreed that -- well, changes
18  were, you know, discussed and made or not made,
19  given, you know, the circumstances in the
20  discussions.
21       Q.  How did the changes physically get
22  made in the word processing system?
23       MR. FISCHER: Objection.
24       A.  On which document?
25       Q  On this document.

Page 79

1       A.  Well, with respect to instructions
2  -- or comments we received from OHSL and
3  Provident, our -- you know, what -- one of our
4  word processing operators or secretary or an
5  assistant, you know, made the change.
6       Q.  On KMK's word processing system,
7  correct?
8       A.  With respect to -- with respect to
9  this particular document? I'm -- I'm not a --
10  I'm not a hundred percent certain that this
11  is -- yes, that's right.
12       Q.  Okay. And you supervised and
13  oversaw any changes that were made by
14  administrative personnel, correct?
15       A.  That's not supervised and oversaw
16  it. I -- I helped facilitate some of the
17  changes that were made to this.
18       Q.  Okay. And when you say you helped
19  facilitate, please describe in as much detail
20  as possible exactly what it is you did.
21       MR. FISCHER: Objection.
22       A.  I, I don't recall. This was four
23  years ago. I don't recall all the -- I don't
24  recall specifically.
25       Q.  Okay. Let's take a look at the

Page 80

1  next two sentences. It says, OHSL's
2  certificate of incorporation provides that the
3  number of directors will be set from time to
4  time by a Board resolution. Do you see that?
5       A.  Yes, I do.
6       Q.  And then it goes on to say, The
7  OHSL Board of Directors has set the current
8  number of directors at eight. Do you see that?
9       A.  Yes, I do.
10       Q.  Okay. Was that true as of August
11  17th, 1999?
12       A.  I don't know
13       Q.  Okay. Did you ever learn that
14  that was not correct?
15       A.  I don't -- I don't recall. I
16  don't, I -- I had no reason to know that this
17  was not accurate.
18       Q.  Do you remember at all in the
19  summer of 1999, whether the number of OHSL
20  directors was ever an issue?
21       A.  I don't recall that being an
22  issue.
23       Q.  Okay. Where did you get this
24  information?
25       MR. FISCHER. Objection.

Page 81

1       MS. ROWE: Objection. Asked and
2  answered.
3       A.  Which information?
4       Q  The OHSL information on the number
5  of directors.
6       A.  Well, as I've already said, I'm
7  not certain that I actually penned or drafted
8  that sentence.
9       Q.  Okay. Where could it possibly
10  have come from?
11       MR. FISCHER: Objection.
12       A.  Communications -- possibly, so
13  you're asking me to speculate as to where it
14  could have come from?
15       Q.  No, I'm asking for the
16  possibilities. I'm not asking you to
17  speculate.
18       MR. FISCHER: Objection.
19  Possibilities are speculation.
20       A.  Well, the possibilities include
21  instructions from OHSL, instructions from
22  Dinsmore & Shohl.
23       Q.  Okay. And that's my point. You
24  may have received instructions from them, but
25  you oversaw any changes that were made because

**Page 82**

1  this was your document on your computer system,
2  correct?
3      MS. ROWE: Objection.
4      MR. FISCHER: Objection to the
5  phrase "your document."
6      A. Again, this particular document
7  may have been on our system. I would assume
8  that Dinsmore would have also had this version
9  or other similar versions on its system as
10  well. So -- or OHSL or Provident, for that
11  matter. I mean --
12     Q. How was it determined which
13  version was final?
14     MR. FISCHER: Objection to the
15  term "final."
16     A. Yes, which -- which version are
17  you talking about being final?
18     Q. The one that was sent to the
19  shareholders.
20     A. How was that determined?
21     Q. Yes.
22     A. Through this collaborative
23  process, which we previously discussed. And
24  through the input in -- of all the different
25  parties, including OHSL and its counsel and

**Page 83**

1  Provident and us, there was a collective -- a
2  collective decision was made.
3      Q. Was there someone who was in
4  overall charge of the finalization of the proxy
5  materials and the registration statement?
6      MR. FISCHER: Objection.
7      MS. ROWE: Objection. Asked and
8  answered.
9      A. I can repeat my prior answer in
10  response to your question. This was a
11  collaborative effort that was only finalized
12  until all of the parties said so.
13     Q. So no one individual person was in
14  charge, is that correct?
15     MS. ROWE: Objection. Asked and
16  answered.
17     MR. FISCHER: Objection.
18     A. Again, this was a collaborative
19  effort. There was not one particular person
20  who was making decisions in a vacuum.
21     Q. Who, if anyone, gave the final
22  authorization for all of the material included
23  in Defendant's Exhibit 1 to go to the printer
24  and be disseminated to the OHSL shareholders?
25     MR. FISCHER: Objection.

