Page 106

1 specifically requests that the letter be
2 disclosed.
3          And in the absence of the
4 compliance with those conditions, I don't
5 recall any securities regulations that would
6 require the disclosure of that resignation.
7      Q.  Are you a fair man?
8          MS. ROWE:  Objection.
9          MR. FISCHER:  Objection.
10     A.  I'm not sure what you mean by
11 "fair."
12     Q.  Do you believe that it was fair
13 not to disclose Mr. Herron's resignation in
14 this context in this way?
15         MR. FISCHER:  Objection.
16         MS. ROWE:  Objection.
17         MR. BUCKLEY:  Objection.
18         MR. FISCHER:  Hypothetical.
19 Asking for a legal opinion.  You're not paying
20 him for his legal advice.  If you want to, I'm
21 sure he'll be happy to send --
22         MS. ROWE:  Also, he testified that
23 he didn't know about the resignation.
24         MR. FISCHER:  That's why I said
25 hypothetical.

Page 107

1      A.  I can't say I don't -- I can't, I
2 don't know enough about what the meaning of
3 fair is in the context of the question to
4 answer
5      Q.  Do you believe that if Mr.
6 Herron's resignation was in part because he
7 strongly disagreed with the OHSL-Provident
8 merger --
9          MR. BUCKLEY:  Objection.
10         MR. FISCHER:  Objection.
11         MS. ROWE:  Objection.
12     Q.  -- would have added to the mix of
13 information that a reasonable shareholder would
14 want to know in making a decision as to how to
15 vote on this merger?
16         MR. FISCHER:  Objection.
17         MS. ROWE:  Objection.
18         MR. BUCKLEY:  Objection.
19         MR. FISCHER:  Assumes facts not in
20 evidence, hypothetical.
21     A.  I -- I don't know.  I didn't know
22 that he was opposed to the merger, I didn't
23 know, and if that is the case, I -- I can't
24 say, I don't know.
25     Q.  What factors would you want to

Page 108

1 consider if you had known?
2          MS. ROWE:  Objection.
3          MR. FISCHER:  Same objection.
4 Wasting time.
5          MS. ROWE:  You're asking him now a
6 hypothetical upon a hypothetical.
7          MR. FISCHER:  I know, it's
8 amazing.
9          MR. BRAUTIGAM:  We're doing fine,
10 we really don't need speaking objections, but I
11 understand Ms. Rowe and Mr. Fischer like the
12 colloquy back and forth, but please, just to
13 have this dialogue --
14         MR. FISCHER:  Mr. Brautigam,
15 you're asking a question which is improper.  If
16 he can answer it, go ahead.
17         MS. ROWE:  And, I mean, if you
18 must raise the subject, which I think is
19 totally inappropriate, but if you feel the need
20 to comment on the objections that we have made
21 on the record, I will state again that the
22 Court granted you permission to take these
23 depositions for the purpose of eliciting facts
24 about the claims raised in your lawsuit, not
25 about eliciting hypotheticals upon

Page 109

1 hypotheticals that have nothing to do with the
2 facts asserted in your lawsuit.
3          MR. BRAUTIGAM:  Rachael, we're
4 doing fine, we really don't need speaking
5 objections.
6          MR. FISCHER:  That's not a
7 speaking objection.  It's an objection to
8 what's going on here, an abuse of the discovery
9 process  I would hope Mr. Mesh would intervene
10 and direct his associate that he's supposed to
11 be supervising and take care of this mess.
12         MR. MESH.  Well, let me speak to
13 that, Mr. Fischer  I believe that Mr.
14 Brautigam is proceeding along a normal path to
15 try to obtain responses from an unwilling
16 witness, and that he's doing a good job in that
17 regard
18         And I'm not sure all of the
19 objections as to privilege that you have
20 instructed -- on which you have instructed the
21 witness not to answer apply in this case, where
22 you have a public company issuing a public
23 document to a class of public shareholders.
24         You might want to revisit what the
25 law is on privilege and work product in that

28 (Pages 106 to 109)

Page 110

1   case. I only say that in response to your
2   invitation, Mr. Fischer, to say something.
3        MR. FISCHER: My invitation, Mr.
4   Mesh, was to control your supervised attorney,
5   which you're not doing.
6        MR. MESH: I think we're doing a
7   very good job. And you have a right to
8   terminate this deposition at any time, Mr.
9   Fischer, and go to the Court for a ruling. And
10  I invite you to do that if it's so distasteful
11  to you.
12       MR. FISCHER: We may have to do
13  that.
14       MR. MESH: I invite you to do it.
15  Would you like to do it now?
16       MR. FISCHER: If he continues in
17  this process, we will.
18       MR. MESH: Fine. Now?
19       MR. FISCHER: We will do it at the
20  appropriate time.
21       MR. MESH: Not now?
22       MR. FISCHER: We'll see.
23  BY MR. BRAUTIGAM:
24       Q. Mr. Reuter, there is a question
25  pending. Would you read it back, please?

Page 111

1        (Record read by Reporter.)
2        MR. FISCHER: Same objection.
3        MS. ROWE: Same objection.
4        A. I think my answer is still, I
5   can't say, I don't know.
6        Q. Mr. Reuter, how is it possible for
7   you to do your job without knowing that Mr.
8   Herron had resigned?
9        MR. FISCHER: Objection.
10       MS. ROWE: Objection.
11       A. I don't know. The fact is I don't
12  -- the fact is, I don't -- I don't know. I
13  mean, I don't know.
14       Q. Okay. Let's go back over the
15  chronology. On August 17th we have an outgoing
16  letter from Mark Weiss to the distribution
17  list, correct?
18       A. Um-hmm. Um-hmm.
19       Q. And it calls for comments on the
20  current draft of the S-4, correct?
21       A. Um-hmm.
22       Q. And it directs the -- could you
23  answer yes or no, please?
24       A. Yes, sir.
25       Q. Okay. And this -- it's just for

Page 112

1   the record. And it directs that comments on
2   the S-4 be made directly to Mark Weiss or to
3   you; is that correct?
4        A. This August 17th letter, that's
5   what it says, that's correct.
6        Q. Right. And why did Mr. Weiss
7   indicate that comments should be made to him or
8   to you?
9        A. Because that was part of the
10  process at that time of developing the document
11  that the parties had been participating in.
12       Q. Is it fair to say that it was
13  important to keep you in the loop, given your
14  duties and responsibilities at this point in
15  the transaction?
16       MS. ROWE: Objection.
17       MR. FISCHER: Objection.
18       A. With respect to certain items,
19  yes. With respect to other items, no.
20       Q. Okay. What items was it important
21  to keep you in the loop on and what items was
22  it not important to keep you in the loop on?
23       A. I -- I can't say. There again, a
24  lot of circumstances under which I -- makes it
25  difficult for me to answer that question.

Page 113

1        Q. As you sit here today, do you find
2   it surprising that you did not know that an
3   OHSL director had resigned?
4        MR. FISCHER: Objection.
5        MR. BUCKLEY: Objection.
6        A. About this resignation, I just
7   don't recall it. And we've discussed that the
8   circumstances -- the circumstances that would
9   require the disclosure of the resignation, to
10  my understanding, don't rise to the threshold
11  of disclosure. So if it wasn't required to be
12  disclosed, I don't know why it would be
13  something that I would be a part of.
14       Q. Have you seen Mr. Herron's
15  resignation letter?
16       A. No, I have not.
17       Q. Then how do you know that there's
18  no basis for disclosure?
19       MS. ROWE: Objection.
20       MR. FISCHER: Objection.
21       A. I guess I understood and assumed
22  that the letter did not include the requests
23  that are required under the regulations for
24  disclosure. I guess that was something that
25  I -- I was never aware. I was never aware that

29 (Pages 110 to 113)

**Page 114**

1  the circumstances ever warranted that.
2      Q.  Okay.  You said you understood and
3  assumed.  Let's take it one at a time.  Where
4  did you get that understanding?
5          MS. ROWE:  Objection.
6          MR. FISCHER:  Objection.  To the
7  extent it calls for discussion or
8  communications between us, don't disclose that.
9      A.  I can't say.
10     Q.  Why did you assume?
11     A.  With respect?
12         MR. FISCHER:  Same instruction.
13     A.  Same -- same answer.  I can't say,
14 I don't know.
15     Q.  As you sit here today, is there
16 anything you would have done differently, had
17 you known that Mr. Herron had resigned?
18         MR. FISCHER:  Same objection.
19         MR. BUCKLEY:  Objection.
20         MS. ROWE:  Objection.
21     A.  No.  The resignation of Mr. Herron
22 is a disclosure item -- and this is why our
23 dialogue has been so confused.  Your questions
24 at least I find so confusing.
25         This is a disclosure item for

**Page 115**

1  OHSL, not for KMK, not for Provident.  This is
2  a resignation by an OHSL director.  So this --
3  KMK did not represent OHSL.  That is why I'm
4  having difficulty answering your questions,
5  because this would be OHSL's responsibility,
6  not KMK's or Provident's, to -- to, you know,
7  provide specific disclosure and -- it would be
8  OHSL's responsibility to provide specific
9  disclosure about it if it were required.
10         MR. BRAUTIGAM:  Okay.  Let's take
11 a short break.
12         (Brief recess.)
13 BY MR. BRAUTIGAM:
14     Q.  Okay.  Mr. Reuter, can I direct
15 your attention to Defendant's Exhibit 1,
16 please?
17     A.  This document?
18     Q.  Yes.  The paragraph that begins,
19 Your Board of Directors unanimously approved
20 the acquisition.  Do you see that?
21     A.  Yes.
22     Q.  Okay.  What individuals does that
23 refer to, if you know?
24         MS. ROWE:  Objection.
25     A.  I -- you're asking me to identify

**Page 116**

1  the individuals of the Board who approved?
2      Q.  Right.  If you know.
3      A.  I can't identify them.
4      Q.  Okay.  But you believe that it was
5  the then existing members of the Board of
6  Directors at that time, August 2nd, correct?
7          MR. FISCHER:  Objection.
8      A.  Who -- those who voted or
9  didn't -- did not enter a -- let me see that.
10 Let me read that, if you don't mind.
11         MR. FISCHER:  Sure.
12     A.  I'm sorry.  This document is
13 dated --
14         MR. FISCHER:  I was trying to find
15 the date.  He mentioned the date.
16     Q.  September 24th.
17     A.  September 24th.  I'm sorry, your
18 question is, as of September 24th --
19     Q.  No, actually my question is this:
20 The paragraph that I'm interested in, Your
21 Board of Directors unanimously approved the
22 acquisition and believes that it is in the best
23 interest of OHSL stockholders, that refers, I
24 believe, to an August 2nd, 1999 vote.  Okay,
25 are you with me so far?

**Page 117**

1      A.  I -- I hear you.
2      Q.  Okay.  And do you believe that the
3  unanimous vote that's referred to means that
4  all of the then directors voted unanimously to
5  approve the merger with Provident?
6          MR. FISCHER:  Objection to form.
7          MS. ROWE:  Objection to form.
8          MR. BUCKLEY:  Objection.
9      A.  Do I believe that?
10     Q.  Yes.
11     A.  No.  I, I believe that the -- I'm
12 confused by your question, but I believe that
13 the -- what this means is that the Board of
14 Directors, members -- all of the members of the
15 Board of Directors who voted approved the
16 acquisition at a time prior to the date of this
17 document.
18     Q.  Okay.  And why do you believe that
19 that refers to only those directors who voted?
20     A.  Because I understand the meaning
21 of the word unanimously to be applicable even
22 in the case where a director abstains from
23 voting.
24     Q.  Okay.  Is that the way they do it
25 in Provident Board meetings?



**Page 118**

1  A. I don't participate in Provident
2 Board meetings, so I don't know.
3  Q. Have you reviewed Provident Board
4 minutes?
5  MS. ROWE: Objection. To the
6 extent the question calls for you to reveal
7 information that you learned during the course
8 of your representation of the Provident Bank,
9 Provident asserts the privilege.
10  A. I don't -- I don't believe I've
11 reviewed Provident Board minutes. I don't
12 recall reviewing Provident Board minutes.
13  Q. Okay. In fairness, back to this
14 transaction and this Board, do you think that
15 if some directors didn't vote for whatever
16 reason, that that should be disclosed?
17  MR. FISCHER: Objection.
18  MS. ROWE: Objection.
19  MR. BUCKLEY: Objection.
20  MR. FISCHER: Objection to the
21 form.
22  A. I don't know of any securities
23 regulation that requires the disclosure of that
24 item.
25  Q. Okay. Let's take a look through

**Page 119**

1 some additional pages here. Let me direct your
2 attention to page 20 of the document, please,
3 if you will.
4  A. This is in the background of the
5 acquisition section?
6  Q. Yes.
7  A. Yes.
8  Q. Actually, let me direct your
9 attention to page 18. Okay. Do you see the
10 first sentence under Background of the
11 Acquisition?
12  A. Yes, I do.
13  Q. Okay. And do you see it says
14 that. At a special meeting of the Board of
15 Directors of OHSL held on August 2nd, 1999, the
16 OHSL Board of Directors determined that the
17 acquisition was advisable to and in the best
18 interest of the OHSL stockholders? Do you see
19 that?
20  A. Yes, I do.
21  Q. And that refers to the seven
22 directors who were members of the Board as of
23 August 2nd, 1999; is that correct?
24  MR. FISCHER: Objection.
25  MS. ROWE: Objection.

