Page 1

1
2                   UNITED STATES DISTRICT COURT
3                  SOUTHERN DISTRICT OF OHIO
4                      WESTERN DIVISION
5

6                          - - -
7    WALTER W. THIEMANN,        :
     On Behalf of Himself :
8    And of All Others     :
     Similarly Situated,   :
9                          :

            Plaintiff,      :
10                         :
        VS.                 : CASE NO. C-1-00-793
11                         :
     OHSL FINANCIAL         :
12   CORPORATION, et al., :
                           :
13          Defendants.    :
14                         - - -
15          Deposition of TIMOTHY B. MATTHEWS, ESQ.,
16   a witness herein, called by the plaintiff for
17   cross-examination pursuant to the Federal Rules
18   of Civil Procedure, taken before me, Lee Ann
19   Williams, a Registered Professional Reporter
20   and Notary Public in and for the State of Ohio,
21   at the offices of Gene Mesh & Associates, 2605
22   Burnet Avenue, Cincinnati, Ohio 45219, on
23   Thursday, August 21, 2003, at 10:03 a.m.
24
25



**Page 2**

1  APPEARANCES:
2  On behalf of the Plaintiff:
3     Gene I. Mesh, Esq.
        and
4     Michael G. Brautigam, Esq.
5     Gene Mesh & Associates
      2605 Burnet Avenue
      Cincinnati, Ohio 45219
6
7  On behalf of the Defendant:
8     James E. Burke, Esq.
      Keating, Muething & Klekamp
9     1400 Provident Tower
      One East Fourth Street
10    Cincinnati, Ohio 45202
11 On behalf of the Defendant:
12    Michael Maundrell, Esq.
      Schroeder, Maundrell, Barbere
13    & Powers
      110 Governor's Knoll
      11935 Mason Road
14    Cincinnati, Ohio 45249
15 On behalf of the Witness:
16    Louis F. Gilligan, Esq.
      Keating, Muething & Klekamp
17    1400 Provident Tower
      One East Fourth Street
18    Cincinnati, Ohio 45202
19       ...
20
21
22
23
24
25

**Page 3**

## INDEX
2  Examination of TIMOTHY MATTHEWS, ESQ.   Page
3  By Mr. Brautigam:            4
4            - - -
5  Defendant's Exhibit    Page Identified
6     No. 47              4
7            - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1        TIMOTHY B. MATTHEWS, ESQ.
2  having been first duly sworn, testified as
3  follows:
4            CROSS-EXAMINATION
5  BY MR. BRAUTIGAM:
6     Q.   Good morning, Mr. Matthews. My
7  name is Michael G. Brautigam and I represent
8  Walter Thiemann and a class of OHSL
9  shareholders. Mr. Matthews, let me place
10 before you what has been marked as Plaintiff's
11 Exhibit 47. And I ask you to take a look at
12 it.
13    A.   Okay.
14    Q.   Have you seen it before?
15    A.   Yes, I have.
16    Q.   Are you familiar with it?
17    A.   Yes, I am.
18    Q.   Do you recognize it?
19    A.   Yes.
20    Q.   What is Plaintiff's Exhibit 47?
21    A.   It's from the web page of Keating,
22 Muething & Klekamp and it's basically my
23 biography.
24    Q.   Okay. And is this current?
25    A.   Yes, it is.

**Page 5**

1     Q.   Are you chairman of the commercial
2  finance practice area of KMK?
3     A.   Yes, I am.
4     Q.   And what are your duties and
5  responsibilities as chairman of the commercial
6  finance area at KMK?
7     A.   To lead the professionals in our
8  group in the designated practice area.
9     Q.   And what are the areas of
10 responsibility in that practice area?
11    A.   Well, commercial finance would
12 encompass any type of financing transaction
13 including commercial loans, mezzanine loans,
14 project financing, equipment leasing,
15 structured finance, asset based loans, and
16 other types of financing transactions.
17    Q.   Okay. Let's talk a little bit
18 about your educational background. I
19 understand you graduated from Harvard in 1978?
20    A.   Correct.
21    Q.   And what was your degree in?
22    A.   Economics.
23    Q.   And you remained at Harvard for a
24 law degree?
25    A.   Correct.

2 (Pages 2 to 5)

**Page 6**

1  Q. And you graduated in 1981; is that
2  correct?
3  A. Correct.
4  Q. And then you spent six years at
5  Brown & Gardner; is that right?
6  A. Yes.
7  Q. And where is that firm located?
8  A. That firm no longer exists. That
9  firm was merged into Keating, Muething &
10  Klekamp in 1987.
11  Q. I see. And you were merged in as
12  a partner at that time?
13  A. That's correct.
14  Q. What is business planning and
15  formation? How would you describe that general
16  area?
17  A. Well, business planning can
18  encompass a lot of different things, but in the
19  context that you see it here, it would mean
20  planning for the capital structure of a
21  business, assisting small business owners or
22  middle market business owners with decisions
23  about how to finance their business, how to
24  grow their business, how to expand it, things
25  of that nature.

**Page 7**

1  Q. I understand you're an expert in
2  taxation; is that correct?
3  A. Well, that's one of my practice
4  areas, yes.
5  Q. Okay. Are you also an expert in
6  mergers and acquisitions?
7  A. Yes.
8  Q. Are you an expert in commercial
9  loan documentation?
10  A. Yes.
11  Q. Estate planning?
12  A. No. I would -- I would not say
13  that at this point in time. I do have
14  substantial expertise in that area, but more
15  recently I've not kept up in that area.
16  Q. Okay. Are you an expert in
17  personal tax services?
18  A. Again, I would not say I'm an
19  expert in personal tax services at this time.
20  In the past I've done substantial amounts in
21  that area, but I would not consider that to be
22  a, a current practice area in which I would
23  hold myself out as an expert.
24  Q. Okay. Are you an expert in
25  private offerings?

**Page 8**

1  A. No.
2  Q. Finance and leveraged leasing?
3  A. I would say that in finance, yes.
4  In the context of leveraged leasing, you know,
5  I would not -- I would not hold myself out as
6  an expert in that area.
7  Q. Okay. Well --
8  A. Well, what you mean by an expert
9  perhaps would merit some clarification, but
10  when I think of, you know, a certain degree of
11  specialization, I would not be specialized in
12  equipment financing.
13  Q. Okay. It says, according to your
14  firm biography, that you specialize -- you have
15  an emphasis on bank transactions; is that
16  correct?
17  A. Yes.
18  Q. And what bank transactions have
19  you been involved in?
20  A. Really all -- all kinds of bank
21  transactions. I've been involved in Federal
22  Reserve Board applications. I've been involved
23  in mergers and acquisitions. I've been
24  involved in divestiture transactions. I've
25  been involved in transactions that, as you

**Page 9**

1  would expect, commercial lending type of
2  transactions, commercial loans, asset based
3  loans, participation arrangements with bank
4  groups and a number of other types of bank
5  transactions.
6  Q. Approximately how many mergers and
7  acquisitions have you been involved in?
8  A. Over what period of time?
9  Q. In your career.
10  A. I would say approximately 150.
11  Q. And how many of those involved
12  banks or other financial institutions?
13  A. I would say directly or indirectly
14  almost all of them, because even ones that did
15  not directly involve financial institutions
16  usually would indirectly involve financial
17  institutions because you have to finance the
18  purchase or the sale of a business.
19  Q. Okay.
20  A. So most of them, certainly.
21  Q. Okay. I understand you serve as a
22  director of a number of public companies; is
23  that correct?
24  A. No.
25  Q. Have you ever --

Page 10

1    A.  I serve as the director for some
2  private companies.
3    Q.  Okay.  Have you ever served as a
4  director for a public company?
5    A.  No.
6    Q.  What's the difference between
7  serving as a director of a public company as
8  opposed to a private company?
9    MR. BURKE:  Objection to form.
10  You may answer.
11    A.  Well, as a director, you know,
12  your allegiance is always in both cases to
13  your -- to your shareholders, you know.  You
14  have fiduciary duties to your shareholders.
15  But with public companies, that takes a
16  different form because often there are many
17  shareholders, whereas in private companies
18  there may be one or two shareholders, or ten
19  shareholders.  So the group to whom you owe
20  obligations are smaller.  That changes the way
21  do you certain things.
22    For example, if in a small company
23  context I want to ensure that my constituents,
24  which are my shareholders, are okay with a
25  transaction, for example, I can simply go to

Page 11

1  them.  And I may be able to talk every single
2  one of them about it to satisfy myself that the
3  transaction may move forward, whereas that's
4  not feasible in a public setting.  I'm not
5  sure -- I mean, there may be other differences,
6  but that's certainly one that comes to mind.
7    Q.  When you're working as an attorney
8  on a merger and acquisition, is it part of your
9  job to ensure that the directors meet their
10  fiduciary responsibilities?
11    A.  No.
12    Q.  Why not?
13    A.  Well, when you -- when you use
14  "ensure," I think -- that implies a lot to me.
15  I think that the role of a corporate attorney
16  representing a company, you know, certainly can
17  include advice to the Board regarding their
18  fiduciary duties.
19    And that would be -- that would be
20  normal, but when you -- your question was are
21  we obligated to ensure that the Board satisfies
22  their fiduciary duties.  I don't think that is
23  our obligation.
24    Q.  So I think a fair restatement of
25  your answer would be that your job as a

Page 12

1  corporate attorney working on a transaction is
2  to assist the directors in meeting their
3  fiduciary duties.  Is that fair?
4    A.  I don't know.
5    MR. GILLIGAN:  Excuse me.  I
6  object to your restating.  You know, you ask a
7  question, he gives an answer.  I don't want you
8  restating his testimony.  If you don't
9  understand it, ask him a question about what
10  you don't understand.
11    MR. BRAUTIGAM:  Lou, we're doing
12  fine.  We don't need speaking objections.
13    MR. GILLIGAN:  I'm sorry?  Excuse
14  me?
15    MR. BRAUTIGAM:  I said we're doing
16  fine, we don't need speaking objections.
17    MR. GILLIGAN:  Well, I want you to
18  understand what the reason for my objection is,
19  so that you won't repeat an improper
20  examination.
21    MR. BRAUTIGAM:  Lou --
22    MR. GILLIGAN:  Go ahead.
23    MR. BRAUTIGAM:  -- if you have an
24  objection, say the word objection and nothing
25  else.

Page 13

1    MR. GILLIGAN:  Don't instruct me
2  on what to do.
3    MR. BRAUTIGAM:  Can we have the
4  question read back, please?
5    (Record read by Reporter.)
6    A.  No.
7    MR. GILLIGAN:  Note my objection.
8    A.  Should I answer the question?
9    Q.  Yes.
10    MR. GILLIGAN:  You don't have to
11  repeat the same answer you already gave.  If
12  you want to just rely on the answer you
13  previously gave, just rely on that, if you
14  wish.
15    A.  I'll rely on the answer.
16  BY MR. BRAUTIGAM:
17    Q.  Okay.  What other roles do you
18  have as a corporate attorney in working on a
19  merger transaction?
20    MR. BURKE:  Objection to form.
21  Calls for a narrative.
22    A.  Well, again, the role that you
23  have in a given transaction depends on a lot of
24  different things, you know, depending on the
25  type of company you represent, whether they

4 (Pages 10 to 13)

**Page 14**

1  have in-house resources to assist in the
2  process or not, you know, what you're asked to
3  do, what you're not asked to do.
4       That's a -- that's a pretty
5  difficult question to answer, because it will
6  depend on the transaction. I don't think there
7  is a set role, but the role is to represent the
8  company. When you are counsel to a company,
9  you represent the company. You do not
10  represent the individual Board members, if
11  that's the import of your question.
12       Q. Okay. What do you do as a
13  director on the Board of Worldwide Equipment
14  Enterprises?
15       A. What do I do?
16       Q. Right.
17       A. Well, I meet when Board meetings
18  are called, which are twice a year. We discuss
19  issues of strategic importance to the company
20  and we make decisions on matters that come
21  before the Board.
22       Q. What kind of a company is that?
23       A. It's about a $300 million a year
24  revenue company, based in Prestonsburg,
25  Kentucky, which is involved in the class six,

**Page 15**

1  seven and eight truck dealership market and has
2  about 35 locations throughout the eastern
3  United States.
4       Q. Okay. What is Lucrum,
5  Incorporated?
6       A. Lucrum -- Lucrum, Incorporated is
7  a privately held IT consulting firm based in
8  Cincinnati. It's about a $12 million a year
9  company which does computer programming, staff
10  augmentation, IT consulting and similar types
11  of services.
12       Q. And are your duties and
13  responsibilities as a Board member for that
14  company essentially the same?
15       A. No.
16       Q. Okay. What do you do as a
17  director for that company?
18       A. Well, in that case part of what I
19  assist the company in doing in my role as a
20  director is to assist them with -- and this
21  really isn't, I guess, a role that is inherent
22  in being a director -- you don't have to do
23  this as a director, but I assist them with
24  their business planning, whereas with Worldwide
25  I don't really do that, they have in-house

**Page 16**

1  people that do that. But in Lucrum's case I'm
2  integrally involved in the business planning
3  process for them.
4       Q. Okay. And with respect to DBA
5  Direct, what are your duties and
6  responsibilities as a director?
7       A. Well, it's kind of similar to
8  Lucrum. It's also a small company, privately
9  held, about a $5 million a year company. And
10  I'm on the Board there, but also have more of a
11  business planning role with them as well.
12       Q. Do you serve on any committees of
13  any of these Boards of the privately held
14  companies?
15       A. Not at the current time, but I
16  have in the past.
17       Q. Okay. What Boards have you served
18  -- excuse me, what committees have you served
19  on?
20       A. Compensation committees and audit
21  committees.
22       Q. Okay. What are the duties and
23  responsibilities of the audit committee of a
24  non-public company?
25       A. Well, in the case of an audit

**Page 17**

1  committee, again the duties and
2  responsibilities can vary from company to
3  company. Where I've served as an audit
4  committee member or chairman, the
5  responsibility has been to review the financial
6  statements, to discuss the audit report with
7  the independent auditors, to determine, you
8  know, what, if any, changes to management's
9  accounting procedures -- or the company's
10  accounting procedures should be made as a
11  result of the auditor's review of the financial
12  statements, and then to report back to the
13  Board of Directors. But that's not necessarily
14  the only role.
15       Q. Okay. Have you served as an audit
16  committee chairman?
17       A. Yes.
18       Q. For what company?
19       A. In the case of -- actually for a
20  nonprofit Northern Kentucky University
21  Foundation, I am currently serving as the audit
22  committee chairman.
23       Q. And as the audit committee
24  chairman and also in your work as an attorney,
25  you have to be familiar with the concept of

Page 18

1  materiality. Is that correct?
2      MR. BURKE: Objection, ambiguous.
3  You may answer.
4      A.  No.
5      Q.  Okay.  Are you familiar with the
6  concept of materiality?
7      A.  Yes.
8      Q.  What is your understanding of
9  materiality?
10     A.  Well, materiality is a term that
11 can take on a lot of different meanings
12 depending on the context.  It's like many words
13 of general application, it can assume a lot of
14 different meanings.
15         It's -- if you were to be asked
16 what's the definition of pornography, for
17 example, you know, there's a well known Supreme
18 Court Justice who said I don't know how to
19 define it, but I know it when I see it.
20         Materiality is something that
21 requires the exercise of judgment in the
22 context of circumstances.  And I think you
23 could probably write a book on it.
24     Q.  When you're working on a
25 transaction, is it necessary to have a working

Page 19

1  definition that's less than book length?
2      A.  Well, in the context of a given
3  transaction, you may have several definitions
4  of materiality.  For example, there may be a
5  set dollar amount that is defined by the
6  parties as material in the context of a given
7  issue.  For example, any litigation in excess
8  of a hundred thousand dollars could be defined
9  as material litigation in that context.
10         In another transaction you could
11 have a definition of any litigation in excess
12 of $1 million.  And both definitions would be
13 equally apropos, depending upon the context or
14 circumstances in which the definition is being
15 used.
16         We find this all the time in
17 connection with audit reports and audit letter
18 requests that are submitted to us as attorneys
19 from accounting firms, because they'll often
20 define materiality in different ways, depending
21 upon the company's size and markets and
22 circumstances and -- and other circumstances.
23     Q.  When you talked about a set dollar
24 amount for materiality, is that sometimes known
25 as a materiality threshold?

