

**Page 134**

1  Q. What input did you have in this
2  section?
3  A. As I said before, I reviewed this
4  section to make sure that it was consistent
5  with my understanding of The Merger Agreement
6  and, and accurate. And I did do that.
7  Q. Do you know whose computers this
8  section came off?
9  MR. BURKE: Objection. You've
10 asked that question a dozen times about the
11 entire document. He's answered every single
12 time the same way. I don't know why you need
13 to keep asking it. Asked and answered.
14 A. I don't have personal knowledge of
15 that.
16 Q. Do you have a belief?
17 MR. MAUNDRELL: Objection.
18 MR. BURKE: Objection.
19 A. Yes.
20 Q. What is your belief?
21 MR. MAUNDRELL: Objection.
22 A. I believe that -- I believe that
23 it came off of KMK's computer.
24 Q. Okay. Let's take a look at the
25 Stock Option Agreement that's found beginning

**Page 135**

1  on page 41, going up to page 43, about the
2  middle of the page where it starts Provident
3  Financial Group. Do you see that section, sir?
4  A. Yes, I do.
5  Q. Did someone at KMK write this
6  section?
7  MR. BURKE: Objection, foundation.
8  A. I don't recall. Again, this is a
9  section which purports to summarize the terms
10 of the stock option agreement, and both parties
11 to that agreement would have been involved in
12 the preparation of this section.
13 Q. And does that mean Provident and
14 OHSL?
15 MR. BURKE: Objection to form. I
16 don't know what that means.
17 A. It means Provident, OHSL and their
18 respective law firms, Dinsmore & Shohl and KMK.
19 Q. Right, I just wanted to clarify
20 that. That's what I thought you meant. This
21 section, Provident Financial Group, beginning
22 on page 43, going over to page 44, that would
23 be the responsibility of Provident, correct?
24 A. Correct.
25 Q. And that would have been written

**Page 136**

1  by attorneys at KMK, correct?
2  MR. BURKE: Objection, foundation.
3  If you know.
4  A. Well, again, I did not write it.
5  Provident would have been responsible for its
6  accuracy and we would have worked with them to,
7  to make sure that the summary was correct -- or
8  this information was correct.
9  Q. With respect to the information
10 contained in Defendant's Exhibit 1, did you
11 believe that KMK had to check information that
12 it obtained from Provident for accuracy?
13 A. It depends on what kind of
14 information you're talking about, but in
15 general I would say no.
16 Q. Okay. Was there a specific type
17 of information that you believed KMK would or
18 should check for accuracy?
19 A. Not necessarily. Remember,
20 Provident has a substantial in-house legal
21 department who was also involved in this
22 transaction, so if we were asked to follow up
23 on particular sections, particular agreements
24 or particular parts of a document, we would --
25 we would do so, but that wouldn't necessarily

**Page 137**

1  fall within our purview.
2  Q. Were you asked to do that in this
3  case?
4  A. My recollection is there were
5  parts of the transaction that we were asked not
6  to be involved in.
7  Q. What parts were they?
8  A. Well, for example, I don't recall
9  any involvement in seeking the approval of the
10 Federal Reserve Board for the approval of the
11 transaction, that I had certainly. And I don't
12 recall -- I don't recall supervising anybody
13 else in the firm on that -- on that topic.
14 Q. With respect to information that
15 came from OHSL and its counsel, what if any
16 responsibility do you believe KMK and Provident
17 had to check the veracity of the information?
18 MR. GILLIGAN: You have two
19 answers to two questions, Tim.
20 A. Yes. I don't think that it is our
21 responsibility to check the veracity.
22 MR. GILLIGAN: Now, is that KMK?
23 He asked you both Provident and KMK.
24 A. Well, the answer would be the same
25 in my opinion.

35 (Pages 134 to 137)

Page 138

```
1        Q.  Okay.  In order to perform your
2   work on the merger transaction, was it
3   necessary for you to have an opinion as to the
4   sophistication of OHSL's Board members?
5        A.  Repeat that question for me.
6            (Record read by Reporter.)
7            MR. BURKE:  Object to the form.
8   You may answer.
9        A.  No.
10       Q.  Was it necessary for you to have
11  an opinion with respect to Provident's Board
12  members?
13       A.  No.
14       Q.  Did the sophistication of OHSL's
15  Board members ever come up in discussions with
16  Cliff Roe?
17       A.  Not that I recall.
18       Q.  Of the approximately 250 hours you
19  spent on this merger transaction, approximately
20  how much time was spent talking --
21       A.  That's not what I said.
22           MR. BURKE:  That's exactly right.
23       Q.  Was it 200?
24           MR. BURKE:  No.
25           MR. GILLIGAN:  No.
```

Page 139

```
1        A.  I said it was less than 250.
2        Q.  Okay.  I said approximately 250, I
3   stand corrected.  How would you like me -- of
4   the total time that you billed on this merger
5   transaction, approximately how much was devoted
6   to conversations with Cliff Roe?
7            MR. BURKE:  Objection.  Calls for
8   speculation, foundation.  You may answer.
9            MR. GILLIGAN:  Do you want numbers
10  or percentages or --
11       Q.  Anything is fine.
12       A.  I -- I couldn't answer that
13  question fairly.  I -- I don't know.  I don't
14  know how you would even calculate such a --
15  such a percentage or number.
16       Q.  Would your billing -- I didn't
17  mean to interrupt.  Would your billing records
18  reflect that?
19       A.  I don't think so.
20       Q.  Do you remember generally what you
21  talked to Cliff Roe about?
22       A.  Yes.
23       Q.  Okay.  Can you give me categories
24  of what you talked to him about?
25       A.  My -- my main effort and most of
```

Page 140

```
1   my time on this transaction was spent in
2   negotiation of the definitive merger agreement.
3   And that would have involved Cliff Roe to a
4   very significant extent.
5            But I was not involved in the
6   preparation of the proxy statement and
7   prospectus and, in fact, had moved on to
8   another bank transaction very shortly after The
9   Merger Agreement was signed.
10       Q.  Which one was that?
11       A.  That was Provident's acquisition
12  of Fidelity Financial.
13       Q.  And that's disclosed here in the
14  proxy materials, correct?
15       A.  I don't recall.
16       Q.  Did Gary Kreider perform services
17  in the OHSL-Provident merger?
18       A.  Yes.
19       Q.  What did Mr. Kreider do?
20       A.  Well, Mr. Kreider served at that
21  time as the head of our securities department.
22  He was aware that this -- the work on this
23  transaction would be -- was going to be
24  delegated to Mark Weiss.  I think he was
25  probably copied on some of the documents.  What
```

Page 141

```
1   exactly he did in the preparation of the
2   documents, I do not recall --
3        Q.  Okay.
4        A.  -- if anything.
5        Q.  Okay.  Did David Rosenberg perform
6   services with respect to the OHSL-Provident
7   merger?
8        A.  Yes.
9        Q.  What did Mr. Rosenberg do?
10       A.  Well, at that time Mr. Rosenberg
11  was a primary contact and liaison between KMK
12  and the Provident Bank.  And he was somewhat
13  involved in the preparation of The Merger
14  Agreement and The Stock Option Agreement at the
15  beginning of the transaction.
16           And I know that because he and I
17  worked together on part of those documents.
18  But his role subsequent to the execution of the
19  definitive agreement, I -- I couldn't tell you.
20  I think it would have been very, very minimal,
21  but I -- I couldn't really speak to that.
22       Q.  In how many merger transactions
23  have you had a director resign days before the
24  definitive vote was taken?
25           MR. MAUNDRELL:  Objection.
```

36 (Pages 138 to 141)

**Page 142**

1    MR. BURKE: Objection. Assumes
2  facts not in evidence. Calls for speculation.
3  Relevance.
4    A.  Some, but I couldn't give you a
5  number.
6    Q.  Would you characterize such a
7  circumstance as being unusual?
8    MR. BURKE: Objection.
9    MR. MAUNDRELL: Objection. Asked
10  and answered also.
11    MR. BURKE: Absolutely.
12    A.  No, not necessarily. As I said
13  before, there are lots of reasons why people
14  can resign from a Board.
15    Q.  Can I direct your attention to
16  page 56, the section entitled Comparison of
17  Stockholder Rights?
18    A.  Yes. I've just looked through
19  page 62.
20    Q.  Okay. Was this section written by
21  KMK attorneys?
22    MR. BURKE: Objection, foundation.
23    A.  Again, this would have been a
24  collaborative effort.
25    Q  Who -- collaborative with

**Page 143**

1  Dinsmore; is that right?
2    A.  Collaborative with Dinsmore,
3  correct.
4    Q   And whose computer system did this
5  ultimately come off, if you know?
6    A.  I don't know.
7    Q   With respect to the majority of
8  this document, whose computer system did it
9  come off, if you know?
10    A.  I think I've said several times, I
11  do not know the answer to that question.
12    Q.  Were you involved in changes that
13  may have been made to this section?
14    A.  I don't recall.
15    Q.  Okay. Let me direct your
16  attention to page 63. Do you see that?
17    A.  Um-hmm, yes.
18    Q.  And can you explain the concept of
19  beneficial ownership of stock?
20    MR. GILLIGAN: As it's used in
21  this context on that page?
22    Q.  Yes, absolutely.
23    A.  All right. Well, beneficial
24  ownership is usually distinguished from legal
25  ownership. And an example of beneficial

**Page 144**

1  ownership would be if I hold securities as
2  agent for a third party or if I hold securities
3  in a trust capacity for a third party or as
4  custodian or guardian for a third party. So
5  it's a kind of indirect ownership concept.
6    Q.  Okay. And Mr. Hanauer appears to
7  be the largest OHSL shareholder; is that
8  correct?
9    MR. BURKE: Objection. Document
10  speaks for itself.
11    MR. GILLIGAN: As opposed to
12  beneficial owners? Are they supposed to be one
13  in the same?
14    A.  Let me read this.
15    MR. GILLIGAN: The question is as
16  to shareholders, and the legend indicates that
17  these percentages are beneficial ownership.
18  That's why I'm asking, are they supposed to be
19  the same?
20    A.  Okay. Do you want me to assume,
21  Mike, in answer this question, whether this
22  information is correct and complete?
23    Q.  Well, let's put it this way:
24  Judging by the table, Mr. Hanauer appears to be
25  the largest OHSL shareholder. Is that fair?

**Page 145**

1    MR. BURKE: Objection. Document
2  speaks for itself.
3    A.  I -- yes. I would agree, except
4  that there was also an option that was held by
5  Provident pursuant to the stock option
6  agreement, which if exercised would have made
7  Provident the largest single shareholder.
8    Q.  When was that option agreement
9  supposed to be exercised or contemplated to be
10  exercised?
11    A.  I would have to review the
12  document to refresh my recollection on that,
13  Mike. I don't remember the timing, but it was
14  a -- I just don't remember
15    Q.  Okay. How was the date July 31st,
16  1999, selected for this table?
17    MR. BURKE: Objection, foundation.
18  Calls for speculation.
19    A.  I don't know.
20    Q.  If the date had been July 30th,
21  which was the effective day of Mr. Herron's
22  resignation, would he have had to have been
23  included in this table?
24    MR. MAUNDRELL: Objection.
25    MR. BURKE: Objection. Calls for

37 (Pages 142 to 145)

**Page 146**

1 speculation.

2     A. I, I don't know.

3     Q. Do you know if Mr. Hanauer was the
4 only member of management who served on OHSL's
5 Board?

6     A. I do not recall that.

7     Q. Do you believe generally speaking
8 that in evaluating a proposed business
9 combination, shareholders and Wall Street
10 analysts often look to a member of management
11 who also serves on the company's Board for
12 information about a transaction?

13     MR. BURKE: Objection,
14 speculation.

15     MR. GILLIGAN: Objection. That's
16 a compound question. Would you separate it
17 out? You asked for two different sets of
18 groups of people.

19     A. I don't know exactly what you
20 mean. When you say like the phrase "looked
21 for" or "look to," what do you mean by that?

22     MR. GILLIGAN: Well, the -- I'm
23 objecting, Tim. He's asking for two different
24 people.

25     A. Right.

**Page 147**

1     MR. GILLIGAN: It's a compound
2 question.

3     A. Well, I also just don't understand
4 the question --

5     MR. GILLIGAN: Okay.

6     A. -- so I need help understanding
7 it

8     MR. GILLIGAN: All right.

9     Q. Do you believe that when Wall
10 Street analysts and shareholders evaluate a
11 proposed business combination --

12     MR. GILLIGAN: Object. Don't
13 answer the question. It's a compound question.
14 Shareholders are not the same. Are you asking
15 if the person is a Wall Street analyst and a
16 shareholder at the same time? Otherwise you're
17 asking two different sets of people.

