Page 1

1

2                    UNITED STATES DISTRICT COURT
3                    SOUTHERN DISTRICT OF OHIO
4                         WESTERN DIVISION
5

6                             - - -
7    WALTER W. THIEMANN,   :
     On Behalf of Himself  :
8    And of All Others     :
     Similarly Situated,   :
9                          :

             Plaintiff,    :
10                         :
       VS.                 :   CASE NO. C-1-00-793
11                         :

12   OHSL FINANCIAL        :
     CORPORATION, et al.,  :
                           :
13        Defendants.      :
14                             - - -
15        Deposition of MARK WEISS, ESQ., a
16   witness herein, called by the plaintiff for
17   cross-examination pursuant to the Federal Rules
18   of Civil Procedure, taken before me, Lee Ann
19   Williams, a Registered Professional Reporter
20   and Notary Public in and for the State of Ohio,
21   at the offices of Gene Mesh & Associates, 2605
22   Burnet Avenue, Cincinnati, Ohio 45219, on
23   Friday, August 22, 2003, at 9:00 a.m.
24

25



Page 2

1  APPEARANCES:
2  On behalf of the Plaintiff:
3      Gene L Mesh, Esq.
          and
4      Michael G. Brautigam, Esq.
       Gene Mesh & Associates
5      2605 Burnet Avenue
       Cincinnati, Ohio 45219
6
   On behalf of the Defendant:
7
8      James E. Burke, Esq.
       Keating, Meuthing & Klekamp
       1400 Provident Tower
9      One East Fourth Street
       Cincinnati, Ohio 45202
10
   On behalf of the Defendant:
11
12     Michael Maundrell, Esq.
          and
       John Hust, Esq.
13     Schroeder, Maundrell, Barbere
       & Powers
14     110 Governor's Knoll
       11935 Mason Road
15     Cincinnati, Ohio 45249
16  On behalf of the Witness:
17     Louis Gilligan, Esq.
       Keating, Meuthing & Klekamp
18     1400 Provident Tower
       One East Fourth Street
19     Cincinnati, Ohio 45202
20         - - -
21
22
23
24
25

Page 3

             I N D E X
2  Examination of MARK WEISS, ESQ.    Page
3  By Mr. Brautigam:              4
        - - -
5  Defendant's Exhibit    Page Identified
6    No. 48             24
        - - -
8

Page 4

1           MR. BURKE:  Okay.  I notice, Mike,
2  this morning that you have a video set up.  You
3  did not notice this deposition, to the best of
4  my recollection, by video.  If you want to show
5  me the subpoena where you did, I will stand
6  corrected, but to my knowledge, you did not
7  notice a videotape deposition.
8           We will object and we'll not
9  permit the video to go forward.  There's no
10 question as to the unavailability of this
11 witness and the --
12          MR. BRAUTIGAM:  Jim, do you
13 represent this witness?
14          MR. BURKE:  No, but I do represent
15 parties and we object to the video.
16          MR. MESH:  Well, Jim, based on
17 yesterday's conduct and the way the deposition
18 was conducted, the screaming, we feel that it's
19 appropriate to have a video record.  We're
20 ready to go forward and ask questions and I
21 think we have several choices.  One, you can
22 walk out --
23          MR. BURKE:  We're not going to
24 walk out, but you're not turning on the video.
25          MR. BRAUTIGAM:  Well, do you

Page 5

1  intend to physically prevent the lady from
2  turning the video on?
3           MR. BURKE:  No, I do not intend to
4  physically -- that's not the way we practice
5  law in Cincinnati, Mike.  What you do is you
6  take a videotape deposition either by notice or
7  by agreement.  There's no notice, no agreement.
8           MR. MESH:  Well, what's the
9  problem with going forward with the videotape?
10 Why does --
11          MR. BURKE:  Well, if the witness
12 had been prepared for it, if you had advised
13 the witness that you were going to video it,
14 that would be different.
15          MR. MESH:  What's the difference?
16 He's going to testify the same way.
17          MR. BURKE:  I don't disagree with
18 that.  It's a needless complication of an
19 already complicated case, which is not being
20 conducted in the way cases are normally
21 conducted.  And we would object to the video.
22          MR. MESH:  Normally I would agree
23 with you that it's irregular, but uncomplicated
24 or complicated -- whatever you said, I don't
25 know.  But yesterday's behavior on the part of

Page 6

1  some counsel in the room, reaching a level of
2  rage and almost stroke level, needs to be
3  recorded for all the world to see.
4          MR. BURKE: What I want to tell
5  you, Gene, is your -- Mr. Brautigam was sneaky
6  enough to make his personal attack, which I
7  heard, against Mr Gilligan off the record,
8  sneaky -- and I choose that word advisely -- to
9  accuse him of being unprepared for a deposition
:0  where he's representing a witness
:          That is conduct which I believe is
:  very, very aggravated and egregious, and that's
5  what prompted it  But you know what, Gene, why
4  don't you address your comments to Mr.
5  Gilligan, because that's apparently who you're
6  talking to
7          MR. MESH: Because you're talking.
8          MR. BRAUTIGAM: Are you done?
9          MR. MESH: Wait a minute, Mike.
:  Jim, you have been the author of ad hominem
:  attacks  Mr. Gilligan used that word yesterday
:  to describe what Mr Brautigam said.  And I
5  apologize on the record, not knowing what he
4  said
5          But your firm has been taking ad

Page 7

hominem shots at me and Mr Brautigam since
this case began in Court for public view.  So
whatever Mr Brautigam may have said off the
record personally, to me it seems to be a
personal matter between Mr. Brautigam and Mr
Gilligan, not something to disrupt the
deposition and cause behavior at a level that
is uncivil, to use your word and your phrase.
        And that's why I want it on TV for
the whole world to see.  And the same goes for
Mr. Maundrell's outbursts, almost raised the
ceiling.  I don't know if you're doing this for
whose benefit, Mike.
        MR. MAUNDRELL: Mr Mesh?
        MR. MESH: Yes.
        MR. MAUNDRELL: I join in with Mr
Burke's comments about the off-the-record
comments made by your associate.
        MR. MESH: Did you hear them?
        MR. MAUNDRELL: I don't mind this
deposition being done by videotape, but certain
rules have to be followed.  You haven't
followed the rules.  And this is a further
sneak attack.  I object to it and I join in
with Mr. Burke in objecting to it.

Page 8

1          It is not correct.  It's not the
2  correct way to do things.  Now, as to your ad
3  hominem attack allegations, let me say that
4  every deposition that's been taken by Mr.
5  Brautigam is full of blatant lies,
6  misrepresentations of facts, and allegations.
7          You said yesterday there is a
8  disagreement about that.  Okay, there's a
9  disagreement about it, but if you think for one
10  moment my objection -- I'm not going to object
11  when blatant misrepresentations of fact occur,
12  you're wrong.  I'm going to do it now and I'm
13  going to do it in Court
14          MR. MESH  Well, I would --
15          MR. MAUNDRELL  He has an
16  obligation -- I would thunk you would advise
17  him of that obligation to have questions that
18  contain accurate facts and not fiction.  And
19  that stunt he pulled yesterday by using Judge
20  Beckwith's decision was an abomination.  An
21  absolute abomination.  And I'll say it now and
22  I'll say it in front of Judge Beckwith today or
23  six months from now
24          MR. MESH.  Well, I think you need
25  to put these concepts in specific terms in

Page 9

1  writing so we can respond in specific terms.
2  If Mr. Brautigam is making false premises or
3  using false premises, I want to know about it
4  and he wants to know about it.  And I want to
5  see what you are talking about that's false.
6  Yelling and screaming false doesn't make it
7  false.
8          MR. MAUNDRELL: Mr. Mesh, Mr.
9  Burke yesterday was kind enough to point out
10  the pages of Hanauer's deposition which
11  directly fly in the face of the questions that
12  Mr. Matthews was asked to assume by Mr.
13  Brautigam as true.  The -- if you would read
14  Mr Hanauer's deposition --
15          MR. MESH  I have 67 and the pages
16  referred to.
17          MR. MAUNDRELL.  -- you would see
18  that.
19          MR. MESH: I didn't see that.
20          MR. MAUNDRELL: Well, then you
21  didn't read it.
22          MR. MESH: I read it.
23          MR. BRAUTIGAM: Mike, I read those
24  pages this morning.  I stand behind what I said
25  a hundred percent.  It was completely true and

3 (Pages 6 to 9)

**Page 10**

1 accurate.
2 MR. MESH: All right. Are we
3 going to go ahead under the present
4 circumstances with the video? Are you going to
5 waive this technicality and let the witness
6 proceed or not?
7 MR. BURKE: I'm not going to waive
8 the technicality, Gene, no. It's a rule. If
9 you want to video a deposition, you have notify
10 us. It's that simple. The witness walked in
11 today, said I wasn't expecting this, I wasn't
12 prepared for it, which I assume is what you
13 wanted to do. It doesn't make any difference.
14 Gene.
15 I also would like to give Mr
16 Gilligan an opportunity to respond to what you
17 said to him. But more importantly, Gene, we're
18 not going to waive it, we do object. It is
19 something that was unsubpoenaed, unprepared
20 for. I think it's unfair and prejudicial to
21 the witness, so no, I can't waive it.
22 MR. MESH: Lou.
23 MR. GILLIGAN: I stand by what I
24 said on the record yesterday. I was peeved and
25 I think I had a reason to be. And it's a

**Page 11**

1 little tough when somebody sits here and
2 accuses your firm of unethical conduct during
3 the day, then makes this ad hominem remark to
4 me, and then does an examination which was
5 unfair to the witness and improper, which I had
6 called to his attention time and time and time
7 during the day.
8 I think you've overstated what
9 took place. You yourself were here when it
10 occurred. You apologized. I had said nothing
11 more and we went on with the deposition and
12 that was the end of it. As far as today is
13 concerned, I will follow what the counsel who
14 are involved in the case have to say.
15 You know the rules, I know the
16 rules. And if you're going to do a videotape
17 deposition, you're supposed to notice it. If
18 you don't notice it, you don't do it that way.
19 So we're prepared to go ahead with the
20 deposition.
21 And the witness is here, the
22 witness is prepared. We've taken time off from
23 work. Let's go on. We're wasting valuable
24 time.
25 MR. MESH: Let's take a five

**Page 12**

1 minute recess, Mike.
2 MR. GILLIGAN: Thank you.
3 (Brief recess.)
4 MR. MESH: In view of statements
5 made by counsel for all the defendants, or all
6 of the defendants that are present, we'll
7 excuse the video court reporter for another
8 day.
9 VIDEOGRAPHER: Okay.
10 MR. BURKE: And, Gene, one thing I
11 would also mention. If you felt or Mike felt
12 yesterday that what occurred was sufficient to
13 warrant a video and had told us yesterday --
14 MR. MESH: I know.
15 MR. BURKE: -- that you were going
16 to video it today, I could not have objected
17 and would not have objected.
18 MR. MAUNDRELL: Nor would I.
19 MR. MESH: I understand. And
20 believe me, I can tell you honestly that it did
21 not occur to me last night, but it did about
22 4:30 a.m.
23 MR. GILLIGAN: I will also express
24 the hope that today all counsel conduct
25 themselves in a way that, you know, is

**Page 13**

1 appropriate for the proceedings.
2 MR. MESH: Fair enough.
3 MR. BRAUTIGAM: I just want to go
4 on the record and say that I did not insult Mr
5 Gilligan. I did not have an ad hominem attack
6 on Mr Gilligan, and I stand behind everything
7 I said a hundred percent.
8 MR. BURKE: Mr Brautigam, that is
9 an absolute false statement.
10 MR. MAUNDRELL: Ditto.
11 MR. BRAUTIGAM: Jim, I think the
12 record speaks for itself.
13 MR. GILLIGAN: That's because you
14 were off the record.
15 MR. MAUNDRELL: You were off the
16 record deliberately.
17 MR. BRAUTIGAM: I think what Mr.
18 Gilligan's comments added to this show whether
19 or not he was prepared for the deposition.
20 It's just my opinion.
21 * * *
22 MARK WEISS, ESQ.
23 having been first duly sworn, testified as
24 follows:
25 CROSS-EXAMINATION

Page 14

BY MR. BRAUTIGAM:

1
2    Q.  Good morning, Mr. Weiss.  My name
3  is Michael G. Brautigam and I represent Walter
4  Thiemann and a certified class of OHSL
5  shareholders.  Mr. Weiss, are you represented
6  by counsel today?
7    A.  Yes.
8    Q.  Who is your counsel?
9    A.  Mr. Gilligan is my counsel today.
10   Q.  How did Mr. Gilligan come to be
11 your counsel?
12   A.  Mr. Gilligan is counsel for KMK
13 and represents -- and in such capacity he
14 represents me in this deposition.
15   Q.  Have you ever been named as a
16 defendant in any litigation arising from the
17 OHSL-Provident merger?
18   A.  Yes.
19   Q.  Have you ever read any of those
20 complaints?
21   A.  I don't recall.
22   Q.  Were you served with a summons and
23 Complaint?
24   A.  I don't recall.
25   Q.  Do you have counsel with respect

