Page 118

1  where you need to communicate with record
2  holders of shares in advance of the meeting for
3  a certain period, so that you can ensure that
4  you have the proper number of proxy statements
5  printed and the -- and that they are submitted
6  to the actual beneficial holders as opposed to
7  record holders. And in this case OHSL had
8  failed to do that in the right time, so the
9  circulation of the document was delayed.
10     Q.  What's the distinction between
11  beneficial holders and record holders, please?
12     A.  Sometimes they are the same, but a
13  record holder is the person who owns shares of
14  issuer common stock on the records of the
15  transfer agent. And that may be an individual
16  or that may be in some cases a depository. And
17  where it's a depository or broker, a lot of
18  times they hold them in their name for the
19  benefit -- benefit of individual holders.
20       If you have a broker and you asked
21  your broker to buy you a hundred shares of XYZ
22  corporation, it may be registered in your name,
23  it may be registered in your broker's name. It
24  may just be an entry on their system or on the
25  system of the depository that you own a hundred

Page 120

1     Q.  I mean, it didn't disturb the flow
2  of getting all of these documents out and
3  finalized?
4     A.  No.
5     Q.  During the course of your work on
6  this transaction, was it necessary for you to
7  form an opinion with respect to the
8  sophistication and integrity of OHSL's Board?
9        MR. GILLIGAN:  The what and
10  integrity? I'm sorry.
11     Q.  Sophistication.
12        MR. GILLIGAN:  Thank you.
13     A.  That wasn't my role.
14     Q.  So you did not have to do that?
15        MR. BURKE:  Objection. Asked and
16  answered. You may answer again.
17     A.  Correct.
18     Q.  Okay. Let's look at the section,
19  The Acquisition, beginning on page 18. Do you
20  see that?
21     A.  Yes.
22     Q.  And the next big section appears
23  to be The Merger Agreement. Do you see that?
24  It's on page 33.
25     A.  Yes.

Page 119

1  shares of XYZ corporation. It may be the same
2  -- again, the beneficial holder may be the same
3  as record holder or may be different.
4     Q.  Now, you mentioned that OHSL had
5  failed to take some action which led to a delay
6  in the transaction, is that correct?
7     A.  Yes.
8     Q.  Who --
9     A.  Well, not a delay in the
10  transaction, a delay in the circulation of the
11  material. I can't recall what the timing of
12  the transaction was.
13     Q.  Who at OHSL failed to take some
14  action that resulted in the delay of the
15  circulation of material?
16     A.  I don't know who that would have
17  been.
18     Q.  Was it someone at OHSL or someone
19  at Dinsmore?
20     A.  I don't know the answer to that
21  question.
22     Q.  Okay. Was this upsetting to you?
23     A.  I don't -- didn't have a personal
24  interest in this transaction, so it didn't
25  matter.

Page 121

1     Q.  Okay. Who was responsible for the
2  text of everything from The Acquisition to The
3  Merger Agreement, between page 18 and page 33?
4     A.  The section entitled The
5  Acquisition on pages 18, 19, 20, all those
6  pages I received from OHSL or their counsel, I
7  can't recall. And I can't recall in what
8  format I received them.
9        Reasons for the Acquisition on
10  pages 20 and 21, I received from OHSL or their
11  counsel. I don't recall from whom I received
12  them or the form of -- submitted to me.
13        Pages 22, 23, 24, 25, 26, 27, 28,
14  29, 30 -- actually through 29 we received
15  from -- no, let's see. Through 28, the entire
16  section consisting of Opinion of OHSL's
17  Financial Advisor we received from the
18  financial advisor. I don't recall from whom,
19  nor do I recall the form of the -- that I
20  received it.
21        The next section, Interests of
22  Certain Persons, would have been OHSL's
23  responsibility and their counsel. Federal
24  Income Tax Consequences, I can't recall who
25  wrote it, but it says here on page 30 that my

31 (Pages 118 to 121)

Page 122

1  firm was to render an opinion as to the tax
2  consequences of the reorganization.
3        Page 31, Federal Securities Law
4  Consequences would have been the responsibility
5  of the attorneys, because that contains some
6  legal conclusions in that.
7        Q.  Which attorneys?
8        A.  Actually both, because the --
9  Provident would -- the characterization of the
10  shares of Provident was important and the
11  treatment of the shares formerly held by OHSL
12  affiliates was important.
13        Q  Please continue
14        A.  Certain Effects of the Acquisition
15  doesn't really say much. but I'm not sure who
16  would -- I mean. that would have been OHSL's
17  responsibility. Contour of Business
18  Acquisition Not Consummated. certainly that was
19  OHSL's obligation. I wouldn't have any idea
20  what OHSL's operations would be if it didn't
21  happen.
22        Regulatory Filings and Approvals.
23  that would have been the responsibility of
24  those -- really of those responsible for those
25  areas at Provident and OHSL  I do not believe

Page 123

1  that my firm was required to acquire any
2  regulatory approvals. I don't know whether any
3  were required.  That brings us to The Merger
4  Agreement
5        Q.  Okay.  What, if anything, did you
6  do to check the veracity of the information
7  that you received from other sources contained
8  between pages 18 and 33 of the document?
9        MR. BURKE.  Objection.  Asked and
10  answered.  What I would suggest is if you just
11  ask him if his answer is the same that he
12  previously gave.  I know we've asked this two
13  or three times.
14        MR. BRAUTIGAM:  I don't think I've
15  asked about these specific pages.
16        MR. BURKE:  I know, but I'm saying
17  we could speed up the deposition if you would
18  say, what did you do to check the document.  It
19  would apply to all pages and you wouldn't have
20  to ask him five times.  But that's just a
21  suggestion.
22        MR. GILLIGAN:  If you can answer
23  it, Mark, go ahead.
24        A.  To check the document, I
25  circulated, again, draft after draft to those

Page 124

1  that had firsthand knowledge of the information
2  in the document.  And it would have also been
3  OHSL's obligation to make sure that their
4  directors reviewed it.
5        Q.  Okay.  Can I direct your attention
6  to page 29, Interests of Certain Persons?
7        A.  Um-hmm.
8        Q.  Do you see the phrase, These
9  agreements were entered into in June 1999?
10        A.  Yes.
11        Q.  And that refers to change of
12  control agreements sometimes known as golden
13  parachutes; is that correct?
14        A.  That's not how they're
15  characterized here, but it refers to these
16  former employment agreements, yes.
17        Q.  And is that a true statement,
18  these agreements were entered into in June of
19  1999?
20        MR. BURKE:  Objection.  Calls for
21  speculation.  You may answer.
22        A.  I have no reason to doubt the
23  truth of that statement.
24        Q  Are you familiar with the
25  ramifications of dissenting Board votes in a

Page 125

1  merger transaction?
2        MR. BURKE.  Objection to form.
3        A.  I don't understand the question,
4  "ramifications."
5        Q.  It's not relating to that page.
6        A.  I don't understand the question
7  though.
8        Q.  Okay
9        A.  The ramifications?
10        Q.  Yes.
11        A.  What do you mean?
12        Q.  Is it harder, easier, or the same
13  to close a merger transaction if a director or
14  some directors are voting against it as Board
15  members?
16        MR. BURKE:  Objection.  Calls for
17  speculation.
18        A.  I think it depends on the
19  circumstances.
20        Q.  What would it depend on?
21        A.  Well, let's say you had a
22  circumstance where one of the directors was a
23  descendent of the founder and wanted to keep
24  the corporate -- wanted to keep the company in
25  his family or her family and voted against it.

Page 126

1  And that was disclosed that they voted against
2  it, but the other -- but that would certainly
3  be disclosed as -- in the document.
4       And I don't know if that was -- if
5  I was the shareholder of that company, I don't
6  know that I would put very much stock in that
7  if that was the sole dissenting vote.
8       Q.  Were you talking hypothetical?
9       A.  Yes.
10      Q.  Okay.  Are you generally familiar
11 with the Hewlett Packard-Compaq merger?
12      A.  I'm generally familiar with the
13 fact that they merged and it was an acrimonious
14 merger.
15      Q.  Okay.  Why was the merger
16 acrimonious?
17           MR. BURKE:  Objection.  Calls for
18 speculation, relevance.
19      A.  I don't -- I don't recall the
20 specifics of that merger.
21      Q.  Do you recall that Walter Hewlett,
22 who was an HWP Board member since 1987,
23 announced after he voted in favor of the merger
24 combination as a director, that he had changed
25 his mind and he was voting his personal shares

Page 127

1  and shares he controlled against the
2  transaction?
3           MR. BURKE:  Objection to form.
4           MR. HUST:  Objection, relevancy.
5           MR. GILLIGAN:  If you have
6  personal knowledge.
7       A.  I was going to say, no, I have no
8  idea.
9           MR. BRAUTIGAM:  I'd like to
10 address the relevancy objection.  This is in
11 our expert report.
12           MR. HUST:  Well?  So what?
13           MR. BRAUTIGAM:  Okay.
14           MR. HUST:  He can put whatever he
15 wants in there.
16           MR. BRAUTIGAM:  She.
17           MR. HUST:  She, excuse me.
18           MR. BRAUTIGAM:  Can I have his
19 answer read back, please?
20           (Record read by Reporter.)
21 BY MR. BRAUTIGAM:
22      Q.  Are you aware that the stock price
23 of HWP reacted dramatically to the announcement
24 that the Board member, Walter Hewitt, was
25 opposing the transaction, would vote his shares

Page 128

1  against it?
2           MR. HUST:  Objection.
3       A.  Even if I was aware that there was
4  a reaction to the stock that corresponded to
5  that announcement, I certainly couldn't comment
6  on the cause or effect.
7       Q.  Do you believe that the dissent of
8  a Board member would make it -- would have any
9  effect on the ability to close a merger
10 transaction such as this merger transaction?
11           MR. BURKE:  Objection.  Calls for
12 speculation.
13           MR. HUST:  Same objection.
14      A.  It may or may not.
15      Q.  What factors would you need to
16 consider in answering that question?
17      A.  Primarily the, the motivations for
18 the dissenting vote, all the motivations.  But
19 again, there was no dissenting vote here.
20      Q.  Well, if Mr. Hanauer testified
21 that he did not believe that the transaction
22 was in the best interest of OHSL's
23 shareholders, and if he announced that to the
24 public, what, if any, effect do you think it
25 might have had on Provident's ability to close

Page 129

1  the merger?
2           MR. HUST:  Objection.
3           MR. BURKE:  That's got to be the
4  most speculative --
5       A.  Not only do I not know, but I
6  think that Mr. Hanauer, if he had felt that,
7  had a fiduciary responsibility to call a
8  meeting of the Board members and open up
9  discussions of that again.
10      Q.  Why do you think that?
11      A.  He has fiduciary duties.  Again,
12 if he thinks in the exercise of his fiduciary
13 duties to the shareholders that this
14 transaction was not advisable, he has a duty to
15 go on record to say that and to carry out his
16 fiduciary duties to the end.
17      Q.  Did anyone at Dinsmore know that
18 Mr. Hanauer opposed the transaction?
19           MR. HUST:  Objection.
20           MR. BURKE:  Objection.  Calls for
21 speculation.
22      Q.  Did anyone at Dinsmore ever tell
23 you that Mr. Hanauer was not in favor of the
24 transaction?
25      A.  I was never informed that there

Page 130

1  was any opposition to this transaction.
2      Q.  Did anyone at Dinsmore ever tell
3  you that Mr. Hanauer was not fully cooperating
4  in the merger transaction?
5          MR. HUST:  Objection.
6      A.  Again, I was never told that there
7  was any difficulty or whatever in the
8  transaction.
9      Q.  If Dinsmore was aware of Mr.
10 Hanauer's opposition, would you have expected
11 them to tell you?
12         MR. HUST:  Objection, speculation.
13         MR. GILLIGAN:  He's asking for a
14 legal opinion now, so if you're qualified and
15 you have enough information to give the answer,
16 then go ahead and answer.
17     A.  I don't know the answer to that
18 question.  I mean, I think that -- I think that
19 OHSL and their advisors and attorneys had an
20 obligation to make sure that the discussion of
21 the background and reasons for the merger were
22 accurate.  And if they thought that that was a
23 material factor that needed to be disclosed in
24 one of those sections, they certainly could
25 have disclosed it.

Page 131

1      Q.  They should have disclosed it,
2  right?
3          MR. HUST:  Objection.
4          MR. BURKE:  Objection.
5      A.  I said they could have disclosed
6  it.
7      Q.  Do you think they should have
8  disclosed it?
9          MR. BURKE:  Objection.
10         MR. HUST:  Objection.
11     A.  Disclosed what?
12     Q.  What you said in your previous
13 answer about opposition to the transaction.
14         MR. BURKE:  No, he referred to a
15 previous answer.
16     A.  Right.
17         MR. GILLIGAN:  If you can't answer
18 the question, you can't answer the question.
19     Q.  I notice that KMK was also
20 providing a tax opinion in addition to doing
21 work on the merger.  Is that industry practice?
22     A.  I don't think there is an industry
23 practice, to answer that question.  It's
24 often -- it's a negotiated point as to who
25 would render the opinion as to tax matters --

Page 132

1  tax consequences of the transaction.
2      Q.  Negotiated with whom?
3      A.  Negotiated among the parties to
4  the merger.
5      Q.  Did you participate in that
6  negotiation?
7      A.  Again, I didn't find out about
8  this transaction until the day that the merger
9  was signed, so I could not have taken any part
10 in any discussions regarding The Merger
11 Agreement.
12         MR. BRAUTIGAM:  Okay.  Let's take
13 a short break.
14         (Brief recess.)
15 BY MR. BRAUTIGAM:
16     Q.  Mr. Weiss, during your work on the
17 OHSL-Provident merger, did you read every word
18 and look at every number of Defendant's Exhibit
19 1?
20     A.  Did I read every number or look at
21 every number or review every number or remember
22 every --
23     Q.  Did you read every word and look
24 at every number?
25     A.  I mean, I don't recall.

