UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WALTER W. THIEMANN, | ) | Case No. C-1-00-793 |
| | ) | |
| Plaintiff, | ) | (Judge Sandra S. Beckwith) |
| | ) | (Magistrate Judge Timothy S. Hogan) |
| -v- | ) | |
| | ) | |
| OHSL FINANCIAL CORP., *et al.*, | ) | **MEMORANDUM IN OPPOSITION TO** |
| | ) | **PLAINTIFF'S OBJECTION TO** |
| Defendants. | ) | **SCHEDULING ORDER** |
| | ) | |

## I.    **INTRODUCTION**

Plaintiff Walter Thiemann ("Thiemann") moves pursuant to Federal Rule of Civil Procedure 72(a) to set aside the November 18, 2003 Scheduling Order issued by Magistrate Judge Timothy S. Hogan.  Thiemann asserts that the Scheduling Order is prejudicial, and therefore requests that "discovery on all aspects of all cases be ordered to commence immediately, and that an accelerated schedule be set in its place."  (Thiemann's Objection to Scheduling Order  (Doc. 222) at 4-5).  Thiemann's objection is nothing more than the latest in a string of dubious filings by Thiemann and his counsel.  Absolutely no part of Magistrate Judge Hogan's Scheduling Order is either clearly erroneous or contrary to law so as to warrant that it be modified or set aside.  In fact, the record reflects that Magistrate Judge Hogan invested substantial time, thought and energy in developing a suitable trial calendar for this case with the full input of Thiemann's counsel and with Thiemann on the phone.  Pursuant to the Scheduling Order, discovery is proceeding with respect to all claims except those asserted against the newly added parties, Defendants Keating, Muething & Klekamp ("KMK") and Ernst & Young.  For these reasons and those discussed in further detail below, there are no legitimate grounds for

Thiemann's objection.  The November 18, 2003 Scheduling Order must be affirmed in its entirety.

## II.    LEGAL STANDARD GOVERNING OBJECTIONS TO A NONDISPOSITIVE MAGISTRATE JUDGE'S ORDER

Federal Rule of Civil Procedure 72(a) provides for reconsideration by the district court of the orders of a magistrate judge on nondispositive matters, such as scheduling.  *See Bank One Columbus, Ohio, N.A. v. First Financial Ventures, LLC*, No. 2:01-CV-0049, 2001 WL 840310, at *3 (S.D. Ohio July 5, 2001) (internal quotations omitted) (copy attached hereto as Exhibit 1).  In considering a party's objections to such orders, the district court may only "modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.").  Review under Rule 72(a) provides "considerable deference to the determinations of magistrates."  *In re Search Warrants Issued Aug. 29, 1994*, 889 F. Supp. 296, 298 (S.D. Ohio 1995) (*quoting* 7 MOORE'S FEDERAL PRACTICE ¶ 72.03).  "The clearly erroneous standard mandates that the district court affirm the magistrate's decision unless, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed.  In the absence of clear error, the magistrate's order must stand." *Bank One*, 2001 WL 840310, at *3 (internal quotations omitted);  *see also S.E.C. v. Thorn*, No. C:01-CV-290, 2001 WL 1678787, at *8  (S.D. Ohio Nov. 16, 2001) (copy attached hereto as Exhibit 2).

### III.    MAGISTRATE JUDGE HOGAN'S SCHEDULING ORDER IS REASONABLE AND APPROPRIATE

#### A.    The Scheduling Order Reflects the Understanding of the Parties and Contains No Obvious Error.

This Court's October 20, 2003 Order in the above-captioned case gave Magistrate Judge Hogan the duty to establish a new trial calendar. (*See* October 20, 2003 Order (Doc. 215) at 20). Pursuant to this Order, Magistrate Judge Hogan held a scheduling conference on November 4, 2003 in which all of the parties to this action actively participated. (*See* Transcript of November 4, 2003 Teleconference ("Transcript") (Doc. 220), attached to Thiemann's Objection to Scheduling Order (Doc. 222) as Exhibit B). The calendar developed as a result of this conference plainly reflects the parties' discussion. Moreover, the record from the teleconference reveals that Magistrate Judge Hogan clearly heard and took into consideration the various concerns raised by each of the parties, including Thiemann's counsel's repeated objections to any further stay of discovery.[1]  (*See* Transcript (Doc. 220) at 10-11, 15-16, 17-22, and 24). Thiemann's statement that "while Magistrate Judge Hogan was properly concerned about prejudice to the defendants, especially the new defendants, he was not similarly concerned with prejudice to the plaintiff[]" (Thiemann's Objection to Scheduling Order (Doc. 222) at 3), is baseless and disrespectful, and lacks any support in the record.

Thiemann fails to point to any legitimate grounds for his contention that Magistrate Judge Hogan's "Scheduling Order is clearly erroneous and contrary to law." (Thiemann's Objection to Scheduling Order (Doc. 222) at 4). A scheduling order is not clearly erroneous or contrary to

---

[1] Thiemann's counsel notably relinquished, however, at least one opportunity to voice his concern when, in response to Magistrate Judge Hogan's question regarding whether Thiemann found the deadline for expert discovery acceptable, Thiemann's counsel stated: "I don't know that we have any choice at this point, Your Honor, and that's not meant to criticize anybody. But we can see the handwriting on the wall here. Do the best you can." (Statement by Gene Mesh, Counsel for Plaintiff Walter Thiemann, Transcript (Doc. 220), attached to Thiemann's Objection to Scheduling Order (Doc. 222) as Exhibit B, at 33).

law simply because a party is unhappy with it, especially when, as in the case at bar, the trial calendar is the product of a conference in which all parties participated and were heard by the Court. Furthermore, in light of the fact that this is, in large part, a new case with a Consolidated Amended Complaint to be filed by December 31, 2003, which presumably will add new defendants and new class certification issues, the Scheduling Order undoubtedly is appropriate and fair. To proceed with discovery on the "accelerated basis" which Thiemann proposes – i.e., setting a general discovery cutoff 90 days from the date on which the Court renders a decision on any pending motions to dismiss (*see* Thiemann's Objection to Scheduling Order (Doc. 222) at 3; Transcript (Doc. 220) at 29) – would be unreasonable, particularly with respect to the recently added defendants, KMK and Ernst & Young. While Thiemann has been gathering information and conducting discovery on this matter (as well as in a related state court action) for years, neither KMK nor Ernst & Young have had this privilege. To force these parties to complete all discovery within an abbreviated three-month time period would prejudice them significantly – a point duly raised and debated in the scheduling conference. (*See* Transcript (Doc. 220) at 28-30). Thus, in setting the deadline for general discovery at the end of October 2004, Magistrate Judge Hogan recognized the importance of choosing a date far enough in the future so as to not only give the newly added defendants sufficient time to complete their discovery, but also to avoid any further amendments to the calendar order (*see* Transcript (Doc. 220) at 30, 32), which this Court firmly advised against. (*See* October 20, 2003 Order (Doc. 215) at 20).

