come forward and reveal his opposition to the OHSL-PFGI merger.  (See, ¶ 30 herein.)

69.    KMK, as one of the primary authors responsible for the Proxy Materials/Registration Statement and various representations therein regarding the full and correct compliance by Provident with all applicable 1933 and 1934 Securities Acts requirements and the legality of the shares issued by Provident pursuant thereto to acquire OHSL.  In this regard, KMK did not inquire sufficiently of Provident or OHSL management as to the compliance by Provident with the 1933 and 1934 Act, but had they inquired further, they would have determined the Proxy Materials/Registration Statement was materially false and misleading in these regards, as is now the case.

70.    KMK knew--but intentionally omitted to disclose—that Mr. Herron had resigned in part in opposition to the merger.

71.    In violation of industry practice, KMK intentionally avoided reading any of the minutes of the directors meeting or audit committee meetings of OHSL.

72.    The OHSL-Provident merger would not have been approved had the true facts surrounding the merger, such as the split of the OHSL board of directors and the resulting lack of unanimity of the directors' vote in favor of the Provident acquisition, the active opposition of OHSL's CEO, Board member, and largest shareholder defendant Ken Hanauer, the resignation in part in protest of OHSL director Thomas M. Herron, and that Provident stock was extremely risky, in part because of undisclosed risks of diminished earnings caused by Provident's

accounting methods of using securitizations to bolster its weakening financial position been known. Additionally, Provident failed to disclose that its accounting methods did not record auto lease transactions on the books of Provident and that consequently Provident was able to show larger earnings that inflated the value of Provident stock. Additionally, it is now admitted that PFGI's financial statements were materially false and misleading before, during, and after the class period, and that PFGI's stock was artificially inflated.

73.     KMK did not inquire of E&Y or Provident as to the validity of the "off-the-books" accounting methods utilized by Provident in determining revenue and profit accuracy from those methods even though Provident files contained warnings and discussions by industry analysts and experts of this accounting method and the attendant risks to cash flow and earnings, all of which were known by Provident and E&Y prior to the transaction.

74.     KMK did not interview personnel of either OHSL or Provident to determine the truthfulness of the Proxy Materials/Registration Statement.

75.     KMK did utilize prior, boiler-plate language from other Provident mergers in the Proxy/Registration Statement in what was essentially a "cut and paste" job; additionally, KMK shared its work product with Roe and Dinsmore, allowing defendant Roe to cross out the name of previous KMK clients, write in OHSL, and return this "edited" document to KMK for inclusion in the materially false and misleading drafts of the Proxy Materials/Registration Statement that

were maintained on the computers at KMK and over which KMK had final control.

76.    KMK had, or in the course of their representation of Provident should have had, knowledge prior to and during and after the subject transaction that Provident's accounting methods regarding auto leases were misleading and faulty, as industry literature in their possession set out these problems, thereby creating an incorrect picture of Provident's share values.  The extremely risky nature of PFGI stock has been definitively demonstrated by PFGI's recent restatements of earnings which was discussed at Audit Committee and Board Meetings by Provident directors and KMK attorneys at various times from 1997-2002, but not disclosed to the public until 2003.  Provident employees who were computing the effect of off the books accounting methods created a lengthy paper trail about their concerns over this method, all of which information was available to KMK and which forms part of the basis for the CAC.

77.  In these restatements, Provident has admitted that the PFGI financial statements upon which the class relied, were materially false and misleading. KMK's role in this merger transaction was to ensure that the Proxy Materials/Registration Statement did not disclose the true facts to the OHSL shareholders.  KMK, through its position as the entity with overall responsibility for the Proxy Materials/Registration Statement, as co-author and draftspersons of the Proxy Materials/Registration Statement and as counsel for Provident, the buyers of OHSL stock and sellers of Provident stock, encouraged plaintiffs and the

class, sellers of OHSL stock, to approve the OHSL-Provident merger and surrender their OHSL shares in exchange for artificially inflated Provident stock, by encouraging plaintiffs and the class to approve the merger based on the materially false and misleading Proxy Materials/Registration Statement. This conduct was intentional, purposeful, and/or reckless.

78.     As part of KMK's efforts to make the Provident-OHSL merger go through at all costs and without proper disclosure, KMK provided materials for use in the Proxy Materials/Registration Statement which were maintained on KMK computers and that had been used by KMK in other transactions, and although these materials were not appropriate to this transaction, were accepted by defendants Roe and Dinsmore with minor editing. In fact, defendant Roe of Dinsmore simply crossed out the names of the entities in the transaction papers sent to Roe and Dinsmore by defendants Weiss and KMK and handwrote in "OHSL."

79.     KMK was on both sides of this transaction yet attempted to create the fiction that the merger was arms-length. KMK had an actual conflict of interest that was not disclosed to the OHSL shareholders in that they wrote the selling document, i.e. the Proxy Materials/Registration Statement, which caused OHSL shareholders to narrowly approve the transaction now the subject of this litigation while representing the buyer Provident, which was KMK's premier client on upon whom a large portion of its law practice was based. OHSL shareholders and directors actually thought that Dinsmore was the sole author of

the subject document; this conflict of interest between KMK and parties on both sides of the subject transaction was brought to light and reaffirmed by KMK's representation of nine separate camps of defendants herein at the same time, to wit, Provident, OHSL, Provident Outside Directors, Provident Management, Provident Inside Directors, OHSL Outside Directors, OHSL Inside Director Ken Hanauer, OHSL Management, and KMK itself.

80.    Additionally, the final document and all drafts were maintained on KMK's computer system.  KMK had overall responsibility for taking the Proxy Materials/Registration Statement to be printed and disseminated to OHSL's shareholders and for finally writing, drafting and approving the content of the subject document.  OHSL's shareholders were ignorant of this actual conflict of interest and of KMK's dominant role in creating and disseminating the materially false and misleading Proxy Materials/Registration Statement.

81.    KMK had vouched for the accuracy and truthfulness and compliance with the securities laws of all Provident public filings (such as annual reports, 10-K's, 10-Q's and Press Releases) referenced in the Proxy/Registration Statement, all of which were shown to be materially false and misleading by the First and Second Restatements; as a result of such acts of affirmance by KMK, they became "Experts" under the definitions set out in the 1933 and 1934 Securities Acts as well as co-authors.

