Not Reported in F.Supp.
(Cite as: 1994 WL 114860 (N.D.Ill.))
<KeyCite Citations>

Page 1

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

The CENTURIONS, an unincorporated association, Wilbur Klein, Sonny Merrit, John Burns, Lewis Taman and Gerald Verr, individually and on behalf of all persons similarly situated, Plaintiffs,
v.
FERRUZZI TRADING INTERNATIONAL, S.A., Ferruzzi Finanziaria S.P.A., Ferruzzi U.S.A., Inc., Central Soya Company, Inc. and Frank Gleason, Defendants.

No. 89 C 7009.

Jan. 7, 1993.

REPORT AND RECOMMENDATION

PALLMEYER, United States Magistrate Judge.

*1 Plaintiffs, buyers of soybean futures contracts at the Chicago Board of Trade, brought this action against Defendants Ferruzzi Finanziaria, S.p.A., and certain of its subsidiaries, also buyers of soybean futures contracts, alleging that Defendants conspired to reap profits by manipulating or cornering the May, July, and August 1989 soybeans futures markets.

This lawsuit was filed in September 1989. Plaintiffs moved for class certification in March 1990. In July 1990, Judge Charles R. Norgle transferred this case to Magistrate Judge Rosemond for all pretrial matters. The parties agreed to defer discovery on the merits of the litigation until after decision on the motion for class certification. Pursuant to an order of the Executive Committee of October 1991, this case was referred to these chambers. Briefing of the class certification motion was not completed until April 1992. For the reasons set forth below, that motion should be denied.

FACTUAL BACKGROUND [FN1]

This case concerns one of the most widely publicized charges of manipulation in the 144-year-old history of the Chicago Board of Trade. In 1988, the United States suffered its worst drought in over fifty years. The fall 1988 soybean harvest was one-fifth below normal, and forecasters predicted that supplies would be extremely tight at least until the harvest of the new crop in fall 1989. When the drought continued into 1989, supply fears increased.

*The Parties*

Plaintiff Centurions is an unincorporated investment club jointly controlled by Wilbur Klein, a citizen of New York, and Sonny Merrit, [FN2] a citizen of New Jersey. Between April and July 1989, the Centurions made the following transactions: sale of one July soybeans futures contract [FN3] on April 6, 1989, at $7.20 per bushel; purchase of one July contract on June 1, 1989 at $7.02 per bushel; sale of one August contract on June 1, 1989 at $6.80 per bushel; and purchase of one August contract on July 5, 1989, at $7.435 per bushel. [FN4]

Other Plaintiffs include Lewis Taman, an Illinois citizen who purchased May 1989 soybean futures contracts beginning January 20, 1989, and July 1989 soybean futures contracts commencing February 13, 1989; John Burns, a Montana resident who purchased August 1989 contracts commencing on July 6, 1989; and Gerald Verr, another Illinois resident who purchased May 1989 contracts commencing February 10, 1989. Verr also purchased July futures in April that he later sold in June. Verr subsequently bought August futures on June 30 and July 12 that he then sold on July 26. Plaintiffs seek to represent a class of "hundreds, perhaps thousands" of "geographically dispersed" traders who purchased May, July, or August soybean contracts between February 1, 1989 and July 11, 1989 (the "class period"). (Complaint, ¶ 15.)

Defendant Ferruzzi Finanziaria S.p.A. ("Ferruzzi" or "Ferruzzi Group") is a global agribusiness conglomerate and holding company with principal executive offices in Ravenna, Italy. Ferruzzi is one of the largest industrial corporations in the world and is Italy's second largest private company. According to Plaintiffs, Ferruzzi is Europe's largest grain importer and, operating through subsidiaries, the third-largest soybean processor in the United

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Case 1:00-cv-00793-SSB-TSH    Document 244-3    Filed 01/21/2004    Page 2 of 15

Not Reported in F.Supp.
(Cite as: 1994 WL 114860, *1 (N.D.Ill.))

Page 2

States. Ferruzzi processes approximately five million tons of soybeans annually, representing nearly seven percent of the world supply. Defendant Ferruzzi U.S.A., Inc. ("Ferruzzi U.S.A."), a wholly-owned subsidiary of Ferruzzi, is a Louisiana corporation. Defendant Ferruzzi Trading International, S.A. ("Ferruzzi Trading"), another Ferruzzi subsidiary, is a Panamanian corporation with offices in Lausanne, Switzerland. Defendant Central Soya Company, Inc. ("Central Soya"), a major soybean processor in the United States, is a wholly owned subsidiary of Ferruzzi based in Indiana. Both Ferruzzi and Central Soya are members of the Chicago Board of Trade ("CBOT"). Defendant Frank Gleason operated out of Ferruzzi's Paris, France office and was in charge of the Ferruzzi Group's soybean futures trading, including trading on the CBOT, from at least autumn 1987 until at least the end of July 1989.

*Soybeans Futures Contracts*

**\*2** In the United States, soybeans are planted in the spring, harvested in the late summer or fall, and stored throughout the year. Ordinarily, the later after harvest that soybeans of the same crop are sold, the higher the price charged to compensate for storage, insurance, and interest costs.

Soybeans represent one kind of agricultural product that has become the subject of futures trading on the nation's organized exchanges and are recognized as a commodity under section 2(a)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 2. Soybean and other futures contracts are standardized according to terms (e.g., quantity, quality, and delivery locations) specified by the commodity exchange on which the contract is traded. Trading of soybeans has long been conducted in soybean futures contracts at the CBOT, the largest futures exchange in the world. Because futures contracts are standardized, sellers and buyers are able to exchange one contract for another and actually offset their obligation to deliver or take delivery of the cash commodity underlying the futures contract. As an example, each purchaser of a July contract can cancel or offset his future obligation to take delivery of the soybeans by selling a July contract. Trading in futures contracts, and particularly in soybean futures contracts, in fact, is generally concluded by "liquidation," i.e., by making an opposite and offsetting transaction. Liquidation occurs on more than 99 percent of the trades initiated; making or taking delivery occurs on fewer than 1 percent of the futures contract trades initiated.

The traders include processors and merchants (like Ferruzzi) who actually process and sell the underlying physical commodities and use the futures market to hedge. [FN5] The traders also include speculators who trade future contracts in the hope of earning trading profits but have no contact with the "cash market" (i.e., the physical commodities underlying the futures contracts).

A person trading futures contracts may be either "long" or "short" a particular contract. One who *buys* a contract acquires the right and obligation to pay for and take delivery of the underlying commodity at the contract price during the delivery month; such a trader is "long" or holds a "long position." Conversely, one who *sells* a contract has the right and obligation to deliver the physical commodity at the contract price during the delivery month; such a trader is "short" or holds a "short" position. By definition, for every open futures contract there is both a long and a short. *See* 1 P. Johnson & T. Hazen, COMMODITIES REGULATION § 1.04, at 12 (2d ed. 1989). A trader who is long expects prices to rise or seeks to hedge against a price increase; a long position increases in value as prices rise. A trader who is short expects prices to fall or seeks to hedge against a decline; a short position increases in value as prices fall and declines in value as prices rise.

