United States District Court, D. Maine.

Helene GIARRAPUTO, on behalf of herself and others similarly situated,
Plaintiff
v.
UNUMPROVIDENT CORP., J. Harold Chandler, James F. Orr, III, Robert E. Broatch
and Thomas R. Watjen, Defendants

**No. Civ. 99-301-PC.**

Nov. 8, 2000.

William D. Robitzek, Berman & Simmons, P.A., Lewiston, ME, Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, Robert I. Harwood, Frederick W. Gerkens, III, Daniella Quitt, Wechsler, Harwood, Halebian & Feffer, LLP, New York, NY, Norman Berman, Michael G. Lange, Berman, Devalerio & Pease, LLP, Boston, MA, Peter D. Bull, Joshua M. Lifshitz, Bull & Lifshitz, LLP, New York, NY, Steven G. Schulman, Samuel H. Rudman, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York, NY, Jack G. Fruchter, Fruchter & Twersky, New York, NY, Steven J. Toll, Lori G. Feldman, Cohen, Milstein, Hausfeld & Toll, PLLC, Seattle, WA, Herbert E. Milstein, Andrew N. Friedman, Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, DC, Jason Adkins, Adkins & Kelston, P.C., Boston, MA, Andrew L. Barroway, Schiffrin & Barroway, LLP, Bala Cynwyd, PA, Andrew M. Schatz, Jeffrey S. Nobel, Schatz & Nobel, PC, Hartford, CT, Michael J. Pucillo, Burt & Pucillo, LLP, West Palm Beach, FL, Arthur L. Shingler, Finkelstein & Krinsk, San Diego, CA, for Helene Giarraputo, plaintiff.

William D. Robitzek, Daniel E. Bacine, Robert I. Harwood, Frederick W. Gerkens, III, Daniella Quitt, Norman Berman, Michael G. Lange, Jennifer L. Finger, Berman, Devalerio & Pease, LLP, Boston, MA, Peter D. Bull, Joshua M. Lifshitz, Steven G. Schulman, Samuel H. Rudman, Jack G. Fruchter, Steven J. Toll, Lori G. Feldman, Herbert E. Milstein, Andrew N. Friedman, Jason Adkins, Andrew L. Barroway, Andrew M. Schatz, Jeffrey S. Nobel, Michael J. Pucillo, Arthur L. Shingler, (See above), for Jeannine Kirk, consolidated plaintiff.

William D. Robitzek, Daniel E. Bacine, Robert I. Harwood, Frederick W. Gerkens, III, Daniella Quitt, Norman Berman, Michael G. Lange, Jennifer L. Finger, Peter D. Bull, Joshua M. Lifshitz, Arthur L. Shingler, (See above), for Frederick Berry, Jr., consolidated plaintiff.

William D. Robitzek, Daniel E. Bacine, Robert I. Harwood, Frederick W. Gerkens, III, Daniella Quitt, Norman Berman, Michael G. Lange, Jennifer L. Finger, Peter D. Bull, Joshua M. Lifshitz, Arthur L. Shingler, (See above), for Richard Bennett, consolidated plaintiff.

William D. Robitzek, Daniel E. Bacine, Robert I. Harwood, Frederick W. Gerkens, III, Daniella Quitt, Norman Berman, Michael G. Lange, Jennifer L. Finger, Peter D. Bull, Joshua M. Lifshitz, Arthur L. Shingler, (See above), for John V. Potero Company, Inc. Profit Sharing Plan, consolidated plaintiff.

William D. Robitzek, Daniel E. Bacine, Robert I. Harwood, Frederick W. Gerkens, III, Daniella Quitt, Norman Berman, Michael G. Lange, Joshua M. Lifshitz, Steven G. Schulman, Samuel H. Rudman, Jack G. Fruchter, Steven J. Toll, Lori G. Feldman, Herbert E. Milstein, Andrew N. Friedman, Jason Adkins, Andrew L. Barroway, Andrew M. Schatz, Jeffrey S. Nobel, Michael J. Pucillo, Arthur L. Shingler, (See above), for Frank Callaway, consolidated plaintiff.

William J. Kayatta, Jr., Pierce, Atwood, Portland, ME, Gandolfo V. Diblasi, Sullivan & Cromwell, New York, NY, for Unumprovident Corp., defendant.

William J. Kayatta, Jr., Gandolfo V. Diblasi, (See above), for J Harold Chandler, defendant.

William J. Kayatta, Jr., Gandolfo V. Diblasi, (See above), for James F Orr, defendant.

William J. Kayatta, Jr., Gandolfo V. Diblasi, (See above), for Robert E Broatch, defendant.

William J. Kayatta, Jr., Gandolfo V. Diblasi, (See above), for Thomas R Watjen, defendant.

*RECOMMENDED DECISION ON DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (DOCKET NO. 16)*

KRAVCHUK, Magistrate J.

*1 Defendants UNUMProvident Corporation, J. Harold Chandler, Robert E. Broatch, Thomas R. Watjen, and James F. Orr move to dismiss Plaintiff Giarraputo's two Consolidated Amended Class Action Complaints (Docket Nos. 11 & 12) for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). The first Consolidated Amended Complaint ("Fraud Complaint") asserts claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("SEA"). (No. 11 at ¶¶ 170-180.) The second Consolidated Amended Class Action Complaint ("Disclosure Complaint") [FN1] asserts five claims based on alleged violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("SA") (No. 12 at ¶¶ 125-145) and Sections 14(a) and 20(a) of the SEA. (No. 12 at ¶¶

146-157). The claims in both complaints stem from a precipitous decline in the value of UNUMProvident's stock following negative financial disclosures made by the company in the wake of the June 30, 1999, merger between its predecessor corporations, UNUM Corporation and Provident Companies, Inc. My recommendation is that the Court DENY, subject to certain limitations, the Defendants' motion as it relates to the Disclosure Complaint, and GRANT the motion as it pertains to the Fraud Complaint.

> FN1. The filing of separate Disclosure and Fraud Complaints underscores the significant difference in the allegations. The claims in the Fraud Complaint require the Plaintiff to allege and prove that the defendant acted with scienter. *See Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1 st Cir.1996). The claims in the Disclosure Complaint, on the other hand, carry no such requirement.

### I. Factual Background

UNUMProvident Corporation ("UP") is a Delaware holding corporation. Its subsidiaries provide disability and specialty risk insurance, long-term disability insurance, life and accident insurance, health insurance and employee benefits services. UP's stock is actively traded on the New York Stock Exchange ("NYSE"). UP was formed on June 30, 1999 through the merger of UNUM and Provident, two Delaware insurance holding companies. J. Harold Chandler served as Provident's CEO and Chairman prior to the merger. From the date of the merger until November 1, 1999, Chandler was UP's President and Chief Operating Officer. Currently, Chandler is UP's President, Chief Executive Officer ("CEO") and Chairman of the Board. James F. Orr, III, served as UNUM's CEO and Chairman of the Board prior to the merger. From the date of the merger until November 1, 1999, Orr was UP's CEO and Chairman of the Board. Robert E. Broatch is UP's Chief Financial Officer ("CFO") and Senior Vice President. Prior to the merger, Broatch served as UNUM's CFO. Thomas R. Watjen is UP's Executive Vice-President of Finance. Prior to the merger, Watjen served as Provident's Vice-Chairman and CFO. (No. 12 at ¶¶ 17-21.) Helene Giarraputo is lead plaintiff for a class of plaintiffs [FN2] who were holders of record of UNUM stock or Provident stock and who purchased their shares based on allegedly fraudulent statements contained in public statements and filings and/or exchanged their shares for shares of UP's common stock on the basis of representations made in the registration statement, prospectus and joint proxy issued by UNUM and Provident on June 2, 1999 and as amended June 30, 1999. (No. 11 at ¶¶ 1 & 20; No. 12 at ¶¶ 1, 2, 16.)

> FN2. No class has yet been certified by the Court. I am merely using the parties' designations.

### A. UNUM's Aggressive Group Renewal Strategy

**\*2** Beginning in 1996, UNUM significantly reduced prices on its disability insurance products claiming that it possessed the ability to better calculate prices based on past claims experience. (No. 11 at ¶ 39.) UNUM's President, James Orr, III, described the new pricing campaign as an "aggressive group insurance renewal strategy" designed to "better match [UNUM's] policies and rates with the risk environment." [FN3] (*Id.*) The basic impact of the new strategy was a marked reduction in the premiums UNUM charged customers for its insurance products. These price reductions boosted UNUM's overall sales in 1996 by 17%, with an 11% increase in UNUM's group long term disability line ("Group LTD"). (No. 11 at ¶ 44.) By February 5, 1997, Unum issued a press release announcing strong increases in operating earnings due in large part to "improved risk management capabilities" and increased sales, including an increase of 20% in Group LTD sales. (No. 11 at 40-41.) On that date, UNUM also filed its results for fourth quarter 1996 with the SEC. Starting with that filing, and continuing through June 30, 1999, the date Unum and Provident merged, Unum made a series of quarterly and year-end filings and press reports describing phenomenal growth in its primary business unit, Group LTD. [FN4]

> FN3. According to an October 1997 press release issued by Standard & Poor, UNUM had "developed an extensive database [that allowed] for a higher degree of accuracy in [its] pricing and underwriting functions." (No. 11 at ¶ 44.)

