LAWRENCE F. GLASER and MAUREEN GLASER, individually and on behalf of KIMBERLY, ERIN, HANNAH and BENJAMIN GLASER, Plaintiffs, v. ENZO BIOCHEM, INC., et al., Defendants.

Civil Action No. 02–1242–A

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

2003 U.S. Dist. LEXIS 14121

July 16, 2003, Decided

July 16, 2003, Filed

**DISPOSITION:** **[*1]** Motions to dismiss granted. Complaint dismissed. Plaintiffs denied leave to amend complaint.

## CASE SUMMARY

**PROCEDURAL POSTURE:** In their fourth attempt to hold defendants, a company and its officials, liable, plaintiff investors claimed that defendants defrauded them in violation of the federal securities laws. The investors also alleged common law fraud and breach of fiduciary duty claims against defendants. Defendants moved to dismiss the investors' amended complaint under Fed. R. Civ. P. 12(b)(6) and 9(b).

**OVERVIEW:** The investors' federal securities fraud claims failed for several reasons. First, the investors' claims were barred by the one–year statute of limitations because one investor admitted, before a bankruptcy court, that he knew about the alleged fraud no later than January 2001. The investors filed their initial complaint on March 6, 2002, more than one year after January 2001. Second, the investors failed, on several occasions, to plead fraud with the requisite specificity. Even if pled with specificity, the alleged misstatements were not material. Third, the investors could not proceed under their conspiracy theories absent primary liability of the conspirators. Fourth, the investors failed to link each alleged purchase or sale to an alleged misrepresentation and failed to show how the market relied on the alleged misrepresentations. Fifth, the amended complaint failed to set forth any facts showing that each defendant's act or omission proximately caused the loss for which the investors sought to recover damages. In addition to dismissing the investors' federal securities fraud claims, the court also dismissed their common law fraud claims and their breach of fiduciary duty claim.

**OUTCOME:** The court dismissed the investors' complaint.

**CORE TERMS:** stock, phase, misrepresentation, protocol, scienter, cell, specificity, investor, patient, actionable, shareholder, matter of law, plead, efficacy, misleading, pump, clinical, motive, federal securities, materiality, pled, publicly, dump, press release, particularity, requisite, vector, omission, patent, gene

### LexisNexis(TM) HEADNOTES – Core Concepts

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN1]   A Fed. R. Civ. P. 12(b)(6) motion should not be granted unless it appears beyond a doubt that a plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Fed. R. Civ. P. 12(b)(6).

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN2]   In considering a Fed. R. Civ. P. 12(b)(6) motion, a court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. However, the court is not limited to the four corners of the complaint. The court may consider any document that is explicitly relied upon in the complaint. The court can also consider the text of an undisputedly authentic document that is integral to the plaintiff's claim, even if the document is not attached or named in the complaint. Conclusory allegations regarding the legal effect of the facts alleged need not be accepted. Because the central purpose of the complaint is to provide the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests, the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendants to prepare a fair response.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN3]

To establish liability under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), and under S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5, a plaintiff must allege that (1) in connection with a purchase or sale of securities, (2) the defendant made a false statement or omission of material fact (3) with scienter (4) upon which the plaintiff justifiably relied (5) that proximately caused the plaintiff damages.

***Securities Law > Bases for Liability > Misleading Statements***

[HN4]   When proceeding under a fraud on the market theory, the plaintiff need not plead direct reliance or that the fraudulent practice was in connection with a particular sale or purchase of securities. Instead, the plaintiff need only show the means of dissemination and the materiality of the misrepresentation.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements***
***Civil Procedure > Dismissal of Actions > Involuntary Dismissal***
***Securities Law > Bases for Liability > Private Securities Litigation***

[HN5]   In addition to meeting the requirements under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), a plaintiff must also meet the requirements of Fed. R. Civ. P. 9(b) that the circumstances constituting fraud be stated with particularity in the complaint. Section 10(b) provides the elements that the plaintiff will have to prove in order to succeed on his claim. Rule 9(b) provides the standard for pleading a fraud case; furthermore, Congress has codified the pleading standard that a plaintiff must meet in a securities fraud action in order to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss –– the Private Securities Litigation Reform Act, 15 U.S.C.S. § 78u–4.

***Securities Law > Bases for Liability > Private Securities Litigation***

[HN6]   The Private Securities Litigation Reform Act codifies the requirements of Fed. R. Civ. P. 9(b) and further requires that the complaint specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement of omissions is made on information and belief, state with particularity all the facts on which that belief is formed. 15 U.S.C.S § 78u–4(b).

***Securities Law > Bases for Liability > Private Securities Litigation***

[HN7]   The Private Securities Litigation Reform Act, 15 U.S.C.S. § 78u–4, requires that a complaint in a securities fraud case state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind. 15 U.S.C.S. § 78u–4(b)(2). A complaint that fails to comply with this requirement must be dismissed on defendant's motion. 15 U.S.C.S. § 78u–4(b)(3)(A).

***Securities Law > Bases for Liability > Private Securities Litigation***

[HN8]   In reviewing whether a plaintiff has pled a "strong inference that the defendant acted with the requisite state of mind" under the Private Securities Litigation Reform Act, 15 U.S.C.S. § 78u–4, a court must (1) take the factual allegations in the complaint as true, (2) draw whatever inferences regarding the defendant's state of mind are supported by these allegations, and (3) determine whether these inferences individually or cumulatively provide a strong––or persuasive and cogent––inference that the defendant possessed the requisite state of mind. If the totality of the circumstances alleged raises a strong inference of the requisite state of mind, it is immaterial whether the plaintiffs satisfied their burden by pleading motive and opportunity, conscious misbehavior, recklessness, or by impressing upon the court a novel legal theory. Hence, the plaintiff need not plead "motive and opportunity," "conscious misbehavior," or recklessness as long as the totality of the circumstances raise a strong inference of scienter.

***Securities Law > Bases for Liability > Liability for Fraud***

[HN9]   The required state of mind, or scienter, for securities fraud liability is recklessness. Recklessness must be based on an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.

***Governments > Legislation > Statutes of Limitations > Time Limitations***

[HN10]   Inquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam. Merely bringing suit after a scheme has been laid bare will not satisfy the requirements of due diligence when there have been prior warnings that something was amiss.

***Governments > Legislation > Statutes of Limitations > Time Limitations***

[HN11]   See 28 U.S.C.S. 1658(b).

***Governments > Legislation > Statutes of Limitations > Time Limitations***

[HN12]   The historical and statutory notes to the Sarbanes–Oxley Act of 2002 provide that the two–year limitations period of 28 U.S.C.S. § 1658(b) shall apply to all proceedings addressed by 28 U.S.C.S. § 1658 that are commenced on or after July 30, 2002.

***Governments > Legislation > Effect & Operation > Prospective & Retrospective Operation***
***Governments > Legislation > Statutes of Limitations > Time Limitations***

[HN13]   While Congress may enlarge a limitations period, Congress' acts do not revive a cause of action that has become time–barred unless Congress specifically provides for retroactive application.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements***
***Securities Law > Bases for Liability > Private Securities Litigation***

[HN14]   Courts have employed a statement–by–statement analysis in evaluating whether the complaint specifies each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, state with particularity all the facts on which that belief is formed. 15 U.S.C.S. § 78u–4(b). The complaint must plead with particularity the time, place, speaker, and contents of the allegedly false statements.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements***

[HN15]    A complaint alleging fraud may not group the defendants together: Fed. R. Civ. P. 9(b) requires that allegations of fraud need to be pled with specificity. Fed. R. Civ. P. 9(b). This specificity requires that "at a minimum" for each alleged misstatement or omission, the plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that the defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false. Group pleading fails to satisfy the requirement that the who, what, where, why, and when of the fraud be specified.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Securities Law > Bases for Liability > Private Securities Litigation*
[HN16]    A fact as material if there is a substantial likelihood that a reasonable investor (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact. However, the determination of materiality is a mixed question of law and fact; and the standard for a motion to dismiss is whether no reasonable juror could determine that the alleged statements would have assumed actual significance in the deliberations of the reasonable investor.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN17]    While it is true that a "guarantee" of approval of a product by a federal agency might be actionable under the federal securities laws, actionable statements are worded as guarantees.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN18]    The market gives the most credence to those predictions supported by specific statements of fact, and those statements are, of course, actionable if false or misleading. However, projections of future performance not worded as guarantees are generally not actionable under the federal securities laws.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN19]    When determining the materiality of an allegation in a federal securities law case, a court must consider the allegation as it relates to the "total mix" of information available to the plaintiff at the time.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN20]    Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen; the market gives the most credence to those predictions supported by specific statements of fact.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN21]    Generalized positive statements about a company's progress are not a basis for liability under the federal securities laws.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN22]    In order for there to be liability under S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5, for omissions or nondisclosure a duty to speak must exist. Such a duty generally arises when omitting particular facts makes some existing statement misleading. 17 C.F.R. § 240.10b–5.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN23]    Soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN24]    Mere allegations of "fraud by hindsight" will not satisfy the requirements of the Private Securities Litigation Reform Act, 15 U.S.C.S. § 78u–4.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN25]    In determining whether a statement affects the total mix of information, a court deciding a federal securities law case must consider whether the statement was made in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media, if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes.

*Securities Law > Bases for Liability > Deceptive Devices*
[HN26]    The securities laws require the defendants to speak truthfully to investors; they do not require a company to police statements made by third parties for inaccuracies, even if third party attributes the statement to the defendants.

*Securities Law > Bases for Liability > Private Securities Litigation*
[HN27]    The Private Securities Litigation Reform Act, 15 U.S.C.S. § 78u–4, requires that the complaint in a securities fraud case state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind. 15 U.S.C.S. § 78u–4(b)(2). A complaint that fails to comply with these requirements must be dismissed on a defendant's motion. 15 U.S.C.S. § 78u–4(b)(3)(A). The ultimate determination for a court under the scienter inquiry is whether, taking the totality of the circumstances as alleged in the complaint, the allegations support a cogent and persuasive inference that the defendant acted intentionally, consciously, or recklessly.

*Securities Law > Bases for Liability > Private Securities Litigation*
[HN28]    A plaintiff may plead scienter under the Private Securities Litigation Reform Act, 15 U.S.C.S. § 78u–4, by alleging either (1) motive and opportunity to commit fraud or (2) recklessness. The plaintiff may plead motive and opportunity by showing both that the defendant would receive concrete benefits by making the misrepresentation, and that the defendant had the means and likely prospects of achieving those benefits. Recklessness is defined as a highly unreasonable act or an extreme departure from the standard of ordinary care where the defendant either knew of the danger of misleading the plaintiff or the danger was so obvious that the defendant must have been aware of it.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN29]  Although as a general rule the plaintiffs may not proceed under theories of aiding and abetting or conspiracy to violate § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), and under S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5, the plaintiffs may proceed under a conspiracy theory so long as they can show that each defendant involved in the conspiracy would be primarily liable.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN30]  Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), requires an actual misrepresentation by the defendant for liability to attach.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN31]  An inference based on a general motive shared by all corporate officers is not probative of scienter to commit securities fraud absent additional circumstances because to find such allegations sufficient would unfairly infer an intent to defraud based on the position an individual held within a company.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN32]  Generally, fraudulent intent is not inferred from the sale of stock by some officers of a corporation. If the stock sales were unusual in scope or timing, they may support an inference of scienter.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN33]  When proceeding under a fraud on the market theory, a plaintiff need not plead direct reliance or that the fraudulent practice was in connection with a particular sale or purchase of securities. Instead, the plaintiff need only show the means of dissemination and the materiality of the misrepresentation.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN34]  In order to proceed under a fraud on the market theory, the plaintiffs need only show the means of dissemination and the materiality of the misrepresentation. The plaintiffs must allege with particularity how the alleged false misrepresentations materially affected the market of a company's stock.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN35]  In evaluating whether a statement is actionable under the federal securities laws, a court examines what other public information was available to reasonable investors at the time.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN36]  The fraud on the market theory is based upon the concept that the market price of shares traded on efficient markets reflects all publicly available information.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN37]  In a suit brought under S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5, a plaintiff must show both loss causation––that the misrepresentations of omissions caused the economic harm––and transaction causation––that the violations in question caused the plaintiff to engage in the transaction in question.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Securities Law > Bases for Liability > Private Securities Litigation*
*Torts > Business & Employment Torts > Deceit & Fraud*

[HN38]  Under Virginia law, in order to prevail on a claim of fraud, a plaintiff must prove by clear and convincing evidence (1) a false representation (2) of a material fact (3) made intentionally and knowingly (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. The heightened pleading requirements of Federal Rule of Civil Procedure continue to apply to the common law claims; although the heightened pleading standards set forth in the Private Securities Litigation Reform Act, 15 U.S.C.S. § 78u–4, do not apply.

**COUNSEL:** For Plaintiff: Jorge Rios– Torres, Esquire, Annandale, Virginia.

For Defendant: Cooley Godward, Reston, Virginia.

For Defendant: Jeffrey Scott Tibbals, Pepper Hamilton, Tysons Corner, Virginia.

**JUDGES:** Gerald Bruce Lee, United States District Judge.

**OPINIONBY:** Gerald Bruce Lee

**OPINION:  MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants', Enzo Biochem, Inc., Barry Weiner, Elazar Rabbani, Sharim Rabbani, John Delucca, Dean Engelhardt, and Heimon Gross, motions to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. This case concerns Plaintiffs' claim that Defendants defrauded them by disseminating allegedly false information to the public and by manipulating **[*2]** the Enzo Biochem, Inc., stock to permit the Defendants to "pump and dump" the Enzo stock. This is the Plaintiffs' fourth attempt at pursuing their claims against Defendants. Defendant Heimon Gross filed a separate motion to dismiss; however, his motion incorporates the other defendants' motion to a large extent. This Memorandum Opinion addresses all motions to dismiss before the Court, specifically the adequacy of Plaintiffs' Amended Complaint with respect to Rule 9(b) and the special pleading requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b), Rule 12(b)(6) and Section 10(b) of the Securities and Exchange Act of 1934. Furthermore, this Memorandum Opinion addresses the adequacy of Plaintiffs' Amended Complaint as to the common law fraud and the breach

of fiduciary duty claims.

The first issue before the Court is whether Plaintiffs' federal securities fraud claims are barred by the relevant statute of limitations where Plaintiffs' allegedly had inquiry notice of the securities fraud more than one year prior to filing their first complaint before the Court. The Court holds that Plaintiffs' claims are governed and barred by the [*3] one–year statute of limitations because Plaintiffs, through several media, had acquired notice of their potential claim. The Court further holds that the two–year limitations period established by the recently enacted Sarbanes–Oxley Act does not revive Plaintiffs' claims.

The second issue is whether Plaintiffs' Amended Complaint adequately pleads a federal securities fraud claim, under 15 U.S.C. § 78u–4(b), to withstand Defendants' motions to dismiss for failure to plead fraud with particularity and failure to state a claim upon which relief can be granted, where the Amended Complaint alleges that Plaintiffs were induced, through several allegedly false and materially misleading communications from Defendants, into purchasing over one million shares of Enzo Biochem, Inc., stock. The Court holds that Plaintiffs' Amended Complaint fails to allege fraud "in connection with" the sale or purchase of a security, fails to establish a misrepresentation of material facts, fails to raise a strong inference that Defendants acted intentionally, consciously, or recklessly, fails to allege direct or indirect reasonable reliance, and fails to allege loss causation. The Amended [*4] Complaint also fails to allege common law fraud claims against all Defendants because the Amended Complaint does not establish material facts which were misrepresented. Furthermore, the Amended Complaint fails to state a proper claim for breach of fiduciary duty against the Defendants because this case was not initiated as a derivative claim. For the reasons set forth below, the Court dismisses the Amended Complaint as to all counts and as to all Defendants.

## I. BACKGROUND

Enzo Biochem, Inc., ("Enzo") is a publicly held biotechnology company engaged in the research, development and marketing of health care products. The Individual Defendants are officers and/or directors of Enzo —— Heimon Gross was a consultant to Enzo and allegedly engaged in investor relations. Plaintiff Lawrence Glaser ("Glaser") and his family purchased over one million shares of Enzo over a six–year period, from 1994 to 2000. Plaintiffs engaged in thousands of purchases and sales of Enzo stock during this period.

Plaintiffs claim that the Defendants made false statements concerning: (1) Enzo's patent estate, (2) the progress of the pre–clinical and clinical trials of Enzo's HIV protocol, (3) the efficacy [*5] of Enzo's gene therapy, and (4) the timing of a major diagnostic transaction with a pharmaceutical company. Plaintiffs further allege that the Defendants conspired to increase the price of the Enzo stock so that they could sell their holdings at favorable prices: a "pump and dump." The Amended Complaint alleges that, as part of the "pump and dump" scheme, the Defendants stated: (1) that the clinical trials of the HIV protocol were successful and on schedule, (2) that the Phase II clinical study would begin shortly, and (3) that Enzo would be opening clinics to treat HIV/AIDS patients in April 2000. As part of the "dump," the Defendants allegedly sold some of their shares at all–time high prices for the Enzo stock. The Amended Complaint also alleges that the Defendants planned to "pump and dump" the Enzo stock a second time but abandoned the plan.

## II. DISCUSSION

The Court grants the motions to dismiss as to the federal securities claims because (1) the federal securities claims are barred by the statute of limitations, (2) the Amended Complaint fails to plead material facts which were misrepresented, (3) the Amended Complaint fails to raise a strong inference that Defendants [*6] acted intentionally, consciously, or recklessly or that the Defendants had the motive and opportunity to defraud Enzo's investors, (4) fails to plead with particularity either direct or indirect reliance, and (5) fails to allege loss causation. The Court grants the motions to dismiss as to the common law fraud claims because the Amended Complaint fails to establish material facts which were misrepresented. Furthermore, the Court grants Plaintiffs' motions to dismiss as to the breach of fiduciary claim because the claim was not initiated as a derivative action.

A. **Standard of Review**

1. Fed. R. Civ. P. 12(b)(6) —— Failure to State a Claim Upon Which Relief May Be Granted

[HN1] A Rule 12(b)(6) motion should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Fed. R. Civ. P. 12(b)(6); Conley v. Gibson, 355 U.S. 41, 45–46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). [HN2] In considering a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). [*7] However, a court is not limited to the four corners of the complaint. A court may consider any document that is explicitly relied upon in the complaint. In re Burlington Coat Factory Sec. Lit., 114 F.3d 1410 (3d Cir. 1997); Gasner v. County of Dinwiddie, 162 F.R.D. 280 (E.D. Va. 1995). A court can also consider the text of an undisputedly authentic document that is integral to the plaintiff's claim, even if the document is not attached or named in the complaint. Id. Conclusory allegations regarding the legal effect of the facts alleged need not be accepted. See Labram v. Havel, 43 F.3d 918, 921 (4th Cir. 1995). Because the central purpose of the complaint is to provide the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendants to prepare a fair response. Conley, 355 U.S. at 47.

This initial standard sets out how the Court construes the Complaint. The follow−on sections provide the substance in analyzing a 12(b)(6) motion. The substantive pleading standards are set **[\*8]**    forth in Section 10(b) of the Securities Exchange Act of 1934, Rule 10b−5, and the Private Securities Litigation Reform Act.

2. Section 10(b) of the Securities Exchange Act of 1934 & Federal Rule of Civil Procedure 9(b)

 [HN3] To establish liability under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and under Rule 10b−5, 17 C.F.R. § 240.10b−5, a plaintiff must allege that "(1) in connection with a purchase or sale of securities, (2) the defendant made a false statement or omission of material fact (3) with scienter (4) upon which the plaintiff justifiably relied (5) that proximately caused the plaintiff damages." *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 613 (4th Cir. 1999). *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b−5. Plaintiffs allege both securities fraud and fraud on the market; thus, the Court analyzes Plaintiffs' claims under a "face to face" n1 standard and a "fraud on the market" n2 standard.

− − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − −

n1 "Face to face" transactions include those involving negotiations between two parties, e.g., "the sale of a business, the private placement of securities, or a stockbroker's advice and recommendations." Donald C. Langevoort, Half−Truths: Protecting Mistaken Inferences by Investors and Others, 52 Stan. L. Rev. 87, 101 (1999).

 **[\*9]**

n2 "Fraud on the market" transactions typically include those transactions involving publicly disseminated information which is false and on which investors rely to make their investment decisions, e.g., corporate filings with the SEC, press releases. *See* Langervoot, *supra* note 1, at 102. As stated by the Supreme Court:The "fraud on the market" theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business ... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.*Basic v. Levinson*, 485 U.S. 224, 241−42, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1987).

− − − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

To state a valid claim for securities fraud resulting from a face to face transaction, the plaintiff must allege all five elements discussed in *Phillips*. [HN4] When proceeding under a fraud on the market theory, the plaintiff need not plead direct reliance or that the fraudulent practice was in connection with a particular sale or purchase of securities. Instead, the plaintiff need only show the means of dissemination and the materiality of the misrepresentation. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2nd Cir. 1968); *Miller v. Asensio*, 101 F. Supp. 2d 395 (D.S.C. 2000).

 [HN5] In addition to meeting the requirements under Section 10(b), a plaintiff must also meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure that "the circumstances constituting fraud . . . be stated with particularity" in the complaint. Section 10(b) provides the elements that the plaintiff will have to prove in order to succeed on his claim. Rule 9(b) provides the standard for pleading a fraud case; furthermore, Congress has codified the pleading standard that a plaintiff must meet in a securities fraud action in order to survive a 12(b)(6) motion to dismiss — the Private Securities Litigation Reform Act.

3. The Private Securities Litigation Reform Act (PSLRA)

 [HN6] The PSLRA codifies the requirements of Rule 9(b) and further requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement of omissions is made on information and belief, . . . state with particularity all the facts which that belief is formed." 15 U.S.C. § 78u−4(b). [HN7] The PSLRA also requires that the complaint in a securities fraud case "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u−4(b)(2). **[\*10]**  A complaint that fails to comply with these requirements must be dismissed on defendant's motion. See 15 U.S.C. § 78u−4(b)(3)(A).

The Fourth Circuit has not adopted a standard as to what a "strong inference" means within the PSLRA; however, the issue is not one of first impression within this Circuit. In *Microstrategy*, Judge Ellis concluded that [HN8] in reviewing whether a plaintiff has pled a "strong inference that the defendant acted with the requisite state of mind," a court must (1) take the factual allegations in the complaint as true, (2) draw whatever inferences regarding the defendant's state of mind are supported by these allegations, and (3) determine whether these inferences

individually or cumulatively provide a strong – or persuasive and cogent – inference that the defendant possessed the requisite state of mind." *In re MicroStrategy Inc. Secs. Litig.*, 115 F. Supp. 2d 620, 627 (E.D. Va. 2000). Judge Ellis added that "if the totality of the circumstances alleged raises a strong inference of the requisite state of mind, it is immaterial whether plaintiffs satisfy their burden by pleading motive and opportunity, conscious misbehavior, **[*11]**    recklessness, or by impressing upon the Court a novel legal theory." *Id.* Hence, the plaintiff need not plead "motive and opportunity," "conscious misbehavior," or recklessness as long as the totality of the circumstances raise a strong inference of scienter.

The Fourth Circuit has held that [HN9] the required state of mind, or scienter, for securities fraud liability is recklessness. Recklessness must be based on "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips*, 190 F.3d at 621. *Accord In re Microstrategy* 115 F. Supp. 2d at 633; *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 474 (E.D. Va. 2002).

B. **The Federal Securities Claims – Counts I and II**

1. Plaintiffs' Claims Are Barred by the Statute of Limitations

At the time the Plaintiffs began their action before this Court, March 6, 2002, the statute of limitations applicable to their federal securities claims barred all actions if **[*12]**  they were filed more than one year after the discovery of the facts constituting the violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 115 L. Ed. 2d 321, 111 S. Ct. 2773 (1991). This limitation period began running when Plaintiffs acquired inquiry notice of the alleged fraud. 15 U.S.C. § 78j(b); *Brumbaugh v. Princeton Partners*, 985 F.2d 157 (4th Cir. 1993).

Defendants contend that Mr. Glaser had informed the Bankruptcy Court in the Eastern District of Virginia that he knew about the alleged fraud no later than January 2001. On or about January 19, 2001, Mr. Glaser filed for bankruptcy. On or about February 7, 2001, Mr. Glaser filed a Federal Rule of Banrkuptcy 2004 motion seeking examinations of Enzo and other parties; the Bankruptcy Court granted the motion. Mr. Glaser proceeded to conduct discovery, for nearly one year, before filing a complaint in this Court on March 6, 2002 (CA 02–327–A). From Mr. Glaser's own admissions before the Bankruptcy Court and his multiple complaints filed with this Court, the Court finds that Plaintiffs had inquiry notice of a federal securities fraud claim against **[*13]**  Enzo no later than February 7, 2001, when Plaintiffs sought the discovery order from the Bankruptcy Court. *See Brumbaugh*, 985 F.2d at 162 [HN10] ("Inquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam. Merely bringing suit after the scheme has been laid bare ... will not satisfy the requirements of due diligence when there have been prior warnings that something was amiss."). Plaintiffs obtained discovery from the Bankruptcy Court, protracted their filings for more than one year, and circumvented the provisions of the Private Securities Litigation Reform Act. Plaintiffs admit in their Amended Complaint that they had suspicion of securities fraud before seeking discovery from the Bankruptcy Court. (Amended Compl. P 125.) The Court finds that there is no issue that needs to be left to the trier of fact because Plaintiffs were admittedly on inquiry notice of the alleged fraud more than one year before they filed their claim. The Court concludes that Plaintiffs's federal securities claims are barred by the one–year statute of limitations because Plaintiffs had inquiry notice on or about February 7, 2001, and did not **[*14]**  file their first complaint until March 6, 2002.

Plaintiffs contend that the two–year limitations period established by Section 804 of the Sarbanes–Oxley Act of 2002 applies to this case. That section provides that: [HN11] a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws ... may be brought not later than the earlier of (1) 2 years after the discovery or the facts constituting the violation, or (2) 5 years after such violation.28 U.S.C. § 1658(b). [HN12] The Historical and Statutory Notes provide that this "limitations period ... shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act [July 30, 2002]." *Id.* Plaintiffs contend that, although they have filed two complaints with this Court – one on March 6, 2002, the other on August 22, 2002, this Court should conclude that the Sarbanes–Oxley Act revived their federal securities fraud claim. Defendants contend that the Sarbanes–Oxley Act did not revive Plaintiffs cause of action because it had already become time–barred **[*15]**  under the previous one–year limitations period.

[HN13] While Congress may enlarge a limitations period, Congress's acts do not revive a cause of action that has become time–barred unless Congress specifically provides for retroactive application. *See Hughes Aircraft Co. v. United States*, 520 U.S. 939, 950, 138 L. Ed. 2d 135, 117 S. Ct. 1871 (1997) ("extending a statute of limitations after the pre–existing period of limitations has expired impermissibly revives a moribund cause of action ... a newly enacted statute of limitations that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme"); *INS V. St. Cyr*, 533 U.S. 289, 317, 316, 150 L. Ed. 2d 347, 121 S. Ct. 2271 (2001) ("a statement that a statute will become effective on a certain date does not even arguably support that it has any application to conduct that occurred at an earlier date") (stating that while Congress has the power to enact laws with retroactive effects, it must clearly and unambiguously state that the law applies retroactively).

The Court holds that Congress did not unambiguously **[*16]**  provide that the two–year limitations period would apply retroactively. Furthermore, the Court has already concluded that Plaintiffs claims were barred under the previous one–year limitations period, and the presumption against retroactive application of the two–year limitations period favors the Defendants. Congress's provision that the statute of limitations would apply to all proceedings commenced on or after July 30, 2002, applies only to actions that may have accrued but that were not time–barred under the previous one–year limitations period. The Court holds that Congress did not specifically intend, with the

Sarbanes–Oxley Act, to revive moribund actions such as the Plaintiffs'. Thus, the two–year limitations period established by the Sarbanes–Oxley Act does not apply retroactively to Plaintiffs' time–barred claims. The Court, therefore, dismisses Plaintiffs' federal securities claims as to all Defendants.

2. Pleading with Specificity and Materiality

 [HN14] Courts have employed a statement–by–statement analysis in evaluating whether the complaint "specifies each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation [*17]  regarding the statement or omissions is made on information and belief ,... state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u–4(b). See Arnlund v. Smith, 210 F. Supp. 2d 755, 762–63 (E.D. Va. 2002); In re The First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 889 (W.D.N.C. 2001). The complaint must plead with particularity the time, place, speaker, and contents of the allegedly false statements. Borow v. nView Corp., 829 F. Supp. 828, 833 (E.D. Va. 1993).

Furthermore, [HN15] a complaint alleging fraud may not group the defendants together: Rule 9(b) requires that allegations of fraud need to be pled with specificity. Fed. R. Civ. P. 9(b). This specificity requires that "at a minimum" for each alleged misstatement or omission,plaintiffs must plead specific facts concerning, for example, when *each* defendant or other corporate officer learned that a statement was false, how *that* defendant learned that the statement was false, and *the particular* document or other source of information from which the defendant came to know that the statement was false. [*18]  In re First Union Corp Sec. Litig., 128 F Supp. 2d at 886. Group pleading fails to satisfy the requirement that the who, what, where, why, and when of the fraud be specified. See id.

As to materiality, the Fourth Circuit has defined [HN16] a fact as material "if there is a substantial likelihood that a reasonable [investor] (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." Longman v. Food Lion, Inc., 197 F.3d 675, 682–83 (4th Cir. 1999). However, the determination of materiality is a mixed question of law and fact; and the standard for a motion to dismiss is whether "no reasonable juror could determine that the alleged statements would have assumed actual significance in the deliberations of the reasonable investor." In re Microstrategy, 115 F. Supp. 2d at 657 (quoting Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999)).

a. *Enzo Biochem Activities in 1999*

Plaintiffs allege that, in 1999, Enzo and the Individual Defendants had begun to [*19]  plan the first of two "pump and dump" schemes. (Am. Compl. PP 31–38.) The purpose of the "pump and dump" was to artificially raise the price of Enzo stock "for the sole purpose of permitting [the Individual Defendants] to dump some of their holdings at highly inflated prices," and "to provide trading opportunities to allow individuals to benefit through the pump and dump by purchasing and selling shares in the open market or short the stock." (*Id.* P 31.) The only allegation of fraud that falls in this section of the Amended Complaint is Dr. Engelhardt's statement, at the 1999 annual shareholders' meeting, allegedly referring to the success of the Phase I trial of Enzo's HIV/AIDS protocol: "it's all over, but the shouting." (*Id.* P 33.) Plaintiffs allege that this statement was false because "there was no increase in the T cell count or decrease in the viral load so that it was anything but "all over, but the shouting." (*Id.*)

The Court finds that this allegation is pled with enough specificity because Plaintiffs provide the reasons the statement is false and state with particularity the facts underlying the misrepresentation. The statement, however, is not material as [*20]  a matter of law. [HN17] While it is true that a "guarantee" of approval of a product by a federal agency might be actionable, actionable statements are worded as guarantees. See Raab v. General Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993) [HN18] ("The market gives the most credence to those predictions supported by specific statements of fact, and those statements are, of course, actionable if false or misleading. However, 'projections of future performance not worded as guarantees are generally not actionable under the federal securities laws.') (citing Krim v. Banctexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir.1993)). In addition, [HN19] when determining the materiality of an allegation, the Court must consider the allegation as it relates to the "total mix" of information available to the plaintiff at the time. Phillips, 190 F.3d at 615 (citing Basic v. Levinson, 485 U.S. 224, 231–32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)). Plaintiffs admit they knew that the purpose of the Phase I clinical trials was solely to determine safety, toxicity and pharmacokinetic properties and not the efficacy of the drug. (Am. Compl., Ex. 3.) Furthermore,  [*21]  no reasonable investor would rely on this statement, and the statement is not specific enough to perpetrate a fraud on the market. See Raab, 4 F.3d at 290.
 [HN20] "Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen[;] ... the market gives the most credence to those predictions supported by specific statements of fact ...." Id. The statement at issue here is a "puffing" statement expressing enthusiasm about the prospects of the HIV/AIDS protocol. Therefore, the Court finds that Dr. Engelhardt's statement that "it's all over, but the shouting" is not material as a matter of law.

b. *False Statements to Brokers*

In this portion of the Amended Complaint, Plaintiffs allege that, as part of the conspiracy to pump the Enzo stock, Defendants Weiner and Gross disseminated non–public information about the company's prospects to various brokers. (*Id.* PP 39–43.) Mr. Gross allegedly told an investment adviser named Robert Jernigan in 1999: (1) that "a major diagnostic deal with a European company was expected in much less than one year" (*id.* P 41); (2) that "the progress in Enzo's therapeutics [*22]  was 'enormous'" (*id.*); (3) that "[Enzo's] stealth vector [was] achieving transduction in cells from 50–90% with an average of 80%, while normally transduction in cells is from 3/4 to 1%" (*id.*); (4) that "[Enzo] expected a patent to issue in 18–24 months" (*id.*); (5) that "clinicians were 'thrilled' with the results that had been obtained in Phase I and they were going to begin Phase II while Phase I was continued" (*id.*); (6) that "the HIV therapeutics were 'working, working, working – doing great'"

(*id.*); and (7) that "clinicals were going well, but [Enzo was] seeing so many unusual happenings [that] must be reported to the FDA – all good happenings, no bad" (*id.*). Although Plaintiffs provide great detail as to the communications themselves, they fail to allege how these statements were false or misleading when made. The Court finds that these allegations do not satisfy the pleading requirements of the PSLRA.

Plaintiffs also allege that Defendants Weiner and Gross disseminated non–public information to a broker named Doug Yates and that Mr. Yates passed this information along to Plaintiffs' broker Ed Stephen. (*Id.* P 42.) Plaintiffs, however, fail [*23] to provide, beyond their conclusory statements, the details of these communications and how these communications are false. The Court finds that this statement is not pled with the requisite specificity.

Plaintiffs allege that a person named Keating was also disseminating information about Enzo and its products. (*Id.* P 43.) Plaintiffs maintain that Keating was a paid consultant to Enzo. (*Id.*) Plaintiffs, however, fail to provide how Keating's statements can be attributed to Enzo; furthermore, Keating is not a party to this case. The Court finds that Keating's statements are not pled with the requisite specificity.

Concerning the statements Defendants, and others, made to various brokers, the Court finds that the allegations are not pled with the requisite specificity: Plaintiffs fail to provide an explanation of how these statements were false or misleading and how these individuals' statements are attributable to Enzo. The Court dismisses the Amended Complaint as to these allegations.

### c. *The January 2000 Shareholders' Meeting*

Plaintiffs allege that, at the January 2000 annual shareholders' meeting, Defendants issued multiple misleading statements of material fact concerning [*24] Enzo's HIV protocol and its prospects. (*Id.* PP 44–70.) Plaintiffs maintain that, at the meeting, the company reported that "its therapeutic division had made significant progress in several areas" (*id.* P 46) and that "it was strongly poised to benefit from new, exciting trends in drug development, and the diagnosis and treatment of disease" (*id.*). Plaintiffs fail to provide how these statements were false; furthermore, the Court finds that these statements are mere "puffery" describing Enzo's predictions about the future, are not material, and are not actionable as a matter of law. *See Raab*, 4 F.3d at 289–90.

Plaintiffs further allege that the Defendants made several statements regarding the progress of Enzo's HIV protocol. Mr. Weiner said that Enzo's Phase I clinical trial was proceeding satisfactorily and on schedule. (*Id.* P 47.) Dr. Engelhardt stated that "it works, they both work," as he was referring to Enzo's HIV protocol and Enzo's gene therapy treatment for Hepatitis–B. (*Id.* P 48.) Dr. Engelhardt also compared Enzo's HIV protocol to a "roach motel" where the virus goes in but does not come out. (*Id.* P 49.) Dr. Engelhardt also stated [*25] that the "FDA will not let them say that they cured AIDS, but they have killed the virus." (*Id.*)

The Court finds that the falsity of Mr. Weiner's general statement as to the Phase I progress is not pled with specificity: Plaintiffs fail to explain how the statement was false. Although the statement reflects an opinion concerning current facts which may be material under *Virginia Bancshares, Inc. v. Sandberg*, 501 U.S. 1083, 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991). The "total mix" of information was based on false assumptions. *Raab*, 4 F.3d at 290. This statement fails to comport with the requirements of Rule 9(b). Furthermore, [HN21] generalized positive statements about a company's progress are not a basis for liability. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 419 (5th Cir. 2001).

