# DEPOSITION TESTIMONY: BRINKER

37

1    from the company, I had no reason to keep them.

2    I've read the suit and such and had that paper,

3    but when it finally started coming to Court, I

4    just destroyed everything.

5         Q.    When it finally started coming to

6    Court, you just destroyed everything --

7         A.    Well, after.

8         Q.    -- is that your testimony?

9         A.    That would have been after

10   December the 3rd.

11        Q.    So if I understand this correctly,

12   you destroyed all of the documents in your

13   possession related to Oak Hills after December

14   3rd, 1999, correct?

15            MR. BURKE:  Objection.  Calls for

16   speculation.  You may answer.

17        A.    Actually some before and some

18   after, yes.

19        Q.    Okay.

20        A.    All of them.

21        Q.    Why did you do this?

22        A.    Because there was too much -- I

23   mean, you know, in a home you don't keep piling

24   papers up and I didn't care to have all that

25   stuff sitting around.

LITIGATION SUPPORT SERVICES, INC.
CINCINNATI (513)241-5605 * DAYTON (937)224-1990

38

1          Q.    Okay.

2          A.    Since we were not a company

3     anymore and I was not in there, I didn't think

4     it bothered me at all.

5          Q.    How did you destroy these

6     documents?

7          A.    Through the shredder.

8          Q.    Did that take a long time?

9          A.    Well, certainly, but I was doing

10    some from the company before that time, so --

11         Q.    Okay.  Let me direct your

12    attention to 1999.  When did you first start

13    destroying documents related to Oak Hills?

14              MR. BURKE:  And let me mention or

15    caution you, Norb, make sure you're testifying

16    from actual recollection as opposed to

17    assumptions.  He's asking you as to what

18    occurred in December 1999.

19              MR. BRAUTIGAM:  Actually I'm not,

20    Jim.  We don't need your speaking objections.

21    We don't need your instructions.  We don't need

22    your misstating my questions.  Have it read

23    back, please.

24              MR. BURKE:  Mr. Brautigam, please

25    control yourself.  Please control yourself and

39

1    act like a professional.

2              (Record read by Reporter.)

3         A.   Well, it would have been in

4    December of '99, I guess after the closing.

5         Q.   Well, a moment ago you said some

6    before and some after.

7         A.   Well, I was talking about papers

8    of the Oak Hills Savings and Loan, which I was

9    connected with, and part of before the thing.

10   Our company papers, and I destroyed all of

11   them.  I had no reason to have them.

12        Q.   I'm interested in that as well.

13   When did you first start destroying documents

14   in 1999, related to Oak Hills in any way?

15        A.   Well, I would say I really can't

16   recollect the exact time.

17        Q.   Okay.  Was it --

18        A.   But it was --

19        Q.   -- in the winter?

20             MR. BURKE:  Objection.  Asked and

21   answered.  You may answer if you know.

22        A.   I really can't pinpoint a time.  I

23   just know I started getting rid of papers

24   because they were piling up too much and -- and

25   it was Oak Hills papers, which I knew we

40

1    wouldn't -- if the thing had gone through, I

2    destroyed what I didn't -- wouldn't need.

3         Q.    Okay.   How did you determine what

4    you would need and what you wouldn't need?

5         A.    Well, I'm talking about basically

6    with -- the company records was like some

7    copies of Board meetings and all of Oak Hills

8    stuff, and I didn't figure I would have any

9    need of them, whether this sale went through or

10   not.

11        Q.    Is there any way you can pinpoint

12   with greater specificity, when you started

13   destroying documents in 1999?

14        MR. BURKE:   Objection.   Asked and

15   answered.   You may answer again.

16        A.    As I said, I can't remember the

17   exact date, but it was -- I started on the Oak

18   Hills papers, gosh, I don't know, probably

19   earlier in 1999, because I had no reason to --

20   for the papers that I had, to keep for any

21   reason.

22        Q.    And what papers specifically are

23   we talking about?

24        A.    Reports from management to the

25   Board, copies of Board meetings, which I didn't

41

1    feel I needed, and all reports from different

2    committees.

3         Q.   And all of these documents were

4    shredded, correct?

5         A.   Um-hmm.

6         Q.   Yes?

7         A.   Yes, sir.

8         Q.   And you personally did the

9    shredding, correct?

10        A.   Yes, sir.

11        Q.   Why did you shred these documents?

12        A.   Because I didn't want to throw

13   them out as they were, just tear them up and

14   have the papers end up in a dump where they

15   would be whole.  I shredded them so that they

16   couldn't be seen by anybody.

17        Q.   Please describe, for the record,

18   what your home office looked like where you did

19   your Oak Hills business.

20        A.   At home?

21        Q.   Yes.

22        A.   It was in our -- I live in a

23   condominium.  We have living quarters on the

24   top and we have a big room downstairs, which I

25   had a desk and I did the work down there.

42

1          Q.   And did you have these Oak Hills

2     related documents in file cabinets or in boxes?

3     Please describe to me how you had these

4     documents.

5          A.   Well, actually the biggest part of

6     them, or a big part of them were being piled up

7     on the desk.  And some of them were in books

8     that were -- would relate to one particular

9     thing, you know.

10         Q.   And during 1999, you maintained

11    books and records related to the proposed

12    merger with Provident or other potential

13    acquirers at your home, correct?

14         A.   You say books.  Yes, the book I

15    had was all of the resolutions and such that

16    had to be made and we had to have on record at

17    Oak Hills.

18         Q.   Now, during 1999, did you take

19    notes at Board meetings and committee meetings

20    and things like that?

21         A.   I didn't take notes, I just

22    conducted the meetings.  And I was always given

23    a copy of the meetings from our president, who

24    conducted -- who took his notes and really

25    conducted the business of the meeting, because

# DEPOSITION TESTIMONY: HANAUER

20

```
 1          A.   My final agreement personally to

 2     sign the agreement was after I had been -- all

 3     opinions and all efforts had been defeated, and

 4     so just to espouse a unanimous vote -- I was

 5     not asked to do that, that was something

 6     personally that I did -- so just to show that,

 7     that unanimous -- that unanimous vote, I did do

 8     that.

 9          Q.   Was it important that the vote to

10     sell the company be unanimous?

11          A.   That was never stressed by the

12     marketers or our legal counsel.  In discussions

13     with different folks throughout the

14     transaction, it had been expressed to me that

15     that would make the sale go better, but that

16     was never -- I was never persuaded to do that.

17     That was something that I just did on my own.

18          Q.   Who told you that it would make

19     the sale go better?

20          A.   I had talked with, again, various

21     people over the years, not specific just to

22     this transaction, but there's some

23     representatives from Stifel, Nicolaus out of

24     St. Louis, some folks from ABN AMRO out of

25     Chicago, and our own, our own marketers, the
```

93

1       because of the remedies within the contract.

2                Q.   The breakup fee?

3                A.   Yes.

4                Q.   Anything else?

5                A.   That and the detriment that would

6       be done to reputation, everything else.  We

7       tried to run as clean an organization as we

8       could run, and independent and community

9       oriented.  And I think again, once you've

10      announced -- that's why I fought the ad hoc

11      committee, once you announce that you're for

12      sale, the whole tenor of your day-to-day

13      operation changes.  Customers change,

14      employees' thought processes change, everything

15      changes.

16               Q.   Would you characterize this deal

17      as remarkable in terms of shareholder value?

18               A.   I don't know that I would.

19               MR. BURKE:  Objection to form.

20      You may answer.

21               A.   I don't know that I would have

22      used the term remarkable, no, sir.

23               Q.   Why not?

24               A.   Because of the value that was

25      created for the, you know, in the proposal of

118

1          A.   Well, I offered my opinion.

2               MR. BURKE:  Him personally, you're

3     saying?

4          Q.   Yes.

5               MR. BURKE:  Objection.

6          A.   Yeah, I offered my opinion.  My

7     opinion was not in the final document.

8          Q.   Well, how about at the shareholder

9     meeting?  Did people say, is this really a good

10    idea, in words or substance to you?

11         A.   In, in that meeting, when it was

12    asked is this -- I believe the question was, is

13    this a good transaction, is it a good

14    transaction.  I have to answer yes.  Is it a

15    transaction that Ken Hanauer would have gone

16    out and sought, no, but that wasn't the

17    question that was asked.  I wasn't ready to

18    retire at 50.

19         Q.   So you were being extremely

20    precise with your language at the shareholder

21    meeting?

