Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 92,000
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 1

United States District Court,
S.D. Ohio.

FIDEL, et al.,
v.
AK STEEL HOLDING CORP., et al.

No. C-1-00-320.

Sept. 19, 2002.

Opinion

WEBER, Senior J.

ORDER

*1 This matter is before the Court upon a motion to dismiss filed on behalf of all Defendants except James F. Will [FN1] (Doc. 18), and upon Defendant Will's separate motion to dismiss. (Doc. 19).

FN1. Those Defendants include AK Steel Holding Corporation, Armco Inc., Richard M. Wardrop, Jr., James L. Wareham, James I. Wainscott, John G. Hritz, Allen Born, Bonnie G. Hill, Robert H. Jenkins, Lawrence A. Leser, Robert E. Northam, Cyrus Tang and James A. Thomson. (*See* Doc. 13).

Procedural History/The Parties' Claims

On April 19, 2000, Plaintiff Bernard Fidel filed a complaint styled as a shareholders' class action against AK Steel Holding Corporation and various officers and directors of that company [collectively, "the AK Steel Defendants"]; Armco Inc. ["Armco"]; and James F. Will, Armco's former President, Chief Executive Officer and Board of Directors Chairman. (*See* Doc. 1). By order dated June 14, 2000, this Court consolidated that action with Case No. C-1-00-349, a similar action filed by Plaintiff Al Shams. (*See* Docs. 3, 4). By order dated July 28, 2000, the Court appointed Plaintiffs Fidel and Ironwood Capital Management ["Ironwood"] as lead plaintiffs on behalf of the putative class. (*See* Doc. 11).

On August 28, 2000, the designated lead plaintiffs filed a consolidated amended complaint, asserting a class action on behalf of those who purchased or otherwise acquired AK Steel publicly-traded securities between July 15, 1999 and January 25, 2000, as well as a sub-class of those who held shares in Armco Inc. as of August 25, 1999. (*See* Doc. 13). Plaintiffs allege that Defendants made false and misleading statements or failed to disclose material facts, thereby artificially inflating the price of AK Steel stock during the class period. They further allege that Defendant AK Steel acquired Defendant Armco on September 30, 1999, in a stock-for-stock acquisition also based on AK Steel stock's artificially inflated price. Claiming that Defendants' actions violated federal securities law, Plaintiffs seek damages, interest, costs and attorneys' fees.

On October 20, 2000, the AK Steel Defendants and Armco moved to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) and the provisions of the Private Securities Litigation Reform Act of 1995 ["PSLRA"], 15 U.S.C. § § 77z, 78u. (Doc. 18). Said Defendants urge that Plaintiffs have failed to demonstrate that Defendants made any material misrepresentation or omission; that Defendants' "forward-looking statements" regarding AK Steel's projected economic performance are insufficient to establish liability under the PSLRA; and that Plaintiffs have not met the requisite standard for pleading scienter under the PSLRA.

On October 23, 2000, Defendant Will filed a separate motion to dismiss on similar grounds. (Doc. 19). Noting that he is implicated only as to the third claim of the amended complaint (*see* Doc. 13, PP 99-103), Defendant Will argues that the content of the Joint Proxy Statement/Prospectus on which that claim relies is not actionable.

Plaintiffs filed a memorandum in opposition to both motions to dismiss. (Doc. 23). They argue that the allegations of the amended complaint are sufficiently particularized to meet the standard for pleading securities fraud; that Defendants had a duty, but failed, to disclose negative information; and that Defendants' "truth on the market" defense must be resolved by the trier of fact and thus is not appropriate on a motion to dismiss. Additionally,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
Fed. Sec. L. Rep. P 92,000  
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 2

Plaintiffs urge that Defendants' statements are protected by neither the PSLRA's "safe harbor" provision nor the "bespeaks caution" doctrine; that Defendants can be held liable for their statements to securities analysts without proof of the elements of the entanglement doctrine; and that the complaint adequately pleads scienter.

*2 In both their opposing memorandum and a separate motion to strike (*see* Doc. 24), Plaintiffs also argue that the Court should not consider certain exhibits proffered in support of Defendants' motions to dismiss. Plaintiffs argue that two purported transcripts of conference calls between AK Steel representatives and industry analysts (*see* Doc. 18, Affidavit of David C. Horn, Exhs. 2 & 3), as well as a purported press release issued by Armco Inc. (*see id.*, Exh. 17), constitute matters outside the pleadings which are not appropriate for consideration on a motion to dismiss.

Although the Court denied the motion to strike as an inappropriate remedy (*see* Doc. 37), Plaintiffs' arguments opposing consideration of those exhibits at this juncture remain before the Court as to the motions to dismiss. In response, the AK Steel Defendants argue that the conference call transcripts reflect the content of the conference calls referred to in the allegations of Plaintiffs' complaint, and that the press release simply records a fact of which the Court could take judicial notice. (Doc. 27). Said Defendants also have submitted copies of the actual tape recordings of such conference calls, to address any objections regarding accuracy or authenticity. (*See* Doc. 28).

The parties' subsequent submissions (*see* Docs. 31, 32) regarding the intervening decision in *Helwig v. Vencor*, 251 F.3d 540 (6th Cir.2001) *(en banc)*, *cert. dismissed*, 122 S.Ct. 2616, 153 L.Ed.2d 800 (2002), previously were accepted by the Court (*see* Doc. 34) and have been considered herein.

### Standard of Review Applicable to Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) authorizes motions to dismiss for failure to state a claim upon which relief can be granted. When deciding a 12(b)(6) motion, the Court must accept all well-pleaded allegations of the complaint as true, *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987), and must construe them in the light most favorable to the plaintiff. *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir.1995), *cert. denied*, 516 U.S. 1158 (1996). *See also Operation Badlaw, Inc. v. Licking Co. Gen. Health Dist. Bd. Of Health*, 866 F.Supp. 1059 (S.D.Ohio 1992), *aff'd*, 991 F.2d 796 (6th Cir.1993). If an allegation is susceptible to more than one inference, the allegation must be construed in the plaintiff's favor. *Columbia Natural Resources*, 58 F.3d at 1109. Dismissal must be granted if plaintiffs can prove no set of facts in support of their claims that would permit them to recover. *Conley v. Gibson*, 355 U.S. 41, 45- 46, 2 L.Ed.2d 80, 78 S.Ct. 99 (1957); *Carter by Carter v. Cornwell*, 983 F.2d 52, 54 (6th Cir.1993).

Allegations of securities fraud must satisfy the requirements of Fed.R.Civ.P. 9(b). *In re Comshare, Inc. Securities Litigation*, 183 F.3d 542, 548 (6th Cir.1999). Under Rule 9(b), a plaintiff averring fraud or mistake must state with particularity the circumstances which constitute such. *Id.* Courts must stay all discovery and other proceedings upon the filing of a motion to dismiss in any private action under the Securities Act of 1933 or 1934, absent compelling circumstances. *See* 15 U.S.C. §§ 77z-1(b), 78u- 4(b)(3)(B).

### Law Applicable to Plaintiffs' Securities Fraud Claims
#### a. The Elements of Securities Fraud

*3 The Securities Act of 1933 ["the 1933 Act"] recognizes a private right of action based upon untrue statements or omissions of material fact in security registration statements. *See* 15 U.S.C. § 77k. The 1933 Act also extends liability for such statements or omissions to "controlling persons," defined as including "every person who, by or through stock ownership, agency or otherwise ...," controls any person liable under 15 U.S.C. § 77k. *See* 15 U.S.C. § 77o.

The Securities Exchange Act of 1934 ["the 1934 Act"] further precludes the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities, as well as the solicitation of proxies in contravention of applicable securities rules and regulations. *See* 15 U.S.C. §§ 78j(b), 78n(a). Like the 1933 Act, the 1934 Act imposes liability for such violations on "controlling

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 92,000
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 3

persons." *See* 15 U.S.C. § 78t(a). A plaintiff can hold individual defendants liable under a "controlling persons" theory of liability only if the defendants were "controlling persons" of an entity that has violated the Securities Act. *Comshare,* 183 F.3d at 554, n. 11 (*citing Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983)). If the Court concludes that plaintiffs have not stated a claim that the defendant company violated the Securities Act, the Court need not reach the plaintiffs' claim to "controlling person" recovery.

