```
 1
 2              UNITED STATES DISTRICT COURT
 3               SOUTHERN DISTRICT OF OHIO
 4                    WESTERN DIVISION
 5
 6                          - - -
 7   WALTER W. THIEMANN,      :
     On Behalf of Himself     :
 8   And of All Others        :
     Similarly Situated,      :
 9                            :
            Plaintiff,        :
10                            :
       VS.                    :  CASE NO. C-1-00-793
11                            :
     OHSL FINANCIAL           :
12   CORPORATION, et al.,     :
                              :
13          Defendants.       :
14                          - - -
15        Deposition of MARK WEISS, ESQ., a
16   witness herein, called by the plaintiff for
17   cross-examination pursuant to the Federal Rules
18   of Civil Procedure, taken before me, Lee Ann
19   Williams, a Registered Professional Reporter
20   and Notary Public in and for the State of Ohio,
21   at the offices of Gene Mesh & Associates, 2605
22   Burnet Avenue, Cincinnati, Ohio 45219, on
23   Friday, August 22, 2003, at 9:00 a.m.
24
25
```

Page 34

1  accounts?
2     A. Institution -- large accounts,
3  wealthy individuals.
4     Q. Okay. High net worth individuals?
5     A. Yes.
6     Q. Okay. So your job for that year
7  was to make phone calls to high net worth
8  individuals to attempt to get their business;
9  is that correct?
10    A. That's a lot of what I did. But I
11 also serviced existing high net worth and also
12 worked on other special projects.
13    Q. Okay. What were some of the
14 special projects that you worked on?
15    A. Sometimes states or other
16 organizations solicit what are called RFPs,
17 request for proposal, where they request
18 information from prospective investment
19 advisors who will receive a fee for their
20 services. And I did complete some of -- some
21 RFPs on behalf of potential institutional
22 clients.
23    Q. During this year, were you working
24 as an attorney?
25    A. No.

Page 35

1     Q. Was there a legal component to
2  your job?
3     A. No. At Coutrywide, no.
4     Q. Why did you leave Coutrywide?
5     A. I was unhappy at Coutrywide.
6     Q. And you returned to the Keating
7  firm in approximately 1998; is that correct?
8     A. It was late '97.
9     Q. Late '97. And to what department
10 or practice group did you return?
11    A. You could say I filled my old job.
12    Q. Okay. What were your duties and
13 responsibilities with respect to the
14 OHSL-Provident merger?
15    A. I was the main coordinator of the
16 registration statement -- of the form S-4
17 registration statement. And I represented
18 Provident in that capacity.
19    Q. When you say you represented
20 Provident, which Provident entity did you
21 represent?
22    A. Provident Financial Group.
23    Q. What, if any, responsibility did
24 you have for the proxy statement?
25    A. None.

Page 36

1     Q. Who had primary responsibility at
2  Keating for the proxy statement?
3     A. Nobody at Keating had primary
4  responsibility for the proxy statement. That
5  was an OHSL document.
6     Q. Please take a look at what has
7  been previously marked as Defendant's Exhibit
8  1. Have you seen that document before?
9     A. Is this the final?
10    Q. Yes.
11    A. Then yes.
12    Q. Are you familiar with that
13 document?
14    A. As familiar as I can be with a
15 transaction that occurred four years ago.
16    Q. What is Defendant's Exhibit 1?
17    A. It is a proxy statement/prospectus
18 relating to the proposed merger of Provident
19 Financial and OHSL.
20    Q. And whom do you believe is
21 ultimately responsible for the accuracy of the
22 information contained within that proxy
23 statement and registration statement?
24    A. I think multiple people are
25 ultimately responsible for the information in

