# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Walter W. Thiemann,<br>on behalf of himself and of<br>all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>OHSL Financial Corporation, et al.<br><br><br><br><br><br><br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No. C-1-00-793<br><br>Judge Sandra S. Beckwith<br><br>Magistrate Judge Hogan<br><br>**AFFIDAVIT OF ERVIN SCHOENBLUM IN SUPPORT OF PLAINTIFFS MOTION FOR SUMMARY JUDGMENT AGAINST PROVIDENT FINANCIAL GROUP, INC. ("PROVIDENT")** |
| STATE OF NEW JERSEY<br><br>COUNTY OF PASSAIC | :<br>:  SS:<br>: | |

**ERVIN SCHOENBLUM**, being duly sworn, deposes and states as follows:

1. I have been retained by plaintiffs as a testifying expert in the field of economic damages and have previously submitted my report on damages to the plaintiff class resulting from the Provident acquisition (the Provident – OHSL merger) of the Ohio Corporation, known as OHSL. Along with the report were my qualifications (attached hereto as Exhibit A) as an expert witness as required by the

1

Fed. R. Civ. Pro. in order to opine in matters such as at bar. Since that time, I have provided advice to the plaintiffs and their counsel in drafting the Consolidated Amended Complaint ("CAC") filed December 31, 2003, as well as other matters relating to economic damages and specifically how, if at all, the negative restatements of financial data as alleged in Pars. 87 to 103 and 120 to 121 of the CAC disclosed by Provident in 2003 affected the 1999 Provident – OHSL merger.

2. I make this affidavit in support of Plaintiffs' Motion for Summary Judgment on liability issues under Sec. 11 of the 1933 Securities Act, 15 U.S.C. § 77K brought against Provident Financial Corporation, Inc. ("Provident") which alleges that the restatements were material facts to investors and caused the loss in value of Provident shares shortly thereafter, and would have done so when the merger was considered in 1999.

3. Provident stock was overvalued during the period of September 27, 1999 to December 3, 1999. This is because Provident's March and April 2003 restatements admit the overvaluation in Provident's financial statements in prior years including 1999. Provident would have been materially less attractive as a merger partner had Provident properly accounted for hundreds of millions of dollars of auto lease transactions.

4. The market reaction on the NASDAQ Stock Exchange on which Provident shares were bought and sold by individuals and other entities on a daily basis indicated that the new negative information was quickly

incorporated into the market place where shares were traded. The market reaction was dramatic and Provident stock lost approximately $300 million in total market value of its shares in one trading day after the first negative restatement on March 5, 2003.

5. The <u>first</u> restatement on March 5, 2003 for the years 1997 to 2002 caused a drop in Provident market price from $28.07 per share at the close of trading on March 4, 2003 to $22.46 on March 5, 2003. The per share price for the ten trading days after the first restatement averaged $21.72 and represented a total decrease per share of 22.6%. Had the true financial picture been known when the merger was considered, that deflation alone would have reduced the total value of Provident shares used in the OHSL merger by $12.9 million (22.6% of $57,162,375).

6. The <u>second</u> restatement on April 15, 2003 for the years 1994 to 2002 further reduced Provident's profit numbers by $44.4 million. Had Provident's true financial picture been known when the merger was considered, the deflation caused by this second reduction in profit would have reduced the per share market price of Provident shares an additional estimated 7.1% of the original artificially inflated exchange value ($57,162,375), or a further negative dollar drop of $4.1 million for OHSL shareholders.



7. The total negative impact on the market value of Provident shares used as the currency for the OHSL-Provident merger caused by the first and second restatements was approximately $17 million in fact.

8. This is the manner by which the market reacted to the restatements by Provident as computed only on the Provident shares used in the OHSL merger; the total market reaction was to decrease the total market capitalization of Provident shares by approximately $300 million almost immediately. This sudden downward spiral was attributable only to the materiality of the Provident restatements as all other comparable banks' share values in the industry remained stable at that time.

9. Provident has announced that the adverse impact on the financial statements resulting from the restatements will continue, albeit in decreasing amounts, for several years to come.

FURTHER AFFIANT SAYETH NAUGHT

*[signature]*
ERVIN SCHOENBLUM

Sworn to before me and subscribed in my presence this 20 day of January 2004.

*[signature]*
Edward Azar
Notary Public of New...
My Comm...

4

Exhibit 1 (p.1 of 2)

<u>Curriculum Vitae</u>

ERVIN SCHOENBLUM
4b MANDEVILLE DRIVE
WAYNE, NEW JERSEY 07470
(973) 696-7682

SUMMARY OF RELEVANT EXPERIENCE

Thirty-two years of management consulting in valuations, acquisitions and other investment evaluations, profit improvement programs and economic analyses in litigation matters. Participated in about 450 engagements in a broad range of industries. Prior to consulting, spent four years in engineering.

