# EXHIBIT A

Preliminary Expert Report of Candace L. Preston, CFA
On Behalf of the OHSL Financial Corp. Plaintiffs

In re: OHSL Financial Corp. Securities Litigation

Case No. C-1-00-793

Southern District of Ohio
Western Division

May 1, 2002

Assignment

1.  I have been retained by Plaintiffs' counsel in connection with this matter as an expert witness to provide expert testimony on issues relating to the materiality of certain information and, if required, to opine on the opinion of defendants' expert(s).  In addition, I was asked to explain the purpose of a Proxy Statement, and its intended use.  I have prepared and signed this written report in fulfillment of the obligations imposed by Federal Rules of Civil Procedure, Rule 26(a)(2).  My opinions in this matter are based in part upon information obtained by Plaintiffs through discovery to date, and are subject to supplementation and/or revision in light of additional information which may come to light through further discovery.

2.  Specifically, counsel for the Plaintiffs ("Counsel") has asked me to opine on the materiality of Defendants' alleged misstatements and omissions in the September 24, 1999 Proxy Materials/Prospectus sent to the shareholders of OHSL Financial Corp. ("OHSL" or "the Company").

Qualifications

3.  A copy of my curriculum vitae is attached as Exhibit 1.  A summary of the matters in which I have rendered testimony either at trial or in a deposition within the last four years is attached as Exhibit 2.

4.  To summarize my qualifications, I am a graduate of Eastern Michigan University and received an MBA from the Wharton School of Finance, University of Pennsylvania. I am a founding member of Financial Markets Analysis, LLC ("FMA").  FMA is a valuation and securities analysis firm with offices located in Princeton, New Jersey and San Diego, California.  FMA provides valuation, financial analysis and related consulting to its clients.  FMA personnel have frequently been called upon to prepare reports and to testify as experts in class actions under Federal and State securities laws.  Such testimony has regularly included market efficiency, the materiality of information conveyed to

2

investors, loss causation, the valuation of publicly traded securities based upon the absence of alleged misstatements and/or the disclosure of alleged omissions and misrepresentations and damages caused by the alleged misstatements and omissions.

5.    Prior to joining FMA I was a managing director at BNY Capital Markets, Inc. ("BNY"), a wholly owned subsidiary of the Bank of New York. At BNY, I was responsible for valuations done in conjunction with fairness opinions, mergers and acquisitions, private financings and other investment banking projects.

6.    Prior to joining BNY I was a founding partner of Triumph Partners, LLC ("Triumph"), a valuation and consulting firm. Before founding Triumph, I was an executive vice president of Princeton Venture Research, Inc. ("PVR").

7.    I have not authored any publications within the past ten years.

8.    FMA is being compensated in this matter based on the number of hours expended at the rates charged for personnel, which range from $75 to $400 per hour, plus out-of-pocket expenses. My hourly rate is $400. Our compensation is in no way contingent upon the outcome of this matter.

<u>Summary of Opinions</u>

9.    It is my opinion that (i) the OHSL shareholders received incomplete and, in some cases, incorrect information in the September 24, 1999 Proxy Materials/Prospectus (the "Proxy"), and in subsequent communications from Defendants, which prevented them from making an informed decision regarding the proposed merger with Provident Financial Group, Inc. ("Provident"); (ii) the Proxy contained material misstatements and omissions regarding the actions and opinions of some members of OHSL's Board of Directors ("OHSL BOD"), and the background of the transaction, which would have been important to OHSL investors in determining whether or not to vote in favor of the merger; (iii) the opinion of OHSL's financial advisor, McDonald Investments, Inc. ("McDonald"), annexed to the Proxy was "stale", due to a material change in Provident's

stock price, and should have been revised concurrent with the date of the letter to shareholders attached to the Proxy; (iv) the Proxy contained inadequate disclosure of the inherent risk associated with Provident's loan securitization activities; and (v) it is likely that the outcome of the vote was affected by these material misstatements and omissions.

Bases of Opinions

10. My opinions are based upon my professional knowledge and experience. In addition, I had access through Counsel to all of the documents and data that I requested which were within their control and nothing I requested was withheld from me by Counsel. In formulating my opinions in this matter, I have examined documents and data including, but not limited to, the following:

a)   Plaintiffs' Class Action Complaint and First Amended Class Action Complaint filed in this Action;

b)   Reply Memorandum in Support of Motion to Reconsider Order Granting Class Certification;

c)   Memorandum in Support of Motion to Dismiss, November 20, 2000 and Appendix of Exhibits;

d)   Plaintiff's Brief in Opposition to the Motion to Dismiss of the OHSL and Provident Defendants, January 3, 2001;

