# EXHIBIT B

Preliminary Report of
William Lutz, Ph.D., J.D.

On Behalf of Plaintiffs
In re: OHSL Financial Corp. Securities Litigation

Case No. C-1-00-793

Southern District of Ohio
Western Division

May 1, 2002

## I.    Qualifications

1.    I am a Professor of English at Rutgers University. I am the author or co-author of fifteen books, including *Doublespeak Defined* (HarperCollins, 1999), and *The New Doublespeak: Why No One Knows What Anyone's Saying Anymore* (HarperCollins, 1996), *Doublespeak: From Revenue Enhancement to Terminal Living* (HarperCollins, 1989), *The Cambridge Thesaurus of American English* (Cambridge University Press, 1994), and *Webster's New World Thesaurus*, (Simon and Schuster, 1985); and I am the author of over two dozen articles in such publications as *The London Times*, *The Los Angeles Times*, *The Atlanta Constitution*, *The Baltimore Sun*, *USA Today*, *Esquire*, *Business and Society Review*, and *Public Relations Quarterly*. I am also an attorney and a member of the Pennsylvania Bar.

2.    As an expert on language, especially clear language or plain English, I have worked with AAL Capital Management Corporation; Addison Design of New York; Bell Atlantic; Alumax Inc.; The Dreyfus Corporation; Herman Miller Inc; Ragan Communications of Chicago; North American Securities Administrators Association; John Nuveen & Co.; The Reddy Corporation International of Albuquerque; Ryder System Inc.; Charles Schwab & Co.; Securities Industry Association; U.S. Postal Service; and the Whirlpool Corporation. My services have included re-writing mutual fund prospectuses into plain language; writing, revising, and editing the prose in annual reports; judging the prose in annual reports in national competitions; and conducting seminars and workshops on plain English and clear communication in various forms of corporate publications.

3.    I have served as a consultant on plain English to the United States Securities and Exchange Commission ("SEC"). I am one of the authors of the SEC's *Plain English Handbook: How to Create Clear SEC Documents* (Aug. 1998).

4.    In 2001 I was presented with the Pennsylvania Bar Association Clarity Award for the Promotion of Plain English in Legal Writing, and in 1996 I was given the George Orwell Award for Distinguished Contribution to Honesty and Clarity in Public Language by the National Council of Teachers of English.

5.    My resume is attached here as Exhibit A.

6.    I am being compensated at the rate of $175 per hour for research and writing, $250 per hour for giving a deposition, and $350 per hour for trial testimony. This rate is in

2

addition to all expenses. My compensation is in no way contingent on the outcome of this litigation.

## II. Assignment and Materials Reviewed

6.    I was asked to review and analyze the language used in the OHSL Financial Corp. Proxy Statement/Prospectus dated September 24, 1999. Specifically, I was asked to review and analyze the language in this document for clarity and accuracy in the presentation of information. In conducting my review and analysis, I read documents and other materials including but not limited to the following:

    a.    OHSL Financial Corp. Proxy Statement/Prospectus, September 24, 1999;

    b.    Hearing on Motion by Plaintiff for Expedited Discovery and Preliminary Injunctive Relief, 24 November 1999;

    c.    Thiemann v. OHSL Financial Corp., et al. (Civil Action C-1-00-793) Complaint filed 20 September 2000;

    d.    Memorandum in Support of Motion to Dismiss, 20 November 2000;

    e.    Reply Memorandum in Support of Motion to Dismiss, 25 January 2001;

    f.    Order of Court in response to Motion to Dismiss, 24 July 2001;

    g.    Letter. James E. Burke, Esq., to Richard B. Brualdi, Esq., and David J. Manogue, Esq., dated 6 August 2001;

    h.    Order of Court granting Class Certification, 13 September 2001;

    i.    Thiemann, et al. v. OHSL Financial Corp., et al. (Civil Action C-1-00-793) First Amended Class Action Complaint filed 4 February 2002;

    j.    Thomas M. Herron's letter of resignation, 27 July 1999;

    k.    Article from *Cincinnati Business Courier*, 10 August 2000; Plaintiff's Exhibit 1;

    l.    Transcript of the Deposition of Kenneth Hanauer;

    m.    Transcript of the Deposition of Thomas Herron.

7.    The review and analysis I present here is preliminary and tentative, and I reserve the right to revise it should additional information become available. I also reserve the right to create charts, graphs, and other visual materials for use at trial.

3

## III.    Introduction

8.    During his tenure as Chairman of the Securities and Exchange Commission, Arthur Levitt instituted a campaign to make financial disclosure documents communicate clearly the "important information investors need to make informed decisions." (*A Plain English Handbook: How to Create Clear SEC Disclosure Documents*, U.S. Securities and Exchange Commission, August 1998, p. 3) As he repeatedly stressed, "disclosure is NOT disclosure if it doesn't communicate." (Remarks of Arthur Levitt, American Savings Education Council, New York, New York, July 23, 1997)

9.    It is fundamental principle of the SEC plain English rules and regulations that the writer not the reader of the document bears the burden of clear communication. The reader should not have to search for or puzzle out the meaning of the document, nor should he have to piece together the meaning by including information from other sources. Warren Buffett of Berkshire Hathaway, who also served as a consultant to the SEC plain language project, articulated a simple yet effective principle for writing a financial disclosure document: "We will be candid in our reporting to you, emphasizing the pluses and minuses important in appraising business value. Our guideline is to tell you the business facts that we would want to know if our positions were reversed. We owe you no less. . . ." (Berkshire Hathaway 1983 Annual Report)

10.    Like any document, a financial disclosure document must be read within a communication context which provides readers with the information they need to understand in the document. Within this communication context readers make the presuppositions they need to make in order to understand the document.

11.    The stated purpose of this Proxy Statement/Prospectus is to "more fully describe[s] the proposed transaction" which is "the proposed acquisition of OHSL by Provident Financial Group, Inc.". (Letter from Norbert G. Brinker, Chairman of the Board, OHSL Financial Corp. to Stockholders) This stated purpose and the legal requirement that the document present stockholders with all the material information they need to make an informed decision create the context for this communication. That is, stockholders rightfully presume that this document will provide them with this material information. Stockholders also presume that the document will conform to all applicable laws and regulations, including the Securities Act of 1933, which directs that "information . . . shall be presented in a clear, concise and

4

understandable fashion. . . ." and that "All information . . . shall be clearly understandable." 17 C.F.R. §230.421.

