# EXHIBIT G

# Graydon
# Head &
# Ritchey
# LLP

*Attorneys at Law*

John B. Pinney
Direct Dial: (513) 629-2730
E-Mail: jpinney@graydon.com

February 11, 2004

**VIA HAND DELIVERY**

The Honorable Sandra S. Beckwith
United States District Court
Southern District of Ohio, Western Division
810 Potter Stewart Courthouse
100 E. Fifth St.
Cincinnati, OH 45202

Re:  Thiemann, et al. v. OHSL, et al.
     <u>Case No. C-1-00-793</u>

Dear Judge Beckwith:

I am writing in response to the letter that Michael Brautigam sent you on February 6, 2004. The Court's November 19, 2003 Scheduling Order required Plaintiffs to file an amended complaint on December 31, 2003, and required Defendants to file any motions to dismiss by January 31, 2004. (Doc. No. 221). In accordance with the Scheduling Order, Plaintiffs filed the Consolidated Amended Class Action Complaint (the "CAC") on December 31, 2003, and our clients, the OHSL and Provident Defendants, filed a Motion to Dismiss on January 30, 2004.[1] Under the terms of the Scheduling Order, Plaintiffs have until February 16, 2004 to file memoranda opposing Defendants' motions to dismiss. (*Id.*).

On February 3, 2004, Plaintiffs filed an "Emergency Motion," asking the Court to strike the motions to dismiss of all Defendants except Ernst & Young. (Doc. No. 261). In support of the request to strike, Plaintiffs raise certain arguments about the motions to dismiss filed by certain Defendants. These arguments are not well taken, as noted below. The simple fact of the matter, however, is that, if Plaintiffs believe that Defendants' motions are not well taken for any reason, they can and should raise such arguments in their memoranda opposing the motions to dismiss. There is absolutely no legal basis for filing a motion to strike inappropriately seeking an advance ruling, in a

---

[1] Mr. Brautigam claims that Defendants had "months" to prepare the Motion to Dismiss. By my calculation, however, December 31, 2003 to January 31, 2004 is 31 days, or, one month.

www.graydon.com      *Mailing Address*          *Cincinnati Office*              *Kentucky Office*
                      P.O. Box 6464               1900 Fifth Third Center         2500 Chamber Center Drive
                      Cincinnati, Ohio 45201-6464 511 Walnut Street               Suite 300
372863.1                                         Cincinnati, Ohio 45202-3157     Ft. Mitchell, Kentucky 41017-7070
                                                 telephone (513) 621-6464        telephone (859) 282-8800
                                                 fax (513) 651-3836              fax (859) 525-0214

The Honorable Sandra S. Beckwith
February 11, 2004
Page 2

vacuum, on Defendants' legal arguments. If Plaintiffs have a point to make that, they believe, impacts the motions to dismiss, they should include it in their memoranda in opposition. This clearly is not a legally appropriate situation for a motion to strike.

Plaintiffs' individual arguments also are without merit. First, Plaintiffs claimed that Defendants' motions to dismiss re-argue issues dispositively decided by the Court in its July 25, 2001 Order (Doc. No. 46). The reasons that we dispute this claim are fully set forth in our Memorandum in Opposition to Plaintiffs' Emergency Motion. (Doc. No. 262). In summary, however, the reasons are as follows:

(1)     The CAC is a new complaint that contains new factual allegations and references that were not part of the original Complaint. Defendants have the right, and obligation, to test the sufficiency of the allegations in the new CAC;

(2)     Sixth Circuit caselaw interpreting the federal securities laws and the legal sufficiency of complaints alleging securities law violations is much different now than it was in July, 2001. The applicable law clearly mandates dismissal of all of Plaintiffs' claims. Defendants have the right to argue for dismissal of all the allegations of the CAC based upon the current state of the law;

(3)     The Court's July, 2001 Order dispositively held that certain of Plaintiffs' allegations failed as a matter of law. The Order did not, however, dispositively rule that Plaintiffs' surviving allegations were legally material, only that they were sufficient "at the pleading stage." Defendants believe that they are entitled to dispute the legal sufficiency of these allegations, particularly in the context of the new CAC, which references documents and testimony which, when viewed in context, demonstrates the legal insufficiency of Plaintiffs' allegations.

The Court should not strike any of the motions to dismiss.

