# EXHIBIT L

**Page 1**

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF OHIO

3    WESTERN DIVISION AT CINCINNATI

4

5                      - - -

6    WALTER W. THIEMANN, on   :
     behalf of himself and    :
7    of all others similarly  :
     situated,                 :
8                              :
         Plaintiff,            :
9                              :
     VS.            : CASE NO. C-1-00793
10                            :
     OHSL FINANCIAL CORP.,   :
11   OAK HILLS SAVINGS AND    :
     LOAN COMPANY, F.A.,      :
12   NORBERT G. BRINKER,      :
     KENNETH L. HANAUER,      :
13   WILLIAM R. HILLEBRAND,   :
     ALVIN E. HUCKE, THOMAS   :
14   E. MCKIERNAN, JOSEPH J.  :
     TENOEVER, HOWARD N.      :
15   ZOELLNER, PROVIDENT      :
     FINANCIAL GROUP, INC.,   :
16   ROBERT L. HOVERSON,      :
     JACK M. COOK, THOMAS D.  :
17   GROTE, JR., PHILIP R.    :
     MYERS, JOSEPH A. PEDOTO, :
18   JOSEPH A. STEGER,        :
     CHRISTOPHER J. CARE,     :
19   CLIFFORD ROE, and        :
     DINSMORE & SHOHL, LLP,   :
20                            :
         Defendants.          :
21                      - - -

22       Deposition of HOWARD ZOELLNER, a

23   defendant herein, called by the plaintiff for

24   cross-examination, pursuant to the Federal

25   Rules of Civil Procedure, taken before me, Lee

**Page 2**

1    Ann Williams, a Registered Professional

2    Reporter and Notary Public in and for the State

3    of Ohio, at the offices of Gene Mesh &

4    Associates, 2605 Burnet Avenue, Cincinnati,

5    Ohio 45219, on Monday, October 15, 2001, at

6    10:10 a.m.

7

8    APPEARANCES:

9        On behalf of the Plaintiff:

10           Michael G. Brautigam, Esq.
             Gene Mesh & Associates
11           2605 Burnet Avenue
             Cincinnati, Ohio 45219
12
             On behalf of the Defendants:
13
             James E. Burke, Esq.
14           Keating, Muething & Klekamp
             1400 Provident Tower
15           One East Fourth Street
             Cincinnati, Ohio 45202
16
             On behalf of the Defendants Dinsmore &
17       Shohl and Clifford Roe:

18           Christopher Moore, Esq.
             Schroeder, Maundrell, Barbiere
19           & Powers
             110 Governor's Knoll
20           11935 Mason Road
             Cincinnati, Ohio 45249
21

22                      - - -

23

24

25

**Page 3**

1              S T I P U L A T I O N S

2        It is stipulated by and among counsel for

3    the respective parties that the deposition of

4    HOWARD ZOELLNER, a defendant herein, called by

5    the plaintiff for cross-examination pursuant to

6    the Federal Rules of Civil Procedure, may be

7    taken at this time by the notary; that said

8    deposition may be reduced to writing in

9    stenotypy by the notary, whose notes may then

10   be transcribed out of the presence of the

11   witness; and that proof of the official

12   character and qualifications of the notary are

13   expressly waived.

14                      - - -

**Page 4**

1                  I N D E X

2    Examination of HOWARD ZOELLNER        Page

3    By Mr. Brautigam:            5, 290
     By Mr. Burke:                280
4    By Mr. Moore:                286

5                      - - -

6
     Zoellner Exhibit           Page Identified
7
       No. 1                        6
8      No. 2                       18
       No. 3                       67
9      No. 4                       69
       No. 5                       71
10     No. 6                       75
       No. 7                       77
11     No. 8                       80
       No. 9                       94
12     No. 10                     102
       No. 11                     104
13     No. 12                     110
       No. 13                     117
14     No. 14                     122
       No. 15                     127
15     No. 16                     140
       No. 17                     166
16     No. 18                     187
       No. 19                     193
17     No. 20               (not identified)
       No. 21                     230
18     No. 22                     233
       No. 23                     243
19     No. 24                     182

20                      - - -

21   (Zoellner Exhibits 12 through 15 were
        not retained by the Reporter.)
22                      - - -

23

24

25

**Page 5**

```
1              HOWARD ZOELLNER
2    having been first duly sworn, testified as
3    follows:
4              CROSS-EXAMINATION
10:17:29  5  BY MR. BRAUTIGAM:
10:17:29  6       Q.  Good morning, Mr. Zoellner.
10:17:32  7       A.  Good morning.
10:17:32  8       Q.  My name is Michael G. Brautigam
10:17:34  9  and I represent Walter Thiemann and a certified
10:17:37 10  class of OHSL shareholders.
10:17:40 11       A.  Um-hmm.
10:17:40 12       Q.  Mr. Zoellner, in your heart did
10:17:42 13  you believe that the merger between Provident
10:17:45 14  and OHSL was in the best interest of OHSL and
10:17:48 15  its shareholders?
10:17:50 16       A.  Yes.
10:17:51 17       Q.  When did you come to believe that?
10:17:55 18       A.  Oh, gee, I don't know the date. I
10:17:58 19  don't know the date. At the beginning there I,
10:18:01 20  I wasn't in favor of it, then I changed, which
10:18:04 21  I think shows in the minutes when certain
10:18:08 22  votes -- I can't tell you the date of that.
10:18:12 23  It's been so long ago, I don't know.
10:18:16 24       Q.  Mr. Zoellner, let me put in front
10:18:20 25  of you what has been marked as Herron
```

**Page 6**

```
10:18:22  1  Deposition Exhibit 2. Have you seen that
10:18:25  2  document before?
10:18:30  3       A.  I don't think so, no. This had to
10:18:35  4  do with Herron. I can't tell what --
10:18:37  5            MR. BURKE: Herron Exhibit 2 is
10:18:38  6  just where it was marked. The question -- this
10:18:41  7  is a document with a bunch of handwriting on it
10:18:43  8  and the question is, have you ever seen this
10:18:45  9  document, if you remember.
10:18:46 10       A.  No, I didn't.
10:18:49 11       Q.  Okay. Have you ever seen this
10:18:50 12  document without the handwriting?
10:18:51 13            MR. BURKE: Objection. Form.
10:18:54 14       A.  I do not remember. I do not
10:18:56 15  remember.
10:19:03 16       Q.  Let me put in front of you
10:19:04 17  Defendant's Exhibit 1. Have you ever seen that
10:19:07 18  document?
10:19:10 19       A.  I don't know. I don't know. It's
10:19:11 20  been so long since any of this, I don't know
10:19:14 21  what I have seen and what I haven't seen.
10:19:17 22       Q.  Did you ever see the proxy
10:19:19 23  materials?
10:19:20 24       A.  Well, before I voted I guess those
10:19:23 25  were -- they mailed that out to everybody to --
```

**Page 7**

```
10:19:28  1       Q.  Are you asking me or are you
10:19:29  2  telling me?
10:19:30  3       A.  I'm asking. Didn't they mail it
10:19:32  4  out? The proxies they mailed out, I think.
10:19:34  5       Q.  Mr. Zoellner, I get to ask the
10:19:36  6  questions.
10:19:37  7       A.  Oh, okay.
10:19:38  8       Q.  And my question for you is, did
10:19:39  9  you ever see the proxy materials, ever?
10:19:42 10       A.  If you're referring to the proxy
10:19:45 11  material they mailed out, yes, every -- every
10:19:47 12  stockholder got one.
10:19:51 13       Q.  Okay. Let me direct your
10:19:52 14  attention to Herron Deposition Exhibit 2. Do
10:19:55 15  you see that? Let me direct your attention to
10:19:58 16  a particular sentence right here. "Your Board
10:20:04 17  of Directors unanimously approved the
10:20:05 18  acquisition and believes that it is in the best
10:20:09 19  interest of OHSL stockholders." Did I read
10:20:12 20  that correctly?
10:20:13 21       A.  That's what it says there.
10:20:15 22       Q.  Is that correct?
10:20:17 23       A.  I don't know. I'd have to refer
10:20:18 24  to the minutes to say whether it was unanimous
10:20:20 25  or not, from --
```

**Page 8**

```
10:20:23  1       Q.  Was Ken Hanauer in favor of this
10:20:25  2  transaction?
10:20:27  3       A.  At the beginning, no, but later
10:20:28  4  on, yes.
10:20:30  5       Q.  Okay. When --
10:20:31  6       A.  I don't know the date though.
10:20:32  7       Q.  Okay. Let's mark this as Zoellner
10:20:41  8  Deposition Exhibit 1. Mr. Zoellner, is it
10:21:12  9  important that the proxy materials be truthful?
10:21:14 10            MR. BURKE: Objection, calls for a
10:21:14 11  legal conclusion. If you know, you may answer.
10:21:17 12       A.  Give me that again.
10:21:18 13       Q.  Is it important that the proxy
10:21:21 14  materials be truthful?
10:21:22 15            MR. BURKE: Same objection. You
10:21:24 16  may answer.
10:21:24 17       A.  Is it important that the proxy
10:21:26 18  material what?
10:21:28 19       Q.  Be --
10:21:29 20       A.  I'm sorry, I'm deaf in this ear.
10:21:31 21       Q.  All right. Would it be helpful if
10:21:32 22  I speak toward your left ear?
10:21:34 23       A.  Yeah.
10:21:37 24       Q.  Okay. Is it important that the
10:21:38 25  proxy materials be truthful?
```

9

10:21:41 1    MR. BURKE:  You don't need to
10:21:41 2  shout in his ear, just speak directly.
10:21:45 3    A.  That's correct.
10:21:46 4    Q.  Okay.
10:21:46 5    A.  Yes.  Everything should be
10:21:47 6  truthful, yes.
10:21:49 7    Q.  Okay.  Do you believe that these
10:21:50 8  proxy materials were truthful?
10:21:51 9    A.  Well, I don't know.  I haven't
10:21:53 10  read these.
10:21:55 11    MR. BURKE:  Do you want to refer
10:21:56 12  to the ones that -- or do you know?  See,
10:22:00 13  you're referring to a document that he hasn't
10:22:01 14  seen before with all sorts of handwriting on
10:22:04 15  it.
10:22:04 16    MR. BRAUTIGAM:  Actually I'm not,
10:22:06 17  Jim, I'm referring him to Defendant's
10:22:09 18  Exhibit --
10:22:09 19    MR. BURKE:  Okay.  That's fine
10:22:10 20  then.  All right.  Do you remember the
10:22:13 21  question, Howard?
10:22:15 22    A.  Are these proxies truthful?
10:22:18 23    Q.  Truthful, yes.
10:22:19 24    A.  Truthful.  I do not know.  I
10:22:20 25  haven't looked at these or read them.

10

10:22:23 1    Q.  Okay.  Who would know?
10:22:25 2    MR. BURKE:  Objection.  Calls for
10:22:27 3  speculation.  You may answer.
10:22:28 4    A.  Well, it would be -- it would be
10:22:31 5  part of the minutes and that, that they would
10:22:32 6  know.  And Ken Hanauer would know because he
10:22:36 7  was our managing officer.
10:22:38 8    Q.  Okay.  Let's take a look at what I
10:22:40 9  had marked as Zoellner Deposition Exhibit 1 and
10:22:42 10  I ask you to take a look at it.  Now, Mr.
10:22:44 11  Zoellner with respect to this document or any
10:22:46 12  other, please take as much time as you need to
10:22:48 13  read the document and familiarize yourself with
10:22:50 14  it, okay?  I believe in many cases I can direct
10:22:53 15  your attention to specific parts, but you take
10:22:56 16  as much time as you need.
10:23:00 17    MR. MOORE:  We would object to the
10:23:01 18  use of this document.  It's a newspaper article
10:23:06 19  which contains no direct statements prior to
10:23:09 20  the filing of a lawsuit as irrelevant, but with
10:23:12 21  that in mind -- the other thing is it's
10:23:15 22  unverified, we don't know where it came from,
10:23:22 23  what the date was, but -- it is hearsay, calls
10:23:22 24  for hearsay.  You may answer.
10:23:25 25    Q.  Mr. Zoellner, have you seen this

11

10:23:27 1  before?
10:23:28 2    A.  I -- not that I know of.  I might
10:23:32 3  have, but I don't remember if I --
10:23:36 4    Q.  Okay.  Do you read the Cincinnati
10:23:37 5  Business Courier?
10:23:37 6    A.  No.
10:23:38 7    Q.  Have you ever read it?
10:23:40 8    MR. BURKE:  Objection to
10:23:40 9  relevance.  You may answer.
10:23:46 10    A.  I don't think I've ever subscribed
10:23:48 11  to it or answered -- or saw it, but I know of
10:23:52 12  it and I've seen it, but I didn't -- I don't
10:23:56 13  have a subscription.
10:23:59 14    Q.  Let me direct your attention to
10:24:01 15  the last column over here.  Do you see that?
10:24:03 16  And there's a bullet point and it says,
10:24:06 17  "Brautigam alleges."  Do you see that at the
10:24:08 18  very top?
10:24:09 19    A.  Okay.  Oak Hills had -- what was
10:24:24 20  the question again?
10:24:25 21    Q.  Okay.  Do you see where it says,
10:24:27 22  "Burke's response"?
10:24:30 23    A.  "Burke's response, Hanauer opposed
10:24:34 24  the Provident takeover because he wanted Oak
10:24:37 25  Hills to remain independent.  But he also

12

10:24:41 1  believed the transaction was fair."  I believe
10:24:44 2  Ken Hanauer did want it to stay, because he --
10:24:50 3  just as it says there.
10:24:53 4    Q.  Okay.  So you believe that Mr.
10:24:54 5  Hanauer opposed the transaction --
10:24:56 6    A.  At the beginning.
10:24:57 7    Q.  -- correct?
10:24:57 8    MR. BURKE:  Objection.
10:25:00 9  Mischaracterizes the testimony.  You're asking
10:25:00 10  for speculation based upon a document he's
10:25:02 11  never seen.  Objection to form.
10:25:04 12    Q.  Okay.  Mr. Zoellner?
10:25:05 13    A.  Yes.
10:25:05 14    Q.  Do you believe that Mr. Hanauer
10:25:06 15  opposed the Provident transaction?
10:25:08 16    MR. BURKE:  Objection.  Asked and
10:25:09 17  answered.  We're not going to do this all day.
10:25:12 18    MR. BRAUTIGAM:  Jim, don't point
10:25:13 19  your finger at me.
10:25:14 20    A.  It's all according to what time
10:25:16 21  you're talking about.  At the beginning he, he
10:25:19 22  wasn't in favor of it, but later on he was in
10:25:23 23  favor of it.
10:25:24 24    Q.  Okay.  Why do you believe that Mr.
10:25:25 25  Hanauer was in favor of the Provident-Oak Hills

13

10:25:28 1  merger later on?
10:25:29 2         A.  I don't know.  He just voted for
10:25:31 3  the merger.
10:25:34 4         Q.  You're talking about as a
10:25:35 5  director, correct?
10:25:38 6         A.  Hanauer as a director, yes.
10:25:41 7         Q.  Okay.  Do you know how --
10:25:42 8         A.  Which should be in the minutes of
10:25:43 9  the, of the -- of Oak Hills.
10:25:45 10        Q.  Right.  We'll get there.
10:25:47 11        A.  Okay.
10:25:47 12        Q.  Do you know how Mr. Hanauer voted
10:25:48 13 his personal shares?
10:25:49 14        A.  No, I do not.
10:25:50 15        Q.  Okay.  Would it surprise you if I
10:25:52 16 told you that he voted against the transaction?
10:25:54 17        MR. BURKE:  Objection.  Calls for
10:25:56 18 speculation as to what would surprise him.
10:25:59 19        A.  I don't know.
10:25:59 20        Q.  Okay.  Do you think that that's
10:26:00 21 fair for Mr. Hanauer to vote one way as a
10:26:04 22 director and to vote the opposite way as a
10:26:06 23 shareholder?
10:26:07 24        MR. BURKE:  Objection.  Calls for
10:26:08 25 speculation.  Ask Mr. Hanauer.  You may answer.

14

10:26:13 1         A.  That, that isn't a judgment for me
10:26:15 2  to make, I don't think.  You'd have to ask
10:26:18 3  Hanauer.
10:26:19 4         Q.  Can you answer my question, Mr.
10:26:21 5  Zoellner?
10:26:21 6         A.  All right.
10:26:22 7         MR. BURKE:  He just did.
10:26:28 8         Q.  Do you think that it was fair for
10:26:30 9  Mr. Hanauer to vote one way as a director and
10:26:33 10 vote another way as a shareholder?
10:26:35 11        MR. BURKE:  Objection.  Asked and
10:26:36 12 answered.
10:26:37 13        A.  Well, he has a right to do
10:26:40 14 whatever he wants to do.  I really should not
10:26:43 15 be a judge of whether he's doing what he should
10:26:45 16 or he shouldn't do.
10:26:45 17        Q.  Do you consider yourself to be a
10:26:47 18 fair man?
10:26:48 19        A.  I hope so.
10:26:49 20        Q.  Do you think that what Mr. Hanauer
10:26:51 21 did was fair?
10:26:53 22        MR. BURKE:  Objection.  Asked and
10:26:54 23 answered.
10:26:54 24        A.  I do not know whether he did that
10:26:55 25 or not.  This was written, you said, in the

15

10:27:03 1  paper -- the --
10:27:08 2         Q.  Cincinnati Business Courier.
10:27:09 3         A.  Cincinnati Business Courier.
10:27:10 4         Q.  All right.
10:27:11 5         A.  And I don't know whether that's
10:27:12 6  true or false.
10:27:13 7         Q.  Okay.
10:27:15 8         A.  And as I said before, Ken has a
10:27:17 9  right to do what -- you and I shouldn't be
10:27:20 10 telling him what to do.
10:27:22 11        Q.  Okay.  Let me ask you a different
10:27:23 12 question.  Do you have Zoellner Deposition
10:27:25 13 Exhibit 1 in front of you?  Okay?
10:27:27 14        A.  All right.
10:27:28 15        Q.  "Burke's response:  Hanauer
10:27:29 16 opposed the Provident takeover because he
10:27:33 17 wanted Oak Hills to remain independent."  Did I
10:27:36 18 read that correctly?
10:27:38 19        A.  I -- yes.  I understand that.
10:27:41 20        Q.  Okay.  Is that true?
10:27:42 21        MR. BURKE:  Objection.  Asked and
10:27:43 22 answered.  He's already answered this three
10:27:45 23 times, Mike.  And we're not going to do this,
10:27:48 24 not again.  Go ahead, Mr. Zoellner.  You can do
10:27:51 25 it again.  Do you understand the question?

16

10:27:58 1         A.  Does Ken Hanauer have a right
10:28:00 2  to --
10:28:01 3         Q.  No, that's not the question, Mr.
10:28:02 4  Zoellner.
10:28:03 5         A.  All right.
10:28:19 6         MR. BRAUTIGAM:  Read that question
10:28:19 7  back.
10:28:19 8         (Record read by Reporter.)
10:28:21 9         MR. BURKE:  Objection,
10:28:21 10 speculation.  This is an unverified document,
10:28:23 11 calls for hearsay.  You may answer.
10:28:24 12        A.  I do not know if that was true or
10:28:26 13 not.  Whether he voted one way or -- I never
10:28:31 14 checked the voting of anybody, so I don't know
10:28:35 15 whether that's true or false that he voted one
10:28:38 16 way or -- and another way.
10:28:41 17        Q.  Okay.  If Mr. Hanauer voted his
10:28:43 18 personal shares against the transaction --
10:28:47 19        A.  Um-hmm.
10:28:47 20        Q.  -- would you have a problem with
10:28:48 21 the proxy materials?
10:28:49 22        MR. BURKE:  Objection.  Calls for
10:28:50 23 speculation.  You may answer.
10:28:56 24        A.  If Mr. Hanauer did what?
10:29:04 25        Q.  If Mr. Hanauer voted his personal

17

10:29:04 1 shares against the Provident-Oak Hills merger,
10:29:05 2 would you have a problem with these proxy
10:29:08 3 materials?
10:29:09 4          MR. BURKE: Objection. Calls for
10:29:10 5 speculation. You may answer.
10:29:13 6          A. Well, I'd have to read these proxy
10:29:16 7 materials to see if he did that, right? I mean
10:29:19 8 I -- does the proxy material say that he voted
10:29:24 9 that way?
10:29:25 10          Q. Mr. Zoellner, I'll show you some
10:28:28 11 information later.
10:29:29 12          A. Okay.
10:29:29 13          Q. Mr. Hanauer's testimony indicates
10:29:30 14 that he voted against the transaction with
10:29:34 15 respect to his personal shares, okay?
10:29:36 16          A. Um-hmm.
10:29:38 17          Q. Assume for the sake of this
10:29:39 18 question that that is, in fact, true, okay? If
10:29:44 19 that's true, do you have a problem with these
10:29:46 20 proxy materials?
10:29:47 21          MR. BURKE: Objection. Calls for
10:29:48 22 speculation, asked and answered. You may
10:29:51 23 answer. Do you understand the question,
10:30:00 24 Howard?
10:30:07 25          A. No. I, I -- give me the question

18

10:30:09 1 again.
10:30:36 2          MR. BRAUTIGAM: Read back the
10:30:37 3 question.
10:30:37 4          (Record read by Reporter.)
10:30:38 5          A. No, I have no trouble with it.
10:31:18 6          Q. Okay. Mr. Zoellner, I'm handing
10:31:20 7 you what has been marked as Zoellner Deposition
10:31:22 8 Exhibit 2. I'd like you to take a look at it.
10:31:24 9 I'd like to direct your attention to page five.
10:31:26 10 This is the testimony of Ken Hanauer. It's the
10:31:29 11 entire four sessions.
10:31:31 12          MR. BURKE: For the record, I will
10:31:32 13 note that this is an 800 page document -- no,
10:31:36 14 more than that -- an 810 page document that
10:31:43 15 this witness, to the best of my knowledge, has
10:31:44 16 never seen before. And I object to you just
10:31:47 17 sort of throwing that in front of him and
10:31:50 18 attempting to question him about something. It
10:31:52 19 calls for speculation, it's an improper
10:31:54 20 question. You may answer.
10:31:55 21          MR. MOORE: I'll join the
10:31:56 22 objection.
10:31:57 23          A. I, I've never seen that. I don't
10:32:00 24 know.
10:32:00 25          Q. Okay. Can you turn to page 25,

19

10:32:02 1 please?
10:32:13 2          MR. BURKE: Do you want him to
10:32:13 3 review this before he turns to page 25?
10:32:16 4          MR. BRAUTIGAM: No, I can direct
10:32:17 5 his attention to it.
10:32:19 6          MR. BURKE: Okay. Page 25 is up
10:32:20 7 there at the top left, Howard.
10:32:20 8 BY MR. BRAUTIGAM:
10:32:23 9          Q. Okay. Mr. Zoellner, do you
10:32:23 10 understand what Zoellner Deposition Exhibit 2
10:32:26 11 is?
10:32:27 12          A. No.
10:32:27 13          Q. Okay. Let me represent to you
10:32:28 14 that this is the deposition testimony as
10:32:31 15 transcribed that Mr. Hanauer gave, okay? Are
10:32:35 16 you with me so far?
10:32:36 17          A. This is what Hanauer gave, okay.
10:32:43 18          Q. And this is testimony that he gave
10:32:45 19 under oath, okay? And it's a deposition
10:32:47 20 procedure just like this one. Do you
10:32:49 21 understand that?
10:32:50 22          A. Um-hmm.
10:32:51 23          Q. Okay. Now, please look at page
10:32:52 24 nine -- excuse me, line nine on page 25.
10:32:58 25          MR. BURKE: Objection. Calls for

