## Page 225

```
14:42:54  1  document before?
14:42:56  2        A.  I was present, yes.
14:42:57  3        Q.  Okay.  On the second page, the
14:42:58  4  second paragraph talks about Mr. Brinker
14:43:01  5  informing the Board that Mr. Herron had
14:43:05  6  resigned, correct?
14:43:06  7        A.  He received a letter of
14:43:07  8  resignation, yeah.
14:43:09  9        Q.  But you already knew that,
14:43:11 10  correct?
14:43:12 11        A.  No, no.  There's dates again, I
14:43:18 12  don't know when he mailed, or when he called
14:43:20 13  me.
14:43:22 14        Q.  Okay.  I believe Mr. Herron
14:43:24 15  testified that he called you that night,
14:43:27 16  meaning the same day he gave the letter to Mr.
14:43:31 17  Brinker, which was July 27th, 1999.  Does that
14:43:37 18  refresh your recollection?
14:43:38 19        MR. BURKE:  Objection.  Calls for
14:43:39 20  speculation.  You may answer.  What page are we
14:43:48 21  referring to now?  I'm sorry.
14:43:50 22        MR. BRAUTIGAM:  Second page.
14:43:50 23        MR. BURKE:  Okay.
14:43:51 24        MR. BRAUTIGAM:  Second paragraph.
14:43:53 25        MR. BURKE:  Thank you.  Okay.
```

## Page 226

```
14:45:01  1  BY MR. BRAUTIGAM:
14:45:03  2        Q.  Okay.  Mr. Zoellner, the question
14:45:04  3  is: Does this refresh your recollection --
14:45:07  4        A.  Yes.
14:45:07  5        Q.  -- that you knew Mr. Herron had
14:45:08  6  already resigned?
14:45:10  7        MR. BURKE:  Does this refresh his
14:45:11  8  recollection of whether he knew the date of Mr.
14:45:15  9  Herron's --
14:45:16 10        MR. BRAUTIGAM:  Yes, plus my
14:45:18 11  comment that he testified that Mr. Herron
14:45:20 12  called Mr. Zoellner on July 27th.
14:45:23 13        MR. BURKE:  Mr. Zoellner didn't
14:45:26 14  testify to that.
14:45:26 15        MR. BRAUTIGAM:  Mr. Herron
14:45:27 16  testified to that.
14:45:34 17        MR. BURKE:  Objection to form.
14:45:34 18        A.  We're with dates again.  This is
14:45:34 19  the August 27th meeting and it states here that
14:45:41 20  Brinker received the resignation from Herron
14:45:46 21  effective July 30th.  These dates kill me.  I
14:45:58 22  don't know.
14:45:58 23        This is August 26th and he's
14:46:01 24  presented this at a Board meeting on the 26th
14:46:05 25  and it was effective as of July 30, so it was
```

## Page 227

```
14:46:08  1  almost a month retroactive?  I don't remember
14:46:12  2  that.
14:46:13  3        Q.  Okay.
14:46:13  4        A.  Or am I reading that wrong?
14:46:14  5        Q.  Okay.  Mr. Zoellner, let me ask a
14:46:16  6  different question.  Do you know what an 8-K
14:46:21  7  is?  8-K?
14:46:25  8        A.  It's eight strike-outs.
14:46:27  9        MR. BURKE:  Objection.  Calls for
14:46:28 10  speculation.
14:46:29 11        Q.  Aside from baseball, in the
14:46:31 12  business context, do you know what an 8-K is?
14:46:34 13        A.  I forget.
14:46:36 14        Q.  Did OHSL ever issue 8-Ks?
14:46:41 15        A.  8-Ks, I don't remember.
14:46:43 16        Q.  Okay.  Did the Board collectively
14:46:45 17  ever consider and reject the idea of filing an
14:46:48 18  8-K with respect to Mr. Herron's resignation?
14:46:51 19        MR. BURKE:  Objection, foundation.
14:46:53 20        A.  I'm not familiar with that at all.
14:46:54 21  Don't know anything about that.
14:46:57 22        Q.  Okay.  Was Mr. Herron's
14:46:59 23  resignation ever disclosed to the shareholders?
14:47:03 24        MR. BURKE:  Objection.
14:47:03 25        A.  I do not know that.
```

## Page 228

```
14:47:05  1        Q.  You don't know one way or the
14:47:06  2  other?
14:47:07  3        A.  I don't know one way or the
14:47:08  4  other --
14:47:09  5        Q.  Okay.
14:47:09  6        A.  -- because Ken would probably
14:47:12  7  be -- handle that.
14:47:16  8        Q.  As a Board member, do you think
14:47:19  9  that his resignation should be disclosed to the
14:47:22 10  shareholders?
14:47:24 11        MR. BURKE:  Objection.  Calls for
14:47:24 12  speculation.
14:47:26 13        A.  Not necessarily.
14:47:27 14        Q.  Why not?
14:47:34 15        A.  I don't know.
14:47:35 16        Q.  Have I convinced you that Mr.
14:47:36 17  Herron was resigning in part in protest?
14:47:39 18        MR. BURKE:  Objection.
14:47:41 19        A.  According to what --
14:47:43 20        MR. BURKE:  Objection.
14:47:44 21        Q.  Please let him finish his answer.
14:47:47 22        MR. BURKE:  Objection.  You can
14:47:47 23  not convince him.  That is an improper
14:47:50 24  question.
14:47:50 25        MR. BRAUTIGAM:  Fine.  If it's
```

229

14:47:51 1 improper, it won't come into evidence.
14:47:54 2         MR. BURKE: It is definitely
14:47:54 3 improper.
14:47:55 4         MR. BRAUTIGAM: Please continue
14:47:55 5 your answer.
14:47:56 6         MR. BURKE: Objection. Calls for
14:47:57 7 speculation. Improper in form. You may
14:47:59 8 answer.
14:48:00 9         THE WITNESS: What was the
14:48:00 10 question again?
14:48:00 11 BY MR. BRAUTIGAM:
14:48:02 12     Q.   Okay. Having read part of Mr.
14:48:04 13 Herron's testimony.
14:48:05 14     A.   Testimony.
14:48:06 15     Q.   Do you understand now that Mr.
14:48:08 16 Herron resigned in part in protest against the
14:48:11 17 Oak Hills and Provident merger?
14:48:13 18         MR. BURKE: Objection.
14:48:14 19 Mischaracterizes the record. Calls for
14:48:16 20 speculation. You may answer.
14:48:17 21     A.   From what you have told me here
14:48:21 22 today, I realize that, that it was in part.
14:48:23 23     Q.   Okay. Now, with this new
14:48:24 24 information in mind, do you think that it would
14:48:26 25 have been fair to say to the shareholders, hey,

230

14:48:32 1 when you consider this proposed merger, you
14:48:35 2 should know that one of your directors resigned
14:48:37 3 in part in protest after voting against
14:48:41 4 continued negotiations with Provident?
14:48:43 5         MR. BURKE: Objection.
14:48:43 6 Foundation. Based upon what he was told today,
14:48:46 7 he should go back two years? Objection to the
14:48:49 8 form, misleading question. You may answer if
14:48:51 9 you know.
14:48:52 10     A.   I don't know the answer to that.
14:48:55 11     Q.   Under what circumstances do you
14:48:57 12 think the resignation of a director should be
14:49:00 13 made public?
14:49:01 14         MR. BURKE: Objection. Calls for
14:49:02 15 a legal conclusion.
14:49:08 16     A.   Probably anything we would do, we
14:49:10 17 would check with our legal people first on the
14:49:13 18 proxy statement, whether this is all-inclusive
14:49:16 19 or not.
14:49:17 20     Q.   Was that done in this case?
14:49:19 21     A.   I don't know. I do not know.
14:49:21 22     Q.   Who would know?
14:49:22 23     A.   I don't know.
14:49:26 24     Q.   Okay. Let's take a look at
14:49:28 25 Zoellner Deposition Exhibit 21. Now, Mr.

231

14:50:00 1 Zoellner, putting aside that document for a
14:50:02 2 minute -- you can keep it in front of you.
14:50:05 3     A.   Okay.
14:50:05 4     Q.   You voted as a director to approve
14:50:07 5 the merger with Provident, correct?
14:50:09 6     A.   Yes.
14:50:09 7     Q.   Okay. Please explain in basic
14:50:11 8 terms how the merger was to work.
14:50:17 9         MR. BURKE: Objection.
14:50:35 10     A.   I don't think I can answer that
14:50:36 11 off the top of my head and be, and be accurate
14:50:39 12 about it, because I really don't know. I can't
14:50:41 13 answer that question.
14:50:42 14     Q.   Can you tell me even one component
14:50:44 15 of the merger?
14:50:47 16         MR. BURKE: Sitting here today?
14:50:48 17     Q.   Yes.
14:50:48 18         MR. BURKE: Without the benefit of
14:50:49 19 any documents? Okay.
14:50:53 20     A.   What was the question again?
14:50:55 21     Q.   Can you think of even one
14:50:57 22 component of the merger that you voted as a
14:50:59 23 director to approve?
14:51:02 24     A.   One reason that made me vote?
14:51:06 25     Q.   One component of how the

232

14:51:07 1 transaction worked.
14:51:09 2     A.   How the transaction worked. On
14:51:17 3 a -- how much per share they were going to pay
14:51:22 4 for the merger, how much you'd get returned.
14:51:26 5 That was one component of the -- what -- what
14:51:35 6 was discussed at the meeting.
14:51:37 7     Q.   Can you think of any other
14:51:41 8 components of the merger?
14:51:43 9     A.   Of the merger? Well, one of them
14:51:47 10 was -- we just read in here about taking care
14:51:51 11 of the employees and management as far as the
14:51:52 12 salary and that. I think that was in one of
14:51:55 13 these minutes.
14:51:58 14     Q.   Are you talking about the change
14:51:59 15 in control contracts that were limited to
14:52:01 16 senior management?
14:52:04 17     A.   Not -- give me that again.
14:52:14 18     Q.   Were you talking about, in your
14:52:15 19 previous answer, the change of control
14:52:18 20 contracts, sometimes known as golden parachute
14:52:25 21 contracts, that were limited to senior
14:52:25 22 management?
14:52:30 23     A.   No, I'm not. No.
14:52:33 24     Q.   Okay. Mr. Zoellner, have you seen
14:52:36 25 these September 24th, 1999 minutes of the OHSL

233

1  Financial Corporation before?
2      A.  I just looked at them here and I
3  was there, so I probably saw them.
4      Q.  Okay.  Are you familiar with the
5  phrase ten-day two-day average?
6      A.  Ten-day two-day average, no, I'm
7  not.
8      Q.  Okay.  Do you think that that
9  phrase was somehow important to this merger
10 transaction?
11     MR. BURKE:  Objection.  Calls for
12 speculation.
13     A.  I don't know.
14     Q.  Okay.  Please take a look at
15 Zoellner Deposition Exhibit 22.
16         (Brief recess.)
17     Q.  Okay.  Mr. Zoellner, I have handed
18 you what has been marked as Zoellner Deposition
19 Exhibit 22 and I ask you to take a look at it.
20 Have you seen that document before?
21     A.  My name is on there, so I have.
22     Q.  Now, this reflects the October
23 22nd, 1999 regular meeting of the Board of
24 Directors of OHSL Financial, correct?
25     A.  Yes.

