# EXHIBIT M

Case 1:00-cv-00793-SSB-TSH     Document 290     Filed 03/01/2004     Page 1 of 19

740

1
2                    COURT OF COMMON PLEAS
3                    HAMILTON COUNTY, OHIO
4
5                           - - -
6   JANET NOLTE, et al.,       :
7           Plaintiff,          :
8       VS.                     :  CASE NO. A-9907039
                                :     VOLUME IV
9   OHSL FINANCIAL CORP.,       :
    et al.,                     :
10                              :
            Defendants.         :
11                          - - -
12          Continuation of the deposition of
13  KENNETH HANAUER, a witness herein, called by
14  the plaintiff for cross-examination, pursuant
15  to the Ohio Rules of Civil Procedure, taken
16  before me, Lee Ann Williams, a Registered
17  Professional Reporter and Notary Public in and
18  for the State of Ohio, at the offices of Gene
19  Mesh & Associates, 2805 Burnet Avenue,
20  Cincinnati, Ohio 45219, on Tuesday, August 8,
21  2000, at 1:00 p.m.
22
23
24
25

741

1   APPEARANCES:
2       On behalf of the Plaintiff:
3           Michael G. Brautigam, Esq.
            Gene Mesh & Associates
4           2605 Burnet Avenue
            Cincinnati, Ohio 45219
5
        On behalf of the Defendant:
6
            Jamie M. Ramsey, Esq.
7           Keating, Muething & Klekamp
            1800 Provident Tower
8           One East Fourth Street
            Cincinnati, Ohio 45202
9
                         - - -
10               S T I P U L A T I O N S
11      It is stipulated by and between counsel for
12  the respective parties that the deposition of
13  KENNETH HANAUER, a witness herein, called by
14  the plaintiff for cross-examination pursuant to
15  the Ohio Rules of Civil Procedure, may be taken
16  at this time by the notary; that said
17  deposition may be reduced to writing in
18  stenotypy by the notary, whose notes may then
19  be transcribed out of the presence of the
20  witness; and that proof of the official
21  character and qualifications of the notary are
22  expressly waived.
23                       - - -
24
25

742

1              I N D E X
2   Examination of KENNETH HANAUER        Page
3   By Mr. Brautigam:                  743, 799
    By Mr. Ramsey:                         788
4
                    - - -
5

743

1              KENNETH HANAUER
2   having been previously duly sworn, further
3   testified as follows:
4            CONTINUED CROSS-EXAMINATION
5   BY MR. BRAUTIGAM:
13:05:50  6      Q.  Good afternoon, Mr. Hanauer.
13:05:51  7      A.  Good afternoon, sir.
13:05:52  8      Q.  I remind you that you're still
13:05:54  9   under oath.
13:05:55 10      A.  Okay.
13:05:55 11      Q.  Mr. Hanauer, we talked at length
13:05:58 12  last time about the proxy materials and the
13:06:00 13  prospectus.  Do you remember generally that
13:06:02 14  testimony?
13:06:02 15      A.  Yes, sir.
13:06:03 16      Q.  And we talked about the vote of
13:06:05 17  the Board of Directors of OHSL unanimously
13:06:10 18  approving the transaction.  Do you remember
13:06:12 19  that testimony?
13:06:13 20      A.  Yes, sir.
13:06:13 21      Q.  And you testified over the course
13:06:14 22  of three days that the Board, in fact, did
13:06:18 23  approve the transaction unanimously.  Do you
13:06:20 24  remember that testimony?
13:06:21 25      A.  That's correct.

744

```
13:06:22  1       Q.  Okay.  And that is reflected here
13:06:24  2   on the first page of the proxy materials, where
13:06:26  3   it says, your Board of Directors has -- excuse
13:06:30  4   me, your Board of Directors unanimously
13:06:32  5   approved the acquisition and believes that it
13:06:35  6   is in the best interest of OHSL stockholders.
13:06:38  7   Do you see that?
13:06:40  8       A.  Yes, sir, I do.
13:06:40  9       Q.  And that sentence refers to the
13:06:42 10   8/2/99 vote, correct?
13:06:45 11       A.  Yes, sir.
13:06:47 12       Q.  Okay.  You're familiar with the
13:06:49 13   word unanimously as it's used in that sentence,
13:06:51 14   correct?
13:06:52 15       A.  Yes, sir.
13:06:53 16       Q.  What do you understand that word
13:06:54 17   to mean as it's used in that sentence?
13:06:57 18       A.  That everyone that participated in
13:07:00 19   the vote, voted in favor of the transaction.
13:07:04 20       Q.  Okay.  It doesn't say that in the
13:07:05 21   document, does it?
13:07:09 22       A.  It's inferred with the term
13:07:11 23   unanimously.  I don't believe it does, no, sir.
13:07:14 24       Q.  Okay.  It says, your Board of
13:07:16 25   Directors unanimously approved the
```

745

```
13:07:18  1   acquisition --
13:07:19  2       A.  Yes.
13:07:20  3       Q.  -- stop.  Correct?
13:07:20  4       A.  Correct.
13:07:21  5       Q.  Now, as of 8/2/99, who were the
13:07:24  6   directors?
13:07:26  7       A.  Norb Brinker, Bill Hillebrand, Al
13:07:30  8   Hucke, myself, Joe Tenoever, Tom McKiernan, and
13:07:40  9   Howard Zoellner, seven of us.
13:07:43 10       Q.  Okay.  And do you think it's a
13:07:45 11   reasonable reading of the first part of that
13:07:47 12   sentence, your Board of Directors unanimously
13:07:51 13   approved the acquisition, stop, that all seven
13:07:54 14   of the directors you just named voted in favor
13:07:56 15   of the transaction?
13:07:59 16       A.  That is correct.
13:07:59 17       Q.  Okay.  Let's --
13:08:01 18       A.  There was no opposition to the
13:08:02 19   vote, okay?  At the time that we voted, there
13:08:06 20   was no opposition to the transaction.
13:08:07 21       Q.  Okay.  Let me ask the question
13:08:08 22   again.
13:08:09 23       A.  Okay.
13:08:10 24       Q.  With respect to that first part of
13:08:13 25   the sentence, your Board of Directors
```

746

```
13:08:14  1   unanimously approved the acquisition, stop.
13:08:19  2       A.  Um-hmm.
13:08:19  3       Q.  Do you believe as you sit here
13:08:20  4   today that it's a fair reading of that part of
13:08:24  5   the sentence that those seven directors you
13:08:26  6   named, unanimously voted to approve the
13:08:30  7   transaction?
13:08:31  8       A.  They voted individually for the
13:08:35  9   transaction, yes, sir.
13:08:36 10       Q.  All seven directors?
13:08:38 11       A.  Yes, sir.
13:08:39 12       Q.  Okay.  Let's take a look at what
13:08:40 13   has been previously marked as McKiernan Exhibit
13:08:45 14   2, and I'm handing it to you.  Have you seen
13:08:49 15   McKiernan Deposition Exhibit Number 2 before?
13:08:53 16       A.  Yes, sir.
13:08:54 17       Q.  Are you familiar with it?
13:08:55 18       A.  Yes, sir.
13:08:56 19       Q.  Do you recognize it?
13:08:57 20       A.  Yes.
13:08:58 21       Q.  What is McKiernan Deposition
13:09:00 22   Exhibit Number 2?
13:09:01 23       A.  It's a copy of the minutes of a
13:09:05 24   meeting held on August 2nd, 1999 of the Board
13:09:10 25   of Directors, a special meeting of the Board of
```

747

```
13:09:12  1   Directors of OHSL Financial.
13:09:14  2       Q.  And this was the special meeting
13:09:15  3   that approved the transaction that we're
13:09:17  4   talking about, correct?
13:09:18  5       A.  That's correct.
13:09:20  6       Q.  Okay.  Would you please read into
13:09:21  7   the record the directors who were present?
13:09:24  8       A.  Brinker, Hanauer, Hillebrand,
13:09:27  9   Hucke, Tenoever, and Zoellner.
13:09:30 10       Q.  Those are six directors, correct?
13:09:31 11       A.  Absolutely.
13:09:32 12       Q.  Mr. McKiernan was not present,
13:09:34 13   correct?
13:09:34 14       A.  According to these minutes, he was
13:09:35 15   not, yes, sir.
13:09:36 16       Q.  In fact, he was in Europe on a
13:09:38 17   cruise, correct?
13:09:39 18       A.  I believe you're correct.  He was
13:09:41 19   in the Mediterranean, I think, yes.
13:09:44 20       Q.  Okay.
13:09:45 21       A.  If memory serves me, yes.
13:09:47 22       Q.  Would it be fair to say that Mr.
13:09:49 23   McKiernan, because he was not present, was not
13:09:51 24   one of the directors who unanimously voted to
13:09:54 25   approve the transaction?
```

748

```
13:09:55  1      A.  Yes, sir, you can -- you could say
13:09:58  2   that.
13:09:59  3      Q.  Is there any other reasonable
13:10:00  4   reading of McKiernan Exhibit 2 and the first
13:10:06  5   page of the proxy materials?
13:10:09  6      A.  No, sir.  Again, the proxy
13:10:14  7   materials state that the Board of Directors,
13:10:18  8   which would infer the whole Board of Directors,
13:10:21  9   unanimously approved.  And in fact, in looking
13:10:24 10   at the minutes dated August 2, it was only the
13:10:27 11   directors at the meeting that unanimously
13:10:30 12   approved the transaction.
13:10:32 13      Q.  Okay.  Do you believe that Mr.
13:10:33 14   McKiernan's lack of a vote on this issue at
13:10:36 15   this meeting is material information?
13:10:39 16      A.  Absolutely not, because he was
13:10:40 17   very pro the transaction.  He was the one
13:10:42 18   that -- he was one of them that spurred the
13:10:45 19   transaction, so I -- in my opinion, it is
13:10:47 20   totally irrelevant that he was not at that
13:10:50 21   meeting.
13:10:51 22      Q.  Okay.  Well, why didn't you tell
13:10:53 23   the shareholders that?
13:10:54 24      A.  Why didn't I tell the shareholders
13:10:56 25   what?
```

