# EXHIBIT N

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

- - -

WALTER W. THIEMANN, on behalf of himself and of all others similarly situated,

Plaintiff,

VS.    CASE NO. C-1-00793

OHSL FINANCIAL CORP., OAK HILLS SAVINGS AND LOAN COMPANY, F.A., NORBERT G. BRINKER, KENNETH L. HANAUER, WILLIAM R. HILLEBRAND, ALVIN E. HUCKE, THOMAS E. MCKIERNAN, JOSEPH J. TENOEVER, HOWARD N. ZOELLNER, PROVIDENT FINANCIAL GROUP, INC., ROBERT L. HOVERSON, JACK M. COOK, THOMAS D. GROTE, JR., PHILIP R. MYERS, JOSEPH A. PEDOTO, JOSEPH A. STEGER, CHRISTOPHER J. CARE, CLIFFORD ROE, and DINSMORE & SHOHL, LLP,

Defendants.

- - -

Deposition of CLIFFORD A. ROE, JR., ESQ., a defendant herein, called by the plaintiff for cross-examination, pursuant to

## Page 2

the Federal Rules of Civil Procedure, taken before me, Lee Ann Williams, a Registered Professional Reporter and Notary Public in and for the State of Ohio, at the offices of Gene Mesh & Associates, 2605 Burnet Avenue, Cincinnati, Ohio 45202, on Thursday, December 13, 2001, at 10:00 a.m.

APPEARANCES:

On behalf of the Plaintiff:

Gene I. Mesh, Esq.
and
Michael G. Brautigam, Esq.
Gene Mesh & Associates
2605 Burnet Avenue
Cincinnati, Ohio 45219
and
Ann Lugbill, Esq.
2406 Auburn Avenue Building
Cincinnati, Ohio 45219

On behalf of the Defendants:

Rachael A. Rowe, Esq.
Keating, Muething & Klekamp
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202

On behalf of the Defendants Dinsmore & Shohl and Clifford Roe:

Michael E. Maundrell, Esq.
Schroeder, Maundrell, Barbiere & Powers
110 Governor's Knoll
11935 Mason Road
Cincinnati, Ohio 45249

## Page 3

STIPULATIONS

It is stipulated by and among counsel for the respective parties that the deposition of CLIFFORD A. ROE, JR., ESQ., a defendant herein, called by the plaintiff for cross-examination pursuant to the Federal Rules of Civil Procedure, may be taken at this time by the notary; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may then be transcribed out of the presence of the witness; and that proof of the official character and qualifications of the notary are expressly waived.

- - -

## Page 4

INDEX

Examination of CLIFFORD ROE, JR., ESQ.    Page

By Mr. Brautigam:    6

- - -

| Plaintiff's Exhibit | Page Identified |
|---|---|
| No. 1 | 6 |
| No. 2 | 8 |
| No. 3 | 13 |
| No. 4 | 20 |
| No. 5 | 22 |
| No. 6 | 25 |
| No. 7 | 68 |
| No. 8 | 78 |
| No. 9 | 134 |
| No. 10 | 258 |
| No. 11 | 279 |
| No. 12 | 291 |
| No. 13 | 293 |
| No. 14 | 317 |
| No. 15 | 336 |
| No. 16 | 337 |
| No. 17 | 339 |
| No. 18 | 343 |
| No. 19 | 346 |
| No. 20 | 366 |
| No. 21 | 383 |

| Defendant's Exhibit | Page Identified |
|---|---|
| No. 1 | 30 |

- - -

CLIFFORD A. ROE, JR., ESQ. 12/13/01

37

1  Q. And your understanding of those
2  Acts is that they prohibit the making of a
3  material misstatement, correct?
4      MR. MAUNDRELL: Objection.
5  A. Yes, that's my understanding of
6  those Acts.
7  Q. And they prohibit the omission to
8  state a material fact, correct?
9      MR. MAUNDRELL: Objection.
10 A. Yes.
11 Q. How do you define materiality in
12 this transaction?
13     MR. MAUNDRELL: Objection.
14 A. I'm not sure I can answer that
15 question in the context of this transaction.
16 Q. Really? Why not?
17     MR. MAUNDRELL: Don't speculate.
18 A. The definition of materiality
19 is -- there is a legally accepted definition,
20 which is of record in all the various cases
21 that have been decided over the years under the
22 1933 Act and 1934 Act.
23 Q. What is that definition?
24 A. The definition is essentially the
25 information that an informed investor needs to

