# Exhibit 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Walter W. Thiemann, on behalf of himself and of all others similarly situated, | : | Case No. C-1-00-793 |
| | : | Judge Sandra S. Beckwith |
| Plaintiff, | : | |
| | : | Magistrate Judge Hogan |
| vs. | : | |
| | : | **AFFIDAVIT OF ERVIN SCHOENBLUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT BY PROVIDENT FINANCIAL GROUP, INC. ("PROVIDENT")** |
| OHSL Financial Corporation, et al. | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

---

STATE OF NEW JERSEY      :
                         : SS:
COUNTY OF PASSAIC        :

**ERVIN SCHOENBLUM**, being duly sworn, deposes and states as follows:

1. I have been retained by plaintiffs as a testifying expert in the field of economic damages and have previously submitted my report on damages to the plaintiff class resulting from the Provident Financial

1

Corporation, Inc. ("Provident") acquisition (the Provident – OHSL merger) of the Ohio Corporation, OHSL Financial Corporation, ("OHSL"). Along with the report were my qualifications (attached hereto as Exhibit A) as an expert witness as required by the Fed. R. Civ. Pro. in order to opine in matters such as at bar. Since that time, I have provided advice to the plaintiffs and their counsel in drafting the Consolidated Amended Complaint ("CAC") filed December 31, 2003, as well as other matters relating to economic damages and specifically how, if at all, the negative restatements of financial data as alleged in Pars. 82 to 95 and 120 – 121 of the CAC disclosed by Provident in 2003 affected the 1999 Provident – OHSL merger.

2. On January 20, 2004, I prepared an affidavit (attached hereto as Exhibit B) in support of Plaintiffs' Motion for Summary Judgment on liability issues under Sec. 11 of the 1933 Securities Act, 15 U.S.C. § 77K brought against Provident which alleged that the restatements were material facts to investors and caused the loss in value of Provident shares shortly thereafter, and would have done so when the merger was considered in 1999.

3. I make this affidavit in support of Plaintiffs' Opposition to Cross-Motion for Summary Judgment by Provident which alleged that had the disclosure in the two restatements been known prior to the OHSL shareholder vote on the merger, it would not have had a material impact

on either the price of Provident shares (symbol "PFGI") or on the merger. This affidavit is also submitted in Further Support of Plaintiffs' Motion for Summary Judgment.

4. The rationale for Provident's argument is developed in an affidavit of Tayfun Tuzun ("Tuzun"), who has worked for Provident for the past 10 1/2 years and has been Senior Vice President, Treasury for Provident since 1998. In his affidavit, Tuzun admitted that "I have been involved in negotiating the auto loan securitization transactions that Provident entered into during the 1990s."

5. Tuzun concluded in his affidavit that "My analysis is that, had the financial impact of the First Restatement and Second Restatement been disclosed in Provident's financial statements during 1999, and in the combined proxy statement and registration statement for the Provident – OHSL merger (the "Proxy Materials"), this would have had no material impact either on the Provident stock price or on the OHSL merger."

6. Since Tuzun was instrumental in the transactions that subsequently caused the damaging restatements to be required, this guilty person clearly can not be considered to be an unbiased spokesperson on the issue as to whether the merger would have occurred on the proposed terms if the OHSL shareholders had been fully cognizant of Provident's artificially inflated earnings and stock price.

7. Regarding the First Restatement, Tuzun argued that the Proxy Materials presented financial information only through June 30, 1999, whereas the restatements covered periods many years beyond that. He tried to claim that any information beyond June 30, 1999 was not available or relevant in the decision-making process as to the merger. Tuzun is highly mistaken, as will be demonstrated by what follows.

8. All nine auto lease securitization transactions were entered into between 1997 and 1999. Provident reported artificially inflated earnings from 1997 through several years beyond the merger date. Although OHSL was provided with earnings only through mid-1999, the impact of the nine auto lease securitization transactions was projected well beyond June 30, 1999 by Provident management in its financial budgets and plans. The projections incorporating artificially inflated earnings were provided to McDonald Investments, Inc. ("McDonald") and to the OHSL Board and were highly instrumental in causing the merger to be consummated.

9. The Proxy Materials/Registration Statement had numerous references to McDonald's reviewing Provident's forward-looking financial forecasts, prospects, projections, and performance. Three examples follow, with the emphasis (underlining) being added by me.

10. "In connection with its review and arriving at its opinion, McDonald relied upon the accuracy and completeness of the financial information

4

and other pertinent information provided by OHSL and Provident Financial to McDonald for purposes of rendering its opinion. McDonald did not assume any obligation to independently verify any of the provided information as being complete and accurate in all material respects. With regard to **financial forecasts** established and developed for OHSL and Provident Financial with the input of the respective managements, as well as **projections** of cost savings, revenue enhancements and operating synergies, McDonald assumed that these materials had been reasonably prepared on bases reflecting the best available estimates and judgments of OHSL and Provident Financial as to the **future performance** of the separate and combined entities and that the **projections** provided a reasonable basis upon which McDonald could formulate its opinion."

