C
Only the Westlaw citation is currently available.

United States District Court, S.D. Ohio, Eastern Division.

Ethelene DANIELS, Plaintiff,
v.
CITY OF COLUMBUS, et al., Defendants.

No. C2-00-562.

Feb. 20, 2002.

MEMORANDUM & ORDER

HOLSCHUH, J.

*1 Plaintiff Ethelene Daniels filed suit against the City of Columbus and police officer Brian Wingard seeking relief under 42 U.S.C. § 1983 for alleged violations of her Fourth Amendment rights. Specifically, she claims that Officer Wingard used excessive force in connection with an investigatory stop, and that a custom or policy of the City of Columbus played a part in the alleged constitutional deprivation. She also brings a claim of assault and battery against Officer Wingard. This matter is currently before the Court on Defendants' motion for summary judgment. (Record at 15).

I. Facts

On November 11, 1999, Columbus police officers Brian Wingard and Keith Kline were on routine patrol. They had with them information concerning outstanding warrants for persons who resided in their precinct. This information included photographs and other identifying information. One of those outstanding warrants was for a woman by the name of Jewell White. She was wanted for forgery. That morning, Plaintiff Ethelene Daniels, who was sixty-one years old, had just exited a drug store and was walking toward the bus stop. As Officers Wingard and Kline passed Ms. Daniels, they noticed that she appeared to match the description of Mrs. White. They stopped the police vehicle and conducted an investigatory stop. After they checked Ms. Daniels' driver's license and determined that she was not Jewell White, they told her that she was free to leave. Ms. Daniels claims to have sustained an injury to her left shoulder as a result of her encounter with the police.

What happened during the course of the investigatory stop that morning is hotly disputed. According to Defendant Brian Wingard, he approached Ms. Daniels and asked to see some identification. (Wingard Aff. ¶¶ 5-6, Ex. A to Mot. Summ. J.). When she questioned his reason for needing to see it, he allegedly explained that she matched the description of a woman for whom there was an outstanding warrant. (Id. at ¶ 6). Ms. Daniels then asked to see Ms. White's picture, looked at it, denied that she was the woman in the photograph, and attempted to walk away. (Id. at ¶¶ 7-8). At that point, Wingard claims that he grabbed Ms. Daniels' denim jacket with his thumb and finger to prevent her from leaving. (Id. at ¶ 8). She attempted to pull away. Officer Kline then exited the police vehicle and stepped to Ms. Daniels' other side. (Id. at ¶ 9). At that point, Daniels asked an unidentified older woman standing nearby whether she thought that Daniels resembled the woman in the photograph. After the woman stated that she thought she did, Ms. Daniels finally showed the officers her driver's license. (Id. at ¶¶ 10-11). After the officers determined that Plaintiff was not Ms. White, they returned her license and told her she was free to go. (Id. at ¶ 12).

Plaintiff tells a very different story. She claims that as she was walking to the bus stop that morning, she was suddenly grabbed from behind with no prior warning. She testified that someone grabbed her upper left arm and yanked it, spinning her around, and knocking her off balance. (Daniels Dep. 14-20). Only after she turned around did she see that the individual who grabbed her was a police officer. (Id. at 15). According to Plaintiff, Officer Wingard then accused her of being Mrs. White, who was wanted for certain felonies. (Id.). He asked to see some identification and she showed him her driver's license. (Id.). After she asked him three times if she could see the picture of Mrs. White, he finally showed it to her. (Id. at 16). She told him that she was not the woman in the photograph. He asked another woman standing nearby for her opinion. The woman said that Ms. Daniels did look like Mrs. White. (Id.). Plaintiff claims that Officer Wingard maintained a firm grip on her upper arm throughout the encounter. (Id. at 23). She denies that she tried to pull loose or walk away from him. (Id. at 30). The officers finally told her that she was free to leave. She was so upset by the encounter that she took the wrong bus home. (Id. at 17).

