# EXHIBIT B

14:59:54

**Page 1**

```
 1
 2               UNITED STATES DISTRICT COURT
 3                 SOUTHERN DISTRICT OF OHIO
 4                 WESTERN DIVISION AT CINCINNATI
 5
 6                          - - -
 7   WALTER W. THIEMANN, on  :
     behalf of himself and   :
 8   of all others similarly :
     situated,               :
 9                           :
           Plaintiff,        :
10                           :
       VS.          : CASE NO. C-1-00793
11                           :
     OHSL FINANCIAL CORP.,   :
12   OAK HILLS SAVINGS AND   :
     LOAN COMPANY, F.A.,     :
13   NORBERT G. BRINKER,     :
     KENNETH L. HANAUER,     :
14   WILLIAM R. HILLEBRAND,  :
     ALVIN E. HUCKE, THOMAS  :
15   E. MCKIERNAN, JOSEPH J. :
     TENOEVER, HOWARD N.     :
16   ZOELLNER, PROVIDENT     :
     FINANCIAL GROUP, INC.,  :
17   ROBERT L. HOVERSON,     :
     JACK M. COOK, THOMAS D. :
18   GROTE, JR., PHILIP R.   :
     MYERS, JOSEPH A. PEDOTO,:
19   JOSEPH A. STEGER,       :
     CHRISTOPHER J. CAREY,   :
20   CLIFFORD ROE, and       :
     DINSMORE & SHOHL, LLP,  :
21                           :
         Defendants.     :
22
                            - - -
23
24        Deposition of NORBERT BRINKER, a
```

**Page 2**

```
 1   defendant herein, called by the plaintiffs for
 2   cross-examination, pursuant to the Federal
 3   Rules of Civil Procedure, taken before me, Lee
 4   Ann Williams, a Registered Professional
 5   Reporter and Notary Public in and for the State
 6   of Ohio, on Thursday, February 5, 2004, at
 7   10:10 a.m.
 8
 9   APPEARANCES:
10       On behalf of the Plaintiff:
11           Michael G. Brautigam, Esq.
             Gene Mesh & Associates
12           2605 Burnet Avenue
             Cincinnati, Ohio 45219
13
         On behalf of the Defendants:
14
             James E. Burke, Esq.
15           Rachael A. Rowe, Esq.
             Keating, Muething & Klekamp
16           1400 Provident Tower
             One East Fourth Street
17           Cincinnati, Ohio 45202
18       On behalf of the Defendants Dinsmore &
     Shohl and Clifford Roe:
19
             John W. Hust, Esq.
20           Schroeder, Maundrell, Barbiere
             & Powers
21           110 Governor's Knoll
             11935 Mason Road
22           Cincinnati, Ohio 45249
23
24
```

**Page 3**

```
 1       On behalf of the Defendants:
 2           Michael Barrett, Esq.
                 and
 3           Thomas W. Breidenstein, Esq.
             Barrett & Weber
 4           105 East Fourth Street
             Suite 500
 5           Cincinnati, Ohio 45202
 6       On behalf of the Defendants:
 7           John B. Pinney, Esq.
             Graydon, Head & Ritchey
 8           1900 Fifth Third Center
             511 Walnut Street
 9           Cincinnati, Ohio 45202
10       On Behalf of the Defendants (via
     telephone):
11
             Mary-Helen Perry, Esq.
12           Jones Day
             51 Louisiana Avenue, N.W.
13           Washington, D.C. 20001
14   ALSO PRESENT:  Magistrate Judge Timothy Hogan
                 Gary Meier
15               Lindsey Meier
                 Marilyn Wieland
16               Kevin Dineen
17                        - - -
18
19             S T I P U L A T I O N S
20       It is stipulated by and among counsel for
21   the respective parties that the deposition of
22   NORBERT BRINKER, a defendant herein, called by
23   the plaintiff for cross-examination pursuant to
24   the Federal Rules of Civil Procedure, may be
```

**Page 4**

```
 1   taken at this time by the notary; that said
 2   deposition may be reduced to writing in
 3   stenotypy by the notary, whose notes may then
 4   be transcribed out of the presence of the
 5   witness; and that proof of the official
 6   character and qualifications of the notary is
 7   expressly waived.
 8                        - - -
 9
10
11                  I N D E X
12   Examination of NORBERT BRINKER    Page
13   By Mr. Brautigam:              7
14                        - - -
15
16
17
18
19
20
21
22
23
24
```

5

10:06:12 1    THE COURT: Before we start, I
10:06:14 2 just want to clarify what we're doing here.
10:06:18 3    MR. BRAUTIGAM: Your Honor, could
10:06:18 4 this be on the record?
10:06:20 5    THE COURT: I don't care if it's
10:06:20 6 on the record or not. It's fairly simple. The
10:06:24 7 length of this deposition is two hours. And
10:06:26 8 we'll decide at the end of two hours whether or
10:06:28 9 not there will be more time, but it won't be
10:06:30 10 today.
10:06:30 11    And secondly, don't count on
10:06:32 12 having more than two hours. In other words, I
10:06:34 13 want this over with to the extent possible in
10:06:36 14 two hours. Secondly, I'm not going to rule on
10:06:40 15 objections. That would be up to Judge
10:06:42 16 Beckwith -- I think it's Judge Beckwith, isn't
10:06:46 17 it?
10:06:46 18    MR. BURKE: Yes, Your Honor.
10:06:48 19    THE COURT: So all I'm doing is
10:06:50 20 trying to enforce what my rules were, a two
10:06:54 21 hour limit and this deposition is to explore
10:06:56 22 new material. It is not to be used to impeach
10:07:00 23 what Mr. Brinker has already said.
10:07:02 24    By the way, I was provided a copy

6

10:07:04 1 of the -- Mr. Brinker's prior testimony in the
10:07:08 2 Nolte case, the Hamilton County case. And I
10:07:14 3 have read it, so I know generally what he
10:07:18 4 testified about. And my own recollection was
10:07:22 5 it was very little having anything to do with
10:07:24 6 Ms. Nolte, mostly about Provident, the merger,
10:07:30 7 and et cetera, so I think a lot of this does
10:07:34 8 apply to this case.
10:07:34 9    And as I recall, Mr. Burke had
10:07:36 10 stipulated that it could be used in lieu of any
10:07:40 11 further testimony on behalf of Mr. Brinker.
10:07:42 12    MR. BURKE: That's correct, Your
10:07:44 13 Honor.
10:07:48 14    THE COURT: So I can't say that I
10:07:48 15 could recall every page, but I did read it. So
10:07:52 16 let's do this, rather than hold this up with
10:07:58 17 objections that the material has already been
10:08:00 18 covered, it seems to me that we can move things
10:08:04 19 along by just saying that I've got a copy of
10:08:06 20 this deposition and if we're into material
10:08:10 21 that's already been covered, it simply can be
10:08:14 22 the subject of a motion to strike, then I'll
10:08:16 23 look it up and see if it was or wasn't and we
10:08:18 24 can deal with it after the fact.

7

10:08:20 1    MR. BURKE: Shall we note the
10:08:22 2 objections for the record, Your Honor?
10:08:24 3    THE COURT: Oh, yes, I think you
10:08:24 4 have to. Okay, ready? Go ahead.
10:08:28 5    VIDEOGRAPHER: Okay. We are on
10:08:30 6 videotape record. Today is Thursday, February
10:08:32 7 5th, 2004. The time is 10:10 a.m., would the
10:08:36 8 reporter please swear in the witness?
9    * * *
10    NORBERT BRINKER
11 having been first duly sworn, testified as
12 follows:
13    CONTINUED CROSS-EXAMINATION
14 BY MR. BRAUTIGAM:
10:08:46 15    Q. Good morning, Mr. Brinker.
10:08:48 16    A. Good morning.
10:08:50 17    Q. My name is Michael G. Brautigam
10:08:52 18 and I represent Walter Thiemann, Gary and Lisa
10:08:54 19 Meier, and Lindsey Meier and a putative class
10:08:58 20 of OHSL shareholders. Mr. Brinker, I
10:09:02 21 appreciate you coming here today and I thank
10:09:02 22 you for your time.
10:09:04 23    Let me hand you what has been
10:09:04 24 previously marked as Plaintiff's Exhibit 1 and

8

10:09:08 1 I ask you to take a look at it. Mr. Brinker,
10:09:12 2 with this document or any other document,
10:09:16 3 please feel free to take as much time as you
10:09:18 4 need to review the document for proper context.
10:09:22 5 However, in most cases I believe I can direct
10:09:24 6 your attention to the appropriate parts.
10:09:42 7    Mr. Brinker, let me represent to
10:09:44 8 you that this is an article from the Cincinnati
10:09:46 9 Business Courier from August 2001. And I ask
10:09:50 10 if you have seen it before?
10:09:50 11    MR. BURKE: Objection. Hearsay,
10:09:52 12 previously covered.
10:10:02 13    A. That means I don't answer?
10:10:04 14    MR. BURKE: No. Go ahead, Norb,
10:10:06 15 I'm sorry.
10:10:06 16    A. I've never seen it.
10:10:08 17    Q. Okay. Can I direct your attention
10:10:10 18 to the extreme right column, sir?
10:10:12 19    MR. BURKE: Objection, foundation.
10:10:14 20    Q. Would you read those two
10:10:14 21 paragraphs with the bullet points to yourself,
10:10:16 22 sir?
10:10:18 23    A. Okay. And out loud or just read
10:10:20 24 them?

10:10:22 1      Q.  To yourself, sir.
10:10:24 2      A.  Okay.
10:11:38 3      Q.  Mr. Brinker, have you had an
10:11:40 4  opportunity to read those two paragraphs?
10:11:42 5      A.  Yes.
10:11:44 6      Q.  Can I direct your attention to the
10:11:44 7  first paragraph where it says, Burke's
10:11:46 8  response: Hanauer opposed the Provident
10:11:50 9  takeover because he wanted Oak Hills to remain
10:11:52 10  independent?
10:11:54 11              MR. BURKE:  Object.
10:11:54 12      Q.  Do you see that, sir?
10:11:56 13              MR. BURKE:  Objection, foundation.
10:11:56 14  Also lacks -- or assumes facts not in evidence.
10:11:58 15  You may answer.  Go ahead and answer, Norb.
10:12:08 16  I'm sorry.
10:12:14 17      A.  And what was it?
10:12:16 18      Q.  The question, sir, is, is that
10:12:18 19  statement true?
10:12:20 20              MR. BURKE:  Objection, foundation.
10:12:22 21  Assumes facts not in evidence.  Go ahead and
10:12:24 22  answer.
10:12:28 23      A.  I don't know about Ken personally
10:12:32 24  not believing and going along with it, but the,

10:12:38 1  at the -- not only at the time he got this
10:12:44 2  375,000, but he wrote it with the Board.  He
10:12:48 3  didn't know he was going to get that.
10:12:50 4      Q.  Mr. Brinker, my question is a
10:12:50 5  little different.  There is a statement from
10:12:54 6  Plaintiff's Exhibit 1 and it says, Hanauer
10:12:56 7  opposed the Provident takeover because he
10:12:58 8  wanted Oak Hills to remain independent.  Is
10:13:00 9  that statement true?
10:13:02 10              MR. BURKE:  Objection.  This was
10:13:02 11  previously covered.  Assumes facts not in
10:13:06 12  evidence.  Asked and answered.  You may answer
10:13:08 13  again, Norb.
10:13:08 14              MR. BRAUTIGAM:  Your Honor, just
10:13:08 15  for the record, this was not previously covered
10:13:10 16  because it came out after the, the other case.
10:13:14 17              THE COURT:  Who cares?  The
10:13:18 18  objection is made, it's -- we can decide this
10:13:18 19  later based on what the testimony already was.
10:13:20 20  Go ahead.
10:13:22 21      A.  He never stated to me that he
10:13:24 22  really opposed it.  I mean, he may have thought
10:13:30 23  that he did, but he didn't state to me that he
10:13:34 24  did oppose it.  He had no objection.

11

10:13:36 1      Q.  What do you mean when you say he
10:13:38 2  may have -- can we have his answer read back,
10:13:42 3  please?
10:13:42 4          (Record read by Reporter.)
10:14:04 5      A.  He voted for it.
10:14:06 6              MR. BURKE:  Did you get that last
10:14:08 7  testimony?
10:14:10 8              COURT REPORTER:  Yes.
10:14:10 9      Q.  Mr. Brinker, when you said in your
10:14:12 10  previous answer, "he may have thought that he
10:14:14 11  did," what exactly did you mean?
10:14:16 12              MR. BURKE:  Objection.  Asked and
10:14:16 13  answered.  You may answer again.
10:14:18 14      A.  Well, he had his own thoughts.  I
10:14:22 15  don't know what he was thinking, but he didn't
10:14:22 16  object to me necessarily.  But he did vote for
10:14:24 17  it, so how could I figure he objected?
10:14:30 18      Q.  When you -- did Mr. Hanauer ever
10:14:32 19  vote against the proposed merger with
10:14:34 20  Provident?
.0:14:36 21      A.  Not that I know of, no.
10:14:36 22      Q.  Did Mr. Hanauer ever abstain with
10:14:40 23  respect to continuing --
10:14:40 24      A.  No, sir.

12

10:14:42 1      Q.  -- negotiations?
10:14:42 2      A.  No, sir.
10:14:44 3      Q.  May I finish my question, sir?
10:14:44 4      A.  No, sir.
10:14:46 5      Q.  Did Mr. Hanauer ever abstain with
10:14:48 6  respect to continued negotiations with
10:14:50 7  Provident?
10:14:54 8      A.  He didn't, because if I say "no,
10:14:56 9  sir," doesn't that mean that he didn't as far
10:15:00 10  as I was concerned?
10:15:00 11      Q.  Okay.  Let me direct your
10:15:02 12  attention to the July 22nd, 1999 OHSL Board
10:15:06 13  meeting.  Do you remember anything about that
10:15:08 14  meeting, sir?
10:15:08 15      A.  That was over 17 years ago, sir,
10:15:12 16  and I don't remember it at all.
10:15:14 17      Q.  How many years ago was it, sir?
10:15:16 18              MR. BURKE:  Objection.
10:15:16 19      A.  I guess close to 17.
10:15:22 20      Q.  Did you ever ask Mr. Brinker
10:15:24 21  how -- Mr. Hanauer how he felt with respect to
10:15:26 22  the OHSL-Provident merger?
10:15:28 23      A.  No, I did not.
10:15:30 24      Q.  Why not?

13

10:15:30  1      MR. BURKE: Objection. Previously
10:15:32  2  covered.
10:15:32  3      A.  He had his own vote. I don't
10:15:34  4  know. I didn't have any reason to question
10:15:38  5  him.
10:15:36  6      Q.  Did you expect Mr. Hanauer to vote
10:15:40  7  his personal shares in favor of the
10:15:42  8  OHSL-Provident merger?
10:15:44  9      MR. BURKE: Objection. Previously
10:15:46 10  covered.
10:15:46 11      A.  I had no way to know that -- how
10:15:48 12  he was going to vote his shares.
10:15:50 13      Q.  My question is a little different,
10:15:50 14  sir. Did you expect Mr. Hanauer to vote his
10:15:54 15  shares in favor of the merger?
10:15:56 16      MR. BURKE: Objection. Asked and
10:15:56 17  answered.
10:15:58 18      A.  I wouldn't think so.
10:15:58 19      Q.  Why not?
10:16:00 20      A.  Why not?  It was none of my
10:16:04 21  business.
10:16:06 22      Q.  Mr. Brinker, if you had an
10:16:08 23  expectation that Mr. Hanauer was not going to
10:16:10 24  vote his shares in favor of the OHSL merger, do

14

10:16:14  1  you think that you had a fiduciary
10:16:16  2  responsibility to tell the OHSL shareholders
10:16:20  3  that that's how their chief executive officer
10:16:22  4  and Board member felt?
10:16:22  5      MR. BURKE: Objection.
10:16:24  6  Argumentative. Mischaracterizes prior
10:16:26  7  testimony. Assumes facts not in evidence. Go
10:16:28  8  ahead and answer, Norb.
10:16:32  9      A.  Your question again?
10:16:34 10      MR. BRAUTIGAM: Would you read it
10:16:34 11  back, please?
10:16:34 12      (Record read by Reporter.)
10:17:02 13      MR. BURKE: Objection. I think
10:17:04 14  you mischaracterized the prior testimony. My
10:17:06 15  recollection is he testified he had no
10:17:08 16  expectation either way.
10:17:08 17      A.  No.
10:17:10 18      MR. BURKE: Same objection.
10:17:10 19      A.  I would not have any way of
10:17:12 20  knowing how he was going to vote. And I
10:17:14 21  wouldn't feel it was any of my business to ask
10:17:16 22  him. I didn't ask any of the other fellows how
10:17:20 23  they were going to vote.
10:17:20 24      Q.  Did you have an expectation with

15

10:17:22  1  respect to the other directors as to how they
10:17:26  2  would vote their personal shares?
10:17:28  3      MR. BURKE: Objection. Asked and
10:17:28  4  answered. You can answer.
10:17:30  5      A.  I -- did I have any objection, did
10:17:32  6  you say, or did I know?
10:17:34  7      Q.  Did you have an expectation as to
10:17:36  8  how the other directors other than Mr. Hanauer
10:17:40  9  would vote their personal shares?
10:17:42 10      A.  Well, based on the meetings or
10:17:44 11  in -- weekly meetings and that -- all went
10:17:46 12  along, I would feel that I did, yes.
10:17:50 13      Q.  And what was that expectation?
10:17:50 14      A.  That they would vote for it.
10:17:52 15      Q.  And was your expectation with
10:17:54 16  respect to Mr. Hanauer any different --
10:17:56 17      A.  No.
10:17:56 18      Q.  -- from the other directors?
10:17:58 19      A.  No, sir.
10:17:58 20      Q.  So you -- it's your testimony that
10:18:00 21  you expected that Mr. Hanauer would vote in
10:18:02 22  favor of the merger; is that correct?
10:18:04 23      A.  I thought he would.
10:18:06 24      Q.  Okay. Did you later learn that he

16

10:18:06  1  did not vote in favor of the merger?
10:18:10  2      MR. BURKE: Objection.
10:18:10  3      A.  I never heard it from anybody.
10:18:12  4      MR. BURKE: Objection, previously
10:18:12  5  covered. Go ahead and answer. I'm sorry.
10:18:16  6      A.  Okay. I never heard it from
10:18:16  7  anybody in the office, had no reason to know
10:18:20  8  otherwise.
10:18:20  9      Q.  Did you ever check the shareholder
10:18:22 10  lists?
10:18:22 11      A.  No.
10:18:22 12      Q.  Did you ever hear from any source
10:18:24 13  that Mr. Hanauer had voted against the
10:18:26 14  transaction with respect to his personal shares
10:18:28 15  and those he controlled?
10:18:32 16      MR. BURKE: Continuing objection.
10:18:32 17  This is just a regurgitation of the prior
10:18:34 18  testimony. You may answer.
10:18:36 19      A.  Well, I, I -- I got mixed up on
10:18:42 20  the question here then. What's the question?
10:18:42 21      (Record read by Reporter.)
10:19:00 22      A.  After the whole meeting was all
10:19:02 23  over and everything, I heard that --
10:19:04 24      Q.  Okay.

17

10:19:04 1   A.   -- in conversation.
10:19:04 2   Q.   Where did you hear that?
10:19:08 3   A.   Just from people talking, Ken
10:19:10 4 himself.
10:19:10 5   Q.   You heard it from Ken himself?
10:19:12 6   A.   Well, talking together.
10:19:14 7   Q.   Okay.  Please tell me everything
10:19:18 8 you can recall about this conversation where
10:19:18 9 Ken Hanauer told you he voted his personal
10:19:22 10 shares against the transaction.
10:19:24 11   A.   I would not remember the whole --
10:19:26 12   MR. BURKE:  Objection.  Continuing
10:19:26 13 objection to --
10:19:28 14   A.   I wouldn't remember the whole
10:19:28 15 conversation from way back then.
10:19:28 16   Q.   Well, please --
10:19:30 17   A.   That was 17 years ago.
10:19:32 18   Q.   Okay.  Well, please tell me as
10:19:34 19 much as you can recall.
10:19:36 20   A.   I wouldn't recall anything really.
10:19:36 21   Q.   You just recall the fact that he
10:19:38 22 told you he voted --
10:19:40 23   A.   It was mentioned.  It was
10:19:42 24 mentioned.  I didn't -- he didn't tell me.  And

18

10:19:44 1 I didn't talk to him in a group or -- as the
10:19:48 2 Board, but I heard that he did.
10:19:52 3   Q.   What was your reaction when you
10:19:52 4 heard that Mr. Hanauer had voted his personal
10:19:56 5 shares and those he controlled against the
10:19:58 6 merger?
10:20:00 7   A.   Well, it certainly wasn't --
10:20:02 8 didn't give me much of a thought that Mr.
10:20:10 9 Hanauer being what I thought he was.
10:20:10 10   Q.   What did you think he was?
10:20:14 11   A.   Well, I always thought he was a
10:20:16 12 very good person and a good guy in his job.
10:20:20 13   Q.   Did you --
10:20:20 14   A.   And --
10:20:20 15   Q.   Please continue.
10:20:20 16   A.   And as the meetings went along, he
10:20:26 17 was going along with it and then votes his
10:20:28 18 shares the other way.  I didn't know that he
10:20:30 19 was going to do that.
10:20:30 20   Q.   Did you feel somehow abused by
10:20:34 21 that shareholder vote?
10:20:36 22   MR. BURKE:  Objection.
10:20:36 23 Argumentative.
10:20:36 24   A.   No, I didn't.

