# Exhibit A

1

1
2        COURT OF COMMON PLEAS
3        HAMILTON COUNTY, OHIO
4
5            - - -
   JANET NOLTE, et al.,   :
6
          Plaintiffs,:
7
   VS.        : CASE NO. A-9907039
8
   OHSL FINANCIAL CORP.,  :    VOLUME I
9
   et al.,        :
10
          Defendants.:
11            - - -
12        Deposition of KENNETH HANAUER, a
13 witness herein, called by the plaintiff for
14 direct examination, pursuant to the Ohio Rules
15 of Civil Procedure, taken before me, Lee Ann
16 Williams, a Registered Professional Reporter
17 and Notary Public in and for the State of Ohio,
18 at the offices of Gene Mesh & Associates, 2605
19 Burnet Avenue, Cincinnati, Ohio 45219, on
20 Tuesday, February 22, 2000, at 9:54 a.m.
21
22
23
24
25

---

2

1  APPEARANCES:
2    On behalf of the Plaintiffs:
3      Michael G. Brautigam, Esq.
         and
4      Lawrence Allen Zeinner, Esq.
       Gene Mesh & Associates
5      2605 Burnet Avenue
       Cincinnati, Ohio 45219
6
     On behalf of the Defendants:
7
       James E. Burke. Esq.
8      Keating, Muething & Klekamp
       1800 Provident Tower
9      One East Fourth Street
       Cincinnati, Ohio 45202
10
   ALSO PRESENT: Janet Nolte
11
12    S T I P U L A T I O N S
13   It is stipulated by and between counsel for
14 the respective parties that the deposition of
15 KENNETH HANAUER. a witness herein, called by
16 the plaintiffs for direct examination pursuant
17 to the Ohio Rules of Civil Procedure, may be
18 taken at this time by the notary; that said
19 deposition may be reduced to writing in
20 stenotypy by the notary, whose notes may then
21 be transcribed out of the presence of the
22 witness; and that proof of the official
23 character and qualifications of the notary are
24 expressly waived.
25        - - -

---

3

1              I N D E X
2  Examination of KENNETH HANAUER      Page
3  By Mr. Brautigam:          4
4            - - -
5  Hanauer Exhibit    Page Identified
6    No. 1          6
     No. 2          88
7    No. 3          97
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

4

1          KENNETH HANAUER
2  having been first duly sworn, testified as
3  follows:
4          DIRECT EXAMINATION
5  BY MR. BRAUTIGAM:
6      Q.  Good morning, Mr. Hanauer.
7      A.  Good morning.
8      Q.  Would you please state your full
9  name for the record.
10     A.  Kenneth L. Hanauer.
11     Q.  Mr. Hanauer, have you spoken to
12 anyone about this deposition?
13     A.  Yes.
14     Q.  With whom did you speak?
15     A.  Spoke with my wife, spoke with my
16 current employer, just that I was coming over.
17 and spoke with Mr. Burke, all in casual
18 conversation. Nothing to do with the proposed
19 intent or anything like that.
20     Q.  Okay. How did you know to be here
21 today?
22     A.  Mr. Burke contacted me.
23     Q.  Okay. Did you and I speak prior
24 to this deposition?
25     A.  I'm not sure whether it was you.



EXHIBIT
Zoellner 2

LITIGATION SUPPORT SERVICES, INC.
Cincinnati (513) 241-5605 / Dayton (937) 224-1990

1

25

1  vote, nothing had ever been unanimous as far as
2  the discussions or prior votes or hiring
3  individuals to represent us or anything.
4       Q.  We'll come back to that.
5       A.  Okay.
6       Q.  Let's talk about the second part
7  of that sentence.
8       A.  Okay.
9       Q.  If I understood your testimony
10  correctly a minute ago, you said that you did
11  not believe that this transaction was in the
12  best interest of Oak Hills stockholders,
13  correct?
14       A.  In -- yeah, that was your
15  question.  Yes, that's what I said.
16       Q.  Then did it bother you that this
17  document was going out, saying the opposite of
18  what you felt, what you believed?
19       A.  I did not dwell on the second
20  piece of that, of that sentence.  Couched the
21  way you've just worked through it, I don't care
22  for that piece of the document, but I did not
23  dwell on, on beliefs that it -- at that point,
24  you know, it doesn't say unanimous there.  If
25  we're getting down to, you know, we unanimously

