Exhibit A



### minutes of a special meeting
### of
### the BOARD OF DIRECTORS
### OF
### provident financial group, inc.

A Special Meeting of the Board of Directors of Provident Financial Group, Inc. was held in the Boardroom of the Company's Executive Offices on Sunday, February 23, 2003.

Present in person at the meeting were Robert Hoverson and Joseph Pedoto. Present at the meeting via conference call were Dr. Sidney Peerless, Jack Cook and Thomas Grote. Dr. Joseph Steger did not attend the meeting.

Also present in person at the meeting were Chris Carey, Jim Gertie, Jim Whitaker, Tony Stollings, Tayfun Tuzun, all of Provident, and Bill Wieners of Ernst & Young LLP. Also present at the meeting via conference call were Gary Kreider and Jim Burke of Keating, Muething & Klekamp, P.L.L., the Company's outside legal counsel.

Mr. Hoverson called the meeting to order at approximately 6:05 p.m. He appointed Mr. Whitaker to serve as Secretary of the meeting and directed him to record the proceedings of the meeting.

Mr. Hoverson announced the sole purpose of the meeting was to update the Directors in regards to the status of the auto lease transactions accounting matter.

He directed Mr. Whitaker to record in these minutes that he and Mr. Gertie had spoken by telephone to each of the Directors on Friday, February 21, 2003, during which the auto lease transaction accounting matter was brought to the attention of, and explained to, the Directors for the first time. Mr. Hoverson also directed Mr. Whitaker to record that he had also reported the matter to Chris Moore and Jay Regal of the Cleveland Federal Reserve Bank and Superintendent Scott O'Donnell and Mary Clark Conner of the Ohio Division of Financial Institutions on Friday, February 21, 2003, as a result of which he requested that their delivery of the Joint Examination Report to the Bank be delayed until after the accounting matter was concluded. He concluded his opening comments by reporting the delivery of the Joint Examination Report had been withheld by the examining authorities as a result of his request.

Thereupon, Mr. Hoverson commenced a report concerning the status of the auto lease transactions accounting matter. He began his report by describing how the accounting matter was first identified by the Bank's finance staff. He pointed out that the finance staff had contracted with an outside contractor for the development of a financial model that would account for eight auto lease transactions originated between 1997 and 1999 in the original principal amount of $1.8 billion. The new financial model was intended to replace the existing financial model that had been developed by the Bank in 1997 and had been used at all times since the first of the eight transactions was originated in 1997. The purpose and objective of the new financial model was to provide additional financial information that the existing financial model was incapable of providing.

PLAINTIFF'S
EXHIBIT NO. 92
FOR IDENTIFICATION
DATE

- 2 -

Results provided in connection with the testing and validation of the replacement financial model were analyzed and compared by the Bank's finance staff against financial information produced by the existing financial model. It was in this context that the Bank's finance staff determined that the existing financial model may not have been properly reporting the financial results of the eight auto leasing transactions to which it was being applied based upon the contractual terms of the transactions. The initial determination was that the existing financial model materially underreported expenses of the eight transactions as a result of which the net earnings of the Company were believed to have been materially overstated for each of the years 1997 through 2002.

The Bank's finance staff first reported the matter to Chris Carey at approximately 5:00 p.m. on Wednesday, February 19, 2003. The Bank's finance, accounting, internal auditing and risk management staffs were thereupon coordinated by Messrs. Hoverson, Carey and Gertie in a more detailed analysis of the matter beginning on ~~Thursday~~, February 20, 2003, and the Company's independent auditor's involvement and assistance was also initiated on ~~Thursday~~, February 20, 2003. Messrs. Whitaker and Kreider were informed of the matter on Friday afternoon and have been participating in regards to the matter continuously since that time.

Mr. Hoverson described the process as "fluid." Separate and apart from the financial model itself, the Bank's staffs and representatives of Ernst & Young have continuously been discussing the accounting methodology that was both applied and/or otherwise applicable to accounting of the eight transactions. At the same time, the Bank's staffs and representatives of Ernst & Young have continuously been calculating and auditing the revenues, expenses and other financial results of the auto lease transactions based upon their respective contractual terms.

Mr. Hoverson went on to report that the current belief of the working group is that the Company's net earnings may have been overstated during the 1997-2002 period by an aggregate amount of approximately $55 million pre-tax ($35 million after tax) and the future impact on the Company's earnings was anticipated to be ($.20) to ($.25) per share for 2003, 2004 and 2005 before taking into account any actions the Board might take to mitigate these results.

If the accounting methodology and calculation and auditing process results in the conclusion that these numbers are correct, Mr. Hoverson reported that earnings for 1997 through 2002 will need to be restated in order to address the overstatement. In addition, the earnings outlook for 2003 will need to be revised downward to reflect the anticipated future impact of the matter.

Finally, Mr. Hoverson addressed the timing of the public announcement of the prior years' restatement and revision to the earnings outlook for 2003. He stated it was management's preference, desire and intention to make a public announcement as soon as possible and indicated preliminary plans to do so on Wednesday morning, February 26, 2002. On the other hand, he stated no announcement would be made unless and until the conclusions were correct and signed off by Ernst & Young. He indicated no public announcement was required to be made until the Company's 10-K report for 2002 was filed with the SEC at the end of March. In this regard, Mr. Hoverson mentioned that the Company would be closely following the trading of the Company's stock for any indication of irregular or unexpected patterns. It may prove to be necessary to issue

- 3 -

a public announcement before everything is finalized if it is determined that trading patterns indicated the auto lease transactions accounting matter had been illegally leaked to sellers of the Company's stock.

