Exhibit A

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**FILED**

TIME:

MAR 2 3 2004

JAMES BONINI, Clerk
COLUMBUS, OHIO

BARRY F. BOVEE, et al.,
                            Plaintiffs,


            v.                                    Case No. 2:97-CV-449
                                                  JUDGE EDMUND A. SARGUS, JR.
                                                  Magistrate Judge Mark R. Abel
COOPERS & LYBRAND, et al.,
                            Defendants.


## OPINION AND ORDER

This matter is before the Court on the Motion of Defendants Coopers and Lybrand and

Coopers and Lybrand, LLP [collectively referred to as "Coopers"] for Summary Judgment (Doc.

#151) and on the Motion of Defendants Roberts, Widders, Wilburn, and White for Summary

Judgment (Doc. #153).  For the reasons that follow, the motions are denied.


## I.

This is a class action under Fed. R. Civ. P. 23(b)(3) comprised of investors who

purchased stock in Mid-American Waste Systems, Inc. ["MAW"] between May 17, 1994 and

January 21, 1997.  (*See Bovee v. Coopers & Lybrand*, 216 F.R.D. 596 (S.D. Ohio 2003)).   Prior

to its filing for bankruptcy in January 1997, stock in MAW publicly traded on the New York

Stock Exchange.  The Defendants in this action are the former executive officers of MAW,

Christopher L. White, Dennis P. Wilburn, Richard A. Widders, Jr., and R. Jay Roberts, together

with Coopers, which performed auditing and accounting services for MAW.  In their Second

Amended Class Action Complaint, filed on June 27, 2002, Plaintiffs bring claims against all

Defendants for violations of Sections 10(b) of the Securities and Exchange Act of 1934, 15

U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Plaintiffs bring claims of negligence

and negligent misrepresentation against all Defendants.

On August 20, 2003, Defendant Coopers filed a Motion for Summary Judgment arguing

that the claims under § 10(b) are barred by the one year statute of limitations.  On August 26,

2003, the individual Defendants filed a Motion for Summary Judgment on the same grounds.

The Plaintiffs oppose the motions, arguing that genuine issues of material fact exist as to when

the Plaintiffs had notice of Defendants' alleged conduct to start the limitations period.  The Court

now considers the merits of Defendants' motions.

## II.

The procedure for considering whether summary judgment is appropriate, is found in

Fed. R. Civ. P. 56(c); this section provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v.*

*Kress & Co.*, 398 U.S. 144, 158-59 (1970).  Summary judgment will not lie if the dispute about a

material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate however, if the opposing party fails to make a showing

sufficient to establish the existence of an element essential to that party's case and on which that

2

party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also, Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

3

### III.

Plaintiffs in this case filed their complaint on April 22, 1997. Defendant Coopers argues that various public disclosures made more than one year prior to this time were sufficient to put the Plaintiffs on constructive notice of the fraud alleged in the complaint, *i.e.*, that Coopers' alleged misstatements in MAW's 1994 and 1995 10-K[1] and 1994 prospectus amounts to a "fraud on the market" in violation of § 10(b). In order to resolve the issue, the Court first outlines the nature of Plaintiffs' claims and the disclosures which Defendants contend were sufficient to give Plaintiffs notice of the alleged fraud.

### A. Plaintiffs' Allegations

#### 1. The 1994 Prospectus

Plaintiffs allege that the May 1994 prospectus overvalued MAW's assets by hundreds of millions of dollars and materially understated accruals for closure and post-closure landfill costs, thus overstating MAW's net income, retained earnings, shareholder equity and presented an inaccurate depiction of the prospects for MAW's landfill projects. (*Second Am. Complaint* at ¶¶ 66, 73-75, 82, 87-89, 94-103). The 1994 prospectus was used in part to obtain "junk bonds"[2] needed to finance MAW's operations. Plaintiffs allege that the prospectus inaccurately indicated that after the junk bond offering, MAW "will be solvent, will have sufficient capital to continue in its business, will be able to pay its debts as they mature, and will have sufficient cash

---

[1] A 10-K is an annual disclosure document that is filed with the SEC and is publicly available.

