```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF OHIO

 3           WESTERN DIVISION AT CINCINNATI

 4

 5                      - - -

 6   WALTER W. THIEMANN, on   :
     behalf of himself and    :
 7   of all others similarly  :
     situated,                :
 8                            :
          Plaintiff,          :
 9                            :
       VS.                    : CASE NO. C-1-00793
10                            :
     OHSL FINANCIAL CORP.,    :
11   OAK HILLS SAVINGS AND    :
     LOAN COMPANY, F.A.,      :
12   NORBERT G. BRINKER,      :
     KENNETH L. HANAUER,      :
13   WILLIAM R. HILLEBRAND,   :
     ALVIN E. HUCKE, THOMAS   :
14   E. MCKIERNAN, JOSEPH J.  :
     TENOEVER, HOWARD N.      :
15   ZOELLNER, PROVIDENT      :
     FINANCIAL GROUP, INC.,   :
16   ROBERT L. HOVERSON,      :
     JACK M. COOK, THOMAS D.  :
17   GROTE, JR., PHILIP R.    :
     MYERS, JOSEPH A. PEDOTO, :
18   JOSEPH A. STEGER,        :
     CHRISTOPHER J. CAREY,    :
19   CLIFFORD ROE, and        :
     DINSMORE & SHOHL, LLP,   :
20                            :
          Defendants.         :
21                            :
                        - - -
22

23       Deposition of GARY MEIER, a plaintiff

24   herein, called by the defendants for cross-

25   examination, pursuant to the Federal Rules of
```

Page 2

1    Civil Procedure, taken before me, Lee Ann

2    Williams, a Registered Professional Reporter

3    and Notary Public in and for the State of Ohio,

4    at the offices of Keating, Muething & Klekamp,

5    One East Fourth Street, Cincinnati, Ohio 45202,

6    on Thursday, June 24, 2004, at 10:00 a.m.

7

8    APPEARANCES:

9            On behalf of the Plaintiff:

10               Michael G. Brautigam, Esq.
                 Gene Mesh & Associates
11               2605 Burnet Avenue
                 Cincinnati, Ohio 45219
12
             On behalf of the Defendants:
13
                 James E. Burke, Esq.
14               Keating, Muething & Klekamp
                 1400 Provident Tower
15               One East Fourth Street
                 Cincinnati, Ohio 45202
16
             On behalf of the Defendants Dinsmore &
17           Shohl and Clifford Roe:

18               John W. Hust, Esq.
                 Schroeder, Maundrell, Barbiere
19               & Powers
                 110 Governor's Knoll
20               11935 Mason Road
                 Cincinnati, Ohio 45249
21
     ALSO PRESENT:  Lisa Meier
22                  Lindsey Meier
                    April Nelson
23

24                    - - -

25

Page 22

1          A.   No, sir.

2          Q.   I think I asked you this earlier.

3    I apologize if this seems to be repetitive, but

4    I take it you're not a person who can read and

5    understand financial statements?

6          A.   No, not at all.

7          Q.   Okay.  How many times have you

8    been involved in -- with companies that were

9    involved in a merger?

10         A.   Just one.

11         Q.   The Provident-OHSL merger?

12         A.   Correct.

13         Q.   Okay.  Have you -- do you know

14   what a tender offer is?

15         A.   No, sir.

16         Q.   Do you understand what frequently

17   happens to the price of a company when someone

18   wishes to merge with that company?

19              MR. BRAUTIGAM:  Objection.

20         A.   No, sir.

21         Q.   Okay.  How closely did you follow

22   the OHSL stock during the time you owned it?

23         A.   Real close the first couple years.

24   And then gave up on it, just --

25         Q.   Let's talk about with respect to

Page 34

1        Q.   Okay.  And same question.  Do you

2   remember the names of any of the directors of

3   Oak Hills Savings & Loan?

4        A.   No.

5        Q.   Okay.  And you never personally

6   spoke to or were introduced to Mr. Hanauer, Mr.

7   Herron or Mr. Brinker, correct?

8        A.   No.

9        Q.   I take it you never met any of the

10  officers or directors of Provident or Provident

11  Financial Group, Inc., correct?

12       A.   Correct.

13       Q.   And you never attended any of

14  their depositions, did you?

15       A.   No.

16       Q.   Did you ever read any deposition

17  testimony that any of those individuals have

18  provided?

19       A.   Who is this?

20       Q.   People at Provident.  Provident

21  directors or officers.

22       A.   No, sir.

23       Q.   Okay.  I apologize if I asked you

24  this.  You never worked at Oak Hills, did you?

25       A.   No.

Page 38

1         A.    I read a lot about it since the

2    merger.

3         Q.    Right.  But you weren't at any of

4    the meetings --

5         A.    No, sir.

6         Q.    -- correct?  Okay.  And you've

7    never met any of those individuals or spoken to

8    them, correct?

9         A.    Correct.

10        Q.    Okay.  Do you have any firsthand

11   knowledge about whether or not those people did

12   anything wrong or improper?

13        A.    Yeah.  I found out about it in The

14   Business Courier.

15        Q.    That's the source of your

16   information?

17        A.    That's where I first heard about

18   it.

19        Q.    Okay.  And what other firsthand

20   knowledge do you have about what, if anything,

21   the Oak Hills officers and directors did that

22   was inappropriate in connection with the

23   Provident merger?

24             MR. BRAUTIGAM:  Objection.

25        A.    I think they sold me out.

1          Q.    They sold you out?

2          A.    Yeah.

3          Q.    And why did they sell you out --

4    or how did they sell you out?

5          A.    When I went to turn in 200 shares

6    of OHSL, forced to do it at the Provident

7    building, they gave me 109 shares of Provident,

8    valued not even -- they ripped me off.

9          Q.    And how -- why do you say that?

10         A.    They told us to vote one way and

11   they went the other.

12         Q.    Who is "they"?

13         A.    Hanauer, I believe, and -- I guess

14   that's really it.

15         Q.    Anything else you can think of

16   that -- that you have knowledge of that the Oak

17   Hills officers and directors did that was

18   inappropriate in connection with the Provident

19   merger?

