FILED
JAMES BONINI
CLERK

04 JUL 19 PM 4:13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| WALTER W. THIEMANN, et al. | : | Civil Action No. C-1-00-793 |
| --- | --- | --- |
| Plaintiffs, | : | Judge Sandra S. Beckwith |
| vs. | : | Magistrate Judge Timothy Hogan |
| OHSL FINANCIAL CORP., et al. | : | |
| Defendants. | : | |

## PLAINTIFFS' OBJECTION TO MAGISTRATE JUDGE HOGAN'S ORDER (DOC. NO. 349)

*"While Plaintiff considers this case to be complex, the Court does not and bases its decision on the efficiency with which counsel for Plaintiff conducted the Brinker deposition, which was taken in the presence of the Court."* (Doc. No. 349).

Plaintiffs respectfully submit this objection to Magistrate Judge Hogan's Order (Doc. No. 349) on the grounds that Magistrate Judge Hogan improperly limited Plaintiffs to only eight hours of questioning Defendants Hoverson, Cook and Carey despite the fact that they are important figures in a complex class action securities case. Plaintiffs further object to the fact that Magistrate Judge Hogan failed to grant Plaintiffs' Motion to Strike Defendant Brinker's Errata Sheet despite the fact that its contents, and likely the method by which it was created, are improper under federal law. Plaintiffs submit the following Memorandum in support of this objection.

1

Dated: 19 July 2004                              GENE MESH & ASSOCIATES

Respectfully Submitted,

*/s/ Michael L. Brautigam*

Gene Mesh (0002076)
Michael G. Brautigam
2605 Burnet Avenue
Cincinnati, Ohio 45219-2502
(513) 221-8800
(513) 221-1097 (Facsimile)

*Attorneys for Plaintiffs and the Putative Class*

## MEMORANDUM IN FURTHER SUPPORT OF OBJECTION

### I.  PRELIMINARY STATEMENT

Plaintiffs respectfully object to two main sections of Magistrate Judge Hogan's Order. First, Plaintiffs object that the Order states that the Plaintiffs will only receive an additional one hour beyond the presumptive seven hour limit to depose Defendant Hoverson, the Provident CEO; Defendant Carey, the Provident CFO; and Defendant Cook, a Provident Director who is a member of the audit committee. (Doc. No. 349). This decision is the result of Magistrate Judge Hogan's erroneous belief that this is not complex litigation. Id. Federal case law, some of the Defendants themselves, and even another judge in the Southern District, believes that the issues in this case are complex. Further, Magistrate Judge Hogan improperly disregards the fact that Plaintiffs are entitled to additional time pursuant to Federal Rule 30 because Plaintiffs did not even truly receive the full seven hours of questioning to which they are entitled because of the

2

improper conduct and interruptions of Keating Muething & Klekamp, LLP (hereinafter "KMK") the Provident Director Defendants.

Second, Plaintiffs respectfully object to the portion of the Order that denies Plaintiffs' Motion to Strike the extensive errata sheet allegedly submitted by former OHSL Chairman Norbert Brinker. Magistrate Judge Hogan does not explain why Defendants Brinker and KMK are being permitted to treat the deposition as a take home examination. Further, since Magistrate Judge Hogan has previously denied Plaintiffs' request to further depose Defendant Brinker (Doc. No. 295), Magistrate Judge Hogan is also improperly denying Plaintiffs the ability to determine the source and cause of the extensive changes to Defendant Brinker's errata sheet. This is the only way to enable a finder of fact to put the corrected and uncorrected versions of Defendant's Brinker's testimony into proper context.

## II.   LEGAL ARGUMENT

### A.   The Court Improperly Denied Plaintiffs' Request for Additional Time to Take the Provident Director Defendants' Depositions.

