# Exhibit B

1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
2                    WESTERN DIVISION

3

4                        - - -

    WALTER W. THIEMANN, et al.,:
5                                :
            Plaintiffs,          :
6    -v-                         : CASE NO. C-1-00-793
                                 :
7    OHSL FINANCIAL CORPORATION,: (Judge S. Beckwith)
    et al.,                      :
8                                :
            Defendants.          :
9                        - - -

10

11

12           Deposition of CHRISTOPHER J. CAREY, a
13    witness herein, taken by the Plaintiffs as upon
14    cross-examination pursuant to the Federal Rules of
15    Civil Procedure, and pursuant to notice and
16    stipulations hereinafter set forth, at the offices
17    of Gene Mesh & Associates, 2605 Burnet Avenue,
18    Cincinnati, Ohio, at 9:11 a.m., on Monday, June
19    21st, 2004, before Kelly Green, RPR, a Notary
20    Public within and for the State of Ohio.

21

22                    Williams and Oliver
                      6689 Raes Creek Court
23                    Loveland, Ohio  45140
                        (513) 683-9626

24



Page 2

APPEARANCES

On behalf of the Plaintiffs:
    MICHAEL G. BRAUTIGAM, ESQ.
    GENE MESH, ESQ.
    Gene Mesh & Associates
    2605 Burnet Avenue
    Cincinnati, Ohio 45219
On behalf of the Defendants:
    JAMES E. BURKE, ESQ. (Of Counsel)
    Keating, Muething & Klekamp
    1400 Provident Tower
    One East Fourth Street
    Cincinnati, Ohio 45202
On behalf of the Defendant,
OHSL and Provident:

    JOSEPH C. OEHLERS, ESQ.
    Bieser, Greer & Landis
    400 National City Center
    6 North Main Street
    Dayton, Ohio 45402

        - - -

Page 4

EXAMINATION INDEX

CHRISTOPHER J. CAREY
    CROSS BY MR. BRAUTIGAM . . . .  5

EXHIBITS

(No exhibits were marked.)

Page 3

STIPULATIONS

It is stipulated by and among counsel for the respective parties that the deposition of CHRISTOPHER J. CAREY, a witness herein, may be taken at this time by the Plaintiffs as upon cross-examination, pursuant to Federal Rules of Civil Procedure and pursuant to notice; that the deposition may be taken in stenotypy by the notary public and court reporter and transcribed by her out of the presence of the witness; that the deposition is to be submitted to the witness for his examination and signature, and that signature is not waived.

Page 5

CHRISTOPHER J. CAREY,
a witness herein, having been duly sworn, was examined and testified as follows:
        CROSS-EXAMINATION
BY MR. BRAUTIGAM:
    Q.   Good morning, Mr. Carey.  My name is Michael G. Brautigam.  I represent Walter Thiemann, Gary and Lisa Meier, and a putative class of OHSL shareholders.
        Mr. Carey, you're Provident's CFO; is that correct?
    A.   That's correct.
    Q.   And you're also the treasurer?
    A.   I think that's true.
    Q.   What are your duties and responsibilities as Provident's CFO?
    A.   What are my duties and responsibilities? Do you want a short answer for that or what?
    Q.   Sure.
    A.   I'm the chief financial officer for the company.
    Q.   And can you --
    A.   That's very self-explanatory.  Okay?
    Q.   Well, not to me.

2 (Pages 2 to 5)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 6

1   A.   Really?
2   Q.   So perhaps we need the longer answer.
3   A.   Okay.  At Provident, I'm responsible for
4  all accounting; treasury activities; strategic
5  planning; human resources; facilities; purchasing;
6  taxes.  I think that's about it.
7   Q.   What are your duties and
8  responsibilities as treasurer?
9   A.   Treasurer -- interest rate sensitivity
10 management; raising capital, raising debt.  Those
11 are the primary responsibilities.  Oh, investor
12 relations in that first one, too.
13  Q.   As CFO?
14  A.   Yes.  Oh, and lastly, mergers and
15 acquisitions.
16  Q.   Don't want to forget that.
17  A.   Wouldn't want to forget that.
18  Q.   Are you a CPA?
19  A.   Yes.
20  Q.   Are you an expert in GAAP?
21  A.   I don't know how you would define
22 expert.  Certainly very proficient with GAAP.
23  Q.   Are you an expert in GAAS?
24  A.   I'd say at this stage, probably no.

Page 7

1   Q.   Is there anyone at Provident more
2  knowledgeable than you about accounting issues?
3   A.   Possibly.
4   Q.   Who would that be?
5   A.   Tony Stollings.  He's the chief
6  accounting officer.
7   Q.   Anyone else?
8   A.   That would probably be it.
9   Q.   How would you describe the distinction
10 and duties between the chief financial officer and
11 the chief accounting officer?
12  A.   He doesn't have M and A; he doesn't have
13 treasury; he doesn't have HR; he doesn't have
14 facilities; he doesn't have investor relations.
15      So he's mostly got accounting and
16 purchasing and taxes.  Financial reporting, which
17 is part of accounting.
18  Q.   You're familiar with Provident's public
19 documents, correct?
20  A.   Yes.
21  Q.   And you've read and signed Provident's
22 public documents, correct?
23  A.   Um-hum.
24  Q.   How long have you been CFO?

Page 8

1   A.   Since November of 1998, mid-November.  I
2  believe it was the 14th.  I don't know if that's
3  the precise date, but around the 14th.
4   Q.   Of '98?
5   A.   Yes.
6   Q.   Is there anyone more knowledgeable about
7  GAAS at Provident than you?
8       MR. BURKE: Objection.  Calls for
9  speculation.  You may answer.
10  A.   I'm not sure.  I don't know.  Are you
11 talking about auditing standards?
12  Q.   Yes.
13  A.   I would look to the internal audit
14 group, but I'm not certain if they are more
15 knowledgeable than me.  We have an internal
16 auditing function.
17  Q.   Which individuals are you talking about?
18  A.   I would just start with the head of
19 internal audit, Greg Dooley.
20  Q.   And you believe that Mr. Dooley --
21  A.   No.  I said he could be.  I'm not saying
22 he is.
23  Q.   I wasn't finished with my question.
24  A.   Okay.

Page 9

1   Q.   You believe that Mr. Dooley is familiar
2  with GAAP and GAAS, correct?
3   A.   Yes.
4   Q.   What's the difference between internal
5  audit and other forms of audit?
6       MR. BURKE: Objection.  Form; vague.
7   Q.   If you understand the question, you can
8  answer.
9   A.   I didn't answer.  He just objected to
10 it.  Is there something --
11      MR. BURKE: No, no.  When I object, it's
12 just for the record.
13      THE WITNESS: Okay.
14      MR. BURKE: You then go ahead and answer
15 unless I instruct you not to.
16  A.   Why don't you give me something more
17 specific when you say other forms of audit.
18  Q.   Okay.  What's the difference between
19 audits that were performed under the supervision of
20 Greg Dooley and audits performed by E&Y?
21  A.   I mean, geez, why are you asking me
22 that?  How is that relevant to anything?
23  Q.   Can you answer my question, please?
24  A.   You want me to answer the difference

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 10

1 between audits that Greg Dooley does and Ernst &
2 Young?
3    Q.    Correct.
4        MR. BURKE: Objection. Overbroad. You
5    may answer.
6    A.    I would refer that to Greg Dooley or
7 someone else to answer that.
8    Q.    Well, I'm entitled to your opinion,
9 Mr. Carey, so please answer the question.
10        MR. BURKE: You can answer if you have
11    an answer. You don't have to give an opinion
12    if you don't have one, but if you have an
13    answer as to the difference between --
14    A.    I have an answer. Greg Dooley's audits
15 typically would be -- typically would be much more
16 comprehensive. Ernst & Young would be typically,
17 but in some cases, theirs would be just as
18 comprehensive; might be more testing, but it would
19 depend. Each audit circumstances could be
20 different.
21    Q.    What's the reason that Provident has an
22 internal audit function?
23    A.    An added internal control, primarily.
24    Q.    And what's the reason that Provident is

Page 11

1 audited by Ernst & Young?
2    A.    It's required.
3    Q.    By whom?
4    A.    The SEC.
5    Q.    Do you know why it's required?
6        MR. BURKE: Objection. Calls for legal
7    conclusion. You may answer. Go ahead.
8    A.    I believe it's required because we're a
9 public company, and we have to have audited
10 financial statements.
11    Q.    And do you have any idea of why the SEC
12 required audited financial statements for a public
13 company?
14        MR. BURKE: Objection. No foundation;
15    calls for a legal conclusion. You may answer.
16    A.    I think it's -- one of the Exchange Acts
17 requires it.
18    Q.    Would you turn to Defendants' Exhibit 1,
19 which is right in front of you, sir.
20    A.    (Witness complies.)
21    Q.    Mr. Carey, have you seen Defendants'
22 Exhibit 1 before?
23    A.    Let me see. What is it?
24    Q.    You're asking me?

Page 12

1    A.    The proxy?
2    Q.    Yes. This is the proxy that was used in
3 the OHSL-Provident merger.
4    A.    If this is the proxy, yes, I've seen it.
5    Q.    Did you read every word and look at
6 every number at some point in 1999?
7    A.    Yes. I've read every word and -- I've
8 read the document.
9    Q.    And you've looked at every number as
10 well, correct?
11        MR. BURKE: Objection. You may answer.
12    A.    I've read the document. I presume that
13 includes looking at every number. I mean, did I
14 look at every page number? I don't know. But most
15 of the numbers in here, I would assume I've looked
16 at.
17    Q.    And what was the purpose of your reading
18 every word and looking at every number in
19 Defendants' Exhibit 1?
20        MR. BURKE: Objection. You may answer.
21    Foundation.
22    A.    What was the purpose? Make sure the
23 document was appropriate before we sent it out to
24 their shareholders.

Page 13

1    Q.    What standard did you use in determining
2 whether or not the document was appropriate before
3 it got sent out to OHSL shareholders?
4        MR. BURKE: Objection. Vague. You may
5    answer.
6    A.    As best as we could determine that
7 whatever we had written in here, whatever numbers
8 were included in here, they were correct,
9 reasonably articulating what we wanted to
10 articulate in here relevant to our company and
11 theirs.
12    Q.    Did you later learn that the numbers
13 that Provident provided that were included in
14 Defendants' Exhibit 1 were materially misstated?
15        MR. BURKE: Objection.
16    A.    No, I didn't learn that.
17    Q.    Did you later learn that the numbers
18 that were included in Defendants' Exhibit 1 that
19 were provided by Provident were inaccurate?
20    A.    Yes.
21    Q.    When did you learn that?
22    A.    Sometime in March of... '04?
23    Q.    '03?
24    A.    '03, yes.

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 14

1    Q.    Was it March or February?
2    A.    February.  Well, we learned we had an
3  issue in February.  I don't know when we really got
4  -- I forget when it exactly concluded, whether it
5  was February or early March that the numbers were
6  inaccurate.  We did some work to determine that for
7  a while.  The issue related to the inaccurate
8  numbers was discovered in February.
9    Q.    You're familiar with the term "material"
10  as accountants use that term, correct?
11    A.    Um-hum.
12    Q.    What does the term mean?
13    A.    I couldn't define that term.
14    Q.    Why not?
15    A.    I don't know how to define that term.
16    Q.    You said you're able to read and
17  interpret Provident documents, correct?
18        MR. BURKE:  Objection.  Misstates prior
19    testimony.  You may answer.
20    A.    I don't think I said exactly that.  I
21  said something like that.
22        MR. BRAUTIGAM:  Could you find that,
23    please?
24        (Off-the-record discussion.)

Page 15

1  BY MR. BRAUTIGAM:
2    Q.    Are you able to read and interpret
3  Provident's public documents?
4    A.    Yes.
5        MR. BURKE:  Objection.  Overbroad and
6    asked --
7    Q.    Would you pick up Plaintiffs' Exhibit
8  90, please, in the pile right here.  Would you turn
9  to the first page, please.  Would you look at the
10  second line, and would you read the sentence that
11  begins, Actual results could differ materially, to
12  yourself.
13    A.    What page are you on?
14    Q.    1.
15        MR. BURKE:  Second line of numbers?
16    Q.    Second line of the text at the bottom.
17    A.    Okay.  I got it.  Um-hum.
18    Q.    What does differ materially mean in that
19  sentence?
20        MR. BURKE:  Objection.  No foundation;
21    calls for speculation; calls for legal
22    conclusion.
23    A.    Look, I'm not going to define what
24  material means.  Okay?

