1  didn't.
2     Q.    Did anything strike you about the OHSL
3  directors?
4     A.    I don't recall anything striking me
5  about the OHSL directors.
6     Q.    So they didn't strike you as being old,
7  tired, and scared, in the words of their former CEO
8  and also fellow director?
9         MR. BURKE: Objection. Mischaracterizes
10       the record completely. Assumes facts not in
11       evidence. Calls for speculation. You may
12       answer.
13    A.    My answer to your question was, no, they
14  didn't strike me as that.
15    Q.    Did you ever meet a gentleman named Tom
16  Herron?
17    A.    I can't remember the names of those
18  directors.
19    Q.    Do you know who Tom Herron was?
20    A.    No.
21    Q.    Did you ever learn that an OHSL director
22  had resigned in part in protest of the OHSL-
23  Provident merger?
24        MR. BURKE: Objection. Assumes facts

1  not in evidence; misstates the record; calls
2  for speculation. You may answer.
3     A.    I learned that a director resigned. I
4  don't know that I ever found out factually why the
5  director resigned.
6     Q.    When --
7     A.    I don't know. I don't remember
8  specifically. I don't want to misquote something.
9     Q.    When did you learn an OHSL director had
10  resigned?
11    A.    That, I don't recall.
12    Q.    Was it before or after the merger
13  agreement was signed?
14        MR. BURKE: Objection. Asked and
15       answered.
16    A.    I don't recall when I learned it.
17    Q.    Was it before or after the proxy
18  materials were created and disseminated to the
19  shareholders?
20        MR. BURKE: Objection. Asked and
21       answered.
22    A.    Yeah, I really don't remember when I
23  learned it.
24    Q.    Did you learn it as part of this or

1  other litigation?
2     A.    I don't remember. I really, you know,
3  don't remember when I learned it.
4     Q.    When you learned it, did you ask any
5  questions to find out why?
6     A.    I may have. I don't remember whether I
7  did or I didn't.
8     Q.    How did you learn that an OHSL director
9  had resigned?
10    A.    I'm not certain how I learned it. I
11  really can't tell -- I really can't remember, Mike,
12  or I would tell you. I don't know if someone told
13  it to me or it came through this litigation. I
14  don't remember.
15    Q.    Did you ever learn the timing with
16  respect to the resignation vis-a-vis the merger
17  agreement?
18    A.    I'm not sure I fully understand the
19  question. What do you mean by the timing?
20    Q.    The merger agreement was signed as of
21  August 2, 1999, correct?
22    A.    That sounds about right.
23    Q.    Did you learn when the director had
24  resigned?

1         MR. BURKE: Objection. Asked and
2        answered. You may answer.
3     A.    I don't have a date attached to when the
4  person resigned, so I don't remember when I learned
5  it or when he did resign.
6     Q.    Okay.
7     A.    Before, during, or after.
8     Q.    Did you ever learn that it was close in
9  time with respect to the signing of the merger
10  agreement?
11        MR. BURKE: Objection. Asked and
12       answered.
13    A.    I'm trying to remember. I'm not really
14  that clear on when the person did resign. I mean,
15  my best remembrance is he may have resigned before,
16  but I'm not sure. He could have resigned after. I
17  don't...
18    Q.    Before what?
19    A.    Before the merger, but he could have
20  resigned afterwards. I'm not certain when the guy
21  resigned.
22    Q.    If this OHSL director resigned in part
23  in protest, and if he resigned before the merger
24  agreement was signed, do you agree that that

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 118

1   information should be included in Defendants'
2   Exhibit 1?
3        MR. BURKE: Objection. Calls for
4   speculation; assumes facts not in evidence;
5   misstates the record.
6   A.    I don't want to speculate on all those
7   different hypotheticals you gave me. I don't know
8   how I could speculate on that. There were a couple
9   there.
10  Q.    Mr. Carey, I just want to point this
11  out. Mr. Burke objects and says, Calls for
12  speculation; and then you respond by saying, I
13  don't want to speculate. There's a pattern here.
14       Now, that being said, I'm entitled to an
15  answer to my question. I don't believe it requires
16  you to speculate.
17  A.    Okay.
18  Q.    I want your belief. If these thing are
19  true, do you believe that this information should
20  have been included in Defendants' Exhibit 1?
21       MR. BURKE: Mr. Brautigam, you have just
22  created a hypothetical based upon facts which
23  do not exist, which are false, which are
24  inaccurate.

Page 119

1        The witness does not have to speculate
2   or give gratuitous opinions on incomplete
3   hypotheticals. I mean, you can demand that he
4   answer all you want, and you can give him your
5   opinion you don't think it calls for
6   speculation.
7        That's his judgment to make. I'm making
8   my objection for the record, and the witness
9   can then answer if he's able.
10       MR. BRAUTIGAM: Jim, we don't need
11  speaking objections. What's going on here
12  with this witness and every other witness is
13  very apparent.
14  BY MR. BRAUTIGAM:
15  Q.    Please answer the question if you can.
16  A.    First of all, repeat the question. I'm
17  not -- just so I'm clear on thinking about it.
18  Q.    Let me represent to you Mr. Herron
19  resigned in part in protest. Let me further
20  represent to you that he resigned in part in
21  protest on July 27, 1999, effective July 30, 1999.
22       I think we've already established that
23  the merger agreement was signed on August 2nd,
24  1999.

Page 120

1        So with those facts and those dates in
2   mind, if everything I've said is true, do you
3   believe that Mr. Herron's resignation should have
4   been disclosed in the proxy materials?
5        MR. BURKE: Objection. Calls for legal
6   conclusion; calls for speculation. You may
7   answer.
8   A.    I don't know whether that -- personally,
9   I don't know whether that should be included or
10  not.
11  Q.    What factors would you consider in
12  making such a determination?
13       MR. BURKE: Objection to form.
14  A.    I'm not sure what factors I would
15  consider. I'm trying to think about it, but I
16  don't -- based on that hypothetical that you just
17  gave me, I'm not sure I'm in a position -- I think
18  that would be more of a legal counsel's prospectus
19  on whether that should be disclosed or not versus
20  an accounting.
21       I mean, so I don't know. I don't know
22  what factors I would consider about it, but it's
23  kind of a unique situation, not one I have a lot of
24  experience with.

Page 121

1   Q.    Why is it unique?
2   A.    I don't know that I've been involved in
3   a situation where a company was purchased in my
4   business career -- and we've purchased a fair
5   amount of companies, at least been involved in some
6   way -- where someone has retired. So I don't --
7   I'm not sure what factors you'd consider with that.
8   Q.    You mean retired or resigned?
9   A.    What did he do? Did he retire or did he
10  resign?
11  Q.    He resigned.
12  A.    Yeah, I mean, it's a new situation for
13  me. I don't have a comparative. I don't know
14  whether that happens frequently or not, so I don't
15  know. I mean, I really can't tell you. I don't
16  know whether that should be disclosed or not. It
17  sounds like a little bit of an unusual situation.
18  Q.    Why does it strike you as unusual?
19  A.    Because I think in my business career of
20  being involved in, I don't know, 20-30 maybe
21  acquisitions, I don't recall ever hearing a
22  situation where a director has resigned before we
23  did -- right before we did a deal.
24       That's why it just seems unusual. It

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 122

1  may not be. I'm just saying it seems -- in my own
2  experience -- let me say this. In the experience
3  I've had, it's unusual. So whether that would be
4  disclosed or something in a document, I have no
5  idea.
6      Q.    Mr. Carey, who does Defendants' Exhibit
7  1 come from?
8          MR. BURKE: Objection. Asked and
9  answered.
10     A.    I think it's a joint proxy from both
11 companies, but the letter is from their chairman of
12 the board.
13     Q.    And it also comes from the directors,
14 correct?
15     A.    Yes.
16     Q.    And it does not come from legal counsel,
17 correct?
18     A.    Right. It does not come -- typically
19 does not come from legal counsel.
20     Q.    In fact, it never comes from legal
21 counsel, correct?
22     A.    I don't know. I mean, the annual
23 proxies are sometimes signed by legal counsel.
24 They do send that to shareholders -- or the

Page 123

1  secretary. They're usually legal guys and gals.
2      Q.    When you said legal counsel, to whom
3  were you referring?
4      A.    Internal and external. When we have
5  what's a legal disclosure question, we talk to our
6  internal counsel and our external typically, not
7  always.
8      Q.    Was the subject of the disclosure of an
9  OHSL director ever raised by anyone as the proxy
10 materials were assembled?
11     A.    Not that I'm aware of.
12     Q.    What role, if any, did you have in
13 Defendants' Exhibit 1?
14     A.    It would have been on the financial
15 statements included in here primarily; but reading
16 the document, I wouldn't have been involved in
17 authoring the general description front section of
18 it, but I would have read it and probably made
19 comments where I thought things were not, you know,
20 as they should be, but it wouldn't have been
21 something that I would have authored.
22     Q.    Who did you make your comments to?
23     A.    I don't recall who I made the comments
24 to because I don't recall exactly who drafted it,

Page 124

1  but internal Provident people and our external
2  legal counsel.
3      Q.    Okay. With respect to internal
4  Provident people, do you remember anything at all
5  that you said with respect to the Defendants'
6  Exhibit 1?
7      A.    No. Do I remember something I said four
8  years ago?
9      Q.    Well, it's more than four years ago.
10     A.    Well, however many years ago it was.
11 Five years ago?
12     Q.    The context, not specifically words, but
13 words or substance.
14     A.    Tell me again what you're looking for.
15     Q.    In other words, you could say I remember
16 the topic of "x" coming up; and I said to someone
17 at Provident, Hey, we have to fix this, something
18 like that?
19     A.    No, I don't remember that.
20     Q.    Did you ever make any comments to anyone
21 at OHSL?
22     A.    About this document?
23     Q.    Yes.
24     A.    I don't recall.

Page 125

1      Q.    Who was the primary point person from
2  Provident with respect to getting the merger done?
3      A.    Getting the merger done or getting these
4  documents completed?
5      Q.    Let's talk about getting the merger
6  done.
7      A.    Hum, are you asking after the deal was
8  approved?
9      Q.    At any time. If it changed over time,
10 tell me.
11         MR. BURKE: Objection. Form; vague.
12     A.    I don't -- I'm not sure I fully
13 understand your question. That's all.
14     Q.    Let me see if I can rephrase it. Was
15 there a person who was primarily responsible for
16 effectuating the merger at Provident?
17         MR. BURKE: Same objection.
18     A.    I'm just not sure I know what you mean
19 when you're saying effectuating the merger.
20 There's trying to get the transaction completed;
21 then integrate the transaction. So there's almost
22 two phases to it.
23     Q.    Okay. Who was the primary person at
24 Provident responsible for getting the merger

32 (Pages 122 to 125)

Page 126

1   completed?
2       MR. BURKE: Objection. Same question.
3   Same objection.
4       A.   Yeah, I'm not really sure. I mean, I
5   would probably be considered one of the
6   individuals, but I don't know that someone would
7   have said I was primary. There could -- it could
8   have been viewed that other people were more
9   primary than me.
10      Q.   Who were these other people you're
11  referring to?
12      A.   I would think that our CEO, Bob
13  Hoverson; myself; perhaps our internal legal
14  counsel. That would probably be the group.
15      Q.   And who was primarily responsible for
16  getting the document, meaning Defendants' Exhibit
17  1, together?
18      A.   I'm not sure. I mean, it's a big
19  document. I'd say it was a combination of the
20  legal staff and the accounting staff. I don't know
21  if there's a primary on that one.
22           The drafting would have been controlled
23  by legal people; but we certainly were -- you know,
24  a lot of the information there is financial.

Page 127

1       Q.   Internal or external legal people?
2       A.   I don't recall. I mean, we used
3   external; but I don't really recall really who was
4   controlling the drafting, whether it was our
5   internal people and getting feedback from the
6   external counsel or vice versa. And I've seen it
7   work both ways in many different instances.
8       Q.   Who was the primary person at OHSL with
9   responsibility for effectuating the merger?
10      A.   I don't know. I'm not sure. I really
11  -- I'd be guessing if I gave you an answer at that.
12      Q.   Who was the primary person at OHSL who
13  was responsible for assembling the document?
14      A.   Again, I don't remember.
15      Q.   Do you know who Pat Condren is?
16      A.   I don't recall who Pat Condren is.
17  What's his title?
18      Q.   CFO, OHSL.
19      A.   Okay.
20      Q.   Did you have any contact with Pat
21  Condren?
22      A.   It was probably pretty limited. I mean,
23  I probably had contact with him, but it's not like
24  this was such a large transaction -- but it's just

Page 128

1   going back five years. There's so many names.
2       Q.   Do you know who Ken Hanauer was?
3       A.   Yes, I know Ken.
4       Q.   How do you know Ken?
5       A.   Ken is the CEO.
6       Q.   Was.
7       A.   Was the CEO.
8       Q.   What, if any, contact with Ken Hanauer
9   did you have?
10      A.   Again, it stretches my memory to go back
11  five years ago and try to remember the contact I
12  had with Ken Hanauer, but he was at the meeting we
13  had to talk about the merging, us buying this
14  company.
15           I know that there were subsequent
16  meetings in between when we reached an agreement
17  and all the way through closing and after closing
18  -- I can't -- you know, I know there were at least
19  some other times I met with Ken and/or talked on
20  the phone with Ken. I wouldn't describe it as a
21  regular dialog, but there's certain dialogue with
22  Ken.
23      Q.   In general, what was the substance of
24  those dialogues?

