Page 234

1 another lawyer.
2    Q.    You haven't done that in this case?
3    A.    I don't -- I haven't personally done
4 that, I don't believe.  There may have been some
5 conversation, but I didn't raise the question.  I
6 know we, for a variety of reasons, have Joe here
7 and another law firm representing us, but...
8    Q.    What other reasons?
9        MR. BURKE:  Objection.  Asked and
10 answered.
11    A.    I think maybe because you all filed some
12 kind of motion with the court to prevent KMK from
13 representing us -- that's in layman's terms --
14 representing us directly, I would say, or something
15 like that.
16    Q.    Do you know if any KMK attorneys have
17 been deposed in the case?
18    A.    No, I don't know of any that have.
19    Q.    Do you know if a trial date has been set
20 in the case?
21    A.    No.
22    Q.    Do you know if any KMK attorneys have
23 given testimony that's adverse or potentially
24 adverse to some of KMK's clients?

Page 235

1        MR. BURKE:  Objection.  Misstates the
2 record; assumes facts not in evidence.
3    A.    I have no recollection of any of that
4 anyway.
5    Q.    Do you believe that your interests are
6 exactly aligned with Ken Hanauer's interests in
7 this litigation?
8        MR. BURKE:  Objection.  Calls for legal
9 conclusion.
10    A.    I wouldn't be able to determine -- I
11 don't know what Ken Hanauer's interests are,
12 really.  I mean, I think -- I don't know the answer
13 to that.
14    Q.    Do you know if Mr. Burke has been named
15 as a witness or potential witness in the
16 litigation?
17    A.    I'm not certain that he has.  It's
18 possible, but I'm not certain.
19    Q.    One of the conditions for the OHSL-
20 Provident merger going through was that there be no
21 injunction issued, correct?
22    A.    One of the conditions when?
23    Q.    In 1999.
24    A.    This was a condition in the merger

Page 236

1 agreement or...
2    Q.    Yes.
3    A.    I don't know.  I'm not sure exactly how
4 to respond to that.  I mean, if that's in the
5 agreement, then I guess it is.
6    Q.    And --
7    A.    Probably kind of unusual, but...
8    Q.    Do you know if there was any litigation
9 instigated before the merger actually closed on
10 December 3rd, 1999?
11    A.    I don't know the answer to that.
12    Q.    Well, let me represent to you that there
13 was.  Do you know if Mr. Burke represented
14 Provident in that litigation?
15    A.    No, I didn't -- I didn't know that there
16 -- I don't remember that there was.  I mean, back
17 then I might have known there was some litigation
18 instigated, but -- and I didn't know that Mr. Burke
19 -- if there was something, if he was involved in
20 it.
21    Q.    Do you know if Mr. Burke made any
22 statements that were false to the state court?
23        MR. BURKE:  Objection.  In addition to
24    being an absolute lie, which is untrue, those

Page 237

1    claims have already been dismissed from this
2    case, Mr. Brautigam.  They're no longer in the
3    case.  So continuing objection to this line of
4    questioning.  Misstates the record.
5    A.    Obviously, I know Jim and I know that
6 Jim doesn't lie, number one; but I'm not aware of
7 any of those allegations.
8    Q.    Have you ever known Mr. Burke to make a
9 mistake?
10    A.    I don't know that I have known him to
11 make a mistake; but last time I checked, he was
12 human, so I suspect he makes them.
13    Q.    This is on page A-31 of the proxy
14 materials, subheading c.
15    A.    Okay.  I see it.
16    Q.    Standard language, correct?
17    A.    I guess so.  I mean, there's a lot of --
18 you know, in part, as you know, there's a lot of
19 legal language in here.
20    Q.    And even though you may not remember as
21 you sit here five years later, at the time if there
22 was litigation before the merger trying to get an
23 injunction, you would have been informed about
24 that, correct?

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 238

1    MR. BURKE: Objection. Calls for
2  speculation; foundation.
3    A.    I can't answer that really.  I think
4  that if somebody -- again, say it again so I can
5  try to be focused on the response.
6    Q.    As you sit here today in 2004, you may
7  not remember if there was litigation initiated
8  before the merger; but if that happened, as I'm
9  representing to you it did happen, you would have
10  been informed about that at the time, correct?
11    MR. BURKE: Objection. Calls for
12  speculation.
13    A.    I don't know whether I would have been
14  informed or not.  I really don't.  I'm not saying I
15  wouldn't have been informed.
16    There's, you know, a fair amount of
17  litigation in the company.  And if somebody deemed
18  it was significant, I presume they would have
19  informed me; but if they thought it wasn't
20  significant, they would not have.  I mean, it's
21  kind of asking me to -- I don't remember what
22  occurred.  That would be the best way to answer the
23  question.
24    Q.    Do you know what it means to shop the

Page 239

1  company?
2    A.    I'm familiar with that general term.
3    Q.    What does that mean?
4    A.    That's when someone wants to sell their
5  company, and they will typically go out and talk to
6  some prospective buyers.
7    Q.    How many prospective buyers of OHSL
8  actually made a bid for the company?
9    A.    I don't know.  I have no idea what
10  happened with them.
11    Q.    Wasn't Provident the only bid?
12    A.    I mean, we did a negotiated transaction
13  with them, but I don't know whether they shopped it
14  before, during, or after.
15    I mean, you know, not after the merger,
16  but certainly the time period before we met with
17  them; during we met with them; and even after the
18  agreement was signed, that allowed the people to
19  sometimes shop things; but I have no recollection
20  whether they did that or not.  You would have to
21  ask their board.
22    Q.    Do you agree that OHSL shareholders were
23  told that their board of directors voted
24  unanimously to approve the merger with Provident,

Page 240

1  correct?
2    MR. BURKE: Objection. Calls for
3  speculation.  This has already been asked and
4  answered.
5    A.    Well, this letter which we sent out to
6  them which was sent out by Norbert Brinker says,
7  Your board of directors unanimously approved the
8  acquisition.  So are you asking me to restate that?
9  I mean, I think this went to their shareholders.
10    Q.    Right.  You agree with what I just read,
11  correct?
12    MR. BURKE: He agrees with what his
13  answer just was.
14    A.    Yeah, I'm just -- I mean, this is what
15  was sent out.  So if you said that, then I agree
16  with that.
17    Q.    Okay.  And the OHSL shareholders were
18  told that the board of directors unanimously
19  believed that the merger with Provident was in
20  their best interest, correct?
21    MR. BURKE: Objection. Misstates the
22  record; already asked and answered.
23    A.    Yeah, that one, Mike, I'm just not sure
24  what the intent was of the wording here, whether

Page 241

1  unanimous related to approved or approved and
2  believes.
3    I can't go back in time and figure out
4  what somebody was thinking about when they wrote
5  it.  I'd say that I think it definitely relates to
6  the approved.  I'm not so sure whether it relates
7  to the believes.
8    Q.    And you agree that there was no
9  indication in either the proxy nor the meeting of
10  shareholders on October 25th, 1999, that
11  Mr. Hanauer, OHSL CEO and board member and largest
12  shareholder, had been opposed to the transaction
13  from the beginning?
14    MR. BURKE: Objection. Misstates the
15  record; calls for speculation; and assumes
16  facts not in evidence.
17    A.    I mean, I think what -- I don't know
18  that Ken was opposed to it.  So you're saying does
19  the record have something in there that says he was
20  opposed to it?  My belief is that Ken was in favor
21  of the transaction.
22    Q.    Why would a comment (indicating) --
23    A.    That is a newspaper article; and believe
24  me, having worked with the media for 20 plus years,

61 (Pages 238 to 241)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 242

1  I don't really consider that because it's in print,
2  it's accurate. I mean, boy, I hope people don't
3  believe everything that's in the newspaper.
4      Q.   Well, I worked for the New York Times,
5  and they strived to be accurate.
6      A.   Well, you can see what they have there.
7  They have probably the biggest scandal in the
8  newspaper business that's ever happened. I mean,
9  they just fired their editor and about eight other
10  people because they had the most inaccurate
11  reporting for three years. That's a proved point.
12      Q.   We can talk about that off the record,
13  if you like. Do you have any idea how this
14  statement attributed to Mr. Burke without quotation
15  marks got in the Cincinnati Business Courier?
16      MR. BURKE: Objection.
17      A.   I think that it got in there because it
18  was wrong, and it happens with some regularity
19  where people get misquoted. That's not, you know,
20  the largest newspaper in town. What is it? The
21  Courier?
22      Q.   Yes?
23      A.   Is that the weekly one?
24      Q.   Yes.

Page 243

1      A.   Yeah, I assume the statement's very
2  incorrect from talking to Jim, and it's not that
3  uncommon that there are incorrect statements in the
4  press in my experience.
5      Q.   Did you ever learn that Mr. Hanauer's
6  signature had been on the first page of Defendants'
7  Exhibit 1 and that he directed that it be removed
8  because he didn't want the transaction to be seen
9  as coming from him?
10      MR. BURKE: Objection. Misstates the
11      record; assumes facts not in evidence; calls
12      for speculation.
13      A.   No. I can't recall that I knew that.
14      Q.   Do you think that's potentially material
15  information?
16      MR. BURKE: Objection.
17      A.   I have no way to judge that.
18      Q.   Do you know how long OHSL was a public
19  company?
20      A.   No.
21      Q.   About six years? Does that sound right?
22      MR. BURKE: Objection. Calls for
23      speculation.
24      A.   I really -- I don't know.

Page 244

1      Q.   Let me represent to you it was about six
2  years, and my understanding is that this was the
3  only shareholder communication of this sort that
4  did not have the signature of the CEO and the
5  chairman of the board. Does that strike you as
6  being unusual in any way?
7      MR. BURKE: Objection. Calls for
8      speculation; form.
9      A.   I don't -- I can't say whether that
10  would be unusual for, frankly, either this specific
11  situation or a general situation.
12      Q.   Do you believe that Mr. Hanauer's views
13  on the merger, whatever they were, were material
14  information?
15      MR. BURKE: Objection. Calls for
16      speculation.
17      A.   I think what's material about
18  Mr. Hanover's[sic] views is that he voted for it,
19  and that's the most relevant bit of information.
20  His own personal views, I really don't know what
21  they are.
22      I've seen some different commentary on
23  it, but I don't think it's -- I don't think I can
24  really comment on whether it's material or not.

Page 245

1  That's more for Ken to comment on, I guess.
2      I hate -- I don't want -- I don't feel
3  it's appropriate for me to comment on what people
4  think Ken Hanover's[sic] views may have been when
5  he voted as a board member to approve the
6  transaction. That would seem to tell me that his
7  action was in favor of the transaction.
8      Q.   Would you turn to paragraph 55 of the
9  consolidated amended complaint, and would you read
10  that to yourself -- it's found on pages 33 and 34
11  -- please.
12      A.   (Examining document.) Okay. I've read
13  it.
14      Q.   The question and answer that appears in
15  the paragraph on page 34 is me asking Mr. Hanauer a
16  question. Do you understand that?
17      A.   Um-hum, I guess. I mean, that's what
18  you're telling me.
19      Q.   Yes. And does Mr. Hanauer's answer
20  suggest that he was in favor of the transaction?
21      MR. BURKE: Objection. Calls for
22      speculation.
23      A.   Yeah, I don't -- I'm not sure that I can
24  interpret what Ken was really thinking of, whether

62 (Pages 242 to 245)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 246

1  it's some personal preference for himself as a CEO
2  or the transaction. I mean, it's really not for me
3  to determine what Ken was thinking anyway, and this
4  doesn't do it for me.
5      Q.   Doesn't do what for you?
6      A.   It doesn't convince me that Ken was not
7  in favor of the transaction.
8      Q.   Okay. So you believe, in spite of his
9  answer here, Mr. Hanauer still may have been in
10  favor of the transaction, correct?
11     MR. BURKE: Objection.
12     A.   Well, I would say I believe Ken was in
13  favor of the transaction.
14     Q.   Okay. Why?
15     A.   Because he voted for it as a board
16  member.
17     Q.   Aside from that, why do you believe
18  Mr. Hanauer was in favor of the transaction?
19     MR. BURKE: Objection.
20     A.   Beyond that, I can't tell you. I mean,
21  I don't know what he was thinking. I mean, I can
22  just go by what he did. He voted for the
23  transaction, so that tells me he was in favor of
24  it. If he wasn't in favor of it, he should have

Page 247

1  not voted.
2      Q.   Okay. If he was not in favor of it, why
3  should he not have voted for it?
4      MR. BURKE: Objection to form; calls for
5  speculation.
6      A.   If you're not in favor of something, you
7  don't vote for it. There's no -- I don't have a
8  further explanation on that.
9      Q.   Would you turn to page 20 of the CAC;
10  and again, I'm interested in paragraph 30. It
11  starts on page 19. You can read that to yourself
12  for some background, and I'm going to have some
13  questions about the two Q and A's that appear.
14     A.   How far do you want me to read here?
15     Q.   To the end of the paragraph, sir.
16     A.   Before the Q and A, or including it?
17     Q.   Including the Q and A.
18     MR. BURKE: Object to relevance to the
19  extent this refers to claims that have been
20  dismissed in this case.
21     A.   (Examining document.) Okay. I've read
22  it. I would have to re-refer to it because there's
23  a lot of legalese here, but...
24     Q.   Do you see the first Q and A at the

Page 248

1  bottom of page 20?
2      A.   Um-hum.
3      Q.   Let me represent to you that that's my
4  questioning Mark Weiss. You know who Mark Weiss
5  is, correct?
6      A.   Yes, I do.
7      Q.   Do you know what, if any, role he had
8  with respect to Defendants' Exhibit 1?
9      A.   Well, Mark I think is more of an SEC
10  counsel, but I might be wrong there, but I don't
11  remember specifically what on this document -- but
12  I've, over the years, had some conversations with
13  Mark and worked with Mark on different things. I
14  can't remember on this deal what his role was, but
15  as I said earlier, I had more interaction with Tim
16  Matthews.
17     Q.   He's the second Q and A. But based on
18  the Q and A that appears at the bottom of page 20,
19  my questioning of Mark Weiss, is it fair to say
20  that based on your previous answer, you agree with
21  Mr. Weiss's concept that if Mr. Hanauer did not
22  believe the merger was in the best interest of OHSL
23  shareholders, he had a fiduciary duty to vote
24  against it?

