Page 354

1  Q. Are there any circumstances where you
2  would not have notified the SEC immediately if you
3  discovered these accounting errors?
4  A. Yeah. If they're not material, you
5  don't notify the SEC. That's the general
6  circumstance. If you have an accounting error
7  that's not material, you don't notify anybody.
8  Q. Okay. And in this case, when you found
9  the accounting errors in February or March of 2003,
10 Provident notified the SEC immediately, correct?
11 A. Yeah, we notified the SEC, not
12 immediately, but once we determined what the
13 amounts were.
14 Q. Right. And that's because the amounts
15 were material, correct?
16     MR. BURKE: Objection. In what year?
17 In what context to what year?
18 A. In the latter years, as we talked
19 earlier, they were material. The earlier years,
20 it's not quite as certain.
21 Q. Did the SEC have an opinion on that?
22     MR. BURKE: Objection.
23 A. I'm not sure that they -- I don't know
24 if they had an opinion on it or not. They didn't

Page 355

1  disagree with what we were doing, but I don't know.
2  They don't really give you opinions on things like
3  that, unless they don't agree with you.
4  Q. Okay. A-30, please. Would you just
5  read section B to yourself.
6  A. (Examining document.) Okay.
7  Q. What does the phrase "in all material
8  respects" mean in that page?
9      MR. BURKE: Objection. Asked and
10 answered.
11 A. Well, there were certain obligations and
12 agreements that had to be done by closing, and this
13 indicates that, from a material standpoint, they
14 met those obligations and agreements.
15 Q. And there was an obligation of
16 cooperation, correct?
17     MR. BURKE: Objection. Foundation.
18 A. Yeah, I don't know that it's articulated
19 in the document exactly like that, but there's an
20 expectation of cooperation. It might be -- I think
21 the word is different, but it might mean the same
22 thing.
23 Q. Would you look at section 4.9 on A-27,
24 please.

Page 356

1  A. How about that. I just can't seem to
2  remember back five years ago.
3  Q. The word cooperation is used, correct?
4  A. Yes, it is.
5  Q. Did you ever learn that Mr. Hanauer was
6  not fully cooperating in effectuating the merger?
7  A. I don't remember. I don't remember it
8  being an issue. It certainly -- I don't recall it
9  being an issue.
10 Q. Okay. A-31, would you read section G,
11 golf, to yourself, please.
12 A. (Examining document.) Okay.
13 Q. GAAP requires consistency from period to
14 period, correct?
15 A. That is correct.
16 Q. Why?
17 A. Unless they change it.
18 Q. Unless they change what?
19 A. Unless GAAP changes.
20 Q. Okay. It hasn't changed for a while.
21 A. It changes every year with different
22 things.
23 Q. Well, with respect to the principal of
24 consistency, correct?

Page 357

1  A. Right.
2  Q. That's about as basic as --
3  A. Pretty basic.
4  Q. -- debit left, credit right, correct?
5  A. Yeah.
6  Q. Would you turn to page A-32, please. In
7  section L, there's a reference to experts. Do you
8  see that?
9  A. Um-hum.
10 Q. And as we started this deposition, I
11 asked whether you were an expert in GAAP and GAAS.
12 Do you remember that?
13 A. Yes, I do.
14 Q. You know what an expert is, correct?
15 A. I have a good sense as to what an expert
16 is; not for everything, but for certain things.
17     MR. BURKE: What section are we looking
18 at?
19     MR. BRAUTIGAM: A-32, L.
20     MR. BURKE: Okay.
21 BY MR. BRAUTIGAM:
22 Q. And you certainly have a sense of what a
23 computer expert would be as it's used in section L,
24 correct?

Page 358

1  MR. BURKE: Objection. Foundation. You
2  may answer.
3  A.  In general, yeah.
4  Q.  Do you know that plaintiffs have hired
5  an accounting expert who's prepared a report for
6  us?
7  A.  Yes, I'm aware of that.
8  Q.  Have you reviewed that report?
9  A.  Not completely, no.
10  Q.  Well, that's our next document. But if
11  you were testifying in federal court on accounting-
12  related issues, specifically related to GAAP or
13  GAAS, do you think you would be recognized as an
14  expert in those areas?
15  MR. BURKE: Objection. Calls for
16  speculation.
17  A.  I don't know. I don't know what the
18  standard is for that, for that type of expert.
19  Q.  Have you ever held yourself out as an
20  expert in GAAP and/or GAAS?
21  MR. BURKE: Objection.
22  A.  Certainly not in recent years.
23  Certainly not -- probably not ever, really.
24  Q.  You made a distinction between recent

Page 359

1  years and prior years. What were you referring to
2  there?
3  A.  I was probably a little bit more of an
4  expert in GAAS when I was auditing 25 years ago or
5  whenever it was, but I still probably was too
6  junior to be considered an expert; but when I
7  audited for a living, I would have been closer, but
8  still probably not considered an expert.
9  Q.  Okay. Just look at section B under
10  6.2. Do you see that?
11  A.  Um-hum, yes.
12  Q.  Can you define "in all material
13  respects" as it's used there?
14  MR. BURKE: Objection. Asked and
15  answered.
16  A.  Again, material -- you know, I think the
17  significant things that we committed to doing would
18  have been done. That's what I think that means.
19  You know, that's the sense of that terminology in
20  these documents.
21  Q.  Okay. A-33, section C refers to no
22  injunctions, correct?
23  A.  Um-hum.
24  Q.  And do you know that an injunction was

Page 360

1  denied plaintiffs in a separate state court action
2  based in part upon some of Mr. Burke's
3  representations?
4  MR. BURKE: That's an absolute false
5  statement, Mr. Brautigam, and you know it,
6  because nothing like that appears in Judge
7  Schweikert's order, which refers solely to the
8  fact that you had no evidence on any of the
9  outlets necessary to obtain -- that's a false
10  statement, and you know it.
11  MR. BRAUTIGAM: Jim, I want to put on
12  the record that Judge Schweikert's order says
13  that he specifically relied on the oral
14  argument, so...
15  MR. BURKE: He didn't say he relied on
16  any statements of counsel. You know what he
17  said, and that's a misrepresentation of that
18  decision, and you know it.
19  MR. BRAUTIGAM: Okay.
20  MR. BURKE: But you may answer,
21  Mr. Carey, if you know.
22  A.  Can you repeat the question? I don't
23  think I know the answer.
24  Q.  This merger closed, correct?

Page 361

1  A.  Correct.
2  Q.  And when it closed, there were no
3  injunctions against the merger, correct?
4  A.  Correct.
5  Q.  And did you know that that was in part
6  because a state court judge had relied in part upon
7  Mr. Burke's oral representation?
8  MR. BURKE: Objection. Misstates the
9  record; mischaracterize the evidence.
10  A.  I wouldn't have had -- no, I wouldn't
11  have known necessarily. I don't recall that it was
12  even Jim Burke involved in even doing it back then.
13  Q.  Is it unusual to close a merger
14  transaction such as this when there is shareholder
15  litigation pending?
16  A.  I don't know the answer to that.
17  Q.  Was that ever discussed by Provident?
18  A.  I don't remember whether it was or it
19  wasn't. I suppose if there was litigation, it
20  would have been discussed. If the suit had been
21  brought, it would have been discussed.
22  BY MR. BRAUTIGAM:
23  Q.  Who would have discussed it?
24  MR. BURKE: Objection. Speculation.

