# Exhibit C

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION

 3

 4                      - - -

    WALTER W. THIEMANN, et al.,:
 5                             :
            Plaintiffs,        :
 6  -v-                        : CASE NO. C-1-00-793
                               :
 7  OHSL FINANCIAL CORPORATION,: (Judge S. Beckwith)
 8  et al.,                    :
                               :
 9          Defendants.        :
                      - - -
10

11

12

            Deposition of ROBERT HOVERSON, a witness
13
    herein, taken by the Plaintiffs as upon cross-
14
    examination pursuant to the Federal Rules of Civil
15
    Procedure, and pursuant to notice and stipulations
16
    hereinafter set forth, at the offices of Gene Mesh
17
    & Associates, 2605 Burnet Avenue, Cincinnati, Ohio,
18
    at 10:30 a.m., on Thursday, May 27th, 2004, before
19
    Kelly Green, RPR, a Notary Public within and for
20
    the State of Ohio.
21

22
                    Williams and Oliver
23                  6689 Raes Creek Court
                    Loveland, Ohio  45140
24                     (513) 683-9626
```

Page 2

APPEARANCES

On behalf of the Plaintiffs:
    MICHAEL G. BRAUTIGAM, ESQ.
    GENE MESH, ESQ.
    Gene Mesh & Associates
    2605 Burnet Avenue
    Cincinnati, Ohio 45219
On behalf of the Defendants:
    JAMES E. BURKE, ESQ. (Of Counsel)
    Keating, Muething & Klekamp
    1400 Provident Tower
    One East Fourth Street
    Cincinnati, Ohio 45202
On behalf of the Defendant,
OHSL and Provident:

    CHARLES F. SHANE, ESQ.
    Bieser, Greer & Landis
    400 National City Center
    6 North Main Street
    Dayton, Ohio 45402

On behalf of the Defendant,
Ernst & Young:
    MARY HELEN PERRY, ESQ. (Telephonic)
    Jones Day
    51 Louisiana Avenue, N.W.
    Washington, D.C. 20001

        - - -

---

Page 4

EXAMINATION INDEX

ROBERT HOVERSON
    CROSS BY MR. BRAUTIGAM . . . .    5

---

Page 3

STIPULATIONS

It is stipulated by and among counsel
for the respective parties that the deposition of
ROBERT HOVERSON, a witness herein, may be taken at
this time by the Plaintiffs as upon cross-
examination, pursuant to Federal Rules of Civil
Procedure and pursuant to notice; that the
deposition may be taken in stenotypy by the notary
public and court reporter and transcribed by her
out of the presence of the witness; that the
deposition is to be submitted to the witness for
his examination and signature, and that signature
is not waived.

---

Page 5

ROBERT HOVERSON,
a witness herein, having been duly sworn, was
examined and testified as follows:
        CROSS-EXAMINATION
BY MR. BRAUTIGAM:
    Q.    Good morning, Mr. Hoverson.  My name is
Michael G. Brautigam, and represent Walter
Thiemann, Gary and Lisa Meier, and a putative class
of OHSL shareholders.
        Can I direct your attention to
Defendants' Exhibit 1 in front of you?
    A.    Um-hum.
    Q.    What is Defendants' Exhibit 1?
    A.    Well, it appears to be an invitation to
a special meeting of OHSL shareholders, it says.
    Q.    Mr. Hoverson, in 1999, did you read
every word and look at every number of that
document?
    A.    I can't -- can't tell you if I did or
not.  Been too long ago.
    Q.    Is it fair to describe Defendants'
Exhibit 1 as the proxy materials registration
statement?
    A.    Appears to be.  I certainly would have

---

Williams & Oliver
(513)683-9626

Page 6

1  been familiar with the documents as it relates to
2  the data that we submitted. I would have looked at
3  all that.
4      Q.    Do you believe that the OHSL
5  shareholders had a right to rely on every word and
6  every number in the document?
7          MR. BURKE: Objection. Calls for
8      speculation.
9      A.    The document is what it is. I mean, I--
10  you know. You have to tell me what they rely on --
11  what they could rely on and what they couldn't rely
12  on.
13      Q.    No, that's not the way it works. My
14  question for you is --
15      A.    I don't know what they're allowed to
16  rely on. Okay! All I know is what the data that
17  we submitted -- and that's all I can speak to.
18      Q.    Mr. Hoverson, I'll try not to step on
19  your answers if you try not to step on my
20  questions, and it really would be best for the
21  record if we don't speak at the same time. Okay?
22          MR. BURKE: Go ahead.
23      Q.    Mr. Hoverson, do you believe that the
24  OHSL shareholders had a right to rely on every word

Page 7

1  and every number in Defendants' Exhibit 1?
2          MR. BURKE: Objection. Asked and
3      answered. You may answer again.
4      A.    I mean, you know, shareholders have a
5  right to rely on the documents that we give them.
6      Q.    Do you believe that Defendants' Exhibit
7  1 tells the truth, the whole truth, and nothing but
8  the truth about the OHSL-Provident merger?
9          MR. BURKE: Objection. Form. You may
10  answer.
11      A.    Yeah, I don't quite sure know how to
12  answer the question, frankly. Again, I can speak
13  to the data that we submitted and am comfortable
14  that it was accurate and they could rely on it.
15      Q.    You're comfortable that the data that
16  Provident submitted to be included in Defendants'
17  Exhibit 1 is accurate?
18      A.    Sure.
19      Q.    And you're comfortable as of today that
20  it was accurate?
21      A.    Sure. Accurate as of the time, sure.
22      Q.    Did you later learn that the data
23  submitted by Provident was not accurate?
24          MR. BURKE: Objection. Calls for

Page 8

1  speculation.
2          THE WITNESS: How do you want me to -- I
3      don't know how to answer the question.
4          MR. BURKE: Then that's fine. You don't
5      have to if you don't understand the question.
6  BY MR. BRAUTIGAM:
7      Q.    Is there something that you don't
8  understand about the question?
9      A.    Yeah. I don't know how to answer the
10  question.
11      Q.    Mr. Hoverson, did Provident provide
12  financial data that went into Defendants' Exhibit
13  1?
14      A.    We did.
15      Q.    Did you ever learn after the fact that
16  the data that Provident provided was not accurate?
17      A.    Would you like to get specific and ask
18  me a specific question about the data? I'll be
19  happy to answer it.
20      Q.    Mr. Hoverson, can you answer my
21  question, please?
22          MR. BURKE: Objection. I think he just
23      indicated he can't, but you may --
24      A.    Well, and I'm happy to answer it if, you

Page 9

1  know -- if you would like me to speculate on
2  things, I'm not going to do that. If you want to
3  talk about the restatement in March 5th of 2003, is
4  that specifically what you're referring to?
5      Q.    Mr. Hoverson --
6      A.    I'm happy to respond to that question if
7  you have a question that relates to that.
8      Q.    Mr. Hoverson, can you answer my
9  questions, please?
10      A.    I did.
11      Q.    Do you believe that the financial data
12  that Provident provided in Defendants' Exhibit 1 is
13  accurate?
14      A.    You know, again, you've got to have
15  context around these questions. When that data was
16  submitted, it was accurate. If you would like to
17  ask a question about the restatement that occurred
18  March 5th, I'm happy to answer that.
19      Q.    What do you mean when you say when that
20  data was submitted, it was accurate?
21      A.    Just that.
22      Q.    Please turn to page 6 in the proxy
23  materials.
24      A.    In the proxy? Is that numbered 1

Page 10

1  through 6, front through back?
2      Q.    It has a 6 at the bottom.
3      A.    Okay.
4      Q.    Provident provided numbers for the year-
5  end 1994 on that page, correct?
6      A.    Yeah.
7      Q.    And we now know that those numbers are
8  materially misstated, correct?
9          MR. BURKE:  Objection.  Misstates the
10     facts; assumes facts not in evidence; calls
11     for speculation.  You may answer.
12     A.    Yeah, I don't know that that's true at
13 all.
14     Q.    Are those numbers correct?
15     A.    As far as I know, they're correct.
16 1994?
17     Q.    Yeah.
18     A.    As far as I know, they're correct.
19     Q.    Okay.  Provident provided financial
20 numbers for the year-end 1995, correct?
21     A.    Yes.
22     Q.    Are those numbers correct?
23     A.    As far as I know, they are correct.
24     Q.    Provident provided financial information

Page 11

1  for year-end 1996; is that right?
2      A.    Yes.
3      Q.    Are those numbers that appear on page 6
4  of this document materially misstated?
5          MR. BURKE:  Objection.  Calls for
6      speculation.
7      A.    Yeah, I don't know what that means,
8  frankly.
9      Q.    You don't know what what means?
10     A.    Materially misstated.  I don't know what
11 that means, number one.  Number two... I'm just
12 trying -- as to when the restatement -- I guess it
13 went back to -- did it go back to '96?  I guess it
14 went back to '96.
15         Look, I will stipulate that we restated
16 our numbers in March of 2003 -- okay? -- and all
17 the way back I believe either to '96 or '97.  That
18 was done.
19     Q.    Actually, the restatement goes back to
20 '94, doesn't it?
21     A.    I don't think so.
22     Q.    Okay.
23     A.    That's not my memory of it.
24     Q.    Okay.  Well, I'll show you some

Page 12

1  documents later.  What does it mean to have a
2  restatement?
3          MR. BURKE:  Objection.  Calls for
4      speculation.
5      A.    Yeah, what's it mean to have a
6  restatement?  It means what it says.  We restated
7  the numbers.
8      Q.    Why did you do that?
9      A.    Because there was an accounting error
10 that was discovered in February of 2003.
11     Q.    You're familiar with the word
12 "material," correct?
13         MR. BURKE:  Objection.
14     A.    I am.
15         MR. BURKE:  Calls for a legal
16     conclusion.  You may answer.
17     Q.    What does the word "material" mean?
18     A.    It means different things in different
19 contexts.
20     Q.    What does it mean in the context of an
21 accounting error?
22         MR. BURKE:  Objection.  Calls for
23     speculation.
24     A.    I'm not going to speculate.

Page 13

1      Q.    What does it mean in the context of a
2  restatement?
3      A.    Again, I'm not going to speculate.  The
4  numbers are what they are.
5      Q.    You testified a moment ago, if I
6  understood your testimony correctly, that you did
7  not know what it means to be materially misstated;
8  is that correct?
9          MR. BURKE:  Your testimony is what it
10     is.
11     A.    You tell me what I said.
12     Q.    Do you know what it means --
13     A.    I'm not...
14     Q.    -- to have the financial statements
15 materially misstated?
16     A.    I believe I said I did not.  I'm not
17 trying to get into speculating what material means,
18 and I'm not gonna.
19     Q.    Mr. Hoverson, are you able to read and
20 interpret documents that come forth from Provident?
21         MR. BURKE:  Objection to form.  What do
22     you mean documents that come forth from
23     Provident?
24     Q.    You can answer the question.

Williams & Oliver
(513)683-9626

Page 14

1    A.    Yeah, I don't know what -- I mean, are
2  you asking me if I can read?  I can read.
3    Q.    Are you able to read and interpret
4  Provident 2002 annual report?
5    A.    Yes, I can.
6    Q.    Did you read every word and look at
7  every number in Provident's 2002 annual report?
8    A.    I did.
9    Q.    Did you understand what you read?
10    A.    Um-hum.
11    Q.    Is that a yes?
12    A.    That's a yes.
13    Q.    It would be better for the record if you
14  could answer questions yes or no and not um-hum.
15         Would you please pick up Plaintiffs'
16  Exhibit 90, which is at that pile by your right
17  elbow.
18         MR. BURKE:  It's in the middle of the
19  pile.
20    Q.    Would you please turn to page 46 of the
21  document.
22    A.    Um-hum.
23    Q.    What do you find on page 46 of the
24  document?

Page 15

1    A.    E&Y opinion.
2    Q.    Can you describe that in greater detail
3  for the record?
4    A.    It's a standard clean, you know, opinion
5  on your financial statements.
6    Q.    Does the word "material" appear in that
7  -- on that page?
8    A.    I would have to read it.  (Examining
9  document.)  Yes, it does.
10    Q.    Does the phrase "free of material
11  misstatement" appear?
12    A.    Would you like to point out where it is?
13    Q.    Second paragraph, second line.
14    A.    Okay.  Um-hum.
15    Q.    What does it mean to be free of material
16  misstatement in this context?
17         MR. BURKE:  Objection.  Calls for
18  speculation.  He's not an accountant.  You may
19  answer.
20    A.    Right.  They're the ones that make the
21  judgments as to materiality.  You would have to ask
22  them, frankly.  It's not my statement.  You know,
23  what it means, you know, is that they believe that
24  the statements are, you know, accurate --

Page 16

1  reasonably accurate, you know.
2    Q.    Did you believe --
3    A.    Can be relied on.
4    Q.    Can you relied on by whom?
5    A.    Whoever reads them.
6    Q.    Did you believe that Provident's
7  financial statements were free of material
8  misstatements in 2002?
9    A.    I believe Provident's financial
10  statements were accurate in 2002.
11    Q.    Do you believe that they were free of
12  material misstatement in 2002?
13    A.    I believe they were accurate in 2002.
14    Q.    Mr. Hoverson, you're not answering my
15  question.
16         MR. BURKE:  Yes, he is, Michael.  He
17  doesn't have to accept your words.  He's
18  responding to your question.  So please don't
19  say he's not answering, because he doesn't
20  have to answer as you prefer.  That's a
21  responsive answer, and let's move on.
22    Q.    Mr. Hoverson, please tell me what your
23  understanding of free material misstatement means
24  in --

Page 17

1         MR. BURKE:  Objection.
2    Q.    -- in the context of Provident's
3  financial statements.
4         MR. BURKE:  Objection.  Asked and
5  answered.  He's told you he doesn't know.  You
6  may answer.
7    A.    I can't -- I can't say any more about
8  it.  Okay?  I'm not going to get into speculating
9  about what's material and what's not.  I'm not.  I
10  don't know.  Okay?
11    Q.    Mr. Hoverson, you are the chief
12  executive officer of Provident Bank --
13    A.    Um-hum.
14    Q.    -- correct?
15    A.    I'm not going to speculate on
16  materiality.  I'm not going to speculate
17  materiality, period.
18    Q.    Mr. Hoverson, can you answer my
19  question?
20         MR. BURKE:  We will stipulate he's the
21  CEO of Provident.  Let's go on.
22    Q.    Mr. Hoverson, are you the chief
23  executive officer of Provident?
24         MR. BURKE:  We will stipulate.  Next

Williams & Oliver
(513)683-9626

Page 18

1  question.
2  Q.   Can you answer my question?
3       MR. BURKE: Mr. Brautigam, no. We've
