Page 114

1　　A.　I would ask counsel.
2　　Q.　Do you agree that the purpose of both
3　the Securities Act and the Securities Exchange Act
4　was to provide full and fair disclosure and to
5　prevent fraud?
6　　　MR. BURKE: Objection. Calls for legal
7　conclusion.
8　　A.　It's probably one of the purposes.
9　　Q.　You agree that OHSL shareholders were
10　told that their board of directors voted
11　unanimously to approve the merger with Provident
12　and that it was in their best interest, correct?
13　　　MR. BURKE: Objection. Document speaks
14　for itself; calls for speculation.
15　　A.　That's what it says.
16　　Q.　Okay. You also agree that there was no
17　indication, either in the proxy nor the meeting of
18　the shareholders on October 25, 1999, that
19　Mr. Hanauer, OHSL CEO and board member, had been
20　opposed to the transaction from the beginning?
21　　　MR. BURKE: Objection. No foundation;
22　calls for speculation as to what happened at
23　OHSL.
24　　A.　Yeah, I mean, as far as I know, none of

Page 115

1　that's in there, no.
2　　Q.　Okay. And you agree that there's no
3　indication in Defendants' Exhibit 1, the proxy
4　materials registration statement, that Mr. Hanauer
5　did not believe the transaction was in the best
6　interest of OHSL shareholders?
7　　　MR. BURKE: Same objection. Calls for
8　speculation as to Mr. Hanauer. You may
9　answer.
10　　A.　Isn't that the same question you just
11　asked me?
12　　Q.　No, it's not.
13　　A.　What's the question again then?
14　　　(The question was read back.)
15　　　MR. BURKE: Same objection. Calls for
16　speculation.
17　　A.　Yeah, I think it's the same question.
18　As far as I know, there's nothing in there.
19　　Q.　Mr. Hoverson, have you seen any of
20　OHSL's other public documents over the years?
21　　A.　Yeah, I'm not sure.
22　　Q.　Okay. Do you happen to recall if they
23　were signed by both Mr. Brinker, as chairman of the
24　board, and Mr. Hanauer, as the CEO?

Page 116

1　　A.　Yeah, again, I don't recall.
2　　Q.　Did you ever learn that this document
3　had been presented to Mr. Hanauer with his
4　signature electronically affixed, and he directed
5　that it be removed because he didn't want the
6　transaction to be seen as coming from him?
7　　　MR. BURKE: Objection. Assumes facts
8　not in evidence; calls for speculation;
9　mischaracterizes the record. You may answer.
10　　A.　I don't know anything about that.
11　　Q.　Would that be of interest to you?
12　　　MR. BURKE: Objection. Same objection.
13　Calls for speculation. You may answer.
14　　A.　I mean, the board -- you know, our focus
15　was the board voted, shareholders voted, and that
16　was... came from our perspective, that was really
17　the relevant issues. Disclose the facts; what are
18　the votes; yes or no.
19　　Q.　Will you agree that the shareholders
20　needed full and complete information in order to
21　make an informed decision, correct?
22　　　MR. BURKE: Objection. Calls for
23　speculation. You may answer.
24　　A.　Yeah, again, the document they were

Page 117

1　furnished, that was his purpose.
2　　Q.　Okay. And you also agree that the
3　financial information that Provident provided was
4　later changed, correct?
5　　A.　I do.
6　　Q.　And you also agree that it doesn't state
7　in this document that Mr. Hanauer intended to vote
8　his personal shares against the transaction,
9　correct?
10　　　MR. BURKE: Objection. Assumes facts
11　not in evidence; calls for speculation.
12　　A.　I don't know -- I'm assuming that it
13　doesn't say that. I have no memory that it did,
14　so...
15　　Q.　Mr. Hoverson, did I ask you --
16　　A.　I haven't read this thing, you know,
17　just now to know everything that's in here; but
18　we'll assume that that's not in there.
19　　Q.　Okay. I'm not sure if I asked you this
20　question or not, but in 1999, did you read every
21　word and look at every number in Defendants'
22　Exhibit 1?
23　　　MR. BURKE: That's the first question
24　you asked him, so it's asked and answered.

30 (Pages 114 to 117)

Page 118

1    A.    I did answer that.
2    Q.    If it's the first question, we'll go
3  back and find it.  Did you see drafts of
4  Defendants' Exhibit 1?
5    A.    I would have.  It would have been the
6  process.
7    Q.    What was the purpose of your seeing
8  drafts of Defendants' Exhibit 1?
9    A.    To -- you know, to review.
10    Q.    Did you make changes?
11    A.    I don't recall making any, no.
12    Q.    Did you make suggestions?
13    A.    I don't recall making any.
14    Q.    Who wrote Defendants' Exhibit 1?
15        MR. BURKE:  Objection.  Calls for
16  speculation.
17    A.    I do not know.  Counsel.
18    Q.    Which counsel?
19    A.    I don't know.  I'm sure that -- you
20  know, I don't know.  Frankly, I don't know.
21    Q.    How did you receive the drafts of
22  Defendants' Exhibit 1?
23    A.    I don't remember.  I'm sure paper back
24  then.  It could have been electronically.  I don't

Page 119

1  know.  Probably paper.
2    Q.    Who did they come from?
3    A.    I don't remember.  Either they would
4  have come from our counsel in that case, Mark
5  McGee, or from KMK.
6    Q.    Did you ever receive any documents from
7  Dinsmore & Shohl?
8    A.    I don't remember.
9    Q.    Did you ever have any discussions with
10  Cliff Roe or anyone from Dinsmore?
11    A.    No.  Well, I don't remember.
12    Q.    Okay.  Do you agree that investors are
13  keenly interested in the opinions of senior
14  management, especially the most senior member, the
15  CEO?
16        MR. BURKE:  Objection.  Calls for
17  speculation; vague; no foundation.
18    A.    Yeah, I mean, you know, I suppose every
19  situation is its own.
20    Q.    Let me come at it a different way.  In
21  the context of a merger, do you believe that
22  investors are keenly interested in the opinions of
23  senior management, especially the most senior
24  member, the CEO?

Page 120

1        MR. BURKE:  Objection.  Calls for
2  speculation as to investors.  You may answer.
3    A.    Yeah, I'm not quite sure how to answer
4  the question.  The -- most of these situations,
5  it's the recommendations that seem to be made by
6  directors as opposed to management.
7        And I think the reason that's the case
8  is that directors and management's interest can
9  diverge.  And the directors are there to look out
10  for the shareholders.  That's their job.
11        So I think in those cases, typically the
12  director's view is, you know, that's why it's done
13  the way it's done.  They're the representatives of
14  the shareholders.
15    Q.    Well, Mr. Hoverson, you wear at least
16  two hats at Provident, correct?
17        MR. BURKE:  Objection.  Vague; form.
18    Q.    You're a director as well as the most
19  senior member of management, correct?
20    A.    Yes.
21    Q.    And I guess a third hat would be that
22  you're the acting chairman of the board, right?
23    A.    Right.
24    Q.    So how do you separate out your interest

Page 121

1  as a member of management and your interest as a
2  director and your interest as acting chairman of
3  board?
4    A.    Well, I like to think --
5        MR. BURKE:  Objection to relevance.  You
6  may answer.
7    A.    I like to think in most cases they
8  coincide, but if they don't, that's -- the rest of
9  the directors' role is to make sure that the right
10  thing is done.  That's why we have a majority of
11  outside directors.
12    Q.    Now, you said that you met the OHSL
13  board.  You're not sure if it's the complete board,
14  but you met the OHSL board at some point in
15  negotiations, correct?
16    A.    Yes, right, yeah.
17    Q.    Did you form an opinion as to their
18  financial literacy at that point?
19    A.    I don't have a memory of forming an
20  opinion other than, as I recall, it seemed as
21  though, you know, there were at least some folks on
22  there who seemed, you know, quite literate, yes;
23  but I don't remember who that would be, but...
24    Q.    What happened at this meeting to give

31 (Pages 118 to 121)

1  you the impression that some of the folks were
2  quite literate?
3      A.    Just more of a sense.
4      Q.    And did anything else strike you about
5  the OHSL board?
6      A.    No.
7      Q.    Did they strike you as being old?
8      A.    Frankly, I don't remember that one way
9  or the other.
10     Q.    In the context of a merger, do you
11 believe that the CEO is generally viewed by
12 shareholders as the person responsible for the
13 day-to-day operations of the corporation as well as
14 strategic planning for its future?
15         MR. BURKE:  Objection.  Calls for
16     speculation, vague; no context.
17     A.    Well, he's obviously a person looked
18 upon for day-to-day operations of the company; and
19 he would be, in my context, looked upon as somebody
20 who should be recommending strategic planning to
21 the board.
22         In the end, it's the board's
23 responsibility to approve the direction of a
24 corporation based on management's recommendations

1  or their disagreement with management.
2      Q.    In the context of a merger, do you
3  believe that the CEO is viewed by the investment
4  community to be most knowledgeable and informed
5  about all matters affecting the corporation and its
6  future?
7          MR. BURKE:  Objection.  Asked and
8      answered; calls for speculation; vague.
9      A.    I'm sure in many cases that's
10 correct.  I don't know if it's correct in all
11 cases, but...
12     Q.    In the context of mergers, do you agree
13 that in conjunction with the chief financial
14 officer, who reports on the financial matters of
15 the corporation, the CEO is the most sought after
16 voice in communications with shareholders and the
17 investment community?
18         MR. BURKE:  Same objection.  Vague; no
19     context; calls for speculation.  You may
20     answer.
21     A.    I think generally that's probably
22 correct.  He's usually the communication point.
23 There are many cases where boards disagree with
24 management as to what should happen with the

1  company, and it's not uncommon.
2      Q.    In this case, do you believe that the
3  role of the CEO as a source of information was even
4  more important because OHSL was a regional savings
5  and loan with six branches in western Cincinnati?
6          MR. BURKE:  Objection.  Calls for
7      speculation; assumes facts not in
8      evidence.  You may answer.
9      A.    His role as -- what was the question?
10 His role as...
11     Q.    As a source of information about the
12 proposed merger.
13     A.    For whom?  As a source of information to
14 whom?
15         MR. BURKE:  I didn't understand the
16     question.
17     Q.    Oh, to whom?
18     A.    Yeah.
19     Q.    For the investment community.
20         MR. BURKE:  Same objection.  Calls for
21     speculation; no foundation.
22     A.    Yeah, again, the nature of the process
23 says they want to hear from the board.  In ours, it
24 was the same thing.

1      Q.    Do you believe --
2      A.    What did the board recommend, you know.
3      Q.    Do you believe that in the context of
4  this merger that, because many of its shareholders
5  were also customers and employees of OHSL, that the
6  CEO's role as a source of information may have been
7  even more important than in the usual case?
8          MR. BURKE:  Objection.  No foundation
9      for any of this; calls for speculation as to
10     OHSL.
11     A.    I don't know how to answer that really.
12     Q.    Do you believe that Mr. Hanauer's role
13 as a source of information was even more important
14 with respect to this proposed merger because OHSL
15 stock was not actively followed by securities
16 analysts?
17         MR. BURKE:  Same objection.  No
18     foundation for any of this.
19     A.    Yeah, again, I don't know how to answer
20 that.
21     Q.    Do you agree that Mr. Hanauer was a
22 visible member of the community?
23         MR. BURKE:  Same Objection.  No
24     basis.  You may answer.

1    A.   I don't know.
2    Q.   Were you aware that he had come up
3  through the ranks and been affiliated with OHSL for
4  more than 20 years?
5    A.   I don't -- you know, I may have known at
6  the time.
7    Q.   Were you aware that he was the only
8  member of management serving as a board member?
9    A.   I think I was aware of that, I think.
10   Q.   Were you aware that Mr. Hanauer was
11 OHSL's largest shareholder?
12   A.   No.  If I was, I'd forgotten.
13   Q.   Do you agree that Mr. Hanauer's opinion
14 regarding the merger clearly would have been
15 important to OHSL shareholders?
16       MR. BURKE:  Objection.  No foundation;
17   calls for speculation.
18   A.   I don't how to -- I don't know what's
19 important to them.
20   Q.   Are you familiar with the ramifications
21 of the dissenting votes with respect to a merger?
22       MR. BURKE:  Objection.  Vague;
23   overbroad.
24   A.   No.

1    Q.   Okay.  We've already covered that all of
2  Provident's directors voted in favor of the merger
3  with National City, correct?
4    A.   They did.
5    Q.   And if some of the directors resigned in
6  part in protest, would that have made it easier,
7  harder, or about the same to get the merger done?
8        MR. BURKE:  Objection.  Calls for
9    speculation.  Are you talking about
10   Provident --
11       MR. BRAUTIGAM:  Yes.
12       MR. BURKE:  -- not National City?
13   Objection.  Calls for speculation.
14   A.   I don't know.  I don't know.
15   Q.   If some of the directors of Provident
16 voted against the National City merger, would that
17 have been disclosed?
18       MR. BURKE:  Same objection.
19   A.   Sure.  I assume it would be.
20   Q.   Why do you assume that?
21   A.   I just assume it would be.  You know,
22 that's an SEC question.
23   Q.   Well, the SEC doesn't answer the
24 question, does it?

