1        MS. PERRY: Join in the objection.
2    A.    Yeah, I'm not quite sure I know how to
3  answer that question as to what I would have
4  expected him to know if they had audited -- kind of
5  tested or validated the financial model. It's our
6  job to do that. Not theirs. They audit what we
7  do. They don't do our accounting. We do our
8  accounting. They audit our accounting.
9    Q.    And audits involve sampling and testing
10  what management does, correct?
11    A.    Correct.
12    Q.    And clearly, the results that this model
13  produced would be material to Provident's financial
14  statements, correct?
15        MR. BURKE: Objection. Calls for
16  speculation.
17        MS. PERRY: Objection. Assumes facts
18  not in evidence; mischaracterizes the record.
19    A.    This model was looked at as an extremely
20  low risk model, and it's one of the things that
21  came out in the final analysis; and as a result, it
22  was one of the reasons it was able to fly kind of
23  below the radar screen for as long as it did,
24  because all it was doing was, you know, income and

1  expense. Nothing fancy about it.
2        Once it got off to a wrong start, it
3  just kind of, you know, kept going. And it was
4  never viewed as anything, you know, of a model that
5  was any kind of super higher risk model where you
6  pay a lot of attention, because it was
7  extraordinarily complex and -- you know, make sure
8  all the time that the darn thing's accurate.
9        This did not fall in that. So I don't
10  know what my CFO would have expected of E&Y because
11  I know he didn't view it either as being a high
12  risk model.
13    Q.    Where did you get the understanding that
14  this was an extremely low risk model?
15    A.    I just told you. You know, it was just
16  recognizing income and expense, and we looked at
17  these transactions, you know, as loans; and so the
18  accounting should have been pretty straightforward.
19  What really happened -- in fact, we brought -- we
20  quit doing off-balance sheet financing for auto
21  lease in...
22    Q.    2000.
23    A.    Okay. And if you look at the accounting
24  from them going forward and all the stuff that's

1  done on a balance sheet, it's right. Okay?
2        And it was only this brief period where
3  the model -- now, the model kept going on all the
4  stuff, it was done on-balance sheet clear through
5  03/04, but the stuff that was done new, it was no
6  longer -- we just quit doing it off-balance sheet
7  because we quit doing everything off-balance sheet
8  in 2000.
9        And then the accounting was 100 percent
10  correct. So again, this thing was used for
11  something that we didn't even do anymore. So it
12  just didn't receive the kind of, you know, scrutiny
13  that you -- that we might have hoped as it turned
14  out.
15    Q.    Who specifically told you that this
16  model was an extremely low risk model?
17        MR. BURKE: Objection.
18        MS. PERRY: Objection.
19        MR. BURKE: Asked and answered.
20    A.    Yeah, I just -- I answered that.
21    Q.    I said what person, okay, who
22  specifically?
23    A.    I'm telling you that it was viewed --
24        MS. PERRY: Foundation.

1    A.    -- viewed in the company as not being a
2  high risk model.
3    Q.    By Chris Carey, correct?
4        MR. BURKE: Objection.
5    A.    By the staff, the financing accounting
6  staff.
7    Q.    Okay. Please tell me which individuals
8  you're referring to?
9    A.    You know, I can't get inside the head of
10  every individual. Okay? I can tell you the senior
11  leadership there looked at it as lower risk. That
12  includes Carey, Stollings, and others.
13    Q.    Which others?
14    A.    Boy, would you like to get a list of
15  everybody in the financing accounting area?
16    Q.    No.
17    A.    I don't know everybody that was
18  involved.
19    Q.    Mr. Hoverson, I'm simply asking a
20  question, and you've now partially answered it, and
21  I thank you. I appreciate that. So you said
22  Carey, Stollings, and others. So who else can you
23  remember?
24    A.    Farrenkopf.

Page 238

1    Q.    Okay. Tayfun Tazun?
2    A.    Other than that, I don't know who
3  exactly would have been involved.
4    Q.    All right. Do you see in the fourth
5  paragraph it says, Mr. Gerde reported the size of
6  the problem now appears to be in the area of 130
7  million? Do you see that?
8    A.    I do.
9    Q.    And that's clearly a material number,
10  correct?
11        MR. BURKE: Objection. Mischaracterizes
12    the entire document -- mischaracterizes the
13    section, taking it out of context.
14    A.    And he also said he described this as
15  nonsensical, right?
16    Q.    Well, we're not there yet. It says --
17    A.    I told you it was fluid.
18    Q.    Okay. We're on --
19    A.    We were kind of making sausage here and
20  reporting to the audit committee as we were going.
21    Q.    Okay. We're on Tuesday, February 25th,
22  2003, special meeting of the audit committee. You
23  made a presentation, and at that presentation,
24  Mr. Gerde reports that the size of the problem now

Page 239

1  appears to be in the area of 130 million, correct?
2    A.    Yeah, which was definitely out of
3  Mr. Gerde's area of expertise, I might add, since
4  he's not the chief financial officer. But that's
5  what he said at the time; and obviously, that's not
6  what it turned out to be.
7    Q.    Okay. What did it turn out to be?
8  70-90 million?
9        MR. BURKE: Objection.
10    A.    We can add it up.
11        MR. BURKE: Asked and answered.
12    A.    Let's go add it up.
13        MR. BURKE: We just looked at that.
14    A.    20, 20, add up the numbers. What is it?
15    Q.    Okay. You're talking about the press
16  release --
17    A.    Yeah.
18    Q.    -- that's attached to the CAC?
19    A.    Yeah, those. Add them up.
20    Q.    I believe that comes up to about 70
21  million.
22    A.    All right.
23    Q.    Okay. So this number was overstated,
24  correct?

Page 240

1    A.    Yeah.
2        MR. BURKE: What number?
3        MR. BRAUTIGAM: 130 million.
4    A.    130 million.
5    Q.    Okay. And that's consistent with what
6  you were saying about a fluid transaction, correct?
7    A.    Yeah.
8    Q.    Okay. Do you see in the next paragraph
9  there's a 4(m) agreement, with small "M" in
10  parenthesis?
11    A.    I do.
12    Q.    What does that mean?
13    A.    It's a regulatory matter. Frankly, I'm
14  not really allowed to discuss it.
15    Q.    Are you refusing to answer the question?
16        MR. BURKE: He's just saying he can't
17    discuss it.
18    A.    I'm not allowed by the realtors to
19  discuss this stuff. This is regulatory in nature.
20    Q.    Well, respectfully --
21    A.    If you can get a judge to tell me to say
22  it, I'll be happy to do it, but until --
23        MR. BURKE: So at the very least, I'm
24    instructing him not to answer subject to

Page 241

1  addressing this under protective order
2  because, obviously, this is confidential --
3        THE WITNESS: I can't.
4        MR. BURKE: -- regulatory information.
5        MR. BRAUTIGAM: Okay.
6        THE WITNESS: Yeah.
7        MR. BRAUTIGAM: I accept your
8    instruction. We'll move on.
9        MR. BURKE: We'll deal with it.
10  BY MR. BRAUTIGAM:
11    Q.    Is the 4(m) agreement, whatever it is,
12  something that you would expect the chairman of the
13  audit committee to know?
14        MR. BURKE: Objection to form;
15    foundation.
16    A.    Yeah, I'd just rather not talk about the
17  4(m) agreement.
18    Q.    Okay. Well, a couple weeks ago, I asked
19  Dr. Steger what the 4(m) agreement was, and he
20  didn't seem to have any idea.
21    A.    Yeah, well --
22    Q.    Does that surprise you?
23    A.    It's not around anymore. It's kind of
24  history, old news. There is no 4(m) agreement

Page 242

1  anymore.
2      Q.    Well, my question was a little
3  different.
4      A.    I can't speak for Dr. Steger.
5      Q.    I'm not asking you to.  Does it surprise
6  you a couple of weeks ago Dr. Steger was unable to
7  tell me what it was?
8          MR. BURKE:  Objection.
9      A.    I can't speak for Dr. Steger.
10         MR. BURKE:  Calls for speculation.
11     Q.    You talk about practical issues in the
12 third line from the bottom.
13     A.    The third line -- third paragraph or
14 third line?
15     Q.    Fourth paragraph.  Actually, the fifth
16 paragraph, third line from the bottom in the
17 middle.
18         MR. BURKE:  It's the same sentence,
19     though, correct?
20         MR. BRAUTIGAM:  Yes.
21         MR. BURKE:  I believe -- and you correct
22     me if I'm wrong -- that the witness has
23     already indicated that he's not allowed to
24     discuss the aspects that are discussed in this

Page 243

1      section, you know, because of regulatory
2      confidentiality constraints.
3          MR. BRAUTIGAM:  Got it.  So same
4      instruction?
5          MR. BURKE:  Yeah.
6          THE WITNESS:  Yes.
7  BY MR. BRAUTIGAM:
8      Q.    Let's look at two paragraphs down.  You
9  apparently described the process as, quote,
10 dynamic.  What did you mean there?
11     A.    Just that.  It's moving all over.  You
12 see the 130 million.  The first number you saw was
13 55, I think, so obviously it was jumping around,
14 and it was -- there was -- turned out to be an
15 awful lot of complexity about going back and
16 redoing all these leases and making sure everybody
17 was clear on the right way to do it and then
18 getting the numbers right.
19     Q.    Okay.  In the last paragraph on this
20 page, it says, Mr. Hoverson responded by stating
21 the company needs to arrive at a conclusion before
22 a third-party review could occur.
23     A.    Right.
24     Q.    Conclusion as to what?

Page 244

1      A.    The numbers.
2      Q.    Okay.
3      A.    Our conclusion as to what the correct
4  thing to do here, what are the correct numbers, how
5  they apply, you know, and get all that done before
6  we have this, you know, reviewed by anybody else.
7      Q.    Mr. Hoverson, as this process was
8  unfolding, were you working with Ernst & Young to
9  solve the problem, or were you working within
10 Provident to solve the problem and then present the
11 solution to Ernst & Young for them to approve of or
12 not approve of?
13     A.    It's a little bit of both, which is what
14 happens.  You know, you have to have some agreement
15 as to the way you're going to do it; that they're
16 in agreement -- right? -- with the way you're going
17 to do the accounting, because if they're not,
18 they're not going to sign off on it.
19         So first, you must work with them to
20 determine how to go about doing it and what should
21 be done and what accounting methodology should be
22 used.  Then it's up to us to do it.  Then they
23 check it and audit it to make sure that they agree
24 that it's right before we put it out in public.

Page 245

1      Q.    At this point in time, had Provident
2  essentially bypassed the local engagement team, and
3  were you dealing with national practice directors
4  or other specialists that came in from somewhere
5  else?
6          MR. BURKE:  Objection.  No foundation;
7      vague.
8          MS. PERRY:  Objection to the
9      characterization it bypassed.
10     A.    Yeah, actually, the answer to that is
11 no.  The local engagement team -- the partner on
12 the account, Bill Weiners, was out of Columbus.  He
13 was a banking partner, and we had local staff who
14 worked with us regularly, and then they had their
15 national practice people as well.
16         So it was a real collaboration.  And the
17 local people were always involved because they're
18 the ones who actually did -- who audited what we
19 came up with.
20     Q.    Did you trust the input of the people
21 from Ernst & Young at this point?
22     A.    We did.
23     Q.    How was it decided -- and this is
24 discussed in the first paragraph on the next page

62 (Pages 242 to 245)

Page 246

1    -- that PwC would be brought in?
2        A.    Well, the audit committee, I think, was
3    performing good governance.  And particularly, you
4    have to remember, too, the context at the time --
5    it's in 2003 -- was when governance was at its
6    height.
7              And you've got, you know, obviously a
8    very sensitive issue here, and it goes right to the
9    heart of governance and how it's dealt with by the
10   board and the audit committee.
11             So the audit committee felt strongly
12   that once we, you know, settle on what we're going
13   to do, that they wanted two things.
14             One, they wanted our result looked at by
15   an independent group after -- even after we report
16   it and look at what had happened and, you know, to
17   look at what we'd done.
18             And the fact that E&Y said it was okay
19   and we reported it, they wanted it independently
20   reviewed as well after the fact by an independent
21   party; and in this case, that turned out to be PwC.
22       Q.    Why did you announce the first
23   restatement before you had a second opinion, so to
24   speak, with PwC?

Page 247

1        A.    Because we felt the numbers were right
2    and were comfortable with what we had done, you
3    know, obviously.
4        Q.    If I understand this problem correctly,
5    it went on for a number of years, right?
6              MR. BURKE:  What problem?
7        Q.    Modeling problem.
8        A.    Yeah.
9        Q.    And once it was brought to your
10   attention, it was solved in a matter of weeks,
11   correct?
12       A.    Yes.
13       Q.    Did that ever raise questions?
14       A.    Enormous amount of man hours.  What do
15   you mean raise questions?  I need a quick break.
16             (A brief break was taken from 3:41 to
17   3:46, 5 minutes.)
18             MR. BRAUTIGAM:  Okay.  Back on the
19   record.  Mary Helen, you there?
20             MS. PERRY:  Sure am.
21   BY MR. BRAUTIGAM:
22       Q.    Mr. Hoverson, if I could direct your
23   attention to the page ending 073.  Do you have that
24   in front of you?  The small numbers on the bottom

Page 248

1    right.
2        A.    Okay.
3        Q.    We're now Friday, February 28th, 2003,
4    correct?
5        A.    Okay.
6        Q.    Special meeting of the audit committee?
7        A.    Right.
8        Q.    And you were present in person for at
9    least part of the meeting, correct?
10       A.    Um-hum, yes.
11       Q.    And you referred to FAS 13, auto sales
12   lease back review of accounting methods, correct?
13       A.    Yeah, I'm looking at it.  Yeah.
14       Q.    Are you familiar with something known as
15   the units method?
16       A.    This is an E&Y term.  I'd never heard it
17   before.  In the interim, that really -- I don't
18   believe that's what was done, although I'm not
19   sure.
20       Q.    What was your understanding of the units
21   method?
22       A.    As I said, I'm not really sure.  I
23   remember -- it was not something I'd ever heard
24   before.  Let's see what it says here.  (Examining

Page 249

1    document.)  It was not anything I was familiar with
2    before this.  I don't remember if we ended up using
3    it or not.  We'd have to go further to find out.
4        Q.    It doesn't seem it was actually used.
5    Is that your recollection?
6        A.    Yeah, but I'm not sure.  I'm not sure
7    what ended up being used.  I remember when it was
8    discussed and it was new to everybody, and...
9        Q.    Could you describe how the units method
10   worked?
11       A.    I can't.
12       Q.    Okay.  On the second page, 074, it says,
13   Mr. Hoverson added that E&Y's national offices,
14   quote, solidly, unquote, on the units method, but
15   he does not know yet why they are now taking this
16   position.
17       A.    Right.
18       Q.    Do you see that?
19       A.    I do.
20       Q.    Did it turn out that E&Y's national
21   office was not so solidly behind the units method?
22       A.    I would have to go further, but as I
23   said before, this was very fluid.  We'd have to go
24   probably to the next meeting and see.

