# Exhibit A



5889 BRIDGETOWN ROAD • (513) 574-3322 • CINCINNATI, OHIO 45248-3199

### MINUTES

July 22, 1999

A Special Meeting of the Board of Directors of OHSL Financial Corp. was called to order by Chairman Norbert G. Brinker at the law offices of Dinsmore and Shohl, Chemed Building, Cincinnati, Ohio.

The following directors were present: Brinker, Hanauer, Herron, Hillebrand, Hucke, McKiernan, Tenoever and Zoellner. Also present were Clifford Roe of Dinsmore and Charles Crowley and Jeff Moritz from McDonald Investments, Inc.

The purpose of the Meeting was to review the proposed terms offered by Provident Financial Group, Inc. in their non-binding expression of interest letter dated July 21, 1999. McDonald Investments had prepared an analysis for the Board to review during this meeting.

Based on the information that was presented by McDonald, which included a more definitive offer from Provident Financial, and after clarification of Provident Financial's offer and telephone negotiations, the Board concluded that the offer from Provident Financial was the best alternative for enhancing the value of OHSL stock. Upon a motion made by Thomas E. McKiernan, seconded by Joseph J. Tenoever, McDonald was authorized to continue in negotiations with Provident Financial in order to complete a Definitive Agreement. Motion carried with Mr. Herron voting against the motion, and Mr. Hanauer abstaining from the vote.

Mr. Roe pointed out that a decision needed to be reached on the Employment Agreements for Management. Discussion ensued, with Mr. Hanauer being excused from the Meeting. Upon rejoining the Meeting, Mr. Hanauer was informed the Employment Agreements would be executed as presented by Management to the Board.

There being no further business to be discussed at this Special Meeting of the Board, the Meeting was adjourned.

_____          _____
Norbert G. Brinker, Chairman          Kenneth L. Hanauer, President

OHSL 02561



5889 BRIDGETOWN ROAD  •  (513) 574-3322  •  CINCINNATI, OHIO 45248-3199

## MINUTES

August 2, 1999

A Special Meeting of the Board of Directors of OHSL Financial Corp. was called to order by Chairman Norbert G. Brinker at the Imperial House Hotel, Rybolt Road, Cincinnati, Ohio.

The following directors were present: Brinker, Hanauer, Hillebrand, Hucke, Tenoever and Zoellner. Also present were Clifford Roe of Dinsmore and Charles Crowley and Jeff Moritz from McDonald Investments, Inc.

The purpose of the Meeting was to review the final draft of the Definitive Agreement between Provident Financial Group, Inc. and OHSL Financial Corp. and discuss any pending issues.

Discussions centered around the Oak Hills Savings and Loan Company, F.A. Employees' Savings and Retirement Plan, the OHSL Financial Corp. Employee Stock Ownership Plan, insurance coverages for Chairman Norbert G. Brinker and a required technical amendment to the Employment Agreements for Senior Management.

After clarification of Provident Financial's position and telephone negotiations with them, the Board concluded that the Definitive Agreement was satisfactory. Upon a motion made by Joseph J. Tenoever, seconded by William R. Hillebrand, the attached resolutions were unanimously adopted.

There being no further business to be discussed at this Special Meeting of the Board, the Meeting was adjourned.

_____        _____
Norbert G. Brinker, Chairman            Kenneth L. Hanauer, President

# OHSL FINANCIAL CORP.

## RESOLUTIONS APPROVING AGREEMENT AND PLAN OF MERGER
## WITH
## PROVIDENT FINANCIAL GROUP, INC.

**RESOLVED**, that the mergers of OHSL FINANCIAL CORP. ("OHSL") WITH AND INTO PROVIDENT FINANCIAL GROUP, INC. ("PFGI") and OAK HILLS SAVINGS AND LOAN COMPANY ("Oak Hills") with and into The Provident Bank ("Provident") on the terms and conditions as described in and as set forth in the Agreement And Plan of Merger, as such terms and conditions have been finally negotiated and agreed upon on this date, are hereby approved, confirmed and adopted.

