Exhibit D

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT CINCINNATI

---

WALTER W. THIEMANN, on
behalf of himself and
of all others similarly
situated,

    Plaintiff,

VS.       : CASE NO. C-1-00793

OHSL FINANCIAL CORP.,
OAK HILLS SAVINGS AND
LOAN COMPANY, F.A.,
NORBERT G. BRINKER,
KENNETH L. HANAUER,
WILLIAM R. HILLEBRAND,
ALVIN E. HUCKE, THOMAS
E. MCKIERNAN, JOSEPH J.
TENOEVER, HOWARD N.
ZOELLNER, PROVIDENT
FINANCIAL GROUP, INC.,
ROBERT L. HOVERSON,
JACK M. COOK, THOMAS D.
GROTE, JR., PHILIP R.
MYERS, JOSEPH A. PEDOTO,
JOSEPH A. STEGER,
CHRISTOPHER J. CAREY,
CLIFFORD ROE, and
DINSMORE & SHOHL, LLP,

    Defendants.

---

Deposition of JOSEPH A. STEGER, a

witness herein, called by the plaintiff for

cross-examination, pursuant to the Federal

Rules of Civil Procedure, taken before me, Lee

**Page 2**

Ann Williams, a Registered Professional

Reporter and Notary Public in and for the State

of Ohio, at the offices of Keating, Muething &

Klekamp, 2605 Burnet Avenue, Cincinnati, Ohio

45202, on Wednesday, January 16, 2002, at

---

APPEARANCES:

    On behalf of the Plaintiff:

        Michael G. Brautigam, Esq.
        Gene Mesh & Associates
        2605 Burnet Avenue
        Cincinnati, Ohio 45219
        and
        Ann Lugbill, Esq.
        2406 Auburn Avenue
        Cincinnati, Ohio 45219

    On behalf of the Defendants:

        James E. Burke, Esq.
        Keating, Muething & Klekamp
        1400 Provident Tower
        One East Fourth Street
        Cincinnati, Ohio 45202

    On behalf of the Defendants Dinsmore &
    Shohl and Clifford Roe:

        Dennis P. Deters, Esq.
        Schroeder, Maundrell, Barbiere
        & Powers
        110 Governor's Knoll
        11935 Mason Road
        Cincinnati, Ohio 45249

**Page 3**

S T I P U L A T I O N S

    It is stipulated by and among counsel for

the respective parties that the deposition of

JOSEPH A. STEGER, a witness herein, called by

the plaintiff for cross-examination pursuant to

the Federal Rules of Civil Procedure, may be

taken at this time by the notary; that said

deposition may be reduced to writing in

stenotypy by the notary, whose notes may then

be transcribed out of the presence of the

witness; and that proof of the official

character and qualifications of the notary are

expressly waived.

**Page 4**

I N D E X

Examination of JOSEPH A. STEGER      Page

By Mr. Brautigam:      5

---

| Steger Exhibit | Page Identified |
| --- | --- |
| No. 24 | 6 |
| No. 25 | 11 |
| No. 26 | 21 |
| No. 27 | 89 |
| No. 28 | 93 |
| No. 29 | 100 |
| No. 30 | 105 |
| No. 31 | 114 |



JOSEPH A. STEGER

6

5

1       JOSEPH A. STEGER
2   having been first duly sworn, testified as
3   follows:
4              CROSS-EXAMINATION
5   BY MR. BRAUTIGAM:
6       Q.  Good afternoon, Dr. Steger.  My
7   name is Michael G. Brautigam and I am one of
8   plaintiff's counsel in this litigation.  To my
9   right is my co-counsel, Ann Lugbill.  Dr.
10  Steger, do you know Judge Sandra Beckwith?
11      A.  Oh, yeah, uh-huh.
12      Q.  How do you know her?
13      A.  She's a graduate of ours.
14      Q.  And do you have any ongoing
15  contact with her?
16      A.  No.
17      Q.  Have you had any contact with her
18  in the last ten years?
19      A.  Yes.  She's spoken at the law
20  school.
21      Q.  And have you personally done
22  anything to interact with her in the last ten
23  years?
24      A.  No.
25          MR. BURKE:  Objection to

1   relevance.  You may answer.  Go ahead.
2       Q.  Do you know Magistrate Judge
3   Timothy Hogan?
4       A.  No.
5          (Steger Exhibit Number 24
6           was marked for identification.)
7       Q.  Dr. Steger, let me hand you what
8   has been marked as Plaintiff's Exhibit 24, and
9   I ask you to take a look at it.  For the
10  record, it is a December 17th, 2001 letter from
11  Jim Burke to Gary Meier.  Dr. Steger, with this
12  document as with any other, please take as much
13  time as you need to review the document, but in
14  many cases I think I can direct your attention
15  to a particular point.
16          With respect to this document, my
17  first question is, have you seen this document
18  before?
19      A.  No.
20      Q.  Do you know who Gary Meier is?
21      A.  No.
22      Q.  Did you authorize Mr. Burke to
23  respond on behalf of the Provident Board of
24  directors to Mr. Meier's inquiry?
25          MR. BURKE:  Objection to

7

8

1   relevance.
2       A.  No, that I know of.
3       Q.  Are you aware that Mr. Meier
4   apparently made an inquiry of the Provident
5   Board?
6       A.  No.
7       Q.  Was this ever discussed at the
8   Provident Board level?
9       A.  I don't remember so.
10      Q.  Did Mr. Meier, in effect, make a
11  demand on the Provident Board?
12          MR. BURKE:  Objection to
13  relevance.
14      A.  I don't have a clear clue.  I
15  never got a letter from him.
16      Q.  If someone were to send a letter
17  to the Provident Board of Directors, would you
18  ultimately see that letter?
19      A.  I don't -- can't answer that
20  question.  I don't process that material.
21      Q.  If someone were to make a demand
22  on the Provident Board in writing by certified
23  mail, how would you know of that demand?
24          MR. BURKE:  Objection.  Calls for
25  speculation.

1       A.  I don't even know what you're
2   asking me.
3       Q.  If someone were to send a
4   certified letter to the Provident Board of
5   Directors, do you believe --
6       A.  Now, let me ask you a question.
7   Is this each individual director or is it to
8   the, you know, to the bank?
9       Q.  Dr. Steger, if someone were to
10  write a letter to the Provident Board
11  collectively, not individually, and send it to
12  the Provident Board at its business address by
13  certified mail or regular mail, would you get
14  that mail?
15      A.  I have no idea.
16      Q.  Have you ever received
17  correspondence in your capacity as a Provident
18  director from shareholders?
19      A.  I wouldn't know if they were
20  shareholders or not.  Once in a while we get
21  something individually to your home or
22  something like that.
23      Q.  Are you familiar with the concept
24  of making a demand on a board?
25      A.  No.

**9**

```
1         Q.  Have you ever heard of a
2    derivative action?
3         A.  No.
4         Q.  Let me direct your attention to
5    the penultimate paragraph in this letter.  Do
6    you see that?  It says the answer to your
7    inquiry is simple.
8         A.  Yeah.
9         Q.  Would you read that to yourself,
10   please?
11        A.  Okay.
12        Q.  What are plaintiffs seeking in the
13   Oak Hills shareholder litigation?
14        A.  I have no idea.
15        Q.  Are you familiar with the concept
16   of fiduciary duty?
17             MR. BURKE:  Objection to form.
18   Objection to relevance.
19        A.  Sure.
20        Q.  What is your understanding of that
21   concept?
22        A.  My understanding is to make sure
23   that -- that we run our bank effectively enough
24   that there is no problems.
25        Q.  Do you consider litigation a
```

**10**

```
1    problem?
2         A.  No, not at all.
3         Q.  Never?
4         A.  No.
5         Q.  Why not?
6         A.  I get -- been all my life in
7    litigation, every job I've ever worked in, it's
8    just part of the scene.
9         Q.  Are you familiar with the concept
10   of full and fair disclosure?
11        A.  No, I'm not a lawyer.
12        Q.  I didn't ask if you were a lawyer,
13   Dr. Steger, I asked if you were familiar --
14        A.  No.
15        Q.  Okay.  Do you believe that as a
16   director of a public company, you have a duty
17   to the shareholders to make full and fair
18   disclosure?
19        A.  Certainly.
20        Q.  How do you go about fulfilling
21   that duty of full and fair disclosure?
22        A.  Well, we have very effective
23   management.
24        Q.  What do you do personally as a
25   director?
```

**11**

```
1         A.  We have our Board meetings, go
2    over the things that are presented to us, and
3    ask questions, but in the main the management
4    handles things very well.
5         Q.  Let's mark this as Exhibit 25,
6    please.
7             (Steger Exhibit Number 25
8              was marked for identification.)
9         Q.  Dr. Steger, before we leave
10   Exhibit 24, can you tell me how it's important
11   that Mr. Burke writes in the first paragraph,
12   quote, I represent and am responding on behalf
13   of the Board of Directors of Provident
14   Financial Group, Inc., given that you've never
15   seen Mr. Meier's letter nor Mr. Burke's letter?
16            MR. BURKE:  Objection.  Relevance.
17   You may answer.
18        A.  Well, that's his job to answer it.
19        Q.  Why is that?
20        A.  Because he's the counsel.
21        Q.  Is it your job to read letters
22   that are directed to the Provident Board?
23        A.  It's not our job to read letters
24   necessarily directed to the Board.  It's to
25   hear what's going on and then assign it to the
```

**12**

```
1    right person to respond.
2         Q.  Okay.  Taking the first part of
3    your answer, to hear what's going on, with
4    respect to whatever Mr. Meier was addressing,
5    did you hear what was going on?
6         A.  No, because we never literally
7    discussed Mr. Meier.
8         Q.  Does that concern you?
9         A.  No, not at all.
10        Q.  Why not?
11        A.  Because we have excellent legal
12   counsel and we have excellent officers.
13        Q.  Okay.  How do you evaluate the
14   officers of the company?
15        A.  By the performance of the company.
16        Q.  Okay.  How do you evaluate legal
17   counsel?
18        A.  Legal counsel?  He keeps us
19   informed and does a good job and that's how you
20   judge them.
21        Q.  Who are you talking about when you
22   said "he" keeps us informed?
23        A.  Mark.  Mark Magee, the legal
24   counsel at the bank.
25        Q.  And is Mr. Magee an attorney at
```

**13**

1  the bank or is he an attorney with the firm
2  KMK?
3      A.  No, he's the attorney for the bank
4  at the bank.  He's an officer in the bank.
5      Q.  Okay.  I'm handing you what has
6  been marked as Plaintiff's Deposition Exhibit
7  25 and I ask you to take a look at it.  Dr.
8  Steger, Plaintiff's Exhibit 25 is a January
9  16th, 2002 press release entitled Provident
10  Financial Posts Net Loss on Problem Loans.
11  Have you seen this document before?
12      A.  Have I seen this document?
13      Q.  Yes.
14      A.  No.
15      Q.  Have you, perhaps, read this on
16  the Internet?
17      A.  No.
18      Q.  Okay.  What is the purpose of
19  Plaintiff's Exhibit 25?
20      MR. BURKE:  Objection to
21  relevance.
22      A.  This document?
23      Q.  Yes.
24      A.  What is the purpose of it?  It
25  essentially -- we discussed this at the Board,

**14**

1  to be honest with you.  And the fact is that
2  many of the banks had a position in airlines.
3  And of course then when 9/11 came along and the
4  problems with the airlines being grounded and
5  losing money, one of the things was the loans,
6  of course, then are at risk.  And we discussed
7  that at length and said, fine, then just tell
8  the public that.
9      Q.  Right.
10      A.  So that's good disclosure.
11      Q.  And how do you determine that
12  it's, in your words, good disclosure?
13      A.  Because we didn't have a problem.
14  They told the public.
15      Q.  Okay.  Do you consider the Oak
16  Hills shareholder litigation to be possibly a
17  problem?
18      A.  I don't know.  I'm not a lawyer.
19      Q.  I'm not asking you as a lawyer.
20  Do you as a director of Provident consider the
21  Oak Hills shareholder litigation to be a
22  possible problem?
23      A.  Not really.
24      Q.  Why not?
25      A.  Because it's such a small thing.

**15**

1  This is millions and millions and millions of
2  dollars.
3      Q.  Okay.  You testified that you
4  don't know what the Provident -- excuse me,
5  what the Oak Hills shareholders are seeking,
6  correct?
7      A.  No, I don't know what they're
8  seeking.
9      Q.  So you have no idea of the dollar
10  magnitude that they are seeking, correct?
11      A.  No, but the deal wasn't that big.
12      Q.  Can you answer my question,
13  please?
14      A.  I just did.
15      Q.  Dr. Steger, do you have any idea
16  of the dollar magnitude that plaintiffs are
17  seeking with respect to the Oak Hills
18  shareholder litigation?
19      A.  No, no.
20      Q.  Okay.  So how can you form a
21  conclusion as to whether or not the pendency of
22  the litigation is material?
23      MR. BURKE:  Objection.  Asked and
24  answered.
25      A.  Yeah.

**16**

1      MR. BURKE:  You may answer again.
2      A.  Okay.  I just don't think it's an
3  overwhelming deal, given the scale of things
4  that banks deal with.
5      Q.  And what is that conclusion based
6  on?
7      A.  The question you asked me in this.
8  There is millions and millions -- $300 million
9  for the airplanes, which every bank held some
10  chunk of.  That's a serious problem for every
11  bank.
12      Q.  Can you define "overwhelming deal"
13  as you used it in your previous answer?
14      A.  No, I can't define it.  It's just
15  a judgment of mine.
16      Q.  You know it when you see it?
17      A.  Not necessarily, but I hope so.
18      Q.  Dr. Steger, do you know that one
19  of the things that plaintiffs are asking for in
20  the Oak Hills shareholder litigation is
21  rescission of the transaction?
22      A.  No, but now I do, I guess you
23  asked that.
24      Q.  Okay.  Do you think that
25  rescinding that transaction, if the judge

17

1 ordered that, would have a material effect or
2 could have a material effect on Provident?
3        MR. BURKE:  Objection.  Calls for
4 speculation.
5        A.  I have no idea.  We'd have to go
6 look at the books.
7        Q.  What would you look for?
8        A.  I'd look for the size of the --
9 the purchase, for the rescission and whatever
10 else goes with it, and the cost.
11        Q.  And Dr. Steger, this lawsuit was
12 filed on September 20th of 2000.  Is that
13 consistent with your recollection?
14        A.  I don't know when it was filed.
15        Q.  Are you aware of any motions that
16 have been filed on your behalf?
17        A.  No.
18        Q.  Are you aware of any motions that
19 have been filed by plaintiffs to certify a
20 class?
21        A.  No.
22        Q.  Are you aware that in some cases
23 with respect to other public companies, when
24 the plaintiffs survive a motion to dismiss,
25 some form of public disclosure is made?

