### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **WALTER W. THIEMANN,** | ) | **Case No. C-1-00-793** |
| | ) | |
| **Plaintiff,** | ) | **(Judge Sandra S. Beckwith)** |
| | ) | **(Magistrate Judge Timothy S. Hogan)** |
| **-v-** | ) | |
| | ) | **NON-PARTY KMK'S REPLY** |
| **OHSL FINANCIAL CORP., et al.,** | ) | **MEMORANDUM IN SUPPORT OF ITS** |
| | ) | **MOTION FOR PROTECTIVE ORDER** |
| **Defendants.** | ) | **AND/OR MOTION TO MODIFY** |
| | ) | **SUBPOENAS** |
| | ) | |

Plaintiffs' opposition to non-party KMK's motion for protective order is another diatribe of attacks without any responsive substantive argument and only further evidences the need for Court supervision of any depositions of non-party KMK attorneys.

KMK is no longer a party to this litigation. All discovery, whether requests for documents or depositions, is governed by Rule 45. Rule 45 imposes a specific and significant burden on Plaintiffs with explicit enforcement authority by this Court.

> **A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.**

*Fed. R. Civ. P. 45(c)(1) (1991)*. The Advisory Committee notes confirm the importance of this burden:

> Paragraph (c)(1) gives specific application to the principle stated in Rule 26(g) and specifies liability for earnings lost by a non-party witness as a result of a misuse of the subpoena. No change in existing law is thereby effected. Abuse of a subpoena is an actionable tort (citation omitted), and the duty of the attorney to the non-party is also embodied in Model Rule of Professional Conduct 4.4. The

- 1 -

liability of the attorney is correlative to the expanded power of the attorney to issue subpoenas. The liability may include the cost of fees to collect attorneys' fees owed as a result of a breach of this duty.

*Fed. R. Civ. P. 45, Adv. Comm. Notes (1991).*

KMK seeks a protective order because Plaintiffs' counsel has utterly failed to fulfill his burden under Rule 45. Plaintiffs' counsel has now deposed four KMK attorneys; he has subpoenaed a fifth and sixth attorney (Messrs. Kreider and Rosenberg); he has requested to depose a seventh attorney (Mr. Jim Burke); he has indicated a potential need to depose an eighth attorney (Ms. Rachael Rowe); and he has stated that he may seek to depose other KMK attorneys in the future. *See, e.g., Plaintiffs' Counsel's August 1, 2004 Correspondence (Exhibit 1, p. 2, attached).* Non-party KMK is being forced to expend unnecessary time, money, and expense in third party discovery solely at the whim of Plaintiffs' counsel – in clear violation of the explicit burden imposed on Plaintiffs' counsel.

Non-party KMK has repeatedly attempted to limit the burden and expense of the depositions:

- KMK requested that the depositions be delayed until after document issues are resolved to avoid continuing and ongoing depositions – Plaintiffs' counsel refused.

- KMK requested a time limit to the depositions of Messrs. Kreider and Rosenberg – Plaintiffs' counsel refused.

- KMK requested an agreement that if they agree to make Messrs. Kreider and Rosenberg available, there would be no more depositions of KMK attorneys – Plaintiffs' counsel refused.

- KMK requested that the depositions be conducted before the Court to avoid problems and unnecessary argument – Plaintiffs' counsel refused.

Every proposal was met with a categorical rejection.

It is important to note that non-party KMK's motion for protective order, despite all that has happened over the past year, did not seek to *prevent* the depositions of Messrs. Kreider and Rosenberg from going forward. No, non-party KMK's motion merely seeks a protective order and modification of the subpoena for depositions to impose two conditions: (a) to delay the depositions until after document production issues are resolved to prevent unnecessary continued/repeated depositions; and (b) to have the depositions conducted before the Court (or special master) to prevent a further waste of time, money, and expense, and to avoid future motion practice and Court involvement. These two conditions are essential and should be imposed by the Court pursuant to Rule 45.

**The Kreider and Rosenberg Depositions Should Not Go Forward Until All Document Production Issues Are Resolved.**

This issue is simple: what is so unreasonable about a condition to resolve document production issues before conducting third party depositions? And why are Plaintiffs adamantly seeking to proceed with depositions without first resolving the pending document production issues?

Plaintiffs' counsel served a subpoena for documents shortly after KMK was dismissed from the litigation; non-party KMK thereafter properly submitted objections pursuant to Rule 45(c)(2)(B). Since that time, Plaintiffs' counsel has not made any reasonable efforts to resolve the document dispute, other than to reiterate its demand for documents responsive to 24 of the 25 requests in the subpoena. The Court has been aware of Plaintiffs' counsel's argument that KMK is refusing to produce documents and noted in its July 9, 2004 Order (T.d. 349, p. 3) that "[p]resumably, counsel for Plaintiff knows the steps to take in order to compel discovery from a non-party and will take those steps if necessary." Despite this, Plaintiffs' counsel has taken no steps to resolve the document dispute. Even more striking, Plaintiffs' counsel has written that "I

would be remiss, for example, if I undertook the deposition of Messrs. Kreider and Rosenberg without their billing records (only one example), which would no doubt assist them in refreshing their recollection of events long ago." *Plaintiffs' counsel's August 1, 2004 Correspondence at 2 (Ex. 1, p. 2, attached).* If Plaintiffs' counsel would be "remiss" in deposing KMK attorneys without documents, doesn't common sense suggest that the depositions should not proceed until document issues are resolved first? And if Plaintiffs' counsel has had time to file five Objections to Magistrate Orders (*T.d. 368 (8/18/04); T.d. 351 (7/19/04); T.d. 311 (4/6/04); T.d. 300 (3/15/04); and T.d. 250 (1/23/04)*); a Motion to Disqualify KMK (*T.d. 314*); a Motion for Contempt against KMK (*T.d. 344*); a Motion for Sanctions against KMK (*T.d. 345*); and a motion for interlocutory certification of the dismissal of KMK (*T.d. 341*), among other unnecessary pleadings, why has Plaintiffs' counsel not filed a motion regarding the document subpoena?

The only reasonable conclusion given the Court's July 9, 2004 Order and Plaintiffs' counsel's motion practice and conduct is that this is a deliberate and intentional strategy to obtain multiple depositions of each KMK attorney **i.e. before and after** document production. Plaintiffs' counsel wants to start a deposition and raise document issues during the deposition in an attempt to continue the deposition at a later date – at more time and expense to all involved. The Court has already seen evidence of this strategy: in Plaintiffs' counsel's request for a third session with Mr. Brinker; the redeposing of witnesses deposed in the underlying state court litigation; and the Plaintiffs' counsel's repeated requests to extend the seven hours rule for depositions contained in Rule 30. Such a strategy against a third party increases the burden on non-party KMK in violation of Rule 45, rather than fulfilling the duty to avoid burdening a non-party, and must be prohibited by court order.

The Court should prohibit any KMK depositions from proceeding until all document issues are resolved.[1]

### The Court Should Oversee the Depositions to Avoid Continued and Ongoing Motion Practice Regarding Future KMK Discovery

This Court knows firsthand the problems associated with Plaintiffs counsel's depositions. After two hours of monitoring the deposition of Mr. Norm Brinker and reviewing 800 pages of his prior testimony, the Court refused to allow any further examination of the deponent.

Plaintiffs' counsel attempts to argue that there is no evidence to suggest that the depositions of KMK attorneys require supervision. To the contrary, the evidence is abundant:

- The Court has explicitly recognized Plaintiffs' counsel's quest against KMK. (T.d. 227, p. 1).

- The Court has commented that Plaintiffs' counsel has "less than warm and fuzzy feelings" toward KMK attorney Patrick F. Fischer. July 9, 2004 Order at 1 (T.d. 349, p. 1).

- The Court is aware of Plaintiffs' counsel's conduct in other depositions in another case which involved shouting and verbal assaults on witnesses, counsel, and court reporters (T.d. 317).

