

**Preliminary Expert Report of Candace L. Preston, CFA**
**On Behalf of the OHSL Financial Corp. Plaintiffs**

**In re: OHSL Financial Corp. Securities Litigation**

**Case No. C-1-00-793**

**Southern District of Ohio**
**Western Division**

**August 30, 2004**

X114

Assignment

    1.  I have been retained by Plaintiffs' counsel in connection with this matter as an expert witness to provide expert testimony on issues relating to the materiality of certain information and, if required, to opine on the opinion of defendants' expert(s).  In addition, I was asked to explain the purpose of a Proxy Statement as well as the functions performed by a public company's board of directors (BOD).  I have prepared and signed this written report in fulfillment of the obligations imposed by Federal Rules of Civil Procedure, Rule 26(a)(2).  My opinions in this matter are based in part upon information obtained by Plaintiffs through discovery to date, and are subject to supplementation and/or revision in light of additional information which may come to light through further discovery.

    2.  Specifically, counsel for the Plaintiffs ("Counsel") has asked me to opine on the materiality of Defendants' alleged misstatements and omissions in the September 24, 1999 Proxy Materials/Prospectus sent to the shareholders of OHSL Financial Corp. ("OHSL" or "the Company").  My previously submitted report, dated May 1, 2002,  set forth my opinions on issues pursuant to Plaintiffs' Complaint dated February 4, 2002.  This report addresses some of those issues, as well as the issue of materiality as it relates to the effect of Provident Financial Group, Inc.'s ("Provident") restatement of earnings in March and April 2003, as set forth in Plaintiffs' Complaint dated December 31, 2003.

Qualifications

    3.  A copy of my curriculum vitae is attached as Exhibit A.  A summary of the matters in which I have rendered testimony either at trial or in a deposition within the last four years is attached as Exhibit B.

    4.  To summarize my qualifications, I am a graduate of Eastern Michigan University and received an MBA from the Wharton School of Finance, University of Pennsylvania.  I am a founding member of Financial Markets Analysis, LLC ("FMA").  FMA is a

2

valuation and securities analysis firm with offices located in Princeton, New Jersey and San Diego, California. FMA provides valuation, financial analysis and related consulting to its clients. FMA personnel have frequently been called upon to prepare reports and to testify as experts in class actions under Federal and State securities laws. Such testimony has regularly included market efficiency, the materiality of information conveyed to investors, loss causation, the valuation of publicly traded securities based upon the absence of alleged misstatements and/or the disclosure of alleged omissions and misrepresentations and damages caused by the alleged misstatements and omissions.

5. Prior to joining FMA I was a managing director at BNY Capital Markets, Inc. ("BNY"), a wholly owned subsidiary of the Bank of New York. At BNY, I was responsible for valuations done in conjunction with fairness opinions, mergers and acquisitions, private financings and other investment banking projects.

6. Prior to joining BNY I was a founding partner of Triumph Partners, LLC ("Triumph"), a valuation and consulting firm. Before founding Triumph, I was an executive vice president of Princeton Venture Research, Inc. ("PVR").

7. I have not authored any publications within the past ten years.

8. FMA is being compensated in this matter based on the number of hours expended at the rates charged for personnel, which range from $75 to $400 per hour, plus out-of-pocket expenses. My hourly rate is $400. Our compensation is in no way contingent upon the outcome of this matter.

Summary of Opinions

9. It is my opinion that (i) the OHSL shareholders received incomplete and, in some cases, incorrect information in the September 24, 1999 Proxy Materials/Prospectus (the "Proxy"), and in subsequent communications from Defendants, which prevented them from making an informed decision regarding the proposed merger with Provident (the "Merger"); (ii) the Proxy contained material misstatements and omissions regarding the

3

actions and opinions of some members of OHSL's BOD, and the background of the transaction, which would have been important to OHSL investors in determining whether or not to vote in favor of the Merger; (iii) the Proxy contained inadequate disclosure of the inherent risk associated with Provident's loan securitization activities; (iv) the Proxy materially misstated Provident's financial condition at the time of the transaction; and (v) it is likely that the outcome of the vote was affected by these material misstatements and omissions.

Bases of Opinions

10. My opinions are based upon my professional knowledge and experience. In addition, I had access through Counsel to all of the documents and data that I requested which were within their control and nothing I requested was withheld from me by Counsel. In formulating my opinions in this matter, I have examined documents and data including, but not limited to, the following:

a) Plaintiffs' Class Action Complaint, First Amended Class Action Complaint, and Consolidated and Amended Class Action Compaint, filed in this Action;

b) Reply Memorandum in Support of Motion to Reconsider Order Granting Class Certification;

c) Memorandum in Support of Motion to Dismiss, November 20, 2000 and Appendix of Exhibits;

d) Plaintiff's Brief in Opposition to the Motion to Dismiss of the OHSL and Provident Defendants, January 3, 2001;

e) Reply Memorandum in Support of Motion to Dismiss, January 25, 2001;

f) Corrected Reply Memorandum in Support of Motion to Dismiss, January 30, 2001;

g) OHSL Financial Corp. Proxy Materials/Prospectus dated September 24, 1999;

h) Deposition transcripts of OHSL board members including Mr.'s Brinker, Hanauer, Herron, Hucke and Zoellner;

i) Deposition transcripts of Provident board members including Mr.'s Cook, Pedato, Steger, Hoverson, Carey, and Grote;

j) Deposition transcripts of Plaintiff, Walter Thiemann, and Keating, Muething & Klekamp attorneys, Mr's Reuter, Matthews, Weiss,

and Winstead;

k) Order of Court granting Class Certification, September 13, 2001;
l) Order of Court re: Motion to Dismiss, July 24, 2001;
m) OHSL's public filings such as Forms 10-K, 10-Q, 8-K and Proxy Statements filed during 1998 and 1999;
n) Provident's public filings such as Forms 10-K, 10-Q, 8-K and Proxy Statements filed during 1998 through 2003;
o) OHSL and Provident's historical stock price and volume data during the period 1998 through 2004, as well as similar data for other banking institutions competing in the same or similar markets as OHSL and Provident during that time period;
p) News articles published in the general and financial press about OHSL and Provident;
q) Reports published by security analysts about Provident and other banking institutions;
r) Historical pricing data for banking industry indices;
s) News articles, analyst reports and historical price information for Hewlett-Packard Company and Compaq Computer Corporation; and
t) The Expert Report of Ross D. Fuerman.

I reserve the right to prepare demonstrative charts and other graphic material for trial.

Background

11. In early 1999, OHSL's BOD began exploring options regarding a possible sale of the Company. The BOD engaged McDonald Investments, Inc. ("McDonald") to assist in the preparation of a valuation and to solicit interest in the Company from potential acquirers. By June 1999, McDonald had received a non-binding indication of interest from Provident and was authorized by OHSL to invite Provident to conduct its due diligence investigation. On July 22, the OHSL BOD met to discuss Provident's offer, and voted to continue negotiations with Provident on the sale of the Company.

12. By August 2, 1999 both parties had agreed upon the Merger terms, and the OHSL BOD had voted to approve the Merger with Provident. However, between July 22 and August 2, one of OHSL's board members resigned, in part, in protest of the transaction.

5

His resignation was not disclosed to shareholders.[1]

13. Consummation of the transaction depended upon approval by a majority of OHSL's shareholders. The shareholder vote was solicited via the Proxy. The Proxy advised shareholders, among other things, that:

    a) A special meeting of shareholders was scheduled for October 25, 1999 at which they would have an opportunity to vote on the proposed Merger with Provident;

    b) The OHSL BOD voted unanimously in favor of the Merger and believed it was in the best interest of shareholders;

    c) If approved, all shares of OHSL stock would be converted into shares of Provident stock based upon the provided exchange ratio; and

    d) The OHSL BOD received an opinion from its financial advisor, McDonald, that the exchange ratio was fair to OHSL shareholders from a financial point of view.

Shareholders were urged to vote by completing and returning the proxy card, although it was clear that not returning a proxy card was a vote against the transaction.

14. On October 25, 1999 OHSL's Chief Executive Officer ("CEO") and director, Kenneth Hanauer conducted the meeting of shareholders at which he recommended the proposed Merger with Provident. Subsequently, OHSL obtained a 52.4% approval vote and OHSL shares were exchanged for shares of Provident effective December 3, 1999. OHSL shareholders received 0.5458 shares of Provident stock for each share of OHSL they owned, or an equivalent dollar amount of $22.04 per share based on the closing

---

[1] On July 22, all eight directors were present for the vote on whether to continue negotiations with Provident. Mr. Hanauer abstained, Mr. Herron voted against, and the other six directors voted in favor. On August 2, the composition of the BOD had changed – Mr. Herron resigned, leaving only seven directors, untold to shareholders. Of the seven, one was absent. On that day Mr. Brinker abstained from casting a vote, so only five directors voted to approve the Merger. From reading the Proxy, the "unanimous" reference, and the omission of Mr. Herron's resignation, would cause me to believe all eight directors voted to approve the transaction.

price for Provident on that day of $40.375.[2]

Allegations

15. It is my understanding that the Consolidated Amended Class Action Complaint ("CAC") alleges Defendants made material misrepresentations to OHSL shareholders and withheld material information from them in conjunction with the Proxy solicitation beginning September 24, 1999. Those misrepresentation included that the transaction was "unanimously approved" by OHSL's BOD, when, in fact there was opposition to the transaction by certain members of OHSL's board, and only five of the then seven members of the BOD voted in favor of the transaction.

