Preliminary Expert Report of Candace L. Preston, CFA
On Behalf of the OHSL Financial Corp. Plaintiffs

In re: OHSL Financial Corp. Securities Litigation

Case No. C-1-00-793

Southern District of Ohio
Western Division

August 30, 2004

DEFENDANT'S EXHIBIT A

PLAINTIFF'S EXHIBIT NO. 114 FOR IDENTIFICATION DATE: 9/1/04 RPTR:

Assignment

1. I have been retained by Plaintiffs' counsel in connection with this matter as an expert witness to provide expert testimony on issues relating to the materiality of certain information and, if required, to opine on the opinion of defendants' expert(s). In addition, I was asked to explain the purpose of a Proxy Statement as well as the functions performed by a public company's board of directors (BOD). I have prepared and signed this written report in fulfillment of the obligations imposed by Federal Rules of Civil Procedure, Rule 26(a)(2). My opinions in this matter are based in part upon information obtained by Plaintiffs through discovery to date, and are subject to supplementation and/or revision in light of additional information which may come to light through further discovery.

2. Specifically, counsel for the Plaintiffs ("Counsel") has asked me to opine on the materiality of Defendants' alleged misstatements and omissions in the September 24, 1999 Proxy Materials/Prospectus sent to the shareholders of OHSL Financial Corp. ("OHSL" or "the Company"). My previously submitted report, dated May 1, 2002, set forth my opinions on issues pursuant to Plaintiffs' Complaint dated February 4, 2002. This report addresses some of those issues, as well as the issue of materiality as it relates to the effect of Provident Financial Group, Inc.'s ("Provident") restatement of earnings in March and April 2003, as set forth in Plaintiffs' Complaint dated December 31, 2003.

Qualifications

3. A copy of my curriculum vitae is attached as Exhibit A. A summary of the matters in which I have rendered testimony either at trial or in a deposition within the last four years is attached as Exhibit B.

4. To summarize my qualifications, I am a graduate of Eastern Michigan University and received an MBA from the Wharton School of Finance, University of Pennsylvania. I am a founding member of Financial Markets Analysis, LLC ("FMA"). FMA is a

2

valuation and securities analysis firm with offices located in Princeton, New Jersey and San Diego, California. FMA provides valuation, financial analysis and related consulting to its clients. FMA personnel have frequently been called upon to prepare reports and to testify as experts in class actions under Federal and State securities laws. Such testimony has regularly included market efficiency, the materiality of information conveyed to investors, loss causation, the valuation of publicly traded securities based upon the absence of alleged misstatements and/or the disclosure of alleged omissions and misrepresentations and damages caused by the alleged misstatements and omissions.

5. Prior to joining FMA I was a managing director at BNY Capital Markets, Inc. ("BNY"), a wholly owned subsidiary of the Bank of New York. At BNY, I was responsible for valuations done in conjunction with fairness opinions, mergers and acquisitions, private financings and other investment banking projects.

6. Prior to joining BNY I was a founding partner of Triumph Partners, LLC ("Triumph"), a valuation and consulting firm. Before founding Triumph, I was an executive vice president of Princeton Venture Research, Inc. ("PVR").

7. I have not authored any publications within the past ten years.

8. FMA is being compensated in this matter based on the number of hours expended at the rates charged for personnel, which range from $75 to $400 per hour, plus out-of-pocket expenses. My hourly rate is $400. Our compensation is in no way contingent upon the outcome of this matter.

Summary of Opinions

9. It is my opinion that (i) the OHSL shareholders received incomplete and, in some cases, incorrect information in the September 24, 1999 Proxy Materials/Prospectus (the "Proxy"), and in subsequent communications from Defendants, which prevented them from making an informed decision regarding the proposed merger with Provident (the "Merger"); (ii) the Proxy contained material misstatements and omissions regarding the

3

actions and opinions of some members of OHSL's BOD, and the background of the transaction, which would have been important to OHSL investors in determining whether or not to vote in favor of the Merger; (iii) the Proxy contained inadequate disclosure of the inherent risk associated with Provident's loan securitization activities; (iv) the Proxy materially misstated Provident's financial condition at the time of the transaction; and (v) it is likely that the outcome of the vote was affected by these material misstatements and omissions.

