detrimental to the ultimate completion of a pending transaction. Some of the Provident directors share this opinion, as stated in their testimony. For example, Mr. Cook stated as follows:

> "I think if a director resigns prior to something big and makes it clear that that's why he's resigning, then I think that should be disclosed in some fashion. Maybe on the 8-K, it should be disclosed. It shouldn't be kept from people's knowledge."[16]

Another Provident Board member, Joseph Pedoto, agreed, when he testified,

> "If...he resigned because he was going to vote against it and did not, I think that's information that probably should have – should be public..."[17]

Further, when asked about the ramifications of dissenting votes, Mr. Steger replied that the deal "may not fly."[18]

35. An obvious example of the impact of dissension among board members in the context of a merger occurred shortly after the OHSL/Provident Merger, when Hewlett-Packard ("HP") agreed to purchase Compaq Computer Corporation ("Compaq"). On September 3, 2001, HP announced its Board of directors had unanimously approved the decision to acquire Compaq. Completion of the merger required an approval by a majority of both Compaq and HP shareholders. From the outset, many HP shareholders were opposed to the acquisition and publicly aired their concerns. Over the next several trading-days following the merger announcement HP's stock price fell 24%.

36. On November 6, 2001, Walter Hewlett, who has served on HP's Board of directors since 1987, announced he was voting his shares, and those of the William R. Hewlett Revocable Trust, against the transaction. He stated, "After careful deliberation,

---

[16] Cook deposition, P88.
[17] Deposition of Joseph Pedoto, May 10, 2004, P247.
[18] Deposition of Joseph Steger, May 7, 2004, P213.

consultation with my financial advisor, and consideration of developments since the announcement of the merger, I have decided to vote against the transaction. I believe that Hewlett-Packard can create greater value for stockholders as a stand-alone company than as a company combined with Compaq." This disclosure caused a 17% one-day increase in the price of HP's shares, coupled with reported trading volume of nearly 35 million shares.



37. The announcement by Mr. Hewlett, made prior to the filing of the merger Proxy, encouraged other major shareholders to follow suit and diminished the likelihood of the deal going through. His voice was a credible threat to the transaction as evidenced by the commentary that followed.

> "This is quite a blow to the current management of H-P," said Bruce Raabe, chief investment officer of Collins & Co., which owns 150,000 Hewlett-Packard shares. "It signals some doubt in Carly's management and judgment. This will change how the vote shakes out."
>
> "It really opens the door for the Boards to re-review the transaction and increases the possibility that the deal won't get done," said David Katz, chief investment officer of Matrix Advisors...
>
> Some investors speculated that directors might be sympathetic to Walter Hewlett's concerns.

17

> "It will make it more of a dogfight," said [Todd] Ahlsten, whose firm holds 650,000 Compaq shares and 150,000 Hewlett-Packard shares. (*Bloomberg News, November 7, 2001*)

38. Immediately following Mr. Hewlett's announcement, securities analysts following the deal reduced the estimated odds of the transaction being completed.

> We now place the odds of the deal going through at less than 50%. The symbolic importance of the announcement far outweighs the Hewlett family's stake in the company. The lead author on the announcement, Walter Hewlett, holds a seat on HWP's Board of directors, indicating a change of heart of at least one member of the Board. (*Credit Suisse First Boston, November 6, 2001*)

> Today Walter Hewlett, son of the company's co-founder, announced that he intends to vote the family's shares against the merger with Compaq. According to HP, the family's stake represents abut 6% of shares outstanding.

> Interestingly, Mr. Hewlett supported the deal initially in his role as a member of the Board of directors.

> Prior to today, we had believed that the odds in getting the deal approved were 50/50 w/ a bias towards approval. Now, we believe the pendulum may have swung the other way though the company clearly still seems focused on getting approval. (*Prudential Securities, November 6, 2001*)

39. As demonstrated by the HP/Compaq analogy, I believe that the disclosure of opinions and actions of Board members is an important source of information to investors and has significant influence on the investment decisions made by such investors. It is my opinion that dissention by board members in a merger situation signals uncertainty and can affect the ultimate outcome of the shareholder vote. In this case, OHSL's shareholders were misled by the claim that OHSL's BOD had unanimously approved the pending transaction with Provident, and believed it to be in the best interest of shareholders. They were not informed about the dissention of certain board members, the

18

deliberate resignation of one board member in protest of the transaction, and most importantly, the fact that OHSL's CEO was against the transaction. Had that information been disclosed, shareholders would have known this was not a smooth and unanimous transition, as was misrepresented in the Proxy, it would have altered the total mix of information provided to shareholders and most likely would have changed the ultimate outcome of the shareholder vote.

