**EXHIBIT B-1**

**EXHIBIT B-1**

1

2          UNITED STATES DISTRICT COURT

           SOUTHERN DISTRICT OF OHIO

3              WESTERN DIVISION

    -------------------------------------)

4   WALTER W. THIEMANN, et al.,

5                       Plaintiffs,

6          vs.

7   OHSL FINANCIAL CORP., et al.,

8                       Defendants.

    -------------------------------------)

9

10

11

12       DEPOSITION OF ROSS D. FUERMAN, Ph.D.

13           New York, New York

14         Thursday, October 21, 2004

15

16

17

18

19  Reported by:

    Toni Allegrucci

20  JOB NO. 165883

21

22

23

24

25

**Page 2**

1
2    October 21, 2004
3    9:13 a.m.
4
5        Deposition of ROSS D. FUERMAN,
6    Ph.D., taken on behalf of the Respected
7    Parties, held at the offices of Esquire
8    Deposition Services, 216 East 45th
9    Street, New York, New York, pursuant to
10   Notice, before Toni Allegrucci, a Notary
11   Public of the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1
2    A P P E A R A N C E S  C O N T' D:
3
4    SCHROEDER MAUNDRELL BARBIERE & POWERS
5    Attorneys for Defendants
6        DINSMORE & SHOHL AND ROE
7        11935 Manson Road  Ste. 110
8        Cincinnati, Ohio 45249
9    BY:   ROBERT S. HILLER, ESQ.
10
11
12   ALSO PRESENT:
13       JASON COHEN, ESQ., KMK, VIA TELEPHONE
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1
2    A P P E A R A N C E S:
3
4    GENE MESH & ASSOCIATES
5    Attorneys for Plaintiffs
6        2605 Burnet Avenue
7        Cincinnati, Ohio 45219
8    BY:   MICHAEL G. BRAUTIGAM, ESQ.
9
10
11   KEATING, MUETHING & KLEKAMP, PLL
12   Attorneys for Defendants
13       OHSL FINANCIAL CORP
14       PROVIDENT
15       1400 Provident Tower
16       One East Fourth Street
17       Cincinnati, Ohio 45202
18   BY:   JAMES E. BURKE, ESQ.
19
20
21
22
23
24
25

**Page 5**

1
2        IT IS HEREBY STIPULATED AND AGREED
3    by and between the attorneys for the
4    respective parties herein, that filing,
5    sealing and certification be and the
6    same are hereby waived.
7
8        IT IS HEREBY STIPULATED AND AGREED
9    that all objections, except as to the form
10   of the question, shall be reserved to the          time
11   of the trial.
12
13       IT IS FURTHER STIPULATED AND AGREED
14   that the within deposition may be signed
15   before any Notary Public with the same force
16   and effect as if signed and sworn to before
17   the Court.
18
19
20
21
22
23
24
25

ESQUIRE DEPOSITION SERVICES
1-800-944-9454

1              FUERMAN
2    R O S S  D.  F U E R M A N, called as a
3    witness, having been duly sworn by a Notary
4    Public, was examined and testified as follows:
5    EXAMINATION BY
6    MR. BURKE:
7        Q.    Good morning, Mr. Fuerman.  We're
8    here to take your deposition in the case of
9    Walter Thiemann versus OHSL Financial Corp.,
10   that's pending in the United States District
11   Court, for the Southern District of Ohio.
12           Have you been deposed before?
13       A.    No, I have not.
14       Q.    I'm sure your counsel has told you
15   sort of the way it works, but I'll be asking
16   you questions here.  You are under oath.  If
17   at any time my questions are unclear, feel
18   free to ask for clarification.
19           If you keep your voice up and answer
20   audibly that helps the Court Reporter.
21   Finally, I have a tendency to speak quickly.
22   I'll try to avoid interrupting you, and if you
23   wait for my question to be finished before you
24   answer the transcript will read that much
25   better.

1              FUERMAN
2           Finally, if at any time you want to
3    take a break just let me know and we'll
4    accommodate you.  If you answer the questions
5    that I'm asking you I will assume that you
6    understood what I was asking.
7           Any questions that you have of me?
8        A.    No.  I think it's fairly clear.
9        Q.    All right.  Do you prefer
10   Professor Fuerman, Mr. Fuerman, Dr. Fuerman,
11   let me know?
12       A.    Professor Fuerman will be fine.
13       Q.    That's fine.  You have been
14   identified as an expert witness for the
15   plaintiffs in this case; is that correct?
16       A.    That is correct.
17       Q.    We're here to take your deposition
18   and expert witness depositions are a little
19   bit different.  I want to understand precisely
20   what you are going to testify to at trial.  We
21   have the report that you previously issued,
22   dated August 8th of 2004.
23           I assume, and if you don't tell me
24   to the contrary that that is everything you
25   are going to testify about, to the extent you

1              FUERMAN
2    do any additional work, to the extent you have
3    done any additional work or come up with any
4    additional opinions other than what's
5    reflected in the filed report, I would ask
6    that you advise your counsel so he can tell
7    me.  I want to understand before trial
8    precisely what you are going to testify to.
9        A.    Okay, yes.
10       Q.    So if anything else happens please
11   let him know because we'll probably want to
12   depose you about that, as well.
13           MR. BRAUTIGAM:  I just want to point
14       out that discovery is continuing.  As I
15       pointed out, I personally received the
16       Chris Carey transcripts from California.
17       Dr. Fuerman has reviewed this.
18       Dr. Fuerman continues to review discovery
19       transcripts as they are made available.
20           MR. BURKE:  That's fine.
21       Q.    All I ask you to do, as you do that
22   to the extent it affects your opinions,
23   changes your opinions, causes you to render
24   new opinions, that you advise Mr. Brautigam
25   and he can advise me so we can be aware of

1              FUERMAN
2    that.  All right?
3        A.    That makes sense.
4        Q.    Would you state your name and spell
5    your last name for the record, please.
6        A.    Ross D. Fuerman, that's
7    F-U-E-R-M-A-N.
8        Q.    What's your residence address?
9        A.    19 Westgait, that's all one word,
10   Road, Newton, Massachusetts 02459.
11       Q.    What is your business address?
12       A.    It is a bit unusual in that I do my
13   research mostly from my home, but at the
14   university, I am at Suffolk University, that's
15   S-U-F-F-O-L-K, 8 Ashburton Place, Boston,
16   Massachusetts 02108.  I'm in the Sawyer School
17   of Management.
18       Q.    What is your position there?
19       A.    Associate Professor of Accounting.
20       Q.    Describe for me what an "associate
21   professor" is?
22       A.    In academe among the tenured or the
23   tenured track faculty there are three levels
24   of professors.  The beginning level is
25   assistant.  Then typically after six or seven

3 (Pages 6 to 9)

Page 10

FUERMAN

1    FUERMAN
2    years a person is considered to be promoted
3    and tenured as an associate.
4        I was promoted and tenured about a
5    year and a half ago, so now I'm an associate.
6    The next level is called full professor, and
7    many professors never reach that level.
8        Q.  How does one go from being an
9    associate professor to a full professor?
10       A.  I happen right now to be serving on
11   the promotion tenure and review committee.
12   That committee reviewed my work when I applied
13   for tenure.  They reviewed my teaching, the
14   quality of my teaching based on student
15   evaluations and other things.
16       They evaluated my service to the
17   school in helping to run the school and they
18   evaluated my research.  They require the
19   professor publish a fair number of articles in
20   referee journals.  They consider all this and
21   they considered my application and promoted me
22   to associate professor.
23       Q.  You are in a tenured position now?
24       A.  That is correct.
25       Q.  My prior question, though, was more

Page 11

FUERMAN

1    FUERMAN
2    directed.  How does one go from being an
3    associate professor to a full professor, if
4    you know?
5        A.  After however many years the
6    applicant wants to wait the applicant
7    professor fills out an application form and
8    submits, again, a dossier of his or her
9    teaching, research and service to the school
10   and it is evaluated by the promotion and
11   tenure committee.
12       And it's then that recommendation is
13   given to the dean of the school, the dean of
14   the school then makes a recommendation to the
15   president of the university, who makes a
16   recommendation to the board of trustees and
17   formally the board of trustees confers either
18   a promotion or a tenure.
19       Q.  Have you ever applied for that?
20       A.  No, I have not.  It would be fairly
21   unusual for someone to apply so quickly after
22   having been promoted to associate professor.
23       Q.  Other than I take it at
24   Suffolk University, you were employed
25   full-time by them?

Page 12

FUERMAN

1    FUERMAN
2        A.  That is correct.
3        Q.  Do you have an employment
4    relationship with any other companies or
5    entities at this time?
6        A.  No, I do not.
7        MR. BURKE:  Off the record.
8        (Discussion off the record.)
9        MR. BURKE:  Let's mark this as
10   deposition Exhibit 1.
11       (Fuerman Exhibit 1, document, marked
12       for identification, as of this date.)
13       Q.  Can you identify what I've marked as
14   deposition Exhibit 1, Professor Fuerman.
15   Fuerman, right?
16       A.  Fuerman, but I'm used to people
17   mispronouncing it throughout my life.  It's
18   titled "Notice of Expert Deposition of
19   Ross D. Fuerman.
20       Q.  This was transmitted to you by
21   Mr. Brautigam in recent days?
22       A.  Right, I received it Monday.
23       Q.  And subsequent --
24       A.  By e-mail.
25       Q.  I'm sorry?