**Page 84**

1      A. I don't recall. I don't recall.
2      Q. Okay. Let's talk about the
3  service list document. What duties and
4  responsibilities, if any, did Mr. Chris Carey
5  have with respect to the process of drafting
6  and reviewing Plaintiff's Exhibit 42?
7      MR. FISCHER: Do not disclose any
8  communications with Mr. Carey. Otherwise, you
9  can answer the question.
10     A. I don't know.
11     Q. Okay. What duties and
12  responsibilities did Mark Magee have with
13  respect to drafting and reviewing of
14  Plaintiff's Exhibit 42?
15     MR. FISCHER: Same instruction.
16     A. I -- I don't recall, nor do I
17  think I know. No, I don't know.
18     Q. Okay. What duties and
19  responsibilities, if any, did John Farrenkopf
20  have with respect to Plaintiff's Exhibit 42?
21     MR. FISCHER: Same instruction.
22     A. I don't know.
23     Q. Okay. What duties and
24  responsibility, if any, did Richard Hanebutt
25  have with respect to Plaintiff's Exhibit 42?

**Page 85**

1      MR. FISCHER: Same instruction.
2      A. I don't recall.
3      Q. Okay. What duties and
4  responsibilities did Robert Litzinger have with
5  respect to Plaintiff's Exhibit 42?
6      MR. FISCHER: Same instruction.
7      A. I don't recall.
8      Q. What duties and responsibilities
9  did Tony Stollings have with respect to
10  Plaintiff's Exhibit 42?
11     MR. FISCHER: Same instruction.
12     A. I don't recall.
13     Q. Okay. What duties and
14  responsibilities, if any, did Mr. Kenneth
15  Hanauer have with respect to Plaintiff's
16  Exhibit 42?
17     MR. BUCKLEY: Objection.
18     A. I -- I don't recall.
19     Q. What duties and responsibilities
20  did Charlie Crowley have with respect to
21  Plaintiff's Exhibit 42?
22     A. I don't recall.
23     Q. What duties and responsibilities
24  did Jeff Moritz have with respect to
25  Plaintiff's Exhibit 42?

Page 86

1    A.  I don't recall.
2    Q.  What duties and responsibilities
3  did Cliff Roe have with respect to Plaintiff's
4  Exhibit 42?
5        MR. BUCKLEY:  Objection.
6    A.  I don't recall specifically.
7    Q.  What duties and responsibilities
8  did Charlie Hertlein have with respect to
9  Plaintiff's Exhibit 42?
10        MR. BUCKLEY:  Objection.
11    A.  In general, OHSL and its counsel
12  was responsible as the author of provisions in
13  this document relating to OHSL.  Other than
14  that, I can't be more specific.
15    Q.  When you say "responsible" in your
16  previous answer, do you mean responsible in a
17  legal sense to the shareholders or responsible
18  in terms of the commitments of drafting and
19  getting the document out?
20    A.  Both.
21        MS. ROWE:  Objection.
22        MR. FISCHER:  Objection.
23    Q.  Okay.  What, if any, duties and
24  responsibilities did Gary Kreider have with
25  respect to Plaintiff's Exhibit 42?

Page 87

1        MR. FISCHER:  Do not disclose
2  discussions with other lawyers at KMK for the
3  rendition of legal services for Provident.
4    A.  I don't recall.
5    Q.  What duties and responsibilities
6  did David Rosenberg have with respect to
7  Plaintiff's Exhibit 42?
8        MR. FISCHER:  Same instruction.
9    A.  I don't recall.
10    Q.  What duties and responsibilities
11  did Tim Matthews have with respect to
12  Plaintiff's Exhibit 42?
13        MR. FISCHER:  Same instruction.
14    A.  I don't recall.
15    Q.  What duties and responsibilities
16  did Mark Weiss have with respect to Plaintiff's
17  Exhibit 42?
18        MR. FISCHER:  Same instruction.
19    A.  Has this already been -- I'm
20  trying to recall my -- I'm trying to understand
21  how this question might be different from a
22  prior question you asked about what Mark Weiss'
23  responsibilities were with respect to this
24  document.
25    Q.  Well, if you answered the