**Page 120**

1  MR. BUCKLEY: Objection.
2  A. I don't know. I don't recall how
3 many members of the Board there were at that
4 time.
5  Q. Okay. Well, let's take a look at
6 the other document then, that table in
7 Deposition Exhibit 42.
8  MR. FISCHER: This is 42.
9  A. Okay. I'm sorry, what page?
10  Q. Fifty-three. Okay. And you can
11 count the number of directors?
12  A. I'm not sure which one -- I don't
13 know which ones of these are directors or
14 executive officers. No, I can't.
15  Q. Okay. Well, let's go to
16 Plaintiff's Exhibit 16, the same page, 53.
17 Okay. Does that assist you in determining who
18 was a director as of July 31st, 1999?
19  A. It does not help me differentiate
20 which ones are directors and which ones are
21 executive officers.
22  Q. Okay. Well, let me represent to
23 you that the top seven names are directors of
24 OHSL and that the last three names are officers
25 of the company, but not directors. Does that

**Page 121**

1 refresh your recollection?
2  A. I, I don't -- I don't recall. I'm
3 not disputing it, but I just don't recall.
4  Q. Fine.
5  A. OHSL was not our client. I don't
6 remember who OHSL's directors were.
7  Q. Got it.
8  A. I didn't have anything to do with
9 it.
10  Q. Can you accept my representation
11 that the first seven names here were the OHSL
12 directors as of July 31st, 1999?
13  MR. FISCHER: Objection.
14  A. I'm not going to dispute it.
15  Q. Okay. Now, do you believe that
16 the vote that's referenced on page one of
17 Defendant's Exhibit 1, Your Board of Directors
18 unanimously approved the acquisition and
19 believe that it is in the best interest of OHSL
20 stockholders, is the vote that's referenced
21 here on page 18 of the proxy materials, talking
22 about the August 2nd, 1999 vote?
23  MS. ROWE: Objection to form.
24  MR. FISCHER: Yeah, about 18
25 objections to form on that.

**Page 122**

1    A. I don't understand the question.
2    Q. Okay. How many directors of Oak
3 Hills do you believe were directors on August
4 2nd, 1999?
5        MR. FISCHER: Objection. Asked
6 and answered.
7    A. I don't know. OHSL is not our
8 client. I don't know how many directors they
9 had. I can't tell you.
10    Q. Okay. Well, can you find the
11 document with the S-4 section that you wrote?
12 Which document was that?
13        MS. ROWE: Objection to form.
14        MR. FISCHER: Objection to form.
15    A. I don't know how to answer that.
16 Are you asking me to refresh or to -- I don't
17 understand what you --
18        MR. FISCHER: Can you rephrase?
19    Q. I think it was Plaintiff's Exhibit
20 42. Can you look at Plaintiff's Exhibit 42 --
21    A. Yes.
22    Q. -- and see if that document
23 includes the section -- yes, in fact it does,
24 page 48.
25    A. Okay.

**Page 123**

1    Q. Okay.
2    A. Okay.
3    Q. Now, it seems to me that your
4 testimony was that you wrote the section that
5 says Number of Directors. Are you with me?
6        MR. FISCHER: Objection.
7    A. That was not -- I did not say
8 that.
9        MR. FISCHER: That was not his
10 testimony.
11    A. I did not testify to that.
12    Q. What was your testimony with
13 respect to that issue?
14        MR. FISCHER: Objection.
15        MS. ROWE: Objection.
16        MR. FISCHER: Asking him to
17 remember his exact words?
18    A. What I was trying to convey
19 earlier was that I prepared an initial draft of
20 the section on Comparison of Stockholder
21 Rights. With respect to disclosures made by
22 OHSL, I did not -- I'm not the author of those
23 sections. I'm not responsible for what it says
24 with respect to OHSL. I, I -- I can't say any
25 more about that.

**Page 124**

1    Q. Okay. It says here on page 48 of
2 Plaintiff's Exhibit 42 that, The OHSL Board of
3 Directors has set the current number of
4 directors at eight, correct?
5    A. That's what that page says.
6    Q. Okay. Now, when you compare that
7 page to Plaintiff's Exhibit 16, page 53 --
8        MR. FISCHER: Hang on, let him
9 pull it out.
10    A. Plaintiff's Exhibit 16?
11    Q. Yes.
12    A. Page 53?
13    Q. Same page, 53, yes.
14    A. Okay. Yes.
15    Q. That indicates that the
16 composition of the Board changed with the
17 resignation of Mr. Herron on July 27th of 1999,
18 correct?
19    A. It -- it's not -- it -- I'm
20 assuming your question is saying that you can
21 infer that from this note that he resigned --
22 that there was a resignation on the 27th.
23    Q. You don't have to infer that,
24 that's what it says, correct?
25    A. There is a note to that effect,

**Page 125**

1 you're right. There is a note.
2    Q. Okay. Now, let's take a look at
3 Defendant's Exhibit 1. Okay. On page 19, it
4 talks about, The Board continued to allocate
5 time. Do you see that in the second paragraph?
6    A. The beginning of the second
7 paragraph.
8        MR. FISCHER: Okay.
9    A. The Board continued to allocate at
10 its monthly meetings.
11    Q. And that refers to the eight
12 directors who were then OHSL directors,
13 correct?
14    A. I don't know. This section on the
15 Background of the Acquisition is not something
16 that I had any part in drafting that I recall,
17 or -- any part in reviewing or having any
18 responsibility for.
19        This part of the document
20 discusses, as you know, the background of the
21 merger and the events leading up to the merger,
22 through OHSL's eyes. So this is not a
23 provision of the document that I'm comfortable
24 answering questions and/or interpreting for
25 you, because I -- KMK didn't draft it. We

Page 126

1  wouldn't be in a position to verify its
2  accuracy.
3       Q.  Didn't KMK have to verify the
4  accuracy of other aspects of the documents, of
5  other pieces of the documents which were
6  submitted?
7       A.  Which other pieces?
8       Q.  Well, like that, for example.
9       A.  No, not this one, not at all.
10      Q.  Okay.  Why not?
11      A.  Because as I've said, OHSL was not
12  KMK's client in this transaction.
13      MR. FISCHER:  And in your view, that means that
14  you are not responsible for the sections that
15  were submitted by OHSL and their counsel; is
16  that correct?
17      MR. FISCHER:  Objection.
18      A.  Again, we're unclear as to which
19  sections we're talking about here, but
20  disclosures relating to OHSL are the
21  responsibility of OHSL, not KMK.
22      Q.  Okay.  As a lawyer who perhaps
23  billed 500 or so hours on this transaction, do
24  you understand the transaction?
25      MR. FISCHER:  Objection.

Page 127

1       MS. ROWE:  Objection.
2       MR. FISCHER:  That's not his
3  testimony.  It's a false assumption in the
4  question, misleading.
5       A.  One, I don't recall -- I don't
6  recall the exact number of hours that I
7  recorded in this transaction.  I -- your
8  question inferred that I might have billed up
9  to 500.  I don't think it was 500, I think it
10  was less than that.  And I can't recall the
11  second part of your question, so I apologize
12  for asking.
13      Q.  Okay.  Do you understand the
14  transaction?
15      A.  Which parts of it?
16      Q.  Okay.  The whole thing.
17      MR. FISCHER:  Objection.
18      A.  I understand certain -- certain
19  parts of the transaction, but, as you know, the
20  transaction is embodied in a merger agreement
21  that is many pages long.
22      Q.  Okay.  What parts of the
23  transaction -- just describe them generally --
24  do you understand?
25      MR. FISCHER:  Same objection.

Page 128

1       MS. ROWE:  Objection.
2       A.  In general, I understand that
3  Provident entered into a merger transaction
4  with OHSL pursuant to which -- upon the -- a
5  number of conditions being met, Provident would
6  acquire all of the outstanding shares of OHSL
7  in exchange for Provident common stock.
8       Q.  And is it necessary for you to
9  understand the background of the transaction in
10  order for you to perform the services for your
11  client on this merger?
12      MR. FISCHER:  Objection to the
13  form of the question.
14      MS. ROWE:  Objection.
15      A.  It's not necessary for me to
16  verify or know the disclosures in the
17  background of the transaction section of these
18  materials in order for me to do my job, no.
19      Q.  Do you believe that if the
20  composition of the Board changed during the
21  discussion of the Board, that that should have
22  been disclosed to OHSL shareholders?
23      MR. BUCKLEY:  Objection.
24      MS. ROWE:  Objection.  Asked and
25  answered.

Page 129

1       MR. FISCHER:  Objection.  Going
2  over it again.
3       A.  I don't know how I can -- I don't
4  know how this question is different from ones
5  you've asked earlier.
6       Q.  Well, let's see if I can make it
7  different.  Okay.  Please turn to page 20 of
8  Defendant's Exhibit 1.  Okay.  The first full
9  paragraph talks about, In May 1999 the OHSL
10  Board of Directors met with representatives of
11  McDonald.  Do you see that?
12      A.  Yes, I do.
13      Q.  And that Board consisted of
14  eight people; is that correct?
15      A.  I don't know
16      MS. ROWE:  Objection.
17      MR. FISCHER:  Objection.
18      Q.  Okay.  Let me represent to you
19  that that Board consisted of eight people.
20  Next -- two paragraphs down says on June 22nd,
21  1999, the Board, its legal counsel and McDonald
22  met.  I'll represent to you that that also
23  consisted of an eight member board.  Okay.
24  Then it goes June 15th, 1999, the Board met
25  with two members of senior management.  Do you

33 (Pages 126 to 129)

**Page 130**

1  see that?
2      A.  Yes, I do, um-hmm.
3      Q.  Then it goes on, July 22nd, 1999,
4  the Board met to receive an update from
5  McDonald.  Do you see that?
6      A.  Yes.
7      Q.  Okay.  Then it says on July 22nd,
8  1999 to August 2nd, 1999, McDonald, the OHSL
9  Board and OHSL's legal counsel engaged in
10  negotiations with Provident Financial related
11  to a definitive agreement.  Do you see that?
12      A.  Yes, I do see that.
13      Q.  Okay.  Based upon what I've shown
14  you in Exhibit 16, do you believe that the
15  composition of the Board, the OHSL Board,
16  changed from July 22nd to August 2nd?
17          MR. BUCKLEY:  Objection.
18          MR. FISCHER:  Objection to form.
19  Asked and answered.
20          MS. ROWE:  Objection.  Asked and
21  answered.
22      A.  Again, I can't tell.  I didn't
23  draft this, OHSL is responsible for this
24  disclosure.  I can't tell, I don't know.
25      Q.  Do you believe that the use of the

**Page 131**

1  OHSL Board is misleading in the context that
2  I've just pointed out to you?
3          MR. BUCKLEY:  Objection.
4          MS. ROWE:  Objection.
5          MR. FISCHER:  Objection.
6      A.  Your question is the references to
7  the full Board here, is it misleading to say
8  that, the Board, when, in fact, one person
9  resigned?
10      Q.  Yes.
11      A.  Is that misleading?
12      Q.  Yes.
13          MR. FISCHER:  Objection.
14          MS. ROWE:  Objection.
15          MR. BUCKLEY:  Objection.
16      A.  No.
17      Q.  Why not?
18          MR. FISCHER:  Objection.  Arguing
19  with the witness.
20      A.  Because --
21          MS. ROWE:  Same objection.
22      A.  A Board can take action, including
23  entering into meetings, discussions with
24  advisors, without having all its members
25  present and accurately say that the Board did

**Page 132**

1  those things, even though one person wasn't
2  there.  That -- that's not misleading, that's
3  just -- that's just corporate law.
4      Q.  Well, didn't the composition of
5  the Board change at some point between July
6  22nd and August 2nd of 1999?
7          MR. FISCHER:  Objection.
8          MS. ROWE:  Objection.  It's been
9  asked and answered now at least five times.
10          MR. BUCKLEY:  Objection.
11      A.  You say so and I rely on your
12  representation.  Yes, I --
13      Q.  Okay.  So if the composition of
14  the Board changed, do you believe that it's
15  misleading for this document to use the phrase
16  the OHSL Board of Directors over and over again
17  and yet not indicate whether a change, i.e.,
18  the resignation of Mr. Herron, took place?
19          MR. FISCHER:  Objection to form.
20          MS. ROWE:  Objection.
21          MR. BUCKLEY:  Objection.
22      A.  My answer to this question
23  continues to be, no, it is not misleading.
24      Q.  Okay.  Let's mark this as the next
25  exhibit.