Page 20

1      A.  Yes, it is.
2      Q.  Are you familiar with the term
3  conflict of interest?
4      A.  Yes.
5      Q.  What do you understand --
6      MR. GILLIGAN:  Is there a context
7  that you're referring to a conflict of
8  interest?
9         MR. BRAUTIGAM:  We're doing fine,
10 Lou.  We're --
11        MR. GILLIGAN:  You won't answer my
12 question?
13        MR. BRAUTIGAM:  Well --
14        MR. GILLIGAN:  Well, then I'll
15 instruct you not to answer, unless you give a
16 context for conflict of interest.  Why sit and
17 ask that broad of a question?  All I'm asking
18 you is if you can put it in context so we don't
19 sit here and waste a lot of time.
20        MR. BRAUTIGAM:  Lou, we're doing
21 fine.
22        MR. GILLIGAN:  Why are you so
23 adverse to working through the deposition?
24        MR. BRAUTIGAM:  Lou --
25        MR. GILLIGAN:  I've never had this

Page 21

1  trouble with any other lawyer I've dealt with.
2  I do depositions all the time.  I've never had
3  that trouble with Mr. Mesh.
4         MR. BRAUTIGAM:  Lou, we're doing
5  fine.  The witness understands the question.
6  Let him answer it, please.  We don't need
7  speaking objections.
8         THE WITNESS:  Can you repeat the
9  question, please?
10        (Record read by Reporter.)
11 BY MR. BRAUTIGAM:
12     Q.  What do you understand the term
13 conflict of interest to mean?
14        MR. BURKE:  Objection, vague.
15     A.  Well, like your question about
16 materiality, it can mean a lot of different
17 things, Mike.  There can be all different kinds
18 of conflicts between people and the various
19 interests that they have.  We talked in terms
20 of, for example, business conflicts of
21 interest.
22        There are legal conflicts of
23 interest.  There's conflicts of interest that
24 might rise to the level of a disciplinary
25 violation, you know, under the Canon of Ethics,



Page 22

1  our code of professional responsibility. But
2  that's -- those aren't the only kinds of
3  conflicts that one has to face or deal with.
4  I'm not sure again what context you're
5  referring to, so it's difficult to answer a
6  question of that breadth.
7       Q.  Okay.  I see Mr. Gilligan is
8  sitting on your left.  Do you know who he
9  represents?
10      A.  Yes.
11      Q.  Who does he represent?
12      A.  Me.
13      Q.  How did that representation come
14 about?
15      A.  I asked him to represent me in --
16 to sit with me during this deposition.
17      Q.  Does he also represent KMK?
18      A.  In what context?
19      Q.  In the context of this litigation.
20      MR. BURKE:  Objection.  KMK has no
21 role in this litigation.
22      A.  Yes.  I, I -- I understood, and
23 you can correct me if I'm wrong, that this
24 litigation involves the Provident Bank as a
25 defendant.  Is that correct?

Page 23

1       Q.  The Provident Bank is one of many
2  defendants.
3       A.  Okay.  And KMK has served as
4  Provident's counsel for many years, and I
5  assume that it's serving as counsel in this
6  case for the Provident Bank.
7       Q.  And who is serving as Provident
8  Bank's counsel in this case?
9       MR. BURKE:  Objection to
10 relevance.
11      A.  Keating, Muething & Klekamp.
12      Q.  Okay.  And what attorneys
13 specifically are representing Provident Bank in
14 this litigation?
15      A.  Because I'm not familiar with the
16 litigation and I've not been involved in the
17 litigation, I probably couldn't tell you a
18 complete list.  I know Jim has been.  I think
19 Rachael Rowe has been, and there may be others.
20 I don't know.
21      Q.  Has Mr. Gilligan ever filed papers
22 on behalf -- well, in this litigation?
23      MR. BURKE:  Objection.
24      A.  I do not know.  You have to
25 understand, I have not read any of the

Page 24

1  pleadings in this case.
2       Q.  Okay.  We're going to get there.
3       A.  Okay.
4       Q.  Has -- do Mr. Gilligan and Mr.
5  Burke represent the same clients?
6       MR. BURKE:  Objection, vague.
7       A.  Not in my mind.
8       Q.  Why not?
9       A.  Well, because I've asked Lou to
10 specifically represent me as a witness in this
11 deposition.  Jim represents the bank in
12 connection with the lawsuit.  That's -- that's
13 how I -- that's how I see it.
14      Q.  What do you know about the OHSL
15 litigation?
16      A.  Very little.
17      Q.  Okay.  Can you tell me what you do
18 know?
19      A.  I know that there was a lawsuit
20 filed against the Provident Bank.  I understand
21 that there was a second suit filed against
22 Keating, Muething & Klekamp, but I have not
23 read any of the pleadings in connection with
24 either of those cases.
25      Q.  Why not?

Page 25

1       MR. BURKE:  Objection.
2       A.  There's no reason to.
3       Q.  What was your reaction when you
4  learned that there was a lawsuit filed against
5  KMK?
6       MR. GILLIGAN:  Is this relevant to
7  this deposition?
8       MR. BURKE:  You are taking this
9  deposition in which case, the Thiemann case?
10 No, no, he's not -- are you taking this
11 deposition in the Thiemann case or the Meier
12 case?  Because you're not authorized to
13 practice with respect to the Meier case,
14 correct?
15      Q.  There's a question pending, sir.
16      A.  Can you repeat the question,
17 please?
18      MR. GILLIGAN:  I'll instruct you
19 not to answer since counsel won't tell the
20 capacity in which he's, he's asking the
21 questions, so I instruct you not to answer,
22 Tim.
23      MR. BRAUTIGAM:  There's no
24 question as to who I'm representing.  I stated
25 at the beginning and I can --

**Page 26**

1  MR. GILLIGAN: Hey, if you're that
2  uncooperative, I'm going to instruct him not to
3  answer. Take it to the Court if you want. I'm
4  very confident the Court will see through your
5  charade.
6  MR. BRAUTIGAM: Can I have the
7  last question read back, please?
8  (Record read by Reporter.)
9  BY MR. BRAUTIGAM:
10  Q. Mr. Matthews, are you going to
11  answer that question?
12  A. No.
13  Q. Okay. Mr. Matthews, how did you
14  learn that there was a lawsuit pending against
15  KMK?
16  MR. GILLIGAN: Does that have
17  relevance to this case? Can you represent to
18  me it does?
19  MR. BRAUTIGAM: Yes.
20  MR. GILLIGAN: All right, then
21  I'll let you go forward, but let's show some
22  connection.
23  A. I think that someone in the office
24  told me probably a year ago or, or so, whenever
25  it was. I have no idea. I mean, I just -- I

**Page 27**

1  just heard about it, you know. We have a big
2  office and someone just, you know, told me KMK
3  was a defendant in the case involving OHSL and
4  Provident.
5  Q. Did that concern you?
6  A. Not really.
7  Q. Did you want to know more facts
8  about why KMK had been sued?
9  A. No.
10  Q. Why not?
11  MR. BURKE: Objection to
12  relevance.
13  A. Because it wasn't necessary for me
14  to know that. We have competent people
15  handling these kinds of things and it just
16  didn't concern me.
17  Q. Who is handling the litigation
18  against KMK?
19  A. I don't know.
20  Q. Okay. Did you ever talk to Gary Kreider
21  about the pending litigation?
22  A. No.
23  Q. Did you ever talk to David
24  Rosenberg about the pending litigation?
25  A. No.

**Page 28**

1  Q. And by "pending litigation," I
2  mean the Thiemann case, not only the suit
3  against KMK.
4  MR. GILLIGAN: You're asking about
5  both cases?
6  MR. BRAUTIGAM: KMK was sued in
7  this case as well.
8  MR. BURKE: That's not true, Mike.
9  That's a misrepresentation. That's a
10  misrepresentation. In fact, your motion for
11  leave to amend was denied, so that's a false
12  statement.
13  MR. BRAUTIGAM: That's not a false
14  statement, Jim.
15  MR. BURKE: That is a false
16  statement.
17  MR. BRAUTIGAM: KMK was sued at
18  various times in this litigation.
19  MR. GILLIGAN: What do you mean by
20  "this litigation," and I'll let him answer.
21  MR. BURKE: Which litigation?
22  MR. BRAUTIGAM: The Thiemann
23  litigation.
24  MR. BURKE: That's false. That
25  motion to leave for amend was denied and that's

**Page 29**

1  the current state of the record, correct, Mr.
2  Brautigam? Correct, Mr. Brautigam?
3  MR. BRAUTIGAM: Jim, I'm not
4  answering your questions. KMK was sued in this
5  litigation.
6  MR. BURKE: Objection. Misstates
7  the record.
8  MR. BRAUTIGAM: Whether the
9  Amended Complaint or Second Amended Complaint
10  will be accepted or not is still an open
11  question.
12  MR. GILLIGAN: Okay. Well, the
13  question is whether or not Mr. Matthews talked
14  to these gentlemen about this litigation?
15  MR. BRAUTIGAM: Correct.
16  MR. GILLIGAN: Being the Thiemann
17  litigation, period?
18  A. The answer is still no.
19  BY MR. BRAUTIGAM:
20  Q. Okay. Did you ever talk to Mark
21  Reuter about this litigation?
22  A. No.
23  Q. Did you ever talk to John Winstead
24  about this litigation?
25  A. No.

Page 30

1    Q.  Do you consider this deposition to
2  be important?
3    A.  Sure.
4    Q.  What, if anything, did you do to
5  prepare for this deposition?
6    A.  I discussed this matter with, with
7  Lou.
8    Q.  Did you participate in a meeting
9  where several KMK attorneys, including Mr.
10  Burke, Ms. Rowe, Mr. Reuter, Mr. Winstead and
11  Mr. Weiss were present?
12    A.  I did for about five or ten
13  minutes.  I was late for that meeting and so I
14  kind of came in on the tail end of it.
15    Q.  What was the purpose of that
16  meeting?
17    A.  In my mind it was to discuss the
18  schedule.
19    MR. GILLIGAN:  Note my objection
20  to it.  And I understand that in one of the
21  other depositions apparently Mr. Fischer, who
22  was representing the lawyers from the firm, who
23  wasn't able to be here today and that's why I'm
24  taking over, allowed him -- allowed the witness
25  to testify about that.  But I want to -- I'm

Page 31

1  going to let him go ahead and answer the
2  questions as one of the other witnesses did,
3  even though I, quite frankly, don't agree that
4  that's a proper area of inquiry, but I just
5  want to state that for the record.
6    A.  Well, first of all, Mike, I think
7  the meeting you're referring to is a meeting --
8  the only meeting I'm aware of is a meeting in
9  maybe late July.  And as I said, I was late for
10  it.
11    The purpose of the meeting in my
12  mind was to discuss -- I had been subpoenaed,
13  so to discuss what my responsibilities were in
14  terms of showing up and when that was going to
15  be scheduled to give the participants an
16  indication of when I would be available and
17  whether that would be -- you know, that could
18  be suitably arranged with you as to place and
19  time and whatnot.  So as far as I was
20  concerned, that was the sole purpose of the
21  meeting.  Nothing substantive was discussed in
22  my presence at that meeting.
23    Q.  When had you been subpoenaed?
24    A.  Well, actually I just got a copy
25  of a subpoena maybe, maybe the week prior to

Page 32

1  that, showed up on my desk.  And I'm not
2  sure -- I wasn't ever personally served with a
3  subpoena.  I don't know -- I don't know how
4  that happened exactly, but I think my secretary
5  gave it to me, so it just showed up on my desk
6  as some things -- some things do.
7    Q.  So you were never present at that
8  time in the meeting when Mr. Burke apparently
9  talked about litigation strategy and what type
10  of questions would be asked at the deposition?
11    MR. BURKE:  Objection.  Misstates
12  prior testimony.
13    A.  No.
14    MR. BURKE:  Assumes facts not in
15  evidence.
16    A.  No.
17    Q.  Okay.  Have you talked to anyone
18  else who's been deposed this week, Mr. Winstead
19  or Mr. Reuter?
20    A.  No.
21    Q.  Did you subsequently meet with Mr.
22  Fischer or Mr. Gilligan in private?
23    A.  Well, I recently did.  I met
24  yesterday with Mr. Fischer and Mr. Gilligan.
25    Q.  And approximately how long did

Page 33

1  that meeting last?
2    A.  Well, there were two separate
3  meetings.
4    Q.  Approximately how long did these
5  meetings last?
6    A.  I would say about a total of an
7  hour and 20 minutes.
8    Q.  Do you have an hourly rate at KMK?
9    A.  Yes, I do.
10    Q.  What is that hourly rate?
11    A.  $350.
12    Q.  And are you charging for your
13  time?
14    A.  No
15    Q.  Are you paying Mr. Fischer or Mr.
16  Gilligan for their time?
17    MR. BURKE:  Objection to
18  relevance.
19    A.  Not that I know of.
20    THE WITNESS:  Lou, do you want
21  something?
22    Q.  Did you perform work --
23    MR. GILLIGAN:  I'm willing to act
24  pro bono.
25    THE WITNESS:  Great, appreciate



**Page 34**

1  it. I'd do the same thing for you.
2       MR. GILLIGAN: Thank you.
3  BY MR. BRAUTIGAM:
4       Q. Did you perform work with respect
5  to the OHSL-Provident merger?
6       A. Yes.
7       Q. What was your role in the merger?
8       A. I would characterize my role as
9  the lead outside counsel retained to coordinate
10  the various aspects of the transaction.
11       Q. And who was your client?
12       A. The Provident Bank.
13       Q. I think you made a point of saying
14  that you did not represent the Provident
15  directors earlier; is that correct? Or maybe
16  you made it generally.
17       A. Correct.
18       Q. In this case you did not represent
19  the Provident directors, correct?
20       A. Correct.
21       Q. Okay. What were your duties and
22  responsibilities as lead outside counsel?
23       A. Well, in this case my primary
24  responsibility was to negotiate a definitive
25  merger agreement.