18     MR. BRAUTIGAM: Lou, you're
19 interrupting me, really --

20     MR. GILLIGAN: I'm trying to save
21 you time, because I'm not going to let him
22 answer the question.

23     MR. BRAUTIGAM: Lou, there is a
24 procedure.

25     MR. GILLIGAN: There will get to

**Page 148**

1 be a point in time when we're going to walk
2 because of this conduct.

3     MR. MESH: Lou, you can do that at
4 any time.

5     MR. GILLIGAN: No kidding, Gene.
6 I appreciate that. I appreciate that.

7     MR. MESH: Since you've invited
8 comment, you can do that at any time you'd
9 like.

10     MR. BRAUTIGAM: Lou, the correct
11 procedure is for me to finish my question and
12 then you can state the word objection.

13     MR. GILLIGAN: Go ahead.

14     MR. BRAUTIGAM: Thank you.

15 BY MR. BRAUTIGAM:

16     Q. Do you believe that shareholders
17 often look to the CEO of a company for
18 information about a proposed business
19 transaction?

20     MR. MAUNDRELL: Objection. Form,
21 foundation, speculation.

22     MR. BURKE: Objection,
23 speculation.

24     A. Mike, I don't think there's really
25 a meaningful answer to that question, because

**Page 149**

1 people behave in lots of different ways and
2 they look to all kinds of different reasons for
3 advice and take into account all different
4 factors when they're considering a transaction.
5 And so the question really doesn't have a
6 categorical answer

7     Q. Do you believe that Wall Street
8 analysts typically look to the CEO,
9 particularly if he's a member of the company's
10 Board, for information with respect to a
11 proposed business combination?

12     MR. MAUNDRELL: Objection. Form,
13 foundation, speculation.

14     A. I would say no, because in the
15 context of a public company, analysts rely on
16 publicly filed information. They don't
17 generally look to the CEO for information
18 that's not otherwise publicly available.

19     Q. Do you believe that Wall Street
20 analysts typically look to the view of the
21 largest shareholder in a company in evaluating
22 a proposed business combination?

23     A. Again, you've used the phrase
24 "looked to" in at least three different
25 questions, and I just don't know what that

38 (Pages 146 to 149)

Page 150

1  means --
2     Q.  Well --
3     A.  -- when you say do they rely upon.
4     Q.  -- as one factor, perhaps among
5  many, in evaluating the total mix of
6  information as to whether or not they should
7  vote for or against a proposed business
8  combination?
9        MR. BURKE:  Objection.
10       MR. MAUNDRELL:  Object to form.
11  Foundation, speculation.
12       MR. BURKE:  Same objection.  Calls
13  for speculation.
14    A.  They might.  In this case I would
15  doubt it, frankly, because the CEO would not be
16  part of the ongoing enterprise, but -- but also
17  analysts wouldn't be concerned about this
18  anyway, but I -- I think your question is very
19  speculative.
20    Q.  You mentioned in your previous
21  answer that the CEO would not be part of the
22  ongoing enterprise.  What was the basis for
23  that part of your answer?
24    A.  Well, the CEO of the acquired
25  company had a relatively, you know, minor

Page 151

1  long-term role, if I recall correctly.  I think
2  this was maybe -- we can look at the document,
3  but I don't recall a significant role on an
4  ongoing basis, other than maybe a two or three
5  year employment agreement or something like
6  that.
7     Q.  When did --
8     A.  And I don't recall that.
9     Q.  When did you understand that the
10  CEO of OHSL would not be offered employment
11  with Provident Bank?
12    A.  Well, like I said, I do not have a
13  recollection on that.  I was really speaking
14  mainly of, you know, my experience in mergers
15  and acquisitions generally, where often the
16  target company executives do not have a
17  continuing role.
18       I do not remember the role that
19  Mr. Hanauer specifically played, you know,
20  after the transaction was completed, if that's
21  who -- are you referring to Mr. Hanauer?
22    Q.  Yes.
23    A.  Yes, I don't recall.
24    Q.  At the time of the shareholder
25  vote, October 25th, 1999, the shareholders

Page 152

1  would have had no way of knowing whether or not
2  Mr. Hanauer was going to continue on with the
3  acquiring entity; is that correct?
4        MR. MAUNDRELL:  Objection.  Form,
5  foundation, speculation.
6        MR. BURKE:  Same objection.  As to
7  what the shareholders of OHSL may or may not
8  have known?
9     A.  Yes, I don't -- I don't know.  I
10  don't recall.
11       MR. BRAUTIGAM:  Okay.  Let's take
12  a break for lunch.
13       (Recess for lunch.)
14  BY MR. BRAUTIGAM:
15    Q.  Good afternoon, Mr. Matthews.
16    A.  Good afternoon.
17    Q.  Mr. Matthews, did you have lunch
18  with Mr. Gilligan and Mr. Burke?
19    A.  Yes, I did.
20    Q.  Did you talk about the deposition?
21    A.  No.
22    Q.  Did you talk about the litigation?
23    A.  No.
24    Q.  Have you ever sought or received
25  legal advice from Mr. Burke?

Page 153

1     A.  No.
2     Q.  Does it strike you as unusual that
3  Mr Gilligan is representing you in this
4  litigation and Mr. Burke is representing other
5  entities?
6        MR. BURKE:  Objection to
7  relevance.
8     A.  No.
9     Q.  Why not?
10       MR. GILLIGAN:  What's this have to
11  do with taking a deposition?  Come on.  Get on
12  with the substance of the deposition, will you?
13  This is nonsense.  I've never seen such a bunch
14  of questions.
15       I've practiced law for 32 years in
16  this community.  I've practiced with every --
17  almost every lawyer around and I have never
18  seen such an exercise as this.  It's
19  ridiculous.  Just get on with the substance.
20       What's that have to do with the
21  substance of the case?  You've got a case, ask
22  him questions about the case.  Try to make your
23  case.  Your case has nothing to do with who's
24  lawyering who.  If you've got a personal
25  problem with somebody here, take it up with the

39 (Pages 150 to 153)

1 Bar Association and stop wasting our time.
2 Let's go.
3     MR. BRAUTIGAM: There's a question
4 pending.
5     THE WITNESS: What's the question?
6 (Record read by Reporter.)
7     MR. BURKE: Objection to form.
8   A. Within the context of why I'm
9 here, which I presume is as a witness in the
10 case, the Thiemann case, I have asked Lou to
11 serve as my lawyer as a witness, and I've not
12 asked Jim. And so the fact that Lou is here as
13 my lawyer and Jim is here in a different
14 capacity is perfectly natural, from my point of
15 view.
16   Q. Are you familiar with the ethical
17 rules and disciplinary rules with respect to
18 the dual role of a lawyer or law firm serving
19 as both witness and advocate in litigation?
20     MR. GILLIGAN: If you've got a
21 problem, take it up with the Bar Association.
22 In fact, I challenge you to do it. And stop
23 wasting time in the deposition. He's not here
24 to answer questions on that and I'll instruct
25 you not to answer. Now, get on with the

1 deposition or we're going to leave.
2     MR. BRAUTIGAM: What's the basis
3 for that instruction?
4     MR. GILLIGAN: Oh, I thought you
5 didn't want to ever hear the basis of the --
6 because it's got nothing to do with this
7 deposition. Nothing to do with the deposition.
8 He's not -- and you're asking him an expert
9 opinion question.
10     MR. BRAUTIGAM: It's an improper
11 instruction and you know it.
12     MR. GILLIGAN: Then take it up
13 with the Court. Take it up with the Bar
14 Association. Let's move on. Why don't you get
15 on to the merits of -- or the lack of merits of
16 your case. Deal with something substantive.
17 That's what we're here for.
18     MR. BRAUTIGAM: Are you done with
19 your speech, Lou?
20     MR. GILLIGAN: Yes.
21     MR. BRAUTIGAM: Well, if you need
22 more time, I want to give you a full
23 opportunity to make your record.
24     MR. GILLIGAN: You've heard it.
25     MR. BRAUTIGAM: Okay. Great.

1 BY MR. BRAUTIGAM:
2   Q. Are you familiar with the term
3 unanimous?
4   A. Sure.
5   Q. What do you understand that term
6 to mean?
7   A. In what context are you referring?
8 It can mean a lot of different things.
9   Q. In the context of voting.
10   A. Voting as in a shareholder vote?
11 A director vote?
12   Q. Either one.
13   A. A written consent document?
14   Q. Voting in general.
15   A. So you want me to --
16     MR. BURKE: Objection to form.
17   A. -- give you a treatise on what the
18 word means?
19   Q. Well, it doesn't have to be a
20 treatise, if you can answer the question,
21 that's all.
22   A. I think -- I think it can have
23 different meanings, but unanimous means, to me,
24 a vote without dissent.
25   Q. On the companies where you serve

1 as a director, if -- let's say five people are
2 present for the vote and no person votes
3 against the transaction, but some people
4 abstain. Is that recorded in the books and
5 minutes of those companies?
6     MR. MAUNDRELL: Objection.
7     MR. BURKE: Objection. Calls for
8 speculation. You may answer.
9   A. Mike, it depends. I mean, I've
10 been involved in the preparation of lots of
11 minutes and that could be reflected as a
12 unanimous vote. That could be reflected in a
13 role call format in a, in an entry. You can
14 have voice votes without necessarily taking
15 role, and that can be considered a unanimous
16 vote.
17     Within my church, for example,
18 when we admit a new member we take a voice
19 vote. And if everybody says yea, it's
20 considered -- and no one says nay, it's
21 considered unanimous, even though some people
22 may not voice a nay objection. So I don't know
23 what you mean. You have to give me a context
24 in which to evaluate this.
25   Q. Okay. Let's assume for the sake

Page 158

1  of this question that you have an OHSL director
2  and he's out of the country.
3      A. Um-hmm.
4      Q. He's not present at the meeting.
5      A. Right.
6      Q. Do you believe that his absence
7  from the meeting should be disclosed to the
8  shareholders?
9          MR. BURKE: Objection.
10         MR. MAUNDRELL: Objection.
11         MR. BURKE: Calls for speculation.
12     A. No.
13     Q. Why not?
14     A. I don't think it's material.
15     Q. Okay. And what factors did you
16 consider in coming to that conclusion?
17     A. Well, I assumed that there was a
18 quorum of the Board which did meet. You said
19 that only one director was, was missing or out
20 of the country, so I'm assuming that the
21 remaining directors are present in person and
22 prepared to vote. And, and so the fact that
23 one director happened to -- happens not to be
24 at a meeting is, is -- is not material.
25     Q. Okay. What if one director was

Page 159

1  not at the meeting and the chairman of the
2  Board did not vote on the transaction at all?
3  Would you consider that to be material?
4          MR. BURKE: Objection.
5          MR. MAUNDRELL: Objection.
6          MR. BURKE: Calls for speculation.
7  Assumes facts not in evidence, form. You may
8  answer.
9      A. Again, as I said, no, not
10 necessarily. I think that you would have to
11 look at all of the facts and circumstances to
12 evaluate the materiality of any of those
13 things. If that caused a quorum not to be
14 present, then that would be an important
15 consideration, because you wouldn't have a
16 valid vote.
17     Q. Okay.
18     A. But if I am to assume a quorum is
19 present and one person recuses himself for some
20 reason -- and there can be lots of reasons why
21 people recuse themselves from participating in
22 a vote -- I don't find that to be a problem or
23 an issue.
24     Q. Okay. Let's go back to the first
25 sentence of this paragraph on page one of

Page 160

1  Defendant's Exhibit 1.
2      A. Yes.
3      Q. Your Board of Directors
4  unanimously approved the acquisition and
5  believes that it is in the best interest of
6  OHSL stockholders. Do you think a fair reading
7  of that states that the chairman of the Board
8  of OHSL voted affirmatively in favor of the
9  merger with Provident?
10         MR. BURKE: Objection.
11         MR. MAUNDRELL: I'll join that.
12     A. I would not necessarily infer
13 that, because the chairman may or may not have
14 been present.
15     Q. Okay.
16     A. And I would have to -- and, and --
17 nor does this disclose whether the chairman was
18 present or voiced an objection. So I, I would
19 say I couldn't answer that question.
20     Q. Okay. Let me ask you to assume
21 for purposes of this question that the chairman
22 was present but simply did not vote. Didn't
23 vote yes, didn't vote no.
24     A. Um-hmm.
25     Q. Do you think that that sentence is