Page 16

1  present at that meeting.
2    Q.  Did Mr. Burke say anything at that
3  meeting?
4    A.  I don't recall.
5    Q.  Did Mr. Fischer say anything at
6  that meeting?
7    A.  I don't recall.
8    Q.  Did you say anything at that
9  meeting?
10   A.  I don't recall.
11   Q.  Do you recall anyone saying
12 anything at the meeting?
13   A.  There was discussion at the
14 meeting.
15   Q.  Okay.  Do you recall anything that
16 was said by anyone?
17   A.  I don't recall.  I could not
18 attribute any statement to anyone.  I just
19 recall that there was discussion that there --
20 that we may be deposed, the four that I
21 mentioned earlier, at some point in late August
22 or September, something like that.  And we were
23 just told about that possibility.  It was not
24 a -- not a long meeting.
25   Q.  After that meeting, what happened

Page 15

1  to any of those litigation or litigations,
2  other than Mr. Gilligan?
3    A.  I'm not sure.
4    Q.  You're a partner in the KMK firm,
5  is that correct?
6    A.  Yes
7    Q.  Is Mr Gilligan a partner in that
8  firm?
9    A.  Yes
10   Q.  Is Mr Burke?
11   A.  Yes.
12   Q.  Who is Mr. Burke representing in
13 this litigation?
14   A.  I'm not sure who he's
15 representing.  I know he's not representing me.
16   Q.  Did you ever speak to Mr. Burke
17 about the OHSL-Provident merger?
18   A.  I don't recall.
19   Q.  Were you in a meeting earlier this
20 year with Mr. Fischer, Mr. Burke, Ms. Rowe, Mr.
21 Matthews, Mr. Reuter and Mr. Winstead?
22   A.  There was a meeting several weeks
23 ago where the possibility that myself, Mr.
24 Matthews, Mr. Reuter and Mr. Winstead might be
25 deposed in this litigation, and Mr. Burke was

Page 17

1  next?
2    A.  I went back to my office.
3    Q.  At any time after that meeting,
4  did you meet with Mr. Gilligan or Mr. Fischer
5  with respect to this deposition?
6    A.  Yes, through my counsel.
7    Q.  Okay.  Approximately when was
8  that?
9    A.  I met with Mr. Gilligan for lunch
10 on Wednesday.  I met with Mr. Fischer late
11 Wednesday and yesterday.  And I also met with
12 Mr. Gilligan yesterday.
13   Q.  Okay.  And approximately how long
14 in total were these meetings?
15   A.  Maybe four hours.
16   Q.  Do you have an hourly rate at the
17 Keating firm?
18   A.  Yes.
19   Q.  What is that hourly rate?
20   A.  I believe it's $250 an hour.
21   Q.  Were you charging any client for
22 these meetings?
23   A.  No.
24   Q.  Are you paying Mr Gilligan or Mr.
25 Fischer?



Page 18

1    A.  No.
2    Q.  Are you charging for your time
3 here today?
4    A.  No.
5    Q.  You testified earlier that you
6 don't know who Mr. Burke represents.  Is that
7 correct?
8    A.  That's correct.
9    Q.  Have you ever explored the
10 possibility that there may be a conflict
11 between Mr. Gilligan's representation and Mr.
12 Burke's representation -- simultaneous
13 representation in this case?
14       MR. BURKE:  Objection.  Misstates
15 the record, assumes facts not in evidence.  You
16 may answer.
17    A.  I don't understand what the
18 question means.
19    Q.  Are you familiar with the term
20 conflict of interest?
21    A.  In what context?  Conflict of
22 interest can mean many things in many contexts.
23    Q.  Have you ever used the term
24 conflict of interest?
25    A.  Yes.

Page 20

1 may answer.
2    A.  It's not -- it's not always clear
3 whether there's a conflict.  The conflict check
4 procedure is to uncover potential conflicts.
5    Q.  Do you think there may be a
6 potential conflict in this case?
7    A.  I'm not qualified to answer that
8 question.
9    Q.  What would you need to know to
10 answer that question?
11    A.  I think I'd need to be an expert
12 in the area of conflicts of interest, and
13 that's not my area.
14    Q.  Well, you make judgments all the
15 time about potential conflicts, given what
16 you've just said with the conflict check at the
17 KMK firm, correct?
18       MR. BURKE:  Objection.
19 Argumentative.
20    A.  Could you repeat the question,
21 please?
22       (Record read by Reporter.)
23       MR. BURKE:  Also objection to
24 form.  You may answer.
25    A.  That's not what I said.  I never

Page 19

1    Q.  Have you ever used the term
2 conflict of interest as it applies to attorney
3 representation?
4    A.  I don't recall.
5    Q.  At a firm like Keating, you have
6 something known as a conflict check, correct?
7    A.  Correct.
8    Q.  How does that work?
9    A.  Well, I'm not responsible for the
10 conflict check procedures, but whenever a
11 matter comes to the office, the involved
12 parties and a brief description of the matter
13 are circulated to all of the attorneys, who are
14 to notify of any potential -- notify the
15 working attorneys of any potential conflict.
16    Q.  So you would know a potential
17 conflict if you saw one, correct?
18    A.  I might.
19    Q.  In fact, you'd have to because
20 it's part of your job as an attorney at KMK; is
21 that correct?
22       MR. BURKE:  Objection to form.
23    A.  Repeat the question.
24       (Record read by Reporter.)
25       MR. BURKE:  Same objection.  You

Page 21

1 said I made judgments with respect to
2 conflicts.
3    Q.  When you receive information about
4 a potential new client, about a potential new
5 issue at the KMK firm, this information is sent
6 to you, correct?
7    A.  What -- I mean, what information
8 is sent to me?  I am -- I am notified of a
9 potential matter to which I respond if I might
10 have some facts that may be a conflict.
11    Q.  Have you ever done so?
12       MR. BURKE:  Objection to form.
13 "Ever done so" what?
14    A.  Yes.  I mean, have I ever done so
15 what?
16    Q.  Have you ever responded to an
17 issue where there may be a conflict?
18    A.  Yes.
19    Q.  Okay.  And how did you determine
20 that there may be a conflict in that particular
21 issue?
22    A.  I had knowledge of some of the
23 other participants in the case and -- or in the
24 matter and wanted to bring it to the attention
25 of the working attorneys to determine whether

Page 22

1  there was a conflict.
2       Q.  Do you think there would be a
3  conflict if you were called as a witness at
4  trial and Mr. Burke was representing Provident
5  and perhaps other defendants?
6       MR. BURKE:  Objection.  Calls for
7  a legal conclusion.  Assumes facts not in
8  evidence.  You may answer.
9       A.  I don't think it's a conflict.
10      Q.  Why not?
11      A.  I'm not an expert in the area of
12  conflicts of interest.
13      Q.  What factors did you consider in
14  coming to the conclusion that you did not
15  believe that that situation would be a
16  conflict?
17      MR. BURKE:  Objection.  Objection
18  to form.  You may answer.
19      A.  I'm not working with anyone at my
20  firm with respect to the litigation that Mr.
21  Burke is handling.
22      Q.  Are you generally familiar with
23  disciplinary rules and the ethical canons with
24  respect to a dual role of an attorney or his
25  firm serving as both witnesses and advocates in

Page 23

1  the same litigation?
2       A.  I am aware.
3       Q.  What is your understanding of
4  those rules?
5       A.  I'd have to have them in front of
6  me to be able to tell you exactly what they
7  say.
8       Q.  Well, what do you understand them
9  generally to say?
10      MR. BURKE:  Objection.  Asked and
11  answered.  He just answered.
12      A.  Is there a question?
13      Q.  Yes.
14      A.  I -- I've answered the question.
15      Q.  I think my question was:  What do
16  you understand them to say generally?
17      MR. BURKE:  Objection.  I think
18  he's indicated he'd need to see them.
19      MR. BRAUTIGAM:  It's a different
20  question, Jim.  We don't need speaking
21  objections, we're doing fine.
22  BY MR. BRAUTIGAM:
23      Q.  Okay.  Mr. Weiss, my question is
24  this:  You said you couldn't answer
25  specifically without these rules in front of

Page 24

1  you, so now I'm asking you generally.
2       A.  Do you understand that I am not a
3  litigator?  I've never litigated a case.  I'm
4  not familiar, even very generally, with Court
5  rules.  I would -- if you would like to take a
6  recess and permit me to review them, I would be
7  happy to look at them for you, as long as it
8  comes out of your time.
9       (Plaintiff's Exhibit Number 48
10          was marked for identification.)
11      Q.  Let me hand you what has been
12  marked as Plaintiff's Deposition Exhibit 48 and
13  ask you to take a look at that.
14      A.  Um-hmm.
15      Q.  Have you seen that before?
16      A.  Yes.
17      Q.  Are you familiar with it?
18      A.  Yes.
19      Q.  Do you recognize it?
20      A.  Yes.
21      Q.  What is Plaintiff's Deposition
22  Exhibit 48?
23      A.  It is my -- a description of me
24  that is on our firm web site.
25      Q.  Does this accurately describe your

Page 25

1  practice areas?
2       A.  Yes.
3       Q.  Are you an expert in business
4  planning and formation?
5       A.  I don't consider myself an expert.
6       Q.  Are you an expert in capital
7  financing?
8       A.  I don't consider myself an expert.
9       Q.  Are you an expert in mergers and
10  acquisitions?
11      A.  I don't consider myself an expert.
12      Q.  You have that listed there twice.
13  Is there a particular reason?
14      MR. BURKE:  Objection to form.
15      A.  I believe somebody screwed up
16      Q.  Are you an expert in private
17  offerings?
18      A.  I have developed an expertise in
19  them by working on a number of them.  I -- I've
20  got a very narrow definition of, of expert.  I
21  think that for somebody to be expert, they need
22  to be recognized nationally, published, et
23  cetera.
24      I think there may be only a dozen,
25  25 maybe securities experts or private

**Page 26**

1  placement experts in the world -- or the
2  country. So I mean, I don't particularly care
3  for the word expert. I have an expertise.
4      Q.  Are you an expert in public
5  offerings?
6      A.  I've developed an expertise in
7  public offerings.
8      Q.  Are you an expert in securities
9  regulation compliance?
10     A.  I've developed an expertise in
11 certain areas. That's a very broad area.
12     Q.  How many mergers and acquisitions
13 have you been involved with?
14     A.  Dozens.
15     Q.  Did you perform services in the
16 OHSL-Provident merger?
17     A.  I don't understand the question,
18 in the merger.
19     Q.  Did you work on the OHSL-Provident
20 merger?
21     A.  What do you mean by merger?
22     Q.  When the two companies combined.
23     A.  Do you mean The Merger Agreement?
24     Q.  Did you perform services in the
25 process that led to the combination of OHSL and

**Page 27**

1  PFGI?
2      A.  Yes.
3      Q.  Approximately how many hours did
4  you bill?
5      A.  I have no idea.
6      Q.  Well, was it more than a thousand?
7      A.  To this matter?
8      Q.  Yes.
9      A.  No.
10     Q.  Was it more than 500?
11     A.  No.
12     Q.  Was it more than 200?
13     A.  Don't know.
14     Q.  Would it be fair to say that it
15 might be between 200 and 300?
16     MR. BURKE: Objection.
17     A.  I don't know.
18     MR. BURKE: Calls for speculation.
19     Q.  If you wanted to find out that
20 information, what would you do?
21     A.  I would see if we -- I would see
22 if KMK has billing records on it.
23     Q.  Do you know if they have billing
24 records on it?
25     A.  I'm not the keeper of billing

**Page 28**

1  records, I don't know.
2      Q.  Are you familiar with the firm's
3  document retention policy?
4      A.  The firm's document retention
5  policy?
6      Q.  Yes.
7      A.  No.
8      Q.  Did you take notes during this
9  transaction?
10     A.  I don't recall.
11     Q.  Is there ever a transaction that
12 you've been involved in where you did not take
13 notes?
14     A.  Yes.
15     Q.  A transaction of this magnitude?
16     A.  Define what you mean by notes.
17     Q.  You don't understand that word,
18 notes?
19     A.  Well, I think notes can mean
20 different things to different people. I do not
21 take a notepad and throw notes in a file or
22 keep them. I may take notes on a draft of a
23 document.
24     Q.  And please describe for the record
25 what you mean by notes

**Page 29**

1      MR. BURKE: Objection to
2  relevancy.
3      A.  You're asking me about notes. I'd
4  like to know what you're asking about
5      Q.  Mr. Weiss, the way the process
6  works is I get to ask the questions.
7      MR. GILLIGAN: No. If he doesn't
8  understand --
9      A.  I don't understand
10     MR. GILLIGAN: -- your question,
11 he should ask you what you mean. You should be
12 willing to tell him.
13     Q.  Well, Mr. Weiss, is it your
14 testimony that you don't understand the word
15 notes?
16     MR. BURKE: Objection. Misstates
17 prior testimony.
18     A.  It's my understanding -- I want to
19 know what you -- what you are -- I do not -- I
20 do not keep a notepad. Several -- I know a
21 number of attorneys that keep a legal pad full
22 of notes for matters, page after page, and
23 throw it in the file. That is not my style. I
24 do not have -- do I normally take notes on
25 corners of documents or on drafts? Yes.