Page 133

1      Q.  Did you designate that someone at
2  KMK do that?
3      A.  I mean, I don't -- I don't recall.
4      Q.  Is there anything in the proxy
5  material -- in Defendant's Exhibit 1 that you
6  didn't understand when you read it?
7      A.  Not that I recall.
8      Q.  I'll direct your attention to page
9  53 of the document.  Actually 63, excuse me.
10     A.  Okay.
11     Q.  You've seen that table before,
12 correct?
13     A.  Yes.
14     Q.  How was the date of July 31st,
15 1999 selected?
16     A.  I don't recall how the date was
17 selected.  The SEC rules require that it be of
18 the most recent practicable date, and I assume
19 that was the most recent practicable date for
20 an accurate rendering for OHSL.
21     Q.  Did you know that Mr. Herron's
22 resignation had become effective one day
23 earlier?
24     A.  I did not know that.
25     Q.  If Mr. Herron had been a director

Page 134

1  as of July 31st, 1999, would his name have had
2  to have been included here?
3      MR. BURKE: Can you read that
4  question back?
5      (Record read by Reporter.)
6      A. The lead-in states that, The
7  following table sets forth, as of July 31st,
8  1999, information with respect to the
9  beneficial ownership of OHSL common stock by
10  each person known by OHSL to be the beneficial
11  owner of more than five percent of the common
12  stock, by each present director of OHSL. So if
13  he was a present director as of the date, yes,
14  he would have had to have been listed.
15      Q. Do you think it's somewhat
16  misleading to select July 31st, 1999, one day
17  after Mr. Herron resigned?
18      MR. HUST: Objection.
19      MR. BURKE: Objection.
20      A. Are you asking for my opinion?
21      Q. Yes.
22      A. No, I do not.
23      Q. Do you note that Mr. Hanauer is
24  the largest shareholder by far there?
25      MR. BURKE: Objection as to the

Page 135

1  meaning of "by far."
2      A. I notice that he's the largest
3  shareholder. He owns the most shares, correct.
4      Q. By owning the most shares, he
5  would have the greatest financial interest in
6  the transaction, correct?
7      A. As -- as to magnitude?
8      Q. What do you mean by "magnitude"?
9      A. Well, I don't know any of these
10  people's net worth. I mean, some -- this could
11  be a significant amount of what -- of
12  somebody's net worth and not a significant
13  amount of Mr. Hanauer's net worth, I don't
14  know. So if you're asking me does he have the
15  most dollars involved in this transaction, the
16  answer is yes. If you're asking me if he has
17  the largest financial interest, I don't know
18  that I can answer the question.
19      Q. Actually I meant the former. I
20  think we're okay.
21      A. Okay.
22      Q. Do you believe that how Mr.
23  Hanauer voted his 123,075 shares would add to
24  the total mix of information as OHSL
25  shareholders considered how to vote in this

Page 136

1  merger?
2      MR. BURKE: Objection.
3      MR. HUST: Objection.
4      MR. BURKE: Asked and answered at
5  least four or five times.
6      MR. HUST: Plus speculative.
7      A. I personally believe my -- my
8  opinion? My --
9      Q. Yes.
10      A. Mark Weiss' opinion is that that
11  information would be misleading.
12      Q. Okay. Why?
13      A. Because Mr Hanauer, again, was on
14  record exercising his fiduciary duties as being
15  in favor of the transaction. If he had some
16  self-interested, individual reason for wanting
17  to vote his personal shares against the merger,
18  but still believed in the exercise of his
19  fiduciary duties that it was in the best
20  interest of the shareholders, I think that
21  information is misleading. But I'm assuming
22  facts that I don't know
23      Q. But if Mr. Hanauer believed that
24  the transaction was not in the best interest of
25  OHSL shareholders, would you still think that

Page 137

1  the lack of disclosure would be misleading?
2      MR. HUST: Objection.
3      MR. BURKE: Objection. Calls for
4  speculation. Argumentative. Asked and
5  answered.
6      A. Again, you're asking me to assume
7  a fact that I know is untrue.
8      Q. What fact is that?
9      A. That he -- that he did not think
10  it was in the best interest of the
11  shareholders.
12      Q. Okay. How do you know that's
13  untrue?
14      A. Because his vote on the record,
15  undisputed, in exercising his fiduciary duties
16  was that he was in favor of the transaction
17      MR. BRAUTIGAM. Hold that thought.
18  Okay. Lou, this is from the same place that I
19  took the quote from the other day.
20      MR. GILLIGAN: Okay. Would you,
21  just for the record --
22      MR. BRAUTIGAM: Certainly. It's
23  from the Nolte litigation, February 22nd, 2000.
24  It's on page 21, lines 11 through 14. This
25  was --

Page 138

1    MR. BURKE: Can you hold on for a
2 second while I pull it out, please?
3    MR. BRAUTIGAM: Sure.
4    MR. GILLIGAN: Would you just tell
5 us, too, who asked the question and who was
6 giving the answer?
7    MR. BRAUTIGAM: Absolutely. I'm
8 about to read you a question and an answer that
9 I asked Mr. Hanauer on February 22nd of 2000 in
10 the Nolte litigation. That was in state court.
11 And the question I asked was --
12    THE WITNESS: What is the Nolte
13 litigation? I'm sorry.
14    MR. BRAUTIGAM: It was litigation
15 on behalf of the OHSL shareholders against the
16 merger transaction.
17    THE WITNESS: Is that case still
18 pending?
19    MR. BRAUTIGAM: No.
20 BY MR. BRAUTIGAM:
21    Q.  The question I asked was,
22 question: In your heart, did you believe that
23 this transaction was in the best interest of
24 the shareholders?
25    Answer: No, sir.

Page 139

1    Is that consistent with what you
2 testified a moment ago you knew to be true?
3    MR. BURKE: Objection.
4    MR. GILLIGAN: Can I just ask you
5 this? I now know you read it accurately. Can
6 you give us a time frame? In other words, do
7 you know what I'm saying? You said -- your
8 question asked him did he think it was in the
9 best interest of the shareholders. Is there a
10 time frame, Mike, that precedes that or
11 anything?
12    MR. BRAUTIGAM: I believe that he
13 said at no time did he believe it was in the
14 interest of the shareholders, but it will take
15 me a while to find that.
16    MR. BURKE: I don't recall that he
17 said that, but certainly there is no time frame
18 for this question, which appears to be, in my
19 interpretation, addressed as of the time of the
20 deposition, not as of the time of the
21 transaction. That's why I believe it's
22 misleading and there certainly is no time frame
23 in the testimony that Mr. Brautigam just read.
24    MR. BRAUTIGAM: Okay. Well --
25    MR. BURKE: And I would further

Page 140

1 point out that at other places in Mr. Hanauer's
2 deposition, such as pages 31 to 32, he went on
3 to say that it was a good transaction. That
4 was the question that he was asking and he
5 said, yes, it was a good transaction in his
6 opinion.
7 BY MR. BRAUTIGAM:
8    Q.  Okay. Back to the question and
9 answer that I just read. Is that consistent
10 with what you have previously testified to?
11    MR. BURKE: Objection. Misstates
12 the record as to the time frame. You may
13 answer.
14    MR. GILLIGAN: If you feel that
15 you can answer, go ahead, Mark. If you feel
16 you can't, tell him why.
17    A.  Is it consistent with what I said?
18 It is consistent with what I said? Again,
19 there was only one time, to my knowledge, in
20 this transaction when Mr. Hanauer was
21 exercising his fiduciary duties as a director
22 of OHSL, when he was looking out for
23 shareholders and on the record voted on the
24 matter of the transaction.
25    And the one time he did that, he

Page 141

1 voted in favor of the transaction. When he was
2 giving his deposition, he was not -- the
3 question you asked does not at all go to -- if
4 the question you asked were very different, his
5 response may have been inconsistent with his
6 earlier vote. But I don't think that in and of
7 itself at all conflicts with what I said
8 earlier.
9    Q.  What did you mean in your previous
10 answer when you said something like, if the
11 question I asked were very different?
12    A.  If you had asked Mr. Hanauer, did
13 you think in the exercise of your fiduciary
14 duties that this transaction was best for the
15 public shareholders of OHSL, but you -- I think
16 your question said something like, in your
17 heart did you think it was best. And that --
18 that's not the standard. And that's not what
19 he voted on. You don't vote with your heart,
20 you vote with your fiduciary duties to the
21 shareholders.
22    Q.  Okay. Turn to page one of
23 Defendant's Exhibit 1, please.
24    A.  Okay.
25    Q.  Okay. Let me direct your

Page 142

1  attention to that sentence that we're
2  interested in, Your Board of Directors
3  unanimously approved the acquisition and
4  believes that it is in the best interest of
5  OHSL stockholders. Do you see that?
6      A.  Um-hmm.
7      Q.  Do you agree that that sentence
8  has two components?
9      A.  I guess.
10     Q.  And on first blush, does it appear
11 to you that the question and answer I read
12 appears to be inconsistent with the second part
13 of that sentence?
14     MR. HUST:  Objection.
15     A.  Again, this sentence speaks to
16 what the Board determined in exercising its
17 fiduciary duties. Not in response to a
18 question as to how someone feels in their
19 heart. I don't think it's inconsistent at all.
20     Q.  Is it possible that Mr. Hanauer
21 voted in favor of the transaction as a director
22 because he simply gave up, but did not believe
23 that the transaction was in the best interest
24 of OHSL stockholders?
25     MR. HUST:  Objection.

Page 143

1      MR. GILLIGAN:  Object to the form
2  of the question on the basis of "possible,"
3  but go ahead if you feel like you can answer
4  it.
5      A.  My opinion is that regardless of
6  why he voted in favor of the transaction, in
7  exercising his fiduciary duties he voted in
8  favor of the transaction. And your implication
9  is that he gave up and by doing so departed
10 from his fiduciary duties. I can't comment as
11 to that. And I also don't know that to be
12 true.
13     Q.  If he voted in favor of the
14 transaction, not believing that it was in the
15 best interest of OHSL stockholders, do you
16 believe he would have violated his fiduciary
17 duties?
18     MR. BURKE:  Objection. Calls for
19 speculation.
20     A.  I'm not an expert on fiduciary
21 duties. I think that it is -- you know, it's a
22 possibility.
23     Q.  What factors would you need to
24 consider in coming to a more formal conclusion?
25     MR. BURKE:  Objection. Calls for

Page 144

1  an opinion.
2      A.  That's an opinion.
3      MR. BURKE:  Speculation.
4      A.  That's an opinion I can't give.
5      Q.  Why not?
6      A.  I've, I've never even met Mr.
7  Hanauer. I mean, I don't know -- I don't know
8  any of the facts -- I mean, you've asked me to
9  assume all of these facts as far as him
10 opposing the transaction, facts that I don't
11 know to be true or not true.
12     You've cited information in a
13 deposition that has no legal significance
14 whatsoever, how somebody feels in their heart.
15 I don't know how I can make any -- any type of
16 a judgment as to whether he was exercising his
17 fiduciary duties or not.
18     Q.  Is it your testimony that you
19 believe that that question and answer that I
20 read has no legal significance whatsoever?
21     MR. BURKE:  Objection. Asked and
22 answered.
23     MR. HUST:  Objection.
24     MR. BURKE:  Argumentative.
25     A.  Yes.