In short, all of the evidence in the record indicates that no mistake was committed by Magistrate Judge Hogan with respect to setting the trial calendar for this action. The "clearly erroneous or contrary to law" standard mandates that this Court uphold the November 18, 2003 Scheduling Order.

**B.    Discovery is Proceeding Immediately with Respect to All but the Newly Added Defendants.**

Thiemann alleges that the current trial calendar is "extremely prejudicial," as it "is the very embodiment of the elevation of form over substance in insisting on stay of discovery upon stay discovery." (Thiemann's Objection to Scheduling Order (Doc. 222) at 4). Thiemann's argument completely glosses over the fact, however, that pursuant to Magistrate Judge Hogan's Scheduling Order, discovery is proceeding now with respect to all but the two most recently added defendants. The November 18th Order reads:

> A stay of discovery pending the Court's decision on motions to dismiss shall pertain only to the claims asserted against the newly added parties, namely Defendants Keating, Muething & Klekamp, and Ernst & Young.

(November 18, 2003 Order (Doc. 221) at 2). Hence, it is indisputable that Thiemann is allowed to proceed straight away with discovery as to the defendants named in the original complaint filed on September 20, 2000 (Doc. 1). Contrary to Thiemann's disingenuous suggestion (*see* Thiemann's Objection to Scheduling Order (Doc. 222) at 1-2), at no time has counsel for the OHSL and Provident Defendants refused to produce any of the individuals Thiemann seeks to depose, even though Thiemann's counsel deposed a number of the same individuals in *Nolte, et al. v. OHSL Financial Corp., et al.*, a related state court action, much closer in time to the events that are the subject of discovery in the present action.[2]  Norbert Brinker and Kenneth Hanauer will be made available for Thiemann to retake their depositions. (*See* December 5, 2003 Letter

---

[2] In 2000, Thiemann's counsel deposed Norbert Brinker, Thomas McKiernan, and Kenneth Hanauer in *Nolte, et al. v. OHSL Financial Corp., et al.*, Case No. A-09907039, Hamilton County Court of Common Pleas. Mr. McKiernan's deposition lasted two days, generating over 600 pages of transcript, while Mr. Brinker's deposition lasted over two days, generating approximately 800 pages of transcript, and Mr. Hanauer's deposition lasted over four days, resulting in more than 1,200 pages of transcript. Largely as a result, Thiemann's counsel's former co-counsel in this action, Mr. Richard Brualdi, previously agreed that the parties would use those depositions in this case to avoid cumulative testimony.

from James E. Burke, attached hereto as Exhibit 3). Although Mr. Brinker's health (he recently suffered a mild stroke and is confined to a wheelchair) will require that his deposition be deferred for some period, he will be made available for deposition as soon as he is well enough to handle a deposition. This subject recently was discussed, in detail, at yet another discovery conference before Magistrate Judge Hogan (Doc. 224), held on Tuesday, December 9, 2003.

It is not disputed that Thiemann has deposed every single OHSL director at length, either in this case or in the *Nolte* action in state court. Defendants also have agreed to make Mr. Brinker and Mr. Hanauer available for depositions in this action and have agreed to produce the other OHSL directors who already have been deposed in this action, for a second time, so that Thiemann's counsel may question them about new information or claims. (*See* December 15, 2003 Letter from James E. Burke, attached hereto as Exhibit 4). Discovery of the original defendants clearly is proceeding, therefore. (*See* December 2, 2003 Letter from James E. Burke, attached to Thiemann's Objection to Scheduling Order (Doc. 222) as Exhibit A). Thus, Thiemann's contention that he has "already been significantly harmed and will continue to be harmed by the imposition of this Scheduling Order" is nonsense. Thiemann has been granted the Court's permission to proceed with discovery as to all claims except those recently asserted against KMK and Ernst & Young. Depositions of the other defendants are proceeding, subject only to Mr. Brinker's health which Magistrate Judge Hogan actively is monitoring.[3] Thiemann's latest hyperbolic claims of extreme prejudice – particularly in light of the fact that he has deposed every single OHSL director either in this case or in the *Nolte* action – are without merit. Magistrate Judge Hogan's trial calendar lawfully serves the interests of all the parties to this case. Accordingly, the November 18, 2003 Scheduling Order must be allowed to stand.

---

[3] At the recent December 9, 2003 discovery conference, Magistrate Judge Hogan instructed Defendants' counsel to confer with Mr. Brinker's physician and obtain more detailed information on when, and under what circumstances, Mr. Brinker might be available to be deposed. This process is underway.

## IV.    <u>CONCLUSION</u>

Thiemann has failed to demonstrate that any portion, much less the entirety, of the November 18, 2003 Scheduling Order is clearly erroneous or contrary to law.    Defendants therefore respectfully urge the Court to adopt and affirm Magistrate Judge Hogan's sensible trial calendar in its entirety.

Respectfully submitted,


_____/s/ James E. Burke_____
James E. Burke (0032731)
Rachael A. Rowe (0066823)
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202
Tel: (513) 579-6428
Fax: (513) 579-6457
jburke@kmklaw.com
rrowe@kmklaw.com
*Attorneys for OHSL and Provident Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing MEMORANDUM IN OPPOSITION TO PLAINTIFF'S OBJECTION TO SCHEDULING ORDER was served upon the following by ordinary U.S. mail, this 15th day of December, 2003.

Michael G. Brautigam
Gene I. Mesh
Gene Mesh & Associates
2605 Burnet Avenue
Cincinnati, Ohio 45219-2502

*Attorneys for the Plaintiff*

John W. Hust
Schroeder, Maundrell, Barbiere & Powers
Governor's Knoll, Suite 110
11935 Mason Road
Cincinnati, Ohio 45249

*Attorney for Dinsmore Defendants*

John B. Pinney
J. Michael Debbeler
Graydon, Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202

*Attorneys for OHSL and Provident Defendants*

James E. Gauch
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

*Attorney for Third Party and Putative Defendant Ernst & Young*

Michael R. Barrett
Thomas W. Breidenstein
Barrett & Weber
500 Fourth & Walnut Centre
105 East Fourth Street
Cincinnati, Ohio 45202-4015

*Attorney for KMK Defendants*

1187770.1

/s/ James E. Burke
_____
James E. Burke

# EXHIBIT 1

2001 WL 840310                                                                    Page 1
(Cite as: 2001 WL 840310 (S.D.Ohio))

Only the Westlaw citation is currently available.

United States District Court, S.D. Ohio, Eastern Division.

BANK ONE COLUMBUS, Ohio, N.A., Plaintiff,
v.
FIRST FINANCIAL VENTURES, LLC., et al., Defendants.