82.    All of these acts served to damage the OHSL shareholders, who were fraudulently induced to approve the merger and forcibly convert their OHSL

46

stock into artificially inflated PFGI stock, and benefit KMK's clients who sought to fraudulently obtain OHSL at all costs. KMK also directly benefited through the payment of substantial legal fees for its work on the merger which fees were not disclosed to OHSL directors or the class, and later for its continued representation of Provident and other defendants such as the OHSL officers and directors and Provident officers and directors who recommended and approved the acquisition and recommended same to the class in the resulting litigation, until disqualified from doing so by this Court on October 20, 2003 (Doc. No. 215). Until that disqualification, KMK had represented nine groups of conflicted parties (including KMK) to this litigation in an attempt to save their work product from liability under the Securities Act of 1933 and the Securities Exchange Act of 1934 and to create a uniform scenario of responses and objections as well as "privilege" and "work product" directions not to answer questions related to plaintiffs' inquiries in the deposition discovery to date about the 1999 merger[2]. This asserted but false privilege has done substantial harm to the discovery to date. Those parties represented by KMK are as follows:

1. Provident
2. Provident Outside Directors
3. Provident Inside Directors
4. Provident Officers
5. OHSL
6. OHSL Outside Directors

---

[2] KMK's disqualification seems to have changed nothing. KMK still represents the various camps of mutually antagonistic defendants, and has continually refused to cooperate in discovery.

7.   OHSL Insider Director Kenneth L. Hanauer, whose interests are mutually antagonistic to the other KMK defendants represented by KMK and KMK itself

8.   OHSL Officers

9.   KMK itself

## KMK Successfully Thwarts Attempts to Obtain
## Expedited Discovery and an Injunction in the State Court Action

83.   In an Ohio State Court action (Case No. A9907039, Court of Common Pleas, Ham. Co., Ohio), OHSL shareholders sought to obtain expedited discovery and to enjoin the merger.  This motion was denied, in large part because Attorney James E. Burke of KMK stated in open court material facts to the state court judge that he knew, or in the exercise of due care should have known, were not true but were made by Mr. Burke in order to defend the above described work product of KMK.  These comments included, but were not limited to, materially false and misleading statements in the Proxy Materials/Registration Statement, such as the OHSL Board had unanimously approved the merger and that the OHSL Board had solicited six bids for OHSL, and that Provident's was the highest bid.  In fact, Provident's bid for OHSL was the only bid.  Dinsmore, also a defendant herein which at the time of the aforementioned misrepresentations in state court represented OHSL and the OHSL individual defendants, adopted KMK's comments, despite actual knowledge that these statements were materially false and misleading and so found by this court to be triable issues of fact.

84.   In the state court action, the plaintiffs sought expedited discovery and an injunction to stop the merger from taking place.  Expedited discovery was

denied, as was the injunction and the OHSL-Provident merger closed with the forced conversion of OHSL stock into new PFGI stock on December 3, 1999.

85.    The injunction was denied at least in part based on comments made by James E. Burke, who was then and now counsel for Provident, and whose comments were adopted by Dinsmore, who was then counsel for OHSL and the OHSL director defendants.  Mr. Burke, as an officer of the court, made at least two material misrepresentations to the state court judge at a hearing on November 24 1999, in substance, that the vote by the OHSL board to approve the merger had been unanimous and that OHSL had obtained six bids for the company and that Provident's bid was the highest.  Neither statement was true, and defendant Burke knew or should have known it at the time the statement was made.  The state court judge relied in part on these statements.

86.    In this action, former OHSL director Thomas M. Herron, who had resigned in part in protest of the OHSL-Provident merger a few days before the final, non-unanimous vote was taken, has directly refuted these statements regarding unanimity and the so-called six bids, of which Provident's was the highest, at his deposition.

### The March 5, 2003 and April 15, 2003 Restatements:<br>Ernst & Young's (E&Y) Role in "Off the Books" Accounting

87.    On Wednesday,  March 5, 2003 at 7:31 a.m. Provident issued a press release entitled "Provident Financial Group, Inc. Announces Restatement of Operating Results for years 1997 through 2002" which purported to deal with only

nine (9) auto lease transactions when, in fact, the Restatement of March and April, 2003 dealt with thousands of auto leases. Provident held a conference call with investors at 11:00 a.m. that day.  This First Restatement, as set out more fully hereinafter, renders the deceptive PFGI financial statements included or incorporated by reference in the Proxy Materials/Registration Statement upon which the class relied admittedly materially false and misleading as to both the accounting procedures and income numbers promulgated by PFGI to the class. Closely upon the heels of the First Restatement came a Second Restatement on April 15, 2003, making the First Restatement false and misleading and further exacerbating the fraud and causing additional damage to the value of the Provident shares exchanged for OHSL.

88.    The First Restatement, which the financial press has described as "the longest continuous string of amendments in memory for a U.S. corporation," was caused by PFGI's improper accounting for certain lease transactions involving nine auto leasing pools during 1997-1999.  These transactions, causing restatement of revenues and earnings from 1994 to 2002, were inappropriately recorded as "off balance sheet," and should have been recorded on Provident's financial statements.  The effect of this fraudulent accounting was that Provident's net income was materially overstated during the class period as these lease transactions were financed by PFGI with borrowings and debt from other sources but the interest expense of those borrowings and debt were kept "off the books" and not reflected as a deduction (or expense) to income during the relevant years.

89.   As a result of the First and Second Restatements, Provident announced that it reduced net income for the period 1997 through 2002 by $70.3 million, or nearly 12%, to $534 million from $604.3 million.  Provident also announced that it was reducing its 2003 forecast of per-share earnings to $2.30 to $2.50 a share from a previous projection of $2.50 to $2.70 a share.  In addition, Provident's Second Restatement reduced net income of Provident further in the cumulative amount of approximately $1 per share, or a total negative additional amount of $44.4 million for 1994—2002.

90.   The Provident restatements cut directly through the heart of the class period.  If the numbers issued in the Provident press release are to be believed, Provident's net income at the time of the class period was overstated.  The genesis of the entire First and Second Restatements were auto leases either originated or accounted for during 1997-1999.  This overstatement had occurred in PFGI's 1997 10-K, 1998 10-K and 1999 10-K (public filings of annual financial results as required by the Securities Exchange Commissions) as well as in the interim financial reports for those years leading up to and including the date of the subject merger and in the subject Proxy Materials/Registration Statement into which those numbers and documents were included expressly and by reference.

91.   The First Restatement was attributable solely to errors in the accounting for the transactions that were originated between 1997 and 1999.  So, near the end of 1999, when the exchange of OHSL shares for PFGI shares occurred, the entire earnings impact should have been known by PFGI management and directors.

The First Restatement showed that net income had been overstated for the period 1997 through 2002 by $70.3 million and by another estimated $9.8 million in 2003. The magnitude of the entire overstatement continues into 2004 and beyond in decreasing amounts. An estimate of the cumulative profit overstatement is in the $100 million range. With appropriate accounting, PFGI management and directors should have been aware of this overstatement magnitude when OHSL shares were forcibly converted into PFGI shares.