**\*3** Futures markets, the standardized and fungible futures contracts, and the clearinghouse mechanism [FN6] are designed to facilitate trading and were not intended to serve as cash markets, or as substitutes for cash markets. To that end, section 4a(1) of the Commodity Exchange Act, 7 U.S.C. § 6a(1), and Commodity Futures Trading Commission ("CFTC") Regulation section 150.2, 17 C.F.R. § 150.2, provide that no person may lawfully hold more than three million bushels (or 600 contracts of 5000 bushels apiece) of soybeans for future delivery in any one delivery month, except, and only to the limited extent that such person could qualify as a bona fide hedger [FN7] under section 4a(3) of the CEA, 7 U.S.C. § 6a(3), and the rules and regulations promulgated thereunder by the CFTC, including CFTC Regulation sections 150.3, 17 C.F.R. § 150.3.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Case 1:00-cv-00793-SSB-TSH    Document 244-3    Filed 01/21/2004    Page 3 of 15

Not Reported in F.Supp.
(Cite as: 1994 WL 114860, *3 (N.D.Ill.))
Page 3

*Plaintiffs' Claims*

Beginning in fall 1987 and continuing until July 1989, Plaintiffs allege that the Ferruzzi Group purchased large numbers of soybean futures contracts on the CBOT and developed and maintained a large long position in such contracts. As soybean futures contract prices escalated between fall 1987 and July 1988, the Ferruzzi Group allegedly profited by millions of dollars on this large long position in soybean futures contracts.

According to Plaintiffs, it was widely acknowledged in the futures industry in 1988-89 that holders of large positions in soybean futures contracts were "obligated to liquidate these in an orderly fashion." (Complaint, ¶ 24.) Despite the CFTC's and CBOT's inquiries of the Ferruzzi Group about its justification for its holdings of such large positions in soybean futures, the Group did not in July 1988, or in the subsequent months through July 1989, fully liquidate its large long position in soybean futures contracts. Instead, from at least July 1988 through May 1989, the Ferruzzi Group maintained a long position in 1988 crop soybean futures but "rolled forward" the timing of the expiration or delivery date for such long position. Thus, at the point in November 1988 when the November 1988 soybean futures contract approached the end of its trading life, the Ferruzzi Group sold many of its November contracts and concurrently purchased soybean futures contracts expiring in January, March, and/or May 1989.

In 1988 and 1989, the Ferruzzi Group steadily increased its ownership of the supplies of cash market soybeans in the only two delivery points for CBOT soybean futures--Chicago, Illinois and Toledo, Ohio. The Ferruzzi Group further enhanced its position by shipping soybeans out of Chicago and Toledo, as well as out of the United States for storage in Europe.

Plaintiffs assert that the 1989 crop soybeans futures contracts, and especially the May, July, and August 1989 contracts, were "chained together" in a pricing relationship by economic theory and by the normal market activities of arbitrageurs and other traders and futures market participants. (Complaint, ¶ 25.) Plaintiffs allege that Defendants manipulated all three contracts during the alleged class period (between February 1, 1989 and July 11, 1989).

*4 By no later than February 1, 1989, Plaintiffs allege, the Ferruzzi Group had devised a plan which would manipulate the contracts to artificially high price levels, thereby enabling the Group to sell its massive long position in soybean futures at higher prices. Pursuant to this plan, the Ferruzzi Group (operating under the immediate direction of Defendant Frank Gleason) developed and held from February 1, 1989, until July 11, 1989, both a dominant and controlling soybean futures market long position and a dominant and controlling cash market long position in the Chicago and Toledo supplies (the supplies deliverable on the contracts). As a result, throughout the class period, the prices of the May contracts and of the July and August contracts were artificially high, and Plaintiffs and the proposed class were forced to pay more to purchase such contracts than they would have paid in a true and lawful market.

*The Alleged Manipulation in May*

Between May 1989 and July 11, 1989, the CFTC and CBOT repeatedly warned Defendants, orally and in writing, that (a) Defendants' actions threatened or constituted a price manipulation, and (b) Defendants should liquidate their long positions to ensure an orderly liquidation of soybean futures. Despite these repeated warnings, Defendants in May 1989 developed a holding of more than 90 percent of the open interest [FN8] in the May contract and an ownership of more than 50 percent of the cash market soybeans deliverable on such contract. (*Id.* ¶ 38.) Consequently, Plaintiffs allege, Defendants "cornered and squeezed" the May 1989 contract as the delivery deadline approached. Since the prices of the May, July, and August contracts were "chained together," Plaintiffs urge that Defendants' manipulation of the May contract pushed up the prices of the July and August contracts. (*Id.* ¶ 25.) On May 18, 1989, according to Plaintiffs, the CFTC officially took the position that the Ferruzzi Group was not a bona fide hedger and ordered it to liquidate.

Defendants express surprise that these named Plaintiffs allege manipulation in May. First, Defendants point out, although the Complaint focuses on the cash and futures position that they acquired in May, none of the named Plaintiffs bought, sold, or held any positions in May futures contracts during May. Nor did these Plaintiffs buy

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Case 1:00-cv-00793-SSB-TSH    Document 244-3    Filed 01/21/2004    Page 4 of 15

Not Reported in F.Supp.  
(Cite as: 1994 WL 114860, *4 (N.D.Ill.))

Page 4

or sell any July or August contracts during May, Defendants add. (*Id.*) Second, Defendants assert that although the Complaint alleges a long manipulation that could have harmed only shorts, none of the named Plaintiffs held a short position in May futures during the entire three-month period preceding the end of May trading. Only two Plaintiffs-- Verr and Taman--held long positions in May contracts; Verr and Taman closed their positions by April 24. Thus, Defendants assert, Verr and Taman would have stood to *benefit* from an artificially high price resulting from a long manipulation.

In order for a long like Verr to establish injury, Defendants contend, he must show that the alleged manipulation had a greater impact in February (when he bought) than in April (when he sold). Defendants insist that such a showing, however, runs counter to the argument that must be advanced by shorts in the proposed class; a short who sold in February and bought in April can recover only by showing the manipulative impact increased rather than decreased between February and April.

*5 The only named Plaintiff who ever held a short position in the May contract was Taman, who was short for a single day between February 15 and 16. (Ex. A to Defendants' Opposition.) Defendants argue that Taman can recover only by proving that Defendants' conduct on February 15 or 16 caused May futures prices to rise artificially; such proof, however, will not assist the "vast majority" of shorts in the proposed class. (Defendants' Opposition, at 8-9.)

*The Alleged Manipulation in July*

Plaintiffs allege a similar manipulative scheme in July. According to Plaintiffs, Defendants again rolled forward their long position by selling May contracts and purchasing July contracts, rather than liquidating in response to the CFTC order. (Complaint, ¶ 40.) Plaintiffs assert that by July 1989, Defendants had developed a long position of more than twenty-three million bushels in the July contract, and the simultaneous ownership of more than 70 percent of the CBOT certified stocks deliverable on the July contract. Plaintiffs add that fewer than thirteen million bushels of soybean stocks were in deliverable position on the July contract from June 30, 1989 forward. (*Id.* ¶ 41.)