> FN4. Giarraputo catalogues disclosures made during this period in the Fraud Complaint. (No. 11 at ¶¶ 66-107.)

Fiscal year 1997 reports were exceptional. Company-wide sales were up 15%, including a 70% increase in sales of Group LTD for fourth quarter 1997 as compared with fourth quarter 1996. (No. 11 at ¶¶ 42-43.) Group LTD, Unum's lead product, accounted for 35% of UNUM's premium revenue. (No. 11 at ¶ 44.) UNUM kept up the pace in 1998, although the overall phenomenal growth of 1997 had begun to wane. On February 9, 1999, UNUM reported results for the quarter and year ending December 31, 1998. Although UNUM touted a 14% increase in its annual operating income and double digit sales growth in its disability and life insurance lines, net income for the fourth quarter was slightly below figures for fourth quarter 1997. However, UNUM's disability insurance segment continued to grow, with a reported 10% increase in pretax operating income for 1998. The 1998 year-end report warned investors that a slight correction was on the horizon. UNUM reported that following the merger, it would increase cash reserves for its group disability segment by $230 million, before-tax,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

purportedly in order to conform its methodology for calculating the discount rate for claim reserves to the methodology used by Provident. [FN5] (No. 11 at ¶¶ 5, 86.) Orr opined to the press that "[t]his consistently strong performance keeps UNUM poised for growth when the anticipated merger with Provident occurs later this year." (No. 11 at ¶ 84.)

> FN5. A contemporaneous press release reported:
> UNUM is evaluating its various portfolio rates used to discount disability claims so that they may be more consistent with Provident's processes and assumptions. Adopting Provident's processes and assumptions would lower various discount rates and require an increase in UNUM's reserves of approximately $230 million on a pretax basis.
> (No. 11 at ¶ 86.)

Although the Aggressive Group Renewal Strategy had a positive impact on market penetration and earnings, it also had its costs. In order to properly price its insurance products, UNUM had to ensure that premiums earned would generate a fund that, together with interest, would be adequate to satisfy future claims filed by beneficiaries, as well as other expenses of operation. As it turned out, because UNUM's strategy was based on significant premium reductions, Unum incurred future policy obligations far in excess of the premiums it earned. (No. 11 at ¶ 30.) Between 1997 and 1998, even while sales data were so remarkable, losses for Group LTD nearly doubled from $124,641,000 to $243,911,000 and total underwriting losses grew from $290,511,000 to $474,001,000. (No. 11 at ¶ 60.)

**\*3** Despite this negative trend, UNUM failed to increase reserves to cover its underwriting losses during this period. Because adequate reserves were not set aside, UNUM's balance sheets reflected significantly more positive results than would otherwise have been the case. (No. 11 at ¶¶ 4-6.) During this period, UNUM made no public disclosure of the losses being incurred by the company. In all of UNUM's relevant quarterly reports, year-end reports and merger related documents, UNUM maintained that its accounting practices complied with generally accepted accounting principles ("GAAP"). Additionally, boilerplate inserted in each of Unum's SEC filings during this period represented that management periodically performed reviews of reserve estimates and assumptions and adjusted reserves when updates were required. [FN6] (No. 11 at ¶¶ 68, 72, 76, 80, 88, 92-93, 116-117, 127-128.)

> FN6. For example, UNUM's Form 10-K annual report, filed March 31, 1999, provided:
> The accompanying consolidated financial statements of UNUM have been prepared on the basis of generally accepted accounting principles.... Unpaid claims and claim expense reserves represent the amount estimated to fund claims that have been reported but not settled and claims incurred but not reported. Reserves for unpaid claims are estimated based on UNUM's historical experience and other actuarial assumptions that consider the effects of current developments, anticipated trends, risk management programs and renewal actions.... Management periodically performs a review of reserve estimates and assumptions. If management determines reserve assumption need to be updated, any resulting adjustments to reserves are reflected in current results.
> (No. 11 at ¶ 88.)

B. The Merger

Beginning in April 1998, the principals of UNUM and Provident began discussing a possible merger between their corporations. (No. 11 at ¶ 52.) On September 15, 1998, Kevin J. Tierney, Senior Vice President and General Counsel of UNUM, and F. Dean Copeland, Executive Vice President and General Counsel of Provident, met in Washington, D.C., to set the groundwork for future discussions and exchanges of information between the two companies in connection with a possible merger. The parties executed a confidentiality agreement on September 21, 1998 governing the exchange of confidential information. Beginning in October 1999, the management of UNUM and Provident began conducting due diligence investigations with the assistance of their respective agents, Morgan Stanley Dean Witter and Salomon Smith Barney. (No. 11 at ¶¶ 47-48.) By November, these discussions and investigations resulted in a mutual decision to give UNUM stockholders a buyout premium of approximately 14% based on, among other things, UNUM and Provident's relative stock prices. On November 22, 1998, UNUM and Provident executed an Agreement and Plan of Merger, subsequently amended on May 25, 1999. Pursuant to that agreement, UNUM would merge into Provident. Each outstanding share of Provident stock would be reclassified and converted into a 0.73 fractional share of UP stock. UNUM stock, on the other hand, would be converted on a 1 to 1 basis. (No. 11 at ¶¶ 49-51; No. 12 at ¶ 38). Around this date, UNUM and the Maclellan family, owners of approximately 26% of Provident's common stock, executed an agreement providing that the Maclellans would vote in favor of the merger provided that the companies did not reduce the Provident exchange ratio below 0.73. (No. 11 at ¶ 159; No. 12 at ¶ 39.)

On November 23, 1998, word of the planned merger hit the airwaves in advance of trading on the NYSE. By the end of

the day, UNUM and Provident's stock prices jumped by approximately 9% and 12%, respectively. (No. 12 at ¶ 42.) On June 2, 1999, UNUM and Provident sent a Joint Proxy Statement and Prospectus to their respective shareholders, informing them of stockholders' meetings scheduled for June 30, 1999 at which stockholders would be requested to vote on a proposal to adopt the merger agreement. The Joint Proxy Statement and Prospectus recommended that stockholders cast their votes in favor of the merger. (No. 12 at ¶¶ 41, 44.) The Proxy Statement informed shareholders that beginning October 19, 1998 representatives of Unum and Provident and their professional advisors had exchanged financial and other information and conducted due diligence and negotiations regarding definitive documentation for the proposed Merger. (No. 12 at ¶ 46.) The Proxy also informed stockholders that Unum recorded a special charge of $101 million in the first quarter of 1999 to increase reserves "for estimated losses in the Lloyd's of London syndicates and certain reinsurance pools, as well as a write-down of goodwill." (No. 12 at ¶ 95.) The Merger Agreement, which was incorporated in the Joint Proxy/Prospectus, represented:

> *4 Except as disclosed in the UNUM SEC Documents filed and publicly available prior to the date of this Agreement, [November 22, 1998,] since the date of the most recent audited financial statements ... there has not been ... any material adverse change in UNUM [or] any change in accounting methods ... materially affecting its assets, liabilities or business....

The Merger Agreement defined a material adverse change as "any change, effect, event, occurrence or state of facts that ... is, or is reasonably likely to be, materially adverse to the business, financial condition or results of operations of such party and its subsidiaries taken as a whole...." (No. 11 at ¶¶ 97-98; No. 12 at ¶¶ 72-73; Merger Agreement, Tab I, Appendix A at A-13, § 3.02 .) Furthermore, the Agreement disclosed:

> Except for liabilities and obligations incurred in the ordinary course of business consistent with past practice since the date of the most recent consolidated balance sheet included in the UNUM SEC Documents, neither UNUM nor any of its subsidiaries has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by U.S. generally accepted accounting principles to be recognized or disclosed on a consolidated balance sheet of UNUM and its consolidated subsidiaries or in the notes thereto.

(No. 11 at ¶ 101.) The Joint Proxy Statement separately informed shareholders that the companies had performed due diligence reviews of one another prior to execution of the Merger Agreement. In particular, Provident stockholders were assured that "[i]n reaching the determination that the terms of the merger were fair to and in the best interest of Provident and its stockholders, the Provident board of directors also considered a number of additional factors, including ... its management's reports concerning the results of its due diligence investigation of UNUM." (No. 11 at. ¶ 104.) On the same date, Provident filed a Form S-4 Registration Statement with the SEC, which represented, *inter alia,* that due diligence had been conducted regarding the merger without any limitations or restrictions. (No. 11 at ¶ 10.) On June 30, 1999, the companies' shareholders voted in favor of the merger. (No. 11 at ¶¶ 54-55.)