The Court finds, however, that Dr. Engelhardt's specific statements as to the efficacy of the HIV protocol are pled with specificity: Plaintiffs allege these statements were false because "as it relates to efficacy, the standard FDA markers of efficacy are that the T–cell counts increase and viral loads decrease." (Am. Compl.P 48.) However, [*26] even if pled with specificity, the statements are not actionable as a matter of law. When determining the materiality of an allegation, the Court must consider the allegation as it relates to the "total mix" of information available to the plaintiff at the time. *Phillips*, 190 F.3d at 615 (citing *Basic*, 485 U.S. at 231–32). The "total mix" of information includes publicly available information. *Id.* at 615, 617. As in *Phillips*, Plaintiffs here rest their Amended Complaint "on mischaracterizations of the public record, exaggeration of [statements], and isolation of [those] statement[s] from [their] context and from the wealth of information publicly available when [they] were made." 190 F.3d at 615. In its 1999 Form 10K, Enzo detailed the purposes of the three phases of clinical trials. n3 Thus, Plaintiffs knew, or are charged with the knowledge, that the Phase I trials did not test the efficacy of the protocol, but merely tested whether the drug was safe in order to proceed to Phase II. "Although measuring cell count and viral load was part of the safety trial, those measurements were for safety monitoring purposes only – [*27] just as taking a complete blood count, height, weight, pulse and blood pressure were regularly performed for safety monitoring purposes." (Defs.' Mem. Opp'n at 12.) Thus, considering the "total mix" of information available to investors, Dr. Engelhardt's comments are just enthusiastic statements about the prospects of Enzo's Phase I clinical trials. *See Raab*, 4 F.3d at 289–90; *supra* Part II.B.2.a.

– – – – – – – – – – – – – – – –Footnotes– – – – – – – – – – – – – – – –

n3 "Phase I trials, concerned primarily with the *safety and preliminary effectiveness* of the drug, involve fewer than 100 subjects. Phase II trials normally involve a few hundred patients and are designed primarily to demonstrate *effectiveness* in treating or diagnosing the disease ... Phase III trials are expanded clinical trials with larger number of patients and are intended to gather the additional information for proper *dosage and labeling* of the drug. Clinical trials may take two to five

years, but the period may vary." (Chase Decl. Ex. J., p. 10.)(Emphasis added)

− − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

At the meeting, **[\*28]** Defendant Weiner allegedly stated that Enzo would be opening three more clinics to treat HIV and AIDS patients by the end of fiscal year 2000. (*Id.* P 50.) Plaintiffs maintain that this statement was false because Enzo did not have permission from the Food and Drug Administration ("FDA") to open such clinics and because "such permission had never been sought by Enzo and could not in any event be obtained within that short period of time. (*Id.*) In addition, Defendant Weiner allegedly stated that Enzo had submitted its Phase I data to the FDA and that the company was awaiting approval for Phase II. (*Id.* P 51.) The Amended Complaint alleges that this statement was false because Enzo did not have Phase I data that it could submit to the FDA for approval. (*Id.*) The Court finds that these allegations are pled with the specificity required under the PSLRA.

These statements, however, are not material and are not actionable as a matter of law. The statement as to Enzo's opening of three more clinics to treat HIV and AIDS patients by the end of fiscal year 2000 is a statement as to future events – a loose prediction as to the timing of the achievement. Plaintiffs even acknowledge **[\*29]** in their own pleadings that the statement was a prediction. (Am. Compl. P 50.) They acknowledge the events that would have to take place in order for Enzo to be able to open up more clinics and to receive revenue from those clinics: Enzo needed FDA approval to open the clinics for revenue. (*Id.*) Furthermore, Plaintiffs admit that "in any event" such approval could not be obtained in such a short period of time. (*Id.*) Also, Enzo had disclosed, in its 1999 Form 10K, that the three phases of clinical trials could take two to five years. (Chase Decl., Ex. J., p. 10.) Thus, a reasonable investor would not rely on this statement, and the statement does not alter the "total mix" of information available to investors. *See Raab*, 4 F.3d at 290.

The statement that Enzo had submitted its Phase I data to the FDA and that company was awaiting approval for Phase II is not material. In the same pleading, Plaintiffs acknowledge that Enzo had "only one patient [who] had been treated and the data from that patient was not confirming any of Enzo's pre−contemplated or any valued therapeutic markers." (Am. Compl. P 51.) Thus, Plaintiffs admit that Enzo had some data that it could **[\*30]** submit to the FDA, even if it was data from only one patient. Furthermore, various company press releases confirm that Enzo was developing a Phase II protocol, but warned that Phase I was not complete. (Chase Decl., Exs. F & G.). Therefore, considering the totality of the information available to investors, this statement is not material.

At the shareholders' meeting, Mr. Weiner made several statements concerning Enzo's HGTV−43 vector for delivering genes to human cells, a process called transduction. (*Id.* PP 52−58.) Mr. Weiner stated that "Enzo scientists had been able to substantially reduce the time period required for successful transduction to 18 hours, as compared to previous transduction times of up to three months." (*Id.* P 53.) Mr. Weiner also stated that the gene transfer vector was able to achieve levels of stable transduction to the patients' non−growing blood stem cells greater than 30%. (*Id.* P 55.) He stated that the HGTV−43 vector was ready for commercialization. (*Id.* P 56.) Also, in a press release, Enzo stated that it was exploring expansion of its trials. (*Id.*) Furthermore, at the shareholders' meeting and in previous press releases, Enzo (individual **[\*31]** unspecified) made reference to its "universal, patented, and ready to be commercialized vector of choice." (*Id.* P 57.) Plaintiffs allege that these statements were false when made because: (1) Mr. Weiner omitted that the absence of any positive data from previous patients had caused Enzo to directly modify the protocol (*id.* P 53); (2) Mr. Weiner omitted that "the data had been negative and had put the trials behind in terms of the period of time that had transpired from the FDA approval to commence the trials – July 13, 1998 – to the issuance of Mr. Weiner's statement (*id.* P 54); (3) the HGTV−43 vector has not been commercialized (*id.* P 56); (4) the HIV protocol trials have not expanded nor has any written protocol been presented to expand the HIV trials (*id.*); and (5) Enzo was using Lipofectin, a system not owned by Enzo, to transduce its antisense genes (*id.* PP 57−58). The Court finds that these allegations are pled with the required specificity under the PSLRA.

However, neither Mr. Weiner's statements regarding the HGTV−43 vector nor Enzo's press release are material statements actionable under the federal securities laws. In these allegations, Plaintiffs **[\*32]** assume that Enzo, and more specifically Defendant Weiner, had a duty to speak as to every aspect of the FDA clinical trials. [HN22] "In order for there to be liability under 10b−5 for omissions or nondisclosure ... a duty to speak must exist." *Walker v. Action Industries*, 802 F.2d 703, 706 (4th Cir. 1986), *cert. denied*, 479 U.S. 1065, 93 L. Ed. 2d 1000, 107 S. Ct. 952 (1987). Such a duty generally arises when omitting particular facts makes some existing statement misleading. *See* 17 C.F.R. § 240.10b−5. Concerning the allegation that Enzo had reduced its transduction time to 18 hours, Plaintiffs themselves admit that "Enzo ... had decided that 18 hours of transduction was all the cells could tolerate of the originally 'months long' process of transduction and growth." (Am. Compl. P 53.) Thus, the statement is immaterial because Defendant Weiner's comments had a factual basis which was not false. Plaintiffs make other allegations concerning Enzo's HGTV−43 vector; however, the Plaintiffs choose to turn a blind eye to the publicly available information. Contemporaneous with the annual shareholders' meeting, Enzo issued documents **[\*33]** indicating that the HIV/AIDS protocol remained in the Phase I trial: (1) the 1999 Form 10K (describing the Phase I clinical trial process and the duration of the three phases of clinical trials); (2) a January 12, 2000 press release (cautioning that the Phase I trial was not yet completed and "that further evaluation of treated individuals and treatment of additional patients was needed to fully document efficacy") (Chase Decl., Ex. F). Thus, no reasonable investor would rely solely on these statements in light of other information indicating that the protocol remained in Phase I and that Phase I was focused on determining the safety of the protocol. Regarding the commercialization of Enzo's HGTV−43 vector, those statements are projections of future events and are expressions of optimism about the potential of commercializing the HGTV−43 vector. Plaintiff allege that the statements about HGTV−43's potential for commercialization are false because they have not been commercialized. However, as discussed previously, the statements referred to HGTV−43 *being ready* for commercialization: this is optimism, not actionable as a matter of law.

Plaintiffs allege that Mr. Weiner discussed [*34] the possibility that Phase II and Phase III would be fast–tracked on the basis of compassionate use. (*Id.* P 59.) Plaintiffs contend that this statement was false because "Weiner had no basis whatsoever to make such a statement, which was not only false, but irresponsible." (*Id.*) The Court finds that Plaintiffs fail to plead this statement with the required specificity because conclusory statements as to the effect of a particular fact will not support allegations of fraud. Furthermore, these statements are predictions of future events: Mr. Weiner discussed the *possibility* of fast–tracking. The statement is an opinion about the course Enzo may follow if approved by the FDA, not a guarantee that the protocol would be fast–tracked. A reasonable investor would not rely on this statement, and it is immaterial. *See Raab*, 4 F.3d at 290.

d. *Preparations for the Second Dump*

In this section of the Amended Complaint, Plaintiffs allege that the Defendants engaged in disseminating false information to the public to pump up the price of the Enzo stock for a second dump. (Am. Compl. PP 77–91.) Allegedly in response to a stock market downturn, Enzo issued a press [*35] release stating that the company had a "solid and uniquely strong scientific position" and that Enzo was in a position "to play a key role in the rapidly advancing field of biotechnology as this millenium gets underway." (*Id.* P 78.) The press release also stated that: (1) the clinical study at the University of California for HIV–1 infected patients was "moving towards its final stages;" (2) HGTV–43 has "successfully delivered – and continues to deliver – antisense genes effectively and quickly to blood stem cells outside the human body;" (3) following transduction and infusion into the patients, "the genetically engineered cells continue to survive in circulation and continue to produce antisense RNA over many months;" (4) an abstract would be presented at the American Society of Gene Therapy in June; (5) Enzo did not know of any other system that had achieved "these levels in unablated adult patients (patients in which the blood cells have not been destroyed); (6) plans for Phase II clinical studies are now proceeding. (*Id.* P 79.)

Plaintiffs allege that these statements are false because "Enzo's trials had not produced promising results, and as to the HIV trials, [the trials] [*36] had actually produced very negative results." (*Id.* P 81.) Enzo had not filed for Phase II approval, during which efficacy is studied. (*Id.* P 82.) "Enzo never had any attributable efficacy to report at any time with its [HIV] protocol and University of California at San Francisco trials and did not have any attributable efficacy to study as a result of its Phase I effort." (*Id.*) Plaintiffs allege that Enzo omitted that the data collected was based on five patients (*id.* P 84); furthermore, Enzo did not have a schedule in place for its testing (*id.*). The Court finds that the above–cited statements are pled with the required specificity.

The statements discussed above, however, are not material within the confines of the securities laws because all of the statements, except (2) and (3), are "puffery." The Fourth Circuit has explained that [HN23] "soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." *Hillson Partners L.P. v. Adage, Inc.*, 42 F.3d 204, 211 (4th Cir. 1994). Concerning Enzo's statements that it was poised to succeed and to play a key role in the market, [*37] the Court finds that the statements are a mere series of sales pitches and can be squarely classified as "puffery." Statements (1), (4), (5) and (6) are mere expressions of hope regarding the future of Enzo and its HIV protocol. For example, "the study at the University of California was moving towards its final stages." (Am. Compl. P 82.) Nothing in the language evinces a guarantee of a final product; the statement merely reflected that Enzo believed that the study was progressing. See also statement (4) ("an abstract would be presented") and statement (6) ("plans ... are now proceeding"). These statements are worded in indefinite and non–committal language, and they are not actionable under the securities laws.

As to statements (2) and (3), Plaintiffs offer that Enzo had little or no efficacy data to report or to study and that the data was based on only five patients. Plaintiffs, once again, seek to second guess the decisions of the company, and they interject their own theories of science and bioengineering to masquerade their own misunderstanding of the clinical trial process. As previously stated on several occasions in this Memorandum Opinion, the goal of the Phase I clinical [*38] process was to determine the safety and preliminary effectiveness of the drug – not the overall efficacy of the drug. In their own pleadings, Plaintiffs admit that Phase II was when Enzo would study the actual efficacy of the drug. (Am. Compl. P 82.) In addition, Plaintiffs confuse the effectiveness of Enzo's gene delivery platform with the efficacy of the drug in treating HIV, that is, increasing the T–cell count and decreasing the viral load. Plaintiffs assume, at their convenience, that the Phase I trials were established to demonstrate effectiveness in treating HIV; however, they undeniably admit that in its Phase I trials, Enzo was focused on determining safety and in *measuring* and *monitoring* the T–cell count and viral load. (*Id.* PP 4–5.) Thus, Plaintiffs seek to impose liability on Enzo and the Individual Defendants on completely inapposite grounds; this they may not do successfully. The record before the Court, however, is clear; and, the minutes of the Recombinant Advisory Committee ("RAC") meeting reveal that the HGTV–43 vector successfully engrafted Enzo–engineered cells: "these data support the conclusion that stable engraftment of some of the antisense RNA–producing [*39] PBSC has occurred." (Chase Decl., Ex. O, p. 3.) Therefore, statements (2) and (3) are immaterial because the statements were based on actual verifiable facts.

Plaintiffs also allege that Enzo misstated its patent estate by stating that it had been awarded over 200 patents worldwide. Enzo has 36 patents issued by the United States Patent and Trademark Office; the remaining patents are, allegedly, the same patents issued in other countries. (*Id.* P 80, 90–91.) The Court finds that this allegation does not meet the pleading requirements of the PSLRA because the allegation that Enzo owned only 36 U.S. patents and that the remaining patents were issued in other countries does not show that Enzo did not own "approximately 200 worldwide patents." (Emphasis added). The allegation fails to set forth how Enzo's valuation of its patent estate was false.

Plaintiffs allege that after the market price of the stock collapsed to $ 35, "Enzo issued a press release stating that it had no explanation for the collapse in the price of the stock, all remained well with Enzo, and the human trials currently being conducted were on schedule." (*Id.* P 85.) Plaintiffs allege that this press release [*40] was materially false because "Enzo knew that the transfer of the 600,000 shares that had not been publicly released was a negative as it demonstrated a lack of confidence by top management." (*Id.*) The press release, allegedly, also omitted to

state that Enzo had no schedule regarding the trials. (*Id.*) The Court finds that this allegation satisfies the pleading requirements under the PSLRA. The allegations, however, are not material as a matter of law because [HN24] mere allegations of "fraud by hindsight" will not satisfy the requirements of the PSLRA. *In re Criimi Mae, Inc., Sec. Litig.*, 94 F. Supp. 2d 652, 662 (D. Md. 2000) (quoting, in part, *Hillson Partners L.P.*, 42 F.3d at 209). In addition, the allegations fail to meet the requirements of Rule 10b–5 as to materiality in fraud on the market cases because the information had not been publicly released; therefore, this allegation is not actionable.

At the RAC meeting of March 8, 2001, Enzo's data from the Phase I trial of its HIV protocol was reviewed. (*Id.* P 86.) Plaintiffs allege that the data did not support the "picture" that Enzo had painted for the investment community. (*Id.* [*41] PP 86–89.) Plaintiffs use these allegations to support their argument that Enzo knew that the Phase I trials were not proceeding according to plan and that Enzo should have disclosed their progress to the public. As explained in *In re Medimmune, Inc., Securities Litigation*, questioning by the FDA does not impose a duty upon the Defendants to disclose every aspect of the review or of the dialogue between the company and the FDA. In re Medimmune, Inc., Sec. Litig., 873 F. Supp. 953, 966 (D. Md. 1995). That court wrote:Mere questioning by the FDA imposed no duty upon Defendants either to trim back their opinions as to the efficacy of the drug or to report to the public the FDA staffers' questions as they arose. Continuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process. Questions may emanate from one or more staffers in random and sporadic fashion. Many, if not all, questions presumably get answered in the process. Requiring ongoing disclosure of FDA's questions would not only be disruptive to the review process; it could easily result in misleading the public more than not reporting the questions. Where mere disclosure of a question [*42] might cause the company's stock to decline in value, the eventual answer to the question might cause it to rise once again.*Id.* The Court finds that Defendants had no duty to report its ongoing discussions with the FDA during the review process. Furthermore, a reasonable investor had enough information to understand that the HIV protocol remained in its Phase I trial and that the purpose of the Phase I trial was to determine how safe the protocol was and to monitor and measure the protocol's effect on its target – not to determine whether the HIV protocol was effective against HIV, as Plaintiffs would have the Court believe. Therefore these statements are not actionable as a matter of law.

e. *Circulation of False Inside Information*

In this portion of the pleadings, Plaintiffs allege that Mr. Weiner and Mr. Gross provided misleading information about Enzo's prospects to certain brokers. (*Id.* PP 92–94.) Plaintiffs provide a list of the alleged misrepresentations (*id.* P 93); however, they fail to provide any facts as to how these statements were false. Furthermore, Plaintiffs impermissibly group Mr. Weiner and Mr. Gross as they fail to attribute a specific statement [*43]  to a specific Defendant. The Court finds that these allegations fail to meet the requisite specificity under the PSLRA or Rule 9(b) because they fail, simply, to set forth the reasons why the statements were false.

f. *The Planned Second Dump*

Plaintiffs contend that the Defendants engaged in a second "pump and dump" scheme whereby they disseminated false information to the public, sought to raise the price of the Enzo stock, and attempted sell their Enzo shares through a private placement. (*Id.* PP 95–115.) Plaintiffs allege that, as part of the scheme, Enzo provided false and inflated revenue estimates to an investment analyst who projected an initial price target of $ 111 per share. (*Id.* P 103.) However, Plaintiffs fail to provide how the information was false; mere conclusory statements as to the effect of the facts will not suffice.

Plaintiffs assert that Defendant Hy Gross also participated in disseminating false information by telling investors that: (1) Enzo was planning to file, within 90 days, a series of patent infringement suits for certain patents issued in the United States and Japan; (2) UBS Warburg (an investment broker) was waiting to issue a report until [*44]  September (year unknown) to allow certain "important customers to front–run the report and ... to wait until their European clients came back from their August vacation;" and (3) the initial report would be followed by a 30–page report distinguishing Enzo from other biotech companies. (*Id.* P 104.) Mr. Gross allegedly also disseminated a claim that Enzo had cured liver cancer in humans. Plaintiffs, however, fail to provide any facts or an explanation as to how these statements were untrue. Also Plaintiffs fail to allege, with specificity, when and how these statements were disseminated, how they impacted the market price of Enzo's shares, or whether Mr. Gross had any knowledge, or any reason to have knowledge, of the alleged falsity of the statements. *See Phillips*, 190 F.3d at 613; *Hillson Partners L.P.*, 42 F.3d at 208; *Arnlund*, 199 F. Supp. 2d at 475. Plaintiffs' allegations fail to meet the heightened pleading standards of the PSLRA.

In addition to the previous statements, Plaintiffs allege that Mr. Gross told an Enzo shareholder that Mr. Gross had just purchased 40,000 shares of Enzo at a cost of $ 2 million. (*Id.* P 105.)  [*45]  According to Plaintiffs, Mr. Gross subsequently admitted to another shareholder that he had not made the previous purchase, but merely made the statement about the purchase so that the other shareholder would not sell his shares. (*Id.*) Plaintiffs' allegations on this point satisfy the pleading requirements of the statute and will be further analyzed as to materiality and scienter.

Mr. Gross' statements, however, are not material because, as pleaded, the statements were not publicly disclosed and a reasonable investor, taking all publicly available information, would not have reasonably relied on such information. [HN25] In determining whether a statement affects the total mix of information, the Court must consider whether the statement was made "in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media, ... if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes." *Texas Gulf Sulphur Co.*, 401 F.2d 833, 862. Mr. Gross' statement to one shareholder about his alleged purchase of 40,000 Enzo shares [*46]  fails to rise to the level of information "reasonably calculated to influence the investing public." The statement was confined to one shareholder. Furthermore, Plaintiffs fail to explain how this one shareholder encompasses "the investing public;" the single shareholder could be one individual as well as

one institutional investor. In addition to its limited release, the statement does not affect the "total mix" of information. Mr. Gross' statement is not the kind of information that a reasonable investor relies upon, such as financial statements, public filings, and press releases. This statement is not actionable as a matter of law.

Plaintiffs allege that Mr. Weiner "planted a false and misleading article in Business Week Online." (*Id.* P 106.) Plaintiffs allege that the article stated that "there was an interest by major pharmaceuticals to do a joint venture with Enzo and there had been a buyout offer." (*Id.*) Plaintiffs contend that the statement was false because no buyout offer had ever been made. (*Id.*) Plaintiffs also allege that Mr. Weiner was quoted as saying that Enzo was the only company that had been able to obtain engraftment without ablation. (*Id.* P 107.) [*47] Plaintiffs contend that the statement was false when issued because three months later, Enzo attempted to amend its protocol to include ablation as engraftment had failed. (*Id.*) Plaintiffs, however, fail to provide any specifics as to how Mr. Weiner controlled the context of the article, or the author's name or the date of issue. *See Raab,* 4 F.3d at 288 [HN26] ("The securities laws require [defendants] to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if third party attributes the statement to [defendants]").

Plaintiffs maintain that in a press release dated October 2, 2000, Enzo reported that "new data on the first individual treated in the Phase I clinical trial of HGTV−43, the company's HIV−1 gene medicine product, show that after nine and one−half months Enzo engineered cells have successfully engrafted in the patient's bone marrow and were spawning new differentiated CD4+ cells designed to fight the virus." (*Id.* P 108.) Plaintiffs contend that this statement was false when made because the data Enzo disclosed to the public on March 8, 2001, at the RAC, indicated that engraftment [*48] had actually failed. (*Id.* P 109.) Furthermore, Plaintiffs provide other allegations describing scientific evidence that potentially contradicts the press release. (*Id.* P 109−112.) When viewed together, these allegations satisfy the pleading requirements of the PSLRA.

These allegations, however, are not material as a matter of law. To explain the matter at issue in this statement, a vector is a platform for delivery of genes to stem cells. Engraftment is the successful delivery of those cells into a patient's bone marrow. Enzo's press release stated, simply, that the HGTV−43 medicine product had successfully delivered some of the Enzo engineered cells to the patient's bone marrow and that those cells were spawning cells designed to fight HIV. Plaintiffs contend that the statement is false because a later discussion before the RAC disclosed that the Enzo engineered cells that had engrafted had not been successful in fighting HIV, that the patient's viral loads had actually increased, that Enzo placed the patients on HAART, a standard HIV+ drug based therapy, and that the original protocol had been abandoned or substituted because of the introduction of HAART. Although at first [*49] blush Enzo's statements seem false and in contradiction of the true data, the statements correctly reflected the results up to that point. Plaintiffs continue to confuse the goals of Phases I and II in contradiction to the public record. At the RAC Committee meeting, Enzo stated that cells had engrafted, but that not enough cells had been engrafted to impact T−cells or the viral load. (Am. Compl., Ex. 6 at 65−66 ("... the number of transduced CD34 cells that we got to the bone marrow is so low and they continue to produce CD4 cells in that appropriate ratio that we are not seeing the numbers go up[;] ... we need to get up to 10% transfected CD34 cells in the marrow making a significant number of CD4 cells in the peripheral circulation.").) Thus, in keeping with its Phase I goal, Enzo had, in fact, successfully engrafted some of its cells; however, these cells had not been successful in decreasing the T−cell count or decreasing the viral load – a Phase II goal. The Court concludes that Plaintiffs mischaracterize the record. In light of the total mix of information and a basic understanding that the Phase I goal, as described in many publicly disclosed documents, was to test the safety [*50] of the protocol and measure and monitor the T−cell count and viral load, the Court concludes that the Enzo's statements in the October 2, 2000 press release are not actionable under the securities laws.

Plaintiffs assert that Dr. Engelhardt, in a press release, stated that "this is a dramatic result, one that underscores, in the light of other achievements we have recorded in this trial, that our gene medicine and technology designed to counter the HIV virus in on the right track." (*Id.* P 113.) Plaintiffs contend that this statement was false because Enzo's protocol had not proven to be effective in fighting the HIV agent. (*Id.*) The Court finds that these allegations meet the pleading standards set forth in the PSLRA. However, the statement is not actionable because it is merely inactionable puffery. *See Raab,* 4 F.3d at 290. Dr. Engelhardt's statement that the Enzo protocol is "on the right track" is a generalized positive statement about the progress of the protocol −− it is not worded as a guarantee. The statement is immaterial.

3. Scienter and Conspiracy Theories

[HN27] The PSLRA requires that the complaint in a securities fraud case "state with particularity [*51] facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u−4(b)(2). A complaint that fails to comply with these requirements must be dismissed on defendant's motion. *See* 15 U.S.C. § 78u−4(b)(3)(A). The ultimate determination for the Court under the scienter inquiry is whether, taking the totality of the circumstances as alleged in the complaint, the allegations support a "cogent and persuasive ... inference that a defendant acted intentionally, consciously, or recklessly." *In re Microstrategy,* 115 F. Supp. 2d at 633−34. [HN28] A plaintiff may plead scienter by alleging either (1) motive and opportunity to commit fraud or (2) recklessness. *Phillips,* 190 F.3d at 621. A plaintiff may plead motive and opportunity by showing both that the defendant would receive "concrete benefits" by making the misrepresentation, and that the defendant had the "means and likely prospects of achieving" those benefits." *Id.* Recklessness is defined as a highly unreasonable act or an extreme departure from the standard of ordinary care where the defendant either knew of the [*52] danger of misleading the plaintiff or the danger was so obvious that the defendant must have been aware of it. *Phillips,* 190 F.3d at 621. In order to meet this high burden, Plaintiff must plead with particularity the facts creating a strong inference that each of the Enzo Defendants had the motive and opportunity to commit fraud or consciously or recklessly made material misstatements or failed to disclose material information. *In re Trex Co. Sec. Litig,* 212 F. Supp. 2d 596 (W.D. Va. 2002). Plaintiffs, however, will not be permitted to proceed based on theories of aiding and abetting which are precluded by *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 128 L. Ed. 2d 119, 114 S. Ct. 1439 (1994).

Plaintiffs proceed under a general theory that the Defendants conspired to pump the price of the stock, on two occasions, so that they could sell their stock at these elevated prices. The Defendants allegedly achieved this by disseminating several false statements, either at the 2000 annual shareholders' meeting or through press releases. [HN29] Although as a general rule plaintiffs may not proceed under theories of aiding **[*53]**    and abetting or conspiracy to violate Section 10(b) or Rule 10b–5, Plaintiffs may proceed under a conspiracy theory so long as they can show that each Defendant involved in the conspiracy would be primarily liable. *See In re Enron Corp. Secs., Derivative & ERISA Litig.,* 235 F. Supp. 2d 549, 592 (S.D. Tex. 2002).

a. *Defendants John DeLucca, Elazar Rabbani and Shahram Rabbani,*

Plaintiffs allege that John DeLucca, a member of Enzo's Board of Directors, sold all of his Enzo holdings when the Enzo stock price hit a 15–year high at approximately $ 81 per share. Plaintiffs contend that Mr. DeLucca is liable as a controlling person. Plaintiffs further allege that Elazar and Shahram Rabbani transferred or sold 400,000 shares of Enzo stock on March 28, 2000, at an inflated market value of over $ 48 million. (Compl. P 74.) They contend that the Rabbanis are liable as controlling persons because Elazar Rabbani was Enzo's Chief Executive Officer and Shahram Rabbani was Enzo's Chief Operating Officer. Plaintiffs, however, fail to provide any facts asserting primary liability as to Defendants DeLucca, Elazar Rabbani or Shahram Rabbani under Section 10(b). Specifically, Plaintiffs **[*54]**  fail to allege how these Defendants perpetrated a fraud: how they misrepresented certain facts or how they omitted material facts. The only allegations in the Amended Complaint as to these Defendants are that they sold their shares in a favorable market. The Court finds that Plaintiffs fail to establish primary liability as to Defendants DeLucca and the Rabbanis. *See Central Bank,* 511 U.S. at 176–77; *Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215, 1226–27 (10th Cir. 1996) (finding [HN30] that section 10(b) requires an actual misrepresentation by the defendant for liability to attach). In *Central Bank,* the Supreme Court held that persons who do not actually make misrepresentations but only "give a degree of aid to those who do" are not liable for securities fraud. 511 U.S. at 176–77. Absent additional allegations beyond those that these defendants sold shares of Enzo and that they were company officers, the Court concludes that Plaintiffs fail to state a federal securities violation claim for which relief may be granted as to Defendants John DeLucca, Elazar Rabbani and Shahram Rabbani. Accordingly, the Court does not consider Mr. Delucca's **[*55]**  or Messrs. Rabbani's sales of Enzo stock in the overall determination of scienter.

b. *Defendants Barry Weiner, Dean Engelhardt and Heiman Gross*

Considering the allegations against the remaining Defendants, the Court finds that Plaintiffs fail to allege scienter with the requisite particularity as to Barry Weiner, Dean Engelhardt, or Heiman Gross. Plaintiffs allege that Defendants Weiner, Engelhardt and Gross "conspired" to pump up the price of the Enzo stock so that they could sell their own shares at artificially inflated prices. They allegedly achieved this by disseminating the various statements discussed in Part II.B.2., supra, generally: (1) the progress of the clinical trials for the HIV protocol, (2) the efficacy of the Enzo gene therapy, (3) Enzo's patent estate of over 200 worldwide patents, and (4) Enzo's undertaking of a major diagnostic transaction with a drug company in the near future. In addition, Plaintiffs allege that Dr. Engelhardt sold approximately $ 350,000 worth of stock in March 2000, and that Mr. Weiner sold or transferred 200,000 shares of Enzo stock on March 28, 2000 at a market value of over $ 48 million.

Plaintiffs' theory of scienter fails for several **[*56]**  reasons. First, as discussed in Part II.B.2., *supra,* the Court determined that the Amended Complaint fails to adequately allege that Defendants' statements were either material or false, affirmatively or through omissions. Thus, Plaintiffs fail to adduce any direct or circumstantial evidence of reckless behavior on the part of the Defendants in making the alleged statements. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813–14 (2d Cir. 1996). Second, the general motive of a corporation or its corporate officers to increase share price and to paint a favorable business picture of the corporation are not sufficient motives for fraud in these circumstances. *See In re Trex Co.,* 212 F. Supp. 2d 596, 607 (W.D. Va. 2002); *In re Microstrategy,* 115 F. Supp. 2d at 642–43. *See also Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir. 1994) (holding that accepting motive of scienter that defendant corporate officers were motivated by incentive compensation "would effectively eliminate the state of mind requirement as to all corporate officers and defendants"). [HN31] An inference based on a general **[*57]**  motive shared by all corporate officers is not probative of scienter absent additional circumstances because "to find such allegations sufficient would unfairly infer an intent to defraud based on the position an individual held within a company." *In re Microstrategy,* 115 F. Supp. 2d at 642–43; *see also In re Criimi Mae, Inc. Sec. Litig.,* 94 F. Supp. 2d at 659–663 (explaining how pleading scienter by making references to what the defendant corporate officers knew or recklessly disregarded is not sufficient where the allegations applied to any corporate officer). Therefore, Plaintiffs' theory that the Defendants acted with scienter because they were officers of the company fails as a matter of law in this instance.

Third, Plaintiffs' allegations that the insiders benefitted from the alleged sales and transfers of stock are not plead with the requisite specificity. Plaintiffs maintain that for the fifteen years preceding the alleged fraudulent scheme, the market price of Enzo common stock was less than $ 20 per share. (Am. Compl. P 10.) As a result of the dissemination of the fraudulent statements generated at the January 2000 shareholders' meeting,  **[*58]**  Plaintiffs allege, the price of Enzo stock increased from $ 44 to $ 139 per share within two weeks. (*Id.* P 45.) They allege that on January 24, 2000, Enzo stock opened at $ 125, rose to $ 139, and closed at $ 78. (*Id.*) Plaintiffs then assert that Dr. Engelhardt subsequently sold approximately $ 350,000 worth of stock in March 2000 and that Mr. Weiner transferred 200,000 shares of Enzo stock on March 28, 2000. (*Id.* PP 73–74.) To establish a link between the timing of the sales by the Defendants and the alleged misrepresentations, Plaintiffs allege that the March 28 sale "occurred within a few days of the alleged promised openings of the clinics and the anticipated revenue stream." (*Id.* P 76.) Within approximately two weeks of these sales, the market price of Enzo stock had dropped from $ 81 to $ 35 per share.

Although Plaintiffs provide some detail as to how the price of Enzo common stock fluctuated between 1998 and 2000, they fail to tie any alleged activity or wrongdoing by the Defendants to the actual price fluctuations. For example, Plaintiffs contend that Enzo stock opened on January 24, 2000, at $ 125, rose to $ 139, and closed at $ 78; this movement in the price, **[\*59]** allegedly, was a result of the "false and misleading" statements that were made at the January 2000 annual shareholders' meeting. The next event in their scienter theory is that the Defendants sold or transferred some of their Enzo shares in March 2000. However, these two events, taken together, do not raise a strong inference of scienter.

 [HN32] Generally, fraudulent intent is not inferred from the sale of stock by some officers of the corporation. *See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540 (3d. Cir. 1999); In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1424; San Leandro Emergency Med. Group, 75 F.3d at 813–14; Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1224 (1st Cir. 1996).* "If the stock sales were unusual in scope or timing, they may support an inference of scienter." *In re Advanta,* 180 F.3d at 540. However, in this instance, Plaintiffs have not alleged with specificity how Mr. Weiner's or Dr. Engelhardt's sales were unusual in scope or in timing. The temporal link Plaintiffs allege is not sufficient, in and of itself, to raise a strong inference of fraudulent intent. For example,  **[\*60]**  in *Burlington Coat Factory Securities Litigation,* the Court of Appeals for the Third Circuit found that the alleged insider stock sales did not raise a strong inference of scienter because:only three of the five defendants had sold stock, plaintiffs provided information on the total stock holdings of only one defendant who had traded only 0.5 percent of his holdings, and plaintiffs failed to plead facts indicating whether such trades were 'normal and routine' for the defendants and whether the trading profits were substantial in comparison to their overall compensation.*In re Advanta,* 180 F.3d at 540 (summarizing the circumstances of the court's previous holding in *Burlington Coat Factory*). Unlike the plaintiffs in *Burlington Coat Factory,* Plaintiffs here fail to provide any information on Mr. Weiner's or Dr. Engelhardt's overall Enzo stock holdings, or what percentage of their total holdings they had sold in March 2000, or whether these transactions constituted substantial profits in comparison to their overall compensation. Plaintiffs failed to allege how Mr. Weiner's and Dr. Engelhardt's trades were abnormal or random.  **[\*61]**  Plaintiffs allege that Defendant DeLucca sold all of his shares; however, Mr. DeLucca is not alleged to have made any misrepresentations or omissions. Thus, as stated previously, Mr. DeLucca's sales may not form a basis for scienter for the other Defendants. "To the extent plaintiffs choose to allege fraudulent behavior based on what they perceive as 'suspicious' trading activity, they have to allege facts that support that suspicion;" n5 this they have failed to do.

– – – – – – – – – – – – –Footnotes – – – – – – – – – – – – – –

n4 Defendants contend that Mr. Weiner did not actually sell his shares, but actually transferred 200,000 shares by gift from the RJ Children Corp. to RJ Children Trust. Thus, Mr Weiner did not actually sell his shares as alleged in the Amended Complaint. However, the Court accepts the pleadings in the Amended Complaint as true.

n5 *In re Burlington Coat Factory,* 114 F.3d at 1423.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – – –

Fourth and last, the private placement agreement, allegedly part of the second "pump and dump" scheme, is irrelevant as to scienter because the parties **[\*62]**  did not carry out the agreement and because an insider sale, either public or private, would have to be disclosed in accordance with 15 U.S.C. § 78p. Thus, the statutes do not prohibit the Defendants from engaging in a private placement so long as the transaction meets the reporting and registration requirements set forth in the United States Code and the regulations promulgated therefrom. Selling through a private placement requires creating a document, such as a private placement memorandum, which, although confidential, clearly discloses the identity of those shareholders intending to sell, how much they will sell and what their holdings will be after the sale. These disclosures would occur before the sale, and the fact of the sale would also become public after the transaction. Plaintiffs fail to explain the relevance of the aborted private placement. Plaintiffs' argument that the private placement agreement was an additional motive and opportunity where the Defendants engaged in fraudulent activity is inapposite and misplaced. Furthermore, the Defendants have retained their substantial holdings of Enzo stock for more than 20 years – this fact strongly negates **[\*63]**  scienter.   *See San Leandro Emergency Med. Group, 75 F.3d at 813–14; In re Advanta,* 180 F.3d at 541.