22         A.   Yes, sir, I was.

23         Q.   Even if it didn't convey the full

24    extent of your feeling?

25         A.   I did not let my personal feelings

128

1    Had I resigned immediately before the deal was

2    signed, it might have been better for the

3    shareholders because they could have perceived

4    that the renegade was gone.  Had I resigned

5    after the deal was done, you know, there may

6    have been some perceptions there, but the deal

7    was already cut, so I'm not sure.

8           Those are all things that as you

9    get into a transaction that is not a

10   transaction of your making, you have to deal

11   with.  And it was -- this was a very difficult

12   time for me personally and professionally.

13         Q.   Aside from considering and

14   ultimately rejecting resigning as CEO and

15   director of the company, what else could you

16   have done to add some chaos to the process, to

17   paraphrase your previous answer?

18         A.   I think I could have probably

19   joined forces with folks who wanted to stop the

20   transaction.  That would have -- that would

21   have been violating, in my opinion, a fiduciary

22   liability to the -- fiduciary responsibility to

23   the shareholders because, you know, you would

24   be acting -- I would be acting personally more

25   than professionally.

LITIGATION SUPPORT SERVICES, INC.
CINCINNATI (513)241-5605 * DAYTON (937)224-1990

Page 242

1          Q.   Now, let's talk about these personal

2    feelings.  When you were conducting this meeting,

3    you were a board member and a CEO of Oak Hills at

4    that time, correct?

5               MR. BURKE:  Objection, asked and

6    answered.  Already established that.

7          A.   Yes.

8          Q.   And do you feel that the shareholders

9    of Oak Hills had a right to your opinion as the

10   CEO of the company and also as a director of the

11   company?

12         A.   Not in that forum.  I believe if they

13   wanted my personal opinion, they certainly had

14   the opportunity to ask my personal opinion and I

15   would have given it to them.  But I was not in a

16   position to offer or editorialize on my personal

17   opinion.

18         Q.   Can you please explain to me the

19   difference between your personal opinion and your

20   opinion as a board member and a CEO of the

21   company?

22         A.   The means by which we got to this

23   transaction was not a means in which I would have

24   taken.  I did not feel that, personally, that I

25   would have entered into this transaction in this

LITIGATION SUPPORT SERVICES, INC.
CINCINNATI  (513) 241-5605      DAYTON (937) 224-1990

Hanauer, Kenneth 02/29/00          Page 242

Page 257

1    at that point, and you said that you felt you

2    were ultimately successful, correct?

3         A.   I believe at the end of the

4    discussion his recollection was cleared that

5    $22.50 a share was not an absolute, yes, sir.

6         Q.   Did anyone else present at the

7    meeting say anything on this topic?

8         A.   There was general discussion.  I do

9    not have recollection as to specific

10   conversations that other individuals might have

11   offered.

12        Q.   Your term "general discussion"

13   implies that other people spoke in addition to

14   you and Mr. Brinker.

15        A.   That's correct.

16        Q.   Can you tell me the sum and

17   substance, if not the actual words, that were

18   said with respect to this particular point?

19        A.   Only that other members were aware of

20   the exchange ratio and the calculation and how it

21   was to be handled.  Again, I had a handout for

22   them in that meeting, and they were reviewing

23   that handout.

24        Q.   And at this meeting, it looked

25   increasingly that the shareholders would get

Page 261

1          MR. BRAUTIGAM:  I won't proceed by

2    your lead.  I just want to make that clear.  Can

3    I have the last question read back, please?

4          (The record was read by the reporter.)

5          A.   No, sir, that would not be fair.  I

6    believe that I'll try to answer your questions as

7    completely and as forthright as I can.  I'm

8    trying to listen to your questions carefully so

9    that I don't answer something you haven't asked.

10   But again, I will volunteer and give you any

11   information that I can that can be factual.

12        Q.   Okay.  Let's jump to the special

13   meeting of the shareholders.  You testified

14   previously that at that meeting you said it was a

15   good transaction, correct?

16        A.   I believe it was a fair transaction.

17   I believe the terminology I used was a fair

18   transaction, yes.

19        Q.   And you also testified that you did

20   not believe that this transaction was in the best

21   interests of the shareholders, correct?

22        A.   I testified that was my personal

23   belief, yes, sir.

24        Q.   And you also testified that you

25   didn't have to reveal your personal belief at

Page 262

1    that meeting because nobody asked you that

2    precise question at the shareholder meeting,

3    correct?

4           A.    It was my belief that it was not my

5    position to offer my personal feelings, and I

6    abstained from doing that in that meeting, and no

7    one asked me my personal feelings.  So I was very

8    careful not to interject in that meeting my

9    personal feelings and my emotions, yes, sir.

10   That's my testimony.

11          Q.    Okay.  At this deposition, unless I

12   tell you otherwise, I am not asking for your

13   personal feelings or your personal emotions.  I'm

14   asking for your opinion as the CEO of Oak Hills

15   and also as a board member; is that fair?

16          A.    That's fine.

17          Q.    Can we proceed on that basis?

18          A.    Yes, sir.

19          Q.    Let me direct your attention to page

20   3186 in this document, which is Hanauer

21   Exhibit 1.  And when we broke last time, we were

22   discussing a series of bullet points, correct?

23          A.    Yes, sir, I believe we were.

24          Q.    And I think we're up to the bullet

25   point more or less in the middle of the page, and

LITIGATION SUPPORT SERVICES, INC.
CINCINNATI  (513) 241-5605       DAYTON (937) 224-1990

Hanauer, Kenneth 02/29/00          Page 262

Page 263

1    your note to the right of that.  Do you see your

2    note, sir?

3        A.    Referencing, "Substantially greater

4    liquidity?"  Is that where you're referring?

5        Q.    Are you on 3186?

6        A.    That's where I am, yes, sir.

7        Q.    Okay.  Do you see your note to the

8    right of that?

9        A.    "No mention of Lindner Family

10   Holdings."

11       Q.    And why did you write that note in

12   your document?

13       A.    That is a note that stems from a

14   conversation that I had had with Barry Forrester,

15   and again, it was his opinion that possibly this

16   document could have contained information to that

17   regard.

18       Q.    Did you agree with that opinion?

19       A.    I didn't know how that would taint

20   the transaction one way or another.  It's a fact

21   that I believe that the Lindner family, through

22   their various holdings, do have some sway over

23   the Provident Bank and Provident Financial, but I

24   don't know that that would have done anything to

25   dissuade this transaction or have any effect on

Page 270

1    management was against the transaction?

2         A.    Cliff Roe knew that.  He had been in

3    discussions with me and in meetings with me, and

4    he knew how this process -- how we had gotten to

5    this process.  And I'm not sure that Cliff had a

6    lot of discussion with other members of

7    management.  I know he had spoken with

8    Mr. Condren on several occasions and probably

9    would have determined that Mr. Condren was not a

10   fan of this transaction.

11        Q.    And would it also be fair to say that

12   because you knew what Cliff's position was and he

13   knew what your position was, that you didn't

14   constantly or even frequently go to him and say,

15   "Hey, maybe we should include this?  Maybe we

16   should include that"?

17        A.    I went to Mr. Roe one time, and that

18   was after I had made all these notes, and talked

19   with him at that point in a phone conversation

20   with regards to some of the allegations that

21   Mr. Forrester had made.  When I heard terms,

22   "Omission of material fact," I raised those

23   questions -- raised some of those questions

24   throughout the document, I felt that that was a

25   point.  I raised those with Mr. Roe, and he told

MR. BURKE: I object. That's not the question you asked him. That is not at all the question you asked him. You asked him whether or not there was a material fact omitted and he said, "Based upon my understanding of that phrase," and he answered that question. Now, if you want to change the question, that's fine, but that's not what you asked him.

MR. BRAUTIGAM: Thank you for that recap. Let me move on to my next question.

Q. Do you think that there are any material facts in this document that are omitted?

A. No.

Q. Do you think that there are any material facts in this document that are misstated?

A. No.

Q. Can you say that without any hesitation?

A. I think I did hesitate, but again, it comes down to material fact, so my answer will be no.

Q. So it would be fair to say, then, despite these extensive conversations that you've had with Barry Forrester, he was not able to

Page 412

1    share, $20 a share, $25 a share?"  We were trying

2    to get some feedback from every director

3    individually and then collectively so that we

4    could create some strategic thinking at our

5    committee level.

6          Q.    How long a document was this

7    questionnaire?

8          A.    I believe it was two pages.

9          Q.    And this was done in-house with

10   members of the strategic planning committee; is

11   that correct?