In addition, Rule 10b-5 of the Rules and Regulations applicable to the 1934 Act provides as follows:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. In essence, Section 10(b) of the 1934 Act and the corollary rule "have the effect of prohibiting the commission of fraud in connection with the sale or purchase of securities." *In re Sofamor Danek Gp., Inc.,* 123 F.3d 394, 400 (6th Cir.1997), *cert. denied,* 523 U.S. 1106 (1998).

In order to state a claim for relief under these sections, a claimant must allege, in connection with the purchase or sale of securities, (1) the misstatement or omission of a material fact, (2) made with scienter, (3) upon which the plaintiff justifiably relied, and (4) which proximately caused the plaintiff's injury. *Comshare,* 183 F.3d at 548. In a case where fraud on the market is alleged, plaintiffs are presumed to have relied on the stock price established by the market. *Basic Inc. v. Levinson,* 485 U.S. 224, 247, 99 L.Ed.2d 194, 108 S.Ct. 978 (1988).

*4 To satisfy the requirement of a misstatement or omission of material fact, plaintiff must allege facts showing that the defendant made an untrue statement of material fact, or failed to state a material fact necessary to make the statements not misleading. 17 C.F.R. § 240.10b-5. A statement or omission is material only if a reasonable investor would consider it important in determining whether to buy or sell stock. *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir.1997) (*citing TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 48 L.Ed.2d 757, 96 S.Ct. 2126 (1976), and *Basic,* 485 U.S. at 231-32). Whether information is material depends on the other information already available to the market. Unless the statement significantly altered the total mix of information available, it will not be considered material. *Sofamor,* 123 F.3d at 400 (*citing Levinson,* 485 U.S. at 232).

Under the securities laws, certain types of statements are considered not to be materially misleading. Vague statements of corporate optimism as to future performance are not considered material, but rather are deemed mere "puffing." *Grossman,* 120 F.3d at 1119. Statements considered to be mere puffing typically are forward-looking statements or generalized statements of optimism not capable of objective verification. *Id.* Such vague optimistic statements are not actionable under the securities laws because reasonable investors would not rely on them in making investment decisions. *Id.; In re Sirrom Capital Corp. Securities Litigation,* 84 F.Supp.2d 933, 943 (M.D.Tenn.1999)(*citing Alfus v. Pyramid Technology Corp.,* 745 F.Supp. 1511, 1519 (N.D.Cal.1990)). In contrast, predictions which are worded as guarantees or are supported by specific factual assertions generally are not regarded as puffing. *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101, 1122 (W.D.Mich.1996). Combining puffery with accurate historical statements does not render the puffery material. *Id.*

In general, the securities laws do not require the disclosure of "soft information." "Soft information" is defined as "statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward-looking statements, such as projections, estimates, and forecasts." *Stavroff v. Meyo,* 987 F.Supp. 987, 994 (N.D.Ohio 1995), *aff'd,* 129 F.3d 1265 (6th Cir.1997)(*citing Craftmatic*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
Fed. Sec. L. Rep. P 92,000  
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 4

*Sec. Litigation v. Kraftsow,* 890 F.2d 628, 642 (3d Cir.1989)). Soft information includes predictions and matters of opinion. *Sofamor,* 123 F.3d at 401. Such information must be disclosed "only if [it is] virtually as certain as hard facts." *Id.* at 402. Statements of opinion may be actionable if the speaker knows that the opinion is untrue at the time it is expressed or if the speaker does not believe the opinion and it is not factually well-grounded. *Mayer v.. Mylod,* 988 F.2d 635, 639 (6th Cir.1993); *Grossman,* 120 F.3d at 1120 n. 6 (citing *Virginia Bankshares, Inc. v. Sandberg,* 501 U .S. 1083, 1093, 115 L.Ed.2d 929, 111 S.Ct. 2749-94 (1991)). Whether a statement in fact is true or false is not an issue to be decided on a motion to dismiss. *Mayer,* 988 F.2d at 639.

*5 Statements also may be considered immaterial under the common law "bespeaks caution" doctrine. That doctrine holds that potentially material economic predictions generally are not actionable if accompanied by sufficient cautionary language. *Mayer,* 988 F.2d at 639; *Sinay,* 948 F.2d at 1040. However, "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *Sandberg,* 501 U.S. at 1097. To be sufficient, the cautionary statements must be substantive and tailored to the specific future projections or opinions alleged to be misleading. *Picard Chemical,* 940 F.Supp. at 1122-23 (citing *In re Donald J. Trump Casino Sec. Litigation,* 7 F.3d 357, 371-72 (3d Cir.1993)). The bespeaks caution doctrine properly may be applied in considering a motion to dismiss. *Grossman,* 120 F.3d at 1120 n. 7 (citations omitted).

Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty to disclose. *Sofamor,* 123 F.3d at 400 (citing *Basic,* 485 U.S. at 239, n. 17). Even when a person is not under an independent duty to provide information, he assumes a duty to provide complete and non-misleading information with respect to subjects on which he undertakes to speak. *See Rubin v. Schottenstein, Zox & Dunn,* 143 F.3d 263, 268 (6th Cir.1998). Accordingly, while a complaint that alleges mere corporate mismanagement does not state a claim under the Exchange Act, *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477, 51 L.Ed.2d 480, 97 S.Ct. 1292 (1977), several courts have recognized a securities fraud claim where the plaintiff alleges that the defendant made certain statements despite knowing that existing mismanagement made those statements false or misleading. *See Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1473 (N.D.Ga.1997); *In re Wells Fargo Securities Litigation,* 12 F.3d 922, 927 (9th Cir.1993), cert. denied, 513 U.S. 917 (1994); *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 282 (3d Cir.1992), cert. denied, 506 U.S. 934 (1992).

b. The Private Securities Litigation Reform Act

The Private Securities Litigation Reform Act of 1995 ["the PSLRA"] was enacted to address Congress's perception that Rule 9(b) had "not prevented abuse of the securities laws by private litigants." *See Comshare,* 183 F.2d at 548 (citing H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 818). Through the PSLRA, Congress sought to establish exacting requirements for stating a cause of action for securities fraud. In actions premised upon an alleged untrue statement or omission of a material fact, plaintiffs are required to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation ... is made on information and belief, ... [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). If plaintiffs establish that the defendant made a misstatement or omission of material fact in connection with the purchase or sale of securities, plaintiffs also must establish that the defendant acted with the requisite scienter, *i.e.,* they must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see also Helwig,* 251 F.3d at 566. The PSLRA therefore requires a plaintiff to plead facts giving rise to a "strong inference" of scienter. *Comshare,* 183 F.3d at 549. If a plaintiff does not meet this requirement, the Court may dismiss the complaint. 15 U.S.C. § 78u-4(b)(3).

*6 In *Comshare,* the Sixth Circuit generally noted that the PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case, but instead changed what a plaintiff must plead in the complaint to survive a motion to dismiss. *Comshare,* 183 F.3d at 548-49. The Court

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 92,000
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 5

concluded that a plaintiff may survive a motion to dismiss a securities fraud claim by pleading facts that give rise to a strong inference of recklessness, a mental state akin to conscious disregard. *Id.* at 550, 552. The Sixth Circuit acknowledged, however, that the PSLRA did change the standard of liability as to certain forward-looking statements, requiring plaintiffs to show intent or "actual knowledge" on the part of the defendant alleged to have made the misleading or untrue forward-looking statement. *Id.* at 549 n. 5. Thus, as to those statements, the PSLRA requires that a plaintiff plead facts giving rise to a strong inference of actual knowledge. Because *Comshare* did not involve forward-looking statements, its determination that a plaintiff may survive a motion to dismiss a securities fraud claim by pleading facts that give rise to a strong inference of recklessness is reconcilable with the PSLRA's "actual knowledge" standard of liability for forward-looking statements as defined under the statute.