Page 37

1  this proxy statement/prospectus.
2     Q. Okay. Can you tell me who?
3     A. With respect to the financial
4  information, that would be the accountants.
5  With respect to the OHSL information, that
6  would be OHSL, their advisors and their
7  attorneys. And with the Provident information
8  it would be Provident, their attorneys and
9  their advisors. With McDonald, it would be
10 McDonald's -- it would be the financial
11 advisor's responsibility.
12    Q. Is it fair to say that the
13 document consists of information received from
14 a variety of sources?
15    A. Yes, many of which were publicly
16 available at the time.
17    Q. And were you the person assigned
18 with the ministerial task of collecting the
19 information and assembling it into Defendant's
20 Exhibit 1?
21    A. Yes.
22    Q. What, if anything, did you do to
23 determine the veracity of the information you
24 received from OHSL and its advisors?
25    A. I had conversations with people

Page 154

1  responsibilities as you understood them on
2  August 2nd, 1999, with respect to this merger?
3      MR. BURKE: Objection. Asked and
4  answered.
5      A.  I couldn't put it any better than
6  you put it at the beginning. I was the
7  ministerial compiler of the document.
8      Q.  Okay. Does that mean that you
9  exercised no professional judgment in the
10 entire transaction?
11     A.  I would say that, that I also
12 represent Provident and, and in that capacity I
13 would have advised Provident on how to disclose
14 certain things.
15     Q.  And did you, in fact, do that?
16     MR. BURKE: Objection. Calls for
17 attorney-client communications.
18     A.  I don't recall.
19     Q.  Okay. Let's take a look at
20 Plaintiff's Exhibit 42. There should be a copy
21 for you in this pile.
22     A.  What is that?
23     Q.  It's a cover letter August 17th,
24 1999.
25     A.  Okay.

Page 155

1      Q.  Okay. Have you seen that document
2  before?
3      A.  Have I seen the document before?
4      Q.  Yes.
5      A.  I mean, I, I signed this letter on
6  August the 17th, 1999. I mean, I'm assuming I
7  saw it during that time.
8      Q.  And on or about August 17th, 1999,
9  was it your intention to disseminate this
10 letter and the attachment to the distribution
11 list?
12     A.  Yes.
13     Q.  What was the purpose of doing
14 that?
15     A.  For all parties who had any
16 information regarding this transaction to
17 review the materials contained in the draft and
18 contact Mark Reuter or me with questions and
19 comments in preparation for filing of the
20 document.
21     Q.  Okay. Did there come a time when
22 you received questions and comments back?
23     A.  I received numerous comments back
24 from different parties.
25     Q.  Okay. Let's take a look at

Page 156

1  Plaintiff's Exhibit 16.
2      A.  Okay.
3      Q.  Have you seen that document
4  before?
5      A.  I don't recall seeing it, but I
6  mean, I must -- I assume I did.
7      Q.  When you received the document
8  like this, was it your practice to distribute
9  this to the service list?
10     A.  When I receive a document like
11 this, it is generally my practice to make the
12 changes and then distribute it to the working
13 group for verification, in particular the
14 people who had submitted the comments.
15     Q.  And to the best of your
16 recollection, is that what you did in this
17 case?
18     A.  Well, to the best of my
19 recollection, I -- prior correspondence talked
20 about filing during the week of August 23rd. I
21 would not have -- unless I got sign-off from
22 Dinsmore & Shohl on behalf of OHSL, I would not
23 have authorized that Provident file the
24 document or -- you know, I don't know that I
25 even -- I don't really authorize it, Provident

Page 157

1  authorizes it, but we would have gotten --
2  Provident would have gotten sign-off from them
3  before filing the document.
4      Q.  How does this process of sign-off
5  work?
6      MR. BURKE: Objection. Asked and
7  answered.
8      A.  We talked about that earlier.
9  It's just -- it's everyone involved who
10 contributed to this says that they are -- that
11 they sign off on the document and it could be
12 filed as, as presented to them.
13     Q.  But it's not a written sign-off,
14 it's an oral communication, correct?
15     A.  Yes, in practice it is an oral
16 communication. There may be occasions when
17 there's a written communication, but my
18 practice is it's generally oral.
19     Q.  Okay. Let me direct your
20 attention to page 48 of the document.
21     A.  Okay.
22     Q.  Do you see where it says, Number
23 of directors?
24     A.  Yes.
25     Q.  And for OHSL, it says, The OHSL