EDUCATION

| | |
|---|---|
| 1966-68 | Harvard Business School - Master of Business Administration |
| 1962-65 | New Jersey Institute of Technology - MSEE (Cum Laude) |
| 1958-62 | New Jersey Institute of Technology - BSEE (top 10%) |

BUSINESS EXPERIENCE

| | |
|---|---|
| Nov. 82 to Present | Management Consultant<br><u>Self-Employed - Wayne, NJ</u><br>Performed valuations, acquisition and other reviews for investors and developed profit improvement programs in numerous industries. Also, prepared valuation and economic analyses in litigation matters and testified thereon. Recently, also Acting President of a publicly-held medical devices company. |
| May 81 to Oct. 82 | Director of Acquisitions and Consulting<br><u>Page Mill Management Group - New York, NY</u><br>Performed valuations, acquisition and other reviews, oversaw several holdings and instituted productivity and profit improvement programs. |

Exhibit 1 (p.2 of 2)

PAGE TWO

ERVIN SCHOENBLUM

| | |
|---|---|
| Aug. 68 to Apr. 81 | Manager, Management Consulting Department<br><u>Peat, Marwick, Mitchell & Co. - New York, NY</u><br>Coordinated big-8 accounting firm's litigation consulting practice. Managed and worked on litigation engagements in many industries with a broad range in client size. Also, worked on valuations, acquisitions and other reviews and profit improvement programs. |
| June 62 to Aug. 66 | Project Engineer in Navigation and Control<br><u>Bendix Corporation - Teterboro, NJ</u><br>Worked as an electrical and aeronautical engineer. |
| Sept. 65 to June 66<br>(evenings) | Adjunct Professor in Electrical Engineering<br><u>New Jersey Institute of Technology - Newark, NJ</u> |

<u>PRESENTATIONS AND PUBLICATIONS</u>
Keynote speaker at conferences and meetings on several management-related topics. Lecturer at American Bar Association and NJ Institute for Continuing Legal Education seminars on Economic Expert Testimony. Quoted in several publications including The Wall Street Journal and articles have appeared in numerous publications. Article, "Overview and Perspective on Productivity", awarded first prize in PMM&Co. Worldwide Author Awards.

<u>AFFILIATIONS</u>

Member of numerous clubs and organizations including National Association of Forensic Economists, National Forensic Center, Harvard Business School Club and four academic honor fraternities. President of an investment group and past-President of a 400-member service organization. Advisory Board member of NJIT's College of Arts and Sciences, Board member of a publicly-held company and several community organizations.

# EXHIBIT B

1999 WL 191540
Fed. Sec. L. Rep. P 90,462
(Cite as: 1999 WL 191540 (S.D.N.Y.))

Page 1

United States District Court, S.D. New York.

David GOLDKRANTZ, Plaintiff,
v.
Merv GRIFFIN; Sun International Hotels Limited; Griffin Gaming & Entertainment, Inc.; Sun International Investments Limited; Caledonia Investments PLC; Safmarine & Rennies Holdings Limited; Rosegrove Limited; World Leisure Group Limited; Solomon Kerzner; Thomas E. Gallagher; and Royale Resorts Holdings Limited, Defendants.

No. 97 CIV. 9075(DLC).

April 6, 1999.

Avrom S. Fischer, Brooklyn, Allan Freedman, New York, Counsel for plaintiff.

Robert H. Baron, David A. Stoll, Cravath, Swaine & Moore, New York, Counsel for defendants.

OPINION AND ORDER

COTE, District J.

*1 Plaintiff brings this securities class action against a number of defendants based on an alleged misrepresentation in a joint proxy and registration statement. Defendants move for summary judgment on the ground that the alleged misrepresentation did not cause plaintiff or any member of the plaintiff class to suffer any damages. For the reasons stated, the motion is granted in full.

BACKGROUND

Plaintiff Goldkrantz was a shareholder in Griffin Gaming & Entertainment ("GGE") at the time of its merger at the end of 1996 with Sun International Hotels Limited ("Sun"), a Bahamian international business company. Prior to the merger, both GGE and Sun were engaged in the operation of hotel resorts and casinos. Plaintiff brings this action on behalf of himself and those who held GGE shares at the time of the merger based on the disclosure at the time of the merger of a license agreement between Sun and Merv Griffin, who was previously Chairman of the Board of GGE and its largest shareholder. As reported, the license agreement allowed Sun to use the Griffin name and likeness to promote the resorts and casinos. The plaintiff contends that Sun had no intention to use Griffin's name and likeness and that the so-called license agreement was the vehicle for a bribe to win Mr. Griffin's support for the merger. The defendants include GGE; Sun; Mr. Griffin; various holding groups and shareholders of Sun and GGE; Thomas E. Gallagher, a former director and officer of GGE; and Solomon Kerzner, Sun's Chief Executive Officer. By Stipulation and Order dated March 27, 1998, the claims against several shareholder defendants were dismissed without prejudice.

The chronology of the critical events is undisputed. On August 19, 1996, Sun and GGE announced that they had reached an agreement whereby Sun would acquire GGE in a stock-for-stock merger. Under the terms of the merger, shareholders of GGE would receive .4324 Sun shares for each share of GGE. On November 1, 1996, Sun and GGE issued a joint proxy statement relating to the merger, and Sun issued a registration statement attaching the joint proxy statement as the prospectus.

In the section entitled "Business of GGE," under the heading "Marketing," the proxy statement indicated that GGE *had* continued to take advantage of the celebrity status of Mr. Griffin in the marketing of its Resorts Hotel Casino. [FN1] In the summary to the proxy statement, under the heading *License and Services Agreement,* the text reads as follows:

> FN1. Although this section is written in the present tense, it is a description of GGE's business as it existed prior to the merger.