e)   Reply Memorandum in Support of Motion to Dismiss, January 25, 2001;

f)   Corrected Reply Memorandum in Support of Motion to Dismiss, January 30, 2001;

g)   OHSL Financial Corp. Proxy Materials/Prospectus dated September 24, 1999;

h)   Deposition transcripts of Mr.'s Hanauer, Herron, Thiemann, and Zoellner;

i)   Order of Court granting Class Certification, September 13, 2001;

j)   Order of Court re: Motion to Dismiss, July 24, 2001;

k)   OHSL's public filings such as Forms 10-K, 10-Q, 8-K and Proxy Statements filed during 1998 and 1999;

l)   OHSL and Provident's historical stock price and volume data during the period 1998 through 2002, as well as similar data for other banking institutions competing in the same or similar markets as OHSL and Provident during that time period;

m)   News articles published in the general and financial press about OHSL and Provident;

n)    Reports published by security analysts about Provident and other banking institutions;

o)    Historical pricing data for banking industry indices; and

p)    News articles, analyst reports and historical price information for Hewlett-Packard Company and Compaq Computer Corporation.

I reserve the right to prepare demonstrative charts and other graphic material for trial.

<u>Background</u>

11. In early 1999, OHSL's BOD began exploring options regarding a possible sale of the Company.  It engaged McDonald to assist in the preparation of a valuation and to solicit interest in the Company from potential acquirers.  By June 1999, McDonald had received a non-binding indication of interest from Provident and was authorized by OHSL to invite Provident to conduct its due diligence investigation.  On July 22, the OHSL BOD met to discuss Provident's offer, and voted to continue negotiations with Provident on the sale of the Company.

12. By August 2, 1999 both parties had agreed upon the merger terms, and the OHSL BOD had voted to approve the merger with Provident.  However, between July 22 and August 2, one of OHSL's board members resigned in protest of the transaction.  His resignation was not disclosed to shareholders.

13. Consummation of the transaction depended upon approval by a majority of OHSL's shareholders.  The shareholder vote was solicited via the Proxy Materials/Prospectus (the "Proxy") dated September 24, 1999.  The Proxy advised shareholders, among other things, that:

a)  A special meeting of shareholders was scheduled for October 25, 1999 at which they would have an opportunity to vote on the proposed merger with Provident;

b)  The OHSL BOD voted unanimously in favor of the merger and believed it was in the best interest of shareholders;

5

c) If approved, all shares of OHSL stock would be converted into shares of Provident stock based upon the provided exchange ratio; and

d) The OHSL BOD received an opinion from its financial advisor, McDonald, that the exchange ratio was fair to OHSL shareholders from a financial point of view.

Shareholders were urged to vote by completing and returning the proxy card, although it was clear that not returning a proxy card was a vote against the transaction.

14. On October 25, 1999 OHSL's Chief Executive Officer ("CEO") and director, Kenneth Hanauer conducted the meeting of shareholders at which he recommended the proposed merger with Provident. Subsequently, OHSL obtained a 52.4% approval vote and OHSL shares were exchanged for shares of Provident effective December 3, 1999. OHSL shareholders received 0.5458 shares of Provident stock for each share of OHSL they owned, or an equivalent dollar amount of $22.04 per share based on the closing price for Provident on that day of $40.375.

Allegations

15. It is my understanding that the Complaint and Amended Complaint allege Defendants made material misrepresentations and withheld material information from them in conjunction with the Proxy solicitation beginning September 24, 1999, as follows:

a) Defendants omitted the fact that OHSL's CEO and director, Kenneth Hanauer, was opposed to the transaction leading up the August 2, 1999 vote of the OHSL BOD, and that he demanded his signature be removed from the letter to shareholders attached to the Proxy.

6

b) Defendants misrepresented that the contracts that provided management with compensation in the event of a change in control ("change of control contracts") were in place in June 1999, when in fact they were not in place until after the July 22, 1999 BOD meeting.

c) Defendants did not disclose that there was opposition to the transaction by certain members of OHSL's Board, including Thomas Herron, who resigned in protest of continuing negotiations with Provident. His resignation was not disclosed to shareholders.

d) Defendants misrepresented that the transaction was "unanimously approved" by OHSL's BOD, when, in fact only five of the then seven members of the Board voted in favor of the transaction.

e) Defendants misrepresented that the OHSL BOD believed the transaction was "in the best interest" of shareholders, when in fact there were directors who did not believe that to be true;

f) OHSL CEO, Mr. Hanauer voted his personal shares against the transaction, notwithstanding the fact that he ran a special meeting of shareholders, at which shareholders were encouraged to vote in favor of the transaction.

g) The fairness opinion by OHSL's financial advisor, McDonald, was not current at the time the Proxy was circulated to shareholders, and should have been updated.

h) The risk disclosures provided in the Proxy materially misleading

and did not provide shareholders with adequate information

regarding the nature of Provident's securitization activities.