12.    Within this context, readers would not presume that the document upon which they depended to inform them fully and to advise them disinterestedly was consciously and affirmatively misleading. They would not presume that information was deliberately omitted out, not fully explained, or misrepresented. They would not presume that a common word would be used with a meaning different from common usage. They would not presume that they would have to compare information in this document with information from other sources in order to derive the material information they need to make an informed decision.

13.    In the Proxy Statement/Prospectus, the Board of Directors has an obligation to present all the information that stockholders need to make an informed decision, and they have to present it within the communication context of a prospectus, as the stockholders have a reasonable right to expect. The Board also has an obligation to present that information in language as complete, clear, precise, and unambiguous as possible. Mere presentation or disclosure of information is insufficient.

14.    In the Proxy Statement/Prospectus, the Board of Directors is giving its best business advice to stockholders based on the information it has gathered and evaluated. The Board is recommending how stockholders should conduct their financial affairs. On page one of the Proxy Statement/Prospectus, stockholders are informed that the "OHSL Board of Directors believes that you will benefit by becoming a stockholder of a bank holding company with a strong financial performance record."

15.    The cover letter on the Proxy Statement/Prospectus, signed by Norbert G. Brinker, Chairman of the Board, states that "Your Board of Directors unanimously approved the transaction and believes that it is in the best interests of OHSL stockholders. The Board unanimously recommends and advises that you approve the acquisition at the Special Meeting so the transaction may be completed." These sentences misrepresent the actual events that led to this transaction. As I will show in the analysis of the language in this document, the Board did not unanimously approve the acquisition, nor did it unanimously recommend and unanimously advise stockholders to approve the acquisition. The Board did not fully disclose the process by which it reached its decision to recommend a merger with Provident. Just the opposite. The

5

Board omitted significant information in this document and only partially disclosed other significant information in the guise of full disclosure. The document is an artfully composed piece of misinformation and disinformation designed so that a reasonable reader would not learn of any dissent. Thus, in reading this Proxy Statement/Prospectus, stockholders did not receive the information they needed to make an informed decision. Indeed, stockholders were consciously and affirmatively misled.

IV.   **The Proxy Statement/Prospectus as a Whole is Consciously and Affirmatively Misleading**

16.    The Proxy Statement/Prospectus depicts the Board of Directors engaging in a smooth, unanimous process that results in the best offer for OHSL Financial Corp. being presented to the stockholders. Yet that process was not smooth and it was not unanimous. The process as presented in this document is vaguely described, chronologically confused, and lacking in important information. This section of the Proxy Statement/Prospectus falls far short of full disclosure about how the decision to sell OHSL Financial Corp. to Provident Financial was made.

17.    According to the Proxy Statement/Prospectus, from January 1997 to February 1999 the Board had received "unsolicited expressions of interest resulting in informal meetings with three institutions." (p. 19) The institutions are not named. Then, in February 1999, the Board appointed an ad hoc committee of three directors "to search and evaluate any benefits of the sale of OHSL." (p. 19) These three directors are never named, nor are we told why they were chosen for this committee and whether they represented a cross section of the Board. Yet this committee became the driving force to promote the sale of the company.

18.    Director Kenneth Hanauer declined an appointment to this ad hoc committee. Hanauer, who had long opposed the sale of OHSL, believed the appointment of Thomas McKiernan and Alvin Hucke, both of whom had long advocated selling the company, clearly demonstrated that the function of this committee was to promote the sale of OHSL. He was especially convinced because Hucke was appointed chairman of the committee. "So I felt this was it. And that ultimately, whether it be in '99, 2000, 2001, the outcome was going to be that

we would be sold, that the outcome was not going to be that we would remain independent, because that was not the interest that Mr. Hucke had." (Hanauauer deposition, page 49)

19.    Thus, in its presentation to the Board in April 1999, only the reasons for selling or merging the company were presented. We do not know if this committee, or the Board or McDonald, ever conducted a comparative analysis of the full range of strategic alternatives comparing the strengths and weaknesses of these alternatives. We do know that the results of any such analysis were never reported to the stockholders.

20.    After McDonald circulated a Confidential Descriptive Memorandum to potential acquirers "on and after June 3" to "six potential acquirers" the Board executed "confidentiality agreements with five of the six prospects." (p. 20) However, we are not told when this occurred, nor who these potential acquirers were. The omission of this date is significant because less than two weeks after the Board had circulated its memorandum, on June 15, 1999, the Board, along with legal counsel and McDonald Investments Inc., the investment banking firm the Board had retained, met with executives from Provident Financial. We are assured that "the parties did not discuss the specific terms and conditions of Provident Financial's non-binding offer." We are assured that the purpose of this meeting was only to discuss "Provident Financial's current financial and business profile and its future strategic plan to enhance shareholder value." Notably absent here is any mention of any meetings or any discussions with other potential acquirers. Yet on June 22, 1999, just one week after this meeting and just nineteen days after circulating its Confidential Descriptive Memorandum, the Board "authorized McDonald to invite Provident Financial to conduct a due diligence investigation."

21.    Next we are told that on July 22, 1999, "the Board met to receive an update from McDonald as to its negotiations with prospective acquirors of OHSL." Note that it is "prospective acquirors" in the plural, yet we are not told who these "prospective acquirors" were, whether any of them were actively interested in OHSL, and whether any had made an offer or were interested in making an offer. While we are told that the Board "concluded that the offer from Provident Financial was the best alternative" we are not told what alternatives the Board considered before reaching this conclusion. Nor are we told anything about the other prospective acquirors. We are not told whether the Board negotiated with any prospective acquiror other than Provident. In short, we are told nothing about what those other bidders were offering, how

7

competitive their offers were, whether McDonald evaluated their other offers, and the results of any evaluation.

22.     Finally, we are told that from July 22, 1999 to August 2, 1999 the Board, McDonald, and OHSL's legal counsel negotiated a definitive agreement with Provident. We are not told that on July 27, 1999, Director Tom Herron submitted his resignation, effective July 30, 1999. Nor are we told that Herron resigned because he opposed the proposed sale to Provident. This is extremely significant and misleading because Herron was Chairman of the Audit Committee. Moreover, Herron's father had been a member of the Board. When the elder Herron resigned Tom Herron took his place on the Board. The family's close and long term ties to OHSL were well known. Thus his resignation was significant and not a routine occurrence.