As an alternative to striking the motions to dismiss, Plaintiffs' "Emergency Motion" requests that the Court summarily convert the motions to dismiss to motions for summary judgment. In support of this argument, Plaintiffs state that the motions to dismiss cite deposition testimony from "another case in another court that was not a securities case." (See Mr. Brautigam's 2/6/04 letter to the Court, at n. 1). Plaintiffs ignore two crucial facts on this point, however. First, the only reason that Defendants discuss these depositions (which were taken in Mr. Brautigam's abandoned State Court Action relating to the Provident-OHSL merger) is that the CAC cites to testimony in these depositions and largely is based upon Plaintiffs' mischaracterizations of what the testimony was. Second, the law is quite clear; a motion to dismiss under Rule 12(b) may rely upon and incorporate any documents referenced in the complaint. *See Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) (*citing Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997) ("Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim."); In *re Gupta Sec. Litig.*, 900 F. Supp. 1217, 1228 (N.D.

The Honorable Sandra S. Beckwith
February 11, 2004
Page 3

Cal. 1994) (*quoting Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)). In other words, because Plaintiffs excerpted and relied upon depositions in the CAC, Defendants, properly have the right to rely upon and cite the Court to the full content of these same depositions in the motions to dismiss, and the consideration of such testimony by the Court does not require converting the motions to dismiss into motions for summary judgment.

What really is going on here is something much more mundane. Plaintiffs are required to respond to the motions to dismiss by February 16, 2004 under the present Scheduling Order (to which Plaintiffs inexplicably have filed objections). Plaintiffs evidently need more time to respond to the pending motions. Plaintiffs apparently reluctant to request it, however, because just a few weeks ago, Plaintiffs refused to grant Defendants any extension of time to respond to Plaintiffs' renewed Motion for Class Certification. (*See* Defendants' Position Paper (Doc. No. 239)). As Defendants' counsel advised both Plaintiffs' counsel and Magistrate Judge Hogan last week, however, Defendants' have no objection to an extension. If Plaintiffs need a reasonable extension of time to respond to these motions to dismiss, Defendants will not oppose it. There is no basis for a motion to strike or convert, however, and Plaintiffs' "Emergency Motion" therefor should be denied.

Sincerely,

GRAYDON HEAD & RITCHEY LLP

John B. Pinney

JBP:jaw

cc:   Magistrate Judge Timothy S. Hogan (via hand-delivery)
      Michael G. Brautigam (via facsimile)
      John W. Hust
      James E. Gauch
      Michael R. Barrett
      Thomas W. Breidenstein
      James E. Burke
      Rachael A. Rowe

372865.1

# EXHIBIT H

# LAW OFFICES OF GENE MESH AND ASSOCIATES

11 February 2004

By Fax 651 6464

John B. Pinney, Esq.
GRAYDON HEAD & RITCHEY LLP
P.O. Box 6464
Cincinnati, OH 45201-6464

<u>Re: Thiemann, et al. v. OHSL, et. al.</u>

Dear Mr. Pinney:

I write in response to your 11 February 2004 letter to Judge Beckwith that was submitted without authorization in violation of the local rules. Your letter is little more than a personal attack on me, and an attempt to re-argue points already made in your opposition to the emergency motion. These scurrilous comments will be responded to at the appropriate time and in the appropriate context.

You state that plaintiffs are required to respond to various motions by 16 February 2004 pursuant to the Scheduling Order. I respectfully disagree. Perhaps you forgot that you filed an Amended Motion to Dismiss on 6 February 2004 in recognition that plaintiffs were correct that (at least some of) your argument that your Motion to Dismiss was more appropriately considered in the summary judgment context. The filing of your Amended Motion (Doc. No. 264) thus starts the clock for the response time, and provides for the normal amount of time under the local rules. Please be advised that I am aware of and reject Mr. Burke's unique view that the filing of the Amended Motion has no effect on our response date. (As you know, the current Scheduling Order provides significantly less time that allowed [in normal circumstances] under the local rules, which is one of the reasons for our objections. )

I respectfully request that you amend your letter to Judge Beckwith, to at least inform Judge Beckwith with respect to the filing of the Amended Motion to Dismiss. Should you not amend your letter, the only reasonable conclusion is that you wish to continue to deliberately mislead the Court, something that you have repeatedly done even given your recent appearance in the case[1].

Finally, on page 2 of your letter you state that the caselaw interpreting the federal securities laws and the sufficiency of the complaint has dramatically changed since July 2001. Would you kindly tell me which cases you are referring to?

2605 Burnet Avenue
at Taft Road
Cincinnati, Ohio 45219

TELEPHONE
(513) 221-8800

FAX
(513) 221-1097



...ery statement on behalf of the OHSL and Provident defendants that plaintiffs filed ...ed Complaint on 4 February 2002 without leave of the Court is a knowingly ...se statement.