20

10:32:59 1 complete speculation. He's never seen this
10:33:01 2 document before, calls for hearsay. You may
10:33:03 3 answer.
10:33:04 4          MR. BRAUTIGAM: I just told him to
10:33:06 5 look at line nine.
10:33:08 6          A. You said number nine?
10:33:08 7 BY MR. BRAUTIGAM:
10:33:10 8          Q. Line nine, yes.
10:33:15 9          A. I don't even know what that means.
10:33:17 10          Q. Okay. Well, let me read it out
10:33:19 11 loud, okay? The question that I asked Mr.
10:33:21 12 Hanauer is this:
10:33:22 13          Question: If I understood your
10:33:24 14 testimony correctly a minute ago, you said that
10:33:26 15 you did not believe that this transaction was
10:33:27 16 in the best interest of Oak Hills stockholders,
10:33:31 17 correct?
10:33:32 18          Answer -- this is by Mr. Hanauer:
10:33:34 19 In -- yeah, that was your question. Yes,
10:33:37 20 that's what I said.
10:33:38 21          Question: Then did it bother you
10:33:40 22 that this document was going out, saying the
10:33:43 23 opposite of what you felt, what you believed?
10:33:47 24          Answer -- this is Mr. Hanauer
10:33:48 25 again: I did not dwell on the second piece of

21

10:33:51 1  that, of that sentence. Couched the way you've
10:33:55 2  just worked it through -- you've just worked
10:33:57 3  through it, I don't care for that piece of the
10:33:59 4  document, but I did not dwell on, on beliefs
10:34:02 5  that it -- at that point, you know, it doesn't
10:34:05 6  say unanimous there. If we're getting down to,
10:34:09 7  you know, we unanimously approved, but it's a
10:34:11 8  true statement that the Board believed. It was
10:34:13 9  not the whole Board that believed that.
10:34:16 10         Okay. Did I read that directly?
10:34:19 11         MR. BURKE: Objection.
10:34:19 12         A.   Well, I don't know whether he did
10:34:20 13  or not.
10:34:21 14         Q.   You weren't able to follow when I
10:34:23 15  was reading?
10:34:24 16         A.   Well, I followed part of it, but I
10:34:25 17  don't know whether that's correct.
10:34:27 18         Q.   Okay. Well, you have it in front
10:34:28 19  of you though, too.
10:34:31 20         MR. BURKE: Objection. It's an
10:34:32 21  800 page document that this witness has never
10:34:34 22  seen before and you just ran over several
10:34:36 23  pages. It's also four pages of transcript per
10:34:39 24  page. And you're taking stuff out of context
10:34:42 25  and attempting to draw speculative testimony

22

10:34:45 1  out of this witness and I object.
10:34:47 2         MR. BRAUTIGAM: Jim, we really
10:34:48 3  don't need speaking objections, we're doing
10:34:50 4  fine.
10:34:50 5  BY MR. BRAUTIGAM:
10:34:51 6         Q.   Okay. Mr. Zoellner, do the
10:34:53 7  questions and answers that I've read appear to
10:34:55 8  you to suggest that Mr. Hanauer did not believe
10:34:59 9  that this transaction was in the best interest
10:35:01 10  of Oak Hills and its stockholders?
10:35:04 11         MR. BURKE: Objection.
10:35:04 12         MR. MOORE: Objection.
10:35:05 13         MR. BURKE: Mischaracterizes the
10:35:06 14  document. Calls for complete speculation.
10:35:09 15  Takes the statements out of context. You may
10:35:11 16  answer.
10:35:16 17         A.   I do not know. I do not know.
10:35:16 18         Q.   You have no opinion on Mr.
10:35:19 19  Hanauer's testimony?
10:35:16 20         MR. BURKE: Objection. Asked and
10:35:18 21  answered.
10:35:19 22         A.   I, I have no opinion on his
10:35:24 23  objection. I'm not familiar with what he said
10:35:26 24  or what he didn't say. I have no comment on
10:35:31 25  it.

23

10:35:33 1         Q.   Mr. Zoellner, with all due
10:35:35 2  respect, this is not a press conference and "no
10:35:37 3  comment" is not an appropriate response.
10:35:39 4         MR. BURKE: Oh, yes, it is, Mr.
10:35:40 5  Brautigam. If that's his answer, that's his
10:35:42 6  answer.
10:35:43 7         MR. BRAUTIGAM: Jim, we don't need
10:35:45 8  speaking objections and I disagree.
10:35:46 9  BY MR. BRAUTIGAM:
10:35:47 10         Q.   Mr. Zoellner, I'm entitled to
10:35:49 11  answers to my questions for the most part.
10:35:52 12         A.   I'm trying to answer the best I
10:35:53 13  can. I'm trying to tell you the truth and it's
10:35:56 14  the truth, I don't understand it.
10:35:57 15         Q.   Mr. Zoellner, do you consider this
10:35:59 16  deposition important?
10:36:06 17         A.   Do I consider it important?
10:36:13 18         MR. BURKE: Objection to form.
10:36:14 19  You may answer.
10:36:21 20         A.   I guess I'd say yes on that.
10:36:24 21         Q.   Okay. What, if anything, did you
10:36:24 22  do to prepare for this deposition?
10:36:30 23         A.   Well, I talked to the -- Mr. Burke
10:36:34 24  for a few minutes about the extent of --
10:36:38 25         MR. BURKE: Don't say what we

24

10:36:39 1  talked about.
10:36:40 2         A.   No, okay.
10:36:41 3         MR. BURKE: That's privileged.
10:36:43 4         A.   I just talked with him about it.
10:36:44 5  I didn't do anything else other than -- oh,
10:36:46 6  that one you sent me, that --
10:36:51 7         MR. BURKE: Well, don't say what I
10:36:52 8  sent you or what we talked about.
10:36:54 9         A.   Okay.
10:36:55 10         MR. BURKE: I instruct you not to
10:36:55 11  answer that.
10:36:56 12         A.   Okay.
10:36:58 13         Q.   Mr. Zoellner, did you review any
10:36:59 14  documents?
10:37:00 15         MR. BURKE: Objection. As I
10:37:01 16  recall, that was off limits for Mr. Herron.
10:37:03 17  Same objection, same instruction. Don't answer
10:37:05 18  it.
10:37:09 19         MR. BRAUTIGAM: Did he review any
10:37:10 20  documents at all?
10:37:11 21         MR. BURKE: As I recall, your
10:37:12 22  instruction to Mr. Herron -- we can pull out
10:37:14 23  the transcript.
10:37:15 24         MR. BRAUTIGAM: Well, Jim, that's
10:37:16 25  not --

25

```
10:37:17  1        MR. BURKE:  You refused to let Mr.
10:37:19  2   Herron talk about the documents that you sent
10:37:21  3   to him.  Am I correct or am I incorrect?
10:37:23  4        MR. BRAUTIGAM:  You're incorrect.
10:37:23  5   BY MR. BRAUTIGAM:
10:37:24  6     Q.  Mr. Zoellner, have you read any
10:37:26  7   documents related to this case?
10:37:29  8        MR. BURKE:  Ever?
10:37:30  9     Q.  Ever.
10:37:31 10        MR. BURKE:  You can answer, Mr.
10:37:32 11   Zoellner.
10:37:33 12     A.  Any documents -- no, I -- I guess
10:37:38 13   there's some documents like the minutes and the
10:37:42 14   Board meetings and stuff, I guess those were
10:37:46 15   read every, every time we had a meeting.
10:37:49 16     Q.  Mr. Zoellner, what is your
10:37:50 17   understanding of the litigation so far?
10:37:55 18        MR. BURKE:  Objection.  Calls for
10:37:56 19   a legal conclusion, form.
10:38:00 20     A.  Give me that again.
10:38:02 21     Q.  What is your understanding of the
10:38:04 22   litigation?
10:38:04 23     A.  What's my understanding of it?  I
10:38:09 24   don't know.  Just that Walt Thiemann has filed
10:38:12 25   a claim against Oak Hills.  That's about all I
```

26

```
10:38:17  1   know about it.
10:38:33  2     Q.  Okay.  Do you know if you're being
10:38:33  3   sued personally?
10:38:33  4     A.  I really do not know that for
10:38:33  5   sure.
10:38:33  6     Q.  Okay.
10:38:33  7     A.  It's important that -- I guess --
10:38:33  8   I think I did hear something in a discussion
10:38:35  9   that the insurance company is representing the
10:38:38 10   directors.  That -- I think that's true, I
10:38:41 11   don't know for sure.
10:38:42 12     Q.  Which directors are you talking
10:38:43 13   about?
10:38:45 14     A.  The directors of Oak Hills Savings
10:38:47 15   & Loan.
10:38:48 16     Q.  Okay.  And which insurance company
10:38:49 17   are you talking about?
10:38:50 18     A.  I do not know which insurance
10:38:52 19   company it's with.
10:38:54 20     Q.  Okay.  I see Mr. Burke is sitting
10:38:55 21   on your left.  Who is Mr. Burke with respect to
10:38:57 22   this litigation?
10:38:59 23     A.  He's the attorney that's
10:39:00 24   representing us.
10:39:01 25     Q.  Okay.  Is Mr. Burke representing
```

27

```
10:39:03  1   anyone else other than the Oak Hills directors?
10:39:05  2     A.  I do not know that.
10:39:07  3     Q.  Okay.  Did you do anything to
10:39:10  4   determine whether or not Mr. Burke has a
10:39:12  5   conflict of interest in representing you?
10:39:15  6        MR. BURKE:  Objection --
10:39:16  7     A.  I do not know.
10:39:17  8        MR. BURKE:  -- to form, calls for
10:39:18  9   speculation.
10:39:18 10     A.  I do not know that.
10:39:20 11     Q.  Did you do anything to check?
10:39:22 12     A.  No, I haven't checked anything.
10:39:23 13   There's nothing to check.
10:39:31 14     Q.  Is it your testimony that at no
10:39:33 15   time did you ever read the proxy materials?
10:39:36 16        MR. BURKE:  Objection.  Misstates
10:39:36 17   the record.  Asked and answered.  You can
10:39:38 18   answer it.
10:39:40 19     A.  I read the proxy material that
10:39:43 20   they mailed out with the, the ballots to vote.
10:39:47 21   That's the only proxy material that I've read.
10:39:50 22     Q.  Okay.  And you read the proxy
10:39:51 23   materials that you received in the mail; is
10:39:54 24   that right?
10:39:54 25     A.  Yeah.
```

28

```
10:39:55  1     Q.  Did you read every word and look
10:39:56  2   at every number?
10:39:57  3     A.  I do not know that.  It's been so
10:40:00  4   long ago, I couldn't even tell you what it
10:40:02  5   said.
10:40:07  6     Q.  Okay.  Do you believe that the
10:40:08  7   proxy materials disclosed the resignation of
10:40:12  8   Director Tom Herron?
10:40:14  9        MR. BURKE:  Objection.  Calls for
10:40:16 10   speculation.  You may answer.
10:40:21 11     A.  I don't even know whether he was a
10:40:22 12   director at the time that went out.  I, I
10:40:26 13   wouldn't be able to answer that.  I don't -- I
10:40:28 14   don't know the timing on that.
10:40:34 15     Q.  Okay.  Do you know when Mr. Herron
10:40:35 16   resigned?
10:40:35 17     A.  Do not know the date.
10:40:40 18     Q.  Okay.  Let's take a look at this.
10:40:41 19   This is Herron Deposition Exhibit 3, and I ask
10:40:46 20   you to take a look at it.  Have you seen that
10:40:51 21   document before?
10:40:52 22        MR. BURKE:  May he have a chance
10:40:52 23   to read it first?
10:40:55 24        MR. BRAUTIGAM:  Absolutely.  Jim,
10:40:55 25   as I've already said --
```

29

10:41:03 1    MR. BURKE: While we're --
10:41:03 2    MR. BRAUTIGAM: Jim, I don't want
10:41:03 3    any comments.
10:41:03 4    MR. BURKE: No, no, no. While Mr.
10:41:06 5    Zoellner is reading that, Mike, I do want to
10:41:06 6    refer you specifically to pages 167 and 168 of
10:41:10 7    Mr. Herron's deposition, when I asked him
10:41:12 8    which documents you had sent him to review for
10:41:15 9    his deposition, you instructed him not to
10:41:17 10    answer.
10:41:18 11    MR. BRAUTIGAM: Jim, it was a
10:41:19 12    different question. I'm not going to debate
10:41:21 13    this now.
10:41:22 14    MR. BURKE: Okay.
10:41:37 15    A. I'm familiar with this. I don't
10:41:38 16    know whether it's identical or not, but he did
10:41:41 17    send me a letter of his resignation to the
10:41:45 18    Board.
10:41:45 19    BY MR. BRAUTIGAM:
10:41:45 20    Q. And does this --
10:41:46 21    A. But I don't know whether it's the
10:41:47 22    same one that I'm reading here.
10:41:49 23    Q. Does this refresh your
10:41:51 24    recollection with respect to the date that Mr.
10:41:52 25    Herron submitted his letter of resignation?

30

10:41:55 1    A. No, I have no idea of the date
10:41:56 2    that --
10:41:57 3    Q. Does it state the date of July
10:41:59 4    27th, 1999 in the letter?
10:42:02 5    MR. BURKE: Objection. The
10:42:02 6    document speaks for itself. You may answer it.
10:42:05 7    A. I do not know without looking at
10:42:06 8    the document what date it was, whether it was
10:42:08 9    the 27th or what.
10:42:13 10    Q. Okay. Do you remember after Mr.
10:42:16 11    Herron resigned, which I will represent to you
10:42:18 12    was July 27th, 1999, effective July 30th, Mr.
10:42:22 13    Herron called you that night; is that correct?
10:42:26 14    A. I believe that is true.
10:42:27 15    Q. And you had a discussion with him
10:42:30 16    with respect to Mr. Herron's resignation,
10:42:33 17    correct?
10:42:35 18    A. Herron's the one that called me.
10:42:36 19    Q. Correct. And you discussed his
10:42:40 20    resignation, correct?
10:42:41 21    A. Yes. I, I asked him not to
10:42:43 22    resign.
10:42:44 23    Q. Okay. Why did you ask him not to
10:42:45 24    resign?
10:42:46 25    A. Because he's a Board member and I

31

10:42:48 1    have -- we're still friends and I wanted him to
10:42:50 2    stay.
10:42:51 3    Q. Why did you want him to stay?
10:42:53 4    A. Because I liked him.
10:42:54 5    Q. Okay.
10:42:54 6    A. And he -- I --
10:42:57 7    MR. BURKE: Wait. Finish your
10:42:58 8    answer, Mr. Zoellner.
10:42:59 9    MR. BRAUTIGAM: I thought he was
10:43:00 10    finished.
10:43:00 11    MR. BURKE: Go ahead.
10:43:01 12    A. I liked him and he did -- he has
10:43:03 13    always done a good job. And I, I didn't see
10:43:06 14    any reason why he should, but that was his
10:43:09 15    decision.
10:43:10 16    Q. Now, Mr. Herron was not in favor
10:43:13 17    of this proposed merger, correct?
10:43:17 18    A. Well, it's all according to what
10:43:19 19    time. At one time he wasn't, but another time
10:43:22 20    he was.
10:43:22 21    Q. When was Mr. Herron in favor of
10:43:25 22    this transaction?
10:43:27 23    A. Oh, I'm sorry, you said Herron
10:43:29 24    or --
10:43:30 25    Q. Yes, Herron.

32

10:43:31 1    A. -- or Hanauer?
10:43:33 2    Q. No, we're talking about Herron,
10:43:35 3    Tom Herron.
10:43:36 4    A. Herron.
10:43:36 5    MR. BURKE: Wait a minute. Mr.
10:43:37 6    Brautigam, please stop shouting at my witness.
10:43:41 7    Keep your voice down.
10:43:42 8    MR. BRAUTIGAM: You're the one
10:43:44 9    that said he had a hearing problem.
10:43:47 10    MR. BURKE: You don't need to
10:43:48 11    yell.
10:43:49 12    A. You don't need to yell.
10:43:51 13    Q. I'll speak in a normal tone of
10:43:53 14    voice.
10:43:54 15    A. No, just as long as I keep my ear
10:43:56 16    this way, we're in good shape. This one is a
10:43:59 17    hundred percent good; this one is a hundred
10:44:02 18    percent bad.
10:44:03 19    Q. You tell me how I need to speak.
10:44:05 20    A. Okay.
10:44:05 21    Q. Was Mr. Herron ever in favor of
10:44:07 22    this transaction?
10:44:09 23    A. I do not know.
10:44:11 24    Q. Okay. Did he ever vote in favor
10:44:13 25    of a proposed merger?

33

| | |
|---|---|
| 10:44:14 1 | A.  I do not know. |
| 10:44:16 2 | Q.  Okay.  Did he tell you in this |
| 10:44:17 3 | phone call that he resigned in part because of |
| 10:44:19 4 | his opposition to the transaction? |
| 10:44:21 5 | A.  No, not that I remember. |
| 10:44:23 6 | Q.  Did you ever tell him that his |
| 10:44:25 7 | resigning was the honorable thing? |
| 10:44:27 8 | A.  No, no, because I wanted him to |
| 10:44:31 9 | stay. |
| 10:44:32 10 | Q.  Did you believe that what Mr. |
| 10:44:34 11 | Herron was doing, even though you wanted him to |
| 10:44:38 12 | stay, in resigning was honorable? |
| 10:44:41 13 | MR. BURKE:  Objection to form. |
| 10:44:42 14 | Calls for speculation. |
| 10:44:44 15 | A.  Well, I don't know.  I do not |
| 10:44:47 16 | know.  When you say was it honorable or not, |
| 10:44:50 17 | that's in a matter of my opinion. |
| 10:44:52 18 | Q.  What is your opinion? |
| 10:44:54 19 | A.  That he had the right to do what |
| 10:44:55 20 | he wanted to do. |
| 10:44:57 21 | Q.  My question is a little different. |
| 10:44:59 22 | Do you believe that Mr. Herron resigning in |
| 10:45:01 23 | part in protest because he did not believe that |
| 10:45:05 24 | the merger of Oak Hills and Provident was in |
| 10:45:08 25 | the best interest of Oak Hills and its |

34

| | |
|---|---|
| 10:45:09 1 | shareholders was honorable? |
| 10:45:11 2 | MR. BURKE:  Objection.  Misstates |
| 10:45:12 3 | the record, assumes facts not in evidence and |
| 10:45:15 4 | mischaracterizes this witness' prior testimony. |
| 10:45:18 5 | A.  I do not know whether he thought |
| 10:45:19 6 | it was honorable or not honorable or -- |
| 10:45:23 7 | Q.  Mr. Zoellner, time out. |
| 10:45:24 8 | A.  Yeah. |
| 10:45:24 9 | Q.  I'm not asking what Mr. Herron |
| 10:45:26 10 | thought.  I'm asking what you thought.  When |
| 10:45:29 11 | Mr. Herron called you on July 27th, 1999, after |
| 10:45:33 12 | he had formally submitted his resignation to |
| 10:45:36 13 | Mr. Brinker, did you believe that the steps he |
| 10:45:39 14 | was taking were honorable? |
| 10:45:42 15 | MR. BURKE:  Objection.  Asked and |
| 10:45:43 16 | answered. |
| 10:45:44 17 | A.  Well, I -- I did not know what |
| 10:45:48 18 | steps he was taking.  He only did one thing and |
| 10:45:55 19 | he resigned.  We tried to have him rescind that |
| 10:45:57 20 | and stay on because we -- at least I did, I |
| 10:46:00 21 | liked Tom. |
| 10:46:03 22 | Q.  Okay.  Do you believe that Mr. |
| 10:46:04 23 | Herron's resignation was honorable? |
| 10:46:07 24 | MR. BURKE:  Objection.  Asked and |
| 10:46:08 25 | answered now three times.  You may answer |

35

| | |
|---|---|
| 10:46:11 1 | again.  Calls for speculation. |
| 10:46:17 2 | A.  As far as my thinking, he's |
| 10:46:21 3 | entitled to do what he wants to do, so it -- |
| 10:46:25 4 | whatever, if he wanted to stay or leave.  I |
| 10:46:27 5 | just wanted him to stay, but it's honorable in |
| 10:46:30 6 | his mind whether he -- whatever he does. |
| 10:46:35 7 | Q.  Okay.  Mr. Zoellner, are you |
| 10:46:37 8 | receiving any money from Provident? |
| 10:46:39 9 | A.  Yes. |
| 10:46:39 10 | Q.  How much are you receiving? |
| 10:46:41 11 | A.  $900. |
| 10:46:42 12 | Q.  Per month? |
| 10:46:43 13 | A.  Per month. |
| 10:46:43 14 | Q.  And how long have you been |
| 10:46:45 15 | receiving that? |
| 10:46:51 16 | A.  Probably a year and what -- let's |
| 10:46:58 17 | see here, I don't -- somewhere around a year or |
| 10:47:02 18 | year and eight months, something like that. |
| 10:47:04 19 | Q.  And what do you do -- I didn't |
| 10:47:07 20 | mean to interrupt you.  Are you finished? |
| 10:47:09 21 | A.  Yes. |
| 10:47:10 22 | Q.  Okay.  What do you do for that |
| 10:47:11 23 | money? |
| 10:47:11 24 | A.  What do we do for that money? |
| 10:47:13 25 | Q.  What do you do for that money? |

36

| | |
|---|---|
| 10:47:15 1 | A.  What do I do?  We have a meeting |
| 10:47:17 2 | once a month of the old directors and discuss |
| 10:47:20 3 | different things about how we could help |
| 10:47:22 4 | Provident. |
| 10:47:23 5 | Q.  Okay.  And -- |
| 10:47:25 6 | A.  And then how -- what's going on |
| 10:47:26 7 | and stuff. |
| 10:47:27 8 | Q.  Okay.  Did Provident ask you to do |
| 10:47:30 9 | that? |
| 10:47:32 10 | A.  Ask us to meet? |
| 10:47:34 11 | Q.  Yes. |
| 10:47:34 12 | A.  No, they didn't, not that I know |
| 10:47:36 13 | of.  They might have, but -- |
| 10:47:40 14 | Q.  Is it your -- |
| 10:47:41 15 | MR. BURKE:  Please let the witness |
| 10:47:42 16 | finish. |
| 10:47:43 17 | MR. BRAUTIGAM:  Jim, I thought he |
| 10:47:44 18 | was finished. |
| 10:47:45 19 | MR. BURKE:  When he's still |
| 10:47:49 20 | talking, that usually means that he's not. |
| 10:47:49 21 | MR. BRAUTIGAM:  Mr. Zoellner -- |
| 10:47:51 22 | MR. BURKE:  Go back, reread the |
| 10:47:52 23 | question and as much of the answer as you have |
| 10:47:55 24 | so the witness can understand where he was. |
| 10:47:55 25 | (Record read by Reporter.) |

37

10:48:23 1      A.   No, I don't remember saying they
10:48:26 2   might have asked us, I -- they didn't ask us to
10:48:29 3   do that.  That's what I answered the first time
10:48:32 4   there, and I don't remember answering that
10:48:34 5   second time.
10:48:37 6      Q.   Mr. Zoellner, does your receipt of
10:48:39 7   900 per month from Provident have anything to
10:48:42 8   do with these meetings?
10:48:51 9      A.   Well, not, not formally.  I --
10:48:56 10     Q.   Are you finished with your answer?
10:48:58 11     A.   Let me think about that.  Does it
10:49:02 12  have anything to do with our meetings that we
10:49:06 13  have?  I, I would say yes, we try to help
10:49:13 14  Provident as much as we can.
10:49:15 15     Q.   Okay.  How do you try to help
10:49:16 16  Provident?
10:49:17 17     A.   By spreading the good word about
10:49:19 18  Provident and --
10:49:21 19     Q.   What is the --
10:49:22 20     A.   -- and, and talk to customers
10:48:23 21  that -- of Oak Hills and tell them how -- to
10:48:27 22  stay with Provident and work with Provident.
10:49:30 23     Q.   Did Provident ask you to do that?
10:49:32 24     A.   No.
10:49:35 25     Q.   Okay.  Let's talk about these

38

10:49:36 1   meetings.  How long have you been having these
10:49:38 2   meetings with the other directors?
10:49:41 3      A.   We have them once a month.
10:49:43 4      Q.   Okay.  And who typically attends?
10:49:45 5      A.   There's Norb Brinker, Al Hucke,
10:49:54 6   Bill Hillebrand, Tom McKiernan, Joe Tenoever,
10:50:05 7   and myself.
10:50:10 8      Q.   Okay.  Tom Herron doesn't attend
10:50:11 9   these meetings, correct?
10:50:13 10     A.   No.
10:50:17 11     Q.   Okay.  Ken Hanauer doesn't attend
10:50:19 12  these meetings, either?
10:50:20 13     A.   No.
10:50:20 14     Q.   And how long have these meetings
10:50:23 15  been going on?
10:50:27 16     A.   Gee, I don't know.
10:50:28 17     Q.   Since the merger?
10:50:30 18     A.   Yeah, oh, after the merger.
10:50:33 19     Q.   Okay.  Where do you have these
10:50:34 20  meetings?
10:50:35 21     A.   Various places for lunch.
10:50:37 22     Q.   Okay.  And have you ever had one
10:50:40 23  of your attorneys at these meetings?
10:50:43 24     A.   No.
10:50:44 25     Q.   Okay.