234

1      Q.  And this was on a Friday, correct?
2      A.  I don't know.  Does it say it?
3      Q.  Well, actually the Board
4  meeting -- excuse me.  The special meeting of
5  shareholders to approve the transaction was
6  October 25th of 1999, and I believe that was a
7  Monday.  Does that ring a bell?
8      MR. BURKE:  Objection.
9      A.  Those dates I don't know.  I don't
10 remember any of those dates.
11     Q.  Okay.  Do you remember anything
12 about the actual shareholder vote?
13     A.  Anything about it?
14     Q.  Yes.
15     A.  No, I wasn't involved in it.  I
16 didn't count them or do a --
17     Q.  Well, the Board received periodic
18 reports in some fashion, correct?
19     A.  Of, of the vote?
20     Q.  Yes.
21     A.  No, there wasn't any periodic
22 report.
23     Q.  So --
24     A.  There was only one vote at the
25 special -- when we sent out the proxies and

235

1  everybody voted.
2      Q.  Okay.
3      A.  At the annual meeting there was --
4  there was just one vote.  And they announced it
5  there that it passed.
6      Q.  But Mr. Zoellner, not everyone
7  voted at the same time, correct?
8      A.  Well, they -- they either sent in
9  proxy votes -- now, the way I remember it is
10 they either sent in proxy votes or they came to
11 the meeting and voted.
12     Q.  Okay.
13     A.  And then they counted the ballots
14 at the meeting and we gave the results right at
15 the meeting.
16     Q.  Okay.  What's a proxy vote?
17     A.  What's a proxy vote?  Somebody
18 voting that can't be there.
19     Q.  Okay.  And what happened in this
20 case if the person didn't return the proxy
21 card?
22     A.  Then it didn't get voted.  It
23 didn't have a vote.
24     Q.  Didn't have a vote at all?
25     A.  No.  If he didn't return the proxy

236

1  or show up and vote in person.
2      Q.  Are you sure about that?
3      A.  I don't know of any other way for
4  them to vote, either proxy or in person.
5      Q.  Okay.  And is it your testimony
6  that the Board of Directors never received a
7  report on how the voting was going, up to and
8  including the special meeting of October 25th,
9  1999?
10     A.  How the voting was going?  Do you
11 mean as far as compiling and counting proxy
12 votes?
13     Q.  Yes.
14     A.  That's the only thing that they
15 would have ahead of time.
16     Q.  Yes.  And did the Board ever
17 receive --
18     A.  I don't remember ever getting a
19 report.
20     Q.  Was that important to you?
21     MR. BURKE:  That he didn't get
22 one?
23     A.  No, no.
24     Q.  That you got one or -- withdrawn.
25 Was it important to you as a director to know

## 237

```
15:04:10  1   how the vote was going?
15:04:12  2        A.  Not ahead of time as in the
15:04:16  3   mailed-in proxies.
15:04:22  4        Q.  Okay.  Did you vote your personal
15:04:23  5   shares?
15:04:23  6        A.  Yes.
15:04:24  7        Q.  How did you vote your personal
15:04:25  8   shares?
15:04:25  9        A.  I voted when I got there at the
15:04:27 10   meeting.
15:04:28 11        Q.  And how did you vote?
15:04:30 12        A.  I voted for it.
15:04:33 13        Q.  Okay.  Did you ever tell anyone
15:04:35 14   that you might vote against it?
15:04:40 15        A.  No.
15:04:41 16        Q.  Did you ever give anyone any
15:04:43 17   reason to believe that you might vote
15:04:46 18   against --
15:04:47 19        MR. BURKE:  Calls for speculation.
15:04:48 20        Q.  -- the transaction with respect to
15:04:49 21   your personal shares?
15:04:54 22        A.  Oh, probably before, before I
15:04:58 23   changed my mind and decided to vote for it.  I,
15:05:03 24   I could have said, well, I -- said if it's like
15:05:09 25   this, then I would vote against it.  But then
```

## 238

```
15:05:13  1   when it was worked out the way that we thought
15:05:15  2   it was right and I thought it was right, then I
15:05:17  3   changed my vote to a vote for it.
15:05:19  4        Q.  And can you provide any details
15:05:21  5   with respect to the way it was worked out as
15:05:23  6   being right that you just --
15:05:25  7        A.  No, no, I can't.
15:05:25  8        Q.  Not even one?
15:05:26  9        A.  No.
15:05:28 10        Q.  Okay.  Please take a look at the
15:05:29 11   Hanauer testimony, whatever --
15:05:32 12        A.  This is it here, isn't it?
15:05:35 13        Q.  No, it's not.
15:05:37 14        A.  Oh, that's Herron.
15:05:38 15        Q.  Please just take a look at page
15:05:40 16   352.
15:05:44 17        MR. BURKE:  Objection.  Continuing
15:05:44 18   objection to questioning this witness on an 800
15:05:50 19   page document never seen before, based upon
15:05:53 20   testimony he's never heard before.  What was it
15:06:00 21   again?  I lost the page.
15:06:00 22        Q.  Page 352.
15:06:00 23        MR. BURKE:  Thank you.  Okay.
15:06:15 24        Q.  Okay.  Do you see line five, Mr.
15:06:16 25   Zoellner?
```

## 239

```
15:06:18  1        A.  Number five?
15:06:19  2        Q.  Page 352, line five.
15:06:22  3        MR. BURKE:  Why don't you read the
15:06:23  4   page just so you can put it in context?
15:06:26  5        Q.  And Mr. Zoellner, let me just tell
15:06:28  6   you what this is again.  This is the deposition
15:06:30  7   testimony of Ken Hanauer that was taken in the
15:06:33  8   state court action which was previous to the
15:06:35  9   Thiemann action, okay?  And he was sitting in
15:06:38 10   this room, I think in this chair, and I was
15:06:41 11   asking him questions.  So when -- have that in
15:06:44 12   mind as you review the document.
15:06:46 13        And on line five, I ask the
15:06:48 14   question, Question:  Do you believe that any
15:06:51 15   other OHSL directors voted against the
15:06:54 16   transaction as shareholders?
15:06:56 17        And then Ken answers.  Answer:  I
15:06:59 18   believe that is possible, yes, sir.
15:07:01 19        Question:  Whom do you believe it
15:07:04 20   was possible with?
15:07:06 21        Answer:  Howard Zoellner I believe
15:07:09 22   could have voted against the transaction.
15:07:12 23        A.  Um-hmm.
15:07:13 24        Q.  Question:  And what is that
15:07:14 25   opinion based on?
```

## 240

```
15:07:15  1        Answer:  Again, casual
15:07:17  2   conversations that we had during and after
15:07:20  3   Board meetings and his feeling that he wanted
15:07:22  4   the company to remain independent as well.
15:07:26  5        Do you see that?
15:07:26  6        A.  Yes.
15:07:27  7        Q.  And you -- did you have
15:07:28  8   conversations like that with Mr. Hanauer before
15:07:31  9   and after Board meetings?
15:07:34 10        MR. BURKE:  Objection to form.
15:07:35 11        A.  Well, this goes back now.  This
15:07:37 12   goes way back before we had any idea of merging
15:07:40 13   with anybody, when we were talking about it.
15:07:43 14   We'd been talking about this for two or three
15:07:45 15   years on a merger or a buy-out or, or that we
15:07:51 16   -- and we investigated these things as they
15:07:54 17   come up.  And we voted for them or against,
15:07:57 18   that we should continue on or not.  And a lot
15:08:00 19   of times I was on Ken's side, if you want to
15:08:03 20   call it that.  And other times I was against
15:08:06 21   what Ken was doing.
15:08:08 22        Q.  But you were never against Ken
15:08:10 23   until July 22nd, 1999, correct?
15:08:14 24        MR. BURKE:  Objection.  Misstates
15:08:15 25   prior testimony.
```

241

```
15:08:16  1        A.  No, because these were other
15:08:17  2   things that we were voting on, too.
15:08:19  3        Q.  No, I meant with respect to the
15:08:20  4   proposed sale of OHSL.
15:08:23  5        MR. BURKE:  Objection.  Asked and
15:08:23  6   answered.
15:08:24  7        A.  No.  That isn't true.  When we
15:08:26  8   decided to sell, I objected.  I didn't want to.
15:08:33  9   No, that's not true.
15:08:36 10        Q.  Okay.  When --
15:08:37 11        A.  When we got to getting to the
15:08:38 12   agreement, I already had made up my mind that's
15:08:41 13   the way to go.
15:08:42 14        Q.  When did the Board decide to sell?
15:08:45 15        A.  When did they decide to sell?
15:08:47 16   Gee, that was in the minutes there and I'd have
15:08:49 17   to go back and look.
15:08:51 18        Q.  What did it say specifically in
15:08:53 19   the minutes?
15:08:54 20        MR. BURKE:  Objection.  I mean the
15:08:55 21   documents speak for themselves.  You've gone
15:08:57 22   over them minute by minute.  To ask him to
15:09:01 23   recall what one says is improper.  You may
15:09:03 24   answer.
15:09:04 25        A.  It's in the minutes and I'd have
```

242

```
15:09:06  1   to find it in the minutes.
15:09:08  2        Q.  Okay.  Do you remember a specific
15:09:08  3   phrase or something that you could clue me in
15:09:11  4   to?
15:09:11  5        A.  No.
15:09:12  6        Q.  But you remember that there's
15:09:13  7   something in the minutes that says that the
15:09:14  8   company was for sale?  Is that your testimony?
15:09:18  9        MR. BURKE:  Objection.  No, that's
15:09:19 10   not what the question was.
15:09:20 11        A.  No, you were talking about my
15:09:21 12   voting against it with Ken Hanauer.  I thought
15:09:25 13   I was answering this question here.
15:09:26 14        Q.  I think we're a little confused
15:09:28 15   here.  Okay.  Does the number 3660 mean
15:09:34 16   anything to you with respect to this
15:09:36 17   transaction?
15:09:37 18        A.  3660?
15:09:38 19        MR. BURKE:  Objection to the form.
15:09:39 20        A.  No, it doesn't mean anything to
15:09:41 21   me.
15:09:42 22        Q.  Does the number 40 mean anything
15:09:44 23   to you with respect to this transaction?
15:09:46 24        MR. BURKE:  Objection to form.
15:09:47 25        A.  No, doesn't mean anything.
```