749

```
13:10:56  1      Q.  That he was not a director who had
13:10:58  2   voted to approve the transaction, and therefore
13:11:00  3   the transaction -- the vote on the transaction
13:11:06  4   was not unanimous.
13:11:07  5      A.  I cannot answer that, because it
13:11:11  6   did not -- that did not cross my mind.  And it
13:11:14  7   was not pointed out to me in the drafting of
13:11:24  8   all the documents that, in fact, and in my
13:11:27  9   memory, in fact, that Mr. McKiernan was not at
13:11:31 10   the meeting of August the 2nd.  He had been at
13:11:34 11   the majority of the other meetings and was very
13:11:36 12   proactive, so that, that is an error in the
13:11:44 13   document which to date I had not even been
13:11:49 14   aware of consciously.
13:11:53 15      Q.  Okay.  Do you believe that the
13:11:54 16   first part of the sentence that we're focused
13:11:56 17   on now, your Board of Directors unanimously
13:11:58 18   approved the acquisition, stop, states that
13:12:10 19   aside from Mr. McKiernan who was in Europe, and
13:12:13 20   aside from Mr. Herron who had resigned and was
13:12:17 21   no longer a member of the Board, the remaining
13:12:20 22   six directors all voted unanimously in favor of
13:12:23 23   the transaction?
13:12:30 24      A.  The -- I'm sorry, when you
13:12:31 25   mentioned Mr. Herron, I -- my mind went off in
```

750

```
13:12:35  1   another -- restate the first part of your
13:12:37  2   question again.
13:12:38  3      Q.  Okay.  You testified a moment ago
13:12:39  4   that you forgot that Mr. McKiernan was in
13:12:41  5   Europe.
13:12:42  6      A.  Okay.
13:12:42  7      Q.  And that to that extent this was
13:12:44  8   wrong, although you did not believe it's
13:12:46  9   material, correct?
13:12:47 10      A.  Yes, sir, that's a good summation.
13:12:51 11      Q.  Okay.  Now, what I'm asking you
13:12:52 12   now is, is it a fair reading that the first
13:12:57 13   part of the sentence, your Board of Directors
13:13:00 14   unanimously approved the acquisition, stop,
13:13:03 15   means to convey that the six remaining
13:13:06 16   directors did, in fact, unanimously vote to
13:13:10 17   approve the transaction?
13:13:11 18      A.  Yes.
13:13:15 19      Q.  Okay.  Mr. Brinker testified under
13:13:16 20   oath that he did not vote at the August 2nd,
13:13:21 21   1999 meeting.  So, in fact, he never voted to
13:13:24 22   approve the transaction.  Is that consistent
13:13:27 23   with your recollection?
13:13:33 24      A.  Mr. Brinker, in any controversial
13:13:45 25   discussions that we ever got into, would always
```

751

```
13:13:49  1   use his position as Chair not to vote.  And I
13:13:54  2   don't recall -- I don't believe there was any
13:13:55  3   discussion in this proceeding, but in other
13:13:58  4   proceedings that he would not -- it was not a
13:14:03  5   requirement for him to vote and would not do so
13:14:06  6   unless there was a tie.  So I do not know what
13:14:14  7   was in his heart at the time.
13:14:17  8           Certainly this document went out
13:14:19  9   over his signature.  He knew of the contents of
13:14:25 10   the document.  And if at this juncture it's his
13:14:30 11   testimony that he didn't vote for the
13:14:32 12   transaction, that's something that's got to be
13:14:36 13   on his conscience, not mine.
13:14:39 14      Q.  Okay.  Let's see if we can put
13:14:41 15   aside what's in Mr. Brinker's heart and on Mr.
13:14:45 16   Brinker's conscious.  At the August 2nd --
13:14:48 17      A.  I can't address whether he said
13:14:50 18   aye or nay.  There were no nays when he asked
13:14:54 19   for the vote.  That's all I can -- that's all I
13:14:56 20   can tell you.  There were -- there was nobody
13:14:59 21   sitting around that table of the six directors
13:15:02 22   present that said they were not in favor of
13:15:05 23   this transaction.
13:15:07 24      Q.  Okay.  My question is a little
13:15:08 25   different.  You were at the meeting on August
```

## 752

13:15:10 1  2nd, 1999, correct?
13:15:12 2      A.  Yes.
13:15:14 3      Q.  Okay.  Did Mr. Brinker vote?
13:15:17 4      A.  I told you I -- whether he said
13:15:19 5  aye or nay, whether he said aye -- he called
13:15:23 6  for the vote.  Should he have said aye?  I
13:15:26 7  cannot address that.  I do not know whether he
13:15:29 8  uttered anything or not.  I, I can't tell
13:15:31 9  you --
13:15:32 10     Q.  Okay.
13:15:32 11     A.  -- because I don't know.
13:15:33 12     Q.  Okay.  Why don't you know?
13:15:34 13     A.  What do you mean, why don't I
13:15:35 14 know?  We didn't sit there and go around the
13:15:38 15 room, all in favor, aye, and there was some
13:15:41 16 grumblings and that was it.  There was no aye,
13:15:44 17 aye, aye.  There was not a call for a vote of
13:15:47 18 each individual person as to what their
13:15:51 19 position was.  It just didn't happen that way.
13:15:54 20      Now, that would be a question why
13:15:56 21 he -- to him, as to why he didn't call for a
13:15:59 22 specific utterance from each individual so you
13:16:03 23 would know whether the relevance of that
13:16:07 24 paragraph -- you know, whether that paragraph
13:16:09 25 is correct or not.  I can't address that, I

## 753

13:16:12 1  didn't run the meeting.
13:16:13 2      Q.  Okay.  Let me ask you to assume
13:16:15 3  for the sake of this question that Mr. Brinker
13:16:17 4  testified that he did not vote in favor of the
13:16:20 5  transaction or against the transaction.  He
13:16:22 6  just didn't vote.  If you assume for the
13:16:26 7  purposes of this question that that is a fact,
13:16:28 8  do you believe that the first part of that
13:16:31 9  sentence --
13:16:32 10     A.  Then his document is wrong, okay?
13:16:34 11     Q.  Okay.  Let me finish the question.
13:16:35 12 Do you believe the first part of that sentence,
13:16:37 13 your Board of Directors unanimously approved
13:16:39 14 the acquisition, is correct?
13:16:52 15     A.  I guess you could stretch that
13:16:54 16 into being it is not correct if he didn't vote
13:16:59 17 either way.  I, I can only assume at this point
13:17:03 18 that if we sat around the table and nobody
13:17:06 19 uttered anything, we would still be sitting
13:17:08 20 there a year later.  You know, it was the --
13:17:16 21 again, in prior meetings and, in fact, when you
13:17:18 22 look at this paragraph, it does not state that
13:17:29 23 it is the meeting of August the 2nd that it is
13:17:32 24 referencing.
13:17:35 25     MR. BRAUTIGAM:  Okay.  Move to

## 754

13:17:35 1  strike everything after "not correct."
13:17:38 2      Q.  I thought we had covered that a
13:17:44 3  moment ago.  When it says here, your Board of
13:17:47 4  Directors unanimously approved the acquisition,
13:17:49 5  stop.  We are talking about that special
13:17:51 6  meeting on August 2nd, 1999, are we not?
13:17:56 7      A.  How would we, the reader of that
13:17:58 8  document, know that, if you want to be that
13:18:00 9  specific?
13:18:01 10     Q.  Well, can you answer that question
13:18:04 11 yes or no?
13:18:06 12     A.  Are we talking about that meeting?
13:18:08 13 I believe the document is talking about that
13:18:09 14 meeting, yes.
13:18:11 15     Q.  Okay.  Is there any other possible
13:18:12 16 meeting that you're referring to?
13:18:14 17     A.  There were, there were many
13:18:17 18 meetings in which all of the directors voiced
13:18:20 19 opinions as to whether they would and had
13:18:25 20 intention of approving the transaction.
13:18:29 21     Q.  Was there any meeting, other than
13:18:32 22 the 8/2/1999 meeting, that you could think of
13:18:40 23 that would be referring to the first part of
13:18:43 24 that sentence, your Board of Directors
13:18:44 25 unanimously approved the acquisition, stop?

## 755

13:18:48 1      A.  No.  I believe it was the intent
13:18:50 2  of this paragraph to refer to the 8/2 meeting.
13:18:54 3      Q.  Do you believe that the vote or
13:18:58 4  nonvote of the Chairman of the Board of
13:18:59 5  Directors on this transaction is material
13:19:01 6  information?
13:19:03 7      A.  Whether he voted or not?
13:19:07 8      Q.  Yes.
13:19:07 9      A.  I believe that -- yeah, I believe
13:19:13 10 that could be material information.
13:19:15 11     Q.  Okay.  Do you believe that it's
13:19:16 12 properly disclosed in this document, based on
13:19:18 13 our conversation today?
13:19:19 14     MR. RAMSEY:  Objection.
13:19:21 15     A.  It is not in the document that he
13:19:22 16 did not vote, if that is his testimony that he
13:19:26 17 did not.
13:19:27 18     Q.  Okay.  Actually it was also the
13:19:28 19 testimony of Mr. McKiernan.  Mr. McKiernan --
13:19:31 20     A.  Mr. McKiernan wasn't even there,
13:19:33 21 how would he know what Norb did?
13:19:37 22     Q.  Actually, from the Board --
13:19:39 23     A.  Mr. McKiernan cannot testify to
13:19:40 24 what Norb did on 8/2, he was thousands of miles
13:19:43 25 away.

**756**

```
13:19:44  1      Q.  Actually I take that back.  What
13:19:45  2   Mr. McKiernan said, and what I meant to convey,
13:19:49  3   was that Mr. McKiernan testified that it was
13:19:52  4   plain that the phrase, your Board of Directors
13:19:57  5   unanimously approved the acquisition, stop,
13:20:00  6   meant that of those directors who were there
13:20:03  7   and who were eligible to vote, that they had
13:20:05  8   unanimously approved the transaction.  And I
13:20:08  9   pointed out that, well, that's not true and
13:20:10 10   correct, either.
13:20:11 11      A.  Okay.
13:20:12 12      Q.  But anyway, that's between --
13:20:13 13      A.  Okay.
13:20:14 14      Q.  -- Mr. McKiernan and myself.
13:20:16 15      A.  Okay.
13:20:16 16      Q.  I did not mean to misspeak
13:20:18 17   earlier.
13:20:20 18      A.  Sure.
13:20:32 19      Q.  Do you believe that whatever Mr.
13:20:34 20   Brinker did as Chairman of the Board should
13:20:36 21   have been disclosed to the shareholders?  In
13:20:38 22   other words, if he didn't vote to approve the
13:20:40 23   transaction, fine, he could have said the
13:20:42 24   directors who were there and who were eligible
13:20:45 25   to vote, did vote to unanimously approve the
```