39

38

10:38:04   1  make an informed investment decision.
10:38:08   2  Q. That definition has nothing to do
10:38:10   3  with whether it would change the outcome of the
10:38:13   4  transaction, correct?
10:38:15   5      MR. MAUNDRELL: Objection.
10:38:16   6  A. I'm not sure I understand that
10:38:17   7  question.
10:38:21   8  Q. What about that question was
10:38:22   9  unclear?
10:38:24  10      MR. MAUNDRELL: Objection. If you
10:38:25  11 don't understand it, you don't have to redo it
10:38:28  12 for him.
10:38:29  13 A. I just don't understand your
10:38:30  14 question.
10:38:32  15 Q. Does your definition of
10:38:33  16 materiality, which you said is generally
10:38:35  17 accepted for many years --
10:38:37  18 A. Um-hmm, um-hmm.
10:38:37  19 Q. -- have anything to do with
10:38:39  20 whether or not the proposed material
10:38:41  21 information would change the outcome -- would
10:38:44  22 change a shareholder vote, or is it something
10:38:46  23 that a reasonable shareholder might want to
10:38:49  24 consider?
10:38:50  25     MR. MAUNDRELL: Objection to form.

# EXHIBIT O

# OHSL FINANCIAL CORP.
## 5889 Bridgetown Road
## Cincinnati, Ohio 45248

Dear OHSL Financial Corp. Stockholder:

    You are cordially invited to attend a Special Meeting of Stockholders of OHSL to be held at 10:00 a.m. Eastern time on October 25, 1999, at Dante's Restaurant, Rybolt Road, Cincinnati, Ohio.

    At the Special Meeting, you will be asked to vote on the proposed acquisition of OHSL by Provident Financial Group, Inc. If the acquisition is approved by the holders of a majority of OHSL shares and certain other conditions occur, OHSL stockholders will become Provident Financial stockholders.

    The number of shares of Provident Financial common stock to be received by OHSL stockholders in exchange for each outstanding share of OHSL common stock will be determined based on an average Provident Financial share price. The average Provident Financial share price is the 10-day average closing price of Provident Financial common stock ending two days before the closing of the acquisition. Each OHSL stockholder **will receive $22.50** worth of Provident Financial common stock if the average Provident Financial share price is between $40.00 and $50.00. If the average Provident Financial share price is below $40.00, each OHSL stockholder will receive 0.5625 shares of Provident Financial common stock for each share of OHSL common stock. If this price is above $50.00, each OHSL stockholder will receive 0.45 shares of Provident Financial common stock for each share of OHSL common stock.

*[handwritten: NOT DATED CORRECTLY — S/B PROXY D:]*

    Your Board of Directors has received an opinion from McDonald Investments Inc., its financial advisor, to the effect that the Exchange Ratio is fair to OHSL stockholders from a financial point of view.

    Your Board of Directors unanimously approved the acquisition and believes that it is in the best interest of OHSL stockholders. The Board unanimously recommends and advises that you approve the acquisition at the Special Meeting so that the transaction may be completed.

    In the materials accompanying this letter you will find a Notice of Special Meeting of Stockholders, a Proxy Statement/Prospectus and a proxy card. The Proxy Statement/Prospectus more fully describes the proposed transaction. We encourage you to read these materials carefully.

    Whether or not you plan to attend the Special Meeting, please take the time to vote by completing, signing and returning to us the enclosed proxy card. A postage paid envelope is enclosed for your convenience. If you sign, date and return your proxy card without indicating how you want to vote, your proxy will be counted as a vote in favor of the transaction. Even if you plan to attend the Special Meeting, please complete, sign and return your proxy card. By following certain procedures discussed in the accompanying Proxy Statement/Prospectus, you can later revoke your proxy if you wish.

Sincerely,

*Norbert P Brinker* (signature)

Norbert G. Brinker
Chairman of the Board

*[Exhibit stamp: Herron 2, 9/4/01]*

# EXHIBIT P

Page 2

Continuation of the deposition of WILLIAM HILLEBRAND, a defendant herein, called by the plaintiffs for cross-examination, pursuant to the Federal Rules of Civil Procedure, taken before me, Lee Ann Williams, a Registered Professional Reporter and Notary Public in and for the State of Ohio, at the offices of Provident Bank, 5889 Bridgetown Road, Cincinnati, Ohio, on Monday, January 5, 2004, at 12:57 p.m.