11. McDonald, in connection with rendering its opinion, "reviewed certain other public and non-public information, primarily financial in nature, relating to the respective businesses, earnings, assets and **prospects** of OHSL and Provident Financial provided to it or publicly available."

12. McDonald, in connection with rendering its opinion, "participated in meetings and telephone conferences with members of senior management of OSHL and Provident Financial concerning the financial condition, business, assets, **financial forecasts and prospects** of the

respective companies, as well as other matters McDonald believed relevant to its inquiry."

13. In addition to what McDonald indicated, the Proxy also stated that among the important factors that supported the OHSL Board's recommendation for the merger was "information concerning the business, earnings, operations, financial condition and **future prospects** of Provident Financial."

14. In paragraph 5 of my January 20, 2004 affidavit (Exhibit B), I showed that the First Restatement caused a 22.6% decrease in the stock price of PFGI. Since the nine auto leases securitization transactions were in place by 1999, had Provident presented the truth about the actual and projected earnings, PFGI's stock price at the time of the merger decision would also likely have decreased by 22.6%.

15. In the same affidavit, I showed that had Provident presented the truth about the actual and projected earnings, the impact of the Second Restatement was such that the PFGI stock price at the time of the merger decision would have been reduced by another 7.1%. The combined reduction would have been 29.7% in PFGI's stock price.

16. I wish to note that my affidavit presenting the above had been provided to Provident prior to issuing their Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment on Liability Issues Under Section 11 of the 1933 Act. Although Provident critiqued

statements in an affidavit by another of Plaintiffs' experts, my affidavit remained unchallenged.

17. As a result of McDonald's efforts on the merger considerations, including its review of Provident's projected earnings and stock price, it issued a Fairness Opinion to the Board of OHSL, dated September 3, 1999, a copy of which was attached to the Proxy Materials/Registration Statement. Had McDonald been fully aware of Provident's artificially inflated earnings and stock price, it likely would not have been able to issue a Fairness Opinion, in which case, the merger probably would not have occurred. Even if McDonald had gone out on a limb and issued a Fairness Opinion, the OHSL shareholders would likely have rejected the merger.

18. When the OHSL shareholders met to vote on the merger, the OHSL share price was $19.875 and PFGI's was $37.785. According to the exchange ratio of 0.5625, the OHSL shareholders would have received $21.30 worth of PFGI shares for each OHSL share, or more than the then-current price of OHSL. However, had the truth been known about the artificially inflated Provident earnings and stock price, and the OHSL shareholders realized that they were receiving 29.7% less than the $21.30, equivalent to $14.98 of PFGI stock per share of OHSL then valued at $19.875, they clearly would have rejected the merger.

19. Even if the OHSL shareholders approved the merger, the merger would likely have been abandoned because of the provision in the Merger Agreement that if the average daily closing price of PFGI for the ten trading days ending two days prior to closing fell below $36.60, OHSL had the right to abandon the merger. The average closing price was $41.494 per share. Absent the artificially inflated earnings and stock price, the 29.7% reduction in the price per share would have caused the average to be $29.167, well below the threshold for abandonment of the merger.

20. The Second Restatement reduced the artificially inflated earnings of Provident by a total of $44.4 million for the years 1994 through 2002. Tuzun stated in his affidavit that "This reduction in income, however, was only a matter of timing, not an overall reduction of income. As a result of this change, it meant that although previously reported income would be reduced by $44 million, Provident's future net income would be <u>increased</u> by approximately the same amount. The issue underlying the Second Restatement was just the timing of certain income."

21. Tuzun's ignoring the impact of the time value of money was` an astonishing statement from a senior banking executive. I am certain that Provident shareholders would be highly displeased if Provident provided me with $44.4 million over a nine year period, which I then returned piecemeal over the subsequent several years, without paying

8

any interest. This is exactly analogous to Tuzun's downplaying the time value of Provident's earnings.

22. In his affidavit, Tuzun also stated that Provident's stock price increased steadily after the Second Restatement and he showed a chart to that effect through the end of 2003. He used this to indicate that the Second Restatement had either no impact or a positive one on the PFGI share price.

23. I believe that the price did not drop when the Second Restatement was made because by 2003, the nine years of artificially inflated earnings were already behind, and now the approximately $44.4 million of earnings will be reflected in future years.

24. As far as the PFGI stock price increasing subsequent to the Second Restatement through the end of 2003, the whole industry of regional banks has been increasing. In fact, among its competitors of Midwestern banks of similar market capitalization, the price increase in PFGI since just prior to the First Restatment, places Provident at or near the bottom of the list.

25. For the reasons stated heretofore in this affidavit, there is no question that the two restatements had a material impact on Provident's stock price and the merger with OHSL. I conclude that had the truth been known about Provident's artificially inflated earnings and stock price by McDonald, the OHSL Board, and the OHSL shareholders when the

merger was considered, the merger would not have occurred. This renders the First and Second Restatements extremely material.

**FURTHER AFFIANT SAYETH NAUGHT**

_____
**ERVIN SCHOENBLUM**

Sworn to before me and subscribed in my presence this 5th day of March 2004.

_____
Notary Public

Edward Azar
Notary Public of New Jersey
My Commission expires April 28, 2005