*2 Ms. Daniels claims that she felt no pain in her shoulder until the next morning. (Id. at 30). She had



no prior injuries to either shoulder before November 11, 1999. (*Id.* at 11). On November 12, 1999, she went to the hospital where they x-rayed her shoulder and told her that the tendon in her left shoulder was torn away from her rotator cuff. (*Id.* at 33). They gave her pain medication. She eventually sought treatment from another physician for her shoulder pain. He scheduled her for surgery to repair the damage to her shoulder. (*Id.* at 35).

On November 15, 1999, Ms. Daniels filed a citizen complaint with the Columbus Police Department. Wingard's supervisor, Sergeant Charles Williams, asked Officers Wingard and Kline to write incident reports. Williams later interviewed Ms. Daniels at her home about her complaint. On December 30, 1999, Sergeant Williams found her complaint to be unfounded. Plaintiff then filed suit against the City of Columbus and Officer Brian Wingard, seeking to recover damages under 42 U.S.C. § 1983. Ms. Daniels also seeks to recover from Wingard for assault and battery. Defendants have filed a motion for summary judgment on all claims.

II. Standard for Granting Summary Judgment

Federal Rule of Civil Procedure 56(c) provides:
> [Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original); *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 467 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627 (1944)); *accord County of Oakland v. City of Berkley,* 742 F.2d 289, 297 (6th Cir.1984).

*3 In making this inquiry, the standard to be applied by the Court mirrors the standard for what was formerly referred to as a directed verdict. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Anderson,* 477 U.S. at 250.
> The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745, n. 11 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson,* 477 U.S. at 251-52. Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970) (footnote omitted); *accord Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1455-56 (6th Cir.), *cert. denied,* 469 U.S. 1062 (1984). Inferences to be drawn from the underlying facts contained in such materials must also be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n,* 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes,* 398 U.S. at 157-60.

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. The existence of a mere

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 252.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*4 Fed.R.Civ.P. 56(e).

III. Discussion

A. Section 1983 Claims

In Counts I and III of Plaintiff's complaint, she seeks relief under 42 U.S.C. § 1983 for alleged violations of her constitutional rights. That statute reads, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

42 U.S.C. § 1983. In order to recover damages under this statute, Plaintiff must show that: (1) Defendants were acting under color of state law; and (2) Defendants' actions deprived her of rights guaranteed by the United States Constitution or laws. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970). Defendants concede that when the investigatory stop took place, Brian Wingard was acting under color of state law.

Plaintiff claims that during the course of the investigatory stop, Officer Wingard used excessive force, depriving her of her Fourth Amendment right to be free from unreasonable seizures. Plaintiff filed suit under 42 U.S.C. § 1983 against the City of Columbus and Officer Brian Wingard in his official and individual capacities. The suit filed against Wingard in his official capacity is the equivalent of a suit against the City of Columbus itself. *See Kentucky v. Graham,* 473 U.S. 159, 165 (1985). However, by suing Wingard in his individual capacity, Plaintiff also seeks to impose personal liability on him. *Id.*

1. Municipal Liability

In order to recover under § 1983 against the City of Columbus or against Brian Wingard in his official capacity, Ms. Daniels must establish that an official custom or policy of the municipality caused her constitutional deprivation. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). The City of Columbus cannot be liable for Wingard's actions under a *respondeat superior* theory. *Id.* at 691. Instead, an official policy or custom must be the "moving force" behind the alleged constitutional deprivation. *See City of Canton v. Harris,* 489 U.S. 378, 389 (1989).

In cases like this, where liability is based on the municipality's alleged inaction rather than on an express policy, a plaintiff must show that the city was "deliberately indifferent" to the constitutional rights of its citizens. *See id.* at 388 ("failure to train" claim); *Berry v. City of Detroit,* 25 F.3d 1342, 1354 (6th Cir.1994)("failure to discipline" claim). [FN1] Not only must a plaintiff show that the municipality had the requisite culpability, but she must also "demonstrate a causal link between the municipal action and the deprivation of federal rights." *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 404 (1997).

> FN1. In *Berry,* the plaintiff had asserted "failure to train" and "failure to discipline" claims. The Sixth Circuit, adopting the deliberate indifference standard set forth in *City of Canton v.. Harris,* noted that under certain circumstances, the need for more or different training may be so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. *See Berry,* 25 F.3d at 1345-46 (citing *City of Canton,* 489 U.S. at 390).