19

10:20:38 1   Q.   Did you feel that it was fair to
10:20:40 2 the fellow -- to Mr. Hanauer's fellow Board
10:20:44 3 members?
10:20:44 4   MR. BURKE:  Objection.  Calls for
10:20:46 5 speculation.
10:20:46 6   A.   That's speculation, too.  I
10:20:48 7 personally wouldn't think it was fair.
10:20:52 8   Q.   You thought it was unfair; is that
10:20:52 9 correct?
10:20:52 10   A.   That is right.
10:20:54 11   Q.   Okay.  Did you think it was unfair
10:20:56 12 to the OHSL shareholders that Mr. Hanauer had
10:21:00 13 said one thing and had done something
10:21:02 14 completely different?
10:21:04 15   MR. BURKE:  Objection.  Assumes
10:21:04 16 facts not in evidence.  Vague.  You can go
10:21:08 17 ahead and answer.
10:21:14 18   A.   How did that go again?
10:21:16 19   Q.   Did you think that what -- what
10:21:18 20 Mr. Hanauer had done was unfair to the OHSL
10:21:20 21 shareholders in that he recommended one thing
10:21:24 22 to them, but he did exactly the opposite
10:21:26 23 himself?
10:21:28 24   MR. BURKE:  Objection.  Calls for

20

10:21:28 1 speculation.  You may answer.
10:21:30 2   A.   It's just speculation.  I, I
10:21:32 3 wouldn't -- I didn't think of it as being
10:21:34 4 unfair.  I mean, he was, but -- I didn't think
10:21:36 5 of it as being not fair necessarily.  The, the
10:21:40 6 shareholders all voted.  They all had their own
10:21:44 7 chance, they could vote the way they wanted and
10:21:46 8 he had the same opportunity.
10:21:48 9   Q.   Do you believe that the
10:21:52 10 shareholders had to have full and fair
10:21:52 11 information in order to cast their votes?
10:21:56 12   MR. BURKE:  Continuing objection.
10:21:58 13   A.   Well, their votes were cast by the
10:21:58 14 time they found out that Ken didn't vote his.
10:22:02 15   Q.   Do you feel that it was wrong to
10:22:04 16 conceal Mr. Hanauer's vote from the
10:22:06 17 shareholders so that they wouldn't know how Mr.
10:22:08 18 Hanauer felt when they were voting?
10:22:10 19   MR. BURKE:  Objection.
10:22:12 20 Argumentative.  Assumes facts not in evidence.
10:22:14 21   A.   I didn't know how he felt before
10:22:16 22 it.  I heard this all after the meeting.  I
10:22:20 23 didn't know what he was going to vote.
10:22:22 24   Q.   What else did you hear after the

21

10:22:22 1  meeting?
10:22:24 2           MR. BURKE:  Objection.  Vague.
10:22:26 3       A.   Seventeen years ago, I don't
10:22:28 4  remember everything -- hardly anything, in
10:22:32 5  fact.
10:22:32 6       Q.   Well, please tell me what you can
10:22:34 7  remember.
10:22:34 8           MR. BURKE:  Objection, vague.
10:22:36 9       A.   I just told you I can't remember.
10:22:38 10          MR. BURKE:  Overbroad.  You may
10:22:38 11  answer.
10:22:38 12      A.   Hmm?
10:22:40 13          MR. BURKE:  Go ahead and answer.
10:22:44 14      A.   I don't know what you mean, what I
10:22:44 15  remember.
10:22:46 16      Q.   You talked about a meeting or a
10:22:48 17  circumstance where you learned that Mr. Hanauer
10:22:50 18  had voted his personal shares against the
10:22:52 19  merger.  And you said that that was after the
10:22:54 20  meeting or something like that.
10:22:56 21      A.   That was after the shareholder
10:22:58 22  meeting.
10:22:58 23      Q.   Right.  And --
10:23:00 24      A.   We didn't know about it before --

22

10:23:00 1       Q.   Right.
10:23:02 2       A.   -- that he was going to do that.
10:23:02 3  He did it.
10:23:04 4       Q.   If you had known that Mr. Hanauer
10:23:06 5  was going to vote his personal shares against
10:23:08 6  the merger, what if anything would you have
10:23:10 7  done differently?
10:23:12 8           MR. BURKE:  Objection.
10:23:12 9  Speculation.  Assumes facts not in evidence.
10:23:14 10      A.   I don't -- I don't think I would
10:23:18 11  have done anything.  I wouldn't have at that
10:23:22 12  time known that it, it should be told to the
10:23:24 13  shareholders after the meeting was over and the
10:23:26 14  shareholders were all gone.
10:23:28 15      Q.   Mr. Brinker, my question is a
10:23:30 16  little different.  If you had known that Mr.
10:23:32 17  Hanauer intended to vote his shares against the
10:23:36 18  transaction before the special shareholder
10:23:38 19  meeting on October 25th, 1999, what if anything
10:23:42 20  would you have done differently?
10:23:44 21          MR. BURKE:  Objection.  Assumes
10:23:46 22  facts not in evidence.  Mischaracterizes the
10:23:48 23  record.  Asked and answered.  You may answer
10:23:50 24  again.

23

10:23:50 1       A.   I don't think really I would have
10:23:52 2  done anything.  I wouldn't know how he was
10:23:56 3  going to vote.  I know his, his actions and
10:23:58 4  such, but I didn't think it was enough to
10:24:00 5  affect any shareholder's vote, plus the rest of
10:24:04 6  the Board.
10:24:04 7       Q.   Mr. Brinker, what's the basis for
10:24:06 8  your last statement that Mr. Hanauer's opinion
10:24:10 9  on the transaction was to the effect of not
10:24:14 10  enough to affect other shareholder votes?
10:24:18 11          MR. BURKE:  Objection.  Asked and
10:24:18 12  answered.
10:24:22 13      A.   Oh, you mean at the meeting?  They
10:24:24 14  were already voted by the time he sat at the
10:24:28 15  meeting and found out that he didn't.
10:24:28 16      Q.   Mr. Brinker, my question is a
10:24:30 17  little different.  If you had known before the
10:24:32 18  merger closed and before the special meeting of
10:24:36 19  shareholders where the shareholders got to vote
10:24:40 20  that Mr. Hanauer opposed the transaction, what
10:24:44 21  if anything would you have done differently?
10:24:46 22          MR. BURKE:  Objection.  Asked and
10:24:48 23  answered.  Calls for speculation.
10:24:50 24      A.   I don't think I would have done

24

10:24:50 1  anything differently.
10:24:52 2       Q.   Why not?
10:24:52 3       A.   I didn't think it, it was
10:24:54 4  necessary.
10:24:54 5       Q.   Why did you not think it was
10:24:58 6  necessary to --
10:25:00 7       A.   I don't think one person like that
10:25:02 8  and his vote and the number of shares that he
10:25:04 9  had would make any difference to anything.
10:25:06 10      Q.   So your answer is based on your
10:25:08 11  opinion that --
10:25:10 12      A.   Surely.
10:25:10 13      Q.   -- one person and his votes
10:25:12 14  wouldn't make any difference to the thing; is
10:25:14 15  that correct?
10:25:14 16          MR. BURKE:  Objection.
10:25:14 17      A.   That was my feeling.
10:25:16 18      Q.   Okay.  Do you agree with me that
10:25:20 19  shareholders in a merger situation often look
10:25:22 20  to the company's CEO when seeking how to vote?
10:25:26 21          MR. BURKE:  Objection.  Calls for
10:25:26 22  speculation as to what all shareholders think.
10:25:30 23      A.   I had nobody seek to -- to me, ask
10:25:32 24  me how to vote.  All the shareholders we've

25

10:25:38 1 got, nobody asked me.
10:25:38 2     Q.   Well, they didn't have to ask you
10:25:40 3 because --
10:25:40 4     A.   No, they didn't.
10:25:40 5     Q.   -- because you had made a written
10:25:44 6 recommendation in the form of the proxy
10:25:46 7 materials and registration statement that they
10:25:50 8 should vote for the merger transaction,
10:25:52 9 correct?
10:25:52 10    A.   That's correct.
10:25:54 11    Q.   And do you believe -- Lee Ann, are
10:25:54 12 you okay?
10:25:54 13          COURT REPORTER:  Move the paper.
10:26:10 14          THE WITNESS:  Sorry.
10:26:10 15    Q.   Do you believe that shareholders
10:26:12 16 have a right to rely on the chief executive
10:26:14 17 officer of a company in considering how they
10:26:16 18 should vote on a merger transaction?
10:26:20 19          MR. BURKE:  Objection.  Asked and
10:26:20 20 answered.  Argumentative.  Assumes facts not in
10:26:22 21 evidence.  You may answer.
10:26:24 22    A.   I don't -- I don't think that they
10:26:26 23 should have any right to say anything to how
10:26:30 24 they should vote for anything.  They vote the

26

10:26:34 1 way they wanted to vote and vote their shares
10:26:38 2 the way they wanted to.  I didn't try to
10:26:38 3 influence one way or the other.
10:26:40 4     Q.   Now, Mr. Brinker, you say you
10:26:42 5 didn't try to influence them one way or the
10:26:44 6 other.  Let me hand you what is the first page
10:26:46 7 of what has previously been marked as
10:26:50 8 Defendant's Exhibit 1.  And I would ask you to
10:26:52 9 take a look at that, sir.  With this document
10:26:54 10 or any other, please feel free to take as much
10:26:58 11 time as you need.  Would you read that over to
10:27:00 12 yourself, sir?
10:27:02 13          MR. BURKE:  Objection.  Covered in
10:27:02 14 the first deposition.
10:27:06 15    A.   Does it stay there?
10:27:12 16          MR. BURKE:  Go ahead and answer,
10:27:12 17 Norb.
10:27:12 18    A.   Oh.
10:27:14 19          MR. BURKE:  He wants you to read
10:27:14 20 that page.
10:27:14 21    A.   Yeah.
10:27:14 22 BY MR. BRAUTIGAM:
10:28:38 23    Q.   Mr. Brinker, have you had an
10:28:38 24 adequate amount of time to review the first

27

10:28:40 1 page of Defendant's Exhibit 1 to yourself?
10:28:48 2     A.   I would think so.  If you said
10:28:50 3 that I -- I keep telling you it's 17 years ago
10:28:52 4 and I don't think I should be expected to
10:28:54 5 remember everything that happened, but let's
10:28:56 6 have the question.
10:28:58 7     Q.   Mr. Brinker, do you agree that the
10:29:00 8 first page is a recommendation to the
10:29:02 9 shareholders of OHSL that went out over your
10:29:08 10 signature, that they should vote in favor of
10:29:10 11 the merger?
10:29:10 12          MR. BURKE:  Objection.  Document
10:29:10 13 speaks for itself.  You may answer.
10:29:14 14    A.   Yeah, I do.  Yes.
10:29:14 15    Q.   So please explain what you meant
10:29:18 16 before when you said words to the effect that
10:29:20 17 it was up to the shareholders to make up their
10:29:22 18 own mind and that you had no effect on their
10:29:26 19 vote.  Words to that effect.
10:29:28 20    A.   We told -- we told them this in
10:29:30 21 advance.  But when they come in to vote, we
10:29:32 22 have no right to tell them how they should
10:29:36 23 actually vote and such.  We can recommend on
10:29:38 24 this, but if they don't want to do it, it's

28

10:29:40 1 their business.
10:29:42 2     Q.   You told them what in advance,
10:29:42 3 sir?
10:29:44 4     A.   Well, this letter.  It's telling
10:29:46 5 the, the proxy and that and that the Board
10:29:48 6 proposed that they vote for it.  You think --
10:29:54 7 the Board of Directors unanimously approved the
10:29:56 8 acquisition and believes that it's in the best
10:29:58 9 interest of the shareholders.  The Board
10:30:00 10 unanimously recommended and advised that you
10:30:02 11 approve the acquisition at the special meeting.
10:30:06 12    Q.   So you were trying to influence
10:30:08 13 the shareholder vote through this letter and
10:30:10 14 the proxy materials and the registration
10:30:16 15 statement attached to this letter, correct?
10:30:16 16          MR. BURKE:  Objection.
10:30:16 17 Argumentative.  Asked and answered.
10:30:18 18    A.   It is argumentative.  I don't
10:30:18 19 think that you're -- you're telling them how
10:30:22 20 they should vote.  You're telling them that it
10:30:24 21 would be a good deal and a good proposition.
10:30:28 22 And then we're not telling them how they have
10:30:32 23 to vote for it.  We suggested they should.
10:30:34 24    Q.   Okay.  Mr. Brinker, I don't mean

**29**

1 to be argumentative with you --
2     A.  Well, you are.
3     Q.  -- in any way. Okay. How did
4 this letter get written?
5     MR. BURKE: Objection. Previously
6 covered.
7     A.  It was written, I believe, by the
8 attorney firm.
9     Q.  Okay. Well, I reviewed Mr. Roe's
10 testimony this morning and he said that he did
11 not write this letter, and that no one from the
12 Dinsmore firm wrote the letter. I also asked
13 some attorneys from the KMK firm and they said
14 that no one from their firm wrote the letter,
15 so I want to probe this mystery.
16     Mr. Brinker, what if anything do
17 you remember about having this letter presented
18 to you for your signature?
19     MR. BURKE: Objection. Assumes
20 facts not in evidence. You may answer.
21     A.  I don't remember that. I, I can
22 read the letter and remember what's in it, but
23 I don't remember that in my mind, that I
24 remember everything.

**30**

1     Q.  You did not write the letter,
2 correct?
3     A.  No. It was presented to me.
4     Q.  Whom do you believe wrote the
5 letter?
6     MR. HUST: Objection.
7     MR. BURKE: Objection. Calls for
8 speculation.
9     A.  I would have thought the attorney
10 firm did.
11     Q.  Which attorney firm are you
12 talking about?
13     A.  I don't remember that. We've had
14 a couple firms.
15     Q.  What was the role of the attorney
16 firm that you're thinking of?
17     MR. BURKE: Objection.
18     A.  I'm not -- the only one I remember
19 was Keating & Muething.
20     Q.  And what was Keating, Muething's
21 role, if any, with respect to this transaction?
22     A.  That's 17 years ago. Of course
23 they saw us through it, because we didn't know
24 all the legal parts of it.

**31**

1     MR. BURKE: Objection.
2     Q.  And when you --
3     A.  I don't remember.
4     Q.  When you say the Keating firm saw
5 you through it, please describe in greater
6 detail --
7     A.  Oh.
8     Q.  -- exactly what it is you expected
9 them to do.
10     MR. BURKE: Objection, Your Honor.
11 This completely mischaracterizes the record and
12 regurgitates prior testimony.
13     A.  I didn't expect, they did it and
14 presented it to us. I didn't know what to
15 expect from the attorney firm in getting into
16 a, a merger like this.
17     Q.  The Keating firm presented what to
18 you, sir?
19     A.  Oh.
20     MR. BURKE: Objection. Assumes
21 facts not in evidence. Grounds previously
22 covered.
23     A.  You say what -- what papers? What
24 do you mean, what do I --

**32**

1     Q.  Mr. Brinker, you testified in your
2 previous answer that the Keating firm presented
3 something to you and I'm trying to find out --
4     A.  Well, they presented to the
5 company.
6     Q.  Okay.
7     A.  This just comes to me and they've
8 all seen it. It was all right, and I signed
9 it.
10     Q.  What --
11     A.  And I believe everything that's in
12 the letter is correct.
13     Q.  What did the Keating firm present
14 to the company?
15     MR. BURKE: Objection. Continuing
16 objection to this, Your Honor.
17     A.  I don't remember all the forms and
18 everything that was necessary to be done with
19 the merger. I don't remember all the forms. I
20 don't.
21     Q.  And you believe that the Keating
22 firm was presenting this material to you; is
23 that correct?
24     MR. BURKE: Objection.

33

10:33:34 1  Mischaracterizes prior testimony. You may
10:33:40 2  answer.
10:33:40 3  A.  We expected the Keating firm to do
10:33:42 4  it. We hired them to represent us and to be
10:33:44 5  our attorney.
10:33:46 6  Q.  Okay. How did that retention
10:33:48 7  agreement come about?
10:33:48 8  MR. BURKE:  Objection.
10:33:54 9  A.  How did it come about?
10:33:56 10  Q.  Yes.
10:33:56 11  A.  I guess it was recommended to us
10:33:58 12  probably from the McDonald Corporation.
10:34:02 13  Q.  So if I understand your testimony,
10:34:04 14  the McDonald Corporation recommended that Oak
10:34:08 15  Hills hire the Keating firm to assist Oak Hills
10:34:10 16  in effectuating the merger. Is that your
10:34:14 17  testimony?
10:34:14 18  MR. BURKE:  Your Honor, this is a
10:34:14 19  complete attempt to re -- to go into prior
10:34:16 20  testimony. It is being mischaracterized and I
10:34:20 21  think that the witness' --
10:34:22 22  A.  Seventeen.
10:34:24 23  MR. BURKE:  -- confusion is clear
10:34:24 24  on this, but --

34

10:34:24 1  A.  Seventeen years ago.
10:34:26 2  MR. BURKE:  -- I just want to note
10:34:26 3  that objection for the record. You may answer,
10:34:28 4  Mr. Brinker.
10:34:30 5  A.  I don't even know what it was
10:34:32 6  anymore.
10:34:34 7  Q.  Would you read it back, please?
10:34:46 8  A.  Didn't we go over all this in the
10:34:48 9  first -- all that information I gave them? Why
10:34:50 10  do I have to 17 years later try to answer these
10:34:54 11  same questions?
10:34:54 12  MR. BURKE:  Just do the best you
10:34:56 13  can, Mr. Brinker.
10:34:56 14  A.  Oh.
10:35:18 15  (Record read by Reporter.)
10:35:18 16  A.  I would say yes.
10:35:20 17  Q.  Mr. Brinker, do you know Gary
10:35:22 18  Meier?
10:35:24 19  A.  No.
10:35:26 20  Q.  Do you know that Gary Meier was a
10:35:26 21  shareholder of Oak Hills?
10:35:28 22  A.  No. So many shareholders, I
10:35:32 23  wouldn't know that he was.
10:35:32 24  Q.  How many shareholders were there,

35

10:35:34 1  approximately?
10:35:36 2  A.  That's too long ago to remember
10:35:38 3  the numbers of that.
10:35:40 4  Q.  Were there approximately 900?
10:35:42 5  A.  I wouldn't have any idea. I --
10:35:46 6  Q.  Do you know that in addition to
10:35:46 7  being a shareholder, Gary Meier banked at OHSL?
10:35:52 8  A.  I don't know that. We had 20,000
10:35:54 9  depositors and such, and I didn't know who --
10:35:58 10  Q.  Do you know that in part based on
10:36:00 11  your influence, he put the first dollar he ever
10:36:02 12  made from cutting grass in third grade into
10:36:04 13  your bank?
10:36:06 14  MR. BURKE:  Objection. Calls for
10:36:08 15  speculation.
10:36:08 16  A.  I have no idea.
10:36:08 17  Q.  Did you know that he had bought
10:36:10 18  shares for himself and for the benefit of his
10:36:12 19  daughter, Lindsey Meier, and that he never sold
10:36:14 20  a share?
10:36:16 21  MR. BURKE:  Objection.
10:36:16 22  Foundation.
10:36:18 23  A.  I don't know. I wouldn't know --
10:36:20 24  have no idea.