26

1  approved, but it is a true statement that the
2  Board believed.  It was not the whole Board
3  that believed that.
4       Q.  Well, you were a part of the Board
5  at this time, correct?
6       A.  That's -- absolutely.
7       Q.  And you did not believe the second
8  part of that sentence, specifically you did not
9  believe that it is in the best interest of Oak
10  Hills' stockholders, correct?
11       A.  That was my opinion, yes, sir.
12       Q.  And I think a fair reading of this
13  suggests that the entire Board believes that
14  this transaction is in the best interest of Oak
15  Hills' stockholders.  Do you agree that that's
16  a fair reading?
17       A.  I believe that that conclusion
18  could be drawn, yes, sir.
19       Q.  Do you believe that -- well, are
20  you familiar with the concept of materiality?
21       A.  Yes, sir.
22       Q.  Please define it as best you can.
23       MR. BURKE:  Objection, calls for a
24  legal conclusion.
25       A.  Materiality, as I know it, and my

27

1  formal training is in -- is in the area of
2  accountancy.  Materiality is something that
3  would not substantially misstate a fact in a
4  document.  And I guess it always gets down to
5  what is -- is there such a thing as something
6  being absolutely correct or, or substantially
7  correct.
8       I think materiality is -- that's a
9  word that's battered about.  If you have, if I
10  can use an example, a company that has a
11  million dollars worth of income and has
12  misstated that income by a hundred thousand
13  dollars, that would be material.  If they
14  misstated it by $100, that would not be
15  material.
16       Q.  Okay.  The example you used was 10
17  percent, correct?  You have a million dollars,
18  10 percent misstated?
19       A.  (Witness nodded head.)
20       Q.  Now, there were seven members of
21  the Board at or about the time of this letter,
22  meaning September 24th, 1999, which happens to
23  be my birthday; is that correct?
24       A.  I suppose.
25       MR. BURKE:  That that's your

28

1  birthday?
2       A.  There were seven members.  I'll
3  stipulate to seven members, not that that's
4  your birthday.
5       Q.  Okay.  And you represent one-
6  seventh of those directors, correct?
7       A.  That's correct.
8       Q.  And that's more than 10 percent,
9  getting back to your example, correct?
10       A.  Yes, sir.
11       Q.  Do you believe that your feelings
12  as the CEO of the company and as a director
13  were material?
14       MR. BURKE:  Objection, asked and
15  answered.  You may answer it.  And calls for a
16  legal conclusion.  Excuse me, Mr. Hanauer,
17  sorry.
18       A.  Okay.  I think I would almost have
19  to answer that with a question, material to
20  whom?  I think they were material to myself.
21  Certain individuals probably would value my
22  opinions and my stance on things, and certain
23  people would not.
24       Q.  Let me see if I can ask it in a
25  slightly different way.

# Exhibit B

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Walter W. Thiemann,<br>on behalf of himself and of<br>all others similarly situated, | : | Case No. C-1-00-793 |
| | : | Judge Sandra S. Beckwith |
| Plaintiff, | : | Magistrate Judge Hogan |
| vs. | : | **AFFIDAVIT OF THOMAS M. HERRON** |
| | : | |
| OHSL Financial Corporation, et al. | : | |
| | : | |
| | : | |
| Defendants. | : | |

**THOMAS M. HERRON**, being duly sworn, deposes and states as follows:

1. I am a former OHSL director and class member in this action.

2. I make this affidavit in further support of Plaintiffs' Motion for Summary Judgment on Unanimity Issues (Doc. No. 315). I have personal knowledge of the facts relating to this affidavit.

3. I have reviewed the response by the OHSL and Provident Defendants (Doc. No. 327) to Plaintiffs' Motion, and I believe that it is materially inaccurate and can mislead the Court.