At this juncture in the meeting, Chris Carey gave a report to the Directors that summarized his views on the matter, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆.

During the course of the meeting, the Directors asked numerous questions and follow-up questions including whether Ernst & Young had any hand in the development of the financial model in use since 1997, what are the pros and cons of waiting until Wednesday morning for a public announcement, what actions the Directors should be taking in regards to the matter and whether management believed any assistance from outside resources was needed or desirable from the standpoint of public relations.

Messrs. Cook and Grote decided the Audit Committee should commence its oversight of the matter and scheduled a first meeting for 4:00 p.m. tomorrow afternoon (Monday, February 24, 2003) on the basis that a public announcement might be issued as early as Tuesday morning if it was necessary to do so as a result of interim developments.

The meeting was adjourned by Mr. Hoverson at approximately 6:35 p.m.

Respectfully submitted,


James R. Whitaker,
Acting Secretary


1075551.2

PFGI 12067

**minutes of a special meeting
of
the audit committee
of
provident financial group, inc.**

A Special Meeting of the Audit Committee of the Board of Directors of Provident Financial Group, Inc. was held in the Founders Conference Room of the law offices of Keating, Muething & Klekamp, P.L.L. in Cincinnati, Ohio on Tuesday, February 25, 2003.

Present in person at the meeting were Jack Cook and Tom Grote. Present at the meeting via phone was Chairman, Joe Steger, who was out of town on fundraising business for the University of Cincinnati. Mr. Steger phoned into the meeting from Georgia.

Also present in person during the entirety of the meeting were Jim Whitaker, General Counsel, and Gary Kreider of Keating, Muething & Klekamp, P.L.L. Greg Dooley was also present in person at the beginning of the meeting.

Mr. Steger called the meeting to order at approximately 8:10 a.m. He appointed Mr. Whitaker to serve as Secretary of the meeting and directed him to record the proceedings of the meeting.

The Chairman then announced the purpose of the meeting was to commence the carrying out of the Audit Committee's oversight responsibilities into the auto lease transactions accounting matter and related issues concerning the adequacy of the Company's internal accounting and financial controls as well as the internal audit functions of the Company.

At this juncture in the meeting, the Chairman requested that Mr. Kreider advise the Audit Committee ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

In response to the Chairman's request, Mr. Kreider ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The agenda was briefly discussed by the members and was thereafter adopted by unanimous consensus. The Committee then requested that Mr. Dooley report to the Audit Committee concerning the auto lease transaction accounting matter.

**Report by Greg Dooley, Internal Auditor**

OFF B/S

Mr. Dooley began his report by summarizing developments that had occurred in regards to the accounting matter since Sunday afternoon. He stated the Company was not yet ready to go public with the matter. He indicated that the Company's internal auditing, finance, accounting and risk management staffs were continuing their review, analysis and auditing of the matter and were also continuing to work closely with representatives of the Company's independent

PFGI 12068

- 2 -



auditors, Ernst & Young, who were being led by Bill Wieners.

During Mr. Dooley's report, the Chairman expressed his opinion that another accounting firm should be engaged by the Audit Committee to review the matter and report to the Audit Committee concerning it. Both Messrs. Cook and Grote concurred with the Chairman.

Mr. Grote asked questions about the Company's financial models and whether the internal or outside auditors had reviewed the soundness of the financial models that the Company uses to account for revenues, expenses and earnings. Mr. Dooley indicated that his work papers indicated that the financial model used by the Company to account for the eight auto loan transactions was in the process of being updated by a replacement model, but the replacement model was, in fact, not coming along as quickly as Mr. Dooley believed was the case. Mr. Grote asked Mr. Dooley to look into this in more detail and report back to the Audit Committee regarding the status of updated models.

Mr. Cook asked Mr. Dooley to respond to two questions:

(1)    Whether, as a result of his involvement in the matter to date, he had made any determination or reached any personal opinion as to whether there was any misconduct or inappropriate action taken or not taken by any person or persons whether acting alone or in concert in regards to the financial model used for the accounting of the eight auto lease transactions.

To this question, Mr. Dooley answered it was his belief that there was no misconduct by anyone. The financial model was designed and developed internally. It's pretty clear now the model was flawed in important respects. He did not know whether Ernst & Young had ever looked at it, although Ernst & Young had audited the Company's financial statements for the years 1997-2001. In this regard, Mr. Dooley observed that Ernst & Young had not discovered the problems in the model since 1997, although it had been the Company's independent auditors at all times. He pointed out that there was a "revolving door" of Ernst & Young accountants coming in and out of the Company. He believed the lack of continuity may have been a factor as to why the accounting errors had not been discovered sooner.

(2)    Mr. Cook's second question was whether the Company's senior management had effectively dealt with, and was effectively dealing with, the auto lease transactions accounting matter at all times since it has surfaced about a week ago.

To this question, Mr. Dooley answered that the Company's working group, which has included the Company's senior management in the executive, finance, accounting, auditing, risk management and legal areas, was putting in a herculean and totally conscientious effort. However, the question remains why it took until February 2003 to discover a flaw in a financial reporting model that was designed and developed in 1997 and used at all times since then.