[2] "Junk bonds" are bonds rated below investment grade. The low rating is a result of the issuing entity possessing a greater than average credit risk. Thus, the bonds carry a high interest rate. *See e.g., Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 289 (5th Cir. 2000).

flow and assets for its business purposes, including the servicing of its debt." (*Id.* at ¶ 71).

Plaintiffs allege that the 1994 prospectus was false and misleading because it failed to reveal that MAW had not satisfied various environmental requirements in its landfill operations. (*Id.* at ¶¶ 69-72). In addition, with respect to the Campo landfill project, Plaintiffs allege that the statements made were "wholly inadequate and misleading, in that they fail to disclose many of the material risks associated with the development of that project" as well as the estimated costs of the project. (*Id.* at ¶¶ 87-88). With respect to the Jacksonville project, Plaintiffs allege that MAW failed to disclose the likelihood of an unfavorable outcome in litigation concerning the project. (*Id.* at ¶ 89). Plaintiffs further allege that MAW made false and misleading statements regarding its directors and officers by not disclosing that they were engaging in "commercial bribery" and "illegal campaign contributions." (*Id.* at ¶ 90).

Plaintiffs also allege that the 1994 prospectus falsely stated that MAW "agrees to maintain its adjusted consolidated net worth in an amount not less than $200 million." (*Id.* at ¶ 91). According to Plaintiffs, the prospectus "failed to disclose that there was no reasonable prospect for MAW to be able to comply with the Indenture provisions . . . with respect to the maintenance of net worth." (*Id.*). Plaintiffs also allege that the Coopers' audit report, contained in the prospectus, was "false and misleading in that [Coopers] did not conduct its audit in accordance with generally accepted auditing standards. . . ." (*Id.* at ¶ 93).

### 2. The 1994 Form 10-K

Plaintiffs allege that the 1994 Form 10-K filed on or about April 4, 1995 with the SEC, contained "many of the same financial statement misrepresentations and omissions" as contained

5

in the 1994 prospectus. (*Second Am. Complaint* at ¶ 105). According to Plaintiffs, the "financial

statement misrepresentations and omissions resulted, in large part" from the following:

> Under-amortization of acquisition and construction costs, resulting in the
> company's assets being materially overstated by hundreds of millions of dollars.

> Under-accrual of closure and post-closure costs, resulting in MAW's net income,
> retained earnings, and shareholders equity being overstated by tens of millions of
> dollars.

> Failure to write-off or write-down impaired assets including, without limitation,
> the Campo, Jacksonville, Cuyahoga, Valley, Fairfield, Local, Gallia, Daubs and
> RCC projects among others (MAW's investment in each of the aforementioned
> projects was impaired at December 31, 1993 and thereafter).

(*Id.* at ¶ 105).

Plaintiffs allege that the 10-K overstated asset values, under-accrued closure and post-

closure costs, and failed to write down landfill projects and other assets. (*Id.* at ¶¶ 107-08, 116-

17, 199-20, 123-25, 128-36). Plaintiffs also contend that the 10-K falsely stated that MAW

would have sufficient cash flow to meet its future financial obligations. (*Id.* at ¶ 126). Plaintiffs

state that they purchased MAW stock "in justifiable reliance upon the truth, accuracy and

completeness of the financial and other information and representations contained in the 1994

Form 10-K, including MAW's audited financial statements contained therein, which were

audited and opined upon by [Coopers]." (*Id.* at ¶ 106).