20         A.    Could you repeat that?

21         Q.    Sure.  Other than what you just

22   talked about, do you have any firsthand

23   knowledge of anything else that the OHSL

24   officers or directors did that was

25   inappropriate in connection with the Provident

Page 42

1                    MR. BRAUTIGAM:  Objection.

2           A.   No, sir.

3           Q.   Okay.  As you sit here today, do

4    you know how the market price of OHSL and

5    Provident compared in the period before the

6    merger was announced?  How the stock prices of

7    those two companies compared?

8           A.   I thought they were even.

9           Q.   That's your best recollection is

10   that before the merger was announced -- I mean,

11   before there was any announcement at all, that

12   the price of Provident was equivalent to the

13   price of OHSL?

14          A.   Yeah.

15          Q.   Is that your testimony?

16          A.   Even.

17          Q.   Would it surprise you to learn

18   that Provident was worth about two or three

19   times more than OHSL prior to the announcement

20   of the merger?

21          A.   With the real numbers?

22          Q.   Yes, sir.

23               MR. BRAUTIGAM:  Objection.

24          A.   Why didn't it show it in the stock

25   transfers?

1        A.    Yes, sir.

2        Q.    Okay.  Did you ever read any of

3   the financial materials that came from OHSL,

4   the annual packets?

5        A.    Yeah, what the officials were paid

6   for doing their job.

7        Q.    Okay.  Did that bother you?

8        A.    Yes, it did.

9        Q.    Why?

10       A.    It seemed like they made an awful

11  lot of money for doing nothing.

12       Q.    And these are the people who

13  worked at OHSL?

14       A.    Yes.

15       Q.    Do you know what they did on a

16  day-to-day basis?

17            MR. BRAUTIGAM:  Objection.

18       A.    Supposed to be treasurers and this

19  and that.

20       Q.    My question is, do you know what

21  they did in the performance of their duties?

22            MR. BRAUTIGAM:  Objection.

23       A.    No, sir.

24       Q.    Okay.  So you have no firsthand

25  knowledge about whether or not they earned

1    their money or didn't earn their money,

2    correct?

3              MR. BRAUTIGAM:  Objection.

4         A.   They make over a hundred thousand

5    dollars a year.  That's way too much money.

6         Q.   Anybody who makes over a hundred

7    thousand dollars a year makes way too much

8    money?  Is that your position?

9         A.   No.

10         Q.   Okay.  Maybe you can explain to me

11    what that last answer meant.

12         A.   They were overpaid.

13         Q.   Okay.  And what do you base that

14    on?

15         A.   That none of them had any

16    knowledge of anything through the depositions I

17    went through.  They were old and senile.

18         Q.   So your view of the OHSL directors

19    is that they were old and senile?

20         A.   (Witness nodded head.)

21         Q.   Right?

22         A.   Yeah.

23         Q.   That's based upon what you --

24         A.   I hope that wasn't when they were

25    investing my money or whatever they were doing

Page 50

1    with it, but --

2            Q.    Do you know the ages of the OHSL

3    directors?

4            A.    Way too old.

5            Q.    And you're talking about when you

6    saw them, correct?

7            A.    Yeah.

8            Q.    When was that?

9            A.    In depositions.

10            Q.    In 2004?

11            A.    They should have been retired at

12    65.

13            Q.    That was in 2004, right, Mr.

14    Meier?

15            A.    Correct.

16            Q.    Do you have any firsthand

17    knowledge about the mental capacity or

18    abilities of those people to perform their

19    duties in 1999?

20            A.    Old and senile.

21            Q.    So your opinion -- are you a

22    doctor, Mr. Meier?

23            A.    No, sir.

24            Q.    Did you ever see these people in

25    1999?

Page 51

```
1           A.   No, sir.

2           Q.   So you have no firsthand knowledge

3    about -- but you still believe that they were

4    old and senile in 1999.  Is that your

5    testimony?

6                MR. BRAUTIGAM:  Objection.

7           Q.   Is that your testimony, Mr. Meier?

8           A.   Yes, sir.

9           Q.   Based upon no firsthand knowledge,

10   correct?

11               MR. BRAUTIGAM:  Objection.

12          A.   Just the way they carried

13   themselves at the depositions.

14          Q.   In 2004?

15          A.   Correct.

16          Q.   Okay.  Did you ever attend a

17   shareholders meeting?

18          A.   No, sir.

19          Q.   Not one time when you held OHSL

20   shares?

21          A.   No, sir.

22          Q.   So how those people conducted

23   themselves at OHSL shareholder meetings is

24   something you have no knowledge of, correct?

25          A.   Correct.
```

Page 52

1          Q.    And you did not attend a

2    shareholders meeting in connection with the

3    Provident-OHSL merger, either, did you?

4          A.    No, sir.

5          Q.    Okay.  Do you recall what the

6    price -- I apologize if I've asked you this --

7    of Provident stock was when the merger was --

8    became effective?

9                MR. BRAUTIGAM:  Objection.

10         A.    No, sir.

11         Q.    Do you know how the value of the

12   Provident stock you received compared to what

13   you originally paid for your OHSL shares?

14         A.    No, sir.

15         Q.    Do you know whether it was higher

16   or lower?

17         A.    I believe it was lower.

18         Q.    So the value of the Provident

19   stock that you received for each of your shares

20   was less than what you had paid for your OHSL

21   shares originally; is that correct?

22               MR. BRAUTIGAM:  Objection.

23         A.    I wasn't looking at the dollar

24   amount, I was looking at the amount of shares I

25   owned.

Page 64

1          A.    No.

2          Q.    Do you recall whether it had any

3    impact on the Provident stock price?

4          A.    No, I don't recall.

5          Q.    Did you buy or sell any shares

6    before or after any of the numbers that you

7    read about Provident that you've talked about?

8                MR. BRAUTIGAM:   Objection.

9          A.    No, I didn't buy any.

10         Q.    Okay.  And you didn't sell any?

11         A.    I didn't sell any.

12         Q.    And what do you recall about the

13   restatement?

14         A.    That they overinflated all of

15   their numbers.

16         Q.    And what does that mean?

17         A.    It means they made their company

18   look a lot better than it really was to buy out

19   OHSL, is the way I believe it happened.

20         Q.    And how do you -- what's your

21   basis for saying that?

22         A.    Why would you lie about your

23   numbers?

24         Q.    And what's your basis for saying

25   anybody lied about anything?