#### 1.   This Case is Complex Litigation.

There are several reasons which require that Plaintiffs be given additional time to take the Provident Director Defendants' depositions. The most significant of which is that this case involves complex litigation. It would hardly seem fair to provide the parties in a simple personal injury case with the same amount of time to depose their witnesses as the parties in a class action securities case. However, this is exactly what happened in this case since Magistrate Judge Hogan rejected the idea that this case involved complex litigation. (Doc. No. 349). In particular, when Plaintiffs' counsel

discussed his rationale for requesting additional time to depose the Provident Director Defendants in this case, Magistrate Judge Hogan responded as follows during the June 30, 2004 status conference:

> "Well, let's do it this way. I just can't - - if these depositions are anywhere near the length of Mr. Brinker's, I just haven't got the time to read them all. So - - and I can't conceive of - - I don't consider this a particularly complex case.
>
> I don't know if any of you do, I don't. And 14 hours just seems off the wall to me, so I'll give Mr. Brautigam a little leeway and give him another hour. Eight hours instead of seven. They could take a late lunch or something. And that's it."

(*See*, Transcript of June 30, 2004 Status Conference, Attached as Exhibit A). This comment was confirmed in this Court's Order. As a result, in response to Plaintiffs request to depose certain parties beyond the seven hour presumptive limit, the Court stated as follows:

> "While Plaintiff considers this case to be complex, the Court does not and bases its decision on the efficiency with which counsel for Plaintiff conducted the Brinker deposition, which was taken in the presence of the Court."

(Doc. No. 349). As a result, Plaintiffs were only given one additional hour to depose Provident Director Defendants Hoverson, Cook, and Carey. (Doc. No. 349). Plaintiffs respectfully disagree with this Court's assessment that this case is not complex for the following reasons.

The case law is very clear that class actions generally, and securities actions specifically, are considered complex litigation. The *Manual for Complex Litigation 2d* mentions class actions as a type of complex litigation. *Alberti v. Sheriff of Harris County,* 688 F. Supp. 1176, 1188 (S.D. TX 1987). Although the manual does not have the force and effect of law, it is considered by other federal courts to be an excellent

4

reference and text on handling complex cases. Further, the federal courts are largely in agreement that securities litigation is considered complex federal litigation. *See, King v. Greenblatt*, 560 F.2d 1024, 1026 (1st Cir. 1977). In *In re AremisSoft Corporation Securities Litigation,* 210 F.R.D. 109 (D.C. NJ 2002), the district court stated that "[t]his case is no exception to the rule that securities litigation involves complex issues of fact and law." Id. at 125. Similarly, in *In re Corel Corporation Inc. Securities Litigation,* 293 F.Supp.2d 484, the court referred to shareholder securities litigation as a "highly complex field." Id. at 486. Additionally, in *Silva Run Worldwide Limited v. Gaming Lottery Corporation, et al.* (May 14, 2004), 2003 U.S. Dist. LEXIS 7987 (S.D. N.Y.), the district court discussed the "complex nature of discovery in securities litigation." Id. at 22.

Also, cases much less complicated than this one have been found to be complex by the federal courts. In *In re Aloha Racing Foundation, Inc.,* 257 F.R.D. 83, 92 (N.D. AL 2000), the bankruptcy court fund the unresolved nature of the law on the issue of what constituted a professional under the Bankruptcy Code to constitute complex litigation. Id. The court stated that while this Court could define professional, the definition is a term of art and one could envision lengthy testimony, including expert testimony, at a trial on this issue which would also require an extensive finding of facts to determine whether an individual fit into that definition. Id. The court found that litigation on the merits of an individual's administrative expense claim also constituted complex litigation. Id.