Page 16

1    Q.    No, it's not okay.
2    A.    I'm not going to, so...
3    Q.    Why not?
4    A.    Because I can't specifically define it.
5    Q.    Do you know what material means as
6  accountants use the term?
7    A.    I don't know exactly how it's defined
8  when accountants use the term.
9    Q.    Do you use the term material?
10    A.    Occasionally.
11    Q.    Have you used the term material in
12  accounting context?
13    A.    I don't know if it's necessarily in
14  accounting context, but...
15    Q.    Have you used the term material with
16  respect to Provident's restatements?
17    A.    I don't know with respect to our
18  restatements whether I used the term material.
19    Q.    Did anyone ever use the term material
20  with respect --
21    A.    I can't speak to whether anyone did or
22  not.
23    Q.    Did you ever hear anyone use the term
24  material with respect to Provident's restatements?

Page 17

1        MR. BURKE:  You mean... I don't know
2    what you mean by restatements.  Objection.
3    Vague.  You may answer.
4    A.    Could you repeat the question?
5    Q.    Did you ever hear anyone use the term
6  material with respect to the discussion of
7  Provident's restatements in 2003?
8        MR. BURKE:  Objection.  Vague.
9    A.    I mean, I think I probably have, but I
10  don't know -- I wouldn't be able to say who, but it
11  wouldn't surprise me if I heard that.
12    Q.    When you heard that word in that
13  context, did you understand what it meant?
14        MR. BURKE:  Objection.  Calls for
15    speculation.
16    A.    Not specifically.
17    Q.    Did you have a general understanding of
18  what it meant in that context?
19        MR. BURKE:  Objection.  Vague;
20    speculation.
21    A.    I wouldn't know what someone else was
22  really thinking when they were using the word
23  material.  I would be speculating.  I'm not trying
24  to not answer the question.  All right?  I can't

5 (Pages 14 to 17)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 18

1 guess what other people mean by it.
2    Q.    Mr. Carey, I'm not asking you to guess.
3 I'm not asking what other people mean by it. I'm
4 asking for your interpretation. When you heard
5 someone use the term material with respect to
6 Provident's restatements in 2003, what did you --
7 what did you understand the term to mean?
8        MR. BURKE: Objection. Asked and
9 answered; calls for speculation.
10    A.    I can't tell you what other people mean
11 when they use the word material.
12    Q.    Mr. Carey, please listen to my question
13 very carefully. When other people use the term
14 material with respect to Provident's 2003
15 restatements, what did you understand the term to
16 mean?
17        MR. BURKE: Objection. Asked and
18 answered.
19    A.    I answered that question already.
20    Q.    Mr. Carey, I'm entitled to your
21 answer --
22    A.    You're asking me what other people
23 undefined meant by using a term, and I don't know
24 what other people undefined meant by using that

Page 19

1 term.
2    Q.    Mr. Carey, please listen carefully. I'm
3 not asking for what other people meant. I'm asking
4 for your interpretation of what that word meant
5 when it was used in your presence. I don't care
6 what other people meant. What I care about is your
7 understanding of the term.
8        MR. BURKE: Objection to form; asked and
9 answered. You're asking him to interpret what
10 some unspecified individual may have meant
11 when he really doesn't recall any specific
12 instance.
13        So I object to the form of the
14 question. It's already been asked and
15 answered, and it's vague, and it calls for
16 speculation. You may answer.
17    A.    I already answered that question.
18    Q.    Mr. Carey, you have not answered the
19 question. You've deflected the question. Please
20 listen carefully and answer my question. I'm not
21 interested in what other people meant when they
22 used the term. I'm interested in your
23 interpretation of the word material when you heard
24 it in the context of Provident's restatements in

Page 20

1 2003.
2        MR. BURKE: Same objections.
3    A.    Again, I don't know how I can answer
4 that question without it being more specific.
5    Q.    What specificity would you need?
6    A.    Who the person is when they asked the
7 question, if it was even asked, if it was even
8 talked about. Give me a better way of saying it.
9 Mark? Is that it?
10    Q.    Mike.
11    A.    Mike.
12    Q.    Mr. Carey, we'll come back to that.
13 Would you turn to page 46, please. What do we find
14 on page 46 of Exhibit 90?
15    A.    Ernst & Young's opinion.
16    Q.    And you've read this before?
17    A.    Yes, I have.
18    Q.    And you're familiar with the terms in
19 the opinion, correct?
20        MR. BURKE: Objection. No foundation;
21 calls for speculation as to Ernst & Young.
22 You may answer.
23    A.    Again, I'm familiar with this. I read
24 it each year.

Page 21

1    Q.    Okay. Would you read the second
2 paragraph to yourself.
3    A.    (Examining document.) Okay. Read.
4    Q.    Do you see the phrase "free of material
5 misstatement" on the second line?
6    A.    Yes, I do.
7        (Attorney Oelers entered the room.)
8    Q.    What does the phrase "free of material
9 misstatement" mean?
10        MR. BURKE: Objection. Calls for
11 speculation; no foundation. You may answer.
12    A.    I would say what it means is what it
13 says right there. I wouldn't expand on it.
14    Q.    What does it mean to have something
15 that's free of material misstatement?
16    A.    I would say it means it's free of
17 material misstatement.
18    Q.    Can you answer the question without
19 using the same words --
20    A.    No.
21    Q.    -- in the question?
22    A.    No. I'm answering it's clear. It's all
23 in English there. It says it's free of material
24 misstatement. It's free of material misstatement.

6 (Pages 18 to 21)

1  I would ask you to ask Ernst & Young as to their
2  opinion, not mine.
3      Q.    Mr. Carey, that's not the way this
4  process works.  Please tell me your understanding
5  of the phrase "free of material misstatement" as it
6  appears on page 46 of Plaintiffs' Exhibit 90.
7          MR. BURKE:  Objection.  Asked and
8  answered; calls for speculation; no
9  foundation.
10     A.    Again, my answer to that question is
11  free of material misstatement means exactly what's
12  written there.
13     Q.    Mr. Carey, that's not an acceptable
14  answer.  Please listen carefully to my question and
15  answer it.
16         What is your interpretation of the
17  phrase "free of material misstatement" using other
18  words as it appears on page 46 of Plaintiffs'
19  Exhibit 90?
20         MR. BURKE:  Mr. Brautigam, you're not
21  entitled to instruct the witness on what's an
22  acceptable or unacceptable answer.  You're
23  entitled to his best answer, and you've gotten
24  it three times, and now you're asking the

1  question again.
2          Objection.  Asked and answered; calls
3  for speculation.  You may answer again.
4      A.    I'm not going to -- I've already
5  answered the question.  I'm not going to answer it
6  again.  Come on.
7      Q.    Mr. Carey, I'm entitled to an answer.
8      A.    I gave you an answer.
9      Q.    I'm entitled to a truthful and complete
10  answer.
11         MR. BURKE:  Objection.  You already got
12  one.
13     Q.    Mr. Carey, do you remember being sworn
14  as a witness?
15     A.    Watch it.  Okay?
16     Q.    Excuse me?
17     A.    I said watch it.  All right?  Of course
18  I remember that.
19     Q.    Okay.
20     A.    Are you insulting me?
21     Q.    No, I'm not insulting you.
22     A.    Then why did you ask that question?  It
23  happened 15 minutes ago.
24     Q.    Did you swear to tell the truth, the

1  whole truth --
2          MR. BURKE:  Objection.
3      Q.    -- and nothing but the truth?
4          MR. BURKE:  Objection.  Mr. Brautigam,
5  please ask your questions.  There's no reason
6  to badger this witness.  Everybody knows
7  that.  He knows he's under oath, so just ask
8  your questions.
9      Q.    Mr. Carey --
10         MR. BURKE:  This is not some TV show.
11     Q.    -- did you swear to tell the truth, the
12  whole truth --
13         MR. BURKE:  Instruct the witness not to
14  answer.
15     Q.    -- and nothing but the truth?
16         MR. BURKE:  Instruct the witness not to
17  answer.  Go ahead.  Go ahead.
18         MR. BRAUTIGAM:  If this keeps up, we're
19  going to call the Magistrate.  I'm entitled to
20  an answer to my question.
21         MR. BURKE:  And he's given you an
22  answer, Mike.  You want him to define a term,
23  and he said he's not able to define it.  This
24  is Ernst & Young's opinion.  I mean, what's so

1  hard to understand about that?
2  BY MR. BRAUTIGAM:
3      Q.    Mr. Carey, is it true that you are not
4  able to understand what the phrase "free of
5  material misstatement" means as Provident's CFO?
6      A.    I've answered that question, Mike.
7      Q.    It's a new question.  Is it true that as
8  you sit here today, you are not able to understand
9  the term "free of material misstatement"?
10     A.    I'd say that's generally not true.
11     Q.    Then tell me what it means.
12     A.    I think it's self-explanatory, free of
13  material misstatements.  I'm not going to define
14  what material means for Ernst & Young or anyone.
15  That's taking it out of context.
16     Q.    Mr. Carey, please define what material
17  means to Provident.
18         MR. BURKE:  Objection.  You may answer.
19  Objection.  Calls for speculation without any
20  context.
21     A.    Yeah, you'd have to give me more before
22  saying what does material mean to Provident.
23     Q.    What else would you need?
24     A.    Some more context.

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 26

1    Q.    How about in the context of Provident's
2  annual report that you have in front of you.
3            MR. BURKE: Objection. Vague;
4  overbroad.
5    A.    Are you still waiting for me?
6    Q.    Yes.
7    A.    Why don't you repeat the question
8  again.
9            (The question was read back.)
10            MR. BURKE: Objection. Vague;
11  overbroad; no context. You may answer.
12    A.    It's too vague.
13    Q.    So as you sit here today, you are not
14  able to respond to my question about what material
15  means to Provident with respect to Provident's
16  annual report; is that correct?
17    A.    That's correct.
18    Q.    Are you able to respond to what material
19  means with respect to Provident's financial
20  statements?
21            MR. BURKE: Objection. Vague. You may
22  answer.
23    A.    That's vague, but I think you're getting
24  closer to where I could probably give you some kind

Page 27

1  of commentary.
2    Q.    Would you give it a shot, please?
3            MR. BURKE: Objection. Form.
4    A.    Well, I mean, relative to the financial
5  statements, there's four financial statements. So
6  there isn't a dollar number I have, but why don't
7  you ask a question like what's material to our
8  financial position.
9    Q.    Well, that's not the way it works.
10    A.    Okay.
11    Q.    What's material to Provident's financial
12  statements?
13            MR. BURKE: Objection. Vague;
14  overbroad.
15    A.    What's material to Provident's financial
16  statements? I mean, which financial statement?
17    Q.    The financial statements included in
18  Plaintiffs' Exhibit 90.
19            MR. BURKE: Objection. Vague;
20  overbroad.
21    A.    Well, I mean, we could probably spend
22  hours on this, but -- and I know you don't want to.
23  There isn't a dollar amount.
24            The financial statements here have 17

Page 28

1  billion in assets; and as far as I know, there
2  isn't a specific agreed-upon amount that is
3  material. So there's not a percentage or a dollar
4  amount that typically people agree upon that's
5  material.
6            But if we have 17 billion in assets,
7  some significant difference on that of, say, 10
8  percent, perhaps that would be material.
9            There isn't a bright line, because there
10  are different situations that could make things
11  viewed differently by different people.
12            So that's why it's hard to answer the
13  question on what's material, because I'm not aware
14  -- maybe there is -- I'm just not aware that there
15  is a bright line.
16    Q.    All right. Let me see if I understand
17  your testimony correctly. You believe that 1.7
18  billion dollars might be material to Provident's
19  financial statements, correct?
20            MR. BURKE: Objection. Misstates the
21  prior testimony. That's not at all what he
22  said. You may answer.
23    A.    I said there's not a bright line, and it
24  would -- it could be looked at that you'd have to

Page 29

1  probably be in excess of 10 percent; but I can't
2  tell you that that necessarily would be material.
3            I mean, I know you want to spend a lot
4  of time on this material issue because we already
5  have. It would depend.
6    Q.    Mr. Carey, you said in some
7  circumstances, an excess of 10 percent could be
8  considered material; is that true?
9    A.    Yeah, I think that's true.
10    Q.    10 percent of what?
11            MR. BURKE: Objection.
12    A.    10 percent of assets.
13    Q.    10 percent of assets?
14    A.    Um-hum.
15    Q.    Would $100 be material to Provident's
16  financial statements?
17            MR. BURKE: Objection. Calls for
18  speculation. You may answer.
19    A.    Would $100? I think it wouldn't be, but
20  I wouldn't --
21    Q.    Would not be?
22    A.    I think $100 would typically not be.
23    Q.    How about a million dollars?
24            MR. BURKE: Objection. Calls for

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 30

1    speculation.
2    A.    Yeah, that's harder for me to make a
3 judgement on.
4    Q.    What factors would you consider in
5 making a judgement on whether a million dollars was
6 material to Provident's financial statements?
7        MR. BURKE: Objection. Calls for
8    speculation.
9    A.    It would depend on what line item was
10 affected, what financial statement was affected.
11 There are four financial statements.
12    Q.    What are the four financial statements?
13    A.    The balance sheet, the income statement,
14 the statement of cash flows, and the statement of
15 changes in financial position.
16    Q.    Would you read the third paragraph of
17 page 46 to yourself, please.
18    A.    Okay.
19    Q.    Are you familiar with the term "in all
20 material respects" as it's included in the first
21 line of paragraph 3 on page 46 of Plaintiffs'
22 Exhibit 90?
23        MR. BURKE: Objection. Asked and
24    answered -- well, not asked and answered, but