Page 129

1       A.   Details related to the acquisition.
2       Q.   Do you remember any of the details?
3       A.   No.
4       Q.   Let's shift gears and go back to the
5   Provident National City merger for a moment. My
6   understanding from reading the document is that the
7   Provident board voted unanimously to merge with
8   National City; is that correct?
9       A.   I believe that's correct.
10      Q.   How did you obtain that belief?
11           MR. BURKE: Objection. Calls for
12  speculation; foundation.
13      A.   I think it's in the document.
14      Q.   And do you agree that the actual vote
15  and believing that the merger with National City is
16  in the best interest of Provident shareholders are
17  separate and distinct concepts?
18           MR. BURKE: Objection to form; vague;
19  calls for speculation. You may answer.
20      A.   Repeat the question.
21      Q.   Okay. Do you believe that the fact that
22  Provident directors voted unanimously to merge
23  National City and the fact that Provident directors
24  believed the merger to be in the best interest of

Page 130

1  Provident shareholders to be separate and distinct
2  concepts?
3       MR. BURKE: Objection to form, vague. I
4  don't understand that question. I think it
5  also calls for speculation, and there's no
6  foundation that he has knowledge of that, but
7  he may answer.
8    A.  Do I believe that those are two separate
9  events? Is that what you're saying?
10   Q.  Separate and distinct concepts.
11   A.  That they voted for it and that it was
12  unanimous?
13   Q.  No, that they voted unanimously to
14  approve the merger as directors and that they
15  believe that the merger is in the best interest of
16  Provident shareholders.
17   A.  I don't know. I can't speak for the
18  directors on something like that, Mike. I'm not...
19  You would have to ask -- whatever you're trying to
20  get at, you have to ask it differently if you want
21  me to give you some kind of response.
22   Q.  You're a Provident shareholder, correct?
23   A.  Yes.
24   Q.  Did you vote your shares in favor of the

Page 131

1  merger?
2    A.  Yes.
3       (Off-the-record interruption.)
4  BY MR. BRAUTIGAM:
5    Q.  Did you have an expectation as to how
6  the Provident directors would vote their shares?
7  I'm not asking how they voted their shares; I'm
8  asking if you personally had an expectation.
9       MR. BURKE: Objection. Foundation;
10  calls for speculation. You may answer.
11   A.  Not something I really... I'm not sure
12  I had an expectation on how they would vote their
13  shares. When? I mean, like right before, after
14  they got presented everything, or -- I mean...
15   Q.  There was a special meeting of Provident
16  shareholders that took place on May 20th of 2004,
17  correct?
18   A.  I don't know the exact date. We had a
19  special meeting. I don't know if it was that date,
20  but it sounds close to it.
21   Q.  What was the purpose of that special
22  meeting?
23   A.  To vote on the, you know, acquisition of
24  Nat City -- of Provident by Nat City.

Page 132

1    Q.  And you attended that special meeting,
2  correct?
3    A.  Yes.
4    Q.  Did you see me there?
5    A.  Excuse me?
6    Q.  Did you see me there?
7    A.  No, I did not.
8    Q.  At any point up to and including the
9  meeting, did you have an expectation as to how
10  Provident directors would vote their personal
11  shares?
12       MR. BURKE: Objection. Foundation;
13  calls for speculation. You may answer.
14   A.  It isn't something that I really thought
15  that much about, frankly. Expectation as to how
16  they would vote their shares?
17       I presume that if they -- if management
18  and Dave Daberko and the investment bankers all
19  made the right presentations, they would probably
20  vote for it. I didn't ever think about would it be
21  unanimous or not. I mean, I -- but I thought that
22  they would vote for it if everybody recommended it.
23   Q.  Okay. Because that stands to reason,
24  correct?

Page 133

1       MR. BURKE: Objection to form. I don't
2  know what you mean.
3    A.  I don't know what you mean by stands to
4  reason, but I have been through the experience
5  before. I expected if everybody recommended the
6  transaction, that the board -- although I've been
7  involved in situations before where they haven't
8  all voted for it, including the sale of my last
9  company.
10       MR. BURKE: He's talking about voting
11  their shares; not voting of the board. Do you
12  understand that?
13       THE WITNESS: No.
14  BY MR. BRAUTIGAM:
15   Q.  It's a good distinction. I think the
16  proxy materials for the National City merger say
17  that the Provident board voted unanimously in favor
18  of the merger. Are you with me?
19   A.  I think that's right.
20   Q.  I further believe that the Provident-
21  National City proxy materials say that the board
22  unanimously believes that the merger is in the best
23  interest of Provident shareholders.
24       MR. BURKE: If you're going to make the

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 134

1  representation, just show the document to the
2  witness, please, so he can verify and see what
3  you're saying.
4      Q.    (Handing witness document.)
5      A.    I don't see the word unanimous in here
6  anywhere that you keep on using, but it says
7  believe the merger is fair. Here we go.
8  Unanimously recommends that Provident shareholders
9  vote for adoption of the merger. Okay.
10     Q.    Do you believe that it's fair to
11 conclude, as a reader of that document, that the
12 Provident board would follow their own
13 recommendation and vote their personal shares in
14 favor of the Provident-National City merger?
15         MR. BURKE: Objection. No foundation;
16     calls for speculation.
17     A.    I don't even think, Mike, people think
18 about that. That's my answer. I don't think
19 people think about that, other than the controlling
20 shareholders.
21     Q.    Well, I'm asking you to think about it
22 right now. Do you believe, based on what you've
23 read, which does include the word unanimously,
24 which you graciously pointed out, that the

Page 135

1  Provident directors would vote their shares in
2  favor of the Provident-National City merger?
3          MR. BURKE: Objection. Calls for
4      speculation.
5      A.    Did they?
6      Q.    No. That's not my question at all. My
7  question is your belief.
8          MR. BURKE: Objection. Calls for
9      speculation.
10     A.    Do I believe that, based on this, they
11 would all vote their shares? That's your question?
12     Q.    In favor of the Provident-National City
13 merger, correct?
14         MR. BURKE: Objection. Same objection.
15     A.    It's not something I would have ever
16 thought about, frankly, but --
17     Q.    But thinking about it now...
18         MR. BURKE: What's that? Objection.
19     A.    You know, yeah, I think they would have,
20 but, I mean, they could not have. I mean, I
21 wouldn't bet on it.
22     Q.    But you think they would have, correct?
23         MR. BURKE: Objection. Calls for
24     speculation.

Page 136

1      A.    You know, I mean, these are just
2  hypothetical questions. I don't know if I
3  understand it. Why is it relevant? I know I can't
4  ask questions, but...
5          MR. BURKE: The question is did you have
6      an expectation one way or the other. Did you
7      have an opinion one way or the other?
8      A.    I want to go back to answer your other
9  question because I mis-answered it because I didn't
10 understand. I had no expectation at any point in
11 time during the entire process as to how the
12 non-Lindner family would vote their shares. I
13 never thought about it.
14     Q.    Are you talking about each individual
15 Provident shareholder or are you talking about --
16     A.    The board members. I never had an
17 expectation how they would vote their shares.
18     Q.    Right. But now that you've read this
19 part of the Provident-National City proxy
20 materials, you do have an expectation that the
21 board members would vote their shares in favor of
22 the merger, correct?
23         MR. BURKE: Objection. Asked and
24     answered.

Page 137

1      A.    Yeah, I think they would vote in favor.
2      Q.    And that, in substance, they would
3  follow their own recommendation, correct?
4          MR. BURKE: Objection. Form; vague.
5      A.    I don't know how that's relevant, but I
6  answered the first question. You're just
7  clarifying.
8      Q.    It's a different question.
9      A.    What's the different question again?
10     Q.    That they would follow their own
11 recommendation, correct?
12     A.    You're making a statement, right?
13     Q.    No. I'm asking if you expected -- I'm
14 not saying whether they did or not -- that the
15 Provident board would follow their own
16 recommendation to the shareholders?
17         MR. BURKE: Objection. Calls for
18     speculation.
19     A.    Let me just say this. I didn't have an
20 expectation at any point in time during the process
21 about how the non-Lindner family -- our board,
22 which doesn't have any Lindners on it -- how they
23 would vote their shares. That was not something
24 that I focused on.

35 (Pages 134 to 137)

Page 138

1   Q.   And you just focused on it now, correct?
2   A.   I think it's likely that they would vote
3   the shares for it, but I don't know. I don't know
4   how they would really -- I don't know how they
5   think. I would be speculating to say what they're
6   going to do.
7   Q.   Why do you think it's likely that
8   Provident directors would vote their shares in
9   favor of the merger?
10       MR. BURKE: Objection.
11  A.   It's typical. I think it's typical, I
12  guess.
13  Q.   Also, it is consistent with their
14  recommendation to their fellow Provident
15  shareholders, whose interest they're appointed to
16  represent, correct?
17       MR. BURKE: Objection. Calls for
18  speculation. You may answer.
19  A.   I think it's consistent.
20  Q.   Great. Now we're getting to the
21  relevant part. Would you please look at the first
22  page of Defendants' Exhibit 1. I want to direct
23  your attention to this sentence that begins, Your
24  board of directors unanimously. Do you see that?

Page 139

1   A.   Um-hum.
2   Q.   Would you read that paragraph to
3   yourself, please.
4   A.   Okay. I read it. It's just two
5   sentences, right?
6   Q.   Right. Now, let's focus on the first
7   sentence. Your board of directors unanimously
8   approved the acquisition and believes that it is in
9   the best interest of OHSL stockholders. Do you see
10  that?
11  A.   Um-hum.
12  Q.   When it says unanimously approved the
13  acquisition, what does that mean to you?
14       MR. BURKE: Objection. Calls for
15  speculation.
16  A.   I think that means everyone on the board
17  voted for it.
18  Q.   How many people were on the OHSL board?
19  A.   I don't recall.
20  Q.   Let me direct your attention to page 57
21  of the document. Would you just look at that,
22  please.
23  A.   Page 57?
24  Q.   Right. It says number of directors.

Page 140

1        MR. BURKE: Hum-um.
2   A.   There it is. Seven.
3   Q.   So from reading the first sentence of
4   the document, you would conclude that OHSL's board
5   of seven members voted unanimously in favor of the
6   merger with Provident, correct?
7        MR. BURKE: Objection. Calls for
8   speculation as to what OHSL directors did. No
9   foundation.
10  A.   Let's take a break.
11       MR. BURKE: You have to answer the
12  question. If you don't have an answer, that's
13  fine. Same objection.
14  A.   Tell me the specific question again.
15       (The question was read back.)
16       MR. BURKE: Objection. Calls for
17  speculation as to what OHSL directors did. No
18  foundation for that. You may answer.
19  A.   I guess I'm not a hundred percent sure
20  of what the word unanimously means there.
21  Q.   Why not?
22  A.   I mean, does that mean it's a -- they
23  received more than the 50 percent, or is that --
24  what is unanimously supposed to mean?

Page 141

1   Q.   Mr. Carey, are you familiar with how the
2   word unanimously appears in the Provident-National
3   City proxy materials?
4        MR. BURKE: Objection. Relevance.
5   A.   I am familiar with that, yes.
6   Q.   Is the word unanimously used in the same
7   sense in the OHSL-Provident merger?
8   A.   I don't know because I'm more familiar
9   with that situation having been closer to it than
10  what these people did separately from us.
11  Q.   Are you a fair man, Mr. Carey?
12       MR. BURKE: Objection to relevance. You
13  may answer. Objection to form.
14  A.   Do I think I'm a fair man? Yes.
15  Q.   Is there any other fair reading of that
16  sentence that we're focused on?
17  A.   I don't know.
18       MR. BURKE: In what? In the Nat City or
19  are we talking about OHSL?
20       MR. BRAUTIGAM: No. We're focused on
21  Defendants' Exhibit 1, the sentence that
22  reads, Your board of directors unanimously
23  approved the acquisition and believes that it
24  is in the best interest of OHSL stockholders.

36 (Pages 138 to 141)

Page 142

BY MR. BRAUTIGAM:
1  BY MR. BRAUTIGAM:
2      Q.    Now, Mr. Carey, what part of speech is
3  the word unanimously, if you know?
4          MR. BURKE:  Objection to relevance.
5      A.    What do you mean by what part of speech?
6      Q.    It's an adverb, isn't it?
7      A.    Yes.
8      Q.    It modifies a verb, correct?
9      A.    Right.
10     Q.    In fact, in this sentence, it modifies
11 two verbs, correct?
12         MR. BURKE:  Objection.  Calls for
13 speculation; no foundation.
14     A.    Certainly, yeah, I think it does.  It
15 certainly modifies one verb.
16     Q.    It modifies approved, and you believe it
17 modifies believes as well, correct?
18         MR. BURKE:  Objection.
19     A.    I don't know that it modifies believes,
20 but...
21     Q.    What other word do you think unanimously
22 may modify?
23     A.    Just approved.
24     Q.    Well, didn't you say a second ago you

Page 143

1  felt it modifies two words?
2      A.    No, no.  I was looking for the other
3  word that it modified.  I'm sorry.  I think it
4  clearly modifies approved.  I don't know whether it
5  modifies believes.  Just the way it's written here,
6  I'm not sure.  That's all.
7      Q.    What would you need to know to determine
8  whether or not unanimously also modifies believes?
9          MR. BURKE:  Objection.
10     A.    I don't know how I would determine that
11 at this stage.
12     Q.    Could you diagram the sentence?
13     A.    No.  I wasn't very -- I was never very
14 good at the diagramming.
15     Q.    Okay.  You were a numbers guy, right?
16     A.    Somewhat.
17         MR. BURKE:  Objection to form.
18     Q.    Do you believe that there's any --
19         MR. BURKE:  Do you want to take a break,
20 by any chance?
21         THE WITNESS:  Let's take a break.
22     Q.    Do you wish to confer with counsel?
23         MR. BURKE:  No.  He wants to take a
24 break.  He asked to take a break earlier.  You

Page 144

1  said, Answer the question.  That was ten
2  minutes ago.
3      Q.    Mr. Carey, do you wish to take a break?
4      A.    Yes.
5      Q.    Do you wish to take a break to confer
6  with counsel?
7      A.    No.
8          MR. BURKE:  None of your business.
9          MR. BRAUTIGAM:  If he's taking a break
10 to confer with counsel, I want it on the
11 record.
12         MR. BURKE:  And the answer was no.
13         MR. BRAUTIGAM:  Okay.  Good enough.
14         (A brief break was taken from 11:42 to
15 11:47, 5 minutes.)
16 BY MR. BRAUTIGAM:
17     Q.    Mr. Carey, did you confer with counsel
18 during the break?
19         MR. BURKE:  Objection.  Instruct the
20 witness not to answer.
21         MR. BRAUTIGAM:  I'm not asking for the
22 substance.  I'm asking if it happened.
23         MR. BURKE:  Did we say anything to each
24 other?  Okay.  He can answer that.  Did we say

Page 145

1  anything to each other.
2  BY MR. BRAUTIGAM:
3      Q.    Did you confer with counsel?  I'm not
4  talking about sports.
5          MR. BURKE:  No.  Did we say anything to
6  each other?  I'm not going to let you get into
7  the subject of it, but he can say whether we
8  said anything during the break, yes.
9      Q.    Did you say anything to Mr. Burke or did
10 Mr. Burke say anything to you related to the
11 deposition?
12         MR. BURKE:  Objection.  I instruct the
13 witness not to answer.  That's the substance
14 of the conversation, Mike.
15         MR. BRAUTIGAM:  Respectfully, I
16 disagree.
17 BY MR. BRAUTIGAM:
18     Q.    Mr. Carey, do you believe that a fair
19 reading of the sentence, Your board of directors
20 unanimously approved the acquisition and believes
21 that it is in the best interest of OHSL
22 stockholders means that the whole OHSL board
23 believes that the merger with Provident is in the
24 best interest of the stockholders?