Page 249

1      MR. BURKE: Objection. Calls for
2  speculation; assumes facts not in evidence;
3  also calls for a legal conclusion.
4      A.   So if Mr. Hanauer did not believe it was
5  in the best interest of the shareholders, the
6  question is should he have voted against it?
7      Q.   Yes.
8      MR. BURKE: Objection. Calls for
9  speculation; assumes facts not in evidence.
10  You may answer.
11     A.   Well, I mean, I don't disagree with that
12  if he thought it wasn't in the best interest of the
13  shareholders. He should vote what he thinks is in
14  the best interest of the shareholder given all the
15  variety of circumstances that could have been
16  involved.
17     Q.   Based on your understanding as someone
18  who signs public documents, if Mr. Hanauer did not
19  believe that the merger was in the best interest of
20  the shareholders but he voted in favor of it
21  anyway, and he allowed Defendants' Exhibit 1 to go
22  out in that form, do you believe that Mr. Hanauer
23  would have violated his fiduciary duties?
24     MR. BURKE: Objection. Calls for legal

63 (Pages 246 to 249)

Page 250

1    conclusion; calls for complete speculation
2    based upon --
3        A.    I don't know how the law would look at
4    all that really.  I can deal easier with the simple
5    issue that he should vote what he thinks is the
6    right thing for the shareholders.  When you get
7    past that, I think it's more of a legal question.
8        Q.    Would you pick up Plaintiffs' Exhibit
9    106, please.
10       A.    Sure.
11       (Off-the-record discussion.)
12   BY MR. BRAUTIGAM:
13       Q.    Based on the first page of Plaintiffs'
14   Exhibit 106, is there anything that suggests to you
15   that Mr. Hanauer's views are accurately reflected
16   in Defendants' Exhibit 1?
17       MR. BURKE:  Objection.  Calls for
18       speculation; calls for legal conclusion.  This
19       witness has no firsthand knowledge of any of
20       this stuff.
21       A.    I don't know how to comment on it
22   because the guy voted for it, and this appears that
23   he's backing off why he voted for it.  But I would
24   ask for a lot more context as to what it's supposed

Page 251

1    to mean.
2        It's hard for me to tell you what Ken is
3    saying here after he's voted for it to go through.
4    I mean, I just would say it's hard for me to really
5    think about it.
6        Q.    Why do you believe Mr. Hanauer voted in
7    favor of the OHSL-Provident merger as a director?
8        MR. BURKE:  Objection.  Calls for
9        speculation; no foundation.
10       A.    I don't know why -- I can't say why he
11   did.
12       Q.    Okay.  Do you dispute the reasons he
13   gives on page 34, paragraph 55, of the consolidated
14   amended complaint?
15       A.    (Examining document.)
16       MR. BURKE:  Objection.  Calls for
17       speculation; no foundation.
18       A.    When you say that, where are you
19   referring to?
20       Q.    The Q and A towards the top of page 34?
21       A.    The Q and A -- do I dispute that?
22       Q.    Right.
23       MR. BURKE:  Objection.  Calls for
24       speculation.

Page 252

1        A.    Why did you change your vote from
2    abstaining on July 22nd to in favor of August 2nd.
3    And what do you want me to say about this again?
4        Q.    Do you dispute Mr. Hanauer's reasons
5    that he gives --
6        A.    I'm not --
7        Q.    -- reflected on page 34?
8        A.    I am not in a position to affirm or
9    dispute his reasons.  It's written here.  It says
10   that.  If that's what he said at this point in time
11   well after the fact, then that's what he said.
12       Q.    Do you believe that Mr. Hanauer was an
13   honest man?
14       MR. BURKE:  Objection.
15       A.    I don't know Ken Hanover[sic] well
16   enough.  I assume he's an honest man, but it's not
17   like I had some kind of business relationship with
18   him.
19       Q.    Mr. Carey, did I ask you earlier today
20   how you expected Mr. Hanauer to have voted his
21   personal shares?
22       MR. BURKE:  Yes, in some length,
23       Counsel.
24       A.    I don't know if you did.  You spent a

Page 253

1    lot of time on how you expected our board members
2    to vote.  I can't remember whether you asked about
3    him voting.
4        Q.    All right.  Let me ask that.  In 1999,
5    did you have an expectation as to how Mr. Hanauer
6    would vote his personal shares?
7        MR. BURKE:  Objection.
8        A.    No.
9        MR. BURKE:  Calls for speculation.
10       A.    I don't recall that I had any
11   expectation on how any of their board members would
12   have voted.  It would have not been something that
13   I would have expected would have been on my radar
14   screen.
15       Q.    Is that true in spite of the fact that
16   the OHSL board of directors were recommending to
17   the shareholders that they vote in favor of the
18   merger?
19       MR. BURKE:  Objection to form.  Calls
20       for speculation.
21       A.    What I'm trying to say is that, as best
22   I can recall for this and, frankly, any deal that I
23   worked on, I didn't remember ever thinking about
24   how are the board members going to vote their

64 (Pages 250 to 253)

Page 254

1  personal shares. They typically have some. They
2  don't typically have a lot, but some have a lot.
3       But it's not something that I don't
4  think would have been something I would have even
5  been thinking about. The vote would have been more
6  how are the shareholders going to vote, not six or
7  seven people.
8     Q.   Okay. Did you ever learn that OHSL was
9  having trouble with the shareholder vote?
10        MR. BURKE: Objection. Misstates the
11    record.
12    A.   I don't think they did --
13        MR. BURKE: Assumes facts not in
14    evidence.
15    A.   -- and I would probably have to correct
16  the record from earlier, because when I was talking
17  about the Nat City vote, I think we only had about
18  75 percent or so vote; and of those that voted, 99
19  percent voted in favor.
20        And I guess I would ask you to correct
21  this record because I think the way you asked the
22  question got put in there wrong.
23        Apparently, only 52 percent voted
24  because I don't even know if we used the proxy

Page 255

1  solicitation for that deal. We used a proxy
2  solicitation for the Nat City deal to get more vote
3  up, but apparently 85 percent or so voted for it.
4       Plus, I think there was an unusual
5  difference in the way they do things. If you don't
6  vote, it counts as a no vote or something. It was
7  odd. It sounds like it was overwhelmingly voted in
8  favor of it, and I'm not aware that we used a proxy
9  solicitation. Maybe we did, but I don't remember
10  it.
11    Q.   So you're attempting to correct your
12  testimony now --
13    A.   Well, you said something that I think I
14  responded to by not -- because I didn't understand
15  your question. So I might have responded to it
16  inaccurately, and I wanted to just kind of make
17  sure that that didn't stay in the record like that.
18    Q.   Okay. Well, let's --
19    A.   I was responding to this thing here.
20    Q.   Mr. Carey, what was the requirement for
21  the National City-Provident merger to be approved?
22        MR. BURKE: Objection to form. You may
23    answer.
24    A.   The requirement was that you had to have

Page 256

1  at least two-thirds of the shareholders vote; and
2  then of those two-thirds, I believe you had to have
3  50 percent voting in favor. I know you had to have
4  two-thirds to vote. I think you just had to have a
5  simple majority of those that voted.
6     Q.   And what were the terms of the OHSL
7  merger?
8     A.   I don't remember.
9     Q.   It was a simple majority, wasn't it?
10    A.   I don't really remember. I mean, I
11  don't remember it ever being an issue at the time
12  whether we were going to get a vote. It's too long
13  ago for me to remember something like that.
14    Q.   Could you look at this sentence that's
15  in bold and see if you want to correct your answer
16  there about the Provident-National City deal?
17    A.   Sure. (Examining document.) Yeah,
18  that's what I said.
19    Q.   Can I have that back?
20    A.   Let me make sure I read this again. I
21  wonder if that's worded right.
22    Q.   It says two-thirds of the outstanding
23  shares, correct?
24    A.   Yeah.

Page 257

1     Q.   It doesn't say anything about two-thirds
2  of those shares actually voting, correct?
3     A.   Well, I know you have to get two-thirds
4  of the shares to vote.
5     Q.   For a quorum?
6     A.   Yes, for a quorum.
7     Q.   But, you need two-thirds of the actual
8  shares outstanding with respect to the Provident --
9     A.   Right.
10    Q.   -- National City merger?
11    A.   Two-thirds have to vote -- I don't think
12  two-thirds have to vote in favor of it, but maybe
13  they do. All I know is this, Mike, we got more
14  than two-thirds voting, and that was a requirement.
15  We had to have more than two-thirds of the
16  shareholders voting, I believe.
17    Q.   I want to clear this up.
18    A.   Maybe I'm mistaken.
19    Q.   On the first page of the document,
20  Provident-National City proxy material, it says, as
21  follows: In order for the merger agreement to be
22  adopted, the holders of two-thirds of the
23  outstanding shares of Provident entitled to vote
24  thereon must vote in favor of the merger

65 (Pages 254 to 257)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 258

1 agreement. It says that, correct?
2    A.   Yeah, that's what's written there, yeah.
3    Q.   Now, in order for the OHSL-Provident
4 merger to close, a simple majority was required,
5 correct?
6    A.   I don't remember.
7    Q.   Let me represent to you that it was a
8 simple majority.
9    A.   I mean, it's in the bylaws. Whatever
10 was in the bylaws. It's not something that gets
11 decided during the merger.
12    Q.   Now, you mentioned something about if a
13 shareholder did not vote, i.e., did not return the
14 proxy card, that it would be counted as a no vote
15 and that that was odd. Is that your testimony?
16    A.   Well, I should strike the word odd. It
17 seemed odd to me. Whether it was really odd or
18 not, I don't know, but...
19    Q.   First of all, we're talking about the
20 OHSL-Provident merger, correct?
21    A.   Right.
22    Q.   Why did that seem odd?
23    A.   Well, it doesn't seem to make sense to
24 me if you don't vote at all that counts as a no

Page 259

1 vote.
2    Q.   Okay. Well, what about the Provident-
3 National City merger; if you didn't vote, how was
4 your vote counted?
5    A.   I don't recall.
6    Q.   My representation is that if you didn't
7 vote with respect to the National City merger, it
8 counted as a no vote. Does it seem less odd?
9       MR. BURKE: Objection. Calls for
10 speculation, and also there's no relevance to
11 that.
12    A.   I don't think that's right, but...
13       MR. BURKE: I don't think it is either.
14    Q.   You don't think that's right? Okay.
15 I'll find it in here.
16    A.   Well, I know the vote in favor was 99
17 and a half.
18    Q.   Okay.
19    A.   So I don't think that -- how do you get
20 -- we only had 75 percent vote. So I don't think
21 the other ones got counted as a no.
22    Q.   Well, I'll find it.
23    A.   Yeah, hey, I -- you know...
24    Q.   Mr. Carey, do you believe that investors

Page 260

1 are keenly interested in the opinions of senior
2 management, especially the most senior manager, the
3 CEO?
4       MR. BURKE: Objection. Calls for
5 speculation; no context; vague.
6    A.   Yes, generally.
7    Q.   In the context of mergers and
8 acquisitions, do you believe that the CEO is
9 generally viewed by shareholders as the person
10 responsible for the day-to-day operations of the
11 corporation as well as strategic planning for its
12 future?
13       MR. BURKE: Objection. Calls for
14 speculation; assumes facts not in evidence.
15    A.   Yeah, I would say that. When you start
16 getting into the little broader of what the
17 investors think CEO's do, I would say there's a
18 pretty wide range of what investors might think.
19 Your mom and pop might not be thinking along those
20 lines.
21    Q.   Do you believe that, in the context of
22 mergers and acquisitions, the CEO is also viewed by
23 the investment community to be the most
24 knowledgeable and informed about all matters

Page 261

1 affecting the corporation and its future?
2       MR. BURKE: Objection. Calls for
3 speculation.
4    A.   That would be -- I wouldn't know how to
5 judge that. There's so many varieties.
6    Q.   Okay. In the context of mergers and
7 acquisitions, do you believe that in conjunction
8 with the chief financial officer, who reports on
9 the financial matters of the corporation, the CEO
10 is the most sought after voice in communications
11 with shareholders in the investment community?
12       MR. BURKE: Objection. Vague; calls for
13 speculation.
14    A.   Yeah, I'll try to answer your question
15 by saying that's -- there's a relatively large
16 group of people on Wall Street that don't ever talk
17 to CEOs or CFOs on purpose.
18       So it's hard for me to speculate how
19 important they think what they say is when they
20 manage hundreds of billions of dollars and
21 purposely say, We don't talk to management.
22       So do some people think the CEO -- what
23 the CEO and CFO do is important? Sure. Does
24 everybody? I don't know. I know you can find

1  people that manage billions and billions of dollars
2  that purposefully go out of your way to tell you,
3  We don't talk to those people.
4      Q.    Well, even if these money managers don't
5  talk to the CEO and the CFO, they still read what's
6  said, correct?
7          MR. BURKE: Objection. Calls for
8    speculation.
9      A.    I don't know.  A lot of the guys don't.
10  They just run numbers.  It's hard to generalize on
11  some of that stuff, Mike, I'm telling you.  You're
12  going down a path that there's a lot of different
13  things that are done out there by money managers
14  who typically are the biggest shareholders.
15      Q.    Do you believe that because OHSL was a
16  regional savings and loan with six branches in
17  western Cincinnati that, with respect to the OHSL-
18  Provident merger, the role of the CEO as a source
19  of information may have been even more important?
20          MR. BURKE: Objection. Calls for
21    speculation.
22      A.    I wouldn't -- more important relevant to
23  what?  I'm not... I don't know how to...
24      Q.    Relative to other mergers and

1  acquisitions.
2          MR. BURKE: Objection to form; calls for
3    speculation.
4      A.    I don't know how I would make a judgment
5  whether they're relevant to others or would be more
6  or less important because of their size.  I'm not
7  sure it would matter.
8      Q.    Did you know that many of the OHSL
9  shareholders were also customers and/or employees
10  of OHSL?
11      A.    I know that some are.  I don't know if I
12  could use the word many, but I know that certainly
13  the employees had shares, and I know that some of
14  the customers had shares.  I wouldn't have known
15  the magnitude of it, but...
16      Q.    Did you know that OHSL shares did not
17  turn over quickly relative to the total number of
18  shares outstanding suggesting that many of its
19  investors were committed long term owners of the
20  stock?
21          MR. BURKE: Objection. Calls for
22    speculation.
23      A.    That would have not been something I
24  would have -- I can't recall.  I might have known

1  something about that, but I really can't recall
2  whether I did or I didn't.
3      Q.    In 1999, did you know that OHSL stock
4  was not actively followed by securities analysts
5  who might have expressed opinions about the merger?
6      A.    I don't remember whether I knew that or
7  not.  With the size of the company, it wouldn't
8  surprise me that they weren't.
9      Q.    Do you agree that Mr. Hanauer was a
10  visible member of the community?
11          MR. BURKE: Objection. Calls for
12    speculation.
13      A.    Yeah, I don't know what you're defining
14  as community there.  I don't think he was a visible
15  member of the Cincinnati at-large community; but of
16  some smaller community, he could have been.  I
17  don't know.
18      Q.    Okay.  Did you know that Mr. Hanauer had
19  come up through the ranks and been affiliated with
20  the bank for more than 20 years?
21          MR. BURKE: Objection. Calls for
22    speculation.
23      A.    I don't remember whether I knew that or
24  not.  I may have.