Page 362

1  A.  Again, I mean, I can't -- I don't
2  remember. I'm just speculating who would have.
3  You're going back five years. I can't remember. I
4  would hate to guess who would have been in that
5  group who would have discussed it.
6  Q.  Was a decision made that, hey, we're
7  just going to squish these guys like a bug; we're
8  going to go forward with the merger?
9     MR. BURKE: Objection.
10  A.  I don't remember anybody saying anything
11  like that.
12  Q.  In substance?
13  A.  No.
14  Q.  Would you please pick up Plaintiffs'
15  Exhibit 87.
16     MR. BURKE: By my calculations, Mike, we
17  have about an hour left.
18     MR. BRAUTIGAM: I'm happy to stop when
19  you tell me that my time is up, but I believe
20  that Mr. Carey is going to come back. If he
21  won't come back voluntarily, I'll file papers.
22     MR. BURKE: That's fine. You've got a
23  presumptive seven-hour limit. There's been no
24  motion to extend it. There's been no consent

Page 363

1  to extend it. So you've got seven hours.
2     MR. BRAUTIGAM: Right.
3     MR. BURKE: Nothing like that has been
4  raised before with respect to Mr. Carey before
5  today.
6  BY MR. BRAUTIGAM:
7  Q.  Mr. Carey, how many employees does PFGI
8  have?
9  A.  A little over 3,000 currently.
10  Q.  Would it be fair to say that you are the
11  number 2 employee?
12     MR. BURKE: Objection.
13  A.  No, I don't think there would be
14  agreement that I'm the number 2 employee.
15  Q.  Do you think you're the number 2?
16  A.  No. You know, I'm one of the top five
17  executives.
18  Q.  How would you rank the executives?
19  Mr. Hoverson's first, right?
20  A.  Mr. Hoverson's first.
21  Q.  Who would be next?
22  A.  There wouldn't be a next. There isn't a
23  next. There would be three or four people that
24  would be in that next group.

Page 364

1  Q.  Jim Gerde?
2  A.  Jim Gerde is one of them.
3  Q.  Tony Stollings?
4  A.  No. It would be Roger Davis, myself,
5  maybe Vince Ronalde. That would probably be the
6  group.
7  Q.  So you're one of the top five?
8  A.  Yeah, I think people would acknowledge I
9  would be the top five. They wouldn't get a total
10  agreement on two or three from anyone in that
11  group.
12  Q.  Is it your understanding that
13  restatements are, by definition, material?
14     MR. BURKE: Objection. We did this
15  already.
16  A.  I answered that question this morning.
17     MR. BURKE: We talked about Wells Fargo,
18  remember?
19  Q.  Are you familiar with something known as
20  the GAAP hierarchy or house of GAAP?
21     MR. BURKE: Objection. Relevance;
22  vague.
23  A.  It doesn't ring a bell right now.
24  Q.  Are you familiar with opinions issued by

Page 365

1  the accounting principles board?
2     MR. BURKE: Objection. Vague.
3  A.  Yes, I am.
4  Q.  Are you familiar with APB opinion number
5  20?
6  A.  Um-hum.
7  Q.  Do you have a working knowledge of APB
8  opinion number 20?
9  A.  Well, I get a little rusty on the
10  numbers that get associated with them, but I'm
11  pretty familiar with, in general, most of the
12  significant accounting principles.
13  Q.  And APB number 20 is significant,
14  correct?
15  A.  Um-hum, most of them are considered
16  significant depending upon the circumstance.
17  Q.  And APB number 20 refers to accounting
18  changes, correct?
19  A.  I believe it does.
20     (Off-the-record interruptions.)
21  BY MR. BRAUTIGAM:
22  Q.  Do you agree that according to APB
23  number 20, paragraph 38, that if an accounting
24  change is not material, no disclosure should be

Williams & Oliver
(513)683-9626

Page 366

1  made?
2  A. I think that's a general view that
3  people hold, although these things change
4  occasionally.
5  Q. Do you hold that view?
6  A. It depends. It depends on what the
7  circumstances are. I think there can be times when
8  it's not material that you'd make a change, and I
9  think there can be times when it's not material
10 that you wouldn't make the change. There's a lot
11 of different variations on that.
12 Q. Is there a difference between an
13 accounting change and a restatement?
14 A. Well, I don't know. You get into some
15 mincing of words there, so I'm not sure. There are
16 required accounting changes where the accounting
17 principles get changed by the financial accounting
18 standards board or the SEC, and those are required.
19 And if they apply to your company, you make those
20 changes, and sometimes you restate and sometimes
21 you don't.
22 Q. With respect to Provident's two 2003
23 restatements --
24 A. We only had one restatement in 2003,

Page 367

1  just to set the record straight.
2  Q. How would you describe the other issue
3  other than the restatement?
4     MR. BURKE: Objection to form.
5  A. I'm not sure I understand the question,
6  Mike.
7     MR. BURKE: Use the date of the press
8  release.
9  Q. April 15th, 2004. How would you
10 describe what happened on April 15th, 2004?
11 A. That's a complex one there. We were
12 following an industry practice that all large banks
13 were following, and it was determined that the
14 practice -- initially, it was determined, I guess I
15 would say, that the SEC did not agree with that.
16    And unfortunately, this is the one we
17 announced on April 15th. We decided we ran out of
18 time, so we would restate; and other companies that
19 had more time were allowed to do some things, so
20 they didn't have to restate.
21 Q. Did you say that with respect to the
22 second issue that reared its ugly head on or about
23 April 15th, 2003, that you did restate?
24 A. Yeah, I said we restated.

Page 368

1  Q. Does that imply to you that there's a
2  second restatement?
3  A. Well, just to set the record straight,
4  from the SEC, we only had one restatement because
5  we only changed our filings once. We had two
6  announcements but one restatement. That's a
7  quote.
8     But relative to the April 15th one, it
9  was a highly technical accounting industry that the
10 entire banking industry, including Wells Fargo, I
11 might add, was following what they considered was
12 an industry practice.
13    And because we were running out of time
14 with our filings, we decided to restate for that
15 issue. Other companies were allowed to go back and
16 modify their RBI insurance and didn't restate; and
17 some that couldn't, decided to restate.
18 Q. Mr. Carey, I'm a little confused here.
19 With respect to the second issue on or about April
20 15th, you used the word restate. So I'm just not
21 getting it.
22    I know you said Provident had one
23 restatement and two announcements, but you've used
24 the word restatement or restate seemingly twice.

Page 369

1  Can you explain that discrepancy?
2  A. Well, there were two issues; one
3  restatement and two issues. We restated our
4  results going back for two different issues, but we
5  only did one restatement because we only went back
6  and changed our filings once, and that's the way
7  the SEC views it. One restatement; two issues.
8  Q. And that's the March 5th restatement?
9  A. Right.
10 Q. Okay.
11 A. March 5th announcement. See, we hadn't
12 filed yet for '03 on March 5th.
13 Q. Right. Okay. You introduced one of
14 your previous answers by saying, The following
15 industry practice. Didn't I see a quote saying
16 that in substance it doesn't matter what the
17 industry practice is if it's not consistent with
18 GAAP, attributed to you?
19    MR. BURKE: Objection.
20 A. Yeah, you probably saw something like
21 that -- something like that. That's the SEC's view
22 now. And I'm just told that in earlier years more
23 companies followed industry practices; and over
24 time, the SEC pretty much started talking to

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 370

1 companies about you can't follow -- there are no
2 such things as industry practices.
3     So it was a change in practice over
4 time. I'm not an expert on that whole matter of
5 industry practices, but it's clear this was an
6 industry practice. That's a fact.
7   Q.   And you said in that same answer, It was
8 determined. My question is, determined by whom?
9   A.   Management --
10     MR. BURKE: What was determined?
11   Q.   As you used that in your previous
12 answer. I think the accounting treatment was
13 incorrect. I think that's what you meant.
14   A.   Yeah, management determined that it was
15 not the right accounting treatment, so we changed
16 it.
17   Q.   Who in management determined that it was
18 not the right accounting treatment?
19   A.   Myself and the chief accounting officer,
20 our CEO, our audit committee.
21   Q.   Financial literacy is a requirement of
22 serving on Provident's audit committee, correct?
23   A.   Correct.
24   Q.   And I believe now it's the requirement