4  stipulated to that fact. Move on, please.
5       MR. BRAUTIGAM: Are you instructing him
6  not to answer?
7       MR. BURKE: I am stipulating to that
8  fact, so let's move on to the next
9  question. That is not -- there's no need for
10 that. You know that's a fact.
11 BY MR. BRAUTIGAM:
12 Q.   Mr. Hoverson, do you also function as
13 Provident's chairman of the board?
14 A.   Yes.
15 Q.   Why don't you have the official title?
16 A.   We just don't have an actual chairman.
17 Q.   As Provident's acting chairman of the
18 board and as Provident's chief executive officer,
19 are part of your duties and responsibilities to
20 produce financial statements that are free of
21 material misstatement?
22       MR. BURKE: Objection. Asked and
23 answered. You may answer.
24 A.   Part of my duty is to produce, you know,

Page 19

1  statements that are accurate, which we do. And
2  when deemed that they're not, we notify and change
3  them. I don't know how else to answer the
4  question.
5  Q.   And is that because you don't know what
6  the phrase "free of material misstatement" means?
7  A.   It means, like I said before, that I'm
8  not going to speculate about materiality issues,
9  period. I'm not.
10 Q.   Mr. Hoverson, you understand that this
11 process -- the way this process works, that I ask
12 you questions, you're to answer based on -- to the
13 best of your ability?
14 A.   Do you understand that --
15       MR. BURKE: To the best of his ability.
16 A.   -- I can answer the questions? You
17 don't answer the questions. I answer the
18 questions.
19 Q.   Mr. Hoverson, are you familiar with
20 something known as materiality threshold?
21       MR. BURKE: Objection. Calls for
22 speculation.
23 A.   Yeah, yeah, I'm... Obviously, this
24 issue -- there is such a thing as materiality.

Page 20

1  What it is, when, where, is not something that's a
2  matter of science.
3  Q.   Are you familiar with something known as
4  material adverse effect?
5       MR. BURKE: Objection. Same objection.
6  Same answer.
7  A.   You know, depends on the context again.
8  Q.   Did you read the agreement and plan of
9  merger between OHSL and Provident at some point in
10 1999?
11 A.   I expect that I did, but it's been five
12 years ago.
13 Q.   Okay. Can I direct your attention to
14 page 82 of the proxy materials, Defendants' Exhibit
15 1.
16 A.   This?
17 Q.   Yes.
18 A.   Okay.
19 Q.   Can I direct your attention to the
20 definition of material adverse effect and ask you
21 to read that to yourself, please.
22 A.   (Examining document.) Okay.
23 Q.   What is the dollar amount that has been
24 selected for a material adverse effect with respect

Page 21

1  to the OHSL-Provident transaction?
2  A.   Well, the number on the page that you
3  point out is $25,000 on that particular item.
4  Q.   And what does that mean to have defined
5  as more than $25,000 as a material adverse effect?
6       MR. BURKE: Objection. Calls for a
7  legal conclusion. You may answer.
8  A.   Frankly, I don't know. We'd have to go
9  to the part of the document where it's used.
10 Q.   It's used on this page, right?
11 A.   No, it's a definition on this page is
12 all.
13 Q.   Well, how do you apply that definition
14 to the merger?
15       MR. BURKE: Objection.
16 A.   I don't know. You would have to go to
17 the contract where it's used.
18 Q.   Isn't this the contract; the agreement
19 and plan of merger?
20 A.   Yeah. You'd have to find the page where
21 that term is used.
22 Q.   Doesn't this mean that if there's a
23 discrepancy of more than $25,000 with respect to
24 anything in the OHSL-Provident merger, that is

6 (Pages 18 to 21)

Page 22

1   deemed material?
2        MR. BURKE: Objection. Calls for
3   speculation.
4        A.   I don't know that that's what that
5   means.
6        Q.   What do you think it means?
7        A.   I don't know what it means. It says
8   material adverse effect, you know. The financial
9   conditions results of operations, you know,
10  $25,000. You would have to go to see the context
11  where they talk about it.
12       Q.   How do you know that it's talked about
13  somewhere in Defendants' Exhibit 1?
14       MR. BURKE: We don't.
15       A.   Well, if they defined it, they would
16  have used it. That's the only reason they would
17  have defined it.
18       Q.   Mr. Hoverson, do you believe that the
19  definition of material adverse effect in excess of
20  $25,000 means that if there is a discrepancy with
21  any numbers with respect to the transaction greater
22  than $25,000, that it is deemed material?
23       MR. BURKE: Objection. Calls for
24  speculation; already asked and answered.

Page 23

1        A.   Yeah, again, all I can do is tell you
2   what it says. It says that, you know, with respect
3   to a person, a material adverse effect on the
4   condition, operation, and business of such person
5   is defined as $25,000, and that we'd have to read
6   where it's used to find out what, you know, just
7   what...
8        Q.   What do you mean, read where it's used?
9        A.   In the contract.
10       Q.   Mr. Hoverson, a person is also defined
11  as any bank in this transaction on the next page,
12  correct?
13       A.   Okay. Yes.
14       Q.   Okay. Let me direct your attention back
15  to 82. Do you see the word "material" appears in
16  quotes under material adverse effect?
17       A.   Yeah, yes.
18       Q.   Please define the word "material" as
19  it's used in quotes --
20       MR. BURKE: Objection.
21       Q.   -- in that section.
22       MR. BURKE: Calls for speculation; asked
23  and answered.
24       A.   I don't think I understand the question.

Page 24

1   What's the question again?
2        Q.   Okay. The word "material" appears on
3   page 82 in quotes, correct?
4        A.   Um-hum.
5        Q.   Yes?
6        A.   Um-hum.
7        MR. BURKE: Just the word "material"
8   does not appear in quotes.
9        THE WITNESS: Yeah, it does.
10       MR. BURKE: The phrase appears in
11  quotes.
12       THE WITNESS: No, it's here.
13       MR. BURKE: Okay. I stand corrected.
14  Withdraw the objection.
15  BY MR. BRAUTIGAM:
16       Q.   Please define material as it's used in
17  quotes in that section on page 82.
18       MR. BURKE: Same objection.
19       A.   $25,000 as it's used in this context.
20       Q.   And did Provident provide numbers to
21  OHSL that were inaccurate by more than $25,000?
22       A.   Again, we restated our numbers in March
23  of '03. Obviously, the restatement affecting '99
24  was more than $25,000. But other than that, I ...

Page 25

1   don't know how to answer that questions. The
2   numbers we gave OHSL, you know, were accurate, you
3   know, at the time based on what we knew.
4        Q.   And later, you learned that the numbers
5   were not accurate, correct?
6        A.   We restated them.
7        Q.   Is my question correct, Mr. Hoverson?
8        MR. BURKE: Mr. Hoverson has already
9   answered your question.
10       A.   We restated the numbers.
11       Q.   And all of the numbers that were
12  restated were greater than $25,000, correct?
13       MR. BURKE: Objection to form. He may
14  answer.
15       A.   What's the question again?
16       Q.   Actually, you said yes. Didn't you say
17  yes a second ago?
18       A.   No. Would you like to ask the question
19  again? I'm willing to answer the question.
20       Q.   Mr. Hoverson, I asked you if you later
21  learned that the numbers were not correct, and you
22  answered by saying we restated them. Does that
23  mean that the original numbers were not correct?
24       A.   Again, we restated the numbers. That's

**Page 26**

1 a fact.
2   Q.   And you restated the numbers because
3 they were materially misstated prior to the
4 restatement, correct?
5      MR. BURKE: Objection. Asked and
6 answered.
7   A.   Right. I mean, I've answered already.
8 We restated the numbers because we determined we
9 had -- in 2003 that there was an accounting error,
10 and so we restated the numbers. Those are facts.
11 They're on the record. It's on the record.
12   Q.   And that means that the numbers that
13 Provident provided to the OHSL shareholders which
14 Provident expected the OHSL shareholders to rely on
15 were materially misstated, correct?
16      MR. BURKE: Objection.
17   A.   I'm not gonna --
18      MR. BURKE: Asked and answered.
19   A.   Yeah.
20      MR. BURKE: Calls for speculation.
21   A.   It's up to you to draw the conclusions
22 you want about that. The facts are the facts. We
23 restated the numbers; that included the numbers in
24 '99.

**Page 27**

1   Q.   Mr. Hoverson, are all restatements by
2 definition material?
3      MR. BURKE: Calls for speculation. You
4 may answer.
5   A.   Yeah, I don't know how to answer that.
6   Q.   Were these restatements material?
7      MR. BURKE: Which restatements?
8      MR. BRAUTIGAM: All of the Provident
9 restatements from 2003.
10      MR. BURKE: From 1997 through 2003? Is
11 that what you're saying?
12      MR. BRAUTIGAM: Going back to 1994.
13 Jim, we're doing fine.
14      MR. BURKE: No, no, we're not doing
15 fine.
16      MR. BRAUTIGAM: No more speaking
17 objections. We're doing fine.
18      MR. BURKE: We're not doing fine. I'm
19 trying to understand what you're saying.
20      MR. BRAUTIGAM: Jim, it's not important
21 for you to understand.
22      MR. BURKE: Mr. Brautigam, my witness is
23 not going to answer unless I understand your
24 questions. Okay?

**Page 28**

1      And your questions are intentionally
2 vague, intentionally opaque, because you like
3 to create a muddy record.
4      Are you saying as of 1996, 1997, 1998,
5 1999, any particular period, the entire
6 period, cumulative basis, individually?
7      And until you make some clarification,
8 this witness can't answer that question,
9 because that question is vague and
10 misleading.
11      Reask your question, and we'll try to
12 figure out what you're saying.
13      MR. BRAUTIGAM: Would you please read
14 back the question?
15      (The question was read back.)
16      MR. BURKE: I have no idea what that
17 question is, so objection to form.
18 Meaningless.
19 BY MR. BRAUTIGAM:
20   Q.   You can answer, Mr. Hoverson.
21      MR. BURKE: If you understand.
22   A.   I don't know how to answer the question,
23 if you want to try again.
24   Q.   Mr. Hoverson, Provident restated its

**Page 29**

1 financial statements going back to 1994 in 2003,
2 correct?
3   A.   My memory of it is it didn't go back to
4 1994, no.
5   Q.   Okay. As you sit here today, what's
6 your memory of it?
7   A.   1997 or 6, correct? '97, I believe.
8   Q.   Okay. I'll show you some documents
9 later, but as you sit here --
10   A.   That's my memory.
11   Q.   Okay. Do you believe that Provident's
12 restatements going back to 1997 were material?
13   A.   I've answered this question --
14      MR. BURKE: Objection.
15   A.   -- 15 times. I'm not going to speculate
16 on materiality.
17   Q.   Mr. Hoverson, why would it require you
18 to speculate as to materiality?
19   A.   I'm not going to speculate on
20 materiality.
21   Q.   Why would a question like that require
22 you to speculate? You're the CEO of the company,
23 correct?
24   A.   The numbers are the numbers. We

Page 30

1 restated them. I'm happy to verify what the
2 numbers are, but I'm not going to speculate as to
3 materiality.
4    Q.    Did Provident ever restate numbers that
5 were not material?
6        MR. BURKE: Objection. Same
7    objection. Calls for speculation. I have no
8    idea what you're talking about.
9    A.    I answered the question already. I'm
10 not going to speculate on materiality.
11    Q.    Mr. Hoverson, it's a different question.
12    A.    I'm not going to speculate on
13 materiality. It's the same damn question.
14    Q.    Mr. Hoverson, my question doesn't call
15 for speculation.
16        MR. BURKE: It does, Mr. Brautigam.
17    With all respect, it does. And he's told you
18    a dozen times now he's not going to speculate.
19    Q.    Mr. Hoverson, are you familiar with
20 something known as a fairness opinion?
21    A.    Yeah.
22    Q.    What is a fairness opinion?
23    A.    Well, I suppose there are various kinds;
24 but typically, the one you would think of used in

Page 31

1 context of evaluation of companies and mergers.
2    Q.    Did the OHSL-Provident merger have a
3 fairness opinion?
4    A.    I don't remember. I assume it did.
5    Q.    Okay. Turn to the last four pages of
6 Defendants' Exhibit 1, which is Annex C.
7    A.    Um-hum.
8    Q.    Have you seen that before, Mr. Hoverson?
9    A.    I don't remember.
10    Q.    What is --
11    A.    It's not addressed to me, so I don't
12 remember.
13    Q.    What is Annex C to Defendants' Exhibit
14 1?
15        MR. BURKE: Objection. Foundation. You
16    may answer if you know.
17    A.    Without really reading it, it would
18 appear to be a fairness opinion from McDonald
19 addressed to OHSL.
20    Q.    And you're familiar with the phrase "due
21 diligence," correct?
22    A.    I am.
23    Q.    And you're familiar with how fairness
24 opinions work with respect to mergers and

Page 32

1 acquisitions, correct?
2    A.    I am.
3    Q.    In fact, just recently, Provident
4 obtained a fairness opinion from UBS Securities
5 with respect to the PFGI-National City merger,
6 correct?
7    A.    We did.
8    Q.    And with respect to that fairness
9 opinion, did National City provide audited
10 financial information to your investment banker?
11    A.    They relied on it.
12    Q.    Excuse me?
13    A.    They relied on it. It's in the public
14 domain. They don't have to provide it for them.
15 It's in the public domain.
16    Q.    And do you believe that UBS had a right
17 to rely on the audited financial statements that
18 were provided to you by National City?
19        MR. BURKE: Objection. Calls for
20    speculation as to what UBS did.
21    A.    Yeah, I don't know where they got the
22 financial statements from National City. They were
23 in the public domain. They relied on them, I'm
24 sure.

Page 33

1    Q.    And they had a right to rely on them,
2 correct?
3        MR. BURKE: Objection. Calls for legal
4    conclusion; calls for speculation.
5    Q.    Mr. Hoverson, we're not done with that
6 yet. If you would, keep the last four pages out.
7    A.    Okay.
8    Q.    Mr. Hoverson, turn to page 2 of the
9 fairness opinion. Would you review the second
10 small 2 to yourself, please.
11    A.    2 little I?
12    Q.    Yes.
13    A.    (Examining document.) Okay.
14    Q.    This is in the public domain, as you put
15 it, stating that McDonald, as the investment
16 advisors to OHSL, reviewed PFGI's annual reports to
17 shareholders, correct?
18    A.    Yes.
19    Q.    And that includes audited financial data
20 going back to December 31st, 1996, correct?
21    A.    That's what it says.
22    Q.    Were the numbers that Provident provided
23 with respect to the OHSL-Provident merger
24 materially misstated as of December 31st, 1996?

Page 34