1        MR. BURKE:  Objection.  You know what he
2    meant.
3    A.   The SEC tells you what to disclose.
4  That's prescribed, all that stuff.  It's whatever
5  the SEC says, that's what you do.
6    Q.   If a Provident director had resigned in
7  part in protest of the National City merger, would
8  you have made sure that that was disclosed?
9        MR. BURKE:  Objection.  Assumes facts
10   not in evidence; calls for speculation;
11   misstates the record, even as to OHSL.  You
12   may answer.
13   A.   Yeah.  I would have asked an SEC
14 attorney what to -- you know, what to disclose.
15   Q.   Do you believe that Defendants' Exhibit
16 1, taken as a whole, would have caused a reader to
17 believe that Mr. Hanauer intended to vote his
18 shares in favor of the OHSL-Provident merger?
19       MR. BURKE:  Objection.  Calls for
20   speculation; argumentative.  You may answer.
21   A.   You know, we talked about this -- I
22 don't know if it would have lead people to believe
23 that or not.  It doesn't talk about it, so...
24   Q.   Isn't that one of the purposes of

1  Defendants' Exhibit 1?
2        MR. BURKE:  Isn't what one of the
3    purposes?
4    A.   As to how he's going to vote?
5    Q.   Yeah.
6        MR. BURKE:  Objection.  Calls for
7    speculation.
8    A.   On its face, I don't think that is the
9  purpose of it, you know, no.  It doesn't seem to be
10 the purpose of it.  The purpose of it is, you know,
11 are the directors in favor and do they recommend
12 that you vote...
13   Q.   And you vote --
14   A.   ...and here's the information.
15   Q.   -- vote for the merger, correct?
16       MR. BURKE:  I'm sorry.  Can you repeat
17   that?
18   Q.   We were all speaking at the same time,
19 so let me slow down.  Defendants' Exhibit 1
20 suggests that all of the OHSL directors voted in
21 favor of the merger with Provident, correct?
22   A.   No.  If we read on with this, it says
23 that the people who voted, all voted for it.
24   Q.   Where did does it say that?

33 (Pages 126 to 129)

Page 130

1    A.    It says unanimous.  That's what
2  unanimous means.
3    Q.    Let's assume hypothetically --
4    A.    There were no -- there were no
5  dissenting votes is how I read that.
6    Q.    Let's assume hypothetically --
7    A.    I don't know if they all voted.
8    Q.    Did you ever read the CAC, the
9  consolidated amended complaint?
10   A.    No.
11   Q.    Let's assume that when the final vote
12  was taken on August 2nd, 1999 --
13   A.    Which vote are you talking about?
14   Q.    OHSL-Provident merger --
15   A.    Director vote?
16   Q.    -- director vote -- that there were six
17  people in the room.  Are you with me?
18       MR. BURKE:  Just ask the question.  Are
19  you with me is not a proper question.
20       MR. BRAUTIGAM:  Jim, I'm trying to set
21  this up.  Relax.
22       MR. BURKE:  Set it up.
23       MR. BRAUTIGAM:  Jim, you're getting
24  agitated.

Page 131

1        MR. BURKE:  Just ask the question.  I'm
2  not getting agitated.
3        MR. BRAUTIGAM:  Jim, you're getting
4  agitated.
5        MR. BURKE:  Go ahead.
6  BY MR. BRAUTIGAM:
7    Q.    Let's further assume that there were
8  seven members in the room on July 22nd, 1999, and
9  that each --
10   A.    Is that a different date than the first
11  date --
12   Q.    Yes.
13   A.    -- you just said?
14   Q.    Right, we're talking about August 2nd,
15  1999, for the final vote and July 22nd, 1999, for
16  the previous vote.
17   A.    All right.
18   Q.    July 22nd, 1999, there was seven --
19  actually, there are eight directors in the room,
20  and they all vote, even the chairman.  Jump ahead
21  to August 2, 1999.
22   A.    What was that vote about?
23   Q.    Continue the negotiations with
24  Provident.  So we jump ahead to August 2nd, 1999,

Page 132

1  and the composition of the board has changed in
2  that Mr. Herron has resigned in part in protest.
3        MR. BURKE:  Objection.  Misstates the
4  record.  You may answer.
5    Q.    Now, we have six people in the room, six
6  directors, because Mr. McKiernan is on a
7  Mediterranean cruise.  How many people would you
8  conclude voted in favor of the OHSL-Provident
9  merger based on that fact pattern?
10       MR. BURKE:  Objection to form.
11   A.    Yeah, I wouldn't --
12       MR. BURKE:  Calls for speculation.  You
13  may answer.
14   A.    I wouldn't conclude other than the fact
15  that all the directors there voting and that there
16  were enough to vote for it to be okay, that there
17  would no dissenting votes would be the way I'd read
18  that.
19   Q.    Would you expect the chairman of the
20  board to vote at both the July 22nd, 1999, meeting
21  and the August 2nd, 1999 meeting?
22       MR. BURKE:  Objection.  Calls for
23  speculation.
24   A.    Yeah, you know, I don't know how they

Page 133

1  ran their company.  I can't answer as to what I
2  would expect them to do...
3    Q.    Well --
4    A.    ...seriously.
5    Q.    You can form an opinion based on reading
6  these paragraphs, correct?
7        MR. BURKE:  Objection.
8    A.    Speak to how we run ours.
9    Q.    Okay.
10   A.    But I won't -- I can't speculate on what
11  they do and why they do it.
12   Q.    You said in the proxy materials that the
13  board of directors of Provident Financial Group
14  unanimously approved the merger because each and
15  every director voted, correct?
16       MR. BURKE:  Objection.  Did you say --
17  can you repeat that question?
18       (The question was read back.)
19       MR. BURKE:  Objection.  That's not in
20  the proxy materials.  That's a
21  misrepresentation.
22       MR. BRAUTIGAM:  These proxy materials.
23       MR. BURKE:  You're saying that those
24  words appear in those proxy materials?

34 (Pages 130 to 133)

Page 134

1    MR. BRAUTIGAM: Yeah.
2    MR. BURKE: I'd like you to pull out
3 where it says each and every director voted in
4 favor.
5    THE WITNESS: It doesn't say that.
6    MR. BURKE: It doesn't say that.
7    THE WITNESS: It says unanimously
8 approved.
9    MR. BRAUTIGAM: Unanimously approved.
10 BY MR. BRAUTIGAM:
11   Q.    You said in the Provident-National City
12 proxy materials that the board of directors of
13 Provident unanimously approved the merger because
14 each and every director voted in favor of the
15 merger, correct?
16   A.    No, that's not what I said. I said that
17 we approved it, and I said, you know, each director
18 did vote. I didn't say because.
19   Q.    If a director didn't vote, what would
20 you have said?
21   MR. BURKE: Objection. Calls for
22 speculation. If the director didn't vote...
23   A.    I would have said it was still
24 unanimously approved.

Page 135

1    Q.    Would you have also included some
2 notation that director A was in the room but he
3 chose to abstain?
4    MR. BURKE: Objection. Calls for
5 speculation.
6    A.    I would have asked -- if that would have
7 happened to me, I would have asked the SEC attorney
8 what to do.
9    Q.    Do you know if OHSL did that?
10   A.    I have no idea what they did.
11   Q.    Do you think it's fair?
12   MR. BURKE: What?
13   Q.    If one of your directors just didn't
14 vote and you didn't disclose that, do you think
15 that would be fair?
16   MR. BURKE: Objection. Calls for
17 speculation.
18   A.    Yeah, again, this isn't an issue of
19 fair. This is a question of what is required. And
20 if that would have happened in our context, I would
21 have asked counsel, you know, what we're required
22 to do about that.
23   Q.    Do you believe that the dissension by
24 board members in a merger or acquisition is

Page 136

1 perceived as being detrimental to the completion of
2 the transaction?
3    MR. BURKE: Objection. Calls for
4 speculation; vague; no context.
5    A.    Well, you mean if you had people voting
6 against it, would that be detrimental? You know,
7 it wouldn't -- it wouldn't be -- it wouldn't be a
8 plus. Doesn't mean it wouldn't happen. We see
9 that all -- you know, we certainly see that, but...
10   Q.    But it would add to the mix of
11 information that shareholders --
12   A.    Sure.
13   Q.    -- would want to consider, correct?
14   A.    Sure. If somebody was dissenting, you
15 bet.
16   Q.    Okay. And if someone resigned in part
17 in protest, it would add to the mix of information
18 that a reasonable shareholder would want to
19 consider, correct?
20   MR. BURKE: Objection. Calls for
21 speculation; calls for legal conclusion;
22 assumes facts not in evidence.
23   A.    Yeah, I don't know how to -- I don't
24 know how to comment on that.

Page 137

1    Q.    And if the chairman of the board changes
2 his vote within ten days from in favor of the
3 merger to abstain, that too would be information
4 that a reasonable shareholder would want to
5 consider, correct?
6    MR. BURKE: Objection. Mischaracterizes
7 the record; misstates the evidence; calls for
8 speculation; and legal conclusion.
9    A.    As I said, I don't know how to -- I
10 really don't know how to comment on that.
11   Q.    Are you familiar with the Hewlett
12 Packard/Compaq merger in 2001?
13   A.    In general.
14   Q.    Okay. Were you an HWP shareholder?
15   A.    I'm an HP shareholder.
16   Q.    I think there's symbol is HWP, but --
17 and you received proxy materials through that
18 merger, correct?
19   A.    Yeah.
20   Q.    And you know who Walter Hewlett is,
21 correct?
22   A.    I do.
23   Q.    And you received information from him,
24 correct?

35 (Pages 134 to 137)

Page 138

```
 1      A.    Probably.
 2      Q.    And Mr. Hewlett was the son of the
 3  founder of HP, correct?
 4      A.    Right.
 5      Q.    And he was also a board member at the
 6  time of the merger in 2000, correct?
 7      A.    No, I don't know if he was, but he had
 8  been.
 9      Q.    Did Mr. Hewlett resign in part in
10  protest?
11          MR. BURKE:  Objection.  Relevance.
12      A.    Somewhere along the line, I think he
13  resigned.
14      Q.    And before Mr. Hewlett resigned, didn't
15  he vote in favor of the merger with Compaq as a
16  director?
17          MR. BURKE:  Objection.  Call for
18  speculation.
19      A.    Yeah, I don't remember now on the
20  context, but there certainly was a big to-do about
21  it.  I didn't read the proxy stuff.
22      Q.    And apparently, Mr. Hewlett later
23  changed his mind and no longer believed that the
24  merger between HP and Compaq was in the best
```

Page 139

```
 1  interest of HP shareholders, correct?
 2          MR. BURKE:  Same objection and
 3    relevance.
 4      A.    He clearly was not in favor of the
 5  merger and actively fought it.
 6      Q.    And do you believe that by actively
 7  fighting it, Mr. Hewlett was a credible threat to
 8  the transaction?
 9          MR. BURKE:  Objection to relevance;
10  foundation; speculation.
11      A.    Yeah, you know, he was -- he was what he
12  was.
13      Q.    Mr. Hewlett's actions signaled
14  uncertainty and affected the outcome of the
15  shareholder vote, correct?
16          MR. BURKE:  Same objection.  No
17  foundation.
18      A.    I don't know.  The merger was approved,
19  so...
20      Q.    Do you believe that Mr. Hewlett's
21  actions --
22      A.    Affected --
23      Q.    -- caused some shareholders to change
24  their votes?
```

Page 140

```
 1      A.    Affected the process.  I have no idea.
 2  I have no idea.
 3      Q.    You testified a moment ago that it
 4  affected the process, correct?
 5      A.    I just did say that.
 6      Q.    Right.  How did it affect the process?
 7      A.    It made it more complex.
 8      Q.    Why was it more complex?
 9      A.    You had an opposition -- you had an
10  active opposition to the deal.
11      Q.    And not only did you have an active
12  opposition, but that active opposition was known to
13  the investing public, correct?
14      A.    And well funded.
15      Q.    That wasn't the case here, correct?
16          MR. BURKE:  What does that mean?
17      Q.    With respect --
18      A.    I have no idea.  I have no idea.
19      Q.    -- to the OHSL-Provident merger?
20      A.    There wasn't any --
21          MR. BURKE:  What wasn't the deal?
22      A.    There wasn't any active dissension.
23      Q.    Okay.  Mr. Hoverson, let's change gears
24  for a moment?
```

Page 141

```
 1          MR. BURKE:  If we're going to change
 2    gears, I'm going to take a break.
 3          MR. BRAUTIGAM:  Sure.  Take a short
 4    break.
 5          (A brief break was taken from 12:45 to
 6    12:51, 6 minutes.)
 7  BY MR. BRAUTIGAM:
 8      Q.    Mr. Hoverson, you're familiar with the
 9  term "conflict of interest," correct?
10      A.    Yes.
11      Q.    What is your understanding of the term
12  "conflict of interest"?
13      A.    That you have a conflict; that your
14  interests are not aligned with somebody else's.
15      Q.    Do you believe that your interests are
16  aligned with that of the OHSL directors?
17          MR. BURKE:  Objection.  As to what?
18      A.    That my interest?
19      Q.    Yes.
20          MR. BURKE:  Objection.  Form; vague.
21      A.    Yeah, I'm not quite sure how to answer
22  that one, really.
23      Q.    What are you unsure about?
24      A.    Well, I don't -- you know, they're
```

36 (Pages 138 to 141)

Page 142

1　not... They're not within my kind of realm to have
2　a contact -- have a conflict with one way or the
3　other. You know what I mean?
4　　Q.　Actually, I don't. Mr. Hoverson, the
5　proxy materials refer to a conflict between --
6　　A.　Are you talking about --
7　　MR. BURKE: What proxy materials?
8　　A.　-- Provident.
9　　Q.　Provident-National City.
10　　MR. BURKE: Okay. We're not talking
11　about OHSL anymore?
12　　Q.　For the purposes of this question. It
13　says, Officer and directors of Provident have
14　potential conflicts of interest in the merger. Do
15　you remember that section?
16　　MR. BURKE: Can you show the document to
17　the witness --
18　　MR. BRAUTIGAM: Absolutely, Jim.
19　　MR. BURKE: -- to refresh his memory?
20　　MR. BRAUTIGAM: I'm happy to. I was
21　about to.
22　　A.　Where? I gotcha. Have interest in the
23　merger... Yes.
24　　Q.　Okay. Now, let's talk about this

Page 143

1　litigation that brings us here today. What is your
2　understanding of the litigation?
3　　MR. BURKE: Objection. Calls for a
4　legal conclusion. You may answer.
5　　A.　It's not, you know, real great, other
6　than I guess the allegation is that somehow some
7　conspiracy was created within OHSL about the merger
8　and people's points of view about it has been my
9　general kind of understanding of it.
10　　Q.　If you believe that the allegations are
11　that there's some conspiracy within OHSL, how could
12　Provident's interest possibly be aligned with
13　OHSL's interest?
14　　MR. BURKE: Objection. Calls for legal
15　conclusion. You may answer.
16　　A.　I don't understand what you're talking
17　about, what you mean.
18　　Q.　Are you a defendant in the litigation?
19　　A.　Yeah.
20　　Q.　Who are the other defendants in the
21　litigation?
22　　A.　All the directors of both companies.
23　　Q.　And who else is a defendant?
24　　A.　I don't know. I can look.