63 (Pages 246 to 249)

Page 250

1  Q.  Okay.  Well, we're not there yet, but --
2  A.  Right.  Again, this is kind of a work in
3  progress --
4  Q.  All right.
5  A.  -- that you're reading.  We're reporting
6  everything -- everything that happened was reported
7  to the audit committee.
8  Q.  Did what Ernst & Young was telling you
9  or not telling you or changing inspire confidence
10  in their abilities at this point?
11      MR. BURKE:  Objection to form.
12      MS. PERRY:  Objection to form.
13      MR. BURKE:  Assumes facts not in
14  evidence.  You may answer.
15  A.  Yeah, it -- the whole thing was, you
16  know...  Folks seemed confused as to what to do.
17  It took them a while.
18  Q.  Okay.  On page 3 of these minutes ending
19  075 in the third full paragraph, there's a
20  reference to a drop dead date concerning the 4(m)
21  agreement.  That's regulatory stuff, correct?
22  A.  Yes, it is.
23  Q.  And per Mr. Burke's instruction, you
24  can't talk about that right now under these

Page 251

1  circumstances, correct?
2  A.  Right.
3      MR. BURKE:  Same instruction,
4  Mr. Brautigam.
5  A.  Yeah.
6  Q.  Okay.
7  A.  It's not really relevant either.
8  Q.  Was it your practice to read audit
9  committee minutes?
10  A.  Not always, but, you know, I read them
11  pretty regularly.  These, I certainly did --
12  Q.  Okay.
13  A.  -- because I was involved in the
14  meetings.
15  Q.  Right.  But you weren't a member of the
16  audit committee?
17  A.  Correct.
18  Q.  You weren't excluded from reading the
19  minutes, correct?
20  A.  That's right.  No, I could.  But I, you
21  know, get other things on audits.  So I generally
22  know what's going on.
23  Q.  Let's jump to the March 3rd, 2003,
24  special meeting of the entire board.  Do you see

Page 252

1  that?  078.
2  A.  All right.
3  Q.  Now, this meeting was called to order at
4  9:00 a.m., correct?
5  A.  That's what it says.
6  Q.  And you opened the meeting by stating
7  that the matter is not yet finalized, correct?
8  A.  Correct.  That's what it says.
9  Q.  Did that concern you at this point?
10      MR. BURKE:  Objection to form; vague.
11  I'm not sure what you're referring to.
12  A.  It was a drawn-out process.
13  Q.  There were some indications that you
14  wanted to make the announcement in February, but
15  for whatever reason, it didn't happen, correct?
16      MR. BURKE:  Objection to the
17  characterization; assumes facts not in
18  evidence.
19  A.  Yeah, we would have liked to have made
20  the announcement as soon as we could; but you know,
21  we weren't going to until we had it right.
22  Q.  Exactly.  At the very last line of this
23  page, Mr. Pedoto asked which result would be better
24  for the company; and Mr. Carey answered,

Page 253

1  off-balance sheet treatment would be better because
2  this is a credibility issue.  Do you see that?
3  A.  Where's that?
4  Q.  The last paragraph continuing over to
5  the --
6  A.  Yeah.
7  Q.  -- next page.  And Mr. Carey then
8  predicted that E&Y would confirm its long-standing
9  advice that the end result would be off-balance
10  sheet treatment.  Do you see that?
11  A.  I do.
12  Q.  Was that something that Provident was
13  really fighting for?
14      MR. BURKE:  Objection.  Mischaracterizes
15  and assumes facts not in evidence.
16  A.  No.
17      MS. PERRY:  Objection.
18  A.  I mean, it is -- it is what it is.  That
19  had been their position.  That's why it was
20  off-balance sheet.  Obviously, we'd rather not have
21  to change that because, you know -- you know,
22  although it's -- the financial impact -- there
23  really isn't any, because it's already counted
24  capital and all of the other stuff.

64 (Pages 250 to 253)

Page 254

1    But as Chris said, it's a credibility
2 issue. But in the end, you know, we'll do what
3 they say we must do. And if they change their
4 mind, they change their mind, which, as I recall,
5 they did. They made us put it back on-balance
6 sheet.
7    Q.   What do you mean credibility issue?
8    A.   Just that, you know. We've got a
9 restatement, and now, also -- you know, it was
10 off-balance sheet, but it should have been
11 on. That's all.
12    Q.   What is a financial holding company?
13    A.   A financial holding company is a bank
14 holding company -- well, it's a special kind of
15 bank holding company that's allowed -- that has
16 powers to do things other than banking.
17    Q.   Is PFGI a financial holding company?
18    A.   It is not.
19    Q.   Is any Provident entity a financial
20 holding company?
21    A.   No.
22    Q.   In the paragraph that begins,
23 Mr. Hoverson then stated, in the middle of the
24 page --

Page 255

1    A.   Where are you at?
2    Q.   In the middle of the page.
3    A.   Yeah, okay. Get back to this 4(m)
4 stuff.
5       MR. BURKE:  We're having the same
6 instruction on this.
7    A.   To give you the context around that, I'd
8 have to discuss the 4(m) thing. Okay? And I just
9 -- I don't want to do that.
10    Q.   Well, this was --
11    A.   I'm told -- I'm told not to by my
12 regulators.
13    Q.   This was talked about in other
14 depositions to some extent.
15    A.   That's fine.
16       MR. BRAUTIGAM:  And I mean, I understand
17 you're instructing him not to answer. I'm not
18 representing I accept that now.
19       MR. BURKE:  I know you're not waiving
20 any rights.
21 BY MR. BRAUTIGAM:
22    Q.   Certainly the regulators considered this
23 to be a serious matter, correct?
24       MR. BURKE:  Objection.

Page 256

1    A.   Sure. Yeah.
2    Q.   As things turned out, the units method
3 was not acceptable to Ernst & Young, correct?
4    A.   Again, you know, it's kind of what I
5 remember, but this thing went back and forth so
6 many times, you know, it was hard to keep up.
7    Q.   Okay.
8    A.   But my memory of it is we did not use
9 units method.
10    Q.   Now, we're on March 3rd, special meeting
11 of the Provident board of directors.
12    A.   What page?
13    Q.   78.
14    A.   Okay.
15    Q.   And Mr. Carey is predicting that
16 off-balance sheet treatment would be reaffirmed by
17 Ernst & Young?
18       MR. BURKE:  We're now back on where?
19       MR. BRAUTIGAM:  78 and 79.
20    A.   We just talked about that.
21    Q.   My question is, less than 48 hours
22 later, Provident made the initial restatement
23 announcement. I believe the press release is dated
24 7:31 a.m. on March 5th.

Page 257

1    A.   Okay. Well, that's when we release
2 them.
3    Q.   Right. And my question is, when did
4 Ernst & Young arrive at its final decision,
5 whatever it was, between 9:00 on March 3rd and 7:31
6 on March 5th?
7    A.   I can't tell you.
8       MS. PERRY:  Assumes facts not in
9 evidence.
10    A.   Somewhere between there.
11    Q.   Okay. How did you learn of the final
12 decision?
13       MR. BURKE:  Decision as to what?
14    Q.   As to whether or not off-balance sheet
15 treatment would be allowed?
16    A.   I don't remember.
17    Q.   Do you remember the circumstances under
18 which you learned?
19    A.   No. This was -- I don't. I mean, this
20 is an ongoing process. I spent half my time in the
21 CFO's office. I mean, we were all together all the
22 time.
23    Q.   Did everyone agree --
24    A.   It was very fluid.

Page 258

1  Q.   Okay.  Did everyone agree that before
2  the restatement announcement was released on March
3  5th at 7:31 that this was the appropriate way to
4  go?
5  A.   Yes.
6  Q.   And when we say everybody in that
7  previous answer, that would include you, Chris
8  Carey, the entire board of directors, and Ernst &
9  Young?
10       MR. BURKE:  By the appropriate way to
11  go, again are we speaking of off-balance sheet
12  and --
13       MR. BRAUTIGAM:  Off-balance sheet.
14       MR. BURKE:  -- on-balance sheet?
15       MR. BRAUTIGAM:  I'm talking about all
16  the events leading up to the announcement of
17  the first restatement that had been discussed
18  in these board minutes.
19       MR. BURKE:  Wait a minute.  That's a
20  much broader question.  I thought you were
21  talking about did everybody agree that putting
22  it back on-balance sheet was the way to go.
23       MR. BRAUTIGAM:  Correct.
24       MR. BURKE:  Is that what you're talking

Page 259

1  about?
2       MR. BRAUTIGAM:  That's what I'm talking
3  about.
4       MR. BURKE:  Okay.
5  A.   Swell, the on-balance sheet/off-balance
6  sheet thing was very much a sidebar in this thing;
7  not a very big issue.
8       Everybody agreed when we issued the
9  restatement with how we went about it and what we
10  said, including on-balance sheet/off-balance sheet
11  as it was determined by -- everybody was in
12  agreement at the time that that was the correct
13  thing to do.  That was the final determination.
14  Q.   If you believe that the off-balance
15  sheet/on-balance sheet was really a sidebar and not
16  a big issue, what do you think the big issue was?
17  A.   The numbers and the fact that we, you
18  know, had an error that had been there for several
19  years.
20  Q.   Who at Ernst & Young insisted that these
21  transactions be put back on the books?
22  A.   It was a collective decision by them,
23  and they always -- you know, they always agree on
24  whatever position they take.

Page 260

1  Q.   Right.  Which gentlemen or ladies were
2  involved in this process?
3  A.   Well, Rich Huskins was involved.  As I
4  recall, there was some other people that came in
5  from national at the end.  There was another fellow
6  who came in who was the super leasing guy from
7  national office, and I think that's when the final
8  determination was made on how to do it.
9  Q.   And you don't remember the name of the
10  super --
11  A.   I don't.
12  Q.   -- leasing guy?
13  A.   I don't.
14  Q.   Would you turn to the page ending 082,
15  please.  Do you recognize the handwriting on this
16  page?
17  A.   I don't.
18  Q.   Would you just skim through and see if
19  you recognize the handwriting anywhere in the
20  document?
21  A.   (Examining document.)  I see somebody
22  took a day off.  I don't recognize it.  I don't
23  know who it is.
24  Q.   Good enough.  Would you kindly pick up

Page 261

1  Plaintiffs' Exhibit 93.  It looks like this
2  (indicating).
3  A.   Okay.
4  Q.   The first two pages of Plaintiffs'
5  Exhibit 93 are the first page -- or a copy of part
6  of the first page of the Wall Street Journal for
7  March 6th, 2003, and then the jump article, which
8  appeared in the B section; is that right?
9       MR. BURKE:  Objection.  Calls for
10  speculation.  You can answer.
11  A.   The what now?  What's the question
12  again?
13  Q.   The first two pages of document 93 are a
14  copy of part of the first page of the Wall Street
15  Journal from March 6th, 2003 --
16  A.   Yes.
17  Q.   -- and then the article that's
18  referenced.
19       MR. BURKE:  There's no date on this on
20  the second page.  It may be; may not be.  I
21  just don't know.
22  A.   Yeah, might be.  Probably is.  I don't
23  -- you know, I don't...
24  Q.   Okay.

66 (Pages 258 to 261)

Page 262

1   A.   There's no dates on here, so...
2   Q.   And on the first page, it indicates that
3  the firm's shares fell 20 percent.  Is that
4  consistent with your recollection of what happened
5  that day?
6   A.   Um-hum.
7   Q.   And do you remember approximately from
8  what they fell to to where they ended up?
9   A.   Well, they ended up down around $20, as
10  I recall.
11   Q.   It actually dipped into the teens,
12  didn't it?
13   A.   Might have.  Not very long.
14   Q.   What was OHSL trading at in the ten-day
15  period prior to December 3rd, 1999?
16   A.   OHSL?  I have no idea.
17   Q.   Excuse me.  Provident.
18   A.   The date of the transaction?
19   Q.   Yes, the date the merger closed.
20   A.   Around 40, I believe.
21   Q.   I believe it was a little bit above 40.
22   A.   Okay.
23   Q.   What's Provident stock trading at now?
24   A.   Just under 40.

Page 263

1   Q.   And OHSL shareholders who were forced to
2  convert their shares pursuant to the merger who
3  sold in the 20s or even in the teens would have
4  been harmed by the merger, correct?
5       MR. BURKE:  Objection.  Calls for
6  speculation.
7   A.   Yeah, I'm not going to --
8       MR. BURKE:  No causal relationship.  You
9  may answer.
10   A.   I'm not going to comment on that.  I
11  don't have a comment on that.
12   Q.   It's just a mathematical fact, right?
13       MR. BURKE:  No.  Objection.
14   A.   I mean --
15       MR. BRAUTIGAM:  Jim, I'm not ready for
16  your deposition yet.
17       MR. BURKE:  Believe me, you're not.
18   A.   The stock went down to, you know, 20
19  bucks; and, you know, six months later, it was back
20  to more than it was when this happened.
21       So, you know, the stock did what it did.
22  I don't know what they did.  Okay?  You can work
23  your own arithmetic based upon what they did or
24  didn't do.

Page 264

1   Q.   Do you believe that OHSL shareholders
2  who were forced to convert into Provident stock and
3  who did not sell are better off today than if the
4  merger had not taken place?
5   A.   Yeah, I can't -- I have no way of
6  knowing that.  I think it's a fair transaction
7  then, and I think they ought to be happy with the
8  currency they have today.  And we had some bumps
9  along the road, and I wish they wouldn't have
10  happened, but they did.
11   Q.   Mr. Hoverson, you said it was a fair
12  transaction then.  What did you mean by that?
13   A.   Just that.
14   Q.   Is anything that we've discussed
15  regarding the restatement and the fact that
16  Provident's numbers included in Defendants' Exhibit
17  1 were wrong -- does anything indicate that it was
18  not a fair transaction?
19       MR. BURKE:  Objection.  Calls for
20  speculation; assumes facts not in evidence.
21       MS. PERRY:  Join in the objection.
22   A.   Yeah, I mean, again, that was a fair
23  transaction when we did it.  We had a restatement
24  in 2003.  We did.  This affected -- that affected

Page 265

1  the stock price in 2003 for a brief period of
2  time.  I mean, those are facts.
3   Q.   For the OHSL-Provident merger to be a
4  fair transaction, the proxy materials would have to
5  be truthful, accurate, and complete, correct?
6       MR. BURKE:  Objection.  Calls for legal
7  conclusion; calls for speculation.
8   A.   They were truthful.
9   Q.   Were they accurate?
10   A.   Yes, they were accurate, you know, as we
11  submitted them.  Again, we ended up restating the
12  numbers in 2003.  You know the facts.
13   Q.   So --
14   A.   I'm not going to draw conclusions.  The
15  facts are what they are.
16   Q.   And what the facts indicate is that
17  although you believed the financial information to
18  be accurate in 1999, it turns out the information
19  was not accurate, correct?
20       MR. BURKE:  Objection.
21   A.   It turned out --
22       MR. BURKE:  Argumentative.
23   A.   -- that we restated the numbers in '97,
24  '96 -- you know, '97, '98, '99.  That's what it

67 (Pages 262 to 265)

1  turned out.
2      Q.    Okay.  Do you know Joe Hallinan?
3      A.    I don't think so.
4      Q.    Did you ever talk to a reporter from the
5  Wall Street Journal named Joe Hallinan?
6      A.    Not that I remember.
7      Q.    Were you ever quoted in the Wall Street
8  Journal?
9      A.    Could have been, because they quote out
10 of your press release.
11     Q.    Okay.
12     A.    That's what they basically do.
13     Q.    Were you accurately quoted in this
14 document, specifically the Wall Street Journal
15 article?
16     A.    Well, there are quotes around two
17 things.  Blow to our credibility, I said
18 that.  Let's see.  There are quotes around, Due to
19 an improper understanding of the transaction.  I
20 said that.  And there are quotes around, that our
21 prospects remain solid, and I said that.  I think
22 the rest of it -- those are the only quotes.
23     Q.    Okay.  So everything so far is accurate,
24 correct?

1      A.    Yeah, that's right out of the press
2  release, I think, if we looked at it.  Plus, we had
3  a conference call that morning.
4      Q.    Do you agree that the company
5  essentially made two errors:  It booked the auto
6  lease transactions off its balance sheet when they
7  should have been on the balance sheet, and it over-
8  recognized income in the early years of the
9  transactions?
10     A.    Yeah, we --
11           MR. BURKE:  Objection.
12     A.    -- corrected just slightly.  The revenue
13 was not over recognized.  The expense turned out to
14 be under accrued or recognized, whatever you want
15 to say.  And as it turned out, they want it
16 on-balance sheet.
17     Q.    And this had more of an affect on the
18 early years, 1997 to 1999, than on the later years,
19 correct?
20           MR. BURKE:  What had more of an effect?
21     A.    Yeah, it's actually wrong.
22     Q.    Can you explain that?
23     A.    Can I just look at the press release?
24 The larger numbers occurred later, not earlier.