**RESOLVED FURTHER**, that the Agreement and Plan of Merger ("Merger Agreement") among PFGI, OHSL, Oak Hills and Provident in the form presented to and explained at this meeting, together with the final terms and conditions that have been negotiated and agreed upon on this date, is hereby approved, confirmed and adopted.

**RESOLVED FURTHER**, that the President and Chief Executive Officer of this Corporation is hereby authorized and directed to execute and deliver the Merger Agreement in the name of and on behalf of this Corporation and the proper officers of this Corporation are hereby further directed and authorized to take all such further action and to execute and deliver, in the name of and on behalf of this Corporation, all regulatory applications and other governmental filings necessary and/or desirable to fully consummate the mergers authorized and approved by these Resolutions, together with all such further documents and certificates required by the terms of the Merger Agreement to fulfill all of the covenants and obligations of this Corporation contained in the Merger Agreement.

**RESOLVED FURTHER**, that the merger of this Corporation described above, together with the Merger Agreement, be submitted to the stockholders of this Corporation as soon as reasonably practicable and that the proper officers of this Corporation are hereby authorized and directed to take all necessary actions to call and hold such meeting.

**RESOLVED FURTHER**, as the sole stockholder of Oak Hills, this Corporation does hereby authorized and approve the merger of Oak Hills with and into Provident, does hereby adopt, approve and confirm the Merger Agreement in the form approved at this meeting which includes the definitive terms negotiated on this date, and does hereby authorize and direct Oak Hills and its officers to take all such further actions as shall be necessary and/or desirable to fully consummate such merger as soon as possible.

**RESOLVED FURTHER**, that the Stock Option Agreement, in the form presented to and described at this meeting is hereby approved, confirmed and adopted on the terms and conditions contained therein and subject to the final terms and conditions negotiated this date, and the President and Chief Executive Officer of OHSL is hereby directed and authorized to execute and deliver such Stock Option Agreement in the name of and on behalf of this Corporation.

OHSL 00041

Exhibit B



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Walter W. Thiemann, on behalf of himself and of all others similarly situated, | : | Case No. C-1-00-793 |
| | : | Judge Sandra S. Beckwith |
| Plaintiff, | : | Magistrate Judge Hogan |
| vs. | : | **AFFIDAVIT OF THOMAS M. HERRON** |
| OHSL Financial Corporation, et al. | : | |
| Defendants. | : | |

**THOMAS M. HERRON**, being duly sworn, deposes and states as follows:

1. I am a former OHSL director and class member in this action.

2. I make this affidavit in further support of Plaintiffs' Motion for Summary Judgment on Unanimity Issues (Doc. No. 315). I have personal knowledge of the facts relating to this affidavit.

3. I have reviewed the response by the OHSL and Provident Defendants (Doc. No. 327) to Plaintiffs' Motion, and I believe that it is materially inaccurate and can mislead the Court.

4. On July 27, 1999, I resigned from the OHSL Board effective July 30, 1999 in part in protest because I opposed the proposed OHSL-PFGI merger and believed that the best business strategy for OHSL at that time was to remain independent.

5. As I indicated in my testimony, I personally called each OHSL director and informed each one of my decision to resign. I also specifically informed each one of them that I was resigning because I fundamentally disagreed with the OHSL-PFGI merger.

6. From my reading of the OHSL and Provident Defendants' response, I believe that they have attempted to use the fact that I did not vote on the final merger on

1

August 2, 1999 as evidence that I could not have opposed it since I never saw the final version of it. However, the final version that was allegedly approved by the OHSL Board on August 2, 1999 did not differ in any material respect from the merger agreement that was presented to the entire OHSL Board on July 22, 1999 and which was included in the Proxy Materials/Registration Statement sent to all shareholders which I have reviewed.

7. I believe that my opposition to the merger with PFGI was obvious to the OHSL Defendants. I had spoken against merging throughout 1999 and before, had consistently voted against proposals that could lead to the sale of the company, and had voted against the proposed merger on July 22, 1999.