18

1        MR. BURKE:  Objection.  Calls for
2 speculation as to what other companies do.
3        A.  Yeah, I don't have any idea what
4 you're talking about.
5        Q.  Okay.  Dr. Steger, are you aware
6 that with respect to some companies, when a
7 class of shareholders is certified against a
8 particular institution, that some companies
9 feel that that's a material event and
10 disclosure is made?
11        MR. BURKE:  Same objection, calls
12 for speculation.
13        A.  That's nice.  I'm not with those
14 other companies.
15        Q.  Are you aware that they do that on
16 occasion?
17        A.  No.
18        Q.  Okay.  Did the Provident Board
19 ever consider disclosing the pendency of this
20 lawsuit?
21        A.  Not that I know of.
22        Q.  Did the Provident Board ever
23 discuss disclosing the pendency of this lawsuit
24 after the plaintiffs had survived the motion to
25 dismiss?

19

1        MR. BURKE:  Asked and answered.
2        A.  I don't know what you're talking
3 about.  What's a pendency or whatever you're
4 saying?
5        Q.  Okay.  Dr. Steger, did the
6 Provident Board ever consider disclosing to the
7 investing public the existence of this lawsuit
8 after a class had been certified?
9        A.  Not that I know of.
10        Q.  Well, you would know what goes on
11 at the Provident Board, correct?
12        A.  Correct.  But, as I said, not that
13 I know of.
14        Q.  Okay.
15        A.  I answered your question.
16        Q.  Okay.  Why not?
17        A.  I haven't a clue.
18        Q.  Is it important that the
19 information in Plaintiff's Exhibit 25, the
20 press release, be accurate and complete?
21        A.  Well, I would assume it always
22 would be.
23        Q.  Okay.  Why would you assume that?
24        A.  Because they want to make sure the
25 public understands this.

20

1        Q.  Is this a policy at Provident that
2 press releases are somehow checked or
3 scrutinized before they're released?
4        A.  I wouldn't know.
5        Q.  Who would know?
6        A.  You'd have to ask the officers.
7        Q.  Have you ever reviewed a press
8 release before it was released?
9        A.  No.
10        Q.  Why not?
11        A.  Because normally all the financial
12 press releases and everything are on the net.
13 And then they also, when they have their
14 monthly or annual reports to the public,
15 they're on the net, too, so you can look them
16 up and read them yourself.
17        Q.  My question was a little
18 different.  Before anything like that is put on
19 the net, is there a policy in place at
20 Provident where these press releases or the
21 information that's put on the net is reviewed
22 by someone at the Board level?
23        A.  No.  It would be the officers'
24 problem, not the Board's problem.
25        Q.  When you said "problem" in your

**21**

1  previous answer, to what are you referring?
2  A.  I'm referring to they have to
3  write it, they have to get it out to the
4  public, and they have to do that kind of thing.
5  The Board isn't sitting around reviewing press
6  releases.
7  Q.  What does the Board do?
8  A.  A lot of things.
9  Q.  Okay.  We'll come back to that
10  later.  Let's mark this as the next exhibit,
11  please.
12  (Steger Exhibit Number 26
13  was marked for identification.)
14  MR. BURKE:  I hate to be
15  disagreeable, Mike.  Is there a reason why
16  we're talking about January 2002 press releases
17  in a lawsuit that relates to a 1999
18  transaction?  I guess you know Mr. Steger has
19  some limited time today.  We're happy to answer
20  any questions you want, I just don't understand
21  where this is -- how this is advancing things
22  and what the relevance of any of these press
23  releases is.
24  MR. BRAUTIGAM:  Well, Jim, I will
25  make an exception and answer your question.

**22**

1  There is a reason for everything that I do and
2  I don't want to debate with you anymore on the
3  record.
4  BY MR. BRAUTIGAM:
5  Q.  Dr. Steger, I have handed you what
6  has been marked as Plaintiff's Deposition
7  Exhibit 26 and ask you to take a look at it.
8  Have you seen this document or the information
9  that it contains before?
10  A.  Well, this is for the financing
11  people.  I probably read it, but go ahead.
12  Q.  For the record, Plaintiff's
13  Exhibit 26 is a press release entitled
14  Provident Financial Group, Inc. invites you to
15  listen to its fourth quarter/year end 2001
16  earnings conference call live on the Internet.
17  A.  Um-hmm.
18  Q.  Now, Dr. Steger, what is the
19  purpose of this conference call?
20  A.  To inform the public how well the
21  institution is doing.
22  Q.  Okay.  How has the institution
23  been doing lately?
24  A.  Pretty well actually.
25  Q.  Okay.

**23**

1  A.  Given the economy.
2  Q.  And when you have a conference
3  call like this --
4  A.  This isn't a conference call.
5  Q.  What is it?
6  A.  This is -- in general, you can get
7  on there, and sometimes I don't even get on
8  these.  This is not calling the Board, this is
9  open to financial people and all kinds of
10  people on the net.
11  Q.  Actually isn't it open to
12  everyone?
13  A.  Yeah.
14  Q.  As a result of --
15  A.  Sure.
16  Q.  Dr. Steger, if you could wait till
17  I finish my question, I think it would be
18  helpful for the reporter and the record.
19  A.  Well, then you listen to me when I
20  talk, too.
21  Q.  Dr. Steger, I am listening to you
22  and I'll try not to step on your lines if you
23  try not to step on my questions.  Is that fair?
24  A.  Fine.
25  Q.  Okay, thank you.  Now, Dr. Steger,

**24**

1  isn't anyone in the world allowed to call in to
2  this conference call?
3  MR. BURKE:  Objection.  Calls for
4  speculation.
5  A.  I wouldn't know.
6  Q.  Provident would not make
7  collective disclosure of material information
8  to some shareholders and not to others,
9  correct?
10  MR. BURKE:  Objection to
11  relevance.
12  A.  I don't know.  I do know that
13  they -- this is just for everyone that wants
14  to.
15  Q.  And do you agree with me that
16  Plaintiff's Exhibit 26 is promulgated on the
17  Internet?
18  A.  Correct.
19  Q.  And anyone with access to the
20  Internet can go and pull this off and read it,
21  correct?
22  A.  Correct.
23  Q.  And what's the purpose of that?
24  A.  Hopefully to get customers.
25  Q.  What about with respect to

**25**

1  shareholders?  Do you want to inform the
2  existing shareholders and potential
3  shareholders of Provident's financial
4  situation?
5       A.  Well, you want to make sure you
6  inform your shareholders, but also other
7  people, because you'd like to increase your
8  business and the Internet is a great way to do
9  that.
10       Q.  Does Provident intend to disclose
11  the pendency and the status of the Oak Hills
12  shareholder litigation in this conference call
13  which is going to take place live in about 35
14  minutes?
15       A.  I don't have a clue.
16       Q.  Why not, Dr. Steger?
17           MR. BURKE:  Objection, Asked and
18  answered.
19       A.  I told you before the management
20  is handling that.  The Board doesn't sit around
21  handling those issues.
22       Q.  When you say "those issues," what
23  issues specifically are you referring to?
24       A.  Well, in terms of the -- your suit
25  and so forth.  We are informed about it and so

**26**

1  forth, and then we tell the management, good,
2  you handle that.  And so that's what they're
3  doing.
4       Q.  Were you informed about the
5  lawsuit by management?
6       A.  Um-hmm.
7       Q.  Who informed you of the fact of
8  the suit?
9       A.  The legal counsel of Provident.
10       Q.  Okay.  Did you ever discuss this
11  lawsuit with anyone other than your legal
12  counsel?
13       A.  No.
14       Q.  Why not?
15       A.  I answered it, that's their job,
16  not my job.
17       Q.  Do you have an understanding as to
18  whether or not you are being sued?
19       A.  Well, I understand as an officer
20  you can be sued.
21       Q.  Are you an officer?
22       A.  I mean, not an officer, as a Board
23  member, but that's a generic thing.
24       Q.  Dr. Steger, are you being sued in
25  the Oak Hills shareholder litigation?

**27**

1       A.  Frankly, I don't know.
2       Q.  Then you wouldn't know what you're
3  being sued for if, in fact, you are being sued?
4       A.  Correct.
5       Q.  Do you think it is part of your
6  fiduciary duty as a director of Provident to
7  keep informed, yourself, as to the pendency and
8  the status of this litigation?
9           MR. BURKE:  Objection.  Calls for
10  a legal conclusion.  You may answer if you
11  know.
12       A.  No, I don't know.  But you must
13  remember, at the University we run 80 cases a
14  month.  I don't track 80 cases.  That's why you
15  have good legal counsel.
16           MR. BRAUTIGAM:  Move to strike as
17  nonresponsive.
18  BY MR. BRAUTIGAM:
19       Q.  Dr. Steger, can you answer my
20  question?
21           MR. BURKE:  Objection.  Asked and
22  answered.  He just did.
23       Q.  Respectfully, Dr. Steger, I don't
24  believe your answer had anything to do with my
25  question.

**28**

1       A.  Repeat your question.
2           MR. BRAUTIGAM:  Could you read it
3  back, please?
4           (Record read by Reporter.)
5       A.  Well, the management does keep us
6  informed.
7       Q.  How does the management keep you
8  informed?
9       A.  By saying it exists, and then
10  they're hiring legal counsel, and then we'll go
11  through the process.
12       Q.  And what process are you referring
13  to?
14       A.  Deposition.
15       Q.  Are you informed periodically
16  about major events in the case?
17       A.  Well, maybe when we have the next
18  Board meeting we will, but no.
19       Q.  Okay.  Prior -- well, up to
20  today's date, January 16th, 2002, it's your
21  testimony that you never discussed the Oak
22  Hills shareholder litigation at a Board meeting
23  or otherwise, except perhaps with your counsel;
24  is that correct?
25           MR. BURKE:  I will instruct you

29

1  not to answer as to any discussions you had
2  with Mark Magee or counsel.  As to discussions
3  with other people you can answer as to that,
4  but what you discussed with counsel is not
5  permissible.
6       A.  Okay.  Only being informed about
7  it originally by the officers at a meeting.
8  Not the suit, being informed about the
9  purchase.
10      Q.  So you were never informed by any
11  Provident officers about the lawsuit, correct?
12      A.  I'd say in general that's correct.
13      Q.  Okay.  Dr. Steger, during 1999,
14  did you maintain a Provident file of material
15  related to Provident at your home?
16      A.  No.
17      Q.  Did you maintain a file at your
18  University office?
19      A.  No.
20      Q.  Did you receive material relating
21  to Provident in 1999?
22      A.  What kind of material relevant to
23  Provident?
24      Q.  Board packets.
25      A.  No, we don't -- the Board packets

30

1  are kept there and when you get to the Board
2  meeting, you go through them.  They don't mail
3  them to you.
4       Q.  Okay.  So --
5       A.  I don't have a file, to answer
6  your question.
7       Q.  Okay.  Dr. Steger, were you able
8  to review Provident Board material in advance
9  of the meetings?
10      A.  Well, yes, because I get there
11  early.
12      Q.  And have you ever taken Provident
13  Board material home with you?
14      A.  No.
15      Q.  Why is that?
16      A.  Why is it?  Security.  I don't
17  want it in my house.  I'm a public official.
18      Q.  Is that true for the other
19  directors as well?
20      A.  I -- you'd have to ask them.
21      Q.  So it's your testimony that you
22  maintained absolutely no materials related to
23  Provident in 1999 or otherwise?
24      A.  Absolutely true.
25      Q.  Approximately how voluminous would

31

1  be a typical Board packet?
2       A.  Oh, about that thick (indicating.)
3       Q.  Approximately four inches?
4       A.  Yeah, something like that.
5       Q.  And you would arrive at these
6  meetings early to go through these materials,
7  correct?
8       A.  Um-hmm.
9       Q.  And in 1999, approximately how
10  early did you arrive to review these materials?
11      A.  Well, before the meeting I try to
12  get there at least 45 minutes to an hour and
13  walk through them.
14      Q.  And with respect to these Board
15  packets, in 1999 did you read every word and
16  look at every number?
17      A.  No.
18      Q.  Why not?
19      A.  Because a lot of it is -- is pro
20  forma, things like number of officers, the new
21  titles.  I really don't -- I think it's a nice
22  thing that they're all getting promoted, but I
23  don't go down through the list and read
24  everybody's name and what they're doing.
25      Q.  Did you ever make notes at a

32

1  Provident Board meeting in 1999?
2       A.  No.
3       Q.  Did you ever make notes at a
4  Provident Board meeting?
5       A.  Rarely.
6       Q.  When is the last time you can
7  remember making notes at a Provident Board
8  meeting?
9       A.  The last meeting.
10      Q.  And did these notes have anything
11  to do with respect to the Oak Hills litigation?
12      A.  No, it was the date for the next
13  Board meeting.
14      Q.  Okay.  Dr. Steger, I understand
15  that you've been president of UC since 1984; is
16  that correct?
17      A.  Correct.
18      Q.  And you make approximately
19  $265,000 a year in salary?
20      A.  Correct.
21      Q.  And you get another 70,000 per
22  year as a retirement contribution?
23          MR. BURKE:  Objection to
24  relevance.
25      Q.  Is that correct?