- In the opposition memorandum to KMK's motion for protective order alone, Plaintiffs' counsel (baselessly) accuses KMK of fraud, deception, or false statements on at least 12 occasions, and accuses KMK of making "bogus" arguments on at least two occasions. Similar allegations can be found in virtually every pleading Plaintiffs counsel files.

- The following illustrative comments are found in correspondence from Plaintiffs' counsel since KMK was dismissed:

   "I am happy to withdraw the motion to strike if you will withdraw the bogus 'Notice of Filing.'" *July 20, 2004 Brautigam Correspondence (Ex. 1, p. 1, attached).*

---

[1]    KMK has stated repeatedly that it remains willing to resolve the document production issues and attempt to reach some compromise; however, the document production issue is currently so problematic and convoluted that Plaintiffs' counsel refuses to even acknowledge that KMK previously produced over 4,300 pages bearing "KMK" bates stamps.

"Since your latest attempt to get false and defamatory letters before the Court is docketed . . . " *July 20, 2004 Brautigam Correspondence (Ex. 1, p. 1, attached).*

"Let me assure you that I will bring to the Court's attention that KMK continues to speak out of both sides of its mouth as it deems appropriate at the moment, and the result is deliberately false statements to the Court." *July 23, 2004 Brautigam Correspondence (Ex. 1, p. 1, attached).*

- Plaintiffs' counsel has filed a motion for sanction, motion for contempt, and motions to strike against KMK, repeating accusations of fraud, deceit, and other nefarious conduct.

Would anyone reading these orders, pleadings and correspondence honestly believe that the depositions of KMK partners will be conducted in a professional and respectful manner and in keeping with the obligation to avoid undue time and expense for the witnesses, absent Court supervision?

Non-party KMK is not requesting that all depositions in this matter be conducted under Court supervision and non-party KMK is not seeking a blanket prohibition against third party discovery at this time. Nor is non-party KMK refusing to produce the witnesses for deposition -- but the record before the Court cannot be ignored. Plaintiffs' counsel seeks an unfettered intrusion into KMK under the guise of third party discovery without making any effort to comply with his obligations under Rule 45 – and it is beyond fair debate that such an unfettered intrusion without Court supervision will undoubtedly result in more motion practice. Plaintiffs' counsel clearly has a vendetta against KMK, and the Court needs to supervise these depositions to avoid continuing motion practice and to bring some closure to the discovery efforts of Plaintiffs'

counsel against non-party KMK. **KMK simply requests the same protection that any and all third parties deserve, and the Court protection required under the Rule 45.[2]**

<u>Conclusion</u>

For the foregoing reasons, KMK respectfully requests that the Court grant KMK's motion for a protective order: (1) requiring that all document production issues be resolved before the depositions of Messrs. Kreider and Rosenberg are taken; and (2) requiring that the depositions of Messrs. Kreider and Rosenberg be taken under Court supervision.

---

[2]    KMK believes that the undisputed record established above is more than ample evidence to support its request for Court supervision of the depositions of Messrs. Kreider and Rosenberg, and believes that the Court need not review the deposition transcripts of prior KMK attorneys to understand the necessity for Court supervision in this case under these circumstances. Yet Plaintiffs' counsel's repeated protestations of innocence during the depositions taken to date is so unrealistic and inaccurate that non-party KMK is compelled to file separately copies of the transcripts for the Court's review and to attach a short – and by no means all-inclusive – synopsis of only a handful of the repetitive questioning; improper and misleading questioning; and improper use of hypothetical questions to lay witnesses. (Exhibit 2, attached hereto). The Court should note that KMK attorneys were not the only attorneys objecting to the various lines of questioning either.

It is an unfortunate reality that the docket in this litigation is riddled with unnecessary and vexatious motions to strike, motions for sanctions and contempt, and numerous other motions filed by Plaintiffs that have taxed the resources of the Court and wasted the time and expense of parties and non-parties. KMK and its counsel have struggled with how to defend its rights without burdening the Court with opposition memoranda and hundreds of pages of exhibits. For this reason, KMK did not initially file the deposition transcripts and still does not believe that the Court must review the transcripts or the summary to grant KMK's motion. The problem is that when Plaintiffs' counsel represents to the Court that KMK cannot "cite a single example of anything that Plaintiffs' counsel has done wrong," (*Plaintiffs' Opposition at 1*), such a blatant misrepresentation of fact cannot go unrebutted and necessitates a more voluminous reply. Accordingly, copies of the full transcripts of the depositions of KMK attorneys Matthews, Reuter, Weiss, and Winstead are being filed separately.

Respectfully submitted,

/s/ Thomas W. Breidenstein
Michael R. Barrett (0018159)
Thomas W. Breidenstein (0064299)
BARRETT & WEBER, LPA
500 Fourth & Walnut Centre
105 East Fourth Street
Cincinnati, Ohio 45202
Tel:  513-721-2120
Fax:  513-721-2139
mrbarrett@barrettweber.com
twbreidenstein@barrettweber.com
*Attorney for Defendants,*
*Keating, Muething & Klekamp, PLL*
*and Mark A. Weiss*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2004, I electronically filed the foregoing "Non-Party KMK'S Reply Memorandum in Support of its Motion For Protective Order and/or Motion To Modify Subpoenas" with the Clerk of the Court using the CM/ECF system which will send notification of such filing to registered counsel electronically.  Pursuant to that notification, to any party or counsel not receiving electronic service, see below, from CM/ECF a true copy of the foregoing was mailed by ordinary U.S. Mail on this 20th day of August, 2004.

Michael G. Brautigam            Stephen J. Brogan
Gene Irving Mesh                Cheryl E. Forchilli
Gene Mesh & Associates          Jones Day
2605 Burnet Avenue              51 Louisiana Avenue, N.W.
Cincinnati, Ohio  45219-2502    Washington, DC 20001
Attorney for the Plaintiffs     Attorney for Defendant Ernst & Young


/s/ Thomas W. Breidenstein
Thomas W. Breidenstein

# EXHIBIT 1

LAW OFFICES OF GENE MESH AND ASSOCIATES

1 August 2004

By Fax 579 6457

Patrick F. Fischer, Esq.
KEATING, MUETHING & KLEKAMP, P.L.L.
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202-3752

### Re: OHSL

Dear Mr. Fischer:

I have and thank you for your letter of 30 July 2004. Let me respond as follows to
the points you raise:

1. I appreciate your efforts to resolve this matter, especially in light of the
   now-pending motion for a protective order that I am informed will be
   amended to remove a false statement. If we can resolve this without
   judicial intervention, so much the better;

2. I thank you for your offer to produce Messrs. Kreider and Rosenberg, but I
   cannot accept on the terms you propose. Although you have repeatedly
   stated that their involvement was minimal, I have no evidence as to support
   this claim. You have not even produced billing records that would support
   (or not support) your position; additionally, although you and Mr. Gilligan
   certainly did interfere with the previous KMK depositions, I am confident
   that this situation will not repeat itself and I am willing to proceed without a
   special master. As BGL and KMK stated in another filing "Given the
   questions asked by Plaintiffs' counsel, the depositions have proceeded
   remarkably free of serious conflict. (See, Doc. No. 354 at 16); Finally,
   these depositions were previously agreed to without any of the conditions
   you are now attempting to impose; there are no changed circumstances that
   warrant the appointment of a special master or limiting the depositions to
   four hours, though if there involvement truly was minimal I doubt the
   depositions will last that long, so it may be a moot point after all;

   2605 Burnet Avenue
   at Taft Road
   Cincinnati, Ohio 45219-2502

   TELEPHONE
   (513) 221-8800

   FAX
   (513) 221-1097

3. With respect to the document dispute, you continually and incorrectly, refer
   to 4,300 documents produced by KMK. KMK did not produce 4,300
   documents; KMK produced a single page of documents in response to our
   subpoena. The OHSL and Provident Defendants produced 4,300 pages, not
   documents. Again, although I appreciate your offer—and I believe it helps



to narrow the issues—I cannot agree. I would be remiss, for example, if I undertook the deposition of Messrs. Kreider and Rosenberg without their billing records (only one example), which would no doubt assist them in refreshing their recollection of events long ago. Surely KMK cannot raise a serious objection to production of billing records for these attorneys on the merger that they worked on;