16. The Proxy omitted the fact that one of OHSL's directors, Thomas Herron, resigned in protest of continuing negotiations with Provident, just prior to the vote by the BOD. His resignation was not disclosed to shareholders. Additionally, Defendants omitted the fact that OHSL's CEO and director, Kenneth Hanauer, was opposed to the transaction leading up the August 2, 1999 vote of the OHSL BOD and that he demanded his signature be removed from the letter to shareholders attached to the Proxy. Hanauer also voted his personal shares against the transaction, notwithstanding the fact that he ran a special meeting of shareholders, at which shareholders were encouraged to vote in favor of the transaction.

17. The Proxy was also misleading in its portrayal of the acquiring company, Provident, which would impact OHSL shareholders going forward because they were to receive shares of Provident stock in exchange for their OHSL shares, if the transaction

---

[2] The exchange was based on the 10-day average closing price for Provident two days prior to the closing of the transaction. The $41.49 value for Provident and 0.5458 ratio were published in a press release on December 6, 1999. My calculation of the exchange ratio, based on $41.49 value for Provident and $22.50 value for OHSL yielded a slightly different exchange ratio of 0.5423.

was completed. The risk disclosures provided in the Proxy were materially misleading and did not provide shareholders with adequate information regarding the nature of Provident's securitization activities. Finally, Provident's financial information contained in the Proxy was incorrect and overstated its earnings. Those financials were not only relied upon by OHSL shareholders, but by McDonald as well, in arriving at their fairness opinion on the transaction.[3]

The Purpose of Proxy Materials

18. The purpose of any proxy materials or prospectus is to provide shareholders with all of the information necessary for them to make a knowledgeable investment decision regarding their shares. The Securities and Exchange Commission ("SEC") requires, under Regulation C, that information in a prospectus be presented in "clear, concise, and understandable" language, and that it not be misleading. It is incumbent upon the board of directors and their advisors to impart all relevant information to shareholders regarding a proposed merger, and to present it in such a way that it is readily comprehensible to shareholders.[4]

19. The strength of the United States financial markets is in the reporting and disclosure rules promulgated by the SEC and implemented by public companies and their

---

[3] McDonald's Fairness Opinion, in the Proxy, stated as follows: In connection with its review and arriving at its opinion, McDonald relied upon the accuracy and completeness of the financial information and other pertinent information provided by OHSL and Provident Financial to McDonald for purposes of rendering its opinion. McDonald did not assume any obligation to independently verify any of the provided information as being complete and accurate in all material respects. With regard to the financial forecasts established and developed for OHSL and Provident Financial with the input of the respective managements, as well as projections of cost savings, revenue enhancements and operating synergies, McDonald assumed that these materials had been reasonably prepared on bases reflecting the best available estimates and judgments of OHSL and Provident Financial as to the future performance of the separate and combined entities and that the projections provided a reasonable basis upon which McDonald could formulate its opinion.

[4] Of some concern to me is the fact that Mr. Zoellner testified that OHSL directors had no responsibility whatsoever for the content of the proxy materials (Zoellner, 10/15/01, P211).

8

advisors. This was not always the case. The Securities Act of 1933 and the Securities

Exchange Act of 1934 (the "Exchange Act") were a direct result of the stock market

crash of 1929 and the ensuing Great Depression. The purpose of the 1933 Acts was, and

remains, "to provide full and fair disclosure...and prevent frauds" in the sale of

securities, and the 1934 Act to provide for the dissemination of accurate information to

investors and thereby "insure the maintenance of fair and honest markets."[5] The required

reporting of financial and other information required in a prospectus demonstrates its

materiality as a matter of public policy.

20. In this case, I believe the alleged misstatements and omissions contained in the

proxy materials distributed to OHSL shareholders were material, pertained to matters at

the heart of the transaction, and affected the ultimate outcome of the shareholder vote.

21. I am prepared to testify that the term "material", as used in the context of my

report, means that certain facts or information, or the omission thereof, i) would be

important to a reasonable person in making an informed investment decision; and ii)

would be expected to affect the market price of the security at hand.[6]

The Purpose of the Fairness Opinion

22. The objective of a fairness opinion is to provide shareholders with an

independent, objective analysis of the proposed transaction, and an opinion as to its

fairness from a financial point of view. McDonald's opinion is set forth as follows:

> The Agreement provides for the merger (the "Merger") of OHSL with and
> into PFGI, pursuant to which, among other things, at the Effective Time
> (as defined in the Agreement), each outstanding share of OHSL Common
> Shares will be exchanged for the right to receive a certain number of

---

[5] Securities Act of 1933; and Securities Exchange Act of 1934, As Amended, Title I, Sec. 2

[6] I am aware that the Proxy materials (A-2) defined "material adverse effect" whereby "an adverse effect
shall be deemed 'material' if its impact is more than Twenty-Five Thousand Dollars ($25,000.00)".

9

shares (the "Exchange Ratio") of the common stock, without par value, of PFGI ("PFGI Common Shares") equal to $22.50, subject to adjustment, as set forth in Section 1.6(a) of the Agreement. The terms and conditions of the Merger are more fully set forth in the Agreement.

Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the Exchange Ratio is fair to the holders of OHSL Common Shares from a financial point of view.

23. In light of the fact that McDonald relied upon Provident's materially misstated historical financials, as well as the market price of Provident's shares, which reflected not only its historical earnings but expectations with regard to forward-looking earnings, in arriving at its opinion that the Exchange Ratio was fair, I believe McDonald's fairness opinion was unreliable and misled OHSL shareholders as to the fairness of the terms of the Merger.

Misrepresentations and Omissions Related to the CEO Were Material

24. OHSL shareholders were told that their BOD voted unanimously to approve the Merger with Provident and that it was in their best interest. There was no indication, in either the Proxy, nor at the meeting of shareholders on October 25, 1999, that Mr. Hanauer, OHSL's CEO and board member: i) had been opposed to the transaction from the beginning; ii) that he did not believe the transaction was in the best interest of OHSL's shareholders; iii) that he directed his signature be removed from the letter to shareholders attached to the Proxy; and iv) that he voted his personal shares against the Merger.

25. It is my opinion that the above information, omitted from the Proxy, was material in that it would have been important to investors, may have caused them to form a different opinion about the transaction with Provident, and in all likelihood would have

altered the outcome of the vote. I base this opinion on the fact that investors are keenly interested in the opinions of senior management, especially the most senior member, the CEO. The CEO is generally viewed by shareholders as the person responsible for the day-to-day operations of the corporation as well as strategic planning for its future. The CEO is also viewed by the investment community to be most knowledgeable and informed about all matters affecting the corporation and its future. In conjunction with the Chief Financial Officer, who reports on the financial matters of the corporation, the CEO is the most sought after voice in communications with shareholders and the investment community.

26. A 1999 Survey conducted by Fleishman-Hillard Research for the Association of Investment Management and Research asked investment professionals and financial analysts what they considered the most important source of financial or corporate information. Nearly three out of four perceived the CFO and CEO as the people within a company who have the most important roles in providing key information.[7]

27. In this case, the role of CEO as a source of information may have been even more important. OHSL was a regional savings and loan with six branches in western Cincinnati. Many of its shareholders were also customers and/or employees of OHSL. My analysis of the historical trading data for OHSL common stock indicates that the shares did not turn over quickly relative to the total number of shares outstanding. This suggests that many of its investors were committed, long-term owners of the stock. The stock was not actively followed by securities analysts, who might have expressed opinions about the transaction. Mr. Hanauer was a visible member of the community.

---

[7] AIMR Corporate Disclosure Survey, February 2000.

He had come up through the ranks and had been affiliated with the bank for more than 20 years. He was the only representative of management serving as a board member. Clearly, his opinion regarding the Merger with Provident, would have been important to OHSL's shareholders, and in all likelihood would have caused some of them to vote differently.[8]

28. Thomas Herron, the OHSL director who resigned just prior to the BOD vote, testified that he believed Mr. Hanauer's opposition to the transaction would have "significantly altered the total mix..." of information available to shareholders.[9] He also testified that Mr. Hanauer repeatedly demonstrated to the rest of the BOD in 1999 that he did not believe the Merger with Provident was in the best interest of OHSL and its shareholders. Mr. Zoellner, another OHSL board member, confirmed that Mr. Hanauer's view against the sale to Provident was generally known by the other members of the BOD.[10] Jack Cook, a Provident Board member, testified that he believed Mr. Hanauer's opposition to the transaction constituted material information.[11] Importantly, Walter Thiemann, an OHSL shareholder and Plaintiff in this action testified that he would have voted his 40,000 shares against the transaction had he known Mr. Hanauer did not believe the Merger was in the best interest of shareholders and had, in fact, voted his personal shares against the transaction.

29. In addition to holding the most important role in the company from the perspective of shareholders, Mr. Hanauer also held the top spot in terms of share

---

[8] Mr. Hanauer testified other members of OHSL management were also not in favor of the transaction. See, for example, Deposition of Kenneth Hanauer, Vol II, P270.
[9] Deposition of Thomas M. Herron, April 30, 2004, pps 121-122.
[10] Deposition of Howard Zoellner, October 15, 2001, P87.
[11] Deposition of Jack Cook, May 24, 2004, pps 127-128.