Bases of Opinions

10. My opinions are based upon my professional knowledge and experience. In addition, I had access through Counsel to all of the documents and data that I requested which were within their control and nothing I requested was withheld from me by Counsel. In formulating my opinions in this matter, I have examined documents and data including, but not limited to, the following:

   a) Plaintiffs' Class Action Complaint, First Amended Class Action Complaint, and Consolidated and Amended Class Action Compaint, filed in this Action;
   b) Reply Memorandum in Support of Motion to Reconsider Order Granting Class Certification;
   c) Memorandum in Support of Motion to Dismiss, November 20, 2000 and Appendix of Exhibits;
   d) Plaintiff's Brief in Opposition to the Motion to Dismiss of the OHSL and Provident Defendants, January 3, 2001;
   e) Reply Memorandum in Support of Motion to Dismiss, January 25, 2001;
   f) Corrected Reply Memorandum in Support of Motion to Dismiss, January 30, 2001;
   g) OHSL Financial Corp. Proxy Materials/Prospectus dated September 24, 1999;
   h) Deposition transcripts of OHSL board members including Mr.'s Brinker, Hanauer, Herron, Hucke and Zoellner;
   i) Deposition transcripts of Provident board members including Mr.'s Cook, Pedato, Steger, Hoverson, Carey, and Grote;
   j) Deposition transcripts of Plaintiff, Walter Thiemann, and Keating, Muething & Klekamp attorneys, Mr's Reuter, Matthews, Weiss,

4

         and Winstead;
- k) Order of Court granting Class Certification, September 13, 2001;
- l) Order of Court re: Motion to Dismiss, July 24, 2001;
- m) OHSL's public filings such as Forms 10-K, 10-Q, 8-K and Proxy Statements filed during 1998 and 1999;
- n) Provident's public filings such as Forms 10-K, 10-Q, 8-K and Proxy Statements filed during 1998 through 2003;
- o) OHSL and Provident's historical stock price and volume data during the period 1998 through 2004, as well as similar data for other banking institutions competing in the same or similar markets as OHSL and Provident during that time period;
- p) News articles published in the general and financial press about OHSL and Provident;
- q) Reports published by security analysts about Provident and other banking institutions;
- r) Historical pricing data for banking industry indices;
- s) News articles, analyst reports and historical price information for Hewlett-Packard Company and Compaq Computer Corporation; and
- t) The Expert Report of Ross D. Fuerman.

I reserve the right to prepare demonstrative charts and other graphic material for trial.

<u>Background</u>

11. In early 1999, OHSL's BOD began exploring options regarding a possible sale of the Company. The BOD engaged McDonald Investments, Inc. ("McDonald") to assist in the preparation of a valuation and to solicit interest in the Company from potential acquirers. By June 1999, McDonald had received a non-binding indication of interest from Provident and was authorized by OHSL to invite Provident to conduct its due diligence investigation. On July 22, the OHSL BOD met to discuss Provident's offer, and voted to continue negotiations with Provident on the sale of the Company.

12. By August 2, 1999 both parties had agreed upon the Merger terms, and the OHSL BOD had voted to approve the Merger with Provident. However, between July 22 and August 2, one of OHSL's board members resigned, in part, in protest of the transaction.

5

His resignation was not disclosed to shareholders.[1]

13. Consummation of the transaction depended upon approval by a majority of OHSL's shareholders. The shareholder vote was solicited via the Proxy. The Proxy advised shareholders, among other things, that:

    a) A special meeting of shareholders was scheduled for October 25, 1999 at which they would have an opportunity to vote on the proposed Merger with Provident;

    b) The OHSL BOD voted unanimously in favor of the Merger and believed it was in the best interest of shareholders;

    c) If approved, all shares of OHSL stock would be converted into shares of Provident stock based upon the provided exchange ratio; and

    d) The OHSL BOD received an opinion from its financial advisor, McDonald, that the exchange ratio was fair to OHSL shareholders from a financial point of view.

Shareholders were urged to vote by completing and returning the proxy card, although it was clear that not returning a proxy card was a vote against the transaction.