<u>Risk Disclosure In Proxy Regarding Provident's Securitization Activities Were Inadequate</u>

40. The Proxy should have contained adequate disclosure of the inherent risk associated with the loan securitization activities from which Provident derived a significant portion of its income. While it did provide the dollar amount of loans securitized and sold, and gains from such sales, it did not reveal that (i) a significant portion of the gains were "non-cash" and booked as revenue up-front, rather than over the life of the loans; and (ii) that if it changed its method of accounting for these transactions, known as "gain on sale", or if the assumptions used regarding such gains proved to be incorrect, it could result in a materially adverse change in operating income.

41. OHSL derived its income from traditional savings and loan activities. It is my opinion that the risk disclosure in the Proxy about Provident's securitization activity did not warn OHSL shareholders that they were getting a much riskier company than OHSL. Unless one assumes OHSL shareholders were previously familiar with the concept of loan securitization, and gain on sale accounting, the risk disclosure section did not adequately explain the very real possibility that Provident's earnings could be negatively impacted in the future.

19

<u>The Proxy Contained Materially Misstated Financial Information for Provident</u>

42. As we now know, Provident's earnings for fiscal years 1997, 1998, and the first half of 1999, which were contained in the Proxy, were incorrect and inflated, due to an error in the way it recognized revenue for certain auto lease transactions. That error caused Provident to restate its financials for the prior 6 years, in the first quarter of 2003. After reviewing the nature and quantification of the restatement, and giving consideration to the fact that Provident's reported earnings and projections were relied upon, at the time, by McDonald, in arriving at its fairness opinion, it is my belief that the restatement was material, would have affected, at a minimum, the terms of the transaction between Provident and OHSL, and may have affected the shareholder vote.

43. In its press release to the investment community dated March 5, 2003, and attached as Exhibit C, Provident revealed the following:

> Provident Financial Group, Inc. announced today a restatement to its operating results for the years 1997 through 2002. The restatement of previously reported operating results is attributed to errors in the accounting for nine auto lease financing transactions originated between 1997 and 1999.

The restated results were provided as follows:

| ($millions, except per share) | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|---|
| **As Reported** | | | | | | |
| Net Income | 119.4 | 23.3 | 73.6 | 150.9 | 122.4 | 114.7 |
| EPS | $ 2.35 | $ 0.45 | $ 1.46 | $ 3.08 | $ 2.48 | $ 2.38 |
| **Restated** | | | | | | |
| Net Income | 99.3 | 3.2 | 57.7 | 139.6 | 120.4 | 113.8 |
| EPS | $ 1.96 | $ 0.05 | $ 1.15 | $ 2.85 | $ 2.44 | $ 2.36 |
| **Variance** | | | | | | |
| Net Income | -20.1 | -20.1 | -15.9 | -11.3 | -2.0 | -0.9 |
| EPS | $ (0.39) | $ (0.40) | $ (0.31) | $ (0.23) | $ (0.04) | $ (0.02) |
| **Variance as % Reported** | -16.6% | -88.9% | -21.2% | -7.5% | -1.6% | -0.8% |

20

The release also explained that due to the nature of the restatement and the "estimated impact of the auto lease financing transactions," Provident was *revising downward its earnings per share outlook* for 2003 at that time. The revised outlook illustrates the ongoing nature of the accounting error and leads me to believe that if the restatement had occurred at the time of the Merger, it would have necessitated a downward revision to forward looking earnings projections which would have affected the value of Provident's shares.