Page 13

FUERMAN

1    FUERMAN
2        A.  By e-mail I received it Monday.
3        Q.  Subsequent to that Mr. Brautigam and
4    I had some discussions of what we would be
5    looking for, and we agreed we are not asking
6    you to reproduce pleadings, depositions,
7    things in the record, but just asking you to
8    produce portions of your file that had not
9    been produced previously.
10       Did you understand that?
11       A.  Yes, and as a matter of practicality
12   that's all I could fit into my briefcase to
13   carry on the train.
14       Q.  Just in generally terms, you've
15   brought with you today about eight ten-inches
16   worth of documents.  Can you generally
17   describe what you've produced for us today.
18       A.  I've produced two sets of documents.
19   The first set I gathered together gradually
20   over the last few weeks.  They are items that
21   I cite in my expert report.  Articles by other
22   professors, accounting standards, things of
23   that nature.
24       The documents that I pulled together
25   since receiving the Notice of the Expert

4 (Pages 10 to 13)

Page 14

FUERMAN

1   FUERMAN
2   Deposition are items that you requested.
3   Should we go through them one by one?
4       Q.   Sure. I think the first is your
5   time sheets?
6       A.   Yes, that's my time sheets with Mesh
7   and Associates. The second is a May 3, 2004
8   memo that I wrote regarding the Joe Stager
9   deposition. The next is correspondence from
10  me to Mike Brautigam.
11       After that is a correspondence from
12  Mike Brautigam to myself. After that is the
13  next to last draft of a document that was
14  filed with the court January 22, 2004, a
15  document that I wrote and signed. Then after
16  that is a document -- have I missed something?
17       There was also a draft of a document
18  that was actually filed with the court
19  March the 5th, 2004. That's a draft in here
20  also. There's then two drafts of a document
21  that was not filed with the court, but was
22  given to you.
23       The second to last draft of Expert
24  Report of Ross D. Fuerman, August 2004. Next
25  to last draft, this would have been the last

Page 15

FUERMAN

1   FUERMAN
2   draft before the final document that was given
3   to you, Expert Report of Ross D. Fuerman,
4   dated August 7, 2004. And then I gave you
5   these.
6       I don't know that they have anything
7   to do with anything. I just thought you might
8   want to see my Business Week article.
9       Q.   I appreciate that. There was one
10  final couple of pages that you also
11  identified?
12       A.   Yes. The first page is from page 75
13  of Provident 10 K, filed March 29, 2000. It
14  is part of the notes to the consolidated
15  financial statements. It's a pro forma
16  footnote and I anticipate that this will come
17  up during the deposition today so.
18       That's why I thought I would give
19  you a copy of it in advance. The other piece
20  of paper is a printout of a short spreadsheet,
21  with four rows and four columns, that shows
22  what Provident reported as its earnings per
23  share and net income for years 1998 and 1999,
24  and how that varied in the 10 K filed
25  March 30, '99, March 29, 2000, March 15, 2001

Page 16

FUERMAN

1   FUERMAN
2   and March 27, 2002. I anticipated this might
3   also come up during the deposition, so I gave
4   you a copy.
5       Q.   The earnings per share figures that
6   you summarize on the second page of the last
7   document you talked about refer to 10 Ks filed
8   in the periods starting March 30, 1999, for
9   the years thereafter?
10       A.   No. Those are in the far left
11  column, those are the filing dates. The 10 K
12  filed 3/30/99 was for the fiscal year ending
13  12/31/98. The 10 K filed 3/29/99 would be for
14  the fiscal year ending 12/31/99 and so forth.
15       Q.   Okay. Thank you. We have
16  previously marked in this case as
17  Plaintiffs' 115 a copy of your report. I ask
18  you to take a look at that and tell me if you
19  can identify that or not?
20       MR. BRAUTIGAM: Are you done with
21  deposition Exhibit 1?.
22       MR. BURKE: Yes.
23       MR. BRAUTIGAM: In addition to being
24  inappropriate and unnecessary. I believe
25  that the document is intentionally

Page 17

FUERMAN

1   FUERMAN
2   misleading, in that it attempts to
3   suggest to the witness and anyone else
4   that Mr. Grier and Mr. Burke are counsel
5   only for the Provident defendants.
6   That's incorrect.
7       I pointed this out to them and
8   apparently they are content to leave a
9   false, misleading impression on the
10  record.
11       MR. BURKE: Mr. Brautigam, we talked
12  about that and that's a silly objection,
13  a silly point and nobody is mislead.
14       Q.   Do you understand who I represent
15  today Mr. Fuerman?
16       A.   To be frank, I'm not quite certain.
17  I do know that there is a difference of
18  opinion among the counsel as to who represents
19  whom.
20       Q.   So you don't know who I represent
21  today?
22       A.   I know that you represent
23  defendants, but there have been issues raised
24  as to exactly which defendants and whether
25  it's proper that you represent certain

5 (Pages 14 to 17)

Page 18

FUERMAN

1
2  defendants, but not other defendants, and it
3  seems to involve conflict of interest. I'm
4  certainly not an expert in attempting to
5  understand those kinds of issues.
6       Q.  I will represent to you that I
7  represent the Provident and the OHSL
8  defendants, along with Mr. Grier and Mr. Cohen
9  who is on the phone with us. Can you accept
10  that?
11      A.  Yes.
12      Q.  You've not been asked to render any
13  kind of opinions on any of the issues you just
14  talked about, have you?
15      A.  No, I have not.
16      Q.  Okay. If at any time you believe
17  that you are confused as to who I represent or
18  anything like that, please feel free to ask
19  for clarification.
20      A.  Thank you.
21      Q.  All right. Plaintiffs' Exhibit 115,
22  which you have.
23      A.  Yes, I identified this. This
24  appears to be a copy of the August 8, 2004
25  expert report of Ross D. Fuerman, Ph.D. which

Page 19

FUERMAN

1
2  I wrote.
3       Q.  Take a look at the last four pages
4  of that document. It's also entitled
5  Exhibit A.
6       A.  Correct.
7       Q.  What is that?
8       A.  That's a copy of my resume.
9       Q.  Is this accurate and complete as we
10  sit here today?
11      A.  Yes, in the sense that it's the
12  resume that I have been using for my faculty
13  documents that I submit to my university and
14  reflects everything that I think is important
15  about me as an accounting professor. The only
16  thing that is a little bit different is that
17  recently one of my article publications, which
18  is regarded here as forthcoming, in corporate
19  ownership and control has actually been
20  published, and with permission of that
21  publisher it was also published in a second
22  journal called IFCA something. I can't
23  remember the rest of it.
24      Q.  Do you know what that stands for?
25      A.  International Federation of

Page 20

FUERMAN

1
2  Chartered Accountants or something like that.
3       Q.  Let's start with your educational
4  history. Can you describe it for me.
5       A.  My high school?
6       Q.  You can start with your university.
7       A.  I went to the University of
8  Cincinnati as an undergrad, majored in
9  History. Went to Jewish Theological Seminary
10  in New York and got a Master's in History.
11  That's here in New York, at 122nd and
12  Broadway.
13          Then I went to, after a period of a
14  couple years I believe it was, went to George
15  Washington University, the National Law Center
16  of George Washington University, and got a JD
17  in 1982. And then I came back to the
18  University of Cincinnati in September of 1991
19  and began a Ph.D. in accounting program,
20  defended my dissertation in May of '96 and
21  received my degree I believe it was June of
22  1996, Ph.D. in Accounting.
23      Q.  I'm sure it's in here, but what was
24  the title of your dissertation?
25      A.  I used to that have in my resume, I

Page 21

FUERMAN

1
2  don't anymore. It was on the impact of the
3  Central Bank of Denver Decision on auditor
4  litigation. That's a Supreme Court decision,
5  April 19, 2004. That's regarded as a very
6  seminal decision in securities litigation.
7       Q.  It's a case that dealt with aiding
8  and abetting liability, correct?
9       A.  That's correct.
10      Q.  I know it's difficult to boil it
11  down, but essentially what was the point of
12  your dissertation, the thesis of your
13  dissertation?
14          MR. BRAUTIGAM: Objection.
15      A.  It showed some evidence that there
16  was a slight reduction in the frequency of
17  lawsuits where the auditor was named a
18  defendant for a short time after that
19  decision, but it was not -- did not seem to
20  be -- did not seem to have a permanent impact
21  on the rate of auditor litigation. That was
22  one of the main things.
23          The other is that not only myself,
24  but a number of people, a number of accounting
25  professors, and law professors also, have

Page 22

FUERMAN

1
2    written papers where we document what
3    characteristics are positively or negatively
4    associated with the auditor being named a
5    defendant, in a private securities class
6    action. And I developed a new variable that
7    no other academic had come up with to that
8    point.
9        Q.   When you say things that are
10    positive and negative with respect to an
11    auditor being named in a litigation, positive
12    or negative as to whom or what?
13        A.   In a statistical sense. My method
14    in, and I have done this in many papers since,
15    and also in that dissertation, is to look at a
16    large sample of several hundred, in some cases
17    a thousand, private securities class actions
18    and identify using what's called logistic
19    regression, what things seem to be present a
20    lot if the auditor does get named a defendant
21    versus do not seem to be present if the
22    auditor gets named a defendant.
23        This is something that a number of
24    accounting professors have been working on
25    because of the interest of the accounting

Page 23

FUERMAN

1
2    industry and auditors in this which reflects
3    the interests of accounting professors.
4        Q.   When did you first take accounting
5    courses?
6        A.   At the University of Cincinnati as
7    an undergrad. I believe I just had one
8    quarter of accounting, not much.
9        Q.   Your Undergrad Degree was in
10    History?
11        A.   That's correct.
12        Q.   Your Master's Degree was in history?
13        A.   That's correct.
14        Q.   So the next time you undertook a
15    comprehensive study of accounting was when you
16    began your Ph.D. studies at the University of
17    Cincinnati?
18        MR. BRAUTIGAM: Objection to "the
19    next time."
20        A.   Actually I omitted my courses that I
21    took at Franklin University in Columbus, Ohio.
22    While I was at the Ohio Division of Securities
23    I took evening courses at Franklin, enough to
24    sit for the Ohio C.P.A. exam. I took a lot of
25    courses there, and so I had a fairly

Page 24

FUERMAN

1
2    substantial accounting background actually
3    before I started my Ph.D. program.
4        And in the course of studying for
5    the C.P.A. exam I was approached by the head
6    of the Columbus office of the Becker C.P.A.
7    Review Course who asked if I would be
8    interested in becoming a teacher for that
9    course, and I said yes. So that really is
10    where I began to develop an interest in
11    teaching accounting, and I've always been a
12    research oriented person.
13        Q.   Maybe that's a way to approach this.
14    I take it you went straight from the
15    University of Cincinnati to the
16    Jewish Theological Seminary?
17        A.   That is correct.
18        Q.   From there did you work following
19    your graduation from the Jewish Theological
20    Seminary?
21        A.   I worked. I had a couple of jobs.
22    First I worked at Georgetown Law School in the
23    placement office, some sort of really kind of
24    a clerical position. Then I worked as a
25    paralegal at Howard and Simon, a law firm on