Page 88

1  question, that's fine.  He's on the service
2  list and I was going in order.  What duties and
3  responsibilities did John Winstead have with
4  respect to this Plaintiff's Exhibit 42?
5        MR. FISCHER:  Same instruction.
6    A.  I don't recall.
7    Q.  Okay.  Were there any other
8  attorneys other than the ones I've mentioned at
9  KMK who worked on the OHSL-Provident merger?
10    A.  Not that I recall.
11    Q.  Did you ever have any
12  conversations with anyone on this service
13  letter?
14    A.  Yes.
15    Q.  Okay.  I believe you referenced a
16  conversation with Tony Stollings earlier.
17  Anyone else?
18        MR. FISCHER:  Again, don't
19  reveal -- you can reveal who you talked to, but
20  not the content of communications with clients
21  or the other lawyers in the office when you're
22  giving advice to Provident.  Otherwise, you can
23  answer.
24    A.  First of all about that
25  communication with Tony Stollings, I may or may

Page 89

1  not have discussed with him, I don't recall.
2  This was four years ago.
3    Q.  Right.  I think that was clear
4  from your previous answer.
5    A.  Right.  I may or may not have, I
6  don't recall.  I may or may not have had
7  discussions with Mark Magee, I don't recall.  I
8  may have had one discussion with Cliff Roe.  I
9  had discussions with Mark Weiss, I don't -- I
10  don't recall any other discussions.
11    Q.  Okay.  When you had your
12  discussion with Cliff Roe, what did you say and
13  what did he say?
14    A.  I don't recall.
15    Q.  What was the topic of the
16  conversation?
17    A.  It had to do -- it was a brief
18  conversation about a -- I don't recall.  It was
19  so -- it was a brief conversation at the very
20  beginning of the preparation of the document
21  that I -- I can't say with certainty what it
22  was about, but it was not about anything -- I
23  don't recall anything substantive or, or
24  meaningful discussed.
25    Q.  Okay.  Now, this August 17th, 1999

23 (Pages 86 to 89)

Page 90

1  cover letter requests that people contact
2  either you or Mark Weiss with questions,
3  comments; is that right?
4      A.  That's what the letter says, yes.
5      Q.  And it's your testimony that to
6  the best of your recollection as you sit here
7  today, you may have spoken with Tony Stollings,
8  you did speak with Cliff Roe, you did speak
9  with Mark Weiss, and you've told me everything
10 you can about those conversations as limited by
11 your counsel; is that right?
12     MR. FISCHER:  Objection to the
13 form, multiple questions, but if you can
14 answer, go ahead.
15     A.  Your question is, I have told you
16 everything I can about my conversations with
17 those individuals?
18     Q.  Right.  As limited by your
19 counsel.
20     A.  Well, I don't -- I don't recall
21 any -- I don't recall any specifics.  I don't
22 recall any specifics that I could share with
23 you.
24     Q.  Did you take notes of any of these
25 conversations?

Page 91

1      A.  I don't recall.  I -- I don't
2  recall.
3      Q.  Okay.  Did you take notes at any
4  time during the OHSL-Provident merger?
5      A.  When you say notes, what does that
6  mean?
7      Q.  It means, among other things,
8  having a pen, writing down words, numbers on a
9  piece of paper, and putting it in a file called
10 notes, or some equivalent.
11     MR. FISCHER:  Objection to the
12 form.
13     A.  I -- I don't recall.
14     Q.  Okay.
15     A.  I don't recall taking notes that
16 way, no.
17     Q.  Okay.  Did you take notes on a
18 computer?
19     A.  No, I didn't.  I didn't.  I don't
20 recall taking notes on a computer.
21     Q.  Okay.  Did you take notes with a
22 dictation machine?
23     A.  No.  I don't recall taking notes
24 on a dictation machine.
25     Q.  Okay.  Did you take notes in any