**Page 133**

1          (Plaintiff's Exhibit Number 44
2          was marked for identification.)
3      Q.  Mr. Reuter, I'm handing you what's
4  been marked as Deposition Exhibit 44 and I ask
5  you to take a look at it.  Have you seen this
6  document before?
7      A.  This particular one, I don't
8  recall seeing it.
9      Q.  Okay.
10      A.  I'm not denying that I ever saw
11  it, I just don't recall seeing it.
12      Q.  Okay.  Do you recognize the
13  handwriting on the front page of the document?
14      A.  No, I do not.
15      Q.  What is the purpose of this
16  document, if you can tell?
17          MS. ROWE:  Objection.
18          MR. FISCHER:  Objection.
19      A.  I -- I don't -- I'm not -- I don't
20  know.
21      Q.  Is it possible to determine the
22  approximate date of this document?
23          MR. FISCHER:  Objection.
24      A.  Anything's possible, I just can't
25  tell you -- I can't give you a feel for when,

34 (Pages 130 to 133)

Page 134

1  when this document is dated or when it was
2  prepared.
3      Q.  Do you have any idea on which
4  computer system this document came off?
5      A.  No, I don't.
6      MR. FISCHER:  Objection.
7      A.  I do not.
8      Q.  Do you have any idea where the
9  final document came off, which computer system?
10      MS. ROWE:  Which final document?
11      Q.  Defendant's Exhibit 1.
12      MS. ROWE:  Objection.  Asked and
13  answered.
14      MR. FISCHER:  There's other
15  documents here.  There were numerous documents
16  attached.
17      A.  We're going back to Exhibit 1, you
18  said?
19      Q.  I asked if you know which computer
20  system Defendant's Exhibit 1 came off.
21      MS. ROWE:  Objection.  Asked and
22  answered.
23      MR. FISCHER:  Same objection.
24      A.  I, I can't -- I can't say with --
25  I can't say definitively, no, I don't know.

Page 135

1      Q.  Okay.  Can you take a look at page
2  57 of Plaintiff's Exhibit 44?
3      A.  Page 57?
4      Q.  Yes.
5      A.  Okay.
6      Q.  Okay.  Now, this is a section that
7  you had seen before and did some work on to
8  some extent, correct?
9      A.  Which -- do you mean the section
10  in its entirety, the Comparison of Stockholder
11  Rights?
12      Q.  Right.
13      A.  I did assist in the preparation of
14  certain parts of this section, yes.
15      Q.  And it says Number of directors.
16  Do you see that?
17      A.  Yes, I do.
18      Q.  And previously OHSL was listed as
19  having eight directors.  Do you remember that
20  testimony?
21      A.  With respect to which document?
22      Q.  I believe it was Plaintiff's
23  Exhibit 42, page 48.
24      A.  Yes, these documents say different
25  things, yes.

Page 136

1      Q.  Okay.  So does this suggest to you
2  that Plaintiff's Exhibit 44 is a later document
3  than Plaintiff's Exhibit 42?
4      MR. FISCHER:  Objection.
5      A.  I mean, not necessarily.  I -- not
6  necessarily.
7      Q.  Okay.  Now, it seems that the
8  number of directors as disclosed in this draft
9  has changed from seven -- excuse me, from eight
10  to seven with respect to OHSL; is that correct?
11      A.  Again, you're correct, the
12  documents say different things.
13      Q.  And it says the number has changed
14  from eight to seven?
15      MS. ROWE:  Objection.
16      Q.  With respect to the number of OHSL
17  directors, correct?
18      MR. FISCHER:  Objection.  That's
19  not what it says.
20      A.  You're asking me if this document,
21  Exhibit Number 44, indicates that the number
22  has changed?
23      Q.  Yes.
24      A.  But it doesn't say that the OHSL's
25  Board of Directors has changed in number.  No,

Page 137

1  it does not say that.
2      Q.  No, it says that OHSL has seven
3  directors?
4      A.  That's right.
5      Q.  And the other document says it has
6  eight directors.  Is that right?
7      A.  Again, that is correct.
8      Q.  Okay.  How did that change get
9  made?
10      A.  I don't know.
11      Q.  Who made the change?
12      A.  I don't know.
13      MR. BRAUTIGAM:  Okay.  Let's take
14  a break for lunch.
15      (Recess for lunch.)
16  BY MR. BRAUTIGAM:
17      Q.  Back on the record.  Good
18  afternoon, Mr. Reuter.  Mr. Reuter, in the
19  course of your work as a securities lawyer, are
20  you familiar with the case TSC Industries, Inc.
21  versus Northway, Inc.?
22      A.  I -- it sounds -- it sounds like
23  I've read it or run across it before, but I
24  can't tell you what -- I can't tell you much
25  more than that.

35 (Pages 134 to 137)

Page 138

1     Q. Okay. Are you familiar with the
2  case Basic, Inc. v. Levinson?
3     A. To the same extent, yes.
4     Q. Okay. And that extent is you ran
5  across it, but you can't recall the holdings or
6  anything like that?
7     A. I've heard the captions of these
8  cases before. I've run across them, but I
9  can't recall the cases' holdings, no.
10    Q. Okay. Could you turn to the table
11 of contents of Defendant's Exhibit 1. Do you
12 believe that the KMK firm was responsible for
13 writing the section questions and answers about
14 the acquisition?
15       MR. FISCHER: Can I hear the
16 question again, please?
17       (Record read by Reporter.)
18    A. No, this is primarily an OHSL
19 responsibility, although there are references
20 in the section to Provident that we may have
21 reviewed and -- and that we may have reviewed
22 and provided advice to our client on.
23    Q. Okay. Do you know who may have
24 reviewed the question and answers about the
25 acquisition section?

Page 139

1        MR. FISCHER: Objection.
2     A. Who?
3        MR. FISCHER: Form.
4     A. I'm sorry, who at --
5     Q. Who at KMK?
6     A. -- KMK reviewed this? Well,
7  only -- only with respect to matters relating
8  to Provident, Mark Weiss and I did.
9     Q. Okay. And what section
10 specifically -- or what questions and answers
11 did you review?
12       MR. FISCHER: Objection.
13    A. The question -- the third
14 question.
15    Q. What will I receive for my OHSL
16 shares?
17    A. Yes, matters in that related to --
18 yes, that's right.
19    Q. Did you write that, that Q and A?
20    A. Did Mark Reuter write that?
21    Q. Yes.
22    A. I did not.
23    Q. Okay. Did Mark Weiss write that?
24    A. I don't know.
25    Q. Do you know who wrote it?

Page 140

1     A. No.
2     Q. Okay. Do you know what word
3  processing system this was on?
4     A. As I said before --
5        MR. FISCHER: Objection.
6     A. -- this -- this particular section
7  or --
8     Q. Yes. Either the entire Q and A
9  section or that particular question and answer.
10       MR. FISCHER: Objection to form.
11    A. Again, as I've said before, this
12 document may have been on our system. It -- I
13 assume that Dinsmore, OHSL and Provident were
14 all also maintaining versions of this document,
15 so this particular one could have been on KMK's
16 system, but it could well have been on the
17 system of the other parties I just mentioned.
18    Q. Right. Well, I'm not asking you
19 to repeat your testimony, I'm trying to see if
20 I can narrow this down by document and by
21 sections of the document.
22    A. Um-hmm.
23    Q. Did you and/or Mark Weiss have any
24 other input into the Q and A that we find on
25 these two pages?

Page 141

1        MR. FISCHER: Objection.
2     A. I'm not sure what you mean by
3  input.
4     Q. Okay. Did you write any of the
5  other Q and As?
6     A. The rest of the Q and A -- to the
7  best of my recollection, no. The rest of the Q
8  and A appears to be items that OHSL should have
9  been responsible for.
10    Q. Okay. The next section of
11 Defendant's Exhibit 1 is the Summary. And the
12 first subsection is The Companies on page
13 three. Do you see that?
14    A. Yes, I do.
15    Q. Did you write anything related to
16 the companies?
17    A. If -- if Mark Weiss or I did, it
18 would --
19       MR. FISCHER: Excuse me, you just
20 asked about The Companies, right?
21       MR. BRAUTIGAM: Yes.
22       MR. FISCHER: Okay. Just this
23 section.
24    A. Oh, that --
25       MR. FISCHER: Just that section

36 (Pages 138 to 141)

Page 142

1 under The Companies.
2      A.  I don't recall who wrote that.
3  BY MR. BRAUTIGAM:
4      Q.  Do you believe that attorneys from
5  KMK wrote anything in the section The
6  Companies?
7      A.  I -- I don't, I don't know.  I
8  don't know where that -- I don't know where the
9  companies disclosure came from.
10      Q.  Okay.  How about the section
11  Recent Developments?  Did you write any of that
12  section?
13      A.  When you say "you," you mean me,
14  Mark Reuter?
15      Q.  I mean you, Mark Reuter.
16      A.  No, I didn't.
17      Q.  Okay.  Did any attorney --
18      A.  Not that I recall.
19      Q.  Did any attorney at KMK write that
20  section?
21      A.  I -- not that I -- Mark Weiss
22  could have or he couldn't have.  I -- I can't
23  recall.
24      Q.  You just don't know?
25      A.  That's right.

Page 143

1      Q.  Okay.  Why was that section
2  included?
3          MR. FISCHER:  Objection.
4          MS. ROWE:  Objection.
5      A.  The section on Recent
6  Developments?
7      Q.  Yes.  Not only the section on
8  Recent Developments, but also the material
9  under that section.
10      A.  I don't know.
11      Q.  Okay.  Did you write the section
12  Reasons for the Acquisition?
13      A.  I do not recall writing that, no.
14      Q.  Did any attorney at KMK write that
15  section?
16      A.  I don't know.
17      Q.  Did you write the section
18  Recommendation to Stockholders?
19      A.  No, I did not.
20      Q.  Did any attorney at KMK write that
21  section?
22      A.  No.
23      Q.  Did you write the section The
24  Acquisition?
25      A.  No, I -- no, I did not.

Page 144

1          (Brief interruption.)
2  BY MR. BRAUTIGAM:
3      Q.  Next question, did you write the
4  section The Acquisition?
5      A.  I do not recall writing that
6  section.
7      Q.  Did any attorney at KMK write that
8  section?
9      A.  Mark Weiss may have provided input
10  on that section.  The ultimate responsibility
11  for the accuracy of that section is -- Mark --
12  I don't recall, but Mark Weiss may have had
13  input on that section, but I'm not -- I'm not
14  certain.
15      Q.  If Mark Weiss had input in that
16  section, to whom would he have given this
17  input?
18          MR. FISCHER:  Objection.
19          MS. ROWE:  Same objection.
20      A.  Mark Magee, I assume.  I don't
21  know.
22          MS. ROWE:  Objection.
23          MR. FISCHER:  Objection.  Don't
24  disclose any client communications.
25      Q.  Why do you assume that?

Page 145

1      A.  Because Mark Magee is the
2  represent -- was a representative of the
3  client.
4      Q.  Okay.  Did you write the section
5  Conditions to Completing the Acquisition?
6      A.  I don't recall writing that, no.
7      Q.  Did any attorney of KMK write
8  Conditions to Completing the Acquisition?
9      A.  I -- again, Mark Weiss may have
10  had --
11          MR. FISCHER:  You don't need to
12  guess.
13      A.  I don't know.  I don't know.
14      Q.  Okay.  Did you write the section
15  Termination of the Merger Agreement?
16      A.  I don't recall writing it, no.
17      Q.  Did any attorney at KMK write that
18  section?
19      A.  I -- I don't recall.
20      Q.  Did any attorney at KMK check that
21  section?
22      A.  I don't know.
23      Q.  Do you see that $36 figure in the
24  last paragraph of that section?
25      A.  Yes.

37 (Pages 142 to 145)

Page 146

1  Q.  Is that figure correct?
2  A.  I don't know.
3  Q.  Did you write the section Stock
4  Option Agreement?
5  A.  I don't recall writing it, no.
6  Q.  Did any attorney at KMK write that
7  section?
8  A.  I -- I don't recall.
9  Q.  Did you write the section Certain
10  Federal Income Tax Considerations?
11  A.  I -- I don't recall writing that,
12  no.
13  Q.  Did any attorney at KMK write
14  that?
15  A.  I -- I can't recall.  I don't
16  know.
17  Q.  Did you write the section
18  Comparative Stock Prices?
19  A.  I don't recall writing that, no.
20  Q.  Did any attorney at KMK write that
21  section?
22  A.  I can't recall, I don't know.
23  Q.  Did you write the section on
24  Accounting Treatment?
25  A.  I don't recall that, no.

Page 147

1  Q.  Did any attorney at KMK write that
2  section?
3  A.  I -- I don't recall.  I don't
4  know.
5  Q.  Do you have a general
6  understanding of the purchase method of
7  accounting?
8  A.  I -- only to the extent it differs
9  from pooling of interest accounting.
10  Q.  Okay.  What is your understanding
11  of the purchase method of accounting?
12  MS. ROWE:  Objection.  Asked and
13  answered.
14  A.  I only understand the purchase
15  method of accounting -- I only understand that
16  it's distinguished from the pooling of
17  interest.  I just know that the two are
18  different.  I don't know anything else.
19  Q.  So you don't have a working
20  definition of either one?
21  A.  That's right.
22  Q.  Did you write the section Required
23  Regulatory Approvals?
24  A.  I don't recall writing that, no.
25  Q.  Did any attorney at KMK write that

Page 148

1  section?
2  A.  I don't recall.  I don't know.
3  Q.  Did you write the section No
4  Dissenters' Rights?
5  A.  I don't recall writing that, no.
6  Q.  Did any attorney at KMK write
7  that?
8  A.  I don't recall, I don't know.
9  Q.  Did you write the section
10  Interests of Certain Persons?
11  A.  I don't recall that, no.
12  Q.  Did any attorney at KMK write that
13  section?
14  A.  Again, I don't recall.  I don't
15  know.
16  Q.  Did you write the section Vote
17  Required?
18  A.  I don't recall, no.
19  Q.  Did any attorney at KMK write that
20  section?
21  A.  I don't recall.  I don't know.
22  Q.  Why is the information about the
23  ownership of stock by OHSL officers and
24  directors included in that section?
25  MR. FISCHER:  Objection.