**Page 35**

1       Q. And you were acting on behalf of
2  the Provident Bank?
3       A. Correct.
4       Q. And with whom did you negotiate?
5       A. Essentially all of my negotiations
6  were with the law firm of Dinsmore & Shohl.
7       Q. And with which attorneys
8  specifically were you negotiating?
9       A. Primarily Cliff Roe.
10       Q. And what were you negotiating
11  about at various times in the transaction?
12       A. Well, we negotiated about all of
13  the terms of the transaction.
14       Q. Okay. What were some of the major
15  terms of the transaction, in your mind?
16       A. The major terms of the transaction
17  would have included all of the representations
18  and warranties that the parties were to give to
19  each other, would have included all of the
20  specific covenants to be performed by the
21  respective parties prior to the closing, would
22  have included the mechanics of effectuating the
23  merger and how the share exchange process would
24  be accomplished.
25       It would have included the terms

**Page 36**

1  of the various legal opinions that were
2  addressed in the merger agreement, the stock
3  option that was executed in connection with the
4  merger and, and other elements as well, which I
5  may or may not recall.
6       Q. Okay. Mr. Matthews, I have placed
7  before you Defendant's Exhibit 1 and I ask you
8  to take a look at it.
9       A. Do you want me to read it or page
10  through it?
11       Q. Page through it is fine. Mr.
12  Matthews, with respect to this document and
13  with any other, I think I can direct your
14  attention in most cases to the relevant
15  portions, but please feel free to take as much
16  time as you feel you need to review the
17  documents.
18       My questions for you with respect
19  to this document begin with, are you familiar
20  with this document?
21       A. Do you want me to identify it for
22  you?
23       Q. That was one of my next questions.
24  What is Defendant's Exhibit 1?
25       A. It appears to be the -- a copy of

**Page 37**

1  the package of material that went out to each
2  of the OHSL Financial Corp stockholders in
3  connection with the transaction that we have
4  been talking about, which included the
5  definitive proxy statement and prospectus, as
6  well as the exhibits, which included the
7  definitive merger agreement, the stock option
8  agreement, and fairness opinion.
9       Q. This document, Defendant's Exhibit
10  1, is two documents; is that correct? I think
11  you've mentioned that it's a proxy statement as
12  well as a prospectus; is that right?
13       A. When you say "two documents,"
14  it's -- I'm not sure what you mean by that.
15  It's --
16       Q. Okay. Perhaps that was inartfully
17  said. It's one document with two major
18  components, in that one is a proxy statement
19  and one is a prospectus; is that correct?
20       A. That -- that is correct.
21       Q. Okay. What is the purpose of a
22  proxy statement?
23       A. Well, the purpose -- I'll use your
24  term, the purpose of the document as a whole is
25  to, is to inform the OHSL shareholders about

**Page 38**

1  the terms of the proposed transaction, various
2  risks that are incident to the transaction, the
3  nature of the transaction, why the transaction
4  is being proposed, why it's been recommended by
5  the Board of Directors, the specific terms of
6  the transaction, and then to disclose to the
7  shareholders financial information that would
8  be relevant in assisting the shareholders in
9  making a decision as to whether to vote in
10  favor of or against the transaction. And
11  that's a general statement purpose, in my mind.
12     Q.  Okay. And did that include the
13  prospectus as well, or was that limited to the
14  proxy statement?
15     A.  That's really -- that's really
16  both of those documents.
17     Q.  Okay. Do you believe that it's
18  important that Defendant's Exhibit 1 be
19  accurate, truthful and complete?
20     A.  Yes.
21     Q.  Why do you believe that?
22     A.  Well, because you're asking people
23  to vote on a transaction that affects their
24  financial interest. The vote, if carried,
25  would result in the exchange of their

**Page 39**

1  securities with Provident securities, so it was
2  important that it be accurate.
3     Q.  Did you follow the actual vote in
4  this case?
5     MR. BURKE:  Objection to form.
6     A.  I'm not sure what you mean by
7  "follow." I, I -- as responsible for the
8  entire -- as, you know, the primary outside
9  counsel responsible for the transaction, yes, I
10  was aware that a vote was taking place that was
11  necessary to consummate the transaction.
12     And, of course, I was interested
13  in what the vote was, whether it carried the
14  day or not. As to the particulars of the vote,
15  no, I would not have concerned myself with the
16  particulars of the vote.
17     Q.  What is your understanding of how
18  the vote went?
19     MR. BURKE:  Objection to form.
20     MR. GILLIGAN:  If you don't know
21  what he means by "went," I think you just ask
22  him to clarify the question, rather than
23  speculate on what he means.
24     A.  Yes. If you would help me in
25  understanding the question, it would be

**Page 40**

1  helpful.
2     Q.  Certainly.
3     A.  Do you mean whether it carried?
4     Q.  Yes. Whether it carried, how it
5  carried, if it was overwhelming. How would you
6  describe the shareholder vote?
7     A.  My only recollection, Mike, would
8  be that the vote was sufficient under the
9  charter documents of OHSL to approve the
10  transaction and to allow the merger to proceed.
11  I don't recall what percentage the vote was or
12  whether it was a large percentage or a small
13  percentage.
14     Q.  Okay. Let me hand you what has
15  been previously marked as Plaintiff's Exhibit 1
16  and ask you to take a look at it.
17     MR. GILLIGAN:  Mike, is this one
18  and the other one -- okay, this is Plaintiff's
19  1, I see.
20     MR. BRAUTIGAM:  Exactly.
21     MR. GILLIGAN:  Thank you.
22     MR. BRAUTIGAM:  You're welcome.
23  BY MR. BRAUTIGAM:
24     Q.  If I can direct your attention to
25  this section here, which is about Oak Hills.

**Page 41**

1     A.  Okay. This looks like an excerpt,
2  part of an article that I -- or wait a second,
3  what part are you -- about Children's Hospital?
4     Q.  Starting here.
5     A.  Oh, I'm sorry.
6     Q.  Excuse my reach.
7     A.  Okay. In the middle of this
8  page -- I've been handed a one page document
9  that looks like it's a newspaper reprint. And
10  it is -- it is an article that appears to
11  discuss Walter Thiemann's complaints.
12     Q.  Okay. Have you seen this article
13  before?
14     A.  No
15     Q.  Let me direct your attention to
16  the extreme right-hand column. Do you see
17  that?
18     A.  Um-hmm.
19     Q.  Would you just read that first
20  bullet point to yourself?
21     MR. BURKE:  Objection. Calls for
22  speculation.
23     Q.  To read part of the document to
24  himself?
25     A.  Okay, I've read it.

Page 42

1    Q.  I'm particularly interested in
2  these words, it says, Burke's response, Hanauer
3  opposed the Provident takeover because he
4  wanted Oak Hills to remain independent.  Do you
5  see those words?
6    A.  I do.
7    Q.  Is that true?
8    MR. BURKE:  Objection.  Calls for
9  speculation.  By the way, Mike, as you well
10  know, this is an inaccurate quote.  So you're
11  questioning him on a third-party document which
12  is inaccurate.
13    MR. BRAUTIGAM:  Jim, I don't know
14  how you can say --
15    MR. BURKE:  Because I'm telling
16  you that it is, because it purports to quote
17  me.
18    MR. BRAUTIGAM:  Jim, when we take
19  your deposition, I'll see.
20    MR. BURKE:  Well, if you think
21  you're going to take my objection, good luck.
22  But I'll tell you that now.  So objection,
23  calls for speculation.
24    A.  Well --
25    MR. GILLIGAN:  Could you read the

Page 43

1  pending question for me?
2    (Record read by Reporter.)
3    Q.  Mr. Matthews, would you like me to
4  re-ask the question?
5    A.  Sure.
6    Q.  Okay.  Mr. Matthews --
7    MR. GILLIGAN:  You're not asking
8  him whether Jim actually gave the quote, you're
9  asking whether he knows if what's said there
10  happens to be true?
11    Q.  Exactly.  So let me just--
12    MR. GILLIGAN:  Okay.  That's --
13    Q.  -- rephrase the question.  Is this
14  true, Hanauer opposed the Provident takeover
15  because he wanted Oak Hills to remain
16  independent?
17    MR. BURKE:  Objection.  Calls for
18  speculation.  You may answer.
19    A.  It, it is speculation, but I would
20  be shocked if it were true.
21    MR. GILLIGAN:  He's asking you if
22  you know of your own personal knowledge whether
23  it's true, Tim.  If you don't know, don't
24  speculate.  That's all he wants to know.
25    A.  I don't know.

Page 44

1    Q.  Okay.  Why would you be shocked if
2  it were true?
3    MR. BURKE:  Objection.  Calls for
4  speculation.  Don't speculate.
5    MR. BRAUTIGAM:  Excuse me, are you
6  instructing this witness?
7    MR. BURKE:  No, I'm not.
8    MR. BRAUTIGAM:  Well, it seemed
9  like it to me.
10    A.  I, I do not know whether it's
11  true.
12  BY MR. BRAUTIGAM:
13    Q.  Okay.  If it were true --
14    MR. MESH:  He's not finished.
15    Q.  I didn't mean to interrupt.
16    MR. MESH:  I don't want to get
17  involved, you have enough lawyers here.
18    A.  I don't know, Mike, if the
19  statement is true, if Hanauer had any personal
20  belief about whether this takeover was good or
21  bad.  What I do know, as of the time we did the
22  transaction, I was informed that the Board of
23  OHSL was fully behind the transaction.
24    Q.  Did you ever learn that any Board
25  members had resigned in part in protest of the

Page 45

1  transaction?
2    MR. BURKE:  Objection.  Misstates
3  the record.  It's a false statement.  You may
4  answer it.
5    A.  If I -- I think the answer is no.
6  because, no, I did not know that any director
7  had resigned because of a protest or, or some
8  disagreement with the transaction.  I never
9  heard that.
10    Q.  Okay.  If Mr. Hanauer were against
11  the transaction, would that be important for
12  you to know as the lead outside counsel?
13    MR. BURKE:  Objection.  Calls for
14  speculation.
15    MR. GILLIGAN:  If he had been
16  against it during the time the documentation
17  was being put together?
18    MR. BURKE:  What's the time frame?
19    Q.  At any time.
20    MR. GILLIGAN:  Well --
21    A.  Before or after the transaction
22  was completed?
23    MR. GILLIGAN:  Yes, that's what
24  I'm --
25    Q.  Well, any time up to and including

Page 46

1  December 3rd, 1999.
2      A.  Was he a member of the Board of
3  Directors?
4      Q.  Yes, he was.
5      A.  Again, I can only speak to my
6  recollection, Mike.
7      Q.  Sure.
8      A.  My recollection as of the time
9  that we had negotiated the definitive merger
10  agreement was that all of the directors were in
11  favor of the transaction.  And, in fact, we had
12  included arrangements with their counsel to
13  have all of the officers and directors agree
14  to, to vote in favor of the transaction and to
15  solicit the proxies, so --
16      Q.  You're talking --
17      A.  So I would be surprised -- as of
18  the date we signed the merger agreement, I
19  would have been shocked to learn that Mr.
20  Hanauer was opposed to the transaction, because
21  that would have been completely new and
22  different information than what I was given at
23  the time.
24      Q.  Who were you given this
25  information by?

Page 47

1      A.  Well, I had -- I was in
2  discussions with Cliff Roe, you know,
3  intensively for a period of a couple weeks as
4  we were negotiating the merger agreement.  And
5  it was -- and also with the investment banking
6  firm which was representing OHSL, so I would
7  have been generally aware of the attitudes of
8  the participants about the transaction.  And as
9  far as I knew, everybody was very positive
10  about it and thought it was in the best
11  interest of the company.
12      Q.  Is that true for Ken Hanauer as
13  well?
14      MR. BURKE:  Objection to form.
15      A.  I -- I believed it was true.
16  Certainly I had every reason to think it was
17  true, based upon what other people had told me.
18  But had -- I had not talked to Ken Hanauer
19  personally about his -- his opinions about the
20  transaction, nor would that have been proper.
21      Q.  Okay.  Let me represent to you
22  that Mr. Hanauer gave this testimony --
23      MR. GILLIGAN:  Is the testimony in
24  this case?
25      MR. BRAUTIGAM:  No, it's not.

Page 48

1      MR. GILLIGAN:  Well, could you go
2  ahead and identify where it's from for me?
3      MR. BRAUTIGAM:  That's what I'm
4  about to do.
5      MR. GILLIGAN:  Okay, thanks.
6      MR. BRAUTIGAM:  It's in the Nolte
7  case, Tuesday, February 22nd, 2000, page 21.
8      MR. GILLIGAN:  Could you give me
9  the caption of it?  I'm not familiar with it,
10  the name of the case.
11      MR. BRAUTIGAM:  Why don't I give
12  you a copy at the break?
13      MR. GILLIGAN:  Well, I would like
14  to, as counsel, just have a context of what
15  it's in, that's all I'm asking.
16      MR. BRAUTIGAM:  That's fine.
17  Court of Common Pleas, Hamilton County, Ohio,
18  Janet Nolte, et al., Plaintiffs, versus OHSL
19  Financial Corporation, et al., case number
20  A99 --
21      MR. BURKE:  Off the record.
22      (Brief recess.)
23      MR. BRAUTIGAM:  Mr. Gilligan, have
24  you had the opportunity to get the information
25  you needed about the prior case?

Page 49

1      MR. GILLIGAN:  Yes, thank you.
2      MR. BRAUTIGAM:  You're welcome.
3      MR. GILLIGAN:  What page did you
4  say that was again?
5      MR. BRAUTIGAM:  Twenty-one, lines
6  11 to 14.
7  BY MR. BRAUTIGAM:
8      Q.  Let me represent to you that this
9  is testimony that Mr. Hanauer gave in the Nolte
10  state court litigation.  And he was asked this
11  question:  In your heart, did you believe that
12  this transaction was in the best interest of
13  the shareholders?
14      Answer:  No, sir.
15      Is that something that you would
16  have wanted to have known as the lead outside
17  counsel in the merger transaction?
18      MR. BURKE:  Objection.  Misstates
19  the record.  You read two sentences out of a
20  150 page deposition.  Mischaracterizes the
21  record.
22      MR. MAUNDRELL:  I'll join in with
23  it.
24      MR. BURKE:  Also no time frame.
25      A.  Yes, Mike, when -- when I was

**Page 50**

1  working with Cliff on this transaction to
2  negotiate an agreement, as I said before, it
3  was my understanding that the directors were
4  fully behind the transaction. And so -- and if
5  I recall correctly, Ken signed the agreement
6  that, that, you know, in favor of this
7  transaction.
8          And furthermore, the company had
9  agreed -- or the -- at least we had discussed
10 with Cliff Roe that -- the concept that, that
11 the officers and directors were in favor of the
12 transaction. So, yes, I would have been
13 totally surprised.
14         At the time the definitive
15 agreement was signed, it was my understanding,
16 as I've said before, that everybody was in
17 favor of this and, in fact, enthusiastic about
18 it, because they had been -- if I recall
19 correctly, they had been bidding -- they had
20 bids out over a period of months and tried to
21 find other people to buy this company and
22 Provident's bid was the best. So yes, I would
23 have liked to have known that, because it would
24 have been news to me.
25         Q   What would you have done

**Page 51**

1  differently, had you known that?
2          MR. MAUNDRELL: Objection.
3          MR. BURKE: Objection. Calls for
4  speculation. Assumes facts not in evidence.
5          A.  Mike, I'd have to -- I'd have to
6  think about what would have been required that
7  was different. I don't know that I'm prepared
8  to answer that question. It's -- it's been a
9  while, so it's -- so I'd have to really think
10 that through and I'm not sure what I would have
11 done differently.
12         Q   Mr. Matthews, you mentioned
13 something about Provident's bid being the best,
14 or words to that effect. Do you remember that
15 testimony?
16         A.  Um-hmm.
17         Q   Were there other bids to buy OHSL
18 in the summer of 1999?
19         A.  I was not privy to the, to the
20 bids themselves, but I was aware generally that
21 there was a -- was a process that the
22 investment bankers had followed that included
23 entertaining other bidders. And that other
24 companies had looked at the company, had either
25 submitted lower bids or, or had declined to

**Page 52**

1  bid, but, yes, I was generally aware of the
2  fact that there were other institutions that
3  were looking at OHSL and that -- for various
4  reasons those, those bids or those indications
5  of interest did not measure up.
6          Q   Did they result in bids, to your
7  knowledge?
8          MR. BURKE: Objection. Asked and
9  answered.
10         A.  I don't recall.
11         Q   Is it possible that Provident's
12 bid was the best because it was the only bid?
13         MR. GILLIGAN: Objection.
14         MR. BURKE: Objection. Calls for
15 speculation.
16         MR. GILLIGAN: He can't possibly
17 answer it if he doesn't know what the other
18 bids were.
19         A.  Again, let me clarify my previous
20 testimony. When we talk about a bid, I don't
21 -- I would be, again, shocked if there
22 wasn't -- if Provident was the only one. That
23 does not sound right at all to me, because
24 there would be -- there would have been other
25 financial institutions that the investment

**Page 53**

1  bankers would have talked to.
2          Now, whether they had given
3  indications of interest that did not rise to
4  the level of a formal, written bid, I don't
5  know. As I said before, I don't recall whether
6  that was the case, but Provident was -- could
7  not have been the only institution that the
8  bankers talked to.
9          Q   Ken Hanauer was the largest OHSL
10 shareholder; is that correct?
11         MR. BURKE: Objection. Calls for
12 speculation.
13         MR. GILLIGAN: If you know.
14         A.  I do recall that he had a -- he
15 didn't have a majority of the shares, if I
16 recall correctly, but he did have -- I seem to
17 recall a substantial plurality of the shares
18 being held by Ken and maybe some affiliates,
19 trusts, children.
20         Q   Does 4.9 percent shares that he
21 controlled sound about right?
22         A.  I don't recall. I couldn't give
23 you a percentage.
24         Q   How did Mr. Hanauer vote his
25 shares?