Page 161

1  still correct?
2          MR. MAUNDRELL: Objection.
3          MR. BURKE: Objection. Incomplete
4  hypothetical. Calls for speculation.
5          MR. GILLIGAN: Is this being asked
6  as an expert witness question? Are you asking
7  him as an expert? I mean, otherwise he's
8  speculating. Who cares what he thinks?
9          MR. BRAUTIGAM: Lou, we're doing
10 fine.
11         MR. GILLIGAN: Well, I'll instruct
12 you if you're not an expert in this and you
13 don't have enough of a foundation for an expert
14 opinion question, don't answer it --
15     A. Well, I don't want --
16         MR. GILLIGAN: -- because it seems
17 to me you're being held to the standard of an
18 expert witness, so I would approach the
19 question that way, Mr. Matthews.
20     A. Well, again it sounded like a
21 hypothetical to me and I'm not sure I
22 understand all of the elements of the
23 hypothetical.
24 BY MR. BRAUTIGAM:
25     Q. Okay. Well, I want you to

41 (Pages 158 to 161)

**Page 162**

1  understand everything about it.
2      A.  Okay.
3      Q.  Okay.  We have the OHSL Board,
4  August 2nd, 1999, they have a meeting, a quorum
5  is present, Cliff Roe is actually in the room
6  and a vote is taken.  And Mr. Brinker, the
7  chairman of OHSL's Board, simply does not vote.
8  Do you believe that that's a unanimous vote?
9      MR. BURKE:  Objection.
10      MR. MAUNDRELL:  Objection.  Form,
11  foundation.
12      MR. BURKE:  Incomplete
13  hypothetical.  How did everybody else vote?
14      MR. GILLIGAN:  And is that -- are
15  you asking for a legal opinion?
16      A.  And did everybody else vote in
17  favor of the transaction on that date?  Am I --
18      Q.  The people who were present -- the
19  OHSL directors who were present, except for Mr.
20  Brinker, did vote in favor of the transaction.
21      MR. MAUNDRELL:  Well, I'll object
22  to that.
23      A.  Did Mr. Brinker vote against the
24  transaction?
25      Q.  No

**Page 163**

1      A.  I would say that's a unanimous
2  vote.
3      Q.  Why would you say that?
4      A.  Because of --
5      MR. MAUNDRELL:  Now you're going
6  to argue with him?  You've asked him a
7  hypothetical question.  You make up the facts,
8  he answers your question.  And then after he
9  answers your question, you're going to argue
10  with him?
11      Q.  I'm not arguing with the witness.
12      A.  Because in your hypothetical, all
13  of the people who participated in the vote
14  voted in favor of the transaction and there was
15  no dissent.  So, therefore, it is a unanimous
16  vote and this is a correct statement.
17      Q.  Do you believe that the statement
18  in the context that I have given you is
19  somewhat misleading?
20      A.  No.
21      Q.  Do you believe that it's complete?
22      MR. MAUNDRELL:  Objection.
23      A.  Yes.
24      Q.  Do you believe that Mr. Brinker's
25  lack of an affirmative vote in favor should

**Page 164**

1  have been disclosed?
2      MR. MAUNDRELL:  Objection.
3      A.  No.
4      Q.  Do you believe that the absence of
5  Mr. McKernan from the meeting should have been
6  disclosed?
7      MR. MAUNDRELL:  Objection.
8      MR. BURKE:  Objection.  Asked and
9  answered.
10      A.  No.
11      Q.  Why not?
12      MR. BURKE:  Objection.  Asked and
13  answered.
14      A.  Because the only thing that does
15  matter is whether according to the articles of
16  incorporation and bylaws of the company, the
17  meeting was properly convened and a vote yea or
18  nay on the transaction as a whole was -- was
19  made.  That's -- whether a particular director
20  is absent from a meeting to me is not a
21  material -- a material item.
22      Q.  Is that still true when you talk
23  about Your Board of Directors, which I submit
24  implies the entire Board?
25      MR. MAUNDRELL:  Objection.

**Page 165**

1      MR. BURKE:  Whose Board?
2      MR. GILLIGAN:  Who is Your Board?
3      MR. MAUNDRELL:  Yes, and who does
4  it imply this to?
5      MR. BURKE:  Objection to form.
6      MR. BRAUTIGAM:  Your Board of
7  Directors refers to the OHSL Board.
8      MR. MAUNDRELL:  I object.
9      MR. BURKE:  Objection.  Is that a
10  question?
11      MR. BRAUTIGAM:  Yes.
12      MR. BURKE:  Objection to form.
13      MR. BRAUTIGAM:  There's a question
14  pending.
15      MR. BURKE:  Objection to form.
16      THE WITNESS:  Repeat the question
17  for me, please.
18      (Record read by Reporter.)
19      A.  Is what still true?
20      (Record read by Reporter.)
21      MR. BURKE:  Objection to form.
22      A.  Still true.
23  BY MR. BRAUTIGAM:
24      Q.  From a point of view of corporate
25  disclosure, would there have been anything

42 (Pages 162 to 165)

Page 166

1  wrong with the disclosure if it said on the
2  first page of Defendant's Exhibit 1, Your Board
3  of Directors voted in favor of the merger with
4  Provident Bank, but by the way, Mr. Herron
5  resigned, Mr. Hansuer changed his vote from
6  abstain to in favor of, Mr. McKeirnan was out
7  of the country, and Mr. Brinker didn't vote?
8          MR. BURKE: Objection to form.
9  Compound question.
10         A. Are you asking me to assume all of
11  those things, none of which I know to be true?
12         Q. Right. If those things were true,
13  would there be anything wrong from the point of
14  view of corporate disclosure in stating that in
15  the proxy materials?
16         MR. GILLIGAN: Again, is that an
17  expert opinion question?
18         MR. BURKE: But I will also note
19  for the record you have materially misstated
20  the facts of this case in that question. And I
21  would caution the witness upon relying upon or
22  assuming facts that are inaccurate and false.
23         MR. BRAUTIGAM: Hold on, I want to
24  address Mr Burke's objection.
25         (Record read by Reporter.)

Page 167

1          A. Okay. Mike, I'm not an expert in
2  corporate disclosure. And in the context of a
3  disclosure in a securities matter, which is
4  what this is, I would not be qualified to
5  answer that question.
6          So if you're asking me as a
7  layperson to -- you know, what my belief or
8  opinion about that is, I want to make sure that
9  it's clear that I'm not answering this as an
10  expert --
11         Q. Okay.
12         A. -- in disclosure.
13         Q. Okay.
14         A. Because your question -- the
15  lead-in phrase of your question was in the
16  context of corporate disclosure are -- with all
17  of these various assumptions, is this true.
18         Q. Okay.
19         A. I was answering the question in
20  the context of corporate governance and whether
21  there could be a proper vote of a Board that
22  would be in compliance with its articles and
23  bylaws. And those are two completely
24  different -- different questions.
25         Q. Okay. Can you answer it in the

Page 168

1  capacity that you feel comfortable with?
2          MR. BURKE: Objection to form.
3          MR. MAUNDRELL: Objection.
4          MR. BURKE: Answer what?
5          MR. BRAUTIGAM: Answer the
6  question.
7          MR. BURKE: The question was
8  phrased in terms of disclosure.
9          THE WITNESS: Are you -- are you
10  saying in the --
11         MR. BRAUTIGAM: If I --
12         THE WITNESS: Can there be a
13  proper vote of the Board of Directors with
14  those set -- with that set of facts for
15  purposes of making a recommendation to the
16  shareholders to approve the merger?
17         MR. BRAUTIGAM: No, that's not my
18  question.
19         THE WITNESS: Okay.
20  BY MR. BRAUTIGAM:
21         Q. My question is: Would there have
22  been anything wrong with including the
23  information that I gave you on the first page
24  or at any point in the proxy materials, meaning
25  Your Board of Directors approved the

Page 169

1  acquisition, but one director resigned, one
2  director was out of the country, the chairman
3  of the Board didn't vote, and the chief
4  executive officer changed his vote from a few
5  days earlier from abstain to in favor.
6          MR. BURKE: Objection.
7          MR. GILLIGAN: Excuse me. Now,
8  he's already testified he can't answer that as
9  an expert.
10         Q. I heard his -- what he said.
11         A. Mike, you're asking me again about
12  disclosure. I thought you were going to talk
13  about corporate governance.
14         Q. Well, I thought you said you could
15  answer the question as a layman or words to
16  that effect. So if you can do that, I
17  understand you claim not to be an expert in
18  corporate governance.
19         MR. BURKE: No, he doesn't claim
20  to be an expert in --
21         Q. Corporate disclosure, excuse me.
22         A. Your question was phrased in terms
23  of would that disclosure on this cover sheet be
24  proper. That's a disclosure question that I'm
25  not qualified to answer.

43 (Pages 166 to 169)

**Page 170**

1        MR. GILLIGAN:  That's the answer,
2   so let's move on.
3        Q.   Would Mark Weiss be qualified to
4   answer that?
5        MR. MAUNDRELL:  Objection.
6        MR. BURKE:  Objection.
7        MR. GILLIGAN:  He'll be here
8   tomorrow, go ahead and ask him that.
9        A.   Yes.
10       Q.   Mark Weiss would be qualified to
11  answer that question?
12       A.   Yes.
13       MR. MAUNDRELL:  Objection.
14       Q.   Are you familiar with the case
15  Basic, Inc. v. Levinson, United States Supreme
16  Court?
17       A.   No.
18       Q.   Are you familiar with the TSC
19  Industries, Inc. v. Northway Industries case?
20       A.   No.
21       Q.   Are you familiar with the Rubin v.
22  Schottenstein, Zox & Dunn case, Sixth Circuit?
23       A.   No.
24       Q.   Mr. Matthews, I hand you what has
25  previously been marked as Plaintiff's

**Page 171**

1   Deposition Exhibit 20.
2        A.   Okay.
3        Q.   Have you seen this document
4   before?
5        MR. GILLIGAN:  Can I ask you,
6   Mike, I'm -- I don't know anything about this,
7   but I look through here and I see big, huge
8   gaps in page numbers.
9        A.   Right.  I think I can explain
10  that.
11       MR. GILLIGAN:  Oh, okay, go ahead.
12       A.   Well, first of all, there's a
13  missing first page to this document.
14       Q.   Okay.
15       A.   The document -- this appears to be
16  a fax, according to the header, sent from our
17  office, starting with page two.  So I think
18  that the first page would probably elucidate
19  this.
20       Q.   Well, you're way ahead of me, so
21  let me just ask my questions in my slow, basic
22  best.  You've seen this document before,
23  correct?
24       A.   Well, can you tell me what day of
25  the week August the 2nd was?