**Page 30**

1  Q.  Okay.  Did you take notes on
2  corners of documents or drafts in this case?
3  A.  I don't remember.
4  Q.  Did you send e-mails in this case?
5  A.  I don't remember.
6  Q.  Did you receive e-mails in this
7  case?
8  A.  I don't remember.
9  Q.  I understand you went to the
10  University of Michigan; is that correct?
11  A.  Yes.
12  Q.  And you graduated in 1989?
13  A.  Yes
14  Q.  What was your degree in?
15  A.  English
16  Q.  And after that you attended the
17  University of Cincinnati law school; is that
18  correct?
19  A.  Yes.
20  Q.  And you graduated in 1992?
21  A.  Yes
22  Q.  And you served on the Law Review?
23  A.  For one year, yes.
24  Q.  What particular aspect of the Law
25  Review were you on?

**Page 31**

1  A.  As merely a second year, we all
2  are -- everybody was required to write one
3  article each term and cite check one article
4  each term as well.
5  Q.  Was it just a general Law Review
6  or was it a specialized Law Review?
7  A.  It was a general Law Review.
8  Q.  Can you tell me a little bit about
9  your employment background since 1992? I
10  understand you were a vice president with a
11  securities firm for one year; is that correct?
12  A.  I was an investment advisor.
13  Q.  Investment advisor.  And what firm
14  was that?
15  A.  It no longer exists.  It was
16  actually merged into Western Southern.  It was
17  a company called Coutrywide Investments.
18  Q.  And when did you work with
19  Coutrywide Investments?
20  A.  During 1997.
21  Q.  Okay.  Let's go back.  What did
22  you do between when you graduated from law
23  school?
24  A.  I took some time off to study for
25  the bar.

**Page 32**

1  Q.  Okay.  And what was your first job
2  after law school?
3  A.  I believe it was when I began at
4  KMK.  I don't remember if I did anything -- I
5  don't recall if I did anything and got paid for
6  it between then and beginning employment.
7  Q.  Okay.  And when did you start with
8  KMK?
9  A.  In late August or early September
10  of 1992.
11  Q.  Okay.  And you were an associate
12  with the firm?
13  A.  Yes.
14  Q.  And what department or practice
15  group were you assigned to?
16  A.  At that time it was just a broad
17  corporate department.
18  Q.  Do you consider yourself to be a
19  corporate lawyer or securities lawyer or
20  something else?
21  MR. BURKE:  Objection.  Compound
22  question
23  MR. GILLIGAN  You can go ahead,
24  Mark.
25  MR. BURKE  I'm just noting my

**Page 33**

1  objections for the record.
2  A.  Okay.  I consider myself to
3  concentrate in the area of securities law, but
4  only certain areas of securities law.
5  Q.  Okay  What areas of securities
6  law do you concentrate your practice in?
7  A.  Primarily the areas of public
8  offerings under the '33 Act.  But I also have
9  expertise in following up with clients and
10  their periodic reporting requirements under the
11  '34 Act.
12  Q.  How long did you stay with Keating
13  after you joined them in the fall of 1992?
14  A.  Well, I was there until early '97.
15  Then I was with Coutrywide, and came back to
16  Keating at the end of '97.
17  Q.  Why did you leave Keating?
18  A.  That's kind of personal.
19  Q.  What were your duties and
20  responsibilities at Coutrywide?
21  A.  I was hired as vice president of
22  key accounts.  My duties were to communicate
23  with and try to bring in accounts to be
24  managed.
25  Q.  Are you talking about retail



**Page 34**

1  accounts?
2      A.  Institution -- large accounts,
3  wealthy individuals.
4      Q.  Okay.  High net worth individuals?
5      A.  Yes
6      Q.  Okay.  So your job for that year
7  was to make phone calls to high net worth
8  individuals to attempt to get their business;
9  is that correct?
10     A.  That's a lot of what I did.  But I
11  also serviced existing high net worth and also
12  worked on other special projects.
13     Q.  Okay.  What were some of the
14  special projects that you worked on?
15     A.  Sometimes states or other
16  organizations solicit what are called RFPs,
17  request for proposal, where they request
18  information from prospective investment
19  advisors who will receive a fee for their
20  services.  And I did complete some of -- some
21  RFPs on behalf of potential institutional
22  clients.
23     Q.  During this year, were you working
24  as an attorney?
25     A.  No

**Page 35**

1      Q.  Was there a legal component to
2  your job?
3      A.  No  At Coutrywide, no.
4      Q.  Why did you leave Coutrywide?
5      A.  I was unhappy at Coutrywide.
6      Q.  And you returned to the Keating
7  firm in approximately 1998, is that correct?
8      A.  It was late '97.
9      Q.  Late '97.  And to what department
10 or practice group did you return?
11     A.  You could say I filled my old job.
12     Q.  Okay.  What were your duties and
13 responsibilities with respect to the
14 OHSL-Provident merger?
15     A.  I was the main coordinator of the
16 registration statement -- of the form S-4
17 registration statement.  And I represented
18 Provident in that capacity.
19     Q.  When you say you represented
20 Provident, which Provident entity did you
21 represent?
22     A.  Provident Financial Group.
23     Q.  What, if any, responsibility did
24 you have for the proxy statement?
25     A.  None.

**Page 36**

1      Q.  Who had primary responsibility at
2  Keating for the proxy statement?
3      A.  Nobody at Keating had primary
4  responsibility for the proxy statement.  That
5  was an OHSL document.
6      Q.  Please take a look at what has
7  been previously marked as Defendant's Exhibit
8  1.  Have you seen that document before?
9      A.  Is this the final?
10     Q.  Yes.
11     A.  Then yes.
12     Q.  Are you familiar with that
13 document?
14     A.  As familiar as I can be with a
15 transaction that occurred four years ago
16     Q.  What is Defendant's Exhibit 1?
17     A.  It is a proxy statement/prospectus
18 relating to the proposed merger of Provident
19 Financial and OHSL.
20     Q.  And whom do you believe is
21 ultimately responsible for the accuracy of the
22 information contained within that proxy
23 statement and registration statement?
24     A.  I think multiple people are
25 ultimately responsible for the information in

**Page 37**

1  this proxy statement/prospectus.
2      Q.  Okay.  Can you tell me who?
3      A.  With respect to the financial
4  information, that would be the accountants.
5  With respect to the OHSL information, that
6  would be OHSL, their advisors and their
7  attorneys.  And with the Provident information
8  it would be Provident, their attorneys and
9  their advisors.  With McDonald, it would be
10 McDonald's -- it would be the financial
11 advisor's responsibility.
12     Q.  Is it fair to say that the
13 document consists of information received from
14 a variety of sources?
15     A.  Yes, many of which were publicly
16 available at the time
17     Q.  And were you the person assigned
18 with the ministerial task of collecting the
19 information and assembling it into Defendant's
20 Exhibit 1?
21     A.  Yes.
22     Q.  What, if anything, did you do to
23 determine the veracity of the information you
24 received from OHSL and its advisors?
25     A.  I had conversations with people

Page 38

1  involved in the transaction. And I circulated
2  multiple drafts to everyone involved allowing,
3  in this case in particular, ample time to
4  review and verify the information.
5      Q.  Do you believe that KMK and/or
6  Provident had a duty to verify the information
7  they received from other sources?
8      MR. GILLIGAN:  In this
9  transaction?
10     Q.  Yes.
11     A.  I only believe that Provident and
12 KMK had a duty to point out any known
13 deficiencies in the document, but not to
14 independently verify information from different
15 sources. I've never -- I've never even been
16 asked to look at accountants' papers, for
17 example, but in order to verify information
18 statements, that's what I would have to do.
19     Q.  Do you believe that you had any
20 independent responsibility to verify the truth
21 of written information, other than financial
22 information, that you received from OHSL and
23 their financial advisors?
24     MR. BURKE:  Objection. Asked and
25 answered. You may answer

Page 39

1      A.  Do I, Mark Weiss?
2      Q.  Mark Weiss or KMK or Provident.
3      A.  I restate my answer. I think our
4  only obligation was to -- we certainly could
5  not inflict ourselves in the OHSL -- in the
6  OHSL corporate matters. To the extent that we
7  may have known of something in particular that
8  was deficient, we would have had a duty to
9  point that out, but I don't think we have a
10 duty to scrub everything, no.
11     Q.  When you said "deficient," how did
12 you mean that?
13     A.  Wrong.
14     Q.  Materially false and misleading?
15     A.  Wrong.
16     Q.  Just factually wrong?
17     A.  Correct.
18     Q.  Have you heard the term take the
19 document to the printer, or a similar term?
20     A.  Similar term, yes.
21     Q.  Okay. What term have you heard
22 with respect to this concept?
23     MR. BURKE:  What concept? Object
24 to form, vague and ambiguous.
25     A.  Yes, what concept?

Page 40

1      Q.  Okay. The concept of getting the
2  information from the law firm to the printer
3  and ultimately to the shareholders?
4      A.  Sending it to the printer.
5      Q.  Okay. Now, I understand that
6  because of electronic advances and such, this
7  is a very different process from the way it
8  used to be. Is that fair to say?
9      A.  Yes.
10     Q.  How did Defendant's Exhibit 1 get
11 from -- get to the financial printer?
12     A.  Physically?
13     Q.  Yes. How did the information in
14 Defendant's Exhibit 1 get to the financial
15 printer?
16     A.  The document was hand delivered, I
17 believe, to Winkler Printing, who, through a
18 process known as camera ready copy, reproduced
19 the document.
20     Q.  Who delivered the document to the
21 financial printer?
22     A.  I don't remember.
23     Q.  Was it someone from KMK?
24     A.  I don't remember.
25     Q.  Who had the final say as to when

Page 41

1  the document was finalized?
2      A.  Everybody.
3      Q.  What individuals are you referring
4  to?
5      A.  I'm not -- I'm not referring to
6  individuals. I'm referring to the -- the
7  document wasn't complete until we had sign-off
8  from everyone, OHSL and their counsel, the
9  accountants, McDonald & Company, Provident.
10     Q.  And KMK?
11     A.  In our representation of
12 Provident.
13     Q.  Describe for me, if you will, this
14 sign-off procedure.
15     A.  I don't recall the sign-off
16 procedure in this case. Generally -- generally
17 I -- if I am the, as you say, ministerial
18 keeper of the document, I will or someone from
19 my office will be in contact with all of these
20 parties. And they will give an oral sign-off.
21     Q.  Did this document come from KMK's
22 computer system?
23     A.  The document that was printed?
24     Q.  Yes.
25     MR. GILLIGAN:  Exhibit 1.

Page 42

1   A.  The master was housed on our
2  system, yes.
3   Q.  Do you have templates on your
4  system that are similar to the components of
5  the document that comprise Defendant's Exhibit
6  1?
7      MR. GILLIGAN:  Objection to form.
8  You may answer.
9   A.  What do you mean by templates?
10   Q   Forms, essentially.
11   A.  Securities documents, in my
12  opinion, are different from general contracts
13  and other documents, because the securities
14  laws, as you alluded to with your comment about
15  electronic transmissions, change rapidly  I
16  don't generally rely on prior forms or prior
17  examples of securities documents that are
18  stale.  I will generally look for recent,
19  similar transactions and not exactly use it as
20  a form, but cut and paste what ought to be in
21  the document.
22   Q   And these recent similar
23  transactions reside on the computer system at
24  KMK; is that correct?
25   A.  No.

Page 43

1   Q.  Where do they reside?
2   A.  The recent similar transactions
3  reside on the EDGAR system, accessible by
4  anyone with a computer and Internet access.
5  The same way anybody could have found out
6  that -- found my name on the cover of this
7  document, the S-4, in August of '99.
8   Q.  Who wrote the first page of
9  Defendant's Exhibit 1?
10   A.  I don't remember.
11   Q.  Was it someone at KMK?
12      MR. BURKE:  Objection.  Asked and
13  answered.
14   A.  I don't remember.
15   Q.  If I needed to find out who wrote
16  the first page of this document, how would I go
17  about doing it?
18   A.  I don't know.  And I'm not sure
19  what the relevance of who wrote it is anyway.
20   Q.  Do you believe that that is an
21  irrelevant question?
22   A.  Yes.
23   Q.  Why do you believe that?
24   A.  Because this document was
25  circulated and people had weeks to review it.

Page 44

1  And who actually put the pen to the paper,
2  which I don't know, I do think is irrelevant
3   Q.  Are you aware of what the issues
4  are in the Thiemann litigation?
5   A.  Some of them.
6   Q.  What is your understanding of the
7  issues?
8   A.  I understand that there's a --
9  that there's an allegation relating to the
10  characterization of the OHSL vote.  I
11  understand there's an allegation relating to a
12  Provident risk factor regarding
13  securitizations.  And I understand there's an
14  allegation related to a director who resigned
15  prior to the vote.
16   Q   Where did you obtain that
17  understanding from?
18      MR. BURKE:  Objection.
19      MR. GILLIGAN:  If it's
20  conversations with myself or Mr. Fischer, don't
21  answer the question.  He's not asking you to
22  reveal attorney-client discussions.
23   A.  It was in a conversation with my
24  counsel.
25   Q   And that was either Mr  Gilligan

Page 45

1  or Mr  Fischer?
2   A.  Absolutely
3   Q.  Did you ever see a draft version
4  of the first page of Defendant's Exhibit 1 with
5  Mr  Hanauer's signature on it?
6   A.  I don't recall
7   Q.  In your experience, is it common
8  to have the signature of both the chairman of
9  the Board and the chief executive officer on
10  the cover page of a document such as
11  Defendant's Exhibit 1?
12   A.  In my experience, there is no
13  commonality to the signature on the cover of
14  a -- of this document -- a document of this
15  type  I've seen secretaries sign it, corporate
16  secretaries, I've seen chairmen sign it, I've
17  seen presidents sign them.  I generally see one
18  signature and not two actually
19   Q.  Did you ever learn from any source
20  that Mr. Hanauer's signature had been
21  electronically imposed on the first page of
22  Defendant's Exhibit 1 in draft form and that
23  Mr  Hanauer directed that it be removed?
24      MR. BURKE:  Objection.  Misstates
25  the record.  Assumes facts not in evidence.