Page 145

1      Q.  What's the basis for that belief?
2      MR. GILLIGAN:  He's already
3  testified --
4      MR. BURKE:  He's testified to
5  that.
6      A.  I don't believe that I have ever
7  seen in any legal treatise that anybody's
8  belief in their heart was important to any
9  corporate matter.
10     Q.  Okay. Let me ask -- let me relate
11 a different question. This is a question on
12 page 25, line nine that I asked Mr. Hanauer the
13 same day. And the question is, question:  If I
14 understood your testimony correctly a minute
15 ago, you said that you did not believe that
16 this transaction was in the best interest of
17 Oak Hills stockholders, correct?
18     Answer:  In -- yeah, that was your
19 question. Yes, that's what I said.
20     I then went on to ask him another
21 question.
22     Question:  Then did it bother you
23 that this document was going out, saying the
24 opposite of what you felt, what you believed?
25     Answer:  I did not dwell on the

Page 146

1  second piece of that sentence. Couched the way
2  you've just worked it though, I don't care for
3  that piece of the document, but I did not dwell
4  on, on the beliefs that -- at that point, you
5  know, it doesn't say unanimous there. If we're
6  getting down to, you know, we unanimously
7  approved, but it was -- but is it a true
8  statement that the Board believed. It was not
9  the whole Board that believed that.
10      Okay. If you had known that that
11  is how Mr. Hanauer felt, would you believe that
12  the sentence we're discussing on page one of
13  Defendant's Exhibit 1 is a true statement?
14      MR. BURKE: Objection to form.
15      MR. HUST: Objection.
16      A. I don't really understand the
17  question, in particular -- again, how -- how
18  somebody felt, again, there's no legal
19  significance to that. When they were -- I
20  mean, what the vote was is what the vote was.
21  If somebody felt some way and didn't vote that
22  way, I mean, I can't know that.
23      Q. Do you believe that sentence, Your
24  Board of Directors unanimously approved the
25  acquisition and believes that it is in the best

Page 147

1  interest of OHSL stockholders, is attempting to
2  convey the belief on the part of the unanimous
3  Board of OHSL directors, that they believe the
4  transaction is in the best interest of OHSL
5  stockholders?
6      MR. HUST: Objection.
7      MR. BURKE: Objection to form,
8  relevance. Asked and answered. Argumentative.
9      A. You'd really have to ask -- you'd
10  really have to ask them. They're responsible
11  for this page. And if certain -- certainly
12  they and their counsel are responsible for the
13  characterization of their Board's position.
14      Q. Based on your understanding of
15  Section 11 of the 1933 Act, do you believe that
16  if there is a material misstatement in
17  Defendant's Exhibit 1, that Provident and KMK
18  are also responsible under Section 11?
19      MR. BURKE: Objection. Calls for
20  legal conclusion.
21      A. Can I see that?
22      MR. BRAUTIGAM: Off the record.
23      (Discussion off the record.)
24      (Record read by Reporter.)
25      MR. BURKE: Objection. Calls for

Page 148

1  a legal conclusion. Calls for a legal opinion.
2      A. I'm not an expert in Section 11.
3  Let me take a look at it though.
4      Q. I'll show you Deposition Exhibit
5  45.
6      A. My opinion is no.
7      Q. What was your answer?
8      A. My opinion was no.
9      MR. BURKE: As the saying goes,
10  what's so hard to understand about no?
11      MR. BRAUTIGAM: I didn't hear it.
12      MR. BURKE: Okay.
13      Q. What was that based on?
14      A. The reading of the statute as you
15  presented it to me
16      Q. Are you familiar with the case
17  Rubin v. Schottenstein, Zox & Dunn from the
18  Sixth Circuit?
19      A. No.
20      Q. Are you familiar with the case
21  Basic v. Levinson from the US Supreme Court?
22      A. Yes, I am.
23      Q. What is your understanding of the
24  holding in that case as it relates to
25  materiality?

Page 149

1      MR. BURKE: Objection. Calls for
2  legal conclusion
3      A. I don't recall the specific
4  wording in that case I just know that that
5  case is one of the seminal Supreme Court cases
6  discussing materiality in certain cases
7      Q. Does that case at all talk about
8  the total mix of information?
9      MR. BURKE: Objection.
10      A. I -- the term "total mix of
11  information" is part of the materiality
12  doctrine as it's discussed, but I can't recall
13  whether that comes out of Basic v. Levinson or
14  not.
15      Q. Are you familiar with another US
16  Supreme Court case, TSC Industries, Inc versus
17  Northway?
18      A. Yes.
19      Q. Okay. What is your understanding
20  of the holding of that case?
21      A. Again, I don't recall the specific
22  holding. That case also dealt with
23  materiality. My best recollection is that that
24  case preceded Basic vs. Levinson. I can't
25  recall whether Basic vs. Levinson changed or

38 (Pages 146 to 149)

Page 150

1  modified or merely, you know, affirmed the
2  language in TSC Industries -- assuming that I'm
3  correct in the procedure.
4      Q.  You talked about the materiality
5  doctrine a moment ago.  Do you remember that?
6      A.  Um-hmm.
7      Q.  What is your understanding of the
8  materiality doctrine?
9          MR. BURKE:  Objection.  Calls for
10  a legal conclusion.
11      A.  I mean, you know, materiality is
12  extremely fact specific.  And cases have been
13  tried all the way up to the Supreme Court.  I'm
14  not sure that I could just put it down into a
15  sentence or anything like that.
16      Q.  Do you have a general
17  understanding of the materiality doctrine that
18  you need to have in terms of doing your work on
19  a day-to-day basis?
20          MR. BURKE:  Objection to form.  I
21  didn't understand it.  You may answer.
22      A.  I am asked from time to time by
23  clients as to whether something needs to be
24  disclosed.  And one of the considerations is
25  whether that fact is material.

Page 151

1      Q.  And how do you form about -- go
2  about forming a conclusion as to whether or not
3  something is material or not?
4      A.  I find out as -- first of all, I
5  don't form an opinion as to whether something
6  is material or not.  I form -- I advise my
7  client based on what they tell me and what I
8  ask them as to whether I think they need to
9  disclose it.  I don't really form a basis as to
10  whether it's material.  I'm not an expert in
11  being able to determine materiality.
12      Q.  What is the distinction in your
13  mind between disclosing a fact and whether or
14  not the fact is material?
15          MR. BURKE:  Objection to form.
16      A.  I think that you can -- I think
17  that you can certainly disclose something
18  that's not material.
19      Q.  On page 63 of Defendant's Exhibit
20  1, the ownership of shares by KMK employees is
21  disclosed.  Why was that disclosed?
22      A.  It's disclosed by SEC rules.
23      Q.  And what's the purpose behind that
24  rule?
25          MR. BURKE:  Objection.

Page 152

1      A.  I don't know what the legislative
2  history is for that rule.
3      Q.  Well, what's the rule as you
4  understand it?
5      A.  The rule as I understand it is
6  that the number of shares owned by those
7  participating in the matter need to be
8  disclosed.
9      Q.  So you disclosed KMK shares, but
10  not Mr. Herron's shares because he wasn't a
11  director as of the date of the merger?
12          MR. BURKE:  Objection.
13  Mischaracterizes his prior testimony in terms
14  of who disclosed it.  He didn't disclose it.
15      A.  I was about to say, it wasn't my
16  decision whether to disclose Mr. Herron's
17  shares or not to disclose Mr. Herron's shares.
18  My opinion is that it was correct the way it
19  was presented, but it wasn't my determination.
20      Q.  You testified before the break
21  that you became involved in the merger
22  transaction the day The Merger Agreement was
23  signed, is that correct?
24      A.  Yes.
25      Q.  And was that August 2nd, 1999?

Page 153

1      A.  I don't remember the date.  I
2  was -- I mean, I can't reveal privileged
3  communications, but that was when I was
4  notified that the deal was going on.  It was on
5  our system and within our firm as a code name,
6  so it was confidential.  I didn't know about it
7  beforehand.
8      Q.  Was this Project Bearcat?
9      A.  I don't recall.  That is one of --
10  my recollection is that that is a Provident
11  transaction that either did or didn't happen,
12  but that -- but there was a Project Bearcat at
13  some point.  I don't know whether this was that
14  or not.
15      Q.  And how did you know that you were
16  going to be performing work with respect to
17  this merger?
18          MR. GILLIGAN:  You can testify to
19  that.
20      A.  Discussions with Tim Matthews.
21      Q.  And what did Mr. Matthews say to
22  you and what did you say to him?
23          MR. GILLIGAN:  That's privileged.
24      A.  That's privileged.
25      Q.  What were your duties and

**Page 154**

1  responsibilities as you understood them on
2  August 2nd, 1999, with respect to this merger?
3         MR. BURKE: Objection. Asked and
4  answered.
5         A.  I couldn't put it any better than
6  you put it at the beginning. I was the
7  ministerial compiler of the document.
8         Q.  Okay. Does that mean that you
9  exercised no professional judgment in the
10  entire transaction?
11        A.  I would say that, that I also
12  represent Provident and, and in that capacity I
13  would have advised Provident on how to disclose
14  certain things.
15        Q.  And did you, in fact, do that?
16        MR. BURKE  Objection. Calls for
17  attorney-client communications.
18        A.  I don't recall.
19        Q.  Okay. Let's take a look at
20  Plaintiff's Exhibit 42. There should be a copy
21  for you in this pile.
22        A.  What is that?
23        Q.  It's a cover letter August 17th,
24  1999
25        A.  Okay

**Page 155**

1         Q.  Okay. Have you seen that document
2  before?
3         A.  Have I seen the document before?
4         Q.  Yes.
5         A.  I mean, I, I signed this letter on
6  August the 17th, 1999. I mean, I'm assuming I
7  saw it during that time
8         Q.  And on or about August 17th, 1999,
9  was it your intention to disseminate this
10  letter and the attachment to the distribution
11  list?
12        A.  Yes.
13        Q.  What was the purpose of doing
14  that?
15        A.  For all parties who had any
16  information regarding this transaction to
17  review the materials contained in the draft and
18  contact Mark Reuter or me with questions and
19  comments in preparation for filing of the
20  document.
21        Q.  Okay. Did there come a time when
22  you received questions and comments back?
23        A.  I received numerous comments back
24  from different parties.
25        Q.  Okay. Let's take a look at

**Page 156**

1  Plaintiff's Exhibit 16.
2         A.  Okay.
3         Q.  Have you seen that document
4  before?
5         A.  I don't recall seeing it, but I
6  mean, I must -- I assume I did.
7         Q.  When you received the document
8  like this, was it your practice to distribute
9  this to the service list?
10        A.  When I receive a document like
11  this, it is generally my practice to make the
12  changes and then distribute it to the working
13  group for verification, in particular the
14  people who had submitted the comments
15        Q.  And to the best of your
16  recollection, is that what you did in this
17  case?
18        A.  Well, to the best of my
19  recollection, I -- prior correspondence talked
20  about filing during the week of August 23rd. I
21  would not have -- unless I got sign-off from
22  Dinsmore & Shohl on behalf of OHSL, I would not
23  have authorized that Provident file the
24  document or -- you know, I don't know that I
25  even -- I don't really authorize it, Provident

**Page 157**

1  authorizes it, but we would have gotten --
2  Provident would have gotten sign-off from them
3  before filing the document.
4         Q.  How does this process of sign-off
5  work?
6         MR. BURKE. Objection. Asked and
7  answered.
8         A.  We talked about that earlier
9  It's just -- it's everyone involved who
10  contributed to this says that they are -- that
11  they sign off on the document and it could be
12  filed as, as presented to them.
13        Q.  But it's not a written sign-off,
14  it's an oral communication, correct?
15        A.  Yes, in practice it is an oral
16  communication. There may be occasions when
17  there's a written communication, but my
18  practice is it's generally oral.
19        Q.  Okay. Let me direct your
20  attention to page 48 of the document.
21        A.  Okay.
22        Q.  Do you see where it says, Number
23  of directors?
24        A.  Yes.
25        Q.  And for OHSL, it says, The OHSL

40 (Pages 154 to 157)



**Page 158**

1  Board has set the current number of directors
2  at eight. Do you see that?
3       A.  Yes.
4       Q.  And would you turn to the next
5  page?
6       A.  Um-hmm.
7       Q   Do you see some handwritten notes
8  there?
9       A.  Yes.
10      Q   Do you know whose handwriting that
11 is?
12      A.  No. I do not.
13      Q   Did you ever determine whose
14 handwriting that was?
15      A.  It was somebody -- it was either
16 somebody at Dinsmore & Shohl or somebody at
17 OHSL, but no.
18      Q.  Well, I think the cover letter
19 indicates that it would be either from Pat
20 Condren or Ken Hanauer.  Do you agree with
21 that?
22          MR. BURKE:  Objection as to
23 interpretation of that letter.
24      A.  I suppose.
25      Q   Okay   Would you read into the

**Page 160**

1  him again so we can move on.
2       A.  The only time -- the only time I
3  had any dealings with this matter was during
4  the preparation of this document.
5       Q.  And does this refresh your
6  recollection as to conversations that you may
7  or may not have had with anyone about the
8  Herron resignation?
9       A.  My recollection is the same.  I
10 had a conversation with somebody.  I don't
11 recall who told me that Mr. Herron had
12 resigned, or a director had resigned.  I can't
13 remember whether we discussed any name in
14 particular   A director had resigned prior to
15 the vote and his letter of resignation
16 specifically said that he had resigned for
17 personal reasons.
18      Q.  Are you familiar with the term red
19 flag?
20          MR. BURKE.  Objection to form.
21      A.  I mean, I don't know what you mean
22 by that.  I've heard the term before
23      Q.  Okay.  When securities lawyers use
24 that term, what do you understand it to mean?
25      A.  Securities lawyers don't use that

**Page 159**

1  record the comments that say memo only on the
2  extreme right?
3       A.  Memo only, asterisk, resigned
4  July -- 7/27/99 from Board of Directors.  You
5  said he had resigned on 7/30.
6       Q.  Actually it was effective July
7  30th
8       A.  The Board themselves didn't know
9  when he resigned?
10      Q.  Well, his resignation letter was
11 submitted on July 27th and it says I'm
12 resigning effective July 30th.
13      A.  Again, it just is interesting to
14 me that they would mischaracterize the -- you
15 know better when he resigned than they do, but
16 that's okay
17      Q.  Do you remember discussing this
18 resignation with anyone?
19      A.  Didn't we -- didn't we cover this?
20          MR. BURKE:  We did cover this,
21 this is asked and answered.
22      Q.  Well, I meant in the context of
23 this particular document.
24      A.  I thought we covered that.
25          MR. GILLIGAN:  Go ahead and tell