No. 2:01-CV-0049.

July 5, 2001.

OPINION AND ORDER

SARGUS, District J.

**\*1** This matter is before the Court on the Defendants'
Motion for Reconsideration of the Magistrate Judge's
Scheduling Conference Order (Doc. # 87) and the Motion to
Stay portions of said Order (Doc. # 88). For the reasons that
follow, the motions are denied and denied as moot,
respectively.

I.

Defendants First, Second and Third Financial Ventures LLC
and the individually named Members move, pursuant to
Fed.R.Civ.P. 72(a), for reconsideration of the May 4, 2001
Scheduling Order issued by Magistrate Judge Mark R. Abel.
The Defendants assert that the Order "improperly intrudes
upon the attorney-client relationship and oversteps the
bounds of judicial authority." (*Motion to Reconsider* at 1).
Before considering the merits of these assertions, the Court
will briefly outline the scope of the Order.

In his May 4, 2001 Order, Judge Abel directed the parties to
agree to a schedule for the exchange of settlement positions
following their respective Rule 26(a)(1) disclosures. Judge
Abel further directed the parties to prepare for their clients
"a detailed case budget for the discovery to be conducted,
the motions to be prepared and briefed, the hearings
required, and trial in this lawsuit." (*Scheduling Conference
Order* at 2). The Judge observed that he was not "presently
convinced that the claims and defenses of the parties justify
the expenditure of time, emotion, and money contemplated
by the wide- ranging discovery and motions practice
counsel identified as likely during the April 30 scheduling
conference." (*Id.*). Judge Abel went on to describe the facts
underlying the claims involved in this case, with particular
emphasis upon the counterclaim filed by the individual
member Defendants.

Judge Abel observed that the instant action is potentially
very costly and that it would be in the interests of both Bank
One and the Members "to reach an early, hard bargained,

but reasonable settlement." (*Id.* at 7). Judge Abel further
observed that, while the Members claim that Bank One
interfered with their business opportunities as investors in
First Financial Ventures, counsel have been unable to
articulate facts in support of such a claim. (*Id.* at 8).

In contrast, Judge Abel observed that the Members have an
arguable claim for loss of the value of the use of the $41
million at issue in this case; however, Judge Abel noted that
there are several facts which could potentially undermine
the claim. (*Id.* at 9-10). Judge Abel concluded that, based
upon his limited knowledge of the issues, some of the
members may be able to recover damages for the loss of use
of their money from the time they sought to withdraw their
deposits at Bank One until the date of release of such
deposits. Further, the likely rate of return would be at simple
interest rate of between 2% and 4%. Thus, Judge Abel
concluded that "there is not sufficient money at issue
between the parties to justify conducting the type of
wide-ranging, expensive discovery and motions practice
needed to bring this case to a final, litigated conclusion."
(*Id.* at 12). Judge Abel noted that Rule 26(a)(2) authorizes
the Court to limit the scope of discovery.

**\*2** In sum, Magistrate Judge Abel directed the parties to
provide their clients with a copy of his Order along with a
detailed case budget within fifteen days of the Rule 26(a)(1)
disclosures. Judge Abel further concluded that when each
side has had the opportunity to evaluate the claims, they
should attempt to engage in settlement negotiations, which
could be facilitated by the Court.

On May 18, 2001, the Defendants filed the motions
presently before the Court. On May 30, 2001, Judge Abel
issued an Order granting the Members' Motion to Stay the
requirement that Defendants serve upon their clients a
detailed case budget and copy of the May 4, 2001 Order,
while the Motion to Reconsider remained pending. (*Order,*
May 30, 2001). Judge Abel also reviewed the Motion to
Reconsider only to the extent necessary to determine
whether the portions of the Order objected to on the basis of
alleged bias and interference with the attorney-client
privilege, should be vacated.

After a thorough consideration of the issues, as well as the
mandates of Rules 11 and 16, Judge Abel concluded that
"there is no factual or legal basis supporting Members'
counsel's request to relieve them from the requirement that
they prepare a case budget for the clients and that they
provide their clients with a copy of my May 4, 2001
Scheduling Conference Order." (*Id.* at 12). Nonetheless,
Judge Abel further concluded that if all parties agreed that
preparation of a case budget and delivery of the May 4
Order would not facilitate the management of this case, that
the challenged portions of the May 4 Order would be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2001 WL 840310
**(Cite as: 2001 WL 840310 (S.D.Ohio))**

Page 2

vacated. Counsel were directed to advise the Court of such a position by June 14, 2001. The record reflects that neither party responded to the Court on this issue.

On June 1, 2001, Defendants Steve Thorn, Global Investors Group and RPB Financial Co., Inc.[collectively referred to as the "Thorn Defendants"] responded to their co-Defendants' Motions to Stay and to Reconsider. (Doc. # 102). The Thorn Defendants agree with Judge Abel's observations in the May 4 Order and support the requirement that the parties prepare case budgets in this action. The Thorn Defendants reject the assertions made by the Financial Ventures and Member Defendants that the Judge's Order allegedly exhibits bias and intrusion on the attorney-client relationship. In sum, the Thorn Defendants view Judge Abel's Orders as "eminently sensible." (*Response* at 6).

Similarly, Plaintiff Bank One supports the rulings made by Judge Abel in the May 4 and May 30 Orders. Moreover, Bank One has certified its compliance with the terms of the Orders. (Doc. # 109). Bank One takes issue with the assertions made by the Financial Ventures and Member Defendants and argues that these Defendants mischaracterize the statements and efforts made by the Magistrate Judge in this case. Bank One also asserts that the requirement for preparation of a case budget and delivery of the same to the client does not impermissibly intrude upon the attorney-client relationship.

*3 With this background in mind, the Court proceeds to consider the merits of the Motion to Reconsider and the Motion to Stay.

## II.

The Defendants ask this Court to reconsider the Magistrate Judge's Order and to vacate the Order insofar as it directs the preparation and service of a detailed case budget and requires counsel to serve on their clients a copy of the May 4 Scheduling Order.

Fed.R.Civ.P. 72(a) provides for reconsideration by the District Judge of orders of the Magistrate Judge on nondispositive matters. The rule provides that, in considering objections to such orders, the District Judge "shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). The clearly erroneous standard "mandates that the district court affirm the magistrate's decision unless, on the entire evidence, it 'is left with the definite and firm conviction that a mistake has been committed.' In the absence of clear error, the magistrate's order must stand." *Farley v. Farley*, 952 F.Supp. 1232, 1235 (M.D.Tenn.1997) (internal citations omitted).

## III.

This Court has considered Judge Abel's May 4 Scheduling Order and firmly concludes that no part of the Order is clearly erroneous or contrary to law so as to warrant that any part of the Order be set aside. The Court observes that Motions to Reconsider case nondispositive matters are a rarity in this district. This fact is indeed attributable to the typically excellent case management service which the Magistrate Judges provide over the civil case dockets of the District Judges in Columbus, Ohio.