92. The First Restatement caused a stock price drop for PFGI from $28.07 per share on March 4, 2003 to $22.46 the next day and an average of $21.72 in the first ten trading days after the restatement, or a decrease of 22.6%. If the correct information was disclosed at the time OHSL shares were forcibly converted into PFGI shares, when the decreased earnings should have already been known, it is likely that the PFGI shares would also have been valued 22.6% less than the $57,162,375 they were told, equivalent to being shortchanged by $12.9 million.

93. The Second Restatement was attributable to additional errors in the accounting for the transactions that occurred from 1994 through 2002. The aggregate profit restatement was a reduction of $44.4 million. Since the 2002 impact was $3.8 million, and the 2001 impact was $4.2 million, the 1994 through 2000 impact was the difference, or $36.4 million. The 1994 through 1999 period accounted for 6 of the 7 years or approximately a $31.2 million loss. If not for the accounting errors, this overstatement in profits should have been known by PFGI

management and directors when the OHSL shares were forcibly converted into PFGI shares.

94. As stated above, the market determined (by its reaction to the First Restatement) that a $100 million decrease in cumulative profit would have resulted in a 22.6% decrease in the market valuation of PFGI shares at the time the shares were converted. Estimating the same proportionate impact from the Second Restatement, a $31.2 million decrease in cumulative profit would equate to a 7.1% decrease in the market valuation of PFGI shares. Therefore, the OHSL shareholders received $4.1 million less in PFGI shares than they should have rightfully received.

95. The resulting impact of both restatements is that the OHSL shareholders received approximately $17 million less of PFGI shares than they rightfully should have received when their shares were forcibly converted into OHSL shares because of the accounting errors not being disclosed by PFGI management and directors and included in the materially false and misleading Proxy Materials/Registration Statement. Since the OHSL shareholders approved the merger by a very narrow margin, it is likely that had they been aware of PFGI's accounting misstatements, the shareholders would have voted against the transaction.

96. In a report prepared by Plaintiffs' damages expert dated May 1, 2002, he presented four scenarios regarding trading losses experienced by the OHSL shareholders as a result of having their shares converted. The four scenarios

resulted in trading losses in a range of $8.7 million to $14.8 million. When added to the $17.0 million in additional PFGI shares that OHSL shareholders should have rightfully received at the time of conversion, the total damages to the OHSL shareholders ranges from $25.7 million to $31.8 million.

97. This means that Provident was, from a financial standpoint, a dramatically different company from the company that the OHSL shareholders were asked to merge with and surrender their OHSL shares for materially artificially inflated PFGI shares. The true scope of the fraud with respect to PFGI's financial statements was not revealed until the March 5, 2003 and April 15, 2003 restatements.

98. GAAP requires a statement of a company's previously issued financial statements to properly correct a material misstatement, called an "error," (whether it is an unintentional error or an intentional fraud) under the relevant accounting standard, APB No. 20. Statement on Financial Accounting Concepts No. 2 states that consistency of accounting practices over time makes accounting information useful for financial statement users. Without consistency, users have difficulty making comparisons over time and discerning whether, and to what extent, the company's performance is improving or deteriorating. This is important for providers of financing, whether debt or equity, in order to extrapolate from current trends in estimating a company's future prospects. Thus, APB No. 20 stresses that only a *material* error or misstatement should be corrected via a restatement, since a restatement clashes with the desire for consistency emphasized in SFAC No. 2.

99.  APB No. 20 states that a company's Net Income and Earnings Per Share, in every period of previously issued financial statements, which are materially misstated, must be restated.  This means that they should now be disclosed both as to what they originally were reported as well as what they are now corrected to be.  AU 561 requires the auditors of companies to make sure that this disclosure is made soon after the material misstatements are discovered. Some companies provide this disclosure in an amended 10-KA or 10-QA.  Others provide this disclosure in an 8-K or in the next regular filing of the 10-K or 10-Q.

100.  The OHSL shareholders were materially misled by this overstatement and until 2003 no attempt had been made to correct the overstatements or to ever revalue the exchange values of the acquisition.  OHSL shareholders were deceived as to PFGI's current and future financial prospects and the 1999 results based upon "off the books" accounting were known to be false at the time the subject merger occurred and which caused the Provident currency that was used in exchange for OHSL shares in the subject transaction to be artificially inflated. The financial statements put forth in the Proxy Materials/Registration Statement and certified by E&Y were admittedly materially false and misleading in many respects including the following:

   a.    As a result of the non-disclosed "off the books" accounting practices there were included in the Proxy Materials and Registration Statement received by OHSL shareholders false financial reports and statements and summaries of Provident's income for the years 1997, 1998 and a portion of 1999 (See, pp. 6-11, 24-27 of Proxy Materials/Registration Statement, Attached as  Exhibit B);

b.   Nowhere in the deceptive Proxy Materials/Registration Statement's section as to Risk Factors or the sub-section as to Securitizations did there appear any disclosure as to this "off the books" accounting procedures (See pp. 13-14 of Proxy Materials/Registration Statement); and

c.   On p. A-19 of the Agreement and Plan of Merger (not attached hereto as an Exhibit to the Proxy Materials/ Registration Statement because of its bulk) in Section 2.27 thereof as well as throughout the Proxy Materials and Registration Statement themselves, Provident re-affirmed that the financials and Proxy materials were "True and Correct."

101.   Since the merger was fraudulently induced, and the plaintiff class was harmed through these misrepresentations and omissions, the merger should be undone. The plaintiff class continues to be harmed by the decline in PFGI's share price, which came about as a result of Provident, and E&Y, cooking the books with faulty accounting and off balance sheet transactions in a manner similar to Enron.

102.   One of the best examples of the materially false and misleading statements in the Proxy Materials/Registration Statement read in the light of the First and Second Restatements can be found in the section in the Proxy Materials/Registration Statement entitled "Questions and Answers About the Acquisition." This section includes the following question and answer, which is ironically comic in light of the restatements:

Q. How will I benefit?

A. The OHSL Board of Directors believes that you will benefit by becoming a stockholder of a bank holding company with a strong financial performance

record. The OHSL Board believes that you will benefit from the opportunity for potential future appreciation of Provident Financial shares.

103. As early as 1993, Provident by virtue of documents held in its files published by a leading investment firm had been made aware of the fact that its method of accounting for auto leases (securitization) ran a high risk of rejection as contracts, should Provident seek federal bankruptcy protection, that these securitizations contained inherent structural risks such as the need to supplant future revenues that default with current Provident liquid assets, causing a drain on equity; that securitization procedures presented extensive problems of administration in order to collect receivables and that Provident had to seek the help and assistance of many other banks and law firms in these regards as Provident did not have the capabilities to control the risks of the securitization procedures; that the credit risks of the underlying auto leases were substantial and that Provident's earnings were based upon these uncertainties; that the creation of a "security" by "securitization" could not be viewed as a true sale of an interest in a receivable causing true revenues due to the convoluted levels of debt subordination and recourse for default of the auto leases; and that "accrued" revenue did not equate "actual" revenue because of the unquantified portion of the "accrued" revenue subject to defaults from the auto lessees.