Thus, the Ferruzzi Group's position alone demanded delivery of almost twice the amount of soybeans available for delivery. Deducting the Ferruzzi Group's own holdings of such deliverable supplies from the total available supplies, Plaintiffs infer that the available cash market supplies deliverable on the July contract were only one-fifth of those required to satisfy the delivery requirements on Defendants' July contract long position from June 1989 forward. (*Id.*) In response to this conduct, according to Plaintiffs, the CFTC informed the Ferruzzi Group that the Group would not be considered a bona fide hedger in the July contract, directed the Ferruzzi Group to liquidate its July contract positions down to the 600-contract speculative limit, and ordered all market participants to gradually liquidate their positions. (*Id.* ¶ 42.)

Defendants assert that, as with the claimed May manipulation, the allegations of the Complaint regarding the July contract do not establish harm to any of the named Plaintiffs. The Complaint alleges that Defendants developed dominant cash and futures positions in July; yet none of the named Plaintiffs, according to Defendants, held any positions in July futures during July. (Ex. A to Defendants' Opposition.) All the named Plaintiffs, except the Centurions, held long positions (and thus would have profited from the alleged manipulation), and these long positions were all liquidated by June 30, Defendants claim.

Defendants also assert that the Centurions, the sole named Plaintiff that ever held a short position in the July contract, actually profited from that position, because the price of July futures dropped between the Centurions' April 6 sale and its offsetting purchase on June 1. (See Ex. D to Defendants' Opposition.) The Complaint alleges that Defendants pushed prices to artificially higher levels during this period; Defendants point out, however, that the Centurions' own experience throughout this span was profitable. In addition, Defendants suggest that prices generally declined rather than rose during the class period. (Defendants' Opposition, at 10.)

DISCUSSION

*6 This court has broad discretion in determining whether or not a class should be certified. *Donovan v. Estate of Fitzsimmons,* 778 F.2d 298, 306 (7th

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Case 1:00-cv-00793-SSB-TSH    Document 244-3    Filed 01/21/2004    Page 5 of 15

Not Reported in F.Supp.
(Cite as: 1994 WL 114860, \*6 (N.D.Ill.))

Page 5

Cir.1985). In evaluating the motion for class certification, the allegations made in support of certification are taken as true and the merits of the case are not examined. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974); *In re Bally Mfg. Sec. Corp. Litig.,* 141 F.R.D. 262, 267 (N.D.Ill.1992). Plaintiffs bear the burden of proving that each of the requirements for class certification has been met. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161 (1982); *In re Bally Mfg. Sec. Corp. Litig.,* 141 F.R.D. at 267.

Rule 23 establishes a two-step procedure to determine whether class treatment is appropriate. First, Plaintiffs must show that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of claims or defenses of the class; and (4) the representative will fairly and adequately protect the interest of the class. Fed.R.Civ.P. 23(a). Assuming these four prerequisites are met, Plaintiffs must then satisfy one of the three requirements set forth in Rule 23(b).

Defendants do not contest Plaintiffs' compliance with the numerosity (Rule 23(a)(1)) or commonality (Rule 23(a)(2)) requirements. Defendants instead focus on the deficiency of Plaintiffs' allegations in regard to the remaining Rule 23(a) elements of typicality (Rule 23(a)(3)) and adequacy of representation (Rule 23(a)(4)), as well as the Rule 23(b)(3) requirement that common questions of law or fact predominate over individual questions.

*Rule 23(a)(3): Typicality*

Rule 23(a)(3) requires the would-be class representatives to demonstrate that their claims are typical of those of the class as a whole. The Seventh Circuit has stated that a " 'plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.' " *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.) (quoting *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983)), *reh'g denied* (1992). The mere existence of issues pertaining to individual class members or of factual variations, however, does not preclude a finding that Plaintiffs' claims are typical of those of a class. *De La Fuente,* 713 F.2d at 232; *Buoniconti v. Bankers Sec. Life Ins. Soc'y,* No. 81 C 6630, 1985 WL 1377, at \*4 (N.D.Ill. May 16, 1985) (Norgle, J.).

Defendants declare that the claims of the named Plaintiffs, who traded on isolated dates in February, April, June, and July, are atypical when compared to those class members who traded futures contracts at other times. Defendants argue that proof of manipulation of one contract does not prove that manipulation occurred with regard to other contracts. [FN9] In other words, the fact that Defendants artificially increased prices during the time that one contract was held by one class representative will not establish that prices of other futures at other times were also artificially inflated. Defendants point out, for instance, that Plaintiffs have not identified the relationship between manipulation of May soybean futures in February and manipulation of July futures during June, beyond merely asserting that such a relationship exists.

\*7 Plaintiffs counter that the effect and illegality of Defendants' conduct--"manipulation causing purchasers to pay too much"--are common to every investor who purchased May, June, or August 1989 soybean contracts and thus suffices to establish typicality. (Reply Memorandum in Support of Plaintiffs' Motion for Class Certification ("Plaintiffs' Reply"), at 20.) In order to demonstrate that prices were artificial on each day of the class period, Plaintiffs propose to establish the existence of Defendants' unlawful scheme and to prepare an "artificial demand graph" reflecting the amount of uneconomic speculative demand pressure exerted on soybean futures by Defendants throughout the class period. (*Id.* at 20-21; Hieronymus aff., Ex A to Plaintiffs' Reply, ¶ 10.)

Plaintiffs' theory of liability, as expressed in the Complaint, focused on the Ferruzzi Group's manipulation of the prices of soybean futures through the cornering and squeezing of the market during the final days of trading. Plaintiffs' Reply, however, deviates somewhat from that earlier theory when it introduces a "manipulation-by-excessive-speculation" theory charging Defendants with artificially pushing prices upward throughout the class period by engaging in "excessive speculation." (Plaintiffs' Reply, at 5.) [FN10] According to this

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.  
(Cite as: 1994 WL 114860, \*7 (N.D.Ill.))

Page 6

latter theory, Plaintiffs assert, each class member suffered injury simply by paying an inflated price for his or her purchase. Plaintiffs propose to have experts prepare an "artificial price graph," which will facilitate the computation of damages suffered by each class member on his or her day of purchase as a result of Defendants' holding an "excessive" number of contracts. (*Id.* at 21.)

Plaintiffs cite *Spicer v. Chicago Bd. Options Exch., Inc.*, [1989-1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,943 at 95,244 (N.D.Ill.1990) to support their contention that they meet the typicality requirement under Rule 23(a)(3) because the evidence supporting the class representatives' claims also proves the claims of other class members. A close reading of *Spicer* suggests it has limited relevance here, however. *Spicer* involved a proposed securities fraud class action brought by option purchasers alleging trading "inadequacies" during a single day of trading in the aftermath of the October 1987 stock market crash. Judge Will of this court concluded that factual differences with respect to the price at which each option series traded did not preclude a finding of typicality where plaintiffs' legal allegations and most of their general fact allegations were the same for the named plaintiffs and class members. Even where the class period spanned only one day, however, Plaintiffs' allegations of inflated prices had to be proven series by series since the market conditions changed vastly from one series to the next and no practical relationship existed between the series. "Proof that the particular series bought by class representatives were overpriced will not prove the claims of class members who bought in other series." *Id.* at 95,250-51.