C. Post-Merger Disclosures

Contrary to the due diligence assurances contained in the registration statement, joint proxy statement and prospectus, a post-merger report issued in July by Morgan Stanley Dean Witter reported that Unum and Provident had expressly limited their due diligence reviews prior to the Merger. (No. 11 at ¶ 10.) On August 2, 1999, UP reported results for the second quarter ended June 30, 1999. UP reported a moderate decline in UNUM's second quarter 1999 net operating income to $156.4 million as compared with $168.7 million earned in second quarter 1998. However, net losses for the quarter far exceeded income for a resulting net loss for the quarter totaling $191.2 million. UP explained the loss as due to after tax charges of $112 million for merger-related expenses, $81.8 million for early retirement offers to employees, and $156.5 million [FN7] for a "portfolio discount rate charge ... to change UNUM's process and assumptions used to calculate the discount rate for claim reserves to those used by Provident." (No. 11 at ¶ 109.) UP explained that UNUM had experienced "lower results in group disability due to higher claims incidence in the second quarter 1999 relative to one year ago." (*Id.*)

> FN7. $240.7 million pretax, which is only $10 million more than the $230 million warned of on February 9, 1999. Giarraputo incorrectly says the August 2 figure was $45.8 million higher. (No. 11 at ¶ 110.) According to a Morgan Stanley analyst's report, the increase was intended to compensate for lower interest rates. (No. 12 at ¶ 98.)

*5 The following day UP's stock fell from $51.688 to $33.50. Analysts reported that in second quarter 1999 UNUM experienced "more claims, and a longer duration of claims, in a block of group disability insurance that insures hospital employees, and in another which insured manufacturing company employees." Analysts suggested that management was hinting at further charges to income such as increases of reserves. (No. 11 at ¶ 112.) On August 3, 1999, a Morgan Stanley Analyst Report stated, "Management said it is just reviewing these issues now, because some data could not be shared between the two companies until their Merger closed and it aims to have definitive answers by year-end." (No. 12 at ¶ 51.) On the same date, Merrill Lynch expressed concern over these

developments:
> This is an extremely disconcerting development because it suggests that the reserve actions taken to date (the claims disruption reserve and the discount rate change) were not nearly as conservative as we had hoped. We were confident, for example, that Provident's experience with the Paul Revere [FN8] merger suggested that management would take the necessary reserve actions up-front to account for potential future problems. However, now we question how appropriate due diligence could have been performed from the standpoint of both UNUM and Provident given that there still seems to be significant uncertainty about the adequacy of reserves.
>
>> FN8. In 1996, Provident had acquired the Paul Revere Corporation, another insurance company, which acquisition was delayed by one year following a due diligence analysis that revealed Paul Revere's reserves were inadequate by $380 million. (No. 12 at ¶¶ 53-60.)

(No. 12 at ¶ 102.) By August 16, 1999 it appeared that UP would post a charge of approximately $300 million to shore up reserves for disability claims. (No. 11 at ¶ 113.) The eventual announcement came on September 29, 1999. However, prior to that event, between August 12, 1999 and August 25, 1999, Chandler exercised options to purchase 842,600 shares of UP stock, paid for through the sale of 444,314 UP shares he already held. [FN9] This transaction was valued at over $16 million. (No. 11 at ¶ 115.) One month later, the September 29 press report informed the market that UP might post a charge of $250 to $500 million in the third quarter.

> FN9. As of July 10, 1999, Chandler beneficially owned 2,313,996 shares of UP stock. (No. 11 at ¶ 168.)

Between September 30, 1999 and October 20, 1999, Giarraputo and fellow class members each filed a class action complaint against UP and the individual defendants. [FN10]

> FN10. These complaints were filed by Giarraputo, 99-301-P-C; Kirk, 99-311-P-C; Berry, 99-315-P-C; Bennett and Callaway, 99-316-P-C; and Potero, 99-324-P-C. See Order Appointing Lead Plaintiff and Lead Counsel at 2. (Docket No. 9.)

On November 1, 1999, UP issued a press release reporting its third quarter 1999 results. The company reported special charges totaling $623.7 million before-tax. Of this amount, $359.2 million consisted of an increase in reserves for UP's domestic Group LTD unpaid insurance claims. (No. 11 at ¶¶ 11, 121, 126.) This charge reflected an "increase in policy and contract benefit liabilities primarily result[ing] from revisions to assumptions for claim termination rates and incurred but not reported ... factors...." (No. 12 at ¶ 106.) Also contributing to the $623.7 million charge was $222 million for "the impact of the previously announced agreement to sell the reinsurance management operations," including a write-off of "impaired unamortized goodwill" and $42 million in additional "merger costs." (*Id.;* No. 11 at ¶ 9.) Discussing these charges November 7, 1999, Chandler opined that the company had "responded with the right financial adjustments." (No. 11 at ¶ 124.)

**\*6** On January 3, 2000, this Court issued an Order Appointing Lead Plaintiff and Lead Counsel, which ordered, *inter alia,* that Giarraputo, as lead plaintiff, "serve upon the Defendants a single, consolidated, amended class action complaint [to] supercede all existing complaints...." (Docket No. 9 at ¶ 8.)

UP announced its fourth quarter and year-end results for 1999 on February 9, 2000. For the year, UP realized an overall net loss of $182.9 million compared with an overall net income of $617.4 million in 1998. (No. 11 at ¶ 130.) Sales for the quarter were down 25% and UP acknowledged that its products had been underpriced in 1998. On February 10, UP's stock closed at $15.8125, down 39% from the previous day's close of $25.6875. By the close of business on February 11, 2000, UP's stock price dropped to close at $14.625, almost 72% lower than the August 2, 1999 price of $51.668. (No. 11 at ¶ 12.) The Wall Street Journal ("WSJ") issued a report on these developments on February 11, 2000.
> For much of the last year, the bad news at UNUMProvident ... largely centered on unfavorable developments in the group-disability business of the former UNUM Corp. "UNUM was in a lot worse shape than anybody believed in their wildest nightmare," said Colin Devine, an analyst with Salomon Smith Barney.... The company said it is boosting prices as it renews business that was underpriced and has dedicated itself to repairing relationships with the disaffected brokers.... The company now has a "credibility issue," said Brian Rogers, manager of T. Rowe Price Equity Income Fund, who nonetheless has opted to hold onto his shares. "A legitimate question is, 'Does management really know what's going on?"' he said.

(No. 11 at ¶ 133; No. 12 at ¶ 110.)

### D. Giarraputo's Complaints

On February 23, 2000, Giarraputo filed two Consolidated Amended Class Action Complaints. (Docket Nos. 11 & 12.) Giarraputo's complaint presents distinct types of claims. The claims in the Fraud Complaint present fraud claims based on the use of "manipulative and deceptive devices" in connection with the sale of registered securities in violation

of Section 10(b) of the SEA and SEC Rule 10b-5 promulgated thereunder. [FN11] The claims in the Disclosure Complaint present claims for false or misleading statements or omissions contained in UP's registration statement and prospectus (Sections 11 and 12(a)(2) of the SA [FN12]), and in UNUM and Provident's Joint Proxy Statement (Section 14(a) of the SEA [FN13]).

> FN11. *See* 15 U.S.C. § 78j (1997); 17 C.F.R. § 240.10b-5. *See also* 15 U.S.C. § 78t(a) (1997) (providing for joint and several liability for controlling persons).

> FN12. *See* 15 U.S.C. §§ 77k & 77l (1997); *see also* 15 U.S .C. § 77o (1997) (providing for joint and several liability of controlling persons).

> FN13. *See* 15 U.S.C. § 78n(a) (1997).

II. *Discussion*

Defendants attack the sufficiency of the allegations in both complaints on four principal grounds. First, Defendants argue that Plaintiffs have no standing to assert "most of the claims alleged in the complaints." (Motion to Dismiss, Docket No. 16, at 44-48, hereinafter "M/D".) Second, Defendants maintain that the "heightened pleading" requirements of Rule 9(b) of the Federal Rules of Civil Procedure require dismissal of both complaints. (M/D at 19-21.) Third, Defendants argue that there is no evidence of a material misstatement or omission that could support the claims in either complaint. (M/D at 18-43.) Fourth, they argue that the allegations on which the claims in the Fraud Complaint rest are insufficient because no facts support a strong inference of scienter. (M/D at 5-18.)

**\*7** One of the greatest challenges in analyzing a case of this size and complexity lies in organizing the many alleged facts and legal issues involved. I have chosen to depart not only from the order in which the issues are presented in the motion, but also from its format. First, I will discuss the issues raised by the motion as they pertain to the Disclosure Complaint. Included within that discussion will be references to the "heightened pleading" requirement of the Private Securities Litigation Reform Act of 1995 ("PSLRA") as it pertains to Section 14(a) of the Securities Exchange Act, which forms the basis of Counts IV and V of the Disclosure Complaint. I will then address the relevant issues pertaining to the Fraud Complaint, most significantly, the issue of "scienter."