As to Mr. Gross, Plaintiffs have not shown either motive and opportunity or recklessness. The Amended Complaint lacks any allegation that Mr. Gross profited in any way from his alleged misconduct. The only allegation that pertains to Mr. Gross' motive and opportunity is that he told another shareholder, some time after March 2000, that he had purchased 40,000 shares of Enzo, while telling another shareholder that this was untrue. The Court has previously found that this statement is not material as a matter of law; even assuming its materiality, the statement fails to raise a strong inference of scienter as to Mr. Gross because the Amended Complaint utterly fails to show how Mr. Gross benefitted from the misrepresentation. Mr. Gross was not involved in the day–to–day operations of Enzo, he was a consultant. (Am. Compl. P 18.) However, his relationship as a consultant to Enzo is not clearly established beyond the conclusory statement that he was authorized to speak on the company's behalf. (*See id.*) Outside of these allegations, Plaintiffs fail to **[\*64]**  provide the requisite facts relating to the alleged false rumors purportedly disseminated by Mr. Gross. (*Id.* P 92.) The Amended Complaint also lacks the particularized allegations sufficient to show the type of extremely reckless conduct required by the PSLRA. *Phillips,* 190 F.3d at 620. The Plaintiffs fail to specify what information Mr. Gross

allegedly had which directly contradicted the statements allegedly made. The Amended Complaint fails to satisfy the pleading requirements as to Mr. Gross' scienter.

c. *Summary*

From the foregoing, the Court concludes that Plaintiffs' scienter theory – that the Defendants conspired to pump the price of the stock, on two occasions, so that they could sell their stock at this elevated prices – fails because: (1) the Defendants may not be held liable under a conspiracy theory absent individual liability by the alleged conspirators; (2) Mr. DeLucca and Messrs. Rabbani are not primarily liable and their alleged sales do not constitute motive and opportunity nor are their sales considered in the scienter analysis for the remaining Defendants; (3) Mr. Weiner's and Dr. Engelhardt's alleged misrepresentations are either immaterial **[*65]** or supported by fact at the time they were made; (4) the general motive of a corporation or its corporate officers to increase share price and to paint a favorable business picture of the corporation is not sufficient motive for fraud in these circumstances; (5) Plaintiffs' allegations that the insiders benefitted from the alleged sales and transfers of stock are not pled with the requisite specificity; (6) the private placement agreement, allegedly part of the second "pump and dump" scheme, is irrelevant as to scienter because the parties did not carry out the agreement and because an insider sale, either publicly or privately, would have to be disclosed in accordance with 15 U.S.C. § 78p; (7) the Defendants have retained their substantial holdings of Enzo stock for more than 20 years; and (8) Mr. Gross' alleged misrepresentations are immaterial, and, even assuming their materiality, the Amended Complaint lacks a nexus between the alleged misrepresentations and any benefit conferred upon Mr. Gross as a result.

4. Reliance

Plaintiffs proceed under both a face to face transaction theory and a fraud on the market theory. As previously discussed, to state **[*66]** a valid claim for securities fraud resulting from a face to face transaction, the plaintiff must allege all five elements discussed in *Phillips*. Furthermore, the plaintiffs reliance must be justifiable in light of the information disseminated to the public. *Banca Cremi S.A. v. Alex. Brown & Sons,* 132 F.3d 1017, 1027–28 (4th Cir. 1997). [HN33] When proceeding under a fraud on the market theory, the plaintiff need not plead direct reliance or that the fraudulent practice was in connection with a particular sale or purchase of securities. Instead, the plaintiff need only show the means of dissemination and the materiality of the misrepresentation. *Basic, Inc.,* 485 U.S. at 244; *Texas Gulf Sulphur Co.,* 401 F.2d 833; *Miller v. Bargain City, U. S. A., Inc.,* 229 F. Supp. 33, 39 (E.D. Pa. 1964).

Plaintiffs allege that they "reasonably relied on those misrepresentations in deciding to purchase Enzo stock." (Am. Compl. P 133.) Plaintiffs offer little, if anything at all, beyond this conclusory allegation that supports their contention that they individually relied on any one of the numerous alleged misrepresentations. Plaintiffs provide their brokerage statements setting forth **[*67]** the thousands of daily transactions in Enzo stock. However, Plaintiffs fail to link each alleged purchase and sale with an alleged misrepresentation. For example, during January 2000, Plaintiffs purchased, on January 26, 30,000 shares of Enzo stock and sold 31,000 shares; on January 28, Plaintiffs bought 20,000 shares and sold 20,300 shares; on January 31, Plaintiffs bought 10,000 shares and sold 10,000 shares. The Court finds that the Plaintiffs' brokerage statements evince a pattern of speculative day–trading, an inherently risky undertaking, by sophisticated investors, not "hapless" plaintiffs, who systematically acquired over one million shares over a six–year period. (*See* Am. Compl. PP 24–27.) Plaintiffs' failure to link each alleged purchase or sale to an alleged misrepresentation is fatal to their claim that they individually relied on these misrepresentations. *See Banca Cremi,* 132 F.3d at 1027–28. Thus, their face to face transaction theory fails as a matter of law.

Plaintiffs also allege that they relied on the integrity of the market when they made their purchases and sales of Enzo stock; however, the Amended Complaint does not support a fraud on the **[*68]** market claim. [HN34] In order to proceed under a fraud on a market theory, the Plaintiffs need only show the means of dissemination and the materiality of the misrepresentation. *Basic,* 485 U.S. at 244. Plaintiffs must allege with particularity how the alleged false misrepresentations materially affected the market of Enzo stock. *See Nathenson,* 267 F.3d at 413–415. Plaintiffs contend that the market for Enzo stock moved "as a result of the false and misleading statements that were made at the January 2000 annual shareholders' meeting" from $ 44 to $ 139 per share within two weeks. (Am. Compl. P 45.) Plaintiffs further allege that, within two weeks of the Defendants transferring or selling their shares, the price of Enzo stock dropped from $ 81 to $ 35 per share. (*Id.* P 76.) Plaintiffs also allege that the Enzo stock rised to almost $ 75 per share as a result of the second "pump." (*Id.* P 95.) Plaintiffs' argument that the market forces, driving the price of Enzo stock, were duped by the alleged misrepresentations is premised on the conclusion that the alleged misrepresentations were material and that reasonable investors would have relied on these **[*69]** statements in valuing Enzo's stock. *See Basic,* 485 U.S. at 246–47; *Phillips,* 190 F.3d at 617; *Nathenson,* 267 F.3d at 413–14. Thus, the materiality of these statements is at issue, once again.

As stated by the Court in Part II.B.2, *supra,* some of the statements were mere "puffing," which are not the types of statements upon which the market relies. *Raab,* 4 F.3d at 289–90 ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen."); *Phillips,* 190 F.3d at 617 ("The market may well take a more jaundiced view of corporate statements—both optimistic puffery and 'holding pattern' statements like the one at hand—than an individual investor."). Furthermore, [HN35] in evaluating whether a statement is actionable, the Court examines what other public information was available to reasonable investors at the time. *Id.* at 617. The Court previously concluded that the remaining statements were not actionable as a matter of law because they were either explained more thoroughly in Enzo's contemporaneous public filings or **[*70]** were contradicted by the publicly available information. *See* Part II.B.2, *supra.* Thus, the Court finds that the alleged misrepresentations did not affect the price of Enzo stock because the market would not have relied on these immaterial statements.

This finding is further supported by the lack of any market movement after the alleged damaging discussion that took place at the RAC meeting on March 8, 2001. Plaintiffs maintain that they first became aware of the "false and misleading nature of the press releases and other statements of Enzo regarding the efficacy of its HIV treatments when Larry Glaser attended the RAC meeting, ..., on March 8, 2001." (*Id.* P 119.) It follows, from this argument, that the results of the RAC meeting were unfavorable to Enzo and would have negatively impacted the price of Enzo shares. However, during the six weeks following this meeting, the price of Enzo stock actually rose from $ 18 to $ 21. Thus, Plaintiffs' allegations fail to show how the market was affected by the allegedly false representations.

Plaintiffs' reliance upon the fraud on the market theory is also misplaced because several of the alleged misrepresentations are described **[\*71]** as insider information. [HN36] The fraud on the market theory is based upon the concept that the market price of shares traded on efficient markets reflects all publicly available information. *See Basic,* 485 U.S. at 247. By definition, insider information is information that is not publicly available, and such information may not be used to support a fraud on the market claim. Thus, Plaintiffs' claim fails for this reason as well.

5. Loss and Transaction Causation

 [HN37] In a suit brought under Rule 10b−5 (the regulatory extension of section 10(b)), "the plaintiff must show both loss causation − that the misrepresentations of omissions caused the economic harm − and transaction causation − that the violations in question caused the plaintiff to engage in the transaction in question." *Gasner v. Board of Supervisors,* 103 F.3d 351, 360 (4th Cir. 1996) (quoting *Bennett v. United States Trust Co.,* 770 F.2d 308, 313 (2d Cir. 1985)). Plaintiffs fail to set forth any facts showing that each Enzo Defendant's act or omission proximately caused the loss for which Plaintiffs seek to recover damages. Plaintiffs allege decreases in market price during certain periods and on certain days; however,  **[\*72]** they make no effort to show how any of the alleged misrepresentations had any effect on the market price during those periods. The Court concludes that the Amended Complaint fails to allege loss causation.

6. Summary of Plaintiffs' Federal Securities Claims

Plaintiffs' federal securities claims fail for several reasons. First, Plaintiffs' claims are barred by the one−year statute of limitations because Mr. Glaser admitted, before the Bankruptcy Court, that he knew about the alleged fraud no later than January 2001. Plaintiffs filed their initial complaint on March 6, 2002, more than one year after January 2001. Second, Plaintiffs fail, on several occasions, to plead fraud with the requisite specificity. Even if pled with specificity, the alleged misstatements are not material because: (1) they are puffery not actionable as a matter of law; (2) public filings supported the statements; (3) "even lies are not actionable when an investor possesses information sufficient to call the misrepresentation into question," n6 i.e., Enzo's Form 10−K explaining the clinical trial process; (4) they are statements predicting future events not worded as guarantees; (5) Enzo had no duty to report **[\*73]** on its ongoing FDA approval process; or (6) the statements were inside information not reasonably calculated to influence the investing public.


− − − − − − − − − − − − − −Footnotes − − − − − − − − − − − − − −

n6 *Phillips,* 190 F.3d at 617.


− − − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

Third, Plaintiffs may not proceed under conspiracy theories absent primary liability of the conspirators. Specifically, Mr. DeLucca and Messrs. Rabbani are not primarily liable because Plaintiff's fail to set forth how these defendants perpetrated a fraud. As to Mr. Weiner and Dr. Engelhardt and Mr. Gross, the Amended Complaint fails to set forth a cogent theory of scienter. Fourth, Plaintiffs fail to link each alleged purchase or sale to an alleged misrepresentation. Furthermore, Plaintiffs fail to show how the market relied on the alleged misrepresentations. Fifth, the Amended Complaint fails to set forth any facts showing that each Enzo Defendant's act or omission proximately caused the loss for which Plaintiffs seek to recover damages. For the reasons stated in this section, the Court dismisses Counts I and II of the **[\*74]**  Amended Complaint as to all Defendants. Plaintiffs also contend that the Individual Defendants are liable as controlling persons under 15 U.S.C. § 78t(a). Having found that neither Enzo nor the Individual Defendants are liable under either Count I or Count II, the Court dismisses any "controlling person" liability claims in the Amended Complaint as to all Defendants.

C. **Common Law Fraud − Count III**

 [HN38] Under Virginia law, in order to prevail on a claim of fraud, the plaintiff must prove by clear and convincing evidence "(1) a false representation (2) of a material fact (3) made intentionally and knowingly (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Richmond Met. Auth. v. McDevitt St. Bovis, Inc.,* 256 Va. 553, 507 S.E.2d 344, 346 (Va. 1998). Plaintiffs' claim for violation of Virginia common law fraud, Count III, fails for some of the same reasons set forth in the federal securities claim analysis,

Part II.B., supra. The heightened pleading requirements of Federal Rule of Civil Procedure continue to apply to the common law claims; although the heightened pleading standards **[\*75]** set forth in the PSLRA do not apply. However, as discussed in Part II.B.2, Plaintiffs fail to set forth any material misrepresentations of fact. Furthermore, Plaintiffs fail to show, either generally or specifically, how their trading activity evinces reliance on the alleged misstatements. For the reasons stated in Part II.B. of this Memorandum Opinion, the Court dismisses Count III of the Amended Complaint.

D. **Breach of Fiduciary Duty – Count IV**

The Court dismisses the breach of fiduciary duty claim against the Individual Defendants because this type of claim may only be asserted derivatively on behalf of the corporation. *Simmons v. Miller*, 261 Va. 561, 544 S.E.2d 666, 674 (Va. 2001); *Storey v. Patient First Corp.*, 207 F. Supp. 2d 431 (E.D. Va. 1002). Thus, as a matter of law, the breach of fiduciary duty claim is foreclosed in this case, and the Court dismisses Count IV as to all Defendants.

## III. CONCLUSION

As the Fourth Circuit has so eloquently stated:Plaintiffs who can allege they have been injured by reliance on fraudulent misstatements or omissions of material current facts can state a cause of action. Those like **[\*76]** [the plaintiffs], who can only allege injury from purported reliance on future projections that did not prove accurate and so for this reason assertedly must be fraudulent, cannot. These are, to be sure, rigorous requirements that do, and will continue to, eliminate many claims at a preliminary stage. This seems justified, however, because "in this type of litigation ... the mere existence of an unresolved lawsuit has settlement value to the plaintiff not only because of the possibility that he may prevail on the merits, an entirely legitimate component of settlement value, but [also] because of the threat of extensive discovery and disruption of normal business practices ...."*Hillson Partners L.P.*, 42 F.3d at 220 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742–43, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975)). This is the Plaintiffs' fourth attempt at formulating a complaint against these Defendants. Plaintiffs have had the benefit of preparing their Amended Complaint after thirteen months of discovery under Bankruptcy Rule 2004. Plaintiffs were also able to review two previously filed motions to dismiss advising them of **[\*77]** several infirmities in their previous complaints. By voluntarily dismissing their second complaint and taking advantage, twice, of their ability to amend as of right, Plaintiffs have had four bites at the apple. The Court finds that amending the complaint would be futile in light of the many opportunities that Plaintiffs have had to present their claim; furthermore, the claims are barred as a matter of law.

As set forth in this Memorandum Opinion, Plaintiffs fail to plead their federal securities claims with the specificity required by the PSLRA. Furthermore, Plaintiffs fail to allege any material misrepresentations, a strong inference of scienter, reasonable reliance – either directly or indirectly, or loss causation; thereby, the Court dismisses Counts I and II of the Amended Complaint. The Court also dismisses the common law fraud claim – Count III, and the breach of fiduciary duty claim – Count IV. The Court grants Enzo Biochem, Inc., Barry Weiner, Elazar Rabbani, Sharim Rabbani, John DeLucca and Dean Engelhardt's, and Heimon Gross's motions to dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

In sum, for the foregoing **[\*78]** reasons, it is hereby

ORDERED that Defendants', Enzo Biochem, Inc., Barry Weiner, Elazar Rabbani, Shraham Rabanni, Dean Engelhardt and John DeLucca, Motion to Dismiss the Amended Complaint is GRANTED. It is further

ORDERED that Defendant Heimon Gross's Motion to Dismiss the Amended Complaint is GRANTED. It is further

ORDERED that Plaintiff's Amended Complaint is DISMISSED as to all Counts and as to all remaining Defendants. It is further

ORDERED that Plaintiffs', Lawrence F. Glaser and Maureen Glaser, individually and on behalf of Kimberly, Erin, Hannah and Benjamin Glaser, are DENIED leave to amend the complaint.

The Clerk is directed to forward a copy of this Order to counsel.

Entered this 16th day of July, 2003.

Gerald Bruce Lee

United States District Judge

Alexandria, Virginia
07/16/03

In re GLOBAL CROSSING, LTD. SECURITIES LITIGATION

02 Civ. 910 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 22930

December 18, 2003, Decided

December 22, 2003, Filed

**PRIOR HISTORY:** Thompson v. Winnick (In re Global Crossing, Ltd. Sec. Litig.), 2003 U.S. Dist. LEXIS 21744 (S.D.N.Y., Dec. 1, 2003)

**DISPOSITION:** [*1] Counts II and VII dismissed as time−barred. Count XII dismissed for lack of standing, with leave to replead. Count XIV dismissed as to defendant DLJ. Motion of April 2000 underwriters to dismiss Count XIII denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff investors alleged federal securities law violations. In the instant consolidation of class actions, four groups of defendants, all banking institutions that underwrote the securities at issue or issued fair value opinions in connection with transactions involving those securities, separately moved to dismiss the counts in which they were named.

**OVERVIEW:** Plaintiffs alleged that the moving defendants, as underwriters and issuers of "fair value" opinions used to gain shareholder approval for the company's two corporate acquisitions, were at least negligent in not uncovering the illusory basis for its revenues and revenue projections, and were therefore liable under § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933 (SA), and/or § 14 (15 U.S.C.S. § 78n) of the Securities Exchange Act of 1934 (SEA). Counts VII, XII, XIII, and XIV fell under the SA, while Count II fell under the SEA. 15 U.S.C.S. § 77k imposed civil liability on persons preparing materially misleading registration statements, while negligent misrepresentations could form the basis for a claim under 15 U.S.C.S.§ 78n. The causes of action against the moving defendants were governed by the one−year/three−year statute of limitations of 15 U.S.C.S. § 77m. Counts II and VII were time−barred under the three−year absolute limitation. Count XIII survived a standing challenge, but Count XII, as pleaded, did not. Count XIV was dismissed as to a defendant which issued fairness opinions, since the complaint nowhere alleged that its statement of opinion was false.

**OUTCOME:** Counts II and VII were dismissed as time−barred. Count XII was dismissed for lack of standing, with leave to replead, and Count XIV was dismissed as to one defendant. The motion of one group of underwriters to dismiss Count XIII was denied.

**CORE TERMS:** registration statement, offering, investor, misleading, statute of limitations, inquiry notice, underwriter, limitations period, purchaser, discovery, notice, accounting, registration, shareholder, stock, securities fraud, inaccurate, traceable, duty of inquiry, consolidated, misstatement, ratio, swap, exercise of reasonable diligence, financial information, question of fact, cause of action, contrivance, three−year, valuation

### LexisNexis(TM) HEADNOTES − Core Concepts

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Evidence > Procedural Considerations > Judicial Notice*

[HN1]   On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as true the facts alleged in the complaint, and may grant the motion only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court may consider documents attached to the complaint as exhibits or incorporated in it by reference. The court may also take judicial notice of matters of public record, including the contents of documents required to be filed with the Securities and Exchange Commission. All reasonable inference are to be drawn in the plaintiff's favor, which often makes it difficult to resolve certain questions as a matter of law.

*Securities Law > Bases for Liability > Civil Liability*

[HN2]   Section 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933 imposes civil liability on persons preparing materially misleading registration statements. To state a claim under that provision, an injured plaintiff must allege only that a defendant made or participated in making a material misstatement or omission in a registration statement for a security the plaintiff acquired; liability for such misstatements extends, among others, to underwriters of securities and to anyone who consented to be named as having prepared or certified a report or valuation which is used in connection with the registration statement. 15 U.S.C.S. § 77k(4), (5). No intent to defraud need be alleged.

*Securities Law > Bases for Liability > Misleading Statements*

[HN3]   Under § 14 (15 U.S.C.S. § 78n) of the Securities Exchange Act of 1934, a plaintiff states a cause of action by, inter alia, alleging that a defendant permitted the use of his name in a proxy solicitation that violated SEC regulations. 15 U.S.C.S. § 78n. Negligent misrepresentations may form the basis for a claim under that provision.

*Securities Law > Bases for Liability > Civil Liability*
*Securities Law > Bases for Liability > Misleading Statements*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN4]   Claims under § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933 must be brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, and in any event no later than three years after the securities in question were offered to the public. 15 U.S.C.S. § 77m. The three–year limitation is absolute, and applies whether or not the investor could have discovered the violation. The same one year/three year limitations period has been applied to claims under § 14 (15 U.S.C.S. § 78n) of the Securities Exchange Act of 1934.

*Securities Law > Bases for Liability > Civil Liability*
*Securities Law > Bases for Liability > Misleading Statements*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN5]   28 U.S.C.S. § 1658(b) does not broadly expand the statute of limitations for all actions brought under the securities laws, as it could easily have done, but rather establishes a distinct federal statute of limitations for certain causes of action arising under the securities laws, namely those that involve a claim of fraud, deceit, manipulation, or contrivance. 28 U.S.C.S. § 1658. This description of the covered causes of action mirrors the language of § 10(b) (15 U.S.C.S. § 78j(b)) of the Securities Exchange Act of 1934, which creates liability for any person who employs any manipulative or deceptive device or contrivance in contravention of Securities and Exchange Commission regulations, 15 U.S.C.S. § 78j(b), and which thus requires a showing of fraudulent intent. A cause of action that is based on negligence is not a claim for fraud, deceit, manipulation, or contrivance, all of which are words connoting deliberate, intentional deception. Therefore, by its plain text, the amendment does not apply to claims under § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933, and § 14 (15 U.S.C.S. § 78n) of the Securities Exchange Act of 1934. Since the plain text of the statute is unambiguous, resort to analysis of the legislative history is unnecessary.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN6]   When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes.

*Securities Law > Bases for Liability > Civil Liability*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN7]   The date of a securities offering for purposes of the three–year limitations period for claims pursuant to § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933 is the effective date of the registration statement.

*Securities Law > Bases for Liability > Liability for Fraud*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN8]   Regarding 15 U.S.C.S. § 77m, the one–year limitations period begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge. Furthermore, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises. The circumstances that give rise to a duty of inquiry are often referred to as "storm warnings." Once a plaintiff receives these storm warnings and a duty of inquiry arises, knowledge will be imputed to the investor who does not make such an inquiry. Moreover, whether the securities fraud claim of a person who receives storm warnings is time barred turns on when, after obtaining inquiry notice, the plaintiff in the exercise of reasonable diligence, should have discovered the facts underlying the defendant's alleged fraud.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Securities Law > Bases for Liability > Liability for Fraud*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN9]   In the context of 15 U.S.C.S. § 77m, whether a plaintiff should have discovered a misrepresentation or omission is an objective determination. It can be resolved at the dismissal stage if the facts needed can be gleaned from the complaint and papers integral to the complaint. On the other hand, the question of whether a plaintiff exercised due diligence is usually a question of fact for the jury to decide. Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case—similar to the type of inferences which must be drawn in determining intent and good faith, and when conflicting inferences can be drawn from the facts, summary judgment is inappropriate. A fortiori, caution is warranted in approaching a motion for judgment on the pleadings on such issues. To avoid dismissal, plaintiffs must allege facts that would establish, drawing all reasonable inferences in their favor, that they neither discovered nor should have discovered by the exercise of reasonable diligence the alleged misrepresentations more than one year before claims were first asserted against them.

*Securities Law > Bases for Liability > Liability for Fraud*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN10]   A single published article can be sufficient to provide inquiry notice.

*Securities Law > Bases for Liability > Liability for Fraud*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN11]   An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice. In a case pursuant to § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933, plaintiffs need not have fully discovered the nature and extent of the fraud before they were on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself. As has been stated in the context of securities fraud cases, the statute is not tolled for a plaintiff's leisurely discovery of the full details of the alleged scheme. Instead, the period runs from the time at which a plaintiff should have discovered the general fraudulent scheme.

*Securities Law > Bases for Liability > Liability for Fraud*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN12]   While a decline in stock value is not in itself proof of fraud, the U.S. Court of Appeals for the Second Circuit has noted that such declines should have put a reasonable investor on notice of fraud.

*Securities Law > Bases for Liability > Liability for Fraud*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN13]   Inquiry notice is tantamount to actual discovery of a fraud when a plaintiff, having received knowledge sufficient to trigger a diligent investigation, fails to inquire into the facts. Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him. On the other hand, if, after the duty to inquire arises, the investor does indeed inquire, it is necessary to determine when the investor would have been able to acquire sufficient information to file suit.

*Securities Law > Bases for Liability > Liability for Fraud*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN14]   Regarding policies of the securities laws, the applicable statute of limitations should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims. It makes little sense from a policy perspective to require specific factual allegations−−on pain of dismissal in cases of this sort−−and then to punish the pleader for waiting until the appropriate factual information can be gathered by dismissing the complaint as time barred.

*Securities Law > Bases for Liability > Liability for Fraud*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN15]   Where, at a minimum, a question of fact is presented as to whether plaintiffs acted with reasonable diligence in briefly delaying the start of their investigation, under such circumstances, as the U.S. Court of Appeals for the Second Circuit has held in Rothman, buttressed by repeated italicized quotations from earlier cases emphasizing that the limitations period begins when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud, the inquiry turns on when, after obtaining inquiry notice, the plaintiffs should have discovered the facts underlying the alleged misstatements by the defendants.

*Securities Law > Bases for Liability > Liability for Fraud*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN16]   Since a person can be liable for securities fraud only if he violates the statute himself, in seeking to bring suit against a secondary party, even once plaintiffs were on inquiry notice that they had been defrauded, they are required to exercise reasonable diligence in discovering the facts establishing liability on the part of the secondary actors. Since the statute of limitations begins to run, in the case of investors who undertook a reasonable effort of inquiry once "storm warnings" had been posted, when a reasonable investor would have discovered the facts necessary to bring the cause of action, it is a question of fact for ultimate resolution at trial (or on summary judgment if the factual record permits only one conclusion) whether plaintiffs in the exercise of reasonable diligence would have discovered the facts underlying the present claim more than one year before those claims were asserted.

*Civil Procedure > Justiciability > Standing*
*Securities Law > Bases for Liability > Private Securities Litigation*

[HN17]   Under the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. 104−67, 109 Stat. 737, the court appoints appropriate plaintiffs, presumptively those seeking the responsibility who have the largest losses, 15 U.S.C.S. § 78u−4(a)(3)(B)(iii), to undertake the selection of lead counsel and the management of the direction of the litigation. But nothing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case. Indeed, the imposition of any such requirement would be at odds with the purposes of the statute, since in the case of large alleged frauds involving issuers of many classes of securities, the consequence would be either the appointment of a large number of lead plaintiffs (undermining the goal of a cohesive leadership and management group) or the premature breakdown of the action into an unmanageable number of separate cases brought by different lead plaintiffs on behalf of each potential subclass of securities holders. Nor does anything in the PSLRA prevent the lead plaintiffs from constructing a consolidated complaint that brings claims on behalf of a number of named parties besides the lead plaintiffs themselves.

*Civil Procedure > Justiciability > Standing*
*Securities Law > Bases for Liability > Private Securities Litigation*

[HN18]   In conducting the lawsuit on behalf of all class members and all those who have brought complaints that have been consolidated under their leadership, lead plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or

claims.

*Civil Procedure > Justiciability > Standing*
*Securities Law > Bases for Liability > Private Securities Litigation*

[HN19]  Judges presiding over complex securities class actions under the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. 104–67, 109 Stat. 737, have repeatedly rejected arguments that seek to confuse the role of lead plaintiffs under the PSLRA with that of named plaintiffs for purposes of ordinary class action standing law, or to claim that the individual lead plaintiff must have standing to bring all of the claims asserted in the class action complaint.

*Civil Procedure > Justiciability > Standing*
*Securities Law > Bases for Liability > Civil Liability*

[HN20]  Under § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933, "any person acquiring" a security issued pursuant to an inaccurate registration statement may bring an action against those responsible for the misstatements. 15 U.S.C.S. § 77k(a). An exception is that the action will be defeated if it is proved that at the time of such acquisition he knew of such untruth or omission. 15 U.S.C.S. § 77k(a).

*Civil Procedure > Justiciability > Standing*
*Securities Law > Bases for Liability > Civil Liability*

[HN21]  The U.S. Court of Appeals for the Second Circuit has expressly ruled that in a case where there has been only one stock offering, any person who acquires the security may sue under § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933, regardless of whether he bought in the initial offering, a week later, or a month after that.

*Securities Law > Bases for Liability > Civil Liability*

[HN22]  Reliance is not an element of a claim pursuant to § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933 for any purchaser who bought securities within 12 months of the registration statement. 15 U.S.C.S. § 77k(a).

*Civil Procedure > Justiciability > Standing*
*Securities Law > Bases for Liability > Civil Liability*

[HN23]  While the law is clear that purchasers of securities issued pursuant to a misleading registration statement can assert a claim pursuant to § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933 whether they purchase their shares directly in the public offering or in the general securities markets, it is equally clear that they may only sue so long as the security was indeed issued under that registration statement and not another. Thus, it has been established in the Second Circuit that to have standing to assert a claim pursuant to that provision, plaintiffs must be able to trace their shares to an allegedly misleading registration statement.

*Civil Procedure > Justiciability > Standing*
*Civil Procedure > Class Actions > Prerequisites*
*Securities Law > Bases for Liability > Civil Liability*

[HN24]  It is well established that a plaintiff seeking to represent a class must be a member of the class he purports to represent. Thus, it is not enough that plaintiffs seek damages only for a class that has standing; at least one named plaintiff must be a member of that class——that is, a named plaintiff must have purchased shares traceable to the challenged offering.

*Civil Procedure > Justiciability > Standing*
*Securities Law > Bases for Liability > Civil Liability*

[HN25]  It is clear that plaintiffs bear the burden of proving securities are traceable. Moreover, the tracing requirement is essential to the cause of action. Stocks are not fungible under § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933. Only those who purchase securities that are subject to allegedly false registration statement, and not those who buy identical stocks already being traded, can sue under 15 U.S.C.S. § 77k. The cause of action inheres in the faulty registration statement that put the shares in question on the market; it is on the basis of the flaw in the underlying registration that § 77k dispenses with the requirements of scienter, and, for those who purchase soon enough after the registration statement, reliance. Those who purchased in the open market shares that were properly registered in an earlier offering are relegated to the securities fraud remedies that include such requirements. Thus, plaintiffs who purchased securities not issued pursuant to the misleading registration statement lack standing as surely as the purchasers of other securities entirely.

*Civil Procedure > Justiciability > Standing*
*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
*Securities Law > Bases for Liability > Civil Liability*

[HN26]  Modern market conditions may have made the tracing requirement obsolete. In a world in which the "shares" purchased by a stockholder might be merely electronic entries in a brokerage firms' books, tracing may be impracticable; at a minimum, as the U.S. Court of Appeals for the Third Circuit more recently has noted, before discovery takes place, it may be impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market. For these reasons, the pleading requirement is not elaborate. Plaintiffs have not been required to explain how their shares can be traced; general allegations that plaintiff purchased "pursuant to" or traceable to false registration statement have been held sufficient to state a claim.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Securities Law > Bases for Liability > Civil Liability*

[HN27]  The materiality of any alleged misstatement is a question of fact that cannot be resolved so easily on the pleadings.

*Securities Law > Bases for Liability > Civil Liability*

[HN28]  See 15 U.S.C.S. § 77k(a)(4).

*Securities Law > Bases for Liability > Civil Liability*

[HN29]  Materially misleading statements of opinion and belief can be actionable under the securities laws, where the party offering the opinion misrepresents its true belief, that is, where the opinion or belief is not truly held.

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
*Securities Law > Bases for Liability > Civil Liability*
[HN30]  It is true that § 11 (15 U.S.C.S. § 77k) of the Securities Act of 1933 provides a defense where an underwriter has no reasonable ground to believe and did not believe that the statements were false or misleading. 15 U.S.C.S. § 77k(b)(3)(C). But the statute expressly provides that the burden of proof is on defendants to establish this defense, and the plaintiffs need not negate such an affirmative defense in their pleading.

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN31]  See Fed. R. Civ. P. 8(a).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN32]  It is perfectly understandable, particularly in light of Fed. R. Civ. P. 9(b)'s requirement that fraud be alleged with particularity, that plaintiffs err on the side of detail and prolixity in an effort to explain the facts from which their claims emerge. A motion to dismiss is a vehicle for testing the legal sufficiency of plaintiffs' claims, and not a device for editing their prose.

COUNSEL: Jay W. Eisenhofer, Sidney S. Liebesman, Michael J. Barry, Lauren E. Wagner, and Marlon Q. Paz, Grant & Eisenhofer, P.A., Wilmington, DE, for Lead Plaintiffs Public Employees Retirement System of Ohio and State Teachers Retirement System of Ohio.

Howard W. Goldstein and Peter L. Simmons, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, for defendants the "April 2000 Underwriters." n1

George A. Schieren, Michael D. Torpey, Steven F. Gatti, and Ignatius A. Grande, Clifford Chance US LLP, New York, NY, for defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith, Inc.

Kenneth M. Kramer, Richard Schwed, and Amy L. Neuhardt, Shearman & Sterling LLP, New York, NY, for defendants Morgan Stanley and Morgan Stanley & Co., Inc.

Thomas P. Ogden and Christopher L. Garcia, Davis Polk & Wardwell, New York, NY, for defendants Donaldson Lufkin & Jenrette, Inc. and Donaldson, Lufkin & Jenrette Securities Corp.
> n1 The Goldman Sachs Group, Inc.; Goldman Sachs & Co.; Merrill Lynch & Co., Inc.; Merrill Lynch, Pierce, Fenner & Smith, Inc.; Salomon Smith Barney Inc.; Salomon Smith Barney Holding, Inc.; The Bear Stearns Companies Inc.; Bear, Stearns Co. Inc.; Bear, Sterns Securities Corp.; J.P. Morgan Chase & Co.: J.P. Morgan Securities, Inc.; Chase H&Q; Credit Suisse First Boston; Donaldson Lufkin & Jenrette, Inc.; Donaldson Lufkin & Jenrette Securities Corp.; Morgan Stanley Dean Witter; and Morgan Stanley & Co., Inc.

 [*2]

JUDGES: GERARD E. LYNCH, United States District Judge.

OPINIONBY: GERARD E. LYNCH

OPINION: OPINION AND ORDER

GERARD E. LYNCH, District Judge:

In this consolidation of numerous securities class action lawsuits arising from the allegedly "consistent[] and pervasive[]" misrepresentation of the "true financial condition" of Global Crossing, Ltd. (GC), between February 1, 1999 and January 28, 2002 (the "class period") (P. Mem. 4), four groups of defendants, all banking institutions that underwrote GC securities or issued fair value opinions in connection with transactions involving those securities, have separately moved to dismiss the counts in which they are named on a variety of grounds. Because the four motions involve similar issues, the plaintiffs have opposed all four in a single Joint Memorandum, and the Court will decide them together. The motions will be granted in part and denied in part. Counts II and VII will be dismissed as time−barred, and the motions will be denied as to the other counts.

BACKGROUND

Global Crossing was founded in March 1997 for the purpose of building and selling the use of a worldwide fiber optic network for the transmission of internet and telecommunications [*3] data. It went public on August 13, 1998, and made several issues of securities throughout the class period. In September 1999, GC acquired Frontier Corporation by exchanging its own shares for Frontier shares. It similarly acquired IXnet, Inc., and its parent IPC Corporation, in early 2000.

A detailed recital of the tale of fraud and deception alleged in the 840−paragraph complaint n2 is unnecessary here. Briefly told, the complaint

alleges that various officers and directors of Global Crossing participated in the fraudulent misstatement of Global Crossing's assets, obligations, and cash revenues, particularly in the manner in which they accounted for certain transactions involving "indefeasible rights of use" ("IRUs").

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n2 After these motions to dismiss were fully briefed, plaintiffs filed a 1088–paragraph Amended Consolidated Complaint on August 11, 2003, incorporating the claims of shareholders of Asia Global Crossing, Ltd., a subsidiary of GC. As the additional allegations do not affect the instant motions, all citations here are to the earlier complaint.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

[*4]

An IRU is the "right to use a specified capacity, or bandwidth, over a designated communications cable owned by a telecommunications company for a set period of time." (Compl. P 117.) IRU transactions represented a large portion of the Company's revenues during the class period and therefore played a substantial role in determining the market value of its shares. Plaintiffs claim that GC, in order to meet performance expectations and thereby boost the value of its securities, reported as immediate cash revenue (1) income that should have been booked over the 25–year term of each IRU; and (2) income from unneeded reciprocal "swaps" with other carriers of such capacity, notwithstanding that, where cash actually changed hands, it was "round–tripped" in the return half of the swap, thereby yielding no actual revenue.

The former practice violated Financial Accounting Standards Board ("FASB") Statement No. 13, which restricts the circumstances under which a company may report as immediate revenue the total lease payments due under a multiyear lease agreement. When the FASB issued, in "FASB Interpretation No. 43" ("FIN 43"), a clarification of FASB 13 that clearly prevented GC from continuing [*5] to book the IRU payments as immediate cash income, GC announced that compliance with FIN 43 "would not have a material impact on the Company's financial position or results of operations." (Compl. P 156 (quoting unattributed source).) But plaintiffs allege that compliance with FIN 43 would, in fact, have been devastating had GC not found a new source of illusory revenue: reciprocal swap transactions with other telecommunications companies. The practice of booking income from swaps as immediate cash revenue is alleged to have violated Accounting Principles Board Opinion No. 29 ("APB 29"), "Accounting for Nonmonetary Transactions." When these sources of income could not be reported immediately as cash revenue under Generally Accepted Accounting Principles ("GAAP"), GC claimed that its own measures of revenue, styled by GC as "pro forma disclosures," "Earnings Before Interest, Taxes, Depreciation, and Amortization" ("EBIDTA"), and "Adjusted EBIDTA," were better measures of its financial health than financial statements according to GAAP. GC's tactics succeeded, plaintiffs claim, in inflating the value of its stock, resulting in steep losses for shareholders when the house of cards collapsed [*6] and GC inevitably went bankrupt in early 2002.