12         A.    That's correct.

13         Q.    And implicit in this questionnaire

14   was that OHSL would remain independent, correct?

15         A.    We had a question in there with

16   regards to something to the effect, "Do you want

17   to see us increase the number of offices?  If so,

18   how many offices in these given time frames?

19   Should we seek strategic merger partners?  Should

20   we sell?  Should we remain independent?"

21   Questions like that were in this document.

22         Q.    In the third paragraph at the very

23   end, it says, "M.U.C."  Do you see that?

24         A.    Yes.  Motion unanimously carried.

25         Q.    Do you remember anything about this

690

1    folks may have them and they may not have them.

2    It's at their sole discretion.

3        Q.   But do you believe that they exist

4    between the books and records of Oak Hills

5    Savings and Loan?

6        A.   No, no.  Hmm-um.  They were not a

7    formal document that would have been kept like

8    a blackboard minutes, no.

9        Q.   When is the last time you saw

10    these minutes, meaning the management team

11    minutes.

12        A.   That would be, that would be

13    difficult.  I had, I had my own set, which I

14    destroyed as I was cleaning my desk out,

15    probably on or about this time -- no, I didn't

16    do that until probably after December 3rd, so I

17    would have waited until after -- yeah, sometime

18    between December 3rd and December 31 as I was

19    cleaning out junk, I would have destroyed my

20    copy.

21        Q.   Okay.  Let me get this straight.

22    Your testimony under oath is that after the

23    filing of this lawsuit, you destroyed documents

24    relevant to the lawsuit; is that correct?

25        A.   I didn't perceive the minutes of

00743
1   KENNETH HANAUER

2   having been previously duly sworn, further

3   testified as follows:

4          CONTINUED CROSS-EXAMINATION

5   BY MR. BRAUTIGAM:

6   Q.   Good afternoon, Mr. Hanauer.

7   A.   Good afternoon, sir.

8   Q.   I remind you that you're still

9   under oath.

10  A.   Okay.

11  Q.   Mr. Hanauer, we talked at length

12  last time about the proxy materials and the

13  prospectus.  Do you remember generally that

14  testimony?

15  A.   Yes, sir.

16  Q.   And we talked about the vote of

17  the Board of Directors of OHSL unanimously

18  approving the transaction.  Do you remember

19  that testimony?

20  A.   Yes, sir.

21  Q.   And you testified over the course

22  of three days that the Board, in fact, did

23  approve the transaction unanimously.  Do you

24  remember that testimony?

25  A.   That's correct.

```
00744
  1   Q.   Okay.  And that is reflected here
  2   on the first page of the proxy materials, where
  3   it says, your Board of Directors has -- excuse
  4   me, your Board of Directors unanimously
  5   approved the acquisition and believes that it
  6   is in the best interest of OHSL stockholders.
  7   Do you see that?
  8   A.   Yes, sir, I do.
  9   Q.   And that sentence refers to the
 10   8/2/99 vote, correct?
 11   A.   Yes, sir.
 12   Q.   Okay.  You're familiar with the
 13   word unanimously as it's used in that sentence,
 14   correct?
 15   A.   Yes, sir.
 16   Q.   What do you understand that word
 17   to mean as it's used in that sentence?
 18   A.   That everyone that participated in
 19   the vote, voted in favor of the transaction.
 20   Q.   Okay.  It doesn't say that in the
 21   document, does it?
 22   A.   It's inferred with the term
 23   unanimously.  I don't believe it does, no, sir.
 24   Q.   Okay.  It says, your Board of
 25   Directors unanimously approved the
```

00745
1  acquisition --

2  A.  Yes.

3  Q.  -- stop.  Correct?

4  A.  Correct.

5  Q.  Now, as of 8/2/99, who were the

6  directors?

7  A.  Norb Brinker, Bill Hillebrand, Al

8  Hucke, myself, Joe Tenoever, Tom McKiernan, and

9  Howard Zoellner, seven of us.

10  Q.  Okay.  And do you think it's a

11  reasonable reading of the first part of that

12  sentence, your Board of Directors unanimously

13  approved the acquisition, stop, that all seven

14  of the directors you just named voted in favor

15  of the transaction?

16  A.  That is correct.

17  Q.  Okay.  Let's --

18  A.  There was no opposition to the

19  vote, okay?  At the time that we voted, there

20  was no opposition to the transaction.

21  Q.  Okay.  Let me ask the question

22  again.

23  A.  Okay.

24  Q.  With respect to that first part of

25  the sentence, your Board of Directors

00746

1   unanimously approved the acquisition, stop.

2   A.   Um-hmm.

3   Q.   Do you believe as you sit here

4   today that it's a fair reading of that part of

5   the sentence that those seven directors you

6   named, unanimously voted to approve the

7   transaction?

8   A.   They voted individually for the

9   transaction, yes, sir.

10   Q.   All seven directors?

11   A.   Yes, sir.

12   Q.   Okay.  Let's take a look at what

13   has been previously marked as McKiernan Exhibit

14   2, and I'm handing it to you.  Have you seen

15   McKiernan Deposition Exhibit Number 2 before?

16   A.   Yes, sir.

17   Q.   Are you familiar with it?

18   A.   Yes, sir.

19   Q.   Do you recognize it?

20   A.   Yes.

21   Q.   What is McKiernan Deposition

22   Exhibit Number 2?

23   A.   It's a copy of the minutes of a

24   meeting held on August 2nd, 1999 of the Board

25   of Directors, a special meeting of the Board of

00747

1  Directors of OHSL Financial.

2  Q.    And this was the special meeting

3  that approved the transaction that we're

4  talking about, correct?

5  A.    That's correct.

6  Q.    Okay.  Would you please read into

7  the record the directors who were present?

8  A.    Brinker, Hanauer, Hillebrand,

9  Hucke, Tenoever, and Zoellner.

10  Q.    Those are six directors, correct?

11  A.    Absolutely.

12  Q.    Mr. McKiernan was not present,

13  correct?

14  A.    According to these minutes, he was

15  not, yes, sir.

16  Q.    In fact, he was in Europe on a

17  cruise, correct?

18  A.    I believe you're correct.  He was

19  in the Mediterranean, I think, yes.

20  Q.    Okay.

21  A.    If memory serves me, yes.

22  Q.    Would it be fair to say that Mr.

23  McKiernan, because he was not present, was not

24  one of the directors who unanimously voted to

25  approve the transaction?

00748
1   A.    Yes, sir, you can -- you could say

2   that.

3   Q.    Is there any other reasonable

4   reading of McKiernan Exhibit 2 and the first

5   page of the proxy materials?

6   A.    No, sir.  Again, the proxy

7   materials state that the Board of Directors,

8   which would infer the whole Board of Directors,

9   unanimously approved.  And in fact, in looking

10  at the minutes dated August 2, it was only the

11  directors at the meeting that unanimously

12  approved the transaction.

13  Q.    Okay.  Do you believe that Mr.

14  McKiernan's lack of a vote on this issue at

15  this meeting is material information?

16  A.    Absolutely not, because he was

17  very pro the transaction.  He was the one

18  that -- he was one of them that spurred the

19  transaction, so I -- in my opinion, it is

20  totally irrelevant that he was not at that

21  meeting.

22  Q.    Okay.  Well, why didn't you tell

23  the shareholders that?

24  A.    Why didn't I tell the shareholders

25  what?

00749
1   Q.   That he was not a director who had

2   voted to approve the transaction, and therefore

3   the transaction -- the vote on the transaction

4   was not unanimous.

5   A.   I cannot answer that, because it

6   did not -- that did not cross my mind.  And it

7   was not pointed out to me in the drafting of

8   all the documents that, in fact, and in my

9   memory, in fact, that Mr. McKiernan was not at

10  the meeting of August the 2nd.  He had been at

11  the majority of the other meetings and was very

12  proactive, so that, that is an error in the

13  document which to date I had not even been

14  aware of consciously.

15  Q.   Okay.  Do you believe that the

16  first part of the sentence that we're focused

17  on now, your Board of Directors unanimously

18  approved the acquisition, stop, states that

19  aside from Mr. McKiernan who was in Europe, and

20  aside from Mr. Herron who had resigned and was

21  no longer a member of the Board, the remaining

22  six directors all voted unanimously in favor of

23  the transaction?

24  A.   The -- I'm sorry, when you

25  mentioned Mr. Herron, I -- my mind went off in

00750

1    another -- restate the first part of your

2    question again.