Plaintiffs may not plead scienter by alleging facts merely establishing that defendant had a motive and opportunity to commit securities fraud if those facts do not establish simultaneously that defendant acted with the requisite state of mind. *Id.* at 550. Facts regarding motive and opportunity, however, may be "relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred," and "may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct." *Id.* at 551.

Allegations in *Comshare* that the individual defendants stood to receive greater compensation if the company's stock prices increased and that the individual defendants had profited by selling many of their shares at artificially inflated prices during the class period "tended to illustrate that Defendants had the motive and opportunity to commit securities fraud." *Id.* at 553. The Court there found that while the plaintiffs' allegations might give rise to a strong inference that the individual defendants had a motive and opportunity to commit securities fraud and could be relevant on the issue of recklessness, the allegations in that case did not give rise to a strong inference that defendant acted with recklessness or that the errors at the heart of that case were "so obvious that any reasonable man would have known of [them]." *Id.* Further, the Court rejected the plaintiff's claim that subsequent revelation that prior statements were false implied scienter, since "mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Id.* at 554 (citing *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 84 (2d Cir.1999)). The Court concluded that because plaintiffs had failed to plead facts to show that the revenue recognition errors should have been obvious to Comshare or that Comshare consciously disregarded "red flags" which would have revealed the errors prior to their inclusion in public statements, the complaint failed to allege facts giving rise to a strong inference of scienter under § 10(b) and Rule 10b-5. *Id.*

c. The "Safe Harbor" Provisions

*7 The PSLRA also creates a "safe harbor" to protect from attack "forward- looking statements" made by an issuer subject to securities reporting requirements, by an officer, director or employee of such issuer, or by an outside reviewer retained by such issuer. 15 U.S.C. § 78u-5(c)(1)(B). The provision applies to all such forward-looking statements except those proven to have been made with "actual knowledge ... that the statement was false or misleading." *Id.* Oral or written statements are protected under this safe harbor if (1) they are identified as forward-looking when made and are accompanied by cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement (§ 78u-5(c)(1)(A)(I)); (2) they are immaterial (§ 78u- 5(c)(1)(A)(ii)); or (3) plaintiff cannot prove that the speaker had actual knowledge that the statement was false or misleading when made. § 78u- 5(c)(1)(B).

Section 78u-5(c)(1)(A) is satisfied for an oral forward-looking statement if the statement is accompanied by a cautionary statement that (i) the oral statement is a forward-looking statement, and (ii) actual results might differ materially from those projected (15 U.S.C. § 78u-5(c)(2)(A)), and (i) if the forward-looking statement is accompanied by an oral statement stating that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, (ii) the oral statement identifies the document, and (iii) the information in the written document is a cautionary statement that satisfies

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                                                  Page 6
Fed. Sec. L. Rep. P 92,000
(Cite as: 2002 WL 31545952 (S.D.Ohio))

(1)(A). 15 U.S.C. § 78u-5(c)(2)(B). A readily available document is one filed with the Securities and Exchange Commission or generally disseminated. § 78u-5(c)(3).

Title 15 U.S.C. § 78u-5(I)(1) identifies a forward-looking statement as any of the following:
  (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
  (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
  (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
  (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
  (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
  (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

*8 Title 15 U.S.C. § 78u-5(c)(1)(A) does not require a listing of all factors that could cause actual results to differ materially from those in the forward-looking statement. *See* H.R. Conf. Rep. 104-369, at 44 (1995), reprinted at 1995 U.S.C.C.A.N. 730, 743 ("Failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor"). "In short, when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris v. Ivax Corp.,* 182 F.3d 799, 807 (11th Cir.1999).

As to motions to dismiss based on that safe harbor provision, the PSLRA directs courts to "consider any statement cited in the complaint and cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 77z-2(e).

OPINION
Analysis of Plaintiff's Securities Fraud Claims

Among the rationale offered for dismissing Plaintiffs' complaint for failure to state a claim upon which relief can be granted, Defendants include several exhibits (*see* Doc. 18, Affidavit of David C. Horn, Exhs. 2, 3 & 17; Doc. 28, Affidavit of Christine Pudvan, Exhs. A & B) which Defendants argue cannot properly be considered on a motion to dismiss. (*See* Doc. 23, pp. 8, 11 n. 4; Doc. 24). As the inclusion or exclusion of those exhibits may affect the Court's determination regarding the viability of Plaintiff's securities fraud claims, we first must assess the appropriateness of considering those exhibits for the purpose proffered.

a. Whether Defendants' Proffered Exhibits Are Cognizable Evidence

Ordinarily, "if ... matters outside the pleadings are presented to and not excluded by the court" on a Rule 12(b)(6) motion to dismiss, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). "A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed.R.Civ.P. 10(c). Plaintiffs are not obligated thereby to attach to their complaint all documents upon which their claims are premised. *See Weiner v. Klais & Co., Inc.,* 108 F.3d 86, 89 (6th Cir.1997), citing 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1327, at 762 (2d ed.1990). Nevertheless, "a defendant may introduce certain pertinent documents if the plaintiff fails to do so." *Id.* (observing that "otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied").

Numerous examples exist wherein courts in this Circuit have considered documents not attached to the complaint without converting a motion to dismiss into one for summary judgment. *See, e.g., Greenberg v. Life Ins. Co. of Virginia,* 177 F.3d 507, 514 (6th Cir.1999) (document central to plaintiff's claim may be considered without

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

conversion); *Butler v. Aetna U.S. Healthcare, Inc.,* 109 F.Supp.2d 856 (S.D.Ohio 2000) (Rice, J.) (defendant may introduce pertinent documents for consideration on motion to dismiss if plaintiff fails to do so). One recent decision which appeared to support such an approach in the context of a securities fraud action has been vacated, however, casting doubt on the viability of that approach. *See Helwig v. Vencor, Inc.,* 210 F.3d 612, 618 (6th Cir.) (securities fraud class action finding that conversion to summary judgment not required when considering documents referred to in complaint and central to plaintiffs' claims), *vacated by* 222 F.3d 268(6th Cir.2000), *rev'd en banc,* 251 F.3d 540 (6th Cir.2001), *cert. dismissed,* 122 S.Ct. 2616 (2002).

*9 In *Helwig,* the district court converted a motion to dismiss into a motion for summary judgment in order to consider certain documents, then ruled in favor of defendants. *See Helwig,* 210 F.3d at 618. A panel of the Sixth Circuit originally found that such conversion without notice to the parties was error, but affirmed based on its conclusion that the complaint could have been dismissed for failure to state a claim upon which relief can be granted. *See id.* at 618-19. The full court reversed, holding that plaintiffs' complaint was sufficient to state a claim for relief. *See* Helwig, 251 F.3d at 552-53.

Although the *en banc* decision in *Helwig* does not directly address whether the motion at issue therein properly could have proceeded as a motion to dismiss despite considering documents not appended to the complaint, the opinion can be read to suggest that any determination which involves consideration of defendant's evidence without allowing plaintiffs "an opportunity to introduce support for their claims" could be deemed erroneous. *See id.* Accordingly, regardless of how closely the conference call transcripts here may be tied to the essence of these Plaintiffs' claims, the Court is reluctant to consider such transcripts without affording Plaintiffs an opportunity to respond.

As Plaintiffs aptly note (*see* Doc. 23, p. 8), other considerations also counsel against considering the challenged evidence at this time. For example, Plaintiffs have not had an opportunity to investigate through discovery the accuracy of the conference call transcripts, or the authenticity and completeness of either the transcripts or the tape recordings themselves. [FN2] Defendants appear to offer at least one portion of the transcripts "to prove the truth of the matter asserted," [FN3] a use proscribed by the hearsay exclusion. *See* Fed.R.Evid. 801(c). Additionally, the Armco press release proffered as Exhibit 17 to the Horn affidavit (*see* Doc. 13, p. 7) is not a document referred to in the complaint, and therefore is a matter outside of the pleadings, not properly before the Court on a motion to dismiss. *See* Fed.R.Civ.P. 12(b). [FN4]

> FN2. Despite this observation, the Court currently has no reason to doubt the authenticity or completeness of the proffered exhibits.