Page 38

1  involved in the transaction. And I circulated
2  multiple drafts to everyone involved allowing,
3  in this case in particular, ample time to
4  review and verify the information.
5      Q. Do you believe that KMK and/or
6  Provident had a duty to verify the information
7  they received from other sources?
8      MR. GILLIGAN: In this
9  transaction?
10     Q. Yes.
11     A. I only believe that Provident and
12 KMK had a duty to point out any known
13 deficiencies in the document, but not to
14 independently verify information from different
15 sources. I've never -- I've never even been
16 asked to look at accountants' papers, for
17 example, but in order to verify information
18 statements, that's what I would have to do.
19     Q. Do you believe that you had any
20 independent responsibility to verify the truth
21 of written information, other than financial
22 information, that you received from OHSL and
23 their financial advisors?
24     MR. BURKE: Objection. Asked and
25 answered. You may answer.

Page 39

1      A. Do I, Mark Weiss?
2      Q. Mark Weiss or KMK or Provident.
3      A. I restate my answer. I think our
4  only obligation was to -- we certainly could
5  not inflict ourselves in the OHSL -- in the
6  OHSL corporate matters. To the extent that we
7  may have known of something in particular that
8  was deficient, we would have had a duty to
9  point that out, but I don't think we have a
10 duty to scrub everything, no.
11     Q. When you said "deficient," how did
12 you mean that?
13     A. Wrong.
14     Q. Materially false and misleading?
15     A. Wrong.
16     Q. Just factually wrong?
17     A. Correct.
18     Q. Have you heard the term take the
19 document to the printer, or a similar term?
20     A. Similar term, yes.
21     Q. Okay. What term have you heard
22 with respect to this concept?
23     MR. BURKE: What concept? Object
24 to form, vague and ambiguous.
25     A. Yes, what concept?

Page 40

1      Q. Okay. The concept of getting the
2  information from the law firm to the printer
3  and ultimately to the shareholders?
4      A. Sending it to the printer.
5      Q. Okay. Now, I understand that
6  because of electronic advances and such, this
7  is a very different process from the way it
8  used to be. Is that fair to say?
9      A. Yes.
10     Q. How did Defendant's Exhibit 1 get
11 from -- get to the financial printer?
12     A. Physically?
13     Q. Yes. How did the information in
14 Defendant's Exhibit 1 get to the financial
15 printer?
16     A. The document was hand delivered, I
17 believe, to Winkler Printing, who, through a
18 process known as camera ready copy, reproduced
19 the document.
20     Q. Who delivered the document to the
21 financial printer?
22     A. I don't remember.
23     Q. Was it someone from KMK?
24     A. I don't remember.
25     Q. Who had the final say as to when

Page 41

1  the document was finalized?
2      A. Everybody.
3      Q. What individuals are you referring
4  to?
5      A. I'm not -- I'm not referring to
6  individuals. I'm referring to the -- the
7  document wasn't complete until we had sign-off
8  from everyone, OHSL and their counsel, the
9  accountants, McDonald & Company, Provident.
10     Q. And KMK?
11     A. In our representation of
12 Provident.
13     Q. Describe for me, if you will, this
14 sign-off procedure.
15     A. I don't recall the sign-off
16 procedure in this case. Generally -- generally
17 I -- if I am the, as you say, ministerial
18 keeper of the document, I will or someone from
19 my office will be in contact with all of these
20 parties. And they will give an oral sign-off.
21     Q. Did this document come from KMK's
22 computer system?
23     A. The document that was printed?
24     Q. Yes.
25     MR. GILLIGAN: Exhibit 1.