*Upon the closing* of the Merger, GGE, The Griffin Group, Inc., a corporation controlled by *Mr. Griffin* (the "Griffin Group"), and [Resorts International Hotel, Inc. ("RIH") ] *will enter into a License and Services Agreement* (the "License and Services Agreement") pursuant to which (a) the current license and services agreement between such parties will be terminated and (b) *the Griffin Group will provide to GGE, RIH and Sun a non-exclusive license to use the name and likeness of Merv Griffin to advertise and promote*

1999 WL 191540 Page 2
Fed. Sec. L. Rep. P 90,462
(Cite as: 1999 WL 191540 (S.D.N.Y.))

Resorts Casino Hotel, Atlantis and the Mohegan Sun Casino. The License and Services Agreement is to continue to September 16, 2001, unless terminated earlier by either GGE or the Griffin Group under certain circumstances. Also, in accordance with the terms of the License and Services Agreement, *total aggregate compensation of $10,973,000 is to be paid to the Griffin Group upon execution of such agreement which amount may be retained by the Griffin Group in the event of any termination.*

*2 (Emphasis supplied.) A more extensive description along the same lines can be found in the section entitled "The Merger," under the heading "License and Services Agreement." On December 10, 1996, GGE shareholders approved the merger overwhelmingly with 99.7% of shares voted and 75.8% of shares outstanding voting in favor of the merger. On December 16, 1996, the merger was completed; on that day, Sun's stock price dropped seven points to $42.125.

Approximately three months later, on March 20, 1997, Sun International North America, GGE's successor, filed its Annual Report on Form 10-K with the SEC. Note 10 to the financial statements of the Annual Report states that the amounts prepaid to Griffin pursuant to the new licensing agreement were to be written off. The day before the filing, Sun's stock closed at $37.625; the day of the filing, Sun Hotels' stock price dropped $0.625, or 2.64%, to close at $37.00. For the next several months, Sun's stock price generally continued to decline, although it fluctuated and traded above the $37.625 price on several days. One year after the merger, on December 9, 1997, the day plaintiff filed suit, Sun's stock closed at $38.50, that is, almost one dollar above its price immediately prior to the disclosure of the writeoff.

Plaintiff alleges three claims under the federal securities laws. The first claim, brought under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78bb(a), alleges that plaintiff and class members were damaged by the false and misleading disclosure with respect to the licensing agreement. For this claim, plaintiff seeks damages in excess of $10,973,000. Plaintiff's second claim is brought under Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k. This claim alleges that plaintiff and the members of the class who either sold their stock after the merger or who continue to hold their stock have sustained an actual loss in an amount in excess of $25,000,000 as a result of the decline in stock price since the merger. Plaintiff's third claim is brought under Section 12 of the Securities Act, 15 U.S.C. § 77l, and seeks rescission of the exchange of securities that occurred through the merger. The Exchange Act claim will be analyzed last.

DISCUSSION

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P.; *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). In deciding whether to grant summary judgment, therefore, this Court must determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the fact in dispute is material based on the substantive law at issue.

1. *Section 11 Claim*

*3 Section 11(a) of the Securities Act imposes civil liability on the signatories of a registration statement for material untrue or omitted statements. *See* 15 U.S.C. § 77k(a); *Akerman v. Oryx Communications, Inc.,* 810 F.2d 336, 340 (2d Cir.1987). Section 11(e) authorizes three measures for recovery of damages.

> [S]uch damages as shall represent the difference between the amount paid for the security ... and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before

1999 WL 191540
Fed. Sec. L. Rep. P 90,462
(Cite as: 1999 WL 191540 (S.D.N.Y.))

Page 3

suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought ....

15 U.S.C. § 77k(e). This language is exclusive and precludes recovery on other theories. *See McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1048 (2d Cir.1995).

Section 11(e) bars recovery of damages if a defendant proves that the loss in the value of a security is due to something other than the alleged misrepresentation on which the Section 11(a) claim is premised. It reads:

> That *if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement*, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, *such portion of or all such damages shall not be recoverable.*

15 U.S.C. § 77k(e) (emphasis supplied). Section 11(e) creates an affirmative defense for defendants who can carry their burden of "disproving causation." *Akerman*, 810 F.2d at 341. Although "not insurmountable," defendants' burden is heavy since "the risk of uncertainty" is allocated to defendants. *Id.*

Although the language of Section 11(e) speaks in terms of value rather than price, stock price is the usual starting point for determining damages. *See McMahan*, 65 F.3d at 1049. Moreover, the stock price immediately before the disclosure that a prior statement was inaccurate is generally the point from which to begin an analysis. "The price before disclosure [that the statement is misleading] may not be charged to defendants." *Akerman*, 810 F.2d at 342. Nonetheless, "[t]he presence or absence of price movement immediately after disclosure is not per se dispositive under Section 11(e)." *Adair v. Kaye Kotts Assocs., Inc.*, 97 Civ. 3375(SS), 1998 WL 142353, at *6 (S.D.N.Y. Mar. 27, 1998). Finally, expert analysis of price declines is useful to determine the effect of disclosure on stock value. *Id.*

It is undisputed that there was no discussion of the licensing agreement between the date of the merger and March 20, 1997, in any public record, including any press report. As a result, the relevant day of disclosure is March 20, 1997, when Sun filed its Form 10-K with the SEC stating, *inter alia*, that it would be writing off the prepayment of the Griffin license. Since any loss prior to March 20, 1997, is not attributable to the alleged misrepresentation, summary judgment is appropriate with respect to any class member who sold stock prior to March 20, 1997.

*4 On the day before the disclosure, Sun's stock closed at $37.625. On the day this action was filed, December 9, 1997, Sun's stock closed at $38.50. Since the stock price was higher at filing than on the day before disclosure, summary judgment is also appropriate with respect to all class members who held Sun stock as of the day of the filing.