The Purpose of Proxy Materials

16. The purpose of any proxy materials or prospectus is to provide shareholders with

all of the information necessary for them to make a knowledgeable investment decision

regarding their shares.  The Securities and Exchange Commission ("SEC") requires,

under Regulation C, that information in a prospectus be presented in "clear, concise, and

understandable" language, and that it not be misleading.  It is incumbent upon the Board

of Directors and their advisors to impart all relevant information to shareholders

regarding a proposed merger, and to present it in such a way that it is readily

comprehensible to shareholders.

17. It has long been accepted that the strength of the United States financial markets

is in the reporting and disclosure rules promulgated by the SEC and implemented by

public companies and their advisors.  This was not always the case.  The Securities Act of

1933 and the Securities Exchange Act of 1934 (the "Exchange Act") were a direct result

of the stock market crash of 1929 and the ensuing Great Depression.  The purpose of the

1933 Acts was, and remains, "to provide full and fair disclosure…and prevent frauds" in

the sale of securities, and the 1934 Act to provide for the dissemination of accurate

information to investors and thereby "insure the maintenance of fair and honest

markets."[1]  The required reporting of financial and other information required in a

prospectus demonstrates its materiality as a matter of public policy.

18. In this case, I believe the alleged misstatements and omissions contained in the

---

[1] Securities Act of 1933; and Securities Exchange Act of 1934, As Amended, Title I, Sec. 2

proxy materials distributed to OHSL shareholders were material, pertained to matters at the heart of the transaction, and affected the ultimate outcome of the shareholder vote.

The Materiality of Misrepresentations and Omissions Related to the CEO

19. OHSL shareholders were told that their Board of Directors voted unanimously to approve the merger with Provident and that it was in their best interest. There was no indication, in either the Proxy, nor the meeting of shareholders on October 25, 1999, that Mr. Hanauer, OHSL's CEO and Board member, had been opposed to the transaction from the beginning; that he did not believe the transaction was in the best interest of OHSL's shareholders; that he directed his signature be removed from the letter to shareholders attached to the Proxy; and that he voted his personal shares against the merger.

20. It is my opinion that the above information, omitted from the Proxy, was material in that it would have been important to investors, may have caused them to form a different opinion about the transaction with Provident, and in all likelihood would have altered the outcome of the vote. I base this opinion on the fact that investors are keenly interested in the opinions of senior management, especially the most senior member, the CEO. The CEO is generally viewed by shareholders as the person responsible for the day-to-day operations of the corporation as well as strategic planning for its future. The CEO is also viewed by the investment community to be most knowledgeable and informed about all matters affecting the corporation and its future. In conjunction with the Chief Financial Officer, who reports on the financial matters of the corporation, the CEO is the most sought after voice in communications with shareholders and the investment community.

21. A 1999 Survey conducted by Fleishman-Hillard Research for the Association of Investment Management and Research asked investment professionals and financial analysts what they considered the most important source of financial or corporate information. Nearly three out of four perceived the CFO and CEO as the people within a company who have the most important roles in providing key information.[2]

22. In this case, the role of CEO as a source of information may have been even more important. OHSL was a regional savings and loan with six branches in western Cincinnati. Many of its shareholders were also customers and/or employees of OHSL. OHSL's shares did not turn over quickly, relative to the total number of shares outstanding, suggesting many of its investors were committed, long-term owners of the stock. The stock was not actively followed by securities analysts, who might have expressed opinions about the transaction. Mr. Hanauer was a visible member of the community. He had come up through the ranks and had been affiliated with the bank for more than 20 years. He was the only representative of management serving as a board member. Clearly, his opinion regarding the merger with Provident, would have been important to OHSL's shareholders, and in all likelihood would have caused some of them to vote differently.[3]

23. Walter Thiemann testified that he would have voted his 40,000 shares against the transaction had he known Mr. Hanauer was not in favor of the transaction and voted his personal shares that way.