23.     The amount of information omitted from this scenario is not only significant in scope but in importance. How many of the five other prospective acquirors expressed an interest in making an offer for OHSL? What happened with these other prospective acquirors? Did any of them make an offer? If so, what was the offer?  Did McDonald evaluate all the offers? If so, what were the results?  The Proxy Statement/Prospectus provides no information to answer these and many other questions. In the guise of presenting information, this section of the document hides more information than it reveals. In fact, Provident's bid was the only bid the Board received. While the Board had access to all this information, the stockholders did not. This missing information has to be considered material because a reasonable investor would want to include it in the mix of information he would rely upon to make an informed decision on the proposed merger.

24.     Stockholders were not informed that Kenneth Hanauer, the CEO of OHSL and Chairman of the Board designate refused to sign the cover letter to the Proxy Statement/Prospectus that was distributed to stockholders. In fact, Hanauer had directed that his signature, which had been electronically placed on a draft of the document, be removed. This omission is significant because the signature of both Hanauer as CEO and Norbert Brinker as Chairman of the Board had consistently appeared on all such communications to stockholders in the past. Stockholders should have been informed that Hanauer had chosen not to sign the letter because of his belief that the merger was not in the best interests of the stockholders. It is clear that this information was excluded from the document because it would reveal that the process

8

that arrived at a decision to merge with Provident Financial was not as smooth and as unanimous as the document claims.

    25.    The Risk section in the Proxy Statement/Prospectus does not follow SEC rules. If you include a risk factors in your prospectus, you must write the risk factors in plain English and avoid "boiler plate" risk factors. We believe a discussion of risk in purely generic terms does not tell investors how the risk may affect their investment in a specific company. You should place any risk factor in context so investors can understand the specific risk as it applies to your company and its operations. (emphasis added) IV.C.2. Securities and Exchange Commission, Release Nos. 33-7497; 34-39593; IC-23011. Effective Date: October 1, 1998.

In the section titled "Risk Factors," there is a brief presentation under the heading "Provident Financial May be Unable to Maintain Volume of Securitization." Stockholders were not informed that a significant portion of Provident Financial's earnings were due to "the securitization and sale of loans and leases." (p. 13) This section does not define or describe what is meant by "securitization of loans and leases." What is the nature of these "loans and leases"? Indeed, what is meant by "securitization"? On what basis does the writer assume that the reader knows the meaning of this technical term? In addition to being filled with technical language and only a very general description of the risks involved in such activity, the section presents numbers with no context. To simply state that "In the first six months of 1999, $1.3 billion of such loans and leases were securitized and sold as compared to $435 million of such loans in the first half of 1998" is to say nothing. What is the context of these figures? What do these figures mean? What percentage of Provident's earnings are dependent on these securitizations? What is the rating of these securitizations? How does the Board interpret these figures? These are just some of the questions that should have been answered in providing stockholders with a clear, understandable assessment of the risks inherent in the securitization of loans and leases. Indeed, this entire section provides no information on risk, just some unanalyzed data. This is exactly the kind of writing that Arthur Levitt was referring to when he said that "disclosure is not communication."

    26.    Defendant argues that "Anyone could determine how much of Provident's overall net profits in 1998 and 1999 resulted from securitization activities, through a simple arithmetic calculation . . . from publicly available information . . . ." (Letter. James E. Burke, Esq., to

Richard B. Brualdi, Esq., and David J. Manogue, Esq., dated 6 August 2001) Yes, anyone who had access to the Provident Financial's forms 10-K and 10-Q, who knew how to read a balance sheet to locate the appropriate numbers, and who could then do the mathematical calculations to determine the nature of the risk involved in being so dependent on such transactions. This "anyone" would have to have sophisticated knowledge about financial reporting, accounting, and the computation of certain financial indices. Is this a description of the average OSHL shareholder?

27.    The most egregious instance of a consciously false and misleading statement occurs in the cover letter to the Proxy Statement/Prospectus:

> Your Board of Directors unanimously approved the transaction and believes that it is in the best interests of OHSL stockholders. The Board unanimously recommends and advises that you approve the acquisition at the Special Meeting so the transaction may be completed. (Letter to OHSL Financial Corp. stockholders accompanying OHSL Financial Corp. Proxy Statement/Prospectus dated September 24, 1999)

28.    In the first sentence, the adverb "unanimously" modifies the two verbs "approved" and "believes" which are a compound predicate joined by the co-ordinating conjunction "and". The adverb in the modifier position preceding such a compound structure modifies both verbs following it. If the writer did not want the adverb to modify the second verb, he could have written this sentence in any number of ways: (1) separated the sentence into two sentences; (2) repeated the subject of the verb after the co-ordinating conjunction "and"; or (3) inserted "also" after "and," or used a similar rhetorical device. As written, the adverb "unanimously" modifies both verbs, stating that the Board of Directors unanimously approved the transaction and unanimously believes the transaction is in the best interests of OHSL stockholders.

29.    The same grammatical analysis holds for the second sentence. The adverb "unanimously" modifies the two verbs "recommends" and "advises" which are a compound predicate joined by the co-ordinating conjunction "and". As written, the adverb "unanimously" modifies both verbs, stating that the Board of Directors unanimously recommends the transaction and unanimously advises that stockholders approve the transaction.

30.    In any act of communication there must be an assumption by all parties to the communication that they are speaking about the same thing and that absent explicit information to the contrary each party assigns the same meaning to the words they use. However, the Board of Directors claims a meaning for the word "unanimously" that is contrary to the common meaning of the word and a meaning that is not found in standard dictionaries. According to the *Oxford English Dictionary*, "unanimously" means: (1) Of one mind or opinion; all in agreement. (2) Held, given, or undertaken by general agreement or consent.  According to *Black's Law Dictionary*, 7th ed., "unanimously" means: (1) agreeing in opinion: being in complete accord. (2) Arrived at by the consent of all. The reader of this document rightfully presumes that the meaning of the word "unanimously" as used in this sentence is the same as the common meaning recorded in these authoritative sources. Thus, if there were one abstention or one person not voting during the vote, there can be no unanimous vote and the use of this word is counter to fact and misleading. As George Orwell wrote, the person who uses words with "his own private definition, but allows his hearer to think he means something quite different" is using words in "a consciously dishonest way". (*Politics and the English Language*, 1946)

31.    The second sentence of this quote is particularly misleading because Kenneth Hanauer, the CEO and largest shareholder, voted his shares against the proposed merger. Clearly stockholders would want to know and would consider it of material importance that the largest shareholder, who was also the Chief Executive Officer of the company, was voting against the merger. Yet even as he told stockholders that the merger "is in the best interests of OHSL stockholders" he was voting against his own advice. If it was in the best interests of stockholders, why didn't he, the largest shareholder, vote his shares for the merger? After all, he along with the rest of the Board "advise[d] that you [stockholders] approve the acquisition."