**LAW OFFICES OF GENE MESH AND ASSOCIATES**

Thank you for your cooperation.

Sincerely,

Michael G. Brautigam

cc:  All Counsel





# LAW OFFICES OF GENE MESH AND ASSOCIATES

21 February 2004

By Fax 651 6464

John B. Pinney, Esq.
GRAYDON HEAD & RITCHEY LLP
P.O. Box 6464
Cincinnati, OH 45201-6464

     Re:  Thiemann, et al. v. OHSL, et. al.

Dear Mr. Pinney:

In your unauthorized 11 February 2004 letter to Judge Beckwith, you state as follows:

> Sixth Circuit caselaw interpreting the federal securities
> laws and the legal sufficiency of complaints alleging
> securities law violations is **much different now than
> it was in July, 2001**.  The applicable law clearly mandates
> dismissal of all of Plaintiffs' claims.  Defendants have the
> right to argue for dismissal of all the allegations of the
> CAC bases upon the current state of the law;

In my 11 February 2004 letter to you, I stated as follows:

> Finally, on page 2 of your letter you state the the caselaw
> interpreting the federal securities laws and the sufficiency
> of the complaint has dramatically changed since July 2001.
> Would you kindly tell me which cases you are referring to?

I am writing to follow-up on my request that you tell me which cases you are referring to.
I have repeatedly read the Amended Motion to Dismiss, and I cannot find the cases you
are referring to.  Presumably if the law changed as significantly as you state in your
unauthorized letter to the Court, this would be a highlight of your brief.

But perhaps I have simply missed it.  Would you kindly call me to discuss?

Thank you for your cooperation.

Sincerely,

Michael G. Brautigam

Counsel

2605 Burnet Avenue
at Taft Road
Cincinnati, Ohio 45219

TELEPHONE
(513) 221-8800

FAX
(513) 221-1097

# EXHIBIT I

PLAINTIFF'S
EXHIBIT NO. 1
FOR IDENTIFICATION
DATE 12/13/01     RPTR: ____



# INSIDER: *Children's Hospital might purchase old Phoenix International campus*

FROM PAGE 1

Children's saw a 72 percent increase in the past 12 months in emergency department psychiatric visits. Numbers hit 3,100 visits for the year ended March 31. And the nurses in the department take 100 calls a day from people looking for psychiatric services. A Psychiatric Response Center was launched in May to handle call volume and direct patients to the services they need.

Now Sherbun is leading a community-wide effort to study how the region can better serve pediatric psychiatric needs.

"Everyone says we need more beds," he said.

Exactly where those beds will be made is still up in the air, hospital spokesman Jim Feuer said.

Children's is still making decisions about square footage needs, costs and how much it wants to spend.

"It's still early," Feuer said. "We're still looking."

But time may be of the essence.

The Department of Labor announced it will halt plans to move the Cincinnati Job Corps Center from the West End to the Hamilton Avenue site to address community concerns.

The delay could open the door for Children's to make an offer on the site, once the Emerson A. North Hospital. The 75,000-square-foot building is on 26 acres. It was built in 1988, and the asking price is $8 million.

Sherbun envisions a residential care facility that would serve children ages 8 to 18, where a majority of patients would be between the ages of 12 and 15.

The College Hill campus is in a serene setting, nestled in a quiet residential neighborhood of modest homes.

Providing psychiatric care in acute care settings is more volatile, Sherbun said. Patients would benefit from a more secluded atmosphere.

If the hospital can't find a suitable facility to buy, Sherbun said it will build. That decision will be made in six months.
— *Andrea Tortora*

• • •

A former shareholder of Oak Hills Savings and Loan Co. is a step closer to unraveling Provident Bank's 1999 acquisition of the West Side thrift.

U.S. District Judge **Sandra Beckwith**, in a July 25 ruling, refused to dismiss **Walter Thiemann's** 10-month-old complaint, which alleges Oak Hills and Provident officials withheld "material information" about the sale. Beckwith dismissed parts of the lawsuit but left intact allegations that Oak Hills board members secretly opposed the deal.

"A reasonable shareholder might find dissent among the board of directors important to the mix of information available," Judge Beckwith wrote in a July 25 order.

"This is not just a question of bad judgment or somebody made a mistake or even gross negligence. This is fraud," said Thiemann's attorney **Mike Brautigam**. "They deliberately misled the shareholders."