39

10:50:44 1      A.   Oh, I -- no, no.
10:50:46 2      Q.   Okay.  Have you ever talked about
10:50:47 3   litigation at these meetings?
10:50:55 4      A.   In what form?
10:50:56 5      Q.   In any form.
10:50:57 6      A.   In any form.  Litigation about
10:51:00 7   who's suing who and that that's brought up,
10:51:03 8   like this with Walt Thiemann?
10:51:03 9      Q.   Yes.
10:51:08 10     A.   That --
10:51:09 11     Q.   That is a topic of discussion at
10:51:10 12  these meetings?
10:51:12 13     A.   Yes.
10:51:12 14     Q.   All right.  Please tell me with as
10:51:14 15  much specificity as possible, who said what
10:51:17 16  with respect to the Thiemann litigation.
10:51:19 17     MR. BURKE:  Objection to breadth.
10:51:20 18  Overbroad, vague.
10:51:21 19     A.   Oh, it's just a matter of a
10:51:23 20  discussion.  I couldn't tell you what, what
10:51:25 21  we've said or what we didn't say.
10:51:26 22     Q.   Can you tell me the substance of
10:51:30 23  these discussions?
10:51:31 24     A.   No, just a little -- there's no --
10:51:34 25  how this is going on, whether --

40

10:51:37 1      Q.   Okay.  Are you aware of any orders
10:51:39 2   in this case that have been issued?
10:51:42 3      A.   Any orders?  No, I don't know
10:51:48 4   personally of any.
10:51:50 5      Q.   Have you ever asked anybody?
10:51:53 6      A.   No.
10:51:55 7      Q.   Do you have an understanding as to
10:51:57 8   whether your personal assets could be at risk?
10:52:00 9      MR. BURKE:  Objection.  Calls for
10:52:01 10  speculation, legal conclusion.  You may answer.
10:52:08 11     A.   I -- what -- do I have any worry
10:52:12 12  about my assets being -- is that what the
10:52:15 13  question was?
10:52:16 14     Q.   Do you have any understanding as
10:52:17 15  to whether or not your personal assets could be
10:52:20 16  at risk?
10:52:22 17     A.   Have any understanding.  Oh, I, I
10:52:29 18  guess it is.  At any time any investment could
10:52:33 19  be at risk.
10:52:39 20     Q.   Do you consider the Thiemann suit
10:52:39 21  to be an investment made by you?
10:52:39 22     MR. BURKE:  Objection.
10:52:40 23  Argumentative.
10:52:40 24     A.   No.  It didn't have nothing -- his
10:52:42 25  suit had nothing to do with me, I don't think.

41

10:52:47 1   Q.   Do you know if you're a defendant
10:52:48 2   in Mr. Thiemann's lawsuit?
10:52:50 3            MR. BURKE:  Objection.  Asked and
10:52:51 4   answered.
10:52:53 5        A.   I think it's -- I've been told by
10:52:55 6   the attorneys that we were.  Not necessarily
10:52:59 7   Mr. Burke, but there's been other attorneys on
10:53:04 8   this that I think we've talked --
10:53:06 9            MR. BURKE:  Don't tell anybody
10:53:07 10  what the attorneys said.
10:53:09 11       Q.   Okay.  Do you know what a
10:53:10 12  defendant is?
10:53:13 13           MR. BURKE:  Objection to
10:53:13 14  relevance.
10:53:16 15       A.   A defendant is -- I know the
10:53:33 16  definition, I think, but -- the defendant is
10:53:39 17  one that is being sued, or that.
10:53:45 18       Q.   Mr. Zoellner, when do you have
10:53:47 19  these meetings?  I know it's once per month.
10:53:49 20  Is it the first Monday or when is it?
10:53:52 21       A.   No, no, it isn't -- when we leave
10:53:54 22  each other at that meeting, then we set another
10:53:58 23  date for the next meeting, and make sure
10:54:01 24  that -- I want to make sure this is correct.
10:54:04 25  Sometimes it isn't a luncheon meeting, it's --

42

10:54:06 1   we meet at one of the fella's homes and we play
10:54:09 2   a little poker.
10:54:11 3        Q.   Have you had the October meeting
10:54:14 4   yet?
10:54:19 5        A.   I don't -- no, I don't think so.
10:54:24 6        Q.   Did you talk to anyone other than
10:54:26 7   your counsel about this upcoming deposition?
10:54:29 8        A.   No.
10:54:32 9        Q.   Okay.  How many meetings have you
10:54:34 10  had in total, approximately?
10:54:38 11           MR. BURKE:  Objection.  Asked and
10:54:39 12  answered.
10:54:40 13       A.   Well, what are we -- this is what,
10:54:43 14  18 months about since the merger; is that
10:54:48 15  right?  So we miss one now and then, so
10:54:51 16  probably maybe 16 in the last 18 months.
10:54:56 17       Q.   Okay.  And can you tell me --
10:54:58 18       A.   That's only an estimate.
10:54:59 19       Q.   And can you tell me anything that
10:55:00 20  was discussed at any of these meetings?
10:55:08 21       A.   The biggest discussion is, is that
10:55:11 22  Walt Thiemann and how -- we didn't understand
10:55:14 23  how Walt could do this.  That's about the
10:55:17 24  extent of it, because we have nothing else to
10:55:20 25  refer to that I can think of at this point.

43

10:55:23 1        Q.   Okay.  What do you mean, "how Walt
10:55:25 2   could do this?
10:55:26 3        A.   "How Walt could sue and stretch
10:55:28 4   this out this long to get the final merger
10:55:35 5   accomplished.
10:55:36 6        Q.   How do you feel about being sued
10:55:37 7   by Mr. Thiemann?
10:55:46 8        A.   I don't -- I don't have a
10:55:49 9   particular feeling.  He was a friend.  He's
10:55:54 10  still a friend of mine, it's just that he has a
10:55:57 11  right to do what he wants to do.
10:55:58 12       Q.   Do you consider Mr. Thiemann to be
10:56:00 13  a man of integrity?
10:56:02 14           MR. BURKE:  Objection.  Calls for
10:56:03 15  speculation.
10:56:04 16       A.   I, I don't know.  I do not know.
10:56:07 17       Q.   Do you consider him to be an
10:56:08 18  honest man?
10:56:09 19           MR. BURKE:  Same objection.
10:56:15 20       A.   I, I'd -- I think he was.
10:56:18 21       Q.   Do you have any idea what charges
10:56:23 22  have been leveled against you?
10:56:28 23       A.   I, I don't know what charges.  I
10:56:30 24  don't -- it's all -- I don't know of any
10:56:33 25  charges against me.

44

10:56:34 1        Q.   Did you ever read the complaint?
10:56:41 2        A.   I don't remember if I did.
10:56:48 3        Q.   Do you consider this litigation
10:56:51 4   and being a defendant in this litigation
10:56:52 5   important to you?
10:56:54 6            MR. BURKE:  Objection.  Vague,
10:56:57 7   relevance.
10:56:59 8        A.   Answer?
10:57:00 9            MR. BURKE:  Yes.  Go ahead, I'm
10:57:01 10  sorry.
10:57:03 11       A.   Yeah, I think it's -- give me the
10:57:07 12  question again?
10:57:09 13       Q.   Okay.  Do you consider being a
10:57:10 14  defendant in this litigation to be important to
10:57:12 15  you?
10:57:12 16       A.   Oh, yes.
10:57:14 17       Q.   Do you think that with respect to
10:57:16 18  something that's important in your life, you
10:57:18 19  might want to read the relevant documents?
10:57:20 20           MR. BURKE:  Objection.
10:57:22 21  Argumentative.
10:57:22 22       A.   That's up to my attorneys -- or
10:57:25 23  our attorneys to handle all that.
10:57:31 24       Q.   Okay.  Please take a look at
10:57:32 25  Herron Deposition Exhibit 1.  Mr. Zoellner,

45

10:58:00 1  have you seen that document before?
10:58:01 2      A.  No.
10:58:04 3      Q.  You've never seen the 1998 Oak
10:58:07 4  Hills annual report before?
10:58:09 5      A.  Yes, but this is Herron's
10:58:11 6  deposition, you said.
10:58:13 7      Q.  No --
10:58:14 8      A.  I didn't see this.
10:58:15 9      Q.  Okay.  Have you seen what has been
10:58:17 10  marked as Herron Deposition Exhibit Number 1?
10:58:21 11      MR. BURKE:  Have you ever seen the
10:58:22 12  document before, if you know.
10:58:25 13      A.  No, I've never seen that.  The
10:58:27 14  only thing I've seen of Herron's is the letter
10:58:30 15  he sent me.
10:58:31 16      Q.  Okay.  Have you ever seen the 1998
10:58:34 17  annual report that was issued by Oak Hills?
10:58:37 18      A.  Well, we were still in operation,
10:58:39 19  weren't we, in '98, so I would have seen that.
10:58:43 20  Because that would have been brought to -- the
10:58:45 21  financial statement would have been brought to
10:58:47 22  the meeting.
10:58:48 23      Q.  Okay.  And let me represent to you
10:58:49 24  that this is a copy of that document.  The only
10:58:52 25  difference is it has this sticker on it and it

46

10:58:54 1  has these WWT numbers on it.  Do you see that?
10:58:56 2      A.  Yeah, I see that.
10:58:59 3      Q.  Would you like to take a minute to
10:59:01 4  just peruse the document to familiarize
10:59:05 5  yourself with it?
10:59:05 6      A.  Oh.
11:00:25 7      Q.  Okay.  Mr. Zoellner, my question
11:00:27 8  is --
11:00:28 9      MR. BURKE:  Wait a minute.  Mr.
11:00:28 10  Zoellner is still reviewing the document, as
11:00:30 11  you invited him to do.
11:00:34 12      A.  Yeah.  There's so much involved in
11:00:36 13  here, I don't remember seeing any of this.
11:00:38 14      Q.  Okay.
11:00:38 15      A.  This probably was at our meeting.
11:00:40 16  If this was in our meeting, then I did see it,
11:00:47 17  but I can't -- nothing recalled.  This seems
11:00:47 18  like an awful lot.
11:00:48 19      Q.  Okay.  Mr. Zoellner, please take a
11:00:50 20  look at the fourth page of the document.  Do
11:00:55 21  you see the third bullet point?  It starts,
11:00:58 22  your Board of Directors.
11:00:59 23      A.  Your Board of Directors increased
11:01:00 24  the company's quarterly cash dividend to .125
11:01:06 25  effective June 30th.  Is that what you're

47

11:01:09 1  referring to?
11:01:10 2      Q.  Right.  Who were the Oak Hills
11:01:11 3  directors at this point in time?
11:01:13 4      MR. BURKE:  Objection.  You may
11:01:14 5  answer.
11:01:22 6      A.  Who were the directors at this
11:01:27 7  time?  I think Tom Herron was still a director
11:01:34 8  at that time, wasn't he?  I don't, I don't know
11:01:36 9  the date that that resignation was.
11:01:43 10      Q.  Okay.  Mr. Zoellner, perhaps I
11:01:44 11  could assist you.  Would you look at the third
11:01:47 12  to last page of the document?  That's the --
11:01:54 13      A.  Oh, okay.
11:01:55 14      Q.  Do you see the directors listed
11:01:56 15  there in the left-hand column?
11:01:59 16      A.  Um-hmm.
11:01:59 17      Q.  And you have eight directors; is
11:02:01 18  that correct?
11:02:02 19      A.  Two, four, six, seven -- who isn't
11:02:07 20  on that?  Yes, there was eight directors.  I
11:02:20 21  was looking at this, there's only seven.
11:02:23 22      Q.  Right.  And the phrase on the
11:02:26 23  fourth page of the document, "Your Board of
11:02:30 24  Directors," refers to those eight directors,
11:02:32 25  correct?

48

11:02:33 1      MR. BURKE:  Objection.  Calls for
11:02:34 2  speculation, document speaks for itself.  You
11:02:36 3  may answer.
11:02:37 4      A.  Yeah.  Well, I don't know what the
11:02:39 5  document says, so I can't say that it does or
11:02:41 6  it doesn't.
11:02:43 7      Q.  Okay.  Mr. Zoellner, please turn
11:02:44 8  to the fourth page of the document.
11:02:53 9      A.  That's the --
11:02:54 10      Q.  And do you see the third bullet
11:02:55 11  point, "Your Board of Directors"?
11:02:56 12      A.  "Your Board of Directors increased
11:02:57 13  the company's quarterly" --
11:03:00 14      Q.  Right.  And when you see the
11:03:01 15  phrase "Your Board of Directors," to whom does
11:03:03 16  that phrase refer?
11:03:06 17      A.  "Your Board of Directors" is the
11:03:07 18  eight of us.
11:03:08 19      Q.  Okay.  Now, let's take a look at
11:03:12 20  Herron Deposition Exhibit 2.
11:03:15 21      MR. BURKE:  I'm going to object to
11:03:16 22  the use of that document, Mike.  He's already
11:03:19 23  testified he hasn't seen it.  If you want to
11:03:21 24  use Defendant's Exhibit 1, that's fine.
11:03:24 25      MR. BURKE:  Jim, that's fine.

49

11:03:24 1   Your objection is noted.
11:03:24 2   BY MR. BRAUTIGAM:
11:03:26 3       Q.   All right.  Do you see that
11:03:27 4   sentence there, "Your Board of Directors" and
11:03:29 5   I'll read the rest of it.  "Your Board of
11:03:31 6   Directors unanimously approved the acquisition
11:03:33 7   and believes that it is in the best interest of
11:03:35 8   OHSL stockholders."  Did I read that sentence
11:03:40 9   correctly?
11:03:40 10      A.   Yes.
11:03:41 11      Q.   Okay.  Is that a true statement?
11:03:42 12      A.   It's all according to the time
11:03:44 13  that was written.  This was before Tom Herron
11:03:52 14  was no longer a director.  He was a director at
11:03:55 15  that time, so then that statement would be
11:03:57 16  true.
11:03:59 17      Q.   Okay.  Mr. Zoellner, you're an
11:04:00 18  accountant by training, correct?
11:04:02 19      A.   Yeah.  Retired.
11:04:03 20      Q.   And you were a CPA, correct?
11:04:03 21      A.   Right.
11:04:06 22      Q.   Correct?
11:04:08 23           MR. BURKE:  Objection.
11:04:09 24      A.   I was a public accountant and then
11:04:11 25  they grandfathered that as a CPA at the end,

50

11:04:15 1   yes.
11:04:15 2       Q.   And you're familiar with the
11:04:16 3   concept of materiality, correct?
11:04:19 4            MR. BURKE:  Objection.  Calls for
11:04:20 5   speculation.  Calls for legal conclusion.
11:04:22 6       A.   I don't know what you mean by
11:04:23 7   that.
11:04:25 8       Q.   You're unfamiliar with the concept
11:04:26 9   of materiality?
11:04:28 10           MR. BURKE:  Objection.  Asked and
11:04:30 11  answered.
11:04:31 12      Q.   Is that correct?
11:04:31 13      A.   Yes.
11:04:32 14      Q.   How can you be a CPA and not be
11:04:34 15  familiar with the concept of materiality?
11:04:37 16           MR. BURKE:  Objection.  Calls for
11:04:37 17  speculation.  You can answer.
11:04:39 18      A.   Well, that was when I was a little
11:04:41 19  sharper at that time.  That's twelve years ago.
11:04:44 20  I haven't practiced or done anything, so
11:04:46 21  I've --
11:04:47 22      Q.   Mr. Zoellner, you were a member of
11:04:48 23  the Oak Hills audit committee, correct?
11:04:51 24      A.   Yes.
11:04:51 25      Q.   And during that time at audit

51

11:04:54 1   committee meetings was the concept of
11:04:56 2   materiality discussed?
11:04:58 3       A.   The concept of materiality.  I'm
11:05:07 4   sorry.  You're talking about whether this was
11:05:09 5   material or not.  My -- had any meaning to it,
11:05:12 6   right, is that what you --
11:05:13 7       Q.   No.  I'm talking about your
11:05:15 8   understanding, whatever it is, if you have one,
11:05:17 9   of the concept of materiality.
11:05:19 10           MR. BURKE:  I think the question
11:05:20 11  was was it discussed at the audit committee
11:05:22 12  meetings, if that's the question.  If you'd
11:05:24 13  like to rephrase it, that's fine.
11:05:26 14           MR. BRAUTIGAM:  I'm comfortable
11:05:27 15  with the question that's pending.
11:05:29 16           MR. BURKE:  Please reread the
11:05:30 17  question.
11:05:30 18           (Record read by Reporter.)
11:05:42 19           MR. BURKE:  Objection.  Asked and
11:05:42 20  answered, calls for speculation.  You may
11:05:44 21  answer it.
11:05:52 22      A.   I really don't understand what you
11:05:54 23  want.
11:05:56 24      Q.   Okay.  Are you familiar with the
11:05:56 25  concept of fiduciary duty?

52

11:05:59 1            MR. BURKE:  Objection.  Relevance.
11:06:00 2       A.   No.  No.  Fiduciary duties, no,
11:06:04 3   I --
11:06:05 4       Q.   Are you familiar with the concepts
11:06:06 5   of the federal securities laws?
11:06:08 6       A.   No.
11:06:09 7            MR. BURKE:  Objection.  Calls for
11:06:10 8   a legal conclusion.
11:06:13 9       Q.   You served as a director of Oak
11:06:16 10  Hills during the entire time it was a public
11:06:17 11  company, correct?
11:06:19 12      A.   Yes.
11:06:22 13      Q.   Did you have any responsibility to
11:06:24 14  the shareholders during that time?
11:06:28 15      A.   Well, it was always a
11:06:31 16  responsibility.  And one of them was to look at
11:06:35 17  anybody that wanted to merge or anybody that
11:06:37 18  wanted to buy or sell or that.  We always tried
11:06:41 19  to keep on top of that.
11:06:43 20      Q.   What other responsibilities did
11:06:44 21  you have to the shareholders?
11:06:52 22      A.   To try to make a profit, pay a
11:06:58 23  dividend after we became a stock company so we
11:06:58 24  could pay a dividend.  The profits was
11:06:59 25  important.

53

11:07:00 1    Q.   What's the function of a Board of
11:07:01 2  Directors?
11:07:02 3       MR. BURKE:  Objection to
11:07:02 4  relevance.  You may answer.
11:07:06 5       A.   The function of a Board of
11:07:09 6  Directors is to guide the savings and loan in
11:07:18 7  the direction where they would make a profit or
11:07:21 8  be beneficial to the shareholder.
11:07:23 9       Q.   Are you familiar with the term
11:07:25 10 management?
11:07:26 11      A.   Management?
11:07:26 12      Q.   Yes.
11:07:27 13      A.   Yes.
11:07:28 14      Q.   Did Oak Hills have management?
11:07:30 15      A.   Yes.
11:07:31 16      Q.   Who was the senior management at
11:07:32 17 Oak Hills?
11:07:33 18      A.   Ken Hanauer.
11:07:35 19      Q.   Anyone else?
11:07:37 20      A.   Well, he was senior.  He was the
11:07:40 21 manager.  Our chairman of the Board was Norb
11:07:43 22 Brinker, but our manager was Ken Hanauer.
11:07:49 23      Q.   Okay.  Was there anyone else who
11:07:50 24 served in a senior management role --
11:07:53 25      A.   Yes.

54

11:07:53 1       Q.   -- at Oak Hills?
11:07:55 2       A.   Yes.  The CFO, chief financial
11:08:02 3  officer.  Another would be -- another one would
11:08:04 4  be the mortgage loan department head.  And then
11:08:16 5  we had a -- what the devil was her title?
11:08:40 6  That's terrible.  Those names aren't coming to
11:08:43 7  me.
11:08:46 8       Q.   Okay.  Mr. Zoellner, let me direct
11:08:49 9  your attention to Defendant's Exhibit 1.  These
11:08:53 10 are the proxy materials, correct?
11:08:59 11      A.   Is that what it says?  Special
11:09:00 12 meeting.  That wouldn't be the proxy, but it --
11:09:05 13 that would --
11:09:09 14      MR. BURKE:  I think that was
11:09:09 15 already asked and answered, that he was unable
11:09:12 16 to identify this document but he recalled the
11:09:15 17 proxy materials, so you may answer it if you
11:09:17 18 know, Mr. Zoellner.
11:09:32 19      A.   I, I don't recall this at all.
11:09:35 20      Q.   Okay.  You understand that there
11:09:37 21 were proxy materials with respect to the
11:09:38 22 merger, correct?
11:09:39 23      A.   Yes.
11:09:39 24      Q.   And you're unable to identify
11:09:42 25 Defendant's Exhibit 1 as being these proxy

55

11:09:44 1  materials, but you know that some proxy
11:09:46 2  materials did exist, correct?
11:09:48 3       A.   That is true.
11:09:49 4       Q.   Okay.  Can you accept my
11:09:50 5  representation that Defendant's Exhibit 1 were
11:09:52 6  the proxy materials that were used with respect
11:09:55 7  to this merger?
11:09:57 8       MR. BURKE:  Objection to form.
11:10:00 9       A.   I, I can't say yes or no, because
11:10:04 10 I don't know.
11:10:04 11      Q.   Well, what I'm saying is, if I ask
11:10:06 12 you to assume that these were the proxy
11:10:10 13 materials that were used for the Oak
11:10:12 14 Hills-Provident merger, can you accept that?
11:10:26 15      A.   Why, why do I want to accept this
11:10:27 16 as such?  It's all according to what it's going
11:10:31 17 to lead into.  If you're going to pull
11:10:33 18 something out of there that I'm not familiar
11:10:35 19 with, then I -- it's hard for me to say this
11:10:40 20 whole thing is okay.  You've --
11:10:43 21      Q.   Mr. Zoellner, I'm not asking you
11:10:45 22 to say that it's okay.  I showed you the
11:10:47 23 document.
11:10:48 24      A.   Yeah.
11:10:48 25      Q.   You were unable to identify it.