243

```
15:09:59  1        Q.  Please take a look at Zoellner
15:10:02  2   Deposition Exhibit 23.
15:10:09  3        MR. BURKE:  Again we have an
15:10:12  4   incomplete document.
15:10:17  5        MR. BRAUTIGAM:  Okay.  I'll fix
15:10:18  6   that in one second.
15:10:18  7        (Discussion off the record.)
15:11:20  8   BY MR. BRAUTIGAM:
15:11:25  9        Q.  Mr. Zoellner, before the special
15:11:27 10   meeting, the week of October 18th through
15:11:30 11   October 25th, did you ever hear that Mr. Hucke
15:11:34 12   had taking any unusual action with respect to
15:11:37 13   the voting?
15:11:42 14        MR. BURKE:  Objection to
15:11:42 15   relevance.
15:11:43 16        A.  Any unusual action in September
15:11:47 17   with the voting?
15:11:48 18        Q.  No, from October 18th to October
15:11:51 19   25th of 1999.
15:11:55 20        A.  I do not know of any unusual
15:11:58 21   action by Al Hucke.
15:12:01 22        Q.  Okay.  Would that answer be true
15:12:03 23   if I opened it up -- did you ever hear of Mr.
15:12:07 24   Hucke taken any unusual action with respect to
15:12:09 25   the voting?
```

244

```
15:12:10  1        MR. BURKE:  Objection to form.
15:12:12  2        A.  No.
15:12:17  3        Q.  Okay.  Is it your testimony that
15:12:18  4   you were not following the voting at all prior
15:12:21  5   to October 25th, and when you showed up at the
15:12:24  6   meeting you just figured they'd tell you what
15:12:27  7   happened?  Is that right?
15:12:29  8        MR. BURKE:  Objection.  Asked and
15:12:29  9   answered.
15:12:30 10        A.  No.  I said that the proxies were
15:12:31 11   mailed in and this is what you just gave me.  I
15:12:34 12   glanced down and saw where the proxies were
15:12:37 13   brought along, the others.  Ken Hanauer asked
15:12:40 14   that the other proxies be given to the
15:12:46 15   secretary and then the votes were done there.
15:12:47 16        Q.  How many shares did you vote?
15:12:50 17        A.  Oh, probably 3500, 3400.
15:12:53 18        Q.  And why did you wait to vote at
15:12:56 19   the special meeting?
15:12:57 20        A.  Because I knew I was going to be
15:12:59 21   there.  I'd vote there rather than send the
15:13:02 22   proxy in.  If I wasn't going to attend the
15:13:08 23   meeting, then I would have mailed it in.
15:13:11 24        Q.  Do you remember anything at all
15:13:12 25   about the October 25th, 1999 special
```

245

1 stockholder meeting?
2     A.  I do not.  I'd have to read it.  I
3 don't know of anything special.
4     Q.  No, no, I'm not asking you to read
5 it.  I'm asking you as you sit here today, do
6 you recall anything about the meeting?
7     A.  Not that I can think of, no.
8     Q.  It says here in the third
9 paragraph that the president, meaning Mr.
10 Hanauer, introduced the directors.  Do you see
11 that --
12     A.  Yes --
13     Q.  -- in the third paragraph?  And do
14 you recall anything being said one way or the
15 other about Mr. Herron?
16     A.  I don't remember anything.  If he
17 did or if he didn't, I don't remember that.
18     Q.  Okay.  Do you think that he should
19 have said something to the effect that Mr.
20 Herron was no longer a director?
21     MR. BURKE:  Objection.  Calls for
22 speculation.
23     A.  That would be my opinion.  And
24 under those circumstances and everything, I
25 don't think it was necessary.  That's just an

246

1 opinion.
2     Q.  Your opinion is what, that he
3 should have or should not have?
4     A.  It wasn't necessary for him to
5 make any mention, but I -- now that I'm talking
6 about it, he might have said it.  Ken Hanauer
7 might have mentioned it.  I don't know.
8     Q.  Were there any questions about Mr.
9 Herron's resignation?
10    A.  No.  Not that I know of.
11    Q.  Okay.  The very last paragraph on
12 page one says "President Hanauer read from a
13 script prepared by counsel, outlining a few of
14 the highlights of the transaction."  Do you see
15 that?
16    A.  Yes.
17    Q.  Do you remember anything about
18 that reading?
19    A.  No, I don't.
20    MR. BRAUTIGAM:  Evidently,
21 counsel, I have not received that.  We can't
22 close the deposition until we get it.  I wrote
23 Mr. Hust a letter and hopefully you guys will
24 get back to me.
25    Q.  Flipping over the page, it talks

247

1 about a question and answer session.  Do you
2 remember anything about those questions and
3 answers?
4     A.  I do not remember anything.
5     Q.  Okay.  Let's take a look at what's
6 been marked as Herron Deposition Exhibit 2.
7 Okay.  Do you see some handwriting on this
8 document?
9     A.  Yes.
10    Q.  Let me represent to you that that
11 looks like -- that is Ken Hanauer's
12 handwriting.  Does that look familiar to you?
13    MR. BURKE:  Objection.
14    A.  No, I don't know.  I don't know
15 his handwriting.
16    Q.  Okay.  Were you aware that Mr.
17 Hanauer had serious reservations with respect
18 to the accuracy of the proxy materials?
19    MR. BURKE:  Objection.
20 Mischaracterizes the record, assumes facts not
21 in evidence.  That's an incorrect statement,
22 counsel.  Object to the form.  You can answer.
23    A.  I don't know anything about that.
24    Q.  Were you aware that Mr. Hanauer
25 directed that his signature be removed from the

248

1 document?
2     MR. BURKE:  Objection.
3 Mischaracterizes the record.
4     A.  No, I didn't know anything about
5 that.
6     Q.  If that's true, would that bother
7 you in any way?
8     MR. BURKE:  Objection.  You don't
9 have to assume that, Mr. Zoellner.
10    A.  I don't know.  I'd hate to make a
11 judgment on that now when it is irrelevant, not
12 to make a judgment on whether he should have
13 done something or he shouldn't have.  I can't
14 say that.  I can't answer it, I don't know.
15    Q.  Mr. Zoellner, you used the word
16 "irrelevant" in your previous answer.  Why did
17 you choose that word?
18    A.  I don't know.  I couldn't think of
19 any other one.
20    Q.  Okay.  You understand that at
21 least some of the things that we're talking
22 about today might be very relevant for a jury
23 that decides --
24    MR. BURKE:  Objection,
25 argumentative.

249

```
15:17:19  1        Q.  -- your culpability and that of
15:17:21  2    Mr. Hanauer and that of the other defendants?
15:17:25  3            MR. BURKE:  Objection.
15:17:26  4        Q.  Do you understand that?
15:17:27  5            MR. BURKE:  Objection.
15:17:27  6        A.  Yeah.
15:17:31  7        Q.  Okay.  Let's take a look at the
15:17:32  8    first page of this document.  Having been
15:17:40  9    through this discussion with me today, do you
15:17:44 10    believe that the sentence, "Your Board of
15:17:47 11    Directors unanimously approved the acquisition
15:17:50 12    and believes that it is in the best interest of
15:17:52 13    OHSL shareholders," is accurate?
15:17:56 14            MR. BURKE:  Objection.  Asked and
15:17:57 15    answered numerous times.
15:18:02 16        A.  Do I answer?
15:18:03 17            MR. BURKE:  Yes.  Yes.
15:18:04 18        A.  We've discussed that two or three
15:18:06 19    times and it's all according to unanimous, the
15:18:18 20    definition of it again.  One's all the
15:18:23 21    directors present at the time or that -- answer
15:18:28 22    me that question again, I might have got off a
15:18:31 23    little bit on that.
15:18:32 24        Q.  Okay.  Let me ask a slightly
15:18:34 25    different question.  That sentence has two
```

250

```
15:18:38  1    components, would you agree with that?  "Your
15:18:40  2    Board of Directors unanimously approved the
15:18:42  3    acquisition," stop.  And then the second
15:18:44  4    component, "and believes that it is in the best
15:18:47  5    interest of OHSL stockholders."  Do you see
15:18:49  6    that?  Do you agree that there are two
15:18:52  7    components?
15:18:52  8            MR. BURKE:  Objection.  The
15:19:00  9    document speaks for itself.
15:19:00 10        A.  I'd -- I don't know what you're
15:19:00 11    referring to.
15:19:00 12        Q.  Well, I'm referring to this
15:19:02 13    sentence right here, "Your Board of Directors
15:19:04 14    unanimously approved the acquisition and
15:19:06 15    believes that it is in the best interest of
15:19:08 16    OHSL stockholders."
15:19:11 17        A.  Yes.
15:19:12 18        Q.  Does that sentence have two
15:19:14 19    components?
15:19:15 20            MR. BURKE:  Objection to form,
15:19:16 21    relevance.  Document speaks for itself.  You
15:19:20 22    may answer.
15:19:22 23        A.  I, I agree that it's the same
15:19:26 24    thing, that the document tells you what it is
15:19:28 25    here, and that's all I have to go by.
```

251

```
15:19:32  1        Q.  My question is completely
15:19:33  2    different.  It actually goes to sentence
15:19:35  3    construction and English.
15:19:37  4        A.  English?
15:19:39  5        Q.  Right.
15:19:39  6        A.  I always got a D in that.
15:19:41  7        Q.  Well, what can I tell you?  Do you
15:19:46  8    agree that that sentence has two components?
15:19:49  9            MR. BURKE:  Objection to relevance
15:19:49 10    and the form.  Argumentative.  You can answer.
15:20:03 11        Q.  Mr. Zoellner?
15:20:05 12        A.  Yeah.  Well, we're back again to
15:20:07 13    the unanimous.
15:20:08 14        Q.  No, no, we're not on unanimous.
15:20:10 15        A.  Okay.
15:20:10 16        Q.  We're on two components to the
15:20:12 17    sentence.
15:20:13 18        A.  Two components is -- well, one of
15:20:17 19    them is talking about unanimous and the other
15:20:19 20    one is talking about believes it is in the best
15:20:22 21    interest of OHSL.  There are two different
15:20:26 22    thoughts there.
15:20:26 23        Q.  Right.  That's exactly my point.
15:20:28 24    And both thoughts reference unanimity by the
15:20:33 25    OHSL Board of Directors, correct?
```

252

```
15:20:35  1            MR. BURKE:  Objection.  Calls for
15:20:36  2    speculation.  You may answer.
15:20:47  3        A.  Now I lost my place.  We are --
15:20:50  4            MR. BURKE:  Right there.
15:20:54  5        A.  What was the question again?
15:20:57  6        Q.  Both components of that sentence
15:20:59  7    refer to unanimity, correct?
15:21:02  8            MR. BURKE:  Objection.  The
15:21:02  9    document speaks for itself.  You can answer.
15:21:05 10        A.  Well, I think it approved the
15:21:07 11    acquisition and believes that it is in the best
15:21:09 12    interest -- well, it could.  It's a matter of
15:21:12 13    interpretation again.
15:21:13 14        Q.  Well, actually there's no other
15:21:15 15    fair reading; isn't that correct?
15:21:17 16            MR. BURKE:  Objection.
15:21:18 17        A.  Okay.
15:21:20 18            MR. BURKE:  Okay.  Wait a
15:21:21 19    minute -- now, wait a minute.  That's improper
15:21:23 20    for you to instruct this witness and Mr.
15:21:26 21    Zoellner to say okay, based on a directive from
15:21:29 22    you.
15:21:30 23            MR. BRAUTIGAM:  Jim, I didn't
15:21:31 24    instruct him.
15:21:31 25            MR. BURKE:  Yes, you did, Michael.
```