**757**

```
13:20:49  1   transaction, but I abstained.  Do you think
13:20:51  2   that would have been better?
13:20:57  3      A.  If it is his testimony and intent
13:21:01  4   to have abstained, yes.  If he purposely, if he
13:21:06  5   purposely did not -- if he purposely did not
13:21:13  6   vote, then I believe that should have been
13:21:15  7   disclosed, yes, sir.
13:21:16  8      Q.  Okay.
13:21:17  9      A.  I believe that.
13:21:18 10      Q.  It is his testimony that he
13:21:19 11   purposely did not vote, because he said he
13:21:22 12   never voted.  He voted only to break ties and
13:21:24 13   he couldn't remember any ties.  And he
13:21:26 14   purposely did not vote on this transaction or
13:21:29 15   any other transaction during the time he was
13:21:32 16   OHSL Chairman, although some people seem to
13:21:35 17   remember him breaking a tie.
13:21:37 18      A.  Yes, he broke ties.
13:21:38 19      Q.  It was his testimony that he did
13:21:39 20   not vote ever.
13:21:41 21      A.  Okay.
13:21:43 22      Q.  Okay.  Why wasn't this disclosed
13:21:45 23   to the shareholders?
13:21:47 24          MR. RAMSEY:  Objection.
13:21:48 25      A.  I'm going to reiterate it again.
```

**758**

```
13:21:49  1   I was not aware of his abstention.  I took
13:21:54  2   these minutes and if it was his will and wish
13:22:02  3   to have abstained, then he should have told me,
13:22:06  4   because if you -- he should have told me of
13:22:09  5   that fact.  Because if you look through our
13:22:11  6   corporate minutes both on the savings and loan
13:22:14  7   side and on the holding company side, at
13:22:17  8   various meetings you will see abstentions
13:22:21  9   noted.  That was something that I did on a
13:22:22 10   regular basis and I made sure I got the names
13:22:25 11   right.
13:22:27 12          So it was not an act that was
13:22:30 13   deliberate, it was an act that -- you know, it
13:22:34 14   was unanimous.  He, in fact, declared that it
13:22:39 15   was unanimous and we moved on.  Now, if it was
13:22:42 16   not unanimous and he didn't vote, or if it was
13:22:46 17   unanimous of those voting, then he should have
13:22:48 18   made some comment to the effect that the
13:22:53 19   transaction is approved by all of those voting
13:22:57 20   and I abstained, or what have you.  He didn't
13:23:00 21   do that.
13:23:07 22          As the minute taker, I don't
13:23:07 23   believe -- and I'm not trying to absolve myself
13:23:07 24   of anything here -- I don't believe that that
13:23:08 25   was my responsibility to try to drag out of him
```

**759**

```
13:23:11  1   that he didn't vote in the transaction.  It
13:23:13  2   never crossed my mind, because the man was for
13:23:16  3   the transaction very early on in the process.
13:23:20  4   So I would have never dreamt that at the, at
13:23:25  5   the final meeting when everything -- we had
13:23:28  6   done literally everything to be done except
13:23:30  7   take the final vote, that he would, he would
13:23:33  8   abstain from that vote.  That never crossed my
13:23:35  9   mind until you raised the question right here
13:23:38 10   along, with Mr. McKiernan not being at the
13:23:41 11   meeting.
13:23:41 12      Q.  Was Charlie Crowley in the room
13:23:44 13   when the vote was taken?
13:24:05 14      A.  For the actual vote, I'm not sure
13:24:07 15   whether he had stepped out, but I believe that
13:24:11 16   they both were there, that Charlie and Jeff
13:24:16 17   were there.
13:24:16 18      Q.  How about Cliff Roe?
13:24:18 19      A.  Yes, he was there.  That I know,
13:24:20 20   but Mr. -- but Mr. Crowley and Mr. Moritz were
13:24:25 21   in and out, making phone calls, so there is a
13:24:28 22   possibility he was not in the room.  I, I am
13:24:31 23   not certain of that, but Cliff was there, yes.
13:24:37 24      Q.  Okay.  Based on what I've told you
13:24:39 25   today, do you believe that the 8/2/99 special
```

**Page 760**

13:24:46  1  meeting of the Board of Directors unanimously
13:24:48  2  approved the acquisition between OHSL and
13:24:51  3  Provident?
13:24:52  4          MR. RAMSEY: Objection.
13:24:54  5      A.   My personal opinion is yes,
13:24:56  6  whether he says he did or didn't. The one
13:24:58  7  absent party was totally in favor of it and the
13:25:02  8  Chairman of the Board was in favor of it.
13:25:04  9  Whether there is a legal issue there that can
13:25:06 10  be brought is something totally out of my
13:25:09 11  purview, but yes, I believe that the
13:25:13 12  transaction was unanimously approved.
13:25:18 13      Q.   Okay. To approve a transaction
13:25:20 14  unanimously or otherwise, what does it take?
13:25:24 15      A.   It takes a quorum of the Board and
13:25:26 16  then a majority of that quorum to approve it,
13:25:29 17  is my understanding.
13:25:31 18      Q.   When you say a majority of the
13:25:32 19  quorum, you're talking about votes, correct?
13:25:34 20      A.   Correct. If there -- if a quorum
13:25:36 21  is established at five, it would take three of
13:25:38 22  that five.
13:25:39 23      Q.   Right. And you testified that you
13:25:41 24  still felt that this was a unanimous approval
13:25:43 25  of the transaction. Is that your testimony?

**Page 761**

13:25:48  1      A.   Yes, sir.
13:25:48  2      Q.   Okay. And that surprised me, and
13:25:50  3  I'd just like you to explain for the record, if
13:25:54  4  you have two people who didn't vote, one who is
13:25:57  5  not there and one who abstained, how you can
13:26:01  6  sit here under oath and say that you still
13:26:03  7  believe it's a unanimous approval? I
13:26:06  8  understand that they were in favor of it, but
13:26:07  9  that's not what this part of the sentence
13:26:10 10  refers to, is it?
13:26:11 11      A.   As I -- as I mentioned, from a
13:26:16 12  legal standpoint, the term unanimously here is
13:26:22 13  obviously causing you and probably is causing
13:26:25 14  other folks difficulty. But, but it is my
13:26:30 15  testimony today that if all seven directors
13:26:35 16  were sitting around this table and this
13:26:39 17  question had been raised of them prior to the
13:26:41 18  taking of the vote, that all seven would have
13:26:48 19  unanimously -- would have voted for the
13:26:49 20  transaction.
13:26:53 21          Again, it is, it is a
13:26:54 22  misstatement, as you pointed out, that Mr.
13:26:56 23  McKiernan was not there. So something to the
13:27:01 24  effect, I guess, that the Board members present
13:27:05 25  at the meeting or something, unanimously

**Page 762**

13:27:07  1  approved, that would have clarified that. As
13:27:09  2  to Norb's actions, I can't address that. I
13:27:15  3  still find that difficult that he, he didn't
13:27:19  4  vote one way or the other for the transaction,
13:27:22  5  but that -- again, that's something that he has
13:27:24  6  stated and that's fine. That's -- that's the
13:27:28  7  position he took.
13:27:29  8          Then I believe that the term
13:27:32  9  unanimously should have been stricken from this
13:27:34 10  document and, and reread and reread and reread
13:27:40 11  at all levels, this page. And that should have
13:27:43 12  been taken out of it. Mr. McKiernan, I
13:27:46 13  believe, was back in town before it was printed
13:27:48 14  and he should have said something as well.
13:27:50 15      Q.   How about Mr. Roe? How could he
13:27:53 16  let this document go out if he was in the room
13:27:55 17  and he knew that it was not a unanimous vote?
13:27:57 18          MR. RAMSEY: Objection.
13:27:59 19      A.   How could he do that? I don't
13:28:01 20  know. He read the document as well. That
13:28:02 21  would be a question for Mr. Roe.
13:28:14 22      Q.   Now, you had previously voted to
13:28:16 23  abstain at the July 22nd, 1999 Board meeting.
13:28:22 24  Do you remember that?
13:28:22 25      A.   Yes, sir.

**Page 763**

13:28:23  1      Q.   Let me place what has been marked
13:28:26  2  as Brinker Deposition Exhibit Number 3 in front
13:28:28  3  of you. Have you seen that document before?
13:28:31  4      A.   Yes, sir.
13:28:31  5      Q.   Are you familiar with it?
13:28:31  6      A.   Yes, sir.
13:28:32  7      Q.   Do you recognize it?
13:28:35  8      A.   Yes, sir.
13:28:35  9      Q.   What is Brinker Deposition Exhibit
13:28:37 10  Number 3?
13:28:37 11      A.   It is a copy of the special
13:28:39 12  meeting minutes of the Board of Directors of
13:28:42 13  OHSL of July 22nd, 1999.
13:28:47 14      Q.   And at this point, when this vote
13:28:49 15  was taken, you did not have your change of
13:28:51 16  control contract in place, correct?
13:29:04 17      A.   Let me review where we are here.
13:29:22 18  I believe that's correct.
13:29:24 19      Q.   And on August 2nd, 1999, you did
13:29:28 20  have your change of control contract in place,
13:29:30 21  correct?
13:29:31 22      A.   Yes, sir, that's correct.
13:29:32 23      Q.   And the change of control contract
13:29:34 24  called for a payment of 375,000 by Provident to
13:29:39 25  you, correct?

764

13:29:40 1   A. Yes, sir. In essence that's what
13:29:42 2 it did. It did not name Provident
13:29:45 3 specifically, but by anyone that would take us
13:29:48 4 over, that's correct. Ultimately it was
13:29:50 5 Provident, yes.
13:29:52 6   Q. Okay. Why did you change your
13:29:53 7 vote from abstaining on July 22nd, to in favor
13:29:55 8 of on August 2nd, 1999?
13:29:59 9   A. We had, we had discussed the
13:30:03 10 ramifications of dissenting votes when we came
13:30:09 11 to publication. And for the benefit of the --
13:30:14 12 it was the opinion of certain individuals that
13:30:19 13 if you had a dissenting vote, that could carry
13:30:27 14 some distinct ramifications that might, in
13:30:30 15 fact, cause difficulties down the road in the
13:30:33 16 transaction. So, so in essence, I just gave
13:30:38 17 up. I felt as the last ditch effort on July
13:30:41 18 22nd, I would, I would vote -- or I would
13:30:46 19 abstain from the vote. And by August 2nd, I
13:30:50 20 just gave in and I voted for the transaction.
13:30:54 21   Q. You said in your previous answer,
13:30:56 22 "we had discussed the ramifications of
13:30:58 23 dissenting votes." First let me ask you, who
13:31:01 24 does the "we" refer to in that answer?
13:31:03 25   A. I had talked with different

765

13:31:06 1 individuals. I had talked with my management
13:31:08 2 team. I had talked with some independent
13:31:14 3 outside counsel and other folks. The majority
13:31:19 4 of professionals agree that a transaction is,
13:31:24 5 is viewed, in the general public's eye, to be a
13:31:30 6 cohesive transaction if, in fact, everybody
13:31:34 7 votes unanimously.
13:31:35 8     Now, counter to that, if, you
13:31:40 9 know, if I personally were going to try to stop
13:31:44 10 the transaction, then, you know, you would vote
13:31:50 11 against it and you would try to garner votes
13:31:52 12 and do those types of things. And that was not
13:31:55 13 my intent. It was going to go, it was evident
13:31:58 14 that it was going to go.
13:32:01 15     My opposition was -- my vehement
13:32:04 16 opposition was voiced before the marketing book
13:32:07 17 was put together. Once the marketing book was
13:32:10 18 out in the hands of those people who were
13:32:14 19 interested in the transaction, I guess one
13:32:17 20 would say I had given up. I had given up the
13:32:20 21 fight.
13:32:21 22   Q. Okay. You said you talked with
13:32:21 23 your management team about this.
13:32:24 24   A. Yes.
13:32:24 25   Q. Did you talk with Terry Todd?