APPEARANCES:
On behalf of the Plaintiff:
  Michael G. Brautigam, Esq.
  Gene Mesh & Associates
  2605 Burnet Avenue
  Cincinnati, Ohio 45219

On behalf of the Defendants:

  James E. Burke, Esq. (Of counsel)
  Keating, Muething & Klekamp
  1400 Provident Tower
  One East Fourth Street
  Cincinnati, Ohio 45202

Page 3

On behalf of the Defendants Dinsmore & Shohl, Clifford Roe, and Charles Hertlein, Jr.:
  John W. Hust, Esq.
  Schroeder, Maundrell, Barbiere
    & Powers
  110 Governor's Knoll
  11935 Mason Road
  Cincinnati, Ohio 45249

On behalf of the Defendants:

  J. Michael Debbeler, Esq.
  Graydon, Head & Ritchey
  1900 Fifth Third Center
  511 Walnut Street
  Cincinnati, Ohio 45202

On behalf of the Defendant Ernst & Young:
  Mary-Helen Perry, Esq.
  Jones Day
  51 Louisiana Avenue, N.W.
  Washington, D.C. 20001

ALSO PRESENT: Gary Meier
  Connie Adkins-Ihle, Videographer
         STIPULATIONS
It is stipulated by and among counsel for the respective parties that the deposition of WILLIAM HILLEBRAND, a defendant herein, called by the plaintiffs for cross-examination pursuant to the Federal Rules of Civil Procedure, may be taken at this time by the notary; that said deposition may be reduced to writing in stenotypy by the notary, whose notes

Page 4

1  may then be transcribed out of the presence of
2  the witness; and that proof of the official
3  character and qualifications of the notary are
4  expressly waived.
5         - - -
6
7             I N D E X
8  Examination of WILLIAM HILLEBRAND    Page
9  By Mr. Brautigam:                      5
10         - - -
11
    Exhibit         Page Identified
12
    No. 60              51
13  No. 61              27
    No. 62              115
14
           - - -
15
16
17
18
19
20
21
22
23
24

Page 5

1            WILLIAM R. HILLEBRAND
2       having been first duly sworn, testified as
3       follows:
4            CROSS-EXAMINATION
5  BY MR. BRAUTIGAM:
6       Q.  Good afternoon, Mr. Hillebrand.
7  My name is Michael G. Brautigam and I represent
8  Gary Meier, Walter Thiemann, and a putative
9  class of OHSL shareholders.
10           Mr. Hillebrand, what is your
11 understanding of the litigation at this point?
12      A.  My understanding.  It has just
13 gone on too long, to start off with.
14      Q.  What do you mean by that?
15      A.  What do I mean by that?  It
16 just -- it's dragging on too long and there's
17 no need for it in the first place.
18      Q.  What do you mean by "there's no
19 need for it in the first place"?
20      A.  Well, let's see here.  If you're
21 going that way, I -- I cannot see what Walter
22 Thiemann or Mr. Meier, why would they even want
23 to have a suit like this.
24      Q.  Okay.  Anything else?

Page 10

Do you live in a house?
    MR. BURKE: Objection.
    A. Yeah, sure I live in a house.
    Q. Okay. In 1999 did you live in the same place?
    A. Well, what the hell difference does it make?
    Q. Can you answer my question?
    A. I want to know why you're asking that type of a question.
    Q. I want to know about documents that you may have taken home in 1999.
    A. Documents?
    Q. Documents.
    A. No, no way. No way.
    Q. Mr. Hillebrand, during the time you were a director in 1999, considering the OHSL-Provident merger, did you receive documents related to the proposed merger?
    A. I saw -- yeah, we had -- we had to have documents, but here again, that was -- that was the basis on which we merged with Provident.
    Q. Now, I want to focus on these

Page 11

documents. You reviewed documents in 1999 to inform yourself as to the merger, correct?
    A. Yeah, to the extent we had -- you had to make a decision, yeah.
    Q. Okay. And you did not maintain an office at OHSL, correct?
    A. No.
    Q. Did you have a home office?
    A. No.
    Q. Did you have documents at home?
    A. Just, just to -- what referred to the -- what referred to the merger.
    Q. Right.
    A. Right.
    Q. Now, these documents, were you ever asked to produce these documents in any litigation?
    A. I -- not that I remember.
    Q. Okay. Where are these documents today?
    A. I think they're in an ash can.
    Q. Okay. Did you shred these documents?
    A. Did I what?