*5 In Count III of her complaint, Plaintiff alleges that Defendant Wingard's acts were caused by certain "customs and policies of the City of Columbus, including but not limited to, the express approval and ratification of the acts alleged herein; and a failure to adequately train, supervise, investigate, and discipline, in regard to the violation of citizen's constitutional rights by police officers." (Compl.¶ 17). [FN2] Plaintiff claims that Defendants are liable because the police department ratified Wingard's

allegedly illegal conduct by failing to meaningfully investigate the incident or discipline him for it.

> FN2. Plaintiff has apparently now abandoned her "failure to train" theory.

As previously noted, on November 15, 1999, four days after the incident in question, Ms. Daniels filed a complaint with the Columbus Division of Police. Wingard's supervisor, Sergeant Williams, told Wingard and Kline about the complaint and asked them to write incident reports. Williams placed them together, unsupervised, in the same room to write the reports. Plaintiff contends that they collaborated with each other because their reports were nearly identical. Both officers indicated that Wingard grabbed Daniels by her left sleeve, rather than by her arm. On December 18, 1999, Sergeant Williams went to Ms. Daniels' home to interview her about the complaint. On December 30, 1999, Sergeant Williams concluded that Ms. Daniels' allegation that Wingard had snatched her arm, injuring it, was unfounded. As to Daniels' allegation that she was wrongfully accused of being a wanted felon, Sergeant Williams exonerated Officer Wingard, finding that Wingard had acted professionally and properly. Because Sergeant Williams found no wrongdoing, Officer Wingard was not disciplined.

Plaintiff claims that the police department's system for investigating citizen complaints is inherently defective and invites results favoring the officers. According to Plaintiff, the investigation conducted by Sergeant Williams was "toothless," and failed to fulfill any useful purpose. See Beck v. City of Pittsburgh, 89 F.3d 966, 974 (3d Cir.1996)(wherein plaintiff argued, and the court agreed, "[t]he investigative process must be real. It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens.").

In most cases, once an individual's rights have been violated, a subsequent failure to conduct a meaningful investigation cannot logically be the "moving force" behind the alleged constitutional deprivation. See Tompkins v. Frost, 655 F.Supp. 468, 472 (E.D.Mich.1987)("wrongful conduct after an injury cannot be the proximate cause of the same injury"); Fox v. VanOosterum, 987 F.Supp. 597, 604 (W.D.Mich.1997)(argument that decision not to investigate, made after alleged violation took place, somehow caused that violation, defies logic). For this reason, mere ratification of the conduct at issue does not generally subject a municipality to § 1983 liability. However, in some cases, the municipality may be held liable where its failure to conduct an investigation or discipline the accused rises to the level of "a policy of acquiescence that in itself was a 'moving force.'" See Alexander v. Beale St. Blues Co., Inc., 108 F.Supp.2d 934, 949 (W.D.Tenn.1999)("[a]lthough ratification may tend to establish the existence of a policy of acquiescence that in itself was a 'moving force,' mere ratification of the conduct at issue by itself cannot legally suffice as a 'moving force.'").

*6 Citing Leach v. Shelby County Sheriff, 891 F.2d 1241 (6th Cir.1989), cert. denied, 495 U.S. 932 (1990), and Marchese v. Lucas, 758 F.2d 181 (6th Cir.1985), cert. denied, 480 U.S. 916 (1987), Ms. Daniels claims that the police department's failure to conduct a meaningful investigation in this case subjects the city to liability under § 1983. In Marchese, the Sixth Circuit found that the county was liable for injuries sustained by a prisoner where the shift officers at the jail knew of a planned assault on the prisoner, heard it in progress but did nothing to stop it, and then sought to cover it up. In addition, the court found that there was "a complete failure to initiate and conduct any meaningful investigation on the part of the Sheriff himself." 758 F.2d at 187-88. In Leach, a paraplegic prisoner alleged that jail employees were deliberately indifferent to his serious medical needs. The jail had a documented history of deliberate indifference to the medical needs of paraplegics and other disabled prisoners. The sheriff failed to investigate this prisoner's complaint and took no action to discipline the jail employee responsible for the mistreatment. Based on its holding in Marchese, the Sixth Circuit found that the government officials had ratified the employee's unconstitutional acts and were liable under § 1983. 891 F.2d at 1248.