36

10:36:20 1  Q.  Mr. Brinker, I understand that you
10:36:22 2  have an accounting background from your college
10:36:24 3  days. Is that correct?
10:36:26 4  A.  Well, I had some accounting, but I
10:36:28 5  didn't -- it wasn't my major or anything, but I
10:36:30 6  had accounting.
10:36:32 7  Q.  Okay. And what was your major?
10:36:34 8  A.  Well, I didn't get through college
10:36:36 9  so I didn't have a major there, but I was
10:36:38 10  working on accounting. I went to night school
10:36:42 11  in college and stuff like that.
10:36:42 12  Q.  And you've had a lot of practical
10:36:44 13  experience in accounting, over 40 or 50 years
10:36:48 14  in banking, correct?
10:36:48 15  A.  Um-hmm.
10:36:50 16  Q.  Is that yes, sir?
10:36:50 17  A.  Yes, sir.
10:36:52 18  Q.  Okay. Are you familiar with the
10:36:52 19  term off balance sheet transactions?
10:36:56 20  A.  No, I'm not.
10:36:58 21  Q.  Are you familiar with the term on
10:37:00 22  balance sheet transactions?
10:37:04 23  A.  Well, it would be something that
10:37:04 24  would be on record, I would say, but I don't --

37

10:37:10 1 don't know what the terms really mean there.
10:37:12 2 Q. Are you familiar with the term
10:37:12 3 securitizations?
10:37:16 4 A. Securitizations. In what respect?
10:37:22 5 Q. With respect to what banks do.
10:37:24 6 MR. BURKE: Objection. Vague.
10:37:26 7 You may answer.
10:37:28 8 A. Well, what banks do, I don't know.
10:37:32 9 We were a savings and loan, so we would --
10:37:36 10 securitization was taking -- that their funds
10:37:40 11 would be secured when they deposited them, and
10:37:42 12 that's what we took care of.
10:37:42 13 Q. Do you have any understanding of
10:37:44 14 the word securitization as it's sometimes used
10:37:46 15 in the banking industry?
10:37:48 16 A. No.
10:37:50 17 Q. Are you familiar with the concept
10:37:52 18 of fiduciary duties?
10:37:54 19 MR. BURKE: Objection. Calls for
10:37:54 20 a legal conclusion.
10:37:56 21 A. Yeah.
10:37:58 22 Q. What is your understanding of
10:37:58 23 fiduciary duties?
10:38:00 24 MR. BURKE: Same objection.

38

10:38:04 1 A. In my respect it was being
10:38:04 2 responsible for what was being done in the
10:38:06 3 company in the best interest of the depositors.
10:38:10 4 Q. And how did you fulfill your
10:38:12 5 fiduciary duties to the Oak Hills shareholders
10:38:16 6 in 1999?
10:38:18 7 MR. BURKE: Objection. Vague,
10:38:18 8 overbroad.
10:38:20 9 A. Well, it was the whole time we
10:38:20 10 were there, we made home loans and other loans
10:38:24 11 to borrowers. And we had to have funds to do
10:38:28 12 that. They'd deposit them with us and we had
10:38:32 13 the insurance of accounts, so we felt we were
10:38:36 14 protecting them in all respects.
10:38:38 15 Q. When you say "protecting them," to
10:38:40 16 whom are you referring?
10:38:42 17 A. Depositors.
10:38:42 18 Q. Okay. How did you fulfill your
10:38:46 19 fiduciary duties to the shareholders of Oak
10:38:48 20 Hills in 1999?
10:38:50 21 MR. BURKE: Objection. Previously
10:38:52 22 covered. Vague, overbroad. You may answer.
10:38:54 23 A. I really don't remember, it's so
10:38:56 24 long ago.

39

10:39:00 1 Q. Mr. Brinker, where did you get an
10:39:02 2 understanding of what your fiduciary duties
10:39:06 3 were?
10:39:06 4 MR. BURKE: Same objection.
10:39:08 5 A. Well, from the time I took my job
10:39:12 6 in the savings and loan business from the
10:39:16 7 beginning, from the -- from the business
10:39:18 8 college. I went through some night college and
10:39:20 9 stuff like that. Where did I get it was in --
10:39:24 10 Williford Nelson School of Business college.
10:39:30 11 And I went to UC night school.
10:39:34 12 THE COURT: Hold up. I think Mr.
10:39:36 13 Brinker needs a break.
10:39:38 14 VIDEOGRAPHER: We are off the
10:39:40 15 record.
10:39:40 16 (Brief recess.)
10:50:58 17 BY MR. BRAUTIGAM:
10:50:58 18 Q. Mr. Brinker, what is your
10:50:58 19 understanding of this litigation?
10:51:02 20 MR. BURKE: Objection. Vague,
10:51:02 21 overbroad.
10:51:06 22 A. I would like to know really. I
10:51:08 23 don't know what they had to sue about.
10:51:12 24 Q. Do you know who the defendants are

40

10:51:12 1 in the litigation?
10:51:14 2 MR. BURKE: Objection.
10:51:16 3 A. Well, I know Walter Thiemann. He
10:51:18 4 was one of our directors when he moved to
10:51:20 5 Florida.
10:51:24 6 Q. Do you know who the plaintiffs are
10:51:24 7 in the litigation?
10:51:26 8 MR. BURKE: Objection, Your Honor,
10:51:26 9 improper question. You may answer.
10:51:32 10 A. The plaintiffs. I don't know.
10:51:40 11 It's that -- what the -- the filing of the suit
10:51:46 12 or the -- we're being the receptionist of the
10:51:50 13 suit.
10:51:50 14 Q. Mr. Brinker, do you know who the
10:51:50 15 plaintiffs are in the litigation?
10:51:52 16 MR. BURKE: Your Honor, obviously
10:51:54 17 the witness doesn't understand the terminology.
10:51:56 18 I object to the question. You may answer.
10:52:00 19 A. Isn't it Walter Thiemann and the
10:52:04 20 Meiers?
10:52:06 21 Q. And I thought you testified that
10:52:10 22 Mr. Meier -- excuse me, Mr. Thiemann was a
10:52:12 23 defendant a moment ago.
10:52:14 24 MR. BURKE: Objection, Your Honor.

41

10:52:14 1    Q.   Do you have any idea who the
10:52:16 2  defendants are in this litigation?
10:52:18 3    A.   We're defendants, I assume.
8:52:20 4    Q.   When you say "we're defendants,"
10:52:20 5  to whom do you refer?
10:52:22 6    A.   Oak Hills Savings & Loan.
10:52:24 7    Q.   Okay.  Who else is a defendant?
10:52:26 8    A.   I wouldn't know.  It's the company
10:52:30 9  as far as I know.
10:52:32 10    Q.   Mr. Brinker, what if any pleadings
10:52:34 11  or documents that have been filed with the
10:52:36 12  Court have you read?
10:52:38 13    A.   I've read a couple of them.
10:52:40 14  The -- I guess all the directors are also
10:52:46 15  defendants in this, along with the corporation.
10:52:50 16    Q.   Anyone else you can think of?
10:53:00 17    A.   I don't know.  Would the
10:53:02 18  shareholders be?  I -- I wouldn't know that.
10:53:06 19    Q.   Mr. Brinker, what documents have
10:53:06 20  you read that relate in any way to this
10:53:08 21  litigation?
10:53:10 22        MR. BURKE:  Objection, vague.
10:53:10 23    A.   I couldn't have remembered, that
10:53:14 24  was so many years ago.

42

10:53:14 1    Q.   When did you read these documents?
10:53:16 2    A.   When we got them.
10:53:18 3    Q.   And when was that?
10:53:20 4    A.   Well, at the time we -- after
10:53:28 5  completed the merger, when that suit was filed.
10:53:28 6  I don't remember the date the suit was filed
10:53:30 7  even.
10:53:32 8    Q.   Okay.  Let me direct your
10:53:32 9  attention to September 20th of 2000.  That was
10:53:36 10  the date that the Thiemann lawsuit was filed.
10:53:38 11  Are you with me?
10:53:40 12    A.   Yes, sir.
10:53:40 13    Q.   How did you learn that the
10:53:44 14  Thiemann lawsuit had been filed?
10:53:48 15    A.   Well, the attorneys had sent the
10:53:48 16  notice to us.
10:53:50 17    Q.   Okay.  Which attorneys are you
10:53:50 18  referring to?
10:53:52 19    A.   Keating and -- what's your firm?
10:53:52 20        MR. BURKE:  Keating, Muething &
10:53:58 21  Klekamp.
10:53:58 22    A.   Keating & Muething.
10:54:00 23    Q.   And that's the first you learned
10:54:02 24  that you were a defendant; is that correct?

43

10:54:04 1    A.   Um-hmm.
10:54:04 2    Q.   Is that yes?
10:54:06 3    A.   Yes, sir.
10:54:06 4    Q.   Okay.  Did you go out and retain
10:54:10 5  counsel when you learned that you had been
10:54:12 6  sued?
10:54:12 7        MR. BURKE:  Objection.
10:54:12 8    A.   Did I?
10:54:14 9        MR. BURKE:  Relevance.
10:54:16 10    Q.   Yes.
10:54:16 11    A.   No, sir, I didn't.
10:54:16 12    Q.   Did the OHSL Board go out and
10:54:20 13  retain counsel after you learned that they had
10:54:22 14  been sued?
10:54:22 15    A.   We had Keating & Muething.
10:54:24 16    Q.   How did you come to have Keating &
10:54:26 17  Muething?
10:54:26 18    A.   Because they put us -- worked with
10:54:28 19  us through this transaction, so we stayed with
10:54:32 20  them.
10:54:34 21    Q.   And it's your testimony today that
10:54:36 22  Keating, Muething & Klekamp represented Oak
10:54:40 23  Hills throughout the merger transaction?
10:54:42 24        MR. BURKE:  Objection.

44

10:54:42 1  Mischaracterizes the record.  Assumes facts not
10:54:46 2  in evidence, as counsel well knows.
10:54:46 3    A.   I can't --
10:54:46 4        MR. BURKE:  You may answer.
10:54:48 5    A.   I can't remember.  There was
10:54:48 6  another counsel in there we had, but I don't
10:54:50 7  remember the name of it.
10:54:52 8    Q.   How did you select the firm of
10:54:52 9  Keating, Muething & Klekamp to represent you?
10:54:58 10    A.   Well, our directors knew of them.
10:55:06 11  And went with McDonald Company when we decided
10:55:10 12  to go stock, talked to them and they suggested
10:55:12 13  the company.
10:55:14 14    Q.   And did McDonald & Company
10:55:16 15  represent -- excuse me -- recommend the Keating
10:55:16 16  firm for --
10:55:20 17    A.   They just --
10:55:22 18    Q.   -- continued representation in the
10:55:22 19  litigation?
10:55:22 20    A.   They just recommended a number of
10:55:24 21  firms.  We picked Keating & Muething.
10:55:28 22    Q.   Who do you believe is going to
10:55:28 23  represent you at trial?
10:55:34 24    A.   Well, Keating & Muething.

45

10:55:36 1    Q.   Okay.  Have you ever read -- let
10:55:44 2  me hand you what has been previously marked as
10:55:48 3  Plaintiff's Deposition -- Exhibit 62.  Mr.
10:55:52 4  Brinker, please take as much time as you need
10:55:54 5  to review that document.
10:55:56 6    A.   Oh, you're kidding.  This
10:56:48 7  document.  I can't read this whole thing.
10:58:38 8    Q.   Mr. Brinker, can I ask you if
10:58:40 9  you've seen that document before?
10:58:42 10    A.   Yes.  I can't remember the date.
10:58:46 11    Q.   You did see the document?
10:58:46 12    A.   Yes.
10:58:48 13    Q.   And what is your understanding of
10:58:48 14  the content of that document?
10:58:50 15    MR. BURKE:  Objection.  Document
10:58:52 16  speaks for itself.
10:58:54 17    A.   Yeah.  Did you read it?  The
10:59:02 18  document?
10:59:02 19    Q.   Mr. Brinker, what is your
10:59:04 20  understanding of the content of the document?
10:59:06 21    MR. BURKE:  Objection, relevance.
10:59:08 22  You may answer.
10:59:12 23    A.   My understanding is that he wants
10:59:16 24  to disqualify Keating & Muething, Klekamp from

46

10:59:20 1  continued representation of us through this
10:59:24 2  trial.
10:59:24 3    Q.   Do you know if that happened or
10:59:26 4  not?
10:59:28 5    MR. BURKE:  Objection, relevance.
10:59:28 6  You may answer.
10:59:30 7    A.   No, I don't.
10:59:32 8    Q.   Is that important to you?
10:59:34 9    MR. BURKE:  Objection.
10:59:34 10    A.   Well, we want to keep the firm.
10:59:35 11    Q.   Why do you want to keep the firm?
10:59:38 12    A.   Because they have handled
10:59:38 13  everything very well for us in this role.
10:59:42 14    Q.   Okay.  What's the basis for that
10:59:44 15  statement, sir?
10:59:46 16    A.   The Board of Directors decided
10:59:54 17  that was the firm that they wanted, so forth.
10:59:54 18    Q.   When, when --
10:59:54 19    A.   When we hired them, that was one
10:59:50 20  of the firms recommended through McDonald's.
11:00:00 21    Q.   When did the Board of Directors
11:00:02 22  make the decision?
11:00:02 23    A.   I -- it's too far back for me to
11:00:06 24  remember.

47

11:00:06 1    Q.   Mr. Brinker, just so we have a
11:00:08 2  clear and accurate record, if I could finish my
11:00:10 3  questions before you answer.  Okay?
11:00:12 4    A.   Okay.
11:00:12 5    Q.   Thank you.  Mr. Brinker, when did
11:00:14 6  the OHSL Board affirmatively make the decision
11:00:18 7  to go out and hire the Keating, Muething &
11:00:20 8  Klekamp firm?
11:00:22 9    MR. BURKE:  Objection.  Asked and
11:00:22 10  answered.  You may answer.
11:00:24 11    A.   I couldn't remember that date now.
11:00:24 12    Q.   Okay.
11:00:26 13    A.   I wouldn't have any idea.
11:00:26 14    Q.   Okay.  Please tell me the
11:00:28 15  circumstances under which this decision was
11:00:30 16  made.
11:00:30 17    MR. BURKE:  Objection, relevance.
11:00:32 18  You may answer.
11:00:32 19    A.   Board's decision.
11:00:34 20    Q.   Okay.  Did the Board make this
11:00:36 21  decision before or after the merger?
11:00:38 22    MR. BURKE:  Objection.  Asked and
11:00:40 23  answered.  You may answer.
11:00:42 24    A.   Keating -- we had a -- I forget

48

11:00:46 1  the name of the different firm.  Early on we
11:00:50 2  had the -- we -- I wouldn't know the date that
11:00:52 3  we went with Keating & Muething.
11:00:52 4    Q.   And please tell me how the Board
11:00:54 5  decided to change attorney firms.
11:00:58 6    A.   I guess on the recommendation of
11:01:00 7  McDonald's.
11:01:02 8    Q.   And you're satisfied with the
11:01:02 9  representation of Keating, Muething & Klekamp?
11:01:06 10    A.   Yes, sir.
11:01:06 11    Q.   And you expect that they will
11:01:08 12  continue to represent you at trial, correct?
11:01:10 13    MR. BURKE:  Objection.
11:01:10 14    A.   I wouldn't know.
11:01:10 15    MR. BURKE:  Assumes facts not in
11:01:12 16  evidence.
11:01:12 17    A.   I would hope so.
11:01:14 18    Q.   Did you know that the Keating,
11:01:16 19  Muething & Klekamp firm is a defendant in the
11:01:20 20  case?
11:01:20 21    A.   It wasn't.  It may be now.
11:01:24 22    Q.   Excuse me?
11:01:26 23    A.   I say it wasn't on the original
11:01:24 24  thing that I read, but I understood that they

49

11:01:32 1 could not -- since they were -- well, I don't
11:01:36 2 know exactly the reason, but that he couldn't
11:01:38 3 represent us at the case.
11:01:40 4          We would have to have an outside
11:01:42 5 attorney. That's -- this, this stuff's
11:01:46 6 happened, but all of this other stuff is years
11:01:48 7 back. I can't remember everything back there.
11:01:52 8 I mean, this is all so --
11:01:56 9      Q.   Mr. Brinker, did you discuss the
11:01:58 10 law firm that's representing you and the other
11:02:00 11 Oak Hills directors with any other Board
11:02:02 12 members?
11:02:03 13      A.   All of the Board members made the
11:02:04 14 decision.
11:02:06 15      Q.   Okay. Please tell me how that
11:02:06 16 decision came about.
11:02:08 17          MR. BURKE: Objection. Asked and
11:02:10 18 answered.
11:02:10 19      A.   Came about? I told you McDonald
11:02:12 20 recommended them. We had to have an attorney
11:02:16 21 firm and at a Board meeting they, they decided
11:02:16 22 to pick Keating & Muething.
11:02:20 23      Q.   So you believe that at an OHSL
11:02:22 24 Board meeting, McDonald & Company recommended

50

11:02:26 1 that you hire the Keating, Muething & Klekamp
11:02:28 2 firm to rep --
11:02:30 3      A.   They didn't --
11:02:30 4      Q.   Can I finish my question, please?
11:02:32 5 -- to represent you in this litigation; is that
11:02:34 6 correct?
11:02:36 7      A.   They didn't recommend anything.
11:02:38 8 They gave us names of firms and our Board
11:02:40 9 decided on this, Keating & Muething.
11:02:42 10      Q.   Okay. At what meeting was that?
11:02:44 11          MR. BURKE: Objection. Asked and
11:02:46 12 answered.
11:02:48 13      A.   I have no idea. I can't remember
11:02:48 14 back that far.
11:02:50 15      Q.   Do you understand that KMK
11:02:56 16 attorneys will be witnesses in the case?
11:02:56 17      A.   Who?
11:02:58 18      Q.   KMK attorneys.
11:02:58 19          MR. BURKE: Objection, relevance.
11:03:02 20      A.   Who is that? Keating, Muething,
11:03:02 21 you mean?
11:03:06 22      Q.   Yes.
11:03:06 23      A.   I heard that they were, were
11:03:10 24 brought into the suit.

51

11:03:12 1      Q.   Do you understand --
11:03:14 2      A.   So that they would have to have
11:03:14 3 different representation. We would have to
11:03:16 4 have different representation at a trial.
11:03:18 5      Q.   Do you have different
11:03:20 6 representation?
11:03:20 7      A.   We don't at this present.
11:03:22 8      Q.   You do not?
11:03:22 9      A.   No.
11:03:24 10      Q.   Okay. So at the present time, you
11:03:28 11 believe that the Keating firm will represent
11:03:30 12 you at trial; is that correct?
11:03:34 13          MR. PINNEY: I'm going to object
11:03:34 14 to that as well.
11:03:36 15          MR. BRAUTIGAM: Your Honor --
11:03:36 16      A.   I would have --
11:03:38 17          MR. BURKE: Your Honor, the -- Mr.
11:03:40 18 Brautigam is knowingly misstating the record
11:03:42 19 and asking the witness questions that he
11:03:44 20 obviously is, of just in an effort
11:03:48 21 to inject confusion and further the confusion
11:03:50 22 of these proceedings. And I do have a
11:03:52 23 continuing objection to this.
11:03:56 24          MR. BRAUTIGAM: Can we have the

52

11:03:56 1 question read back, please?
11:03:56 2          (Record read by Reporter.)
11:04:14 3      A.   Well, from what I gather from the
11:04:20 4 last information we had, that they couldn't do
11:04:22 5 it and we would have to have an outside firm,
11:04:26 6 but we as directors haven't done anything as of
11:04:26 7 yet.
11:04:30 8      Q.   Okay. What do you plan to do?
11:04:34 9      A.   Well, I --
11:04:34 10          MR. BURKE: Objection. Calls for
11:04:34 11 speculation. You may answer.
11:04:36 12      A.   Yeah, it would be speculating. I
11:04:38 13 guess we'd talk to the Board of Directors and
11:04:40 14 see what they wanted to say. And we won't know
11:04:42 15 if it ends up that Keating won't be able to
11:04:46 16 stay with us. If they can't, we'll find
11:04:46 17 another one.
11:04:50 18      Q.   Okay. But you have no one as of
11:04:52 19 today --
11:04:52 20      A.   No.
11:04:54 21      Q.   -- is that right?
11:04:54 22          MR. BURKE: Objection.
11:04:54 23      A.   That's right.
11:04:54 24          MR. BRAUTIGAM: Your Honor, I

53

11:04:56 1 object to being double teamed.
11:04:56 2 BY MR. BRAUTIGAM:
11:04:58 3 Q. Now, Mr. Brinker, what factors
11:05:02 4 would you consider in seeking representation
11:05:04 5 for the OHSL Board?
11:05:06 6 MR. BURKE: Continuing objection
11:05:06 7 to relevance.
11:05:08 8 A. That would be for the Board to
11:05:10 9 make the decision.
11:05:10 10 Q. Okay. Would you convene the Board
11:05:12 11 as a group?
11:05:12 12 A. Sure.
11:05:14 13 Q. Okay. Would this be a formal or
11:05:16 14 informal meeting?
11:05:18 15 A. Well, probably an informal meeting
11:05:22 16 first and if we have to have a formal meeting.
11:05:24 17 We'd make it a formal meeting if we have to, if
11:05:28 18 we have to select somebody.
11:05:30 19 Q. Okay. How could you have a formal
11:05:32 20 meeting?
11:05:32 21 A. I'd call all of the boys together,
11:05:34 22 go someplace for lunch, sit down and talk to my
11:05:38 23 lawyer.
11:05:38 24 Q. Would you consider that to be a

54

11:05:38 1 formal -- a formal meeting of the Board of
11:05:40 2 OHSL?
11:05:42 3 MR. BURKE: Objection.
11:05:42 4 A. If I had the whole Board together
11:05:44 5 and that's what we were together for, that to
11:05:46 6 me would be our formal meeting. Whether we're
11:05:48 7 at lunch or not, we --
11:05:50 8 Q. Would you invite Ken Hanauer to
11:05:52 9 that meeting?
11:05:54 10 MR. BURKE: Objection. Calls for
11:05:54 11 speculation.
11:05:56 12 A. That would be speculation. I
11:05:56 13 don't know if he would come.
11:05:58 14 Q. Would you invite him?
11:06:00 15 A. Well, we'd ask him, yes.
11:06:02 16 Q. Why did you --
11:06:06 17 A. But I wouldn't know why we should.
11:06:06 18 Q. Well, he was a Board member of
11:06:08 19 OHSL?
11:06:10 20 A. Yeah, he was on there. You know,
11:06:14 21 we would ask him.
11:06:14 22 Q. Do you know if Mr. Hanauer --
11:06:16 23 A. That would make it formal.
11:06:18 24 Q. That would make it formal?