4. On July 27, 1999, I resigned from the OHSL Board effective July 30, 1999 in part in protest because I opposed the proposed OHSL-PFGI merger and believed that the best business strategy for OHSL at that time was to remain independent.

5. As I indicated in my testimony, I personally called each OHSL director and informed each one of my decision to resign. I also specifically informed each one of them that I was resigning because I fundamentally disagreed with the OHSL-PFGI merger.

6. From my reading of the OHSL and Provident Defendants' response, I believe that they have attempted to use the fact that I did not vote on the final merger on

1

August 2, 1999 as evidence that I could not have opposed it since I never saw the final version of it. However, the final version that was allegedly approved by the OHSL Board on August 2, 1999 did not differ in any material respect from the merger agreement that was presented to the entire OHSL Board on July 22, 1999 and which was included in the Proxy Materials/Registration Statement sent to all shareholders which I have reviewed.

7. I believe that my opposition to the merger with PFGI was obvious to the OHSL Defendants. I had spoken against merging throughout 1999 and before, had consistently voted against proposals that could lead to the sale of the company, and had voted against the proposed merger on July 22, 1999.

8. I ultimately resigned in part in protest because I did not want to be involved in, and responsible for, a transaction with which I deeply disagreed. This was very difficult for me because my family had been associated with Oak Hills for decades, and well before OHSL became a public company. My father had served on the Oak Hills Board for almost 30 years. However, neither my father, nor I, nor many other OHSL shareholders, believed that OHSL should be sold at all.

9. Although my resignation letter was written in the spirit of diplomacy and did not specifically cite any disagreement with the company, there were reasons for expecting my resignation to be disclosed in the Proxy Materials/Registration Statement, and I was very surprised when it was not. First, OHSL's counsel, Cliff Roe, was in the room when I voted against the merger. Second, I felt it was obvious from my voting history, my specific vote against continued negotiations with PFGI on July 22, 1999, my conversations with my fellow OHSL Directors during and before the vote, and then my conversations with my fellow OHSL Directors after my resignation, that I opposed the OHSL-PFGI merger.

10. Although I did cite my need to commit additional time to my job with Michelman, Inc. in my resignation letter as a reason for my resignation, the OHSL Defendants knew and understood that I did so in the spirit of diplomacy. The OHSL Defendants knew that the timing of this resignation did not make any sense unless it was made part in protest since there would be no more OHSL, no more need for OHSL Board meetings, and no more conflicts with business and travel, if the merger was approved, as clearly expected.

11. Similarly, my resignation letter also stated that I would not be exercising stock options to which I was entitled. Although these options were then worth tens of thousands of dollars, I did not exercise because I did not want to profit from, or be associated with, a transaction that I did not believe to be in the best interests of OHSL shareholders, and with which I fundamentally disagreed.

12. Thus, although it might not have been obvious to the average person from reading my resignation letter that I resigned in part in protest, based upon the foregoing, I

do not believe that there was any other way that the OHSL Defendants could have interpreted it.

13.  I do not believe that it is a coincidence that the date selected for the table listed on page 63 of the Proxy Materials/Registration Statement—July 31, 1999—one day after my resignation became effective—is a chance occurrence, but rather a deliberate attempt to mislead OHSL shareholders by not informing them that I had resigned.

14. On page 7 of their opposition, the OHSL and PFGI defendants state:  "Herron admitted he never told his counsel of any objection to or protest of the merger, and never put it in the corporate minutes."  This is false, since I voted *against* the OHSL-Provident merger, this vote against was duly recorded in the minutes, and Cliff Roe, presumably the reference to "his counsel," was in the room when I voted against the merger.

15. On page 8 of their opposition, the OHSL and PFGI defendants attempt to analogize my resignation to "readily available industry trends."  I do not believe that my resignation—which was never disclosed—is analogous to "readily available industry trends,"  and I do not follow their presumed reasoning.