Mr. Dooley's report to the Audit Committee ended at approximately 9:20 a.m. and he was excused by the Chairman at that time.

Report by Messrs. Bob Hoverson, Chris Carey and Jim Gertie

PFGI 12069

- 3 -

Thereupon, Messrs. Hoverson, Carey and Gertie joined the meeting and were asked by the Chairman to report on the status of the accounting matter.

Mr. Hoverson started off by bringing the Audit Committee up to date concerning developments since the meeting of the Board held at 6:00 p.m. Sunday evening. He stated the accounting methodology being used to calculate and analyze the accounting issues was pretty well determined by Bill Huskins of Ernst & Young on Sunday afternoon. Tom Grote asked whether or not the accounting methodology was determined on the basis of what the final result would be. Mr. Hoverson answered in the negative and pointed out it is not clear yet what the final results will be.

Mr. Carey pointed out the financial model had been reviewed by the Company's finance staff, but the review had not detected the flaws embedded in it. In reply to Mr. Grote's question, Mr. Carey answered he does not know now whether Ernst & Young has ever tested or validated the financial model.

Mr. Gertie reported the size of the problem now appears to be in the area of $130 million. The calculations and accounting analysis are focusing on how much of the $130 million looks backwards and how much looks forwards. He described the calculations as "not yet settled" and "shifting." For example, he mentioned one version of the calculations would "push" the entire amount into the future. He described this as "nonsensical."

At this juncture in the meeting, Mr. Hoverson mentioned the resolution of the matter was now being analyzed on the basis of a change in the Company's accounting methodology. If there was a change in accounting methodology, the Company would report a one-time charge to earnings in 2002 and restatements of earnings in prior years would not occur. Messrs. Hoverson and Carey described to the Audit Committee the circumstances under which accounting changes occur in general and emphasized Ernst & Young's participation and approval by the SEC were required. Mr. Hoverson described the "practical issues" associated with an accounting change resolution as being timing, public communication and the Company's "4(m) agreement" with the FRB relating to its status as "financial holding company."

(At this juncture in the meeting which occurred at approximately 10:00 a.m., Dr. Steger was unable to continue his participation in the meeting. He indicated he would resume his participation as soon as possible. The meeting proceeded without Dr. Steger.)

Mr. Hoverson continued in regards to the possible change in accounting that we are still "dynamic" enough that we are not ready to settle yet as to how to proceed.

Mr. Cook suggested that the Audit Committee revisit this and suggested Friday as a meeting date for the Audit Committee to be updated by management.

Mr. Grote then raised the Audit Committee's desire, from the governance point of view, for a third party to review the accounting methodology as well as the calculations. Mr. Hoverson responded by stating the Company needs to arrive at a conclusion before a third party review could occur. He concurred with Mr. Cook's suggestion of another meeting on Friday.

PFGI 12070

- 4 -

Mr. Cook asked the management group for a recommendation as to what accounting firm the Audit Committee might engage for the third party review. Mr. Carey disclosed that his daughter works for Deloitte & Touche in Boston and that his son has been paid a signing bonus by KPMG in the financial institutions practice area. Mr. Hoverson indicated the management group would work on getting a recommendation to the Audit Committee for the third party review. Mr. Gertie mentioned he had a good contact at PWC.

Mr. Carey stated it was his goal to finalize all of the accounting methodology issues by tomorrow evening, i.e, Wednesday, and to complete all of the accounting calculations by Friday. Mr. Hoverson stated mitigation strategies were being considered by the Company to mitigate the financial consequences of the final results in the future. He indicated the Company also needs time to identify and analyze the financial consequences of possible mitigation strategies.

On the basis of the foregoing, although Dr. Steger will not be returning to Cincinnati until Monday, March 3, 2002, Messrs. Cook and Grote decided it was important, under the circumstances, that the Audit Committee reconvene on Thursday or Friday afternoon and left it to Mr. Whitaker to set the date based on subsequent developments.

The report of Messrs. Hoverson, Carey and Gertie ended at approximately 11:10 a.m. and they were excused from the meeting at that time.

Report by William Wieners of Ernst & Young

Bill Wieners was requested to join the meeting and did so at approximately 11:20 a.m. Mr. Steger rejoined the meeting via phone just as Mr. Wieners was starting with his report.

Dr. Steger asked Mr. Wieners to report from his viewpoint where we are today in regards to the auto lease transactions accounting matters and Mr. Wieners did so.

He identified how the problem was identified and what actions have been taken since the problem had been identified. He addressed the significance of the assumption made in the Bank's accounting of the transaction that the "early buyout option" would be exercised.

Mr. Wieners indicated there were two phases to the problem. First, the determination of whether there will be restatements at December 31, 2002 and for prior years. He stated that looking at the problem from a restatement standpoint, there may not be one. Second, the determination of looking forward. In this regard he stated there may be a problem because "the economy has gone south." This could prove to result in a situation where early gains in the transactions were followed by later losses. Mr. Wieners reported he and his team were "looking at the future."

Mr. Cook asked Mr. Wieners how would a change in accounting methodology work and Mr. Wiener's answered the question pointing out that the change would be prospectively only and that there would be a "cumulative effect adjustment" or charge to earnings for 2002. He went on to state that there was no basis, in his opinion, for a change in how the auto lease transactions were accounted for, but indicated he was still pursuing some things.