### 3. The 1995 Form 10-K

Plaintiffs allege that the 1995 Form 10-K, filed with the SEC on April 16, 1996, failed to

disclose "that many of the Company's older facilities were not built in compliance with the

Subtitle D regulations[3] for operating landfills" (*Id.* at ¶ 141) and, that a "significant amount of closure and post-closure costs [would be ] necessary to comply with Subtitle D Regulations. . . ." (*Id.* at ¶ 142). Plaintiffs further allege that the report failed to disclose that many of MAW's facilities were nearing capacity and did not have a sufficient captive waste stream to operate profitably. (*Id.* at ¶¶ 143-47). In addition, Plaintiffs claim that the report "materially overstated [MAW's assets] by several hundred million dollars as a consequence of the failure to use appropriate accounting estimates and to adequately amortize acquisition and development costs." (*Id.* at ¶ 148). With respect to Defendant Coopers, Plaintiffs allege that they "lacked sufficient competent evidential matter to conclude that MAW's financial statements present fairly . . . the consolidated financial condition of MAW and its subsidiaries as of December 31, 1994 and 1995, and the consolidated results of their operations and cash flows for each of the three years in the period end[ing] December 31, 1995." (*Id.* at ¶ 156).

Plaintiffs further allege that the 1995 Form 10-K materially misstated MAW's Consolidated Statement of Income because it did not "reflect write-offs relating to the Fairfield, Local and Gallia facilities in the approximate amount of $7 million" or the "write-downs of impaired assets in the cumulative amount of approximately $113 million relating to the Daubs, RCC-Berwind and Valley projects." (*Id.* at ¶ 158).

In short, Plaintiffs allege that the Defendants had actual knowledge of the misrepresentations and omissions contained in the Form 10-K.

---

[3]Subtitle D refers to the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6941-6949a. The regulations promulgated by the Environmental Protection Agency accompanying Subtitle D are found at 40 C.F.R. pt. 256 and 257.

**B. Defendants' Alleged Public Disclosures of Material Information about MAW**

Defendants contend that certain public disclosures made in 1994, 1995 and 1996 were sufficient to put the Plaintiffs on inquiry notice, more than one year prior to this action being filed, as to the fraud alleged. The Court outlines each alleged disclosure, in turn.

**1. 1994 Disclosures**

In May 1994, an Oppenheimer report characterized the disparity between actual and estimated costs for closing a landfill as "astounding." (Exhibit A attached to *Affidavit of Robert N. Webner*). The report cites MAW as one of the companies for which the disparity applies.

On June 2, 1994, the Wall Street Journal reported that MAW had many problems. The headline reads: "Mid-American Waste Finds Itself Down in the Dumps. Recent Glut of Disposal Sites has Firm trying to Haul away a Load of Debts." (*Exhibit B, Id.*). The article goes on to report that MAW "completed a $175 million sale of notes, due 2003, but only after increasing the interest rate on the notes to a junk-bond level of 12.25%. The proceeds will be used to repay other borrowings; the company had been in violation of certain covenants on some of those borrowings." (*Id.*). The article also reports that "some disposal businesses acquired by [MAW] at boom-time prices have been written down sharply" and large investments in other businesses are "tied up in litigation . . . ." (*Id.*). The article concludes, however, that the "company's operations remain profitable enough . . . so that over time debt will be reduced and [MAW] can start growing more aggressively again." (*Id.*).

In August 1994, MAW's second quarter Form 10-Q stated that MAW's estimates of closure and post-closure costs had increased from $8.462 million, as reported in the prospectus,

8

to $44 million.  (Exhibit C, *Id*.).

**2.  1995 Disclosures**

In a March 1, 1995 press release, MAW announced its fourth quarter income from

continuing operations of $2.1 million compared with $4.1 million in the fourth quarter of 1993.

(Exhibit D, *Id*.).  The public release also states that, for the three month period ending December

31, 1994, "total revenue decreased to $40.1 million from $43.9 million in 1993."  (*Id*.).  Landfill

revenue increased by 14% from the fourth quarter of 1993.  (*Id*.).  The press release states,

somewhat contradictorily, that landfill revenues "were adversely affected in the fourth quarter as

a result of actions taken by the Mayor of the City of Gary [Indiana] which effectively limited the

use of the landfill exclusively to the disposal of the City of Gary's trash collections operations."