Page 65

1        A.    I'm not an accountant, but if they

2    can't push a calculator and keep their numbers

3    right, somebody's cheating or lying, something.

4        Q.    And that's just --

5        A.    They ain't playing with their own

6    money, they're playing with someone else's.

7        Q.    And what is your basis for saying

8    that -- do you have any idea what led to the

9    restatement?

10            MR. BRAUTIGAM:  Objection to the

11    form.

12        Q.    What caused it?

13        A.    They're probably going to try to

14    buy something else out.

15        Q.    That's not my question.  What led

16    to it in the accounting issues or the

17    accounting matters that led to the restatement?

18    What caused it?  Do you have any idea?

19            MR. BRAUTIGAM:  Objection.

20        A.    No idea.

21        Q.    Did you read any press reports

22    about what happened or why it came to be?  What

23    the accounting matters were that were at issue?

24            MR. BRAUTIGAM:  Objection.

25        A.    I read some stuff about car

Page 66

1    leasing and this and that.  That part stuff,

2    I -- don't make sense to me.

3            Q.   Do you understand any of that?

4            A.   None of it.

5            Q.   Do you know what a securitization

6    is?

7            A.   No, sir.

8            Q.   Do you understand anything about

9    accounting for auto leases or auto lease

10   securitizations?

11           A.   No, sir.

12           Q.   So in terms of the specifics of

13   what happened, you're not aware of that?

14           A.   No.

15           Q.   Did anyone ever tell you or did

16   you ever come across anything indicating that

17   this was based upon an accidental error in a

18   financial model?  Does that ring a bell at all?

19           A.   Year after year since 1994?  No,

20   sir.

21           Q.   So you never heard anything about

22   an error in a financial model?

23           A.   They called it an error.

24           Q.   So you did read that?

25           A.   I believe I did read something

Page 67

1   about it.

2        Q.   And did you read anything about

3   the error being unintentional?

4        A.   Yeah.

5        Q.   But you disagree with that?

6        A.   Correct.

7        Q.   And how do you know whether or not

8   this was or was not unintentional?  What facts

9   do you have to, to --

10       A.   No facts.

11       Q.   You have no facts to base your

12  opinion on, correct?

13       A.   Just my opinion.

14       Q.   And I take it you have no

15  firsthand knowledge of who at Provident knew

16  what, when they knew it, or what they didn't

17  know --

18            MR. BRAUTIGAM:  Objection.

19       Q.   -- as it relates to this subject,

20  correct?

21            MR. BRAUTIGAM:  Objection.

22       A.   Correct.

23       Q.   And you have no knowledge, of your

24  own firsthand knowledge, that anyone at

25  Provident intentionally or recklessly did

1   anything as it relates to this financial model,

2   correct?

3              MR. BRAUTIGAM:  Objection.

4        A.   Correct.

5        Q.   And I take it you also have no

6   knowledge of the accounting methodologies and

7   topics and issues that the accountants

8   disagreed over as it relates to these

9   restatements, correct?

10             MR. BRAUTIGAM:  Objection.

11       A.   Correct.

12       Q.   All right.  Did you have any -- I

13  apologize if I asked you this, Mr. Meier.  I

14  take it you didn't read any reports or

15  documents or newspaper articles specifically

16  related to the restatement and what it was all

17  about, or did you?

18             MR. BRAUTIGAM:  Objection.

19       A.   I read the restatement.

20       Q.   And what's that?  What is the

21  restatement?

22       A.   That.

23       Q.   Plaintiff's Exhibit 91?  Is that

24  what you're referring to?

25       A.   Isn't that the restatement?

Page 101

1          A.    Correct.

2          Q.    Okay.  Tell me what happened after

3    you got the proxy statement.

4          A.    I checked it out, looked through

5    it as best I could, and thought I wasn't

6    interested in it.

7          Q.    Not interested in what?

8          A.    In the merger.

9          Q.    And why were you not interested in

10   it?

11         A.    Because I was happy with the way

12   it was.

13         Q.    Okay.  Let me show you a document

14   previously marked as Defendant's Exhibit 1.  I

15   don't know if you need it or not, Mike?

16              MR. BRAUTIGAM:  No, thank you.

17         Q.    What is Defendant's Exhibit 1?

18         A.    That's the proxy.

19         Q.    Okay.  Is this -- does this appear

20   to be the document you received sometime in

21   1999 relating to the Provident merger?

22         A.    It wasn't that thick.

23         Q.    Okay.  The one you got was not

24   this thick?

25         A.    Nope.

Page 102

1          Q.   Okay.  One of the reasons it may

2     be a little bit thicker is because it's not on

3     front and back copying, it's single page.  But

4     can you flip through this and tell me whether

5     or not this appears to be what you got?

6          A.   I can tell by the front page it

7     is.

8          Q.   Okay.

9          A.   And on page -- yeah, that's it.

10          Q.   Okay.  So this is the document

11     that you received sometime in 1999?

12          A.   Yes.

13          Q.   Tell me how long after you got it

14     that you reviewed it.

15          A.   I looked at it for an hour or so

16     and put it in my file cabinet.

17          Q.   Okay.  You read it the day or

18     approximately the --

19          A.   The day it came, yeah.

20          Q.   The day it came, all right.

21          A.   That night.

22          Q.   And what sections did you review?

23          A.   Front page, looked through some

24     numbers and read what they wanted us to vote.

25          Q.   What does that mean, which

Page 103

1    section?

2           A.    They recommended that we vote for

3    the merger.

4           Q.    Okay.  And what else?  Anything

5    else that you remember?

6           A.    That's about all.

7           Q.    You read the front page, which is

8    the letter to shareholders signed by Mr.

9    Brinker, correct?

10          A.    (Witness nodded head.)

11          Q.    And you indicated you looked at

12   some numbers.  What numbers did you look at?

13          A.    I was looking at page six and then

14   I was -- there's a page in there where it told

15   us which way they thought we should vote.

16          Q.    What is page six?

17          A.    It was Provident's financial

18   statements.

19          Q.    And what --

20          A.    Supposedly.

21          Q.    And what of these various numbers

22   did you read and what did you understand?