*In re Aloha Racing Foundation, Inc.* is not nearly as complex as the facts of this case. There are almost 20 individual defendants in this action, and Plaintiffs alone have four nationally recognized experts in separate disciplines to support their case. Plaintiffs

also have individually reviewed hundreds of thousands of pages of documents in relation to this case. This case deals with lengthy documents which cover an extensive period of time. Similarly, the action deals with complex legal and factual issues, such as the application of the Sarbanes-Oxley Act to the Consolidated Amended Complaint, which have been interpreted differently by different federal courts. Additionally, the case has been litigated for almost four years, and has almost 350 docket entries. Finally, even Defendants in this action believe that this case deals with complex issues. Provident CFO Carey stated that this case dealt with "relatively complex accounting" issues, whereas Provident CFO stated that the auto leases, which were the cause of the restatements, were "extraordinarily complex transactions". (Carey dep. p. 92; Hoverson dep. p. 341, Attached as Exhibits B and C respectively). It should also be noted that in this Court's Order which granted Ernst & Young's Motion to Dismiss (Doc. No. 336), the Court stated that Judge Spiegel had noted in a parallel case involving the same financial restatements and GAAP provisions, that GAAP principle FAS 13 was a "complex provision" which allowed a "range of professional discretion in application." Id.

Given these factors, and the case law discussed above, the Plaintiffs find it inconceivable that Magistrate Judge Hogan would not view this as a complex case, and consequently unfairly limit the Plaintiffs' ability to fully and fairly question these key witnesses on that basis. If this case does not constitute complex litigation, than Plaintiffs submit that such a concept must not exist.

    2. **<u>The Conduct of Counsel and the Deponents Mandates Additional Time under Fed. Rule 30(d).</u>**

The Federal Rules also permit depositions to be extended if the conduct of counsel or the deponents necessitates granting opposing counsel additional time to

compensate for said conduct. In particular, Federal Rule 30(d) sets forth some rules for the taking of deposition and states, in pertinent part, as follows:

> (1) Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4).
>
> (2) Unless otherwise authorized by the court or stipulated by the parties, a deposition is limited to one day of seven hours. The court must allow additional time consistent with Rule 26(b)(2) if needed for a fair examination of the deponent or if the deponent or another person, or other circumstance, impedes or delays the examination.
>
> (3) If the court finds that any impediment, delay, or other conduct has frustrated the fair examination of the deponent, it may impose upon the persons responsible an appropriate sanction, including the reasonable costs and attorney's fees incurred by any parties as a result thereof.

Id. Thus, Federal Rule 30 clearly provides for beyond the presumptive seven hour limit if the conduct of counsel or the deponent has frustrated a fair examination of the deponent. Plaintiffs submit that this is exactly what occurred in the present case.

The conduct of KMK and its clients, as part of a deliberate strategy, impeded the deposition process in two main ways. First, in many cases, the individual defendants refused to answer even the most basic questions directly related to that person's area of expertise. In particular, Defendants Hoverson and Defendant Carey refused to answer questions which should have been within their purview. When Defendant Hoverson was asked questions about the financial data that Provident provided for the Proxy Materials/Registration Statement, the following exchange occurred:

> Q. Mr. Hoverson, did Provident provide financial data that went into Defendants' Exhibit 1?
>
> A. We did.

> Q. Did you ever learn after the fact that the data that Provident provided was not accurate?
>
> A. Would you like to get specific and ask me a specific question about the data? I'll be happy to answer it.
>
> Q. Mr. Hoverson, can you answer my question, please?
>
> MR. BURKE: Objection. I think he just indicated that he can't, but you may - -
>
> A. Well, and I'm happy to answer it if, you know - - if you would like me to speculate on things, I'm not going to do that. If you want to talk about the restatement in March 5th of 2003, is that specifically what you're referring to?
>
> Q. Mr. Hoverson - -
>
> A. I'm happy to respond to that question if you have a question that relates to that.

(Hoverson dep. pp. 8-9, Attached as Exhibit C). Similarly, when Defendant Carey was asked questions about Provident's audits, the following exchange occurred:

> Q. Okay. What's the difference between the audits that were performed by Greg Dooley and audits that were performed by E&Y?
>
> A. I mean, geez, why are you asking me that? How is that relevant to anything?