Page 31

1    calls for speculation.
2    A.    Well, I've just read the term, so I'm
3 familiar as from reading it; but as I've said
4 earlier, I read this each year that they put it in
5 the report, and I think it's pretty similar, but
6 not identical.
7    Q.    What do you understand that term to
8 mean?
9        MR. BURKE: Objection. Calls for
10    speculation.
11    A.    I think the term is self-explanatory.
12    Q.    Well, Mr. Carey, next May, I'm going to
13 have to explain this to a jury, and I doubt that
14 they will find it self-explanatory, and they are
15 entitled to your opinion as Provident CFO.
16        MR. BURKE: Objection. That's not a
17    question.
18    Q.    So please tell me what your opinion is.
19        MR. BURKE: No. First of all, it's your
20    job to explain your case, whatever it is.
21    It's not Mr. Carey's job to furnish you
22    testimony that he doesn't have. You may
23    answer.
24    A.    The answer to my question is that I

Page 32

1 think that you need to talk to Ernst & Young who
2 wrote this on what they mean about it.
3        As I said, there's not a bright line on
4 materiality, but -- and I think that it's
5 explanatory as it is; but if you want more
6 information, I would go to Ernst & Young.
7    Q.    Well, actually, I want the opinion of
8 Provident's CFO.
9        MR. BURKE: Objection.
10    A.    I gave you my answer, Mike.
11    Q.    Mr. Carey, is it part of your job to be
12 able to read and understand the report of the
13 independent auditors?
14        MR. BURKE: Objection. You may answer.
15    A.    I don't know whether I'd say that's part
16 of my job. I mean, it's -- I think you'd expect a
17 CFO to be capable of doing that.
18    Q.    You'd expect what?
19    A.    A CEO to be capable of doing that. It's
20 not listed in my job requirements to read the
21 opinion they give on us.
22    Q.    Did you say CEO or CFO?
23    A.    CFO.
24    Q.    And are you able to read and interpret

Page 33

1 page 46 of Plaintiffs' Exhibit 90?
2        MR. BURKE: Objection. Asked and
3    answered. You may answer.
4    A.    Well, yes, I can read it certainly and
5    interpret it.
6    Q.    Please tell me in words other than
7 material what in all material respects means?
8        MR. BURKE: Objection. Asked and
9    answered a dozen times.
10    A.    I already answered that question.
11    Q.    Mr. Carey, who makes the ultimate
12 determination as to what is deemed to be material
13 with respect to Provident's financial statements?
14        MR. BURKE: Objection. Vague;
15    overbroad; no context. You may answer.
16    A.    Who makes that determination? I don't
17 know. It's probably a collaborative group of the
18 audit committee, Ernst & Young, and the financial
19 management.
20    Q.    My understanding is that Provident's
21 financial statements are the responsibility of
22 management; is that true?
23    A.    That's true.
24    Q.    Well, under what circumstances would

9 (Pages 30 to 33)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 34

1  Ernst & Young make a decision for Provident with
2  respect to materiality?
3      A.   I guess that's wrong.  They wouldn't
4  make a decision, but they would affirm a decision
5  we made.
6      Q.   Who makes the decision on behalf of
7  Provident?
8          MR. BURKE:  Objection.  No context;
9      vague.  You may answer.
10     A.   The financial management and perhaps the
11 audit committee.  The audit committee would be
12 involved if it was something significant.
13     Q.   When you say significant, do you mean
14 material?
15         MR. BURKE:  Objection.
16     A.   It could be but it could not be
17 material.  It could be significant because it's
18 important but not necessarily material.
19     Q.   Who represents the financial management
20 of Provident?
21     A.   I do.
22     Q.   Please explain the distinction you made
23 between significant and important and material.
24         MR. BURKE:  Objection.  Vague; calls for

Page 35

1  speculation.
2      A.   It's hard to define material, as I've
3  said to you repeatedly, but there are important
4  events that occur in the company that we describe
5  in the financial statements; and they may not be
6  material, but we may deem they're important or
7  noteworthy.
8          So those would be things that would or
9  could be discussed with a variety of people
10 including the audit committee.
11     Q.   Please define significant as you used it
12 in one of your previous answers.
13     A.   I don't have a description for
14 significant.  It's a judgment issue what's
15 significant.
16     Q.   And ultimately, you make the judgement,
17 correct?
18         MR. BURKE:  Objection.  Vague.  About
19     what?  What are we talking -- this is complete
20     speculation.
21     A.   Can you just give me a little more on
22 what your question is relative to significant?
23     Q.   Certainly.  We were talking about
24 materiality and who makes the decisions as to what

Page 36

1  may or may not be material with respect to
2  Provident's financial statements, which are the
3  responsibility of management, correct?
4      A.   Correct.
5      Q.   And in this discussion, you used several
6  words, and I want to define these words word by
7  word.  One of the words you used was significant.
8  Please define that as you used that in one of your
9  previous answers.
10         MR. BURKE:  Objection.  Calls for
11     speculation.
12     A.   I'm not going to define significant.  I
13 just told you I couldn't define significant.
14     Q.   Okay.  So you used it in a previous
15 answer, but you can't define it, correct?
16     A.   Not in that context, no.
17     Q.   In what context?
18         MR. BURKE:  Objection to form.  What
19     question are we asking each other now?
20     Q.   Mr. Carey, you used the word significant
21 in a previous answer.  Please define what you meant
22 when you used the word significant.
23         MR. BURKE:  Objection.
24     A.   Let me tell you what I meant by:

Page 37

1  significant.  Significant.  Okay?  Get the
2  dictionary out if you want a definition of the
3  word.
4      Q.   Mr. Carey, I want a definition of the
5  word from you.
6          MR. BURKE:  Objection.
7      A.   I just gave you it:  Significant.
8      Q.   Mr. Carey, it's not appropriate to
9  define a word using the same word.
10     A.   Oh, really?  Why?  Why is that?
11         MR. BURKE:  Where did that come from?
12     Where's the rule?
13     Q.   Mr. Carey, please define important as
14 you used it in your previous answer.
15         MR. BURKE:  Objection.  Vague.
16     A.   I'm not going to define the word
17 important for you.  Come on.
18     Q.   Mr. Carey, do you understand how this
19 process works?
20     A.   Very much I understand how this process
21 works.
22     Q.   You understand it's my job to ask
23 questions?
24     A.   That's right.

10 (Pages 34 to 37)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 38

1    Q.    You understand it's your job to answer
2  my questions to the best of your ability?
3    A.    Right. I understand that.
4    Q.    Okay. Please define important as you
5  used it in your previous answer.
6        MR. BURKE: Objection. Asked and
7    answered.
8    A.    Important is self -- I'm not going to
9  define the word important. Get out the Webster
10 dictionary if you want a definition of the word
11 important. All right?
12       MR. BRAUTIGAM: Okay. We're going to
13    take a break, and I'm going to call the
14    Magistrate. This farce is going to end.
15       MR. BURKE: I agree with that.
16       (Attorney Brautigam making a phone
17    call.)
18       MR. BRAUTIGAM: This will be on the
19    record.
20       (Answering machine.)
21       MR. BRAUTIGAM: Hi, Barbara. This is
22    Mike Brautigam. I'm here at the deposition of
23    Chris Carey with Jim Burke and a
24    representative of Bieser, Greer & Landis.

Page 39

1        We're having a problem at the
2    deposition, and we would respectfully request
3    that Magistrate Hogan call us back and perhaps
4    resolve the problem. We can be reached at
5    221-8800. Thank you very much.
6        MR. BURKE: For the record, this is Jim
7    Burke. Again, as in the prior time, we don't
8    believe there's an opinion or a problem or an
9    issue that requires the intervention of the
10    Magistrate; however, it is Mr. Brautigam's
11    prerogative to suggest that there is.
12        But we just want you to know that we do
13    not concur that there is any kind of a problem
14    that requires the intervention of the
15    Magistrate. Thank you.
16       MR. BRAUTIGAM: Thank you.
17    (Disconnected phone call.) I'm not going to
18    continue until this is resolved.
19       MR. BURKE: Fine. Are you terminating
20    the deposition?
21       MR. BRAUTIGAM: No. If the Magistrate
22    calls us back -- we're going to take a break
23    until he calls.
24       MR. BURKE: No, we're not going to sit

Page 40

1    here. If you want to take the deposition,
2    fine. If you want to stop the deposition,
3    that's fine.
4        MR. BRAUTIGAM: If he's going to answer
5    my questions, I'll continue.
6        MR. BURKE: Then call us back when
7    you're ready to proceed, but we're not going
8    to sit here and wait.
9        I mean, the gentleman is here. If you
10    want to get an answer from the Magistrate,
11    fine. That's fine. If you want to terminate
12    the deposition, that's your prerogative.
13    We'll come back when you're ready to restart.
14 BY MR. BRAUTIGAM:
15    Q.    Mr. Carey, are you going to answer my
16 questions at this deposition?
17       MR. BURKE: Mr. Brautigam, he has
18    answered your questions at this deposition.
19    He has answered.
20       MR. BRAUTIGAM: Jim --
21       MR. BURKE: The mere fact that you don't
22    like the answer, Mike, is not good enough. He
23    doesn't have to have opinions on things you
24    want him to have opinions on.

Page 41

1        MR. BRAUTIGAM: Jim, he specifically
2    stated he's not going to answer my question.
3    That's in the record.
4        MR. BURKE: No, that's not what he said.
5        THE WITNESS: That is not in the
6    record. I don't agree with that statement.
7        MR. BRAUTIGAM: Can you read back his
8    answer when I said, Can you answer; and he
9    said, I'm not going to answer that question?
10    Can you find that, please.
11       MR. BURKE: That's because he had
12    answered that two or three times in a row.
13    That doesn't mean he's not going to answer any
14    of your questions. That's just silly.
15       MR. BRAUTIGAM: The reporter's going to
16    find it, and we're going to have it read back.
17       (Two answers were read back.)
18       MR. BRAUTIGAM: That's good enough.
19 BY MR. BRAUTIGAM:
20    Q.    Mr. Carey, are you going to answer my
21 questions if we continue the deposition?
22    A.    I'm going to answer the questions as I
23 have been, appropriately.
24    Q.    Mr. Carey, please define significant as

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 42

1  you've used it in previous answers.
2      MR. BURKE: Objection. Asked and
3  answered. You are asking him if he has a
4  definition, right?
5      MR. BRAUTIGAM: Right.
6      MR. BURKE: If he has a personal
7  definition of that word?
8      MR. BRAUTIGAM: He just used it.
9      MR. BURKE: That doesn't mean he has a
10  definition he can hand to you. Go ahead and
11  answer, Mr. Carey.
12      A.    Mike, the problem -- significant can be
13  different in different circumstances. It's a
14  general word that most people understand. But in
15  one circumstance something might be significant,
16  and in another, it might not be.
17      So I'm just getting a little bit
18  concerned that you're trying to box me into
19  something. But in general, significant is a word
20  that has a common knowledge. It's important. It's
21  significant.
22      Q.    Okay. And that's what you meant when
23  you used the word significant in your previous
24  answer, correct?

Page 43

1      MR. BURKE: Objection. What previous
2  answer?
3      A.    It's been -- I'd have to have Kelly go
4  back and read it to me if that's exactly -- I'm not
5  sure.
6      Q.    Okay. Please define the word important
7  as you've used it in previous answers.
8      MR. BURKE: Same objection.
9      A.    Bear with me. I'm searching for some
10  way to describe important different than the word
11  is as it is. It's hard for me not to say important
12  isn't anything other than the word important.
13      It means in every context it could be
14  different, but important means... I'm coming up at
15  a loss for definition for important other than the
16  word important.
17      Q.    Please define the word noteworthy as
18  you've used it in previous --
19      A.    Noteworthy/important -- I think there's
20  some parallels to those two.
21      Q.    Do you believe that the three words you
22  used -- significant, important, and noteworthy --
23  are the equivalent of material with respect to
24  Provident's 2003 restatements?