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 146

1      MR. BURKE: Objection to form; calls for
2  speculation.
3      A.    As I said, Mike, I think that the
4  unanimously is likely to -- you know, clearly
5  relates to the word approved; but I don't know
6  whether it means believes, also. I mean, I can't
7  make a judgment on that. I didn't ask Norbert
8  here. He wrote it.
9      Q.    Why can't you make a judgment on that?
10      MR. BURKE: Objection. Asked and
11  answered.
12      A.    I don't know the answer to that really.
13      Q.    Can't you read it today and form a
14  conclusion based on the sentence structure?
15      A.    No. If I could, I would. I don't
16  really have a conclusion on whether it related to
17  believes. I'm not sure. That's my answer. My
18  answer is I'm not sure that you can conclude that.
19  I'm not saying you can't; I'm not saying you can.
20  I just am not sure how one should conclude that
21  based upon the way it's written here.
22      Q.    Is there any hint of dissent in
23  Defendants' Exhibit 1?
24      MR. BURKE: Objection. The entire

Page 147

1  document?
2      Q.    Yeah, the entire document.
3      MR. BURKE: Objection. Overbroad.
4  Document speaks for itself. You may answer.
5      A.    I don't know if there's any hint of
6  dissent in the entire document. I don't believe
7  there's anything in the first page, but it's a
8  hundred page document.
9      Q.    If there was some dissent, do you think
10  it would have caught your attention in '99 as you
11  reviewed it?
12      MR. BURKE: Objection. Calls for
13  speculation.
14      A.    I think it would have.
15      Q.    And you don't recall it happening,
16  correct?
17      A.    No.
18      Q.    Did you believe that the OHSL directors
19  were enthusiastic about the merger with Provident?
20      MR. BURKE: Objection. Foundation.
21      A.    I don't know what -- you know, what you
22  mean by enthusiastic in that case, but I think it
23  was an emotional decision for them to sell their
24  company to us.

Page 148

1      Q.    Do you believe that the OHSL directors
2  were in favor of selling their company to
3  Provident?
4      A.    Yeah. In general, yeah.
5      Q.    Do you believe that that was true --
6      A.    I don't know that I believe it was
7  equally true that everyone was the same -- had the
8  same level of enthusiasm. It's typical that it's
9  not.
10      Q.    Okay.
11      A.    I don't really recall; but, I mean, I
12  don't remember thinking that everybody was in the
13  same exact place.
14      Q.    Which directors do you believe had a
15  higher level of enthusiasm than other directors?
16      A.    I couldn't possibly recall after five
17  years.
18      Q.    What's the basis for that statement?
19      A.    Just sort of general business
20  experience, that when you buy companies, there's
21  not usually the same level of enthusiasm by every
22  board member to sell a company and have it go away.
23      Q.    Did you believe that Mr. Hanauer was in
24  favor of the merger with Provident?

Page 149

1      A.    I can't really recall specifics about
2  how they felt back five years. I mean, I don't
3  recall anyone not being in favor of it, but...
4      Q.    Mr. Carey, with respect to the Provident
5  National City merger, if I understand your
6  testimony correctly, you said that you expected the
7  board would follow their own recommendation and
8  vote their shares in favor of the merger with
9  National City; is that correct?
10      MR. BURKE: Objection. Misstates prior
11  testimony.
12      A.    That's different than what I said. I
13  said I didn't have expectations for how they would
14  vote their shares. I really don't know how they
15  voted their shares. I mean, I think it's a fact at
16  this stage. I think it's likely that they would
17  vote them that way, but they might not. I don't
18  know.
19      Q.    Well, actually, that's a fair point,
20  that until I asked you to consider that question,
21  you didn't have an understanding or an expectation
22  as to how the Provident directors would vote their
23  shares with respect to the National City merger.
24  That much is correct, right?

38 (Pages 146 to 149)

Page 150

1       MR. BURKE: Objection. Can you repeat
2   that? You lost me midway.
3       (The question was read back.)
4       MR. BURKE: Objection. Prior testimony
5   speaks for itself. Asked and answered.
6   Objection to form.
7   A.    Well, I don't know how to interpret the
8   word understanding that you had interjected in
9   there, because I doubt that I used that word, if I
10  said it, but I didn't have an expectation.
11  Q.    Okay. And then I asked you to think
12  about this very question today as you sit here.
13  And if I understood your testimony correctly, you
14  said, Yes, my expectation was that they would
15  probably vote in favor of the merger with National
16  City, in substance.
17      MR. BURKE: Objection.
18  A.    Right.
19      MR. BURKE: Asked and answered.
20  Q.    Correct?
21      MR. BURKE: Misstates prior testimony.
22  A.    I think I answered it, but I'll still
23  answer it again, yeah.
24  Q.    Yes?

Page 151

1   A.    Yes.
2   Q.    Okay. Thank you. From reading the
3   sentence that we've talked about here -- actually,
4   let's read the next sentence as well.
5   A.    Okay.
6   Q.    The board unanimously recommends and
7   advises that you approve the acquisition at the
8   special meeting so that the transaction may be
9   completed. Do you see that?
10  A.    Um-hum.
11  Q.    Did I read it correctly?
12  A.    Yes, you did.
13  Q.    Does the word unanimously modify
14  recommends and advises?
15      MR. BURKE: Objection. Speculation.
16  A.    Again, I think it modifies recommends.
17  I don't know whether it modifies advises. I don't
18  know whether that's an important distinction or
19  not, but...
20  Q.    All right. Well, let's focus on
21  unanimously recommends. Did you have an
22  expectation in 1999 that the OHSL board would
23  follow their own recommendation and vote their
24  shares consistent with this document?

Page 152

1       MR. BURKE: Objection. Calls for
2   speculation; no foundation.
3   A.    I would say that I didn't -- I don't
4   recall having an expectation about how these guys
5   were going to vote their shares. It's not
6   something I would have typically thought about.
7   Q.    Are you familiar with the phrase "voting
8   agreements"?
9   A.    I think I've heard of it. I'm not sure
10  I could tell you what it means.
11  Q.    What are voting agreements?
12  A.    I think there was a discussion about
13  having a voting agreement with the Lindners in the
14  Nat City transaction, and that's where I think you
15  ask large shareholders to commit to voting their
16  shares a certain way. But maybe it's something
17  else, so tell me if I'm wrong.
18  Q.    Was that ever done with respect to the
19  Provident-National City merger?
20  A.    I believe it was not.
21  Q.    Why not?
22      MR. BURKE: Objection.
23  A.    I'm not sure why it wasn't done. It
24  wasn't part of my negotiation process.

Page 153

1   Q.    Were voting agreements ever considered
2   and rejected with respect to the Provident-Oak
3   Hills merger?
4   A.    I've no idea. I don't recall that they
5   were, but I don't know.
6   Q.    Are voting agreements common in mergers
7   and acquisitions?
8       MR. BURKE: Objection to form.
9   A.    I'm not sure. I'm guessing they're not
10  common.
11  Q.    Why?
12  A.    Because I don't recall seeing many of
13  them.
14  Q.    What's the purpose of voting agreements?
15  A.    I think it's -- typically, when you have
16  a controlling shareholder, you want to make sure
17  they're going to vote in your favor; but there
18  could be different reasons.
19  Q.    Who is OHSL's largest shareholder?
20  A.    I don't know.
21  Q.    Do you know how Ken Hanauer voted his
22  personal shares?
23      MR. BURKE: Objection. Foundation. You
24  may answer.

39 (Pages 150 to 153)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 154

1    A.    My understanding, he did not vote for
2  the merger.
3    Q.    Where did you get that understanding?
4    A.    I think I got it from the litigation,
5  but I'm not certain that's where I got it from.
6    Q.    Did that surprise you in any way?
7    A.    Yeah, I guess it did, you know.
8    Q.    Why?
9    A.    I don't think he had a lot of shares.  I
10 wasn't sure why he didn't vote them.  He didn't
11 have a lot of shares.  It's more typical that they
12 would vote for it, but he gets to vote his own
13 shares however he wants.  That's the whole system.
14         You know, he doesn't have to vote for
15 the merger.  They're his own individual shares.  So
16 he didn't vote them for it.  What was the
17 percentage that the deal went through for?  I don't
18 know.  Pretty high.
19   Q.    Do you consider 52.4 percent pretty
20 high?
21   A.    52.4 percent.  That's the margin of
22 victory?  Is that what it was?
23   Q.    Yes.
24        MR. BURKE:  Objection as to

Page 155

1  characterization; mischaracterizes the
2  evidence.  You may answer.
3    A.    It's a majority.
4    Q.    Do you consider it pretty high?
5    A.    I don't know if I would be able to make
6  a judgment whether that's high or not in terms of
7  what happens with mergers.
8    Q.    What was the margin of victory with
9  respect to the Provident-National City merger.
10   A.    99 percent.
11   Q.    What was the margin of victory, as you
12 used the phrase, with respect --
13        (Off-the-record interruption.)
14        MR. BRAUTIGAM:  Magistrate Judge Hogan
15 is on the line, so we'll get him.
16        (Attorney Brautigam picking up phone.)
17        MR. BRAUTIGAM:  Your Honor?
18        MS. SMITH:  Judge Hogan is on vacation
19 this week.  This is Linda Smith calling to let
20 you know that he will not be returning your
21 phone call.
22        MR. BRAUTIGAM:  Are you from his
23 chambers?
24        MS. SMITH:  Yes.

Page 156

1        MR. BRAUTIGAM:  What do you suggest we
2  do?
3        MS. PERRY:  I have no suggestion for
4  you.  He's out of the office for the week, so
5  there's nothing he can do to help you with
6  this deposition.  I don't know.  What case is
7  it?
8        MR. BRAUTIGAM:  It's the OHSL securities
9  litigation.  I guess if there's nothing you
10 can do, that covers it.
11        MS. PERRY:  You can call the district
12 judge on the case, if it's not a consent case.
13        MR. BRAUTIGAM:  What do you mean by a
14 consent case?
15        MS. SMITH:  If you haven't consented to
16 final judgment by the magistrate --
17        MR. BRAUTIGAM:  Correct.  Okay.
18        MS. SMITH:  -- and it's still with the
19 district judge, I would suggest you call their
20 chambers and try to get their input on it.
21        MR. BRAUTIGAM:  Thank you very much.
22        MR. BURKE:  Thank you.
23        MS.PERRY:  You're welcome.
24        (Attorney Brautigam hung up the phone.)

Page 157

1        MR. BRAUTIGAM:  I think I had a partial
2  question.
3        (The question was read back.)
4        "QUESTION:  What was the margin of
5  victory, as you used the phrase, with
6  respect" --
7  BY MR. BRAUTIGAM:
8    Q.    -- to some of the other mergers and
9  acquisitions with which you've been involved in
10 your 20-30 year business career?
11        MR. BURKE:  Objection.  Vague;
12 overbroad.
13   A.    I really don't recall what they
14 typically were.
15   Q.    Were any of these margins of victory in
16 the 50 percent range?
17   A.    I don't know.
18        MR. BURKE:  Objection to form.
19   A.    Don't know.  They could have been.  I
20 don't know.
21   Q.    Provident bought Centennial, correct?
22   A.    Yeah.
23   Q.    What was the margin of victory with
24 respect to that acquisition?