1      Q.    Did you know that Mr. Hanauer was the
2  only representative of management serving as an
3  OHSL board member?
4          MR. BURKE: Objection. Speculation.
5      A.    I can't remember, but I probably would
6  have -- I mean, as I remember -- as best as I
7  remember, I think he was the only manager on the
8  board.  I don't think the CFO was on the board.
9      Q.    And based on these factors that we've
10  just discussed right now, do you believe that his
11  opinion regarding the merger of Provident would
12  have been important to OHSL shareholders in the
13  sense that it would have added to the total mix of
14  information available to them in making their
15  judgment decisions?
16          MR. BURKE: Objection. Calls for
17    complete speculation.  He said he didn't know
18    most of those factors; and also calls for
19    legal conclusion.
20      A.    Yeah, I can't say whether his opinion
21  would or not.  I don't know what kind of
22  relationship they had with -- he had with his
23  shareholders.
24      Q.    You testified earlier, if I understood

Page 266

1  your testimony correctly, that you believe
2  Mr. Hanauer was a small shareholder; is that right?
3      A.    You know, I don't remember exactly how
4  many shares he had.  It didn't strike me that he
5  was a controlled shareholder.  That's what I meant
6  by that.
7      Q.    What do you mean by controlled
8  shareholder?
9      A.    20 percent and above.
10     Q.    Okay.  Would you turn to page 63 of the
11 proxy materials.  Mr. Hanauer owned 123,075 OHSL
12 shares as of July 31st, 1999, correct?
13     A.    That's what it says in here, so I assume
14 it's correct.
15     Q.    And that equated to owning 4.9 percent
16 of the company, correct?
17     A.    Um-hum.
18     Q.    And he was certainly the largest
19 shareholder by far, correct?
20         MR. BURKE:  Objection.  Calls for
21 speculation.
22     A.    Yeah, I would say with what's listed on
23 here, he's clearly the largest shareholder.
24     Q.    And the next largest shareholder is the

Page 267

1  CFO, who owns less than half the company, correct?
2          MR. BURKE:  Are you saying the
3  shareholder of all or among the management --
4      Q.    The next largest shareholder on page 63.
5          (Off-the-record interruption.)
6          (The question was read back.)
7          MR. BURKE:  Do you understand the
8  question?
9      A.    I mean, I agree with the numbers that
10 are on here.  I think they're probably right.
11     Q.    Okay.
12     A.    I think partly when I was thinking about
13 whether Ken was a big shareholder or not was more
14 the value of the stake than the percentage of the
15 stake.  I think correctly I remember he was not a
16 control shareholder.  You wouldn't be a control
17 shareholder at 4.9 percent.
18     Q.    Well, the entire board representation
19 had under 20 percent, right?
20     A.    Um-hum.  That's a good representation
21 for a typical board.  I would say that's above
22 average.
23     Q.    Why?
24     A.    You don't see too many boards where

Page 268

1  individual board members have even 1 percent of a
2  company.  Most of these guys have more than 1
3  percent.
4          From a percentage standpoint, that would
5  be above average; maybe not for this size company,
6  but for -- if you compare it to the average
7  company.  I just remember him not having a huge
8  financial stake in it, you know, and it doesn't
9  look like he has.
10     Q.    This was almost 3 million dollars,
11 correct?
12     A.    Right.
13     Q.    Do you agree that Mr. Hanauer held the
14 most important role in the company with respect to
15 the shareholders?
16         MR. BURKE:  Objection.  Calls for
17 speculation.
18     A.    I would expect that the board -- in the
19 company?
20     Q.    Yes.
21     A.    As an operating person?  Sure, the CEO
22 is the number one job.  I don't know how they
23 viewed it, but -- because I don't know their
24 shareholders.  I mean, typically -- I would be

Page 269

1  speculating if I say how they really viewed it.  It
2  is a smaller company here.
3      Q.    And obviously, Mr. Hanauer held the top
4  spot in terms of share ownership, correct?
5          MR. BURKE:  Objection.  Among the board
6  members or overall?
7          MR. BRAUTIGAM:  Overall.
8          MR. BURKE:  Calls for speculation.
9      A.    I don't know.  I mean, I forget the
10 rules now, but if you had someone that had probably
11 over 5 percent, it would probably have to be
12 disclosed.  I don't see it being disclosed, so I
13 would assume he's the largest individual
14 shareholder, but I don't know.
15         If you have a total unaffiliated with a
16 larger -- you could have someone with larger shares
17 here -- with a larger -- I would have to check with
18 SEC counsel to see whether that was true or not, or
19 if it's disclosed somewhere else in the document.
20 I don't know the answer to that.  I suspect he
21 probably did, but I don't know.
22     Q.    Do you agree with this statement -- this
23 is a statement made by our expert witness -- It is
24 my opinion, meaning the opinion of the expert, that

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 270

1  if shareholders had known that a person on the
2  board with the largest financial stake in the
3  company and most able to impact vote by virtue of
4  share ownership did not believe the merger was in
5  the best interest of OHSL shareholders, the outcome
6  of the shareholder vote would most likely be
7  different?
8       MR. BURKE: Objection. Speculation.
9    A.   I could no way speculate on that.
10   Q.   You can't agree or disagree?
11      MR. BURKE: Objection. Calls for
12  speculation.
13   A.   I couldn't possibly determine whether
14  that was true. What if the shareholders all
15  thought this guy was a nut and just wanted to keep
16  his job, and they all knew that? They might not
17  care how he voted.
18      It's very typical for CEOs to want to
19  stay and run the company and be king. So I don't
20  know. I don't know how they would have viewed it.
21  I don't know the circumstances of how the
22  shareholders viewed him or the board.
23   Q.    Do you believe that a fair reading of
24  the proxy materials would have caused a reader to

Page 271

1  believe that Mr. Hanauer intended to vote his
2  shares in favor of the merger?
3       MR. BURKE: Objection. Calls for
4  speculation.
5    A.   Yeah, I don't -- I really can't tell you
6  how I think other people would have assumed. I
7  would only tell you I don't know that most other
8  people would have even thought about that. How he
9  was going to vote his shares is not the kind of
10  thing that typically comes up.
11      I think people would have looked at this
12  and said these guys voted for the deal. I've got
13  all this information. I'll make my decision. I
14  don't think the average shareholder thinks about
15  who's going to vote what that's on the board.
16   Q.   Do you believe that the average
17  shareholder is interested in the opinions of the
18  person who wears the hat of the largest
19  shareholder, the only member of management on the
20  board, and the CEO of the company?
21      MR. BURKE: Objection. Asked and
22  answered. Calls for speculation.
23   A.   I don't -- I can't even talk about their
24  average shareholder. I'm not that familiar with

Page 272

1  it. It would be interesting. I don't know how
2  much weight they put on it. Every situation is
3  unique.
4    Q.    But it would add to the total mix of
5  information that a reasonable shareholder would
6  want to consider, right?
7       MR. BURKE: Objection. Calls for
8  speculation; calls for a legal conclusion.
9    A.   It might; it might not. I don't know.
10   Q.   Mr. Carey, I've put before you some
11  quotes, various documents that suggest to me that
12  Mr. Hanauer did not believe the merger was in the
13  best interest of OHSL shareholders, and he wasn't
14  in favor of the transaction. You're not convinced
15  by the documents that I've shown you, correct?
16      MR. BURKE: Objection. Calls for
17  speculation. You may answer.
18   A.   I don't know -- I'm not sure what to
19  believe. I mean, I've seen what you've provided,
20  and we've talked through all this stuff today. The
21  guy voted for the deal.
22      My best guess is that he wanted to keep
23  it as an independent company so he could be CEO,
24  but he felt this was the right transaction for the

Page 273

1  company, so he voted his shares but would have
2  preferred to stay independent. That's what a lot
3  of people want to do.
4      I mean, I'm not -- I'm not sure. I
5  don't know what was really going through the guy's
6  mind. I've seen the different documents and
7  statements from him, but I can't read Ken Hanauer's
8  mind as to why he was -- why he did what he did.
9    Q.    Okay. And I don't believe any of my
10  questions have asked you to read Ken Hanauer's
11  mind, so I just want that to be clear.
12      By the way, with respect to the
13  Provident-National City merger, I found that
14  section that I was looking at. Would you just take
15  a look at what I've highlighted on page 2.
16   A.   (Examining document.) Um-hum. I read
17  it.
18   Q.   So if a Provident shareholder did not
19  vote on the National City merger, that would be
20  counted as a no vote, correct?
21   A.   I don't know. I'm still not sure.
22   Q.   Okay. You're not sure, but let me just
23  read this sentence into the record. This is the
24  sentence I've directed your attention to.

69 (Pages 270 to 273)

Page 274

1    A.    I gotcha.
2    Q.    Therefore, if you do not vote or abstain
3    from voting, your failure to vote or your
4    abstention will count the same as a vote against
5    approving the merger and the related transactions.
6    A.    I think that's an ineffective
7    interpretation of the way it really works, but it's
8    different than how one would think about it.
9    Q.    Isn't that exactly the same way that the
10    OHSL transaction worked?
11    A.    I don't remember, but maybe -- it maybe
12    gets you to the same place.
13    Q.    Let's take a look at page 18 of --
14        MR. BURKE:  Can we take a five-minute
15    break?
16        MR. BRAUTIGAM:  Sure.
17        (A brief break was taken from 2:45 to
18    2:52, 7 minutes.)
19  BY MR. BRAUTIGAM:
20    Q.    Would you pick up Exhibit 74 and turn to
21    page 11, please.
22    A.    Okay.
23    Q.    Were you aware that a vote of 63,000
24    shares would have stopped the OHSL merger from

Page 275

1    going forward?
2        MR. BURKE:  Objection.  Calls for
3    speculation; assumes facts not in evidence.
4    You may answer.  What is the number on this,
5    Mike?
6        MR. BRAUTIGAM:  74.  If you don't have
7    it, I can make you a quick copy if you like.
8        MR. BURKE:  I'll just look off of his.
9    A.    I wasn't aware of it.
10    Q.    Okay.  Let me represent to you that my
11    client, Walter Thiemann voted 40,000 shares in
12    favor of the merger, but he's testified that he
13    would have changed his vote had he known the true
14    facts.  So if you do the math, that leaves 23,000
15    shares, correct?
16        MR. BURKE:  Objection.  Calls for
17    speculation as to Mr. Thiemann and also
18    misstates the record.
19    A.    Yeah, I don't know.  I mean, you've got
20    some numbers here.  I don't know how accurate any
21    of them are.  I mean, how would I know that other
22    than you just saying that it is.
23    Q.    Okay.  Well, you can check in the proxy
24    materials that OHSL shares outstanding were

Page 276

1    2,503,470, correct?
2        MR. BURKE:  Objection.  The document
3    speaks for itself.  It is what it is.
4    Mr. Carey cannot sign off on your expert's
5    opinion, Mike.  I guess I don't understand
6    this line of questioning.
7    Q.    Okay.  On page 12, do you dispute any of
8    the math?
9        MR. BURKE:  Objection.  Relevance.
10    A.    I don't have a calculator with me.
11    Q.    I've addressed that.  (Handing witness
12    calculator.)  Now you do.
13    A.    Do you want me to calculate the math?
14    Is that it?
15    Q.    You can if you want.  I'm simply asking
16    if you dispute any --
17    A.    I don't affirm it and I don't dispute
18    it.  I'm not here to affirm the math in this
19    calculation, am I?
20    Q.    You're here to answer my question.
21    That's a fair question.
22        MR. BURKE:  I think he answered your
23    question.
24    Q.    Okay.  Do you agree that the dissension

Page 277

1    by board members in a merger or acquisition is
2    perceived as being detrimental to the completion of
3    the transaction?
4        MR. BURKE:  Objection.  Calls for
5    speculation; vague; no context.
6    A.    I mean, I don't think I could comment on
7    a general commentary like that.  It could be or it
8    could not be.  It would depend upon the
9    circumstances.
10    Q.    In the circumstances of this particular
11    merger, do you believe if there was any dissension
12    by any board member for any reason --
13    A.    I have no idea, Mike, whether that would
14    have been an issue or not.
15    Q.    An issue for whom?
16    A.    To complete the merger.
17    Q.    Would it be detrimental to the
18    completion of the transaction?
19        MR. BURKE:  Objection.
20    A.    I don't know.  I don't know if it would
21    or wouldn't.  I don't know how I could determine
22    that now after the fact.
23    Q.    Would it assist the completion of the
24    merger?