Page 371

1 to serve on the audit committee of any public
2 company, correct?
3   A.   Correct.
4   Q.   Is Tom Grody financially literate, in
5 your opinion?
6   A.   Yes.
7   Q.   What's the basis for that statement?
8   A.   He's been on the board for quite a
9 period of time. Based on the questions he asked,
10 he runs the business, he seems very financially
11 literate to me.
12   Q.   Do you believe that financially literate
13 embraces familiarity with GAAP and GAAS?
14   A.   Sometimes it does; sometimes it
15 doesn't. Depends what you're -- how literate you
16 are.
17   Q.   Okay. As it's used as a requirement for
18 serving on Provident's audit committee, please
19 describe the circumstances under which one can be
20 qualified, i.e., financially literate, and not be
21 familiar with GAAP and GAAS?
22   A.   Can I ask you a question to try to make
23 sure I answer your question properly?
24   Q.   If you need a clarification, go ahead.

Page 372

1   A.   Are you talking about a financial expert
2 or financial literacy?
3   Q.   I'm talking about financial literacy as
4 it's defined in Provident's audit committee
5 charter, because I asked Mr. Grody and he said he
6 didn't know if he was financially literate.
7     MR. BURKE: I think he said he didn't
8 have an opinion one way or the other on that.
9     MR. BRAUTIGAM: Isn't that the same
10 thing?
11     MR. BURKE: No. You asked him whether
12 or not he met those certain requirements under
13 Sarbanes-Oxley. Whatever the record is, it
14 is.
15     MR. BRAUTIGAM: Okay.
16   A.   What's your question now again? How did
17 I determine -- did I determine whether Tom is
18 financially literate?
19   Q.   No.
20   A.   I think Tom is financially literate.
21   Q.   No, it was a different question. Under
22 what circumstances can one be financially literate
23 consistent with Provident's audit committee charter
24 and not familiar with GAAP and GAAS?

Page 373

1     MR. BURKE: Objection. Calls for
2 speculation. You may answer.
3   A.   I don't know if you would have to be
4 familiar with GAAS. I think you probably have to
5 be familiar with GAAP.
6   Q.   Okay. So it's your understanding --
7   A.   I'm not sure. I'm not sure the answer
8 to your question.
9   Q.   And as you sit here today, you can't
10 provide me with a single example of how one could
11 be qualified as per Provident's audit committee
12 charter and not familiar with GAAP and GAAS?
13     MR. BURKE: Objection. I have no idea
14 what one example means. Calls for
15 speculation; form; vague.
16   A.   Yeah, I don't --
17     MR. BURKE: There's a double negative in
18 there somewhere.
19   A.   Ask the question again, and I'll try to
20 either understand it better and/or answer it.
21   Q.   Are there any circumstances you can
22 imagine where a person would meet the requirements
23 of financial literacy as it's outlined in
24 Provident's audit committee charter and not be

Williams & Oliver
(513)683-9626

Page 374

1  familiar with GAAP and GAAS?
2      MR. BURKE: Again, I think there's a
3  double negative in there. That's why I'm
4  having trouble following. Object to the form.
5  A.  I don't know if there is. I mean,
6  familiar is a pretty broad term. I would feel...
7  I'm not sure I could come up with a circumstance
8  where they wouldn't be familiar with those two,
9  although I think the reliance is much more on GAAP
10 than GAAS, but it's both, I guess.
11     MR. BURKE: Can we take a brief break?
12     (A brief break was taken from 4:32 to
13 4:35, 3 minutes.)
14 BY MR. BRAUTIGAM:
15 Q.  Do you agree with the concept that if an
16 accounting change is not material, no disclosure
17 should be made?
18     MR. BURKE: Objection. Asked and
19 answered.
20 A.  I already answered that question.
21 Q.  I just forget what your answer was.
22 A.  My answer was that sometimes if it's not
23 material, I don't think you need to disclose it;
24 and sometimes it might be helpful to disclose it

Page 375

1  based on what it's really about.
2  Q.  Okay. Do you believe that APB number
3  20, paragraph 38, requires that a restatement is
4  appropriate if and only if, quote -- if and only if
5  the, quote, correction has material affect on
6  income before extraordinary items or on net income
7  or a material affect on the trend of earnings,
8  unquote?
9      MR. BURKE: Objection. Speculation.
10 You may answer.
11 Q.  That's the fourth page of the document.
12 Unfortunately, he didn't number the pages, but it's
13 the fourth page.
14 A.  I'm not sure I agree with it anyway.
15 That says it's only material if it only affects
16 income? It doesn't say anything about a financial
17 decision? That doesn't sound right to me.
18 Q.  You think it should be more
19 comprehensive?
20 A.  Well, I thought the standard related to
21 both income and financial position. This doesn't
22 look like the entire stand here. What page is that
23 in here?
24 Q.  The fourth page, toward the bottom.

Page 376

1  A.  I don't think that's what APT 20 says.
2  Q.  Okay.
3  A.  I guess it could, but I thought it was a
4  little broader than that. That's all I'd say.
5  Q.  Do you agree --
6  A.  But as I said earlier, people --
7  clearly, there are some people and circumstances
8  where, even though it doesn't look like it's
9  material, people do restatements anyway.
10     And it looked like to some of us that
11 Wells Fargo just did that for part of one of our
12 issues. You know, the measurement of any kind of
13 standard of materiality, it looked like it was way
14 below it.
15     So I don't -- you know, that's like a
16 current example of someone that appeared to make a
17 change that wasn't material and restated.
18 Q.  Can you think of any other examples?
19 A.  I can't think of a specific one. When I
20 saw the Wells Fargo, it wasn't -- I didn't recall
21 that that was the only time I'd ever seen someone
22 do that. I think there are some consistency
23 reasons why people might do it even though it's not
24 material to income.

Page 377

1  Q.  Were you curious as to why Wells Fargo
2  did what they did?
3  A.  A little bit, but I didn't call them and
4  ask them.
5  Q.  Okay. That was my next question. Who
6  audits Wells Fargo?
7  A.  I don't know.
8  Q.  Do you agree with the statement the
9  company disclosed in its April 15th, 2003, filings
10 that the amount of the restatement was much larger
11 and that the accounting problems were a of greater
12 depth and breadth than the company initially
13 disclosed in March 5th, 2003?
14     MR. BURKE: Objection. You're asking
15 does he agree with that statement?
16     MR. BRAUTIGAM: Yes.
17     MR. BURKE: Calls for speculation. You
18 may answer.
19 A.  Are you reading this out of this
20 document?
21     MR. BURKE: Yes.
22 Q.  Yes.
23 A.  Where are you?
24 Q.  I think it's the fifth page.