```
 1        MR. BURKE: Objection.
 2     A.   I already answered the question. I'm
 3  not going to answer it again. I answered it
 4  already. I'm not going to speculate as to
 5  materiality.
 6     Q.   Mr. Hoverson, were the numbers provided
 7  as of December 31st, 1996, inaccurate?
 8     A.   We restated our numbers in March of
 9  2003. I would have to check to see if that
10  affected any 1996 member numbers. My memory of it
11  is it might have, but I'm not sure if it did or
12  not. Those are the facts.
13     Q.   Were the numbers that may have been
14  changed in 1996 more than $25,000?
15        MR. BURKE: Objection. Calls for
16  speculation.
17     A.   Don't know.
18     Q.   Mr. Hoverson, did Provident provide
19  financial information as of December 31st, 1997?
20     A.   Provide it to who in relation to what?
21     Q.   To OHSL and/or its investment advisor in
22  relation to the OHSL-Provident merger?
23     A.   I mean, again, it -- I'm sure it was
24  reviewed. It's in the public domain.
```

Page 35

```
 1     Q.   Were the numbers that Provident provided
 2  as of year-end 1997 materially misstated?
 3        MR. BURKE: Same objection.
 4     A.   Yeah.
 5        MR. BURKE: Asked and answered.
 6     A.   Same comment.
 7     Q.   Were the numbers that Provident provided
 8  for year-end 1997 inaccurate?
 9     A.   Same comments I made before. We
10  restated our numbers in 2003.
11     Q.   Mr. Hoverson, I'm trying to --
12     A.   And it's on the record as to what that
13  number was, and I will be happy to verify if we had
14  the numbers around here that that's the number.
15  Okay?
16     Q.   Mr. Hoverson, that's not the way the
17  process works. I'm trying to ask clear and precise
18  questions and it's your job --
19     A.   No. You're trying to get me to
20  speculate as to materiality, and I'm not going to
21  do that. If you would like to ask clear questions,
22  I would be happy to do them.
23     Q.   Mr. Hoverson, the year-end numbers from
24  1997, were they wrong?
```

Page 36

```
 1        MR. BURKE: Objection. Asked and
 2  answered.
 3     A.   We restated our numbers in 2003 and that
 4  affected the 1997 numbers. That's the way I'm
 5  going to answer that question.
 6     Q.   And you restated the numbers because
 7  they were inaccurate, correct?
 8        MR. BURKE: Objection. Asked and
 9  answered; argumentative.
10     A.   I've answered.
11     Q.   What was your answer?
12     A.   We restated the numbers in March of
13  2003, and it changed those numbers. Okay?
14     Q.   The year-end 1998 numbers, correct?
15     A.   Sure. They were restated in 2003.
16     Q.   Okay.
17     A.   I've said that ten times.
18     Q.   What was the order of magnitude of the
19  restatement?
20        MR. BURKE: What restatement?
21     A.   Yeah.
22        MR. BURKE: '98, '99, '97, cumulatively?
23     A.   As to what year? Yeah.
24     Q.   How many restatements did Provident have
```

Page 37

```
 1  in 2003?
 2     A.   Two.
 3     Q.   And with respect to the first one, can
 4  you describe it?
 5        MR. BURKE: Can you describe it?
 6     A.   Yeah, can we get -- don't we have a
 7  document so we can talk about the numbers instead
 8  of speculating? I think, you know, I can give you
 9  rough numbers, but wouldn't you rather be precise?
10     Q.   Just describe the restatement,
11  Mr. Hoverson.
12        MR. BURKE: Objection to form; vague.
13     A.   Okay. I'll describe the restatement.
14  It was a restatement of lease accounting due to an
15  inadvertent error made in a lease accounting model
16  starting, I believe, in 1997 is when we determined
17  that the error started, and we discovered it in
18  February of 2003, and restated those prior periods.
19     Q.   Describe the error.
20        MR. BURKE: Objection.
21     A.   Error in a model used to recognize
22  incumbent expenses relating to auto leases.
23     Q.   Who made the error?
24     A.   The model has got an issue in it, and
```

10 (Pages 34 to 37)

Page 38

1 you know, as to who made the error, it's very
2 difficult to say.
3    Q.    As to...
4    A.    As to who made the error.  It was -- the
5 model basically was flawed.
6    Q.    Who put the model together?
7    A.    I don't know who the names are, who --
8 the exact people who built the model.
9    Q.    What entity put the model together?
10    A.    Provident.
11         MS. PERRY:  Objection to foundation.
12    A.    Our folks as well as E&Y.
13    Q.    So E&Y had some input into building the
14 model, correct?
15         MR. BURKE:  Objection.  Calls for
16 speculation.
17         MS. PERRY:  Objection.  Foundation.
18         MR. BURKE:  No foundation.
19    A.    Yeah, I mean, I really wasn't involved
20 in building the model, so...
21    Q.    Mr. Hoverson --
22    A.    That model is PFGI's responsibility.
23    Q.    Mr. Hoverson, did E&Y have some input
24 into building the model?

Page 39

1         MS. PERRY:  Objection.
2         MR. BURKE:  Objection.  Asked and
3 answered.
4         MS. PERRY:  Lacks foundation; also asked
5 and answered.
6    A.    Frankly, I don't know.
7    Q.    Was E&Y auditing its own work?
8         MR. BURKE:  Objection.  Speculation.
9         MS. PERRY:  Also vague.
10    A.    Yeah, I don't know what that means.  E&Y
11 audits our work.
12    Q.    Mr. Hoverson, how can you not know if
13 E&Y had some input into the model as the CEO and
14 acting chairman of the board of Provident?
15         MR. BURKE:  Objection.
16         MS. PERRY:  Objection.
17         MR. BURKE:  Form.
18         MS. PERRY:  Foundation; argumentative.
19    A.    I don't know if E&Y had any involvement
20 or not.
21    Q.    Did you ever --
22    A.    That's a fact.  Okay?  I don't know.
23    Q.    Isn't that of concern to you?
24         MR. BURKE:  Objection to form.  Isn't

Page 40

1 what of concern to him?
2    A.    No.
3    Q.    Why not?
4         MR. BURKE:  Objection to form.
5    A.    I don't know how to answer that
6 question.
7    Q.    So Mr. Hoverson, if I understand your
8 testimony correctly, you're saying as Provident's
9 acting chairman of the board, as its chief
10 executive officer, it's of no concern to you
11 whether E&Y had input into creating the model that
12 E&Y was then auditing?
13         MR. BURKE:  Objection.  That's a knowing
14 misstatement of what he just testified to, and
15 you know that, Mr. Brautigam.
16 Mischaracterizes his prior testimony.
17    A.    If you'd like to ask me a question, I'll
18 be glad to tell you, you know, but don't tell me
19 what I said when it's not what I said.  Here's what
20 I said.  I don't know if E&Y had anything to do
21 with the model or not, period.
22    Q.    Is that of concern --
23    A.    Period.
24    Q.    -- to you --

Page 41

1    A.    Period.
2    Q.    -- as Provident's acting chairman of the
3 board and chief executive officer?
4    A.    I previously answered that question.
5    Q.    What was your answer?
6    A.    No.
7    Q.    Why not?
8    A.    Just not.
9    Q.    Do you believe that the restatement in
10 2003 affected Provident's prospects?
11         MR. BURKE:  Objection to form.
12    A.    Yeah.  What's that mean?
13    Q.    As it's used in the fairness opinion.
14    A.    I don't know what's used in the fairness
15 opinion.
16    Q.    Mr. Hoverson, it's right in front of
17 you.  You can pick it up if you like.
18    A.    I can't answer that question did it --
19 how did -- did it affect our prospects.  You'd have
20 to define what that means.  You've got to define it
21 to me.  Okay?  Ask me a question.  I will answer
22 the question.
23    Q.    Mr. Hoverson, did you ever read Annex C
24 to Defendants' Exhibit 1?

11 (Pages 38 to 41)

Page 42

```
1        MR. BURKE: Objection. Already asked
2  and answered.
3    A.   I don't know that I did.
4    Q.   Do you know what the word --
5    A.   I wouldn't have had any reason to.  It's
6  not addressed to me.
7    Q.   Did you read the fairness opinion that
8  Provident obtained with respect to the National
9  City merger?
10       MR. BURKE: Objection to relevance.  You
11  may answer.
12   A.   I did.
13   Q.   Did that deal with prospects at all?
14   A.   I don't remember.  It was more focused
15  on the valuation, whether or not, you know,
16  comfortable with the valuation.
17   Q.   Turn to page 3 of the fairness opinion,
18  please.  Would you read that first sentence into
19  the record, please?
20   A.   The IX?
21   Q.   In our review.
22   A.   You want me to read the whole thing?
23   Q.   I want you to read the first sentence
24  into the record, please.
```

Page 43

```
1    A.   Oh, the first sentence.  In our review
2  and analysis in arriving at our opinion, we have
3  assumed and relied upon the accuracy and
4  completeness of all the financial and other
5  information reviewed by us and relied upon the
6  accuracy and completeness of the (inaudible).
7        MR. BURKE: There's no reason for him --
8  I mean, it's in the record.
9    A.   In the record.  PFGI contained in the
10  agreement.
11   Q.   The financial information that Provident
12  provided was not accurate, correct?
13       MR. BURKE: Objection.  Argumentative;
14  asked and answered.
15   A.   I've answered this.
16   Q.   Mr. Hoverson, please --
17   A.   Would you like me to answer it again the
18  way I've answered it ten times?
19   Q.   No, you haven't answered it ten times.
20  I'd just like you to answer my question.  We're
21  talking about a specific question --
22   A.   I said it before and I'll say it again.
23   Q.   -- in the context of this document.
24   A.   We restated our numbers in 1997.  Okay?
```

Page 44