Page 144

1　　Q.　Well, actually you don't have to look.
2　I'm asking from memory.
3　　MR. BURKE: He can look if -- you can
4　refresh your memory if you need -- care to,
5　Mr. Hoverson.
6　　A.　Looks like the law firms, E&Y.
7　　Q.　Okay. Based on our discussion so far
8　today, do you believe that your personal interests
9　in the litigation are exactly aligned with the Oak
10　Hills directors?
11　　MR. BURKE: Objection. Calls for
12　speculation.
13　　A.　Yeah, I don't know how to answer that.
14　I really -- I really don't.
15　　Q.　Well --
16　　A.　Seems to me that, you know, we seem to
17　be on the same side of the lawsuit.
18　　Q.　What documents have you read regarding
19　the litigation?
20　　A.　I haven't read any.
21　　Q.　Ever?
22　　A.　Not that I remember.
23　　Q.　How did you know that you were
24　originally sued?

Page 145

1　　A.　Informed. Served.
2　　Q.　How were you served?
3　　A.　I don't remember.
4　　Q.　And after you were served, did you hire
5　counsel?
6　　A.　Our counsel did. You know, I have a
7　general counsel. He deals with this, so...
8　　Q.　And did you later learn that -- which
9　firm was hired?
10　　A.　You know, my memory of it is we hired
11　KMK.
12　　Q.　And did the board vote to hire KMK?
13　　A.　I'm sure there was a resolution passed,
14　but, you know, I don't remember specifically.
15　　Q.　And that's a pretty common occurrence
16　because KMK has been Provident's counsel for 50
17　years, correct?
18　　A.　Not for that long, but for quite a long
19　time, yeah.
20　　Q.　And did you later learn that KMK had
21　been added to the lawsuit as a defendant?
22　　A.　I did.
23　　Q.　How did you learn that?
24　　A.　I don't know. You know, was told. I'm

37 (Pages 142 to 145)

Page 146

1    sure McGee told me.
2    Q.    Do you believe that your interest and
3    KMK's interest are exactly aligned?
4         MR. BURKE: Objection to form.
5    A.    I don't know how to answer that
6    question. We're on the same side of the lawsuit.
7    Q.    Okay. Well, Ernst & Young is on the
8    same side of the lawsuit, correct?
9    A.    Um...
10   Q.    Yes?
11   A.    Yeah.
12   Q.    And they have their own counsel,
13   correct?
14   A.    I assume they do. I don't know that for
15   a fact.
16   Q.    And Dinsmore is on the same side of the
17   lawsuit, correct?
18   A.    That's what it says.
19   Q.    And they have their own counsel,
20   correct?
21   A.    Again, I'll assume they do.
22   Q.    Have you ever been in a situation where
23   your counsel is also a defendant in the lawsuit,
24   meaning the firm?

Page 147

1         MR. BURKE: Objection. Calls for legal
2    conclusion.
3    A.    Not to my knowledge.
4    Q.    Did you consider and reject the idea of
5    hiring other counsel?
6         MR. BURKE: Objection. Misstates the
7    record.
8    A.    Just because they were sued?
9    Q.    Yes.
10   A.    No.
11   Q.    Why not?
12   A.    Easy to sue. People sue all the time.
13   Doesn't mean it's true.
14   Q.    When you seek legal advice, aren't you
15   looking for independence?
16        MR. BURKE: Objection. Calls for legal
17   conclusion. You may answer.
18   A.    Yeah, I'm looking for advice.
19   Q.    Are you looking for independent advice?
20   A.    Yeah. You know, you're looking for
21   unbiased advice.
22   Q.    Do you believe that KMK can possibly
23   provide you with unbiased advice given their status
24   as defendants in the litigation?

Page 148

1    A.    Very comfortable with the advice KMK
2    provides me.
3    Q.    So the answer is yes?
4    A.    Yes.
5    Q.    Were you ever represented by the firm
6    Graydon, Head & Ritchey in this litigation?
7         MR. BURKE: Objection.
8    A.    I don't -- don't know.
9    Q.    Did the Provident board ever hire the
10   firm of Graydon, Head & Ritchey?
11   A.    I don't know.
12   Q.    Who is --
13   A.    If they did, you know...
14   Q.    Who is this gentleman on your left, not
15   Mr. Burke, but the other one? I heard him
16   introduce himself to you at the break?
17   A.    Um-hum. Did you? Were you listening in
18   on the conversation?
19   Q.    It was right in front of me, so yeah, I
20   was.
21   A.    No, you weren't in the room when I asked
22   him who he worked for. You were not in the room.
23   Nobody was in the room --
24   Q.    Well, I was in the hallway, but in any

Page 149

1    event --
2    A.    -- except he and I.
3    Q.    In any event, I listened and I heard
4    it.
5    A.    They're the firm that's representing
6    them -- representing us now in the litigation.
7    Q.    Who is representing KMK as a defendant?
8         MR. BURKE: Objection.
9    A.    I don't know.
10        MR. BURKE: No foundation.
11   Q.    What firm's this gentleman with?
12   A.    I don't remember the name of the firm.
13   Q.    What, if anything, did you do to
14   evaluate this gentleman's credentials and his
15   firm's credentials?
16   A.    Met with the senior guy who would be
17   handling the case.
18   Q.    Who was that?
19   A.    I don't remember his name, but if you
20   gave it to me, I can say, yeah, that's him. He
21   seemed to be competent and experienced.
22   Q.    Were you satisfied with KMK's
23   representation so far?
24   A.    I am.

38 (Pages 146 to 149)

Page 150

1    Q.    Why was it necessary for you to hire
2    another firm?
3    A.    My understanding is that if we wanted to
4    be represented in court, we needed another firm
5    because of the nature of your suit.
6    Q.    Could you be --
7    A.    You required it.  Because of you, we
8    hired them.  We had to.
9    Q.    And how did I require it?
10    A.    The court required it, I believe.
11    MR. BURKE:  You filed a motion.
12    A.    Yeah.
13    Q.    Do you know why the court required it?
14    A.    No.
15    Q.    Is it your testimony that you have not
16    read any of the documents that have been filed in
17    the litigation?
18    A.    That would be my testimony.
19    MR. BURKE:  Objection.  Asked and
20    answered.
21    Q.    Not even one?
22    MR. BURKE:  Objection.  Asked and
23    answered; argumentative.  You don't know that
24    none -- do you not know what none means?

Page 151

1    Q.    Not even one?
2    A.    That's correct.
3    Q.    Why not?
4    A.    Haven't needed to.
5    Q.    You have other people take care of this
6    stuff for you?
7    A.    That's right.
8    Q.    Did the board affirmatively vote to hire
9    this gentleman's firm?
10    A.    I don't remember.  They wouldn't need
11    to.
12    Q.    They would not need to?
13    A.    Hum-um.
14    Q.    Who would make that decision?
15    A.    General counsel.
16    Q.    And is that Mark McGee?
17    A.    No.  That's Jim Whitaker.
18    Q.    What firm did Jim Whitaker come from?
19    A.    KMK.
20    Q.    And has Mr. Whitaker been offered a job
21    with National City?
22    MR. BURKE:  Objection.  Calls for --
23    THE WITNESS:  Do I need to get into
24    this?

Page 152

1    MR. BURKE:  That's none of your
2    business.  I'm instructing the witness not to
3    answer.  There's no basis for that being an
4    issue in this case.  What's that got to do
5    with anything?
6    A.    Jim's private business.  I'm not sure --
7    MR. BRAUTIGAM:  And the basis for your
8    instruction?
9    MR. BURKE:  My basis for my instruction
10    not to answer is you're invading the privacy
11    of someone who is not even a party to this
12    case.
13    So I mean if you can give me some reason
14    why you think that's remotely relevant, that's
15    fine.  But I mean, that's a potential invasion
16    of someone else's personal private business
17    interest.
18    MR. BRAUTIGAM:  That's not a legitimate
19    instruction under the Federal Rules.
20    MR. BURKE:  Well, you failed to give me
21    any possible reason why that's relevant, Mike.
22    MR. BRAUTIGAM:  I don't have to give you
23    reasons, Jim.
24

Page 153

1    BY MR. BRAUTIGAM:
2    Q.    Mr. Hoverson, what's your date of birth?
3    A.    4/1/42.
4    Q.    What's your Social Security number?
5    THE WITNESS:  Do I have to give him
6    that?
7    MR. BURKE:  I don't know that --
8    A.    With privacy stuff these days, I don't
9    want my Social Security number on anybody's record
10    that I don't have to have it on.  Tell me why you
11    need it.
12    Q.    Mr. Hoverson, what's your address?
13    A.    8700 Pipewell Lane; Cincinnati.
14    Q.    What's your approximate net worth?
15    MR. BURKE:  Objection.  Instruct the
16    witness not to answer.
17    A.    I'm not going to answer that.
18    Q.    Why not?
19    MR. BURKE:  Because I instruct him not
20    to.
21    A.    It's not your affair.  It has nothing to
22    do with this.
23    Q.    Mr. Hoverson, you're a defendant in the
24    litigation, and I respectfully disagree.  Are you

39 (Pages 150 to 153)

Page 154

1　refusing to provide your Social Security number as
2　well?
3　　　　MR. BURKE:  Yes.
4　A.　Yes.
5　　　　MR. BRAUTIGAM:  Jim, we had an agreement
6　with Rachael that the other directors would
7　provide this information on a confidential
8　basis.  Can we have the same agreement?
9　　　　MR. BURKE:  We will -- I will discuss it
10　with Rachael if that's the agreement.  We'll
11　see if that's the agreement.
12　　　　MR. BRAUTIGAM:  That's the agreement I
13　had with Rachael on the other directors.  It's
14　obviously not with Mr. Hoverson yet.
15　　　　MR. BURKE:  Okay.  I'm unaware of this,
16　nor do I see any possible basis, and I
17　completely agree with Mr. Hoverson that
18　people's Social Security numbers leads to a
19　lot of very bad consequences these days --
20　　　　THE WITNESS:  I don't want this showing
21　up in this...
22　　　　MR. BURKE:  And his personal net worth
23　is also --
24　　　　THE WITNESS:  ...document.

Page 155

1　　　　MR. BURKE:  -- completely relevant.
2　　　　THE WITNESS:  Right.
3　　　　MR. BRAUTIGAM:  I don't agree with any
4　of the things you said.
5　　　　MR. BURKE:  That's fine.  We can take it
6　up with the magistrate judge.  And if there's
7　a need to provide that information, we can
8　address that outside of the context of this
9　deposition.
10　　　　MR. BRAUTIGAM:  Before we get the
11　magistrate involved, which I think is
12　unnecessary, I have an agreement with Rachael
13　with respect to the other directors.  Do you
14　want to talk to her about it?
15　　　　MR. BURKE:  I will discuss that with her
16　and get back to you.
17　　　　THE WITNESS:  Somebody is going to have
18　to give me a very good reason why I have to
19　give you that information.
20　　　　MR. BRAUTIGAM:  Generally speaking --
21　　　　THE WITNESS:  And just because he tells
22　me, it doesn't mean I'm going to do it.  All
23　right?  If you got a good reason, give me a
24　good reason.

Page 156

1　　　　MR. BRAUTIGAM:  How about if a federal
2　judicial officer tells you to provide your
3　Social Security number?
4　　　　MR. BURKE:  And as soon as a federal
5　judicial officer does that, we'll discuss it.
6　　　　THE WITNESS:  I will do it.
7　　　　MR. BURKE:  And you're not representing
8　that any federal judicial officer has done
9　that, are you?
10　　　　MR. BRAUTIGAM:  No.
11　　　　MR. BURKE:  Okay.  that's fine.
12　BY MR. BRAUTIGAM:
13　Q.　Mr. Hoverson, let's go back to Graydon,
14　Head & Ritchey.  Do you believe that they
15　represented any of the Provident board members --
16　A.　I don't know anything -- frankly, I
17　don't have any contacts with Graydon, Head &
18　Ritchey.  No relation to this.
19　Q.　As far as you know --
20　A.　I know that Dinsmore was involved with
21　OHSL, but...
22　Q.　So as far as you know, you were never
23　represented by Graydon, Head & Ritchey at any
24　time --

Page 157

1　　　　MR. BURKE:  Objection.
2　Q.　-- correct?
3　　　　MR. BURKE:  Calls for speculation.
4　A.　Again, I don't -- I don't recollect
5　anything about Graydon, Head & Ritchey.
6　　　　THE WITNESS:  Is there some?
7　　　　MR. BURKE:  Don't worry about it.
8　BY MR. BRAUTIGAM:
9　Q.　Do you know how many KMK attorneys have
10　been designated as witnesses in the case?
11　A.　No.
12　Q.　Is that of interest to you?
13　A.　No.
14　Q.　Why not?
15　A.　Because, I mean, your suit looks like
16　harassment to me, so that's just what you're doing.
17　Q.　Why does the suit look like harassment?
18　A.　Because you're just trying to dismiss
19　our counsel.
20　Q.　Mr. Hoverson, respectfully, if you
21　haven't read even a single document, how can you
22　say that the suit looks like harassment?  What's
23　the basis for that?
24　A.　Your whole -- your whole involvement

40 (Pages 154 to 157)

1  seems to be harassment.
2      Q.    Why do you say that?
3      A.    My personal experience with you would
4  certainly be part of it.
5      Q.    What is your personal experience with
6  me?
7      A.    Unpleasant.
8      Q.    Please describe for the record what it
9  is.
10     A.    I just did.
11     Q.    What it consists of.
12     A.    Your demeanor.
13     Q.    That's only for today, right?
14     A.    You're an unpleasant person.
15     Q.    Anything else?
16     A.    No.
17     Q.    And that's based on sitting across the
18  table from me at the deposition, correct?
19     A.    It is.
20     Q.    Have we ever had any contact before?
21     A.    No.
22     Q.    I did attend the Provident special
23  meeting, correct?
24     A.    I saw you there.