1      Q.    Okay.
2      A.    (Examining document.)
3      Q.    Mr. Hoverson, was it Provident's intent
4  to record these transactions off-balance sheet?
5      A.    I don't know what you mean by that.  You
6  -- it's not a choice.  You either are required to
7  or you're required not to, depending upon their
8  evaluation of the transaction.  And their initial
9  evaluation was they -- you're required to -- you
10 know, to record them off-balance sheet.  It's not
11 -- you don't get to choose this stuff.
12     Q.    Didn't Provident deliberately seek out
13 off-balance sheet transactions for these leases?
14     A.    Not to my knowledge.
15     Q.    Okay.  Would you turn to the page ending
16 912, please.
17     A.    In the back?
18     Q.    Yes, sir.
19     A.    Okay.
20     Q.    Do you agree with the statement that
21 earnings restatements rewrite a company's history
22 generally in unflattering ways?
23     A.    Yeah, this is --
24           MR. BURKE:  Objection.  Vague;

1  argumentative.
2      A.    Yeah, this is --
3           MR. BURKE:  Calls for speculation.
4      A.    This is Yahoo.  You know, this is their
5  spin on it.  This is their spin, not our
6  spin.  Okay?  They can say what they want.
7      Q.    Do you agree with that?
8      A.    It's not what we said.  It's not what I
9  said.  It's not what I'm saying now.  I said it
10 over and over again what it was.
11     Q.    Okay.  Do you agree with Mr. Min's
12 opinion?
13           MR. BURKE:  Mr. Min Woo of NYU's
14 department of accounting?
15           MR. BRAUTIGAM:  Yes.
16     A.    We restated our numbers.  Okay?  Period.
17     Q.    Do you see Mr. Carey is quoted at the
18 bottom of this page, going over to the next page,
19 At some point, we expect to go out and tell people
20 face to face exactly where why it happened and
21 exactly why it won't happen again.  Do you see
22 that?
23     A.    Yeah, where are you at?
24     Q.    Very bottom of the first page going over

Page 270

1 onto the second page.
2 A. Okay.
3 Q. Was Mr. Carey authorized to speak on
4 behalf of Provident?
5 MR. BURKE: Are you asking him whether
6 he can confirm that as his statement, or are
7 you just asking him to --
8 MR. BRAUTIGAM: No. Did he see that.
9 MR. BURKE: Yeah, okay. That's fine.
10 All right.
11 A. I don't know if he said it.
12 Q. I didn't ask you that. Was he
13 authorized to speak on behalf of Provident?
14 A. Sure.
15 Q. Did you ever go out and tell people
16 exactly what happened and why it won't happen
17 again?
18 A. Well, we went on the road. I can't
19 remember when we went. It was quite a while
20 though -- and talked about you do -- you know, you
21 gotta face up.
22 Q. Did you speak largely to institutional
23 investors?
24 A. Yeah.

Page 271

1 Q. Were these generally described as road
2 shows?
3 A. Yeah. I guess you could call them road
4 shows. They weren't really road shows in the
5 classic sense of selling stock.
6 Q. Where did you go?
7 A. You would go to New York or -- typically
8 New York or Boston. I don't recall that we did
9 much of this, frankly.
10 As it turned out, I spoke at a
11 conference in -- sometime mid last year and
12 certainly addressed it in that public forum. We
13 went on the road pretty late. We didn't do a lot
14 of the road stuff.
15 Q. When you went --
16 A. The market seemed to move on from it,
17 you know.
18 Q. When you went to this conference, where
19 was it?
20 A. Cleveland.
21 Q. Did you have a script?
22 A. Yeah.
23 Q. Were you accompanied by Mr. Carey?
24 A. No.

Page 272

1 Q. Were you accompanied by anyone from
2 Provident?
3 A. I think Tony was there, but he came in
4 late. I can't remember. Tony might have been
5 there, Tony Stollings.
6 Q. Was this a Power Point presentation?
7 A. Um-hum.
8 Q. Where is this script?
9 A. It's back -- we have it.
10 Q. And what was the thrust of your
11 presentation?
12 A. You know, what they always are, an
13 explanation of the company; you know, what the
14 company's made up of. It's always about the
15 future, right? -- that's all they're interested
16 in -- and your prospects and talk about your
17 various business lines; how they're doing; where
18 your weaknesses are; where your strengths are, that
19 sort of thing. And in this particular -- you know,
20 you have to acknowledge a restatement. You can't
21 just act like it didn't happen.
22 Q. Would you look at the last paragraph of
23 this document, page 913?
24 A. Yeah.

Page 273

1 Q. Do you agree that by keeping these
2 transactions off-balance sheet, Provident gave the
3 appearance that it had more capital and higher
4 income?
5 A. That's wrong.
6 Q. Why?
7 A. Just is. Doesn't affect income at all,
8 number one. Income is reported the same way if you
9 have it on-balance sheet or off-balance sheet. And
10 secondly, the capital issue, you have to capital
11 charge either way. Those are federal capital
12 rules. Capital is the same.
13 Q. Could you turn to page 916, please. Do
14 you know who Jeff McKinney is?
15 A. Yes.
16 Q. Did you ever have a conversation with
17 Mr. McKinney?
18 A. I'm sure I did.
19 Q. The headline says --
20 A. Which Jeff does it right, by the way, he
21 says.
22 Q. It says Provident error faulted, expert
23 decision made return on assets seem higher.
24 A. Yeah, that's a bunch of BS.

69 (Pages 270 to 273)

Page 274

1  Q.  And it says --
2  A.  The implication is that we did it to
3  increase our return on assets, which would mean we
4  committed a fraud to -- that's kind of what he's
5  implying, which is bullshit.
6  Q.  Did you ever write a letter to the
7  Enquirer and say this is bullshit?
8  A.  No, we don't get down and fight in the
9  mud with newspapers.
10  Q.  The first paragraph reads, A decision to
11  keep some accounting items off Provident Financial
12  Group, Inc.'s, balance sheet could have stemmed
13  from a desire to make the Cincinnati banking
14  company's returns appear higher than they were, a
15  banking expert said Thursday.  Do you see that?
16  A.  I remember the comment.  I don't see it,
17  but I remember the comment.  It's just total
18  speculation.  There's no facts.
19  Q.  It's the first paragraph.
20  A.  Okay.
21  Q.  And you don't believe --
22  A.  That's newspaper -- that's selling
23  newspapers.  That's all that is.
24  Q.  And you certainly don't believe there

Page 275

1  was any intentional wrongdoing, correct?
2  A.  There wasn't any intentional wrongdoing.
3  Q.  And do you believe that, whether there
4  was intentional wrongdoing or not, keeping these
5  items off the balance sheet made Provident's
6  returns appear higher than they were known?
7  MS. PERRY:  Objection to the form.
8  A.  No.  The fact that the leases were
9  off-balance sheet would impact the ROA calculation.
10  That's a fact.
11  Q.  Would you look at the page ending
12  918.  There's a quote from some so-called expert,
13  and it says, He can make a company look more
14  valuable than its peers, which in turn could help
15  boost the stock valuation.  Do you agree with that?
16  MR. BURKE:  Objection.  Calls for
17  speculation.
18  MS. PERRY:  Join in the objection.
19  A.  It isn't what's going on here, and this
20  guy just speculating on, you know, gee, if it was
21  this and this and this and this and this and this
22  and this, then it would be this.  That's all that
23  is.
24  Q.  Do you know Mr. Taparia (phonetic)?

Page 276

1  A.  No, never heard of him.  He's a
2  professor.
3  Q.  You agree that as a matter of math,
4  keeping the leases off the books would make the
5  return on assets appear higher, correct?
6  A.  Yes, I do.
7  Q.  Would you turn to the next page.
8  A.  My favorite headline.
9  Q.  That couldn't have been easy for you
10  that day, correct?
11  A.  No, it was not.
12  Q.  Did you ever talk with John Newberry?
13  A.  No, I didn't.
14  Q.  So he quoted from the press releases?
15  A.  No.  He talked to Chris.
16  Q.  Okay.
17  A.  He kind of asked him a beat-your-wife
18  question, and Chris made a mistake of answering
19  it.  Are you Enron?  No, we're not like -- are you
20  like Enron?  No, we're not like Enron.  What a
21  great headline.  We're not Enron.  Provident says
22  we're not Enron.  That's how that happened.
23  Q.  Mr. Carey talks about stopping the
24  practice in 2000 so it would be hard to say we're

Page 277

1  trying to hide something.  Do you see that?
2  A.  Where do you see that?
3  Q.  Very bottom of the first paragraph going
4  over to the top of the second.
5  A.  Okay.
6  Q.  And you talked about what had happened
7  in 2000 and how you had stopped the practice of
8  recording certain leases off-balance sheet,
9  correct?
10  A.  Yeah, we actually stopped recording all
11  off-balance sheet stuff.  We started recording
12  everything we had on-balance sheet.
13  Q.  Would that have been a logical time to
14  go back and look at the model?
15  MR. BURKE:  Objection.  Calls for
16  speculation.
17  A.  Obviously, we didn't think so.
18  Q.  Why not?
19  A.  We didn't think there was anything wrong
20  with it.  Hell, when it was looked at, they didn't
21  think there was anything wrong with it when we
22  found the error.
23  Q.  When who looked at it?
24  A.  Our finance and accounting staff who

70 (Pages 274 to 277)

Page 278

1 actually developed -- the way they caught the error
2 is we developed a new model because we wanted more
3 information, and we have investor reporting and all
4 this kind of stuff going along with this, and we
5 wanted to model with more bells and whistles.
6 That's how it -- that's how it came out.
7    Q.    So you wanted a more complex model as
8 opposed to a simple model?
9    A.    Well, it wasn't more complex.  It would
10 do some more stuff for reporting and provide a
11 little more information and make it easier for the
12 accounting people, and that's when it really came
13 out.
14    Q.    What individuals were involved in
15 creating the new model?
16       MR. BURKE:  Objection.  Foundation.
17    A.    Yeah, I can't tell you exactly.  It was
18 some outside people and inside people.
19    Q.    Where did the outside people come from?
20    A.    I don't know.
21    Q.    Was it a consulting firm?
22    A.    No.  It was an individual who had been
23 involved with the original model.  I think that's
24 correct.

Page 279

1    Q.    What's this guy's name?
2    A.    Don't know.
3    Q.    Do you know the name of his company?
4    A.    (Witness shakes head, no.)
5    Q.    Do you agree that leaving items off a
6 balance sheet essentially hides such financial
7 transactions?
8       MR. BURKE:  Objection.
9    A.    No, I do not.  They're fully reported
10 and disclosed in the footnotes.  It's not a choice.
11    Q.    The next article talks about how --
12    A.    Page?
13    Q.    921.  The decision not to account for
14 auto lease financings on its balance sheet was made
15 in consultation with E&Y; is that right?
16       MR. BURKE:  Is what right?  Is that what
17 it says or is that statement right?
18    Q.    Is that statement right?
19       MR. BURKE:  Objection to foundation.
20 You may answer.
21       MS. PERRY:  Objection.
22    Q.    And Mr. Carey --
23    A.    I'm just reading it.  I haven't...
24    Q.    Oh, okay.

Page 280

1    A.    (Examining document.)  That's what he
2 said.
3    Q.    Why was Provident so quick to fall on
4 its sword and specifically to not blame E&Y for
5 these problems?
6       MR. BURKE:  Objection to form.
7    A.    Chris says it's our accounting.
8       MS. PERRY:  Please note my joining in
9 the prior objection.
10    Q.    Do you agree with Mr. Carey's quote
11 that, We let our shareholders down?
12       MR. BURKE:  Objection.
13    A.    I apologized to them.
14    Q.    And even if there were no intentional
15 misconduct and even with your apology, there's
16 really no way of making this up to the OHSL
17 shareholders who were considering merging with
18 Provident in 1999, correct?
19       MR. BURKE:  Objection.  The question
20 makes no sense.  Objection.  Calls for
21 speculation; form.
22    A.    I can't comment on that.
23    Q.    Could you turn to page ending 930,
24 please.  Do you recognize the handwriting on this

Page 281

1 page going over to the next page?
2    A.    I don't.
3    Q.    You can put that aside.  Would you pick
4 up Plaintiffs' Exhibit 91 again, please.
5       MR. BURKE:  Off the record for a second.
6       (Off-the-record discussion.)
7 BY MR. BRAUTIGAM:
8    Q.    Would you turn to page 302 in this
9 document, please.  Would you read to yourself the
10 two paragraphs under, Why did you restate your
11 earnings.
12    A.    Okay.
13    Q.    Do you see the last sentence of the
14 first paragraph reads, PwC subsequently discussed
15 the accounting practice with E&Y, at which time E&Y
16 then agreed that the accounting practice was
17 incorrect; do you see that?
18    A.    I do.
19    Q.    What time frame are we talking about?
20 Is this before or after March 5th of 2003?
21    A.    After.
22    Q.    Did Ernst & Young agree that the
23 accounting practice was incorrect before or after
24 March 5th, 2003?

Williams & Oliver
(513)683-9626

1        MR. BURKE:  Objection.  Asked and
2  answered.
3        MS. PERRY:  Objection.  Foundation.
4     A.     Did...
5        MR. BURKE:  Under the accounting
6  practice --
7     A.     Who's agree or disagree with whom and
8  what?  You asked a very general -- read the
9  question.
10       (Part of the question was read back.)
11    A.     What's the accounting practice mean?
12    Q.     The accounting practice as it's used in
13  this document.
14    A.     That's not good enough.  What do you
15  want to know?  Get specific.
16    Q.     Mr. Hoverson, I'm afraid I can't get
17  more specific than that.
18    A.     Yes, you can.
19    Q.     This is a document that went out over
20  your signature, I believe.
21    A.     I'm happy to answer the questions.  Just
22  ask me a little clearer what dates and whom and
23  what you're looking for.
24    Q.     Okay.  I'm focused on this sentence, and

1  it says --
2     A.     Which sentence?
3     Q.     PwC subsequently discussed.  Are you
4  with me?
5     A.     Yeah.
6     Q.     The accounting practice.  What is the
7  accounting practice referred to in that sentence?
8     A.     The lease accounting.
9     Q.     Okay.  With Ernst & Young --
10    A.     Um-hum.
11    Q.     -- at which time E&Y then agreed that
12  the accounting practice was incorrect.
13    A.     Um-hum.
14    Q.     Now, that implies to me that this took
15  place after March 5th of 2003, correct?
16    A.     I already told you that.
17    Q.     Right.  But my question is, why did E&Y
18  have to agree again if they had already agreed
19  before March 5th, 2003?
20       MS. PERRY:  Objection.  Mischaracterizes
21   the evidence; also assumes facts not in
22   evidence?
23    A.     Yeah, you just don't have it right.  As
24  of March 5th, we reported it.  We restated.  Okay?

1     Q.     Okay.
2     A.     Based upon the way that E&Y wanted us to
3  do it.  Subsequent to March 5th, after a review by
4  PwC, PwC determined that the way E&Y had us do it
5  was not correct.  All right?
6        At that time, based upon facts and the
7  way they were presented by PwC, E&Y agreed with
8  them then, and then we subsequently issued the
9  second restatement on 4/15, I believe it is.  Okay?
10    Q.     So after all the work that went into
11  getting everything right by March 5th -- correct?
12    A.     Um-hum.
13    Q.     It was later determined by PwC that at
14  least part of that work was wrong, correct?
15       MS. PERRY:  Objection.
16       MR. BURKE:  Objection.
17       MS. PERRY:  Assumes facts not in
18   evidence; mischaracterizes the record.
19       MR. BURKE:  Calls for speculation.  You
20   may answer.
21    A.     Yeah, again, we talked about this.  I'm
22  getting tired of telling you things over and over
23  again.
24       This had to do with the finance lease --

1  operating lease issue and the residual value policy
2  and the whole issue of per unit or -- you know, the
3  altogether policy.
4        That was the determination that PwC
5  made.  They felt that our residual value policy was
6  flawed as it relates to FAS 13 and getting FAS 13
7  -- and getting finance lease treatment.  That's
8  what that restatement was about.
9     Q.     So in other words, this Q. and A. only
10  relates to the second restatement?
11    A.     Correct.
12    Q.     Okay.  Now, in the next paragraph,
13  there's a sentence that says, This change in flow
14  will cause earnings to decrease in years going back
15  to 1994, but will cause earnings to increase from
16  2003 to 2009; is that correct?
17    A.     Yes.
18    Q.     Okay.  Does this mean that the numbers
19  that Provident provided to OHSL were higher than
20  they should have been for 1994?
21       MR. BURKE:  Objection.  Calls for
22   speculation.
23    A.     Again, we restated the numbers back.  I
24  don't know if there's a press release around here,

72 (Pages 282 to 285)

Page 286

1  but if there is, we could look at it to see what
2  they were restated, and they would have been
3  restated downward through -- from '94 through 2002.
4     Q.    Okay.  So in 1994, the numbers were too
5  high, correct?
6          MR. BURKE:  Objection.  Calls for
7     speculation; no foundation.
8     A.    The earnings were decreased.  The
9  restatement decreased the numbers in those years.
10    Q.    Okay.  And in 1994, the restatement
11 decreased earnings as well, correct?
12         MR. BURKE:  Same objection.
13    A.    I just said that.
14    Q.    Okay.  Did I say '95 in the previous
15 question?
16         MR. BURKE:  No.  You said '94.
17    Q.    Okay.  In '95, the numbers were
18 decreased as well, correct?
19         MR. BURKE:  Objection.
20    A.    You know.  I don't have the numbers
21 front of me.
22         MR. BURKE:  Right.  I mean, it calls for
23    speculation.
24    A.    If I had them, I could look at them and

Page 287

1  tell you what they did; but the effect from '94
2  through '02 was to restate the numbers downward.  I
3  would have to see them to know exactly each year
4  what happened.
5     Q.    Okay.
6     A.    Okay?
7     Q.    But the effect leading up to the closing
8  of the OHSL-Provident merger on December 3rd, 1999,
9  was that the numbers for year-end '94, '95, '96,
10 '97 --
11    A.    I don't know that.  I'd have to see the
12 numbers.  Okay?
13    Q.    Isn't that what that says?
14         MR. BURKE:  Objection.
15    A.    It says it happened between -- it
16 decreased in years going back to '94.  That's a
17 little -- that's not a very precise comment.  If we
18 had the press release, we can look at it.  Do you
19 have it?
20    Q.    I'll see if we can find it.
21    A.    All right.
22    Q.    Are you familiar with something known as
23 the time value of money?
24    A.    I am.