8. I ultimately resigned in part in protest because I did not want to be involved in, and responsible for, a transaction with which I deeply disagreed. This was very difficult for me because my family had been associated with Oak Hills for decades, and well before OHSL became a public company. My father had served on the Oak Hills Board for almost 30 years. However, neither my father, nor I, nor many other OHSL shareholders, believed that OHSL should be sold at all.

9. Although my resignation letter was written in the spirit of diplomacy and did not specifically cite any disagreement with the company, there were reasons for expecting my resignation to be disclosed in the Proxy Materials/Registration Statement, and I was very surprised when it was not. First, OHSL's counsel, Cliff Roe, was in the room when I voted against the merger. Second, I felt it was obvious from my voting history, my specific vote against continued negotiations with PFGI on July 22, 1999, my conversations with my fellow OHSL Directors during and before the vote, and then my conversations with my fellow OHSL Directors after my resignation, that I opposed the OHSL-PFGI merger.

10. Although I did cite my need to commit additional time to my job with Michelman, Inc. in my resignation letter as a reason for my resignation, the OHSL Defendants knew and understood that I did so in the spirit of diplomacy. The OHSL Defendants knew that the timing of this resignation did not make any sense unless it was made part in protest since there would be no more OHSL, no more need for OHSL Board meetings, and no more conflicts with business and travel, if the merger was approved, as clearly expected.

11. Similarly, my resignation letter also stated that I would not be exercising stock options to which I was entitled. Although these options were then worth tens of thousands of dollars, I did not exercise because I did not want to profit from, or be associated with, a transaction that I did not believe to be in the best interests of OHSL shareholders, and with which I fundamentally disagreed.

12. Thus, although it might not have been obvious to the average person from reading my resignation letter that I resigned in part in protest, based upon the foregoing, I

2

do not believe that there was any other way that the OHSL Defendants could have interpreted it.

13. I do not believe that it is a coincidence that the date selected for the table listed on page 63 of the Proxy Materials/Registration Statement—July 31, 1999—one day after my resignation became effective—is a chance occurrence, but rather a deliberate attempt to mislead OHSL shareholders by not informing them that I had resigned.

14. On page 7 of their opposition, the OHSL and PFGI defendants state: "Herron admitted he never told his counsel of any objection to or protest of the merger, and never put it in the corporate minutes." This is false, since I voted *against* the OHSL-Provident merger, this vote against was duly recorded in the minutes, and Cliff Roe, presumably the reference to "his counsel," was in the room when I voted against the merger.

15. On page 8 of their opposition, the OHSL and PFGI defendants attempt to analogize my resignation to "readily available industry trends." I do not believe that my resignation—which was never disclosed—is analogous to "readily available industry trends," and I do not follow their presumed reasoning.

16. Also on page 8 of their opposition brief, the OHSL and PFGI defendants state "Second, there is no dispute that Herron's departure from OHSL's Board *was* disclosed." (emphasis in original). The remaining sentences of this paragraph echo this same theme. These statements are false. Since my resignation was *not* disclosed in any part of the Proxy Materials/Registration Statement, I do not understand how the OHSL and PFGI defendants can continue to repeat this misstatement. My resignation—and the reasons behind it, in part in protest—were neither "publicly available" nor "readily determinable," and any statements to the contrary are false.

17. Similarly, the OHSL and PFGI defendants state that "The Information Is Not Material" at page 9. I consider myself to be a reasonable investor, and I take issue with the statements made in this section. I believe that all reasonable investors would care and should be informed as to the actual vote. This is especially true since any reasonable investor reading the Proxy Materials/Registration Statement would conclude that the vote was 8-0, not 7-0 or 5-0, because my resignation was not disclosed.