**33**

```
 1        A.  Yeah, that's correct.  That's
 2   public knowledge.
 3        Q.  Right.  And you have housing
 4   allowances and other benefits; is that correct?
 5        A.  No, we don't have housing
 6   allowances.
 7        Q.  You do have other benefits?
 8        A.  Well, other than retirement and
 9   Medicaid -- Medicare, we don't have any -- I
10   mean medical, we don't have anything.
11        Q.  And Dr. Steger, I understand that
12   you're a Ph.D.; is that correct?
13        A.  Correct.
14        Q.  And what is your field,
15   engineering?
16        A.  Psychophysics.
17        Q.  And what did you do your thesis
18   in?
19        A.  The assimilation in vision.
20        Q.  Dr. Steger, can you just go
21   through very briefly your educational
22   background since high school?
23        A.  Gettysburg College, Bachelor's
24   degree.  And I went on to Kansas State
25   University, got a Master's degree and a Ph.D.
```

**34**

```
 1   in psychophysics.
 2        Q.  And since you graduated from
 3   college, what have your employment positions
 4   been?
 5        A.  Well, let's see.  I worked for
 6   Martin Marietta, I worked for Grumman, I
 7   worked for Provident -- I mean Prudential.  And
 8   then I went to SUNY Albany.  And then I went to
 9   Rensselaer Polytechnic, and then I went to work
10   for Consult Industries, and then I came to
11   Cincinnati.  Sounds like a gypsy or something,
12   but --
13        Q.  Dr. Steger, you went through that
14   very quickly.  Let me see if I can back up a
15   little bit, I may have missed a couple.  With
16   respect to Martin Marietta, what did you do?
17        A.  Psychophysics.
18        Q.  And can you describe as you would
19   to a layman what that field is?
20        A.  Yeah.  It's the mathematical
21   modeling of human sensory processing.
22        Q.  Could you give me an example of
23   the field of psychophysics?
24        A.  Well, for example, when you have a
25   steering wheel with power steering, if you
```

**35**

```
 1   notice, you still have to turn it hard.  I
 2   mean, it's not, it's not perfect.  We could
 3   give you a perfect power steering, there would
 4   be no feedback at all and you'd crash, because
 5   human beings judge the harder it is to turn,
 6   then that means, you know, that it's doing
 7   something.  But we could make perfect power
 8   steering and you'd crash.
 9            Well, somebody has to design the
10   dampening on that that signals to you you're
11   turning too hard and it's a very sophisticated
12   thing.  And for Grumman, for example, I have
13   designed the dampening on the limb controls
14   that landed on the moon.  Even electronically
15   -- it was all electronic but we had to give
16   them a spring so that when they pulled and
17   pulled, they were getting towards the end.
18        Q.  To protect them from themselves,
19   in other words?
20        A.  Yeah.  And you mathematically
21   model that amount of dampening.
22        Q.  And when you were at Martin
23   Marietta, you worked as an engineer, correct?
24        A.  Well, I was not an engineer, but I
25   worked in engineering.
```

**36**

```
 1        Q.  And then you left and went to
 2   Grumman, approximately when was that?
 3        A.  Oh, sometime, let's see, '63 or
 4   four.
 5        Q.  And what did you do with Grumman?
 6        A.  Grumman I worked on the limb
 7   vehicle, landed on the moon.
 8        Q.  Right.  And approximately how long
 9   were you there?
10        A.  Oh, only about maybe eight, ten
11   months.
12        Q.  And your next job was with
13   Prudential?
14        A.  Yeah, actually it was with
15   Prudential.
16        Q.  And we're talking mid-sixties at
17   this point?
18        A.  '64 or five.
19        Q.  And what did you do with
20   Prudential?
21        A.  Put in the first IBM 360s and
22   redesigned their whole systems for handling
23   databases.
24        Q.  So it's what today we would call
25   computer consulting?
```

37

1    A.  Well, no, I was actually hired by
2  them, I wasn't a consultant.  What they did was
3  -- computing was real new to almost anybody
4  that wasn't in science.  And everybody that was
5  an engineer or scientist knew how to write
6  Fortran.  And they couldn't go out -- and there
7  was no such thing as a degree in computer
8  science, so they wanted scientists and
9  engineers to come into the businesses because
10  we could write Fortran.  We could write the
11  software.
12    Q.  And that software had to do with
13  punch cards and stuff in those days?
14    A.  Yeah, in those days.  And we, for
15  example, it was at the time Prudential was
16  setting up the different field offices, the one
17  in Boston, one in Jacksonville, one in LA, and
18  that was the first time they were ever tied
19  together with computers so the data could be
20  shared for the first time throughout the
21  company very fast.  Well, as far as the old
22  360s would do.
23    Q.  And Dr. Steger, after you left
24  Prudential, where did you go?
25    A.  I went to SUNY Albany.

38

1    Q.  As a professor?
2    A.  As a professor.
3    Q.  And in your field of
4  psychophysics?
5    A.  Um-hmm.
6    Q.  And how long were you there?
7    A.  Five years.
8    Q.  And did you start as an assistant
9  professor?
10    A.  Yeah.
11    Q.  And you rose through to the rank
12  of associate professor?
13    A.  I think it was associate, yeah.
14    Q.  And did you receive tenure at SUNY
15  Albany?
16    A.  Yeah.
17    Q.  And what did you do next?
18    A.  I went to Rensselaer.
19    Q.  RPI?
20    A.  RPI.  And in the business school.
21    Q.  What was your position in the
22  business school?
23    A.  I started as a full professor with
24  them and I was essentially to do two things.
25  One, I taught statistics and mathematical

39

1  modeling.  And then the other side was to do
2  research, which we did on, of all things, early
3  identification of management talent.  How's
4  that for a switch.
5    Q.  And that was a very quantitative
6  approach?
7    A.  No, actually it went back to work
8  histories and went back to personal
9  characteristics, all kinds of things.  But we
10  were trying to build them a model from it, what
11  would be the various characteristics and the
12  weights that we would put on these to choose 18
13  and 19 years old that would be the management
14  ten years out in a company.
15    Q.  Is this a form of psychological
16  profiling for the benefit of companies?
17    A.  No, not really.  It wasn't
18  psychological as much as it was background,
19  training, that kind of thing, risk taking,
20  courage, you know, things like that.  To make a
21  long story short, it worked.
22    Q.  Okay.  Is that still in use today,
23  Dr. Steger?
24    A.  By some people, yeah.
25    Q.  Dr. Steger, after you left RPI,

40

1  where did you go?
2    A.  Well, I stayed there for a while
3  because I became the dean of the business
4  school.  And then I left to go to Colt
5  Industries.
6    Q.  And you went to Colt as CEO; is
7  that correct?
8    A.  No, I was a -- in New York, in the
9  corporate group.  And I reported to the chair
10  and the VP for -- well, I don't know what you
11  would call it, planning and huge relations or
12  whatever.
13    Q.  Colt Industries makes firearms,
14  correct?
15    A.  Colt Industries at the time was a
16  conglomerate that had 60 -- I mean had 39
17  divisions.  Firearms was a division.  They
18  owned Pratt & Whitney; they owned Fairbanks
19  Morris, they owned Garlock.
20    Q.  And approximately when did you
21  join Colt?
22    A.  Oh, 70 something because I came
23  out here from Colt.
24    Q.  Tell me about your career at Colt
25  very briefly, if you can.

41

1    A. Oh, I did two or three things.
2  One, I moved the early identification
3  management talent there, that's one of the
4  things they wanted me to do. And we set up a
5  wonderful program to bring college students in,
6  which you don't need to hear the rest of. Then
7  the other, I was partly the ears and eyes of
8  the Chairman of the Board, so I would visit
9  divisions and keep my eye on things and so
10  forth.
11          The Chairman of the Board of Colt,
12  by the way, happened to be the Chairman of the
13  Board of Rensselaer Polytechnic and that's how
14  I got there, because he said I'll pay you a lot
15  of money if you want to come, to make a long
16  story short, so I traveled a lot and kept an
17  eye on various things in the corporation, did
18  some planning, told them maybe we should get
19  out of this business and stay in that one.
20    Q. Now, Dr. Steger, when you left
21  Colt, what was your position?
22    A. I had responsibility for all of
23  human resources and planning around the early
24  identification program.
25    Q. And what was your title?

42

1    A. Director of -- what was it,
2  director of something or other. Director of
3  Human Relations or something.
4    Q. Were you on the board of directors
5  of Colt?
6    A. No.
7    Q. Was Colt a public company?
8    A. Yeah.
9    Q. Dr. Steger, how were you lured to
10  Cincinnati?
11    A. Well, a friend of mine called me
12  and said that the president was 70 years old,
13  and it's a good chance, to take a shot at it.
14  But the reason was that the provost job was
15  open, so if you came out, you'd have two years
16  before he was retiring. So I came -- on my way
17  -- I also worked in New York City. And I said,
18  do you want to take a chance. If we go out and
19  the two years doesn't work, we'll go somewhere
20  else. So we went out and I got the presidency,
21  so that answered our question.
22    Q. Okay. And that was in the early
23  eighties and you've been here ever since,
24  correct?
25    A. Right.

43

1    Q. Dr. Steger, do you consider this
2  deposition important?
3    A. Any deposition is important.
4    Q. What did you do, if anything, to
5  prepare for this one?
6    A. Met with counsel.
7    Q. Approximately how long did that
8  meeting take?
9    A. An hour and a half.
10    Q. How many times did you meet with
11  counsel?
12    A. Once.
13    Q. Did you look at documents?
14    A. Some.
15    Q. What documents did you look at?
16    A. I don't have a clue. I'd have to
17  go back through.
18    Q. Did the documents you looked at in
19  any way refresh your recollection as to the
20  events with respect to the Provident-Oak Hills
21  merger?
22    A. Yes.
23    Q. Which documents refreshed your
24  recollection?
25    A. Well, again, I'd have to see the

44

1  documents.
2    Q. Okay. Well, I'll show you some in
3  a few minutes.
4    A. Okay.
5    Q. And maybe that will help. Dr.
6  Steger, are you on the board of any other
7  public companies?
8    A. Yes.
9    Q. Which ones?
10    A. Milacron.
11    Q. Anything else?
12    A. I'm trying to think. Most of what
13  I'm on are nonprofits. You don't want
14  nonprofits, I take it.
15    Q. I do, but later. With respect to
16  public companies?
17    A. Public. That's it, I guess.
18    Q. Okay. With respect to the
19  Provident Board, what if any committees do you
20  serve on?
21    A. I serve on audit.
22    Q. Okay. With respect to the
23  Milacron Board, what if any committees do you
24  serve on?
25    A. I serve on the -- I'm trying to

45

1  think of the name, I think it was a different
2  name. The nominating committee for the Board.
3  And I serve on the -- I guess you'd call it
4  administrative committee, which is really
5  benefits and, you know, that kind of thing.
6      Q. Okay. Dr. Steger, did you serve
7  on any other boards prior to today, other than
8  the ones you've mentioned?
9      MR. BURKE: Other than nonprofits.
10      Q. Other than nonprofits?
11      A. Yeah, we have. I'm on the Board
12  of Crucible Steel, which is privately held.
13      Q. Okay. Have you been on the boards
14  of any other public companies, but you're not
15  on the public company's now -- you're not on
16  the Board?
17      A. No.
18      Q. Okay. Who owns --
19      A. Wait a minute, I have to correct,
20  I don't want to mislead you. I was on the
21  Board of PNC before it became -- what was it
22  called?
23      MS. LUGBILL: Central Trust.
24      A. Yeah, Central Trust. I was on the
25  Central Trust Board, but once PNC took over I

46

1  got out of that, I didn't like it.
2      Q. Okay. Did you resign?
3      A. Yeah.
4      Q. And that was based on a
5  philosophical difference?
6      A. Yeah.
7      Q. And when you resigned did you
8  submit a letter of resignation?
9      A. Um-hmm.
10      Q. Did PNC release this information
11  to the investing public?
12      A. I don't think so, no. I never
13  remember it being released.
14      Q. When was this?
15      A. Oh, gees, let's see, eighties.
16      Q. What were the philosophical
17  differences you had with PNC?
18      MR. BURKE: Objection to
19  relevance. You may answer.
20      A. It wasn't philosophical
21  differences, it was that -- that it was a fine
22  small bank, liked it, and enjoyed the officers
23  and the way they were returning it. And then
24  when a very large bank came in from Pittsburgh,
25  that's not my style, I don't want to deal with

47

1  Pittsburgh. So I said, you know, nothing
2  wrong, I think they run a fine bank, I just
3  don't want to have the -- to be on a Board that
4  essentially has nothing to do, because it's
5  going to be run out of Pittsburgh.
6      Q. Dr. Steger, who owns Crucible
7  Steel?
8      A. Who owns it?
9      Q. Yes.
10      A. The management.
11      Q. Could you list a couple of
12  individuals?
13      A. Oh, these were all former Colt
14  employees that bought out Crucible Steel. It
15  was a division of Colt at one time. And they
16  used their pensions to buy it out. And so it's
17  privately held.
18      Q. Okay. Could you just give me a
19  couple of names?
20      A. John Vincell is the CEO.
21      Q. And anyone else?
22      A. David Yates is VP for sales.
23      Q. Okay. Dr. Steger, how did you
24  come to be on the Central Trust Board?
25      A. Originally?

48

1      Q. Yes.
2      A. God, what's his name? I'm getting
3  old -- asked me. The CEO at the time asked me.
4  I can see him, but I can't tell you his name
5  right now. Darn it, what's his name?
6      MS. LUGBILL: Mr. Rippe.
7      A. No, Rippe wasn't ever the CEO, I
8  don't think. The Chairman of the Board. Darn
9  it, I can see him and I can't think of his last
10  name.
11      Q. Well, in any event you were asked
12  by the CEO to join the Board?
13      A. Yeah.
14      Q. And approximately how long did you
15  serve?
16      A. Oh, probably was three, four
17  years.
18      Q. And how did you come to be on the
19  Provident Board?
20      A. How did I come to be on the
21  Provident Board? Actually they asked me to
22  serve on there. And I had -- I wasn't on any
23  bank board at the time, I had long -- that was
24  long after.
25      Q. All right. Who asked you to join

JOSEPH A. STEGER

49

1   the Provident Board?
2       A.   Allen.
3       Q.   Allen who?
4       A.   Allen Davis.
5       Q.   Davis, okay.  And when was this?
6       A.   Oh, gees, I don't know.  I'd have
7   to look it up.
8       Q.   Early nineties?
9       A.   Yeah, somewhere around there.
10      Q.   And how did you come to be on the
11  Milacron Board?
12      A.   How did I?
13      Q.   Yes.
14      A.   Jim Geiner and I are close
15  friends, or were very close friends.
16      Q.   Would it be fair to say that being
17  president of UC is a full-time job?
18      A.   Oh, yeah.  Any job is a full-time
19  job.
20      Q.   Okay.  During 1999, how much time
21  did you devote to your activities on the
22  Provident Board?
23      A.   How much time?  Oh, I don't know,
24  I'd say two to three days a month, or something
25  like that.