4. With respect to your final point about there being no further depositions of KMK attorneys, once again I cannot agree. As you know, our objection to Magistrate Judge Hogan's Order preventing Plaintiffs from taking Mr. Burke's deposition remains pending, and this deposition is crucial to Plaintiffs in that Plaintiffs believe it will assist the jury in determining why the preliminary injunction was not granted in the state court. Additionally, as you know, Mr. Burke twice called former OHSL director and class member Thomas M. Herron, misinformed him as to the status of the case and suggested, in substance, that he not proceed. Another KMK attorney, presumably Ms. Rowe, was also on the call, and both must be deposed on this issue. Additionally, the most recent motion for leave to oppose class certification discusses the alleged lack of "support" of this litigation from the class. As you may also know, Gary Meier, who was a class member and is now a class plaintiff, called Mr. Burke in an attempt to gain information about the case after reading an article in the Cincinnati Business Courier that quoted Mr. Burke of KMK as stating that Mr. Hanauer opposed the OHSL-PFGI merger because he wanted OHSL to remain independent. Although Mr. Meier is unsure of exactly whom he spoke to, he did speak to someone at KMK who told him, in substance, that the case was going nowhere. These allegations of witness tampering or worse must be looked into, and Mr. Burke's deposition is the logical place to start. I am confident that the Court will ultimately rule in our favor on this issue, and I cannot agree to waiving my right to these depositions.

Finally, I thank you for your offer, but for the above reasons, I am unable to accept. Thank you for your cooperation.

Sincerely,

Michael G. Brautigam

cc: All Counsel by Fax

2

LAW OFFICES OF GENE MESH AND ASSOCIATES

20 July 2004

By Hand Delivery

Patrick F. Fischer, Esq.
KEATING, MUETHING & KLEKAMP, P.L.L.
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202-3752

### Re: OHSL

Dear Mr. Fischer:

I am writing in response to your letter of 19 July 2004, which was received after my letter
of the same day that I had hand delivered to you. I will respond based on the numbered
paragraphs in your letter.

1. I thank you for explaining who to deal with on the subpoena, which I will review
   and respond to under separate cover.

2. With response to your Notice of Filing (Doc. No. 342), you misinterpret the
   purpose and effect of the 30 June 2004 and the resulting 9 July 2004 Order (Doc. No. 349). The Court denied the initial motion to strike because Magistrate Judge
   Hogan felt it was improper (or perhaps impossible) to strike a non-docketed letter.
   Since your latest attempt to get false and defamatory letters before the Court is
   docketed, a motion to strike or otherwise not consider is indeed appropriate. Of
   course, as I indicated previously, I am happy to withdraw the motion to strike if
   you will withdraw the bogus "Notice of Filing." Please let me know what your
   position is on this matter.

   I also resent your implication that I am improperly doing anything *ex parte*, which
   is clearly not the case, although perhaps your criticism is more appropriately
   directed to the Court. First, there was no *ex parte* communication. KMK was
   ably represented by Rachael Rowe. Despite her muted protestations to the
   contrary, she clearly spoke for KMK and Magistrate Hogan literally looked to her
   on questions related to KMK. Second, you had notice of the Status Conference
   and notice that KMK's complete lack of cooperation in the discovery process and
   active efforts to thwart the discovery process would be discussed. You made a
   strategic decision not to attend, or even attempt to attend. Although I am not the
   final arbiter on this matter, my impression is that the Court would have welcomed
   your participation on issues related to KMK. As a result, you might want to
   reconsider your position for the next scheduled status conference set for August 3,
   2004 at 10 am, where KMK's obstructionist tactics are sure to be discussed.

3605 Burnet Avenue
at Taft Road
Cincinnati, Ohio 45219-2502

TELEPHONE
(513) 221-8800

FAX
(513) 221-1097



LAW OFFICES OF GENE MESH AND ASSOCIATES

I intend to inform Magistrate Judge Hogan on the lack of progress, and KMK's lack of good faith in negotiating with respect to the subpoenas of Messrs. Kreider and Rosenberg at this status conference. I personally would welcome your presence, and an explanation of your indefensible positions, at the status conference.

3. The entirely self-serving statements you make in ¶ 3 do not merit a response. What does merit a response is that, despite perhaps more than a thousand pages and four KMK attorneys, you are unable to provide a single example of a single question or line of questioning that is improper. On the other hand, the record is replete with improper behavior by both you and Mr. Gilligan. Please keep in mind that these depositions have been previously agreed to, and in one case, even scheduled, without any of the ridiculous and completely unnecessary conditions that you now seek to unilaterally impose. Would you kindly explain why depositions that were agreed to many months ago now warrant the presence of a special master? Your decision to create phantom issues out of whole cloth as an excuse not to cooperate is entirely consistent with KMK's complete lack of cooperation in the case. Should you file a motion to quash, I will have no choice but to bring all of this misconduct to the Court's attention. In sum, my position is that the conditions you have attempted to unilaterally impose are unacceptable. Do what you have to do.

4. With respect to ¶ 4, you are, once again, incorrect. In fact, when KMK, through Barrett & Weber filed its boilerplate objections, objecting to literally everything, I took the initiative and wrote to Mr. Breidenstein, who had filed the objection, in an attempt to narrow the scope of the subpoena in good faith. Continuing the "bait and switch" tactics of KMK and Barrett & Weber, it took several weeks for you to respond and to indicate that I should deal with KMK on subpoena related issues. In any event, I will respond shortly with a separate letter. Nevertheless, given your ostensible insistence on a Special Master, evincing your intent not to voluntarily comply with the duly issued subpoena, including the witness fee, it hardly seems that the issues raised in ¶ 4 of your letter are the most important.

It has become abundantly clear to me that you have no intention of cooperating in good faith with respect to these discovery issues, but seek only to impose unilateral conditions that are patently unacceptable. This is the case despite the fact that you have been unable to respond to my request to provide me with a single specific example of any specific questions or lines of questioning that are improper. I find this emblematic of your



LAW OFFICES OF GENE MESH AND ASSOCIATES

lack of good faith in these discussions. As a result, since I do not foresee a change in your behavior, I anticipate receipt of your motion to quash. Kindly confirm in writing for two reasons: first, so I will not waste my time preparing for depositions that will not take place next week, and second, so that I can accept a date offered by Mr. Burke regarding the deposition of Dr. Peerless.

Sincerely,

Michael G. Brautigam

Cc:    All Counsel by Fax



LAW OFFICES OF GENE MESH AND ASSOCIATES

23 July 2004

By Fax 721 2139

Thomas W. Breidenstein, Esq.
BARRETT & WEBER
105 East Fourth Street, Suite 500
Cincinnati, OH 45202-4015

    Re: OHSL

Dear Mr. Breidenstein:

In your opposition to Plaintiffs' motion to strike the notice of filing (Doc. No. 355), you state as follows in footnote 1 on page 2:

> Given Plaintiffs' conduct at prior depositions that has already
> necessitated Court supervision of depositions, ...

I believe that to be a false statement. Magistrate Judge Hogan presided at the two hour deposition of former OHSL COB Norbert Brinker as an accommodation to his fragile health. Additionally, this was the only deposition that had any type of Court or other supervision. If you do not believe that this is a false statement, would you kindly provide even a shred of evidence to support your position?

2605 Burnet Avenue
at Taft Road
Cincinnati, Ohio 45219-2502

I invite you to amend the pleading to withdraw that statement. If you do not, I will be forced to point out that you are deliberately making false statements to the Court.