12

ownership. The table below illustrates that of all of the OHSL executive officers and directors, Mr. Hanauer owned the most stock, and therefore was the person most likely to be able to influence the vote.

| Shares Outstanding | 2,503,470 | | |
|---|---|---|---|
| Shares Owned by Insiders | | | |
| Hanauer, Kenneth | 123,075 | 4.9% | CEO, director |
| Condren, Patrick | 59,330 | 2.4% | Exec. Officer |
| Wieland, Marilyn | 57,728 | 2.3% | Exec. Officer |
| Hillebrand, William | 49,294 | 2.0% | Director |
| Hucke, Alvin | 48,064 | 1.9% | Director |
| Todd, Terry | 40,926 | 1.6% | Exec. Officer |
| Tenoever, Joseph | 32,320 | 1.3% | Director |
| McKiernan, Thomas | 29,692 | 1.2% | Director |
| Brinker, Norbert | 29,534 | 1.2% | Chairman |
| Zoellner, Howard | 24,672 | 1.0% | Director |
| | | | |
| Directors and Exec. Officers | | | |
| as a Group: | 494,635 | 19.8% | |

30. It is my opinion that if shareholders had known that the person on the BOD with the largest financial stake in the Company, and the greatest ability to impact the vote by virtue of share ownership, did not believe the Merger was in the best interest of shareholders, the outcome of the shareholder vote would most likely have been different. Further, I believe that misrepresentations in the Proxy caused shareholders to believe that Mr. Hanauer intended to vote his shares in favor of the transaction. In fact, Mr. Hanauer had already voted his shares against the transaction at the time of the special meeting of shareholders, at which they were urged to vote in favor of the Merger.

31. It is my understanding that 52.4% of the outstanding shares were voted in favor of the transaction. The table below illustrates that a "no" vote by approximately 63,000 additional shares would have been enough to terminate the transaction.

13

| | | OHSL Shares Outstanding | 2,503,470 |
|---|---|---|---|
| Percentage required to approve transaction | 50.1% | Approximate number of shares required to approve transaction | 1,254,238 |
| Percentage voted in favor of transaction | 52.4% | Approximate number of shares voted in favor of transaction | 1,311,818 |
| Percentage voted against transaction or abstained | 47.6% | Approximate number of shares voted against transaction or abstained | 1,191,652 |
| | | Additional "no" votes, or abstentions, needed to terminate transaction | 62,587 |

Thus, in addition to Mr. Thiemann's 40,000 shares, it would have taken only an additional 23,000 shares voting "no" or abstaining to have terminated the transaction. The transaction was approved by a slight majority of the shares, many of which I believe would have been cast in opposition to the transaction, had shareholders been provided with accurate and non-misleading information in the Proxy. Regardless of whether or not the outcome of the vote would have been different, OHSL shareholders were entitled to consider all relevant information, including an accurate description of the background of the transaction and opinions and votes of members of the BOD. Indeed Mr. Herron testified as follows regarding the potential impact of a truthful disclosure of Mr. Hanauer's opinion on the transaction:

> "It was my opinion at that time, and is my opinion that, yes, at least 23,000 shares and probably many more would have changed their vote."[12]

Misrepresentations and Omissions Related to Dissention Among OHSL's BOD Were Material

32. Mr. Hanauer testified, and I concur, that dissention by Board members in a

---

[12] Herron deposition, P127.

merger or acquisition, is perceived as being detrimental to the completion of the transaction.[13] During the course of negotiations in 1999 at least four of the eight original Board members were not in favor of continuing merger negotiations with Provident and expressed their objections.[14]

33. Shortly after the July 22, 1999 meeting of the Board, at which it voted to continue negotiations with Provident, Mr. Herron tendered his resignation from the OHSL BOD.[15] It is his testimony that the other members of the OHSL BOD were aware that his resignation was in protest to the OHSL BOD's decision to move forward with the Merger. Certainly, he had expressed during negotiations his discontent with the Merger. OHSL chose not to disclose Mr. Herron's resignation at all, much less the reasons behind it. Mr. Herron had been a member of the OHSL BOD since 1993, when it became a public company. He also owned 14,000 shares of OHSL stock as of April 1999. It is my opinion that his dissention, and resignation, was material information, in that it would have been important to investors in deciding on whether or not to vote their shares in favor of the Merger, and should have been disclosed.

34. In my experience, dissention among company insiders, including management and the board of directors, creates an atmosphere of uncertainty, and is generally

---

[13] Hanauer deposition, Volume IV, pps 764 – 767.

[14] At page 87 of his deposition, Mr. Zoellner testified that as of June 24, 1999, he, Mr. Hanauer, Mr. Herron, and Mr. Hillenbrand were not in favor of a sale to Provident.

[15] In the section of the Proxy entitled "Background of the Acquisition", Defendants chronicle events including negotiations with Provident and the final vote as follows: *From July 22, 1999 to August 2, 1999 McDonald, the OHSL Board and OHSL's legal counsel engaged in negotiations with Provident Financial related to a definitive agreement. On August 2, 1999 the Board held a meeting at which it approved the Merger Agreement and authorized OHSL to execute and deliver it to Provident Financial. Separately, the Board of Directors of Oak Hills (which consists of the same directors as OHSL) also adopted and approved the Merger Agreement and authorized its execution.* The phrase "the board" or "the OHSL board" is used several times, however, any mention of the fact that the composition of the board changed between July 22 and August 2 is conspicuously absent. I believe this was a material omission and shareholders would have benefited from that information, as well as the reasons behind Mr. Herron's departure.

detrimental to the ultimate completion of a pending transaction. Some of the Provident directors share this opinion, as stated in their testimony. For example, Mr. Cook stated as follows:

> "I think if a director resigns prior to something big and makes it clear that that's why he's resigning, then I think that should be disclosed in some fashion. Maybe on the 8-K, it should be disclosed. It shouldn't be kept from people's knowledge."[16]

Another Provident Board member, Joseph Pedoto, agreed, when he testified,

> "If...he resigned because he was going to vote against it and did not, I think that's information that probably should have – should be public..."[17]

Further, when asked about the ramifications of dissenting votes, Mr. Steger replied that the deal "may not fly."[18]

35. An obvious example of the impact of dissension among board members in the context of a merger occurred shortly after the OHSL/Provident Merger, when Hewlett-Packard ("HP") agreed to purchase Compaq Computer Corporation ("Compaq"). On September 3, 2001, HP announced its Board of directors had unanimously approved the decision to acquire Compaq. Completion of the merger required an approval by a majority of both Compaq and HP shareholders. From the outset, many HP shareholders were opposed to the acquisition and publicly aired their concerns. Over the next several trading-days following the merger announcement HP's stock price fell 24%.

36. On November 6, 2001, Walter Hewlett, who has served on HP's Board of directors since 1987, announced he was voting his shares, and those of the William R. Hewlett Revocable Trust, against the transaction. He stated, "After careful deliberation,

---

[16] Cook deposition, P88.
[17] Deposition of Joseph Pedoto, May 10, 2004, P247.
[18] Deposition of Joseph Steger, May 7, 2004, P213.

16

consultation with my financial advisor, and consideration of developments since the announcement of the merger, I have decided to vote against the transaction. I believe that Hewlett-Packard can create greater value for stockholders as a stand-alone company than as a company combined with Compaq." This disclosure caused a 17% one-day increase in the price of HP's shares, coupled with reported trading volume of nearly 35 million shares.



37. The announcement by Mr. Hewlett, made prior to the filing of the merger Proxy, encouraged other major shareholders to follow suit and diminished the likelihood of the deal going through. His voice was a credible threat to the transaction as evidenced by the commentary that followed.

> "This is quite a blow to the current management of H-P," said Bruce Raabe, chief investment officer of Collins & Co., which owns 150,000 Hewlett-Packard shares. "It signals some doubt in Carly's management and judgment. This will change how the vote shakes out."

> "It really opens the door for the Boards to re-review the transaction and increases the possibility that the deal won't get done," said David Katz, chief investment officer of Matrix Advisors...

> Some investors speculated that directors might be sympathetic to Walter Hewlett's concerns.

17

> "It will make it more of a dogfight," said [Todd] Ahlsten, whose firm
> holds 650,000 Compaq shares and 150,000 Hewlett-Packard shares.
> (*Bloomberg News, November 7, 2001*)

38. Immediately following Mr. Hewlett's announcement, securities analysts

following the deal reduced the estimated odds of the transaction being completed.

> We now place the odds of the deal going through at less than 50%. The
> symbolic importance of the announcement far outweighs the Hewlett
> family's stake in the company. The lead author on the announcement,
> Walter Hewlett, holds a seat on HWP's Board of directors, indicating a
> change of heart of at least one member of the Board. (*Credit Suisse First
> Boston, November 6, 2001*)

> Today Walter Hewlett, son of the company's co-founder, announced that
> he intends to vote the family's shares against the merger with Compaq.
> According to HP, the family's stake represents abut 6% of shares
> outstanding.

> Interestingly, Mr. Hewlett supported the deal initially in his role as a
> member of the Board of directors.