14. On October 25, 1999 OHSL's Chief Executive Officer ("CEO") and director, Kenneth Hanauer conducted the meeting of shareholders at which he recommended the proposed Merger with Provident. Subsequently, OHSL obtained a 52.4% approval vote and OHSL shares were exchanged for shares of Provident effective December 3, 1999. OHSL shareholders received 0.5458 shares of Provident stock for each share of OHSL they owned, or an equivalent dollar amount of $22.04 per share based on the closing

---

[1] On July 22, all eight directors were present for the vote on whether to continue negotiations with Provident. Mr. Hanauer abstained, Mr. Herron voted against, and the other six directors voted in favor. On August 2, the composition of the BOD had changed – Mr. Herron resigned, leaving only seven directors, untold to shareholders. Of the seven, one was absent. On that day Mr. Brinker abstained from casting a vote, so only five directors voted to approve the Merger. From reading the Proxy, the "unanimous" reference, and the omission of Mr. Herron's resignation, would cause me to believe all eight directors voted to approve the transaction.

price for Provident on that day of $40.375.[2]

Allegations

15. It is my understanding that the Consolidated Amended Class Action Complaint ("CAC") alleges Defendants made material misrepresentations to OHSL shareholders and withheld material information from them in conjunction with the Proxy solicitation beginning September 24, 1999. Those misrepresentation included that the transaction was "unanimously approved" by OHSL's BOD, when, in fact there was opposition to the transaction by certain members of OHSL's board, and only five of the then seven members of the BOD voted in favor of the transaction.

16. The Proxy omitted the fact that one of OHSL's directors, Thomas Herron, resigned in protest of continuing negotiations with Provident, just prior to the vote by the BOD. His resignation was not disclosed to shareholders. Additionally, Defendants omitted the fact that OHSL's CEO and director, Kenneth Hanauer, was opposed to the transaction leading up the August 2, 1999 vote of the OHSL BOD and that he demanded his signature be removed from the letter to shareholders attached to the Proxy. Hanauer also voted his personal shares against the transaction, notwithstanding the fact that he ran a special meeting of shareholders, at which shareholders were encouraged to vote in favor of the transaction.

17. The Proxy was also misleading in its portrayal of the acquiring company, Provident, which would impact OHSL shareholders going forward because they were to receive shares of Provident stock in exchange for their OHSL shares, if the transaction

---

[2] The exchange was based on the 10-day average closing price for Provident two days prior to the closing of the transaction. The $41.49 value for Provident and 0.5458 ratio were published in a press release on December 6, 1999. My calculation of the exchange ratio, based on $41.49 value for Provident and $22.50 value for OHSL yielded a slightly different exchange ratio of 0.5423.

7

was completed. The risk disclosures provided in the Proxy were materially misleading and did not provide shareholders with adequate information regarding the nature of Provident's securitization activities. Finally, Provident's financial information contained in the Proxy was incorrect and overstated its earnings. Those financials were not only relied upon by OHSL shareholders, but by McDonald as well, in arriving at their fairness opinion on the transaction.[3]

The Purpose of Proxy Materials

18. The purpose of any proxy materials or prospectus is to provide shareholders with all of the information necessary for them to make a knowledgeable investment decision regarding their shares. The Securities and Exchange Commission ("SEC") requires, under Regulation C, that information in a prospectus be presented in "clear, concise, and understandable" language, and that it not be misleading. It is incumbent upon the board of directors and their advisors to impart all relevant information to shareholders regarding a proposed merger, and to present it in such a way that it is readily comprehensible to shareholders.[4]

19. The strength of the United States financial markets is in the reporting and disclosure rules promulgated by the SEC and implemented by public companies and their

---

[3] McDonald's Fairness Opinion, in the Proxy, stated as follows: In connection with its review and arriving at its opinion, McDonald relied upon the accuracy and completeness of the financial information and other pertinent information provided by OHSL and Provident Financial to McDonald for purposes of rendering its opinion. McDonald did not assume any obligation to independently verify any of the provided information as being complete and accurate in all material respects. With regard to the financial forecasts established and developed for OHSL and Provident Financial with the input of the respective managements, as well as projections of cost savings, revenue enhancements and operating synergies, McDonald assumed that these materials had been reasonably prepared on bases reflecting the best available estimates and judgments of OHSL and Provident Financial as to the future performance of the separate and combined entities and that the projections provided a reasonable basis upon which McDonald could formulate its opinion.