44. On April 15, 2003, Provident again restated its results downward, by an additional $44.4 million, this time going as far back as 1994. A copy of this press release has been attached as Exhibit D. It explained that the additional restatement was brought about after a review by PriceWaterhouseCoopers LLP ("PWC") following the initial restatement on March 5, 2003. Copies of the restated results as filed in the March 5, 2003 8-K and April 15, 2003 10-K have been attached as Exhibit E. Restated results were published in Provident's 2002 10-K filed on or about April 15, 2003 as follows:

| ($millions, except per share) | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|
| **As Reported** | | | | | |
| Net Income | 119.4 | 23.3 | 73.6 | 150.9 | 122.4 |
| EPS | $ 2.35 | $ 0.45 | $ 1.46 | $ 3.08 | $ 2.48 |
| **Restated** | | | | | |
| Net Income | 95 | -1 | 57 | 127 | 118 |
| EPS | $ 1.88 | $ (0.04) | $ 1.12 | $ 2.58 | $ 2.38 |
| **Variance** | | | | | |
| Net Income | -24.4 | -24.3 | -16.6 | -23.9 | -4.4 |
| EPS | $ (0.47) | $ (0.49) | $ (0.34) | $ (0.50) | $ (0.10) |
| **Variance as % Reported** | -20.0% | -108.9% | -23.3% | -16.2% | -4.0% |

*Results for 1997 were not included in the 10-K; the aggregate amount of the variance for years 1994 - 1997 was imputed to be $24.2 million by virtue of a subtraction of years 1998 - 2002.

21

45. In determining the materiality of Provident's restatement, and the potential impact it would have had on the Merger, I needed to answer the following questions:

   a) What was the nature of the restatement and would there be any recurring impact on future earnings?

   b) Was the amount of the overstatement material, and, if Provident had accurately reported its earnings on a timely basis, would it have altered investors' perceptions regarding the value of the stock?

   c) Did the restatement announcement materially affect the value of Provident's stock at the time it was announced?

   d) Would the restatement have affected the value of Provident's stock if it had been announced at the time of the Merger?

46. I am familiar with studies that have examined stock price changes in response to earnings restatements, in general, including those by Hirst and Hopkins (2000), Anderson and Yohn (2002), Owers (2002), and Wu (2002).[19] I have also studied the price changes in Provident's stock during the time period surrounding the earnings restatement on March 5, 2003. In the context of that study, I reviewed the opinions of securities analysts who were following Provident's stock at the time. In addition, I have reviewed the SEC guidelines regarding materiality as it relates to financial statements and earnings. Based on this examination, as well as my experience, it is my opinion that had Provident restated its earnings for 1997, 1998, and the first half of 1999, at the time the Proxy was issued, it would have significantly altered the total mix of information and may have caused a majority of OHSL shareholders to vote against the Merger.

---

[19] See, for example, Hirst, D. Eric, and Hopkins, Patrick E., 2000. Earnings: Measurement, Disclosure, and the Impact on Equity Valuation (The Research Foundation of AIMR and Blackwell Series in Finance, Charlottsville, Va.).; Anderson, Kirsten L. and Yon, Teri Lombardi, The Effect of 10K Restatements on Firm Value, Information Asymmetries and Investors' reliance on Earnings (September 2002). http://ssrn.com/abstract=332380.; Owers, James E., Chen-Miao Lin and Ronald C. Rogers, 2002, The Information content and valuation ramifications of earnings restatements, International Business and Economics Research Journal 1, 71-84.; and Wu, Min, 2002. A Review of Earnings Restatements (Softrax Corporation, Canton, MA).

22

47. In addition, to the extent McDonald relied upon Provident's historical financials, and/or Provident's stock price, in arriving at its fairness opinion and the prescribed Exchange Ratio, I believe it is likely McDonald would have reexamined that opinion based on the restatement and its impact on future earnings. It is likely the restatement would have changed the market price of Provident's stock.[20]

48. There is evidence that security analysts following Provident at the time were valuing the stock, in part, based on expected earnings. For example, a September 15, 1999 report, by Stephens Inc., stated as follows: "We expect third quarter earnings to come in at $0.82, or in line with our original estimate. After speaking with management last night we get a sense that the first two months of the quarter were right on track." That analyst had a "buy" recommendation on the stock and a "target price" of $52.00. The same firm increased its earnings estimates for Provident for 1999, 2000 and 2001 in a report dated October 21, 1999, after Provident reported its results for the third quarter, which, in all likelihood were inflated. The analyst stated that his expectation for future earnings growth was the basis for his recommendation on the stock.