Page 25

FUERMAN

1
2    Pennsylvania Avenue, I think they've merged
3    with another firm by now, for perhaps six
4    months. And it was there that I developed my
5    interest in the process of litigation, the way
6    that the cases flow from District Court to
7    Appellate Court to Supreme Court, and
8    sometimes back began and around and around.
9        I found that interesting, the whole
10    process. That has been probably a major
11    reason for the success of my research. I know
12    and understand that process so well.
13        Q.   Were you a litigation paralegal at
14    Howard and Simon?
15        A.   Yes.
16        Q.   What kind of things did you do?
17        A.   I worked gathering documents
18    together and categorizing them or analyzing
19    them in some way. I can't recall the details.
20    It had to do with a hospital that was accused
21    of anti-trust violations, and Howard and Simon
22    was defending that hospital. I believe that
23    was the gist of it.
24        Q.   I take it that after the employment
25    you've just described was when you entered the

7 (Pages 22 to 25)

Page 26

FUERMAN

1 George Washington University Law School?
2
3     A.  Yes, shortly after that.  I think I
4 did do a bit of traveling after that for
5 perhaps a month and then I went to law school.
6     Q.  Were you a full-time law student?
7     A.  I was a full-time law student.
8     Q.  You obtained your degree in 1982?
9     A.  That's correct.
10     Q.  Following your recent of your law
11 degree, where did you go, did you work again
12 after that?
13     A.  I did.  I worked for a short time
14 at -- it was on Wall Street.  I can't
15 remember.  It was an insurance brokerage firm,
16 but it was just for a few months and it did
17 not suit me.
18        So I went back to Ohio where I'm
19 from, and I'm trying to remember the exact
20 sequence of events.  Maybe I can refresh my
21 memory from what I've got down here.  At some
22 point I met people who I discussed the idea of
23 working at the Ohio Division of Securities.
24 That sounded like an interesting thing to do
25 and it could be a good way to proceed.

Page 27

FUERMAN

1
2     Q.  Let me go back to George Washington.
3 While you were there were you on the law
4 review?
5     A.  No.
6     Q.  The moot court team?
7     A.  I was not.  I don't know if it was a
8 requirement, but many of us did participate in
9 moot court classes or competitions of some
10 sort.  I do remember having participated in a
11 bit of that.
12     Q.  Were you under the coif?
13     A.  No.
14     Q.  Where were you originally born in
15 Ohio, where did you grow up?
16     A.  I was born in New Philadelphia, and
17 we moved to Dover when I was six years old.
18     Q.  Approximately when did you begin
19 working at the Ohio Division of Securities?
20     A.  Would have been 1983.
21     Q.  How long did you stay with them?
22     A.  A couple of years and then I took a
23 position with, as an associate, with a small
24 law firm called F-.. Jones and LeGrand.
25     Q.  Can you spell that?

Page 28

FUERMAN

1
2     A.  Enz, E-N-Z, Jones and LeGrand,
3 capital L-E, capital G-R-A-N-D.
4     Q.  Where are they based?
5     A.  I think they've broken up, but they
6 were based in Columbus.  I think they at one
7 point moved to Westerville, but I just have
8 heard through the grapevine they've broken up.
9     Q.  All right.  While you were at the
10 Ohio Division Securities from '83 to '85,
11 describe your duties?
12     A.  I was an examiner.  Companies that
13 were interested in doing securities operations
14 in Ohio, that needed to get the permission of
15 the Ohio divisions -- this is part of the
16 merit review process -- would file papers
17 asking for permission.  They had to get the
18 permission in some cases not only of the
19 securities exchange commission, but also from
20 us, not always.
21        There are many exemptions, but
22 sometimes they would be required and different
23 people would review different securities
24 offering applications.  These could be
25 secondary offerings or initial public

Page 29

FUERMAN

1
2 offerings, stock offerings, limited
3 partnership syndications of real estate, oil
4 and gas.  Syndications were very big at this
5 time.  This is before the tax reform of 1986.
6     Q.  What were the nature of the duties
7 you were performing in this review process?
8     A.  We had lists of things we were
9 supposed to examine, that were motivated by
10 the desire for in investor protection that we
11 would not, in some cases, we would not permit,
12 for example, a company to do a stock offering
13 if their debt equity ratio was not good enough
14 in our view, or if their return on assets
15 wasn't good enough in our view.
16        Or if we felt that it was a deal
17 structured where the fees, the front end fees
18 were too high and too much of the offering was
19 going into fees, to the underwriter, the
20 broker, the accountant, the securities
21 transaction attorney, rather than into the
22 substantive investment of the company that was
23 raising the funds.
24     Q.  What was your title at the Ohio
25 Division of Securities?

8 (Pages 26 to 29)

Page 30

FUERMAN

1    FUERMAN
2        A.  I think actually I have that right
3    here, which is good, financial institutions
4    examiner.  That was my official title.
5        Q.  Did that indicate that you were
6    dealing primarily with financial institutions
7    or not?
8        A.  It does not.  It really is a
9    misnomer.  I reviewed the applications of all
10   kinds of securities offerings.
11       Q.  Were you at a junior level?  Is this
12   an entry level position?
13       A.  It was an entry level position, yes.
14       Q.  In the course of your review there
15   are other people above you who were also
16   involved in that process?
17       A.  There were.
18       Q.  Who would you have been reporting
19   to?
20       A.  It was really a fairly thin
21   reporting structure.  There was the assistant
22   commissioner and there was the commissioner
23   and that was really it.  The assistant
24   commissioner I believe was Phil Lemcool at the
25   time and the commissioner was Roger Mardy.

Page 31

1    FUERMAN
2        Q.  While at the Ohio Division of
3    Securities, were you involved at all in the
4    enforcement side of things?
5        A.  Occasionally I would help out.  We
6    would all be drafted from time to time to help
7    out in various tasks where they needed a lot
8    of people, but not very often.
9        Q.  Did you ever try any cases or
10   actually participate in litigation while at
11   the Ohio Division of Securities?
12       A.  No, not at all.
13       Q.  Your role in enforcement proceedings
14   would have been more of a behind the scenes
15   support role?
16       A.  Yes, and very trivially.  We all
17   came into observe a securities fraud trial, at
18   least once, all the attorneys of the office,
19   but I had no substantive role in that.
20       Q.  Why did you choose to leave the Ohio
21   Division of Securities?
22       A.  I felt that it was a good offer that
23   was being made to me by Enz Jones and LeGrand.
24   I came to be friendly with those attorneys.
25   They had dealings with the Ohio division, and

Page 32

1    FUERMAN
2    they were a growing firm and they needed
3    people and they thought that I would add
4    something to their firm.  So we talked and I
5    became an associate there.
6        Q.  What was the nature of their
7    practice?
8        A.  It was a general practice, just
9    about every kind of transaction or civil
10   litigation you could think of.  They did no
11   criminal litigation at all, but they did civil
12   litigation, both plaintiffs and defendants.  A
13   lot of securities syndication, limited
14   partnership transactions, tax return
15   preparation, tax consulting, tax advising,
16   probate, estate work, trust planning, wills.
17       Q.  How long did you stay with Enz Jones
18   and LeGrand?
19       A.  Two and a half years.
20       Q.  Which of the departments did you
21   practice in primarily?
22       A.  It was such a small firm we did not
23   have formal departments.  There were only
24   three partners and perhaps four associates.  I
25   worked with all three of the partners.  I did

Page 33

1    FUERMAN
2    a fair amount of securities litigation and
3    syndication and transaction work, forming
4    corporations, that kind of thing, with
5    David LeGrand, to a lesser extent with Steve
6    Enz.  Civil litigation, especially insurance
7    defense work on behalf of nationwide with
8    Gray Jones.
9        Q.  During the two and a half years you
10   spent with this firm, how many cases did you
11   in fact try?
12       A.  I did not try a single case.
13       Q.  How many securities litigation cases
14   were you involved with?
15       A.  I was involved as a document creator
16   in many cases.  I'm trying to remember how
17   many.
18       Q.  Just a rough order magnitude, if you
19   can remember?
20       A.  This would be a real wild guess, but
21   maybe 30 or 40.  My job was a document person
22   really.  I drafted Complaints, Answers,
23   replies, memos in support for motions of
24   summary judgment or for motions on the
25   pleadings.  I assembled documents.

9 (Pages 30 to 33)

Page 34

FUERMAN

1
2    I remember one case in particular
3  where I had to spend a lot of time assembling
4  documents to try to build a case. It had to
5  do with intangible rights with proprietary
6  rights on photographs, or had to do something
7  with a dispute between a magazine publisher
8  and a printer.
9       Q.  During the time that you were
10 involved in the litigation process, did you
11 take any depositions during your time at
12 Enz LeGrand?
13      A.  I would sometimes sit in and told to
14 attend a deposition, but unless something
15 extreme were to happen I would not get
16 involved.
17      Q.  You don't recall taking any
18 depositions on your own?
19      A.  Not really. My role would have been
20 more or less just to observe that things went
21 reasonably in accord with the rules for which
22 the depositions are governed, but nothing
23 significant.
24      Q.  How about, did you argue any of the
25 motions you wrote?

Page 35

FUERMAN

1
2    A.  No.
3       Q.  Do you recall any of the cases on
4  which you worked actually going to trial?
5       A.  I don't remember any case actually
6  going to trial. It seemed like everything
7  settled. One case I remember had to do with
8  arbitration. There was a Supreme Court
9  holding that came out and suddenly made
10 arbitration clauses more strong in the
11 interpretation of the courts.
12      I remember I wrote a lot of
13 documents for that. And I left the firm, I
14 was told after I left the firm the case
15 settled.
16      Q.  Why did you leave Enz Jones and
17 LeGrand after two and a half years?
18      A.  Well, it was by mutual agreement
19 with the firm. It was partly a matter of I
20 had a better opportunity with Cardinal
21 Industries and partly they felt I was not a
22 sufficient rainmaker.
23      I was not bringing in the clients,
24 and that's a very important thing for a small
25 firm. I don't think they had any complaint

Page 36

FUERMAN

1
2  with the technical aspects of my work.
3       Q.  When you went to
4  Cardinal Industries, tell me what you did?
5       A.  I specialized in writing many, many
6  real estate limited partnership syndications.
7  I wrote the syndication documents, I review
8  the projections. I would participate in the
9  legal research needed for them.
10      I was a liaison with an outside law
11 firm that provided a tax opinion, and also
12 occasionally with a C.P.A. firm that would
13 provide what's called an examination of the
14 forecast. We rarely did forecast, we usually
15 did projections. We rarely had them opined on
16 by an outside C.P.A. firm.
17      Q.  What was the business of Cardinal
18 Industries?
19      A.  They had two, maybe three, depends
20 how you look at it, basic business. One is
21 they manufactured housing. They were a
22 pioneer in developing the whole concept of
23 modular housing, manufactured housing.
24      And they had five factories in
25 different locations across the United States.