Page 92

1  form whatsoever?
2      A.  I -- I'm certain that I did.
3      Q.  Okay.  In what form did you take
4  notes?
5      A.  I -- I don't recall.  I mean, when
6  you said with a pen and a paper, that would be
7  the only method with which I would have taken
8  the notes, but I -- whether or not they made it
9  into a file is not something that I recall
10 doing.
11     I mean, I -- it was four years
12 ago, I can't -- I'm certain -- I mean, I take
13 notes in every transaction.  I just can't -- I
14 can't -- I don't recall putting them in a
15 specific file and I -- I just don't recall
16 specifics about it.
17     MR. FISCHER:  Just a second.  I
18 notice you looked at your watch, Mr. Brautigam.
19 I don't need to leave till 12:30 today instead
20 of 11:30, so we have time.
21     Q.  Where were these notes the last
22 time you saw them?
23     MS. ROWE:  Objection.
24     MR. FISCHER:  Objection.
25     MS. ROWE:  He testified he doesn't

Page 93

1  recall specifics.
2      A.  I haven't seen the notes.  I don't
3  recall seeing the notes in four years about.  I
4  couldn't tell you if they even still exist
5  anymore.  In transactions like these occur and
6  close, I -- I don't -- I mean, I can't tell
7  you -- I can't tell you where they are or when
8  the last time I saw them was.
9      Q.  Okay.  Is there a document
10 retention policy at KMK?
11     A.  I don't know.  I'm not familiar
12 with it if there is one.
13     Q.  Okay.  Were you ever asked to
14 produce documents or preserve documents with
15 respect to any litigation arising out of the
16 OHSL-Provident merger?
17     MR. FISCHER:  Don't disclose
18 communications between you and me.
19     A.  No, not that I recall.  I -- no.
20     Q.  When did you learn from the first
21 time that there had been any litigation with
22 respect to the OHSL-Provident merger?
23     A.  My counsel --
24     MR. FISCHER:  Don't tell him what
25 you disclosed.  He asked whenever.

24 (Pages 90 to 93)

**Page 94**

1    A.  Whenever my counsel approached me
2 and told me about it. The date on which --
3    MR. FISCHER: Don't tell him what
4 was discussed.
5    A.  I don't recall when. Your
6 question is when?
7    Q.  Yes.
8    A.  I don't know.
9    Q.  Was it in July of 2003?
10    A.  No.
11    Q.  Okay. When did you learn that KMK
12 had been sued as a defendant in litigation
13 related to the OHSL-Provident merger?
14    MS. ROWE: Objection.
15    MR. FISCHER: Again, he's asking
16 when, if ever.
17    A.  I don't know. I don't know.
18    Q.  Did you find it unusual that you
19 had not been asked to preserve your notes and
20 records of the OHSL-Provident merger?
21    MR. FISCHER: Objection. Assumes
22 facts not in evidence.
23    A.  I don't -- I don't know. I don't
24 know.
25    Q.  This has been previously marked as

**Page 95**

1 Plaintiff's Exhibit 16. I'm not sure that I
2 have -- here. Mr. Reuter, I've handed you what
3 has been previously marked as Plaintiff's
4 Deposition Exhibit 16. And I ask you to take a
5 look at it. Have you seen that document
6 before?
7    A.  I, I --
8    MR. FISCHER: Don't speculate.
9    A.  I don't recall. I don't recall.
10 I'm not denying that I've seen it, but I -- I
11 don't recall.
12    Q.  Okay. Well, we'll get into it in
13 more detail and see if that refreshes your
14 recollection.
15    Okay. What is Plaintiff's Exhibit
16 16?
17    A.  Appears to be a letter from Mr
18 Hertlein to Mark Weiss that attaches
19 handwritten comments on the S-4 purportedly
20 from Pat Condren and Ken Hanauer.
21    Q.  And in the normal course of
22 business, with respect to the Provident merger
23 at or about this time, meaning August 17th to
24 August 19th of 1999, would you have seen this
25 in the ordinary course of business?

**Page 96**

1    MR. FISCHER: Objection,
2 hypothetical.
3    A.  I don't know. I mean, I may have,
4 I may not have. I don't know.
5    Q.  Okay. Was there an invariable
6 process with respect to documents that were
7 hand delivered to Mr. Weiss that presumably
8 would then go to you and other members of the
9 KMK team?
10    MS. ROWE: Object to form.
11    MR. FISCHER: I want to hear the
12 question again.
13    (Record read by Reporter.)
14    MR. FISCHER: Note my objection.
15    A.  I don't understand what you mean
16 by "invariable."
17    Q.  Okay. When this document was hand
18 delivered to Mark Weiss, did he somehow get you
19 this document?
20    MR. FISCHER: Objection.
21    A.  I've already stated that I don't
22 recall this. I'm not denying that I saw it, I
23 just don't -- don't recall it.
24    Q.  Okay. What's the purpose of this
25 document?