Page 149

1  A.  I don't know.
2  Q.  Do you believe that to be material
3  information?
4  MS. ROWE:  Objection.
5  MR. FISCHER:  Objection.
6  A.  I'm not sure.  I don't know.
7  Q.  What factors would you need to
8  know to make a determination as to whether or
9  not that's material information?
10  A.  Well, I'd have to refresh my
11  review of the disclosure regulations relating
12  to votes required and the, the regulation 14-A,
13  I guess.
14  Q.  Okay.  Did you write the next
15  section, Comparison of Stockholder Rights?
16  A.  I don't recall writing this.
17  However, I may well have because of my
18  involvement in the preparation of disclosures
19  relating to Provident in the section of the
20  document captioned Comparison of Stockholder
21  Rights that we discussed earlier.  I don't
22  recall specifically.
23  Q.  Okay.  If you wrote this, what
24  would you have done with it when you were
25  finished?

Page 150

```
1           MR. FISCHER: Objection.
2       Q. Do you understand the question?
3       A. Maybe not.
4       Q. Okay. In other words, how did it
5   get from your computer -- assuming you wrote
6   it, which you say you may have -- into the
7   final document?
8           MR. FISCHER: Same objection.
9       A. I would have given the words here
10  and -- I would have given the words here to --
11  I would have given the words here to one of our
12  word processors, who would have inputed it
13  into the document. But even at that time, at
14  that moment, that disclosure was nowhere near
15  final.
16          After that time, this disclosure
17  would have been reviewed I don't know how many
18  times. The document was sent out in
19  distributions six, twelve times, I can't
20  recall, but it would have been reviewed by
21  parties on the distribution list and any of
22  their, you know, representatives.
23          Not only -- representatives or
24  agents not on the list of -- I don't know who
25  that would be, but there would be other --
```

Page 151

```
1   there would be other people reviewing it before
2   it became finalized. So just because I
3   submitted an initial draft of this section to a
4   word processor is only the very first step in
5   the processive finalizing of the language.
6       Q. When you say you submitted an
7   initial draft to word processing, did you also
8   submit it to another attorney, someone who was
9   supervising you?
10      A. Simultaneously --
11          MR. FISCHER: Do you know?
12      A. Yes. I mean, simultaneously it
13  was submitted to Mark Weiss. I mean, he
14  reviewed my work.
15      Q. And you talked about how the
16  document or your words went to word processing
17  to be input into the document. What document
18  exactly are you referring to, a draft of the
19  entire document?
20          MR. FISCHER: Objection to the
21  form.
22      A. No, just a piece of the entire
23  document. I can't -- I can't recall. I can't
24  be more specific, I just don't know.
25      Q. Okay. Do you know if KMK had on
```

Page 152

```
1   its computers a master draft of the entire
2   document, or was it done by sections and then
3   assembled later?
4           MR. FISCHER: Objection.
5       A. I -- I don't recall. However,
6   I'll repeat, you know, clarification on how we
7   maintained on our system, on our computer
8   system, a version -- multiple versions of S-4
9   drafts. But again, I have no reason to believe
10  why Dinsmore or OHSL or Provident would not
11  have also maintained similar or -- or different
12  versions.
13      Q. Who had the final say as to which
14  version went to the printer?
15          MR. FISCHER: Objection. Asked
16  and answered so many times at this point.
17          MS. ROWE: Objection. Asked and
18  answered.
19      A. I don't know how that -- I don't
20  know how to answer that any differently from
21  what I did before. My answer is the same.
22  This was a collective effort among a number of
23  parties, including OHSL, Provident, its counsel
24  and us.
25          Final decision was -- in the
```

Page 153

```
1   preparation of the documents like this, final
2   decisions are not vested in one person in a
3   vacuum. It's a collective decision by all
4   parties that the document is ready and final.
5       Q. Were you part of that final
6   decision?
7       A. To the -- well, I didn't have -- I
8   didn't have any reason to tell anyone that the
9   document wasn't final. I mean for
10  everything -- for all I knew, it was final.
11  And when I understood that it was becoming
12  final, I didn't object to the finalization of
13  it. And so to that extent -- to that extent I
14  was, yes.
15      Q. Okay. The next section, Opinion
16  of Financial Advisor. Did you write that
17  section?
18      A. No, I do not recall.
19      Q. Did any attorney at KMK write that
20  section?
21      A. I do not recall, no.
22      Q. Okay. Let's turn to the next
23  section, it's 20 pages, it's Provident
24  Financial Selected Consolidated Historical
25  Financial Data. Do you see that?
```

39 (Pages 150 to 153)

Page 146

1   Q.  Is that figure correct?
2   A.  I don't know.
3   Q.  Did you write the section Stock
4   Option Agreement?
5   A.  I don't recall writing it, no.
6   Q.  Did any attorney at KMK write that
7   section?
8   A.  I -- I don't recall.
9   Q.  Did you write the section Certain
10  Federal Income Tax Considerations?
11  A.  I -- I don't recall writing that,
12  no.
13  Q.  Did any attorney at KMK write
14  that?
15  A.  I -- I can't recall.  I don't
16  know.
17  Q.  Did you write the section
18  Comparative Stock Prices?
19  A.  I don't recall writing that, no.
20  Q.  Did any attorney at KMK write that
21  section?
22  A.  I can't recall, I don't know.
23  Q.  Did you write the section on
24  Accounting Treatment?
25  A.  I don't recall that, no.

Page 147

1   Q.  Did any attorney at KMK write that
2   section?
3   A.  I -- I don't recall.  I don't
4   know.
5   Q.  Do you have a general
6   understanding of the purchase method of
7   accounting?
8   A.  I -- only to the extent it differs
9   from pooling of interest accounting.
10  Q.  Okay.  What is your understanding
11  of the purchase method of accounting?
12  MS. ROWE:  Objection.  Asked and
13  answered.
14  A.  I only understand the purchase
15  method of accounting -- I only understand that
16  it's distinguished from the pooling of
17  interest.  I just know that the two are
18  different.  I don't know anything else.
19  Q.  So you don't have a working
20  definition of either one?
21  A.  That's right.
22  Q.  Did you write the section Required
23  Regulatory Approvals?
24  A.  I don't recall writing that, no.
25  Q.  Did any attorney at KMK write that

Page 148

1   section?
2   A.  I don't recall.  I don't know.
3   Q.  Did you write the section No
4   Dissenters' Rights?
5   A.  I don't recall writing that, no.
6   Q.  Did any attorney at KMK write
7   that?
8   A.  I don't recall, I don't know.
9   Q.  Did you write the section
10  Interests of Certain Persons?
11  A.  I don't recall that, no.
12  Q.  Did any attorney at KMK write that
13  section?
14  A.  Again, I don't recall.  I don't
15  know.
16  Q.  Did you write the section Vote
17  Required?
18  A.  I don't recall, no.
19  Q.  Did any attorney at KMK write that
20  section?
21  A.  I don't recall.  I don't know.
22  Q.  Why is the information about the
23  ownership of stock by OHSL officers and
24  directors included in that section?
25  MR. FISCHER:  Objection.

Page 149

1   A.  I don't know.
2   Q.  Do you believe that to be material
3   information?
4   MS. ROWE:  Objection.
5   MR. FISCHER:  Objection.
6   A.  I'm not sure.  I don't know.
7   Q.  What factors would you need to
8   know to make a determination as to whether or
9   not that's material information?
10  A.  Well, I'd have to refresh my
11  review of the disclosure regulations relating
12  to votes required and the, the regulation 14-A,
13  I guess.
14  Q.  Okay.  Did you write the next
15  section, Comparison of Stockholder Rights?
16  A.  I don't recall writing this.
17  However, I may well have because of my
18  involvement in the preparation of disclosures
19  relating to Provident in the section of the
20  document captioned Comparison of Stockholder
21  Rights that we discussed earlier.  I don't
22  recall specifically.
23  Q.  Okay.  If you wrote this, what
24  would you have done with it when you were
25  finished?

**Page 150**

1    MR. FISCHER: Objection.
2    Q. Do you understand the question?
3    A. Maybe not.
4    Q. Okay. In other words, how did it
5 get from your computer -- assuming you wrote
6 it, which you say you may have -- into the
7 final document?
8    MR. FISCHER: Same objection.
9    A. I would have given the words here
10 and -- I would have given the words here to --
11 I would have given the words here to one of our
12 word processors, who would have inputted it
13 into the document. But even at that time, at
14 that moment, that disclosure was nowhere near
15 final.
16    After that time, this disclosure
17 would have been reviewed I don't know how many
18 times. The document was sent out in
19 distributions six, twelve times, I can't
20 recall, but it would have been reviewed by
21 parties on the distribution list and any of
22 their, you know, representatives.
23    Not only -- representatives or
24 agents not on the list of -- I don't know who
25 that would be, but there would be other --

**Page 151**

1 there would be other people reviewing it before
2 it became finalized. So just because I
3 submitted an initial draft of this section to a
4 word processor is only the very first step in
5 the processive finalizing of the language.
6    Q. When you say you submitted an
7 initial draft to word processing, did you also
8 submit it to another attorney, someone who was
9 supervising you?
10    A. Simultaneously --
11    MR. FISCHER: Do you know?
12    A. Yes. I mean, simultaneously it
13 was submitted to Mark Weiss. I mean, he
14 reviewed my work.
15    Q. And you talked about how the
16 document or your words went to word processing
17 to be input into the document. What document
18 exactly are you referring to, a draft of the
19 entire document?
20    MR. FISCHER: Objection to the
21 form.
22    A. No, just a piece of the entire
23 document. I can't -- I can't recall. I can't
24 be more specific, I just don't know.
25    Q. Okay. Do you know if KMK had on

**Page 152**

1 its computers a master draft of the entire
2 document, or was it done by sections and then
3 assembled later?
4    MR. FISCHER: Objection.
5    A. I -- I don't recall. However,
6 I'll repeat, you know, clarification on how we
7 maintained on our system, on our computer
8 system, a version -- multiple versions of S-4
9 drafts. But again, I have no reason to believe
10 why Dinsmore or OHSL or Provident would not
11 have also maintained similar or -- or different
12 versions.
13    Q. Who had the final say as to which
14 version went to the printer?
15    MR. FISCHER: Objection. Asked
16 and answered so many times at this point.
17    MS. ROWE: Objection. Asked and
18 answered.
19    A. I don't know how that -- I don't
20 know how to answer that any differently from
21 what I did before. My answer is the same.
22 This was a collective effort among a number of
23 parties, including OHSL, Provident, its counsel
24 and us.
25    Final decision was -- in the

**Page 153**

1 preparation of the documents like this, final
2 decisions are not vested in one person in a
3 vacuum. It's a collective decision by all
4 parties that the document is ready and final.
5    Q. Were you part of that final
6 decision?
7    A. To the -- well, I didn't have -- I
8 didn't have any reason to tell anyone that the
9 document wasn't final. I mean for
10 everything -- for all I knew, it was final.
11 And when I understood that it was becoming
12 final, I didn't object to the finalization of
13 it. And so that extent -- to that extent I
14 was, yes.
15    Q. Okay. The next section, Opinion
16 of Financial Advisor. Did you write that
17 section?
18    A. No, I do not recall.
19    Q. Did any attorney at KMK write that
20 section?
21    A. I do not recall, no.
22    Q. Okay. Let's turn to the next
23 section, it's 20 pages, it's Provident
24 Financial Selected Consolidated Historical
25 Financial Data. Do you see that?