14 (Pages 50 to 53)



Page 54

```
 1      A.  I don't know.
 2          MR. GILLIGAN:  Now, these are
 3   questions if you know.  He doesn't want you to
 4   speculate.
 5      A.  I don't know.
 6      Q.  You mentioned something earlier
 7   about voting agreements.  Do you recall that
 8   testimony?
 9      A.  I do.
10      Q.  What are voting agreements?
11      A.  Well, there are all different
12   kinds of voting agreements.  You can have a --
13   you can have in effect a voting trust where
14   someone places securities in a trust to be --
15   to be voted in a certain way.  A proxy is a
16   form of voting agreement.  A power of attorney
17   can be considered a voting agreement.
18          In the context in which I'm
19   referring to a voting agreement, I'm
20   communicating to you that there was an
21   understanding between the parties that the
22   company would make an effort to ensure that the
23   officers and directors voted in favor of the
24   merger.
25      Q.  Were voting agreements used in
```

Page 55

```
 1   this case?
 2      A.  Again, I think that there was a
 3   provision in one of the documents that I don't
 4   have a specific recollection about that dealt
 5   with voting, but I don't recall that there were
 6   any separate instruments that constituted full
 7   voting trust or voting agreements per se.
 8      Q.  As part of this transaction, did
 9   someone from KMK review OHSL's Board minutes
10   and major committee minutes for the last five
11   years or so?
12      A.  I don't recall.
13      Q.  Is that typically done in mergers
14   and acquisitions of this type?
15          MR. BURKE:  Objection.  Calls for
16   speculation.
17      A.  Sometimes it is and sometimes it
18   isn't.  It's not -- certainly not necessary.
19      Q.  Okay.  Let me direct your
20   attention to Defendant's Exhibit 1.  Did
21   someone from KMK read every word and look at
22   every number in that document?
23          MR. BURKE:  Objection.  Calls for
24   speculation.
25      A.  I don't know.
```

Page 56

```
 1      Q.  Did you read every word and look
 2   at every number in that document?
 3      A.  No.
 4      Q.  What portions, if any, did you
 5   review?
 6      A.  Well, I would have read every word
 7   in the Agreement and Plan of Merger.  I would
 8   have read every word in the document that's
 9   identified as Annex B, I think.
10      Q.  The fairness opinion?
11      A.  No.  Annex B is the stock option
12   agreement.
13      Q.  Okay.
14      A.  Okay.  I would have read every
15   word in Annex C, which is the fairness opinion.
16   I did review the prospectus and proxy
17   statement.  So the textual material there, I
18   would have -- I would have reviewed as to form.
19      Q.  What pages are you referring to?
20      A.  Well, I'm referring to the body of
21   the prospectus and proxy statement, which
22   starts -- it's really the third page of the
23   document, on to the end of the document.  But I
24   would not have -- I would not have analyzed or
25   really had any opinion about the specific
```

Page 57

```
 1   numbers or the financial statements which were
 2   being provided.  And I would not have read or
 3   reviewed necessarily every document that was
 4   incorporated by reference in the document.
 5      Q.  Did you read the first page of
 6   Defendant's Exhibit 1?
 7      A.  I don't think I did.
 8      Q.  Who wrote the first page of
 9   Defendant's Exhibit 1?
10          MR. BURKE:  Objection, foundation.
11   Calls for speculation.
12      A.  I don't know.
13      Q.  Do you know what computer system
14   Defendant's Exhibit 1 came off, the entire
15   document?
16          MR. BURKE:  Same objection,
17   foundation.
18      A.  No.
19      Q.  Do you know what computer system
20   the first page of Defendant's Exhibit 1 came
21   off?
22      A.  Isn't that -- I'm sorry, I thought
23   that was the same --
24      Q.  I said the whole document and then
25   I narrowed it to the first page.
```

15 (Pages 54 to 57)

**Page 58**

1    A.  Oh, I, I -- I'm sorry, I'm a
2  little confused as to the first question then.
3    Q.  Okay.
4    A.  I thought you were referring to
5  the first page in both instances.
6    Q.  No, no, no.  What computer system
7  did the entire document come off, if you know?
8  I think you said you don't know.
9    MR. GILLIGAN:  You mean, okay,
10  every -- if you know.  He's talking about every
11  page.
12    Q.  Correct.
13    MR. GILLIGAN:  Including the very
14  first page to the very last.  You've already
15  said you don't know.
16    A.  I don't know.
17    Q.  New question.
18    MR. GILLIGAN:  Now he wants to ask
19  you -- go ahead.
20    Q.  Limiting this to the first page,
21  do you know what computer system the first page
22  came off?
23    MR. BURKE:  Objection.  Asked and
24  answered.
25    A.  No. I do not.

**Page 59**

1    Q.  Did you ever see a draft of the
2  first page of this document?
3    A.  I have no specific recollection of
4  reviewing this cover letter, no.
5    Q.  Is it common that a cover letter
6  of this sort have both the signatures of the
7  chief executive officer and the chairman of the
8  Board if they're different people?
9    MR. MAUNDRELL:  Objection.
10    MR. BURKE:  Objection.  Calls for
11  speculation.
12    MR. MAUNDRELL:  And foundation.
13    A.  I would say sometimes yes and
14  sometimes no.  Again, it's just a cover letter.
15  It's not necessary.
16    Q.  As the lead outside counsel, would
17  it concern you if I represented that Mr.
18  Hanauer's testimony was that a draft of the
19  first page of Defendant's Exhibit 1 was
20  circulated with his signature on it and he
21  directed that it be removed?
22    MR. BURKE:  Objection.
23    MR. GILLIGAN:  Is this testimony
24  in the Nolte case or his testimony where?
25    MR. BRAUTIGAM:  In the Nolte case.

**Page 60**

1  Mr. Hanauer has not yet been deposed in this
2  case.
3    MR. GILLIGAN:  I have no clue
4  where he's been deposed.
5    MR. BURKE:  Misstates the record
6  from Mr. Hanauer's testimony.
7    MR. GILLIGAN:  Just take the sound
8  bite as it is.  He's represented it's from the
9  Nolte case.  If you know, you know; if you
10  don't, you don't.
11    MR. BURKE:  Objection.  Calls for
12  speculation.
13    A.  I don't know anything about what
14  you --
15  BY MR. BRAUTIGAM:
16    Q.  Would it concern you as the lead
17  outside counsel?
18    MR. MAUNDRELL:  Objection.
19    MR. BURKE:  Objection.  Assumes
20  facts not in evidence.
21    A.  Not necessarily.  I mean, it's
22  just a cover letter, so who signs it and for
23  what reason may or may not be important, so
24  I -- I would say no, not necessarily.
25    Q.  What factors would you want to

**Page 61**

1  consider in determining whether or not who
2  signs it and who doesn't would be important?
3    MR. BURKE:  Objection.  Calls for
4  speculation.
5    MR. MAUNDRELL:  Objection.
6    MR. BURKE:  This is an OHSL
7  document.  Are you talking if he was counsel
8  for OHSL, counsel for Provident?  I mean, what
9  are you talking about?  Or as Provident's
10  counsel would he be concerned about OHSL?  The
11  question is ambiguous.
12    A.  Yes.  I -- Mike, I -- I think that
13  depends on so many different things.  As
14  Provident's lawyer here, I wasn't -- I was not
15  concerned with who signed the cover letter to
16  the proxy statement.
17    And, and unless there was
18  something, you know, major going on that we all
19  needed to know about -- Provident needed to
20  know about or I needed to know about, whether
21  one person signs this cover letter or another
22  person signs this letter is immaterial.
23    Q.  Would the opposition to the merger
24  transaction by the CEO of OHSL be something
25  major in your mind?

**Page 62**

1  MR. BURKE: Objection.
2  MR. MAUNDRELL: Objection.
3  MR. GILLIGAN: You're asking him
4  to assume --
5  MR. BURKE: Misstates the record.
6  MR. GILLIGAN: -- hypothetically?
7  MR. BRAUTIGAM: No, those are the
8  facts in this case.
9  MR. GILLIGAN: Well, he's already
10 indicated in his testimony, Mike, that he was
11 not aware of any opposition whatsoever. You're
12 now asking him a question, saying that there
13 was opposition.
14 MR. BRAUTIGAM: Okay.
15 MR. GILLIGAN: And he's already
16 said that he was not aware that there was any.
17 All I'm asking you is, you're asking him a
18 hypothetical question, to assume that there was
19 some that he's not aware of. That's different.
20 MR. BRAUTIGAM: Let me rephrase
21 the question.
22 MR. GILLIGAN: Okay.
23 BY MR. BRAUTIGAM:
24 Q.  Mr. Matthews, let me represent to
25 you that Mr. Hanauer testified that he was

**Page 63**



1  opposed to the OHSL-Provident merger. Is that
2  in your mind something major going on that the
3  entire team should be informed about?
4  MR. BURKE: I will object. That
5  absolutely misstates the record in this case.
6  That is a false representation of his
7  testimony. Calls for speculation, incomplete
8  hypothetical.
9  MR. MAUNDRELL: And I'll join in
10 with that.
11 A.  Again, not necessarily. For
12 example, he may have had personal issues that
13 were irrelevant to what was in the best
14 interest of the shareholders, for all I know,
15 based on the speculation. But I'm telling you
16 what my understanding was at the time the
17 merger agreement was signed, was that everybody
18 was on board and enthusiastic about the
19 transaction.
20 Q.  How would you have expected Mr.
21 Hanauer to have voted his personal shares?
22 MR. BURKE: Objection.
23 MR. MAUNDRELL: Objection.
24 MR. GILLIGAN: Answer if you can.
25 MR. BURKE: Calls for speculation.

**Page 64**

1  A.  You're asking me to speculate as
2  to how --
3  MR. GILLIGAN: No, if you have to
4  speculate, he doesn't want you to do that.
5  That's against the rules of evidence. So if
6  you have to speculate, say I'd have to
7  speculate so I can't answer. But if you can
8  answer without speculating, please answer.
9  A.  If your question is -- you know if
10 you're asking me to speculate about how he
11 actually voted his shares, I can't do that.
12 But if you're asking me whether I believed he
13 would vote his shares in favor of the merger,
14 my answer is I believed he would vote his
15 shares in favor of the merger.
16 Q.  And what was that belief based
17 upon?
18 A.  That was based upon, again, the
19 information from Cliff and the investment
20 bankers that the directors were enthusiastic
21 about the transaction.
22 Q.  Okay. Did you ever learn how Mr.
23 Hanauer had actually voted his shares?
24 A.  No.
25 Q.  Let me represent to you that Mr.

**Page 65**

1  Hanauer voted his shares and the shares he
2  controlled against the merger transaction.
3  Does that surprise you?
4  MR. BURKE: Objection.
5  MR. MAUNDRELL: Objection.
6  MR. BURKE: Calls for speculation.
7  You're asking him to assume double, triple
8  levels of speculation here and then draw
9  conclusions. It's an improper question.
10 Objection to form.
11 A.  You know, again, depending upon
12 why he did that, maybe he changed his mind
13 again for some personal reasons, I don't know.
14 You know, I'm surprised, based upon my
15 knowledge at the time the merger agreement was
16 signed, because again, I expected that
17 everybody was -- was in favor of the
18 transaction.
19 It was a good transaction for the
20 shareholders, so that's -- and that was -- and
21 it was my belief that that was how all of the
22 directors and officers of the company felt
23 about the transaction at that time. So you
24 know, if I knew more, perhaps.
25 Q.  Based on what we've discussed

Page 66

1  today, as the lead outside counsel would you
2  have wanted to know more based upon these
3  representations?
4      MR. BURKE: Objection. Calls for
5  speculation.
6      MR. GILLIGAN: After the fact?
7  After the vote had occurred, talking about that
8  point in time?
9      Q. Talking about at any point, if you
10 had learned --
11     MR. GILLIGAN: I'm just trying to
12 understand your question, Mike. In other
13 words, you've represented something that Tim
14 doesn't know, that is that when Hanauer voted,
15 he voted against the transaction, right?
16     MR. BRAUTIGAM: Right. And also
17 that he did not believe the transaction was in
18 the best interest of OHSL shareholders.
19     MR. BURKE: Which you --
20     MR. GILLIGAN: You're saying he
21 testified to that?
22     MR. BRAUTIGAM: Yes.
23     MR. GILLIGAN: Okay. Now you're
24 asking Tim to assume that to be accurate?
25     MR. BRAUTIGAM: No. I'm

Page 67

1  representing to him that these are facts.
2      MR. GILLIGAN: Okay. But then
3  you're asking him to accept those as being
4  fact?
5      MR. BRAUTIGAM: Yes.
6      MR. GILLIGAN: Okay. And then
7  what's the question with -- based on those
8  facts? What are you asking him?
9      MR. BRAUTIGAM: As lead outside
10 counsel, would he have wanted to know more.
11     MR. GILLIGAN: After the fact,
12 after the vote had taken place? Well, it has
13 to be.
14     MR. BURKE: It has to be.
15     MR. GILLIGAN: Go ahead.
16     MR. BRAUTIGAM: I think there are
17 different votes. My question stands. There's
18 a vote as a director, there's a vote as a
19 shareholder. So my question goes to the summer
20 of 1999.
21     MR. BURKE: Objection. Compound
22 question. That's completely improper. You've
23 got totally different time frames.
24     THE WITNESS: Mike, I'm confused
25 as to your question as well, because --