**Page 172**

1        Q.   August the 2nd of 1999?
2        A.   Um-hmm.
3        Q.   I can't do it right now.  Maybe I
4   can do it at a break.
5        A.   Okay.  I do not -- I do not recall
6   seeing this document specifically.  As I said
7   here, I think that with some additional help, I
8   would be able to recall this though.
9        Q.   Okay.  Are you familiar with this
10  document?
11       MR. GILLIGAN:  He just --
12       MR. BURKE:  Objection.  Asked and
13  answered.
14       MR. GILLIGAN:  He just answered
15  that.
16       A.   I can certainly see what it is,
17  Mike.  And again, with a little help I might be
18  able to help you identify where it came from or
19  the circumstances under which it was -- it was
20  telecopied.
21       Q.   Okay.  Well, I'm not getting to
22  the circumstances under which it was telecopied
23  yet.  What is this document?
24       A.   Well, it appears to be an
25  incomplete fax, missing the cover sheet, with

**Page 173**

1   selected pages from The Merger Agreement and
2   The Stock Option Agreement showing changes that
3   were made to the two documents.
4        It would also appear that this was
5   very close to the conclusion of the process,
6   where -- where we were negotiating these two
7   documents.  And again, without some additional
8   information, I don't want to speculate as to
9   where it came from, but I --
10       Q.   Okay.  Well, do you see the fax
11  signature line on the first page and actually
12  on each and every page?
13       MR. MAUNDRELL:  On the first page,
14  no.  It says page two and the witness has
15  already said the first page is missing.
16       MR. BURKE:  Mike, this is not the
17  first page of the document.
18       MR. BRAUTIGAM:  This is what I
19  have.  This is the document, this is
20  Plaintiff's Exhibit 20.
21       THE WITNESS:  I just can't tell
22  you then.
23       MR. MAUNDRELL:  Are you going to
24  listen to what the witness said?
25       MR. BRAUTIGAM:  I listened to what

Page 174

1  the witness said, Mike. I don't have the first
2  page. This is Plaintiff's Exhibit 20. This is
3  the document. That's the universal document.
4  Maybe it exists, maybe it doesn't. This is
5  what I have.
6          MR. MAUNDRELL: Don't get me
7  involved in universal documents, it's not my
8  universal document.
9          MR. BRAUTIGAM: I didn't say
10  universal document.
11         MR. MAUNDRELL: You did.
12  BY MR. BRAUTIGAM:
13     Q. Anyway, does it appear to you that
14  this document was sent to you from someone at
15  KMK?
16     A. Based solely on the fact that it
17  has a telecopier on the head of the documents,
18  yes, but it is complete.
19     Q. Is this something that would have
20  been sent out on or about August 2nd, 1999?
21     A. Again, based solely upon the
22  header at the top of the page I would agree
23  with you, but I don't know where -- I don't
24  know whether that header is accurate or if --
25  or not. I mean, I couldn't tell you without

Page 175

1  some additional information.
2     Q. Do you recognize the fax --
3     A. I'm not trying to be evasive, I'm
4  just trying to help you.
5     Q. I understand. Do you recognize
6  the fax number at the top of the document?
7     A. I think that's one of our law firm
8  fax numbers, but I couldn't be -- I'm not sure.
9  I can -- again, I can tell you if you wanted me
10  to consult a telephone list.
11     Q. Does that appear to be the
12  outgoing fax or the incoming fax?
13     A. I think that's the outgoing fax.
14     Q. Okay. And this document does
15  relate to the OHSL-Provident merger, correct?
16         MR. BURKE: Objection. Asked and
17  answered. He already told you what it is.
18     A. Yes, it appears to relate.
19     Q. Was this document on the computers
20  or word processing system at KMK?
21     A. Well, again, first of all, it's
22  not one document. It's stapled together as if
23  it were one document, but, but it would appear
24  to be excerpts from two different documents on
25  our system.

Page 176

1     Q. Okay. And when the Keating firm
2  is involved in a merger, they don't write all
3  of the necessary documents from scratch in each
4  case, do they?
5         MR. BURKE: Objection. Calls for
6  speculation. Overbroad.
7     A. No, not necessarily. Sometimes we
8  do and sometimes we don't. Depends on what the
9  need is.
10     Q. Okay. You maintain templates of
11  sorts for use in various transactions; is that
12  fair?
13         MR. BURKE: Objection.
14     A. Yes.
15     Q. And did you have a template for
16  the OHSL-Provident merger where you could
17  borrow from previously created documents?
18         MR. BURKE: A template? Objection
19  to the -- I don't know what you mean by
20  template.
21         MR. BRAUTIGAM: Well, the witness
22  does, so that's what counts.
23         MR. BURKE: Objection to the
24  question as vague and ambiguous.
25     A. Well, taking the word template to

Page 177

1  mean were there prior examples of similar
2  documents that we could draw upon in the course
3  of drafting The Merger Agreement, yes, there
4  were examples. How much of this document is
5  comprised of previously prepared material
6  versus originally prepared material, I have no
7  recollection. Usually in a transaction of this
8  nature, there are extensive provisions that
9  have to be customized.
10     Q. So you take the template and you
11  go in and customize it to a particular
12  transaction. Is that right?
13         MR. BURKE: Objection.
14     A. Sometimes
15     Q. Is that what you did in this case?
16     A. I don't recall. I will sometimes
17  draft these from scratch.
18     Q. Do you recall drafting the merger
19  documents from scratch in this particular case?
20     A. I said I don't recall --
21     Q. Oh, okay.
22     A. -- one way or the other. When you
23  say merger documents, are you talking about the
24  agreement and plan of merger or are you talking
25  about all of the other documents that were

45 (Pages 174 to 177)

Page 178

1  incident to this?
2      Q. Everything combined.
3      MR. BURKE: Objection, overbroad.
4      A. Mike, I don't recall which were
5  originally drafted versus which came primarily
6  from templates.
7      Q. Are you familiar with the Unitog
8  transaction?
9      A. What do you mean by "familiar
10 with"? I'm aware of the fact that Cintas and
11 Unitog entered into an acquisition agreement
12 sometime I think in '98 or '99, four or five
13 years ago. But that -- I did not work on the
14 transaction and I'm not familiar with the
15 terms.
16     Q. Did Mr. Roe ever ask you to fax
17 essentially template documents or documents
18 that had been used before by KMK to him?
19     A. I don't recall.
20     Q. Let's take a look at what has
21 previously been marked as Plaintiff's Exhibit
22 8.
23     A. Okay. I just note for the record
24 that I can't really read the first page, if
25 there's anything on it.

Page 179

1      Q. Could you take a few moments and
2  review these pages to yourself, please?
3      A. All of them?
4      Q. I would suggest that you skim
5  through them and then I can direct your
6  attention to particular pages.
7      A. Okay. I've looked through the
8  stack.
9      Q. Okay. Can I direct your attention
10 to page 25 going by the Bates number, which is
11 the number in the lower right-hand corner?
12     A. Twenty-five or 25B?
13     Q. Twenty-five.
14     A. Okay
15     Q. Are you familiar with the
16 transaction known as United Bankshares?
17     A. No
18     Q. Did KMK ever work on a transaction
19 involving United Bankshares?
20     A. I don't know.
21     Q. Let me represent that I believe
22 these pages came from the files of Dinsmore.
23 Do you know how this document would have gotten
24 in Dinsmore's file?
25     MR. BURKE: Objection. Calls for

Page 180

1  speculation.
2      A. I do not know.
3      Q. Do you see that on Bates number
4  25, it appears that United Bankshares is
5  crossed out and OHSL is written in at various
6  times?
7      A. Yes.
8      Q. Do you recognize the handwriting
9  on this page?
10     A. I do not. I know it's not mine.
11     Q. Do you know if anyone at KMK sent
12 Cliff Roe merger documents that KMK had used
13 previously?
14     A. I do not know.
15     Q. Is Cliff Roe an expert in mergers
16 and acquisitions in your mind?
17     MR. MAUNDRELL: Objection.
18     MR. BURKE: Objection. Calls for
19 speculation. You may answer if you know.
20     A. I do not know.
21     Q. What was Mr. Roe's level of
22 familiarity with mergers and acquisitions, in
23 your opinion?
24     MR. MAUNDRELL: Objection to the
25 form and foundation.

Page 181

1      A. I had not dealt with Mr. Roe in a
2  prior transaction, so I was not familiar with
3  his level of expertise.
4      Q. Did you become familiar with his
5  level of expertise in working with him on this
6  transaction?
7      A. Only to a limited extent.
8      Q. Did you have a sufficient extent
9  to form an opinion with respect to Mr. Roe's
10 talents and abilities with respect to mergers
11 and acquisitions?
12     A. My -- yes.
13     Q. What was that opinion?
14     A. My opinion was that he was doing
15 his job competently.
16     Q. If Mr. Roe did not share with you
17 material information, would that opinion
18 change?
19     MR. MAUNDRELL: Objection.
20     MR. BURKE: Objection. Calls for
21 speculation. Assumes facts not in evidence.
22 You may answer.
23     A. Well, when you say "material
24 information," are you talking material
25 information about what? And material to whom?

46 (Pages 178 to 181)

Page 182

1    Q. Well, if Mr. Roe did not share
2  with you information about dissent within
3  OHSL's Board and within OHSL's management --
4        MR. MAUNDRELL: Objection.
5    Q. -- would you still consider him
6  competent?
7        MR. MAUNDRELL: Objection.
8  Misrepresentation, mischaracterization of
9  testimony and the facts.
10        MR. GILLIGAN: Are you asking this
11  as an expert opinion answer?
12        MR. BRAUTIGAM: I'm asking his
13  opinion as an attorney who worked on the
14  merger.
15        THE WITNESS: Did I --
16        MR. GILLIGAN: As an area of
17  expertise then. So go ahead if you have enough
18  to give an expert opinion. That's what he's
19  asking you.
20        MR. BRAUTIGAM: No, my questions
21  stand as I phrase them. I don't need your
22  help.
23        MR. GILLIGAN: Let me tell you
24  something that you apparently haven't discerned
25  yet. I have a job here, okay? I don't know

Page 183

1  about the merits of the case. I don't know
2  necessarily what is relevant and what's
3  irrelevant.
4        My objections don't go to that
5  unless it's obvious. But Tim is here to be
6  helpful. He's been helpful. He's answering
7  your questions, but he is not a litigator. If
8  you are asking a person an expert opinion
9  question, he is entitled to know that.
10        I'm a litigator. I can't discern
11  from your question, Mike, whether you're asking
12  an expert opinion question or not. You're not
13  asking him for facts he knows. You're asking
14  him for some type of an opinion. You've
15  established in the beginning of today that Tim
16  feels that he has certain areas of expertise as
17  a lawyer.
18        It is only fair for me to make a
19  legitimate inquiry as to whether you're asking
20  my client, this witness, an expert opinion
21  question based upon his expertise. You can't
22  possibly tell me there's anything wrong with my
23  making that inquiry.
24        MR. BRAUTIGAM: Are you done?
25        MR. GILLIGAN: That's it, but I

Page 184

1  started earlier this morning to make that clear
2  to you.
3        MR. BRAUTIGAM: Lou, we're doing
4  fine. We don't need your help. We don't need
5  your speaking objections.
6        MR. GILLIGAN: No, we're not doing
7  fine. You see, that's the problem, we're not
8  doing fine at all.
9        MR. BRAUTIGAM: You interrupted me
10  again. Lou, my questions are clear. The
11  witness can understand the questions and if he
12  doesn't, he can tell me.
13        MR. GILLIGAN: Well, let me make
14  something clear then. If you will not identify
15  in your question whether you're asking him the
16  question as an expert and asking for an expert
17  opinion, then I'm going to instruct him not to
18  answer, because that's the only recourse I have
19  left.
20        MR. BRAUTIGAM: Lou, my question
21  was clear. I'm happy to accommodate you.
22  BY MR. BRAUTIGAM:
23    Q. Mr. Matthews, my question goes to
24  your opinion as an attorney who worked on the
25  transaction. I'm not asking you for an expert

Page 185

1  opinion in this area or that area yet. I may,
2  just as an attorney who worked on the
3  transaction. Okay. Are you with me?
4    A. Yes. And I think, Mike, what I
5  haven't heard is enough information about the
6  circumstances that you're hypothesizing may
7  have occurred in order to provide you with an
8  answer to that question.
9    Q. Okay.
10    A. Because it assumes facts that I
11  don't have any knowledge about and other things
12  that I may or may not know about. So this -- I
13  can't answer that question.
14    Q. Okay. Fair enough. If Mr. Roe
15  knew that Mr. Hanauer were opposed to the
16  transaction but Mr. Roe did not share that with
17  you, would that change your opinion as to Mr.
18  Roe's competence?
19        MR. MAUNDRELL: Objection.
20        MR. BURKE: Objection. Assumes
21  facts not in evidence. Misstates the record.
22  Calls for speculation.
23        MR. MAUNDRELL: This witness is
24  not required to answer questions in which the
25  facts are basically false.