Page 46

1 You may answer.
2    A. I -- I was never aware of anything
3 like that.
4    Q. Did you ever learned from any
5 source that Mr. Hanauer was opposed to the
6 transaction?
7    MR. BURKE: Same objection.
8 Assumes facts not in evidence. Misstates the
9 record. You may answer.
10    A. No
11    Q. Let's take a look at Plaintiff's
12 Exhibit 1.
13    A. Okay. Do you want me to read the
14 whole thing?
15    Q. No. With this document or any
16 other, please take as much time as you need to
17 look at it or review it. In this particular
18 case, I think I can direct your attention to
19 the relevant sections which start at the bottom
20 of the second column, if you can just read that
21 to yourself.
22    A. The bottom of the second column?
23    Q. Yes.
24    A. Is there a question?
25    Q. Well, yes. My question is: Do

Page 47

1 you see in the third column there's a paragraph
2 that begins Brautigam alleged? Do you see that
3 at the top of the --
4    A. I see it in the fourth column.
5    Q. The fourth column?
6    A. Yes
7    Q. Okay. And later down in the
8 paragraph it says, Burke's Response: Hanauer
9 opposed the Provident takeover because he
10 wanted Oak Hills to remain independent. Is
11 that a true statement?
12    MR. BURKE: Objection. As I told
13 you yesterday, Mr. Brautigam -- and it's
14 interesting, there are no quotation marks
15 around that -- that is a mischaracterization of
16 anything I said. You're cross-examining the
17 witness on a document he's never seen and I
18 object. I think it misstates the record and
19 assumes facts not in evidence.
20    MR. GILLIGAN: We went through
21 this yesterday. Is -- the question is not
22 whether Mr. Burke made a response. Your
23 question is whether Hanauer opposed the
24 Provident takeover because he wanted Oak Hills
25 to remain independent. Is that right, Mike?

Page 48

1    MR. BRAUTIGAM: Yes.
2    MR. GILLIGAN: You can answer it
3 that way. Do you understand?
4    A. Answer what? That I -- do I know
5 of this to be a true fact, that Hanauer
6 opposed?
7    Q. Yes.
8    MR. GILLIGAN: Yes.
9    A. No, I do not know that.
10    Q. If that is a true fact, would it
11 have been of interest to you with respect -- if
12 this had been a true fact, would this have been
13 of interest to you with respect to performing
14 your duties and responsibilities with respect
15 to the Oak Hills-Provident merger?
16    MR. BURKE: Objection. Assumes
17 facts not in evidence.
18    A. This one sentence in itself, no.
19    Q. The fact of Mr. Hanauer's
20 opposition?
21    MR. MAUNDRELL: Objection. Asked
22 and answered.
23    MR. BURKE: Objection. Asked and
24 answered.
25    A. This fact in and of it -- Mr.

Page 49

1 Hanauer, to my knowledge, was on the record as
2 a director approving the merger.
3    Q. Okay. How do you know that?
4    A. OHSL and their counsel provided a
5 couple sections in the document from which it
6 was clear that the Board had approved the
7 transaction unanimously.
8    Q. Okay. What is your understanding
9 of the word unanimous?
10    A. I understand unanimous to mean
11 that all recorded votes are in favor of a
12 particular matter.
13    Q. No opposition from OHSL's CEO
14 Hanauer was included in Defendant's Exhibit 1,
15 is that correct?
16    MR. BURKE: Objection to form.
17    A. I haven't looked at the document
18 closely recently. I don't recall there being
19 any discussion of his -- of any alleged
20 opposition.
21    Q. Directing your attention back to
22 Plaintiff's Exhibit 1, if you could look
23 further down where there's a sentence and it
24 said, Burke claims that Herron's departure was
25 disclosed to shareholders. Do you see that?

Page 50

1 Could you just read that paragraph to yourself?
2    A.  Okay.
3    Q.  First of all, do you know who
4 Thomas M. Herron was?
5    A.  I learned from conversations with
6 my counsel that he was a director.  I knew that
7 there had been a director, but I didn't know --
8 I couldn't recall his name until I talked with
9 my attorneys.
10    Q.  Okay.  When you say a director,
11 you mean a director of OHSL?
12    A.  A director of OHSL who resigned
13 prior to the vote on the merger.
14    Q.  How much prior to the vote on the
15 merger?
16    A.  I don't know.
17    Q.  Do you know why Mr. Herron
18 resigned from OHSL's Board?
19    A.  It's -- at some point I was
20 informed that he had resigned from the Board.
21 And I was -- and I was speaking with -- I can't
22 recall who I was speaking with.  I asked why he
23 had resigned and he said that -- and whoever it
24 was said that Mr. Herron had submitted a letter
25 of resignation to the Board citing his reason

Page 51

1 for leaving as personal reasons.
2    Q.  Did you ever see that letter?
3    A.  No.
4    Q.  Did you ever ask to see the
5 letter?
6    A.  No.
7    Q.  Did you ever review OHSL's Board
8 minutes?
9    A.  No.
10    Q.  Did you ever direct that anyone at
11 KMK review OHSL's Board minutes and major
12 committee minutes for perhaps the last five
13 years?
14    A.  I don't recall.
15    Q.  The provisions of The Merger
16 Agreement call for an exchange of financial
17 information and other information between the
18 acquiring company and the company that is
19 potentially acquired.  Is that right?
20    A.  I'm not familiar with The Merger
21 Agreement, but merger agreements generally
22 state those kinds of things.
23    Q.  And generally they refer to Board
24 minutes as the type of information that both
25 sides might be interested in looking at,

Page 52

1 correct?
2    A.  I don't know that I would say that
3 they're enumerated.  I think that sometimes
4 corporate records are referred to.
5    Q.  Do you believe that, as a good
6 practice in your business, that it would be
7 wise to look at the Board minutes of the
8 company to be acquired?
9       MR. BURKE:  Objection.  Calls for
10 speculation.  You may answer.
11       MR. GILLIGAN:  By him to --
12    Q.  By --
13       MR. GILLIGAN:  Go ahead.  Would
14 you clarify what you mean?
15    Q.  Certainly.  By anyone at KMK.
16    A.  If our client requests that we
17 perform a legal review of the records of the
18 company to be acquired, yes.  Sometimes clients
19 specifically do not want us to do that, they do
20 their own review.
21    Q.  Did your client request that type
22 of review in this case?
23    A.  I don't know.  It wasn't requested
24 of me.
25    Q.  Was Mr. Herron's resignation ever

Page 53

1 disclosed to shareholders?
2    A.  I don't believe so.
3    Q.  Okay.  So you -- let me read you
4 something from Plaintiff's Exhibit 1
5 Burke's -- Burke claims Herron's departure was
6 disclosed to shareholders.  How?  His name was
7 omitted in a list of directors included with
8 the proxy statement seeking shareholder
9 approval of the sale.  So do you disagree or
10 agree with that statement?
11       MR. BURKE:  Objection.  You're
12 cross-examining him on a third-party,
13 misleading, erroneous news article that
14 misquotes me.  Calls for speculation and I
15 think it's absolutely inappropriate.  He
16 already told you.
17       MR. HUST:  Objection.
18       MR. BRAUTIGAM:  He told me what?
19       MR. BURKE:  He told you everything
20 he knows about Herron's resignation.  You may
21 answer.
22       THE WITNESS:  What was the
23 question again?
24       (Record read by Reporter.)
25       MR. BURKE:  I would also note that

14 (Pages 50 to 53)

Page 54

```
1    you asked him about a resignation.  This talked
2    about departure, so your question is inherently
3    misleading.  You may answer.
4         A.  Actually I correct my earlier
5    statement.  I do think that his resignation was
6    disclosed in the total mix of information by
7    not being listed in that table.
8    BY MR. BRAUTIGAM:
9         Q.  Were you involved in discussions
10   as to whether or not Mr. Herron's resignation
11   should be disclosed in a different fashion?
12        A.  I don't remember.
13        Q   Do you believe that if Mr. Herron
14   resigned in part in protest, that that would be
15   potentially material information?
16            MR. HUST.  Objection.
17            MR. BURKE.  Objection.  Assumes
18   facts not in evidence.
19            THE WITNESS:  But I should answer?
20            MR GILLIGAN  Go ahead.  You can
21   answer.  He's making the comments for the
22   record.
23            THE WITNESS.  I understand.
24            MR. GILLIGAN:  But he is not to
25   tell you whether you can answer it or not
```

Page 55

```
1    answer.  You can only get that instruction from
2    me
3            THE WITNESS:  Okay.
4            MR. GILLIGAN  So if I don't for
5    any reason tell you not to answer, go ahead.
6    Do you have the question?
7         A.  Yes.  The disclosure of a director
8    resignation is statutorily provided for and is
9    not required under the Exchange Act rules or
10   the proxy rules, except in limited
11   circumstances.
12   BY MR. BRAUTIGAM:
13        Q.  Are things included in Defendant's
14   Exhibit 1 that are not required by the proxy
15   rules?
16            MR. BURKE:  Objection.  Calls for
17   a narrative.  Do you want him to read
18   everything?  Overbroad.
19        A.  I can't -- I couldn't answer that
20   question without looking at the entire
21   document.
22        Q.  Are you familiar with the
23   Regulation C promulgated by the SEC?
24        A.  Yes.
25        Q.  What's your understanding of
```

Page 56

```
1    Regulation C?
2         A.  Regulation C is a large group of
3    general rules relating to registration
4    statements generally.
5         Q.  Okay.  And do you understand the
6    general purpose to be that information included
7    in a prospectus be presented in a clear,
8    concise and understandable manner?
9         A.  Yes.
10        Q.  And that the purpose of the proxy
11   material -- well, the language of the proxy
12   material should be written in a way so that
13   it's not misleading?  Is that your
14   understanding of reg C?
15        A.  Reg C does not regulate proxy
16   materials.
17        Q   Prospectus.
18            MR. BURKE:  Objection to form.
19        A.  Then I don't understand the
20   question.
21        Q.  Okay.  Does reg C regulate the
22   prospectus?
23        A.  Yes.
24        Q.  Is language in a prospectus
25   supposed to be written in a way that's clear,
```

Page 57

```
1    concise and understandable?
2            MR. BURKE:  Objection.  Asked and
3    answered.
4         A.  As a matter of fact, the SEC has
5    got plain English rules regarding those
6         Q   What's your understanding of the
7    plain English rules?
8         A.  Just what you said.
9         Q   And generally speaking, the SEC
10   requires all public filings to be written in a
11   way so that it's not misleading; is that
12   correct?
13        A.  Correct.
14        Q.  Have you ever heard of Dr. Bill
15   Lutz, who was a consultant on plain language to
16   the SEC?
17        A.  Name sounds familiar
18        Q.  Were you aware that he was
19   retained as an expert in this case?
20        A.  No.
21        Q.  Please describe for the record
22   what the rules are regarding director
23   resignation.
24        A.  Under form 8-K and under the proxy
25   rules, if a director resigns or refuses to
```

Page 58

1  stand for reelection, and on -- this is off the
2  top of my head, I can't tell you with a hundred
3  percent certainty -- but if a director resigns
4  or refuses to stand for reelection because of a
5  disagreement with the Board, and submits a
6  letter to the Board stating his or her
7  disagreement and requests that that -- that the
8  disagreement be disclosed, then the director
9  resignation must be disclosed.
10     Q.  Do you believe that it was
11  misleading in these circumstances not to
12  disclose Mr. Herron's resignation, except as
13  you have stated it was disclosed?
14         MR. MAUNDRELL:  Objection.
15         MR. BURKE:  Objection to form.
16  You may answer it.
17     A.  No, I do not.
18     Q.  Why not?
19         MR. MAUNDRELL:  Objection.
20     A.  I don't believe that a -- I don't
21  believe that a director resigning prior to a
22  decision on a transaction has any more -- their
23  opinion has any more relevance than anyone
24  else's.
25     Q.  When you said "anyone else's," to

Page 59

1  whom were you referring?
2     A.  You.  I don't know that --
3  anybody.  He wasn't there for the final -- for
4  the final discussions regarding The Merger
5  Agreement, he resigned.  He did not -- he
6  didn't have a vote.  I don't even understand
7  what the issue was.
8     Q.  You mentioned something earlier
9  about it being your understanding that Mr.
10  Herron resigned for personal reasons; is that
11  correct?
12     A.  That's what I was informed, yes.
13     Q.  Okay.  And who informed you of
14  that?
15         MR. MAUNDRELL:  Objection.  Asked
16  and answered.
17     A.  I told you I didn't recall.
18     Q.  Okay.  And if you had been
19  informed that Mr. Herron resigned in part
20  because he disagreed with the proposed
21  OHSL-Provident merger, would that have been of
22  interest to you in the summer of 1999?
23         MR. BURKE:  Objection.  Misstates
24  the record.  It is a fact that he resigned
25  before the vote on the final transaction.