**Page 161**

1  term as a matter of practice, to my knowledge.
2       Q.  Do corporate lawyers use that
3  term?
4          MR. BURKE   Objection.  Calls for
5  speculation.
6       A.  Not to my knowledge
7       Q.  Okay   In what context have you
8  heard that term?
9          MR. BURKE   During the end zone.
10      A.  Red flag is something that might
11 rise -- might require you to ask additional
12 questions in order to determine some
13 circumstances.
14      Q.  Did you believe that Mr Herron's
15 resignation at this time was a red flag?
16      A   No
17      Q.  You testified that you felt -- or
18 you were informed that he resigned for personal
19 reasons.  Do you remember what those personal
20 reasons were?
21      A.  I didn't inquire into the personal
22 reasons.
23      Q.  Did anyone tell you that it had
24 something to do with his other commitments and
25 not having enough time to continue on the OHSL

**Page 162**

1  Board?
2      A.  I don't recall.
3          MR. GILLIGAN:  In fairness to the
4  witness, he said he didn't recall.
5          MR. BRAUTIGAM:  Just trying to
6  probe his recollection, but I can move on.
7          MR. GILLIGAN:  All right.  You
8  answered it, didn't you, Mark?
9          MR. BRAUTIGAM:  Yes, he did.
10         THE WITNESS:  I said I don't
11  recall.
12         MR. GILLIGAN:  Okay.
13  BY MR. BRAUTIGAM:
14     Q.  Do you remember making the change
15  in the proxy materials/registration statement
16  to change the number of OHSL directors from
17  eight to seven?
18     A.  Where is that?
19     Q.  Well, in this document, on page 48
20  it says that the number is set at eight.
21     A.  Um-hmm.
22     Q.  And in the final version it's
23  seven.
24     A.  I don't recall.  But again, that
25  deals with OHSL.  I would have gotten that from

**Page 163**

1  them or their counsel.
2      Q.  Let's take a look at Plaintiff's
3  Exhibit 46.
4      A.  Okay.
5      Q.  Have you seen that document
6  before?  And I would ask you to look carefully
7  at the handwriting.
8      A.  I don't recall ever seeing this
9  document before.
10     Q.  Okay.  Could you just skim through
11  it and look for the handwriting off various
12  pages, please.
13     A.  How about could you point me to
14  specific pages where you'd like me to look?
15     Q.  Certainly.  Well, the first page.
16     A.  Okay.  Do you have a question
17  about the first page?
18     Q.  Well, I just would like you to
19  look at the handwriting.
20         MR. GILLIGAN:  On the first page.
21     A.  Okay.
22         MR. GILLIGAN:  Look at it.
23     Q.  The page that's numbered two.
24     A.  So we're done with the first page?
25     Q.  Well, I just want you to look at

**Page 164**

1  the handwriting to get kind of generally
2  familiar with it.
3      A.  Okay.
4      Q.  Page number three.  Do you see the
5  footnote on the bottom?
6          MR. BURKE:  Footnote.
7      A.  Okay.
8      Q.  Page number four.
9      A.  Okay.
10     Q.  Page number five.
11     A.  Okay.
12     Q.  Page number 19.
13     A.  Okay.
14     Q.  Twenty.
15     A.  And I'm just looking at the
16  handwriting, not the substance, correct?
17     Q.  Yes.
18     A.  Okay.
19     Q.  Twenty-one.
20     A.  Okay.
21     Q.  Twenty-two.
22     A.  Okay.
23     Q.  Twenty-four.
24     A.  Okay.
25     Q.  Twenty-five.

**Page 165**

1      A.  Okay.
2      Q.  I skipped some things, and 28 and
3  29.
4      A.  Twenty-eight and twenty-nine or
5  regular 28.
6      Q.  Regular 28 and 29.  Okay.
7      A.  Okay.
8      Q.  Let's just stay on pages 28 and 29
9  for now.  Let me represent to you that the
10  handwriting belongs to Ken Hanauer.  Are you
11  with me so far?
12     A.  The handwriting belongs to Ken
13  Hanauer, yes.
14     Q.  And that Mr. Hanauer wrote these
15  things down based on a conversation he had with
16  Mr Barry Forrester, who was an investment
17  banker.  Are you with me so far?
18     A.  When did he have that
19  conversation?
20     Q.  Okay.  At or about the time of the
21  merger.
22     A.  At or about the time of the
23  meeting or at or about the time The Merger
24  Agreement was signed?
25     Q.  At or about the time The Merger

Page 166

1  Agreement was signed.
2      MR. BURKE: That's an inaccurate
3  statement. This document didn't exist then.
4  You know that's not right.
5      Q   Okay. At or about the time these
6  proxy materials were produced, meaning at or
7  about September 24th, 1999. I stand corrected
8  on the previous representation.
9      MR. BURKE: I think that's also an
10 inaccurate characterization of the record. And
11 it's also an inaccurate characterization of
12 what these comments reflect. And I think to be
13 fair to the witness, you ought to at least tell
14 him what the testimony was with respect to
15 that. If you don't care to, that's fine, but I
16 think it's misleading.
17     Q   I'm getting to -- I made a
18 representation that these were notes that Mr.
19 Hanauer wrote down based on a conversation with
20 Barry Forrester at some point after he received
21 the final document. Are you with me so far?
22     A   So these are -- these are really
23 Mr Forrester's comments as written down by Mr.
24 Hanauer?
25     Q   These are comments that Mr.

Page 167

1  Hanauer wrote down, based on a conversation
2  with Mr Forrester.
3      A   Okay.
4      Q   Okay. Now, I believe the
5  testimony is that Mr. Hanauer discussed each
6  and every one, or if not each and every one,
7  the vast majority of these comments with Mr
8  Roe. And my question is, would you have
9  expected Mr Roe to share these -- the contents
10 of that discussion with you?
11     MR. HUST: Objection.
12     MR. BURKE: Objection. Misstates
13 the record. You may answer.
14     A   I haven't even looked at the --
15 again, you asked me to look at the handwriting.
16 I don't know what the substance of these
17 comments -- I don't know who Mr. Forrester is.
18     Q   Okay. Well, look at page 29. It
19 says, Material misstatement of fact. Do you
20 see that?
21     A   I see the comment.
22     Q   Does that jump out at you as
23 something you would like to know?
24     MR. BURKE: Objection.
25     A   If true. The fact that somebody

Page 168

1  made -- if you're asking me if the fact that
2  somebody wrote this comment down jumps out at
3  me, no. If it's true that that is a material
4  misstatement of fact -- and I'm not sure that
5  it would -- it would depend on what was wrong
6  with it. Again, we'd be arguing over whether
7  it was material or not.
8      Q   Does the fact that the CEO of the
9  company to be acquired wrote that down make it
10 something that you would be interested in?
11     MR. HUST: Objection.
12     MR. BURKE: Objection.
13     A   I don't, I don't know what his
14 capability is of -- number one, I don't know
15 what his capability is of determining
16 materiality. And, number two, I don't know
17 whether that was his comment or Mr. Forrester's
18 comment.
19     Q   You said you needed to know some
20 information about Mr. Forrester in order to
21 form an assessment as to the credibility, is
22 that right, or words to that effect?
23     MR. BURKE  He didn't say --
24     MR. GILLIGAN  He didn't say
25 anything about credibility

Page 169

1      A   No  Just to be able to have
2  really input, you'd have to tell me who he is.
3  And even then I may not be able to, because
4  I've never heard of him
5      MR. BRAUTIGAM  Okay. Mr.
6  Forrester was an investment banker. I believe
7  he was with ABN Amro, and I believe his area of
8  specialization was banks and other financial
9  institutions.
10     MR. BURKE: I would submit that
11 based upon the deposition testimony that we
12 talked about yesterday, you know that that's a
13 misleadingly incomplete characterization of
14 what his interest in this whole transaction
15 was.
16     MR. MESH  Why don't you give us
17 your version?
18     MR. BURKE: Sure. My version is
19 as page 153 to 156 of Mr. Hanauer's deposition
20 stated Mr. Forrester was a person that wanted
21 to have this business. He wanted to be the
22 investment banker. He was a jilted suitor, so
23 to speak, to have this business.
24     And he had an axe to grind about
25 it, which is exactly what Mr. Hanauer said. He

**Page 170**

1  said he was mad because he wasn't in Mr.
2  Crowley's position, had not been selected as
3  the investment banker. And as a result he was
4  nitpicking this, and Mr. Hanauer didn't agree
5  with what he said.
6      MR. MESH: That's fine. I don't
7  mean to get into a dialogue necessarily, Jim.
8      MR. BURKE: Okay. That's what it
9  is.
10      MR. MESH: But does that make what
11  Mike characterized as his employment false?
12      MR. BURKE: No, he said what was
13  his role. I'd have to know more about his role
14  in this transaction. He said he's an
15  investment banker who specialized in banking.
16  Mr Hanauer testified this guy was angry about
17  not having gotten the business and was
18  nitpicking this.
19      That's what he testified to.
20  That's why I object to these questions where
21  the hypothetical is incomplete. But you asked
22  for my position and that's it, Gene.
23      MR. MESH: Thank you.
24      MR. BRAUTIGAM: Well, I took your
25  guidance and I did review that testimony both

**Page 171**

1  last night and this morning and you're sort of
2  in the ballpark. Mr Hanauer referred to Mr.
3  Forrester as a spurned individual. But what --
4  I don't believe that's important
5  BY MR. BRAUTIGAM:
6      Q   What's important is Mr Hanauer
7  took these comments to Mr Roe. And my
8  question for you, sir, is would you have
9  expected Mr Roe to share that discussion with
10  you?
11      MR. HUST: Objection
12      A   I can't -- I can't have an opinion
13  on that.
14      Q   Why not?
15      A   I don't know whether any of these
16  statements are true. I mean, if somebody calls
17  Mr Roe and says that, you know, spreads some
18  falsehood about a director on the Board and
19  he -- and he realizes or through his diligence
20  finds out that that's not true, I wouldn't
21  expect him to share it with me.
22      Q   If you had known that this
23  document had existed in September of 1999,
24  would you have wanted to see it?
25      MR. BURKE: Objection. I don't

**Page 172**

1  believe there's any testimony in the record
2  that it existed at that time.
3      A   I don't know.
4      MR. GILLIGAN: Go ahead and tell
5  him.
6      A   My answer doesn't change. I don't
7  know what -- I mean, I -- again, this doesn't
8  tell me anything. As a matter of fact, before
9  I got the history of this, I looked at the
10  bottom of page 28, asterisk, was MD afraid we
11  could have done things that might have led to
12  higher profits. paren AKA stock price, end
13  paren, without a sale.
14      First of all, that -- reading
15  that, again before hearing the history, said a
16  number of things to me. Number one was the use
17  of the word "we" here. That indicated to me
18  that that was not Mr. Hanauer's note, that was
19  a direct note taken from Mr. Forrester.
20      And my guess would have been that
21  this was a company who thought that they could
22  have done a better job or was pissed off that
23  they didn't get the business. I think that's
24  pretty -- I mean, again, just looking at one
25  comment, that was my impression

**Page 173**

1      Q   Do you think that the question in
2  that comment refers to Mr. Forrester and Mr.
3  Hanauer?
4      A   No. I think the "we" refers to Mr
5  Forrester and his firm.
6      Q   You don't believe that the "we"
7  refers to OHSL?
8      A   No, I do not.
9      MR. GILLIGAN: He said that's how
10  he interpreted it --
11      Q   Okay.
12      MR. GILLIGAN: -- in a document
13  he's never seen before in his life
14      A   Why would -- absolutely
15      MR. GILLIGAN: That's good enough,
16  Mark.
17      Q   Well, I'll ask Mr Hanauer about
18  that when I depose him. So if I understand
19  your testimony correctly, this -- you would not
20  necessarily have wanted to see this document if
21  you knew of its existence?
22      MR. BURKE: Objection. Asked and
23  answered.
24      A   I mean, I don't -- I don't know.
25  I don't have -- I don't have nearly enough

44 (Pages 170 to 173)

Page 194

1  quid pro quo?
2      MR. BURKE: Objection.
3      A. I'm, I'm --
4      MR. GILLIGAN: Just --
5      A. Yes.
6      MR. GILLIGAN: I think we're all
7  going to be better off --
8      A. Yes.
9      MR. GILLIGAN: -- if you give
10  yeses or nos and we'll try to get through this.
11      A. Okay, yes.
12      Q. What do you understand the term
13  quid pro quo to mean?
14      MR. GILLIGAN: Does this have
15  anything to do with this?
16      A. Exchanging value for --
17      MR. GILLIGAN: Is this a term
18  that's used in the documents? Why are we doing
19  this?
20      MR. BRAUTIGAM: Absolutely. I
21  thought it would be clear, but I'm happy to
22  explain it to you.
23      MR. GILLIGAN: The term quid pro
24  quo?
25      MR. BRAUTIGAM: Yes.