While the Court takes the matters raised in the Motion to Reconsider seriously, after a careful review of the Motion, the Memoranda *contra* and the history of this case, this Court finds no basis upon which to vacate any part of the May 4 Scheduling Order. The record reflects that Judge Abel invested a great deal of time and energy in developing a schedule for this case to ensure that the case stay within the parameters of the Court's eighteen month trial track. Moreover, Judge Abel's schedule and directives ensure that a "just, speedy and inexpensive determination" of the action will transpire. Fed.R.Civ.P. 1.

As Judge Abel observed in his May 30, Order, the directive that counsel prepare and serve upon the client a case management budget is certainly not beyond the pale. Rather, it is a tool which has garnered much support in district courts across the country. (*Order* at 9-10). This Court concludes that the requirement that counsel prepare and deliver to the client a detailed case budget in no way intrudes upon the attorney client relationship. Moreover, the Court finds that ordering preparation of a case budget fully comports with the Court's duties under Fed.R.Civ.P. 16. Thus, Defendants Financial Ventures' and the Members' argument that the requirement "has no legal basis" is simply unfounded.

*4 In the Court's view, the very fact that counsel objects to the preparation and service of a case budget on their clients together with Judge Abel's Scheduling Order underscores the need for preparation and service of the same. Clearly, counsel have an ethical duty to ensure that their clients are fully informed and also to act in the best interests of their clients. Preparation of a case management budget simply furthers these duties.

In addition, the Court concludes that the Defendants' assertion that the May 4 Order exhibits a bias towards the Financial Ventures and the Individual Member Defendants is wholly lacking in support. The Defendants take issue with Judge Abel's attempt to preliminarily assess the counterclaim and assert that he exhibited animus against their legal position. In reviewing the May 4 and May 30 Orders, along with the Motion to Reconsider, this Court finds that the record clearly indicates that Judge Abel was

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

simply attempting to glean a factual and legal basis to support the scope of discovery envisioned by the Defendants. Moreover, as Judge Abel points out in his May 30 Order, Defendants have yet to proffer a factual or legal basis that would support the type of wide-ranging and expensive discovery proposed. Thus, this Court finds no basis from which to conclude that Judge Abel's rulings were motivated by an animus toward the Financial Ventures and Member Defendants.

In sum, the Court finds the Defendants' Motion To Reconsider wholly without merit. While the Court certainly recognizes the Defendants' right to move for reconsideration of orders on nondispositive case matters, the Court finds the tone and the basis for the Defendants' Motion to Reconsider disturbing. [FN1] With this in mind, the Court reminds counsel, who are proceeding *pro hac vice,* of this Court's ability to withdraw such status "at any time." S.D. Ohio Local Rule 83.5(e).

> FN1. For example, the movants assert that Judge Abel's Order evinces "a prejudice against the moving parties;" makes an "unfounded inference that counsel for the moving parties are not properly advising their clients;" and is "replete with indications of bias against the Members, Financial Ventures and their counsel." (*Motion to Reconsider* at 2, 7). The movants further assert that Judge Abel made "unformed and premature determinations" as to the value of movants' proposed counterclaim. (*Id.* at 4).

Judge Abel's May 4 Scheduling Order is hereby ADOPTED and AFFIRMED in its entirety. The Financial Venture and Individual Member Defendants are hereby DIRECTED to certify their compliance with the terms of the May 4 Order within fifteen (15) days of the date of this Order.

IV.

The Defendants' Motion to Reconsider (Doc. # 87) is DENIED. The Motion to Stay (Doc. # 88) is DENIED as moot.

IT IS SO ORDERED.

2001 WL 840310, 2001 WL 840310 (S.D.Ohio)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# EXHIBIT 2

Not Reported in F.Supp.2d                                                                                    Page 1
(Cite as: 2001 WL 1678787 (S.D.Ohio))

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. Ohio, Eastern Division.

SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
Steven E. THORN, et al., Defendants.

No. C:01-CV-290.

Nov. 16, 2001.

*OPINION AND ORDER*

SARGUS, J.

*1 This matter is before the Court for consideration of various motions. For the reasons that follow, the Plaintiff's Motion to Continue the Asset Freeze (Doc. # 94, under seal) is granted; Defendants Thorn and Global Investors Group's Motion to Partially Dissolve the Asset Freeze and to Provide Ancillary Relief (Doc. # 96) is denied; Defendants Thorn and Global Investors' Motion for Reconsideration (Doc. # 88) is denied; and the Ventures Defendants' Uncontested Motion to file a Sur-reply (Doc. # 110) is denied as moot.

I.

This action was commenced by the Plaintiff Securities and Exchange Commission ["SEC"] on April 2, 2001 to remedy alleged violations of § 17(a)(1)-(3) of the Securities Act of 1934, 15 U.S.C. § 77q(a); alleged violations of § 10(b), § 15(a)(1) and (c)(1) of the Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78o(a) and 78o(c)(1); as well as alleged violations of Rules 10b-5 and 15c1-2, 17 C.F.R. §§ 240.10b-5 and 240.15c1-2, promulgated under the Act, by Defendants Steven E. Thorn, Karen Estrada and other entity defendants.

The SEC alleges, *inter alia*, that Defendant Thorn conducted a series of fraudulent investment schemes to raise at least $63.5 million from at least 92 investors for the purported purpose of investing in European bank trading programs. These programs would allegedly generate high investment returns with little or no risk. According to the SEC, Thorn and others raised at least $9.5 million in a series of schemes beginning in 1998, referred to by the SEC as the "Early Thorn Programs." The SEC further alleges that, from November 1999 to April 2001, Thorn and others raised an additional $54 million through entities he formed and controls, *i.e.,* Defendant Global Investors, LLC and the various Ventures Defendants. [FN1] The SEC refers to the investments raised during this period as the "Bank One

Program."

> FN1. Specifically, First Financial Ventures, LLC; Second Financial Ventures, LLC; and Third Financial Ventures, LLC.

As this case has progressed, the SEC has released approximately $34 million in frozen funds to various investors. On August 29, 2001, the SEC and the Defendants entered into an Agreed Order of Preliminary Injunction which enjoins all Defendants from future violations of the securities laws as alleged in the SEC's complaint. The SEC now moves the Court to continue the asset freeze with respect to Defendants Thorn, Global and the Ventures Defendants "to prevent further dissipation of assets and to preserve the remaining assets for disgorgement back to investors." [FN2] (*Motion to Continue Asset Freeze* at 2). The Defendants oppose continuation of the freeze; in particular, Defendants Thorn and Global move to partially dissolve the freeze and seek ancillary relief from this Court.