**The Conduct of Ernst & Young (E&Y) Was Wrongful, Intentional, Reckless and Violated Both Generally Accepted Accounting Principles (GAAP) and Generally Accepted Auditing Standards (GAAS) as to Revenue Recognition Methods**

**and Procedures regarding Auto Leases and "Off-the-Books" Accounting**

104.   In connection with each such audit relevant to the subject merger, E&Y represented that it was and held themselves out as an EXPERT as such is defined in the Federal Securities Acts and that it had performed its audits in accordance with GAAS and that, in E&Y's opinion, such financial statements were presented fairly in accordance with GAAP; E&Y knew that OHSL shareholders would rely upon E&Y's audits in order to cast an informed vote as to the subject transaction as the value of Provident shares was one of the key elements of such vote.  After having approved the subject transaction, the damage caused by Provident shares and thus to OHSL shareholders resulted from the false, but restated financials.

105.   In addition, E&Y contractually undertook and agreed with Provident to provide EXPERT services to Provident in connection with the subject transaction and so held themselves out as such in the Proxy Materials/Registration Statement.

106.   In connection with the annual Forms 10-K for 1997-1999 and the subject Proxy Materials/Registration Statement, as well as all public documents before and after the class period, E&Y consented to the inclusion of its audit opinion therein, and to its designation as experts in accounting and auditing.  As a result of consenting to the inclusion of their audit opinion in the annual Forms

10-K and Proxy Materials and Registration Statement and for all the years between 1997-2002, and as a result of E&Y's being designated as an expert on accounting and auditing therein, E&Y was required by GAAP and GAAS to read the forepart of these documents with understanding and to identify anything contained therein which contradicts the financial and other information contained in the audited financial statements and to make timely corrections thereto. Not until 2003 when another nationally known accounting firm--PricewaterhouseCoopers ("PwC")--required them to do so, did Provident correct its financial statements that had previously been certified by E&Y.

107. E&Y knew that the Forms 10-K and the Proxy Materials/Registration Statement would be disseminated to the class, and that the class would rely on these documents. Additionally, E&Y had actual knowledge that PFGI's financial statements, and E&Y's opinion on those financial statements, was materially false and misleading, since both PFGI and E&Y had actual knowledge that PFGI's accounting did not meet the technical requirements of FAS 13.

108. In performing its audits, E&Y was required to obtain sufficient competent evidential matter to support its opinions as expressed in its audit reports. The most basic determination of the assembling of the financial statements by the company, and a starting point for any audit, is whether to include transactions on or off balance sheet.

109.   E&Y knew, or absent a reckless disregard for the truth should have known, that Provident was maintaining "off the books" accounts which did not properly reflect the investor's risk to Provident revenues and earnings as set out hereinabove, and that such treatment and disclosures of the massive auto lease financial results of Provident was incorrect and misleading.

110.   As the auditors, E&Y knew, or absent a reckless disregard for the truth should have known, that Provident's earnings were of a magnitude as to have materially misstated earnings and cash flow for each year in which E&Y performed an audit and required two Restatements, both of which were demanded by another nationally known accounting firm, PwC, who were called finally by Provident to fix what E&Y did not.

111.   In addition to the above-described departures from GAAP and GAAS, E&Y also violated most if not all of the remaining GAAS standards in connection with its audit of Provident's financial statements for the years 1994-2002, as described hereinbelow.

### a. E&Y Violated the Requirements of SAS 57 (AU 342)

112.   E&Y recklessly failed to examine the risks of material misstatements in Provident's accounting practices.  These risks were substantial and included the following:

- Provident's internal procedures and interest computations were material to the financial statements and any material fault such as represented by the "off the books" accounting methods would be devastating to share values;

- Little existed in the way of controls over the preparation of Provident's management's estimates and the data upon which E&Y approved the estimates and E&Y failed to provide better methods;

- Management's historical experience in accounting for loan interest on auto leases was poor and was under internal scrutiny as early as 1997;

- The data on which earnings were based was often unreliable in that it was not integrated with Provident's books and records, all of which went unrecognized by E&Y.

113.    E&Y accepted Provident's data and assumptions upon which the earning of Provident were based without performing any procedures to test the reliability of the data or the reasonableness of the assumptions.  All of the above violated GAAS.

**b.**    **E&Y Violated the Requirements of SAS 11 (AU 336)**

114.    E&Y encountered matters potentially material to Provident's financial statements that required special knowledge or further inquiry.  Given the materiality of these matters such as "off the books accounting" and the high risk of material misrepresentation associated therewith, E&Y should have given careful consideration to using the work of a specialist (available either within their own personnel or from other national accounting firms such as PwC, the correcting accountants) or pursued intensive inquiry.  They did neither.

115.    E&Y's procedures in evaluating the qualifications of Provident's financial managers, as well as their independence from Provident, fell short of the requirements of SAS 11 in the following respects:

- E&Y did not give any consideration or reacted at all to the disclosure and findings of E&Y or Provident employees by performing additional procedures with respect to some or all of those findings. (AU 336.08)

- E&Y does not appear to have made any tests of accounting or other data provided by Provident to them as this data relates to the auto leasing business of Provident. (AU 336.08)

116. In violation of GAAS, E&Y failed to obtain the necessary understanding of the methods or assumptions used by Provident to determine whether their findings were suitable for corroborating Provident's financial statements for the years 1994 through 2002.

## THE FOUR MATERIAL MISSTATEMENTS AND OMISSIONS IN THE PROXY MATERIALS/REGISTRATION STATEMENT

117. The first materially false statement or omission, found in the cover letter accompanying the Proxy Materials made is that:

Your Board of Directors unanimously approved the acquisition and believes that it is in the best interest of OHSL stockholders. The Board unanimously recommends and advises that you approve the acquisition at the Special Meeting so that the transactions may be completed.

This statement was knowingly false, the substance of which, the unanimity of the Board vote and the unanimous belief that the transaction was in the best interests of OHSL shareholders, was repeated throughout the Proxy Materials/Registration Statement.