\*8 The *Spicer* court did observe that the fact that one series or another traded at fair prices would not render class representatives atypical; the court recognized, however, that typicality would be compromised if "it appears that the representatives were not damaged by their own trades on October 20, 1987." *Id.* at 95,251. *Spicer* acknowledges, further, that the "net losses" measure is the appropriate way to calculate damages. Defendants in this case urge that under the "net loss" theory, at least some of the named class representatives are not typical of other class members because the evidence shows they have not suffered any injury.

*In the Matter of VMS Ltd. Partnership Sec. Litig.*, Nos. 90 C 171, 90 C 866, and 90 C 809, 1992 WL 247198 (N.D.Ill. Sept. 24, 1992) (Zagel, J.), another case which Plaintiffs cite in their recent letter to the court, is similarly unhelpful here. (Letter from Charles R. Watkins to Magistrate Judge Rebecca R. Pallmeyer of 12/4/92, at 1.) *VMS Ltd.* represented the consolidated proceedings of five securities cases based upon alleged oral misrepresentations that purportedly varied among investors. Each representative case involved a prospectus or other offering materials distributed to securities purchasers that contained uniform representations or omissions. Although plaintiffs maintained different positions on the question of damages, the court noted that such differences were fractions or multiples of a "uniform damages measure" and were therefore not an obstacle to certification. 1992 WL 247198, at \*3. Plaintiffs' counsel suggests that they have proposed a similar "uniform damage measure." Specifically, Plaintiffs contend they intend to compare each individual class member's transactions to a theoretical standard representing the price at which soybean futures would have traded but for Defendants' allegedly unlawful conduct.

*VMS Ltd.* suggests that classes could be certified in complex cases where plaintiffs proposed a standard and consistent way of calculating damages that varied among class members. Plaintiffs here have made no showing, however, that the undefined "uniform damage measure" cited approvingly by the *VMS Ltd.* court applies to the sort of exhaustive price artificiality analysis that has been described by Professor Hieronymus. (*See* Hieronymus aff., Ex. A to Plaintiffs' Reply.) Moreover, *VMS Ltd.* concerned fraud and misrepresentation in the securities context and not commodity manipulation; it did not address futures trading or intra-class conflicts between longs and shorts, and thus does not reach the question of whether class certification is appropriate where conflicts exist among representatives.

*Spicer* and *VMS Ltd.* do indicate that damages conflicts need not preclude class treatment. They do not address the issue, however, of whether the injury allegedly suffered by each named plaintiff is typical of those of the class. As Defendants urge, an individual who purchased at an inflated price but sold a day later suffers, at most, only the difference

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.
(Cite as: 1994 WL 114860, *8 (N.D.Ill.))

Page 7

between the profit he or she actually received and what he or she would have recovered on the contract had there been no manipulation during that one day. Nor have Plaintiffs explained how the injury (if any) suffered by persons who bought long position but sold them two months later is typical of that suffered by persons who held short positions over that same period. Neither *Spicer* nor *VMS* supports the notion that this court should disregard the fact that at least some persons who purchased contracts also sold them during the proposed class period.

*Rule 23(a)(4): Adequacy of Representation*

**\*9** The final subdivision of Rule 23(a) requires that the representative plaintiffs fairly and adequately represent the class. *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.), *reh'g denied* (1992). This subsection consists of two factors. The first requirement is that the class representative not have interests antagonistic to those of the class. The second requirement is that Plaintiffs vigorously pursue the litigation on behalf of the class, and their chosen attorney be qualified, experienced, and capable of conducting the litigation. *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 186 (N.D.Ill.1992); *see also Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986).

Defendants contend that the named Plaintiffs fail to meet these two requirements. First, Defendants argue that "an inherent conflict of interest" precludes the named Plaintiffs from representing the "shorts," who would have been harmed as a result of any alleged long manipulation. (Defendants' Opposition, at 11.) If long futures traders did corner the soybean supply as charged by Plaintiffs, Defendants observe, the shorts would have been forced to settle their contracts at inflated prices as the end of trading approached. Named Plaintiffs Verr, Taman, and Burns, however, purchased and held long positions. Defendants contend that a long like Verr, who purchased July futures in April and sold them in June, will want to demonstrate that the price was artificially high in April but that the alleged manipulative impact decreased thereafter. In contrast, Defendants suggest a short like the Centurions, which sold July futures in April and bought in June, must prove that prices were manipulated upward between its two trades. Defendants point out that Verr and the Centurions are themselves in direct conflict.

Plaintiffs contend that Defendants' emphasis on the sales portion of each class member's transaction misconstrues the nature of Plaintiffs' claim. Plaintiffs insist that they are not claiming damages based on the difference between their purchase price and sales price; the only damages they seek, Plaintiffs assert, is the difference between the price they actually paid and the price they would have paid in an unmanipulated market. In support of this method of establishing damages, Plaintiffs rely upon *Strobl v. New York Mercantile Exch.,* 582 F.Supp. 770 (S.D.N.Y.1984), *aff'd,* 768 F.2d 22 (2d Cir.), *cert. denied,* 474 U.S. 1006 (1985). [FN11]

*Strobl* arose out of the highly publicized default of Maine potato futures contracts in May 1976 that occurred when the sellers of nearly one thousand contracts failed to deliver some fifty million pounds of potatoes. Plaintiff speculator, who had purchased long contracts and liquidated them prior to the close of trading, contended that defendant potato processors conspired to drive down potato prices and default on Maine potato futures contracts and that they profited by reducing the prices they paid for potatoes in and after 1976. Plaintiff had invested in May 1976 potato futures; he won a large jury award measured by the difference between what he received from the sale of those futures and what he would have received but for defendants' manipulation. Significantly, however, in affirming that award on appeal, the Second Circuit recognized that a trader's profit was determined by "[t]he difference in price between the original contract and the offsetting contract...." 768 F.2d at 24.

**\*10** According to Defendants, this measure of damages demonstrates that conflicts within the proposed class are irreconcilable with class treatment. In light of the lengthy (five-and-a-half) month proposed class period, it is extremely likely that a substantial number of the class members both purchased *and sold* soybean futures during the period in which prices were allegedly artificially high. For instance, all of the named Plaintiffs who held positions in May and July soybean futures bought and sold those futures during the alleged period of manipulation. (Surreply of Ferruzzi Trading International S.A., Ferruzzi Finanziaria S.p.A., Ferruzzi Trading U.S.A., Inc., and Central Soya Company, Inc., in Opposition to Plaintiffs' Motion for Class Certification ("Defendants' Surreply"), at 10; Ex. A to Defendants'

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.  
(Cite as: 1994 WL 114860, *10 (N.D.Ill.))

Page 8

Opposition.) The only harm to Plaintiffs who both bought and sold futures must be the difference between profit enjoyed by each trader and what he or she would have recovered in an unmanipulated market. Further, if class members who bought soybean futures at artificially high prices but did not sell them during the class period were harmed, others who sold soybean futures at artificially high prices but did not make an offsetting purchase actually benefitted.