A. THE DISCLOSURE COMPLAINT

The Disclosure Complaint asserts three Securities Act ("SA") claims and two SEA claims. Count I is a claim pursuant to Section 11 of the SA for allegedly untrue statements of material fact and omissions of material fact made in registration statements filed with the SEC, *see* 15 U.S.C. § 77k, which is asserted against UP, Chandler and Watjen. Count II is a claim pursuant to Section 12(a)(2) of the SA for allegedly untrue statements of material fact and omissions of material fact made in the prospectus, *see* 15 U.S.C. § 77l, which is asserted against all defendants. Count III is a derivative claim to Counts I and II pursuant to Section 15 of the SA against the individual defendants as "controlling persons," *see* 15 U.S.C. § 77o. Count IV is a claim pursuant to Section 14(a) of the SEA for illegal solicitation of proxies, *see* 15 U.S.C. § 78n(a), in violation of SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, which is asserted against all defendants. Count V is a derivative claim to Count IV pursuant to Section 20(a) of the SEA against the individual defendants as "controlling persons," 15 U.S .C. § 78t(a).

> Sections 11 and 12(a)(2) are enforcement mechanisms for the mandatory disclosure requirements of the Securities Act of 1933. Section 11 imposes liability on signers of a registration statement, and on underwriters, if the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. Section 12 [ (a) ](2) provides that any person who "offers or sells" a security by means of a prospectus or oral communication containing a materially false statement or that "omits to state a material fact necessary to make the statements, in the light of the circumstances under which they were made, not misleading," shall be liable to any "person purchasing such security from him." 15 U.S.C. § 77l (2).

*Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1201 (1st Cir.1996). Similarly, Section 14(a) of the Exchange Act provides a private remedy for shareholders against parties soliciting votes through a proxy statement containing false or misleading statements regarding a material fact or omitting material facts necessary to make the statements therein not false or misleading. *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9; *Royal Business Group, Inc. v. Realist, Inc.,* 933 F.2d 1056, 1059 (1st Cir.1991).

1. Threshold Standing Considerations

a. The "Provident Class"

**\*8** The Defendants argue that the Provident class, those plaintiffs whose Provident stock was reclassified as UP stock after the Merger, have no standing to bring claims pursuant to Section 10(b) of the SEA or Sections 11 and 12 of the SA because they did not "purchase," "sell" or "acquire" securities, but rather, maintained Provident securities that were reclassified as UP securities. (M/D at 44.) The analysis of this issue varies somewhat based on the type of claim that is under consideration. I will address my

attention only to the Section 11 and 12 claims.

The Defendants argue that Provident stockholders could not have Section 11 and 12 claims because they could not have acquired securities pursuant to an allegedly defective registration statement or prospectus. (M/D at 45-46.) Among the cases they cite for support is *Gustafson v. Alloyd Co.,* 513 U.S. 561 (1995). That case has nothing to do with the Defendants' standing argument. In *Gustafson,* the Supreme Court considered whether a Section 12 claim could be maintained by plaintiffs purchasing stock through a private contract rather than a public offering. The Court concluded it could not, because a contract through which a private sale of securities is accomplished is not a "prospectus" for purposes of Section 12. *See id.* at 566 & 584. The next case they rely on is *Maldonado v. Dominguez,* 137 F.3d 1 (1st Cir.1998). There the First Circuit Court of Appeals considered whether plaintiffs had purchased stock in the Puerto Rico International Bank through a private placement or a public offering. *See id.* at 3 & 8. Because the Court concluded the placement was private, plaintiffs' Section 12 claim was dismissed. *See id.* at 8. Finally, *Barnes v. Osofsky,* 373 F.2d 269 (2d Cir.1967), merely stands for the unremarkable proposition that a Section 11 claim is only available to a party that purchases newly registered stock, but not to a party who owns *previously issued stock* in the corporation. *See id.* at 271-72. Clearly, Provident stockholders exchanged their shares for shares in a new company, UNUMProvident.

Those plaintiffs who exchanged Provident stock for UP stock based on allegedly false or misleading information in the registration statement (Section 11) or prospectus (Section 12) have standing to bring these claims.

b. *"Aftermarket" purchasers' Section 11 and 12 claims*

Defendants argue that any plaintiffs in this case who purchased stock in UP on the open market and not directly from the issuer in the primary distribution [FN14] have no standing to assert Section 11 or Section 12 claims with respect to such "aftermarket" shares. (M/D at 46-47.)

> FN14. "A primary distribution is a public offering made on behalf of the issuer. The proceeds realized from the offering [are] available to the issuer to be used for corporate purposes. A secondary distribution broadly defined is one made on behalf of some person or persons other than the issuer." 3A HAROLD S. BLOOMENTHAL, SECURITIES AND FEDERAL CORPORATE LAW, § 6.03, p. 4 (1988). "Trading in securities involves transactions by someone other than an issuer; it assumes that the securities are presently outstanding and are being bought and sold in the organized securities market." *Id.* at § 6.04, p. 5.

(i.) Section 11 Claims

In the Section 11 context, the only Circuit Court to have addressed the issue squarely on point is the Tenth Circuit. *See Joseph v. Wiles,* No. 99-1258, 2000 WL 1089514 (10 th Cir. Aug. 4, 2000) (citing District Court cases on both sides of the issue). [FN15] The Court of Appeals for the Tenth Circuit holds that a Section 11 action is not limited to those who purchase in an initial offering; that an action is available to those who purchase in the secondary market as well, so long as the stock purchased originated from the offering covered by the false registration statement. *See id.* at *3- *4. Without belaboring the issue, I agree with this conclusion for the reasons stated in the opinion: (1) the statutory language is clearly broad enough to include such plaintiffs ("any person acquiring such security"); (2) Section 11(a) envisions plaintiffs who acquire securities more remotely than 12 months after the filing of the registration statement; and (3) the damages provision of Section 11(e) would otherwise contain superfluous language. *See id.* at * 4.

> FN15. The Tenth Circuit contends that the "federal courts of appeal addressing the issue have agreed that section 11 covers aftermarket purchasers." *Wiles* at *3 (citing *Versyss Inc. v. Coopers & Lybrand,* 982 F.2d 653 (1 st Cir.1992) and *Barnes v. Osofsky,* 373 F.2d 269 (2d Cir.1967)). Based on my reading, the issues presented in *Versyss* and *Barnes* are distinguishable: *Versyss,* because the plaintiff was a corporation buying all of another corporation's outstanding registered stock; and *Barnes,* because the plaintiff sued with respect to stock already registered and traded on the market and not with respect to the stock newly issued pursuant to the false registration statement. Thus, to the extend that the language in these opinions supports extension of the Section 11 action to open market purchasers who can trace their stock to the false registration statement, it is *obiter dicta.* In its brief, the Defendants quote *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272 (3d Cir.1992), *cert. denied,* 506 U.S. 934 (1992), out of context and claims that it supports nonrecognition of Section 11 standing. It does not. A reading of the paragraph containing the quote and the preceding paragraph makes clear that the Third Circuit allows plaintiffs to trace their shares to a registration statement when they are not purchased in the initial offering. However, this is *dicta* because the "secondary market" shares at issue in *Shapiro,* like in *Barnes,* were shares already issued on the date of the registration statement. *See id.* at 285-86.

(ii) Section 12(a)(2) Claims

**\*9** Unlike the broad language of Section 11, the language of Section 12(a)(2) suggests that a purchaser of a registered security on the open market could not sue the issuer because the issuer was not the immediate seller of the security. *See* 15 U.S.C. § 77l ("Any person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement ... shall be liable ... to the person purchasing such security *from him* ) (emphasis added). Pursuant to a plain reading of this language, an issuer would be insulated from liability to a purchaser of an issued security if the issuer did not sell the security directly to the purchaser. *See Pinter v. Dahl,* 486 U.S. 622, 644 n. 21 (1988) ("[A] buyer cannot recover against his seller's seller."); *see also Shaw,* 82 F.3d at 1215-16 (holding that party purchasing issuer's securities from underwriter had no Section 12(a)(2) claim against issuer).

Based on the foregoing, it is my recommendation that those plaintiffs having purchased UP securities on the open market have standing to bring a claim pursuant to Section 11 but not pursuant to Section 12(a)(2) of the Securities Act.

*2. Pleading Requirements of Rule 9 and the Private Securities Litigation Reform Act*

The Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure require heightened specificity in pleadings alleging securities fraud pursuant to the provisions of the Securities Exchange Act. *See* 15 U.S.C. § 78u-4(b)(1) (1997); Fed.R.Civ.P. 9(b). Pursuant to the PSLRA and Rule 9(b), plaintiffs asserting claims for securities fraud must specify the time, place and content of all allegedly false representations. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 193 (1 st Cir.1999) ("Our previous strict pleading requirements under Rule 9(b) are ... consistent with the PSLRA.").