Plaintiffs allege that the defendants here, as underwriters of various securities offerings and issuers of "fair value" opinions used to gain shareholder approval for GC's two corporate acquisitions, were at least negligent in not uncovering the illusory basis for GC's revenues and revenue projections, and are therefore liable to plaintiffs under section 11 of the Securities Act, 15 U.S.C. § 77k, and/or section 14 of the Exchange Act, 15 U.S.C. § 78n, for the misstatements they made or endorsed in connection with those offerings or opinions. Specifically, the "April 2000 Underwriters" underwrote secondary offerings of common stock (Count XII) and 6–3/4% preferred stock (Count XIII) on April 3, 2000, and are allegedly liable under Section 11; Merrill Lynch and Morgan Stanley ("the Frontier Defendants") issued fairness opinions which they consented to be used in connection with the Frontier merger Registration Statement and proxy materials, and are allegedly liable under both Section 11 (Count VII) and Section 14 (Count II); and Donaldson, Lufkin & Jenrette ("DLJ") issued fairness opinions which [*7] it consented to be used in connection with the IXnet/IPC merger Registration Statement and is allegedly liable under Section 11 (Count XIV).

DISCUSSION

I. Legal Standards

A. Standard for Dismissal

[HN1] On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept "as true the facts alleged in the complaint," Jackson Nat'l Life Ins. Co. v. Merrill, Lynch & Co., 32 F.3d 697, 699–700 (2d Cir. 1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Thomas v. City of New York, 143 F.3d 31, 36 (2d Cir. 1998) (citations omitted); see also Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996) (when adjudicating motion to dismiss under Fed. R. Civ. P. 12(b)(6), the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the

claims" (internal quotation marks and citations omitted)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider [*8] documents attached to the complaint as exhibits or incorporated in it by reference. Brass v. American Film Techs., Inc., 987 F.2d 142,150 (2d Cir. 1993). The Court may also take judicial notice of matters of public record, including the contents of documents required to be filed with the SEC. Kramer v. Time–Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991). All reasonable inference are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [certain questions] as a matter of law." In re Independent Energy Holdings PLC, 154 F. Supp. 2d 741, 747 (S.D.N.Y. 2001).

B. Elements of Asserted Claims

 [HN2] Section 11 imposes civil liability on persons preparing materially misleading registration statements. To state a claim under section 11, an injured plaintiff must allege only that a defendant made or participated in making a "material misstatement or omission" in a registration statement for a security the plaintiff acquired; liability for such misstatements extends, among others, to underwriters of securities and to anyone who consented to be "named as having prepared or certified [a] report or valuation which is [*9] used in connection with the registration statement." 15 U.S.C. § 77k(a)(4), (5). No intent to defraud need be alleged under section 11. Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983).

 [HN3] Under section 14, a plaintiff states a cause of action by, inter alia, alleging that a defendant "permitted the use of his name" in a proxy solicitation that violated SEC regulations. 15 U.S.C. § 78n. Negligent misrepresentations may form the basis for a claim under section 14. Wilson v. Great American Industries, Inc., 855 F.2d 987, 995 (2d Cir. 1988). The exceedingly detailed complaint makes the required allegations.

C. Applicable Statute of Limitations

 [HN4] Claims under section 11 must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," and in any event no later than three years after the securities in question were offered to the public. 15 U.S.C. § 77m. The three–year limitation is absolute, and applies whether or not the investor could have discovered the violation. [*10] Jackson Nat'l Life, 32 F.3d at 704. The same one year/three year limitations period has been applied to claims under section 14. Ceres Partners v. GEL Assoc., 918 F.2d 349, 363–64 (2d Cir. 1990); Westinghouse Elec. Corp. v. Franklin, 993 F.2d 349, 353 (3d Cir. 1993).

Plaintiffs make little effort to argue that their claims were brought within this time period. Instead, they primarily argue that the statute of limitations set forth in 15 U.S.C. § 77m and the case law cited above has been superseded by the Sarbanes–Oxley Act of 2002, Pub. L. 107–204, § 804(a) (2002). Sarbanes–Oxley amended 28 U.S.C. § 1658, the residual statute of limitations for civil actions arising under acts of Congress, to read, in relevant part:[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of–−

(1) 2 years after the [*11] discovery of the facts constituting the violation; or

(2) 5 years after such violation.28 U.S.C. § 1658(b). If this limitations period applies to the instant claims, they would be unquestionably be timely, since the consolidated complaint was filed within two years of the period in which defendants argue that reasonable investors should have become aware of the alleged fraud, and within five years of the earliest of the transactions at issue. Defendants respond, however, that the extended statute of limitations does not apply here, because the claims at issue are not "claim[s] of fraud, deceit, manipulation, or contrivance," but rather claims of negligent misrepresentation, so the extended limitations period does not apply. n3

− − − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − − −

n3 Defendants also argue that the expansion of the statute of limitations does not apply to these claims because section 804(b) of the Act states that it "shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act," that date being July 30, 2002. Pub. L. No. 107–204 sec. 804(b), 116 Stat. 745, 801 (2002). Defendants claim that this "proceeding" commenced on February 5, 2002, when "the plaintiffs filed their first complaints in this action." (April 2000 Underwriters Mem. 10.) Because the Court agrees with defendants' other reason for finding the Sarbanes–Oxley Act inapplicable, the Court need not consider the more complex issue of whether this "proceeding," which is actually a consolidation of many proceedings commenced by different plaintiffs against different defendants at different times, should be deemed to have been commenced before or after July 30, 2002.

− − − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

[*12]

Defendants are correct. The only claims asserted by plaintiffs against these defendants are based on two sections of the securities laws which, as pointed out above and as plaintiffs themselves affirmatively argue (P. Mem. 43–44.), n4 do not require any showing of fraudulent intent, but establish liability even for negligent representations. But the Sarbanes–Oxley provision on which plaintiffs rely [HN5] does not broadly expand the statute of limitations for all actions brought under the securities laws, as it could easily have done, but rather "establish[s] a distinct federal statute of limitations for certain causes of action arising under the securities laws," Verizon Maryland Inc. v. RCN Telecom Services. Inc., 232 F. Supp. 2d 539, 553 n.6 (D. Md. 2002), namely those that "involve[] a claim of fraud, deceit, manipulation, or contrivance." 28 U.S.C. § 1658. This description of the covered causes of action mirrors the language of section 10(b) of the Exchange Act, which creates liability for "any person" who "employ[s]... any manipulative or deceptive device or contrivance in contravention of" SEC regulations, 15 U.S.C. § 78j [*13]_(b)_, and which thus requires a showing of fraudulent intent, Herman & MacLean, 459 U.S. at 382. A cause of action that is based on negligence is not a claim for "fraud, deceit, manipulation, or contrivance," all of which are words connoting deliberate, intentional deception. Therefore, by its plain text, the amendment does not apply to claims under sections 11 and 14. n5 Since the plain text of the statute is unambiguous, resort to analysis of the legislative history is unnecessary. In re Venture Mortgage Fund. L.P., 282 F.3d 185,188 (2d Cir. 2002) ("Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous.") (quoting Lee v. Bankers Trust Co., 166 F.3d 540, 544 (2d Cir.1999)). n6

– – – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n4 Plaintiffs expressly state, for example, that they "do not allege that the Frontier Defendants are liable for intentional misconduct in connection with [Count II]" (Compl. P 730), and emphasize that they "do not allege that the [Frontier or Individual] Defendants are liable for intentionally fraudulent or intentional conduct, and disavow[] and disclaim[] allegations of fraud in connection with [Counts VII or XIV]." (id. PP 754, 808.) Similarly, Counts XII and XIII expressly disavow for purposes of those claims any allegations in the complaint that "charge the ... Defendants with intentional or reckless misconduct." (Id. PP 792, 800.)

[*14]

n5 The textual arguments made by plaintiffs range from the frivolous to the misleading. Plaintiffs rely on the Act's reference to "the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934," which they correctly point out include sections 11 and 14. (P. Mem. 67.) But their argument rips the phrase from its context, which applies the extended limitations period to lawsuits involving "*a claim of fraud, deceit, manipulation or contrivance* in contravention of ... the securities laws." The reference to the securities laws is necessary, given the provision's placement in Title 28, to establish that the extended limitations period applies to claims of *securities* fraud, and not to all manner of fraud claims; it does not supersede the explicit restriction of the extended statute to claims of securities *fraud.* And plaintiffs' claim that Sarbanes–Oxley "specifically states that it applies to "misrepresentation" claims (P. Mem. 67 n. 34) is simply inaccurate.

n6 Although resort to the legislative history is unnecessary in this case because of the statute's unambiguous language, the Court notes, "for the sake of completeness," United States v. Lucien, 347 F.3d 45_, 2003 WL 22333062 at *4 (2d Cir. Oct. 14, 2003),, that the history here confirms that the provision applies only to securities fraud claims. The single sentence quoted by plaintiffs from the section–by–section analysis of the Sarbanes–Oxley Act placed into the Congressional Record by Senator Leahy indeed refers to "all the already existing private causes of action under the various federal securities laws." (P. Opp. 68 (quoting 148 Cong. Rec. S7418).) But plaintiffs' quotation is taken out of context, for the surrounding text refers repeatedly to securities fraud actions. Furthermore, the discussion of the section–by–section analysis placed in the Congressional Record by its sponsors reveals that the provision was motivated by considerations involving intentional misrepresentations: specifically, the fact that "in fraud cases the short limitations period under current law is an invitation to take sophisticated steps to conceal the deceit." The provision was viewed by some as a "legislative reversal of the Lampf decisions," 148 Cong. Rec. S7420, referring to the Supreme Court's decision in Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 115 L. Ed. 2d 321, 111 S. Ct. 2773 (1991), which dealt with the statute of limitations for private actions under section 10(b) of the Securities Act. See id. at 358–59 ("We are faced with the awkward task of discerning the limitations period that Congress intended courts to apply to a cause of action it really never knew existed."). That section 804 of Sarbanes–Oxley legislatively establishes a limitations period where none had previously been provided for by statute may also explain why Congress created a new provision within 28 U.S.C. § 1658, rather than simply amending the existing statute of limitations provisions already incorporated in 15 U.S.C. § 77m, which Sarbanes–Oxley pointedly left in place.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – –

[*15]

Other district courts have also concluded that the Sarbanes–Oxley modification of the statute of limitations is inapplicable to Section 11 claims. See In re Merrill Lynch Research Reports Securities Litigation, 272 F. Supp. 2d 243, 265 (S.D.N.Y. 2003) (Pollack, J.); Friedman v. Rayovac Corp.,2003 U.S. Dist. LEXIS 13135, No. 02–C–308–C, slip op. at 3–4 (W.D. Wis. Jun. 20, 2003). Plaintiffs cite no authority to the contrary.

Accordingly, plaintiffs' causes of action against the moving defendants are governed by the one–year/three–year statute of limitations set forth in 15 U.S.C. § 77m and the case law cited above, and not by the two–year/five–year statute set forth in 28 U.S.C. § 1658.

II. Statute of Limitations

All of the moving defendants argue that the claims against them are barred by the applicable statute of limitations. All claims against these defendants were asserted for the very first time in the consolidated amended complaint filed on January 28, 2003. See Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000) [HN6] ("When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the [*16] motion to amend constitutes the date the action was commenced for statute of limitations purposes."). Thus, claims under section 11 or section 14 may not be based on transactions that occurred before January 28, 2000, or on violations that plaintiffs discovered or should have discovered before January 28, 2002. The various defendants make somewhat different limitations arguments regarding different groups of counts.

A. Counts II and VII

Plaintiffs' claims regarding the Frontier transaction (Counts II and VII) are time–barred under the three–year absolute limitation. [HN7] The date of a securities offering for purposes of the three–year limitations period for section 11 claims is the effective date of the registration statement, Finkel v. Stratton Corp., 962 F.2d 169, 173 (2d Cir. 1992), and it is an undisputed matter of public record that the registration statement for the GC securities issued in connection with the Frontier transaction was August 5, 1999. Similarly, all the allegedly misleading proxy statements invoked in plaintiffs' section 11 claims were issued before September 9, 1999. Plaintiffs make no attempt to argue that these claims are timely under the three–year [*17] limitations period, relying entirely on the argument, rejected above, that the five–year Sarbanes–Oxley statute applies. The claims against defendants Merrill Lynch and Morgan Stanley based on the Frontier transaction (Counts II and VII) must therefore be dismissed.

B. Counts XII, XIII and XIV

The acquisition of IXnet and IPC (which is the subject of Count XIV) and the April 2000 underwriting (which is the subject of Counts XII and XIII) took place in the spring of 2000, and claims relating to those transactions are not barred by the three–year absolute limitations period. The April 2000 underwriters and DLJ claim, however, that those claims are barred by the one–year statute of limitations, since plaintiffs were on notice of the fraudulent accounting practices of which they complain at the latest by the end of 2001, more than one year before these claims were first asserted.

The Second Circuit recently summarized the law governing application of the one–year discovery limitations period: [HN8] The one–year limitations period begins to run after the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable [*18] diligence, would have led to actual knowledge." Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992). Furthermore, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993). The circumstances that give rise to a duty of inquiry are often referred to as "storm warnings." Id. Once a plaintiff receives these "storm warnings" and a duty of inquiry arises, "knowledge will be imputed to the investor who does not make such an inquiry." Id. Moreover, whether the securities fraud claim of a person who receives "storm warnings" is time barred "turns on *when*, after obtaining inquiry notice," the plaintiff "in the exercise of reasonable diligence, should have discovered the facts underlying the [defendant's] alleged fraud." Rothman v. Gregor, 220 F.3d 81, 97 (2d Cir. 2000),Levitt v. Bear, Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003).

[HN9] Whether a plaintiff "should have" discovered a misrepresentation or omission is an objective determination. [*19] Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003); Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983). It can be resolved at the dismissal stage if "the facts needed ... can be gleaned from the complaint and papers ... integral to the complaint." LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir. 2003), quoting Dodds v. Cigna Securities, Inc., 12 F.3d 346, 352 n.3 (2d Cir. 1993). On the other hand, the question of whether a plaintiff exercised due diligence is "usually a question of fact for the jury to decide." In re Integrated Resources Real Estate Limited Partnerships Securities Litig., 815 F. Supp. 620, 638 (S.D.N.Y. 1993). "Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case – similar to the type of inferences which must be drawn in determining intent and good faith, [and w]hen conflicting inferences can be drawn from the facts, ... summary judgment is inappropriate." Robertson v. Seidman & Seidman, 609 F.2d 583, 591 (2d Cir. 1979) (citations omitted). A fortiori, caution [*20] is warranted in approaching a motion for judgment on the pleadings on such issues.

To avoid dismissal, plaintiffs must allege facts that would establish, drawing all reasonable inferences in their favor, that they neither discovered nor should have discovered "by the exercise of reasonable diligence" the alleged misrepresentations of these defendants more than one year

before claims were first asserted against them on January 28, 2003. 15 U.S.C. § 77m. Defendants claim that plaintiffs' duty to inquire had arisen by late 2001, pointing to several news articles published at that time and cited in the complaint, and to the "steady" drop in the price of GC stock "throughout the fall and winter of 2001." (April 2000 Underwriters Mem. 14–16.)

Because of their misguided reliance on the longer Sarbanes–Oxley statute of limitations, plaintiffs make only a passing attempt to show that they could meet the one–year limitation, stating that "the Bank Defendants still have failed to show that plaintiffs were on inquiry notice prior to January 28, 2002 [when] Global Crossing filed for bankruptcy" (P. Opp. 69 n.35), and that "plaintiffs had no way of knowing about the fraud [*21] at Global Crossing until Roy Olofson ... stepped forward publicly on January 29, 2002." (Id. at 71.)

Plaintiffs' claim that reasonable investors were not at least on inquiry notice of GC's fraudulent accounting practices before the bankruptcy filing is preposterous. As plaintiffs acknowledge, a *Fortune* magazine article about the "fall of much–hyped Global Crossing," published on December 24, 2001, and referenced in the complaint, provided earlier notice that something was amiss at GC. (Id. 71–72.) Indeed, the Court finds that the article suggests that *much* was amiss and that this article by itself provided the required "storm warning" –knowledge of "circumstances [suggesting] to an investor of ordinary intelligence the probability that she has been defrauded" – that constitutes inquiry notice. n7 Dodds, 12 F.3d at 350. The article did not merely indicate general financial difficulties at GC; rather, it laid out in detail precisely the transactions at the heart of plaintiffs' allegations of accounting fraud, revealing that much of Global Crossing's revenue was coming from unneeded capacity swaps, and that key information was not shared with stockholders: [*22]

Global Crossing has plenty of company in its misery ...

With their business plans stymied, some of the new carriers have looked to a new source of revenues –– each other. Telcos often swap capacity to fill in gaps in their networks, usually in the form of long–term leases for use of a stretch of fiber. The company leasing out its fiber records the transaction as a sale, and the company paying for the fiber records the purchase as a capital expenditure. Most of the deals are perfectly kosher. But some analysts charge that telcos have entered into mirror transactions for buying and selling capacity never used to carry paying traffic, thus using capital expenditures to pump up each other's revenues. What is more, by booking their costs as capital expenses –– which are amortizable over a number of years –– they boost current earnings as well. "It had the appearance of a Ponzi scheme or shell game," says Rob Rock, a fixed–income analyst at John Hancock mutual funds. "The question is, Was there an end user for all this capacity, or were they just manufacturing revenue?" Rock worries that in some cases the answer was clearly the latter.

[Global Crossing's CEO John] Legere admits that [*23] telcos left investors in the dark about the deals. "The industry gave no information," he says. "We showed a huge cash number, but we didn't answer questions about price, supply, capacity, or the number of units." While he won't say the practice was wrong, he does allow that shareholders may have been confused about the robustness of revenues. This year lease payments from rivals will account for about $ 1.6 billion of Global Crossing's revenues. When asked how Global Crossing used capacity it bought from rivals –– at a cost of about $ 1.3 billion this year –– Legere says he doesn't know the specifics of deals completed before he arrived.

Julie Creswell, "Global Flameout; Chairman Gary Winnick Spent Like a Roman Emperor. But the Fall of Much–Hyped Global Crossing Spells Trouble for Other Telcos Too," *Fortune*, Dec. 24, 2001, at 109.

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – –

n7 [HN10] A single published article can be sufficient to provide inquiry notice. See In re Ultrafem Inc. Securities Litigation, 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000); Sterlin v. Biomune Systems, 154 F.3d 1191, 1202–04 (10th Cir. 1998).

– – – – – – – – – – – End Footnotes– – – – – – – – – – – –

[*24]

Plaintiffs attempt to raise a factual issue by claiming that the *Fortune* article did not adequately put them on inquiry notice because "the ... disclosures say nothing about the pre–July 1999 mismatch of costs to revenues, the Hindery memo, the flouting of APB 29, the misleading nature of Global Crossing's disclosures about FIN 43, creation of the deceptive measurements of 'cash revenue' and 'adjusted EBITDA' or the last minute, end of quarter swaps for economically worthless assets." (P. Opp. 72.) Plaintiffs do not explain why, absent these details, the *Fortune* article did not trigger a duty to inquire. More importantly, this argument is legally insufficient, as [HN11] "an investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." Dodds, 12 F.3d at 352; see also Anixter v. Home–Stake Production Co., 939 F.2d 1420, 1438 (10th Cir. 1991) (stating, in section 11 case, that "Appellants need not ... have fully discovered the nature and extent of the fraud before they were on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of [*25] the scam itself" (quoting Kennedy v. Josephthal & Co., 814 F.2d 798, 802 (1st Cir. 1987))). As has been stated in the context of securities fraud cases, "the statute is not tolled for a plaintiff's 'leisurely discovery of the full details of the alleged scheme.' Instead, the period runs from the time at which a plaintiff 'should have discovered the general fraudulent scheme.'" In re Integrated

Resources, 815 F. Supp. at 637 (quoting Klein v. Bower, 421 F.2d 338, 343 (2d Cir. 1970) and Robertson v. Seidman & Seidman, 609 F.2d at 587).

While the *Fortune* article alone would have put a reasonable investor on notice that the GC's financial statements, which were at the heart of the registration and proxy statements at issue in the claims here, were fraudulently overstated, it hardly stood alone as a harbinger of fraud. By October 2001, it was apparent both that GC was in a state of collapse, and that its sudden decline stemmed from underlying weaknesses that had been fraudulently concealed. As of October 4, 2001, the stock issued in April 2000 was trading at 10% of the offering price, following a 50% drop in a single **[\*26]** day. (Compl. PP 497–498; Simmons Decl. Ex. 8.) [HN12] While a decline in stock value is not in itself proof of fraud, the Second Circuit has noted that such declines "should have put [a reasonable investor] on notice of fraud." Berry Petroleum Co. v. Adams & Peck, 518 F.2d 402, 411 (2d Cir. 1975); see also De La Fuente v. DCI Telecommunications. Inc., 206 F.R.D. 369, 382–83 (S.D.N.Y. 2002) (holding drop in stock price was one of several storm warnings sufficient to put plaintiff on notice of fraud).

The fall in the stock price was neither unexplained nor unaccompanied by other indicia of fraud. The October collapse followed immediately upon a press release announcing the company's fourth change of CEO in three years, and a likely shortfall of third quarter revenues "due primarily to a sharp falloff in [IRU] sales." (Compl. P 497.) The complaint itself acknowledges that by early October 2001 "market observers ... characterized the company as 'looking shaky' and questioned Global Crossing's ability to continue as a going concern." (Compl. P 690; emphasis in original.) According to plaintiffs, "between October 4 and 5, Global Crossing issued a series **[\*27]** of announcements calling into question its ability to continue operating without filing for bankruptcy." (Id. P 692.) The plaintiffs quote an October 15, 2001, interview in which the incoming CEO stated that "the IRU business has always been somewhat of a mystery," and that "we're going to lay out a plan and stop this charade." (Id. P 503.)

When a company that has touted its rosy financial picture sees its stock prices plummet by over 90%, suddenly finds itself in danger of bankruptcy, and refers through its CEO to a principal source of its reported profitability as a "mystery" and a "charade," it is fatuous to claim that the circumstances would not "suggest to an investor of ordinary intelligence the probability that she has been defrauded." Dodds, 12 F.3d at 350.

Defendants contend that this conclusion ends the inquiry. They argue that the statute of limitations began to run as of the time when the plaintiffs were on inquiry notice, and that, since the claims against DLJ and the April 2000 underwriters were not brought until more than a year after such inquiry notice was obtained, those claims are time–barred. Plaintiffs, on the other hand, argue that the **[\*28]** statute of limitations begins to run "from the date on which a plaintiff should have *actually* discovered the facts underlying the alleged fraud," not from the date of any "inquiry notice." (P. Mem. 69.)

The disagreement is rooted in a distinction made in the relevant caselaw. [HN13] Inquiry notice is tantamount to actual discovery of a fraud when a plaintiff, having received knowledge sufficient to trigger a diligent investigation, fails to inquire into the facts. "Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." Higgins v. Crouse, 147 N.Y. 411, 416, 42 N.E. 6 (1895), quoted with approval in Armstrong, 699 F.2d at 88. On the other hand, "if, after the duty to inquire arises, the investor does indeed inquire," it is necessary to determine when the investor would have been able to acquire sufficient information to file suit. Rothman, 220 F.3d at 97.

Defendants argue **[\*29]** that the time when actual discovery would have occurred is only relevant when plaintiffs actually investigate after receiving inquiry notice: "If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." LC Capital Partners, 318 F.3d at 154. They point out that plaintiffs have not alleged, in either the complaint or their motion papers, that they made a diligent effort to undertake any kind of investigation of Global Crossing's finances prior to January 28, 2002, and note that the Second Circuit stated in LC Capital Partners that, "once the facts on the face of the complaint and related documents give rise to a duty of inquiry, it is appropriate to require a plaintiff ... at least to allege that inquiry was made." Id. at 156.

But LC Capital Partners is distinguishable, and defendants' effort to erect the Court's statement in that case into an iron rule of pleading is unpersuasive. In LC Capital Partners, the plaintiff "conceded that it made no inquiry until ... more than a year after the duty of inquiry arose." Id. In this case, by contrast, the earliest of plaintiffs' actions against **[\*30]** GC directors and others was filed on February 5, 2002, within a few days of the GC bankruptcy and a mere four months after the earliest date on which defendants contend a duty of inquiry could have arisen. While the consolidated amended complaint does not explicitly allege that the plaintiffs undertook an investigation of the fraud they now allege, that complaint, in all its massive detail, is persuasive evidence that a lengthy and complicated investigation into the details of GC's activities and its relationship with various investment bankers, auditors, and other parties was indeed undertaken. The record of the case reveals, moreover, that plaintiffs sought to pursue discovery from the first conference in the case (and were met with objections founded on the automatic discovery stay imposed by the Private Securities Litigation Reform Act of 1995("PSLRA"), Pub. L. No. 104–67, 109 Stat. 737 (1995) ), and that adjournments of the deadline to file a consolidated amended complaint were predicated on their need to secure documents available from various public sources. Whether or not alleged in the complaint, it is fully apparent that plaintiffs were vigorously investigating the alleged **[\*31]** fraud no later than the time of GC's bankruptcy filing on January 28, 2003.

Thus, unlike the plaintiffs in LC Capital Partners, who waited a year after being put on inquiry notice to take action, the plaintiffs here began to investigate at a minimum within a few months after inquiry notice arose. Even if it is assumed, in the absence of a pleading to the contrary, that plaintiffs did nothing affirmative between October 4, 2002, and January 28, 2003, to investigate GC's finances, it is hardly rational to conclude

that such a brief period of slumber entails treating the earliest "storm warning" as equivalent to constructive knowledge of the entire fraud for statute of limitations purposes. The last months preceding GC's bankruptcy, as is often the case in highly–publicized financial scandals, were a period of escalating press attention, culminating in the *Fortune* article, published on Christmas Eve, 2003. Investors can hardly be faulted for pausing to see what additional disclosures would appear before undertaking their own investigation into GC's accounting. Such a delay accords with the [HN14] policies of the securities laws: "The applicable statute of limitations should not precipitate [*32] groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims." Sterlin v. Biomune Systems, 154 F.3d 1191, 1202 (10th Cir. 1998), quoted with approval in Rothman, 220 F.3d at 97. "It makes little sense from a policy perspective to require specific factual allegations – on pain of dismissal in cases of this sort – and then to punish the pleader for waiting until the appropriate factual information can be gathered by dismissing the complaint as time barred." Levitt, 340 F.3d at 104.

Thus, on the face of the complaint and the public record of this case, plaintiffs here cannot be found to have slept in the face of inquiry notice. [HN15] At a minimum, a question of fact is presented as to whether plaintiffs acted with reasonable diligence in briefly delaying the start of their investigation (if indeed, they did not undertake such investigation before January 28, 2003). Under such circumstances, as the Court of Appeals held in Rothman, buttressed by repeated italicized quotations from earlier cases emphasizing that the limitations [*33] period begins when a "reasonable investor of ordinary intelligence *would have discovered* the existence of the fraud," the inquiry "turns on *when,* after obtaining inquiry notice, ... the [plaintiffs] should have discovered the facts underlying the alleged" misstatements by the defendants. 220 F.3d at 97 (quoting Dodds, 12 F.3d at 350, and citing Henley v. Slone, 961 F.2d 23, 24 (2d Cir. 1992) (emphasis supplied in Rothman)).

This is not a determination that can be made on the face of the pleadings. It is certainly plausible to believe that, even had a diligent investigation been commenced on October 4, 2001, it would have taken a minimum of several months for plaintiffs to unravel the complex accounting machinations that form the basis of the complaint. Moreover, even after the facts regarding GC's fraudulent accounting were known, further investigation would be required to examine the various transactions and associated financial filings on which the present causes of action against secondary parties such as DLJ and the April 2000 underwriters are based, and to determine whether those parties acted with the requisite culpability. [*34] As the Court of Appeals noted in Levitt, [HN16] since "a person can be liable for securities fraud only if he violates the statute himself," in seeking to bring suit against a secondary party, even once plaintiffs were on inquiry notice that they had been defrauded, "they were required to exercise reasonable diligence in discovering the facts establishing" liability on the part of the secondary actors. 340 F.3d at 103. Since the statute of limitations begins to run, in the case of investors who undertook a reasonable effort of inquiry once "storm warnings" had been posted, when a reasonable investor would have discovered the facts necessary to bring the cause of action, it is a question of fact for ultimate resolution at trial (or on summary judgment if the factual record permits only one conclusion) whether plaintiffs in the exercise of reasonable diligence would have discovered the facts underlying the present claim more than one year before those claims were asserted on January 28, 2003. Accordingly, the motions to dismiss Counts XII, XIII and XIV on statute of limitations grounds is denied.

III. Standing

The April 2000 underwriters also move to dismiss Counts [*35] XII and XIII on grounds of standing.

A. Count XIII

Defendants argue that plaintiffs lack standing to bring a section 11 claim with reference to the April 2000 offering of 6 3/4% preferred shares. First, they contend that the only named plaintiff alleged to have purchased any of these shares, B. I. Shuster (see Compl. P 15), is not one of the Lead Plaintiffs appointed by the Court pursuant to the PSLRA. See Order dated 12/13/02, Appointment of Lead Plaintiff and Organization of Counsel (entered 12/18/02). According to defendants, the addition of Shuster as a named plaintiff in the consolidated amended complaint constitutes an illegitimate "attempt to appoint Shuster as a lead plaintiff" and "an improper encroachment on this Court's authority and duty under the PSLRA" to appoint lead plaintiffs. (April 2000 Br. at 23.)

This argument, essentially abandoned by defendants in their reply brief, is without merit. [HN17] Under the PSLRA, the Court appoints appropriate plaintiffs, presumptively those seeking the responsibility who have the largest losses, 15 U.S.C. § 78u–4(a)(3)(B)(iii), to undertake the selection of lead counsel and the management [*36] of the direction of the litigation. But nothing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case. Indeed, the imposition of any such requirement would be at odds with the purposes of the statute, since in the case of large alleged frauds involving issuers of many classes of securities, the consequence would be either the appointment of a large number of lead plaintiffs (undermining the goal of a cohesive leadership and management group) or the premature breakdown of the action into an unmanageable number of separate cases brought by different lead plaintiffs on behalf of each potential subclass of securities holders.

Nor does anything in the PSLRA prevent the Lead Plaintiffs from constructing a consolidated complaint that brings claims on behalf of a number of named parties besides the Lead Plaintiffs themselves. That is all that has been done here. [HN18] In conducting the lawsuit on behalf of all class members and all those who have brought complaints that have been consolidated under their leadership, Lead [*37] Plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or claims. By naming additional plaintiffs who, as purchasers of different categories of securities, have standing to bring claims on behalf of the various potential subclasses of securities purchasers, the Lead Plaintiffs in this case have simply exercised that responsibility.

The complaint does not purport to add Shuster to the list of Lead Plaintiffs appointed by the Court, or to assign him any of the responsibilities that devolve upon lead plaintiffs under the PSLRA. It merely identifies him, along with a number of other plaintiffs besides the Lead Plaintiffs, as one of the plaintiffs in the case who alleges he has been aggrieved by the acts of the defendants. [HN19] Judges presiding over complex securities class actions under the PSLRA have repeatedly rejected arguments, like those defendants raise here, that seek to confuse the role of lead plaintiffs under the PSLRA with that of named plaintiffs for purposes of ordinary class action standing law, or [*38] to claim that the individual lead plaintiff must have standing to bring all of the claims asserted in the class action complaint. See In re Initial Public Offering Securities Litig., 214 F.R.D. 117, 122–23 (S.D.N.Y. 2002); In re Enron Corp. Securities, Derivative & ERISA Litig., 258 F. Supp. 2d 576, 609–11 (S.D. Tex. 2003); In re Worldcom Inc. Securities Litig., 2003 U.S. Dist. LEXIS 8245, No. 02–3288, 2003 WL 21219049 at *26–*28 (S.D.N.Y. May 19, 2003).

Second, defendants argue that Shuster does not in any case have standing to bring section 11 claims regarding the April 2000 offering, because he did not purchase his preferred shares until March 2001, by which time, defendants claim, any reasonable purchaser should have been aware of the inaccuracy of GC's registration statements. This argument is also unavailing.

[HN20] Under section 11, "any person acquiring" a security issued pursuant to an inaccurate registration statement may bring an action against those responsible for the misstatements. 15 U.S.C. § 77k(a). The only relevant exception is that the action will be defeated if "it is proved that at the time of such acquisition he knew of [*39] such untruth or omission." Id. Essentially, defendants assert as a matter of fact that by eleven months after the issuance of the registration statements, when he acquired his shares, Shuster must, as a reasonable investor aware of the already–sharply–declining GC share price, have been aware of the inaccuracy of the registration statement.

Whether Shuster knew of the erroneous statements in the registration statement is a factual issue. Moreover, it is one on which the defendants effectively bear the burden of proof. Section 11 provides that any person acquiring a security registered pursuant to a misleading registration statement may sue "unless *it is proved*" that he knew of the untruth of the statement at the time he made the purchase. 15 U.S.C. § 77k(a) (emphasis added). At this stage of the proceedings, then, it is presumed that the purchasing plaintiff did not know of the false or misleading statements. Perhaps there are cases in which the facts pled demonstrate that the purchaser must have known the truth, but this is clearly not one of them. The only fact to which defendants point in making this argument is that the price of GC securities has [*40] already fallen by the time Shuster bought his shares. This may or may not have alerted a purchaser that there was some risk or problem associated with the securities, but a declining share price alone would not have demonstrated the falsity of any particular assertion in the registration statement, and defendants do not suggest any evidence, still less any portion of the plaintiffs' pleading, indicating that the facts about GC's accounting fraud were known as early as March 2001.

Finally, in a closely related argument, defendants argue that Shuster did not purchase his shares pursuant to the erroneous registration statement. This argument, for which no plausible authority is cited, appears to be an attempt to revive the universally rejected claim that only those who purchased stock in the initial offering, and not aftermarket purchasers, are entitled to sue under section 11. Every appellate court to have considered that argument, including the Second Circuit, has rejected it based on the plain language of section 11. See DeMaria v. Andersen, 318 F.3d 170, 175–78 (2d Cir. 2003); Lee v. Ernst & Young, LLP, 294 F.3d 969, 976–78 (8th Cir. 2002); Joseph v. Wiles, 223 F.3d 1155, 1158–61 (10th Cir. 2000); [*41]   Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076, 1080–82 (9th Cir. 1999). Contrary to defendants' argument, [HN21] the Second Circuit expressly ruled that "in a case such as this one, where there has been only one stock offering, any person who acquires the security may sue under § 11, 'regardless of whether he bought in the initial offering, a week later, or a month after that.'" DeMaria, 318 F.3d at 176, quoting Hertzberg, 191 F.3d at 1080. As defendants concede (R. Mem. at 10), there was only one offering of 63/4% preferred shares, and so there is no question that Shuster's shares are traceable to that offering. Defendants' claim that it is "absurd" to think that Shuster relied on the registration (Mem. at 25) is legally irrelevant, since [HN22] reliance is not an element of a section 11 claim for any purchaser who bought securities within twelve months of the registration statement. 15 U.S.C. § 77k(a); In re WorldCom, 2003 U.S. Dist. LEXIS 8245, 2003 WL 21219049 at *11; Schwartz v. Celestial Seasonings, Inc., 904 F. Supp. 1191, 1196 (D. Colo. 1995).

Accordingly, the claim that plaintiffs lack standing to assert [*42]    a section 11 claim regarding the 6 3/4% offering is rejected.

B. Count XII

Defendants raise a more troubling standing argument with respect to Count XII. The April 2000 stock issue was a secondary offering of GC common stock. As defendants point out (and as the Court may take judicial notice of, since the facts are based on public SEC filings), the shares offered in April 2000 represented only 5.5% of the total number of GC shares then outstanding. [HN23] While, as noted above, the law is clear that purchasers of securities issued pursuant to a misleading registration statement can assert a section 11 claim whether they purchase their shares directly in the public offering or in the general securities markets, it is equally clear that they may only sue "so long as the security was indeed issued under *that* registration statement and not another." Lee, 294 F.3d at 976–77, quoted in DeMaria, 318 F.3d at 176. Thus, it has been established in the Second Circuit since Barnes v. Osofsky, 373 F.2d 269 (2d Cir. 1967) (Friendly, J.), that to have standing to assert a section 11 claim, plaintiffs must be able to "trace their shares to an allegedly [*43]    misleading registration statement." DeMaria, 318 F.3d at 176.

Plaintiffs claim that they have satisfied this requirement, since they clearly assert that they seek to bring their action only "on behalf of those who purchased or otherwise acquired Global Crossing common stock traceable to the Secondary Offering and pursuant to the Registration Statement and Prospectus filed in conjunction with the April 3, 2000 shelf offering." (Compl. P 793.) More, however, is required. [HN24] It is well established that a plaintiff seeking to represent a class must be a member of the class he purports to represent. See, e.g., Bailey v. Patterson,

369 U.S. 31, 32–33, 7 L. Ed. 2d 512, 82 S. Ct. 549 (1962); Nat'l Super Spuds, Inc. v. Mercantile Exchange, 660 F.2d 9, 17 (2d Cir. 1981). Thus, it is not enough that plaintiffs seek damages only for a class that has standing; at least one named plaintiff must be a member of that class – that is, a named plaintiff must have purchased shares traceable to the challenged offering.

Nowhere in the complaint is it alleged that any named plaintiff meets this requirement. At most, plaintiffs allege that various named plaintiffs purchased [**44**]  securities during the class period (Compl. PP 9, 12); they also cite the Lead Plaintiffs' certification (referenced in the complaint), which shows that the Lead Plaintiffs purchased substantial numbers of GC shares within weeks of the Secondary Offering. (P. Mem. at 54 & n. 26.) But they cite no portion of the voluminous complaint, or any document referenced in it, that establishes that any named plaintiff can trace his, her or its shares to that offering.