3    Q.    Okay.  You testified a moment ago

4    that you forgot that Mr. McKiernan was in

5    Europe.

6    A.    Okay.

7    Q.    And that to that extent this was

8    wrong, although you did not believe it's

9    material, correct?

10   A.    Yes, sir, that's a good summation.

11   Q.    Okay.  Now, what I'm asking you

12   now is, is it a fair reading that the first

13   part of the sentence, your Board of Directors

14   unanimously approved the acquisition, stop,

15   means to convey that the six remaining

16   directors did, in fact, unanimously vote to

17   approve the transaction?

18   A.    Yes.

19   Q.    Okay.  Mr. Brinker testified under

20   oath that he did not vote at the August 2nd,

21   1999 meeting.  So, in fact, he never voted to

22   approve the transaction.  Is that consistent

23   with your recollection?

24   A.    Mr. Brinker, in any controversial

25   discussions that we ever got into, would always

00751
```
 1   use his position as Chair not to vote.  And I
 2   don't recall -- I don't believe there was any
 3   discussion in this proceeding, but in other
 4   proceedings that he would not -- it was not a
 5   requirement for him to vote and would not do so
 6   unless there was a tie.  So I do not know what
 7   was in his heart at the time.
 8   Certainly this document went out
 9   over his signature.  He knew of the contents of
10   the document.  And if at this juncture it's his
11   testimony that he didn't vote for the
12   transaction, that's something that's got to be
13   on his conscience, not mine.
14   Q.   Okay.  Let's see if we can put
15   aside what's in Mr. Brinker's heart and on Mr.
16   Brinker's conscious.  At the August 2nd --
17   A.   I can't address whether he said
18   aye or nay.  There were no nays when he asked
19   for the vote.  That's all I can -- that's all I
20   can tell you.  There were -- there was nobody
21   sitting around that table of the six directors
22   present that said they were not in favor of
23   this transaction.
24   Q.   Okay.  My question is a little
25   different.  You were at the meeting on August
```

00752
1    2nd, 1999, correct?

2    A.    Yes.

3    Q.    Okay.  Did Mr. Brinker vote?

4    A.    I told you I -- whether he said

5    aye or nay, whether he said aye -- he called

6    for the vote.  Should he have said aye?  I

7    cannot address that.  I do not know whether he

8    uttered anything or not.  I, I can't tell

9    you --

10   Q.    Okay.

11   A.    -- because I don't know.

12   Q.    Okay.  Why don't you know?

13   A.    What do you mean, why don't I

14   know?  We didn't sit there and go around the

15   room, all in favor, aye, and there was some

16   grumblings and that was it.  There was no aye,

17   aye, aye.  There was not a call for a vote of

18   each individual person as to what their

19   position was.  It just didn't happen that way.

20   Now, that would be a question why

21   he -- to him, as to why he didn't call for a

22   specific utterance from each individual so you

23   would know whether the relevance of that

24   paragraph -- you know, whether that paragraph

25   is correct or not.  I can't address that, I

00753
1    didn't run the meeting.

2    Q.   Okay.  Let me ask you to assume

3    for the sake of this question that Mr. Brinker

4    testified that he did not vote in favor of the

5    transaction or against the transaction.  He

6    just didn't vote.  If you assume for the

7    purposes of this question that that is a fact,

8    do you believe that the first part of that

9    sentence --

10    A.   Then his document is wrong, okay?

11    Q.   Okay.  Let me finish the question.

12    Do you believe the first part of that sentence,

13    your Board of Directors unanimously approved

14    the acquisition, is correct?

15    A.   I guess you could stretch that

16    into being it is not correct if he didn't vote

17    either way.  I, I can only assume at this point

18    that if we sat around the table and nobody

19    uttered anything, we would still be sitting

20    there a year later.  You know, it was the --

21    again, in prior meetings and, in fact, when you

22    look at this paragraph, it does not state that

23    it is the meeting of August the 2nd that it is

24    referencing.

25    MR. BRAUTIGAM:  Okay.  Move to

00754

 1   strike everything after "not correct."

 2   Q.   I thought we had covered that a

 3   moment ago.  When it says here, your Board of

 4   Directors unanimously approved the acquisition,

 5   stop.  We are talking about that special

 6   meeting on August 2nd, 1999, are we not?

 7   A.   How would we, the reader of that

 8   document, know that, if you want to be that

 9   specific?

10   Q.   Well, can you answer that question

11   yes or no?

12   A.   Are we talking about that meeting?

13   I believe the document is talking about that

14   meeting, yes.

15   Q.   Okay.  Is there any other possible

16   meeting that you're referring to?

17   A.   There were, there were many

18   meetings in which all of the directors voiced

19   opinions as to whether they would and had

20   intention of approving the transaction.

21   Q.   Was there any meeting, other than

22   the 8/2/1999 meeting, that you could think of

23   that would be referring to the first part of

24   that sentence, your Board of Directors

25   unanimously approved the acquisition, stop?

00755
1   A.   No.  I believe it was the intent
2   of this paragraph to refer to the 8/2 meeting.
3   Q.   Do you believe that the vote or
4   nonvote of the Chairman of the Board of
5   Directors on this transaction is material
6   information?
7   A.   Whether he voted or not?
8   Q.   Yes.
9   A.   I believe that -- yeah, I believe
10  that could be material information.
11  Q.   Okay.  Do you believe that it's
12  properly disclosed in this document, based on
13  our conversation today?
14  MR. RAMSEY:  Objection.
15  A.   It is not in the document that he
16  did not vote, if that is his testimony that he
17  did not.
18  Q.   Okay.  Actually it was also the
19  testimony of Mr. McKiernan.  Mr. McKiernan --
20  A.   Mr. McKiernan wasn't even there,
21  how would he know what Norb did?
22  Q.   Actually, from the Board --
23  A.   Mr. McKiernan cannot testify to
24  what Norb did on 8/2, he was thousands of miles
25  away.

00756
1    Q.    Actually I take that back.  What
2    Mr. McKiernan said, and what I meant to convey,
3    was that Mr. McKiernan testified that it was
4    plain that the phrase, your Board of Directors
5    unanimously approved the acquisition, stop,
6    meant that of those directors who were there
7    and who were eligible to vote, that they had
8    unanimously approved the transaction.  And I
9    pointed out that, well, that's not true and
10   correct, either.
11   A.    Okay.
12   Q.    But anyway, that's between --
13   A.    Okay.
14   Q.    -- Mr. McKiernan and myself.
15   A.    Okay.
16   Q.    I did not mean to misspeak
17   earlier.
18   A.    Sure.
19   Q.    Do you believe that whatever Mr.
20   Brinker did as Chairman of the Board should
21   have been disclosed to the shareholders?  In
22   other words, if he didn't vote to approve the
23   transaction, fine, he could have said the
24   directors who were there and who were eligible
25   to vote, did vote to unanimously approve the

00757

1    transaction, but I abstained.  Do you think

2    that would have been better?

3    A.    If it is his testimony and intent

4    to have abstained, yes.  If he purposely, if he

5    purposely did not -- if he purposely did not

6    vote, then I believe that should have been

7    disclosed, yes, sir.

8    Q.    Okay.

9    A.    I believe that.

10    Q.    It is his testimony that he

11    purposely did not vote, because he said he

12    never voted.  He voted only to break ties and

13    he couldn't remember any ties.  And he

14    purposely did not vote on this transaction or

15    any other transaction during the time he was

16    OHSL Chairman, although some people seem to

17    remember him breaking a tie.

18    A.    Yes, he broke ties.

19    Q.    It was his testimony that he did

20    not vote ever.

21    A.    Okay.

22    Q.    Okay.  Why wasn't this disclosed

23    to the shareholders?