> FN3. Defendants do appear to suggest that a transcript reference to one defendant stating that AK Steel typically did "not ... give [earnings per share] guidance" (*see* Doc. 18, Affidavit of David C. Horn, Exh. 3, p. 15) is evidence that Defendants in fact did not do so in this instance. (*See* Doc. 18, p. 4).

> FN4. The Court declines Defendants' invitation "to take judicial notice" of facts set forth in the subject Armco press release. (*See* Doc. 27, p. 2). The fact that workers were locked out at the Mansfield plant indeed is not disputed (*see* Doc. 13, PP 4, 56), so judicial notice of that fact would be superfluous. The critical issues for purposes of Plaintiffs' claim are when Defendants knew that a lock out was imminent, and whether they improperly withheld that information from the market. This Court cannot take judicial notice as to the facts relevant to those issues.

For all of the foregoing reasons, the Court will consider Defendants' motions to dismiss without reference to either the contested transcripts (*see* Doc. 18, Affidavit of David C. Horn, Exhs. 2, 3) or the actual tape recordings (*see* Doc. 28, Exhs. A, B) of the conference calls at issue, or to the contested press release. (*See* Doc. 18, Affidavit of David C. Horn, Exh. 17).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
Fed. Sec. L. Rep. P 92,000  
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 8

b. Whether Plaintiffs' Allegations Of Misleading Statements/ Omissions Are Sufficient

Plaintiffs identify a series of allegedly "false and misleading statements" as having given rise to their cause of action. Their recitation begins with the issuance of a press release on July 15, 1999, in which AK Steel announced its second quarter results for 1999. (*See* Doc. 13, P 43). Plaintiffs allege that after issuing that press release, "AK Steel management held a conference call for analysts, media representatives and large AK Steel shareholders and made additional statements not included in the press release." (Doc. 13, P 44). According to Plaintiffs, during that conference call "and in follow-up conversations," AK Steel management represented that:

*10 • [it] expected a strong fourth quarter in terms of revenues and earnings due to higher volume, improved mix and lower costs ...;
• demand remained strong for AK Steel products;
• [it] expected to generate significant benefits from its Rockport Works facility, primarily the ability to roll stainless steel;
• AK Steel would benefit rather than suffer from continued strengthening in the prices in the domestic steel markets; and
• AK Steel was on track to report [earnings per share] of $ 2.60+ for 2000.

(Doc. 13, P 44). Plaintiffs claim that analyst reports based on that information forecast earnings of $ 2.60 to $ 2.85 per share for 2000, and thus rated AK Steel very favorably. (*See* Doc. 13, P 45).

The complaint alleges that Armco's results for the same quarter of 1999 were issued in a press release dated July 21, 1999. (Doc. 13, P 46). According to Plaintiffs, Armco management thereafter held a similar conference call and follow-up conversations, in which it represented that:
• the outlook for the remainder of 1999 and into 2000 was good[,] as demand was strong for stainless and electrical steels and pricing was becoming more favorable;
• prices in Asia were increasing[, ] which would benefit Armco's future results;
• Armco had made contingency plans for potential labor problems at the Mansfield facility to prevent any impact on customers;
• Armco would be renegotiating its sales contracts at year-end and would be able to increase prices at that time; and

• the merger with AK Steel would provide promising prospects to Armco shareholders.

(Doc. 13, P 47). Plaintiffs allege that Armco management's statements to that effect also led to favorable analyst reports. (*See* Doc. 13, P 48).

The complaint also quotes a prospectus filed by AK Steel (*see* Doc. 13, P 50) and a Joint Proxy Statement/ Prospectus filed by AK Steel and Armco (*see* Doc. 13, PP 52-53), in relation to the proposed merger of the two companies. Both documents portrayed the merger as a positive measure for both companies. (*See id.*).

Plaintiffs contend that Defendants' actions led to the merger of AK Steel and Armco on September 30, 1999, consummated through an inequitable stock-for-stock exchange ratio. (*See* Doc. 13, PP 58-61). Moreover, they contend that Defendants "were motivated to conceal the Company's problems" even after the merger. (Doc. 13, P 62). They allege that a favorable analyst report issued on October 5, 1999, was "based on and repeated statements made by AK Steel management." (*See* Doc. 13, P 63). They also cite a October 21, 1999, press release announcing AK Steel's third quarter results (*see* Doc. 13, P 64), which AK Steel again allegedly followed with a conference call and "follow-up one [-]on[-]one conversations" with analysts, purportedly representing that:
• the Armco merger had an extremely positive effect on AK Steel's results, reflecting the accretive benefits of the merger;
*11 • the merger charges associated with the acquisition of Armco would be much lower than previously expected, in the $ 150[-$ 175] million range versus prior estimates of $ 250[-$ 300] million;
• management believed AK Steel's stock price was so low relative to the Company's earnings and prospects, they might consider taking the Company private;
• management expected to enjoy $ 50 million in synergies from the merger with Armco;
• two-thirds of AK Steel's contract business was up for renegotiation at year-end[,] which would allow AK Steel to modestly increase prices;
• the costs of the Mansfield strike would increase only to $ 12 million in the [fourth quarter of 1999];
• management expected costs to decline in 2000 due to the blast furnace reline in the Ashland

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

facility; and
• the Company was still on track to report 2000 [earnings per share] of at least $ 2.25.
(Doc. 13, P 65). Plaintiffs claim that such statements again led to favorable analyst ratings and reports, forecasting 2000 earnings per share of $ 2.24 to $ 2.30 (*see* Doc. 13, P 66), and to a stock price exceeding $ 17 per share. (Doc. 13, P 67).

Plaintiffs contend that additional analyst reports issued on November 4, 1999, and on January 7, 2000, contained positive forecasts based on conversations with AK Steel management. (*See* Doc. 13, PP 72, 76). They also quote a press release dated January 14, 2000, in which "AK Steel announced a favorable ruling in its labor dispute involving Mansfield." (*See* Doc. 13, P 77).

Plaintiffs aver that AK Steel's stock price had declined "to the $ 16 range" during mid-December, and closed at $ 16-3/16 on January 25, 2000. (Doc. 13, PP 75, 80). They allege that AK Steel "shocked the markets," however, when after the close of trading on January 25, the company reported its fourth quarter and year end results for 1999, and projected "significantly higher" operating costs for 2000. (*See* Doc. 13, P 80). According to Plaintiffs, "shocked" analysts "immediately cut their 2000 [earning per share] forecasts for AK Steel," causing a collapse in AK Steel stock prices ("to a low of $ 11-1/2 on January 26, 2000," and "below $ 11 per share" as of the date the complaint was filed). (*See* Doc. 13, PP 81, 82).

The complaint alleges that AK Steel's 1999 Form 10-K filed on February 25, 2000, "included a new disclosure" revealing the adverse effects of its long-term customer contracts. (*See* Doc. 13, P 83). Finally, Plaintiffs quote a United Steelworker's press release dated March 8, 2000, addressed to AK Steel shareholders, containing further allegations regarding AK Steel's handling of the Mansfield labor situation. (*See* Doc. 13, P 84).