The remaining class members are those who sold after March 20, 1997, but before the filing of the suit, at a price lower than $37.625. Such class members are likely to exist, since the stock price lingered below the pre-disclosure price for much of this period. With respect to these remaining shareholders, defendants are still entitled to summary judgment if they can demonstrate that any decrease in price was not caused by the disclosure that defendants were writing off the payments to Mr. Griffin.

To that end, defendants have provided a study by William Silber, a professor of Finance and Economics at New York University. Silber analyzed the stock price from the completion of the merger on December 16, 1996, until the filing of this action on December 9, 1997. Silber notes that during this entire period the Griffin licensing write-off was never mentioned in any newspaper, industry article, or magazine, nor in any of the regular analysts' reports from the five securities firms that cover Sun. [FN2] Silber also conducted a type of regression analysis known as an "Event Study Analysis." After removing the effects of market and industry information, Silber developed a measure called "residual returns" that reflect firm specific price changes in Sun stock on particular days. Silber then looked at the days on which there

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1999 WL 191540
Fed. Sec. L. Rep. P 90,462
(Cite as: 1999 WL 191540 (S.D.N.Y.))

Page 4

was a statistically significant residual return, which he defined as a movement greater than 4.41%, based on an application of the "standard" 95% confidence interval. Based on this analysis, Silber concluded that since none of the public announcements on the statistically significant residual return days made any mention of the Griffin licensing arrangement, those price declines were unrelated to the write-off announced on March 20, 1997. Five of the seven days on which there were statistically significant residual returns are related to specific news items unconnected to the license agreement. The remaining two occurred in August and September 1997, which was sufficiently long after the March disclosure to eliminate any connection to that disclosure.

> FN2. Instead, a review of the analysts' reports indicates that analysts generally regarded Sun as a well-run company but were concerned about three main issues: Sun's ability to succeed in the competitive New Jersey market, which it was entering for the first time with the purchase of GGE, against more experienced gaming companies; an investigation into its chairman in South Africa; and the expansion of its successful Paradise Island property in The Bahamas.

Plaintiff has provided its own expert, Lewis P. Freitas, a Professor of Financial Economics at the University of Hawaii, to review Silber's analysis. Freitas conducted no independent statistical analysis of Sun's stock. Freitas challenges Silber's choice of 4.41% as the statistically significant residual return. He points out that Sun stock dropped 2.64% on the day in March that the Sun 10-K with the write-off disclosure was filed. Freitas also claims, without further support or explanation, that an Event Study Analysis based on a single event is "highly suspect."

*5 The defendants have met their burden. Defendants' uncontested claim that there was a complete lack of reaction in the financial press to the write-off or any aspect of the licensing agreements, even though Sun was well covered by analysts, is nearly sufficient, by itself, to carry their burden. The analysts' reports show that the market's view of Sun's value was driven by other factors.

Any doubt, however, is resolved by the failure of plaintiff to contest that the defendants' Event Study Analysis reliably isolates firm specific price changes and that none of the statistically significant changes are explainable by the release of information related to the licensing agreements. *Cf. In re Executive Telecard, Ltd. Securities Litigation,* 979 F.Supp. 1021, 1025-27 (S.D.N.Y.1997) (faulting expert testimony for failure to conduct an event study analysis and for exclusive reliance on a single index).

Plaintiff's argument that adopting a different confidence interval could make the 2.64% stock price change in March statistically significant is of course true. Plaintiff has, however, provided no explanation for why a 95% confidence interval is inappropriate, other than its failure to pick up the 2.64% price change. In particular, plaintiff has made no case for application of a different confidence level that would pick up 2.64% as statistically significant, without also picking up other statistically insignificant residual returns. As a result, defendants have met their burden of showing that any decline in stock price between March 20, 1997 and December 9, 1997, is not attributable to the revelation of the alleged misrepresentation. Plaintiff's conclusory critique of defendants' statistical analysis is insufficient to create a material question of fact. Summary judgment is therefore also appropriate with respect to these remaining class members.

*2. Section 12 Claim*

Section 12(a)(2) of the Securities Act, known prior to 1995 as Section 12(2), allows a buyer to bring a private right of action in the nature of rescission against a seller that "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact ...." 19 U.S.C. § 771(a)(2). Specifically, the section entitles the defrauded buyer

> to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

19 U.S.C. § 771(a)(2); *Commercial Union Assur. Co. v. Milken,* 17 F.3d 608, 615 (2d Cir.1994). As interpreted, the provision

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1999 WL 191540  
Fed. Sec. L. Rep. P 90,462  
(Cite as: 1999 WL 191540 (S.D.N.Y.))

Page 5

allow[s] the plaintiff no choice of remedy. If plaintiff owns the stock, he is entitled to rescission but not damages. If plaintiff no longer owns the stock, he is entitled to damages but not rescission.

*Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir.1980). *See also Royal American Managers v. IRC Holding Corp.*, 885 F.2d 1011, 1019 n. 4 (2d Cir.1989).

*6 Although an analysis of the causation of any loss was previously "irrelevant" for Section 12 claims, *see Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F.Supp. 212, 220 (S.D.N.Y.1993), Congress added a loss causation provision to Section 12 for suits filed after December 22, 1995, through adoption of the Private Securities Reform Act of 1995. That provision prohibits recovery to the extent that

> the person who offered or sold such security proves that any portion or all of the *amount recoverable* ... represents other than depreciation in the value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted ....