24. In addition to holding the most important role in the company from the

---

[2] AIMR Corporate Disclosure Survey, February 2000.
[3] Mr. Hanauer testified Terry Todd and Pat Condren, also members of OHSL management, were not in favor of the transaction.

perspective of shareholders, Mr. Hanauer also held the top spot in terms of share

ownership. The table below illustrates that of all of the OHSL executive officers and

directors, Mr. Hanauer owned the most stock, and therefore was the person most likely to

be able to influence the vote.

| Shares Outstanding | 2,503,470 | | |
|---|---|---|---|
| Shares Owned by Insiders | | | |
| Hanauer, Kenneth | 123,075 | 4.9% | CEO, director |
| Condren, Patrick | 59,330 | 2.4% | Exec. Officer |
| Wieland, Marilyn | 57,728 | 2.3% | Exec. Officer |
| Hillebrand, William | 49,294 | 2.0% | Director |
| Hucke, Alvin | 48,064 | 1.9% | Director |
| Todd, Terry | 40,926 | 1.6% | Exec. Officer |
| Tenoever, Joseph | 32,320 | 1.3% | Director |
| McKiernan, Thomas | 29,692 | 1.2% | Director |
| Brinker, Norbert | 29,534 | 1.2% | Chairman |
| Zoellner, Howard | 24,672 | 1.0% | Director |
| | | | |
| Directors and Exec. Officers | | | |
| as a Group: | 494,635 | 19.8% | |

25. It is my opinion that if shareholders had known that the person on the Board with

the largest financial stake in the Company, and most able to impact the vote by virtue of

share ownership, did not believe the merger was in the best interest of shareholders, the

outcome of the shareholder vote would most likely be different. Further, I believe that

misrepresentations in the Proxy would have caused a reader to believe that Mr. Hanauer

intended to vote his shares in favor of the transaction. In fact, Mr. Hanauer had already

voted his shares against the transaction at the time of the special meeting of shareholders,

at which they were urged to vote in favor of the merger.

26. It is my understanding that 52.4% of the outstanding shares were voted in favor of

the transaction. The table below illustrates that a "no" vote by approximately 63,000

additional shares would have been enough to terminate the transaction. Thus, in addition

to Mr. Thiemann's 40,000 shares, it would have taken only an additional 23,000 shares

voting "no" or abstaining to have terminated the transaction. The transaction was approved by a slight majority of the shares, many of which I believe would have been cast in opposition to the transaction, had shareholders been provided with accurate and non-misleading information in the Proxy.

| | | OHSL Shares Outstanding | 2,503,470 |
|---|---|---|---|
| Percentage required to approve transaction | 50.1% | Approximate number of shares required to approve transaction | 1,254,238 |
| Percentage voted in favor of transaction | 52.4% | Approximate number of shares voted in favor of transaction | 1,311,818 |
| Percentage voted against transaction or abstained | 47.6% | Approximate number of shares voted against transaction or abstained | 1,191,652 |
| | | Additional "no" votes, or abstentions, needed to terminate transaction | 62,587 |

The Materiality of Misrepresentations and Omissions Related to OHSL's BOD

27. Mr. Hanauer testified, and I concur, that dissention by Board members in a merger or acquisition, is perceived as being detrimental to the completion of the transaction.[4] During the course of negotiations, at least three of the eight original Board members were not in favor of continuing negotiations with Provident to acquire the Company, and expressed their objections. One was Mr. Hanauer, as previously discussed, and the others were Thomas Herron and Howard Zoellner.[5]

28. Shortly after the July 22, 1999 meeting of the Board, at which it voted to continue negotiations with Provident, Mr. Herron tendered his resignation from the OHSL BOD. It is his testimony that the other members of the OHSL BOD were aware that his

---

[4] Deposition of Kenneth Hanauer, Volume IV, pps 764 – 767.
[5] Mr. Herron testified that the management team was against the transaction. Hanauer, Volume II, pps 269-270.

resignation was in protest to the OHSL BOD's decision to move forward with the merger. OHSL chose not to disclose Mr. Herron's resignation. Mr. Herron had been a member of the OHSL BOD since 1993, when it became a public company. He also owned 14,000 shares of OHSL stock as of April 1999. It is my opinion that his dissention, and resignation, was material information, in that it would have been important to investors in deciding on whether or not to vote their shares in favor of the merger, and should have been disclosed.

29. In order to independently verify the importance of a dissenting opinion by a company director or insider, I examined the pending situation with the Hewlett-Packard/Compaq Computer Corp. merger transaction. I was interested in whether or not a director, who voices a dissenting opinion about a transaction, has the ability to influence the shareholder vote and/or the price of the stock.

30. On September 3, 2001, Hewlett-Packard ("HWP") announced its Board of directors had unanimously approved the decision to acquire Compaq Computer Corp. ("Compaq"). Completion of the merger required an approval by a majority of both Compaq and HWP shareholders. From the outset, many HWP shareholders were opposed to the acquisition and publicly aired their concerns. Within three trading-days of the announcement, HWP's stock price fell 24%.