32.    The Board of Directors that initiated the process leading to the proposal to merge OSHL with Provident Financial was composed of 8 members. On July 27, 1999, Director Tom Herron submitted his resignation which was effective on July 30, 1999. Herron had previously voted against continued negotiations with Provident. Although he did not state so in his letter of resignation, Herron resigned in protest over the proposed merger. "Protest, of course, is just an expression of disapproval. And in that sense, I certainly resigned in protest." (Herron Deposition, page 61) his resignation . The Board never informed stockholders of his resignation, nor did the

Board inform stockholders of his opposition to the merger. Nor did OHSL file a form 8-K. As Director Kennth Hanauer stated, "I can only say that they [the stockholders] were not formally notified in any fashion that Mr. Herron was no longer a director." (Hanauer Deposition, page 23)

33.    Director Kenneth Hanauer initially opposed the merger, abstaining from the July 22, 1999, vote. However, at the August 2, 1999, meeting he voted in favor of the merger because ". . . so in essence, I just gave up. . . . And by August 2nd, I just gave in and voted for the transaction." (Deposition page 764) Also, in the time between the two votes, Hanauer received a contract specifying he would receive $375,000 in the event of a merger or other change in control of OSHL. As a Director, Hanuauer voted for the merger even though he did not believe the transaction was in the best interest of the stockholders, as he stated in his deposition on page 21of Plaintiff's Exhibit 1:

> Q.    In your heart, did you believe that this transaction was
>        in the best interest of the shareholders?
>
> A.    No, sir.

When asked during his deposition whether his opposition to the merger was ever disclosed to public shareholders, he replied, "No, sir, I don't believe it was." (page 29) As a shareholder, Hanauer voted his shares against the merger. He even chaired the special meeting of the shareholders on October 25, 1999, without once informing the shareholders of his opposition. Although it appears that it was common knowledge to all but OHSL shareholders that Hanauer opposed the merger, his opposition is never mentioned in the Proxy Statement/Prospectus. In an August 10, 2001, newspaper article, Hanauer's lawyer, James Burke, acknowledged that his client had opposed the merger.

34.    At the Board meeting of July 22, 1999, Chairman of the Board Norbert Brinker voted in favor of continued negotiations with Provident. At the August 2, 1999, meeting of the Board Brinker changed his vote and affirmatively abstained from voting on approving the proposed merger. As significant and material as both of these votes are, and the fact that he had changed his vote from in favor to abstain, neither of these votes by Brinker was communicated to stockholders. Most importantly, stockholders were not informed that Brinker had affirmatively abstained at the August 2, 1999, voting.

35.    Director Thomas McKiernan was not present at the meeting so he did not vote.

36.    Thus, of a Board of Directors composed now of 7 members and not the 8 stockholders believed voted, one did not vote and one was not present. The vote then should have been recorded as 5 in favor of the proposal, none opposed, 1 not attending and 1 abstaining. This result is not consistent with any meaning of the word "unanimous" that can be found in any standard dictionary, nor is it consistent with any meaning of the word with which I am familiar, and I have written two thesauruses.

37.    Throughout the Proxy Statement/Prospectus the phrases "your Board" and "the OHSL Board" are used repeatedly. These are misleading phrases because stockholders were not informed that the Board voting on and promoting the merger was composed of seven not eight members. No where in the Proxy Statement/Prospectus were the stockholders informed of the resignation of Director Herron. It is consciously and affirmatively misleading to imply that it was an 8-member Board that "unanimously approved the acquisition and believes it is in the best interest of OHSL shareholders" when the Board knew that one of its members had resigned because of opposition to the merger. It is consciously and affirmatively misleading to imply that it was an 8-member Board that "unanimously recommends and advises that you approve the acquisition" when the Board knew that one of its members had resigned because he did not believe the merger was in the best interests of the stockholders.

38.    It is consciously and affirmatively misleading to deliberately leave out information stockholders needed to make an informed decision. Defendant claims that stockholders could and should have learned that the Board was now composed of seven members if they had sought this information from other sources, such as Schedule 14a Disclosures filed with the SEC, or if they had compared the list of Board members on page 63 of the Proxy Materials/Registration Statement with a list of members in other unspecified documents. Such comparison would have allowed them to determine that there had been a change in the composition of the Board. Defendant did bury this information without discussion on page 57 of the Proxy Statement/Prospectus in a manner that avoids informing stockholders of Herron's resignation and the reasons for his resignation:

> Provident Financial's Board of Directors consists of seven
> Directors and OHSL's Board of Directors also consists of
> seven Directors.

This is entire and only statement in the materials informing stockholders of the change in OHSL's Board of Directors. Burying material data deep within a document with no explanation of its meaning or significance is exactly the kind of writing technique Arthur Levitt attacked because "disclosure is not disclosure if it doesn't communicate." Because they weren't given any contrary information in this document, stockholders would rightly assume that the Board that voted on August 2 was the full Board of 8 members and that all 8 members had voted to approved the merger ("unanimously approved the acquisition"). Stockholders would also rightfully presume that the Board that voted at the August meeting was the same Board that was presenting this Proxy/Statement/Prospectus to them for their approval on October 25, 1999. They were deliberately led to these conclusions by the misleading use of the phrases "your Board" and "OHSL Board" throughout the Proxy/Statement/Prospectus.

## V.    State Court Litigation: Request for Expedited Discovery and Preliminary Injunction

39.    I have also been asked to opine on the clarity of language used by defendants in state court litigation, specifically the language used by defense counsels James E. Burke and Mark VanderLaan at the hearing on plaintiff's request for expedited discovery and a preliminary injunction. (Hearing on Motion by Plaintiff for Expedited Discovery and Preliminary Injunctive Relief, 24 November 1999) The language used by defense counsel in this hearing was affirmatively misleading in at least three respects.

40.    First, defense counsel claimed that the merger was "unanimously approved by the Oak Hills Board of Directors." (p. 11) As I have demonstrated in my analysis in paragraphs 30 through 34 above, the vote was not unanimous in any legitimate sense of that word. Counsel knew, or through exercise of due care should have known, that this claim was false and misleading.