No they didn't, said attorney **Jim Burke**, who represents all Provident and Oak Hills directors named as defendants in the case.



**Beckwith**

"Everybody on our side was very pleased by the decision," said Burke, a partner at Keating Muething and Klekamp. "What the court did was knock out about 70 percent of what they alleged the first time around. We believe that after the evidence comes in those claims will be dismissed also."



**Hanauer**

Provident acquired Oak Hills in November 1999 for $57 million. OHSL shareholders approved the stock-swap transaction at a special meeting in October 1999. But Thiemann's lawsuit alleges important information was withheld from shareholders.

Among the allegations left intact:

• **Brautigam alleges Oak Hills CE Kenneth Hanauer** personally believed th sale was not in the best interest of sharehol ers but voted as a director in favor of th transaction after receiving a golden par chute provision in his employment contra worth $375,000. Burke's response: Hanau opposed the Provident takeover because h wanted Oak Hills to remain independen But he also believed the transaction was fa to shareholders.

• The resignation of Oak Hills directo **Tom Herron** was never disclosed to shar holders. Thiemann's complaint alleges th departure should have been reported t shareholders because Herron "strongly di agreed" with the transaction and retired t avoid voting on it. Burke claims Herron departure was disclosed to shareholder How? His name was omitted in a list of dire tors included with the proxy statement seel ing shareholder approval of the sale.

Brautigam said the complaint is likely t be amended with new allegations by th time the trial takes place. A November 200 trial date has been set for the case. Bot sides are awaiting a second ruling fro Judge Beckwith on whether the case shoul be certified as a class action.

*Got a tip for Insider? Call Courier government reporter Dan Monk at (513) 621-6665. Or e-ma him at dmonk@bizjournals.com*

# EXHIBIT J

# AGENDA

## SPECIAL MEETING OF THE STOCKHOLDERS OF
## OHSL FINANCIAL CORP.
## OCTOBER 25, 1999

1.  Call to order by Chairman of the Meeting

2.  Inspectors of Election

3.  Introductions

4.  Certification of Notice of Meeting

5.  Report of Inspectors of Election on existence of quorum

6.  Vote on Acquisition Proposal

    a.  Placing of Action Before the Meeting
    b.  Chairman's Introductory Comments and Discussion From the Floor
    c.  Vote on Acquisition Proposal

7.  Adjournment

# SPECIAL MEETING OF STOCKHOLDERS

## OHSL FINANCIAL CORP.
### OCTOBER 25, 1999

### Call to Order

Mr. Kenneth L. Hanauer
Chairman:          1.          Good afternoon Ladies and Gentlemen.  Since it is 10:00 A.M., I now call to order the Special Meeting of the Stockholders of OHSL Financial Corp.  My name is Kenneth L. Hanauer and I am the President and Chief Executive Officer of OHSL Financial Corp.  I am serving as Chairman of today's stockholder meeting.

### Inspectors of Election

Chairman:          2.          I hereby note that the Board of Directors has appointed _____ to serve as Inspectors of Election in connection with the matters to be voted on at this meeting.  The Inspectors of Election will supervise the conduct of the voting at this meeting.

### Introduction of Directors and Officers

Chairman:          3.          Next, I would like to introduce the other directors and executive officers of the Corporation.  I'll ask them to stand and be recognized as I introduce them. [Introduce all directors and executive officers present at the Special Meeting.]

### Introduction of Attorney and Accountant

Chairman:          4.          I would also like to introduce our attorney who is representing the Corporation and Oak Hills Savings and Loan Company in the proposed transaction, Mr. Clifford Roe of the Cincinnati law firm of Dinsmore & Shohl, and a representative of the Corporation's accounting firm, _____ of Crowe, Chizek and Company LLP.

### Certification of Notice of Meeting

Chairman:          5.          I will now read the certificate concerning the giving of notice of this meeting.

[Chairman reads certificate - attached hereto]
### Certificate of Inspectors of Election on Existence of Quorum

Chairman:          6.          I now call on the Inspectors of Election to report on the existence of a quorum.

[Inspectors report the number of shares represented in person and the number represented by proxy, making sure that all proxies are properly signed and report that the total shares present constitute a quorum.   Inspectors then execute the Certificate specifying existence of a quorum.]

Chairman:              7.      The Inspectors of Election have reported that more than _____% of the issued and outstanding shares, namely 2,503,470 shares, are represented in person or by proxy at this meeting and that a quorum is present.