56

11:10:50 1  What I'm saying is, can you accept my
11:10:52 2  representation that these were the document --
11:10:55 3  this was the document that was mailed to the
11:10:57 4  Oak Hills shareholders?
11:10:59 5       MR. BURKE:  Objection.  Asked and
11:11:00 6  answered.
11:11:01 7       A.   Well, I, I don't think this is the
11:11:02 8  document that was mailed to them.  It -- it was
11:11:07 9  not that thick.  That's a big --
11:11:09 10      Q.   Okay.  Will you accept my
11:11:11 11 representation that this is a copy of the
11:11:12 12 document that was mailed to the shareholders?
11:11:14 13      A.   Not the whole thing, because this
11:11:15 14 whole thing was not mailed out.
11:11:17 15      Q.   Mr. Zoellner, I believe that
11:11:19 16 that's inaccurate, that this document in a
11:11:22 17 slightly different form, perhaps it was bound,
11:11:25 18 perhaps there were copies on both sides, this
11:11:28 19 is a one-sided copy, was mailed out.  But in
11:11:31 20 substance, this is the document.  Can you
11:11:33 21 accept that representation?
11:11:35 22      MR. BURKE:  Objection.
11:11:35 23      A.   Okay.  I'll accept it.
11:11:36 24      Q.   Okay, thank you.  Now, what is the
11:11:38 25 function of the proxy materials?

57

11:11:40 1          MR. BURKE: Objection. Calls for
11:11:41 2  a legal conclusion and speculation. You may
11:11:42 3  answer if you know.
11:11:46 4          A.   What's the purpose of a proxy?
11:11:48 5          Q.   Yes.
11:11:49 6          A.   It is if you can't be there and
11:11:50 7  attend, you can vote by proxy.
11:11:57 8          Q.   Okay. And what were the Oak Hills
11:11:58 9  shareholders being asked to vote on?
11:12:04 10         A.   At this meeting about the merger
11:12:06 11 with Provident, they were asking to approve it
11:12:08 12 or disapprove it.
11:12:11 13         Q.   And what material was sent to them
11:12:13 14 so they could evaluate the proposed
11:12:15 15 transaction?
11:12:16 16         A.   I don't know. I don't remember.
11:12:19 17         Q.   Would it be fair to say that it
11:12:20 18 was this document, Defendant's Exhibit 1, that
11:12:23 19 was sent to them?
11:12:24 20         MR. BURKE: Objection. Asked and
11:12:25 21 answered. You may answer.
11:12:26 22         A.   Well, from my memory, I don't
11:12:28 23 think it was that big. It was smaller, so I
11:12:31 24 can't say it's this, this here.
11:12:37 25         Q.   Okay. You agree that some proxy

58

11:12:45 1  materials were sent to the Oak Hills
11:12:47 2  shareholders, correct?
11:12:48 3          A.   Yes.
11:12:49 4          MR. BURKE: Objection. Asked and
11:12:49 5  answered.
11:12:50 6          Q.   Okay. What was the purpose of
11:12:51 7  that document, whatever form it took?
11:12:54 8          A.   What was the purpose?
11:12:55 9          Q.   Yes.
11:12:57 10         A.   Well, that's -- if I'm not
11:13:00 11 mistaken, every year the proxies are mailed out
11:13:02 12 to every stockholder. And they have a right to
11:13:07 13 vote by proxy, or if they're going to attend
11:13:12 14 the meeting then they don't send it in, they go
11:13:15 15 and vote in person.
11:13:16 16         Q.   Are you referring to the annual
11:13:16 17 meeting of shareholders?
11:13:23 18         A.   I'm referring to the annual
11:13:23 19 meeting, yes.
11:13:23 20         Q.   Okay. During 1999 was there a
11:13:23 21 special meeting of shareholders on or about
11:13:26 22 October 25th, 1999?
11:13:29 23         A.   I was reading some of this that
11:13:31 24 you laid out here, and there was a special
11:13:34 25 meeting, I just saw that. I read it here,

59

11:13:37 1  otherwise I wouldn't have remembered what date,
11:13:41 2  but they were mailed out also, just like the
11:13:45 3  regular, for a special meeting.
11:13:49 4          Q.   And what was the purpose of that
11:13:51 5  special meeting?
11:13:54 6          A.   Whether we should merge with
11:13:55 7  Provident or not.
11:13:58 8          Q.   And this merger was to some extent
11:14:02 9  dependent on the shareholder vote, correct?
11:14:04 10         A.   Well, it was dependent on that.
11:14:06 11 If -- however they voted it, if they voted for
11:14:10 12 it, it was consummated; if they voted against
11:14:13 13 it, we'd still be in business.
11:14:15 14         Q.   And the purpose of the proxy
11:14:18 15 materials was to inform the Oak Hills
11:14:21 16 shareholders as to the proposed transaction,
11:14:24 17 correct?
11:14:25 18         MR. BURKE: Objection, leading.
11:14:26 19         A.   Well, I'd have to read what was
11:14:28 20 sent out. I don't remember what was sent out,
11:14:31 21 whether that's completely true or not, but it
11:14:34 22 was for them to vote for the merger or against
11:14:37 23 the merger.
11:14:40 24         Q.   Okay. And how were the
11:14:43 25 shareholders to form an opinion with respect to

60

11:14:46 1  whether or not they should vote in favor of or
11:14:49 2  against this proposed merger?
11:14:51 3          MR. BURKE: Objection.
11:14:55 4          A.   I don't know.
11:14:57 5          Q.   Would it be --
11:14:58 6          A.   I don't know.
11:14:58 7          Q.   Would it be fair to say that the
11:15:01 8  shareholders were to rely on the proxy
11:15:03 9  materials?
11:15:04 10         MR. BURKE: Objection.
11:15:06 11         A.   I do not know.
11:15:12 12         Q.   Is there anything other than the
11:15:14 13 proxy materials that you believe the
11:15:16 14 shareholders should rely on with respect to
11:15:19 15 this decision?
11:15:21 16         MR. BURKE: Objection. Calls for
11:15:24 17 speculation.
11:15:24 18         A.   I do not know.
11:15:38 19         Q.   Let me direct your attention to
11:15:40 20 this sentence again, it says, "Your Board of
11:15:44 21 Directors unanimously approved the acquisition
11:15:46 22 and believes that it is in the best interest of
11:15:48 23 OHSL stockholders." Do you see that sentence,
11:15:52 24 Mr. Zoellner?
11:15:52 25         A.   Yes.

61

11:15:54 1 　Q.　Okay.　We talked about how Mr.
11:15:59 2 Zoellner was not a director later in 1999 --
11:16:03 3 excuse me, Mr. Herron was not a director later
11:16:06 4 in 1999; is that correct?
11:16:07 5 　A.　That is right.
11:16:09 6 　Q.　Do you know if Mr. Herron voted
11:16:12 7 with respect to the proposed merger?
11:16:18 8 　A.　I do not know.
11:16:23 9 　Q.　Okay.　Putting Mr. Herron aside
11:16:24 10 for the moment, we talked about this phrase,
11:16:29 11 "Your Board of Directors," referring to eight
11:16:31 12 directors, correct?
11:16:33 13 　A.　I, I would --
11:16:35 14 　　MR. BURKE:　Objection to form.
11:16:36 15 You may answer.　Mischaracterizes the document.
11:16:39 16 Document speaks for itself.　I think it's
11:16:44 17 already been asked and answered.　You may
11:16:45 18 answer it, Howard.　On second thought, read
11:16:50 19 that question back.
11:16:50 20 　　(Record read by Reporter.)
11:17:01 21 　　MR. BURKE:　Objection.　You
11:17:02 22 referred to it in a different document,
11:17:04 23 misleading question.
11:17:07 24 　　MR. BRAUTIGAM:　Actually the
11:17:07 25 phrase carries over so it's not misleading, but

62

11:17:10 1 anyway.
11:17:10 2 　　MR. BURKE:　It's totally
11:17:11 3 misleading, Mike, but you referred to it in a
11:17:15 4 different document.
11:17:17 5 　　MR. BRAUTIGAM:　Jim, I'm not going
11:17:17 6 to debate this with you.
11:17:17 7 BY MR. BRAUTIGAM:
11:17:19 8 　Q.　Mr. Zoellner, we talked about the
11:17:20 9 phrase "Your Board of Directors" referring to
11:17:21 10 eight directors, correct?
11:17:24 11 　A.　Yeah.　Well, it's all according to
11:17:26 12 the timing of what -- the date.
11:17:28 13 　Q.　Okay.
11:17:29 14 　A.　And I do not know when he sent his
11:17:32 15 resignation in.
11:17:34 16 　Q.　Okay.
11:17:34 17 　A.　If he was a director at this time
11:17:37 18 or not.
11:17:39 19 　Q.　Okay.　This --
11:17:40 20 　A.　This is --
11:17:41 21 　　MR. BURKE:　Wait a minute.　Go
11:17:42 22 ahead and answer.
11:17:42 23 　A.　I don't know whether he was a
11:17:43 24 director at this time or not.　It's -- this is
11:17:47 25 July the 27th, '99.　What's the date on this

63

11:17:50 1 one?
11:18:03 2 　Q.　Mr. Zoellner, I can't find the
11:18:05 3 date right this minute, but let me represent to
11:18:07 4 you that this came out at some point before
11:18:10 5 July 27th, 1999, in 1999.　This was used for
11:18:14 6 your annual meeting which took place on April
11:18:18 7 15th, 1999.　Does that ring a bell?
11:18:21 8 　A.　April 15th?　Well, then his
11:18:23 9 resignation was after this, right?　This was
11:18:27 10 April, this was July?
11:18:29 11 　　MR. BURKE:　And "this," just so
11:18:31 12 the record is somewhat intelligible, is Herron
11:18:33 13 Deposition Exhibit 1, the OHSL Financial Corp
11:18:37 14 1998 annual report.
11:18:41 15 　Q.　Okay.　And the phrase "Your Board
11:18:44 16 of Directors" as it's used in Herron Deposition
11:18:47 17 Exhibit 1 is also used in Herron -- excuse me,
11:18:52 18 Defendant's Exhibit 1 as well, correct?
11:18:54 19 　　MR. BURKE:　Objection.
11:18:54 20 Mischaracterizes the document.
11:18:56 21 Mischaracterizes his testimony.　You may
11:18:59 22 answer.
11:18:59 23 　A.　You said Herron, this is --
11:19:01 24 Hanauer has written this up and signed it.
11:19:05 25 Herron --

64

11:19:06 1 　Q.　Mr. Zoellner, for the minute --
11:19:08 2 　A.　Yeah.
11:19:09 3 　Q.　-- this is a different document.
11:19:10 4 It doesn't have anything to do with Mr. Hanauer
11:19:13 5 right now.
11:19:15 6 　A.　Okay.
11:19:22 7 　Q.　Do you see the phrase "Your Board
11:19:24 8 of Directors" here?
11:19:25 9 　　MR. BURKE:　Now we're referring to
11:19:26 10 a different document, Defendant's Exhibit 1?
11:19:33 11 　Q.　Right.
11:19:33 12 　　MR. BURKE:　Okay.
11:19:36 13 　Q.　Mr. Zoellner, do you see that
11:19:38 14 phrase?
11:19:38 15 　A.　"Your Board of Directors
11:19:39 16 unanimously approved the acquisition and
11:19:42 17 believes that it is in the best interest of
11:19:44 18 OHSL stockholders.　The Board then recommends
11:19:49 19 and advises that you approve the acquisition."
11:19:52 20 Yeah, I see that.
11:19:55 21 　Q.　Okay.　To which directors does the
11:19:56 22 phrase in Defendant's Exhibit 1, "Your Board of
11:19:59 23 Directors," refer to?
11:20:13 24 　A.　Well, let's see, we've got -- this
11:20:16 25 was for -- as of -- going to be presented

**65**

11:20:19 1 October 25th, '99 and he resigned on July 27th
11:20:24 2 in '99. So this would be seven rather than
11:20:29 3 eight.
11:20:30 4     Q.  Okay.  Does it say that there are
11:20:31 5 only seven directors anywhere in the document?
11:20:34 6         MR. BURKE:  Objection.
11:20:34 7     A.  I do not know.
11:20:35 8         MR. BURKE:  You can go ahead and
11:20:36 9 answer.  Read it if you want to, but the
11:20:38 10 document speaks for itself, Mr. Brautigam.
11:20:41 11     Q.  Okay.  Mr. Zoellner --
11:20:41 12     A.  Yeah.
11:20:42 13     Q.  -- do you think it's important to
11:20:43 14 tell the shareholders that one of their eight
11:20:46 15 directors resigned?
11:20:47 16         MR. BURKE:  Objection. Calls for
11:20:48 17 speculation.  You may answer.
11:20:53 18     A.  I don't think it's important that
11:20:56 19 they be notified, no.
11:20:58 20     Q.  Why not?
11:20:56 21     A.  Well, I don't know.  I don't know.
11:21:20 22     Q.  Okay.  Let's take a look at what
11:21:22 23 has previously been marked as Defendant's
11:21:25 24 Exhibit 23. Mr. Zoellner, have you ever seen
11:21:27 25 that document before?

**66**

11:21:40 1     A.  Is this a list of the
11:21:41 2 shareholders?
11:21:44 3         MR. BURKE:  His question is, have
11:21:45 4 you ever seen it before.
11:21:47 5     A.  I don't think I have seen it
11:21:48 6 before.
11:21:48 7     Q.  Are you familiar with this
11:21:49 8 document?
11:21:50 9         MR. BURKE:  Objection. It sort of
11:21:52 10 follows from the prior answer.
11:21:57 11     A.  I, I know what it is, but I
11:21:56 12 haven't -- I don't think I've seen it before.
11:22:01 13     Q.  What is this document?
11:22:03 14     A.  It's a list -- according to what
11:22:04 15 it says here, this is a list of the
11:22:07 16 stockholders.
11:22:08 17     Q.  And that's the extent of your
11:22:10 18 knowledge with respect to this document; is
11:22:11 19 that correct?
11:22:11 20     A.  Yes.  I, I don't -- I don't
11:22:14 21 remember seeing this at all.
11:22:33 22     Q.  Okay.
11:22:33 23         MR. BURKE:  Off the record.
11:22:33 24         (Discussion off the record.)
11:22:50 25     Q.  Mr. Zoellner, I have placed before

**67**

11:22:51 1 you Zoellner Deposition Exhibit 3 and I ask you
11:22:54 2 to take a look at it.  Have you seen it before?
11:22:59 3     A.  Well, I probably have because it's
11:23:02 4 a regular meeting of the Board of Directors of
11:23:06 5 January 21st, '99, and we received these
11:23:12 6 minutes each time, so I -- and I was present
11:23:18 7 there, so I did see it.
11:23:19 8     Q.  Okay.  And if you flip over to the
11:23:21 9 second page of the document, do you see that
11:23:27 10 Mr. Herron is nominated to be a director again?
11:23:36 11 Is that correct?
11:23:37 12         MR. BURKE:  Where are you
11:23:38 13 referring to?
11:23:39 14     Q.  At the bottom, three individuals
11:23:41 15 named.
11:23:42 16         MR. BURKE:  Okay.
11:23:54 17     A.  Okay.  Yes, it says there at the
11:23:56 18 bottom that Tom Herron, Bill Hillebrand and Joe
11:24:01 19 Tenoever, yes.
11:24:02 20     Q.  And what was the term that Mr.
11:24:04 21 Herron was supposed to serve as a director?
11:24:29 22     A.  I forget the term.  I think that
11:24:36 23 the term was three years.
11:24:39 24     Q.  And Mr. Herron resigned before his
11:24:41 25 time was up, correct?

**68**

11:24:43 1     A.  That is correct.
11:24:43 2     Q.  And you don't believe that it's
11:24:45 3 important to notify the shareholders of that
11:24:47 4 fact, correct?
11:24:49 5         MR. BURKE:  Objection. Asked and
11:24:49 6 answered.
11:24:51 7     A.  No, I don't think it's -- my
11:24:53 8 personal thinking, no, it isn't.
11:24:56 9     Q.  Well, I'm not interested in your
11:24:57 10 personal thinking, I'm interested in your
11:25:01 11 thinking as an OHSL Board member.
11:25:01 12     A.  Board member.
11:25:02 13     Q.  Is your answer the same?
11:25:04 14     A.  Answer is the same.
11:25:05 15     Q.  Okay, great.  On January 21st,
11:25:07 16 1999, what were you looking forward to with
11:25:09 17 respect to Oak Hills in 1999?  Did you think
11:25:12 18 they'd have a good year or bad year or
11:25:15 19 something else?
11:25:15 20         MR. BURKE:  Objection to form,
11:25:18 21 vague.  You can answer.
11:25:18 22     A.  Well, we naturally -- we were
11:25:23 23 always looking for a good year and we were
11:25:22 24 doing a good job.  But we also, as I said
11:25:24 25 earlier, we, we didn't turn anybody away that

69

11:25:28 1 wanted to talk about a merger or a buy-out. We
11:25:32 2 figured it was in the best interest of the
11:25:34 3 stockholders to look and talk to anybody that
11:25:36 4 wanted to talk to us to see whether it was
11:25:39 5 better for them.
11:25:40 6     Q.   Okay.  On January 21st, 1999, were
11:25:44 7 you in favor of Oak Hills continuing to remain
11:25:47 8 independent?
11:25:48 9     A.   Oh, these dates kill me.  I don't
11:25:53 10 know.
11:25:54 11     Q.   Okay.
11:25:54 12     A.   I -- that date, I don't know.
11:26:06 13     Q.   Okay.  I'm handing you what has
11:26:07 14 been marked as Zoellner Deposition Exhibit 4
11:26:09 15 and I ask you to take a look at that.  This
11:26:13 16 reflects the February 25th, 1999 OHSL Financial
11:26:18 17 Corporation Board meeting, correct?
11:26:20 18     A.   Yes.
11:26:21 19     Q.   And on or about February 25th,
11:26:24 20 1999, were you in favor of Oak Hills
11:26:28 21 maintaining its independence?
11:26:33 22     A.   Oh, boy, these dates are killing
11:26:44 23 me, because at one time I was in favor of Oak
11:26:48 24 Hills staying independent and another time I
11:26:51 25 was in favor of the merger, but it's all

70

11:26:59 1 according to the dates when this -- I don't
11:26:59 2 know whether it was before this date or after
11:26:59 3 this date.
11:27:00 4     Q.   Okay.  Well, Mr. Zoellner,
11:27:01 5 generally speaking, why were you in favor of
11:27:04 6 Oak Hills remaining independent when you were
11:27:06 7 in favor of that?
11:27:08 8     A.   Why?  Because we were doing so
11:27:11 9 well.  We were strong.
11:27:33 10     Q.   Any other reasons?
11:27:36 11     A.   Well, the other was we didn't have
11:27:37 12 anybody that was interested in, in a merger or
11:27:41 13 a sale that was to the advantage of the
11:27:44 14 stockholders, so then we would dismiss that.
11:27:48 15     Q.   All right.  How would you define a
11:27:49 16 merger or sale that was in the best interest of
11:27:52 17 the stockholder?
11:27:53 18     A.   How would I define it?  I guess
11:27:55 19 the best way would be to say that they'd earn
11:28:00 20 some money.  They'd get cash, that's to the
11:28:04 21 benefit of the stockholders.  We come out with
11:28:07 22 a profit.
11:28:10 23     Q.   Was that the only consideration?
11:28:12 24         MR. BURKE:  Objection.  For what?
11:28:23 25     A.   I, I don't know.

71

11:28:37 1     Q.   Okay.  Mr. Zoellner, I am handing
11:28:39 2 you what has been marked as Zoellner Deposition
11:28:42 3 Exhibit 5.  Mr. Zoellner, does this appear to
11:28:45 4 be the Board meeting of Oak Hills Savings &
11:28:50 5 Loan Company, F.A., February 25th, 1999?  Now,
11:28:58 6 we just had one with the same date on it.
11:29:12 7     A.   Well, one of these has to be
11:29:15 8 wrong.
11:29:15 9     Q.   Why do you say that, Mr. Zoellner?
11:29:19 10     A.   Because the minutes are February
11:29:20 11 25th, and February 25th is the same.
11:29:24 12         MR. BURKE:  I'll direct your
11:29:26 13 attention, Mr. Zoellner, to the left column.
11:29:28 14     A.   Oh, it's corrected.
11:29:30 15     Q.   Mr. Zoellner, is there a
11:29:32 16 distinction between OHSL Financial Corporation
11:29:34 17 and Oak Hills Savings & Loan Company, F.A.?
11:29:37 18     A.   Yes.
11:29:37 19     Q.   What is that distinction?
11:29:41 20     A.   That was the, the holding
11:29:43 21 corporation which the stock was issued from.
11:29:51 22     Q.   And although the directors of both
11:29:55 23 boards were the same --
11:29:56 24     A.   Same.
11:29:56 25     Q.   -- they had different meetings,

72

11:29:58 1 correct?
11:29:59 2     A.   Yes.
11:29:59 3     Q.   And they had different meeting
11:30:01 4 minutes, correct?
11:30:01 5     A.   Yes.  I believe so.
11:30:03 6     Q.   And Zoellner Deposition Exhibit 5
11:30:05 7 reflects the Board meeting of the savings and
11:30:08 8 loan, not of the holding company.  Is that
11:30:10 9 correct?
11:30:11 10     A.   Oh, yes.  Now I -- this is the
11:30:12 11 stock company, this is the -- okay.
11:30:15 12     Q.   Okay.  I'd like to direct your
11:30:17 13 attention to the meeting of the savings and
11:30:19 14 loan on or about February 25th, 1999.  Do you
11:30:22 15 remember anything about that meeting?  And let
11:30:25 16 me give you a hint, this was the meeting where
11:30:27 17 the ad hoc committee was apparently appointed.
11:30:30 18 That's referred to on the second page of the
11:30:34 19 document at the very top.
11:30:36 20         MR. BURKE:  Objection to form.
11:30:39 21     Q.   Okay.  Now, Mr. Zoellner, do you
11:30:42 22 remember anything independently about this
11:30:43 23 meeting where the ad hoc committee was
11:30:46 24 appointed?
11:30:55 25     A.   I don't -- I remember them being

73

11:30:56 1 appointed, but I don't remember anything about
11:30:58 2 the meeting.
11:30:59 3     Q.  Okay.  What was the purpose of the
11:31:00 4 ad hoc committee?
11:31:02 5     A.  To investigate other companies and
11:31:07 6 that that might be good for the stockholders.
11:31:13 7     Q.  Was the purpose of the ad hoc
11:31:14 8 committee to sell the company?
11:31:16 9     MR. BURKE:  Objection.  Asked and
11:31:17 10 answered.  You may answer.
11:31:19 11     A.  No.  It wasn't to sell the
11:31:22 12 company, it was to make sure and -- that we
11:31:25 13 investigated everybody or every lead we had, so
11:31:28 14 that we could know whether it was in the
11:31:30 15 interest of the stockholders, not -- that we
11:31:35 16 did.  And if the ad hoc committee came out with
11:31:39 17 some information on it that wasn't good, we'd
11:31:41 18 turn it down.
11:31:42 19     Q.  Who was on the ad hoc committee?
11:31:45 20     A.  Oh, I haven't tried -- there's no
11:31:54 21 list in there.
11:31:59 22     Q.  Okay.  Mr. Zoellner, were you in
11:32:01 23 favor of Oak Hills merging with a much larger
11:32:04 24 financial institution at this point, on or
11:32:06 25 about February 25th, 1999?