### 253

```
15:21:33  1  That's improper. This gentleman basically
15:21:35  2  agreed with you. He was not answering a
15:21:37  3  question. You mandated a statement that was
15:21:39  4  not a question at all and he was saying okay.
15:21:42  5          MR. BRAUTIGAM: Jim, we really
15:21:43  6  don't need your speaking objections. The
15:21:46  7  record is fine and --
15:21:47  8          MR. BURKE: That's improper
15:21:48  9  testimony. That's an improper question.
15:21:50 10  That's fine.
15:21:52 11          MR. BRAUTIGAM: Jim, you don't
15:21:53 12  need to make speaking objections. We're going
15:21:55 13  along swimmingly.
15:21:57 14          MR. BURKE: Move to strike. Mr.
15:21:57 15  Zoellner --
15:21:59 16          MR. BRAUTIGAM: Jim, it's my turn.
15:22:01 17          MR. BURKE: Mr. Zoellner, tell me
15:22:02 18  what -- were you just agreeing with Mr.
15:22:05 19  Brautigam in that last question and answer?
15:22:08 20          MR. BRAUTIGAM: Objection.
15:22:09 21          THE WITNESS: Yes, and it's --
15:22:13 22  yes, I disagreed with it.
15:22:13 23  BY MR. BRAUTIGAM:
15:22:17 24     Q.  Mr. Zoellner, are you done with
15:22:19 25  your answer?
```

### 254

```
15:22:19  1     A.  Yes.
15:22:20  2     Q.  Didn't you just say a minute ago
15:22:21  3  you agreed with it, now you're disagreeing with
15:22:24  4  it?
15:22:25  5     A.  Well, we're getting confused here.
15:22:28  6  Too many different -- maybe we ought to start
15:22:30  7  over.
15:22:31  8          MR. BURKE: That's fair.
15:22:32  9     Q.  Let me do something else, Mr.
15:22:33 10  Zoellner. Please take a look at Zoellner
15:22:35 11  Deposition Exhibit 2, this is the testimony of
15:22:37 12  Ken Hanauer, and let me direct your attention
15:22:40 13  to page 29. Do you see that, sir?
15:22:45 14          MR. BURKE: Continuing objection
15:22:45 15  to making this witness answer questions on
15:22:48 16  testimony he's not read in its entirety and
15:22:51 17  taken out of context. Page 29?
15:22:55 18     A.  Oh, it's already there. Where did
15:22:57 19  I get the 28? Oh, I was going by eight down
15:23:01 20  here.
15:23:01 21     Q.  Now, Mr. Zoellner let me just key
15:23:03 22  you in on this. This is testimony given by Ken
15:23:05 23  Hanauer in the previous state court action,
15:23:08 24  okay?
15:23:09 25          MR. BURKE: This is a question and
```

### 255

```
15:23:10  1  answer previously read about which you
15:23:12  2  interrogated already today; am I correct?
15:23:15  3          MR. BRAUTIGAM: No, this is
15:23:16  4  completely different.
15:23:17  5          MR. BURKE: Okay.
15:23:19  6          MR. BRAUTIGAM: Feel free to
15:23:20  7  fantasize at any time as to --
15:23:22  8          MR. BURKE: I don't fantasize, Mr.
15:23:23  9  Brautigam. That's an unnecessary comment, but
15:23:26 10  that's okay.
15:23:26 11          MR. BRAUTIGAM: Jim, your comments
15:23:28 12  are unnecessary, too. Okay.
15:23:30 13          MR. BURKE: Okay.
15:23:30 14          MR. BRAUTIGAM: If you would pay
15:23:31 15  attention and you would listen to the
15:23:32 16  questions, you would realize that we are doing
15:23:34 17  just fine without your --
15:23:36 18          MR. BURKE: People who are
15:23:37 19  admitted to the Ohio Bar don't take depositions
15:23:41 20  like that. I think if you're going to be a
15:23:43 21  member pro hac vice of this bar, you ought to
15:23:46 22  conduct yourself in a way that is consistent
15:23:49 23  with practice in this region.
15:23:49 24  BY MR. BRAUTIGAM:
15:23:51 25     Q.  Mr. Zoellner, are you keyed into
```

### 256

```
15:23:53  1  this now? This is Mr. Hanauer's testimony in a
15:23:56  2  previous action, okay?
15:23:58  3     A.  Okay.
15:23:58  4     Q.  And when it says question, that's
15:23:59  5  me asking Mr. Hanauer a question. And when it
15:24:07  6  says answer, that's Mr. Hanauer answering. Do
15:24:07  7  you see that?
15:24:07  8     A.  Yes.
15:24:07  9     Q.  Okay. And on page 29 and line
15:24:10 10  two, I ask: Question: On or about September
15:24:14 11  24th, 1999, when this transaction was being
15:24:17 12  proposed to the shareholders, your testimony is
15:24:20 13  you did not believe that it was in the best
15:24:23 14  interest of Oak Hills' shareholders, correct?
15:24:27 15          Answer: That's correct.
15:24:29 16          Question: And I'm asking you --
15:24:31 17  well, was your opinion that you did not believe
15:24:33 18  this transaction was in the best interest of
15:24:36 19  Oak Hills shareholders, disclosed in this
15:24:38 20  document?
15:24:39 21          And Mr. Hanauer answers: No, sir,
15:24:43 22  I don't believe it was.
15:24:45 23          Now --
15:24:47 24          MR. BURKE: I would ask him to
15:24:48 25  continue to read so he can put in this context,
```

### Page 257

15:24:51  1    Mr. Brautigam.
15:24:55  2        Q.   Okay.  Question:  Was it disclosed
15:24:58  3    anywhere?
15:24:58  4             Answer:  It was disclosed -- well,
15:25:01  5    the term disclosed is a misnomer, I guess.  It
15:25:05  6    was recorded in the corporate minutes of the
15:25:07  7    organization.
15:25:08  8             Question:  Well, let's limit the
15:25:10  9    question to disclosed to the public
15:25:12 10    shareholders.
15:25:13 11             Answer:  No, sir, I don't believe
15:25:17 12    it was.
15:25:18 13             MR. BURKE:  Please continue.
15:25:19 14             MR. BRAUTIGAM:  No, no, I'm done.
15:25:21 15             MR. BURKE:  Then I'd like to have
15:25:22 16    my witness continue --
15:25:23 17             MR. BRAUTIGAM:  Jim, wait a
15:25:24 18    minute.
15:25:24 19             MR. BURKE:  Wait a minute, Mr.
15:25:25 20    Brautigam.
15:25:25 21             MR. BRAUTIGAM:  You can ask him
15:25:26 22    whatever you want.
15:25:27 23             MR. BURKE:  This witness is being
15:25:28 24    asked to read from a deposition he's never seen
15:25:30 25    before.  You're giving him an excerpt out of

### Page 258

15:25:33  1    context and I want him to continue to read the
15:25:36  2    next page and a half so he can put it in
15:25:38  3    context.  You don't have to read it into the
15:25:41  4    record, but I'm going to ask him to take the
15:25:44  5    opportunity to do that.
15:25:45  6             MR. BRAUTIGAM:  Jim, I said at the
15:25:46  7    beginning that he can take as much time as he
15:25:47  8    needs with any document.  It's a standing
15:25:49  9    instruction.
15:25:50 10             MR. BURKE:  All right.  Keep
15:27:23 11    going.
15:27:24 12             THE WITNESS:  This is a lot for me
15:27:25 13    to remember.
15:27:26 14             MR. BURKE:  I understand.  I just
15:27:27 15    want you to be able to put it in context.
15:27:59 16             THE WITNESS:  Do you just want
15:27:59 17    halfway down?
15:28:01 18             MR. BURKE:  Just read it to right
15:28:02 19    here and then we'll stop there.  That's enough.
15:28:58 20             THE WITNESS:  Oh, okay.
15:29:00 21    BY MR. BRAUTIGAM:
15:29:18 22        Q.   Mr. Zoellner, do you now
15:29:19 23    understand that Mr. Hanauer never believed that
15:29:22 24    this merger was in the best interest of OHSL
15:29:26 25    stockholders?

### Page 259

15:29:27  1             MR. BURKE:  Objection.
15:29:28  2             MR. MOORE:  Objection.
15:29:30  3             MR. BURKE:  Mischaracterizes the
15:29:30  4    record.  Mischaracterizes the transcript we're
15:29:32  5    looking at.
15:29:32  6        A.   This is what he's saying, but I
15:29:35  7    don't know whether that's true or not.
15:29:37  8        Q.   Okay.  This is Mr. Hanauer's
15:29:38  9    testimony under oath.  Do you understand that?
15:29:40 10        A.   Yeah.
15:29:41 11        Q.   Do you think that Mr. Hanauer is a
15:29:42 12    liar?
15:29:44 13             MR. BURKE:  Objection.
15:29:45 14        A.   No, no.
15:29:46 15        Q.   Do you have reason to believe that
15:29:47 16    Mr. Hanauer would testify falsely under oath?
15:29:51 17             MR. BURKE:  Objection.  Relevance,
15:29:52 18    argumentative.
15:29:53 19        A.   No.  I don't think he would.
15:29:54 20        Q.   So you think that his testimony is
15:29:56 21    true?
15:29:57 22        A.   That is correct, yes.
15:29:59 23        Q.   Okay.  Accepting that for a
15:30:00 24    moment, do you believe that the sentence we're
15:30:02 25    talking about is, therefore, inaccurate?

### Page 260

15:30:06  1             MR. BURKE:  Objection.
15:30:06  2             MR. MOORE:  Objection.
15:30:07  3             MR. BURKE:  Calls for speculation.
15:30:08  4        A.   Which sentence?
15:30:09  5        Q.   "Your Board of Directors
15:30:09  6    unanimously approved the acquisition and
15:30:12  7    believes that it is in the best interest of
15:30:14  8    OHSL stockholders."
15:30:17  9             MR. BURKE:  Objection.
15:30:17 10    Mischaracterizes the record.
15:30:21 11        A.   That wasn't on here, was it?
15:30:27 12        Q.   Here, it's right here.  This is
15:30:29 13    the proxy material.
15:30:30 14        A.   That's what we're talking about,
15:30:31 15    not this one here?
15:30:32 16        Q.   Correct, correct.
15:30:33 17        A.   Okay.
15:30:35 18        Q.   Let's get this then.  Mr.
15:30:44 19    Zoellner, would it be helpful to you if I
15:30:47 20    highlighted that sentence in yellow?
15:30:49 21        A.   I've got it now.  I've got my
15:30:50 22    finger on it.
15:30:51 23        Q.   Okay.
15:30:52 24        A.   Well, I did have it.  That right
15:30:54 25    there, unanimously.  This is his testimony?