766

13:32:26 1   A. Yes.
13:32:27 2   Q. Do you remember what you said and
13:32:28 3 what he said? If words, fine; if substance,
13:32:32 4 also fine.
13:32:33 5   A. It was just general conversations
13:32:34 6 that again, we had talked about, you know, all
13:32:40 7 of those people that were in favor of the
13:32:43 8 transaction and that -- not that we were going
13:32:46 9 to vote unanimously for it, but that it was
13:32:50 10 going to pass and there was no -- there was no
13:32:56 11 reason to, when it come down to the final vote,
13:32:59 12 to fight, to fight the transaction. We were
13:33:02 13 totally outnumbered. We did not have the
13:33:07 14 backing or the means from a fiscal standpoint
13:33:12 15 to try to do anything.
13:33:13 16   Q. When you said "we" in your
13:33:15 17 previous answer, to whom were you referring to?
13:33:18 18   A. Those folks on management and in,
13:33:22 19 and in the company that might try to keep the
13:33:26 20 thing glued together.
13:33:27 21   Q. Well, how about at the Board
13:33:29 22 level?
13:33:29 23   A. Didn't approach anyone at the
13:33:31 24 Board level about that.
13:33:33 25   Q. Okay. Did you talk to Cliff Roe

767

13:33:35 1 about this very point?
13:33:36 2   A. About a unanimous vote?
13:33:39 3   Q. Or the ramifications of dissenting
13:33:41 4 votes.
13:33:42 5   A. No, sir.
13:33:43 6   Q. You said you talked to your
13:33:44 7 outside counsel.
13:33:45 8   A. Um-hmm.
13:33:45 9   Q. That's the person from Vorys,
13:33:47 10 Sater?
13:33:48 11   A. No, I talked with some other
13:33:49 12 individuals.
13:33:50 13   Q. Okay. With whom did you speak?
13:33:52 14   A. I talked with Bill Sulau, who
13:33:54 15 is -- was our corporate counsel at Oak Hills.
13:34:00 16 And I also talked with, with Barry Forrester,
13:34:07 17 who is not an attorney, but I sought him as
13:34:10 18 counsel, just in the general sense of the word
13:34:12 19 counsel.
13:34:12 20   Q. Now, when you say Bill Sulau, is
13:34:15 21 there an older Bill Sulau who's in his
13:34:18 22 seventies or eighties?
13:34:20 23   A. A Charles Sulau, his father.
13:34:22 24   Q. But this Sulau --
13:34:24 25   A. Is his son.

768

13:34:25 1   Q. And he's an attorney?
13:34:26 2   A. Yes, sir.
13:34:27 3   Q. And what did you say to him and
13:34:28 4 what did he say to you?
13:34:29 5   A. Again, we just -- in general, we
13:34:31 6 chatted about the transaction. He had -- on
13:34:36 7 one occasion he called and stated his father
13:34:39 8 was upset about the transaction. And I said
13:34:45 9 his father was not alone and that, you know, it
13:34:53 10 was going to go and, you know, it was to the
13:34:55 11 benefit of everyone at this point in time,
13:34:57 12 unless we were going to launch some, some major
13:35:00 13 undertaking, to go along with the transaction.
13:35:04 14   Q. Okay. How about with Barry
13:35:06 15 Forrester?
13:35:07 16   A. Um-hmm.
13:35:07 17   Q. What did you say to him and what
13:35:09 18 did he say to you?
13:35:14 19   A. There's no way that I could
13:35:14 20 capsulize those discussions. Those discussions
13:35:14 21 went over years. I mean, we -- we talked about
13:35:19 22 different transactions on many occasions, and
13:35:26 23 the fact that -- before we ever got far into
13:35:31 24 this process, marketing books weren't out, I
13:35:36 25 mean nothing was really happening.

769

13:35:39 1   He had talked about different
13:35:41 2 transactions throughout the country that --
13:35:42 3 where the management was not on board with the
13:35:47 4 transaction and, and how it would literally --
13:35:51 5 it can take a transaction apart and that it was
13:35:54 6 to the benefit of our Board to, first of all,
13:35:56 7 have management on board, have them locked up
13:36:01 8 with, with contracts. And then at the same
13:36:06 9 time, he was quite taken aback that McDonald
13:36:11 10 had not required --
13:36:15 11   Q. The opinion of management in the
13:36:17 12 document?
13:36:17 13   A. No, no, no. I cannot think of the
13:36:21 14 term, voting agreements.
13:36:24 15   Q. Oh.
13:36:25 16   A. That, in fact, prior to entering
13:36:27 17 into the transaction or coming down to the last
13:36:29 18 day, August 2, if you will, that they had not
13:36:34 19 required those to be executed, because in a lot
13:36:37 20 of documents you see that, and that never came
13:36:40 21 to fruition in our transaction.
13:36:43 22   Q. Okay. Other than what you've
13:36:44 23 mentioned, anyone else you can recall talking
13:36:47 24 to about ramifications of dissenting votes?
13:36:50 25   A. I don't believe so.

770

13:36:53 1   Q. Okay. Between July 22nd, 1999 and
13:36:56 2 August 2nd, 1999, did you feel like you had
13:36:59 3 lost an ally with the resignation of Mr.
13:37:04 4 Herron?
13:37:05 5   A. I was saddened to see Mr. Herron
13:37:08 6 go. I don't think I lost an ally. I think
13:37:14 7 he's still in agreement that the transaction
13:37:16 8 wasn't in the best interest and just did not --
13:37:22 9 I guess to answer your question succinctly, I
13:37:27 10 don't feel I lost an ally, I believe he is
13:37:29 11 still an ally. He didn't change his mind.
13:37:35 12 Yes, I, I lost him in the fact that he was not
13:37:39 13 on the Board at the time of the vote, but I
13:37:44 14 don't think that would have made any
13:37:45 15 difference.
13:37:46 16   Q. Okay. Between July 22nd, 1999 and
13:37:48 17 August 2nd, 1999, did you have any discussions
13:37:52 18 with Mr. Zoellner about what was going to
13:37:57 19 happen at the next special meeting?
13:38:01 20   A. Not that I can recall.
13:38:06 21   Q. Did you perceive Mr. Zoellner as
13:38:09 22 voting in favor of this transaction only
13:38:12 23 reluctantly?
13:38:13 24   A. Yes. Mr. Zoellner was a proponent
13:38:16 25 of continuing an independent operation.

771

13:38:20 1   Q. Despite his vote as a director in
13:38:22 2 favor of the transaction?
13:38:23 3   A. Absolutely.
13:38:26 4   Q. Then why did he vote in favor of
13:38:27 5 the transaction as a director?
13:38:29 6   MR. RAMSEY: Objection.
13:38:29 7   A. That would be a question you'd
13:38:31 8 have to ask Howard.
13:38:41 9   Q. Mr. Hanauer, if I can sum this up,
13:38:44 10 it seems to me that you've learned for the
13:38:46 11 first time here today that Mr. Brinker did not
13:38:48 12 vote in the transaction on August 2nd, 1999 at
13:38:54 13 the special meeting, at least as per his
13:38:58 14 testimony; is that fair?
13:38:59 15   A. That's my testimony.
13:39:01 16   Q. And you did not remember at our
13:39:08 17 prior sessions and until I put the minutes in
13:39:13 18 front of you, that Mr. McKiernan was out of the
13:39:16 19 country on August 2nd, 1999 and, therefore, did
13:39:20 20 not vote to approve the transaction on August
13:39:22 21 2nd, 1999, correct?
13:39:25 22   MR. RAMSEY: Objection.
13:39:25 23   A. That is correct.
13:39:26 24   Q. But you weren't the only one who
13:39:28 25 was assembling these documents who would have

772

```
13:39:30  1   or should have known these facts, correct?
13:39:33  2            MR. RAMSEY:  Objection.
13:39:35  3        A.  That should have known that these
13:39:37  4   people were out of town?
13:39:39  5        Q.  Well, only Mr. McKiernan was out
13:39:41  6   of town.
13:39:42  7        A.  Okay.
13:39:43  8        Q.  But --
13:39:44  9        A.  Or that he didn't -- I don't know.
13:39:47 10   Let's address Norb's voting, nonvoting -- the
13:39:52 11   nonvoting issue.  I don't know that anyone was
13:39:58 12   aware or not aware of the fact of how he voted
13:40:04 13   or did not vote, abstained in this case.
13:40:07 14   Because again, in the minutes it was not -- it
13:40:11 15   was not pointed out that that's, in fact, how
13:40:14 16   it should be.
13:40:15 17            And it's ironic that the minutes,
13:40:17 18   I believe this is the last minutes before
13:40:19 19   August 2, I did just as I testified, point out
13:40:24 20   when we had negative votes, you saw that.  And
13:40:28 21   when we had abstentions, you saw that.  So it
13:40:32 22   was -- you know, it was not a -- any action on
13:40:36 23   my part to try to conceal the fact that, that
13:40:42 24   Norb did not vote.
13:40:47 25        Q.  How about Mr. McKiernan being out
```

773

```
13:40:49  1   of town?  I mean, with all of the people who
13:40:51  2   looked at this document, referring to the proxy
13:40:53  3   materials and the prospectus, how was that
13:40:58  4   missed?
13:40:59  5        A.  I can't answer that.  Again, we
13:41:03  6   reviewed and did not sit there and head count
13:41:09  7   when it came down to a statement of
13:41:12  8   unanimously -- unanimously approved.  How was
13:41:17  9   it?  I don't know.  That's something that
13:41:22 10   again, in hindsight, I would think that someone
13:41:30 11   possibly could have mentioned, you know, Tom
13:41:31 12   was -- Tom was in Europe, that's not correct.
13:41:37 13            I believe you stated it was Tom's
13:41:38 14   testimony that, that he felt unanimously meant
13:41:43 15   of those present and able to vote at that point
13:41:47 16   in time.  So if that's the case, was that the
13:41:51 17   feeling of everyone else in the room and
13:41:53 18   everyone else that looked at this document, you
13:41:55 19   know.
13:41:56 20            I would have to exonerate my
13:41:58 21   management team who reviewed the document, they
13:42:01 22   didn't know, you know, who was at the meeting
13:42:05 23   and who wasn't, so I don't think they were
13:42:07 24   aware that Tom was out of the country, maybe
13:42:09 25   they were.  But again, when you start putting
```