Page 12

1    Q. Shred them.
2    A. No, I tore them up. I only got
3  the shredder just for Christmas.
4    Q. Okay. So when did you tear up the
5  documents related to the Oak Hills-Provident
6  merger?
7       MR. BURKE: Objection. Calls for
8  speculation. You may answer.
9    A. When did I do it? I have no idea.
10   Q. Okay. Let me see if I can bracket
11 this. Did you do it before or after the merger
12 closed on December 3rd of 1999?
13   A. Well, I would -- I did this while
14 I -- I did it after we made the decision to
15 merge.
16   Q. And when was that?
17   A. I have no idea.
18   Q. When you tore up the documents,
19 was the merger finalized?
20   A. As far as I know, yes.
21   Q. Okay. And the merger was
22 finalized on December 3rd of 1999, correct?
23   A. I don't remember the date. I
24 don't really remember the date.

Page 13

1    Q. Okay. But as far as you know, you
2  destroyed all of the documents in your
3  possession related to OHSL and Provident after
4  the merger closed, correct?
5       MR. BURKE: Objection.
6  Mischaracterizes prior testimony. That's not
7  at all what he testified to. He may answer.
8       MR. BRAUTIGAM: He didn't testify
9  on this topic.
10      MR. BURKE: Yes, he just did. But
11 you can answer, Mr. Hillebrand.
12   A. I, I tore it up after we -- after
13 we had made the merger, period. That's all
14 there is to it.
15   Q. And why did you destroy all of the
16 documents in your possession related to OHSL
17 and Provident after the merger closed?
18      MR. BURKE: He's not testified to
19 any documents in his possession regarding
20 Provident.
21      MR. BRAUTIGAM: Jim, we're doing
22 fine.
23      MR. BURKE: So you're
24 mischaracterizing prior testimony.

Page 14

    MR. BRAUTIGAM: His testimony is clear. We don't need speaking objections.
    A. What did I do with them?
BY MR. BRAUTIGAM:
    Q. You tore them up.
    A. Why did I?
    Q. Yes.
    A. I got rid of them.
    Q. Why?
    A. I didn't need them anymore.
    Q. And no one from the Dinsmore law firm or any other law firm suggested that you retain these documents, correct?
    A. I -- nobody told me to keep them, no.
    Q. Okay. Mr. Hillebrand, I understand that you were on the OHSL audit committee; is that right?
    A. Yeah, I was on the audit committee.
    Q. And to be on the audit committee, you had to be familiar with basic accounting and auditing terminology, correct?
    A. You had to -- as far as I know,

Page 15

yeah.
    Q. Are you familiar with GAAP?
    A. No, not anymore.
    Q. Are you familiar with GAAS?
    A. No.
    Q. Are you familiar with the term restatement?
    A. Yeah, as far as a restatement. That's -- restatement. I know what a restatement is, yeah, it's a reworking of whatever document you're talking about.
    Q. Did Provident make a restatement or restatements in 2003?
    A. Did Provident make a -- evidently they -- I guess I'd have to say yes, due to the -- due to the situation that brought this about.
    Q. Are you a Provident shareholder?
    A. Yes.
    Q. Did you buy Provident stock on the open market or did you obtain it in some other way?
    A. Well, I got some through the merger and then I also had bought some over the

Page 16

years.
    Q. Okay. Please describe the terms of the merger.
    MR. BURKE: Objection. Calls for a narrative.
    A. Terms of the merger. What -- I don't know.
    Q. How did the merger work?
    A. How did it work?
    Q. Yes.
    MR. BURKE: Objection.
    Q. Describe it very generally.
    MR. BURKE: Objection to form. You may answer.
    A. What do you want now?
    Q. Please describe how the merger worked, very generally.
    MR. BURKE: Same objection. You may answer.
    A. Well, as far -- how did the merger work. Well, it was just the case of Provident and Oak Hills getting together and, and working out the information necessary to have Provident take over Oak Hills.

Page 17

    Q. And how did Provident pay to buy Oak Hills?
    A. How did they pay? I don't know how they paid. It -- I gather it was in stock -- based on the stock.
    Q. That's what I meant. It was a stock-for-stock transaction, correct?
    A. Yeah.
    Q. And the stock that Provident had issued and used as the currency to pay OHSL shareholders such as Mr. Meier was newly registered stock. Is that correct?
    MR. BURKE: Objection, foundation. You may answer.
    A. I have no idea what happened to Mr. Meier. All I know is I was involved as a director and I received my stock and the whole -- the whole situation went through as a merger between Provident and Oak Hills.
    Q. And why did it go through?
    A. Why did it go through, because -- because Oak Hills' directors had come to the conclusion that, okay, this might be the proper time to merge with a larger company.