Although the Sixth Circuit imposed municipal liability in Leach and Marchese based, at least in part, on the alleged failure of the governmental entity to conduct a meaningful investigation, Ms. Daniels' situation is distinguishable for two reasons. First, unlike the government officials in those two cases, the Columbus police department did investigate the complaint at issue. After the complaint was filed, Sergeant Williams asked Officers Kline and Wingard to complete incident reports. He also interviewed Ms. Daniels in her home prior to submitting his findings. [FN3] In cases where an investigation has been conducted, courts have been reluctant to impose

municipal liability based on a ratification theory. *See Anthony v. Vaccaro,* 43 F.Supp.2d 843, 848 (N.D.Ohio 1999)(no municipal liability based on ratification theory where government officials conducted investigation of alleged misconduct); *Walker v. Norris,* 917 F.2d 1449, 1457 (6th Cir.1990)(distinguishing *Marchese* ). Ms. Daniels may not agree with the outcome of Sergeant Williams' investigation, and may believe that her complaint was not taken as seriously as she thought it should have been. Nevertheless, it is undisputed that an investigation was conducted.

> FN3. While it is unfortunate that Sergeant Williams permitted Kline and Wingard to complete their incident reports in the same room with no supervision, raising a suspicion that they may have collaborated on their stories to protect Officer Wingard, Wingard testified that they did not talk to each other while they were writing their reports; his testimony is undisputed. (Wingard Dep. at 45-46).

Second, *Leach* and *Marchese* are distinguishable from the case at hand because, in those cases, not only was there a complete failure to investigate the complaint, but the government officials were also on notice that constitutional deprivations were actually going to occur, or had occurred frequently in the past, yet they did nothing to stop the misconduct. Ms. Daniels' complaint alleges that the Columbus police department had a custom or policy of failing "to train, supervise, investigate, and discipline, in regard to the violation of citizen's constitutional rights by police officers." (Compl. at ¶ 17). However, Plaintiff offers no evidence to support this theory; in fact, her memorandum in opposition to the motion for summary judgment is limited solely to a discussion of how the investigation of her particular complaint was flawed. She has failed to produce any evidence to establish that the City of Columbus or its police department had a "policy of acquiescence" that was the moving force behind the alleged constitutional violation.

*7 Without evidence that Officer Wingard's conduct was anything more than an isolated incident of unconstitutional activity by a non-policymaking government official, Plaintiff cannot establish municipal liability. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 821-23 (1985)(absent evidence of prior existence of policy or custom of failing to investigate or discipline officers, single incident of unconstitutional activity by an officer is insufficient to impose municipal liability); *Hullett v. Smiedendorf,* 52 F.Supp.2d 817, 828 (W.D.Mich.1999)("municipal liability for failing to investigate or discipline its officers cannot be derived from a single act by a non-policy-making municipal employee"); *Berry,* 25 F.3d at 1354 (plaintiff must show a "history of widespread abuse that has been ignored by the City" to establish liability under a "failure to discipline" theory).

Ms. Daniels has offered no evidence from which a reasonable jury could find that the Columbus police department had an established policy or custom of failing to investigate complaints or discipline its officers or that the City was "deliberately indifferent" to the constitutional rights of its citizens. Furthermore, Ms. Daniels has failed to establish a causal link between the City's allegedly inadequate investigation and her own constitutional injury. There is simply no evidence that Officer Wingard's conduct on the morning in question was the direct result of a custom or policy of the City of Columbus. Since Plaintiff has failed to present sufficient evidence from which a reasonable jury could infer that a custom or policy of the City of Columbus caused the alleged constitutional deprivation, the Court will grant summary judgment to Defendants on Plaintiff's § 1983 claims against the City of Columbus and against Brian Wingard in his official capacity.