55

11:06:20 1 A. Complete, complete Board.
11:06:20 2 Q. What about Mr. Herron? Would you
11:06:22 3 invite Mr. Herron to the meeting?
11:06:24 4 A. I don't know if he's in South
11:06:26 5 America or where he is. I have no idea.
11:06:28 6 Q. Well, if he were in town, would
11:06:30 7 you invite him to the meeting?
11:06:30 8 MR. BURKE: Objection. Calls for
11:06:32 9 speculation. Relevance.
11:06:34 10 A. He, he had retired from the Board
11:06:34 11 before this merger went through.
11:06:36 12 Q. Did he retire from the Board or
11:06:38 13 did he resign from the Board?
11:06:38 14 A. Well, resigned from the Board.
11:06:40 15 Q. Did he resign in part in protest
11:06:42 16 of the merger with Provident?
11:06:44 17 MR. BURKE: Objection. Previously
11:06:44 18 covered.
11:06:46 19 A. I -- the reason I felt that he
11:06:48 20 resigned, or not even felt, he told me, he may
11:06:52 21 have to move to South America because he went
11:06:54 22 to South America so often on -- with his work,
11:06:58 23 that he was going to have to move down there,
11:06:58 24 so he felt he better get off the Board right

56

11:07:02 1 away.
11:07:02 2 Q. Did Mr. Herron ever tell you that
11:07:04 3 he resigned in part in the protest of the --
11:07:04 4 A. He never told me --
11:07:10 5 Q. -- OHSL-Provident merger?
11:07:12 6 A. Never told me that. Never told me
11:07:14 7 that.
11:07:16 8 Q. So if he testified that he did
11:07:16 9 tell you that, he would be mistaken? Is that
11:07:18 10 correct?
11:07:20 11 A. I would say so, yes.
11:07:20 12 Q. Okay.
11:07:20 13 A. I mean, he told me that at a
11:07:24 14 different meeting -- not a Board meeting -- in
11:07:28 15 the office, that he may have to move to, to
11:07:30 16 South America so he was going to resign. And
11:07:34 17 that would -- I forget what kind of meeting it
11:07:38 18 was, but it was just a -- it wasn't the whole
11:07:40 19 Board. It was a committee meeting when he told
11:07:42 20 me.
11:07:44 21 Q. Okay. But he never told you that
11:07:46 22 he was resigning in part in protest --
11:07:48 23 A. No.
11:07:48 24 Q. -- of the OHSL-Provident merger?

**57**

| | |
|---|---|
| 11:07:50 1 | A. No. |
| 11:07:52 2 | Q. Okay. |
| 11:07:52 3 | A. Never did. |
| :07:52 4 | Q. Was it obvious from the |
| 11:07:52 5 | circumstances that he was resigning in part in |
| 11:07:56 6 | protest -- |
| 11:07:56 7 | MR. BURKE: Objection. |
| 11:07:56 8 | A. Not to, not to me. |
| 11:07:56 9 | Q. -- because of the OHSL-Provident |
| 11:07:58 10 | merger? |
| 11:08:00 11 | A. Not to me. |
| 11:08:00 12 | Q. How did you expect Mr. Herron to |
| 11:08:06 13 | vote his shares and the shares he controlled? |
| 11:08:06 14 | MR. BURKE: Objection to |
| 11:08:06 15 | relevance. |
| 11:08:06 16 | A. I'm -- I would expect -- should |
| 11:08:06 17 | I -- |
| 11:08:10 18 | MR. BURKE: You may answer. |
| 11:08:10 19 | A. I would expect him to vote for the |
| 11:08:12 20 | thing. |
| 11:08:12 21 | Q. Why? |
| 11:08:14 22 | A. Well, because he was a director |
| 11:08:16 23 | and it was the best interest of the company and |
| 11:08:18 24 | that's what he's supposed to work for. |

**58**

| | |
|---|---|
| 11:08:24 1 | Q. Okay. Mr. Brinker, we talked a |
| 11:08:24 2 | little bit about your accounting background |
| 11:08:26 3 | before. Do you remember that testimony? |
| 11:08:28 4 | A. Yes. |
| 11:08:30 5 | Q. You were on the audit committee; |
| 11:08:32 6 | is that correct? |
| 11:08:38 7 | A. Audit committee, yes. |
| 11:08:38 8 | Q. And you served with Mr. Herron as |
| 11:08:40 9 | the chair? |
| 11:08:40 10 | A. Right. |
| 11:08:42 11 | Q. Mr. Hillebrand and Mr. Zoellner? |
| 11:08:42 12 | A. Right. |
| 11:08:46 13 | Q. Is that correct? |
| 11:08:46 14 | A. Um-hmm. |
| 11:08:46 15 | Q. And Mr. Zoellner had an accounting |
| 11:08:48 16 | background; is that right? |
| 11:08:50 17 | A. Right. |
| 11:08:50 18 | Q. In fact, you -- |
| 11:08:50 19 | A. And so did -- so did Mr. -- oh, |
| 11:08:54 20 | heck, what was his name? You mentioned him a |
| 11:08:56 21 | moment ago. |
| 11:08:56 22 | Q. Hillebrand? |
| 11:08:58 23 | A. Hillebrand, yeah. |
| 11:09:00 24 | Q. What was Mr. Hillebrand's |

**59**

| | |
|---|---|
| 11:09:02 1 | accounting background? |
| 11:09:04 2 | A. I don't know his education, but I |
| 11:09:04 3 | know he was in accounting and he was with a big |
| 11:09:08 4 | firm down there on Spring Grove Avenue for |
| 11:09:10 5 | years doing accounting. |
| 11:09:12 6 | Q. Okay. Mr. Brinker, let's talk |
| 11:09:14 7 | about how the merger was structured. Can you |
| 11:09:16 8 | please describe the details, whatever you |
| 11:09:20 9 | remember, of how the merger was structured? |
| 11:09:22 10 | MR. BURKE: Objection. Vague, |
| 11:09:22 11 | previously covered. You may answer, Norb, if |
| 11:09:26 12 | you can answer. |
| 11:09:30 13 | A. How the merger was -- well, the |
| 11:09:32 14 | Board talked and decided. We had a meeting and |
| 11:09:42 15 | decided that a merger would not be a bad |
| 11:09:44 16 | situation to gather -- it was just for a merger |
| 11:09:52 17 | now, do you say? |
| 11:09:54 18 | Q. Yes, sir. |
| 11:09:54 19 | A. That was what -- other company |
| 11:09:58 20 | with us. |
| 1:10:00 21 | Q. Mr. Brinker, how was the merger |
| 11:10:02 22 | structured? |
| 11:10:02 23 | MR. BURKE: Objection. |
| 11:10:02 24 | A. Well, we had a meeting and decided |

**60**

| | |
|---|---|
| 11:10:06 1 | and the -- the Board members got together and a |
| 11:10:10 2 | smaller company wanted to meet with us and join |
| 11:10:12 3 | us. It would be good, we could have another |
| 11:10:16 4 | branch in Price Hill and our branch was in |
| 11:10:18 5 | Western Hills, so -- and they wanted to merge, |
| 11:10:20 6 | so we talked it -- talked it over with our |
| 11:10:24 7 | Board and got together with their Board and |
| 11:10:26 8 | made the merger. |
| 11:10:28 9 | Q. What merger are you talking about? |
| 11:10:30 10 | A. I don't know which one you were |
| 11:10:32 11 | talking about. |
| 11:10:32 12 | Q. Okay. Let's talk about the |
| 11:10:34 13 | OHSL-Provident merger that took place in 1999. |
| 11:10:38 14 | Are you with me? |
| 11:10:38 15 | A. Oh, yes. I was on the wrong one. |
| 11:10:40 16 | Q. Okay. |
| 11:10:40 17 | A. I was on when the small company |
| 11:10:44 18 | merged with us. |
| 11:10:44 19 | Q. All right. Let's talk about the |
| 11:10:44 20 | OHSL-Provident merger. Are you with me? |
| 11:10:48 21 | A. Yes. |
| 11:10:48 22 | Q. And that took place in 1999; is |
| 11:10:50 23 | that correct? |
| 11:10:52 24 | A. I, I don't remember the date, but |

61

11:10:52 1 it was around in the nineties, I know.
11:10:58 2 Q. Okay. How was this merger
11:10:58 3 structured?
.11:11:00 4 A. How was it structured? We called
11:11:02 5 the McDonald firm and the Board of Directors
11:11:04 6 agreed to go ahead with the -- the stock. And
11:11:12 7 we called the McDonald Company, who come in and
11:11:16 8 did what was all necessary to complete the
11:11:18 9 merger. And on the recommendation of that
11:11:24 10 firm, the law firm being one on the
11:11:26 11 recommendation, we took them and we went ahead
11:11:28 12 from there.
11:11:30 13 Q. Was there ever any dissent to this
11:11:32 14 merger?
11:11:32 15 MR. BURKE: Objection. Previously
11:11:34 16 covered. Continuing objection --
11:11:34 17 A. No.
11:11:36 18 MR. BURKE: -- to this line of
11:11:38 19 question.
11:11:38 20 A. I didn't hear any dissent at the
11:11:40 21 Board meeting.
11:11:40 22 Q. No one ever voted against this
11:11:42 23 proposed combination. Is that your testimony?
11:11:44 24 A. I don't know how they voted

62

11:11:46 1 really, but they -- it went through.
11:11:50 2 Q. Mr. Brinker, why would you not
11:11:52 3 know as chairman of the Board how your fellow
11:11:56 4 directors voted?
11:11:58 5 A. Oh, because it's been so many
11:12:00 6 years ago and I wouldn't know how our directors
11:12:02 7 voted. But I, I think all of this is in the
11:12:06 8 minutes of the -- the company minutes. And
11:12:08 9 there's stacks of that around that you could
11:12:10 10 have all this information.
11:12:12 11 Q. So you knew at the time, but you
11:12:14 12 no longer remember today. Is that correct?
11:12:16 13 MR. BURKE: Objection.
11:12:18 14 Argumentative. You may answer.
11:12:22 15 A. I don't remember what today --
11:12:24 16 there, there was a -- I don't remember any
11:12:24 17 objections to the voting, no.
11:12:28 18 Q. Okay. Now, Mr. Brinker, I don't
11:12:28 19 mean to be argumentative with you in any
11:12:30 20 fashion. I just want to put that on the
11:12:32 21 record.
11:12:32 22 Now, how was this merger
11:12:34 23 structured to come about? How was Provident
11:12:36 24 going to pay to buy OHSL?

63

11:12:40 1 MR. BURKE: Previously covered,
11:12:42 2 vague. You may answer.
11:12:42 3 A. How?
11:12:42 4 Q. Yes.
11:12:44 5 A. I don't know how Provident was,
11:12:46 6 but we knew they were a, a company capable of
11:12:50 7 taking the size of our company on.
11:12:52 8 Q. What was the form of currency, if
11:12:56 9 you will, that Provident was going to use to
11:12:58 10 take over OHSL?
11:13:02 11 A. I don't know. I don't remember.
11:13:04 12 Q. If I suggested to you that
11:13:06 13 Provident was going to buy OHSL with newly
11:13:10 14 issued Provident stock, would that ring a bell?
11:13:22 15 A. I, I just don't remember how that
11:13:24 16 all went about --
11:13:26 17 Q. Mr. Brinker --
11:13:28 18 A. -- clearly.
11:13:28 19 Q. -- are you familiar with something
11:13:26 20 known as a fairness opinion?
11:13:30 21 MR. BURKE: Objection. Previously
11:13:32 22 covered, relevance.
11:13:38 23 A. We hired the McDonald Company to
11:13:40 24 give us a fairness opinion of whether it would

64

11:13:44 1 be.
11:13:44 2 Q. And when you hired McDonald &
11:13:46 3 Company to render a fairness opinion, did you
11:13:48 4 believe that they would investigate whether or
11:13:52 5 not Provident stock was artificially inflated?
11:13:58 6 A. I have no reason to believe that.
11:14:00 7 Q. No reason to believe what?
11:14:02 8 A. That their stock was artificially
11:14:04 9 inflated.
11:14:06 10 Q. Okay. Are you familiar with the
11:14:06 11 term artificial inflation?
11:14:10 12 A. I wouldn't know how it would be
11:14:12 13 done. No, sir, I don't.
11:14:14 14 Q. My question is a little different,
11:14:16 15 sir. Are you familiar with the term artificial
11:14:18 16 inflation?
11:14:18 17 A. No.
11:14:20 18 Q. Are you familiar with the term
11:14:22 19 material as it's sometimes used by auditors and
11:14:24 20 accountants?
11:14:26 21 MR. BURKE: Objection. Calls for
11:14:28 22 speculation. Foundation.
11:14:28 23 A. Yeah. I, I wouldn't have any idea
11:14:32 24 on that.

65

11:14:34 1     Q.  During the time you served on
11:14:36 2 OHSL's audit committee, did you have an
11:14:38 3 understanding of what the word material meant?
11:14:42 4     MR. BURKE: Same objection. You
11:14:42 5 may answer.
11:14:42 6     A.  Well, material, it means it's
11:14:50 7 necessary, facts -- things that have to be
11:14:52 8 done -- necessarily done to be -- have the
11:14:54 9 company run right. That's what we were doing.
11:14:56 10     Q.  Who were OHSL's auditors?
11:15:02 11     A.  First it was Frank Miles &
11:15:06 12 Company. And then they, they dropped him. I
11:15:12 13 don't even remember the company that we got.
11:15:16 14     Q.  Who were Provident's auditors?
11:15:18 15     MR. BURKE: Objection.
11:15:18 16     A.  I have no idea.
11:15:20 17     MR. BURKE: Calls for speculation,
11:15:20 18 foundation.
11:15:20 19     Q.  Now, you knew that Provident was a
11:15:22 20 public company, correct?
11:15:24 21     A.  Yes.
11:15:24 22     Q.  And as a public company, you
11:15:26 23 expected them to have outside, independent
11:15:28 24 auditors, correct?

66

11:15:30 1     A.  I would think so.
11:15:32 2     Q.  And did you know at the time that
11:15:34 3 in 1999 and for some years before, their
11:15:38 4 independent auditors were Ernst & Young?
11:15:42 5     A.  I didn't know that, but I would
11:15:42 6 imagine McDonald's knew that and talked -- took
11:15:46 7 it all in consideration.
11:15:48 8     Q.  When you recommended to OHSL's
11:15:50 9 shareholders that they merge with Provident,
11:15:54 10 did you believe that Provident's financial
11:15:56 11 statements were correct?
11:16:00 12     A.  Well, we had no reason to think
11:16:02 13 they were incorrect and we had the
11:16:04 14 recommendation of the company that we hired to
11:16:06 15 find out for us.
11:16:08 16     Q.  Okay. That company is McDonald;
11:16:10 17 is that right?
11:16:10 18     A.  Yes.
11:16:12 19     Q.  And what did you expect McDonald
11:16:14 20 to do to find out for you that Provident's
11:16:18 21 financial statements were not materially
11:16:20 22 misstated?
11:16:22 23     A.  I would expect that any company
11:16:24 24 they recommended to us, they had checked out or

67

11:16:26 1 had previously checked out and would know all
11:16:30 2 about them.
11:16:30 3     Q.  And how did you expect McDonald &
11:16:32 4 Company to check out Provident?
11:16:34 5     MR. BURKE: Objection. Calls for
11:16:36 6 speculation, foundation.
11:16:36 7     A.  I wouldn't know how they checked
11:16:38 8 anything. That's their company.
11:16:42 9     Q.  What do you mean, it's their
11:16:44 10 company?
11:16:44 11     A.  McDonald's. I mean, you pay them
11:16:46 12 to find out the information for you and make
11:16:48 13 recommendations. And they gave us a number of
11:16:52 14 companies' names and we picked Provident.
11:16:56 15     Q.  Well, isn't it true that Provident
11:16:58 16 was the only company that made a bid for Oak
11:17:02 17 Hills?
11:17:02 18     A.  We had the names of the others.
11:17:04 19 We asked and then, then they made the bid.
11:17:06 20 It's the only one we took, wasn't it? I --
11:17:10 21     Q.  Mr. Brinker, is it your testimony
11:17:10 22 that other companies bid for Oak Hills?
11:17:14 23     A.  No, I didn't -- I don't, don't
11:17:16 24 remember that they did.

68

11:17:18 1     Q.  Okay. Is it true that Provident
11:17:20 2 was the only bid for Oak Hills?
11:17:22 3     MR. BURKE: Continuing objection.
11:17:24 4     A.  No.
11:17:24 5     MR. BURKE: This was previously
11:17:26 6 covered.
11:17:26 7     A.  Only bid as far as we're
11:17:28 8 concerned.
11:17:28 9     Q.  Only bid?
11:17:30 10     A.  I wouldn't know Provident -- if we
11:17:30 11 were the only bid for Provident. That's the
11:17:32 12 company we chose. They gave us four or five
11:17:36 13 company names of different companies.
11:17:38 14     Q.  Mr. Brinker, is there a
11:17:40 15 distinction in your mind between getting these
11:17:42 16 names from McDonald and getting actual bids?
11:17:48 17     A.  Well, when we told McDonald which
11:17:50 18 one we would want to go with, then they
11:17:52 19 contacted Provident, I assume. I don't
11:17:56 20 remember what all happened after that.
11:17:56 21     Q.  Why do you assume that?
11:17:58 22     A.  Well, because that would be the
11:18:00 23 way business would work. They recommend them
11:18:02 24 and if we hired them, they would go in and

**69**

11:18:06 1 check them and -- or have checked them before
11:18:12 2 they recommend them to us.
11:18:12 3     Q. Now, Mr. Brinker, you testified
11:18:14 4 about certain information that you hired
11:18:16 5 McDonald to get. Do you remember that
11:18:20 6 testimony generally?
11:18:22 7     A. No. I didn't say we hired them to
11:18:24 8 get information. We hired them to find out how
11:18:28 9 this merger would work and how we would get
11:18:32 10 companies to make a bid for us if they were
11:18:34 11 interested.
11:18:34 12     Q. And what did you expect McDonald
11:18:36 13 to do, consistent with their assignment?
11:18:40 14     MR. BURKE: Objection. Asked and
11:18:42 15 answered.
11:18:42 16     A. Well, I expected they knew what
11:18:44 17 they were doing and all the, the companies --
11:18:46 18 the four or five that they gave us, I expected
11:18:50 19 they knew of or had checked them out and, and
11:18:52 20 made the recommendation of the companies for
11:18:56 21 us.
11:18:56 22     Q. And how did you expect McDonald to
11:18:58 23 check Provident out?
11:19:02 24     A. I don't know what you mean by

**70**

11:19:04 1 how -- what --
11:19:06 2     Q. For example, did you expect
11:19:08 3 McDonald -- do you need some water, sir?
11:19:14 4     A. Um-hmm. Thank you.
11:19:22 5     Q. You're welcome. Mr. Brinker, did
11:19:30 6 you expect McDonald to perform an audit of
11:19:32 7 Provident?
11:19:38 8     A. I wouldn't know. I wouldn't think
11:19:40 9 so.
11:19:40 10     Q. Why not?
11:19:40 11     A. Well, because I figured they
11:19:42 12 knew -- or they had done it before. It's one
11:19:46 13 of the companies they would have done probably.
11:19:48 14 And they have different companies that they're
11:19:50 15 ready to suggest for a merger.
11:19:52 16     Q. Is it your testimony that you did
11:19:52 17 not expect McDonald to do an audit of Provident
11:19:56 18 because they had previously audited Provident's
11:20:00 19 financial statements?
11:20:02 20     MR. BURKE: Objection.
11:20:02 21 Mischaracterizes prior testimony and assumes
11:20:04 22 facts not in evidence. You may answer.
11:20:10 23     A. Repeat that, please.
11:20:10 24     Q. Certainly. Is it your testimony

**71**

11:20:14 1 that you believed it was unnecessary for
11:20:16 2 McDonald to perform an audit of Provident's
11:20:20 3 financial statements, because McDonald had
11:20:22 4 previously audited Provident's financial
11:20:26 5 statements?
11:20:26 6     MR. BURKE: Same objection.
11:20:28 7     A. Well, I expected that they would
11:20:28 8 check to bring it up-to-date if they had
11:20:32 9 previously checked -- did audit it, they would
11:20:34 10 bring their audit up-to-date or they wouldn't
11:20:36 11 recommend the company to us.
11:20:38 12     Q. Mr. Brinker, you were on OHSL's
11:20:42 13 audit committee, correct?
11:20:42 14     A. Yes.
11:20:42 15     Q. What is the function of an audit?
11:20:46 16     MR. BURKE: Objection to
11:20:46 17 relevance. Previously covered. You may
11:20:48 18 answer.
11:20:48 19     A. I, I don't see where this makes
11:20:50 20 any difference here. You audit, you want to
11:20:56 21 find out that everybody is doing their job
11:20:58 22 properly and all the figures are in proper
11:21:04 23 order.
11:21:06 24     Q. And how is that done?