16. Also on page 8 of their opposition brief, the OHSL and PFGI defendants state "Second, there is no dispute that Herron's departure from OHSL's Board *was* disclosed." (emphasis in original).  The remaining sentences of this paragraph echo this same theme.  These statements are false.  Since my resignation was *not* disclosed in any part of the Proxy Materials/Registration Statement, I do not understand how the OHSL and PFGI defendants can continue to repeat this misstatement.    My resignation—and the reasons behind it, in part in protest—were neither "publicly available" nor "readily determinable," and any statements to the contrary are false.

17. Similarly, the OHSL and PFGI defendants state that "The Information Is Not Material" at page 9.  I consider myself to be a reasonable investor, and I take issue with the statements made in this section.  I believe that all reasonable investors would care and should be informed as to the actual vote.  This is especially true since any reasonable investor reading the Proxy Materials/Registration Statement would conclude that the vote was 8-0, not 7-0 or 5-0, because my resignation was not disclosed.

18. Additionally, a reasonable investor would expect that all of the OHSL Directors believed that the merger was both fair and in the best interests of OHSL shareholders. In other words, even though the merger may have been considered "fair" from a financial point of view at the time, it does not follow that the merger was necessarily in the best interests of OHSL shareholders.  As a former OHSL director, I did not believe that the merger with Provident was in the best interests of OHSL shareholders.  I have reviewed the testimony of former OHSL's CEO

3

and Board member Ken Hanauer, and he apparently did not believe the merger was in the best interests of OHSL shareholders. Additionally, while I was a director, Mr. Hanauer had repeatedly told me in words and substance that he did not believe that any merger was in the best interests of OHSL shareholders.

19. Finally, the OHSL and PFGI defendants state that "a reasonable investor voting on a merger in October, 1999 would not care that a director resigned three months earlier, before the merger proposal was finalized when that director voiced no formal opposition in his resignation letter and did not even oppose the OHSL-PFGI merger specifically." (Opposition at 9-10). This, too, I consider to be a false and misleading statement. A reasonable investor—especially those of a smaller community organization who were for the most part long-time customers as well--would certainly care that a director had resigned in part in protest of the proposed merger. While it may or may not change the vote of any particular investor, it is certainly something that a reasonable investor would want to consider and should be entitled to consider. Additionally, as indicated above, there were no material differences between the draft merger agreement that was presented to me and that I voted *against* and the final version of the merger agreement that was later presented to me and all of the other OHSL shareholders. Furthermore, I feel that the OHSL and PFGI defendants attempt to mislead the Court by their reference to an imaginary "three month" gap, when in fact, my resignation was effective only three *days* before the final vote on the OHSL-PFGI merger. This is certainly something that would add to the mix of information that a reasonable shareholder would want to consider.

**FURTHER AFFIANT SAYETH NAUGHT**

*Thomas M. Herron*
Thomas M. Herron

Subscribed to and sworn before me this 25th day of May 2004

**NOTARY PUBLIC** *Stephanie A. Hite*

**STEPHANIE A. HITE**
Notary Public, State of Ohio
My Commission Expires
February 16, 2009

4

# Exhibit C

ANNEX C

# McDonald Investments

McDonald Investments Inc.
800 Superior Avenue
Cleveland, Ohio 44114-2603

September 3, 1999

Board of Directors
OHSL Financial Corp.
6581 Harrison Road
Cincinnati, OH 45247

Attention: Mr. Kenneth L. Hanauer
President & Chief Executive Officer

Gentlemen:

You have requested our opinion with respect to the fairness, from a financial point of view, as of the date hereof, to the holders of the common stock, par value $0.01 per share ("OHSL Common Shares"), of OHSL Financial Corp. ("OHSL"), of the Exchange Ratio, as set forth in Section 1.6 (a) of the Agreement and Plan of Merger dated as of August 3, 1999 (the "Agreement"), among OHSL, Oak Hills Savings and Loan Company, FA, Provident Financial Group, Inc. ("PFGI"), and The Provident Bank.

The Agreement provides for the merger (the "Merger") of OHSL with and into PFGI, pursuant to which, among other things, at the Effective Time (as defined in the Agreement), each outstanding share of OHSL Common Shares will be exchanged for the right to receive a certain number of shares (the "Exchange Ratio") of the common stock, without par value, of PFGI ("PFGI Common Shares") equal to $22.50, subject to adjustment, as set forth in Section 1.6 (a) of the Agreement. The terms and conditions of the Merger are more fully set forth in the Agreement.