- 5 -

Mr. Grote urged a prompt resolution of the situation and Mr. Wieners responded that was certainly everyone's goal, but the work had to be done correctly.

In response to Mr. Cook's questions, Mr. Wieners reported his opinion that nothing he had seen or heard indicated there was any deliberate management culpability in regards to this situation or that there was any intent to inflate earnings.

Mr. Wieners was excused from the meeting when his reported ended at approximately 12:05 p.m.

Report by Tayfun Tuzun, Senior Vice President – Treasury Services

Tayfun Tuzun was thereupon asked to join the meeting and did so at approximately 12:10 p.m. Mr. Tuzun was asked how these transactions started and what was Ernst & Young's involvement with them. Mr. Tuzun answered that he was informed in 1996 that the Bank was facing an alternative minimum tax position and Ernst & Young was consulted as to how the Bank should address it. E&Y referred the Bank to investment bankers for a possible solution that involved a strategy of transferring tax benefits. E&Y was also involved in making sure that the tax benefits had been effectively transferred for each of the transactions and that it was proper for all of the transactions not to be carried on the Bank's balance sheet.

Mr. Tuzun pointed out that the investment banker who had structured Provident's auto lease transactions, Mike Baker, had died last week as a result of cancer.

Mr. Tuzun stated that it was his personal understanding that E&Y was not involved in the original development of the earnings model. He believes it had been developed and designed "in house."

Finally, Mr. Tuzun was asked if there were opportunities to mitigate future results of the problem. He indicated he believed there were mitigation strategies available to the Bank and identified two – negotiations within each deal and extending the deals beyond their EBO dates.

Mr. Tuzun was excused from the meeting at approximately 12:25 p.m.

After a brief recap by the members and brief comments by Mr. Kreider, the meeting was adjourned at approximately 12:40 p.m. on the basis that Mr. Whitaker would set up a subsequent meeting at 2:00 in the afternoon on either Thursday or Friday based upon subsequent developments.

Respectfully submitted,


James R. Whitaker,
Acting Secretary

1075472.2

PFGI 12072

**minutes of a special meeting**
**of**
**the audit committee**
**of**
**provident financial group, inc.**

A Special Meeting of the Audit Committee of the Board of Directors of Provident Financial Group, Inc. was held in the Founders Conference Room of the law offices of Keating, Muething & Klekamp, P.L.L. in Cincinnati, Ohio on Friday, February 28, 2003.

Present in person at the meeting were Jack Cook and Tom Grote. Present at the meeting via phone was Chairman, Joe Steger, who was out of town on fundraising business for the University of Cincinnati. Mr. Steger phoned into the meeting from Georgia.

Also present in person during the entirety of the meeting were Jim Whitaker and Gary Kreider.

Bob Hoverson and Chris Carey were also present in person at the beginning of the meeting and Jim Gertie joined the meeting in progress at approximately 2:15 p.m.

Mr. Steger called the meeting to order at approximately 2:05 p.m. and stated the sole purpose of the meeting was the continuing oversight of the Audit Committee into the financial and accounting issues related to the auto lease transactions accounting matter. He appointed Mr. Whitaker to serve as Secretary of the meeting and directed him to record the proceedings of the meeting.

At that time, the Chairman asked Mr. Kreider ███████████████████████████████ ████████████████████████████████████████████████████████████████████ The Chairman then stated the meeting would proceed on the basis of the agenda as presented with allowance for changes as the members may decide and requested Mr. Whitaker to attach the agenda to the minutes of the meeting.

The Chairman then requested Mr. Hoverson to report to the Audit Committee concerning developments in regards to the auto lease transactions accounting matter since the Committee's initial meeting concerning the matter on Tuesday morning, three days ago.

Mr. Hoverson began by distributing to all present the document entitled "Auto Sale Leaseback Review of Accounting Methods," a copy of which is attached to these minutes. He stated that Ernst & Young's initial advice to the Company had been that strict operating lease accounting pursuant to FAS 13 should have been used in regards to the accounting for the auto lease transactions as a result of which income would have been recognized based on rent receipts and rent expenses being straight-lined over the eight-year term of each transaction. The current results of the application of this methodology are represented as method "1" in the attached schedule.

Ernst & Young then considered a revision of this methodology as a result of which income would have been recognized based on scheduled rent receipts in accordance with the

PFGI 12073

- 2 -

contract documents and rent expenses being straight-lined over the eight-year term of each transaction. The current results of the application of this methodology are represented as method "2" on the attached schedule.

Two days ago, Ernst & Young began advising the Company there might be a preferable accounting methodology known as the "units method" to apply to these transactions as a result of which income would have been recognized based on scheduled rent receipts and expenses would be "unit" booked. Chris Carey stated that the "units method" is not well known in the accounting literature and that he has been researching the "units method" to determine the applicability of its use. The current results of the application of the "units method" are represented as method "3" on the attached schedule. Mr. Carey pointed out that E&Y believes the units method better matches revenues and expenses than the cash basis methods represented as "1" and "2."

Mr. Carey further indicated that Ernst & Young is bringing in additional experts this weekend to further study and valuate the accounting methodology.