(*Id*.).  Revenues from that landfill operation fell and MAW stated that it would pursue its rights

in state court against the City of Gary.  (*Id*.).  Nevertheless, MAW concluded that, overall, it

"continues to actively pursue various avenues to reduce its debt and capital expenditures through

strategic dispositions of certain assets or other alternatives."  (*Id*.).

On March 10, 1995, Prudential Securities issued a release stating that MAW's outlook

"remains uncertain" as its stock price had "dropped 30.4% since November 2, 1994."  (Exhibit E,

*Id*.).  The report predicted an earnings decline of 20% in 1995 and a continuation of litigation in

Jacksonville, Florida and Gary, Indiana.  In addition, the report states that MAW's debt load

remains high "with little potential for reduction."  (*Id*.).

MAW's 1994 Form 10-K, filed in April 1995, states that closure and post-closure

estimates would be increased to $51 million.  (Exhibit F, *Id*.).  MAW also reported on the status

9

of its litigation in Florida, California, Ohio and Indiana, noting that the United States Attorney's

Office in Indiana was investigating MAW's affairs. (*Id.*).

MAW's Form 10-Q[4], filed on May 15, 1995, stated that MAW "continues to actively

pursue various alternatives to reduce its notes payable and term obligations including strategic

dispositions of certain assets. . .to use any proceeds exceeding $5,000,000 from such sales to pay-

down its obligations under its unsecured bank credit agreement and Senior Notes agreements."

(Exhibit G, *Id.*).  Nevertheless, MAW concluded that its cash from operations, cash on hand and

proceeds from the sale of assets would suffice to finance its planned 1995 development projects

and capital expenditures of $18,300,000, to meet its 1995 operating cash requirements, and to

meet expected 1995 and 1996 debt service obligations. (*Id.*).

MAW's press release of August 2, 1995 stated that MAW had a second quarter net

income of $1,662,000.  Gross revenue rose 5.8% and earnings from operations increased 1.6%.

(Exhibit H, *Id.*).  With respect to the Campo landfill project, MAW reported an end to investment

in the project as it had been declared in default of its agreement with the Campo Band of Mission

Indians. (*Id.*).  MAW also reported the status of mediation in the Gary, Indiana case. (*Id.*).

MAW further reported that its landfill revenue for six months ending June 30, 1995 increased

13.4% compared to the 1994 six month period. (*Id.*).

On August 14, 1995, MAW filed a Form 10-Q , stating, *inter alia*, that the sale of assets

was on-going as a method of reducing debt. (Exhibit I, *Id.*).  In September 1995, Standard and

Poor's outlook on MAW was changed from "stable" to "negative." (Exhibit J, *Id.*).  The outlook

noted a "worse than expected financial performance year to date, principally as a result of legal

---

[4]A Form 10-Q is a quarterly disclosure document filed with the SEC and also publicly available.

10

and regulatory challenges to the operation of several important and costly landfill sites . . . combined with high capital expenditures, the loss of cash flow from those landfills . . . [and a] lost . . . option to expand its bank line by $40 million for the purpose of repaying senior debt . . . ." (*Id.*). According to Standard and Poor's, MAW needed to "negotiate favorable resolutions at unprofitable landfill sites to restore credit protection measures to levels adequate for the rating." (*Id.*). Standard and Poor's concluded that, "[a]bsent a meaningful improvement in financial performance or management actions to improve financial flexibility, ratings could be lowered." (*Id.*).

MAW's 1995 third quarter Form 10-Q disclosed a $7.7 million pre-tax loss on sales of collection operations and landfill development projects during 1995. (Exhibit K, *Id.*). In addition, MAW wrote off $12.5 million in the Jacksonville project due to an adverse ruling in litigation. (*Id.*). The report noted that landfill operations revenues increased 7.1% from a comparable time period in 1994. (*Id.*). In addition, MAW and the City of Gary, Indiana reached a settlement that would return operation of the landfill to MAW. (*Id.*). MAW reported that it would be able to "meet all of the financial covenants under its unsecured bank credit agreements and its Senior Notes agreements through the fourth quarter of 1996." (*Id.*). Without "certain improved financial operating results," however, MAW reported that it "may not be able to meet" certain financial covenants after the fourth quarter of 1996. (*Id.*). MAW further reported that it would "require additional sources of capital including the sale of additional debt or equity securities or the sale of assets in order to meet expected 1996 debt service requirements." (*Id.*).