23          A.    None of it.

24          Q.    You didn't understand any of it?

25          A.    No.

```
 1          Q.    Did you read any of it carefully?

 2          A.    That's another reason -- yeah,

 3   real carefully.

 4          Q.    Did you?  What in particular,

 5   based upon your experience, was of interest to

 6   you on this page?

 7          A.    The big number.

 8          Q.    What's the big number?

 9          A.    And how it's been growing over the

10   years.

11          Q.    What big number are you referring

12   to?

13          A.    Total interest income.

14          Q.    Okay.  That was the one that

15   you -- was most important to you?

16          A.    That I just -- yeah, that's what I

17   was looking at.

18          Q.    Okay.  Anything else that stuck

19   out at you on these pages?

20          A.    No.

21          Q.    Okay.

22          A.    I couldn't really make heads or

23   tails of none of it.

24          Q.    So total interest income is the

25   number you looked at, but in terms of the
```

1    remainder of the page, you didn't understand

2    it?

3              A.    Hmm-um.

4              Q.    Is that correct?

5              A.    Correct.

6              Q.    Any other numbers that you looked

7    at on this page -- pardon me, strike that.  Any

8    other numbers that you looked at in this

9    document?

10             A.    No more numbers.

11             Q.    Okay.  And you indicated you read

12   something about a recommendation on the vote.

13             A.    Yes.

14             Q.    All right.  And what specifically

15   are you referring to?

16             A.    I can't remember where it's at in

17   there.  Our elected officials were telling us

18   to vote for the merger, it would be the best

19   thing for us.

20             Q.    Okay.  And at least --

21             A.    I don't know what page it's on or

22   where it was.

23             Q.    Okay.  So at some -- someplace in

24   here you remember reading a recommendation that

25   you vote in favor of the merger, correct?

Page 106

1          A.    Correct.

2          Q.    All right.  Other than the front

3    page, the numbers you have described on page

4    six and the recommendation to vote, what other

5    portions of this document did you read, if any?

6          A.    That's about all that made sense

7    to me.

8          Q.    Okay.  Did you read anything other

9    than those three sections you just described?

10          A.    I think that was about it.

11          Q.    Okay.  And in terms of -- do you

12    recall reading anything in here about why the

13    Board thought that a sale was in the best

14    interest of OHSL shareholders or what they

15    considered?

16          A.    Repeat that?

17          Q.    Sure.  Do you remember reading a

18    discussion in here about why OHSL's Board felt

19    that a sale made sense and was beneficial to

20    OHSL and its shareholders?

21          A.    No.  I don't remember reading that

22    part.

23          Q.    Do you remember reading anything

24    in here about what information they considered

25    in reaching their decision?

Page 107

1        A.   No.  Sorry.

2        Q.   Okay.  Other than what you've

3  talked about already, did you do anything else

4  or make any other use of the proxy when it came

5  to you?

6        A.   No, sir.

7        Q.   And I take it that your principal

8  reason for opposing the Provident-OHSL merger

9  was because you liked banking at Oak Hills and

10  you wanted Oak Hills to remain independent; is

11  that true?

12       A.   Yeah.  I liked banking there, but

13  that's not the only reason.

14       Q.   Okay.  What are the other reasons?

15       A.   Didn't want to lose my company.

16       Q.   Okay.  Any other reasons other

17  than you liked banking there and you didn't

18  want to lose your company?

19       A.   No.  That's probably about it.

20       Q.   Okay.  Did you ever determine that

21  the price that was being offered was an unfair

22  price or a price that didn't reflect the value

23  of Oak Hills?  Did you ever make that

24  calculation?

25       A.   No, sir.

1          Q.   Okay.  So after you read the

2    proxy, as you just described it and for the

3    reasons you talked about, you decided to vote

4    against the merger -- or to oppose the merger;

5    is that right?

6          A.   I thought my -- my little vote

7    wouldn't count --

8          Q.   Okay.

9          A.   -- is the reason I didn't vote it.

10         Q.   But you were opposed to the

11   merger?

12         A.   I was opposed to it.

13         Q.   And notwithstanding the fact that

14   the Board recommended you vote in favor of it,

15   you didn't want to?

16         A.   Right, correct.

17         Q.   So the fact that they recommended

18   that you vote in favor didn't persuade you, did

19   it?

20         A.   No.

21         Q.   Okay.  So tell me what happened

22   next in the process.

23         A.   Well, it all went through,

24   everything was said and done.  And we're

25   standing there looking at OHSL stock and I

Page 110

1          A.    Correct.

2          Q.    Do you know why?

3          A.    Too busy.

4          Q.    Okay.  Do you have any knowledge

5    about what happened at the shareholders

6    meeting?

7          A.    No.

8          Q.    Okay.  And you don't know who said

9    what or what was -- what occurred at the

10   shareholders meeting, correct?

11         A.    Correct.

12         Q.    All right.  Subsequently you were

13   advised to come down to exchange your OHSL

14   shares for Provident shares?

15         A.    To Provident Securities -- I don't

16   know, one of these buildings down here.

17         Q.    Okay.

18         A.    Yes.

19         Q.    And you did that?

20         A.    Yes.

21         Q.    And --

22         A.    That's when I knew I got ripped

23   off.

24         Q.    And how did you know that?

25         A.    Just because I had 200 shares of a

Page 111

1    good stock and I get 109 shares of garbage.

2           Q.    Of garbage?

3           A.    Yeah.

4           Q.    And what do you base that on?

5           A.    That restatement going -- that I

6    read since '94.  Big business, big banks --

7    they can't keep records straight?  Who is

8    supposed to oversee that?  Isn't there -- no

9    one said that -- they apologized and that's it,

10   everybody -- they live high on the hog and what

11   do we do?  We just keep on working for a

12   living?

13          Q.    Are you finished?  My question is:

14   At that time you felt ripped off, in your

15   phrase?

16          A.    Exactly.

17          Q.    But you had no idea how the value

18   of Provident stock compared to the value of

19   OHSL in terms of the -- -

20          A.    If there was a buyout and we were

21   supposed to listen to those people and vote for

22   it, it should have been 50-50, exact.

23          Q.    And what do you base that on?

24          A.    Just what I thought.

25          Q.    My question is, but you didn't --

Page 112

1          A.    I had no basis for it.

2          Q.    And you didn't know how the value

3     of the two stocks compared, did you?

4          A.    No.   They said they were

5     equivalent, I thought.

6          Q.    Well, can you point me to anything

7     in the proxy statement where they said the

8     value of these two shares were equivalent?