(Carey dep. p. 9, Attached as Exhibit B). However, the following exchange is even worse:

> Q. Could you give me a general view as to how the six-month data could be accurate but the year data inaccurate?
>
> [Objection omitted]
>
> A. I don't - - I don't - - I'm not going to - - I don't have a general view of that. I'm just saying that I think it's possible that the six-month data could be accurate. This is relatively complex accounting, and I think it's possible. I don't - - I'm not saying it is, but I don't want to speculate on something like that without having the answer.

8

>   Q.   Right. But as you sit here today as Provident's CFO, you can't give me one set of circumstances where it's possible that the six month data is accurate but the year end date is inaccurate, correct?
>
>   A.   That's not what I said.
>
>   Q.   Okay. Well, then, give me an example.
>
>   A.   I said I wasn't going to speculate on that.

(Carey dep. pp. 92-93). It took the next four pages of this deposition, with repeated objections and discussion by counsel, to get some type of an answer from Mr. Carey on this question. (Carey dep. pp. 92-97). This is obviously a poor rate of return as far as depositions are concerned, and illustrates how much of Plaintiffs' seven hours KMK and its deponents were able to use up with their improper objections and refusals to answer questions on the basis of speculation or other grounds.

In fact, Defendants Hoverson, Carey, and Cook even stated that they were unable to answer questions which directly related to documents they either drafted, reviewed, or signed. In Defendant Carey's deposition, the following exchange occurred:

>   Q.   Would you pick up Plaintiffs' Exhibit 90, please, in the pile right here. Would you turn to the first page please. Would you look at the second line, and would you read the sentence that begins, Actual results could differ materially, to yourself.
>
>   . . .
>
>   Q.   What does differ materially mean in that sentence?
>
>   MR. BURKE: Objection. No foundation, calls for speculation; calls for legal conclusion.
>
>   A.   Look, I'm not going to define what material means. Okay?
>
>   Q.   No, it's not okay.
>
>   A.   I'm not going to, so. . .

9

    Q.    Why not?

    A.    Because I can't specifically define it.

(Carey dep. pp. 15-16).[1] However, this was not true, for as the deposition continued, Defendant Carey gradually began to provide more information about his understanding of the term material. As a result, this was just an exercise to impede Plaintiffs' deposition and/or waste the seven hours allotted to Plaintiffs under the federal rules.

Magistrate Judge Hogan acknowledged the appropriateness of the use of documents at the status conference, but observed that the documents used should likely have some logical relationship to the deponent. (*See*, Transcript of June 30, 2004 status conference, attached as Exhibit A). He went on give a hypothetical which he thought would apply to the facts of this case. In particular, he stated as follows:

> "Refusal to answer questions? I mean, the witness is supposed to be directed to answer questions unless it's privileged. And then there better be a good reason why he's told not to answer the question. I don't know about refusing to answer - - - comment on a question, refusing to answer it based on it's not for me to interpret.
>
> Well, I don't know if it is or it isn't. It depends on what the document is and what is asked. If you presented me with a document from the Air Force Base and said interpret it, I'd way what is this? If it's an appropriate witness who was asked a question he should know, it's different. I can't decide that in a vacuum."

(*See*, Transcript of Proceedings at 32-33, Attached as Exhibit A).

Plaintiffs are concerned that Magistrate Judge Hogan did make his decision in a vacuum, for this is the only way that this ruling makes any sense. The depositions

---

[1] There is obviously something unusual about a CFO of a public company who is unable to define "material," a commonly used accounting term that appears repeatedly in documents Defendant Carey reviewed and signed. Defendant Carey also refused to answer questions which requested that he define other terms used in documents such as important and significant. (Carey dep. pp. 36-37).

confirm that an opposite result should have been reached. Further, the "air force document" hypothetical is not even close to being analogous to this case. The Provident CEO, CFO and directors are being directed not to answer questions and/or are refusing to answer questions about documents which they have drafted and/or signed including, but not limited to, the Proxy Materials/Registration Statement, Board and committee minutes, and Provident's own financial statements. Thus, if Magistrate Hogan was using his "air force base" hypothetical to support his decision that the Provident Defendants were improperly asked to review documents in the present case, Plaintiffs submit that his reasoning behind the decision is clearly erroneous. The only logical conclusion to be drawn from the Provident Director Defendants' responses are that these Defendants are shockingly ignorant of subjects which are basic to their positions, or that they have been improperly instructed to refuse to answer question and/or to say that they are unable to do so.