Page 44

1      MR. BURKE: Objection. Calls for
2  speculation; vague; overbroad.
3      A.    No, I don't believe that.
4      Q.    Were Provident's 2003 restatements
5  significant?
6      MR. BURKE: Objection. In what context?
7  Vague; form.
8      A.    2003 restatements to what years? What
9  quarters? What do you mean?
10      Q.    Well, the restatements go all the way
11  back to '94, correct?
12      MR. BURKE: Objection. Misstates the
13  record.
14      A.    I don't know if they go all the way back
15  to '94. They certainly go back into the history.
16  I don't remember what year they stop at, but...
17      Q.    Okay. Well --
18      A.    Certainly for at least five years. I
19  think it goes further, but I'm not sure of the
20  exact date, but...
21      Q.    Okay. Do you believe that Provident's
22  restatements going back as far as they go back, the
23  2003 restatements, were noteworthy?
24      MR. BURKE: Objection. Vague; no

Page 45

1  context; form.
2      A.    Well, let me... I do believe that in
3  some of the years that the restatements were
4  significant to the financial results.
5      Q.    Which years?
6      A.    I don't remember which years.
7      Q.    Was it the early years or the later
8  years?
9      A.    I believe it was primarily the later
10  years.
11      Q.    And why do you believe that the later
12  years were significant to Provident's financial
13  results?
14      A.    Because of the size of the adjustments.
15      Q.    Didn't the restatements have the effect
16  of making Provident look better in earlier years
17  and worse in later years?
18      MR. BURKE: Objection. Vague;
19  overbroad; form; no context.
20      A.    The restatements -- can you define for
21  me which years you're talking about with early
22  years versus later years?
23      Q.    Well, my understanding is that the
24  restatements go back to '94. So let's talk about

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 46

1   '94 to '99 as the early years, and '99 and 2003 as
2   the later years.
3       A.   I think the primary issue was with the
4   later years then where they were significant.  I
5   think primarily with the earlier years, they were
6   not viewed as significant.  I'm not certain about
7   that, but that's my best remembrance.
8       Q.   Do you agree that restatements are, by
9   definition, material?
10      A.   No, absolutely do not agree with that.
11      Q.   Why not?
12      A.   Because over the years, I've seen
13  companies make misstatements that most people view
14  aren't material.
15      Q.   Did you say misstatements?
16      A.   Restatements.
17      Q.   Give me an example --
18      A.   Wells Fargo.
19      Q.   What did Wells Fargo do?
20      A.   They restated their numbers for
21  adjustments to the auto lease accounting.
22      Q.   When did they do it?
23      A.   I think they announced it in the first
24  quarter.

Page 47

1       Q.   Of what year?
2       A.   '04.  And it was for five to seven
3   years, I believe, going back.
4       Q.   And you believe that these restatements
5   were not material?
6       A.   Yes, I believe they were not material.
7       Q.   Why?
8       A.   Because the numbers seemed relatively
9   small to their financial position.
10      Q.   And did you ever read anything that said
11  that these restatements were not material?
12      A.   I never read anything that used those
13  exact words that you just said, but I read the
14  financial release, which a number of people
15  commented on that they didn't look like they were
16  very significant adjustments.
17           There was some commentary on why were
18  they restating because it didn't look like they
19  were very significant.
20      Q.   And implicit in that comment is that
21  restatements are always significant, correct?
22           MR. BURKE:  Objection.  Calls for
23  speculation.
24      A.   No.  No.  There's different reasons why

Page 48

1   you would restate.  Obviously, they had a
2   restatement, which I think that, in general, people
3   in the financial services industry looked at and
4   didn't think it was very significant.  But there's
5   different reasons why you would do restatements.
6   It doesn't always have to be a materiality issue.
7       Q.   Okay.  Has Provident ever done a
8   restatement for a non-material reason?
9            MR. BURKE:  Objection.  Calls for
10  speculation.
11      A.   No, but I will tell you that it's
12  relatively typical for companies to include
13  disclosures that they reclassify accounts --
14  certain accounts and things in prior years to --
15  for comparative purposes that aren't particularly
16  significant.
17           That's not necessarily a restatement,
18  but it has the same -- it has a similar impact of a
19  restatement in that they change previously reported
20  numbers.
21      Q.   A restatement is a term of art, correct?
22           MR. BURKE:  Objection.  Calls for
23  speculation; vague.
24      A.   I don't know what you mean by term of

Page 49

1   art.  Is that what you said?  Term of art?
2       Q.   Yes.
3       A.   I'm not sure I understand what that
4   means.
5       Q.   A restatement has a specific definition
6   under GAAP, correct.
7            MR. BURKE:  Objection.  Calls for
8   speculation.
9       A.   I'm not sure -- I'm not sure it really
10  does.  I mean, it's used commonly.  I'm not sure if
11  it's a specific term under GAAP.
12      Q.   And when it's used, commonly what is it
13  used to refer to?
14           MR. BURKE:  Objection.  Calls for
15  speculation; vague; no context.
16      A.   Typically, when there's a restatement,
17  it's changing previously reported results; but it
18  had been very common with mergers and acquisitions
19  to have a word -- people use the word restatement
20  where there wasn't -- I mean, you restated the
21  previously reported results.
22           And you would say that when you bought a
23  company in pooling of interest accounting, which I
24  think is a different kind of restatement than

13 (Pages 46 to 49)

Page 50

1  you're referring to.  I don't think it has a
2  commonly referred-to viewpoint.
3      Q.    So it's your understanding as
4  Provident's CFO that the term restatement does not
5  have a specifically understood meaning within the
6  accounting community?
7          MR. BURKE: Objection.  Asked and
8      answered.
9      A.    I don't think it -- I don't think it has
10  one meaning.  I think there are several different
11  meanings relative to it.
12     Q.    Okay.  what are the several different
13  meanings?
14         MR. BURKE: Objection.  No foundation.
15     You may answer.
16     A.    Well, the broad meaning is you've
17  changed previously reported results, so that may be
18  similar.  It probably has a similar term.  It's
19  where you change something that's previously
20  reported.  The differences are why you did it.
21     Q.    What are some reasons why companies
22  restate?
23         MR. BURKE: Objection.  Calls for
24     speculation.  There's no context.  Vague.

Page 51

1      A.    I can't -- you know, I mean... I guess
2  I can.  Why do companies restate?  I think there's
3  been two broad reasons:  One, for mergers and
4  acquisition's activity, pooling of interest
5  accounting, you would restate previously issued
6  financials.
7          And two, if they have some type of an
8  accounting and reporting error; or actually, if
9  that's a change in accounting principles, they
10  might.
11         So there's probably three reasons:
12  Mergers and acquisitions; changes in accounting
13  principles; and some type of error -- accounting or
14  reporting error.
15     Q.    Okay.  With respect to Provident's 2003
16  restatements, it was not due to mergers and
17  acquisitions and pooling of interest, correct?
18     A.    Correct.
19     Q.    It was not due to a change in accounting
20  principles, correct?
21         MR. BURKE: Objection.  You may answer.
22     A.    Well, I mean, that's a complicated one
23  to say that one, because there was a little bit of
24  an accounting and reporting issue involved in it;

Page 52

1  but I would say it was primarily due to an
2  accounting error.
3      Q.    And do you believe that Provident's
4  restatements were material to Provident's financial
5  statements?
6          MR. BURKE: Objection.  Asked and
7      answered; vague; overbroad.  You may answer.
8      Calls for speculation.
9      A.    I couldn't comment on the entire period.
10  I wouldn't comment on the entire period.  As I said
11  to you earlier, Mike -- I think I answered this --
12  I think that it was material to the later periods,
13  and I'm not sure it was material to the earlier
14  periods.
15     Q.    Then why did you restate?
16         MR. BURKE: Objection.  You may answer.
17     A.    The accounting change went back, and --
18  no different than Wells Fargo -- we were correcting
19  it; and you're required to correct it for the
20  material periods.
21         It's optional for periods where you may
22  think it's not significant or not material, however
23  that's defined.
24         So for the later years, it was material.

Page 53

1  And since the error began in -- there were a couple
2  different errors, by the way -- but began partly in
3  '94 and partly in '97, I believe.
4          We went back and changed what was
5  reported.  Although I really think we only restated
6  five years for the record, by the way.  We only
7  have SEC filings on file for five years.
8      Q.    Was Provident required to restate its
9  financial statements going back to 1994?
10         MR. BURKE: Objection.
11     A.    No, I don't believe so.
12     Q.    Was Provident required to restate its
13  financial statements going back to '97?
14         MR. BURKE: Objection.  Foundation.  You
15     may answer.
16     A.    I'm not sure.  I think it was to '98
17  they were required.  I don't think '97 they're
18  covered.
19     Q.    Who required Provident to restate?
20         MR. BURKE: Objection.  No foundation
21     for that, but you may answer.
22     A.    Well, I would say the SEC rules would
23  dictate it.
24     Q.    Which rule in particular?

14 (Pages 50 to 53)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 54

1        MR. BURKE: Objection. Calls for legal
2    conclusion.
3        A.    I don't know the specific name of the
4    rule, but... And it might be more the FASB than
5    the SEC; but between the two of them, they cover
6    it.
7        Q.    So if I understand your testimony
8    correctly, as Provident CFO, you're saying that
9    Provident restated back to 1994 on an optional
10   basis --
11       A.    No.
12       Q.    Let me finish my question.
13       A.    Okay.
14       Q.    -- and Provident was required by the SEC
15   to restate back to '98?
16       MR. BURKE: Objection. Misstates prior
17   testimony.
18       A.    That's not what I said. What I was I
19   believe we only restated back to 1998.
20       Q.    Didn't you say you were required to
21   restate back to 1998?
22       A.    Right.
23       Q.    Okay. Would you pick up Plaintiffs'
24   Exhibit 91.

Page 55

1        A.    Gotcha.
2        Q.    You've seen Plaintiffs' Exhibit 91
3    before, correct?
4        MR. BURKE: Can we take a minute to look
5    at it?
6        MR. BRAUTIGAM: Absolutely.
7        A.    Let me just take a minute to look at
8    it. (Examining document.) It looks familiar.
9        MR. BURKE: Are you talking about this
10   whole four pages or just the first page?
11       MR. BRAUTIGAM: All four pages.
12       MR. BURKE: Okay. Then I would ask the
13   witness to review all four.
14   BY MR. BRAUTIGAM:
15       Q.    Mr. Carey, with this document or any
16   other, please take as much time as you need to
17   familiarize yourself with the documents. In many
18   cases, I think I can clue you in on where we need
19   to be.
20       A.    I'm familiar with it.
21       Q.    Would you turn to page 2. There's a
22   bold question, and it says, What happened, correct?
23       A.    Um-hum.
24       Q.    Would you read into the record the first

Page 56

1    sentence under, What happened?
2        A.    Provident has restated its earnings
3    results from 1994 to 2002.
4        Q.    Okay. Does that refresh your
5    recollection as to how far back the restatement
6    went?
7        A.    No, it doesn't.
8        Q.    Okay.
9        A.    I think what I'm trying to tell you is
10   that you only restate -- I mean, that's a -- this
11   is a document put together to try to explain to
12   internal people, I think, what went on. But in
13   terms of an actual restatement, you only go back
14   and change our filings with the SEC through 1998.
15       Maybe that's just an interpretation of
16   mine, but that's what I'm trying to say. We went
17   back five years and changed our filings. You don't
18   go back further than that. Did the accounting
19   error relate to periods before that? Yes. And
20   that's what this is trying to describe.
21       Q.    Did you have any input into this
22   document?
23       A.    Yes, absolutely.
24       Q.    Did you write this document?

Page 57

1        A.    I was certainly involved in the
2    drafting. I wouldn't say I was the sole author,
3    but I was involved in the drafting.
4        Q.    Plaintiffs' Exhibit 91 consists of two
5    documents that are stapled together, correct?
6        A.    Um-hum.
7        Q.    The first one is a memorandum, correct?
8        A.    Right.
9        Q.    And the second part is a question and
10   answer type document that says, Earnings
11   restatement Q and A, 4/15/03, correct?
12       A.    Um-hum.
13       Q.    Now, Mr. Hoverson signed the first page
14   of Plaintiffs' Exhibit 91, correct?
15       A.    Correct.
16       Q.    Did you write anything on that page?
17       A.    As I said, I was involved in authoring
18   it, but I was not the sole author. There were
19   other people involved, so...
20       Q.    What other people were involved in
21   writing the first page of Plaintiffs' Exhibit 91?
22       A.    Bob Hoverson; I believe our general
23   counsel; our investor relations group; our, you
24   know, media group. I don't know. I'm not sure who

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 58

1  all the other people were, but there were clearly
2  other people involved.
3      Q.   General counsel is Mark McGee?
4      A.   That's Jim Whitaker.
5      Q.   Jim Whitaker.  Okay.  Who are the
6  investor relations group by name?
7      A.   Tayfun Tazun and Patricia Forsythe.
8      Q.   Who were the media group by name?
9      A.   It would be Tom McGill and Chris Kemper.
10     Q.   And you don't recall specifically
11 writing any sentences on page 1 of Defendants'
12 Exhibit 91 -- excuse me -- Plaintiffs' Exhibit 91,
13 correct?
14     A.   Well, as I, I was involved in authoring
15 it.  I just don't remember, you know, which
16 sentences I wrote in here.  I can't remember who
17 prepared the original draft, for example; but it's
18 a document I would have read carefully before Bob
19 issued it.
20     Q.   Why would you have read it carefully
21 before Bob issued it?
22     A.   Because it was considered important.
23 We're sending a message out to all of our
24 employees.