40 (Pages 154 to 157)

Page 158

1    A.    No idea.
2    Q.    You mentioned that, in substance, if
3  Mr. Hanauer wished to vote his shares in favor of
4  the merger or against the merger or not vote,
5  that's his own business; is that right?
6    A.    Correct.
7    Q.    Do you believe that's true for the CEO
8  of the company?
9        MR. BURKE: Objection to form.
10    A.    I don't know what you -- he is the CEO
11  of the company.
12    Q.    Do you believe that it's true in spite
13  of the language of the proxy materials where he, as
14  a director, is making a recommendation to the
15  shareholders to vote in favor of the merger?
16        MR. BURKE: Objection. Calls for
17    speculation.
18    A.    What's the question again?
19    Q.    You agree that the OHSL board is
20  unanimously recommending that the acquisition
21  between OHSL and Provident be approved, correct?
22        MR. BURKE: Objection. The document
23    speaks for itself.
24    A.    I think that statement is correct.  It's

Page 159

1  in the document.
2    Q.    And do you believe, as a general matter,
3  that if the CEO is not going to follow his own
4  recommendation as a director, that he has an
5  obligation to disclose his opposition to the
6  merger?
7        MR. BURKE: Objection. Calls for
8    speculation; calls for legal conclusion;
9    assumes facts not in evidence.  You may
10    answer.
11    A.    I don't know the answer to that
12  question.  I wouldn't know how to answer that
13  question, whether that should be disclosed or not,
14  if that's what it is.  I don't know.
15    Q.    If Mr. Hanauer were opposed to the
16  merger, do you believe that Defendants' Exhibit 1
17  provides full and fair disclosure?
18        MR. BURKE: Objection. Calls for
19    speculation; assumes facts not in evidence.
20    A.    Again, you're going through this
21  hypothetical situation.
22    Q.    What hypothetical are you talking about?
23    A.    If he was opposed to the merger.
24    Q.    Do you have any reason to believe that

Page 160

1  Mr. Hanauer was in favor of the merger?
2        MR. BURKE: Objection. Calls for
3    speculation.  You may answer.
4    A.    I think he voted for it.  I thought he
5  voted for it, didn't he?
6    Q.    As a director?
7    A.    Yeah.
8    Q.    Do you know why he voted for it?
9    A.    I presumed he voted for it for the
10  reasons that are stated here.  He thought it was
11  good for the shareholders.
12    Q.    Would you just read the first page of
13  Plaintiffs' Exhibit 106 to yourself.
14    A.    (Witness complies.)
15    Q.    Mr. Carey, based on reading the first
16  page of Plaintiffs' 106, do you still believe that
17  Mr. Hanauer voted as a director in favor of the
18  merger because he believed it was in the best
19  interest of OHSL shareholders?
20        MR. BURKE: Objection. Calls for
21    speculation; assumes facts not in evidence.
22    You're asking him to assume -- take out-of-
23    context statements, and it's an improper
24    question.

Page 161

1    A.    Yeah, I mean, I don't know who this is.
2  Where does it say that Hanover[sic] is even -- his
3  name isn't even mentioned here.
4    Q.    Let me represent to you that where it
5  says question, "Q," that's me.  Where it says "A,"
6  that's Mr. Hanauer.
7        MR. BURKE: Objection. Still calls for
8    speculation as to what this witness can
9    testify to.
10    A.    Yeah, I don't -- you know, look, I'm not
11  going to try to interpret your legal document
12  there.  I don't think I'm qualified to interpret
13  your deposition.  I think that's more your job.
14    Q.    Mr. Carey, do you understand that, among
15  other things, the purpose of a deposition is to
16  interpret documents?
17    A.    Not for me to interpret what some other
18  person said that you're deposing.
19    Q.    My question goes to your belief, sir.
20  Mr. Carey, based on what you read on the first page
21  of Plaintiffs' Exhibit 106, now that we've
22  correctly identified the parties -- who's speaking,
23  who's asking the questions, etc. -- do you still
24  believe that Mr. Hanauer voted as a director in

Page 162

1  favor of the OHSL-Provident merger because he
2  believed it was in the best interest of OHSL
3  shareholders?
4       MR. BURKE: Objection.
5   A.   I really do not want to speculate on why
6  Hanover[sic] voted for it.
7   Q.   Doesn't he say why?
8       MR. BURKE: Where? What are you talking
9  about?
10  Q.   On the first page of Plaintiffs' Exhibit
11 106.
12      MR. BURKE: Objection. Calls for
13 speculation as to some other person's
14 testimony.
15  A.   I don't think it's appropriate for me to
16 speculate on what he is thinking or saying or why
17 he did -- or, did what he did, frankly. I don't
18 see the relevancy of it, Mike.
19  Q.   Mr. Carey, respectfully, that's not the
20 way the process works. I'm entitled to ask for
21 your comments on Mr. Hanauer's sworn testimony.
22      And my first question right now is
23 doesn't Mr. Hanauer specifically say in substance
24 that he voted in favor of the merger, not because

Page 163

1  he believed it was in the best interest of OHSL
2  shareholders, but because he just gave up?
3       MR. BURKE: Objection. You know what?
4   You're asking him to have opinions that call
5   for speculation. He does not have to answer
6   those questions if he doesn't have those
7   opinions you're requesting.
8       Objection. Calls for speculation. You
9   may answer, if you know.
10  A.   I don't want to speculate on what Ken
11 Hanover[sic] is saying or thinking. I'm not
12 qualified to.
13  Q.   Can I have that document back?
14  A.   Sure.
15  Q.   I think it's in your pile somewhere. Is
16 there anything in Defendants' Exhibit 1 that says
17 that the entire OHSL board did not believe that the
18 merger with Provident was in the best interest of
19 OHSL shareholders?
20      MR. BURKE: Objection. Calls for
21 speculation.
22  A.   I don't know.
23  Q.   Do you think that's material
24 information?

Page 164

1       MR. BURKE: Objection. Calls for legal
2   conclusion.
3   A.   I don't know and I don't know. That
4   would be the way I would respond to both of those
5   for the record.
6   Q.   Do you read the Wall Street Journal?
7   A.   Yes, I do.
8   Q.   Have you read it for a number of years?
9   A.   Yes, I have.
10  Q.   Do you read the Cincinnati Business
11 Courier?
12  A.   Not really.
13  Q.   Have you ever read any press regarding
14 this litigation?
15  A.   Pretty limited. I don't know.
16  Q.   Take a look at that, please, Plaintiffs'
17 Exhibit 1. I direct your attention to the column
18 in the right-hand side of the document.
19  A.   Okay.
20  Q.   Do you see the words "Burke's response"?
21  A.   Um-hum.
22  Q.   And after that, there is a statement
23 without any quotation marks that reads, Hanauer
24 opposed the Provident takeover because he wanted

Page 165

1  Oak Hills to remain independent; is that correct?
2       MR. BURKE: That that's what it says?
3   A.   That's what it says here.
4   Q.   Is that true?
5       MR. BURKE: Objection. Calls for
6   speculation; incomplete and erroneous quote;
7   assumes facts not in evidence. You may
8   answer.
9   A.   I have no idea whether that's true.
10 It's printed in the newspaper. That doesn't mean
11 to me that it's true at all. I mean, come on.
12  Q.   If that's true --
13  A.   I'm not going to speculate on if that's
14 true. Okay?
15  Q.   Mr. Carey, you're going to answer my
16 questions.
17  A.   No, I'm not going to -- I'm not going to
18 speculate on if that's true.
19  Q.   Mr. Carey, I have the right to ask you
20 to accept certain things as true; and if it's not
21 true Mr. Burke and other counsel have various
22 options. And he can object and say it's an
23 improper hypothetical. I'm entitled to answers to
24 my questions, and I'm going to get them.

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 166

1       MR. BURKE:  Mr. Brautigam, you're not
2   entitled to ask him for opinions he doesn't
3   have.  It's that simple.
4       You can ask him to speculate, but he
5   doesn't have to if he doesn't have opinions on
6   these myriad of hypotheticals that you like to
7   raise.  So you're not necessarily entitled to
8   a question or to an answer if he doesn't have
9   one.
10  Q.    Mr. Carey, if Mr. Hanauer opposed the
11  Provident takeover because he wanted Oak Hills to
12  remain independent, do you believe, as a fair man,
13  that that information should have been included in
14  Defendants' Exhibit 1?
15      MR. BURKE:  Objection.  Calls for
16  speculation; assumes facts not in evidence.
17  A.    I don't -- I can answer that one.  All
18  right?  If that were the case, I have no idea
19  whether that should be included in there.  And as a
20  fair man, I don't know whether that should be
21  included in there.
22  Q.    Under what circumstances do you believe
23  that it would be fair to have the CEO -- the
24  largest shareholder and the only member of

Page 167

1   management on OHSL's board -- say one thing and
2   believe another?
3       MR. BURKE:  Objection.  Calls for
4   speculation; vague; form.
5   A.    I think the circumstances are where he
6   thought the transaction was fair, but -- which he
7   obviously did because he voted for it.  He may not
8   have wanted the company to be sold for his own
9   personal reasons, but he obviously thought the
10  transaction was fair or he wouldn't have voted his
11  shares.  He wouldn't have voted as a board member
12  for it.
13  Q.    Mr. Carey, do you believe that the
14  concept of the transaction being fair and the
15  concept of the transaction being in the best
16  interest of shareholders are separate and distinct?
17      MR. BURKE:  Objection.  Calls for
18  speculation; vague.
19  A.    I don't know how to make the -- what are
20  you saying?  Are they the same?
21  Q.    Are they distinct.
22      MR. BURKE:  Same objection.
23  A.    I think they are very much aligned, fair
24  and in the best interest of the shareholders.

Page 168

1   Q.    Why do you think that?
2   A.    Well, I'm sorry.  I guess you're right.
3   They could be different.  But typically, if you do
4   a merger transaction and it's fair, that's in the
5   best interest of the shareholders.  Why would you
6   sell it if it wasn't?
7   Q.    Because you just gave up?
8       MR. BURKE:  Objection to form.
9   A.    Yeah, I guess so, but I'm not sure
10  people give up that easily.
11  Q.    Would you turn to the last couple of
12  pages of Defendants' Exhibit 1.  It's the fairness
13  opinion, Annex C.  What's a fairness opinion?
14  A.    It's an opinion that an investment
15  advisor typically provides to the shareholders of
16  the firm that's being acquired stating that the
17  valuation is appropriate.
18  Q.    And the opinion is limited specifically
19  to the fairness from a financial point of view of
20  the transaction, correct?
21      MR. BURKE:  Objection.
22  A.    I believe so.  Is that right?  Yeah.
23  I'm not an expert on fairness opinions, but I think
24  it's -- I'm not really sure.  I would have to say

Page 169

1   actually, as I take a minute, whether it's just
2   limited to that or not, I don't know.
3   Q.    Okay.  Mr. Carey, did you read this
4   fairness opinion before today?
5   A.    I probably read this fairness opinion
6   when it was written five years ago.
7   Q.    Okay.  And you're familiar with the
8   fairness opinion, among other things, because the
9   Provident-National City has one from UBS?
10  A.    Um-hum.
11  Q.    UBS, I guess?
12  A.    UBS, yeah.
13  Q.    And would you just skim page 3 of the
14  fairness opinion, please, particularly the last
15  paragraph that goes over to the fourth page.
16      MR. BURKE:  I'd suggest the witness
17  review the whole document --
18      MR. BRAUTIGAM:  Certainly.
19      MR. BURKE:  -- at least those two pages
20  just so he can put everything in context.
21      MR. BRAUTIGAM:  Certainly.
22      (Off-the-record discussion.)
23  BY MR. BRAUTIGAM:
24  Q.    I want to focus in on this sentence.

43 (Pages 166 to 169)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 170

1 It's a long sentence, so bear with me.
2     A.    Okay.
3     Q.    I'll read it into the record --
4     A.    Sure.
5     Q.    -- and then we'll go back and deal with
6 the components.
7         In addition, our opinion is, in any
8 event limited to the fairness as of the date hereof
9 from a financial point of view of the exchange
10 ratio to the holders of OHSL common shares and does
11 not address the underlying business decision by
12 OHSL's board of directors to affect the merger;
13 does not compare or discuss the relative merits of
14 any competing proposal, or any other terms of the
15 merger; and does not constitute a recommendation to
16 any OHSL shareholder as to how such shareholder
17 should vote with respect to the merger. Do you see
18 that?
19     A.    Yes, I do.
20     Q.    Did I read it correctly?
21     A.    Yes, I believe you did.
22     Q.    What does it mean to be fair from a
23 financial point of view?
24         MR. BURKE: Objection. No foundation;

Page 171

1 calls for speculation. You may answer.
2     A.    Well, I mean, I think it's the pricing
3 based on market pricings for similar transactions
4 is appropriate.
5     Q.    And do you agree with me that being fair
6 from a financial point of view is a separate and
7 distinct concept from being in the best interest of
8 OHSL shareholders?
9         MR. BURKE: Objection. Calls for
10 speculation; vague.
11     A.    I don't know if I would agree with your
12 question there. I think if it's fair from a
13 financial standpoint, I'm not sure why that would
14 be separate from being in the best interest of the
15 shareholders. I mean, it's a publicly-traded
16 common stock.
17     Q.    Well, suppose I want to buy your car and
18 it's worth $20,000. Are there circumstances where
19 even if $20,000 is a fair price, it's not in your
20 best interest at this time to sell me your car?
21         MR. BURKE: Objection. Calls for
22 speculation; relevance.
23     A.    I don't know the answer to that
24 question. My car?