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 278

1    MR. BURKE: Objection. Calls for
2  speculation.
3    A.   I think I tried to answer that. I don't
4  know whether in this circumstance, with what was
5  going on with this company, whether -- what the
6  impact would have been of that kind of dissension.
7    Q.   Okay.
8    A.   I could only speculate. I don't think
9  that's really helpful for me to guess what it might
10 have done.
11   Q.   Okay. Under what circumstances would
12 dissension by any OHSL board member have assisted
13 in the effectuation of the merger?
14   MR. BURKE: Read that question back,
15 please.
16   (The question was read back.)
17   MR. BURKE: Objection. Calls for
18 speculation.
19   A.   Yeah, I don't -- I don't know of a
20 specific circumstance where it would help or hurt.
21 I don't really think it's appropriate for me to try
22 to speculate on what that would do. I think there
23 are cases where it could help or hurt.
24   Q.   Mr. Carey, I want to make absolutely

Page 279

1  sure I have this straight.
2    A.   Okay.
3    Q.   It's your testimony as Provident's CFO
4  under oath that you believe there are some
5  circumstances where dissension by board members of
6  the company to be acquired could help effectuate
7  the merger; is that right?
8    MR. BURKE: Objection. Asked and
9  answered.
10   A.   Well, I'll revise it a little bit just
11 to get it clear. I think there are circumstances
12 where dissension by a board member in a transaction
13 would not prevent and/or impact a merger from
14 getting completed. I'm not sure that dissension
15 would help get completed. So if that's what I
16 said, I was probably speaking too quickly.
17   Q.   There's a difference between preventing
18 the merger from being effectuated and impacting the
19 merger, correct?
20   MR. BURKE: Objection. Vague;
21 speculation; no context.
22   A.   There's a difference between the word
23 prevent and impact, yes.
24   Q.   Do you believe that dissent by one or

Page 280

1  more members of OHSL's board would have added to
2  the total mix of information that a reasonable
3  shareholder would want to consider?
4    MR. BURKE: Objection. Speculation;
5  calls for legal conclusion?
6    A.   I don't know what a reasonable
7  shareholder would have considered important for
8  that.
9    Q.   Do you agree with our expert's
10 conclusion that Mr. Herron's resignation was
11 material information?
12   MR. BURKE: Objection. Calls for
13 speculation; legal conclusion.
14   A.   I wouldn't be able to comment on that.
15 Your expert has apparently done a lot of work that
16 I haven't done on it. I'm not sure -- you know,
17 there's more of a legal question, I think, anyway.
18   Q.   Well, it's a simple concept. You have a
19 director; he's not in favor of the transaction; he
20 resigns in part in protest.
21   MR. BURKE: Objection.
22   Q.   Do you believe that's material
23 information?
24   MR. BURKE: Misstates the record; calls

Page 281

1  for speculation; asked and answered.
2    A.   I would say, as I said earlier when you
3  asked that question, I don't know what factors one
4  would determine -- should look at and determine
5  relative that type of thing happening and whether
6  that would be material or not.
7    So I would consult with legal counsel
8  about whether they thought that was important or
9  not. It's not a normal situation, I don't think,
10 but there must be some precedent for it.
11   Q.   The resignation of a director?
12   MR. BURKE: Objection to form.
13   A.   In the midst of a transaction.
14   Q.   Okay. Glad you asked that. Glad you
15 suggested that. Are you an HP shareholder, by
16 chance?
17   A.   Hewlett Packard?
18   Q.   Yes.
19   A.   I have to think about that for a
20 second. I don't think I am, but I'm familiar with
21 the company.
22   Q.   Were you in 2001 and 2002?
23   A.   I don't think so.
24   Q.   You testified that you read the Wall

71 (Pages 278 to 281)

Page 282

1  Street Journal for a number of years, so you're
2  familiar with the HP/Compaq merger, correct?
3    A.   Yes.
4    Q.   And you know who Walter Hewlett is,
5  correct?
6    A.   Yes.
7    Q.   And you know that Mr. Hewlett served on
8  Hewlett Packard's board in 2001, correct?
9    A.   Um-hum.
10   Q.   And you know that Mr. Hewlett, after
11  voting in favor of the merger with Compaq, resigned
12  in protest of the merger, correct?
13         MR. BURKE:  Objection.  Calls for
14   speculation.  You may answer.
15   A.   Yes, I do know that he resigned.  I know
16  that he resigned.  I don't think -- and he was not
17  in favor of the transaction.
18   Q.   Okay.  After he resigned, Mr. Hewlett
19  actively opposed the transaction, correct?
20   A.   That's correct.
21   Q.   Did that have an effect on the market?
22  I'm not asking if it changed the outcome, but did
23  it have an effect on how the merger was perceived
24  in the market?

Page 283

1    A.   I have no idea.
2         MR. BURKE:  Objection.  Calls for
3   speculation.
4    A.   I couldn't answer that question.
5    Q.   What factors would you need to know in
6  answering that question?
7    A.   I don't know how you make that judgment.
8  That's probably beyond my scope of expertise.
9    Q.   Okay.  Would you take a look at --
10   A.   He was ineffective as you -- you're not
11  asking about, but he did not succeed in his quest;
12  and the jury is now saying that it was a good
13  transaction.
14   Q.   The market is saying that?
15   A.   Right.
16   Q.   But whether he succeeded or not,
17  Mr. Hewlett's views were certainly disclosed to the
18  investing public, correct?
19         MR. BURKE:  Objection.
20   A.   He disclosed them.
21   Q.   And he had a lot of money to bank roll
22  the (inaudible) of his views, correct?
23   A.   I wouldn't want to speculate on how much
24  money he had.  I think he was a big shareholder,

Page 284

1  bigger than anyone on this board.
2    Q.   I'm not sure in terms of percentage, but
3  certainly in terms of dollar amount.
4    A.   Might have been.  The foundation was
5  pretty big.
6    Q.   Okay.  Could you read paragraph 31 to
7  yourself, please.
8    A.   (Examining document.)  Okay.  I read it.
9    Q.   You testified in your previous answer
10  that you weren't sure how to evaluate Mr. Hewlett's
11  position.  Does a 17 percent increase in the price
12  of HWP shares coupled with dramatically increased
13  trading volume suggest that Mr. Hewlett's views had
14  some effect on the market?
15         MR. BURKE:  Objection.  Calls for
16   speculation.
17   A.   There's so much speculation that I'd
18  have to do on a deal this complex.  I think it's
19  really totally an inappropriate question.  I
20  couldn't possibly comment on it.  I don't know what
21  happened to price movements before and after the
22  original deal was announced.
23         I'm not capable to really comment on the
24  Hewlett Packard deal.  I've read about it

Page 285

1  extensively; but even with that acknowledgment that
2  I read about it extensively, I wouldn't be able to
3  comment on that having any relationship to what
4  went on at Provident and OHLC.
5    Q.   OHSL?
6    A.   OHSL.  It's getting late in the day.
7    Q.   Mr. Carey, this is a relatively simple
8  concept though, isn't it?  Mr. Hewlett is a
9  director; he votes in favor of the merger as a
10  director; changes his mind; resigns; and announces
11  his active opposition to the merger; correct?
12  That's what we have before us, right?
13         MR. BURKE:  Objection.
14   A.   I don't think it's a very -- I don't
15  think it's a valid comparison.  This is a company
16  buying a PC maker, effectively, in a business that
17  a lot of people thought was a terrible business.
18  They're not analogous at all, these two
19  transactions.
20   Q.   What about the concepts of the
21  director's impact on a proposed merger --
22   A.   I don't think they're analogous --
23         MR. BURKE:  Objection.
24   A.   -- because I think the transactions are

72 (Pages 282 to 285)

Page 286

1  so dissimilar.
2     Q.    Because of the nature of the industries?
3     A.    People didn't like the PC industry, so
4  that's why they were uncertain about it. You know,
5  I don't think they're analogous at all.
6           I can't try to make any kind of
7  comparison between the two, because I think that if
8  you were comparing two bank deals, maybe there
9  would be some reason -- it would still be me
10 speculating -- but using Hewlett Packard as a
11 comparison I find to be extraordinary that someone
12 would introduce that as some relevant fact to our
13 deal, extraordinary that you could get someone to
14 do that.
15    Q.    Do you think Disney would be a better
16 example?
17    A.    No, I don't think Disney would be a good
18 example either.
19    Q.    I'll tell that to Mr. Cook when he gets
20 back. I think he suggested that.
21    A.    Yeah, well, I don't think Disney's a
22 very good one.
23    Q.    Do you believe that Mr. Hewlett's voice
24 against the transaction was perceived as a credible

Page 287

1  threat to the transaction?
2           MR. BURKE: Objection. Calls for
3     speculation.
4     A.    I don't -- I really don't know whether
5  it was or not.
6     Q.    Okay. Do you agree with the statement
7  that the disclosure of opinions and actions of
8  board members is an important source of information
9  to investors?
10          MR. BURKE: Objection. Calls for
11    speculation; no foundation.
12    A.    Yeah, I don't agree or disagree with
13 that statement. I couldn't possibly. It would
14 depend on what they had to say, frankly; but I
15 still -- you know, I can't make a judgment on just
16 the statement of whether they -- their particular
17 viewpoints.
18    Q.    Do you agree that dissension by board
19 members in a merger situation signals uncertainty
20 and can affect the ultimate outcome of the
21 shareholder vote?
22          MR. BURKE: Objection. Speculation; no
23    foundation.
24    A.    I can't comment on what the dissension

Page 288

1  by board members means without knowing what it's
2  about. Just dissension in itself could be for
3  reasons that might not create uncertainty in the
4  deal. Who knows? It could be for a lot of
5  different things.
6     Q.    How about a director resigning in part
7  in protest?
8           MR. BURKE: Objection. Speculation;
9     assumes facts not in evidence.
10    A.    I have no idea why the guy resigned.
11    Q.    Would you pick up document 106, please.
12    A.    Um-hum.
13    Q.    Would you turn to the second attachment.
14 It's the affidavit of Thomas M. Herron, and would
15 you read that to yourself, please.
16    A.    Is there a page number on that?
17    Q.    It's page number 1.
18    A.    This one here (indicating)?
19    Q.    Yeah. If you go back three pages, that
20 will be it.
21    A.    Do you want me to read this whole thing?
22    Q.    Why don't you read --
23          MR. BURKE: Obviously, Counsel, this is
24    objectionable because you're not giving him

Page 289

1  the full story.
2     Q.    Why don't you read paragraph 4.
3     A.    Okay. So he resigned in part because he
4  opposed the OHSL merger?
5     Q.    Right.
6           MR. BURKE: Object. That is what is
7     being represented to you. I object to that
8     because that's an incomplete and inaccurate
9     representation, as Mr. Brautigam knows.
10    Q.    Mr. Carey, this is an affidavit,
11 correct?
12          MR. BURKE: Objection. Calls for
13    speculation.
14    A.    This is a copy of a paper that you've
15 given me. Whether it's an affidavit, I have no
16 idea.
17    Q.    Does it say affidavit?
18    A.    It does say affidavit.
19    Q.    On the fourth page of the document, does
20 it appear to have Mr. Herron's signature?
21    A.    It appears to. I have no idea that's
22 his signature. It's certainly signed by somebody.
23    Q.    Does it appear to have a notary stamp as
24 well?

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 290

1    A.    It has a notary stamp.
2    Q.    Is this consistent with your
3  understanding of what an affidavit is?
4        MR. BURKE: Objection. Calls for legal
5    conclusion.
6    A.    I would refer that to legal counsel
7  whether this is. I'm not going to say it isn't,
8  you know. I don't have any idea whether it's an
9  affidavit.
10    Q.    Okay. Now, you testified a moment ago
11  you didn't have any idea why Mr. Herron resigned,
12  right?
13    A.    Right.
14    Q.    Do you now have an idea why Mr. Herron
15  resigned?
16        MR. BURKE: Objection. Calls for
17    speculation; and this is, as you know,
18    inaccurate and incomplete, Mr. Brautigam, and
19    I object on that basis.
20        MR. BRAUTIGAM: I don't need speaking
21    objections, and I don't agree it's inaccurate
22    or incomplete.
23        MR. BURKE: Would you prefer to give to
24    the witness the entire record with respect to

Page 291

1  his resignation to be fair, or not? Obviously
2    not.
3        MR. BRAUTIGAM: Jim, when I'm done, you
4    can make whatever representations and ask
5    whatever questions you'd like.
6        MR. BURKE: Objection. Calls for
7    speculation; no firsthand knowledge of this.
8    A.    The only thing I would say is the
9  statement before here reads -- it says he resigned
10  in part because he opposed the merger.
11    Q.    Do you believe --
12    A.    That's what this statement says.
13    Q.    Right. And do you believe that that's
14  material or potentially material information?
15    A.    I have no idea what -- no, I don't
16  believe that it is or it isn't.
17    Q.    Okay. What's the --
18    A.    I have no idea why he opposed it if he,
19  in fact, did. What if he opposed it for all the
20  wrong reasons?
21    Q.    Well, finish paragraph 4. What does it
22  say?
23    A.    I believe that the best business
24  (inaudible) for OHSL at the time was to remain

Page 292

1  independent.
2    Q.    You may or may not agree, but that's a
3  legitimate position for --
4    A.    The market doesn't agree with that.
5    Q.    -- a director to have, correct?
6    A.    So I would say that, you know...
7    Q.    What do you --
8    A.    But again, I don't know. All I can
9  say -- what's your question for me? I'm not
10  refuting anything you have written here. I'm not
11  trying to bicker with you here, but this says that
12  he was opposed to the merger, and I -- I mean,
13  fine. Do I think that is material information?
14        MR. BURKE: Objection.
15    A.    I have no idea. I mean, I'm not going
16  to comment. I don't know whether it is or it
17  isn't. I don't dispute that's what this document
18  says, and it looks like an affidavit.
19        Apparently, he also has some other
20  thoughts that Jim has mentioned, but I'm not
21  disputing that this document says that. What I am
22  saying is I don't feel that if this were true, that
23  that is something that would change the opinion of
24  the investors.

Page 293

1    Q.    Is it something that the investors would
2  want to consider?
3        MR. BURKE: Objection.
4    A.    I don't know.
5        MR. BURKE: Calls for speculation.
6    A.    I'm really not sure, as I said earlier,
7  if you have someone that resigns for some reasons,
8  some of which obviously relate to the merger,
9  whether that's factual information that should be
10  given to investors prior to a vote. I'm not sure
11  what the answer is to that.
12    Q.    When did Mr. Herron's resignation become
13  effective?
14        MR. BURKE: Objection. Speculation; no
15    foundation.
16    A.    I don't know personally. This document
17  says effective July 30th.
18    Q.    Right. And how many days before the
19  final OHSL-Provident merger was signed by you is
20  July 30th?
21    A.    When was it signed by me? August 3rd?
22  Is that what it was? August 2nd?
23    Q.    2nd.
24    A.    A few days before.