Williams & Oliver
(513)683-9626

Page 378

1     MR. BURKE: What's the paragraph again?
2     MR. BRAUTIGAM: It's a continuation from
3  the next paragraph. It looks like this
4  (indicating).
5     MR. BURKE: What is the statement?
6     MR. BRAUTIGAM: It's the last sentence
7  of the first paragraph.
8     MR. BURKE: First full paragraph?
9     MR. BRAUTIGAM: No, not the first full
10 paragraph.
11    MR. BURKE: Okay.
12  A.   I don't necessarily... no, I don't
13 really agree with that statement. That's not what
14 we disclosed. That's somebody's interpretation of
15 what we disclosed. I don't think it's correct.
16  Q.   Are you familiar with the phrase "off-
17 the-books transactions"?
18  A.   Not particularly, no.
19  Q.   Are you familiar with the phrase "off-
20 balance-sheet transactions"?
21  A.   Yes, I am.
22  Q.   What are off-balance-sheet transactions?
23  A.   Those are -- typically, those are
24 financing structures where the asset that is being

Page 379

1  financed by some debt or debt in equity do not get
2  recorded on the balance sheet.
3   Q.   And is it appropriate to use
4  off-balance-sheet transactions and off-the-books
5  transactions interchangeably?
6      MR. BURKE: Objection. Speculation.
7   A.   Off the books is not a terminology that
8  I'm familiar with.
9   Q.   It's not an accounting term?
10  A.   Well, neither is the first one; but the
11 second one is not a terminology that I'm familiar
12 with.
13  Q.   I think we got things confused. You are
14 familiar with off-balance-sheet transactions?
15  A.   That's not an accounting -- that's not
16 an accounting terminology. That's a phraseology
17 people use related to transactions that aren't
18 recorded.
19      That's not necessarily a GAAP definition
20 or anything like that. It's more of a customary
21 way to describe transactions that aren't recorded
22 on the balance sheet.
23  Q.   Fair enough.
24  A.   I'm not trying to go overboard, but

Page 380

1  there's a little bit of a difference.
2   Q.   Got it. Are you familiar with the
3  Sarbanes-Oxley Act?
4   A.   Sure.
5   Q.   What is your understanding of the
6  Sarbanes-Oxley Act as it applies to your duties and
7  responsibilities as Provident CFO?
8   A.   It's a pretty broad act, but it
9  certainly, I think, has increased the standard of
10 making sure that you -- your internal control
11 system is reviewed so that your reporting is
12 accurate.
13      I mean, there's a lot of components to
14 it, but that's one of them. I mean, we could spend
15 six hours talking about it.
16  Q.   And there's a new requirement of
17 certification, correct?
18  A.   Correct.
19  Q.   And that appears of page 15 of Exhibit
20 90, the 2002 annual report?
21  A.   I'm not sure it's in that report. I
22 think it doesn't really come about until the end of
23 this year.
24  Q.   Would you turn to page 15 of Exhibit 90,

Page 381

1  please.
2   A.   Yeah.
3   Q.   This page is entitled, Report of
4  Management, correct?
5   A.   Right.
6   Q.   And that's your signature in the lower
7  right?
8   A.   Correct.
9   Q.   Before you signed this, did you read
10 every word that appears --
11  A.   Yes, I did.
12  Q.   -- on page 15? Did you understand every
13 word?
14  A.   Um-hum.
15  Q.   Yes?
16  A.   Yes, I did.
17  Q.   Okay.
18  A.   This was here before Sarbanes-Oxley,
19 just to answer your question. This is not because
20 of Sarbanes-Oxley.
21  Q.   Is that because Provident is a financial
22 institution?
23  A.   No. It's optional. The treadway
24 commission put something out, and this was

Page 382

1  optional, but many companies put something in
2  there, which we did. Sarbanes-Oxley requirements,
3  in terms of reporting, aren't effective until the
4  end of this year.
5      Q.   And the first paragraph embraces the
6  concept that the financial statements are the
7  responsibility of management, correct?
8      A.   Right. That is correct.
9      Q.   And based on your previous testimony,
10 you've been on both sides, correct? You've been an
11 auditor of public companies and you've been
12 management, correct?
13     A.   Correct.
14     Q.   And certainly, management has to use
15 judgment and from time to time make estimates,
16 correct?
17     A.   Correct.
18     Q.   Should those estimates be reasonable?
19     A.   They should be reasonable and
20 conservative.
21     Q.   Why should they be conservative?
22     A.   Well, it's an accounting concept to be
23 conservative when you're making estimates.
24     Q.   Is the opposite accounting concept

Page 383

1  aggressive accounting?
2        MR. BURKE: Objection.
3      A.   I don't know if that would be the
4  opposite, but -- I think it might be described
5  differently than that, but I'm not sure exactly how
6  people would describe it; not conservative.
7  Optimistic maybe instead of aggressive. Aggressive
8  has a different connotation I think in accounting.
9      Q.   Are you familiar with the term control
10 person?
11       MR. BURKE: Objection. Calls for legal
12    conclusion.
13     A.   Control person?
14       MR. BURKE: Form.
15     A.   I'm not sure what you mean by that.
16     Q.   Did you have the ability to affect what
17 information appeared in Provident's public
18 documents?
19     A.   Yeah, um-hum, yes.
20     Q.   What are internal accounting controls?
21     A.   Well, that's a broad set of controls
22 throughout the company that are designed to prevent
23 fraud and to insure that the financial reporting
24 depicts the actual results of the company.

Page 384

1      Q.   And Greg Dooley, as the chief of
2  internal audit, was responsible for Provident's
3  internal controls, correct?
4      A.   No, I don't think I'd say Greg is
5  responsibile for the -- the internal controls are
6  the responsibility of management throughout the
7  company. Greg Dooley's responsible for testing the
8  internal controls to insure that they were
9  effective.
10     Q.   Who was primarily responsible for
11 Provident's internal controls?
12     A.   You know, Sarbanes-Oxley I believe is
13 putting that responsibility more specifically on
14 the CEO and the CFO; but in many companies, those
15 controls are decentralized.
16          So the operations group, which doesn't
17 report up through finance, maintains very
18 significant internal controls, and they would be
19 responsible for making sure those internal controls
20 are effective.
21          The new rules that are coming out make
22 it more incumbent upon finance to make sure
23 internal controls that aren't under their sphere of
24 influence are correct; but that's a little bit of a

Page 385

1  seat change at some companies.
2      Q.   Did you form a conclusion as to what
3  individuals, by name, were responsible for
4  Provident's restatement and April 15th
5  announcement?
6        MR. BURKE: Responsible for the
7    announcements?
8        MR. BRAUTIGAM: Well, he said it wasn't
9    a second restatement, so I was just --
10       MR. BURKE: No, I'm saying -- I'm
11   thinking announcement in terms of press
12   release. Is that what you're talking about?
13       MR. BRAUTIGAM: No. I was going to
14   refer to it as a second restatement, but he
15   said it's not accurate, so...
16       MR. BURKE: My question is are you
17   directing it as the announcements, the
18   underlying issues --
19       MR. BRAUTIGAM: The underlying issues.
20       MR. BURKE: -- the accounting theory?
21   Okay.
22     A.   Well, again, there were two issues, so
23 I'll try to answer your question, because they're
24 different for those two issues.