```
1  And that included numbers back to '97 -- I mean in
2  2003 and that affected numbers back to '97, '98,
3  and '99.
4    Q.   Mr. Hoverson, please take page 3, and
5  keep it in front of you.
6    A.   Um-hum.
7    Q.   Do you see that it says that McDonald,
8  as OHSL's investment banker, relied upon the
9  accuracy of all the financial information that
10  Provident provided?
11       MR. BURKE: Objection.
12   Q.   Do you see that?
13       MR. BURKE: Document speaks for itself.
14  Go ahead.  Next question.
15   A.   Yeah, I see that.
16   Q.   The information that Provident provided
17  was not accurate, correct?
18       MR. BURKE: Objection.  Argumentative;
19  asked and answered.  You may answer again.
20       THE WITNESS: Do I really have to answer
21  the same question 50 times?
22       MR. BURKE: No, you don't, but I mean,
23  you know, we're going to go one more time and
24  then that's it.  You asked this question 15
```

Page 45

```
1  times, Mr. Brautigam.
2    A.   Would you like me to answer it the same
3  way I've answered it before?
4    Q.   No.  I would just like you to answer the
5  question --
6    A.   That's the answer I'm going to give you.
7    Q.   Mr. Hoverson, it's a different
8  question.
9        MR. BURKE: That's not a different
10  question.  That's the same question, and he'll
11  give you the same answer.
12   A.   It is the same question.
13       MR. BRAUTIGAM: We're going to call the
14  Judge, right now.
15       MR. BURKE: That's fine.
16       (Mr. Brautigam makes phone call,
17  receives recorded message, and leaves the
18  following message.)
19       MR. BRAUTIGAM: Hi, Barbara.  This is
20  Mike Brautigam.  I'm here with Jim Burke and
21  some other counsel, and there's other counsel
22  on the phone telephonically.
23       We're having a problem at the
24  deposition, and we would like to run the
```

12 (Pages 42 to 45)

Williams & Oliver
(513)683-9626

Page 46

1   problem by Magistrate Judge Hogan.
2        If he could give us a call back at
3   221-8800, we would all appreciate it.  Thank
4   you very much.
5        MR. BURKE:  For the record, this is Jim
6   Burke.  I do not believe we're having a
7   problem, but if Mr. Brautigam -- and no one
8   else is thinking there's a problem, nor
9   consenting to the Judge's involvement, but if
10  Mr. Brautigam wants to involve the Judge,
11  that's his prerogative.
12       MR. BRAUTIGAM:  Okay.
13       MR. BURKE:  Thank you.
14       MR. BRAUTIGAM:  We'd appreciate a call
15  back at your earliest convenience.
16       (Ended phone call.)
17  BY MR. BRAUTIGAM:
18  Q.   Mr. Hoverson, if you refuse to answer my
19  questions or if you continue to answer questions in
20  this way and Mr. Burke continues to make speaking
21  objections, I'm going to abort this deposition, and
22  we'll have to come back.
23       MR. BURKE:  Mr. Brautigam, you do what
24  you want.  This witness has answered every

Page 47

1   question.  No one's making speaking
2   objections.
3        Your questions are repetitive, and he's
4   told you repeatedly what he can say and what
5   he can't say and what he's not prepared to
6   say.
7        If you want to abort the deposition, you
8   go right ahead, but you can't force this
9   witness to answer as you would have him
10  witness.
11       All he can do is answer to the best of
12  his ability, which he's done.  If you don't
13  like it, that's too bad.
14       MR. BRAUTIGAM:  Jim, we don't need a
15  speaking objections.
16       MR. BURKE:  That's not a speaking
17  objection.  That's a statement of my position
18  for the record.  You stated yours.  I stated
19  mine.
20       Go ahead and abort of deposition if you
21  so choose.  This witness is going to answer
22  the questions to the best of his ability,
23  period.
24       MR. BRAUTIGAM:  I'd like to remind all

Page 48

1   counsel and the witness that we should not be
2   speaking at the same time so that we can have
3   a clear and accurate record.
4        Now, would you please find the last
5   question and read it back.
6        (The question was read back.)
7   BY MR. BRAUTIGAM:
8   Q.   Mr. Hoverson, page 3 of the fairness
9   opinion.  The information that Provident provided
10  was not accurate, correct?
11       MR. BURKE:  Objection.  Asked and
12  answered.  You may answer again.
13  A.   I mean, again, I'm answering the
14  question, and you know I'm answering the
15  question.  We restated our numbers in March of
16  2003, and that included changing the numbers from
17  '97, '98, '99, and forward.  Okay?  Those are
18  facts.  You put your interpretation on that.
19  That's a fact.
20  Q.   Mr. Hoverson, and you changed --
21  A.   I'm not going to interpret it.  Okay?
22  That's factual and I'm answering the question.  All
23  right?
24  Q.   Mr. Hoverson --

Page 49

1   A.   I don't know how to get into discussing
2   what was accurate and not accurate in 1999.  Okay?
3   Q.   Mr. Hoverson, do you know what the word
4   "accurate" means?
5        MR. BURKE:  Objection to relevance.  You
6   may answer.
7   A.   Um-hum.  Relating to what?
8   Q.   Relating to OHSL-Provident merger.
9   A.   What does that mean?  What does that
10  mean?
11  Q.   Mr. Hoverson, can you answer my
12  question?  If you can't answer, that's fine.
13  A.   Okay.  I don't think I can answer that
14  question.
15  Q.   Do you know what the word "complete"
16  means?
17  A.   I do.
18  Q.   What does it mean?
19       MR. BURKE:  Objection to form;
20  relevance.  You may answer.
21  A.   Yeah.  As it relates to what?
22  Q.   As it relates to the OHSL-Provident
23  merger and as the word "completeness" is used on
24  page 3 of the fairness opinion that's attached to

13 (Pages 46 to 49)

Page 50

1  Defendants' Exhibit 1.
2      A.    Okay.  So let's go.  Where's it at?
3      Q.    It's in the second line of the first
4  full paragraph.
5      A.    So what's your question?
6      Q.    Do you know what the word "completeness"
7  means in general?
8          MR. BURKE:  Objection to form.  Vague,
9  relevance.
10     A.    I suppose I do.
11     Q.    What does it mean?
12     A.    In general?
13     Q.    In general.
14     A.    It means it's complete.
15     Q.    What does the word "complete" mean in
16  the context of the OHSL-Provident merger?
17         MR. BURKE:  Objection.  Vague; form.
18     A.    That the data we provided was complete.
19     Q.    Was the data that Provident provided
20  complete?
21     A.    Yes.
22     Q.    Was there anything wrong with the data?
23     A.    As it turned out in 2003, we restated
24  the number; and so that number, you know, was

Page 51

1  restated in 2003.  That's a fact.
2      Q.    Now, Mr. Hoverson, are fairness opinions
3  in general a recommendation as to how shareholders
4  should vote?
5          MR. BURKE:  Objection.  Relevance;
6  speculation.
7      A.    They're used -- I'm not sure I would say
8  it exactly that way.  They're more of a commentary
9  that the valuation being discussed is fair.
10     Q.    Okay.  Was that the case with respect to
11  the fairness opinion provided in the OHSL-Provident
12  merger?
13         MR. BURKE:  Objection.  Foundation.  You
14  may answer.
15     A.    I assume that, you know, it was, sure.
16     Q.    Mr. Hoverson, I don't want you to
17  assume.  It says it right in the document, doesn't
18  it?
19         MR. BURKE:  Objection.
20     A.    It's not my document, you know, but, you
21  know...
22     Q.    Mr. Hoverson, when you said it's not
23  your document, to what were you referring?
24     A.    That I didn't write it.

Page 52

1      Q.    To what were you referring?
2          MR. BURKE:  Objection.  What are you
3  talking about?
4      A.    Fairness.  What are you referring to?
5      Q.    Were you referring to the fairness
6  opinion?
7      A.    Yeah.
8      Q.    Okay.  Do you believe that Defendants'
9  Exhibit 1 is your document?
10     A.    Yeah, I'm not sure I know how to answer
11  that question.  Obviously, we signed off on the
12  proxy, and all the data that we supplied I'm very
13  comfortable was, you know, our material.  And, you
14  know, it's a proxy, so I guess it is -- I'm not
15  really sure I know how to answer that question from
16  a legal standpoint.
17     Q.    I'm not asking for a legal standpoint.
18     A.    That's a legal document.
19     Q.    Mr. Hoverson, you certainly signed
20  public documents that are filed through the SEC,
21  correct?
22     A.    I do.
23     Q.    And this is one of them, correct?
24     A.    Yes.

Page 53

1      Q.    And this was a joint document coming
2  from OHSL and Provident, correct?
3      A.    Um-hum.
4      Q.    Yes?
5      A.    Yes.
6      Q.    And you were the CEO of Provident at the
7  time, correct?
8      A.    Yes.
9      Q.    And you were on Provident's board at the
10  time, correct?
11     A.    Um-hum.
12     Q.    Yes?
13     A.    Yes.
14     Q.    And as a result, this document came in
15  part from you, correct?
16     A.    Yes.
17     Q.    What is a registration statement?
18         MR. BURKE:  Objection.  Calls for a
19  legal conclusion.  You may answer if you know.
20     A.    Yeah, I'm not sure I know the technical
21  answer to that.  Typically, you would register if
22  it's a public document.
23     Q.    Was there a registration statement used
24  in this case?

Page 54

1   A.    You're getting -- you're out of my area
2   of expertise.  I really don't know how to answer
3   that question.
4   Q.    Please describe the terms of the OHSL
5   and Provident merger.
6   A.    I don't remember the terms.  It was a
7   stock deal.  I don't recall.  I'm vague on the
8   terms of the price for -- as I recall, had a collar
9   on it, but I don't remember the exact terms.  Quite
10  frankly, it was five years ago.
11  Q.    I understand.  Let me be more general.
12  This was a stock for stock transaction --
13  A.    Right.
14  Q.    -- correct?
15  A.    Um-hum.
16  Q.    Yes?
17  A.    Yes.
18  Q.    And Provident was paying for OHSL with
19  newly issued Provident stock, correct?
20  A.    Yes.
21  Q.    And pursuant to this new issuance of
22  Provident stock, a registration statement was
23  required, correct?
24  A.    I assume so.

Page 55

1   Q.    You know so, correct?
2   A.    Okay.
3   Q.    Because you signed the registration
4   statement that was filed with the SEC, correct?
5   A.    Okay, yes.
6   Q.    Are you familiar with the term
7   "artificial inflation" as it applies to a company's
8   stock?
9   A.    No.
10  Q.    Have you ever heard the term "artificial
11  inflation"?
12  A.    You just said it.
13  Q.    Before I just said it, have you ever
14  heard the term?
15  A.    Not as a term of art, no.
16  Q.    Are you familiar with the concept of a
17  company stock being materially overvalued?
18        MR. BURKE:  Objection to form.  Vague.
19  A.    I'm not sure.
20        MR. BURKE:  Calls for speculation.
21  A.    I don't know how to answer the question.
22  You'd have to give me context and stuff, but --
23  what's the question?  I don't know how to determine
24  what an overvalue is.

Page 56

1   Q.    The question didn't go to that at all,
2   Mr. Hoverson.
3         MR. BRAUTIGAM:  Would you read the
4   question back, please.
5         MR. BURKE:  I'm going to object.  I
6   think the question did go exactly to that, but
7   you may answer.
8         (The question was read back.)
9   A.    Frankly, I don't know.
10  Q.    Have you ever heard that a company stock
11  was materially overvalued?
12        MR. BURKE:  Objection.  Form; value;
13  calls for speculation.
14  A.    I don't know.
15  Q.    Was Provident stock materially
16  overvalued up to and including March 4th of 2003?
17  A.    No.
18  Q.    Why not?
19  A.    I don't know how to answer that
20  question, why not.  It was fairly valued.
21  Q.    On March 4th, 2003, it's your testimony
22  the Provident stock was fairly valued?
23  A.    I thought you meant -- oh, I'm sorry.
24  Restate the previous question.  I thought you were

Page 57

1   talking about '99.
2   Q.    Mr. Hoverson, do you want me to reread
3   it, or do you want me to restate it?
4   A.    Reread it.
5         (The question was read back.)
6   A.    No.  Stocks are valued based upon the
7   information in the public domain.
8   Q.    And that's sometimes referred to as the
9   efficient market hypothesis, correct?
10        MR. BURKE:  Objection.  Calls for
11  speculation.
12  A.    Um-hum.
13  Q.    Mr. Hoverson, it really would be helpful
14  for the record if you could answer the questions
15  yes or no as instead of um-hum.  You don't have to
16  limit your answers in most cases to yes or no, but
17  just so we have a clear record.  Okay?
18        MR. BURKE:  Go ahead.
19  A.    Okay.
20  Q.    My question went to Provident stock on
21  March 4th, 2003.  As part of your duties and
22  responsibilities, you followed Provident stock,
23  correct?
24  A.    I do.

15 (Pages 54 to 57)

Page 58

1    Q.    And you certainly followed Provident
2  stock in the days and perhaps hours leading up to
3  the announcement of the restatement, correct?
4    A.    Um-hum.
5    Q.    Is that yes?
6    A.    Yes.
7    Q.    And you had to be very careful as the
8  chief executive officer and acting chairman of the
9  board not to allow information about the future
10  restatement leak out before Provident announced it
11  to the world, correct?
12    A.    We were very careful.
13    Q.    Why were you very careful?
14    A.    Well, it's the prudent thing to do.
15    Q.    And you testified a moment ago that
16  Provident stock, in your opinion, was not
17  materially overvalued on March 4th of 2003,
18  correct?
19    A.    What I said was that it was valued
20  fairly based upon the information in the market.
21    Q.    Right.  And on March 4th, 2003 --
22    A.    That's all I'm going to say.  I mean, it
23  was.
24    Q.    And on March 4th, 2003, the information

Page 59

1  in the marketplace was not accurate, correct?
2        MR. BURKE:  Objection.  Calls for
3    speculation.
4    A.    Yeah, I'm not gonna -- I'm not gonna --
5  that's a -- that's a crazy question.  The
6  information in the market is what it is until we
7  publicly file, you know, with new information.
8        There's no other way to kind of answer
9  that question because all of this is done in the
10  context of what's, you know, available to
11  everybody.  It's either available to everybody or
12  to nobody.
13    Q.    Mr. Hoverson, you said that that was a
14  crazy question.  Why?
15        MR. BURKE:  Objection.  Vague.
16    A.    It doesn't make any sense.  The stock is
17  based -- it's value is based upon the public -- the
18  information that is available in the public
19  marketplace.
20    Q.    Mr. Hoverson, before you announced the
21  restatement, did you have an expectation as to what
22  impact, if any, it would have on the stock price?
23    A.    We did.
24    Q.    What was your expectation?

Page 60

1    A.    That the stock would go down.
2    Q.    Did you believe that the stock would go
3  down in a material way?
4        MR. BURKE:  Objection.
5    A.    No way to determine that, frankly.
6    Q.    How much --
7    A.    We did not have an expectation, you
8  know, on that.  We knew it would adversely affect
9  it, but we didn't know how much.
10    Q.    Mr. Hoverson, you used "we" in your
11  previous answer.  You understand that today I want
12  your opinion unless I ask for the opinion of
13  others.  Okay?
14    A.    I understand, Counsel.
15    Q.    Thank you.  Now, Mr. Hoverson, did you
16  expect that Provident stock would decrease by a
17  material amount when you made the first restatement
18  announcement?
19        MR. BURKE:  Objection.  Asked and
20    answered.
21    A.    I expected the stock would decline in
22  value when we made the announcement.
23    Q.    Why did you expect the stock to decline
24  in value?

Page 61

1    A.    It was, you know, a negative event.
2    Q.    Did you, therefore, conclude that the
3  information that was available in the public
4  marketplace up to March 5th, 2003, was materially
5  misstated?
6        MR. BURKE:  Objection.
7    A.    No.
8        MR. BURKE:  Calls for speculation.
9    A.    That's a crazy question.  You know it's
10  a crazy question.  You know, the information was
11  not in the public domain until we made it -- put it
12  in the public domain, you know.  You understand
13  that totally.
14    Q.    And this --
15    A.    And nothing required us to put it in the
16  public domain until we were ready to put it in the
17  public domain, and you know that as well.
18    Q.    And this is material information that
19  you're talking about, correct?
20        MR. BURKE:  Objection.  Calls for
21    speculation.
22    A.    It was information we deemed obviously
23  needed to be in the public domain once we released
24  it.

16 (Pages 58 to 61)

Page 62

1  Q.  And you deemed that it needed to be in
2 the public domain because you deemed it to be
3 material information, correct?
4      MR. BURKE: Objection. Calls for
5 speculation. You're badgering the witness,
6 Mr. Brautigam. You may answer.
7  A.  What's material and what's not material,
8 you know, obviously it needed to be disclosed.
9  Q.  Mr. Hoverson --
10  A.  It's required to be disclosed.
11  Q.  You're able to read and interpret
12 Provident board minutes, correct?
13  A.  Um-hum.
14  Q.  Yes?
15  A.  Yes.
16  Q.  Does the word "material" appear in
17 Provident board minutes?
18      MR. BURKE: Objection. Vague.
19  A.  I don't know. I'd have to see them.
20  Q.  Okay. Well, I'll show them to you
21 later, but do you believe that the word "material"
22 was used at Provident board meetings?
23      MR. BURKE: Objection. Calls for
24 speculation. You can answer.

Page 63

1  A.  I'd have to see them.
2  Q.  That's not whether it's in the minutes
3 or not.
4  A.  I don't remember.
5  Q.  It's a different question.
6  A.  I don't remember.
7  Q.  As you sit here today, it's your
8 testimony that you don't remember the word
9 "material" being used at Provident board meetings?
10      MR. BURKE: Objection.
11  A.  I don't remember if it was used or not.
12  Q.  Ever?
13  A.  To the beginning of time?
14  Q.  To the beginning of your service on the
15 board.
16      MR. BURKE: Objection. Vague.
17  A.  I have no idea. Okay?
18  Q.  Mr. Hoverson --
19  A.  Was the word ever uttered in the board
20 meeting?
21  Q.  Yes.
22  A.  The word "material"?
23  Q.  Yes.
24  A.  I'm sure it was.

Page 64

1  Q.  Okay. And when it was uttered in a
2 board meeting, did you understand what it meant?
3      MR. BURKE: Objection. Vague.
4  A.  I would like to think I did.
5  Q.  What did it mean?
6  A.  It's a general question. We're not
7 talking about a specific event.
8      MR. BURKE: Objection. Vague.
9  A.  Yeah, I don't know how to answer that.
10  Q.  Mr. Hoverson, you said that the word
11 "material" was used in board meetings. You said
12 that you knew what it meant when it was used in
13 board meetings. Please tell me what your
14 understanding --
15  A.  Because when it's used --
16  Q.  Mr. Hoverson --
17  A.  When the word's used in relation to a
18 context, I can -- you know, I made an
19 interpretation as to what it meant.
20  Q.  Mr. Hoverson, I'd just like to remind
21 you, I will try not to step on your answers if you
22 try not to step on my questions, and we really
23 should not be speaking at the same time. Okay?
24      Now, my question was when you were at

Page 65

1 Provident board meetings and the word "material"
2 was used, what did you understand it to mean?
3      MR. BURKE: Objection. Vague; calls for
4 speculation.
5  A.  Yeah.
6      MR. BURKE: No context. You may answer.
7  A.  I don't know how to answer that
8 question.
9  Q.  Okay. Why not?
10  A.  It's too vague.
11  Q.  Okay. Let's see if I can focus you.
12 The financial statements of a public company such
13 as Provident are the responsibility of management,
14 correct?
15  A.  Right.
16  Q.  And management strives to present to its
17 independent auditors financial statements that are
18 free of material misstatement, correct?
19  A.  Right.
20      MR. BURKE: Objection.
21  Q.  And that concept has been discussed at
22 board meetings that you attended and at audit
23 committee meetings where you made presentations,
24 correct?

17 (Pages 62 to 65)

Williams & Oliver
(513)683-9626

Page 66

1      MR. BURKE: Objection. Calls for
2  speculation. You may answer.
3      A.    Actually, I've not made any
4  presentations to the audit committee, but sure, in
5  general.
6      Q.    Did you ever address the audit committee
7  in your career with Provident?
8      A.    Yes.
9      Q.    And did you address the audit committee
10  specifically during the -- in the meetings leading
11  up to the restatements?
12      A.    Yes.
13      Q.    Were these not formal presentations; is
14  that what you meant?
15      A.    Yeah, I thought you meant on a regular
16  basis with the audit committee. I don't meet with
17  the audit committee on a regular basis.
18      Q.    No, I understand. But with respect to
19  exceptional events --
20      A.    Yeah, sure.
21      Q.    -- you have addressed the audit
22  committee?
23      A.    Sure.
24      Q.    Now, everyone at Provident was striving

Page 67

1  to produce statements that were free of material
2  misstatement, correct?
3      MR. BURKE: Objection. Calls for
4  speculation. You may answer.
5      A.    Yeah, everybody at Provident strives to
6  produce accurate statements.
7      Q.    Are accurate statements, in your view,
8  the same as financial statements that are free of
9  material misstatements?
10      MR. BURKE: Objection. Argumentative.
11      A.    Yes.
12      Q.    So is it fair to use the word accurate
13  and free of material misstatement interchangeably?
14      MR. BURKE: Objection. Vague; calls for
15  speculation; argumentative. You may answer.
16      A.    Yeah, in certain contexts, I'm sure it
17  is.
18      Q.    Okay. Are you familiar with the phrase
19  "due diligence"?
20      A.    Yeah, we've...
21      MR. BURKE: Objection. Vague.
22      A.    ...answered this, yes.
23      Q.    Was there a due diligence process with
24  respect to the OHSL-Provident merger?

Page 68

1      A.    Yes.
2      Q.    How did that process work?
3      A.    I, you know, don't have specific
4  recollection of it, but it -- you know, we would
5  have had our credit people look at their credit
6  files. We would have had our audit staff review
7  any audit, you know, papers they had as well as
8  loan data; and our finance people would have, you
9  know, reviewed their books.
10      Q.    Similarly, did OHSL people or people
11  acting on their behalf review Provident's financial
12  statements?
13      MR. BURKE: Objection. Foundation. You
14  may answer.
15      A.    I would assume they did.
16      Q.    What was the purpose of that?
17      A.    You know, an analysis of the situation
18  to make an evaluation.
19      Q.    And we've determined in part through our
20  discussion of the fairness opinion that McDonald
21  and OHSL relied on the accuracy and completeness of
22  Provident's financial statements in 1999, correct?
23      MR. BURKE: Objection. Calls for
24  speculation. You may answer.

Page 69

1      A.    Yes, I believe we have.
2      Q.    And we now know that Provident's
3  financial information that was provided to OHSL and
4  that Provident expected OHSL shareholders to rely
5  on was not accurate and was not complete, correct?
6      MR. BURKE: Objection. Mischaracterizes
7  prior testimony; assumes facts not in
8  evidence. You may answer.
9      A.    Again, I'm going to answer this question
10  a ton of times. We restated those numbers in 2003,
11  so obviously they changed when we restated them.
12      Q.    And they changed in a way that rendered
13  the numbers that were included in Defendants'
14  Exhibit 1 inaccurate and incomplete, correct?
15      MR. BURKE: Objection.
16      A.    They changed the numbers. They did
17  change the numbers.
18      Q.    Have we agreed that the fairness opinion
19  does not constitute a recommendation to
20  shareholders with respect to the OHSL-Provident
21  merger?
22      MR. BURKE: Objection.
23      A.    I don't know that we've agreed. All I
24  said was that it's, you know, an opinion as to

18 (Pages 66 to 69)

Page 70