1  harassment?
2          MR. BURKE: Objection. Argumentative.
3      A.    I didn't.
4      Q.    You didn't what?
5      A.    I didn't bother to know. Okay?
6      Q.    You just concluded immediately that it
7  was harassment?
8          MR. BURKE: Objection. Argumentative.
9      A.    I just said that.
10     Q.    Mr. Hoverson, I understand you have been
11  telling some of the directors that this suit in
12  substance has no merit; is that correct?
13     A.    That is our counsel's opinion, yes.
14     Q.    That is your -- and which counsel is
15  that?
16     A.    Our general counsel. He's the one that
17  makes these representations. It's a matter of
18  public record.
19     Q.    What's a matter of public record?
20     A.    We don't think that the suit has any
21  merit. I believe that you'll find it in our
22  documents. I'd be surprised if it's not in there.
23  Either that or it's probably not mentioned.
24     Q.    What documents are you referring to?

1      Q.    And we had no contact, correct?
2      A.    Correct.
3      Q.    So your comments about me are based on
4  being across the table from me today exclusively,
5  correct?
6      A.    No.
7          MR. BURKE: Objection. Asked and
8  answered.
9      A.    No, but, you know, let's just drop it.
10     Q.    No. Let's continue, Mr. Hoverson. What
11  are your comments about me based on?
12     A.    I told you.
13     Q.    Mr. Hoverson, your previous answer
14  suggested there was something else. Let's have it.
15         MR. BURKE: No.
16     A.    You're harassing our counsel. You sued
17  our counsel. That's one of the things that you did
18  that seemed to me was harassment. You can
19  characterize it any way you want. That's what it
20  seemed like to me.
21     Q.    Do you know why we sued your counsel?
22     A.    No.
23     Q.    Wouldn't you have to know why we sued
24  your counsel before you could conclude that it's

1      A.    Public documents. We talk about
2  lawsuits on a regular basis.
3      Q.    Would you pick up Exhibit 90, please.
4  It's the annual report.
5      A.    I'm talking about KMK. This is not
6  where you would find that sort of thing.
7      Q.    Would you turn to page 82, please.
8  Would you look at the section entitled, Legal
9  Matters?
10     A.    Um-hum.
11     Q.    Would you take a moment to read this to
12  yourself, please.
13     A.    (Examining document.) Yeah.
14     Q.    Mr. Hoverson, are you responsible in any
15  way for the information that's included and not
16  included in Plaintiffs' Exhibit 90, PFGI's 2002
17  annual report?
18     A.    I certified it.
19     Q.    And you know how to read and interpret
20  the information contained therein, correct?
21     A.    I do.
22     Q.    Please define for me legal proceedings
23  -- excuse me -- routine litigation incidental to
24  Provident's business.

41 (Pages 158 to 161)

Page 162

1      MR. BURKE:  What was that?
2    Q.    Routine litigation incidental to
3  Provident's business.
4    A.    Where does it say that?
5    Q.    First paragraph.
6    A.    Other than routine litigation.
7  Okay.  Except for the following matters.  Um-hum.
8    Q.    And my question is, please define what
9  is routine litigation incidental to Provident's
10  business.
11      MR. BURKE:  Objection.  Calls for
12  speculation.  You may answer.
13    A.    Yeah, you have -- you know, we're
14  involved in litigation all the time.  All banks
15  are.
16    Q.    Someone slips and falls in the bank?
17    A.    It's not so much of that sort of thing.
18  It's probably more disputes over, you know, legal
19  matters where people owe us money is more likely to
20  be the case.
21    Q.    People who don't pay on their car loans,
22  mortgages, things like that?
23      MR. BURKE:  Objection.
24    A.    Yeah, other things.  There are all sorts

Page 163

1  of things.
2    Q.    Give me a list of the categories of
3  routine litigation --
4    A.    I can't.
5    Q.    -- incidental --
6    A.    I can't.
7    Q.    -- to Provident's business.
8    A.    I'm sure we could get that for you if
9  you'd like to from our counsel.
10    Q.    That's not the way it works,
11  Mr. Hoverson.
12    A.    I can't give it to you.
13    Q.    Mr. Hoverson, you already started to
14  give it to me, so we were doing fine.  You said
15  that there are disputes over money with respect to
16  people who had car loans, correct?
17    A.    Look, I cannot give you a list of
18  litigation.  Okay?
19    Q.    Mr. Hoverson, I'm not asking you for a
20  list of your litigation.  Do you understand that?
21    A.    I can't give you --
22      MR. BURKE:  No, you asked the
23  question --
24    A.    I can't give you the categories of these

Page 164

1  litigation.  Okay?  It's a very precise thing.  If
2  you want the information, we'll get it for you.
3    Q.    Do you believe that this information --
4  excuse me -- this litigation is routine litigation
5  incidental to Provident's business?
6    A.    Well, it's not listed here, is it?
7    Q.    No, it's not, and that surprised me.
8    A.    And -- and the determination has been
9  made by SEC counsel it does not need to be -- all
10  right? -- or it would be -- otherwise, it would be
11  listed, I assure you, and that I guess then -- and
12  that says that it follows in the fact that it's
13  routine and incidental to the business.  Now, you
14  know, all I can do is tell you what it says.
15    Q.    Who is SEC counsel?
16    A.    Gary Kreider, KMK.
17    Q.    Do you know if Gary Kreider is going to
18  be a witness in the litigation?
19    A.    I do not know.
20    Q.    Would that affect your opinion as to
21  whether or not Mr. Kreider's view is unbiased?
22    A.    It would not.  I have had long extensive
23  experience with Mr. Kreider and can't imagine that
24  he would even think about risking his reputation

Page 165

1  with the SEC over anything related to that sort of
2  thing.  His integrity is beyond, you know,
3  reproach.
4    Q.    Do you know if Gary Kreider performed
5  work on this document?
6    A.    I'm sure he did.
7    Q.    And in effect, he's opining on the
8  veracity of his own work, correct?
9      MR. BURKE:  Objection.  Calls for
10  speculation.  That makes no sense.
11    A.    What do you mean?
12      MR. BURKE:  I have no idea what you're
13  talking about.
14    Q.    In other words, a document that he
15  helped create is at issue in the litigation,
16  correct?
17    A.    Yeah.
18    Q.    And you as Provident CEO and acting
19  chairman of the board are relying on Mr. Kreider's
20  opinion that the work he and others at KMK did is
21  fine with respect to the litigation?
22      MR. BURKE:  Instruct you not to answer
23  anything about conversation with counsel,
24  opinions, or any communication between you and

42 (Pages 162 to 165)

Page 166

1  counsel. Instruct you not to answer to any of
2  that.
3      A.  I would answer the question this way:
4  I'm comfortable with recommendations and points of
5  view given to me by Gary Kreider, absolutely.
6      Q.  Auditors are not allowed to audit their
7  own work, correct?
8          MR. BURKE: Objection.
9          MS. PERRY: Objection. Vague; calls for
10 speculation.
11     A.  I don't know what that means.
12     Q.  Okay. If you had Ernst & Young, for
13 example, do consulting work in setting up a model,
14 they wouldn't be allowed to audit the model that
15 they set up, correct?
16         MR. BURKE: Objection. No foundation;
17 calls for speculation.
18     A.  Yeah, I don't --
19         MS. PERRY: Same objection.
20     A.  I don't know that that's true.
21     Q.  Well, hypothetically.
22     A.  I don't know that that's true.
23     Q.  Are you familiar with GAAP?
24     A.  I am.

Page 167

1      Q.  What's GAAP?
2      A.  General Accepted Accounting Principles.
3      Q.  Are you familiar with GAAS?
4      A.  No.
5      Q.  Have you ever heard of Generally
6  Accepted Auditing Standards?
7      A.  Um-hum, I've heard the term.
8      Q.  Is one of the Generally Accepted
9  Auditing Standards independence?
10         MR. BURKE: Objection. Speculation.
11     A.  I'm sure it is.
12         MS. PERRY: Join in the objection.
13     Q.  Why is independence a requirement of
14 GAAS?
15         MS. PERRY: Objection. No foundation.
16     A.  Doesn't have anything to do with me, so,
17 you know, one would assume so that they're
18 independent.
19     Q.  Do you believe that Mr. Kreider in
20 telling you what to disclose and what not to
21 disclose in legal matters, note 26, page 82, of
22 Provident's 2002 annual report, is in effect
23 rendering opinion on the work of KMK?
24         MR. BURKE: Objection. Calls for

Page 168

1  speculation; no foundation.
2      A.  Yeah, he's rendering an opinion, and I'm
3  comfortable with his opinion.
4      Q.  Why was the litigation that is included
5  here included?
6      A.  Again, you would have to ask counsel.
7  These are -- you know, counsel determined as to
8  what goes in the K -- or, what goes in the 10K.
9      Q.  Well, Mr. Hoverson, it's not that easy,
10 because when I ask counsel, they assert privilege.
11 So what is your understanding of why this
12 litigation is included?
13         MR. BURKE: I'll instruct you not to
14 answer as to any communication you had --
15     A.  Yeah, I mean, all I can tell you is I'm
16 told it's required to be disclosed, so it's
17 disclosed.
18     Q.  And similarly, you were told that this
19 litigation is not required to be disclosed,
20 correct?
21     A.  That's why it's not there.
22     Q.  And that's exclusively Mr. Kreider's
23 opinion, correct?
24     A.  I doubt that. It would be our general

Page 169

1  counsel as well.
2      Q.  Okay. Mr. Kreider in conjunction with
3  Mr. Whitaker, correct?
4      A.  Um-hum, and whoever counsel that we have
5  involved.
6      Q.  So we have Mr. Kreider of KMK and
7  Mr. Whitaker, formally of KMK, rendering an opinion
8  on KMK's work, correct.
9          MR. BURKE: Objection. I instruct not
10 to answer on any --
11     A.  I don't know if they're rendering an
12 opinion --
13         MR. BURKE: -- communication with
14 counsel.
15     A.  -- on KMK's work. They made a
16 recommendation as to what is disclosed, and we
17 followed those recommendations.
18     Q.  Mr. Hoverson, when you were served with
19 this lawsuit, was it your job to call your fellow
20 directors and tell them that they had been sued?
21     A.  No.
22     Q.  Did you ever discuss this litigation
23 with any directors at board meetings?
24     A.  Not on any serious manner other than the

43 (Pages 166 to 169)

Page 170

```
 1  fact that this suit had been filed and counsel --
 2  you know, comment -- general counsel was always a
 3  member -- was always at the board meetings; would
 4  have commented at the time; but, you know, so long
 5  ago, I don't remember when the suit was served,
 6  frankly.
 7      Q.    Okay.  Let me direct your attention to
 8  September 20th of 2000.  That's the inception of
 9  this litigation.
10      A.    Okay.
11      Q.    Since September 20th of 2000, have you
12  spoken to individual Provident directors about the
13  lawsuit?
14      A.    You know, not in any meaningful way
15  other than, you know, you have deposed directors
16  from time to time, and you know, that comes up.
17      Q.    Did you ever tell any of the Provident
18  directors this lawsuit has no merit?
19      A.    I don't remember what I told them.
20      Q.    Did you ever tell any of the Provident
21  directors that you would likely never be deposed
22  because the case will get thrown out?
23      A.    I don't remember telling anybody that.
24      Q.    Did you ever tell anyone that you're
```

Page 171

```
 1  going to win this case at trial?
 2      A.    I have no idea.
 3      Q.    Do you remember any specific
 4  conversations with the fellow directors?  Because
 5  some of the directors I deposed remember some
 6  conversations with you, but not the specifics of
 7  it.
 8      A.    Okay.  I don't.
 9      Q.    Okay.  Do you consider this deposition
10  to be important?
11      A.    It's important to you.
12      Q.    Is it important to you?
13      A.    It's important that I answer the
14  questions truthfully, you bet.
15      Q.    What, if anything, did you do to prepare
16  for this deposition?
17      A.    Nothing.
18      Q.    Did you look at documents?
19      A.    Did not.
20      Q.    Why did you do nothing to prepare for
21  the deposition?
22      A.    I just didn't.  I don't have any
23  documents relating to this stuff except all -- you
24  know, all your stuff here.  I figured any documents
```

Page 172

```
 1  you had, you would show me.
 2      Q.    Do you think it would have assisted you
 3  with refreshing your recollection if you would have
 4  looked at the documents from five years earlier?
 5      A.    No.
 6      Q.    Why not?
 7      A.    You know, it's easy enough to look at
 8  the document and make the judgment here.
 9      Q.    Just so I understand your testimony
10  correctly, it's your testimony that it would have
11  been of no assistance to go back and look at
12  documents that were from 1999 to prepare you for
13  testimony today?
14          MR. BURKE:  Objection.  Mischaracterizes
15      the answer.
16      A.    Just to make sure you don't put words in
17  my mouth, all I said was I did not prepare.  I
18  didn't put any adjectives around it.  I didn't.
19      Q.    And you said the reason you didn't
20  prepare was there was no need --
21      A.    The documents would be here.
22      Q.    Do you think if you had prepared, that
23  your testimony perhaps would be more accurate and
24  complete?
```

Page 173

```
 1      A.    No.
 2      Q.    Why not?
 3      A.    I don't.
 4      Q.    Doesn't it stand to reason that if you
 5  had refreshed your recollection, that the events
 6  might be a little fresher in your mind?
 7          MR. BURKE:  Objection.  Argumentative.
 8      A.    No.  There are no documents that would
 9  refresh my recollection.
10      Q.    Did you talk to any of your fellow
11  directors about this deposition?
12      A.    No, other than the fact that I was going
13  to be deposed.
14      Q.    Who did you speak to on that?
15      A.    I think Joe Steger knew, and I think --
16  I think they all knew because you're deposing
17  everybody.  You know, we all knew we were being
18  deposed.
19      Q.    Did you talk to Dr. Steger about how his
20  deposition went?
21      A.    He talked to me about his deposition.
22      Q.    Okay.  When did this conversation take
23  place?
24      A.    He told me that he had been deposed by
```

44 (Pages 170 to 173)

Page 174

1  you. We didn't get into details.
2      Q.   Okay. As best you can recall, what did
3  Dr. Steger say and what did you say, other than
4  what you just told me?
5      A.   I didn't have any comment on it.
6      Q.   Did he have a comment on it?
7      A.   You know, that it was, you know, you
8  were your normal kind of confrontational self.
9  Other than that, you know...
10     Q.   Did you talk to Mr. Cook about his
11 deposition?
12     A.   I did not.
13     Q.   Did you talk to Mr. Pedoto about his
14 deposition?
15     A.   No.
16     Q.   Did you talk to Dr. Peerless?
17     A.   No.
18     Q.   Did you talk to Mr. Grote?
19     A.   I did not.
20         MR. BRAUTIGAM: Okay. Let's take a
21 lunch break.
22         MR. BURKE: No, let's keep going. How
23 much more time do you have?
24         MR. BRAUTIGAM: I've got hours, Jim.