Page 288

1     Q.    What do you understand that to mean?
2     A.    I understand it to mean that a dollar
3  today is worth more than a dollar a year from now.
4     Q.    And does the first sentence in the
5  second paragraph under, Why did you restate
6  earnings -- this change does not materially impact
7  the total amount of earnings generated -- implicate
8  in any way the time value of money?
9     A.    It does not.
10         MR. BURKE:  Objection to form.
11    A.    No.
12    Q.    Are you familiar with the accounting
13 concept of revenue recognition?
14         MR. BURKE:  Objection.  Calls for
15    speculation; no foundation.
16    A.    I suppose I am in general.
17    Q.    And revenue recognition calls for the
18 numbers to be placed on the books at a time when
19 it's generated, correct?
20         MR. BURKE:  Objection.
21    A.    Yeah.
22    Q.    And it's supposed to be applied
23 consistently to be in conformance with GAAP,
24 correct?

Page 289

1          MR. BURKE:  Objection.  Calls for
2     speculation; no foundation.
3     A.    To the extent it can be, um-hum.
4     Q.    And this 44.4 million dollar restatement
5  is inconsistent with GAAP in the sense that it
6  changes --
7     A.    No, it --
8     Q.    -- the timing of --
9     A.    It is GAAP.  You're required to restate
10 when you determine an error.  Okay?  It's GAAP.
11    Q.    Because the prior accounting was not
12 GAAP, correct?
13         MR. BURKE:  Objection.
14    A.    No.
15         MR. BURKE:  Calls for speculation.
16    A.    You know, again, we did it.  You
17 know, again, we did it.  I've only told you that
18 150 times, but I guess you need it another 150
19 times.
20    Q.    This Q. and A. called for questions to
21 be submitted in a group-wise internal mailbox; is
22 that correct?
23    A.    I don't recall.
24    Q.    On the last page of the document.

73 (Pages 286 to 289)

Page 290

1    A.    If that's what it says.
2    Q.    And it says that all questions will be
3 answered; is that right?
4    A.    That's what it says.
5    Q.    Who answered the questions?
6    A.    It would have been answered, you know,
7 by people up in accounting.
8    Q.    Which people?
9    A.    Probably would have been a collective --
10 Chris would have okayed all the answers.
11    Q.    Would he have looked at all of them?
12    A.    He would have.
13    Q.    And that's Chris Carey, correct?
14    A.    Hum.
15    Q.    Yes?
16    A.    Yes. I'm sure he would have.
17    Q.    Are these Q. and A. maintained in the
18 files of Provident?
19    A.    I can't tell you.
20    Q.    Is it possible that they've been
21 discarded?
22        MR. BURKE: Objection. Possibility is
23    -- if he knows, he can answer. If he doesn't
24    know, he can't speculate.

Page 291

1    A.    I have no idea.
2    Q.    Does Provident have a document retention
3 policy?
4    A.    We do.
5    Q.    What is the policy?
6    A.    I can't tell you. I don't know exactly
7 what it is, but there's a policy.
8    Q.    Can you tell me --
9    A.    I don't administer it.
10    Q.    Can you tell me what it is in broad
11 strokes?
12        MR. BURKE: Objection. Calls for
13    speculation.
14    A.    I really can't. I mean, you know, it's
15 in line with, you know, today's governance stuff on
16 retention of documents.
17    Q.    And would you expect that it calls for
18 the presentation of relevant evidence with respect
19 to a restatement?
20        MR. BURKE: Objection. Don't speculate.
21    A.    Yeah, I can't speculate.
22        MR. BURKE: Calls for speculation.
23    A.    We have one. We follow it.
24    Q.    Do you follow it?

Page 292

1    A.    I don't have anything.
2    Q.    Do you follow --
3    A.    Any documents. All I have are public
4 documents. Those are all retained.
5    Q.    So you do follow policy?
6    A.    Public documents are all retained,
7 period.
8    Q.    When you say public documents, if you
9 send an email to Joe Steger, is that a public
10 document?
11        MR. BURKE: Objection.
12    A.    No. And that would be maintained in
13 accordance with whatever our policy is on
14 maintaining emails. It wouldn't have anything to
15 do with me.
16    Q.    What is the policy of --
17    A.    I don't know.
18    Q.    -- maintaining emails?
19    A.    I don't know.
20    Q.    Do you delete emails?
21    A.    Sure.
22    Q.    Under what circumstances do you delete
23 emails?
24    A.    As soon as I'm done with them, I delete

Page 293

1 them. That doesn't mean they're not retained. I
2 delete them off my computer.
3    Q.    But they're theoretically retained
4 somewhere else?
5    A.    I don't know what goes on elsewhere. It
6 follows the retention policy.
7    Q.    How do you know when you delete a
8 computer off your email, it's retained somewhere
9 else?
10        MR. BURKE: I don't think he said
11    deleted a computer --
12    A.    I don't know for a fact. You know,
13 that's just my operating assumption.
14    Q.    Have you sent emails to anyone related
15 to the restatements?
16    A.    Employee stuff probably, communications.
17 Whether or not this was email or if there was
18 another email on the 5th -- I suspect there was an
19 email on that day.
20    Q.    Have you communicated directly with any
21 of the directors through email?
22    A.    No, I don't.
23    Q.    Have they communicated through email
24 with you?

74 (Pages 290 to 293)

Page 294

1  A.  No.
2  Q.  How about other documents that you
3  personally created such as letters, whatever else
4  you may write?
5      MR. BURKE:  What does how about mean?
6  Q.  Are they subject to the document
7  retention policy?
8  A.  We keep our letters.
9  Q.  Please describe that process.
10     MR. BURKE:  Objection.
11  A.  They're in my folder in my secretary's
12  desk.
13  Q.  Were you ever asked to produce any
14  documents with respect to this litigation?
15  A.  Sure.  We went through all of our files.
16  I don't recall really having anything, but we went
17  through all our files.
18  Q.  Approximately how much time did you
19  devote to that process?
20  A.  Probably a couple hours or so, two to
21  three hours.  Actually, the lawyers came up and
22  went through them.
23  Q.  Lawyers from KMK?
24  A.  No.  Internal.

Page 295

1  Q.  Would you pick up document 94,
2  please.  Take a moment to look at that.
3  A.  (Examining document.)  Okay.
4  Q.  Are you familiar with something known as
5  American Banker Online?
6  A.  No.
7  Q.  Have you ever seen this article before?
8      MR. BURKE:  Talking about this third
9  page?
10     MR. BRAUTIGAM:  And fourth, yes.
11     MR. BURKE:  Okay.  So not the first two?
12     MR. BRAUTIGAM:  Right.
13  A.  It's an article about the restatement.
14  Q.  Okay.
15  A.  I'm sure I read it.
16  Q.  Do you see Mr. Carey's quote, We knew
17  the business wasn't super profitable, and it looked
18  like it was more profitable than it should be?
19  A.  Yeah, I don't know what that means.
20  Doesn't sound like an accurate quote.
21  Q.  Did Mr. Carey ever claim that he was
22  misquoted?
23  A.  I have no idea.
24  Q.  Did he ever write a letter to the

Page 296

1  American Banker Online in an attempt to set the
2  record straight?
3      MR. BURKE:  You mean other than
4  pleadings filed in this case, correct?
5      MR. BRAUTIGAM:  I don't think any
6  pleadings filed in this case were sent to
7  American Banker Online.
8      MR. BURKE:  They certainly indicated
9  that was a misquote; that you had taken it out
10  of context.
11     MR. BRAUTIGAM:  In this case?
12     MR. BURKE:  In our case, yes.
13  A.  Yeah, I have no idea on any of that.
14  Q.  Did you ever try to rein in Mr. Carey
15  and stop him from giving so many quotes to the
16  press?
17     MR. BURKE:  Objection.
18  A.  Mr. Carey was fine.
19  Q.  So you have no idea what he's talking
20  about here, correct?
21  A.  Look, I didn't quote it.  It doesn't
22  sound like anything Chris would say.  The first
23  part does; the second doesn't.
24  Q.  We knew this business wasn't super-

Page 297

1  profitable?
2  A.  We knew that.
3  Q.  Did the model make it appear that the
4  business was more profitable than it should have
5  been?
6  A.  Yeah.
7  Q.  And when did you first know that?
8  A.  When we discovered the error.  They
9  didn't think it was profitable.  Super profitable
10  is different than -- you know, anyway.  It's a thin
11  business -- thin margin business for everybody.
12  Q.  And Provident has largely exited the
13  business, correct?
14  A.  Largely.
15  Q.  Are you familiar with something known as
16  gain-on-sale accounting?
17  A.  I am.
18  Q.  What is gain-on-sale accounting?
19  A.  Gain-on-sale accounting is where you
20  sell the asset and it's written as a gain-on-sale.
21  Q.  And it's an accounting treatment,
22  correct?
23  A.  Yes.
24  Q.  Are there other accounting treatments

75 (Pages 294 to 297)

Page 298

1  that are different from gain-on-sale accounting
2  that could also be used?
3        MR. BURKE: Objection to form; vague.
4        MS. PERRY: Join in the objection.
5     A.   No.  If you're required to use gain-on-
6  sale, you're required to use gain-on-sale, period.
7  And the other way to not use it is to change the
8  nature of what you're doing so it's not required.
9  I mean, again, accounting isn't -- it's not a
10  voluntary thing.
11    Q.   Was Provident ever required to use gain-
12  on-sale accounting?
13    A.   Based on the way we were structuring the
14  transactions through 2000, yes.
15    Q.   And did that change?
16    A.   We changed the structure of them in 2000
17  so we would no longer have to do it.
18    Q.   And you changed the structure to what in
19  2000?
20    A.   The structure of the securitizations.
21    Q.   And --
22    A.   And I can't tell you exactly what we did
23  to do that, but we did.
24    Q.   Okay.  And why did you do that?

Page 299

1     A.   Because we didn't want to treat them --
2  we didn't want to use gain-on-sale anymore because
3  the street wasn't paying us for the earnings.
4     Q.   And that's another way of saying that it
5  was a disfavored accounting methodology, correct?
6        MR. BURKE: Objection.
7     A.   By mid 2000, it was.
8     Q.   And when Provident switched from gain-
9  on-sale accounting to another accounting
10  treatment -- by the way, what was the name of the
11  accounting treatment that you switched to?
12       MR. BURKE: Objection.
13    A.   I'm not sure there's a name of it.
14    Q.   What happened to Provident's stock price
15  when that was announced?
16    A.   Nothing.
17    Q.   It didn't go down significantly?
18    A.   It didn't go down at all.  It already
19  had gone down with the street telling us we don't
20  like this anymore.  So when we -- that's when we
21  stopped.
22    Q.   When you switched, did it go up?
23    A.   Began to go up later that year.
24       (Off-the-record interruption.)

Page 300

1  BY MR. BRAUTIGAM:
2     Q.   Mr. Hoverson, isn't it true that
3  Provident switched from gain-on-sale accounting in
4  August of 2000?
5     A.   I just said that.
6     Q.   And you said that the stock went up
7  toward the end of the year; is that correct?
8     A.   I said the stock didn't move when we
9  went off of it, and then it gradually -- my
10  recollection, it began to go up after that.
11    Q.   After what?
12    A.   After going off gain-on-sale.
13    Q.   How much time elapsed between going off
14  gain-on-sale and the stock going up?
15    A.   I don't recall exactly.
16    Q.   Approximately.
17    A.   I don't recall.
18       MR. BURKE: Objection.
19    Q.   Okay.  Mr. Hoverson, you understand that
20  it's appropriate -- if you can't tell me exactly
21  what happened, then I can then follow up and say,
22  well, approximately.  You understand that?
23    A.   Yeah.  I don't recall.  I'm not going to
24  speculate on it.  The fact's out there.  We can

Page 301

1  look that up.  You want to know?  Look it up.  We
2  can look at it; and I can say, yeah, I agree that's
3  what it did.
4     Q.   Mr. Hoverson, would you pick up document
5  95, please.
6     A.   Okay.
7     Q.   Would you take a moment to look this
8  document over to yourself, please.
9     A.   Okay.
10    Q.   The first page of Plaintiffs' Exhibit 95
11  is an email from Greg Dooley to Todd Klostermann;
12  is that right?
13    A.   That's what it says.
14    Q.   And the date is August 24th of 2001,
15  correct?
16    A.   Um-hum, right.
17    Q.   And it's talking about new auto lease
18  models; is that right?
19    A.   That's the subject.
20    Q.   And Greg Dooley is head of internal
21  audit, correct?
22    A.   He is.
23    Q.   Who's Todd Klostermann?
24    A.   I don't know.  I don't know if he works

76 (Pages 298 to 301)

1  for Greg or if he's in finance. I don't know.
2      Q.    Were new auto lease models being
3  developed in or about August 2001?
4      A.    I can't tell you.
5      Q.    Can you tell me from looking at this
6  document?
7          MR. BURKE: Objection. Asked and
8  answered.
9      A.    Yeah, I don't know how to answer the
10 question. I don't know.
11     Q.    Okay.
12     A.    It's not something I was involved in.
13     Q.    Does it appear that work was being done
14 on new auto lease models in August 2001?
15     A.    It looks to me like they were looking at
16 it.
17     Q.    And the second sentence reads, The
18 examiners have been asking a lot of questions, and
19 too many people are very sensitive and are on edge
20 regarding the topic of securitizations. Do you see
21 that?
22     A.    I do.
23     Q.    Have you ever seen this email before?
24     A.    No.

1      Q.    When did you first learn that anyone at
2  Provident was working on new auto lease models?
3      A.    I couldn't tell you. No idea.
4      Q.    Any idea what year it might have been?
5      A.    Hum-um.
6      Q.    Would it surprise you if work was being
7  done of new auto lease models in 2001?
8      A.    I don't have any knowledge one way or
9  the other, so I wouldn't be surprised one way or
10 the other.
11     Q.    In the second sentence, whom do you
12 believe the examiners refers to?
13     A.    The federal or state examiners I'm sure
14 is who that refers to.
15     Q.    Why would people working on auto lease
16 models be sensitive and on edge regarding the topic
17 of securitizations?
18     A.    I don't know. I don't know that the
19 securitization topic or comment here necessarily is
20 referring to auto lease securitizations either. A
21 lot of securitizations in the company, so I think
22 -- I don't even know for sure what it's referring
23 to. The examiners always looked at that stuff
24 pretty close, all of it.

1      Q.    Why would anything the examiners do make
2  Provident's people sensitive and on edge?
3      A.    It doesn't say that --
4          MR. BURKE: Objection. Foundation;
5      calls for speculation.
6      A.    It doesn't say that's what's making them
7  -- you know, I don't know what he's -- you'd have
8  to ask him.
9      Q.    Doesn't it say that the examiners have
10 been asking a lot of questions, and too many people
11 are very sensitive and are on edge regarding the
12 topic of securitizations?
13     A.    Yes.
14         MR. BURKE: That's what it says.
15     A.    It doesn't say that they're connected.
16 You would have to ask Greg. He wrote it.
17     Q.    What questions is Mr. Dooley referring
18 to in the last line?
19         MR. BURKE: Objection. Calls for
20     speculation; foundation. You may answer.
21     A.    What what now?
22     Q.    Mr. Dooley says, We will go back to the
23 questions after --
24     A.    Oh, I don't know.