18. Additionally, a reasonable investor would expect that all of the OHSL Directors believed that the merger was both fair and in the best interests of OHSL shareholders. In other words, even though the merger may have been considered "fair" from a financial point of view at the time, it does not follow that the merger was necessarily in the best interests of OHSL shareholders. As a former OHSL director, I did not believe that the merger with Provident was in the best interests of OHSL shareholders. I have reviewed the testimony of former OHSL's CEO

and Board member Ken Hanauer, and he apparently did not believe the merger was in the best interests of OHSL shareholders. Additionally, while I was a director, Mr. Hanauer had repeatedly told me in words and substance that he did not believe that any merger was in the best interests of OHSL shareholders.

19. Finally, the OHSL and PFGI defendants state that "a reasonable investor voting on a merger in October, 1999 would not care that a director resigned three months earlier, before the merger proposal was finalized when that director voiced no formal opposition in his resignation letter and did not even oppose the OHSL-PFGI merger specifically." (Opposition at 9-10). This, too, I consider to be a false and misleading statement. A reasonable investor—especially those of a smaller community organization who were for the most part long-time customers as well—would certainly care that a director had resigned in part in protest of the proposed merger. While it may or may not change the vote of any particular investor, it is certainly something that a reasonable investor would want to consider and should be entitled to consider. Additionally, as indicated above, there were no material differences between the draft merger agreement that was presented to me and that I voted *against* and the final version of the merger agreement that was later presented to me and all of the other OHSL shareholders. Furthermore, I feel that the OHSL and PFGI defendants attempt to mislead the Court by their reference to an imaginary "three month" gap, when in fact, my resignation was effective only three *days* before the final vote on the OHSL-PFGI merger. This is certainly something that would add to the mix of information that a reasonable shareholder would want to consider.

**FURTHER AFFIANT SAYETH NAUGHT**

_____
Thomas M. Herron

Subscribed to and sworn before me this 25th day of May 2004

**NOTARY PUBLIC**

Stephanie A. Hite

**STEPHANIE A. HITE**
Notary Public, State of Ohio
My Commission Expires
February 16, 2009

4

# Exhibit C

```
                                    1
            COURT OF COMMON PLEAS

            HAMILTON COUNTY, OHIO


                     - - -

JANET NOLTE, et al.,      :

         Plaintiff,       :

    vs.                   :  CASE NO. A-9907039

OHSL FINANCIAL CORP.,     :  VOLUME I
et al.,                   :

         Defendants.      :
                     - - -

         Videotaped deposition of NORBERT
BRINKER, a defendant herein, called by the
plaintiff for cross-examination, pursuant to
the Ohio Rules of Civil Procedure, taken before
me, Lee Ann Williams, a Registered Professional
Reporter and Notary Public in and for the State
of Ohio, at the Imperial House Hotel, 5510
Rybolt Road, Dent, Ohio 45211, on Tuesday,
April 11, 2000, at 8:45 a.m.
```

```
                                                    2
 1   APPEARANCES:
 2       On behalf of the Plaintiff:
 3           Michael G. Brautigam, Esq.
             Gene Mesh & Associates
 4           2605 Burnet Avenue
             Cincinnati, Ohio 45219
 5
         On behalf of the Defendant:
 6
             James E. Burke, Esq.
 7                 and
             Jamie M. Ramsey, Esq.
 8           Keating, Muething & Klekamp
             1800 Provident Tower
 9           One East Fourth Street
             Cincinnati, Ohio 45202
10
     ALSO PRESENT:  Richard Grubb, Videographer
11                     - - -
12                S T I P U L A T I O N S
13       It is stipulated by and between counsel for
14   the respective parties that the deposition of
15   NORBERT BRINKER, a defendant herein, called by
16   the plaintiff for cross-examination pursuant to
17   the Ohio Rules of Civil Procedure, may be taken
18   at this time by the notary; that said
19   deposition may be reduced to writing in
20   stenotypy by the notary, whose notes may then
21   be transcribed out of the presence of the
22   witness; and that proof of the official
23   character and qualifications of the notary are
24   expressly waived.
25                     - - -
```

```
                                    3
                   I N D E X

Examination of NORBERT BRINKER       Page
By Mr. Brautigam:                      4

                     - - -

Brinker Exhibit              Page Identified
    No. 1                          94
    No. 2                         261
    No. 3                         263
    No. 4                         295
    No. 5                         315

                     - - -
```

```
                                                    4
 1              NORBERT BRINKER
 2   having been first duly sworn, testified as
 3   follows:
 4              CROSS-EXAMINATION
 5   BY MR. BRAUTIGAM:
 6       Q.  Good morning, Mr. Brinker.
 7       A.  Good morning.
 8       Q.  Mr. Brinker, my name is Michael G.
 9   Brautigam and I represent Janet Nolte and a
10   class of OHSL shareholders.  Mr. Brinker, could
11   you describe, for the record, where we are
12   today?
13       A.  I don't know the name of this
14   room, but we're in the Dante's Restaurant
15   complex in a private room.
16       Q.  And do you feel comfortable in
17   this room?
18       A.  Yes, sir.
19       Q.  Have you been in this room before?
20       A.  I wouldn't recollect. I was in
21   one up here.  We held one meeting up here one
22   time.  Whether it was this room or another one
23   along here, I don't know.
24       Q.  When you say "we," are you
25   referring to the OHSL Board?
```