50

1       Q.   Okay.  And those are full days?
2       A.   Well, I'm, I'm collapsing that.
3   Over the month it may be that I went to the
4   meeting and I spent my hour reading, and then
5   we had the two or three hour meeting, and then
6   there might be other things that we did or
7   committees, and then -- the audit committee and
8   so forth.  I'm just saying roughly over the
9   month, two or three days' worth of work.
10      Q.   And are you talking about full
11  eight hour days?
12      A.   Yeah.
13      Q.   Okay.  Approximately how much time
14  did you devote to Milacron during 1999?
15      A.   Well, Milacron doesn't meet as
16  frequently.  I would probably say a day a
17  month.
18      Q.   Okay.  And let's talk about the
19  nonprofit boards that you're on now.  Can you
20  list all of the nonprofit boards, please?
21      A.   Oh, brother.  Tech Solve, Drake
22  Hospital, UC Physicians, let's see, what else
23  am I on that's nonprofit?  Oh, the Ohio
24  Computer Center, which is a state computer
25  center.  Let's see, what are the other

51

1   nonprofits?  Well, for boards, that's probably
2   about it.
3       Q.   Okay.  Dr. Steger, could you spell
4   Tech Solve?
5       A.   Tech, T E C H, solve, S O L V E,
6   two words.
7       Q.   And what kind of a nonprofit is
8   that?
9       A.   It's a technical nonprofit
10  underwritten by the state that's right out on
11  Paddock Road.
12      Q.   And how much time do you devote to
13  Tech Solve?
14      A.   Not very much.  I go to their
15  Board meetings, but it's run very well by Gary.
16  And I would say, I don't know, maybe six hours
17  a month.
18      Q.   Okay.  And was that true in 1999
19  as well?
20      A.   No.  I was a little bit more
21  involved because I was Chairman of the Board.
22      Q.   Okay.  In 1999, approximately how
23  much time did you devote to Tech Solve?
24      A.   I thought you said nineties, no,
25  '99 I wasn't the chair anymore.

52

1       Q.   Okay.  So it was about six hours a
2   month?
3       A.   Yeah.
4       Q.   How about with respect to Drake
5   Hospital, in 1999, approximately how much time
6   did you spend devoted to Drake Hospital?
7       A.   Oh, I'd say eight to ten hours a
8   month.
9       Q.   Okay.  How about with respect to
10  UC Physicians?
11      A.   That's very short.  I'd say no
12  more than four hours a month.
13      Q.   And how about Ohio Computer?
14      A.   If I did it by month, it probably
15  would be about an hour a month because it only
16  meets twice a year.
17      Q.   Okay.  Dr. Steger, how would you
18  describe your job as a university president?
19  For example, I've heard that a university
20  president is first and foremost a fund raiser.
21  How would you describe it?
22      A.   No, it's not first and foremost a
23  fund raiser, not -- that's a myth.  It's a very
24  complex management job that is -- as any CEO
25  would have.  You have different audiences, you

THIEMANN VS. OHSL

53

1  have different sources of income, you have all
2  kinds of different jobs.  You have to meet the
3  public and you have to meet the donors, just
4  like you said, but you also have to deal with
5  all the contingencies, so it's just a normal
6  CEO's job.  I don't see it very much different
7  from watching Colt executives, except it's
8  public and public is a killing.
9       Q.  It requires more schmoozing than
10  being a CEO of a public company, correct?
11          MR. BURKE:  Objection to form.
12      A.  I wouldn't say that, no, because
13  the schmoozing that the executives do in a
14  private company is with the federal government
15  and the federal politicians and so forth.  And
16  my audience happens to be Columbus and
17  elsewhere, so --
18      Q.  Dr. Steger, do any PFGI Board
19  members have any significant relationships with
20  UC?
21      A.  That's a good question.
22      Q.  Thank you.
23      A.  You know, not really.  I'm trying
24  to think of -- I mean, literally committing
25  their time and money, I don't think so, no.

54

1       Q.  Dr. Steger, how are you paid by
2  Provident?
3       A.  How am I paid?
4       Q.  Yes.
5       A.  You're paid by Board meeting.
6       Q.  Is it so much per Board meeting?
7       A.  Yeah.
8       Q.  A few thousand?
9       A.  And committee meetings.
10      Q.  Right, how much per Board meeting?
11      A.  You know, I don't know.
12      Q.  How much per committee meeting?
13      A.  You know, I don't know.  I'll tell
14  you why.  Because I take half of it and defer
15  it, so I'd have to -- you'd have to ask them.
16      Q.  It's in the order of several
17  thousand dollars per Board meeting though,
18  correct?
19          MR. BURKE:  Objection, asked and
20  answered.  You may answer.
21      A.  I don't know.
22      Q.  Okay.  Aside from the audit
23  committee, what committees does PFGI have?
24      A.  Let's see, there is audit, there
25  is a kind of a minority committee in the sense

55

1  of making sure that we reach that audience and
2  serve them well.  There is the finance
3  committee.  I think that's it.
4       Q.  Nominating?
5       A.  No, there's no nominating
6  committee.
7       Q.  Compensation?
8       A.  Well, actually I have a feeling
9  the -- there's a personnel committee, I think.
10  That compensation rings a bell, but it may be
11  done by finance, I'm not sure.
12      Q.  Any others that you can think of?
13      A.  No.
14      Q.  Have you always served on the
15  audit committee?
16      A.  No, actually I didn't serve on any
17  committees at first.  And then I got on the
18  audit committee.
19      Q.  How long have you been on the
20  audit committee?
21      A.  Three, four years.
22      Q.  Is the audit committee the most
23  important committee within Provident?
24      A.  I won't answer that question
25  because I'm biased, I'm on it.

56

1       Q.  Well, isn't there an SEC
2  requirement that the audit committee consist
3  entirely of outside directors?
4          MR. BURKE:  Objection.
5       A.  Don't know.
6       Q.  Are you familiar with the term
7  outside directors?
8       A.  Nonofficers?  Is that what you
9  mean?
10      Q.  Yes.
11      A.  Um-hmm.
12      Q.  Okay.  Are you familiar with the
13  term inside directors, sometimes referred to as
14  management directors?
15      A.  Isn't that what I just said,
16  officers?  Officers are inside, and outside
17  directors aren't officers.
18      Q.  Right.  But not every officer is a
19  director.
20      A.  No.
21      Q.  Okay.  Does Provident have a
22  mandatory retirement age for Board members?
23      A.  Yes, 70.
24      Q.  Okay.  Do you think that's a good
25  idea?

57

1    A.  I never thought about it.  I
2  should have, I'm getting near there.
3    Q.  Do you have an opinion of the OHSL
4  Board as it was constituted in 1999?
5    A.  Is that the bank board?
6    Q.  Yes.
7    MR. BURKE:  No, OHSL.
8    Q.  It's the public company Board.
9    A.  No.
10    Q.  Why not?
11    A.  Never bothered me, I'd have to be
12  bothered by it before I can concern myself.
13    Q.  Well, you were buying their bank,
14  correct?
15    A.  Yes, we were buying their bank.
16    Q.  And didn't you want to know who
17  was running their bank?
18    A.  No, because, you know, when you
19  buy a bank, you buy a bank.  I don't care who's
20  running it, I just hope it's good.
21    Q.  How do you make that determination
22  that it's good?
23    A.  The management makes that
24  determination.
25    Q.  What role, if any, did the

58

1  Provident Board have with respect to the
2  purchase of OHSL in 1999?
3    A.  What role did we have?  We
4  reviewed it, we were presented the case for
5  acquiring it, and then said that's a good idea.
6    Q.  What was the case for acquiring
7  OHSL, as you remember it?
8    A.  As I remember it, it's
9  profitability and the -- and the -- also its
10  customers.  That's the two major things you
11  get.
12    Q.  How did you assess OHSL's
13  profitability?
14    A.  I didn't.
15    Q.  How did you review the work of
16  whoever assessed OHSL's profitability?
17    A.  Well, as I said, we got a Board
18  presentation, but I didn't memorize it.
19    Q.  Who made that presentation?
20    A.  You know, I've got to think about
21  who made that presentation.  It wasn't the CEO,
22  it was one of the financial officers, but I
23  can't remember who did that.
24    Q.  Was it Chris Carey, perhaps?
25    A.  I don't -- was Chris there when we

59

1  did that?  Chris is fairly new.  I don't
2  remember.
3    Q.  How did you assess OHSL's
4  customers?
5    A.  I didn't.  Again, they just said
6  they had a good customer base.
7    Q.  Would it be fair to say that OHSL
8  and Provident were very different types of
9  institutions?
10    A.  I don't know.  I can't answer that
11  question.
12    Q.  Are you familiar with the term
13  community bank?
14    A.  Not really, no.
15    Q.  How would you describe what
16  Provident Bank is?
17    MR. BURKE:  Objection to form.
18    A.  It's a financial institution.
19    Q.  Well, in terms of size.  It's not
20  a community bank, is it?
21    A.  Well, I don't know because what's
22  a community bank?
23    Q.  Okay.  Would you describe
24  Provident as an international bank?
25    A.  No, probably regional.

60

1    Q.  Okay.  Or perhaps a super regional
2  bank?
3    A.  I don't know.  I don't know what
4  super means.
5    Q.  Did the Provident Board ever
6  consider the possibility that OHSL's customers
7  would want to stay with a smaller bank and not
8  move their deposit accounts and other accounts
9  to Provident?
10    MR. BURKE:  Objection.  Calls for
11  speculation.
12    A.  No.
13    MR. BURKE:  Assumes facts not in
14  evidence.  You may answer.
15    Q.  Why not?
16    A.  Why didn't we?
17    Q.  Yes.
18    A.  Well, we don't go around asking
19  customers that question when we're looking at
20  acquiring a financial institution.  You acquire
21  it because it looks like it has a sound base
22  and that.  And you don't say to customers,
23  would you like to keep moving your money.
24    Q.  Well, by acquiring the customers,
25  you want to retain the customers, correct?

61

1     A.  Correct.
2     Q.  Did you ever learn in 1999 that
3  after the announcement of the merger, that OHSL
4  depositors were moving their accounts out of
5  OHSL in wholesale levels?
6        MR. BURKE:  Objection.
7  Mischaracterizes the record.  You may answer.
8     A.  No, we never learned that.
9     Q.  That was never discussed at the
10 Board?
11    A.  Hmm-um.
12    Q.  Okay.  Does that concern you in
13 any way?
14    A.  No.  Change is change.
15    Q.  Are you familiar with Provident's
16 advisory board that existed, I believe, at
17 least from late 1999 to late 2001?
18       MR. BURKE:  Advisory board?
19    Q.  Yes.
20    A.  What's an advisory board?
21    Q.  You don't know what Provident's
22 advisory board is?
23    A.  No.
24       MR. BRAUTIGAM:  Okay.  Let's take
25 a short break.  We've been going for about an

62

1  hour.
2              (Brief recess.)
3  BY MR. BRAUTIGAM:
4     Q.  Dr. Steger, I have placed two
5  deposition exhibits in front of you, the one on
6  your right is Defendant's Exhibit 1.  The one
7  on your left is Plaintiff's Exhibit 9.
8  Directing your attention to Defendant's Exhibit
9  1, have you seen that document before?  And
10 again, Dr. Steger, please take as much time as
11 you need to familiarize yourself with the
12 document.
13    A.  I don't think so.
14    Q.  Okay.  Why not?
15       MR. BURKE:  Why doesn't he think
16 so?
17    Q.  No.
18    A.  I don't have a clue.
19    Q.  Okay.  Did you sign a registration
20 statement with respect to the Provident-OHSL
21 merger?
22    A.  What's a registration statement?
23    Q.  Do you remember signing anything
24 with respect to the Provident-OHSL merger?
25    A.  That's a good question.  Not that

63

1  I can remember.
2     Q.  Okay.  Dr. Steger, are you
3  familiar with the concept of pooling of
4  interest accounting?
5     A.  The -- say that again.
6     Q.  Are you familiar with the concept
7  of pooling of interest accounting?
8     A.  Is that when -- that's the one we
9  got out of and changed from at the bank?
10    Q.  Dr. Steger, are you asking me or
11 telling me?
12    A.  I'm asking you.
13    Q.  Well, I'm afraid that's not how
14 the process works.
15    A.  Oh.
16    Q.  Are you familiar with the concept
17 of purchasing accounting?
18    A.  Well, the -- is a gain on sale?
19 Is that what you're talking about?
20    Q.  Dr. Steger, are you familiar with
21 the concept of securitizations?
22    A.  Yes.
23    Q.  What are securitizations?
24    A.  Well, we bundle together say a
25 package of loans and sell them.

64

1     Q.  Why would an entity do that?
2     A.  Make money.
3     Q.  Is there a certain amount of risk
4  involved with respect to securitizations?
5     A.  There's always a risk whenever you
6  do anything with money.
7     Q.  Is it important to disclose risks
8  to the investing public?
9     A.  Sure.
10    Q.  Okay.  Why is that important?
11    A.  Because then they know what risk
12 they're taking.
13    Q.  Dr. Steger, were proxy materials
14 assembled with respect to the OHSL-Provident
15 merger?
16    A.  Were they assembled?  I don't
17 know.
18    Q.  What role did Provident directors,
19 if any, play in assembling the final document,
20 the final proxy materials used for this merger?
21    A.  My recollection is we didn't
22 pay -- play any role in assembling the
23 materials.
24    Q.  Did you personally play any role
25 in reviewing the materials that were assembled?