TELEPHONE
(513) 221-8800

Finally, the overall tone and content of the document is false, but I will address that in our reply brief. The OHSL and Provident Defendants, in response to our motion to hold KMK in contempt, have stated as follows:

FAX
(513) 221-1097

> **Given the questions asked by Plaintiffs' counsel, the depositions
> have proceeded remarkably free of serious conflict.**

Doc. No. 354 at 16, emphasis added.

Let me assure you that I will bring to the Court's attention that KMK continues to speak out of both sides of its mouth as it deems appropriate at the moment, and the result is deliberately false statements to the Court.



## LAW OFFICES OF GENE MESH AND ASSOCIATES

Kindly let me know how you wish to proceed.

Sincerely,

*Michael G. Brautigam*

Michael G. Brautigam

cc: all Counsel by Fax

And also Patrick F. Fischer, Esq. By Fax 579 6457



# EXHIBIT 2

| Deposition of John Winstead, Esq., August 19, 2003, 10:58 a.m. | | |
|---|---|---|
| **Objection** | **Excerpt from transcript** | **Cite** |
| **Repetitive** | Q: Was there ever a time when you were told to preserve any documents that you may have had related to the Oak Hills-Provident merger?<br>MR. FISCHER: Objection. Same Instruction<br>A: To my recollection, no.<br>… | Page 17, Lines 22-25; Page 18, Lines 1-3. |
| | Q: Did you ever take notes regarding the OHSL-Provident merger?<br>A: I don't recall any specific notes.<br>Q: Did you send any e-mail?<br>A: Yes<br>Q: Okay. Where are those e-mails?<br>A: I don't know.<br>Q: Were you ever asked to produce them?<br>MR. FISCHER: Objection.<br>A: No. | Page 18, Lines 8-18 |
| | Q: Right. And to summarize, you believe that you sent e-mails related to the OHSL-Provident merger, correct?<br>A: My testimony is that with respect to this transaction, I do not have any recollection of specific e-mails, but I do believe that sending e-mails was a part of what I did on this transaction.<br>Q: And without any specific recollection of taking notes, you believe that you took notes, correct?<br>MR. FISCHER: Same objection. That wasn't his testimony.<br>A: My recollection is that in working on this transaction, I took or would have taken notes. I have no knowledge of any specific notes that I took when working on this transaction.<br>Q: Right. And you don't know where these notes are today, correct?<br>A: I have no knowledge of where any of those notes are today.<br>MS. ROWE: Objection<br>MR. FISCHER: Objection, I was going to say, he hasn't testified to any.<br>Q: And you don't know where the e-mails are today, correct?<br>MS. ROWE: Objection. Form. | Page 25, Lines 24-25; Page 26, Lines 1-25; Page 27, Lines 1-14 |

| | | |
|---|---|---|
| | MR. FISCHER: He didn't testify about any specific emails.<br>A: I have no knowledge of where any e-mails, if any e-mails, are at.<br>Q: And to the best of your recollection, no one asked you to produce or preserve these notes in e-mails, correct?<br>MR. FISCHER: Same objection. We're repeating ourselves again, Mr. Brautigam.<br>MS. ROWE: Objection.<br>A: To the best of my recollection, I don't recall any request to produce or preserve any e-mails.<br>… | |
| | Q: So it would be fair to say that you were never asked to preserve any documents that may be relevant to the lawsuit; is that correct?<br>MR. FISCHER: Objection<br>A: I have no recollection of being asked to produce or preserve any documents with respect to the matter placed in front of me, Gary and Lisa Meier, and Gary Meier C-F Lindsey Meier versus OHSL Financial Corp and various other defendants.<br>… | p. 20, Lines 20-25; Page 21. Lines 1-5 |
| | Q: Okay. Since December 3rd, 1999, have you had any conversations with Tim Matthews outside the presence of Pat Fischer with respect to either the OHSL-Provident merger or any pending litigation arising from that merger?<br>MR. FISCHER: Same instruction. If it involves the rendition of legal services to Provident, work product for Provident or with regard to conversations about your deposition here, don't answer.<br>A: I don't recall any conversations with Mr. Matthews other than to make Mr. Matthews aware that I would not be present in the office today.<br>Q: So you don't recall any conversations with Mr. Matthews at or about the time of the filing of the lawsuit in September of 2000?<br>MR. FISCHER: Any conversations with Mr. Matthews at all?<br>Q: Yes, about the time of the filing of the lawsuit on September 20th of 2000.<br>A: I don't recall any specific conversations with Mr. Matthews in that time frame in the year 2000. | Page 48, Lines 2-25; Page 49, Lines 1-7. |

| | | |
|---|---|---|
| | Q: Okay.  Do you recall any general conversations with Mr. Matthews at about that time?<br>A: No.<br>…<br>Q: And would these time records have a more detailed breakdown of what you did and when you did it?<br>A: As a general statement, my billing records would reflect the specific matters and the specific amount of time spent.<br>Q: And do you think that these billing records would assist your recollection in testifying today?<br>A: With respect to specific matters worked on specific dates, I don't know what those billing records contain, but as a general statement, billing records are going to have more specific information regarding what I accomplished on any given day.<br>Q: And this specific recollection would assist you as you sit here today and give testimony under oath, correct?<br>MS. ROWE: Objection to form.<br>MR. FISCHER: Objection.<br>A: I can't say whether any particular billing record would or would not refresh my memory.<br>Q: Okay.  Would you—<br>A: It would depend on what the billing record said.<br>Q: Okay.  And you wouldn't be able to make a definitive conclusion unless you had those billing records in front of you, correct?<br>MS. ROWE: Objection.<br>MR. FISCHER: Objection.<br>A: Again, a definitive—a billing record could or could not recollect a memory of a particular transaction or a particular matter I worked on.  It would depend on what the billing records said or didn't say.<br>Q: Okay.  For the purposes of this deposition, would it be of assistance to you to have those billing records in front of you so you could refer to them if needed?<br>MR. FISCHER: Objection.<br>A: Assistance in what matter?<br>MR. FISCHER: Exactly.<br>Q: Would it be if assistance in helping you recall specifically what you did on a specific day? | Page 64, Lines 16-25; Page 65, Lines 1-25; Page 66 |

| | | |
|---|---|---|
| | MR. FISCHER: Objection. He's already answered that question.<br>…<br>Q: Did this document come from the computers at KMK?<br>MR. FISCHER: Which document?<br>Q: Defendant's Exhibit 1.<br>A: BY Defendant's EXHIBIT 1, you mean this entire document?<br>Q: Did any part of the document come from the computers at KMK?<br>MR. FISCHER: That's a different question.<br>A: I don't know what you mean by, "come from the computers at KMK."<br>Q: Let me see if I can explain it to you…<br>A: As I believe I testified to earlier, I recall that the Agreement and Plan of Merger, which is one of the documents which is part of Defendant's Exhibit Number 1, was at some point on the computer system, the word processing system at KMK. I don't have any specific knowledge of any of the other documents as to their status on the computers of KMK. | Page 92, Lines 23-25; Page 93, Lines 1- 24; page 94, Lines 1-22. |
| | Q:…Who wrote the first page of Defendant's Exhibit 1?<br>MR. FISCHER: Objection.<br>A: I don't know.<br>Q: Okay. What computer system did it come off?<br>A: I don't know.<br>Q: Okay. What are the choices? It could have come off KMK's computer system, correct?<br>A: I don't know that that's a choice. I could— conceivably it could have come off any computer in the world.<br>Q: Okay. Do you think that this document just fell from the sky somewhere?<br>MR. FISCHER: Objection.<br>MS. ROWE: Objection to form.<br>A: No<br>MR. FISCHER: He said he didn't know.<br>MS. ROWE: He said he didn't know where it came from. | Page 94, Lines 1-20 |
| | Q: From reading that sentence, would it be fair to infer that all of the Board members would vote | Page 137, Line 25; Page 138, |