> Prior to today, we had believed that the odds in getting the deal approved
> were 50/50 w/ a bias towards approval. Now, we believe the pendulum
> may have swung the other way though the company clearly still seems
> focused on getting approval. (*Prudential Securities, November 6, 2001*)

39. As demonstrated by the HP/Compaq analogy, I believe that the disclosure of

opinions and actions of Board members is an important source of information to investors

and has significant influence on the investment decisions made by such investors. It is

my opinion that dissention by board members in a merger situation signals uncertainty

and can affect the ultimate outcome of the shareholder vote. In this case, OHSL's

shareholders were misled by the claim that OHSL's BOD had unanimously approved the

pending transaction with Provident, and believed it to be in the best interest of

shareholders. They were not informed about the dissention of certain board members, the

deliberate resignation of one board member in protest of the transaction, and most importantly, the fact that OHSL's CEO was against the transaction. Had that information been disclosed, shareholders would have known this was not a smooth and unanimous transition, as was misrepresented in the Proxy, it would have altered the total mix of information provided to shareholders and most likely would have changed the ultimate outcome of the shareholder vote.

Risk Disclosure In Proxy Regarding Provident's Securitization Activities Were Inadequate

40. The Proxy should have contained adequate disclosure of the inherent risk associated with the loan securitization activities from which Provident derived a significant portion of its income. While it did provide the dollar amount of loans securitized and sold, and gains from such sales, it did not reveal that (i) a significant portion of the gains were "non-cash" and booked as revenue up-front, rather than over the life of the loans; and (ii) that if it changed its method of accounting for these transactions, known as "gain on sale", or if the assumptions used regarding such gains proved to be incorrect, it could result in a materially adverse change in operating income.

41. OHSL derived its income from traditional savings and loan activities. It is my opinion that the risk disclosure in the Proxy about Provident's securitization activity did not warn OHSL shareholders that they were getting a much riskier company than OHSL. Unless one assumes OHSL shareholders were previously familiar with the concept of loan securitization, and gain on sale accounting, the risk disclosure section did not adequately explain the very real possibility that Provident's earnings could be negatively impacted in the future.

19

<u>The Proxy Contained Materially Misstated Financial Information for Provident</u>

42. As we now know, Provident's earnings for fiscal years 1997, 1998, and the first half of 1999, which were contained in the Proxy, were incorrect and inflated, due to an error in the way it recognized revenue for certain auto lease transactions. That error caused Provident to restate its financials for the prior 6 years, in the first quarter of 2003. After reviewing the nature and quantification of the restatement, and giving consideration to the fact that Provident's reported earnings and projections were relied upon, at the time, by McDonald, in arriving at its fairness opinion, it is my belief that the restatement was material, would have affected, at a minimum, the terms of the transaction between Provident and OHSL, and may have affected the shareholder vote.

43. In its press release to the investment community dated March 5, 2003, and attached as Exhibit C, Provident revealed the following:

> Provident Financial Group, Inc. announced today a restatement to its operating results for the years 1997 through 2002. The restatement of previously reported operating results is attributed to errors in the accounting for nine auto lease financing transactions originated between 1997 and 1999.

The restated results were provided as follows:

| ($millions, except per share) | | 2002 | | 2001 | | 2000 | | 1999 | | 1998 | | 1997 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **As Reported** | | | | | | | | | | | | |
| Net Income | | 119.4 | | 23.3 | | 73.6 | | 150.9 | | 122.4 | | 114.7 |
| EPS | $ | 2.35 | $ | 0.45 | $ | 1.46 | $ | 3.08 | $ | 2.48 | $ | 2.38 |
| **Restated** | | | | | | | | | | | | |
| Net Income | | 99.3 | | 3.2 | | 57.7 | | 139.6 | | 120.4 | | 113.8 |
| EPS | $ | 1.96 | $ | 0.05 | $ | 1.15 | $ | 2.85 | $ | 2.44 | $ | 2.36 |
| **Variance** | | | | | | | | | | | | |
| Net Income | | -20.1 | | -20.1 | | -15.9 | | -11.3 | | -2.0 | | -0.9 |
| EPS | $ | (0.39) | $ | (0.40) | $ | (0.31) | $ | (0.23) | $ | (0.04) | $ | (0.02) |
| **Variance as % Reported** | | -16.6% | | -88.9% | | -21.2% | | -7.5% | | -1.6% | | -0.8% |

The release also explained that due to the nature of the restatement and the "estimated impact of the auto lease financing transactions," Provident was *revising downward its earnings per share outlook* for 2003 at that time. The revised outlook illustrates the ongoing nature of the accounting error and leads me to believe that if the restatement had occurred at the time of the Merger, it would have necessitated a downward revision to forward looking earnings projections which would have affected the value of Provident's shares.

44. On April 15, 2003, Provident again restated its results downward, by an additional $44.4 million, this time going as far back as 1994. A copy of this press release has been attached as Exhibit D. It explained that the additional restatement was brought about after a review by PriceWaterhouseCoopers LLP ("PWC") following the initial restatement on March 5, 2003. Copies of the restated results as filed in the March 5, 2003 8-K and April 15, 2003 10-K have been attached as Exhibit E. Restated results were published in Provident's 2002 10-K filed on or about April 15, 2003 as follows:

| ($millions, except per share) | | 2002 | | 2001 | | 2000 | | 1999 | | 1998 |
|---|---|---|---|---|---|---|---|---|---|---|
| **As Reported** | | | | | | | | | | |
| Net Income | | 119.4 | | 23.3 | | 73.6 | | 150.9 | | 122.4 |
| EPS | $ | 2.35 | $ | 0.45 | $ | 1.46 | $ | 3.08 | $ | 2.48 |
| **Restated** | | | | | | | | | | |
| Net Income | | 95 | | -1 | | 57 | | 127 | | 118 |
| EPS | $ | 1.88 | $ | (0.04) | $ | 1.12 | $ | 2.58 | $ | 2.38 |
| **Variance** | | | | | | | | | | |
| Net Income | | -24.4 | | -24.3 | | -16.6 | | -23.9 | | -4.4 |
| EPS | $ | (0.47) | $ | (0.49) | $ | (0.34) | $ | (0.50) | $ | (0.10) |
| **Variance as % Reported** | | -20.0% | | -108.9% | | -23.3% | | -16.2% | | -4.0% |

*Results for 1997 were not included in the 10-K; the aggregate amount of the variance for years 1994 - 1997 was imputed to be $24.2 million by virtue of a subtraction of years 1998 - 2002.

21

45. In determining the materiality of Provident's restatement, and the potential impact it would have had on the Merger, I needed to answer the following questions:

a) What was the nature of the restatement and would there be any recurring impact on future earnings?

b) Was the amount of the overstatement material, and, if Provident had accurately reported its earnings on a timely basis, would it have altered investors' perceptions regarding the value of the stock?

c) Did the restatement announcement materially affect the value of Provident's stock at the time it was announced?

d) Would the restatement have affected the value of Provident's stock if it had been announced at the time of the Merger?

46. I am familiar with studies that have examined stock price changes in response to earnings restatements, in general, including those by Hirst and Hopkins (2000), Anderson and Yohn (2002), Owers (2002), and Wu (2002).[19] I have also studied the price changes in Provident's stock during the time period surrounding the earnings restatement on March 5, 2003. In the context of that study, I reviewed the opinions of securities analysts who were following Provident's stock at the time. In addition, I have reviewed the SEC guidelines regarding materiality as it relates to financial statements and earnings. Based on this examination, as well as my experience, it is my opinion that had Provident restated its earnings for 1997, 1998, and the first half of 1999, at the time the Proxy was issued, it would have significantly altered the total mix of information and may have caused a majority of OHSL shareholders to vote against the Merger.

---

[19] See, for example, Hirst, D. Eric, and Hopkins, Patrick E., 2000. Earnings: Measurement, Disclosure, and the Impact on Equity Valuation (The Research Foundation of AIMR and Blackwell Series in Finance, Charlottsville, Va.).; Anderson, Kirsten L. and Yon, Teri Lombardi, The Effect of 10K Restatements on Firm Value, Information Asymmetries and Investors' reliance on Earnings (September 2002). http://ssrn.com/abstract=332380.; Owers, James E., Chen-Miao Lin and Ronald C. Rogers, 2002, The Information content and valuation ramifications of earnings restatements, International Business and Economics Research Journal 1, 71-84.; and Wu, Min, 2002. A Review of Earnings Restatements (Softrax Corporation, Canton, MA).

47. In addition, to the extent McDonald relied upon Provident's historical financials, and/or Provident's stock price, in arriving at its fairness opinion and the prescribed Exchange Ratio, I believe it is likely McDonald would have reexamined that opinion based on the restatement and its impact on future earnings. It is likely the restatement would have changed the market price of Provident's stock.[20]

48. There is evidence that security analysts following Provident at the time were valuing the stock, in part, based on expected earnings. For example, a September 15, 1999 report, by Stephens Inc., stated as follows: "We expect third quarter earnings to come in at $0.82, or in line with our original estimate. After speaking with management last night we get a sense that the first two months of the quarter were right on track." That analyst had a "buy" recommendation on the stock and a "target price" of $52.00. The same firm increased its earnings estimates for Provident for 1999, 2000 and 2001 in a report dated October 21, 1999, after Provident reported its results for the third quarter, which, in all likelihood were inflated. The analyst stated that his expectation for future earnings growth was the basis for his recommendation on the stock.