[4] Of some concern to me is the fact that Mr. Zoellner testified that OHSL directors had no responsibility whatsoever for the content of the proxy materials (Zoellner, 10/15/01, P211).

8

advisors. This was not always the case. The Securities Act of 1933 and the Securities Exchange Act of 1934 (the "Exchange Act") were a direct result of the stock market crash of 1929 and the ensuing Great Depression. The purpose of the 1933 Acts was, and remains, "to provide full and fair disclosure...and prevent frauds" in the sale of securities, and the 1934 Act to provide for the dissemination of accurate information to investors and thereby "insure the maintenance of fair and honest markets."[5] The required reporting of financial and other information required in a prospectus demonstrates its materiality as a matter of public policy.

20. In this case, I believe the alleged misstatements and omissions contained in the proxy materials distributed to OHSL shareholders were material, pertained to matters at the heart of the transaction, and affected the ultimate outcome of the shareholder vote.

21. I am prepared to testify that the term "material", as used in the context of my report, means that certain facts or information, or the omission thereof, i) would be important to a reasonable person in making an informed investment decision; and ii) would be expected to affect the market price of the security at hand.[6]

The Purpose of the Fairness Opinion

22. The objective of a fairness opinion is to provide shareholders with an independent, objective analysis of the proposed transaction, and an opinion as to its fairness from a financial point of view. McDonald's opinion is set forth as follows:

> The Agreement provides for the merger (the "Merger") of OHSL with and into PFGI, pursuant to which, among other things, at the Effective Time (as defined in the Agreement), each outstanding share of OHSL Common Shares will be exchanged for the right to receive a certain number of

---

[5] Securities Act of 1933; and Securities Exchange Act of 1934, As Amended, Title I, Sec. 2
[6] I am aware that the Proxy materials (A-2) defined "material adverse effect" whereby "an adverse effect shall be deemed 'material' if its impact is more than Twenty-Five Thousand Dollars ($25,000.00)".

9

> shares (the "Exchange Ratio") of the common stock, without par value, of PFGI ("PFGI Common Shares") equal to $22.50, subject to adjustment, as set forth in Section 1.6(a) of the Agreement. The terms and conditions of the Merger are more fully set forth in the Agreement.
>
> Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the Exchange Ratio is fair to the holders of OHSL Common Shares from a financial point of view.

23. In light of the fact that McDonald relied upon Provident's materially misstated historical financials, as well as the market price of Provident's shares, which reflected not only its historical earnings but expectations with regard to forward-looking earnings, in arriving at its opinion that the Exchange Ratio was fair, I believe McDonald's fairness opinion was unreliable and misled OHSL shareholders as to the fairness of the terms of the Merger.

<u>Misrepresentations and Omissions Related to the CEO Were Material</u>

24. OHSL shareholders were told that their BOD voted unanimously to approve the Merger with Provident and that it was in their best interest. There was no indication, in either the Proxy, nor at the meeting of shareholders on October 25, 1999, that Mr. Hanauer, OHSL's CEO and board member: i) had been opposed to the transaction from the beginning; ii) that he did not believe the transaction was in the best interest of OHSL's shareholders; iii) that he directed his signature be removed from the letter to shareholders attached to the Proxy; and iv) that he voted his personal shares against the Merger.

25. It is my opinion that the above information, omitted from the Proxy, was material in that it would have been important to investors, may have caused them to form a different opinion about the transaction with Provident, and in all likelihood would have

10

altered the outcome of the vote. I base this opinion on the fact that investors are keenly interested in the opinions of senior management, especially the most senior member, the CEO. The CEO is generally viewed by shareholders as the person responsible for the day-to-day operations of the corporation as well as strategic planning for its future. The CEO is also viewed by the investment community to be most knowledgeable and informed about all matters affecting the corporation and its future. In conjunction with the Chief Financial Officer, who reports on the financial matters of the corporation, the CEO is the most sought after voice in communications with shareholders and the investment community.