49. As reported, Provident's earnings per share seemingly grew by 24% year-over-year from 1998 to 1999, from $2.48 to $3.08 per share. On an actual basis, earnings growth was 1/3 of that, or 8%, as the restated results for 1998 and 1999 were $2.38 and $2.58 per share, respectively. It is my opinion that if Provident had disclosed its historical revenue and earnings were overstated, and that it's earnings in the future would be much lower than anticipated, the value of Provident's stock would have been

---

[20] Hirst and Hopkins (Earnings: Measurement, Disclosure, and the Impact on Equity Valuation) conclude: "More than 30 years of academic research in accounting and finance has documented the relevance of accounting earnings for explaining both the levels of and changes in equity security prices."

23

significantly lower.

50. A change in the value of Provident's stock at the time of the Merger would have, in all likelihood, necessitated a revision to the recommended Exchange Ratio of Provident shares for each OHSL share.[21] If the value of Provident's shares at the time of the Merger was inflated due to the overstatement of earnings, then OHSL shareholders were damaged, since they received an inadequate number of Provident shares to compensate them for the risk commensurate with becoming owners of Provident.

<u>The Nature of the Restatement</u>

51. There are a number of characteristics regarding a restatement of earnings that indicate its importance to investors such as – is the restatement voluntary, did management intentionally overstate earnings, are the company's internal controls vulnerable, and will the restatement affect future earnings? The magnitude and characteristics of the restatement typically determine whether investors deem the restatement material, and whether it has an affect on the value of the stock.[22] Generally, voluntary changes such as those done to bring accounting policies more in line with a company's competitors, or adjustments made due to mergers or acquisitions, are benign and do not precipitate significant stock price changes. Obviously, intentional errors made by dishonest managers are the most egregious and have the largest negative impact on stock prices. Provident's restatement was significant and affected the value of its stock for a number of reasons. First, the restatement included 6 years of previously reported

---

[21] Surprisingly, a number of the former OHSL BOD members testified that they did not believe Provident's restatement would have changed anything about the outcome of the vote or the structure of the transaction. Mr. Hucke, however, acknowledged that if Provident was worth less, as a result of the restatement, the "whole transaction would have probably been restructured." (Hucke, 1/5/04, P41).

[22] See Wu, Min, 2002. A Review of Earnings Restatements (Softrax Corporation, Canton, MA).

24

financials and involved revenue recognition problems. Second, the amount of the earnings variance grew in significance, year-to-year, and wiped out a large percentage of reported earnings in the latter years. Finally, the change in accounting was expected to be recurring and negatively impact future earnings. Studies have shown that earnings restatements based on accounting irregularities, including revenue recognition problems, are typically accompanied by stock price declines in excess of 30%.[23]

SEC Guidelines on Materiality

52. I have reviewed the SEC's discussion of the materiality threshold as it relates to financial statements. It discusses the use of a numerical percentage "rule of thumb" for determining whether a misstatement must be corrected and concludes that while the use of a numerical threshold such as 5% may provide a basis for a preliminary assumption of materiality, a lower threshold may be appropriate, and a full analysis must be conducted in any event to determine whether, "a reasonable person would consider it important."

53. Certainly, the overstatement of earnings for 1999 by 16%, meets any "rule of thumb" threshold of which I am aware and conforms to the SEC guidance discussed above. Further, the restatement variance, that is the difference between reported and restated earnings, grew over time, increasing from less than 5% in 1997 to more than 100% of reported earnings in 2001.[24] Security analysts and other market participants relied upon historical earnings and anticipated future earnings in assessing the value of Provident's shares and to determine what a "reasonable person" would be willing to pay to own the shares. The fact that the change in accounting for the auto lease transactions

---

[23] See DeMel, Tammy, 2002, All earnings restatements are not created equal, The State of Business, 15.
[24] It is likely that 1997 earnings per share were overstated by an amount in excess of the $0.02 per share disclosed in the March 5, 2003 8-K, however, the 2002 10-K contained no restatement of 1997 results.