Page 37

FUERMAN

1
2  They also managed the properties that got
3  built. They managed apartment complexes,
4  Nights Inn, motels and a relatively smaller
5  number of what they called "Cardinal
6  retirement villages."
7       This was the beginning of the adult
8  living community kind of thing that has become
9  very big today. Then the third thing was
10 really what I was mostly involved in, which
11 was the raising of equity capital via mostly
12 by private placement memoranda, real estate
13 limited partnerships, to fund these various
14 projects that got built. They would be
15 financed partly with those funds and partly
16 with bank loans.
17      Q.  In the course of your duties you
18 were writing or assisting in the preparation
19 and writing of the offering documents?
20      A.  That's correct.
21      Q.  To attract investors to Cardinal
22 projects?
23      A.  Well, as an attorney my job was to
24 protect the company from legal liability, not
25 to be a marketer, promoter. But there were

10 (Pages 34 to 37)

Page 38

FUERMAN

1
2   other people who collaborated on these
3   documents, whose role was along those lines.
4   And so the document really was a hybrid
5   between the two purposes.
6       Q.  Okay.  You answered my question.
7   Were you in the legal department of
8   Cardinal Industries at this time or
9   functioning as a lawyer?
10      A.  I was and I wasn't.  They had
11  shifting relationships within the groups at
12  Cardinal Industries.  At one point I was very
13  clearly under the supervision of a manager by
14  the name of Bill Wolf who was in charge of the
15  syndications.
16          He was a person really with a
17  management marketing kind of background, who
18  really knew nothing about law or accounting.
19  He had legal and accounting people like myself
20  who would help him produce the documents and
21  do what needed to be done.
22          But there also was a general counsel
23  at Cardinal, Howard Spiece.  As time went on I
24  began to develop a closer relationship with
25  him and his assistant general counsel, I think

Page 39

FUERMAN

1
2   they may have even had one or two other
3   people, in doing the things that they would
4   do.  So in time we were all working together I
5   think is the way it worked out.
6       Q.  Your job was sort of a combination
7   or a hybrid of a business position as well as
8   a legal position?
9       A.  Well, I saw myself as entirely a
10  legal and accounting position.  At one point I
11  was under the supervision of a non-lawyer,
12  non-accountant Bill Wolf, but gradually I
13  became more and more under the supervision of
14  the general counsel.  I think it involved
15  interoffice politics, which probably happens
16  at a lot of companies.
17      Q.  Were the syndications you were
18  preparing for Cardinal Industries project
19  specific?
20      A.  Yes.
21      Q.  Would they syndicate the rights to a
22  particular apartment complex or retirement
23  home?
24      A.  That's usually the way it went.  The
25  exception to that was they did one or maybe

Page 40

FUERMAN

1
2   two real estate investment trusts, and those
3   were public offerings, and those would have a
4   portfolio of projects in each one of them.
5       Q.  While you were at Cardinal
6   Industries, did you do any litigation?
7       A.  I think I may have from time to time
8   assisted the general counsel in some trivial
9   tasks related to litigation, but not
10  substantively, no.
11      Q.  It was not a primary focus of your
12  time?
13      A.  Not at all, not at all.
14      Q.  How long did you stay at Cardinal?
15      A.  I was there I think a year and a
16  half.  Yeah, I think I was there a year and a
17  half.
18      Q.  Did your title or position change
19  during that year and a half?
20      A.  I don't think so.  It was never
21  terribly clear what my title was to begin
22  with.  Things were run fairly informally.
23      Q.  Why did you leave Cardinal?
24      A.  They went into Chapter 11.  They had
25  some terrible financial difficulties brought

Page 41

FUERMAN

1
2   on in part by the tax reform act of 1986,
3   making it more difficult for them to raise the
4   funds they needed to continue their
5   syndications.  They thought that they could
6   somehow adjust to that, but in time it caught
7   up with them.
8          It was one of the largest Chapter 11
9   bankruptcies ever filed in the
10  Southern District of Ohio, in the Columbus
11  Division.
12      Q.  Was there litigation filed in
13  connection with any of the syndications that
14  you participated in?
15      A.  Not that I'm aware of.  I would not
16  be surprised if when the company became
17  insolvent during the last few months before
18  filing for Chapter 11 that there may have been
19  such lawsuits, but I'm not aware of them.  I
20  was told by somebody, I can't remember who,
21  there were 600 outstanding lawsuits against
22  the company.  Things had gotten so bad.
23      Q.  Do you have any idea whether any of
24  those lawsuits you heard about secondhand were
25  securities litigation lawsuits against

11 (Pages 38 to 41)

Page 42

FUERMAN

1  Cardinal?
2
3      A.  Again, this is secondhand
4  information at this point.  I cannot even
5  remember whether it was the general counsel,
6  assistant general counsel or somebody else who
7  commented, proudly, that there were lawyers
8  that came in there attempting to see if they
9  could develop a securities lawsuit and then
10 when they got more information they backed off
11 and they felt there was not a case to be made.
12     Q.  After you left Cardinal, where did
13 you go?
14     A.  After that, I went to Schottenstein
15 Stores Corporation, which could also simply be
16 regarded as working for the Schottenstein
17 family in Columbus.  A friend of mine knew
18 that I was distressed, that it looked like my
19 job was going to come to an end.  They were
20 laying off large numbers of people every day,
21 literally every day at Cardinal.
22         He said look, I've heard that so and
23 so needs a job, why don't you get in touch
24 with them.  I think you might be good for
25 them, this might be a good fit.

Page 43

FUERMAN

1
2      Q.  Were you hired by the stores or by
3  the family, if you remember?
4      A.  I was really -- well, let me kind of
5  explain the way it worked.  It was very
6  informal. The Schottenstein family is a very
7  wealthy family in Columbus.
8         Originally started out in just
9  retail.  They were big in retailing.  They've
10 been big in retailing for the last hundred
11 years.
12         They gradually began to develop
13 other kinds of businesses, probably the
14 biggest being, in addition to retailing, is
15 they would go around the country to
16 bankruptcies and they would buy inventory at
17 bankruptcy auctions, and then they would make
18 deals to resell the inventory either through
19 their own stores, through other peoples
20 stores.
21         And they always were very shrewd
22 business people.  They would always be on the
23 lookout for distressed businesses that they
24 felt they wanted to acquire, either companies
25 that were already in bankruptcy or that were

Page 44

FUERMAN

1
2  teetering towards bankruptcy.  They would
3  frequently buy a 50 percent interest in these
4  companies.
5         They liked to do that rather than
6  buy 100 percent interest for whatever reasons.
7  So this mode of business created a need for
8  some legal and financial people in-house and
9  tax people to sort out the inevitable
10 complexities that come from doing business
11 this way.  I was one of those people.
12         I was corporate staff assistant I
13 have written down here.  You could also regard
14 me as an assistant to the general counsel.  I
15 worked for various people there.
16     Q.  Who was the general counsel at
17 Schottenstein?
18     A.  At that time Louise Grewin.
19     Q.  How long did you stay at
20 Schottenstein?
21     A.  I was there for only six months.
22     Q.  Generally describe what you were
23 doing, what you were personally doing during
24 that six months period?
25     A.  A little bit of everything.  They

Page 45

FUERMAN

1
2  were constantly racing around from
3  transaction, transaction.  They would do
4  things, like they would purchase a company or
5  buy a 50 percent interest in a company that
6  was in bankruptcy and then they would enter
7  into negotiation.
8         If this was a retailing company they
9  bought, which more often than not was the
10 case, there would be the issue of the
11 outstanding leases that this company had in
12 shopping malls around the country, and in
13 bankruptcy a company has the right to rescind
14 those.  So there's a matter of negotiation
15 between the landlord and the tenant at that
16 point as to what's going to happen, so I would
17 be involved in that.  I would be involved in
18 purchases of real estate, in factoring.
19         I remember they had dealings with
20 CIT Corporation.  They were a big factor at
21 the time.  There were just many miscellaneous
22 things that came up.  Things like purchasing
23 goods from outside the United States and
24 customs duties and letters of credit that
25 needed to be made available because when you

ESQUIRE DEPOSITION SERVICES
1-800-944-9454

Page 46

FUERMAN

1    FUERMAN
2    are doing an international transaction that's
3    very important, more so than domestic.
4        Just so many things. I can't
5    remember them all. I left there because it
6    really was not what I wanted and I had been
7    doing some thinking ever since the Cardinal
8    Industries started to go downhill of making a
9    change in my career direction.
10        As I said sometime before, I very
11    much enjoyed teaching at the Becker C.P.A.
12    review course. I've always enjoyed
13    researching. I felt I wasn't getting any
14    researching done at Schottenstein's, and it
15    was a very fast paced kind of business that
16    had to be done almost on the fly.
17        My wife is a faculty brat. My
18    father-in-law taught music theory at Miami for
19    38 years and she has other relatives and
20    friends in academe. I knew nothing about
21    this, but she said I think this is something
22    you should consider.
23        We talked about it, and I knew from
24    her and from other people that accounting was
25    an attractive field of academe to go into. I

Page 47

FUERMAN

1    FUERMAN
2    spoke -- I had lunch and met Dean Jensen who
3    at the time I believe was head of the Ph.D. in
4    Accounting program at Ohio State University in
5    Columbus. We talked and I concluded this was
6    something that I wanted to do.
7        I began to prepare myself by -- one
8    of the things I found out by talking with a
9    number of people is that my calculus
10    background was insufficient. So I began to
11    take some calculus courses to improve on that,
12    and then I began making applications to
13    schools.
14        I was accepted at several schools.
15    I chose Cincinnati because my wife's family is
16    in Oxford, and it was nice having the
17    grandparents nearby while we lived in Oxford
18    for six years.
19    Q.    When you were working at the
20    Schottenstein firm, the Schottenstein group
21    we'll call it, were you in more of a legal
22    function, an accounting function, a tax
23    function; how would you describe it?
24    A.    I would describe it mostly as a
25    legal function, but interfacing as much with

Page 48

FUERMAN

1    FUERMAN
2    people outside the legal function as within
3    the legal function.
4    Q.    And you indicated that a lot of work
5    you were doing was in sort of a general
6    corporate and real estate area?
7    A.    Yes.
8    Q.    Did you do any litigation or
9    oversight of litigation while at
10    Schottenstein?
11    A.    Actually now that you mention that I
12    was involved with one case. Now, I did not do
13    much. It was mostly helping to sort and
14    locate and analyze some documents for
15    litigation.
16        Actually I had made one trip to
17    Boston. We engaged Hall and Door as outside
18    counsel. It had to do with alleged fraudulent
19    conveyance of the Wiebolts Store in Chicago.
20        This was one of many situations
21    where Schottenstein's went in, bought a
22    company out of bankruptcy and I cannot recall
23    the details other than it involved alleged
24    fraudulent conveyance. So I helped to defend
25    the company against those charges.