**Page 97**

1    MR. FISCHER: Objection. It's
2 somebody else's document and he doesn't recall
3 if he saw it or not.
4    A.  I don't know.
5    Q.  What do you think the purpose is
6 of sending this document to KMK?
7    MR. FISCHER: Objection to form.
8    MR. BUCKLEY: Objection.
9    A.  I -- what do I think the purpose
10 is?
11    Q.  Yes.
12    MS. ROWE: Objection.
13    A.  So you're asking me to --
14    MR. FISCHER: Object to the form,
15 calls for him to speculate. Go ahead.
16    A.  Okay. It is a -- I mean, I'm
17 presuming that it -- you know, the purpose was
18 for it to be a vehicle or mechanism to transmit
19 comments on the document from OHSL to Mark
20 Weiss, so the changes would be made in the S-4.
21    Q.  And the purpose of making those
22 changes was to make the S-4 accurate, truthful
23 and complete, correct?
24    MR. FISCHER: Objection to the
25 form --

25 (Pages 94 to 97)

Page 98

1    MS. ROWE: Objection to the form.
2    MR. FISCHER: -- of the question.
3    A.  I can't tell you what OHSL's --
4  whether or not they intended to provide
5  accurate and complete and correct disclosure. I
6  hope they did, but I can't tell you what their
7  specific purpose was with respect to those
8  objectives.
9    Q.  Do you have any reason to believe
10  that OHSL did not want to make the S-4
11  accurate, truthful and complete?
12    A.  I don't know. I don't have a
13  reason.
14    Q.  Do you have any reason to believe
15  that Ken Hanauer did not fully cooperate in the
16  merger process?
17    A.  I don't know.
18    Q.  Do you have any reason to believe
19  that Ken Hanauer was against the merger
20  transaction?
21    A.  Again, I don't know.
22    Q.  Okay. Let's take a look at this
23  document. If I could direct your attention to
24  -- let's look at page 53 of the document.
25    MR. FISCHER: Is there a page 54?

Page 99

1    Q.  Apparently not. Look at the Bates
2  numbers
3    MR. FISCHER: Okay. Do you see
4  that?
5    A.  Page 53, yes.
6    Q.  Right, okay. What's the purpose
7  of listing a table of security ownership,
8  certain beneficial owners and management in an
9  S-4?
10    MS. ROWE: Objection.
11    A.  Complying with the disclosure
12  regulations.
13    Q.  And what are those disclosure
14  regulations, as you understand it?
15    MR. FISCHER: Objection.
16    A.  I'd have to review regulation SK
17  to tell you specifically what the ownership
18  disclosure regulations are, but -- yes, I'd
19  have to review those specifically to go through
20  those regulations.
21    Q.  You can tell me just generally.
22    MS. ROWE: Objection.
23    MR. FISCHER: Objection to the
24  form.
25    A.  What the purpose is of the

Page 100

1  disclosure regulations relating to ownership?
2    Q.  Yes.
3    A.  To disclose the beneficial
4  ownership of certain OHSL executive officers
5  and directors.
6    Q.  And do you have any idea why
7  that's required?
8    A.  By the securities laws?
9    Q.  Yes.
10    MS. ROWE: Objection.
11    MR. FISCHER: Objection.
12    A.  I don't know what the SEC had in
13  mind when they promulgated that rule
14  specifically.
15    Q.  Okay. Look in the first line
16  under the caption, and it sets forth as of July
17  31st, 1999. Do you see that?
18    A.  Yes.
19    Q.  Okay. How was that date selected?
20    MR. FISCHER: Objection.
21    A.  I don't know.
22    Q.  Who's responsible for selecting
23  that date?
24    MS. ROWE: Objection.
25    MR. BUCKLEY: Objection.