39 (Pages 150 to 153)

Page 154

```
1       A.  Yes.
2       Q.  And why is this information
3   included?
4       A.  I believe that the disclosure
5   regulations require it, but I'm -- but I'd have
6   to check the regulations to confirm that.
7       Q.  Okay.  Did you have anything to do
8   with these two pages?
9       A.  I do not recall, no.
10      Q.  Okay.  Did KMK have anything to do
11  with the inclusion of these two pages?
12      A.  To the extent they were submitted
13  to us by Provident or its accountants or --
14  yes, to the extent that these materials were
15  submitted to us by Provident and/or its
16  accountants, to the extent they requested --
17      MR. FISCHER:  Don't discuss things
18  that were requested.  No communications with
19  the client should be disclosed.
20      A.  We -- well, then I --
21      Q.  But that's --
22      A.  We were told to put them in there.
23      Q.  Okay.  Did someone at KMK check
24  these numbers?
25      A.  These?
```

Page 155

```
1       Q.  Yes.
2       A.  Not to my knowledge.
3       Q.  Is it your understanding that
4   these numbers have been restated?
5       MR. FISCHER:  Objection.  We went
6   through this.
7       MS. ROWE:  Objection to relevance.
8       A.  Which numbers?
9       Q.  Provident's financial information
10  included or incorporated by reference in the
11  proxy materials.
12      A.  I don't know which numbers on this
13  page you're referring to has been restated.
14      Q.  I'm referring to the numbers in
15  their entirety.
16      MR. FISCHER:  Objection.
17      A.  I don't -- I don't understand.  I
18  didn't understand -- I don't know very much
19  about the restatement, as we discussed.  I
20  don't know which numbers have changed or which
21  ones haven't.
22      Q.  Okay.  Let me ask it a different
23  way.  What, if any, effect has the restatement
24  had on these numbers, if you know?
25      MR. FISCHER:  Objection.
```

Page 156

```
1       MS. ROWE:  Objection.
2       A.  I don't really know.
3       Q.  Okay.  The section, OHSL Selected
4   Consolidated Historical Financial Data, do you
5   see that?
6       A.  Is that on page eight?
7       Q.  Yes.
8       A.  Yes.
9       Q.  And is it your testimony that that
10  was the responsibility of OHSL and its counsel?
11      A.  Yes.  And OHSL's accountants.
12      Q.  Okay.  And no one --
13      A.  And/or OHSL's accountants.
14      Q.  Okay.  And no one from KMK checked
15  these numbers, correct?
16      A.  Not to my knowledge.
17      Q.  Okay.  Next section, Comparative
18  Per Share Data.  Do you see that?
19      A.  Yes.
20      Q.  Did you have any input into this
21  section?
22      A.  I don't recall, no.
23      Q.  Did KMK have any input into this
24  section?
25      A.  I don't recall, no.
```

Page 157

```
1       Q.  This section does include
2   information about Provident, correct?
3       A.  It appears that way, yes.
4       Q.  And did that information come from
5   OHL, Provident, or some other source?
6       A.  I don't know
7       MR. FISCHER:  Objection.
8       Q.  Okay.  Next section, Comparative
9   Stock Price and Dividend Information.  Do you
10  see that?
11      A.  Yes.
12      Q.  Did you write or include any of
13  the information on this page?
14      A.  I don't recall, no.
15      Q.  Did anyone from KMK write or
16  include any of the information on this page?
17      A.  I don't recall, no.
18      Q.  Okay.  Next section, Forward
19  Looking Statements.  Did you write any part of
20  this section?
21      A.  I -- I don't recall, no.
22      Q.  Did anyone at KMK write any part
23  of this section?
24      A.  Someone at KMK may have assisted
25  in the preparation of this section, yes.
```

40 (Pages 154 to 157)

Page 158

1   Q.  Assisted whom?
2   A.  Provident.
3   Q.  Okay.  Who do you believe at KMK
4   worked on this section?
5       MS. ROWE:  Objection.
6   A.  Mark Weiss.
7   Q.  Okay.  Directing your attention to
8   the next page, Risk Factors, do you see that
9   section?
10  A.  Yes.
11  Q.  Did you write any of that section?
12  A.  I do not recall, no.
13  Q.  Did anyone at KMK write any of
14  that section?
15  A.  Yes.
16  Q.  Okay.  Who wrote this section?
17  A.  Mark Weiss in working with
18  Provident did --
19  Q.  Okay.  Are you --
20  A.  -- in preparing and facilitating
21  the preparation of it, yes.
22  Q.  Are you familiar with the term
23  securitizations?
24  A.  I've heard it before.
25  Q.  What do you understand

Page 159

1   securitizations to mean?
2   A.  I've never -- I don't ever recall
3   working on a securitization transaction.  I
4   don't really understand them, frankly, at all.
5   Q.  Okay.  So you don't have a working
6   definition of securitizations?
7   A.  I assume it means a transaction
8   that involves a -- that involves some kind of
9   secured assets, but I don't understand.  Like I
10  said, I'm not -- I'm not familiar with those
11  transactions.  I don't work on them.
12  Q.  Are you familiar with off-balance
13  sheet transactions?
14  A.  I heard about them in the Enron
15  news, but other than that, I don't have any
16  exposure to them.
17  Q.  Do you have a working definition
18  of off-balance sheet transactions?
19  A.  I assume it means a transaction
20  that is not disclosed on a company's balance
21  sheet.
22  Q.  Do you have any understanding as
23  to under what circumstances it may or may not
24  be appropriate to use off-balance sheet
25  transactions?

Page 160

1       MR. FISCHER:  Objection.
2   A.  I don't know the rules on
3   off-balance sheet transactions, so I don't
4   know.
5   Q.  Okay.  Let me direct your
6   attention to page 16 of Defendant's Exhibit 1,
7   The Special Meeting.  Did you write any of this
8   section, which continues on to -- well, did you
9   write anything from The Special Meeting to The
10  Acquisition on page 18?
11  A.  No.  However, on page 18, there is
12  a paragraph -- the second paragraph under
13  Solicitation of Proxies regarding the
14  Kissel-Blake.  Do you see that where it says,
15  OHSL has retained Kissel-Blake, proxy
16  solicitation firm?
17  Q.  Yes.
18  A.  I may have had input in initial
19  wording, disclosure of that item.  I'm not
20  responsible for what OHSL said on that, but I
21  did -- I don't recall specifics, but I do
22  recall having some exposure to the preparation
23  of the disclosure of the -- you know, the fee
24  and the general fact that OHSL had retained a
25  proxy solicitation firm.

Page 161

1   Q.  That one sentence, correct?  Or
2   actually it's two sentences.  Those two
3   sentences, correct?
4   A.  That -- those are the two
5   sentences to which I'm referring, yes.
6   Q.  Okay.  And to whom did you give
7   this input?
8       MS. ROWE:  Object to form.
9   A.  I, I -- I don't recall
10  specifically.  I can -- I don't recall
11  specifically.  I can guess, but I --
12      MR. FISCHER:  Don't guess.
13  A.  I don't recall specifically.
14  Q.  I don't want you to guess, but
15  generally did you give it to someone at
16  Dinsmore, someone at OHSL, or someone else?
17  A.  I -- I can't recall.  I just
18  can't --
19  Q.  But it was not someone at KMK?
20  A.  It -- not necessarily.  I could
21  have given it to someone at KMK, too.  I don't
22  remember it.
23  Q.  Okay.
24  A.  Four years ago.
25  Q.  Okay.  Did you write any words

41 (Pages 158 to 161)

Page 162

1  from page 18, The Acquisition, to page 33, The
2  Merger Agreement?
3      A.  I think we've discussed that --
4  and it includes this entire section, the
5  Background of the Acquisition, was something
6  that I had -- that I recall having nothing to
7  do with, that that was a section to which OHSL
8  was -- and its counsel were responsible.  I'm
9  sorry, all the way up to page what?
10     Q.  Thirty-three.
11     A.  Thirty-three.
12     Q.  The top of page 33 where it says
13 The Merger Agreement.
14     A.  That's correct.  I do not recall
15 drafting any of -- any of the parts of that
16 section.
17     Q.  Okay.  The section we're talking
18 about, from page 22 to page 33?
19     A.  That's correct.
20     Q.  Did you review this section at
21 all?
22     A.  No, I --
23     Q.  You never read it before today?
24     A.  Well, I -- I guess I should
25 correct my statement.  I was -- I don't recall

Page 163

1  the level of my familiarity with this section,
2  but particularly The Background and Reasons for
3  the Merger section was something -- it was a
4  section, as we discussed earlier, that was so
5  related to OHSL that KMK didn't have anything
6  to do with, with that section.  That was OHSL
7  and its counsel's responsibility.
8      Q.  Okay.  When you say didn't have
9  anything to do with that section, that would
10 include reviewing for accuracy, correct?
11     A.  We -- I did not review that OHSL
12 section for accuracy, no, I did not.
13     Q.  And no one from KMK reviewed that
14 section for accuracy, correct?
15     MS. ROWE:  Objection.
16     MR. FISCHER:  Objection.
17     A.  I don't know.
18     Q.  Okay.  What role did McDonald
19 Investments, Inc. have in this transaction?
20     A.  I understand that they prepared
21 the fairness opinion in this transaction.
22     Q.  How was McDonald Investments, Inc.
23 compensated for their role in this transaction?
24     A.  I don't recall.
25     Q.  Would it be fair to say that they

Page 164

1  were paid a retainer, but they were given
2  substantially more money if and when the
3  transaction closed?
4      MR. FISCHER:  Objection.
5      MS. ROWE:  Objection to relevance.
6      A.  I don't know how -- I don't recall
7  how they were paid.
8      Q.  Was McDonald & Company following
9  Provident stock at this time?
10     MR. FISCHER:  Objection.
11     MS. ROWE:  Objection.
12     A.  I don't know.
13     Q.  Did you ever consider the
14 possibility that McDonald & Company had a
15 conflict of interest with respect to this
16 transaction?
17     A.  No facts ever came to my attention
18 that would have led me to consider that, no.
19     Q.  So that was never discussed by KMK
20 attorneys?
21     A.  Never.
22     MR. FISCHER:  Objection.  Don't
23 discuss what was discussed among KMK attorneys.
24     Q.  Okay.  Let me direct your
25 attention to page 33, The Merger Agreement.

Page 165

1      MR. FISCHER:  I'm sorry, did you
2  say 33?
3      Q.  Yes.  Going from page 33 to page
4  41, about the middle of the page, Stock Option
5  Agreement.  Did you write any part of The
6  Merger Agreement?
7      MR. FISCHER:  Of that section?
8      Q.  Yes.
9      A.  I don't recall writing that, no.
10     Q.  Okay.  Do you see the section on
11 page 38 where it says Advisory Board?  Did you
12 have any input into that section?
13     A.  Not that I recall, no.
14     Q.  I'm not sure if I asked this
15 question or not, but did any KMK attorney write
16 any of the words on The Merger Agreement
17 between pages 33 and 41?
18     MS. ROWE:  Objection.
19     MR. FISCHER:  Objection.
20     A.  I, I can't recall.  I don't know.
21     Q.  Okay.  Remember I showed you
22 documents previously -- I'm on page 38, The
23 Advisory Board, where it was listed that OHSL
24 had eight directors and then seven directors at
25 various times.  Do you remember that testimony

42 (Pages 162 to 165)

**Page 166**

1  generally?
2      A.   That we had this morning?
3      Q.   Yes.
4      A.   About the change from seven to
5  eight?
6      Q.   Right.
7      A.   I, I -- I recall --
8      Q.   Okay.
9      A.   -- some of our testimony, yes.
10     Q.   Do you have any idea how this
11 section Nonemployee Members of OHSL Board of
12 Directors made it into the final document?
13          MS. ROWE:  Objection.
14          MR. FISCHER:  Objection.
15     A.   I have no idea.
16     Q.   Okay.  Let me direct your
17 attention to page 41, Stock Option Agreements,
18 up to 43, Provident Financial Group, Inc.  Did
19 you write anything in that section?
20     A.   I don't recall, no.
21     Q.   Do you believe that anyone at KMK
22 wrote anything in that section?
23     A.   I, I don't know.  I can't be for
24 certain.
25     Q.   Okay.  Let's look at the next

**Page 167**

1  section, Provident Financial Group, Inc.  Do
2  you see that in the middle of page 43?
3      A.   Yes.
4      Q.   Okay.  Let's take that section up
5  to page 55, Description of Provident Financial
6  Capital Stock.  Okay?  Are you with me?
7      A.   From pages 43 to 55?
8      Q.   Yes.  Did you write any of this
9  section?
10     A.   I -- I don't recall writing
11 anything in that section, no.
12     Q.   Do you believe that anyone at KMK
13 wrote any of that section?
14     A.   Well, from page 43 to top of page
15 44, that first -- that carryover paragraph,
16 that's Provident Financial Group, Inc.  That's
17 information that relates to Provident Financial
18 Group, Inc.
19          I don't recall -- I don't recall
20 KMK having any specific input on that.  I will
21 say that everything from page 44, beginning at
22 OHSL Financial Corp, all the way through to
23 page 55 where you asked me to stop, relates to
24 OHSL and looks like it appears to be OHSL MDNA,
25 liquidity and capital resources, other

**Page 168**

1  expenses.  None of this would have been
2  written, to use your term, by KMK.
3      Q.   Okay.  Was any of it reviewed by
4  KMK?
5          MR. FISCHER:  When you say "it" --
6      Q.   Any of the information contained
7  on the pages that be referenced.
8          MR. FISCHER:  Okay.
9      A.   It -- it may have been.  I can't
10 recall.
11     Q.   Is it standard practice to review
12 information provided from the other side of the
13 transaction?
14     A.   Depends on the transaction.
15     Q.   In evaluating this transaction,
16 was it necessary for KMK to evaluate OHSL's
17 Board of Directors?
18          MS. ROWE:  Objection.
19     A.   I don't understand what you mean
20 by evaluate the Board of Directors.
21     Q.   Evaluate their competence, their
22 sophistication, their honesty, their integrity,
23 things like that.
24     A.   KMK was never in a position to do
25 that.