Page 68

1      MR. BRAUTIGAM: Okay. I don't
2  want to confuse you.
3      THE WITNESS: Yes.
4      MR. BRAUTIGAM: Let me see if I
5  can simplify things.
6      THE WITNESS: Okay.
7  BY MR. BRAUTIGAM:
8      Q. As the lead outside counsel for
9  Provident Bank, if you had known that Mr.
10 Hanauer was against the transaction, would you
11 have done anything differently?
12     MR. BURKE: Objection. Misstates
13 the record.
14     MR. GILLIGAN: Objection. At what
15 time?
16     A. At what time?
17     Q. At any point in time, up to and
18 including the December 3rd, 1999 closing.
19     MR. BURKE: Objection. Misstates
20 the record. Assumes facts not in evidence.
21     MR. MAUNDRELL: I'll join in with
22 that.
23     MR. BURKE: Calls for speculation.
24     A. This is similar to the question I
25 think you've already asked me, which was at the

Page 69

1  time the merger agreement was signed, would I
2  have done something different had I known that
3  he objected to the merger.
4      And my answer at that time was, I
5  believe that I would have to think about it. I
6  mean, it was a complicated transaction. I
7  don't know what the import of his objection or
8  what his objections might have been, whether
9  they would have been important to other
10 shareholders or whether they were purely for
11 personal reasons.
12     I would -- I did not -- I would
13 not have known and would have had to inquire
14 about whether this would have affected anybody
15 else's vote at the time the Board voted. There
16 are so many different factors here, I just -- I
17 think this is a -- from my point of view, this
18 is a pure hypothetical and purely speculative,
19 because it's contrary to my understanding of
20 the facts at the time.
21     Q. But if you knew these things to be
22 true, you would have inquired further, is that
23 fair?
24     MR. BURKE: Objection.
25     MR. MAUNDRELL: Objection. Asked

**Page 70**

1  and answered.
2        MR. GILLIGAN: Objection. At what
3  point? At what point in time?
4    Q.  Do you understand the question?
5        MR. MAUNDRELL: Well, you're
6  asking him --
7    A.  Well --
8        MR. MAUNDRELL: Hold on. You're
9  asking him now to agree to your
10  recharacterization and rephrasing of his answer
11  and I object to that.
12    A.  I think I've answered this maybe
13  twice, but --
14        MR. GILLIGAN: Then you don't have
15  to answer again, Tim.
16    A.  Okay.
17        MR. GILLIGAN: Let's get a new
18  question that makes --
19    Q.  Do you agree that the --
20        MR. GILLIGAN: -- sense.
21    Q.  Do you believe that Mr. Hanauer's
22  vote against the transaction should have been
23  disclosed to the OHSL shareholders?
24        MR. BURKE: Which vote?
25        MR. BRAUTIGAM: As a shareholder.

**Page 71**

1        MR. BURKE: The vote as a
2  shareholder that occurred a month after the
3  proxy statement was issued? Is that what
4  you're saying?
5        MR. BRAUTIGAM: It occurred when
6  it occurred.
7        MR. BURKE: You're misleading the
8  witness.
9        MR. GILLIGAN: You can't answer
10  it, Tim.
11        MR. BURKE: Objection to
12  speculation.
13        MR. GILLIGAN: I instruct you not
14  to answer unless we get it clarified. Mike,
15  all we're asking you to do is let's make sure
16  what the question is. As I understand it, and
17  I'm not familiar with all of the facts of the
18  case, but you yourself mentioned there was a
19  vote that Hanauer made sometime, I guess in the
20  summer, having to do with -- as a Board of
21  Directors member.
22        And then we're talking about
23  somebody voting their shares at the end of the
24  day, if you will, in December. There's two
25  different votes. And we keep trying to -- he's

**Page 72**

1  already answered the question about the vote as
2  a member of the Board of Directors, so if we're
3  now talking about how he voted his shares in
4  whenever, December -- let's identify which one.
5        MR. BURKE: Just make it a
6  meaningful question, a clear question that you
7  can get an answer to so we just don't have a
8  mucked up record.
9        THE WITNESS: Mike, which vote are
10  you referring to?
11  BY MR. BRAUTIGAM:
12    Q.  Okay. Let's talk about two votes.
13  Mr. Hanauer, I believe, voted on August 2nd,
14  1999 as a director in favor of the merger
15  transaction with Provident. Are you with me so
16  far?
17    A.  I understand that.
18        MR. GILLIGAN: Are you asking him
19  if he knows that to be so?
20        MR. BRAUTIGAM: No, I'm
21  representing that to him.
22        MR. GILLIGAN: All right, fine.
23  BY MR. BRAUTIGAM:
24    Q.  Okay. If you had known that Mr.
25  Hanauer did not believe that the transaction

**Page 73**

1  was in the best interest of OHSL shareholders
2  at or about August 2nd, 1999, would you have
3  taken any action differently?
4        MR. BURKE: Objection.
5        MR. MAUNDRELL: Objection.
6        MR. BURKE: Misstates the record.
7  It also -- as counsel for Provident?
8        MR. GILLIGAN: If you've already
9  answered it, just refer to your answer. If you
10  haven't answered, give an answer. I think he's
11  already said that it has so many variables, he
12  can't give you an answer. Isn't that what you
13  testified to, or not?
14    A.  Mike, I -- at that time, and the
15  time that I'm referring to is the time that the
16  merger agreement was executed -- and I note
17  here that my recollection was correct, that he
18  actually signed the definitive merger
19  agreement -- I would have been surprised if he
20  was opposed to the merger, because I had been
21  told that he was in favor of the merger, that
22  he had voted in favor of the merger, and that
23  the entire Board was enthusiastic about the
24  prospects of this merger.
25        So would I have done something

Page 74

1 different? Possibly. I'm not sure what that
2 would have been today though, not knowing, you
3 know, all of the details, you know, four years
4 later about the transaction and what was
5 transpiring at the time. I certainly would
6 have asked the question, why would he vote in
7 favor of the merger, which he did on August
8 2nd, if he was actually against the merger.
9 That would make no sense to me, so I probably
10 would ask why.
11     Q.  Okay. Let me direct your
12 attention to a different vote. Contrary to
13 what Mr. Gilligan said, this vote took place on
14 October 25th, 1999. Are you with me? This was
15 the OHSL shareholder special meeting where the
16 proxies were tallied and people could vote, et
17 cetera.
18     A.  Okay, yes.
19     Q.  Were you aware that Mr. Hanauer
20 made a presentation to the OHSL shareholders
21 who was assembled at Dante's restaurant at that
22 meeting?
23         MR. BURKE: Objection. Calls for
24 speculation, foundation.
25     A.  No, because I was not at that

Page 75

1 meeting.
2     Q.  Okay. But that's typically how
3 things are done, an officer or director of the
4 company makes a presentation to the
5 shareholders?
6         MR. BURKE: Objection. Calls for
7 speculation.
8         MR. MAUNDRELL: Object to form.
9     A.  Not necessarily. Again, there --
10 it can happen in a variety of different ways.
11 That's only one way that it may happen.
12     Q.  Okay. Let me represent --
13     A.  Fundamentally, all you need is a
14 vote.
15     Q.  Let me represent to you that Mr.
16 Hanauer made a presentation to the OHSL
17 shareholders, and I think I even have the
18 script and we can talk about it this afternoon.
19     Would it surprise you if Mr.
20 Hanauer made a presentation soliciting votes in
21 favor of the transaction when he had
22 previously, at some point, voted his shares
23 against the transaction?
24         MR. BURKE: Objection. Misstates
25 the record.

Page 76

1     A.  I'm confused by that. There
2 was -- up until --
3         MR. BURKE: Objection. Calls for
4 speculation, too.
5     A.  Right. I'm confused about your
6 question, because -- can you repeat the
7 question verbatim, please?
8         (Record read by Reporter.)
9         MR. BURKE: Objection. Calls for
10 speculation. Assumes facts not in evidence.
11 You may answer it.
12     A.  The question makes no sense to me,
13 Mike, because there was no prior opportunity to
14 vote as a shareholder against the transaction,
15 as the question states.
16     Q.  What I meant was he returned his
17 proxy card voting against the transaction.
18 That's what I meant by a prior opportunity to
19 vote. Do you follow me?
20         MR. BURKE: Objection to form.
21         MR. MAUNDRELL: I'll join in.
22     A.  I --
23     Q.  You're not following me?
24     A.  Well, I think you're confused as
25 to the process.

Page 77

1         MR. MAUNDRELL: Well, you're
2 asking questions, Mike, about total
3 hypotheticals based on things he didn't --
4         MR. BURKE: Why don't you ask what
5 he did?
6     A.  The proxy cards could have sat in
7 a mailbox until they were counted. I have no
8 knowledge of what happened to the proxies prior
9 to the shareholders meeting. They very well,
10 as in many cases, would sit in a box, waiting
11 to be tabulated.
12     Q.  Would it surprise you if Mr.
13 Hanauer ran a meeting, asking for votes in
14 favor of the transaction, when he had voted his
15 shares against the transaction?
16         MR. MAUNDRELL: Objection.
17         MR. BURKE: Objection. Calls for
18 speculation. Assumes facts not in evidence.
19 You may answer.
20         MR. MAUNDRELL: And we're back to
21 the same thing we were at ten or fifteen
22 minutes ago about which votes, et cetera, et
23 cetera, et cetera.
24         MR. BRAUTIGAM: No, we're not.
25 We're on October 25th, 1999.

20 (Pages 74 to 77)

Page 78

1    MR. MAUNDRELL: Yes, we are.
2  Listen to your question.
3    THE WITNESS: Mike, your question
4  makes no sense to me.
5    MR. BRAUTIGAM: Perhaps all of
6  these objections make it so --
7    MR. MAUNDRELL: No, perhaps your
8  question makes no sense.
9  BY MR. BRAUTIGAM:
10    Q.  Okay.  Mr. Matthews, October 25th,
11  1999, Dante's restaurant, special meeting of
12  OHSL shareholders.  Are you with me so far?
13    A.  Yes.
14    Q.  Let me represent to you that Mr.
15  Hanauer made a presentation to a group of
16  assembled OHSL shareholders.  Are you with me
17  so far?
18    A.  I assume your assumptions or
19  representations.
20    Q.  Okay.  Now, my next representation
21  is Mr. Hanauer at that meeting solicited the
22  votes of OHSL shareholders, even though he had
23  voted against the transaction himself.  Does
24  that surprise you?
25    MR. BURKE: Objection.  Assumes

Page 79

1  facts not in evidence.
2    MR. MAUNDRELL: Objection.
3    MR. GILLIGAN: Solicited votes in
4  favor?
5    Q.  Yes.
6    MR. BURKE: Calls for speculation.
7  This witness has no knowledge of this.
8    A.  I don't have any knowledge of it,
9  I wasn't there.  And again, the question
10  assumes a process which, which is different
11  from what I understand to be the correct
12  corporate process for voting.
13    Q.  Well, can you accept my
14  representation that Mr. Hanauer made a
15  presentation at the meeting?
16    A.  Sure.
17    MR. BURKE: Objection.  Asked and
18  answered.
19    Q.  And can you accept my
20  representation that this presentation asked
21  shareholders to vote affirmatively in the
22  transaction?
23    MR. BURKE: Asked and answered.
24  Objection.
25    A.  I can accept that as a statement

Page 80

1  of --
2    Q.  Okay.  And can you accept my
3  representation that Mr. Hanauer had voted his
4  shares against the transaction?
5    A.  No.
6    Q.  Why not?
7    A.  Because the votes were to be cast
8  at the meeting.  And if he was present and in
9  person at the meeting to cast a vote, I do not
10  understand what you mean by having a prior
11  vote, or as having submitted a prior -- a prior
12  vote.  It doesn't make any sense to me.
13  Doesn't make any sense to me, that's -- that's
14  all I'm saying.
15    Q.  Would it bother you if Mr. Hanauer
16  asked shareholders to vote for the transaction
17  when he voted against the transaction himself?
18    MR. BURKE: Objection.
19    MR. MAUNDRELL: Objection.
20    MR. BURKE: Asked and answered.
21  Assumes facts not in evidence.
22    MR. GILLIGAN: You've already
23  answered that, I think.
24    A.  I think I have.
25    MR. GILLIGAN: He said he couldn't

Page 81

1  answer that, Mike, so I think we ought to move
2  on.
3    Q.  Mr. Matthews, are you generally
4  familiar with the Hewlett Packard-Compaq
5  combination?
6    MR. BURKE: Objection to
7  relevance.
8    A.  I'm aware of the fact that it
9  occurred, yes.
10    Q.  Okay.  Are you aware of the fact
11  that one of the family members involved was a
12  director of Hewlett Packard?
13    A.  No.
14    Q.  Were you aware that this family
15  member, I think his name was David Packard, I'm
16  not a hundred percent sure, voted in favor of
17  the merger with Compaq as a director?
18    A.  No.
19    Q.  Were you aware that he later
20  changed his mind and actively lobbied against
21  the merger transaction -- voted his shares
22  against the merger transaction?
23    A.  No.
24    Q.  Do you believe that in such a
25  circumstance, the director's opposition should

21 (Pages 78 to 81)

Page 82

1 be disclosed?
2            MR. MAUNDRELL: Objection.
3            MR. BURKE: Objection. Calls for
4 speculation. Assumes facts not in evidence.
5 Completely irrelevant.
6       A.  I think that's a ridiculous
7 question, Mike, because there are so many
8 things that could go into a process such as
9 this. I mean, how am I supposed to speculate
10 as to whether that is something that should or
11 shouldn't be disclosed? I don't know anything
12 about it.
13      Q.  Do you think that if Mr. Hanauer
14 was opposed to the merger transaction, that his
15 opposition should have been disclosed?
16            MR. MAUNDRELL: Objection.
17            MR. BURKE: Objection. Asked and
18 answered about eight times.
19            MR. GILLIGAN: Do you feel that
20 you've answered the question, Tim? If you
21 have, then don't answer.
22      A.  I do.
23            MR. BURKE: Assumes facts not in
24 evidence.
25      A.  I feel like I've answered that

Page 83

1 question.
2       Q.  How many directors did OHSL have
3 in 1999?
4       A.  I don't recall.
5       Q.  Did the composition of the Board
6 ever change in 1999?
7            MR. BURKE: Objection.
8 Foundation.
9            MR. GILLIGAN: He's asking you if
10 you know.
11      A.  I do recall that the composition
12 did change.
13      Q.  Okay. What were the circumstances
14 under which the composition of the Board did
15 change?
16            MR. BURKE: Objection. Calls for
17 speculation. Foundation.
18      A.  I do not -- I do not know the
19 circumstances.
20      Q.  How do you know that the
21 composition of the Board changed?
22      A.  Well, at some point prior to the
23 closing of the transaction someone told me, I
24 believe, that one of the directors had
25 resigned. And so that -- if that's what you

Page 84

1 mean by a change in the composition of the
2 Board, then that would be my -- the extent of
3 my knowledge about it.
4       Q.  Who told you this?
5       A.  I think that Charles Crowley told
6 me that.
7       Q.  And did you inquire further?
8       A.  Maybe Jeff Moritz. I'm not sure.
9 No. Well, I -- no, it really wasn't -- didn't
10 seem relevant at the time, so I did not inquire
11 further.
12      Q.  Why did it not seem relevant?
13      A.  Well, because what -- what I
14 recall about the situation was that one of the
15 directors had resigned for personal reasons.
16 It didn't seem to be my place to ask about what
17 those reasons were, and so I didn't. And
18 again, it didn't -- it didn't appear to effect
19 anything relating to the transaction, so it was
20 irrelevant to me.
21      Q.  Did you ever ask to see the
22 resignation letter?
23      A.  No.
24      Q.  Did you ever discuss this matter
25 with Cliff Roe?