47 (Pages 182 to 185)

Page 186

1    MR. GILLIGAN: Mr. Matthews, if
2  you can -- if you have enough to answer it,
3  answer it. If you don't, just say you can't
4  answer it as proposed and let's move on.
5  That's the best I can suggest.
6    A. Right. I -- with only the
7  information contained in your question, Mike, I
8  don't think there's enough information, facts
9  and assumptions for me to answer that question.
10    Q. Fair enough. What other
11  information would you need in order to answer
12  the question?
13    MR. MAUNDRELL: You mean other
14  than true facts, actual facts? Other than
15  those, you mean? You know, rather than your
16  basic misrepresentations which you're so used
17  to doing? Other than those?
18    MR. MESH: Is there a necessity
19  for this --
20    MR. MAUNDRELL: Yes.
21    MR. MESH: -- constant harping,
22  Mike?
23    MR. MAUNDRELL: Yes, Gene, there
24  is.
25    MR. MESH: Why don't you take it

Page 187

1  to the Court? That's what you're good at.
2    MR. MAUNDRELL: True. Very true.
3  Why don't you?
4    MR. MESH: Why don't I?
5    MR. MAUNDRELL: Why don't you? I
6  know why you don't.
7    MR. MESH: Why should I?
8    MR. MAUNDRELL: I've made my
9  record, I'm very happy with it.
10    MR. MESH: You've been doing this
11  since this case began.
12    MR. MAUNDRELL: I will continue
13  when there is blatant misrepresentation of
14  facts, period.
15    MR. MESH: You should put it in
16  writing and put it before the Court or
17  Magistrate
18    MR. MAUNDRELL: I hope our
19  competent court reporter is taking down what
20  I'm saying so it is in writing.
21    MR. MESH: And you're going to act
22  on that, right?
23    MR. MAUNDRELL: At some point in
24  time with this Court or some other Court or
25  some other administrative body, true. That is

Page 188

1  true.
2    MR. MESH: Okay. In the meantime,
3  can we move through the deposition?
4    MR. MAUNDRELL: As long as I put
5  my objections on.
6    MR. MESH: And without criticism
7  and without harping?
8    MR. MAUNDRELL: I'm not coaching
9  anybody. I would suggest that you talk with
10  your fellow counsel and tell him that when he
11  asks questions, that the questions should have
12  some predicate of truth to them.
13    MR. MESH: And I think he's doing
14  just fine, Mike.
15    MR. MAUNDRELL: I know you do.
16  And I don't.
17    MR. MESH: We have a difference of
18  opinion.
19    MR. MAUNDRELL: That is very true.
20    MR. MESH: You have a right to act
21  on it.
22    MR. MAUNDRELL: Thank you, and I
23  have.
24  BY MR. BRAUTIGAM:
25    Q. Can we have the last question read

Page 189

1  back, please?
2    A. That's not necessary. The fact
3  that Mr. Roe might not have disclosed to me or
4  to our firm circumstances about Mr. Hanauer's
5  questions, whatever they might have been, about
6  the transaction or reservations about the
7  transaction would not necessarily have affected
8  my opinion at all of his competence. And I --
9  I stand on that without, without more.
10    Q. If Mr. Roe knew that Mr. Herron
11  resigned in part in protest of the
12  OHSL-Provident merger, would you have expected
13  him to share that information with you?
14    MR. BURKE: That is an absolute
15  mischaracterization of the record and assumes
16  facts not in evidence. And that's -- and is
17  directly contrary to Mr Herron's deposition
18  testimony in this matter. I object on that
19  basis.
20    MR. MAUNDRELL: I join in with
21  that.
22    A. No. I believe you told me that
23  Mr. Herron had resigned prior to the meeting at
24  which a vote was taken.
25    Q. Well, I believe Mr. Herron's final

48 (Pages 186 to 189)

Page 190

1 act as a director of OHSL was voting against
2 continued negotiations with Provident. And I
3 further understand that the terms of the
4 transaction did not change.
5    MR. BURKE: Objection. That's
6 not --
7    MR. MAUNDRELL: Now you're
8 arguing.
9    MR. GILLIGAN: Let's move on.
10   Q. Mr. Matthews, I hand you what has
11 been previously marked as Plaintiff's
12 Deposition Exhibit 46 and I ask you to take a
13 look at it. I suggest you skim through that
14 and look for the handwritten comments, as an
15 initial matter.
16   A. Okay. I've skimmed through it.
17   Q. Have you seen Plaintiff's Exhibit
18 46 before, the document with the handwriting?
19   A. No.
20   Q. Do you know whose handwriting that
21 is?
22   A. No.
23   Q. Let me represent to you that the
24 handwriting as it appears is Mr. Ken Hanauer's
25 handwriting. Were you aware that a document

Page 191

1 such as this with Mr. Hanauer's handwriting
2 existed?
3    A. No.
4    Q. I think it's fair to characterize
5 the handwriting as issues that Mr. Hanauer had
6 with the transaction and with the disclosure in
7 Defendant's Exhibit 1.
8    MR. BURKE: Michael, I challenge
9 you to find in Mr. Hanauer's deposition where
10 he said that. He said exactly the opposite.
11 You know that's not what he said. That's an
12 absolute misrepresentation, Gene.
13   MR. MAUNDRELL: Gene, this is
14 absolutely what I'm talking about.
15   MR. BRAUTIGAM: What do you
16 believe he said?
17   MR. BURKE: I'm not going to get
18 into a debate with you. But I'm telling you
19 that that is an absolute mischaracterization of
20 what he said. Find the portion of the
21 deposition where he said that or I'm not going
22 to allow the witness to answer that.
23   MR. BRAUTIGAM: Are you
24 representing the witness, Jim?
25   MR. BURKE: No, I'm not.

Page 192

1    MR. BRAUTIGAM: It sounded like
2 you are.
3    MR. BURKE: That's an absolute
4 mischaracterization.
5    MR. BRAUTIGAM: Jim, it's a little
6 confusing with all of the KMK lawyers in the
7 room.
8    MR. MAUNDRELL: What is confusing
9 is your blatant misrepresentations.
10   MR. BRAUTIGAM: Would you please
11 find the pending question?
12   (Record read by Reporter.)
13   MR. GILLIGAN: You can't answer
14 the question as posed anyway.
15   MR. BURKE: Absolutely false.
16   THE WITNESS: That's not a
17 question, is it?
18   MR. GILLIGAN: No, it's not. You
19 can't answer it like that.
20 BY MR. BRAUTIGAM:
21   Q. Let me represent to you that Mr.
22 Hanauer discussed with Mr. Roe most or all of
23 the comments that are handwritten on this
24 document. Would you have expected Mr. Roe to
25 share with you Mr. Hanauer's discussion with

Page 193

1 respect to the merger itself and the
2 transactional documents?
3    MR. MAUNDRELL: Objection.
4    MR. BURKE: Objection.
5    A. No.
6    Q. Why not?
7    A. Because that conversation would
8 presumably have been privileged and I would not
9 have been a party to it, nor would I have
10 expected Mr. Roe to share it with me.
11   Q. If it related to Mr. Hanauer
12 writing down material misrepresentation in the
13 proxy materials, would you have expected that
14 information to be shared with you?
15   MR. BURKE: Objection. Assumes
16 facts not in evidence. That's a direct
17 mischaracterization of Mr. Hanauer's testimony.
18   MR. MAUNDRELL: Ditto.
19   MR. BRAUTIGAM: I just want the
20 record to be clear that at page OHSL 03187, in
21 Mr. Hanauer's handwriting it says, misstatement
22 of material fact.
23   MR. BURKE: Do you know where this
24 came from, Mr. Brautigam? Because I will tell
25 you, and I'm now looking at exactly where it

49 (Pages 190 to 193)

**Page 194**

1 came from from Mr. Hanauer's deposition.
2       MR. BRAUTIGAM: Jim, don't point
3 your finger at me.
4       MR. BURKE: You are
5 misrepresenting that that came from Mr. Hanauer
6 and you know it didn't.
7       MR. MAUNDRELL: You absolutely
8 know it didn't.
9       MR. BRAUTIGAM: I am representing
10 that Mr. Hanauer wrote that down.
11       MR. BURKE: And you know he's not
12 the source of it.
13       MR. BRAUTIGAM: I am representing
14 that Mr. Hanauer wrote it down and that he
15 discussed it with Mr. Roe. That's what I'm
16 representing.
17       MR. BURKE: Okay.
18       MR. BRAUTIGAM: That's the extent
19 of my representation, for the record.
20       MR. BURKE: Okay.
21       MR. BRAUTIGAM: Mr. Hanauer wrote
22 it down, Mr. Hanauer discussed it with Mr. Roe.
23 That's the extent of my representation.
24       MR. BURKE: Okay. And you know
25 that that was not from Mr. Hanauer, nor were

**Page 195**

1 they his thoughts. They were someone else's
2 thoughts, correct?
3       MR. MAUNDRELL: And that's a fact.
4       MR. BRAUTIGAM: I don't agree with
5 that entirely. Anyway, can I have my question
6 read back, please?
7       (Record read by Reporter.)
8       MR. BURKE: Same objection,
9 mischaracterizes the facts.
10       MR. MAUNDRELL: Ditto.
11       A. Not necessarily.
12 BY MR. BRAUTIGAM:
13       Q. If you had known this document
14 existed, would you have wanted to discuss it
15 with someone?
16       MR. MAUNDRELL: Objection.
17       MR. BURKE: Objection.
18       A. No, not necessarily. Again, you
19 told me that this is a document that was
20 communicated to Mr. Roe by his client or by a
21 representative of his client. And I would not
22 have expected these matters to have been
23 discussed or disclosed to me.
24       I would have expected that Mr.
25 Roe, in consultation with other members of the

**Page 196**

1 Board or other officers of OHSL, as well as
2 other members of his law firm, to have
3 evaluated these various comments and disposed
4 of them accordingly.
5       Q. If Mr. Roe became aware of the
6 material misrepresentation in the proxy
7 materials, would you have expected him to share
8 that with you in some fashion?
9       MR. MAUNDRELL: Objection. Calls
10 for speculation and a legal conclusion.
11       A. Prior to the vote of the
12 shareholders?
13       Q. Yes.
14       A. Prior to the finalization of the
15 proxy or after it?
16       Q. At any point up to and including
17 December 3rd, 1999.
18       MR. MAUNDRELL: Objection.
19       A. And in his opinion, are you
20 talking about if Mr. Roe had reached a
21 conclusion that there was a material
22 misrepresentation in the proxy?
23       Q. Yes.
24       A. I would think that he would share
25 that with us.

**Page 197**

1       Q. Are you aware that a federal Judge
2 has reached the conclusion that there may be
3 material misstatements in the proxy materials
4 and registration statement?
5       MR. BURKE: That's not --
6       A. I'm not aware of what any Judge
7 may have concluded in this case.
8       MR. MAUNDRELL: That is a false
9 statement totally.
10       MR. GILLIGAN: He's answered
11 anyway.
12       MR. BRAUTIGAM: Let's take a short
13 break.
14       (Brief recess.)
15 BY MR. BRAUTIGAM:
16       Q. Okay. Let's take a look at what
17 has been previously marked as Plaintiff's
18 Exhibit 28. It's hard to read, but it is 28.
19       A. Do you want me to read this?
20       Q. Why don't you take a look at it
21 and I can direct your attention to certain
22 paragraphs.
23       A. Okay. Which paragraphs?
24       Q. Well, why don't you read it
25 yourself, starting on page 17.

Page 198

1    MR. BURKE: Objection, foundation.
2  Document speaks for itself. While he's reading
3  that, Mike, I will note for the record that
4  starting at page 153, about line 13 or 14 of
5  Mr. Hanauer's deposition, proceeding through
6  page 165 or 166 is a detailed discussion of the
7  source of those comments and makes it very
8  clear that some of the questions that you
9  previously posed mischaracterized the record as
10  far as Mr. Forrester being the source of those
11  comments and Mr. Hanauer's opinion of them. So
12  I'll just note that for the record that that's
13  where you can find the correct testimony.
14    MR. BRAUTIGAM: Well, thank you
15  for sharing. I do not believe that I
16  misrepresented the record. I did not intend to
17  misrepresent the record. It's a thousand pages
18  of Hanauer's deposition and I believe that I
19  stated clearly that Mr. Hanauer wrote down
20  these comments, which is correct. And Mr.
21  Hanauer discussed the majority, if not each and
22  every one, with Mr. Roe. That was my
23  representation and I believe it is correct.
24    MR. MESH: Is there a question
25  pending?

Page 199

1    MR. BRAUTIGAM: No, he's reading.
2    MR. BURKE: He's reading the
3  12(B)(6) decision.
4    MR. MESH: All right, excuse me.
5    THE WITNESS: Okay. I've skimmed
6  up to page 24, which is the next section.
7    MR. BRAUTIGAM: Okay.
8    THE WITNESS: Do you want me to
9  read beyond that?
10    MR. BRAUTIGAM: No.
11  BY MR. BRAUTIGAM:
12    Q. Can I direct your attention to
13  page 20? Toward the bottom of the page,
14  there's a section three, Unanimity of OHSL's
15  Board. There's a sentence that begins in the
16  extreme right, Therefore, the Court finds at
17  least at the pleading stage that a reasonable
18  shareholder might find dissent among the Board
19  of Directors important to the mix of
20  information available.
21    Now, do you agree with that part
22  of the sentence, that a reasonable shareholder
23  might find dissent among the Board of Directors
24  important to the mix of information available?
25    MR. BURKE: Objection. Calls for

Page 200

1  speculation on a document he's never seen
2  before. No foundation.
3    MR. MAUNDRELL: In addition, this
4  has been asked and answered at least three
5  times by this particular witness in perhaps
6  different phraseology, but the exact same
7  point.
8    MR. GILLIGAN: Well, it's --
9  you're basically putting him in a position of
10  rendering an expert opinion and testimony that
11  is contrary to a holding of the Judge in this
12  case. That's what you're asking him to do.
13    I don't think that's appropriate.
14  Why put this man in that position? I mean,
15  you're giving him a decision by the Judge,
16  which is the law of this case, and asking him
17  to disagree with the Judge or agree with the
18  Judge? That's totally unfair. That's
19  improper. I instruct him not to answer.
20    MR. BRAUTIGAM: And what's the
21  basis of the instruction?
22    MR. GILLIGAN: I just gave it to
23  you.
24    MR. BRAUTIGAM: It's unfair and
25  improper?