Page 60

1  That's why I'm objecting that it misstates the
2  record.  Calls for speculation.
3         MR. MAUNDRELL:  Objection.
4         MR. BRAUTIGAM:  Jim, how does that
5  misstate the record?
6         MR. BURKE:  Because he resigned
7  before the final vote on the final merger
8  agreement.
9         MR. BRAUTIGAM:  I agree with you.
10         MR. BURKE:  You know that and
11  that's why I'm saying your question misstates
12  the record, because you said he opposed the
13  Provident transaction.  He never voted on the
14  Provident transaction.
15  BY MR. BRAUTIGAM:
16     Q.  Well, okay, I'll back up.  Do you
17  know that at a Board meeting of OHSL directors
18  on July 22nd, 1999, Mr. Herron affirmatively
19  voted against continued negotiations with
20  Provident with respect to this merger?
21     A.  No, I wasn't aware of that.  I
22  don't know if that's true.
23     Q.  You could have found out if that
24  were true if you had read the Board minutes,
25  correct?

Page 61

1         MR. MAUNDRELL:  Objection,
2  argumentative.
3         MR. BURKE:  Objection,
4  argumentative.  You can answer.
5         MR. GILLIGAN:  He doesn't know
6  whether it's in the Board minutes or not.
7         MR. MAUNDRELL:  Also calls for
8  speculation.
9         MR. GILLIGAN:  He said he doesn't
10  know, so let's move on.
11         MR. BRAUTIGAM:  I think he can
12  answer that question.
13         MR. GILLIGAN:  What?
14         MR. BRAUTIGAM:  I think he can
15  answer that question.
16         MR. GILLIGAN:  I thought he did
17  though, didn't he?
18         THE WITNESS:  I lost track of what
19  the question was.
20         MR. GILLIGAN:  Go ahead.  I
21  thought he answered it.
22         (Record read by Reporter.)
23     A.  I don't know what's in the Board
24  minutes.
25  BY MR. BRAUTIGAM:

Page 62

1    Q.  Is that something you would expect
2  to be included in the Board minutes?
3       MR. MAUNDRELL:  Objection.
4       MR. BURKE:  Objection.  Calls for
5  speculation.  You may answer.
6    A.  I don't, I don't know how -- I
7  mean, different companies keep minutes in
8  different ways.
9    Q.  Would you expect the vote of the
10  directors of OHSL to be included in the Board
11  minutes on a proposed merger?
12       MR. MAUNDRELL:  Objection.
13       MR. BURKE:  Objection.  Calls for
14  speculation as to what different companies did.
15  You may answer.
16    A.  He did not vote on this
17  transaction.
18    Q.  Would you expect the July 22nd,
19  1999 Board minutes reflecting a vote on whether
20  to continue negotiations with Provident to
21  reflect Mr. Herron's vote against?
22       MR. BURKE:  Objection.  Calls for
23  speculation.  You may answer.
24       MR. MAUNDRELL:  Join in.
25    A.  I would find that to be irrelevant

Page 63

1  that he didn't want to go forward on
2  negotiations.  That has nothing to do with the
3  final terms of the transaction.
4    Q.  Okay.  My question was a little
5  different though.  Would you expect his vote
6  against to be recorded in the Board minutes?
7       MR. MAUNDRELL:  Objection.  Asked
8  and answered.
9       MR. GILLIGAN:  He's already
10  answered.  Go ahead and answer it again.  Let's
11  move on, Mark.
12    A.  If a Board takes a vote, I would
13  expect the vote to be reflected in the minutes.
14    Q.  Did the terms of the transaction
15  change between July 22nd, 1999 and August 2nd,
16  1999?
17    A.  I have no idea.
18    Q.  Who would know that, Tim Matthews?
19    A.  Perhaps.
20    Q.  If Mr. Herron had resigned in part
21  in protest, would that have been of interest to
22  you?
23       MR. BURKE:  Objection.
24       MR. MAUNDRELL:  Objection.  Asked
25  and answered.  This is at least the third time.

Page 64

1       MR. BURKE:  It also misstates the
2  record.
3       MR. GILLIGAN:  Would you finish
4  the question?
5       MR. BRAUTIGAM:  It is.
6       MR. GILLIGAN:  Protest over what?
7       MR. BRAUTIGAM:  Over continued
8  negotiations with OHSL and Provident that would
9  lead to a merger.
10       MR. BURKE:  Objection.
11       MR. GILLIGAN:  I think you've
12  answered it, but go ahead one more time.
13  Let's --
14    A.  No.
15  BY MR. BRAUTIGAM:
16    Q.  And that's because you consider it
17  to be totally irrelevant, correct?
18       MR. MAUNDRELL:  Objection,
19  argumentative.  Asked and answered.
20    A.  I said if my -- I believe my
21  testimony was that I believe, because he did
22  not vote on the final merger agreement, that
23  his -- he had no vote and, therefore, his view
24  is irrelevant to the other shareholders.
25    Q.  During the time you worked on the

Page 65

1  OHSL-Provident merger, were you aware -- excuse
2  me.  Did you have an understanding of the
3  feeling of the OHSL Board and OHSL's management
4  with respect to the transaction?
5    A.  Only as reflected in the sections
6  of the documents that were submitted to me by
7  them and their counsel.
8    Q.  Did you have an understanding that
9  the Board was unanimously in favor of the
10  merger?
11    A.  I understand that the Board
12  unanimously voted in favor of the merger.
13       MR. BURKE:  Can we take a break at
14  this point?
15       MR. BRAUTIGAM:  Certainly.
16       (Brief recess.)
17  BY MR. BRAUTIGAM:
18    Q.  Mr. Weiss, what is the purpose of
19  Defendant's Exhibit 1?
20       MR. BURKE:  Objection.  Vague and
21  ambiguous.  You may answer.
22    A.  I would like some more
23  clarification on the question.
24    Q.  Okay.  What would you like
25  clarified?

17 (Pages 62 to 65)

Page 66

1    A.  What do you mean by "purpose"?
2    Q.  Well, why is Defendant's Exhibit 1
3  created?
4    A.  Well, the portions of Exhibit 1
5  that relate to OHSL's vote on the merger are
6  required by OHSL's charter documents and by the
7  proxy rules under the Exchange Act.  And the
8  portions that relate to the potential issuance
9  of Provident Financial common stock are
10  required by the Securities Act.
11    Q.  Would it be fair to say that this
12  document is going to be sent to OHSL
13  shareholders?  Correct?
14    A.  I think it's fair to say that this
15  document was sent to OHSL shareholders in 1999.
16    Q.  And it was sent to OHSL
17  shareholders so they could make an informed
18  decision as to how to vote on the proposed
19  merger with Provident, correct?
20    A.  Yes.
21    Q.  Do you believe that Defendant's
22  Exhibit 1 has to be truthful?
23    MR. BURKE:  Objection.  Asked and
24  answered.  You may answer
25    A.  Has to be truthful, yes

Page 67

1    Q.  Do you believe it has to be
2  accurate?
3    A.  Yes.
4    Q.  Do you believe that it has to be
5  complete?
6    A.  I think that due -- in a greater
7  disclosure within the four corners of this
8  document, complete also includes documents
9  which are incorporated by reference into it and
10  other publicly available information relating
11  to these companies.
12    Q.  So with that caveat that it also
13  includes documents incorporated by reference,
14  you believe it has to be complete, right?
15    MR. BURKE:  Objection.  Misstates
16  his testimony.  That's not what he said.
17    Q.  I didn't mean to misstate your
18  testimony.
19    MR. BURKE:  Then just read it
20  back.
21    MR. GILLIGAN:  Why don't you read
22  what his answer was?
23    Q.  I can ask a different question.
24  It's your testimony that Defendant's Exhibit 1
25  does not tell the whole story because it

Page 68

1  incorporates other exhibits; is that correct?
2    MR. BURKE:  That's not what he
3  said.
4    MR. BURKE:  Objection.  Misstates
5  the testimony.
6    Q.  What did you say?
7    A.  What I said is if you're asking me
8  that the four corners of this document contain
9  all information, under SEC rules, I believe if
10  you -- certain information can be incorporated
11  by reference and is deemed to be part of this,
12  but is not actually in this.
13    Q.  Right.  So --
14    A.  Under Where you can find more
15  information.
16    Q.  So including all of the documents
17  that are deemed to be part of Defendant's
18  Exhibit 1, you believe that it's important for
19  the document to be complete, correct?
20    MR. BURKE:  Objection.
21    A.  I think it's important for the
22  document to adhere to the applicable Securities
23  & Exchange Act rules.
24    Q.  And you believe that the document
25  should not contain any material misstatements

Page 69

1  of fact, correct?
2    A.  Yes.
3    Q.  And you believe that the document
4  should not omit to state any material facts,
5  correct?
6    A.  That's not exactly the standard
7    Q.  Okay.  What is the standard as you
8  understand it?
9    A.  I believe the standard is omit to
10  state any matter which -- I don't know off the
11  top of my head, but I don't believe the
12  standard is specifically omit to state any
13  material fact.  I think it's in light of the
14  circumstances, should have been disclosed, or
15  something like that
16    Q.  Did you learn from any source that
17  Mr. Hanauer has testified in a previous action
18  that he did not believe the OHSL-Provident
19  merger was in the best interest of
20  shareholders?
21    MR. BURKE:  Objection, misleading.
22  Misstates facts, also has no time frame
23  attached to it.
24    A.  I was never informed of that.
25    Q.  Is that something you would have

Page 70

1  been interested in?
2       MR. BURKE: Objection. Misstates
3  the testimony. Misstates the record in this
4  case. No time frame. You may answer.
5       A. Not particularly.
6       Q. Why not?
7       A. Which director are we speaking
8  about again?
9       Q. Ken Hanauer, who was OHSL's CEO
10  and only member of management who was a
11  director.
12       A. And who voted on the record in
13  favor of the transaction?
14       Q. Who voted as a director in favor
15  of the transaction
16       A. I think the inquiry ends after --
17  the inquiry ends there.
18       Q. Why do you say that?
19       A. I think it's very easy for someone
20  when they don't have fiduciary duties hanging
21  on them to make any statements. But when it
22  came time for him to make a statement in his
23  capacity as a fiduciary for the shareholders,
24  he voted in favor of the transaction. And to
25  my knowledge, he never retracted that vote.

Page 71

1       Q. Who was OHSL's largest
2  shareholder?
3       A. No idea.
4       Q. Okay. Let's take a look at the
5  first page of Defendant's Exhibit 1, and I'm
6  particularly interested in the sentence, Your
7  Board of Directors unanimously approved the
8  acquisition. Do you see that?
9       A. Yes.
10       Q. And you're an English major,
11  correct?
12       A. Yes.
13       Q. So you understand how to diagram
14  sentences and what adverbs modify what other
15  parts in a sentence?
16       A. No. That was a grammar major. I'm
17  an English major.
18       Q. Was there a grammar major at the
19  University of Michigan?
20       A. No. I would say I was really an
21  English major.
22       Q. Okay. Would you please read that
23  sentence to yourself?
24       A. Okay.
25       Q. Now, the sentence reads, Your

Page 72

1  Board of Directors unanimously approved the
2  acquisition and believes that it is in the best
3  interest of OHSL stockholders. Do you see
4  that?
5       A. Yes.
6       Q. Did I read it correctly?
7       A. Yes.
8       Q. Do you believe the word
9  unanimously modifies both approved the
10  acquisition and believes that it is in the best
11  interest of OHSL stockholders?
12       MR. BURKE: Objection to
13  relevance.
14       A. I don't know
15       Q. Okay. If Mr Hanauer did not
16  believe that the transaction was in the best
17  interest of OHSL stockholders, would that be a
18  true statement?
19       MR. BURKE: Objection. Misstates
20  the record. No time frame. Vague and
21  ambiguous. You may answer.
22       A. Again, he's on the record as
23  voting that it was in the best interest of OHSL
24  shareholders
25       Q. Okay. I'm with you on that

Page 73

1  concept. Let's talk about the second concept.
2  And believes that it is in the best interest of
3  OHSL stockholders. If Mr. Hanauer did not
4  believe that, is that a true statement?
5       MR. BURKE: Objection. Assumes
6  facts not in evidence. Calls for speculation
7  No time frame.
8       A. He wouldn't have approved the
9  acquisition if he didn't think it was in the
10  best interest of OHSL stockholders.
11       Q. Why do you say that?
12       A. Isn't that exactly what a Board of
13  Directors is supposed to do? As a fiduciary he
14  wouldn't have approved an acquisition that he
15  didn't think was in the best interest of OHSL
16  shareholders
17       Q. Do you know that Mr Hanauer's
18  testimony with respect to his affirmative vote
19  in favor of the OHSL-Provident merger is that
20  he voted that way because he just gave up?
21       MR. BURKE: That's an absolute
22  mischaracterization of the record.
23       MR. HUST: I'll object also.
24       A. I -- I cannot read anyone's mind,
25  much less someone who --

19 (Pages 70 to 73)