Page 195

1      MR. GILLIGAN: Okay. Go ahead.
2      MR. BRAUTIGAM: Okay. It appears
3  that this was either changed or not corrected
4  to be factually accurate to avoid the
5  appearance of a quid pro quo, when Mr. Hanauer
6  changed his vote from abstaining to in favor
7  of, even though he didn't believe the
8  transaction was in the best interest of OHSL
9  shareholders, because he received his $375,000
10  employment agreement, which had the change of
11  control provision.
12      MR. BURKE: And just so we
13  understand, Mr. Brautigam, that is your theory.
14      MR. BRAUTIGAM: Yes.
15      MR. BURKE: That is not in any
16  sense a representation of the record in this
17  case, correct?
18      MR. BRAUTIGAM: Mr. Gilligan asked
19  me to explain where I was going and I
20  accommodated him.
21      MR. BURKE: Okay, fine.
22      MR. GILLIGAN: Well, go ahead. I
23  was asking if quid pro quo was a term that was
24  used in writing in the agreement, and is that
25  what you were inquiring about.

Page 196

1      MR. BRAUTIGAM: No.
2      MR. GILLIGAN: Well, okay. Let's
3  go on. Go ahead.
4      (Record read by Reporter.)
5  BY MR. BRAUTIGAM:
6      Q. Okay. Mr. Weiss, it appears that
7  the record was cut off and you had said
8  exchanging value?
9      A. Exchanging value for value. Or
10  exchanging, you know, just a --
11      MR. GILLIGAN: This for that.
12      A. This for that, right.
13      Q. Do you believe that if June 1999
14  was factually incorrect, that it should be
15  changed to the correct information?
16      MR. BURKE: Objection. Assumes
17  facts not in evidence. You may answer.
18      A. Again, my belief is that
19  shareholders were adequately informed that Mr.
20  Hanauer, who was an executive officer and
21  director of the company, could receive a
22  potential windfall if the transaction were to
23  go forward. And again, when he signed a change
24  of control agreement, in my mind, doesn't
25  change that mix at all.

Page 197

1      Q. Do you believe that the timing of
2  his signing of the change of control contract
3  vis-a-vis his changing of the vote would have
4  added anything to the total mix of information
5  that a reasonable shareholder would have wanted
6  to consider?
7      MR. BURKE: Objection. Calls for
8  speculation. You may answer it.
9      A. I can't say it any more plain. In
10  my opinion, the disclosure that was advisable
11  here was what Mr. Hanauer could receive. And,
12  and I guess Mr. Hanauer -- we could argue that
13  Mr. Hanauer could have been motivated beginning
14  in June of 1999 to embark upon a course that
15  would lead to a transaction where he could
16  receive $375,000 as well.
17      Q. Okay. Let's jump down to the
18  footnote. Would you read into the record the
19  handwritten notes, please?
20      A. Asterisk, this is not true. Why
21  for such a short time? Why no S-4 filing? Why
22  not 10-Q? Bad date, shareholders should know
23  agreement was just shot -- was just signed.
24  Doesn't know terms, et cetera.
25      Q. Okay. Let's take the first part

Page 174

1  facts to figure that out. I don't know what --
2  again.
3       MR. GILLIGAN: I want to ask you
4  to please move forward. I mean, this is
5  obvious repetition now. He's giving you more
6  than a fair answer to this inquiry.
7       MR. BRAUTIGAM: Well, if his
8  answer is the same, that's fine, I'll move on.
9       MR. GILLIGAN: Okay. I think
10  that's what he said. Have you finished your
11  answer?
12       A.  I don't know what else to say. I
13  mean. I don't know what -- this doesn't really
14  tell me anything other than these are notes
15  somebody put on a document. For all I know
16  they're not even talking about this document.
17  I don't know. I don't know the comment context
18  of this discussion.
19       Q.  So my question is, would you have
20  wanted to know?
21       A.  I'll say again, I don't know. I
22  can't know that. Would I have wanted to know
23  that this exists based on what you've given me
24  here? I don't know. I -- again, if somebody
25  called Cliff Roe -- if somebody called Cliff

Page 175

1  Roe and said, director XYZ of this corporation
2  was arrested last night at a -- I don't know,
3  for armed robbery, and Cliff Roe called them up
4  -- called the directors up, checked the record
5  and found out that it was not true. I wouldn't
6  want to know. Why would I want to know? I
7  don't know that anything in here is true. I
8  haven't looked at the comments because I really
9  just focused on handwriting, as you asked me
10  to.
11       Q.  Okay. Let's take that document
12  back. Okay. You're familiar with the fairness
13  opinion, correct?
14       A.  With a fairness opinion?
15       Q.  Yes, the term fairness opinion.
16       A.  Yes, yes.
17       Q.  Have you ever heard the term stale
18  fairness opinion?
19       MR. BURKE: Objection. Counsel,
20  that claim is no longer in this case, as you
21  know. It's been dismissed by Judge Beckwith.
22       MR. MESH: It's still reasonable
23  discovery.
24       MR. BURKE: On a claim that's been
25  dismissed?

Page 176

1       MR. BRAUTIGAM: It hasn't been
2  dismissed with prejudice and it's in the Second
3  Amended Complaint.
4       MR. BURKE: Yes, and it
5  violated --
6       MR. BRAUTIGAM: Jim, even though
7  you put in the papers that it was dismissed
8  with prejudice, that was not true. You may
9  have amended the papers, but it has not been
10  dismissed. We've refiled with greater
11  specificity, and it remains pending.
12       MR. BURKE: I disagree. It has
13  been dismissed.
14  BY MR. BRAUTIGAM:
15       Q.  Okay. Are you familiar with a
16  stale fairness opinion?
17       MR. GILLIGAN: With the term, you
18  mean?
19       Q.  Yes.
20       MR. GILLIGAN. Go ahead, Mark.
21       A.  I can guess as to what its meaning
22  is.
23       Q.  What do you believe the term stale
24  fairness opinion means?
25       MR. BURKE: Objection.

Page 177

1       A.  My guess is that when you're
2  referring to a stale fairness opinion, you're
3  referring to a fairness opinion that is no
4  longer timely.
5       Q.  Okay. What was the date of the
6  proxy materials?
7       A.  If this is -- if this Exhibit 46
8  is the last one, the date of the proxy
9  materials is September 24th, 1999.
10       Q.  Okay. What was the date of the
11  fairness opinion?
12       A.  Where is the fairness opinion?
13       Q.  The last couple pages of the
14  document.
15       MR. BURKE: Continuing objection
16  to this line of questioning in view of the fact
17  that the Court has dismissed all claims based
18  upon this particular allegation.
19       A.  September 3rd.
20       Q.  Is it consistent with industry
21  practice for a fairness opinion to be dated
22  three weeks from the date of the proxy
23  materials?
24       A.  There is no industry practice on
25  the date of a fairness opinion. It's a

1  negotiated arrangement between the people
2  contracting for the rendering of the fairness
3  opinion and the people rendering the fairness
4  opinion.
5      Q.  Well, doesn't a fairness opinion
6  have to be fresh?
7      MR. BURKE:  Objection.  Form.
8      A.  My -- I don't know what fresh
9  means.  And I think that its republication in
10  and of itself makes it fresh, but -- if I
11  understand your meaning of the word fresh.
12      Q.  What do you mean, "its
13  republication"?
14      A.  Republication in the proxy
15  materials.
16      Q.  Do you mean somehow that the
17  fairness opinion as of September 3rd, 1999
18  speaks as of September 24th, 1999, because it's
19  included in the proxy materials?
20      A.  And because McDonald specifically
21  consented to its inclusion in the proxy
22  materials and, to my knowledge, never withdrew
23  such consent.
24      Q.  How was the compensation for the
25  OHSL shareholders to be set?

1      A.  I don't recall.  There was a
2  mechanism in The Merger Agreement.
3      Q.  It was based on a formula based on
4  the price of Provident stock, correct?
5      A.  I -- if you say so.  I can't
6  recall.
7      Q.  And there was a ten-day, two-day
8  provision for the determination of the final
9  formula.  Does that sound familiar?
10      A.  That's how it's done in a number
11  of transactions.  Again, I'm not -- I can't
12  recall.
13      Q.  If Provident stock had declined
14  from approximately 42 and an eighth on
15  September 3rd to approximately 36 and an eighth
16  on September 24th, a $6 decline, would that --
17  would you consider that to be material in the
18  context of this transaction?
19      MR. BURKE:  Objection.  Calls for
20  complete speculation.
21      A.  I, I can't answer that question.
22  Again, I can't determine materiality.
23      Q.  Are you familiar with what's
24  sometimes known as a walk away price?
25      A.  I think I know what you mean by

1  that.
2      Q.  What is a walk away price?
3      A.  If I understand what you mean, in
4  certain -- there's a termination provision in
5  certain agreements where a party can walk away
6  under certain circumstances, one of which may
7  be, in a merger or stock deal, the price of
8  either their stock or the acquirer's stock.
9      Q.  What was the walk away provision
10  in this case?
11      A.  I have no idea.
12      Q.  Okay.  Could you turn to page four
13  of the document?
14      MR. HUST:  I'm sorry, I lost
15  track.  Are we still on --
16      A.  Forty-six.
17      MR. BURKE:  Which is not the final
18  document.
19      A.  Can I go back to Exhibit 1?
20      Q.  It is the final document.
21      A.  Page number four.
22      Q.  Right.  You can look at it, but
23  it's not going to have the handwriting.
24      A.  That's okay.
25      Q.  Okay.  Do you see where it says 36

1  in the right-hand column at the top?
2      A.  Yes.
3      Q.  Could you compare it to
4  Plaintiff's Exhibit 46, please?
5      A.  Yes.
6      Q.  Okay.  Which figure is right, the
7  handwritten figure of 36 60 or the printed
8  figure of $36?
9      A.  I, I don't know.
10      Q.  Could you look at The Merger
11  Agreement and check, please?
12      A.  Do you know where the provision
13  is?  I'm not finding it.  Okay, I've got it.
14  Average daily per share
15      Q.  Okay.  So which figure is right?
16      A.  The Merger Agreement says 36 60.
17      Q.  So what appears on page four
18  printed is incorrect; is that right?
19      A.  What's printed on page four is
20  inconsistent with The Merger Agreement,
21  correct.
22      Q.  And the handwritten comments says
23  S/B 36.60, correct?
24      A.  Yes.
25      Q.  And that handwritten comment

Page 182

1  appears to be correct and the printed text
2  appears to be incorrect, right?
3      A.  Appears to be inconsistent with
4  The Merger Agreement.
5      Q.  Does that mean incorrect?
6      MR. BURKE:  Objection.  Asked and
7  answered.  Argumentative.
8      A.  Inconsistent with The Merger
9  Agreement.
10     Q.  Someone was supposed to check this
11 page, correct?
12     A.  Really all parties were supposed
13 to check that page.
14     Q.  And do you believe now that this
15 is a mistake?
16     A.  I believe it's inconsistent with
17 The Merger Agreement that's contained in
18 Defendant's Exhibit 1.
19     Q.  Okay.  So it's fair to say that
20 you now believe, consistent with The Merger
21 Agreement, the walk away price is 36.60?
22     A.  I believe that's what The Merger
23 Agreement contained in Defendant's Exhibit 1
24 says, yes.
25     Q.  And 36 and an eighth is less than

Page 183

1  36.60, correct?
2      A.  Yes.
3      Q.  And if Provident stock were
4  trading at 36 and an eighth as of September
5  24th, 1999, that would be below the walk away
6  price, correct?
7      A.  Correct.
8      Q.  And although the final price had
9  not been determined and could not be determined
10 until further out, do you believe that this is
11 something that would add to the total mix of
12 information that a reasonable investor might
13 want to know?
14     MR. BURKE:  What --
15     Q.  That Provident stock was trading
16 below the walk away price as of the date of the
17 proxy materials.
18     MR. BURKE:  Objection.  Assumes
19 facts not in evidence, calls for speculation.
20     A.  I don't have an opinion on that.
21     Q.  Are you familiar with pooling of
22 interest accounting?
23     A.  I'm familiar with it to the effect
24 that I know that it's a form of accounting and
25 that -- and my best recollection is it has been

Page 184

1  retired, so to speak.
2      Q.  Are you familiar with purchase
3  accounting?
4      A.  I'm familiar with the fact that it
5  is a manner of accounting that differs from
6  pooling of interest, but again, I'm not an
7  accountant.
8      Q.  Which form of accounting was used
9  to -- in this transaction?
10     A.  I don't recall.  I mean, again,
11 I'm not an accountant and I didn't --
12     MR. GILLIGAN:  It's all right.  If
13 you don't recall, just tell him you don't
14 recall.
15     A.  I don't recall.
16     MR. GILLIGAN:  You don't have to.
17     A.  I don't recall.  Again, it should
18 be in there somewhere.
19     Q.  Was the accounting treatment used
20 an important part of the merger transaction?
21     A.  I don't know what the motivation
22 was -- the -- to whom, first of all?
23     Q.  To the OHSL shareholders.
24     A.  I don't know whether that was
25 considered as an important fact to them or not.