> FN2. The SEC has filed a separate motion for Appointment of a Special Agent. The SEC proposes that such agent receive, investigate and evaluate claims regarding the remaining frozen funds and to recommend to the Court the disposition of remaining assets in the event disgorgement is warranted. The Defendants oppose this request. The Court will address the merits of the SEC's motion at a later time when Defendant Thorn has retained new counsel.

II.

A. SEC's Motion to Continue the Asset Freeze and Thorn's Motion to Partially Dissolve the Freeze and for Ancillary Relief

*Standard of Review*

In SEC enforcement actions, a request for an asset freeze is a request for ancillary relief in the nature of an attachment. *SEC v.. Pinez,* 989 F.Supp. 325, 334 (D.Mass.1997). The relief sought serves to preserve the basis for any disgorgement remedy that may be ordered in the event that a securities violation is established at trial. *SEC v. Current Financial Services,* 783 F.Supp. 1441, 1443 (D.D.C.1992). The ultimate remedies available in an enforcement action include disgorgement, restitution and recission. *SEC v. Pinez,* 989 F.Supp. at 336.

*2 The SEC's authority to secure an asset freeze in connection with preliminary injunctive relief derives from Section 21(d) of the Exchange Act, which states:
Whenever it shall appear to the Commission that any person is engaged in or is about to engage in acts or

Not Reported in F.Supp.2d                                                    Page 2
(Cite as: 2001 WL 1678787 (S.D.Ohio))

practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, [or rules of exchanges and other designated entities], it may in its discretion bring an action in the proper district court ... to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d).

In *SEC v. Unifund Sal,* 910 F.2d 1028, 1036 (2 nd Cir.1990), the Second Circuit observed that, under this provision, the SEC is relieved of the traditional obligation imposed upon private litigants under Rule 65 to show the risk of irreparable injury or the unavailability of remedies at law. *Accord SEC v. Pinez,* 989 F.Supp. 325, 333 (D.Mass.1997). "[T]he critical question ... is whether there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Ctrs, Inc.,* 458 F.2d at 1082. Nonetheless, in considering a request for preliminary relief, courts "should bear in mind the nature of the preliminary relief the Commission is seeking, and should require a more substantial showing of likelihood of success, both as to violation and risk of recurrence, whenever the relief sought is more than preservation of the status quo." *Id.* at 1039.

When the SEC seeks preliminary relief to prohibit future securities law violations, the Commission "has to make a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *Id.* at 1040. When, however, the relief sought is an asset freeze, such a remedy "may be granted, even in circumstances where the elements required to support a traditional SEC injunction have not been established...." *Id.* at 1041. An asset freeze is warranted if the SEC simply shows that it is likely to succeed on the merits. *SEC v. Cavanagh,* 155 F.3d 129, 132 (2 nd Cir.1998). In addition, the Court must "weigh 'the deleterious effects' the freeze may have on the defendant['s] business against 'the considerations indicating the need for such relief." ' *Id.,* quoting *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1106 (2 nd Cir.1973). Such a remedy "is especially warranted where it is sought for a limited duration." *SEC v. Unifund Sal,* 910 F.2d 1028, 1041 (2 nd Cir.1990) (internal citations omitted). Furthermore, "[u]nlike the injunction against securities law violations, the freeze order ... simply assures that any funds that may become due can be collected." *Id.* at 1041; *see also SEC v. Gonzalez de Castilla,* 145 F.Supp.2d 402, 415 (S.D.N.Y.2001) (holding that an asset freeze is warranted "even where the SEC has failed to meet the standard necessary to enjoin future violations of the securities laws.").

*Application*

**\*3** As a preliminary matter, the Court notes that Defendant

Thorn urges a more stringent standard for continuation of the asset freeze. In particular, Thorn argues that the SEC must show that "the specific property that is subject to an asset freeze is traceable to a violation of securities laws." (*Motion to Partially Dissolve Asset Freeze* at 4). In support of this proposition, Defendant Thorn relies upon *SEC v. Huttoe,* No. 96-2543, 1998 U.S. Dist. LEXIS 23211 (D.D.C. Sept. 14, 1998) and *SEC v. United Communications,* 899 F.Supp. 9 (D.D.C.1991). In those cases, however, the asset freezes were sought in connection with permanent, rather than preliminary injunctive relief. This Court finds that, in the context of preliminary injunctive relief, the SEC need only show that it is likely to succeed on the merits in order for continuation of the asset freeze.

The SEC alleges that Thorn violated Section 17(a) of the Securities Act of 1933 and Sections 10(b), 15(a), and 15(c)(1) of the Securities Act of 1934. The SEC further contends that Thorn violated Rules 10b-5 and 15c1-2, promulgated under the Act. Before addressing whether the SEC is likely to succeed on these claims, so as to warrant a further freeze of Thorn's assets, the Court will set forth the standards for violations of the foregoing securities laws.

Section 17(a), § 10(b) and Rule 10b-5 [FN3] prohibit fraudulent conduct or practices in connection with the offer or sale of securities. Violations of § 17(a)(1), § 10(b) and Rule 10b-5 require proof of *scienter.* Proof of recklessness (*i.e.,* conduct that demonstrates an " 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it" ') satisfies the *scienter* requirement. *SEC v. Dain Rauscher, Inc.,* 254 F.3d 852, 856 (9 th Cir.2001), quoting *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9 th Cir.1990)(*en banc* ). Violations of § 17(a)(2) and (3) require a showing of negligence. *SEC v. Hughes Capital Corp.,* 124 F.3d 449, 453-54 (3 rd Cir.1997).

> FN3. Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), forbids any person in the offer or sale of any securities by means of interstate commerce
> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
> Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful for any person by means of interstate commerce "[t]o use ... any

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                Page 3
(Cite as: 2001 WL 1678787 (S.D.Ohio))

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." Rule 10b-5, 17 C.F.R. § 240.10b-5, provides, "It shall be unlawful for any person ... to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading...."

Section 15(a) of the Exchange Act prohibits any broker from using interstate commerce to effect a transaction in securities or to induce or attempt to induce others to purchase or sell securities unless the broker is registered with the SEC. 15 U.S.C. § 78o(a)(1). *Scienter* is not an element of a violation under § 15(a). *SEC v. Randy*, 38 F.Supp.2d 657, 667 (N.D.Ill.1999).

The SEC contends that it is likely to succeed on the merits of its claims under the foregoing. The SEC proffers various evidence in connection with its motion in support of its position that, from February 1998 to April 2001, Thorn: (1) misrepresented the existence and safety of the various "trading programs;" (2) failed to sufficiently investigate the accuracy of his representations to investors; and (3) misrepresented his use of investor funds. The SEC further contends that Thorn's trading programs are fraudulent and nonexistent and that his conduct evinces an ongoing scheme to defraud investors.