118. The second material misstatement or omission appears on page 13 of the Proxy Materials/Registration Statement in the section entitled "Risk Factors." The subsection entitled "Provident Financial May be Unable to Maintain Value of

Securitizations" omits material facts concerning the nature and extent of the risks involved with this activity. This subsection does not disclose the proportion of Provident Financial's reported earnings related to "securitization" accounting and operating procedures and methods relating to its huge loan portfolio nor that thousands of auto leases were incorrectly treated. Rather, they mislead the class into thinking only nine (9) auto leases were affected. According to Provident Financial's public records, Gains on Sale of Loans and Leases were $52.1 million, or 49% of the company's $107.0 million of pretax earnings, for the six months ended June 30, 1999 and were $80.2 million, or 46% of the company's $176.1 million of pretax income, for the year ended December 31, 1998. Further, this subsection does not disclose that $37 million of such gains (71% of the total) for the six months ended June 30, 1999 and $41.1 million of such gains (51% of the total) for the year ended December 31, 1998 were "non-cash." On August 22, 2000, less than one year following the date of the Proxy Materials, Provident Financial announced a change in accounting for the "non-cash" gains arising from this "securitization" activity to a realistic "secured financings" methodology from a "gain on sale" methodology, causing Provident Financial to reduce by 26% its estimate of operating earnings for 2000 to $2.65 per share from $3.60 per share. By this time, the per share price of PFGI stock, having been impacted by actual and projected earnings dropped approximately 8% in response to the August 22, 2000 announcement, thereby diminishing the value of the securities that the class had been deceived into receiving. In the announcement, Provident's CEO,

defendant Robert Hoverson, stated that "the investment community has clearly signaled its dissatisfaction with this accounting method and we believe this sentiment has been factored into our stock price."  In short, this "Risk Factor" failed to inform OHSL's shareholders of Provident's substantial reliance on a risky earnings stream and the potential for an adverse change in accounting treatment, and OHSL shareholders were thus deceived as to the risks of investing in Provident Financial stock through the merger, all of which was known to the defendants but not known to the class.

119.   The third material misstatement or omission is that the resignation of director Thomas M. Herron—in part in protest over the merger--was not disclosed to OHSL shareholders.  This is a material omission.  The term "Board of Directors" is used throughout the Proxy Materials/Registration Statement, in a way that does not reflect that the composition of the Board changed with Mr. Herron's resignation.  Information found at page 63 of the Proxy Materials/Registration Statement entitled "Security Ownership of Certain Beneficial Owners and Management," includes a table of all directors and executive officers as a group.  The date of the table is July 31, 1999, one day after the effective date of the resignation of director Thomas M. Herron.  The selection of the date July 31, 1999 as opposed to July 30, 1999 or any date prior to July 30, 1999 is a deliberate attempt to avoid informing shareholders that Mr. Herron was no longer a director, and the circumstances of his resignation, nor was it possible for OHSL shareholders to determine that Mr. Herron had resigned through other

sources. The fraudulent concealment was complete. In the case of Mr. Herron, his voice against the transaction would have been particularly significant, since the Herron family was associated with OHSL for decades. In fact, Mr. Herron had taken his father's position on the OHSL board, and it was especially important to the merger to conceal the Herron opposition to the merger and resignation as a board member.

120. The fourth material misstatements or omissions relates to the restatements and are found in the Proxy Materials/Registration Statement at pp. 6, 7, 9, 10, 11, 13 and 43 thereof as well as on p. 22 thereof in the form of the "fairness" opinion by a financial expert which based such opinion and exchange ratio on the relevant financial data such an Annual Reports, Securities Exchange Commission filings such as 10-K's, 10-Q's, and 8-K's and Press Releases promulgated by the issuer (financials) and opined to by KMK and E&Y as being true, correct and accurate. All of these financial tables, statements, comparisons and relevant text are materially false and misleading as was the descriptions of the accounting methodology used by Provident and so admitted--contrary to the representations and statements or absence thereof in the subject documents. On March 5, 2003 and April 15, 2003 Provident Admitted that "Off-the-Books" Accounting Procedures for Auto Loan Leases was materially and financially misleading accounting as it improperly reported earnings and cash flows on a total and per share basis in the subject document.

121.  Consequently, Provident "wrote-down" about $100 million of earnings commencing with the year 1997.  Then--again and shortly thereafter on April 15, 2003--Provident was required a second time to "write-down" earnings and cash flow of $44,400,000, thereby not only making the first restatement false but creating a majestic, melt-down of the financials in the total amount of approximately $144 million and causing the market values of Provident shares used as currency to acquire OHSL shares in the subject transaction to be deficient by about  $17 million or 29.7%, resulting further in the overnight reduction of the consideration received by OHSL shareholders (the Class) from $57,162,325 to about $40 million.  In other words, the class received approximately $40 million dollars for their OHSL shares, not the more than $57 million that they believed.

## VI. CLAIMS FOR RELIEF

### COUNT I

### AGAINST ALL DEFENDANTS
### FOR VIOLATION OF SECTION 11
### OF THE SECURITIES ACT, 15 U.S.C. § 77 k

122.  All previous paragraphs are repeated and realleged as if set forth fully herein.

123.   The defendants made material misrepresentations and omissions in the Proxy Materials/Registration Statement, in connection with their offering of securities to plaintiffs and members of the class.  Each of these defendants is liable for untrue statements of a material fact pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k and the defendant Provident, the issuer of the currency used

in the exchange for OHSL shares, is absolutely liable without regard to its corporate state of mind or intent for the full amount of the subject transaction, to wit: $57,162,325.

124.   The Proxy Materials/Registration Statement and the documents incorporated therein by reference contained untrue statements of material facts, and omitted to state material facts required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, in violation of Section 11 of the Securities Act, 15 U.S.C. §§77k and 77l.

125.   Further, the misrepresentations and omissions contained in the Proxy Materials/Registration Statement and the documents incorporated therein by reference were calculated to and did misinform plaintiffs and class members concerning the offer of PFGI.  Thus, they were materially false and fraudulently induced the merger.

126.   The class had no knowledge of the false and misleading nature of the alleged representations when they voted on the merger and their concomitant acquisition of PFGI shares, and could not have known in the exercise of reasonable care of the false and misleading nature of defendants' misrepresentations.

127.   Had the matters that defendants concealed and misrepresented been fully and adequately disclosed in a timely fashion, defendants would have been unable to consummate the merger and purchase OHSL with PFGI stock, or would

have done so only at a price substantially higher than the price at which they did so. This allegation is supported by Provident's recent restatements, which <u>admits</u> that Provident's <u>actual</u> financial condition from 1997-2002 and specifically in 1999 was materially different from Provident's <u>stated</u> financial position.

128.   The OHSL Individual Defendants and the Provident Individual Defendants were directors of their respective companies at the time the false Proxy Materials/Registration Statement were sent to plaintiffs and the class, and signed the Registration Statement containing the false and misleading Proxy Materials on behalf of themselves and OHSL and PFGI. E&Y certified PFGI's financial statements (and experts for PFGI) that were included or incorporated by reference in the Proxy Materials/Registration Statement that Provident, with its restatement, now admits was materially false and misleading.