In a similar case where defendants allegedly "cornered and squeezed" the July 1977 coffee futures contract, such a conflict between longs and shorts was fatal to class certification. In *C & S Assocs., Inc. v. Anderson, Clayton & Co., et. al,* [1977-80 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,593, at 22,464 (S.D.N.Y.1978), plaintiff investor alleged that defendants had conspired to and did manipulate the price of July 1977 coffee futures by squeezing the sellers (shorts) of the July coffee futures and cornering the July futures market. Plaintiff, which held a net short position, alleged that it was compelled to liquidate its position at artificially high prices. *Id.* at 22,465. The court observed that the proposed class included even those who liquidated their short position or who changed to a long position at any time prior to the last day of the class period. The definition in fact even included "those traders who, like some of the defendants, sold long as well as those who, like plaintiff, sold short." *Id.* Concluding that such definitions proposed by plaintiff were too wide-ranging, the court denied the motion for class action on the grounds that plaintiff investor could not describe the class with sufficient clarity.

Finally, Plaintiffs cite another securities class action, *Fry v. UAL Corp.,* 136 F.R.D. 626, 633 (N.D.Ill.1991), that, like *Spicer,* involved an alleged intra-class conflict. In *Fry,* the plaintiff class consisted of sellers of stock and sellers of put options who sustained losses from sales allegedly induced by defendant corporation's misleading statements and omissions regarding distribution. Although the price of put options ordinarily rise as stock prices fall, Judge Nordberg of this court concluded that the interests of sellers of stock and sellers of put options did not conflict because both groups sought to establish that the allegedly withheld information depressed both the market price of the stock and the value of the put options.

The court added that "any alleged conflict in the fact that [the named plaintiffs] were primarily sellers of put contracts as opposed to sellers of common stock will arise at the damages stage of the litigation and does not prevent a finding of typicality." *Id.* at 634; *see also In re McDonnell Douglas Corp. Sec. Litig.,* 98 F.R.D. 613, 620 (E.D.Mo.1982) ("[A]ny variation in damages based on the differences in price movement that may arise can be addressed later if liability is established through, for example, the creation of subclasses.").

*11 Defendants here assert that conflicts in this case present not simply different theories of liability. By definition, a class representative who has suffered no injury is not an adequate representative. *See Katz v. Comdisco, Inc.,* 117 F.R.D. 403, 407 (N.D.Ill.1987) (named plaintiff who sold more shares of stock at artificially inflated prices during the class period than he bought suffered no injury and cannot represent a class). [FN12] Plaintiffs have not effectively challenged Defendants' contention that to establish injury to themselves, named plaintiffs will need to prove that Defendants manipulated the market in such a way that other members of the class did not suffer injury.

Defendants also contend that Plaintiffs cannot satisfy the vigorous representation requirement of the adequacy test because their own purchases of futures contracts were so limited that they will have no interest in demonstrating that Defendants' conduct artificially increased prices of other futures at other times. (Defendants' Surreply, at 13.) A competent class representative must have a direct interest in proving the claims of all members of the class. [FN13] Citing *Gordon v. Hunt,* 98 F.R.D. 573 (S.D.N.Y.1983), Defendants urge that the named Plaintiffs here lack such a direct interest.

*Gordon* presents circumstances more similar to those of this case than do *Strobl* or *Fry.* In *Gordon,* which involved alleged manipulation of the silver market, the named plaintiff sought certification of a class of 10,000 persons who traded more than sixty silver futures contracts short on three exchanges between August 1979 and March 1980 and who suffered as a result. Plaintiff Gordon himself, however, traded only on one exchange during August 1979. The court concluded that it was unrealistic, under these circumstances, "to expect Gordon to have equal incentive to develop all

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.  
(Cite as: 1994 WL 114860, *11 (N.D.Ill.))

Page 9

of the intricate facts occurring after August in this exceptionally complex case...." *Id.* at 579. The court thus limited the class to those persons who sold silver futures contracts short on the same exchange on which the named plaintiff traded during the same period in August 1979 in which the named plaintiff traded. *Id.* at 580.

Defendants here note that only one named Plaintiff, Lewis Taman, was short the May contract. Taman sold one contract short on February 15, 1989, and liquidated that position the very next day by purchasing one contract. Taman's only interest, Defendants argue, is in proving that the Ferruzzi Group's conduct caused the May soybean futures price to be higher on February 16 than on February 15. Such a showing is crucial to Taman's claim, Defendants urge, but irrelevant to the claims of the other class members who were not trading on those days. It follows that Taman has no interest in proving what all other holders of short May futures positions must prove: that Defendants caused prices to rise to artificial levels during the rest of the proposed class period. Nor, add Defendants, can the class members be adequately represented by Verr, who like Taman, held a long position in the May contract but had liquidated his position by April 24.

*12 Defendants add that because none of the named Plaintiffs traded the July contract during July, none of them can adequately represent the interests of class members who did trade July futures during July. Even the Centurions, the only Plaintiff that held a short position in the July contract, liquidated that position on June 1 at a profit. Thus, Defendants contend, the Centurions suffered no injury as the result of alleged manipulation at all. In any event, Defendants urge, the Centurions lack incentive to prove that Defendants caused July futures prices to rise to artificially high levels during the final seven weeks of trading.

Plaintiffs insist that holding a position in even one futures contract provides each class representative with adequate incentive to establish that other futures were manipulated. Plaintiffs seek to distinguish their circumstances from *Gordon* on the grounds that together they have holding periods which span the entire class period. (Plaintiffs' Reply, at 10.) Yet Defendants' exhibit charting Plaintiffs' soybean futures trades for May, July, and August futures contracts between February and July 1989 demonstrates that Plaintiffs did *not* hold short or long positions in each of those three contracts over the duration of the class period. (Ex. A to Defendants' Opposition.) For instance, Plaintiffs held a short position in the May contract for only a single day. Plaintiffs also held long May futures positions only until April 24, even though the contract traded until May 19. Similarly, Plaintiffs did not hold any positions in the August future during the first four months of the class period. (Defendants' Surreply, at 13 n. 12.)

In *Smith v. Groover,* [1977-1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,935, at 23,759 (N.D.Ill.1979), plaintiffs, buyers and sellers of soybean futures contracts during an eight-year period at the CBOT's soybean pit, brought an action against defendants, individual soybean traders or brokers and the CBOT, alleging that they were injured by defendant brokers' bucketing [FN14] of customers' orders and the failure of defendant CBOT to enforce its rules. Plaintiffs moved for class certification.

As in the present case, the proposed class in *Smith* included traders in numerous contracts who held both long and short positions. Although the court concluded that this fact alone did not prohibit class treatment, it found the proposed class too broad for other reasons relevant here. *Smith* involved a class composed of traders who held both long and short positions, as well as non-position traders, such as scalpers or day traders. [FN15] Moreover, the class included traders who had liquidated their positions as well as traders who assumed and maintained their positions with regard to a particular contract. The proposed class consisted of individuals who traded in soybean futures over a very lengthy (eight-year) period. Finally, the proposed class in *Smith* included plaintiffs who "started from different positions and traded in different directions." *Id.* at 23,762. Accordingly, the court concluded that the proposed class encompassing both longs and shorts over an eight-year period span lacked the "common impact or effect" and that the class certification motion must be denied. [FN16] *Id.*

*13 Although not as lengthy as the proposed class period in *Smith,* the proposed-five-and-a-half month class period here is sufficiently lengthy such that the named Plaintiffs traded at different times, assumed



Case 1:00-cv-00793-SSB-TSH    Document 244-3    Filed 01/21/2004    Page 10 of 15

Not Reported in F.Supp.
(Cite as: 1994 WL 114860, *13 (N.D.Ill.))