> Rule 9 imposes a heightened pleading requirement for allegations of fraud in order to give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage "strike suits," and to prevent the filing of suits that simply hope to uncover relevant information during discovery.

*Doyle v. Hasbro, Inc.,* 103 F.3d 186, 194 (1 st Cir.1996). The issues presented in the Disclosure Complaint are not so simply stated.

*a. Securities Act Sections 11 and 12(a)(2)*

There is no question but that Rule 9 and the PSLRA's pleading requirements apply to Giarraputo's fraud complaint. However, the PSLRA does not place a parallel provision to § 78u-4(b) in the Securities Act. Moreover, "Fraud is not an element of a claim under either Section 11 or 12(a)(2) [of the Securities Act], and a plaintiff asserting such claims may avoid altogether any allegations of scienter or reliance." *Shaw,* 82 F.3d at 1223. For these reasons, the heightened pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA do not generally apply to Section 11 and Section 12(a)(2) claims. However, "if a plaintiff were to attempt to establish violations of Sections 11 and 12(a)(2) as well as the anti-fraud provisions of the Exchange Act through allegations in a single complaint of a unified course of fraudulent conduct, fraud might be said to 'lie[ ] at the core of the action." ' *Id.* In such a case, the pleading requirements of Rule 9(b) could be applied to claims based on Sections 11 and 12(a)(2).

**\*10** The Defendants argues that Giarraputo's Disclosure Complaint challenges the same "course of conduct" as her Fraud Complaint so that Rule 9(b) applies to it the same as it does to the Fraud Complaint. (M/D at 21.) The Defendants cite a handful of cases in which Rule 9(b) was applied to complaints containing Sections 11 and 12 claims that "drip[ped] with allegations of intentional misconduct," *Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.,* 68 F.Supp.2d 480, 487 (D.N.J.1999), or contained allegations "which, if proven would constitute fraud," *Hershey v.. MNC Financial, Inc.,* 774 F.Supp. 367, 375 (D.Md.1991), or contained allegations that defendant, *inter alia,* "issue[d] Notes to an unsuspecting public[, and] manipulated the market", *In re Computervision Corp,* 869 F.Supp. 56, 64 (D.Mass.1994). [FN16]

> FN16. The Defendants also cite *In re Websecure, Inc., Sec. Litig.,* 182 F.R.D. 364 (D.Mass.1998). *Websecure* does not aid the Defendants. In *Websecure,* the District Court held that Rule 9(b) was inapplicable to the plaintiffs' §§ 11 and 12 claims because "[n]owhere in the complaint is there any allegation of scienter...." *Id.* at 367.

The dividing line between allegations regarding false or misleading statements and omissions and allegations of fraud consists of scienter. Although the Defendants complain that Giarraputo has merely "sanitized" the fraud allegations in order to put together her Disclosure Complaint, they do not point to any particular allegations in the Disclosure Complaint that suggest fraudulent conduct. My independent review of the Disclosure Complaint does not reveal allegations suggesting a fraudulent course of conduct. Giarraputo has appropriately separated her disclosure claims from her fraud claims in separate complaints to avoid tainting her disclosure claims with allegations of fraudulent conduct. By doing so, she not only has avoided potentially adverse consequences that could result from blending the factual allegations, she has also ensured that, should the fraud complaint be dismissed, the disclosure complaint can proceed without a risk that the defendants' reputations would be exposed publicly to

meritless fraud claims.

*b. Securities Exchange Act Section 14(a)*

The heightened pleading requirements of the PSLRA apply to "any private action arising *under this chapter* [that] alleges the defendant ... made an untrue statement of material fact...." 15 U.S.C. § 78u-4(b)(1)(A) (emphasis added). Giarraputo's Section 14(a) claim arises "under this chapter" and is based on untrue statements of material fact even though it does not allege fraud. Accordingly, Giarraputo must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading...." *Id.* This she has done with sufficient specificity in all respects save one. *(See Disclosure Complaint,* Docket No. 12, ¶ 3, ¶¶ 44-96.)

*c. Section 14(a) "Standing" for the Unum Class*

The Defendants contend in the "standing" section of its brief that Giarraputo has failed to allege an injury traceable to a misstatement or omission in the Joint Proxy. (M/D at 47.) Contrary to the Defendants' motion, this is not a standing issue. Rather, this is an argument that calls into question the sufficiency of Giarraputo's pleadings with respect to the elements of a Section 14(a) claim, specifically, causation of injury.

**\*11** Section 14(a) of the SEA and Rule 14a-9 make it unlawful to solicit proxies by means of a materially false or misleading proxy statement. The Supreme Court has recognized this section as providing a private right of action. *See J.I. Case Co. v. Borak,* 377 U.S. 426, 430-31 (1964). As part of a Section 14(a) claim, a plaintiff must "establish a causal nexus between [her] alleged injury and some corporate transaction authorized (or defeated) as a result of the allegedly false and misleading proxy statements." *Royal Business Group,* 933 F.2d at 1063. Thus, in this case, Giarraputo and the other class members must allege how they were injured by the transaction their votes authorized; in other words, how consummation of the merger caused them injury. *See id.*

According to the Defendants, the UNUM class "has not-and cannot-allege any damages" as a result of an allegedly false proxy, because overvaluation of UNUM meant that members of the UNUM Class received more shares in UP than they deserved. Looking to the Disclosure Complaint for an allegation of an injury related to the consummation of the merger, Paragraph 151 provides, "Had the Individual Defendants disclosed in the Joint Proxy the conduct described herein, there is a substantial likelihood that neither the UNUM nor the Provident shareholders would have voted for or given their proxies in favor of the Merger."

I agree with the Defendants that the Disclosure complaint does not set forth allegations tending to show how the UNUM class was injured as a result of the consummation of the merger. I conclude that Giarraputo fails to establish the existence of a Section 14(a) claim for former shareholders of UNUM because the complaint does not set forth any set of facts or permit an inference that UNUM shareholders would have been better off had the merger not been consummated. By way of contrast, I do draw a clear inference from the incorporated allegations of the Disclosure Complaint that Provident shareholders suffered injury by merging with UNUM because, according to the complaint, UNUM was materially overvalued. I therefore recommend that the UNUM class's Section 14(a) claims be dismissed.

*3. Materiality of Any Misstatement or Omission*

Giarraputo brings her claims under Sections 11, 12(a)(2) and 14(a) based on false or misleading statements and omissions regarding material facts in the registration statement, prospectus and proxy statement filed or issued on June 2, 1999 in connection with the June 30, 1999 merger and the stock offering related to it. According to Giarraputo, these documents contained the following materially false and misleading statements or omitted the following material facts:

> (a) statements that UNUM and Provident completed due diligence prior to the Merger when, in fact, their due diligence was expressly limited in scope, and, most important, did not include a review of UNUM's reserves;
> (b) statements that the companies had not experienced any significant material negative change that would have an adverse effect on the Company going forward when, in fact, the Company needed to take almost $300 million in additional, undisclosed charges, a mere 32 days after the last amendment to the Joint Proxy, in order to increase reserves for group disability claims;
> **\*12** (c) [omission from] UNUM's financial statements, which were incorporated by reference in the Joint Proxy, ... that UNUM was severely under- reserved for group disability claims which required that substantial charges be taken after the merger in order to increase reserves;
> (d) [omission of statements] that the roughly $600 million in additional charges for various other items, such as additional merger costs and exiting of the reinsurance business, would have a disastrous effect on the quarterly earnings and the other financial results of the combined company following consummation of the Merger; and
> (e) [omission of statements that UNUM] failed to disclose adverse trends in sales of new and renewal disability insurance policies, because the Company was abandoning its policy of severely underpricing such policies, causing policyholders to contract with competitors.

(No. 12 at ¶ 45.) I note that the differences between some of these separate allegations are smaller than their similarities. For that reason, I address (b), (c) and (e) collectively as "adequacy of reserves" claims. The other categories that I identify and that the parties identify in their pleadings are "due diligence" and "other unannounced charges to reserves." I address the adequacy of reserves first because I consider the "due diligence" claim to depend on the materiality of the reserves issue. I then turn to the due diligence issue and the issue of the "cost of exiting the reinsurance business," in that order. Before I begin this discussion, however, I note that the Defendants' motion fails to address the materiality issue apart from the fraud issue. Virtually all of the cases they cite in their motion involve fraud claims subject to the heightened pleading requirements of Rule 9(b). Thus, for instance, the Defendants argue that, at best, Giarraputo pleads merely corporate mismanagement, which is not actionable under federal securities law unless the defendant knew of the mismanagement and materially misrepresented its occurrence. (M/D at 23-24.) I found this approach to the issues unhelpful to my analysis. The Defendants' "mere mismanagement" argument clouds what should be distinct legal analyses by conjoining the materiality issue with arguments that Giarraputo failed to adequately plead a case of *intentional* misrepresentation of known mismanagement (*i.e.,* scienter). [FN17] Nevertheless, I have attempted to cull materiality arguments from the Defendant's motion.