The Second Circuit has not directly addressed whether plaintiffs asserting a section 11 claim must explicitly plead that they purchased shares traceable to the flawed registration statement. In Barnes, the issue was simply whether class members participating in a settlement fund needed to prove that their shares were traceable; in DeMaria, since there was only one offering of the relevant securities, the issue of tracing did not arise. Nevertheless, those district courts that have considered the question have required plaintiffs to plead as well as prove that their shares were issued pursuant to the misleading registration statement. See Ciresi v. Citicorp., 782 F. Supp. 819, 823 (S.D.N.Y. 1991) (dismissing [**45**] class action complaint where there had been more than one offering, and plaintiffs failed to allege they purchased shares issued pursuant to allegedly false registration statement); Lorber v. Beebe, 407 F. Supp. 279, 286–87 (S.D.N.Y. 1976) (same); Guenther v. Cooper Life Sciences, Inc., 759 F. Supp. 1437, 1440–41 (N.D. Cal. 1990) (same); McFarland v. Memorex Corp., 493 F. Supp. 631, 641–42 (N.D. Cal. 1980) (same); Lilley v. Charren, 936 F. Supp. 708, 718 (N.D. Cal. 1996) (same).

These decisions appear correct. [HN25] It is clear that plaintiffs bear the burden of proving securities are traceable. Barnes, 373 F.2d at 273 n.2; Lorber, 407 F. Supp. at 286; Kirkwood v. Taylor, 590 F. Supp. 1375, 1382–83 (D. Minn. 1984) (on motion for summary judgment). Moreover, the tracing requirement is essential to the cause of action. Stocks are not fungible under section 11. Barnes, 373 F.2d at 272–73 (2d Cir. 1967). Only those who purchase securities that are subject to allegedly false registration statement, and not those who buy identical stocks already being traded, [**46**]  can sue under section 11. Id.; Wolfson v. Solomon, 54 F.R.D. 584, 588 (S.D.N.Y. 1972); Guenther, 759 F. Supp. at 1440–41; see also DeMaria, 318 F.3d at 176 (citing Barnes and Lee v. Ernst & Young, 294 F.3d at 976–77). The cause of action inheres in the faulty registration statement that put the shares in question on the market; it is on the basis of the flaw in the underlying registration that section 11 dispenses with the requirements of scienter, and, for those who purchase soon enough after the registration statement, reliance. Those who purchased in the open market shares that were properly registered in an earlier offering are relegated to the securities fraud remedies that include such requirements. Thus, plaintiffs who purchased securities not issued pursuant to the misleading registration statement lack standing as surely as the purchasers of other securities entirely.

As Judge Friendly noted more than 35 years ago, [HN26] modern market conditions may have made the tracing requirement obsolete. See Barnes, 373 F.2d at 273. In a world in which the "shares" purchased by a stockholder might be merely [**47**]  electronic entries in a brokerage firms' books, tracing may be impracticable; at a minimum, as the Third Circuit more recently noted, "before discovery takes place, [it may be] impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market." Shapiro v. UJB Financial Corp., 964 F.2d 272, 286 (3d Cir. 1992). For these reasons, the pleading requirement is not elaborate. Plaintiffs have not been required to explain how their shares can be traced; general allegations that plaintiff purchased "pursuant to" or traceable to false registration statement have been held sufficient to state a claim. Shapiro, 964 F.2d at 285–86; In re Crazy Eddie Securities Litig., 747 F. Supp. 850, 854–55 (E.D.N.Y. 1990); In re AES Corp. Securities Litig., 825 F. Supp. 578, 592 (S.D.N.Y. 1993); Neuberger v. Shapiro, 1998 U.S. Dist. LEXIS 10944, Fed. Sec. L. Rep. 90, 261, 1998 WL 408877at *2 (E.D. Pa. July 17, 1998). But absent any such allegation, the named plaintiffs lack standing to assert a claim pursuant to section 11, and therefore to represent the class of purchasers of GC common stock traceable [**48**]  to that offering. Accordingly, Count XII must be dismissed as currently pled, with leave to plaintiffs to replead should they have a good faith basis for believing that some of their shares were or must have been issued pursuant to the April 2000 offering.

IV. DLJ's Fairness Opinion

DLJ argues that Count XIV, relating to the IXnet/IPC merger, should be dismissed as to DLJ for failure to state a claim. As to DLJ's involvement in that transaction, the complaint alleges only that DLJ "issued fairness opinions" to IXnet/IPC opining "that the stock exchange ratio was fair to the IXnet and IPC shareholders from a financial point of view," and consented to the inclusion of those opinions in the IXnet/IPC registration statement. (Comp. PP 359, 361, 809, 811.) Plaintiffs maintain that the registration statement was thus rendered inaccurate, because the overvaluation of GC stock due to its inaccurate financial statements rendered the exchange anything but fair.

Certain of DLJ's arguments may be quickly dismissed. DLJ argues that any inaccuracy in its fairness opinion could not have been material to purchasers of GC shares issued pursuant to the IXnet/IPC registration statement, since [**49**]  that opinion was only a minor part of the total information package, and related only to the relative value of the shares of GC and IXnet/IPC, not the absolute value of GC shares themselves. n8 More cynically, it contends that the alleged falsity of its opinion could not hurt purchasers of GC shares, since the acquisition of IXnet/IPC with overvalued GC stock could only have raised the shareholder value of GC.

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – –

n8 DLJ appears to assume that the acquired company's financial statements may have been just as bogus as GC's, and that plaintiffs are to be faulted for not alleging the specific impact of the inaccurate valuation of GC shares as against the true value of the acquired company's shares. (DLJ Mem. at 8.) There is no reason for the Court to make this assumption; if the valuation of GC shares was inflated by inaccurate accounting procedures, as plaintiffs profusely allege, it is a logical inference that an exchange ratio that was assertedly fair on the basis of the inflated stock value was not fair in light of the true value of the shares.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

 **[\*50]**

These arguments are without merit. They all go to [HN27] the materiality of any alleged misstatement, which is a question of fact that cannot be resolved so easily on the pleadings. TSC Indus.v. Northway, 426 U.S. 438, 450, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976). Count XIV is not brought by or on behalf of anyone who acquired GC shares issued pursuant to the IXnet/IPC registration statement, but only by and on behalf of IXnet/IPC shareholders who obtained shares in the merger itself by exchanging their shares in the acquired companies. (Compl. P 810.) It is difficult to see how an opinion about the fairness of the exchange ratio could be other than material to those shareholders.

DLJ's argument that it is not subject to the provisions of section 11 is no more persuasive. Section 11 applies to [HN28] every accountant, engineer, or appraiser, or any *person whose profession gives authority to a statement made by him,* who has with his consent been named as having prepared or certified any part of the registration statement, or as *having prepared or certified any report or valuation* which is used in connection with the registration statement, with respect to the statement ... which **[\*51]** purports to have been prepared or certified by him.15 U.S.C. § 77k(a)(4). DLJ queries whether it is a "person whose profession gives authority to a statement made by him," and denies that its opinion letters are "reports of valuations." (DLJ Mem. at 15.) But DLJ's opinion letters affirmatively tout its professional expertise as a reason to take its opinion as authoritative (Ogden Decl. Ex. A at D–1–2, D–2–2), and a reasonable factfinder could easily conclude that a letter from a professedly expert appraiser of business transactions opining that a particular exchange ratio for securities of two companies is fair, delivered to the shareholders of one side of the transaction and deliberately included in the registration statement of the securities to be issued in connection with the deal, constitutes a "report or valuation ... used in connection with [a] registration statement."

DLJ's more serious argument, however, is that the complaint does not actually allege that the opinion letters were false. The letters are carefully hedged as to the opinion being given, and quite explicit as to the nature of the investigation upon which the opinion is based. n9 **[\*52]** With respect to the value of GC shares, DLJ represents only that it has "reviewed financial and other information that was publicly available or furnished to us by [the parties, including] Global Crossing, including information provided during discussions with their respective managements, such as certain financial projections of [Global Crossing] for the five years 2000–2004 prepared by the management of Global Crossing." (Ogden Decl. Ex. A at annex D–1–1, D–2–1.) DLJ specifically states that in rendering its opinion, "we have relied upon and assumed the accuracy and completeness of all of the financial and other information that was available to us from public sources [or] that was provided to us by ... Global Crossing or their ... representatives" (id. at annex D–1–1, D–2–1 – D–2–2) and that "we have not assumed any responsibility for making an independent evaluation of any assets or liabilities or for making any independent verification of any of the information reviewed by us." (Id. at annex D–1–2, D–2–2.)

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – –

n9 DLJ offers this as yet another reason why the opinions are not material. But that, again, is a question of fact. A skeptic might well question why anyone would pay huge fees for an opinion that its proponent later dismisses as so hedged as to be meaningless, but the directors of IXnet and IPC appear to have found it worthwhile to solicit just such an opinion, and GC sought and obtained DLJ's consent to include the opinion letters in the registration materials. However useless DLJ now claims its services were, a reasonable factfinder could find its opinions material.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

 **[\*53]**

Thus, DLJ's statement is quite clear that it is offering only its opinion of the fairness of the exchange ratio, based on the financial information provided by GC. That does not mean that DLJ is exempt from liability for false statements under section 11. [HN29] Materially misleading statements of opinion and belief can be actionable under the securities laws, where the party offering the opinion misrepresents its true belief, that is, where the opinion or belief is not truly held. See Virginia Bankshares Inc. v. Sandberg, 501 U.S. 1083, 1095, 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991); Shields v. Citytrust Bancorp Inc., 25 F.3d 1124, 1131 (2d Cir. 1994); Freedman v. Value Health Inc., 135 F. Supp. 2d 317, 337 (D. Conn. 2001) (decided under § 11).

Plaintiffs, however, nowhere allege that DLJ was aware that its purported opinion about the fairness of the transaction was wrong, or that it was based on faulty information, or that DLJ was privy to information known to GC executives that would have undermined the financial information on which DLJ purported to rely. Count XIV alleges that the registration statement was misleading, incorporating the many allegations [*54] of the complaint claiming that GC's financial information was false. (Compl. P 811.) It further represents that DLJ "consented to the use of its fairness opinions" in the registration statement, and that none of the Count XIV defendants, presumably including DLJ, "made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IXnet Registration Statement were true ... and were not misleading." (Id.) But DLJ had not purported to make a reasonable investigation of the financial information provided by GC. To the contrary, it expressly revealed that it had taken the information provided by GC at face value, and opined only that, *if that information was true,* the exchange ratio was fair. Plaintiffs do not allege that DLJ knew that the information provided by GC was false, or that it misstated in any way its opinion that the exchange ratio was fair based on that information. If the fairness opinion was misleading about the true state of DLJ's information, in other words, it would be actionable, but plaintiffs do not allege that the statements DLJ made about its beliefs were in fact inaccurate.

Plaintiffs make no credible response [*55] to this argument. In their brief, plaintiffs claim that DLJ "purported to conduct a due diligence investigation in support of its fairness opinions," that it should be found liable under section 11 "for falsely representing that it had independently assessed the value" of GC, and that it "represented falsely that it had some basis to believe that Global Crossing's reported revenues [and other financial information] were accurate." (P. Mem. at 45–46.) However, the complaint makes no such allegations, and the actual opinion letters incorporated by reference in the complaint, as discussed above, make no such representations: DLJ explicitly *denied* making an "independent evaluation" of GC's value. Thus, the theory set forth in plaintiffs' brief – essentially, that DLJ misled investors by purporting to undertake an investigation of GC's value when in reality it was opining on the fairness of the merger "without so much as questioning the market value of Global Crossing's stock" (P. Mem. at 46), is not only not alleged in the complaint, but is flatly inconsistent with the documents referenced there, which make clear that DLJ affirmatively disclosed that it did not "so much as question[]" [*56] the accuracy of the financial information provided by GC. n10

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n10 Plaintiffs' complaint could be read, with considerable generosity, as alleging that DLJ misrepresented its true opinion, insofar as it could be read as alleging that none of the defendants named in Count XIV had reason to believe the "statements" that they made (Compl. P 811); hence, since the only statement DLJ made was that in its opinion the transaction was fair based on the information provided to it, the complaint must be alleging that DLJ had no reason to believe, and hence did not believe, that this was its true opinion. This would be a remarkably strained reading of a sentence that more naturally is read to assert that none of the parties had reason to believe in the accuracy of the underlying statements about GC's financial condition. Moreover, as discussed in the text, plaintiffs make no attempt to assert or defend such a theory in their brief, and instead present an altogether different, and untenable, theory of DLJ's liability.

– – – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

Accordingly,  [*57]  Count XIV must be dismissed as to DLJ, since the complaint nowhere alleges that DLJ's statement of opinion was false.

V. Other Arguments

Defendants' other arguments are more quickly disposed of. The April 2000 underwriters argue that plaintiffs fail to state a claim under section 11 because they have not identified a specific false statement in the April 2000 registration statements. They also argue that they were entitled to rely on the expertise underlying the audited financial statements prepared by GC's accountants, Arthur Andersen LLP.

The complaint alleges, among other things, that the registration statement and prospectus incorporated by reference GC's 1999 form 10–K, which plaintiffs claim was misleading in that it was based on inaccurate interpretations of FASB 13 as applied to the recognition of revenue from IRU's. (Compl. P 370; see id. PP 120–121.) The complaint also alleges that the April 2000 registration statement "repeated Global Crossing's misleading disclosure regarding its change in accounting procedures after FIN 43 became effective." (Id. P 371.) The complaint adequately sets forth the theory on which plaintiffs contend that GC's position on [*58] the effect of FIN 43 was intentionally misleading. (Id.

PP 154–157.) These, of course, are contested claims, and they may or may not be established on a full factual record. But it cannot be maintained that plaintiffs have not adequately alleged that the registration statements contained false and misleading information.

As for the claim of justified reliance on the audited financial statements, [HN30] it is true that section 11 provides a defense where an underwriter has "no reasonable ground to believe and did not believe" that the statements were false or misleading. 15 U.S.C. § 77k(b)(3)(C). But the statute expressly provides that the burden of proof is on defendants to establish this defense, id., and the plaintiffs need not negate such an affirmative defense in their pleading. In re Enron, 258 F. Supp. 2d at 596; Funke v. Life Financial Corp., 237 F. Supp. 2d 458, 474–75 (S.D.N.Y. 2002); In re Turkcell Iletisim Hizmetler A.S. Securities Litig., 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001); Griffin v. PaineWebber Inc., 84 F. Supp. 2d 508, 513 (S.D.N.Y. 2000); In re Chambers Dev. Securities Litig., 848 F. Supp. 602, 624 (W.D. Pa. 1994). [*59]

The April 2000 underwriters also claim that plaintiffs' enormous mountain of a pleading fails to satisfy the requirement of Rule 8(a), Fed. R. Civ. P., that a complaint provide [HN31] "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint, which contains 840 paragraphs spread over 326 pages, certainly could not be characterized as pithy. Nor is this failing entirely dismissible as a mere question of style. It has not been easy for the Court, any more than it was likely easy for defendants, to identify clear–cut statements, for example, that juxtapose what the complaint alleges were misleading statements with what it asserts were the true facts.

Nevertheless, the complaint should not be dismissed on this basis. Plaintiffs appropriately have chosen to join a large number of claims against a large number of defendants, based on a number of different theories and securities offerings, since those claims all arise out of the same underlying alleged accounting fraud, which itself is quite complex. [HN32] It is perfectly understandable, particularly in light of Rule 9(b)'s requirement that fraud be alleged with particularity, [*60] that plaintiffs have erred on the side of detail and prolixity in an effort to explain the facts from which their claims emerge. A motion to dismiss is a vehicle for testing the legal sufficiency of plaintiffs' claims, and not a device for editing their prose.

Finally, the underwriters argue that plaintiffs have named a variety of defendants who are mere corporate affiliates of the actual underwriters, and who played no part in the actual stock issue. It appears quite likely that this is the case. Defendants provide a chart which appears accurately to list the corporate entities identified in the prospectuses of the April 2000 offerings, and which also lists a number of other defendants, affiliated in one way or another with those underwriters, who are named as defendants in the complaint. (Mem. at 8.) The complaint at most vaguely defines these additional defendants as members of groups that are "collectively" identified by a general title, and then alleges in its substantive portions that the group or collective participated in the underwriting, without identifying the particular role alleged to have been played by any of the specific affiliated entities.

Plaintiffs argue that [*61] they have alleged that all of these entities participated in the underwriting, and that the extent of their participation is simply a question of fact to be resolved at a later stage of the action. See In re Enron Corp., 235 F. Supp. 2d 549, 564 n. 5 (S.D. Tex. 2002) (postponing consideration of accuracy of plaintiffs' identification of affiliated defendants). The attractiveness of this approach is somewhat undermined by instances in which plaintiffs' identification of particular defendants is less than plausible, or where it is not even clear that an entity has been named as a defendant at all. n11

– – – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n11 For example, plaintiffs define J.P. Morgan Securities, Inc., a subsidiary of defendant J.P. Morgan Chase & Co., as a defendant (Compl. P 79), when the actual underwriter of the April 2000 common stock offering was another subsidiary, Chase Securities Inc., which did not merge with Chase until December 2000 and apparently had nothing to do with the underwriting. (Mem. at 8 n. 7.) Defendant Salomon Smith Barney Holding, Inc., is defined in the complaint as the parent of underwriter defendant Salomon Smith Barney Inc. (Compl. P 70), but the relevant counts in the complaint are charged against "SSB," which is the complaint's defined shorthand term only for the subsidiary and not for the parent (id.).

– – – – – – – – – – – End Footnotes – – – – – – – – – – – –

[*62]

Nevertheless, there is no particular reason to resolve these issues at this stage. Plaintiffs have, on whatever factual basis, alleged that the named defendants played a role in the underwriting. If those allegations cannot be borne out by the evidence, they will assuredly be dismissed at a later stage; if plaintiffs do not have a good faith basis for their allegations, any defendant that is not promptly dismissed after putting plaintiffs on notice of their error may well be in a position to move for sanctions. Since all of the arguably misnamed defendants are affiliates of properly–named underwriters, and since none of them have retained separate counsel or otherwise undergone unnecessary expense, the effort to sort out the proper defendants at this stage (which would in any event permit later amendment of the complaint based on evidence uncovered in discovery) seems inefficient. The motion to dismiss these defendants is therefore denied, without prejudice to later renewal, and with a strong

admonition to plaintiffs promptly to dismiss any defendant as soon as it is clear that a claim against it cannot be sustained.

CONCLUSION

For the reasons stated above, Counts II and VII **[*63]** are dismissed as time–barred, Count XII is dismissed for lack of standing, with leave to replead, and Count XIV is dismissed as to defendant DLJ. The motion of the April 2000 underwriters to dismiss Count XIII is denied.

SO ORDERED.

Dated: December 18, 2003

GERARD E. LYNCH

United States District Judge

ALLISON HINES, Plaintiff, v. ESC STRATEGIC FUNDS, INC., and SUNTRUST EQUITABLE SECURITIES CORPORATION, Defendants.

Case No. 3:99–0530

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

1999 U.S. Dist. LEXIS 15790; Fed. Sec. L. Rep. (CCH) P90,684

September 17, 1999, Decided

September 17, 1999, Entered

**DISPOSITION:   [\*1]**  Defendants' Motion to Dismiss Plaintiff's First Amended Complaint GRANTED in part and DENIED in part. Counts One, Two and Four DISMISSED with prejudice.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff brought action alleging state securities fraud, common law fraud, breach of fiduciary duty, breach of implied contract, and violations of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2), and the Securities and Exchange Act of 1934, 15 U.S.C.S. § 78j. Defendants filed a motion to dismiss.

**OVERVIEW:** Plaintiff invested in a value fund offered by defendants. When defendants decided to liquidate the assets and discontinue operation of the fund, plaintiff received only 70 percent of her initial investment. Plaintiff brought an action against defendants, alleging state securities and common law fraud, breach of fiduciary duty, breach of implied contract, violation of § 12(2) of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2), and violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.S. § 78j. The court granted defendants' motion to dismiss all state law claims, except breach of fiduciary duty, on the ground they were preempted under the Securities Litigation Uniform Standards Act, 15 U.S.C.S. § 77p(b). The fiduciary duty claim was not preempted because it involved post–sale allegations. The court denied defendants' motion to dismiss the federal securities laws claims, because representations in the prospectus were misleading and plaintiff sufficiently alleged scienter.

**OUTCOME:** Court granted motion to dismiss state claims where such claims were preempted under federal law. Court denied motion to dismiss state claim involving post–sale allegations and denied motion to dismiss federal claims, where defendants' failure to warn investors that fund could be terminated was misleading and plaintiff showed requisite scienter.

**CORE TERMS:** prospectus, investor, omission, misleading, motion to dismiss, material fact, misrepresentation, cautionary, class action, long–term, issuer, invested, untrue, Uniform Standards Act, preempted, liquidate, warnings, scienter, discovery, prospectuses, assurance, front–end, recklessness, misstatement, Securities Act, sale of securities, securities fraud, fiduciary duties, cause of action, mutual fund

## LexisNexis(TM) HEADNOTES – Core Concepts

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN1]   On a motion to dismiss, all well–pleaded facts in the complaint are treated as true. Dismissal of a complaint is not proper unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Securities Law > Bases for Liability > Misleading Statements*
*Securities Law > Bases for Liability > Private Securities Litigation*

[HN2]   Pursuant to § 16(b) of the Securities Litigation Uniform Standards Act, 15 U.S.C.S. § 77p(b), no covered class action based upon the statutory or common law of any state or subdivision thereof may be maintained in any state or federal court by any private party alleging (1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

*Securities Law > Bases for Liability > Private Securities Litigation*

[HN3]   There are certain statutory exceptions to the preemption provision of § 16(b) of the Securities Litigation Uniform Standards Act, 15 U.S.C.S. § 77p(b), including a covered class action that is based upon the statutory or common law of the state in which the

issuer is incorporated or organized which may be maintained in a state or federal court by a private party. 15 U.S.C.S. § 77p(d)(1)(A).

***Securities Law > Bases for Liability > Private Securities Litigation***

[HN4]    For purposes of 15 U.S.C.S. § 77p(d)(1)(A), a "covered class action" is an action which involves (i) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or (ii) any recommendation, position, or other communication with respect to the sale of securities of the issuer that –– (I) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and (II) concerns decisions of those equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights. 15 U.S.C.S. § 77p(d)(1)(B).

***Securities Law > Bases for Liability > Private Securities Litigation***

[HN5]    Section 16(f)(2)(A)(i) of the Securities Litigation Standards Act, 15 U.S.C.S. § 77p (f)(2)(A), provides that a "covered class action" is any single law suit in which ––

(i) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

(ii) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members.

***Securities Law > Initial Public Offerings & the Securities Act of 1933 > Definitions***
***Securities Law > Bases for Liability > Private Securities Litigation***

[HN6]    Section 16(f)(3) of the Securities Litigation Uniform Standards Act (Act), 15 U.S.C.S. § 77p(f)(3), provides that a "covered security" for purposes of the Act is the same as a "covered security" pursuant to § 18(b)(1)–(2) of the Securities Acts of 1933, 15 U.S.C.S. § 77r(b). Under § 18(b)(2), a "covered security" includes a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940. 15 U.S.C.S. § 77r(2).

***Securities Law > Regulation of Securities Markets > Registration & Regulation of Brokers & Dealers***
***Securities Law > Investment Companies > Advisory Contracts***
***Securities Law > Blue Sky Laws > Civil Liability***

[HN7]    Although no fiduciary relationship is created between a broker and a client where the account is not discretionary, a fiduciary relationship is created where the account is discretionary such that the broker makes decisions as to what investments to make.

***Securities Law > Bases for Liability > Controlling Persons Liability***

[HN8]    Section 77o of the Securities Act of 1933, 15 U.S.C.S. § 77o, provides that every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under §§ 77k or 77l of this title, shall also be liable jointly or severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. 15 U.S.C.S. § 77o. Under 15 U.S.C.S. § 78t, the liability of a control person for § 10(b) of the Securities Exchange Act of 1934 or Rule 10b–5 claims is the same. 15 U.S.C.S. § 78t.

***Securities Law > Bases for Liability > Civil Liability***

[HN9]    Section 12(2) of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2), provides that any person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading may be liable to an unknowing purchaser of the security. In a § 12(2) claim, reliance on alleged misrepresentations or omissions is not an element.

***Securities Law > Bases for Liability > Civil Liability***

[HN10]    In order to establish a violation of § 12(2) of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2), a plaintiff must show that (1) defendants offered or sold a security; (2) by the use of any means of communication in interstate commerce; (3) through a prospectus or oral communication; (4) by making a false or misleading statement of a material fact or by omitting to state a material fact; (5) plaintiff did not know of the untruth or omission; and (6) defendants knew, or in the exercise of reasonable care could have known of the untruth or omission.

***Securities Law > Bases for Liability > Civil Liability***

[HN11]    Section 12(2) of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2), applies exclusively to public offerings by issuers and not to private agreements to sell securities.

***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss***
***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action***
***Securities Law > Bases for Liability > Civil Liability***

[HN12]    Consideration of Securities and Exchange Commission (SEC) Form N1–A by the court as evidence that plaintiff's allegations regarding §12(2) of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2), are insufficient to withstand the defendants' motion to dismiss is not appropriate because this SEC form falls outside the four corners of the complaint. Although, on a motion to dismiss, courts may consider the full text of SEC filings, prospectuses, and statements integral to the complaint, even if they are not attached to the complaint, SEC Form N1–A does not fall within this scope.

*Securities Law > Bases for Liability > Civil Liability*
*Securities Law > Bases for Liability > Deceptive Devices*

[HN13]   For an omitted fact to be "material" in a claim under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. Courts have used this same materiality standard for claims under § 12(2) of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2).

*Securities Law > Bases for Liability > Civil Liability*
*Securities Law > Bases for Liability > Deceptive Devices*

[HN14]   In reviewing the representations in a prospectus, the prospectus must be read as a whole. Thus, the central issue is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities.

*Securities Law > Bases for Liability > Deceptive Devices*

[HN15]   In order to state a claim under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.S. § 78j, and Rule 10(b)−5, a plaintiff must allege in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury. To establish liability under § 10(b), a plaintiff must, as a threshold matter, allege in his complaint that the defendant acted with sufficient scienter.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Securities Law > Bases for Liability > Liability for Fraud*
*Securities Law > Bases for Liability > Deceptive Devices*

[HN16]   Allegations of securities fraud, as with all allegations of fraud, must satisfy the requirements of Fed. R. Civ. P. 9(b). Fed. R. Civ. P. 9(b) requires that when a plaintiff alleges fraud, the circumstances constituting fraud or mistake shall be stated with particularity.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Securities Law > Bases for Liability > Deceptive Devices*
*Securities Law > Bases for Liability > Private Securities Litigation*

[HN17]   Pursuant to the amendments in the Private Securities Litigation Reform Act, 15 U.S.C.S. § 77p(b), a plaintiff alleging a misstatement or omission must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C.S. § 78u−4(b)(1). Furthermore, the complaint shall, with respect to each act or omission alleged to have violated this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C.S. § 78u−4(b)(2).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Securities Law > Bases for Liability > Deceptive Devices*
*Securities Law > Bases for Liability > Private Securities Litigation*

[HN18]   A plaintiff must plead scienter in a case under § 10(b) of the Securities and Exchange Act, 15 U.S.C.S. § 78j, or Rule 10(b)−5 by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud. Recklessness is highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it. Recklessness is to be understood as a mental state apart from negligence and akin to conscious disregard.

**COUNSEL:** For ALLISON HINES, plaintiff: Harold Naill Falls, Jr., Falls & Veach, P.L.C., Nashville, TN.

For ESC STRATEGIC FUNCS INC, SUNTRUST EQUITABLE SECURITIES CORPORATION, defendants: Overton Thompson, III, Michael L. Dagley, Warren L. Ratliff, Farris, Warfield & Kanaday, Nashville, TN.

**JUDGES:** ALETA A. TRAUGER, United States District Judge.

**OPINIONBY:** ALETA A. TRAUGER

**OPINION:  MEMORANDUM**

This matter comes before the court on Defendants' Motion to Dismiss. (Docket No. 5) Plaintiff has filed a Response to Defendants' Motion to Dismiss. (Docket No. 12) The defendants have filed a Reply. (Docket No. 16) On September 3, 1999, the parties appeared before this court for oral argument. Upon further reflection, the court has reconsidered its original, tentative decision and, for the reasons expressed herein, modifies that ruling.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

Defendant ESC Strategic Funds, Inc. ("ESC") is an open−end management registered investment company. Defendant SunTrust Equitable Securities Corporation ("Equitable Securities") **[*2]**  served as the investment advisor for the ESC Strategic Value Fund ("Value Fund"). Plaintiff Allison Hines invested $ 50,000 in Class A shares of the Value Fund in September 1997.

Defendants offered shares of the Value Fund to the public by way of a prospectus filed with the Securities and Exchange Commission ("SEC") on February 18, 1997. n1 The defendants sold two classes of shares of the Value Fund. Class A shares carried a maximum front–end sales charge of 4.50% and annual operating expenses of approximately 1.80%, and Class D shares carried a maximum front–end sales charge of 1.50% and annual operating expenses of 2.30%. The Value Fund began operating on May 7, 1997.

– – – – – – – – – – – – – –Footnotes – – – – – – – – – – – – – –

n1 The defendants provided a 1997 Prospectus as an exhibit to their Motion to Dismiss. (Docket No. 6, Ex. A) Although the date of the 1997 Prospectus submitted as an exhibit (May 5, 1997) is not the same as the initial 1997 Prospectus cited in Plaintiff's First Amended Complaint (February 18, 1997), Plaintiff has not indicated that there are any substantive differences between the two prospectuses that should prevent the court from considering Defendants' Exhibit A.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

 [*3]

On November 25, 1998, the defendants filed a Semi–Annual Report for all ESC funds, including the Value Fund, with the SEC. (Docket No. 6, Ex. B) The Semi–Annual Report provided the following information with respect to the Value Fund:**ESC Strategic Value Fund** Like a Category 4 hurricane, the storm from Asia slammed into the world's financial markets – and wreaked havoc during the six months ended September 30, 1998. Damage was apparent across the spectrum and in all sectors – growth stocks, value stocks, large caps, small caps and international stocks – all suffered to some degree. . . .

Our contrarian/value investment philosophy was sorely tested over the course of the period. But, we believe the key to successful investing is having the discipline to stick to the strategy in all market environments. Historically, the markets have handsomely rewarded such investors for their pain and suffering. Nonetheless, the period was a very disappointing and frustrating one. . . .

*Standing Strong* In recent weeks, many of the situations that so frightened investors earlier in the year have calmed. Asia's rate of decline has slowed, or possibly even flattened out. The [*4]  Russian economy, while still very shaky, is no longer in complete free–fall. And, in an effort to spark activity overseas, the U.S. Federal Reserve has cut interest rates twice. As a result, the stock market has firmed and even gained back some of the ground lost.

Given this, while we aren't completely out of the woods yet, we believe the worst may be over. But uncertainty lingers – so new highs are rather unlikely in the near–term. Long–term, however, we believe prospects remain extremely bright for the market in general, and our holdings in particular. Which is why we have no plans to change our strategy – we believe it is a proven one. And we know 'you've gotta dance with who brung ya' to succeed over the long–term." (Docket No. 3, at P20; Docket No. 6, Ex. B, at 4)

On February 9, 1999, ESC sent a letter to all investors stating that, on the recommendation of Equitable Securities, the Board of Directors of ESC had decided to liquidate the assets and discontinue operation of the Value Fund effective March 26, 1999. (Docket No. 6, Ex. C) In the letter, ESC informed investors that "during the almost two years of its existence, the Value Fund has not attracted sufficient interest [*5]  among prospective investors and is considered unlikely to do so in the future. Furthermore, because of the Fund's asset size, the Board of Directors is concerned that it cannot operate, on an ongoing basis, at a competitive or reasonable expense ratio." (Docket No. 6, Ex. C, at 1) In the letter, Plaintiff was also informed of her right to transfer her investment to another ESC Strategic Fund without incurring any front–end sales charge. Id.

Plaintiff did not exercise her transfer option. After the defendants liquidated the Value Fund, Plaintiff was sent a check in the amount of $ 35,000, the dollar value of a share in the Value Fund (at the time of liquidation) times the number of shares she owned.

On May 19, 1999, Plaintiff filed suit in the Circuit Court for Davidson County. On June 17, 1999, the defendants filed a Notice of Removal to the United States District Court for the Middle District of Tennessee. (Docket No. 1) On June 23, 1999, Plaintiff filed her First Amended Complaint. (Docket No. 3)

MOTION TO DISMISS STANDARD

 [HN1] On a motion to dismiss, all well–pleaded facts in the complaint are treated as true. See In re Comshare, 183 F.3d 542, 1999 WL 460917, at *3 (6th [*6]  Cir. July 8, 1999). Dismissal of a complaint is not proper "unless it appears beyond doubt that plaintiff can prove no

set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

DISCUSSION

The defendants seek the dismissal of all claims in Hines' First Amended Complaint.

1. *State Law Claims (Counts One through Four)*

The defendants argue that Plaintiff's state law claims (Counts One through Four) should be dismissed because they are all preempted under the Securities Litigation Uniform Standards Act ("Uniform Standards Act"), 15 U.S.C. § 77p(b). n2

– – – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n2 After Congress raised the pleading standards for federal securities fraud claims through passage of the Private Securities Litigation Reform Act ("PSLRA") in 1995, plaintiffs filed suits in state courts in an attempt to avoid these heightened standards in federal court. In 1998, Congress passed the Securities Litigation Uniform Standards Acts to preclude litigants from flooding state courts with securities fraud suits.

– – – – – – – – – – – – – – –End Footnotes– – – – – – – – – – – – – – – [HN2]

 **[\*7]**

Pursuant to Section 16(b), 15 U.S.C. § 77p(b),No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging –
(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
(2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

 [HN3] There are certain statutory exceptions to this preemption provision, including "a covered class action . . . that is based upon the statutory or common law of the State in which the issuer is incorporated . . . or organized . . . may be maintained in a State or Federal court by a private party." 15 U.S.C. § 77p(d)(1)(A).

 [HN4] For purposes of this section, a "covered class action" is an action which involves(i) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or

(ii) any recommendation, position, or other communication with respect **[\*8]** to the sale of securities of the issuer that ––(I) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and
(II) concerns decisions of those equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights. 15 U.S.C. § 77p(d)(1)(B).

Although Plaintiff attempts to argue that her class action falls under the exception listed in 15 U.S.C. § 77p(d)(1)(A), she fails to demonstrate that her suit is a covered class action under 15 U.S.C. § 77p(d)(1)(B). (Docket No. 12, at 17–18) Accordingly, Plaintiff's state law claims are not subject to these statutory exceptions. n3 See Docket No. 16, Defendants' Reply at 7–8.

– – – – – – – – – – – – – –Footnotes – – – – – – – – – – – – – –

n3 Plaintiff also requests that this court deny the defendants' motion to dismiss Counts One and Two of her First Amended Complaint in order to "allow plaintiff an opportunity to pursue discovery concerning the precise relationship between ESC and [Equitable Securities]. This would also give plaintiff, depending upon what the discovery revealed, an opportunity to seek leave to amend to include a state securities law claim under the laws of the state of Maryland, where ESC is incorporated." (Docket No. 12, at 19) As the defendants point out, all discovery is to be stayed during the pendency of a motion to dismiss "unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice." 15 U.S.C. § 78u–4(b)(3)(B); 15 U.S.C. § 77z–1(b)(i). This assertion does not persuade the court that discovery is needed to preserve evidence or to prevent undue prejudice.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

**[*9]**

Plaintiff's state claw claims are preempted if (1) Plaintiff's suit is a "covered class action," (2) the claims are based on Tennessee law, (3) Plaintiff's claims concern a "covered security," and (4) Plaintiff alleges untrue, manipulative, or deceptive statements or omissions in connection with the sale or purchase of the security.

First, Plaintiff's suit is a covered class action pursuant to [HN5] Section 16(f)(2)(A)(i), which provides that a "covered class action" is any single law suit in which —

(i) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

(ii) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members . . . . 15 U.S.C. § 77p **[*10]**  (f)(2)(A).

In her First Amended Complaint, Plaintiff asserts that she has brought this action "on her own behalf and as a plaintiff class action pursuant to Rule 23(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a plaintiff class (the 'Plaintiff Class') consisting of those individuals and entities who purchased the Value Funds' shares from its commencement on May 7, 1997 until the time it was terminated in March of 1999 (the 'Class Period')." (First Amended Complaint at P9). Furthermore, Plaintiff alleges that "common questions of law and fact exist as to all members of the Plaintiff Class and predominate over any questions solely affecting individual members of the Plaintiff Class." (First Amended Complaint at P14)

Accordingly, Plaintiff's suit is a "covered class action" pursuant to 15 U.S.C. § 77p(f)(2)(A).