24    MR. RAMSEY:  Objection.

25    A.    I'm going to reiterate it again.

00758
1   I was not aware of his abstention.  I took
2   these minutes and if it was his will and wish
3   to have abstained, then he should have told me,
4   because if you -- he should have told me of
5   that fact.  Because if you look through our
6   corporate minutes both on the savings and loan
7   side and on the holding company side, at
8   various meetings you will see abstentions
9   noted.  That was something that I did on a
10  regular basis and I made sure I got the names
11  right.
12  So it was not an act that was
13  deliberate, it was an act that -- you know, it
14  was unanimous.  He, in fact, declared that it
15  was unanimous and we moved on.  Now, if it was
16  not unanimous and he didn't vote, or if it was
17  unanimous of those voting, then he should have
18  made some comment to the effect that the
19  transaction is approved by all of those voting
20  and I abstained, or what have you.  He didn't
21  do that.
22  As the minute taker, I don't
23  believe -- and I'm not trying to absolve myself
24  of anything here -- I don't believe that that
25  was my responsibility to try to drag out of him

00759
1    that he didn't vote in the transaction.  It
2    never crossed my mind, because the man was for
3    the transaction very early on in the process.
4    So I would have never dreamt that at the, at
5    the final meeting when everything -- we had
6    done literally everything to be done except
7    take the final vote, that he would, he would
8    abstain from that vote.  That never crossed my
9    mind until you raised the question right here
10   along, with Mr. McKiernan not being at the
11   meeting.
12   Q.    Was Charlie Crowley in the room
13   when the vote was taken?
14   A.    For the actual vote, I'm not sure
15   whether he had stepped out, but I believe that
16   they both were there, that Charlie and Jeff
17   were there.
18   Q.    How about Cliff Roe?
19   A.    Yes, he was there.  That I know,
20   but Mr. -- but Mr. Crowley and Mr. Moritz were
21   in and out, making phone calls, so there is a
22   possibility he was not in the room.  I, I am
23   not certain of that, but Cliff was there, yes.
24   Q.    Okay.  Based on what I've told you
25   today, do you believe that the 8/2/99 special

# DEPOSITION TESTIMONY: HERRON

1  circumstances -- I'm positive I used that

2  phrase with most of them -- that led me to that

3  decision.

4        Q.    Okay.  Would it be fair to say

5  that you were resigning in part in protest?

6              MR. BURKE:  Objection.

7  Mischaracterizes the evidence.  You may answer.

8        A.    I don't know that "protest"

9  characterizes it.  It was a very low profile

10  type of a thing.  I was one of eight directors

11  and was the only one apparently against it as

12  of that July 22nd meeting.

13        Q.    Well, what was Mr. Hanauer's

14  position at that July 22nd meeting?

15        A.    In the vote that was taken, he

16  abstained.

17        Q.    Did you perceive that as being

18  against the merger?

19              MR. BURKE:  Objection.  Calls for

20  speculation.

21        A.    My personal perception of Ken

22  Hanauer up until that date was that he was

23  against the transaction.

24        Q.    Did that change on that date?

25        A.    Changed from a no vote to an

00059

 1   September 11th before the deposition, correct?

 2   A.   Correct.

 3   Q.   Did Mr. Burke correct in any way

 4   what he told you previously that was not true?

 5   A.   No, he did not.

 6   Q.   Okay.  I'm handing you what has

 7   been marked as Herron Deposition Exhibit 8 and

 8   I ask you to take a look at it.  Have you seen

 9   it before?

10   A.   Yes, sir.

11   Q.   Are you familiar with it?

12   A.   Yes, I am.

13   Q.   Do you recognize it?

14   A.   Yes, I do.

15   Q.   What is Herron Deposition Exhibit

16   8?

17   A.   This is the transcript of my first

18   deposition session on September 11th, 2001.

19   Q.   Have you had a full and fair

20   opportunity to review this transcript?

21   A.   Yes, I have.

22   Q.   Is there anything you would like

23   to change or anything you'd like to amplify

24   with respect to the first day of your

25   deposition?

00061

1    Q.    Page 14, line 23.

2    MR. BURKE:  Thank you.

3    A.    I'd like to amplify that comment.

4    The objection to relevance and the length of

5    the question were distracting.  Of course the

6    document, by not stating complete information,

7    would not have been fair.

8    Q.    Can you just reference which

9    document we're referring to?

10    A.    The proxy statement, I'm sorry,

11    Herron Deposition Exhibit 2.

12    Q.    Okay.  Please continue.

13    A.    Fairness on the grounds of

14    completeness and accuracy.  Regarding page 30,

15    line -- the answer beginning with line eight,

16    the question was had I resigned in part in

17    protest.  Being from the 1960s, my immediate

18    image of protest is something a little more

19    violent than what I was involved with here.

20    Protest, of course, is just an expression of

21    disapproval.  And in that sense, I certainly

22    resigned in protest.

23    Q.    Do you have anything else to add

24    or clarify or amplify with respect to that

25    transcript?

00260

1   August the 2nd, 1999; is that right?

2   A.   That's correct.

3   Q.   Okay.  You never did see the final

4   definitive agreement of merger because that was

5   prepared after July 22nd; is that correct?

6   MR. BRAUTIGAM:  Objection.  It was

7   included in the proxy materials.

8   A.   Yes.  I saw it in the proxy

9   materials.

10  Q.   Okay.  As a member of the Board of

11  Directors, you never saw a definitive merger

12  agreement, correct?

13  A.   That's correct.

14  Q.   Okay.  That had not been prepared

15  as of July 22nd?

16  A.   That's correct.

17  MR. BRAUTIGAM:  Objection.  He was

18  on the Board till the 30th.

19  MR. BURKE:  Please don't testify,

20  Mr. Brautigam.

21  MR. BRAUTIGAM:  Ask --

22  BY MR. BURKE:

23  Q.   You indicated that at this

24  meeting, Mr. Brinker stated that he was in

25  favor of that transaction, correct?

00261
1   A.   Yes, sir.

2   Q.   You also indicated that from your

3   prior experience with Mr. McKiernan, you knew

4   that he was in favor of the transaction,

5   correct?

6   MR. BRAUTIGAM:  Objection.

7   Objection.

8   A.   Yes, sir.  And he voted the way I

9   expected him to vote.

10  Q.   On July the 22nd?

11  A.   Yes, sir.

12  Q.   Was there any doubt in your mind

13  that Mr. McKiernan would vote in favor of this

14  transaction at any point after July 22nd, 1999?

15  MR. BRAUTIGAM:  Objection.

16  A.   I have no doubt at all.

17  Q.   Okay.  Is there any doubt in your

18  mind after what you heard on July 22nd, 1999,

19  that Mr. Brinker was going to continue to vote

20  in favor of this transaction when he had the

21  opportunity to do so?

22  MR. BRAUTIGAM:  Objection.  Wait a

23  second.  Are you representing that he did vote

24  in favor of this transaction?

25  Q.   You may answer, Mr. Herron.

00262

1    MR. BRAUTIGAM:  Objection.  Let's

2    have the question read back, please.

3    (Record read by Reporter.)

4    MR. BRAUTIGAM:  That

5    representation is directly contrary to the

6    evidence so far.

7    Q.    You can answer, Mr. Herron.

8    A.    Contrary to what I have said in

9    the past, he voted because he was asked to

10   vote.  In all other situations, he was the

11   chairman, he was not asked to vote and, as I've

12   stated in the past, generally did not vote.

13   Q.    Okay.

14   A.    And that's different from

15   abstaining, correct?

16   MR. BRAUTIGAM:  Objection.

17   A.    Not voting?

18   Q.    Yes.

19   A.    And abstaining?  I'm sorry, I

20   don't know the difference.

21   Q.    Well, you'd indicated that Mr.

22   Brinker, during your experience, as chairman

23   did not vote unless he was asked to do so?

24   MR. BRAUTIGAM:  Objection.

25   A.    If a tie needed to be broken.

1998 OHSL 10-K
Excerpts

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

**OHSL FINANCIAL CORP.**

Date: March 24, 1999     By: /s/Kenneth L. Hanauer
                             ---------------------------------
                             Kenneth L. Hanauer, President
                                and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

/s/Kenneth L. Hanauer               /s/Norbet G. Brinker
- ----------------------------       ----------------------------
Kenneth L. Hanauer, President       Norbert G. Brinker, Chairman
   and Director                        of the Board
   (Principal Executive Officer)


Date:     March 24, 1999            Date:     March 24, 1999

/s/William R. Hillebrand            /s/Thomas M. Harron
- ----------------------------       ----------------------------
William R. Hillebrand, Director     Thomas M. Herron, Director


Date:     March 24, 1999            Date:     March 24, 1999




/s/Alvin E. Hucke                    /s/Thomas E. McKiernan
- ----------------------------       ----------------------------
Alvin E. Hucke, Director            Thomas E. McKiernan, Director


Date:     March 24, 1999            Date:     March 24, 1999


/s/Joseph J. Tenoever                /s/Howard H. Zoellner
- ----------------------------       ----------------------------
Joseph J. Tenoever, Director        Howard H. Zoellner, Director


Date:     March 24, 1999            Date:     March 24, 1999



/s/Patrick J. Condren
- ----------------------------
Patrick J. Condren, Treasurer
(Principal Financial and
 Accounting Officer)


Date:     March 24, 1999




Exhibit 11.  Earnings Per Share

The calculation of earnings per share ("EPS") is presented below. Earnings per share are calculated by dividing the Corporation's net income by the weighted average shares outstanding during the period. Weighted average shares

*Copyright 2001 10-K Wizard Technology, LLC*

KMK 01036

# 1998 PFGI 10-K
# Excerpts

- - Operating lease income and the growth in operating lease revenue is the result of three activities. First, $693.4 million of automobiles were sold and leased back during 1998 and 1997. As these automobiles are subleased to third-party consumers, lease revenue from the consumers, net of lease expense to the purchasers of the automobiles, is recognized as operating lease income. Prior to the sales-leaseback transactions, the automobiles had been accounted for as direct finance leases on which interest income was recorded. Second, Information Leasing Corporation was acquired near the end of 1996. During 1998 and 1997, Information Leasing recognized operating lease revenue of $8.6 million and $8.8 million, respectively. Finally, the continued expansion of Provident Commercial Group resulted in an increase in operating lease revenue of $4.1 million and $7.5 million during 1998 and 1997, respectively.