The complaint charges that the various Defendants' statements identified therein "were false and misleading as [Defendants] knew or recklessly disregarded" certain facts "which seriously undermined their positive statements," to wit:
*12 • [that] the increasing prices of steel in the spot markets [were] actually a negative factor for AK Steel[,] as the Company had moved away from long-term contracts for purchasing raw materials[,] which meant that increases in spot market prices would cause AK Steel's costs to increase;
• [that] AK Steel's long-term contracts to sell its products were a detriment in times of rising spot market prices[,] as AK Steel was committed to selling product at below market prices;
• [that] AK Steel's "record" shipments of steel and its reported revenue and earnings were actually artificially inflated due to the Company's practice of double shipping orders to customers from AK Steel's processing plants;
• [that] AK Steel's processing plants (independent companies which perform finishing processes for AK Steel) ... received letters from AK Steel instructing them to double ship AK Steel products to its customers regardless of what the customers said ... [, with credits to be issued] in the following quarter;
• [that] the majority of AK Steel's long-term contracts with its customers could not be renegotiated to provide for significantly higher prices[,] which, assuming steel prices continued to increase, would result in a deterioration in AK Steel's 2000 earnings;
• [that] the issues with the United Steel-workers in the Mansfield facility were much more serious than disclosed and would be a significant problem for Armco and AK Steel going forward until the issues were resolved;
• that the merger was not in the best interest of Armco shareholders due to the problems caused by AK Steel's long-term contracts and ... [its] approach to the labor problems in Mansfield; and
• [that] ... there was no way AK Steel would be able to report [earnings per share] of $ 2.60+ (or later, $ 2.25+) in 2000.
(*See* Doc. 13, PP 49, 54, 69, 79). Plaintiffs further allege that AK Steel management not only was aware of and indeed controlled the labor situation in Mansfield, but also "engaged in a scheme to conceal the extent of" that situation's impact on AK Steel's results, "telling analysts not to discuss the situation in their ... reports." (*See* Doc. 13, PP 55-57, 80, 84). They suggest that AK Steel failed to disclose the high cost of the Mansfield lockout, or the occurrence of two "maintenance outages." (*See* Doc. 13, PP 73, 78). According to Plaintiffs, AK Steel also was motivated to conceal such problems in order to convince holders of Senior Notes issued by Armco to continue to hold such notes rather than

Not Reported in F.Supp.2d  
Fed. Sec. L. Rep. P 92,000  
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 10

requiring AK Steel to repurchase them. (*See* Doc. 13, PP 70-71, 74).

As accurately articulated in the memorandum in support of the AK Steel Defendants' motion to dismiss, most of Plaintiffs' allegations of material misrepresentations and/ or omissions by Defendants can be distilled into three categories: 1) projections of earnings per share for 2000, 2) labor problems at the Mansfield plant, and 3) the combined effect of increased raw material costs and AK Steel's existing long-term contracts. (*See* Doc. 18, pp. iii-iv).

*13 Allegations of a fourth type of misconduct-double shipping of finished product to customers in order to manipulate sales figures (*see* Doc. 13, P 49(c)-(d))-received only cursory treatment in Defendants' motion to dismiss. (*See* Doc. 18, p. 12, n. 14). Because the Court finds that Plaintiffs' allegations regarding double shipping were sufficiently particular [FN5] to withstand the minor protest raised by Defendants and addressed by Plaintiffs (*see* Doc. 23, p. 7), we hold without further discussion that those allegations survive the motion to dismiss.

> FN5. Specifically, the complaint avers that Southern Ohio Steel and Precision Strip, an independent company which performs finishing processes for AK Steel, "received letters from AK Steel instructing them to double ship AK Steel products to its customers regardless of what the customers said. When the customers complained, AK Steel would grant credits to them in the following quarter[.]" (Doc. 13. P 49(d)). The complaint also identifies two customers-"Walker, a subsidiary of Tenneco, and Arvin"- alleged to have received such double shipments. (Doc. 13, P 18). The details thus pled are sufficient to warrant discovery as to that issue.

For the sake of consistency with the format adopted in the parties' respective memoranda, the Court first will address Plaintiffs' three other categories of allegations in accordance with that categorization.

(i) *Earnings Projections*

The AK Steel Defendants argue that Plaintiffs have not adequately alleged a material misstatement or omission of fact as to the Defendants' purported inaccurate earnings forecasts, as Plaintiffs have provided no factual support for their assertions that Defendants projected certain earnings per share for AK Steel in 2000. (Doc. 18, pp. 3-6). Defendants contend that Plaintiffs' generalized allegations fail on their face for lack of sufficient particularity, and also are refuted unequivocally by transcripts of AK Steel's two conference calls identified in Plaintiffs' complaint. (*See* Doc. 18, Affidavit of David C. Horn, Exhs. 2, 3; *see also* Doc. 28, Exhs. A, B (copies of the tape recordings from which the proffered transcripts were transcribed)).

Plaintiffs counter that their allegations regarding earnings projections are adequate to withstand a motion to dismiss. They argue that the allegations are sufficiently particular, and that transcripts of the conference calls cannot defeat their claims at this juncture. (Doc. 23).

The Court agrees that Defendants' reliance upon the transcripts for this purpose is misplaced. As Plaintiffs' aptly note, the complaint is crafted so as to allow for the possibility that Defendants' alleged projections may have been made during "follow-up conversations" not captured or reflected as part of the conference call recordings and/ or transcripts themselves. (*See* Doc. 13, PP 44, 65; Doc. 23, p. 8). Additionally, the Court has determined, *supra*, that the proffered transcripts of those conference calls, and even the recordings themselves, are not cognizable evidence at this juncture. (*See* Doc. 23, p. 8).

Exclusion of the transcripts, however, is not dispositive of Defendants' motion. A plaintiff averring fraud or mistake must state with particularity the circumstances which constitute such, and where allegations of material misstatements or omissions are based upon information or belief, also "must state with particularity all facts on which that belief is formed." *See* Fed.R.Civ.P. 9(b); 15 U.S.C. § 78u-4(b)(1); *Comshare*, 183 F.3d at 548. A complaint can meet that pleading requirement "by providing documentary evidence and/ or a sufficient general description of the personal sources of the plaintiffs' beliefs." *Helwig*, 251 F.3d at 557 n. 4 (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 92,000
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 11

Cir.2000)).

*14 A careful reading of the complaint reveals that Plaintiffs attribute earnings per share forecasts to "AK Steel management" generically, without identifying any particular individual or individuals purported to have made such forecasts. (*See* Doc. 13, PP 44, 65). (*See also* Doc. 23, p. 7 (acknowledging that "pleading of the who" consists of references to "AKS management")). Plaintiffs' failure to identify with specificity those individuals believed to have been responsible for projecting on AK Steel's behalf certain earnings per share seems to contravene Rule 9(b)'s particularity requirement. *See Helwig,* 251 F.3d at 557 n. 4 (finding significant those plaintiffs' "attribution of the earnings projections" to two named individual executives of the corporate defendant); *see also Branca v. Paymentech, Inc.,* 2000 U.S. Dist. LEXIS 1704 (N.D.Tex.2000) (finding that allegations against "defendants" which did not "identify the speaker" did not satisfy Fed.R.Civ.P. 9(b)). Indeed, Defendants cite a case involving strikingly similar allegations (of misleading statements made in "follow-up conversations" with participants in analyst conference calls), with the following result:

> The Complaint does not allege with any specificity who participated in the one-on-one conversations, when they took place, or, most important, the specific content allegedly communicated to the analysts. These allegations do not satisfy the particularity, requirements of Rule 9(b) or the Reform Act.

*Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1242-43 (N.D.Cal.1998). This Court concurs in that analysis.