15 U.S.C. § 77l(b) (emphasis supplied). The accompanying Senate Report states that "[t]he amendment ... is modeled after Section 11 of the Securities Act, which provides for a similar affirmative defense." S.Rep. No. 104-98 (1995), *reprinted in* 1996 U.S.C.C.A.N. 679, 1995 WL 372783, at *21.

Since the newly added Section 12(b) is modeled after Section 11, defendants claim that summary judgment is automatically appropriate under the new section as well. Although the language of the statute suggests that the allocation of burdens under Section 12(b) is the same as under Section 11, the two sections differ in their theories of recovery. As a result, it is appropriate to analyze the "amount recoverable" available to the various class members under the two theories of recovery established by Section 12(a)(2), and then determine whether the defendants have carried their statutory burden of showing that a portion or all of that amount is not attributable to the alleged misrepresentation.

Plaintiff's class consists of present holders of Sun stock and those who have already sold their Sun shares. With respect to those who continue to hold the shares, their "amount recoverable" is the difference between the consideration they originally paid for the shares and the value of the shares at the time of filing the complaint, minus any income received. [FN3] *Wigand*, 609 F.2d at 1035. The relevant times for this analysis are December 16, 1996, the day the merger was completed and December 9, 1997, the day the action was filed. Between those two dates, Sun stock dropped from $42.125 to $38.50. Thus, the "amount recoverable" would ordinarily be the difference between those two prices. The "amount recoverable" of the remaining class members, who sold their Sun shares prior to the filing of this action, is determined by a damages remedy. Those class members are "entitled to a return of the consideration paid, reduced by the amount realized when [they] sold the security and by any 'income received' on the security." *Randall v. Loftsgaarden*, 478 U.S. 647, 656 (1986). As a result, all class members who sold their shares at a price less than the December 16, 1996 merger price would be entitled to damages for the difference between the two prices.

> FN3. The parties have not provided any evidence of income received. To the extend it exists, it would reduce the amount of plaintiff's damages.

*7 Defendants have carried their burden with respect to both groups of plaintiff's class under Section 11(b) by showing that none of the "amount recoverable" to which the various class members are entitled was attributable to the alleged misrepresentation. As discussed above, prior to March 20, 1997, there was no public disclosure with respect to the license agreement, and therefore any decrease can not be attributed to the alleged misrepresentation. In the period between March 20, 1997, and the filing of the complaint, defendants have established that none of the drops in the stock were attributable to any disclosure related to the licensing agreements. Defendants have therefore carried their burden under Section 12(b), and summary judgment is appropriate.

3. *Section 14(a)*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1999 WL 191540  
Fed. Sec. L. Rep. P 90,462  
(Cite as: 1999 WL 191540 (S.D.N.Y.))

Page 6

Section 14(a) of the Exchange Act and Rule 14a-9 issued thereunder create an implied cause of action for misrepresentations contained in a proxy statement. *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9(a); *Koppel v. 4987 Corp.,* 167 F.3d 125, 131 (2d Cir.1999). One of the elements of a claim under Section 14(a) is loss causation. *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 381-82 (2d Cir.1974). *See also Koppel,* 167 F.3d at 137. The loss causation element requires a plaintiff to establish that "the damage suffered was a foreseeable consequence of the misrepresentation." *Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992).

In addition, any recovery is limited by Section 28(a) of the Exchange Act, which states that "no person permitted to maintain a suit for damages under the provisions of this chapter shall recover ... a total amount in excess of ... actual damages." 15 U.S.C. § 78bb(a). Nonetheless, Section 28(a) does not limit plaintiff's recovery to out-of-pocket damages, but instead permits recovery under other theories that compensate plaintiff for economic loss, including a benefit-of-the-bargain measure. *Osofsky v. Zipf,* 645 F.2d 107, 111 (2d Cir.1981). The appropriate measure of damages is a matter for determination by the district court based on the facts of a particular case. *See Panos v. Island Gem Enters., Ltd.,* 880 F.Supp. 169, 175 (S.D.N.Y.1995).

The normal measure of recovery is out-of-pocket damages, defined as the difference between the price paid for the security and its true value absent the fraud on the date of the transaction. *Id.* at 176; *Quintel Corp., N.V. v. Citibank, N.A.,* 596 F.Supp. 797, 802 (S.D.N.Y.1984). "Actual value is generally defined as the fair market value of a security on the date of purchase or at a subsequent date when the fraud was or should have been discovered." *Quintel,* 596 F.Supp. at 802. In lieu of an out-of-pocket measure, benefit-of-the-bargain damages are available in the limited instance
> where misrepresentation is made in the ... proxy solicitation materials as to the consideration to be forthcoming upon an intended merger. But, of course, giving the plaintiff benefit-of-the-bargain damages is appropriate only when they can be established with reasonable certainty.

*8 *Osofsky,* 645 F.2d at 114. The Second Circuit has precluded benefit-of-the-bargain recovery as clearly "speculative" where damages sought were "based on the value the stock purportedly would have had if [defendant's] true financial condition had been publicly known at the time of the transaction ...." *Barrows v. Forest Lab. Inc.,* 742 F.2d 54, 60 (2d Cir.1984). Instead,
> [a] claim for benefit-of-the-bargain damages must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypotheses about what the parties would have done if the circumstances surrounding their transaction had been different.

*Id.* *See also McMahan,* 65 F.3d at 1049-50; *Wilson v. Great American Indus., Inc.,* 855 F.2d 987, 996 (2d Cir.1988). In other special circumstances, courts have also awarded damages under the Exchange Act under a disgorgement or consequential damages theory. *See Panos,* 880 F.Supp. at 176.