31. On November 6, 2001, Walter Hewlett, who has served on HWP's Board of directors since 1987, announced he was voting his shares, and those of the William R. Hewlett Revocable Trust, against the transaction. He stated, "After careful deliberation, consultation with my financial advisor, and consideration of developments since the announcement of the merger, I have decided to vote against the transaction. I believe that

Hewlett-Packard can create greater value for stockholders as a stand-alone company than as a company combined with Compaq." This disclosure caused a 17% one-day increase in the price of HWP's shares, coupled with reported trading volume of nearly 35 million shares.



32. The announcement by Mr. Hewlett, made prior to the filing of the merger Proxy, encouraged other major shareholders to follow suit and diminished the likelihood of the deal going through. His voice was a credible threat to the transaction as evidenced by the commentary that followed.

"This is quite a blow to the current management of H-P," said Bruce Raabe, chief investment officer of Collins & Co., which owns 150,000 Hewlett-Packard shares. "It signals some doubt in Carly's management and judgment. This will change how the vote shakes out."

"It really opens the door for the Boards to re-review the transaction and increases the possibility that the deal won't get done," said David Katz, chief investment officer of Matrix Advisors...

Some investors speculated that directors might be sympathetic to Walter Hewlett's concerns.

"It will make it more of a dogfight," said [Todd] Ahlsten, whose firm holds 650,000 Compaq shares and 150,000 Hewlett-Packard shares.

*(Bloomberg News, November 7, 2001)*

33. Immediately following Mr. Hewlett's announcement, securities analysts following the deal reduced the estimated odds of the transaction being completed.

> We now place the odds of the deal going through at less than 50%. The symbolic importance of the announcement far outweighs the Hewlett family's stake in the company. The lead author on the announcement, Walter Hewlett, holds a seat on HWP's Board of directors, indicating a change of heart of at least one member of the Board. (*Credit Suisse First Boston, November 6, 2001*)

> Today Walter Hewlett, son of the company's co-founder, announced that he intends to vote the family's shares against the merger with Compaq. According to HP, the family's stake represents abut 6% of shares outstanding.

> Interestingly, Mr. Hewlett supported the deal initially in his role as a member of the Board of directors.

> Prior to today, we had believed that the odds in getting the deal approved were 50/50 w/ a bias towards approval. Now, we believe the pendulum may have swung the other way though the company clearly still seems focused on getting approval. (*Prudential Securities, November 6, 2001*)

34. As demonstrated by the HPW/Compaq analogy, I believe that the disclosure of opinions and actions of Board members is an important source of information to investors. It is my opinion that dissention by Board members in a merger situation signals uncertainty and can affect the ultimate outcome of the shareholder vote. In this case, OHSL's shareholders were misled by the claim that OHSL's BOD had unanimously approved the pending transaction with Provident, and believed it to be in the best interest of shareholders. They were not informed about the dissention of certain Board members, the deliberate resignation of one Board member in protest of the transaction, and most importantly, the fact that OHSL's CEO was against the transaction. Had that information been disclosed, shareholders would have known this was not a smooth and unanimous

transition, it would have altered the total mix of information provided to shareholders, and most likely would have altered the ultimate outcome.

<u>The Significance of the Misstatement Regarding Management Contracts</u>

35. Based on the testimony of Mr. Hanauer and Mr. Herron, the change of control contracts, that provided severance payments to OHSL's four senior management members in the event they were not employed by Provident after the merger, were not in place as of the July 22, 1999 OHSL BOD meeting. It appears the contracts were signed sometime between July 22 and the August 2, 1999 special meeting of the OHSL BOD. This course of events is significant, because it was not until the August 2 vote that Mr. Hanauer, who stood to earn $375,000 from the agreement, cast his BOD vote in favor of the merger with Provident. This last minute "deal", that effectively sealed the BOD's approval of the transaction, was never disclosed to shareholders. In fact, the Proxy erroneously represented that these contracts were in place in June, rather than the end of July, or just prior to the final BOD vote.

36. Mr. Hanauer's testimony makes clear the fact that the misdating of these agreements was not an accident or an oversight. It effectively disguised the *quid pro quo* appearance of the contracts. Taken on its own, the misstatement of the date of the contracts may not have had an impact on the shareholder vote, however, it is part of the composite of misrepresentations with regard to the history of the transaction, the actions and intentions of the CEO, and dissention by members of the Board.