41.    Second, defense counsel claimed that the Board voted "after conducting an action proceedings where they solicit six bids, Provident being the highest." As I have pointed out in my analysis in paragraphs 19 to 20 above, there was only one bid, Provident's, and not six. Counsel knew, or through exercise of due care should have known, that this claim was false and misleading.

42.     Third, defense counsel claimed that the stockholders "overwhelmingly approved" the merger with 65 per cent of the eligible stockholders voting; of those voting, 52 per cent voted yes and 12 per cent voted no. (pp. 11 - 12) This is by no means an overwhelming vote. In fact, it is just the opposite. Counsel stated there are approximately 890 stockholders. Using his numbers for those who voted to approve the merger, we find that approximately 300 or 34 per cent of all stockholders voted for the merger while 66 per cent of the stockholders opposed it. It is false and misleading to make a claim of "overwhelmingly approved" based on these results.

43.     The judge in any litigation needs complete, accurate, and truthful information in order to make a reasoned and informed decision. Defense counsels' affirmative misrepresentations were successful in persuading the judge that theirs was the compelling argument. However, their presentation to the judge was not complete, accurate, or truthful.

## V.     Conclusion

44.     Defendant argues that to include certain information in this document would be to fill it with "minutiae". What Defendant sees as minutiae stockholders and the SEC see as material information necessary for them to make an informed decision. Defendant considers as "minutiae" such material information as the change in the number and composition of the Board of Directors; the resignation of a member of the Board; the non-participation of two members of the Board in a crucial vote on the merger; how many bidders there were for the company; how many bids were submitted and what the highest bid was; what alternatives other than this merger were considered by the Board; the strengths and weaknesses of any alternatives, and why they were rejected; and the nature of some of the risks in this transaction. The omission of this material information is evidence of attempts to affirmatively defraud the stockholders of OHSL. The members of the Board of Directors who presented this Proxy Statement/Prospectus to the stockholders were fully informed, but they chose not to communicate what they knew to all the stockholders in the company.

45.     During the four years I served as a plain language consultant to the SEC, and the over fourteen years I have served as a plain language consultant, I have encountered many such examples of this kind of false, deceptive, and misleading communication. The use of language in the Proxy Statement/Prospectus, through affirmative material misstatements and material

omissions, is exactly the kind of lack of communication that Arthur Levitt targeted in the plain English project. This use of language affirmatively and deliberately misinforms the reader. Such "disclosure" places the burden on the reader to find the meaning that is left out of the prose. Omission of information is not inclusion. Distortion is not explanation. To claim that a vote was unanimous when it was not is simply false, deceptive, and misleading.

46.    The language in this document is an outstanding example of corporate doublespeak. It is language which pretends to communicate but really doesn't. It is language which makes the bad seem good, the negative appear positive. It is language which is at variance with its real or its purported meaning. Basic to this language is incongruity, the incongruity between what is said or left unsaid, and what really is, the incongruity between word and referent, between the essential function of language -- communication -- and what this language really does: mislead, distort, deceive, inflate, circumvent, obfuscate.

47.    As George Orwell wrote in his essay, *Politics and the English Language*, "The great enemy of clear language is insincerity." Orwell went on to say that "When there is a gap between one's real and one's real declared aims" one turns to language that conceals rather than reveals, misleads rather than directs, and ultimately prevents rather than promotes communication. An apt and appropriate description of this document.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___*first*___ day of May, 2002, at ___*Philadelphia, PA*___.

*William Lutz*

William Lutz

EX 1

William D. Lutz
Professor of English
Rutgers, The State University of New Jersey
Camden, New Jersey  08102

**EDUCATION:**

J.D., Rutgers School of Law, 1983; admitted to Pennsylvania Bar, 1983.

Ph.D., University of Nevada, Reno, 1971 (Major in Victorian Literature; Minors in Linguistics and Rhetoric).  Dissertation: *The Literary Criticism of James Thomson (B.V.)*.

M.A., Marquette University, 1963 (Major in English). Thesis: *Pope's Homer: A Comparison of Pope's Translation of Book X of the Odyssey with the Original Greek and a Modern Translation by Robert Fitzgerald.*

A.B., Dominican College, Racine, Wisconsin, 1962 (Major in English; Minors in Greek and Latin). Thesis: *Poetic Technique in E. E. Cummings' Poetry.*

**TEACHING EXPERIENCE:**

**Rutgers University, Camden, 1971-present:**

**Graduate Courses:**  Rhetoric of the Image;  Language, Rhetoric, and Law; Applied Linguistics; Modern American Grammar; The Evaluation of Writing; The Teaching of Writing; Theory of Composition; Victorian Literature; Introduction to Graduate Literary Study.

**Undergraduate Courses**: Freshman Composition, Remedial grammar and composition courses, Business Communications, Dialectology, Doublespeak, History of the English Language, Introduction to Literary Study, Literary Masterpieces, Major English Writers, Materials and Methods in Teaching English in the Secondary School, Prose and Poetry of the Romantic Period, Prose and Poetry of the Victorian Period, Rhetoric and the Modern Media, Science Fiction Film, The War Film, Science Fiction Literature, Seminar in Victorian Literature (Tennyson and Browning), Structure of Modern English, Literature and Law, Media and Spectacle (Honors Program), Literary Masterpieces (Honors Program), Language, Literature, and Law (Honors Program).

**Jilin University, Changchung, People's Republic of China, 1983**:  Visiting Professor; graduate course in the History of the English Language.

**University of Nevada Reno, 1970-71**: Freshman Composition, Introduction to Linguistics.

**University of Wisconsin, Stevens Point, 1967-70**: Freshman Composition, Introduction to Linguistics, Literary Criticism, Modern English Grammar, Modern Short Story, Survey of English Literature.

**ADMINISTRATIVE SERVICE:**

Acting Director, Graduate Program in Liberal Studies, Rutgers University, Camden, 1999.
Acting Chair, Department of English, Rutgers University, Camden, 2000.
Director, English Graduate Program, Rutgers University, Camden, 1991-1997.
Chair, Department of English, Rutgers University, Camden, 1979-1985.
Director, New Jersey Basic Skills Assessment Program, New Jersey Department of Higher
Education, (on leave from Rutgers), 1977-79
Director of the Writing Program, Rutgers University, Camden, 1971-77.

**AWARDS:**

Pennsylvania Bar Association Clarity Award for the Promotion of Plain English in Legal Writing,
2001
Rutgers University President's Award for Public Service, 2000.
George Orwell Award for Distinguished Contribution to Honesty and Clarity in Public
Language, National Council of Teachers of English, 1996.
Warren I. Susman Award for Excellence in Teaching, Rutgers University, 1991.
New Jersey Department of Higher Education Distinguished Service Award, 1989.