### Vote on Acquisition

Chairman:              8.      The next scheduled order of business is to consider and vote upon the transaction discussed in the Proxy Statement/Prospectus dated September 24, 1999. I will now entertain motions relative to such transaction.

Mr./Ms. _____:    9.      I move that the following action be placed for a vote before the stockholders of the Corporation:

Approval and adoption of the Agreement and Plan of Merger dated August 3, 1999, by and among the Corporation, Oak Hills Savings and Loan Company, F.A., Provident Financial Group, Inc. and The Provident Bank and the transactions contemplated thereby.

Chairman:             10.      Is there a second?

Mr./Ms._____:    11.      I second the motion.

Chairman:             12.      At this point, I would like to give you a short summary of the transaction described in the Proxy Statement/Prospectus.

The purpose of this meeting is to consider and vote on the proposed acquisition of the Corporation by Provident Financial Group, Inc. through the merger of the Corporation with and into Provident Financial Group and the merger of Oak Hills Savings and Loan Company, F.A. with and into The Provident Bank.  If the acquisition is approved today and certain other conditions occur, our stockholders will become stockholders of Provident Financial Group.

The number of shares of Provident Financial Group common stock to be received by our stockholders in

exchange for each outstanding share of the Corporation's common stock will be determined based on an average Provident Financial Group share price. The average Provident Financial Group share price is the 10 day average closing price of Provident Financial Group common stock as reported on the Nasdaq National Market ending two days before the closing of the acquisition. Each of our stockholders will receive $22.50 worth of Provident Financial Group common stock if the average Provident Financial Group share price is between $40 and $50. If the average Provident Financial Group share price is below $40, each of our stockholders will receive 0.5625 shares of Provident Financial Group common stock for each share of the Corporation's common stock. If the price is above $50, each of our stockholders will receive 0.45 shares of Provident Financial Group common stock for each share of the Corporation's common stock.

The details of this transaction are more fully explained in the Proxy Statement/Prospectus dated September 24, 19^^ that you received in the mail.

Your Board of Directors has determined that the acquisition and the Agreement and Plan of Merger are advisable and in the best interests of our stockholders. The Board unanimously approved the Agreement and Plan of Merger and the acquisition on August 2, 1999 and has recommended that our stockholders vote for adoption of the Agreement and Plan of Merger.

The Board considered many factors in reaching its determination. The primary consideration was that the transaction will strengthen Provident Financial Group and will serve the long-term interests of our stockholders, as well as the interests of our employees, customers and the communities in which the Corporation operates.

We also have received an opinion from McDonald Investments Inc., the Corporation's financial advisor, to the effect that the exchange ratio is fair to our stockholders from a financial point of view.

In order to approve this transaction, a majority of the Corporation's outstanding shares must be voted in favor of

it.

This concludes my introductory comments on the proposed transaction.

Is there any discussion from the floor concerning this matter? Mr. Roe and _____ are here to assist in answering any questions you may have.

Chairman:        13.    (Hearing none/The discussion being concluded), we will now proceed to vote on the motion. The Inspectors of Election will distribute the ballots.

---

(1)    Inspectors distribute ballots to proxies and to anyone who intends to vote in person.

(2)    Ballots are voted - Proxy Committee signs ballot.

(3)    Inspectors collect ballots and tabulate vote.

(4)    Inspectors execute and give certificate to Chairman on the result of the vote.

---

Chairman:        14.    The Inspectors of Election certify that a total of _____ votes were cast in favor of the action while _____ votes were cast against it and _____ votes abstained. I hereby declare that since (**more than**/less than) a majority of the issued and outstanding shares of the Corporation's common stock were voted in favor of the action, the action approving the Agreement and Plan of Merger and the transactions contemplated thereby (**has**/has not) been duly approved by the stockholders.

Chairman:        15.    Is there any other business?

## Adjournment

Chairman:        16.    There being no further business I will now entertain a motion for adjournment of the meeting.

Mr./Ms._____: 17.    I move that the Special Meeting of the Stockholders of OHSL Financial Corp. be adjourned.

Chairman:        18.    Is there a second?

Mr./Ms._____ : 19.   I second that motion.

Chairman:          20.   Is there any discussion?

Chairman:          21.   All those in favor of the motion, please signify by say "yes."  All those opposed to the motion, please signify by saying "no."

Chairman:          22.   I declare the motion has been adopted and this meeting is adjourned.