74

11:32:08 1     A.  I'd have to look at the minutes in
11:32:10 2 the minute book to tell what -- whether I -- at
11:32:12 3 one time I wasn't in favor of it.  We're with
11:32:17 4 dates again and I don't remember any of the
11:32:19 5 dates.
11:32:19 6     Q.  Okay.  You said you'd like to look
11:32:21 7 at the minutes.  Could you look at these
11:32:23 8 minutes and would that help refresh your
11:32:25 9 recollection?
11:32:26 10     A.  Well, these minutes should say
11:32:27 11 whether I voted against it or for it.
11:32:29 12     Q.  Against or for?
11:32:31 13     A.  The merger.
11:32:32 14     Q.  Well, I don't believe we're there
11:32:33 15 yet.
11:32:34 16     A.  Oh, okay.
11:32:36 17     Q.  Okay.  Do you remember anything
11:32:36 18 about a discussion that took place at this
11:32:37 19 meeting?
11:32:39 20     MR. BURKE:  Objection.  Asked and
11:32:40 21 answered.
11:32:48 22     A.  I don't remember anything except
11:32:51 23 there was an ad hoc committee appointed.
11:32:53 24 That's the only thing I remember about these --
11:32:56 25 that meeting.

75

11:33:10 1     Q.  Okay.  Mr. Zoellner, I'm handing
11:33:12 2 you what has been marked as Zoellner Deposition
11:33:15 3 Exhibit 6 and I'd ask you to take a look at it.
11:33:17 4 Have you seen that document before?
11:34:01 5     A.  Yes, I have.  I've seen this
11:34:03 6 before.
11:34:03 7     Q.  Okay.  Did you attend the annual
11:34:05 8 stockholder meeting on or about April 15th,
11:34:09 9 1999?
11:34:10 10     A.  The minutes here show that I did.
11:34:11 11     Q.  Do you remember anything about the
11:34:12 12 meeting?
11:34:21 13     A.  No, other than what's written in
11:34:29 14 here, introduction of the directors and the
11:34:32 15 others that were present, just what the
11:34:35 16 minutes -- the minutes say.
11:34:41 17     Q.  Okay.  But you remember that the
11:34:41 18 directors were introduced, correct?
11:34:43 19     A.  Yes.
11:34:43 20     Q.  And do you remember that there was
11:34:44 21 some mention that Mr. Tenoever was able to
11:34:51 22 attend?
11:34:52 23     A.  Tenoever?
11:34:53 24     Q.  Do you remember that?
11:34:55 25     A.  I don't remember that, but it says

76

11:34:56 1 it here and I believe that's what it -- what
11:35:00 2 happened.
11:35:00 3     Q.  Do you believe it was important to
11:35:02 4 inform the shareholders that Mr. Tenoever was
11:35:05 5 unable to attend?
11:35:07 6     MR. BURKE:  Objection.  Calls for
11:35:10 7 speculation.
11:35:11 8     A.  I don't know whether he -- he
11:35:13 9 might have said when he introduced the
11:35:15 10 directors that Tenoever wasn't able to attend.
11:35:19 11 He might have said that, I don't know.
11:35:20 12     Q.  Who might have said --
11:35:22 13     A.  Ken Hanauer, who ran the meeting.
11:35:24 14     Q.  Why did Ken Hanauer run the
11:35:26 15 meetings?
11:35:28 16     A.  Because he's our managing officer.
11:35:30 17 He always has.
11:35:32 18     Q.  Isn't it more customary for the
11:35:33 19 chairman of the Board to run the meetings?
11:35:37 20     MR. BURKE:  Objection.
11:35:37 21     A.  I don't know.
11:35:38 22     Q.  Have you ever been to an annual
11:35:39 23 meeting of a public company other than OHSL?
11:35:42 24     A.  No.
11:35:45 25     Q.  Were you in favor of Oak Hills

77

```
11:35:47  1   maintaining its independence on or about April
11:35:53  2   15th, 1999?
11:35:55  3        A.  I'd have to look that up.  Of our
11:36:00  4   regular meeting, it should show in there how we
11:36:03  5   voted at our regular meeting before we got it
11:36:07  6   to the stockholders, but I did vote against it
11:36:11  7   at times, but I can't tell you the dates.  Then
11:36:15  8   I changed and voted for it.
11:36:20  9            MR. BRAUTIGAM:  Move to strike
11:36:21 10   nonresponsive portions.
11:36:23 11            MR. BURKE:  I think we've
11:36:24 12   established that on the record, that that is
11:36:27 13   his testimony on several occasions.
11:36:30 14        Q.  Can you mark this as the next
11:36:31 15   exhibit, please.  Mr. Zoellner, I'm handing you
11:36:44 16   what has been marked as Zoellner Deposition
11:36:47 17   Exhibit 7 and I'd ask you to take a look at it.
11:36:51 18   Have you seen that before?
11:36:54 19        A.  Are these the minutes?  I probably
11:36:56 20   have.  I can't say for sure, but I think I
11:36:58 21   have.
11:36:59 22        Q.  Okay.  Were you in favor of Oak
11:37:01 23   Hills maintaining its independence on or about
11:37:04 24   March 25th, 1999?
11:37:06 25            MR. BURKE:  Objection.
```

78

```
11:37:07  1        A.  I, I don't know.  I'd have to read
11:37:08  2   it to see what it says in the minutes.  Those
11:37:12  3   all should be in the minute book.
11:37:14  4        Q.  Okay.  What specifically would you
11:37:15  5   want to see?
11:37:17  6        A.  Well, if they said who voted for
11:37:21  7   and who voted against it.
11:37:25  8        Q.  Well, it doesn't appear to me that
11:37:27  9   you were offered a choice to vote for or
11:37:30 10   against it, whatever "it" refers to, at this
11:37:32 11   meeting.  Is that fair?
11:37:35 12        A.  I do not know that.  I'd have to
11:37:37 13   read this more.
11:37:39 14        Q.  Okay.  Why don't you take your
11:37:40 15   time and read that with -- more carefully while
11:37:46 16   we premark some of these exhibits.
11:38:43 17        A.  It doesn't say anything unless I'm
11:38:45 18   looking over top of it, about any vote for
11:38:48 19   stockholders to, to -- on the merger.
11:38:52 20        Q.  So my question for you, Mr.
11:38:53 21   Zoellner, is independently of the document, do
11:38:57 22   you believe that you were in favor of Oak Hills
11:38:59 23   maintaining its independence, some type of
11:39:02 24   sale, or something else on or about March 25th,
11:39:05 25   1999?
```

79

```
11:39:06  1            MR. BURKE:  Objection.  Asked and
11:39:07  2   answered.  You may answer.
11:39:08  3        A.  I do not know.  It's all according
11:39:10  4   to the date.  As I said, at one point I was
11:39:13  5   against it and then I changed, but I do not
11:39:15  6   know whether it was before March 25th or after
11:39:19  7   March 25th.
11:39:20  8            MR. BRAUTIGAM:  Okay.  Move to
11:39:21  9   strike, nonresponsive.
11:39:22 10        A.  Then this doesn't -- the minutes
11:39:24 11   should say that we had a vote of the directors
11:39:26 12   and this is what it is, because I can't tell
11:39:29 13   you whether -- when -- when I voted one way and
11:39:33 14   when I voted the other.
11:39:35 15            MR. BURKE:  And I will
11:39:35 16   respectfully disagree that that's not
11:39:38 17   responsive.  I think he's said that time and
11:39:41 18   time again.
11:39:41 19            MR. BRAUTIGAM:  It has nothing to
11:39:42 20   do with the question.
11:39:44 21            MR. BURKE:  Yes, it does.
11:39:45 22            MR. BRAUTIGAM:  Therefore it is
11:39:46 23   not responsive.
11:39:47 24            MR. BURKE:  It is responsive.
11:39:47 25   BY MR. BRAUTIGAM:
```

80

```
11:39:47  1        Q.  I think I'm going to be able to
11:39:49  2   help, Mr. Zoellner.  Mr. Zoellner, please take
11:39:52  3   a look at what is marked as Zoellner Deposition
11:39:55  4   Exhibit 8.
11:41:04  5        A.  Okay.  That says it right there.
11:41:06  6        Q.  Mr. Zoellner --
11:41:08  7        A.  Four of them for and three of them
11:41:09  8   against.
11:41:10  9        Q.  Have you seen Zoellner Deposition
11:41:12 10   Exhibit 8 before?
11:41:13 11        A.  Yes.
11:41:14 12        Q.  Are you familiar with it?
11:41:14 13        A.  Yes.
11:41:15 14        Q.  Do you recognize it?
11:41:16 15        A.  Yes.
11:41:17 16        Q.  What is Zoellner Deposition
11:41:19 17   Exhibit 8?
11:41:21 18        A.  It's the minutes of the OHSL
11:41:27 19   Financial Corp.
11:41:28 20        Q.  For April 20th, 1999, correct?
11:41:31 21        A.  That is correct.
11:41:32 22        Q.  And did you attend a special
11:41:34 23   meeting of the Board of Directors of OHSL
11:41:37 24   Financial Corp on or about April 20th, 1999?
11:41:40 25        A.  That's what it says there.
```

81

11:41:42 1     Q.  And what was the purpose of that
11:41:43 2 special meeting?
11:41:44 3     A.  To have the ad hoc committee
11:41:46 4 report.
11:41:47 5     Q.  Okay.  Now, Mr. Zoellner, without
11:41:49 6 just reading what's in the document, is there
11:41:52 7 anything that you remember independently about
11:41:55 8 this April 20th, 1999 meeting?
11:42:00 9     A.  No.  I don't remember it, no.
11:42:06 10     Q.  Okay.  Do you remember voting at
11:42:07 11 this meeting?
11:42:10 12     A.  I remember voting.  I can't say --
11:42:12 13 well, I was there and I voted, yes, so I --
11:42:18 14 this refreshed my memory and says I did.
11:42:18 15     Q.  Okay.  How did you vote?
11:42:20 16     A.  I voted against the merger.
11:42:20 17     Q.  What merger?
11:42:21 18     A.  Or, or the ad hoc committee going
11:42:24 19 ahead with discussions of these -- of a merger
11:42:37 20 or a buy-out or sellout.  It says right here, I
11:42:40 21 think, motion carried with four votes for,
11:42:45 22 three against, Hanauer, Herron and Zoellner,
11:42:48 23 with Mr. Brinker not voting because he would
11:42:52 24 only vote if there was a tie.
11:42:54 25     Q.  Okay.  Now, this vote taken on

82

11:42:55 1 April 20th, 1999, was not unanimous, correct?
11:42:59 2     A.  That is true.  It shows four of us
11:43:01 3 were -- four were for and three were against.
11:43:05 4     Q.  And for the vote to be unanimous,
11:43:07 5 each of the directors who were there would have
11:43:10 6 to vote the same way, correct?
11:43:13 7     A.  That is correct, to be unanimous.
11:43:15 8     Q.  Right.  So for this vote to be
11:43:17 9 unanimous, all eight of the directors would
11:43:20 10 have had to vote in favor of the resolution or
11:43:24 11 against the resolution; is that correct?
11:43:26 12     MR. BURKE:  Objection.
11:43:26 13 Mischaracterizes prior testimony.  You may
11:43:28 14 answer.
11:43:41 15     A.  The chairman of the Board only
11:43:43 16 votes if there's a tie, is that -- that's
11:43:47 17 correct.  The chairman, which was Norb Brinker,
11:43:51 18 he didn't vote, I don't think.  I think it said
11:43:54 19 it in there, Brinker not voting.  That's
11:43:57 20 because he was chairman and he only votes if
11:44:00 21 there's a tie.
11:44:02 22     Q.  Okay.  Why --
11:44:02 23     A.  And we had a four to three so
11:44:04 24 there wasn't a tie.  That's why it says here
11:44:07 25 not voting.

83

11:44:08 1     Q.  Okay.  What's your understanding
11:44:09 2 of the word unanimous?
11:44:12 3     MR. BURKE:  Objection.  Calls for
11:44:12 4 speculation.  You may answer.
11:44:14 5     A.  I would say everybody in favor of
11:44:17 6 the same thing, unanimously agreed the same.
11:44:22 7     Q.  Okay.
11:44:23 8     A.  It doesn't say that in there.  It
11:44:24 9 says that we're split four and three.
11:44:27 10     Q.  Okay.  And Mr. Brinker not voting?
11:44:30 11     A.  That is what it says here.
11:44:33 12     Q.  Okay.  Would it be fair to say
11:44:35 13 that up to and including April 20th, 1999, you
11:44:38 14 were not in favor of continued merger
11:44:42 15 negotiations with whomever?
11:44:44 16     MR. BURKE:  Objection.
11:44:45 17 Mischaracterizes prior testimony.  You may
11:44:47 18 answer.
11:44:47 19     A.  No.  It wasn't that I was against
11:44:49 20 talking to anybody, I was against the merger.
11:44:52 21     Q.  What merger were you
11:44:53 22 against on or about April 20th, 1999?
11:44:56 23     A.  I do not know who they were -- who
11:44:58 24 was in there.  I looked over the top of it, but
11:45:01 25 I don't know who I was --

84

11:45:05 1     Q.  Were you against the proposal to
11:45:07 2 hire McDonald & Company?
11:45:20 3     A.  I don't, I don't recall that.
11:45:23 4     Q.  Are you familiar with an entity
11:45:24 5 known as McDonald & Company?
11:45:27 6     A.  Yes.
11:45:27 7     Q.  Okay.  What are they?
11:45:31 8     A.  Well, they helped to get a -- find
11:45:35 9 a buyer and, and carry the full transaction
11:45:39 10 through on a -- on a merger or sale.
11:45:44 11     Q.  And you did not want to retain the
11:45:46 12 services of McDonald & Company on or about
11:45:50 13 April 20th, 1999?
11:45:52 14     A.  Not at this time.
11:45:53 15     Q.  Okay.  Why not?
11:45:54 16     A.  Because I, I liked where we were
11:45:57 17 and we were -- we was making money for the
11:46:02 18 stockholders.  Everything was going fine and I
11:46:05 19 didn't see any reason why, but then it came to
11:46:09 20 my attention that it would be best for the
11:46:11 21 stockholders if we did and --
11:46:15 22     Q.  Did --
11:46:18 23     MR. BURKE:  Go ahead and finish
11:46:18 24 your answer, Mr. Zoellner.
11:46:20 25     A.  And it could have been that we

85

11:46:22 1 maybe should have done it even earlier. That's
11:46:25 2 hindsight, but at the time it was best to do
11:46:27 3 it. It was in -- that's why I changed my vote
11:46:30 4 and --
11:46:33 5        MR. BRAUTIGAM: Move to strike
11:46:34 6 nonresponsive portions. Mr. Zoellner, if you
11:46:36 7 could limit your answer to something related to
11:46:38 8 my question, I'd appreciate it.
11:46:40 9        MR. BURKE: You know, there's no
11:46:41 10 need to try to insult the witness, Mr.
11:46:43 11 Brautigam. Mr. Zoellner, you keep doing
11:46:46 12 exactly what you have been doing, which is
11:46:47 13 answering the questions to the best of your
11:46:50 14 ability. Don't worry about his motions to
11:46:53 15 strike, you just answer as well as you can.
11:46:53 16        MR. BRAUTIGAM: Read back the
11:46:53 17 question and answer.
11:47:23 18        (Record read by Reporter.)
11:47:23 19 BY MR. BRAUTIGAM:
11:47:23 20        Q. Mr. Zoellner, you said that you
11:47:24 21 liked where you were on or about April 20th,
11:47:28 22 and you were making money. Do you remember
11:47:29 23 that testimony?
11:47:30 24        A. I just said that, yes.
11:47:31 25        Q. Okay. Did you continue to make

86

11:47:33 1 money in 1999?
11:47:36 2        A. Yes, we continued.
11:47:38 3        Q. That never changed, correct?
11:47:42 4        MR. BURKE: Objection to form.
11:47:45 5        A. I can't answer that for sure
11:47:46 6 either way. I don't remember what the
11:47:49 7 statements showed.
11:47:51 8        Q. On December 2nd, 1999, the day
11:47:54 9 before the merger was finalized, was Oak Hills
11:47:57 10 a profitable company?
11:47:59 11        A. Yes.
11:47:59 12        Q. Was it a strong company?
11:48:01 13        A. Yes.
11:48:01 14        Q. Did it need to be sold?
11:48:04 15        A. No.
11:48:08 16        Q. Okay. It's no secret that Mr.
11:48:09 17 Hucke was very much in favor of a sale of Oak
11:48:12 18 Hills, correct?
11:48:13 19        MR. BURKE: Objection.
11:48:13 20        A. Correct.
11:48:14 21        Q. And Mr. Hucke had had that view
11:48:16 22 for some years, correct?
11:48:18 23        A. Yes, that's correct.
11:48:19 24        Q. And it's no secret that Mr.
11:48:25 25 Hanauer was a proponent of remaining

87

11:48:25 1 independent, correct?
11:48:26 2        A. Yeah. Well, that shows that in
11:48:28 3 the minutes here that Hanauer and Herron and
11:48:30 4 myself were in favor of staying -- I should
11:48:35 5 just answer yes or no. I'm sorry.
11:48:37 6        MR. BURKE: You don't have to
11:48:37 7 answer yes or no, Howard. If you care to
11:48:39 8 explain, you're free to do so.
11:48:42 9        A. Okay.
11:48:42 10        Q. Mr. Hucke's view pro sale was
11:48:45 11 generally known by the Oak Hills Board,
11:48:47 12 correct?
11:48:47 13        MR. BURKE: Objection to form.
11:48:48 14        A. Yes.
11:48:49 15        Q. And Mr. Hanauer's view against any
11:48:51 16 such sale was also generally known, correct?
11:48:54 17        A. Yes.
11:48:54 18        Q. And that view is reflected in the
11:48:56 19 minutes of April 20th, 1999, correct?
11:48:59 20        A. That is correct.
11:49:00 21        Q. And would it be fair to say that
11:49:03 22 without reading what you have here, you don't
11:49:06 23 remember anything about Mr. Hucke's
11:49:08 24 presentation on that day, correct?
11:49:10 25        A. No, I don't remember.

88

11:49:12 1        Q. And you don't remember anything
11:49:14 2 about Mr. Tenoever's presentation on that date,
11:49:17 3 correct?
11:49:17 4        A. No, I don't.
11:49:18 5        Q. And you don't remember anything
11:49:19 6 about Mr. McKiernan's presentation on that day?
11:49:22 7        A. No, other than what's on the
11:49:23 8 minutes there.
11:49:24 9        Q. Now, when you attended Board
11:49:26 10 meetings, did you take notes?
11:49:27 11        A. No.
11:49:28 12        Q. You never took notes during the
11:49:29 13 entire time Oak Hills was a public company?
11:49:32 14        MR. BURKE: Objection. Asked and
11:49:33 15 answered.
11:49:37 16        A. Well, I, I don't know. I
11:49:39 17 probably -- probably when we had the minutes or
11:49:42 18 there was some comment or that, I might have
11:49:45 19 written something alongside them, but I don't
11:49:48 20 remember. I don't remember.
11:49:49 21        Q. Okay. But you probably took notes
11:49:50 22 at some point in 1999; is that your testimony?
11:49:52 23        MR. BURKE: Objection. That is
11:49:53 24 not his testimony. If you would like to read
11:49:55 25 it back, we can read it back.

## 89

11:49:57 1    MR. BRAUTIGAM: Jim, we don't need
11:49:59 2 speaking objections, we're doing fine.
11:50:01 3    MR. BURKE: Objection.
11:50:02 4 Mischaracterizes the prior testimony. Asked
11:50:04 5 and answered.
11:50:04 6 BY MR. BRAUTIGAM:
11:50:04 7    Q.   Mr. Zoellner, let me ask the
11:50:05 8 question a different way. During 1999, did you
11:50:08 9 ever take notes at OHSL Board meetings?
11:50:11 10    A.   I cannot say that, I do not know.
11:50:13 11 I do not know.
11:50:15 12    Q.   Okay. Did you retain a file of
11:50:17 13 OHSL related documents at your home?
11:50:21 14    A.   No, just ones that they might give
11:50:24 15 us that I had at my home, like they'd give us a
11:50:27 16 copy of the minutes or something.
11:50:29 17    Q.   Okay. Do you think it's possible
11:50:30 18 that you had some notes on these documents?
11:50:34 19    MR. BURKE: Objection.
11:50:34 20 Mischaracterizes the --
11:50:36 21    A.   I, I do not know.
11:50:37 22    Q.   You don't know one way or the
11:50:38 23 other?
11:50:39 24    A.   No.
11:50:40 25    Q.   Okay.

## 90

11:50:40 1    A.   But -- because I shredded all of
11:50:44 2 those, everything. I don't have a thing.
11:50:47 3    Q.   Okay. When did you shred these
11:50:49 4 documents?
11:50:53 5    A.   I don't know the exact date, but
11:50:54 6 it was right after the merger.
11:51:00 7    Q.   Let me --
11:51:00 8    A.   I think it was right after the
11:51:02 9 merger when I did that.
11:51:06 10    Q.   Okay. And did you have a shredder
11:51:07 11 at your house?
11:51:08 12    A.   No, I went and bought one.
11:51:10 13    Q.   For this specific purpose?
11:51:11 14    A.   Yes. And also for my accounting
11:51:14 15 records, because I had retired from my
11:51:17 16 accounting business, so it was a double thing.
11:51:19 17    Q.   But at some time after December
11:51:21 18 3rd, 1999, the day of the merger, you went out
11:51:24 19 and bought a shredder, correct?
11:51:27 20    MR. BURKE: Objection.
11:51:27 21 Mischaracterization.
11:51:28 22    A.   I don't know of the date. I don't
11:51:29 23 know. I don't know the exact date when I
11:51:31 24 bought it.
11:51:32 25    Q.   Mr. Zoellner, I'm not asking for

## 91

11:51:34 1 the exact date. I'm trying to determine --
11:51:36 2    A.   Yeah, well --
11:51:38 3    Q.   -- whether it was before or after
11:51:39 4 the merger.
11:51:39 5    MR. BURKE: Objection.
11:51:40 6    A.   I don't know.
11:51:40 7    Q.   You testified --
11:51:41 8    A.   It was right there. I don't know
11:51:42 9 when. It could have been either side of it.
11:51:45 10    Q.   Okay. How much on either side?
11:51:47 11    A.   I probably would say it was right
11:51:49 12 after the merger.
11:51:49 13    Q.   Okay. And you --
11:51:51 14    A.   I don't know whether there is any
11:51:53 15 way I can prove that to myself or not.
11:51:56 16    Q.   Okay. Now, what was the purpose
11:51:57 17 in shredding these documents?
11:51:59 18    A.   I didn't need them around anymore
11:52:00 19 because we were going to be part of Provident.
11:52:03 20 We were no longer going to be directors.
11:52:05 21    Q.   Okay.
11:52:06 22    A.   There was no need to keep these.
11:52:10 23    Q.   Did you understand at the time you
11:52:14 24 shredded the documents that there was some
11:52:16 25 litigation pending in a state court?