261

```
15:30:58  1        Q.   No, that's the proxy material.
15:31:00  2        A.   Oh, that's the proxy material.
15:31:07  3        Q.   And my question is --
15:31:09  4        A.   And this one says that it's
15:31:10  5   unanimous and this says that he didn't, right?
15:31:13  6        Q.   Yes.
15:31:14  7             MR. BURKE: Objection.
15:31:14  8        Q.   That's my point.
15:31:15  9             MR. BURKE: Mischaracterizes the
15:31:16 10   document.
15:31:19 11        Q.   Can you reconcile those two
15:31:22 12   concepts for me, please?
15:31:23 13             MR. BURKE: Objection. Calls for
15:31:24 14   speculation. You may answer.
15:31:25 15        A.   No, I can't. I can't.
15:31:30 16        Q.   Do you think, knowing what you
15:31:31 17   know now, that Mr. Hanauer's belief as a Board
15:31:35 18   member and as the CEO of OHSL, that his belief
15:31:42 19   that he did not believe it was in the best
15:31:44 20   interest of OHSL stockholders should have been
15:31:47 21   disclosed to the shareholders?
15:31:49 22             MR. BURKE: Objection.
15:31:49 23   Mischaracterizes the record. Calls for a legal
15:31:52 24   conclusion. You may answer.
15:31:55 25        A.   Well, I don't think he ever came
```

262

```
15:31:58  1   out and said that he was completely against it,
15:32:02  2   so there wouldn't be any reason to disclose it.
15:32:07  3        Q.   Did you ever ask him?
15:32:09  4        A.   No.
15:32:11  5        Q.   You said "completely against it."
15:32:12  6   Did he come out and tell --
15:32:14  7        A.   Well, I mean when they're saying
15:32:16  8   here that -- I'm sorry, go ahead.
15:32:22  9        Q.   You used the phrase "completely
15:32:29 10   against it" in your previous answer.
15:32:29 11        A.   Um-hmm.
15:32:29 12        Q.   Did Mr. Hanauer ever lead you to
15:32:30 13   believe that he was partially against it or
15:32:32 14   almost completely against it or something like
15:32:34 15   that?
15:32:35 16             MR. BURKE: Objection to form.
15:32:36 17   What's "it"?
15:32:37 18        Q.   As he used it in the previous
15:32:39 19   answer.
15:32:40 20             MR. BURKE: Objection to form.
15:32:52 21        A.   He has at one time or another, was
15:32:56 22   against it the same as Tom Herron and myself,
15:32:59 23   where -- which we talked about earlier. So
15:33:04 24   it's all according to what time this was
15:33:10 25   referring to, when he said he wasn't in favor
```

263

```
15:33:14  1   of it at all, where he was earlier, he was
15:33:21  2   against it.
15:33:22  3        Q.   Mister --
15:33:24  4             MR. BURKE: Please let the witness
15:33:25  5   finish.
15:33:26  6        Q.   I thought he was finished, Jim.
15:33:28  7        A.   I'm sorry.
15:33:30  8             MR. BURKE: No, he's not.
15:33:32  9        Q.   Mr. Zoellner, are you finished
15:33:34 10   with your answer?
15:33:35 11             MR. BURKE: You interrupted him
15:33:36 12   again. Please finish your answer.
15:33:38 13        Q.   Mr. Zoellner, let me just state
15:33:40 14   generally that I don't mean to interrupt you.
15:33:42 15   And if you can indicate in some way if you want
15:33:44 16   to continue speaking, please do it. I don't
15:33:46 17   want to interrupt you, I'm just having trouble
15:33:50 18   picking up when you're stopping and when you're
15:33:52 19   continuing. I don't mean any respect and I
15:33:54 20   don't mean to interrupt you.
15:33:56 21             MR. BURKE: Let's start again.
15:33:57 22   Can we pick up the answer?
15:33:59 23             MR. BRAUTIGAM: Okay. Can you
15:33:59 24   read the question and answer back, please?
15:33:59 25             (Record read by Reporter.)
```

264

```
15:34:49  1        Q.   Okay. You referenced Mr. Hanauer
15:34:53  2   being against it along with you and Mr.
15:34:56  3   Zoellner in your previous answer. Do you
15:34:58  4   remember that?
15:35:00  5        A.   Mr. Hanauer -- Herron?
15:35:05  6        Q.   Right.
15:35:05  7        A.   You said you and Mister --
15:35:07  8             MR. BURKE: Zoellner.
15:35:08  9        A.   Zoellner. You meant Herron,
15:35:10 10   didn't you?
15:35:12 11        Q.   Okay. I guess I meant Mr. Herron.
15:35:13 12        A.   Yeah. Well, I --
15:35:16 13             MR. BURKE: Objection to form.
15:35:17 14   You may answer.
15:35:19 15        A.   Well, it shows in the minutes that
15:35:21 16   the three of us were against it at one time or
15:35:23 17   another until it worked out where it was the
15:35:26 18   best for the stockholders, then our minds
15:35:29 19   changed.
15:35:32 20        Q.   Okay. Mr. Herron's mind didn't
15:35:33 21   change, correct?
15:35:35 22        A.   I didn't know whether it did or
15:35:36 23   didn't until I read -- and I've heard of his
15:35:41 24   resignation and also that he was against it.
15:35:45 25   That was part of his resignation, which I
```

## 265

```
15:35:49  1   didn't know was that strong as I've learned
15:35:51  2   today -- that he was against it that strong.
15:35:58  3       Q.  Okay.  And with respect to Mr.
15:35:59  4   Hanauer, his mind didn't change, either, did
15:36:02  5   it?
15:36:03  6            MR. BURKE:  Objection.
15:36:04  7   Mischaracterizes the record and the documents.
15:36:06  8       A.  Yeah.  He was in favor of it at
15:36:07  9   one time or another and he was against it
15:36:10 10   another time.
15:36:11 11       Q.  Okay.  When was Mr. Hanauer in
15:36:13 12   favor of --
15:36:14 13       A.  I do not know the dates.
15:36:17 14       Q.  Okay.  Let's take a look at
15:36:19 15   Zoellner Deposition Exhibit 2.  And if you
15:36:22 16   could turn to page 764.
15:36:26 17            MR. BURKE:  Continuing objection
15:36:26 18   to cross-examining a witness with a deposition
15:36:30 19   that he has never read and is being taken out
15:36:34 20   of context.  Page 764?
15:36:36 21            MR. BRAUTIGAM:  Yes.  It's the
15:37:00 22   fourth session, if that helps.
15:37:03 23            MR. BURKE:  Okay.
15:37:10 24       Q.  If I would direct your attention
15:37:11 25   to line six.  Okay.  Mr. Zoellner, if I can
```

## 266

```
15:37:15  1   just focus you on this, this is the deposition
15:37:19  2   testimony of Ken Hanauer in the previous state
15:37:22  3   court action.  I'm asking the questions and
15:37:24  4   he's giving the answers.  And let me just go
15:37:27  5   through one of these questions.
15:37:29  6            Question:  Okay.  Why did you
15:37:31  7   change your vote from abstaining on July 22nd,
15:37:35  8   to in favor of on August 2nd, 1999?
15:37:40  9            Answer by Ken Hanauer:  We had, we
15:37:43 10   had discussed the ramifications of dissenting
15:37:46 11   votes when we came to publication.  And for the
15:37:48 12   benefit of the -- it was the opinion of certain
15:37:51 13   individuals that if you had a dissenting vote,
15:37:54 14   that could carry some distinct ramifications
15:37:56 15   that might, in fact, cause difficulties down
15:37:59 16   the road in the transaction.  So, so in
15:38:01 17   essence, I just gave up.  I felt as the last
15:38:06 18   ditch effort on July 22nd, I would, I would
15:38:08 19   vote -- or I would abstain from the vote.  And
15:38:10 20   by August 2nd, I just gave in and I voted for
15:38:14 21   the transaction.
15:38:15 22            Okay.  Did you know that that was
15:38:19 23   Mr. Hanauer's true feelings on or about August
15:38:21 24   2nd, 1999?
15:38:23 25            MR. BURKE:  Objection to the
```

## 267

```
15:38:23  1   characterization.
15:38:24  2       A.  Not to his --
15:38:25  3            MR. BURKE:  Objection to the
15:38:26  4   characterization of his true feelings.  And you
15:38:28  5   don't have to accept his characterization of
15:38:30  6   what he is saying.  You may answer, Mr.
15:38:32  7   Zoellner.
15:38:34  8       A.  I forgot what I was going to say.
15:38:38  9            MR. BURKE:  Would you read the
15:38:39 10   question back?  Mr. Zoellner, there are 800
15:38:41 11   pages of testimony here.  There's a lot of
15:38:43 12   things he's not showing you and that's all --
15:38:45 13   you do not have to accept his characterization
15:38:48 14   of what Mr. Hanauer said.  So with that you can
15:38:51 15   answer the question back.
15:38:51 16            (Record read by Reporter.)
15:39:14 17       A.  The true feelings that he was
15:39:16 18   against the merger?
15:39:17 19       Q.  That he just gave up.
15:39:19 20       A.  That he gave up.  No, I didn't
15:39:25 21   know that.
15:39:25 22       Q.  Did you ever ask him?
15:39:25 23            MR. BURKE:  Ask him?
15:39:25 24       A.  Whether he gave up or not, no.
15:39:27 25       Q.  Why not?
```

## 268

```
15:39:28  1       A.  Why would I?
15:39:29  2       Q.  Well, because --
15:39:31  3       A.  I mean, I didn't know he changed
15:39:32  4   his vote really until you told me today.
15:39:36  5       Q.  You didn't know he changed his
15:39:37  6   vote?
15:39:38  7       A.  No.  If I did, I forgot it.  I
15:39:42  8   don't remember.
15:39:44  9       Q.  Okay.  Mr. Zoellner, do you
15:39:45 10   remember any Board meetings where the
15:39:46 11   ramifications of dissenting votes were
15:39:50 12   discussed?
15:40:02 13       A.  I can't recall when it was, but I,
15:40:05 14   I -- we just had the minutes here that the
15:40:09 15   three of us that voted against it earlier in
15:40:13 16   this stage of the negotiations.  But then I had
15:40:18 17   changed and thought it was better to go the
15:40:22 18   other way and I changed my vote.  And I didn't
15:40:24 19   know what Ken did or -- and I didn't know until
15:40:27 20   we got the letter, I guess it was a letter, I'm
15:40:31 21   confused now, that Herron had -- that part of
15:40:36 22   that was the reason he quit.  The reason I had
15:40:39 23   in my mind was business reasons for being in
15:40:44 24   South America that he may have to move down
15:40:46 25   there and he wouldn't be able to make it.
```

Page 269

```
15:40:49  1        Q.   Mr. Zoellner --
15:40:50  2             MR. BURKE: Mr. Zoellner, let me
15:40:52  3   also represent to you that if someone has led
15:40:55  4   you to believe what Mr. Herron's letter says in
15:40:58  5   terms of reasons, his letter is here and you do
15:41:01  6   not have to accept any characterizations
15:41:04  7   anywhere as to what the letter says. The
15:41:06  8   letter says what it says. And that is
15:41:08  9   exhibit -- Herron Exhibit 3, so you don't have
15:41:10 10   to get confused.
15:41:12 11        A.   Okay.
15:41:25 12        Q.   Mr. Zoellner, it was no secret
15:41:26 13   that Mr. Herron was against the transaction,
15:41:29 14   correct?
15:41:30 15             MR. BURKE: Objection. Asked and
15:41:32 16   answered. This is just beating a dead horse.
15:41:33 17   We've gone over this 15 times.
15:41:40 18        A.   At this stage know that he was
15:41:45 19   against it, I believe it --
15:41:46 20        Q.   At what stage?
15:41:48 21        A.   Today you told me that he was
15:41:50 22   completely against it. I didn't know it was
15:41:58 23   the main reason for him quitting.
15:42:06 24        Q.   Okay.
15:42:07 25             MR. BURKE: Mr. Zoellner, are you
```