774

```
13:42:10  1   this document together, that's the furthest
13:42:18  2   thing from your mind that there was someone
13:42:20  3   absent from this meeting that was -- I believe
13:42:23  4   if it had been a -- had Tom Herron, who was
13:42:31  5   opposed to the transaction, not been at the
13:42:34  6   meeting, I believe it would have been recalled,
13:42:43  7   because people could then raise the question,
13:42:46  8   you took the vote when you knew you could put
13:42:49  9   unanimous in there because he wasn't there.
13:42:51 10            That is not the case with Mr.
13:42:52 11   McKiernan.  Mr. McKiernan, I believe, would
13:42:59 12   have voted for the transaction, had he been
13:43:01 13   given the opportunity to do so, because
13:43:03 14   certainly he was the one that led McDonald to
13:43:05 15   us and, and did all the -- did all of the work
13:43:08 16   and was the proponent of the transaction.
13:43:10 17        Q.  Right, absolutely.
13:43:11 18        A.  But --
13:43:12 19        Q.  Mr. McKiernan's testimony in
13:43:13 20   substance was, yes, had he been there, he would
13:43:17 21   have voted in favor of the transaction.
13:43:18 22        A.  Okay.  Okay.
13:43:19 23        Q.  But my question was, why wasn't
13:43:20 24   that addressed with a footnote or another
13:43:23 25   sentence?
```

775

```
13:43:23  1        A.  It was --
13:43:24  2            MR. RAMSEY:  Objection.
13:43:24  3        A.  It was missed, just we're human,
13:43:28  4   it was missed.
13:43:29  5        Q.  Okay.  Knowing what you know now
13:43:33  6   and accepting my representation about Mr.
13:43:35  7   Brinker's nonvote as true, do you have any
13:43:38  8   problems with this document?
13:43:43  9            MR. RAMSEY:  Objection.
13:43:53 10        A.  The term unanimously approved is
13:43:55 11   in there, that is an incorrect term.  I believe
13:43:59 12   we've gone through this thing page after page
13:44:01 13   and found a couple of other items that were in
13:44:03 14   there as well, but, but in the overall scheme
13:44:08 15   of things, I don't think it would have changed
13:44:10 16   anything.
13:44:11 17            This page is wrong.  I believe at
13:44:17 18   this point in time there's, there's nothing
13:44:20 19   that could be done to change -- there's nothing
13:44:23 20   that can be done that is going to change that.
13:44:27 21        Q.  Okay.  A couple of things.  First
13:44:29 22   of all, if you could limit your answer not to
13:44:32 23   whether or not you feel that this would have
13:44:33 24   changed the outcome or anything like that, and
13:44:36 25   to go back in time, we're sitting here on
```

776

1  August 8th, 2000, let's go back to when this
2  document was being assembled. Knowing what you
3  know now, is there anything that you would have
4  done differently with respect to the ultimate
5  publication and dissemination of this document?
6       A.  Certainly, I would have changed
7  that paragraph to read correctly.
8       Q.  Okay. And how would you have
9  changed that paragraph? What language would
10 you use?
11      A.  Well, if it would have -- if I
12 would have known, first of all, that the
13 Chairman of the Board would have abstained, I
14 would have called on an attorney to write that
15 paragraph.
16      Q.  Okay. Well, I can't write it, so
17 what language would you use?
18      A.  I don't know. I don't think --
19 and again, I didn't write it, I don't think
20 that's relevant. What would I have done, that
21 the Chairman of the Board was too chicken to
22 vote yes or no on the transaction? I don't
23 know.
24          I mean, it was his, it was his --
25 it was his wish that we forward -- that went

777

1  forward with this whole transaction. Now
2  you're telling me we got to the last day and he
3  backed away. That's starting to get under my
4  crawl a little bit.
5       Q.  Well, actually I think he did more
6  than back away, because he attempted to shift
7  responsibility for the merger from the Board of
8  Directors to the shareholders, because he
9  testified in substance, I didn't vote for this,
10 I didn't approve this transaction, it was the
11 shareholders, they voted for this, what could I
12 do. That seemed to be his testimony in
13 substance.
14      A.  He could have stopped it, it would
15 have never --
16          MR. RAMSEY: Objection. Assumes
17 facts not in evidence.
18      A.  Yeah, I don't -- I don't know what
19 his testimony was, but quite frankly he had --
20 I -- he was given many opportunities to, to
21 shut this whole transaction down. And he
22 couldn't get some of his other directors under,
23 under control and so, sure, he has seen --
24 hindsight is wonderful.
25          He has seen the -- what has

778

1  happened to his company, if you will. And
2  quite frankly, a year later with his net worth
3  being tapped away as it's been, he's probably
4  got some second thoughts on the thing, but you
5  have to move -- you have to move on.
6          For him to say that he didn't vote
7  for the transaction, the shareholders did -- he
8  had the wherewithal to stop that. It would
9  have never gotten there if he had had any, any
10 backbone at all as we went through the whole
11 process. We would have never gotten to the
12 process in the first place, had he not been in
13 favor of it.
14      Q.  Okay. Mr. Hanauer, let's see if I
15 can rewrite this sentence and this paragraph.
16 You said it should have written by a lawyer,
17 let me throw some things out and we'll see if
18 you agree or disagree that this would be more
19 informative and more accurate.
20      A.  Can I ask you a question before
21 you start that? What is the relevance of doing
22 this? Why, why are we writing -- why are we
23 writing this? You know, I have testified that
24 paragraph is wrong, I would have rewritten it.
25 If, if it had been, to my recollection, that

779

1  Mr. McKiernan wasn't there, certainly we would
2  have noted that. Had I known that Mr. Brinker
3  abstained from the vote, we would have put that
4  in there. I will stipulate to all that. Why
5  are we wasting time on this paragraph?
6       Q.  Okay. I'll accept what you just
7  said. How about Mr. Herron's resignation, is
8  there anything --
9       A.  Absolutely not. Mr. Herron was
10 not a part of the Board on August the 2nd. And
11 everybody knows that, and we've talked about
12 that up one side and down the other for the
13 last several times I've been here. And there's
14 nothing we can do.
15          We disclosed, albeit in somewhat
16 of a left-handed format, that he was not on
17 the, on the Board, because he's not listed as a
18 Board member. Did we disclose that Mr. Herron
19 several days before the vote was taken,
20 tendered his resignation? We did not. That is
21 something that was brought up with our legal
22 counsel and they felt that it should stay out
23 of the document and we left it out. That's
24 something I broached with him and he said leave
25 it out and we did not dwell on that. It's

780

13:49:02 1  immaterial to the transaction, his opinion.
13:49:05 2  And that's what we did.
13:49:07 3      Q.  Why do you say "it's immaterial to
13:49:09 4  the transaction"?
13:49:10 5      A.  I didn't say that, Cliff said
13:49:13 6  that.
13:49:14 7      Q.  Oh, excuse me.
13:49:15 8      A.  Cliff said it's immaterial to the
13:49:17 9  transaction, I didn't say that.
13:49:19 10     Q.  Did you agree with that?
13:49:23 11     A.  Having talked with Barry
13:49:24 12 Forrester, Barry felt that it was a
13:49:27 13 misstatement of fact, I think was his
13:49:30 14 phraseology, that -- or a -- he had another
13:49:35 15 term, may have been that we had left something
13:49:37 16 out in not openly disclosing that Mr. Herron
13:49:45 17 had left the Board, had resigned from the
13:49:48 18 Board.
13:49:49 19     People could infer, the
13:49:52 20 shareholders could infer a lot of things from
13:49:54 21 that, but I don't think it's something that,
13:49:59 22 that correctly warranted on the face of this
13:50:03 23 document in bold print, Tom Herron resigned
13:50:06 24 from the Board.  And I don't think it belonged
13:50:09 25 on the first page or the second.  It belonged

781

13:50:11 1  possibly in the Board makeup piece back here,
13:50:13 2  that he had, in fact, tendered his resignation.
13:50:17 3      That is something that Cliff said
13:50:20 4  and he certainly, I hope, knows a lot more
13:50:25 5  about law than I do, said it was something that
13:50:28 6  did not need to be in the document and,
13:50:30 7  therefore, it is not in the document.
13:50:33 8      Q.  Okay.  And Mr. Roe gave you his
13:50:35 9  legal guidance, correct?
13:50:36 10     A.  He gave me his opinion that, and I
13:50:39 11 called him under the guise of seeking his legal
13:50:42 12 opinion, yes.
13:50:43 13     Q.  Okay.
13:50:44 14     A.  I was billed for that, so I would
13:50:45 15 say it was legal, yes.
13:50:48 16     Q.  Okay.  Let's put aside legal.  You
13:50:50 17 talked about how you disclosed -- you felt you
13:50:53 18 disclosed Mr. Herron's resignation in some kind
13:50:57 19 of a left-handed fashion.  Let's talk purely
13:51:00 20 from a fairness point of view.  You have
13:51:02 21 testified earlier that you said you're a fair
13:51:04 22 man.  Did you ever suggest to Mr. Roe or to
13:51:06 23 anyone, hey, let's not do this in a left-handed
13:51:10 24 fashion, let's say Mr. Herron did not agree
13:51:16 25 with the direction of the company, he voted

782

13:51:18 1  against this transaction on July 22nd, 1999.
13:51:23 2  Shortly thereafter, he tendered his resignation
13:51:28 3  effective July 30th, 1999.  Did you ever say,
13:51:30 4  let's be fair, let's tell the shareholders
13:51:33 5  exactly what the deal is?
13:51:34 6      A.  No, because we didn't disclose any
13:51:36 7  votes other than the August 2 vote.  So no, it
13:51:39 8  was not -- no.
13:51:47 9      Q.  Okay.  I previously sent you Mr.
13:51:49 10 Condren's deposition.  Have you had time to
13:51:51 11 review that?
13:51:52 12     A.  Yeah.  What was the purpose of
13:51:53 13 that?
13:51:54 14     Q.  Just so you can be fully informed.
13:51:56 15 Do you have any --
13:51:57 16     A.  Of what?
13:52:02 17     Q.  To refresh your recollection.
13:52:04 18     A.  I'd like to have seen some of the
13:52:05 19 other ones rather than Pat's, but that's okay.
13:52:09 20     Q.  You tell me --
13:52:09 21     A.  No.
13:52:10 22     Q.  -- what depositions you'd like to
13:52:11 23 see, I'd be happy to send them to you.
13:52:14 24     A.  I really don't.  Let's not kill
13:52:15 25 any more trees.  Yeah, I got his deposition.