2. Personal Liability

a. Objective Reasonableness

In *Graham v. Connor,* 490 U.S. 386 (1989), the United States Supreme Court set forth the appropriate analysis to be used in determining whether a particular seizure is "reasonable" under the Fourth Amendment.
> [It] requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and

whether he is actively resisting arrest or attempting to evade arrest by flight.

*8 The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight ... "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

Id. at 396-97 (internal citations omitted).

Defendant argues that, even if the Court construes the facts in a light most favorable to the Plaintiff, the amount of force Officer Wingard used in connection with Ms. Daniels' detention was objectively reasonable under the circumstances. [FN4] The Court disagrees. As noted earlier, the parties have presented very different versions of what transpired during the investigatory stop. Wingard claims that he politely approached Ms. Daniels and asked to see some identification. He admits that she stopped voluntarily. (Wingard Dep. at 30). Only after Daniels refused to comply with his request for identification and attempted to walk away from him did he grab her denim jacket between his thumb and finger. He claims that he held onto her jacket near her left elbow for only "three or four seconds." He denies ever grasping her arm. (Id. at 18, 32).

> FN4. In the Court's view, whether the investigatory stop itself was warranted, i.e., whether Ms. Daniels closely resembled Ms. White, is not at issue. Although Plaintiff raises it as an issue for the first time in her memorandum contra, her complaint did not contain any allegation that Wingard had no reasonable basis to detain her.

Daniels, however, claims that Wingard completely surprised her from behind, by brutally grabbing her upper arm and violently jerking her around to face him, making her lose her balance. (Daniels Dep. at 14-20). She claims that she did not hear Wingard ask for identification or say anything else to her prior to this time. (Id. at 17). According to Daniels, Wingard maintained a firm, but not painful, grip on her arm throughout the investigatory stop. (Id. at 23, 26). She denies trying to pull loose or get away. (Id. at 30). Ms. Daniels had never had problems with her shoulder before the date in question. However, the morning after this incident she woke up with a throbbing pain in her left shoulder. She was diagnosed as having a torn rotator cuff and needed surgery to repair it. While Plaintiff has not yet presented conclusive evidence that the torn rotator cuff was caused by Officer Wingard's actions, if a jury believed Ms. Daniels' version of events, they could certainly infer that the causal connection existed.

As noted in *Graham*, Officer Wingard's actions must be analyzed in light of the particular facts of the case. Factors to be considered include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether she is actively attempting to flee. In this case, Officer Wingard believed Ms. Daniels to be Jewell White, a woman wanted for forgery. While forgery is a felony, it is not a violent crime and there was no apparent reason to believe that Ms. White would pose an immediate threat to the safety of the officers or anyone else. Officer Wingard may have been justified in believing that Ms. Daniels was Jewell White, and even that she may attempt to flee when approached by police officers. However, in any event, the Court notes that Ms. Daniels was sixty-one years old when this incident took place and it is unlikely that any attempt to "flee" would have been successful. [FN5]

> FN5. The Court must, of course, construe all evidence in a light most favorable to the plaintiff. However, even assuming *arguendo* that Officer Wingard's version of this story is true, there is no credible evidence that Ms. Daniels ever made a serious attempt to flee. Wingard testified that when he approached her to ask for identification, she stopped voluntarily. (Wingard Dep. at 30). He further testified that after he showed her the photo, she denied that she was the woman in the photo and started to walk away. But when pressed for specifics, he conceded that she did not move quickly and only took "about half a step." He did not have to take any steps to "catch her" before he reached out to grab her jacket. (Id. at 30-31).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*9 While Officer Wingard may have had the right to use some degree of physical force, and must be given some leeway in determining how much force was needed under the circumstances, a reasonable jury could find that the amount of force he used against Ms. Daniels was excessive. Even if Wingard reasonably believed that she was a felon who was attempting to flee, and even if he grabbed her jacket rather than her arm, the fact remains that Ms. Daniels suffered a severe injury to her shoulder, apparently as a result of Wingard's actions. In the Court's view, there are genuine issues of material fact concerning the amount of force used, as well as its reasonableness under the circumstances. Because the objective reasonableness of Wingard's conduct turns on issues of credibility, summary judgment is inappropriate.