**72**

11:21:10 1     A. Well, we met and we looked over
11:21:12 2 different features and discussed them every
11:21:16 3 couple months, what's going on in the company.
11:21:20 4     Q. And when you say "we met," to whom
11:21:22 5 are you referring?
11:21:22 6     A. Audit committee.
11:21:26 7     Q. And whom, if anyone, did the audit
11:21:32 8 committee rely on to make sure that Oak Hills'
11:21:36 9 financial statements were free of material
11:21:38 10 misstatements?
11:21:38 11     A. Well, we had four or five on the
11:21:46 12 auditing committee. Ken was on it and Bill
11:21:50 13 Hillebrand and he, he did accounting work. And
11:21:56 14 who else? Tom Herron. His business wasn't
11:22:00 15 accounting, but he -- he knew some of it. He
11:22:04 16 was in sales. And myself. That was our
11:22:06 17 committee.
11:22:10 18     Q. During most of the nineties, OHSL
11:22:14 19 was a public company, correct?
11:22:14 20     MR. BURKE: Objection. Previously
11:22:16 21 covered.
11:22:18 22     A. (Witness nodded head.)
11:22:18 23     Q. Yes?
11:22:18 24     A. Yes.

73

```
11:22:18  1        Q.   Was it necessary to have some
11:22:22  2   independent entity to audit OHSL's financial
11:22:24  3   statements?
11:22:26  4        A.   Yes, to make your annual report.
11:22:28  5   We always had an independent -- I, I -- so
11:22:32  6   Frank Miles was our first one and then I know
11:22:34  7   we changed over, but I can't remember the name
11:22:36  8   of the company that we had.
11:22:38  9        Q.   Similarly, did you believe when
11:22:40 10   you were considering the OHSL-Provident merger,
11:22:44 11   that Provident had independent, outside
11:22:46 12   auditors?
11:22:48 13        A.   I believe it, yes, sure.  I would
11:22:50 14   expect it to have to.
11:22:52 15        Q.   And did you rely on these auditors
11:22:54 16   to assure you that Provident's financial
11:22:56 17   statements were free of material misstatements?
11:23:06 18        A.   Did I rely on them?
11:23:08 19        Q.   Yes.
11:23:08 20        A.   Rely on what?
11:23:10 21        Q.   Did you rely on Provident's
11:23:12 22   independent auditors to determine to your
11:23:16 23   satisfaction that Provident's financial
11:23:18 24   statements were free of material misstatement?
```

74

```
11:23:22  1        A.   Yes, sir.  And we figured that
11:23:24  2   McDonald made the same check in knowing these
11:23:28  3   companies and, and we relied on that.
11:23:30  4        Q.   Are you familiar with the phrase
11:23:32  5   due diligence?
11:23:34  6        MR. BURKE:  Objection to
11:23:34  7   relevance, vague.  You may answer.
11:23:38  8        A.   Yeah.  Due diligence is doing
11:23:40  9   your, your job properly.
11:23:46 10        Q.   Have you ever understood the
11:23:46 11   phrase due diligence to have a specialized
11:23:48 12   meaning in the context of mergers and
11:23:50 13   acquisitions?
11:23:54 14        A.   Well, we figured that McDonald did
11:23:56 15   the due diligence in making this recommendation
11:23:56 16   of these companies before we got the names,
11:24:02 17   recognized that due diligence was done there.
11:24:06 18        Q.   What due diligence was performed?
11:24:08 19        MR. BURKE:  Objection.
11:24:08 20        A.   I have no idea.  They did it, but
11:24:10 21   we just got the names of the companies from
11:24:12 22   them and relied on that.
11:24:16 23        Q.   As, as the chairman of the Board
11:24:16 24   of Directors, how were you able to fulfill your
```

75

```
11:24:20  1   fiduciary duties to OHSL shareholders if you
11:24:22  2   had no idea what due diligence was performed?
11:24:26  3        MR. BURKE:  Objection.
11:24:26  4   Mischaracterizes the record.  Previously
11:24:28  5   covered.
11:24:30  6        A.   Well, you hire a firm like, like
11:24:32  7   McDonald's and you figure they're done doing
11:24:36  8   their job.  And I don't know what else we would
11:24:40  9   have to rely on.
11:24:40 10        Q.   Do you believe that you fulfilled
11:24:42 11   your fiduciary duties to the OHSL shareholders?
11:24:46 12        A.   Yes, we did.
11:24:46 13        Q.   Do you believe that Ken Hanauer
11:24:48 14   fulfilled his fiduciary duties to the OHSL
11:24:50 15   shareholders?
11:24:52 16        A.   Well, I guess in what respect do
11:24:56 17   you mean?  I mean, he voted with them on the
11:25:00 18   Board, but when it come to voting his shares,
11:25:04 19   as you know, he voted otherwise.  And --
11:25:08 20        Q.   Are you aware that Mr. Hanauer did
11:25:10 21   not believe that you and the other OHSL
11:25:14 22   directors fulfilled their fiduciary duties to
11:25:16 23   the shareholders?
11:25:16 24        MR. BURKE:  Objection.  Calls for
```

76

```
11:25:18  1   speculation.  Assumes facts not in evidence.
11:25:18  2        A.   I have no idea.
11:25:20  3        Q.   Okay.  Well, let me read to you
11:25:22  4   some of his testimony.  This is from his
11:25:24  5   deposition on Tuesday, February 22nd, 2000.
11:25:28  6   And I asked Mr. Hanauer this question:
11:25:32  7        Question:  Aside from yourself, do
11:25:34  8   you believe that the directors of Oak Hills
11:25:36  9   fulfilled their fiduciary duty to the
11:25:38 10   shareholders, including Janet -- Mr. Burke made
11:25:44 11   an objection -- with respect to this
11:25:44 12   transaction?
11:25:46 13        There was some colloquy and I'll
11:25:48 14   leave that out.  And then the answer is:
11:25:50 15   Answer, do I believe they fulfilled their
11:25:52 16   fiduciary responsibility to all the
11:25:54 17   shareholders?  That was your question?
11:25:56 18        Question:  Yes.
11:25:58 19        Answer:  No.
11:25:58 20        Question:  Why not?
11:26:00 21        Answer -- this is Mr. Hanauer
11:26:02 22   speaking -- I believed that there were
11:26:04 23   different alternatives to this transaction and
11:26:08 24   that that could ultimately -- and again, this
```

**77**

```
11:26:10  1   is speculation on my part, you asked for
11:26:14  2   belief -- would have eventually turned out
11:26:16  3   differently than the Provident transaction.
11:26:18  4        And I can only speak to -- through
11:26:20  5   today.  Today something might happen and these
11:26:22  6   shares go up and it be totally different.  But
11:26:26  7   through today, I believe that there was some
11:26:28  8   different avenues that could have been pursued
11:26:30  9   that were not.
11:26:30 10        Did you realize that Mr. Hanauer
11:26:34 11   believed that the other Board members did not
11:26:35 12   fulfill their fiduciary duties to the
11:26:40 13   shareholders?
11:26:40 14        MR. BURKE:  Objection.
11:26:40 15   Mischaracterizes the record.
11:26:44 16        A.   That the Board -- the Board did
11:26:46 17   not fulfill our duties?
11:26:46 18        Q.   Yes.  That's Mr. Hanauer's
11:26:48 19   belief --
11:26:48 20        MR. BURKE:  Objection.
11:26:48 21        Q.   -- as I just read.
11:26:50 22        A.   I, I don't agree with him.
11:26:52 23        Q.   You don't agree with that?
11:26:54 24        A.   I do not, no.
```

**78**

```
11:26:56  1        Q.   Do you believe that he fulfilled
11:26:56  2   his fiduciary duties to the shareholders?
11:27:00  3        MR. BURKE:  Objection.  Asked and
11:27:00  4   answered.
11:27:02  5        A.   He was on the Board and he went
11:27:02  6   along with the project.  If he -- all he, I
11:27:08  7   guess, was looking at was the, the stock and
11:27:10  8   value of it.  And our, our stock wasn't moving
11:27:14  9   anyplace.  So why he thinks we should have sat
11:27:16 10   and done nothing, I don't know.
11:27:18 11        Q.   But you agree that Mr. Hanauer did
11:27:20 12   believe that you should have sat and done
11:27:22 13   nothing, correct?
11:27:24 14        MR. BURKE:  Objection.
11:27:24 15   Mischaracterizes the --
11:27:24 16        A.   I have no idea what he believed.
11:27:28 17        Q.   But isn't that what you just said?
11:27:30 18        MR. BURKE:  Objection.
11:27:30 19   Argumentative.
11:27:34 20        A.   No, I don't think I said that.  I
11:27:36 21   said he -- he was on the Board and voted for
11:27:36 22   it, so -- with us.  And we had our -- as I
11:27:44 23   said, hired McDonald, it seemed we were going
11:27:48 24   through and doing everything we should to find
```

**79**

```
11:27:50  1   out.
11:27:50  2        Q.   Mr. Brinker, did you ever learn
11:27:52  3   that Mr. Hanauer was not cooperating with
11:27:54  4   Provident in effectuating the merger?
11:28:00  5        A.   I can -- couldn't recall that.
11:28:02  6        Q.   Mr. Brinker, are you familiar
11:28:04  7   with --
11:28:04  8        THE COURT:  Wait.  Let's take a
11:28:06  9   break.
11:28:06 10             (Brief recess.)
11:39:00 11   BY MR. BRAUTIGAM:
11:39:00 12        Q.   Mr. Brinker, are you familiar with
11:39:02 13   GAAP?
11:39:04 14        A.   GAAP?
11:39:06 15        Q.   GAAP, capital G A A P.
11:39:10 16        A.   No.
11:39:10 17        Q.   Are you familiar with GAAS,
11:39:12 18   capital G A A S?
11:39:14 19        A.   I don't remember.  Those are past
11:39:18 20   my time, I think -- or before my time.
11:39:20 21        Q.   How could you serve on the OHSL
11:39:24 22   audit committee and not be familiar with GAAP
11:39:26 23   and GAAS?
11:39:26 24        MR. BURKE:  Objection.
```

**80**

```
11:39:28  1        A.   Well, I know it's about
11:39:30  2   accounting.  And I knew the accounting and I
11:39:32  3   did run the company for how many years.
11:39:38  4        Q.   Okay.  Tell me what GAAP has to do
11:39:38  5   about accounting.
11:39:42  6        MR. BURKE:  Objection.
11:39:42  7   Argumentative, vague, overbroad.  You may
11:39:44  8   answer.
11:39:44  9        A.   I, I don't recall.
11:39:46 10        Q.   Now, Mr. Brinker --
11:39:48 11        A.   I've been out of the business so
11:39:50 12   many years.
11:39:50 13        Q.   How many years have you been out
11:39:50 14   of the business?
11:39:52 15        A.   Well, I retired in 1987 as manager
11:40:02 16   of the company, and I was 70 years old then.
11:40:10 17   And I stayed on the Board, of course, and
11:40:12 18   became the -- I was still running the company,
11:40:20 19   but we hired Ken then as the CEO and general
11:40:26 20   manager, but I was there yet then.
11:40:32 21        Q.   Do you regret that decision?
11:40:34 22        MR. BURKE:  Objection.
11:40:34 23        A.   Do I regret the decision?
11:40:34 24        Q.   Yes.
```

81

11:40:38 1     A.   Which decision do you mean?
11:40:40 2     Q.   Hiring Ken.
11:40:42 3     A.   I have nothing against Ken, until
11:40:44 4 this all happened, I didn't regret it at all.
11:40:46 5 I thought he was a capable fellow, but I
11:40:50 6 thought he had more sense.
11:40:50 7     Q.   More sense than what?
11:40:52 8     A.   Doing what he did.
11:40:54 9     Q.   What did he do?
11:40:56 10     A.   Oh, he went along with the Board
11:41:02 11 and voted for the thing and then everybody
11:41:04 12 talks all about he didn't believe in it and we
11:41:08 13 did -- we didn't do our job because we could
11:41:10 14 have got a better company. How does he know we
11:41:12 15 could have got a better company? I don't know.
11:41:14 16 And I don't think that he was right in doing
11:41:16 17 that.
11:41:16 18     Q.   In other words, you believe he
11:41:18 19 violated his fiduciary duties to the
11:41:20 20 shareholders when he said one thing, but he did
11:41:24 21 another?
11:41:24 22     MR. BURKE: Objection.
11:41:24 23 Argumentative.
11:41:26 24     A.   With the shareholders it was all

82

11:41:26 1 over when he did all this talking.
11:41:28 2     Q.   What talking are you referring to?
11:41:30 3     A.   Oh, well, he -- he talked to, I
11:41:38 4 know, some of the employees and he tried to get
11:41:40 5 all of this kind of stuff started, to get a
11:41:42 6 suit going. And when the, the lady's suit
11:41:52 7 didn't go along, then he and Walter, I guess,
11:41:54 8 talked -- Mr. Thiemann, and all of a sudden
11:41:58 9 there was a suit by Mr. Thiemann from down in
11:42:00 10 Florida.
11:42:00 11     Q.   And you blame Ken on that?
11:42:02 12     MR. BURKE: Objection.
11:42:04 13     A.   No.
11:42:04 14     Q.   You blame that on Ken, right?
11:42:06 15     MR. BURKE: Objection.
11:42:06 16     A.   I'm not saying I blame Ken. I
11:42:08 17 said it was all part of it, him going along
11:42:10 18 with -- probably with him. And I have no idea.
11:42:12 19 All that's so far back for me, I --
11:42:14 20     Q.   You said all part of something.
11:42:16 21 All part of what?
11:42:18 22     MR. BURKE: Objection. Previously
11:42:20 23 testified about. Mischaracterizes the record.
11:42:22 24 You may answer.

83

11:42:24 1     A.   I don't know what to answer. I
11:42:26 2 thought I did. Now, what's the question?
11:42:32 3     Q.   All part of what?
11:42:32 4     MR. BURKE: Objection. Form.
11:42:34 5     Q.   All part of what?
11:42:36 6     Q.   You seemed to suggest that Ken
11:42:38 7 Hanauer was part of something. And you used
11:42:40 8 the phrase all part of this.
11:42:42 9     A.   Well, I think he was part of
11:42:44 10 giving the employees and that lady that first
11:42:46 11 filed the suit and upset some of the other
11:42:50 12 employees and that -- just put them against the
11:42:52 13 company.
11:42:54 14     Q.   When's the last time you spoke
11:42:56 15 with Ken Hanauer?
11:42:56 16     A.   I haven't seen him or spoken to
11:42:58 17 him since.
11:43:00 18     Q.   Since when?
11:43:00 19     A.   Well, since we got out of the
11:43:02 20 business.
11:43:04 21     Q.   Are there bad feelings between the
11:43:06 22 Board and Ken?
11:43:06 23     MR. BURKE: Objection. Calls for
11:43:08 24 speculation.

84

11:43:08 1     A.   I have no idea.
11:43:10 2     MR. BURKE: Relevance.
11:43:10 3     Q.   Do you have any bad feelings
11:43:12 4 toward Ken?
11:43:12 5     A.   No, I just don't see him.
11:43:14 6     Q.   You don't want to see him, either?
11:43:18 7     MR. BURKE: Objection.
11:43:18 8     A.   Not particularly.
11:43:20 9     Q.   Okay. Now, I understand that
11:43:20 10 since you were last deposed in April of 2000,
11:43:24 11 some of the former OHSL directors have gotten
11:43:26 12 together maybe once a month, maybe not as
11:43:30 13 frequently. Are you familiar with those
11:43:32 14 meetings?
11:43:32 15     A.   That's after we were out of the
11:43:34 16 company. We'd still have together -- get a --
11:43:38 17 get together for lunch once in a while.
11:43:40 18     Q.   Right.
11:43:42 19     A.   Ken doesn't -- wasn't -- doesn't
11:43:44 20 want to belong to the place anymore, I guess.
11:43:46 21     Q.   Okay. Is he invited to these
11:43:48 22 meetings?
11:43:48 23     A.   Not now.
11:43:50 24     Q.   Why not?

85

11:43:50 1  MR. BURKE: Objection to
11:43:50 2  relevance.
11:43:52 3      A.  Well, he has never come.  We've
11:43:54 4  had the meetings since that time.  Once a month
11:43:56 5  we would meet and have lunch and he didn't
11:43:58 6  come.  He didn't say anything, so why should we
11:44:02 7  call him?
11:44:02 8      Q.  Was he ever invited to these
11:44:04 9  meetings?
11:44:04 10     MR. BURKE: Objection to
11:44:04 11 relevance.
11:44:06 12     A.  I would think he knew the first
11:44:06 13 one anyway.
11:44:08 14     Q.  Okay.  Have you talked about this
11:44:10 15 litigation since February -- or since it was
11:44:16 16 filed in September of 2000?
11:44:16 17     A.  To whom?
11:44:18 18     Q.  To the fellow directors.
11:44:22 19     A.  Well, we -- we'd talk about it,
11:44:22 20 yeah, what are we -- what do you mean?  Just
11:44:26 21 like you would talk about it.
11:44:26 22     Q.  Okay.  With as much specificity as
11:44:28 23 possible -- I know this is a broad question --
11:44:32 24 please tell me what you said and what your

86

11:44:32 1  fellow directors said with respect to this
11:44:36 2  litigation.
11:44:36 3      MR. BURKE: Objection.  Vague,
11:44:38 4  overbroad, form.  You may answer.
11:44:42 5      A.  Well, I know I thought it was a,
11:44:44 6  was a silly suit that -- first one that was
11:44:50 7  filed anyway.  And this last suit, I don't
11:44:54 8  know, it didn't seem to be necessary at all,
11:44:56 9  but for some reason they filed it.
11:45:02 10     Q.  Okay.  You testified that it was
11:45:04 11 your belief that the first suit, the Nolte
11:45:06 12 suit, was a silly suit; is that correct?
11:45:08 13     A.  Yeah.
11:45:10 14     Q.  And what's your basis for that
11:45:10 15 testimony?
11:45:12 16     A.  Well, I don't think she had any
11:45:14 17 basis to file it because it wasn't a bad deal
11:45:18 18 in any respect.  And she -- her information,
11:45:22 19 she hadn't worked for the company for a while.
11:45:24 20 And any information she got, I know was from
11:45:26 21 Ken and a couple of the other girls there that
11:45:28 22 worked with her, I guess.
11:45:32 23     Q.  So you believe that at the time
11:45:34 24 Mr. Hanauer was providing information to Ms.