McDonald Investments Inc., as part of its investment banking business, is customarily engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements and valuations for estate, corporate and other purposes.

Board of Directors
September 3, 1999
Page 2

We have acted as OHSL's financial advisor in connection with, and have participated in certain negotiations leading to, the Agreement.  In connection with rendering our opinion set forth herein, we have among other things:

(i)     Reviewed OHSL's Annual Reports to Shareholders and Annual Reports on Form 10-K for each of the years ended December 31, 1998, December 31, 1997 and December 31, 1996, including the audited financial statements contained therein, and OHSL's Quarterly Reports on Form 10-Q for the quarters ended March 31, 1999 and June 30, 1999;

(ii)    Reviewed PFGI's Annual Reports to Shareholders and Annual Reports on Form 10-K for each of the years ended December 31, 1998, December 31, 1997 and December 31, 1996, including the audited financial statements contained therein, and PFGI's Quarterly Reports on Form 10-Q for the quarters ended March 31, 1999 and June 30, 1999;

(iii)   Reviewed certain other public and non-public information, primarily financial in nature, relating to the respective businesses, earnings, assets and prospects of OHSL and PFGI provided to us or publicly available;

(iv)    Participated in meetings and telephone conferences with members of senior management of OHSL and PFGI concerning the financial condition, business, assets, financial forecasts and prospects of the respective companies, as well as other matters we believed relevant to our inquiry;

(v)     Reviewed certain stock market information for OHSL Common Shares and PFGI Common Shares, and compared it with similar information for certain companies, the securities of which are publicly traded;

(vi)    Compared the results of operations and financial condition of OHSL and PFGI with that of certain companies, which we deemed to be relevant for purposes of this opinion;

(vii)   Reviewed the financial terms, to the extent publicly available, of certain acquisition transactions, which we deemed to be relevant for purposes of this opinion;

(viii)  Reviewed the Agreement dated August 3, 1999 and certain related documents; and

Board of Directors
September 3, 1999
Page 3

(ix) Performed such other reviews and analyses as we have deemed appropriate.

In our review and analysis and in arriving at our opinion, we have assumed and relied upon the accuracy and completeness of all of the financial and other information reviewed by us and have relied upon the accuracy and completeness of the representations, warranties and covenants of OHSL and PFGI contained in the Agreement. We have not been engaged to undertake, and have not assumed any responsibility for, nor have we conducted, an independent investigation or verification of such matters. We have not been engaged to and we have not conducted a physical inspection of any of the assets, properties or facilities of either OHSL or PFGI, nor have we made or obtained or been furnished with any independent valuation or appraisal of any of such assets, properties or facilities or any of the liabilities of either OHSL or PFGI. With respect to financial forecasts used in our analysis, we have assumed that such forecasts have been reasonably prepared by management of OHSL and PFGI, as the case may be, on a basis reflecting the best currently available estimates and judgments of the management of OHSL and PFGI, as to the future performance of OHSL, PFGI, and OHSL and PFGI combined, as the case may be. We have not been engaged to and we have not assumed any responsibility for, nor have we conducted any independent investigation or verification of such matters, and we express no view as to such financial forecasts or the assumptions on which they are based. We have also assumed that all of the conditions to the consummation of the Merger, as set forth in the Agreement, including the tax-free treatment of the Merger to the holders of OHSL Common Shares, would be satisfied and that the Merger would be consummated on a timely basis in the manner contemplated by the Agreement.

We will receive a fee for our services as financial advisor to OHSL, a substantial portion of which is contingent upon closing of the Merger. We will also receive a fee for our services in rendering this opinion. In the past, we have also provided certain other investment banking services for PFGI and have received customary compensation for such services.

In the ordinary course of business, we may actively trade securities of OHSL and PFGI for our own account and for the accounts of customers and accordingly, we may at any time hold a long or short position in such securities.