If the final determination of Ernst & Young is that (1) the "units method" is the preferable accounting method and (2) the original accounting of the auto lease transactions as off-balance sheet operating leases was correct, the Company will pursue an accounting change with Ernst & Young and the SEC. In this case, a review by another accounting firm may not be necessary.

On the other hand, there will be an earnings restatement if E&Y determines that the auto lease transactions should have been accounted for as on-balance sheet financing leases even if the "units method" is preferable.

Mr. Hoverson stated that PriceWaterhouseCoopers cannot do anything, however, until Ernst & Young announces its final position.

Messrs. Cook and Grote expressed their believe that it would be valuable to bring in PWC to answer whether the units method is a reasonable accounting methodology.

Mr. Hoverson added that E&Y's national office is "solidly" on the "units method" but he does not know yet why they are now taking this position.

Mr. Grote asked Mr. Hoverson for management's position on the accounting change/one time charge vs. operating results restatement. Mr. Hoverson answered that E&Y must state its position first. Mr. Grote followed-up by asking what the timeline is now expected to be. He asked if E&Y would have a final answer by next Monday (March 3) and whether it was possible that PWC could be finished with a review by the next Friday (March 7).

Mr. Hoverson stated the Company would be preparing a presentation for the bank examiners covering the status of the auto lease transactions accounting matter and would also be preparing a draft of the preferability letter.

The discussion then turned to what PWC's engagement should be: is the units method acceptable and is it preferred and if so, is this an accounting change or a restatement of operating results. Everyone agreed with Mr. Cook's observation that the Audit Committee could always

- 3 -

ask PWC to do more.

Mr. Grote persisted that he was trying to get an agreement as to how the Audit Committee was going to proceed.

Mr. Steger mentioned he was more concerned about PWC's engagement than he was about the timing of Ernst & Young's final position.

With respect to the timing issue, Mr. Hoverson stated next Friday (March 7) was a "drop dead" date concerning the "4(m) agreement." He reported he was considering that PFGI would relinquish its "financial holding company" status. He expects to discuss this subject with the bank examiners during the status report meeting on Monday (March 3).

Mr. Carey pointed out with respect to the possibility of an accounting charge that we would not go to the SEC until there was conformity between E&Y and PWC. If there was not conformity between the two accounting firms, we would have to address our course of action at that time.

Mr. Grote asked in regards to the accounting change scenario when the Company would issue a press release in relation to the accounting change filing with the SEC. Mr. Hoverson answered it would be preferable to hold off until the filing occurred, but we will be prepared to announce when we decide it is otherwise necessary under the circumstances for us to do so.

At this juncture in the meeting, Mr. Kreider advised ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

Upon motion duly made by Mr. Cook and seconded by Mr. Grote, the following motion was unanimously adopted by the Audit Committee:

> BE IT RESOLVED, that this Audit Committee engage the accounting firm of PriceWaterhouseCoopers to assist it in connection with its oversight of the auto lease transactions accounting matter pursuant to the terms and conditions of an engagement letter and such other arrangements as may be determined by this Audit Committee to be acceptable to it."

Next, Mr. Grote announced he would like the authorization of members to speak with Bill Wieners and inform him the Audit Committee expects a final position from Ernst & Young by 9:00 a.m. on Monday morning. Messrs. Steger and Cook authorized Mr. Grote to do so.

The Audit Committee then set its next meeting for 9:00 a.m. on Monday, March 3.

Mr. Hoverson then stated for the record that he had spoken with each of the members of the Audit Committee yesterday for the purpose of updating them in regards to the status of the accounting matter. Mr. Steger thereupon directed Mr. Whitaker to reflect that Mr. Hoverson's conversations with the members of the Audit Committee be included in the minutes of this meeting.

PFGI 12075

- 4 -

At this point in the meeting, the members decided to ask Bill Wieners for an update of the matter from E&Y's standpoint. Mr. Grote stated that he intended to request that E&Y reach a final decision on the accounting issues by 9:00 a.m. on Monday morning.

Messrs. Hoverson, Carey and Gertic were excused from the meeting at about 3:35 p.m. and the Committee adjourned for a short break while Bill Wieners was being asked to join the meeting.

Mr. Wieners joined the meeting to update the Audit Committee from the meeting held earlier this week on Tuesday morning.

Mr. Wieners described the accounting methods being used to address the auto lease transactions accounting matter and pointed out that E&Y is now looking at a different methodology – the "units method" – which he also described as a "declining balance" approach. He reported Ernst & Young's national office now believes the "units method" is the preferable method.

Mr. Wieners then address the available options as follows:

First option    —    Apply to the SEC for an "accounting change." If approved, there would be a cumulative catch-up adjustment or charge at the 4th quarter of 2002 of approximately $50 million after taxes.

Second option —    Apply to the SEC for an "accounting change." The SEC could respond that the accounting change is approved, but the Company still must restate operating results.

Mr. Wieners stated E&Y would need Provident's permission to apply to the SEC for the accounting change. In response to a question, he further stated the one-time charge would result in a $50 million reduction in Provident's equity.

He observed that his involvement in the matter had concluded this is "unique." It was his opinion that accounting errors were "not intentional." This is a case of "mistakes."

Jack Cook asked where E&Y was on the audit. Bill Wieners answered that the last audit task was to calculate the number of future units in the transactions using a supportable methodology. He further indicated that Provident had already completed its calculations.