11

### 3. 1996 Disclosures

In a press release dated February 2, 1996, MAW announced a sale of "substantially all of the operating assets of its Atlanta market for $52,000,000 in cash or registered common stock" with Republic Industries. (Exhibit L, *Id.*). MAW also announced the receipt of various waivers from bank lenders and its negotiation for waiver of defaults under certain existing agreements. (*Id.*). The release also stated that several operations "underperformed" in the fourth quarter. (*Id.*). The release also reported a continued cooperation with the United States Attorney's investigation in the Gary, Indiana landfill project. (*Id.*).

With respect to company outlook, MAW reported that it was continuing to evaluate the "carrying value of its landfills and related assets for impairment, as well as the adequacy of its accruals related to the closure and post-closure costs of both its operating and closed landfills." (*Id.*). MAW predicted that the result of such evaluation would "likely require significant additional charges for asset impairment, asset write-downs and additions to these accruals. . . . preliminary indications are that such charges will likely be significant and may exceed $200 million." (*Id.*). Finally, MAW disclosed its preliminary negotiations with various parties for the sale of "all or a part of the Company's operations [which] would likely result in minimal value to the existing shareholders of the Company." (*Id.*).

On February 6, 1996, MAW announced that Defendant Christopher White would take a leave of absence as President and CEO. (Exhibit M, *Id.*). White was replaced by Mr. Gene Meredith. (*Id.*).

On February 13, 1996, MAW issued a press release stating that previously negotiated waivers on notes had expired and MAW was in default. (Exhibit N, *Id.*). The same day,

12

Standard & Poor's lowered MAW's corporate credit rating to reflect "poor financial performance and strained financial resources due to loss of bank line availability following a covenant violation." (Exhibit O, *Id.*). Standard & Poor's noted that the sale of the Atlanta facility to Republic Industries could "be used to redeem senior debt, modestly lowering total debt to $310 million from $360 million. However, overall financial risk could remain very high . . . ." (*Id.*). On February 19, 1996, MAW's credit score was lowered again. (Exhibit P, *Id.*).

On March 1, 1996, an analyst report characterized MAW as being in a "difficult financial position as a result of its deteriorating financial picture and lack of liquidity." (Exhibit Q, *Id.*). On April 12, 1996, MAW issued a press release on the indictment of two of its former officers in Indiana, including Christopher White. In addition, MAW announced that the United States Securities and Exchange Commission had begun an investigation of the company. (Exhibit R, *Id.*). MAW's Form 10-K, filed on April 16, 1996, reflected the same information and described a bleak financial picture. MAW observed that if its lenders chose to accelerate the outstanding debt instruments, MAW would be unable to pay the obligations. (Exhibit S, *Id.*). According to MAW, its "viability as a going concern is dependent upon the restructuring of its obligations and asset base, and ultimately, a return to profitability." (*Id.*). MAW noted, however, that "[i]f present trends continue and the Company is unable to obtain relief or otherwise cure the events of default, the Company may be required to seek protection under federal bankruptcy laws." (*Id.*).

On May 17, 1994, the beginning of the class period, MAW's stock price closed at $6 1/8 per share. By the end of 1995, the value was $3 ½ per share. On April 17, 1996, the value was $1 ½ per share.

13

**IV.**

**A. Limitations Period**

Private securities fraud claims under § 10(b) of the Securities and Exchange Act are subject to the statutory limitation provision of § 9(e) of the Act, which states that such claims must be "brought within one year after discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e). In *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495 (6th Cir. 2003), the Sixth Circuit considered whether the word "discovery" as used in the statute extends to constructive discovery as well as to actual discovery of the alleged fraud.