9          A.    No, sir.

10         Q.    Okay.

11         A.    I can show you somewhere in there,

12    that it's in your best interest.

13         Q.    Let me point you to this, and I

14    don't know if you read this or not.   On page

15    one of the proxy, there is a statement that

16    basically says, what will I receive for my OHSL

17    shares.   Do you see that?

18         A.    Yes.

19         Q.    It says, The total number of

20    Provident Financial shares to be issued in the

21    transaction will be determined by dividing

22    $57,162,375 by an average Provident Financial

23    share price determined over a ten day trading

24    period ending two days prior to closing.   You

25    will receive a proportionate number of

Page 113

1    Provident Financial shares to be issued to OHSL

2    shareholders.  However, if the average price of

3    Provident Financial shares is greater than $50,

4    you'll receive .45 Provident Financial shares

5    for each OHSL share.  If the average price of

6    Provident Financial shares is less than $40,

7    you'll receive .5625 Provident Financial shares

8    for each OHSL share you own.  Did you read

9    that?

10         A.   No.

11         Q.   It tells you right there that it's

12   going to be roughly one Provident share for

13   each two OHSL shares, doesn't it?

14              MR. BRAUTIGAM:  Objection.

15         A.   That's what it looks like.

16         Q.   Okay.  And that was in the proxy

17   statement that you got, correct?

18         A.   Yeah.

19         Q.   Okay.  But you didn't remember

20   reading that at the time?

21         A.   No.

22         Q.   Okay.  If you had read that, do

23   you think you would have felt a little less

24   surprised when you turned your shares in?

25              MR. BRAUTIGAM:  Objection.

Page 114

1         A.    Not too sure.

2         Q.    Nobody hid that from anybody.

3    That was clearly stated in the proxy statement,

4    correct?

5         A.    It was in there.

6         Q.    Okay.  And the transaction was

7    approved by the OHSL shareholders, right?

8         A.    Very slimly.

9         Q.    And what's your basis for saying

10   that?

11        A.    It barely passed.

12        Q.    Based upon what?

13        A.    Just what I know.

14        Q.    Okay.  And do you know of the

15   votes cast, where people actually voted, how

16   many of the votes that were cast were in favor

17   and how many were opposed?

18             MR. BRAUTIGAM:  Objection.

19        A.    No.  I just heard it was a slim

20   margin.

21        Q.    Okay.  But you don't know how many

22   of the votes that people actually cast --

23             MR. BRAUTIGAM:

24        A.    No.

25             MR. BRAUTIGAM:  Objection.

Page 117

```
 1            A.    I'm sure I have.

 2            Q.    And how do you know that?

 3            A.    Just because the numbers are

 4    overinflated.

 5            Q.    But you didn't sell any stock, did

 6    you?

 7                  MR. BRAUTIGAM:  Objection.

 8            A.    No, not yet.

 9            Q.    Okay.  And if you sold it today,

10    do you have any idea how the stock price would

11    compare to the $19 a share you talked about

12    earlier?

13            A.    I'm not too sure.

14            Q.    Is your loss -- does your loss

15    that you claim in this case assume that

16    Provident's stock is still around 18 or $19?

17                  MR. BRAUTIGAM:  Objection.

18            A.    Time heals it?  I mean, what do --

19            Q.    What's your loss, Mr. Meier?

20    That's all I'm asking you.

21                  MR. BRAUTIGAM:  Objection.

22            Q.    What have you lost?

23            A.    I'm not too sure.

24            Q.    Okay.  At least as you sit here

25    today, you can't give me any dollar amount or
```

Page 118

```
 1    even any indication of how you've been damaged;

 2    is that correct?

 3              MR. BRAUTIGAM:  Objection.

 4         A.   I've been lied to.

 5         Q.   That's not my question.  Can you

 6    give me any indication in dollars or in concept

 7    how you've been damaged, as you sit here today?

 8              MR. BRAUTIGAM:  Objection.  He had

 9    a perfectly good answer to that last question.

10         A.   I'm not too sure.

11         Q.   Do you have any numbers or any

12    damage methodology that you can tell me how you

13    lost anything?

14              MR. BRAUTIGAM:  Objection.

15         A.   Not at this minute.

16         Q.   Okay.  I think you indicated

17    that -- or at some point in time you remember

18    seeing The Business Courier article, correct?

19         A.   My wife brought it to my

20    attention.

21         Q.   Your wife brought it to your

22    attention?  And do you or your wife subscribe

23    to The Business Courier?

24         A.   She got it from work.

25         Q.   Okay.  And when you received that,
```

1    did you understand what was being talked about?

2          A.    Yeah, I knew what happened.

3          Q.    Okay.  And what happened?

4          A.    We were lied to.

5          Q.    Okay.  And do you know --

6          A.    We were gave false numbers.

7          Q.    Did you know in 2001 that they

8    were false numbers?

9          A.    I knew when The Courier came out.

10         Q.    So you knew that there were some

11   inaccurate numbers in the OHSL proxy at the

12   time The Business Courier article came out,

13   correct?

14         A.    Correct.

15         Q.    Okay.  After you read that

16   article -- first of all, are you aware of any

17   other shareholder who believes, as you believe,

18   that you were lied to?  Can you -- have you

19   talked to any other OHSL shareholders who

20   believe the same things you believe?

21               MR. BRAUTIGAM:  Objection.

22         A.    Not offhand.

23         Q.    Okay.  After you read the article,

24   what did you do next?

25         A.    Called the two attorneys.

Page 124

1   Instruct you not to answer.

2           Q.   How did you -- what did you do to

3   investigate the claims that were being asserted

4   in the lawsuit?

5           A.   Read a bunch of stuff that he had.

6           Q.   Okay.  And did you also speak to

7   Mr. Brautigam from time to time?

8           A.   Occasionally.

9           Q.   Okay.  About those claims?

10          MR. BRAUTIGAM:  Objection.

11  Instruct you not to answer.

12          MR. BURKE:  He just answered it.

13          MR. BRAUTIGAM:  Well, I'm

14  instructing him now not to answer it.

15  BY MR. BURKE:

16          Q.   Okay.  Do you understand that some

17  of the claims asserted in the complaint arise

18  under Ohio law?

19          A.   No, sir.

20          Q.   And who did you rely upon for

21  purposes of the legal side of the claims to be

22  asserted?