Second, perhaps even worse, there is a disturbing pattern of conduct by both counsel and their clients whereby counsel objects to a question and then the deponent parrots the attorneys' objection and then refuses to respond to the question on this basis. One of the best, and most frequently occurring examples of this, is the objection that the question calls for "speculation." KMK would object to the question on the basis of speculation, even though no speculation was required to answer it, and then the witness refused to answer the question on this basis. The following are a few of the many excruciating examples regarding this technique:

> Q.  And you restated the numbers because they were materially misstated prior to the restatement, correct?
>
> MR. BURKE: Objection. Asked and answered.

A.     Right. I mean, I've answered already. We restated the numbers because we determined we had - - in 2003 that there was an accounting error, and so we restated the numbers. Those are facts. They're on the record. It's on the record.

Q.     And that means that the numbers that Provident provided to the OHSL Shareholders which Provident expected the OHSL shareholders to rely on were materially misstated, correct?

MR. BURKE: Objection.

A.     I'm not gonna - -

MR. BURKE: Asked and answered.

A.     Yeah.

MR. BURKE: Calls for speculation.

A.     It's up to you to draw the conclusions you want about that. The facts are the facts. We restated the numbers; that included the numbers in '99.

(Hoverson dep. p. 26). Another example is as follows:

Q.     Would you expect the chairman of the board to vote at both the July 22nd, 1999 meeting and the August 2, 1999 meeting?

MR. BURKE: Objection. Calls for speculation.

A.     Yeah, you know, I don't know how they ran their company. I can't answer that as to what I would expect them to do.

Q.     Well - -

A.     . . . seriously.

Q.     You can form an opinion based on reading these paragraphs, correct?

MR. BURKE: Objection.

A.     Speak to how we run ours.

Q.     Okay.

A.     But I won't - - speculate on what they do and why they do it.

(Hoverson dep. p. 133).

Magistrate Judge Hogan discussed this type of situation during the status conference, but only in relation to his experiences in viewing Defendant Brinker's deposition. (*See*, Transcript of June 30, 2004 Status Conference, attached as Exhibit A). Although Magistrate Judge Hogan stated that he did observe such conduct during Defendant Brinker's deposition, he stated that he did not attribute this to misbehavior on the part of the lawyer, but rather that Defendant Brinker was "having trouble making the connection between the question and the answer." (*See*, Transcript of June 30, 2004 Status Conference at 31-32, attached as Exhibit A). Plaintiffs submit that the Provident Director Defendants at issue do not have the same age or infirmity issues which Defendant Brinker possessed. Further, in this regard, their conduct was much more egregious than that of Defendant Brinker. While Defendant Brinker truly had infirmities which impaired his ability to answer Plaintiffs' counsel questions, the Provident Director Defendants had no such infirmities, but just improperly refused or declined to do so.

In fact, more than one of the Provident Defendants confused the deposition process with a press conference. When faced with a tough question, the deponent would repeatedly say that he could not comment on the particular question. This was illustrated in Defendant Carey's deposition through the following question and answer:

> Q. Do you agree that the Securities and Exchange Commission requires, under Regulation C, that information in a prospectus be presented in, quote, clear, concise, and understandable, unquote language and that it not be misleading?
>
> [Objection omitted]
>
> A. And your question on that is what?