Page 59

1      Q.   Okay.  Would you turn to page 2, please.
2  Do you dispute the first sentence under, What
3  happened, that reads, Provident Bank has restated
4  its earnings results from 1994 to 2002?
5      A.   Well, I don't know if I -- I'm not sure
6  what the answer would be to that question.  This is
7  a general communication that we're sending out to
8  our employees; and I don't know how the SEC views a
9  restatement, and that's what I would refer to.
10          We were trying to convey a message here
11 that the problem went back to 1994, but I think you
12 only really restate your financials for a five-year
13 period.  You don't go back past five years.  I may
14 be mincing words, Mike, but I think that's the way
15 it's viewed.
16     Q.   So you don't agree with the first
17 sentence that I just read?
18          MR. BURKE:  Objection.
19     A.   I think the message we're trying to
20 convey to our employees is an appropriate thing.
21     Q.   But you have some reservations with
22 respect to the word restated as it's used in that
23 sentence, correct?
24          MR. BURKE:  Objection.  Asked and

Page 60

1  answered.  Misstates prior testimony.  You may
2  answer.
3      A.   I guess I'll take one more shot at it
4  again.  The accounting problem that's being
5  referred to here commenced in 1994.  The technical
6  restatement of your financial statements I believe
7  kind of -- you only go back five years.
8          So this was trying to convey to people
9  the length and duration of when the accounting
10 problem started and stopped.
11         So I think it's more of a technical
12 answer that technically it may have -- we may have
13 really only restated back to '98 or so, because
14 that's the way it works with your SEC filings.
15         I'm not trying to tell you that the
16 problem didn't go back there.  Okay?  So let me
17 make that clear.
18         Here, we weren't really trying to convey
19 a message to our people about how the technical
20 filings with the SEC worked.  We're trying to
21 describe the problem as honestly as we could and
22 accurately.
23     Q.   Why do you believe that restatements
24 only go back for a period of five years?

Page 61

1      A.   Well, I think the way the filings with
2  the SEC worked, you don't go further than that.
3  You don't get to go back and change '94 and '95.
4      Q.   Is there a specific SEC pronouncement
5  that you're referring to?
6      A.   No.  It's a convention, I believe.  I
7  don't believe you go back past five years.  There's
8  no ability to do it.
9      Q.   In what sense?
10     A.   I don't think there's a mechanism to go
11 back and change your filings past a five-year
12 period.  There could be, but I'm telling you what I
13 think.  I don't think there's a mechanism to go
14 further back than that.
15     Q.   Got it.  Do you believe that the
16 accounting error that went back to '94 had any
17 impact on the OHSL-Provident merger?
18         MR. BURKE:  Objection.
19     A.   I wouldn't -- I would be speculating if
20 I answered that.
21     Q.   Why would you have to speculate to
22 answer that?
23     A.   Because I couldn't tell whether -- right
24 now, I don't know whether that would have any

16 (Pages 58 to 61)

Page 62

1  impact on that, really.
2      Q.   When I say impact -- let me see if I can
3  narrow this down -- I'm not asking if it would have
4  changed the vote in your opinion. I'm not asking
5  if the merger would have gone through. The numbers
6  that Provident provided in Defendants' Exhibit 1
7  would have changed based on what you learned in
8  2003, correct?
9          MR. BURKE: Objection. Calls for
10  speculation. You may answer. Learned in 2003
11  about what?
12         MR. BRAUTIGAM: About accounting
13  errors.
14         MR. BURKE: Objection. Calls for
15  speculation. You may answer.
16     A.   I'm sorry. I was trying to...
17     Q.   Certainly. You're following a lot of
18  voices. Let me back up and ask the question again.
19         With respect to Defendants' Exhibit 1,
20  the proxy materials registration statement that you
21  have in front of you, the numbers that Provident
22  provided would have changed had you known in 1999
23  what you knew in 2003 with respect to accounting
24  errors, correct?

Page 63

1          MR. BURKE: Objection to form; vague.
2  What numbers? You may answer.
3      A.   Do you want to just be a little more
4  clear on what you're talking about in terms of
5  numbers? Are you talking about this memo that I
6  have in front of me here?
7      Q.   No. We're on Defendants' Exhibit 1.
8  Provident provided financial information to Oak
9  Hills shareholders in that document, correct?
10     A.   Correct.
11     Q.   That financial information would have
12  changed to reflect the accounting error that goes
13  back to '94 had you known about it in 1999,
14  correct?
15         MR. BURKE: You're talking about the one
16  that goes back to '94, because there are two
17  pieces. I mean, there are two separate
18  restatements, and you're talking about this
19  one that goes back to '94?
20         MR. BRAUTIGAM: I'm talking about both
21  restatements combined that collectively go
22  back to '94.
23         MR. BURKE: Objection to form. I don't
24  know what -- you may answer if you know.

Page 64

1      A.   What's your -- go back again. I'm not
2  trying to --
3      Q.   I know.
4      A.   Was there an impact? I mean, basically,
5  the financial statements would have been different.
6      Q.   The numbers that Provident provided
7  would have been different --
8      A.   Right.
9      Q.   -- had you known in 1999 what you
10  learned in 2003, correct?
11     A.   Correct.
12     Q.   Okay. What's the purpose of Defendants'
13  Exhibit 1?
14         MR. BURKE: Objection to form;
15  foundation.
16     A.   What's the purpose of this? I believe
17  this is a proxy statement -- right? -- where we're
18  soliciting their vote on the merger.
19     Q.   Okay. I also believe it's a
20  registration statement, but it's your belief that
21  counts.
22     A.   Okay. It's financial information to
23  give them information relative to making a decision
24  to vote on whether they should merge their company

Page 65

1  with Provident or not.
2      Q.   Do you believe that that information
3  should be free of material misstatement?
4          MR. BURKE: Objection. Calls for legal
5  conclusion. You may answer.
6      A.   Yes.
7      Q.   Do you believe that OHSL shareholders
8  had the right to rely on every word and every
9  number in Defendants' Exhibit 1?
10         MR. BURKE: Objection. Calls for
11  speculation.
12     A.   Repeat the question again.
13     Q.   Do you believe that OHSL shareholders
14  had the right to rely on every word and every
15  number in Defendants' Exhibit 1 in making their
16  decision as to how to vote with respect to the
17  OHSL-Provident merger?
18         MR. BURKE: Objection. Calls for legal
19  conclusion; calls for speculation. You may
20  answer.
21     A.   Well, yeah, I think they should be able
22  to rely on the data we give them.
23     Q.   And we now know that the data that
24  Provident provided was incorrect, right?

17 (Pages 62 to 65)

Page 66

```
 1       MR. BURKE: Objection.
 2   A.   That's correct.
 3   Q.   Did you ever learn that at least some of
 4  the data that OHSL provided to Provident was
 5  incorrect?
 6       MR. BURKE: Some of the data that OHSL
 7   provided to Provident?
 8       MR. BRAUTIGAM: Yes.
 9   A.   I don't know. I can't recall that any
10  of it was incorrect.
11   Q.   Do you agree --
12       MR. BURKE: Take a break.
13   A.   It could have been. I don't recall.
14       (A brief break was taken from 10:14 to
15   10:18, 4 minutes.)
16  BY MR. BRAUTIGAM:
17   Q.   Mr. Carey, do you believe that
18  Defendants' Exhibit 1 should tell the truth, the
19  whole truth, and nothing but the truth about the
20  OHSL-Provident merger?
21       MR. BURKE: Objection. Form.
22   A.   I wouldn't -- I wouldn't characterize it
23  exactly like that.
24   Q.   How would you characterize it?
```

Page 67

```
 1       MR. BURKE: Objection. Asked and
 2   answered.
 3   A.   I think I answered that earlier, what I
 4  thought it should do.
 5   Q.   Well, can you answer it again?
 6   A.   It should present, you know, the
 7  financial statement and other information relative
 8  to the merger in an appropriate manner so people
 9  can make a judgment whether they should vote their
10  shares in favor of the acquisition.
11   Q.   And Defendants' Exhibit 1 did not do
12  that, correct?
13       MR. BURKE: Objection.
14   A.   No, I can't say that it did not do that.
15   Q.   Well, we agree, do we not, that
16  Defendants' Exhibit 1 contained information --
17  financial information from Provident that was
18  inaccurate?
19       MR. BURKE: Objection. You may answer.
20   A.   I think we agreed that there was some
21  inaccurate information in there, but that doesn't
22  mean that it was significant enough to affect what
23  was being communicated here.
24   Q.   When you said in your previous answer
```

Page 68

```
 1  that you did not believe that it was significant
 2  enough to affect what is being communicated here,
 3  what exactly did you mean?
 4       MR. BURKE: Objection. Asked and
 5   answered. You may answer.
 6   A.   I said that I wasn't sure -- I want to
 7  make that clear, first of all -- whether it was
 8  significant enough or not so, because we -- as I
 9  answered earlier, the later years, where there was
10  more of a significant impact, versus the earlier
11  years, there was less of a significant impact.
12  That's what we talked about earlier.
13   Q.   And define early and later years,
14  please.
15       MR. BURKE: Objection. I think we
16   already did that.
17   A.   I think you defined it. Can you
18  redefine it again? I think you said it was '99,
19  2000, and forward was later, and before that was
20  earlier or something like that.
21       MR. BURKE: I think we previously
22   defined it as '94 to '99, is what you defined
23   as the early years. After that were the later
24   years.
```

Page 69

```
 1   Q.   Do you accept that representation?
 2       MR. BURKE: I think that's what we
 3   talked about.
 4   Q.   Right. And my question now is do you
 5  agree with that, or do you want to change that in
 6  any way?
 7   A.   I don't know the exact timing. I don't
 8  have the timing committed to memory as to when
 9  there were adjustments, which years were more
10  significant.
11       But as I said to you earlier, I know
12  that the later years were where the more
13  significant adjustments were versus the earlier
14  years.
15   Q.   The restatements go through 2009,
16  correct?
17       MR. BURKE: 2009?
18   A.   No, no. They only go to 2002. They
19  don't affect 2009.
20   Q.   Would you pick up Plaintiffs' 91 again,
21  please?
22   A.   Yes.
23   Q.   Would you read the paragraph, This
24  change. It's the second paragraph under why did
```

18 (Pages 66 to 69)

Page 70

1  you restate earnings.
2      A.   Gotcha. All right. (Examining
3  document.) You can't have a restatement in the
4  future. That's what I'm telling you. You can only
5  have restatements in the past.
6      Q.   Okay. Please describe the effect of the
7  accounting change that goes out to 2009.
8      A.   The accounting change is more of a
9  timing issue. So to the degree earlier years'
10  income was revised down in general, that would be
11  reversed in future years.
12      Q.   When you say the income that was revised
13  down in earlier years, you're talking about the
14  years '94 to '99, correct?
15      A.   No. I'm talking about the years 2002 to
16  1994. 2002 to 1994 income was, in general -- 2002
17  -- in that general time period, because I'm not
18  sure what happened in 2002, but the earnings were
19  revised down by this 44.4 million.
20         In general, that will come back in,
21  because this was an accounting convention. In
22  general, whatever you moved it down by, it would
23  come back. So the overall impact on financial
24  position should be close to zero.

Page 71

1      Q.   Do you have the sentence in front of
2  you, This change does not materially impact the
3  total amount of earnings generated? Do you see
4  that?
5      A.   Where?
6      Q.   Under, Why did you restate earnings,
7  second paragraph.
8         MR. BURKE: First sentence?
9         MR. BRAUTIGAM: In the second paragraph,
10  yes.
11  BY MR. BRAUTIGAM:
12      Q.   First of all, did you write anything
13  that appears on this page?
14      A.   I was involved in the authoring of it,
15  so -- and read it all before it was released.
16      Q.   When you read it before it was released,
17  did you understand it?
18      A.   Um-hum.
19      Q.   That's a yes?
20      A.   I'm sorry. Yes.
21      Q.   What does the word materially mean as
22  it's used in that sentence?
23         MR. BURKE: Objection. You may answer
24  if you know.

Page 72

1      A.   It means what it says: Materially. I
2  don't have a definition for that, but let me read
3  the sentence again. (Examining document.)
4         What this is saying is that the total
5  earnings from this business activity does not
6  really change at all.
7      Q.   But the timing changes, correct?
8      A.   But the timing changes.
9      Q.   And I'm particularly interested in this
10  sentence: This change in flow will cause earnings
11  to decrease in years going back to 1994 but will
12  cause earnings to increase from 2003 to 2009. Do
13  you see that?
14      A.   Yes, I do.
15      Q.   Did I read it correctly?
16      A.   Yes, you did.
17      Q.   Let's talk about the first part of that
18  sentence. One of the conditions for the merger was
19  related to Provident's earnings, correct?
20         MR. BURKE: Objection. Form. I don't
21  know what you're talking about. What merger?
22         MR. BRAUTIGAM: The OHSL-Provident
23  merger in 1999.
24         MR. BURKE: One of the conditions?