Page 172

1     Q.    Do you believe that the response in
2 Plaintiffs' Exhibit 1 that's attributed, without
3 quotation marks, to Mr. Burke embraces two
4 concepts: The first concept being Mr. Hanauer
5 opposed the transaction, and the second concept
6 being that he believed the transaction was fair?
7         MR. BURKE: Objection. Calls for
8 speculation; assumes facts not in evidence
9 based upon inaccurate statements. You may
10 answer.
11     A.    I don't want to try to interpret the
12 newspaper article here. It is what it is. Why do
13 you want my opinion on what's in the newspaper? I
14 have no idea whether it's accurate. Why are
15 calling me in here to ask me what I think a
16 newspaper article reads?
17     Q.    Mr. Carey, this is the way the
18 deposition process works. I'm entitled to your
19 opinion on these questions.
20         MR. BURKE: Objection. It's not
21 accurate. The witness may answer to the best
22 of his ability if he has an answer and
23 should. Calls for speculation.
24     A.    I think you should be able to interpret

Page 173

1 that comment as well as I am.
2     Q.    Respectfully, that's not an acceptable
3 answer. The purpose of the deposition is to get
4 your interpretation of documents, your thought
5 process --
6     A.    It's a newspaper article.
7     Q.    -- your views. Excuse me?
8     A.    It's a newspaper article.
9     Q.    I understand what it is.
10         MR. BURKE: Your question is does he
11 have --
12         MR. BRAUTIGAM: I want the question read
13 back. I lost my train of thought.
14         (The question was read back.)
15         MR. BURKE: Objection. Calls for
16 speculation; form; vague.
17     A.    I'm thinking. There's no time, right?
18 Are there two different concepts in the highlighted
19 version? Is that what you're kind of saying?
20     Q.    In any version.
21         MR. BURKE: Objection to form; vague;
22 calls for speculation.
23     A.    I don't know what you mean by the
24 question, really. I don't -- really, it doesn't

44 (Pages 170 to 173)

Page 174

1  seem to make sense to me.
2     Q.    Mr. Carey, do you believe that the
3  concept of a transaction being fair and the concept
4  of a transaction being in the best interest of
5  shareholders are the same?
6           MR. BURKE: Objection. Asked and
7     answered.
8     A.    Yeah, I think I said if it's fair and
9  it's a financial transaction like this, that it
10 typically is in the best interest of the
11 shareholders.
12    Q.    Do you believe that in this case, if the
13 transaction was fair, that it inevitably follows
14 that the transaction was in the best interest of
15 OHSL shareholders?
16    A.    Yeah, yeah, I believe that.
17    Q.    Why do you believe that?
18    A.    Because it's an inanimate object here.
19 This is a financial transaction. This is a
20 publicly-held company. They said the price was
21 fair that's being paid for it. So that's that.
22 It's really kind of a -- I don't know. Am I
23 missing something there?
24    Q.    And because the price is fair, it

Page 175

1  automatically follows that the transaction --
2     A.    Typically, I said.
3     Q.    -- is in the best interest -- okay.
4  Well, I'm asking specifically in this case.
5  Because the --
6     A.    To the best of my knowledge, yeah, I
7  believe it was a fair transaction, and of course,
8  it would be in the best interest of the
9  shareholders.
10    Q.    Okay. You understand that the fairness
11 opinion does not constitute a recommendation as to
12 how shareholders should vote, correct?
13    A.    I think it just relates to the financial
14 fairness of the exchange ratio as I reread it here,
15 but...
16    Q.    And the fairness opinion, both in
17 general and specifically, does not compare or
18 discuss the relative merits of any competing
19 proposal, correct?
20    A.    That's correct.
21    Q.    Okay. Now, what type of an entity
22 typically provides a fairness opinion?
23    A.    Investment banks; investment advisors.
24    Q.    And McDonald Investments is an

Page 176

1  investment banking firm, correct?
2     A.    I guess so. I mean, that's probably
3  right. I wouldn't swear to that, but they're an
4  investment, slash, advisor investment banker.
5     Q.    And McDonald Investments is not an
6  auditing firm, correct?
7     A.    Correct. Not that I'm aware of.
8     Q.    And they're not qualified to do audits
9  as far as you know, correct?
10    A.    I wouldn't know whether they're
11 qualified to do audits or not.
12    Q.    And you don't know if investment banking
13 firms in general are qualified to do audits?
14    A.    What kind of audits?
15    Q.    Any kind of audits. Audits of public
16 companies.
17    A.    I think they probably have some
18 qualifications to do some kinds of audits. I don't
19 think they're going to give opinions on companies,
20 but --
21    Q.    Can you name --
22    A.    -- they do due diligence. That's pretty
23 significant typically.
24    Q.    Is due diligence the same as an audit?

Page 177

1     A.    It can be.
2     Q.    In what circumstance can it be?
3           MR. BURKE: Objection.
4     A.    They can go through it and look at a
5  complete loan -- set of loan files to determine
6  whether the credit quality is reasonable.
7     Q.    That's very different from what an audit
8  is, correct?
9     A.    It's more work than an audit.
10    Q.    Right. An audit is sampling, right?
11    A.    Right.
12    Q.    Scientifically documented, correct?
13    A.    Um-hum.
14          MR. BURKE: Objection to form.
15    Q.    Yes?
16    A.    I don't know about scientifically, but
17 an audit is different than that.
18    Q.    What is due diligence?
19          MR. BURKE: Objection. Relevance.
20    A.    For what?
21    Q.    In the merger and acquisition context.
22    A.    Well, who is doing the due diligence?
23    Q.    Well, did Provident perform due
24 diligence with respect to the OHSL-Provident

45 (Pages 174 to 177)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 178

1  merger?
2      A.    Yes.
3      Q.    What did they do?
4      A.    We would have reviewed their financial
5  statements, their loan files, their general ledger
6  accounts.  I mean, you know, it's pretty broad.
7      Q.    Okay.  With respect to the review of the
8  OHSL financial statements, did Provident do an
9  audit of them?
10     A.    No, we did not.
11     Q.    Did Provident direct that any entity do
12 an audit of OHSL's financial statements as part of
13 their due diligence?
14     A.    No, I think they were already audited by
15 somebody, so we didn't do an audit, but we did a
16 lot of work.
17     Q.    Okay.  You know they were audited by
18 somebody because they were --
19     A.    Yeah.
20     Q.    -- a publicly-traded company --
21     A.    Right.
22     Q.    -- correct?
23     A.    Right.
24     Q.    And the auditing firm is Crowe Chizek,

Page 179

1  correct?
2      A.    That's right.  Well, I don't know.  I
3  don't remember the name of the firm, but it could
4  have been Crowe Chizek.
5      Q.    Whatever the firm name was, you relied
6  on OHSL's audited financial statements as part of
7  your due diligence, correct?
8      A.    Partly, but I think there was a bigger
9  emphasis on the due diligence.
10     Q.    I didn't mean to say exclusively, but
11 you definitely relied on Oak Hills' audited
12 financial statements, correct?
13          MR. BURKE:  Objection.  Asked and
14     answered.  You may answer again.
15     A.    Yeah, I don't know if I would use the
16 word rely, but we can use the word rely if you
17 want.
18     Q.    And it was your expectation that OHSL
19 would similarly rely on Provident's audited
20 financial statements, correct?
21          MR. BURKE:  Objection.  Calls for
22     speculation.
23     A.    I didn't have a particular expectation
24 as to what they were doing.  That's not what I

Page 180

1  would have been thinking about.
2      Q.    Well, you read the fairness opinion
3  letter, correct?
4      A.    Um-hum.
5      Q.    In 1999, correct?
6      A.    Um-hum.
7      Q.    And it specifically says, on the second
8  page, little 2, that McDonald Investments, acting
9  on behalf of OHSL, reviewed PFGI's annual reports
10 to shareholders and annual reports on Form 10K for
11 each of the years ending December 31st, 1998,
12 December 31st, 1997, and December 31st, 1996,
13 including the audited financial statements
14 contained therein and PFGI's quarterly reports on
15 Form 10Q for the quarters ending March 31st, 1999,
16 and June 30th, 1999; correct?
17          MR. BURKE:  The first part of that
18     statement does not appear in this document, at
19     least as you read it.  It starts with the word
20     review, two small i's does.  It doesn't say
21     anything about acting as OHSL's advisor.
22     However you prefaced that statement, that does
23     not appear in this document as you've read it.
24          MR. BRAUTIGAM:  It certainly does.  It's

Page 181

1  right at the top.  We have acted as OHSL's
2  financial advisor in connection with -- etc.
3          MR. BURKE:  Go back and read the
4     beginning of that question.
5          (The question was read back.)
6          MR. BURKE:  That does not appear there.
7  That's my problem.
8          MR. BRAUTIGAM:  Let me clear this up.
9          MR. BURKE:  I object.
10         MR. BRAUTIGAM:  I provided some
11 background that appears in the first paragraph
12 on page 2, and then I read small 2.
13         MR. BURKE:  But what you said does not
14 appear on page 2 either.
15         MR. BRAUTIGAM:  It does appear on page
16 2.  Look at the first line.
17         MR. BURKE:  You said, Acting on behalf
18 of OHSL.
19         MR. BRAUTIGAM:  We have acted as OHSL's
20 financial advisor in connection with...
21         MR. BURKE:  Right.  That's different.
22         MR. BRAUTIGAM:  The substance is the
23 same.
24

46 (Pages 178 to 181)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 182

1 BY MR. BRAUTIGAM:
2    Q.    Mr. Carey, my question was, it was your
3 expectation in 1999 that McDonald would read and
4 rely on these documents, correct?
5         MR. BURKE: Objection. Calls for
6 speculation.
7    A.    For what? For the fairness opinion?
8    Q.    Yes.
9    A.    No, that wasn't my expectation.
10   Q.    What was your expectation with respect
11 to these documents that are referred to at small 2
12 on page 2 of the fairness opinion?
13   A.    That they would read these documents;
14 but more importantly, their job is to prepare a
15 fairness opinion, which is really more of a
16 financial market calculation as to the right price
17 to pay for the company.
18   Q.    And that price is based on the accuracy
19 and completeness of Provident's financial
20 information, correct?
21        MR. BURKE: Objection. Calls for
22 speculation.
23   A.    Not necessarily.
24   Q.    What do you --

Page 183

1    A.    It's more of a forward earnings look.
2 It's usually valued-based on forward earnings, and
3 the forward earnings aren't included in the
4 financial statements. It's not that often that
5 anyone values something on historical data.
6    Q.    Okay. Let me go at this a certain way.
7 Look at small 2 on page 3.
8    A.    Yeah.
9    Q.    And we now know that the information
10 that Provident provided with respect to its
11 financial statements for year-end December 31st,
12 1996, was incorrect, right?
13        MR. BURKE: Objection.
14   A.    Again, I'm not going to comment on the
15 specific years, but there's a time period there
16 where clearly there was some data that was
17 incorrect. I don't know that that necessarily
18 would have affected materially the forward earnings
19 forecast that one would have used to value the
20 company.
21   Q.    Mr. Carey, my question is a little
22 different.
23   A.    Okay.
24   Q.    Would you turn to the press release

Page 184

1 that's attached to Plaintiffs' Exhibit 45.
2    A.    Is that something I have out already or
3 is that...
4    Q.    Yeah. It's right there. Just keep that
5 open. Now, you said you're not going to comment
6 with respect to year-end December 31st, 1996. Is
7 that your testimony?
8    A.    Well, I don't know the numbers for 1996.
9    Q.    But you know they were wrong, correct?
10        MR. BURKE: Objection. Calls for
11 speculation. You may answer.
12   A.    I know that there was -- there was -- if
13 you go back to '94, there was some discrepancy
14 there. I don't know the specific years once you go
15 past '97 because that's where we stopped doing the
16 restatement for SEC filing purposes.
17   Q.    Knowing what we now know, would the
18 numbers for year-end 1996 that McDonald relied on
19 in forming their fairness opinion be different?
20        MR. BURKE: Objection. Calls for
21 speculation.
22   A.    I don't know if they'd be different for
23 1996.
24   Q.    Okay. Do you agree that we now know

Page 185

1 that the numbers that McDonald Investments relied
2 on for December 31st, 1997, were wrong?
3        MR. BURKE: Same objection.
4    A.    They're different.
5    Q.    Does that mean they're wrong?
6    A.    Yeah. I'd say they're wrong, yeah.
7    Q.    Okay. We now know that the numbers that
8 McDonald Investments relied on for year-end 1998
9 were wrong, correct?
10   A.    Um-hum.
11   Q.    And you're not sure about the quarterly
12 numbers from March 31st, '99, and June 30th, '99,
13 correct?
14   A.    Right.
15   Q.    If Provident knew in 1999 what it now
16 knows, would the numbers be different as they
17 appear in Defendants' Exhibit 1?
18        MR. BURKE: Objection. Asked and
19 answered.
20   A.    Yeah, I already answered that question.
21 It would be different, of course. That's what this
22 document says.
23   Q.    Okay. Would you turn the page for a
24 moment, and would you look at the first full

Page 186

```
1   paragraph. We're talking on the fairness opinion.
2       A.   (Examining document.)
3           MR. BURKE: Third page?
4           MR. BRAUTIGAM: Yes.
5   BY MR. BRAUTIGAM:
6       Q.   Would you just read that paragraph to
7   yourself, please.
8       A.   Is that the paragraph that starts with,
9   This opinion?
10      Q.   In our review.
11      A.   Okay. (Examining document.) Okay.
12      Q.   Now, the first sentence is a long
13  sentence, but I'm going to read it; and then we'll
14  go back and look at the components, so just bear
15  with me.
16      A.   Okay.
17      Q.   In our review and analysis and in
18  arriving in our opinion, we have assumed and relied
19  upon the accuracy and completeness of all the
20  financial and other information reviewed by us and
21  have relied upon the accuracy and completeness of
22  the representations, warranties, and covenants of
23  OHSL and PFGI contained in the agreement.
24          Did I read that correctly?
```

Page 187

```
1       A.   Yes, you did.
2       Q.   The information that Provident provided
3   with respect to its financial statements was not
4   accurate, correct?
5           MR. BURKE: Objection. Calls for
6   speculation. You may answer.
7       A.   Yeah, it was not accurate.
8       Q.   And it was not complete, correct?
9           MR. BURKE: Objection.
10      A.   I think there's a difference. I don't
11  know what you mean by -- you're differentiating
12  between complete and accurate?
13      Q.   As it's used here.
14          MR. BURKE: Objection.
15      A.   It was complete, I think, but not
16  accurate.
17      Q.   Does the fairness opinion issued by UBS
18  contain similar language with respect to the
19  Provident-National City merger?
20      A.   I believe it does.
21      Q.   In fact, that's the way mergers and
22  acquisitions work, correct?
23      A.   Um-hum.
24          MR. BURKE: Objection. Vague.
```

Page 188

```
1       Q.   Yes?
2       A.   Typically.
3       Q.   Are you familiar with something known as
4   a materiality threshold?
5           MR. BURKE: Objection. Vague.
6       A.   That specific term? Threshold? I don't
7   know if I have a -- I'm familiar with the term in
8   concept of materiality, but it's...
9       Q.   Are you familiar with the concept of
10  materiality threshold where transactions above a
11  certain number are prohibited in the context of
12  mergers and acquisitions?
13          MR. BURKE: Objection. Vague;
14  overbroad; calls for speculation.
15      A.   I'm not sure I understand the question.
16      Q.   Are you familiar with the term "material
17  adverse event"?
18          MR. BURKE: Objection.
19      A.   Yes, I am.
20      Q.   What is a material adverse event?
21          MR. BURKE: Objection. Speculation;
22  vague.
23      A.   Relative to what?
24      Q.   As it's used in merger transactions
```