74 (Pages 290 to 293)

Page 294

1    Q.    Okay. Would you turn to page 63 of the
2    proxy materials again. Mr. Herron's name does not
3    appear in that table, does it?
4    A.    It doesn't look like it appears.
5    Q.    What's the date of that table?
6        MR. BURKE: Let the witness read it so
7    he can see what it is.
8    A.    It says July 31st.
9    Q.    And that's one day after Mr. Herron's
10   resignation became effective, correct?
11   A.    Um-hum.
12   Q.    Who picked the date July 31st, 1999, for
13   that table?
14   A.    No idea.
15   Q.    Does it appear to you that the table is
16   misleading in that context?
17       MR. BURKE: Objection.
18   A.    No, it doesn't appear to me. I mean, I
19   don't know what the SEC rules are on what you
20   should put in here. I don't think I picked the
21   date, but I don't know what the reason was for
22   picking the date. These dates are probably
23   typically picked on month end. Maybe they're not.
24   Q.    Are they typically picked the day after

Page 295

1    a director resigns?
2        MR. BURKE: Objection. Speculation.
3    A.    I don't really know when they're
4    typically picked, frankly. Usually, I think people
5    try to get them current, but...
6    Q.    Are you familiar with something known as
7    a change of control contract?
8    A.    The general term, yeah.
9    Q.    It's also sometimes referred to as a
10   golden parachute, correct?
11   A.    Sometimes.
12   Q.    Do you have one?
13       MR. BURKE: Objection.
14   A.    Yes.
15   Q.    It calls for three times your annual
16   salary plus bonus; is that right?
17   A.    I don't think it's relevant. I don't
18   think it could possibly be relevant to what we're
19   doing here.
20   Q.    Does it call for three times your annual
21   salary?
22   A.    Why is that relevant?
23       MR. BURKE: What's the relevance,
24   Mr. Brautigam? He's told you he has one.

Page 296

1    What's the relevance?
2    Q.    What are the terms of your golden
3    parachute?
4        MR. BURKE: What's the relevance?
5    A.    Why is that relevant to this deposition?
6        MR. BURKE: I mean, this has nothing to
7    do with the Thiemann case, as you know. I'm
8    giving you great latitude in going into
9    National City. Why does that matter?
10   Q.    Mr. Carey, are you going to answer my
11   question?
12       MR. BURKE: We're going to ask you why
13   it's relevant, Mr. Brautigam.
14       MR. BRAUTIGAM: I'm not justifying every
15   individual question. I'm asking a question, I
16   believe it's relevant, and that's it.
17       MR. BURKE: Then we'd like to try to
18   address this with the magistrate at our
19   conference that's coming up to see whether or
20   not this is relevant.
21       MR. BRAUTIGAM: Are you directing him
22   not to answer?
23       MR. BURKE: Until we have an opportunity
24   to speak to the magistrate, yes.

Page 297

1        MR. BRAUTIGAM: Can you explain for the
2    record why you allowed Mr. Hoverson to answer
3    the question, but Mr. Carey you're directing
4    not to answer just as you've allowed --
5        MR. BURKE: Because the witness
6    obviously doesn't want to answer the question.
7    He feels this is personal financial
8    information which you know has nothing to do
9    with the case. Besides, the other thing is I
10   think it's already publicly disclosed, is it
11   not?
12   A.    Yeah, the information is publicly
13   available.
14       MR. BURKE: It's out there.
15   A.    It's about what you said.
16       MR. BURKE: It's probably in the Nat
17   City proxy materials.
18   A.    It's not precisely what you said, but
19   it's about that. I didn't think it was that
20   relevant. Let's move on.
21   Q.    Do you intend to stay with National City
22   after the merger?
23   A.    No.
24   Q.    What are you going to do?

Page 298

1    A.    I'm going to get another job, not with
2  Nat City.
3    Q.    Do you have one lined up?
4    A.    Yes, I do.
5    Q.    Will you be leaving the Cincinnati area?
6    A.    Yes, I will.
7    Q.    Do you have any idea what your new
8  address will be?
9    A.    I'm not disclosing that publicly yet
10  because it hasn't been announced.  Of course I know
11  what the address is, but it's not been announced
12  publicly.
13    Q.    Well, I'm entitled to your address --
14  your new address.
15    MR. BURKE:  No, you're not entitled to
16    it.
17    A.    We'll get you the address when you need
18  it, Mike.  Come on.  I'm not disappearing.  All
19  right?
20    MR. BRAUTIGAM:  Do I have your
21    representation that you will provide me with
22    Mr. Carey's new contact information?
23    MR. BURKE:  You have my representation
24    that if you need to get in touch with

Page 299

1  Mr. Carey, contact me, and I will get in touch
2  with Mr. Carey.  I will make sure that I am
3  able to get in contact with Mr. Carey at your
4  request.
5    MR. BRAUTIGAM:  Good enough.
6    A.    They'll be able to contact me.  That's
7  not an issue.
8    Q.    Would you turn to page 18 of the proxy
9  materials.
10    A.    Okay.
11    Q.    Toward the bottom, there's a section
12  called the acquisition, and the second subheading
13  is background of the acquisition.  Do you see that?
14    A.    Yes, I do.
15    Q.    And I believe we established earlier in
16  the day that it was your belief that the
17  shareholders of a public company should be able to
18  determine who their directors are at any particular
19  time; is that correct?
20    MR. BURKE:  Objection.  Misstates prior
21    testimony.  I don't recall that.
22    Q.    If I misstated that, I didn't mean to.
23    A.    No, I think you got it about right.
24    Q.    I got it about right?

Page 300

1    A.    Yeah.
2    Q.    Okay.  The first sentence of the first
3  paragraph on the background of the acquisition
4  refers to the board of directors of OHSL.  Do you
5  see that?
6    A.    Um-hum.
7    Q.    And it refers to a special meeting on
8  August 2nd, 1999.  Do you see that?
9    A.    Yes, I do.
10    Q.    And as of August 2nd, 1999, the OHSL
11  board had seven directors, correct?
12    MR. BURKE:  Objection.  Calls for
13    speculation.
14    A.    I don't remember how many board members
15  they have.  I think this document said they had
16  seven.
17    Q.    It's page 57.
18    A.    So I assume it's seven.
19    Q.    Okay.  Now, would you turn to page 19.
20    A.    Okay.
21    Q.    Top of the page, first line, gives some
22  background of OHSL conversion from a mutual company
23  or a stock company.  Do you see that?
24    A.    Um-hum.

Page 301

1    Q.    And on the first line, continuing onto
2  the second line, it says the OHSL board of
3  directors.  Do you see that?
4    A.    Since that time, the OHSL board of
5  directors -- is that what you're saying?
6    Q.    Yes.
7    A.    Yes.
8    Q.    That goes back to 1993, correct?
9    MR. BURKE:  Objection.  Calls for
10    speculation.  I mean, you didn't even set up a
11    foundation for this discussion with this
12    witness.  Obviously, he was not at Provident
13    in 1993.  You know that.  Objection;
14    speculation.
15    A.    I think the sentence is referring -- you
16  know, since it follows the 1993 -- is referring to
17  1993 and forward.
18    Q.    And how many directors did OHSL have
19  from the time it became a public company until July
20  31st, 1999?
21    MR. BURKE:  Objection.  Calls for
22    speculation.
23    A.    I have no idea.
24    Q.    Let me represent to you that it had

Page 302

1  eight directors.
2      A.   Okay.
3      Q.   Now, do you see the reference to the
4  board --
5      A.   Um-hum.
6      Q.   -- in the next paragraph?
7      A.   Yes.  The board continued to allocate
8  its time.
9      Q.   Right.  And that's talking about
10  February of 1999, correct?
11     A.   Um-hum.  Well, there's a specific
12  reference to February of 1999.
13     Q.   Right.  And how many directors did the
14  reference "the board" refer to?
15         MR. BURKE:  Objection.  Calls for
16     speculation.
17     A.   I don't know.  I don't know what -- I
18  don't know how many they had then.
19     Q.   Okay.  Well, I represent that they had
20  eight.
21     A.   Okay.  Then they had eight.  I don't
22  know.
23     Q.   Okay.
24     A.   They could have had ten at that time for

Page 303

1  all we know.
2      Q.   No, that's not true.  They had eight.
3      A.   I know, but that's just because you're
4  representing it.  I have no idea, Mike.  You're
5  asking me a question about something I wouldn't
6  possibly know the answer to.
7      Q.   Well, I think we can piece it together.
8  On page 57, the OHSL board has seven directors,
9  correct?
10         MR. BURKE:  Objection.
11     A.   They could have had more or less.
12         MR. BURKE:  Objection.  He has no
13     foundation for this.  There's no firsthand
14     knowledge of any of this.
15     A.   My experience with boards is that board
16  sizes range from 12 to 24 and can change with some
17  frequency.  At least at the last company I worked,
18  there was a lot of change.  Over that 13 years I
19  was there, our board size went from 12 to 24,
20  roughly -- rough numbers.  Go look at it.  You'll
21  see.  There was a lot of movement.
22     Q.   Mr. Carey, you said that your experience
23  is that boards have 12 to 24 members, correct?
24     A.   Yeah.  Well, bigger companies.  Maybe

Page 304

1  that's too far of a generalization.
2      Q.   How many board members does Provident
3  have?
4      A.   Six.  The larger companies have the
5  bigger boards.
6      Q.   Do you see the paragraph that begins, At
7  a meeting of the OHSL board of directors in April
8  1999?
9      A.   Um-hum.
10     Q.   How many directors does that refer to?
11         MR. BURKE:  Objection.  Calls for
12     speculation; no foundation.
13     A.   I don't know because it really is
14  talking about an ad hoc committee.  I don't know.
15  It doesn't say.
16     Q.   Turn the page to page 20.  In May 1999,
17  the OHSL board of directors met.  Do you see that?
18     A.   Um-hum.
19     Q.   Is that referring to the full board?
20         MR. BURKE:  Objection.  Calls for
21     speculation.
22     A.   I don't know if all the board members
23  were at a particular meeting or what.  Who would
24  know?

Page 305

1      Q.   If you read the board minutes, you'd
2  know, right?
3          MR. BURKE:  Ask him if he's read the
4      board minutes then.
5      A.   I don't think I read the board minutes.
6      Q.   Okay.  Is it typical for someone on the
7  acquiring side to read the board minutes of the
8  acquiring company?
9      A.   Um-hum.
10     Q.   Yes?
11     A.   It's typical.  I don't know if -- it
12  depends.  It's typical there will be some review of
13  the board minutes.
14     Q.   Did someone from Provident review OHSL's
15  board and committee minutes for, say, the last five
16  years?
17     A.   Probably.  I don't know if they would
18  have gone back five years, but I would presume that
19  there would be some review of the board minutes by
20  someone from either Provident or someone
21  representing Provident.
22     Q.   Whom do you believe was given that task?
23     A.   I don't remember.  It could have been
24  legal, finance, or outside legal counsel.  It would

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 306

1 have been one of those three groups.
2   Q.   Do you have reason to believe that this
3 actually took place with respect to this specific
4 transaction?
5       MR. BURKE: Objection.
6   A.   I can't remember. I would -- I can't
7 remember whether it took place or not.
8   Q.   Did you ever see a report about the
9 board minutes?
10   A.   I don't remember five years ago whether
11 there was a report about it. It would -- usually,
12 you're looking for issues that might be in a board
13 -- in minutes. So if there aren't issues, there
14 wouldn't be much of a report.
15   Q.   If there were issues, would there be a
16 report?
17       MR. BURKE: Objection. Calls for
18 speculation.
19   A.   If they were deemed significant by the
20 person doing the review.
21   Q.   Would dissent by board members be deemed
22 significant by you?
23       MR. BURKE: Objection. Calls for
24 speculation.

Page 307

1   A.   It would depend what it related to. I
2 don't know that in the context of a merger it would
3 be relevant at all. It wouldn't be the kind of
4 thing we would be looking for.
5   Q.   If directors had voted against the
6 merger and then switched their votes, is that
7 something that would be significant to you as the
8 CFO of the acquiring company?
9       MR. BURKE: Objection. Calls for
10 speculation.
11   A.   That kind of goes back to what we said
12 earlier.
13       MR. BURKE: Assumes facts not in
14 evidence. You may answer.
15       (Off-the-record discussion.)
16       MR. BURKE: Objection. Calls for
17 speculation; assumes facts not in evidence.
18 You may answer.
19   A.   I don't know, as I said earlier, if
20 there was dissent, whether that would be something
21 that would -- I think you'd have to have more
22 reason -- you would have to understand the full
23 depth of the dissent, but I don't know whether that
24 would cause a concern or not myself. I mean, it's

Page 308

1 such an individual situation.
2   Q.   In this situation, if there was dissent
3 and you knew about it in 1999, would it have caused
4 you to inquire further?
5       MR. BURKE: Objection. Calls for
6 speculation.
7   A.   I don't -- I don't know. I doubt it,
8 but I don't know.
9   Q.   Did you have the ability to pick up the
10 telephone and call Mr. Hanauer and say, Hey, I've
11 heard certain things about the merger; I'd like to
12 know more?
13       MR. BURKE: Objection. Speculation.
14   A.   I'm not sure I understand the question,
15 I've heard certain things about the merger. What
16 do you mean?
17   Q.   In other words --
18   A.   During due diligence?
19   Q.   Let me give you an example. During the
20 due diligence phase or even after the merger as you
21 were trying to fit the pieces together, was it
22 ethical and proper for you to call Mr. Hanauer with
23 questions about the merger?
24       MR. BURKE: Objection. Legal

Page 309

1 conclusion. You may answer.
2   A.   There was something preventing me, and I
3 think I had some conversations with Ken; some face-
4 to-face, some over the phone. I don't remember
5 specifically, but I'm sure we had some
6 conversations.
7   Q.   If you had known that a director had
8 resigned in part in protest three days before the
9 merger agreement was finalized, would you have
10 asked Mr. Hanauer about it?
11       MR. BURKE: Objection. Speculation.
12   A.   Yeah, I don't know, and I suspect that
13 someone else might have asked that question other
14 than me perhaps, but I don't know.
15   Q.   Mr. Hoverson?
16   A.   Perhaps, yeah.
17   Q.   If you had known that Mr. Hanauer was
18 not in favor of the merger despite what the proxy
19 materials say, would you have inquired further?
20       MR. BURKE: Objection. Calls for
21 speculation; assumes facts not in evidence.
22   A.   I don't know the answer to that. I
23 would have to see what the circumstances were at
24 the time. I mean, he voted for it.