Page 386

1  The first issue related to a modeler,
2  and there was a group responsible for setting up
3  the model and monitoring the model in the company;
4  and they didn't get that to work right. So that
5  group is viewed as the one that is responsible for
6  an internal control breakdown.
7      Q.   Did Ernst & Young have any input into
8  setting up the model?
9      A.   I don't think that they did. I've asked
10 that question numerous times. My best recollection
11 is it was done before I started there; but in
12 talking to people, I don't believe they were
13 involved in setting up the model.
14     Q.   Is that concept still somewhat ambiguous
15 even at this point?
16         MR. BURKE: What concept?
17         MR. BRAUTIGAM: Whether or not Ernst &
18     Young was involved in --
19     A.   No, I don't believe -- we've asked a lot
20 of different people, and I don't think anyone has
21 come back and said they were involved in setting up
22 the model.
23         I think it was more an outside
24 investment bank that was familiar with these

Page 387

1  transaction structures that helped set up the model
2  and internal people.
3      Q.   Are you aware that Mr. Cook testified to
4  the contrary? He said that Ernst & Young was
5  involved in setting up the model.
6      A.   I'm not aware of that.
7      Q.   If that was his testimony, he's just
8  wrong?
9          MR. BURKE: Objection. I mean, you
10     can't ask him to characterize testimony he
11     hasn't read.
12     A.   Yeah, to the best of my knowledge, they
13 were not involved in setting up the model. Now,
14 they were involved in determining that the
15 accounting related to the business activity was
16 appropriate. That's different than setting up the
17 model.
18     Q.   Okay.
19     A.   And there's a subissue probably in there
20 that he may be thinking of.
21     Q.   One of the standards of GAAS is
22 independence; is that correct?
23     A.   Correct.
24     Q.   And that would mean that an accounting

Page 388

1  firm could not audit its own work, correct?
2          MR. BURKE: Objection. Calls for
3     speculation.
4      A.   I don't know if I can answer
5  specifically. Those rules seem to be in flux a
6  little bit right now, what an accounting firm can
7  and can't do.
8      Q.   Is the trend toward preventing
9  accounting firms from auditing their own work even
10 if the work is done by the consulting arm of the
11 accounting firm?
12     A.   Yes.
13     Q.   Why is that trend happening?
14     A.   To promote independence.
15     Q.   Do you think that's a good concept?
16     A.   Yes.
17     Q.   Why?
18     A.   Anything that promotes independence with
19 the auditing firm I think is a good concept.
20     Q.   You talked about the group that was
21 setting up the model before your tenure with
22 Provident. By name, who are these people?
23     A.   Jon Farrenkopf. I'm very bad with the
24 names. I'm going to not do too well after that,

Page 389

1  but Jim might be able to help me. Is it "Lafka" or
2  "Leska" or... The person that set up the model
3  does not work at the company anymore.
4      Q.   Who was that person?
5      A.   It begins with an "L." He wasn't at the
6  company when I arrived. I don't remember the exact
7  spelling of the name. It began with an "L." I
8  think it began with an "L."
9      Q.   What was his background?
10     A.   I don't know. I never met the
11 individual, so... He set up the model. I assume
12 he had somewhat of a modeling background, but I
13 don't know.
14     Q.   Do you know who Michelle Beagle is?
15     A.   Yes.
16     Q.   Who is Michelle Beagle?
17     A.   She's a vice president that is
18 responsible for primarily the investor reporting
19 around the auto lease securitizations and some of
20 the operational activities related to the auto
21 lease program.
22     Q.   Did she get sick for an extended period
23 of time in a way that it affected the restatement
24 or the announcement of the restatement?

Page 390

1  A.  I don't think so.
2  Q.  Dr. Steger testified to that effect, and
3  I wasn't sure where it was coming from, but in your
4  recollection --
5  A.  I don't recall that, no.
6  Q.  Okay. You don't recall that. Okay. Do
7  you think as CFO that Greg Dooley did an adequate
8  job with respect to the internal controls?
9       MR. BURKE: Does he think as CEO?
10      MR. BRAUTIGAM: CFO.
11 A.  Yes, I do think that he did. When you
12 look at the internal controls in the company, I
13 believe that the situation was very unique, and it
14 was -- there was really primarily one breakdown in
15 the internal control.
16      In the broad picture, I think Greg's
17 team did a good job. They missed one item. It
18 happened to be significant, and that's been a
19 problem, but...
20 Q.  And they missed that item year after
21 year after year, correct?
22 A.  Yes, it was overly complex.
23 Q.  Are you capable of firing Greg Dooley?
24 A.  No, I personally am not. He does not

Page 391

1  work for me, and we don't get to fire the auditor.
2  I could make a recommendation, but that would be
3  unusual.
4  Q.  Did you make a recommendation that
5  anyone be fired?
6  A.  No, we did not. I did not make a
7  recommendation that anyone be fired.
8  Q.  You testified in one of your previous
9  answers that the situation was, quote, very unique,
10 and yet you seemed to testify previously that the
11 problem with the model was a common industry
12 practice. Can you reconcile that --
13      MR. BURKE: The problem with the model
14 was a common industry practice? I don't think
15 that's what he said.
16      MR. BRAUTIGAM: Well, anyway, he's going
17 to explain.
18 A.  As I've said all along, there was two
19 issues. There was a model that was set up wrong
20 from the start that didn't get picked up, and that
21 led to one accounting error.
22      There was the recording of the auto
23 leases with what was an industry practice, which
24 was a separate issue; and there wasn't a model

Page 392

1  breakdown.
2       I mean, we were recording them properly,
3  but we were recording in what was believed to be an
4  industry practice, which industry practices aren't
5  GAAP, so we and other banks changed that.
6       So one was an operational -- or, that
7  produced the wrong accounting answer, and one was a
8  judgment made that this was the right method to
9  produce -- to report these assets; that looking at
10 later critically, despite what everybody else in
11 the banking industry was doing, we determined that
12 it didn't meet GAAP, so we changed it.
13 Q.  Did you ever think that Ernst & Young
14 was asleep at the switch?
15      MR. BURKE: Objection. Calls for
16 speculation; form.
17 A.  Yeah, I wouldn't use those words about
18 Ernst & Young. They were two issues. The industry
19 practice, which everybody was following -- it was
20 hard to be overly critical of Ernst & Young when
21 the rest of the banks were doing the same thing.
22      The accounting error -- you know, I do
23 still think it was kind of a unique item, and it's
24 not an audit. You can't just catch everything.

Page 393

1  They missed this and so did our internal audit
2  group, which is disappointing, but those things
3  happen.
4  Q.  And when those things happen,
5  shareholders are harmed, correct?
6       MR. BURKE: Objection. Calls for
7  speculation.
8  A.  Sometimes they are and sometimes they
9  aren't. It depends. People make mistakes. That's
10 the point I would make. People make unintentional
11 mistakes. That's what happened here. Everybody
12 knows it.
13 Q.  Year after year after year?
14 A.  It happens.
15 Q.  What's the treadway commission?
16 A.  It was a commission put together many
17 years ago -- I'm going to guess 10 plus years ago
18 -- to look at improvements in financial reporting
19 and disclosures and recommendations on what
20 companies should do about internal control
21 environments and -- just an industry group.
22      And I think it had to do with how you
23 would audit companies, and it was a driver behind
24 -- one of their many -- one of their

Page 394

1  recommendations was that companies should put in
2  their financial statements a statement by
3  management about their internal controls and about
4  the responsibility of the financial statements.
5      And not everybody has, as I said,
6  included that statement in there, but I'd say a lot
7  of companies have. I don't know whether it's a
8  majority or not, but I guess a majority of larger
9  companies put some statement in there like that.
10     Q.   Did you ever recommend to the audit
11 committee that Ernst & Young be fired?
12     A.   No. I didn't make that recommendation
13 to the audit committee.
14     Q.   Why not?
15     A.   It was not... I think the better answer
16 is we had discussions about continuing with Ernst &
17 Young. We didn't get to a point of recommending
18 them be fired or not yet, but we were committed to
19 doing an evaluation of Ernst & Young as our
20 auditor.
21     Q.   What were the pro and con of continuing
22 with Ernst & Young as reflected in these
23 discussions with the audit committee?
24     A.   I can't remember exactly what we talked