```
1   value to the board.
2       Q.    Would you --
3       A.    The board makes the recommendation to
4   the shareholders.
5       Q.    Would you read the last paragraph on
6   page 3 going over to page 4 to yourself, please.
7       A.    The last starting with, "This opinion"?
8       Q.    Yes, sir.
9       A.    (Witness complies.) Okay.
10      Q.    Now, it states there quite specifically
11  that the fairness opinion provided by McDonald does
12  not constitute a recommendation as to how to vote,
13  correct?
14      A.    Right.
15      Q.    And it also --
16      A.    To the shareholders.
17      Q.    Correct.  And it also says that it does
18  not compare or discuss the relative merits of any
19  competing proposal or any other business strategy,
20  correct?
21          MR. BURKE:  Objection.  Document speaks
22      for itself.  It says what it says.
23      A.    (Examining document.) Yeah, it says it
24  doesn't compare or discuss the relative merits of a
```

Page 71

```
1   competing proposal.  I see that it says that, or
2   other terms of the merger.
3       Q.    Mr. Hoverson, you agree that the
4   fairness of a transaction is a separate concept
5   from the transaction being or not being in the best
6   interest of the shareholders, correct?
7          MR. BURKE:  Objection.  Calls for
8      speculation; vague.
9       A.    Yeah, I don't know how to answer that.
10      Q.    Okay.  Let's take a look at --
11      A.    It is what it is.
12      Q.    Let's take a look at the first page of
13  Defendants' Exhibit 1.  Would you read the
14  sentence, Your board of directors unanimously
15  approved the acquisition, to yourself, please.
16      A.    (Examining document.) Okay.
17      Q.    Do you agree that the first sentence
18  constitutes two different concepts:  The first
19  concept being unanimously approved the acquisition,
20  and the second concept unanimously believes that it
21  is in the best interest of OHSL stockholders?
22          MR. BURKE:  Objection.  Calls for
23      speculation; calls for a legal conclusion; and
24      I think you're trying to get him to
```

Page 72