Page 175

1          MR. BURKE: Hours?
2          MR. BRAUTIGAM: Yeah. I've got hours.
3  We're going to take an hour for lunch. 2:15.
4          (A break was taken for lunch from 1:19
5  to 2:25.)

Page 176

1              AFTERNOON SESSION
2  BY MR. BRAUTIGAM:
3      Q.   Back on the record. Good afternoon,
4  Mr. Hoverson, welcome back. Would you kindly pick
5  up Plaintiffs' Exhibit 91, which is by your right
6  elbow.
7      A.   This?
8      Q.   No. It's in that pile, and it has a
9  yellow sticker on it.
10     A.   89, 92. Oh, I'm sorry. Here it is.
11     Q.   Mr. Hoverson, have you seen Plaintiffs'
12 Exhibit 91 before?
13     A.   Yes. Let me see. Refresh my... Okay.
14     Q.   Are you familiar with Plaintiffs'
15 Exhibit 91?
16     A.   I am.
17     Q.   Do you recognize it?
18     A.   I do.
19     Q.   What is Plaintiffs' Exhibit 91?
20     A.   It was a communication to all of our
21 associates about the March 5th restatement.
22     Q.   Did you write the first page of the
23 exhibit?
24     A.   I did.

Page 177

1      Q.   Did you sign it Bob?
2      A.   I did, yeah.
3          MR. BURKE: Okay.
4      A.   We had a news release that morning,
5  so...
6      Q.   Who's responsible for the other pages of
7  the exhibit?
8      A.   Probably a combination of people.
9  Finance and legal probably.
10     Q.   Did Exhibit 91 go out together to all of
11 the Provident employees?
12     A.   I would have thought they would have.
13 Only reason I hesitate is sometimes they would
14 communicate directly through email, but I believe
15 that, yes, it would have.
16     Q.   Okay. Can I direct your attention to
17 the second paragraph. The second sentence says, As
18 you know, this unintentional error resulted in a
19 restatement of our earnings going back to 1997. Do
20 you see that?
21     A.   Yes.
22     Q.   Did the restatement go back to 1997 or
23 1994?
24     A.   My understanding, it went back to 1997.

45 (Pages 174 to 177)

Page 178

1    Q.    Okay.  Would you turn the page.
2    A.    Um-hum.
3    Q.    Would you read the first paragraph under
4  what happened to yourself?
5    A.    Yeah, I can't answer.  I see the '94.  I
6  can't answer that.
7    Q.    You acknowledge it's a discrepancy, but
8  you can't explain it; is that right?
9    A.    Right, because in my mind, this has
10  always been a '97 on kind of thing ever since we
11  discovered it.
12    Q.    Who do you think would be able to
13  address that issue?
14        MR. BURKE:  What issue?
15        THE WITNESS:  The '94.
16        MR. BRAUTIGAM:  The '94.
17    A.    Chris Carey.
18    Q.    Chris Carey?
19    A.    Anybody in our...
20        MR. BURKE:  Off the record for a second.
21        (Off-the-record discussion.)
22    A.    That's an interesting question.  Let me
23  see this for a minute.
24        MR. BURKE:  You might want to read the

Page 179

1  whole document just to make sure.
2    A.    Yeah, let me read this, and I think we
3  can straighten it out.  (Examining document.)  The
4  '94 is the second restatement.  The first
5  restatement went back to '97.  That was the
6  unintentional error.
7        The second restatement was a totally
8  different matter, and that's the '94.  So that's
9  why those two dates.
10    Q.    Are the amounts different?
11    A.    Yeah, they were different.
12    Q.    What's the amount of the first
13  restatement?
14        MR. BURKE:  You mean cumulatively or by
15  year?
16    Q.    Cumulatively.
17    A.    Yeah, I hate to speculate that on that.
18  Why can't we just get the number?
19        MR. BURKE:  If you don't remember, you
20  don't remember.
21    A.    It was around 90 million.
22    Q.    It was around 90 million?
23    A.    I believe.  70 to 90 million.  I'd have
24  to get -- you know, this one is 44.

Page 180

1    Q.    And those --
2    A.    They're pretty substantially different
3  issues.
4    Q.    Okay.  But the total amount of the
5  restatement would be to add the 70 to 90 million
6  plus the 44, correct?
7        MR. BURKE:  Total amount of what
8  restatement?
9    Q.    Of the two restatements.
10    A.    Well, the one statement's for what it
11  was, and the next statement was for what it was.
12    Q.    But to come up with the total amount for
13  both restatements, you would add those numbers,
14  correct?
15        MR. BURKE:  I don't understand the
16  question.
17    Q.    In other words, there's no commonality
18  between the 70 to 90 million and the 44 million;
19  they're separate and distinct?
20    A.    Separate and distinct.  They both did
21  involve auto lease, but they're separate and
22  distinct issues.
23    Q.    Is 70 to 90 million material to
24  Provident's financial statements?

Page 181

1        MR. BURKE:  Objection.
2        MS. PERRY:  Join in the objection.
3    A.    You know, it's 70 to 90 million.  It's a
4  big number, and obviously, we disclosed it
5  publicly, and it was a significant event.  I mean,
6  again, I'm happy to acknowledge all of that.
7    Q.    Is 44.4 million material to Provident's
8  financial statements?
9        MR. BURKE:  Same objection.
10  Speculation.  And again, you're not putting
11  any period of time to this, right?
12    Q.    Is the second restatement from 1994 to
13  2002 representing 44.4 million dollars material to
14  Provident's financial statements?
15        MR. BURKE:  At what point?  Objection.
16    A.    Again, it -- 44 million, you know, is a
17  large number, and we considered it a significant
18  event.  The street, frankly, didn't.  Kind of
19  shrugged it off because it didn't -- going forward,
20  actually it was considered kind of a non-issue.
21        And there have been a few of that type
22  of restatements since then by the banks, and it was
23  kind of shrugged off; but the number is 44 million,
24  and it's a significant number.  That's the

1  cumulative number.
2      Q.    Are you familiar with off-balance sheet
3  transactions?
4      A.    I'm familiar with what it means.
5      Q.    Are you familiar with off-balance sheet
6  transactions?
7          MR. BURKE: Objection.
8      A.    I'm familiar with what it means.
9      Q.    I meant to say off-the-books
10  transactions.
11      A.    I'm not sure what that means, off the
12  books.
13      Q.    Okay. What are off-balance sheets
14  transactions?
15      A.    Transactions that are not reflected in
16  the actual balance sheet that are more likely
17  reflected in footnotes.
18      Q.    Did Provident engage in off-balance
19  sheet transactions in a significant way up to and
20  including December 3rd, 1999?
21          MR. BURKE: Objection. Form.
22      A.    Yeah. The term significant I think I
23  wouldn't comment on, but we were engaged in
24  financings -- okay? -- beginning in '96 that were

1  off-balance sheet in nature.
2      Q.    Are these transactions that are
3  off-balance sheet mentioned in Defendants' Exhibit
4  1?
5      A.    They're all disclosed.
6      Q.    Where?
7      A.    Footnotes in the financial statements.
8      Q.    Okay. Where?
9      A.    Well, we'll have to dig through. I
10  don't know.
11          MR. BURKE: The document speaks for
12  itself.
13      A.    Is that what you want me to do?
14      Q.    All right. We'll come back to
15  that. What are financing leases?
16      A.    A financing lease -- let me get my
17  terminology straight here. A financing lease...
18  how do I explain the difference?
19          A financing lease is a lease where you
20  would as, us being lessor, owner of the equipment,
21  would treat it as a financing just like a
22  loan. Okay? So the accounting would be like you
23  would account for a loan. That's kind of what a
24  financing lease is.

1      Q.    What are operating --
2      A.    Or finance leasing.
3      Q.    What are operating leases?
4      A.    Operating leases are leases where you
5  would not treat it as a loan. Instead, you would
6  treat the asset as though you owned it like -- it's
7  like if you owned something and rented it to me,
8  you would treat that on your books as a car, in
9  this case, and then count the rent as income as
10  rent and have -- and depreciate the asset on your
11  books, which you do not do in a finance lease.
12  That's essentially the difference.
13      Q.    Before March 5th, 2003, was Provident
14  engaging in finance leases that were recorded
15  off-balance sheet?
16          MR. BURKE: Can you repeat that
17  question?
18      A.    Yeah, before when again?
19      Q.    March 5th, 2003.
20          MR. BURKE: Just repeat that question
21  just to make sure I understand it.
22          (The question was read back.)
23      A.    Yes.
24      Q.    Who made the decision to engage in

1  finance leases that would be recorded off-balance
2  sheet?
3      A.    Well, the finance lease has to do...
4  It's apples -- kind of difficult to answer the
5  question the way you asked it. You engage in a
6  lease, period. Okay?
7          We own the car. We lease the car. This
8  is what all banks kind of do. And whether or not
9  it's classified in the -- if I were renting the car
10  to you, you know, it's going to look the same to
11  you if it's a finance lease or an operating lease.
12  Same deal.
13          The classification of it as a finance
14  lease versus an operating lease depends on a
15  present value calculation. And that then -- that
16  depends upon the residual value of the car and
17  whether or not that can be present valued as
18  guaranteed or not. Okay?
19          And that present value has to equal a
20  percentage, roughly 90 percent, for it to be called
21  a finance lease. Okay? If it does not equal 90
22  percent, then it's called an operating lease, and
23  you book it different.
24          So you start with that. We believed we

Page 186

1   had residual insurance on our cars. So basically,
2   we booked all of our leases as finance leases as
3   all banks did.
4       In fact, banks booked it that way who
5   didn't have insurance because it had just been
6   custom in the industry. So that's why they were
7   booked as finance leases.
8       Q.   And you're familiar with something known
9   as RVI or residual value insurance, correct?
10      A.   That's what I'm talking about.
11      Q.   Okay. And is there sometimes a
12  distinction between insuring the pool of cars for
13  RVI as opposed to each individual car?
14      A.   Well, there turned out to be.
15      Q.   What does that mean?
16      A.   Just that. Some people insured every
17  car; some people insured pools. We insured
18  pools. You get the same economics if you do it one
19  way or the other.
20      As it turned out technically, that is
21  what the second restatement hinged on is that issue
22  there. I guess it was deemed that we were insuring
23  pools; and while we had effectively covered the
24  risk, technically, we were not totally in

Page 187

1   compliance with FAS 13 as it related to finance
2   lease treatment.
3       So we had to restate those as operating
4   leases, and that's what the second restatement was
5   about.
6       Q.   Let's go back to the first restatement.
7   You would describe the first restatement as a
8   mistake in the model that underreported expenses,
9   correct?
10      A.   Yeah, that's basically what the
11  explanation's come down to.
12      Q.   And Ernst & Young knew about the model
13  from the beginning, correct?
14          MR. BURKE: Objection. Calls for
15  speculation.
16          MS. PERRY: Objection. Assumes facts
17  not in evidence.
18      A.   They looked at the model every year.
19      Q.   And they missed it every year, correct?
20      A.   Yeah.
21          MS. PERRY: Objection. Assumes facts
22  not in evidence.
23      A.   Let's put it this way. They didn't find
24  any error.

Page 188

1       Q.   Did Provident ever lose confidence in
2   Ernst & Young?
3           MR. BURKE: Objection. Calls for
4   speculation. You may answer.
5       A.   No.
6           MS. PERRY: Also vague.
7       Q.   Did Provident ever consider and reject
8   the idea of firing Ernst & Young?
9       A.   No.
10          MS. PERRY: Objection.
11      Q.   Did Provident ever lose confidence in
12  Greg Dooley?
13          MS. PERRY: Objection. Vague.
14      A.   No.
15      Q.   Did you ever consider and reject the
16  idea of firing Greg Dooley?
17      A.   No.
18      Q.   Why did you not consider firing Ernst &
19  Young?
20      A.   Financial statements are responsibility
21  of management. You know, we didn't find error
22  either until '03.
23      Q.   Did you expect that Ernst & Young would
24  perform a GAAS audit applying GAAP?