1      Q.    -- a, quote, settle down period.
2      A.    I don't know.
3      Q.    What is a settle down period?
4      A.    Don't know.
5      Q.    Who's John Farrenkopf?
6      A.    He's on the finance -- senior VP.
7      Q.    Do you see Tony in the penultimate line
8  of the document?
9      A.    I'm sorry?
10     Q.    Tony -- does that refer to Tony
11 Stollings?
12     A.    Where are you at?
13     Q.    (Indicating.)
14     A.    Yeah, Tony Stollings.
15     Q.    Was Tony Stollings working with new auto
16 lease models in August of 2001?
17     A.    I don't know. Tony Stollings is the
18 chief accounting officer of the bank. He's
19 involved in anything going on. The modeling really
20 fell under Farrenkopf. The model was his
21 responsibility.
22     Q.    And at least from this document, it
23 appears that Mr. Farrenkopf was developing new
24 models in August of 2001, correct?

77 (Pages 302 to 305)

Page 306

```
 1    A.    He was wanting to discuss the new models
 2  with Tony.  I don't know what was on John's mind.
 3    Q.    And this implies that new models already
 4  exist, right?
 5         MR. BURKE:  Objection.  Misstates the
 6  record; assumes facts not in evidence;
 7  mischaracterizes the document.
 8    A.    No, I don't think it does at all.
 9    Q.    Okay.  Turn the page, please.  You said
10  that John Farrenkopf was in charge of the model,
11  correct?
12    A.    Yeah.  He reported in to him.
13    Q.    Who was Michelle Beagle?
14    A.    An analyst; works on auto lease and
15  reporting and worked with the model.
16    Q.    And was she sick at some crucial point?
17    A.    Sick or gone or something.  I don't
18  remember.  There was something about Michelle.
19    Q.    How long was she gone?
20    A.    I can't tell you.  I don't know.
21    Q.    Days?  Weeks?  Months?
22         MR. BURKE:  Objection.  Asked and
23  answered.
24    A.    I don't know.
```

Page 307

```
 1    Q.    Did her departure significantly impact
 2  on fixing the restatement issues?
 3         MR. BURKE:  Objection.  No foundation;
 4  assumes facts not in evidence.  What do you
 5  mean by fixing the restatement?
 6    A.    I thought Michelle was there when we did
 7  the restatement.
 8    Q.    Well, Dr. Steger testified about some
 9  woman being sick, and she was the only one who
10  understood the model, and nothing could get done
11  because she was sick.  And he didn't remember her
12  name, and then I showed him Michelle Beagle on one
13  of the documents, and he seemed to remember this
14  was the person.
15         And do you remember an issue relating to
16  Michelle Beagle's absence?
17    A.    I remember that there was, but I can't
18  tell you how long she was gone.
19    Q.    Okay.  Do you remember if this issue
20  took place in 2003?
21    A.    No, no, no.  I think it was significant
22  -- it was before that.
23    Q.    And --
24    A.    Like '01 or '02.
```

Page 308

```
 1    Q.    And I'm trying to link Dr. Steger's
 2  testimony with her being gone and the 2003
 3  restatements.  Is there any link that you can think
 4  of?
 5         MR. BURKE:  Objection.
 6    A.    There's no link.  No link that I know
 7  of.
 8    Q.    Okay.  Have you had the opportunity to
 9  read the second page of this document to yourself?
10    A.    Yeah.  I just looked at it.
11    Q.    And it seems clear that people at
12  Provident are working on new models for auto lease
13  deals, correct?
14    A.    Yeah, again, my understanding of the new
15  models was driven a lot by getting more
16  information, not necessarily that there was
17  anything wrong with the income recognition off the
18  original model.  That was kind of my understanding
19  from John.
20    Q.    Well, in the second paragraph, it talks
21  about shortcomings of the current models, correct?
22    A.    Yeah, I see that.
23    Q.    And how the new models will address
24  these shortcomings, correct?
```

Page 309

```
 1    A.    I see it.
 2    Q.    And the time table for the whole
 3  project, correct?
 4    A.    I wasn't involved in it, so I don't have
 5  any knowledge of it.
 6    Q.    As CEO, you're ultimately responsible
 7  for the models, correct?
 8         MR. BURKE:  Objection.  Assumes facts --
 9    A.    I've already taken responsibility for
10  this accounting restatement.  Okay?
11    Q.    And the buck stops --
12    A.    As I said, you know, accounting was our
13  responsibility, but I don't know the details of
14  this.  All right?
15    Q.    And the buck stops with you, correct?
16         MR. BURKE:  Objection.  Calls for
17  speculation.
18    A.    I made my comment on that.  Okay?
19    Q.    You see in the last typed line, it says,
20  Based on the complexity of the issue, I'm sure I
21  will be talking to you or someone else in finance;
22  do you see that?
23    A.    I do.
24    Q.    Can you tell me what the complexity of
```

78 (Pages 306 to 309)

Page 310

1  the issue is?
2      A.    That the financings themselves were
3  pretty complex.
4      Q.    What do you mean by the financings
5  themselves?
6      A.    Just that.
7      Q.    If I go and lease a car and finance the
8  lease through Provident, is that complex?
9      A.    That's not what we're talking about
10  here.
11      Q.    Okay.  What are we talking about?
12      A.    We're talking about the securitization.
13  Do you know what a securitization is?
14      Q.    Describe it for me, please.
15      A.    It's a financing where you pledge the
16  asset to an outside group, and they basically lend
17  you money against that asset.  That's a
18  securitization.
19      Q.    The assets are bundled and sold,
20  correct?
21      A.    Yes, or pledged.
22      Q.    What's the difference?
23      A.    They don't have to be sold.
24      Q.    What's the difference between sold and

Page 311

1  pledged?
2      A.    Well, that's the gain-on-sale issue,
3  whether or not they're sold for accounting purposes
4  or just legally.
5      Q.    Who was in charge of finance and
6  securitization accounting in August of 2001?
7      A.    Tony Stollings is in charge of all
8  accounting ultimately.
9      Q.    And Todd Klostermann was involved
10  specifically with --
11      A.    I don't know what Todd does.
12      Q.    Does it appear to you from the first two
13  pages of Plaintiffs' 95 that there was significant
14  concerns with auto lease models going back to
15  August of 2001?
16          MR. BURKE:  Objection.  Misstates the
17      record; assumes facts not in evidence;
18      mischaracterizes the document.  You may
19      answer.
20      A.    No, it doesn't say that to me.  It says
21  to me they want to review it.  Doesn't say that
22  they have significant concerns.  If they would
23  have, they would have raised them.
24      Q.    How would they have raised them?

Page 312

1      A.    To Chris and to me.
2      Q.    Is it ever appropriate for Provident
3  employees to go directly to the audit committee
4  with respect to an accounting problem?
5      A.    If that's what they think they have to
6  do, they're free to do that.  Typically, you
7  wouldn't go to the audit committee unless you felt
8  that it was not being handled internally.  That
9  would be normal protocol.
10      Q.    Will you turn to the third page of the
11  document ending 937.  Who's Mark Von Handorf?
12      A.    Don't know.
13      Q.    Were you aware that revised auto lease
14  securitization models were due to be completed by
15  now, meaning September 9th of 2002?
16      A.    No.
17      Q.    Were you aware that the people working
18  on these auto lease models had some kind of a time
19  table?
20      A.    No.
21      Q.    As of August of 2001, did you believe
22  that everything was fine with respect to the auto
23  lease models?
24      A.    Yeah.

Page 313

1      Q.    As of September of 2002, did you believe
2  that everything was fine with the auto lease
3  models?
4      A.    I had no reason to believe otherwise.
5      Q.    Could you turn to the next page of the
6  document, please.  Do you recognize the handwriting
7  on this page?
8      A.    I don't.
9      Q.    Okay.  Would you turn to the next page.
10  This is an email from you --
11      A.    Right.
12      Q.    -- on 7/29 on ground hog day, March 5th,
13  2003, correct?
14          MR. BURKE:  Objection to the form.
15      A.    Yes.  This was sent out to all
16  associates that morning.
17      Q.    And in the second paragraph, you say,
18  This is a very serious matter, correct?
19      A.    Um-hum.
20      Q.    And you go on to say, However, we are
21  confident that there are no other transactions like
22  these, correct?
23      A.    Yes.
24      Q.    Was the second restatement a transaction

Page 314

1    like this as you used it in that sentence?
2        A.    No. Different.
3        Q.    It was just different. Okay. Would you
4    pick up document 96, please. Let's take a moment
5    to read that to yourself.
6        A.    Okay.
7        Q.    Does this refresh your recollection to
8    the name of the other accounting treatment that you
9    went to from gain-on-sale accounting?
10       A.    I missed that we called it something.
11       Q.    Portfolio approach?
12       A.    I don't think that's a name; just
13   descriptive. Either -- if you don't use gain-on-
14   sale, then you -- gain-on-sale is kind of a thing
15   all its own; otherwise, you're, you know...
16       Q.    Did you say in one of your previous
17   answers about gain-on-sale that you were forced to
18   use it?
19       A.    Well, by the nature of the structure --
20   with the structures -- you know, the way we have
21   them structured, you're required to use it, yeah.
22       Q.    What effect did the change from gain-on-
23   sale have on Provident's earnings?
24       A.    Lowered them going forward.

Page 315

1        Q.    And that's a common sense thing, because
2    if you're recognizing all of the revenue at the
3    very beginning, and you change from that, you have
4    to recognize the revenue all the time, correct?
5        MR. BURKE: Objection to form.
6        A.    Right. Over time, the earnings are the
7    same. It's a question of when you recognize them;
8    but from that point forward for a while, they would
9    be lower. Eventually, they would catch up and be
10   higher.
11       Q.    Didn't the market react in a dramatic
12   way to the change from gain-on-sale accounting in
13   that Provident stock went down significantly?
14       MR. BURKE: Objection.
15       A.    No, it did not. In fact, let's see
16   here. It wouldn't have said anything in here
17   because this was the day -- this was the same day
18   we released this.
19            But as the fact of the matter is, the
20   stock did not go down at all because the street had
21   already discounted it into the numbers by saying,
22   you know, we're not going to stop in giving you
23   credit for these earnings. Our stock price had
24   drifted down already. We were already down before

Page 316

1    we announced this.
2        Q.    Did the stock go up when you announced
3    it?
4        A.    No, it stayed the same. It just didn't
5    kind of move. The street was very much in favor of
6    the announcement. It was applauded.
7        Q.    Would you pick up document 97, please.
8        A.    Okay.
9        Q.    First of all, do you recognize the
10   handwriting on the first two pages of the document?
11       A.    I do not.
12       Q.    At the top of the page --
13       A.    It's all about auto lease, though.
14   That's what it's about.
15       Q.    It says, E&Y was back check. Is that --
16   can you interpret that?
17       A.    Seems to be what it says.
18       Q.    And Joy or Jay was the advisor with the
19   investment bankers. Is there a Joy or a Jay at
20   Provident who had responsibilities in this area?
21       A.    No, not that I know of.
22       Q.    Then there's some bullet points, review
23   the EBO portion of the agreements. Do you see
24   that?

Page 317

1        A.    Um-hum.
2        Q.    What are EBO portions of the agreements?
3        A.    EBO stands for early buy-out.
4        Q.    And --
5        A.    That had to do with -- you know, it was
6    a technical part of the whole determination from
7    the accountant's standpoint.
8        Q.    Did this have to do with
9    securitizations?
10       A.    It had to do with -- yes, it had to do
11   with the financing and then our ability to early
12   buy-out of the financing of the securitization.
13       Q.    And the next bullet point says something
14   like schedule out the GL...
15       A.    I don't know. GL something.
16       Q.    ...by quarter, and then there was some
17   numbers, by company. GL refers to general ledger,
18   correct?
19       A.    I would assume.
20       MR. BURKE: Objection. Calls for
21   speculation. You may answer.
22       Q.    And the B word, could that be balances?
23       MR. BURKE: Objection. Calls for
24   speculation.

Page 318

1    A.    Yeah, I don't know.  Doesn't look like
2  it.
3    Q.    That word is hard to figure out, isn't
4  it?
5    A.    Hum.
6    Q.    All right.  The next bullet point talks
7  about review model inputs and model tie to
8  agreements, and there's a star to the right.  Do
9  you see that?
10   A.    I do.
11   Q.    What does it mean to review model inputs
12  and tie to agreements?
13         MR. BURKE:  Same objection.
14   A.    I don't know.
15   Q.    Next bullet point talks about pull
16  residual review 1999, Randall Horner.  Is that a
17  name of a person who works at Provident?
18   A.    Don't know.  Don't know.
19   Q.    What's a residual review?
20   A.    I don't know what they meant by that.
21   Q.    Was what Provident expected the fair
22  market value of the autos to be after they came off
23  of lease reviewed continually?
24         MR. BURKE:  Objection to form.

Page 319

1    A.    What's the question?
2    Q.    Was what Provident expected the fair
3  market value of the cars to be after they came off
4  lease --
5    A.    They're all insured with the exception
6  of a six-month portion.  So except for that, we
7  wouldn't really care.
8    Q.    Okay.
9    A.    It was looked at, though.  We always
10  managed that as well as we could.  Wanted to
11  maximize the value of the car.
12   Q.    The six-month portion that you talked
13  about, is that sometimes referred to as a gap?
14         MR. BURKE:  Objection.
15   A.    No.
16   Q.    What does that refer to?
17   A.    It means we had a six-month period where
18  we did not insure residuals.
19   Q.    Why not?
20   A.    Thought it was the right economics.
21  Changed our mind.
22   Q.    The third bullet point, there's a box
23  next to pull residual review, and it seems to
24  indicate FMV leases at EBO date.  That's talking

Page 320

1  about fair market value of leases at early buy-out
2  date?
3          MR. BURKE:  Objection.  Calls for
4  speculation.  You may answer.
5    A.    That's how I'd read it.
6    Q.    Do you know what's going on there?
7    A.    No.
8    Q.    Is it possible to tell what the date of
9  these notes are?
10   A.    No, it's not.
11   Q.    All right.
12   A.    It could be -- this could be the first
13  restatement or the second.
14   Q.    Okay.
15   A.    It could be either one.
16   Q.    It says something about understand new
17  model, late '01, received base model, different
18  LKE.  Do you see that?
19   A.    Yeah.
20   Q.    Does this indicate to you that there was
21  a new model that was received in late 2001?
22         MR. BURKE:  Objection.
23  Speculation.  You may answer.
24   A.    No, it doesn't.  I don't know what it

Page 321

1  means.
2    Q.    LKE refers to like-kind exchange, right?
3    A.    That's right.
4    Q.    Can you describe that?
5          MR. BURKE:  Can you describe...
6    Q.    A like-kind exchange.
7          MR. BURKE:  In general?
8          MR. BRAUTIGAM:  Yes.
9          MR. BURKE:  Objection to form;
10  relevance.
11   A.    In general, it means that this was a
12  sale/lease-back transaction where we had sold the
13  automobiles to an entity and leased them back for
14  eight years.
15         We would lease them out for five.  So at
16  the end of the fifth year, we would do what is
17  called a like-kind exchange of the automobile when
18  that automobile came off lease.  And that would,
19  you know, make the guy who owned it whole.  It was
20  a tax structure.
21   Q.    Did you say at the end of the fifth
22  year?
23   A.    Or if that -- if the car went to five,
24  whatever.

81 (Pages 318 to 321)

Page 322

1    Q.    Whatever the lease period is?
2    A.    That's right.
3    Q.    Did Provident have something known as a
4    business unit review?
5    A.    Um-hum.
6    Q.    What is the business unit review as it
7    existed at Provident?
8    A.    We review our business units results on
9    a monthly basis relative to plan.
10    Q.    And who is involved in that?
11    A.    Myself and CFO and division heads; their
12    finance person; Tayfun Tazun.
13    Q.    Is that information reported to the
14    board on a monthly basis?
15    A.    Not always, no.
16    Q.    What is Tayfun Tazun's role at
17    Provident?
18    A.    He's involved in financings, really
19    would be, and he's kind of Chris's number two guy.
20    Although he's not the chief accounting officer;
21    he's the finance guy.
22    Q.    Is Mr. Tazun an accountant by training?
23    A.    No, he's not. It's a Ph.D. in finance
24    -- or economics.