### 109

A. The fact that we did with the company what we did and all of our customers were treated right and so on.

Q. And also your involvement with civic activities in the community?

A. Civic activities, centers.

Q. Can you just give me a list of some of the civic activities that you've participated in over the years?

A. I was with the Catholic Order of Foresters. I was president of the Bridgetown Civic Club for several years.

COURT REPORTER: I'm sorry, the Catholic --

A. The Catholic Order of Foresters, and the Bridgetown Civic Club for several years. I was one of the founders of the Bridgetown, Denton, Mack Business Association, along with my boss at Antonio when I was there. And I've been very active in our church and --

Q. That's St. Jude's, correct?

A. Um-hmm. Um-hmm.

Q. Anything else?

A. We had been on their fund drives and all such as that, many different things in

### 110

the prior years.

Q. Would it be -- I didn't mean to interrupt.

A. Go ahead.

Q. Would it be fair to say that bankers, by their very nature, are often influential people within their communities?

MR. BURKE: Objection. Calls for speculation. Foundation. You may answer.

A. If you said "often," I would say yes.

Q. And did you consider yourself to be an influential person within the business community in Cincinnati?

A. Well, you're bringing in Cincinnati. I would say in -- where we were in Western Hills, yes, but I wouldn't say Cincinnati. I wasn't necessarily influential in Cincinnati.

Q. Okay. Would you say that you were a highly influential person in the Western Hills area?

A. It was my understanding.

Q. How did the community react when they learned that Oak Hills was to be sold and

### 111

sold to Provident?

A. Personally, I wouldn't have any idea.

Q. Didn't people come up to you in church or in the parking lot and say hey, Norb, what's going on?

A. A few people said what's going on, yeah.

Q. Okay. And who said that to you?

A. I don't know, different people. Might have been customers. They were unhappy because it was going to change, but -- you know, it was a -- as I told them, I didn't make the change, the shareholders voted it. And I just had to be part of it, so they had no reason to have any -- any animosity towards me.

Q. Did any customer or shareholder ask you what's going on before the shareholders voted on October 25th, 1999?

A. No. I would say no.

Q. Do you remember any of the people who spoke to you about this?

A. Just offhand, I couldn't recall them but I did know them.

### 112

Q. But you don't recall their names right now?

A. Right.

Q. Did anyone come up to you and say in words or substance, hey, Norb this is great, we really think it's a great idea to sell to Provident?

A. No, I would say no.

Q. So everyone who came up to you complained about the transaction, correct?

A. Not everyone, but I wouldn't say -- no, there's been some of each is all I can say.

Q. Okay. Who was positive about the transaction?

A. Who was positive? I couldn't recall that.

Q. Are you familiar with the term stakeholders?

A. Stakeholders?

Q. Yes.

A. No.

Q. You've never heard that term before?

A. No. I understood them as