65

1    A.  No.
2    Q.  Why not?
3    A.  Because we were briefed, remember?
4  I said we were briefed by the management on the
5  purchase.
6    Q.  What is the purpose of proxy
7  materials?
8    A.  To inform the stockholders.
9    Q.  Of what?
10    A.  Of a purchase or whatever you're
11  doing.
12    Q.  Are you familiar with the term
13  material information?
14    A.  No.
15    Q.  Have you ever heard that term at
16  audit committee meetings, let's say?
17    A.  Not material information, no.
18    Q.  Have you ever heard the term
19  material?
20    A.  I don't think so.
21    Q.  Dr. Steger, do you believe that
22  it's important that the proxy materials be
23  accurate and complete?
24    A.  Absolutely.
25    Q.  Why?

66

1    A.  Because you owe it to the
2  customer.
3    Q.  And which customer are you talking
4  about?
5    A.  The shareholders.
6    Q.  Dr. Steger, what, if anything, did
7  you personally do to ensure that the proxy
8  materials used in this merger were full and
9  complete?
10    A.  I didn't do anything.
11    Q.  And if I asked you why not, you'd
12  say because management did everything; is that
13  correct?
14    A.  Yeah.
15    Q.  Okay.  So it's fair to say that
16  you personally didn't devote any time to making
17  sure the proxy material and registration
18  statement was accurate?
19    A.  That's correct.
20    Q.  Dr. Steger, would it be fair to
21  say that you're a prominent man in the
22  community?
23    A.  I'm not going to judge that.
24    Q.  Do you think you're a fair man?
25    A.  Very.

67

1    Q.  As a director involved in a
2  transaction of this sort, is one of the things
3  you're saying, hey, I'm Dr. Joe Steger, I'm the
4  president of UC and a Board member, and I
5  support this transaction?
6    MR. BURKE:  Objection.
7    Q.  Was that one of the things the
8  proxy materials were saying?
9    MR. BURKE:  Objection to form.
10    A.  Well, two things.  One, it has
11  nothing to do with me being at the University
12  and the president.  It has to do with my role
13  as a director.  And I could be, you know, own a
14  small company and be a director.  But the point
15  is that we trust the management.  And when they
16  deliver documents or things that you're talking
17  about, we look at them, we say that's fine,
18  good, that looks like a good purchase.  But we
19  don't write the documents, we don't review the
20  documents because that's not our role.
21    Q.  What is your role?
22    A.  Our role is oversight.
23    Q.  Dr. Steger, do you believe that
24  you are personally responsible for any material
25  misstatements or material omissions in the

68

1  proxy materials used in the OHSL-Provident
2  merger?
3    MR. BURKE:  Objection.  Calls for
4  a legal conclusion.  You may answer.
5    A.  Number one, how would I know
6  they're overstatements or misstatements.
7    Q.  Is there a number two, Dr. Steger?
8    A.  No.
9    Q.  Do you have any understanding on
10  the role of KMK, the law firm of Keating,
11  Muething & Klekamp, in writing the proxy
12  materials used in the OHSL-Provident merger?
13    A.  No.
14    Q.  You don't know who the lawyers
15  were who were involved in the transaction --
16    A.  No.
17    Q.  -- correct?  Okay.  You didn't
18  have any interaction with these lawyers?
19    A.  No.  Up until now.
20    Q.  During 1999, did you have a clear
21  understanding of what the KMK firm was doing on
22  behalf of Provident?
23    A.  Doing in terms of what?
24    Q.  Working on the merger transaction.
25    MR. BURKE:  Objection.  Asked and

JOSEPH A. STEGER

69

1  answered.
2        A.  No.
3        Q.  Do you think it's in general,
4  generally speaking, a good idea for the client,
5  meaning Provident, to have a clear
6  understanding of what its attorneys, meaning
7  KMK, are doing?
8        A.  Sure.  I would assume we do.
9        Q.  Why would you assume that?
10        A.  Because we had very good legal
11  counsel.
12        Q.  No, my question went to the
13  Board's understanding of what the self
14  described, very good legal counsel is doing.
15        MR. BURKE:  I just note that's a
16  different question.  You asked about Provident,
17  not the Board.
18        Q.  Okay.
19        A.  You asked -- right.
20        Q.  Okay.  Different question.
21        A.  Well, the Board wouldn't be
22  involved at that level.
23        Q.  Do you have any understanding of
24  the role of Dinsmore & Shohl with respect to
25  this merger transaction between Provident and

70

1  OHSL?
2        A.  No.
3        Q.  Dr. Steger, are you familiar at
4  all with the federal securities laws?
5        A.  Well, I wouldn't say I was very
6  familiar, but I -- we do get good counsel by
7  outside auditors and so forth.
8        Q.  And what are the outside auditors
9  telling you with respect to the federal
10  securities laws
11        A.  Well, REGO and things like that.
12        Q.  Have you had any Board meetings
13  since the Enron scandal hit the newspapers?
14        A.  No.
15        MR. BURKE:  Objection to
16  relevance.
17        Q.  Are you familiar with what's known
18  as the 1933 Act?
19        A.  No.
20        Q.  Are you familiar with what's known
21  as the 1934 Act?
22        A.  No.
23        Q.  Are you generally familiar with
24  the concept of full and fair disclosure?
25        A.  In general.

71

1        Q.  And what do you understand that
2  concept to mean?
3        A.  Well, as a public official, it
4  means that you just stick with the facts.
5        Q.  Does it further mean that you
6  can't omit material things?
7        A.  I don't know.
8        Q.  For example, when you swore to
9  tell the truth today, you swore to tell the
10  truth, the whole truth, and nothing but the
11  truth, correct?
12        A.  Um-hmm.
13        Q.  That's yes, Dr. Steger?
14        A.  Yes.
15        Q.  And the second part of that, the
16  whole truth, that's roughly equivalent to the
17  federal securities laws calling for full and
18  fair disclosure.  Is that correct?
19        MR. BURKE:  Objection to form.
20        A.  I have no idea.  I'm not going to
21  guess at something.
22        Q.  Okay.  Dr. Steger, let's take a
23  look at what has been marked as Plaintiff's
24  Exhibit 1 previously.
25        A.  There is nothing marked.

72

1        Q.  It was marked in a different
2  deposition.  You can take my word for it --
3        A.  Oh.
4        Q.  -- that that's Plaintiff's Exhibit
5  1.  If I can direct your attention to the two
6  columns on the right.  If you could read that
7  to yourself, Dr. Steger.
8        A.  Okay.
9        Q.  For the record, Dr. Steger,
10  Plaintiff's Exhibit 1 is an article from August
11  2000 from the Cincinnati Business Courier.
12  Have you seen this document before today?
13        A.  No.
14        Q.  Dr. Steger, what is your
15  understanding of the word unanimous?
16        A.  Well, it's whoever present at a
17  quorum, they all voted the same way.
18        Q.  How did Provident's Board work
19  with respect to unanimous votes?  Can you
20  describe that process?
21        A.  Yeah.  Everybody votes yes, or
22  everybody votes no.
23        Q.  And would that include the
24  Chairman of the Board?
25        A.  Chairman of the Board doesn't

73

```
 1    vote.
 2          Q.  At Provident?
 3          A.  Well, he does -- see, the outside
 4    officers vote.  And by the outside, I mean the
 5    outside members vote.
 6          Q.  Okay.
 7          A.  You know Robert's Rules of Order,
 8    and you define the quorum, and the quorum is
 9    who votes.  And I don't know what this bank had
10    as a quorum.  Did they all vote or what?
11          Q.  Well, let me ask you with respect
12    to Provident.  When something is -- when a
13    motion is made at a Provident Board meeting,
14    it's then seconded, correct?
15          A.  Correct.
16          Q.  And then a vote is taken, correct?
17          A.  Correct.
18          Q.  And when that vote is recorded in
19    the minutes as being unanimous --
20          A.  Um-hmm.
21          Q.  -- that means that each director
22    present voted in favor of the -- whatever we're
23    talking about, correct?
24          A.  Correct.
25          Q.  Okay.  And that would include the
```

74

```
 1    Chairman of the Board, correct?
 2          A.  I don't know that it does.  It
 3    depends again on the rules, but I would assume
 4    he is a voting member.
 5          Q.  Okay.  And you've been on --
 6          A.  But typically it's just the
 7    outside board members that vote.
 8          Q.  And why is that?
 9          A.  Why is that?  Because that's the
10    way they set it up.
11          Q.  How many inside directors does
12    Provident now have?
13          A.  You know, I don't know.
14          Q.  How many inside directors did it
15    have in 1999?
16          A.  That's -- the only inside director
17    is probably the CEO.
18          Q.  Dr. Steger, if I could direct your
19    attention to Defendant's Exhibit 1, do you see
20    that in front of you?
21          A.  Um-hmm.
22          Q.  I am interested in the sentence,
23    "Your Board of Directors unanimously approved
24    the acquisition and believes that it is in the
25    best interest of OHSL stockholders."  Do you
```

75

```
 1    see that?  It's the third paragraph from the
 2    bottom.
 3          A.  Yeah.
 4          Q.  Okay.  How do you read unanimously
 5    in that sentence?
 6          A.  They all voted yes.
 7          Q.  Okay.  And when you say "they
 8    all," you're referring to the Oak Hills
 9    directors, correct?
10          MR. BURKE:  Who -- which Oak Hills
11    directors?
12          A.  No, no.
13          MR. BURKE:  You can answer.
14          A.  No, whoever was at the meeting.
15          Q.  Okay.  Does it say anything about
16    whoever was at the meeting?
17          A.  No.
18          Q.  Okay.
19          A.  If you're absent, your vote can't
20    count.
21          Q.  If you're absent, do you think
22    that's something that should be disclosed to
23    the shareholders?
24          A.  No.
25          Q.  Why not?
```

76

```
 1          A.  Because you have a quorum.
 2          Q.  Well, why don't you say we had a
 3    quorum, but the entire Board didn't vote in
 4    favor of it, because not everybody was there?
 5          MR. BURKE:  Objection.  Calls for
 6    speculation.  You may answer.
 7          A.  It's all so redundant, you don't
 8    run around doing that.
 9          Q.  Just can't be bothered?
10          A.  It doesn't make any sense.  You
11    have a Board meeting, if one person's missing,
12    everyone votes, that person trusts those
13    people.
14          Q.  Is it fair to tell the investing
15    public that the Board voted unanimously if
16    people were absent?
17          A.  Absolutely.
18          Q.  Why?
19          A.  Because those present voted
20    unanimously.  That's what Robert's Rules of
21    Order say.  People that aren't there can't
22    vote.
23          Q.  Okay.  Dr. Steger, let me direct
24    your attention to Plaintiff's Exhibit 1, the
25    right-hand column, the first paragraph.  There
```

77

1    is a sentence that says "Brautigam alleges."
2    Do you see that?
3        A.  Where are you?
4        Q.  Very top of the right-hand column
5    there.  Right by your finger, "Brautigam
6    alleges."
7        A.  Yeah.
8        Q.  Okay.  Would you just read that to
9    yourself, please?
10       MR. BURKE:  I'll object, there's
11   no foundation that this witness has ever seen
12   it, it's a hearsay document.  I believe this is
13   inappropriate questioning, but you may go
14   ahead.  I object.
15       A.  Okay.  I read it.
16       Q.  Okay.  After that sentence it
17   says, "Burke's response," and I'd read it,
18   "Hanauer opposed the Provident takeover because
19   he wanted Oak Hills to remain independent."  Do
20   you know who Hanauer is from that previous
21   sentence?
22       A.  He's got -- obviously he's got
23   something to do with Oak Hills.
24       Q.  You don't know who he is?
25       A.  No.

78

1        Q.  Okay.  Can you accept my
2    representation that he was the CEO and a Board
3    member of OHSL in 1999?
4        A.  Oh, I assume you don't lie.
5        Q.  Okay.  Dr. Steger, do you believe
6    that this is information that should be shared
7    with the shareholders, meaning the position of
8    the CEO and the only director who is a member
9    of management?
10       MR. BURKE:  Objection.  Assumes
11   facts not in evidence.  This calls for complete
12   speculation on the part of this witness.
13       A.  No, because he voted in favor.
14   That's it.
15       Q.  What do you mean by "that's it"?
16       A.  The vote was unanimous and he was
17   one of the votes.  I don't care what he
18   speculates about afterward.
19       Q.  Do you think if the CEO of a
20   corporation voted his shares in a different way
21   from the way he voted as a director, that that
22   would be material information?
23       A.  No.
24       Q.  Why not?
25       A.  Because the vote is the vote.  And

79

1    that's what he did.  He did his public
2    statement by voting.  If he wants to then go do
3    his shares, that's a private statement.
4        Q.  Dr. Steger, you said you're a very
5    fair man, correct?
6        A.  Right.
7        Q.  Let me represent to you that Ken
8    Hanauer ran the special meeting of shareholders
9    for Oak Hills on October 25th, 1999.  And the
10   purpose of that meeting was to approve the
11   Provident-Oak Hills merger.  Are you with me so
12   far?
13       A.  Yes.
14       Q.  Okay.  And even though Mr. Hanauer
15   ran that meeting for the purpose that I've
16   outlined, he had previously voted his personal
17   shares against the transaction.  Do you think
18   that's fair?
19       MR. BURKE:  Objection.  Assumes
20   facts not in evidence, calls for speculation.
21       A.  It's irrelevant.  If he voted yes
22   at that meeting, that's the vote.
23       Q.  Which meeting are you referring
24   to?
25       A.  This one where he says he had

80

1    voted in favor of the transaction.
2        Q.  Okay.  Let's take a look at that
3    sentence in Defendant's Exhibit 1 again.  "Your
4    Board of Directors unanimously approved the
5    acquisition."
6        A.  They did.
7        Q.  Okay.  The second part of that
8    sentence continues, "and believe that it is in
9    the best interest of OHSL stockholders."  Did I
10   read that correctly?
11       A.  Correct.
12       Q.  Does unanimous also -- I'm sorry,
13   unanimously also modify the second part of that
14   sentence?
15       MR. BURKE:  Objection.  Calls for
16   speculation.
17       A.  No.  They're both unanimous.
18       Q.  When you say both, what are you
19   referring to?
20       A.  I'm saying that the vote was
21   unanimous and, therefore, the people have to
22   understand that the Board was unanimous.
23       Q.  What about the belief that the
24   acquisition is in the best interest of OHSL
25   stockholders?  Is that also unanimous as it

81

1 appears on that page?
2         MR. BURKE: Objection. Document
3 speaks for itself.
4         A. Sure, it says the Board was
5 unanimous in recommending that.
6         Q. Okay. Dr. Steger, let me
7 represent to you that Mr. Hanauer testified
8 that at no time in 1999 did he believe that the
9 OHSL-Provident merger was in the best interest
10 of OHSL shareholders. Do you have a problem
11 with that?
12         A. No.
13         MR. BURKE: Objection. Misstates
14 the --
15         A. He voted --
16         MR. BURKE: Misstates the record.
17         A. Let's make this very simple. He
18 voted yes. Once he did that, I don't care what
19 he said privately. I don't care what he did
20 with his stock, because he said yes, it's a
21 great merger.
22         Q. What if he changes his mind later?
23         A. That's tough.
24         Q. Wouldn't that have to be disclosed
25 to the shareholders?