| | | |
|---|---|---|
| | their shares in favor of the merger transaction?<br>MS. ROWE: Objection.<br>MR. FISCHER: Objection.<br>MR. BUCKLEY: Objection.<br>A: I don't have any opinion or answer as to whether it's fair to infer beyond what the sentence says.  It says, The Board unanimously recommends and advises that you approve the acquisition at the special meeting so that the transaction may be contemplated, period.<br>Q: Completed<br>A: I'm sorry, you're correct, completed.<br>S: So would it be fair to say that a logical extension of that sentence is that all of the OHSL directors voted their shares in favor of the merger? Correct?<br>MR. FISCHER: Objection.<br>MR. BUCKLEY: Objection.<br>MS. ROWE: Objection.<br>A: I don't have any, any reason what would be and would not be a logical extension from that sentence.  The sentence is what it is.<br>… | Lines 1-25;  Page 139, Lines 1-2. |
| | Q: Was there a lawyer who you felt was in charge of the overall transaction?<br>MR. FISCHER: Asked and answered.<br>A: Again, my understanding in this transaction is that various lawyers were working on various aspects of the transaction,  I have no knowledge of one attorney who was the lead—quote, unquote, lead for the transaction. | Page   100,   Lines 11-20 |
| | Q: Do you know who was responsible for finalizing the overall document?<br>MR. FISCHER: Objection.<br>A: No. | Page 158, Lines 9-12 |
| | Q: With respect to Defendant's Exhibit 1, the overall document, okay, could you estimate what role KMK had in the production and completion and finalizing of the document vis-à-vis the Dinsmore firm?  For example, was KMK 50 percent responsible, 80 percent?<br>MR. FISCHER: Objection.<br>MS. ROWE: Objection.<br>MR. BUCKLEY: Objection. | Page   165,   Lines 22-25;  Page   166, Lines 1-11 |

| | | |
|---|---|---|
| | A: I have no knowledge beyond what I've testified earlier about the preparation of the proxy statement or whose involvement was required or the extent of any one or more parties' involvement. | |
| | Q: From your approximately 50 hours working on the case, did you form an opinion as to who was in charge of the overall transaction from KMK's point of view?<br>MR. FISCHER: Same objection.<br>MR. BUCKLEY: Objection<br>MS. ROWE: Objection<br>MR. Fischer: Asked about three times now.<br>… | Page 178, Lines 14-17. |
| | Q: Okay. And my question was then, how do you verify information from Provident?<br>Ms. ROWE: Objection<br>MR. FISCHER: Objection. Again, don't-<br>A: I don't understand that –<br>MR. FISCHER: -- disclose communications with the client.<br>A: I don't understand the question to the extent I don't know what information you're talking about verifying. | Page 194, Lines 18-25; Page 195, Lines 1-3 |
| | Q: Right. And how is the information presented in the proxy statements and in the draft of proxy statements verified?<br>MR. FISCHER: Objection.<br>MS. ROWE: Objection.<br>MR. FISCHER: He's already testified he didn't work on it. You're asking him to speculate and guess and we've been doing this for hours. I object to this continued harassment.<br>… | Page 195, Lines 15-24. |
| **Hypothetical** | Q: Okay. But as an attorney, it would stand to reason that documents should be preserved when an entity such as KMK is named in litigation, correct?<br>… | Page 24, Lines 20-23 |
| | Q: Okay. Mr. Winstead, I'm not asking for specialized knowledge. I'm asking the situation like this where KMK has been named as a defendant, do you believe that KMK should | Page 25, Lines 7-12 |

| | preserve documents relative to the litigation? … | |
| | Q: Okay. Can you think of such an occasion where legal documents should be untruthful? | Page 83, Lines 17-19 |
| | Q: Okay. How about if a director resigned in part in protest of the transaction, would you think that that's material? … | Page 88, Lines 3-5 |
| | Q: Do you believe that the opposition of the CEO of the company, who's the largest shareholder, who is the only member of management to be on the Board, the opposition to a merger transaction would be potentially material information? … | Page 108, Lines 11-16 |
| | Q: …If Mr. Burke's statement to the Cincinnati Business Courier is true, that Hanauer opposed the transaction because he wanted Oak Hills to remain independent , is it your opinion,. as you sit here today, under oath, that that information should have been disclosed to the OHSL shareholders? … | Page 114, Lines 12-19 |
| | Q: Okay. Would it surprise you if Ken Hanauer, the CEO and Board member of OHSL, did not follow the advice that he's telling others to follow in this sentence? | Page 139, Lines 18-21 |
| **Irrelevant** | Q: Do you consider Provident and PFGI to be the premier client of KMK? … | Page 47, Lines 16-17 |
| | Q: Okay. And aside from the OHSL-Provident merger, what experience do you have in complex financial transactions involving mergers and acquisitions between financial institutions? | Page 55, Lines 16-20 |
| **Mischaracterization of prior testimony/evidence** | Q: Okay. Is it important that the proxy materials be accurate? MR. FISCHER: Objection. A:  Again, I think that's a question that in the context of preparation of proxy materials, accurate may have a specific legal definition that I'm not knowledgeable enough to provide. Q: So, its your testimony as you sit here under oath that you're not aware one way or the another whether it's important for the proxy materials to be accurate. Is that your testimony? MR. FISCHER: Objection.  That's not what he said. Form. | Page 80, Lines 23-25; Page 81, Lines 1-12; Page 82, Lines 15-23 |

| | | |
|---|---|---|
| | Q: Let me try that a different way.  Do you think you can answer this question yes or no?  Is it important that proxy materials be accurate?<br>MR. FISCHER: Objection.<br>MR. BUCKLEY: Objection.<br>MR. FISCHER: You can answer it yes or no, but you're not limited to that.  You can always give an explanation. | |
| | | |

| | Deposition of F. Mark Reuter, Esq., August 20, 2003, 9:35 a.m. | |
|---|---|---|
| **Objection** | **Excerpt from transcript** | **Cite** |
| **Repetitive** | Q: Did you ever learn from any source that Mr. Ken Hanauer, the CEO and a Board member of OHSL, was opposed to a merger with Provident?<br>MR. FISCHER: To the extent that it calls for revealing communications between you and me, don't do that.  Other than that, you can answer.<br>A: I can't say.<br>Q: You can't say because you don't remember?<br>MR. FISCHER: Objection.<br>Q: During the time you were working on the merger, did you ever learn from any source that Ken Hanauer opposed the merger with Provident.<br>A. No.<br><br>…<br>Q: Okay.   Who was ultimately responsible for finalizing Defendant's Exhibit 1?<br>MR. FISCHER: Objection.<br>A: This document represents a collaborative effort of a number of parties.   Parties primarily responsible for this document are OHSL and Provident.  Your question, I'm—is your question with respect to the entire document?<br>Q: Yes.<br>A: All—however many pages here?<br>MR. FISCHER: Go through each page if he wants, Mr. Reuter.<br>Q: Yes<br>A: This page right here?  Are you asking about this page right here?<br>Q: My first question is, who is responsible for the overall document, the entire document?<br>A: I answered.  I said it was a collaborative effort.<br>Q: Isn't there someone who is responsible for | Page 5, Lines 9-25<br><br><br><br><br><br><br><br><br><br><br>Page 16, Lines 16-25; Page 17, Lines 1-21 |