49. As reported, Provident's earnings per share seemingly grew by 24% year-over-year from 1998 to 1999, from $2.48 to $3.08 per share. On an actual basis, earnings growth was 1/3 of that, or 8%, as the restated results for 1998 and 1999 were $2.38 and $2.58 per share, respectively. It is my opinion that if Provident had disclosed its historical revenue and earnings were overstated, and that it's earnings in the future would be much lower than anticipated, the value of Provident's stock would have been

---

[20] Hirst and Hopkins (Earnings: Measurement, Disclosure, and the Impact on Equity Valuation) conclude: "More than 30 years of academic research in accounting and finance has documented the relevance of accounting earnings for explaining both the levels of and changes in equity security prices."

significantly lower.

50. A change in the value of Provident's stock at the time of the Merger would have, in all likelihood, necessitated a revision to the recommended Exchange Ratio of Provident shares for each OHSL share.[21] If the value of Provident's shares at the time of the Merger was inflated due to the overstatement of earnings, then OHSL shareholders were damaged, since they received an inadequate number of Provident shares to compensate them for the risk commensurate with becoming owners of Provident.

The Nature of the Restatement

51. There are a number of characteristics regarding a restatement of earnings that indicate its importance to investors such as – is the restatement voluntary, did management intentionally overstate earnings, are the company's internal controls vulnerable, and will the restatement affect future earnings? The magnitude and characteristics of the restatement typically determine whether investors deem the restatement material, and whether it has an affect on the value of the stock.[22] Generally, voluntary changes such as those done to bring accounting policies more in line with a company's competitors, or adjustments made due to mergers or acquisitions, are benign and do not precipitate significant stock price changes. Obviously, intentional errors made by dishonest managers are the most egregious and have the largest negative impact on stock prices. Provident's restatement was significant and affected the value of its stock for a number of reasons. First, the restatement included 6 years of previously reported

---

[21] Surprisingly, a number of the former OHSL BOD members testified that they did not believe Provident's restatement would have changed anything about the outcome of the vote or the structure of the transaction. Mr. Hucke, however, acknowledged that if Provident was worth less, as a result of the restatement, the "whole transaction would have probably been restructured." (Hucke, 1/5/04, P41).

[22] See Wu, Min, 2002. A Review of Earnings Restatements (Softrax Corporation, Canton, MA).

financials and involved revenue recognition problems.  Second, the amount of the earnings variance grew in significance, year-to-year, and wiped out a large percentage of reported earnings in the latter years.  Finally, the change in accounting was expected to be recurring and negatively impact future earnings.  Studies have shown that earnings restatements based on accounting irregularities, including revenue recognition problems, are typically accompanied by stock price declines in excess of 30%.[23]

SEC Guidelines on Materiality

52. I have reviewed the SEC's discussion of the materiality threshold as it relates to financial statements.  It discusses the use of a numerical percentage "rule of thumb" for determining whether a misstatement must be corrected and concludes that while the use of a numerical threshold such as 5% may provide a basis for a preliminary assumption of materiality, a lower threshold may be appropriate, and a full analysis must be conducted in any event to determine whether, "a reasonable person would consider it important."

53. Certainly, the overstatement of earnings for 1999 by 16%, meets any "rule of thumb" threshold of which I am aware and conforms to the SEC guidance discussed above.  Further, the restatement variance, that is the difference between reported and restated earnings, grew over time, increasing from less than 5% in 1997 to more than 100% of reported earnings in 2001.[24]  Security analysts and other market participants relied upon historical earnings and anticipated future earnings in assessing the value of Provident's shares and to determine what a "reasonable person" would be willing to pay to own the shares.  The fact that the change in accounting for the auto lease transactions

---

[23] See DeMel, Tammy, 2002, All earnings restatements are not created equal, The State of Business, 15.
[24] It is likely that 1997 earnings per share were overstated by an amount in excess of the $0.02 per share disclosed in the March 5, 2003 8-K, however, the 2002 10-K contained no restatement of 1997 results.

affected future years, and would continue to impact future earnings convinces me that it would have reduced the value of Provident's shares, at the time of the Merger, necessitating a change to the Exchange Ratio, at a minimum.

Management Credibility and Internal Controls

54. A second reason why the earnings restatement was material and would have affected Provident's value is that accounting errors and restatements, in general, call into question the competence of management and the integrity of internal controls. The added "risk factor" of diminished management credibility and poor internal controls is typically mentioned as contributing to the share price decline following a restatement. This was the case with Provident's restatement in March 2003, as evidenced by the following comments.

> "Earnings restatements rewrite a company's history," generally in an unflattering way, said Min Wu of NYU's Department of Accounting Taxation and Business Law…When companies restate earnings and particularly when that's accompanied by a warning about future earnings – as was the case with Provident – there are usually reverberations, Wu said. (*Dow Jones Newswire, March 5, 2003*)

> "You don't like to see restatements. Period," said Bob Nameri, who helps manage $62 billion, including Provident shares, at Victory Capital Management in Cleveland. "This certainly makes you wonder how well the controls are internally and who all is overseeing this." (*Bloomberg News, March 5, 2003*)

> "It's hard to believe the accounting could have been that bad for that long," said [Mark] Cheffers [former PricewaterhouseCoopers LLP accountant]. "It had to be supported by cash flows. And if they weren't producing in accordance with reality, why would it remain undetected for six years? That dog doesn't hunt!" (*Bloomberg News, March 5, 2003*)

The Restatement Caused a Significant Decline in the Value of Provident's Stock

55. In order to assess the impact of the restatement announcement on the value of Provident's stock, I performed an "event study". An event study involves a mathematical

calculation (a regression analysis) of the price change of a stock that occurs on a particular day in question relative to the price change of a market and/or industry index. The calculation is done in order to measure the price change caused by company-specific information being released to the market as opposed to factors that may affect the market in general or the industry in which the company participates.

56. In this case, I first compared the daily price changes for Provident's stock to those of the Standard & Poor's Midcap Banks Index ("SP MBI") for the period January 2002 through December 2002. I performed a regression analysis which resulted in an equation that described the relationship between the stock price changes and SP MBI changes. Those results demonstrated that the changes in the price of Provident stock had a significant statistical relationship to the changes in the SP MBI. Using the regression equation, I calculated the "predicted" price changes for Provident, based on the SP MBI for the period surrounding Provident's restatement announcement. Using these results I observed that on March 5, 2003, the day Provident announced it was restating its financial results, Provident's stock declined by approximately 20% in excess of market or industry movement. The 20% one-day price decline was statistically significant at the 99% level. Based on these results, it is my opinion that this price decline reflected the diminution in the perceived value of Provident's stock in light of its earnings restatement disseminated to the market that day. I have attached, as Exhibit F, the regression equation as well as the event study results.

The Earnings Restatement Would Have Been Material at the Time of the Merger

57. Provident's earnings restatement was clearly material at the time it was first announced. For a number of reasons, I believe it would have been material if it was

27

announced at the time of the Merger. Historical earnings provide an important

foundation upon which forward valuation relies. A downward adjustment of 7.5% to

earnings for the first half of 1999 would have caused the basis for all forward projections

to be materially lower.[25] More importantly, the nature of the accounting error would

have caused Provident to lower its earnings expectations moving forward, by an amount

that substantially exceeded 7.5%, as the earnings variance grew in magnitude beyond

1999. Such a reduction in forward-looking earnings would have significantly impaired

the value of Provident's stock at the time.

58. The following excerpt from the Proxy describes the Exchange Ratio of Provident

shares to be exchanged for OHSL shares, dependent upon the price of Provident's stock:

> The number of shares of Provident Financial common stock to be received by OHSL
> stockholders in exchange for each outstanding share of OHSL common stock will be
> determined based on an average Provident Financial share price. The average
> Provident Financial share price is the 10-day average closing price of Provident
> Financial common stock ending two days before the closing of the acquisition. Each
> OHSL stockholder will receive $22.50 worth of Provident Financial common stock if
> the average Provident Financial share price is between $40.00 and $50.00. If the
> average Provident Financial share price is below $40.00, each OHSL stockholder will
> receive 0.5625 shares of Provident Financial common stock for each share of OHSL
> common stock. If this price is above $50.00, each OHSL stockholder will receive
> 0.45 shares of Provident Financial common stock for each share of OHSL common
> stock.

The Proxy also stated that if the "average daily per share closing price of Provident

Financial common stock falls below $36.00 for the ten trading days ending two days

before closing" the Merger could be terminated. I refer to this as the "walk-away" price.

59. When the transaction closed, on December 3, 1999, Provident's stock, for purpose

of the Exchange Ratio, was valued at $41.49. OHSL shareholders received .5458 shares

---

[25] The variance between restated and previously reported earnings for 1999 increased from -7.5% at March 5, 2003 to -16% at April 15, 2003 as a result of PWC's review following the March 5, 2003 press release and restatement.

of Provident for each share of OHSL they owned. Assuming prior to close of the Merger, Provident announced a restatement of earnings for 1997, 1998, and the first half of 1999, and also disclosed that future earnings would be negatively impacted by the change in accounting, it is my opinion that such a disclosure would have caused a material decline in the price of Provident's stock. I believe OHSL shareholders were entitled to know this vital information.