26. A 1999 Survey conducted by Fleishman-Hillard Research for the Association of Investment Management and Research asked investment professionals and financial analysts what they considered the most important source of financial or corporate information. Nearly three out of four perceived the CFO and CEO as the people within a company who have the most important roles in providing key information.[7]

27. In this case, the role of CEO as a source of information may have been even more important. OHSL was a regional savings and loan with six branches in western Cincinnati. Many of its shareholders were also customers and/or employees of OHSL. My analysis of the historical trading data for OHSL common stock indicates that the shares did not turn over quickly relative to the total number of shares outstanding. This suggests that many of its investors were committed, long-term owners of the stock. The stock was not actively followed by securities analysts, who might have expressed opinions about the transaction. Mr. Hanauer was a visible member of the community.

---

[7] AIMR Corporate Disclosure Survey, February 2000.

He had come up through the ranks and had been affiliated with the bank for more than 20 years. He was the only representative of management serving as a board member. Clearly, his opinion regarding the Merger with Provident, would have been important to OHSL's shareholders, and in all likelihood would have caused some of them to vote differently.[8]

28. Thomas Herron, the OHSL director who resigned just prior to the BOD vote, testified that he believed Mr. Hanauer's opposition to the transaction would have "significantly altered the total mix..." of information available to shareholders.[9] He also testified that Mr. Hanauer repeatedly demonstrated to the rest of the BOD in 1999 that he did not believe the Merger with Provident was in the best interest of OHSL and its shareholders. Mr. Zoellner, another OHSL board member, confirmed that Mr. Hanauer's view against the sale to Provident was generally known by the other members of the BOD.[10] Jack Cook, a Provident Board member, testified that he believed Mr. Hanauer's opposition to the transaction constituted material information.[11] Importantly, Walter Thiemann, an OHSL shareholder and Plaintiff in this action testified that he would have voted his 40,000 shares against the transaction had he known Mr. Hanauer did not believe the Merger was in the best interest of shareholders and had, in fact, voted his personal shares against the transaction.

29. In addition to holding the most important role in the company from the perspective of shareholders, Mr. Hanauer also held the top spot in terms of share

---

[8] Mr. Hanauer testified other members of OHSL management were also not in favor of the transaction. See, for example, Deposition of Kenneth Hanauer, Vol II, P270.
[9] Deposition of Thomas M. Herron, April 30, 2004, pps 121-122.
[10] Deposition of Howard Zoellner, October 15, 2001, P87.
[11] Deposition of Jack Cook, May 24, 2004, pps 127-128.

ownership. The table below illustrates that of all of the OHSL executive officers and directors, Mr. Hanauer owned the most stock, and therefore was the person most likely to be able to influence the vote.

| Shares Outstanding | 2,503,470 | | |
|---|---|---|---|
| Shares Owned by Insiders | | | |
| Hanauer, Kenneth | 123,075 | 4.9% | CEO, director |
| Condren, Patrick | 59,330 | 2.4% | Exec. Officer |
| Wieland, Marilyn | 57,728 | 2.3% | Exec. Officer |
| Hillebrand, William | 49,294 | 2.0% | Director |
| Hucke, Alvin | 48,064 | 1.9% | Director |
| Todd, Terry | 40,926 | 1.6% | Exec. Officer |
| Tenoever, Joseph | 32,320 | 1.3% | Director |
| McKiernan, Thomas | 29,692 | 1.2% | Director |
| Brinker, Norbert | 29,534 | 1.2% | Chairman |
| Zoellner, Howard | 24,672 | 1.0% | Director |
| | | | |
| Directors and Exec. Officers as a Group: | 494,635 | 19.8% | |

30. It is my opinion that if shareholders had known that the person on the BOD with the largest financial stake in the Company, and the greatest ability to impact the vote by virtue of share ownership, did not believe the Merger was in the best interest of shareholders, the outcome of the shareholder vote would most likely have been different. Further, I believe that misrepresentations in the Proxy caused shareholders to believe that Mr. Hanauer intended to vote his shares in favor of the transaction. In fact, Mr. Hanauer had already voted his shares against the transaction at the time of the special meeting of shareholders, at which they were urged to vote in favor of the Merger.