25

affected future years, and would continue to impact future earnings convinces me that it would have reduced the value of Provident's shares, at the time of the Merger, necessitating a change to the Exchange Ratio, at a minimum.

Management Credibility and Internal Controls

54. A second reason why the earnings restatement was material and would have affected Provident's value is that accounting errors and restatements, in general, call into question the competence of management and the integrity of internal controls. The added "risk factor" of diminished management credibility and poor internal controls is typically mentioned as contributing to the share price decline following a restatement. This was the case with Provident's restatement in March 2003, as evidenced by the following comments.

> "Earnings restatements rewrite a company's history," generally in an unflattering way, said Min Wu of NYU's Department of Accounting Taxation and Business Law...When companies restate earnings and particularly when that's accompanied by a warning about future earnings – as was the case with Provident – there are usually reverberations, Wu said. (*Dow Jones Newswire, March 5, 2003*)

> "You don't like to see restatements. Period," said Bob Nameri, who helps manage $62 billion, including Provident shares, at Victory Capital Management in Cleveland. "This certainly makes you wonder how well the controls are internally and who all is overseeing this." (*Bloomberg News, March 5, 2003*)

> "It's hard to believe the accounting could have been that bad for that long," said [Mark] Cheffers [former PricewaterhouseCoopers LLP accountant]. "It had to be supported by cash flows. And if they weren't producing in accordance with reality, why would it remain undetected for six years? That dog doesn't hunt!" (*Bloomberg News, March 5, 2003*)

The Restatement Caused a Significant Decline in the Value of Provident's Stock

55. In order to assess the impact of the restatement announcement on the value of Provident's stock, I performed an "event study". An event study involves a mathematical

26

calculation (a regression analysis) of the price change of a stock that occurs on a particular day in question relative to the price change of a market and/or industry index. The calculation is done in order to measure the price change caused by company-specific information being released to the market as opposed to factors that may affect the market in general or the industry in which the company participates.

56. In this case, I first compared the daily price changes for Provident's stock to those of the Standard & Poor's Midcap Banks Index ("SP MBI") for the period January 2002 through December 2002. I performed a regression analysis which resulted in an equation that described the relationship between the stock price changes and SP MBI changes. Those results demonstrated that the changes in the price of Provident stock had a significant statistical relationship to the changes in the SP MBI. Using the regression equation, I calculated the "predicted" price changes for Provident, based on the SP MBI for the period surrounding Provident's restatement announcement. Using these results I observed that on March 5, 2003, the day Provident announced it was restating its financial results, Provident's stock declined by approximately 20% in excess of market or industry movement. The 20% one-day price decline was statistically significant at the 99% level. Based on these results, it is my opinion that this price decline reflected the diminution in the perceived value of Provident's stock in light of its earnings restatement disseminated to the market that day. I have attached, as Exhibit F, the regression equation as well as the event study results.

<u>The Earnings Restatement Would Have Been Material at the Time of the Merger</u>

57. Provident's earnings restatement was clearly material at the time it was first announced. For a number of reasons, I believe it would have been material if it was

27

announced at the time of the Merger. Historical earnings provide an important foundation upon which forward valuation relies. A downward adjustment of 7.5% to earnings for the first half of 1999 would have caused the basis for all forward projections to be materially lower.[25] More importantly, the nature of the accounting error would have caused Provident to lower its earnings expectations moving forward, by an amount that substantially exceeded 7.5%, as the earnings variance grew in magnitude beyond 1999. Such a reduction in forward-looking earnings would have significantly impaired the value of Provident's stock at the time.