Page 49

FUERMAN

1    FUERMAN
2    Q.    Were you taking an in-court role or
3    sort of a support role at the company?
4    A.    No, just a support role.
5    Q.    I take it after you applied to the
6    University of Cincinnati and were accepted,
7    from there on your career was in an academic
8    mode, first at the University of Cincinnati,
9    later at Suffolk; is that correct?
10    A.    That's pretty much true. I have
11    occasionally done some tax return work. I did
12    one fraud audit. This was during the process
13    of my studying to become a certified fraud
14    examiner.
15        But pretty much I focused almost
16    entirely until very recently on teaching,
17    research and service to the university because
18    it's difficult to obtain tenure if you don't
19    really focus like that.
20    Q.    Let's go back and I want to deal a
21    little bit with your professional training.
22    You had indicated that you began to take
23    accounting courses while you were working at
24    the Ohio Division of Securities?
25    A.    That's right.

13 (Pages 46 to 49)

Page 50

FUERMAN

1
2    Q.  How many years did you take
3    accounting courses at that time?
4    A.  Well, the courses probably stretched
5    beyond the time when I was at the Ohio
6    Division of Securities.  I may have started to
7    study before.  I know I certainly continued
8    after.  Two years probably, I'm guessing,
9    maybe three.  Probably two years is more.
10    Q.  What was the name of the
11   institution?
12    A.  Franklin University.
13    Q.  Is that a four year institution?
14    A.  It's a four year institution.  They
15   may have some Master Degrees also.  It's in
16   Columbus Ohio.
17    Q.  Did you obtain any degree from
18   Franklin University?
19    A.  I did not.  At that time I already
20   had enough I felt.
21    Q.  You became -- you were at the Ohio
22   Division of Securities from '83 to '85; is
23   that correct?
24    A.  That's correct.
25    Q.  Did you indicate you sat for the

Page 51

FUERMAN

1
2   C.P.A. exam during that time?
3    A.  I sat after I finished my accounting
4   courses, probably around '86.
5    Q.  And what was the result?
6    A.  I passed.
7    Q.  All three parts?
8    A.  All four parts.  Not in one fell
9   swoop.  I did not even attempt to do them all
10   in one fell swoop.  I did them in stages.  We
11   were permitted in Ohio to do that.
12    Q.  When did you finally pass all four
13   parts?
14    A.  It may have been '86, may have been
15   '87.  I can't remember.  I do know that I got
16   the certificate in '87.
17    Q.  That's what I was going to mention
18   to you.  Your resume says you became a C.P.A.
19   in '87.  I didn't know if that's correct or
20   not.  Did you continue to take accounting
21   courses after you left the Ohio Division of
22   Securities and worked at Enz Jones LeGrand?
23    A.  I did take one course at Miami
24   University in what's called advanced
25   accounting.  That includes consolidations.  I

Page 52

FUERMAN

1
2   took one course there.  That was shortly
3   before I started my Ph.D. program or maybe
4   right at the beginning of it.  I was living
5   right there in Oxford, so it was convenient.
6    Q.  Is your C.P.A. license still active?
7    A.  Yes, it is.
8    Q.  And what states are you licensed in?
9    A.  Only in Ohio.
10    Q.  What about your bar admissions,
11   where are you admitted?
12    A.  I'm admitted in Ohio and the
13   District of Columbia, but I am not actively
14   licensed to practice because I let my -- I did
15   not continue meeting my CPE requirements each
16   year.
17    Q.  When did your license to practice
18   cease to be active in those two states if you
19   remember?
20    MR. BRAUTIGAM:  License to practice
21   law?
22    MR. BURKE:  Yes.
23    A.  Oh, ten years ago I'm guessing.
24    Q.  So around the time you became a
25   participant at the Ph.D. program at the

Page 53

FUERMAN

1
2   Univerity of Cincinnati is when you let your
3   bar admissions become inactive?
4    A.  Right, something like that.
5    Q.  Tell me about the kinds of things
6   you did as a professor or assistant professor
7   while you were getting your Ph.D. at the
8   University of Cincinnati?
9    MR. BRAUTIGAM:  Objection.  Question
10   makes no sense.
11    MR. BURKE:  Let me rephrase that.
12    Q.  During the time you were acquiring
13   your Ph.D. at the University of Cincinnati in
14   accounting, did you also do some TA work?
15    A.  Yes, I did.  After a couple years in
16   the program all the grad students who teach
17   entry level financial accounting and entry
18   level managerial accounting, we typically
19   would have three sections of 72 students
20   each -- usually you would teach financial
21   accounting in the fall and maybe in the winter
22   and then managerial in the spring.
23    I'm trying to remember how they
24   worked it there.  Cincinnati at the time, I
25   don't know if they still are, at the time they

14 (Pages 50 to 53)

Page 54

FUERMAN

1
2    were on a quarter system. I can't remember
3    exactly when the courses were, but I taught a
4    lot of entry level financial accounting to
5    undergrads and managerial accounting to
6    undergrads, mostly sophomores.
7        Q.  Did you have a specialty in
8    accounting when you obtained your Ph.D., was
9    there any area of focused?
10       A.  Yes. It's the area I focused my
11   dissertation on. It comes back to me also. I
12   requested and they gave me permission also
13   while I was a grad student to teach auditing.
14       So I actually taught auditing for a
15   couple of years before becoming an assistant
16   professor. I wanted to get experience
17   teaching that before I became an assistant
18   professor, so I could develop my teaching
19   skills better.
20       Q.  How did you come to go from the
21   University of Cincinnati to Suffolk?
22       A.  I submitted my resume to a number of
23   different colleges and universities across the
24   United States, focusing on schools looked most
25   interesting, City's that looked like the most

Page 55

FUERMAN

1
2    interesting places to live. And some schools
3    would respond favorably or not, some schools
4    would interview me at the national meeting
5    that was held each August.
6        A smaller number of schools would
7    invite me to visit their campus, make a
8    presentation and meet the people. Then a
9    still smaller number made an offer to me.
10   There were three schools that made an offer
11   and Suffolk was one of them.
12       Q.  When were those three offers made to
13   you?
14       A.  In I think it was the spring of 1996
15   was one offer, but I didn't feel it was all
16   that attractive. Then two more offers came in
17   December of '96.
18       Q.  When did you complete your
19   dissertation and receive your Ph.D. from UC?
20       MR. BRAUTIGAM:  Objection, asked and
21       answered.
22       Q.  You can answer.
23       A.  I defended the dissertation May of
24   '96, marched in the commencement ceremony June
25   of '96.

Page 56

FUERMAN

1
2        Q.  Did you apply for a position, a
3    full-time position at UC after you obtained
4    your Ph.D.?
5        A.  I did in the sense of I applied for
6    an instructor position for one year and I was
7    given a one-year instructor position.
8        Q.  You didn't apply for a faculty
9    position at UC?
10       A.  No, I was not encouraged to do so.
11   It on occasion has happened that Ph.D.
12   students do become a member of the faculty, a
13   real professor at that institution, but it's
14   very unusual.
15       Q.  So when you say you were not
16   encouraged, who did not encourage you to do
17   that?
18       A.  Nobody in particular encouraged me,
19   but I knew just from talking with people. And
20   the whole history of the UC Ph.D. program,
21   there's only one person who ever went through
22   the Ph.D. program and was asked to become a
23   professor there out of all the people. She
24   was my dissertation advisor.
25       Q.  The three offers that were made to

Page 57

FUERMAN

1
2    you, one was from Suffolk?
3        A.  That's correct.
4        Q.  Where were the other two?
5        A.  University of Wisconsin Greenbay.
6        Q.  Okay.
7        A.  And Cleveland State University.
8        Q.  You began to work at Suffolk in
9    1997?
10       A.  That's correct, September of '97.
11       Q.  Just generally trace for me the
12   evolution of your career at Suffolk.
13       MR. HILLER:  Jim, can I interrupt.
14       You asked him a little while ago what
15       area of study he dealt with in his Ph.D.
16       and that reminded him that he taught
17       auditing and told us about that, but I
18       don't think he really answered your
19       question.
20       Q.  Was there a focus of your Ph.D.
21   training, did you have a particular area of
22   academic concentration?
23       A.  Yes. Like all the students there,
24   after you do your course work you -- let me
25   back up. When you are doing your course work

Page 58

FUERMAN

1    FUERMAN
2    you can tailor your course work a little bit
3    to what you intend to do your Ph.D. on, but
4    not that much. Then once you finished your
5    course work and passed your comprehensive
6    exam, then you study just for the purpose of
7    being knowledgeable enough to write your
8    dissertation.
9         By that time, of course, I had
10   decided that my natural nitch was to write on
11   the role of auditors in litigation. So I read
12   everything I could possibly get my hands on on
13   that subject.
14   Q.   That also was the focus of your
15   dissertation?
16   A.   That was, yes.
17   Q.   So you would identify the role of
18   auditors in litigation as the area of academic
19   focus during your Ph.D. career at University
20   of Cincinnati; is that fair?
21   A.   That's correct.
22        MR. BURKE: Let's take five minutes
23   and then we'll come back.
24        (Recess taken.)
25        (Record read.)