Page 101

1    MR. FISCHER: Objection.
2    A.  OHSL.
3    Q.  Who at OHSL?
4    A.  I don't know
5    Q.  Okay. Do you ever -- do you
6  remember ever seeing this page of the document
7  before?
8    A.  This page with these handwritten
9  comments?
10    Q.  Yes.
11    A.  With these handwritten comments,
12  I -- I do not recall seeing this page, no.
13    Q.  Does this refresh your
14  recollection as to whether or not Thomas M.
15  Herron resigned as an OHSL director on
16  7/29/1999?
17    MR. FISCHER: Objection.
18    MS. ROWE: Objection.
19    A.  No, it does not. I don't recall
20  that. I don't recall that resignation back,
21  back then. No, I don't recall that resignation
22  back then.
23    Q.  Okay. Was the topic of Mr.
24  Herron's resignation ever discussed by KMK
25  attorneys or anyone working on the deal?

26 (Pages 98 to 101)

Page 102

1    MR. FISCHER: Objection.
2    MR. BUCKLEY: Objection.
3    MR. FISCHER: To the extent it
4  calls for discussions with clients or among the
5  lawyers at KMK to give advice to the client,
6  don't disclose. Other than that, you can
7  disclose.
8    A.  I don't recall discussions at KMK
9  regarding the resignation.
10    Q.  So this is the first you've
11  learned of it, in fact, from these notes?  Is
12  that correct?
13    MR. FISCHER: Objection. Don't
14  disclose anything we've discussed.
15    A.  From this source?
16    Q.  Yes.
17    A.  The -- like I said, I may or may
18  not have seen this. I don't -- I don't recall,
19  but this -- but your bringing this document to
20  my attention is the first time that I've become
21  aware of this note indicating that --
22  indicating the resignation.
23    Q.  Okay. Aside from the note, do you
24  recall any issue of Mr. Herron's resignation
25  with respect to the OHSL-Provident merger?

Page 103

1    MR. FISCHER: Same instruction.
2    A.  Recall at what time?
3    Q.  In the summer of 1999 when you
4  were working on the merger.
5    A.  No.
6    MR. FISCHER: Same instruction.
7    A.  No, I do not.
8    Q.  Okay. That would include the fall
9  of 1999, all the way up to the closing on
10  December 3rd. Same answer?
11    MR. FISCHER: Same instruction.
12    A.  I do not recall. I do not recall
13  that -- I do not recall the resignation issue
14  at that time.
15    Q.  Okay. And aside from what you may
16  have discussed with Mr. Fischer, you don't
17  recall the resignation of Mr. Herron ever to
18  have been an issue; is that fair?
19    MR. FISCHER: Same instruction.
20    A.  To my recollection, yes, that's
21  correct. That's correct.
22    Q.  Okay. Do you believe that the
23  shareholders of a public company have a right
24  to know who their directors are at any given
25  time, as a general proposition?

Page 104

1    MR. FISCHER: Objection.
2    MR. BUCKLEY: Objection.
3    MS. ROWE: Objection.
4    A.  I believe the shareholders have a
5  right to have the company comply with
6  disclosure requirements relating to who its
7  directors are.
8    Q.  I respectfully suggest that that's
9  not responsive to my question. My question is
10  this: Do you believe that the shareholders of
11  a public company as a general matter should be
12  able to tell who their directors are at any
13  particular time?
14    MS. ROWE: Same objection. Asked
15  and answered.
16    MR. FISCHER: Same objection.
17  Asked and answered. Arguing with the witness,
18  prior answer.
19    A.  Can I repeat my prior answer?
20    Q.  Well, I can repeat it, it's not
21  responsive. If that's the best you can do,
22  I'll move on.
23    A.  You can continue to ask the
24  question and argue with me if you want, but
25  I'll repeat my answer.

Page 105

1    Q.  No, I'm not arguing with you.
2    MR. FISCHER: Yes, you are,
3  because you don't like his answers.
4    Q.  Do you believe that Mr. Herron's
5  resignation is a material fact that should have
6  been disclosed to the shareholders in the
7  context of this transaction?
8    MR. FISCHER: Objection.
9    MS. ROWE: Objection.
10    MR. BUCKLEY: Objection.
11    MR. FISCHER: He never knew about
12  it, he already testified. Hypothetical.
13    A.  This should have been disclosed if
14  it was required by the proxy rules -- by the
15  securities disclosure rules relating to proxy
16  materials/8-K. And if I recall the proxy
17  disclosure rules for director resignations are
18  comparable, if not exactly the same as the form
19  8-K resignation requirements.
20    In other words, the proxy
21  materials do not have to disclose the
22  resignation unless there is a writing from the
23  resigning director that sets forth the terms of
24  the disagreement over which the director is
25  resigning and the letter additionally