**Page 169**

1      Q.   In this merger transaction, did
2  KMK have access to the directors and officers
3  of OHSL?
4      A.   I don't know what you mean by
5  "access," but --
6      Q.   Okay.  Well, let me explain
7  "access."  If you had wanted to ask Ken Hanauer
8  a question, could you call him up and ask him?
9          MR. FISCHER:  Objection.  It would
10 be unethical.
11     A.   I, I would have been -- the
12 thought never occurred to me.  I never needed
13 to, so I never really thought of doing it, so I
14 wouldn't know whether or not I could have or
15 should have.
16     Q.   Okay.  Out of necessity, KMK had
17 to have access to OHSL's books and records,
18 correct?
19          MR. FISCHER:  Can you read that
20 again?
21          MS. ROWE:  Objection.
22          (Record read by Reporter.)
23          MR. FISCHER:  Objection.
24     A.   No.
25     Q.   How could you perform your due

Page 170

1 diligence without access to OHSL's books and
2 records?
3     A.  Are you asking about due diligence
4 in connection with the preparation of the S-4?
5     Q.  Let me ask a different question.
6 Are you familiar with the phrase due diligence?
7     A.  Yes.
8     Q.  What do you understand that phrase
9 to mean in the context of a merger transaction?
10    A.  There's a lot -- there's a lot
11 behind due diligence in the context of a merger
12 transaction.  It can -- we could talk for days
13 about just the contents of the due diligence
14 request in a merger transaction and argue about
15 its contents.
16    Q.  Okay.  Well, let's see if we can
17 summarize this.  Did KMK perform due diligence
18 with respect to the merger between OHSL and
19 Provident?
20    A.  Prior to the signing of the merger
21 agreement?  Is that what your question is?
22    Q.  At any time.
23    A.  I don't know if we were -- I don't
24 know if we were asked by our client to do that.
25 I don't -- I don't know

Page 171

1     Q.  So you don't know if KMK performed
2 due diligence with respect to this merger
3 transaction; is that correct?
4     A.  I, I can't -- I can't say for
5 certain.  I'm not sure.
6     Q.  But to the best of your knowledge,
7 you never performed due diligence with respect
8 to this merger transaction, correct?
9     A.  I never performed due diligence on
10 this merger transaction, that's correct.
11    Q.  Okay.  Do you know if anyone at
12 KMK performed due diligence on this merger
13 transaction?
14    MR. FISCHER:  Objection.  Asked
15 and answered.
16    A.  I don't know if KMK was ever asked
17 to conduct due diligence of OHSL in connection
18 with this transaction prior to the signing of
19 the merger agreement.  I just don't know.  I
20 don't know if we were asked.  I don't know if
21 we did it.
22    Q.  Did KMK conduct due diligence
23 after the signing of the merger transaction?
24    MR. FISCHER:  Same objection,
25 repeating.

Page 172

1     A.  Again, I don't know if we were
2 ever asked to conduct due diligence with
3 respect to OHSL in connection with this
4 transaction.
5     Q.  How would you describe the work
6 that KMK performed with respect to this merger
7 transaction if you would not use the word due
8 diligence?
9     MR. FISCHER:  Objection.  Form.
10    A.  With respect to everything about
11 the transaction that Provident asked for our
12 assistance on?
13    Q.  Yes.
14    A.  Well, that would involve
15 discussing some of the things that Provident
16 asked us to do.
17    MR. FISCHER:  Well, don't --
18    MR. BRAUTIGAM:  Do you need to
19 take a --
20    MR. FISCHER:  Don't tell him
21 what -- about any discussions you had with
22 Provident.
23    MR. BRAUTIGAM:  Do you need to
24 take a break to confer with your counsel?
25    THE WITNESS:  No, I don't.

Page 173

1 BY MR. BRAUTIGAM:
2     Q.  Okay.
3     A.  So that -- I apologize, what's
4 the -- can you repeat the question, please?
5     (Record read by Reporter.)
6     A.  I understand that KMK represented
7 Provident in connection with the negotiation of
8 the merger agreement and the preparation of
9 matters related to Provident in the S-4 and the
10 closing of the acquisition.
11    Q.  Do you believe that due diligence
12 is a condition precedent for a merger to be
13 effected?
14    MS. ROWE:  Objection.
15    MR. FISCHER:  Objection.
16    A.  It depends on what the merger
17 agreement says.  I don't know if there's a due
18 diligence set out in this merger agreement or
19 not, I'd have to read it again.
20    Q.  Okay.  Let me direct your
21 attention to page 55, Description of Provident
22 Capital Stock.  Do you see that?
23    A.  Yes.
24    Q.  And that carries over to the next
25 page.  Did you write any of that section?

44 (Pages 170 to 173)

**Page 174**

1   A.  I can't -- I've already answered
2  this question.
3   Q.  Well, if you --
4      MR. FISCHER:  He's asking it
5  again.  I object.
6   Q.  If you've already answered it and
7  it's in the record, there's no reason for you
8  to answer it again.
9   A.  Okay.
10   Q.  Next section.  Did you write the
11  section Comparison of Stockholder Rights?
12      MR. FISCHER:  I think that's been
13  asked and answered, but go ahead.
14   A.  Again, we talked about this this
15  morning.  I already answered the question on
16  this section.
17   Q.  Okay.  We'll skip over that.
18   A.  I know it's been a -- I've already
19  discussed this.
20   Q.  Okay.  Security Ownership of
21  Certain Beneficial Owners and Management.  I
22  know we talked about this, but I'm not sure if
23  I asked you if you wrote this section.
24   A.  I'm going to be very clear about
25  this.  I did not write that section.

**Page 175**

1   Q.  Okay.  Did you write the section
2  on Experts found on page 64?
3   A.  I do not recall, no.
4   Q.  It says in that section that Ernst
5  & Young are experts in accounting and auditing.
6  Do you see that?
7   A.  Yes.
8   Q.  Do you understand what that means?
9   A.  You mean what the term expert
10  means?
11   Q.  In that context, yes.
12   A.  Not in -- not entirely, no.
13   Q.  Is KMK expert in mergers and
14  acquisitions?
15      MS. ROWE:  Objection.
16   A.  I don't --
17      MR. FISCHER:  Objection.
18   A.  I don't know if any of our
19  attorneys have been qualified by courts as
20  experts in mergers and acquisitions or not.  I
21  don't know.  I don't know.
22   Q.  So you don't know if the firm
23  overall considers themselves or holds
24  themselves out as experts in the field of
25  mergers and acquisitions?

**Page 176**

1   A.  We consider ourselves to have
2  extensive experience in merger and acquisitions
3  transactions.  I don't know if that equates to
4  expertise in the sense that we're discussing it
5  or not.
6   Q.  Okay.  Let me direct your
7  attention to page 65, and it says Provident
8  Financial SEC Filings.  Do you see that
9  section?
10   A.  I'm sorry, page 65?
11   Q.  Yes.
12   A.  Yes.
13   Q.  Okay.  And it talks about four
14  categories of documents that relate to
15  Provident Financial's SEC filings, correct?
16   A.  I see items one through four, yes.
17   Q.  Why are items one through four
18  included in this document at this point?
19   A.  I'd have to double-check the
20  regulations, but I'm pretty certain that the
21  form S-4 requires -- requires the statement --
22  requires it.
23   Q.  And this statement essentially is
24  an incorporation by reference of other
25  Provident Financial information; is that

**Page 177**

1  correct?
2   A.  I -- I believe it's required
3  straight from the form, yes.  Form S-4.
4   Q.  Okay.  And why do you believe that
5  this other financial information is required to
6  be either included or incorporated by
7  reference?
8      MS. ROWE:  Objection.
9      MR. FISCHER:  Objection.
10   A.  Do you mean these items one
11  through four right here?
12   Q.  Yes.
13   A.  Again, because I understand that
14  the form S-4 regulations require it.
15   Q.  Okay.  Besides the regulations
16  requiring it, do you have any idea why the
17  regulations require it?
18      MR. FISCHER:  Objection.
19      MS. ROWE:  Objection.
20   A.  Not exactly.
21   Q.  You would agree with me, would you
22  not, that the items that are incorporated by
23  reference are available for the shareholders to
24  rely on when they're making an investment
25  decision about how to vote on this merger.

45 (Pages 174 to 177)

Page 178

1  Correct?
2        MR. FISCHER:  Objection.
3        A.  Can you repeat the question,
4  please?  I'm sorry.
5        (Record read by Reporter.)
6        MR. FISCHER:  Same objection.
7        A.  I don't know if that's the -- I
8  don't know if that's the purpose of that
9  section in those regulations or not.  I -- I
10  don't know.  I'd have to review the legislative
11  history of, of the adoption of those
12  regulations to give you a better answer.  I
13  don't know.
14        Q.  Okay.  Let's look at the next
15  pages, F1 through F29.  And if you could just
16  skim through those.  There is all financial
17  information related to OHSL; is that correct?
18        A.  It appears that way, yes.
19        Q.  And KMK had no role in the
20  inclusion of this financial information related
21  to OHSL in the joint proxy materials/
22  registration statement, correct?
23        MS. ROWE:  Objection.
24        MR. FISCHER:  Objection.
25        A.  KMK had nothing to do with OHSL's

Page 179

1  financial statements.
2        Q.  Okay.  Did KMK review them for
3  accuracy?
4        A.  No.
5        Q.  Okay.
6        A.  Not that I'm -- not that I know.
7  I don't know, no.  I don't know  I doubt it,
8  but I don't know.
9        Q.  Okay.
10        A.  I highly doubt it.
11        Q.  Let's turn to the next page of the
12  document, Annex A.  Do you see that?
13        A.  Yes.
14        Q.  This is a document that came from
15  KMK's computers; is that correct?
16        A.  I don't -- I don't know that.  I
17  don't know
18        Q.  Did Tim Matthews have primary
19  responsibility for the creation of this
20  document?
21        A.  I, I don't know.  I know that he
22  negotiated this -- certain provisions of this
23  document, but I don't know if -- but that's all
24  I know
25        Q.  What provisions of this document

Page 180

1  did Tim Matthews negotiate?
2        A.  I don't know.
3        Q.  How do you know he negotiated
4  certain provisions of the document?
5        MR. FISCHER:  If you can answer
6  without revealing communications --
7        A.  I, I --
8        MR. FISCHER:  -- privileged
9  communications, go ahead.  If you can't,
10  then --
11        A.  I can't say.  I can't say.  I
12  can't say without revealing privileged
13  communications.
14        Q.  Okay.  Did you write any of Annex
15  A?
16        A.  No, I had nothing to do with the
17  negotiation or preparation of this merger
18  agreement.
19        Q.  And that would include reviewing
20  it, correct?
21        A.  That -- that's correct, I had
22  nothing to do with this document.
23        Q.  Okay.
24        A.  To the best of my recollection.
25        Q.  Are you familiar with the term

Page 181

1  fairness opinion?
2        A.  Yes.
3        Q.  What is a fairness opinion?
4        A.  In the context of this
5  transaction, it is a -- an opinion rendered by
6  a financial advisor as to whether or not the
7  consideration to be received by OHSL's
8  shareholders is fair from a financial point of
9  view.
10        Q.  Okay.  And in your experience, is
11  the date of the financial opinion the same date
12  as the proxy materials?
13        MS. ROWE:  Objection to relevance.
14        MR. FISCHER:  Objection.
15        A.  I -- I don't understand the
16  question.
17        Q.  Okay.  What is the date of the
18  proxy materials?  I think we've established
19  it's September 24th, 1999
20        A.  Okay.
21        Q.  Okay.  What is the date of the
22  fairness opinion that you can find as Annex C
23  in the documents?  I think it's a couple of
24  pages from the back.
25        A.  I'd have -- I'd have to read this

Page 182

1    opinion in its entirety to, to tell you that.
2         Q.   To tell me what?
3         A.   To answer your question.
4         Q.   Oh, okay.  Well, why don't we take
5    a short break and have you do that.
6              (Brief recess.)
7              (Plaintiff's Exhibit Number 45
8              was marked for identification.)
9    BY MR. BRAUTIGAM:
10        Q.   Back on the record.  Mr. Reuter,
11   have you had an opportunity to review the
12   fairness opinion?
13        A.   Yes.
14        Q.   Does it strike you as unusual that
15   the fairness opinion is dated differently from
16   the date of the proxy?
17             MS. ROWE:  Objection to relevance.
18        A.   It's not clear to me that the
19   opinion is, you know, dated differently from
20   that of the proxy materials.  The opinion does
21   at the top of it, contemplate -- it clearly
22   states September 3rd, but later on in the
23   opinion it says that it can be included in the
24   proxy statement.
25             And I interpret that to mean that

Page 183

1    the opinion would be effective and good in a
2    later delivered proxy statement.  So no, it
3    doesn't strike me as unusual, to answer your
4    question.
5         Q.   Why do you think that -- well, are
6    you saying that this fairness opinion that's
7    dated September 3rd, 1999, speaks as of
8    September 24th, 1999 --
9              MS. ROWE:  I'm going to object
10   to --
11             MR. BRAUTIGAM:  Can I finish my
12   question, please?
13             MS. ROWE:  I'm sorry, I thought
14   you finished.
15             MR. BRAUTIGAM:  No, I did not
16   finish.
17             MS. ROWE:  Okay.
18   BY MR. BRAUTIGAM:
19        Q.   -- speaks as of September 24th,
20   1999, because of language in it saying that it
21   can be included in the proxy materials?
22             MS. ROWE:  Okay.  Are you
23   finished?
24             MR. BRAUTIGAM:  Yes.
25             MS. ROWE:  I'm going to object to

Page 184

1    relevance.  The Court has already dismissed the
2    plaintiff's claims related to the fairness
3    opinion.
4              MR. FISCHER:  Then I'm going to
5    object because we're wasting time, once again.
6              THE WITNESS:  Can you read the
7    question back?
8              (Record read by Reporter.)
9              MS. ROWE:  Same objection and
10   objection to form.
11             THE WITNESS:  I'm sorry.  Can
12   you --
13             (Record read by Reporter.)
14             MR. FISCHER:  Objection.
15        A.   I don't -- I don't see a problem
16   here.  I don't see a discrepancy.  I -- I don't
17   see a problem with this.
18   BY MR. BRAUTIGAM:
19        Q.   Wouldn't you need to know what, if
20   anything, happened to Provident stock in the
21   intervening three weeks between September 3rd
22   and September 24th?
23             MS. ROWE:  I have the same
24   objection to relevance.  The Court already has
25   dismissed plaintiff's claim related to the