Page 85

1       A.  I don't think so.
2       Q.  Were you concerned about the
3 timing of the resignation, vis-a-vis the merger
4 transaction?
5            MR. BURKE: Objection. Asked and
6 answered.
7            MR. MAUNDRELL: I'll join in with
8 that.
9       A.  No.
10      Q.  Why not?
11            MR. MAUNDRELL: Objection.
12            MR. BURKE: Why was he not --
13 objection. Asked and answered.
14            MR. MAUNDRELL: Asked and
15 answered.
16      A.  Because I was informed that he had
17 resigned for personal reasons and that's -- I
18 took it at face value that that was the case.
19      Q.  Okay. Let me direct your
20 attention to the first page of Defendant's
21 Exhibit 1.
22      A.  Okay.
23      Q.  Could you read the paragraph that
24 begins, Your Board of Directors unanimously
25 approved the acquisition to yourself, please?

22 (Pages 82 to 85)

1      MR. BURKE: Objection, foundation.
2  He already testified he never read this.
3      A.  Okay.
4      Q.  Mr. Matthews, as the lead outside
5  counsel for Provident Bank, you should have no
6  trouble understanding this document, correct?
7      MR. BURKE: Objection, relevance.
8      MR. GILLIGAN: Can you please
9  clean up the question? Seriously, Mike.  You
10  asked him to read one paragraph on one page.
11      A.  One paragraph.
12      MR. GILLIGAN: And you now said
13  the document.
14      MR. BRAUTIGAM: It's a different
15  question.
16      MR. GILLIGAN: Oh, all right.  I'm
17  sorry.  I --
18      THE WITNESS: I'm sorry, what was
19  the question?
20  BY MR. BRAUTIGAM:
21      Q.  The question is:  As the lead
22  outside counsel for Provident Bank in this
23  transaction, you should have no trouble reading
24  and interpreting Defendant's Exhibit 1,
25  correct?

1      MR. BURKE: Objection.
2      A.  You mean the entire document?
3      MR. MAUNDRELL: The entire
4  document?
5      MR. GILLIGAN: The document as a
6  whole?
7      Q.  Yes.
8      A.  Well, taken as a whole, no, I
9  wouldn't have any problem reading and
10  interpreting what it is or what it means.
11      Q.  Okay.  And is the same true for
12  the first page or the cover letter of
13  Defendant's Exhibit 1?
14      A.  Okay.
15      Q.  So you can read and understand
16  that cover letter, correct?
17      A.  Sure.
18      Q.  Okay.  Let's focus on the
19  sentence, Your Board of Directors unanimously
20  approved the acquisition and believes that it
21  is in the best interest of OHSL stockholders.
22  Did I read that correctly?
23      A.  Yes.
24      Q.  Is that sentence true?
25      MR. BURKE: Objection.  Calls for

1  speculation, foundation.
2      MR. GILLIGAN: He's now asking you
3  if you know that it is.
4      A.  Well, it was certified to us to be
5  true, so I believe it to be true.
6      Q.  What, if anything, did KMK do to
7  check the veracity of that statement?
8      MR. BURKE: Objection.  Assumes
9  facts not in evidence.  Calls for speculation.
10  You may answer.
11      A.  I don't recall.
12      Q.  Do you believe that as a general
13  matter of corporate governance, that the
14  shareholders of a company are entitled to know
15  who their directors are at any particular time?
16      MR. BURKE: Objection.  Calls for
17  speculation.  Vague, ambiguous.
18      MR. GILLIGAN: Can you answer that
19  as posed?  If you can't, then --
20      A.  I'm thinking about it.
21      MR. GILLIGAN: You're allowed to
22  ask him what he means.
23      A.  I, I would have to think about
24  that some more before answering that question.
25      Q.  Okay.  We'll come back to that.

1      A.  Okay.
2      Q.  The director who resigned, do you
3  know that his name was Thomas M. Herron?
4      A.  I -- I do not recall that that was
5  his name.
6      Q.  Okay.  Well, that is his name and
7  I just want to use that for purposes of our
8  discussion.
9      A.  Okay.
10      Q.  Was Mr. Herron's resignation ever
11  disclosed to the OHSL shareholders?
12      MR. BURKE: Objection.  Calls for
13  speculation.  You may answer.
14      A.  I don't know.
15      Q.  Do you believe that Mr. Herron's
16  resignation should have been disclosed to the
17  shareholders?
18      MR. MAUNDRELL: Objection.
19      MR. BURKE: Objection.  Calls for
20  speculation, foundation.
21      A.  Not necessarily.
22      Q.  Under what circumstances should it
23  be disclosed and under what circumstances
24  should it not be disclosed, in your view?
25      MR. MAUNDRELL: Objection, form,

23 (Pages 86 to 89)

**Page 90**

1  foundation. Calls for speculation.
2      A.  I think that there are so many
3  different, again, circumstances that could
4  have, you know, where his resignation would
5  have been -- again, as I understand it, at the
6  time the director who resigned had resigned for
7  personal reasons.
8      That's something that I think is
9  fairly innocuous and would not have -- in my
10  opinion, would not have given any rise to any
11  obligation in and of itself to be disclosed.
12  So I think I would have to know all the facts
13  and circumstances prior to making a
14  determination.
15      Q.  If Mr. Herron resigned in part in
16  protest -- in protest of the OHSL-Provident
17  merger, do you believe that his resignation
18  should have been disclosed?
19      MR. MAUNDRELL:  Objection, form,
20  foundation.
21      MR. BURKE:  Objection.  Assumes
22  facts not in evidence.
23      A.  Can you tell me when he resigned?
24      Q.  He resigned July 27th, 1999,
25  effective July 30th, 1999.

**Page 91**

1      MR. MAUNDRELL:  Same objection.
2      A.  Then I would have considered it
3  totally irrelevant.
4      Q.  Totally irrelevant?
5      A.  Totally irrelevant.  Because the
6  meeting required to approve the transaction
7  from the Board of Directors' point of view did
8  not occur until after his resignation.  And the
9  fact that he was no longer on the Board was --
10  would be in my view totally irrelevant.
11      Q.  Even if he resigned --
12      A.  As a matter of corporate law.
13      Q.  Even if he resigned in part in
14  protest?
15      MR. BURKE:  Objection.
16      MR. MAUNDRELL:  Objection.  Asked
17  and answered, argumentative.
18      A.  Answer, yes.
19      Q.  Okay.  Does the timing of his
20  resignation factor into your decision that it
21  would be totally irrelevant?
22      MR. BURKE:  Objection.  Asked and
23  answered.
24      MR. GILLIGAN:  I think he just
25  said that it did.  He just answered it, Mike.

**Page 92**

1      A.  Yes.
2      Q.  And that's because of the meeting
3  taking place when he was no longer on the
4  Board?
5      MR. MAUNDRELL:  Objection.
6      A.  No.  It's because there -- again,
7  as I said, there are a number of circumstances
8  that I would want to take into account in
9  determining whether or not that was appropriate
10  for disclosure.  If I were counsel to OHSL,
11  which I was not, of course, I was working for
12  Provident, but as a -- being familiar with the
13  process that had occurred, which was that the
14  summer had been spent by the OHSL shareholders
15  with their investment bankers looking for
16  alternatives for the sale of the company, you
17  know, a director could have resigned because he
18  didn't want to sell the company at all, because
19  he had personal reasons for resigning.
20      There could be a plethora of
21  reasons for why he might have resigned prior to
22  this transaction even coming about.  The fact
23  that someone resigned in July when this
24  agreement wasn't negotiated until August would
25  have been of no concern to me.

**Page 93**

1      Q.  Wasn't the --
2      A.  Would have been irrelevant to me.
3      MR. GILLIGAN:  Based upon what you
4  know?
5      A.  Based upon what I know.
6      Q.  Wasn't the agreement negotiated
7  also in July?
8      MR. BURKE:  Objection.  Calls for
9  speculation.
10      A.  The process of negotiating the
11  agreement was initiated in July, but it was not
12  concluded until, until August.  So it was an
13  ongoing process that, again, you know, the fact
14  that someone dropped out during the process
15  would have been of very little concern to me.
16      Q.  Would it concern you if Mr. Herron
17  had voted as a director against continued
18  negotiations with Provident?
19      MR. MAUNDRELL:  Objection.
20      MR. BURKE:  Objection.  Asked and
21  answered.
22      A.  At what point in time?
23      Q.  July 22nd, 1999, or thereabouts.
24      MR. MAUNDRELL:  Objection.
25      MR. GILLIGAN:  You're saying voted

24 (Pages 90 to 93)

Page 94

```
1   against it at a Board meeting?
2          MR. BRAUTIGAM: Yes.
3          MR. GILLIGAN: Are you
4   representing -- well, could you finish the --
5   if you're going to ask him to assume something,
6   would you give him the actual assumption? In
7   other words, the date, whether it was a Board
8   meeting or not, so that it's a fair question.
9          MR. BRAUTIGAM: Well, I think --
10         MR. GILLIGAN: You're asking --
11         MR. BRAUTIGAM: I think it was a
12  fair question, Lou, but I'm happy to try to
13  accommodate you.
14         MR. GILLIGAN: Okay, thank you.
15  BY MR. BRAUTIGAM:
16     Q. Mr. Matthews, let me represent to
17  you that Mr. Herron voted as an OHSL director
18  against continued negotiations with Provident
19  Bank on or about July 22nd, 1999. Would that
20  concern --
21         MR. GILLIGAN: At an Oak Hills
22  Saving & Loan Board meeting?
23     Q. At an OHSL Board meeting.
24         MR. BURKE: Objection.
25         MR. MAUNDRELL: Now, what's your
```

Page 96

```
1   your hypothetical?
2          MR. MESH: Just stick with the
3   question.
4          MR. BRAUTIGAM: The question is
5   fine.
6          MR. MAUNDRELL: Then I object,
7   contains facts not in evidence and it
8   misrepresents facts that should be in evidence
9   as part of the question.
10     A. Yes, as you phrase the question
11  I'm going to have to say no, not necessarily,
12  because it would not necessarily have concerned
13  me. And, in fact, it didn't concern me at the
14  time, because again, I was told that he had
15  resigned for personal reasons.
16         And I had no knowledge of the
17  Board meetings, I wasn't there. I was never
18  present at Board meetings. And whether he
19  voiced opposition to Provident's -- this
20  transaction is totally something outside of my
21  knowledge.
22     Q. Do you think it would have been a
23  good idea to review the Board minutes of OHSL?
24         MR. BURKE: Objection.
25         MR. MAUNDRELL: Objection.
```

Page 95

```
1   question?
2      Q. Did you know that?
3          MR. BURKE: Objection. Calls for
4   speculation.
5          MR. MAUNDRELL: Objection.
6          MR. GILLIGAN: Factually he wants
7   to know.
8      A. I do not recall that, no.
9      Q. Would that have concerned you if
10  you had known that?
11         MR. MAUNDRELL: Objection.
12         MR. BURKE: Objection. Asked and
13  answered.
14     A. No, not necessarily.
15     Q. In the context of his voting
16  against continued negotiations with Provident
17  on July 22nd, 1999 and his resignation five
18  days later, effective three days after that,
19  would this mix of information have concerned
20  you?
21         MR. MAUNDRELL: The resignation
22  being for personal reasons?
23         MR. BURKE: Objection. Asked and
24  answered.
25         MR. MAUNDRELL: Is that part of
```

Page 97

```
1          MR. GILLIGAN: Wait a minute. He
2   can't answer that in that form, Mike. Listen
3   to the question.
4      A. Well, at what time, Mike?
5          MR. GILLIGAN: Wait a minute,
6   you're talking about him? You were asking him
7   to put himself in the shoes of an OHSL lawyer
8   at one point in time?
9          MR. BRAUTIGAM: No, absolutely --
10         MR. GILLIGAN: Are you asking him
11  whether it was important for Tim himself to
12  have looked at it at the time? That's what I
13  want to know.
14         MR. BRAUTIGAM: Okay.
15         MR. GILLIGAN: Okay.
16         MR. BRAUTIGAM: Mr. Matthews, as
17  the --
18         MR. GILLIGAN: Rephrase, please.
19  BY MR. BRAUTIGAM:
20     Q. Given our discussion so far this
21  morning, as the lead outside counsel for
22  Provident Bank in this transaction, do you now
23  believe that it would have been a good idea to
24  have someone at KMK review the OHSL corporate
25  Board minutes?
```

25 (Pages 94 to 97)

**Page 98**

1    MR. BURKE: Objection.
2    A.  At what point in time?
3    Q.  Summer of 1999.
4    MR. MAUNDRELL: Objection.
5    A.  Well, that's not a point in time.
6    MR. MAUNDRELL: Objection. Form,
7  foundation and relevancy.
8    Q.  Well, if you can't answer the
9  question, you can't answer the question.
10    MR. GILLIGAN: Okay. Let's go to
11  the next question.
12    Q.  Do you believe that in light of
13  our discussion here this morning, that it would
14  have been a good idea to have someone at KMK
15  review the corporate Board minutes of OHSL at
16  any point between July of 1999 and October
17  25th, 1999?
18    MR. GILLIGAN: I'll instruct the
19  witness not to answer. That's impossible to
20  answer. That's just not a fair question with
21  that preamble, "in light of our discussion here
22  this morning."
23    MR. BURKE: What does that mean?
24    MR. GILLIGAN: He can't -- that's
25  just a totally unfair question. I instruct you

**Page 99**

1  not to answer that, Tim. And I've been trying
2  to tell you why, Mike, so that you can rephrase
3  if you'd like.
4    Q.  Do you think it would have been a
5  good idea to have someone at KMK review OHSL's
6  corporate Board minutes before the merger
7  closed?
8    MR. BURKE: Objection. Asked and
9  answered.
10    MR. MAUNDRELL: And objection to
11  form, foundation.
12    MR. GILLIGAN: If you feel that
13  you've already answered it, just say I've
14  already answered it. If you don't, go ahead
15  and try to answer it if you can without
16  speculating.
17    A.  No.
18    Q.  Why not?
19    A.  Because OHSL had represented to us
20  in the definitive merger agreement that the
21  requisite approval had been obtained by the
22  Board of Directors already as of the date of
23  the signing of the agreement.
24    And further, we had received a
25  legal opinion from their counsel to the effect

**Page 100**

1  that the necessary approval had been obtained.
2  And further, we knew that the officers -- some
3  of the officers of OHSL had certified to their
4  counsel that the requisite approvals had been
5  obtained. So we had basically three bases for
6  knowing that the proper approval of the Board
7  of Directors had been obtained. And there
8  wasn't any need to go read the minutes.
9    Q.  You testified that it was your
10  belief that all of the officers of OHSL were in
11  favor of and, indeed, enthusiastic about the
12  merger. Is that your understanding?
13    MR. MAUNDRELL: Objection. Asked
14  and answered.
15    MR. GILLIGAN: You said officers,
16  are you talking about directors?
17    MR. BRAUTIGAM: I said officers.
18    MR. BURKE: Objection. Assumes
19  facts not in evidence. Misstates prior
20  testimony.
21    THE WITNESS: That does misstate
22  prior testimony, because I --
23    MR. GILLIGAN: Don't answer the
24  question.
25    MR. BRAUTIGAM: I didn't mean to

**Page 101**

1  misstate prior testimony.
2    MR. MAUNDRELL: Well, you did.
3    MR. GILLIGAN: All right. Well,
4  let's move on.
5  BY MR. BRAUTIGAM:
6    Q.  Did you believe that all of OHSL's
7  officers were in favor of the merger with
8  Provident and enthusiastic about the merger
9  with Provident?
10    A.  I had no knowledge of what all of
11  the officers of OHSL might have believed.
12    Q.  Well, there were only four. Isn't
13  that correct?
14    MR. BURKE: Objection, foundation.
15    A.  I would not have known that.
16    Q.  Did someone tell you that the
17  officers of OHSL were in favor of and
18  enthusiastic about the merger with Provident?
19    MR. MAUNDRELL: Objection. Asked
20  and answered.
21    A.  Yes.
22    Q.  And that was which person?
23    A.  Well, I think that -- that was my
24  understanding through their counsel, as well as
25  through their investment bankers.