Page 201

1    MR. GILLIGAN: Yes.
2    MR. BRAUTIGAM: That's not an
3  appropriate basis.
4    MR. GILLIGAN: Great. Take it to
5  the Bar Association and take it to the Judge.
6  I've asked you to do that, please do. And
7  don't you ever, ever again accuse me of
8  unethical conduct and don't make an ad hominem
9  comment about me when I ask to see a document,
10  that I haven't prepared for the deposition. No
11  one in 32 years has ever accused me of any of
12  those things. Nobody has done that, and I'll
13  tell you that right now.
14    MR. MESH: Both sides.
15    MR. GILLIGAN: You, Mr. Mesh, know
16  that. And that's nonsense, so you either get
17  this guy straightened out or I will walk out of
18  here. Don't you make any ad hominem remarks
19  about --
20    MR. MESH: Lou, we've had a few
21  from you.
22    MR. GILLIGAN: I don't care, Gene,
23  this is me. This is a personal attack and
24  remarks about me.
25    MR. MESH: This whole case has

Page 202

1 been full of that. It should be out.
2          MR. GILLIGAN: You hear what I
3 have to say.
4          MR. BURKE: I second that, Gene.
5          MR. MESH: And I personally
6 apologize to you for anything that would
7 resemble an aspersion on you, because I know
8 the --
9          MR. GILLIGAN: Did you hear the
10 comment he made when you walked out of the
11 room?
12          MR. MESH: No, I did not hear it.
13          MR. GILLIGAN: Well, that's what
14 he made the comment on, so I have instructed
15 him not to answer. Let's move on.
16          MR. BRAUTIGAM: I want the record
17 to reflect that you're yelling, screaming and
18 pounding on the table.
19          MR. GILLIGAN: I did. I banged my
20 hand on the table and raised my voice,
21 absolutely.
22          MR. BRAUTIGAM: And you pointed
23 your finger at me.
24          MR. GILLIGAN: Yes, I did. And I
25 told you not to do that.

Page 203

1          MR. BRAUTIGAM: I want the record
2 to be clear that I did not make any personal
3 attacks on you in any way.
4          MR. MAUNDRELL: That's a lie.
5          MR. BURKE: That's not true. You
6 were off the record, but that is not true.
7          MR. BRAUTIGAM: I disagree with
8 your comments, Mr. Burke, but are not surprised
9 that you agree with your partner.
10          MR. BURKE: Let's move on, please,
11 Mr. Brautigam.
12 BY MR. BRAUTIGAM:
13      Q. Mr. Matthews, if I continue to ask
14 questions on this order, are you going to
15 continue to answer them?
16          MR. BURKE: Objection to form. I
17 don't know what you're talking about.
18      A. If I'm instructed on a particular
19 question not to answer it, I will follow the
20 advice of my question.
21          MR. BRAUTIGAM: Mr. Gilligan, if I
22 continue to ask questions with respect to this
23 order, are you going to instruct him not to
24 answer those questions?
25          MR. GILLIGAN: You ask the

Page 204

1 questions and I'll take them as they come. If
2 you do it on the same basis that you just did,
3 I'll instruct him not to answer.
4          MR. BRAUTIGAM: Well, can we skip
5 this meaningless exercise then and move on to
6 another document?
7          MR. GILLIGAN: Do whatever you
8 want.
9 BY MR. BRAUTIGAM:
10      Q. Put that document away. I'm
11 handing you what has been previously marked as
12 Plaintiff's Exhibit 42 and I ask you to take a
13 look at it.
14      A. Okay. I've briefly paged through
15 it.
16      Q. Have you seen this document
17 before?
18      A. Yes.
19      Q. Are you familiar with it?
20      A. At the present time I am not.
21      Q. Do you recognize it?
22      A. Yes.
23      Q. What is Plaintiff's Exhibit 42?
24      A. It looks like an interim
25 distribution of the form S-4 while it was in

Page 205

1 the drafting stage.
2      Q. What is a form S-4?
3      A. It's a type of registration
4 statement.
5      Q. And what is being registered?
6      A. Provident securities.
7      Q. And were these the Provident
8 securities --
9      A. PFGI securities, actually.
10      Q. And were these the PFGI securities
11 that were used to compensate the OHSL
12 shareholders for their stock if the merger were
13 approved?
14      A. Yes.
15      Q. There's a distribution list on the
16 second and third page. Do you see that?
17      A. Yes.
18      Q. What is the purpose of this
19 distribution list?
20      A. To put the document in the hands
21 of people that would have an interest or need
22 to review it.
23      Q. Was it understood that the people
24 on the distribution list would review the
25 documents that were attached?

Page 206

1    A.  In, in pertinent part, yes.
2    Q.  Okay.  What was Mr. Carey's role
3  with respect to the merger transaction in
4  general?
5    A.  Mr. Carey was the executive vice
6  president and chief financial officer of
7  Provident Bank and would have been familiar
8  with, you know, certain of the information that
9  was provided in the document, including the
10  financial information.
11    Q.  What was Mr. Magee's role in this
12  document?
13    A.  Mr. Magee was at that time, I
14  believe, the senior counsel in-house for the
15  Provident Bank, general counsel.  And he is the
16  -- he is the individual who engaged us to
17  assist with the transaction in the first
18  instance.
19    Q.  What was Mr. Farrenkopf's role in
20  the transaction?
21    A.  John Farrenkopf participated in
22  various aspects of the transaction, including a
23  number of the due diligence responsibilities
24  for the bank.
25    Q.  What is due diligence?

Page 207

1    A.  Due diligence is a process by
2  means of which a party to a transaction learns
3  information that, you know, that is relevant to
4  the way the transaction may be structured or
5  concluded.
6    Q.  Did KMK undertake due diligence in
7  this case?
8    MR. BURKE:  Objection.  Vague,
9  ambiguous, overbroad.
10    A.  Some.
11    Q.  What due diligence did KMK
12  perform?
13    A.  KMK would have, or did examine the
14  structure of the target company, which was a
15  parent subsidiary company, so as to become
16  informed as to how to structure the transaction
17  in a way that would, would hopefully comply
18  with Section 368 of the Internal Revenue Code
19  and make the transaction a tax-free
20  reorganization.
21    In addition, KMK would have been
22  involved in -- or was involved in the process
23  of, you know, negotiating and discussing issues
24  with counsel to OHSL that would have been, you
25  know, important issues to confirm about the

Page 208

1  company prior to consummating a merger.
2    KMK also looked at the good
3  standing of the respective organizations of the
4  companies -- there are, I think, three or four,
5  I don't recall exactly how many, different
6  corporate enterprises that were involved in the
7  transaction.  I know there was a parent, a
8  subsidiary, and at least one other company.
9    I don't remember if there were
10  more than three, but we would have examined
11  state records to determine whether those
12  companies were in good standing so that our
13  merger could be effectuated properly.
14    We would have made inquiries to
15  counsel for OHSL regarding the matters required
16  for disclosure in the proxy statement and
17  prospectus, although I was not personally
18  involved in that process, but those are some of
19  the kinds of things that we would have done as
20  part of our diligence.
21    Q.  I notice that there is a provision
22  in The Merger Agreement for an exchange of
23  information between OHSL and Provident.  Does
24  that sound familiar to you?
25    A.  Yes.

Page 209

1    Q.  And does it specifically call for
2  access to the Board minutes of the respective
3  companies?
4    A.  I don't recall.  It might have,
5  but I don't recall.
6    Q.  Is this common to find in such
7  merger agreements?
8    MR. BURKE:  Objection.  Asked and
9  answered.
10    A.  Common, yes.
11    Q.  Why is it common to find in merger
12  agreements?
13    MR. BURKE:  I'm sorry, can you
14  read that back, please?
15    (Record read by Reporter.)
16    MR. BURKE:  Objection.  You may
17  answer it.
18    A.  Well, there's almost always in an
19  acquisition agreement a provision that permits
20  an acquiring company to have access to
21  information about the other company on a wide
22  range of topics.  And depending on the nature
23  of the transaction, there may be deeper or not
24  quite as deep inquiries into a whole, large
25  number of areas, such as, you know, how the

Page 210

1  employee benefits are structured, whether
2  there's outstanding litigation.
3       There may -- there may be -- an
4  acquirer might want to physically inspect
5  assets of the company if the physical assets
6  are important. They might want to read the
7  contracts relating to the company. There are a
8  number of things. And so generally speaking,
9  you would have a provision in an acquisition
10 document that would permit an acquirer to have
11 access to the target company's books, records,
12 physical assets, plants, facilities, contracts,
13 corporate records, and things of that nature.
14     Q. Did this merger close with
15 litigation pending against Provident?
16     A. I don't know.
17     Q. Is it common to close a merger
18 with litigation pending?
19     A. It happens. I, I -- I would say
20 it's not common.
21     Q. Have you ever done it at any point
22 in your career other than this case?
23         MR. BURKE: Objection, overbroad.
24 Calls for speculation. Assumes facts not in
25 evidence. You may answer.

Page 211

1      A. Yes.
2      Q. Approximately how many times?
3      A. Probably four or five.
4      Q. In this particular case, were
5  there ever any discussions as to whether or not
6  this transaction should close with litigation
7  pending?
8          MR. BURKE: Objection to the
9  extent it calls for attorney-client privileged
10 information.
11     A. Now, what kind of -- let me back
12 up. What kind of litigation pending are we
13 talking about here? Because there are many
14 transactions closed with the target company
15 being involved in some litigation. I took your
16 question to mean that we're talking about
17 litigation concerning the transaction itself.
18     Q. Yes. That's correct.
19     A. And that's the context in which I
20 answered it. But there are many situations in
21 which you have litigation pending against one
22 or both of the companies and you close. And I
23 would say that's extremely common.
24     Q. Well, I'm not talking about a slip
25 and fall case or a car accident type case. I'm

Page 212

1  talking about litigation against the merger
2  transaction itself.
3      A. I would say that's relatively
4  uncommon, but it does happen.
5      Q. Okay. Did you discuss with anyone
6  whether or not the merger should close with
7  litigation pending in this case?
8          MR. BURKE: Objection.
9          MR. GILLIGAN: If as an attorney
10 in dealing with your clients on attorney-client
11 privilege, then don't disclose the answer --
12 don't answer the question.
13     A. I did not. I had no such
14 discussions.
15     Q. What was Mr Richard Hanebutt's
16 role in this transaction?
17     A. Mr. Who?
18     Q. Hanebutt, lower left.
19     A. I don't recall.
20     Q. What was Mr. Robert Litzinger's
21 role in this transaction?
22     A. I don't remember.
23     Q. What was Tony Stollings' role in
24 this transaction?
25     A. Tony is in the finance department

Page 213

1  of the bank. And he reviewed some of the
2  financial information, both being provided by
3  Provident as well as OHSL Financial
4  information.
5      Q. What was Ken Hanauer's role in the
6  transaction?
7          MR. BURKE: Objection. Calls for
8  speculation. You may answer.
9      A. I didn't have any direct contact
10 with Mr. Hanauer.
11     Q. Do you have an understanding of
12 what the CEO of the target company's role is in
13 effectuating the merger?
14         MR. BURKE: Objection. Calls for
15 speculation. Relevance.
16     A. You mean as a general matter?
17     Q. Yes.
18     A. Not in this specific instance?
19     Q. Yes.
20     A. Yes.
21     Q. Okay. What is your understanding
22 of that role as a general matter?
23     A. Well, I've -- like other executive
24 officers in the transaction, if the Board of
25 Directors has undertaken to engage in a

Page 214

1 transaction, the officers would be there to
2 serve to facilitate the transaction. And they
3 would be -- have a responsibility to the
4 company to, to comply with the directions of
5 the Board of Directors and to cooperate as the
6 contract requires for the exchange of
7 information. And there may be other roles,
8 too, but those are some of the roles.
9       Q.   Did you ever learn from any source
10 that Mr. Hanauer was not fully cooperating in
11 effectuating the merger?
12      A.   No.
13      Q.   If Mr. Hanauer did not believe
14 that this transaction was in the best interest
15 of OHSL shareholders, do you believe that he
16 had an obligation to tell someone about his
17 position?
18      MR. BURKE:  Objection.  Asked and
19 answered at least half a dozen times.
20      MR. MAUNDRELL:  Objection.
21      MR. BURKE:  Calls for speculation.
22      A.   I can't speak as to his legal
23 obligations.  That would be something that
24 maybe someone more familiar with his
25 circumstances could tell you.