Page 74

1   MR. GILLIGAN: No, he just asked
2 you if you read the testimony or you --
3   A. No. I didn't read the testimony.
4   MR. BRAUTIGAM: Was that my
5 question?
6   MR. GILLIGAN: Isn't that what you
7 asked?
8   MR. BRAUTIGAM: I'm not sure.
9   MR. GILLIGAN: Is that what the --
10   MR. BRAUTIGAM: No, it has nothing
11 to do with testimony.
12 BY MR. BRAUTIGAM:
13   Q. My question is: If Mr. Hanauer
14 did not believe that the proposed merger with
15 Provident was in the best interest of OHSL
16 shareholders, would this sentence that I've
17 directed your attention to be true?
18   MR. BURKE: You're asking him to
19 assume facts that are not in evidence. Calls
20 for speculation. Mischaracterizes the record.
21 You may answer.
22   MR. HUST: He's asked and answered
23 already.
24   MR. GILLIGAN: I think he's
25 already answered it --

Page 75

1   MR. HUST: Same objection.
2   MR. GILLIGAN: -- but go ahead one
3 more time, answer it. Maybe we can move on.
4   A. Again, my belief is that he -- his
5 vote in favor of the acquisition means that he
6 believed, as a fiduciary to the shareholders
7 that it was in their best interest. And --
8   Q. So --
9   A. And if he didn't believe that, it
10 was incumbent upon him to retract his vote or
11 to tell people involved in the transaction.
12   Q. Do you know how Mr. Hanauer voted
13 his personal shares?
14   A. No, I do not.
15   Q. Would it surprise you if I told
16 you that Mr. Hanauer voted his personal shares
17 against the transaction?
18   A. I don't know whether it would
19 surprise me or not surprise me.
20   Q. What factors would you need to
21 consider in making that assessment?
22   MR. BURKE: To know if he's
23 surprised? Objection to form.
24   Q. Yes.
25   A. I would have to know everything

Page 76

1 about Mr. Hanauer and -- I don't know why I
2 should -- I don't know why I should be
3 surprised or not surprised about someone I've
4 never met.
5   Q. Well, would it surprise you if any
6 director of OHSL voted his personal shares
7 against the transaction?
8   A. I, I guess I don't know what you
9 mean by "surprise."
10   Q. Would you --
11   A. I don't, I don't think it's
12 necessarily inconsistent with their votes as
13 directors, if that's what you're asking me.
14   Q. Okay. Why not?
15   A. Because when you're voting as a
16 director, you have a fiduciary obligation to
17 shareholders. When you're voting as a
18 shareholder, you're voting on your own behalf.
19 Now, Mr. Hanauer was an executive, correct?
20   Q. He was a member of management,
21 yes.
22   A. Okay. I can't remember whether he
23 had any type of employment agreement or
24 anything like that following this transaction,
25 but he may -- he may very well have had

Page 77

1 personal reasons as a shareholder for voting
2 against the transaction, but still in the
3 exercise of his fiduciary duties think that it
4 was in the best interest of the shareholders
5 and he went on record as voting that way.
6   Q. Do you think it was incumbent upon
7 Mr. Hanauer to explain to the shareholders that
8 he didn't believe in the transaction?
9   MR. BURKE: Objection. Calls for
10 speculation as to what Mr. Hanauer believed.
11 You may answer.
12   A. I don't know what you mean by he
13 doesn't believe in the transaction.
14   Q. Okay. Let's take a look at what
15 has been previously marked as Plaintiff's 14.
16   A. What do you want me to look at?
17   Q. Can I direct your attention to
18 page four of the document, please?
19   A. The numbers at the top or the
20 bottom?
21   Q. At the bottom.
22   MR. GILLIGAN: The part that's
23 marked.
24   Q. Actually, it's already highlighted
25 for you. Could you take a look and read that

20 (Pages 74 to 77)

Page 78

1 paragraph to yourself, please?
2       MR. HUST: Which paragraph is the
3 witness reading? I'm sorry.
4       MR. GILLIGAN: Can I ask that he
5 read it into the record so that the other
6 counsel knows what we're talking about?
7       Q.  Absolutely.
8       A.  Your Board of Directors has
9 determined that the acquisition and the
10 Agreement and Plan of Merger are advisable and
11 in the best interests of our stockholders.  The
12 Board unanimously approved the Agreement and
13 Plan of Merger and acquisition on August 2nd,
14 1999 and has recommended that our stockholders
15 vote for the adoption of the agreement and plan
16 of merger
17       Q.  Okay.  Now, let me represent to
18 you that these were words that were prepared by
19 Dinsmore for Mr. Hanauer to read at the October
20 25th, 1999 special meeting of OHSL
21 shareholders.  Are you with me so far?
22       A.  Um-hmm.
23       Q.  And I believe a fair reading of
24 Mr Hanauer's testimony is that he read the
25 words or substance of this outline at the

Page 79

1 October 25th, 1999 meeting.  Are you with me so
2 far?
3       MR. BURKE  Objection to the
4 characterization of the evidence  You may
5 answer.
6       A  I wasn't there, but --
7       MR. BURKE: The question is:  Are
8 you with me so far?
9       MR. BRAUTIGAM: Yes.
10       MR. BURKE: Am I correct?
11       A.  I suppose. I don't know where
12 you're going.
13 BY MR. BRAUTIGAM:
14       Q.  Okay  If Mr. Hanauer previously
15 voted his shares against the merger
16 transaction, do you think it's fair to run the
17 shareholders that he get up and run the meeting
18 soliciting their votes in favor of the merger?
19       MR. BURKE: Objection. Misstates
20 the record as to prior vote of his shares.  You
21 may answer.
22       MR. HUST: Objection.
23       MR. GILLIGAN: Are you asking him
24 that as a legal opinion?
25       MR. BRAUTIGAM: His opinion as an

Page 80

1 attorney who performed work on this merger.
2       A.  Again, you're mixing two different
3 standards.  Just -- there may be -- there may
4 very well be a situation where in his own
5 personal -- that it's not in his own personal
6 interest as a shareholder to vote in favor.
7 And he's certainly able to vote against it if
8 that's what he wants.  But I do not think that
9 it's inconsistent -- in fact, I think it's
10 entirely consistent with the record from the
11 August 2nd meeting that he voted in favor of
12 the transaction.
13 BY MR. BRAUTIGAM
14       Q.  Don't you think he should disclose
15 his personal vote against the transaction to
16 the shareholders when he's asking them to do
17 the opposite?
18       MR. BURKE:  Objection.
19       A.  No.
20       Q.  Okay.  Are you familiar with the
21 mosaic theory?
22       MR. BURKE  Objection.
23       A.  No.
24       Q.  Do you believe that investors and
25 analysts look to the CEO in large measure in

Page 81

1 determining how to vote on a proposed merger
2 transaction?
3       MR. BURKE:  Objection.
4       MR. GILLIGAN  Could I ask you to
5 eliminate the compound nature and split your
6 question?  You asked him two different sets of
7 people.
8       Q.  Okay.  Do you believe that
9 investors often look to the CEO with respect to
10 how they should vote in a merger transaction?
11       MR. HUST: Objection, irrelevant
12       MR. BURKE: Objection. And also
13 calls for speculation as to what unnamed
14 investors do
15       A.  Am I supposed to answer?
16       MR. HUST: Yes
17       MR. GILLIGAN: Go ahead and answer
18 if you can, Mark.
19       A.  I can't really speak for
20 investors.  I would -- wouldn't pretend to.
21       Q.  Okay.  Do you believe that
22 analysts often look to the CEO of a company
23 with respect to how to vote shares they control
24 on a merger like this?
25       MR. HUST: Objection.

Page 82

1      MR. BURKE: Same objection.
2      A.  Again, I think the most relevant
3  and important factor is the fact that when he
4  was exercising his fiduciary responsibility
5  with all of the knowledge of what was best for
6  his fiduciary to shareholders, he went on
7  record as voting for it. I don't know if his
8  personal vote, which could have been motivated
9  by one of any of a multitude of factors, is
10  material
11      Q.  Do you think it's potentially
12  material?
13      MR. HUST  Objection.
14      A.  I would need to know so many facts
15  to even engage in a guess
16      Q  Okay  What would you need to
17  know?
18      MR. HUST.  Objection.
19      MR. BURKE:  Objection.
20      A.  Why was he -- why he opposed them
21  as a -- as an individual shareholder and every
22  reason for that.  He -- he certainly wasn't
23  going to be a Board member after this
24  transaction.  Sometimes people like to be Board
25  members

Page 83

1      Q.  Okay.  Anything else?
2      A.  Anything, any other -- I don't
3  know what other reasons there might be.  I
4  don't -- I don't know this individual.  I've
5  never talked to this individual.
6      Q.  Do you think that there should
7  have been disclosure of Hanauer's vote of his
8  personal shares so that there was a curative
9  disclosure, saying to the shareholders before
10  the final vote, hey, this CEO of the company,
11  the largest shareholder of the company, voted
12  his shares against the merger transaction?
13      MR. HUST:  Objection to form.
14      MR. BURKE:  Objection.
15      MR. GILLIGAN:  I just want to
16  state one thing, and I had asked you many times
17  yesterday and I've asked you that again today.
18  When you asked for "you think," you're asking
19  for an opinion.  And I want the witness to
20  know, Mike, whether or not you're asking him
21  this question as rendering an expert opinion
22  testimony, okay.
23      MR. BRAUTIGAM:  Okay.
24      MR. GILLIGAN:  And because you're
25  really asking him at this point to speculate on

Page 84

1  something that happened at a point in time when
2  Mark had no involvement, KMK had no
3  involvement.  I mean, this document was out,
4  the shareholders had it.  And as I understand
5  it, this is something that happened totally
6  outside of the scope of any Provident Bank or
7  KMK involvement.
8      So these questions stand alone at
9  a point in time where he and our law firm had
10  nothing to do with this.  And therefore, you're
11  asking him to render expert opinion testimony,
12  is what I believe.  Do you understand what --
13      MR. BRAUTIGAM.  Okay.
14      MR. GILLIGAN  -- my concern is
15  and reasons for it?
16      MR. BRAUTIGAM  I think I can
17  address your concerns  First of all, I believe
18  that Mr. Weiss testified that he's not an
19  expert in mergers and acquisitions, so I'm not
20  asking for an expert opinion.  I'm asking for
21  his opinion with respect to his view as an
22  attorney who worked on the transaction.  So
23  does that address your concern?
24      MR. GILLIGAN  Except that I don't
25  think that he needs to have an opinion  But

Page 85

1  he's asking you expert opinion testimony on
2  something that happened later on in the
3  transaction, obviously.  So I'd leave it up to
4  you  If you think you can answer that, go
5  ahead
6      A.  Repeat the question
7      MR. GILLIGAN.  Do you understand?
8      (Record read by Reporter.)
9      MR. BURKE.  Assumes facts not in
10  evidence.  Incomplete hypothetical.  Calls for
11  speculation.  You may answer.
12      MR. HUST:  Objection.  Same.
13      A.  I, I don't -- I guess I don't
14  understand the word "curative."  I don't know
15  what we'd be curing here.
16  BY MR. BRAUTIGAM.
17      Q.  If you found out that something is
18  materially misstated in Defendant's Exhibit 1
19  after it goes out to the shareholders, what if
20  any obligation do the parties have to set the
21  record straight?
22      A.  If it was the determination of all
23  the parties that there was a material
24  misstatement in this document or any document,
25  there are filings that can be made to correct

Page 86

1  it or amended to the document to correct it.
2       Q.  What are the names of the filings?
3       A.  In some circumstances you can file
4  a form 8-K.  In some circumstances you can
5  recirculate an entire new document.
6       Q.  Did you suggest in your previous
7  answer that all of the parties would have to be
8  in unanimous agreement for that to be done?
9       MR. GILLIGAN:  What he had said in
10  his prior answer is on the record.  Do you
11  recall what you said here?
12       A.  It would be discussed among all
13  the parties.
14       Q.  Right.  And would they all have to
15  agree before an 8-K would be filed or a new
16  document circulated?
17       A.  In, in practice I haven't had an
18  instance where that hasn't happened, because
19  everybody strives to have the best disclosure.
20  I've never had a -- I've never had a situation
21  where, where I thought disclosure was advisable
22  and someone was opposed to it -- or in a
23  situation where somebody else thought
24  disclosure was advisable and I was opposed to
25  it.

Page 88

1       Q.  Do you recall generally?
2       A.  I am certain that I spoke with
3  representatives of my client in the preparation
4  of this document.
5       Q.  What was Mr. Hanauer's role in the
6  creation of Defendant's Exhibit 1?
7       A.  That would -- that would be a
8  question properly asked of his counsel.  I
9  don't know.
10       Q.  What was Mr. Roe's role in the
11  creation of Defendant's Exhibit 1?
12       A.  I guess the best way to answer it
13  is that collectively OHSL and their counsel and
14  advisors are responsible for all the OHSL
15  information in the document.
16       Q.  And when you say -- did you say
17  all of the information in the document?
18       A.  All the OHSL information in the
19  document.
20       Q.  All the OHSL information.  So if
21  information related to OHSL is materially
22  misstated, it's your belief that that's the
23  responsibility of OHSL and the Dinsmore firm,
24  is that correct?
25       MR. BURKE:  Objection.  Assumes

Page 87

1       Q.  Have you ever had a situation
2  where you've been sued for securities fraud?
3       MR. BURKE:  Objection.  Violation
4  of Rule 111 maybe, but you may answer.
5       A.  Other than this one?
6       Q.  Yes.
7       A.  No.
8       Q.  Okay.  What was Mr. Carey's role
9  with respect to the creation and dissemination
10  of Defendant's Exhibit 1?
11       A.  I don't know.
12       Q.  What was Mr. Magee's role?
13       A.  I don't know.
14       Q.  What was Mr. Farrenkopf's role?
15       A.  I don't know.
16       Q.  What was Mr. Hanebutt's role?
17       A.  I don't know.
18       Q.  What was Mr. Litzinger's role?
19       A.  I don't even know who that is.
20       Q.  What was Mr. Stollings' role?
21       A.  I don't know.
22       Q.  Did you ever talk to any of those
23  individuals about the creation and
24  dissemination of Defendant's Exhibit 1?
25       A.  I don't recall specifically.