Page 185

1      Q.  Okay.  Would you look on the next
2  page?
3      A.  Page what?
4      Q.  Five.
5      MR. GILLIGAN:  Where are you?
6      A.  Page five.
7      MR. GILLIGAN:  Which document,
8  Exhibit 1?
9      Q.  Plaintiff's Exhibit 46.
10     A.  Okay.  It's the same thing though,
11 other than the handwritten comments on it.
12     Q.  Correct.
13     A.  Okay.
14     Q.  Do you see where it says Interests
15 of Certain Persons?
16     A.  Um-hmm.
17     Q.  Why is that section included?
18     A.  I suppose that OHSL thought that
19 it was good disclosure.  I agree with it -- the
20 fact that it's good disclosure.
21     Q.  You agree that the merger
22 agreements should be disclosed, correct -- not
23 the merger agreements, the change of control
24 agreements?
25     MR. BURKE:  Objection.  These are

Page 186

```
 1  employment agreements. And that's a misleading
 2  question, again, Mr. Brautigam, for two
 3  reasons. Number one, those claims have been
 4  dismissed. And number two, you know there were
 5  none in this case. You know that.
 6       MR. BRAUTIGAM: I know what?
 7       MR. BURKE: You know there were no
 8  change of control agreements. There were
 9  employment agreements.
10  BY MR. BRAUTIGAM:
11       Q. Are employment agreements and
12  change of control agreements sometimes used
13  interchangeably?
14       A. I wouldn't use them
15  interchangeably.
16       Q. Did these employment agreements
17  have a change of control provision?
18       A. It says here that they provide for
19  payments to such officers if they are
20  terminated following a change of control of
21  OHSL, so yes.
22       Q. And you mentioned earlier that you
23  felt that this was good disclosure, correct?
24       A. Yes.
25       Q. And that's because you feel that
```

Page 187

```
 1  the fact of change of control provisions should
 2  be disclosed, correct?
 3       MR. BURKE: Continuing objection
 4  to the pursued questioning on claims that have
 5  been dismissed. You may continue.
 6       A. Whether somebody would consider
 7  that to be material or not, I don't know. I
 8  certainly don't see anything wrong with the
 9  disclosure. It's factually true. I don't know
10  whether the absence of that disclosure would
11  have been an omission, a material omission.
12  And I don't -- so, I mean, again, good
13  disclosure in my mind does not mean that it's
14  the disclosure that's only -- you know, only
15  the required disclosure. Good disclosure is
16  good disclosure.
17       Q. Good disclosure is by definition
18  factually true, correct?
19       MR. BURKE: Objection. Asked and
20  answered.
21       A. It would have to be.
22       Q. Okay. Turn to page 29 of the
23  document, please.
24       A. Okay.
25       Q. Do you see under Interests of
```

Page 188

```
 1  Certain Persons, second paragraph?
 2       A. Um-hmm.
 3       Q. And it's underlined and there's an
 4  asterisk?
 5       A. I'm not looking at that copy, but
 6  yes.
 7       Q. Well, could you -- maybe it would
 8  be best if you had them side by side, because I
 9  am interested in the handwriting.
10       MR. GILLIGAN: Are you looking at
11  46?
12       A. I thought we'd already covered
13  this whole matter, that I thought that not
14  knowing anything about the generation of this,
15  I can't form an opinion on any of this
16  except --
17       Q. Right. Well, we're going to go
18  through it.
19       MR. GILLIGAN: Which page do you
20  want?
21       Q. Twenty-nine. We're going to go
22  through it and I'll direct your attention to
23  handwriting, and then we'll see if you can form
24  a conclusion as to the veracity of the
25  comments.
```

Page 189

```
 1       Okay. I believe you testified a
 2  few moments ago that you believe that good
 3  disclosure is factually correct, correct?
 4       A. Right.
 5       Q. Now, on page 29 it says that these
 6  agreements were entered into in June 1999. And
 7  that's underlined, there's an asterisk on the
 8  left. And above that printed it says material
 9  misstatement of fact. Do you know if that
10  statement in the context that these agreements
11  were entered into in June of 1999 was factually
12  true?
13       A. I would have gotten that from OHSL
14  or Provident -- we would have gotten from it
15  OHSL or their counsel. I don't know if it's
16  true or not.
17       Q. If it were not factually true,
18  would it bother you?
19       MR. BURKE: Objection to form.
20       MR. HUST: Objection.
21       A. It would depend on why it wasn't
22  true.
23       Q. If Mr. Hanauer changed his vote
24  after entering into his employment contract,
25  would that be something that would add to the
```

Page 190

1  material mix of information that a reasonable
2  shareholder might want to consider?
3      MR. BURKE: Objection. Material
4  misstatement of the record and you know it.
5  It's a misleading question and you know it.
6  That's exactly contrary to what Mr. Hanauer
7  testified to. He did not say that there was
8  any causal connection. In fact, he denied a
9  causal connection.
10      MR. BRAUTIGAM: Jim, I'm only --
11  my question only goes to the timing. It has
12  nothing to do with a causal connection.
13      MR. BURKE: That's why I'm
14  objecting --
15      MR. BRAUTIGAM: Only to the
16  timing.
17      MR. BURKE: -- because you're
18  suggesting a fact to the witness that
19  mischaracterizes the record upon which it's
20  premised. That's why I'm objecting, that's
21  all.
22      MR. BRAUTIGAM: Jim, I'm not
23  suggesting anything. Mr. Weiss and ultimately
24  the jury can form their own conclusions. I'm
25  just questioning as to the timing.

Page 191

1      THE WITNESS: I don't understand
2  the question
3  BY MR. BRAUTIGAM:
4      Q. Okay. My question is thus: We
5  talked about some votes on July 22nd and August
6  2nd, 1999 of OHSL's Board. Do you remember
7  that testimony generally?
8      A. I didn't give testimony as to
9  those dates because I wasn't sure of them. I
10  remember you pointing out text and telling me
11  about those dates, yes.
12      Q. Right. And I made a
13  representation that at the July 22nd OHSL Board
14  meeting, when voting to continue merger
15  negotiations with Provident, Mr. Herron had
16  voted against and Mr Hanauer abstained. Do
17  you remember that representation?
18      A. No, I don't remember that
19  representation. I remember you asking me
20  whether the -- when -- presenting me with the
21  minutes and asking me whether they were
22  accurate or whether they reflected what had
23  happened. I don't recall anybody mentioning --
24  I could be wrong, but I don't recall anybody
25  mentioning an abstention or --

Page 192

1      Q. Well, I don't remember showing you
2  the minutes, but the record will speak for
3  itself. In any event, let me represent to you
4  now that at that July 22nd meeting, Mister --
5      A. You didn't show me the minutes,
6  you showed me the script for the special
7  meeting, I apologize.
8      Q. That's okay. -- Mr. Hanauer
9  abstained and Mr. Herron had voted against,
10  okay? Are you with me so far?
11      A. Um-hmm.
12      Q. And we agree that on August 2nd,
13  1999, Mr. Hanauer voted as a director in favor
14  of the merger transaction. Are you with me
15  again?
16      A. Um-hmm.
17      Q. Mr. Hanauer also testified that
18  these employment agreements were not in place
19  in June 1999 and were put in place at some
20  point between his abstention on July 22nd and
21  his vote in favor of on August 2nd, 1999. Is
22  that fact something that you would be
23  interested in in light of the printed
24  disclosure in the final version, that the
25  employment agreements were entered into in June

Page 193

1  of 1999?
2      MR. HUST. Objection.
3      MR. BURKE Objection to form.
4  Assumes facts not in evidence Calls for
5  speculation
6      A. My opinion is not, not
7  particularly would it, no.
8      Q. You wouldn't be interested in
9  that, even though the CEO of the company to be
10  acquired wrote in his own handwriting, material
11  misstatement of fact, with that part of the
12  sentence underlined?
13      MR. HUST. Objection.
14      MR. BURKE Mischaracterizes
15      A. Again, I don't know whether that
16  was his opinion or whose opinion And the
17  material fact here in my mind is not the timing
18  of the entering of the agreement. The material
19  fact in my mind, with respect to Mr. Hanauer,
20  is what he would be receiving upon a change of
21  control, which doesn't change no matter when he
22  signed it. And whether he signed it before,
23  during or after the negotiations, he may have
24  still been motivated by the -- by the $375,000.
25      Q. Are you familiar with the term

**Page 198**

1  of that note. This is not true. From your
2  vantage point at KMK, would you have wanted to
3  know this bit of information?
4         MR. BURKE: Objection.
5     A   What bit of information?
6         MR. BURKE: Asked and answered.
7     Q   That this document says that the
8  date is not true.
9         MR. BURKE: Objection. Asked and
10 answered
11    A   I, I don't know how else to answer
12 the question. I mean, if, if it should have
13 been --
14        MR. GILLIGAN  I think he's just
15 asking that, so would you like to have
16 corrected the date if the date was inaccurate.
17    A   If somebody brought it to my
18 attention that the date was inaccurate, I would
19 have corrected the date.
20    Q   Okay  If Mr Hanauer brought the
21 inaccuracy of the date to Mr. Roe's attention,
22 would you have expected him to correct the
23 date?
24        MR BURKE  Objection. Calls for
25 speculation

**Page 199**

1         MR. GILLIGAN: Just yes or no. Do
2  you have an expectation of that or not, Mark?
3  If you can answer
4     A   I would have -- I probably would
5  have expected a, you know, a handwritten
6  comment that it should be changed to July or
7  whatever it ought to be changed to.
8     Q   Did you ever receive a such a
9  comment from Mr Roe?
10    A   Not to my recollection.
11    Q   Okay. The next part of the
12 handwritten notes, why for such a short time?
13 What do you think that means?
14        MR. BURKE: Objection.
15    A   I have no idea.
16    Q   Okay. Why no S-4 filing? What do
17 you think that means?
18    A   I, I think that's a bad comment.
19 I don't know what that refers to.
20    Q   Okay. Why not in 10-Q? What do
21 you think that means?
22        MR. BURKE: Objection. Calls for
23 speculation.
24    A   I don't know. I mean, again --
25        MR. GILLIGAN: You're not being

**Page 200**

1  asked to speculate, Mark, so --
2     A   I don't know,
3         MR. GILLIGAN: Then that's your
4  answer.
5     A   I mean, I'm being asked to review
6  notes that I don't know are true.
7         MR. GILLIGAN: We're being as
8  cooperative as we can.
9     A   I don't know the relevance of any
10 of this.
11    Q   How about taking the last two
12 lines collectively, bad date, shareholders
13 should know agreement was just signed, doesn't
14 know terms, et cetera  Do you agree with all
15 or part of that?
16        MR. HUST: Objection.
17        MR. BURKE: Objection. Calls for
18 speculation.
19    A   I'll say again, my opinion is that
20 the material term is what these people could
21 get paid. And in particular with respect to
22 Mr. Hanauer, who had a vote on the transaction
23 as the director, I would want to know as a
24 shareholder, that if he were terminated and
25 otherwise were eligible to receive money under

**Page 201**

1  this employment agreement, I would want to know
2  that he would be entitled to that. And I could
3  weigh whether I thought that that would have
4  influenced his decision or not
5     Q   Okay  Let's take a look at page
6  13
7     A   Going back now?
8     Q   Yes.
9     A   Okay
10    Q   Under the Risk Factors, Provident
11 Financial may be unable to maintain volume of
12 securitizations. There's a note following
13 that. Would you read that into the record,
14 please?
15    A   Percentage sign of earnings S/B
16 disclosed. Stock value concerns -- concern
17    Q   Do you think that S/B might be
18 should be disclosed?
19        MR. BURKE: Objection. Calls for
20 speculation.
21    A   I can't speculate as to what he
22 means by that.
23    Q   Okay. Do you believe in this
24 document Provident's risk factors associated
25 with securitizations was adequately disclosed?

51 (Pages 198 to 20

**Page 202**

1    A.  Yes.

2    Q.  Do you understand that a Federal

3 Judge has reached a different conclusion?

4        MR. BURKE:  Objection.  That's a

5 false statement.

6        MR. GILLIGAN:  Just say yes or no.

7    A.  No.

8    Q.  Was Provident using an accounting

9 treatment for securitizations at or about the

10 time that was disfavored?

11    A.  I don't know.

12    Q.  Did Provident later change to a

13 different accounting treatment before the March

14 5th, 2003 restatement?

15    A.  Again, I don't know what led up to

16 the March restatement.

17    Q.  I mean, substantially before then.

18 Years before?

19    A.  I don't know.

20    Q.  Okay.

21    A.  I'm not their accountant

22        MR. GILLIGAN:  Just --

23    A  Okay

24        MR. GILLIGAN:  -- no and I don't

25 know  You don't need to --

**Page 203**

1    Q.  Do you believe that the March 5th,

2 2003 restatement has any impact on this

3 paragraph?

4        MR. BURKE:  Objection  Calls for

5 speculation.  You may answer.

6        MR. GILLIGAN:  Which paragraph, on

7 page 13?

8    Q.  Yes.  Provident Financial may be

9 unable to maintain volume of securitizations.

10        MR. GILLIGAN:  Third paragraph for

11 the record, okay.