**\*4** In opposition to the SEC's motion and in support of his motion to partially dissolve the asset freeze, Thorn argues that he was engaged in "medium term note trading." Thorn offers the sworn testimony of one Stuart D. Rose, an officer of one RPB Financial Company, a Nevada Corporation, which is also purportedly engaged in the trading of medium term notes. (*Exhibit 11* in support of *Thorn's Motion* ).

According to Leonard A. Zawistowski, a Senior Special Investigator of the Federal Reserve System, High Yield Investment Programs ["HYIP"] of the type in which Thorn was engaged, are quite common. (*Exhibit 9* in support of *SEC's Motion* ). Zawistowski avers that, while the programs often purport to trade in medium term notes, any such trading would be subject to SEC oversight. Zawistowski acknowledges that there is a thriving medium term note market in the United States and Europe. According to Zawistowski, however, Thorn was not engaged in any SEC sanctioned trading program. Furthermore, in Zawistowski's view, the terminology used by Thorn to his investors was incorrect, false and misleading, particularly with respect to the Federal Reserve's involvement. Zawistowski further avers that the market in which Thorn purported to trade is nonexistent. (*Id.*).

In support of its position that Thorn traded in a nonexistent market, the SEC points to the statements contained in

Thorn's "Member Update" letters sent to Financial Ventures investors. According to the SEC, Thorn misled investors as to why they were not receiving promised profit returns. In the updates, Thorn assures investors that they will receive payments and states that delay in receipt is the result of actions taken by banks, attorneys and the Federal Reserve. (*Exhibit 6* in support of *SEC's Motion* ).

The SEC also offers evidence to demonstrate that Thorn not only misrepresented the nature of the trading programs but also misrepresented his own use of investor funds. According to Luz Aguilar, Senior Accountant with the SEC, Thorn transferred investor funds to his personal accounts and used the same to purchase his home, a diamond ring, luxury vehicles for himself and his family and expensive home furnishings. (*Exhibit 10* in support of *SEC's Motion* ). In addition, Aguilar avers that bank records demonstrate Thorn's use of investor funds to pay returns to other investors in different trading programs. (*Id.*). According to Aguilar, Thorn controls at least twenty-eight accounts at six financial institutions in at least three offshore jurisdictions. (*Id.*).

In opposing the SEC's motion, Thorn offers the declarations of seven individuals who testify that, in their view, Thorn did not defraud or mislead them. For example, Mr. Michael Fraina, who placed $1,000,000.00 in a Thorn managed account, states that he "knew that substantial risk was involved and ... understood it was not a traditional investment or registered with the SEC or other governmental authorities." (*Exhibit 2* at ¶ 5 in support of *Thorn's Motion* ). Fraina further avers that he has never "accused Mr. Thorn, any of Mr. Thorn's company's (*sic* ) or anyone associated with them of defrauding or misleading me." (*Id.*). Finally, Fraina contends that, due to the asset freeze, he has been unable to pay his personal expenses, he has had to borrow funds, and he may file for bankruptcy. (*Id.* at ¶ 6). Other investors offer similar testimony.

**\*5** Despite the economic hardship to the various investors, the SEC urges the Court to continue the asset freeze because there are currently not enough funds to satisfy disgorgement for all investor claims. The SEC contends that, while investors may be entitled to at least $15 million if the SEC ultimately prevails, only $9.34 million is currently frozen. (*Id.*). The SEC argues that if funds are unfrozen, there is a great risk that the monies will be dissipated before any return could be made to investors.

Thorn disputes the SEC's assertions and argues that he has $7 million in "contingent" assets invested through LaMont Asset Management SA in Zurich, Switzerland which could be counted toward any disgorgement remedy. Thorn offers the declaration of Michael Thalmann, Head Investment Manager at LaMont, in support of this position. According

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                    Page 4
(Cite as: 2001 WL 1678787 (S.D.Ohio))

to Thalmann, Thorn has two contracts with his firm, with a total trading principal of $7 million. (*Exhibit 13* in support of *Thorn's Motion* ). Thalmann avers, however, that his firm is a "private investment firm" which operates under Swiss bank secrecy laws. (*Id.*).

The SEC opposes this Court's reliance upon any assets contained in "contingent" funds in considering the source for a future disgorgement remedy. The SEC points out that Thorn has refused to offer bank records to verify the existence of such funds; consequently, the SEC remains skeptical of their existence. Furthermore, the SEC argues that Thorn has refused, since July 2001, to sign "Ghidoni" letters. [FN4] Without such letters, the SEC is precluded from accessing information regarding the existence of non-U.S. accounts.

> FN4. A "Ghidoni" letter authorizes the SEC to financial records directly from a financial institution which is outside the jurisdiction of the United States. *See United States v. Ghidoni,* 732 F.2d 814 (11 th Cir.1984).

In view of the evidence presented, this Court concludes that the SEC is likely to succeed on its claims and finds that a continuation of the asset freeze is warranted. In particular, the Court concludes that the SEC has raised a reasonable inference that Thorn's conduct and activities were in violation of the various anti-fraud provisions of the securities laws. The evidence demonstrates, at a minimum, that Thorn's statements regarding the investments were misleading. As the SEC points out, while the investors present declarations stating that they were not misled, they also aver that they knew there was a substantial risk associated with the investments. In contrast, Thorn testified that he told investors that the investments were virtually risk-free. Furthermore, Thorn's account activity raises an inference that he was using the invested funds to pay other investors as well as to support an extravagant lifestyle.

The Court also finds that the SEC is likely to succeed on its claim under § 15(a) of the Exchange Act. The testimony of Leonard Zawistowski as well as the evidence regarding the nature of the investments in which Thorn dealt, clearly lead to an inference that Thorn acted as a broker and induced others to trade in securities without registering with the SEC. Thus, Thorn's apparent violation of the registration requirement also warrants a continuation of the asset freeze.

**\*6** The Court further concludes that, unless the assets remain frozen, there is a risk that they may be dissipated before any eventual disgorgement award. The evidence demonstrates that Thorn has used numerous offshore entities governed by secrecy laws in which to "invest" the funds. Further, as the SEC points out, Thorn has been reluctant to disclose account information regarding these

funds. [FN5] In addition, the evidence demonstrates that Thorn has grown accustomed to a quite expensive lifestyle since he commenced his "investment" dealings. Consequently, this Court is concerned about the extent of available assets in the event that the SEC prevails.

> FN5. In light of this reluctance, the Court declines Thorn's request to consider the purported $7 million contained in the LaMont accounts in Switzerland. Rather, the Court considers only the $9.34 million frozen in U.S. accounts.