129.   The Dinsmore defendants and the KMK defendants as professionals who co-wrote the Proxy Materials/Registration Statement knew or should have known that the Proxy Materials/Registration Statement they jointly prepared and co-authored were materially false and misleading, but did not insist upon a true document being disseminated in order to see the merger consummated at any cost or that a corrective document be communicated to the class; the Dinsmore and KMK defendants, once undertaking to speak through its authorships of the Proxy Materials/Registration Statement and consent to being named as having prepared the registration statement had--as lawyers--the heightened duty to speak the full truth in the Proxy Materials/Registration Statement, which they did not.

130. As a result of the aforementioned violations of Section 11 of the Securities Act, plaintiffs and the class have been damaged in the full amount of the subject transaction, an amount believed to be approximately $57,162,375, plus pre-judgment interest and punitive damages.

## COUNT II

### AGAINST OHSL, PFGI, THE OHSL INDIVIDUAL DEFENDANTS, THE PROVIDENT INDIVIDUAL DEFENDANTS AND ERNST & YOUNG FOR VIOLATION OF SECTION 12 (2) OF THE SECURITIES ACT, 15 U.S.C. § 77 l (2)

131. All previous paragraphs are repeated and realleged as if set forth fully herein.

132. The Proxy Materials/Registration Statement filed with the SEC, plaintiffs and all class members contained numerous untrue statements of material fact and omissions of material fact that illegally caused the sales and exchanges of securities through the merger now complained of. With respect to PFGI's materially false and misleading financial statements, this is now admitted by PFGI, who was both a buyer of OHSL securities and a seller of Provident securities in the subject transaction.

133. Defendants PFGI and the Provident Individual Defendants, OHSL, the OHSL Individual Defendants and E&Y were sellers of the PFGI shares sold and exchanged through the merger agreement and the Proxy and Registration Materials. Plaintiffs and the class members were buyers of the PFGI securities sold. Further PFGI, OHSL, the OHSL Individual Defendants, the Provident

Individual Defendants, and E&Y knew or absent a failure to exercise reasonable care would have known of the existence of untrue statements of material fact and omissions of material fact as set out above at ¶¶ 117 to 121.

134.   OHSL and PFGI (the issuer of Provident securities) issued the materially false and misleading Proxy Materials/Registration Statement, which contained financial information for 1997-1999 and by reference for the years 1994-1999 and which were falsely certified by E&Y, and the OHSL Individual Defendants and the Provident Individual Defendants signed the materially false and misleading Registration Statement containing the materially false and misleading Proxy Materials.  Further, plaintiffs and class members did not know of the untrue statements of material fact and omissions of material fact in the Proxy Materials/Registration Statement when deciding how to vote on the merger with PFGI.

135.   Each of the defendants owed to plaintiffs and to class members the duty to make a reasonable and diligent investigation of the statements contained in the Proxy Materials/Registration Statement to ensure that said statements were true and that there were no omissions to state material facts required to be stated in order to make the statements contained therein not misleading.

136. As a result of the aforementioned violation of Section 12 (2) of the Securities Act, plaintiffs and class members have been damaged in the full amount of the subject transaction, an amount believed to be approximately $57,162,375, plus appropriate interest, and punitive damages.

70

## COUNT III

### AGAINST KEN HANAUER, ROBERT HOVERSON, AND JACK COOK FOR CONTROL PERSON LIABILITY PURSUANT TO SECTION 15 OF THE SECURITIES ACT, 15 U.S.C. § 77 (o)

137.    All previous paragraphs are repeated and realleged as if set forth fully herein.

138.    Defendants Hanauer, Hoverson, and Cook had the power and influence and exercised the same to cause OHSL and PFGI to engage in the illegal and improper conduct complained of herein.    Because of their executive, managerial, and directorial positions at OHSL and/or PFGI, or their professional positions, defendants Hanauer, Hoverson, and Cook participated in the operations of OHSL and PFGI, and had access to material non-public information alleged herein, and acted to conceal and/or omitted to disclose such information in the Proxy Materials/Registration Statement.

139.    By reason of the above, Defendants Hanauer, Hoverson, and Cook are liable to plaintiffs and the class in the full amount of the subject transaction, such amount believed to be approximately $57,162,375 plus interest and punitive damages for their conduct in controlling and/or not preventing the conduct complained of in Counts I and II.

### COUNT IV

### AGAINST OHSL, PFGI, THE OHSL INDIVIDUAL DEFENDANTS AND THE PROVIDENT INDIVIDUAL DEFENDANTS AND ERNST & YOUNG FOR VIOLATION OF SECTION 14 OF THE EXCHANGE ACT, 15 U.S.C. §78n(a) AND SEC RULE 14a-9, 17 C.F.R. §240.14a9 PROMULGATED THEREUNDER

140.   All previous paragraphs are repeated and realleged as if set forth fully herein.

141.   The Proxy Materials/Registration Statement sent to plaintiffs and all class members contained numerous materially false and misleading statements of fact and omissions of material fact, which fraudulently induced and proximately caused the OHSL shareholders to vote for and approve the subject merger by a narrow majority.

142.   Defendants OHSL, PFGI, the OHSL Individual Defendants and the Provident Individual Defendants knew, or absent a reckless and negligent disregard of their responsibilities would have known of the misleading and untrue nature of these statements.  Further, PFGI and Defendant Ken Hanauer profited by virtue of the misleading and untrue material statements contained in the Proxy Materials/Registration Statement that enabled them to mislead shareholders and thus acquire OHSL, including PFGI's admittedly false and misleading financial statements, which were falsely certified by Ernst & Young.  The OHSL Individual Defendants profited by virtue of the misleading and untrue material statements contained in the Proxy Materials/Registration Statement because they enabled them to mislead shareholders and thus allow PFGI to acquire OHSL, causing them to receive substantial additional fees as Provident "Advisory Directors," essentially a no-show honorific, for which they were each paid $900/month for

two years.  All defendants were sellers of OHSL stock and plaintiff and the class

were buyers of PFGI stock, as well as sellers of OHSL stock.

143.   As a result of the material false and misleading statements in the

Proxy Materials/Registration Statement and the resulting vote on the 1999 merger,

the class was injured in the full amount of the subject transaction, such amount

believed to be approximately $57,162,375 plus pre-judgment interest and punitive

damages as they were induced to vote to end OHSL's life as an independent entity

based on materially false and misleading information.

## COUNT V

### AGAINST ALL DEFENDANTS
### FOR VIOLATIONS OF §10(b), 15 U.S.C. § 78 (j) b OF THE EXCHANGE ACT AND RULE 10b-5, 17 C.F.R. §240.10b-5, PROMULGATED THEREUNDER

144.   All previous paragraphs are repeated and realleged as if set forth

fully herein.

145.   This Count is asserted against all defendants and is based upon

Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R.

§240.10b-5 promulgated thereunder.