Page 10

conflicting positions in the market when they traded, and traded on different contracts. In light of the significant differences among class members in attempting to prove that they suffered injuries for which Defendants are liable, named Plaintiffs have not shown that they are adequate representatives of the proposed class.

*Rule 23(b)(3): Predominance of Common Questions*

If the court declines these recommendations regarding the issues of typicality and adequacy, it must proceed to determine whether Plaintiffs' claims meet the requirements of Rule 23(b)(3). Rule 23(b)(3) authorizes class treatment where "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." This predominance test "does *not* require [the court] to sum up the common and individual issues and predict which will be greater." *Spicer,* at 95,254. Rather, the test obligates the court to find that the proposed class seeks to remedy a common legal grievance, and that the central legal and factual questions raised in this litigation are common to all class members. *Id.*

Defendants argue that common questions do not predominate here because each class member's manipulation claim will depend on the date and contract he traded. As an initial matter, they note that in order to prove that a futures contract was manipulated, Plaintiffs must establish each of the following four elements: (1) the price of the futures contracts was artificial, (2) Defendants had the ability to influence prices, (3) Defendants had the specific intent to influence prices, and (4) Defendants caused the artificial prices. *See In the Matter of Cox* [1986-87 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,786, at 34,058, 34,061 (CFTC 1987). These issues are exceedingly complex, Defendants contend, and vary from day to day and week to week.

1. *Proof That Prices Were Artificial Will Vary From Day To Day*

Defendants assert that circumstances that influencing soybeans futures prices varied on a weekly, daily, and frequently, an hourly basis. [FN17] Indeed, Defendants contend the pricing circumstances were so varied that Plaintiffs will be unable to prove that Defendants' conduct itself resulted in artificially high prices. The only way to determine whether prices are artificial, explains Defendants, is to examine the forces operating over the five and a half months of the proposed class period--"a truly monumental task." (Defendants' Opposition, at 22.) Since these factors changed on a daily, and often, an hourly basis, and since they caused a varying impact on each of the three relevant soybean contracts, [FN18] Defendants urge that the predominance of common issues cannot be established.

*14 Defendants also cite *Smith v. Groover,* [1977-1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,935, at 23,759 (N.D.Ill.1979), in support of their contention that the myriad of world factors is relevant to the prices of soybean futures. *Smith* involved alleged manipulation in the soybean futures market over an eight-year period. Defendants highlight the *Smith* court's observation that the determination of legal injury depends not only on defendants' conduct in regard to a particular futures contract, but also on "the other factors which ordinarily influence the price at which soybean futures are traded." *Id.* at 23,761.

Plaintiffs reject Defendants' "myriad of world factors" theory as a "red herring." (Plaintiffs' Reply, at 12.) Plaintiffs insist that the primary dispute here does not involve the "myriad" of legitimate weather and other factors, as reflected in soybean futures prices; rather, they contend, the focus should be on "isolating and quantifying [D]efendants' *response* to price, which [P]laintiffs believe will establish [D]efendants' illegitimate market influence, excessive speculation, and uneconomic behavior." (Plaintiffs' Response to Defendants' Surreply on Plaintiffs' Motion for Class Certification ("Plaintiffs' Response to Defendants' Surreply"), at 15.) They submit an affidavit from Agricultural Economics Professor Thomas Hieronymus, asserting that the price effect of all the supply reports, dock strikes, weather reports, and other disparate events of the 1988-89 period that were publicly reported, is assumed to be reflected in the soybean futures prices for the February 1- July 11 period. (Hieronymus Aff., Ex. A to Plaintiffs' Reply Memorandum, ¶ 7.)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.  
(Cite as: 1994 WL 114860, *14 (N.D.Ill.))

Page 11

According to Professor Hieronymus, the principal basis for assessing the amount of price artificiality here is the "false demand pressure" for soybeans that Defendants' purchasing and holding of twenty-three million bushels of soybean futures exerted upon the price and the market. (Id. ¶ 8.) Professor Hieronymus does identify several factors, evidence of which Plaintiffs would have to develop, that he would have to analyze in order for Plaintiffs to establish their claim. Indeed, Plaintiffs themselves acknowledge that they must explore each Defendant's decisions to buy soybean futures contracts before and during the class period, to hold the futures, to "roll over" their futures positions, to take delivery, to hold delivered soybeans, to dispose of such soybeans. Plaintiffs add that they must also analyze each Defendant's needs for soybeans at, between, and before each of these decisions. Plaintiffs' expert then must compare this information to assess whether Defendants were participating in bona fide hedging on any given day. (Plaintiffs' Reply, at 14-15.)

Although he admits that developing such evidence would be an "enormous task" and that an "exhaustive analysis" of Defendants' business would have to be completed, Professor Hieronymus insists that he can indeed isolate the extent to which Defendants' conduct was not economically justified and can plot the amount of speculative demand pressure exerted on soybean futures by Defendants on an "artificial demand graph." According to Professor Hieronymus, the impact of global economic events will be insignificant in these determinations.

*15 This court's review of market manipulation cases suggests that, although the courts consider the "myriad of world events" that influence the price of commodities futures, they focus attention on historical patterns, cash market prices, and illegitimate factors. See In the Matter of Indiana Farm Bureau Coop. Ass'n., Inc., [1977-80 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,796, at 27,279 (CFTC 1982) (concluding that respondent agricultural cooperative enjoyed a "natural" corner due to transportation shortages, heavy export shipments, and quality problems); In the Matter of Cox, [1977-80 Transfer Binder] Comm.Fut.L.Rep. (CCH), ¶ 23,786, at 34,058, 34,064 (CFTC 1987) ("Proof of artificiality generally has focused on significant deviations from normal historical futures market patterns and from related contemporaneous markets.") The "myriad of world events" affecting soybeans futures prices need not preclude a class action challenging transportation of those prices. The myriad of events does, however, suggest that the five-and-one-half month class period that Plaintiffs have proposed may be too unwieldy for the type of analysis Professor Hieronymus proposes.

2. *Whether Longs and Shorts Have Common Interest in Proving Manipulation or Establishing Liability*

Defendants point again to the potential intra-class conflict as inconsistent with a predominance finding. Plaintiffs contend that their assertion of a course of continuous manipulative conduct satisfies their burden of proving the predominance of common issues. Citing a recent unpublished opinion, *Petruzzi's IGA Supermarkets v. Darling-Delaware Co., Inc.*, 1992 WL 212226 (M.D.Pa. July 31, 1992), Plaintiffs' counsel urges this court to distinguish between liability issues and damages issues for purposes of the "predominance" requirement of Rule 23(b)(3). (Letter from Charles R. Watkins to Magistrate Judge Rebecca R. Pallmeyer of 12/4/92.) Mr. Watkins cites to language in that antitrust case, where the court held that "[p]roof of impact and causation can be established on a class-wide basis if all plaintiffs were victims of the same conspiracy and all were affected to one degree or another by the conspiracy." 1992 WL 212226, at *3.