> FN17. All but one of the cases the Defendants cite that support its "poor reserve estimates as mere mismanagement" argument address, quite specifically, Section 10(b) claims and, for this reason, are not addressing simply the "materiality" of improper reserve estimates. *See Serabian v. Amoskeag Bank Shares,* 24 F.3d 357, 361 (1 st Cir.1994); *In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 927* (9 th Cir.1993); *Vachon v. BayBanks, Inc.,* 780 F.Supp. 79, 80 (D.Mass.1991); *Wilkes v. Heritage Bancorp, Inc.,* 767 F.Supp. 1166, 1168 & 1170-71 (D.Mass.1991); *Haft v. Eastland Financial Corp.,* 755 F.Supp. 1123, 1126-31 (D.R.I.1991). The exception, *Akerman v. Bankworcester Corp.,* 751 F.Supp. 11 (D.Mass.1990), is completely unhelpful because there dismissal was based on the fact that the complaint "does little more than allege that each quoted section was a misrepresentation or omission of a material fact." *Id.* at 13.

The materiality component of Giarraputo's claims is a straightforward one. "[I]nformation is 'material' only if its disclosure would alter the 'total mix' of facts available to the investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision." *Milton v. Van Dorn Co.,* 961 F.2d 965, 969 (1st Cir.1992) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988)); *see also Cooperman v. Individual, Inc.,* 171 F.3d 43, 49 (1st Cir.1999). "When a corporation does make a disclosure-whether it be voluntary or required-there is a duty to make it complete and accurate." *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1 st Cir.1987). "The task of deciding whether particular information is subject to mandatory disclosure is not easily separable from normative judgments about the kinds of information that the securities laws should require to be disclosed, which depend, in essence, on conceptions of materiality." *Shaw,* 82 F.3d at 1202-03.

**\*13** [T]he question of whether an omission or misleading statement is material "is normally a jury question and should not be taken from it unless the court has engaged in meticulous and well articulated analysis of each item of withheld or misrepresented information." *SEC v. Seabord Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982). *See also Milton,* 961 F.2d at 970 (" '[T]he [objective] determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of [undisputed] facts and the significance of those inferences to him and those assessments are peculiarly ones for the trier of fact." ') (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976)).

*Lucia v. Prospect Street High Income Portfolio,* 36 F.3d 170, 176 (1 st Cir.1994). "A complaint may not properly be dismissed pursuant to Rule 12(b)(6) ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

*a. Adequacy of Reserves*

Defendants argue that claims based on "inadequate" reserve estimates must allege that the inadequate estimates differed materially from contemporaneous internal estimates. (M/D at 23-25.) But this is precisely what Giarraputo has alleged: that Unum should have known that reserves were materially inadequate based on specific increases in disability losses, thereby making false or misleading the financial statements contained in the registration statement, prospectus and proxy statement that there had been no material changes in UNUM's financial condition. Addressing the materiality of reserve estimates for claims based on §§ 10(b), 11 and 12(a)(2), the Third Circuit has observed that:
> A reasonable investor might well be willing to take some chances with regard to the future of the economy, but might be quite unwilling to invest in a company that knew that its reserves were insufficient under current conditions and knew it would be taking another major write-down in

the near future. *In Re Westinghouse Sec. Litig.,* 90 F.3d 696, 709-10 (3d Cir.1996). Still, the Defendants argue that the facts alleged cannot meet the materiality standard because the complaints do not explain what the company's reserves were or what they should have been, (M/D at 27), and because the eventual $359 million adjustment to reserves in November 1999 comprised only about 3.9% of Unum's overall reserves, and less than 1.5% of UP's reserves, (M/D at 27-28) (citing UP 2Q 1999 Form 10-Q, at 3). Although all of the cases Defendants cite in support of these specificity arguments are fraud cases applying the strict pleading requirements of Rule 9(b), which are not applicable here, I consider it reasonable to draw the inference that Unum's reserves were understated, as of the date of the Joint Proxy's issuance and amendment, by exactly $359 million. The Defendants cite *Gassman v. Computervision,* 90 F.3d 617, 633 (1 st Cir.1996), for the proposition that a "minor drop of a few percent is not adequate to support a claim." *Gassman* is a case presenting claims under Sections 11 and 12(a)(2), but it is one in which the plaintiffs alleged fraud. Thus, the Court's discussion occurs within the context of the pleading requirements of Rule 9(b). *See id.* at 621 n. 6 & 624. Furthermore, *Gassman* involved a claim that a "soft" disclosure describing backlog levels as "unusually low" was misleading because "hard" numbers were not provided to investors. *See id.* at 633. The Court rejected the claim based on the principle that "[w]here a variable, although material, is of only minor predictive value, disclosure of a rough estimate of that variable's value can obviate the need for more specific disclosure." *Id.* Although $359 million may have been a relatively small percentage of Unum's or UP's *overall* reserves on either June 2 or June 30, 1999, it bears a far greater significance in relation to UNUM's Group LTD figures and to loss and income figures in the relevant quarter and year-end reports. I cannot conclude as a matter of law that this information, which I conclude the Defendants were aware of at least as of June 30, 1999, would have been immaterial to the investment decision of a reasonable investor.

*b. Due Diligence Representations*

**\*14** Giarraputo alleges that the Joint Proxy "without qualification or limitation" erroneously assured investors that UNUM and Provident had conducted due diligence reviews of the proposed merger, before the Merger Agreement was signed. (No. 12 at ¶ 46.) The referenced sections of the Joint Proxy provided as follows:

> Beginning on October 19, 1998, representatives of UNUM, Provident and their respective advisors [ (Morgan Stanley for UNUM and Salomon Smith Barney for Provident) ] exchanged certain business, personnel, legal and financial information and conducted due diligence and negotiations regarding definitive documentation for the proposed Merger. During this due diligence investigation, Messrs. Watjen, Copeland and Crispin and Ms. Rosen met several times to discuss the most desirable operational structure, as well as transition planning, for the combined company.

(Appendixes to M/D, Tab I at 33). Additionally, says Giarraputo, the Joint Proxy made assurances that "UNUM did not impose any limitations with respect to the investigations made or procedures followed by Morgan Stanley in rendering its opinion." (*Id.* at 52.) The Joint Proxy further informed investors that Provident was recommending the merger based on, *inter alia,* "management's reports concerning the results of its due diligence investigation of UNUM." (*Id.* at 38.)

According to Giarraputo, the reference to due diligence signified to investors that the Defendants had conducted a reasonable and thorough investigation of one another's companies prior to issuing the Joint Proxy, including a review of actuarial methods designed to calculate risk factors related to liability for future policy benefits so that adequate reserves might be set aside to meet them. (No. 12 at ¶ 48.) She further contends:

> If [the] Defendants had performed due diligence, as they represented in the Joint Proxy, they would have discovered that UNUM was severely under-reserved in its group disability segment and required an increase in undisclosed reserves of approximately $370 million. Furthermore, the failure to disclose this adverse trend to larger underwriting losses in group disability claims and the additional charges required to exit the reinsurance business rendered the statements in the Joint Proxy regarding no "material adverse changes" materially false and misleading. Finally, the Joint Proxy was materially false and misleading because it expressly incorporated Unum's prior financial statements[,] which were materially misleading because they did not properly reserve for disability claims despite the existence of an adverse trend to larger underwriting losses in its group disability segment.

(No. 12 at ¶ 112.) She contends the representations were also false because the August 3, 1999 Morgan Stanley Analyst Report revealed that data concerning adequacy of reserve levels was not shared between the companies prior to the Merger. Additionally, the February 11, 1999 report from UNUM indicated that any increase in reserves following the merger would be made solely "to match the methodology" used by the companies in calculating reserves, and "not because of any perceived additional risks." (No. 12 at ¶ 52 .)

**\*15** Giarraputo provides anecdotal evidence of the materiality of such information by reference to Provident's 1996 acquisition of the Paul Revere Corporation. In that transaction, Provident's financial advisor did investigate the

adequacy of Paul Revere's reserves, which investigation resulted in Paul Revere increasing reserves by some $380 million and delayed the acquisition by more than a year. (No. 12 at ¶¶ 58-59.) Giarraputo argues that "if Provident and UNUM had undertaken due diligence reviews, as [Provident] had done in the Paul Revere acquisition, the inadequacy of UNUM's reserves would have been discovered." (No. 12 at ¶ 59.) According to Giarraputo, the analyst community was surprised to discover that Provident had not learned its lesson and "question[ed] how appropriate due diligence could have been performed." (No. 12 at ¶ 60.)