Second, Plaintiff's Counts One (State Securities Fraud), Two (Common Law Fraud), Three (Breach of Fiduciary Duty), and Four (Breach of Implied Contract) are all based on Tennessee law. (First Amended Complaint at PP29–45)

Third, Plaintiff's state law claims concern a "covered security" as defined in Section 16(f)(3),  **[*11]**   15 U.S.C. § 77p(f)(3). [HN6] Section 16(f)(3) provides that a "covered security" for purposes of the Uniform Standards Act is the same as a "covered security" pursuant to Section 18(b)(1)–(2) of the Securities Acts of 1933, 15 U.S.C. § 77r(b). Under Section 18(b)(2), a "covered security" includes "a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940." 15 U.S.C. § 77r(2).

Here, ESC is a registered investment company (First Amended Complaint at P5) and filed a registration statement with the SEC (First Amended Complaint at P17). Accordingly, Plaintiff's suit concerns a "covered security."

The final factor to be considered is whether Plaintiff's individual state claims are based on allegations of untrue statements, omissions of material fact, or manipulative or deceptive devices in connection with the purchase or sale of a security. For this factor, each count will be examined separately.

(a) *Count One: State Securities Fraud*

In Count One of her First Amended Complaint, Plaintiff alleges that "in connection with the offer **[*12]**  and sale of these securities[,] defendants employed devices, schemes and artifices to defraud, made material misrepresentations and omitted to state material facts . . . necessary to make the statements not misleading, and engaged in acts and practices that operated as a fraud or deceit on plaintiff and the other members of the Plaintiff Class, all in violation of T.C.A. § 48–2–121(a) and (b)." (First Amended Complaint at P30)

Plaintiff further alleges that "Defendants also made or caused to be made statements which at the time and in light of the circumstances under which they were made were false and misleading with respect to material facts as set forth herein, in violation of T.C.A. P48–2–121(c)." (First Amended Complaint at P31)

Clearly, this claim is preempted under the Uniform Standards Act because the claim is based on allegations of untrue statements, omissions of material facts, and manipulative or deceptive devices. This claim is dismissed with prejudice.

(b) *Count Two: Common Law Fraud*

In Count Two of her First Amended Complaint, Plaintiff alleges that "Defendants sold the Value Fund to investors through the use of intentional or reckless misrepresentations and **[\*13]** omissions of material fact . . . ." (First Amended Complaint at P35)

As with Count One, this claim is preempted under the Uniform Standards Act because the claim is based on allegations of untrue statements and omissions of material fact. Thus, Plaintiff's second cause of action is dismissed with prejudice.

(c) *Count Three: Breach of Fiduciary Duty* n4

− − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − −

n4 [HN7] Although no fiduciary relationship is created between a broker and a client where the account is not discretionary, a fiduciary relationship is created where, as here, the account is discretionary such that the broker makes decisions as to what investments to make. See J.C. Bradford Futures, Inc. v. Dahlonega Mint. Inc., 1990 U.S. App. LEXIS 11787, 1990 WL 95625, \*5 (6th Cir. July 11, 1990) (unpublished opinion); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1481 (6th Cir. 1989).

− − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

In Count Three of her First Amended Complaint, Plaintiff alleges that "Defendants and their officers and directors owed . . . fiduciary duties to act with good faith and **[\*14]** integrity, to act in conformance with the representations made to the Plaintiff Class, and to act in the best interests of the Plaintiff Class and not for their own self interest." (First Amended Complaint at P40)

Specifically, Plaintiff alleges that the defendants breached their fiduciary duties by "causing or allowing the fund to charge excessive fees in light of the short duration of the fund and the performance of the fund, by failing to operate the fund for a reasonable length of time consistent with representations to investors, and by terminating the fund for reasons related to defendants' economic self−interest rather than the best interests of investors." (First Amended Complaint at P40) Finally, Plaintiff alleges that "if it was defendants' view that the Value Fund had to attract a certain minimum amount of funds to be economically viable, then defendants should not have spent, invested, paid themselves fees from, and/or lost any investor money until that minimum had been achieved." (First Amended Complaint at P41). Thus, Plaintiff alleges that the defendants are liable for a continuing breach of their fiduciary duties.

The defendants argue that Plaintiff's allegations **[\*15]** concerning her breach of fiduciary duty claim are nothing more than assertions that Plaintiff was misled through "(1) false representations about long−term investing in the 1997 Prospectus, (2) false assurances about long−term investing in the Semi−Annual Letter, and (3) false explanations in the February 1999 Letter that ESC was terminating the Value Fund because it could not attract investors." (Docket No. 6, at 8) The defendants contend that because these allegations merely boil down to allegations of untrue statements, omissions of material fact, and deception, they are preempted under the Uniform Standards Act. Id.

In their moving papers, the defendants fail to acknowledge that only those allegations based on untrue statements or omissions of material facts made in connection with the purchase or sale of a covered security are preempted under the Uniform Standards Act. 15 U.S.C. § 77p(b). In their Reply, the defendants limit their motion to dismiss this third cause of action, stating that Plaintiff's claim should be dismissed to the extent that her claim is based on allegations that the representations in the 1997 Prospectus were misleading. (Docket **[\*16]** No. 16, at 9) The defendants alternatively argue that this cause of action should be dismissed even if it is ostensibly based on allegations unrelated to the sale of the Value Fund securities because Plaintiff has failed to separate her sale and post−sale allegations. (Docket No. 16, at 9)

Plaintiff argues that her breach of fiduciary duty claim concerns actions by the defendants after she purchased the securities in September 1997. (Docket No. 12, at 16) Because Plaintiff has alleged that the defendants' breach of their fiduciary duties resulted from their actions after she purchased her shares, Plaintiff's post−sale allegations are sufficient to withstand a motion to dismiss.

Accordingly, the defendants' motion to dismiss this third cause of action is denied.

(d) *Count Four: Breach of Implied Contract*

In Count Four, Plaintiff alleges that "as a result of the representations made to the Plaintiff Class and the decision of the Plaintiff Class to entrust their funds to defendants, defendants assumed an implied contractual obligation to operate the fund and manage investor funds for a reasonable period of time consistent with stated goals and objectives and the load charged to **[\*17]** investors, and an implied obligation not to terminate the fund for reasons of their own self−interest." (First Amended Complaint at P44)

Plaintiff alleges that the defendants breached their implied contract at the time they terminated the fund in March 1999. However, the obligations under the implied contract would have arisen at the time Plaintiff invested in the Value Fund. Thus, it appears that Plaintiff's allegations concern actions by the defendants "in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b).

Accordingly, Count Four of Plaintiff's First Amended Complaint is preempted pursuant to the Uniform Standards Act and is dismissed with prejudice.

2. *Count Five: Violation of § 12(2) of the Securities Act of 1933*

In Count Five, Plaintiff alleges that "defendants intentionally and/or recklessly made oral and written communications which included material misrepresentations and omitted to state material facts necessary to make the statements made not misleading, all in violation of § 12(2) of the federal Securities Act of 1933, 15 U.S.C. § 77l(a)(2)." (First Amended Complaint at P47) Plaintiff further [*18] alleges that she "invested in the Value Fund at a price that was affected by defendants' misrepresentations and material omissions." (First Amended Complaint at P48) Finally, Plaintiff alleges that Equitable Securities is liable for the violations of ESC under the Securities Act of 1933 as a "control person" n5 under 15 U.S.C. § 78t. (First Amended Complaint at P49) n6

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n5 [HN8] Section 77o provides that "every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly or severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." 15 U.S.C. § 77o. Under 15 U.S.C. § 78t, the liability of a "control person" for section 10(b) or Rule 10b–5 claims is the same. 15 U.S.C. § 78t.

n6 The defendants argue that Plaintiff's claims against Equitable Securities –– in both Counts Five and Six –– are based only on Plaintiff's allegation that Equitable Securities is a "control person" with respect to ESC pursuant to § 77o (section 12(2) claim) and § 77t (section 10(b) claim). (Docket No. 6, at 19) The defendants contend that because Plaintiff's claims against ESC should be dismissed, Plaintiff's claims against Equitable Securities must also be dismissed because "control person" liability is derivative. Id. (citing In re Comshare, 183 F.3d 542, 1999 WL 460917, at *10 n.11 (6th Cir. 1999)).

– – – – – – – – – – – – – – – –End Footnotes– – – – – – – – – – – – – – – – [HN9]

 [*19]

Section 12(2) provides that any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading" may be liable to an unknowing purchaser of the security. 15 U.S.C. § 77l(a)(2). In a Section 12(2) claim, reliance on alleged misrepresentations or omissions is not an element. See Wright v. National Warranty Co., 953 F.2d 256, 262 (6th Cir. 1992); n7 see also Parkhurst v. North American Fin. Services, 919 F. Supp. 270, 275 (E.D. Mich. 1996). The defendants argue that the allegations in Count Five are not sufficient to support a claim under Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2). (Docket No. 6, at 14–18)

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n7 [HN10] In order to establish a section 12(2) violation, a plaintiff must show that "(1) defendants offered or sold a security [;] (2) by the use of any means of communication in interstate commerce; (3) through a prospectus or oral communication; (4) by making a false or misleading statement of a material fact or by omitting to state a material fact; (5) plaintiff did not know of the untruth or omission; and (6) defendants knew, or in the exercise of reasonable care could have known of the untruth or omission." Wright, 953 F.2d at 262 n.3 (citing Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 687–88 (3rd Cir. 1991)).

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

**[*20]**

First, the defendants argue that Hines' Section 12(2) claim must be based only on representations contained in the 1997 Prospectus because a defendant is only liable for untrue statements in written or oral communications which offer securities for sale or confirm the sale of any securities. (Docket No. 6, at 14–15). In Gustafson v. Alloyd Co., 513 U.S. 561, 577–78, 131 L. Ed. 2d 1, 115 S. Ct. 1061 (1995), the Supreme Court held that [HN11] Section 12(2) applies exclusively to public offerings by issuers and not to private agreements to sell securities. Thus, any alleged misrepresentations or omissions of material fact contained in the Semi–Annual Letter and the February 1999 Letter are not actionable under Section 12(2).

The defendants further argue that (1) Section 19(a) precludes liability for good faith conformity with SEC rules and regulations and (2) any representations in the 1997 Prospectus were not misleading. (Docket No. 6, at 15–18)

Plaintiff alleges that the misleading and untrue statements and omissions of material fact in the 1997 Prospectus were as follows: "The ESC Strategic Value Fund is a suitable investment for investors seeking long–term capital appreciation **[*21]** from purchasing 'value' securities. The Manager [of the Value Fund] expects the average holding period of its securities to be two to five years. The Fund is not appropriate for investors seeking to capitalize on shortterm market fluctuations or for investors who would be likely to sell shares in the event of shortterm declines in value." (First Amended Complaint at P18)

The plaintiff alleges that defendants failed to disclose in the 1997 Prospectus that one risk investors needed to consider was the possibility that they would "decide to sell out the fund prematurely because they do not like current market conditions or do not believe that they themselves are making enough money from the fund." (First Amended Complaint at P19) The plaintiff also alleges that the 1997 Prospectus "omitted to tell investors that defendants themselves might liquidate the fund if market conditions or the amount of fees they were earning were not to their liking." (First Amended Complaint at P25) Further, the defendants "wholly failed to inform investors that the defendants themselves (and not the investors) might determine the period of the investment by liquidating the fund after only a short time. **[*22]** Indeed, defendants failed to make any disclosures to potential investors regarding the circumstances under which the Value Fund might be terminated or whether investors would have any right to vote on the issue of termination." (First Amended Complaint at P26)

The defendants first argue that Section 19(a) precludes liability for good faith conformity with SEC rules and regulations. (Docket No. 6, at 15–16) They assert that the 1997 Prospectus addressed all of the matters required by SEC Form N1–A. n8 In addition, SEC Form N1–A did not require the defendants to disclose that they might liquidate the fund. (Docket No. 6, at 16) Thus, according to the defendants, because they complied with Form N1–A, Plaintiff's Section 12(2) claim should be dismissed.

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n8 According to the defendants, Form N1–A requires disclosure in a prospectus of the principal risk factors concerning investment in a mutual fund, including both those risks peculiar to the fund and those generally applicable to funds with similar investment policies. (Docket No. 6, at 16)

– – – – – – – – – – – – – – – –End Footnotes– – – – – – – – – – – – – – – – [HN12]

**[*23]**

Consideration of Form N1–A by the court as evidence that Plaintiff's Section 12(2) allegations are insufficient to withstand the defendants' motion to dismiss is not appropriate because this SEC form falls outside the four corners of the complaint. Although the Sixth Circuit has held that, on a motion to dismiss, courts may consider the full text of SEC filings, prospectuses, and statements integral to the complaint, even if they are not attached to the complaint, SEC Form N1–A does not fall within this scope. See In Re Royal Appliance Sec. Litig., 1995 U.S. App. LEXIS 24626, 1995 WL 490131, *2 (6th Cir. Aug. 15, 1995) (unpublished opinion) (citing I. Meyer Pincus & Assoc. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991)); see also In re Revco Sec. Litig., 1991 U.S. Dist. LEXIS 20715, 1991 WL 353385, at *1 (N.D. Ohio Dec. 12, 1991).

The defendants also argue that Plaintiff's Section 12(2) claim should be dismissed because the representations in the 1997 Prospectus were not misleading. (Docket No. 6, at 16–18; Docket No. 16, at 6–7) Specifically, the defendants contend that there were ample warnings in the 1997 Prospectus such that there is "no credible argument that plaintiff was **[*24]** unaware of a material risk before she invested." (Docket No. 6, at 18)

In Basic Inc. v. Levinson, 485 U.S. 224, 231–32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988), the Supreme Court held that, [HN13] for an omitted fact to be material in a 10(b) claim, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc., 485 U.S. at 231–32 (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)). Although Basic Inc. involved a 10(b) claim, other

courts have used this same materiality standard for section 12(2) claims. See In Re Craftmatic Sec. Litig., 890 F.2d 628, 640 (3rd Cir. 1990); Kademian v. Ladish Co., 792 F.2d 614, 622 (7th Cir. 1986); Cook v. Avien, Inc., 573 F.2d 685, 693 (1st Cir. 1978).

[HN14] In reviewing the representations in a prospectus, the prospectus must be read as a whole. See McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990);  [*25]   see also Werbowsky v. American Waste Serv., Inc., 1998 U.S. App. LEXIS 31984, 1998 WL 939882, at *2 (6th Cir. Dec. 22, 1998) (unpublished opinion). Thus, the "central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the [securities]." McMahan & Co., 900 F.2d at 579.

In their moving papers, the defendants only address Hines' claim that the 1997 Prospectus was misleading in emphasizing that the ESC Value Fund was for long–term investment. (Docket No. 6, at 17) The defendants contend that this excerpt from the 1997 Prospectus is not misleading because immediately following the objected–to portion of the 1997 Prospectus, there is a cautionary statement that "there can be no assurance that the Fund will achieve its investment objective." (Docket No. 6, Ex. A at 7)

They also point to the following cautionary statements in support of their argument that, as a whole, the 1997 Prospectus was not misleading:(1) Although it is expected that the Fund will invest for long–term capital appreciation, the  [*26]  Manager [of the Value Fund] may liquidate securities without regard to how long they have been held, if such action is considered appropriate. (Docket No. 6, Ex. A at 7, emphasis in original)

(2) **There can be, of course, no assurance that the fund will achieve its investment objective. Moreover, investors should be aware that the value of the fund's shares will fluctuate, which may cause a loss in the principal value of the investment.** (Docket No. 6, Ex. A at 2, emphasis in original)

(3) The Manager will attempt to manage the Fund's risk, although there can be no assurance the Manager will be successful in this effort. (Docket No. 6, Ex. A at 7)

(4) There is, of course, no assurance that the Fund will achieve its investment objective or be successful in preventing or minimizing the rick of loss that is inherent in particular types of investment products. (Docket No. 6, Ex. A at 7)

In Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996), the Second Circuit held that the cautionary statements in the prospectus precluded the plaintiffs' claim under Section 12(2) of the Securities Act of 1933. In affirming the district court's [*27]  dismissal of the suit under Fed. R. Civ. P. 12(b)(6), the Second Circuit found that, despite the plaintiffs' claims that the prospectus misrepresented both the investment strategy and the risks involved in the investment, there were sufficient cautionary statements in the prospectus such that the "prospectuses warned investors of exactly the risk the plaintiffs claim was not disclosed." Olkey, 98 F.3d at 5. While the plaintiffs sought to have all cautionary language in the prospectuses disregarded as "boilerplate," the Second Circuit found that the cautionary language was "too prominent and specific to be disregarded." Id.

Here, the defendants claim that, as in Olkey, the termination of the Value Fund "fell well within the terms of these warnings." (Docket No. 6, at 18) The defendants claim that because the warnings in the 1997 Prospectus were "conspicuous, clear, and readily understandable, there can be no credible argument that Plaintiff was unaware of a material rick before she invested." (Docket No. 6, at 18)

However, the cautionary language in the 1997 Prospectus is not, as it was in Olkey, specific to the actual risks Plaintiff alleges were material.  [*28]  Indeed, the cautionary language from the 1997 Prospectus cited in (1) above only indicates that the Manager of the Value Fund expected to keep certain securities for a period of two to five years but may need to liquidate certain securities –– not the fund as a whole –– in a shorter period of time. Even if this language were to apply to the Value Fund as a whole (and it does not), the language would not put investors on notice of when and under what circumstances the Value Fund would be terminated. As for the cautionary language cited in (2)–(4) above, these warnings are only general statements that the Value Fund may not achieve its investment objective. The warnings do not indicate that there was a risk that the defendants would close the Value Fund in the event that it did not reach some unspecified goal for the number of investors or the amount of investment in the Value Fund. (Docket No. 12, at 13)

Accordingly, the defendants' motion to dismiss Plaintiff's Section 12(2) claim is denied.

3. *Count Six: Violation of § 10(b) of the Securities and Exchange Act*

In Count Six of Plaintiff's First Amended Complaint, Plaintiff alleges that "in connection with the offer and sale [*29]  of securities, defendants intentionally and/or recklessly employed devices, schemes and artifices to defraud, made material misrepresentations and omitted to state material facts . . . necessary to make the statements not misleading, and engaged in acts and practices that operated as a fraud or deceit on plaintiff and the other members of the Plaintiff Class, all in violation of § 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j, and Rule 10(b)–5 of the SEC Regulations promulgated under that Act." (First Amended Complaint at P52)

Plaintiff also alleges in Count Six that "Plaintiff was unaware of defendants' misrepresentations and reasonably relied on defendants' misrepresentations, omissions and false and misleading statements. Plaintiff also invested in the Value Fund at a price that was affected by defendants' misrepresentations and material omissions. (First Amended Complaint at P53)

The defendants argue that Plaintiff has failed to allege scienter with particularity. n9 (Docket No. 6, at 10–14)

− − − − − − − − − − − − − −Footnotes − − − − − − − − − − − − − − −

n9 The defendants also contend that Counts One through Four and Count Six should be dismissed because Plaintiff has failed to allege any misrepresentation of any material fact. (Docket No. 6, at 18; Docket No. 16, at 7) The defendants contend that all of the representations cited by Plaintiff were "qualified by the explicit warnings in the 1997 Prospectus . . . ." (Docket No. 6, at 18) However, as discussed above with respect to Plaintiff's Count Five (see pp. 16–17), ESC's liquidation of the Value Fund during a short−term decline in the market did not fall "within the terms of these warnings." (Docket No. 6, at 18) Thus, the defendants have failed to demonstrate that any of Plaintiff's claims should be dismissed because Plaintiff has failed to allege any material misrepresentations.

− − − − − − − − − − − − − − −End Footnotes− − − − − − − − − − − − − − − [HN15]

 **[\*30]**

In order to state a claim under Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10(b)−5, a plaintiff must allege "in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." In re Comshare, 183 F.3d 542, 1999 WL 460917, at *4 (1999) (citing Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1409 (6th Cir. 1991)). To establish liability under Section 10(b), a plaintiff "must, as a threshold matter, allege in his complaint that the defendant acted with sufficient scienter." Id.

 [HN16] Allegations of securities fraud, as with all allegations of fraud, must satisfy the requirements of Fed. R. Civ. P. 9(b). Rule 9(b) requires that when a plaintiff alleges fraud, "the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). Despite the heightened pleading standard in Rule 9(b), Congress passed the Private Securities Litigation Reform Act ("PSLRA") in 1995 after determining that Rule 9(b) had not stemmed the abuse of the securities laws by **[\*31]** private litigants. H.R. Conf. Rep. No. 104−369 (1995).

 [HN17] Pursuant to the amendments in the PSLRA, a plaintiff alleging a misstatement or omission must specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u−4(b)(1). Furthermore, "the complaint shall, with respect to each act or omission alleged to have violated this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u−4(b)(2) (1998).

The Sixth Circuit recently held that [HN18] a plaintiff must plead scienter in a Section 10(b) or Rule 10(b)−5 case "by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud." In re Comshare, 183 F.3d 542, 549, 1999 WL 460917, at *5. In defining recklessness, the Sixth Circuit looked to **[\*32]** earlier opinions, stating that "recklessness [is] highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." Id. at 550 (citing Mansbach v. Prescott, 598 F.2d 1017, 1025 (6th Cir. 1979)). The Sixth Circuit further explained that recklessness is to be understood as a "mental state apart from negligence and akin to conscious disregard." Id. In applying this pleading standard to the facts of the case, the Sixth Circuit found that the plaintiff's allegations did not satisfy the standard because they merely alleged that the defendants had the motive and opportunity to commit securities fraud. 183 F.3d at 549.

Here, the defendants contend that Plaintiff's allegations are also insufficient under the pleading standard set forth in In re Comshare. (Docket No. 6, at 11−14)

First, the defendants contend that Plaintiff has not alleged any "reason for the Court to believe that it is 'standard' in the mutual fund industry for prospectuses or other communications with shareholders to state that an investment company may **[\*33]** liquidate a mutual fund if its fails to attract investors −− or, as in this case, if it faces a precipitous decline in investors threatening the value of the remaining shareholders' assets." (Docket No. 6, at 12)

Although Plaintiff does not specifically allege that the defendants' omissions of material fact were clear departures from the standard of ordinary care in the mutual fund industry, her failure to make such an allegation is not fatal to her claim. Indeed, Plaintiff has alleged that the defendants failed to provide material information concerning the potential duration of the Value Fund and the risk of early termination, especially in light of the defendants' emphasis on the long−term nature of the investment and the high front−end sales charges. (First Amended Complaint at

PP25–28) Furthermore, there is circumstantial evidence in the February 1999 letter that the defendants were aware at the time the 1997 Prospectus was issued that there was a minimum investment amount needed to ensure the viability of the Value Fund. See Docket No. 6, Ex. C ("During the almost two years of its existence, the Value Fund has not attracted sufficient interest among prospective investors [*34] and is considered unlikely to do so in the future.")

The defendants also contend that Plaintiff has failed to allege that ESC had the required state of mind when ESC made the misleading statements or omitted to make material statements in the 1997 Prospectus. (Docket No. 6, at 13) Although the defendants point to the cautionary statements in the 1997 Prospectus as being sufficient to warn investors that they might liquidate the Value Fund if necessary, these cautionary statements do not inform Plaintiff of the risk that the Value Fund would not be able to successfully weather a short–term decline in the market if the Value Fund was unable to attract a minimum total investment.

In all, Plaintiff has alleged that the defendants failed to warn investors that they might terminate the Value Fund during a short–term decline in the market even though they repeatedly emphasized the long–term nature of the defendants' investment strategy. Plaintiff also alleges that, as a result of the misleading statements and omissions, Plaintiff invested in the Value Fund "at a price that was affected" by the misstatements and omissions because she invested in Class A shares which had a higher front–end [*35] sales charge but lower annual expenses.

Thus, in repeatedly emphasizing their long–term investment strategy, the defendants failed to warn investors of the risks that the defendants themselves would not be able to follow such a strategy in the event of a short–term decline in the market. Thus, Plaintiff has adequately alleged that the defendants acted with the requisite scienter and the allegations in her First Amended Complaint are sufficient to withstand a motion to dismiss. See Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 650 n.7 (7th Cir. 1997) (reversing district court's dismissal of complaint, finding that plaintiff had adequately alleged scienter where plaintiff had alleged that the defendant had represented that its business strategy was to focus on "core business" and to divest "non–strategic businesses" even though the defendant had been negotiating to acquire another business); see also Page v. Derrickson, 1997 U.S. Dist. LEXIS 3673, 1997 WL 148558, at *4–6 (M.D. Fla. Mar. 25, 1997) (finding that plaintiffs had sufficiently alleged 10(b) claim); Carley Capital Group v. Deloitte & Touche, L.L.P., 27 F. Supp. 2d 1324, 1339–40 (N.D. Ga. 1998) [*36] (same).

CONCLUSION

Upon review of the First Amended Complaint and the papers filed in support of and in opposition to Defendants' Motion to Dismiss, this court hereby

(1) grants the defendants' motion to dismiss Counts One, Two, and Four with prejudice; n10 and

(2) denies the defendants' motion to dismiss Count Three, Five, and Six.

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – –

n10 "Although federal courts are inclined to grant leave to amend following a dismissal order, there are circumstances where amendment will not be allowed." Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1041 (6th Cir. 1991). Because there is no indication that amendment of these claims would withstand a motion to dismiss, Plaintiff is not to be given an opportunity to replead these claims.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – –

An appropriate Order will enter.

ALETA A. TRAUGER

United States District Judge

**ORDER**

Defendants' Motion to Dismiss Plaintiff's First Amended Complaint is GRANTED in part and DENIED in part. (Docket No. 5) Defendants' Motion to Dismiss Counts One, Two and Four [*37] is hereby GRANTED and these counts are hereby DISMISSED with prejudice. Defendants' Motion to Dismiss Counts Three, Five and Six is hereby DENIED.

It is so ORDERED.

Entered this 17th day of September, 1999.

ALETA A. TRAUGER

United States District Judge

**ORDER**

On August 20, 1999, the plaintiff filed a Motion to Certify Class. The court now having denied the defendants' Motion to Dismiss in part, it is hereby **ORDERED** that the defendants shall respond to the Motion to Certify Class by October 4, 1999.

It is further **ORDERED** that the Initial Case Management Conference shall be held on October 21, 1999 at 2:00 p.m. in the Chambers of Judge Trauger, 825 United States Courthouse, 801 Broadway, Nashville, Tennessee.

Enter this 17th day of September 1999.

ALETA A. TRAUGER

U.S. District Judge

IN RE WORLDCOM, INC. SECURITIES LITIGATION. This Document Relates to: STATE OF ALASKA DEPT. OF REVENUE and ALASKA STATE PENSION INVESTMENT BOARD, Plaintiffs, –v– BERNARD J. EBBERS, JOHN W. SIDGMORE, SCOTT D. SULLIVAN, CLIFFORD ALEXANDER, JR., JAMES C. ALLEN, JUDITH AREEN, CARL H. AYCOCK, MAX E. BOBBITT, FRANCESCO GALESI, STILES A. KELLETT JR., GORDON S. MACKLIN, JOHN A. PORTER, BERT C. ROBERTS JR., LAWRENCE C. TUCKER, JUAN VILLALONGA, CITIGROUP, INC., SALOMON SMITH BARNEY INC., J.P. MORGAN SECURITIES INC., J.P. MORGAN CHASE & CO., BANK OF AMERICA CORP., BANC OF AMERICA SECURITIES LLC, ABN AMRO INC., DEUTSCHE BANK AG, DEUTSCHE BANK ALEX. BROWN INC., LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS INC., CREDIT SUISSE GROUP, CREDIT SUISSE FIRST BOSTON CORP., GOLDMAN SACHS GROUP INC., GOLDMAN SACHS & CO., UBS WARBURG LLC, NATIONSBANC MONTGOMERY SECURITIES LLC, UTENDAHL CAPITAL PARTNERS L.P., BLAYLOCK & PARTNERS L.P., TOKYO– MITSUBISHI INTERNATIONAL PLC, WESTDEUTSCHE LANDESBANK GIROZENTRALE, BNP PARIBAS SECURITIES CORP., CABOTO HOLDING SIM S.p.A., CABOTO–GRUPPO INTESABEI, ROBERTSON STEPHENS INTERNATIONAL LIMITED, MIZUHO INTERNATIONAL PLC, FLEET SECURITIES INC. and ARTHUR ANDERSEN LLP, Defendants.

MASTER FILE 02 Civ. 3288 (DLC), No. 03 Civ. 6592

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 20955; Fed. Sec. L. Rep. (CCH) P92,633

November 21, 2003, Decided

November 21, 2003, Filed

**SUBSEQUENT HISTORY:** Later proceeding at  Regents of the Univ. of Cal. v. Solomon Smith Barney, Inc. (In re Worldcom, Inc.), 2003 U.S. Dist. LEXIS 21061 (S.D.N.Y., Nov. 24, 2003)

**PRIOR HISTORY:**  In re WorldCom Sec. Litig., 2003 U.S. Dist. LEXIS 20748 (S.D.N.Y., Nov. 17, 2003)

**DISPOSITION:** Motions to dismiss granted in part and denied in part. Claims dismissed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff investors filed numerous actions in state court, which were removed and consolidated with a class action, and alleged violations of §§ 11and 12 (a)(2) of the Securities Act of 1933, 15 U.S.C.S. §§ 77k, 77l(a)(2). Defendant executives, directors, and underwriters, moved to dismiss, arguing the limitations period of 28 U.S.C.S. § 1658 did not apply and the statute of limitations, 15 U.S.C.S. § 77m, barred the claims.

**OVERVIEW:** The  15 U.S.C.S. § 77k claims were based on strict liability or negligence, not fraud. 28 U.S.C.S. § 1658 governed only fraud claims. 15 U.S.C.S. § 77m applied to the 15 U.S.C.S. §§ 77k claim arising from the 1998 offering and was time–barred. Claims based on the May 2000 and May 2001 offerings were not time–barred. Press reports put the investors on inquiry notice as of June 15, 2002. The initial complaint was filed on April 21, 2003, but many of the underwrites and the directors were not added until an amended complaint was filed on September 24, 2003. The claims against the added defendants did not relate back. The American Pipe tolling doctrine did not apply because the complaint was filed before class certification. Since the investors failed to amend their complaint within the period provided by 15 U.S.C.S. § 77m, the claims against the added underwriters and the directors were time–barred. A December, 2000, offering was a private placement and was exempt from the registration requirements of 15 U.S.C.S. § 77l(a)(2).

**OUTCOME:** The underwriters' motion to dismiss the claim of a misleading registration statement based on the May, 2000 and May, 2001 offerings was denied. The motion to dismiss was granted as to the misleading registration statement claims on the 1998 offering, all such claims against the added underwriters, and the misleading prospectus claims based on the December, 2000, private placement. The directors' motions to dismiss were granted with prejudice.

**CORE TERMS:** offering, underwriter, Securities Act, accounting, statute of limitations, investor, placement, motion to dismiss, class certification, billion, registration, class action, securities fraud, inquiry notice, tolling, notice, public offering, individual action, registration statement, contrivance, supplied, deceit, manipulation, time–barred, prospectus, acquisition, goodwill, analyst, earnings, exempt

**LexisNexis(TM) HEADNOTES – Core Concepts**

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > Disclosures & Schedules*

[HN1]    Section 11 of the Securities Act of 1933 provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. 15 U.S.C.S. § 77k(a). The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > Disclosures & Schedules*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Prospectuses*

[HN2]    Section 12(a)(2) of the Securities Act of 1933 allows a purchaser of a security to bring a private action against a seller that offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements not misleading. 15 U.S.C.S. § 77l(a)(2).

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*

[HN3]    Section 13 of the Securities Act of 1933 sets forth the statute of limitations for Securities Act claims. 15 U.S.C.S. § 77m.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*

[HN4]    See 15 U.S.C.S. § 77m.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*

[HN5]    Under Section 13 of the Securities Act of 1933, 15 U.S.C.S. § 77m, plaintiffs must bring suit by the earlier of (a) three years from the date the parties in the offering "obligate themselves to perform," in the case of a § 12(a)(2) of the Act, 15 U.S.C.S. § 77l(a)(2), claim, or three years from the date of the initial registration statement, in the case of a § 11 of the Act, 15 U.S.C.S. § 77k, claim, or (b) one year from the date on which they are put on actual or constructive notice of the facts underlying the claim.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*

[HN6]    On July 30, 2002, Congress enacted the Sarbanes–Oxley Act of 2002 (Sarbanes–Oxley). Section 804 of Sarbanes–Oxley lengthened the statute of limitations for private causes of action alleging securities fraud. 28 U.S.C.S. § 1658.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*

[HN7]    See 28 U.S.C.S. § 1658.

*Governments > Legislation > Interpretation*

[HN8]    Construction of a statute must begin with the words of the text. Whether the meaning of the statute is plain or ambiguous is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. A court must give effect, if possible, to every clause and word of a statute. A particular section of a statute should be understood in context with and by reference to the whole statutory scheme. In addition, comparison to other similar statutory provisions and the statute's legislative history may be used to resolve ambiguity.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
*Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Scope & Jurisdiction > Limitations on Remedies*

[HN9]    Section 804 of the Sarbanes–Oxley Act of 2002, 28 U.S.C.S. § 1658, extends the statute of limitations for claims that involve fraud, deceit, manipulation, or contrivance in contravention of the "securities laws," which it defines to include the Securities Act of 1933 as well as the Securities Exchange Act of 1934. 15 U.S.C.S. § 78c(a)(47).

*Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Scope & Jurisdiction > Limitations on Remedies*

[HN10]    Section 804 of the Sarbanes–Oxley Act of 2002, 28 U.S.C.S. § 1658, states that it applies to claims under the securities laws as defined by § 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78c(a)(47).

*Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Definitions*

[HN11]    See 15 U.S.C.S. § 78c(a)(47).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > Disclosures & Schedules*
*Securities Law > Bases for Liability > Private Securities Litigation*

[HN12]    To state a claim for violation of § 11 of the Securities Act of 1933, 15 U.S.C.S. § 77k, plaintiffs only need allege that material facts have been omitted from a registration statement or presented in such a way as to obscure or distort their significance. Because of its minimal proof requirements, § 77k creates extensive liability for issuers and those involved in the preparation and dissemination of the registration statements filed in the context of a public offering. Such a § 77k claim is not held to the heightened pleading standard required of fraud allegations by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
*Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Definitions*
*Securities Law > Bases for Liability > Deceptive Devices*

[HN13]    In the context of the securities laws, "deceit," "manipulation," and "contrivance" refer to securities fraud. The language of § 804 of the Sarbanes–Oxley Act of 2002, 28 U.S.C.S. § 1658, directly mirrors that of § 10(b) of the Securities Act of 1934, 15 U.S.C.S. § 78j(b), and S.E.C. Rule 10b–5, which provides the private cause of action for securities fraud. 15 U.S.C.S. § 78j(b)

provides that it is unlawful to use or employ any manipulative or deceptive device or contrivance in contravention of such rules and regulations. S.E.C. Rule 10b–5 describes what constitutes a manipulative or deceptive device and provides that it is unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b–5. Section 17 of the Securities Act of 1933, 15 U.S.C.S. § 77q, the criminal securities fraud provision, employs similar language. Section 77q prohibits, among other things, employing any device, scheme, or artifice to defraud. 15 U.S.C.S. § 77q(a)(1).

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > Disclosures & Schedules*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*

[HN14]    Section 804 of the Sarbanes–Oxley Act of 2002, 28 U.S.C.S. § 1658, parallels the private causes of action for securities fraud: it extends the statute of limitations for a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement. These terms are not found in § 11 of the Securities Act of 1933, 15 U.S.C.S. § 77k(a), or § 12(a)(2) of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2), which refers only to material misrepresentations or omissions in certain documents required to be filed with the Securities and Exchange Commission.

*Governments > Legislation > Interpretation*

[HN15]    As a rule, legislative history should be used only to resolve ambiguity.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
*Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Scope & Jurisdiction > Limitations on Remedies*
*Securities Law > Bases for Liability > Liability for Fraud*

[HN16]    Section 804 of the Sarbanes–Oxley Act of 2002, 28 U.S.C.S. § 1658, sets the statute of limitations in private securities fraud cases, not strict liability and negligence claims under § 11 of the Securities Act of 1933, 15 U.S.C.S. § 77k(a), and § 12(a)(2) of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2).