- - Gain on Sales of Loans and Leases -- Provident securitizes and/or sells a portion of its loans and leases, while generally retaining the servicing of these loans and leases. The proceeds from these sales permit Provident to originate a higher volume of loans and leases than would normally be possible for a company its size. The following provides detail of the gain on sales recognized during the past three years.

TABLE 7:  Gain on Sale of Loans and Leases

|  | 1998 | 1997 | 1996 |
|---|---|---|---|
|  | (In Thousands) | | |
| Gain/(Loss) Based on Cash Received: |  |  |  |
| Equipment Lease Securitization | $13,429 | $- | $- |
| Equipment Lease Residuals | 8,939 | 1,761 | 1,694 |
| Auto Lease Sales and Terminations | 7,549 | 4,804 | 2,468 |
| Conforming Residential Loan Sales | 5,077 | 6,335 | 2,266 |
| Credit Card Whole Loan Sales | 3,420 | -- | -- |
| Nonconforming Whole Loan Sales | 290 | 495 | 1,800 |
| Other Loan Sales | 447 | 156 | 328 |
| Gain/(Loss) Based on Retained Interest in Securitized Assets Received: |  |  |  |
| Nonconforming Loan Securitizations | 36,337 | 36,886 | 17,699 |
| Prime Consumer Home Equity Securitizations | 4,733 | 10,446 | -- |
|  | $80,221 | $60,883 | $26,255 |

Equipment leases of $211.3 million, originated or acquired by our Information Leasing business line, were securitized and sold during 1998. The recognized gain of $13.4 million was based on cash cash received.

18

KMK 01192

Nonconforming loans, which are generated by our Consumer Financial Services business line, have been securitized and sold on a quarterly basis since 1996. Total loans securitized and sold were $1,060 million, $844 million and $264 million in 1998, 1997 and 1996, respectively. Under these types of sales, gains or losses are determined based on a present value calculation of future cash flows, using the cash-out methodology, of the underlying loans, net of interest payments to security holders, loan loss and prepayment assumptions and normal servicing revenue. Interest income is recognized throughout the life of the securitization at the rate that the future cash flows have been discounted.

Under the securitizations, residual cash flows are retained in the securitization trusts and allowed to accumulate. These accumulated cash flows act as credit enhancement assets for the securitization trusts' security holders. Once certain targeted levels are achieved, subsequent residual cash flows are distributed to Provident on an unrestricted basis. In addition, the accumulated cash flows held within the securitization trusts will also be distributed to Provident over the term of the securitization. The cash-in method of determining the fair value of the retained interest in securitized assets discounts the projected residual cash flows at the time such cash flows are expected to be received by the securitization trust. The cash-out method of determining the fair value of retained interest in securitized assets required by the FASB and SEC discounts the projected residual cash flows at the time such cash flows are expected to be distributed to Provident.

During the first quarter of 1998, Provident changed its securitization structure as discussed in Note C to the Consolidated Financial Statements, and as a result, the calculation of gains on securitization of loans was computed using the cash-out method. Prior to 1998, the cash-in method had been used. During the fourth quarter of 1998, the Financial Accounting Standards Board and Securities and Exchange Commission indicated that the cash-out method is the only acceptable method to calculate gains. The cash-out method results in lower initial gains on the sale of loans and higher subsequent interest income from the accretion of the additional cash-out discount. As discussed in Provident's amended Form 10-K for 1997, prior years' results were restated to reflect the change in methodology.

Home equity loans have also been sold and securitized during 1998 and 1997. During 1998, $183.2 million of home equity lines of credit were sold resulting in a recognized gain of $4.7 million. During 1997, $244.5 million of home equity loans were sold providing a gain of $10.4 million.

<center>19</center>

KMK 01193

Management's estimates of the value of its investment retaining noncash loan sale gains. However, management believes it is making conservative assumptions as to anticipated prepayment speeds and credit losses. Prepayment speed assumptions for nonconforming loan securitizations have been increased, starting with a base 10% constant prepayment rate ("CPR") for unseasoned loans, and increasing during the life to a 35% CPR for sales occurring since June 30, 1998. Weighted average CPR's for all securitizations are 10.6% and 29.5% for the base CPR and ramped CPR, respectively. The average annual loan loss assumption is 1.06% and the total loan loss to loans sold is 3.25%.

No assurance can be provided that the level of loan originations and acquisitions, along with a favorable interest rate market, will continue to permit the recognition of such gains on sales of loans in future years.

-- Security Gains -- Security gains increased during 1998 and 1997 as a result of management's decision to adopt a more active portfolio management style and to take advantage of interest rate movements.

-- Other -- The largest components of revenue within other income have been income from investment in partnerships ($1.7 million in 1998 and 2.9 million in 1997) and the receipt of additional consideration related to a loan that had been restructured ($4.0 million in 1997 and $10.0 million in 1996).

Noninterest Expense

Table 8 details the components of noninterest expense and their change since 1996:

TABLE 8:  Noninterest Expense

| | 1998 | 1997 | 1996 | Percentage Increase (Decrease) | |
| | | | | 1998/97 | 1997/96 |
|---|---|---|---|---|---|
| | | (In Thousands) | | | |
| Salaries and Employee Benefits | $124,639 | $101,454 | $79,830 | 22.9% | 27.1% |
| Depreciation on Operating Lease Equipment | 21,662 | 17,667 | 7,221 | 22.6 | 144.7 |
| Occupancy | 16,951 | 12,744 | 9,673 | 33.0 | 31.7 |
| Professional Services | 18,276 | 14,912 | 11,463 | 22.6 | 30.1 |
| Equipment Expense | 20,771 | 15,208 | 11,348 | 36.6 | 34.0 |
| Charges and Fees | 14,317 | 12,652 | 8,583 | 13.2 | 47.4 |
| Marketing | 9,624 | 7,890 | 5,103 | 22.0 | 54.6 |
| Other | 54,161 | 43,451 | 33,780 | 24.6 | 28.6 |
| Noninterest Expense Before Significant and Unusual Items | 280,401 | 225,978 | 167,001 | 24.1 | 35.3 |
| Special Charges and Exit Costs | 22,005 | - | - | - | - |
| One-Time Deposit Insurance Charge | - | - | 8,161 | - | - |
| | $302,406 | $225,978 | $175,162 | 33.8% | 29.0% |

Noninterest expense before significant and unusual items increased $54.4 million (24%) and $59.0 million (35%) during 1998 and 1997, respectively. Components of noninterest expense, along with an explanation as to their fluctuations, follow:

20

KMK 01194

# 03-31-99
# PFGI 10-Q Excerpt

PROVIDENT FINANCIAL GROUP, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF INCOME
(Unaudited)
(In Thousands, Except Per Share Amounts)

| | Three Months Ended March 31, | |
|---|---|---|
| | 1999 | 1998 |
| **Interest Income:** | | |
| Interest and Fees on Loans and Leases | $131,582 | $123,142 |
| Interest on Investment Securities | 24,588 | 23,157 |
| Other Interest Income | 1,305 | 887 |
| Total Interest Income | 157,475 | 147,186 |
| **Interest Expense:** | | |
| Interest on Deposits: | | |
| Savings and Demand Deposits | 13,245 | 10,798 |
| Time Deposits | 41,923 | 43,888 |
| Total Interest on Deposits | 55,168 | 54,686 |
| Interest on Short-Term Debt | 14,906 | 12,886 |
| Interest on Long-Term Debt | 12,471 | 10,772 |
| Interest on Junior Subordinated Debentures | 2,166 | 2,166 |
| Total Interest Expense | 84,711 | 80,510 |
| Net Interest Income | 72,764 | 66,676 |
| Provision for Loan and Lease Losses | 12,900 | 5,000 |
| Net Interest Income After Provision for Loan and Lease Losses | 59,864 | 61,676 |
| **Noninterest Income:** | | |
| Service Charges on Deposit Accounts | 7,264 | 6,412 |
| Other Service Charges and Fees | 13,447 | 14,958 |
| Operating Lease Income | 8,898 | 9,054 |
| Gain on Sales of Loans and Leases | 31,839 | 13,526 |
| Security Gains (Losses) | (7) | 3,692 |
| Other | 3,126 | 2,063 |
| Total Noninterest Income | 64,567 | 49,705 |
| **Noninterest Expense:** | | |
| Salaries, Wages and Benefits | 34,980 | 29,337 |
| Depreciation on Operating Lease Equipment | 4,725 | 5,282 |
| Occupancy | 4,208 | 3,807 |
| Equipment Expense | 5,302 | 4,231 |
| Professional Fees | 3,635 | 3,973 |
| Charges and Fees | 3,732 | 2,394 |
| Other | 15,715 | 15,607 |
| Total Noninterest Expense | 72,297 | 64,631 |
| Income Before Income Taxes | 52,134 | 46,750 |
| Applicable Income Taxes | 18,379 | 16,090 |
| Net Income | $33,755 | $30,660 |
| **Per Common Share:** | | |
| Basic Earnings Per Share | $.79 | $.71 |
| Diluted Earnings Per Share | .76 | .68 |
| Cash Dividends Declared | .22 | .20 |

See notes to consolidated financial statements.

4

*Copyright 2001 10-K Wizard Technology, LLC*

KMK 01257

Noninterest Income

The following table details the components of noninterest income and
their change for the first quarters of 1999 and 1998 (dollars in
thousands):

| | Three Months Ended March 31, | | |
| | 1999 | 1998 | Pctg Change |
|---|---|---|---|
| Service Charges on Deposit Accounts | $7,264 | $6,412 | 13.3% |
| Other Service Charges and Fees | 13,447 | 14,958 | (10.1) |
| Operating Lease Income | 8,898 | 9,054 | (1.7) |
| Gain on Sales of Loans and Leases | 31,839 | 13,526 | 135.4 |
| Security Gains (Losses) | (7) | 3,692 | (100.2) |
| Other | 3,126 | 2,063 | 51.5 |
| Total Noninterest Income | $64,567 | $49,705 | 29.9 |

Noninterest income for the first quarter of 1999 increased by $14.9
million, or 30%, from the prior year first quarter. Explanations for
significant changes in noninterest income by category follow:

- - Service charges on deposit accounts increased $0.9 million due
  primarily from pricing and volume increases of corporate and
  personal demand deposit accounts. Also ATM surcharges have increased
  due to the placement of ATMs in Wal-mart and Sam's Club stores.

- - Other service charges and fees decreased $1.5 million as the first
  quarter of 1998 included gains on the sale of stock and stock
  warrants of commercial loan customers which had been received as
  part of the loan fee structure. Offsetting this decrease was an
  increase in loan servicing fees principally resulting from the 1998
  nonconforming and warehouse lending loan sales and the auto sale-
  leaseback transactions.

18

*Copyright 2001 10-K Wizard Technology, LLC*

KMK 01271

- - Gain on sales of loans and leases increased $18.3 million during the first quarter of 1999 as compared to the first quarter of 1998. The following table provides detail of the gain on sales recognized during the first quarters of 1999 and 1998 (in thousands):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 1999 | 1998 |
| Gain/(Loss) Based on Cash Received: |  |  |
| Equipment Lease Securitization | $6,914 | $- |
| Equipment Lease Residuals | 2,642 | 230 |
| Auto Lease Sales and Terminations | 1,925 | 623 |
| Conforming Residential Loan Sales |  |  |
| Servicing Released | 873 | 634 |
| Nonconforming Whole Loan Sales | 141 | 169 |
| Credit Card Whole Loan Sales | - | 3,238 |
| Other Loan Sales | 20 | 781 |
| Gain/(Loss) Based on Retained Interest in Securitized Asset Received: |  |  |
| Nonconforming Loan Securitizations | 19,324 | 7,851 |
|  | $31,839 | $13,526 |

During the first quarter of 1999, $116 million of equipment leases, originated or acquired by the Information Leasing Corporation unit, were securitized and sold. This sale generated a cash gain of $6.9 million. During the first quarter of 1998, $38 million of credit cards receivables were sold servicing released resulting in a cash gain of $3.2 million.

Nonconforming residential loans, originated or acquired by the Provident Consumer Financial Services business line, have been securitized and sold on a quarterly basis since 1996. Major characteristics of these nonconforming loans include: 85% with "B" credit grade or better; 65% with full documentation and 10% to 15% with reduced documentation; 65% have prepayment penalties; 95% are secured by first mortgages; 90% are owner occupied; and, on average, have a 75% loan-to-value ratio. Total loans securitized and sold were $515 million and $200 million in the first quarter of 1999 and 1998, respectively. Under these types of sales, gains or losses are determined based on a present value calculation of future cash flows, using the cash-out methodology, of the underlying loans, net of interest payments to security holders, loan loss and prepayment assumptions and normal servicing revenue. Interest income is recognized throughout the life of the securitization at the rate that the future cash flows have been discounted.

19

*Copyright 2001 10-K Wizard Technology, LLC*

KMK 01272

06-30-99
PFGI 10-Q Excerpt

PROVIDENT FINANCIAL GROUP, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF INCOME
(Unaudited)
(In Thousands, Except Per Share Amounts)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 1999 | 1998 | 1999 | 1998 |
| Interest Income: | | | | |
| Interest and Fees on Loans and Leases | $135,716 | $127,346 | $267,298 | $250,488 |
| Interest on Investment Securities | 25,669 | 27,009 | 50,257 | 50,166 |
| Other Interest Income | 1,508 | 944 | 2,813 | 1,831 |
| Total Interest Income | 162,893 | 155,299 | 320,368 | 302,485 |
| Interest Expense: | | | | |
| Interest on Deposits: | | | | |
| Savings and Demand Deposits | 13,099 | 12,429 | 26,344 | 23,227 |
| Time Deposits | 42,865 | 42,811 | 84,788 | 86,699 |
| Total Interest on Deposits | 55,964 | 55,240 | 111,132 | 109,926 |
| Interest on Short-Term Debt | 15,220 | 18,306 | 30,126 | 31,192 |
| Interest on Long-Term Debt | 10,822 | 10,761 | 23,293 | 21,533 |
| Interest on Junior Subordinated Debentures | 2,226 | 2,165 | 4,392 | 4,331 |
| Total Interest Expense | 84,232 | 86,472 | 168,943 | 166,982 |
| Net Interest Income | 78,661 | 68,827 | 151,425 | 135,503 |
| Provision for Loan and Lease Losses | 8,050 | 5,000 | 20,950 | 10,000 |
| Net Interest Income After Provision for Loan and Lease Losses | 70,611 | 63,827 | 130,475 | 125,503 |
| Noninterest Income: | | | | |
| Service Charges on Deposit Accounts | 7,867 | 6,789 | 15,131 | 13,201 |
| Other Service Charges and Fees | 17,867 | 13,843 | 31,314 | 28,801 |
| Operating Lease Income | 10,334 | 9,405 | 19,232 | 18,459 |
| Gain on Sales of Loans and Leases | 20,263 | 21,023 | 52,102 | 34,549 |
| Security Gains | 113 | 2,024 | 106 | 5,716 |
| Other | 2,473 | 3,747 | 5,599 | 5,810 |
| Total Noninterest Income | 58,917 | 56,831 | 123,484 | 106,536 |
| Noninterest Expense: | | | | |
| Salaries, Wages and Benefits | 34,417 | 31,569 | 69,397 | 60,906 |
| Depreciation on Operating Lease Equipment | 5,578 | 5,242 | 10,303 | 10,524 |
| Occupancy | 4,348 | 4,104 | 8,556 | 7,911 |
| Equipment Expense | 5,853 | 4,783 | 11,155 | 9,014 |
| Professional Fees | 4,985 | 4,341 | 8,620 | 8,314 |
| Charges and Fees | 3,437 | 3,607 | 7,169 | 6,001 |
| Other | 16,044 | 17,258 | 31,759 | 32,865 |
| Total Noninterest Expense | 74,662 | 70,904 | 146,959 | 135,535 |
| Income Before Income Taxes | 54,866 | 49,754 | 107,000 | 96,504 |
| Applicable Income Taxes | 19,340 | 17,364 | 37,719 | 33,454 |
| Net Income | $35,526 | $32,390 | $69,281 | $63,050 |
| Per Common Share: | | | | |
| Basic Earnings Per Share | $.83 | $.75 | $1.62 | $1.46 |
| Diluted Earnings Per Share | .80 | .72 | 1.56 | 1.40 |
| Cash Dividends Declared | .22 | .20 | .44 | .40 |

See notes to consolidated financial statements.