Recognizing that plaintiffs historically have been afforded some latitude to plead matters as to which defendants control the evidence, *see, e.g., Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 680 (6th Cir.1988), this Court might not deem Plaintiffs' failure to identify specific Defendants alone to be fatal to their claim. Of even greater concern, however, is Plaintiffs' glaring omission of either "documentary evidence" or "a sufficient general description of the personal sources of [their] beliefs." *See Helwig,* 251 F.3d at 557, n. 4. In light of the complaint's lack of detail regarding the identity of the supposed speaker(s), the Court can only presume that Plaintiffs' allegations regarding supposed earnings projections by AK Steel management are based upon information and belief rather than personal knowledge. By requiring particularity as to the facts from which such beliefs are derived, *see* 15 U.S.C. § 78u-4(b)(1), the PSLRA attempts to protect defendants from wholly unfounded allegations, while allowing some latitude for pleading claims which lack a "smoking gun." This complaint, however, reveals no basis beyond pure conjecture for assuming that the earnings per share projections contained in various analyst reports were derived from earnings per share forecasts made by any Defendant. Significantly, although several analyst reports cited in the complaint do contain earnings per share projections, not one of those reports attributes the numbers it projects to forecasts made by Defendants. (*See* Doc. 13, PP 45, 63, 66). To the contrary, those reports' use of the words "our 2000 estimate" or "our estimates" (Doc. 13, p. 15, Bear Stearns report; p. 24, CS First Boston report) would seem to reflect the analysts' personal responsibility for the earnings projections contained in their reports. Indeed, the fact that different analysts reported differing projections after conferring with Defendants (*see, e.g.,* Doc. 13, P 45 (citing projections ranging from $ 2.60 to $ 2.85); P 66 (citing projections ranging from $ 2.24 to $ 2.30)) further belies any inference that Defendants supplied the specific earnings projections cited in the analysts' reports.

*15 While we agree with the Second Circuit's conclusion that plaintiffs need not name confidential sources of information "as long as they supply sufficient specific facts to support their allegations," *see Novak,* 216 F.3d at 314, Plaintiffs in this matter have supplied no specific facts to support their allegations that "AK Steel management" conveyed earnings per share forecasts to others. Absent evidence that they were responsible for the projections made by independent analysts, defendants cannot be held liable for the analysts' statements. *See In re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 934 (9th Cir.1996); *In re Time Warner, Inc. Sec. Litig.,* 9 F.3d 259, 265 (2d Cir.1993). Because Plaintiffs' allegations regarding earnings per share forecasts by Defendants do not comport with the requirements of Fed.R.Civ.P. 9(b) and 15 U.S .C. § 78u-4(b)(1), those allegations alone would not be adequate to support Plaintiffs' claims.

The motion of the AK Steel Defendants appears to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 92,000
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 12

suggest that if Plaintiffs cannot establish that Defendants made earnings per share projections as alleged, the entire complaint must fail. (*See* Doc. 18, p. 3) (urging that Plaintiffs "cannot argue that the [other] two alleged omissions (*i.e.,* re the Mansfield labor and raw material/ long-term contract situations) were necessary to prevent the [earnings per share] projections from being misleading"). The Court does not agree. Accepting the allegations of Plaintiffs' complaint as true, Defendants could be liable without having made earnings per share projections, if other information they did disclose or omit gave an unduly optimistic portrayal of AK Steel's prospects, in light of existing circumstances. For that reason, the Court must analyze Plaintiffs' remaining allegations.

*(ii) The Mansfield Labor Situation*

Defendants argue that Plaintiffs' allegations regarding Armco's and AK Steel's problems with the United Steelworkers at the Mansfield facility "lack[ ] even a shred of the particularity required by Fed.R.Civ.P. 9(b) and the PSLRA." (Doc. 18, p. 6). They further contend that the SEC filings and analyst reports cited in Plaintiff's complaint reveal that Defendants "repeatedly disclosed" both the potential for a labor stoppage at Mansfield and its possible consequences for AK Steel's operating results. (Doc. 18, pp. 6-7). Among the documentary evidence of such disclosures they offer are an Armco press release announcing a lock out at the Mansfield plant (*see* Doc. 18, p. 7, Affidavit of David C. Horn, Exh. 17), and excerpts from AK Steel's conference calls transcripts. (*See* Doc. 18, p. 8, Affidavit of David C. Horn, Exh. 3, pp. 5-6).

In response, Plaintiffs again assert that their allegations are sufficient to withstand a motion to dismiss. Claiming that Defendants were aware "at least by September 1999" of the extent of the labor problems at Mansfield, Plaintiffs urge that facts regarding that labor situation were not "soft information" exempt from disclosure. (Doc. 23, pp. 8-9). Moreover, they contend that even if such information could be deemed "soft," Defendants became obligated "to disclose the full truth" once they undertook to release any information regarding the situation at Mansfield. (Doc. 23, p. 9). Plaintiffs once again urge that the conference call transcripts and the Armco press release are not cognizable evidence on this point (Doc. 23, p. 11, n. 4); additionally, they urge that a "truth on the market defense" cannot prevail on a motion to dismiss. (Doc. 23, pp. 10-11).

\*16 Although the complaint again fails to identify the individuals at AK Steel or Armco who supposedly made the misrepresentations at issue, Plaintiffs' allegations as to the Mansfield labor situation differ from their earnings projections allegations in at least one significant respect-as to the labor situation, Plaintiffs do cite some "documentary evidence" or "general description of the personal sources of [their] beliefs." *See Helwig,* 251 F.3d at 557, n. 4. For example, Plaintiffs identify "a July 22, 1999 report by Lehman Brothers written by Aldrich," which purportedly attributes certain information about the Mansfield plant directly to Armco management, as follows:

> In a conference call following the release of its results, *management made the following key points:*
> \* \* \*
>
> Armco has a labor contract up on August 31st at the Mansfield plant. Management noted that negotiations will commence in early August" and they hope to reach an agreement before the deadline, though they have made contingency plans for a strike and believe that if it happens there will not be any effect on its customers.

(*See* Doc. 13, P 48) (emphasis added). Another analyst report they identify (from J.P. Morgan, dated November 4, 1999) also attributes information regarding Mansfield directly to AK Steel; stating as follows:

> *AK management indicated* that the Mansfield issue adds about $ 4 million to $ 5 million to cost each month, or around $ 0.09 per share for the quarter ..."

(Doc. 13, P 72). Indeed, the context of still other analyst reports cited in the complaint strongly supports an inference that AK Steel management also was the source of information about Mansfield contained therein. (*See, e.g.,* Doc. 13, P 63). [FN6] Such disclosures by Defendants are consistent with Plaintiffs' theory that Defendants did little more "than disclose that a labor dispute existed." (Doc. 13, p. 11). They do not dispel allegations that Defendants may have been withholding information about the likely duration and impact of the Mansfield labor problems.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
Fed. Sec. L. Rep. P 92,000  
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 13

FN6. For example, the "Strong Buy rating" for AK Steel contained in Credit Suisse First Boston's October 5, 1999 analyst report was based in part upon the expected "resolution [of] labor issues at its Mansfield operation ... by early 2000 via either a new contract with existing workers or with replacement workers." (See Doc. 13, P 63). While analysts may well have arrived at independent earnings projections for AK Steel without the company supplying specific numbers, it seems far less likely that analysts independently concluded (without specific input from AK Steel) that the Mansfield labor issues would be resolved by early 2000.

Indeed, Plaintiffs' allegations of concealment tend to be bolstered by two United Steelworkers press releases cited in the complaint, suggesting that while AK Steel publicly attempted to minimize the extent of its Mansfield labor problems, the company in fact was planning to lock out workers at that facility. (See Doc. 13, PP 56, 84). Additionally, an allegation that AK Steel "engaged in a scheme to conceal the extent of problems" by "telling analysts not to discuss the situation in their [ ] reports" (Doc. 13, P 57) is supported by some specific information, including the names of two individuals [Waldo Best, a Morgan Stanley Dean Witter analyst, and Dan Dorfman, a Wall Street commentator] purported to have information regarding AK Steel's efforts to suppress revelations about its labor difficulties. (See Doc. 13, PP 68, 84).

By identifying these sources, Plaintiffs have demonstrated that their allegations regarding AK Steel's treatment of the Mansfield labor situation are based upon something more substantive than their own speculation. Accordingly, here, unlike with their earnings projections allegations, Plaintiffs have articulated some reason to believe that exploring such allegations further "could lead to the discovery of admissible evidence" to support their claims. See Fed.R.Civ.P. 26(b)(1). Under such circumstances, the Court is unwilling to dismiss Plaintiffs' claims simply for failing to identify particular persons within Defendants' management alleged to have misrepresented the situation at the Mansfield plant.