Plaintiff claims that class members have been damaged in the amount of $10,973,000, the amount of the prepayment under the license agreement. Nonetheless, plaintiff does not relate this amount to any measure of recovery available to the class under Section 14(a). Although this failure is likely fatal to plaintiff's claim, the Court will nonetheless analyze plaintiff's Section 14(a) claim for damages under two measures: out-of-pocket loss and recovery of the benefit of the bargain. Assuming first that plaintiff seeks the standard out-of-pocket damages, plaintiff has produced no evidence that the decrease in value of the Sun stock was attributable to the alleged misrepresentation. On the other hand, defendants have established that any decrease in price can not be attributed to the misrepresentation. Assuming instead that the damage claim is based on a benefit-of-the-bargain theory, the only argument made by the plaintiff that can be construed as an articulation of this theory of damages is the following: if Griffin had not been paid the "license fee," he would have been able to negotiate a better price for GGE shareholders. As an initial matter, since the alleged misrepresentation concerns something other than the consideration for the merger, benefit-of-the-bargain damages are unavailable. *Osofsky,* 645 F.2d at 114. Furthermore, plaintiff's argument is unduly speculative. It depends for its success on the following chain of events. First, Sun would have abandoned the licensing arrangement if it were forced to disclose

1999 WL 191540
Fed. Sec. L. Rep. P 90,462
(Cite as: 1999 WL 191540 (S.D.N.Y.))

Page 7

in the proxy statement its intent not to use the license. Second, Griffin would have demanded more compensation for all shareholders in lieu of the licensing fee. Third, Sun would have agreed to Griffin's demand. This chain of events is too speculative to support recovery of damages. *Barrows*, 742 F.2d at 60. Under any measure of recovery, therefore, plaintiff's claim of damages is deficient as a matter of law. *Cf. Unterberg Harris Private Equity Partners, L.P. v. Xerox Corp.*, 995 F.Supp. 437, 442-43 (S.D.N.Y.1998) (summary judgment under Exchange Act claim appropriate on loss causation grounds, without expert testimony, where stock's decline was not "visibly exacerbated" by defendants' allegedly wrongful actions); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F.Supp. 248, 258 (S.D.N.Y.1997) (summary judgment under Exchange Act claim appropriate where plaintiff failed to show loss was a result of defendant's act). As a result, plaintiff has not carried its burden to create a material issue of fact as to "loss causation" under Section 14(a).

## CONCLUSION

*9 The defendants' motion for summary judgment is granted. The Clerk of Court shall close the case.

SO ORDERED:

1999 WL 191540, 1999 WL 191540 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,462

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# EXHIBIT C

26 Fed.Appx. 472 Page 1
(Cite as: 26 Fed.Appx. 472, 2002 WL 22000 (6th Cir.(Tenn.)))

**H**
This case was not selected for publication in the Federal Reporter

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.

Not selected for publication in the Federal Reporter.

This opinion was not selected for publication in the Federal Reporter. Please use FIND to look at the applicable circuit court rule before citing this opinion. FI CTA6 Rule 28(g).

United States Court of Appeals,
Sixth Circuit.

Andrew A. DOWNS and Maria Downs,
Plaintiffs-Appellants,
v.
PERSTORP COMPONENTS, INC., and ICI Americas, Inc., Defendants-Appellees.
No. 00-5507.

Jan. 4, 2002.

Action was brought to recover for neurological injuries suffered after exposure to allegedly toxic chemical. The United States District Court for the Eastern District of Tennessee, James H. Jarvis, J., granted summary judgment for defendants, and appeal was taken. The Court of Appeals, Norris, Circuit Judge, held that exclusion of causation testimony by plaintiff's expert was not abuse of discretion.

Affirmed.

West Headnotes

[1] Evidence ⚖═555.10
157k555.10 Most Cited Cases

Trial court did not abuse its discretion in excluding proposed expert testimony linking plaintiff's neurological illness to exposure to defendant manufacturer's allegedly toxic chemical; expert's methodology, of reasoning backwards from plaintiff's condition and, through process of elimination, concluding that chemical must have caused it, was not accepted by medical community. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

[2] Federal Civil Procedure ⚖═928
170Ak928 Most Cited Cases

Trial court did not abuse its discretion in holding plaintiff to agreed order prohibiting one of his experts from testifying as to causation, in suit for personal injuries from exposure to toxic chemical, even after his other expert's causation testimony was excluded as unreliable; plaintiff was aware of challenge to second expert's testimony at time of agreed order, but agreed to order anyway in response to threat that court would exclude first expert's testimony altogether for failure to produce expert witness report.

[3] Products Liability ⚖═15
313Ak15 Most Cited Cases

Tennessee law requires proof of causation for products liability actions, whether based on strict liability or negligence.
*473 On Appeal from the United States District Court for the Eastern District of Tennessee.

Before NORRIS and BATCHELDER, Circuit Judges; GWIN, District Judge. [FN*]

> FN* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

OPINION

NORRIS, Circuit Judge.

**1 Andrew A. Downs and Maria Downs brought suit against defendants, Perstorp Components, Inc., ("Perstorp") and ICI Americas, Inc., ("ICI") for injuries allegedly suffered by Andrew Downs as a result of an exposure to Rubiflex SI 30690, a

26 Fed.Appx. 472                                                                                                              Page 2
(Cite as: 26 Fed.Appx. 472, 2002 WL 22000 (6th Cir.(Tenn.)))

chemical product manufactured by ICI. The district court granted summary judgment to defendants. We affirm.