<u>The Fairness Opinion</u>

37. Plaintiffs allege the fairness opinion provided by McDonald and dated as of September 3, 1999, was "stale" and should have been updated in conjunction with the

mailing of the Proxy on or around September 24, 1999. The objective of a fairness opinion is to provide shareholders with an independent, objective analysis of the proposed transaction, and an opinion as to its fairness from a financial point of view. McDonald's opinion is set forth as follows:

> The Agreement provides for the merger (the "Merger") of OHSL with and into PFGI, pursuant to which, among other things, at the Effective Time (as defined in the Agreement), each outstanding share of OHSL Common Shares will be exchanged for the right to receive a certain number of shares (the "Exchange Ratio") of the common stock, without par value, of PFGI ("PFGI Common Shares") equal to $22.50, subject to adjustment, as set forth in Section 1.6(a) of the Agreement. The terms and conditions of the Merger are more fully set forth in the Agreement.
>
> Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the Exchange Ratio is fair to the holders of OHSL Common Shares from a financial point of view.

38. As of September 3, 1999, Provident's stock price was $42.125, thus entitling OHSL shareholders to about $22.50 per share worth of Provident stock. However, by September 24, 1999, Provident's stock price had declined by $5.00 per share or approximately 14% to $36.125. Since it was below $40.00 per share, OHSL shareholders would get about $20.32 per share (0.5625 x $36.125) pursuant to the Exchange Ratio.

39. In the case of a non-cash transaction, such as this one, where the "value" OHSL shareholders would receive in the deal was solely dependent upon (i) Provident's stock price; and (ii) the Exchange Ratio, it is unusual that the fairness opinion was not updated to reflect the declining price of Provident's stock, and the reduced per share value OHSL shareholders would receive.

40. The closing prices for both OHSL and Provident stock as of September 23, 1999 were provided in the Proxy, and shareholders would have been able to compute the value

they would receive, based on the Exchange Ratio, if the price of Provident remained at its reduced level. By September 24, 1999, Provident's stock had fallen below the "walk-away" price in the Proxy. The material change in Provident's stock price, in my opinion, renders the fairness opinion obsolete. But, because McDonald's fairness opinion was not updated concurrent with the Proxy, it is unclear as to whether McDonald thought the deal was fair, notwithstanding Provident's significantly reduced stock price.

41. I have previously been engaged to render fairness opinions and perform the requisite financial analyses associated with those engagements. In addition, I have reviewed numerous proxy/merger documents in connection with my previous assignments. In my experience, it is very unusual, and is at odds with industry practice, that the date of the fairness opinion is not within a day or two of the proxy/merger materials, especially when the consideration being offered is stock. This is especially the case when changes in market conditions warrant an updating of the opinion. In this case, the fairness opinion endorses a proposed Exchange Ratio with a value to OHSL shareholders of $22.50 which is valid, based on Provident's stock price as of September 3, 1999, but no longer valid as of September 24, 1999.

Inadequate Risk Disclosure Regarding Securitization

42. The Proxy should have contained adequate disclosure of the inherent risk associated with the loan securitization activities from which Provident derived a significant portion of its income. While it did provide the dollar amount of loans securitized and sold, and gains from such sales, it did not reveal that (i) a significant portion of the gains were "non-cash" and booked as revenue up-front, rather than over the life of the loans; and (ii) that if it changed its method of accounting for these transactions,

18

known as "gain on sale", or if the assumptions used regarding such gains proved to be incorrect, it could result in a materially adverse change in operating income.

43. OHSL derived its income from traditional savings and loan activities.  It is my opinion that the risk disclosure in the Proxy about Provident's securitization activity did not warn OHSL shareholders that they were getting a much riskier company than OHSL. Unless one assumes OHSL shareholders were previously familiar with the concept of loan securitization, and gain on sale accounting, the risk disclosure section did not adequately explain the very real possibility that Provident's earnings could be negatively impacted in the future.

The "Mosaic" Theory

44. The process of making an informed investment decision includes gathering information from a variety of sources, analyzing the relevance of the information, and forming a conclusion based upon a composite of that information deemed to be relevant. Investors do not process each piece of information in isolation, but in the context of all other information.  This is often referred to as the "mosaic" theory.

45. In the case of OHSL shareholders, the Proxy was the most comprehensive and important source of information about the proposed merger with Provident.  It is my opinion that OHSL shareholders did not have the benefit of complete and accurate information with regard to (i) the history of the transaction and process through which the merger gained approval by OHSL's BOD; (ii) the opinions and actions of the CEO regarding the merger and voting of shares; (iii) the dissention by certain Board members and senior management regarding the merger with Provident; (iv) a current opinion regarding fairness from McDonald; and (v) the risk associated with owning Provident

stock, as a result of its securitization activities, on which it relied to produce a substantial portion of its income.

46. Further, I believe that in light of the fact that the transaction was approved by only a slight majority of the shares, it is highly likely that with the benefit of full, fair, and accurate information, the ultimate outcome of the vote would have been different.