**SERVICE TO THE ENGLISH DEPARTMENT:**

Member of the Curriculum, Goals and Resources, Teacher Evaluation, and Graduate
committees; chair of Freshman Writing, Personnel, and Graduate committees.

**SERVICE TO THE COLLEGE:**

Member, EOF-Community Liaison and Nursing Admission Committees; Chair of Scholastic
Standing Committee; Member of Faculty Senate; Secretary of Faculty Senate; Vice President
of Faculty Senate; President of Faculty Senate; Chair of Humanities Appointments and
Promotion Committee.

**SERVICE TO THE UNIVERSITY:**

Member, Student Judiciary Committee; Member, University Senate; Executive Committee,
University Senate; Senate Committee on Rutgers University and the Public; Basic Skills
Task Force; Doctoral Committee for Graduate School of Education.

**SERVICE TO THE COMMUNITY:**

Consultant on Plain Language to the U. S. Securities and Exchange Commission, 1995-99
Rutgers University Speakers Project.
Member, Reading and Writing Advisory Committee, New Jersey Basic Skills Council.
Member, Assessment Advisory Committee, New Jersey Basic Skills Council.
Member, Test Development Committee for Secondary School Reading Test, New Jersey
Department of Education.
Director of New Jersey Basic Skills Assessment Program, New Jersey Department of Higher
Education (on professional leave from Rutgers University) 1977-79.

Member, Technical Services Committee on Statewide Testing in Writing, New Jersey Department of Higher Education.
Expert witness on language and advertising, Federal Trade Commission, Washington, D.C.
Consultant on "Educating the Urban Child," Camden City Public Schools.

## GRANTS RECEIVED:

### EXTERNAL:

New Jersey State Department of Higher Education Humanities Grant of $23,048 to teach a series of faculty seminars on Strengthening Expository Writing at Three Colleges, 1989.

New Jersey State Department of Higher Education Humanities Grant of $28,863 to teach a series of faculty seminars on Writing in the Liberal Arts at Three Colleges, 1988.

New Jersey State Department of Higher Education Humanities Grant of $20,606 to teach a series of faculty seminars on Writing As A Mode of Learning in the Humanities, 1987.

### INTERNAL:

Rutgers University Council for the Improvement of Teaching Grant of $2,500 to teach a series of seminars on Training Graduate Assistants to Use Microcomputers, 1989.

Rutgers University Council for the Improvement of Teaching Grant of $3,000 to teach a series of faculty seminars on Using Microcomputer in Humanities Courses, 1988.

Rutgers University Research Council Grant of $500 to update data base of doublespeak, 1988.

Rutgers University Council for the Improvement of Teaching Grant of $5,000 to teach a series of faculty seminars on Microcomputer Applications in the Humanities, 1987.

Rutgers University Resources for Innovative Teaching Grant of $3,600 to purchase computer software to use in remedial writing courses and Business Communication course, 1986.

Rutgers University Council for the Improvement of Teaching Grant of $5,000 to teach a series of faculty seminars on Writing in the Liberal Arts, 1986.

Rutgers University Resources for Innovative Teaching Grant of $1,500 to purchase computer software to use in remedial writing courses and Business Communication course, 1986.

Rutgers University Research Council Grant of $750 to prepare data base of doublespeak in preparation of book manuscript, 1986.

Rutgers University Research Council Grant of $500 for travel to present paper at International Symposium on Educational Testing in Stirling, Scotland, July, 1982.

Rutgers University Council on Instructional Development grant of $1,800 to integrate the computer-assisted writing program with the Writing Center, 1980.

Rutgers University Council on Instructional Development grant of $2,400 to prepare a computer-assisted instructional program in remedial writing, 1971.

Rutgers University Research Council grant of $1,000 on the topic: "The Selected Literary Criticism of James Thomson (B.V.)", 1975.

**RESEARCH:**

Consortium on Research and Development of the Wisconsin State Universities, in cooperation with the U.S. Department of Health, Education and Welfare, Office of Education, grant of $2,400 on the topic: "A Feasibility Study to Determine the Possibility of Teaching Freshman Composition with a Programmed Text," 1969.

**PUBLICATIONS:**

**Books:**

*Doublespeak Defined*, HarperCollins, 1999.

*A Plain English Handbook: How to Create Clear SEC Disclosure Documents*, U.S. Securities and Exchange Commission, 1998, (with staff members of the SEC)

*The New Doublespeak: Why No One Knows What Anyone's Saying Anymore*, HarperCollins, 1996.

*The Politics, Policies, and Practices of Assessment in Writing*, Modern Language Association, 1996, (co-edited with Edward White and Sandra Kamusikiri).

*The Cambridge Thesaurus of American English*, Cambridge University Press, 1994.

*The Horizon Reader*, St. Martin's Press, 1992 (co-edited with Harry Brent).

*Beyond Nineteen Eighty-Four: Doublespeak in a Post-Orwellian Age*, National Council of Teachers of English, 1989.

*Doublespeak: From Revenue Enhancement to Terminal Living -- How Government, Business, Advertisers, and Others Use Language to Deceive You*, Harper and Row, 1989; paperback edition 1990.

*The Critical Reader*, Harper and Row, 1989 (co-edited with Harry Brent).

*Webster's New World Thesaurus*, revised edition, Simon and Schuster, 1985.

*The Perennial Reader*, Harper and Row, 1984 (co-edited with Harry Brent).

*Rhetorical Consideration: Essays for Analysis*, Little, Brown Publishers, 1984 (co-edited with Harry Brent).

*Rhetorical Considerations: Essays for Analysis*, Winthrop Publishers, 1974, 1977, 1980 (co-edited with Harry Brent).

*Modern English Reader*, 2nd edition, Prentice-Hall, 1977 (co-edited with Charlton Laird, Robert Gorrell, and Ronald Freeman).

*The Age of Communication*, Goodyear Publishing Company, 1974.

*On Revolution*, Winthrop Publishers, 1971 (co-edited with Harry Brent).

**Articles in Books:**

"Legal Considerations of Large-Scale Assessment in Writing" in *The Practice and Politics of Assessment in Writing*. Edward White, William Lutz, and Sandra Kamusikiri, eds. Modern Language Association, 1996.