# EXHIBIT K

**Page 2**

Continuation of the deposition of ALVIN E. HUCKE, a defendant herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Lee Ann Williams, a Registered Professional Reporter and Notary Public in and for the State of Ohio, at the offices of Provident Bank, 5889 Bridgetown Road, Cincinnati, Ohio, on Monday, January 5, 2004, at 10:46 a.m.

APPEARANCES:

On behalf of the Plaintiff:

Michael G. Brautigam, Esq.
Gene Mesh & Associates
2605 Burnet Avenue
Cincinnati, Ohio 45219

On behalf of the Defendants:

James E. Burke, Esq. (Of counsel)
Keating, Muething & Klekamp
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202

**Page 3**

On behalf of the Defendants Dinsmore & Shohl, Clifford Roe, and Charles Hertlein, Jr.:

John W. Hust, Esq
Schroeder, Maundrell, Barbiere
& Powers
110 Governor's Knoll
11935 Mason Road
Cincinnati, Ohio 45249

On behalf of the Defendants:

J. Michael Debbeler, Esq.
Graydon, Head & Ritchey
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202

On behalf of the Defendant Ernst & Young:

Mary-Helen Perry, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

ALSO PRESENT: Gary Meier
Connie Adkins-Ihle, Videographer

STIPULATIONS

It is stipulated by and among counsel for the respective parties that the deposition of ALVIN E. HUCKE, a defendant herein, called by the plaintiffs for cross-examination pursuant to the Federal Rules of Civil Procedure, may be taken at this time by the notary; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may then

**Page 4**

1  be transcribed out of the presence of the
2  witness; and that proof of the official
3  character and qualifications of the notary are
4  expressly waived.
5              - - -
6
7              I N D E X
8  Examination of ALVIN E. HUCKE      Page
9  By Mr. Brautigam:            5
10             - - -
11
      Exhibit         Page Identified
12
      No. 60              96
13    No. 61              15
14             - - -
15
16
17
18
19
20
21
22
23
24

**Page 5**

1              ALVIN E. HUCKE
2  having been first duly sworn, testified as
3  follows:
4              CROSS-EXAMINATION
5  BY MR. BRAUTIGAM:
6        Q.  Good morning, Mr. Hucke.  We met
7  previously.  As you know, my name is Michael G.
8  Brautigam and I represent Walter Thiemann, Gary
9  and Lisa Meier, and a putative class of OHSL
10 shareholders.
11       And, Mr. Hucke, we have some
12 background noise.  I'll try to keep my voice
13 up.  I don't want to shout at you.  If you
14 can't hear me, just let me know.  If I'm
15 speaking too loudly, please let me know.  Okay?
16       A.  Right.
17       Q.  Thank you.  Mr. Hucke, what is
18 your understanding of this litigation?
19             MR. BURKE:  Objection to the form,
20 vague.
21       A.  This litigation?
22       Q.  Yes.
23       A.  I have no idea.
24       Q.  Do you know who the defendants

Williams & Oliver
(513)683-9626

Page 38

1    Q.   Okay.  Let me direct your
2  attention to paragraph 18 on page 14.  And
3  while you're turning to that, you said
4  something --
5    A.   What page?
6    Q.   Fourteen, paragraph 18.  You said
7  something about being disillusioned with this
8  whole process.  Could you please explain what
9  you meant by that?
10    A.   I said -- I said it earlier that
11  -- just refer back to your notes and then
12  you'll, you'll have the answer.
13    Q.   That you think it's taking too
14  long?
15    A.   Yeah.
16    Q.   That it's taking too long?
17    A.   And it's ridiculous.
18    Q.   What specifically is ridiculous?
19    A.   I'll tell you why I think it's
20  ridiculous.  Today Oak Hills shareholders are
21  holding a piece of paper of Provident Bank
22  equal to Oak Hills of $18 a share.  When we
23  made this transaction it was $13 a share.  And
24  I think that amounts to about a 38 percent

Page 39

1  increase in value, all right?
2    Now, I look back at our peers in
3  this business, Oak Hills', savings and loans,
4  and I pick out Winton, who was very much the
5  same as we were, same size, same operation,
6  same type of company.
7    And I see they're selling at $13 a
8  share today.  And that's probably where Oak
9  Hills would have been today, at $13 a share.
10  So how anybody can object to holding something
11  that's worth $18 is beyond my comprehension.
12  Amen.
13    Q.   Okay.  So you believe that
14  Provident shareholders who were former Oak
15  Hills shareholders, such as Mr. Meier, are
16  significantly better off today than they would
17  have been, had the merger not taken place?
18    A.   That is correct.
19    Q.   Okay.  Have you taken pen to paper
20  to rough out some of these calculations?
21    A.   Yes, sir.
22    Q.   Okay.  And --
23    A.   I gave you a copy previous.
24    Q.   Right.  I remember that and I