## 92

11:52:18 1    A.   No. I don't remember any of that,
11:52:20 2 no.
11:52:20 3    Q.   Okay. Do you --
11:52:21 4    A.   As far as I was concerned, there
11:52:22 5 wasn't any litigation. I shredded them before
11:52:28 6 that.
11:52:28 7    Q.   What do you mean, as far as you're
11:52:30 8 concerned?
11:52:31 9    A.   Well, as far as I remember, that
11:52:32 10 was -- it was done before the -- I don't --
11:52:40 11 you --
11:52:41 12    Q.   Are you familiar with any
11:52:43 13 litigation that took place in a state court?
11:52:47 14    A.   No.
11:52:53 15    Q.   Did any of your attorneys ever ask
11:52:54 16 you to produce documents in the state court
11:52:58 17 action?
11:53:01 18    A.   Well, I said no to the state, but
11:53:03 19 there was some discussion, something about they
11:53:05 20 gave us this information and I -- I just don't
11:53:08 21 remember, I'm sorry to say.
11:53:12 22    Q.   Did you receive some type of
11:53:13 23 document request, some document calling for you
11:53:16 24 to produce your records?
11:53:18 25    A.   No, no.

93

11:53:19 1    Q.   You never received anything like
11:53:20 2 that?
11:53:20 3    A.   No.
11:53:20 4    Q.   Did you receive a document request
11:53:22 5 in this case, the Thiemann action?
11:53:30 6    A.   The one you just gave me to read
11:53:32 7 was all.  A majority of it was if you had any
11:53:37 8 documents, to turn them over -- to bring them
11:53:40 9 to the meeting, but that's the only thing that
11:53:44 10 there was and I didn't have any.
11:53:46 11    MR. BURKE:  Okay.  I want the
11:53:47 12 record to reflect that the witness looked at
11:53:49 13 Mr. Burke and Mr. Burke nodded his head and
11:53:51 14 then the witness said yes.
11:53:53 15    MR. BURKE:  Certainly.  Because
11:53:55 16 it's the truth, Mr. Brautigam.
11:53:57 17    A.   Because I was asking if that's the
11:53:58 18 document he gave me.
11:53:59 19    Q.   And you didn't have any documents
11:54:01 20 because you had already shredded these
11:54:03 21 documents, to the best of your recollection, at
11:54:05 22 some point after the merger on December 3rd,
11:54:07 23 1999?
11:54:09 24    MR. BURKE:  Objection.
11:54:09 25 Mischaracterizes the testimony as you know, Mr.

94

11:54:11 1 Brautigam.  He does not recall the date.
11:54:14 2    MR. BRAUTIGAM:  Jim, I didn't ask
11:54:15 3 for the date.  We're doing fine, Jim.  The
11:54:18 4 record speaks for itself.  Can I have an answer
11:54:20 5 to my question?
11:54:21 6    MR. BURKE:  Do you recall the
11:54:21 7 question?
11:54:22 8    MR. BRAUTIGAM:  Lee Ann will read
11:54:23 9 it back.
11:54:23 10    (Record read by Reporter.)
11:54:38 11    MR. BURKE:  Objection.
11:54:39 12 Mischaracterizes the record, you may answer.
11:54:48 13    A.   I have, that's true.
11:54:48 14 BY MR. BRAUTIGAM:
11:54:53 15    Q.   Okay.  Mr. Zoellner, I'm handing
11:54:54 16 you Zoellner Deposition Exhibit 9 and I ask you
11:54:58 17 to take a look at it.  Mr. Zoellner, have you
11:55:39 18 seen these minutes before?
11:55:40 19    A.   It says that I was at that Board
11:55:42 20 meeting, so I have seen them.
11:55:44 21    Q.   Okay.  Let me direct your
11:55:45 22 attention back to the meeting of April 20th.
11:55:48 23 Would you say that the Board was split because
11:55:51 24 you had four votes in favor of hiring McDonald
11:55:55 25 and three against and Mr. Brinker not voting?

95

11:55:58 1    MR. BURKE:  Objection to form.
11:55:59 2 Mischaracterizes the record.  You may answer.
11:56:02 3    A.   I would say it's split.  Three and
11:56:05 4 four is a split.
11:56:06 5    Q.   Okay.  What was Mr. Brinker's
11:56:07 6 opinion as to whether or not McDonald should be
11:56:09 7 hired at this point?
11:56:10 8    A.   Oh, I, I do not know for sure what
11:56:13 9 his opinion was.
11:56:15 10    Q.   Do you suspect one way or another?
11:56:17 11    A.   I suspect, yes.
11:56:19 12    Q.   Okay.
11:56:19 13    MR. BURKE:  Objection.
11:56:19 14    Q.   What do you suspect?
11:56:20 15    MR. BURKE:  Objection.  Calls for
11:56:21 16 speculation.  If you know, you know.  You don't
11:56:23 17 have to speculate.
11:56:25 18    A.   Okay.  I don't know.  I don't know
11:56:26 19 what his feeling was.
11:56:28 20    Q.   Do you believe that you could form
11:56:30 21 an opinion with respect to Mr. Brinker's
11:56:32 22 opinion on or about April 20th of 1999?
11:56:36 23    MR. BURKE:  Objection to form.
11:56:37 24 Asked and answered.
11:56:40 25    A.   No, I don't know.  That's -- I do

96

11:56:44 1 not know.
11:56:45 2    Q.   Okay.  Was there heated discussion
11:56:46 3 at the special meeting on April 20th, 1999?
11:56:50 4 How would you describe what took place?
11:56:52 5    MR. BURKE:  Objection to form.
11:56:54 6    A.   On April the 22nd?
11:56:56 7    Q.   April the 20th.
11:56:59 8    A.   Gee, I don't know whether there
11:57:02 9 was any heated discussion.  I know there was a
11:57:03 10 discussion.
11:57:04 11    Q.   How would you describe the
11:57:05 12 relationship between Mr. Hucke and Mr. Hanauer?
11:57:13 13    A.   Well, I think they both felt kind
11:57:15 14 of the same way as far as they were in favor of
11:57:17 15 it, which the minutes show here that they were
11:57:20 16 in favor of a merger, or a sellout.
11:57:27 17    Q.   Could you direct --
11:57:27 18    MR. BURKE:  Please let the witness
11:57:29 19 finish his answer.
11:57:30 20    MR. BRAUTIGAM:  Jim --
11:57:31 21    MR. BURKE:  Mr. Brautigam --
11:57:32 22    MR. BRAUTIGAM:  You don't have to
11:57:32 23 scream at me.  I thought he was finished.
11:57:35 24    MR. BURKE:  Mr. Brautigam, he was
11:57:35 25 still talking.  Don't interrupt the witness.

97

11:57:38 1 And I'd like you to finish. Read the question
11:57:41 2 back. Let the gentleman finish his answer and
11:57:45 3 -- let the man finish his answers. I know you
11:57:49 4 want to get things moving.
11:57:51 5        MR. BURKE: Jim, it's not a
11:57:52 6 question of getting things moving, we're doing
11:57:54 7 fine.
11:57:55 8        MR. BURKE: I agree.
11:57:55 9        MR. BRAUTIGAM: Mr. Zoellner, I
11:57:57 10 didn't mean to interrupt you, I thought you
11:57:59 11 were finished. Let's have the question read
11:58:00 12 back and your answer, then you can add to it or
11:58:02 13 you can say you're finished or whatever you'd
11:58:04 14 like.
11:58:04 15        (Record read by Reporter.)
11:58:30 16 BY MR. BRAUTIGAM:
11:58:31 17        Q. Okay. And Mr. Zoellner, could you
11:58:32 18 please show me in the minutes where Mr. Hucke
11:58:36 19 and Mr. Hanauer were both in favor of the
11:58:38 20 merger, the April 20th, 1999 minutes?
11:58:49 21        MR. BURKE: Wait a minute, he's
11:58:49 22 talking about the April 20th minutes.
11:58:52 23        A. Here is the 20th.
11:58:55 24        MR. BURKE: That is the 22nd.
11:58:56 25        MR. BRAUTIGAM: Exhibit 8.

98

11:58:58 1        MR. BURKE: Exhibit 8.
11:58:59 2        A. Oh, here.
11:59:45 3        Q. Mr. Zoellner, you're free to look
11:59:46 4 at the document wherever you want, but if you
11:59:48 5 turn the page, I believe the voting is
11:59:50 6 reflected there in the first paragraph.
12:00:12 7        A. Well, that was to approve the
12:00:14 8 hiring of McDonald to conduct the study for us.
12:00:18 9 You were saying -- well, Herron -- not Herron.
12:00:26 10        Q. Hanauer?
12:00:27 11        A. Hanauer -- no, no.
12:00:29 12        MR. MOORE: Hucke?
12:00:30 13        A. Tenoever and -- no, Hucke and
12:00:32 14 McKiernan were in -- were in favor of it.
12:00:35 15 That's what it says on this, this here, of
12:00:40 16 going ahead, so to end up with a 4-3 majority
12:00:46 17 to go ahead with McDonald to get some more
12:00:50 18 information. It was just information, it
12:00:57 19 wasn't to sell.
12:00:57 20        Q. Okay. Mr. Zoellner, how would you
12:00:57 21 generally describe the relationship as Board
12:01:00 22 members between Mr. Hucke and Mr. Hanauer
12:01:04 23 during 1999?
12:01:07 24        A. Well, Hucke was in favor of
12:01:09 25 selling, Hanauer was in favor of staying the

99

12:01:14 1 way it was. And they each expressed himself to
12:01:17 2 that extent.
12:01:19 3        MR. BURKE: We've been going two
12:01:20 4 hours roughly, I'd like to take a break.
12:01:23 5        MR. BRAUTIGAM: Certainly.
12:01:23 6        (Brief recess.)
12:12:04 7 BY MR. BRAUTIGAM:
12:12:05 8        Q. Mr. Zoellner, I understand you had
12:12:06 9 a conversation with Mr. Burke during the time I
12:12:09 10 was out of the room. Is that correct?
12:12:12 11        MR. BURKE: Yes. We discussed the
12:12:14 12 war. We just talked about World War II, pardon
12:12:17 13 me.
12:12:19 14        Q. Was there anyone else in the room
12:12:23 15 during that conversation?
12:12:23 16        A. This gentleman right here.
12:12:25 17        Q. Who is "this gentleman" that you
12:12:26 18 pointed to?
12:12:27 19        A. I do not know.
12:12:28 20        MR. MOORE: For the record, that's
12:12:29 21 Christopher Moore.
12:12:30 22        Q. Do you know what his function is
12:12:32 23 at the deposition?
12:12:32 24        A. No.
12:12:35 25        Q. With respect to this conversation,

100

12:12:37 1 please tell me what you said, if anything, what
12:12:40 2 Mr. Burke said, and what Mr. Moore said.
12:12:43 3        MR. MOORE: I'll object.
12:12:45 4        MR. BURKE: You can talk about
12:12:45 5 what -- the conversation.
12:12:47 6        MR. MOORE: You can go ahead, but
12:12:48 7 I've got to tell you this was like -- go ahead
12:12:51 8 and answer. Mike, that's just --
12:12:53 9        A. I talked about World War II, what
12:12:55 10 I did. They asked was I in World War II and I
12:12:58 11 told them yes, that I was a Navy pilot,
12:13:01 12 graduated from Pensacola, Florida, spent four
12:13:04 13 years in the Pacific. Told them that the
12:13:06 14 Seabees were great guys -- first of all the
12:13:09 15 marines, the marines were taking an island, the
12:13:12 16 Seabees come in and put us a landing strip in
12:13:15 17 and we'd fly in. That was about the extent.
12:13:18 18        MR. MOORE: There was another
12:13:19 19 thing. Didn't you tell me you would never
12:13:20 20 dream of being a lawyer?
12:13:22 21        A. Yes. I don't like controversy so
12:13:25 22 I don't want to be a lawyer.
12:13:26 23        Q. Okay. And you did not speak about
12:13:28 24 the substance of the case?
12:13:29 25        A. No.

101

12:13:31 1    Q.  Okay.  Directing your attention to
12:13:32 2  Zoellner Exhibit 9.  This is a regular meeting
12:13:37 3  on or about April 22nd, 1999, correct?
12:13:46 4    A.  This is a regular meeting of the
12:13:49 5  Board of Directors of Oak Hills Financial
12:13:51 6  Corporation.
12:13:54 7    Q.  And how would you describe this
12:13:55 8  meeting?  Was it tense, was it relaxed, was it
12:13:59 9  something else?  How would you describe it?
12:14:01 10    A.  Gosh, I can't answer that, I don't
12:14:02 11  know.
12:14:06 12    Q.  Now, at this point, April 22nd,
12:14:08 13  1999, you were still against the engagement of
12:14:12 14  McDonald and you were in favor of the continued
12:14:15 15  independence of OHSL, correct?
12:14:17 16    MR. BURKE:  Objection.  You may
12:14:18 17  answer if you know.
12:14:19 18    A.  Does it say it here?  I don't know
12:14:20 19  that.  The minutes have to say what, what I did
12:14:24 20  or how I voted.  This doesn't say anything
12:14:30 21  about votes on the 22nd, does it?  I don't see
12:14:34 22  it.
12:14:34 23    Q.  I don't believe it does, but I
12:14:36 24  still want to know your position, if you
12:14:38 25  remember it.

102

12:14:39 1    A.  I don't, I don't remember.  These
12:14:40 2  dates are vague to me, I don't know.
12:14:43 3    Q.  Okay.  Let me hand you Zoellner
12:14:46 4  Deposition Exhibit 10.  Have you seen that
12:14:53 5  document before?
12:14:56 6    A.  I was there so I have seen it.
12:15:03 7    Q.  Okay.  Now, this was a
12:15:05 8  reorganization meeting; is that right?
12:15:11 9    A.  That's what it says.
12:15:13 10    Q.  What's the purpose of a
12:15:14 11  reorganization meeting?
12:15:17 12    A.  I just had that thought myself.
12:15:20 13  Why would we be reorganizing?
12:17:05 14    Q.  Mr. Zoellner, if you don't know,
12:17:07 15  you can just say that.
12:17:08 16    A.  I don't know what this is.  I am
12:17:11 17  not following.  Why a reorganization?  I don't
12:17:13 18  know.
12:17:13 19    Q.  Okay.  Mr. Zoellner, it says that
12:17:15 20  Norbert G. Brinker presided at the meeting.
12:17:20 21    A.  Yes.
12:17:22 22    Q.  Do you see that?
12:17:20 23    A.  Yes.
12:17:21 24    Q.  Was that unusual?
12:17:22 25    A.  No.

103

12:17:23 1    Q.  And --
12:17:24 2    A.  Because he was chairman.
12:17:25 3    Q.  Okay.  In the other minutes, it
12:17:26 4  doesn't say that Mr. Brinker presided, does it?
12:17:30 5    MR. BURKE:  Objection.  What
12:17:31 6  minutes are you referring to?
12:17:33 7    MR. BRAUTIGAM:  The other ones
12:17:35 8  we've looked at so far.
12:17:37 9    MR. BURKE:  Objection.  You can
12:17:39 10  answer, Mr. Zoellner.
12:17:41 11    A.  I don't know.  I'd have to look
12:17:42 12  back at all of those minutes that we've been
12:17:45 13  referring to.
12:17:45 14    Q.  Generally speaking --
12:17:47 15    A.  They would speak for themselves
12:17:48 16  whether Norb was presiding or not.
12:17:51 17    Q.  Generally speaking, how did Oak
12:17:53 18  Hills Financial Corporation Board meetings run
12:17:57 19  in 1999?
12:17:59 20    A.  How did they run?
12:18:03 21    Q.  In other words, isn't it fair to
12:18:04 22  say that Mr. Brinker called the meeting to
12:18:07 23  order and then turned it over to Ken?
12:18:10 24    MR. BURKE:  Objection.  Calls for
12:18:11 25  speculation.  You may answer.

104

12:18:15 1    A.  He would call the meeting to
12:18:17 2  order, but I do not remember him turning it
12:18:19 3  over to Ken Hanauer.
12:18:23 4    Q.  Do you remember Mr. Brinker
12:18:23 5  running these meetings?
12:18:25 6    A.  Yes.
12:18:30 7    Q.  Okay.  Do you remember anything
12:18:31 8  about the April 22nd, 1999 meeting other than
12:18:34 9  what's reflected in the minutes here?
12:18:36 10    A.  No.
12:18:43 11    Q.  I'm handing you Zoellner 11, I ask
12:18:47 12  you to take a look at it.  Have you seen this
12:18:59 13  document before?
12:19:14 14    A.  I do not know --
12:19:20 15    Q.  Now, I --
12:19:20 16    A.  -- because I wasn't there.  I was
12:19:20 17  unable to attend, so it would be that -- I
12:19:22 18  don't know whether I got one later on or not.
12:19:24 19    Q.  Well, wasn't that --
12:19:26 20    A.  But I was not at the meeting.
12:19:27 21    Q.  Okay.  But wasn't it the practice
12:19:30 22  of Oak Hills Financial Corporation to pass out
12:19:32 23  the minutes at the next meeting?
12:19:34 24    A.  Yes, if you missed.
12:19:40 25    Q.  Okay.  Up to this point in time,

105

1  who did you consider your lawyer to be as an
2  Oak Hills Board member?
3       MR. MOORE: Objection.
4       A.  Who our lawyer was?
5       Q.  Yes.
6       A.  For -- that's what you're
7  referring to?  Are you referring to loan
8  closings or --
9       Q.  No, with respect to the business
10 of OHSL Financial Corporation and its Board.
11      A.  I don't remember.
12      Q.  Does the name Chuck Hertlein ring
13 a bell?
14      A.  No.
15      MR. MOORE: Objection.
16      Q.  Does the firm Dinsmore & Shohl
17 ring a bell?
18      A.  Yes.
19      MR. MOORE: Objection.
20      Q.  Do you understand that Dinsmore &
21 Shohl are defendants in this action?
22      A.  Yes.  I think they -- I heard
23 that.
24      Q.  Okay.  What is your understanding
25 of why they're defendants?

106

1       A.  I don't know.
2       Q.  Does the name Cliff Roe ring a
3  bell?
4       A.  Yes.
5       Q.  Okay.  Who is Cliff Roe?
6       A.  He's the attorney with the --
7  isn't he in your office?  No, you're at
8  Keating.  No, I'm sorry.  Cliff Roe, yes.
9       Q.  Was Cliff Roe ever the Board's
10 attorney, the Oak Hills' Board's attorney?
11      A.  I don't -- I do not know him being
12 designated as Oak Hills' Board's attorney.  He
13 was just a -- occasionally they would call on
14 him for some advice, but I never referred to
15 him as Oak Hills' Board's attorney.
16      Q.  Who called on Mr. Roe for advice?
17      MR. MOORE: Objection.
18      A.  I don't know.  If -- probably if
19 anybody, it would be Ken Hanauer because he was
20 our managing officer/CEO.  And anybody on the
21 Board would say check this out, Ken, or check
22 this out, Ken.  Do this, do that.
23      Q.  Mr. Zoellner, I forget, were you
24 familiar with a guy named Chuck Hertlein at
25 Dinsmore & Shohl?

107

1       MR. BURKE: Objection.  Asked and
2  answered.
3       A.  Hertlein.  I recognize the name,
4  but I couldn't tell you -- no, I'm not that
5  familiar that I would know him.
6       Q.  Did he ever perform work for the
7  OHSL Board?
8       A.  I do not know.
9       Q.  Okay.  Do you remember why you
10 were unable to make this meeting on May 6th,
11 1999?
12      A.  I don't know.
13      Q.  Okay.
14      A.  I don't know why.
15      Q.  Were you still against any
16 proposed transaction at this point, May 6th,
17 1999?
18      MR. BURKE: Objection, cumulative.
19      A.  I do not know.  I don't know
20 whether I was for it or against it at this
21 point.
22      Q.  Okay.  For or against what?
23      A.  You said was I for or against a
24 merger.  Isn't that what you just said to me?
25      Q.  Close.  I don't believe I used the

108

1  word "merger," but that's okay.  Now, did you
2  ever come to believe that this transaction was
3  going to happen, whether it was -- whether you
4  were in favor of it or against it?
5       MR. BURKE: Objection to form,
6  ambiguous.
7       A.  No.  No, I wouldn't say that it
8  was going to happen.  It just took a majority
9  of the vote.  Whatever the majority of the vote
10 was, that's the way it would go.
11      Q.  The majority of what vote?
12      A.  Of the directors, should submit it
13 to the stockholders or not on a merger.
14      Q.  Okay.  But you didn't use the term
15 majority of the directors voted in favor of it,
16 did you?
17      MR. BURKE: What?  Objection to
18 form.
19      Q.  Okay.  In Defendant's Exhibit 1,
20 you talk about the vote by your Board of
21 Directors being unanimously approved.
22      MR. BURKE: You say "you."  You're
23 referring to him?
24      MR. BRAUTIGAM: I'm referring to
25 the OHSL directors.

109

12:24:07 1    MR. MOORE: I'll object.
12:24:08 2    MR. BURKE: Object to form. I
12:24:09 3 have no idea what we're asking now. You may
12:24:13 4 answer, Howard.
12:24:13 5 BY MR. BRAUTIGAM:
12:24:14 6    Q. Mr. Zoellner, is the question
12:24:15 7 clear?
12:24:16 8    A. No. I don't know what you're
12:24:17 9 referring to.
12:24:18 10    Q. Okay. Let me withdraw that
12:24:19 11 question and ask you a different question. You
12:24:21 12 mentioned something in your previous answer
12:24:23 13 about a majority of the Board of Directors. Do
12:24:25 14 you remember that testimony?
12:24:26 15    A. Yes. I just said the --
12:24:28 16    Q. Okay.
12:24:28 17    A. Because anything we did was
12:24:31 18 majority rule, you know.
12:24:35 19    Q. Okay. Do you believe that a
12:24:36 20 majority of the Board of Directors approved the
12:24:39 21 Oak Hills-Provident merger?
12:24:43 22    MR. BURKE: Objection to form.
12:24:44 23    A. Well, it's all according to the
12:24:46 24 date again.
12:24:47 25    Q. Okay.

110

12:24:48 1    A. Well, maybe at the early stages it
12:24:49 2 wasn't, but there was --
12:24:54 3    Q. Okay. Let's take a look at
12:24:56 4 Zoellner 12. Zoellner Deposition Exhibit 12 is
12:25:32 5 the minutes of the May 18th, 1999 special
12:25:34 6 meeting of the Board of Directors of the OHSL
12:25:36 7 Financial Corporation, correct?
12:25:37 8    A. Correct.
12:25:38 9    Q. And you were at that meeting,
12:25:39 10 correct?
12:25:40 11    A. Please?
12:25:40 12    Q. And you were at that meeting,
12:25:42 13 correct?
12:25:42 14    A. Yes.
12:25:42 15    Q. And pooling of interest accounting
12:25:45 16 was discussed, correct?
12:25:50 17    A. The pooling of interest? I, I did
12:26:10 18 not understand the question.
12:26:11 19    Q. Okay. Was pooling of interest
12:26:12 20 accounting treatment discussed at this meeting?
12:26:15 21 I believe it's referenced in the third
12:26:17 22 paragraph.
12:26:38 23    A. I do not understand.
12:26:40 24    Q. You do not understand pooling of
12:26:42 25 interest accounting?