Page 270

```
15:42:08  1   tired?
15:42:08  2        A.   Yeah, I'm ready to go home.
15:42:10  3             MR. BURKE: Yeah, I figured.
15:42:21  4        Q.   With respect to Mr. Hanauer's
15:42:22  5   deposition, you heard me read the words in
15:42:26  6   effect that Mr. Hanauer just gave up, correct?
15:42:29  7        A.   I heard you say that, yes.
15:42:31  8        Q.   Do you think it's fair that the
15:42:32  9   shareholders were not informed of that?
15:42:35 10             MR. BURKE: Objection.
15:42:39 11        A.   I don't know. I can't make that
15:42:41 12   decision.
15:42:43 13        Q.   What factors would you need to
15:42:45 14   come to some kind of a conclusion with respect
15:42:47 15   to that issue?
15:42:48 16             MR. BURKE: Objection. Calls for
15:42:49 17   speculation.
15:42:49 18        A.   I, I don't know. I don't know.
15:42:51 19   I -- I can't answer that.
15:43:00 20        Q.   Okay. I was asking you some
15:43:01 21   questions about dissenting votes. If -- is it
15:43:05 22   your understanding that if someone had voted
15:43:08 23   affirmatively against the transaction at the
15:43:12 24   August 2nd, 1999 vote on the merger, that that
15:43:17 25   would have to be disclosed to the shareholders
```

Page 271

```
15:43:19  1   in some fashion?
15:43:21  2             MR. BURKE: Read that back. That
15:43:22  3   made no sense.
15:43:22  4             (Record read by Reporter.)
15:43:42  5             MR. BURKE: I misunderstood. No
15:43:43  6   objection. You may answer if you know.
15:43:49  7        A.   I don't know why it would have to
15:43:51  8   be disclosed. All it -- it was either passed
15:43:59  9   or didn't pass, so there would be votes for and
15:44:02 10   votes against it. And I don't know whether we
15:44:07 11   had to send out a special mailing on it. I
15:44:10 12   don't believe it --
15:44:15 13        Q.   Did I say anything about a special
15:44:17 14   mailing in that question, Mr. Zoellner?
15:44:18 15        A.   No.
15:44:20 16        Q.   Okay.
15:44:20 17        A.   I did.
15:44:21 18        Q.   Again, let's put Defendant's
15:44:29 19   Exhibit 1 in front of you. You did disclose
15:44:32 20   that the vote to approve the transaction was
15:44:34 21   unanimous, correct?
15:44:35 22             MR. BURKE: Objection. Asked and
15:44:36 23   answered.
15:44:39 24        A.   Whatever it says in the records.
15:44:44 25   I don't recall now.
```

Page 272

```
15:44:54  1        Q.   Okay. Do you remember any
15:44:57  2   discussions during Board meetings about
15:45:02  3   dissenting votes?
15:45:06  4             MR. BURKE: Objection. Asked and
15:45:07  5   answered.
15:45:09  6        A.   I don't think there was any
15:45:10  7   discussion about dissenting votes or just --
15:45:18  8   whether it was for or against and what was the
15:45:22  9   results.
15:45:23 10        Q.   Okay. If you could just look at
15:45:24 11   page 764 again briefly.
15:45:28 12             MR. BURKE: Continuing objection.
15:45:30 13        Q.   Do you see lines nine through
15:45:33 14   twelve? Again, this is Ken Hanauer speaking:
15:45:36 15   We had discussed the ramifications of
15:45:39 16   dissenting votes when we came to publication.
15:45:41 17   Do you see that?
15:45:43 18             MR. BURKE: Where are we? Okay.
15:45:44 19        Q.   Line twelve.
15:45:55 20        A.   I do not remember any of that.
15:46:02 21        Q.   Okay. Defendant's Exhibit 1 --
15:46:03 22   let me ask a different question. How did
15:46:06 23   Defendant's Exhibit 1, the proxy materials,
15:46:09 24   come into existence? Did you write it, did Ken
15:46:12 25   Hanauer write it, did someone else write it?
```

## 273

1   MR. BURKE: Objection. Asked and
2 answered. He's already talked about this at
3 length.
4   A.  How did the dissenting votes?
5   Q.  No, no, how did Defendant's
6 Exhibit 1 come into being?
7   A.  I don't understand. How did --
8 give me that again.
9   Q.  Okay.
10   A.  I'm not --
11   Q.  You had the proxy materials,
12 correct, in this case? You're not following
13 me, okay. When the OHSL Board decided to merge
14 with Provident --
15   A.  Yes.
16   Q.  -- you had to have shareholder
17 approval, correct?
18   A.  Yes, that's what it -- the special
19 meeting.
20   Q.  All right. But before the special
21 meeting the shareholders had to be informed in
22 some fashion that this is what the Board
23 decided, correct?
24   A.  I do not know how that was
25 handled. Ken handled that again.

## 274

1   Q.  Okay. Were the proxy materials
2 created to inform the shareholders as to the
3 terms of the merger?
4   MR. BURKE: Objection. Asked and
5 answered. Calls for a legal conclusion. You
6 may answer.
7   MR. BRAUTIGAM: Okay. Withdrawn.
8 Were proxy materials created?
9   MR. BURKE: Of course they were,
10 counsel.
11   MR. BRAUTIGAM: Jim, I'm not ready
12 for your deposition yet.
13   MR. BURKE: We'll stipulate to
14 that. Of course they were created.
15 BY MR. BRAUTIGAM:
16   Q.  Were proxy materials created?
17   A.  Yes. They were mailed out.
18   Q.  Okay. Why were they created?
19   MR. BURKE: Objection. Asked and
20 answered.
21   A.  So that the stockholders could
22 vote for the sale or be against it, for or
23 against.
24   Q.  How were the proxy materials
25 created?

## 275

1   A.  Ken Hanauer, with -- I think I
2 read somewhere in here, with the help of legal
3 counsel.
4   Q.  And what role, if any, did the
5 OHSL Board have in reviewing these proxy
6 materials before they were finalized and sent
7 to the shareholders?
8   MR. BURKE: Objection.
9 Foundation. You may answer.
10   A.  I don't know that. I don't know
11 that.
12   Q.  Did you personally have any role
13 in reviewing the proxy materials before they
14 were finalized and sent to the shareholders?
15   A.  No. Not that I know of.
16   Q.  Why not?
17   A.  I don't know. I don't know why.
18   MR. BRAUTIGAM: Let's just take a
19 short break.
20   (Discussion off the record.)
21 BY MR. BRAUTIGAM:
22   Q.  Mr. Zoellner, did Ken Hanauer ever
23 lose the confidence of the OHSL Board?
24   MR. BURKE: Objection to
25 relevance. You can answer.

## 276

1   A.  I did not know that.
2   Q.  No, I'm asking.
3   A.  I don't know whether he lost
4 confidence in the Board.
5   Q.  No, no, confidence of the Board,
6 not in the Board. Did the Board of Directors
7 collectively ever lose confidence in Ken
8 Hanauer's ability to run the show, so to speak?
9   A.  Oh, I thought you reversed that.
10   Q.  No, no.
11   A.  Not that I know of, no.
12   Q.  Never?
13   MR. BURKE: Objection. Asked and
14 answered.
15   A.  No.
16   Q.  Okay. Mr. Zoellner, you were on
17 the accounting committee throughout your tenure
18 as an OHSL director, correct?
19   A.  All right, yes.
20   Q.  Were there ever significant
21 accounting problems that OHSL experienced?
22   MR. BURKE: Objection to
23 relevance. This has nothing to do with your
24 lawsuit, Mr. Brautigam, with all due represent.
25 You may answer.

277

```
15:51:34  1    A.  Not that I know of.
15:51:36  2    Q.  Was there ever a time that OHSL
15:51:39  3  didn't know the numbers in the general ledger?
15:51:41  4        MR. BURKE:  Objection to
15:51:41  5  relevance.
15:51:43  6    A.  Not that I know of.
15:51:44  7    Q.  Did OHSL experience a computer
15:51:47  8  conversion at some point in the late nineties?
15:51:53  9        MR. BURKE:  Continuing objection
15:51:54 10  to relevance.
15:51:56 11    A.  Did they change computers?
15:52:01 12    Q.  Some kind of a switch from one
15:52:02 13  system to another.
15:52:04 14    A.  Yes.
15:52:04 15    Q.  How would you describe that
15:52:05 16  transaction?
15:52:06 17    A.  I can't describe it.  All I know
15:52:07 18  is they did it.  I don't know how.
15:52:11 19    Q.  You can't describe it at all?
15:52:12 20    A.  No.
15:52:13 21    Q.  Why not?
15:52:14 22        MR. BURKE:  Objection, counsel.
15:52:16 23    A.  I don't know anything about it,
15:52:18 24  whether it -- our accounting, outside
15:52:22 25  accountant firm took care of most of that, I
```

278

```
15:52:25  1  think.  I don't know.
15:52:27  2    Q.  What was your role as a member of
15:52:30  3  the audit committee?
15:52:40  4    A.  What was my role?  I don't
15:52:55  5  remember.  I don't remember what I did.
15:52:56  6    Q.  Generally speaking, what is the
15:52:58  7  role of a member of an audit committee for a
15:53:01  8  public company?
15:53:08  9    A.  Well, in this particular case we
15:53:09 10  had outside auditors, so we reviewed what they
15:53:14 11  gave us.  That's what the committee did.  We --
15:53:19 12  I can't think of the firm now, they're out of
15:53:22 13  Indianapolis, who was the accounting firm that
15:53:26 14  did our auditing and advised us on different
15:53:30 15  things.
15:53:31 16    Q.  Mr. Zoellner, what was the
15:53:32 17  function of Dinsmore & Shohl in this merger?
15:53:36 18        MR. BURKE:  Objection.  Asked and
15:53:37 19  answered.
15:53:37 20        MR. MOORE:  Objection.
15:53:44 21    A.  They were our legal counsel,
15:53:46 22  advising us on ways to do things.
15:53:50 23    Q.  And as you sit here today, are you
15:53:52 24  satisfied with the voice that they provided
15:53:57 25  you?
```