783

13:52:22 1      Q.  Do you have any comments on his
13:52:22 2  deposition?
13:52:22 3      A.  He, he seemed to take the middle
13:52:24 4  road on a few things and exonerated himself
13:52:27 5  from some of the -- some of the things, but in
13:52:29 6  all it was relatively factual.  People's
13:52:32 7  opinion, everybody's opinion is different, I
13:52:34 8  guess, of their capabilities and how they're
13:52:37 9  treated and so forth.
13:52:38 10     I think as it relates to the
13:52:40 11 transaction, from a Board standpoint, Pat was
13:52:47 12 not treated fairly, his opinion was not
13:52:49 13 requested.  His opinion -- his opinion was not
13:52:52 14 valued by the Board, and so subsequently I
13:52:57 15 could see why he'd -- he drew some of the
13:53:06 16 opinions of me and of the Board that he did.
13:53:09 17 That's something that I have to shoulder.
13:53:15 18     Q.  Did his testimony with respect to
13:53:17 19 the actions of Al Hucke several days before
13:53:20 20 October 25th, 1999 and the special meeting of
13:53:25 21 shareholders to approve the transaction, did
13:53:27 22 that surprise you in any way?
13:53:29 23     MR. RAMSEY:  Objection.
13:53:29 24     A.  I'm not sure exactly what, what
13:53:31 25 actions Pat referred to with Al, other than --

784

```
13:53:38  1   if you're referring to, you know, wanting to
13:53:42  2   procure a list to contact shareholders. Did
13:53:45  3   that surprise me? No. I was aware of the fact
13:53:51  4   that he was doing that.
13:53:52  5        Q. How about the threats to fire Pat
13:53:54  6   Condren and the entire management team if this
13:53:57  7   deal blew up for any reason other than
13:53:59  8   Provident's stock price at that time, in the
13:54:02  9   last days before October 25th?
13:54:06 10        MR. RAMSEY: Objection.
13:54:06 11        A. That didn't surprise me in reading
13:54:08 12   that. Mr. Hucke blatantly and in public
13:54:12 13   threatened to fire me on several occasions. So
13:54:14 14   that didn't -- you know, long before -- Mr.
13:54:17 15   Hucke, just a little piece of history, if you
13:54:19 16   will.
13:54:19 17        Mr. Hucke was the one that was
13:54:21 18   instrumental in terminating our employment
13:54:23 19   contracts several years prior. And he has a
13:54:27 20   history of labor-management difficulties, I
13:54:36 21   guess would be the proper phraseology. And so,
13:54:39 22   you know, he was -- from that standpoint, he
13:54:45 23   was a detractor to the company.
13:54:47 24        Had he focused his energies in a
13:54:49 25   positive light, you know, things would have,
```

785

```
13:54:54  1   would have transpired a lot differently than
13:54:57  2   they did. But Mr. Hucke was one that didn't
13:55:01  3   like to relinquish power and, in fact, in
13:55:04  4   several Board meetings when we were offering
13:55:07  5   opinions, he stood up and threatened me and
13:55:10  6   told me that I could be found insubordinate.
13:55:14  7        And I pointed out to him at that
13:55:16  8   point in time that when we sat around the
13:55:18  9   table, we were all equals and that he really
13:55:21 10   should sit down and gather his thoughts before
13:55:23 11   he came at me again in that manner, because I
13:55:27 12   was not a subordinate of his when we sat in the
13:55:30 13   boardroom, I was an equal of his. So he had --
13:55:35 14   he had difficulties with us.
13:55:36 15        Q. If you remember the specific
13:55:37 16   testimony, Mr. Hucke told Mr. Condren that if
13:55:42 17   this deal collapsed, the entire Board would --
13:55:46 18   excuse me, the entire management team would be
13:55:49 19   fired, and that the Board had met and he had
13:55:52 20   the Board's backing to make these
13:55:54 21   representations in substance. Do you remember
13:55:56 22   in substance that testimony?
13:55:58 23        MR. RAMSEY: Objection.
13:56:00 24        A. I do not draw immediately on, on
13:56:04 25   that, but I will accept that, that in there in
```

786

```
13:56:11  1   form and substance, okay. I understand what
13:56:13  2   you're saying.
13:56:14  3        Q. My question now is that was not
13:56:16  4   true, meaning the Board had not met that week
13:56:18  5   and had not come to the conclusion that you and
13:56:21  6   the entire management team would be fired if
13:56:24  7   this transaction did not go through for any
13:56:27  8   reason other than Provident's stock price,
13:56:30  9   correct?
13:56:31 10        MR. RAMSEY: Objection.
13:56:32 11        A. I, I will -- I will testify that
13:56:38 12   the Board had not met formally where I was
13:56:43 13   present and minutes were taken. If they got
13:56:46 14   together, being any number of the Board, if
13:56:49 15   they got together -- I mean that certainly is
13:56:52 16   possible, because that happened frequently.
13:56:57 17   That is possible and that could be a very true
13:57:00 18   statement. I was -- I am unaware that they had
13:57:04 19   met and I am unaware of any vote, if you will,
13:57:08 20   that had been taken.
13:57:11 21        MR. BRAUTIGAM: Okay. Mr.
13:57:11 22   Hanauer, I don't have anything further for you
13:57:14 23   at this time.
13:57:15 24        THE WITNESS: Okay.
13:57:15 25        MR. BRAUTIGAM: And I would like
```

787

```
13:57:16  1   to close this deposition and wrap it up
13:57:18  2   completely.
13:57:19  3        THE WITNESS: Okay.
13:57:19  4        MR. BRAUTIGAM: But I cannot do
13:57:20  5   that because full discovery has not been made,
13:57:23  6   meaning there are several things that you have
13:57:26  7   referenced as existing that presumably are in
13:57:29  8   the hands of KMK that I have not received. And
13:57:31  9   I am going to shut it down for today.
13:57:35 10        THE WITNESS: Okay.
13:57:36 11        MR. BRAUTIGAM: And I'll take that
13:57:36 12   up with Mr. Burke and Jamie and see what the
13:57:39 13   deal is.
13:57:40 14        THE WITNESS: Okay. Are these
13:57:41 15   documents that I had referenced earlier?
13:57:43 16        MR. BRAUTIGAM: For example, one
13:57:44 17   was a lavender legal pad and there was several
13:57:47 18   other references in your deposition to
13:57:50 19   documents that I have not received.
13:57:52 20        THE WITNESS: I'm not sure that
13:57:53 21   those are in the hands of KMK. Those were
13:57:56 22   shipped --
13:57:57 23        MR. BRAUTIGAM: To Dinsmore?
13:57:58 24        THE WITNESS: To Dinsmore, right.
13:58:07 25        MR. BRAUTIGAM: Right.
```

788

```
13:58:07  1          THE WITNESS:  So I won't blame
13:58:07  2  them.  I don't know that they're there.  They
13:58:07  3  may be in Dinsmore's --
13:58:07  4          MR. BRAUTIGAM:  As per my
13:58:09  5  understanding of the testimony, they existed.
13:58:10  6          THE WITNESS:  They existed.
13:58:11  7          MR. BRAUTIGAM:  You were very
13:58:12  8  specific about where you last saw them, they
13:58:16  9  were shipped to Dinsmore and I'm assuming the
13:58:18 10  material from Dinsmore went to KMK.
13:58:21 11          THE WITNESS:  Okay.
13:58:22 12          MR. RAMSEY:  Are you going to be
13:58:24 13  calling him again?  You don't know?
13:58:25 14          MR. BRAUTIGAM:  I don't know until
13:58:27 15  I get the documents.
         16          MR. RAMSEY:  I have a few
         17  questions for you.
         18                EXAMINATION
         19  BY MR. RAMSEY:
13:58:33 20      Q.  Now, as a shareholder, you voted
13:58:37 21  your shares against the transaction --
13:58:39 22      A.  That's correct.
13:58:40 23      Q.  -- because it was your personal
13:58:41 24  belief that it was better to remain
13:58:44 25  independent?
```

789

```
13:58:46  1          MR. BRAUTIGAM:  Objection to
13:58:46  2  personal belief.
13:58:50  3      A.  I wanted, I wanted the company in
13:58:59  4  the, I guess the original sense -- or the
13:59:02  5  deepest sense, I wanted the company to remain
13:59:05  6  independent.  I also wanted just to express my,
13:59:15  7  I guess displeasure with the, the general
13:59:20  8  transaction in that way.  And so I voted -- so
13:59:24  9  I voted against the transaction.
13:59:26 10          I don't know.  I did not disclose
13:59:28 11  that to anyone.  I did not run around saying I
13:59:35 12  was going to vote for the transaction, but I
13:59:37 13  did not disclose to anyone that I was going to
13:59:39 14  vote my shares against the transaction, because
13:59:42 15  quite frankly, I feel that everyone has, you
13:59:47 16  know, their right to vote their shares without
13:59:52 17  somebody trying to sway them one way or
13:59:56 18  another.
13:59:56 19          And it's interesting, it goes back
14:00:00 20  to a vote that we had several years ago when
14:00:04 21  Mr. Hucke abstained from the voting of his
14:00:07 22  shares that year.  And when we asked him why
14:00:10 23  did you do that, he said I didn't want to taint
14:00:12 24  the vote.  Well, you could always see what the
14:00:15 25  vote was, do the math on how many shares you
```

790

```
14:00:18  1  voted and you'd know how people -- you didn't
14:00:21  2  really have to abstain.
14:00:22  3          So it was displeasure with, with
14:00:25  4  the way that the transaction came about.  It
14:00:29  5  was not really displeasure with, with the
14:00:33  6  ultimate buyer at that point in time, it was
14:00:36  7  just voicing displeasure, period.  And it was
14:00:40  8  something that I felt like I wanted to do.
14:00:45  9      Q.  Do you believe that the Board of
14:00:48 10  Directors, when they voted in favor of this
14:00:50 11  transaction, believed that it was in the best
14:00:53 12  interest of the shareholders?
14:00:55 13          MR. BRAUTIGAM:  Objection.
14:00:59 14      A.  I think so, and certainly I tried
14:01:04 15  to give them enough information that we could
14:01:10 16  have gotten to this point in a different
14:01:13 17  fashion.  But do I believe that they thought it
14:01:17 18  was in the best interest?  I believe they did.
14:01:21 19          They had -- and in private
14:01:24 20  conversations and around the Board table, you
14:01:27 21  know, everybody had some of their own money in
14:01:30 22  the transaction or in the company.  And I think
14:01:35 23  they always looked for a, a bigger return and a
14:01:41 24  snappier return -- a quicker, quicker return of
14:01:45 25  their money.
```