b. Qualified Immunity

Defendant Wingard also claims to be entitled to qualified immunity on Plaintiff's § 1983 claim against him in his individual capacity. In *Harlow v. Fitzgerald,* the United States Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1982). The Supreme Court recently readdressed the issue of qualified immunity in *Saucier v. Katz,* 121 S.Ct. 2151 (2001), noting that a court should rule on the issue of qualified immunity early in the proceedings so that if the defendant is immune from suit, he is spared the costs of further litigation. *Id.* at 2155-56. In order to defeat summary judgment on qualified immunity grounds, a plaintiff must: (1) identify the clearly established right that was allegedly violated; and (2) "establish that a reasonable officer in the defendant's position should have known that his conduct violated that right." *Gardenhire v. Schubert,* 205 F.3d 303, 311 (6th Cir.2000).

As Defendant points out, in *Graham v. Connor,* the Court recognized that officers have the right to use some degree of physical coercion during the course of an investigatory stop. However, at the time this incident took place, Ms. Daniels also had a clearly established constitutional right to be free from the use of excessive force in course of an investigatory stop. *See Walton v. City of Southfield,* 995 F.2d 1331, 1342 (6th Cir.1993). Obviously, the degree of force that may be considered reasonable varies greatly depending on the circumstances of the case. Therefore, the Court must make a more particularized inquiry, determining "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 121 S.Ct. at 2156. If the Court finds that the right allegedly violated was clearly established, the Court must then determine whether a reasonable officer in Officer Wingard's position should have known that his conduct violated that right. Normally, these are questions of law. There are, however, exceptions.

*10 In *Saucier,* the Supreme Court cautioned that the question of whether a defendant is entitled to qualified immunity cannot be fused with the question of whether excessive force was used. *Id.* at 1253-54, 1258. To submit both questions to a jury simply because the questions of objective reasonableness are intertwined defeats the purpose of qualified immunity. Nevertheless, as Justice Ginsburg noted in her concurring opinion, which was joined by Justices Stevens and Breyer:

> Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official. And that is as it should be. When a plaintiff proffers evidence that the official subdued her with a chokehold even though she complied at all times with his orders, while the official proffers evidence that he used only stern words, a trial must be had.

*Id.* at 2164 (Ginsburg, J., concurring).

Sixth Circuit law supports this view. Where the exact character of the defendant's actions are in dispute, a jury must determine "the credibility of the defendant's account of the need for force." *Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir.1994)(*citing Brandenburg v. Cureton,* 882 F.2d 211, 215-16 (6th Cir.1989)). In *Gardenhire,* the Sixth Circuit noted that summary judgment is inappropriate if there is a factual dispute "involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights." 205 F.3d at 311 (*quoting Poe v. Haydon,* 853 F.2d 418, 425-26 (6th Cir.1988), *cert. denied,* 488 U.S. 1007 (1989)). *See also Walton,* 995 F.2d at 1336 ("if genuine issues of material fact exist as to whether the defendants actually did commit acts that would violate a clearly established right, then summary judgment on qualified immunity is improper").

Defendants attempt to distinguish *Adams, Brandenburg,* and *Walton* on the grounds that those

cases dealt with much more extreme factual situations. They claim that in this case, even assuming that Plaintiff's version of the story is true, "all Officer Wingard did was grab Plaintiff from behind and hold her arm as he attempted to determine her identity." (Reply Mem. at 5). The Court finds no basis for distinction. These cases all stand for the proposition that when the true nature of the defendant's actions turns on the parties' credibility, summary judgment is inappropriate. The Court acknowledges that there may be cases where the allegations are so frivolous and factual discrepancies so slight that no genuine issues of material fact exist. This, however, is not one of those cases. Whatever transpired during the investigatory stop, the end result was that Ms. Daniels suffered a serious shoulder injury.