87

11:45:38 1  Nolte to allow her to file suit; is that
11:45:40 2  correct?
11:45:40 3      MR. BURKE: Objection to
11:45:40 4  relevance.  Calls for speculation.  You may
11:45:44 5  answer.
11:45:44 6      A.  I think that he did, yes.
11:45:46 7      Q.  Okay.  And let's talk about the
11:45:46 8  Thiemann suit.  You mentioned the conversation
11:45:48 9  that Ken had with Walter Thiemann.  And shortly
11:45:52 10 after that conversation, if I understand your
11:45:54 11 testimony correctly --
11:45:56 12     A.  I don't --
11:45:56 13     Q.  -- Mr. Thiemann filed suit.  Is
11:46:00 14 that correct?
11:46:00 15     MR. BURKE: Objection.  No
11:46:00 16 foundation.
11:46:00 17     A.  No, I didn't say that.
11:46:02 18     Q.  Okay.
11:46:02 19     A.  Mr. Thiemann had, had moved to
11:46:04 20 Florida by that time and he wanted to come back
11:46:06 21 and be a director.  And I said, well, would you
11:46:10 22 come up every -- once a month every Friday
11:46:12 23 night to a meeting, and he said no.
11:46:14 24     I said, well, you can't be a

88

11:46:16 1  director then.  We're not going to hire
11:46:18 2  somebody that lives in another state and won't
11:46:20 3  come to a meeting.
11:46:22 4      Q.  But aside from --
11:46:22 5      A.  So we didn't leave him go, he just
11:46:24 6  went on his own.
11:46:26 7      Q.  You're talking about Mr. Thiemann?
11:46:28 8      A.  Yeah.
11:46:28 9      Q.  And that's because Mr. Thiemann
11:46:30 10 was a good, honest employee, correct?
11:46:32 11     A.  Sure.
11:46:32 12     MR. BURKE: Objection.
11:46:34 13     A.  Well, he was a director.
11:46:36 14     Q.  He was a director of Oak Hills
11:46:38 15 before it was a public company.  Is that right?
11:46:38 16     A.  Right.
11:46:40 17     Q.  And that was in the eighties,
11:46:42 18 correct?
11:46:42 19     A.  He moved -- I don't know when he
11:46:44 20 moved to Florida.  I have no idea, but he did
11:46:48 21 move to Florida.
11:46:48 22     Q.  Okay.  But during the time he was
11:46:50 23 a director, Oak Hills was a, a non-public
11:46:52 24 company, correct?

89

11:46:54 1    MR. BURKE:  Objection.  You may
11:46:54 2  answer.
11:46:54 3        A.   Yes.
11:46:56 4        Q.   Okay.  Did Oak Hills have
11:46:58 5  shareholders when it was a non-public company?
11:47:02 6        A.   Shareholders?  No, you had your
11:47:06 7  deposits into a company or depositors.  We had
11:47:08 8  no shareholders.
11:47:10 9        Q.   Did your fiduciary duties change
11:47:14 10  when Oak Hills went from a non-public company
11:47:16 11  to a public company?
11:47:16 12        MR. BURKE:  Objection.  Calls for
11:47:18 13  a legal conclusion.  You may answer.
11:47:18 14        A.   Did they change?  That's too far
11:47:22 15  back for me to remember what changes might have
11:47:26 16  been.  I'm sure it would change from a
11:47:28 17  shareholder company to a stock company.
11:47:34 18        Q.   Okay.  Let's talk about Walter
11:47:34 19  Thiemann.  You said that he left OHSL
11:47:38 20  voluntarily; is that correct?
11:47:40 21        A.   Yes.
11:47:40 22        Q.   And you wanted him to remain on
11:47:40 23  the Board if he was willing to come to meetings
11:47:44 24  once a month.  Is that correct?

90

11:47:46 1        A.   Yes.
11:47:46 2        Q.   And --
11:47:48 3        A.   We didn't want him to, I say.  He
11:47:50 4  called and wanted to.  And I said, you -- well,
11:47:52 5  you moved to Florida.  Are you willing to come
11:47:54 6  back one Friday a month every month?  And he
11:48:00 7  didn't want to do that.  Well, that's not being
11:48:02 8  a director if he didn't do that.
11:48:04 9        Q.   Okay.  But if he had been willing
11:48:06 10  to do that, you would have been happy to have
11:48:08 11  him on the Board, correct?
11:48:10 12        A.   Oh, yeah.
11:48:10 13        MR. BURKE:  Objection.
11:48:10 14        A.   Yeah.
11:48:10 15        Q.   And Mr. Thiemann was not a
11:48:12 16  disgruntled former employee, correct?
11:48:16 17        MR. BURKE:  Objection.
11:48:16 18        A.   Didn't -- I didn't understand him
11:48:18 19  to be.  I don't know.
11:48:20 20        Q.   He left on good terms, correct?
11:48:20 21        A.   Yes.
11:48:22 22        Q.   You respected Mr. Thiemann and you
11:48:24 23  respect him to this day, correct?
11:48:26 24        A.   I do.

91

11:48:26 1        Q.   So if people filed papers on your
11:48:30 2  behalf that said Mr. Thiemann was a disgruntled
11:48:34 3  former employee who had an axe to grind with
11:48:36 4  the OHSL Board, that would be untrue, correct?
11:48:40 5        MR. BURKE:  Objection.
11:48:44 6        A.   I wouldn't answer for somebody
11:48:44 7  else.
11:48:46 8        Q.   For you, sir.
11:48:48 9        A.   Well, I told you I had, I had
11:48:48 10  respect for him.  I didn't have no axe to grind
11:48:52 11  at that point.
11:48:52 12        Q.   And you have respect for him now,
11:48:56 13  correct?
11:48:56 14        A.   As far as I know he's moved to
11:48:58 15  Florida.  I know Walter as well as before, from
11:49:02 16  what I know of him.
11:49:02 17        Q.   And he's --
11:49:04 18        A.   I, I think he was wrong in filing
11:49:04 19  the suit, but that's beside the point.
11:49:08 20        Q.   Okay.  But he's a good and honest
11:49:08 21  man, correct?
11:49:10 22        A.   As far as I know.
11:49:10 23        Q.   And sometimes good and honest men
11:49:12 24  can disagree, correct?

92

11:49:14 1        A.   Sure.
11:49:14 2        MR. BURKE:  Objection to form.
11:49:14 3        Q.   And you said Mr. Thiemann was
11:49:18 4  wrong in filing the suit, correct?
11:49:18 5        A.   Yes.
11:49:20 6        Q.   Why do you believe that Mr.
11:49:20 7  Thiemann was wrong in filing the suit?
11:49:22 8        A.   What did he have to file about?
11:49:24 9  Sold the stock -- he had his stock and he was
11:49:30 10  a -- I don't know what he was doing down in
11:49:32 11  Florida, because that's where he lived.  I
11:49:36 12  haven't known anything about him anymore.
11:49:36 13        Q.   Mr. Brinker, do you know the
11:49:38 14  allegations that Mr. Thiemann has raised in his
11:49:40 15  original complaint?
11:49:42 16        MR. BURKE:  Objection to
11:49:42 17  relevance.
11:49:42 18        A.   No.
11:49:44 19        Q.   Do you know the --
11:49:44 20        A.   I don't recall them.
11:49:46 21        Q.   -- allegations --
11:49:46 22        A.   I don't recall that far back.
11:49:48 23        Q.   Okay.  Do you know any of the
11:49:50 24  allegations that Mr. Thiemann has ever raised

**93**

```
11:49:52  1  in any of his complaints?
11:49:56  2       A.  No.  I, I do -- one thing I recall
11:50:00  3  is that he complained about the -- felt we
11:50:04  4  should have been more diligent, I guess, when
11:50:06  5  the -- in the first half a year when the annual
11:50:14  6  report was filed, Provident had written off
11:50:16  7  some -- I don't know if they were car loans or
11:50:20  8  airplane loans or something like that.
11:50:20  9       And Walter thought that we should
11:50:22 10  have checked their books and know that they had
11:50:26 11  problems with that.  And I don't know of any
11:50:30 12  company that ever did that.
11:50:32 13       Q.  What other experience do you have
11:50:34 14  in mergers and acquisitions?
11:50:36 15       MR. BURKE:  Objection to
11:50:36 16  relevance.
11:50:38 17       A.  None.  Just with Oak Hills all my
11:50:40 18  life.
11:50:40 19       Q.  So the basis for your statement
11:50:42 20  that you don't know of any companies that would
11:50:44 21  check on auto loans or whatever it was that
11:50:46 22  you --
11:50:46 23       A.  I, I've never heard of them -- in
11:50:52 24  the -- our -- the company itself.  You figure
```

**94**

```
11:50:52  1  that stuff was all done by McDonald when they
11:50:56  2  said they were a company good enough to merge
11:50:58  3  with us.
11:50:58  4       Q.  Okay.  Are you familiar with the
11:51:00  5  term restatement?
11:51:02  6       A.  Restatement?
11:51:04  7       Q.  Yes.
11:51:08  8       A.  No, I don't -- we never had any.
11:51:10  9       Q.  Did Provident ever have any
11:51:10 10  restatements?
11:51:16 11       A.  Well, I think they had a
11:51:18 12  restatement after -- I think they did.  I don't
11:51:22 13  know when, when it was.
11:51:24 14       Q.  When do you think that Provident
11:51:26 15  had a restatement?
11:51:30 16       A.  Well, I don't know.  My, my
11:51:32 17  thinking was when -- at the first filing of the
11:51:38 18  annual reports after that, and they had to
11:51:40 19  write off that -- some were -- some of those
11:51:44 20  bad loans.  Well, all companies get bad loans.
11:51:50 21       Q.  Are you a Provident shareholder?
11:51:52 22       A.  Yes.
11:51:54 23       Q.  Do you receive Provident's public
11:51:56 24  documents, such as annual and quarterly
```

**95**

```
11:51:58  1  reports?
11:51:58  2       A.  Yes.
11:51:58  3       Q.  When you receive them, have you
11:52:02  4  read them?
11:52:04  5       A.  Not completely.  Not too much, no.
11:52:06  6       Q.  Have you read some of them?
11:52:08  7       A.  I -- say I can recall reading
11:52:14  8  much at all about it early on, and that's years
11:52:18  9  ago, so I don't have --
11:52:18 10       Q.  Okay.
11:52:18 11       A.  -- have any idea what you're --
11:52:22 12       Q.  Let me direct your attention to
11:52:22 13  March of 2003, 11 months ago.  Are you with me?
11:52:26 14       A.  March 2003.
11:52:28 15       Q.  Okay.  Did Provident announce a
11:52:32 16  massive restatement to the investing public?
11:52:34 17       MR. BURKE:  Objection.  Assumes
11:52:34 18  facts not in evidence, form.
11:52:38 19       A.  I don't recall.
11:52:40 20       Q.  Do you recall Provident ever
11:52:42 21  announcing a massive restatement in 2003?
11:52:44 22       MR. BURKE:  Same objection.
11:52:46 23       A.  I, I don't recall.
11:52:46 24       Q.  Would it be of interest to you if
```

**96**

```
11:52:48  1  Provident admitted to the world that its
11:52:52  2  financial statements were materially misstated
11:52:54  3  for a period that included 1999?
11:52:56  4       MR. BURKE:  Objection.  Misstates
11:52:58  5  the record.  Assumes facts not in evidence.
11:53:02  6       A.  I, I -- I still -- I just don't
11:53:04  7  recall all that kind of stuff.
11:53:10  8       Q.  Provident purchased OHSL with
11:53:12  9  stock, correct?
11:53:14 10       A.  With stock.
11:53:16 11       Q.  And you owned approximately 1.2
11:53:20 12  percent of the company, correct?  Of OHSL?
11:53:24 13       A.  Of OHSL?
11:53:26 14       Q.  Correct.
11:53:26 15       A.  I didn't figure I owned anything.
11:53:28 16  I was just a shareholder in it like anybody
11:53:32 17  else.  I didn't own, own the company.  I was
11:53:34 18  renting it, but I didn't own it.
11:53:36 19       Q.  Mr. Brinker, by virtue of the
11:53:38 20  number of shares you owned, you owned
11:53:40 21  approximately 1.2 percent of OHSL, correct?
11:53:44 22       A.  Whatever deposit we had in the
11:53:44 23  company.  I don't know.  It wasn't too much,
11:53:44 24  but -- I didn't have shares in the, in the
```

97

11:53:50 1   company Oak Hills.
11:53:52 2        Q.   Mr. Brinker, is it your testimony
11:53:54 3   that you did not own shares in Oak Hills?
11:53:56 4        MR. BURKE:  Objection.  Misstates
11:53:58 5   prior testimony.
11:53:58 6        A.   We didn't have shares in Oak Hills
11:54:00 7   Savings & Loan as a savings and loan company.
11:54:04 8        Q.   Did you have shares in OHSL
11:54:04 9   Financial Corporation?
11:54:06 10       A.   Financial I have some, yes.
11:54:08 11       Q.   Okay.  And did you own
11:54:08 12  approximately 1.2 percent of OHSL?
11:54:12 13       A.   I wouldn't know that.
11:54:12 14       Q.   And was the value of the shares at
11:54:18 15  the time of the merger approximately $684,000?
11:54:26 16       A.   I wouldn't remember that total.
11:54:28 17       Q.   Does that sound like it's in the
11:54:30 18  ballpark?
11:54:32 19       MR. BURKE:  Objection.  Asked and
11:54:32 20  answered.
11:54:32 21       A.   I can't remember even how many
11:54:34 22  shares were there.  I, I know it was running
11:54:36 23  around $12 or something like that a share about
11:54:38 24  that time, so what that would come at, I don't

98

11:54:42 1   know.  I just --
11:54:42 2        Q.   Do you remember owning 29,534
11:54:44 3   shares --
11:54:46 4        MR. BURKE:  Objection.  Asked and
11:54:46 5   answered.
11:54:46 6        Q.   -- equivalent to 1.2 percent of
11:54:48 7   OHSL Financial Corporation --
11:54:52 8        MR. BURKE:  Objection.
11:54:52 9        Q.   -- in or about 1999?
11:54:54 10       MR. BURKE:  Objection.  Asked and
11:54:54 11  answered.
11:54:54 12       A.   How much?
11:54:56 13       Q.   29,534 shares.
11:55:00 14       A.   I don't recall that.
11:55:06 15       Q.   Have you sold any Provident shares
11:55:08 16  since the merger?
11:55:10 17       A.   Yes.
11:55:10 18       Q.   Okay.  When did you sell the
11:55:12 19  shares?
11:55:14 20       A.   Sometime this year.
11:55:16 21       Q.   How many shares did you sell?
11:55:20 22       A.   Is that material to all of this?
11:55:23 23       Q.   Mr. Brinker, how many shares did
11:55:26 24  you sell?

99

11:55:28 1        A.   I say, is that material to this?
11:55:30 2   I -- about 1750 in total.
11:55:34 3        Q.   And when did you sell those
11:55:36 4   shares?
11:55:38 5        A.   Oh, about four months ago, I
11:55:40 6   guess, four months ago.
11:55:42 7        Q.   So it was last year, correct?
11:55:46 8        A.   Well, we might have applied to
11:55:48 9   sell them last year, but we told them to wait
11:55:50 10  till it got to 30 and then it didn't do that
11:55:52 11  until about three months ago.  That's when we
11:55:56 12  sold them.
11:55:58 13       Q.   Are you personally financially
11:56:00 14  better off before or after the merger with
11:56:02 15  respect to your OHSL stock that was forcibly
11:56:04 16  converted into Provident stock?
11:56:06 17       MR. BURKE:  Objection to form.
11:56:08 18       A.   I'm better off than I was before.
11:56:10 19       Q.   You are?
11:56:10 20       A.   Um-hmm.
11:56:12 21       Q.   And why is that?
11:56:14 22       A.   Because I didn't have stock in the
11:56:16 23  Oak Hills company.  Nobody owned it, it was a
11:56:18 24  mutual company.  And this one I have some

100

11:56:22 1   stock.  There is some value to it.
11:56:24 2        Q.   Mr. Brinker, was OHSL Financial
11:56:28 3   Corporation, Inc. a mutual company in 1999?
11:56:36 4        A.   As far as I recall.
11:56:44 5        Q.   Your daughter Marilyn owned 57,728
11:56:50 6   shares.  Is that correct?
11:56:50 7        A.   I have no idea.
11:56:52 8        Q.   Have you ever talked with Marilyn
11:56:54 9   about this litigation?
11:56:56 10       A.   No.
11:56:58 11       Q.   Never?
11:56:58 12       A.   No.
11:56:58 13       MR. BURKE:  Objection.  Asked and
11:57:00 14  answered.
11:57:00 15       Q.   Not even one word passed back and
11:57:02 16  forth --
11:57:02 17       MR. BURKE:  Objection.
11:57:02 18       Q.   -- between you and your daughter
11:57:04 19  on this litigation?
11:57:04 20       A.   All I said was --
11:57:04 21       MR. BURKE:  Objection.  Badgering
11:57:06 22  the witness.
11:57:06 23       A.   All I ever said was I thought it
11:57:08 24  was a silly suit.

101

11:57:10 1    Q.    So you did talk about the
11:57:10 2    litigation?
11:57:12 3    A.    Well, I just mentioned that.
11:57:12 4    Q.    Okay.
11:57:12 5    A.    That's all.
11:57:12 6    Q.    And did Ms. Wieland respond when
11:57:14 7    you said it was a silly suit?
11:57:16 8    A.    I, I couldn't recall.
11:57:18 9    Q.    Did she nod her head?
11:57:18 10   A.    I couldn't recall.
11:57:20 11   Q.    But she said nothing herself?
11:57:22 12         MR. BURKE:  Objection.
11:57:22 13   A.    I, I don't --
11:57:22 14         MR. BURKE:  Asked and answered.
11:57:24 15   A.    -- recall, if I say I can't
11:57:24 16   remember.
11:57:40 17   Q.    How many shares of Provident stock
11:57:42 18   do you own now?
11:57:46 19   A.    I truthfully couldn't say.  It's
11:57:48 20   not very many.
11:57:50 21   Q.    How many shares of Provident stock
11:57:52 22   did you receive?
11:57:58 23   A.    I don't recall what the total was
11:57:58 24   that -- the carryover.  Sold 1750.  The rest is

102

11:58:06 1    in an IRA, and I don't know what -- what that
11:58:08 2    is.
11:58:12 3    Q.    Approximately what was Provident
11:58:14 4    trading at at the time of the merger?
11:58:18 5    A.    I don't recall that far back.
11:58:20 6    Q.    Was it trading around 40?
11:58:24 7    A.    It could have been, but I don't
11:58:24 8    remember it.
11:58:26 9    Q.    And since the merger, how has
11:58:28 10   Provident stock performed?
11:58:30 11   A.    Well, it dropped quite
11:58:32 12   drastically, but it was always more than what
11:58:34 13   Oak Hills was at and could have gone to.  But
11:58:38 14   it's, it's been going real well lately.
11:58:42 15   Q.    When you say that Provident stock
11:58:44 16   was always more than Oak Hills, are you
11:58:46 17   comparing one share of Provident to one share
11:58:48 18   of Oak Hills?
11:58:48 19   A.    Um-hmm.  The value of a share.
11:58:50 20   Q.    Right.  So if Provident stock was
11:58:52 21   trading at 40 in 1999 --
11:58:54 22   A.    Um-hmm.
11:58:56 23   Q.    -- and Oak Hills stock was trading
11:58:56 24   at 18, let's say, in 1999 --

103

11:59:00 1    A.    I don't think it was that high.
11:59:02 2         MR. BURKE:  Objection.  Misstates
11:59:02 3    the record.
11:59:04 4    Q.    Okay.  You're comparing it apples
11:59:06 5    to apples; is that right?
11:59:08 6    A.    What do you -- what do you mean,
11:59:10 7    in that I'm better off?
11:59:12 8    Q.    No.  In other words, you're saying
11:59:14 9    that because Provident stock is trading at a
11:59:18 10   higher number, meaning 30 or above, and Oak
11:59:22 11   Hills never got up to 30 --
11:59:22 12   A.    No.
11:59:24 13   Q.    -- that it's better.  You're not
11:59:26 14   saying that?
11:59:26 15   A.    Well, that's what I'm saying,
11:59:28 16   yeah.
11:59:28 17   Q.    Okay.
11:59:28 18   A.    It is.
11:59:30 19   Q.    So that is what you're saying?
11:59:30 20   A.    It's up over 30 and then --
11:59:34 21   Q.    And Oak Hills stock --
11:59:36 22        MR. BURKE:  Wait, wait, wait.  Can
11:59:36 23   the witness please finish his answer, Mr.
11:59:36 24   Brautigam?

104

11:59:38 1    Q.    Absolutely.  Mr. Brinker, I didn't
11:59:40 2    mean to interrupt you at all.  Please proceed.
11:59:42 3    A.    What was I talking about?
11:59:44 4    Q.    Why don't you read back the
11:59:44 5    question and his partial answer, please?
11:59:44 6         (Record read by Reporter.)
12:00:32 7    A.    And Oak Hills never was, so it, it
12:00:36 8    was better naturally, but that wasn't the --
12:00:44 9    Q.    Okay.
12:00:44 10   A.    -- in any respect our reason for
12:00:46 11   going with Provident for that.  I mean, I
12:00:48 12   wasn't -- personally I wasn't looking at that.
12:00:50 13   Q.    Personally you weren't what?
12:00:52 14   A.    Looking at the fact that Provident
12:00:54 15   was a higher stock than our stock, but we were
12:00:58 16   merging to improve the stock value.
12:01:02 17   Q.    Mr. Brinker, do you believe that
12:01:04 18   former OHSL shareholders, such as Gary Meier
12:01:06 19   and his daughter Lindsey Meier, are better off
12:01:10 20   today as a result of the merger?
12:01:12 21   A.    I don't know why they shouldn't
12:01:14 22   be.
12:01:16 23   Q.    Have you --
12:01:16 24   A.    I believe they are.