This opinion is based on economic and market conditions and other circumstances existing on, and information made available as of, the date hereof. In addition, our opinion is, in any event, limited to the fairness, as of the date hereof, from a financial point of view, of the Exchange Ratio, to the holders of OHSL Common Shares, and does not address the underlying business decision by OHSL's Board of Directors to effect the Merger, does not compare or discuss the relative merits of any competing proposal or any

Board of Directors
September 3, 1999
Page 4

other terms of the Merger, and does not constitute a recommendation to any OHSL shareholder as to how such shareholder should vote with respect to the Merger.  This opinion does not represent an opinion as to what the value of OHSL Common Shares or PFGI Common Shares may be at the Effective Time of the Merger or as to the prospects of OHSL's business or PFGI's business.

This opinion is directed to the Board of Directors of OHSL and may not be reproduced, summarized, described or referred to or given to any other person without our prior written consent.  Notwithstanding the foregoing, this opinion may be included in the proxy statement to be mailed to the holders of OHSL Common Shares in connection with the Merger, provided that this opinion will be reproduced in such proxy statement in full, and any description of or reference to us or our actions, or any summary of the opinion in such proxy statement, will be in a form reasonably acceptable to us and our counsel.

Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the Exchange Ratio is fair to the holders of OHSL Common Shares from a financial point of view.

Very truly yours,

*McDonald Investments Inc.*

McDONALD INVESTMENTS INC.

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Walter W. Thiemann,<br>on behalf of himself and of<br>all others similarly situated, | : | Case No. C-1-00-793 |
| | : | Judge Sandra S. Beckwith |
| Plaintiff, | : | Magistrate Judge Hogan |
| vs. | : | **AFFIDAVIT OF** |
| OHSL Financial Corporation, et al. | : | **ERVIN SCHOENBLUM**<br>**IN SUPPORT OF** |
| | : | **PLAINTIFFS' MOTION**<br>**FOR SUMMARY**<br>**JUDGMENT AND** |
| | : | **OPPOSITION TO CROSS-**<br>**MOTION FOR SUMMARY**<br>**JUDGMENT BY**<br>**PROVIDENT** |
| | : | **FINANCIAL GROUP, INC.**<br>**("PROVIDENT")** |
| Defendants. | : | |

---

| | | |
|---|---|---|
| STATE OF NEW JERSEY | : | |
| | : | SS: |
| COUNTY OF PASSAIC | : | |

**ERVIN SCHOENBLUM, being duly sworn, deposes and states as**
**follows:**

1. I have been retained by plaintiffs as a testifying expert in the field of

    economic damages and have previously submitted my report on

    damages to the plaintiff class resulting from the Provident Financial



1

Corporation, Inc. ("Provident") acquisition (the Provident -- OHSL merger) of the Ohio Corporation, OHSL Financial Corporation, ("OHSL"). Along with the report were my qualifications (attached hereto as Exhibit A) as an expert witness as required by the Fed. R. Civ. Pro. in order to opine in matters such as at bar. Since that time, I have provided advice to the plaintiffs and their counsel in drafting the Consolidated Amended Complaint ("CAC") filed December 31, 2003, as well as other matters relating to economic damages and specifically how, if at all, the negative restatements of financial data as alleged in Pars. 82 to 95 and 120 – 121 of the CAC disclosed by Provident in 2003 affected the 1999 Provident – OHSL merger.

2. On January 20, 2004, I prepared an affidavit (attached hereto as Exhibit B) in support of Plaintiffs' Motion for Summary Judgment on liability issues under Sec. 11 of the 1933 Securities Act, 15 U.S.C. § 77K brought against Provident which alleged that the restatements were material facts to investors and caused the loss in value of Provident shares shortly thereafter, and would have done so when the merger was considered in 1999.

3. I make this affidavit in support of Plaintiffs' Opposition to Cross-Motion for Summary Judgment by Provident which alleged that had the disclosure in the two restatements been known prior to the OHSL shareholder vote on the merger, it would not have had a material impact

on either the price of Provident shares (symbol "PFGI") or on the

merger.  This affidavit is also submitted in Further Support of Plaintiffs'

Motion for Summary Judgment.