From the broader perspective as to where E&Y is, Mr. Wieners reported experts from Ernst & Young's national office would be coming in over the weekend for the purpose of determining whether the auto lease transactions were entitled to operating lease accounting or were financing leases.

Tom Grote jointed in and asserted that he felt strongly that it was the Audit Committee's fiduciary and governance responsibility to be advised as soon as possible: (1) whether the "units methods" is a preferable and acceptable accounting method for the resolution of this matter and (2) whether this is an accounting change or a restatement. Mr. Grote further asserted that the

- 5 -

Audit Committee wanted Ernst & Young's final opinion before management meets with the bank examiners on Monday. He stated it was critical, in his opinion, that the Audit Committee maintains its independence.

Bill Wieners stated he had no problem with writing a letter to be delivered to the Audit Committee on Monday morning and further stated he would speak with Jim Whitaker about E&Y's letter over the weekend.

Jack Cook observed that it was his belief Ernst & Young was getting closer to a final position and Mr. Wieners stated that he agreed. He further stated there was no question in his mind: "This is an accounting change." The only question is whether the accounting change will result in a one-time charge or a restatement of earnings.

Having concluded his report, Mr. Wieners was excused by the Audit Committee at approximately 4:20 p.m.

The meeting continued for a short time thereafter. During the continuation, the members discussed when and under what circumstances should the Audit Committee inform Bill Wieners (i.e., Ernst & Young) about its decision to engage PriceWaterhouseCoopers for its review. The members requested that Messrs. Whitaker and Kreider be prepared to advise ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓ the Audit Committee now scheduled for 9:00 a.m. on Monday, March 3.

The Chairman adjourned the meeting at approximately 4:30 p.m.

Respectfully submitted,


James R. Whitaker,
Acting Secretary


1077782.2

**minutes of a special meeting**
**of**
**the BOARD OF DIRECTORS**
**of**
**provident financial group, inc.**

A Special Meeting of the Board of Directors of Provident Financial Group, Inc. was held in the Founders Conference Room of the law offices of Keating, Muething & Klekamp, P.L.L. in Cincinnati, Ohio on Monday, March 3, 2003.

All of the directors were present in person at the meeting. Also present in person at the meeting were Chris Carey, Tony Stollings and Jim Whitaker, all of Provident, and Gary Kreider, of Keating, Muething & Klekamp, P.L.L., legal counsel to the Company.

Mr. Hoverson called the meeting to order at 9:00 a.m. He appointed Mr. Whitaker to serve as Secretary of the meeting and directed him to record the proceedings of the meeting.

Mr. Hoverson stated the purpose of the meeting was to provide the Directors with a report concerning the present status of the auto lease transactions accounting matter. He also stated that the Special Meeting was in lieu of the Special Meeting the Audit Committee had set last Friday afternoon for this same date and time.

Mr. Hoverson opened his report by stating the matter is not yet finalized and that Ernst & Young is still working and has, therefore, not finalized its position.

Whereupon, Chris Carey distributed a presentation, a copy of which is attached to these minutes, and commenced to review and explain each page. He pointed out that this presentation (or a revision thereof) would be used to report the status of the accounting matter to the Bank's examiners in a meeting scheduled for 3:30 that afternoon.

Mr. Carey reported that a leasing expert from Ernst & Young was in the Company's offices over the weekend and had reviewed the accounting of the auto lease transactions. Mr. Hoverson explained the intent of the original model was to level out the mismatch of revenues and expenses caused by the deal terms. Mr. Carey described this as an accounting error. As a result, the restatement/accounting change issue was determined by Ernst & Young on Saturday afternoon to require a restatement.

In addition, Rick Jones, national director of accounting for Ernst & Young, informed Mr. Carey on Saturday that E&Y now believes all nine of the auto lease transactions (the number increased from eight to nine because one of the eight is now regarded as consisting of two transactions) should have been recorded on the balance sheets as finance leases.

If these transactions are accounted for on the balance sheets, the result will be different than if they are accounted for off balance sheet. The difference is described on the "Current Status" page of the attachment.

Mr. Pedoto asked which result would be better for the Company. Mr. Carey answered off

PFGI 12078

- 2 -

balance sheet treatment would be better because this is a credibility issue. He predicted Ernst & Young's review would confirm its long-standing advice to the Company and that the end result will be off balance sheet treatment.

Mr. Carey also pointed out that a new accounting pronouncement has been issued as a result of which he has concluded some (but not all) of the auto lease transactions will be required to come back on the balance sheet in the third quarter of 2003. He emphasized this accounting pronouncement affects just the Company's auto lease transactions.

Mr. Cook asked what the prospective effect of the restatement/on balance sheet treatment will be. Mr. Carey estimated ($.20) per share in 2003 and then less beginning in 2004 and until the transactions mature at full term.

The difference in the financial results of the off-balance sheet vs. on-balance sheet treatment were the discussed by reference to the "Current Status" page of the attachment.

Mr. Carey reported that it will be Ernst & Young who will determine the treatment that will be used. He also pointed out that Ernst & Young's national office was closely involved in the original structuring of all of the transactions as qualifying for off-balance sheet treatment.