In that case, as in the case at bar, a Plaintiff investor sued Fruit of the Loom, Inc., certain officers and directors and the accounting firm Ernst & Young, LLP, for violations of § 10(b) and Rule 10b-5. Plaintiff alleged that Fruit of the Loom, Inc., and certain of its directors and officers "intentionally overstated earnings on Fruit's financial statements for 1996 and the first two quarters fo 1997, and . . . made additional public statements about Fruit's performance and prospects that were intentionally false (including representations that the financial statements adhered to GAAP)." *Id.* at 498. Plaintiff also alleged that Defendant Ernst & Young "participated in the fraud by certifying the 1996 financial statements as consistent with GAAP, stating that it audited the statements in accordance with GAAS, and consenting to the use of its audit report in Fruit's offering documents." *Id.* Defendant Ernst & Young moved to dismiss the claims raised against it on several grounds, including that the claims were time-barred.

In considering the issue, the Sixth Circuit observed that § 9(e) refers only to "discovery" of fraud as the trigger to the limitations period. "That does not necessarily mean, however, that

14

§ 9(e) requires actual discovery of fraud before the limitations period will begin to run." *Id.* at 499. The Court held that "discovery" should be interpreted to mean "constructive or inquiry notice" as well as actual notice. Thus, "inquiry notice is sufficient to trigger the one-year limitations period for actions brought under § 10(b)." *Id.* at 500, citing *LC Capital Partners v. Frontier Insurance Group*, 318 F.3d 148, 154 (2nd Cir. 2003); *In re NAHC, Inc. Securities Litigation*, 306 F.3d 1314, 1324-25 (3rd Cir. 2002); *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002); *Theoharous v. Fong*, 256 F.3d 1219, 1228 (11th Cir. 2001); *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1196 (10th Cir. 1998); *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 670 (7th Cir. 1998, *cert. denied*, 525 U.S. 1114 (1999); *Howard v. Haddad*, 962 F.2d 328, 330 (4th Cir. 1992).

The Sixth Circuit next addressed when the limitations period begins to run under an "inquiry notice" standard. The Court adopted the majority view on the issue which is that "the limitation period begins to run only when a reasonably diligent investigation would have discovered the fraud." *Id.* at 501 (citations omitted). The Court reasoned that this view "reflects an appropriate balance between 'the staunch federal interest in requiring plaintiffs to bring suit promptly . . . and the equally strong interest in not driving plaintiffs to bring suit . . . before they are able, in the exercise of reasonable diligence, to discover the facts necessary to support their claims.'" *Id.*, quoting *Young*, 305 F.3d at 9. In accordance with this rule, "knowledge of suspicious facts – "storm warnings," they are frequently called – merely triggers a duty to investigate." *Id.* The § 9(e) limitations period "begins to run when a plaintiff should have discovered, by exercising reasonable diligence, the facts underlying the alleged fraud." *New England Health Care*, 336 F.3d at 501.

15

**B. Application**

The Defendants argue that the various disclosures made in 1994 through 1996, outlined in Section III, *supra*, were sufficient to place the Plaintiffs on inquiry notice as to the alleged fraud. In particular, Defendants contend that "storm warnings" began as early as May 1994 when the Oppenheimer Report disclosed that MAW's closure and post-closure costs would exceed previous estimates. Defendants further contend that the 1995 Form 10-K is replete with "storm warnings" as to MAW's asset values, default on covenants, criminal investigation and other cash flow problems.

The Plaintiffs argue that although certain negative information about MAW was made public from 1994 to 1996, the information was not sufficient to place a reasonable investor on notice of the probability of fraud. Plaintiffs further argue that the information would have in no way alerted Plaintiffs to the possibility of fraud on the part of Defendant Coopers. In addition, Plaintiffs contend that genuine issues of material fact on the notice issue preclude summary judgment.