23          A.   Myself.

24          Q.   You investigated this?

25          A.   I -- I don't know.  No one.

Page 136

1  had looked at and pull it out for him?

2          MR. BRAUTIGAM:  Objection.

3      A.    Pretty much all of it.

4      Q.    So you are responsible for all of

5  the factual analyses and statements that are in

6  here; is that correct?

7          MR. BRAUTIGAM:  Objection.

8      A.    Pretty much so.

9      Q.    Okay.  And that's based upon your

10  review of documents and other materials?

11      A.    Stuff I read and -- yeah.

12      Q.    And specifically, what had you

13  read and relied upon for purposes of preparing

14  the Consolidated Amended Complaint?  Can you

15  answer that question or do you want me to break

16  it down, Mr. Meier?  It may be a little broad.

17  But my question is, what specific documents do

18  you remember relying upon for purposes of

19  having to prepare this?  What did you look at

20  and analyze?

21          MR. BRAUTIGAM:  Objection.

22      A.    I got a lot of it from the last

23  two depositions I sat in.

24      Q.    And those were the director

25  depositions?

1          A.    Yes.

2          Q.    Okay.  Are you aware that those

3    depositions occurred after this was filed?

4          A.    No, I wasn't aware of that.

5          Q.    Okay.  Other than the depositions

6    of the directors, do you recall any other

7    documents or materials that you reviewed and

8    analyzed for purposes of putting this together?

9          A.    Just about all of the lies and all

10   of the false numbers and it's just --

11         Q.    But my question is, what documents

12   did you look at, rely upon and analyze for

13   purposes of putting this together.  That's all?

14         A.    I can't remember which ones they

15   were, but it's --

16              MR. BURKE:  Let's take five

17   minutes for a rest room break and then we'll go

18   back and be a little more specific.  How is

19   that?

20              (Brief recess.)

21   BY MR. BURKE:

22         Q.    Mr. Meier, I want to ask you one

23   thing.  What is the situation between you and

24   your wife as it relates to being the class rep

25   in this case?  Is it you, is it her, is it

Page 138

1    primarily you, is it both?  Can you --

2         A.    It's all me.

3              MR. BRAUTIGAM:  Objection.

4         A.    She knows nothing about it.

5         Q.    Okay.

6         A.    Neither one of us do, to tell you

7    the truth.

8         Q.    I just want to -- and Mrs. Meier,

9    I just want to make sure I understand.  Are you

10   attempting to become the class representative

11   in this case?

12             MS. MEIER:  By class

13   representative, does that mean it --

14        Q.    You're going to be maintaining

15   this case and running it as basically the

16   plaintiff?

17             MR. BRAUTIGAM:  Objection.

18             MS. MEIER:  No.

19        Q.    Okay.  So you don't want the Court

20   to certify you or analyze you as a potential

21   representative who will be responsible for

22   running this case?

23             MS. MEIER:  No.

24        Q.    And is your husband correct that

25   in terms of the details that we've been talking

Page 139

1    about today of the Oak Hills-Provident merger,

2    you have no knowledge of that?

3                MS. MEIER:  No.

4         Q.   Okay.  And you're not asserting a

5    claim, at least directly?

6                MS. MEIER:  Correct.

7         Q.   All right.  Okay.  Going back to

8    exhibit --

9                MR. BRAUTIGAM:  Does that mean

10   we're done with Mrs. Meier?

11               MR. BURKE:  I think we may well be

12   done with Mrs. Meier unless she's enjoying this

13   so much that she wants to stick around.

14               MS. MEIER:  I have some work to

15   do.

16               MR. BURKE:  Why don't I ask you a

17   couple more questions?

18               MS. MEIER:  Why don't I wait until

19   we go to lunch?

20               MR. BURKE:  All I want to do is,

21   your name appeared on the pleadings as a

22   potential class representative and I just

23   wanted to make sure that it's clear for the

24   record that you're not suggesting or attempting

25   to become a class representative in this

Page 140

1  matter?

2          MS. MEIER:  No.  A lot of stuff

3  I'm seeing for the first time today.

4          MR. BRAUTIGAM:  I disagree with

5  that.  I would say that Mrs. Meier is a named

6  representative by virtue of being on the joint

7  account with Mr. Meier.

8          MR. BURKE:  I see.

9          MR. BRAUTIGAM:  But Mr. Meier made

10  all of the investment decisions.

11          MR. BURKE:  Okay.  You're here

12  because your name happened to be on the shares.

13          MR. BRAUTIGAM:  Yes.  I think

14  that's fair.

15          MR. BURKE:  But in terms of being

16  the actual class representative here, it really

17  is your husband, Gary, who is making the

18  decisions, working with counsel and prosecuting

19  the lawsuit?

20          MS. MEIER:  Yes, that's correct.

21          MR. BURKE:  Is that as far as you

22  know it also, Mr. Meier.

23          MR. MEIER:  That's the way it is.

24          MR. BURKE:  Thank you.  And I take

25  it your daughter is completely uninvolved.

Page 141

1              MR. MEIER:  Same -- yeah,

2    completely.  That's all --

3              MR. BURKE:  Okay.  Then after

4    lunch, whenever is convenient, Mrs. Meier, if

5    you have nothing else to offer on the topics

6    we've talked about today --

7              MS. MEIER:  Okay.

8              MR. BURKE:  -- I have no problem

9    with you going back to work.

10             MS. MEIER:  No.

11                  * * *

12             GARY MEIER

13   having been previously duly sworn, further

14   testified as follows:

15             CROSS-EXAMINATION

16   CONTINUED BY MR. BURKE:

17        Q.   Okay.  Back on Defendant's Exhibit

18   37, Mr. Meier.  Let's go to page eight, where

19   it says, the parties.  Do you see that?

20        A.   Yes.

21        Q.   Okay.

22        A.   Yes.

23        Q.   Obviously you are the source of

24   the information as it relates to your holdings

25   of OHSL, correct?