13

>   MR. BURKE: Do you agree with that, or do you known anything about that? Objection calls for a legal conclusion.
>
> A. I don't want to comment on something you're reading off a form there. I mean, it sounds reasonable, but I'm not sure what you're trying to get at.

(Carey dep. p. 101). This was not an isolated event. Another example follows:

> Q. Do you think in terms of good corporate governance here.
>
> A. I'm not going to comment on good corporate governance here.

(Carey dep. p. 321). All parties should agree that "no comment" is not an appropriate answer in a deposition.

Thus, for the foregoing reasons, Plaintiffs respectfully argue that pursuant to Federal Rule 30 (d), the improper conduct and interruptions of KMK and the Provident Defendants necessitates that Plaintiffs be given more than eight hours to depose Defendants Hoverson, Cook and Carey in order to ensure that Plaintiffs are given at least their presumptive seven hours of meaningful questioning. The Defendants and their counsel should not be rewarded for a deliberate strategy of running out the clock.

### 3. Magistrate Judge Hogan's Gratuitous Comments Raise Concern Regarding the Analysis Behind his Decisions.

Magistrate Judge Hogan's *sua sponte* comments during status conferences and orders of this Court cause concern regarding the analysis behind his decisions. This is seen in one of two ways. First, Magistrate Judge Hogan has an apparent bias against one of Plaintiffs' counsel. In response to the issue of whether or not Plaintiffs should have been given additional time to depose the Provident Director Defendants, and whether or not KMK's alleged improper conduct should be another reason for extending the deposition, Magistrate Judge Hogan unnecessarily harkened back to Defendant Brinker's deposition and stated as follows:

> "You known, I did read the deposition of Mr. Brinker that was taken in the state court before his deposition here. And it was, seems to me, somewhere around 800 pages. I mean, it took me three days to read it. Three days that I might add could have been better spent.
>
> And I was relatively unimpressed with the depositions of Mr. Brinker, too, I might add. My feeling when I left that deposition is probably 70 percent of what he said was demonstrated by documents or could have been."

(*See*, Transcript of June 30, 2004 Status Conference, Attached as Exhibit A). Once again, this is not only inaccurate, but not responsive to the issues before the Court. The issue was whether or not KMK had improperly impeded Plaintiff's counsel's ability to use take the depositions, and not what Magistrate Judge Hogan's opinion of Plaintiffs' counsel's deposition skills were. As a result, although the Court states in its Order that it is basing its decision to not provide Plaintiffs with more than one additional hour for the depositions based upon the "efficiency with which counsel for Plaintiff conducted the Brinker deposition," it is clear from Magistrate Judge Hogan's comments during the status conference that this sentence was not intended to have a positive connotation.

Another example of the bias by Magistrate Judge Hogan is the inequitable handling of the Pat Fischer letter. Pat Fischer copied the Court on a routine letter in violation of the Federal Rules and Local Rules. The sole purpose of this letter was to defame Plaintiffs' counsel, Michael G. Brautigam, Esq. More recently, apparently in recognition of the flagrant violation of the Local Rules, Mr. Fischer, KMK's shadow counsel, has had Barrett & Weber file other letters with the Court as part of a "Notice of Filing." Once again, the sole purpose of this dubious "filing" is to defame one of Plaintiffs' counsel, and Plaintiffs have filed a Motion to Strike or Otherwise Not Consider this Notice of Filing. The original motion (Doc. No. 204) was unopposed, which was not unexpected given the fact that Mr. Fischer knew that his conduct was improper.

Although Plaintiffs agree with the Court that it is difficult for it to strike something that has never been docketed or made a part of the record, Plaintiffs disagree with the commentary that associated Magistrate Judge Hogan's decision to deny Plaintiffs' Motion to Strike or Otherwise Not Consider this Notice of Filing[2]. In particular, Magistrate Judge Hogan stated as follows:

> "Yes. Here's my decision. I'm going to sua sponte strike the motion to strike as silliness and recommend, Mike, if you think he's calling you names, why don't you write Pat a letter and call him names and then leave the Court of gross silliness, all right?"