Page 73

1      A.   I don't know what you mean by that.
2      Q.   That was poorly phrased. OHSL
3  shareholders had a right to rely on Provident's
4  earnings as they were stated in Defendants' Exhibit
5  1, correct?
6         MR. BURKE: Objection. Calls for
7  speculation.
8      A.   Yeah, I wouldn't -- I don't want to get
9  into what they thought. I think you need to
10  restate that, Mike.
11      Q.   Okay. You agree that the purpose of the
12  proxy materials was to allow shareholders to make
13  an informed decision, correct?
14         MR. BURKE: Objection. That's not what
15  he said. Mischaracterizes prior testimony.
16  He did answer that question.
17      A.   I think the sense of my answer is
18  similar enough to my statement.
19      Q.   Okay. And one of the things that was
20  included was Provident's earnings, correct?
21         MR. BURKE: Included -- objection to
22  form.
23      Q.   In Defendants' Exhibit 1.
24      A.   In our financial statements, our

19 (Pages 70 to 73)

Page 74

1  earnings are included.
2     Q.   And if I understand the effect of the
3  restatements, Provident's earnings decreased in
4  years going back to 1994, correct?
5        MR. BURKE: Objection.
6     A.   Yeah.
7     Q.   So that means that OHSL shareholders
8  were given an incorrect -- were given incorrect
9  information with respect to Provident's earnings
10 for year-end '94, correct?
11       MR. BURKE: Objection. Misstates prior
12 testimony. You may answer. Calls for
13 speculation.
14    A.   Repeat the question again.
15    Q.   Certainly. Does Defendants' Exhibit 1
16 have financial information about Provident's
17 earnings for year-end 1994?
18    A.   I'm not sure. I don't think it goes
19 back that far, so I'd say I think no. Do you want
20 to look and see?
21    Q.   Why don't you look on page 6.
22    A.   I stand corrected. There's some
23 financial highlights there back to '94.
24    Q.   And we now know that the information

Page 75

1  related to Provident's earnings for year-end 1994
2  was incorrect, right?
3        MR. BURKE: Objection. Calls for
4  speculation; assumes facts not in evidence.
5  You're asking if he knows whether those
6  numbers would be changed by the restatement,
7  correct?
8        MR. BRAUTIGAM: Yes.
9     A.   I don't know whether '94 would be
10 changed by the restatement. That's when the
11 business activity started.
12    Q.   It appears from Plaintiffs' 91 that the
13 numbers would be changed going back to '94,
14 correct?
15       MR. BURKE: What are you referring to,
16 Mike, just so we know?
17    Q.   Second paragraph under, Why did you
18 restate earnings, specifically this sentence: This
19 change in flow will cause earnings to decrease in
20 years going back to 1994.
21       MR. BURKE: And the question is...
22       MR. BRAUTIGAM: Can I have the question
23 back, please?
24       (The question was read back.)

Page 76

1        MR. BURKE: Same objection. You may
2  answer.
3     A.   You know, the business activity started
4  in 1994. Whether there would be a change in '94 --
5  during that time period, there's a change going
6  back from 2002 to '94. But whether there would
7  actually be a change in 1994, I'm not sure.
8     Q.   Is there anyone else at Provident who
9  would know?
10       MR. BURKE: Objection. Calls for
11 speculation; no foundation.
12    A.   I don't know if there is anyone who
13 would know about going all the way back to 1994.
14    Q.   Okay. Can you reconcile this part of
15 Plaintiffs' 91 with this financial information that
16 appears on page 6 of Defendants' Exhibit 1?
17    A.   What do you mean by reconcile?
18    Q.   In other words, as I read this, it says
19 that the numbers with respect to earnings for 1994
20 are incorrect. And I just want to know if you read
21 it that way, you read it a different way, or you
22 don't have enough information to make a
23 determination?
24       MR. BURKE: Objection to form. He's

Page 77

1  answered this question. You may answer it
2  again.
3     A.   Yeah, I would just say I don't know -- I
4  don't personally know if it would affect the
5  numbers going back to 1994. I think that's the
6  maximum time period it could affect them, but I
7  don't know if it would actually affect 1994.
8     Q.   Did this restatement change the numbers
9  for year-end '95?
10       MR. BURKE: By this restatement, you're
11 referring to the one in Exhibit 91?
12       MR. BRAUTIGAM: Yes. Actually, I think
13 that talks about both.
14       MR. BURKE: Okay.
15    A.   You want to know if this restatement
16 changed the numbers for 1995?
17    Q.   Correct.
18    A.   Changed them where?
19    Q.   In Defendants' Exhibit 1.
20       MR. BURKE: Objection. Foundation;
21 calls for speculation. You may answer.
22    A.   I don't know the answer to that; but as
23 I said earlier, you would only restate back to
24 1998, to begin with.

20 (Pages 74 to 77)

Page 78

1    Q.    Let's talk about year-end '96. Did
2    either or both Provident's 2003 restatements render
3    inaccurate the financial information related to
4    year-end 1996 as included in Defendants' Exhibit 1?
5        MR. BURKE: Same objection.
6    A.    I'm not sure. I'm not sure whether
7    those numbers going back that far would... I
8    really can't comment on '98 -- or, '96, I mean. We
9    did go back and revise '02 through '98, but we
10   didn't go back and revise periods prior to that.
11   So I would just be speculating as to what would
12   happen there.
13   Q.    Why would you be speculating when it
14   says right here in a document that you helped
15   prepare, This change in flow will cause earnings to
16   decrease in years going back to 1994?
17       MR. BURKE: Objection. Asked and
18   answered. He already told you what that
19   means.
20   A.    Yeah, it goes back -- this activity
21   started then. I'm not sure there would be enough
22   business activity to warrant a change going back
23   there. This could be other circumstances, too. We
24   restated from '02 to '98.

Page 79

1    Q.    What other circumstances are you
2    referring to?
3        MR. BURKE: Objection to form.
4    A.    You know, I don't know what the
5    magnitude of the business activity was then. I
6    don't recall -- I mean, I wasn't even with the
7    company then -- whether there would be enough
8    business activity to require any kind of change.
9    It was a start-up business at that point in time.
10   Q.    You said that Provident restated from
11   '02 to '98, correct?
12   A.    I think that's right. I'm trying to
13   write the numbers down here to make sure I'm not
14   giving you -- best as I understand, I think it's
15   '02 to '98.
16   Q.    And you agree that Plaintiffs' 91 says
17   something different with respect to what happened
18   where the first sentence reads, Provident Bank has
19   restated its earnings results from 1994 to 2002,
20   correct?
21       MR. BURKE: Objection. He already
22   answered that question at least twice, at
23   least twice.
24   A.    I really have answered that probably

Page 80

1    three times.
2    Q.    And your answer was...
3        MR. BURKE: His answer was what he
4    gave. He explained to you the difference
5    between this word and the technical
6    definition.
7        MR. BRAUTIGAM: Jim, we're not ready for
8    your deposition yet. I will be, not yet.
9        MR. BURKE: No, you won't ever be.
10   Trust me on that. Won't ever.
11       MR. BRAUTIGAM: Anyway, we don't need
12   speaking objections. They're improper.
13       MR. BURKE: I know that, Mike, but
14   you've asked the question at least three
15   times. He told you the difference between
16   what this says and his technical definition.
17   BY MR. BRAUTIGAM:
18   Q.    Mr. Carey, does Plaintiffs' Exhibit 91
19   suggest that Provident's earnings were decreased
20   for year-end 1997?
21       MR. BURKE: Objection. Asked and
22   answered. Document speaks for itself. You
23   may answer.
24   A.    I've answered that question already.

Page 81

1    Q.    We're at '97. You've not answered that
2    question.
3    A.    I've answered that question numerous
4    times, and you can ask Kelly to read it back
5    because she'll give you the answer if you would
6    like.
7    Q.    Are we talking about '97?
8    A.    Mike, I told you that we technically
9    only restate back to 1998. So if I told you that,
10   that would let you know that we couldn't go back to
11   97, wouldn't it?
12   Q.    Mr. Carey, it's a different question.
13   I'm not talking --
14   A.    I know it's a different question.
15   Q.    I'm talking about a change in the flow
16   of earnings. Does Plaintiffs' Exhibit 91 suggest
17   that there was a decrease in Provident's earnings
18   for year-end 1997?
19       MR. BURKE: Objection. Asked and
20   answered. You may answer again. Related
21   specifically to 1997?
22       MR. BRAUTIGAM: Yes.
23       MR. BURKE: Objection. Misstates the
24   document. You may answer.

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 82

1    A.    Well, again, the business activity
2  started in 1994. We did a restatement back to
3  1998. I'm trying to answer your question because
4  it's slightly different than the numerous ones
5  you've asked me before on this same topic.
6        I -- you know, I can't -- I mean, I
7  can't really -- I don't really have the information
8  to specifically talk to '97 when I know that we
9  only restated back to 1998.
10       There's a period prior to that where
11 there was some difference in the earnings amount.
12 I just don't know what it was, and I don't know --
13 it's hard for me to speak to a single year like
14 that.
15    Q.    Mr. Carey, is Plaintiffs' Exhibit 91
16 accurate?
17    A.    Yes, I believe it's accurate.
18    Q.    Is there anything in Plaintiffs' Exhibit
19 91 that's inaccurate?
20    A.    In the context that it's there, I don't
21 think it's inaccurate. I'm not aware of anything
22 that's inaccurate.
23    Q.    When do you mean by in the context that
24 it's there?

Page 83

1    A.    It's an employee communication trying to
2  give them a message as to what occurred at the
3  company.
4    Q.    Was this ever released to the public?
5    A.    Well, I don't know. I don't believe it
6  was, but I'm not sure.
7    Q.    When this was prepared, did Provident
8  people allow for the possibility that it would
9  somehow be released to the public?
10       MR. BURKE: Objection. Calls for
11    speculation.
12    A.    I don't know the answer to that
13 question.
14    Q.    Did you consider that this document
15 might be released to the public?
16    A.    I don't recall whether I considered that
17 or not.
18    Q.    Are you --
19    A.    That's a year ago. I don't remember.
20    Q.    Are you suggesting that there was a
21 higher standard of disclosure for documents that
22 were released to the public as opposed to internal
23 communications with Provident's personnel?
24    A.    No, I'm not suggesting that.

Page 84

1    Q.    So you agree then that Plaintiffs' 91 is
2  held to the same standard of truthfulness as public
3  documents, correct?
4        MR. BURKE: Objection. Calls for
5    speculation.
6    A.    I don't know if I can comment on that;
7  but as I said earlier, we believed this document
8  was accurate and still do believe that.
9    Q.    Okay. Let's talk about year-end '98.
10 Provident provided financial information with
11 respect to its earnings in Defendants' Exhibit 1
12 for year-end '98, correct?
13       MR. BURKE: You're referring to the
14    proxy statement now?
15       MR. BRAUTIGAM: Yes.
16       MR. BURKE: Okay. Not 91.
17    A.    Yes.
18    Q.    Were those numbers with respect to
19 Provident's earnings inaccurate?
20       MR. BURKE: Objection. You may answer.
21    A.    Yes, I believe they were inaccurate.
22    Q.    Were those numbers related to '98
23 something that you expected OHSL shareholders to
24 rely on?

Page 85

1        MR. BURKE: Objection. Calls for
2    speculation; legal conclusion. You may
3    answer.
4    A.    I don't know. I mean, rely -- I'm not
5  sure what you mean by the word rely on it.
6    Q.    Are you a Provident shareholder?
7    A.    Yes, I am.
8    Q.    Do you hold shares in other companies?
9    A.    Yes, I do.
10    Q.    Do you understand the concept of public
11 disclosures that are made so shareholders can read
12 and rely on what they're being told in the context
13 of their investment decisions?
14       MR. BURKE: Objection. Calls for
15    speculation; vague; no context. You may
16    answer.
17    A.    Yeah. I don't know -- I think we're...
18 I don't want to speak for something that broad,
19 would be the way I would answer that.
20       MR. BRAUTIGAM: Can I have the question
21    back, please?
22       (The question was read back.)
23    Q.    Defendants' Exhibit 1 was created so
24 that OHSL shareholders would have all the

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 86

1  information they needed to make their investment
2  decision, correct?
3      MR. BURKE: Objection. Asked and
4  answered. You may answer.
5      A.    In general, yeah, I think that's why
6  it's created.
7      Q.    And I believe you stated that the
8  information related to Provident's earnings for '98
9  was inaccurate; is that right?
10     MR. BURKE: Objection. Misstates prior
11  testimony. You may answer.
12     A.    I believe there was some inaccurate
13  information in there, yes.
14     Q.    And the nature of the inaccurate
15  information, among other things perhaps, was that
16  Provident's earnings appeared to be higher than
17  they actually were, correct?
18     A.    Correct.
19     Q.    And the numbers for year-end '98 falsely
20  portrayed Provident's financial position with
21  respect to earnings for that year, correct?
22     MR. BURKE: Objection.
23     A.    I wouldn't say that, no.
24     Q.    Why not?