Page 189

```
1   generally.
2           MR. BURKE: Objection. Vague.
3       A.   I don't know if I can speak to all
4   merger transactions. I mean...
5       Q.   Are you familiar with the term "material
6   adverse effect" as it was used with respect to the
7   OHSL-Provident merger?
8       A.   Not -- I don't -- I mean, I don't
9   remember it now.
10      Q.   Okay. What does that concept embrace,
11  material adverse effect?
12      A.   If there's a material adverse effect, it
13  gives you an opportunity to not do the transaction
14  if you choose not to.
15      Q.   What would a material adverse effect be?
16          MR. BURKE: Objection. Calls for
17  speculation; vague.
18      A.   Yeah, I can't say. I mean, I wouldn't
19  know. Specifically for what? For this
20  transaction?
21      Q.   Yeah.
22          MR. BURKE: For the Oak Hills merger
23  with Provident?
24          MR. BRAUTIGAM: Right.
```

48 (Pages 186 to 189)

Page 190

1    A.    I don't know.  I wouldn't want to put a
2  bright line on it.
3    Q.    Typically, where you have a material
4  adverse effect included in the merger agreement,
5  there is a bright line on it.  There's a number of
6  scientific --
7    A.    I don't know if there always is --
8        MR. BURKE:  Objection.
9    A.    -- but there are at times, clearly.
10    Q.    I said typically.
11    A.    Yeah, I think typically there is.
12    Q.    And there was in this case, correct?
13        MR. BURKE:  Objection.
14    A.    I believe there was.
15    Q.    And that number was $25,000, correct?
16    A.    Well, I understand only recently that
17  the number was 25,000, but I think that number was
18  in there as a mistake and wasn't meant to be
19  25,000.
20    Q.    Well, you understood that at the time,
21  correct?
22    A.    No.
23        MR. BURKE:  Understood what at the
24    time?

Page 191

1    Q.    You understood that the number was
2  25,000?
3    A.    No, I would have assumed the number
4  would have been much larger than that for a
5  transaction that size.
6    Q.    Why?
7    A.    Because that's too small a number.  That
8  number doesn't make any sense.  I think that
9  number's a typo.
10    Q.    What do you think the number should have
11  been?
12        MR. BURKE:  Objection.  Calls for
13    speculation.
14    A.    I don't know.  I don't know.  I don't
15  know what the number should have been, but I think
16  that would be -- if you looked at transactions this
17  size, you wouldn't find any that were remotely that
18  low.  That would be my guess.
19    Q.    Well, you signed the merger agreement,
20  correct?
21    A.    I don't know if I signed it or Bob
22  signed it.  I can't remember who signed it.  I
23  might have.  I can't remember.  One of us two did.
24  I read it.

Page 192

1    Q.    And you didn't catch that there was a
2  mistake, if there is a mistake?
3    A.    Believe me, I don't want you to think I
4  could catch every mistake in a document.  It's a
5  big document.
6    Q.    A lot of people looked at it, right?
7    A.    Right.  I think it was a mistake.
8  That's all I can say about it.
9    Q.    Okay.
10    A.    It doesn't make any sense.  I'm sure, if
11  you looked at other transactions, you wouldn't see
12  something that low.
13    Q.    What's the number for the material
14  adverse effect with respect to the Provident-
15  National City merger?
16    A.    I don't remember.
17    Q.    A million dollars?
18    A.    I don't remember what the number is.  I
19  don't think it's a million dollars, but I don't
20  know.  Tell me what it is if you have it there.
21  Show it to me.
22    Q.    I think it's a million dollars.
23    A.    That seems...
24    Q.    Do you want to turn to page A-40 of the

Page 193

1  proxy, please.
2    A.    Um-hum.  That's not the proxy there.
3    Q.    A-40.
4    A.    Okay.
5    Q.    Does that refresh your recollection as
6  to who signed --
7    A.    Yeah.
8    Q.    -- the merger?
9    A.    I signed it.  I said I could have signed
10  it.  I just didn't remember.  I sign a lot of
11  documents.
12    Q.    And you read them before you sign them,
13  correct?
14    A.    Yeah, yeah.  I see them.
15    Q.    Was this an important document?
16    A.    Um-hum.
17    Q.    And did you read it thoroughly?
18    A.    Yes, I did.
19    Q.    Approximately how much time did you
20  devote to reading the document before you --
21    A.    I don't recall how much, but it was
22  significant.
23    Q.    -- before you signed it?
24    A.    Yeah.  It was significant.

49 (Pages 190 to 193)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

1    Q.    You testified that the $25,000 number
2  makes no sense. What did you mean by that?
3    A.    It seems low. It seems like it would be
4  a low number.
5    Q.    As you sit here today, are you
6  absolutely sure that it's a mistake?
7    A.    My best judgment would be that is a
8  mistake. Absolutely, my best judgment is that
9  number's a mistake.
10   Q.    Even if it is a mistake, do you believe
11  that the parties are bound by that agreement?
12       MR. BURKE: Objection.
13   A.    That's a legal question.
14       MR. BURKE: Legal conclusion.
15   A.    Ask the legal guys.
16   Q.    Well, I'm asking you. What do you
17  believe?
18   A.    I think if it's a mistake in there, no,
19  you wouldn't be bound by it.
20   Q.    Why not?
21   A.    It's a legal thing. I'm going to
22  withdraw that from the record. I would say I would
23  defer to legal counsel on it, if there's a mistake
24  in the document are you bound by it or not, if

1  everyone agreed it was a mistake. I can't answer
2  whether you would be bound by it or not.
3    Q.    When did you come to believe that this
4  $25,000 figure was a mistake?
5    A.    Recently, I learned there was a $25,000
6  number in there, and I assumed that number was a
7  mistake because it seemed too low.
8    Q.    So you didn't know about this in 1999,
9  correct?
10   A.    No. No. I don't recall. I mean...
11   Q.    Do you believe that Provident's
12  restatements, had they been known in 1999, would
13  meet the definition of a material adverse effect
14  with the $25,000 figure?
15       MR. BURKE: Objection. Calls for
16  speculation.
17   A.    I wouldn't want to speculate on what
18  that would mean. There are different amounts for
19  different periods, so I wouldn't speculate on that.
20   Q.    Are at least some of the numbers greater
21  than $25,000?
22       MR. BURKE: Objection. What numbers?
23   Q.    The different numbers.
24       MR. BURKE: Objection. Vague.

1    A.    I mean, the aggregate numbers in '98 and
2  '97 based on what's here are greater than 25,000.
3    Q.    Okay.
4    A.    I think you know the answer to that
5  question.
6    Q.    And what does that mean for --
7    A.    I don't know what it means.
8    Q.    -- the material adverse effect?
9    A.    I don't know because I think that was a
10  -- I think that number in there was a mistake to
11  begin with, and it doesn't mean anything.
12       It doesn't mean anyone has to act on
13  it. You don't take an action just because there's
14  a material adverse change. It gives you an
15  opportunity to take one if you choose. Not
16  everybody always does.
17   Q.    But in this case, no one knew that
18  something that could be defined as a material
19  adverse effect had happened in 1999, correct?
20       MR. BURKE: Objection. Calls for
21  speculation as to what happened in 1999. You
22  may answer.
23   A.    Would you repeat the question?
24   Q.    We don't know what the OHSL board would

1  have done in 1999 because what could be defined as
2  a material adverse event was only discovered in
3  2003, correct?
4        MR. BURKE: Objection. Calls for
5  speculation.
6    A.    I'm not going to speculate on what those
7  guys would have done.
8    Q.    I'm not asking you to.
9    A.    Well, if you're stating factual
10  information, just state it for the record and let
11  it be on the record. Why do you need my agreement
12  if it's factual?
13       MR. BRAUTIGAM: Kelly, would you kindly
14  read the question back, please.
15       (The question was read back.)
16       MR. BURKE: Objection. Calls for
17  speculation. There's a number of
18  hypotheticals built into that.
19   A.    I gave my answer to that one already, so
20  you can let that stand.
21   Q.    Mr. Carey, respectfully, your answer
22  didn't have anything to do with the question.
23   A.    I said I wasn't going to speculate on
24  your factual hypothetical statements, so I'm not

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 198

1  going to.
2     Q.    Mr. Carey, do you understand that it's
3  appropriate for me to ask you hypothetical
4  questions at points?
5     A.    Some of these hypothetical questions
6  don't seem appropriate to me.
7     Q.    Which ones?
8     A.    These if/then things that make little
9  sense to me.
10    Q.    And you think they're inappropriate
11 because you don't understand the question; is that
12 right?
13    A.    No, because I don't know why it's
14 relevant that I answer a hypothetical scenario.
15    Q.    Well, Mr. Carey, with all due respect,
16 it's not your job to make relevance determinations.
17 It's your job to sit here and answer my questions
18 truthfully to the best of your ability.
19       If Mr. Burke doesn't like my question,
20 he can object; he can walk out of the deposition;
21 he has his options. But your job is to answer my
22 questions today to the best your ability. Do you
23 understand that?
24    MR. BURKE:  We've had this speech about

Page 199

1  four times. He understands that. The only
2  caveat I add to it, Mike, is he's got to have
3  an answer. That's all.
4     MR. BRAUTIGAM:  Well, when he says I'm
5  not going to answer the question or I'm not
6  going to speculate or I have no comment, those
7  are not answers.
8        That's not acceptable, and I'm going to
9  go to court, if necessary, to force you to
10 answer my questions truthfully and completely.
11    MR. BURKE:  I think you and the witness
12 are saying the same things, but it's just like
13 two ships passing in the night.
14       He is saying he can't answer, and that's
15 what he's saying. "I'm not going to
16 speculate" means I can't answer. Maybe we're
17 just misunderstanding each other's
18 definitions.
19 BY MR. BRAUTIGAM:
20    Q.    Mr. Carey, if you can't answer my
21 question, just say, I can't answer the question --
22    A.    Okay.
23    Q.    -- and then I'll ask why.
24    MR. BURKE:  That's fair. That's fair.

Page 200

1     Q.    Now, what do you understand about the
2  litigation that brings us here today?
3     MR. BURKE:  Objection. Vague. You may
4  answer.
5     A.    What do I understand about the
6  litigation that brings us here today? I'm trying
7  to see if I can summarize that, Mike.
8        You guys are suing Provident in attempts
9  to get some money from us. That's the general
10 sense I have. Your law firm in particular is suing
11 us to try to get a fee. That's my sense of it.
12    Q.    And who are the plaintiffs?
13    A.    Well, you're representing some very
14 small shareholders, as I understand.
15    Q.    Who are the defendants?
16    A.    The named defendants are... I'd have to
17 guess. I think it might be the board members at
18 both Oak Hills and Provident and myself. I think
19 I'm a defendant.
20    Q.    Why do you think you're a defendant?
21    A.    Because I'm the CFO of the company.
22    Q.    And what are Plaintiffs alleging, if you
23 know?
24    A.    Well, I think the original case was that

Page 201

1  -- I didn't fully understand it. There's a lot of
2  things going on in our company, but I think it had
3  to do with the fact that Ken Hanover[sic] didn't
4  vote his shares.
5        So there was some belief that that was
6  the problem. I didn't fully understand why just
7  because Ken Hanover[sic] didn't vote his shares
8  that was the problem, so I'd have to tell you I
9  didn't spend too much time on it.
10    Q.    What documents, if any, have you read
11 related to the litigation?
12    A.    I've probably been given a couple of the
13 -- you know, the -- what do you call the -- the
14 plaintiff -- the lawsuit or whatever it is. It's a
15 legal looking document.
16       I can't say that I -- I mean, I've
17 skimmed through it, the complaint against our
18 company and/or who's ever else is involved, but I
19 haven't read it word for word. I mean, I've read
20 more a summary probably from our legal counsel that
21 this is what's going on; here's the issue.
22    Q.    And do you believe that your interests
23 as a defendant are exactly aligned with the
24 interests of the OHSL directors?

51 (Pages 198 to 201)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 202

1        MR. BURKE: Objection. Calls for legal
2   conclusion.
3      A.   I don't know the answer to that, whether
4   my interests are aligned to theirs or not.
5      Q.   Did you ever consider that?
6      A.   I'm not sure I've considered whether my
7   interests are aligned to theirs.
8      Q.   Are you familiar with the phrase
9   "conflict of interest"?
10     A.   Um-hum.
11     Q.   What is your understanding of the phrase
12  "conflict of interest"?
13       MR. BURKE: Objection to the extent it
14  calls for a legal conclusion.
15     A.   It seems self-explanatory to me, Mike,
16  what a conflict of interest is. You have two
17  people, and there's a conflict between their
18  different interests.
19     Q.   Do you believe that that situation
20  exists with respect to the representation in this
21  litigation?
22       MR. BURKE: Objection. Calls for legal
23  conclusion.
24     A.   I don't know if I even understand the

Page 203

1   question.
2      Q.   Are you aware of the distinction between
3   a conflict of interest and a potential conflict of
4   interest?
5      A.   I think I understand what you just said.
6      Q.   Okay. What's your understanding of
7   those?
8      A.   There's a difference between potential
9   and not having potential. One has no potential,
10  and I guess one has one. You said the difference
11  between a conflict of interest and a potential
12  conflict of interest?
13     Q.   Right. Did you go out and hire counsel
14  to represent you in this litigation?
15     A.   I didn't, but our company did.
16     Q.   How did that process happen?
17     A.   You would have to ask our general
18  counsel. I don't handle that.
19     Q.   Mark Whitaker?
20       MR. BURKE: That's a morphing of two
21  names.
22     A.   Yeah. Jim Whitaker is our head --
23     Q.   Jim Whitaker.
24     A.   You'll have to ask our internal legal

Page 204

1   counsel. They're responsible for that. I have no
2   idea how it worked.
3      Q.   Who is your counsel?
4        MR. BURKE: Internal?
5      Q.   No. Who is your counsel representing
6   you as a defendant in this litigation?
7      A.   I believe it's a firm that's up in
8   Dayton, and I don't remember the name of the firm.
9      Q.   Okay. Did you select them to be your
10  counsel?
11     A.   I didn't select them, but our internal
12  legal counsel selected them and we accepted it.
13  They said, hey, we've got to use this firm, and I
14  said fine.
15     Q.   When you say "we," who are you referring
16  to?
17     A.   The company. I mean, I don't get
18  involved in selecting legal counsel. So they came
19  to us and said we were going to select this firm,
20  and that's their judgment, that's what they do, and
21  I said okay.
22     Q.   You know Mr. Burke, right?
23     A.   Sure.
24     Q.   What's his role here today?