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 310

```
 1      If I heard that he was not in favor of
 2  it, I suppose I would have talked to him, but it
 3  wouldn't have -- I mean, I don't know how to make a
 4  judgment on what I would have done three or four
 5  years ago or five years ago.
 6      Q.   What would you have said?
 7          MR. BURKE:  Objection.  Speculation.
 8      A.   I don't know what I would have said at
 9  the time.  I really don't.
10      Q.   If you had known that Mr. Hanauer
11  intended to vote his personal shares against the
12  merger, would you have discussed this issue with
13  him?
14          MR. BURKE:  Objection.  Speculation.
15      A.   I don't know whether I would have taken
16  that up -- that issue or not.  If you didn't think
17  it would affect the overall vote, I suspect I
18  wouldn't have.  It's a personal decision.
19      Q.   And your answer is based on the
20  conclusion that it may not have affected the
21  overall vote, correct?
22          MR. BURKE:  Objection.  Speculation.
23      A.   My answer is that you get to vote your
24  shares however you want to vote them.
```

Page 311

```
 1      Q.   Is there a difference in your mind
 2  between issues that would change the outcome of the
 3  vote as opposed to issues that would add to the
 4  total mix of information that a reasonable
 5  shareholder has the right to consider?
 6          MR. BURKE:  Objection to form;
 7  speculation; legal conclusion; vague.
 8      A.   I'm not sure.  Why don't you repeat
 9  that, Mike.
10          (The question was read back.)
11          MR. BURKE:  Same objections.
12      A.   There's a difference between those two
13  concepts, I think.
14      Q.   Back on page 20 of the proxy materials,
15  do you see a reference to, on June 22nd, 1999, the
16  board?
17      A.   Um-hum.
18      Q.   And does it refer to the whole board?
19          MR. BURKE:  Objection.  Calls for
20  speculation.
21      A.   I don't know.
22          MR. BURKE:  He's told you time --
23      A.   I don't know.
24          MR. BURKE:  -- and time again,
```

Page 312

```
 1  Mr. Brautigam, he doesn't know anything about
 2  these details.
 3          MR. BRAUTIGAM:  Okay.
 4          MR. BURKE:  I mean, if you would ask him
 5  a question if he knows anything about any of
 6  the references we might be able to cut to the
 7  chase.
 8          MR. BRAUTIGAM:  It's a reasonable
 9  question because it's a joint document.  He's
10  the CFO.  Next question.
11  BY MR. BRAUTIGAM:
12      Q.   On June 15th, 1999, the board met.  Do
13  you see that?
14      A.   Um-hum.
15      Q.   Does that refer to the whole board?
16          MR. BURKE:  Objection.  Calls for
17  speculation; no foundation.
18      A.   I don't know.  I don't know whether -- I
19  can't remember whether the whole board was at these
20  meetings.  I don't certainly know -- I don't even
21  remember if the whole board was at the meeting that
22  I was at.  I really have no idea whether they were
23  -- whether they had a hundred percent attendance at
24  all of their meetings.
```

Page 313

```
 1      Q.   Okay.  Next reference.  On July 22nd,
 2  1999, the board met.  Does that refer to the whole
 3  board?
 4          MR. BURKE:  Objection.  Speculation; no
 5  foundation.
 6      A.   Again, I don't know, unless it would
 7  tell you in here; and it doesn't look like it does.
 8      Q.   Now let's jump to the chase.  This is
 9  what I'm really interested in.  The next
10  reference:  From July 22nd, 1999, to August 2nd,
11  1999, McDonald, the OHSL board, and OHSL's legal
12  counsel engaged in negotiations with Provident
13  Financial related to a definitive agreement.  Do
14  you see that?
15      A.   Um-hum.
16      Q.   Based on the documents that I've shown
17  you, does it appear to you that the composition of
18  OHSL's board changed during that period from July
19  22nd, 1999, to August 2nd, 1999?
20          MR. BURKE:  Objection.  No foundation;
21  calls for speculation as to this witness.
22      A.   I guess I have to ask a question.  I
23  don't know whether the --
24          MR. BURKE:  The question is, you have to
```

Page 314

1  answer his question.
2      A.   Yeah, I don't know whether the board
3  changed because I don't know whether this person
4  that appears to have resigned in that time period
5  was attending the meetings during any of this time
6  period.
7      Q.   Whether he was attending the meetings or
8  not, the composition of the board changed, correct?
9      A.   That's the question I was going to ask
10  you.  If you're just talking to the board
11  regardless of whether they attended the meetings or
12  not, it appears that the board changed and was
13  reduced in size to one during that time period.
14      Q.   And that's not disclosed, correct?
15          MR. BURKE:  Objection.  Misstates the
16  document.
17      A.   I don't believe it's disclosed.
18      Q.   And then on the following page, page 21,
19  at a meeting on August 2nd, 1999, the OHSL board of
20  directors unanimously approved the merger agreement
21  and the acquisition and recommended approval of the
22  merger agreement and acquisition by the
23  stockholders of OHSL.  Do you see that?
24      A.   Um-hum.

Page 315

1      Q.   And there's no indication in that
2  sentence or anywhere else in the document that the
3  composition of the OHSL board had changed between
4  July 30th, 1999, and August 2nd, 1999, correct?
5          MR. BURKE:  Objection.  Calls for
6      speculation, particularly as to the rest of
7      this document.
8      A.   Well, yeah, I guess I have no idea
9  whether this whole document talks about that change
10  in there anywhere.  This particular section doesn't
11  talk about it.
12      Q.   What do you mean you have no idea
13  whether this whole document --
14      A.   Well, I don't -- you know, it's five
15  years ago.  I don't remember what was in the
16  document.  I don't believe it was in there, but...
17      Q.   Okay.
18      A.   The document I think in here indicates
19  that there are seven board members, and I guess at
20  one time there were eight.  So people will be able
21  to see they had less board members if they were
22  looking at that if it was important.
23      Q.   Okay.  How would they be able to tell if
24  they had eight board members at one point and then

Page 316

1  they had seven board members at another point at
2  relevant times in this document?  Tell me that.
3          MR. BURKE:  Objection.  Asked and
4      answered.  You may answer.
5      A.   Well, it's hard to say because you could
6  have your board sizes broken down at interim
7  periods, but I presume they could look at the
8  annual report and see that presumably they had
9  eight at their annual report, and then they came
10  here and saw there were seven.  So they'd know
11  there were less -- one less.
12      Q.   In this document --
13          MR. BURKE:  The witness has answered.
14      A.   All those documents are incorporated by
15  reference to this thing.
16      Q.   Okay.  Tell me how a shareholder would
17  know that the composition of OHSL's board had
18  changed and when it had changed from the four
19  corners of Defendants' Exhibit 1.
20          MR. BURKE:  Objection.  Asked and
21      answered.
22      A.   I told you.  How they would do it is
23  look at the other documents that are incorporated
24  by reference here and see that it had changed.

Page 317

1  That's how they'd do it.
2      Q.   But you couldn't do it if you only had
3  Defendants' Exhibit 1 in front of you, correct?
4      A.   I don't know if you could do everything
5  you wanted to do by just this document either on a
6  whole list of other fronts.  I don't know.  To be
7  honest with you, I don't know if there's something
8  else in here that shows at one point in time there
9  were eight and now there were seven.
10      Q.   Okay.  You're familiar with the concept
11  that public documents shall not contain any untrue
12  statement of a material fact or omit to state any
13  material fact necessary in order to make the
14  statements made therein in light of the
15  circumstances under which they are made not
16  misleading?  You're familiar with that concept,
17  correct?
18          MR. BURKE:  Objection.  Calls for legal
19      conclusion.  I don't know what you're
20      referring to, but answer.
21      A.   You know, I've obviously read and am
22  familiar with that general concept.
23      Q.   Okay.  If you would like to look at it,
24  it's page A-22 of the merger agreement which you

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 318

1  read and signed.
2       Now, do you believe that the discussion
3  of the OHSL board, particularly with respect to the
4  period between July 22nd and August 2nd, 1999,
5  contains an untrue statement of a material fact or
6  omits to state any necessary material facts
7  necessary in order to make the statements made
8  therein in light of the circumstances under which
9  they are made not misleading?
10      MR. BURKE: Objection. Calls for legal
11   conclusion. You may answer.
12      A.   I would defer to legal counsel there,
13  but I guess I have to tell you I don't think that
14  there was any material information omitted there
15  anyway, but I would still defer to having legal
16  counsel say whether they agreed with that or not,
17  but my own opinion is there wasn't.
18      Q.   Do you believe that what we've been
19  talking about with respect to Mr. Herron's
20  resignation, without respect to whether it's
21  material or not, is misleading?
22      MR. BURKE: Objection. Asked and
23   answered. You may answer.
24      Q.   Are you saying that because it was not

Page 319

1  stated in there that he resigned, that that's
2  misleading? Is that the question?
3       MR. BURKE: I think so.
4       Q.   I'm talking about the concept, which
5  includes more than that. In light of the
6  circumstances under which these statements are
7  made.
8       MR. BURKE: Objection to form.
9       A.   I don't personally think that that is a
10  material misstatement of fact. I would go to legal
11  counsel for guidance, but my own opinion is the
12  fact that this own individual resigned -- no, no,
13  it doesn't trouble me.
14      Q.   If one of the Provident directors
15  resigned in part in protest of the National City
16  merger days before the merger agreement is
17  finalized and signed, would you have insisted that
18  that information be disclosed to Provident
19  shareholders?
20      MR. BURKE: Objection. Calls for legal
21   conclusion.
22      A.   I think, you know, again, we're really
23  getting into the speculating, but I don't think it
24  would be material information to any of our

Page 320

1  investors at all, by the way.
2       But I would defer to legal counsel as to
3  whether they thought it should be disclosed, but I
4  don't think it would -- I'd give you the same
5  answer. I don't think if one of our directors
6  resigned, that our shareholder base would -- not
7  knowing that would feel they were misled.
8       Q.   And that's true if a director of
9  Provident resigned in part in protest --
10      MR. BURKE: Objection.
11      Q.   -- just days before the merger was
12  finalized?
13      MR. BURKE: Calls for speculation; asked
14   and answered.
15      A.   I've answered the question, Mike. Yeah,
16  I don't think that that's -- here's what I've said:
17  My own opinion, I would defer to legal counsel; but
18  I don't think that if a director resigned -- I
19  mean, there's other facts and circumstances around
20  it. Everybody voted for the merger. This person
21  resigned. I don't think that in itself would be
22  one that I think you'd have to disclose in there in
23  our document.
24      Q.   Do you think in terms of good corporate

Page 321

1  governance, it should be disclosed whether --
2       A.   I'm not going to comment on good
3  corporate governance here.
4       Q.   Why not?
5       MR. BURKE: Objection.
6       Q.   Mr. Carey, once again, you've confused
7  this with a press conference.
8       A.   I'll just tell you I would defer to
9  legal counsel to determine if they thought that was
10  good corporate governance or not.
11      Q.   Do you think it's fair --
12      A.   I'm not sure it's a corporate governance
13  issue, by the way. It's a disclosure issue.
14      Q.   Okay. You testified previously that you
15  consider yourself a fair man. Putting material
16  aside, putting requirements aside, do you believe
17  it was fair to the OHSL shareholders not to tell
18  them that one of their eight directors had resigned
19  in part in protest days before the merger?
20      MR. BURKE: Objection. Speculation;
21   assumes facts not in evidence; misstates the
22   record; calls for speculation; and legal
23   conclusion. You may answer.
24      A.   Again, I would defer to what our legal

81 (Pages 318 to 321)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

1 counsel would advise us to do there, but I did
2 state already a couple times that I didn't think it
3 was information that needed to be included in
4 there.
5        (Off-the-record interruption.)
6 BY MR. BRAUTIGAM:
7    Q.    Would you turn to page A-2 of the proxy
8 materials, please. We've previously talked about
9 material adverse effect, right?
10   A.    Um-hum.
11   Q.    And you believe that the $25,000 number
12 is just a mistake, right?
13   A.    Yeah, it looks like a mistake to me. It
14 looks too small.
15   Q.    Would you turn to page A-19, and I'd
16 like to direct your attention to section 2.27,
17 statements true and correct. Do you see that?
18   A.    Um-hum.
19   Q.    Could you just read that to yourself for
20 a moment?
21   A.    Okay.
22   Q.    What does this mean to you as the CFO of
23 Provident, as the person who signed this document?
24        MR. BURKE: What does what?