Page 395

1  about. It was -- you know, now we're going back a
2  while ago, probably six months or so ago.
3  Consistency; continuity was a plus; and they were
4  changing their audit partner. That would be viewed
5  as a plus.
6      Q.   Bill Weiners retired, correct?
7      A.   He was retired, and I think he's
8  unretired; but he was retired from our account and
9  he was retiring. I heard recently there might be a
10 change to his status, but he was retired for a
11 while.
12     Q.   He's coming back to Ernst & Young?
13     A.   I think he may be coming back, just to
14 try to answer your question accurately.
15     Q.   Where did you hear that?
16     A.   I think from Bill Weiners or one of the
17 Ernst & Young people. I think it's a relatively
18 new development.
19     Q.   When's the last time you spoke with Bill
20 Weiners?
21     A.   Probably about three weeks ago.
22     Q.   And what was the nature of that call?
23     A.   Bill was in Philadelphia. I think it
24 might have been for one of our last audit committee

Page 396

1  meetings or something like that.
2      Q.   Provident audit committee?
3      A.   Yes. We still have audit committee
4  meetings, and we've had first quarter results that
5  got cleared, those sorts of things. The merger
6  doesn't close for two weeks.
7      Q.   Did the Provident audit committee meet
8  in Philadelphia a couple weeks ago?
9      A.   Did I say Philadelphia?
10     Q.   Because you said he was in Philadelphia,
11 and I was wondering --
12     A.   Did I say Philadelphia?
13     Q.   I think you did.
14     A.   I've got Philadelphia on the mind. It
15 wasn't Philadelphia. I meant Cincinnati. I've
16 been out probably like -- I spent 22 years in
17 Philadelphia. Occasionally I insert Philadelphia
18 instead of Cincinnati. No, the audit committee was
19 here.
20     Q.   He was a Columbus-based partner,
21 correct?
22     A.   Yes.
23     Q.   Was it a de facto requirement of
24 Provident continuing with Ernst & Young that

Page 397

1  Mr. Weiners not be on the account anymore?
2      MR. BURKE: Was it a what requirement?
3      MR. BRAUTIGAM: De facto.
4      MR. BURKE: Object to the form.
5      A.   I don't know if I would say -- Ernst &
6  Young approached us and said that they thought that
7  a partner change would -- might be appropriate, and
8  we agreed with them that would be a good thing to
9  do.
10     Q.   How long had Mr. Weiners been on the
11 account?
12     A.   Three years, and he was closely
13 approaching retirement age. I think he's 58 or 59.
14     Q.   Under Sarbanes-Oxley, he would have to
15 be rotated off after five years anyway, correct?
16     A.   Right.
17     Q.   And that's a change, correct?
18     MR. BURKE: What's a change?
19     MR. BRAUTIGAM: The rotation period.
20     A.   Yes.
21     Q.   What were the weaknesses of Provident's
22 internal controls as outlined on page 15 of
23 Plaintiffs' Exhibit 90?
24     MR. BURKE: Just take a look at the

Page 398

1  statement. Make sure you put it in context.
2    You're referring to the report of management?
3    MR. BRAUTIGAM: Yes.
4  BY MR. BRAUTIGAM:
5    Q. In the third paragraph, it talks about
6  the weaknesses in our internal controls, and I
7  want, with as much specificity as possible, what
8  those weaknesses were.
9    A. The primary weakness in our internal
10 controls was the review process of the modeling
11 activity in the company.
12   Q. Who best understood the modeling
13 activity in the company?
14   A. Well, the modeling activity in the
15 company was decentralized. So there were two or
16 three groups that did most of the modeling
17 activity. It wasn't all in one business area.
18   So there wasn't one person -- it's
19 possible that the internal audit group who looked
20 at a lot of these models may have been the one
21 group who best understood what was being done
22 everywhere. I'm not certain that that's the case.
23   Q. Are there certain individuals who come
24 to mind as being extremely knowledgeable about the

Page 399

1  model?
2    A. The audit would be the one that would
3  come to mind for me.
4    Q. Any individual there?
5    A. Greg Dooley.
6    Q. Was Tayfun Tazun involved in the
7  modeling at all?
8    A. Oh, not really. I mean, he was -- he
9  had a significant modeling function underneath him,
10 but that related to interest rate risk and capital
11 planning.
12   The modeling for the auto lease was
13 under John Farrenkopf. Tayfun Tazun was familiar
14 with the auto lease securitization activity that
15 was in this model that ended up not being accounted
16 for appropriately.
17   Q. Mr. Carey, aside from what you already
18 mentioned, what were some of the Provident's other
19 weaknesses with respect to internal controls?
20   MR. BURKE: Objection.
21   A. I don't believe that we've identified
22 any other weaknesses, and I'm not aware that any
23 other material weaknesses besides that related to
24 the modeling activity either from Ernst & Young or

Page 400

1  our internal audit group.
2    Q. You used the word weaknesses on page
3  15. That implies plural, correct?
4    A. Um-hum.
5    Q. And you've only mentioned the one
6  weakness. So is it fair to conclude there are no
7  others?
8    A. Well, you know, we had modeling
9  activities, so we had to put controls around the
10 modeling activity that was going on throughout the
11 company. So there isn't just one model here now.
12   We identified a hundred models, and some
13 were very significant; some were less significant;
14 some were not significant -- and established
15 controls around in making sure those models were
16 all working properly, so... and a variety of
17 different controls to make sure those models were
18 working properly and being checked and tested and
19 those kind of things.
20   Q. Mr. Carey, are you familiar with the
21 time value of money?
22   A. Yes.
23   Q. What does that concept embrace?
24   A. A dollar today is worth a lot more than

Page 401

1  a dollar ten years from now.
2    Q. And you would expect someone who is
3  financially literate and serving on Provident's
4  audit committee to understand that concept,
5  correct?
6    MR. BURKE: Objection. Speculation.
7    A. I think -- described properly, I think
8  they probably would. Sometimes things like that
9  aren't always articulated in the best way for
10 someone else to understand. They might understand
11 it but not understand it the way it's being
12 described.
13   Q. If I were to ask a member of Provident's
14 audit committee, hey, are you familiar with the
15 time value of money, and the person said no, would
16 that surprise you?
17   MR. BURKE: Objection. Calls for
18 speculation; assumes facts not in evidence.
19   A. I think I'd really rather hear the whole
20 context of the question than to guess or speculate
21 on a question like that.
22   Q. You didn't have any hesitation in
23 answering that question, did you?
24   A. No, I did not.

Page 402

1    Q.   Okay. When the second issue talks about
2  shifting income from one period to another, does
3  that trigger the concept of the time value of
4  money?
5        MR. BURKE: Objection. Speculation.
6    A.   No. I don't -- I'm not sure that it
7  really does. The cash flows were the same. You
8  know, that's an accounting concept. Time value of
9  money relates more to cash than it does to GAAP
10 non-cash entries.
11   Q.   But with respect to GAAP, when income is
12 generated is an important concept, correct?
13   A.   It is. It is, but not everybody
14 believes GAAP results because they don't reflect
15 cash flows as well as -- cash flows analyses are,
16 you know, the best way to look at a company. I
17 mean, that's somewhat common.
18        But I think that concept is more related
19 to cash than it is to GAAP. People don't look at
20 GAAP results and feel like they can do necessarily
21 all things in some time value of money.
22        I'm not saying they don't do it at times
23 because they do for simplicity reasons. But if
24 they were doing a true financial analysis, they'd

Page 403

1  look at the cash; not the GAAP answer.
2        If they were buying an asset or selling
3  an asset, they typically look at cash, an asset;
4  not a company.
5    Q.   Could you pick up Plaintiffs' 92,
6  please.
7    A.   Okay.
8    Q.   Now, the first page of this document
9  reflects a Sunday meeting, February 23rd, 2003, of
10 the board of directors of Provident Financial
11 Group, correct?
12   A.   Yes, that's what it looks like.
13   Q.   And you were present at this meeting,
14 correct?
15   A.   Correct.
16   Q.   And did you review the minutes of this
17 meeting?
18   A.   Yes, I did, I'm sure.
19   Q.   Did you typically review Provident board
20 minutes?
21   A.   Yes.
22   Q.   Did you typically review Provident audit
23 committee minutes?
24   A.   Yes.