```
1   reinterpret the document different from what
2   the language actually says.  You may answer.
3          MR. BRAUTIGAM:  Jim, we're doing
4   fine.  We don't need speaking objections.
5          MR. BURKE:  It's not a speaking
6      objection.
7       A.    Yeah, I don't know that I would agree
8   with your interpretation.  It seems to me that if
9   you thought it was in the best interest -- you
10  know, you wouldn't approve it unless you thought it
11  was in their best interest, but, you know, I don't
12  know.
13      Q.    All right.  Let's break down the
14  sentence.  Your board of directors unanimously
15  approved the acquisition, stop.
16      A.    This is not my board, by the way.
17      Q.    I understand that, but that's what the
18  sentence says.
19          MR. BURKE:  The document speaks for
20      itself.
21      Q.    Mr. Hoverson, are you focused on the
22  first part of that sentence?
23      A.    Um-hum.
24      Q.    Okay.  What was your understanding in
```

Page 73

```
1   1999 as to how many directors voted to approve the
2   OHSL-Provident merger?
3          MR. BURKE:  Objection.  Foundation.  You
4      may answer.
5       A.    I do not have a specific memory of that.
6       Q.    Did you ever learn that not all of the
7   OHSL directors had voted to approve the merger?
8          MR. BURKE:  Objection.  Misstates the
9      record; mischaracterizes the evidence.
10      A.    Always relates to, you know, the issue
11  -- the argument you have made.  I don't remember --
12  to be honest with you, I don't remember that much
13  about that, because it wouldn't have been that
14  important to me.  They either approved it or they
15  didn't.  It was unanimous approval, so...
16      Q.    You understand what the phrase
17  "unanimous approval" means, correct?
18          MR. BURKE:  Objection.
19      A.    I believe I do.
20      Q.    In fact, the concept of unanimous
21  approval is included in the Provident National City
22  financial materials, correct?
23      A.    If you say it is.
24      Q.    You know that, correct?
```

19 (Pages 70 to 73)

Page 74

```
 1      A.   I don't recall every word.
 2      Q.   I didn't ask you to recall every word,
 3  Mr. Hoverson.
 4      A.   It was unanimously approved, if that's
 5  the question.
 6      Q.   Okay.  And also, the concept of
 7  unanimous approval is included in the OHSL --
 8  excuse me -- the Provident-National City merger,
 9  correct?
10      A.   Yeah.  I just said it was unanimously
11  approved.
12      Q.   And it was also included in the proxy
13  materials, correct?
14      A.   I don't remember every word.
15           MR. BURKE:  Objection.
16      A.   Okay?
17           MR. BURKE:  What are we talking about?
18      A.   You know, if it is, it is.
19           MR. BURKE:  Can we take five minutes for
20  a bathroom break, please?
21           MR. BRAUTIGAM:  Certainly.
22           (A brief break was taken from 11:40 to
23  11:45.)
24
```

Page 75

```
 1  BY MR. BRAUTIGAM:
 2      Q.   Back on the record, Mr. Hoverson.  I'd
 3  just like to remind you if you would try not to
 4  step on my questions, I will try not to step on
 5  your answers.
 6           Mr. Hoverson, the first line of the
 7  proxy materials registration -- excuse me -- the
 8  proxy materials for the Provident-National City
 9  merger reads, The board of directors of Provident
10  Financial Group, Inc., has unanimously approved the
11  merger of Provident with and into National City
12  Corporation.  Does that refresh your recollection?
13           MR. BURKE:  Can he see the document?
14           MR. BRAUTIGAM:  Absolutely.
15           MR. BURKE:  Are we going to mark this as
16  an exhibit or --
17           MR. BRAUTIGAM:  No, because it's
18  mine.  I asked Rachael for some extra copies,
19  and she refused to provide them to me, so...
20           MR. BURKE:  So you can't copy it?
21      A.   Okay.
22      Q.   What does it mean that the board of
23  Provident unanimously approved the merger?
24      A.   Well, you know, everybody who was there
```

Page 76

```
 1  voted for it.
 2      Q.   Was everybody there?
 3      A.   Everybody was there.
 4      Q.   And how many directors does Provident
 5  have?  Seven, correct?
 6      A.   Six counting me.
 7      Q.   And all six of the directors voted in
 8  favor of the merger, correct?
 9      A.   Yes, everybody that was there.  They all
10  -- they were all there.
11      Q.   Okay.  Do you believe that unanimously
12  recommending shareholder approval is a different
13  concept from the concept that the board of
14  directors unanimously approved the merger?
15           MR. BURKE:  Objection to form.  Are you
16  referring to that document still?
17           MR. BRAUTIGAM:  Yes.
18           MR. BURKE:  Show him what you're
19  referring to.
20      A.   What's the question again?
21           MR. BURKE:  I didn't follow it either.
22      Q.   Certainly.  Would you read
23  recommendation on page 4 to yourself, please.
24      A.   (Examining document.)  Okay.
```

Page 77

```
 1      Q.   And the concept that's embraced there is
 2  that the Provident directors unanimously recommend
 3  that Provident shareholders vote for the merger,
 4  correct?
 5      A.   That's what it says.
 6      Q.   And what does that mean to you?
 7      A.   It means they recommend they vote for
 8  it.
 9      Q.   And that means that each director
10  recommends that the shareholders vote for it,
11  correct?
12           MR. BURKE:  Objection.  You may answer.
13      A.   I guess it would technically mean each
14  director who voted -- who was there and voted
15  unanimously recommends that, yes.
16      Q.   Because they --
17      A.   They all -- all the people who voted
18  recommended.
19      Q.   And --
20      A.   I think that's what that means.
21      Q.   There's another concept here that
22  Provident's board of directors believes that the
23  merger is in the best interest of Provident
24  shareholders.  Do you see that?
```

Page 78

1    A.    Yeah, I saw that.
2    Q.    Do you understand that concept to mean
3  that all of Provident's directors believed that the
4  merger with National City was in the best interest
5  of Provident shareholders?
6    A.    Again, if you want to get technical, I
7  guess what it means is that the directors who were
8  present and voted also unanimously recommend and
9  think it's in the best interest of the
10 shareholders.  That's what it means.
11   Q.    Did you vote your personal shares in the
12 Provident-National City merger?
13   A.    I did.
14   Q.    Did you vote in favor of the merger?
15   A.    I did.
16   Q.    Do you know how the other directors
17 voted their personal shares?
18   A.    I don't.
19   Q.    Do you have an expectation as to how
20 they would have voted their shares?
21   A.    I would have expected that they voted
22 for it, but I don't know that they all did.
23   Q.    Okay.  Do you believe that all of the
24 OHSL directors voted in favor of the OHSL-Provident

Page 79

1  merger at the August 2, 1999, board meeting that's
2  referenced in Defendants' Exhibit 1?
3        MR. BURKE:  Objection.  Foundation;
4  calls for speculation.  You may answer.
5    A.    Well, as I read this -- you're referring
6  to this, correct?  To this document here?
7    Q.    I'm referring to Defendants' Exhibit 1,
8  yes.
9    A.    Unanimously approved?
10   Q.    Well, it appears other places as well.
11   A.    Is that what you're --
12   Q.    I'm referring to the whole document, but
13 we can start with that sentence.
14   A.    Reading that, I would have expected that
15 all the directors who were present and voting voted
16 for it.
17   Q.    You qualified your answer a little bit
18 by saying --
19   A.    All directors who were, you know --
20 yeah.
21   Q.    All the directors were in the room?
22   A.    All directors who voted for it.  There
23 were no votes against.  That's how I interpret
24 that.

Page 80

1    Q.    That's a little bit different than what
2  I thought you said with respect to Provident board
3  meetings.
4    A.    No, it's not.
5        MR. BURKE:  No, it's not at all.
6    Q.    Okay.
7        MR. BURKE:  It's exactly the same thing
8  he said.
9    Q.    Tell me how many --
10   A.    I didn't say it that way, but it's the
11 same thing.
12   Q.    Okay.  Tell me what number of directors
13 you believe voted in favor of the OHSL-Provident
14 merger based on that first sentence.
15       MR. BURKE:  Objection.
16   A.    I don't know the number.  All the
17 directors who voted in favor of it is what that
18 says to me.  I don't know how many voted on it.
19   Q.    Is there any indication that any
20 director abstained?
21   A.    No.
22   Q.    Is there any indication that any
23 director changed his vote within days of the final
24 vote?

Page 81

1        MR. BURKE:  Objection.  Misstates the
2  record.  You may answer.
3    A.    No.
4    Q.    In the entire document, is there any
5  hint of dissent?
6        MR. BURKE:  Objection.  Calls for
7  speculation.  That's overbroad.
8    A.    Not that I recall.
9    Q.    Let's turn now to the second part of
10 that same sentence.  Your board of directors
11 unanimously believes that it is in the best
12 interest of OHSL stockholders.
13       MR. BURKE:  Misstated the document.
14 Please read it accurately, Mr. Brautigam.  At
15 least -- at least read it accurately.
16       MR. BRAUTIGAM:  Jim, we don't need a
17 speaking objection.  I did read it accurately
18 on the --
19       MR. BURKE:  No, you did not,
20 Mr. Brautigam.
21       MR. BRAUTIGAM:  -- second part of the
22 sentence.
23       MR. BURKE:  Yeah.
24       MR. BRAUTIGAM:  I read it fine.

21 (Pages 78 to 81)

Page 82

1    MR. BURKE: Are you reading the second
2  sentence or the second part of the first
3  sentence?
4    MR. BRAUTIGAM: Jim, I'm not going to
5  debate with you, Jim. What I read is what I
6  read.
7    MR. BURKE: Then fine. Read the
8  question back.
9    THE WITNESS: Yeah, he didn't read it
10  right.
11    MR. BURKE: You didn't read it
12  accurately.
13  A.    It doesn't say unanimously as it relates
14  to that. It says and believes. Unanimously
15  approves the acquisition and believes that it's in
16  the best interest.
17  Q.    Right. And do you believe that the word
18  "unanimously" modifies and believes that is in the
19  best interest of OHSL stockholders?
20    MR. BURKE: Objection.
21  A.    What do you mean by modifies?
22  Q.    Well, I believe, and I have expert
23  testimony that the word "unanimously" refers to
24  approved the acquisition and believes that it is in

Page 83

1  the best interest of OHSL stockholders.
2  A.    Yeah.
3  Q.    So I did read it correctly when we're
4  talking about the second part of the sentence. Do
5  you agree with that reading?
6    MR. BURKE: No. That's not --
7    MR. BRAUTIGAM: Jim, we don't need
8  speaking objections.
9    MR. BURKE: I'm going to speak an
10  objection, Mr. Brautigam, and I don't care
11  whether you like it or not. That's a
12  mischaracterization of the document, and I
13  have no idea what your question means.
14  A.    I don't know what the question means.
15    MR. BURKE: You're throwing in there
16  some expert testimony that nobody knows
17  anything about.
18    So read the sentence, and we will have
19  no objection. Whether he agrees with your
20  expert or not is irrelevant.
21  A.    This says to me that the board
22  unanimously approved the acquisition, and that the
23  board also believes that was in the best interest
24  of the stockholders.

Page 84

1  Q.    Okay.
2  A.    That's what it says.
3  Q.    Does the sentence say to you that the
4  entire OHSL board believes that the merger with
5  Provident is in the best interest of OHSL
6  stockholders?
7  A.    Again, as I said before, unanimously
8  says to me that everybody that voted was in favor
9  and would have also said that all those same people
10  thought it was in the best interest of the
11  shareholders.
12  Q.    Okay. So you do agree then that the
13  word "unanimously" modifies both parts of the
14  sentence, correct?
15  A.    Okay.
16    MR. BURKE: Objection. Calls for
17  speculation.
18  A.    If that's what you mean, yeah.
19  Q.    Well, you know who Ken Hanauer was,
20  correct?
21  A.    Yeah, the CEO.
22  Q.    Of OHSL, correct?
23  A.    Right.
24  Q.    Did you ever learn from any source that

Page 85

1  Mr. Hanauer did not believe that the merger with
2  Provident was in the best interest of OHSL
3  shareholders?
4  A.    I've learned it in relation to in the
5  context of your suit. I don't have any real
6  recollection of that before, no.
7  Q.    Is that something that you would have
8  wanted to know in 1999?
9    MR. BURKE: Objection. Calls for
10  speculation; assumes facts not in evidence.
11  You may answer.
12  A.    To be honest with you, it wouldn't have
13  been materially relevant to me. The question would
14  be what did the board vote and what did the
15  shareholders vote.
16  Q.    If you had known that in 1999
17  specifically that Mr. Hanauer did not believe that
18  the merger with Provident was in the best interest
19  of OHSL shareholders, would you have insisted that
20  that information be disclosed?
21    MR. BURKE: Objection. Misstates the
22  record; assumes facts not in evidence; that's
23  not an accurate characterization. You may
24  answer.

22 (Pages 82 to 85)

Page 86

1    A.    I don't know how to answer that. I
2 really don't know how to answer the question. I
3 really don't.
4    Q.    Why not?
5    A.    Because, you know, the whole context of
6 it is -- I have no idea.
7    Q.    Context of what?
8    A.    Of your comment, you know, of your
9 statement that if I had known. I mean, I have no
10 idea what I would have thought. Had to have been
11 there, had the facts, and made a judgment at the
12 time.
13    Q.    Okay. Mr. Hoverson, I grant you it's a
14 hypothetical question. Now, with that in mind,
15 it's appropriate for me to ask hypothetical
16 questions in some cases.
17        Now, given what you now know
18 specifically that Mr. Hanauer did not believe that
19 the merger was in the best interest of OHSL
20 shareholders --
21    A.    I don't know that.
22        MR. BURKE: Right.
23    Q.    You're not letting me finish my
24 question.

Page 87

1    A.    Okay. I just want you to know that I
2 don't know that he -- I have no first-hand
3 knowledge of what Ken Hanover thought -- or,
4 Hanauer. I don't know.
5        (Plaintiffs' Exhibit No. 106 was marked
6    for identification.)
7    Q.    Okay. Would you please pick up what has
8 been marked as Plaintiffs' Exhibit 106 and would
9 you read this Q. and A. on the first page to
10 yourself?
11    A.    And who is this with?
12    Q.    This is with Mr. Hanauer.
13    A.    (Examining document.) Okay.
14    Q.    Mr. Hoverson, back to this page and this
15 sentence, you agree that the sentence, Your board
16 of directors unanimously approved the acquisition
17 and believes that it is in the best interest of
18 OHSL stockholders, has two concepts, correct?
19        MR. BURKE: Objection. Vague; calls for
20    speculation. You may answer.
21    A.    I mean, we discussed this already. I
22 mean, I agree that it says what it says. They
23 approved it and they recommended it.
24    Q.    And approving and recommending are two

Page 88

1 different things, correct?
2    A.    That's what you say.
3    Q.    Actually, it talks about a belief. Do
4 you disagree with my interpretation that it
5 embraces two concepts?
6        MR. BURKE: Objection. Calls for legal
7    conclusion; calls for speculation. You may
8    answer.
9    A.    No, I don't disagree.
10    Q.    Okay.
11    A.    I would agree -- disagree -- you know,
12 it says what it says.
13    Q.    Now, your answer confused me a little
14 bit. Let me try again. Do you agree that the
15 sentence we're talking about contains two concepts?
16        MR. BURKE: Objection.
17    A.    You know, it talks about approval; it
18 talks about recommendation. You know, yeah, I
19 guess those are two concepts.
20    Q.    And the first concept refers to
21 something that actually happened; a vote, correct?
22    A.    The approval.
23    Q.    Correct. Yes?
24    A.    Yes.

Page 89

1    Q.    And the second concept refers to a
2 belief, correct?
3    A.    Belief, recommendation, I guess. Right?
4 It's a belief. Okay? Yeah, okay, they say belief.
5    Q.    From what you've read on the first page
6 of Plaintiffs' Exhibit 106, does it suggest to you
7 that Mr. Hanauer, the CEO, the largest shareholder,
8 and the only member of management on OHSL's board
9 did not believe that the merger was in the best
10 interest of OHSL shareholders?
11        MR. BURKE: Objection. Calls for
12    speculation based upon incomplete
13    hypothetical.
14    A.    Yeah, all I know is what I see here on
15 your page. I don't know what happened in the board
16 meeting. He was there and could -- you know, I
17 don't know what he said. I assume he was
18 there. Was he there?
19    Q.    Mr. Hoverson, do the question and
20 answers on page 1 of Plaintiffs' Exhibit 106 lead
21 you to conclude that Mr. Hanauer was not -- did not
22 believe that the OHSL-Provident merger was in the
23 best interest of OHSL shareholders?
24        MR. BURKE: Objection. Calls for

23 (Pages 86 to 89)

Page 90

1　speculation; vague; out of context; assumes
2　facts out of evidence. You may answer.
3　　A.　Yeah, all I can say is that this data
4　that you have furnished me says that that was his
5　opinion. That's what this says. That's all I -- I
6　don't know anything other than that.
7　　Q.　Is that opinion reflected anywhere in
8　Defendants' Exhibit 1?
9　　　MR. BURKE: Objection. No time
10　frame. Calls for speculation. You may
11　answer.
12　　A.　Not to my knowledge.
13　　Q.　As the CEO of Provident, do you believe
14　that if Mr. Hanauer did not believe that the merger
15　with Provident was in OHSL shareholders best
16　interest, that that information should be
17　disclosed?
18　　　MR. BURKE: Objection. Calls for
19　speculation; calls for legal conclusion. You
20　may answer.
21　　A.　Yeah, again, that's a legal question. I
22　don't have an answer to that. That's a question
23　for him and them, seems to me. If he -- you know,
24　felt that way, I don't know why he didn't -- why

Page 91

1　didn't he say something.
2　　Q.　Do you as CEO of Provident --
3　　A.　I don't know what he felt then. That's
4　what he says here.
5　　Q.　Mr. Hoverson, again, I'd just like to
6　remind you, I'm really trying not to step on your
7　answers if you would try not to step on my
8　questions.
9　　　MR. BURKE: I think he was completing
10　the prior answer, Mr. Brautigam.
11　　A.　Relax.
12　　Q.　Mr. Hoverson, I'm perfectly relaxed.
13　Can I hand you what has been previously been marked
14　as Plaintiffs' Exhibit 1. Would you take a look at
15　the sections that I've highlighted for you.
16　　A.　Which one?
17　　Q.　In the extreme right column.
18　　　MR. BURKE: There are two of them.
19　　A.　There are two highlights.
20　　Q.　Yes. Read both of them to yourself.
21　Mr. Hoverson, with this document or any other,
22　please feel free to take as much time as you need
23　to put it in context. Usually I think I can direct
24　your attention to where we need to be.

Page 92

1　　A.　(Examining document.) Okay. Question?
2　　Q.　There's a statement there attributed to
3　Mr. Burke, and it reads, Hanauer opposed the
4　Provident takeover because he wanted Oak Hills to
5　remain independent. Do you see that?
6　　A.　Um-hum.
7　　Q.　Did I read it correctly?
8　　A.　That's what it says.
9　　Q.　Is that a true statement?
10　　　MR. BURKE: Objection. Misstates the
11　facts; assumes facts not in evidence; relies
12　upon an inaccurate quote. You may answer.
13　　A.　I don't know.
14　　Q.　Is there anything in Defendants' Exhibit
15　1 that indicates that Mr. Hanauer opposed the
16　merger?
17　　　MR. BURKE: Objection.
18　　A.　I'm sure not.
19　　Q.　Why not?
20　　A.　I don't know. I don't know.
21　　Q.　Mr. Hoverson, are you a fair man?
22　　　MR. BURKE: Objection to form; objection
23　to relevance; vague. What does that mean? Go
24　ahead, Mr. Brautigam. What does that mean?

Page 93

1　　Q.　Do you have the question in mind,
2　Mr. Hoverson?
3　　A.　Do you have a question?
4　　Q.　Yes. Are you a fair man?
5　　　MR. BURKE: Objection to relevance.
6　　A.　What do you think?
7　　Q.　Mr. Hoverson, are you a fair man?
8　　A.　Of course.
9　　Q.　Do you believe that it's fair not to
10　have any hint of Mr. Hanauer's opposition in the
11　proxy materials, slash, registration statement?
12　　　MR. BURKE: Objection. Calls for
13　speculation.
14　　A.　I don't know when Hanauer felt --
15　　　MR. BURKE: Assumes facts not in
16　evidence.
17　　A.　-- what he felt, how he felt, when he
18　felt it, anything about it. Okay? And as to what
19　should be disclosed in there, I don't have -- you
20　know. I'm not going to speculate on what should
21　have been in there regarding him and what he
22　thought, because I don't know what he thought or
23　when he thought it.
24　　Q.　Did you ever ask him?

24 (Pages 90 to 93)

Page 94