Page 189

1           MR. BURKE: Objection. Calls for
2   speculation.
3       A.   Yeah, I don't know how to answer that
4   question.
5           MS. PERRY: Join in the objection.
6       A.   They do what they do to certify our
7   statements.
8       Q.   And this goes to your expertise. Did
9   you expect Ernst & Young to perform a GAAS audit
10  applying GAAP?
11          MR. BURKE: Objection. Same objection.
12      A.   I expect Ernst & Young to audit our
13  statements and render an opinion using, you know,
14  the appropriate methodologies that they're required
15  to.
16      Q.   Right, and that's GAAS audit applying
17  GAAP?
18      A.   That's what you say.
19      Q.   Do you agree with that?
20      A.   As I said, that's what you say, and what
21  I said was I expect them to audit our statements in
22  an independent manner using the processes and
23  techniques required of them by the AICPA to render
24  an opinion, whatever those might be.

48 (Pages 186 to 189)

Page 190

1    Q.    Do you believe that to perform a GAAS
2  audit applying GAAP, Ernst & Young would have to
3  test the model for the auto leases?
4    A.    Not necessarily.
5        MR. BURKE: Calls for speculation.
6    A.    Not necessarily.
7        MS. PERRY: Join in the objection.
8    Q.    Do you believe that Ernst & Young ever
9  tested the model that you later found out to be
10 problematic?
11       MR. BURKE: Objection. Foundation.
12       MS. PERRY: Join in the objection.
13   A.    Don't know.
14   Q.    Did Ernst & Young ever make a
15 presentation and say we tested this or we did not
16 test this?
17   A.    Not that I was involved in.
18   Q.    How could you deal with the first
19 restatement without knowing whether Ernst & Young
20 had tested or not tested the model?
21       MS. PERRY: Objection. Argumentative.
22   A.    I don't understand the question. We
23 dealt with the first restatement by restating them.
24   Q.    Was it necessary to understand what

Page 191

1  happened and why with respect to the issues raised
2  in the first restatement?
3    A.    It was more important to understand what
4  had happened, not necessarily why right out of the
5  box. We went to why later.
6    Q.    Okay. Why did this happen?
7    A.    I don't think we have a good
8  explanation. We had it looked at independently;
9  and basically, there was a flaw in the model, and
10 it was not picked up in the internal process, you
11 know, that we had going on in the company. There's
12 no other way to say it.
13   Q.    Who is responsible for that inside the
14 company?
15       MR. BURKE: Responsible for what.
16   Q.    Not picking up the flaw in the model?
17       MR. BURKE: Who was responsible for not
18 picking it up?
19       MR. BRAUTIGAM: Yes.
20   A.    Yeah, you know --
21       MS. PERRY: Vague.
22   A.    The process, you know, this is a
23 question of internal controls. We didn't have as
24 good of internal controls around that obviously as

Page 192

1  we would have liked, otherwise it would have been
2  picked up.
3    Q.    And Greg Dooley was in charge of
4  internal controls, correct?
5    A.    Not necessarily Greg Dooley. This is
6  all the people involved in all that process. Greg,
7  -- all he does is audit what people are doing. He
8  doesn't necessarily create the controls.
9    Q.    Who was in charge of internal controls
10 at Provident from 1997 until 2003.
11   A.    Probably nobody was in charge of
12 internal controls, per se, at that time.
13   Q.    Did you expect that Ernst & Young, as
14 part of their audit, would evaluate Provident's
15 internal controls?
16   A.    Yes, and they did, you know, to some
17 extent, as do the regulators as well.
18   Q.    How is it possible then that Ernst &
19 Young, who audited Provident's internal controls,
20 missed this issue year after year after year?
21       MR. BURKE: Objection. Foundation;
22 calls for foundation.
23   A.    Yeah.
24       MS. PERRY: Join in the objection.

Page 193

1    A.    I can't answer the question. They did.
2    Q.    And that did not cause you to lose
3  confidence in Ernst & Young?
4    A.    It did not.
5    Q.    Did you lose confidence in any of the
6  people from Ernst & Young who were performing the
7  actual audit services?
8    A.    No.
9        MS. PERRY: Objection. Asked and
10 answered.
11   Q.    Are you familiar with FAS 13?
12   A.    Yeah.
13   Q.    What is FAS 13?
14   A.    I just explained that to you. That's
15 the 90 percent test that determines a finance
16 versus an operating lease.
17   Q.    Were you ever upset with Ernst & Young
18 that they did not voice any disagreement since you
19 started this accounting treatment back in 1994?
20       MR. BURKE: Objection. Vague. I don't
21 know what you're talking about. What
22 accounting treatment?
23       MS. PERRY: Join in the objection.
24   A.    Yeah, again, as I've said, the

49 (Pages 190 to 193)

Page 194

1  accounting's the responsibility of management, you
2  know. We take responsibility for what happens
3  here.
4      Q.    And you've actually apologized to the
5  shareholders for these restatements, correct?
6      A.    I have.
7      Q.    When you apologized to the shareholders,
8  did that include the OHSL shareholders who were
9  forced to convert their OHSL stock into Provident?
10         MR. BURKE: Objection. No OHSL
11     shareholders --
12     A.    I did what I did. I apologized to our
13 shareholders. If there are shareholders, then, you
14 know, they would be in that group.
15     Q.    Okay. Let's turn the page, please.
16     A.    Of...
17     Q.    91. You don't dispute that Provident
18 has restated its earnings results from 1994 to
19 2002, correct?
20     A.    Correct.
21     Q.    And are you familiar with something
22 known as APB number 20?
23     A.    Not offhand.
24     Q.    Are you familiar with the accounting

Page 195

1  principles board?
2      A.    Yes.
3      Q.    What is the accounting principles board?
4      A.    I think it still is that, you know...
5  sounds like it's kind of an old name for them
6  because really people talk today about the
7  Financial Accounting Standards Board, FAS, as
8  opposed to APB. APB I think is an old name, but
9  they set the -- basically the accounting rules.
10     Q.    Mr. Hoverson, I think you are absolutely
11 correct. The APB was the immediate predecessor of
12 the Financial Accounting Standards Board or FASB.
13 Are you familiar with APB opinion number 20 --
14         MR. BURKE: Objection. Asked and
15     answered.
16     Q.    -- and the accounting changes?
17         MR. BURKE: Objection. Asked and
18     answered.
19     A.    Yeah, I'm not.
20     Q.    You understand that a restatement is an
21 accounting change, correct?
22         MR. BURKE: Objection. Calls for
23     speculation. You may answer.
24     A.    I mean, it's a restatement. It's

Page 196

1  action, yeah. Accounting change is the word of
2  art, and I would hesitate for me to get into a
3  discussion of what an accounting change is.
4      Q.    Okay. Do you agree that ideally there
5  should be no accounting changes from one year or
6  quarter to the next because changes such as this
7  impair consistency?
8          MR. BURKE: Objection. Calls for
9      speculation; vague.
10     A.    Yeah, what do you mean?
11     Q.    I can repeat the sentence if you like.
12     A.    Clarify what you mean. I just said that
13 accounting changes -- I'm not going to -- you know,
14 I'm not going to try to define accounting change.
15 That is a bit of a word of art to accountants.
16     Q.    Okay. With respect to a company's
17 financial statements do you believe that they
18 should be consistent?
19     A.    We would certainly want them to be.
20     Q.    And do you accept that consistency is
21 the ability to meaningfully compare the financial
22 statements of a company from one year or quarter to
23 the next?
24         MR. BURKE: Objection. Calls for

Page 197

1  speculation; vague.
2      A.    That would be the purpose.
3      Q.    And do you agree that users of financial
4  statements value consistency because consistency
5  makes it easier to determine whether the company's
6  improving or deteriorating with regards to its
7  financial performance?
8          MR. BURKE: Objection. Calls for
9      speculation.
10         MS. PERRY: Vague.
11     A.    I guess it depends on the circumstances,
12 but everything else being equal, you'd like, you
13 know, everything to be consistent.
14     Q.    Do you agree that consistency is a
15 fundamental objective with respect to GAAP?
16         MR. BURKE: Objection. Calls for
17     speculation; no foundation.
18     A.    Yeah.
19         MS. PERRY: Join in the objection.
20     A.    I don't think I can answer that one.
21     Q.    You're familiar with GAAP, correct?
22     A.    I am.
23     Q.    And isn't consistency a very basic
24 principle of GAAP?

50 (Pages 194 to 197)

Page 198

1      MR. BURKE:  Same objection.
2      A.    Yeah, lots of things are very basic
3  principles of GAAP, you know.  There are things
4  that get changed in GAAP.  There are times when
5  GAAP requires you to change things, and then it's
6  not consistent, is it?
7      It's more correct from the standpoint
8  that it be correct rather than be... It's kind of
9  a context question.  Obviously, you would like
10  things to always be consistent.
11    Q.    Do you dispute that APB number 20
12  requires that a company restate its financials only
13  when they're materially misstated?
14      MR. BURKE:  Objection.
15    A.    Again, I don't -- I'm not intimately
16  familiar with APB 20.
17    Q.    So you just don't know one way or the
18  another?
19    A.    I don't.  I don't.
20    Q.    Okay.  Have you ever heard of a
21  situation where a company restated its financial
22  statements for non-material reasons?
23      MR. BURKE:  Objection.  Calls for
24  speculation.

Page 199

1    A.    Yeah, I don't know how to answer that
2  one.  I don't.
3    Q.    Did Provident ever restate its
4  financials for non-material reasons?
5    A.    Yeah, see, the materiality is kind of an
6  issue from the SEC standpoint.  If it's incorrect,
7  you restate it.  I suppose there is some threshold
8  of materiality.  What is that?  That's a good
9  question.
10    Q.    Was there a threshold for materiality
11  with respect to the OHSL-Provident merger?
12      MR. BURKE:  Objection to form; vague.
13    A.    I don't know what that means.
14      MR. BURKE:  I don't either.
15    Q.    Well, didn't we talk about it on page
16  18?
17    A.    This is in March of '03.  It didn't have
18  anything to do with the OHSL merger.
19    Q.    I respectfully disagree.  But didn't we
20  discuss the materiality threshold for the OHSL-
21  Provident merger on page 82 of Defendants' Exhibit
22  1?
23      MR. BURKE:  Objection.
24    A.    You did --

Page 200

1      MR. BURKE:  That's not what it said.
2    A.    -- at length.
3    Q.    Would you pick up Plaintiffs' Exhibit
4  92, please.
5    A.    Okay.
6    Q.    Mr. Hoverson, you are familiar with
7  Provident's board minutes, correct?
8    A.    I am.
9    Q.    And you're able to read and interpret
10  the language in Provident's board minutes, correct?
11    A.    I am.
12      MR. BURKE:  Objection.  You may answer.
13    Q.    You've seen the board minutes for the
14  special meeting of the board of directors for
15  Provident Financial Group, Inc., for Sunday
16  February 23rd, 2003, correct?
17    A.    Um-hum, yes.
18    Q.    You were present at that meeting,
19  correct?
20    A.    I was.
21    Q.    Would you turn to the second page of the
22  document, please.
23    A.    Um-hum.
24    Q.    Do you see in the first full paragraph

Page 201

1  the words "materially underreported and materially
2  overstated" appear --
3    A.    Where are you at?
4    Q.    The third line from the bottom and the
5  second line from the bottom.
6    A.    Which paragraph?
7    Q.    First paragraph.
8    A.    Okay.
9    Q.    And the board minutes read, The initial
10  determination was that the existing financial model
11  materially underreported expenses of the eight
12  transactions as a result of which the net earnings
13  of the company were believed to have been
14  materially overstated for each of the years 1997
15  through 2002.  Do you see that?
16    A.    I see it.
17    Q.    And was that initial determination later
18  ratified as the final determination?
19    A.    Well --
20      MR. BURKE:  Objection.  Calls for
21  speculation.  You may answer.
22    A.    That's a good question.  And the reason
23  I say that is that this thing -- if you're looking
24  at the first paragraph -- or, the third paragraph

51 (Pages 198 to 201)

1  -- or, the first sentence of the third paragraph, I
2  describe the process as fluid.
3         And over -- we didn't announce the
4  restatement until March 5th, and this was the 23rd.
5  And the reason we didn't is this took a while to
6  get nailed down.
7         And where the numbers fell and what
8  moved around and where they were exactly here on
9  the 23rd relative to where we ended up as to
10  periods, I couldn't tell you.
11        So it could have been -- the numbers
12  could have been bigger here in '97/'98 or not. I
13  don't remember. They were moving around. So that
14  would be my comment on that.
15     Q.    You understand the phrase "materially
16  underreported" as it's used in that document,
17  correct?
18     A.    Materially underreported, yes, I do.
19     Q.    Please explain that.
20     A.    Well, you know, it substantially
21  underreported the level of expenses.
22     Q.    And you understand the phrase
23  "materially overstated" as it's used in that
24  sentence, correct?

1     A.    I do.
2     Q.    And please explain that.
3     A.    Same thing. It substantially overstated
4  the amount of income recognized.
5     Q.    So you're using materially and
6  substantially interchangeably, correct?
7     A.    In that -- in this context, I would.
8  But again, I'm not sure what the number was
9  then. It may not have been the number we ended up
10  at.
11     Q.    Without regard to specific numbers, was
12  there ever a conclusion reached with respect to the
13  first restatement or the second restatement that
14  the numbers were not materially incorrect?
15         MR. BURKE: What numbers?
16         MS. PERRY: Objection. Vague;
17  misleading; mischaracterizes the record.
18         MR. BURKE: Plus, object to the form. I
19  don't know whether you're talking about for a
20  period, in the aggregate, or anything else.
21     A.    Which?
22     Q.    You can answer the question if you can.
23     A.    Well, I think the overall number, you
24  know, was -- you know, was significant and

1  material. You bet.
2     Q.    Would you turn to Plaintiffs' Exhibit
3  45. It's the consolidated amended complaint.
4     A.    Say again? Number what?
5     Q.    45. Let me see if I can help you find
6  it. Would you turn to Exhibit A, which is the
7  press release, the last couple pages of the
8  document.
9     A.    Okay.
10     Q.    What is Exhibit A to the consolidated
11  amended complaint?
12     A.    Looks to be like a copy of our press
13  release that you downloaded off the internet or
14  somebody did.
15     Q.    And the second page of the press release
16  has some numbers, correct?
17     A.    Yeah.
18     Q.    And let's talk about these numbers. The
19  table at the top talks about net income and diluted
20  earnings per share. Do you see that?
21     A.    Yes.
22     Q.    And the first group of words on the left
23  says as reported, and then it has net income and
24  earnings for share. Do you see that?