Page 323

1    Q.    Does Mr. Tazun have a particular area of
2    expertise?
3    A.    Finance.
4    Q.    And do you believe that Mr. Tazun is
5    qualified to opine on accounting issues?
6        MR. BURKE: Objection. Calls for
7    speculation.
8    A.    Yeah, I don't --
9        MR. BURKE: You can answer.
10    A.    I don't know how to answer that. He has
11    -- I'm sure he knows some accounting, you know, but
12    he's not who I would ask.
13    Q.    Why not?
14    A.    Ask the CFO. That's what he's there
15    for.
16    Q.    Mr. Tazun worked directly on the auto
17    lease models, correct?
18    A.    I don't know that to be the case.
19    Q.    Do you know if Mr. Tazun submitted any
20    affidavits in this case?
21    A.    I don't know.
22    Q.    You wouldn't consider Mr. Tazun to be
23    independent of Provident if he was a Provident
24    employee, correct?

Page 324

1        MR. BURKE: Objection. Calls for
2    speculation. You may answer.
3    A.    He's a Provident employee.
4    Q.    Do you see on the penultimate line of
5    this document, it says, Stream is negative, dash,
6    servicing is positive?
7    A.    Um-hum.
8    Q.    What does that mean?
9    A.    I don't know.
10    Q.    And below that it says charge-off.
11    What's a charge-off?
12    A.    Charge-off's a charge-off. That would
13    be a bad debt. Credit.
14    Q.    On the left, it says, Issue regards
15    larger income, discussed in ALCO, capital A-L-C-O?
16    A.    That's a liability committee.
17    Q.    And who constituted the asset and
18    liability committee?
19    A.    Myself; Chris; Tayfun; Rob New; a number
20    of other people on the finance staff that monitored
21    our investment portfolio; Jim Gerde, chief risk
22    officer; Ed Times, chief retail officer.
23    Q.    What is the function of the chief risk
24    officer?

Page 325

1    A.    To determine that our process for
2    measuring and controlling risk are adequate.
3    Q.    Does that include the risk that the
4    model on the auto leases would be incorrect?
5        MR. BURKE: Objection. Calls for
6    speculation; foundation. You may answer.
7    A.    Probably not directly. We have
8    developed some new process around that, though. It
9    didn't at the time.
10    Q.    Okay. Would you turn three pages into
11    the document, please.
12        MR. BURKE: 11948?
13        MR. BRAUTIGAM: Yes.
14    BY MR. BRAUTIGAM:
15    Q.    Who's Mark Von Handorf?
16    A.    I don't know. You asked me that before.
17    Q.    Excuse me. I don't mean to be --
18    A.    I think it looks like he's an internal
19    audit guy. This is an internal audit memo.
20    Q.    What are TRACs?
21    A.    A track is a terminal rental adjustment
22    clause, and it's a word of art in the IRS code; and
23    basically is used with autos and trucks and things
24    of that nature where you can have a fixed purchase

Page 326

1  option and still get true lease treatment for tax
2  purposes; a very special kind of lease, TRAC lease.
3  Q.  Do you see the sentence where it says,
4  Leveraged or securitized are considered sales and
5  are off the balance sheet?
6  A.  Yes.
7  Q.  And this was what Provident wanted,
8  correct?
9  MR. BURKE:  Objection.  Asked and
10  answered.
11  A.  Yeah, they were -- can't tell you what
12  we wanted.
13  Q.  Well --
14  A.  I wasn't involved in that.
15  Q.  It didn't just happen that these
16  transactions were structured off-balance sheet; it
17  was an affirmative choice, correct?
18  MR. BURKE:  Objection.  No foundation.
19  A.  Yeah, you'd have to ask the people who
20  did it.  I didn't do it.
21  Q.  Would you turn the page, please.  We're
22  now on 949.  What's the securitization review?
23  A.  It appears to be what it says here.  I
24  don't even know whose document this is.

Page 327

1  Q.  It's hard to figure out, isn't it?  What
2  is your understanding of what a securitization
3  review is?
4  A.  Make sure you're comfortable with what's
5  going on in general.
6  Q.  And you see point 6 there?
7  A.  Yes.
8  Q.  In bold, it says, Analyze accounting
9  model to validate that estimates and assumptions
10  are appropriate; is that correct?
11  A.  That's what it says.
12  Q.  Is this the very same accounting model
13  that led to the 2003 restatements?
14  A.  I would assume it is, but I don't know
15  for sure.
16  Q.  And the date of this document is
17  7/31/01, correct?
18  A.  Um-hum.
19  Q.  And from this document, does it appear
20  that Provident personnel were analyzing the
21  accounting model to validate that estimates and
22  assumptions were appropriate?
23  MR. BURKE:  Objection.  Foundation;
24  calls for speculation.  You may answer.

Page 328

1  A.  Yeah, as I read it, it says John
2  Farrenkopf's working on it.  This looks like it was
3  just kind of a committee review to get an update on
4  everything that was going on.
5  Q.  Actually it says John Farrenkopf is
6  working on a new model?
7  A.  That's what I said.
8  Q.  Is that different from testing the
9  existing model?
10  A.  I suppose.
11  Q.  And it also says an outside consultant
12  has been hired --
13  A.  This is just reporting everything that's
14  been going on regarding securitization --
15  surrounding auto lease securitization, I believe.
16  So there were a number of things going on.
17  Q.  In regard to what type of
18  securitization?
19  A.  Auto lease.
20  Q.  Oh, auto lease.
21  A.  I think that's all it is.  I think they
22  had a meeting, and this is an update on everything
23  going on.
24  Q.  And there were problems with respect to

Page 329

1  the existing auto lease model, correct?
2  MR. BURKE:  Objection.
3  A.  That's not --
4  MR. BURKE:  Misstates the record.
5  A.  That's not what this says.
6  Q.  Okay.  Let's look at this sentence under
7  6.
8  A.  My understanding is that everybody had
9  confidence, you know, that the income was being
10  reported out of that model.
11  Q.  Okay.  But under 6, the last sentence
12  reads, See what the problems are with the current
13  model and how the new one will fix those problems;
14  is that correct?
15  A.  Yeah.
16  Q.  Okay.
17  A.  Doesn't say there were any problems.  It
18  says see what they are.
19  Q.  Well, doesn't that imply to you that
20  there are problems?
21  A.  It doesn't.
22  MR. BURKE:  Objection.
23  Q.  If they weren't sure if there were
24  problems, wouldn't it say, See if there are

83 (Pages 326 to 329)

Page 330

1   problems with the current model?
2          MR. BURKE: Objection.
3     A.   I don't know what it would say, you
4   know.
5     Q.   Okay.
6     A.   I don't know what they meant. All
7   right?
8     Q.   Okay. Were you aware on or about July
9   31st, 2001, that there were problems with the
10  existing accounting model for all auto leases?
11         MR. BURKE: Objection. Asked and
12  answered. You may answer again.
13    A.   No.
14    Q.   Do you believe that this is something
15  that should have been brought to your attention?
16         MR. BURKE: Objection.
17    A.   There weren't any problems that anybody
18  was talking about.
19    Q.   Well, somebody was writing about a
20  problem with the model on 7/31/2001, correct?
21         MR. BURKE: Objection. Mischaracterizes
22  the document; asked and answered.
23    A.   Yeah, I already commented on the
24  document. I don't know what they meant. See what

Page 331

1   the problems are. That doesn't mean there are any.
2     Q.   Well, it goes on to say how the new one
3   will fix those problems, correct?
4     A.   I didn't write the memo. I don't know
5   what they meant.
6     Q.   Does it imply to you that --
7     A.   I'm not going to speculate on what it
8   implies. I don't know what it means.
9     Q.   Can you read number 7 to yourself,
10  please.
11    A.   Yeah, I read it already.
12    Q.   Okay. What is the exchange value that's
13  referenced in the second sentence?
14    A.   I don't know. I would assume that's LKE
15  value, but I don't know.
16    Q.   And the next sentence says, Review the
17  amounts being removed and adjusted back to the GL.
18  What's going on there?
19    A.   Don't know.
20    Q.   What's going on in the next sentence
21  that says, Also, review the analysis of new
22  production being able to fund the deals once
23  accounts are paid off?
24    A.   Don't know.

Page 332

1     Q.   Skip ahead to 952, please.
2     A.   (Examining document.)
3     Q.   Have you ever seen this memo before?
4     A.   No.
5     Q.   When you were informed that there were
6   significant problems with respect to the model, did
7   you gather up information that was related to the
8   model from prior years?
9     A.   I didn't.
10    Q.   Why not?
11    A.   We gathered all relevant information,
12  you know, for this stuff, and that's why you have
13  this. It was all gathered. I didn't do it.
14    Q.   Do you believe that this is relevant to
15  the accounting model?
16    A.   No. This looks to me like it's just,
17  again, a comment on a meeting and that they're
18  gonna -- that they will be performing a review.
19  That's kind of what it says, and it talks about
20  stuff, but it -- you know, that's all it says.
21    Q.   But if all these reviews were performed,
22  how come --
23    A.   We review lots of stuff in the company
24  all the time. That's what audit's there for.

Page 333

1     Q.   Internal audit?
2     A.   Yeah.
3     Q.   But if all these reviews of the specific
4   model were being performed, how come nobody caught
5   it?
6     A.   I can't tell you that. If we would have
7   caught it, we'd fixed it. And we did. We did fix
8   it.
9     Q.   Well, you fixed it too late to provide
10  the correct information to the OHSL shareholders,
11  correct?
12         MR. BURKE: Objection. Argumentative.
13  Move on.
14    A.   I can't comment on that.
15    Q.   You're not going to comment on that?
16    A.   I'm not going to comment on that, no.
17    Q.   Why not?
18    A.   I'm already -- I'm on the record a
19  million times about this. Okay?
20    Q.   Well, when you're answering the
21  questions in a way where you keep saying, well, we
22  fixed it, I think I'm entitled to follow up and say
23  that you didn't fix it in time to affect my
24  clients.

84 (Pages 330 to 333)

Page 334

1    A.    You can say anything you want.
2    Q.    What is an impairment analysis on the
3 models?
4    A.    That would be on models where there's
5 been gain-on-sale. It wouldn't have applied to the
6 auto lease.
7    Q.    Okay. Let's take a look at the last two
8 pages of the documents. What is an actual versus
9 model comparison?
10    A.    I don't know. I've never seen this
11 before.
12    Q.    The first part of this internal memo
13 talks about step 3. Do you have any idea or can
14 you figure out from the context what steps 1 and 2
15 might be?
16    A.    No.
17    Q.    Do you know what the result was of the
18 comparison to determine how the off-balance sheet
19 auto lease securitizations are performing in
20 comparison to the accounting model?
21    A.    No, other than nobody brought anything
22 to anybody's attention that was a problem.
23    Q.    Do you agree that if this testing were
24 done correctly, the problem would have been

Page 335

1 identified in 2001?
2        MR. BURKE: Objection. Calls for
3    speculation.
4    A.    Don't know now how to answer that.
5    Q.    Well, aren't they testing exactly the --
6    A.    I can't -- I can't -- I can't answer the
7 question. I really don't know what they could have
8 done or not done at the time to catch it. I just
9 don't.
10    Q.    Aren't they testing exactly the area
11 that later became a problem?
12        MR. BURKE: Objection.
13    A.    Testing the model.
14        MR. BURKE: Calls for speculation.
15    A.    Testing the model, but -- you know,
16 that's all I can say.
17    Q.    What were they testing the model for?
18        MR. BURKE: Same objection.
19    A.    It would look to me like they were
20 testing it for accuracy.
21    Q.    And did they determine in September of
22 2001 --
23    A.    They must have determined that they were
24 comfortable with it.

Page 336

1    Q.    Did you ever call these people into your
2 office and talk to them?
3    A.    No, I wouldn't have.
4    Q.    Why not?
5    A.    There wasn't any need for it. There was
6 no issue brought to my attention.
7    Q.    But isn't that in itself an issue? Why
8 wasn't this brought to your attention?
9        MR. BURKE: Why wasn't what brought to
10    his attention? He just said the testing
11    showed no problems.
12    Q.    Exactly, but when you found out there
13 were no problems and that the problems went back
14 for many years, why didn't you call these people
15 into your office and demand an explanation?
16    A.    We hired PwC to do that review, and they
17 conducted that review.
18    Q.    Did PwC provide you with some kind of a
19 report at the end of the day?
20    A.    Yeah.
21        THE WITNESS: What can we say about
22    that?
23        MR. BURKE: Yes, you can state that they
24    did.

Page 337

1    A.    Yeah, they did.
2    Q.    Okay. Describe that report to me.
3        MR. BURKE: Objection. Instruct the
4    witness not to answer. It's work product.
5    Q.    What was the purpose of PwC's report?
6    A.    Well, they were hired by the audit
7 committee to do two things; to determine, number
8 one, that the accounting that had been used, or
9 whatever the proper word is, on the 5th of March
10 was, in fact, correct. Okay? And number two, to
11 determine if there was any inside culpability here
12 as to, you know, an intentional misdeed.
13    Q.    Was this report prepared in anticipation
14 of litigation?
15        MR. BURKE: Objection. Instruct --
16    A.    It was prepared because the audit
17 committee wanted to know the answers to those
18 questions.
19    Q.    Describe the report to me. Was it a
20 Power Point presentation; is it a bound volume; how
21 thick is it? In any way you can, please describe
22 it to me?
23    A.    I don't remember, frankly.
24    Q.    Did PwC make a Power Point or other

Page 338

1    presentation to the board?
2        A.    We had presentations to the audit
3    committee.  That's who hired them.
4        Q.    Did you attend the PwC presentation to
5    the audit committee?
6        A.    I did not.
7        Q.    Did you see the report that they
8    produced?
9        A.    I saw a report.
10       Q.    Okay.  Describe what it looked like.
11       A.    Typed, as I recall.
12       Q.    How thick was it approximately?
13       A.    I don't remember.
14       Q.    Are we talking telephone book size?
15           MR. BURKE:  Objection.
16       Q.    Very thin?
17           MR. BURKE:  Asked and answered.
18       A.    I don't remember.  I don't remember.
19       Q.    Was it as thick as this (indicating)?
20       A.    I don't remember.
21       Q.    Where is this document now?
22       A.    I frankly don't know where it is.
23   Obviously, it's in our possession.
24           MR. BRAUTIGAM:  And Jim, your assertion

Page 339

1    is it's work product?
2            MR. BURKE:  Yes.
3            MR. BRAUTIGAM:  Whose work product?
4            MR. BURKE:  Because we hired them, my
5    work product.
6        A.    They were actually --
7            MR. BURKE:  The audit committee hired
8    them.
9        A.    They were actually hired by KMK, and
10   engaged -- the audit committee engaged KMK, who
11   then hired --
12       Q.    Right.  Okay.
13       A.    -- PwC.
14       Q.    Okay.  I thought that's what happened,
15   but I thought your testimony skipped that step.
16       A.    Yeah.
17       Q.    Okay.  But I just want to clarify this.
18   The report was not prepared in anticipation of
19   litigation, correct?
20           MR. BURKE:  Objection.  Calls for
21   speculation.  He's not involved in the
22   retention process.  You may answer.
23       A.    Yeah, again, from my perspective, it was
24   -- it was -- they brought PwC in for governance

Page 340

1    purposes, as they should have.
2        Q.    And you did or did not sit through PwC's
3    presentation?
4        A.    Not to the audit committee.
5        Q.    Did they give a presentation to you?
6            MR. BURKE:  Who?
7        Q.    PwC.
8        A.    I don't remember if I had a
9    presentation, or if we just read the report and
10   talked to one of the senior guys, but I don't
11   remember.
12       Q.    You did read the report, correct?
13       A.    I did read the report.
14       Q.    And you talked to one of PwC's senior
15   guys about the report, correct?
16       A.    Yes.
17       Q.    Okay.  Please tell me what you said and
18   what he said as best you can recall.
19       A.    Well, the essence of it was that -- my
20   question was are you comfortable that this was an
21   unintentional error or not.  That was my main
22   issue.
23           And they indicated that they were
24   comfortable with that, that it was totally

Page 341

1    unintentional.  That was my main thrust.  That's,
2    you know, a credibility issue in the market and we
3    have to make sure what we have going on inside the
4    company.
5        Q.    Did you have secondary thrusts?
6            MR. BURKE:  Objection to form; vague.
7        A.    Yeah, I'm not sure what that means.
8        Q.    You said your main thrust was was there
9    any intentional conduct.
10       A.    In general, how it happened.  I think
11   the general answer was extraordinarily complex
12   transaction, not as well understood within the
13   company as it might have been; and with a lot of
14   people involved in it, when there was a mistake,
15   that probably contributed to the fact it wasn't
16   picked up.
17       Q.    What is so extraordinarily complex about
18   auto leases?
19       A.    Financing itself.
20           MR. BURKE:  Objection.  Asked and
21   answered.
22       A.    The securitizations.  It's complex.
23       Q.    Did you believe that Ernst & Young had
24   the appropriate resources and expertise to perform

86 (Pages 338 to 341)

1  GAAS audits applying GAAP given the complexity of
2  the securitizations?
3          MR. BURKE: Objection. Calls for
4  speculation; no foundation.
5          MS. PERRY: Join in the objection.
6      A.   Yeah, we did.
7      Q.   When did you anticipate that a new model
8  for auto lease securitizations would be
9  implemented?
10     A.   I really wasn't involved in this whole
11 new model/old model thing. I didn't have any
12 expectations about it.
13     Q.   Would you look at page 954. Do you see
14 the subheading that says, Further comparison of the
15 nine off-balance sheet deals at C, dash, 2?
16     A.   Right.
17     Q.   What does C, dash, 2 refer to?
18     A.   I don't know.
19     Q.   And then it says, Three deals have
20 differences of actual rents received less than
21 model on more than one million dollars. Does that
22 appear significant?
23     A.   Not necessarily in the scheme of the
24 whole thing, no.