82

1         A. No, it's after the fact.
2         Q. After the fact of what?
3         A. After the vote. He already said
4 his public statement with that vote.
5         Q. When you say "public statement,"
6 what are you referring to?
7         A. I'm referring to the fact that
8 this becomes the record of the meeting, that he
9 said yes to the merger.
10         Q. Let the record reflect that the
11 witness is referring to Plaintiff's Exhibit 1.
12         A. Right.
13         Q. Dr. Steger, this is a newspaper
14 article from August of 2000. And you were
15 pointing at it and said that this becomes the
16 public record. Can you just explain your
17 answer?
18         A. I didn't say the --
19         MR. BURKE: You handed it to him.
20         A. I said the action becomes the
21 public record, not the paper.
22         Q. How would the vote of a director
23 become part of a public record?
24         A. Simply because they already
25 announced in that document it was unanimous.

83

1         Q. In Defendant's Exhibit 1?
2         A. Yeah.
3         Q. Dr. Steger, what if I were to
4 represent to you that the Chairman of the Board
5 did not vote with respect to this transaction,
6 would it then be unanimous in your view?
7         A. I'm not going to make that
8 assumption. He's already done it, it is
9 unanimous. Why are you getting away from the
10 facts?
11         Q. Dr. Steger, let me represent to
12 you that Norbert Brinker was the chairman of
13 the OHSL Board in 1999. Are you with me?
14         A. Yeah. I don't know who he is,
15 but --
16         Q. Okay. Dr. Steger, you can see
17 that he signed the document --
18         A. Yeah.
19         Q. -- correct? And beneath his
20 signature it says Chairman of the Board,
21 correct?
22         MR. BURKE: Document speaks for
23 itself and calls for speculation from this
24 witness. You may answer.
25         Q. Okay. Dr. Steger, let me

84

1 represent to you that Mr. Brinker simply did
2 not vote with respect to the OHSL-Provident
3 merger, okay? Can you accept that
4 representation?
5         A. Sure.
6         Q. Okay. Do you --
7         A. I assume it's a fact.
8         Q. Okay. Do you then -- do you still
9 believe this sentence, "Your Board of Directors
10 unanimously approved the acquisition and
11 believes that it is in the best interest of
12 OHSL stockholders," to be true?
13         MR. BURKE: Objection. Calls for
14 speculation. You may answer.
15         A. Okay. All of those that voted
16 voted unanimously and it was all yes. If the
17 man doesn't want to vote, he doesn't count.
18         Q. Does it --
19         A. It's that six.
20         Q. Does it say that in the document?
21         A. Well, of course not.
22         Q. Do you think it should say that in
23 the document?
24         A. No.
25         Q. Why not?

85

1    A. You don't need it. You had a vote
2 large enough to carry the transaction. If I
3 don't want to vote and I'm there, that's my
4 problem.
5    Q. Don't you think that's something
6 that's potentially of interest to OHSL
7 shareholders?
8        MR. BURKE: Objection. Calls for
9 speculation.
10    A. It's after the fact.
11    Q. After what fact?
12    A. They already voted to sell it.
13    Q. Well, Dr. Steger, let me represent
14 to you that I believe the vote referred to here
15 took place on August 2nd, 1999. That didn't
16 close the deal, did it?
17        MR. BURKE: Objection. Calls for
18 speculation.
19    A. I have no idea if it closed the
20 deal.
21    Q. Well, there were other things that
22 were required before the merger could be
23 effected, correct?
24    A. Yeah, but what's that relevance to
25 their vote?

86

1    Q. One of the things that was
2 necessary for the merger to be effected was the
3 vote of OHSL shareholders, correct?
4    A. That's what we've just been
5 talking about.
6    Q. And the shareholders had to have
7 some guidance with respect to how to vote,
8 correct?
9    A. They did. They got the guidance
10 right there, they voted unanimously.
11    Q. Okay. And do you believe that the
12 shareholders should rely on that guidance, as
13 you put it, they voted unanimously?
14        MR. BURKE: Objection. Calls for
15 speculation as to what's in the mind of the
16 shareholders. You may answer.
17    A. All I know is that I would assume
18 that when a Board votes unanimously for
19 something, and I'm a shareholder, I'd go with
20 them, but it's a shareholder's decision.
21    Q. And if there was some dissent
22 within the Board, you would want additional
23 information, correct?
24        MR. BURKE: Objection.
25    A. I don't see any dissent.

87

1    Q. If the Board was somehow split,
2 you would want to receive that information as a
3 shareholder, correct?
4        MR. BURKE: Objection. Calls for
5 speculation. He's not an OHSL shareholder.
6    A. Back to the vote. The vote was
7 not split. Everybody that voted voted yes. So
8 you're giving me an after the fact split.
9 Well, that's tough.
10    Q. Dr. Steger, assume for purposes of
11 this question that an OHSL director resigned in
12 part in protest three days before this vote was
13 taken. Do you think that that's material
14 information?
15        MR. BURKE: Objection. Calls for
16 speculation, assumes facts not in evidence.
17    A. If he resigned, it's irrelevant.
18 He's gone.
19    Q. Even if he resigned in part in
20 protest?
21        MR. BURKE: Objection.
22    A. Sure.
23        MR. BURKE: Assumes facts not in
24 evidence. You can answer.
25    A. Yeah.

88

1    Q. Why do you believe that, Dr.
2 Steger?
3    A. Because if he really wanted to
4 have an effect, he would have stayed and voted
5 no.
6    Q. Well, Dr. Steger, you resigned
7 from the PNC Board, correct?
8    A. Correct.
9    Q. And that's because you just didn't
10 want to be there, correct?
11    A. But I wasn't protesting, I just
12 thought I don't like that style of management.
13 It's my opinion and I can quit whenever I want
14 to. I wasn't protesting anything.
15    Q. Okay. Well, Mr. Herron, this is
16 the director we're talking about, testified
17 that he did resign in part in protest.
18        MR. BURKE: Objection.
19    Q. Are you with me?
20        MR. BURKE: Calls for speculation.
21 Assumes facts not in evidence. This witness
22 has no knowledge of any of this stuff, Mike.
23    Q. Dr. Steger, if one of the Oak
24 Hills directors resigned in protest three days
25 before the vote was taken, the vote of the

89

1  directors to merge with Provident, is that
2  something that you would be interested in as a
3  Provident director?
4      A.  No, because he did a great
5  disservice.  He left the Board, and once you
6  leave the Board, that's it.  He should have
7  stayed and voted no if he really wanted to make
8  a protest.
9      Q.  Why do you say that, Dr. Steger?
10     A.  Because that's what you do.
11 That's why we have boards.  You don't quit when
12 it gets tough, that you don't like something,
13 you vote against it.
14     Q.  So would it be fair to say that
15 you view Mr. Herron's actions in resigning as
16 somehow dishonorable?
17        MR. BURKE:  Objection.  Calls for
18 speculation.
19     A.  Well, I don't know that I'd call
20 it that.  I'd call it somewhat cowardly.
21     Q.  Cowardly, okay.  Let's mark this
22 as Plaintiff's Exhibit 27.
23        (Steger Exhibit Number 27
24        was marked for identification.)
25     A.  What are we looking at here?

90

1      Q.  Dr. Steger, I have handed you what
2  the reporter has marked as Plaintiff's
3  Deposition Exhibit 27, which I will represent
4  to you is an August 3rd, 1999 press release
5  from Provident Financial Group, Inc.  Have you
6  seen this document before?
7      A.  I'm sure I have, yeah.  I mean I
8  didn't memorize it, but --
9      Q.  Okay.  Are you familiar with this
10 document?
11     A.  I would say yes.
12     Q.  Do you recognize this document?
13     A.  Um-hmm.
14     Q.  What is Plaintiff's Deposition
15 Exhibit 27?
16     A.  You want me to answer yes?
17     Q.  If you could answer the question.
18 What is the document?
19     A.  Oh, it's essentially the
20 announcement of the acquisition of OHSL.
21     Q.  Did you see this document before
22 it went out?
23     A.  No.
24     Q.  Did you read it on or about August
25 3rd, 1999?

91

1      A.  I can't remember the -- when, but
2  it certainly would have probably been around
3  then.
4      Q.  Okay.  Let me direct your
5  attention to the third paragraph.  Well, before
6  that, when you read this document, did you
7  understand it?
8      A.  Mostly, um-hmm.
9      Q.  Are there things in it that you
10 did not understand?
11     A.  Well, I'd have to study it at
12 length to answer your question, but in general
13 I understand it, yeah.
14     Q.  Okay.  Let me direct your
15 attention to that third paragraph, the second
16 sentence.  It says, "Due diligence work,
17 including an assessment of year 2000 readiness,
18 has been completed by both companies and their
19 advisors."  Do you see that sentence?
20     A.  Um-hmm.
21     Q.  Did I read that correctly?
22     A.  Um-hmm.
23     Q.  Okay.  Can you define due
24 diligence work, please?
25     A.  Due diligence is essentially a

92

1  measure of concern about the readiness for the
2  year 2000 changeover in the computing system.
3      Q.  Okay.  Does due diligence include
4  anything else in this context?
5      A.  No.
6      Q.  Did you have any special expertise
7  with respect to the Y2K changeover?
8      A.  Did I?
9      Q.  Yes.
10     A.  No.
11     Q.  So you were not consulted with
12 respect to OHSL's computer systems or anything
13 like that?
14     A.  No.
15     Q.  Okay.  From reading this document,
16 which we've concluded is dated August 3rd,
17 1999, would you conclude that the OHSL Board
18 had already voted to approve the transaction on
19 or before this date?
20     A.  I'll have to read it again
21 carefully to answer that question.  Let me read
22 it again.  It says right here it was approved
23 by both Boards.  Wasn't that your question?
24     Q.  Well, the answer is, you would
25 conclude that it was approved by the OHSL Board

93

1  on or before August 3rd, 1999, correct?
2      MR. BURKE: Objection. Document
3  speaks for itself, he has no firsthand
4  knowledge of that.
5      A. I don't know about the date, but I
6  do know it says the Board of both have approved
7  it.
8      Q. And the date of this press release
9  is August 3rd, correct?
10     A. Yeah.
11     Q. Top left?
12     A. Yeah.
13     Q. Okay. So it couldn't be referring
14 to any vote that took place after August 3rd of
15 1999, correct?
16     MR. BURKE: Objection. You may
17 answer. I mean, I don't think there's any
18 foundation.
19     A. Yeah. It already says it was
20 approved by both.
21       (Steger Exhibit Number 28
22         was marked for identification.)
23     Q. Dr. Steger, the reporter has
24 handed you what has been marked as Plaintiff's
25 Deposition Exhibit 28. And in an earlier

94

1  deposition it was marked as Herron Deposition
2  Exhibit 7. Let me represent to you that this
3  is the Court's July 25th, 2000 order on the
4  motion to dismiss.
5      Please take as much time as you
6  need to familiarize yourself with the document.
7  I believe that I can clue you in to certain
8  things that we need to talk about. Dr. Steger,
9  my first question is, have you seen this
10 document before?
11     A. No.
12     Q. Okay. Dr. Steger, are you
13 familiar with the term control person?
14     A. No, but you can educate me.
15     Q. Dr. Steger, are you familiar with
16 something that's sometimes referred to as rule
17 10(B)(5)?
18     MR. BURKE: Objection. Calls for
19 a legal conclusion.
20     A. No.
21     Q. Are you generally familiar with
22 the concept that it's unlawful to make any
23 untrue statement of material fact or to omit to
24 state a material fact -- I'm on page 15 of the
25 document --

95

1      A. Okay, that helps.
2      Q. -- necessary in order to make the
3  statements made, in light of the circumstances
4  under which they were made, not misleading?
5      MR. BURKE: Objection.
6      A. I have no clue what you just said.
7      Q. Okay. I essentially read --
8      A. B?
9      Q. -- paragraph B.
10     MR. BURKE: You want him to -- I
11 mean, I don't understand what you're asking.
12     MR. BRAUTIGAM: I asked if he was
13 familiar with that concept.
14     MR. BURKE: Okay.
15     MS. LUGBILL: Start reading here,
16 otherwise it doesn't make any sense.
17 BY MR. BRAUTIGAM:
18     Q. Dr. Steger, my co-counsel has
19 suggested I approach this in a slightly
20 different way.
21     A. Okay.
22     Q. May I direct your attention to
23 page 14?
24     A. All right.
25     Q. Do you see toward the bottom,

96

1  footnote nine starts out, 17 C.F.R. Section
2  240.10b (a) and then it says "provides." And
3  the first part of that is -- take as much time
4  as you need to review it, Dr. Steger.
5      A. Okay. That's good not to scheme
6  to defraud. Okay. I'm up to here, now what?
7      Q. Well, actually I think it jumps
8  over to the footnote here, section B.
9      A. Oh, okay. All right.
10     Q. Dr. Steger, are you generally
11 familiar with the concepts outlined in footnote
12 nine?
13     MR. BURKE: Objection. You're
14 asking about a document which he's never seen,
15 asking him to read statutory provisions in the
16 Code of Federal Regulations. I mean, I think
17 it at the very least calls for a legal
18 conclusion, but I object to the form.
19     A. Where is footnote nine anyway?
20     Q. It starts on page 14, Dr. Steger.
21     A. This?
22     Q. Yes, right by your finger.
23     A. Oh, this little tiny nine?
24     Q. Yes, Doctor.
25     A. I'm looking at 17.