| | | |
|---|---|---|
| | saying that this document is in final form and can go out to the shareholders?<br>MR. FISCHER: Objection.<br>MS. ROWE: Objection.  Asked and answered,<br>MR. FISCHER: We've gone through it.   We're repeating ourselves, Mr. Brautigam.<br>A: I repeat my prior answer. | |
| | Q: Okay.   Who at KMK was responsible for finalizing this document?<br>MR. FISCHER: Objection.<br>A: KMK's not responsible for finalizing this document in its entirety.  That question is not—I can't respond to your question.  KMK is not solely responsible for this document. | Page 19, Lines 16-23. |
| | Q: Who, if anyone, gave the final authorization for all of the material included in Defendant's Exhibit 1 to go to the printer and be disseminated to the OHSL shareholders?<br>MR. FISCHER: Objection.<br>A: I don't recall. I don't recall.<br>… | Page 83, Lines 21-25; Page 84, Line 1 |
| | Q: Okay.  Are you an expert in business planning and formation?<br>MR. FISCHER: Objection.<br>A: I've never been qualified by a court as an expert in that, although I practice in those areas.<br>Q: Do you hold yourself out as an expert in that area?<br>MR. FISCHER: Which area?<br>Q: Business planning and formation.<br>A: I believe my practice area has been concentrated in those areas, but I do not—again, I have never been qualified by a court as an expert. I don't understand what you mean by an expert, I guess.<br>Q: Okay. Do you consider yourself to be an expert in business planning and formation?<br>MS. ROWE: Objection.  Asked and answered.<br>MR. FISCHER: Same objection.  Going over this again, wasting time.<br>A: I'd like to repeat my prior answer.<br>Q: Well, its non-responsive to the question.  Do you consider yourself to be an expert in mergers and acquisitions? | Page29,  Lines  7-25; Page 30, Lines 1-17. |

| | | |
|---|---|---|
| | MR. FISCHER: Same objection.<br>A: I have a concentration in that area. I do not—I have not been qualified as an expert in that area.<br>Q: Do you consider yourself to be an expert in mergers and acquisitions?<br>MS. ROWE: Objection.<br>MR. FISCHER: Objection. Totally irrelevant. | |
| | Q: Are you an expert in mergers and acquisitions?<br>A: I have a concentration in those areas. I have never been qualified by a court as an expert in those areas. A large part of my practice is in those areas. I don't—I'm not qualified—I've never been qualified by a court as one.<br>… | Page 31, Lines 7-14 |
| | Q: Okay. Are you familiar with the term material misrepresentation?<br>A: In connection with what?<br>Q: The securities laws.<br>A: I've—I've heard it used before, yes.<br>Q: Okay. What do you understand that term to mean?<br>A: It depends on the situation in which that term is applied.<br>Q: In the context of the securities laws, what do you understand a material misrepresentation to be?<br>MR. FISCHER: Objection.<br>MS. ROWE: Objection. Asked and answered.<br>MR. FISCHER: Badgering the witness.<br>A: I'd like to repeat my prior answer.<br>… | Page 38, Lines 3-22 |
| | Q: Was there someone who was in overall charge of the finalization of the proxy materials and the registration statement?<br>MR. FISCHER: Objection.<br>MS. ROWE: Objection. Asked and answered.<br>A: I can repeat my prior answer in response to your question. This was a collaborative effort that was only finalized until all of the parties said so.<br>Q: So no one individual person was in charge; is that correct?<br>MS: Rowe: Objection. Asked and answered.<br>MR. FISCHER: Objection.<br>A: Again, this was a collaborative effort. There was not one particular person who was making decisions in a vacuum. | Page 83, Lines 3-20 |

| | | |
|---|---|---|
| | …<br>Q: And that refers to the seven directors who were members of the Board as of August 2, 1999; is that correct?<br>MR. FISCHER: Objection.<br>MS. ROWE: Objection.<br>MR. BUCKLEY: Objection.<br>A: I really don't know.  I don't recall how many members of the Board there were at that time.<br>Q: Okay. Well, let's take a look at the other document then, that table in Deposition Exhibit 42.<br>MR. FISCHER: This is 42.<br>A. Okay. I'm sorry, what page?<br>Q: Fifty-three. Okay. And can you count the number of directors?<br>A: I'm not sure which one—I don't know which ones of these are directors or executive officers. No, I can't.<br>… | Page 119, Lines 21-25; Page 120, Lines 1-14 |
| | Q: Okay. How many directors of Oak Hill do you believe were directors on August 2, 1999?<br>MR. FISCHER: Objection. Asked and answered.<br>A: I don't know.  OHSL is not our client. I don't know how many directors they had.  I can't tell—<br>… | Page 122, Lines 2-9 |
| | Q: Do you believe that if the composition of the Board changes during the discussion if the Board, that that should have been disclosed to OHSL shareholders?<br>MR. BUCKLEY: Objection.<br>MS. ROWE: Objection. Asked and answered.<br>MR. FISCHER: Objection. Going over it again.<br>A: I don't know how I can—I don't know how this question is different from ones you've asked earlier.<br>… | Page 128, Lines 19-25; Page 129, Lines 1-5 |
| | Q: Okay. Based upon what I've shown you in Exhibit 16, do you believe that the composition of the Board, the OHSL Board, changed from July 22nd to August 2nd?<br>MR. BUCKLEY: Objection.<br>MR. FISCHER: Objection to form. Asked and answered.<br>A: Again, I can't tell. I didn't draft this, OHSL is responsible for this disclosure. I can't tell , I don't know. | Page 130, Lines 13-24 |

11

| | | |
|---|---|---|
| | Q: Well, didn't the composition of the Board change at some point between July 22nd and August 2nd of 1999?<br>MR. FISCHER: Objection.<br>MS. ROWE: Objection. It's been asked and answered now at least five times.<br>MR. BUCKLEY: Objection.<br>… | Page 132, Lines 4-10. |
| | Q: Who had the final say as to which version went to the printer?<br>MR. FISCHER: Objection. Asked and answered so many times at this point.<br>MS. ROWE: Objection. Asked and answered.<br>A: I don't know how that—I don't know how to answer that any differently from what I did before. My answer is the same. This was a collective effort among a number of parties, including OHSL, Provident, its counsel and us.<br>… | Page 152, Lines 13-24 |
| | Q: Okay. Let me direct your attention to page 55, description of Provident Capital Stock. Do you see that?<br>A: Yes.<br>Q: And that carries over to the next page. Did you write any of that section?<br>A: I can't—I've already answered that question.<br>… | Page 173, Lines 20-25; Page 174, Lines 1-2 |
| | Q: Next section. Did you write the section Comparison of Stockholder Rights?<br>MR. FISCHER: I think that's been asked and answered, but go ahead.<br>A: Again, we talked about this this morning. I already answered the question on this section.<br>… | Page 174, Lines 10-16 |
| | Q: Now do you interpret that to mean that the OHSL Board unanimously believed that the merger with Provident was in the best interest of OHSL stockholders?<br>MR. FISCHER: Objection. We've gone through this.<br>MS. Rowe: Same objection<br>… | Page 186, Lines 24-25; Page 187, Lines 1-5 |
| **Hypothetical** | Q: If you had known of that, do you think that's something that you would want to have shared with the OHSL shareholders? | Page 6, Lines 7-9 |

| | | |
|---|---|---|
| | …<br>Q: Okay.  Is there a situation there they would not be adverse when you're negotiating a merger transaction with a buyer and a seller? | Page 36, Lines 20-23 |
| | …<br>Q: If the chairman of the audit committee of a public company resigned, is that something that you would want to consider filing an 8-K on? | Page 50, Lines 14-17 |
| | …<br>Q: And in the normal course of business, with respect to the Provident merger at or about this time, meaning August 17th to August 19th of 1999, would you have seen this in the ordinary course of business? | Page 95, Lines 21-25 |
| | …<br>Q: Do you believe that if Mr. Herron's resignation was in part because he strongly disagreed with the OHSL-Provident merger—<br>MR. BUCKLEY: Objection.<br>MR. FISCHER: Objection.<br>MS. ROWE: Objection.<br>Q:--would have added to the mix of information that a reasonable shareholder would want to know in making a decision as to how to vote on this merger? | Page 107, Lines 5-15 |
| | …<br>Q: What factors would you want to consider of you had known? | Page 107, Line 25; Page 108, Line 1 |
| | …<br>Q; If you wrote this, what would you have done with it when you were finished? | Page 149, Lines 23-25. |
| | …<br>Q: Okay. Let me represent to you that Mr. Hanauer, OHSL's CEO, largest shareholder, and the only member of management who was a director, testified that he did not believe that this transaction was in the best interest of OHSL stockholders. Would you consider that to be material information? | Page 187, Lines 9-15 |