60. I have not been asked to quantify the impact on Provident's stock of a restatement at the time of the Merger, however, the table below illustrates a range of hypothetical stock price declines that I believe could have been reasonably anticipated in response to such an announcement, and the implications for the Merger.

| Value at Time of Merger: | | $41.49 | |
|---|---|---|---|
| Price Decline % | Value | | Implication for Merger |
| 10% | $37.34 | | Exchange Ratio .5625 shares of Provident |
| 15% | $35.27 | | Merger Could be Terminated – Below "walk-away" price |
| 20% | $33.19 | | Merger Could be Terminated – Below "walk-away" price |
| 30% | $29.04 | | Merger Could be Terminated – Below "walk-away" price |

At a minimum, valuation changes would have altered the Exchange Ratio and may have caused the termination of the transaction altogether.[26]

61. Regardless of the resultant valuation of Provident, in light of the restatement, OHSL shareholders may have opposed the Merger based on diminished management credibility, alone. Further, a restatement due to problems with Provident's securitization of auto loans may have heightened concerns about Provident's higher-risk lines of business relative to those of OHSL. For these reasons, it is my opinion that the restatement would have had a material impact on the Merger had it been known to investors at that time. I believe that, at a minimum, it would have changed the Exchange

---

[26] From mid-September through the end of October, 1999, the closing price for Provident's stock was below $40.00 per share, even closer to the "walk-away" price.

Ratio, and likely would have caused OHSL shareholders to vote against the Merger with Provident. In any event, OHSL shareholders were entitled to consider all of the relevant information prior to voting their shares.

The "Mosaic" Theory

62. The process of making an informed investment decision includes gathering information from a variety of sources, analyzing the relevance of the information, and forming a conclusion based upon a composite of that information deemed to be relevant. Investors do not process each piece of information in isolation, but in the context of all other information. This is often referred to as the "mosaic" theory.

63. In the case of OHSL shareholders, the Proxy was the most comprehensive and important source of information about the proposed Merger with Provident. It is my opinion that OHSL shareholders did not have the benefit of complete and accurate information with regard to (i) the history of the transaction and process through which the Merger gained approval by OHSL's BOD; (ii) the opinions and actions of the CEO regarding the Merger and voting of shares; (iii) the dissention by certain Board members and senior management regarding the Merger with Provident; (iv) Provident's historical financials and reasonable expectations regarding future earnings; and (v) the risk associated with owning Provident stock, as a result of its securitization activities, on which it relied to produce a substantial portion of its income.

64. Further, I believe that in light of the fact that the transaction was approved by only a slight majority of the shares, it is highly likely that with the benefit of full, fair, and accurate information, the ultimate outcome of the vote would have been different.

Candace L. Preston, CFA

Date: August 30, 2004

Exhibit A

# CANDACE L. PRESTON

| | |
|---|---|
| Present | Financial Markets Analysis, LLC. Founding member of the firm. Financial consultant specializing in securities and business valuations in mergers, acquisitions, appraisals, business planning, brokerage/customer arbitrations, and litigation. Significant testimonial experience in breach of contract, bankruptcy, anti-trust, securities and consumer class actions. Clients include private and public companies, individual and institutional investors, the S.E.C. and law firms. |
| 1998 – 2001 | The Bank of New York, BNY Capital Markets. Managing Director responsible for valuations and special financial services. Valuations relating to fairness opinions, mergers, acquisitions, executive compensation, estate and intergenerational transfers, and litigation. |
| 1998 | Triumph Partners, LLC. Founding member of the firm. Financial consultant specializing in securities and business valuations in mergers, acquisitions, appraisals, business planning, brokerage/customer arbitrations, and litigation. Valuation expert for the S.E.C. in its prosecution of Crazy Eddie, Inc. and Eddie Antar, and in efforts to recover monies from the Antar family. |
| 1985 - 1998 | Princeton Venture Research, Inc. Executive Vice President. Princeton Venture Research is an investment banking and consulting firm. Managed Princeton and San Diego offices. Supervised all analytic and research staff. Responsible for valuations in mergers and acquisitions, due diligence investigations, and litigation projects. Clients included Securities Investors Protection Corporation (SIPC), major financial institutions and law firms. Valuation expert for damages claims against Drexel Burnham Lambert, SubClass B. |
| 1980 - 1985 | NewMarkets. Senior consultant for management consulting firm, specializing in marketing and business planning for new ventures and turn-around situations. Developed plans for Fortune 500 companies as well as smaller businesses, which resulted in the creation and funding of new divisions and enterprises. |
| 1974 - 1978 | Family-owned businesses. Participated in the operation and management of a diverse group of businesses, including acquisitions and divestitures of numerous stand-alone operations. Among the businesses were an automotive plastics manufacturer, restaurants, automobile dealerships and real estate holdings. |
| 1970 - 1973 | U.S. Army, Tank and Automotive Command (TACOM). Civilian employee of branch responsible for negotiation and administration of contracts for wheeled and track vehicles. Negotiated and audited contracts for tank prototypes as well as tanks in production. |

## EDUCATION

| | |
|---|---|
| 1985 | M.B.A. University of Pennsylvania, Wharton School of Finance |
| 1970 | B.A. History, Eastern Michigan University |

## PROFESSIONAL DESIGNATIONS AND AFFILIATIONS

Chartered Financial Analyst (CFA)
Member, CFA Institute
Member, New York Society of Security Analysts (NYSSA)

| OTHER | University of Chicago | American Bar Association Annual Meetings, |
|---|---|---|
| | Guest lecturer in finance | Securities Litigation Panels |
| | University of Pennsylvania | National Association of Public Pension Attorneys |
| | Guest lecturer in finance | Securities Litigation Panel |

Exhibit B

In Re: Frontier Insurance Group, Inc.
Civil Action No. 94 Civ. 5213 (EHN)
U.S. District Court, Eastern District of New York
Deposition: November 9, 1998
Hearing Testimony: July 27, 2001

In Re: Sunglass Hut International, Inc.
Case No. 97-0191-CIV-MOORE/O'SULLIVAN
U.S. District Court, Southern District of Florida
Deposition: March 28, 2001

In Re: Real Estate Associates Limited Partnership Litigation
Case No. CV 98-7035 DDP (AJW)
U.S. District Court, Central District of California
Deposition: May 16, 2001; Trial October 24, 2002

In Re: Morgens, Waterfall, Vintiadis & Co., Inc. v. Donaldson Lufkin & Jenrette Securities
Corp.
Case No. 00 Civ.9517 (MP)
U. S. District Court, Southern District of New York
Deposition: October 10, 2001

In Re: Jennifer Convertibles Securities Litigation
Master File No. CV-94-5570 (DRH)
U.S. District Court, Southern District of New York
Deposition: July 22, 2002

Dennis Johnson v. Garden Ridge Corporation, et al
Civil Action No. 17651NC
Court of Chancery of the State of Delaware
New Castle County
Deposition: July 29, 2002

In Re: Alliance Pharmaceutical Corp. Securities Litigation
01-CV-1674 (CM) (MDF)
U.S. District Court, Southern District of New York
Deposition: August 2, 2002

In Re: One Stop Realtour Place v. Allegiance Telecom, Inc.
U.S. Bankruptcy Court, Eastern District of Pennsylvania
Trial: September 19, 2002

In Re: SmarTalk Teleservices, Inc. Securities Litigation
U.S. District Court, Southern District of Ohio, Eastern District
Deposition: October 2 & 3, 2002

In Re: Comer Finance, Ltd. and Prival N.V. v. Michael Berger, et al.
Index No.00 Civ. 2284 (DLC)
U.S. District Court, Southern District of New York
Deposition: December 20, 2002

Martin I. Cohen v. Berkshire Hathaway, Inc. et al (MidAmerican Energy Holdings, Inc.)
Iowa District Court for Polk County
CL 81833
Deposition: March 31, 2003

In re: Laidlaw Stockholder Litigation
C.A.:3:00-CV-855-17
U.S. District Court, District of South Carolina, Columbia Division
Deposition, September 29, 2003

Exhibit C

PRN      Provident Financial Group, Inc. Announces Restatement
          Mar 5 2003  7:31

Of Operating Results for Years 1997 through 2002

CINCINNATI, March 5 /PRNewswire-FirstCall/ -- Provident Financial Group, Inc. announced today a restatement to its operating results for the years 1997 through 2002.

The restatement of previously reported operating results is attributed to errors in the accounting for nine auto lease financing transactions originated between 1997 and 1999.

The errors that existed in the accounting for these transactions were first discovered by the company's finance staff in connection with the testing and installation of a financial model that identified differences in income that was originally recorded, compared with the income generated by the financial model. The company then notified its independent auditors and bank regulators and has reported all relevant information to its board of directors and audit committee. The company has been working closely with its independent auditors since the accounting errors were first discovered.

A review of the accounting for the nine transactions also concluded that none of the transactions should have been reported off-balance sheet as a sale and lease back of operating leases. The appropriate accounting was to report the transactions as financing leases with all assets and related liabilities included on the balance sheet. As a result, the company will also be restating its balance sheets for the years 1997 through 2002 to include the nine auto lease financing transactions.

Christopher J. Carey, Executive Vice President and Chief Financial Officer of Provident, stated, "The restatement announced today is attributable solely to errors in the accounting for the nine auto lease transactions that were originated between 1997 and 1999. All auto lease transactions originated beginning in 2000 and thereafter were structured and treated as financing leases and have been included on our balance sheet. We also reviewed the accounting for each of the subsequent transactions and concluded that they were accounted for correctly."