31. It is my understanding that 52.4% of the outstanding shares were voted in favor of the transaction. The table below illustrates that a "no" vote by approximately 63,000 additional shares would have been enough to terminate the transaction.

|  |  |  | |
|---|---|---|---|
|  |  | OHSL Shares Outstanding | 2,503,470 |
| Percentage required to approve transaction | 50.1% | Approximate number of shares required to approve transaction | 1,254,238 |
| Percentage voted in favor of transaction | 52.4% | Approximate number of shares voted in favor of transaction | 1,311,818 |
| Percentage voted against transaction or abstained | 47.6% | Approximate number of shares voted against transaction or abstained | 1,191,652 |
|  |  | Additional "no" votes, or abstentions, needed to terminate transaction | 62,587 |

Thus, in addition to Mr. Thiemann's 40,000 shares, it would have taken only an additional 23,000 shares voting "no" or abstaining to have terminated the transaction. The transaction was approved by a slight majority of the shares, many of which I believe would have been cast in opposition to the transaction, had shareholders been provided with accurate and non-misleading information in the Proxy. Regardless of whether or not the outcome of the vote would have been different, OHSL shareholders were entitled to consider all relevant information, including an accurate description of the background of the transaction and opinions and votes of members of the BOD. Indeed Mr. Herron testified as follows regarding the potential impact of a truthful disclosure of Mr. Hanauer's opinion on the transaction:

> "It was my opinion at that time, and is my opinion that, yes, at least 23,000 shares and probably many more would have changed their vote."[12]

Misrepresentations and Omissions Related to Dissention Among OHSL's BOD Were Material

32. Mr. Hanauer testified, and I concur, that dissention by Board members in a

---

[12] Herron deposition, P127.

14

merger or acquisition, is perceived as being detrimental to the completion of the transaction.[13] During the course of negotiations in 1999 at least four of the eight original Board members were not in favor of continuing merger negotiations with Provident and expressed their objections.[14]

33. Shortly after the July 22, 1999 meeting of the Board, at which it voted to continue negotiations with Provident, Mr. Herron tendered his resignation from the OHSL BOD.[15] It is his testimony that the other members of the OHSL BOD were aware that his resignation was in protest to the OHSL BOD's decision to move forward with the Merger. Certainly, he had expressed during negotiations his discontent with the Merger. OHSL chose not to disclose Mr. Herron's resignation at all, much less the reasons behind it. Mr. Herron had been a member of the OHSL BOD since 1993, when it became a public company. He also owned 14,000 shares of OHSL stock as of April 1999. It is my opinion that his dissention, and resignation, was material information, in that it would have been important to investors in deciding on whether or not to vote their shares in favor of the Merger, and should have been disclosed.

34. In my experience, dissention among company insiders, including management and the board of directors, creates an atmosphere of uncertainty, and is generally

---

[13] Hanauer deposition, Volume IV, pps 764 – 767.
[14] At page 87 of his deposition, Mr. Zoellner testified that as of June 24, 1999, he, Mr. Hanauer, Mr. Herron, and Mr. Hillenbrand were not in favor of a sale to Provident.
[15] In the section of the Proxy entitled "Background of the Acquisition", Defendants chronicle events including negotiations with Provident and the final vote as follows: *From July 22, 1999 to August 2, 1999 McDonald, the OHSL Board and OHSL's legal counsel engaged in negotiations with Provident Financial related to a definitive agreement. On August 2, 1999 the Board held a meeting at which it approved the Merger Agreement and authorized OHSL to execute and deliver it to Provident Financial. Separately, the Board of Directors of Oak Hills (which consists of the same directors as OHSL) also adopted and approved the Merger Agreement and authorized its execution.* The phrase "the board" or "the OHSL board" is used several times, however, any mention of the fact that the composition of the board changed between July 22 and August 2 is conspicuously absent. I believe this was a material omission and shareholders would have benefited from that information, as well as the reasons behind Mr. Herron's departure.

15