58. The following excerpt from the Proxy describes the Exchange Ratio of Provident shares to be exchanged for OHSL shares, dependent upon the price of Provident's stock:

> The number of shares of Provident Financial common stock to be received by OHSL stockholders in exchange for each outstanding share of OHSL common stock will be determined based on an average Provident Financial share price. The average Provident Financial share price is the 10-day average closing price of Provident Financial common stock ending two days before the closing of the acquisition. Each OHSL stockholder will receive $22.50 worth of Provident Financial common stock if the average Provident Financial share price is between $40.00 and $50.00. If the average Provident Financial share price is below $40.00, each OHSL stockholder will receive 0.5625 shares of Provident Financial common stock for each share of OHSL common stock. If this price is above $50.00, each OHSL stockholder will receive 0.45 shares of Provident Financial common stock for each share of OHSL common stock.

The Proxy also stated that if the "average daily per share closing price of Provident Financial common stock falls below $36.00 for the ten trading days ending two days before closing" the Merger could be terminated. I refer to this as the "walk-away" price.

59. When the transaction closed, on December 3, 1999, Provident's stock, for purpose of the Exchange Ratio, was valued at $41.49. OHSL shareholders received .5458 shares

---

[25] The variance between restated and previously reported earnings for 1999 increased from -7.5% at March 5, 2003 to -16% at April 15, 2003 as a result of PWC's review following the March 5, 2003 press release and restatement.

28

of Provident for each share of OHSL they owned. Assuming prior to close of the Merger, Provident announced a restatement of earnings for 1997, 1998, and the first half of 1999, and also disclosed that future earnings would be negatively impacted by the change in accounting, it is my opinion that such a disclosure would have caused a material decline in the price of Provident's stock. I believe OHSL shareholders were entitled to know this vital information.

60. I have not been asked to quantify the impact on Provident's stock of a restatement at the time of the Merger, however, the table below illustrates a range of hypothetical stock price declines that I believe could have been reasonably anticipated in response to such an announcement, and the implications for the Merger.

| Value at Time of Merger: | $41.49 | |
| --- | --- | --- |
| Price Decline % | Value | Implication for Merger |
| 10% | $37.34 | Exchange Ratio .5625 shares of Provident |
| 15% | $35.27 | Merger Could be Terminated - Below "walk-away" price |
| 20% | $33.19 | Merger Could be Terminated - Below "walk-away" price |
| 30% | $29.04 | Merger Could be Terminated - Below "walk-away" price |

At a minimum, valuation changes would have altered the Exchange Ratio and may have caused the termination of the transaction altogether.[26]

61. Regardless of the resultant valuation of Provident, in light of the restatement, OHSL shareholders may have opposed the Merger based on diminished management credibility, alone. Further, a restatement due to problems with Provident's securitization of auto loans may have heightened concerns about Provident's higher-risk lines of business relative to those of OHSL. For these reasons, it is my opinion that the restatement would have had a material impact on the Merger had it been known to investors at that time. I believe that, at a minimum, it would have changed the Exchange

---

[26] From mid-September through the end of October, 1999, the closing price for Provident's stock was below $40.00 per share, even closer to the "walk-away" price.

29

Ratio, and likely would have caused OHSL shareholders to vote against the Merger with Provident. In any event, OHSL shareholders were entitled to consider all of the relevant information prior to voting their shares.

### The "Mosaic" Theory

62. The process of making an informed investment decision includes gathering information from a variety of sources, analyzing the relevance of the information, and forming a conclusion based upon a composite of that information deemed to be relevant. Investors do not process each piece of information in isolation, but in the context of all other information. This is often referred to as the "mosaic" theory.

63. In the case of OHSL shareholders, the Proxy was the most comprehensive and important source of information about the proposed Merger with Provident. It is my opinion that OHSL shareholders did not have the benefit of complete and accurate information with regard to (i) the history of the transaction and process through which the Merger gained approval by OHSL's BOD; (ii) the opinions and actions of the CEO regarding the Merger and voting of shares; (iii) the dissention by certain Board members and senior management regarding the Merger with Provident; (iv) Provident's historical financials and reasonable expectations regarding future earnings; and (v) the risk associated with owning Provident stock, as a result of its securitization activities, on which it relied to produce a substantial portion of its income.

64. Further, I believe that in light of the fact that the transaction was approved by only a slight majority of the shares, it is highly likely that with the benefit of full, fair, and accurate information, the ultimate outcome of the vote would have been different.

30

_Candace L. Preston, CFA_

Date: August 30, 2004

31