Page 59

FUERMAN

1    FUERMAN
2    Q.   I think before we clarified that,
3    one of the things I was asking just in a
4    summary fashion is tell me about your career
5    at Suffolk, what you've done, what you've
6    focused in and what you've taught?
7    A.   I've continued to research this
8    topic using different variables to determine
9    what characteristics are generally present if
10   the auditor gets named a defendant, what
11   characteristics are not. That seems like a
12   very simple thing, but I've created half a
13   dozen published research papers on that doing
14   it in different ways, looking at different
15   time periods, different contexts, different
16   variables.
17        The unique variable that I came up
18   with before anybody else, undisputed, I was
19   the first to demonstrate that the restatement
20   of previously issued audited annual financial
21   statements is strongly positively associated
22   with the auditor subsequently being named a
23   defendant in a private securities class
24   action. That was in my dissertation which I
25   defended in May of '96. Then I saw around

Page 60

FUERMAN

1    FUERMAN
2    November, December of '96 there was a group of
3    Stanford law professors that showed how that
4    is associated in general with companies being
5    named, companies and officers and directors,
6    being named defendants in the securities
7    lawsuits also.
8         They had a slightly different
9    approach, but they showed that. Subsequently
10   that has become a big thing that has been
11   cited in a number of papers. At that time
12   restatements were not that interesting I don't
13   think to people.
14   Q.   Which time are you talking about?
15   A.   In 1996. But they became I think
16   much more interesting as a result of
17   Lynn Turner talking about restatements, I
18   can't remember if it was '98 or '99. He gave
19   a speech and he talked about restatements.
20        Then that generated interest in
21   other people in doing research on this and
22   then, of course, there's been the general
23   accounting office study on restatements
24   pursuant to Sarbane's-Oxley Act. So I cranked
25   out these various research papers, got them

Page 61

FUERMAN

1    FUERMAN
2    published in a variety of journals because,
3    well, for two reasons.
4         One, I needed to do that to get
5    tenured, but I love research. If I had any
6    one thing that I was allowed to do all the
7    time every day, that's what I would do. I
8    can't, I have to also teach my students and do
9    service to the university.
10        So far as teaching at the
11   university, mostly I have been teaching entry
12   level financial accounting and auditing. The
13   entry level financial accounting is for
14   sophomores who are just in any area of
15   business.
16        All the business students,
17   regardless of what they are going to major in,
18   have to take that course, much to their
19   chagrin I think after my last midterm that I
20   gave them. But it's one of the courses that I
21   teach. Also, I teach auditing both to
22   undergrads, mostly seniors who are majoring in
23   accounting, and also I teach a separate course
24   to Master students in auditing.
25        Most of those people are studying

16 (Pages 58 to 61)

Page 62

FUERMAN

1           FUERMAN
2 for a Master in Science and Accountancy,
3 although some of them are going for an MBA or
4 a graduate diploma in Professional
5 Accountancy, which people call a GDPA. Then
6 the third course -- actually I did teach
7 managerial accounting once several years ago
8 at Suffolk, but that was it. It's not my
9 favorite thing.
10    Q. What is "managerial accounting"?
11    A. "Managerial accounting" is the kind
12 of accounting that is used internally by
13 companies, so as to run the company more
14 efficiently and profitably. It's not
15 information that is released to the outside
16 investors. That's what financial accounting
17 is.
18       Around '98 or '99 I began to discuss
19 with the head of our accounting department at
20 Suffolk his idea that, what he called forensic
21 accounting, was a real up and coming thing and
22 that our department ought to develop a course
23 in that. We talked about it and first I
24 resisted, I didn't want to take time away from
25 my research, but as I thought about it and

Page 63

FUERMAN

1           FUERMAN
2 learned more about it I became intrigued by
3 the topic, because it fits my background so
4 well.
5       It's in many ways it is a
6 cross-disciplinary topic. Especially the way
7 I teach it, where you have the disciplines of
8 accounting and auditing and criminal law and
9 criminal justice and criminology all involved
10 in this course. When people use the phrase
11 "forensic accounting" there are two meanings.
12       The meaning that I usually use is
13 conveyed by fraud, the title "fraud
14 examination." That's how I've renamed my
15 course starting a couple years ago. It is the
16 approach taken by Joseph Wells who founded the
17 Association of Certified Fraud Examiners to
18 focus on the disciplines I've talked about.
19       Some people when they use the phrase
20 "forensic accounting," they include additional
21 things, such as business valuation, in
22 divorces and other kinds of disputes.
23 Computation of economic damages, for example,
24 which I know there have been experts engaged
25 in this case for that topic. But those are

Page 64

FUERMAN

1           FUERMAN
2 not really areas that I'm in or that I teach
3 at Suffolk.
4    Q. Okay. You said that you base your
5 course on the approach taken by Joseph Wells?
6    A. Correct.
7    Q. How do you define "forensic
8 accounting"? You may have told me, but I
9 missed it.
10    A. I think of it as fraud examination,
11 and that's the title that my course uses now
12 for the last two years. And that's the title
13 of the textbook I use by Steve Albrecht.
14    Q. When did Mr. Wells, if you know,
15 found the Association of Certified Fraud
16 Examiners?
17    A. 1988.
18    Q. At some point you became a certified
19 fraud examiner?
20    A. That's correct.
21    Q. When was that?
22    A. Would have been 1999.
23    Q. Tell me if you would what you had to
24 do to become that?
25    A. I had to go through a course of

Page 65

FUERMAN

1           FUERMAN
2 study and then pass an exam and submit
3 evidence that I had substantial experience
4 that would entitle me to call myself a
5 certified fraud examiner. Experience in
6 pretty much the things that I'm experienced
7 in; accounting, auditing, law, some
8 involvement in fraud investigations, broadly
9 interpreted through the division of securities
10 at a private law firm, having performed a
11 fraud audit.
12    Q. You performed one fraud audit?
13    A. I did perform one fraud audit.
14    Q. When was that?
15    A. That was in, I think it was in 1999.
16 It was shortly before I became a certified
17 fraud examiner.
18    Q. Assuming you are at liberty to
19 discuss that, what did that involve?
20    A. It involved going through the books
21 and records and documents of a company, in a
22 town in Ohio, that according to the classic
23 profile of fraud could have possibly
24 experienced fraud. Because the owners were
25 not heavily involved in the business and so,

17 (Pages 62 to 65)

Page 66

FUERMAN

1    therefore, the manager and the bookkeeper were
2    not extensively supervised. People would call
3    this a weak internal control situation. So I
4    went and I examined the books and the records.
5        The cancelled checks, the checkbook
6    registers and I did various investigations,
7    looked at things and I found no evidence of
8    fraud that came to my attention. That's when
9    I wrote my report.
10    Q. Who hired you?
11    A. The partners of this business.
12    Q. What was the name of the business?
13    A. Monroe Associates.
14    Q. They are based where?
15    A. Well, I don't want to say.
16    Q. Okay. You looked at some books,
17    checks, check registers and concluded there
18    was no fraud?
19    A. Right.
20    Q. How long did this take you?
21    A. Several weeks.
22    Q. That's the sum total of your fraud
23    examination experience as we sit here today?
24    A. That's the sum total of my having

Page 67

FUERMAN

1    performed fraud audits, yes.
2    Q. You indicated that to become a
3    certified fraud examiner there was a course of
4    study?
5    A. That is correct.
6    Q. How long did that take you?
7    A. It took me several months.
8    Q. Was it computer correspondence or
9    did you attend classes?
10    A. I did not attend physical classes.
11    It was on a CD Rom that I purchased from the
12    Association of Certified Fraud Examiners.
13    Q. Then you took an exam?
14    A. That is correct.
15    Q. Was that also on line or on a CD
16    Rom?
17    A. That was on a separate compact disc
18    or maybe it was a floppy disc, a special
19    device, to assure that the person taking it
20    only has a limited amount of time to answer
21    each question.
22    Q. Following -- have you been hired to
23    perform a fraud exam since the Monroe
24    situation?

Page 68

FUERMAN

1    A. No.
2    Q. I take it you did not in the course
3    of your duties for this case perform any fraud
4    exam?
5    A. Not in the sense of a formal fraud
6    examination, however, I brought my knowledge
7    and experience to bear when reading and
8    interpreting the materials that I reviewed for
9    this course.
10    Q. But my question is the first one you
11    answered, which is did you perform a formal
12    fraud exam in accordance with whatever the
13    standards and practices are of the certified
14    fraud examiner designation for purposes of
15    this case?
16    MR. BRAUTIGAM: Objection.
17    Q. Do you understand that?
18    A. I believe that the opinions I've
19    rendered that might be regarded as being
20    related to fraud examination and certified
21    fraud examiners are within the parameters of
22    the things -- of the kind of opinions that
23    certified fraud examiners are entitled to
24    give.

Page 69

FUERMAN

1    Q. Maybe I'm misusing terms. You
2    talked earlier and I think you defined your
3    retention for the Monroe Company or Monroe
4    Associates as a "fraud audit"?
5    A. Right. It was to look to see if any
6    fraud had occurred. There was no suggestion
7    that fraud had occurred, but just as a
8    prophylactic some businesses like to
9    periodically have a C.P.A. or a certified
10    fraud examiner come in and conduct such a
11    study.
12    Q. Is "fraud auditing" a defined term
13    among certified fraud examiners?
14    A. Yes. I mean my understanding is --
15    I have to back up. There are some variations
16    in the jargon that's used in the field. I
17    just mentioned earlier that some people refer
18    to the field as forensic accounting and others
19    call it fraud examination.
20        Generally a fraud audit is formally
21    known as a situation where a certified fraud
22    examiner, for example, is brought in as a
23    prophylactic to investigate a business or
24    situation where there's no allegation of fraud

18 (Pages 66 to 69)

Page 70

FUERMAN

2  that has occurred. A fraud investigation is
3  more typically thought of as, for example,
4  when the Lernout and Hauspie scandal broke.
5      I was told that KPMG is the auditor
6  there. Arthur Anderson's Boston office was
7  sent in to perform a fraud examination or a
8  forensic accounting engagement, however you
9  want to term it. Usually fraud examination is
10  more in terms of when there's allegations of
11  fraud, and at the point when they were brought
12  in allegations of fraud had been made.
13     Q. So "fraud examination" would also be
14  a defined term among certified fraud
15  examiners; is that right?
16     A. I think so, yes.
17     Q. You told me about a fraud audit.
18     A. Well, if I could interrupt, I'm
19  sorry. Fraud examination has at least two,
20  maybe three meanings among people in the
21  field. One is, it's an area of knowledge and
22  expertise.
23      Another is that it's a particular
24  kind of engagement. When I use the term
25  "fraud examination" for my course at

Page 71

FUERMAN

2  Suffolk University that's to indicate that
3  this is the field of, this is the area that
4  we're studying.
5      Q. Were you retained in this case to
6  perform a fraud examination engagement?
7      A. No.
8      MR. BRAUTIGAM: Objection. This is
9  the third time this question has been
10  asked in almost exactly the same form.
11     MR. BURKE: Just trying to get the
12  terms straight.
13     Q. Thanks, Mr. Fuerman. I want to ask
14  you, we talked about your C.P.A. license and
15  when you were licensed.
16     Have you ever worked for a public
17  accounting firm?
18     A. No, I have not.
19     Q. Have you ever participated in the
20  audit of financial statements, either public
21  or private?
22     A. No.
23     Q. Have you ever issued an audit
24  opinion?
25     A. No.