Page 185

1    fairness opinion.
2              MR. FISCHER:  Same objection.
3    Wasting time.
4         A.   I don't know.  In addition, it's
5    not clear to me that McDonald's not -- it's
6    just not clear to me that McDonald is not
7    saying that this opinion isn't good on
8    September 24th.  It looks still good to me.  I
9    don't -- I don't understand.
10        Q.   What in the fairness opinion makes
11   it look still good to you as of September 24th?
12        A.   The fact that it says --
13             MR. FISCHER:  Same objection,
14   killing time.
15             MS. ROWE:  Objection.
16        A.   The fact that it says it can be
17   included in the proxy materials.
18        Q.   Have you ever heard the phrase
19   stale fairness opinion?
20        A.   No.
21        Q.   What, if anything, happened
22   between September 3rd, 1999 and September 24th,
23   1999, with respect to Provident stock?
24        A.   I have no idea.
25        Q.   Did it drop by about $6 per share

47 (Pages 182 to 185)

**Page 186**

```
 1   from approximately 42 and change to
 2   approximately 36 and change?
 3              MS. ROWE:  Objection.  Asked and
 4   answered.
 5        A.   I already told you, Mike, I don't
 6   know.
 7        Q.   Wouldn't you need to know that to
 8   assess whether or not this fairness opinion is
 9   still good on September 24th?
10              MS. ROWE:  Objection to relevance.
11   The Court already has dismissed the plaintiff's
12   claims relating to the fairness opinion and its
13   date.
14              MR. FISCHER:  Same objection.  Are
15   we going to move on or not?
16        A.   I don't know.  I don't know.
17        Q.   Okay.  Turn to the first page of
18   the proxy materials, please.  Let me direct
19   your attention to the sentence, Your Board of
20   Directors unanimously approved the acquisition
21   and believes that it is in the best interest of
22   OHSL stockholders.  Do you see that?
23        A.   Yes.
24        Q.   Now, do you interpret that to mean
25   that the OHSL Board unanimously believed that
```

**Page 188**

```
 1   answer.  Question:  In your heart, did you
 2   believe that this transaction was in the best
 3   interest of the shareholders?  Answer:  No,
 4   sir.  Okay?
 5              MR. FISCHER:  Do you know -- from
 6   what deposition and date is that -- are we
 7   quoting, and which page and line, which would
 8   be required when quoting in federal court a
 9   deposition.
10              MR. BRAUTIGAM:  Tuesday, February
11   22nd, 2000, 9:54 a.m., page 21, lines 11
12   through 14.
13              MR. FISCHER:  Thank you.
14              MR. BRAUTIGAM:  You're welcome.
15   BY MR. BRAUTIGAM:
16        Q.   Okay.  Do you consider that to be
17   material information?
18              MS. ROWE:  Okay.  I would like to
19   now register an objection and I assume that --
20   are you finished with your question?
21              MR. BRAUTIGAM:  Yes.
22              MS. ROWE:  Okay.  If you're going
23   to ask Mr. Reuter questions about an earlier
24   deposition that was taken, it's not appropriate
25   to take out a two line question and answer from
```

**Page 187**

```
 1   the merger with Provident was in the best
 2   interest of OHSL stockholders?
 3              MR. FISCHER:  Objection.  We've
 4   gone through this.
 5              MS. ROWE.  Same objection.
 6        A.   It's not clear to me how -- how I
 7   can tell you anything more about this sentence
 8   than I already have.
 9        Q.   Okay.  Let me represent to you
10   that Mr. Hanauer, OHSL's CEO, largest
11   shareholder, and the only member of management
12   who was a director, testified that he did not
13   believe that this transaction was in the best
14   interest of OHSL stockholders.  Would you
15   consider that to be material information?
16              MS. ROWE:  Objection.
17              MR. FISCHER:  Objection.
18              MS. ROWE:  That's a misstatement
19   of the record, first of all.  Second of all,
20   you're asking for a hypothetical.
21              MR. FISCHER:  I object to the
22   form, and timing is everything.
23   BY MR. BRAUTIGAM:
24        Q.   Let me withdraw the question.  Mr.
25   Hanauer was asked this question and gave this
```

**Page 189**

```
 1   a 16 hour deposition that you took, when you
 2   know absolutely certainly that the record is
 3   clear that Mr. Hanauer testified that he
 4   believed it was in the shareholders' best
 5   interest for this merger to go forward, but
 6   that in his own personal interest, he was not
 7   ready to retire from the business.
 8              MR. FISCHER:  Same objection.
 9              MR. BRAUTIGAM:  I'm not going to
10   debate with you.  We don't need speaking
11   objections.  That is incorrect.
12              MR. FISCHER:  We're wasting time.
13              MS. ROWE:  You're
14   mischaracterizing the record.  What I said is
15   not incorrect.
16              MR. BRAUTIGAM:  Ms. Rowe, when I'm
17   done, you can ask questions if you deem it
18   improper.
19              MR. FISCHER:  Same objection,
20   wasting time.
21   BY MR. BRAUTIGAM:
22        Q.   Now, do you have my question in
23   mind?
24        A.   Could you please repeat it?  I'm
25   sorry.
```

Page 190

1    (Record read by Reporter.)
2         A.  I'm sorry, "that" meaning the
3    lines from the deposition that you --
4         Q.  Yes, Mr. Hanauer's statement that
5    he did not believe that this merger was in the
6    best interest of OHSL stockholders.
7         MR. FISCHER:  Objection.
8         MS. ROWE:  Same objections.
9         A.  I would -- I, I have difficulty
10   answering that question not knowing the rest of
11   the statements that he made in that deposition.
12   And he obviously said other things about the
13   transaction in that deposition.  And I
14   assume -- I haven't read it, so I -- I have a
15   hard time answering your question without
16   knowing more about what he said.
17        Q.  Okay.  Well, try to answer my
18   question.  Your counsel or Ms. Rowe can ask you
19   questions, but my question is:  Do you believe
20   that Mr. Hanauer's belief that the merger with
21   Provident was not in the best interest of the
22   OHSL shareholders is material information?
23        MS. ROWE:  Objection.  Misstates
24   the record.
25        MR. FISCHER:  Objection.  Form.

Page 191

1    He's repeating questions.
2         A.  I don't know how to answer that
3    question without knowing more about Mr.
4    Hanauer's statement in that deposition.
5         Q.  Well, what more would you need to
6    know about that particular statement?  It seems
7    to me to be a self-contained statement.
8         MR. FISCHER:  Objection.
9         MS. ROWE:  Objection.
10        MR. FISCHER:  That's a lecture,
11   there's no question.
12        A.  I'm telling you, I -- I don't know
13   enough about -- I would want to know -- it's
14   hard taking one or two lines from a deposition
15   that long and trying to -- for me to understand
16   what he meant and apply it to this without
17   knowing more.  I just -- I can't say any more
18   than that, I don't know.
19        Q.  Does it strike you on the surface
20   at least that this would be potentially
21   material information?
22        MS. ROWE:  Objection.
23        MR. FISCHER:  Same objection.
24        A.  I, I don't -- I don't know.  And
25   what's more, it's -- no, I don't know.  I don't

Page 192

1    know.
2         Q.  What factors would you want to
3    consider in evaluating whether or not that
4    statement, that belief, is material
5    information?
6         MR. FISCHER:  Objection.
7         MS. ROWE:  Objection.
8         MR. FISCHER:  Objection to the
9    phrase "that belief."
10        A.  I, I can't -- I can't think of
11   any.  Nothing -- I don't know.  I don't know.
12        Q.  Does Mr. Hanauer's statement, as I
13   read it to you, appear to be inconsistent with
14   that sentence that we were talking about, Your
15   Board of Directors unanimously approved the
16   acquisition and believes that it is in the best
17   interest of OHSL stockholders?
18        MR. FISCHER:  Objection.
19        MS. ROWE:  Objection.
20        A.  Take that by parts, it -- no, it
21   does not.  It definitely doesn't conflict with
22   the unanimous approval.  And it doesn't
23   conflict with the fact that the Board believes
24   it's in the best interest, you know.  The --
25   no, I don't -- I don't see a -- I don't see the

Page 193

1    conflict.
2         Q.  Doesn't it say, Your Board of
3    Directors unanimously believes that it is in
4    the best interest of OHSL stockholders?
5         A.  No. it says the Board unanimously
6    approved.
7         Q.  Okay.  And then believes, right?
8         A.  It says the Board believes.
9         Q.  Okay.  You don't believe that
10   unanimously modifies both approved and
11   believes?
12        MS. ROWE:  Objection.
13        MR. FISCHER:  Objection.
14        A.  I understand that unanimously
15   refers to the approved, not believes.
16        Q.  Okay.  So it's your testimony that
17   unanimously does not modify believes?
18        MS. ROWE:  Objection.
19        MR. FISCHER:  Objection.  Asked
20   and answered.  More repetition.
21        A.  I don't know how to answer your
22   question differently.  I feel like I've
23   answered it.  It relates to approved.
24        Q.  Okay.  Do you know how Mr. Hanauer
25   voted his personal shares in the merger

**Page 194**

1  transaction?
2       A.  No.
3       Q.  Would it surprise you if I
4  represented to you that he voted his shares
5  against the merger transaction?
6       MS. ROWE:  Objection to relevance.
7       MR. FISCHER:  Objection, waste of
8  time.
9       A.  I don't know enough about Mr.
10  Hanauer to, to answer that question.  I don't
11  know.
12       Q.  What would you need to know about
13  Mr. Hanauer to answer that question?
14       A.  What type of shareholder -- well,
15  I don't know.  I'm not sure.  I'm not sure.
16       Q.  Do you know that Mr. Hanauer made
17  a presentation to the OHSL shareholders on
18  October 25th, 1999, asking them in effect to
19  approve the merger transaction?
20       A.  I -- did not know that.
21       Q.  You knew there was a special
22  meeting of the OHSL shareholders on October
23  25th, correct?
24       A.  I -- I was not at that meeting.  I
25  assumed it took place because that's what the

**Page 195**

1  proxy materials contemplated, but I can't
2  confirm that it existed.  I -- I mean, I assume
3  it took place.
4       Q.  Approximately when did you
5  complete your work on the OHSL-Provident
6  merger?
7       A.  I can't recall.
8       Q.  Is it unusual to close a
9  transaction such as this when there's
10  litigation pending?
11       MR. FISCHER:  Objection.
12       A.  Is it unusual to close a
13  transaction such as this when there is
14  litigation pending?
15       Q.  Yes.
16       A.  Not -- not necessarily.  Not --
17  no.
18       Q.  Have you ever been involved in a
19  transaction such as this where litigation was
20  pending and the merger closed, other than this
21  one?
22       MR. FISCHER:  Objection.  I think
23  he's testified this is the only one he knows
24  about litigation --
25       A.  That --

**Page 196**

1       MR. FISCHER:  -- earlier.
2       A.  This is the only transaction that
3  I know about -- that I've been involved in that
4  has had litigation, yes.
5       Q.  So then it's fair to say that to
6  close a transaction when litigation is pending
7  is uncommon?
8       MR. FISCHER:  Objection.
9       MS. ROWE:  Objection.
10       MR. FISCHER:  That's not what he
11  said.
12       A.  That's not what I said.  That's
13  not what I said.
14       Q.  Isn't closing a transaction with
15  litigation pending unique in your experience?
16       MS. ROWE.  Objection.  In fact, he
17  said one transaction with litigation -- the one
18  that he had had litigation pending, so that
19  would make it nonunique.
20       MR. BRAUTIGAM:  Rachel, we're
21  doing fine.  We don't need speaking objections.
22       A.  No, I wouldn't characterize it as
23  unique, no.
24  BY MR. BRAUTIGAM:
25       Q.  Okay  Are you familiar with

**Page 197**

1  something known as the Unitog transaction?
2       A.  Which Unitog transaction?  You
3  said Unitog?
4       Q.  Yes  Did KMK ever work on a
5  Unitog transaction?
6       A.  KMK never represented Unitog, if
7  that's what you're asking.
8       Q.  Did they ever work on a merger
9  where Unitog was involved?
10       A.  Yes.
11       Q.  What role did KMK have in that
12  transaction?
13       MR. FISCHER.  Again, don't reveal
14  any attorney-client communications with that
15  client.  You can say who we represented.
16       A.  KMK represents Cintas Corporation
17  and represented Cintas Corporation in
18  connection with its acquisition of Unitog.
19       Q.  And did KMK have documents on its
20  computer system related to the Cintas-Unitog
21  combination?
22       A.  Related to the transaction?
23       Q.  Yes.
24       A.  Oh, definitely.
25       Q.  Did you ever work on the

Page 198

1  Cintas-Unitog transaction?
2     A.  Yes, I did.
3     Q.  Did you ever fax any documents to
4  Cliff Roe from that transaction that he could
5  use as a model in writing his sections of the
6  OHSL-Provident proxy materials and registration
7  statement?
8     A.  I -- I personally don't recall
9  doing that.
10    Q.  Do you recall anyone having done
11  that?
12    A.  I, I don't -- I don't specifically
13  recall that happening, but I'm not denying that
14  it happened.  I just don't -- I just -- I
15  just -- I don't deny that it happened, I just
16  don't recall it.
17    Q.  Okay.  After the merger closed,
18  did you continue to follow the OHSL-Provident
19  transaction?
20    A.  No.
21     MR. FISCHER:  Objection.
22    A.  No.
23    Q.  Did you ever talk --
24    A.  Not that I recall.
25    Q.  -- to any one of the attorneys who

Page 199

1  worked on the transaction about the litigation,
2  other than recently in meetings with Pat
3  Fischer?
4    A.  I don't recall.
5    Q.  Let me hand you what has been
6  marked as Plaintiff's Deposition Exhibit 45 and
7  ask you to take a look at it.  Could you read
8  through this document to yourself, please?
9     MS. ROWE:  Do you have a copy for
10  me, Mike?
11     MR. BRAUTIGAM:  No.  I'll make one
12  for you at the break.
13     MR. MESH:  I'll be glad to make
14  one for you.
15     MS. ROWE:  That's all right.  We
16  can share.
17  BY MR. BRAUTIGAM:
18    Q.  Have you seen this document
19  before, perhaps in a different form?
20    A.  I've heard of Section 11 of the
21  Securities Act of 1933 and I have read
22  different provisions of it at different times.
23    Q.  And is it fair to say that KMK had
24  a role in preparing Defendant's Exhibit 1, as
25  limited by your testimony today?