26 (Pages 98 to 101)

Page 102

```
1        Q.  Okay.  That's fine.
2            MR. MAUNDRELL:  And that's
3    consistent with his earlier testimony.
4        Q.  Mr. Matthews, do you believe that
5    the proxy materials and registration statement
6    should not be misleading?
7            MR. BURKE:  Objection.
8            MR. MAUNDRELL:  Objection.
9            MR. GILLIGAN:  This is a general
10   statement?
11           MR. BRAUTIGAM:  Yes.
12           MR. GILLIGAN:  It's just a
13   general, it's like do you think it's
14   appropriate to beat your wife.  I mean, gees.
15   Go ahead and answer it if you can.
16       A.  That's the feeling I have about
17   that question.  Yes, as a general matter they
18   should not be misleading.
19   BY MR. BRAUTIGAM:
20       Q.  Do you think that Defendant's
21   Exhibit 1 is materially misleading in anyway,
22   given our discussion here today so far?
23           MR. BURKE:  Objection.
24           MR. GILLIGAN:  I instruct you not
25   to answer.
```

Page 103

```
1            MR. BRAUTIGAM:  What's the basis
2    for that instruction?
3            MR. GILLIGAN:  Based upon our
4    discussion so far today?  These are not --
5            MR. BRAUTIGAM:  I disagree with
6    you.  I think it's an improper instruction.
7            MR. GILLIGAN:  That's okay.
8    BY MR. BRAUTIGAM:
9        Q.  Okay.  Let's take a look at the
10   first page of Defendant's Exhibit 1, the
11   sentence I'm particularly interested in, Your
12   Board of Directors unanimously approved the
13   acquisition.  Do you see that?
14           MR. BURKE:  That's not what it
15   says.  Please read the whole sentence.
16           MR. BRAUTIGAM:  Jim, when you're
17   asking the questions, you can read whatever
18   you'd like.
19   BY MR. BRAUTIGAM:
20       Q.  Do you see that sentence, sir?
21       A.  I do.
22           MR. BURKE:  That's not the
23   sentence.
24       Q.  Okay.  And that Board refers to
25   the seven then existing members as of the date
```

Page 104

```
1    of the proxy materials, which is September
2    24th, 1999, correct?
3            MR. MAUNDRELL:  Objection.
4            MR. BURKE:  Objection.  Assumes
5    facts not in evidence.  Calls for speculation.
6            MR. MAUNDRELL:  Calls for
7    speculation.
8            MR. BURKE:  Foundation.
9            MR. GILLIGAN:  You're asking him
10   what it means to you, what it means to him or
11   what --
12           MR. BRAUTIGAM:  Lou, I really
13   think that the question is clear.
14           MR. GILLIGAN:  All right.  Will
15   you read --
16           MR. BRAUTIGAM:  Fine.
17           MR. GILLIGAN:  Let me hear the
18   question again.
19           (Record read by Reporter.)
20           MR. BURKE:  Objection,
21   speculation, foundation.
22       A.  I don't know, because I don't
23   remember how many members of the Board there
24   were and I don't know to what date this
25   specifically refers or what meeting this might
```

Page 105

```
1    be referring to.
2    BY MR. BRAUTIGAM:
3        Q.  Okay.  Can I direct your attention
4    to page 18 of the document?
5            MR. GILLIGAN:  There's more than
6    one page 18.  Make sure we've got the right
7    one.  Which document is this?
8        A.  Eighteen of the proxy statement
9    and prospectus?
10       Q.  Yes.
11       A.  Or the merger agreement?
12       Q.  Page 18.  I think we're doing
13   fine.
14       A.  Okay.
15       Q.  Do you see the section The
16   Acquisition?
17       A.  The Acquisition, yes.
18       Q.  And this is talking about OHSL,
19   correct?
20       A.  Yes.
21       Q.  And this was written by OHSL,
22   correct?
23           MR. MAUNDRELL:  Objection.  Form,
24   foundation.  Calls for speculation.
25           MR. GILLIGAN:  Are you talking
```

27 (Pages 102 to 105)

**Page 106**

1 about that whole section, because there are
2 several different pages?
3       MR. BRAUTIGAM: Yes.
4       MR. GILLIGAN: Was that whole
5 section written by --
6       MR. BRAUTIGAM: OHSL.
7       MR. MAUNDRELL: Same objection.
8 There's no foundation.
9       THE WITNESS: Should I read the
10 entire section verbatim to answer your
11 question, Mike?
12       MR. BRAUTIGAM: No, if you know if
13 they wrote that section of the document, you
14 can tell me. If you don't know, that's fine.
15       MR. BURKE: Does OHSL include
16 OHSL's counsel or just OHSL?
17       MR. BRAUTIGAM: Okay. Let me ask
18 a different question.
19       MR. BURKE: Okay.
20 BY MR. BRAUTIGAM:
21       Q. Mr. Matthews, do you know who
22 wrote the section The Acquisition?
23       A. When you say who wrote it, what do
24 you mean by that? Do you mean the content?
25       Q. Yes.

**Page 108**

1       MR. MAUNDRELL: Objection. Form,
2 foundation. Calls for speculation.
3       MR. GILLIGAN: Can you repeat the
4 question? I think you changed it at the end.
5 I'm confused.
6       MR. MAUNDRELL: You did.
7 BY MR. BRAUTIGAM:
8       Q. Do you want me to rephrase it?
9       A. Are you asking me whether I know
10 it was seven versus eight directors?
11       Q. No. I'm asking -- I'm
12 representing to you that on August 2nd, 1999,
13 OHSL had seven directors. Are you with me?
14       A. Yes.
15       MR. GILLIGAN: Are you asking him
16 if he knew that at that time as well?
17       MR. BRAUTIGAM: No.
18       MR. GILLIGAN: Okay, you're
19 just -- okay. Go ahead.
20 BY MR. BRAUTIGAM:
21       Q. So my question is, when the Board
22 of Directors of OHSL is used, that refers to
23 the then existing directors as of August 2nd,
24 1999, correct?
25       MR. BURKE: Objection.

**Page 107**

1       A. Would have been supplied by OHSL
2 or through its counsel.
3       Q. Okay. KMK did not write that,
4 correct?
5       MR. MAUNDRELL: Objection.
6       A. That is correct.
7       Q. Okay. Let's look at some distinct
8 things here. The first paragraph, the first
9 line refers to the Board of Directors of OHSL.
10 Do you see that?
11       A. No, I don't see that. Under The
12 Acquisition?
13       Q. Actually Background of the
14 Acquisition.
15       A. Oh, the next section?
16       Q. Yes. Subsection, I think.
17       A. Okay.
18       Q. Okay. And is it fair to say that
19 the Board of Directors refers to the then seven
20 Board members of OHSL on August 2nd, 1999?
21       MR. BURKE: Objection.
22       MR. MAUNDRELL: Objection.
23       Q. We had eight, Mr. Herron resigned
24 effective July 30th, 1999. Are you with me?
25       MR. BURKE: Objection, form.

**Page 109**

1       MR. MAUNDRELL: Objection. Form,
2 foundation, speculation.
3       MR. BURKE: Foundation.
4       A. That would be my impression.
5       Q. Okay. Now, if you look at the
6 second paragraph on the next page, The Board
7 continued to allocate its time at monthly
8 meetings to review its options. And at a
9 meeting held in February 1999, the Board
10 appointed an ad hoc committee of the Board of
11 Directors consisting of three directors to
12 research and evaluate any benefits to the sale
13 of OHSL. Do you see that?
14       A. Yes, I do.
15       Q. There's a reference to the Board
16 of Directors in that paragraph, correct?
17       A. Yes.
18       Q. And the time reference is February
19 of 1999, correct?
20       A. Right.
21       Q. Did the Board's composition change
22 between February 1999 and August 2nd, 1999?
23       MR. BURKE: Objection. Calls for
24 speculation. This witness has no firsthand
25 knowledge. You may answer.

28 (Pages 106 to 109)

Page 110

```
1          A.  I don't know in what ways the
2   Board composition may have changed during that
3   intervening period of time, nor would I have
4   viewed it as relevant.
5          Q.  Okay.
6          A.  Because we're speaking here as, as
7   an entity collectively, the Board.
8          Q.  Okay.
9          A.  It's like referring to the White
10  House.
11         Q.  Okay.  Let's take a look --
12         A.  Okay.
13         Q.  -- at the reference to April 1999.
14         A.  Okay.
15         Q.  It says, The OHSL Board of
16  Directors in April 1999.  Do you see that?
17         A.  No.
18         MR. GILLIGAN:  Where is that?
19         A.  Where is that?  Oh, the next
20  paragraph?
21         Q.  Yes.
22         MR. GILLIGAN:  Where, Tim?
23         MR. MAUNDRELL:  So your question
24  is what, does he see it?
25         Q.  Does he see it.
```

Page 111

```
1          A.  I do see it.
2          Q.  Okay.  And that refers to the
3   entire Board that existed as of April of 1999;
4   is that correct?
5          MR. BURKE:  Objection.  Calls for
6   speculation.  You're asking him to interpret a
7   document he never read or --
8          MR. MAUNDRELL:  Objection.
9          MR. GILLIGAN:  What I thought you
10  had been asking here was the obvious, and that
11  is where it says Board of Directors.  The Board
12  of Directors is the Board.  It's just the Board
13  of Directors.
14         A.  However it may be constituted from
15  time to time.
16         MR. GILLIGAN:  Right.  That's what
17  he's been answering and I thought that's what
18  you were asking.  Why are we -- were you in
19  some other context?
20         MR. BRAUTIGAM:  I'm doing fine,
21  really.
22         MR. MAUNDRELL:  You may be, but --
23  BY MR. BRAUTIGAM:
24         Q.  Mr. Matthews, Mr. Burke made an
25  objection that you did not read this section.
```

Page 112

```
1   Is that true?  Did you read the section The
2   Acquisition?
3          A.  At what time?
4          Q.  At any time.
5          A.  During the time of the
6   transaction?
7          Q.  At any time, did you read the
8   section The Acquisition?
9          A.  Yes.
10         Q.  Thank you.  Now, let me direct
11  your attention to the entry July 22nd, 1999.
12  It's on page 20, and it talks about the Board.
13  Do you see that?
14         MR. GILLIGAN:  What paragraph?
15  Second from the bottom?
16         Q.  Penultimate.
17         MR. GILLIGAN:  Is there a
18  question?  Do you want him to read that
19  paragraph?
20         Q.  No.  Do you see that paragraph?
21         MR. GILLIGAN:  He sees it.  Do you
22  see it?
23         A.  I do.
24         Q.  And do you believe that that
25  paragraph refers to the then existing Board of
```

Page 113

```
1   OHSL directors in whatever form?
2          MR. BURKE:  Objection.
3          MR. MAUNDRELL:  Objection.
4          MR. GILLIGAN:  Why don't you read
5   the whole paragraph before you answer the
6   question?
7          MR. MAUNDRELL:  Form and
8   foundation.
9          Q.  Why don't you read the next
10  paragraph to yourself as well, because that
11  will be my follow-up question.
12         MR. GILLIGAN:  Okay.
13         A.  Yes.
14         Q.  Okay.  Have you read both
15  paragraphs?
16         A.  Yes.
17         Q.  Okay.  Let me direct your
18  attention to the bottom paragraph.  From July
19  22nd, 1999 to August 2nd, 1999, McDonald, the
20  OHSL Board, and OHSL's legal counsel engaged in
21  negotiations with Provident Financial related
22  to a definitive agreement.  Do you see that?
23         A.  Yes.
24         Q.  Do you believe that that use of
25  the OHSL Board is misleading in this context?
```

29 (Pages 110 to 113)

Page 114

1    MR. MAUNDRELL: Objection.
2    MR. BURKE: Objection.
3    MR. MAUNDRELL: Form, foundation,
4  relevancy. Calls for speculation.
5    A. No.
6    Q. Why not?
7    MR. MAUNDRELL: Objection.
8    A. I, I think it's clear that, that
9  the Board of Directors as a whole, regardless
10 of changes in composition that may have
11 occurred during that intervening period of
12 time, did, in fact, in various forms engage in
13 negotiations relating to a definitive
14 agreement.
15    Some Board members may have been
16 more active than others. Some officers may
17 have been more active than others. Counsel was
18 involved. I think it's an absolutely true
19 statement, so I did not believe it was
20 misleading in any way.
21    Q. Okay. Let's go back to the first
22 page of the document, please.
23    A. Okay.
24    Q. Is this document -- well, who was
25 responsible for this document, Defendant's

Page 116

1    MR. BRAUTIGAM: We don't need
2  speaking objections.
3    MR. MAUNDRELL: That's what he
4  asked. He just asked.
5    MR. BRAUTIGAM: I think we're
6  doing fine. I can say who's responsible for
7  the document, we can go page by page, use the
8  index. I think we're doing fine. But I
9  respectfully request that you keep the speaking
10 objections to a minimum.
11    MR. GILLIGAN: I asked you a
12 question. I didn't make an objection. I simply
13 asked you to be fair and say, you know, he's --
14 look, whether you're doing fine or not really
15 is irrelevant.
16    Let me just explain to you the
17 problem, which is he's already talked about,
18 for example, this first page ad nauseam and
19 indicated to you he had nothing to do with the
20 preparation of that, never saw it before, et
21 cetera. So then when you ask him about the
22 whole document, you're asking him a repetitious
23 question, which he's already answered that the
24 answer would be no. Do you see what I'm --
25 what I'm trying to say?

Page 115

1  Exhibit 1?
2    MR. BURKE: Objection to
3  foundation.
4    MR. MAUNDRELL: Objection. Asked
5  and answered.
6    MR. GILLIGAN: He's already
7  answered that. Haven't you answered that, Tim?
8    MR. MAUNDRELL: Yes.
9    A. Who -- I'm not sure that that
10 question has been posed in that exact form.
11    Q. Thank you. I don't think so,
12 either.
13    MR. MAUNDRELL: Well, it doesn't
14 have to be formed in the precise form to have
15 been asked and answered previously, Mr.
16 Brautigam. I've got news for you.
17    A. What do you mean by, responsible
18 for the document?
19    Q. Okay. Who was responsible for
20 finalizing Defendant's Exhibit 1?
21    MR. BURKE: Objection, foundation.
22    MR. GILLIGAN: When you say -- he
23 means -- you mean every page starting with this
24 page that you already testified about to the
25 last? That's what you're asking, Mike?