Page 215

1       Q.   What was the role of McDonald
2 Investments in this transaction?
3       A.   That was the investment banking
4 firm hired by OHSL to represent them in
5 connection with the transaction to solicit
6 interest in OHSL and to render a fairness
7 opinion in connection with the transaction.
8       Q.   And soliciting interest is
9 sometimes known as shopping a company?
10      A.   Yes.
11      Q.   And what was Mr. Crowley's
12 particular role in effectuating the merger?
13      A.   Beyond what I've already said?
14      Q.   Well, you talked about McDonald
15 Investment's role.  Did he have a particular
16 role within the rubric of McDonald's?
17      A.   I don't really know what his, if
18 he -- I don't -- if your question is, did he
19 have distinct responsibilities within McDonald
20 that were different from, from Jeff Moritz?
21      Q.   Right.
22      A.   I don't know.
23      Q.   Okay.  Did you negotiate
24 personally with Mr. Crowley?
25      A.   No.

Page 216

1       Q.   Did you negotiate personally with
2 Mr. Moritz?
3       A.   No.
4       Q.   You did testify that you
5 negotiated with Cliff Roe, correct?
6       A.   Yes.
7       Q.   And do you know who Cliff Roe
8 represented?
9       A.   Yes.
10      Q.   Who did he represent?
11      A.   I understood him to represent OHS
12 Financial.
13      Q.   OHSL?
14      A.   Or OHSL Financial, right.
15      Q.   That's the parent company; is that
16 correct?
17      A.   Right.
18      Q.   And did Mr. Roe represent the
19 directors of OHSL?
20      MR. BURKE:  Objection.  Calls for
21 speculation.
22      A.   I did not under -- I did not
23 understand him to represent the directors, no.
24      Q.   Did anyone represent the directors
25 of OHSL in this merger, as far as you know?

Page 217

1       MR. BURKE:  Objection.  Calls for
2 speculation.  Assumes facts not in evidence,
3 foundation.
4       A.   I do not recall.
5       Q.   What was Mr. Hertlein's role in
6 this merger?
7       A.   My understanding was that he was
8 involved on the -- in some of the securities
9 laws aspects of the transaction as distinct
10 from The Merger Agreement itself.
11      Q.   When you say "some of the
12 securities laws," which ones are you referring
13 to?
14      A.   Well, just as -- just as when the
15 acquisition document was completed and signed,
16 I stepped aside from the transaction and Mark
17 Weiss and others in our securities department
18 worked on it, it was my impression that Cliff
19 Roe had similarly delegated to Mr. Hertlein
20 responsibility for handling some of the
21 securities aspects of the transaction.
22      Q.   So would it be fair to say that
23 you were involved more heavily before August
24 2nd, 1999, and then you handed off the
25 finalization of the merger to Mark Weiss in

55 (Pages 214 to 217)

**Page 218**

1   large part?
2       A.   No. I don't think that's exactly
3   correct, but the degree of my involvement did
4   change dramatically after Mark became involved,
5   because the preparation of the proxy statement
6   and prospectus was a matter within his
7   expertise and not mine. And so from the
8   standpoint of that particular part or phase of
9   the transaction, he was more heavily involved,
10  much more so than I.
11      Q.   Did Mark Weiss work with Cliff Roe
12  or Charles Hertlein extensively in the
13  preparation of the proxy materials?
14          MR. MAUNDRELL: Objection. Form,
15  foundation.
16      A.   Yes.
17      Q.   Was he the person with the overall
18  responsibility -- he meaning Mark Weiss -- for
19  finalizing the proxy materials and registration
20  statement?
21          MR. BURKE: Objection. Calls for
22  speculation. He'll be here tomorrow.
23      A.   No. I think that it was a
24  collaborative effort. I believe I've testified
25  to that previously, that this was an effort

**Page 219**

1   that required cooperation on the part of both
2   of the law firms involved, as well as the
3   principals themselves, the knowledgeable
4   officers and directors.
5       Q.   Was a committee ever formed to
6   effectuate the merger?
7           MR. BURKE: Committee?
8       A.   A committee of whom? By whom?
9       Q.   Of anyone involved with the
10  merger, for example, KMK attorneys, Dinsmore
11  attorneys, Provident people.
12          MR. BURKE: A committee?
13      Q.   Yes.
14          MR. BURKE: Objection to form. I
15  have no idea what that means.
16      A.   Yes. I don't know really what you
17  mean, either. I -- not to my knowledge, but
18  there could have been.
19      Q.   Okay. What was Mr. Kreider's role
20  with respect to this merger?
21      A.   Minimal. He was the -- as, again,
22  I've testified previously, he was the head of
23  the securities department.
24      Q.   Right.
25      A.   And so as a -- in an oversight

**Page 220**

1   capacity, he was there to consult with if
2   questions came up.
3       Q.   Okay. I think I've asked you
4   about the remaining KMK attorneys. Could I
5   direct your attention to page 48 of the
6   document, please, where it says the number of
7   directors?
8       A.   Right. Part of mine is obscured
9   with a black mark.
10      Q.   Right. Well, the part that I'm
11  interested in is below that.
12      A.   Okay.
13      Q.   The last sentence of the second
14  paragraph in that section says, The OHSL Board
15  of Directors has set the current number of
16  directors at eight.
17      A.   Um-hmm.
18      Q.   Does that mean that the bylaws of
19  the OHSL provided for eight directors at that
20  time?
21          MR. BURKE: Objection, foundation.
22          MR. MAUNDRELL: Objection,
23  foundation. Document speaks for itself as
24  well.
25          MR. BURKE: It also calls for

**Page 221**

1   speculation on the part of this witness. He's
2   already testified to his role in this matter.
3       A.   No, it does not mean that.
4       Q.   Does that mean that there are
5   eight directors -- eight OHSL directors at this
6   time?
7       A.   No.
8           MR. MAUNDRELL: Objection.
9       Q.   What does it mean?
10      A.   It means that, you know, one or
11  more of the charter documents of the company,
12  that is OHSL, permit the -- well, actually it
13  says in the first sentence, certificate of
14  incorporation. It says that the Board of
15  Directors has the ability from time to time to
16  determine how many directors there should be.
17  And, therefore, the Board has the ability to
18  change that.
19          I don't know what further
20  limitations there might have been. That would
21  be speculation on my part, but sometimes there
22  are minimums and maximums, but the certificate
23  of incorporation permits the Board to set by
24  resolution the number of directors.
25          And the fact that the Board has

56 (Pages 218 to 221)

**Page 222**

1  set the number of directors at eight does not
2  mean that there are necessarily eight serving
3  actively at a given time, because you can
4  always have vacancies.
5      Q.  If there's a vacancy on the Board,
6  do you believe it should be disclosed to the
7  OHSL shareholders?
8      MR. MAUNDRELL:  Objection.  Asked
9  and answered.
10     A.  No.
11     Q.  Okay.  You can put that document
12 to the side for a moment.  Let's take a look at
13 what has previously been marked as Plaintiff's
14 Exhibit 16.
15     A.  Mine is stapled on both ends so I
16 can't open it.  Okay.  I've paged through it.
17     Q.  Okay.  Mr. Matthews, I think it's
18 fair to say that Plaintiff's Exhibit 42
19 provides a draft of some merger related
20 documents and calls for comments --
21     A.  I see Plaintiff's Exhibit 16 on
22 the first page.
23     Q.  Right.  Well, what I was saying
24 was, Plaintiff's Exhibit 42 calls for comments
25 to be made

**Page 223**

1      A.  That's not marked on mine.
2      Q.  Well, it is 42.
3      A.  Are you referring to this document
4  that begins at the bottom KMK 03960?
5      Q.  Yes.
6      A.  Okay.
7      Q.  And my question is, KMK calls for
8  comments with respect to the attached document.
9  And in Plaintiff's Exhibit 16, they receive
10 comments; is that fair?
11     A.  Well, that's certainly what it
12 appears, yes.
13     Q.  Okay.  Now, on Plaintiff's Exhibit
14 16, which is the document you have in front of
15 you, it appears that it was hand delivered to
16 Mark Weiss.  Do you see that?
17     A.  I do
18     Q.  And the document states that it
19 contains handwritten comments from Pat Condren
20 and Ken Hanauer.  Do you see that?
21     A.  That I see, yes.
22     Q.  Okay.  What was the procedure for
23 sharing this document with the distribution
24 list when it was received by Mark Weiss at KMK?
25     MR. BURKE:  Objection.  Calls for

**Page 224**

1  speculation, foundation.
2      A.  Are you assuming that there was a
3  procedure or that there should have been a
4  procedure?
5      Q.  Was there a procedure to share
6  this document with members of the distribution
7  list?
8      A.  There would have been no reason to
9  necessarily do that, so I -- no, I would say
10 that there wasn't.
11     Q.  Okay.  What do you believe
12 happened when this document was hand delivered
13 to Mark Weiss?
14     MR. MAUNDRELL:  Objection.
15     MR. BURKE:  Objection to
16 foundation.  Calls for speculation.
17     A.  I believe Mark would have taken
18 this document and disposed of each of the
19 comments in a way that he felt was prudent.  In
20 some cases discussing it with Provident people,
21 in some cases discussing it with other lawyers
22 in the firm, and in other cases going back to
23 OHSL's attorneys and discussing comments with
24 them.
25     Q.  Did he ever discuss any of these

**Page 225**

1  comments with you?
2      A.  I don't think so.
3      Q.  Can I direct your attention to
4  page 151 by Bates number in the lower right?
5      A.  Okay.
6      Q.  Do you ever recall looking at this
7  page with the handwritten notes?
8      A.  I do not recall.
9      Q.  Do you ever recall discussing with
10 anyone the fact that Mr. Herron had resigned
11 from the OHSL Board?
12     MR. BURKE:  Objection.  Asked and
13 answered.  You may answer it.
14     A.  Yes
15     Q.  And that's with Cliff Roe?
16     A.  Well, I, I said it was -- I
17 thought it was either with Cliff or Charles
18 Crowley.
19     Q.  Okay.  And that's just one
20 discussion?
21     A.  Yes.
22     Q.  Okay.  Other than that discussion,
23 do you remember any other discussions about Mr.
24 Herron's resignation?
25     A.  No.