Page 89

1  facts not in evidence.  Calls for speculation.
2  You may answer.
3       MR. HUST:  Objection.
4       A.  Yes.
5       Q.  And if information related to
6  Provident is materially misstated, do you
7  believe that that would be the responsibility
8  of Provident and the KMK firm?
9       MR. BURKE:  Same objection.
10       A.  I think it would be the
11  responsibility of Provident.  We -- you know,
12  we represent Provident.  Ultimately it goes to
13  the issuers themselves.
14       Q.  Okay.  So if I understand your
15  testimony correctly, if information is
16  misstated regarding OHSL, that's the
17  responsibility of OHSL and the Dinsmore firm.
18  And if information is misstated regarding
19  Provident, that's Provident's responsibility.
20  Is that your testimony?
21       MR. HUST:  Objection.
22       A.  I think if there's information in
23  the document that is about OHSL that is
24  incorrect, it is OHSL's obligation with their
25  advisors and attorneys.  And if there's

Page 90

1  information regarding Provident that is
2  incorrect, it is Provident's obligation, along
3  with their advisors and attorneys.
4      Q.  So you do believe that KMK would
5  be ultimately liable, along with Provident, if
6  there were material misstatements in
7  Defendant's Exhibit 1 --
8      MR. GILLIGAN:  That's not what he
9  said.
10     Q  -- related to the document?
11     A  I did not say that.
12     MR. BURKE:  Objection.
13  Mischaracterizes the testimony.
14     MR. HUST:  Note my objection also.
15     MR. GILLIGAN:  I'm going to
16  instruct him not to answer the question. I'm
17  going to tell you why.
18     MR. BRAUTIGAM:  I'd like his
19  answer read back.
20     MR. GILLIGAN:  That's fine.  I
21  think he already answered it, so there's no
22  question pending is my point.
23     (Record read by Reporter.)
24     MR. BRAUTIGAM:  Did you want to
25  say something?

Page 91

1      MR. GILLIGAN:  (Shook head.)
2  BY MR. BRAUTIGAM:
3      Q.  Okay.  Mr. Weiss, in your previous
4  answer you used the word "obligation," my
5  question went to responsibility.  If there was
6  information that was materially misstated with
7  respect to Provident, do you believe that it is
8  the responsibility of KMK and Provident for any
9  alleged material misstatements?
10     MR. BURKE:  Objection.  Calls for
11  a legal conclusion.  Assumes facts not in
12  evidence  He's not here as a legal expert.
13  He's already told you he's not a litigator.
14     MR. HUST:  Same objection.
15     THE WITNESS.  Am I suppose to do
16  answer that?
17     MR. GILLIGAN:  Yes.  If you can.
18     THE WITNESS:  I'm sorry, what was
19  the question again?
20     (Record read by Reporter.)
21     MR. BURKE:  Same objection.  Calls
22  for a legal conclusion.
23     A.  I think that if I was aware of
24  material misstatements involving Provident, I
25  would bring it to their attention and fix it.

Page 92

1  And if Provident became aware of one, they
2  would bring it to my attention and fix it, if
3  fixing was even necessary.  Don't know what it
4  was, you know -- depends on what the matter
5  was.  Sometimes there's questions of whether
6  something is material or not.
7      Q.  Okay.  Assume for the purposes of
8  this question that something related to
9  Provident is materially misstated in
10 Defendant's Exhibit 1.  Whom do you believe is
11 ultimately responsible for that?
12     MR. BURKE:  Objection.  Asked and
13  answered.  Calls for a legal conclusion.
14     A.  I don't know the answer to that
15  question.
16     Q.  Okay.  What was Mr. Hertlein's
17  role with respect to this merger agreement?
18     A.  I don't know.
19     Q.  When you're preparing public
20  filings such as this, isn't one of your
21  objectives to protect the client?
22     A.  It's probably my primary
23  objective.
24     Q.  And in protecting the client, that
25  would mean that no one sues the client, among

Page 93

1  other things, correct?
2      MR. BURKE:  Objection.  Calls for
3  speculation, form.
4      MR. GILLIGAN:  He can't -- suing
5  has nothing to do with it.  I mean, somebody
6  can sue for anything.  I mean, I don't
7  understand the context of your question.
8      Q.  Okay.  Well, you want to create a
9  document that doesn't lead to litigation; is
10 that fair?
11     MR. GILLIGAN:  You can answer
12 that.
13     A.  I suppose.
14     Q.  I think you said a moment ago it
15  was your primary --
16     A.  No, I said protecting my client
17  was my primary.
18     MR. HUST:  Objection.
19     MR. BURKE:  No, that's not true.
20     Q.  Okay.
21     MR. GILLIGAN:  The point is
22  protecting the client.  Doesn't really say
23  anything about being sued.
24     A.  I would really appreciate it if
25  you wouldn't mischaracterize my statements.

24 (Pages 90 to 93)

Page 94

1    Q.  I didn't mean to mischaracterize
2  your statements.
3    A.  Okay.
4    Q.  What was Mr. Kreider's role with
5  respect to the creation and dissemination of
6  Defendant's Exhibit 1?
7    A.  Mr. Kreider was the -- really the
8  senior partner of the, the securities practice.
9  And I don't recall exactly what role he had.
10    Q.  Well, he was listed on the various
11  distribution lists, correct?
12    A.  I suppose, if that's -- if that's
13  what the distribution lists say.
14    Q.  And would you infer that Mr.
15  Kreider reviewed the various drafts, the
16  various documents that were circulated?
17    MR. BURKE:  Objection.  Calls for
18  speculation.
19    A.  I don't know what Mr. Kreider
20  reviewed.
21    Q.  Did you ever have discussions with
22  Mr. Kreider about the OHSL-Provident merger?
23    MR. GILLIGAN:  You can answer --
24    MR. BURKE:  Yes or no.
25    MR. GILLIGAN:  -- whether you had

Page 95

1  discussions.  Not what the discussions were.
2    A.  Yes.
3    Q.  Okay.  Approximately how many
4  discussions did you have with Mr. Kreider?
5    A.  I don't recall.
6    Q.  Approximately how long did they
7  last?
8    A.  I wouldn't recall a conversation I
9  had with Mr. Kreider three weeks ago, much less
10  four years ago.
11    Q.  Okay.  Would these conversations
12  be reflected in your billing records?
13    A.  Probably not.
14    Q.  Why not?
15    A.  Well, the conversations -- the
16  existence of the conversations would, but the
17  length would not.
18    Q.  Okay.  What was Mr. David
19  Rosenberg's role in the creation of Defendant's
20  Exhibit 1?
21    A.  I don't think Mr. Rosenberg had a
22  role.
23    Q.  All right.  Well, I'll show you
24  later that he's on the distribution list and we
25  can revisit that.

Page 96

1    What was Mr. Matthews' role with
2  respect to the creation of Defendant's Exhibit
3  1?
4    A.  As the person who handled the
5  negotiation of The Merger Agreement on behalf
6  of Provident, he would have been included due
7  to his knowledge of the transaction.
8    Q.  And what was Mr. Reuter's role in
9  the preparation and dissemination of
10  Defendant's Exhibit 1?
11    A.  Mr. Reuter worked with me in, as
12  you say, the ministerial compilation of the
13  document.
14    Q.  What was Mr. Winstead's role with
15  respect to the creation and dissemination of
16  Defendant's Exhibit 1?
17    A.  I don't recall.
18    Q.  Did any other attorneys work on
19  the OHSL-Provident merger at KMK, other than
20  the ones I've already mentioned?
21    A.  I don't know of any others in the
22  securities area.  I, I would have to defer to
23  Mr Matthews as to whether he worked with any
24  other attorneys on the negotiation of The
25  Merger Agreement

Page 97

1    Q.  When is the first time that you
2  became aware of any litigation involving the
3  OHSL and Provident merger?
4    A.  I don't remember.
5    Q.  At any point since you became
6  aware of any litigation, did you talk to anyone
7  at KMK other than Mr. Gilligan and Mr. Fischer
8  about the pending litigation?
9    A.  I don't remember.
10    Q.  Did anyone ever ask you what was
11  going on after it became known that you had
12  been named as a defendant in the pending
13  litigation?
14    MR. BURKE:  Did anyone ever ask
15  him what was going on?
16    A.  Yes.  I don't understand what --
17    Q.  Did anyone ever mention to you
18  that you had been sued or that they had learned
19  that you had been sued with respect to your
20  work in the OHSL-Provident merger?
21    A.  Yes.
22    Q.  Okay.  Who mentioned it?
23    A.  Actually, Mark Magee called me
24  after it happened.
25    Q.  Okay.  And when you spoke to Mark

Page 98

1   Magee, were you providing him with legal
2   advice?
3       A.  Absolutely not.
4       Q.  Okay.  Well, what did Mr. Magee
5   say and what did you say?
6       A.  I don't recall the conversation,
7   but it was not a substantive conversation about
8   the case at all, other than that he had noted
9   that I had been brought into this case.
10      Q   And that was it?
11      A.  That was.
12      Q.  Okay.  Aside from Mr. Magee,
13  anyone else?
14      A.  Talked to my attorneys.
15      Q   Mr Gilligan and Mr Fischer?
16      A.  Correct.
17      Q.  Okay.  You never talked with Mr.
18  Reuter or people you work closely with about
19  the status and the progression of the
20  litigation?
21      A.  We may have mentioned it in
22  passing.  We certainly aren't dissecting it or
23  discussing it at length.
24      Q.  Did you follow it generally?
25      A.  A little bit

Page 99

1       Q.  Okay.
2           MR. GILLIGAN  Which litigation?
3   You're talking about the litigation where you
4   sued him, right?  As opposed to the Thiemann
5   litigation?
6       Q.  Well --
7           MR. GILLIGAN  Is that --
8       Q.  Is it your understanding that
9   you've been sued in the Thiemann litigation?
10      A.  It's my understanding that there
11  is a -- I believe I was informed that there's a
12  motion to add me.
13      Q.  And who informed you of that?
14      A   My attorneys
15      Q   Mr Gilligan and Mr Fischer?
16      A.  Correct.
17      Q.  You never talked to Mr. Burke
18  about the Thiemann litigation, other than the
19  one conversation with the other lawyers
20  present?
21      A.  Not that I recall.
22      Q.  Okay.  Could you look through
23  Defendant's Exhibit 1 and please tell me what
24  represents the prospectus and what represents
25  the registration statement?

Page 100

1           MR. BURKE:  Objection.  Calls for
2   a narrative.  Overbroad.
3       A.  I think I can simply answer the
4   question to say that the primary responsibility
5   -- for the OHSL information, the primary
6   responsibility was OHSL, its counsel and its
7   advisors.  And primary responsibility for the
8   Provident information was Provident, its
9   counsel and its advisors.
10          The fairness opinion matters were
11  the primary responsibility of the financial
12  advisor.  And the portions relating -- the
13  portions relating to the proxy statement are
14  those that relate to the meeting of OHSL and
15  the matters that are required to be disclosed
16  in proxy materials and was the responsibility
17  of OHSL and their advisor and accountants --
18  and attorneys.
19      Q.  Okay.  How many documents comprise
20  Defendant's Exhibit 1?
21      A.  It's a single document.
22      Q.  Okay  Is the first page of the
23  document part of the proxy materials, part of
24  the registration statement, or something else?
25      A.  That's not really an answerable

Page 101

1   question.  This is a portion of an S-4
2   registration statement that comprises -- that
3   contains both a proxy statement for OHSL and a
4   prospectus for the Provident common stock.  I
5   suppose you could say that this is part of the
6   proxy statement because it certainly wouldn't
7   have been required --
8       Q.  Okay.
9       A.  -- in a Provident registration.
10      Q.  How about the second page of the
11  document?
12      A.  Which page is that?  There's no
13  numbers
14      Q.  That's the page
15      A.  Well, this has got --
16      Q.  Actually, I think you skipped
17  over, somehow got skipped.  How would you
18  describe this page of the document?
19      A.  Notice of Special Meeting of
20  Stockholders.
21      Q.  And is that part of the proxy
22  statement, the registration statement, or
23  something else?
24      A.  That's the document that was sent
25  to the OHSL shareholders announcing the special

Page 102

1 meeting.
2 Q. Okay. Could you turn the page?
3 Okay. In the upper left column it talks about
4 proxy statement. Do you see that?
5 A. Yes.
6 Q. And in the upper right it talks
7 about prospectus of Provident Financial Group,
8 Inc. Do you see that?
9 A. Yes.
10 Q. Is this page part of the proxy
11 statement, part of the prospectus, both, or
12 something else? How would you describe this
13 page?
14 MR. BURKE: Objection to form,
15 compound
16 A. The information in the left column
17 relating to the proxy statement relates to the
18 OHSL special meeting. And the column on the
19 right relates to the shares of common stock of
20 Provident to be issued in the transaction.
21 Q. Okay. Can you turn the page,
22 please?
23 A. (Witness complied.)
24 Q. Okay. This is a table of
25 contents, correct?