12    A.  I have -- I don't have an answer

13 to that question.

14    Q.  Okay.  Would you turn to page 19,

15 please.

16    A.  Okay

17    Q.  The second paragraph from the top,

18 the phrase, an ad hoc committee of, is

19 underlined  Do you see that?

20    A.  Um-hmm.

21    Q.  And then there are comments below.

22 Would you read those into the record, please?

23    A.  Asterisk, it's the shareholder's

24 right to know who was driving this transaction.

25    Q.  And then jumping to the bottom?

**Page 204**

1    A.  Asterisk, should have been a

2 cross-section of the, I guess, Board

3 Comparison analysis of strategic alternatives

4 omitted.

5    Q.  Do you agree with some or all of

6 those comments as a matter of corporate

7 disclosure?

8        MR. HUST:  Objection.

9        MR. BURKE:  Objection.  Calls for

10 speculation.

11    A.  I have -- I would have no

12 knowledge of any facts leading to these

13 comments

14    Q.  Okay  Could you turn the page,

15 please?

16    A.  Yes.

17    Q.  The first bullet point there, it

18 says, OHSL's need for commitment of significant

19 resources to technology.  Do you see that?

20    A.  Yes.

21    Q.  And that's listed as a reason to

22 further investigate opportunities to sell or

23 merge OHSL  Do you see that on the preceding

24 page?

25    A.  Yes

**Page 205**

1    Q.  And there's a note to the right of

2 that.  Would you please read that into the

3 record?

4    A  Did this two years ago

5    Q.  If, in fact, that statement about

6 OHSL's need for commitment of significant

7 resources to technology was, in fact, not true,

8 would it be appropriate to include it in this

9 document?

10        MR. BURKE:  Assumes facts not in

11 evidence.  Misstates the record.  Calls for

12 speculation.

13        MR. HUST:  Objection.

14    A.  I mean, I can't speculate  Again,

15 I'm looking at notes that I don't know where

16 they came from.  For all I know, anybody could

17 have written these notes.

18    Q.  You refuse to accept my

19 representation that Mr. Hanauer wrote these

20 notes?

21        MR. BURKE:  He has no knowledge.

22    A.  I have no knowledge.  That's all

23 I'm saying.  I'm not saying that he did or

24 didn't write them, I just have no knowledge.  I

25 don't know whose comments they were.  You don't

Page 206

1   know whose comments they were.
2        Q.   Actually, I think I do, based on
3   the testimony, but I'll move on.
4        A.   But I mean, I don't have the
5   benefit of the testimony, I mean.
6        Q.   Well, usually in a deposition I
7   can say I represent this to you and then you
8   can assume it to be true.  And you seem to be
9   resisting that.
10        MR. GILLIGAN:  Okay.  That's all
11   right.  I think he's --
12        MR. BRAUTIGAM:  Let the record
13   reflect laughter and snickering.
14        THE WITNESS:  I'd like the record
15   to reflect that I didn't laugh nor snicker.
16        MR. GILLIGAN:  Nor did I.
17        MR. BRAUTIGAM:  Okay.
18        MR. GILLIGAN:  So who are you
19   referring to?
20        MR. BRAUTIGAM:  That's okay.
21        MR. GILLIGAN:  Okay.  Well, go
22   ahead and ask the question.
23   BY MR. BRAUTIGAM:
24        Q.   Do you see the asterisk next to
25   the first full paragraph on page 20?

Page 207

1        A.   Yes.
2        Q.   Could you read the comment at the
3   bottom?
4        A.   Was any other objective data
5   presented by MCD, alternatives for Board
6   consideration.
7        Q.   Could you just take a moment to
8   read that paragraph to yourself, the paragraph
9   relating to the asterisk.  The first full
10   paragraph.
11        A.   Okay.
12        Q.   Do you believe that the suggestion
13   noted at the bottom is a reasonable one?
14        MR. BURKE:  Objection.  Calls for
15   speculation.
16        A.   I have no idea.
17        Q.   Could you read the last two lines
18   of handwritten comments, please?
19        A.   How many bidders were there,
20   question mark.  Was this the highest bid,
21   question mark.
22        Q.   How many bidders were there for
23   OHSL?
24        MR. BURKE:  Objection, foundation.
25        A.   I don't know.

Page 208

1        Q.   Okay.  Going to the next page.
2        (Brief interruption.)
3        MR. HUST:  On these last two areas
4   of inquiry, the date of change of control
5   contracts, exhibit -- Plaintiff's Exhibit 28 is
6   Judge Beckwith's opinion in which she states,
7   The Court does not find the actual date that
8   the change of control contracts were entered
9   into significantly altered the mix of
10   information available.
11        The proxy statement indicates that
12   such contracts were executed under the section
13   Interests of Certain Persons and reasonably
14   alerts shareholders that certain OHSL
15   executives had a personal financial interest in
16   seeing the merger consummated and that the
17   contracts might be a quid pro quo for their
18   votes in favor of the merger.  End of quote.
19   I'd move to strike all of the questions and
20   answers relating to that subject.
21        And on to the ad hoc committee.
22   Judge Beckwith in the same decision stated, and
23   I won't read the whole paragraph because it's
24   lengthy.  First sentence, This alleged
25   misstatement or omission is immaterial as a

Page 209

1   matter of law.  Last sentence of that
2   paragraph, Requiring a corporation to disclose
3   every discussion in every decision relative to
4   the membership composition of the various Board
5   subcommittees would only serve to add confusion
6   to the mix of information, unquote.  And
7   likewise I object and move to strike all of the
8   questions and answers related to that subject.
9   Thanks.
10        A.   I'm a little -- I have to say I'm
11   a little confused, because you've been asking
12   me to assume a lot of facts and now I've got a
13   little bit of skepticism based on what was just
14   read that your representations as to the truth
15   of the facts are actually true.
16        I just want to be careful going
17   forward that when you, you know, when you
18   represent facts as being true, that I'm able
19   to -- that you are clear and honest about it.
20        Q.   Are you questioning my honesty?
21        A.   I'm questioning whether you have
22   been completely honest in asking me to assume
23   things that you say are true.  And now I
24   understand that at least one thing is not true.
25        Q.   What did I say that was not true?

**Page 218**

1  You alleged that the absence of
2  those should have been disclosed and the Court
3  rejected that as a matter of law, so I think
4  this line of questioning is improper. You may
5  answer.
6     A. I forgot what the question was.
7        (Record read by Reporter.)
8     A. Is what important in this
9  transaction?
10    Q. Voting agreements.
11    A. My understanding now is that there
12  were no voting agreements.
13    Q. You would agree with me, would you
14  not, that voting agreements were contemplated
15  in The Merger Agreement, correct?
16    A. I would agree with you that there
17  is a statement that there may be voting
18  agreements. I don't -- I don't see that as
19  being a condition to the merger.
20    Q. Well, OHSL is supposed to use its
21  best efforts to obtain voting agreements,
22  correct?
23    A. That's what it says
24    Q. Do you know if OHSL did that?
25    A. I have no idea

**Page 219**

1     Q. Voting agreements -- what's the
2  purpose of voting agreements?
3        MR. GILLIGAN: Here in this
4  context?
5     Q. In general.
6     A. A voting agreement is an agreement
7  on how to vote. It could be on anything.
8     Q. And what was the purpose in
9  attempting to get voting agreements in this
10  case?
11        MR. GILLIGAN: If you know.
12    A. I don't know that they attempted
13  to get voting agreements in this case.
14    Q. Well, it is in The Merger
15  Agreement, right?
16        MR. BURKE: Objection.
17  Argumentative
18        MR. GILLIGAN: But he said he
19  doesn't know. I think you ought to respect
20  that.
21    A. It could have been waived, I don't
22  know.
23    Q. Okay. If it was waived, where
24  would that appear?
25    A. Wouldn't have to appear anywhere.

**Page 220**

1     Q. Why would voting agreements be
2  waived in such a transaction?
3     A. Again, I don't know.
4     Q. Do you know if it were possible to
5  get voting agreements from OHSL's management?
6     A. I don't know.
7     Q. Do you know how OHSL's management
8  voted?
9        MR. BURKE: Objection. Calls for
10  speculation.
11        MR. GILLIGAN: On what?
12        MR. BURKE: Asked and answered.
13    Q. On the merger transaction.
14    A. I don't know. I don't know how I
15  could know when we were preparing this
16  document, either.
17    Q. As a general matter of corporate
18  disclosure, do you believe that the
19  recommendation of management is something that
20  would add to the total mix of information that
21  a reasonable shareholder would want to
22  consider?
23        MR. BURKE: Objection. Calls for
24  speculation.
25        MR. GILLIGAN: Recommendation on

**Page 221**

1  what?
2     Q. As to how to vote.
3     A. You're asking me my --
4        MR. GILLIGAN: On this transaction
5  here?
6     Q. Yes.
7     A. You're asking me my opinion
8  whether the nondirector executives --
9     Q. Yes.
10    A. Doesn't stand a good chance of not
11  having a job after this transaction. I think
12  that's -- depending on the circumstances, that
13  could be misleading or that could be material,
14  but I don't -- I can't really think of why it
15  would be material, especially because they're
16  not the ones that have fiduciary duties to the
17  shareholders. They may be voting in their own
18  self-interest.
19    Q. Well, do you believe as a general
20  matter that the opinion of management should be
21  included in the proxy materials in a
22  transaction such as this?
23        MR. BURKE: Objection. Asked and
24  answered.
25    A. No.

Page 210

1    A.  We can read back in the record.
2    Q.  What would you like to have read
3  back?
4    A.  Your characterization of some of
5  these facts here.
6    Q.  Okay.  Ask the court reporter to
7  find what I said that you believe is untrue.
8      MR. GILLIGAN:  I think we'll do
9  this at another time.  Go ahead and ask your
10  questions.
11      MR. BRAUTIGAM:  No, I want the
12  witness to be comfortable going forward that I
13  am not misleading him or being dishonest in any
14  way.  Do you have a particular point in mind?
15      MR. GILLIGAN:  Let me tell you
16  what is -- concerned me, Mr. Brautigam.  And
17  that is that you asked him all these questions
18  having to do with these employment contracts.
19  And it sounds like from what Mr. Hust just
20  read, there's already been a finding by the
21  federal Judge who's handling this case right on
22  this point.  And I have difficulty in why you
23  are asking him these questions when the Judge
24  has already ruled on it.
25      MR. BRAUTIGAM:  Well. I'm sure

Page 211

1  that I --
2      MR. GILLIGAN:  And putting my
3  client in this -- in that type of a situation.
4  I would think if you're being totally candid,
5  why wouldn't you tell him that this is not an
6  issue, that the Judge has already ruled on
7  this?
8      MR. BRAUTIGAM:  Well, actually I
9  believe your partner, Mr. Burke, made
10  essentially that very point some time ago,
11  point one.  Point two is Mr. Mesh and I believe
12  that these questions are reasonably calculated
13  to lead to admissible evidence.  And I want
14  to --
15      MR. GILLIGAN:  To what, defy the
16  Judge?  Defy the Judge's ruling?
17      MR. BRAUTIGAM:  I would never defy
18  the Judge's ruling.
19      MR. GILLIGAN:  That was what my
20  problem was yesterday, too, with Mr. Matthews,
21  that you were trying to put him into that
22  position.
23      MR. BRAUTIGAM:  I would never even
24  consider defying the Judge's ruling.  As you
25  know and as Mr. Burke knows, these allegations

Page 212

1  have been re-pled in an Amended Complaint.  And
2  these allegations were dismissed without
3  prejudice, so we don't know if they will
4  ultimately be accepted or not accepted.
5      But in any event, Mr. Mesh and I
6  reasonably believe that these questions will
7  lead to the discovery of admissible evidence
8  and that's why I've asked them.  Now, I
9  understand Mr. Hust has objected and moved to
10  strike.  It's duly noted on the record and I
11  would like to proceed.
12      MR. GILLIGAN:  Go ahead.
13      MR. BURKE:  I would note one
14  thing, that you have said these have been
15  repeated in the Amended Complaint.  That's
16  inaccurate.  In this case you have filed an
17  Amended Complaint which Judge Beckwith ordered
18  to be determined or viewed as a Motion for
19  Leave to Amend.
20      MR. BRAUTIGAM:  Which was deemed a
21  Motion to Leave for Amend.
22      MR. BURKE:  Right.  Which then was
23  briefed and denied by the Magistrate Judge.
24      MR. BRAUTIGAM:  That's correct.
25      MR. BURKE:  Okay.  And that ruling

Page 213

1  is the final word to this point on that.  So as
2  we sit here today, the Magistrate Judge's
3  ruling, which remains binding, as you've
4  already cited in other cases, until the
5  district court overrules it.  The motion for
6  leave to file that Complaint has been denied as
7  we sit here today.  And that denial has not
8  been acted upon by the Federal Judge
9      MR. BRAUTIGAM:  Actually, I don't
10  believe that's a correct recitation of the
11  facts, because after the restatement, we filed
12  a motion for leave to file a Second Amended
13  Complaint, which we would respectfully submit
14  moots the previous debate over the First
15  Amended Complaint
16      MR. BURKE:  Which also has been
17  briefed and has not been permitted.
18      MR. BRAUTIGAM:  It hasn't been
19  ruled on in any way.
20      MR. BURKE:  Right.
21      MR. BRAUTIGAM:  Jim, in fairness,
22  I think it's important to point out that if I
23  remember correctly, Magistrate Hogan's ruling
24  reversing himself in August of 2002 was
25  entirely because of the trial schedule that was

Page 214

1  vacated shortly thereafter.
2         MR. BURKE: I disagree, but the
3  court order speaks for itself.
4         MR. BRAUTIGAM: Okay.
5         MR. GILLIGAN: Okay. Go ahead.
6  BY MR. BRAUTIGAM:
7         Q.  Okay. Did you form a conclusion
8  with respect to the opinion of management, OHSL
9  management on this merger transaction?
10        MR. BURKE: Objection to form.
11  Calls for speculation.
12        A.  What do you mean by "management"?
13  The Board of Directors?
14        Q.  No. I mean Terry Todd, Marilyn
15  Weiland, Pat Condren and Ken Hanauer.
16        MR. GILLIGAN: Did he himself form
17  an opinion?
18        A.  No.
19        Q.  Yes. Okay. I believe Mr.
20  Matthews testified yesterday that it was his
21  belief that the OHSL Board was completely
22  behind -- Board and management was completely
23  behind and indeed enthusiastic about the
24  proposed merger transaction. Was that your
25  understanding as well?