The Financial Ventures Defendants oppose continuation of the freeze. The Defendants argue that the freeze is inappropriate because the assets contained in the accounts do not belong to Financial Ventures but rather to the individual investing members. In response, the SEC argues that it was through the Financial Ventures entities that Thorn conducted the series of allegedly fraudulent transactions at issue in this case. Thus, the SEC maintains that the funds contained in the Ventures accounts are derived from illicit dealings. Furthermore, the SEC argues that continuation of the freeze is warranted because the Ventures entities are named as Defendants herein.

The SEC also asserts that the remaining frozen funds are subject to various levels of competing claims. For example, the SEC represents that it has been contacted by at least 16 investors who claim that they are entitled to money in the frozen accounts. The SEC states that the Defendants' bank records do not, however, reflect any funds being deposited by such members. While the SEC has endeavored to release funds upon verification of entitlement to the same, the SEC argues that in the absence of continuation of the freeze there is a risk that individuals who are not entitled to funds may receive them.

The Court concludes that continuation of the freeze is warranted as to the Ventures accounts. The Court rejects the assertion by the Ventures Defendants that the SEC must satisfy a heightened standard to continue the freeze. The Court notes that on October 26, 2001, the Ventures Defendants filed an Uncontested Motion to respond to certain representations regarding investors made by the SEC in response to the Ventures' memorandum *contra* continuation of the asset freeze. Although the motion is uncontested, the Court concludes that such response would in no way effect the disposition of this motion.

In sum, the Court concludes that the SEC has satisfied its burden to warrant a continuation of the asset freeze. The assets shall remain frozen during the pendency of this action.

Thorn additionally requests that the Court partially dissolve the freeze. In particular, Thorn seeks the release of

approximately $300,000.00 to pay his tax liability for the year 2000 and $20,000 per month for five months to pay his living and legal expenses. Thorn also asks that the SEC release money to certain investors; specifically, $200,000 to Attorney Freiburger, and $280,000 to D-Mo, LLC. Thorn, however, offers no justification as to why funds should be released to these investors as opposed to others. [FN6]

> FN6. While the investors represent their intent to repay funds at a later time if the evidence demonstrates that they were overpaid, the Court finds the risk associated such a scenario outweighs any benefit associated by the release of funds to certain investors. Further, if these investors are able to establish ability to repay such amounts, this fact is at least some evidence that a release of funds at this stage is unnecessary.

*7 The SEC opposes Thorn's requests and argues that certain investors should not be favored over others whose funds are also frozen. The SEC further asserts that Thorn should not be allowed to use frozen funds to pay tax liability or to support a lavish lifestyle. [FN7] This Court agrees. Consequently, Thorn's Motion to Partially Dissolve the Asset Freeze and Request for Ancillary Relief is not well-taken.

> FN7. The SEC contends that Thorn removed at least $202,000.00 from his accounts on the day the asset freeze was imposed and that, although he has had five months to secure alternate employment, he has failed to do so. The Court notes that, on November 9, 2001, the SEC filed a Motion to Show Cause as to why Thorn and one Kimberly Hockenhull-Edwards should not be held in contempt with respect to Thorn's alleged violation of the freeze order on the date it was imposed. The Court will consider this motion upon Thorn's retention of new counsel.

As a final matter, the Court notes that the continuance of the asset freeze should in no way be construed as a means to postpone the ultimate resolution of the claims at issue in this case. The Court recognizes that the asset freeze places a hardship on many individuals. The Court cannot, however, ignore the gravity of the alleged violations of the securities laws at issue. Thus, the funds must remain frozen. This case must, however, proceed expeditiously.

The Court notes that counsel for Defendants Thorn and Global Investors has withdrawn. The Court has ordered Defendants to retain new counsel and to notify the Court of the same. Thereafter, the Court will confer with counsel for all parties to establish a schedule for the prompt resolution of this case. The Court will address the SEC's Motion for Appointment of a Special Agent and Motion to Show Cause

at that time.

B. Defendants Thorn and Global Investors' Motion for Reconsideration

Defendants Thorn and Global Investors seek reconsideration of Magistrate Judge Abel's August 14, 2001 Discovery Order which ruled on Defendants' April 17, 2001 Motion for Protective Order. In their Motion for Protective Order, the Defendants requested that all copies of confidential banking or financial records, materials identifying investors and other designated "confidential" materials be maintained in non-public files at the SEC; that the files be used only for purposes of the present civil case; and that all such "confidential" material and all references to the substance of the material be kept under seal.

Magistrate Judge Abel granted in part and denied in part the request for protective order. Judge Abel observed that, under Rule 26(c), a party seeking a protective order must make a showing of "good cause." (*Discovery Order,* August 14, 2001 at 3). In considering whether good cause exists, the Court is to weigh the presumption of openness of litigation materials against the asserted right of confidentiality. Furthermore, when the government is a party to the litigation, the matters are of significant public concern and the existence thereof generally outweighs any interest of confidentiality. (*Id.* at 4).

The SEC conceded that investor-identifying information should indeed be kept confidential. Thus, Judge Abel held that the same would be subject to a protective order. With regard, however, to information such as bank account numbers and financial information regarding transfers of funds and current assets, Judge Abel concluded that a protective order was not warranted. Judge Abel reasoned that "discovery in a case in which the SEC is a party is not subject to a protective order simply because the SEC may share that information with other authorities, including criminal authorities." (*Id.* at 9-10, citing *SEC v. Gilbert,* 79 F.R.D. 683, 687 (S.D.N.Y.1978). Judge Abel concluded that "there is no evidence that this action was brought for any purpose but to recover funds for defrauded investors and to enforce federal securities laws ." (*Id.* at 10). In addition, Judge Abel reasoned that "[i]f it were the case that the SEC instituted this action for the sole purpose of gathering evidence for law enforcement officials, then defendants' arguments concerning the need for a protective order might have merit. However, defendants have presented no 'special circumstance' sufficient to outweigh the public interest in protecting investors." (*Id.* at 11). Thus, Judge Abel denied the request for a protective order with regard to bank account numbers and financial information regarding the transfers of funds

Not Reported in F.Supp.2d                                                                                       Page 6
**(Cite as: 2001 WL 1678787 (S.D.Ohio))**

and current assets.

**\*8** In their Motion for Reconsideration, Defendants argue that Judge Abel "should have authorized broader relief by way of a Protective Order [as to the financial affairs of Defendant Thorn] ... in view of the particular exigencies of this case." (*Motion to Reconsider* at 3). Defendants argue that Judge Abel erroneously concluded that a protective order was not warranted in the absence of some indication that the SEC instituted the action for the purpose of gathering evidence for law enforcement officials. Defendants further argue that Judge Abel "mistakenly focused on 'the public interest in protecting investors." ' (*Id.* at 5). In support of their position, Defendants cite the Court to *Martindell v. ITT,* 594 F.2d 291, 296 (2 nd Cir.1979).