146.   During the class period, all defendants, individually and in concert,

directly, by the use and means and instrumentalities of interstate commerce, the

United States mails, and the facilities of a national securities market, engaged in

an unlawful course of conduct, pursuant to which defendants knowingly or

recklessly engaged in acts, transactions, practices, and courses of business to

conceal and omit adverse material information in the Proxy Materials/Registration Statement hereinabove referenced about OHSL's proposed merger agreement with PFGI which operated as a fraud and deceit upon plaintiffs and the other members of the class, and in those Proxy Materials/ Registration Statement, made various deceptive and untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs and the other members of the class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to fraudulently induce and cause plaintiffs and the other members of the class to approve the proposed merger between OHSL and PFGI to the benefit of defendants and to the detriment of the class.

147. Defendants had a duty to plaintiffs and the class to not make material misrepresentations or omissions in any statement made, but the statements made by defendants as set forth throughout the CAC were materially false and misleading.

148. Defendants had actual and/or constructive knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendants PFGI and the Provident Individual Defendants also benefited financially from the misrepresentations and omissions because PFGI was able to acquire OHSL for artificially inflated currency in the form of Provident shares while defendant

Hanauer benefited because of the newly added change of control provisions in his contract. All of the OHSL director defendants benefited from their positions as Provident "Advisory Directors."

149. Defendants Roe, Hertlein, and Dinsmore, Weiss and KMK (the defendant Law Firms) benefited from the misrepresentations and omissions in the Proxy Materials/Registration Statement because they earned substantial legal fees from PFGI's purchase of OHSL for the authorization of the operative document and its usage in the acquisition by Provident. Defendants Weiss and KMK benefited in the misrepresentations in Proxy Materials/Registration Statement by earning huge fees for its work on the merger transaction, and KMK continued to receive huge fees for its work in litigation arising from the OHSL-Provident merger even though their representation has been found by this Court to be conflicted and they have been disqualified as of Oct. 20, 2003. (Doc. No. 215).

150. Defendant Ernst & Young benefited from the misrepresentations by continuing to receive huge fees for its auditing services prior to and during the 1999 merger as well as thereafter, despite the fact that E&Y knowingly and/or recklessly failed to perform GAAS audits applying GAAP, which finally forced Provident to twice restate its earlier financials.

151. As a result of the dissemination of the false and misleading statements set forth above, the proposed merger between OHSL and PFGI was barely approved by the shareholders. The OHSL shareholders would not have approved the merger on these terms had they known that PFGI's financial

statements were materially false and misleading in that PFGI had <u>admittedly</u> overstated its net income by tens of millions of dollars, which artificially inflated the value of PFGI's stock. In ignorance of the false and misleading nature of the statements described above, the class relied, to their damage, on the integrity of the solicitation materials in voting to approve the merger.

152.   Plaintiffs and the other members of the class have suffered substantial damages as a result of the wrongs herein alleged in an amount believed to be approximately $57,162,375 (the alleged value of the Provident shares received by the class in the merger), plus appropriate interest, and punitive damages.

153.   By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT VI

### AGAINST DEFENDANTS KEN HANAUER, ROBERT L. HOVERSON, JACK M. COOK FOR VIOLATIONS OF THE CONTROL PERSON PROVISIONS §20(a) OF THE EXCHANGE ACT

154.   All previous paragraphs are repeated and realleged as if set forth fully herein.

155.   This Count is asserted against defendants Hanauer, Hoverson, and Cook, and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

156.   Defendants Hanauer, Hoverson, and Cook had the power and influence and exercised the same to cause OHSL and PFGI to engage in the illegal and improper conduct complained of in Counts IV and V. Because of their

executive, managerial, and directorial positions at OHSL and Provident, or their professional positions, these defendants had access to material non-public information alleged herein, and acted to conceal and/or omitted to disclose such information from plaintiff and other OHSL shareholders, and caused the dissemination of the Proxy Materials/Registration Statement with false and misleading statements and caused the shareholders to approve the merger to the benefit of defendants and to the detriment of the shareholders.

157.   By reason of the above, defendants Hanauer, Hoverson, and Cook are liable to plaintiffs and the class for their conduct in controlling or not preventing the conduct complained of in this complaint.

## COUNT VII

### (OHIO SECURITIES LAW VIOLATIONS UNDER ORC § 1707.41 AGAINST ALL DEFENDANTS)

158.   All previous paragraphs are repeated and realleged as if set forth fully herein.

159.   Defendants, and each of them, participated in, and aided and abetted the seller by a written or printed circular, prospectus, or advertisement in offering a security for sale.

160.   Defendants and each of them had knowledge of the publication thereof prior to the transaction in which the class purchased Provident shares.

161.   Defendants and each of them did not have just or reasonable grounds to believe such statements to be true or the omitted facts to be not material.

162.    Defendants and each of them did not undertake reasonable diligence in ascertaining the fact of such publication or the falsity of any statement contained in it or of the omission of such material fact, and therefore are deemed to have knowledge of such publication and of the falsity of any untrue statement in it or of the omission of material facts, and received the profits accruing from such sale.  In fact, many of the defendants had actual knowledge of the material falsity of the Proxy Materials/Registration Statement.

163.    Plaintiffs were damaged as a result thereof.  Therefore the defendants are liable to the plaintiffs who purchased such securities relying on such circular, prospectus, or advertisement, for the loss or damage sustained by the class by reason of the falsity of material statements contained therein, or for the omission therefrom of material facts or for rescissory damages in the full amount of $57,162,325 plus interest.

164.    The violations of the Ohio Securities Law, Ohio Revised Code Chapter 1707, et seq. did materially affect the protection contemplated by the violated provisions, as detailed hereinabove.

## COUNT VIII

### (OHIO SECURITIES LAW VIOLATIONS UNDER ORC § 1707.43 AGAINST ALL DEFENDANTS)

165.    All previous paragraphs are repeated and realleged as if set forth fully herein.

166.    Defendants and each of them, participated in, and aided and abetted the seller by a written or printed circular, prospectus, or advertisement in offering a security for sale.

167.    Defendants and each of them had knowledge of the publication thereof prior to the transaction in which plaintiffs purchased the shares of Provident.

168.    Defendants and each of them did not have just or reasonable grounds to believe such statements to be true or the omitted facts to be not material.

169.    Defendants and each of them did not undertake reasonable diligence in ascertaining the fact of such publication or the falsity of any statement contained in it or of the omission of such material fact, and therefore are deemed to have knowledge of such publication and of the falsity of any untrue statement in it or of the omission of material facts, and received the profits accruing from such sale.

170.    Therefore the defendants are liable to the class who purchased such securities relying on such circular, prospectus, or advertisement, for rescission.

171.    The class hereby elect to void sales and exchanges of said securities in violation of Chapter 1707 of the Ohio Revised Code.  The class hereby tender to the defendants and each of them all securities sold to the class for the full amount paid by the class and for all taxable court costs.