In the sentence following the quoted passage, however, the court indicates that its ruling is especially applicable to the antitrust context: "Although damage amounts may vary among plaintiffs, this fact alone, *particularly in antitrust actions,* will not defeat certification." *Id.* (emphasis supplied). Since the case does not address futures trading or intra-class conflicts between longs and shorts, *Petruzzi's IGA Supermarkets* is of only limited value here. Nor did *Petruzzi* involve circumstances where, at least arguably, proof that one class member suffered injury must result in the conclusion that another did not.

*16 As in the present case, *Smith v. Groover*, [1977-1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,935, at 23,759 (N.D.Ill.1979), involved a proposed class there included traders in



Not Reported in F.Supp.     Page 12
(Cite as: 1994 WL 114860, *16 (N.D.Ill.))

numerous contracts who held both long and short positions. Not only did that class include plaintiffs who started from different positions and traded in different directions, but it also included some traders who liquidated their positions as well as others who assumed and then held a position with respect to a particular contract. *Id.* at 23,762. Without specifying any particular factor as conclusive, the court found that the predominance of common questions was absent from the action. In denying the motion for class certification, the court observed that "had plaintiffs proposed a class of smaller dimension, the factual and legal questions common to the class would have been more likely to predominate over individual questions." *Id.* at 23,761.

As in *Smith,* the proposed class here includes traders who started from different positions and traded both long and short. Such differences are reflected in significant intra-class conflicts, which preclude a finding here of predominance. Defendants' objection to class certification on this ground is well taken.

Significantly, Plaintiffs have made no attempt to address the other prerequisite of Rule 23(b)(3): that a class action represents a superior form for the fair and efficient adjudication of this controversy. This Report's recommendation that certification be denied
>obviates the need to reach the question, but we cannot overlook the serious problems of manageability that would present themselves were the action to proceed as a class action. Of course, the problems could be reduced were the size of the class reduced, but plaintiffs have come forward with no reasonable basis for dividing the class into subclasses or narrowing the class definition.

*Smith,* at 23,762. As with Rule 23(a)(4), Plaintiffs have not met their burden here of demonstrating both the predominance of common questions and the superiority of the class action.

*Subclasses*

Plaintiffs indicate in their reply brief that if "differing interests should later arise," Rules 23(c) [FN19] and (d) warrant creation of subclasses. Not until their response to Defendants' surreply (in a footnote), however, do Plaintiffs propose any basis for dividing the class into subclasses or narrowing the class definition. [FN20] *See Smith,* at 23,762. This court recognizes the possibility that a subclass might be certified or the class definition narrowed; the court, however, declines the invitation to fashion such an action where Plaintiffs' proposal has been raised for the first time in a footnote on the final page of their final brief, to which Defendants have had no opportunity to respond. As the *Smith* court acknowledged:
>We are troubled that our disposition of this motion may mean that some aggrieved class members go without a remedy. But our decision does not foreclose any absentee class members from bringing their own class action, based on a class of smaller compass and with stronger elements of commonality than the one proposed here.

*Id.*

CONCLUSION

*17 The significant differences among class members in attempting to prove injuries for which Defendants are liable prevents the named Plaintiffs from adequately representing members of the proposed class. In addition, the lengthy duration of the class period and the conflicts between longs and shorts precludes a finding that common questions predominate over the interests of class members in matters peculiar to them. Plaintiffs thus have failed to meet their burden of satisfying the Rule 23 elements of adequacy of representation and predominance of common issues. Absent a more thorough treatment by both parties on the issue of possible subclasses, certification of a smaller subclass is inappropriate. Accordingly, the motion for class certification should be denied.

>FN1. The following statement of facts is drawn from the allegations of Plaintiffs' Complaint and uncontested assertions in Defendants' opposition brief. References to other sources are cited where appropriate.

>FN2. Although the caption and body of the Complaint identify Wilbur Klein and Sonny Merrit as Plaintiffs, Plaintiffs' counsel have asserted that these two individuals are not in fact Plaintiffs in this action. (*See* Ex. C to Memorandum of Ferruzzi Trading International S.A., Ferruzzi Finanziaria S.p.A., Ferruzzi Trading U.S.A., and Central Soya Company, Inc. in Opposition to Plaintiffs' Motion for Class Certification ("Defendants' Opposition"), at



Case 1:00-cv-00793-SSB-TSH    Document 244-3    Filed 01/21/2004    Page 13 of 15

Not Reported in F.Supp.
(Cite as: 1994 WL 114860, *17 (N.D.Ill.))

Page 13

2.)

FN3. According to Plaintiffs, each July contract consisted of 5,000 bushels of specified grade soybeans: the seller of the July contract was to deliver 5,000 bushels of soybeans, and the purchaser of the July contract was to accept delivery and pay for 5,000 bushels of soybeans on or after July 20, 1989. (Complaint, ¶ 4(b).)

FN4. Although Plaintiffs' Complaint alleges that the July 5 sale involved a July contract, Defendants have produced a chart based in part upon the Centurions' Thomson McKinnon Inc. or Prudential Bache Inc. Statements indicating that the sale actually concerned an August contract. Although they submitted two subsequent memoranda, Plaintiffs have not disputed the accuracy of the information contained in Defendants' chart. (Ex. A to Defendants' Opposition.)

FN5. Hedging, which refers to the practice of buying or selling futures contracts to offset the risks of changing prices in the cash markets, is a primary economic purpose of futures markets. This risk-transfer mechanism has made futures contracts essential in attempts to limit costs and protect profit margins. Chicago Board of Trade, COMMODITY TRADING MANUAL 13 (1989).

FN6. The clearinghouse is an agency or separate corporation of a futures exchange that is responsible for settling trade accounts, clearing trades, collecting and maintaining margin monies, regulating delivery, and reporting trading data. Clearinghouses serve as third parties to all futures and options contracts-- acting as buyer to every clearing member seller and a seller to every clearing member buyer. The exchange's clearing mechanism is essential to the marketplace; hedgers and speculators rely on the clearinghouses to ensure that market participants fulfill their contract commitments. Chicago Board of Trade, COMMODITY TRADING MANUAL 15, 365 (1989).

FN7. Bona fide hedging refers, in general, to transactions or positions in a futures contract whose purpose is to offset price risks incidental to commercial cash operations. Bona fide hedging positions are established and liquidated in an orderly manner according to sound commercial practices. 17 C.F.R. § 1.3(z).

FN8. "Open interest" refers to the total number of futures contracts of a given commodity that has not yet been offset by an opposite futures transaction nor fulfilled by delivery of the commodity. Chicago Board of Trade, COMMODITY TRADING MANUAL, 374 (2d ed. 1989).

FN9. These circumstances affect not only the typicality requirement, but the adequacy analysis, as well. Analysis of whether Plaintiffs' claims are typical will, thus, overlap, to some degree, with the adequacy inquiries discussed under subsection (a)(4) below. The overlap is not complete, however, and satisfaction of the typicality criterion of Rule 23(a)(3) , will not automatically render Plaintiffs adequate class representatives for purposes of Rule 23(a)(4). The adequacy test is broader than the typicality test; a representative may have claims typical of those of other class members but may otherwise have a conflict with the class unrelated to those typical claims or may not be able to assure the competency of class counsel to prosecute the claims vigorously. *General Tel. Co. of Southwest v. Falcon*, 457 U.S 147 (1982); 1 NEWBERG ON CLASS ACTIONS, § 3.22, at 200 (2d ed. 1985). In their briefing, Defendants here have discussed the two criteria together; for purposes of isolating discrete facts or issues affecting each claim, however, this Report will address the typicality and adequacy elements separately.