The Defendants respond that Giarraputo has failed to allege that UNUM and Provident actually failed to conduct due diligence. (M/D at 34.) Such an allegation does not strike me as being required. There are two equally damaging inferences to draw from Giarraputo's allegations: either the Defendants did conduct due diligence, which based on my earlier assessment would support the allegation that they were aware of the false or misleading information disclosed in the merger documents, or they did not conduct due diligence, which would support the conclusion that representations in the documents to the contrary were false.

The Defendants next argue that the Proxy was not misleading because it never said that UNUM and Provident "would have unfettered access to sensitive information of the other company." (M/D at ¶ 35.) This argument is true, but beside the point. Although the Defendants suggest that antitrust laws prevented them from disclosing any of the actuarial methods used to calculate reserves, (M/D at 35-36 & n. 23), it is evident that such information was exchanged by the companies based on the fact that UNUM reported plans to increase reserves "to match the methodology" used by Provident.

The Defendants next argue that the Joint Proxy did disclose that Provident's investment advisor's due diligence review "did not include making any actuarial determinations or evaluations or an attempt to evaluate actuarial assumptions.... Solomon Smith Barney made no analyses of, and expressed no opinion as to, the adequacy of the loss and the loss adjustment expense reserves of Provident or UNUM." (M/D at 35--*see also* Tab I at 42.) This is a far more persuasive argument. I add a related observation of my own: The Joint Proxy's assurances that "UNUM did not impose any limitations with respect to the investigations made or procedures followed by Morgan Stanley in rendering its opinion" were made following a sentence that made clear that Morgan Stanley's narrow, designated task was to evaluate whether the exchange ratio was fair to UNUM stockholders.

I conclude that these qualifications regarding the degree and scope of the financial advisors' reviews raise doubts about the misleading nature of some of the statements Giarraputo focuses on, not to mention their materiality. However, I also conclude that the assurances contained in Joint Proxy that management itself conducted due diligence could have mislead investors, particularly in light of the fact that pre-merger announcements reflected that the companies were aware of the differences in one another's reserve "methodologies." Put simply, I cannot conclude as a matter of law that UNUM and Provident's due diligence statements were not materially misleading when issued.

*c. Costs of Exiting Reinsurance Business*

**\*16** Giarraputo also contends that the Defendants misrepresented UNUM's cost to exit the reinsurance business. She bases this allegation on the fact that the Joint Proxy stated (1) that "UNUM intends to sell the reinsurance management operations and either reinsure the risk assumption businesses or place them in run-off" and (2) that UNUM recorded a special charge of $101.1 million in the first quarter of 1999 to increase reserves "for estimated losses in the Lloyds of London syndicates and certain reinsurance pools, as well as a write-down of goodwill." (No. 12 at ¶¶ 95-96.) The Defendants argue that these statements do not amount to false statements of material fact because they do not say anything about what the overall cost would be to exit the reinsurance business, but only what *currently existing* losses from the business were estimated to be. (M/D at 34.)

I agree with the Defendants in this regard. The complaint suggests that a sale of the reinsurance businesses was completed sometime after the issuance of the Joint Proxy. (No. 12 at ¶ 96.) Without additional information, I cannot assess whether the higher cost of exiting the reinsurance business could have been estimated with any great accuracy in first quarter 1999. Thus, the facts contained in the Disclosure Complaint fail to reveal or imply the existence of any information, let alone material information, that investors might have been entitled to as of the dates of issuance and amendment of the Joint Proxy.

*d. "Bespeaks Caution" or "Safe Harbor" Considerations*

Defendants also assert that none of these statements are actionable misstatements under the securities laws because of the "Bespeaks Caution Doctrine" and the "Safe Harbor" doctrine. The former doctrine recognizes that a statement or omission must be viewed in context and that if its context sufficiently "bespeaks caution" any misleading inference arising from the statement or omission is rendered immaterial as a matter of law. See *Shaw,* 82 F.3d at 1214. Likewise, the PSLRA provides a safe harbor to forward-looking statements, if certain criteria are met. See 15 U.S.C. § 77z-2 (1997); 15 U.S.C. § 78u-5 (1997). The primary consideration under either doctrine for purposes of

this motion is that the statement in question must be a "forward- looking statement" such as a financial projection, future management plans or objectives, statements of future economic performance or other statements of prediction.

The First Circuit has noted that the "bespeaks caution" doctrine does not preclude a claim that a reserve "adequacy" statement was materially misleading. If the plaintiffs allege that the reserve adequacy statement encompasses a representation of *present* fact, the statement is not rendered immaterial as a matter of law, even if there is surrounding cautionary language. *See Shaw,* 82 F.3d at 1213. Here, the statement in issue is premised on hard data regarding historical information about UNUM's losses in its group disability business. Neither doctrine provides refuge for these statements.

### B. THE FRAUD COMPLAINT

*\*17* The Fraud Complaint presents two claims. Count I is a claim pursuant to Section 10(b) of the SEA, 15 U.S.C. § 78j(b), asserted against all defendants for allegedly fraudulent statements made in violation of SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. (No. 11 at 170-76.) Count II is a derivative claim asserted against the individual defendants pursuant to Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), which makes "controlling persons" jointly and severally liable for violations of Section 10(b) committed by "controlled persons." (No. 11 at ¶¶ 177-80.)

The Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure require heightened specificity in pleadings alleging securities fraud pursuant to the provisions of the SEA. *See* 15 U.S.C. § 78u-4(b)(1) (1997); Fed.R.Civ.P. 9(b). Pursuant to the PSLRA and Rule 9(b), plaintiffs asserting claims for securities fraud must specify the time, place and content of all allegedly false representations. *See Greebel,* 194 F.3d at 193 ("Our previous strict pleading requirements under Rule 9(b) are ... consistent with the PSLRA.").

> Rule 9 imposes a heightened pleading requirement for allegations of fraud in order to give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage "strike suits," and to prevent the filing of suits that simply hope to uncover relevant information during discovery.

*Doyle,* 103 F.3d at 194.

Securities fraud claims seeking monetary damages have an even higher pleading requirement than that set by Rule 9. For these claims, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Thus, although evidence of the requisite state of mind may be inferred from indirect and circumstantial evidence, the inference drawn from such evidence must be more than merely reasonable, it must be reasonable and "strong." *See id.; Greebel,* 194 F.3d at 195-96.

Giarraputo contends that UNUM, Provident, UP and the individual defendants as controlling persons in these corporations disseminated to the investing public statements containing false and misleading financial information and omitting material adverse facts concerning UNUM's financial health and the prospective financial health of UNUMProvident following the Merger. (No. 11 at ¶¶ 1-2, 135, 146, 153-155.) Specifically, she contends that the Defendants were well aware or were recklessly unaware that, as early as first quarter 1998, UNUM's claims reserves were materially inadequate due to expanding underwriting losses related to the "aggressive group renewal strategy." According to Giarraputo, the known or reckless failure to disclose the material inadequacy of reserves meant (1) that UNUM's financial filings violated GAAP and SEC reporting rules because the need to increase reserves was clear and the amount of the needed increase was estimable and material and (2) that UNUM's public releases, including its use of securities analysts to disseminate information to the public, perpetuated a fraud on investors. (*Id.* at ¶¶ 7, 57, 63, 135-152, 172-174 & 178-180.) Giarraputo additionally alleges that the individual defendants' fraudulent course of conduct was motivated by their desire to ensure the consummation of the merger and to obtain cash and stock incentive awards. (*Id.* at ¶ 156.) With respect to the merger, Giarraputo states that the individual defendants wanted to artificially inflate or maintain the market price of UNUM and Provident common stock so as not to jeopardize the Maclellan agreement and so that there would be no shift in power related to the composition of the UP board of directors, which was initially to consist of eight members from UNUM and seven from Provident. (*Id.* at ¶¶ 159-160.) With respect to personal financial incentives, Giarraputo alleges that the large cash and stock awards [FN18] received by the individual defendants in 1997, coupled with their substantial holdings of shares in the companies constitutes evidence of motive. (*Id.* at ¶¶ 162-169.)

> FN18. Executive salary and stock compensation at both UNUM and Provident was heavily tied to performance and profitability. (No. 11 at ¶¶ 162-169.)

*\*18* "The traditional elements of a 10b-5 action are scienter, material omissions and/or misrepresentations, reliance, and due care by the plaintiff." *Holmes v. Bateson,* 583 F.2d 542, 551 (1st Cir.1978). The Supreme Court has defined scienter as "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976) (holding that scienter is a necessary element of a cause of action under §

10(b) and rule 10b-5). For purposes of Rule 12(b)(6), allegations of securities fraud must generate a "strong inference" of scienter. A plaintiff may prove the existence of scienter by implication, using indirect and circumstantial evidence, as well as by direct evidence. *See Greebel,* 194 F.3d at 195. The First Circuit has not endorsed a particular test for determining whether allegations of scienter are sufficiently strong to overcome a motion to dismiss. Instead, courts in this circuit conduct a "fact-specific inquiry." *See id.* at 196.