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > Disclosures & Schedules*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
*Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Scope & Jurisdiction > Limitations on Remedies*

[HN17]    Section 804 of the Sarbanes–Oxley Act of 2002, 28 U.S.C.S. § 1658, does not state that it extends the statute of limitations for all claims under the securities laws. Instead, it includes limiting language that extends the time for private causes of action under the securities laws only for claims that involve "fraud, deceit, manipulation, or contrivance." This language does not encompass § 11 of the Securities Act of 1933, 15 U.S.C.S. § 77k(a), and § 12(a)(2) of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2), claims.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN18]    The one–year limitations period of Section 13 of the Securities Act of 1933, 15 U.S.C.S. § 77m, begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge. A duty to inquire arises when the circumstances would suggest to an investor of ordinary intelligence the probability that she has a cause of action.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN19]    Knowledge of a cause of action for a violation of the securities laws is imputed in two different ways, depending on whether the investor undertakes to inquire. If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose. However, if the investor makes some inquiry once the duty arises, we will impute knowledge of what an investor in the exercise of reasonable diligence, should have discovered concerning the wrongdoing. If the facts appearing in the complaint and related documents give rise to a duty of inquiry, it is appropriate to require a plaintiff, resisting a motion to dismiss on limitations grounds, at least to allege that inquiry was made.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN20]    The circumstances giving rise to the duty to inquire, in the context of the statute of limitations and a securities law violation, are referred to as "storm warnings." The financial information that triggers the storm warnings must be such that it relates directly to the misrepresentations and omissions that the plaintiffs later allege in their action against the defendants. An investor does not, however, have to have notice of the entire fraud being perpetrated to be on inquiry notice. To trigger the duty to inquire, the wrongdoing indicated by the storm warnings must be probable, not merely possible.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN21]    In some cases, despite the presence of storm warnings, investors are not placed on inquiry notice, in the context of the statute of limitations and a securities law violation, because the warning signs are accompanied by reliable words of comfort from management. While such statements must be considered, their existence will prevent or dissipate the duty to inquire only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern. Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on (1) how significant the company's disclosed problems are, (2) how likely they are of a recurring nature, and (3) how substantial are the "reassuring" steps announced to avoid their recurrence.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*

*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN22]   Whether a plaintiff was placed on inquiry notice, in the context of the statute of limitations and a securities law violation, is often inappropriate for resolution on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) but, if the facts needed to make the determination can be gleaned from the complaint and papers integral to the complaint, resolution of the issue on a motion to dismiss is appropriate.

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*

[HN23]   Fed. R. Civ. P. 15 provides that an amended pleading relates back to the date of the original timely pleading when, first, the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or, second, the amendment changes the party or the naming of the party against whom a claim is asserted if the first provision is satisfied and, within 120 days the party to be brought in by amendment (A) has received such notice of this institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party. Fed. R. Civ. P. 15(c).

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*

[HN24]   There are three requirements to be met before an amended complaint naming a new party can be found to relate back to a timely complaint: (1) both complaints must arise out of the same conduct, transaction or occurrence, (2) the additional defendant must have been omitted from the original complaint by mistake; and (3) the additional defendant must not be prejudiced by the delay. The relation–back principles are designed to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense.

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*

[HN25]   A "mistake" for purposes of Fed. R. Civ. P. 15 may be a mistake of either fact or law. A mistake of fact occurs when a plaintiff misapprehends the identities of the individuals she wishes to sue. The requirement that a new defendant "knew" he was not named due to a mistake concerning identity presupposes that in fact the reason for his not being named was a mistake in identity. A mistake of law occurs when she misunderstands the legal requirements of her cause of action. Where a plaintiff shows neither type of mistake, the amended pleading will not relate back.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*

[HN26]   Under Fed. R. Civ. P. 15, the addition of a defendant is permitted if the amended pleading is within the statute of limitations applicable to the action. Fed. R. Civ. P. 15(c)(1).

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*
*Governments > Legislation > Statutes of Limitations > Tolling*

[HN27]   The American Pipe tolling doctrine provides that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*
*Governments > Legislation > Statutes of Limitations > Tolling*

[HN28]   Although the American Pipe tolling doctrine tolls the statute of limitations for those who move to intervene after class certification has been denied, the doctrine has been extended to apply to class members who choose to file separate suits after class certification is denied. Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action. Without the tolling rule a putative class member who fears that class certification may be denied would have every incentive to file a separate action prior to the expiration of his own period of limitations, which would result in a needless multiplicity of actions.

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*
*Governments > Legislation > Statutes of Limitations > Tolling*

[HN29]   A plaintiff who chooses to file an action independently of the class before a determination on class certification cannot benefit from the American Pipe tolling doctrine. The plaintiffs who choose to file an independent action without waiting to consider the determination of class certification are not entitled to enjoy the benefits of the tolling rule.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > Disclosures & Schedules*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Prospectuses*

[HN30]   Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C.S. § 77l(a)(2), does not provide a cause of action for private placements. The primary innovation of the Act was the creation of duties in connection with public offerings. While the liability imposed by § 11 of the Securities Act of 1933, 15 U.S.C.S. § 77k(a), flows from the requirements for the filing of registration statements, the liability imposed by 15 U.S.C.S. § 77l(a)(2) flows from the requirements to distribute prospectuses. Section 77l(a)(2) does not create a cause of action for written misrepresentations contained other than those contained in a prospectus. The term "prospectus" in § 77l(a)(2) is confined to a document that must include the information contained in the registration statements. It is a document soliciting the public to acquire securities. The proposition that § 77l(a)(2) covers any communication offering a security for sale has been rejected.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > Prohibitions & Restrictions*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > Disclosures & Schedules*

[HN31]   Private placements or sales of securities are permitted by the securities laws. The general registration requirement in § 5 of the Securities Act of 1933, provides that it is unlawful to sell or offer for sale a security unless a registration statement has been filed

as to that security. 15 U.S.C.S. § 77e, Sections 3 and 4 of the Securities Act of 1933 create exceptions to the registration requirements. 15 U.S.C.S. §§ 77c, 77d. Section 77d(2) contains an exception for transactions by an issuer not involving any public offering. 15 U.S.C.S. § 77d(2). Such private offerings are permitted to be made to, among others, investors such as qualified institutional investors.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Definitions*

[HN32]    S.E.C. Rule 144A governs private resales of securities to institutions and defines the qualified institutional buyers authorized to purchase in a private placement. 17 C.F.R. § 230.144A(7)(a).

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN33]    On a motion to dismiss, a court may consider documents the plaintiffs possessed or knew about and upon which they relied in bringing suit.

**COUNSEL:**  [*1]  For Lead Plaintiff in the Securities Litigation: Max W. Berger, John P. Coffey, Steven B. Singer, Beata Gocyk–Farber, John C. Browne, Jennifer L. Edlind, Bernstein Litowitz Berger & Grossman LLP, New York, NY. Leonard Barrack, Gerald J. Rodos, Jeffrey W. Golan, Mark R. Rosen, Jeffrey A. Barrack, Pearlette V. Toussant, Barrack Rodos Bacine, Philadelphia, PA.

For Plaintiffs State of Alaska Dept. of Revenue and Alaska State Pension Investment Board: William S. Lerach, Darren J. Robbins, Spencer Burkholz, Michael J. Dowd, Randall Baron, Thomas E. Egler, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA. Melvyn I. Weiss, Steven G. Schulman, Sol Schreiber, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY. Patrick J. Coughlin, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA. Gregg D. Renkes, Attorney General, Michael A. Barnhill, Assistant Attorney General, Juneau, AK.

Liaison Counsel for Individual Action Plaintiffs as amici curiae: Neil L. Selinger, David C. Harrison, Todd S. Garber, Lowey Dannenberg Bemporad & Selinger P.C., White Plains, NY.

For Defendant Bernard J. Ebbers: David Wertheimer, Lyndon Tretter, Hogan & Hartson, New York, NY.

Of Counsel [*2]  for Defendant Bernard J. Ebbers: R. David Kaufman, M. Patrick McDowell, Brunini Grantham Grower & Hewes PLLC, Jackson, MS.

For Director Defendants: Paul Curnin, David Elbaum, Simpson Thacher & Bartlett LLP, New York, NY.

For Underwriter Defendants: Jay B. Kasner, Susan L. Saltzstein, Steven J. Kolleeny, Skadden Arps Slate Meagher & Flom LLP, New York, NY.

For Defendants Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc., Citigroup Inc., and Jack Grubman: Martin London, Richard A. Rosen, Brad S. Karp, Eric S. Goldstein, Walter Rieman, Marc Falcone, Joyce S. Huang, Paul Weiss Rifkind Wharton & Garrison LLP, New York, NY. Robert McCaw, Peter K. Vigeland, Wilmer Cutler & Pickering, New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINIONBY:** DENISE COTE

**OPINION:** OPINION & ORDER

DENISE COTE, District Judge:

On June 25, 2002, WorldCom, Inc. ("WorldCom") declared that it would undertake a massive restatement of its financial statements. Shortly thereafter, it filed the largest bankruptcy in United States history.

Even before WorldCom's June 25 announcement, the first class action alleging WorldCom claims was filed in the Southern District of New York on [*3]  April 30, 2002 and assigned to this Court. Subsequent class actions were filed here and transferred to this Court by the Judicial Panel on Multi–District Litigation ("MDL Panel"). The class actions were consolidated for pre–trial purposes by Order dated August 15, 2002.

Numerous actions alleging individual, but not class, claims have also been filed in venues across the country, primarily in state courts ("Individual Actions"). The majority of those actions have been removed to federal court as "related to" the WorldCom bankruptcy and transferred to this Court. By Order dated December 23, 2003 ("December 23 Order"), the Court found that the Individual Actions and the securities class actions involved common questions of law and fact, and that consolidation of these actions for pretrial proceedings was necessary. See In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2002 WL 31867720, at *1 (S.D.N.Y. Dec. 23, 2002). The Individual Actions were consolidated with the Class Action for pre–trial purposes by Opinion and Order dated May 28, 2003. See In re WorldCom, Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 8979, No. 02 Civ. 3288 (DLC), 2003 WL 2003 WL 21242882 (S.D.N.Y. May 28, 2003).  [*4]

Of the Individual Actions, approximately forty–seven have been filed in state courts beginning on July 5, 2002, and most recently on October 3, 2003, by the law firm Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") on behalf of over one hundred twenty private and public pension fund clients. ("Milberg Weiss Actions"). The Milberg Weiss Actions allege claims under the Securities Act of 1933 ("Securities Act"), but not under the Exchange Act of 1934 ("Exchange Act"). n1 The allegations in the complaints filed in each of the Milberg Weiss Actions are

similar, but not identical. This Opinion addresses a motion to dismiss one of the Milberg Weiss Actions. n2

− − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − − −

n1 The Milberg Weiss Actions have been drafted to avoid the removal and class action provisions of the federal securities laws. See In re WorldCom, Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 8525, No. 02 Civ. 3288 (DLC), 2003 WL 21219037, at *1 (S.D.N.Y. May 22, 2003).

n2 The Order scheduling this motion to dismiss was entered on September 22, 2003. The motion was filed on October 3, and fully submitted on October 31. On November 10, Milberg Weiss filed a motion requesting that this Court defer consideration of any pending motions impacting their cases and defer distribution of the notice to the Class while they await resolution by the Second Circuit, in the event their motion for certification of an interlocutory appeal is granted and accepted by the Court of Appeals, of the legality of the removal of the Milberg Weiss Actions to federal court. By Order dated November 19, any party opposing the Milberg Weiss Actions' November 10 motion is required to so inform the Court by December 1. The Court declines to delay a decision on the motion to dismiss to await the completion of briefing on the November 10 Milberg Weiss motion.

− − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

 **[\*5]**

The first motion to dismiss in this consolidated securities litigation was made against the Consolidated Class Action Complaint. By Opinion and Order dated May 19, 2003, defendants' motions to dismiss the Class Action Complaint were denied with limited exceptions. n3 See In re WorldCom, Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 8245, No. 02 Civ. 3288 (DLC), 2003 WL 21219049 (S.D.N.Y. May 19, 2003). By Opinion and Order dated October 24, 2003, the lead plaintiffs' motion to certify a class was granted. n4 See In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2003 WL 22420467 (S.D.N.Y. Oct. 24, 2003).

− − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − − −

n3 The Exchange Act Section 10(b) claims against four WorldCom directors who were members of the Audit Committee ("Audit Committee Defendants") were dismissed with leave to amend. The motions by WorldCom's auditors and accountants were addressed in an Opinion and Order dated June 24, 2003. Arthur Andersen LLP's motion to dismiss was denied; the motions to dismiss filed by related entities and individuals were granted. See In re WorldCom, Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 10863, No. 02 Civ. 3288 (DLC), 2003 WL 21488087 (S.D.N.Y. June 24, 2003).

**[\*6]**

n4 The certified class consists of all persons and entities who purchased or otherwise acquired publicly traded securities of WorldCom during the period beginning April 29, 1999 through and including June 25, 2002, and who were injured thereby, including all persons or entities who acquired shares of WorldCom common stock in the secondary market or in exchange for shares of acquired companies pursuant to a registration statement, and all persons or entities who acquired debt securities of WorldCom in the secondary market or pursuant to a registration statement (the "Class"). See In re WorldCom, Inc. Sec. Litig., 2003 WL 22420467, at *2, 36.

− − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

As noted, this Opinion addresses a motion to dismiss one of the Individual Actions. It is one of two motions that comprise the first tranche of motions to dismiss claims common to many Individual Actions. n5 It is brought against the complaint filed by Milberg Weiss on behalf of two Alaska plaintiffs ("MW Alaska Action" and "Complaint"), and raises two issues: (1) the statute of limitations for claims under Sections 11 and 12(a)(2) of the **[\*7]**     Securities Act, and (2) whether the sale of WorldCom debt securities in December 2000 supports a Securities Act Section 12(a)(2) claim.

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n5 Certain defendants have moved to dismiss securities fraud claims in the Individual Action captioned Public Employees Retirement Sys. of Ohio v. Ebbers, 2003 U.S. Dist. LEXIS 7406, No. 03 Civ. 338 (DLC) ("Ohio Action"), on statute of limitations grounds. The Ohio Action is not one of the Milberg Weiss Actions, and will be addressed in a separate Opinion. The second tranche of motions to dismiss claims common to many Individual Actions will be fully submitted on December 5, 2003, and will address preemption issues under the Securities Litigation Uniform Standards Act of 1998, and issues specific to holding companies.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

In addition to the plaintiffs in the MW Alaska Action, plaintiffs from all of the other Individual Actions before this Court ("Amici") have been permitted to oppose this motion through the submission of a single joint amicus brief. As described in an Order of September 22, the parties [*8] in each of the Individual Actions will be permitted to show why the Opinion issued today in the MW Alaska Action should not govern the same issues to the extent that the defendants move to dismiss claims in their Individual Actions based on this Opinion.

Complaint

The Alaska Plaintiffs filed their original complaint ("Initial Complaint") on April 21, 2003. On August 22, 2003, the MDL Panel transferred the action to this Court. Some five months after the filing of the Initial Complaint, the Alaska Plaintiffs filed an amended complaint dated September 24, 2003 ("Complaint"). n6 The principal changes in the Complaint relevant to this motion to dismiss were the inclusion of ten additional members of the underwriting syndicates for the bond offerings and the addition of fifteen individual defendants. With their opposition to this motion, they have submitted proposed insertions to further amend the Complaint.

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n6 Although the docket sheet for this action in the Southern District of New York reflects that the Complaint was filed on October 21, 2003, the Alaska Plaintiffs attempted to file the Complaint on or about September 24. The filing was initially rejected due to uncertainty that arose regarding the timeliness of the filing as governed by the May 28 Consolidation Order. The May 28 Consolidation Order provides that any Individual Action transferred to this Court after July 11, 2003,shall have the later of July 11, 2003, or twenty–one days following arrival on this Court's docket to file an amended complaint. No further amendments of any complaint in an Individual Action will be permitted without permission of the Court.The Complaint in the Alaska Action was filed more than three weeks after the Alaska Action was first assigned a Southern District docket number, and was rejected as untimely. The Clerk of Court did not receive the file and certified docket from the transferor court, however, until September 17. As explained in an Order of October 7 issued to clarify the trigger dates described in the May 28 Order, see In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2003 WL 22299350, at *2 (S.D.N.Y. Oct. 7, 2003), the September attempted filing of the Complaint in the Alaska Action was timely.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

 [*9]

The following summarizes the allegations in the Complaint relevant to this Opinion. The Complaint contains two claims alleging violations of the Securities Act arising out of the purchase of WorldCom debt securities sold during four bond offerings: the August 1998 ("1998 Offering"), May 2000 ("May 2000 Offering"), December 2000 ("December 2000 Offering"), and May 2001 ("2001 Offering") offerings (together, the "Offerings").

It alleges that in August 1998, WorldCom conducted an offering of debt securities worth over $ 6 billion pursuant to a registration statement with an effective date of August 7, 1998. On May 12, 2000, WorldCom conducted a public debt offering through which it sold $ 5 billion in bonds pursuant to a registration statement filed with the SEC. In December 2000, WorldCom and J.P. Morgan raised approximately $ 2 billion from a bond private placement. The December 2000 private placement was exempt from the registration requirements imposed by the

SEC and was conducted pursuant to an Offering Memorandum dated December 14, 2000 ("Offering Memorandum"). Finally, on May 9, 2001, WorldCom conducted an $ 11.8 billion bond offering pursuant to a registration statement filed **[*10]** with the SEC. n7

− − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − −

n7 The May 2000 and 2001 Offerings are also the basis for Securities Act Section 11 claims in the Consolidated Class Action. The 1998 and December 2000 Offerings are not. In addition to the Section 11 claims, the Consolidated Class Action brings Section 12(a)(2) claims, and in connection with certain defendants Exchange Act Section 10(b) claims, based on the May 2000 and 2001 Offerings.

− − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

The Complaint explains that the "action involves solely strict liability and negligence claims." The first claim pleads a violation of Section 11 of the Securities Act against underwriters, individual defendants and WorldCom's auditor for misrepresentations in three of the four Offerings: the 1998, May 2000, and 2001 Offerings. The second claim pleads a violation of Section 12(a)(2) of the Securities Act against J.P. Morgan Chase & Co. ("J.P. Morgan") arising from misrepresentations in connection with the December 2000 Offering.

The Parties

The plaintiffs are the State of Alaska Department of Revenue, **[*11]** a state agency that collects and invests public funds, and the Alaska State Pension Investment Board, a state entity that manages and invests state pensions funds ("Alaska Plaintiffs"). Together, the Alaska Plaintiffs purchased bonds issued during each of the four Offerings.

The Complaint names the following WorldCom executives and directors as individual defendants: Bernard J. Ebbers, WorldCom's former President and Chief Executive Officer; Scott D. Sullivan, n8 the former Executive Vice President and Chief Financial Officer; and WorldCom directors John W. Sidgmore, Clifford Alexander, Jr., James C. Allen, Judith Areen, Carl J. Aycock, Max E. Bobbitt, Francesco Galesi, Stiles A. Kellett, Jr., Gordon S. Macklin, John A. Porter, Bert C. Roberts, Lawrence C. Tucker, and Juan Villalonga ("Individual Defendants"). n9 None of the Individual Defendants is named in the Initial Complaint.

− − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − −

n8 Litigation against Sullivan was stayed by Order dated December 5, 2002.

n9 With the exception of Villalonga, all of the individual defendants named by the Complaint are also defendants in the Consolidated Class Action.

− − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

**[*12]**

The Initial Complaint and the Complaint also name underwriter defendants Citigroup, Inc., Salomon Smith Barney, Inc., J.P. Morgan Chase & Co., J.P. Morgan Securities Inc., Bank of America Corp., Banc of America Securities LLC, ABN Amro Inc., Deutsche Bank AG, Deutsche Bank Alex. Brown Inc., Lehman Brothers Holdings Inc., Lehman Brothers Inc., Credit Suisse Group, Credit Suisse First Boston Corp., Goldman Sachs Group, Inc., Goldman Sachs & Co., UBS Warburg LLC, NationsBanc Montgomery Securities LLC. The Complaint added the following underwriters as defendants: Utendahl Capital Partners, L.P., Blaylock & Partners, L.P., BNP Paribas Securities Corp., Fleet Securities, Inc., Tokyo–Mitsubishi International PLC, Westdeutsche Landesbank Girozentrale, Caboto Holding SIM S.p.A., Caboto–Gruppo Intesabei, Robertson Stephens International Ltd., and Mizuho International PLC ("Additional Underwriter Defendants," and together "Underwriter Defendants"). n10 Arthur Andersen LLP, WorldCom's auditor, is also named as a defendant in both the Initial Complaint and the Complaint. n11

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n10 With the exception of Robertson Stephens International, Ltd. and NationsBanc Montgomery Securities LLC, all of the Underwriter Defendants named by the Complaint are also named defendants in the Consolidated Class Action. NationsBanc was an underwriter for the 1998 Offering only, after which it merged into Bank of America, which is a defendant in the Consolidated Class Action. Robertson Stephens was an underwriter for the 2001 Offering.

**[*13]**

n11 Andersen is also a defendant in the Consolidated Class Action.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

False Financial Reporting

The Complaint alleges that as early as 1998, WorldCom was using a variety of accounting devices that artificially inflated WorldCom's reported assets, net worth, and cash flow. It identifies, in particular, WorldCom's improper accounting treatment of sales, "line costs," n12 merger reserves and acquisitions, impaired goodwill, records of revenue, uncollectible receivables, and software development costs. One of the examples of improper accounting described is WorldCom's treatment of goodwill and property, plant and equipment value in connection with its acquisition of MCI, which is alleged to have artificially inflated WorldCom's reported earnings by hundreds of millions of dollars. The WorldCom SEC filings that were incorporated into the registration statements and Offering Memorandum at issue in the Offerings were materially false and misleading as a result of these accounting improprieties.

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n12 Line costs are the costs incurred by WorldCom's long–term lease agreements with various telecommunications carriers to allow WorldCom to use the carriers' networks to carry the calls of WorldCom's customers.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

**[*14]**

Discovery of the Fraud

The Complaint alleges that "a series of revelations that quickly destroyed WorldCom" began in February 2002. In February 2002, WorldCom slashed its revenue and earnings forecasts for the year, and revealed that it would write–down between $ 15 and $ 20 billion of the impaired value of prior acquisitions. On April 22, WorldCom again cut its revenue and earnings forecasts for 2002. At the time, analysts suggested that WorldCom's write–downs due to the impaired value of acquisitions would amount to more than $ 45 billion. Rating agencies reduced WorldCom's credit rating to "junk" status by April 24, and CEO Ebbers was forced to resign. As a result, WorldCom bonds "plunged in value." On June 13, WorldCom's CEO in effect admitted that the May 2001 Offering had been necessary to prevent the financial collapse of WorldCom.

On June 25, 2002, WorldCom announced that it had improperly treated more than $ 3.8 billion in ordinary costs as capital expenditures and would have to restate its publicly–reported financial results for 2001 and the first quarter of 2002. WorldCom later announced that its reported earnings for 1999 through the first quarter of 2002 had **[*15]** been affected by manipulation of various reserves and had overstated earnings by $ 3.3 billion. WorldCom has admitted that its financial results were overstated by $ 9 billion from 1999 through the first quarter of 2002. By March 2003, news reports suggested that WorldCom had misstated its accounting by approximately $ 11 billion.

Discussion

The Underwriter Defendants have moved to dismiss the Complaint on the ground that it is barred by the statute of limitations. n13 They contend that the claim for the 1998 Offering is barred since the Initial Complaint was filed more than three years after that offering. They contend that every claim in the Initial Complaint is time−barred since the plaintiffs were on inquiry notice as of April 20, 2002, more than one year before the Initial Complaint was filed, and that in any event, the Section 11 claim against the Additional Underwriter Defendants and the Individual Defendants added to the Complaint in September 2003 is time−barred. Finally, they contend that the December 2000 Offering was a private placement and therefore is not covered by the sole claim made in connection with that offering, the Section 12(a)(2) claim.

− − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − −

n13 All defendants, with the exception of Sullivan against whom litigation is stayed, join in the Underwriter Defendants' motion.

− − − − − − − − − − − End Footnotes− − − − − − − − − − − −

**[*16]**

The discussion of these issues begins with a brief description of the statutory framework that will govern this motion. The claims are brought under Sections 11 and 12(a)(2) of the Securities Act. The statute of limitations provisions that are at issue are contained in Section 13 of the Securities Act and in the Sarbanes−Oxley Act passed in response to the WorldCom debacle.

Section 11

 [HN1] Section 11 of the Securities Act provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. § 77k(a). "The section was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." Herman & MacLean v. Huddleston, 459 U.S. 375, 381−82, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983).

Section 12(a)(2) **[*17]**

 [HN2] Section 12(a)(2) of the Securities Act, previously known as Section 12(2), allows a purchaser of a security to bring a private action against a seller that "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. § 77l(a)(2).

Section 13

 [HN3] Section 13 of the Securities Act sets forth the statute of limitations for Securities Act claims. It provides: [HN4] No action shall be maintained to enforce any liability created under section 77k [Section 11] or 77l(a)(2) [Section 12(a)(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . . In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(2) of this title more than three years after the security was bona fide offered to the public, or under section 77l(a)(2) of this title more than three years after the sale. **[*18]**

15 U.S.C. § 77m (emphasis supplied). Thus, [HN5] under Section 13, plaintiffs must bring suit by the earlier of (a) three years from the date the parties in the offering "obligate themselves to perform," in the case of a Section 12(a)(2) claim, see Finkel v. Stratton Corp., 962 F.2d 169, 173 (2d Cir. 1992) (citation omitted), or three years from the date of the initial registration statement, in the case of a Section 11 claim, id. at 174 (citation omitted), or (b) one year from the date on which they are put on actual or constructive notice of the facts underlying the claim. Dodds v. Cigna Secs., Inc., 12 F.3d 346, 350 (2d Cir. 1993).

Sarbanes−Oxley Act

[HN6] On July 30, 2002, Congress enacted the Sarbanes–Oxley Act of 2002 ("Sarbanes–Oxley"). Section 804 of Sarbanes–Oxley lengthened the statute of limitations for private causes of action alleging securities fraud. See 28 U.S.C. § 1658 ("Section 804"). Section 804 is entitled "Statute of Limitations for Securities Fraud" and provides in pertinent part that [HN7] a private right of action that involves a claim of fraud, deceit, **[*19]** manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the [Exchange Act] [15 U.S.C. § 78c(47)], may be brought not later than the earlier of —–

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.28 U.S.C. § 1658 (emphasis supplied).

1. Application of Sarbanes–Oxley to Sections 11 and 12(a)(2) Claims

The defendants move to dismiss the claim based on the 1998 Offering as time–barred by the statute of limitations period contained in Section 13, which requires the Securities Act claim to be filed by the earlier of three years after the date of the registration statement for the 1998 Offering or one year from the date the plaintiff is on actual or constructive notice. The Underwriter Defendants contend that because the MW Alaska Action was filed on April 21, 2003, more than four years after the 1998 Offering was offered to the public, the claim based upon the 1998 Offering is time barred.

In response, the Alaska Plaintiffs contend that Section 804 of Sarbanes–Oxley **[*20]** governs and that they had until the earlier of five years from the offering or two years from the date of notice to bring their action. Although the Alaska Plaintiffs' Section 11 claim for the 1998 Offering would have expired under Section 13 in August 2001, almost a year before Sarbanes–Oxley was passed, the Alaska Plaintiffs argue that the Sarbanes–Oxley limitations period should be retroactively applied to extend the statute of limitations for their claim. Plaintiffs do not dispute that if Section 13 applies to their 1998 claims, the 1998 claims are time–barred.

[HN8] Construction of a statute "must begin with the words of the text." Saks v. Franklin Covey Co., 316 F.3d 337, 345 (2d Cir. 2003); see Mallard v. United States Dist. Court, 490 U.S. 296, 300–01, 104 L. Ed. 2d 318, 109 S. Ct. 1814 (1989). Whether the meaning of the statute is plain or ambiguous "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341, 136 L. Ed. 2d 808, 117 S. Ct. 843 (1997); see also K–Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 100 L. Ed. 2d 313, 108 S. Ct. 1811 (1988); **[*21]** United States v. Dauray, 215 F.3d 257, 260–61 (2d Cir. 2000). A court must "give effect, if possible, to every clause and word of a statute." State St. Bank & Trust Co. v. Salovaara, 326 F.3d 130, 139 (2d Cir. 2003)(citation omitted). A particular section of a statute should "be understood in context with and by reference to the whole statutory scheme . . . ." Auburn Housing Auth. v. Martinez, 277 F.3d 138, 144 (2d Cir. 2002); see also Saks, 316 F.3d at 345. In addition, comparison to other similar statutory provisions, Mallard, 490 U.S. at 305–07, and the statute's legislative history may be used to resolve ambiguity. Dauray, 215 F.3d at 264; Auburn Housing Auth., 277 F.3d at 143–44.

The only other courts to have confronted this question have concluded, without discussion, that Section 13 still applies to Sections 11 and 12(a)(2) claims. See In re Merrill Lynch & Co. Research Sec. Litig., 272 F. Supp. 2d 243, 265 (S.D.N.Y. 2003); Friedman v. Rayovac Corp., 2003 U.S. Dist. LEXIS 13135, at *27–28 (W.D.Wis. May 29, 2003). Their conclusion is compelled by the **[*22]** text of Sarbanes–Oxley, the text of other securities statutes, relevant precedent, and the legislative history of Sarbanes–Oxley.

[HN9] Section 804 extends the statute of limitations for claims that involve "fraud, deceit, manipulation, or contrivance" in contravention of the "securities laws," which it defines to include the Securities Act as well as the Exchange Act. n14 See 15 U.S.C. § 78c(a)(47). The question presented here is whether the Securities Act claim alleged by the Alaska Plaintiffs is a claim involving "fraud, deceit, manipulation or contrivance" that is subject to Section 804's longer statute of limitations.

– – – – – – – – – – – – – –Footnotes – – – – – – – – – – – – – –

n14 [HN10] Section 804 states that it applies to claims under the "securities laws as defined by section 3(a)(47)" of the Exchange Act. Section 3(a)(47) provides: [HN11] The term 'securities laws' means the Securities Act of 1933, the Securities Exchange Act of 1934, the Public Utility Holding Company Act of 1935, the Trust Indenture Act of 1939, the Investment Company Act of 1940, the Investment Advisers Act of 1940, and the Securities Investor Protection Act of 1970.15 U.S.C. § 78c(47) (citations omitted). Given this definition, defendants do not contend that Section 804 could never apply to any Securities Act claims.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – –

[*23]

The Complaint's Section 11 claim does not sound in fraud. n15 The Complaint repeatedly disavows that its claims are anything other than strict liability or negligence claims, and explicitly states that its claims do not allege fraud. For example, the opening paragraph of the Complaint pleads that the action "involves solely strict liability and negligence claims." Each claim for relief pleads that "plaintiffs assert only strict liability and negligence claims. Plaintiffs do not assert claims of fraud or intentional misconduct." (Emphasis in original.)

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n15 Although this prong of the defendants' motion only addresses the Section 11 claim based on the 1998 Offering, it is also true that the Complaint's Section 12(a)(2) claim does not sound in fraud.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

Plaintiffs' limitation of their Section 11 claim is not exceptional. [HN12] To state a claim for violation of Section 11, plaintiffs only need allege that "material facts have been omitted" from a registration statement or "presented in such a way as to obscure or distort **[*24]** their significance . . . ." I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991) (citation omitted). Because of its minimal proof requirements, Section 11 creates extensive liability for issuers and those involved in the preparation and dissemination of the registration statements filed in the context of a public offering. A Section 11 claim like that alleged here is not held to the heightened pleading standard required of fraud allegations by Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See In re WorldCom, Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 8245, 2003 WL 21219049, at *27–28.

Admitting that their claim does not sound in fraud, the Alaska Plaintiffs nonetheless argue that their claim arises from WorldCom's accounting manipulations and therefore involves a sufficient use of a "manipulation or contrivance" to bring them within the scope of Section 804. Amici argue that by including "deceit, manipulation or contrivance" as well as "fraud" in Section 804, Congress signified its intent to extend Section 804 beyond Section 10(b) securities fraud claims to reach Sections 11 and 12(a)(2) claims. They assert that **[*25]** Sections 11 and 12(a)(2) codified the common law doctrine of deceit.

[HN13] In the context of the securities laws, "deceit," "manipulation" and "contrivance" refer to securities fraud. The language of Section 804 directly mirrors that of Section 10(b) and Rule 10b–5, which provides the private cause of action for securities fraud. n16 Section 10(b) provides that it is unlawful "to use or employ . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations." 15 U.S.C. § 78j(b). Rule 10b–5 describes what constitutes a manipulative or deceptive device and provides that it is unlawful for any person, directly or indirectly to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . ." 17 C.F.R. § 240.10b–5; see also Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999). Section 17 of the Securities Act, 15 U.S.C. § 77q, the criminal securities fraud provision, employs similar language. Section 17 prohibits, among **[*26]** other things, "employing any device, scheme or artifice to defraud." 15 U.S.C. § 77q(a)(1).

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n16 Prior to Sarbanes–Oxley, the statute of limitations for Exchange Act claims provided that "no action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e); see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 n.9, 115 L. Ed. 2d 321, 111 S. Ct. 2773 (1991).

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

The requirement of pleading and proving scienter in a Section 10(b) claim comes directly from this statutory language. As the Second Circuit has observed, "the requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5, that the plaintiff must allege is an intent to deceive, manipulate or defraud." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (citation **[*27]** omitted) (emphasis supplied). In Ernst & Ernst v. Hochfelder, 425 U.S. 185, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976), the Supreme Court drew on the statutory text and interpretations of that text to find that negligence does not give rise to Section 10(b) claims, which are limited by the text of the statute to fraud. Id. at 199. In

Hochfelder, the Court explained that "the words 'manipulative, 'deceit,' and 'contrivance' . . . make unmistakable a congressional intent to proscribe a type of conduct quite different from negligence." Id. (emphasis supplied). In particular, it held that the "use of the word 'manipulative' is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Id.

 [HN14] Section 804 parallels the private causes of action for securities fraud: it extends the statute of limitations for "a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement." 28 U.S.C. § 1658 [*28]  (emphasis supplied). These terms are not found in Section 11 (or Section 12(a)(2)), which refers only to material misrepresentations or omissions in certain documents required to be filed with the SEC. See 15 U.S.C. §§ 77k & 77l(a)(2).

 [HN15] As a rule, legislative history should be used only to resolve ambiguity, see Dauray, 215 F.3d at 264, a problem not presented by Section 804. In this case, however, the legislative history is noteworthy because Sarbanes–Oxley was enacted a month after WorldCom declared bankruptcy and the legislative record is replete with references to the company's collapse. Plaintiffs and Amici rely heavily on the legislative history to argue that WorldCom's massive restatements and its investors' losses weighed heavily on Congress.

The legislative history on which the Alaska Plaintiffs and Amici rely leaves little doubt that Congress was concerned about the emerging accusations of wrongdoing at WorldCom. But, the portions of the record to which they point indicate that in the debate that produced Section 804 and its lengthened statute of limitations, congressional concern focused on the securities fraud at WorldCom.

For [*29]  example, Amici emphasize that Senator Patrick Leahy, a sponsor of the portion of the Act that included Section 804, noted that the Act was designed to provide an opportunity "when there has been such enormous fraud and all the pension funds have been lost, and all the people have lost their life savings – [to] give them at least some chance to recover something . . . . We go two–five instead of one–three." 148 Cong. Rec. S6524, 6535 (July 10, 2002)(emphasis supplied). Similarly, in the House debate on the statute of limitations, Representative Edward J. Markey stated: "we should extend from 3 years to 5 years the time that people have to go in and do something about fraud . . . ." 148 Cong. Rec. H4838, 4846 (July 17, 2002)(emphasis supplied). The Alaska Plaintiffs emphasize Senator Leahy's statement that Section 804 "is intended to lengthen any statute of limitations under federal securities law." 148 Cong. Rec. S7418 (daily ed. July 26, 2002). Read in context, however, even this seemingly broad comment is limited to claims alleging securities fraud. Immediately under the caption "Section 804 – Statute of Limitations," Senator Leahy stated:This section would set [*30]  the statute of limitations in private securities fraud cases to the earlier of two years after the discovery of the facts constituting the violation or five years after such violation. The current statute of limitations for most private securities fraud cases is the earlier of three years from the date of the fraud or one year from the date of discovery. This provision states that it is not meant to create any new private cause of action, but only to govern all the already existing private causes of action under the various federal securities laws that have been held to support private causes of action. This provision is intended to lengthen any statute of limitations under federal securities law, and to shorten none.Id. (emphasis supplied). As Senator Leahy himself stated, [HN16] Section 804 "sets the statute of limitations in private securities fraud cases," not strict liability and negligence claims under Sections 11 and 12.

If Congress had intended to extend the statute of limitations for every private securities law claim, it could have done so. [HN17] Section 804 does not, however, state that it extends the statute of limitations for all claims under the securities laws.  [*31]  Instead, it includes limiting language that extends the time for private causes of action under the securities laws only for claims that involve "fraud, deceit, manipulation or contrivance." This language does not encompass Sections 11 and 12(a)(2) claims.

There are advantages to bringing solely strict liability and negligence claims: the pleading and proof thresholds are far lower than for claims asserting securities fraud, and liability is "extensive." n17 One of the disadvantages of bringing negligence claims, however, is a more narrow window of time in which to sue. Because Section 13, not Section 804, applies to the Section 11 claim arising from the 1998 Offering, that claim expired in August 2001 and is time–barred. n18

– – – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – – –

n17 It would appear that the plaintiffs believed that another advantage in pleading individual claims under the Securities Act, as opposed to the Exchange Act, was that they could sue in state rather than federal court. State and federal courts have concurrent jurisdiction over Securities Act claims. See In re WorldCom, Inc. Sec. Litig., 293 B.R. 308, 328 (S.D.N.Y. 2003). Due to WorldCom's bankruptcy, however, the Individual Actions that pleaded solely Securities Act claims were nonetheless properly removed as "related to" the WorldCom bankruptcy. Id. at 328–29.