- 4 -

Copyright 2001 10-K Wizard Technology, LLC

KMK 01289

PROVIDENT FINANCIAL GROUP, INC. AND SUBSIDIARIES
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
RESULTS OF OPERATIONS

Noninterest Income

The following table details the components of noninterest income and
their change for the second quarter and first six-month periods of
1999 and 1998 (dollars in thousands):

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 1999 | 1998 | Pctg Change | 1999 | 1998 | Pctg Change |
| Service Charges on Deposit Accounts | $7,867 | $6,789 | 15.9% | $15,131 | $13,201 | 14.6% |
| Other Service Charges and Fees | 17,867 | 13,843 | 29.1 | 31,314 | 28,801 | 8.7 |
| Operating Lease Income | 10,334 | 9,405 | 9.9 | 19,232 | 18,459 | 4.2 |
| Gain on Sales of Loans and Leases | 20,263 | 21,023 | (3.6) | 52,102 | 34,549 | 50.8 |
| Security Gains | 113 | 2,024 | (94.4) | 106 | 5,716 | (98.1) |
| Other | 2,473 | 3,747 | (34.0) | 5,599 | 5,810 | (3.6) |
| Total Noninterest Income | $58,917 | $56,831 | 3.7 | $123,484 | $106,536 | 15.9 |

Noninterest income for the three-month and six-month periods ended
June 30, 1999 increased by $2.1 million and $16.9 million,
respectively, over the comparable periods in 1998. Explanations for
significant changes in noninterest income by category follow:

- Service charges on deposit accounts increased $1.1 million and $1.9
  million in the quarterly and six-month comparisons. The increases
  for both periods were a result of pricing and volume increases on
  corporate and personal demand deposit accounts. Also ATM surcharges
  have risen due to the placement of ATMs in Wal-mart and Sam's Club
  stores.

- Other service charges and fees increased $4.0 million and $2.5
  million in the quarterly and six-month comparisons. The higher
  revenue was primarily due to increases in loan servicing fees, from
  the nonconforming, warehouse lending and auto sale-leaseback
  securitization transactions, credit card fees and trust fees.
  Offsetting these higher fees were reduced stock and warrant gains,
  which had been received as part of certain loan fee structures.

- 20 -

KMK 01306

*Copyright 2001 10-K Wizard Technology, LLC*

**PROVIDENT FINANCIAL GROUP, INC. AND SUBSIDIARIES**
**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND**
**RESULTS OF OPERATIONS**

- Gain on sales of loans and leases decreased $.8 million during the
  second quarter of 1999 as compared to the second quarter of 1998,
  but increased $17.6 million during the first half of 1999 as
  compared to the first half of 1998. The following table provides
  detail of the gain on sales recognized during the second quarter and
  first six month periods of 1999 and 1998 (in thousands):

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 1999 | 1998 | 1999 | 1998 |
| **Cash Gains -- Lease Terminations:** |  |  |  |  |
| Equipment Lease Residual Sales | $1,019 | $4,979 | $3,661 | $5,209 |
| Auto Lease Sales and Terminations | 700 | 2,765 | 2,625 | 3,388 |
|  | 1,719 | 7,744 | 6,286 | 8,597 |
| **Cash Gains -- Loan and Lease Sales:** |  |  |  |  |
| Equipment Lease Securitization | - | - | 6,914 | - |
| Conforming Residential Whole Loan Sales | 576 | 1,474 | 1,449 | 2,108 |
| Nonconforming Residential Whole Loan Sales | - | 75 | 141 | 244 |
| Credit Card Whole Loan Sales | - | 247 | - | 3,485 |
| Other Loan Sales | 301 | 744 | 321 | 1,525 |
|  | 877 | 2,540 | 8,825 | 7,362 |
| **Non-cash Gains -- Loan and Lease Sales:** |  |  |  |  |
| Nonconforming Residential Loan Securitizations | 14,372 | 10,739 | 33,696 | 18,590 |
| Credit Card Loan Securitizations | 3,295 | - | 3,295 | - |
|  | 17,667 | 10,739 | 36,991 | 18,590 |
|  | $20,263 | $21,023 | $52,102 | $34,549 |

Significant loan and lease sales occurring in 1999 and 1998 follow:

- During the first six months of 1999, $1.0 billion of
  nonconforming residential loans were securitized and sold
  resulting in non-cash gains of $33.7 million, a gain to loans
  sold ratio of 3.27%. During the first six months of 1998, $435
  million of nonconforming residential loans were sold producing
  non-cash gains of $18.6 million, a gain to loans sold ratio of
  4.27%. The lower gain to loans sold ratio for 1999 was due
  primarily to more conservative assumptions and higher funding
  costs.
- Credit card receivables of $185.0 million were securitized and
  sold in the second quarter of 1999, generating a non-cash gain of
  $3.3 million.
- Equipment leases totaling $115.0 million were sold during the
  first quarter of 1999, resulting in a cash gain of $6.9 million.
- A cash gain of $3.2 million was recognized on $38.3 million of
  credit card whole loan sales during the first quarter of 1998.

- 21 -

*Copyright 2001 10-K Wizard Technology, LLC*

PROVIDENT FINANCIAL GROUP, INC. AND SUBSIDIARIES
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
RESULTS OF OPERATIONS

Nonconforming residential loans, originated or acquired by the
Provident Consumer Financial Services business line, have been
securitized and sold on a quarterly basis since 1996. Major
characteristics of these nonconforming loans include: 60% with "A"
credit grade and 25% with "B" credit grade; 65% with full
documentation and 10% with reduced documentation; 65% have prepayment
penalties; 95% are secured by first mortgages; 90% are owner occupied;
and, on average, have a 78% loan-to-value ratio.

Loan sales through securitizations permit Provident to enhance
operating profits, provide for immediate cash flows to fund additional
loan originations, and provide for future cash flows generated by the
interest payment differentials between interest paid by the borrowers
and remitted to the investors. Total loans securitized and sold were
$515 million and $235 million in the second quarter of 1999 and 1998,
respectively. The methodology used by Provident to calculate gains on
sale of these securities follow:

1) An amortization schedule is created for the loan portfolio based on
   each loan's maturity, rate and balance.
2) The amortization schedule is adjusted using a prepayment speed
   curve. The prepayment curve estimates the actual timing of principal
   payments by mortgage borrowers.
3) The net spread is calculated on the loan portfolio by taking the
   cash inflows (loan portfolio yield and prepayment penalties) and
   reducing it by the cash outflows (bond yield paid to investors,
   servicing fees and other fees). Prepayments reduce the average life
   of the portfolio, which in turn reduces the net spread collected by
   Provident.
4) The present value of the net spread is calculated by applying a
   discount rate indicative of the risk associated with the
   transaction.
   - In traditional credit enhancement structures, the net spread is
     used to create excess collateral as credit support. In these
     transactions, cash flow to Provident is delayed until the target
     over-collateralization is met and cash is released. This delay in
     cash receipts reduces the present value.
   - Beginning with the March 1998 securitization, Provident has
     provided credit enhancement in the form of a cash reserve
     account. Therefore Provident does not experience delays in cash
     receipts. The spread is not subordinated to the losses. Losses
     are paid directly from the cash reserve account instead of
     reducing the net spread. In addition the cash reserve account is
     placed in a noninterest bearing checking account at Provident,
     whereby no cash outlay is experienced in the funding of the
     account.
5) The gain is calculated by taking the present value of the net spread
   and reducing it by the present value of the expected credit losses,
   underwriting expenses, accounting and legal fees and deferred
   expenses paid to originate the loans.

- 22 -

*Copyright 2001 10-K Wizard Technology, LLC*