*17 Defendants' remaining arguments as to this issue are no more convincing. Even assuming that Defendants' statements regarding the likely resolution of Mansfield workers' expiring contract were "soft" opinions, those opinions could give rise to a cause of action if Defendants realized that the Mansfield situation was more serious than they were leading the market to believe. See Mayer, 988 F.2d at 639. For reasons previously stated, the Court declines for purposes of this motion to consider the proffered press release or transcripts of conference calls as evidence of the statements Defendants actually made. Moreover, whether Defendants' statements on the subject were true or false is not an issue to be decided on a motion to dismiss. Id. In light of Plaintiffs' allegations that Defendants not only knew that their depiction of the Mansfield situation was inaccurate, but in fact actively sought to conceal the extent of the problems there (see Doc. 13, PP 57, 68, 84), the Court at this juncture cannot dismiss Plaintiffs' claims brought on that basis.

*(iii) Raw Materials Costs/ Long-Term Contracts*

As to the remaining basis for Plaintiffs' claims, Defendants deny that they committed a "material omission" by failing to disclose that raw material price increases could negatively impact AK Steel due to its long-term contract structure. Defendants urge that the complaint lacks factual support for allegations that AK Steel knew that raw material prices would rise in 2000, and assert that AK Steel cannot be held liable for failure to predict the future. (Doc. 18, pp. 9-10). Pointing again to transcripts of the conference calls referenced in Plaintiffs' complaint, they also claim those transcripts demonstrate that AK Steel did disclose, and analysts understood, "[that] AK Steel's need for certain raw materials and the nature of its long-term contracts [ ] could combine to produce a negative effect on earnings in the event of price increases ..." (Doc. 18, pp. 10-11). That basic economic principle, they assert, need not to be "spelled out" for the market. (Doc. 18, pp. 11-12).

Plaintiffs counter that the rising cost of raw materials was not "soft" information, and moreover, that Defendants' voluntary statements regarding such costs obligated them to disclose the full truth regarding the total effect of those costs. (Doc. 23, pp. 9-10). They again contend that the conference

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 92,000
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 14

call transcripts may not be considered for the purpose offered. (Doc. 23, p. 11). Finally, they urge that Defendants' truth on the market defense cannot succeed on a motion to dismiss. (Doc. 23, pp. 10, 11-12).

Plaintiffs' allegations as to this issue turn on the premise that "the Individual Defendants ... knew at the beginning of the Class Period that they were expecting increases in the spot market for steel ... and raw materials ..." (Doc. 13, P 18). Alleging that Defendants anticipated price increases, however, is not tantamount to alleging that Defendants knew to a certainty that costs would rise. The possibility of future increases in the price of raw materials would seem to be an economic reality throughout the manufacturing industry, readily apparent to any reasonable investor. Unless these Defendants' suspicion of future price increases was "virtually as certain as hard facts," they would not be obligated to disclose their opinions to that effect. See *Sofamor*, 123 F.3d at 402. Aside from the hindsight reality that prices in this instance apparently did increase, the Court gleans nothing from the complaint which would support a conclusion that Defendants truly "knew" to a virtual certainty of a pending hike in their cost of doing business.

*18 Nevertheless, the complaint does suggest that AK Steel management voluntarily undertook to comment on the likelihood of future cost increases. For example, the complaint quotes a Lehman Brothers analyst report as saying:
   In a conference call following the release of its results, [AK Steel] *management made the following key points:*
   * * *

   Pricing, unfortunately, remains depressed but should improve over the coming quarters. *Management noted that it expects about a $ 5/ton increase on spot business* going into the next quarter. Hot-roller sheet should get tighter, but cold-rolled remains quite competitive.

(Doc. 13, P45) (emphasis added). Having thus chosen to address the topic of higher costs, Defendants assumed a duty to provide complete and non-misleading information with respect to the true net effect of those costs on AK Steel's bottom line. See *Rubin*, 143 F.3d at 268. Once again, the Court declines to consider the conference call transcripts with respect to this motion. See discussion, *supra* . As a question of fact is implicated by the inquiry into whether Defendants accurately conveyed that rising raw material costs could hurt rather than help AK Steel, Defendants' motion to dismiss for lack of a material omission must be denied as to this issue.

c.   Whether   The   "Safe   Harbor"   For Forward-Looking Statements Applies

Nothing withstanding our conclusion that Defendants are not entitled on the foregoing grounds to dismissal of Plaintiffs' claims based upon the Mansfield labor situation and the increased cost of raw materials, Defendants still may prevail if the statements on which Plaintiffs' claims are based qualify as "forward-looking," and if Plaintiffs cannot prove that such statements were made with "actual knowledge ... that [they were] false or misleading." 15 U.S.C. § 78u-5(c)(1)(B); 15 U.S.C. § 77z-2(c)(1)(B).

Asserting that any statements they may have made regarding AK Steel's future economic performance are entitled to that "safe harbor" protection, Defendants argue that Plaintiffs have not alleged with particularity any facts demonstrating that Defendants were aware of adverse factors at the time the forward-looking statements were made. Specifically, they urge that Plaintiffs "do not plead a single fact that suggests [Defendants] knew ... at the outset of the alleged class period[ ] that raw material costs ... would increase dramatically in 2000[,] or how AK Steel would fare in year-end renegotiations of its long-term contracts." (Doc. 18, p. 15).

In response, Plaintiffs argue that many of Defendants' allegedly false statements were statements "of *existing* or *historical* conditions," not entitled to the safe harbor protection. (Doc. 23, p. 13) (emphasis in original). They identify only five particular statements, however, which they claim fall into that category. (*See* Doc. 23, p. 13, citing Doc. 13, PP 43, 44, 47, 53). As to other statements made by Defendants "which can be considered forward-looking," Plaintiffs contend that such statements were neither "identified as such at the time" or "accompanied by meaningful cautionary statements," and that the protection thus does not apply. (Doc. 23, pp. 13-14). Finally, Plaintiffs suggest that even if any forward-looking statements

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
Fed. Sec. L. Rep. P 92,000  
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 15

fulfill those requirements, the safe harbor is rendered inapplicable by allegations "that Defendants made those statements with actual knowledge of their falsity."

*19 Because determining whether safe harbor protection applies to a particular statement requires a fact-specific analysis, and because Plaintiffs' individual "Claims for Relief" are premised on different alleged false statements by Defendants, the Court will examine certain statements separately.

*(I) Statements Allegedly Related to "Existing or Historical Conditions"*

Plaintiffs characterize the following alleged misstatements as being related to "existing or historical conditions" rather than "forward-looking:"
1) that AK Steel reported "record" revenues on "record shipments" for the second quarter of 1999 (Doc. 13, P 43);
2) that at that time, "demand remained strong for AK Steel products" (Doc. 13, P 44);
3) that "Armco had made contingency plans for potential labor problems at the Mansfield facility to prevent any impact on customers" (Doc. 13, P 47);
4) that the proposed merger was "in the best interests of [Armco's] stockholders" (Doc. 13, P 53); and
5) that the AK Steel management team had "reduced operating costs throughout the organization" (Doc. 13, P 53).

(Doc. 23, p. 13). They argue that safe harbor protection does not apply to statements which fall outside the PSLRA's definition of "forward-looking." *See* 15 U.S.C. § 78u-5(I)(1); *Robertson v. Strassner,* 32 F.Supp.2d 443, 450 (S.D.Tex.1998); *In re ValuJet, Inc. Sec. Litig.,* 984 F.Supp. 1472, 1479 (N.D.Ga.1997).

A statement-by-statement examination reveals that the first of these alleged statements (re "record" revenues and shipments) is taken from an AK Steel press release dated July 15, 1999. (*See* Doc. 13, P 43). Because the statement plainly relates to past or current, rather than future, performance, the statement cannot be considered forward-looking. Moreover, Plaintiff has provided specific information suggesting that Defendants knew that the underlying figures were based upon misleading "double shipping" practices. (*See* discussion, *supra*). The second ("demand remained strong") and third ("contingency plans for potential labor problems") statements, attributed to AK Steel and Armco management, respectively, also are not forward-looking. (Doc. 13, PP 44, 47). Finally, the fourth ("best interests of [Armco's] stockholders") and fifth ("reduced operating costs") statements, taken from Defendants' Joint Proxy Statement/ Prospectus, also arguably invoke existing or past conditions rather than "forward-looking" ones, and thus cannot reap the benefits of safe harbor protection. (Doc. 13, P 53). The Court finds that none of these statements is subject to dismissal based by the "safe harbor" provision.