I.

In 1995, Perstorp purchased Rubiflex, which is used in the production of foam insulation, from ICI. Another company, SurfAir, was hired to transport the Rubiflex to Perstorp's operation in Tennessee. Downs reported that the plane chartered to ship the containers of Rubiflex was too small. JoAnn Holland, a SurfAir employee, then contacted Jayne Collyar, a Perstorp representative, about the problem. Collyar suggested repackaging the Rubiflex in smaller containers. Holland relayed this suggestion to Downs, who expressed some concern about breaking the seal on the container because he was afraid its contents might be hazardous. Holland told Downs that Rubiflex was not referenced in a book she had consulted on hazardous materials, and Downs proceeded to repackage the Rubiflex.

*474 During the repackaging attempt. Rubiflex splashed out of the containers and onto Downs' arms and face. He experienced a burning sensation on his skin and contacted Holland to report the problem. After checking with Collyar, Holland assured Downs that exposure to the chemical was safe.

In December of 1995. Downs began noticing neurological symptoms and subsequently sought treatment from Dr. Kaye H. Kilburn. Dr. Kilburn diagnosed plaintiff with "chemical encephalopathy" and, after extensive testing, concluded that the cause of his condition was the exposure to Rubiflex.

In June 1996, plaintiffs instituted this diversity action. The complaint sought recovery against ICI based upon the Tennessee Product Liability Act and against Perstorp because one of its representatives negligently misrepresented the danger associated with exposure to Rubiflex.

The district court entered a discovery order requiring parties to submit expert-witness reports and disclosures required by Federal Rule of Civil Procedure 26(a)(2) by a certain date. [FN1] When plaintiffs failed to submit the required Rule 26(a) reports for Dr. Kilburn and another identified expert, Thomas J. Callender, M.D., by June of 1998, defendants moved to compel production of the reports. Plaintiffs ultimately produced Dr. Kilburn's report but failed to submit a report from Dr. Callender.

> FN1. Rule 26(a)(2)(B) requires that the disclosure of the identity of "a witness who is retained or specially employed to provide expert witness testimony in the case ... be accompanied by a written report prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B).

After defendants moved to exclude any testimony by expert witnesses for whom plaintiffs had not produced a report, the parties agreed to an order stipulating that Dr. Callender would not offer testimony on causation. With respect to Dr. Kilburn, defendants moved to exclude his testimony on the ground that it failed to satisfy the standards for scientific testimony outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The magistrate judge conducted a *Daubert* hearing and granted defendants' request to exclude Dr. Kilburn's testimony. The district court affirmed the exclusion of Dr. Kilburn's testimony.

**2 At this point, defendants moved for summary judgment on the ground that plaintiffs lacked evidence of causation. In response, plaintiffs argued that they should be relieved of the restrictions placed on Dr. Callender's testimony by the earlier agreed order so that he could testify on the issue of causation. The district court concluded that plaintiffs were bound by the agreed order, and that, without the testimony of doctors Kilburn or Callender, plaintiffs lacked any evidence of causation. Accordingly, the court granted summary judgment to defendants.

II.

We review the district court's decision to exclude the testimony of plaintiffs' expert witnesses for abuse of discretion. See *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 248 (6th Cir.2001). We review the district court's grant of summary judgment de novo. See *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir.1997).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

26 Fed.Appx. 472
(Cite as: 26 Fed.Appx. 472, 2002 WL 22000 (6th Cir.(Tenn.)))

Page 3

A. Exclusion of Dr. Kilburn's Testimony

Plaintiffs argue that Dr. Kilburn's testimony meets the standard of Federal Rule of Evidence 702 for the admission of expert testimony, as well as the criteria articulated by the Supreme Court in *Daubert* *475 for assessing the admissibility of scientific evidence under Rule 702.

1. *Daubert* Standard

In *Daubert*, the Supreme Court held that the Federal Rules of Evidence provide the standard for admitting expert scientific testimony and require that such testimony must be both relevant and reliable. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. The Court explained that "in order to qualify as 'scientific knowledge.' an inference or assertion must be derived from the scientific method. Proposed testimony must be supported by appropriate validation--*i.e.*, 'good grounds,' based on what is known." *Id.* at 590, 113 S.Ct. 2786. In assessing the admissibility of expert scientific testimony, the trial judge must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93, 113 S.Ct. 2786. In *Daubert* the Court identified several factors that may be included in this inquiry but emphasized that the inquiry is "a flexible one." *Id.* at 594, 113 S.Ct. 2786. These factors include whether the theory or technique can be and has been tested, has been subject to peer review and publication, has a known potential error rate, and is generally accepted by the scientific community. *Id.* at 593-94, 113 S.Ct. 2786.

After careful review of the magistrate judge's opinion and the arguments made by the parties, we are convinced that the magistrate judge did not abuse his discretion in excluding Dr. Kilburn's testimony because his conclusions were not based on valid scientific methodology.

2. Dr. Kilburn's Methodology

[1] The magistrate judge identified numerous "red flags" raised by Dr. Kilburn's proposed testimony. Among those that the magistrate judge identified were: (1) Dr. Kilburn's methodology is not accepted by the medical community; (2) he extrapolated results from unrelated chemical compounds in forming his conclusions; (3) he failed to test his hypothesis; and (4) he reached a conclusion before conducting any research.