Candace L. Preston, CFA

Date: May 1, 2002

EX 1

# CANDACE L. PRESTON

| | |
|---|---|
| Present | Financial Markets Analysis, LLC. Founding member of the firm. Financial consultant specializing in securities and business valuations in mergers, acquisitions, appraisals, business planning, brokerage/customer arbitrations, and litigation. Significant testimonial experience in breach of contract, bankruptcy, anti-trust, securities and consumer class actions. Clients include private and public companies, individual and institutional investors, and law firms. |
| 1998 – 2001 | BNY Capital Markets. Managing Director responsible for valuations and special financial services. Valuations relating to fairness opinions, mergers, acquisitions, executive compensation, estate and intergenerational transfers, and litigation. |
| 1998 | Triumph Partners, LLC. Founding member of the firm. Financial consultant specializing in securities and business valuations in mergers, acquisitions, appraisals, business planning, brokerage/customer arbitrations, and litigation. Valuation expert for the S.E.C. in its prosecution of Crazy Eddie, Inc. and Eddie Antar, and in efforts to recover monies from the Antar family. |
| 1985 - 1998 | Princeton Venture Research, Inc. Executive Vice President. Princeton Venture Research is an investment banking and consulting firm. Managed Princeton and San Diego offices. Supervised all analytic and research staff. Responsible for valuations in mergers and acquisitions, due diligence investigations, and litigation projects. Clients included Securities Investors Protection Corporation (SPIC), major financial institutions and law firms. Valuation expert for damages claims against Drexel Burnham Lambert, SubClass B. |
| 1980 - 1985 | NewMarkets. Senior consultant for management consulting firm, specializing in marketing and business planning for new ventures and turn-around situations. Developed plans for Fortune 500 companies as well as smaller businesses, which resulted in the creation and funding of new divisions and enterprises. |
| 1974 - 1978 | Family-owned businesses. Participated in the operation and management of a diverse group of businesses, including acquisitions and divestitures of numerous stand-alone operations. Among the businesses were an automotive plastics manufacturer, restaurants, automobile dealerships and real estate holdings. |
| 1970 - 1973 | U.S. Army, Tank and Automotive Command (TACOM). Civilian employee of branch responsible for negotiation and administration of contracts for wheeled and track vehicles. Negotiated and audited contracts for tank prototypes as well as tanks in production. |

EDUCATION

| | |
|---|---|
| 1985 | M.B.A. University of Pennsylvania, Wharton School of Finance |
| 1970 | B.A. History, Eastern Michigan University |

| OTHER | University of Chicago<br>Guest lecturer in finance | American Bar Association Annual Meetings,<br>Securities Litigation Panels |
|---|---|---|
| | University of Pennsylvania<br>Guest lecturer in finance | Shippensburg University<br>Executive-in-Residence |

PROFESSIONAL DESIGNATIONS AND AFFILIATIONS

Chartered Financial Analyst (CFA)
Member, New York Society of Security Analysts (NYSSA)
Member, Association for Investment Management and Research (AIMR)

EX 2

Testimony of Candace L. Preston, CFA

In Re.- Church's Fired Chicken, Inc.
Civil Action No. SA-88-CA-1238 and SA-88-1385
U.S. District Court, Western District of Texas, San Antonio Division
Hearing testimony: January 21 & 27, 1989

In Re: Energy Systems Equipment Leasing
Civil Action No. MDL-637 (LDW)
U.S. District Court, Eastern District of New York
Deposition: June 14, 1989

In Re: Mohawk Data Sciences Corporation
Civil Action No. 85-2539
U.S. District Court, District of New Jersey
Deposition: June 21, 1989

In Re: Technicolor, Inc.
Civil Action No. 7129 & 8358
Court of Chancery of the State of Delaware, in and for New Castle County
Deposition: September 20, 1989; Trial testimony: February 12 & 13, 1990.

In Re: Wolverine Technologies, Inc. 11
Civil Action No. 89-916167-CZ
State of Michigan in the Circuit of Wayne County
Deposition: June 5, 1991 and July 11, 1991

In Re: Mentor Corporation
Civil Action No. 91 2163 RJK (JRX)
U.S. District Court, Southern District of California
Deposition: May 28 & 29, 1992

In Re: Revco, Inc.
Civil Action No. 1:89 CV0593

U.S. District Court, Northern District of Ohio, Eastern Division
Deposition: October 22, 1992

In Re: Angus Tank Cleaning Corporation
Civil Action No.HUD-C-197-91
Superior Court of New Jersey, Chancery Division, Hudson County
Deposition: November 23, 1992

Testimony of Candace L. Preston, CFA

In Re: Chevron U.S. Inc. f/k/a Gulf Oil Corp.
Civil Action No. 87DV8982
U.S. District Court, Southern District of New York
Deposition: March 2, 1993; Arbitration testimony: March 22, 1993