"The World of Doublespeak" in *The State of the Language 1990*. Leonard Michaels and Christopher Ricks, eds. University of California Press, 1990: 254-264; reprinted in *The Sunday Times* (London), 7 January 1990, p. C6.

"Language, Appearance, and Reality: Doublespeak in 1984" in *The Legacy of Language: A Tribute to Charlton Laird*, Phillip Boardman, ed. University of Nevada Press, 1987, pp. 103-119.

"Annotated Bibliography on Writing Assessment" in *Writing Assessment: Issues and Strategies*, Karen Greenberg, Harvey Weiner, and Richard Donovan, eds. Longman, 1986, pp. 183-191.

"How I Write" in *Writers on Writing*, Thomas Waldrep, ed., Random House, 1985, pp. 183-88.

"James Thomson (B.V.)" in *Dictionary of Literary Biography, Victorian Poets After 1850*, Vol. 35, William Fredernan and Ira B. Nadel, eds. Gale Research Co., 1985, pp. 268-280.

"Who Speaks Doublespeak in 1984?" in *Orwell's 1984: The Text and Its Transformation and Legacy*, University of Minnesota, 1984, pp. 39-43.

**Articles:**

"Nothing in Life is Certain Except Negative Patient Care Outcome and Revenue Enhancement" *Journal of Adolescent and Adult Literacy* (November 2000): 230-233.

"Peace in Site" *Communicators in Business* [London, England] (October 2000): 21.

"Where's the Word Going?" *Communicators in Business* [London, Englasnd] (March 2000): 11-12.

"Worth Reading?" *Communicators in Business* [London, England] (September 1999): 24-27.

"The End of the Flat Web Site" *wallstreetlawyer.com* (July 1999): 8-10.

"Words Worth" *Communicators in Business* [London, England] (May 1999): 14-19.

"Think You Don't Write Doublespeak?  Think Again" *Journal of Employee Communication Management* (November/December 1996): 25-32.

"Visual Doublespeak" *The AIGA Journal of Graphic Design*, Vol. 15 No. 2 (1996): 31-33.

"The Meaning Behind the Word: Being Clear . . . Obscurely" *Two and Two* (Amsterdam, The Netherlands) 3 (December 1990/January 1991): 3-6.

"Doublespeak, the Invasion of Panama, and the Corruption of Public Discourse" *The North American Review* (June 1990): 56-57.

"Doublespeak: *Nineteen Eighty-Four* is Still with Us" *Connoisseur* (March 1990): 70-73

"Doublespeak" *Public Relations Quarterly* 33 (Winter 1988-89): 25-30.

"Fourteen Years of Doublespeak" *English Journal*. Vol. 77, No. 3 (March 1988): 40-42.

"Language, Appearance and Reality: Doublespeak in 1984" *ETC.: A Review of General Semantics*. Vol. 44, No. 4 (Winter 1987): 382-391.

"Doublespeak At Large" *English Today*. Vol. 3 No. 12 (October 1987): 21-24; reprinted in *Anthropology 90/91*, Elvio Angeloni, ed. The Dushkin Publishing Group, 1990: 40-44.

"Doublespeak in 1984" *Halcyon 1986 A Journal of the Humanities*, University of Nevada, Reno, (1986): 75-80.

"Scenario: Setting Parameters for a Task Force to Implement Language Enhancement" *Social Education*. Vol. 48 No. 3 (March  1984): 177-179.

"Corporate Doublespeak: Making Bad News Look Good" *Business and Society Review*, Winter, 1983: 19-22.

"What We Know and Don't Know About Using Multiple Choice Tests to Assess Writing" *Notes From the National Testing Network in Writing*, January, 1983.

"Unholy Preachings: The Gospel According to the Advertising Council" *Cyrano's Journal*, Fall, 1982.

*How To Read 55,000 Essays a Year and Love It.* ERIC ED 185 563. Washington, D.C.: GPO, 1980.

*Statewide Testing in New Jersey.* ERIC ED 181 485. Washington, D.C.: GPO, 1979.

"'Unswept stone besmear'd with sluttish time' James Thomson's Grave" *Notes and Queries*, New Series, Vol. 24, No. 1, February, 1977: 35-36.

"The Death of James Thomson (B.V.)" *Notes and Queries*, New Series, Vol. 24, No. 1, February, 1977: 36-38.

"'The American Economic System': The Gospel According to the Advertising Council" *College English*, Vol. 38, April, 1977: 860-865.

"Bonehead English" *English Journal*, October, 1975.

"On Training Teachers of Remedial English" *Freshman English News*, Fall, 1973.

"Teaching Minority Students: Some Additional Comments" *Freshman English News*, December, 1972.

"Making Freshman English a Happening" *College Composition and Communication*, February, 1971.

**Monographs:**

"The Annual Report in Plain Language" Mead Annual Report Conference, October 3-4, 1996, New York.

"Doublespeak: A Brief History, Definition, and Bibliography, with a List of Award Winners, 1974-1990" Concept Paper No. 2, National Council of Teachers of English, 1991.

"A Feasibility Study to Determine the Possibility of Teaching Freshman Composition with a Programmed Text" *The Consortium on Research and Development of the Wisconsin State Universities*, Wisconsin State University, Stevens Point, 1969.

**EDITORIAL:**

Editor, *The Samsung Magazine*, 1997-2000.
Editor, *Quarterly Review of Doublespeak*, 1980-1994.
Contributing Editor, *The Oxford Companion to the English Language*, 1988-90.
Contributing Editor, *Longman Bibliography of Composition and Rhetoric 1984-1985*, Erika Lindemann, ed. (Longman, 1987).

**PAPERS PRESENTED AT INTERNATIONAL CONFERENCES:**

9

Global Conversations on Language and Literacy, University of Bordeaux, Bordeaux, France, 1998.
Global Conversations on Language and Literacy, Heildelberg University, Heidelberg, Germany, 1996.
Global Conversations on Language and Literacy, Oxford University, England, 1994.
Fourth International Conference on the Teaching of English, Ottawa, Canada, 1986.
Third International Conference on the Teaching of English, Michigan State University, 1984.
Forum for Interdisciplinary Research International Conference on Language Policy and Social Problems, Curacao, The Netherlands Antilles, 1983.
Fifth International Symposium on Educational Testing, University of Stirling, Scotland, 1982.
Forum for Interdisciplinary Research International Conference on Language Policy and Social Problems, Cancun, Mexico, 1981.