Page 40

1  thank you for that.  Have you done it since the
2  restatement?
3    A.   No, sir.
4    Q.   Okay.  You agreed to sell
5  Provident -- excuse me, Oak Hills to Provident
6  for a little bit more than $57 million.  Is
7  that correct?
8    A.   I don't remember the exact amount.
9    Q.   But it was about 57 million,
10  correct?
11    MR. BURKE:  Objection.  Asked and
12  answered.
13    A.   If you say so, it's --
14    Q.   Okay.  And you would not have
15  agreed to sell Provident -- Oak Hills to
16  Provident for about $40 million, correct?
17    MR. BURKE:  Objection.  Assumes
18  facts not in evidence.  Calls for speculation.
19    A.   Correct.  I -- that would be
20  speculation.
21    Q.   $40 million would have been too
22  low a price, correct?
23    MR. BURKE:  Objection.  Calls for
24  speculation.  Assumes facts not in evidence.

Page 41

1    MS. PERRY:  Also asked and
2  answered.
3    A.   Things are going through my head
4  and the whole -- the whole transaction would
5  have probably been restructured if Provident
6  was worth less.  It doesn't say we wouldn't
7  have went ahead with it, but it might have been
8  restructured.
9    Q.   And it would have been
10  restructured in a way that would have been more
11  favorable to OHSL's shareholders, correct?
12    MR. BURKE:  Objection.  Calls for
13  speculation --
14    A.   I don't know.
15    MR. BURKE:  -- based upon facts
16  not in evidence.
17    Q.   Well, would it have been
18  restructured in a way that would have been
19  unfavorable to OHSL shareholders?
20    MR. BURKE:  Objection.  Vague,
21  calls for speculation.
22    A.   I don't know.
23    Q.   In fact, logically it would have
24  to be restructured in a way that would increase

11 (Pages 38 to 41)

Page 42

1  the amount of stock that OHSL's shareholders
2  were receiving; is that correct?
3          MR. BURKE: Objection. Calls for
4  speculation.
5          MS. PERRY: Objection.
6          MR. BURKE: Asked and answered.
7  You may answer.
8      A. I don't know.
9      Q. Okay. Take a look at paragraph
10 18. And I would ask you to read the paragraph
11 to yourself. With this document or any other
12 document, please take as much time as you need
13 to read the paragraph or other parts of the
14 document for context, but usually I feel that I
15 can direct your attention to a particular
16 section. And at this point I'm asking you to
17 read paragraph 18 to yourself.
18     A. All right.
19     Q. Okay. Now, Mr. Hucke, you
20 received the Provident 2002 annual report as a
21 shareholder, correct?
22     A. Yeah, I probably got it.
23     Q. And did you read some or all of
24 that document when you received it?

Page 43

        A. No, sir.
        Q. Okay. Did you read the MD&O, the
management discussion?
        MR. BURKE: Objection.
        Q. MD&A, excuse me, management
discussion and analysis?
        A. I don't remember.
        MR. BURKE: Objection. Asked and
answered.
        Q. Did you read anything in the
Provident 2002 annual report?
        A. I don't remember.
        Q. Okay. Well, the last part of
paragraph 18 is a quote that's from the annual
report, so let's take a look at that. The
first part of the quote says, A blemish was
added when our finance and accounting staff
discovered an accounting error in late
February. Do you see that?
        MR. BURKE: The document speaks
for itself, counsel. It's sitting right there.
        Q. Okay. Do you see that?
        A. I see it, yeah.
        Q. Okay. Did you have a particular

Page 44

1  reaction when you learned that Provident had
2  committed an accounting error?
3          MR. BURKE: Objection. He said he
4  didn't, didn't read it. Calls for speculation,
5  no foundation. You may answer.
6      A. Already got the answer. I didn't
7  read it.
8      Q. Okay. But you, you learned from
9  another source that Provident had committed
10 these accounting errors, correct?
11     A. I don't remember.
12     Q. Okay. Do you see where it says,
13 The error was unintentional and it relates to
14 nine auto lease financing transactions
15 originated between 1997 and 1999. Do you see
16 that?
17     A. Yes, sir.
18     Q. When you were considering merging
19 Oak Hills with Provident in 1999, had you known
20 about this, is this something you would want to
21 have considered?
22         MR. BURKE: Objection. Calls for
23 speculation.
24     A. I have no opinion.