111

12:26:44 1    MR. BURKE: Objection. I don't
12:26:45 2 see the words pooling of interest accounting.
12:27:04 3    A. I do not know what they mean by
12:27:07 4 that sentence there. Honestly I don't.
12:27:09 5    Q. All right. Aside from the
12:27:11 6 document -- putting the document aside for a
12:27:12 7 moment.
12:27:13 8    A. All right.
12:27:13 9    Q. Are you familiar with the phrase
12:27:14 10 pooling of interest accounting treatment?
12:27:16 11    A. No.
12:27:17 12    MR. BURKE: Objection to
12:27:17 13 relevance. You may answer.
12:27:19 14    A. Not at the present time. I don't
12:27:21 15 remember anything about that.
12:27:25 16    Q. Was some understanding of pooling
12:27:28 17 of interest accounting versus some other
12:27:30 18 accounting treatment necessary to understand
12:27:33 19 this proposed merger?
12:27:35 20    A. No, I'm -- I'm not familiar with
12:27:42 21 it, I'm sorry.
12:27:42 22    Q. Are you familiar with a change of
12:27:44 23 control contract, sometimes known as a golden
12:27:46 24 parachute?
12:27:48 25    MR. BURKE: Objection to

112

12:27:48 1 relevance.
12:27:49 2    A. No, I --
12:27:50 3    MR. BURKE: Assumes facts not in
12:27:51 4 evidence. You can answer.
12:27:53 5    A. I'm not familiar with that,
12:27:54 6 either.
12:28:08 7    Q. Did Mr. Hanauer get any money if
12:28:11 8 the company was sold in 1999?
12:28:13 9    MR. BURKE: Objection.
12:28:14 10 Foundation. Assumes facts not in evidence.
12:28:16 11    A. Did Ken Hanauer get any money?
12:28:31 12 You're referring to a merger of Provident and
12:28:37 13 they had -- gave us an agreement on the
12:28:41 14 employees, and Ken Hanauer was an employee,
12:28:45 15 that if they didn't get a job with Provident
12:28:49 16 they got some amount of cash.
12:28:52 17    Q. Right.
12:28:53 18    A. Yeah.
12:28:54 19    Q. And how much cash did Mr. Hanauer
12:28:56 20 get?
12:28:57 21    A. Gee, I don't know. I don't know.
12:28:59 22    Q. Was it $375,000?
12:29:03 23    MR. BURKE: Objection. Asked and
12:29:04 24 answered.
12:29:05 25    A. I do not know the amount that he

113

12:29:06 1  got.

12:29:06 2      Q.  Was it somehow related to his
12:29:08 3  salary?

12:29:09 4      A.  I think it was.

12:29:11 5      Q.  Was it two and a half years of his
12:29:13 6  salary?

12:29:17 7      A.  I don't know.  I don't remember
12:29:20 8  that.

12:29:22 9      Q.  Was it important in your mind to
12:29:26 10 include this information in the proxy
12:29:28 11 materials?

12:29:29 12     MR. BURKE:  What information?
12:29:30 13 Objection to form.  I don't understand what --
12:29:32 14 it's vague.

12:29:35 15     A.  No, I --

12:29:38 16     Q.  Why not?

12:29:40 17     A.  Well, that was -- that was part of
12:29:42 18 the agreement between Provident and the
12:29:43 19 employees.

12:29:47 20     Q.  Did all former OHSL employees have
12:29:50 21 some type of an agreement with Provident that
12:29:53 22 they would receive some amount of cash?

12:29:55 23     MR. BURKE:  Objection, foundation.
12:29:56 24 You may answer.

12:29:59 25     A.  It, it had to do with whether they

114

12:30:01 1  hired them or not and whether they were
12:30:03 2  separated.  I don't know the details, but there
12:30:05 3  was some arrangements for -- with all of the
12:30:08 4  employees, if they did not take the position or
12:30:12 5  something, that they got a separation amount.
12:30:16 6  To what extent, I do not remember, if I ever
12:30:19 7  knew.

12:30:18 8      Q.  Were you concerned about Oak Hills
12:30:20 9  employees --

12:30:21 10     A.  Absolutely.

12:30:22 11     Q.  -- in 1999?

12:30:23 12     A.  Absolutely.

12:30:24 13     Q.  And why were you concerned?

12:30:25 14     A.  Because they were good employees
12:30:26 15 and we wanted to make sure they were taken care
12:30:30 16 of.

12:30:30 17     Q.  Were you able to make sure that
12:30:31 18 the employees were taken care of?

12:30:33 19     A.  Yeah.  It was part of the
12:30:34 20 agreement.

12:30:35 21     Q.  What was the agreement with
12:30:37 22 respect to this particular part?

12:30:40 23     A.  I do not remember what the
12:30:42 24 employees' agreement was.

12:30:45 25     Q.  Well, was every former Oak Hills

115

12:30:49 1  employee taken care of, in your words?

12:30:52 2      A.  I cannot say that for sure, but I
12:30:53 3  think they were.

12:30:55 4      Q.  Okay.  And what's the basis for
12:31:00 5  that statement?

12:31:01 6      A.  Because I think I heard at one
12:31:03 7  time that they were going to do it, at one of
12:31:05 8  the meetings we had.

12:31:06 9      Q.  Going to do what?  I didn't mean
12:31:08 10 to interrupt you.

12:31:09 11     A.  To take care of.  The employees
12:31:10 12 were either going to get a separation -- I
12:31:14 13 don't know the details on it, but there was
12:31:17 14 something to --

12:31:19 15     Q.  Okay.

12:31:19 16     A.  -- to make sure the employees got,
12:31:22 17 got taken care, they weren't just put out on
12:31:26 18 the street.

12:31:27 19     Q.  And can you define "taken care of"
12:31:28 20 as you used it in your previous answer?

12:31:31 21     MR. BURKE:  Objection.  Asked and
12:31:32 22 answered.

12:31:32 23     A.  That they did have some income.

12:31:35 24     Q.  Are you finished?

12:31:36 25     A.  Yes.

116

12:31:37 1      Q.  For how long?

12:31:37 2      A.  I do not know.

12:31:40 3      Q.  Okay.

12:31:40 4      A.  I do not know.

12:31:41 5      Q.  Would it be fair to say that on or
12:31:43 6  about May 18th, 1999, the Board of Directors
12:31:47 7  was still split with you, Mr. Herron and Mr.
12:31:54 8  Hanauer being against continued negotiations to
12:31:57 9  find a buyer, and the other directors being in
12:32:00 10 favor of continued negotiations, except for Mr.
12:32:04 11 Brinker, whose position was unclear?

12:32:07 12     MR. BURKE:  Objection.  Asked and
12:32:08 13 answered.  Mischaracterizes the prior record,
12:32:10 14 and I believe -- there was one other.  I forget
12:32:13 15 it.  That should be enough for right now.
12:32:16 16 Calls for speculation.

12:32:33 17     Q.  Can you answer the question,
12:32:34 18 please?

12:32:35 19     A.  Oh, I'm sorry.  I didn't hear you
12:32:36 20 say it.

12:32:37 21     MR. BURKE:  I'm sorry.  Go ahead
12:32:39 22 and answer it if I don't tell you not to.

12:32:41 23     A.  Now I forgot what --

12:32:43 24     MR. BURKE:  If I don't tell you
12:32:43 25 not to answer, Howard, go ahead and answer.

117

12:32:46 1    Q.   Let me ask the question again.
12:32:48 2    A.   What was the question again?  I
12:32:49 3    forgot it.
12:32:49 4    Q.   May 18th, 1999.
12:32:51 5    A.   Yeah.
12:32:52 6    Q.   There's a special meeting of the
12:32:58 7    Board of Directors.  And my question is, was
12:32:58 8    the Board still split at that point?
12:33:00 9    A.   Well, the minutes are -- I don't
12:33:00 10   know whether they were or not, because it
12:33:03 11   doesn't show any vote taken and how it was
12:33:07 12   voted.  Usually it's always recorded and this
12:33:10 13   doesn't show it.  And I do not remember what
12:33:13 14   happened on May 18th.
12:33:15 15   Q.   Okay.  Let's go on to the next
12:33:16 16   exhibit, Zoellner 13.  Okay.  Mr. Zoellner,
12:33:32 17   have you seen Zoellner Deposition Exhibit 13
12:33:35 18   before?
12:33:35 19   A.   Yes.  The minutes show that I was
12:33:36 20   there, so I have seen it.
12:33:51 21   Q.   Okay.  What was the role of
12:33:52 22   McDonald Investments, Inc. with respect to this
12:33:55 23   proposed transaction?
12:33:56 24          MR. BURKE:  Objection.  Asked and
12:33:57 25   answered.

118

12:34:01 1    A.   They were guiding us through the
12:34:03 2    merger, if it would take place.  That's about
12:34:13 3    the extent of theirs.
12:34:15 4    Q.   Okay.  Now, on or about May 25th,
12:34:17 5    1999, there was no merger, correct?
12:34:19 6    A.   No, there was none at that time.
12:34:21 7    Q.   And McDonald Investments had
12:34:25 8    prepared some type of a book, correct?
12:34:27 9    A.   Yeah.  They were giving us some
12:34:29 10   kind of a -- always giving us information on
12:34:31 11   what would happen if this happened or what we
12:34:34 12   could do or couldn't do.  They were a kind of
12:34:39 13   information for the Board.
12:34:44 14   Q.   And did you review this
12:34:45 15   information?
12:34:46 16   A.   Yes, we did.
12:34:48 17   Q.   Did you review it?
12:34:50 18   A.   I think so.
12:34:51 19   Q.   And did you take this book home
12:34:52 20   with you?
12:34:56 21   A.   Gee, I don't remember.
12:34:57 22   Q.   Well, you received the book from
12:35:00 23   McDonald, correct?
12:35:02 24   A.   I think we -- yes, I think we --
12:35:04 25   Q.   And where is this book now?

119

12:35:05 1    A.   In shreds in the trash.
12:35:10 2    Q.   Okay.  Did you review the book
12:35:11 3    prepared by McDonald?
12:35:13 4    A.   At the time, yes, we discussed a
12:35:15 5    number of -- at one of the Board meetings.
12:35:20 6    Q.   Okay.  Was it the May 25th, 1999
12:35:23 7    special meeting?
12:35:24 8    A.   I do not know.  It doesn't say in
12:35:26 9    there and I can't remember what was discussed
12:35:29 10   on May the 25th.
12:35:32 11   Q.   Can I direct your attention to the
12:35:34 12   third paragraph?  The purpose of the meeting
12:35:36 13   was to have McDonald Investments, Inc. review
12:35:38 14   the evaluation book they prepared.
12:35:41 15   A.   Um-hmm, okay.
12:35:42 16   Q.   Does that refresh your
12:35:43 17   recollection?
12:35:43 18   A.   Yes.  So they did review it with
12:35:45 19   us, I think.
12:35:45 20   Q.   Okay.
12:35:47 21   A.   It shows it in the minutes.
12:35:49 22   Q.   Who reviewed this book with you?
12:35:51 23   A.   Charles Crowley, I guess they
12:35:53 24   pronounce it.
12:35:56 25   Q.   And did you form an opinion of Mr.

120

12:35:56 1    Crowley with respect to this review of the
12:36:00 2    book?
12:36:03 3          MR. BURKE:  Objection to form.
12:36:05 4    A.   I don't know why I wouldn't -- or
12:36:11 5    whether there's a reason to judge him, whether
12:36:14 6    he's good or bad.
12:36:15 7    Q.   Well, was Mr. Crowley in favor of
12:36:19 8    some type of a merger for Oak Hills?
12:36:22 9          MR. BURKE:  Objection, foundation.
12:36:23 10   A.   I feel like it was just giving us
12:36:25 11   information at that time.
12:36:26 12   Q.   Well, how was McDonald to be paid
12:36:29 13   with respect to this transaction?
12:36:31 14          MR. BURKE:  Objection.
12:36:31 15   A.   I can't tell that exactly.  Well,
12:36:35 16   I think it was some kind of commission deal,
12:36:38 17   percentage or something.  I don't know how it
12:36:41 18   was really, but he did get paid, but I don't
12:36:45 19   remember the details of it.
12:36:47 20   Q.   Would it be fair to say that
12:36:48 21   McDonald Investments got paid substantially
12:36:52 22   more if they sold the company?
12:36:54 23          MR. BURKE:  Objection.  Calls for
12:36:55 24   speculation.
12:36:55 25   A.   No, no, it wasn't.  They didn't

121

12:36:58 1    decide as far as whether we'd sell or not.
12:37:03 2        Q.   No.  Actually, Mr. Zoellner, my
12:37:06 3    question had to do with McDonald's
12:37:08 4    compensation.
12:37:09 5        A.   Yeah, I --
12:37:10 6        Q.   Do you have something to add?
12:37:12 7            MR. BURKE:  Listen to his
12:37:13 8    question.
12:37:13 9        A.   All right.
12:37:14 10        Q.   Did McDonald Investments get paid
12:37:16 11    substantially more if Oak Hills was sold?
12:37:19 12            MR. BURKE:  Objection.  Calls for
12:37:20 13    speculation.  You may answer.
12:37:22 14        A.   Well, anything they got paid would
12:37:24 15    be more, because I, I don't know whether there
12:37:29 16    was anything at this point -- whether they were
12:37:30 17    getting paid at all.  They were just giving us
12:37:33 18    information, so they would get paid more if
12:37:36 19    they did do all of the work of merging the two
12:37:39 20    companies.
12:37:41 21        Q.   And if the Board or the
12:37:44 22    shareholders decided not to merge, McDonald &
12:37:48 23    Company wouldn't do very well financially,
12:37:49 24    correct?
12:37:50 25            MR. BURKE:  Objection.  Calls for

122

12:37:52 1    speculation.  You may answer.
12:37:53 2        A.   I can't answer that, I don't know.
12:37:57 3        Q.   Didn't the Board engage in a
12:37:58 4    contract between OHSL and McDonald Investments?
12:38:07 5        A.   I don't remember.  I don't
12:38:09 6    remember.
12:38:10 7        Q.   Do you believe that McDonald
12:38:11 8    Investments had some type of an incentive to
12:38:14 9    sell the company?
12:38:15 10            MR. BURKE:  Objection to
12:38:19 11    relevance, vague, form.
12:38:23 12        A.   I have no way of saying yes or no,
12:38:26 13    but anybody that's in business wants to sell
12:38:28 14    something so they get paid something, but I
12:38:38 15    don't know what the agreement was with them,
12:38:41 16    with McDonald.
12:38:53 17        Q.   Please take a look at Zoellner
12:38:55 18    Deposition Exhibit 14.  This reflects the
12:39:15 19    regular meeting of OHSL Financial Corporation
12:39:19 20    on or about May 27th, 1999, correct?
12:39:23 21        A.   Right.
12:39:23 22        Q.   And you were present at this
12:39:24 23    meeting, correct?
12:39:29 24        A.   Yes.
12:39:29 25        Q.   And what was the feeling of the

123

12:39:29 1    Board with respect to continued merger
12:39:29 2    negotiations with some merger partner?
12:39:35 3            MR. BURKE:  At this date?
12:39:36 4        Q.   Yes.
12:39:37 5            MR. BURKE:  Objection to form,
12:39:39 6    calls for speculation.  You may answer.
12:40:34 7        A.   What was the question?
12:40:36 8        Q.   What was the feeling of the Board
12:40:38 9    with respect to a proposed merger on or about
12:40:40 10    May 27th, 1999?
12:40:46 11        A.   I was looking for that in here and
12:40:48 12    don't see, see anything in here.  I don't
12:40:50 13    recall what the -- I don't see it in here, so I
12:40:56 14    don't know what their feeling -- the Board's
12:40:59 15    feeling was.
12:41:00 16        Q.   Would it be fair -- well, what was
12:41:01 17    your feeling on or about May 27th?
12:41:03 18        A.   I can't tell that, either.  It
12:41:05 19    should show in here.
12:41:08 20        Q.   Okay.  On page two it says that
12:41:09 21    you made a motion --
12:41:12 22        A.   Seconded by Joe Tenoever.
12:41:14 23        Q.   Right.  With respect to the
12:41:14 24    payment of the company's 24th consecutive
12:41:17 25    quarterly cash dividends.  Do you remember

124

12:41:20 1    doing that?
12:41:21 2        A.   Yes.
12:41:21 3        Q.   And that was a good thing for Oak
12:41:22 4    Hills, correct?
12:41:23 5        A.   Yes.
12:41:23 6        Q.   And as of May 27th, 1999, Oak
12:41:26 7    Hills was doing well, correct?
12:41:28 8        A.   Yes.  In my opinion.
12:41:29 9        Q.   Right.  It was financially strong,
12:41:30 10    correct?
12:41:32 11        A.   In my opinion.
12:41:32 12        Q.   Now, were shareholders clamoring
12:41:34 13    for the company to be sold at this point?
12:41:37 14            MR. BURKE:  Objection to form.
12:41:37 15        A.   I don't know.
12:41:38 16        Q.   Did a shareholder ever come up to
12:41:40 17    you and say, hey, Mr. Zoellner, I'd like you to
12:41:44 18    sell the company?
12:41:45 19        A.   No.  I've never had them come up
12:41:47 20    to me and ask me.
12:41:48 21        Q.   And that's true for the entire
12:41:49 22    time Oak Hills was a public company, correct?
12:41:54 23            MR. BURKE:  Objection to form.
12:42:02 24        A.   I can't think of anybody that
12:42:05 25    wanted me to sell it.  If there was anybody --

125

12:42:08 1  if there was anybody, I don't remember.
12:42:13 2      Q.  And this is what, six weeks after
12:42:16 3  the annual meeting of shareholders on April the
12:42:20 4  15th of 1999? This is May 27th, 1999, correct?
12:42:25 5      A.  Yes.
12:42:26 6          MR. BURKE:  Objection.
12:42:26 7      Q.  And you didn't tell the
12:42:27 8  shareholders at the annual meeting that, hey,
12:42:29 9  the Board is seriously considering selling the
12:42:31 10  company, correct?
12:42:32 11          MR. BURKE:  Objection.
12:42:33 12  Mischaracterizes the record. You may answer.
12:42:37 13      A.  I don't know -- the timing of all
12:42:41 14  of this is difficult for me, whether it was
12:42:43 15  before or afterward.
12:42:45 16      Q.  Before or after what?
12:42:47 17      A.  The meeting that we --
12:42:52 18      Q.  Well, Mr. Zoellner, let me see if
12:42:54 19  I can help you. The annual meeting took place
12:42:58 20  on or about April 15th, 1999, correct?
12:43:00 21      A.  Yes.
12:43:01 22      Q.  So this meeting, May 27th, is
12:43:02 23  approximately six weeks after, correct?
12:43:04 24      A.  After, yes.
12:43:06 25      Q.  So my question is -- I think I'm

126

12:43:07 1  okay on the calendar. My question is, you
12:43:10 2  didn't tell the shareholders at the annual
12:43:12 3  meeting on April 15th, 1999, that the Board was
12:43:16 4  seriously considering selling the company,
12:43:18 5  correct?
12:43:20 6          MR. BURKE:  Objection.
12:43:20 7  Mischaracterizes the record. Mischaracterizes
12:43:24 8  the record as to when that decision was made.
12:43:27 9  We've just gone through the minutes.
12:43:32 10      A.  I don't know. We did talk about
12:43:34 11  when it was. Wasn't it in December or
12:43:37 12  something that la decision was made? These --
12:43:40 13  I don't know. We went through that, I thought,
12:43:44 14  on the minutes.
12:43:46 15      Q.  Mr. Zoellner?
12:43:48 16      A.  Yes.
12:43:48 17      Q.  Was the OHSL Board seriously
12:43:51 18  considering selling the company on or about
12:43:54 19  April 15th, 1999?
12:43:57 20          MR. BURKE:  Objection. The
12:43:59 21  documents speak for themselves. You may
12:44:00 22  answer.
12:44:01 23      A.  I do not know. I'd have to find
12:44:03 24  in the minutes where we did this or that.
12:44:07 25      Q.  Okay. Was the OHSL Board

127

12:44:09 1  seriously considering selling the company on or
12:44:11 2  about May 27th, 1999?
12:44:13 3      A.  I do not know.
12:44:15 4      Q.  Okay. When did the OHSL Board
12:44:17 5  seriously consider selling the company?
12:44:19 6      A.  I do not know. I'd have to get
12:44:20 7  the minutes. It should show it in the minutes.
12:44:23 8      Q.  What would you look for in the
12:44:24 9  minutes?
12:44:25 10      A.  When the motion was made that we
12:44:26 11  sell.
12:44:26 12      Q.  Didn't you seriously consider
12:44:30 13  selling before the motion that was made to
12:44:32 14  sell?
12:44:34 15      A.  I do not know of -- I -- me
12:44:36 16  personally or the -- all the directors? I do
12:44:40 17  not know.
12:44:46 18      Q.  Please take a look at Zoellner
12:44:50 19  Deposition Exhibit 15. Okay. Mr. Zoellner,
12:45:14 20  have you seen these minutes before?
12:45:17 21      A.  I wasn't there. My name isn't on
12:45:21 22  there.
12:45:21 23      Q.  That wasn't my question, Mr.
12:45:23 24  Zoellner.
12:45:23 25      A.  So I've, I -- I am not sure

128

12:45:27 1  whether I saw these or not. If they gave them
12:45:29 2  to me later, I would have.
12:45:31 3      Q.  Was it --
12:45:33 4      A.  But I don't know.
12:45:33 5      Q.  Was it the practice of the OHSL
12:45:35 6  Board to give the directors the minutes later?
12:45:38 7      A.  Yes. If you missed a meeting,
12:45:40 8  they would normally.
12:45:41 9      Q.  Okay. So do you have reason to
12:45:42 10  believe that you saw these June 1st, 1999
12:45:46 11  minutes?
12:45:47 12      A.  I would say so.
12:45:48 13      Q.  Okay. Why do you -- did you miss
12:45:51 14  this meeting?
12:45:54 15      A.  I don't know. I'd have to -- it
12:45:57 16  was maybe the four-way bypass I had on my heart
12:46:00 17  that I missed. That was sometime around that
12:46:07 18  time, so I don't know. Probably sickness of
12:46:07 19  some sort.
12:46:08 20      Q.  Okay. Were these minutes
12:46:09 21  discussed at the next meeting?
12:46:12 22      A.  I'd have to look at the next
12:46:15 23  meeting to see if I was there.
12:46:17 24      Q.  Okay. Do you see in the fourth
12:46:17 25  paragraph, the last sentence, it says motion

129

12:46:21 1 carried. Do you see that?
12:46:26 2      A.   One, two, three, four. Motion was
12:46:28 3 made by Joe Tenoever, seconded by McKiernan,
12:46:33 4 confidential memorandum to express interest --
12:46:49 5 what was the question again?
12:46:51 6      Q.   The last sentence in the fourth
12:46:52 7 paragraph says motion carried, correct?
12:46:55 8      A.   Motion carried.
12:46:56 9      Q.   And does that imply to you that
12:46:58 10 the motion was not unanimously approved?
12:47:00 11      MR. BURKE: Objection. Calls for
12:47:01 12 speculation. You may answer.
12:47:02 13      A.   Well, it shows that I wasn't there
12:47:04 14 so I couldn't have voted. So it wouldn't be
12:47:08 15 unanimous because I wasn't there.
12:47:10 16      Q.   Because if you're not at a
12:47:12 17 meeting, you can't vote, correct?
12:47:14 18      A.   That is true.
12:47:15 19      Q.   And a unanimous vote couldn't
12:47:17 20 possibly take place if all of the directors
12:47:20 21 were not present, correct?
12:47:22 22      MR. BURKE: Objection. Calls for
12:47:22 23 speculation. You may answer.
12:47:27 24      A.   That, that's right. If I wasn't
12:47:29 25 there, I couldn't vote.