279

```
15:53:57  1        MR. MOORE:  Objection.
15:53:57  2    A.  Yes.
15:53:58  3    Q.  It doesn't bother you that you
15:53:59  4  relied on advice from Dinsmore & Shohl and
15:54:01  5  you're sitting here today sued?
15:54:03  6        MR. MOORE:  Objection.  That goes
15:54:05  7  to the complaint itself and whether or not the
15:54:06  8  complaint has any validity, but if you think
15:54:09  9  you can answer, go ahead.
15:54:12 10    A.  I'm satisfied with it.
15:54:25 11    Q.  Have you ever seen any of the
15:54:27 12  documents filed in your name in this action?
15:54:45 13    A.  I don't remember any.  There could
15:54:49 14  be, but I don't know.
15:54:51 15    Q.  Is it important to you that any
15:54:59 16  documents filed in your name be accurate?
15:54:59 17        MR. BURKE:  Objection.
15:54:59 18        MR. MOORE:  Objection.
15:55:02 19    A.  Well, I'd hope they'd be accurate,
15:55:05 20  truthful.
15:55:05 21    Q.  Why?
15:55:07 22    A.  Because that's the way to live by,
15:55:08 23  that's the thing to do.
15:55:12 24    Q.  Is there anything in the proxy
15:55:14 25  materials that you believe is inaccurate, based
```

280

```
15:55:17  1  on our discussion today or otherwise?
15:55:22  2    A.  No.
15:55:22  3    Q.  Not even one thing?
15:55:24  4    A.  No.  Fine.
15:56:02  5        MR. BRAUTIGAM:  Mr. Zoellner,
15:56:03  6  subject to additional documents being produced
15:56:06  7  at some future date, I have no further
15:56:09  8  questions at this time, and I thank you for
15:56:10  9  your time.
15:56:12 10        THE WITNESS:  Thank you.
15:56:12 11             DIRECT EXAMINATION
15:56:13 12  BY MR. BURKE:
15:56:13 13    Q.  Mr. Zoellner, I have a couple of
15:56:15 14  questions, these are brief.  Mr. Brautigam
15:56:16 15  never asked you about your background.  When
15:56:18 16  were you born?
15:56:20 17    A.  February 25th, '21.
15:56:22 18    Q.  How old are you, sir?
15:56:24 19    A.  Eighty years old.
15:56:25 20    Q.  And what was your work experience?
15:56:28 21    A.  I had my own accounting firm.
15:56:32 22    Q.  And when did you retire?
15:56:34 23    A.  1989.
15:56:35 24    Q.  So you've been retired for
15:56:36 25  approximately twelve years?
```

281

```
15:56:38  1       A.  Yeah.
15:56:40  2       Q.  How good is your memory of the
15:56:43  3   day-to-day details that Mr. Brautigam has been
15:56:46  4   asking you about today?
15:56:47  5           MR. BRAUTIGAM: Objection to the
15:56:48  6   "day-to-day details."
15:56:50  7       A.  Not too good.
15:56:51  8       Q.  Were there things that Mr.
15:56:53  9   Brautigam told you today that were -- you did
15:56:57 10   not know?
15:56:59 11           MR. BRAUTIGAM: Objection.
15:57:02 12       A.  Should I answer?
15:57:03 13           MR. BRAUTIGAM: Yes.
15:57:04 14       A.  Yes, yes.
15:57:05 15       Q.  Okay. And some of the things Mr.
15:57:06 16   Brautigam said to you today, did you accept
15:57:09 17   them just because he told them to you?
15:57:11 18           MR. BRAUTIGAM: Objection.
15:57:12 19       A.  Well, the way I understood them.
15:57:14 20   I might have misunderstood it, but as I
15:57:17 21   understood it, I -- I answered as truthfully as
15:57:20 22   I could.
15:57:21 23       Q.  And specifically with Mr. Hanauer
15:57:22 24   and Mr. Herron, let's talk about that. Mr.
15:57:25 25   Brautigam talked to you about Mr. Herron's
```

282

```
15:57:27  1   resignation a number of times and what his
15:57:30  2   reasons were. Do you remember that?
15:57:31  3       A.  Um-hmm.
15:57:32  4       Q.  And you also testified as to what
15:57:34  5   your understanding of his reasons were back at
15:57:36  6   that time, correct?
15:57:37  7       A.  Um-hmm, yes.
15:57:37  8       Q.  And do you remember what you
15:57:38  9   testified to as to what you understood his
15:57:40 10   reasons for resigning to be?
15:57:42 11       A.  Yes.
15:57:43 12       Q.  What were they?
15:57:46 13       A.  The majority was because of his
15:57:48 14   job in South America. I think it was Brazil.
15:57:55 15       Q.  Did he say anything to you at that
15:57:57 16   time about another reason for his resignation
15:58:00 17   being any opposition? Did he ever say that to
15:58:02 18   you?
15:58:03 19       A.  Not that I remember.
15:58:04 20       Q.  Take a look at Herron Exhibit 3.
15:58:06 21   That's Mr. -- what has been represented to you
15:58:09 22   by counsel for the plaintiff, that is Mr.
15:58:12 23   Herron's resignation letter itself, dated July
15:58:15 24   27, 1999.
15:58:16 25       A.  Um-hmm.
```

283

```
15:58:17  1       Q.  Take a look at that.
15:58:20  2       A.  Due to increasing responsibility,
15:58:23  3   commitment to the company, I hereby tender my
15:58:27  4   resignation as a member of the Board of
15:58:29  5   Directors of Oak Hills Savings & Loan effective
15:58:32  6   July 30th.
15:58:33  7       Q.  Now, read the -- you don't have to
15:58:35  8   read it out loud, just read it to yourself.
15:58:38  9       A.  Okay. Yeah, he --
15:58:51 10       Q.  Now, let me --
15:58:53 11           MR. BRAUTIGAM: Jim, you
15:58:54 12   interrupted the answer. I think he was
15:58:55 13   speaking.
15:58:56 14           MR. BURKE: I think I was asking
15:58:58 15   him to read the letter.
15:59:00 16           MR. BRAUTIGAM: Jim, you
15:59:01 17   interrupted him, that's the point.
15:59:01 18   BY MR. BURKE:
15:59:02 19       Q.  Have you had an opportunity to
15:59:03 20   read the resignation letter?
15:59:05 21       A.  Half of it.
15:59:06 22       Q.  Read the rest of it, if you would.
15:59:09 23       A.  All right.
15:59:29 24       Q.  Have you read that?
15:59:30 25       A.  Yes.
```

284

```
15:59:30  1       Q.  Okay. Are you finished reading
15:59:32  2   the resignation letter --
15:59:33  3       A.  Yes.
15:59:34  4       Q.  -- that Mr. Herron sent to the
15:59:36  5   Board on July 27, 1999?
15:59:38  6       A.  Yes.
15:59:38  7       Q.  Does that letter say anything
15:59:39  8   about any opposition to the discussions about a
15:59:43  9   possible merger?
15:59:46 10       A.  Pardon?
15:59:46 11       Q.  Let me ask it again. Does that
15:59:47 12   letter say anything at all about Mr. Herron's
15:59:51 13   alleged opposition to any merger discussions
15:59:55 14   being a reason for his resignation?
15:59:59 15           MR. BRAUTIGAM: Objection.
15:59:59 16       A.  I don't read anything in there
16:00:00 17   that is an objection to the -- the only thing
16:00:05 18   that exercise -- is not going to exercise his
16:00:09 19   stock option.
16:00:10 20           MR. BURKE: Right.
16:00:12 21       A.  And we said to him to, or at least
16:00:14 22   I did, you ought to do that, it's to your
16:00:17 23   advantage, but --
16:00:18 24       Q.  But does this say anything about
16:00:20 25   him being opposed to the transaction?
```

### Page 285

1  A. No.
2  Q. Does it say anything in there
3  about him resigning in protest?
4  A. No.
5  Q. And did Mr. Herron ever use those
6  words to you, that he was resigning in protest
7  over the discussions?
8  A. No, no.
9  Q. Mr. Brautigam talked to you about
10 Mr. Hanauer and made you go through pages of
11 deposition testimony. Back in 1999, did Mr.
12 Hanauer ever tell you that he had changed his
13 mind since his vote as a director and was going
14 to vote his personal shares against the
15 Provident-Oak Hills merger?
16      MR. BRAUTIGAM: Objection.
17 A. No, I -- I never talked about
18 shares with, with Ken.
19 Q. And after the decision was made to
20 proceed with the Provident transaction, did Mr.
21 Hanauer ever come to you, or to your knowledge
22 anyone else on the Board, and talk about any
23 opposition to that transaction or how he was
24 going to vote his personal shares?
25      MR. BRAUTIGAM: Objection.

### Page 286

1  A. No.
2      MR. BURKE: I have nothing
3  further.
4      CROSS-EXAMINATION
5  BY MR. MOORE:
6  Q. Sir, my name is Christopher Moore
7  and I'm here for Dinsmore & Shohl. I just want
8  to ask you a couple more background questions
9  if you don't mind.
10     I don't want to pry, but I do
11 think it's important for anyone to read this to
12 know more about you. Were you born and raised
13 in this area?
14 A. Western Hills.
15 Q. And I believe you testified
16 earlier that you actually served in World War
17 II on behalf of our country?
18 A. Four years.
19 Q. And what was your rank when you
20 went in?
21 A. Ensign.
22 Q. And what did you come out as?
23 A. Lieutenant.
24 Q. Lieutenant. And after serving our
25 country, did you then go to college?

### Page 287

1  A. I went -- I had to have half of my
2  credits for college to get in, then I finished
3  it up when I came back.
4  Q. Where did you finish up?
5  A. UC, business administration.
6  Q. Okay. And thereafter then you
7  started your own business?
8  A. Yes.
9  Q. And you operated that business it
10 looks to me like for approximately 45 years?
11 A. Yes.
12 Q. Where was your business located?
13 A. Glenway Avenue -- not Glenway --
14 yeah, Glenway Avenue.
15 Q. And again, as you were talking
16 with your attorney, now that you've been
17 retired for almost twelve years, those sort of
18 details have sort of gone by the wayside?
19 A. They're tough. When you get this
20 old, it's even hard to remember what you had
21 for breakfast.
22 Q. Well, you had a bagel today, I can
23 tell you.
24 A. I'll put that in my pocket, then I
25 can remember.