791

```
14:01:46  1          I often said when you -- and I'm
14:01:50  2  not there, but when you become 70 plus years of
14:01:53  3  age, you don't have the staying power, you
14:01:57  4  don't have the ability to wait for a return as
14:02:00  5  long as a person 50 years old does.  And so I
14:02:05  6  think they viewed it that way as well, that
14:02:09  7  this is a way that, that they could create some
14:02:14  8  additional wealth for themselves, as well as
14:02:19  9  the shareholders.
14:02:20 10          And I think they thought that it
14:02:23 11  was the best -- it was purported to them by
14:02:25 12  McDonald that it was -- it was a good
14:02:27 13  transaction, it was the best transaction and it
14:02:30 14  would be good for the shareholders.  I think
14:02:33 15  they bought into that.
14:02:35 16      Q.  Okay.  Assuming you disagreed with
14:02:37 17  the transaction, would you characterize that as
14:02:40 18  just a legitimate business disagreement with
14:02:43 19  the Board of Directors?
14:02:45 20          MR. BRAUTIGAM:  Objection.
14:02:48 21      A.  Yeah, it -- it was a, a legitimate
14:02:53 22  disagreement, I think, a business disagreement.
14:02:59 23  We had offered up a couple of other
14:03:00 24  alternatives and, and it was literally the
14:03:04 25  opinion of different folks that this bank is
```

792

```
14:03:10  1   better, this bank isn't, this bank isn't big
14:03:14  2   enough, this bank doesn't have as much --
14:03:17  3   enough liquidity, that if I would want to sell
14:03:20  4   the majority of my shares at one time, I
14:03:23  5   couldn't do that, I would have to wait and do
14:03:26  6   that in dribbles and drabs. So I think all in
14:03:31  7   all, it was -- it was just a legitimate
14:03:34  8   disagreement as to whether it was -- the
14:03:39  9   transaction was a good one or bad one.
14:03:48 10        Q.  Okay.  Do you believe that there
14:03:49 11   were any material facts omitted from the proxy
14:03:52 12   statement?
14:03:52 13        A.  As, as we have gone around and
14:03:54 14   around and reviewed those, I believe that there
14:04:06 15   could have been some rewording, especially on
14:04:10 16   the front page as we talked about today, that
14:04:15 17   would have been correct as opposed to the
14:04:18 18   document that we have in front of us.  Is that
14:04:24 19   material?  I don't know that I can weigh
14:04:28 20   material in that regard.
14:04:31 21        And I have no way of knowing
14:04:33 22   whether there would -- whether that would have
14:04:36 23   had any other outcome.  We've chatted about
14:04:40 24   some of the other things within the, within the
14:04:46 25   document, Mr. Herron's resignation and those
```

793

```
14:04:47  1   types of things.  Again, relying on legal
14:04:51  2   counsel and, and setting my personal opinion
14:04:55  3   aside -- and certainly we paid good money for
14:04:58  4   that counsel, he said that those were not
14:05:02  5   material to the transaction.
14:05:06  6        And so I guess my, my testimony
14:05:10  7   would be that even though a general feeling is
14:05:15  8   if you did have a -- if you could have a
14:05:18  9   perfect document, there would be a little more
14:05:20 10   in it.  Whether that constitutes material or
14:05:24 11   not, I don't know.  I don't know whether it
14:05:28 12   does.
14:05:29 13        Q.  Is it your testimony that -- is
14:05:36 14   there anything about the proxy statement, if
14:05:38 15   done differently, that would have changed the
14:05:43 16   vote?
14:05:45 17        MR. BRAUTIGAM:  Objection.  That's
14:05:46 18   ridiculous.
14:05:49 19        A.  We talked -- one of the things
14:05:50 20   that we talked about -- I don't know whether it
14:05:53 21   would have changed the vote, it could have
14:05:55 22   raised some questions that might have been
14:05:57 23   asked of the Board.  For example, the -- I
14:06:01 24   believe there was a -- after the printing there
14:06:04 25   was a misstatement of the signing of the
```

794

```
14:06:10  1   management agreements.  I believe it was
14:06:12  2   referred in the document as June when, in fact,
14:06:14  3   it was the end of July.
14:06:18  4        I don't know whether that would
14:06:19  5   have caused any concern or not.  There are
14:06:23  6   several people within our organization, Mr.
14:06:26  7   Condren was one of them, that believed that,
14:06:29  8   you know, the majority of the people when
14:06:32  9   they're handed a document that size do not read
14:06:34 10   it page for page as the people that wrote it.
14:06:40 11        And as you can see and as we have
14:06:43 12   discovered through this process, even reading
14:06:46 13   it page for page, line by line, there can be,
14:06:50 14   there can be differences of opinion and there
14:06:52 15   can be some omissions.  I don't think there was
14:06:57 16   anything on my part that was deliberately left
14:07:01 17   out of the document or misleading.  There were
14:07:04 18   things that I put in the document that were
14:07:06 19   omitted by legal counsel, and that was their
14:07:12 20   prerogative to do that.
14:07:18 21        Q.  Okay.  Is it your testimony that
14:07:19 22   this is not necessarily the transaction that
14:07:22 23   you would have liked, but in the end, you were
14:07:26 24   comfortable with it?
14:07:28 25        MR. BRAUTIGAM:  Objection.
```

795

```
14:07:29  1        A.  After it was -- the transaction
14:07:33  2   that I would have liked would have been another
14:07:35  3   transaction, I'll be candid about that.  It was
14:07:39  4   not something that I -- I had sought more of a
14:07:43  5   merger of equals type transaction.  Having
14:07:51  6   started down the road with this transaction
14:07:55  7   and, and once we had actually signed a contract
14:07:59  8   with McDonald, we assimilated the marketing
14:08:07  9   materials.
14:08:07 10        At that point I believe that you
14:08:10 11   go for continuity and closure in a transaction.
14:08:19 12   You do not put yourself up for sale, take
14:08:21 13   yourself off of the market, put yourself up for
14:08:24 14   sale, take yourself off of the market again.
14:08:27 15   It is obvious that -- and everything has to do
14:08:30 16   with timing.  And it is obvious with the, I
14:08:33 17   believe five companies that we were shopped to,
14:08:35 18   ultimately four had no interest at that time.
14:08:44 19        Now, our guys could have closed
14:08:47 20   the process down and waited.  There was
14:08:51 21   allegations that -- and they were
14:08:57 22   unsubstantiated because I never got a call from
14:09:02 23   anyone, but unsubstantiated allegations that
14:09:06 24   Fifth Third had too much on their plate and
14:09:08 25   they would do this and they would do that, and
```

796

1  everybody knows that Fifth Third overpays and
2  all of those types of things.
3        But I think once you enter into
4  this process and once you are -- you have
5  marketed yourself, then I felt, and this is why
6  I voted -- one of the reasons I voted on August
7  2, I felt that you don't -- you can't stop the
8  transaction and act like it never happened, go
9  down the road a year and a half or two years
10 later and gear it up again and be effective.
11       It has had impact on the
12 management team, it has had impact on Board
13 members, on relationships and other things, and
14 it's not going to be the same. So the cloud is
15 not going to be going in the same direction as
16 it was before. There's going to be a lot of
17 forces tearing it apart. So when we got to
18 this part of the transaction, I felt it was
19 good to finalize the transaction, not to -- not
20 to stop the transaction and, and do something
21 totally different.
22   Q.  In the end when all was said and
23 done, do you think that the transaction was a
24 good transaction?
25       MR. BRAUTIGAM: Objection.

797

1   A.  One year later and having
2  Provident's stock price tank, and we have no
3  control over that, if I had it to do over
4  again, I would have liked to have possibly
5  structured the exchange ratio differently. We
6  all know now that it was -- Provident was at
7  one of its highest points at the time that the
8  exchange ratio was set. And certainly you
9  can't hold a transaction open for a year, but
10 you know, it had gone down and it went back up.
11       And when we signed the intent was
12 when it was high and then it dropped. And I
13 think there was some disservice possibly on the
14 part of McDonald to, to have not helped us with
15 that a little bit. They've seen that thing
16 happen before. They chalk it up to, well,
17 that's what the market does.
18       And certainly I would have a
19 totally different opinion if Provident was
20 trading at 60, so -- and that's just from a
21 personal standpoint, but a lot of individuals,
22 and I don't know -- I obviously cannot speak
23 for where OHSL would be trading today, because
24 certainly the financial industry as a whole has
25 been beaten up pretty good right now. So --

798

1   Q.  How about when the deal went
2  through, did you think it was good thing?
3       MR. BRAUTIGAM: Objection. What
4  time exactly are we talking about, December
5  3rd, 1999?
6   Q.  When the deal was closed.
7   A.  Yeah. When all was said and done,
8  I think from a corporate Board perspective,
9  yes. I would have liked to have seen the
10 management of, of Provident do things
11 differently, both for our personnel and quite
12 frankly for our customers as well. But we had
13 totally different operational styles, totally
14 different operational philosophies.
15      People discussed with me and have
16 chatted later that they don't care for
17 Provident, some don't, some do. You know, it
18 was change and people don't like change. And
19 there's no way that you can go through a
20 merger, a merger of, of companies at this
21 magnitude and not have some drastic change.
22      And I think we looked to have
23 maybe a little more insight into that and that
24 didn't happen. And depending upon who you talk
25 to within Provident, some would have liked to

799

1  have had us involved a little more, but the
2  transaction was -- I've never been involved in
3  a transaction like this before, so I don't
4  know, I guess. What I would have liked to have
5  happened and what happened was a little
6  different.
7   Q.  Do you think that at the time it
8  closed, it was a fair transaction?
9   A.  It was fair. It, it was for --
10 for the shareholders, I would have to say it
11 was fair. And again as, you know, they were
12 given enough information to vote the
13 transaction down if they did not, you know, if
14 they did not want it. So I think that's where
15 a lot of times we get caught up in the personal
16 things. And they voted that they wanted
17 something different and so we have to respect
18 that. Don't have to like it, but we have to
19 respect it and that's fine.
20      MR. RAMSEY: That's all I have.
21      RECROSS-EXAMINATION
22 BY MR. BRAUTIGAM:
23  Q.  Okay. I have a few follow-up
24 questions based on what Mr. Ramsey asked.
25  A.  Okay.

**Page 800**

Q. First of all, you just said that you felt the shareholders were given enough information to vote the transaction down if they didn't want it. Do you remember that?

A. Yes, sir.

Q. Okay. Were the shareholders given the information that the Chairman of the Board did not take a position on this with respect to the Board meeting on 8/2/99?

MR. RAMSEY: Objection.

A. You know they were not given that information.

Q. Okay. Were the shareholders given the information that one of the members of the ad hoc committee, Tom McKiernan, was not even in the country and thus did not vote on the transaction, contrary to what's reflected on the first page of the document?

MR. RAMSEY: Objection.

A. They were not given that information, no.

Q. Okay. Were the shareholders given the information, except in a left-handed way, that Mr. Herron had voted against the transaction and then resigned?

**Page 801**

MR. RAMSEY: Objection.