In this case, Defendant Wingard's entitlement to qualified immunity clearly turns on the credibility of Wingard and Daniels. If Wingard's version of the facts is to be believed, the Court agrees that he would be entitled to qualified immunity. Simply pinching the fabric of a suspect's jacket for three or four seconds so that she could not flee while he determined her true identity would not violate the suspect's constitutional rights. However, if a jury were to believe Ms. Daniels' version of events, Wingard would not be entitled to qualified immunity. Surprising a sixty-one year old woman by grabbing her upper arm from behind and spinning her around with such force that she was knocked off balance and suffered a torn rotator cuff in her shoulder, especially when there was no indication at that time that she posed any threat or would attempt to flee, would, in this Court's view, constitute excessive force. Furthermore, a reasonable officer in Wingard's position would know that this kind of conduct would clearly violate Ms. Daniels' constitutional right to be free from an unreasonable seizure. Because there are genuine issues of material fact concerning the events that took place and the true nature of Defendant Wingard's conduct, Wingard is not entitled to summary judgment on the grounds of qualified immunity.

B. Assault and Battery

*11 In Count II of Plaintiff's complaint, she alleges that Defendant Wingard's conduct constitutes assault and battery. Defendants argue that both the City of Columbus and Brian Wingard are immune from liability on this claim pursuant to Ohio Revised Code §§ 2744.02 and 2744.03. Ohio Revised Code § 2744.02(A)(1) states that, "a political subdivision is not liable in damages in a civil action for injury ... allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." Plaintiff fails to address this argument in her memorandum in opposition and apparently concedes that the City of Columbus is not liable on this claim. The Court finds that the City of Columbus is entitled to statutory immunity on Plaintiff's claim of assault and battery.

With three exceptions, Ohio Revised Code § 2744.03(A)(6) provides political subdivision employees with immunity from civil liability in actions to recover damages for injuries caused by the employee's acts or omissions. One of those exceptions applies when the employee's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Revised Code § 2744 .03(A)(6)(b). Wingard claims that Plaintiff has no evidence of a malicious purpose or bad faith. The Court agrees.

However, in the Court's view, Plaintiff has submitted sufficient evidence from which a reasonable jury could find that Wingard acted in a wanton or reckless manner. [FN6] For the same reasons that summary judgment was inappropriate on the question of qualified immunity on the § 1983 claim, it is also inappropriate on the question of statutory immunity on the state claim. Because there are conflicting stories about the nature of Wingard's actions during the investigatory stop, this issue must be submitted to a jury. See Brockman v. Bell, 78 Ohio App.3d 508, 517 (Ohio Ct.App.1992)(when reasonable minds might differ as to whether conduct is negligent, as opposed to willful and wanton, the issue should be submitted to a jury); Hunter v. City of Columbus, 139 Ohio App.3d 962, 970 (Ohio Ct.App.2000)(same); Irving v. Austin, 138 Ohio App.3d 552, 556 (Ohio Ct.App.2000)("[w]hether behavior constitutes wanton misconduct is ordinarily a jury question"); Fabrey v. McDonald Village Police Dep't, 70 Ohio St.3d 351, 356 (Ohio 1994)(same). Defendants' motion for summary judgment on the assault and battery claim is therefore denied.

FN6. "Wanton" misconduct is of a degree greater than negligence and has been described as the "failure to exercise any care toward one to whom a duty of care is owed when the failure occurs under circumstances for which the probability of harm is great and when the probability of harm is known to the tortfeasor." Brockman v. Bell, 78 Ohio App.3d 508, 515 (Ohio Ct.App.1992).

"Reckless" misconduct occurs when an individual "does an act or intentionally fails to do an act which is in his duty ..., knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Hunter v. City of Columbus,* 139 Ohio App.3d 962, 969 (Ohio Ct.App.2000)(internal citations omitted).

IV. Conclusion

For the reasons stated above, Defendants' motion for summary judgment (Record at 15) is GRANTED IN PART AND DENIED IN PART. The Court grants summary judgment on all of Plaintiff's claims against the City of Columbus and against Brian Wingard in his official capacity. However, as to Plaintiff's claims filed against Brian Wingard in his individual capacity, the Court finds that genuine issues of material fact preclude a finding of either qualified or statutory immunity, and preclude the granting of summary judgment.

*12 IT IS SO ORDERED.

2002 WL 484622 (S.D.Ohio)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works