105

12:01:16 1    Q.   Okay.  What's the basis for your
12:01:20 2  belief?
12:01:20 3    A.   Well, the value of their stock.
12:01:24 4  Actually it was higher than it is now, but it's
12:01:26 5  dropped some.  But if they still have some, it
12:01:30 6  was higher than they were getting from our
12:01:32 7  company.
12:01:32 8    Q.   But isn't it true that people who
12:01:34 9  forcibly converted their OHSL shares into
12:01:36 10 Provident shares got fewer Provident shares?
12:01:40 11 In other words, it wasn't a one for one --
12:01:42 12   A.   Well, it wasn't --
12:01:44 13   Q.   -- transaction?
12:01:44 14   A.   There was an adjustment made,
12:01:46 15 sure.
12:01:46 16   Q.   Right.
12:01:46 17   A.   I mean, ours was valued low and
12:01:48 18 theirs was higher.  And they paid us a certain
12:01:52 19 amount for the shares and naturally there were
12:01:54 20 adjustments there.
12:01:54 21   Q.   And there was a formula, correct?
12:01:56 22   A.   Yeah.  I don't --
12:01:58 23   Q.   And how did -- were you finished?
12:01:58 24   A.   I don't recall it.

106

12:02:00 1    MR. BURKE:  Objection, this --
12:02:02 2    Q.   How did the formula work?
12:02:02 3    MR. BURKE:  Excuse me.  This is
12:02:04 4  a --
12:02:04 5    A.   I have no idea.  I don't recall
12:02:04 6  it.
12:02:06 7    MR. BURKE:  -- repetition of the
12:02:06 8  prior testimony.  I apologize.  Sorry, Mike.
12:02:08 9    Q.   Why do you think that shareholders
12:02:10 10 such as the Meiers are better off financially
12:02:12 11 today if they did not sell their Provident
12:02:14 12 shares?
12:02:16 13   MR. BURKE:  Objection.  Asked and
12:02:16 14 answered.
12:02:18 15   A.   If they still have stock, it's
12:02:18 16 gone up very well.  And their stock is worth
12:02:22 17 more than the -- our stock in our company at
12:02:28 18 this time would have been.
12:02:28 19   Q.   How do you know that?
12:02:30 20   A.   Well, because I know the size of
12:02:32 21 the company and what was going on.  And
12:02:34 22 Provident's a big company.
12:02:36 23   Q.   Is Provident --
12:02:38 24   A.   Their stock is worth twice what

107

12:02:40 1  ours would be worth now.
12:02:40 2    Q.   What's the basis for that
12:02:42 3  statement?
12:02:46 4    A.   It just normally.  Take a look at
12:02:48 5  any of the savings and loans that have stayed
12:02:50 6  savings and loans.  Their stock is not near as
12:02:54 7  high as what it would be with the other -- the
12:02:58 8  bank, a bigger company.
12:02:58 9    Q.   Mr. Brinker, what's happened to
12:03:00 10 Provident stock generally since December 3rd of
12:03:04 11 1999?
12:03:04 12   MR. BURKE:  Objection.  Vague,
12:03:06 13 overbroad.
12:03:08 14   A.   It -- all I can say is it's gone
12:03:10 15 up and up.
12:03:10 16   Q.   It's gone up and up?
12:03:12 17   A.   There was an early time when it
12:03:14 18 was down a bit, but it was never under what was
12:03:16 19 our value.
12:03:20 20   Q.   What's the basis for that
12:03:20 21 statement?
12:03:20 22   MR. BURKE:  Objection.  Asked and
12:03:22 23 answered.
12:03:22 24   A.   Well, because the shares are worth

108

12:03:24 1  more than the shares that we held of the Oak
12:03:28 2  Hills Savings -- of the Oak Hills.  But they're
12:03:30 3  gone, but Prov -- Oak -- Provident itself,
12:03:34 4  their stock had gone down some, but then it's
12:03:38 5  gone back up now.  It's doing real well.
12:03:40 6    Q.   Is it your testimony that
12:03:42 7  Provident stock has almost continuously traded
12:03:46 8  above the levels where it was at the time of
12:03:48 9  the merger, December 3rd, 1999?
12:03:52 10   MR. BURKE:  Objection.
12:03:52 11 Mischaracterizes prior testimony.  Asked and
12:03:54 12 answered.  You may answer.
12:03:56 13   A.   Do I what now?
12:04:00 14   Q.   Do you believe that Provident
12:04:02 15 stock traded higher than it did in the ten day
12:04:06 16 period before December 3rd, 1999, almost
12:04:14 17 continually since 1999?
12:04:14 18   MR. BURKE:  Same objection.
12:04:16 19   A.   I don't understand the question.
12:04:20 20   Q.   Okay.  Do you believe that
12:04:20 21 Provident stock never dropped below the levels
12:04:24 22 it was trading at when the merger was
12:04:26 23 effectuated?
12:04:28 24   A.   I -- I really don't recall.  I

109

12:04:30 1 just know now that it's been doing much better
12:04:34 2 over the, oh, past half year, I guess.
12:04:38 3      Q.   Well, my question is better than
12:04:38 4 what?  Is it doing better than the time of the
12:04:42 5 merger?
12:04:42 6      A.   Much.
12:04:42 7      Q.   Much better?
12:04:44 8      A.   Um-hmm.
12:04:46 9      Q.   And what's the basis for that
12:04:48 10 statement?
12:04:48 11      A.   I don't have -- you'll have to ask
12:04:50 12 Provident.  I mean, I know the value of the
12:04:54 13 stock that I have now and what I had before
12:04:56 14 that.  That's, that's what I'm thinking of.
12:05:00 15      Q.   And please explain that.
12:05:04 16      A.   Well, I had -- I didn't have stock
12:05:06 17 in Oak Hills Savings & Loan.  You had shares in
12:05:10 18 that -- well, when it did go stock, I had some
12:05:14 19 stock in there.  See, this is all so far back,
12:05:16 20 I'm telling you.  But that stock never did get
12:05:22 21 up to as high as what Provident was at the
12:05:28 22 beginning of this year even.
12:05:30 23      Q.   Well, the stock split, didn't it?
12:05:32 24           MR. BURKE:  Objection to form.

110

12:05:34 1      A.   Which stock?
12:05:36 2      Q.   Oak Hills.
12:05:36 3      A.   Oak Hills.  Well, it did once.
12:05:38 4      Q.   Okay.
12:05:40 5      A.   That, that was before this period
12:05:42 6 though.
12:05:42 7      Q.   Please describe how a stock split
12:05:44 8 works.
12:05:46 9           MR. BURKE:  Objection to
12:05:46 10 relevance.
12:05:46 11      A.   I have no idea.  I didn't do it,
12:05:50 12 take care of it.
12:05:52 13      Q.   Well, just generally.
12:05:52 14      A.   Well, they get -- they give you
12:05:56 15 two for one.  So you give your stock back, if
12:05:58 16 you get ten shares, you give it back and you
12:06:02 17 get 20 shares.
12:06:02 18      Q.   And did the Board do this?
12:06:04 19      A.   Our Board?
12:06:06 20      Q.   Yes.
12:06:06 21      A.   No.
12:06:06 22      Q.   Who did it?
12:06:08 23      A.   Provident.  Oh, no, pardon me,
12:06:12 24 pardon me.  Oak Hills did that once, yeah.

111

12:06:14 1      Q.   And why did Oak Hills split its
12:06:18 2 stock?
12:06:18 3      A.   I don't recall why.
12:06:20 4      Q.   And how did the Board split its
12:06:22 5 stock?
12:06:24 6      A.   I -- I have no idea.  I wasn't
12:06:26 7 there -- around them.  It was done by somebody
12:06:28 8 through the accounting department.  I don't
12:06:32 9 know how it was done.
12:06:34 10      Q.   Did the Board --
12:06:34 11      A.   But you get more shares.
12:06:36 12      Q.   Did the Board vote to split the
12:06:40 13 stock?
12:06:40 14      A.   Sure.
12:06:40 15      Q.   Did you vote?
12:06:40 16      A.   Sure.
12:06:42 17      Q.   Was there a tie that needed to be
12:06:44 18 broken?
12:06:44 19           MR. BURKE:  Objection.
12:06:46 20      A.   Was there what?
12:06:48 21      Q.   When you voted as the chairman of
12:06:50 22 the Board to split OHSL stock, was there a tie
12:06:54 23 that needed to be broken?
12:06:56 24      A.   I couldn't possibly remember that.

112

12:07:00 1      Q.   But you vote -- voted on occasion
12:07:02 2 when it wasn't necessary to break a tie,
12:07:06 3 correct?
12:07:06 4           MR. BURKE:  Objection.  Calls for
12:07:06 5 speculation.  Assumes facts not in evidence.
12:07:10 6      A.   I voted only when it was necessary
12:07:12 7 to break a tie.  That was the only time I
12:07:14 8 voted.
12:07:14 9      Q.   Well, OHSL had eight directors for
12:07:18 10 the most part, correct?
12:07:18 11      A.   Um-hmm.
12:07:18 12      Q.   So how would there be a tie if you
12:07:20 13 had eight directors?
12:07:22 14           MR. BURKE:  Objection to form.
12:07:24 15      A.   Well, because they weren't all
12:07:26 16 there all the time.  For one reason one would
12:07:28 17 be absent, you wouldn't have a -- and they
12:07:32 18 wouldn't all necessarily vote, half and half.
12:07:40 19      Q.   Mr. Brinker, are you familiar with
12:07:42 20 the phrase conflict of interest?
12:07:44 21      A.   Yeah.
12:07:46 22      Q.   What do you understand the phrase
12:07:46 23 conflict of interest to mean?
12:07:48 24           MR. BURKE:  Objection to

**113**

| | |
|---|---|
|12:07:50 1| relevance. Covered in the prior testimony.|

12:07:50 1  relevance. Covered in the prior testimony.
12:07:54 2      A.   Using inside knowledge of your
12:07:56 3  company for your own advantage usually would be
12:08:02 4  conflict of interest.
12:08:04 5      Q.   Was it part of your fiduciary duty
12:08:06 6  not to let news of the merger get out so that
12:08:10 7  people could trade on non-public information?
12:08:12 8          MR. BURKE:  Objection to
12:08:14 9  relevance.  You may answer.
12:08:16 10      A.   I had no idea.
12:08:16 11      Q.   Isn't that something that a
12:08:18 12  director would have to know?
12:08:20 13          MR. BURKE:  Objection.  Calls for
12:08:22 14  speculation.
12:08:24 15      A.   Well, I don't -- I don't recall
12:08:26 16  really too much of the discussion from way back
12:08:28 17  then what was going on.
12:08:30 18      Q.   Were there any unusual trading
12:08:32 19  activity in Oak Hills stock before the merger
12:08:36 20  was announced?
12:08:36 21          MR. BURKE:  Objection to
12:08:38 22  relevance.
12:08:38 23      A.   I have no idea.  I couldn't
12:08:40 24  remember.

**114**

12:08:40 1      Q.   Did you personally ever tell any
12:08:42 2  family members about the proposed merger before
12:08:46 3  it was announced to the investing public?
12:08:48 4      A.   No.  Well, one of my daughters
12:08:50 5  worked there so she knew it.  I didn't --
12:08:54 6  didn't tell her.
12:08:54 7      Q.   Did Steve Brinker ever trade in
12:08:56 8  Oak Hills stock before the merger was
12:08:58 9  announced --
12:08:58 10          MR. BURKE:  Objection to --
12:09:00 11      Q.   -- in an unusual manner?
12:09:00 12          MR. BURKE:  Objection to
12:09:00 13  relevance.
12:09:02 14      A.   I have no idea.
12:09:04 15      Q.   Isn't it the job of the Board of
12:09:06 16  Directors to check such things?
12:09:08 17          MR. BURKE:  Objection to
12:09:08 18  relevance.
12:09:10 19      A.   How would I check it?
12:09:10 20          MR. BURKE:  Assumes facts not in
12:09:12 21  evidence.
12:09:12 22      A.   I didn't even know if he would
12:09:14 23  have stock or what he was doing with it.
12:09:16 24  Nothing I could check.

**115**

12:09:16 1      Q.   Isn't it possible to scrutinize
12:09:18 2  the trading activity in the time period leading
12:09:22 3  up to a merger?
12:09:22 4          MR. BURKE:  Objection to
12:09:24 5  relevance.  Assumes facts not in evidence.
12:09:26 6      A.   I didn't get that.
12:09:26 7      Q.   Isn't it possible for OHSL, either
12:09:28 8  the company or the Board, to check the trading
12:09:32 9  activity of people buying the stock in the days
12:09:34 10  and weeks leading up to a merger announcement?
12:09:38 11          MR. BURKE:  Form, foundation.
12:09:40 12  Assumes facts not in evidence.
12:09:42 13      A.   Buying stock.  How could he buy
12:09:44 14  it, the merger wasn't completed yet.
12:09:46 15      Q.   What happened to the price of OHSL
12:09:48 16  stock when the merger was announced?
12:09:50 17      A.   What happened to it?
12:09:50 18      Q.   Yes.
12:09:54 19      A.   It didn't grow any.  It stayed
12:09:56 20  very close to where it was.
12:09:58 21      Q.   And were you following OHSL stock
12:10:00 22  at that time?
12:10:00 23      A.   I didn't follow stock too much at
12:10:02 24  any time.

**116**

12:10:06 1      Q.   What's your basis for your
12:10:08 2  statement that --
12:10:10 3      A.   Well, I never had too much stock.
12:10:12 4  I didn't have any reason to do that.
12:10:16 5      Q.   You had 1.2 percent of the
12:10:18 6  company; isn't that right?
12:10:18 7          MR. BURKE:  Objection.
12:10:20 8  Argumentative.
12:10:20 9      A.   Yeah, that is argumentative.
12:10:22 10      Q.   Mr. Brinker, I don't mean to be
12:10:24 11  argumentative.  I'm just --
12:10:24 12      A.   Well, it is.
12:10:26 13      Q.   -- following up.
12:10:28 14      A.   I don't know what 1.2 is.  Are you
12:10:30 15  talking about Oak Hills or Provident?
12:10:32 16      Q.   I'm talking about 1.2 percent of
12:10:34 17  Oak Hills.
12:10:34 18      A.   Well, I just had my deposit
12:10:36 19  account in there.  I didn't have any 1.2
12:10:40 20  percentage.  I didn't know what that is.  I
12:10:40 21  don't remember.
12:10:48 22      Q.   Mr. Brinker, when you were
12:10:50 23  evaluating the proposed merger with Provident,
12:10:54 24  did you believe that Provident's financial

117

| | |
|---|---|
| 12:10:56 1 | statements were free of material misstatement? |
| 12:11:02 2 | A. Sure, we believed it. |
| 12:11:04 3 | Q. Okay. |
| 2:11:04 4 | A. We took the word from McDonald. |
| 12:11:06 5 | Q. Okay. Did you later learn that |
| 12:11:08 6 | Provident's financial statements during the |
| 12:11:10 7 | relevant time, 1999, were not free of material |
| 12:11:14 8 | misstatement? That is, that they contained |
| 12:11:16 9 | material misstatements? |
| 12:11:18 10 | MR. BURKE: Objection. Misstates |
| 12:11:18 11 | the record. Assumes facts not in evidence. |
| 12:11:20 12 | A. I, I didn't -- didn't know that or |
| 12:11:22 13 | ever find it out until the, the first -- the |
| 12:11:24 14 | first statement that they made was that the -- |
| 12:11:28 15 | had the write-off for some bad loans on -- I |
| 12:11:34 16 | don't know if it was cars or airplanes or what, |
| 12:11:36 17 | but there was no way that I would know that |
| 12:11:38 18 | either before or after until they announced it. |
| 12:11:42 19 | Q. Is that something you would have |
| 12:11:42 20 | wanted to know at the time? |
| 12:11:44 21 | A. That's something that would have |
| 12:11:48 22 | been, by McDonald's, known whether it's |
| 12:11:52 23 | valuable or invaluable, because they -- they |
| 12:12:00 24 | did the checking of the accounts when they |

118

| | |
|---|---|
| 12:12:02 1 | make -- give the recommendation on the company. |
| 12:12:04 2 | We got to take them at their word and figure |
| 12:12:08 3 | that they checked everything out. |
| 12:12:10 4 | Q. If McDonald had found out that |
| 12:12:14 5 | Provident's financial statements were |
| 12:12:16 6 | materially misstated, is that something that |
| 12:12:20 7 | you would have expected them to share with you? |
| 12:12:22 8 | MR. BURKE: Objection. Assumes |
| 12:12:22 9 | facts not in evidence. Mischaracterizes the |
| 12:12:24 10 | record. |
| 12:12:26 11 | A. If it was materially, I would have |
| 12:12:30 12 | expected that they would tell us, yeah. |
| 12:12:30 13 | Q. Okay. |
| 12:12:32 14 | A. But they wouldn't recommend the |
| 12:12:34 15 | company. Why would they recommend the company |
| 12:12:36 16 | if they know they've got misstatements? |
| 12:12:40 17 | Q. Do you believe that Provident's |
| 12:12:40 18 | financial statements were materially misstated |
| 12:12:42 19 | from 1994 to 2002? |
| 12:12:46 20 | A. I have no reason to believe it. |
| 12:12:50 21 | Q. Did you read that section of the |
| 12:12:52 22 | annual report that was sent to you -- |
| 12:12:54 23 | A. No. |
| 12:12:54 24 | Q. -- as a Provident shareholder? |

119

| | |
|---|---|
| 12:12:56 1 | A. I didn't. |
| 12:12:56 2 | Q. Is this information that you would |
| 12:12:58 3 | have wanted to know in 1999 when you were |
| 12:13:00 4 | making a recommendation to OHSL shareholders |
| 12:13:04 5 | that they approve the merger? |
| 12:13:06 6 | MR. BURKE: Objection. Calls for |
| 12:13:06 7 | speculation. Assumes facts not in evidence. |
| 12:13:08 8 | A. I'm saying we went out and paid |
| 12:13:10 9 | that company for the information they gave us. |
| 12:13:12 10 | And they gave us the name of Provident and |
| 12:13:14 11 | that's the one we picked. Now, why would they |
| 12:13:18 12 | give us something that they felt was bad? |
| 12:13:22 13 | Q. Mr. Brinker, let me hand you what |
| 12:13:24 14 | has been marked as Plaintiff's Exhibit 60. |
| 12:13:26 15 | A. Oh, gosh. |
| 12:13:26 16 | Q. And I'd ask you to take a look at |
| 12:13:30 17 | paragraph 18, please. It's the CAC. |
| 12:13:32 18 | A. Where? |
| 12:13:34 19 | Q. Paragraph 18, it's on page 14. |
| 12:13:36 20 | Now, Mr. Brinker, with this document or any |
| 2:13:38 21 | other, please take as much time as you feel |
| 12:13:40 22 | that you need. |
| 12:13:42 23 | A. I can't take too much time, I've |
| 12:13:42 24 | got -- |

120

| | |
|---|---|
| 12:13:58 1 | Q. If you could read that paragraph |
| 12:14:00 2 | to yourself, sir. It continues on to the next |
| 12:14:02 3 | page. |
| 12:17:20 4 | A. What was the question? |
| 12:17:22 5 | Q. Mr. Brinker, have you had a |
| 12:17:24 6 | sufficient amount of time to read paragraph 18 |
| 12:17:26 7 | of the Consolidated Amended Complaint to |
| 12:17:28 8 | yourself? |
| 12:17:28 9 | A. I've read it. |
| 12:17:30 10 | Q. Have you understood paragraph 18? |
| 12:17:34 11 | A. Yes. I remember when that, that |
| 12:17:36 12 | happened. |
| 12:17:36 13 | Q. Okay. As the former chairman of |
| 12:17:38 14 | the Board of a public company and a member of |
| 12:17:42 15 | that company's audit committee, are you |
| 12:17:42 16 | familiar with something known as FAS-13? |
| 12:17:48 17 | A. FAS-13? |
| 12:17:52 18 | Q. Yes. |
| 12:17:52 19 | A. No. |
| 12:17:54 20 | Q. You -- |
| 12:17:54 21 | A. Not that I recall. |
| 12:17:56 22 | Q. Okay. Were you familiar with any |
| 12:17:58 23 | pronoun -- accounting pronouncements? |
| 12:18:04 24 | A. Just reports. Reports. Never |