4. The rationale for Provident's argument is developed in an affidavit of

Tayfun Tuzun ("Tuzun"), who has worked for Provident for the past 10

1/2 years and has been Senior Vice President, Treasury for Provident

since 1998.  In his affidavit, Tuzun admitted that "I have been involved

in negotiating the auto loan securitization transactions that Provident

entered into during the 1990s."

5. Tuzun concluded in his affidavit that "My analysis is that, had the

financial impact of the First Restatement and Second Restatement been

disclosed in Provident's financial statements during 1999, and in the

combined proxy statement and registration statement for the Provident –

OHSL merger (the "Proxy Materials"), this would have had no material

impact either on the Provident stock price or on the OHSL merger."

6. Since Tuzun was instrumental in the transactions that subsequently

caused the damaging restatements to be required, this guilty person

clearly can not be considered to be an unbiased spokesperson on the

issue as to whether the merger would have occurred on the proposed

terms if the OHSL shareholders had been fully cognizant of Provident's

artificially inflated earnings and stock price.

7. Regarding the First Restatement, Tuzun argued that the Proxy Materials presented financial information only through June 30, 1999, whereas the restatements covered periods many years beyond that. He tried to claim that any information beyond June 30, 1999 was not available or relevant in the decision-making process as to the merger. Tuzun is highly mistaken, as will be demonstrated by what follows.

8. All nine auto lease securitization transactions were entered into between 1997 and 1999. Provident reported artificially inflated earnings from 1997 through several years beyond the merger date. Although OHSL was provided with earnings only through mid-1999, the impact of the nine auto lease securitization transactions was projected well beyond June 30, 1999 by Provident management in its financial budgets and plans. The projections incorporating artificially inflated earnings were provided to McDonald Investments, Inc. ("McDonald") and to the OHSL Board and were highly instrumental in causing the merger to be consummated.

9. The Proxy Materials/Registration Statement had numerous references to McDonald's reviewing Provident's forward-looking financial forecasts, prospects, projections, and performance. Three examples follow, with the emphasis (underlining) being added by me.

10. "In connection with its review and arriving at its opinion, McDonald relied upon the accuracy and completeness of the financial information

and other pertinent information provided by OHSL and Provident Financial to McDonald for purposes of rendering its opinion. McDonald did not assume any obligation to independently verify any of the provided information as being complete and accurate in all material respects. With regard to **financial forecasts** established and developed for OHSL and Provident Financial with the input of the respective managements, as well as **projections** of cost savings, revenue enhancements and operating synergies, McDonald assumed that these materials had been reasonably prepared on bases reflecting the best available estimates and judgments of OHSL and Provident Financial as to the **future performance** of the separate and combined entities and that the **projections** provided a reasonable basis upon which McDonald could formulate its opinion."

11. McDonald, in connection with rendering its opinion, "reviewed certain other public and non-public information, primarily financial in nature, relating to the respective businesses, earnings, assets and **prospects** of OHSL and Provident Financial provided to it or publicly available."

12. McDonald, in connection with rendering its opinion, "participated in meetings and telephone conferences with members of senior management of OSHL and Provident Financial concerning the financial condition, business, assets, **financial forecasts and prospects** of the

respective companies, as well as other matters McDonald believed relevant to its inquiry."

13. In addition to what McDonald indicated, the Proxy also stated that among the important factors that supported the OHSL Board's recommendation for the merger was "information concerning the business, earnings, operations, financial condition and **future prospects** of Provident Financial."

14. In paragraph 5 of my January 20, 2004 affidavit (Exhibit B), I showed that the First Restatement caused a 22.6% decrease in the stock price of PFGI. Since the nine auto leases securitization transactions were in place by 1999, had Provident presented the truth about the actual and projected earnings, PFGI's stock price at the time of the merger decision would also likely have decreased by 22.6%.

15. In the same affidavit, I showed that had Provident presented the truth about the actual and projected earnings, the impact of the Second Restatement was such that the PFGI stock price at the time of the merger decision would have been reduced by another 7.1%. The combined reduction would have been 29.7% in PFGI's stock price.