Mr. Hoverson then stated that one issue to be discussed with the bank examiners this afternoon will be the "4(m) agreement" and PFGI's "financial holding company" status. He reviewed for the Board the courses of action available to the examiners as a result of the fact the examination report has not yet been issued. He informed the Board he would probably relinquish the "financial holding company" status if the examination report is not issued by Friday, when the current, informal extension of the "4(m) agreement" expires. He concluded his discussion on this point by observing the Company has no "financial holding company" activities.

As regards timing, Mr. Hoverson stated he would like to announce the restatement tomorrow (Tuesday, March 4), but realizes that is not likely because Ernst & Young is not likely to be completed with its work by that time.

Next, Mr. Hoverson pointed out that a complicating factor for the regulators could be the recently announced hacking incident into the computers of Data Processing International and the Congressional investigation concerning the hacking incident. Mr. Hoverson stated the Bank is DPI's sponsor into VISA and MasterCard.

Mr. Pedoto asked Mr. Kreider about



Mr. Kreider answered

- 3 -



Jack Cook stated the Board should continue meeting regarding the status and developments of the auto lease transaction accounting matter.

Tom Grote asked whether Jim Whitaker could phone the Directors depending on what happens with the examiners this afternoon and Messrs. Hoverson and Whitaker answered in the affirmative.

Finally, in response to Mr. Pedoto's earlier questions, Mr. Kreider

At approximately 10:05 a.m., Messrs. Hoverson, Carey and Stollings were excused and the other Directors briefly recessed.

\* \* \* \* \* \* \* \*

The Directors (excluding Mr. Hoverson) reconvened the meeting at approximately 10:10 a.m.

Questions were then raised as to how the Board of Directors should proceed.

The following decisions were made by consensus of the Directors:

(1)   The Audit Committee will continue its work concerning the auto lease transactions accounting matter.  Dr. Steger asked Mr. Kreider

(2)   Mr. Whitaker will report to the Board concerning officers and directors insurance and the limits thereof.

(3)   Jim Burke

(4)   Mr. Whitaker will arrange for a meeting between the Audit Committee and representatives of PriceWaterhouseCoopers.  Mr. Grote pointed out the Audit Committee has a regularly scheduled meeting for next Monday, March 10.

Finally, Mr. Cook asked Mr. Whitaker if there was a draft of the press release announcing the restatement.  Mr. Whitaker answered that he and Messrs. Hoverson, Carey, Gertie and Kreider had prepared a working draft of the press release yesterday (Sunday, March 2) afternoon and evening and that he had the current version of the working draft with him.  Mr. Cook then requested that Mr. Whitaker distribute the working draft to the Directors and Mr. Whitaker did

- 4 -

so. A copy of the working draft that Mr. Whitaker furnished to the Directors is attached to these minutes. Thereupon, each of the Directors reviewed the working draft and asked Messrs. Kreider and Whitaker questions about it. Suggested language changes concerning the press release were furnished to Mr. Whitaker for his consideration.

All business before the Special Meeting have been concluded, the Special Meeting was adjourned at approximately 10:40 a.m.

Respectfully submitted,


James R. Whitaker,
Acting Secretary

1077879;2

# AUDIT COMMITTEE AGENDA

### February 24, 2003



1. Audit Committee, with Counsel – discuss responsibility and authority of the Audit Committee. See Audit Committee Charter, attached.

2. Separate meetings of Audit Committee and Counsel with:

   2.1   Internal auditor

   2.2   Management

   2.3   Ernst & Young

3. Audit Committee and Counsel:

   3.1   Steps to take

   3.2   Internal controls

   3.3   Reviews

   3.4   Briefing from counsel on Sarbanes §304

10735702.1

- Original
- replacement

PFGI 12083

## AUDIT COMMITTEE CHARTER
### PROVIDENT FINANCIAL GROUP, INC.

### Organization

This charter governs the operations of the Audit Committee. The Committee shall review and reassess the charter at least annually and obtain the approval of the Board of Directors. The Committee shall be appointed by the Board of Directors and shall be comprised of at least three directors, each of whom is independent of management and the company. Members of the Committee shall be considered independent if they have no relationship that may interfere with the exercise of their independence from management and the company. All Committee members shall be financially literate, (or shall become financially literate within a reasonable period of time after appointment to the Committee) and at least one member shall have accounting or related financial management expertise.

### Statement of Policy

The Audit Committee shall provide assistance to the Board of Directors in fulfilling their oversight responsibility to the shareholders, potential shareholders, the investment community, and others relating to the company's financial statements and the financial reporting process, the systems of internal accounting and financial controls, the internal audit function, the annual independent audit of the company's financial statements, and the legal compliance and ethics programs as established by management and the Board. In so doing, it is the responsibility of the Committee to maintain free and open communication between the Committee, independent auditors, the internal auditors and management of the company. In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention, with full access to all books, records, facilities, and personnel of the company and the power to retain outside counsel, or other experts for this purpose.

### Responsibilities and Processes

The primary responsibility of the Audit Committee is to oversee the company's financial reporting process on behalf of the Board and report the results of their activities to the Board. Management is responsible for preparing the company's financial statements, and the independent auditors are responsible for auditing those financial statements. The Committee in carrying out its responsibilities believes its policies and procedures should remain flexible, in order to best react to changing conditions and circumstances. The Committee should take the appropriate actions to set the overall corporate "tone" for quality financial reporting, sound business risk practices, and ethical behavior.