The Court agrees with the Plaintiffs' position. In reviewing the various forms of public disclosures made in 1994, 1995 and early 1996, the Court concludes that, despite the many negative comments about MAW's financial wherewithal and corporate stability, reassuring statements were also made that could have negated the "storm warning" effect of the disclosures. In this regard, the Court notes that, contrary to Defendant Coopers' suggestion, it is not the "storm warning" that triggers the limitations period under § 9(e). As the Sixth Circuit explained in *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495 (6th Cir. 2003), "'storm warnings' as they are frequently called-- merely trigger[ ] a duty to

16

investigate, and the limitation period begins to run only when a reasonably diligent investigation would have discovered the fraud." *Id.* at 501 (citations omitted).

Given the nature of the various disclosures, the Court cannot conclude as a matter of law that the disclosures made in 1994 and 1995 and early 1996 amounted to "storm warnings" sufficient to trigger a duty to investigate the possibility of fraud on the part of Defendants. The disclosures in 1994 and 1995 presented a positive and negative analysis of MAW's financial health. The Court notes that, by February 13, 1996, the public disclosures took on a more negative tone. MAW's February 13, 1996 press release stated that the company was in default of various bank notes. (Exhibit N, *Id.*). The same day, Standard & Poor's lowered MAW's corporate credit rating to reflect "poor financial performance and strained financial resources due to loss of bank line availability following a covenant violation." (Exhibit O, *Id.*). On February 19, 1996, MAW's credit score was lowered again. (Exhibit P, *Id.*). On March 1, 1996, an analyst report characterized MAW as being in a "difficult financial position as a result of its deteriorating financial picture and lack of liquidity." (Exhibit Q, *Id.*). On April 12, 1996, MAW issued a press release on the indictment of two of its former officers in Indiana and an investigation by the United States Securities and Exchange Commission. (Exhibit R, *Id.*). Finally, MAW's April 16, 1996 Form 10-K stated that MAW would be unable to meet its financial obligations if notes were accelerated. (Exhibit S, *Id.*). MAW also sated that "[i]f present trends continue and the Company is unable to obtain relief or otherwise cure the events of default, the Company may be required to seek protection under federal bankruptcy laws." (*Id.*).

Despite the negative tone apparent in the 1996 disclosures, the Court is still not prepared

17

to say that, as a matter of law, the disclosures amounted to "storm warnings" sufficient to trigger a duty to investigate on the Plaintiffs' part.   In addition, the Court cannot conclude as a matter of law when the Plaintiffs should have discovered, by the exercise of reasonable diligence, the facts underlying the alleged fraud by Coopers and the MAW executives.  This Court agrees with the position of the First Circuit, which held as follows:

> The multifaceted question of whether storm warnings were apparent involves issues of fact. . . . In the archetypical case, therefore, it is for the factfinder to determine whether a particular collection of data was sufficiently aposematic to place an investor on inquiry notice. *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 368-69 (7th Cir.1997); *see also Gen. Builders*, 796 F.2d at 12 (emphasizing that this sort of factual question may be determined as a matter of law only when the underlying facts are either admitted or undisputed). So too the related question of whether a particular plaintiff exercised reasonable diligence in the face of such warnings. *Maggio*, 824 F.2d at 128; *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 803 (1st Cir.1987).

*Young v. Lepone*, 305 F.3d 1, 9 (1st Cir. 2002).   The First Circuit also agreed with the Sixth Circuit that the statute of limitations under § 9(e) begins to run when the Plaintiff, through the exercise of reasonable diligence, would have discovered the fraud; not when the storm warnings first became apparent. *Id.*

   In sum, this Court finds that genuine issues of material fact preclude resolution of the statute of limitations issue on Defendants' Motions for Summary Judgment.  The motions are therefore denied.

18

## V.

In light of the foregoing, the Motion of Defendants Coopers and Lybrand and Coopers and Lybrand, LLP for Summary Judgment (**Doc. #151**) is **DENIED.** The Motion of Defendants Roberts, Widders, Wilburn, and White for Summary Judgment (**Doc. #153**) is also **DENIED.**

**IT IS SO ORDERED.**

3-23-2001
—————————————
**DATE**

—————————————
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

19