Page 146

```
 1            Q.    Joseph Pedoto?

 2            A.    No.

 3            Q.    Christopher Carey?

 4            A.    No.

 5            Q.    Joseph Steger?

 6            A.    No.

 7            Q.    Do you have any knowledge about

 8   what role any of those people had at Provident?

 9            A.    I guess all falsifying the numbers

10   so they could make their stock look good.

11            Q.    So your understanding is that all

12   of those individuals were involved in

13   falsifying the numbers so they could make their

14   stock look good?

15            A.    I guess.  Why else would you pay

16   all of them people that kind of money and have

17   all -- it seems like one person could do the

18   whole thing, couldn't they?

19            Q.    What are you talking about?

20            A.    You only need a president.

21            Q.    You only need a president of a

22   bank?

23            A.    Yeah.

24            Q.    You think that one person can run

25   a billion dollar bank?
```

Page 166

```
 1          A.    Yes.
 2          Q.    Okay.  Do you remember reading and
 3   signing this affidavit?
 4          A.    Yes.
 5          Q.    Okay.  Paragraph three says,
 6   although I voted against the merger by not
 7   returning my proxy card, I was misled by the
 8   materially false and misleading proxy
 9   materials/registration, which I believe
10   contained materially false and misleading
11   information and failed to state material facts.
12   Do you see that?
13          A.    (Witness nodded head.)
14          Q.    Do you know what that means?
15          A.    Yes.
16          Q.    Okay.  What -- although you voted
17   against -- how could you be misled by the proxy
18   materials if you, in fact, voted against the
19   merger?  What were you misled about?
20                MR. BRAUTIGAM:  Objection.
21          A.    When I filed this, this was after
22   I found out about the restate and all the -- at
23   the time of the vote, I wasn't -- didn't think
24   I was being misled, I just didn't want to --
25   didn't want to sell my company --
```

Page 167

1        Q.    Okay.

2        A.    -- and my shares.

3        Q.    And if you had known the financial

4    information we talked about earlier today

5    relating to the restatements, how would you

6    have voted?

7              MR. BRAUTIGAM:  Objection.

8        A.    No one would ever really know what

9    would happen.

10       Q.    I mean, would you vote against it

11   or for it?

12             MR. BRAUTIGAM:  Objection.

13       A.    I think I still would have voted

14   against it.

15       Q.    Okay.  So your vote wouldn't have

16   changed, correct?

17             MR. BRAUTIGAM:  Objection.

18       A.    Right.

19       Q.    Okay.  When you referred to the

20   materially false and misleading proxy materials

21   and registration, what does that mean to you?

22       A.    False numbers that Provident

23   showed and the lies that were given to us by

24   our elected officials.

25       Q.    Those are the matters you talked

Page 169

1    Do you see that?

2            A.    Um-hmm.

3            Q.    What documents have you produced?

4            A.    I can't remember.

5            Q.    Do you remember giving any

6    documents that related to your OHSL stock to

7    Mr. Brautigam?

8            A.    Not offhand.

9            Q.    Okay.  Do you believe that when it

10   states here that you produced documents in the

11   case, that might be a mistake?

12           A.    Correct.

13           Q.    I'm sorry?

14           A.    Correct.

15           Q.    You didn't do that to defraud or

16   mislead anybody, did you?

17           A.    No.

18           Q.    That was just a mistake?

19           A.    Just --

20           Q.    Sometimes that happens, doesn't

21   it?

22           A.    Yes.

23           Q.    The next document is Plaintiff's

24   Exhibit 43.

25                 MR. BRAUTIGAM:  Defendant's

1    to speak to you about the case, not that I told

2    you it wouldn't amount to anything?

3                    MR. BRAUTIGAM:  Objection.  It

4    speaks for itself.

5         Q.    Is that correct?

6         A.    Correct.

7         Q.    Do you recall, as you sit here

8    today, what the real story was, whether you

9    spoke to me and I said something to you, or I

10   declined to speak to you?

11                   MR. BRAUTIGAM:  Objection.

12        A.    No, you didn't decline not to

13   speak to me.  They just told me the case wasn't

14   going to amount to anything.

15        Q.    Whoever spoke to you?

16        A.    Ever who spoke to me, yeah.

17        Q.    And you can't sit here today under

18   oath and say it was me, correct?

19        A.    Correct.

20        Q.    All right.  Do you understand --

21   know how this error came to be in your

22   affidavit?

23                   MR. BRAUTIGAM:  Objection.  What

24   error?  No error.

25        Q.    You say that Mr. Burke declined to

Page 174

1   speak to me substantively about the case.  And

2   if I understand your last answer, you stated

3   that, A, you don't know if I spoke to you, and

4   B, whoever spoke to you didn't speak to you,

5   they said the case had no merit.  Is that

6   right?

7                MR. BRAUTIGAM:  It doesn't follow

8   that that's an error.  Objection.

9          A.    That's the way it happened.

10         Q.    Okay.  So do you agree with me

11  that your affidavit does not correctly state

12  what you just told me?

13         A.    Correct.

14         Q.    Okay.  You then in paragraph four

15  talked about speaking to Mr. Brautigam,

16  correct?

17         A.    Correct.

18         Q.    And you say, I informed Mr.

19  Brautigam of my interest in serving as a class

20  representative in the litigation.  Do you see

21  that?

22         A.    Correct.

23         Q.    Did you know at that time what a

24  class representative in litigation was?

25         A.    I had a little bit of an idea

1    about what was going on.

2         Q.    And how had you heard of that

3    before this time?

4         A.    Class action?

5         Q.    Yes.

6         A.    I guess it was in the newspaper or

7    something.

8         Q.    Okay.

9         A.    I was reading a class action

10   lawsuit on something.

11        Q.    Paragraph nine, you say, I have

12   selected the firm of Gene Mesh & Associates

13   based on -- I think that's a typo -- their

14   experience and expertise in the area of

15   securities class actions generally.  How did

16   you come to know of the experience of Gene Mesh

17   & Associates and that firm in securities class

18   actions?

19              MR. BRAUTIGAM:  Gary, you can

20   answer the question, but don't reveal

21   conversations that we had.  And if you can't

22   answer the question without doing that, you

23   should tell Mr. Burke.

24        A.    I don't know how I decided to pick

25   Gene Mesh.

1          Q.    I'm sorry?

2          A.    I don't know how I decided to pick

3     Gene Mesh & Associates.

4          Q.    Have you ever read anything about

5     either Mr. Mesh or Mr. Brautigam or the firm's

6     experience and expertise in securities class

7     actions?