(*See*, Transcript of June 30, 2004 Status Conference, Attached as Exhibit A). Similarly, in the Order, Magistrate Judge Hogan stated as follows:

> "The Court, attempting to focus on the merits of the case, is unswayed by such silliness and regards the filing of a Motion to Strike a piece of undocketed correspondence as completely unnecessary. That the lawyers have less than warm and fuzzy feelings toward one another has been patently obvious, with or without the benefit of being copied on correspondence. The Motion to Strike (Doc. 204) is itself denied and stricken from the record as an unnecessary distraction from the merits of the case."

(Doc. No. 349). Given the fact that it was Mr. Fischer, and not Mr. Brautigam, Esq., who improperly sent this letter to the Court, Magistrate Judge Hogan's comments once again show his bias against Plaintiffs' counsel.

Second, Magistrate Judge Hogan also seems to often not be in touch with the facts or procedure of this case. During the June 30, 2004 status conference, Magistrate Judge Hogan stated that he was unaware that the cases against Keating Muething & Klekamp, LLP and Ernst & Young had been dismissed on statute of limitations grounds. (*See*,

---

[2] It is ironic that Plaintiffs are criticized for filing a motion to strike or otherwise not consider the letter, when this very suggestion on how to proceed on this issue came from Magistrate Judge Hogan's chambers. (*See*, Doc. No. 204)

Transcript of Proceedings at 8, Attached as Exhibit A). This is especially disturbing since these rulings had been part of the case record for weeks and was specifically raised in a letter submitted to Magistrate Judge Hogan (with the Court's permission) days before the status conference, and were in part, the reason for the status conference. (*See*, Letter from Michael G. Brautigam to Magistrate Judge Hogan, Attached as Exhibit D).

This pattern has already been noted in the Objection to Magistrate Judge Hogan's Order Denying Plaintiffs' Additional Time to Depose OHSL Chairman of the Board Norbert Brinker (Doc. No. 295). In this Objection, Plaintiffs argued that Magistrate Judge Hogan had incorrectly limited Plaintiffs to only being able to depose the former OHSL Chairman, Norbert Brinker, to two hours on the basis that Plaintiffs' counsel had not asked Defendant Brinker any questions about topics which had not previously been covered during his state action deposition. (Doc. No. 295). This was clearly incorrect for the questioning dealt with topics including Plaintiff Thiemann, the Restatements, and the Order disqualifying KMK, all of which transpired since Defendant Brinker's last deposition. Thus, it was simply unknown how Magistrate Judge Hogan could reach this conclusion based upon this argument.

Thus, given the bias shown by Magistrate Judge Hogan against one of Plaintiffs' counsel, and his previous inattention to detail related to this case, Plaintiffs submit that these are further reasons to object to Magistrate Judge Hogan's decision to limit the Plaintiffs to only one additional hour for purposes of deposing Provident Director Defendants Hoverson, Carey, and Cook.

  **B.** **Defendant Brinker's Errata Sheet Should be Stricken Because a Deposition is Not a Take Home Examination.**

Plaintiffs also respectfully object to Magistrate Judge Hogan decision not to strike Defendant Brinker's errata sheet. An errata sheet is meant to catch transcription errors or to correct non-substantive errors in the deponent's testimony. It is not meant to be a take home examination whereby the deponent can make substantive changes to his deposition testimony after consulting with counsel. However, not only does Magistrate Judge Hogan's ruling in essence permit Defendant Brinker to treat his deposition as a take home examination, but this decision is doubly damaging because he has also previously denied Plaintiffs the ability to learn how the errata sheet came into existence.