Page 87

1      A.    I don't know that just because there's
2  inaccuracy in the numbers, they would falsely
3  betray overall earnings.
4      Q.    Well, if the numbers are inaccurate and
5  they overstate earnings, isn't that, by definition,
6  a false betrayal?
7      MR. BURKE: Objection. Calls for
8  speculation; argumentative. You may answer.
9  Asked and answered, too.
10     A.    Yeah, I'm not -- I'm still not sure I
11  would say that's a false betrayal of our financial
12  statements.
13     Q.    It would be an inaccurate portrayal of
14  your financial statements, correct?
15     A.    Of a component of one of our financial
16  statements.
17     Q.    Were Provident's earnings overstated for
18  year-end 1999?
19     MR. BURKE: Objection. Are you
20  representing that the year-end 1999 documents
21  are in here?
22     MR. BRAUTIGAM: No, I'm not.
23     MR. BURKE: Okay.
24     A.    I'd have to see again what adjustments

Page 88

1  were made, because there were different adjustments
2  made to different years before I answered that.
3      Q.    What would you need to see?
4      A.    The documents that show what amounts we
5  adjusted each year for. I'm sure it's in this pile
6  somewhere.
7      Q.    Pick up Plaintiffs' Exhibit 45. It's
8  the consolidated amended complaint.
9      A.    In here?
10     Q.    Here we go. If you would just turn to
11  the last couple of pages, there's a press release
12  with the numbers I think you're looking for. If
13  you could, just review that to yourself.
14     A.    What year are you referring to again?
15     Q.    We're talking about 1999.
16     MR. BURKE: In the press release or in
17  Defendants' Exhibit 1, which is the proxy?
18     Q.    The proxy materials only include
19  financial information for the six months ending
20  June 30, 1999, correct?
21     A.    Correct.
22     Q.    And the press release that's attached to
23  consolidated amended complaint includes from '97 to
24  2002, correct?

Page 89

1      A.    Um-hum.
2      Q.    And was the information related to
3  Provident's earnings for the first six months of
4  1999 included in the proxy material inaccurate?
5      MR. BURKE: Objection. Calls for
6  speculation. You may answer.
7      A.    Yeah, I don't have the six-month
8  information. All I have is the annual information
9  here.
10     Q.    Well, is the annual information
11  inaccurate?
12     MR. BURKE: What annual information?
13     Q.    It's 11.3, isn't it?
14     MR. BURKE: I don't understand what
15  you're talking about. Form of the question.
16  Objection.
17     A.    Which year?
18     Q.    1999.
19     A.    Yes, the 1999 numbers were inaccurate.
20     Q.    Okay. And do you know when the OHSL-
21  Provident merger closed?
22     A.    I don't know the exact date of that, no.
23     Q.    Would it refresh your recollection if I
24  suggested December 3rd, 1999?

23 (Pages 86 to 89)

Page 90

1    A.    Is that right?  Sounds right.
2        MR. BURKE:  Objection.  It's up to you.
3    A.    I mean, we had a couple acquisitions,
4  and I... I don't remember the exact date.
5    Q.    Does the information that you have
6  attached to the consolidated amended complaint
7  suggest to you that the six-month information
8  included in the proxy materials was inaccurate?
9        MR. BURKE:  Objection.  Asked and
10      answered; calls for speculation.  You may
11      answer.
12    A.    Yeah, I wouldn't want to -- I wouldn't
13  want to speculate on the six months results only
14  having the year results.  I'd have to look at that.
15    Q.    What would you look for?
16    A.    To see if the six months results were
17  inaccurate.  I don't have that data.
18    Q.    And you're unable to conclude that
19  because the year-end --
20    A.    I don't want to speculate here.  This is
21  too important.
22    Q.    Why would you be required to speculate?
23  I just don't understand that.
24    A.    I mean, I don't have the six-month

Page 91

1  data.  If you want me to answer a question about
2  six-month data, I would have to see it.  I don't
3  have it.
4    Q.    Do you believe that the six-month data
5  included in Defendants' Exhibit 1 is inaccurate?
6        MR. BURKE:  Same objection.  You may
7      answer.
8    A.    I don't want to speculate on that.  I
9  mean...
10    Q.    I'm not asking for speculation.  I'm
11  asking for belief.
12        MR. BURKE:  Objection.
13    A.    What I am saying is I would have to
14  speculate to convey that belief.
15    Q.    Why would you have to speculate?
16        MR. BURKE:  Objection.  Asked and
17      answered.
18    A.    Because I'd want to look at the
19  six-month data.
20    Q.    Okay.  Please explain how it could
21  conceivably be possible that the six-month data
22  included in Defendants' Exhibit 1 could be accurate
23  whereas the year data is inaccurate.
24    A.    I don't have a particular explanation,

Page 92

1  but I do think it's possible that it could be.
2    Q.    Okay.  Under what circumstances would it
3  be possible?
4    A.    I don't -- I mean, I don't know.  I'm
5  just saying it could be.  I'm not giving you a
6  specific circumstance, but I do believe it's
7  possible the six-month data could be accurate.
8    Q.    Okay.  Could you --
9    A.    I don't have a circumstance for it.  I'm
10  not going to speculate on the circumstance.  But
11  you're asking me to answer a question.  I don't
12  have the information here.
13    Q.    Could you give me a general view as to
14  how the six-month data could be accurate but the
15  year data inaccurate?
16        MR. BURKE:  Objection.  Asked and
17      answered.  You may answer again.
18    A.    I don't -- I don't -- I'm not going to
19  -- I don't have a general view of that.  I'm just
20  saying that I think it's possible that the
21  six-month data could be accurate.
22        This is relatively complex accounting,
23  and I think it's possible.  I don't -- I'm not
24  saying it is, but I don't want to speculate on

Page 93

1  something like that without having the answer.
2    Q.    Right.  But as you sit here today as
3  Provident's CFO, you can't give me one set of
4  circumstances where it's possible that the
5  six-month data is accurate but the year-end data is
6  inaccurate, correct?
7    A.    That's not what I said.
8    Q.    Okay.  Well, then, give me an example.
9    A.    I said I wasn't going to speculate on
10  that.
11    Q.    Mr. Carey, this is the way the
12  deposition process works.  No comment is not an
13  appropriate response.  I'm not going to speculate
14  is often not an appropriate response.  I don't
15  believe that you have to speculate.  I'm asking for
16  your belief.
17        You said that you believed it could be
18  true; you don't have the specifics; and I said
19  fine.  Tell me, generally speaking, conceptually
20  how it could be true.
21        MR. BURKE:  Objection.  That's a
22      speech.  That's not a question.  But he has
23      every right to say he's not going to speculate
24      as you know, Mr. Brautigam.

24 (Pages 90 to 93)

Page 94

```
 1        He doesn't have to have an
 2   opinion on your myriad hypotheticals --
 3        MR. BRAUTIGAM: Jim, I know --
 4        MR. BURKE: -- about how many angels can
 5   dance on the head of a pin.  I mean, he
 6   doesn't have to have that opinion.
 7        MR. BRAUTIGAM: Jim, we don't need
 8   speaking objections.  In this record and every
 9   other record it's clear that you have
10   instructed all these witnesses to say,
11   virtually whatever the question is, I'm not
12   going to speculate, and that's improper.
13        MR. BURKE: Perhaps that's the problem
14   with your questions, Mr. Brautigam, and it is,
15   because you ask these broad open-ended opinion
16   questions that witnesses may or may not be
17   able to answer.  I mean, it's my job to say
18   you're asking a question that calls for
19   speculation.  That's all I'm doing.
20        MR. BRAUTIGAM: Right, and it's his job
21   to answer the questions.
22        MR. BURKE: No, not if he has to
23   speculate.
24
```

Page 95

```
 1   BY MR. BRAUTIGAM:
 2        Q.   Mr. Carey, do you have the question in
 3   mind?
 4        A.   Yes, I do.
 5        Q.   Can you answer it?
 6        A.   I've answered the question.
 7        Q.   And your answer is...
 8        A.   I don't want to speculate on the variety
 9   of circumstances whereas 1999 for six months would
10   be accurate when we've restated the year.
11        Q.   And I'm not asking you to speculate.  I
12   want you to understand that.  Just name one
13   circumstance where that could be possible.
14        MR. BURKE: Same objection.  You may
15   answer.
16        A.   To me, that would be speculating.  I'm
17   not going to speculate.
18        Q.   Mr. Carey, you said there are a variety
19   of circumstances where --
20        A.   I think I said there could be a variety.
21        Q.   Okay.  There could be a variety of
22   circumstances.  Name one.
23        A.   I'm really not going to try to speculate
24   on what that could be.
```

Page 96

```
 1        Q.   Mr. Carey --
 2        A.   I don't have the six-month results.
 3   That's clear.  I don't think it's appropriate for
 4   me to speculate on why something could be something
 5   in this hypothetical.
 6        Q.   Mr. Carey, respectfully, that's not an
 7   appropriate response.  I'm entitled to an answer to
 8   the question.  You said there could be a variety of
 9   circumstances, and I asked you to name one.
10        MR. BURKE: And he answered --
11        Q.   If you can't name one, that's fine.
12        MR. BURKE: That's exactly what he said.
13   He can't name one.  He's not going to
14   speculate.
15        Q.   Is that your testimony, that you can't
16   name one?
17        MR. BURKE: No, that he's not going to
18   speculate about a variety of circumstances,
19   hypothetically speaking.  That's what he just
20   said.
21        Q.   Mr. Carey, I'm entitled to your answers,
22   not Mr. Burke's answers.
23        MR. BURKE: Objection.  Asked and
24   answered.
```

Page 97

```
 1        A.   I've answered this question, Mike.
 2        Q.   Mr. Carey, we're not moving on until I
 3   get an answer.  All right?  Now, you said that
 4   there are a variety of circumstances where this
 5   could be true.  I'm not an accountant.  I'm not a
 6   CFO.  Bear with me.  Name one.  And if you can't
 7   name one, tell me I can't name one as I sit here
 8   today, and I'll ask another question.
 9        MR. BURKE: Objection.  Asked and
10   answered.
11        A.   I really -- it's complex accounting.  I
12   would tell you that I don't think it's appropriate
13   for me to speculate on the variety of answers.
14        The closest I could come to say this
15   business activity could be such that it's
16   backloaded to the end of the year.  It gets
17   securitized at the end of the year, and that could
18   affect the way that it's accounted for.
19        Q.   Do you know for a fact that this
20   information was backloaded or securitized to the
21   end of the year?
22        A.   Yes.  It is securitized in the fourth
23   quarter of every year.
24        Q.   What does that mean?
```

25 (Pages 94 to 97)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 98

1    A.    That means the financing vehicle that we
2  put in place doesn't get utilized typically until
3  the fourth quarter of the year.
4    Q.    What's a financing vehicle?
5    A.    It's the way that we finance the auto
6  leases.
7    Q.    And how did you do that?
8    A.    Through a securitization structure.
9    Q.    And what are securitization structures?
10    A.    They're a variety of things, but they're
11  usually meant to fund asset growth.  They're debt
12  and equity-like structures that you use to fund
13  this asset growth.
14    Q.    You pull the assets and sell them,
15  correct?
16    A.    Correct.
17    Q.    In your previous answer, you said
18  they're debt and equity like.
19    A.    This has debt and equity.  This funding
20  structure has debt and equity associated with it.
21    Q.    So it's similar to a preferred stock as
22  opposed to a common stock, correct?
23        MR. BURKE:  Objection.
24    A.    No.