Page 205

1      A.   I don't know. It's a legal role. I
2   don't know how I'd advise it -- how I'd explain it.
3      Q.   Who is Mr. Burke representing?
4      A.   Why don't you ask Mr. Burke that.
5      Q.   You don't know?
6      A.   Well, what I know is I think at one
7   point in time he was representing our company, but
8   because you guys -- I forget what you did, but we
9   had to get another counsel because I think there
10  was some perceived conflict of interest.
11     Q.   Did you ever analyze that for yourself?
12     A.   No, I didn't analyze that.
13     Q.   Who's this gentleman on my right?
14       THE WITNESS: Why don't you introduce
15  yourself.
16       MR. OEHLERS: Joe Oehlers.
17     A.   He's the lawyer from the firm in Dayton
18  that's representing us.
19     Q.   Have you ever met Mr. Oehlers before
20  today?
21     A.   I don't know. I don't think so.
22     Q.   You don't know who Mr. Oehlers
23  represents, correct?
24       MR. BURKE: Objection. Asked and

52 (Pages 202 to 205)

1    answered.
2    A.    No, he represents the -- he represents,
3  at our company, I believe, who's ever getting sued
4  on the Provident side.  I don't know.  I guess
5  we're also representing -- I guess he represents
6  the OHSL board, Bob, and myself.  Are those the
7  people that are named defendants?
8    Q.    Are you familiar with the firm Graydon,
9  Head & Ritchey?
10   A.    I don't believe I am.  I could be.
11   Q.    Do you know John Penny?
12   A.    I don't think so.
13   Q.    Do you know Mike Debbeler?
14   A.    I don't believe so.
15   Q.    Were you ever represented by the firm
16  Graydon, Head & Ritchey?
17       MR. BURKE:  Objection.  Calls for
18  speculation.
19   A.    I could have been.  I don't know.  We
20  get sued by lots of different companies.
21   Q.    Were you ever represented in this
22  litigation by the firm of Graydon, Head & Ritchey?
23   A.    I don't know.  Ask our legal counsel.  I
24  don't know the answer to that.  We could have been.

1  I don't know.
2    Q.    Mr. Carey, what's your date of birth?
3    A.    July 18, 1954.
4    Q.    What's your Social Security number?
5        MR. BURKE:  Instruct the witness not to
6  answer.  We've talked about this.
7    A.    I'm not going to give you my Social
8  Security number.  Christ, there's all sorts of
9  identity theft going on out there.
10   Q.    What's your net worth?
11       MR. BURKE:  Objection.  Instruct the
12  witness not to answer.  We've already talked
13  about this, Mike.
14       MR. BRAUTIGAM:  Will you provide that
15  information --
16       MR. BURKE:  No, I'm not saying that
17  we're necessarily going to provide it.  Okay?
18  What I need to do is -- Rachel just got back
19  in town last Thursday.
20       I did not have a chance to talk to her
21  about the so-called agreement you allege and
22  even whether or not that's appropriate given
23  the interest of these people.
24       But you and I will have that discussion

1  about whether or not under any circumstances
2  that kind of information is going to be
3  provided.
4        MR. BRAUTIGAM:  Are you overriding the
5  agreement that I have with Rachel and Jamie
6  Greer?
7        MR. BURKE:  No.  I'm not overriding
8  anything.  I want to inquire about it and see
9  whether or not they agree, because frequently,
10  there's some differences in opinion as to what
11  you think an agreement is and what they think.
12       MR. BRAUTIGAM:  It's in the transcript.
13       MR. BURKE:  It may be.  It may be.  And
14  if you want to pull the page, let me see, and
15  I'll talk about it.
16       But for purposes of today, because
17  that's sufficiently sensitive information --
18  but I think I'm entitled, as you suggested, to
19  go to the magistrate and talk about open
20  issues.  That's one of them.
21       MR. BRAUTIGAM:  That's fair enough.
22       MR. BURKE:  Are you moving onto a
23  different subject?
24       MR. BRAUTIGAM:  I have a couple more

1    questions on this.  I can wrap it up in about
2    ten minutes.
3  BY MR. BRAUTIGAM:
4    Q.    Do you consider this deposition to be
5  important?
6        MR. BURKE:  Objection to relevance;
7  vague.
8    A.    I think any time there's litigation
9  relative to our company and I'm asked to
10  participate, it's important.
11   Q.    What, if anything, did you do to prepare
12  for this deposition?
13   A.    I met with Jim, and we had a brief
14  meeting to talk about the case a little bit.
15   Q.    Did you look at documents?
16   A.    I think I looked at maybe one or two
17  documents.
18   Q.    What documents did you look at?
19   A.    A little refresher on the press release,
20  brief review of the merger agreement.  It was not a
21  long meeting.
22   Q.    Aside from anyone who's an attorney,
23  have you talked with other people about their
24  depositions in this case?

53 (Pages 206 to 209)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 210

1    A.    No, I have not talked to anyone about
2    their depositions on this case.
3    Q.    When did you first learn that you were
4    to be deposed?
5    A.    I don't know.  Three weeks ago.  Some
6    short period of time.  I knew other people were
7    being deposed, but I guess at one point in time I
8    thought I wasn't going to be.  So in the last
9    month, at the most.  That's as best as I can
10    recall.  I don't know if that's significant or not,
11    but...
12    Q.    If OHSL provided inaccurate information
13    that ended up in the proxy materials, would you
14    point the finger at them as part of your defense?
15    Would you essentially say, Hey, we didn't have
16    anything to do with this; we didn't know about
17    this?
18        MR. BURKE:  Objection.  Calls for
19    speculation.
20    A.    I don't know what I would do in a
21    situation like that.  I'm not aware that they did,
22    but I would have to -- there would have to be a lot
23    more context around that.
24    Q.    Was the resignation of Thomas Herron

Page 211

1    disclosed in the proxy materials?
2        MR. BURKE:  Objection.
3    A.    I don't believe it was disclosed.
4    Q.    Why not?
5        MR. BURKE:  Objection.  Calls for legal
6    conclusion.
7    A.    I don't know why it wasn't disclosed,
8    and I don't know whether it should have been or
9    shouldn't have been.
10    Q.    What factors would you need to consider
11    in determining whether or not his resignation
12    should be disclosed?
13        MR. BURKE:  Same objection.
14    A.    I don't know what the -- I don't know
15    what the factors are that one should consider,
16    because as we talked about it earlier, it's kind of
17    an unusual event.
18        It's not something I have a lot of
19    experience with, as I said earlier.  And I would
20    tell you that I would have -- if it came up as an
21    issue, I would have talked to legal counsel about
22    whether it was a disclosable item.
23    Q.    When did you first learn that Mr. Herron
24    had resigned?

Page 212

1        MR. BURKE:  We went over this, I'm
2    pretty sure.
3    A.    I don't remember.  I really don't.  I
4    don't know whether it was before or after.  I know
5    at one point in time, I did learn that, but it
6    could have been -- the time period I would tell you
7    could have been anywhere from before to years
8    after.  I don't remember.
9    Q.    Okay.  Let me represent to you that the
10    merger closed on December 3rd of 1999.
11    A.    Okay.
12    Q.    I'm going to try to bracket it by
13    specific events.
14    A.    Yeah.
15    Q.    Do you believe you learned Mr. Herron
16    had resigned before or after the merger closed?
17        MR. BURKE:  Objection.  Asked and
18    answered.
19    A.    I'll tell you I honestly do not
20    remember.
21    Q.    Okay.  Let me represent to you that the
22    OHSL special meeting of shareholders was October
23    25th, 1999.  Do you believe that you knew about
24    that, Mr. Herron's resignation, before or after the

Page 213

1    special meeting of shareholders?
2        MR. BURKE:  Objection.  Asked and
3    answered.
4    A.    I don't remember.
5    Q.    Let me represent to you that the merger
6    agreement was signed on August 2, 1999.  Do you
7    believe that you learned Mr. Herron's resignation
8    was disclosed before or after the merger agreement
9    was signed on August 2nd, 1999?
10        MR. BURKE:  Objection.  Asked and
11    answered.
12    A.    I don't remember when I learned that
13    information.
14    Q.    Okay.  Could you turn to page 20 of the
15    proxy materials.  Actually, go back two pages.  Go
16    back to page 18.  There's a section that starts on
17    page 18 called the acquisition.  Do you see that?
18    A.    Yes.
19    Q.    And the second subheading is background
20    of the acquisition.  Do you see that?
21    A.    Um-hum.
22    Q.    And it talks about at a special meeting
23    of the board of directors of OHSL held on August
24    2nd, 1999, the OHSL board of directors determined

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 214

1  that the acquisition was advisable to and in the
2  best interest of the OHSL stockholders. Do you see
3  that?
4      A.    Um-hum.
5      Q.    What did the OHSL board consist of at
6  that time?
7          MR. BURKE: Objection. Calls for
8  speculation.
9      A.    I have no idea.
10     Q.    Okay. Do you think, as a general rule,
11 that it's important that the shareholders of a
12 public company have the right to know who their
13 directors are at any given time?
14         MR. BURKE: Objection. Calls for
15 speculation; calls for legal conclusion also,
16 I believe.
17     A.    They know who their shareholders are.
18 All they have to do is go look at the annual proxy
19 information.
20     Q.    They're directors. You said
21 shareholders.
22     A.    I'm sorry.
23     Q.    You just got it backwards?
24     A.    Sure.

Page 215

1      Q.    And if the composition of the board
2  changes, do you believe that that should be
3  announced and available to shareholders?
4          MR. BURKE: Objection. Calls for legal
5  conclusion; calls for speculation.
6      A.    I would really refer that to legal on
7  what they think about that. I mean, it's not
8  really a financial or an accounting issue.
9      Q.    But this document doesn't come from
10 legal, correct?
11         MR. BURKE: Objection.
12     A.    Well, I told you it's jointly prepared,
13 with the front section, which we're talking about
14 here, typically prepared by the legal; and the back
15 section, the financial stuff, typically prepared by
16 the financial people.
17     Q.    Who do you believe is ultimately
18 responsible for the contents of Defendant's Exhibit
19 1?
20         MR. BURKE: Objection. Calls for legal
21 conclusion.
22     A.    Well, I think that the legal people are    .
23 responsible for getting the legal stuff right, and
24 the financial people are responsible for getting

Page 216

1  the financial stuff right. Executive management,
2  you know, you could say overall.
3          I rely on legal counsel, in case you
4  don't know that, that they're doing their job, just
5  as they rely on what we do.
6      Q.    Which legal people and which financial
7  people by name did you refer to in your previous
8  answer?
9      A.    Is this a test or do we want to just ask
10 Kelly to give it back to us?
11     Q.    By name.
12     A.    I gave it by name last time.
13         MR. BURKE: Objection. Asked and
14 answered.
15     Q.    Mr. Carey, I'm not sure --
16     A.    Maybe I didn't. Maybe I can't remember
17 because it was already two hours ago. I thought
18 when you asked a similar question before, I
19 answered with names. That's all I'm saying, Mike.
20         So what's your question? I mean, I
21 thought I already answered this question. That's
22 my response to your question.
23     Q.    Well, Mr. Carey, I'm not trying to
24 burden you --

Page 217

1      A.    Okay.
2      Q.    -- by asking the same question --
3      A.    Okay.
4      Q.    -- over and over again.
5      A.    Okay.
6      Q.    Maybe we just crossed in the night. Why
7  don't we take a lunch break and come back in an
8  hour or so.
9      A.    Yeah, and if I didn't answer, I'll be
10 glad to answer.
11         (A break was taken for lunch from 12:56
12 to 1:44, 47 minutes.)
13
14
15
16
17
18
19
20
21
22
23
24

55 (Pages 214 to 217)

Page 218

1      AFTERNOON SESSION
2      (The question was read back.)
3   BY MR. BRAUTIGAM:
4      Q.    Good afternoon, Mr. Carey.  Welcome
5   back.  Mr. Carey, I certainly don't mean to burden
6   you by asking the same questions over and over
7   again, but it's in a slightly different context.
8   So I can start over for the afternoon.
9          You talked about legal and financial
10  people being responsible for Defendants' Exhibit
11  1.  Other than what you've already told me, are
12  there any legal and financial people by name who
13  you can mention who were responsible in whole or in
14  part for Defendants' Exhibit 1?
15     A.    I can't remember exactly what I said
16  before, so to be expedient, I'll try to repeat it
17  again.
18          On the financial side, Tony Stollings,
19  who is our controller; Rick Hannebut, who was head
20  of financial reporting; probably John Farrenkopf,
21  mergers and acquisitions.  They would have been the
22  principal people on the financial side.
23          On the legal side, when this document
24  was prepared, it would have been Mark McGee, who

Page 219

1   was our general counsel at the time and now I think
2   is our deputy general counsel because Jim Whitaker
3   wasn't there, and I'm sure he had someone else on
4   his staff, but I just can't remember who that would
5   have been; and then there would have been some
6   people from KMK.
7          And my best remembrances would have been
8   Tim Matthews is probably the person that I would
9   have had the most direct dialogue with.  Maybe
10  David Rosenburg.  Tim was more of a hands-on kind
11  of person; David was not.
12          And then there clearly would have been
13  interaction with OHSL, their controller -- and
14  probably primarily their controller would have been
15  the person -- and perhaps some legal firm they
16  would have used.  I wouldn't remember the name of
17  their legal firm.
18          Typically, there might have been
19  conversations about the document with their legal
20  firm and our legal people and myself in terms of
21  talking about the document, any questions and that
22  sort of thing.
23     Q.    When you say OHSL's controller, I don't
24  remember who that is offhand.  Was it Pat Condren?