1        MR. BRAUTIGAM: Section 2.27.
2        MR. BURKE: Objection.
3    A.    You're trying to --
4        MR. BURKE: Objection. Calls for legal
5 conclusion. I think you've got to see what
6 this is talking about. So go ahead. You can
7 answer if you can.
8    A.    I mean, in general, the information that
9 is being supplied is correct.
10   Q.    Okay. And Provident was relying on that
11 information, correct?
12   A.    Um-hum. We did our due diligence, but
13 we were relying on it also, partly.
14   Q.    And based on things that we've discussed
15 today, do you believe that any information that Oak
16 Hills provided to Provident was inaccurate?
17   A.    I'm sorry. Based on what? Based on...
18   Q.    ...our discussion here today and the
19 documents I've shown you.
20        MR. BURKE: Objection. You may answer.
21   A.    Based on the discussions we've had
22 today, do I think any of the information that Oak
23 Hills provided us was inaccurate? I don't know
24 that I'm aware of anything out of today's

1 conversation.
2    Q.    Are you troubled by anything you may
3 have learned today about the behavior of
4 Mr. Hanauer?
5    A.    No, I'm not. I'm not troubled by
6 anything I learned today about the behavior of
7 Mr. Hanauer.
8    Q.    Are you troubled about anything you
9 learned about the behavior of Mr. Hanauer after the
10 merger?
11   A.    Troubled isn't the word that I would
12 use.
13   Q.    What word would you use?
14   A.    I'd like to think of the right word,
15 but... curious, maybe; mildly surprised, perhaps.
16 You know, he didn't vote his shares, and I thought
17 that was unusual.
18        But I've seen senior executives at large
19 companies that get bought out that don't vote their
20 shares for a variety of reasons that had a lot more
21 stock than he had, I think. Well, maybe not more
22 than him, but probably a lot. People do different
23 things, but surprised, not shocked.
24   Q.    Do you know Mr. Hanauer ran the October

1 25th, 1999, OHSL special meeting that was roughly
2 comparable to the May 20th, 2004, meeting that
3 Mr. Hoverson ran?
4        MR. BURKE: Objection. Calls for
5 speculation as to that; no foundation for it;
6 also disagree with the comparison to the two,
7 but you may answer.
8    A.    I don't recall that he ran the special
9 meeting. I assume he did because he's the CEO, but
10 I didn't know whether he or one of the board
11 members ran it; but if you tell me he ran it, I'll
12 accept that.
13   Q.    Okay. He did run it.
14   A.    Okay.
15   Q.    Do you believe that it was fair -- as
16 we've previously discussed what that word means --
17 that Mr. Hanauer got up in front of the OHSL
18 shareholders and said, in substance, vote in favor
19 of this merger, knowing that he had voted 123,075
20 shares, 4.9 percent of the company, against the
21 merger?
22        MR. BURKE: Objection. Calls for
23 speculation; no foundation for this witness;
24 and also mischaracterizes the record.

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 326

1    A.    Yeah, I can't really interpret why he
2   said what he said when he voted for it but didn't
3   vote his shares for it.  I don't know what to think
4   of that.
5    Q.    I'm not asking you to interpret why.
6   I'm asking you if you think it was fair.  It's a
7   simple question.
8        MR. BURKE: Objection. Calls for
9    speculation.  He wasn't there.
10    A.    I think everybody should get to vote
11   their shares however they chose.  So he voted his
12   shares the way he decided to vote them.  I don't
13   really fully understand why, but...
14    Q.    If Joe Blow votes a hundred shares in
15   favor of or against the merger, who cares, right?
16        MR. BURKE: Objection.  What does that
17    mean?  Objection to form.  Who's Joe Blow?
18    Q.    Do you understand my question,
19   Mr. Carey?
20    A.    I mean, the specific question on Joe
21   Blow?
22    Q.    Yes.
23        MR. BURKE: Objection.
24    A.    I think I would say that if someone

Page 327

1   votes a hundred shares in most of these
2   transactions, nobody would really care about which
3   way they voted.
4    Q.    Right, and that's true if there's no
5   affiliation with the company.  You're a
6   shareholder, you own a hundred shares, no --
7    A.    Well, the size of the shares is probably
8   the bigger factor; but I'm not sure that people
9   care whether you vote 100 or 123,000.  I mean, I'm
10   not.
11    Q.    And we've already discussed
12   Ms. Preston's conclusions; some of which you agree
13   with and some of which you disagree with, correct?
14        MR. BURKE: Objection.
15    Q.    She was our expert.
16        MR. BURKE: Objection.
17    A.    I don't know whether -- how much I
18   really agreed with her.  I certainly disagreed with
19   the Hewlett Packard comparison that she made.
20   That, I remember not agreeing with.
21    Q.    Do you believe that how a board member
22   and how the CEO of a company intends to vote his
23   shares is potentially material information?
24        MR. BURKE: Objection.  I mean, I know

Page 328

1    we've asked --
2    A.    I don't --
3        MR. BURKE:  This has been asked and
4    answered a dozen times.
5    A.    I don't know how a board member or CEO
6   votes their shares is material information.  I
7   don't know that.  I would defer that to legal
8   counsel.
9        It's not something I have a lot of
10   experience with, this entire issue that this person
11   voted their shares differently than the way they
12   voted for the deal.
13    Q.    Can you just read section 3.5, financial
14   information, on page A-20 of the proxy materials to
15   yourself.
16    A.    (Examining document.)  Okay.  I got the
17   general gist of it.
18    Q.    And if I'm still looking at this
19   correctly, I think that's one long sentence; is
20   that right?
21        MR. BURKE:  What is one long sentence?
22    A.    Could be.
23        MR. BURKE:  Section 35?
24        MR. BRAUTIGAM:  Section 35.

Page 329

1    A.    Might be the longest sentence in here.
2   Let's see.  It looks like it could be.
3    Q.    And that sentence is not true, correct?
4        MR. BURKE: Objection.
5    A.    I don't know that the entire sentence
6   isn't true.
7    Q.    Well, let's go through this, and tell me
8   what parts of the sentence are true and what parts
9   are not true.
10    A.    Well, as you know, we had a restatement
11   that impacted the income we reported, and the 1999
12   amount -- I forget what it was here, but --
13    Q.    11.3 million.
14    A.    Yeah, it was probably -- it was close to
15   being material.  The other years looked like they
16   weren't.  But these statements also refer to cash
17   flows, which weren't affected.  They refer to the
18   balance sheet which would have been not material.
19        They refer to a host of other things
20   that -- you know, a big portion of what's in here
21   -- actually, this only relates to '98 in the first
22   six months.
23        So I'm really not sure that in the
24   context of what they're saying here, it's not

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 330

1 materially in compliance when I think about it
2 because you don't have the full year '99 where
3 there's the biggest impact.
4    Q.    Well, the part of the sentence that
5 starts at the very bottom of page A-20, Have been
6 prepared in accordance with generally-accepted
7 accounting principles applied on a consistent
8 basis -- and I'm skipping some stuff -- and fairly
9 present in all material respects the consolidated
10 financial position and the consolidated results of
11 operations charges in shareholder equity --
12    MR. BURKE:  Changes.
13    Q.    -- changes in shareholder equity and
14 cash flows of PFGI and its consolidated
15 subsidiaries as of the dates and for the periods
16 indicated -- that's incorrect, right?
17    MR. BURKE:  You might want to complete
18 the sentence just so the record is clear.
19    Q.    In parenthesis, subject in the case of
20 interim financial statements to normal recurring
21 year-end adjustments, none of which would be
22 material?
23    A.    Well, I wouldn't say that that was all
24 incorrect.  I would say that it's possible that

Page 331

1 part of it is incorrect; but again, if you --
2 they're talking about our financial statements, and
3 you know, it's a question.  It's likely that the
4 financial position -- let's start with the cash
5 flow since these adjustments typically didn't
6 affect the cash flows.
7    The financial position would have been
8 material -- probably materially correct.  The
9 income statement would have probably been the
10 biggest question.
11    And for the prior years, I don't think
12 those numbers were particularly material looking,
13 and we don't have the full year '99 statements in
14 here.
15    So I mean, it's -- I'm not really sure,
16 to tell you the truth.  You know we had a
17 restatement.  You've got the numbers yourself, and
18 you see how they play out; but it's not a -- it's
19 not certain as to what that would be.
20    Q.    Is it fair to say that Provident's
21 financial statements were not prepared in
22 accordance with GAAP from 2002 to 1994?
23    A.    No, I don't think that's -- that's
24 probably not fair to say.

Page 332

1    Q.    Why not?
2    A.    Because I think the earlier years were
3 clearly the material standpoint, and you're always
4 -- GAAP -- it has to be material.  It has to be --
5 if you have immaterial differences, you can still
6 be in compliance with GAAP.
7    So if it was immaterial in any of those
8 periods, those years would have been considered in
9 accordance with GAAP.
10    Q.    Do you see section 3.7?
11    A.    Um-hum, yes.
12    Q.    That talks about the pendency of an
13 injunction, judgment, order, decree, or regulatory
14 restriction as a material adverse effect on PFGI,
15 correct?
16    A.    Correct.
17    Q.    And later down, section 3.9, there's a
18 reference to all material reports and statements.
19 Do you see that?
20    A.    Um-hum, yes.
21    Q.    How are material reports defined?
22    A.    I don't know if it's defined in here.
23    Q.    What is your understanding of material
24 reports as it's used on that page?

Page 333

1    MR. BURKE:  Objection.  Foundation.
2    A.    Where does it say it again?  Where does
3 it say the word materially?
4    Q.    On the top line.
5    A.    I would say material reports would
6 primarily be the SEC and the call reports.
7    (Off-the-record interruption.)
8 BY MR. BRAUTIGAM:
9    Q.    Would you turn to page A-22 and read
10 section 3.14 to yourself, please.
11    A.    Okay.
12    Q.    That section has two long sentences,
13 correct?
14    A.    Right.
15    Q.    And the concept that's embraced in the
16 first sentence is true for the filing of all public
17 documents, correct?
18    MR. BURKE:  Objection to form.  I didn't
19 understand that question.
20    A.    Yeah, I mean, I think that's true.  I
21 mean, it's saying that the filings should not
22 contain any untrue statement of a material fact or
23 omit, you know, etc., etc.
24    Q.    Right, and it also refers to in light of

84 (Pages 330 to 333)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 334

1  the circumstances of which statements are made not
2  be misleading, correct?
3      A.    Yes.
4      Q.    And despite what we've talked about
5  today with the composition of the board,
6  Mr. Hanauer's views, you don't think anything is
7  misleading in light of the circumstances under
8  which they are made that we've discussed so far,
9  correct?
10     MR. BURKE:  Counsel, this has nothing to
11  do with OHSL.  This is a rep and a warranty of
12  Provident's.
13     MR. BRAUTIGAM:  I understand.
14     MR. BURKE:  And the proxy statement
15  didn't exist at this point.
16     MR. BRAUTIGAM:  I understand, but he
17  said that this is generally the standards for
18  all public documents.
19     MR. BURKE:  What is?
20     MR. BRAUTIGAM:  This concept.
21     MR. BURKE:  I don't understand why we're
22  talking about a rep and a warranty dated
23  August 2nd when the proxy statement didn't
24  come into existence for more than a month

Page 335

1  after this.
2      MR. BRAUTIGAM:  Got it.  It's part of
3  the proxy statement.
4      MR. BURKE:  This is the merger agreement
5  at the time it was signed.  It was signed on
6  August the 2nd.
7      MR. BRAUTIGAM:  It's attached to the
8  proxy material.  It's part of it.
9      MR. BURKE:  But it predates it.
10     MR. BRAUTIGAM:  I understand.
11     MR. BURKE:  And it's not referring to
12  the proxy statement because it didn't exist at
13  that time.  That's why the question is
14  misleading.
15     A.    Understanding all that, I tried to say
16  regarding Ken's activities -- and is it Tim Herron
17  or somebody?
18     Q.    Tom Herron.
19     A.    Tom Herron -- that I am unable to
20  determine at this juncture whether that is
21  information that should have been disclosed,
22  although intuitively, I don't think that it would
23  be required disclosure, but I would defer to legal
24  counsel for their advice and would prefer to look

Page 336

1  at whether there are any other comparable
2  situations that might exist.
3      So it's hard for me to conclude on that.
4  I don't have a lot of experience in either of those
5  circumstances.  They're both a little bit unusual.
6      Q.    And for reasons you've already stated,
7  you don't believe the HP merger is comparable,
8  correct?
9      A.    Right.  I do not believe that is
10  comparable.
11     Q.    And when you use --
12     A.    I do not believe HP disclosed that.  I
13  think Hewlett disclosed on his own, went out to
14  everybody.  They didn't voluntarily disclose that.
15  He went out on his own and protested the whole
16  thing.
17      What's so comparable about somebody
18  doing that that owns 15 -- that controls 15 percent
19  of the stock.
20     Q.    And you don't believe Mr. Hewlett's
21  resignation and active opposition was disclosed --
22     A.    Yeah, he put a press release out.  He
23  put a press release out.
24     Q.    No, I'm not talking about Hewlett's

Page 337

1  press release.  I'm talking about in Hewlett
2  Packard's public documents; in other words, Carly
3  put a press release out.
4      MR. BURKE:  Objection.  Speculation.
5      A.    There's a lot of speculation there,
6  Mike.  I don't think the situations are very
7  analogous to ours.  They're widely different.
8      Q.    Now, in one of your previous answers,
9  you said intuitively everything we've discussed
10  today strikes you as information that really
11  doesn't need to be disclosed, and I just want to
12  know why?
13     MR. BURKE:  Objection.  Asked and
14  answered.
15     A.    Well, I kind of said, Mike, that there
16  are unusual circumstances, and I'm not certain, so
17  I would rely on legal counsel's advice, SEC
18  counsel.
19      I'm really not sure I'm qualified to
20  determine a disclosure issue like that.  It's a
21  little bit unusual, but you had the board voting
22  for it, and one of the members decided not to vote
23  his shares.
24      You wouldn't even know that he wasn't

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 338

1  going to vote his shares. How would you disclose
2  that? I understand he was not disclosing to
3  everybody that he wasn't voting his shares, so how
4  would we disclose that?
5      Q.   Mr. Carey, you refer to not voting his
6  shares, and you've repeatedly referred to that. In
7  fact, that's not what happened, correct?
8      A.   I don't know.
9      Q.   Mr. Hanauer did vote his shares. He
10 just voted them against the merger.
11     A.   I'm sorry.
12     Q.   That's what I meant.
13     A.   I mean, did he disclose to people that
14 he wasn't going to vote them so that someone could
15 put that in a document? I don't know.
16     Q.   Who would he disclose it to?
17     A.   He's got legal counsel. He could have
18 called them up and said, Hey, I think I might not
19 vote my shares. Should this be a disclosure item
20 or not. I don't know if he did that or not.
21     Q.   Do you think he should have?
22     MR. BURKE: Objection. Calls for
23     speculation.
24     A.   I told you I don't know. I don't know,

Page 339

1  but I don't even know whether he did -- let's put
2  it this way. If he didn't disclose that he wasn't
3  going to vote his shares --
4      Q.   If he did not?
5      A.   If he did not, how would anyone know to
6  put it in here anyway? That's sort of like -- you
7  know, first, I'm not sure it should be in there;
8  but if we didn't know about it, we couldn't have
9  put it in there anyway.
10     Q.   I asked Mr. Hoverson similar questions
11 about this as to if he intended to vote his shares
12 against the merger with National City, what would
13 he do.
14     Mr. Hanauer, as the CEO of OHSL, already
15 knew that he was going to vote his shares against
16 the transaction. In other words, there's no one to
17 tell, because he's the CEO, right?
18     MR. BURKE: Objection. What are you
19     talking about?
20     A.   I don't know. I don't know.
21     MR. BURKE: Calls for speculation.
22     Q.   Actually, I misrepresented something. I
23 was talking to one of the other directors, I think
24 it was Mr. Cook. And I said, Mr. Cook, if you

Page 340

1  intended to vote your shares against the Provident-
2  National City merger, what would you do.
3      And he said, in substance, I would go to
4  Mr. Hoverson and say, I don't believe in this
5  transaction, because Mr. Hoverson is the CEO. Are
6  you with me so far?
7      MR. BURKE: Objection. Calls for
8      speculation; assumes facts not in evidence;
9      and mischaracterizes prior testimony about
10     which this witness knows nothing.
11     Q.   You understand the hypothetical I'm
12 setting up?
13     A.   Yes. Yes, I do.
14     Q.   Now, with respect to Mr. Hanauer,
15 because he was a board member and he was also the
16 CEO, he didn't have to go to himself and tell him
17 that he was against the merger because he already
18 knew that.
19     MR. BURKE: Objection.
20     Q.   So my point is, do you agree that
21 Mr. Hanauer's knowledge of his opposition to the
22 merger is imputed to the corporation?
23     MR. BURKE: Oh, my god. Objection. I
24     have no idea what that means.