Page 404

1    Q.   Why?
2    A.   Because I typically attended those
3  meetings and typically presented; and most of the
4  time, my review was directed at my comments.
5        I mean, that's where -- where there was
6  something that I would give comments on typically
7  was what I heard or what I said or sometimes what
8  someone else might have said that didn't look like
9  it was being transcribed properly.
10   Q.   Now, when you reviewed these particular
11 minutes, Sunday, February 23rd, 2003, did you
12 understand them?
13        MR. BURKE: Objection. Foundation.
14   A.   Well, in general, sure, I understood
15 them.
16   Q.   Okay. Turn to the second page, please,
17 first paragraph, last sentence. It says, The
18 initial determination was that the existing
19 financial model materially underreported expenses
20 of the eight transactions, as a result of which the
21 net earnings of the company were believed to have
22 been materially overstated for each of the years
23 1997 through 2002.
24        MR. BURKE: Also ask the witness to make

Page 405

1  sure you read this to put it in context.
2    A.   Yeah, I mean, I've got it. That was the
3  initial determination.
4    Q.   Did that determination ever change?
5    A.   I think it did change, yeah.
6    Q.   Did it ever change with respect to
7  whether or not the net earnings for Provident were
8  materially overstated for 1997 through 2002 and the
9  financial model materially underreported the
10 expenses?
11        MR. BURKE: Objection to form.
12   A.   I'm not sure I understand what your
13 question is here.
14   Q.   In other words, this was an early
15 meeting dealing --
16   A.   Right.
17   Q.   -- with this problem, correct?
18   A.   That's right. Um-hum.
19   Q.   And my question is -- this is the best I
20 can put it -- some of the details with respect to
21 the numbers may have changed, but the concept that
22 "the financial model materially underreported
23 expenses of the eight transactions and as a result
24 the net earnings of Provident were materially

Williams & Oliver
(513)683-9626

Page 406

1  overstated for each of the years 1997 through 2002"
2  did not change; is that correct?
3     A.   No, that did change.
4     Q.   That did change. Okay. How did that
5  change?
6     A.   That changed because, at the time, we
7  weren't focused on the periods at all, and we
8  didn't even have -- we had little period
9  information.
10         We knew there was an error, and we were
11 trying to look at the aggregate impact and not
12 focused on how much of it was in 2002, 1, whatever.
13         We knew when it started, and we had a
14 ballpark sense of the aggregate; but we had to do a
15 tremendous amount of work to try to get the number
16 by year.
17    Q.   And the ballpark sense was about 130
18 million, correct?
19         MR. BURKE: What point in time, Counsel?
20         MR. BRAUTIGAM: Late February/early
21 March, 2003.
22         MR. BURKE: I think it changed.
23    A.   It changed. I don't remember exactly
24 what it was, but it ended up being whatever it was.

Page 407

1     Q.   But --
2     A.   But to answer your question, this was an
3  early call within a short period of time of me
4  finding out about the problem, and there was a
5  tremendous amount of work done to figure out what
6  was the correct answer and then what was the
7  correct answer by period.
8     Q.   Does anything ever appear in Provident
9  board minutes or Provident audit committee minutes
10 that says that the financial model did not
11 materially underreport expenses of the eight
12 transactions and did not materially overstate
13 Provident's net income for the years 1997 through
14 2002?
15    A.   Yeah, yeah, for the second one.
16    Q.   Where?
17    A.   There's factual information, I believe,
18 that shows that all of those years weren't
19 materially misstated.
20         I don't know there's word that goes back
21 to do that; but at some point in time, the numbers
22 are presented that show that it doesn't look like
23 it was particularly material to '97 and '98.
24    Q.   Is particularly material an accounting

Page 408

1  term?
2     A.   Material sort of is an accounting term.
3  Particular might not be, but as I said earlier,
4  there's no bright line on what's material and
5  what's not.
6          But the numbers were smaller in those
7  earlier years as you've seen; and at this point in
8  time, people didn't really have a sense, I don't
9  recall, as to how much they were to each year.
10    Q.   Where does that concept appear in
11 Provident board minutes or audit committee minutes,
12 at least in Exhibit --
13         MR. BURKE: What concept?
14    A.   I don't --
15         MR. BURKE: Just a minute. Just so
16 we're clear, what concept?
17         MR. BRAUTIGAM: The concept that appears
18 on page 12066 is incorrect with respect to the
19 years '97 and '98.
20         MR. BURKE: Objection. Asked and
21 answered.
22    A.   Are you looking for a sentence?
23    Q.   Yes.
24         MR. BURKE: Do you want to review these

Page 409

1  documents?
2     A.   What I said was I don't recall whether
3  this got -- later when this was talked about how it
4  got described, but the numbers -- we didn't have, I
5  don't believe -- we didn't have annual numbers when
6  these statements were being made.
7          This was referring to a time period and
8  estimates and initial things. Later, we eventually
9  presented to the audit committee and the outside
10 world what were the actual changes.
11         They are what they are. I have no
12 further comments on what people may judge are
13 material or not.
14         But I don't recall whether this got
15 specifically refuted other than there's factual
16 information about what the answer -- this wasn't
17 meant to be the final answer. We eventually came
18 up with the final answer, and it's in the press
19 releases.
20    Q.   Did the SEC take a position as to what
21 was material and what was not material?
22    A.   No, not -- I mean, I don't know. I
23 don't know how to respond to that because I don't
24 know what the SEC really does about these matters,

Williams & Oliver
(513)683-9626

e49da87b-a1b1-491d-8eee-0c88afaef3fe

Page 410

1   but they didn't have a conversation with me about
2   what was material or what wasn't.
3        Q.   On the next page, in the first full
4   paragraph, it starts out, At this juncture in the
5   meeting, Chris Carey gave a report to the directors
6   that summarized his views on the matter. Do you
7   see that?
8        A.   Um-hum.
9        Q.   And as best you can recall, in words or
10  substance, what were your views on the matter as of
11  Sunday, February 23rd, 2003?
12            MR. BURKE: And I will caution you,
13  Mr. Carey, the reason for the redaction is
14  because it was determined by us that this was
15  attorney/client communications. Okay?
16            And what I would caution you not to do
17  is to reveal any attorney/client
18  communications that may have been encompassed
19  within that report that I guess is referenced
20  in this paragraph.
21       A.   Let me see if I can find some context
22  here with what I may have been thinking on that
23  date. (Examining document.)
24            I have no idea what I would be thinking

Page 411

1   about then. It was a pretty intense time. So I
2   don't know whether his views on this matter...
3   It's not -- I will tell you this. I have no
4   recollection of what I said right then. All right?
5            And if I could speculate about what I
6   would have said right then, frankly, there's enough
7   in the documents around here that articulate -- my
8   views on the matter then I think would have
9   probably been irrelevant because we ended up
10  figuring out what the issues were.
11           I don't know whether I was talking -- if
12  I was trying to theorize about what happened or
13  not. It just -- I can't remember.
14       Q.   Okay. Did you make remarks off the
15  cuff, or did you have an actual Power Point or
16  other presentation that you made to the board?
17       A.   I don't remember. I don't know that I
18  would have had a Power Point for this meeting or
19  not, but I don't remember.
20       Q.   It was only a 30-minute meeting,
21  correct?
22            MR. BURKE: It was only what?
23            MR. BRAUTIGAM: A 30-minute meeting.
24            MR. BURKE: Where is the commencement?