```
 1     A.    No.
 2     Q.    Did you have any contact with
 3  Mr. Hanauer in 1999?
 4     A.    Very little, but the sense of it was
 5  that he seemed to be in favor of the transaction.
 6  It wasn't -- he wasn't acting like he wasn't, from
 7  what I knew.
 8     Q.    Please describe with as much specificity
 9  as you can recall what contact you had with
10  Mr. Hanauer in 1999.
11     A.    Frankly, I cannot recall any direct
12  contact that I had with him, but I'm quite sure
13  that's wrong.  Okay?  But I just -- I don't have
14  any specific memory of contact with him.
15     Q.    I understand it's a long time ago.  Do
16  you have any general recollection?
17     A.    I really don't.
18     Q.    Did you ever meet Mr. Hanauer?
19     A.    Again, I know I did.
20     Q.    What were the circumstances under which
21  you met him?
22     A.    We met all the directors one night, and
23  he would have been there; and that's the only
24  specific kind of thing that I can recall that I --
```

Page 95

```
 1  he would have, I'm sure, been there.  I don't have
 2  a specific memory though from being there.
 3     Q.    When you say "we," are you referring to
 4  the Provident board?
 5     A.    No.  That would have been myself and
 6  Chris Carey.
 7     Q.    And please describe the circumstances
 8  under which you met them.  Did you go to them?  Did
 9  they come to you?
10     A.    It was a discussion of the transaction.
11     Q.    Where did --
12     A.    We had approached them, as I recall.
13     Q.    Where did it take place?
14     A.    I don't remember.  It could have been
15  the Queen City Club, but I'm not -- I'm not
16  positive of that.
17     Q.    And you met all of the directors; is
18  that correct?
19     A.    Could not tell you that with certainty.
20     Q.    When did this meeting --
21     A.    They're board, you know.
22     Q.    When did this meeting take place?
23     A.    Sometime in '99.
24     Q.    Did it take place before or after the
```

Page 96

```
 1  proxy materials were finalized?
 2     A.    Way before.
 3     Q.    Did you ever meet Tom Herron?
 4     A.    Name is not familiar.  It doesn't mean I
 5  didn't meet him.
 6     Q.    When you say way before --
 7     A.    Transaction was still not agreed to.
 8     Q.    Oh, okay.
 9     A.    Just discussion.
10     Q.    Did you ever learn that a director had
11  resigned in part in protest --
12         MR. BURKE:  Objection.
13     Q.    -- from OHSL's board?
14         MR. BURKE:  Misstates the record;
15  mischaracterizes the evidence.
16     A.    Not that I recall.  I mean, obviously,
17  I'm aware of the allegation that you made regarding
18  that, but not that I recall during the time period,
19  no.
20     Q.    If you had been aware that a director of
21  OHSL had resigned in part in protest, would you
22  have insisted it be included in the proxy
23  materials?
24         MR. BURKE:  Objection.  Calls for
```

Page 97