1     A.    Yes.
2     Q.    And then beneath that, it says restated
3  in the same columns, correct?
4     A.    Correct.
5     Q.    And then the last column at the top of
6  the table is variance for net income and earnings
7  per share, correct?
8     A.    Right.
9     Q.    And all the numbers are in millions
10  except per share data, correct?
11     A.    Yes.
12     Q.    And when accountants put numbers like
13  these together and when they're in parenthesis,
14  that means that they're negative numbers, correct?
15     A.    Correct.
16     Q.    All right. let's talk about the
17  variance in net income. Do you see that?
18     A.    I do.
19     Q.    Was Provident's net income important to
20  the OHSL-Provident merger?
21         MR. BURKE: Objection. Calls for
22  speculation; no foundation. You may answer.
23     A.    Yeah, in relation to...
24     Q.    The fairness opinion, among other

Page 206

1  things.
2        MR. BURKE: Objection. Calls for
3  speculation.
4        MS. PERRY: Join in the objection.
5    A.    Yeah, you'd have to ask McDonald.
6    Q.    Would you pull out the fairness opinion
7  which is attached as Annex C to the proxy
8  materials.
9    A.    Are you asking a general question, or
10  are you asking a question about this?
11    Q.    I'm asking if net income was important
12  to the terms of the OHSL-Provident merger?
13        MR. BURKE: Same objection.
14    A.    Yeah, I mean, I'm sure that that -- you
15  know, it's important from a standpoint that, you
16  know, the income is what it is, and that's part of
17  what they took into consideration.
18    Q.    And you believe that a reasonable
19  shareholder considering a merger with Provident in
20  1999 would want to consider Provident's net income,
21  correct?
22        MR. BURKE: Objection. Calls for
23  speculation.
24    A.    I don't know.

Page 207

1    Q.    Under what circumstances would a
2  reasonable shareholder not want to consider
3  Provident's net income in considering whether or
4  not to merge with Provident?
5    A.    Yeah, I think --
6        MR. BURKE: Same objection; also calls
7  for legal conclusion. You may answer.
8    A.    I can't answer -- I can't tell you what
9  people consider when they make investment decisions
10  about this sort of thing. It's part of the whole
11  -- it's obviously part of it.
12    Q.    It's part of the total mix of
13  information available to the shareholders, correct?
14    A.    Yeah, sure.
15    Q.    Okay. And you don't dispute that a
16  material adverse effect with respect to the
17  Provident-OHSL merger is greater than $25,000,
18  correct?
19        MR. BURKE: Objection to form. I
20  don't --
21    A.    No, I never did agree to that comment
22  that you made.
23    Q.    Okay.
24    A.    I said, you know, that's the

Page 208

1  definition. We never did get to the context of
2  what that meant.
3    Q.    Well, now we're going to put it in
4  context. Would you please turn to page 82 of the
5  proxy materials.
6    A.    Okay.
7    Q.    And it says that a material adverse
8  effect on the financial condition, the results of
9  operations, the business or assets of such person
10  shall be material if the impact is more than
11  $25,000, correct?
12        MR. BURKE: Objection.
13    A.    That's what it says.
14        MR. BURKE: The document speaks for
15  itself.
16    Q.    Now, look at the first number under the
17  restatement of net income from 1997. That's a 0.9,
18  correct?
19    A.    Yeah.
20    Q.    And that represents a negative $900,000,
21  correct?
22    A.    Yes.
23    Q.    And $900,000 is greater than $25,000,
24  correct?

Page 209

1    A.    Yes, it is.
2    Q.    And do you, therefore, conclude that
3  this point 9 number for 1997 represents a material
4  adverse effect as defined in the merger agreements?
5    A.    No. I'd have to see how this term is
6  used in the contract. What is it talking about?
7  What were they talking about in the contract when
8  they talked about a material adverse effect? Can
9  we go to there?
10    Q.    What contract are you referring to?
11        MR. BURKE: The merger agreement.
12    A.    The merger agreement.
13    Q.    That is the merger agreement.
14    A.    No.
15        MR. BURKE: That's a definition.
16    A.    Where is it in the merger agreement?
17  Where is it used?
18    Q.    Okay. Well, take as much time as you
19  need to find where it's used.
20    A.    I don't know that I can. Let's
21  see. (Examining document.) I don't see it. I
22  don't see it anywhere.
23    Q.    Okay. Mr. Hoverson, doesn't the
24  definition of material adverse effect as it appears

53 (Pages 206 to 209)

1  on page 82 of proxy materials indicate to you that
2  anything that would affect Oak Hills or Provident's
3  financial statements more than $25,000 is a
4  material adverse effect?
5     A.   See, it doesn't, and I'll tell you why.
6     Q.   Does not?
7        MR. BURKE:  Does not.
8     A.   It does not say that to me, and I'll
9  tell you why.
10    Q.   Okay.
11    A.   Because on its face, it seems
12 ludicrous.  $25,000 is change for us, with us
13 having made 120 million dollars the previous year,
14 is so insignificant a number as to not have been
15 defined by anybody as being material.
16       So it's relating -- I don't know what it
17 relates to.  It doesn't make any sense.  I don't
18 remember what Oak Hills profitability was at the
19 time.  Obviously, it would have been a much smaller
20 number.
21       For all I know, you know, although I'm
22 sure the way this thing is defined, it applies to
23 everybody in here as a person defined as both of
24 us --

1     Q.   Next page, yes.
2     A.   So it doesn't -- see, the context of it
3  doesn't make sense to me that $25,000 would have
4  been a material adverse effect.  It's so small.
5     Q.   Turn to page A24.  Would you look at
6  small XVII.
7     A.   XVII, yeah.
8     Q.   What number is listed there?
9     A.   25.
10    Q.   25,000?
11    A.   Let's see what this is about.  This is
12 an agreement of Oak Hills to not purchase any real
13 or personal property in excess of $25,000.  That's
14 what that is.
15    Q.   And that's something that Oak Hills and
16 Provident agreed to, correct?
17       MR. BURKE:  Objection.
18    A.   That's something Oak Hills agreed to.
19 This is an agreement of OHSL and Oak Hills.  That's
20 what that applies to.
21    Q.   But this is a joint agreement, right;
22 both parties agreed, correct?
23    A.   Yes, it is.
24    Q.   So somehow, Provident agreed to the

1  $25,000 figure as well, correct?
2        MR. BURKE:  Objection.
3     A.   All it says is that Oak Hills will not
4  purchase any real or personal property or other
5  capital expenditures in excess of $25,000.  That's
6  what it says.  That's what it means.
7     Q.   If Oak Hills made a capital expenditure
8  of more than $25,000, that would be, by definition,
9  a material adverse effect, correct?
10       MR. BURKE:  Objection.
11    A.   No, I don't think so.
12       MR. BURKE:  Misstates the document.
13    A.   It does not follow at all to me -- that
14 is not the way the document reads, because it
15 doesn't talk about a material adverse effect there.
16    Q.   Okay.  What would happen if Oak Hills
17 made a --
18    A.   Material adverse effect is a defined
19 term.  So they would use it.  You would use the
20 term.  That's why you define it.
21    Q.   When you say it's a defined term, what
22 exactly does that mean?
23    A.   It's a definition in the document.
24    Q.   How is it used in the document?

1     A.   That's what we're trying to find and
2  can't seem to find, but it's not used there.
3     Q.   Okay.  But you don't dispute that the
4  document defines material adverse effect as having
5  an impact of more than $25,000, correct?
6        MR. BURKE:  Objection.  I mean, that's
7        been established a half a dozen times.
8     A.   That's what it says.
9     Q.   And $900,000 is greater than $25,000,
10 correct?
11    A.   Yes, it is.
12    Q.   And do you dispute that the 1997
13 variance net income of $900,000 is a material
14 adverse effect with respect to the merger?
15    A.   No, I would not, you know, agree with
16 that one way or the other.
17    Q.   Why not?
18    A.   I just wouldn't.  You know, I doubt that
19 that -- well, it's all speculation as to what
20 effect that would have had on our numbers at the
21 time and the stock price and the evaluation of the
22 deal.  Who knows if it would have had any effect.
23 It very well might not have had any.  All -- none
24 of those numbers might not have had any impact.

Page 214

1 There was no way of knowing.
2    Q.    Putting aside the effect or possible
3 effect on the stock price --
4    A.    And the valuation of the deal. There's
5 just no way to know.
6    Q.    Well, the Oak Hills people would
7 certainly want to have accurate information,
8 correct?
9       MR. BURKE: Objection. Calls for
10 speculation.
11    A.    We kind of covered that, I think.
12    Q.    Right. And this point 9 in parenthesis
13 for 1997 indicates that Provident's numbers are off
14 by $900,000?
15       MR. BURKE: Objection.
16    A.    It indicates that we restated the
17 numbers in '97, and the difference is point -- and
18 the variance is point 9. That's what it indicates.
19 That's what it says. That's what it indicates.
20    Q.    Right. And you agreed --
21    A.    Nothing more; nothing less.
22    Q.    Right. And you agree that OHSL
23 shareholders would want to consider that number --
24    A.    I didn't agree to that at all.

Page 215

1    Q.    You did not agree with that; you don't
2 think it matters one way or the other?
3    A.    It doesn't have anything to do with
4 it. You know, it happened in 2003. We restated
5 the numbers. They are what they are.
6    Q.    Did the point 9 overstatement mean that
7 Provident's financial statements in 1997 appeared
8 better than they actually were?
9       MR. BURKE: Objection. Calls for
10 speculation.
11    A.    Yeah, that's a relative -- it's hard to
12 -- what it says again is that, you know, it was a
13 $900,000 impact in 1997; that income was restated
14 by that amount and lowered. That's what it says.
15    Q.    Okay. Let's go to 1998. Provident had
16 a variance in net income of 2 million dollars,
17 correct?
18    A.    Right.
19    Q.    And that means that Provident overstated
20 its income by 2 million dollars, correct?
21       MR. BURKE: Objection. Asked and
22 answered. You may answer.
23    A.    Yeah, again, it says that the variance
24 for '98 based on the restatement is 2 million.

Page 216

1 That's what it says. It doesn't say here, you
2 know, anything other than that. That's what it
3 says.
4    Q.    Okay. And that means that Provident had
5 overstated its net income for 1998 by 2 million
6 dollars, correct?
7       MR. BURKE: Objection. Argumentative;
8 asked and answered.
9    A.    I've answered that.
10    Q.    That's what it means, correct?
11       MR. BURKE: Objection. That's not what
12 he said. Asked and answered.
13    A.    I've answered that. It's on the record.
14 It means it's 2 million dollars lower than we
15 originally reported.
16    Q.    Okay. Let's take a look at the numbers
17 for 1999. Do you see that number?
18    A.    Um-hum.
19    Q.    And that's 11.3, correct?
20    A.    Right.
21    Q.    And that means that Provident's real
22 numbers were 11.3 million dollars lower than were
23 actually reported, correct?
24       MR. BURKE: Objection to form; vague --

Page 217

1    A.    Yeah, again, I'll kind of stick to
2 technically what happened here. The numbers were
3 restated. The restated numbers for 1999 are 11.3
4 million dollars lower than originally reported.
5    Q.    And based on this transaction closing on
6 December 3rd of 1999, it wouldn't be fair to take
7 the entire year overstatement, correct?
8       MR. BURKE: Objection. I have no idea
9 what that question means.
10    A.    Yeah, I don't understand the question.
11    Q.    Okay. Provident didn't have its year-
12 end financial statements complete by December 3rd,
13 1999, correct?
14    A.    Right.
15    Q.    So you would have to prorate this 11.3
16 million dollar figure up to and including December
17 3rd, 1999, to determine how it impacted on the
18 OHSL-Provident merger, correct?
19       MR. BURKE: Objection. Misstate the
20 record; calls for speculation.
21    A.    I frankly can't answer that because the
22 impact per quarter. Yeah, I don't have those
23 numbers. It doesn't mean that it was smooth. You
24 know, who knows. I can't answer it. That's the

Page 218

1  impact of '99, and we didn't attempt to break it
2  down by quarter; or if they did, they certainly
3  didn't report it that way.
4      Q.    Do you believe that a number in excess
5  of 14 million dollars in overstatement of
6  Provident's net income would be of interest to the
7  OHSL shareholders in considering whether or not to
8  merge with Provident in 1999?
9          MR. BURKE: Objection. Calls for
10  speculation.
11     A.    Yeah --
12         MR. BURKE: Adding those three together,
13  so you have to add everything together, I take
14  it. Okay? Objection.
15     A.    I'll speak as to facts, what I
16  know. Okay? And I've said it again -- say it
17  again for you. We restated our numbers. Okay?
18  And these are the results of those restatements,
19  and these numbers are lower.
20         As to how OHSL's shareholders would have
21  reacted to this, I have no way of knowing. I have
22  no way of knowing how Wall Street in general would
23  have reacted to it. I don't know.
24     Q.    Mr. Hoverson --