1      Q.   One deal has a difference of actual
2  rents received greater than model by more than one
3  million. Does that appear significant?
4      A.   It's the other way. Again, in context
5  of the whole transaction, I've got billions in
6  financings here.
7      Q.   Eight of the nine deals have an overall
8  difference of 5.6 percent or less. Does that
9  appear significant?
10     A.   Again, I can't really answer that
11 question.
12     Q.   The 1997, dash, 1 deal makes up over 6.7
13 million of the 8.7 million difference of actual
14 rents less than model. Does that appear
15 significant?
16     A.   Yeah, I don't have any way of commenting
17 on that one way or the other.
18     Q.   What does it mean to have 8.7 million
19 dollars difference of actual rents less than model?
20     A.   I'm not sure other than what it says.
21     Q.   Does that suggest to you that the model
22 is 8.7 million dollars higher than actual?
23     A.   Not necessarily. It says that that
24 particular transaction is 6.7. I guess it does say

1  8.7 than model. Yeah, I don't know what that
2  means.
3      Q.   And the next sentence says, This
4  analysis was reviewed with Michelle Beagle, and she
5  indicated it was an accurate assessment. Do you
6  see that?
7      A.   I do.
8      Q.   And does any of the information directly
9  above that indicate that there is perhaps a
10 significant problem with the model as of September
11 7th, 2001?
12     A.   No.
13     Q.   Michelle Beagle apparently goes on to
14 indicate that management has not set a particular
15 threshold for the models. What does that mean?
16     A.   I don't know what it means.
17     Q.   Why did management not set a particular
18 threshold that the models have to be accurate
19 within a certain percentage?
20     A.   I don't know.
21     Q.   The last sentence on this page going
22 over to the next page says, The percentage is not
23 the issue. It's the fact the models are off and
24 will continue to be off. Do you see that?

1      A.   Um-hum.
2      Q.   Nobody told you about that in September
3  of 2001, correct?
4      A.   No.
5      Q.   In retrospect, is that something you
6  wished the internal people would have told you?
7      A.   No.
8          MR. BURKE: Objection. Calls for
9  speculation.
10     A.   It's not anything that would have, you
11 know, tipped me one way or the other on what was
12 going on.
13     Q.   Why not?
14     A.   Just wouldn't have.
15     Q.   If someone had told you in September of
16 2001 that the models were producing differences in
17 the seven figures, close to eight figures, you
18 wouldn't have been interested in that?
19     A.   Again, you know, folks, you know, didn't
20 deem that this was something that needed -- you
21 know, that was really that big a concern, or it
22 would have been raised. You have billions of
23 dollars of financings here. You know, I don't know
24 how to answer the question. I really don't know.

Page 346

1    Q.    On the top of page 955, When the new
2  models are implemented, the plan will be to adjust
3  books quarterly to reflect actual activity.  Do you
4  see that?
5    A.    I do.
6    Q.    Does that imply to you that from
7  September 7th, 2001, going back the number of
8  years, that the books did not reflect actual
9  activity?
10       MR. BURKE:  Objection.  Misstates the
11    record; assumes facts not in evidence.  That's
12    absolutely inaccurate.
13       MS. PERRY:  Join in the objection.
14    A.    Yeah, I don't know what it means.
15    Q.    Does it suggest to you --
16    A.    I don't know what it implies.  Okay?  I
17  don't know.
18    Q.    Does it suggest to you that the current
19  models are not properly recording what's actually
20  happening on Provident's books and records?
21       MR. BURKE:  Objection.
22    A.    Yeah, I --
23       MR. BURE:  Same Objection.  Calls for
24    speculation.

Page 347

1    A.    I see the memo.  I see what it says.
2  Okay?  I'm not going to try to interpret it.
3    Q.    Mr. Hoverson, do you not understand that
4  that's exactly the purpose of a deposition --
5       MR. BURKE:  Objection.  There's no to
6    need --
7    Q.    -- to attempt to interpret a document
8  such as this?
9    A.    It's not my document.  I didn't write
10  it.  Okay?  I don't know anything about it.  I
11  don't have the context of it, you know.  I don't
12  know.
13       I can't speculate on what was in these
14  people's -- you know, what they were trying to say
15  here.  I see the numbers.  I'll acknowledge that
16  the numbers are what -- you know, that's what they
17  say they are.
18    Q.    And you do you find this memo to be
19  disturbing?
20       MR. BURKE:  Objection.
21    A.    No.
22    Q.    Let's look at the section, Further
23  comparison of the nine off-balance sheet deals at
24  C-2.  Do you see that?

Page 348

1    A.    Yeah.
2    Q.    And first bullet point is, Seven of the
3  nine deals having actual charge-offs less than the
4  model ranging from 8.9 percent to 27.8 percent.  Do
5  you see that?
6    A.    Yeah, where are you at?  Oh, you're back
7  here?
8    Q.    Yes, first bullet point under further
9  comparison of the nine off-balance sheet deals at
10  C-2.  What does that first sentence that I just
11  read mean to you?
12    A.    I don't know what it means.  Those
13  numbers are not anything I really relate to, that
14  8.9 or the 27.8.  You know charge-off levels and
15  this kind of stuff are under one percent.  So I
16  don't know what they mean.
17    Q.    Doesn't it imply to you that the model
18  is off ranging from 8.9 percent to 27.8 percent?
19       MR. BURKE:  Objection.
20    A.    I don't -- I don't know --
21       MR. BURKE:  Mischaracterizes the
22  document.
23    A.    I don't know what it means.  Okay?
24    Q.    Okay.  what does it mean when it says

Page 349

1  two deals of actual charge-offs greater than model
2  by 8.9 percent and 32.5 percent?
3    A.    I don't know.
4    Q.    What does it mean to have an actual
5  charge-off greater than model?
6    A.    I don't know.
7    Q.    What is a charge-off?
8    A.    The credit charge.
9    Q.    And...
10    A.    Losses.  Losses in this portfolio were
11  under one percent, so...
12    Q.    How can you explain --
13    A.    I can't.
14    Q.    Okay.  The last bullet point says,
15  Overall, actual charge-offs are $1,059,668 less
16  than model or 6.8 percent of total model charge-
17  offs.  What does that mean?
18    A.    I don't know.  I don't know.
19    Q.    Next sentence reads, Per Michelle
20  Beagle, a comparison of percentages is not done by
21  management.  Do you see that?
22    A.    Um-hum.
23    Q.    Who was doing the comparison of
24  percentages?

88 (Pages 346 to 349)

Page 350

1    A.    I don't know anything about what is
2  going on here. Okay?
3    Q.    Okay.
4    A.    I have no way of answering any of those
5  questions.
6    Q.    The models are structured in a manner
7  that is inconsistent with reality. Do you see
8  that?
9    A.    I see it.
10    Q.    Does that bother you?
11    A.    I have no idea what it means.
12    Q.    Isn't it fairly plain what it means?
13         MR. BURKE: Objection.
14    A.    No, it's not.
15         MR. BURKE: Apparently not.
16    A.    No, it's not.
17    Q.    Why not?
18    A.    It could be constructed very
19  conservatively, you know. I don't know what it
20  means.
21    Q.    Doesn't it mean the model is wrong?
22         MR. BURKE: Objection.
23    A.    I don't know that it means that at all.
24    Q.    Well, what does it mean to be --

Page 351

1    A.    I don't --
2    Q.    -- structured in a manner --
3    A.    I don't --
4    Q.    -- inconsistent with reality?
5    A.    I don't know. You would have to ask
6  them.
7    Q.    Okay. I will, but for right now, I'm
8  asking you.
9    A.    I don't know.
10         MR. BURKE: And his answer is I don't
11  know.
12    Q.    Generally speaking, putting the document
13  aside for the moment, if I were to come to you and
14  say, Mr. Hoverson, I have a model and it's
15  structured in a way that is inconsistent with
16  reality, would that be something that would concern
17  you as CEO of the company?
18         MR. BURKE: Objection.
19    A.    And I would say, if you said that to me,
20  what do you mean. Okay?
21    Q.    And I would then say --
22    A.    Get a bit more precise.
23    Q.    -- the model is top heavy in its
24  estimate of charge-offs.

Page 352

1    A.    I don't know what that means either.
2    Q.    It uses charge-offs of 50 basis points
3  based on the outstanding balance. The charge-off
4  estimates decrease monthly with the decrease of the
5  outstanding balance?
6         MR. BURKE: Is there a question?
7    Q.    Well, do you see that?
8         MR. BURKE: Yeah, we see that. We're on
9  the document. Everybody sees that. We're
10  reading from it.
11    Q.    In realty, less charge-offs occur at the
12  beginning of the deal that will likely increase
13  over time. Do you see that?
14    A.    I do. This whole thing -- this whole
15  paragraph would appear to be addressing an issue of
16  basically kind of leveling out the charge-offs
17  throughout the deal.
18    Q.    And it's a problem, correct?
19         MR. BURKE: Objection.
20    A.    No, not necessarily at all. They're
21  just taking them in kind of on a -- what they're --
22  you know, on a level basis as opposed to -- they're
23  actually recognizing -- they would imply they're
24  recognizing more charge-offs in front and less in

Page 353

1  back, which would actually hurt income in front and
2  help it in back.
3         And they're just leveling it. Nothing
4  charges off in 60 days. Right? Everybody pays
5  their bills for 60 days. The charge-offs occur a
6  little bit down the road.
7         This is a model. So what they've done
8  is they've modeled in -- I'm assuming. I don't
9  know. Okay? -- that they have modeled in some kind
10  of life approach to the charge-offs and kind of
11  leveled it right consistent with the balance, that
12  over the term, it's going to be 50 basis points.
13         And that's the way we're going to
14  recognize it because it's a model. I think that's
15  -- that's kind of what that implies to me. Doesn't
16  mean there's anything wrong with it.
17    Q.    Okay. The last sentence of the document
18  reads, Management would be concerned -- become
19  concerned if the account shows that actual charge-
20  offs are significantly higher than model charge-
21  offs. Do you agree with that statement?
22    A.    Yeah, probably.
23    Q.    Is that what happened in 2003?
24    A.    No.

89 (Pages 350 to 353)

Page 354

1    Q.    Is that --
2    A.    It's not.
3    Q.    -- at odds with what happened in 2003?
4         MR. BURKE:  Objection to form.
5    A.    Has nothing to do with it.
6    Q.    Would you pick up document number 98,
7    please.
8    A.    I'll be right back.
9         MR. BRAUTIGAM:  Let's take 5.
10        (A brief break was taken from 5:39 to
11   5:49, 10 minutes.)
12        MR. BRAUTIGAM:  It's 5:45 approximately.
13   I intend to stop at 6:00.  I have a wake to
14   attend this evening, and that's the way it is.
15        MR. BURKE:  That is not the way it
16   is.  It's not acceptable to us, Mr. Brautigam.
17        The witness on a prior break has
18   indicated to you that we are here.  We came
19   here to finish this deposition today.  We will
20   stay as long as it takes.
21        The court reporter just calculated how
22   much time remains in the presumptive seven-
23   hour limit that you have under the Federal
24   Rules, and it's only an hour and 17 minutes.

Page 355

1    We're fully prepared to stay here to
2    conclude this deposition.  We're not agreeing
3    to continue it.  We're not agreeing to show up
4    again, because we are affording you the full
5    opportunity today to complete this deposition.
6         And at no time prior to today did you
7    talk to me in terms of there being a need to
8    cut off at 6:00 or anything else.
9         And the witness is here; the witness
10   wants to finish it; the witness is prepared;
11   and we've only got an hour and 17 minutes to
12   go.  So we're not agreeing to terminating, but
13   obviously, you have the right to.
14        MR. BRAUTIGAM:  I just want to point out
15   that in previous depositions, Rachael Rowe has
16   insisted that the deposition stopped at
17   5:00.  I thought that would be the case.
18        You are correct that we did not speak
19   about this specific deposition.  I am also
20   concerned about getting an accurate record
21   because I note that Mr. Hoverson is
22   particularly difficult to take down.
23        And I'm going to continue for a while,
24   and then we'll stop, and I would respectfully

Page 356

1    request that you extend me the courtesy to
2    allow me to attend a wake.  If you are not
3    willing to do that, I'll have to petition the
4    court.
5         MR. BURKE:  You can attend the wake.  I
6    mean, nobody is stopping you from attending
7    the wake.  The bottom line is that we were
8    here to conclude the deposition.  It's your
9    choice to terminate it when you wish.
10        MR. BRAUTIGAM:  Thank you for that
11   courtesy.
12        MR. BURKE:  Thank you.
13   BY MR. BRAUTIGAM:
14   Q.    Mr. Hoverson, do you have document 98 in
15   front of you?
16   A.    I do.
17   Q.    Have you had an opportunity to review
18   Plaintiffs' Exhibit 98?
19   A.    I looked at it.
20   Q.    Who are Lessor Capital Services?
21   A.    I'm not sure.
22   Q.    Were they some financial entity that
23   assisted Provident in structuring its auto lease
24   portfolio financing?

Page 357

1    A.    I would assume that they were one of the
2    firms that made a presentation regarding this.  I
3    don't know if they're the firm we used or not.
4    They could be.  I don't know.
5    Q.    Okay.  How would you describe that?  Are
6    they an investment banking firm or --
7    A.    Again, I'm not sure who Lessor Capital
8    Services is, but the people who presented about
9    this were investment banking firms.
10   Q.    Okay.  Could I direct your attention to
11   the last bullet point on the first page of the
12   document.  Do you see that?
13   A.    Yeah.
14   Q.    And it talks about objectives at the
15   top.  Do you see that?
16   A.    I do.
17   Q.    And it says under this last bullet
18   point, Enable Provident to move leases off-balance
19   sheet and receive rating agency benefits by
20   isolating and measuring the credit and residual
21   risk inherent to the portfolio.  Do you see that?
22   A.    I do.
23   Q.    Was that an objective of Provident in
24   1997?

Page 358

1    A.    I don't recall that it was one way or
2    the other, to be honest with you.
3    Q.    Was it an objective of Provident to move
4    leases off-balance sheet?
5    A.    Again, you know, I don't recall that
6    that was an objective. I wasn't involved. I
7    wasn't the CEO in '97 -- okay? -- when this
8    started.
9    Q.    What was your position in '97?
10   A.    EVP. Auto lease reported to me, but the
11   financing was -- financing area did not report to
12   me.
13   Q.    Was it important to Provident to move
14   the leases off-balance sheet?
15       MR. BURKE:  Objection. Asked and
16       answered a dozen times.
17   A.    I don't know the answer to that
18   question.
19   Q.    What is AMT?
20   A.    I would normally think that would be
21   alternative minimum tax, but I don't know if that
22   applies to corporations. Maybe it does.
23   Q.    I was going to ask you if that applies
24   to Provident?