97

1    Q.  That's the first line of the
2  footnote.
3    A.  Okay.  Well, in general, yeah, I
4  mean, I understand you're not supposed to
5  mislead people.
6    Q.  Okay.  Dr. Steger, if Mr. Hanauer,
7  the OHSL CEO and Board member, was against the
8  transaction but he didn't disclose his feelings
9  to the investing public, do you think that that
10  had the effect of misleading the investing
11  public?
12    MR. BURKE:  Objection.  Calls for
13  speculation, misstates the record.  Assumes
14  facts not in evidence.  And I believe it's been
15  asked and answered.  You may answer.
16    A.  No, he voted yes.
17    Q.  Okay.  What about his vote as a
18  shareholder?
19    A.  That's irrelevant.
20    Q.  Why do you believe that that's
21  irrelevant?
22    A.  When you're in a role as a
23  director and you vote yes, that's your role as
24  a director.  If I then want to sell my stock or
25  I want to burn the stock, it's my business.  It

98

1  has nothing to do with the transaction.
2    Q.  Dr. Steger, please clarify for the
3  jury why you believe that the vote of the
4  person who's running the meeting, asking people
5  to vote in favor of the transaction --
6    A.  I don't know that.
7    Q.  -- but who voted his personal
8  shares against the transaction, is irrelevant.
9    MR. BURKE:  Objection.  Asked and
10  answered.
11    A.  Yeah.  I don't know how many times
12  I've got to answer this for you.  The act of
13  voting is the defining moment for the decision.
14  Not selling your stock.  That has nothing to do
15  with the business of the day.  The business of
16  the day is do we want to go with Provident or
17  not.  Unanimously we do, period.
18    Q.  Dr. Steger, in the previous answer
19  you referred to not selling your stock.  I
20  believe the hypothetical that I set up was a
21  little different in the sense that it didn't
22  involve selling the stock, it involved voting
23  your shares against the transaction.
24    A.  Fine.
25    Q.  Are you with me?

99

1    A.  Yeah, but that's irrelevant.
2    Q.  And your answer is the same?
3    A.  Yeah.
4    Q.  Okay.  Dr. Steger, with respect to
5  Plaintiff's Deposition Exhibit 27, the press
6  release --
7    A.  Yeah.
8    Q.  -- if I could direct your
9  attention to the paragraph that starts, "OHSL
10  president and chief executive officer."  Do you
11  see that?
12    A.  Yeah.  This one, Hoverson?
13    Q.  No.
14    A.  Oh, down here.  Oh, that's the
15  guy, Hanauer.
16    Q.  Yes.  Do you see that paragraph,
17  Dr. Steger?
18    A.  Um-hmm.
19    Q.  Could you read that to yourself,
20  please.
21    A.  Um-hmm.
22    Q.  Dr. Steger, would it be fair to
23  conclude from reading that paragraph that Mr.
24  Hanauer is in favor of this transaction?
25    A.  Yeah, and he voted yes.

100

1    Q.  Okay.  Would it be further fair to
2  conclude from reading that paragraph that Mr.
3  Hanauer would vote his personal shares in favor
4  of the transaction?
5    MR. BURKE:  Objection.
6    A.  That's speculation.  I can't --
7  I'm not Hanauer.
8    Q.  Dr. Steger, are you familiar with
9  the term known as voting agreements?
10    A.  No.
11    Q.  Dr. Steger, have you ever heard of
12  Project Bearcat?
13    A.  No.  Bearcat, that's good.  I'd
14  like to find out about it.
15    (Steger Exhibit Number 29
16    was marked for identification.)
17    Q.  Dr. Steger, I have handed you what
18  has been marked as Plaintiff's Deposition
19  Exhibit 29, and I ask you to take a look at it.
20  For the record, this is a document entitled
21  McDonald Equity Research.  And it's dated
22  August 18th, 1999.
23    A.  Oh, this is somebody doing
24  research.  Probably a broker or somebody like
25  that?  Do you know what the group is?

101

```
 1        Q.  Yes, Dr. Steger, I believe it's
 2  McDonald Investments.  Dr. Steger -- right.
 3  Their contact information is referenced on the
 4  last page of the document, I believe they're
 5  based in Cleveland.  In the lower right-hand
 6  side there's a little key that says McDonald
 7  Investments and then has their address in
 8  Cleveland.
 9        A.  Oh, yes, thank you.
10        Q.  Dr. Steger, if you could keep this
11  in front of you, are you familiar with the
12  phrase conflict of interest?
13        A.  Um-hmm.
14        Q.  What do you understand that phrase
15  to mean?
16        A.  It means that essentially you have
17  what I would call a concern because your
18  interest in one thing has a problem with
19  another activity that you're engaged in.
20        Q.  And in the business world, is that
21  a problem?
22        MR. BURKE:  Objection.  You may
23  answer.  Calls for speculation.
24        A.  It can be or it can't be, depends
25  how you deal with it.
```

102

```
 1        Q.  Okay.  How was the Oak
 2  Hills-Provident merger structured?
 3        A.  I have no idea, its structure.  I
 4  don't know what that means.
 5        Q.  Can you tell me the terms of the
 6  OHSL-Provident merger?
 7        A.  No.
 8        Q.  Not even one term?
 9        A.  (Witness shook head.)  I mean, I
10  know you bought out stock and things like that,
11  but I don't remember all that stuff.
12        Q.  Dr. Steger, did OHSL's Board, or
13  the company itself, have investment bankers
14  advising them on the transaction?
15        A.  I wouldn't have a clue.
16        Q.  Do you think that if they had
17  McDonald & Company advising them on the
18  transaction, that McDonald investments should
19  also be rating Provident stock?
20        MR. BURKE:  Objection.  Calls for
21  speculation.
22        A.  Yeah, I mean, I would -- I don't
23  object because most of those are in companies,
24  the investment people are not the people that
25  are advising them, those are writing this
```

103

```
 1  stuff.  So unless you know the circumstances, I
 2  can't answer the question.
 3        Q.  Are you familiar with the term
 4  Chinese wall?
 5        A.  Um-hmm.
 6        Q.  What do you understand that term
 7  to mean?
 8        A.  Well, it's big with law firms.
 9  And if he's working for me and you're working
10  for someone else, the two of you don't talk to
11  each other about the case.
12        Q.  Is that the concept that you
13  referred to in your previous answer?
14        MR. BURKE:  Objection.  I don't
15  think he referred to that concept.
16        A.  No, I didn't refer to that
17  concept.  I referred to the fact that they're
18  very busy doing their shtick and I don't see
19  where -- it could be that it could be an
20  influence.  It could be that it couldn't be an
21  influence.  But I can't answer the question.  I
22  don't know enough about the firm.  I don't know
23  enough about what you're talking about.  You're
24  asking me to speculate.
25        Q.  Dr. Steger, was the merger between
```

104

```
 1  Oak Hills and Provident in some way dependent
 2  on the price of Provident stock?
 3        A.  Well, yeah, because the stock was
 4  used for the purchase.
 5        Q.  And if McDonald Investments was
 6  advising OHSL with respect to the transaction
 7  and at the same time changing its rating to the
 8  highest rating and aggressive buy, do you think
 9  that that raises possible conflict of interest
10  questions?
11        MR. BURKE:  Objection.  Calls for
12  speculation.
13        A.  Yeah, you're asking me to assess
14  whether they did a dastardly act or not, and I
15  don't have a clue.
16        Q.  Well, respectfully, Dr. Steger,
17  I'm not asking you to assess whether or not
18  there was a dastardly act.
19        A.  That's what you're trying to get
20  at with McDonald and you're saying they got
21  together and there was collusion among their
22  companies and that's why they came out with
23  this.  I can't tell you the answer to that, I
24  have no clue.
25        Q.  Does the fact that McDonald
```

105

1   Investments was advising OHSL and at the same
2   time changing a rating on Provident stock cause
3   you any concern?
4         MR. BURKE:  Objection.  Misstates
5   the record.
6         A.  Not, not at all.
7         Q.  Why not?
8         A.  Because that's not unusual.
9   You're assuming they cheat, I'm assuming they
10  don't.
11        Q.  Dr. Steger, in your previous
12  answer, you said "you're assuming they cheat."
13  Why do you --
14        A.  You, not me.
15        Q.  Yes, I understand.  Why did you
16  say that?
17        A.  Why did I say it?  Because you're
18  coming to some great conclusion with no
19  evidence.  And the only thing you have left is
20  to assume these people were in collusion.
21  Well, I can make the opposite assumption, and
22  both of us could be wrong
23           (Steger Exhibit Number 30
24            was marked for identification.)
25        Q.  Dr. Steger, the reporter has

106

1   handed you what has been marked as Plaintiff's
2   Deposition Exhibit 30.  Please take a look at
3   that.  For the record, this is a transcript of
4   a conference call that took place on January
5   19th, 2000, bearing Bates numbers P02016 to
6   P02025.  Dr. Steger, my first question is, have
7   you seen this document before?
8         A.  No.
9         Q.  Have you perhaps read this
10  document in a different form, such as on the
11  Internet?
12        A.  No.
13        Q.  Dr. Steger, are you familiar with
14  the concept of forward looking statements?
15        A.  No.
16        Q.  If I could direct your attention
17  to several pages into the document, bearing the
18  Bates stamp, that's that P number, ending in
19  19.  Do you have that?
20        A.  Yes.
21        Q.  Okay.  Do you see where Fred
22  Cummins of McDonald Investments starts speaking
23  in the middle of the page?
24        A.  Um-hmm.
25        Q.  Okay.  A little further down he's

107

1   talking about the OHSL acquisition.  Do you see
2   that?
3         A.  Um-hmm.
4         Q.  Would you take a moment to read
5   that part of the page to yourself, please?
6         A.  Just Fred Cummins?
7         Q.  Yes.
8         A.  Okay.
9         Q.  Have you had a chance to review
10  that section?
11        A.  Yeah.  There's two sentences
12  there.
13        Q.  Okay.  Do you see Chris Carey has
14  a comment in the penultimate paragraph?
15        A.  Um-hmm.
16        Q.  And would you read that comment
17  into the record, please?
18        MR. BURKE:  The penultimate
19  paragraph, are we talking one, two -- fourth
20  paragraph from the bottom?
21        Q.  No, penultimate means second to
22  the last.
23        A.  Oh, down here.  So that one has
24  come off without a hitch.
25        Q.  Right.  And Mr. Carey was

108

1   referring to the OHSL merger, correct?
2         A.  Um-hmm.
3         Q.  Do you agree with his assessment
4   that the merger came off without a hitch?
5         A.  Yeah.
6         Q.  Well, what about the fact of the
7   litigation and you sitting here today?
8         A.  Oh, you can get sued for anything.
9   That doesn't mean a thing.
10        Q.  Do you believe that this
11  litigation has no merit?
12        A.  Yeah, I'd say so.
13        Q.  Okay.  What is that conclusion
14  based on?
15        A.  The unanimous vote of their Board
16  and so forth.
17        Q.  Anything else?
18        A.  No.  I mean, it's a transaction
19  that seems to me to have gone the way it --
20  both Boards voted and there's nothing else in
21  there.
22        Q.  Do you understand that a federal
23  judge has reached a slightly different
24  conclusion?
25        MR. BURKE:  That's a

109

1  misrepresentation of the record, Mike.
2      A. Well, first of all --
3          MR. BURKE:  Objection to the
4  form.  Assumes facts not in evidence.
5      A. How could I answer that question?
6  I can't answer that question.  I'm not going to
7  say what a federal judge should be doing.
8      Q. Well, did you read the order?
9  That's one way you can answer the question.
10         MR. BURKE:  Objection.  Asked and
11 answered, he said no.
12     Q. Dr. Steger?
13     A. Hmm-um.
14     Q. Okay.  Is there a particular
15 reason why you did not read the order?
16     A. I, I told you earlier, we run so
17 many suits at the University.  And you know
18 what? Most of them are brought and we win 80
19 or 90 percent of them because, as I said, most
20 of the time there's not a misbehavior.  And
21 I -- and you're trying to get there and I don't
22 see you getting there.
23     Q. Dr. Steger, what would a material
24 amount be to Provident's financial statements?
25     A. A material amount?

110

1      Q. Yes.
2      A. I don't know.  We'd have to talk
3  about when and what time and in what sense.
4      Q. How about in 2002?
5          MR. BURKE:  Objection.  Calls for
6  speculation.
7      A. In 2002, again, I don't know what
8  it would be defined as.
9      Q. Well, order of magnitude.  A
10 hundred dollars would not be a material amount
11 with respect to an institution as large as
12 Provident, correct?
13     A. Yeah, but I'm not going to
14 speculate on what is.
15     Q. Well, perhaps we could bracket it.
16 A hundred million would be a material amount to
17 Provident, correct?
18         MR. BURKE:  Objection.  Asked and
19 answered.
20     A. It depends on what it did for or
21 against us.  I mean sometimes you have to write
22 off things like that.
23     Q. Right.  If you had to pay someone
24 a hundred million dollars, would that be a
25 material amount to Provident?

111

1          MR. BURKE:  Objection.  Calls for
2  speculation.
3      A. Again, I'd have to have Provident
4  answer that question, not me.  I mean we'd have
5  to go back and officers could answer that
6  question.
7      Q. Do you believe there's any
8  Provident director who would be capable of
9  answering that question?
10         MR. BURKE:  What question?  As to
11 what's a material amount?
12     Q. Yes.
13     A. No.
14         MR. BURKE:  Objection.  Calls for
15 speculation.
16     A. That's the thing that's bothering
17 me, I don't know what it would be.
18     Q. Do you think that that's something
19 that a member of the audit committee should
20 know?
21     A. Well, we don't sit down and
22 calculate material amounts.
23     Q. Have the auditors ever discussed
24 with the committee materiality thresholds?
25     A. No.