| Deposition of Timothy B. Matthews, Esq., August 21, 2003, 10:03 a.m. | | |
|---|---|---|
| **Objection** | **Excerpt from transcript** | **Cite** |
| **Repetitive** | Q: No, no, no. What computer system did the entire document come off, if you know? I think you said you didn't know.<br>MR. GILLIGAN: You mean, okay, every—if you | Page 58, Lines 6-16 |

| | | |
|---|---|---|
| | know. He's talking about every page.<br>Q: Correct.<br>MR. GILLIGAN: Including the very first page to the very last. You've already said you don't know.<br>A: I don't know. | |
| | Q: Limiting to the first page, do you know what computer system the first page came off?<br>MR. BURKE: Objection. Asked and answered.<br>A: No, I do not. | Page 58, Lines 20-25 |
| | Q: Do you know whose computers this section came off?<br>MR. BURKE: Objection. You've asked that question a dozen times about the entire document. He's answered every time in the same way. I don't know why you need to keep asking it. Asked and answered.<br>A: I don't have personal knowledge of that. | Page 134, Lines 7-15 |
| | Q: With respect to the majority of this document, whose computer system did it come off, if you know?<br>A: I think I've said several times, I do not know the answer to that question.<br>… | Page 143, Lines7-11 |
| | Q: Do you believe that Mr. Hanauer's vote against the transaction should have been disclosed to the OHSL shareholders?<br>[Objections] | Page 70, Lines 21-23 |
| | Q: Do you think that if Mr. Hanauer was opposed to the merger transaction, that his opposition should have been disclosed?<br>Mr. MAUNDRELL: Objection.<br>MR. BURKE: Objection. Asked and answered about eight times.<br>MR. GILLIGAN: Do you feel that you've answered the question, Tim? If you have, then don't answer.<br>A: I do. | Page 82, Lines 13-22 |
| | Q: If Mr. Hanauer did not believe that this transaction was in the best interest of OHSL shareholders, do you believe that he had an obligation to tell someone about his position? | Page 214, Lines 13-19 |

| | | |
|---|---|---|
| | MR. BURKE: Objection. Asked and answered at least a half dozen times.<br>…<br>Q: If Mr. Herron resigned in part in protest—in protest of the OHSL-Provident merger, do you believe that his resignation should have been disclosed?<br>MR. MAUNDRELL: Objection, form, foundation.<br>MR. BURKE: Objection. Assumes facts not in evidence.<br>A: Can you tell me when he resigned?<br>Q: He resigned July 27th, 1999, effective July 30th, 1999.<br>MR. MAUNDRELL: Same objection.<br>A: Then I would have considered it totally irrelevant.<br>Q: Totally irrelevant?<br>A: Totally irrelevant because the meeting required to approve the transaction from the Board of Directors' point of view did not occur until after his resignation. And the fact that he was no longer on the Board was—would be in my view totally irrelevant | Page 90, Lines 15-25; Page 90, Lines 1-10. |
| | Q: Okay. Does the timing of his resignation factor into your decision that it would be totally irrelevant?<br>MR. BURKE: Objection. Asked and answered.<br>MR. GILLIGAN: I think he just said that it did. He just answered it, Mike.<br>A: Yes. | Page 91, Lines 19-25; Page 92, Line 1 |
| | Q: In the context of his voting against continued negotiations with Provident on July 22nd, 1999 and his resignation three days after that, would this mix of information have concerned you?<br>[Objections]<br>A: Yes, as you phrase the question I'm going to have to say no, not necessarily, because it would not have concerned me. And, in fact, because again, I was told that he had resigned for personal reasons.<br>And I had no knowledge of the Board meetings, I wasn't there. I was never present at Board meetings. And whether he voiced opposition to Provident's—this transaction is totally something | Page 95, Lines 15-25; Page 96, Lines 1-21 |

| | | |
|---|---|---|
| | outside my knowledge.<br>…<br>Q: And does that mean that the previous financial statements were materially incorrect?<br>A: No.<br>MR. BURKE: Objection. Calls for speculation.<br>Q: It does not mean that the previous financial statements were materially incorrect?<br>A: That would not be my understanding of it. | Page 129, Lines 21-25; Page 130, Lines 1-5 |
| **Hypothetical** | Q: What would you have done differently, had you known that?<br>… | Page 50, Line 25; Page 51, Line 1 |
| | Q: Is it possible that Provident's bid was the best because it was the only bid?<br>… | Page 52, Lines 11-12 |
| | Q: As the lead counsel, would it concern you if I represented that Mr. Hanauer's testimony was that a draft of the first page of Defendant's Exhibit 1 was circulated with his signature on it and he directed that it be removed?<br>… | Page 59, Lines 16-21 |
| | Q: Would the opposition to the merger transaction by the CEO of OHSL be something major in your mind?<br>… | Page 61, Lines 23-25 |
| | Q: Based on what we've discussed today, as the lead counsel would you have wanted to know more based upon these representation?<br>… | Page 65, Line 25; Page 66, Lines 1-3 |
| | Q: As the lead outside counsel for Provident Bank, if you had known that Mr. Hanauer was against the transaction, would you have done anything differently?<br>… | Page 68, Lines 8-11 |
| | Q: Okay. If you had known that Mr. Hanauer did not believe that the transaction was in the best interest of OHSL shareholders at or about August 2nd, 1999, would you have taken any action differently?<br>… | Page 72, Lines 24-25; Page 73, Lines 1-3 |
| | Q: …Would it surprise you if Mr. Hanauer made a presentation soliciting votes in favor of the transaction when he had previously, at some point, voted his shares against the transaction?<br>… | Page 75, Lines 19-23 |

| | | |
|---|---|---|
| | Q: Would it surprise you if Mr. Hanauer ran a meeting, asking for votes in favor of the transaction, when he had voted his shares against the transaction?<br>… | Page 77, Lines 12-15 |
| | Q: Do you think that if Mr. Hanauer was opposed to the merger transaction, that his opposition should have been disclosed?<br>… | Page 82, Lines 13-15 |
| | Q: If the date had been July 30th, which was the effective day of Mr. Herron's resignation, would he have had to have been included in this table?<br>… | Page 145, Lines 20-23 |
| | Q: Okay. What if one director was not at the meeting and the chairman of the Board did not vote on the transaction at all? Would you consider that to be material?<br>… | Page 158, Line 25; Page 159, Lines 1-3 |
| | Q: Okay. Let me ask you to assume for purposes of this question that the chairman was present but simply did not vote. Didn't vote yes, didn't vote no.<br>A: Um-hmm.<br>Q: Do you think that sentence is still correct?<br>MR. MAUNDRELL: Objection.<br>MR. BURKE: Objection. Incomplete hypothetical. Calls for speculation.<br>… | Page 160, Lines 20-25; Page 161, Lines 1-4 |
| | Q: Right. If those things were true, would there be anything wrong from the point of view of corporate disclosure in stating that in the proxy materials?<br>… | Page 166, Lines 12-15 |
| | Q: If Mr. Roe did not share with you material information, would that opinion change?<br>… | Page 181, Lines 16-18 |
| | Q: …If Mr. Roe knew that Mr. Hanauer were opposed to the transaction but Mr. Roe did not share that with you, would that change your opinion as to Mr. Roe's competence?<br>… | Page 185, Lines 14-18 |
| | Q: If Mr. Roe knew that Mr. Herron resigned in part protest of the OHSL-Provident merger, would you have expected him to share that information with you?<br>… | Page 189, Lines 10-13 |

| | | |
|---|---|---|
| | Q: If it related to Mr. Hanauer writing down material misrepresentation in the proxy materials, would you have expected that information to be shared with you?<br>… | Page 193, Lines 11-14 |
| | Q: If you had known this document existed, would you have wanted to discuss it with someone?<br>… | Page 195, Lines 13-15 |
| | Q: If Mr. Roe became aware of the material misrepresentation in the proxy materials, would you have expected him to share that with you in some fashion?<br>… | Page 196, Lines 5-8 |
| | | |