The previously announced earnings per share outlook for 2003 was between $2.50 and $2.70. As a result of the evaluation of the estimated impact of the auto lease financing transactions, the revised earnings per share outlook is between $2.30 and $2.50. The company's expectation is that the impact of this matter will be significantly less in 2004 and in future years.

The chart below shows as reported and restated net income and diluted earnings per share for the years 1997 through 2002.

Net Income & Diluted Earnings Per Share
($ in millions, except per share data)

| | Year Ended December 31, | | | | | |
| | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|---|
| As Reported<br>Net Income | $119.4 | $23.3 | $73.6 | $150.9 | $122.4 | $114.7 |

Copyright (c) 2004

PRN      Provident Financial Group, Inc. Announces Restatement
         Mar 5 2003  7:31

| | | | | | | |
|---|---|---|---|---|---|---|
| Earnings<br>Per Share | $2.35 | $0.45 | $1.46 | $3.08 | $2.48 | $2.38 |
| Restated<br>Net Income | $99.3 | $3.2 | $57.7 | $139.6 | $120.4 | $113.8 |
| Earnings<br>Per Share | $1.96 | $0.07 | $1.15 | $2.85 | $2.44 | $2.36 |
| Variance<br>Net Income | $(20.1) | $(20.1) | $(15.9) | $(11.3) | $(2.0) | $(0.9) |
| Earnings<br>Per Share | $(0.39) | $(0.40) | $(0.31) | $(0.23) | $(0.04) | $(0.02) |

The chart below shows as reported and restated end of period assets for
the years 1997 through 2002.

End of Period Assets
($ in millions)

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 |
| As Reported<br>Total<br>Assets | $16,721.2 | $15,573.6 | $13,857.4 | $10,537.9 | $8,949.7 | $7,946.6 |
| Restated<br>Total<br>Assets | $17,534.4 | $16,540.0 | $14,982.5 | $11,821.1 | $9,581.4 | $8,269.4 |
| Variance<br>Total<br>Assets | $813.2 | $966.4 | $1,125.1 | $1,283.2 | $631.7 | $322.8 |

The total risk based capital ratio at December 31, 2002 on a restated
basis was 11.69% compared with the originally reported 12.17%.

Forward-Looking Statements
This news release contains certain forward-looking statements that are
subject to numerous assumptions, risks or uncertainties. The Private
Securities Litigation Reform Act of 1995 provides a safe harbor for
forward-looking statements. Actual results could differ materially from those
contained in or implied by such forward-looking statements for a variety of
factors including: sharp and/or rapid changes in interest rates; significant
changes in the anticipated economic scenario which could materially change
anticipated credit quality trends; the ability to generate loans and leases;
significant cost, delay in, or inability to execute strategic initiatives

Copyright (c) 2004

PRN        Provident Financial Group, Inc. Announces Restatement
           Mar 5 2003  7:31

designed to grow revenues and/or manage expenses; consummation of significant
business combinations or divestitures; and significant changes in accounting,
tax, or regulatory practices or requirements and factors noted in connection
with forward-looking statements. Additionally, borrowers could suffer
unanticipated losses without regard to general economic conditions. The result
of these and other factors could cause differences from expectations in the
level of defaults, changes in the risk characteristics of the loan and lease
portfolio, and changes in the provision for loan and lease losses. Forward-
looking statements speak only as of the date made. Provident undertakes no
obligations to update any forward-looking statements to reflect events or
circumstances arising after the date on which they are made.

    About Provident Financial Group, Inc.
    Provident Financial Group, Inc. (Nasdaq: PFGI) is a bank holding company
located in Cincinnati, Ohio. Its main subsidiary, The Provident Bank, provides
a diverse line of banking and financial products and services regionally;
selected business activities are also conducted nationally. Consumer, small
business, and investment products and services are offered through a
network of retail financial centers located primarily within Southwestern Ohio
and Northern Kentucky. Provident also has a growing presence on the West Coast
of Florida with 13 retail financial centers. Commercial banking products and
services are offered through nine regional offices. Customers have access to
banking services 24-hours a day through Provident's extensive network of ATMs,
Telebank, a telephone customer service center, and the internet at
www.providentbank.com. At December 31, 2002, Provident Financial Group had
$11.3 billion in loans outstanding, $9.8 billion in deposits, and assets of
$17.5 billion. Provident has served the financial needs of its customers for
100 years, and currently 3,400 Provident associates serve approximately
600,000 customers. Provident Financial Group's common stock trades on the
Nasdaq Stock Market under the symbol PFGI.

    Conference Call
    A conference call will be held today (Wednesday, March 5, 2003) at
11:00 a.m. (ET) to discuss the contents of this news release. The call can be
accessed by calling 1-877-818-4511. A replay of the call will be available
through Monday, March 10, 2003 by calling 1-800-642-1687 (passcode 131 20).

    For further information, please contact:
    Christopher J. Carey
    Executive Vice President & Chief Financial Officer
    1-513-639-4644 / 1-800-851-9521
    e-mail: IR@provident-financial.com

SOURCE  Provident Financial Group, Inc.
    -0-                      03/05/2003
    /CONTACT:  Christopher J. Carey, Executive Vice President & Chief
Financial Officer of Provident Financial Group, Inc., +1-513-639-4644 or

Copyright (c) 2004

```
PRN         Provident Financial Group, Inc. Announces Restatement
            Mar 5 2003  7:31


1-800-851-9521, or IR@provident-financial.com/
    /Company News On-Call; http://www.prnewswire.com/gh/cnoc/comp/721925.html/
    /Web site:  http://www.providentbank.com /
    (PFGI)

CO:  Provident Bank; Provident Financial Group, Inc.
ST:  Ohio
IN:  FIN
SU:  CCA ERN

-0- Mar/05/2003 12:31 GMT
```

Copyright (c) 2004

Exhibit D

BN          Provident Financial Says It Will Restate More Results (Update3)
            Apr 15 2003  10:57

Provident Financial Says It Will Restate More Results (Update3)

    (Adds comment from CFO in fourth paragraph.)

    Cincinnati, April 15 (Bloomberg) -- Provident Financial Group
Inc., almost half owned by financier Carl Lindner's family, said
it overstated profit by $44.4 million since 1994 because of a
faulty accounting on auto-lease contracts. It was the second time
in six weeks the Cincinnati-based bank restated results.
    The disclosure brought to $114.4 million the amount of profit
the bank is erasing. On March 5, Provident said it would restate
$70 million in earnings form 1997 through 2002 because of improper
accounting on nine auto leases. The company said its auditor,
Ernst & Young LLP, approved the initial bookkeeping.
    Accounting scandals at Enron Corp. and WorldCom Inc. and
other companies have triggered more restatements because of
tougher scrutiny of financial statements by regulators and
auditors. Provident said the latest accounting change was prompted
by a review of its March 5 restatement by PricewaterhouseCoopers
LLP, the largest U.S. accounting firm.
    ``We wanted to validate that the earlier accounting problem
was unintentional and that we had it right going forward,'' said
Christopher Carey, Provident's chief financial officer.

                        Accounting Change

    Provident said it will reclassify all the auto leases on its
balance sheet from finance leases, which are the equivalent of
loans, to operating leases. Because finance leases generate more
interest income in the early years of the contract, the change
will reduce the earnings Provident booked from 1994 through 2002
but and add to earnings in 2003 and beyond, the company said.
    Provident shares, down 15 percent this year, rose 33 cents to
$22.17 in morning trading. The impact of the statement will be to
add 10 cents to earnings per share in 2003 and 25 cents in 2004.
    Carey said the accounting treatment recommended by Ernst &
Young was similar to that followed by the rest of the banking
industry. ``I don't think that E&Y blew it,'' he said. ``The
treatment recommended by PwC more precisely follows GAAP, which is
what people want to do these days,'' he said. GAAP is generally
accepted accounting principles.
    The Lindner family owns 44 percent of Provident Financial,
which has branches in Ohio, Kentucky and Florida. Lindner also
owns the Cincinnati Reds baseball team and is chief executive of
insurer American Financial Group Inc., Provident's biggest
shareholder.
    Regulators from the Federal Reserve Bank of Cleveland were to

BN      Provident Financial Says It Will Restate More Results (Update3)
        Apr 15 2003  10:57

begin an inspection of the bank ``relatively quickly,'' Carey said
in a conference call last month.
    Following the latest restatement, Provident said its earnings
for the year ended Dec. 31 were $95.5 million, or $1.88 a share,
compared with a loss of $1 million, or 4 cents a share, year
earlier.

--Jack Duffy and Chris Burritt in the New York newsroom (212) 940-
1694 or jduffy3@bloomberg.net. Editor: Hertling.

Story illustration: To compare the company's stock performance
with relevant indexes, see {PFGI US <Equity> COMP D <GO>}.

Company news: PFGI US <Equity> 5092Z US <Equity> 10182Z US
<Equity>

NI codes: NI US NI COS NI ERN NI WARN NI FIN NI BNK NI CORPFIN NI
ACC


#<648901.52818>#


#<563213.1230382>#


#<708506.81751>#


#<708506.81751>#
-0- (BN ) Apr/15/2003 14:57 GMT

**Bloomberg** - Your definitive source
If you need help on the BLOOMBERG press the HELP key twice
Copyright (c) 2004, Bloomberg, L. P.