Page 72

FUERMAN

2      Q. Have you ever --
3      A. Other than my opinion after
4  completing the fraud audit.
5      Q. I'm talking about the audit of
6  financial statements?
7      A. That's correct.
8      Q. So you've never signed off on an
9  audit opinion, whether it be qualified or
10  unqualified, on any financial statements,
11  public or private, in your career?
12     A. That is correct.
13     Q. And we talked earlier about your
14  legal experience. At least as you sit here
15  today you've never tried a lawsuit?
16     A. That is correct.
17     Q. Have you ever taken a deposition?
18     A. I would sit sometimes at
19  depositions. My firm would send me and I
20  would sit there for hours without saying a
21  word.
22     Q. Did you ever actually question
23  anybody that you remember?
24     A. Substantively in a meaningful way,
25  the way you are doing, no.

Page 73

FUERMAN

2      Q. Did you ever during the course of
3  your legal career write or prepare public SEC
4  filings?
5      A. I did help prepare SEC filings for
6  Cardinal Industries in the sense that when we
7  would do our private placement offerings those
8  would be filed with a Regulation D form. As
9  far as public offerings, I did assist at least
10  once, maybe twice, in a public offering that
11  was done.
12      I know one of them was the real
13  estate investment trust. There may have been
14  a limited partnership public offering too. I
15  can't remember at this point.
16     Q. Did you actually write those
17  documents or did you just assist with them?
18     A. I did some of the writing, other
19  people did some of the writing.
20     Q. What was the nature of what you were
21  describing or writing about in those public
22  offerings?
23     A. The general nature of the
24  transaction and who are the people at Cardinal
25  Industries and who are the people involved,

19 (Pages 70 to 73)

Page 74

FUERMAN

1    FUERMAN
2    who were the underwriters, who were the
3    accountants. I would review looking for
4    mistakes. I would not generally write
5    anything of a tax opinion because that was
6    handled by an outside law firm.
7        But sometimes I would or sometimes
8    I would point out things that were unique or
9    different about this particular transaction
10   that I thought the outside law firm doing the
11   tax opinion ought to know. I would review the
12   projections.
13       Q.  Is it fair to say that your role was
14   more in the nature of reviewing and
15   commenting, as opposed to actually writing
16   disclosure documents or SEC documents in the
17   first instance?
18       MR. BRAUTIGAM:  Objection to the
19   form.
20       A.  By "SEC documents," do you mean
21   private placement offerings or just the public
22   offerings.
23       Q.  I'm talking about the public
24   offerings.
25       A.  My experience with public offerings

Page 75

FUERMAN

1    FUERMAN
2    is very limited, if that's what you mean to
3    ask.
4        Q.  That's what I mean, thank you. Did
5    you ever participate in restatement of
6    financials by any company?
7        A.  No.
8        Q.  Did you ever serve in any employment
9    position where you were involved in the
10   compilation or preparation of financial
11   statements on the inside, working as a company
12   employee?
13       A.  No, but I would help with
14   compilation and preparation of projections for
15   the private placement offerings.
16       Q.  But in terms of compiling internal
17   financial statements, working as an accountant
18   within a company, you never did that during
19   your job experience?
20       A.  Well, the work with the projections
21   I regard as accounting related work. I would
22   do that.
23       Q.  Other than that that's the extent?
24       A.  And well, I also regarded as
25   accounting related the review and commenting

Page 76

FUERMAN

1    FUERMAN
2    of things having to do with the tax opinion.
3        Q.  Tax opinion on what, on offerings?
4        A.  Well, we came to one point, and this
5    was not a trivial matter in my view, where the
6    company Cardinal Industries was getting into
7    worse and worse financial condition. And I
8    happen to know from my own knowledge of tax
9    accounting that the current tax opinion, that
10   the boiler plate that had been used in
11   offering after offering after offering was
12   really no longer appropriate and needed to be
13   changed because there was substantial doubt
14   whether Cardinal Industries, by that point,
15   had a positive net worth.
16       I felt it was appropriate for me to
17   let tax counsel know this, not be left hanging
18   out to dry. There were some people at
19   Cardinal Industries that were not happy about
20   what I had done, but I felt that was the right
21   thing to do.
22       Q.  I take it you never worked for an
23   investment banking outfit; is that correct?
24       A.  That is correct.
25       Q.  Have you ever been involved in a

Page 77

FUERMAN

1    FUERMAN
2    merger transaction, either on behalf of the
3    acquiring company or the acquired company?
4        A.  No.
5        Q.  Have you ever written a proxy
6    statement?
7        A.  No.
8        Q.  Have you ever sat on the board of
9    directors of a private or a public company?
10       A.  Not a for profit organization, no.
11       Q.  That's what I'm referring to, for
12   profit. Have you ever sat on the audit
13   committee of a public company?
14       A.  No.
15       Q.  Have you ever been retained to
16   advise the board of a public company or the
17   audit committee of a public company?
18       A.  No.
19       Q.  Have you ever been hired to perform
20   forensic accounting work, other than the one
21   engagement you talk about earlier?
22       A.  No. Other than, you know, voicing
23   my opinions based on my background as a
24   certified fraud examiner.
25       Q.  You've been a certified fraud

20 (Pages 74 to 77)

Page 78

FUERMAN

1
2  examiner for five years now roughly?
3      A.   That is correct.
4      Q.   Have you ever worked in the criminal
5  justice system?
6      A.   No.
7      Q.   Earlier you talked about articles
8  that you wrote that relate to the area of
9  accountant liability or accountants being
10  named as defendants.  You say those are the
11  articles you wrote.  Which articles on your
12  resume relate to that topic?
13         MR. BRAUTIGAM:  Objection to the
14     form of the question.
15     A.   They all relate to that topic.  I'm
16  not sure how to respond.
17     Q.   Let me just try to rephrase that.
18  The first two pages of your resume there are a
19  series of article publications that you've
20  listed.
21     A.   Correct.
22     Q.   What is the general topic of these
23  articles?  Did these deal with your principal
24  focus on securities litigation and auditors?
25   .   MR. BRAUTIGAM:  Objection.

Page 79

FUERMAN

1
2      A.   Some of them do and some of them do
3  not.
4      Q.   Which ones of the ones at the bottom
5  of the first page of your resume, which is
6  Exhibit A to Plaintiffs' Exhibit 115, carrying
7  over to the second page deal with that topic?
8      A.   The topic of?
9      Q.   Auditor involvement in securities
10  litigation.
11     A.   Okay.  They all do, but some more
12  than others.
13     Q.   Okay.
14     A.   I'm trying not to be evasive.  Okay,
15  starting with the third article, fraudulent
16  audited annual financial statements, starting
17  with that article and continuing on the next
18  page, most of the next six articles have to do
19  with analyzing, "What are the characteristics
20  associated with auditors being named a
21  defendant or not being named a defendant in a
22  particular private securities class action."
23         One of those is a little difficult.
24  The first article lists, at top of the second
25  page of the resume, balkanized auditor

Page 80

FUERMAN

1
2  liability research.  It's a very short piece,
3  part of a special issue where I and other
4  professors argued that there should be more
5  debate about some of the issues of auditor
6  liability within accounting academe.
7         Then if you go farther down that
8  page, starting with the articles the C.P.A's
9  responsibilities for client-related
10  information, that's an article that talks
11  about the accounting professions code of
12  ethics and what responsibilities the auditor
13  has to keep information of the client
14  confidential in some situations, but disclose
15  it in other situations.
16         It also talks about some lawsuits
17  that are in this area.  Then the last two
18  articles are entirely on accountants in
19  litigation, although not exclusively auditors.
20  There might be some discussion in some of
21  those of liability related tax preparation,
22  for example.
23         Then going back to the first page,
24  the first two articles that I cite, the first
25  one being audit quality examined, the second

Page 81

FUERMAN

1
2  one being accountable accountants, these are
3  both on my new theme which is discussed by
4  Robert Barker in Business Week.
5      Q.   What is that team?
6      A.   The new theme is I'm developed an
7  evaluation method to measure auditor quality
8  of a particular C.P.A. firm based on their
9  performance in the aggregate over time in a
10  large number of lawsuits.  Now those two
11  articles consider not just private securities
12  litigation but also SEC enforcement actions
13  and justice department criminal actions.
14     Q.   Is it fair to say that in this case
15  you are not opining on anything dealing with
16  your new theme in terms of evaluating auditor
17  quality?
18     A.   No, I am not.  And I would emphasize
19  that I am not opining in my articles on anyone
20  individual C.P.A. firm in anyone individual
21  case.  I'm opining on their quality in the
22  aggregate.
23     Q.   But that particular area of academic
24  focus is not involved at all with the opinions
25  that you are rendering in this case?