Page 200

1     A.  I'll -- to provide an accurate
2  answer, KMK was part of a collaborative effort
3  that resulted in the preparation of this
4  document.  KMK's role was narrowly limited to
5  disclosures relating to Provident, not OHSL.
6     Disclosures in this document
7  relating to OHSL were OHSL's responsibility and
8  the responsibilities of its counsel and its
9  other agents.  And, you know, to that extent
10  KMK had a role in the process of the
11  preparation of that document.
12    Q.  Are you familiar with the term
13  voting agreements?
14    A.  I've heard of that term, yes.
15    Q.  What are voting agreements?
16    A.  There's different kinds.  Do you
17  have a particular kind in mind?
18    Q.  Were voting agreements
19  contemplated or used with respect to this
20  merger transaction?
21    A.  I haven't -- I don't -- I don't
22  recall any being -- I don't recall any voting
23  agreements in connection with this transaction.
24    Q.  Did KMK ever consider attempting
25  to obtain voting agreements from OHSL's

Page 201

1  management?
2     MS. ROWE:  Objection to relevance.
3     MR. FISCHER:  Objection.  That's
4  irrelevant.
5    A.  I don't -- I don't know.  Not that
6  I recall, no.  I don't know.
7    Q.  In creating this document,
8  Defendant's Exhibit 1, were there all hands
9  meetings from time to time?
10     MS. ROWE:  Objection to form.
11     MR. FISCHER:  Object to the term
12  all hands.
13    A.  I don't know what you mean by all
14  hands meetings.
15    Q.  Okay.  Were there meetings with
16  all or most of the KMK attorneys involved in
17  the merger?
18    A.  Not that I -- no, not -- well, not
19  that I recall.
20    Q.  Did you ever meet with anyone with
21  respect to your work on the merger?
22     MR. FISCHER:  Objection.
23    A.  I spoke to Mark Weiss about my
24  work.
25     MR. BRAUTIGAM:  Okay.  And you're

51 (Pages 198 to 201)

Page 202

1   not going to allow me to inquire as to the
2   content of those conversations. Is that
3   correct, Mr. Fischer?
4          MR. FISCHER: I'm not, but you can
5   ask the question.
6          MR. BRAUTIGAM: Okay. Well, I
7   don't want to waste time.
8   BY MR. BRAUTIGAM:
9       Q. Did you meet with anyone else with
10  respect to your work -- any other KMK attorneys
11  with respect to your work on the merger?
12      A. Not that I recall.
13      Q. Did you meet with anyone from
14  Provident with respect to your work on the
15  merger?
16      A. Again, I may have had
17  conversations with Mark Magee and Tony
18  Stollings. I don't -- I don't recall. I'm not
19  denying that I had conversations, I just -- I
20  just don't recall.
21      Q. Do you currently do work for
22  Provident?
23      A. Yes. Yes, I do.
24      Q. Did you have any input into
25  whether or not the Thiemann litigation would be

Page 203

1   disclosed in Provident's most recent annual
2   report?
3          MR. FISCHER: Objection.
4          MS. ROWE: Objection.
5          MR. FISCHER: Don't disclose any
6   communications to or from clients in regard to
7   the rendition of legal services
8          A. I apologize for asking to have the
9   question repeated.
10         (Record read by Reporter.)
11         MR. FISCHER: Same instruction.
12      A. No, not that I recall.
13      Q. Okay. I'd like to direct your
14  attention back to the July 2003 meeting that
15  you had with Pat Fischer and other people
16  attending: Jim Burke, Ms. Rowe, John Winstead,
17  Tim Matthews and Mark Weiss. Do you remember
18  saying anything at that meeting?
19         MR. FISCHER: Again, I'm objecting
20  but letting him disclose just to get it over
21  with on this one. We're with -- keeping all of
22  our objections. Go ahead.
23      A. I'm -- I know I said something.
24  I -- I don't recall what I -- I imagine I asked
25  a question and I imagine I said hello to

Page 204

1   everybody, but I didn't -- I don't recall
2   speaking at that meeting other than -- other
3   than asking a question.
4       Q. Okay. What question did you ask?
5       A. I don't recall. I asked when my
6   deposition was.
7       Q. Did there come a time when the
8   attorneys who worked on the merger transaction
9   went around the room and essentially stated
10  what they remembered of the transaction?
11      A. I don't recall that. I'm not
12  denying that it didn't happen, but I don't
13  recall -- I don't recall that being a part of
14  the meeting.
15      Q. Okay. What do you recall about
16  the meeting?
17      A. I --
18         MR. FISCHER: Same objection. Go
19  ahead.
20      A. Like I said earlier today, we
21  talked about the mechanics of the -- the
22  mechanics and scheduling of the deposition. We
23  were informed that we were being deposed. We
24  were informed of the issues in the -- you know,
25  still pending in the case. And we were -- we

Page 205

1   talked about mechanical, procedural things
2   related to the depositions.
3       Q. What is your understanding of the
4   issues still pending in the case?
5       A. I understand that the unanimously
6   approved issue is still pending. I understand
7   that the resignation issue is still part of the
8   case. Those are the two issues that I
9   understand are still remaining.
10      Q. Anything else about
11  securitizations?
12      A. Oh, I -- I don't recall the -- it
13  wouldn't surprise me if that were still part of
14  the case. I just don't recall -- yes, that may
15  have been discussed.
16      Q. Okay.
17      A. Like I said, I just have had no
18  exposure to the securitization issue, that I
19  don't --
20         MR. FISCHER: Don't guess.
21      A. I don't know anything about that,
22  so I don't know.
23      Q. Did you take notes at this
24  meeting?
25      A. I did not.

52 (Pages 202 to 205)

Page 206

1    Q.  Okay.  Did you observe anyone
2  taking notes at the meeting?
3    A.  I saw no one taking notes.
4    Q.  Did Mr. Matthews say anything at
5  the meeting that you recall?
6    A.  Not that I recall.
7    Q.  Did --
8    A.  I know he spoke.  I don't recall
9  what he said.
10    Q.  Did Mr. Weiss say anything at the
11  meeting that you recall?
12    A.  No.
13    Q.  Did Mr. Winstead say anything at
14  the meeting that you recall?
15    A.  No.
16    Q.  Did Ms. Rowe say anything at the
17  meeting that you recall?
18    A.  No.
19    Q.  Did Mr. Burke say anything at the
20  meeting that you recall?
21    A.  Yes.
22    Q.  What did he say?
23    A.  He told me that my depo -- when
24  our depositions were scheduled.  He informed us
25  that we were having depositions.  He told us

Page 207

1  about the issues remaining in the case, like I
2  just, you know, as I just said them -- or just
3  understood them, told us what the issues
4  remaining were, as pleaded, I guess.  That's
5  all I recall.
6    Q.  Do you believe that this meeting
7  took place in July of 2003?
8    MR. FISCHER:  Objection.  We went
9  through this this morning.
10    A.  I mean, again, Mike, I -- I mean
11  it could have been June.  I don't -- I don't
12  know.  It feels like July.
13    Q.  Okay.  Well, my question is
14  related to this.  How did Mr. Burke know when
15  your depositions were going to take place
16  whenever this meeting took place?
17    A.  I'm sorry?
18    Q.  Okay.  It's my understanding that
19  your depositions were not scheduled until
20  approximately two weeks ago, so if this meeting
21  took place in June or July of 2003, my question
22  is, how did Mr. Burke know how to tell you when
23  your deposition was going to take place?
24    A.  Well, he didn't give us a specific
25  date as to when the depositions were scheduled,

Page 208

1  he gave us a time frame.  And it was like a few
2  weeks time frame, a few months time frame as to
3  when they were.
4    Q.  So essentially he said that they
5  were coming up?
6    A.  He said -- actually he didn't even
7  say -- he said there was a -- if I recall
8  correctly, he discussed the possibility of
9  being deposed and the mechanics of it.  And
10  just kind of alerting us to, to the fact that
11  they might happen and kind of a general time
12  frame that they would occur.
13    Q.  Did anyone discuss at this meeting
14  the importance of these depositions to KMK?
15    A.  No, that wasn't -- I don't recall
16  that being something that was discussed.
17    Q.  Did anyone discuss the importance
18  of these depositions to Provident at the
19  meeting?
20    MR. FISCHER.  Same objection.  He
21  can answer.  Go ahead.
22    A.  Did anyone discuss the importance
23  of these depositions to Provident at that
24  meeting?
25    Q.  Yes.

Page 209

1    A.  No.  Not -- not that I recall.
2    Q.  After this group meeting, did you
3  personally meet with Pat Fischer?
4    MR. FISCHER.  Are you saying
5  immediately after?
6    Q.  No, at some point after
7    A.  Yes.
8    Q.  Okay.  Approximately how long did
9  this meeting or meetings take?
10    A.  I have met with Pat three times
11  maybe.  And how long over the course of those
12  three times?
13    Q.  Yes.
14    A.  I would guess -- I would -- I can
15  only guess.
16    MR. FISCHER  Don't guess
17    A.  Less -- I can't tell you how long
18  I --
19    Q.  Approximately three hours?
20    A.  I would -- I would guess that.
21    Q.  Okay.  You're not billing anyone
22  for your time at this deposition or in these
23  meetings; is that correct?
24    A.  That's correct.
25    Q.  Do you know if Mr. Fischer is

53 (Pages 206 to 209)

**Page 210**

1  billing anyone?
2      MR. FISCHER: Objection. Don't
3  discuss any discussions between us.
4      A. I don't know.
5      Q. Okay. Do you know if Mr. Burke
6  and Ms. Rowe were billing anyone for their time
7  during the meeting?
8      A. I don't know.
9      MR. BRAUTIGAM: Okay. I'd like to
10 take a short break and I think we may be done.
11      (Brief recess.)
12      (Plaintiff's Exhibit Number 46
13      was marked for identification.)
14 BY MR. BRAUTIGAM:
15     Q. Mr. Reuter, I've handed you what
16 has been marked as Plaintiff's Deposition
17 Exhibit 46. Have you seen that document
18 before?
19     A. No, I have not.
20     Q. You do not recognize the
21 handwriting that appears at various places in
22 the document?
23     A. No, I do not.
24     Q. Were you aware of this document's
25 existence? Let me represent to you that the

**Page 211**

1  handwriting is Ken Hanauer's, OHSL's former CEO
2  and Board member.
3      A. No, I am not aware of this
4  document's existence.
5      Q. Okay. Do you see the first page
6  of the document with Mr. Brinker's signature?
7      A. This page?
8      Q. Yes.
9      A. Yes.
10     Q. Did you ever see a draft of the
11 first page of that document with Mr. Hanauer's
12 and Mr. Brinker's signature on that?
13     A. Not that I recall.
14     Q. Is it typical in your experience
15 for a merger like this to have both the
16 Chairman of the Board and the CEO's signatures
17 appear in the cover letter, essentially?
18     MR. FISCHER: Objection to form.
19     MS. ROWE: Objection.
20     A. Is it typical to have both
21 signatures?
22     Q. Yes.
23     MR. FISCHER: Same objection.
24     A. I don't -- I don't know what you
25 mean by typical, but having just -- having one

**Page 212**

1  signature on the notice letter, as here, is
2  something that I feel like I see on a
3  relatively frequent basis.
4      Q. Okay. Did you know that Mr.
5  Hanauer's signature had appeared on a draft of
6  this document and that he directed that it be
7  removed?
8      A. Not until -- until now, no.
9      Q. Have you seen Mr. Winstead since
10 his deposition?
11     A. I have -- yes, I have seen him,
12 yes.
13     Q. Did you talk to Mr. Winstead about
14 the litigation since his deposition?
15     A. No, I did not.
16     MR. BRAUTIGAM: Mr. Reuter, I
17 thank you for your time. I think we're done.
18     MR. MESH: Thank you, gentlemen
19 and ladies.
20
21
22
23
24
25

**Page 213**

_____
F. MARK REUTER, ESQ

- - -

(Deposition concluded at 4:18 p.m.)

- - -

54 (Pages 210 to 213)