Page 117

1    MR. BRAUTIGAM: Actually, I don't.
2    MR. GILLIGAN: It's a document
3  made up of many parts, some of which he was
4  involved in, some of which he was not. He's
5  already testified to that.
6    MR. BURKE: Exactly.
7    MR. BRAUTIGAM: Great. We're
8  going to get there, okay? If I could just have
9  a dialogue with the witness, I think we'll be
10 fine. In other words --
11    MR. GILLIGAN: Go ahead and answer
12 the question.
13    MR. BRAUTIGAM: Thank you.
14    THE WITNESS: Well, no --
15    MR. GILLIGAN: Don't answer the
16 question unless you get another -- let's just
17 get another question. I'll instruct you not to
18 answer. And with that, I ask you to rephrase
19 it.
20    MR. BRAUTIGAM: Fine. I'm happy
21 to accommodate you.
22    MR. GILLIGAN: And I'm trying to
23 tell you why so that we can move ahead.
24    MR. BRAUTIGAM: Well, I didn't
25 understand you, but I'm happy to accommodate

30 (Pages 114 to 117)

Page 118

1  you and rephrase the question.
2  BY MR. BRAUTIGAM:
3       Q.   Mr. Matthews, was there a person
4  or entity with overall responsibility for the
5  finalization of Defendant's Exhibit 1?
6            MR. BURKE:  Objection.
7  Speculation, foundation.
8       A.   I would say not, because, I mean,
9  the way you phrased the question, was there a
10  single person or entity responsible for
11  finalizing this document?  I would say no.
12       Q.   Okay.  Was there a person or
13  entity responsible for finalizing certain
14  sections of the document?
15       A.   Yes.
16       Q.   Okay.  With respect to the
17  sections provided by Provident or KMK, were you
18  that person?
19       A.   No.
20       Q.   Who was that person?
21       A.   Mark Weiss would have been
22  primary -- and again, let me back up.  Which
23  part of the document are you referring to,
24  because we would have had different
25  responsibilities for different parts.

Page 119

1            I was primarily responsible, for
2  example, for The Merger Agreement portion of
3  this document.  Mark was not involved in the
4  negotiation of the definitive agreement.  With
5  regard to the proxy statement and prospectus,
6  that was a joint effort of OHSL's counsel and
7  KMK, and I did not take a primary lead in that
8  part of the process.  That's -- that would have
9  been -- that would have been Mark Weiss for
10  KMK.
11       Q.   And who was Mark Weiss' opposite
12  number at the Dinsmore firm?
13            MR. BURKE:  Objection to form.
14       A.   I -- I don't recall.  I don't
15  recall.
16       Q.   So if I understand your testimony
17  correctly, the portions of Defendant's Exhibit
18  1 that constitute the proxy statement are the
19  joint responsibility of Provident, KMK, OHSL,
20  and Dinsmore; is that correct?
21            MR. BURKE:  Objection.  Misstates
22  prior testimony.
23            MR. GILLIGAN:  Objection.
24       A.   That's not what I said.
25            MR. GILLIGAN:  That's the answer.

Page 120

1       Q.   How is my recitation incorrect?
2       A.   Well, first of all --
3            MR. GILLIGAN:  You restated his
4  answer.  I told you in the beginning, I only
5  let him answer questions -- if you don't
6  understand his answer, then ask him about what
7  part you don't understand.  But he just
8  answered your question, so it's in black and
9  white after she types it up, so that's it.
10            If you have to rephrase his
11  answer, you're therefore automatically asking a
12  repetitious question.  He gave you an answer.
13  If you don't understand part of it, I don't
14  have a problem with you asking him about what
15  you don't understand about it, but I do object
16  and I will not let him answer questions that
17  restate testimony already given.
18            MR. BRAUTIGAM:  Let's go off the
19  record briefly.
20            MR. GILLIGAN:  Fine.
21            (Brief recess.)
22  BY MR. BRAUTIGAM:
23       Q.   Mr. Matthews, are you familiar
24  with Section 11 of the Securities Act of 1933?
25       A.   No.  I'm familiar that there is

Page 121

1  one, but I couldn't tell you what it says right
2  now.
3       Q.   Do you have a working
4  understanding of the Securities Act of 1933,
5  specifically Section 11?
6       A.   No.
7            MR. BURKE:  Objection.  Asked and
8  answered.
9       Q.   Okay.  Could I direct your
10  attention to the table of contents of
11  Defendant's Exhibit 1?  Who wrote Questions and
12  Answers About the Acquisition?
13            MR. BURKE:  Objection, foundation.
14       A.   Well, the last time you asked me a
15  question about something that was written, I
16  explained that that term can be used in a
17  couple different contexts.  Are you talking
18  about who the scrivener of the information was,
19  or who supplied the content for that particular
20  section?
21       Q.   Well, let's take both questions.
22       A.   Okay.
23       Q.   With respect to the questions and
24  answers, who was the scrivener for the words
25  that appear on those pages?

31 (Pages 118 to 121)

Page 122

1        MR. BURKE: Objection, foundation.
2    Calls for speculation.
3        A.  I do not know.
4        Q.  Do you believe that it was someone
5    at KMK?
6        MR. MAUNDRELL: Objection.
7        MR. BURKE: Objection. Calls for
8    speculation.
9        A.  I don't know.
10       Q.  You have no idea where it --
11       MR. BURKE: Objection.
12       Q.  Who was the scrivener?
13       MR. BURKE: Asked and answered.
14       MR. MAUNDRELL: Objection,
15   repetitious.
16       A.  I don't know.
17       Q.  Okay. Where did the information
18   come from with respect to the content of the Q
19   and A?
20       A.  Don't know.
21       Q.  Did some of that information come
22   from Provident through KMK?
23       MR. MAUNDRELL: Objection.
24       MR. BURKE: Objection. Calls for
25   speculation.

Page 123

1        A.  I don't know.
2        Q.  Let's take the next section,
3    Summary. Let's look at pages three to five.
4    Have you read these pages before today?
5        MR. MAUNDRELL: Objection. Asked
6    and answered at least twice before.
7        A.  Yes.
8        Q.  Did you read these pages as the
9    proxy materials and registration statement were
10   being prepared?
11       A.  I'm not exactly -- I've probably
12   -- I think I recall reading this as it was
13   close to the end of the preparation process.
14   I, I was not involved in the process of
15   preparing it.
16       Q.  And what was the purpose for your
17   reading that?
18       A.  To review it generally for form
19   and to determine if there was any information
20   of which I had knowledge that might need to be
21   corrected.
22       Q.  Was there any?
23       A.  No.
24       Q.  How many hours did you bill in the
25   Provident-OHSL merger?

Page 124

1        A.  I don't recall.
2        Q.  More than a thousand?
3        A.  No.
4        MR. BURKE: A thousand?
5        Q.  More than 500?
6        A.  No.
7        Q.  More than 250?
8        A.  No.
9        Q.  In the area of 200 or so?
10       A.  Less than 250, I feel.
11       Q.  Okay. Who at KMK was responsible
12   for working on this summary, these pages?
13       MR. BURKE: Objection, foundation.
14       A.  Mark Weiss.
15       Q.  Who at Dinsmore was responsible
16   for working on this summary?
17       MR. MAUNDRELL: Objection.
18       A.  Cliff Roe.
19       Q.  Do you know whose computer system
20   this summary came off?
21       A.  No.
22       Q.  The entire document at some point
23   went to a financial printer; is that correct?
24       A.  Yes. I seem to recall that it
25   did.

Page 125

1        Q.  Okay. Perhaps that was inartful,
2    but the information that became the final
3    document went to a financial printer, correct?
4        A.  Yes.
5        Q.  And how did that information get
6    from wherever it was prior to the financial
7    printer?
8        A.  I don't know.
9        Q.  Did KMK send someone to the
10   financial printer to ensure the accuracy of the
11   document?
12       MR. BURKE: Objection.
13       MR. MAUNDRELL: Objection.
14       MR. BURKE: Misleading question.
15       A.  I don't know. I did not go.
16       Q.  In 1999, was that a common
17   practice?
18       MR. BURKE: Objection. Form.
19       MR. GILLIGAN: I don't think you
20   can answer the question as posed. It's too
21   open-ended.
22       A.  Mike, you know, I'll answer it in
23   this way: Fifteen years ago, in the eighties
24   that would have been a common practice. In the
25   mid to late nineties that became much less of a

Page 126

```
1   common practice and today it would not be a
2   common practice.
3        Q.  Because of the electronic
4   transmittal of data, correct?
5        A.  Right.
6        Q.  Okay.  Can I direct your attention
7   to the second column on page four?  Do you see
8   the $36 figure there?  Third bullet point in
9   the right-hand column?
10       A.  Yes.
11       Q.  Is that figure correct?
12       MR. GILLIGAN:  Is it correct in
13  that context?
14       MR. BURKE:  What page are we on?
15       A.  Is the figure correct?  I don't
16  know what you mean by that question.
17       Q.  Is the number $36 correct?
18       A.  It's correctly printed, it's $36.
19       Q.  Should it be $36?  That's my
20  question.
21       MR. BURKE:  Objection.
22       MR. GILLIGAN:  I'll instruct you
23  not to answer.
24       Q.  Page four.
25       MR. GILLIGAN:  Come on, Mike,
```

Page 127

```
1   you've got to make the question in a context
2   that's understandable.
3        A.  I don't know what you mean.  I --
4        MR. GILLIGAN:  Tim --
5        A.  I see 36 on the page here.
6        Q.  Okay.  Is 36 the right number?
7   It's a very simple question.
8        A.  Do you want to relate that to
9   something?  Right in connection with -- do you
10  mean did it correctly reflect the merger
11  agreement?
12       Q.  Yes.  I'll adopt your question.
13       A.  I don't recall.  We can easily
14  check by looking at The Merger Agreement.
15       Q.  Does the number 36.60 ring a bell?
16       MR. GILLIGAN:  Again --
17       MR. BURKE:  Does the number ring a
18  bell?
19       A.  The Merger Agreement --
20       MR. BURKE:  Objection to form.
21       A.  Mike, it appears to me that the
22  figure should have been $36.60, instead of $36
23  even.
24       Q.  Okay.  Can I direct your attention
25  to pages six and seven of the document?
```

Page 128

```
1        A.  Of the prospectus?
2        Q.  Yes.
3        A.  Okay.
4        Q.  Where did this information come
5   from?
6        A.  Provident Financial Group.
7        Q.  And was KMK responsible for
8   inserting this information into the document?
9        MR. BURKE:  Objection, foundation.
10       A.  Well, the ultimate responsibility
11  is with Provident, but we did -- we did insert
12  this information in the document.
13       Q.  What did you mean in your previous
14  answer when you said the ultimate
15  responsibility is with Provident?
16       A.  Well, Provident is responsible for
17  its financial information and the accuracy of
18  the financial information.  And we would have
19  not undertaken any due diligence or
20  verification as to the, the numbers themselves.
21  So Provident was responsible for the numbers,
22  but --
23       Q.  Were these numbers correct?
24       MR. BURKE:  Objection,
25  speculation.
```

Page 129

```
1        A.  I -- I don't know.
2        Q.  Are you familiar with Provident's
3   March 5th, 2003 restatement?
4        A.  I'm not personally familiar with
5   it, no.
6        Q.  Did you read about it in the
7   papers?
8        A.  Yes.
9        Q.  Are you familiar with the term
10  restatement?
11       A.  Yes.
12       Q.  What do you understand restatement
13  to mean?
14       A.  Well, a restatement can mean a lot
15  of things, but in the context, I believe, in
16  which you're asking this question, a
17  restatement would be a change in the
18  presentation of the financial information based
19  upon a change in accounting practice or
20  principle.
21       Q.  And does that mean that the
22  previous financial statements were materially
23  incorrect?
24       A.  No.
25       MR. BURKE:  Objection.  Calls for
```

33 (Pages 126 to 129)

Page 130

1  speculation.
2      Q.  It does not mean that the previous
3  financial statements were materially incorrect?
4      A.  That would not be my understanding
5  of it.
6      Q.  Okay.  Are you disagreeing with me
7  on the word material?
8      MR. BURKE:  Objection.  He's
9  disagreeing with you.
10      MR. MAUNDRELL:  Yes.  He doesn't
11  agree with your question.
12      MR. GILLIGAN:  He just answered it
13  no, so no is no.
14      Q.  Okay.  What does a restatement
15  mean with respect to materiality of financial
16  statements?
17      A.  I couldn't answer that question,
18  because I'm not an accounting expert.
19      Q.  Okay.  Can I direct your attention
20  to page 12 of the document?
21      A.  Okay.
22      Q.  Did KMK write this page?
23      MR. BURKE:  Objection, foundation.
24      A.  I do not know.
25      Q.  Let's look at page 13 of the

Page 131

1  document that's entitled Risk Factors.  Do you
2  see that?
3      A.  Right.
4      Q.  And it goes on for three pages.
5      A.  Um-hmm, okay.
6      Q.  Did KMK write this section?
7      A.  I don't know.
8      Q.  Are you familiar with the term
9  securitizations?
10      A.  Yes.
11      Q.  What are securitizations?
12      A.  Well, there are a lot of different
13  kinds of securitizations.  Do you just want a
14  general definition?
15      Q.  Sure.
16      A.  A general definition of a
17  securitization is a transaction in which the
18  ownership of some kind of asset is converted
19  into a different form in which securities can
20  be held to represent ownership interest.
21      Q.  Are you familiar with whether it
22  is and is not appropriate to have securitized
23  assets off the balance sheet?
24      A.  No.  I said before I'm not an
25  accounting expert.

Page 132

1      Q.  Did you read the section on Risk
2  Factors in the course of your work on the
3  OHSL-Provident merger?
4      MR. MAUNDRELL:  Objection.  Asked
5  and answered.
6      A.  I believe I've answered that
7  question, yes.  I read the entire prospectus.
8      Q.  Okay.  Let me direct your
9  attention to page 16, The Special Meeting.  Was
10  this the responsibility of OHSL?
11      MR. MAUNDRELL:  Objection.
12      MR. BURKE:  Was what the
13  responsibility, The Special Meeting?
14      Q.  The section The Special Meeting.
15  It continues up to page 18, I believe.
16      MR. MAUNDRELL:  Same objection.
17      A.  Yes.
18      Q.  Did you ever see this in draft
19  form?
20      A.  By "draft form," do you mean in
21  a -- in a form prior to it being sent to the
22  printer?
23      Q.  Yes.
24      A.  Yes.
25      Q.  Did you have discussions with

Page 133

1  anyone as to what should or should not be
2  included on these drafts?
3      MR. GILLIGAN:  If you're referring
4  to specific drafts, you'd have to put them in
5  front of him, I would think, but go ahead if
6  you can answer it, Tim.
7      A.  I don't recall.  Well, let me make
8  sure I understand the question.  Repeat the
9  question for me, please.
10      (Record read by Reporter.)
11      A.  I don't recall.
12      Q.  Okay.  Can I direct your attention
13  to page 33, The Merger Agreement?  Who was
14  responsible for the section, The Merger
15  Agreement?
16      A.  This is a section that briefly
17  summarizes The Merger Agreement.  And all the
18  parties to The Merger Agreement would have been
19  consulted and had input on this section.
20      Q.  Did you have any input into this
21  section?
22      A.  Yes.
23      Q.  Did you write any of the language
24  that appears in this section?
25      A.  No.

34 (Pages 130 to 133)