**Page 226**

1  Q.  Do you remember any discussions
2  about how the date July 31st, 1999, that
3  appears on this page, was selected?
4      MR. BURKE:  Objection.  Asked and
5  answered.
6  A.  No.
7  Q.  Do you ever remember receiving a
8  copy of this document yourself, Plaintiff's 16?
9  A.  No.
10  Q.  Do you believe that you would have
11  received a copy of Plaintiff's Exhibit 16 in
12  the normal course of business?
13      MR. BURKE:  Objection.  Calls for
14  speculation.
15  A.  No.
16  Q.  Okay.  You can put that aside for
17  the moment.  Let me hand you what has been
18  previously marked as Plaintiff's Exhibit 23.
19  A.  Okay.
20  Q.  Have you seen this document
21  before?
22  A.  I don't have a specific
23  recollection of this document.
24  Q.  Okay.  That was all --
25  A.  I see that my name is on the

**Page 227**

1  distribution list.
2  Q.  Right.
3  A.  But I do not specifically recall
4  this document.
5  Q.  Right.  A long time ago.  Do you
6  believe that you received this document?
7  A.  Yes.
8  Q.  What was the purpose for this
9  document being circulated to the distribution
10  list?
11      MR. BURKE:  Objection.  Calls for
12  speculation.  You may answer.
13  A.  Being on the distribution list, I
14  would say the purpose is as stated in the cover
15  letter.
16  Q.  And that is essentially to
17  facilitate the finalizing of the document,
18  right?
19  A.  Right, because of the fact that
20  there were blanks in the document.
21  Q.  Was it your expectation that
22  everyone who received this on the distribution
23  list reviewed it to some extent?
24  A.  When you say "reviewed," I think
25  everybody would have taken note of it to some

**Page 228**

1  extent.  I don't think that some of these
2  people would have spent any appreciable time on
3  this.
4  Q.  Okay.  We talked about Mr. Kreider
5  and Mr. Rosenberg being very senior people in
6  their departments.
7  A.  I doubt that they spent any time
8  looking at this, but that's purely speculation.
9  Q.  Okay.  If they did, they would
10  have billed for their time, correct?
11      MR. MAUNDRELL:  Objection.
12      MR. BURKE:  Objection.
13  A.  I don't know.
14  Q.  During the time you worked on this
15  transaction, did you take notes?
16  A.  Oh, I'm sure I did.
17  Q.  Did you send e-mails?
18  A.  Again, I'm sure I did.  I don't
19  have any specific recollection as to the
20  content of those e-mails, but --
21  Q.  At any point after litigation was
22  instigated in any OHSL-Provident merger related
23  cases, were you asked to preserve your notes?
24      MR. BURKE:  Objection.  Time
25  frame

**Page 229**

1      MR. GILLIGAN:  Don't refer to any
2  conversations with counsel.
3  A.  Well, maybe this will help you
4  understand.  I don't keep any personal notes
5  with regard to any client matters, so to the
6  extent that any of my notes existed and were in
7  the files, I don't keep either the notes or the
8  physical files, okay, so --
9  Q.  Whatever notes you --
10  A.  I would not have had possession of
11  any notes.  And I don't recall being asked
12  about notes, because I didn't have any notes.
13  Q.  Okay.  So whatever notes you had
14  went in the file, the file went off to the
15  filing system somewhere?
16  A.  Right.
17  Q.  And after litigation was
18  instituted, do you ever recall being asked to
19  preserve or to produce materials related to the
20  litigation?
21      MR. GILLIGAN:  Well, those are two
22  different questions.  Were you asked to
23  preserve?
24  Q.  Okay.
25      MR. GILLIGAN:  Or to produce?

**Page 230**

1  Q. Yes.
2      MR. GILLIGAN: Do you want to take
3  it one at a time?
4      A. Well, I don't have a recollection
5  as to whether I was asked to -- it probably
6  would -- again, would have been pretty
7  insignificant to me because I don't keep them
8  anyway, so I -- I wouldn't have had anything to
9  preserve or to produce.
10     Q. Well, I was down at KMK the other
11 day --
12     A. Yes.
13     Q. -- looking at documents.
14     A. Um-hmm.
15     Q. And I came across an e-mail from
16 someone at Provident going out to I guess
17 everyone. And it said, please preserve all of
18 the documents related to the restatement,
19 interpret this as broadly as possible. Do you
20 ever recall seeing anything at KMK similar to
21 that?
22     A. I don't recall, no.
23     Q. I think I have a clear
24 understanding of what happened to your notes
25 being placed in the file and going to the file

**Page 231**

1  room. What happens to the e-mail and the other
2  information that you may have maintained in an
3  electronic form?
4      A. Well, my e-mail is deleted on a
5  fairly regular basis. I did, prior to this
6  deposition, out of curiosity more than anything
7  else, check yesterday to see if I had any
8  e-mails on my computer relating to this and
9  couldn't find any, so I'm assuming that I
10 deleted them in the ordinary course sometime
11 shortly after the transaction was completed.
12 I'm talking about the electronic copies --
13     Q. Right.
14     A. -- on my computer. I've already
15 changed computers though twice since then, so
16 that would also explain why there's nothing on
17 the computer.
18     Q. So if I understand your testimony
19 correctly, you checked yesterday out of
20 curiosity, and this is a computer twice removed
21 from 1999, correct?
22     A. Right. Because I didn't know if
23 there was anything on our network that might be
24 under my name.
25     Q. But you weren't asked to do that,

**Page 232**

1  you just did it out of curiosity?
2      A. Yes, correct.
3      Q. And if I understood you correctly,
4  you said you deleted your e-mails related to
5  the merger transaction shortly after the
6  closure of the merger between OHSL and
7  Provident, correct?
8      A. No. I would say that usually I do
9  not retain my e-mails, because we have a limit
10 on how many e-mails we're permitted to retain
11 and at some point they may have been deleted.
12 All I know is that yesterday I did not have any
13 e-mails and I looked for them.
14     Q. Do you think you deleted any
15 e-mails after litigation was initiated in
16 November of 1999?
17     MR. BURKE: Counsel, you know
18 that's an improper question. First of all,
19 that's a case that you voluntarily dismissed,
20 so there's no obligation to preserve until
21 after November of 1999.
22     Secondly, there was no discovery
23 request to this person or KMK from that
24 litigation, so again I object to that question
25 as misleading. You may answer.

**Page 233**

1      A. I would have -- if I had been told
2  not to delete something, I wouldn't have
3  deleted it. But like I said, I do delete my
4  e-mails because it clutters up my e-mail box,
5  so at some point -- it could have even been
6  during the transaction or after the
7  transaction, I don't know.
8      All I know is that when I checked,
9  and I do specifically recall checking
10 yesterday, because again out of curiosity I
11 wanted to know, I didn't see anything. So
12 that's a -- that's all I know about e-mails. I
13 have no specific recollection about even
14 sending an e-mail in this case, although maybe
15 we did send some. I just don't know.
16     Q. Do you have any specific
17 recollection of litigation being pending before
18 the transaction closed?
19     MR. BURKE: Objection. Asked and
20 answered.
21     A. I believe that Mark Magee told me
22 that there was some litigation about the
23 transaction at some point. I couldn't pin the
24 time frame down for you, but I do have a
25 recollection that he told me that.

59 (Pages 230 to 233)

Page 234

```
 1      Q.  Do you believe that you deleted an
 2  e-mail after Mr. Magee told you that?
 3          MR. BURKE:  Objection.  Asked and
 4  answered.
 5      A.  I don't recall.  I --
 6      Q.  Can I direct your attention to
 7  page four of this document?
 8      A.  Sure.
 9          MR. BURKE:  Exhibit 23?  Is that
10  what we're on?
11      Q.  Yes.  Actually it's this page.
12      A.  Oh.
13          MR. MAUNDRELL:  What, 266?
14      Q.  It's cut off at the bottom, it
15  looks like 268.
16          MR. BURKE:  268.
17      Q.  Okay.  Do you see where it says
18  Recommendation to Stockholders?
19      A.  I do.
20      Q.  Do you see that someone apparently
21  circled that?
22      A.  Yes, I do.
23      Q.  Do you have any idea why someone
24  may have circled it?
25          MR. BURKE:  Objection.  Calls for
```

Page 235

```
 1  speculation.
 2      A.  I have no idea.
 3      Q.  Do you ever remember discussing
 4  this particular page and this particular circle
 5  at or around September 1st, 1999?
 6      A.  No.
 7      Q.  Is it fair to say that comments
 8  and input on the merger documents were coming
 9  back to KMK and Mark Weiss?
10      A.  What merger documents are you
11  referring to?
12      Q.  Proxy materials, the registration
13  statement and other merger -- The Merger
14  Agreement.
15      A.  After The Merger Agreement had
16  been signed?
17      Q.  Yes.
18      A.  Yes.
19      Q.  And was Mark Weiss the person most
20  knowledgeable about the assembling of the
21  entire document?
22          MR. BURKE:  Objection.  Calls for
23  speculation.
24      A.  I would, I would say not.  I mean,
25  there were areas of this document clearly that
```

Page 236

```
 1  would not have been within his knowledge or
 2  expertise, so I would say no.
 3      Q.  What I'm trying to get at is, who
 4  was in charge of assembling the overall
 5  document and putting it together, even if it
 6  wasn't his or her particular area of expertise.
 7  Was there such a person at KMK?
 8      A.  Oh, I see what you're saying.  In
 9  terms of the ministerial act of assembling the
10  various pieces?
11      Q.  Yes.  Let's take the ministerial
12  acts first.
13      A.  That would have been Mark.
14      Q.  Okay.  And this is not -- this
15  does not go to ministerial acts, but who was in
16  charge of saying that a particular section of
17  the document was final?  For example, were you
18  the person who was in charge of saying that The
19  Merger Agreement was final?
20          MR. BURKE:  The Merger Agreement?
21  I don't follow you.
22      A.  No, I wasn't.
23          MR. BURKE:  Objection to form.
24      Q.  Okay.  Who was in charge of saying
25  that the plan of merger was final?
```

Page 237

```
 1      A.  The two principals, which would
 2  have been PFGI and OHSL Financial.
 3      Q.  And which people --
 4      A.  In other words, when our clients
 5  decided -- when our client, PFGI, and when
 6  Dinsmore's client, OHSL, were satisfied that
 7  the document was in a proper and correct form
 8  and included all of the pertinent provisions
 9  that needed to be included, then it was final
10  and then it was signed.  And so that's
11  ultimate -- ultimately the responsibility was
12  with the two respective clients.
13      Q.  And what person did that
14  responsibility lie with at PFGI?
15      A.  Bob Hoverson eventually
16      Q.  And what person did that lie with
17  at OHSL?
18      A.  I don't know.  I, I -- I don't
19  know.  I can make an assumption.
20          MR. GILLIGAN:  No.
21      A.  But I guess I'm not allowed to do
22  that.
23          MR. GILLIGAN:  Just what you know.
24      Q.  It would be either Ken Hanauer or
25  Norbert Brinker, correct?
```

60 (Pages 234 to 237)

Page 238

```
 1        MR. MAUNDRELL: Objection.
 2        MR. BURKE: Objection. Asked and
 3  answered.
 4        A.  I don't know. It could be the
 5  whole Board.
 6        MR. BRAUTIGAM: Okay. Let's take
 7  a short break.
 8        (Brief recess.)
 9  BY MR. BRAUTIGAM:
10        Q.  Mr. Matthews, did you form an
11  opinion with respect to the quality of the work
12  that McDonald & Company did with respect to the
13  transaction?
14        MR. BURKE: Objection. Calls for
15  speculation.
16        A.  No.
17        Q.  Do you know that McDonald &
18  Company was covering Provident stock at the
19  same time they were advising OHSL on the deal?
20        A.  No.
21        Q.  Do you know that McDonald &
22  Company had issued a buy recommendation of
23  Provident stock at a relevant point in the
24  deal?
25        MR. MAUNDRELL: Objection.
```

Page 239

```
 1        MR. GILLIGAN: Excuse me, what's
 2  that? What's relevant? What's the time? Give
 3  that --
 4        A.  I didn't know at any time, Mike.
 5        Q.  Okay.
 6        MR. GILLIGAN: Okay. Well, then
 7  it doesn't matter.
 8        Q.  Do you think that's a potential
 9  conflict of interest?
10        MR. MAUNDRELL: Objection.
11        MR. BURKE: Objection. They're
12  not defendants. Go sue them. You can answer
13  it.
14        A.  No.
15        MR. GILLIGAN: He's asking you as
16  an expert apparently, so --
17        A.  Doesn't trouble me at all.
18        Q.  Even given the way the transaction
19  was structured?
20        MR. BURKE: Objection, form.
21        A.  I think I already answered that.
22  It doesn't trouble me.
23        Q.  Okay. Do you believe that the
24  March 2003 restatement had an effect on the
25  OHSL shareholders?
```

Page 240

```
 1        MR. BURKE: Objection to form.
 2  And there's no such thing as an OHSL
 3  shareholder in March 2003.
 4        A.  I think I also already told you
 5  that I was not really familiar with the 2003
 6  restatement except that there was one. But I
 7  know nothing of the details of that restatement
 8  or why, or why it was done or its import, so --
 9        Q.  You understand that Provident
10  stock lost a significant amount of value in a
11  short amount of time, correct?
12        A.  No. I don't own any Provident
13  stock and I don't follow it.
14        MR. GILLIGAN: Obviously not
15  prepared for the deposition.
16        MR. BRAUTIGAM: Did you get Mr.
17  Gilligan's comments?
18        COURT REPORTER: Yes.
19        THE WITNESS: Mr. Gilligan, was I
20  supposed to buy some stock?
21        MR. GILLIGAN: No.
22        MR. BRAUTIGAM: Mr. Matthews, I
23  thank you for your time and I have nothing
24  further.
25        THE WITNESS: Great. Thank you.
```

Page 241

```
 1
 2
 3
 4
 5        _____
 6        TIMOTHY B. MATTHEWS, ESQ.
 7
 8        - - -
 9        (Deposition concluded at 4:00 p.m.)
10        - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```