Page 103

1 A. Yes.
2 Q. And the first section is questions
3 and answers about the acquisition, correct?
4 A. Yes
5 Q. Is that part of the proxy
6 statement, the registration, or something else?
7 A. Some of the questions relate to
8 the Provident common stock to be issued in the
9 merger and some relate to the OHSL special
10 meeting.
11 Q. So at least with respect to page
12 one, there's no way to separate that out and
13 say, this is part of the prospectus and this is
14 part of the proxy statement, correct?
15 A. I think you can separate it out by
16 which ones relate to the meeting and which ones
17 relate to the common stock.
18 Q. Right. But you can't separate it
19 out by the page. In other words, this page has
20 information that relates to both documents,
21 correct?
22 MR. BURKE: Objection. Asked and
23 answered.
24 A. I mean, this page contains
25 information about the prospectus -- I mean,

Page 104

1 about the common stock to be issued in the
2 merger and information about the special
3 meeting.
4 Q. What, if any, role did you have in
5 assembling the information on pages one and
6 two?
7 MR. BURKE: Numbered page one and
8 two or the first we looked at?
9 Q. The Q and A.
10 A. I don't remember.
11 Q. Some of the information on that --
12 on those pages came from Provident, correct?
13 A. Which information in particular?
14 The only information I see that may have come
15 from Provident has to do with -- and that would
16 have -- this actually comes from both because
17 it comes out of the agreement. I think that --
18 I don't know what part relates to Provident, I
19 think it only relates to the transaction and
20 OHSL.
21 Q. Who wrote the information
22 contained on pages one and two?
23 MR. BURKE: Objection. Asked and
24 answered
25 A. Don't know. Don't remember.

Page 105

1 Q. What computer system did this
2 document come off -- did these pages, excuse
3 me, come off?
4 MR. BURKE: Objection to the
5 phrase "come off," vague.
6 A. The master document was on KMK's
7 system. I don't know if it was also on anyone
8 else's system.
9 Q. And is it true that you were in
10 charge ultimately of the overall master
11 document?
12 MR. BURKE: Objection as to what
13 you mean by "in charge." Mischaracterizes
14 prior testimony. You may answer
15 A. I think that I was the ministerial
16 compiler of the document, as you said in your
17 opening statements.
18 Q. Okay. Could you turn the page to
19 page three, please, Summary?
20 A. Um-hmm.
21 Q. The Summary goes on for three
22 pages. Could you skim through those pages,
23 please? What, if anything, did you write on
24 these three pages?
25 A. I don't remember.

Page 106

1      Q. What, if anything, on these three
2 pages did an attorney at KMK write?
3      A. I don't remember.
4      Q. Was the summary of the document
5 maintained on the master system at the law
6 offices of KMK?
7      MR. BURKE: Objection. Asked and
8 answered.
9      A. I didn't hear the question.
10      Q. Okay. Was the information
11 contained on these three pages contained in the
12 computers of KMK?
13      A. I've answered that question
14 several times. I would like to state on the
15 record that the entire document was on the
16 system of KMK.
17      Q. Okay. Well, that --
18      A. Except for perhaps the financial
19 statements, as I look back. Financial
20 statements were never put on our system, to my
21 knowledge.
22      Q. Okay. That was my next question
23 and I won't ask you again --
24      A. Okay.
25      Q. -- to make you needlessly repeat

Page 107

1 things. Now I understand where you're coming
2 from.
3      A. And I believe that The Merger
4 Agreement was on our system, but I would not
5 know that for sure.
6      Q. Okay. With respect to the
7 financial statements that are included on pages
8 six, seven, eight, nine, ten and eleven, do you
9 see that information, essentially tables of
10 numbers?
11      A. Yes.
12      Q. How did this information get into
13 the final document?
14      A. Somebody would have provided KMK
15 with a -- either a disc containing the
16 information or with -- with the information
17 handwritten. And then it would have been
18 returned and circulated among the people that
19 provided it to make sure that it was correct.
20      Q. So ultimately did the financial
21 information on these pages come to the computer
22 system at KMK in electronic form?
23      A. I don't know.
24      Q. Okay.
25      A. They may have been handwritten. I

Page 108

1 don't know whether we got it on disc, e-mail,
2 hard copy or what.
3      Q. Okay. Are you familiar with the
4 phrase restatement?
5      A. In what context?
6      Q. In the context of a company
7 restating its financials.
8      A. I believe that's an accounting
9 term. I'm familiar with the term.
10      Q. Okay. What is your understanding
11 of the term?
12      A. A restatement of financials occurs
13 when a company goes back and changes some of
14 the numbers -- some of those numbers from prior
15 periods.
16      Q. And is it your understanding that
17 a restatement is made only when the numbers
18 that are being changed were materially
19 incorrect?
20      MR. BURKE: Objection. Misstates
21 the record. Calls for a legal conclusion.
22 Calls for an accounting conclusion. You may
23 answer.
24      MR. HUST: Same objection.
25      A. I'm not that knowledgeable about

Page 109

1 when a restatement is necessary. I think that
2 sometimes restatements may be necessary due to
3 new accounting changes, maybe due to a new
4 accounting interpretation that gets released.
5 I don't know that necessarily that means that
6 in any way they were misleading prior to that
7 time.
8      Q. Are you familiar with the March
9 5th, 2003 restatement by Provident?
10      A. I'm aware that such a restatement
11 occurred, yes.
12      Q. What do you understand that
13 restatement means?
14      A. That Provident went back and
15 changed some of its financial numbers from
16 prior periods.
17      Q. And is it your understanding that
18 the numbers for prior periods were materially
19 misstated and that's why they made the change?
20      MR. BURKE: Objection. Calls for
21 an accounting judgment, foundation. You may
22 answer. It calls for speculation.
23      A. I can't make an accounting -- I
24 mean, I understand that they didn't feel that
25 the -- I understand that they didn't feel that

Page 110

1    the numbers were correct and that's why they
2    had to change them, but I don't know -- have
3    any idea what the magnitude was or whether they
4    were actually misleading or what the
5    consequences were and circumstances leading up
6    to the restatement.
7        Q.  Do companies issue restatements
8    when the amount in question is not materially
9    off?
10       MR. BURKE:  Objection.  Calls for
11   speculation.  Already asked and answered.
12       A.  I don't know the answer to that
13   question
14       Q   Are you aware that the period of
15   Provident's restatement covers 1997 to 2002?
16       A.  I'm not -- I haven't looked that
17   closely at the restatement.
18       Q.  Do you believe that the
19   restatement has any impact on former OHSL
20   shareholders?
21       A.  I don't know how to answer that
22   question.
23       Q.  This was a stock-for-stock
24   transaction, correct?
25       A.  It was a statutory merger

Page 111

1        Q.  And Provident was issuing new
2    Provident shares in exchange for OHSL stock; is
3    that correct?
4        A.  Yes
5        Q   And a stock-for-stock transaction
6    is inherently more risky than a cash
7    transaction, correct?
8        MR. HUST:  Objection.
9        MR. BURKE:  Objection.
10       A.  I cannot say that.
11       Q.  Well, with a stock-for-stock
12   transaction, the shareholders who surrender
13   their shares are subject to the vagaries of the
14   marketplace with respect to the new stock that
15   they acquire.  Is that correct?
16       MR. BURKE:  Objection.  Calls for
17   speculation.  You may answer.
18       A.  I suppose.
19       Q.  In other words, if it's a cash
20   transaction, you get a fixed dollar amount, X
21   dollars per share.  But in a stock-for-stock
22   transaction, you get shares in a different
23   company, correct?
24       MR. BURKE:  Which can then be sold
25   and converted to cash in a fixed amount.

Page 112

1    That's why I don't follow your question.  Go
2    ahead.
3        MR. GILLIGAN:  If you have the
4    question in mind, just give him a yes or no
5    answer if you can.  Let's move on.
6        A.  I mean, these were already people
7    who held public shares, so they were already
8    subject to, as I think you said, the vagaries
9    of the marketplace.  And that -- and then as
10   Mr. Burke said, they could have certainly sold
11   their shares the minute they received them and
12   turned it into cash and eliminated that -- or
13   anytime prior to the merger they could have
14   sold their OHSL shares and turned them into
15   cash
16       Q   And the purpose of including the
17   information about Provident's financial status
18   is to alert the shareholders as to -- or to
19   provide information to the OHSL shareholders
20   with respect to the new company whose shares
21   they may receive; is that correct?
22       A.  I don't know what you mean by
23   "status"
24       Q   Okay   Why is Provident's
25   financial information included in Defendant's

Page 113

1    Exhibit 1?
2        A   Some of the information -- it's
3    all either included or incorporated by
4    reference because of the requirements of the
5    Securities Act.
6        Q   And do you understand the meaning
7    behind this Securities Act?
8        A.  The Securities Act has many
9    meanings.  It does many things.
10       Q.  Okay.  Would it be fair to say
11   that Provident's financial information is
12   included in Defendant's Exhibit 1 to provide
13   OHSL shareholders with full and complete
14   information upon which they can make a decision
15   on a proposed merger transaction?
16       A.  I think Provident's financial
17   information is included because it's required
18   by rule.  But in effect, it will be reviewed by
19   and considered by the OHSL shareholders.
20       Q.  Are you familiar with the term
21   risk factors as it's sometimes used by
22   corporate and securities lawyers?
23       A.  Yes.
24       Q.  What do you understand risk
25   factors to be?



**Page 114**

1  A. Risk factors are considerations
2  that potential buyers of securities ought to
3  keep in mind when making a decision on whether
4  to acquire such securities.
5  Q. Are you familiar with the term
6  securitizations?
7  A. A little bit.
8  Q. What do you understand that term
9  to mean?
10  A. I understand, and again, I'm not a
11  financial wizard, but securitizations generally
12  refers to the pooling of assets, usually income
13  producing assets, and selling them in pieces or
14  shares in securities offerings.
15  Q. Are you familiar with on-balance
16  sheet transactions?
17  A. I understand on-balance sheet and
18  off-balance sheet a little bit, due to my
19  readings about Enron, but I'm not -- again, I'm
20  not an accountant.
21  Q. Do you know how to read a balance
22  sheet?
23  A. Yes.
24  Q. What is your understanding of an
25  on-balance sheet transaction?

**Page 115**

1  MR. BURKE: Objection to
2  relevance.
3  A. Anything that appears on the
4  balance sheet.
5  Q. What is your understanding of
6  off-balance sheet transactions?
7  A. Anything that is not required to
8  be included in the balance sheet.
9  Q. Were Provident securitizations
10  required to be on the balance sheet in 1999?
11  MR. BURKE: Objection. Calls for
12  speculation. You may answer.
13  A. I have no idea. Again, I'm not an
14  accountant.
15  Q. Okay. Did you read the papers in
16  early March about Provident's restatement?
17  MR. GILLIGAN: When, 2003?
18  Q. 2003.
19  A. Did I read the papers? I may have
20  read an article. I don't remember following
21  it. I mean, if you -- you seem to imply that
22  there were several articles. I may have read
23  an article.
24  Q. In reading what may have been an
25  article, did you form a conclusion as to what

**Page 116**

1  had happened with respect to the Provident
2  restatement?
3  A. The only conclusion that I came to
4  was that, again, the -- someone determined that
5  a restatement was necessary to change the -- to
6  change the -- some of the numbers from prior
7  periods.
8  Q. Can I direct your attention to
9  page 16 of the document, please?
10  A. Yes.
11  Q. Who was responsible for the
12  section on the special meeting?
13  A. That deals with the OHSL special
14  meeting and would have been their
15  responsibility.
16  Q. And how did KMK's computer system
17  acquire the text that appears on pages 16, 17
18  and 18?
19  A. I don't remember.
20  Q. Was it likely that this was
21  essentially an electronic transfer?
22  A. I, I don't remember.
23  Q. Do you know who gave you the text?
24  A. I don't remember.
25  Q. Do you believe that it came from

**Page 117**

1  the Dinsmore firm?
2  A. I still don't remember.
3  Q. What, if anything, did you do to
4  review the veracity of that section?
5  MR. BURKE: Objection. Asked and
6  answered. You may answer it again.
7  A. I have no idea. I don't remember.
8  Q. Do you think you did something?
9  A. What in particular are you asking
10  me about?
11  Q. Any text on those pages.
12  A. Among other things, I circulated
13  drafts, including this information, to OHSL and
14  to their counsel and everybody else in the
15  working group. And again, due to certain
16  circumstances involved in this transaction, the
17  participants had more than the usual amount of
18  time to review these documents.
19  Q. Why did participants in this
20  transaction have more than the usual amount of
21  time?
22  A. There was a -- my best
23  recollection is there are some requirements
24  when you're getting ready to -- when you're
25  getting ready to have a shareholders meeting

30 (Pages 114 to 117)