Page 2?

1         A.  No.
2         Q.  Did Provident ever seek voting
3  agreements from OHSL's management?
4         MR. BURKE: Objection. That's
5  another claim that is no longer in this case.
6         A.  Did they ever solicit? I'm sorry,
7  what was the question?
8         Q.  Did they ever attempt to get
9  voting agreements from OHSL's management?
10        MR. HUST: Objection.
11        MR. BURKE: Same objection.
12        MR. HUST: Same basis.
13        A.  I have no idea.
14        Q.  Were voting agreements
15  contemplated in The Merger Agreement?
16        MR. HUST: Objection.
17        A.  I'd have to look at The Merger
18  Agreement again. I don't believe so.
19        Q.  Okay. Would you do that?
20        A.  Where do you want to point out?
21  Show me where it is in The Merger Agreement.
22        Q.  Why don't we both look and see who
23  finds it first?
24        MR. GILLIGAN: Are you
25  representing it's in there?

Page 215

1         MR. BURKE: Objection to the
2  characterization.
3         MR. GILLIGAN: Objection. He said
4  that as to the Board I thought he said on the
5  management that he wasn't sure he knew where
6  each of them stood. That's my recollection.
7         MR. BRAUTIGAM: Tim Matthews?
8         MR. GILLIGAN: Yes. I could be
9  wrong.
10        MR. BRAUTIGAM: Well, I think he
11  said that management was enthusiastic about the
12  deal as well.
13        MR. GILLIGAN: Okay. So the
14  question is, did I -- was he -- well,
15  regardless of what Tim Matthews said --
16        MR. BRAUTIGAM: Right.
17        MR. GILLIGAN: -- because I just
18  asked you to make the question --
19        MR. BRAUTIGAM: Sure.
20        MR. GILLIGAN: -- whether he --
21  BY MR. BRAUTIGAM:
22        Q.  Did you form an opinion with
23  respect to OHSL's management, whether they were
24  behind the transaction, against the
25  transaction, or something else?

Page 217

1         Q.  I have to check.
2         MR. GILLIGAN: Okay.
3         Q.  Try page A-13.
4         A.  A-13?
5         Q.  No, that's not it, excuse me.
6  A-25, Section 4.3(c).
7         A.  That doesn't appear to be a voting
8  agreement to me.
9         Q.  In the paragraph below that, in
10  addition?
11        A.  Use its best efforts. I don't
12  know whether any such voting agreement ever
13  happened. I see that they were going to use
14  their best efforts to do so.
15        Q.  Who was going to use best efforts
16  to do so?
17        A.  The agreement says, OHSL shall use
18  its best efforts.
19        Q.  Is that important to this
20  transaction, in your view?
21        MR. BURKE: Objection. Again, Mr.
22  Brautigam, you're talking about a claim the
23  district court has dismissed as legally
24  insufficient. There were none, you know that's
25  a fact.

Page 222

```
 1         Q.  Why not?
 2         MR. GILLIGAN:  He just said,
 3  didn't he?
 4         Q.  Because it could potentially be
 5  misleading?
 6         A.  Well, first of all, I -- as of the
 7  time of this -- the vote is necessarily weeks
 8  after the preparation of these documents.  How
 9  would anybody determine how they're going to
10  vote
11         Q.  Isn't that the very purpose of
12  voting agreements?
13         A.  If there was one
14         Q.  Right.
15         A.  Whether there's a voting agreement
16  is a negotiated point.  And whether a party
17  goes forward in a transaction with a -- with a
18  provision such as this, where somebody is to
19  use their best effort to get voting agreements,
20  that is up to the party who has requested that
21  you get the voting agreements.
22         My understanding is there were no
23  voting agreements here.  Provident obviously
24  did not require it to continue to go forward
25  with this transaction  I don't understand the
```

Page 223

```
 1  question.
 2         Q.  Did Provident expect that there
 3  would be voting agreements?
 4         A.  No idea.
 5         Q.  Well, isn't that what it says on
 6  page A-25?
 7         A.  No
 8         Q.  When you read that paragraph on
 9  page A-25 that begins, In addition, you don't
10  come away with the conclusion that OHSL will
11  use its best efforts and obtain voting
12  agreements from management?
13         MR. BURKE:  That's not what you
14  asked.
15         MR. BRAUTIGAM  That's what I'm
16  asking now
17         MR. GILLIGAN  It probably means
18  what it says in black and white.  Can't we just
19  accept that?
20         A.  I think that it absolutely does
21  not mean what you are alleging it means.  I
22  think that, that if this was a condition of
23  going forward, it would not have "best efforts"
24  language in it, it would have within ten days
25  after the execution of this agreement, all of
```

Page 224

```
 1  the OHSL officers and directors shall have,
 2  period.  It wouldn't have best effort in this.
 3         Q.  Could that be enforceable against
 4  the individual members of management?
 5         MR. BURKE:  Objection to form.
 6         A.  Could what be?
 7         Q.  Well, you said, "shall have,"
 8  which implies that somehow they would be forced
 9  to sign voting agreements.
10         A.  I didn't say forced.
11         Q.  You said "shall have."
12         A.  No, I said that would be a
13  condition to the merger  I said that if it
14  said that they are to sign them as a condition
15  to the merger  That's not what this says here
16  though.  It says they shall use best efforts to
17  try to obtain.
18         Q.  How would you expect OHSL and/or
19  its counsel to use best efforts to obtain
20  voting agreements?
21         MR. BURKE:  Objection.  Calls for
22  speculation.
23         A.  I can't speculate on that.
24         Q.  If you were going to get voting
25  agreements from your client, how would you go
```

Page 225

```
 1  about doing that?
 2         A.  It would depend entirely on the
 3  circumstances
 4         Q.  Okay  Let's go back to page 22
 5         A.  A-22 or regular 22?
 6         Q.  Regular 22
 7         A.  Okay.
 8         Q.  Does it concern you at all that
 9  the CEO wrote at the bottom of the page, not
10  using proxy date, willful misconduct, stock
11  price drastically different?
12         MR. BURKE:  Objection.
13  Mischaracterizes the record
14         MR. GILLIGAN  Can I ask that you
15  explain what you mean by that?  Does it concern
16  him at all?
17         Q.  Right.  In other words --
18         MR. GILLIGAN:  I mean, his
19  capacity has nothing to do with this per se.
20  This is being done by Dinsmore & Shohl.
21         A.  Actually this is prepared by
22  McDonald themselves.
23         Q.  Okay.
24         MR. GILLIGAN:  But somebody else
25  other than Mark.  So I mean, I guess the thing
```

Page 226

1  I'm trying to understand, in what capacity is
2  he supposed to be concerned or not concerned.
3      Q.  Okay.  Here is the point of my
4  question.  If you knew that Mr. Roe had had a
5  discussion with Mr. Hanauer about this point,
6  would you have wanted to know about that
7  discussion?
8      A.  I've answered that question --
9          MR. HUST:  Objection.
10     A.  -- several times.  Not
11 necessarily.
12         MR. BURKE:  Off the record for a
13 second.
14         (Discussion off the record.)
15         MR. BRAUTIGAM:  Okay.  I'll shift
16 gears now based on that representation, thank
17 you for that.  You understand that we're not
18 done --
19         MR. BURKE:  I --
20         MR. BRAUTIGAM:  -- with the
21 deposition.
22         MR. BURKE:  You haven't said
23 you're done.  I haven't claimed you're done.
24 BY MR. BRAUTIGAM:
25     Q.  Okay.  Can I direct your --

Page 227

1          MR. BURKE:  You have seven hours
2  and you've not used them up.
3      Q.  -- attention to Plaintiff's
4  Exhibit 23, please.
5          MR. GILLIGAN:  Do you have time
6  limits?
7          MR. BURKE:  Yes.
8      A.  Which one is Exhibit 23?
9      Q.  September 1st.
10     A.  Okay.
11     Q.  Could you take a moment to skim
12 through that document, please?
13     A.  Okay.
14     Q.  What is this document?
15     A.  It appears to be a fax from our
16 office requesting information to complete the
17 proxy statement/prospectus.
18     Q.  And in addition to being faxed to
19 Cliff Roe and Charles Hertlein, was this
20 document distributed to the other members of
21 the distribution list?
22     A.  I mean, I can't say that with
23 certainty.  It was certainly the intention that
24 it would be.
25     Q.  And within KMK, it was the

Page 228

1  invariable practice that when something was
2  supposed to be circulated, it was, correct?
3          MR. BURKE:  Objection.  Calls for
4  speculation.
5      A.  I suppose.
6      Q.  Okay.  Can I direct your attention
7  to page four of the document, going by the
8  Roman Numerals in the middle of the page.
9      A.  Roman Numerals --
10     Q.  I meant Arabic numerals.
11     A.  Okay.
12     Q.  Summary.
13     A.  Okay.
14     Q.  Do you see someone has circled
15 Recommendation to Stockholders?
16     A.  I see that having been circled,
17 yes.
18     Q.  Did you circle it?
19     A.  I don't recall.
20     Q.  Do you have any idea who may have
21 circled it?
22     A.  Absolutely none.
23     Q.  Do you remember seeing this
24 document in this form with a circle around
25 that?

Page 229

1      A.  I don't remember.
2      Q.  Do you have any idea why that was
3  circled?
4      A.  No.
5      Q.  Do you remember discussing the
6  unanimity of the OHSL's Board or lack of
7  unanimity with anyone at any time with respect
8  to the merger transaction?
9      A.  I had one conversation with -- I
10 can't recall who -- regarding unanimity.
11     Q.  And what was the substance of that
12 conversation, as best you can recall?
13     A.  That the vote had been unanimous.
14     Q.  Why did you have that
15 conversation?
16     A.  I don't recall.
17     Q.  How long did the conversation
18 last?
19     A.  I don't recall.
20     Q.  The section Recommendation to
21 Stockholders was written by someone at OHSL or
22 its counsel; is that correct?
23     A.  I don't recall, but it would have
24 been.  It deals with them.
25     Q.  And the last page of this

Page 230

```
1    document, which is page 17, that was also
2    written by either OHSL or its counsel; is that
3    correct?
4         A.   It deals with OHSL's special
5    meeting, yes.
6         MR. BRAUTIGAM:  Okay.  Well, it's
7    a minute before 2:00, I suggest this is an
8    appropriate time.
9         MR. MESH:  We thank you very much.
10        MR. BURKE:  Thank you.
11        MR. GILLIGAN:  When is Mark's depo
12   going to be -- off the record
13
14
15
16          MARK WEISS, ESQ.
17
18             - - -
19        (Deposition continued in
20         progress at 1:54 p.m.)
21             - - -
22
23
24
25
```

Page 231

```
1              C E R T I F I C A T E
2    STATE  OF  OHIO
                      SS.
3    COUNTY OF HAMILTON:
4         I, Lee Ann Williams, a duly qualified
5    and commissioned notary public in and for the
6    State of Ohio, do hereby certify that prior to
7    the giving of his deposition, the within named
8    MARK WEISS, ESQ. was by me first duly sworn to
9    testify the truth, the whole truth and nothing
10   but the truth, that the foregoing pages
11   constitute a true and correct transcript of
12   testimony given at said time and place by said
13   deponent, that said deposition was taken by me
14   in stenotypy and transcribed under my
15   supervision; that I am neither a relative of
16   nor attorney for any of the parties to this
17   litigation, nor relative of nor employee of any
18   of their counsel, and have no interest
19   whatsoever in the result of this litigation.
20        IN WITNESS WHEREOF, I hereunto set
21   my hand and official seal of office at
22   Cincinnati, Ohio this ___ day of
23   _____, 2003.
24   MY COMMISSION EXPIRES: _____
     AUGUST 26, 2004    LEE ANN WILLIAMS, RPR/CRR
25               NOTARY PUBLIC-STATE OF OHIO
```

59 (Pages 230 to 231)