The Court finds Defendants' reliance upon *Martindell* misplaced. That case involved a stockholders' derivative action in which the Government, which was not a party to the suit, sought access to the civil deposition transcripts, which were subject to a protective order, for investigative purposes. The Second Circuit held that the Government was not entitled to access the transcripts. The instant case, however, was instituted by the Government. As Judge Abel correctly observed, the SEC is an independent federal agency with the responsibility of enforcing the securities laws and protecting the investing public. Furthermore, as Judge Abel observed, there is no evidence that this action was brought for any other purpose.

Fed.R.Civ.P. 72(a) provides for reconsideration by the District Judge of orders of the Magistrate Judge on nondispositive matters. The rule provides that, in considering objections to such orders, the District Judge "shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). The clearly erroneous standard "mandates that the district court affirm the magistrate's decision unless, on the entire evidence, it 'is left with the definite and firm conviction that a mistake has been committed.' In the absence of clear error, the magistrate's order must stand." *Farley v. Farley,* 952 F.Supp. 1232, 1235 (M.D.Tenn.1997) (internal citations omitted).

This Court concludes that Judge Abel's decision denying Defendants' request for a protective order as to the financial affairs of Defendant Thorn was neither clearly erroneous nor contrary to law. Accordingly, the decision is hereby ADOPTED and AFFIRMED.

                              III.

In light of the foregoing, the Plaintiff's Motion to Continue the Asset Freeze (Doc. # 94, under seal) is GRANTED; Defendants Thorn and Global Investors Group's Motion to Partially Dissolve the Asset Freeze and to Provide Ancillary Relief (Doc. # 96) is DENIED; and Defendants Thorn and Global Investors' Motion for Reconsideration (Doc. # 88) is DENIED; the decision of the Magistrate Judge (Doc. # 80) is ADOPTED and AFFIRMED. Finally, the Uncontested Motion of the Ventures Defendants to file a sur-reply (Doc. # 110) is DENIED as moot.

**\*9** Counsel for Defendants Thorn and Global Investors are DIRECTED to notify this Court of their identity by way of Notice of Appearance so that the Court can proceed expeditiously with resolution of the issues in this case.
    IT IS SO ORDERED.

2001 WL 1678787 (S.D.Ohio)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# EXHIBIT 3

# KMK
**ATTORNEYS AT LAW**

# KEATING, MUETHING & KLEKAMP, P.L.L.

1400 PROVIDENT TOWER • ONE EAST FOURTH STREET • CINCINNATI, OHIO 45202-3752
TEL. (513) 579-6400 • FAX (513) 579-6457 • www.kmklaw.com

**JAMES E. BURKE**
DIRECT DIAL: (513) 579-6429
FACSIMILE: (513) 579-6457
E-MAIL: JBURKE@KMKLAW.COM

December 5, 2003

*Via Facsimile*

Michael G. Brautigam, Esq.
Gene Mesh & Associates
2605 Burnet Avenue
Cincinnati, Ohio  45219-2502

Re:     Thiemann v. OHSL, et al.

Dear Michael:

I am writing in response to your December 2, 2003 letter regarding depositions of Messrs. Brinker and Hanauer and Ms. Wieland, and your recent voicemails. As I have made clear a number of times, we are not, in any way, attempting to obstruct discovery that the court has permitted to proceed at this time. We have cooperated, and will continue to cooperate, with discovery on a mutually-convenient schedule. We are trying, however, to streamline the discovery process to avoid unnecessarily protracted and repetitive depositions. You deposed both Mr. Brinker and Mr. Hanauer in the *Nolte* action, much closer in time to the events that are the subject of discovery in this action. You deposed Mr. Brinker over two days, generating approximately 800 pages of transcript. You deposed Mr. Hanauer over four days, resulting in more than 1,200 pages of transcript. Your former co-counsel in this action, Mr. Brualdi, agreed that we would use those depositions in this case to avoid cumulative testimony.

In any event, we have informed you that we will make all three individuals available for deposition as soon as is reasonably possible. Ms. Rowe indicated to you that Mr. Hanauer is available for deposition in the third week in December. Unfortunately, since Ms. Rowe spoke to you last, Mr. Hanauer realized that he has a conflicting obligation on December 22, but he remains available to be deposed on December 23. If your vacation schedule does not permit you to depose Mr. Hanauer on the 23rd, please propose alternative dates in early January. Ms. Wieland also is available for deposition after January 1. Please propose two or three potential dates after January 1, and I will make every effort to accommodate your schedule. I also have a call in to Ms. Wieland to re-check on her availability before December 31. As I made clear to you, Mr. Brinker is unavailable for deposition at this time due to his health. Your voicemail messages indicate that you refuse to accept my representation in this regard, so I will attempt to obtain non-confidential confirmation of his medical condition. I am hard-pressed to see how you are prejudiced, however, with 800 pages of deposition testimony already in hand. Your

Michael G. Brautigam, Esq.
December 5, 2003
Page 2

messages also indicate that you wish to discuss this with Magistrate Judge Hogan.  I agree with this approach.  Let me know what dates work for such a telephone conference.

Sincerely yours,

KEATING, MUETHING & KLEKAMP, P.L.L.

By: _____
James E. Burke

cc:    John W. Hust, Esq.
       Michael R. Barrett, Esq.
       John B. Pinney, Esq.
       J. Michael Debbler, Esq.
       James E. Gauch, Esq.

# EXHIBIT 4



# KEATING, MUETHING & KLEKAMP, P.L.L.

**ATTORNEYS AT LAW**

1400 PROVIDENT TOWER • ONE EAST FOURTH STREET • CINCINNATI, OHIO 45202-3752
TEL. (513) 579-6400 • FAX (513) 579-6457 • www.kmklaw.com

**JAMES E. BURKE**
DIRECT DIAL: (513) 579-6428
FACSIMILE: (513) 579-6457
E-MAIL: JBURKE@KMKLAW.COM

December 15, 2003

*Via Facsimile and Regular Mail*
Michael G. Brautigam, Esq.
Gene Mesh & Associates
2605 Burnet Avenue
Cincinnati, Ohio 45219-2502

Dear Michael:

I am in receipt of your letter dated December 12, 2003.

I am actively pursuing the process which we discussed with Magistrate Judge Hogan on Tuesday, December 9, 2003. I have corresponded with the OHSL directors whom you asked to depose and have discussed tentative dates for three of the four. I still need to speak with one remaining director to finalize a date. I have also spoken with Mr. Brinker's doctor and expect to receive a letter from him this week. As soon as I receive it, I will forward it to you and Magistrate Judge Hogan.

If you have any questions, please let me know.

Sincerely yours,

KEATING, MUETHING & KLEKAMP, P.L.L.

By: _____
    James E. Burke

JEB:ltw

cc:    Michael R. Barrett, Esq.
       J. Michael Debbler, Esq.
       John B. Pinney
       John Hust, Esq.
       James E. Gauch, Esq.

1192506.1