172.  The violations of the Ohio Securities Law, Ohio Revised Code §
1707, et seq. did materially affect the protection contemplated by the violated
provisions, as detailed herein and damage to Plaintiffs.

## COUNT IX

## SPOLIATION (AGAINST DEFENDANTS HANAUER, BRINKER, AND ZOELLNER, AND DINSMORE & SHOHL)

173.  All previous paragraphs are repeated and realleged as if set forth
fully herein.

174.  Defendants Hanauer, Brinker, and Zoellner destroyed documents
relevant to this lawsuit after related litigation was filed in the state court on
November 18, 1999.  Defendant Hanauer testified that he destroyed a number of
documents that he believed were duplicative.

175.  Defendants Brinker and Zoellner testified in substance that they
shredded their entire file of OHSL materials containing voluminous documents
relating to the OHSL-Provident merger.  Defendant Brinker testified in substance
that he shredded his entire file "so that they couldn't be seen by anybody."

176.  Defendant Zoellner even went through the trouble of buying a
shredder after the merger and destroyed his entire file of material related to OHSL
and the OHSL-Provident merger.  These documents were destroyed after the filing
of the litigation in state court.  Plaintiffs have been harmed by the destruction of
these documents.

177.   Defendant Dinsmore, as the firm representing the OHSL directors in the initial phase of the state court litigation, had a clear legal duty to instruct its clients not to destroy relevant documents.  Additionally, a lavender legal pad containing critical notes regarding the subject transaction of defendant Ken Hanauer, former CEO of OHSL, was turned over to Dinsmore shortly after the filing of the state court litigation, but that document has disappeared.

## COUNT X

### COMMON LAW FRAUD (Against All Defendants)

178.   All previous paragraphs are repeated and realleged as if set forth fully herein.

179.   All defendants have a duty to plaintiffs and the class not to permit affirmative misrepresentations and/or to omit to state material facts in the Proxy Materials/Registration Statement.  Defendants, who all wanted to close the transaction at any cost, in part so that OHSL would not be harmed in the marketplace, failed to take reasonable steps and make reasonable inquiries to determine that the Proxy Materials/Registration Statement was full, fair, and complete.  For example, defendant Roe, the managing partner of Dinsmore and a self-described expert in banking and securities laws and mergers and acquisitions, said that he never even bothered to ask defendant Hanauer (former CEO of OHSL) if he was opposed to the transaction because he didn't believe it to be his job to make such inquiries.  The fraud with respect to the material misrepresentations of PFGI's financial statements has now been admitted by all defendants by virtue of

81

the two Restatements of March 5 and April 15, 2003. All defendants knew that plaintiffs and the class would justifiably rely on the contents of the Proxy Materials/Registration Statement.

## COUNT XI

## BREACH OF FIDUCIARY DUTY (Against the OHSL Director Defendants)

180. All previous paragraphs are repeated and realleged as if set forth fully herein.

181. As directors of a public company, the OHSL directors owed fiduciary duties to plaintiffs and the class, including a duty of loyalty and good faith to the OHSL shareholders. The OHSL Individual defendants did not fulfill their fiduciary duties to plaintiffs and the class, *inter alia*, because they disseminated a materially false and misleading Proxy Materials/Registration Statement in an attempt to mislead plaintiffs and the class into voting in favor of the merger transaction and, in conjunction with Dinsmore and KMK, conspired to keep opposition to the transaction from the OHSL shareholders. Plaintiffs and the class were harmed as a result of this breach of fiduciary duty by the OHSL individual defendants. In fact, members of the KMK transactional team have opined that Defendant Hanauer, a client of the KMK trial team, may have violated his fiduciary duties to OHSL shareholders with respect to his actions and inactions relating to the merger.

182.   Based on the foregoing paragraphs, the OHSL directors breached the fiduciary duties owed to plaintiffs and damaged the class and are liable to the class to the full extent of the damages suffered by the class.

**PUNITIVE DAMAGES**

183.   Plaintiffs demand punitive damages to the fullest extent provided by law.

**JURY TRIAL DEMANDED**

184.   Plaintiffs demand a trial by jury on all issues so triable.

**WHEREFORE**, plaintiffs on behalf of themselves and the class prays for judgment as follows:

A.   Certifying this case as a Class Action pursuant to Rule 23 (b)(3) of the F.R. Cv. Pr. and naming plaintiffs as class representatives;

B.   Awarding plaintiffs and the class the right to rescind the merger or monetary damages computed on a rescissory or other basis in the full amount of the transaction, such amount being approximately $57,162,375;

C.   Awarding plaintiffs and the class alternative damages in the amount by which the Provident shares were artificially inflated at the time of the acquisition by Provident of OHSL, of approximately $17 million, as well as $8 1/2 to $14 million in trading losses subsequent to the merger, bringing the total estimated losses to $25.7 million to $31.8 million, plus interest.

D.    Awarding plaintiffs and the class appropriate prejudgment interest at the maximum rate allowable by law;

E.    Awarding plaintiffs and the class their costs and expenses for this litigation including reasonable attorneys' and experts' fees and other disbursements;

F.    Awarding plaintiffs and the class appropriate punitive damages in an amount to be determined at trial; and

G.    Granting such other and further legal and equitable relief as this Court deems to be just and proper.

Dated: 31 December, 2003.

**GENE MESH & ASSOCIATES**

By:    _____

Gene Mesh (0002076)
Michael G. Brautigam
2605 Burnet Avenue
Cincinnati, Ohio 45219-2502
(513) 221-8800
(513) 221-1097 (Facsimile)

Attorneys for Plaintiffs and the Class

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of December 2003 a true and correct

copy of the Consolidated Class Action Complaint was served as follows:

**BY HAND DELIVERY**

> John B. Pinney, Esq.
> J. Michael Debbler. Esq.
> GRAYDON HEAD & RITCHIE
> 1900 Fifth Third Center
> 511 Walnut Street
> Cincinnati, OH 45202

> Michael R. Barrett, Esq.
> BARRETT & WEBER, LPA
> 105 Fourth Street, Suite 500
> Cincinnati, OH 45202-4015

> James E. Burke, Esq.
> KEATING, MUETHING & KLEKAMP, P.L.L.
> 1400 Provident Tower
> One East Fourth Street
> Cincinnati, OH 45202-3752

**BY FIRST CLASS MAIL**

> John Hust, Esq.
> SCHROEDER, MAUNDRELL,
>   BARBIERE & POWERS
> 11935 Mason Road, Suite 110
> Cincinnati, Ohio 45249

> James Gauch, Esq.
> JONES DAY
> 51 Louisiana Avenue, NW
> Washington, D.C. 20001-2113

**Michael G. Brautigam**