FN10. In *Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1175 (7th Cir.), *reh'g denied* (1991), the Seventh Circuit described "price manipulation" as the elimination of effective price competition in a market for cash commodities or futures contracts (or both) through the domination of either demand or supply in order to produce artificially high or low prices. Broadly stated, "manipulation" punishable under the CEA is the intentional exaction of a price determined by forces other than supply and demand. *Id.* at 1175. The elements for proving manipulation, as outlined by federal court decisions, are (1) that the accused holds a controlling dominant long position in the market; (2) that the accused specifically intends to influence prices: (3) that an artificial price exists at the time of the offense; and (4) that the accused causes the artificial price. *Id.*
A "corner" refers to control or domination of the available supply of a *cash* commodity. The term "corner" is used to describe concentrations of supply

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Case 1:00-cv-00793-SSB-TSH   Document 244-3   Filed 01/21/2004   Page 14 of 15

Not Reported in F.Supp.                                                                  Page 14
(Cite as: 1994 WL 114860, *17 (N.D.Ill.))

that are obtained for the specific purpose of influencing market prices of the cash commodity or its related futures contract. The supply is "cornered," therefore, if it is captured by long futures traders for the purpose of making it unavailable to shorts for delivery, so that the shorts are forced to settle their contracts with the longs at inflated prices.

A "squeeze" generally refers to one type of manipulation, where a trader who does not have direct control over the cash crop achieves a dominant long futures position and is able to force shorts facing an inadequate cash supply to cover their positions at unfair prices. In these circumstances, the shorts are "squeezed" into settling their holdings with the dominant long at above-market prices as the delivery date approaches. *Id. See generally* P. Johnson & T. Hazen, 3 COMMODITIES REGULATION § 5.05, at 11-12 (2d ed. 1989).

FN11. Plaintiffs also cite *Goldschmidt v. Hunt*, 556 F.Supp. 123 (N.D.Tex.1983), but have not explained its relevance to the facts here. *Goldschmidt* addressed the issue of whether purchasers of futures had standing to assert antitrust claims against persons alleged to have manipulated prices; the case is not a class action, nor does it make mention of any method of establishing damages.

FN12. Plaintiffs note that the *Katz* court did certify another class representative, one who purchased stock two days before the end of the class period (Plaintiffs' Reply, at 11 n. 5); significantly, however, *Katz* and the other cases cited in footnote 5 all involve securities fraud claims, proof of which is vastly different from claims of commodities manipulation.

FN13. A significant part of meeting this qualification relates to standing concepts. Specifically, plaintiff must show that the individual injury in fact suffered arose directly from the violations charged that are common to the class. 1 NEWBERG ON CLASS ACTIONS, § 2.05, at 48 (2d ed. 1985).

FN14. "Bucketing" refers to the practice in which a broker executing a customer order takes the opposite side of the order without a customer's consent and in violation of exchange rules. See In re Wilkens, [1987-90 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,390, at 35,701 (CFTC 1989).

FN15. A scalper trades for small, short-term profits during the course of a trading session, rarely carrying a position overnight. A day trader takes positions in futures or option contracts and liquidates them before the close of the same trading day. Chicago Board of Trade, COMMODITY TRADING MANUAL, 367, 376 (1989).

FN16. The Smith opinion effectively distinguishes another commodities futures case in which a class was certified, *National Super Spuds, Inc. v. New York Mercantile Exch.*, 77 F.R.D. 361 (S.D.N.Y.1977). In *National Super Spuds, Inc.*, the class consisted of persons who had liquidated long positions in a single contract over a three-week period. *Id.* at 365-366.

FN17. Defendants present a litany of factors that affected or may have affected soybean futures prices during the relevant time period. For instance, Defendants submit that the following factors influenced soybean prices during the class period: drought in soybean-producing areas in Argentina in early 1989; delay of soybean exports resulting from a major dock strike in Brazil from March until May 1989; delay in marketing and exporting soybeans due to an expected Brazilian currency devaluation; predictions that soybean production in Indiana and Ohio would be down due to abnormally moist conditions that delayed soybean planting; USDA reports in 1989 indicating that farmers were keeping a high percentage of their soybeans off the market because of expectations that soybean prices would rise during the summer of 1989; a May 15, 1989 market sell-off in soybeans attributed to reported heavy Brazilian soybean shipments; an increase of 30,000 tons over the previous week in the quantity of soybeans to be loaded for export from the Gulf of Mexico on May 18, 1989; the Argentine government's unexpected 10 percent increase in farm export taxes on May 19, 1989; a June 23, 1989 announcement by a major Brazilian processor that it may invoke *force majeure* clauses in its contracts with customers as a result of farmer protests causing delays in soybean loading; a June 28, 1989 report that there was no loading of soybeans for export from the Gulf of Mexico; reports that as of July 6, 1989, soybeans in some locations in Iowa had gone dormant due to lack of rain; a July 10, 1989 report by a leading analyst stating that weather for the first ten days of July had not been favorable for U.S. soybean production; Argentina's July 9, 1989



Not Reported in F.Supp.  
(Cite as: 1994 WL 114860, *17 (N.D.Ill.))

Page 15

devaluation of its currency by 116 percent, which, it was reported, would encourage heavy farmer selling of soybeans; and a July 13, 1989 USDA crop report estimating that there would be 6.46 million acres of double-cropped soybeans in 1989 compared to 5.1 million acres in 1988. (Defendants' Opposition, at 21-22.)

FN18. Defendants supply an affidavit from Dr. John A. Schnittker, a consultant on matters involving agricultural economics and former Undersecretary of Agriculture, who states that cash and future prices of soybeans rise and fall in response to information regarding the current and projected supply and demand for soybeans. (Schnittker Aff., Ex. G to Defendants' Opposition, ¶ 3.)

FN19. The relevant portion of Rule 23(c) provides:
(4) When appropriate ... a class may be divided into subclasses and each subclass treated as a class,....

FN20. In their response to Defendants' surreply, Plaintiffs suggest the following subclasses:
(1) plaintiff Burns could represent a subclass of purchasers who made initial opening purchases of July or August contracts during the class period and did not sell during the class period; (2) plaintiffs Verr and Taman could represent a subclass of purchasers who made initial opening purchases of May, July, or August contracts during the class period and did sell during the class period; and (3) plaintiff Centurions could represent a subclass consisting of purchasers who were liquidating short positions. The Burns subclass would have only purchasers and no purchasers *and* sellers, *i.e.,* no "ins and outs".
(Plaintiffs' Response to Defendants' Surreply, at 19 n. 7.)
In a subsequent letter addressed to this court dated July 14, 1992, counsel for Plaintiffs stated that "Plaintiffs have not proposed subclasses here because they do not believe they are necessary. If, during or after discovery, it appears subclasses are appropriate, they can be implemented,...." (Letter from Charles R. Watkins to Magistrate Judge Rebecca R. Pallmeyer of 7/14/92, at 3.)

1994 WL 114860 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