The Defendants argue that Giarraputo has failed to generate a strong inference of scienter in her fraud complaint. (M/D at 6-18.) Giarraputo relies heavily on an inference drawn from Defendant Chandler's exercise of certain stock options. Defendants maintain that Chandler's stock transactions were not unusual because Chandler exercised his options following an August 2, 1999 drop in UP's stock price and because Chandler increased his holdings in the company. (M/D at 7-8.) They also argue that cash and stock option incentives are a baseless ground for inferring the existence of scienter, as is the motive to sustain stock prices in order to complete the merger. (M/D at 8-9.) Finally, they argue that no other allegations generate a strong inference that the Defendants consciously or recklessly perpetrated securities fraud. (M/D at 9-14.) I conclude that the various allegations Giarraputo presents do not in themselves, or in concert, generate a strong inference of scienter.

*1. Motive and Opportunity*

Facts probative of scienter include the existence of motive and opportunity on the part of the defendant to engage in fraudulent conduct. *See id.* at 197. However, allegations merely presenting the existence of motive and opportunity do not constitute sufficient pleadings under the PSLRA. "It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent." *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068-69 (5th Cir.1994), cited with approval in *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 368 n. 20 (1st Cir.1994). Giarraputo's Fraud Complaint reveals that the individual defendants had a financial incentive to ensure that UNUM, Provident and UP succeeded in the market. But, "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2nd Cir.1995). There is nothing distinctive about Giarraputo's compensation-related scienter pleadings that elevate them above this prudential admonition.

**\*19** Similarly, "[p]leadings of generalized motives to support the stock price 'which could be imputed to any publicly-owned, for-profit endeavor, [are] not sufficiently concrete for purposes of inferring scienter." ' *In re Cendant Corp. Securities Litigation,* 76 F.Supp.2d 539, 548 (D.N.J.1999) (quoting *Chill v. General Elect. Co.,* 101 F.3d 263, 267 (2d Cir.1996)). Giarraputo's merger-related motive allegations do not present anything more than the same generalized motive that all corporate managers have to increase or sustain their companies' stock price. Giarraputo points to the Maclellan agreement as though it alone provides sufficiently strong evidence of fraudulent intent. (No. 11 at ¶¶ 157-161.) However, Giarraputo does not adequately explain how the alleged artificial manipulation of UNUM's stock price helped to preserve the Maclellan agreement. If anything, fraudulent manipulation of UNUM's stock to maintain or increase its value undermined the Maclellan deal, because an inflated valuation of UNUM stock relative to Provident stock actually weighed in favor of lowering the exchange ratio. Giarraputo also argues that UNUM wanted to inflate its stock price in order to ensure a majority control over UP's board. This concern over balance of power in internal governance exists in any merger transaction and the facts alleged by Giarraputo do not add any gloss that generates a strong inference of scienter.

*2. Insider Trading*

Like motive and opportunity allegations, bare allegations of insider trading are insufficient, in and of themselves, to generate a strong inference of scienter. *See Greebel,* 194 F.3d at 137 ("At a minimum, the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, well beyond the normal patterns of trading by those defendants.")

The Defendants cite *San Leandro Emergency Med. Group v. Phillip Morris Co.,* 75 F.3d 801, 814 (2d Cir.1996), for the proposition that when a corporate insider acquires additional shares it "makes clear that the trading was not 'unusual." ' (M/D at 7.) This is a flagrant mischaracterization of *San Leandro.* The actual sentence that this quotation is taken from reads, "[D]efendants *argue that* the fact that Maxwell retained a large holding in the company, and actually acquired more shares by the conclusion of the transaction than he had sold, makes clear that the trading was not 'unusual'...." *Id.* (emphasis added). As it turns out, the court did not accept this argument. Defendants also argue that there was no insider trading because there was no sale: "Chandler exercised 700,000 options to *purchase* UnumProvident stock, ... while 'surrendering' 366,419 shares for payment ... and income taxes...." [FN19] (M/D at 7.) This argument is hollow. In fact, in *San Leandro,* the insider trading consisted precisely of such an exchange. *See id.* at 807.

FN19. These numbers correspond to an August 12, 1999 transaction. The balance of the trading was accomplished on August 25, when Chandler "surrendered" 77,895 shares to pay the exercise price for 142,600 new shares and income taxes. (M/D at 7.)

**\*20** The fact that Chandler exercised options to buy 842,600 shares of UP stock paid for by the sale of 444,314 shares, shortly before a substantial decline in the stock's value, generates a permissible inference that Chandler may have bought himself a buffer against a known future decrease in the value of UP's stock. I also consider this volume of trading significant in relation to the 2,313,996 shares Chandler owned immediately following the merger. (No. 11 at ¶ 166.) However, viewed in context, these insider-trading allegations do not raise a strong inference of scienter on the part of UP or the other corporate insiders.

*3. Other Circumstantial Evidence of Conscious or Reckless Conduct*

Defendants argue that Giarraputo's fraud allegations fall short because they "do[ ] not ... provide any factual basis for the conclusion that the alleged falsity was [known or obvious]" (M/D at 9) and because they "do[ ] not explain the role of each of the Individual Defendants in the alleged misstatements and omissions...." (M/D at 15). They insist that in order to create a strong inference of scienter, Giarraputo must "specifically cite[ ] reports and documents presented to defendants...." (M/D at 10; Defendants' Reply, Docket No. 23, at 5.)

In her opposition motion, Giarraputo responds:
> [T]he Defendants knew or recklessly disregarded the impact of entering into long-term[,] noncancellable disability insurance unprofitable [sic] policies that were running off around the time of and subsequent to the Merger, which were being repriced at higher prices, resulting in loss of customers and brokers. Similarly, all defendants must of [sic] known of the undisclosed limitations placed on the review of both UNUM's and Provident's reserves in connection with the Merger. Finally, in the August 2, 1999 press release, defendants baldly admitted that "the lower results in group disability are primarily the result of higher claims incidence in the second quarter...." The adverse impact of the higher claims incidence was not disclosed in the false and misleading Joint Proxy, which many UNUM and Provident shareholders relied upon to exchange their shares for those of UNUMProvident only a month earlier.

(Plaintiffs' Opposition Motion, Docket No. 20, at 35.)

Contrary to the Defendants' contention, Giarraputo is not required to specifically cite internal reports and documents that were presented to each individual defendant. It is true that specifically citing internal reports and documents that are contrary to contemporaneous public disclosures is one particularly effective method of proving scienter. After all, such evidence would be very strong because it is, virtually, *direct* evidence of scienter. But it is not required. *Greebel* provides a more accurate list of the many ways that strong inferences of scienter may be shown. *See Greebel,* 194 F.3d at 196 (including in the list "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information"). Moreover, pursuant to the "group published" doctrine, the pleading requirements of Rule 9 and the PSLRA can be met without specifically pleading the fraudulent intent of corporate officers, other than outside directors, when "the allegedly false and misleading 'group published information' complained of is the collective action of officers and directors." *Berry v. Valence Technology, Inc.,* 175 F.3d 699, 706 (9th Cir.1999); *see also Serabian,* 24 F.3d at 367-68. The Joint Proxy, Prospectus and Registration Statement were the kinds of group published documents that this rule encompasses.

**\*21** In the First Circuit, the test has always required an analysis of the particular facts alleged in each individual case to determine whether the allegations were sufficient to support scienter. *See Greebel,* 194 F.3d at 196. The substantive standard for proving scienter is the same pre and post- PSLRA, "a mental state embracing intent to deceive, manipulate or defraud." *Id.* at 194 (quoting *Ernst & Ernst,* 425 U.S. 185, 193 n. 12 (1976)). The difference contemplated by the PSLRA is that, "[w]hile under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable, as is true when pleadings for other causes of action are tested by motion to dismiss under Rule 12(b)(6)." *Id.* at 195. In this case Plaintiffs have mundane evidence of motive and opportunity, evidence of "insider trading" which might or might not support even a permissible inference of scienter, and additional circumstantial evidence that the August, 1999, disclosure of inadequate reserves was relatively close in time to the allegedly misleading statements of June 30, 1999. In my view, all of these facts, taken in concert and even though pled with the requisite specificity, cannot give rise to a strong inference of scienter as set forth under *Greebel.* Accordingly, the Fraud Complaint must be dismissed.

Conclusion

Based on the foregoing analysis, I recommend that the Court GRANT the Motion to Dismiss as it relates to Docket No. 11, the Fraud Complaint, and DENY the Motion to Dismiss as it relates to Docket No. 12, the Disclosure Complaint, provided however, that the Court should DISMISS the claims within the Disclosure Complaint pertaining to: (1) the Section 12(a)(2) claims made by

aftermarket" purchasers; (2) the Section 14(a) claims asserted by the "Unum" class; and finally, (3) those claims relating to the alleged materiality of misstatements or omissions regarding the costs of exiting the reinsurance business.

*NOTICE*

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) (1993) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

2000 WL 1701294 (D.Me.), Fed. Sec. L. Rep. P 91,296

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works