 [*32]

n18 Having concluded that Section 804 of Sarbanes–Oxley does 18 not apply to the plaintiffs' claims, it is unnecessary to consider whether the statute could be retroactively applied.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

2. Inquiry Notice as of April 20, 2002

The Underwriter Defendants contend that the Alaska Action is time–barred because it was commenced more than one year after the plaintiffs were on inquiry notice of the basis of their claims. The Initial Complaint in the Alaska Action was filed on April 21, 2003.

 [HN18] The one–year limitations period of Section 13 "begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." Levit v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003) (citation omitted). A duty to inquire arises "when the circumstances would suggest to an investor of ordinary intelligence the probability" that she has a cause of action. Id. (citation omitted).

 [HN19] Knowledge of a cause of action is imputed in two different ways, depending on whether **[*33]**  the investor undertakes to inquire. LC Capital Partners LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003). "If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose. However, if the investor makes some inquiry once the duty arises, we will impute knowledge of what an investor in the exercise of reasonable diligence, should have discovered" concerning the wrongdoing. Id. (citation omitted). If the facts appearing in the complaint and related documents give rise to a duty of inquiry, "it is appropriate to require a plaintiff, resisting a motion to dismiss on limitations grounds, at least to allege that inquiry was made." Id. at 156.

 [HN20] The circumstances giving rise to the duty to inquire are referred to as "storm warnings." See Levitt, 340 F.3d at 101. The financial information that triggers the storm warnings "must be such that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants." Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003). An investor does not, however,  **[*34]**   "have to have notice of the entire fraud being perpetrated to be on inquiry notice." Dodds, 12 F.3d at 351–52. To trigger the duty to inquire, the wrongdoing indicated by the storm warnings "must be probable, not merely possible." Newman, 335 F.3d at 193 (citation omitted). For example, the Second Circuit has found that inquiry notice existed when there were three substantial reserve charges in increasing amounts within four years, LC Capital, 318 F.3d at 155, and when the necessary disclosures of the wrongdoing were contained in prospectuses, Dodds, 12 F.3d at 351.

 [HN21] In some cases, despite the presence of storm warnings, investors are not placed on inquiry notice "because the warning signs are accompanied by reliable words of comfort from management." LC Capital, 318 F.3d at 155. While such statements must be considered, their existence will prevent or dissipate the duty to inquire "only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." Id. "Whether reassuring statements justify reasonable reliance that apparent storm warnings have **[*35]**  dissipated will depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence." Id.

 [HN22] Whether a plaintiff was placed on inquiry notice "is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)" but, if the facts needed to make the determination "can be gleaned from the complaint and papers integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." Id. at 156 (citation omitted); see also Dodds, 12 F.3d at 352 n.3. The Second Circuit has resolved the question of inquiry notice on a motion to dismiss "in a vast number of cases." LC Capital, 318 F.3d at 156 (citation omitted).

The Underwriter Defendants' motion requires a determination as to whether plaintiffs were on notice of their potential claims as of April 20, 2002. Because the Alaska Plaintiffs do not contend, either in the Complaint or their proposed amendments to their pleading, that they undertook any inquiry at any time prior to December 2002, knowledge is imputed as of the date **[*36]**   their duty to inquire arose. See id. at 154; Levitt, at 101. The following describes the allegations in the Complaint and the 2002 news reports n19 on which the parties have relied in arguing this motion.

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n19 The articles are appropriately considered on a motion to dismiss. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47–48 (2d Cir. 1991).

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

February 2002

The Complaint alleges that WorldCom took a $ 15–20 billion write–down for the impaired value of prior acquisitions in February 2002. n20 A February 7 Associated Press ("AP") report opined that the effects of "concerns about [WorldCom's] debt burden and fallout from the Enron scandal and related accounting practices" had contributed to "spiraling stock prices." The AP report also noted that Ebbers and other executives had "sought to dismiss concerns about WorldCom's accounting practices, debt load and cash flow" during a conference call **[\*37]** with investors and analysts.

– – – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – – –

n20 Although the February write–down announcement involved a substantial sum, it followed shortly after the implementation of new accounting guidelines for the treatment of goodwill. None of the parties submitted the text of WorldCom's February 2002 write–down announcement. Analyst reports, however, describe the writedown as an effort to comply with the new standards ("FAS 142") set by the Financial Accounting Standards Board, as does an article in Business Week cited by plaintiffs in the first class action complaint filed in connection with WorldCom. See Albert Fadem Trust v. Ebbers, No. 02 Civ. 3288 (DLC). FAS 142 required companies to write–down goodwill to reflect any permanent decline in the value of acquisitions for fiscal years beginning after December 15, 2001, but encompassing acquisitions made after June 30, 2001. See Financial Accounting Standards Board, Financial Accounting Services, Statement of Financial Accounting Standards No. 142, Goodwill and Other Intangible Assets (2001).

– – – – – – – – – – – – End Footnotes– – – – – – – – – – – – – –

**[\*38]**

A February 3 article in the New York Times discussed the aftermath of the Enron debacle, and noted that "the stock market plunged on concerns that hidden financial practices like those that felled Enron could affect other companies, particularly in energy and in banking" and noted that WorldCom shares, among others "sank sharply." Another article that day in the Financial Times reported that WorldCom had "delivered a spirited rebuttal of the accusations and rumors swirling around it," and observed that "WorldCom's accounting seems straightforward."

On February 9, the Financial Times reported that investors in United States equity markets were "jittery about the growing list of companies coming under scrutiny" over their accounting practices. The article noted that "even the reassurances of top executives from several companies, including WorldCom, Tyco and Whirlpool, that their accounting problems were exaggerated or false, failed to bolster markets."

March

A March 4 Forbes article discussed WorldCom in some detail. The article identifies WorldCom as one of four stocks to avoid due to potential accounting problems. In particular, the Forbes article discussed **[\*39]** WorldCom's accounting of property, plant and equipment assets from the MCI acquisition, and its treatment of the $ 14.1 billion purchase price for MCI. The article explained that "WorldCom artificially depressed the depreciation charges it is taking on MCI's assets," inflating WorldCom's reported earnings by ten percent. The March 4 Forbes article also described the accounting improprieties associated with WorldCom's write–offs. It observed that after WorldCom acquired MCI, the company reclassified approximately $ 3.4 billion of MCI's property, plant and equipment value as goodwill, and explained that WorldCom's accounting treatment was designed to inflate profits. The Forbes article suggested that the improper categorization of MCI's assets as goodwill artificially depressed the depreciation charges taken by WorldCom and may have inflated the company's earnings by close to $ 700 million.

On March 11, WorldCom announced that it had received a confidential request from the SEC for voluntary production of documents and information relating to accounting policies, tracking and review of analysts' earnings estimates, and federal or state agency investigations of WorldCom, among **[\*40]** other things. A March 12 New York Times article described the SEC request as an "unusually wide–ranging letter," and noted that WorldCom's outside accountant Arthur Andersen had also served as the auditor for Enron and Global Crossing, companies whose accounting had come under scrutiny after they filed for bankruptcy protection. The report noted that investors were not comforted by the SEC's customary caution that the investigation should not be seen as "an adverse reflection" on the company or its securities.

The SEC investigation of WorldCom was also reported by CNBC on March 12, 2002. The next day, a detailed article appearing in the New York Times reported the commencement of the SEC's "sweeping" investigation into whether WorldCom "improperly manipulated its financial reports." The article quoted a telecommunications analyst who observed that in the twelve years he had been following the industry, he had "never seen an SEC request like this" and noted that WorldCom may have taken "too many risks" with its accounting. The March 13 article noted that Ebbers's focus on costs had "drawn concern that the company may be too ambitious in taking one–time charges against its earnings [*41]  –– like improperly masking operating losses as one–time charges that might make its operating results appear stronger than they really are." The article also observed that the SEC investigation reflected an interest in WorldCom's accounting practices in connection with its many acquisitions.

In proposed amendments to their pleading, the Alaska Plaintiffs describe statements from WorldCom and Ebbers that plaintiffs contend neutralized the February and March adverse press reports. On March 11, 2002, WorldCom commented that "all of its policies, practices, and procedures have complied, and continued to comply, with all applicable accounting standards and laws" and Ebbers told "fund managers and analysts" that he was "not aware of any information that would give rise to this inquiry other than newspaper articles." n21 The Alaska Plaintiffs add that outside analyst Jack Grubman "issued the strongest denial" on March 11, when he commented that "we view" the SEC inquiry "as a very straightforward –– almost boilerplate –– letter of inquiry" to WorldCom. n22

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n21 The proposed amendments do not identify the source of these statements.

[*42]

n22 The proposed amendments do not identify the source or clarify to whom Grubman was referring as "we." Presumably Grubman was referring to himself and to his employer, Salomon Smith Barney. Although there are extensive allegations in the Class Action Complaint that Grubman functioned as a WorldCom insider, the Complaint and proposed amendments do not contain allegations that Grubman was speaking on behalf of WorldCom.

– – – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

April

(The Complaint was filed on April 21, 2003). According to the Complaint, on April 22, analysts increased their estimates of WorldCom's write–down of goodwill to $ 45 billion; on April 24, WorldCom debt was downgraded to "junk" status; and on April 30, Ebbers resigned under pressure.

The allegations in the Complaint and the publicly available documents to which the parties have pointed do not establish as a matter of law that the Alaska Plaintiffs were on inquiry notice of their claims as of April 20, 2002. While the press reports certainly show that there were serious, publicly expressed concerns about WorldCom before that date, those reports do not necessarily [*43]  constitute the full–blown storm warnings that trigger a duty of inquiry. The February write–down appears to have been caused by a change in accounting guidelines. None of the press reports identify particular statements by WorldCom itself that would sufficiently alert an investor to her potential claims. The service of a sweeping SEC subpoena is also an insufficient trigger. It does not reveal, by itself, any particular accounting irregularity. The greatest cause for concern came from the collapse of other companies, the fall of WorldCom's securities prices and a few penetrating articles, most notably the March 4 Forbes article.

The March 4 Forbes article describes problems with WorldCom's accounting for MCI's goodwill, and how it was designed to inflate profits. This is one of the accounting improprieties at the heart of the Initial Complaint. While this article, and all of the other press reports before April 20, create a question of fact as to whether the Alaska Plaintiffs were on inquiry notice as of that date, they do not establish as a matter of law a probability of misconduct sufficient to trigger inquiry notice. See Newman, 335 F.3d at 193.

The cases [*44]  on which the Underwriter Defendants particularly rely are readily distinguishable. The events at issue in those cases projected far more developed warnings to the investing public than were present here before April 20, 2002. In LC Capital, "a series of three charges in substantial and increasing amounts for the same purpose within four years" was sufficient to "alert any reasonable investor that something is seriously wrong." LC Capital, 318 F.3d at 155. Similarly, in de la Fuente v. DCI Telecomm., Inc., 206 F.R.D. 369 (S.D.N.Y. 2002), the company restated its financials in two SEC filings and disclosed that it had revised its accounting at the request of the SEC. Id. at

382. In addition, the SEC ordered a ten day suspension in trading defendant's stock. Id. In In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678 (S.D.N.Y. 2000), the article that put the plaintiffs on inquiry notice discussed precisely the information alleged as the basis for plaintiffs' action, including the material omissions in the prospectus. Id. at 692. In addition, the Ultrafem registration statements themselves [*45] contained a description of product flaws similar to those underlying plaintiffs' claims. Id. In Westinghouse Elec. Corp. v. 21 Int'l Holdings, Inc., 821 F. Supp. 212 (S.D.N.Y. 1993), there were more than five analyst reports that suggested that the issuer would be taking significant write–offs in the near future and that "did not differ qualitatively" from the announcement that plaintiffs admitted had placed them on notice of their claims. Id. at 222.

3. Relation Back for Additional Underwriter Defendants

The Underwriter Defendants also move to dismiss the claims against the Additional Underwriter Defendants as time–barred because the Additional Underwriter Defendants were not added to the action until the Alaska Plaintiffs filed an amended complaint on September 24, 2003. Plaintiffs do not respond directly to this argument.

 [HN23] Rule 15 of the Federal Rules of Civil Procedure provides that an amended pleading relates back to the date of the original timely pleading when:(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth [*46] or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within [120 days] the party to be brought in by amendment (A) has received such notice of this institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.Fed. R. Civ. P. 15(c)(emphasis supplied). Thus, [HN24] there are three requirements to be met before an amended complaint naming a new party can be found to relate back to a timely complaint: (1) both complaints must arise out of the same conduct, transaction or occurrence, (2) the additional defendant must have been omitted from the original complaint by mistake; and (3) the additional defendant must not be prejudiced by the delay. VKK Corp v. National Football League, 244 F.3d 114, 128 (2d Cir. 2001); Soto v. Brooklyn Correctional Facility, 80 F.3d 34, 35 (2d Cir. 1996). [*47] The relation–back principles are designed "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense." VKK Corp., 244 F.3d at 128 (citation omitted).

 [HN25] A "mistake" for purposes of Rule 15 may be a mistake of either fact or law. See Soto, 80 F.3d at 35–36. A mistake of fact occurs when a plaintiff misapprehends the identities of the individuals she wishes to sue. Id. "The requirement that a new defendant 'knew' he was not named due to a mistake concerning identity presupposes that in fact the reason for his not being named was a mistake in identity." Cornwell v. Robinson, 23 F.3d 694, 705 (2d Cir. 1994). A mistake of law occurs when she misunderstands the legal requirements of her cause of action. Soto, 80 F.3d at 36. Where a plaintiff shows neither type of mistake, the amended pleading will not relate back. In Cornwell, the plaintiff had always known the identities of the defendants who were added in the amended complaint, and their absence from the original complaint did not make that complaint legally deficient.  [*48]  Id. at 705. The Second Circuit explained that "Cornwell was not required to sue [the individual defendants], and her failure to do so in the original complaint . . . must be considered a matter of choice, not mistake." Id.

Like Cornwell, the Alaska Plaintiffs knew the identities of the Additional Underwriter Defendants, were not required to name them to make their original complaint legally sufficient, and chose not to name them. The Additional Underwriter Defendants were identified by name in the Offering documents giving rise to the claims alleged in the Initial Complaint, and the Additional Underwriter Defendants had been named in other, earlier complaints asserting similar claims. Since the plaintiffs knew of the proposed defendants and chose not to name them, they are assumed to have omitted the defendants intentionally, not by mistake. See Cornwell, 23 F.3d at 705; Corcoran v. New York Power Auth., 935 F. Supp. 376, 393 (S.D.N.Y. 1996)(DLC).

Since plaintiffs have failed to demonstrate that the omission was a mistake, the claims against the Additional Underwriter Defendants in the Complaint do not relate back to the date of the [*49] Initial Complaint.   [HN26] Under Rule 15, the addition of a defendant is nonetheless permitted if the amended pleading is within the statute of limitations applicable to the action. See Fed. R. Civ. P. 15(c)(1).

The Alaska Plaintiffs' Complaint has been deemed filed on September 24, 2003, approximately one year and three months after WorldCom's June 25 restatement announcement. Plaintiffs allege in the Complaint that "by 6/25/02, WorldCom admitted it had engaged in one of the largest financial falsifications in history." Plaintiffs also allege that in June 2002, WorldCom filed a report with the SEC admitting that its accounting since 1999 was flawed, the SEC sued WorldCom for fraud, and that by August 2002 WorldCom's Chief Financial Officer had been indicted on criminal fraud charges.

There can be no doubt that at least as of WorldCom's announcement on June 25, 2002 –– that it would have to restate its publicly reported financial results for 2001 and the first quarter of 2002 by $ 3.8 billion –– plaintiffs were on inquiry notice of their Sections 11 and 12(a)(2) claims. n23 Because the Alaska Plaintiffs' September 24, 2003 Complaint was filed more [*50] than a year after they had been put on notice of their claims, Section 13's statute of limitations requires that the defendants' motion to dismiss the claims against the Additional Underwriter Defendants be granted, unless the statute of limitations period was tolled. n24

− − − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − − −

n23 Amici contend that the plaintiffs were not on inquiry notice that WorldCom's financial statements for the period before 2001 were "teeming with fraud" until November 26, 2002, when the SEC filed an amended complaint against WorldCom with claims based on violations of the Securities Act. Similarly, they argue that the press reports before June 2002 did not give notice that the underwriters for the Offerings had participated in the fraud. The Securities Act claims, as already described, do not sound in fraud and create extensive liability for the underwriters. Therefore, the statute of limitations for Securities Act claims begins to run from the date that an investor was on notice that the registration statement or prospectus for the offering probably contained misrepresentations actionable under the Securities Act.

n24 For the same reasons, the motions by the Individual Defendants, all of whom were added to the Alaska Action in the Complaint, must also be granted unless the statute of limitations period was tolled. The Individual Defendants are WorldCom executives, officers and directors who have been identified by name in numerous WorldCom documents and named as defendants in many earlier complaints asserting similar claims, including in the complaint filed in October 2002 in the Consolidated Class Action. As with the Additional Underwriter Defendants, the Alaska Plaintiffs are assumed to have omitted the Individual Defendants by intention, not mistake.

− − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

 **[*51]**

4. American Pipe Tolling for Actions filed before Class Certification

The Alaska Plaintiffs and Amici rely on the American Pipe tolling doctrine to extend Section 13's statute of limitations period. n25 [HN27] The doctrine provides that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." American Pipe & Construc. Co. v. Utah, 414 U.S. 538, 554, 38 L. Ed. 2d 713, 94 S. Ct. 756 (1974). The Court explained thatA contrary rule allowing participation only by those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure. Potential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable.Id. at 553. The Court observed that under Rule 23, class actions are "designed to avoid, rather than encourage" repetitious filing. Id. at 550. **[*52]**  American Pipe found equitable tolling appropriate precisely because it did not want to punish putative class members who had waited to file an action, as encouraged by Rule 23, and had relied, knowingly or not, on the class litigation only to find that the class was not certified and their time to file independent actions had expired. See 414 U.S. at 551.

− − − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − − −

n25 American Pipe tolling could not save the claims relating to either the 1998 or December 2000 Offerings since the Consolidated Class Action complaint does not assert claims based on either offering.

− − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

 [HN28] Although American Pipe itself tolled the statute of limitations only for those who moved to intervene after class certification had been denied, the Supreme Court later extended the doctrine to apply to class members who choose to file separate suits after class certification is denied. See Crown, Cork & Seal Co v. Parker, 462 U.S. 345, 350, 76 L. Ed. 2d 628, 103 S. Ct. 2392 (1983). In Crown, Cork, the Court **[*53]**  held that "once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." Id. at 354. In Crown, Cork, the Supreme Court emphasized that without the tolling rule "[a] putative class member who fears that class certification may be denied would have every incentive to file a separate action prior to the expiration of his own period of limitations," which would result in "a needless multiplicity of actions." Id. at 350–51; see also Arneil v. Ramsey, 550 F.2d 774, 783 (2d Cir. 1977).

Although both American Pipe and Crown, Cork address only actions brought by putative class members after class certification was denied, the Alaska Plaintiffs and Amici urge that the American Pipe doctrine applies as well to plaintiffs who filed individual actions before a class is certified. Although the Second Circuit has not yet decided this issue, district courts in this circuit have held that [HN29] a plaintiff who chooses

to file an action **[\*54]** independently of the class before a determination on class certification cannot benefit from the American Pipe tolling rule. See, e.g., In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 221 (E.D.N.Y. 2003); Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 514 (S.D.N.Y. 2001); Wahad v. City of New York, 1999 U.S. Dist. LEXIS 12323, No. 75 Civ. 6203(AKH), 1999 WL 608772, at \*6 (S.D.N.Y. Aug. 12, 1999); see also Chinn v. Giant Food, Inc., 100 F. Supp. 2d 331, 335 (D. Md. 2000); Rahr v. Grant Thornton LLP, 142 F. Supp. 2d 793, 800 (N.D. Tex. 2000); In re Brand Name Prescription Drugs Antitrust Litig., 1998 U.S. Dist. LEXIS 12534, No. 94 C 897, MDL 997, 1998 WL 474146, at \*8 (N.D.Ill. Aug. 6, 1998); Stutz v. Minn. Mining & Mfg. Co., 947 F. Supp. 399, 404 (S.D. Ind. 1996); Chemco, Inc. v. Stone, McGuire & Benjamin, 1992 U.S. Dist. LEXIS 11657, 1992 WL 188417, at \*2 (N.D. Ill. July 29, 1992); Wachovia Bank and Trust Co. v. National Student Marketing Corp., 461 F. Supp. 999, 1012 (D.D.C. 1978). As explained in these decisions, the plaintiffs who choose to file an independent action **[\*55]** without waiting to consider the determination of class certification are not entitled to enjoy the benefits of the tolling rule. Applying the tolling doctrine to separate actions filed prior to class certification would create the very inefficiency that American Pipe sought to prevent.

The cases on which plaintiffs rely are not to the contrary. None of the decisions upon which Amici rely addresses whether the tolling doctrine applies to individual actions commenced before a decision on class certification. Instead, each applies the American Pipe tolling doctrine to actions filed by class members who opted out of the class and thereafter filed independent actions. See Realmonte v. Reeves, 169 F.3d 1280, 1283 (10th Cir. 1999); Adams Pub. Sch. Dist. v. Asbestos Corp., 7 F.3d 717, 718 (8th Cir. 1993); Tosti v. City of Los Angeles, 754 F.2d 1485, 1487 (9th Cir. 1985). n26

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n26 One case on which Amici rely, Edwards v. Boeing Vertol Co., 717 F.2d 761 (3d Cir. 1983), vacated on other grounds, 467 U.S. 867, 81 L. Ed. 2d 718, 104 S. Ct. 2794 (1984), involved claims of employment discrimination. The Third Circuit required each individual class member to intervene and present evidence of having satisfied the jurisdictional prerequisites for such claims in order to be entitled to relief through the class action vehicle. Id. at 765. The plaintiff filed his individual action over two years after the class action had been filed. Id. at 762. The Third Circuit held that the plaintiff was entitled to rely on the class action so long as it was pending. It observed that any other rule "would needlessly proliferate separate lawsuits." Id. at 766.

**[\*56]**

n27 Amici contend that the McKowan court addressed whether American Pipe tolling would benefit a class member intervening "before" class certification had been ruled upon, quoting the following language: "We see no good reason why class claims should not be tolled where the district court had not yet reached the issue of the validity of the class. [The defendant] has not supplied any persuasive reason for making such a distinction." McKowan, 295 F.3d at 389. In fact, the plaintiff in McKowan intervened after the district court rejected the motion to certify, and the Circuit Court found that post–decision intervention protected by American Pipe tolling.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

The only case on which Alaska Plaintiffs rely, McKowan Lowe & Co. v. Jasmine Ltd., 295 F.3d 380 (3d Cir. 2002), is also inapposite. There, the district court had denied a motion to certify a class based on a determination that the named plaintiff's claims were not typical and that he would not provide adequate representation for the class. Id. at 383 Shortly thereafter, a new **[\*57]** party moved to intervene. n27 Id. Applying American Pipe tolling, the district court held that his
individual claims were timely, but ruled that the class claim he sought to bring was barred by the statute of limitations. Id. The Third Circuit held "that the class claims of intervening class members are tolled if a district court declines to certify a class for reasons unrelated to the appropriateness of the substantive claims for certification." Id. at 389.

Neither the Alaska Plaintiffs nor Amici have explained how applying the American Pipe tolling doctrine to individual actions filed prior to a determination on class certification would advance any of the goals identified by American Pipe and its progeny. Instead, the Alaska Plaintiffs argue that without access to the American Pipe tolling doctrine, institutions intending to file their own suits will simply forbear doing so until it is time to opt out of the class. They ask rhetorically what good purpose will be served by such delay?

Many good purposes are served by such forbearance, as American Pipe and Crown, Cork themselves spell out. The parties and courts will not be burdened **[\*58]** by separate lawsuits which, in any event, may evaporate once a class has been certified. At the point in a litigation when a decision on class certification is made, investors usually are in a far better position to evaluate whether they wish to proceed with their own lawsuit, or to join a class, if one has been certified. This very motion illustrates the wisdom of waiting. Investors who wait can take the measure of class counsel and the course of the litigation as it unfolds and can then make an informed decision as to whether their interests are best served

by remaining in the action or by opting out. n28

− − − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − − −

n28 Litigation over Milberg Weiss' written solicitation efforts has revealed that it has urged pension funds to retain Milberg Weiss and file independent actions by inducing confusion and misunderstanding regarding the benefits of an individual action and by derogating the class action option. See In re WorldCom, Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 20748, No. 02 Civ. 3288 (DLC), 2003 WL 22701241, at *6–7 (S.D.N.Y. Nov. 17, 2003). As a consequence, a curative notice will be provided to all plaintiffs who have filed Individual Actions. See id. 2003 U.S. Dist. LEXIS 20748, at *9.

− − − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

**[\*59]**

Amici argue that without American Pipe tolling there will be a "bizarre gap" from the filing of a class action until a decision on certification, and an "onslaught of individual actions" by plaintiffs who wish to preserve their right to pursue individual actions. n29 Quite the opposite is true. Because American Pipe tolling applies to all putative class members, no individual action, much less an onslaught of individual actions, need be filed prior to a certification decision in order to preserve the right to bring such an action. After a decision on certification is rendered, a plaintiff may file an individual action. If a class has been certified, the plaintiff will opt out of the class and file an individual action. n30

− − − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − − −

n29 Amici argue that individual plaintiffs will be forced to choose at an early point in the litigation whether to file an individual action or be precluded from doing so until a decision on class certification, which could require a wait of "several years." To the contrary, the Federal Rules of Civil Procedure require that certification of a class should be determined "as soon as practicable" after an action has been commenced, Fed. R. Civ. P. 23(c)(1), so that the defendants may "be told promptly the number of parties to whom [they] may ultimately be liable for money damages." Siskind v. The Sperry Retirement Prof., Unisys, 47 F.3d 498, 503 (2d Cir. 1995) (citation omitted). In this case, the class was certified on October 24, 2003, twelve weeks after the filing of the Consolidated Amended Complaint in the class action.

**[\*60]**

n30 It would appear that the filing of an individual action after certification is, de facto, notice of an intent to opt out of the class. The parties have not addressed that issue, however.

− − − − − − − − − − − − End Footnotes− − − − − − − − − − − − −

Limiting the American Pipe tolling doctrine to plaintiffs who wait until after a decision on class certification to commence their actions is consistent with the purpose and holdings of both American Pipe and Crown, Cork. Those decisions were driven by concerns regarding the fate of class members in cases that were not allowed to proceed as class actions. The tolling rule provides that when the class certification decision is made, those who relied knowingly or not on the class action to pursue their claims will not be penalized for their forbearance. The same logic does not warrant extending the tolling period to individual actions filed before a determination on class certification. Plaintiffs who choose, as is their right, to pursue separate litigation may not enjoy the benefits of that separate litigation without bearing its burdens. One of the burdens plaintiffs bear is the obligation **[\*61]** to commence their actions within the applicable statute of limitations.

Having chosen to pursue an individual action prior to a decision on class certification, the Alaska Plaintiffs are not protected by the American Pipe tolling doctrine. Since they failed to amend their pleading within the period provided by Section 13, the Alaska Plaintiffs' claims against the Additional Underwriter Defendants and the Individual Defendants are time−barred and dismissed with prejudice. n31

− − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − −

n31 Amici argue that "at most" the statute of limitations clock should begin to run again with whatever time remained unelapsed when the class action was filed. They do not explain how this would work or what they mean. The Alaska Plaintiffs remark in passing that a time barred suit can be refiled after class certification is denied. They cite no authority that would support the refiling of litigation that has been dismissed as time−barred. Any such dismissal is with prejudice.

− − − − − − − − − − − End Footnotes− − − − − − − − − − − −

5. Section 12(a)(2) Liability for December 2000 Offering **[*62]**

The Underwriter Defendants move to dismiss the Section 12(a)(2) claim against J.P. Morgan arising from the December 2000 Offering. They contend that the December 2000 sale of bonds was not a public offering but a private placement, and therefore, not covered by Section 12(a)(2).

It is undisputed that [HN30] Section 12(a)(2) does not provide a cause of action for private placements. The "primary innovation" of the Securities Act was the creation of duties "in connection with public offerings." Gustafson v. Alloyd Co., 513 U.S. 561, 571, 131 L. Ed. 2d 1, 115 S. Ct. 1061 (1995). While the liability imposed by Section 11 flows from the requirements for the filing of registration statements, the liability imposed by Section 12(a)(2) flows from the requirements to distribute prospectuses. Id. In Gustafson, the Supreme Court held that Section 12(a)(2) did not create a cause of action for written misrepresentations contained other than those contained in a prospectus. Id. at 584. The Court explained that the term "prospectus" in Section 12(a)(2) is confined to a document that "must include the information contained in the registration statements." Id. at 569 **[*63]**    (citation omitted). It is "a document soliciting the public to acquire securities." Id. at 574. See also id. at 581, 584. The Court explicitly rejected the proposition that Section 12(a)(2) covers any communication offering a security for sale. Id. at 574.

 [HN31] Private placements or sales of securities are permitted by the securities laws. The general registration requirement in the Securities Act, Section 5, provides that it is unlawful to sell or offer for sale a security unless a registration statement has been filed as to that security. 15 U.S.C. § 77e. Sections 3 and 4 of the Securities Act create exceptions to the registration requirements. See 15 U.S.C. §§ 77c & 77d. Of the exceptions in Sections 3 and 4, the one that is relevant to the WorldCom bonds sold in December 2000 is Section 4(2)'s exception for "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(2). n32 Such private offerings are permitted to be made to, among others, investors such as the qualified institutional investors at issue here. n33

− − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − −

n32 Plaintiffs admit that the December 2000 bonds were exempt from the SEC registration requirements, and have not identified any exception other than that for private placements that would have allowed the defendants to conduct a bond offering without filing a registration statement. While they point out that an offering to foreign investors pursuant to Regulation S need not be registered, they do not contend that that is the exemption at issue here. Nor could they. The Alaska Plaintiffs are clearly not foreign investors.

**[*64]**

n33 The Alaska Plaintiffs admit that they were qualified institutional investors, as defined by the securities regulations. [HN32] SEC Rule 144A governs "private resales of securities to institutions" and defines the "qualified institutional buyers" authorized to purchase in a private placement. See 17 C.F.R. § 230.144A(7)(a).

− − − − − − − − − − − End Footnotes− − − − − − − − − − − −

The fact that the December 2000 Offering was a private placement is clear from its face. The Offering Memorandum states that it "is personal to each person to whom it has been delivered and does not constitute an offer to any other person or to the public generally." n34 It prohibits offerees from photocopying or disseminating the document. On its first page and in a section captioned "transfer restrictions," it explains that

the Notes "have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, in a transaction not subject to or in a transaction in compliance with the registration requirement of the Securities **[\*65]** Act." Each Note was required to bear a legend stating that the security "has not been registered under the Securities Act . . . and may not be offered, sold, pledged or otherwise transferred" except in accordance with certain limitations, including the limitation that the acquirer be a "qualified institutional buyer" as defined by Rule 144A or "not a U.S. person" as defined by SEC Regulation S.

– – – – – – – – – – – – –Footnotes – – – – – – – – – – – – –

n34 [HN33] On a motion to dismiss, the Court may consider documents the plaintiffs possessed or knew about and upon which they relied in bringing suit. Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001); Rothman, 220 F.3d at 88. Plaintiffs are presumed to have relied upon the December 2000 Offering Memorandum, and have submitted it as an exhibit in support of their opposition to the motion to dismiss.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – –

The first page of the Offering Memorandum explains that the notes are being offered only "to qualified institution buyers (as defined in rule 144A under the Securities Act) in compliance **[\*66]** with Rule 144A, and [] to non–U.S. persons outside the United States in reliance on Regulation S." The Offering Memorandum warns qualified institutional buyers that the seller "may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A." Rule 144A exempts private placements from the registration requirements of Section 5. See 15 U.S.C. 77e(d)(2); 17 C.F.R. § 230.144A.

The Complaint offers only limited allegations regarding the December 2000 transaction, but its limited allegations confirm that the transaction was a private placement. The Complaint alleges that in December 2000 "WorldCom and J.P. Morgan raised " $ 2 billion from [a] bond private placement." n35 It also alleges that the December 2000 transaction was exempt from SEC registration requirements. It consistently describes the document disseminated in connection with the December 2000 transaction as an "offering memorandum," not as a prospectus. n36

– – – – – – – – – – – – –Footnotes – – – – – – – – – – – – –

N35 Inserted into the body of the Complaint following page ten, and incorporated into the text of paragraph sixteen, is a multi–colored and annotated graph reflecting WorldCom's daily stock and bond prices for four years. The graph bears a color picture of Bernard J. Ebbers, the stock and bond prices, each in their own separate color, and annotations in red or black explaining both the accounting abuses and key events, such as the following entry for December 2000. "WorldCom and JP Morgan raise $ 2 billion from bond private placement. Used proceeds to pay down commercial paper debt. Does not borrow from banks." The graph bears a copyright notice that reads, "copyright (c) by William S. Lerach and Milberg Weiss []. William S. Lerach and Milberg Weiss [] will vigorously defend all of their rights to this writing/publication." This copyright notice is in addition to that given below the Complaint's caption for the contents of the entire pleading.

**[\*67]**

n36 By comparison, the Complaint consistently describes the documents disseminated in connection with the three other Offerings as prospectuses.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – –

Although the Complaint describes the December 2000 Offering as a "private placement," the plaintiffs remarkably contend in their opposition to this motion, that the December 2000 Offering was not a private placement, but a public offering. They propose to circumvent both the clear language of the Offering Memorandum and their Complaint by simply amending the Complaint. They now seek to allege through a proposed three–page addition to their pleading that the December 2000 transaction was a public offering because (1) the Offering Memorandum was a mass–produced document which incorporated WorldCom SEC filings and contained a clause that indemnified JP Morgan for claims that it had violated the Securities Act; (2) JP Morgan functioned as an underwriter in the same manner as it would in a firm commitment public offering of

securities; (3) JP Morgan created a public trading market for the December 2000 bonds after their initial distribution and sale; **[*68]** and (4) the bonds were offered to hundreds of "qualified institutional investors" and were sold to over 200 such buyers in the initial public offering. The proposed amendments also allege for the first time that the "prospectus" for the December 2000 Offering contained "the type of information" contained in a prospectus in a registered public offering. n37

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n37 The proposed amendment does not include any deletion of the Complaint's allegations that the December 2000 Offering was exempt from registration or that the December Offering was a private placement.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

The explicit restrictions of the Offering Memorandum indicate that it was not issued in connection with a public offering and is instead a private placement. As noted, it refers specifically to the exemption from registration for private placements. Although the Second Circuit has not addressed this issue, other courts in this Circuit have found that offerings made via private placement memoranda similar to that at issue here are not public offerings. **[*69]**    See In re J.W.P. Inc. Sec. Litig., 928 F. Supp. 1239, 1259 (S.D.N.Y. 1996) (summary judgment); Glamorgan Coal Corp. v. Ratner's Group PLC, 1995 U.S. Dist. LEXIS 9548, No. 93 Civ. 7581 (RO), 1995 WL 406167, at *2–3 (S.D.N.Y. 1995) (motion to dismiss).

The terms of the Offering Memorandum compel the conclusion that the December 2000 Offering was a private placement, and allegations in the proposed amendments to the Complaint which contradict the Offering Memorandum (as well as the Complaint) are ineffective to convert it into a public offering subject to Section 12(a)(2). As the Glamorgan court found when it was confronted with a similar effort at amendment to escape dismissal, "no matter how the plaintiff might word the claim, the document involved cannot be silkenized into a § 12(a)(2) 'prospectus.'" Id. (citation omitted).

The Alaska Plaintiffs argue that leave to amend must be freely given, and once their pleading is amended, this motion to dismiss must be denied since the pleading raises questions of fact that are not suitable to resolution on a motion to dismiss, particularly because the defendants' assertion that the offering was a private placement is an affirmative **[*70]** defense on which the defendants bear the burden. The Alaska Plaintiffs admit that the December 2000 Offering "was structured to be exempt from registration because those bonds were to be initially offered to only qualified institutional investors," but contend that the transaction nonetheless became a public offering. (Emphasis in original.) They argue that the determination of whether a transaction was a private placement or public offering requires the application of a multi–factor test. None of the cases on which they rely, however, applies such a test to circumstances remotely similar to those here.

This application to amend must be denied. The Alaska Plaintiffs admit that they can bring no Section 11 claim based on the December 2000 Offering because it was exempt from the registration requirements of the securities laws. They have not identified how the December 2000 Offering was exempt from registration requirements other than as a private placement. Given the contents of the December 2000 Offering Memorandum, the admissions in the Complaint that the December 2000 Offering was a private placement, and the absence of any explanation of how the December 2000 Offering is both **[*71]** exempt from registration and yet properly considered a public offering, it would be wrong to allow the amendment that the Alaska Plaintiffs have proposed.

Conclusion

The Underwriter Defendants' motion to dismiss is granted in part and denied in part. The motion to dismiss the Section 11 claims based on the May 2000 and May 2001 Offerings is denied. The motion to dismiss is granted with respect to the following claims, each of which is dismissed with prejudice: (1) the Section 11 claim based on the 1998 Offering, (2) all Section 11 claims against the Additional Underwriter Defendants, and (3) the Section 12(a)(2) claim based on the December 2000 private placement.

The motions to dismiss by the Director Defendants and by Ebbers are granted with prejudice.

SO ORDERED:

Dated: New York, New York

November 21, 2003