*(ii) Forward-Looking Statements*

Plaintiffs have advanced no reasons why any remaining false statements alleged in their complaint should not be considered "forward-looking" statements. Instead, they argue that Defendants failed to take specific action necessary to bring any forward-looking statements within the safe harbor protection. (*See* Doc. 23, pp. 13-14).

*20 In effect, Plaintiffs' approach amounts to a concession that any remaining false statements are forward-looking. Their opposing memorandum, however, does not accurately state the parameters of safe harbor protection. (*See* Doc. 29, pp. 12-13). According to the applicable sections of the PSLRA, a forward-looking statement is protected if the plaintiff fails to prove that the speaker had actual knowledge of its false or misleading nature, irrespective of whether the statement was identified as for-ward-looking and accompanied by meaningful cautionary statements. *See* 15 U.S.C. § 78u-5(c)(1)(B); 15 U.S.C. § 77z-2(c)(1)(B); *see also Harris v. IVAX Corp.,* 182 F.3d 799, 803 (11th Cir.1999), *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 930 (D.N.J.1998) ("even in the absence of sufficient cautionary language, the safe harbor can prevent liability ... from attaching if plaintiffs fail to prove individual defendants acted with actual knowledge of the falsity"). Defendants here have not asserted that they are entitled to protection under the first prong of the safe harbor provision; their argument solely rests on the contention that Plaintiffs have not satisfied the second, "actual knowledge," prong.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 92,000
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 16

Although the opposing memorandum attempts to address this point by perfunctorily observing that "plaintiffs have alleged that defendants made those [forward-looking] statements with actual knowledge of their falsity," it then provides no details regarding the factual underpinnings for such allegations. (*See* Doc. 23, p. 14). Without the benefit of Plaintiffs' explanation of the facts on which they rely, the Court's own careful examination of the complaint reveals little support for allegations that Defendants knew certain statements to be false when made.

Plaintiffs do offer some factual support, however, for allegations that Defendants' forward-looking statements regarding the Mansfield labor situation were misleading. Recitation of the facts surrounding the September 1999 lock out of union workers at the Mansfield plant-including the undisputed assertion that workers were not offered a new contract until the day that the old contract expired and that Defendants then rejected the workers' offer to continue working under the old contract (*see* Doc. 13, PP 4, 56, 84)-tend to support allegations that prior to the actual lock out in September 1999, Defendants anticipated a protracted labor dispute at Mansfield

Given that factual scenario, evidence now of record does suggest that Defendants may have known that certain forward-looking statements attributable to them (*e.g.,* a July 22, 1999 representation that Armco "hoped to reach an agreement before the deadline" (Doc. 13, P 48) and an October 5, 1999 analyst report anticipating "resolution [of] labor issues at [Mansfield] ... by early 2000 via either a new contract with existing workers or with replacement workers" (Doc. 13, P 63)) were false when made. Additional facts suggesting that AK Steel actively attempted to conceal the extent of the Mansfield labor problems (*see* Doc. 13, PP 57, 68, 84) further support that inference. In light of such indicia, the Court cannot conclude at this pre-discovery stage that Plaintiffs would be unable to establish that Defendants knew their statements to be false when made. Accordingly, Defendants are not entitled to dismissal of Plaintiffs' claims related to the Mansfield labor situation based upon the safe harbor provision.

*21 We reach a similar conclusion as to Defendants' forward-looking statements regarding possible increases in raw material prices. While the complaint falls far short of proving that Defendants knew when or how much raw material prices would increase, the complaint does sufficiently establish that Defendants knew that any cost increase could not be passed on to customers under the terms of its then-existing long term contracts. The evidence of record at this time supports an inference that Defendants knew statements portraying possible price increases as a positive rather than negative factor would convey a false impression. Dismissal of Plaintiffs' increased raw material costs/ long-term contract claims under the safe harbor provisions therefore is not warranted at this time.

### d. Whether Plaintiffs Sufficiently Allege The Requisite Scienter

Defendants' final argument applies only as to the first Claim for Relief (Doc. 13, PP 90-93) set forth in Plaintiff's complaint. (*See* Doc. 23, p. 7, n. 3). Urging that Plaintiffs' allegations fall short of establishing the state of mind necessary to state a claim under Rule 10b-5 and Section 10(b) of the 1934 Act, they ask the Court to dismiss that claim. (Doc. 18, p. 17).

To prevail on a claim for a misstatement or omission of material fact in connection with the purchase or sale of securities, plaintiffs must establish that the defendant acted with the requisite scienter, *i.e.,* they must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Plaintiffs bringing Section 10(b) claims therefore must plead facts giving rise to a strong inference of knowing or reckless conduct in order to avoid dismissal. *See Comshare,* 183 F.3d at 549; 15 U.S.C. § 78u-4(b)(3). As to certain forward-looking statements, however, plaintiffs must plead facts giving rise to a strong inference of actual knowledge. *Id.* at 549 n. 5.

Defendants contend that Plaintiffs attempt to satisfy the scienter requirement by alleging merely that Defendants had motive and opportunity to perpetrate fraud. (*See* Doc. 13, PP 19-23). While such allegations do not establish scienter if the facts pled do not establish simultaneously that defendant acted with the requisite state of mind, facts regarding motive and opportunity may be "relevant to pleading circumstances from which a strong

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
Fed. Sec. L. Rep. P 92,000  
(Cite as: 2002 WL 31545952 (S.D.Ohio))

Page 17

inference of fraudulent scienter may be inferred," and "may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct." *Comshare,* 183 F.3d at 551.

In our foregoing analysis regarding Defendants' entitlement to the protection of the safe harbor provision, the Court concluded that Plaintiffs had articulated facts adequate to suggest that Defendants knew their statements regarding the Mansfield labor situation and the effect of rising raw material costs to be false. That conclusion, combined with allegations that Defendants were motivated to artificially inflate AK Steel's stock price in order to complete the Armco merger, is sufficient to create a strong inference of reckless or knowing conduct. *See In re Nuko Info. Sys., Inc. Sec. Litig.,* 199 F.R.D. 338, 343 (N.D.Cal.2000). In addition, Plaintiffs' allegations suggesting that AK Steel double shipped products to its customers remain another viable basis from which scienter could be inferred. (*See supra,* pp. 21-22). Plaintiffs' first Claim for Relief is not subject to dismissal at this time for failure to allege scienter.

Conclusion

*22 The Court finds that Plaintiffs' allegations regarding earnings per share forecasts purportedly made by "AK Steel management" to analysts, and the analysts' statements following conference calls on July 15 and 21 and October 5, 1999, do not state a legally adequate basis for maintaining a securities fraud action against Defendants. Were any of Plaintiffs' claims premised solely on those allegations, dismissal of such claims would be appropriate. In light of our conclusion, however, that Plaintiffs' remaining allegations-those relating to the Mansfield labor situation, the impact of cost increases on AK Steel's long-term contracts, and the practice of double shipping products-are sufficient on their face to support the claims that Plaintiffs have asserted, none of the Claims for Relief actually set forth in Plaintiffs' amended complaint is subject to dismissal for the reasons argued in Defendants' motion.

IT THEREFORE IS ORDERED that the motions to dismiss filed by all Defendants except Defendant Will (Doc. 18), and by Defendant Will (Doc. 19), hereby are DENIED without prejudice. This matter hereafter shall proceed in accordance with the directives thus provided by the Court.

IT IS SO ORDERED.

2002 WL 31545952 (S.D.Ohio), Fed. Sec. L. Rep. P 92,000

END OF DOCUMENT