**3 In addition, the magistrate judge discussed problems with Dr. Kilburn's methodology in light of testimony by defendants' expert witnesses who described commonly accepted methods for conducting a toxicological investigation. The magistrate judge highlighted the fact that, at the time he diagnosed Andrew Downs, Dr. Kilburn was not aware of the constituent components of Rubiflex [FN2] and did not know the amount of Rubiflex to which Downs had been exposed. The magistrate judge also noted that Dr. Kilburn testified that he had found no scientific literature suggesting that Rubiflex could lead to neurological problems and had not conducted any testing himself to determine the potential effects of exposure to Rubiflex or its components. We agree that these represent fundamental flaws in the methodology underlying Dr. Kilburn's opinion that Rubiflex caused Downs' neurological problems.

> FN2. Dr. Kilburn did eventually familiarize himself with the constituent components of Rubiflex. His original conclusion, however, was based simply on Downs' symptoms and the fact that he had been exposed to Rubiflex.

The most obvious problem with Dr. Kilburn's methodology is that he never identified the component or components in Rubiflex that were responsible for Downs' condition. Plaintiffs argue that it was sufficient that Dr. Kilburn identified Rubiflex as an epoxy and determined that it contains *476 two substances identified as toxic in scientific literature. In his testimony, however, Dr. Kilburn admitted that he could not identify which components of Rubiflex caused the various neurological problems that he had diagnosed Downs as having, and that it would be simply speculation to attempt to identify the specific effects of these toxins. Moreover, Dr. Kilburn stated that his primary basis for concluding that Rubiflex is toxic was his observation of Downs' condition.

Another significant flaw in Dr. Kilburn's method was the fact that he made no attempt either to determine the dose to which Downs was exposed or

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

26 Fed.Appx. 472
(Cite as: 26 Fed.Appx. 472, 2002 WL 22000 (6th Cir.(Tenn.)))

Page 4

to identify independently what dose of Rubiflex, or the toxins he had identified in Rubiflex, is necessary to cause the conditions that he observed in Downs. Therefore, Dr. Kilburn was unable to state whether Downs had received a dose sufficient for Rubiflex to have caused his condition and was unable to state what minimum dose would be required to do so.

In essence, Dr. Kilburn's methodology primarily involved reasoning backwards from Downs' condition and, through a process of elimination, concluding that Rubiflex must have caused it. Dr. Kilburn's response to the question of whether he had conducted any testing to calculate Downs' potential exposure summarizes his methodological approach: "We know we had an effect, we know that Rubiflex was there, we've excluded all other possibilities.... I see nothing else needed."

As evidenced by the fact that he was unaware of the components of Rubiflex when he came to his initial conclusion about what caused Downs' condition, Dr. Kilburn's method does not include any reference to existing scientific knowledge or any attempt to test independently the validity of his conclusion. In effect, Dr. Kilburn **simply formed a hypothesis** based on his observations of Downs and what he knew of Downs' medical history. He failed to take the necessary step of either supporting his hypothesis through reference to existing scientific literature or conducting his own tests to prove its reliability. *See Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir.2000) (stating that "*Daubert* and its progeny make clear that '[p]roposed [expert] testimony must be supported by appropriate validation.' ") (quoting *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786). In light of these methodological shortcomings, the magistrate judge did not abuse his discretion in determining that Dr. Kilburn's testimony should be excluded because it lacked scientific reliability.

B. Exclusion of Dr. Callender's Testimony

**4 [2] Plaintiffs argue that they should be relieved of the limitations in the agreed order that prohibited Dr. Callender from testifying on the issue of causation because, at the time it was entered, Dr. Kilburn's testimony had not yet been challenged. They contend that they agreed to limit Dr. Callender's testimony only because they assumed Dr. Kilburn would be permitted to testify on the issue of causation.

Plaintiffs' position is undermined by the fact that they were on notice of the potential exclusion of Dr. Kilburn's testimony for nearly fifteen months before they requested relief from the order. As the Supreme Court recently observed, "It is implausible to suggest, post-*Daubert*, that parties will present less than their best expert evidence in the expectation of a second chance should their first try fail." *Weisman v. Marley Co.*, 528 U.S. 440, 442, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000).

"District courts have broad discretion to exclude untimely disclosed expert- witness testimony." *Pride*, 218 F.3d at 578. In *477 this case, the district court refused to grant the plaintiffs relief from an agreed order prohibiting Dr. Callender from testifying on the issue of causation because, at the time they agreed to this limitation, plaintiffs faced the very real threat that the magistrate judge would exclude Dr. Callender's testimony altogether due to their failure to produce an expert witness report. In view of that reasoning, we are unable to say that the district judge abused his discretion in refusing to relieve plaintiffs of the terms of their agreement.

C. Summary Judgment

[3] The district court correctly concluded that, without admissible expert testimony on causation, no reasonable jury could find for plaintiffs because Tennessee law requires proof of causation for both strict liability and negligence actions. *See, e.g., Caldwell v. Ford Motor Co.*, 619 S.W.2d 534, 539 (Tenn.Ct.App.1981) (Tennessee strict liability statute requires a showing that the product caused the injury); *Dillard v. Vanderbilt Univ.*, 970 S.W.2d 958, 960 (Tenn.Ct.App.1998) (negligence claim requires establishing causation in fact).

III.

The district court's orders excluding the testimony of Dr. Kilburn, denying plaintiffs' request for relief from the terms of the agreed order, and granting summary judgment for defendants are affirmed.

26 Fed.Appx. 472, 2002 WL 22000 (6th Cir.(Tenn.))

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works