In Re: Microdyne, Inc.
Civil Action No. 92-1515 and 92-1730-A
U.S. District Court, Eastern District of Virginia, Alexandria Division
Deposition: March 9 & 11, 1992, November 17, 1992; Trial testimony: May 11, 1993

In Re: Digital Systems International
Civil Action No. C91-1521
U.S. District Court, Western District of Washington at Seattle
Deposition: May 6, 1993

In Re: American Dental Laser, Inc.
Civil Action No. 92-CV-71917-DT
U.S. District Court, Eastern District of Michigan, Southern Division
Deposition: July 12, 29 & 30, 1993 and August 2, 1993

In Re: Legent Corporation
Civil Action No. 93-894-A
U.S. District Court, Eastern District of Virginia
Deposition: November 16, 1993; Trial testimony: February 3 & 7, 1994

In Re: Heart Technology, Inc.
Civil Action No. C92-9862
U.S. District Court, Western District of Washington at Seattle
Deposition: January 25, 1994

In Re: ICN Pharmaceutical, Inc.
Civil Action No. 86Civ. 6776 (VLB) & 87 Civ. 4296 (VLB)
U.S. District Court, Southern District of New York
Deposition: January 28, 1994

In Re: Crazy Eddie, Inc.
Civil Action No. 87 CIV 0033 (EHN)
U.S. District Court, Eastern District of New York
Trial testimony: March 29, 1995

<u>Testimony of Candace L. Preston. CFA</u>

<u>In Re: Energy Management Corporation</u>
Civil Action No. 83-369
U.S. District Court, Eastern District of Kentucky at Pikeville
Deposition: April 6, 1995

<u>In Re: Digitran Systems, Inc.</u>
Civil Action No. 93 -C73 8G
U.S. District Court, District of Utah, Salt Lake City Division
Deposition: May 11, 1995

<u>In Re: Tseng Labs, Inc.</u>
Civil Action No. 93-2756
U.S. District Court, Eastern District of Pennsylvania
Deposition: June 28, 1995

<u>In Re: International Lottery, Inc.</u>
Civil Action No. C- 1 -94-3 68
U.S. District Court, Southern District of Ohio, Western Division
Deposition: October 31, 1995

<u>In Re: Symbol Technology, Inc. 11</u>
Civil Action No 92-CIV 3492 (LDW)
U.S. District Court, Eastern District of New York
Deposition: November 6, 1995

<u>In Re: Glenmede Trust Company</u>
Civil Action No. 92-CV-5233
U.S. District Court, Eastern District of Pennsylvania
Deposition: December 27, 1995

<u>In Re: Search Capital Group</u>
Civil Action No. 394-CV- 1428-J
U.S. District Court for the Northern District of Texas, Dallas Division
Hearing testimony: January 3, 1996

<u>In Re: Ross Cosmetics Distribution Center, Inc.</u>
Civil Action No. 7-92-1706-3
U.S. District Court, District of South Carolina
Deposition: March 8 & 15, 1996

Testimony of Candace L. Preston, CFA

In Re: Cascade International Securities Litigation
Case No. 91-8652-CIV-NESBITT
U.S. District Court, Southern District of Florida, West Palm Beach Division
Deposition: October 6, 1998

In Re: RMED International, Inc. v. Sloan's Supermarkets, Inc. and John A. Catsimatidis
Civil Action No. 94 Civ. 5587 (PKL)
U.S. District Court, Southern District of New York
Deposition: September 21 and November 19, 1998

In Re: Securities and Exchange Commission v. Sam M. Antar, Allen Antar, and Benjamin Kuszer
Civil Action No. 93-3988 (HAA)
U.S. District Court, District of New Jersey
Deposition: November 23, 1998
Trial Testimony: December 1 and 4, 1998

In Re: Frontier Insurance Group, Inc.
Civil Action No. 94 Civ. 5213 (EHN)
U.S. District Court, Eastern District of New York
Deposition: November 9, 1998
Hearing Testimony: July 27, 2001

In Re: Sunglass Hut International, Inc.
Case No. 97-0191-CIV-MOORE/O'SULLIVAN
U.S. District Court, Southern District of Florida
Deposition: March 28, 2001

In Re: Real Estate Associates Limited Partnership Litigation
Case No. CV 98-7035 DDP (AJW)
U.S. District Court, Central District of California
Deposition: May 16, 2001

In Re: Morgens, Waterfall, Vintiadis & Co., Inc. v. Donaldson Lufkin & Jenrette Securities Corp.
Case No. 00 Civ.9517 (MP)
U. S. District Court, Southern District of New York
Deposition: October 10, 2001