**PAPERS PRESENTED AT NATIONAL CONFERENCES:**

College English Association: 1979;
Conference on College Composition and Communication: 1969, 1970, 1972, 1974, 1976, 1977, 1978, 1979, 1981, 1983, 1984, 1987, 1990, 1991, 1993;
Conference on Twentieth Century Literature: 1975;
Modern Language Association: 1979, 1982, 1992, 1993, 1996;
National Association for Remedial/Developmental Studies in Post-Secondary Education: 1978, 1979;
National Council on Measurement in Education: 1983;
National Council of Teachers of English: 1971, 1974, 1976, 1977, 1980, 1981, 1993;
National Testing Network in Writing Conference: 1985, 1986, 1987;
Seventh Conference on Learning in Higher Education, 1986;
Southeastern Conference on English in the Two-Year College, 1987, 1989;
Speech Communication Association: 1980.

**LECTURES GIVEN BY INVITATION:**

(partial list)

Dyson Humanities Lecture, Center for Applied Ethics, Pace University, New York, 1987.
Jane Globus Lecture in the Humanities, Baruch College, City University of New York, 1987.
Chautauqua Lecture, Missouri Western State University, 1990.
Federal Executive Institute, Charlottesville, VA, 1991.
Crypto-Linguistic Association, National Security Agency, Fort Meade, MD, 1990.
National Association of Government Communicators, Washington, D.C., 1990.
Radio and Television News Directors Association, 1990.
Administrative Conference of the United States, Washington, D.C., 1989.
Wisconsin Intellectual Freedom Coalition, Milwaukee, 1984.
The Miracle of Language: A Symposium in Honor of Charlton Laird, University of Nevada, Reno, 1984.
Institute on National Affairs, Iowa State University, 1984.
Ohio Wesleyan University, 1984.
University of San Diego, 1984.

University of Wisconsin - Whitewater, 1984.
Canadian Council of Teachers of English, 1984.
York University, Downsview, Ontario, Canada, 1983.
Texas Library Association, 1984.
Conference on Orwell's 1984: The Text and Its Transformation and Legacy, University of
Minnesota, 1984.

## POSITIONS HELD IN PROFESSIONAL ORGANIZATIONS:

Executive Committee, Division on Language and Society, Modern Language Association,
1985-1990.
Executive Committee, Delaware Valley Writing Council, 1984-85.
President, New Jersey College English Association, 1983-85.
Delegate Assembly, Modern Language Association, 1980-82.
Chair of the Committee on Public Doublespeak, National Council of Teachers of English,
1978-1994.
Commission on the English Language, National Council of Teachers of English, 1978-81.
Executive Committee, Conference on College Composition and Communication, 1976-79.
College Section Executive Committee, National Council of Teachers of English, 1974-77.
Chair, Executive Committee, College and University Conference, Wisconsin, 1969-70.

## PROFESSIONAL ACTIVITIES:

Reader for *College English* and *College Composition and Communication*.
Consultant on computers and writing for Salem County College and Middlesex County
College.
Chief Reader, General Educational Development Testing Service essay reading, 1984.
Consultant on writing assessment for General Educational Testing Service, Maryland State
Department of Education, Maryland Board of Higher Education, Florida Department
of Education, Louisiana Technological University.
Evaluator of writing programs at Borough of Manhattan Community College, New York;
Hunter College, New York; Florida State University Board of Regents; Camden
County College, New Jersey; Burlington County College, New Jersey; Kean College of New
Jersey.

## MEMBERSHIPS:

American Bar Association
American Dialect Society
North American Dictionary Association
Pennsylvania Bar Association
Rhetoric Society of America

## SELECTED LIST OF MEDIA APPEARANCES:

**Profiled on**: CBS Evening News with Dan Rather (CBS Television Network); CNN Headline News (CNN Cable Television); New Jersey Network News (Public Television); The Osgood File (Charles Osgood, CBS Network Radio).

**Interviewed on**: MacNeil-Lehrer News Report (PBS Television); Walter Cronkite Special (CBS Television Network); Today Show (3 appearances, NBC Television Network); CBS Nightwatch (CBS Television Network); Larry King Show (2 appearances, Mutual Broadcasting System, Radio); Booknotes (C-SPAN Cable Television); Dick Cavett Show (CNBC Cable Television).

**Invited Commentary on**: Today Show (NBC Television Network); Monitor News (The Discovery Channel, Cable Television); Morning Edition, National Public Radio.

**Narrator and Host**: 30 minute PBS program "Doublespeak" produced by WNET Channel 13, New York, and syndicated on public television stations across the United States as part of its "Currents" series.


# EXPERT ON LANGUAGE IN:

*In Re America Online, Inc. Version 5.0 Software Litigation*
Reed R. Katherine, Esq.
Milberg Weiss Bershad Hynes & Leach
100 Pine Street, Suite 2600
San Francisco, California 94111

*Federated Management Co. v. Coopers & Lybrand*
Leo R. Beus, Esq.
Beus, Gilbert & Devitt, P.L.L.C.
Suite 1000 Great American Tower
3200 North Central Avenue
Phoenix, AZ 85012-2417
*Hicks v. Nationwide*
Marian McGuire, Esq.
Milberg Weiss Bershad Specthrie & Lerach
225 Broadway
2000 Coast Savings Tower
San Diego, California 92101-5050

*Sprague v. Qualcomm, Inc.*
Michelle M. Ciccarelli, Esq.
Milberg Weiss Bershad Hynes & Lerach
600 West Broadway
1800 One America Plaza
San Diego, California 92101-3356

*JVC v. Singh*

Roberta Jacobs-Meadway, Esq.
Panitch Schwarze Jacobs & Nadel
1601 Market Street, 36th Floor
Philadelphia, Pennsylvania  19103

*Selective Insurance Company v. Raffa Construction*
Marie A. Cappuccio, Esq.
Raso & Cappuccio, P.C.
847-A Twelfth Street
Route 54
Hammonton, New Jersey  08037

*Eastabrooks v. UNUM*
Arthur J. Seidner, Esq.
Glenview Corporate Center
3220 Tillman Drive, Suite 100
Bensalem, Pennsylvania  19020

*Cosans v. Division of State Police*
Ronald J. Cappuccio, Esq.
1409 Kings Highway North, Suite 2A
Cherry Hill, New Jersey  08034

*Cindy Blank v. Mutual of Omaha Insurance Company et al.*
Arthur J. Seidner, Esq.
Glenview Corporate Center
3220 Tillman Drive, Suite 100
Bensalem, Pennsylvania  19020