Page 45

1      Q. Okay. Under what circumstances in
2  1999 would you have wanted more information
3  about the off-the-books accounting treatment
4  for auto lease financing transactions?
5          MS. PERRY: Objection to form.
6          MR. BURKE: Same objection.
7      A. No opinion. I am not familiar
8  with auto leases. I wouldn't have been smart
9  enough to ask for more information.
10     Q. Well, if -- do you believe that
11 this was a very serious matter?
12         MR. BURKE: Objection to the form.
13 What?
14     A. Yeah, why?
15     Q. The restatements.
16     A. No, sir.
17     Q. You don't believe they're serious?
18     A. No, sir.
19     Q. Okay. Would you turn the page?
20     A. Turn it?
21     Q. Turn it. Do you see at the top,
22 and I've underlined this, Mr. Hoverson says, we
23 consider this a very serious matter. Do you
24 see that?

12 (Pages 42 to 45)

Williams & Oliver
(513)683-9626

Page 46

1     MR. BURKE: I'd appreciate it if
2 you'd read the entire sentence, counsel.
3     MR. BRAUTIGAM: Jim, when I'm
4 done, you can read whatever sentences you'd
5 like.
6     MR. BURKE: Well, I think you're
7 taking this statement out of context. And I
8 believe that you're misleading the witness by
9 not reading the entire sentence. Object to the
10 form of that question for that reason.
11     Q. Do you see that?
12     A. Yeah, I see it.
13     Q. Okay. So do you disagree with Mr.
14 Hoverson that this is a very serious matter?
15     A. No opinion.
16     Q. Okay. Let's go down to the other
17 part that I have underlined and I'll read that
18 whole sentence. It results in less income in
19 earlier periods and more income in later
20 periods. Do you see that?
21     A. Yes, sir.
22     Q. Do you know what periods are being
23 referred to?
24     A. No, sir.

Page 47

1     Q. Do you believe that that sentence
2 relates in any way to the OHSL-Provident
3 merger?
4     A. No opinion.
5     MS. PERRY: Objection to form,
6 foundation.
7     Q. Do you think that you would have
8 been required to adjust the structure of the
9 transaction to be more favorable to OHSL
10 shareholders, had you known about this
11 accounting error?
12     MS. PERRY: Objection to form.
13     MR. BURKE: Objection to
14 foundation. Calls for speculation.
15     MS. PERRY: Also asked and
16 answered.
17     A. I have no opinion.
18     Q. Are you at all mad at Provident
19 because they didn't get their financials
20 correct?
21     A. No, sir.
22     MS. PERRY: Objection to form.
23     Q. Why not?
24     A. I think it's a good company and I

Page 48

1 think they'll continue to be a good company.
2     Q. You don't believe that Provident
3 fraudulently induced OHSL and OHSL's
4 shareholders to approve the merger based on
5 false financials?
6     A. No, sir.
7     MS. PERRY: Objection to form.
8 Calls for a legal conclusion.
9     A. I'm sorry.
10     MR. BURKE: Go ahead.
11     MS. PERRY: That's okay.
12     MR. BURKE: You can go and answer
13 it, Al.
14     A. I said no, sir.
15     Q. Do you agree that the financials
16 leading up to 1999 were materially misleading?
17     MR. BURKE: Objection.
18     MS. PERRY: Same objection.
19     MR. BURKE: Assumes facts not in
20 evidence. Mischaracterizes the record.
21     A. Do I believe it's misleading?
22     Q. Yes.
23     A. On purpose?
24     Q. No, for any reason.

Page 49

1     A. No, I don't say they were.
2     Q. Do you believe they were
3 accidentally misleading?
4     A. Accidentally maybe.
5     Q. Okay. What's the basis for your
6 answer?
7     A. Well, all through this that you
8 read here, that it was an honest mistake, and
9 then that's good enough for me.
10     Q. Okay. And if this honest mistake
11 had the effect of materially misstating
12 Provident's financials, don't you think it
13 would be fair to explain that to the OHSL
14 shareholders?
15     MR. BURKE: Objection. Assumes
16 facts not in evidence. Calls for speculation.
17     MS. PERRY: And a legal
18 conclusion.
19     MR. BURKE: No foundation.
20     A. No opinion.
21     Q. Why not?
22     A. No opinion.
23     MR. BRAUTIGAM: Can I have my
24 previous question read back?

13 (Pages 46 to 49)