130

12:47:32 1      MR. BRAUTIGAM: Could you answer
12:47:33 2 my question, please? Lee Ann will read it
12:47:36 3 back.
12:47:36 4      (Record read by Reporter.)
12:47:47 5      MR. BURKE: Objection. Calls for
12:47:48 6 speculation.
12:47:48 7      A.   That is true.
12:47:49 8      Q.   And a unanimous vote could not
12:47:50 9 take place if all of the directors --
12:47:53 10      A.   Were not present.
12:47:55 11      Q.   And if all of the directors who
12:47:56 12 were present didn't vote, correct?
12:47:59 13      MR. BURKE: Objection. Calls for
12:47:59 14 speculation.
12:48:04 15      Q.   Correct?
12:48:05 16      A.   If they're not there.
12:48:06 17      Q.   No. If they are there but they
12:48:07 18 don't vote, you can't say that it's a unanimous
12:48:10 19 vote, correct?
12:48:11 20      MR. BURKE: Objection. Calls for
12:48:12 21 speculation.
12:48:13 22      A.   Well, this -- this doesn't say
12:48:15 23 anything about if they voted -- all voted or
12:48:17 24 didn't vote, so I don't know.
12:48:21 25      Q.   We're not there yet, Mr. Zoellner.

131

12:48:23 1      A.   Okay.
12:48:24 2      Q.   My question is as a freestanding
12:48:25 3 question --
12:48:26 4      A.   Okay.
12:48:26 5      Q.   -- unrelated to these minutes.
12:48:28 6      A.   All right.
12:48:28 7      Q.   The way the OHSL Board functioned,
12:48:31 8 you have a unanimous vote, correct? And that
12:48:33 9 was -- I'm talking generally, I'm not talking
12:48:36 10 about any one specific vote. That means all of
12:48:38 11 the directors are present and they all vote one
12:48:40 12 way, they all vote in favor or they all vote
12:48:43 13 against. That's a unanimous vote, correct?
12:48:45 14      MR. BURKE: Objection. Objection
12:48:46 15 to form. Calls for speculation. Asked and
12:48:49 16 answered. You may answer again.
12:48:50 17      A.   Well, if you're talking about the
12:48:52 18 definition of "unanimous," if they're referring
12:48:55 19 to all of those present at the meeting, it
12:48:57 20 could be, but if they're referring to all
12:48:59 21 directors, then it wouldn't be. Do you follow
12:49:03 22 me?
12:49:05 23      Q.   Okay. So --
12:49:06 24      A.   If they were saying it was a
12:49:08 25 unanimous vote by all directors present, then

132

12:49:12 1 it would be.
12:49:13 2      Q.   Okay. But all of the officers
12:49:15 3 present -- excuse me, all of the directors
12:49:17 4 present --
12:49:17 5      A.   Directors present.
12:49:18 6      Q.   -- would have to vote, right?
12:49:19 7      A.   Yes.
12:49:20 8      Q.   You couldn't abstain, correct?
12:49:23 9      A.   That's right.
12:49:25 10      Q.   Okay, great. Now, you'd been on
12:49:26 11 the Board the entire time Oak Hills was a
12:49:28 12 public company, correct?
12:49:29 13      A.   That is true.
12:49:30 14      Q.   And you're familiar with the way
12:49:31 15 the minutes were written, correct?
12:49:34 16      A.   That's true.
12:49:35 17      Q.   And would it be fair to say that
12:49:36 18 you're able to interpret OHSL Board minutes
12:49:40 19 even if you didn't attend the meeting, correct?
12:49:43 20      MR. BURKE: Objection.
12:49:43 21      A.   Well, not all of them. There's a
12:49:45 22 couple of them here today that I had trouble
12:49:48 23 interpreting.
12:49:48 24      Q.   Okay. Well, let's --
12:49:53 25      A.   Don't remember what they were,

12:49:53 1  but --

12:49:54 2      Q.   Put these two exhibits side by

12:49:56 3  side.

12:49:56 4      A.   Okay.

12:49:57 5      Q.   This is Zoellner 14 and Zoellner

12:49:59 6  15.  Do you see MUC in Zoellner 14?

12:50:02 7      A.   Yes.

12:50:02 8      Q.   And that means motion unanimously

12:50:04 9  carried, correct?

12:50:05 10     MR. BURKE:  Objection.  Calls for

12:50:06 11 speculation.

12:50:07 12     A.   I guess it does.  At least the

12:50:09 13 letters show it.  I do not know.

12:50:12 14     Q.   Mr. Zoellner, are you saying that

12:50:14 15 you do not know how to interpret MUC in the

12:50:19 16 Board minutes of OHSL Financial Corporation?

12:50:23 17     MR. BURKE:  Objection.  Asked and

12:50:23 18 answered.  You may answer again.

12:51:06 19     A.   That is saying they all passed by

12:51:08 20 unanimous consent, right?

12:51:10 21     MR. BURKE:  No, no.  His question

12:51:11 22 is -- read the question back.

12:51:11 23     (Record read by Reporter.)

12:51:24 24     MR. BURKE:  Do you understand the

12:51:25 25 question?  Do you know what that means?

12:51:30 1      A.   Unanimous consent, right?

12:51:32 2      MR. BURKE:  No, no, you're not

12:51:33 3  asking him.  He's asking you if you know.

12:51:35 4      A.   Oh.  Well, yeah, I -- I should

12:51:51 5  know that.  Yes -- say yes.

12:51:53 6      Q.   Okay.  What does MUC mean?

12:51:57 7      MR. BURKE:  Objection.

12:51:58 8      A.   I guess maybe I don't know.

12:52:01 9  Unanimous consent.  I forget what the M stands

12:52:05 10 for.

12:52:06 11     Q.   Would it refresh your recollection

12:52:07 12 if I suggested to you that MUC stands for

12:52:11 13 motion unanimously carried?

12:52:13 14     A.   Yes.

12:52:13 15     MR. BURKE:  Objection.  Mr.

12:52:14 16 Zoellner, you do not have to accept the

12:52:16 17 characterizations that he suggests to you.  All

12:52:19 18 you have to testify to is what you know.  If

12:52:21 19 you know, you know, but you don't have to

12:52:27 20 accept his characterizations or suggestions.

12:52:27 21     A.   Okay.  I don't know.

12:52:27 22     Q.   Okay.  Would you agree that MUC,

12:52:29 23 whatever it stands for, is different from

12:52:30 24 motion carried?

12:52:31 25     MR. BURKE:  We'll stipulate to

12:52:32 1  that.

12:52:34 2      A.   Yes, they're different.

12:52:36 3      Q.   Okay.  Do you believe that when it

12:52:37 4  says MUC -- excuse me, motion carried in

12:52:42 5  Zoellner 15, that that implies that the motion

12:52:46 6  passed by a vote was not unanimous?

12:52:49 7      MR. BURKE:  Objection.  Calls for

12:52:50 8  speculation.  You may answer if you know.

12:52:57 9      A.   No, it doesn't necessarily mean

12:52:58 10 that it's unanimous.  Motion carried does not

12:53:02 11 mean that it's unanimous.

12:53:04 12     Q.   In fact, it specifically means

12:53:06 13 it's not unanimous, correct?

12:53:08 14     MR. BURKE:  Objection.  Calls for

12:53:10 15 speculation.  You may answer.

12:53:15 16     A.   That doesn't necessarily mean

12:53:16 17 either one.  It doesn't mean that it

12:53:19 18 unanimously carried or that the majority -- it

12:53:25 19 could be either one, just that it was carried.

12:53:30 20     Q.   Wasn't it the practice of OHSL

12:53:33 21 during the entire time it was a public company

12:53:35 22 to write MUC, or motion unanimously carried,

12:53:41 23 when something, in fact, was unanimously

12:53:43 24 approved?

12:53:44 25     MR. BURKE:  Objection.  Asked and

12:53:45 1  answered.  You may answer.

12:53:57 2      A.   Now that I'm recalling, I think

12:53:58 3  that Ken did use that quite often, that MUC.

12:54:01 4      Q.   And he only used it when it was

12:54:03 5  appropriate, correct?

12:54:04 6      MR. BURKE:  Objection.

12:54:04 7      A.   I don't know when he used it, why

12:54:06 8  he would use it or why he didn't use it.

12:54:08 9      Q.   Mr. Zoellner, are you testifying

12:54:09 10 that you do not know how to interpret OHSL

12:54:11 11 Board minutes?

12:54:12 12     MR. BURKE:  Objection.

12:54:14 13     A.   No, it -- no, no.

12:54:18 14     Q.   You do or do not know how to

12:54:20 15 interpret the Board minutes?

12:54:22 16     MR. BURKE:  Objection.  Asked and

12:54:23 17 answered.  Do you know what the question is?

12:54:45 18     THE WITNESS:  No.  I -- well, I --

12:54:47 19     MR. BURKE:  No, no, do you know

12:54:48 20 what the question is?

12:54:50 21     THE WITNESS:  Well, I think I know

12:54:51 22 what it is.

12:54:52 23     MR. BURKE:  Okay.  Let --

12:54:52 24 BY MR. BRAUTIGAM:

12:54:55 25     Q.   Mr. Zoellner, let me ask a new

137

12:54:57 1 question. Do you know or do you not know how
12:55:00 2 to interpret OHSL Board minutes?
12:55:02 3     MR. BURKE: Objection. Asked and
12:55:03 4 answered. You may answer.
12:55:04 5     Q. I just want some clarity on it.
12:55:06 6     A. Yes, I do.
12:55:07 7     Q. Okay. How do you interpret MUC?
12:55:10 8     MR. BURKE: Objection. Asked and
12:55:11 9 answered.
12:55:16 10     A. Motion unanimously carried is what
12:55:20 11 it --
12:55:21 12     Q. Okay. How do you interpret motion
12:55:23 13 carried?
12:55:24 14     MR. BURKE: Objection. Asked and
12:55:24 15 answered.
12:55:27 16     A. How would I interpret that? That
12:55:29 17 would be the majority voted for it.
12:55:32 18     Q. So it would not be a unanimous
12:55:34 19 motion?
12:55:35 20     A. I don't think it would be.
12:55:36 21     Q. Okay. Did you ever inquire as to
12:55:38 22 how this vote on June 1st, 1999 shook out, in
12:55:43 23 other words, which directors voted which way?
12:55:45 24     MR. BURKE: Objection.
12:55:46 25     A. No, I never did do that.

138

12:55:48 1     Q. Why not?
12:55:51 2     A. I had no reason to.
12:55:53 3     Q. You didn't think it was important
12:55:54 4 to learn how your fellow directors voted at a
12:55:58 5 meeting you missed?
12:56:04 6     MR. BURKE: Objection.
12:56:05 7 Argumentative. You may answer.
12:56:18 8     A. I don't know. I didn't contact
12:56:20 9 them and ask them how they voted, and this
12:56:23 10 is -- this is years later. I really don't
12:56:26 11 recall.
12:56:34 12     Q. Mr. Zoellner, my question was,
12:56:36 13 apparently you didn't think it was important to
12:56:38 14 contact your fellow directors and find out how
12:56:41 15 they voted; is that correct?
12:56:42 16     MR. BURKE: Objection.
12:56:42 17 Argumentative.
12:56:43 18     A. No, I do not know that at this
12:56:45 19 time. That's been so long ago, I don't know
12:56:48 20 what I thought back then.
12:56:49 21     Q. Okay. Why didn't you contact your
12:56:51 22 fellow directors?
12:56:52 23     A. I don't know. I might have. I
12:56:54 24 don't know whether I did or I didn't.
12:56:58 25     Q. Okay. On or about June 1st, 1999,

139

12:57:01 1 were you in favor of or against the
12:57:03 2 independence of Oak Hills?
12:57:04 3     MR. BURKE: Objection.
12:57:05 4 Repetitive, cumulative. Asked and answered.
12:57:07 5 You may answer.
12:57:08 6     A. I'd have to look at the minutes
12:57:09 7 where we approved it -- where I voted for it.
12:57:15 8 I do not know the date.
12:57:18 9     Q. Mr. Zoellner, would it be fair to
12:57:20 10 say then that you were against the sale of Oak
12:57:23 11 Hills --
12:57:23 12     A. No, it's all --
12:57:24 13     Q. Can I finish my question?
12:57:25 14     A. Oh, I'm sorry.
12:57:26 15     Q. You were against the sale of Oak
12:57:28 16 Hills at every point in 1999 until the point
12:57:30 17 where you voted in favor of the proposed merger
12:57:34 18 with Provident?
12:57:34 19     MR. BURKE: Objection.
12:57:35 20 Mischaracterizes his prior testimony.
12:57:38 21     Q. Is that fair?
12:57:38 22     MR. BURKE: Objection.
12:57:39 23 Mischaracterizes his prior testimony.
12:57:40 24     A. No.
12:57:42 25     Q. How does that mischaracterize your

140

12:57:43 1 prior testimony or your feelings?
12:57:45 2     A. I do not know when I changed.
12:57:46 3 That's another date that comes up that I do not
12:57:50 4 know, whether it was before this or after this.
12:57:52 5     MR. BURKE: And by "this" you're
12:57:53 6 referring to the minutes of June 1, 1999?
12:57:57 7     Q. Okay.
12:57:57 8     MR. MOORE: Exhibit 15.
12:57:58 9     Q. Okay. Please take a look at
12:57:59 10 Exhibit 16. Mr. Zoellner, is Deposition
12:58:51 11 Exhibit 16 the minutes of the regular meeting
12:58:55 12 of the Board of Directors of OHSL Financial
12:58:58 13 Corporation for June 24th, 1999?
12:59:02 14     MR. BURKE: Have you completed
12:59:02 15 your review of the document, Mr. Zoellner?
12:59:04 16     A. I haven't read the whole thing.
12:59:10 17     MR. BURKE: Okay. Feel free to
12:59:10 18 read it before you answer Mr. Brautigam's
12:59:10 19 question.
12:59:30 20     A. What was the question?
12:59:32 21     Q. Are these the minutes of the June
12:59:34 22 24th, 1999 regular meeting of OHSL Financial
12:59:38 23 Corporation?
12:59:39 24     MR. BURKE: Hang on for one
12:59:40 25 second. Your exhibit is incomplete. There are

---

**141**

12:59:42 1 two sides to it. You've only given him a
12:59:45 2 one-sided copy. For whatever reason I've got
12:59:48 3 both. Do you want to remark the exhibit?
13:00:44 4     MR. BRAUTIGAM: Okay.
13:00:44 5     MR. BURKE: Do you want to make
13:00:45 6 copies so we can share?
13:00:45 7     (Brief recess.)
13:09:05 8 BY MR. BRAUTIGAM:
13:09:05 9     Q. Okay. Mr. Zoellner, have you had
13:09:06 10 an opportunity to review Zoellner Deposition
13:09:09 11 Exhibit 16?
13:09:09 12     A. Yes.
13:09:10 13     Q. And this reflects the June 24th,
13:09:16 14 1999 regular meeting of the OHSL Board which
13:09:19 15 you attended, correct?
13:09:20 16     A. Yes.
13:09:21 17     Q. And does this refresh your
13:09:22 18 recollection with respect to what your position
13:09:23 19 was with respect to the continued independence
13:09:26 20 of OHSL?
13:09:30 21     A. No, I don't think it reflects
13:09:31 22 that.
13:09:34 23     Q. Okay. Could I direct your
13:09:35 24 attention to the second page of the document?
13:09:40 25 Are you familiar with the term called Project

**142**

13:09:43 1 Tree?
13:09:44 2     A. No. I -- I remember hearing it,
13:09:49 3 but I can't tell you what it is. I've
13:09:52 4 forgotten it.
13:09:53 5     Q. Okay. In what context did you
13:09:54 6 hear it?
13:09:55 7     A. I don't know.
13:09:59 8     Q. What had happened with respect to
13:10:02 9 the proposed sale of OHSL up to and including
13:10:06 10 June 24th, 1999?
13:10:11 11     MR. BURKE: Objection. Vague, one
13:10:12 12 of --
13:10:12 13     A. What things happened?
13:10:15 14     Q. Right.
13:10:16 15     MR. BURKE: I don't understand the
13:10:16 16 question. Objection.
13:10:17 17     A. To what?
13:10:19 18     Q. Okay. Was OHSL for sale by June
13:10:23 19 24th, 1999?
13:10:24 20     A. I do not know.
13:10:24 21     Q. Who would know?
13:10:25 22     A. Those dates I do not know. I'd
13:10:27 23 have to refer to the minutes to recall these.
13:10:30 24     Q. Okay. You have the June 24th,
13:10:31 25 1999 minutes in front of you, correct?

**143**

13:10:33 1     A. Yes.
13:10:34 2     Q. So was OHSL for sale as of that
13:10:37 3 date?
13:10:37 4     A. It doesn't say it anywhere that
13:10:39 5 day, I don't think, so it isn't.
13:10:43 6     Q. It was not for sale as of that
13:10:44 7 date?
13:10:45 8     MR. BURKE: Objection.
13:10:45 9 Mischaracterizes his testimony.
13:10:48 10     Q. Mr. Zoellner, did I
13:10:49 11 mischaracterize your testimony in any way?
13:10:57 12     A. I don't know.
13:10:59 13     Q. Okay. Mr. Zoellner, it's a simple
13:11:00 14 question. June 24th, 1999 -- are you with me?
13:11:04 15     A. I'm with you.
13:11:05 16     Q. There's a regular meeting of the
13:11:06 17 OHSL Board. Are you with me?
13:11:09 18     A. Yes.
13:11:10 19     Q. On or about this date, June 24th,
13:11:12 20 1999, was OHSL for sale?
13:11:16 21     A. I do not know. That doesn't say
13:11:19 22 there, so I do not know. The minutes do not
13:11:23 23 show that.
13:11:25 24     Q. Okay. What was your feeling on
13:11:28 25 June 24th, 1999? Did you believe that Oak

**144**

13:11:31 1 Hills would be best served by continuing
13:11:34 2 independence?
13:11:34 3     A. I, I cannot answer. I don't know.
13:11:37 4     Q. Okay. Did you speak at this
13:11:38 5 meeting?
13:11:39 6     A. Did I speak at this meeting?
13:11:40 7     Q. Yes.
13:11:42 8     A. I don't know why I would.
13:11:45 9     Q. Okay. Let's take a look at the
13:11:46 10 second page of the document, the first full
13:11:49 11 paragraph. The first sentence of that
13:11:52 12 paragraph is, "a discussion took place with
13:11:54 13 regards to Project Tree and the limited number
13:11:57 14 of interested parties McDonald Investments has
13:12:02 15 been able to attract to the process." Did I
13:12:04 16 read that correctly?
13:12:05 17     A. Yes.
13:12:05 18     Q. Now, you don't know what Project
13:12:07 19 Tree is, correct?
13:12:08 20     A. No.
13:12:08 21     Q. What does it mean when it says
13:12:10 22 "limited number of interested parties McDonald
13:12:12 23 Investments has been able to attract to the
13:12:14 24 process"?
13:12:23 25     A. I do not know.

145

13:12:25 1    Q.   Mr. Zoellner, respectfully, how
13:12:28 2 could you be a Board member and not know
13:12:29 3 what --
3:12:30 4    A.   I don't know.  I can't recall
13:12:31 5 this, this is so far remote.  It's been a long
13:12:38 6 time ago and I can't recall these things.
13:12:41 7    Q.   Are you able to interpret these
13:12:42 8 minutes today?
13:12:44 9         MR. BURKE:  Objection.  He doesn't
13:12:45 10 have to interpret the minutes, he has to answer
13:12:47 11 your questions.
13:12:50 12    A.   What was the question?
13:12:51 13    Q.   Are you able to interpret these
13:12:52 14 minutes today?
13:12:54 15    A.   To some extent, yes.
13:12:56 16    Q.   Okay.
13:12:56 17    A.   Offhand I don't remember what
13:12:57 18 Project Tree was.
13:12:59 19    Q.   Okay.  Are you able to interpret
13:13:01 20 what "limited number of interested parties
13:13:03 21 McDonald Investments has been able to attract
13:13:06 22 to the process" means?
13:13:13 23    A.   No, I don't know what that means.
13:13:16 24    Q.   Okay.  The next sentence is, "at
13:13:17 25 meeting time it appeared Fifth Third was not

146

13:13:20 1 going to respond to the invitation to
13:13:22 2 participate."  What does that mean?
13:13:27 3    A.   It appears Fifth Third was not
13:13:26 4 going to respond to the -- that means they
13:13:34 5 weren't going to make an offer.
13:13:36 6    Q.   Was that good or bad?
13:13:41 7    A.   I don't know.  It's all according
13:13:43 8 to what -- your thinking of it.
13:13:48 9    Q.   Well, what was your thinking as of
13:13:50 10 this time?
13:13:52 11    A.   Neither way.  Was just interested,
13:13:55 12 whether they made us an offer or not.
13:14:07 13    Q.   Mr. Zoellner, I'm not quite sure I
13:14:08 14 understand your answer.  What did you mean when
13:14:10 15 you said "neither way" in your previous answer?
13:14:13 16         MR. BURKE:  You asked him if it
13:14:16 17 was good or bad.  Objection, asked and
13:14:18 18 answered.
13:14:18 19    A.   Well, you had said is it bad or
13:14:20 20 good that Fifth Third did not answer or respond
13:14:27 21 to our invitation.  And it was -- it was
13:14:28 22 neither.
13:14:30 23    Q.   It was neither good nor bad?
13:14:31 24    A.   Good nor bad.
13:14:33 25    Q.   Okay.

147

13:14:33 1    A.   It was just information.
13:14:35 2    Q.   Okay.  Why did you perceive that
13:14:36 3 as being neither good nor bad?
13:14:48 4    A.   I don't think we had voted at this
13:14:51 5 point to, to sell or merge with anybody, so it
13:14:56 6 was just information we were gathering, the way
13:14:58 7 I would interpret this.
13:14:59 8    Q.   And what was the purpose of
13:15:00 9 gathering this information?
13:15:02 10    A.   To know whether we should be doing
13:15:05 11 something or not, whether it's good for the
13:15:07 12 stockholders or --
13:15:08 13    Q.   When you say "doing something or
13:15:10 14 not," what specifically are you referring to?
13:15:12 15    A.   To merge or to sell out.
13:15:20 16    Q.   Okay.  "McDonald representatives
13:15:21 17 were still hopeful they could persuade them to
13:15:25 18 bid."  Can you interpret that sentence for me?
13:15:28 19         MR. BURKE:  Objection to form.
13:15:29 20 Objection to relevance.  You may answer.  Calls
13:15:31 21 for speculation.  You may answer.
3:15:36 22    A.   What was that again?  I lost my
13:15:37 23 train of thought.
13:15:38 24    Q.   Can you interpret this sentence,
13:15:40 25 "McDonald representatives were still hopeful

148

13:15:43 1 they could persuade them to bid"?
13:15:47 2         MR. BURKE:  Same objection.  You
13:15:48 3 may answer.
13:15:48 4    A.   Well, they were hoping that maybe
13:15:50 5 they could get a bid out of them, that they
13:15:52 6 weren't going to give up on them.  That's how I
13:15:55 7 interpreted it.
13:15:56 8    Q.   Was it important to you that Fifth
13:15:58 9 Third submit a bid?
13:16:01 10         MR. BURKE:  Objection.  Asked and
13:16:01 11 answered.
13:16:01 12    A.   Well, if we want a comparison
13:16:04 13 we've got to get a bid, otherwise we don't have
13:16:06 14 a comparison.
13:16:07 15    Q.   Did you end up with more than one
13:16:08 16 bid?
13:16:09 17    A.   As it ended up, I think we only
13:16:11 18 ended up with one bid.
13:16:14 19    Q.   Was that a good time to sell the
13:16:16 20 company, when you had one bid?
13:16:18 21         MR. BURKE:  Objection.
13:16:21 22    A.   Well, it's a matter if -- it was
13:16:23 23 the way things would go, if you have one bid
13:16:33 24 that's going to be higher than all of the
13:16:35 25 others, then you -- then you had a good one.