### Page 288

1  Q. Glenway Avenue. Just so anyone
2  reading this is clear, that's in Cincinnati,
3  correct?
4  A. Yes, Price Hill.
5  Q. With the exception of your years
6  in the armed services serving our country,
7  you've essentially lived in Cincinnati,
8  correct?
9  A. That is correct.
10 Q. That's where you were married, in
11 Cincinnati?
12 A. That is correct.
13 Q. Did you raise a family?
14 A. That is correct, five children.
15 Q. Five children, all live in
16 Cincinnati?
17 A. All --
18 Q. Well, you raised them in
19 Cincinnati?
20 A. Yeah. Centerville is the furthest
21 one away.
22 Q. Okay. But you've essentially
23 lived your entire life in this city?
24 A. Yes.
25     MR. BRAUTIGAM: Objection. Wait

289

1  for the question.
2  Q. Those kind of questions -- you can
3  jump in on any of those kinds of questions.
4  A. I'm too quick, I've got to slow
5  up.
6  MR. BRAUTIGAM: I think Lee Ann
7  would disagree with you.
8  Q. She's used to me talking fast. I
9  have one more question closer to this matter
10 for you. You were asked some questions today
11 about what you knew, when and where. I want to
12 give you a hypothetical. Assume with me that
13 at the time you were voting on this agreement,
14 you knew that Mr. Herron was resigning because
15 of this deal, okay, and you knew that Mr.
16 Hanauer, in fact, intended to vote his personal
17 shares against this deal. From what I'm
18 hearing from you, you still would have voted in
19 favor of this deal though?
20 A. Oh, yes, yes.
21 Q. You believed it was the best deal
22 for the shareholders?
23 A. Yes.
24 Q. So whether or not those
25 individuals were doing things that you did or

290

1  didn't know about was really irrelevant to your
2  decision-making process?
3  A. That is true.
4  Q. You made your decision based on
5  the information in front of you?
6  A. Yes.
7  Q. And it's your opinion as you sit
8  here today that the decision was -- the best
9  decision, if you will, was to approve the
10 merger?
11 A. Yes.
12 MR. MOORE: Thank you.
13 MR. BRAUTIGAM: Okay. Mr.
14 Zoellner, I actually have some follow-up
15 questions based on Mr. Burke and based on
16 Chris.
17 RECROSS-EXAMINATION
18 BY MR. BRAUTIGAM:
19 Q. Chris just asked you, knowing what
20 you know today, essentially, would you have
21 voted your personal shares differently. And
22 you answered no, correct?
23 A. Yes.
24 MR. MOORE: I object. I said
25 hypothetically assuming those things to be

291

1  correct.
2  MR. BRAUTIGAM: Right.
3  BY MR. BRAUTIGAM:
4  Q. Knowing what you know today, would
5  you have insisted that the proxy materials be
6  changed to reflect this new knowledge?
7  MR. BURKE: Objection.
8  MR. MOORE: Objection.
9  MR. BURKE: Assumes facts not in
10 evidence, calls for speculation. Those are not
11 the facts. You may answer.
12 A. No.
13 Q. Why not?
14 A. They all did the best they could.
15 And they're all friends of mine. Even Walter
16 is a friend of mine. I hired Walter, so I, I
17 have no animosity to any of them.
18 Q. Mr. Zoellner, my question had
19 nothing to do with animosity. My question is:
20 Would you have insisted that the proxy
21 materials --
22 A. No, I --
23 Q. Can I finish my question?
24 A. Oh, pardon me.
25 Q. -- be changed to reflect that

292

1  information?
2  MR. BURKE: Objection.
3  A. No, I wouldn't do it.
4  Q. Why not?
5  A. I don't think it's necessary.
6  That's a matter of opinion.
7  Q. Okay. With respect to Mr.
8  Herron's resignation letter, Mr. Herron in
9  effect left money on the table, correct?
10 A. Yes.
11 MR. BURKE: Objection.
12 Q. And not only with respect to the
13 stock options, but with respect to the $900 a
14 month for 24 months that he could have received
15 as an advisory director to Provident?
16 A. That's correct.
17 MR. BURKE: Objection. Calls for
18 speculation.
19 Q. And you testified that your duties
20 and responsibilities to earn this 900 per month
21 are essentially nothing, correct?
22 MR. BURKE: Objection.
23 Mischaracterizes the prior testimony,
24 argumentative.
25 Q. Is that -- different question.

## 293

```
16:06:05  1   What if anything do you do to earn your 900 per
16:06:08  2   month from Provident?
16:06:10  3       A.  I think I answered that when we
16:06:11  4   started out.
16:06:11  5       Q.  I think you did as well, I just
16:06:13  6   want to clarify, because Provident hasn't asked
16:06:16  7   you to do anything, correct?
16:06:18  8       A.  No.
16:06:18  9       Q.  Whatever you do to the benefit of
16:06:20 10   Provident or not, you're doing on your own,
16:06:22 11   correct?
16:06:23 12       MR. BURKE:  Objection.
16:06:24 13   Mischaracterizes the testimony.
16:06:25 14       A.  Yes.
16:06:25 15       Q.  So you have no duties and
16:06:26 16   responsibilities that earn the $900 a month,
16:06:30 17   correct?
16:06:31 18       A.  No.  That was part of the deal,
16:06:33 19   part of the purchase and sale.
16:06:39 20       Q.  What was part of the deal?
16:06:40 21       A.  About the employees would get so
16:06:41 22   much of their pay if they left.  The directors
16:06:44 23   would get, as you said, $900 a month.
16:06:48 24       Q.  But my point is, you don't have to
16:06:51 25   do anything to receive that money, correct?
```

## 294

```
16:06:52  1       A.  That is correct.
16:06:56  2       Q.  Okay.  Now, did Mr. Herron tell
16:06:58  3   you why he left money on the table?
16:07:00  4       A.  No.
16:07:02  5       Q.  He never suggested that it was
16:07:04  6   because he didn't want to profit from a
16:07:07  7   transaction --
16:07:08  8       A.  No.
16:07:09  9       Q.  Can I finish my question, please?
16:07:10 10       A.  Oh, I'm sorry.
16:07:11 11       Q.  -- from a transaction that he
16:07:12 12   fundamentally disagreed with?
16:07:14 13       MR. MOORE:  Objection.
16:07:15 14       MR. BURKE:  Objection.
16:07:15 15   Mischaracterizes the record.  You may answer.
16:07:19 16       A.  We never -- now I lost the
16:07:25 17   question.  What was the question again?
16:07:25 18       (Record read by Reporter.)
16:07:38 19       A.  No, he never said that to me.
16:07:42 20   There was only one thing he said to me after I
16:07:45 21   tried to talk him into it, don't forget to call
16:07:49 22   me for golf.
16:07:50 23       Q.  Have you played golf with Mr.
16:07:52 24   Herron since that phone call?
16:07:54 25       A.  No, no.
```

## 295

```
16:07:54  1       Q.  Why not?
16:07:55  2       A.  I haven't gotten around to it.
16:07:56  3   I've -- my knees and back are too bad.
16:08:00  4       Q.  Mr. Zoellner, are you familiar
16:08:01  5   with the phrase to use something as a sword and
16:08:04  6   not as a shield?
16:08:06  7       MR. BURKE:  Objection to form.
16:08:07  8       A.  No.  I don't know what you're
16:08:08  9   referring to.
16:08:15 10       Q.  Now, you testified when Mr. Burke
16:08:17 11   was asking you the questions, that when you
16:08:20 12   talked to Mr. Herron on the phone, he said a
16:08:23 13   majority of the reasons for his resignation was
16:08:27 14   because of his job in Brazil; is that right?  I
16:08:29 15   wrote it down, I want to make sure I have your
16:08:32 16   testimony accurately.
16:08:33 17       A.  Yes.
16:08:33 18       Q.  What was the rest of his reason
16:08:34 19   for resigning?  You said "the majority," so
16:08:37 20   that implies there was something else.
16:08:39 21       A.  I don't know if there was, but we
16:08:40 22   had different conversations like this one,
16:08:42 23   don't forget to call me to play golf and stuff
16:08:44 24   like that.  It was just a friendly call.
16:08:48 25       Q.  Okay.  Since July 27th, 1999, what
```

## 296

```
16:08:53  1   other conversations have you had with Mr.
16:08:54  2   Herron?
16:08:55  3       A.  I haven't had any that I remember.
16:09:07  4       Q.  Mr. Zoellner, it seems that one of
16:09:09  5   the issues in this case is the disclosure of
16:09:13  6   Mr. Hanauer's true feelings, whatever they were
16:09:17  7   with respect to this merger.  Do you agree with
16:09:19  8   that?
16:09:19  9       MR. MOORE:  Objection.
16:09:20 10       MR. BURKE:  Objection.  Calls for
16:09:20 11   speculation as to what the issues in the
16:09:23 12   lawsuit are.
16:09:23 13       A.  I don't know what his feelings
16:09:25 14   are.
16:09:26 15       Q.  No, no, it's not a question of his
16:09:28 16   feelings.  The question is:  Do you understand
16:09:29 17   that one of the issues in the lawsuit has to do
16:09:33 18   with Mr. Hanauer's true feelings and whether
16:09:35 19   they were disclosed or not?
16:09:37 20       MR. MOORE:  Objection.
16:09:37 21       MR. BURKE:  Objection.  Calls for
16:09:38 22   speculation.
16:09:39 23       A.  I don't know anything about that.
16:10:01 24       Q.  You testified that the Board of
16:10:02 25   Directors in substance never inquired of Mr.
```

297

```
16:10:04  1   Hanauer with respect to his true feelings with
16:10:07  2   regard to certain aspects of the transaction;
16:10:10  3   is that fair?
16:10:11  4          MR. BURKE: Objection. Beyond the
16:10:11  5   scope of cross. You may answer.
16:10:13  6          A.  What did I say? That the Board
16:10:17  7   did not do what?
16:10:18  8          Q.  Did not inquire of Mr. Hanauer
16:10:22  9   with respect to his true feelings. And my
16:10:26 10   question is, is that correct?
16:10:29 11          A.  I do not know what the rest of the
16:10:31 12   people on the Board did. I don't know whether
16:10:34 13   they talked to him and asked him about anything
16:10:38 14   or not.
16:10:38 15          Q.  Well, did this ever happen at
16:10:40 16   Board meetings?
16:10:41 17          MR. BURKE: What?
16:10:43 18          Q.  Did anyone at Board meetings -- in
16:10:45 19   other words, you said you don't know what the
16:10:46 20   other members or directors did.
16:10:49 21          A.  Yeah.
16:10:50 22          Q.  But you would know what they did
16:10:52 23   with respect to Board meetings that you
16:10:54 24   attended.
16:10:54 25          A.  Yes.
```

298

```
16:10:55  1          Q.  And even with respect to Board
16:10:57  2   meetings that you missed, you would find out
16:11:05  3   what happened because you would get the minutes
16:11:05  4   and review them, correct?
16:11:05  5          A.  I don't know of anything that
16:11:05  6   would -- was said that wasn't already said for
16:11:10  7   -- at our Board meetings after he wasn't there.
16:11:13  8   Nobody put him down or nothing else, just
16:11:16  9   accepted it.
16:11:18 10          Q.  Accepted what?
16:11:19 11          A.  His resignation.
16:11:22 12          Q.  Actually we were talking about Mr.
16:11:23 13   Hanauer.
16:11:24 14          A.  Oh, Hanauer. Oh, I'm sorry, I had
16:11:27 15   Tom Herron in my mind.
16:11:31 16          MR. BRAUTIGAM: Okay. Mr.
16:11:31 17   Zoellner, I have nothing further at this time.
16:11:33 18          MR. BURKE: Thank you.
```

299

HOWARD ZOELLNER

---

(Deposition concluded at 4:05 p.m.)

---

300

C E R T I F I C A T E

STATE OF OHIO:
         SS:
COUNTY OF HAMILTON:

I, Lee Ann Williams, a duly qualified and commissioned notary public in and for the State of Ohio, do hereby certify that prior to the giving of his deposition, the within named HOWARD ZOELLNER was by me first duly sworn to testify the truth, the whole truth and nothing but the truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by me in stenotypy and transcribed under my supervision; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, and have no interest whatsoever in the result of this litigation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio this ___ day of _____, 2001.

MY COMMISSION EXPIRES: _____
AUGUST 26, 2004    LEE ANN WILLIAMS, RPR/CRR
                   NOTARY PUBLIC-STATE OF OHIO