A. Mr. Herron -- I will answer no to that. Mr. Herron never had the opportunity to vote against the transaction. There was only one vote taken and that was the vote on August 2nd to accept that and go forward. We had votes at other points -- at other points in time for different situations, but when we came down to the final vote to accept the transaction as presented and negotiated, we only did that one time and he was not a member of the, the Board at that time.

Q. Okay.

A. So that was not -- he did not have an opinion to be expressed at that time.

Q. Okay. But on July 22nd, 1999 at a special meeting of the Board of Directors of OHSL Financial, Mr. Herron voted against continuing negotiations with respect to this transaction, correct?

A. That's correct. He voted, he voted against continuing the negotiations.

Q. Okay. In some of your previous answers when Mr. Ramsey was asking you questions, you seemed to link the definition of

**Page 802**

materiality with the outcome of the transaction, meaning, well, we might have done some things differently, but I don't think it would have changed the outcome of the transaction. Are you with me on that?

A. Yes, sir, I am.

Q. Okay. Do you believe that there is a link to materiality and changing the outcome of the transaction?

A. I do not know to what degree materiality would have, would have or can change an outcome of any transaction. To be very specific, I do not know what makes up material versus immaterial. When it comes to this, this transaction, as we have discussed correct and uncorrect -- and not correct, I can see that the term unanimously is not a correct term. Whether that is a material fact or not, I'm not sure. I cannot draw that distinction.

So to, to elaborate on your point then, leaving out unanimously and had that paragraph read your Board of Directors approved, which I believe we all say would -- was -- would be more correct than unanimously approved, would that have changed the outcome

**Page 803**

of this transaction? My testimony would be, my belief is no, it would not have. I believe the word approved is strong enough in that paragraph that the word unanimously did not, did not do. Would it have changed the vote slightly? Maybe, but I don't know that.

Q. Now, Mr. Hanauer, your belief that this would not have changed the outcome of the transaction is unknown and unknowable. Meaning there's no way to test this?

A. Absolutely. Absolutely.

Q. So this is just, in a sense, your wild speculation, correct?

A. You can call it wild, yes.

Q. Okay. Have you ever heard a definition from Mr. Roe or anyone that talks not about changing the outcome of the transaction, but information that would be of interest to a reasonable shareholder with respect to the total mix of information available to him or her in the marketplace?

A. From Mr. Roe, no.

Q. Have you ever heard a definition that refers to the total mix of information that a reasonable shareholder would be

804

```
14:19:51  1  interested in in your conversations with Mr.
14:19:54  2  Forrester or with anyone with respect to a
14:19:56  3  definition of materiality?
14:19:58  4       A.  Yes.  And we've testified to that
14:20:00  5  fact early on.
14:20:04  6       Q.  Okay.  You testified previously
14:20:06  7  when Mr. Ramsey was asking you questions that
14:20:09  8  you felt that there was nothing in the proxy
14:20:11  9  materials and the prospectus that was
14:20:14 10  deliberately misleading.  Do you remember that
14:20:16 11  testimony?
14:20:17 12       A.  Yes, sir.  I, I believe I
14:20:20 13  testified that I put nothing in or took
14:20:24 14  anything out that would deliberately mislead
14:20:27 15  people.
14:20:28 16       Q.  Okay.  Do you think that, given
14:20:29 17  some of the representations that I've asked you
14:20:30 18  to accept and our discussion over what's been
14:20:34 19  four days now, that whether it's deliberate or
14:20:37 20  not, this document has the effect of being
14:20:41 21  misleading, at least in certain areas?
14:20:45 22       MR. RAMSEY:  Objection.
14:20:51 23       A.  I -- you could draw the conclusion
14:20:52 24  that it could have a misleading effect.
14:21:00 25       Q.  Okay.  You also testified, and I
```

805

```
14:21:01  1  was surprised by this, that with respect to
14:21:06  2  what made it into the final document, that it
14:21:09  3  was up to legal counsel, and you used the
14:21:11  4  phrase, that was their prerogative.  Why did
14:21:14  5  you believe that to be the case?
14:21:18  6       A.  I had reviewed different pieces of
14:21:22  7  the document and questions that Mr. Forrester
14:21:26  8  had brought to me, and again we have outlined
14:21:29  9  these in our part of the -- part of my prior
14:21:34 10  testimony.  And when we reviewed those with,
14:21:36 11  with Mr. Roe, he said that those were not
14:21:42 12  things that would cause any difficulty, they
14:21:47 13  did not need to be included in the -- he would
14:21:50 14  not rewrite the document, they did not need to
14:21:53 15  be included.
14:21:54 16       One of the questions that -- or
14:21:58 17  one of the things as we initially wrote the
14:22:02 18  document up, Mr. Condren and I, was an account
14:22:09 19  of the thought processes that the ad hoc
14:22:17 20  committee had gone through and the members --
14:22:20 21  the makeup and the members of the ad hoc
14:22:23 22  committee.  And a large portion of that had
14:22:29 23  been removed from the document as well in one
14:22:33 24  of the first readings of it.
14:22:36 25       Q.  This document that you just
```

806

```
14:22:38  1  referred to, an account of the thought process
14:22:40  2  of the ad hoc committee, that existed in draft
14:22:44  3  form to be inserted into this document or not
14:22:46  4  inserted at some point, correct?
14:22:48  5       A.  When we started putting the
14:22:50  6  document together, you know, you -- we had a
14:22:53  7  lot of different pages.  And literally it was
14:22:55  8  in the document.  It was typeset, it was in the
14:22:58  9  document and it was taken out.
14:23:01 10       Q.  Okay.  I don't believe that I've
14:23:02 11  seen that, so when is the last time you've seen
14:23:04 12  that?
14:23:04 13       A.  Mr. Condren had that document.  He
14:23:07 14  was -- he was the keeper.  He was our scribe,
14:23:12 15  if you will.  He was the person that kept all
14:23:15 16  of that -- all of that information.  And that,
14:23:18 17  again, would have been sent down to Cliff.  He
14:23:23 18  bundled up boxes of information and sent --
14:23:26 19  three boxes of information, I believe, was sent
14:23:29 20  down to --
14:23:30 21       Q.  And why did you believe that that
14:23:32 22  account should have been included in the
14:23:34 23  document?
14:23:36 24       A.  I felt it was, it was of
14:23:40 25  interest -- or would be of interest to our
```

807

```
14:23:44  1  local shareholders of who drove the transaction
14:23:52  2  to get it to that point.  I would characterize
14:23:52  3  that also as a vindictive move at this point,
14:23:53  4  but it was something that, you know, if they
14:24:02  5  felt so strongly about it, then once the
14:24:03  6  document came out, let them answer the
14:24:06  7  questions on it.
14:24:07  8       Q.  Now, you testified that you felt
14:24:08  9  McDonald had done OHSL and its shareholders a
14:24:11 10  disservice.  Other than what you mentioned, is
14:24:14 11  there anything else that you want to point out
14:24:16 12  where you felt that OHSL and its shareholders
14:24:19 13  were ill served by McDonald?
14:24:22 14       MR. RAMSEY:  Objection.
14:24:29 15       A.  You always look for personal
14:24:32 16  service when you hire professionals.  And
14:24:40 17  Charlie Crowley was -- his attentions were,
14:24:47 18  were geared to Al Hucke and not to myself.  I
14:24:53 19  took that as a personal affront that I felt
14:25:01 20  that maybe I didn't command his respect, but I
14:25:06 21  deserved his respect as the president and CEO
14:25:11 22  of both Oak Hills Savings and OHSL Financial.
14:25:15 23       And over my objections, which very
14:25:17 24  possibly could have been shared with Charlie
14:25:19 25  over time, his company was hired.  I would not
```

808

1  put that past Mr. McKiernan or Mr. Hucke, to
2  let Charlie know that I was not in favor of him
3  being hired to do it -- to do the transaction.
4  We overpaid, I had informal bids less than what
5  he charged, and it was my personal opinion we
6  could have got a better job, but the Board
7  would not hear of it, because they felt that
8  these people were too closely aligned with
9  myself and the management team.
10      Q. And when you say you overpaid,
11  other than a token payment, I think $15,000,
12  had the transaction not gone through, McDonald
13  would not have received a lot of money,
14  correct?
15      A. Well, they got 15 on the front and
16  a total of 50 to put the book together and do
17  some other things, but right, had the
18  transaction failed -- yeah, they were paid on
19  performance, right.
20      Q. And performance in this case means
21  closing the transaction?
22      A. Got to go or they don't get any
23  money, correct.
24      Q. Okay. Now, in one of your
25  previous answers, you used the phrase sway one

809

1  way or another. Do you remember using that
2  phrase?
3      A. Can you help me with where I used
4  it?
5      Q. It was with respect to a question
6  that Jamie asked you, and I wasn't actually
7  sure of the context and I wanted to follow up
8  on that. Let me ask the next question.
9      A. Okay.
10      Q. You agree with me, do you not,
11  that the prospectus and the proxy materials are
12  documents that do -- that are intended to sway
13  the shareholders to vote in favor of the
14  transaction, correct?
15      MR. RAMSEY: Objection.
16      A. Yes, I believe that -- I believe
17  that they are written in that regard, yes.
18      Q. All right. In fact --
19      A. Sure.
20      Q. In fact, it says on the first
21  page, the Board unanimously recommends and
22  advises that you approve the transaction.
23      A. Sure, sure.
24      MR. BRAUTIGAM: All right.
25  Subject to what I have said, I think that we're

810

1  done for today.
2      THE WITNESS: Okay.
3      MR. BRAUTIGAM: And I thank you
4  for your time.
5      THE WITNESS: All right. And if
6  you need anything else, certainly feel free to
7  get me. I'm not leaving the jurisdiction.
8  I'll be here.

KENNETH HANAUER

- - -

(Deposition concluded at 2:22 p.m.)

- - -

811

CERTIFICATE

STATE OF OHIO:
            SS:
COUNTY OF HAMILTON:

    I, Lee Ann Williams, a duly qualified
and commissioned notary public in and for the
State of Ohio, do hereby certify that prior to
the giving of his deposition, the within named
KENNETH HANAUER was by me first duly sworn to
testify the truth, the whole truth and nothing
but the truth; that the foregoing pages
constitute a true and correct transcript of
testimony given at said time and place by said
deponent; that said deposition was taken by me
in stenotypy and transcribed under my
supervision; that I am neither a relative of
nor attorney for any of the parties to this
litigation, nor relative of nor employee of any
of their counsel, and have no interest
whatsoever in the result of this litigation.
        IN WITNESS WHEREOF, I hereunto set
my hand and official seal of office at
Cincinnati, Ohio this ___ day of
_____, 2000.

MY COMMISSION EXPIRES: _____
AUGUST 26, 2004    LEE ANN WILLIAMS, RPR/CRR
              NOTARY PUBLIC-STATE OF OHIO