121

12:18:08 1    announcements.
12:18:08 2        Q.   By accounting -- the Accounting
12:18:10 3    Standards Board, for example.  Were you
12:18:12 4    familiar with their pronouncements?
12:18:15 5        MR. BURKE:  Objection.
12:18:16 6        A.   Accounting Board?
12:18:18 7        Q.   Yes.
12:18:20 8        A.   I wouldn't -- I wasn't into
12:18:20 9    accounting really that much then that I would
12:18:22 10   recall now.
12:18:24 11       Q.   Okay.  With respect to the quote
12:18:26 12   that I include from Provident's 2002 annual
12:18:28 13   report in the Consolidated Amended Complaint,
12:18:32 14   what do you believe Mr. Hoverson is trying to
12:18:34 15   communicate to the shareholders, of which you
12:18:36 16   are one?
12:18:38 17       MR. BURKE:  Objection.  Calls for
12:18:40 18   speculation.  Document speaks for itself.
12:18:42 19       A.   Yeah, what are you -- what do you
12:18:44 20   mean?
12:18:44 21       Q.   What is Mr. Hoverson trying to
12:18:46 22   tell the Provident shareholders?
12:18:48 23       MR. BURKE:  Same objection.
12:18:50 24       A.   Well, he's told the shareholders

122

12:18:52 1    that they misstated one -- incorrectly in their
12:18:56 2    accounting on those leases.
12:18:58 3        Q.   And --
12:19:00 4        A.   And he wants them to know that
12:19:00 5    they are correcting that.
12:19:02 6        Q.   Okay.  Did this affect the
12:19:04 7    OHSL-Provident merger in any way?
12:19:08 8        MR. BURKE:  Objection to form.
12:19:10 9    Assumes facts not in evidence.
12:19:10 10       A.   No, not at all.
12:19:10 11       Q.   Why not?
12:19:12 12       A.   What year was this?  Ninety -- let
12:19:32 13   me see here.  It wouldn't affect our thinking
12:19:38 14   on this, that's for sure.  I would say actually
12:19:48 15   he made a good statement in here in stating
12:19:50 16   what was wrong and what they did about it.
12:19:56 17   Didn't have to be concerned with that -- for
12:19:58 18   that particular reason.
12:20:00 19       Q.   Mr. Brinker, in your previous
12:20:00 20   answer, you said something to the effect that
12:20:02 21   it wouldn't affect our thinking on it, that's
12:20:06 22   for sure.  Were you referring to the
12:20:06 23   restatement?
12:20:12 24       A.   I was referring to the restatement

123

12:20:14 1    referring to the leases situation, yes.
12:20:16 2        Q.   And it's your belief that the
12:20:20 3    situation referred to in paragraph 18 of the
12:20:22 4    Consolidated Amended Complaint had no effect on
12:20:26 5    the Oak Hills-Provident merger; is that
12:20:30 6    correct?
12:20:30 7        A.   That's correct.
12:20:32 8        Q.   Okay.
12:20:32 9        A.   I would say, yes.
12:20:32 10       Q.   Okay.  Let me direct your
12:20:34 11   attention to the single spaced part.  It's at
12:20:38 12   the bottom of page 14 and it goes over to page
12:20:40 13   15.  Are you with me, sir?
12:20:42 14       A.   I'll get there.  Okay.
12:20:48 15       Q.   The first part is an incomplete
12:20:48 16   sentence.  It says, A blemish was added when
12:20:52 17   our finance and accounting staff discovered an
12:20:54 18   accounting error in late February.  Are you
12:20:56 19   with me, sir?
12:20:58 20       A.   Yes.
12:20:58 21       Q.   During 1999 when Oak Hills was
12:21:02 22   considering merging with Provident, would you
12:21:04 23   have been concerned about any accounting errors
12:21:06 24   that Provident had on its financial statements?

124

12:21:10 1        MR. BURKE:  Objection.  Asked and
12:21:10 2    answered.  You may answer.
12:21:12 3        A.   Personally?
12:21:14 4        Q.   Yes.
12:21:16 5        A.   I don't think it would have.  I
12:21:18 6    don't know.  The -- they were correcting that
12:21:20 7    and they, they have to file the reports every
12:21:22 8    year the same way we did to -- for the
12:21:26 9    insurance of accounts and such.  And that --
12:21:30 10   that's just something that happens in, in
12:21:32 11   bookkeeping sometimes.
12:21:32 12       Q.   Now, Mr. Brinker, you asked me a
12:21:36 13   question.  You said, "personally?"  Were you
12:21:38 14   meaning to distinguish your roles or the hats
12:21:42 15   that you were wearing, if you will, between a
12:21:44 16   personal hat and a chairman of the Board hat
12:21:46 17   when you asked me that question?
12:21:48 18       MR. BURKE:  Objection to form.
12:21:50 19       A.   I was saying as the chairman of
12:21:52 20   the Board.
12:21:52 21       Q.   Okay.
12:21:54 22       A.   And member of the Board itself.
12:21:54 23       Q.   Right.  And that's what I'm
12:21:56 24   interested in, your testimony as the former

## 125

12:21:56 1 chairman of the Board and a member of the
12:21:58 2 accounting committee of a public company. So
12:22:02 3 we're on the same page, right?
12:22:04 4     A. Yeah.
12:22:06 5     Q. Okay. The next sentence says, The
12:22:08 6 error dates back to 1997 and resulted in our
12:22:10 7 announcing on March 5th, 2003, a restatement of
12:22:12 8 our earnings for the last six years. Do you
12:22:16 9 see that?
12:22:20 10     A. I didn't see 2003. I remember
12:22:22 11 when this was all in the paper though.
12:22:22 12     MR. BURKE: Go off the record,
12:22:22 13 please.
12:31:00 14     (Brief recess.)
12:31:00 15     Q. Mr. Brinker, back on the record.
12:31:12 16 In your previous answer, you said something to
12:31:12 17 the effect that you remembered reading about
12:31:18 18 this in the paper. Do you remember that
12:31:16 19 testimony?
12:31:18 20     A. Um-hmm.
12:31:18 21     Q. Okay. What do you remember
12:31:20 22 reading about in the paper last spring?
12:31:24 23     A. Well, it was just like they say
12:31:26 24 about the way they were handling the leases on

## 126

12:31:26 1 their books and that needed to be changed.
12:31:32 2     Q. And do you believe that that
12:31:34 3 affected the Oak Hills-Provident merger in any
12:31:38 4 way?
12:31:38 5     A. No.
12:31:38 6     Q. Why not?
12:31:42 7     A. Well, that's -- it's how many
12:31:44 8 years after the merger?
12:31:46 9     Q. Well --
12:31:46 10     A. I mean --
12:31:46 11     Q. -- let's take it --
12:31:46 12     A. -- how that can affect it?
12:31:50 13     MR. BURKE: Wait.
12:31:50 14     Q. I didn't mean to interrupt you,
12:31:50 15 sir.
12:31:52 16     A. I said, how could it affect it?
12:31:52 17 The merger was already done and finished.
12:31:52 18     Q. Okay.
12:31:56 19     A. And done when that record came
12:31:58 20 out.
12:31:58 21     Q. Okay. I didn't mean to interrupt
12:31:58 22 you, again.
12:32:00 23     A. Okay.
12:32:00 24     Q. Now, let's answer your question,

## 127

12:32:00 1 how could it have affected the merger. Look at
12:32:04 2 the first full sentence in that quote in
12:32:08 3 document 60, sir. And I'll read it into the
12:32:12 4 record. The error dates back to 1997 and
12:32:16 5 resulted in our announcing on March 5th, 2003,
12:32:20 6 a restatement of our earnings for the last six
12:32:24 7 years. Do you see that, sir?
12:32:26 8     A. Yeah.
12:32:26 9     Q. What does it mean when Provident
12:32:28 10 restated its earnings for the last six years?
12:32:36 11     A. That means, I guess, they had to
12:32:36 12 do it, so I don't know what -- what it meant to
12:32:42 13 us. That -- it couldn't have been -- caused
12:32:46 14 more loss. I don't see how it could have.
12:32:50 15     Q. You said it could not have caused
12:32:52 16 more loss. Is that your testimony?
12:32:54 17     MR. BURKE: Objection.
12:32:54 18 Argumentative.
12:32:56 19     A. Yeah.
12:32:56 20     Q. Mr. Brinker, I don't mean to be
12:32:56 21 argumentative with you.
12:32:58 22     A. Well --
12:32:58 23     Q. Is that your testimony?
12:33:02 24     A. Well, whatever I said, she has, I

## 128

12:33:04 1 guess.
12:33:06 2     Q. Okay. Do you believe that the
12:33:08 3 restatements going back to 1997 means that your
12:33:14 4 reliance wasn't well placed in Provident?
12:33:20 5     MR. BURKE: Objection to form.
12:33:20 6     A. At that time, at this point
12:33:22 7 when -- not -- I'm saying well placed, it's
12:33:24 8 something that they -- this on the bookkeeping
12:33:28 9 can be changed -- I guess changes at any time.
12:33:32 10 And people up there didn't know that they were
12:33:36 11 doing this wrong, either, when this -- their
12:33:38 12 accounting system finally shows up a
12:33:42 13 misjudgment, the mistake was corrected.
12:33:44 14     Q. Okay. And was it corrected in
12:33:46 15 time to make the OHSL shareholders whole?
12:33:52 16     MR. BURKE: Objection to form.
12:33:54 17     A. It was, it was after we were
12:33:54 18 already merged.
12:33:56 19     Q. So the Oak Hills shareholders were
12:33:58 20 damaged because the mistake wasn't caught until
12:34:00 21 after the merger, correct?
12:34:02 22     MR. BURKE: Objection.
12:34:04 23     A. I wouldn't say they were damaged.
12:34:06 24 Their shares had gone higher than Oak Hills

129

```
12:34:08  1    shares were.
12:34:08  2        Q.  Mr. Brinker, you agreed to sell
12:34:10  3    Oak Hills to Provident for approximately $57
12:34:14  4    million; is that correct?
12:34:14  5        A.  I think that was it.
12:34:16  6        Q.  And would you have agreed to sell
12:34:18  7    Oak Hills to Provident for $40 million?
12:34:20  8            MR. BURKE:  Objection.  Misstates
12:34:22  9    the record.  Assumes facts not in evidence.
12:34:24 10        A.  I couldn't say that I would agree
12:34:24 11    at all.  It would have to be the whole Board.
12:34:26 12    And I don't think I would agree to anything
12:34:30 13    like 40,000.
12:34:30 14        Q.  40 million.
12:34:30 15        A.  40 million.
12:34:32 16        Q.  Okay.  Why would you not agree to
12:34:34 17    40 million?
12:34:34 18            MR. BURKE:  Objection.  Calls for
12:34:36 19    speculation.
12:34:36 20        A.  Well, because of the -- I wouldn't
12:34:38 21    have known that figure unless we got it from
12:34:40 22    the company we hired to check the stuff for us.
12:34:42 23    And I would never have done it really.
12:34:44 24        Q.  Well, the company you hired to
```

130

```
12:34:46  1    check the stuff for you was McDonald
12:34:48  2    Investments, correct?
12:34:50  3        A.  Um-hmm.
12:34:50  4        Q.  Yes?
12:34:50  5        A.  Yes.
12:34:52  6        Q.  And they said that 57 million was
12:34:52  7    a fair price, correct?
12:34:54  8        A.  Yeah.
12:34:56  9        Q.  And if the transaction were to be
12:35:00 10    effected with Provident stock, the stock would
12:35:02 11    have to be fairly valued in order for it to be
12:35:06 12    a fair transaction, correct?
12:35:08 13        A.  Well, they'd have to pay the 57
12:35:10 14    million worth, yeah.
12:35:12 15        Q.  Right.  And if Provident stock
12:35:14 16    were artificially inflated by approximately $17
12:35:18 17    million, that would mean that, in effect, Oak
12:35:22 18    Hills was sold to Provident for not $57
12:35:26 19    million, but about 40 million.  Do you -- are
12:35:30 20    you with me?
12:35:30 21            MR. BURKE:  Objection to form.
12:35:30 22    Calls for speculation.
12:35:32 23        A.  No.
12:35:32 24            MR. BURKE:  Misstates the record
```

131

```
12:35:34  1    and assumes facts not in evidence.
12:35:36  2        A.  I wouldn't understand that at all.
12:35:38  3        Q.  What part of that don't you
12:35:40  4    understand?
12:35:40  5        A.  The whole question.  The whole
12:35:42  6    thing.
12:35:44  7        Q.  Okay.  If Provident stock said
12:35:44  8    that it was doing better than it really was,
12:35:50  9    wouldn't that have the effect of making its
12:35:52 10    stock go up?
12:35:54 11            MR. BURKE:  Objection.  Misstates
12:35:56 12    the record and assumes facts not in evidence.
12:35:58 13    Calls for speculation.
12:35:58 14        A.  Would it make it go up?
12:36:00 15        Q.  Yes.
12:36:02 16        A.  Well, if it went up, they would
12:36:04 17    have to pay it.
12:36:06 18        Q.  Mr. Brinker, what happened to
12:36:08 19    Provident stock after the first restatement was
12:36:12 20    announced?
12:36:14 21        A.  I don't recall back then.
12:36:16 22        Q.  Did the stock lose about $300
12:36:18 23    million in shareholder value in a day?
12:36:22 24            MR. BURKE:  Objection.  Asked and
```

132

```
12:36:22  1    answered.
12:36:22  2        A.  I have no idea.  I could not
12:36:24  3    remember whatsoever.
12:36:26  4        Q.  Can you remember generally what
12:36:28  5    happened?
12:36:28  6        A.  No.
12:36:28  7        Q.  Was --
12:36:30  8        A.  I just know like it was a -- their
12:36:32  9    accounting system and they found the error and
12:36:34 10    they corrected it and that's the important
12:36:36 11    thing.
12:36:38 12        Q.  Was that important to Oak Hills
12:36:40 13    shareholders?
12:36:42 14            MR. BURKE:  Objection.  Calls for
12:36:42 15    speculation, form.
12:36:48 16        A.  Well, sure, it was important to
12:36:48 17    anybody that had stock there.
12:36:52 18        Q.  Would this be information you
12:36:52 19    would have wanted to know when you were
12:36:54 20    considering the merger in 1999?
12:36:58 21            MR. BURKE:  Objection.  Calls for
12:36:58 22    speculation.  You may answer.
12:37:00 23        A.  Well, we wouldn't have had any way
12:37:02 24    of knowing.  And these people were making
```

**133**

12:37:04 1 reports to the federal authorities and
12:37:06 2 everything on all the times, so we had --
12:37:10 3    Q.  Right.  And now you believe these
12:37:12 4 reports are incorrect, right?
12:37:14 5    MR. BURKE:  Objection.  Calls for
12:37:14 6 speculation.
12:37:20 7    A.  I have no way of knowing.
12:37:20 8    COURT REPORTER:  I need you to
12:37:20 9 re-answer.
12:37:22 10    A.  I have no way of knowing.
12:37:22 11    Q.  Well, if they say that they're
12:37:26 12 correcting things --
12:37:26 13    A.  They were incorrect.
12:37:28 14    Q.  -- does that suggest --
12:37:28 15    A.  That's correct.
12:37:30 16    Q.  Does that suggest to you that the
12:37:30 17 previous reports were incorrect?
12:37:32 18    A.  That's correct.
12:37:32 19    Q.  Okay.  Do you now believe that
12:37:34 20 Provident's financial statements were
12:37:36 21 materially misstated from 1997 through 2002?
12:37:42 22    MR. BURKE:  Objection.  Misstates
12:37:44 23 the record.
12:37:44 24    THE COURT:  Three minutes, go

**134**

12:37:46 1 ahead.
12:37:46 2    MR. BURKE:  Objection.  Asked and
12:37:46 3 answered.  Misstates the record.
12:37:46 4    A.  How did he question that?
12:37:50 5    COURT REPORTER:  Do you want me to
12:38:04 6 read it?
12:38:04 7    Q.  Yes.  Okay.  I'll find it, I'll --
12:38:04 8 okay.  Mr. Brinker, do you consider the
12:38:04 9 Provident restatements of 2003 to be a serious
12:38:08 10 matter?
12:38:08 11    MR. BURKE:  Objection.  Misstates
12:38:08 12 the record.  Calls for speculation.
12:38:12 13    A.  I -- personally?
12:38:12 14    Q.  Yes.
12:38:14 15    A.  Right now, no, I don't know.  I
12:38:20 16 think you'll find bookkeeping changes in
12:38:22 17 everybody's business.  They do something one
12:38:24 18 way and then they change it to another way.
12:38:26 19 And I don't think that there was anything there
12:38:30 20 other -- they made this correction.  I don't
12:38:34 21 know what others -- what would come up.
12:38:36 22    Q.  Mr. Brinker, isn't consistency
12:38:38 23 from one period to another one of the basic
12:38:42 24 principles of accounting for public companies?

**135**

12:38:46 1    A.  Sure.
12:38:48 2    Q.  Don't principles have to be
12:38:48 3 applied from one year to another, such as GAAS
12:38:52 4 and GAAP?
12:38:52 5    MR. BURKE:  Objection.
12:38:54 6 Foundation.
12:38:54 7    A.  Yes, probably.
12:38:56 8    Q.  So what did you mean in your
12:38:56 9 previous testimony when you said that
12:38:58 10 accounting changes are made all the time?
12:39:02 11    MR. BURKE:  Objection.  Asked and
12:39:02 12 answered.
12:39:02 13    A.  Well, they are.  They report all
12:39:04 14 the time to the, the authorities where the
12:39:10 15 reports come in.  And if the authorities don't
12:39:12 16 catch something and make a, a complaint about
12:39:14 17 it, how are they going to know about it, or how
12:39:18 18 are we supposed to know about it?
12:39:20 19    Q.  Is this something you would have
12:39:22 20 wanted to know about in 1999?
12:39:24 21    A.  In this particular case, this is
12:39:26 22 one item and this one wouldn't have bothered
12:39:30 23 me.
12:39:30 24    Q.  Why not?

**136**

12:39:30 1    A.  Because I don't think it made any
12:39:32 2 change too much in their stock and what they
12:39:36 3 offered.  And it wouldn't have been any more.
12:39:38 4    Q.  Why do you say that?
12:39:40 5    THE COURT:  One minute.
12:39:42 6    A.  Why do I say that?  I don't think
12:39:50 7 he -- the information was announced, so it
12:39:52 8 wouldn't change the stock that much.  People
12:39:54 9 wouldn't know about it till it's actually
12:39:56 10 published.
12:39:58 11    Q.  And isn't that because Provident
12:40:00 12 fraudulently concealed the accounting errors?
12:40:04 13    MR. BURKE:  Objection.
12:40:04 14 Argumentative.  Assumes facts not in evidence.
12:40:06 15    A.  I wouldn't say it's fraud.  I
12:40:08 16 wouldn't have no idea if it was fraudulently
12:40:10 17 concealed or not.
12:40:12 18    Q.  But it was --
12:40:12 19    A.  Maybe they --
12:40:12 20    Q.  -- concealed for a number of
12:40:12 21 years, correct?
12:40:14 22    MR. BURKE:  Objection.  Calls for
12:40:14 23 speculation.  Assumes facts not in evidence.
12:40:14 24    A.  I don't like the term concealed.

137

12:40:16 1 I don't know that they necessarily were
12:40:20 2 concealing something.
12:40:20 3     Q.   Well --
12:40:22 4     A.   If they just weren't doing it the,
12:40:22 5 the right way, but maybe they didn't know they
12:40:24 6 weren't doing it the right way.
12:40:26 7     Q.   In any event, did whatever
12:40:28 8 Provident was doing, intentionally or
12:40:30 9 unintentionally, have an effect on the
12:40:32 10 OHSL-Provident merger?
12:40:34 11         MR. BURKE:  Objection.  Asked and
12:40:34 12 answered at least three times.  You may answer.
12:40:38 13     A.   At least three times.  No, it
12:40:40 14 wouldn't.
12:40:40 15         THE COURT:  That's it.  Time.
16
17
18    _____
19    NORBERT BRINKER
20
21        - - -
22 (Deposition session concluded at 12:42 p.m.)
23        - - -
24

138

1         C E R T I F I C A T E
2 STATE OF OHIO:
          SS:
3 COUNTY OF HAMILTON:

4     I, Lee Ann Williams, a duly qualified and
5 commissioned notary public in and for the State
6 of Ohio, do hereby certify that prior to the
7 giving of his deposition, the within named
8 NORBERT BRINKER was by me first duly sworn to
9 testify the truth, the whole truth and nothing
10 but the truth; that the foregoing pages
11 constitute a true and correct transcript of
12 testimony given at said time and place by said
13 deponent; that said deposition was taken by me
14 in stenotypy and transcribed under my
15 supervision; that I am neither a relative of
16 nor attorney for any of the parties to this
17 litigation, nor relative of nor employee of any
18 of their counsel, and have no interest
19 whatsoever in the result of this litigation.
20    IN WITNESS WHEREOF, I hereunto set my hand
21 and official seal of office at Cincinnati, Ohio
22 this __ day of _____, 2004.
23 MY COMMISSION EXPIRES: _____
   AUGUST 26, 2004    LEE ANN WILLIAMS, RPR/CRR
24              NOTARY PUBLIC-STATE OF OHIO