16. I wish to note that my affidavit presenting the above had been provided to Provident prior to issuing their Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment on Liability Issues Under Section 11 of the 1933 Act. Although Provident critiqued

statements in an affidavit by another of Plaintiffs' experts, my affidavit remained unchallenged.

17.  As a result of McDonald's efforts on the merger considerations, including its review of Provident's projected earnings and stock price, it issued a Fairness Opinion to the Board of OHSL, dated September 3, 1999, a copy of which was attached to the Proxy Materials/Registration Statement.  Had McDonald been fully aware of Provident's artificially inflated earnings and stock price, it likely would not have been able to issue a Fairness Opinion, in which case, the merger probably would not have occurred.  Even if McDonald had gone out on a limb and issued a Fairness Opinion, the OHSL shareholders would likely have rejected the merger.

18.  When the OHSL shareholders met to vote on the merger, the OHSL share price was $19.875 and PFGI's was $37.785.  According to the exchange ratio of 0.5625, the OHSL shareholders would have received $21.30 worth of PFGI shares for each OHSL share, or more than the then-current price of OHSL.  However, had the truth been known about the artificially inflated Provident earnings and stock price, and the OHSL shareholders realized that they were receiving 29.7% less than the $21.30, equivalent to $14.98 of PFGI stock per share of OHSL then valued at $19.875, they clearly would have rejected the merger.

19.  Even if the OHSL shareholders approved the merger, the merger

would likely have been abandoned because of the provision in the

Merger Agreement that if the average daily closing price of PFGI for

the ten trading days ending two days prior to closing fell below $36.60,

OHSL had the right to abandon the merger.  The average closing price

was $41.494 per share.  Absent the artificially inflated earnings and

stock price, the 29.7% reduction in the price per share would have

caused the average to be $29.167, well below the threshold for

abandonment of the merger.

20.  The Second Restatement reduced the artificially inflated earnings of

Provident by a total of $44.4 million for the years 1994 through 2002.

Tuzun stated in his affidavit that "This reduction in income, however,

was only a matter of timing, not an overall reduction of income.  As a

result of this change, it meant that although previously reported income

would be reduced by $44 million, Provident's future net income would

be <u>increased</u> by approximately the same amount.  The issue underlying

the Second Restatement was just the timing of certain income."

21.  Tuzun's ignoring the impact of the time value of money was` an

astonishing statement from a senior banking executive.  I am certain that

Provident shareholders would be highly displeased if Provident

provided me with $44.4 million over a nine year period, which I then

returned piecemeal over the subsequent several years, without paying

8

any interest. This is exactly analogous to Tuzun's downplaying the time value of Provident's earnings.

22. In his affidavit, Tuzun also stated that Provident's stock price increased steadily after the Second Restatement and he showed a chart to that effect through the end of 2003. He used this to indicate that the Second Restatement had either no impact or a positive one on the PFGI share price.

23. I believe that the price did not drop when the Second Restatement was made because by 2003, the nine years of artificially inflated earnings were already behind, and now the approximately $44.4 million of earnings will be reflected in future years.

24. As far as the PFGI stock price increasing subsequent to the Second Restatement through the end of 2003, the whole industry of regional banks has been increasing. In fact, among its competitors of Midwestern banks of similar market capitalization, the price increase in PFGI since just prior to the First Restatment, places Provident at or near the bottom of the list.

25. For the reasons stated heretofore in this affidavit, there is no question that the two restatements had a material impact on Provident's stock price and the merger with OHSL. I conclude that had the truth been known about Provident's artificially inflated earnings and stock price by McDonald, the OHSL Board, and the OHSL shareholders when the

merger was considered, the merger would not have occurred.  This renders the First and Second Restatements extremely material.

### FURTHER AFFIANT SAYETH NAUGHT

**ERVIN SCHOENBLUM**

Sworn to before me and subscribed in my presence this 5th day of March 2004.

Notary Public

Edward Azar
Notary Public of New Jersey
My Commission expires April 26, 2005

10