The following shall be the principal recurring processes of the Audit Committee in carrying out its oversight responsibilities. The processes are set forth as a guide, with the understanding that the Committee may supplement them as appropriate.

PFGI 12084

- The Committee shall have a clear understanding with management and the independent auditors that the independent auditors are ultimately accountable to the Board and the Audit Committee, as representatives of the company's shareholders. The Committee shall have the ultimate authority and responsibility to evaluate and, where appropriate, replace the independent auditors. The Committee shall discuss with the auditors their independence from management and the company and the matters included in the written disclosures required by the Independence Standards Board. Annually, the Committee shall review and recommend to the Board the selection of the company's independent auditors, subject to shareholders' approval.

- The Committee shall discuss with the internal auditors and the independent auditors the overall scope and plans for their respective audits including the adequacy of staffing and compensation. Also, the Committee shall discuss with management, the internal auditors, and the independent auditors the adequacy and effectiveness of the accounting and financial controls, including the company's system to monitor and manage business risk, and legal and ethical compliance programs. Further, the Committee shall meet separately with the internal auditors and the independent auditors, with and without management present, to discuss the results of their examinations.

- The Committee shall require the independent auditor's review of the company's quarterly financial statements prior to the filing of the 10-Q. The Committee will review items brought forward by the independent auditor.

- The Committee shall review with management and the independent auditors the financial statements to be included in the company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of Form 10-K), including their judgement about the quality, not just acceptability, of accounting principles. Also, the Committee shall discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards.

1019515.1

PFGI 12085

| | 2/21 | Received a call from J. Peters regarding |
| | | adv. line issue |
| | | — pulled cards with work equip. & *illegible* |
| | | *illegible* |
| | | *illegible* |
| | | *illegible* |
| F | 2/22 | *illegible* Byork looked model & understand what |
| | | we need. T. *illegible* find ledger. |
| Su | 2/23 | *illegible* |
| M | 24 | met with trust committee |
| T | 25 | |
| W | 26 | |
| Th | 27 | |
| F | 28 | |
| Sa | 3/1 | 2 HR |
| S | 3/2 | DAY OFF |
| M | 3/3 | |
| T | 3/4 | *illegible* deferred with *illegible* by *illegible* by *illegible* |
| W | 3/5 | press release |
| Th | 3/6 | |

PFGI 12086

- Debt factors + debt amort tables

97

Cash pmts recon to deferred income

- DM  No EBO date

- new model ⟶ to term of $ years

AE + F        INCOME        EXPENSE

                                    Sof

                ↓

forecast                              ↓

unknown                Known

- Resonableness of cash flow for the
  forecast compared to actual for the reasonableness of forecast
  - for ones with a way to go to term

• On Balance Sheet (Clean up Tony)
  - is there a ramp up of expense there?
  - note payable

PFGI 12087

28-1                              Inventor

95'88
1st Prot
12/9/02  indig Ad        End

98-1     B LR

PFGI 12088

DFT come back at end

PFGI 12089

Draft Committee comm

• Different understood

• Deal Structure — needs to be reviewed

  ✓ SPE

  ✓ OFF BALANCE SHEET

  ✓ SECURED FINANCING

  ? Funded by Debt with a stepup
    pmt

  EBO date set at a % per terms of
  agreement

• Originally recorded by a model 97
  - The model has been consistently booked
    by Actuary per original model

  - The model used estimated income & expense
    up to EBO date & smoothed the income
      - debt payment increase not factored
        in (unless prior to EBO date)

  - A new model was to be built as mgt
    recognized deficiencies. In 2001 we received a timber
    plan to prepare a new model

  ✱ - Missed by a refresh process due to
        lower lease yield & spread

PFGI 12090

mo

mgt

BH last Friday    JG    2/24    GD

will?  CC  last monday or Tuesday 2/14 or 2/15
JG
JT-TS                5/15
JF              week of 2/10

~ 10 total          Disclosure 9/30  50  IE
                              12/31  CF

- internally co-operating (for more)   12/31 50
                                       IEG

✓ ELG (Skin in game)
    - Actual costs lowers the effect of
      prior periods

Got outsider to review existing treatment
    Theory
                    Deal structure
                    EXPENSE not briefly impact
                    Income omitted due to Reflec. of losses
                    + refreshed.

old model in 7/01 wk papers
    - did not test old new model
      would have in

RISA on PCFS who formed?
    - This was not thought to be a risk

ELG turnover
ELG have schedules + sensitivities but

PFGI 12091

|      | Dec-02      |
|------|-------------|
| BF   | 42,545,726  |
| FS   | 92,932,485  |
| GS   | 100,642,987 |
| LS   | 226,563,462 |
| MS   | 145,254,078 |
| NS   | 106,589,345 |
|      | 714,528,063 |
|      |             |
| CB   | 61,529,745  |
| DB   | 28,169,458  |
| DM   | 12,220,129  |
|      | 101,919,332 |
|      |             |
| recs | 816,447,395 |
|      |             |
| OFA  | 816,447,393 |

PFGI 12092

Case 1:09-...-38730-SSB-TBM    Document ...-37    Filed 11/...-10...    Page 30 of 30

1998-2   you do see a step up in
aint payments & the net spread
goes to negative

PFGI 12093