8          A.    No.

9          Q.    Okay.  Turn over to the next page

10    if you would, please.  Paragraph 12, you state

11    I estimate the amount of my losses to be

12    approximately $872 in the account jointly held

13    with my wife and an additional $872 in the

14    account held in the benefit of my daughter,

15    Lindsey Meier.  And if you want to, please feel

16    free to read the remainder of that paragraph.

17         A.    And what's the question?

18         Q.    My question is:  Can you explain

19    to me how you calculated the $872 loss?

20               MR. BRAUTIGAM:  Objection.

21         A.    Not offhand.

22         Q.    Down below it says, this estimate

23    is made by taking the number of shares I

24    received due to the forcible conversion, 109 --

25    and that's the number of shares you ended up

Page 177

1    with, correct?

2          A.    Correct.

3          Q.    It says, multiplying by $40.  Do

4    you know why you multiplied it by $40?

5          A.    That was the share price.

6          Q.    When?

7          A.    At the time, I guess.

8          Q.    Do you know that?

9          A.    Yes.

10         Q.    Okay.  So you believe the -- is it

11   the Oak Hills share price or the Provident

12   share price?

13         A.    That would be Provident's share

14   price.

15         Q.    Okay.  And then deducting 20

16   percent.  Do you see that?

17         A.    (Witness nodded head.)

18         Q.    Do you know where the 20 percent

19   comes from?

20         A.    No.

21         Q.    Do you know why you subtracted 20

22   percent from that calculation?

23         A.    Not offhand.

24               MR. BURKE:  Okay.  Let's take five

25   minutes.

Page 227

1                    MR. BRAUTIGAM:  Objection.

2          A.    I thought they didn't.

3          Q.    Okay.  If I told you that both Mr.

4    Brinker, who was the chairman of the Board, and

5    Mr. McKiernan, two people who weren't there,

6    have both testified under oath that they were

7    fully supportive of the transaction.  That

8    would be seven, wouldn't it?

9          A.    Yes.

10          Q.    And are you aware of the fact that

11    at the next Board meeting after the August 2nd

12    Board meeting, that all seven of those

13    directors were present and approved the

14    transaction in the minutes that described it?

15                    MR. BRAUTIGAM:  Objection.

16          Q.    Are you aware of that?  That all

17    seven of those directors approved the

18    transaction at a subsequent Board meeting?

19                    MR. BRAUTIGAM:  Objection.

20          A.    No, I wasn't aware of it.

21          Q.    Okay.  That subsequent Board

22    minutes is not something Mr. Brautigam ever

23    gave to you?

24          A.    Not that I can remember.

25          Q.    Okay.  Mr. Brautigam talked to you

Page 237

1          Q.    So those numbers for 2000, 2001

2    and 2002 would have no bearing on these

3    numbers, right --

4                MR. BRAUTIGAM:  Objection.

5          Q.    -- because they occurred after?

6                MR. BRAUTIGAM:  Objection.

7          A.    There's a lot that happened before

8    then --

9          Q.    My question --

10         A.    -- bearing on that all the way

11   through.

12         Q.    My question is, though, the

13   numbers for 2000, 2001 and 2002 would have no

14   bearing on a document that was prepared in

15   1999, correct?

16               MR. BRAUTIGAM:  Objection.

17         A.    Yes, it should.

18         Q.    It should?

19         A.    Yeah.  They were taking numbers

20   off of a merger that -- yeah, everything's

21   wrong.

22         Q.    Okay.  Everything is wrong?

23         A.    It was all done by lies and cheat

24   and --

25         Q.    Okay.  So you believe that the

Page 238

1    financial results for 2000, 2001 and 2002

2    should have been included in the proxy

3    statement, Defendant's Exhibit 1?

4              MR. BRAUTIGAM:  Objection.

5         Q.   Is that right?

6         A.   I'm not sure how they're going to

7    make good on it.

8         Q.   Do you know how these numbers for

9    the columns 2000, 2001 and 2002 fit into the

10   proxy statement numbers that were prepared in

11   September of 1999 --

12             MR. BRAUTIGAM:  Objection.

13        Q.   -- if at all?

14        A.   No, I don't.

15        Q.   Okay.  If I understand your

16   testimony with Mr. Brautigam finally, with

17   respect to the factual allegations that are

18   contained in the Consolidated Amended

19   Complaint, other than the ones that relate to

20   you and your personal shares, the lawyers are

21   responsible for those, correct?

22        A.   Anybody that touched that proxy

23   I'd say was.  I don't know.

24        Q.   No, I'm talking about the

25   complaint.

Page 239

1          A.    Oh.

2          Q.    Do you remember the factual

3    allegations in the complaint, and you talked

4    about providing some information with respect

5    to your personal shares in this document,

6    correct?

7          A.    Yeah.

8          Q.    Okay.  I'll show you that.  It

9    talks about the Meier family, and you did

10   provide that information?

11         A.    Correct.

12         Q.    I think you testified in response

13   to Mr. Brautigam's questions that the remainder

14   of these facts were provided by the lawyers,

15   correct?

16         A.    Correct.

17         Q.    And you relied upon the lawyers to

18   see to it that those facts were accurate and

19   correct, correct?

20         A.    Correct.

21         Q.    And that they were well supported

22   by the evidence, correct?

23         A.    Correct.

24         Q.    And you also relied upon the

25   lawyers to tell you or to make a determination

1    as to who should be sued, who the defendants

2    should be?

3            A.   Correct.

4            Q.   And you now know that at least two

5    of those defendants have been dismissed?

6            A.   Correct.

7            Q.   Does that make you wonder whether

8    or not your lawyers made the right decision

9    when they prepared this document?

10           A.   No, not at all.

11           MR. BURKE:  Okay.  Nothing

12   further.  Thank you.

13           MR. BRAUTIGAM:  Okay.  I'm not

14   done.  Would you turn to the second page of

15   Plaintiff's Exhibit 91?

16           MR. BURKE:  I don't think -- we'll

17   go on for a little bit, but I don't see what --

18   you're redirecting your own witness?

19           MR. BRAUTIGAM:  That's what it is,

20   yes.

21           MR. BURKE:  Okay.

22               REDIRECT EXAMINATION

23   BY MR. BRAUTIGAM:

24           Q.   Would you just read this paragraph

25   to yourself?  It's the second paragraph under,