Although it is true that Magistrate Judge Hogan argued that it was in essence unnecessary to strike the errata sheet since the finders of fact would be able to consider both the uncorrected and corrected versions of Defendant Brinker's testimony, this does not answer Plaintiffs' concern of how the errata sheet came into existence. As discussed in Plaintiff's Motion to Strike (Doc. No. 305), Defendant Brinker and KMK filed this errata sheet only after Magistrate Judge Hogan had ruled that Plaintiffs could not further depose Defendant Brinker beyond the two hours that had previously been granted by the Court. (Doc. No. 295). As a result, once shielded from further scrutiny, Defendant Brinker and KMK immediately filed an errata sheet that then not only substantively changed Defendant Brinker's testimony on critical issues, but also precluded Plaintiffs from further inquiring as to the process whereby the errata sheet was created. Based upon Defendant Brinker's performance at his deposition, Plaintiffs do not believe that Defendant Brinker was capable of making these changes without assistance from KMK. (Doc. No. 305), indeed it appears that Mr. Brinker was incapable of even <u>reading</u> his deposition, but had it read to him. (*See*, Brinker errata sheet, Attached as Exhibit E). The

only way to verify this is to continue the deposition of Defendant Brinker. Without this information, the finder of fact will only be able to guess that KMK made the changes to Mr. Brinker's errata sheet, and will not have this fact confirmed through Defendant Brinker's deposition testimony.

Thus, since Magistrate Judge Hogan has already denied Plaintiffs the right to depose Defendant Brinker more than two hours (Doc. No. 295), Plaintiffs submit it is not enough to make both the uncorrected and corrected versions of Defendant Brinker's testimony available to the finder of fact. Rather, it must be stricken in its entirety so that the issue of the creation of the errata sheet will not be unresolved.

### III. CONCLUSION

Therefore, for the foregoing reasons, Plaintiffs respectfully request that the Order objected to be overturned with respect to only those areas objected to herein.

DATED: 19 July 2004                    Respectfully Submitted,

*[signature]*

Gene Mesh (OH Bar # 0002076)
Michael G. Brautigam
GENE MESH & ASSOCIATES
2605 Burnet Avenue
Cincinnati, Ohio 45219-2502
(513) 221-8800
(513) 221-1097 (fax)

*Attorneys for Plaintiffs and the Putative Class*

only way to verify this is to continue the deposition of Defendant Brinker. Without this information, the finder of fact will only be able to guess that KMK made the changes to Mr. Brinker's errata sheet, and will not have this fact confirmed through Defendant Brinker's deposition testimony.

Thus, since Magistrate Judge Hogan has already denied Plaintiffs the right to depose Defendant Brinker more than two hours (Doc. No. 295), Plaintiffs submit it is not enough to make both the uncorrected and corrected versions of Defendant Brinker's testimony available to the finder of fact. Rather, it must be stricken in its entirety so that the issue of the creation of the errata sheet will not be unresolved.

### III. CONCLUSION

Therefore, for the foregoing reasons, Plaintiffs respectfully request that the Order objected to be overturned with respect to only those areas objected to herein.

DATED: 19 July 2004                                        Respectfully Submitted,

*[signature]*

Gene Mesh (OH Bar # 0002076)
Michael G. Brautigam
GENE MESH & ASSOCIATES
2605 Burnet Avenue
Cincinnati, Ohio 45219-2502
(513) 221-8800
(513) 221-1097 (fax)

*Attorneys for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

This is to certify that a true and accurate copy of the foregoing Plaintiffs' Objection to Magistrate Judge Hogan's Order (Doc. No. 349) was served this 19th day of July 2004 as follows:

**BY HAND DELIVERY**

James E. Burke, Esq.
Keating, Muething & Klekamp, P.L.L.
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202-3752

**BY U.S. MAIL**

Michael E. Maundrell, Esq.
John W. Hust, Esq.
Schroeder, Maundrell, Barbiere & Powers
11935 Mason Road, Suite 110
Cincinnati, Ohio 45249

David Greer, Esq.
Bieser, Greer & Landis
400 National City Center
6 North Main Street
Dayton, OH 45402-1908

_____
Stephanie A. Hite