Page 99

1    Q.    No?
2    A.    No.
3    Q.    Do you believe that -- we're back on
4  Defendants' Exhibit 1 -- the purpose of any proxy
5  materials or prospectus is to provide shareholders
6  with all of the information necessary for them to
7  make a knowledgeable investment decision regarding
8  their shares?
9        MR. BURKE:  Objection.  You've asked and
10    answered this question.  It calls for a legal
11    conclusion and speculation because you're
12    reading somebody else's whatever and asking
13    him to characterize it.  You may answer.
14    A.    I think I've answered that question a
15  couple times, Mike.  That would be my response to
16  that.
17    Q.    Well --
18    A.    At least three times I think I answered
19  that.  Can I just take a quick pit stop?
20        MR. BRAUTIGAM:  Sure.
21        (A brief break was taken from 10:52 to
22    10:57, 5 minutes.)
23  BY MR. BRAUTIGAM:
24    Q.    Mr. Carey, do you believe that the

Page 100

1  purpose of any proxy materials or prospectus is to
2  provide shareholders with all of the information
3  necessary for them to make a knowledgeable
4  investment decision regarding their shares?
5        MR. BURKE:  Objection.  Calls for
6    speculation; asked and answered; calls for
7    legal conclusion.
8    A.    I think I answered that a couple times
9  already.
10    Q.    Well, I don't believe that you have.
11  Would you please answer it now?
12        THE WITNESS:  How do I respond to that?
13        MR. BURKE:  What I'd say is just answer
14    the way -- answer the question to the best of
15    your ability.  I mean, he's asked you that two
16    or three times.  You're correct, but go ahead
17    and answer it to the best of your ability.
18    A.    Yeah, I think what you said is
19  reasonably correct.
20    Q.    Are you familiar with Reg C of the SEC
21  requirements?
22        MR. BURKE:  Objection.  Calls for legal
23    conclusion.
24    A.    I don't know.  I'm not sure if I'm

Page 101

1  familiar with Reg C.
2    Q.    Okay.
3    A.    Tell me more about it, and I'll tell you
4  if I am.
5    Q.    Do you agree that the Securities and
6  Exchange Commission requires, under Regulation C,
7  that information in a prospectus be presented in,
8  quote, clear, concise, and understandable, unquote,
9  language and that it not be misleading?
10        MR. BURKE:  Objection.  Calls for legal
11    conclusion.
12    A.    And your question on that is what?
13        MR. BURKE:  Do you agree with that, or
14    do you know anything about that?  Objection.
15    Calls for legal conclusion.
16    A.    I don't want to comment on something
17  you're reading off a form there.  I mean, it sounds
18  reasonable, but I'm not sure what you're trying to
19  get at.
20    Q.    Mr. Carey, why do you feel it's
21  appropriate for you to say I don't want to comment
22  from something you're reading off a form?
23    A.    I don't know if that's --
24    Q.    Where did you get that understanding of

26 (Pages 98 to 101)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 102

1  the deposition process?
2     A.   I don't know if that's an SEC document
3  or not.  I mean, I'm not sure I can -- I'm not sure
4  I can answer the question.  Read it to me again.
5  Tell me -- repeat the question.
6     Q.   If this is an SEC document or not, does
7  that affect your ability to answer the question?
8        MR. BURKE:  What he asked you to do is
9     read the question.
10    A.   I'm sorry.  Please read the question.
11    Q.   Certainly.  Do you agree that the
12 Securities and Exchange Commission requires, under
13 Regulation C, that information in a prospectus be
14 presented in, quote, clear, concise, and
15 understandable, unquote, language, and that it not
16 be misleading?
17       MR. BURKE:  Objection.  Calls for legal
18    conclusion; calls for speculation.  You may
19    answer.
20    A.   My answer would be that I can't attest
21 to whether that's Regulation C of the SEC code, but
22 I do believe that's the spirit of what the SEC
23 wants in the recording that is done through proxies
24 prospectuses and all that.  So I don't disagree

Page 103

1  with the message.  I just don't know if it's
2  Regulation C or some other regulation.
3     Q.   Do you agree that it's incumbent upon
4  the board of directors and their advisors to impart
5  all relevant information to shareholders regarding
6  a proposed merger?
7        MR. BURKE:  Objection.  Calls for legal
8     conclusion.  You may answer.
9     A.   I think it's appropriate to give the
10 shareholders all the relevant information.
11    Q.   Do you further agree it's incumbent upon
12 the board of directors and their advisors to
13 present all relevant information in such a way that
14 it is relatively comprehensible to shareholders?
15       MR. BURKE:  Objection.  Calls for legal
16    conclusion; calls for speculation.  You may
17    answer.
18    A.   Can you repeat that one again?
19    Q.   Certainly.  Do you also believe that it
20 is incumbent upon the board of directors and their
21 advisors to present all relevant information in
22 such a way that it is readily comprehensible to
23 shareholders?
24       MR. BURKE:  Same objection.

Page 104

1     A.   Yes.
2     Q.   Are you familiar with the Securities Act
3  of 1933?
4        MR. BURKE:  Objection.
5     A.   Am I familiar with the overall act?
6  Yes.
7     Q.   What is your understanding of the
8  overall act?  I understand it's a very general
9  question.
10       MR. BURKE:  Vague.  Calls for a legal
11    conclusion.
12    A.   I really -- Mike, come on.  You're
13 asking me to give you my general understanding of
14 the overall '33 act?
15    Q.   Yeah, that's the question.
16       MR. BURKE:  Objection.  Vague;
17    overbroad.
18    A.   I think it's too vague a question.
19    Q.   Well, Mr. Carey, I'm sorry you feel that
20 way; but respectfully, I'm entitled to an answer to
21 my question.
22    A.   I gave you my answer.
23    Q.   What's your answer?
24    A.   I think it's too vague a question to ask

Page 105

1  me to comment on the overall '33 act.
2     Q.   Can you name one provision of the '33
3  act?
4        MR. BURKE:  Objection.  Calls for a
5     legal conclusion; form.
6     A.   You're still looking for me to answer a
7  question here, Mike?
8     Q.   Yeah.  That's the way it works.
9     A.   What do you mean by provision?
10    Q.   One part.
11       MR. BURKE:  Objection to form.
12    A.   I don't...  It's such a broad act and
13 large act, I don't know that -- you know, I'm not
14 sure how to answer the question.  So maybe you can
15 try to ask it differently.
16    Q.   Are you familiar with the Securities
17 Exchange Act of 1934?
18       MR. BURKE:  Same objection.  Vague;
19    calls for a legal conclusion.
20    A.   Yes, I am familiar with it.
21    Q.   What is your understanding of the
22 Securities Exchange Act of 1934?
23       MR. BURKE:  Same objection.
24       THE WITNESS:  What do you want me to do

27 (Pages 102 to 105)

Page 106

```
1    here, Jim?
2        MR. BURKE: If you can answer, answer.
3    A.    It generally governs the financial
4    statements of public companies and the reporting
5    requirements of public companies.
6    Q.    And do you believe that generally the
7    '33 act and the '34 act are designed to provide
8    full and fair disclosure and prevent frauds?
9        MR. BURKE: Objection. Calls for legal
10   conclusion.
11   A.    I would say I think they are to provide
12   full and fair disclosure. I'm not sure about the
13   prevent fraud part of it, but I wouldn't -- I
14   wouldn't opine on that part of it.
15   Q.    Do you believe that in general the
16   federal securities laws are designed to prevent
17   fraud?
18       MR. BURKE: Objection. Vague; calls for
19   legal conclusion.
20   A.    I mean, I think they're designed for you
21   to have accurate reporting and fair disclosure to
22   investors. The outcome of that would be to prevent
23   frauds, I would guess; but again, I think I'm
24   speculating a little bit there.
```

Page 107

```
1    Q.    Mr. Carey, as part of your job as CFO of
2    a public company, you sign public documents,
3    correct?
4    A.    Um-hum, yes.
5    Q.    And because you sign public documents,
6    you have to have an understanding that the
7    documents you're signing are free of material
8    misstatement, correct?
9        MR. BURKE: Objection. Asked and
10   answered. You may answer.
11   A.    Yes.
12   Q.    So you have to know what free of
13   material misstatement means, correct?
14       MR. BURKE: Objection.
15   A.    You have to have a sense of what it
16   means. It's not a bright line as I said earlier.
17   Q.    And you do have a sense of what it
18   means, correct?
19   A.    Um-hum.
20   Q.    Yes?
21   A.    Yes.
22   Q.    Now, Provident recently voted to merge
23   with National City, correct?
24   A.    Correct.
```

Page 108

```
1    Q.    And proxy materials were created for
2    that merger, correct?
3    A.    Correct.
4    Q.    And with respect to those proxy
5    materials, did you read every word and look at
6    every number of those proxy materials?
7        MR. BURKE: Objection to relevance. You
8    may answer.
9        THE WITNESS: Does that mean I don't
10   have to answer because it's irrelevant?
11       MR. BURKE: No. It is irrelevant, but I
12   did not instruct you not to answer, so the
13   answer is, yes, you do have to answer.
14       And the question is did you read every
15   word and look at every number in the Provident
16   National City proxy if I'm correctly
17   paraphrasing.
18   A.    I read it. I can't say that I looked at
19   every number. Those documents were sent out by Nat
20   City people.
21   Q.    Excuse me?
22   A.    Those documents were sent out by the
23   National City people; not the Provident people.
24   Q.    Who wrote the proxy materials for the
```

Page 109

```
1    Provident National City merger?
2    A.    Who wrote it? I'm not sure who wrote
3    it.
4    Q.    Who wrote Defendants' Exhibit 1, the
5    proxy materials, slash, registration statement, for
6    the OHSL-Provident merger?
7        MR. BURKE: Objection. Foundation;
8    calls for speculation.
9    A.    I can't recall back then who wrote that.
10   Q.    Did you write anything in Defendants'
11   Exhibit 1?
12   A.    I can't recall. I would have probably
13   been an editor, not an author, of this document.
14   Q.    Do you know who wrote the first page of
15   Defendants' Exhibit 1?
16   A.    That page (indicating)?
17   Q.    Yes.
18   A.    No, I do not.
19   Q.    Do you know who had the overall
20   responsibility for compiling the document?
21       MR. BURKE: Objection. No foundation;
22   calls for speculation.
23   A.    I can't recall now who that would be.
24   Q.    Defendants' Exhibit 1 is a joint
```

28 (Pages 106 to 109)

**Page 110**

1  document, correct?
2      MR. BURKE:  Objection.  You may answer
3  if you know.
4      A.   I'm not sure.  I think it may be.  I'm
5  not sure.
6      Q.   Who do you think Defendants' Exhibit 1
7  comes from?
8      A.   Well, I think it... typically, it comes
9  from the acquirer.  I'm just not certain in this
10  case if that's how it worked.
11     Q.   The who?
12     A.   The acquirer, who's making the
13  acquisition.  The letter is from the CEO; but
14  typically, the acquirer is involved in putting it
15  together.
16     Q.   When you say from the CEO, what are you
17  referring to?
18     A.   I said there's a letter from their
19  chairman of the board included in here.
20     Q.   Did you say chairman of the board or
21  CEO?
22     A.   I said CEO, but actually, he's listed as
23  the chairman.  I don't know if he's the CEO.  I
24  presume he's the CEO, also, but I'm not sure.  I

**Page 111**

1  guess he's not, now that I think about it.  The
2  letter is from the chairman of the board, but I
3  don't think he's the CEO.
4      Q.   Mr. Carey, you met the Oak Hills
5  directors, correct?
6      A.   Yes, I did.
7      Q.   What were the circumstances under which
8  you met them?
9      A.   We met them to talk about Provident
10  buying their company.
11     Q.   Where did you meet them?
12     A.   I don't remember now.
13     Q.   Queen City Club?
14     A.   It could be.  I'm not certain where we
15  met them.
16     Q.   Approximately how much time did you
17  spend with the Oak Hills directors?
18     A.   My best remembrance is that I think it
19  was one meeting.  It could have been more than one
20  meeting, but I think we just had one meeting, but
21  I'm not certain.
22     Q.   And how many directors did you meet
23  with?
24     A.   I thought it was the whole board, but

**Page 112**

1  I'm not certain.  The majority of the board was
2  there.
3      (Off-the-record interruption.).
4  BY MR. BRAUTIGAM:
5      Q.   When did you meet the OHSL directors?
6      A.   I have to beg off on the memory, but
7  prior to the acquisition, we met with -- and we
8  made other acquisitions, so I can't remember which
9  was which -- but we had -- typically we had a
10  meeting.  I don't know if they were always dinner
11  meetings, but we had a meeting; and I'm not totally
12  cognizant of how this meeting worked, but I'm
13  pretty sure we met with the directors and...
14     Q.   Was it before or after the merger
15  agreement had been signed?
16     A.   Oh, before.  Well before.
17     Q.   What was the purpose of meeting the OHSL
18  directors?
19     A.   To talk to them about the possibility of
20  Provident acquiring their company.
21     Q.   Did you make a presentation at this
22  meeting?
23     A.   I don't recall.  I don't recall whether
24  I made the presentation or Bob made the

**Page 113**

1  presentation or our CEO.  I believe there was a
2  presentation made.
3      Q.   Aside from you and Mr. Hoverson, who
4  else, if anyone, from Provident attended this
5  meeting?
6      A.   I don't think anyone else attended,
7  although I'm not a hundred percent sure of that,
8  but I don't believe anyone else attended.
9      Q.   Did you have enough contact with the
10  OHSL directors to form an opinion with respect to
11  their financial sophistication?
12         MR. BURKE:  Objection.  Calls for
13  speculation.  You may answer.  No foundation.
14     A.   I'm not... I'm trying to think about
15  that one.  Did I have enough contact to form an
16  opinion on their -- about their financial
17  sophistication?  Was that the question?
18     Q.   Yes, sir.
19     A.   I don't know how you would judge what
20  enough contact would be to make that judgment.
21     Q.   Did you form an opinion with respect to
22  the financial sophistication of some or all of the
23  OHSL directors?
24     A.   I don't recall whether we did or we

29 (Pages 110 to 113)

e49da87b-a1b1-491d-8eee-0c88afaef3fe