Page 220

1      A.    I think it was Pat Condren, yeah.
2      Q.    I know he was the CFO.  I don't know if
3   he also had that title.
4      A.    I would say I think they probably had a
5   controller.  I don't think we would have worked
6   with the controller on it.  He could have been both
7   even in that size company.
8      Q.    Exactly.  Did you know that KMK was
9   named as a defendant in this litigation?
10     A.    Yes.  I don't think they were
11  initially.  I think it was later.
12     Q.    How did you learn that?
13     A.    I don't recall exactly, but I suspect I
14  would have been -- our legal counsel would have
15  told me that.  That's probably how I would have
16  learned, or Mark McGee probably would have said,
17  Hey, they've been named in the litigation.
18     Q.    Did Mark McGee come from KMK?
19     A.    I don't think so.  I'm not sure.
20     Q.    Did Jim Whitaker come from KMK?
21     A.    Yes, Jim Whitaker came from KMK.
22     Q.    When you learned from whatever source
23  that KMK had been named a defendant in an amended
24  complaint, what was your reaction?

Page 221

1      A.    Well, my reaction to learning that was
2   that it was kind of a bogus kind of thing that they
3   were mentioned; but I'm not an expert on these kind
4   of processes, but it sounded a little bit odd that
5   they would be named.
6      Q.    Okay.  You used the word bogus in your
7   previous answer.  What did you mean by that?
8      A.    I mean that it was probably
9   inappropriate that they were being named; that it
10  was a legal maneuvering to have us spend more money
11  or something like that.  I just viewed it as legal
12  maneuvering.  I didn't see that it was going to
13  help resolve the issue.
14     Q.    Do you know why they were named?
15     A.    I don't remember.  At the time, I'm sure
16  it was described to me.  I don't remember.  I mean,
17  I know you talked about conflict of interest area,
18  but I'm really getting more from you.  I don't
19  remember why they were named.  It could have been
20  that.  I'm sure I knew at the -- when I was
21  informed, I'm sure I knew.
22     Q.    Do you know what pleadings are?
23     A.    I probably need a little more work on
24  what a pleading is.

Page 222

1    Q.   Let me represent to you pleadings are
2 documents that are filed with the court. Sometimes
3 they have a file stamp on it; sometimes they're
4 filed electronically. That's what a pleading is.
5    A.   Okay.
6    Q.   Have you read any pleading cover to
7 cover?
8    A.   Something like this (indicating)?
9    Q.   Yes.
10    A.   For the OHSL?
11    Q.   For the Thiemann litigation.
12    A.   Probably. I think the very first one I
13 think I read cover to cover because I didn't know
14 what to make of it, and I don't know when we first
15 got it if there was such a quick response as to
16 whether it was something that should be taken
17 seriously.
18        So I probably read the first one. I
19 can't say that I read -- I don't recall whether I
20 read any ones that came after that cover to cover.
21    Q.   And when you say the first one, is it
22 likely that you're referring to the initial
23 complaint?
24    A.   Right, that would be likely what I would

Page 223

1 be referring to.
2    Q.   Okay. And did you form a conclusion as
3 to whether or not the initial complaint was
4 something that should be taken seriously?
5    A.   Well, I formed a conclusion that the
6 initial complaint appeared to be -- and I don't
7 know if this is the right word -- is specious the
8 right way to describe this? Like, not -- this was
9 an effort by somebody to try to extract some money
10 from the company without any real reason that they
11 should be doing that.
12    Q.   So you associated this with the
13 equivalent of court-filed blackmail, essentially?
14    A.   I wouldn't use the word blackmail, no.
15 It didn't seem like, to me, there was a real reason
16 to be trying to get money from the company, because
17 my general sense of it was that the case was about
18 the fact that their CEO decided not to vote his
19 shares.
20        And I can't remember whether this -- the
21 resigning or retiring of the director was in that
22 or not, but it didn't seem like there was anything
23 in there that made it sound like somebody should be
24 suing us and our company because of the

Page 224

1 acquisition.
2        That was my judgment at the time, and I
3 think that was the conclusion that other people
4 drew, too.
5    Q.   Okay. I want to make sure I understand
6 this correctly. Was it your conclusion, when you
7 used the phrase "us and our company," that
8 Provident was not appropriately named as a
9 defendant?
10    A.   No, it wasn't Provident, per se. I
11 mean, we'd bought their company, so it was --
12 because I believe the directors of their company
13 and our directors and myself were all named as
14 defendants in this.
15        And it didn't seem like it made sense --
16 didn't seem like to me -- I wasn't focused on who
17 was the defendant. I was more focused on is there
18 some legitimate claim here, and it didn't appear
19 that there was a legitimate claim. And as you can
20 imagine, that happens numerous times to larger
21 companies.
22    Q.   What happens?
23    A.   We get people that sue us for things
24 because we're a deep pocket, and most of the time

Page 225

1 they resolve with no settlement at all.
2    Q.   What would an example of something like
3 that be?
4    A.   Well, on the lending side there
5 typically are some where -- in the distressed
6 situation -- in a distressed situation where a
7 customer -- we have to call our collateral and do
8 things like that. Sometimes people will sue you no
9 matter what; and in my experience over the years,
10 it's usually unsuccessful.
11    Q.   With respect to reading the initial
12 complaint, did you get a sense that the accusations
13 were in part about corporate suffrage?
14        MR. BURKE: Objection. Calls for
15    speculation; legal conclusion.
16    A.   What do you mean by suffrage?
17    Q.   About the ability of the OHSL
18 shareholders to exercise their voting rights based
19 on fair, accurate, and complete information.
20        MR. BURKE: Same objection.
21    A.   I don't... That's probably a little
22 tough for me to go back that far and remember
23 whether that was something that I focused on. I
24 mean, so I can't recall whether that -- my focus

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 226

1 was is this a legitimate suit or not.
2          I don't recall that far back. I mean,
3 my best remembrance is really more is this some
4 legitimate lawsuit against us or not.
5      Q.    And you concluded there was not?
6      A.    Yes.
7      Q.    And did you believe that the lawsuit
8 would be thrown out of court shortly in due course?
9      A.    No. These things -- I mean, these
10 things tend to drag on. I didn't necessarily think
11 it would be thrown out shortly. I didn't have an
12 opinion on that.
13          We really try to find out is this
14 something that there should be some accounting
15 recognition for or, you know, disclosure issues;
16 and it didn't seem like it was going to be
17 something like that.
18      Q.    Other than legal counsel, did you
19 discuss the relative merits of the lawsuit with
20 others?
21      A.    Well, I can't recall. I think it's
22 possible we might have talked to our accounting
23 firm because it -- it's probably included in our
24 quarterly litigation letter. But I might not if

Page 227

1 Tony -- our controller might have talked to them
2 about it.
3          I don't -- I can't recall. It's
4 possible I could have talked to KMK. I just can't
5 recall whether I -- there's a lot going on in the
6 company, and I don't know if it went beyond just
7 our legal counsel and our board.
8      Q.    This was back in 2000. Do you remember
9 talking to Mr. Hoverson about this?
10      A.    It would be hard for me to remember a
11 specific conversation in 2000 with all the things
12 that go on in a company.
13      Q.    I understand. Do you remember generally
14 the topic of this litigation coming up?
15      A.    I don't know about in 2000, but I know
16 that -- I'm sure there were some occasion where the
17 topic came up. I don't think it was ever a
18 substantive conversation, but I can't recall.
19      Q.    And as best you can, what were the
20 substance of these conversations: Lawsuit's not
21 meritorious; don't worry about it; no one will ever
22 be deposed; it'll be over?
23          MR. BURKE: Objection to form.
24      A.    I would say that the substance was that

Page 228

1 we didn't think there was a legitimate lawsuit
2 here. There was no discussion of whether people
3 were going to be deposed or not. That's more what
4 lawyers might -- must talk about. Our discussions
5 would have been more is this a viable suit or not.
6      Q.    Was there anything in the initial
7 complaint that surprised you?
8      A.    I don't remember. There could have
9 been. I don't remember. I don't know whether
10 that's when I found out, for example, that this guy
11 resigned or not.
12          If that was when I found out, and I
13 don't remember, that probably would have been a
14 surprise; but I just don't know whether I already
15 had known that or not. I don't have a remembrance
16 that I read this and there was a surprise.
17      Q.    Provident is a significant consumer of
18 legal services, correct?
19          MR. BURKE: Objection to form. You may
20      answer.
21      A.    I'm not totally sure. I mean, I think
22 we spend a meaningful amount on an annual basis in
23 legal fees outside law firms, and not just KMK, of
24 course, but a large group of law firms.

Page 229

1      Q.    And Provident has existed for 102 years,
2 correct?
3      A.    Correct.
4      Q.    And for the last 50 years, Provident has
5 been relying, in part, on KMK for legal advice,
6 correct?
7          MR. BURKE: Objection. Calls for
8      speculation.
9      A.    Yeah, I can't say at all about the last
10 50 years. I can tell you that I know that for the
11 last -- since when I joined the company, they were
12 using KMK, but other law firms, too.
13          And I think significant other law firms
14 with significant fees, sometimes greater than KMK,
15 for example, for legal advice on an annual basis.
16 I don't think KMK on an annual basis.
17          I can't recall the exact numbers, but I
18 have looked at the numbers. I don't think every
19 year KMK would have been the single largest firm
20 that we paid the most to. I think it's likely
21 there would be other firms in different years that
22 might have -- that we might have paid more out to.
23      Q.    Why was that?
24      A.    Business activity.

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 230

1    Q.    When Provident seeks out legal services,
2  do you expect to get independent legal advice?
3         MR. BURKE: Objection. Calls for
4    speculation; no foundation. You may answer.
5    A.    I would say that I have not personally
6  looked at it that way. We expect to get accurate
7  legal advice, sound legal advice. There are
8  certain situations where independent thinking, of
9  course, is appropriate; but I don't know if that
10 would apply to every situation.
11   Q.    Do you believe that independent thinking
12 on the part of a law firm representing Provident,
13 its directors, and others, including yourself, is a
14 good thing in litigation?
15        MR. BURKE: Objection. Calls for
16   speculation; no foundation.
17   A.    I don't know if I'm really qualified to
18 answer that, Mike. I know you're asking me how I
19 believe, but... Why don't you restate it.
20   Q.    Certainly. Mr. Carey, do you personally
21 believe that you will be best served by legal
22 advice that's completely independent?
23        MR. BURKE: Objection. Calls for
24   speculation.

Page 231

1    A.    I don't know -- I don't know how to
2  answer that because I rely heavily on our legal
3  counsel internally, and he's not independent; and I
4  don't tell him to go call KMK to check his answer.
5  I'm not sure how to really answer that.
6    Q.    Do you believe that KMK is capable of
7  providing you with independent legal advice --
8    A.    Absolutely.
9    Q.    -- in this litigation?
10   A.    Absolutely.
11   Q.    Why?
12   A.    Because they're an extremely high
13 integrity firm that I've dealt with numerous of the
14 associates/partners in the firm, and I feel like I
15 get -- you know, we've gotten really strong
16 services from them.
17        So I'm not worried that they would try
18 to see things our way. It's not a concept I've
19 thought a lot about with our legal relationship. I
20 mean, it's a good concept that they should be
21 independent thinking. I'm not saying it isn't, but
22 I certainly would expect them to say what they
23 think.
24        That's what we want these kind of

Page 232

1  advisors to tell us. We don't want agreement.
2  Tell us what you think; be independent and
3  objective.
4    Q.    How can KMK be independent if they were,
5  for a time, defendants in the litigation?
6         MR. BURKE: Objection. Calls for
7    speculation.
8    A.    Yeah, I think that is more probably
9  something that I think almost a legal person would
10 have to answer, because I'm not sure -- I don't
11 know if I have a good comparable.
12        I'm trying to think about whether an
13 accounting firm could be independent. You know,
14 they audit your numbers. They're involved with
15 your company. They still seem to be independent.
16 You pay them. Seems like a similar relationship.
17   Q.    Actually, isn't it a requirement that
18 the accounting firm be independent?
19        MR. BURKE: Objection.
20   A.    Yes, it is.
21   Q.    In fact, on page 46, the accounting
22 report says, Report of Ernst & Young, LLP,
23 independent auditors, correct?
24   A.    I think that's correct.

Page 233

1    Q.    Do you know if there have been any
2  witnesses from KMK who have been designated as
3  witnesses at trial?
4    A.    I don't know the answer to that
5  question.
6    Q.    Would the answer to that question assist
7  you in making a determination as to whether or not
8  KMK was in a position to provide you and Provident
9  with truly independent legal advice?
10        MR. BURKE: Objection. Speculation.
11   A.    I don't know. I don't know whether it
12 would or wouldn't. I mean, can I just -- you're
13 saying if they have been deposed as a witness,
14 would that prevent them from being independent?
15   Q.    Would that be a factor that you would
16 want to consider?
17        MR. BURKE: Objection. Speculation.
18   You can answer.
19   A.    I don't know how to -- I'm not really a
20 qualified expert in determining the factors to
21 judge a legal firm's independence or not. It's a
22 new concept for me; not totally foreign, but
23 somewhat new. So I don't know. I'd have to really
24 think about what that would be. I'd probably ask

59 (Pages 230 to 233)