Page 341

1      A.   That's a legal question. I wouldn't try
2  to guess what the answer is, but I would let the
3  legal people try.
4      Q.   Mr. Carey, we talked about material
5  adverse effect being set at $25,000 and your belief
6  it's a mistake, correct?
7      A.   (Witness nods head.)
8      Q.   Would you please turn to page A-24 and
9  look at small xvii.
10     A.   Um-hum, yes.
11     Q.   What is going on with respect to that
12 section?
13     A.   Well, let me start it a little earlier
14 to see what they're trying to do here. (Examining
15 document.)
16     Well, this section is things that Oak
17 Hills agrees that they will do in the ordinary
18 course of business.
19     So it looks like to me if they were
20 going to make capital expenditure above $25,000,
21 they would probably talk to us about it before they
22 did it. We'd probably say okay, but...
23     Q.   Does that number strike you as being
24 ridiculously low?

Page 342

1    A.    It seems a little low, but for their
2  size company, it might not be terribly bad.  It's
3  not quite as different as the other thing, but...
4    Q.    Does that number seem consistent with a
5  material adverse effect as it's defined on page
6  A-2?
7        MR. BURKE:  Objection.  Calls for legal
8    conclusion; speculation.
9    A.    I don't really know the answer to that.
10  I mean, I think this number seems a little low, but
11  they're dealing with different issues.
12    Q.    Okay.  Would you turn the page and read
13  section 4.3 to yourself, submission to management
14  and shareholders.
15    A.    Okay.
16    Q.    In subheading A, what does it mean where
17  it says, Subject only to the fiduciary obligations,
18  the board of directors?
19        MR. BURKE:  Objection.  Calls for legal
20    conclusion.  You may answer.
21    A.    I'm not a hundred percent sure.  I would
22  really rather defer to legal counsel on what that
23  means.  I could speculate or guess on it, but I'm
24  not -- it's kind of a legal term, isn't it; not a

Page 343

1  financial term?
2    Q.    Mr. Carey, would you turn to page A-40.
3    A.    Okay.
4    Q.    The "S" slashes there represent your
5  signature, correct?
6    A.    Yes, that is my signature.
7    Q.    It doesn't represent legal counsel's
8  signature, correct?
9    A.    Right.
10        MR. BURKE:  We'll stipulate to that.
11    Q.    Was it necessary for you personally as
12  CFO to have an understanding, a working knowledge,
13  of the provisions of this document that you signed
14  on behalf of Provident?
15        MR. BURKE:  Independent of legal
16    counsel.
17        MR. BRAUTIGAM:  Not independent; just
18    for him to have one.
19    A.    A working knowledge of the document?
20  Yeah.
21    Q.    Yes?
22    A.    Yes.
23    Q.    Now, tell me what your understanding --
24  not legal counsel's understanding --

Page 344

1    A.    What page are you on?
2    Q.    Back to A-25 -- subject only to the
3  fiduciary obligations of the board of directors?
4        MR. BURKE:  Same objection.
5    A.    I would say that I think it's self-
6  explanatory.  Recommend that shareholders vote for
7  the approval subject to the fiduciary obligations
8  of the board of directors.  That's what it means.
9    Q.    Can you give us a better definition of
10  the --
11    A.    I don't know if I can improve upon that
12  definition.  One does not come to mind.
13    Q.    Does that mean that you really don't
14  understand what it means except to read the words
15  back?
16        MR. BURKE:  No.  I think it means just
17    what he said.
18    A.    I didn't say that.
19    Q.    Okay.  Remember --
20    A.    You asked me if I could give a better
21  definition of that; and I said, no, one didn't come
22  to mind.
23    Q.    Well, I actually have a dictionary here
24  if you would like to refer to that.

Page 345

1    A.    That's okay.
2    Q.    Remember you had this situation this
3  morning when I asked what material was, and you
4  said it means material; and I asked what
5  significant meant, and you said it means
6  significant?  Remember that?
7    A.    It wasn't exactly like that.  I remember
8  that we were mincing words this morning, though, so
9  it's somewhat like that.
10    Q.    Have we come full circle?
11        MR. BURKE:  Objection to form.  I don't
12    know what the relevance of that question is.
13    Q.    In other words, you're not going to say
14  what this means except it means what it says,
15  right?
16        MR. BURKE:  Objection.  Asked and
17    answered.  He already told you what he can
18    answer, Mike.  Don't characterize --
19    A.    Mike, is it you want me to give you a
20  further definition of the word fiduciary?
21    Q.    I want your understanding --
22    A.    Is that what you're looking for?
23    Q.    -- of those words.
24    A.    The words subject only to the fiduciary

87 (Pages 342 to 345)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 346

1  obligations of the board?
2    Q.  Yes.
3      MR. BURKE:  Asked and answered.
4    A.  I mean, I'll give you somehow -- I don't
5  know if this will do, but they have to carry out --
6  they want to recommend the shareholders vote for
7  this subject to any fiduciary obligations that they
8  may feel would, I guess, prevent them from making
9  that recommendation.
10    Q.  Right.  And if Mr. Hanauer did not
11  believe that the merger between OHSL and Provident
12  was in the best interest of OHSL shareholders, is
13  it your understanding that he would have a
14  fiduciary obligation to vote that way?
15      MR. BURKE:  Objection.  Speculation;
16    calls for legal conclusion; assumes facts not
17    in evidence in which this witness has no
18    foundation for.
19    A.  I'm very confused by the end of the
20  question, so you might have to repeat it.  You said
21  you have me involved in that.  I didn't vote on it.
22  Maybe I just misheard it.
23    Q.  Okay.  Let me read it slowly.  And if
24  Mr. Hanauer did not believe that the merger between

Page 347

1  OHSL and Provident was in the best interest of OHSL
2  shareholders, is it your understanding that he
3  would have a fiduciary obligation to vote against
4  the merger?
5      MR. BURKE:  Objection.  Calls for
6    speculation; no foundation; legal conclusion.
7    In what capacity?
8      MR. BRAUTIGAM:  As a director.
9    A.  Now, we'll go back.  I answered that
10  question this morning.  I'll just tell you that.  I
11  answered that question this morning.  You asked it
12  this morning.
13    Q.  Can you answer it this afternoon?
14    A.  Yeah.  I think that you have to vote the
15  way you think in performing your fiduciary
16  responsibilities.
17      So if Mr. Hanover[sic], when he voted
18  for the merger, didn't think it was in the best
19  interest of the shareholders, then he should have
20  not voted that way.  Apparently, when he voted, he
21  did.
22    Q.  Why do you say that?
23    A.  Because he voted his shares, which to me
24  is the only --

Page 348

1      MR. BURKE:  His shares or his --
2    A.  He voted.  Forget the shares.  He voted
3  in the special board meeting for the merger.  So to
4  me, that's the only evidential data I have.
5      Whatever he may -- he may have changed
6  his mind later.  He may have done this or that.
7  And I know there's documents here, and you've
8  talked to him and all that.
9      I'm just saying when he went to vote for
10  the merger, he voted for it.  And I do agree that
11  if he didn't think the merger was in the best
12  interest of the shareholders, then I think he
13  shouldn't have voted that way, but apparently at
14  the time he did.
15    Q.  I was almost ready to move on, and you
16  tack on "but apparently at the time, he did."
17    A.  Okay.  Strike that.
18      MR. BURKE:  No, no, no, no.  You can't
19  strike that.
20    A.  It appeared that he did.
21    Q.  What appeared that he did?
22      MR. BURKE:  Objection.  Wait for a
23    question, please.
24    Q.  What did you mean when you said it

Page 349

1  appeared that he did?
2    A.  I'll just wait for you to ask me a
3  question.
4    Q.  Plaintiffs' Exhibit 45, page 34,
5  paragraph 55, Q and A.
6    A.  Plaintiffs' Exhibit...
7    Q.  The consolidated amended complaint.
8    A.  Page 45?
9    Q.  Page 34, Q and A on that page.  By the
10  way, do you know how Mr. Hanauer voted at the July
11  22nd, 1999, meeting?
12    A.  I don't know, but this would imply that
13  he abstained; is that correct?
14      MR. BURKE:  Objection.
15    Q.  Right.  That is correct.
16      MR. BURKE:  Don't speculate, please.
17    A.  I don't factually know.  There's a Q and
18  A here that suggests something, but I don't know.
19    Q.  And you were right.  You drew the right
20  conclusion.  Does Mr. Hanauer's answer, as it
21  appears on page 34 of the consolidated amended
22  complaint, suggest that he believed that the merger
23  transaction was in the best interest of OHSL
24  shareholders?

88 (Pages 346 to 349)

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 350

1    MR. BURKE: Objection. Calls for
2 speculation.
3    A.    Yeah, I really cannot interpret. I see
4 what's written here; and frankly, I don't -- when I
5 read the whole thing in full, I think it's
6 impossible for me to interpret what he was thinking
7 or why he did what he did. I've read the words
8 here.
9    Q.    Doesn't he say he just gave up?
10    MR. BURKE: Objection. Calls for
11 speculation.
12    A.    I'm not really sure what he really means
13 by, I just gave up.
14    MR. BURKE: Mr. Brautigam, we have gone
15 over this now for hours.
16    MR. BRAUTIGAM: He keeps tacking
17 something on.
18    MR. BURKE: No, he doesn't. He's
19 answered the same way all the way through. So
20 this is about the last time we're going to ask
21 these same questions.
22 BY MR. BRAUTIGAM:
23    Q.    Mr. Carey, can you keep that document
24 open, and can you look at the first page of 106

Page 351

1 sitting on the table somewhere?
2    A.    Here's 106.
3    Q.    Okay. Now, those two documents
4 together, the first page of 106 and the Q and A on
5 page 34 of Plaintiffs' 45 --
6    MR. BURKE: That are 700 pages apart in
7 the deposition transcript, correct?
8    MR. BRAUTIGAM: Whatever it is.
9    MR. BURKE: One is 726 and one is 24, or
10 724 and 26, just so we're clear.
11    Q.    Particularly, the last Q and A -- and
12 I'll read that. Question -- And you did not
13 believe the second part of that sentence.
14 Specifically, you did not believe that -- and then
15 there's an insertion, the merger -- is in the best
16 interest of Oak Hills stockholders, correct?
17    And Mr. Hanauer answers, That was my
18 opinion, yes, sir.
19    Does that, in conjunction with the Q and
20 A on page 34 and in conjunction with Plaintiffs'
21 Exhibit 1 where there's a statement attributed to
22 Mr. Burke that Mr. Hanauer opposed the Provident
23 takeover because he wanted Oak Hills to remain
24 independent, suggest to you that Mr. Hanauer did,

Page 352

1 in fact, oppose the merger?
2    MR. BURKE: Objection. Calls for
3 speculation. There's no time frame. Assumes
4 facts not in evidence; mischaracterizes the
5 record.
6    A.    I really -- I mean, I really don't think
7 I can put it all together and draw some conclusion
8 about what Ken is thinking or doing or why he did
9 this.
10    MR. BURKE: Asked and answered finally.
11 Thank you.
12    Q.    Okay. A-28, section 5.1, section E.
13    A.    Which document is that?
14    Q.    The big one, the proxy materials.
15    A.    A-28?
16    Q.    A-28, yes.
17    A.    Okay.
18    Q.    Would you read section E to yourself,
19 please.
20    A.    Section E, did you say?
21    Q.    E, echo.
22    A.    (Examining document.) Okay.
23    Q.    If Provident had known about the
24 accounting errors that it learned about in 2003 in

Page 353

1 1999, would they have been considered material
2 adverse effects?
3    MR. BURKE: Objection. Calls for
4 speculation; assumes facts not in evidence.
5    A.    I would just answer that the way I
6 answered before. I don't know that they would or
7 would not have.
8    Q.    Would Provident have notified Oak Hills
9 that there was this accounting error?
10    MR. BURKE: Same objection.
11    A.    I think if we became aware of it, then
12 we would have probably notified them. I mean,
13 that's hard to speculate.
14    If we knew about it, then -- I mean,
15 again, if you knew about it then, it would -- the
16 overall magnitude of the whole thing would have
17 been significantly less. I'm not sure. I'd have
18 to have some data to look at there.
19    Q.    If you knew about the accounting errors
20 in August of 1999, would you have notified the SEC?
21    MR. BURKE: Objection. Calls for
22 speculation.
23    A.    I would have to see the data at the
24 time, really.

89 (Pages 350 to 353)

e49da87b-a1b1-491d-8eee-0c88afaef3fe