Page 412

1   There it is. Okay. 6:05 to 6:35, 30-minute
2   meeting.
3        A.   I don't think there would have been a
4   Power Point. We were still in the -- trying to
5   figure out what the issue was at this stage.
6        Q.   Let's turn to the next meeting.
7            THE WITNESS: Can I just take a
8   few-second break?
9            MR. BRAUTIGAM: Certainly.
10           (A brief break was taken from 5:15 to
11  5:16, 1 minute.)
12  BY MR. BRAUTIGAM:
13       Q.   Two days later, there's a special
14  meeting of the audit committee, and you are brought
15  in to make a presentation to the committee. Do you
16  see that?
17       A.   I'm looking at it, but I don't
18  necessarily see that. Is there a reference in here
19  to it? Is that the report by Hoverson, Carey, and
20  Gerde?
21       Q.   Yeah.
22       A.   Okay.
23       Q.   And at this point, February 25th, 2003,
24  you did not know whether Ernst & Young had ever

Page 413

1   tested or validated the financial model; is that
2   correct?
3        A.   I don't remember about that time what I
4   knew. I mean, I can read what's in these minutes,
5   but I certainly don't remember then.
6        Q.   Okay. Well, that's what the minutes
7   say, right?
8        A.   Then that's probably accurate.
9        Q.   Okay. And do you now know whether Ernst
10  & Young ever tested or validated the financial
11  model?
12       A.   I don't know. I don't -- my general
13  sense was they didn't do a lot of work with it,
14  but...
15       Q.   They did not?
16       A.   That's my general sense. They probably
17  did some work with it, but I don't really know. I
18  forget now. It was viewed as a low risk area for a
19  variety of reasons. It was not an area that would
20  have been high risk.
21           Of course, that's because nobody thought
22  there was an error; but it wasn't like a high risk
23  asset, and it was -- so I can't remember.
24           I know our audit group looked at it, I

Page 414

1  think, annually, but certainly because they issued
2  reports related to the activity there. And I don't
3  really know whether Ernst & Young did much work.
4  My sense was they didn't do much work, but I'm not
5  certain about that.
6     Q.   You talked about the various levels of
7  risk. Do you remember that testimony?
8     A.   Yeah.
9     Q.   When one says this is a high risk audit,
10 risk to whom?
11    A.   Risk for some type of error or estimate
12 being wrong, something like that; but it usually
13 relates to whether there's high operational
14 activity or there's an estimation process that
15 people worry about.
16       Interest rates might change or something
17 like that. Credit is obviously considered the
18 highest risk at a bank of the audit, so that's
19 viewed a little bit differently than every other
20 area.
21    Q.   Right. And with respect to the risk of
22 the audit, isn't the risk that the financial
23 statements would be materially misstated?
24       MR. BURKE: Objection. Misstates the

Page 415

1  testimony. You may answer.
2     A.   I don't -- you know, that's not the way
3  we typically look at it, that the financial
4  statements were materially misstated. It's just an
5  area that has higher risk. I guess that could be
6  the outcome, but... You know, it's a variety of
7  factors.
8     Q.   Okay. Can you describe to me, as you
9  described to the audit committee, the circumstances
10 under which accounting changes occur in general and
11 how and when approval by the SEC is required?
12       MR. BURKE: What paragraph are we?
13       MR. BRAUTIGAM: It begins, At this
14 juncture in the meeting, page 3.
15    A.   Okay. I see it. My memory is
16 refreshed. So what do you want me to explain
17 that's not in here?
18    Q.   Okay. Just tell me what you told the
19 audit committee.
20    A.   I told the audit committee that there's
21 a process that's out on the web site, I believe,
22 where if you have an accounting practice and you
23 believe there is a more preferred accounting
24 practice, that you have to go through and prepare a

Page 416

1  statement of position, if you will.
2        Your accounting firm has to put in
3  writing that they agree with it, and then you would
4  -- I think you -- I don't -- I think you send it in
5  to the SEC. They review and decide whether they
6  will consider it or not.
7     Q.   And was Provident considering doing that
8  at this point in time?
9     A.   Well, Ernst & Young's -- one of their
10 initial theories was that even though the answer is
11 different than we expected, it might not be an
12 understatement or an overstatement of earnings. It
13 could be an understatement of earnings.
14       And if that were the case, then that was
15 coming from them, not us. They said they're not
16 sure that you've understated earnings.
17       You might not have accomplished what you
18 were setting out to do with this model, but we're
19 not a hundred percent -- we're not sure yet that
20 you understated earnings. You may -- or, we're not
21 sure that you overstated earnings. You may have
22 understated earnings.
23       We said, well, fine, if that's true --
24 and I'm not going to say we all thought that was

Page 417

1  true. We said if that's true, then we might have
2  the option of changing the accounting methodology
3  -- requesting a change in accounting methodology to
4  one that we think is more reflective of the actual
5  activities of business and presents a better
6  answer.
7        And that's where we got into this
8  discussion. It became relevant later when the
9  national office came back finally and said, no,
10 it's not. That's not -- you didn't -- there's --
11 what they had looked at didn't work out. So that
12 idea went away.
13    Q.   Did that strike you as a desperate
14 attempt?
15    A.   No, it did not.
16    Q.   Did it strike you as grasping at straws?
17    A.   No. The person that suggested -- no, I
18 think they initially thought that was it. I mean,
19 this business was a little bit complex, and there
20 was no question there was an attempt by the group
21 to recognize income conservatively, and that was
22 pretty evident.
23       And there was a lot of discussion about
24 how do you really account for an off-balance-sheet

Page 418

1  auto lease securitization, and it was -- we were
2  having difficulty trying to figure that out,
3  frankly.
4      MR. BURKE: We are past -- I've even
5  given you -- plus the breaks, we're past the
6  seven-hour limit including the most recent
7  break.
8      So if there's another couple questions
9  you would like to ask, that's fine, but I'd
10 like to wrap it up.
11     MR. BRAUTIGAM: I would respectfully
12 request that you consider Mr. Carey returning
13 voluntarily. This is complex stuff. I
14 believe that I need more than the presumptive
15 seven hours, and I will follow that up with a
16 letter.
17     Mr. Carey, I thank you for your time and
18 your cooperation, and perhaps I'll see you
19 again.
20     (DEPOSITION ADJOURNED AT 5:22 P.M.)
21
22     _____
23         CHRISTOPHER J. CAREY
24

Page 419

1              CERTIFICATE
2  STATE OF OHIO    :
3                   : SS
4  COUNTY OF HAMILTON :
5      I, Kelly Green, the undersigned, a duly
6  qualified and commissioned notary public within and
7  for the State of Ohio, do hereby certify that
8  before the giving of the aforesaid deposition, the
9  said CHRISTOPHER J. CAREY was by me first duly
10 sworn to tell the truth; that the foregoing is a
11 deposition given at said time and place by the said
12 CHRISTOPHER J. CAREY; that said deposition was
13 taken in all respects pursuant to notice as to the
14 time and place; that said deposition was taken by
15 me in stenotype and transcribed by computer-aided
16 transcription under my supervision; and that
17 examination and signature to the transcribed
18 deposition is not waived.
19     I further certify that I am not a
20 relative, employee of, or attorney for any of the
21 parties in the above-captioned action; I am not a
22 relative or employee of an attorney of any of the
23 parties in the above-captioned action; I am not
24 financially interested in the action; I am not, nor

Page 420

1  is the court reporting firm with which I am
2  affiliated, under a contract as defined in Civil
3  Rule 28(D).
4      IN WITNESS WHEREOF, I hereunto set my
5  hand and official seal of office at Cincinnati,
6  Ohio, this 3rd day of July, 2004.
7
8      _____
9  My commission expires:      Kelly Green
10 August 9, 2004        Notary Public/State of Ohio