```
 1  speculation; assumes facts not in evidence;
 2  incomplete hypothetical.
 3     A.    No.  You know, what's -- what's included
 4  in the proxy materials is a matter of law, and put
 5  everything in there that the law requires, period.
 6  You know, make sure it's in there.
 7     Q.    Mr. Hoverson, do you --
 8     A.    SEC attorneys make those kind of
 9  decisions.
10     Q.    Do you agree that you can delegate
11  authority but never responsibility?
12         MR. BURKE:  Objection.  Vague.
13     A.    I don't know how to answer that.  It's
14  certainly a common comment.
15     Q.    Mr. Hoverson, we've already talked about
16  you voting your personal shares in favor of the
17  National City merger and your expectation that the
18  other Provident directors will vote their shares in
19  favor of the merger.
20     A.    But I don't know that they did.
21     Q.    Right.  I don't understand that.
22     A.    Good thing.  Nobody really said.
23     Q.    Okay.  But based on the proxy materials,
24  a reasonable shareholder could only conclude that
```

Page 98

1  the directors would follow their own recommendation
2  and vote their shares in favor of the Provident-
3  National City merger, correct?
4          MR. BURKE: Objection. Calls for
5     complete speculation as to what a reasonable
6     shareholder would conclude. You may answer.
7     A.    Yeah, I don't know how to answer
8  that. I don't know what they would conclude.
9     Q.    Mr. Hoverson, did you notice that your
10 answer was almost an exact paraphrase of
11 Mr. Burke's objection?
12         MR. BURKE: That's because your question
13    would call for speculation.
14    A.    I didn't.
15    Q.    Mr. Hoverson, let's try this from a
16 different angle. With respect to the National
17 City-Provident merger, no reasonable person could
18 conclude that the Provident directors would vote
19 anything but in favor of the merger, correct?
20         MR. BURKE: Objection. Calls for
21    speculation.
22    A.    Yeah, I don't know how to answer that,
23 frankly. I doubt that they gave much thought to
24 how much stock the directors owned. I don't know

Page 99

1  how to answer that.
2     Q.    Well, you had an expectation that each
3  of your --
4     A.    I did.
5     Q.    -- fellow directors would vote in favor
6  of the merger, correct?
7     A.    I did.
8     Q.    And was that expectation based in part
9  on the proxy materials?
10    A.    No. It was based upon my firsthand
11 knowledge and experience with them, and they're
12 each -- seemed to be personal enthusiasm for
13 them. So that was a judgment I made based on my,
14 you know, one-to-one with them. I don't know if
15 it's true, but that's...
16    Q.    Right, and it's not based at all on the
17 proxy materials?
18         MR. BURKE: Objection.
19    A.    No, it's not.
20         MR. BURKE: Asked and answered.
21    A.    It's not really in my case since I have
22 a different relationship with them.
23    Q.    Is there anything in the proxy materials
24 that's inconsistent with the directors of Provident

Page 100

1  voting in favor of the National City merger?
2          MR. BURKE: Objection. Vague;
3     overbroad.
4     A.    Yeah, I'm not sure what that means.
5     Q.    Okay. How did you expect the OHSL
6  directors to vote their personal shares with
7  respect to the Provident-Oak Hills merger?
8     A.    I would have expected them to vote for
9  it.
10    Q.    Why?
11    A.    Because they voted for the transaction.
12    Q.    Did you later learn that OHSL's CEO had
13 not voted in favor of the merger?
14    A.    I did.
15    Q.    How did you learn that?
16    A.    I don't remember.
17    Q.    When did you learn that?
18    A.    I don't remember that either.
19    Q.    Was it before or after any litigation
20 was filed?
21    A.    I honestly do not remember.
22    Q.    Did that trouble you in any way?
23    A.    No.
24    Q.    Why not?

Page 101

1     A.    He's free to vote the way he wants.
2     Q.    Now, Mr. Hoverson, you ran the special
3  meeting with shareholders that took place on May
4  20th, correct?
5     A.    I did.
6     Q.    And you got up before the assembled
7  shareholders, and you gave a pitch essentially to
8  vote in favor of the merger, correct?
9          MR. BURKE: Objection.
10    A.    Actually, that's not what I did.
11    Q.    Okay. Please describe what you did.
12    A.    All I did was, you know, run the meeting
13 on an official basis and indicate that, you know,
14 we had a quorum of the votes present; asked for a
15 motion; received a motion. We voted the shares
16 that we had present and -- that were in favor of
17 the transaction, and we concluded the meeting.
18    Q.    Well, not so fast. Before you concluded
19 the meeting, didn't you talk for a little while
20 about what a great deal the Provident-National City
21 merger was?
22    A.    After the official meeting was
23 concluded.
24    Q.    After the official meeting was concluded

26 (Pages 98 to 101)

Page 102

1  or after the vote was taken?
2     A.    After the official meeting was
3  concluded.
4     Q.    How long did the meeting last?
5     A.    The official part of the meeting
6  probably lasted five minutes.
7     Q.    What did you say to close the meeting?
8     A.    I believe I said the meeting's
9  adjourned.
10    Q.    And after you said the meeting was
11 adjourned, did you remain at the podium and say
12 something?
13    A.    Yes.  We then made some informal
14 remarks.
15    Q.    What was the nature of the informal
16 remarks that you made?
17    A.    I thanked our employees; thanked the
18 Lindner family for their support over the years;
19 thanked our directors for their support; said I was
20 proud of the transaction; and wished everybody
21 well.
22    Q.    And were you aware that the OHSL
23 shareholders went through a similar process on
24 October 25th, 1999?

Page 103

1         MR. BURKE:  Objection.  Foundation;
2    calls for speculation.  You may answer.
3    A.    Well, I know they would have had a
4  special shareholder meeting.  You have to have one.
5    Q.    Did you know that Mr. Hanauer ran that
6  meeting?
7         MR. BURKE:  Objection.  Calls for
8    speculation.  You may answer.
9    A.    I don't know who ran it.
10    Q.    Do you think it would have been fair for
11 you to conduct the Provident-National City merger
12 special meeting if you had voted your shares
13 against the merger?
14        MR. BURKE:  Objection.  Calls for
15   speculation.  You may answer.
16    A.    Yeah, it's my job.
17    Q.    Do you think that it would be fair to
18 run the meeting without telling anyone that you had
19 voted your shares against the merger?
20    A.    Yeah.
21    Q.    Do you think that it would be fair for
22 you to run the meeting calling for a vote in favor
23 of the Provident-National City merger if you
24 believed that the merger was not in the best

Page 104

1  interest of Provident shareholders?
2         MR. BURKE:  Objection.  Assumes facts
3    not in evidence; calls for speculation.
4    A.    Yeah, I don't know how to answer that
5  question.  I would answer it this way.  If I
6  thought that the deal was not in the best interest
7  of the shareholders, I never would have voted for
8  it in the board meeting.  I would have voted
9  against it in the board meeting.
10    Q.    And you would have voted against it in
11 the board meeting because that's your understanding
12 of what your fiduciary duties requires, correct?
13    A.    If I was against it -- I'm just telling
14 you what I would have done.  That's what I would
15 have done.
16    Q.    You're familiar with the term "fiduciary
17 duty," right?
18    A.    Yeah.
19    Q.    What is your understanding of the phrase
20 "fiduciary duty"?
21        MR. BURKE:  Objection.  Calls for legal
22   conclusion.  You may answer.
23    A.    I mean, to do -- you know, to do the
24 right thing, basically.

Page 105

1    Q.    Even if --
2    A.    For others.
3    Q.    For the shareholders, correct?
4    A.    Um-hum, yeah.
5    Q.    Do you believe that Mr. Hanauer did the
6  right thing as per your definition?
7         MR. BURKE:  Objection.
8    A.    Yeah, I can't --
9         MR. BURKE:  Calls for legal conclusion;
10   speculation.
11    A.    I can't speculate as to what he
12 did.  I'm not inside his head.
13    Q.    Mr. Hoverson, I'm not asking you to
14 speculate as to what he did.  You're the CEO of a
15 public company.  You have fiduciary duties --
16    A.    And I will -- and I will speak to what I
17 did and what I, you know, would have done if I was
18 not in favor of the merger.  I wouldn't have voted
19 for it.
20    Q.    Mr. Hoverson, respectfully, the way this
21 process works is you are to answer my question.
22    A.    Okay.  Okay.
23        MR. BRAUTIGAM:  Now, can I have my
24   question read back?

27 (Pages 102 to 105)

Page 106

1          (The question was read back.)
2          MR. BURKE:  Objection to form; vague.
3      A.   I can't answer as to what Ken did.  I
4  can't.
5      Q.   Mr. Hoverson, as the acting chairman of
6  Provident's board, was it necessary for you to
7  assess whether your fellow directors were meeting
8  their fiduciary duties?
9          MR. BURKE:  Objection.
10      A.   In our transaction, you know, if the
11  board would have not been in favor, we wouldn't
12  have recommended for the transaction, right?  If I
13  would have felt that I wasn't -- I'm the one who
14  recommended to the board we do the transaction.  So
15  the context is kind of weird to even consider, you
16  know, any other kind of action.
17      Q.   Do you know if Mr. Hanauer ever voted
18  against or abstained from continued negotiations
19  with Provident?
20          MR. BURKE:  Objection.  Foundation.
21      A.   I don't know.
22      Q.   You do not know?
23      A.   Do not know.
24      Q.   Do you know if Mr. Hanauer ever voted in

Page 107

1  favor of the merger?
2      A.   I don't know that either.
3      Q.   Okay.  Please pick up the consolidated
4  amended complaint, and would you read paragraph 55
5  to yourself, please.
6      A.   (Examining document.)  Okay.
7          MR. BURKE:  Just a second.
8      A.   Okay.
9      Q.   Mr. Hoverson, do you understand that the
10  question and answer in paragraph 55 is my asking
11  Mr. Hanauer a question?
12          MR. BURKE:  Objection.  Calls for
13  speculation; no foundation.
14      A.   Yeah, I understand that.
15      Q.   And is Mr. Hanauer's testimony, to wit,
16  that he voted in favor of the transaction because
17  he just gave up, consistent with your understanding
18  of a director of a public company meeting his
19  fiduciary duties?
20          MR. BURKE:  Objection.  Calls for
21  speculation; asks for a legal conclusion.
22      A.   Yeah, I'm not gonna -- I'm not going to
23  speculate on what he did.  He did what he did.
24      Q.   Mr. Hoverson, respectfully, I don't

Page 108

1  believe that the question requires you to
2  speculate.  Okay?  It goes to your thought process.
3  We've already established that you're the acting
4  chairman of the board; you have fiduciary duties;
5  you know what they are; and you know if your
6  directors are exercising them, correct?
7      A.   I wasn't there.
8          MR. BURKE:  Respectfully --
9      A.   I don't know what --
10          MR. BURKE:  One second.  We believe -- I
11  believe your question does call for
12  speculation, which is why I stated that
13  objection.
14          MR. BRAUTIGAM:  Well, he can still
15  answer it.
16      A.   I wasn't there.  I don't know why he did
17  what he did.
18      Q.   That's not my question.  I'm not asking
19  you why he did what he did.  I'm asking you to
20  accept Mr. Hanauer's sworn testimony, and the
21  question is does this meet your standard of how a
22  director should fulfill his fiduciary duties?
23          MR. BURKE:  Objection.  Calls for
24  speculation; calls for a legal

Page 109

1  conclusion.  You may answer.
2      A.   Yeah, again, I'm not going to speculate
3  on what he did or why he did it.  You know, he did
4  what he did.  Okay?  I don't know why he did that.
5      Q.   Did you know in 1999 that this is how
6  Mr. Hanauer felt?
7          MR. BURKE:  Objection.  Calls for
8  speculation.  You may answer.
9      A.   Not that I remember.
10      Q.   Would this have been of interest to you?
11          MR. BURKE:  Objection.  Assumes facts
12  not in evidence.  You may answer.
13      A.   Yeah, frankly, I'm not sure how to
14  answer that.  I don't know if it would have been or
15  not.  In many cases with these small S&L's, the
16  CEO was a good job, and I can see where he would
17  have wanted to keep his job, and the directors
18  would have wanted to sell the company.
19          And he probably wouldn't have a job if
20  he sold the company, so his interest frankly could
21  diverge a bit from shareholders and the other
22  directors, but I'm speculating.  I don't know if
23  that's true.
24      Q.   My question is much simpler than that,

28 (Pages 106 to 109)

Page 110

Mr. Hoverson. Do you believe based on this question and answer that Mr. Hanauer fulfilled his fiduciary duties to the OHSL shareholders?
A. Yeah, I'm not --
MR. BURKE: Same objection. Asked and answered.
A. I'm not going to comment on whether or not he fulfilled his fiduciary duties. It's not something I have an opinion on.
Q. This is not a press conference, and no comment is not an appropriate response.
MR. BURKE: I don't have an answer is an appropriate response, Mr. Brautigam. That's exactly what he said.
A. I don't have an opinion on Ken Hanauer's actions.
Q. Mr. Hoverson, what are the purpose of proxy materials?
MR. BURKE: Objection. Calls for legal conclusion; asked and answered.
A. To provide information to the folks you send it to.
Q. Do you agree that the purpose of any proxy materials or prospectus is to provide

Page 111

shareholders with all the information necessary for them to make a knowledgeable investment decision regarding their shares?
MR. BURKE: Objection. Calls for legal conclusion. You may answer.
A. Sure, and that's -- you know, and there are regulations that prescribe the information that needs to go in there.
Q. And as CEO and a board member of Provident, are you familiar with those regulations?
A. Not all of them, no, you know, but we have counsel and people that are.
Q. But you personally have a working knowledge of what should be disclosed and what should not be disclosed, correct?
MR. BURKE: Objection. Mischaracterizes prior testimony. You may answer.
A. I certainly have knowledge of things that -- you know, of the process. I guess that's the way I'd answer it, I guess.
Q. Do you agree with this statement: The Securities and Exchange Commission requires under Reg C that information in a prospectus be presented in, quote, clear, concise, and understandable

Page 112

language and that it not be misleading?
MR. BURKE: Objection. Calls for legal conclusion. You may answer.
A. Yeah, I mean, if that's what it says, that's what it says.
Q. Do you believe that Defendants' Exhibit 1 presents information in clear, concise, and understandable language and that it not be misleading?
A. Yes.
Q. Do you agree that it's incumbent upon the board of directors and their advisors to impart all relevant information to shareholders regarding a proposed merger and to present it in such a way that it is readily comprehensible to shareholders?
MR. BURKE: Objection. Calls for legal conclusion. You may answer.
A. Again, that's the purpose of the proxy.
Q. Are you familiar with the Securities Act of 1933?
MR. BURKE: Same objection.
A. Yes, I know that there is one obviously.
Q. Do you have a working knowledge of its provisions?

Page 113

A. I'm not an SEC attorney.
Q. I didn't ask if you were.
A. What's the question?
Q. Do you have a working knowledge of the provisions of the Securities Act of 1933?
MR. BURKE: Objection. Calls for legal conclusion.
A. I don't know, frankly.
Q. Okay. Are you familiar with the Securities Exchange Act of 1934?
MR. BURKE: Same objection. You may answer.
A. Yeah, you're getting too technical for me. My issue with the SEC is -- it's a full disclosure approach, and that's what it's about, and those rules are there to make sure that happens.
Q. Do you believe that the resignation of a director in part in protest would be something that should be disclosed under full disclosure?
A. You would have to ask counsel.
Q. You have no opinion on that?
MR. BURKE: Objection. Asked and answered.