Page 219

1      A.    None of us know.
2      Q.    Mr. Hoverson, in addition to Provident
3  stock, you own other stocks, correct?
4      A.    I do.
5      Q.    Such as Hewlett Packard, correct?
6      A.    Yeah.
7      Q.    And do you consider yourself to be a
8  reasonable shareholder?
9          MR. BURKE: Objection. Calls for legal
10  conclusion.
11     A.    I have no idea.
12         MR. BURKE: Let's take five seconds.
13     A.    I am what I am.
14         (Off-the-record discussion.)
15  BY MR. BRAUTIGAM:
16     Q.    Mr. Hoverson, if were you an Oak Hills
17  shareholder in 1999 considering how to vote,
18  whether or not to merge with Provident, would you
19  have wanted to have these numbers, meaning the
20  point 9 number, the 2.0 number and whatever 11.3
21  million prorates out to to December 3rd, 1999?
22         MR. BURKE: Objection. Calls for
23  speculation?
24     A.    Yeah, I'm not going to speculate on

Page 220

1  that.
2      Q.    Mr. Hoverson, respectfully, I don't
3  believe that it calls for speculation. I'm asking
4  you a hypothetical question.
5      A.    A hypothetical question calls for
6  speculation. Okay?
7      Q.    No, it's not okay, Mr. Hoverson.
8      A.    Well, that's -- that's -- I'm not going
9  to speculate.
10     Q.    Mr. Hoverson, I'm asking you to stand in
11  the shoes of an OHSL shareholder in 1999. Would it
12  be important to you in considering the merger to
13  have these correct numbers?
14         MR. BURKE: Objection. Calls for
15  speculation.
16     A.    Yeah, and I'm not going to speculate.
17  Okay?
18     Q.    No, it's not okay. We're going to come
19  back. I'm going to petition the court --
20     A.    That's fine.
21         MR. BURKE: Go ahead. Make your motion,
22  Mr. Brautigam.
23     Q.    -- and make you answer these questions.
24         MR. BURKE: Don't speak. Just make your

Page 221

1  motion. Move on.
2      Q.    Mr. Hoverson, what does the 15.9 million
3  dollar number mean for 2000?
4      A.    It means the same thing the other three
5  meant, just a number for 2000. It's a variance.
6      Q.    And what does the 20.1 million mean for
7  2001?
8      A.    Same thing.
9      Q.    And the 20.1 million for 2002?
10     A.    Same thing.
11     Q.    Okay. Let's go back to the board
12  minutes, Plaintiffs' 92. Now, you described in one
13  of your previous answers that the process was
14  fluid. What did you mean as you used that word?
15     A.    Just that. It took a while to sort it
16  out.
17     Q.    And did PwC ultimately resolve the
18  problem?
19     A.    No.
20     Q.    How did the problem ultimately get
21  resolved?
22         MR. BURKE: Did PwC ultimately resolve
23  the problem? Is that what the question was?
24         MR. BRAUTIGAM: Yeah.

56 (Pages 218 to 221)

Page 222

```
 1        MR. BURKE:  I don't know what problem
 2   you're talking about.  Objection to form.
 3        MS. PERRY:  I note my objection.
 4   A.    No, they didn't.
 5   Q.    Was the modeling problem ever resolved?
 6   A.    Sure, yeah.
 7   Q.    When was the modeling problem resolved?
 8   A.    We restated our numbers.
 9   Q.    So the modeling problem was resolved on
10   March 5th, 2003, correct?
11   A.    That's when we reported the results of
12   what -- of the new -- yeah.
13   Q.    Why did you need PwC after March 5th,
14   2003?
15   A.    PwC was hired by the audit committee as
16   an independent entity to investigate what had
17   happened and to make sure that, you know, there
18   wasn't any wrongdoing that had gone on by people on
19   our staff.
20   Q.    So --
21   A.    That was the purpose of -- that was
22   their initial purpose.
23   Q.    Did they have a secondary purpose?
24   A.    They later performed a review of our
```

Page 223

```
 1   internal controls, and that was a secondary job and
 2   didn't really have -- was not connected to the
 3   restatement.
 4   Q.    The review of the internal controls, was
 5   that exactly comparable to what you had been paying
 6   Ernst & Young to do pursuant to the audits?
 7   A.    No.
 8        MS. PERRY:  Objection to form.
 9   Q.    It was a completely different
10   assignment?
11   A.    Yeah.  It was an independent second
12   overall look at our entire internal control
13   mechanism.  In the context of corporate America at
14   the time, it was going on lots of places.
15   Q.    And I just want to make sure I have this
16   testimony correct.  The problem with respect to the
17   modeling was resolved on or before March 5th, 2003,
18   when you announced the restatement, correct?
19        MR. BURKE:  The problem with the
20   modeling?  I don't understand your question.
21   Objection to form.
22        MS. PERRY:  Join in the objection.
23   A.    Well, the model is where the accounting
24   error was.  The accounting error was sized and, in
```

Page 224

```
 1   fact, fixed, I guess you could say, and reported on
 2   March 5th.
 3   Q.    So PwC had absolutely no input into
 4   fixing the modeling error, correct?
 5   A.    That's correct.
 6   Q.    Why was it necessary to closely follow
 7   the trading of Provident stock to look for
 8   irregular or unexpected patterns at this point?
 9        MR. BURKE:  Can you show the witness
10   what you're reading from so he can put it in
11   context, Mr. Brautigam?
12        MR. BRAUTIGAM:  Certainly.  Plaintiffs'
13   Exhibit 92, second page of the document ending 066,
14   last paragraph, last two lines.
15        MR. BURKE:  Okay.  Thank you.
16   A.    Yeah, because there were a -- more than
17   a handful of people who were involved in rectifying
18   this, and so we wanted to make sure we didn't have
19   anybody out there trading the stock based upon news
20   that was not public.
21   Q.    And why did you want that to happen?
22        MR. BURKE:  Why did we want what to
23   happen?
24   A.    It would have been illegal to do to have
```

Page 225

```
 1   anybody trading the stock on non-public
 2   information.  So we monitored to make sure that,
 3   you know, if it happened, we caught it right away,
 4   and there was nothing going on.
 5   Q.    Okay.  There's a question that's raised
 6   on the next page in the second full paragraph.  Do
 7   you see that?  Would you read that to yourself,
 8   please?
 9   A.    Which one?
10   Q.    During the course of the meeting.
11   A.    (Examining document.)  Okay.
12   Q.    Was there ever an answer to the question
13   whether Ernst & Young had any hand in the
14   development of the financial model in use since
15   1997?
16   A.    I'm not sure that there was --
17        MS. PERRY:  Object to form.  Foundation.
18   A.    I'm not sure that there was a totally
19   definitive answer to that question, frankly, from
20   my perspective.
21   Q.    Did you ever ask the audit committee?
22        MR. BURKE:  Ever ask the audit committee
23   what?
24   A.    No, I didn't.
```

57 (Pages 222 to 225)

Page 226

1    Q.    Did the audit committee ever ask you?
2    A.    No.
3    Q.    How is it possible to understand and fix
4    the problem without knowing whether or not Ernst &
5    Young had any hand in the development of the
6    financial model in use since 1997?
7         MS. PERRY: Objection to form; asked and
8    answered; lacks foundation; vague.
9    A.    It was possible and we did it. I don't
10   know how else to answer that.
11   Q.    This meeting reflected in the first few
12   pages of Plaintiffs' Exhibit 92 took place on
13   Sunday evening, February 23rd, 2003, correct?
14   A.    That's what it says.
15   Q.    And when did you first learn that there
16   may be a possible problem with respect to the
17   modeling for auto leases?
18   A.    It was closer to the middle of February.
19   Q.    How did you learn there might be a
20   problem in this area?
21   A.    Chris Carey, the CFO, John Farrenkopf,
22   and Tayfun Tazun, and all senior vice presidents in
23   the finance and accounting area came into my office
24   -- and Tony Stollings -- and told me.

Page 227

1    Q.    What did they say?
2    A.    They said we think we have a problem.
3    Q.    What did you say?
4    A.    You know, explain the problem.
5    Q.    Did you understand it immediately?
6    A.    Oh, I understood what they said to me.
7    Q.    It's a pretty complex problem, correct?
8    A.    Yes.
9    Q.    Takes some time to wrap one's mind
10   around the problem, correct?
11   A.    The exact particulars of it, yes, very
12   complex.
13   Q.    And what, if any, action did you take in
14   response to that meeting?
15   A.    Well, I did several things actually. I
16   immediately called our regulators at both the
17   Federal Reserve in Cleveland and state of Ohio, and
18   I got on the phone and notified all the directors.
19   Q.    Okay. Let's talk about your contact
20   with the regulators. What did you say to them, and
21   what did they say to you?
22   A.    Yeah, frankly, I'm not really... The
23   regulators really don't let us disclose our
24   discussions with them, but I will tell you what --

Page 228

1    you know, I told them exactly what I knew and
2    invited them in; and they basically kind of came in
3    and sat through the next couple weeks.
4    Q.    And who specifically did you deal with?
5    A.    A number of people. The people on the
6    point for the Federal Reserve were Jay Restal
7    (phonetic), whose name is mentioned in here; Chris
8    Moore, who is Jay's boss at the time, was the
9    senior regulator in the Fourth District; Scott
10   O'Donnell for the state of Ohio, who's a director
11   of banking; and Mary Clark Connor, who was our
12   point person from the state.
13   Q.    And when you called the directors to
14   inform them that there may be a problem, what did
15   you say to them?
16   A.    Told them what -- you know, what had
17   happened; what we knew; what we're doing about it.
18   Q.    Can you tell me with greater specificity
19   exactly how those conversations unfolded?
20   A.    You know, I had a number of them. I had
21   so many conversations that day. You know, we think
22   we have an accounting issue relating to the auto
23   lease area with the model. It appears to be as --
24   at this moment of "X" size, and I can't even

Page 229

1    remember what the hell it was then because it kept
2    moving around, but it was a number that, you know,
3    obviously was meaningful and that we were
4    endeavoring to get to the bottom of it, and we
5    didn't have a lot of answers yet.
6    Q.    What day was this, by the way?
7    A.    I don't remember. I can't believe I'm
8    actually saying that, but I'm thinking it was
9    February 17th. It's one of those days -- ground
10   hog day as we kept calling it -- as we called it.
11   Yeah, let's see. This says...
12        MR. BURKE: I recommend you review the
13   minutes just to see --
14   A.    This says February 21st, and the day
15   that I learned -- I mean, I called the Federal
16   Reserve within an hour of being told, and so this
17   says February 21st.
18   Q.    How did this Sunday night special
19   meeting of the board of directors get set up?
20   A.    We set it up.
21   Q.    Now, would you turn to page 068,
22   please. It's the fourth page. Now, this reflects
23   minutes of a special meeting of the audit
24   committee --

Page 230

1    A.    Now, what are we doing here?
2    Q.    -- for Tuesday, February --
3    A.    What are we doing here?
4    MR. BURKE: The number's down at the
5    bottom.
6    A.    Oh, I've got it. 06...
7    Q.    068.
8    A.    All right.
9    Q.    This is a special meeting of the audit
10   committee of Provident Financial Group, correct?
11   A.    Yeah, that's what it says.
12   Q.    And on the second page, it indicates
13   that you reported to the committee on that date,
14   correct?
15   A.    Um-hum, yeah.
16   Q.    Did it bother you that Dr. Steger was
17   out of town for some of these meetings?
18   A.    We dealt with it. We got him on the
19   phone.
20   Q.    But he wasn't on the phone for the first
21   special meeting of the entire board, correct?
22   A.    I don't remember. This says not.
23   Q.    It's actually the first page.
24   A.    He was present at the first audit

Page 231

1    committee meeting via phone. He may not have been
2    for this one. Let's see.
3    Q.    Second paragraph, last line.
4    A.    Yeah, okay.
5    Q.    Did that bother you?
6    MR. BURKE: Objection.
7    A.    No. I mean, he was out of town and kind
8    of hard to reach, as I recall; but we didn't want
9    to wait. Thought it was important to have a
10   meeting.
11   Q.    Okay. Who's Bill Huskins of Ernst &
12   Young?
13   A.    Rich Huskins, should be. Where's that
14   at?
15   Q.    Page 070, second paragraph, and it says
16   Bill Huskins?
17   A.    I thought it was Rich. He's part of
18   their national group. He's the -- he's the kind of
19   guy at national who looks over our guy's shoulder
20   for them.
21   Q.    Is he what's known as a national
22   practice director?
23   A.    I don't know if he specifically was
24   called that, but that's kind of the way we looked

Page 232

1    at him.
2    Q.    And did Mr. Huskins have a particular
3    area of expertise?
4    A.    Yeah. There was some talk of him being
5    the leasing expert, but there was another guy there
6    that was a much more of an expert than Huskins was,
7    as it turned out. I wouldn't speculate on that
8    one.
9    Q.    Okay. It says here that you stated that
10   the accounting methodology being used to calculate
11   and analyze the --
12   A.    Wait a minute. Where are you at?
13   Q.    Second sentence of the second paragraph.
14   Why don't you just read that to yourself for a
15   moment.
16   A.    Yes, okay.
17   Q.    What accounting methodology are we
18   talking about here?
19   A.    They had an approach to how they wanted
20   us at the time to go back and, in fact, redo --
21   right? -- everything to come up with the final
22   numbers. And so as I said, that was -- this
23   thing was a little fluid, and I don't know if
24   that's the methodology that we ended up using or

Page 233

1    not.
2    Q.    Was there ever any doubt in your mind
3    that Provident would have to restate from the time
4    you first learned that there were problems with the
5    model?
6    A.    There were a couple times when people
7    didn't think we would have to.
8    Q.    Did you ever think that way?
9    A.    It seemed unlikely to me.
10   Q.    When did you first think that Provident
11   would be sued as a result of this?
12   MR. BURKE: Objection. Calls for
13   speculation.
14   A.    You really want -- yeah, I'm not going
15   to speculate on that one.
16   Q.    I see that the question is raised by
17   Mr. Grote --
18   A.    Where you at?
19   Q.    Third paragraph -- about whether Ernst &
20   Young had ever tested or validated the financial
21   model. Is that something that you as CEO would
22   expect your CFO to know?
23   MR. BURKE: Objection. Calls for
24   speculation; no foundation.

59 (Pages 230 to 233)