Page 359

1    A.    I don't know.
2    Q.    Mr. Hoverson, let's talk about your
3    background. Where did you go to college?
4    A.    University of Washington.
5    Q.    Washington, D.C., or Washington State?
6    A.    Washington State.
7    Q.    When did you graduate?
8    A.    1968--1969.
9    Q.    '69?
10   A.    Yes.
11   Q.    And what was your degree?
12   A.    I have a BA in finance and an MBA in
13   finance in '71.
14   Q.    From the same university?
15   A.    Um-hum.
16   Q.    And what was your first job after MBA
17   school?
18   A.    Union Bank in Los Angeles.
19   Q.    And what was your position?
20   A.    Trainee.
21   Q.    And what were your duties and
22   responsibilities as a trainee?
23   A.    All sort of things. Learning how to be
24   a banker; was credit trained, went through their

Page 360

1    credit training program.
2    Q.    And how long were you with Union Bank in
3    Los Angeles.
4    A.    Three years.
5    Q.    What did you do in or about '74.
6    A.    Actually, I was in San Francisco by then
7    with Union Bank. I went to work for Itel
8    Corporation, which is a leasing company.
9    Q.    Itel?
10   A.    I-t-e-l.
11   Q.    What did they lease?
12   A.    Containers and rail cars, things like
13   that, computers.
14   Q.    What was your title?
15   A.    Vice president.
16   Q.    For a specific field?
17   A.    Equipment management.
18   Q.    Did you say equipment management?
19   A.    I did.
20   Q.    And how long were you vice president for
21   equipment management?
22   A.    I went there in '75 actually, I
23   think. Four years.
24   Q.    And did --

Page 361

1    A.    Four and a half years.
2    Q.    -- your duties and responsibilities
3    change?
4    A.    I ended up running the division before I
5    left.
6    Q.    Did you become president?
7    A.    No. I ran the division.
8    Q.    How big a division was it?
9    A.    Ten people.
10   Q.    In terms of revenue?
11   A.    I don't remember.
12   Q.    What was the next stop?
13   A.    The next stop was a company in Chicago.
14   That was one guy and myself for a year.
15   Q.    What was the name of that company?
16   A.    Cap Form.
17   Q.    Cat, c-a-t?
18   A.    Cap.
19   Q.    Cap?
20   A.    Form.
21   Q.    What was the nature of that business?
22   A.    It's equipment management and leasing
23   focused on rail equipment.
24   Q.    Railroad stuff?

91 (Pages 358 to 361)

Page 362

1    A.    Um-hum.
2    Q.    Would you lease a box, container?
3    A.    We didn't do leasing. We just arranged
4    things. You would lease rail cars or locomotives
5    or something like that to a railroad.
6    Q.    And you said this venture lasted about a
7    year?
8    A.    Well, I left it after a year.
9    Q.    So that brings us to '77; is that right?
10   A.    That would bring you to 1980.
11   Q.    I missed a few. What happened in 1980
12   with respect to your career?
13   A.    Helm Financial Corporation, H-e-l-m.
14   Q.    Where was that located?
15   A.    San Francisco.
16   Q.    What was your title?
17   A.    President.
18   Q.    What were your duties and
19   responsibilities?
20   A.    I was a CEO.
21   Q.    How big a company in terms of revenue
22   was Helm?
23   A.    It was pretty small. We started off
24   with only three people. So we were, you know,

Page 363

1    doing deals, transactions, brokering deals, that
2    sort of thing.
3    Q.    What type of deals were you brokering?
4    A.    Rail cars, locomotives, containers,
5    chassis, that sort of thing.
6    Q.    Was this different from leasing?
7    A.    It was an offshoot of leasing.
8    Q.    And how long were you president and CEO
9    of Helm?
10   A.    Five years.
11   Q.    What did do you professionally in or
12   about 1985?
13   A.    Came to work for Provident Bank.
14   Q.    How did that come about?
15   A.    Was recruited.
16   Q.    Through a head hunter?
17   A.    No.
18   Q.    Through someone in the Lindner family?
19   A.    No.
20   Q.    Who recruited you?
21   A.    Allen Davis, the CEO.
22   Q.    How did you know Mr. Davis?
23   A.    I had done business with him.
24   Q.    Through Helm or --

Page 364

1    A.    Um-hum, and Itel.
2    Q.    What was your first title with
3    Provident?
4    A.    I don't honest to gosh remember.
5    Q.    What were your duties and
6    responsibilities when you came here?
7    A.    I was put in charge of their leasing
8    company.
9    Q.    Was that a separate subdivision?
10   A.    It was a subsidiary of the bank,
11   Provident Leasing.
12   Q.    And was that primarily responsible for
13   auto leases?
14   A.    No. It wasn't any auto lease at all.
15   Q.    What kind of leasing did --
16   A.    Same kind of stuff, bigger equipment.
17   Q.    Who would a typical client be?
18   A.    Railroads, airlines, that sort of thing,
19   and, you know, anybody, any corporation. It was
20   all commercial stuff.
21   Q.    Okay. And what was your next position
22   with Provident?
23   A.    I just gradually got -- assumed more
24   responsibility; took over retail. I turned this

Page 365

1    into a commercial finance kind of operation. Then
2    I ended up with all commercial as well, and then
3    trust and financial services. And by the time I
4    was CEO, all the businesses reported to me.
5    Q.    When did you become CEO?
6    A.    '98.
7    Q.    '88?
8    A.    '98.
9    Q.    And when did you go on Provident's
10   board?
11   A.    Then, when I became CEO.
12   Q.    And when you went on the board, did
13   Provident have a chairman of the board?
14   A.    No.
15   Q.    Were you acting chairman of the board
16   immediately?
17   A.    Yeah.
18   Q.    Do you do business with any of the
19   Provident directors?
20   A.    No.
21   Q.    Do any of the board members do business
22   among themselves?
23        MR. BURKE: Objection. You may answer.
24   A.    I have no idea.

92 (Pages 362 to 365)

Page 366

1  Q.    Do you know Judge Beckwith?
2  A.    No.
3  Q.    Do you know Magistrate Judge Hogan?
4  A.    No.
5  Q.    Describe your relationship with the
6  Lindner family.
7        MR. BURKE: Objection. Relevance.
8  A.    So I have to answer that? I mean,
9  they're 40 percent owners of the bank. They're not
10 involved in running the bank, you know, but I talk
11 to them on a regular basis.
12 Q.    Did you talk to them specifically with
13 respect to the restatements?
14 A.    Sure.
15 Q.    Who did you speak with specifically?
16 A.    Craig Lindner. You know what? I'm not
17 sure I did talk to him about that.
18 Q.    Did you --
19 A.    I'd have to go back and check.
20 Q.    Did you attend any meetings with
21 representatives?
22 A.    I think I did inform them, and then they
23 basically waited until it was over.
24 Q.    What did you say to Craig Lindner?

Page 367

1  A.    What I've told you.
2  Q.    And what did he say?
3  A.    He said let me know when you know.
4  Q.    Did you tell him to expect to take a
5  significant hit with respect to the stock?
6  A.    I told him the nature of the situation,
7  I mean, he could speculate on what was going to
8  happen.
9  Q.    He could what?
10 A.    I didn't speculate on what was going to
11 happen.
12 Q.    Was it obvious from the circumstances
13 that the stock would take a steep hit?
14       MR. BURKE: Objection. Calls for
15 speculation.
16 A.    Yeah, it depends on the nature of it.
17 Q.    Do you have a change of control
18 agreement with Provident?
19 A.    I do.
20 Q.    When was this put in place?
21 A.    In February.
22 Q.    Of this year?
23 A.    Um-hum.
24 Q.    And when was the deal finalized?

Page 368

1  A.    February.
2  Q.    Was your change of control put in place
3  before or after the deal was finalized?
4  A.    Before.
5  Q.    Couple days before?
6  A.    A few days.
7  Q.    What does your change of control
8  contract call for?
9        MR. BURKE: Objection. There's no
10 relevance to this. And, you know, if we need
11 to take time to get a protective order on
12 this, we will; but there's no relevance to
13 this.
14 A.    You know, go get what's in the public
15 record.
16       MR. BURKE: That's true. On second
17 thought, you're right. It is in the public
18 record.
19 A.    It's filed.
20       MR. BURKE: So I withdraw the objection.
21 A.    I mean, you can go get it.
22 Q.    Well, I can do that or you can tell me.
23 A.    Three time salary; three times bonus.
24 Q.    What's your salary?

Page 369

1  A.    670.
2  Q.    What's your bonus?
3  A.    400.
4  Q.    So if National City chooses not to
5  include your employment, you're going to get 6
6  million dollars?
7  A.    No.
8  Q.    How much will you get?
9  A.    About 3.3. Three times.
10       MR. BURKE: You add them together, and
11 multiply them by 3.
12 Q.    Got it. How did you come to be CEO of
13 the company?
14 A.    Directors named me CEO.
15 Q.    How long has Provident been without a
16 formal chairman of the board?
17 A.    Ever since I've been with the company,
18 19 years.
19 Q.    Why is that?
20 A.    They just don't have one. There's no
21 need to have one.
22 Q.    Seems an unusual corporate structure.
23 Is that your experience?
24       MR. BURKE: Objection.

93 (Pages 366 to 369)

Page 370

1    A.    No. I mean, a lot of banks have the
2  same person as the chairman and president. I mean,
3  what's the difference if you don't have a
4  chairman? Same thing.
5    Q.    Are you familiar with Sarbanes-Oxley?
6    A.    I am.
7    Q.    What is your understanding of the
8  Sarbanes-Oxley Act?
9        MR. BURKE: Objection. Calls for a
10  legal conclusion.
11        (Off-the-record interruption.)
12    A.    What's the point answering that? The
13  thing is hundreds of pages long.
14        MR. BRAUTIGAM: I think we should stop.
15        (A brief break was taken from 6:03 to
16  6:05, two minutes.)
17        MR. BURKE: Objection. Calls for a
18  legal conclusion.
19    A.    I have no idea how to answer. The thing
20  is hundreds if not thousands of pages long.
21    Q.    What do you do differently after the
22  passing of Sarbanes-Oxley as opposed to before?
23        MR. BURKE: Objection. Irrelevance;
24  calls for legal conclusion. You may answer.

Page 371

1    A.    Frankly, banks don't do a whole lot
2  because we were already pretty firmly regulated
3  on -- an awful lot of stuff that Sarbanes-Oxley
4  prohibits, banks couldn't do anyway.
5        So it didn't -- it hasn't really changed
6  a lot of stuff for us. Obviously all the
7  certifications and all of that stuff is new per
8  Sarbanes-Oxley.
9        But as it relates to things that you're
10  no longer allowed to do, that you used to be able
11  to do, banks couldn't do that stuff anyway. So it
12  really hasn't had a very big impact on banks.
13        We have -- the majority of our directors
14  are independent. We don't have any business stuff,
15  you know, on and on and on and on and on, no insider
16  loans, you know, all that stuff. So it really
17  hasn't had a huge impact on banks in general.
18    Q.    Tell me about the certification.
19    A.    Well, everybody certifies their
20  statements these days.
21    Q.    What does it mean to certify the
22  statements these days?
23    A.    Sign a certification each quarter to
24  certify they're correct to the best of your

Page 372

1  knowledge, and you better have some kind of a
2  process in back of it that gives you good reason to
3  rely on your process to say, to the best of my
4  knowledge, they're okay.
5    Q.    And these certifications have to be
6  based on personal knowledge, correct?
7    A.    To the best of your knowledge.
8    Q.    And describe in greater detail the
9  backup that you were talking about.
10    A.    We create a process that goes out there
11  every quarter and pulls in any issues that people
12  have. It's meant to surface issues if there are
13  any.
14    Q.    And who has to certify -- or file these
15  certifications? The CEO and the CFO?
16    A.    Yes.
17    Q.    Does Sarbanes-Oxley have a preference
18  for whether the positions of chairman and CEO
19  should be split?
20    A.    I don't think so.
21    Q.    Does Sarbanes-Oxley --
22    A.    I don't think it addresses that.
23    Q.    Does Sarbanes-Oxley have any limitations
24  with respect to outside work that the auditors can

Page 373

1  do; in other words, non-audit services?
2        MR. BURKE: Objection.
3    A.    Yeah, I believe it does.
4        MR. BURKE: Calls for legal conclusion.
5  You may answer.
6    A.    I think it does.
7    Q.    What is your understanding of that?
8    A.    Well, you can't have an auditor, for
9  example, being your internal auditor and also
10  auditing your books. You can't have an auditor
11  doing an extensive consulting work for you and
12  being your independent auditor, that sort of thing.
13    Q.    The first part was true even before
14  Sarbanes-Oxley, correct?
15    A.    Should have been if it wasn't.
16    Q.    Does Ernst & Young do any consulting
17  work for Provident?
18    A.    Not really.
19    Q.    Do they do any tax work?
20    A.    They do our taxes.
21    Q.    And does --
22    A.    It's permitted.
23    Q.    Does Sarbanes-Oxley speak to that?
24    A.    Yeah. It permits tax work.

94 (Pages 370 to 373)



Page 374

1    Q.    You said not really with respect to
2  consulting.  That implies to me they do some.
3    A.    They don't really anymore.  We had them
4  look at a couple processes along the way and help
5  us do some things, but they were pretty minor
6  things, not any big deal.
7    Q.    Was that as a result of Sarbanes-Oxley
8  or otherwise?
9        MR. BURKE:  Was what as a result of
10  Sarbanes-Oxley?
11    Q.    The change.
12    A.    I suppose these days, you wouldn't do
13  anything.  It's easier not to.
14    Q.    Mr. Hoverson, do you serve on any other
15  boards of public companies?
16    A.    No.
17    Q.    Do you serve on boards of non-Provident?
18    A.    Um-hum.
19    Q.    Have you ever served on a board of
20  another public company?
21    A.    No.
22    Q.    How many of the board members currently
23  on the board were there when you first became CEO
24  in '98?

Page 375

1    A.    All of them.
2    Q.    So you did not recruit any of the board
3  members?
4    A.    No.
5    Q.    And the composition of the board has
6  stayed the same; is that correct?
7    A.    Yes.
8        MR. BRAUTIGAM:  Mr. Hoverson, it's 10
9  after 6:00.  I'm going to shut this down now
10  because of a personal obligation that I
11  have.  And I thank you for your time.  I hope
12  we meet again.
13        MR. BURKE:  We're obviously reserving
14  our rights as we indicated earlier.  And
15  obviously, the amount time allowed or
16  remaining is even less than an hour at this
17  point in time.  So we believe that we should
18  and could continue tonight.
19        MR. BRAUTIGAM:  Well, I just want to say
20  I don't agree that I'm limited to seven hours.
21  I understand that it's presumptive.
22        This is complex litigation, and this is
23  the CEO of the acquiring company.  So I guess
24  we'll dispute that on the papers.

Page 376

1        MR. BURKE:  Okay.  Fair enough.
2        (DEPOSITION ADJOURNED AT 6:10 P.M.)
3
4
5              ROBERT HOVERSON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 377

1              CERTIFICATE
2  STATE OF OHIO       :
                      : SS
3  COUNTY OF HAMILTON :
4        I, Kelly Green, the undersigned, a duly
5  qualified and commissioned notary public within and
6  for the State of Ohio, do hereby certify that
7  before the giving of the aforesaid deposition, the
8  said ROBERT HOVERSON was by me first duly sworn to
9  tell the truth; that the foregoing is a deposition
10  given at said time and place by the said ROBERT
11  HOVERSON; that said deposition was taken in all
12  respects pursuant to notice as to the time and
13  place; that said deposition was taken by me in
14  stenotype and transcribed by computer-aided
15  transcription under my supervision; and that
16  examination and signature to the transcribed
17  deposition is not waived.
18        I further certify that I am not a
19  relative, employee of, or attorney for any of the
20  parties in the above-captioned action; I am not a
21  relative or employee of an attorney of any of the
22  parties in the above-captioned action; I am not
23  financially interested in the action; I am not, nor
24  is the court reporting firm with which I am

95 (Pages 374 to 377)

Page 378

1  affiliated, under a contract as defined in Civil
2  Rule 28(D).
3      IN WITNESS WHEREOF, I hereunto set my
4  hand and official seal of office at Cincinnati,
5  Ohio, this 5th day of June, 2004.
6
7
8  My commission expires:      Kelly Green
9  August 9, 2004      Notary Public/State of Ohio
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Williams & Oliver
(513)683-9626