112

1      Q. Are you familiar with the term
2  materiality threshold?
3      A. Not particularly, because as I
4  said, we sit down with the auditors and we go
5  through a lot of things, but they're already
6  done at that level.
7      Q. What are some of the things that
8  you go through with the auditors?
9      A. Well, we go through audited
10 statements to make sure that they find no
11 misrepresentation, that they find that we have
12 a -- gone along with all of the federal and
13 state laws and so forth and that the
14 information is accurate.  And then we also go
15 through our computing area and the year 2000
16 problems.  We go through things with the
17 auditors over training of our people.  We go
18 through them with new things that are coming
19 down from whatever those audit commissions are
20 called, that are now going to be the future way
21 you do things, so forth.
22     Q. And how does that process work?
23 Does the auditor speak and the committee
24 listen, or is there interchange?  Can you just
25 describe for the jury what that process

113

1   consists of?
2          MR. BURKE:  Objection to form.
3          A.  Well, there's more than one
4   auditor.  There's the audit committee, there's
5   our internal auditor, then there's the external
6   auditor, and you go through that.  And it could
7   be, for example, the feds just finished a
8   review and we walk through the federal review
9   of what, you know, everything looks like.  And
10  we get a clean review and we're all very happy
11  and so forth.
12         Q.  Dr. Steger, have you asked
13  questions at audit committee meetings?
14         A.  Certainly.
15         Q.  Do you remember any of these
16  questions?
17         MR. BURKE:  Objection to
18  relevance, you may answer.
19         A.  Yeah, I mean especially around,
20  because of my background, around the change
21  from the 2000 for the computing system and all
22  of that kind of thing, I asked a lot of
23  questions.
24         Q.  Okay.  Did Provident recently,
25  within the last year or so, change its

114

1   accounting treatment?
2          MR. BURKE:  For what?
3          A.  Yeah.
4          Q.  In any way.
5          MR. BURKE:  Objection.  Calls for
6   speculation.
7          A.  I don't know what you -- what
8   accounting you're talking about.
9          Q.  Did Provident change any
10  accounting treatment at all?
11         A.  I, again, you know, there's -- you
12  have fund accounting, you have profitability
13  accounting, you have cash accounting.  What are
14  you talking about?  You've got to give me a
15  clue to answer your question.
16         (Steger Exhibit Number 31
17         was marked for identification.)
18         Q.  Dr. Steger, the reporter has
19  handed you what has been marked as Plaintiff's
20  Deposition Exhibit 31.  I would ask you to take
21  a look at it, sir.  Dr. Steger, have you seen
22  that document before?
23         A.  Yes.
24         Q.  Are you familiar with it?
25         A.  No.

115

1          Q.  Do you recognize it?
2          A.  Um-hmm.
3          Q.  What is Plaintiff's Deposition
4   Exhibit 31?
5          A.  What is it?
6          Q.  Yes.
7          A.  The minutes from the meeting of a
8   Board of Directors meeting.
9          Q.  And it's the meeting of September
10  16th, 1999, correct?
11         A.  Correct.
12         Q.  And it's in heavily redacted form?
13         A.  Yeah.
14         Q.  Redacted form.  Is that fair?
15         MR. BURKE:  It's in redacted form.
16         Q.  Okay.  Dr. Steger, what's the
17  purpose of Board minutes?
18         A.  To document the Board meeting.
19         Q.  And how are Board minutes used?
20         A.  How are they used?
21         Q.  Yes.
22         A.  Well, I guess if anybody has a
23  question, they can go back and read them.
24         Q.  Okay.  Dr. Steger, did Provident
25  intend from the beginning to close down some

116

1   Oak Hills branches?
2          A.  Never was discussed.
3          Q.  Can I direct your attention to the
4   second page of the document bearing Bates
5   number P001034?  Do you see that?
6          A.  Yeah.
7          Q.  And the heading at the bottom of
8   that page reads, "Branch Consolidation and
9   Closure."  Is that correct?
10         A.  Correct.
11         Q.  And that refers to Oak Hills
12  branches that are targeted for foreclosure?
13         A.  Yeah.
14         Q.  Does that refresh your
15  recollection as to whether or not this topic
16  was discussed?
17         A.  Well, that's not what you asked
18  me.  You asked me did they plan on doing it.
19  And this is when it was up -- brought to the
20  Board, so I don't know if they planned on doing
21  it when.  That's what you asked.
22         Q.  Dr. Steger, when you used "they"
23  in your previous --
24         A.  The management.
25         Q.  Okay.  Do you think that it's

117

1   important for the directors to know what the
2   management planned to do?
3       A.  Well, that's what they brought to
4   us.  They brought a consolidation plan to us,
5   which is good, saving money.
6       Q.  And did you agree with closing
7   these branches?
8       A.  Yes.
9       Q.  Okay.  Because it saved money?
10      A.  Um-hmm.
11      Q.  That's yes?
12      A.  Yeah.
13      Q.  Did you disclose Provident's
14  intention to close branches to the investing
15  public?
16      A.  Well, I didn't disclose anything
17  to anybody.
18      Q.  Okay.  Did Provident disclose its
19  intent to close OHSL branches to the investing
20  public?
21      MR. BURKE:  Objection.  Calls for
22  speculation.  You may answer.
23      A.  I have no idea if they did.
24      Q.  Okay.  Where would you go to find
25  an answer to that question?

118

1       A.  Well, you'd have to call
2   Provident.
3       Q.  And who would you suggest that I
4   speak to to get an answer to that question?
5       A.  Probably one of the officers.
6       Q.  Okay.  Anyone in particular?
7       A.  Well, this was brought by Mr.
8   Magee, legal counsel, so call the legal
9   counsel.
10      MR. BRAUTIGAM:  Okay.  Dr. Steger,
11  we've been at this for another hour.  I think
12  we're close to the end.  I suggest a short
13  break.  Is that agreeable?
14      THE WITNESS:  That's fine.
15      MR. BURKE:  That's fine.
16          (Brief recess.)
17  BY MR. BRAUTIGAM:
18      Q.  Dr. Steger, back on the record.
19  What types of things are brought to the audit
20  committee at Provident?
21      A.  What types of things are brought?
22      Q.  Yes.
23      A.  Well, we go over, for example, the
24  distribution of manpower in terms of auditing
25  and make sure they have enough people.  We go

119

1   over the schedule of the kinds of things
2   they're auditing and why they're auditing.  And
3   the criteria that auditors suggest for his
4   distribution of his manpower -- I shouldn't say
5   that -- people power, that's better -- people
6   power for the next month or two months, and
7   then what they're going to audit and how
8   they're going to do it and so forth.
9       Q.  And what type of things are not
10  brought to the audit committee?
11      MR. BURKE:  Objection.
12      A.  I don't know because they're not
13  brought.
14      Q.  Okay.  Have there been other
15  purchases or mergers at Provident while you've
16  been a director?
17      A.  Purchases, yeah.
18      Q.  Which ones?
19      A.  Off the top of my head I can't
20  name them.  We bought some other small banks.
21      Q.  Okay.  And --
22      MS. LUGBILL:  Where is the
23  McDonald document?
24      Q.  All right.  Does Fidelity
25  Financial of Ohio ring a bell?

120

1       A.  Yeah, Columbus.
2       Q.  All right.  Dr. Steger, could I
3   direct your attention to this document?  It's
4   Exhibit 29.
5       A.  Here it is.
6       Q.  Can I direct your attention to the
7   page ending 27?
8       A.  Twenty-seven.  Okay.
9       Q.  Do you see a chart at the top of
10  the page?
11      A.  Uh-huh.
12      Q.  Are those banks that Provident has
13  acquired?
14      A.  I don't know if they are or not.
15  Some of them may go way back.
16      Q.  Okay.  What does that chart
17  represent, if you know?
18      A.  I don't know.  Where is the chart
19  explained?
20      Q.  Good question.
21      MR. BURKE:  Counsel, I don't mean
22  to suggest a -- I believe that's a comparison
23  of revenue growth among various types of
24  financial institutions.
25      Q.  Right.  It's not related to --

**121**

1 　　　MR. BURKE: These are not
2 companies that we bought.
3 　　　A. I was going to say, I don't
4 remember buying any of them.
5 　　　Q. All right. Do you remember any
6 other acquisitions or mergers?
7 　　　A. By name, not off the top of my
8 head, no.
9 　　　Q. Okay. Dr. Steger, we talked a
10 little bit about conflict of interest before.
11 Do you remember that testimony generally?
12 　　　A. Um-hmm.
13 　　　Q. Are you familiar with the state
14 court litigation that was filed about this
15 merger?
16 　　　A. No.
17 　　　Q. Did you know that state litigation
18 was filed with respect to this merger?
19 　　　A. Hmm-um.
20 　　　Q. Okay. Let me represent to you
21 that there was such an action and Provident was
22 represented by Mr. Burke and the KMK firm, and
23 Oak Hills at the beginning was represented by
24 the Dinsmore firm. Are you with me so far?
25 　　　A. Um-hmm.

**122**

1 　　　Q. Okay. In this federal litigation,
2 are you aware that the KMK firm represents
3 Provident and the Provident directors, as well
4 as Oak Hills and the Oak Hills directors? Are
5 you aware of that fact?
6 　　　A. No.
7 　　　Q. Do you think that that may be a
8 possible conflict of interest?
9 　　　MR. BURKE: Objection. Calls for
10 speculation, irrelevant.
11 　　　A. Well, off the top of my head, no,
12 because they've been acquired so why shouldn't
13 they be defended.
14 　　　Q. Do you think that the interests of
15 the former Oak Hills directors and the
16 interests of Provident and the Provident
17 directors such as yourself are exactly the
18 same?
19 　　　A. Now that they're merged, yeah.
20 　　　Q. Well, the Oak Hills directors
21 aren't merge with the Provident directors,
22 correct?
23 　　　A. No, but the -- assuming the bank
24 says that they're part of Provident.
25 　　　Q. Dr. Steger, I understand that OHSL

**123**

1 is now a part of Provident --
2 　　　A. Yeah.
3 　　　Q. -- but the Oak Hills directors
4 remain individuals, correct?
5 　　　A. Well, they remain individuals,
6 except you were telling me that Provident is
7 representing them in the particular case.
8 　　　Q. Correct.
9 　　　A. Yeah.
10 　　　Q. And my question is, do you believe
11 that your interests as a Provident director are
12 exactly the same as the interests of the Oak
13 Hills directors?
14 　　　MR. BURKE: Objection. Calls for
15 speculation. You can answer.
16 　　　A. They voted yes, they wanted to be
17 part of us, so I assume their interests are the
18 same.
19 　　　Q. Dr. Steger, is there anything that
20 you would do different, you personally, with
21 respect to the OHSL and Provident merger?
22 　　　A. No.
23 　　　Q. You are a person who depends in
24 large part upon his reputation, correct?
25 　　　A. Everybody does.

**124**

1 　　　Q. But you in particular, as a public
2 figure and university president, correct?
3 　　　A. No. I think every individual has
4 to have credibility. I don't care if they're a
5 janitor or they're the head of the university.
6 　　　Q. Dr. Steger, does it bother you in
7 some sense that you've been accused of
8 securities fraud?
9 　　　A. No. I know I didn't.
10 　　　Q. And how do you know that?
11 　　　A. Because we've been spending all
12 afternoon with me telling you how I know it.
13 　　　Q. Could you be more specific with
14 respect to that answer?
15 　　　A. Very simply the Board of the bank
16 that we acquired voted unanimously to be
17 acquired, so what's the fraud?
18 　　　Q. Dr. Steger, were the proxy
19 materials ever brought to the audit committee
20 before they were released to the investing
21 public?
22 　　　A. Well, the proxy materials would
23 never be brought to the audit committee anyway.
24 　　　Q. Were they ever brought to the
25 Board?

125

1    MR. BURKE: Objection. Asked and
2  answered. You may answer again.
3    A. Yeah, I -- I don't believe they
4  were brought to the Board before they were
5  released, no. I mean --
6    MR. BURKE: Off the record.
7    (Discussion off the record.)
8  BY MR. BRAUTIGAM:
9    Q. Dr. Steger, was the deal itself
10 ever brought before the audit committee?
11   A. Not that I recommend -- I mean
12 remember.
13   Q. Was the acquisition of Fidelity
14 ever brought to the audit committee before it
15 occurred?
16   A. Was the acquisition of what?
17   Q. Of Fidelity.
18   A. Oh, you mean the one up in
19 Columbus?
20   Q. Yes.
21   A. Yes, that was brought to the
22 Board.
23   MR. BURKE: To the Board or the
24 audit?
25   A. No, not the audit.

126

1    Q. Why was this one brought to the
2  Board and this one not brought to the Board?
3    A. This was brought to the Board.
4    Q. What was the circumstances of it
5  being brought to the Board?
6    A. This was a presentation like we
7  normally had, and everybody listened and said
8  that sounds good.
9    Q. And how long did this presentation
10 take?
11   A. Oh, I can't remember.
12   Q. Was it at one Board meeting?
13   A. Yes.
14   Q. And how long do Board meetings
15 typically last?
16   A. They can last four hours, five
17 hours, or they can last two hours depending on
18 the docket.
19   Q. And you don't remember how long
20 this one was?
21   A. No.
22   MR. BRAUTIGAM: Okay. Well, Dr.
23 Steger, I'm afraid that I have no further
24 questions at this point, subject to reconvening
25 at some point later. And I thank you for your

127

1  time.
2    THE WITNESS: Thank you.
3
4
5
6    JOSEPH A. STEGER
7
8    - - -
9    (Deposition concluded at 3:15 p.m.)
10   - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

128

1    C E R T I F I C A T E
2  STATE   OF   OHIO:
                        SS:
3  COUNTY OF HAMILTON:
4    I, Lee Ann Williams, a duly qualified
5  and commissioned notary public in and for the
6  State of Ohio, do hereby certify that prior to
7  the giving of his deposition, the within named
8  JOSEPH A. STEGER was by me first duly sworn to
9  testify the truth, the whole truth and nothing
10 but the truth; that the foregoing pages
11 constitute a true and correct transcript of
12 testimony given at said time and place by said
13 deponent; that said deposition was taken by me
14 in stenotypy and transcribed under my
15 supervision; that I am neither a relative of
16 nor attorney for any of the parties to this
17 litigation, nor relative of nor employee of any
18 of their counsel, and have no interest
19 whatsoever in the result of this litigation.
20   IN WITNESS WHEREOF, I hereunto set
21 my hand and official seal of office at
22 Cincinnati, Ohio this ____ day of
23 _____, 2002.
24 MY COMMISSION EXPIRES: _____
   AUGUST 26, 2004        LEE ANN WILLIAMS, RPR/CRR
25                         NOTARY PUBLIC-STATE OF OHIO