**Deposition of Mark Weiss, Esq., August 22, 2003, 9:00 a.m.**

| Objection | Excerpt from transcript | Cite |
|---|---|---|
| **Repetitive** | Q: Who wrote the first page of Defendant's Exhibit 1?<br>A: I don't remember.<br>Q: Was it someone at KMK?<br>MR. BURKE: Objection. Asked and answered.<br>A: I don't remember.<br>… | Page 43, Lines 8-14 |
| | Q: Do you know why Mr. Herron resigned from OHSL's Board?<br>A: It's—at some point I was informed that he had resigned from the Board. And I was—and I was speaking with—I can't recall who I was speaking with. I asked why he had resigned and he said that—and whoever it was said that Mr. Herron had submitted a letter of resignation to the Board citing his reason for leaving as personal reasons. | Page 50, Lines 17-25, Page 51, Line 1 |
| | Q: You mentioned something earlier about it being your understanding that Mr. Herron resigned for personal reasons; is that correct?<br>A: That's what I was informed, yes.<br>Q: Okay. Who informed you of that?<br>MR. MAUNDRELL: Objections. Asked and answered.<br>A: I told you I didn't recall. | Page 59, Lines 8-17 |
| | Q: Do you remember discussing this resignation with anyone?<br>A: Didn't we—didn't we cover this? | Page 159, Lines 17-21 |

| | |
|---|---|
| MR. BURKE: We did cover this, this is asked and answered.<br>…<br>Q: Okay. And if you had been informed that Mr. Herron resigned in part because he disagreed with the proposed OHSL-Provident merger, would that have been of interest to you in the summer of 1999? | Page 59, Lines 18-22 |
| Q: If Mr. Herron had resigned in part in protest, would that have been of interest to you?<br>MR. BURKE: Objection.<br>MR. MAUNDRELL: Objection. Asked and answered. This is at least the third time.<br>… | Page 63, Lines 20-25 |
| Q: What computer system did this document come off—did these pages, excuse me, come off?<br>MR. BURKE: Objection to the phrase "come off."<br>A: The master document was on KMK's system. I don't know if it was also on anyone else's system. | Page 105, Lines 1-8 |
| Q: Was the summary of the document maintained on the master system at the law offices of KMK?<br>MR. BURKE: Objection. Asked and answered.<br>A: I didn't hear the question.<br>Q: Okay. Was the information contained on these three pages contained in the computers of KMK?<br>A: I've answered that question several times. I would like to state on the record that the entire document was on the system of KMK.<br>… | Page 106, Lines 4-16 |
| Q: And how did KMK's computer system acquire the text that appears on pages 16, 17 and 18?<br>A: I don't remember.<br>Q: Was it likely that this was essentially an electronic transfer?<br>A: I, I don't remember.<br>Q: Do you know who gave you the text?<br>A: I don't remember.<br>Q: Do you believe that it came from the Dinsmore firm?<br>A: I still don't remember,<br>… | Page 116, Lines 16-25, Page 117, Lines 1-2 |
| Q: What, if anything, did you do to review the veracity of that section?<br>MR. BURKE: Objection. Asked and answered. | Page 117, Lines 3-7 |

19

|  | You may answer it again.<br>A: I have no idea. I don't remember. |  |
|  | Q: Okay. What, if anything, did you do to check the veracity of the information that you received from other sources contained between pages 18 and 33 on the document?<br>MR. BURKE: Objection. Asked and answered. What I would suggest is if you just ask him if his answer is the same that he previously gave. I know we've asked this two or three times.<br>… | Page 123, Lines 5-13 |
|  | Q: If you had known that this document had existed in September of 1999, would you have wanted to see it?<br>MR. BURKE: Objection. I don't believe there's any testimony in the record that it existed at that time.<br>A: I don't know. | Page 171, Lines 22-25; Page 172, Lines 7-3 |
|  | Q: Well, I'll ask Mr. Hanauer about that when I depose him. So if I understand your testimony correctly, this—you would not necessarily have wanted to see this document if you knew of its existence?<br>MR. BURKE: Objection. Asked and answered.<br>A: I mean, I don't—I don't know. I don't have nearly enough facts to figure that out. I don't know what—again. | Page 173, Lines 17-25, Page 174, Lines 1-2 |
| **Hypothetical** | Q: If that is a true fact, would it have been of interest to you with respect—if this had been a true fact, would this have been of interest to you with respect to performing your duties and responsibilities with respect to the Oak Hills-Provident merger?<br>… | Page 48, Lines 10-15 |
|  | Q: Okay. And if you had been informed that Mr. Herron resigned in part because he disagreed with the proposed OHSL-Provident merger, would that have been of interest to you in the summer of 1999?<br>… | Page 59, Lines 18-22 |
|  | Q: My question is: If Mr. Hanauer did not believe that the proposed merger with Provident was in the best interest of OHSL shareholders, would this sentence that I've directed your attention to be | Page 74, Lines 13-17 |

| | | |
|---|---|---|
| | true? | |
| | … | |
| | Q: Would it surprise you if I told you that Mr. Hanauer voted his personal shares against the transaction? | Page 75, Lines 15-17 |
| | … | |
| | Q: Do you believe that the dissent of a Board member would make it—would have any effect on the ability to close a merger transaction such as this merger transaction? | Page 128, Lines 7-10 |
| | … | |
| | Q: Well, if Mr. Hanauer testified that he did not believe that the transaction was in the best interest of OHSL's shareholders, and if he announced that to the public, what, if any, effect, do you think it might have had on Provident's ability to close the merger? | Page 128. Lines 20-25; Page 129, Line 1 |
| | … | |
| | Q: But if Mr. Hanauer believed that the transaction was not in the best interest of OHSL shareholders, would you still think that the lack of disclosure would be misleading? | Page 136, Lines 23-25, Page 137, Line 1 |
| | … | |
| | Q: Is it possible that Mr. Hanauer voted in favor of the transaction as a director because he simply gave up, but did not believe that the transaction was in the best interest of the OHSL stockholders? | Page 142, Lines 20-24 |
| | … | |
| | Q: If you had known this document had existed in September of 1999, would you have wanted to se it? | Page 171, Lines 22-24 |
| | … | |
| | Q: If Provident stock had declined from approximately 42 and an eighth on September 3rd to approximately 36 and an eighth on September 24th, a $6 decline, would that—would you consider that to be material in the context of this transaction? | Page 179, Lines 13-18 |
| | … | |
| | Q: If, in fact, that statement about OHSL's need for commitment of significant resources to technology was, in fact, not true, would it be appropriate to include it in this document? | Page 205, Lines 5-9 |
| **Mischaracterization of prior** | Q: Okay. So if I understand your testimony correctly, if information is misstated regarding | Page 89, Lines 14-25; Page 90, Lines |

| | | |
|---|---|---|
| **testimony/evidence** | OHSL, that's the responsibility of OHSL and the Dinsmore firm. And if information is misstated regarding Provident, that's Provident's responsibility. Is that your testimony?<br>MR. HURST: Objection.<br>A: I think if there's information in the document that is about OHSL that is incorrect, it is OHSL's obligation with their advisors and attorneys. And if there's information regarding Provident that is incorrect, it is Provident's obligation, along with their advisors and attorneys.<br>Q: So do you believe that KMK would be ultimately liable, along with Provident, if there were material misstatements in Defendant's Exhibit 1—<br>MR. GILLIGAN: That's not what he said.<br>Q:--related to the document?<br>A: I did not say that. | 1-11 |
| | | |