Exhibit E

# UNITED STATES

# SECURITIES AND EXCHANGE COMMISSION

## Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

March 5, 2003
(Date of Report - Date of Earliest Event Reported)

### PROVIDENT FINANCIAL GROUP, INC.

(Exact Name of Registrant as Specified in Charter)

Ohio
(State or Other Jurisdiction of Incorporation)

1-8019

(Commission File Number)

31-0982792

(IRS Employer Identification Number)

One East Fourth Street, Cincinnati, Ohio 45202
(Address of Principal Executive Offices) (Zip Code)

1-800-851-9521 or 513-345-7102

(Registrant's Telephone Number, Including Area Code)

<original-page -1- >

Item 5.   Other Events and Required FD Disclosure.
-------------------------------------------------------

On March 5, 2003, the Registrant issued the press release filed as Exhibit 99.

Item 7.   Financial Statements, Pro Forma Financial Information and Exhibits.
------------------------------------------------------------------------------------

(c) Exhibit 99 Press Release Dated March 5, 2003.

<original-page -2- >

|  | Year Ended December 31, | | | | | |
|  | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|---|
| As Reported | | | | | | |
| Net Income | $ 119.4 | $ 23.3 | $ 73.6 | $ 150.9 | $ 122.4 | $ 114.7 |
| Earnings Per Share | $ 2.35 | $ 0.45 | $ 1.46 | $ 3.08 | $ 2.40 | $ 2.38 |
| Restated | | | | | | |
| Net Income | $ 99.3 | $ 3.2 | $ 57.7 | $ 139.6 | $ 120.4 | $ 113.8 |
| Earnings Per Share | $ 1.96 | $ 0.05 | $ 1.15 | $ 2.85 | $ 2.44 | $ 2.36 |
| Variance | | | | | | |
| Net Income | $ (20.1) | $ (20.1) | $ (15.9) | $ (11.3) | $ (2.0) | $ (0.9) |
| Earnings Per Share | $ (0.39) | $ (0.40) | $ (0.31) | $ (0.23) | $ (0.04) | $ (0.02) |

The chart below shows as reported and restated end of period assets for the years 1997 through 2002.

End of Period Assets
($ in millions)

|  | Year Ended December 31, | | | | | |
|  | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|---|
| As Reported Total Assets | $16,721.2 | $15,573.6 | $ 13,857.4 | $ 10,537.9 | $8,949.7 | $7,946.6 |
| Restated Total Assets | $17,534.4 | $16,540.0 | $ 14,982.5 | $ 11,821.1 | $9,581.4 | $8,269.4 |
| Variance Total Assets | $ 813.2 | $ 966.4 | $ 1,125.1 | $ 1,283.2 | $ 631.7 | $ 322.8 |

# SECURITIES AND EXCHANGE COMMISSION

## Washington, D.C. 20549

# FORM 10-K

Annual Report Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

For the Fiscal Year Ended                                            Commission File
December 31, 2002                                                       No. 1-8019

### PROVIDENT FINANCIAL GROUP, INC.

Incorporated Under                                                   IRS Employer I.D.
the Laws of Ohio                                                      No. 31-0982792

One East Fourth Street, Cincinnati, Ohio 45202
Phone: 1-800-851-9521 or 513-345-7102

Securities Registered Pursuant to Section 12(b) of the Act:    None

Securities Registered Pursuant to Section 12(g) of the Act:    Common Stock,
                                                                 Without Par

Indicate by check mark whether the Registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months, and (2) has been subject to such filing
requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to
Item 405 of Regulation S-K is not contained herein, and need not be
contained, to the best of registrant's knowledge, in definitive proxy or
information statements incorporated by reference in Part III of this Form
10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is an accelerated filer
(as defined in Rule 12b-2 of the Act). Yes [X] No [ ]

As of February 28, 2003, there were 48,787,190 shares of the
Registrant's Common Stock outstanding. The aggregate market value of the
Common Stock held by non-affiliates at June 30, 2002, was approximately
$776,037,000 (based upon non-affiliated holdings of 26,751,000 shares and a
market price of $29.01 per share).

Documents Incorporated by Reference:

Proxy Statement for the 2002 Annual Meeting of Shareholders (portions which are incorporated by reference into Part III
hereof).

Please address all correspondence to:

|  | 2002 | | | | 2001 | | | |
|---|---|---|---|---|---|---|---|---|
|  | Fourth Quarter | Third Quarter | Second Quarter | First Quarter | Fourth Quarter | Third Quarter | Second Quarter | First Quarter |
| High Close | $28.05 | $29.51 | $31.35 | $29.97 | $26.29 | $35.09 | $33.37 | $37.38 |
| Low Close | 21.48 | 24.28 | 24.42 | 22.17 | 21.41 | 24.90 | 32.92 | 25.88 |
| Period End Close | 26.03 | 25.09 | 29.01 | 28.80 | 26.28 | 25.25 | 32.92 | 28.13 |
| Cash Dividends | .24 | .24 | .24 | .24 | .24 | .24 | .24 | .24 |

At March 31, 2003, there were 4,942 holders of record and an additional 11,413 non-registered or "street name" holders of Provident's Common Stock.

Provident paid dividends on its Common Stock of $47.4 million and $47.1 million during 2002 and 2001, respectively, and $0.9 million on its Preferred Stock for both years. Provident's quarterly dividend rate per share was $.24 for 2002 and 2001. It is expected that in the next several years, Provident's (Parent's) revenues will consist principally of dividends paid to it by its subsidiaries and interest generated from investing activities. A discussion of limitations and restrictions on the payment of dividends by subsidiaries to Provident is contained under ITEM 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity" and Note 26 included in "Notes to Consolidated Financial Statements."

<original-page -5- >

PROVIDENT FINANCIAL GROUP, INC. AND SUBSIDIARIES

ITEM 6.  SELECTED FINANCIAL DATA

|  | For Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| (Dollars In Millions Except Per Share Amounts) | 2002 | 2001 | 2000 | 1999 | 1998 |
| **Earnings:** | | | | | |
| Total Interest Income | $ 841 | $ 973 | $ 906 | $ 680 | $ 657 |
| Total Interest Expense | (526) | (703) | (662) | (430) | (403) |
| Net Interest Income | 315 | 270 | 244 | 250 | 254 |
| Provision for Loan and Lease Losses | (99) | (216) | (133) | (46) | (29) |
| Noninterest Income | 805 | 757 | 660 | 537 | 279 |
| Noninterest Expense | (876) | (813) | (680) | (544) | (323) |
| Income (Loss) Before Income Taxes | 145 | (2) | 91 | 197 | 181 |
| Applicable Income Taxes | (50) | 1 | (34) | (70) | (63) |
| Net Income (Loss) | $ 95 | $ (1) | $ 57 | $ 127 | $ 118 |
| **Per Common Share Data:** | | | | | |
| Basic Earnings (Loss) | $ 1.94 | $ (0.04) | $ 1.14 | $ 2.66 | $ 2.47 |
| Diluted Earnings (Loss) | 1.88 | (0.04) | 1.12 | 2.58 | 2.38 |
| Dividends Paid | .96 | .96 | .96 | .88 | .80 |
| Book Value | 17.91 | 16.15 | 18.79 | 17.89 | 16.30 |

Exhibit F

# Exhibit 6 – Regression Equation and Event Study Results for March 5, 2003

**PFGI vs S&P Midcap Banks Index**
**Control period 2002**

| Regression Statistics | |
|---|---|
| Multiple R | 0.749996 |
| R Square | 0.5624 |
| Adjusted R Square | 0.56069 |
| Standard Error | 0.01444 |
| Observations | 252 |

**ANOVA**

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 1 | 0.06699 | 0.06699 | 321.34970 | 0.00000 |
| Residual | 250 | 0.05211 | 0.00021 | | |
| Total | 251 | 0.11910 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | (0.00007) | 0.00091 | (0.08092) | 0.93557 | (0.00187) | 0.00172 | (0.00187) | 0.00172 |
| X Variable 1 | 0.99827 | 0.05569 | 17.92623 | 0.00000 | 0.88859 | 1.10794 | 0.88859 | 1.10794 |

| Date | PFGI Price | S&P Index | PFGI Return | S&P Return | Pred. Return | Res. Return | T-stat |
|---|---|---|---|---|---|---|---|
| 28-Feb-03 | $28.91 | 359.95 | 0.9% | 0.4% | 0.4% | 0.6% | 0.383 |
| 3-Mar-03 | $28.63 | 358.44 | -1.0% | -0.4% | -0.4% | -0.5% | (0.376) |
| 4-Mar-03 | $28.07 | 354.92 | -2.0% | -1.0% | -1.0% | -1.0% | (0.571) |
| 5-Mar-03 | $22.46 | 354.69 | -20.0% | -0.1% | -0.1% | -19.9% | (13.793) |
| 6-Mar-03 | $21.57 | 351.73 | -4.0% | -0.8% | -0.8% | -3.1% | (2.162) |
| 7-Mar-03 | $21.95 | 353.89 | 1.8% | 0.6% | 0.6% | 1.2% | 0.801 |
| 10-Mar-03 | $21.36 | 343.61 | -2.7% | -2.9% | -2.9% | 0.2% | 0.152 |