21 (Pages 78 to 81)

Page 82

FUERMAN

1
2    A.  That is correct.
3    Q.  You have not evaluated the
4    performance of earns young or any of the other
5    auditors in this case?
6    A.  I have not been asked to give my
7    opinion on anything other than materiality and
8    restatements and the next sus between them.
9    Q.  I think this is apparent but just to
10   make sure the record is clear, you are not
11   opining on anything in this case relating to
12   your other area of focus in terms of auditor
13   involvement in securities class actions?
14       MR. BRAUTIGAM:  Objection.
15   Q.  Do you understand the question?
16   A.  I'm a little confused.
17   Q.  Okay.  We talked about a couple of
18   areas of focus, one of which that has been a
19   focus of yours for a long time is what
20   indicates whether auditors are or are not
21   involved in securities litigation or get
22   named, correct?
23   A.  Correct.
24   Q.  Are any of the opinions you are
25   expressing in this case related to that

Page 83

FUERMAN

1
2    particular area of your academic and
3    professional focus?
4    A.  No, other than in a very trivial
5    sense that in the database of my current
6    research, which includes about 1,200 lawsuits,
7    one of them is Provident and currently I
8    believe I've coded Ernst and Young's
9    involvement as a one.  The involvement of the
10   C.P.A. firm ranges from zero to five,
11   depending on their involvement.  A C.P.A. firm
12   that has been named a defendant but appears to
13   have gone no further is coded a one.
14   Q.  But are you testifying in this case
15   about anything as it relates to your academic
16   focus with respect to Ernst and Young?
17       MR. BRAUTIGAM:  Objection.
18   A.  No, I am not.  Unless -- well, I
19   anticipate that conceivably at this deposition
20   somebody will ask me possibly my opinion on
21   things that are not strictly related to
22   materiality and restatements and the nexus
23   between them.  Conceivably at this deposition
24   if somebody asks me my opinion, then I should
25   give it unless there's some legal reason that

Page 84

FUERMAN

1    I shouldn't.
2
3    Q.  Have you ever been qualified as an
4    expert by a court?
5    A.  No.
6    Q.  Have you ever been retained as an
7    expert?
8    A.  No.
9        MR. BRAUTIGAM:  Objection.  Other
10   than in this case, right?
11       MR. BURKE:  Yes, and it remains to
12   be seen whether he will be qualified or
13   anything.
14       MR. BRAUTIGAM:  But he's been
15   engaged.
16       MR. BURKE:  I understand.
17   Q.  You have never testified at a
18   deposition or trial in any proceeding?
19   A.  That is correct.
20   Q.  Have you ever been consulted with anybody
21   in litigation as an "expert" prior to this
22   case?
23   A.  No.
24   Q.  Do you know what an "event study"
25   is?

Page 85

FUERMAN

1
2    A.  Yes.
3    Q.  Did you perform any kind of an event
4    study in this case?
5    A.  No, I did not.
6    Q.  Is that something that in the course
7    of your academic training you consider
8    yourself qualified to perform?
9    A.  There are different kinds of event
10   studies.  I should back up.  First of all, I
11   felt there was no appropriate time to do an
12   event study for this case, for my role.
13       I didn't feel that was an
14   appropriate thing to do.  Event studies, I
15   have studied event studies in my Ph.D. program
16   at Cincinnati.  We read many articles on
17   different kinds of event studies.
18       The most popular genre is "What is
19   the relationship between earnings and
20   returns."  There are many, many studies on
21   that topic.  I have not published any articles
22   in that area.  I do not purport to be an
23   expert in performing event studies.
24   Q.  Thank you.  With respect to your
25   testimony here today, tell me what area of

22 (Pages 82 to 85)

Page 86

FUERMAN

1    your professional expertise is involved in the
2    reports that you've rendered?
3
4        A.  I have spent many years studying
5    every conceivable aspect of restatements. I
6    was the first academic to come up with proof
7    of a statistical relationship between
8    restatement of previously issued audited
9    financial statements and the auditor being
10   named as a defendant.
11       Almost all my papers since then have
12   been on the topic one way or another of
13   restatements, probably with the exception of
14   the last two papers, the two most recent
15   papers that are listed in my resume.
16       Materiality in the context of
17   restatements is very carefully laid out.
18   There's no wiggle room for much difference of
19   opinion in Accounting Principles Board, Option
20   Number 20. The kind of materiality research
21   that is appropriate, that is laid out in
22   Accounting Principles Board, Option Number 20
23   or APB No. 20, I feel very qualified to
24   perform.
25       MR. BURKE:  Sorry about that.

Page 87

FUERMAN

1
2        Let's go off the record for a moment.
3        (Discussion off the record.)
4        Q.  I apologize for the interruption,
5    Mr. Fuerman. We talked about your areas of
6    expertise being restatements and materiality
7    in the context of APB 20?
8        A.  That's correct.
9        Q.  Any other areas of expertise that
10   you believe are relevant to the opinions that
11   you have rendered in this case?
12       A.  My general expertise in all of GAAP,
13   generally accepted accounting principles, and
14   GAS, generally accepted auditing standards,
15   from my research and my teaching I think is
16   relevant. I think at times I'd have to go
17   page by page, paragraph by paragraph to
18   identify where that comes in to shape my
19   opinion in the document, but I think it comes
20   in.
21       Not as directly as materiality and
22   restatements and APB No. 20, but they do come
23   in. The other thing that comes in is my
24   knowledge and experience in being a certified
25   fraud examiner. I've had -- well, in regard

Page 88

FUERMAN

1
2    to the certified fraud examiner -- the fraud
3    examination field and the auditing field are
4    coming together.
5        This is partly a result of the
6    recommendations that are being implemented,
7    issued by the committee on audit effectiveness
8    in the year 2000. They recommended that
9    auditors, financial statement auditors
10   implement more of the kinds of things that are
11   part of the knowledge and training of
12   certified fraud examiners; especially
13   interview and interrogation techniques and
14   statement analysis, which is part of
15   interviewing and interrogation.
16       So this is an area where I've
17   studied and, in fact, PricewaterhouseCoopers
18   put on a workshop this summer where a
19   substantial amount of time was spent on that
20   very topic of interview and interrogation and
21   statement analysis and analysis of deception.
22   In fact, the title of it was called "Detection
23   of Deception."
24       Q.  Even those areas of expertise that
25   you just talked about, restatements,

Page 89

FUERMAN

1
2    materiality, your general expertise in GAAP
3    and GAS and the certified fraud examiner, you
4    have never previously been qualified as an
5    expert in those areas?
6        A.  By a court of law?
7        Q.  Yes.
8        A.  That is correct.
9        MR. BRAUTIGAM:  Objection, asked and
10   answered.
11       Q.  Other than what you told me about,
12   are there any other areas of expertise that
13   you brought to bear for purposes of the report
14   that you provided in the case, to testify in
15   this case?
16       A.  I may have unwittingly brought
17   additional areas of expertise to the table.
18   Looking back at my career, there's so many
19   things I learned in so many different jobs,
20   where it appeared immediately after that job
21   that this knowledge and experience is
22   irrelevant, but then later it became extremely
23   useful.
24       It's difficult for me to identify
25   everything that has an impact on these, you

23 (Pages 86 to 89)

Page 90

FUERMAN

1    FUERMAN
2    know, 22 pages. But the bulk of it is focused
3    on materiality, restatements and the nexus
4    between the two. I think that's a fair
5    statement.
6        Q.  Are you an expert on the federal
7    securities law and disclosures pursuant to
8    them?
9        A.  No. I have a threshold knowledge
10    but, which I must because I have to teach that
11    topic a little bit in my auditing classes, but
12    I do not purport to be an expert in that.
13        Q.  Are you an expert in the public
14    securities markets?
15        MR. BRAUTIGAM:  Objection, over
16    broad.
17        A.  It's difficult to answer because
18    what is meant by the "public securities
19    markets." I mean I have probably as good a
20    knowledge of some areas of regulation that
21    have an impact on the public securities
22    markets. Maybe things that touch on my
23    research and teaching.
24        I keep abreast of the latest new
25    rules governing audit committees that are

Page 91

1    FUERMAN
2    issued by the SEC, the NASDAQ or the New York
3    Stock Exchange, for example, because that's
4    something I'm responsible to know and stay up
5    on.
6        Q.  Do you hold yourself out as an
7    expert in those areas?
8        MR. BRAUTIGAM:  Objection.
9        A.  Yes, I do.
10        Q.  So are you an expert in stock price
11    behavior?
12        A.  I am not a capital markets
13    researcher if that's what you mean. There are
14    academics that full-time research the
15    relationship between earnings and returns, for
16    example, or the variability of stock price
17    returns. I don't do that kind of research.
18        Q.  I take it you've never -- I'm sorry,
19    I didn't mean to interrupt.
20        A.  Under APB No. 20 the directive is to
21    assume that earnings are important to the
22    public securities markets. That's emphasized
23    heavily in all the financial statement
24    analysis textbooks as very important, and to
25    focus on earnings in studying materiality

Page 92

1    FUERMAN
2    under APB No. 20.
3        Q.  Have you ever taught financial
4    statement analysis?
5        A.  No, I have not.
6        Q.  Have you ever taught any course in
7    public securities markets or securities
8    regulation?
9        A.  No, I have not, other than the part
10    that is part of my auditing course.
11        Q.  Have you ever -- I'm sorry.
12        A.  I'm sorry too. There's also a bit
13    of that in my fraud examination course. We
14    have a chapter where we talk about that.
15        Q.  Have you ever participated in the
16    preparation of public company 10Ks or 10Qs?
17        MR. BRAUTIGAM:  Objection, asked and
18    answered.
19        Q.  I apologize if I did.
20        A.  I did participate in the preparation
21    of real estate investment trusts public
22    offering at Cardinal Industries. There may
23    also have been a publicly offered real estate
24    limited partnership. I can't remember about
25    that exactly.

Page 93

1    FUERMAN
2        Q.  My question is not about public
3    offering documents because we did talk about
4    that. Have you ever participated in the
5    preparation of 10Ks or 10Qs, periodic filings
6    with the SEC on behalf of a public company?
7        A.  No, I have not.
8        Q.  Have you ever participated in a
9    securities class action as a plaintiff or
10    defense counsel?
11        A.  No. At the small law firm in
12    Columbus we had no class actions either, in
13    defense or plaintiff role. They were all
14    direct actions.
15        Q.  I take it you've never participated
16    in a securities class action as a party on
17    either side?
18        MR. BRAUTIGAM:  Objection. Do you
19    mean a class member or named class
20    representative?
21        MR. BURKE:  No, I'm talking
22    plaintiff or defendant.
23        A.  I from time to time have gotten
24    notices from my broker which happens to be
25    McDonald, a notice of settlement of class

24 (Pages 90 to 93)