**EXHIBIT B-2**

**EXHIBIT B-2**

Page 94

FUERMAN

1          FUERMAN
2    action, and they keep track of their customers
3    who have -- who own stock. So they send me
4    the notice, so technically I'm a member of
5    that plaintiff class when that happens. I
6    think they sent me one for 3 COM, for example.
7        Q. Have you ever served as a class
8    plaintiff?
9        A. No.
10        Q. Do you consider yourself an expert
11    on shareholder behavior?
12        A. No.
13        Q. Do you consider yourself an expert
14    on the public savings and loan market or the
15    market for publicly held savings and loans in
16    the time frame 1999 to 2000?
17        MR. BRAUTIGAM: Objection.
18        A. No, in the sense of I don't know the
19    I had idiosyncrasies of that market.
20        Q. Do you consider yourself an expert
21    on calculating damages in connection with
22    securities actions or other litigation cases?
23        A. No, I do not. In fact, one of my
24    papers I co-authored with professor
25    Steve Freund who has the knowledge to do that.

Page 95

FUERMAN

1          FUERMAN
2    He did that in part of my paper, my paper
3    included that. He did that because he has
4    that knowledge.
5        Q. Which paper of the ones you've
6    listed?
7        A. That's the third one down called
8    "Fraudulent Audited Annual Financial
9    Statements."
10        Q. Third one down on what page?
11        A. Third one down on the first page,
12    third article listed.
13        Q. Thank you. When were you retained
14    in this case?
15        A. It was in the fall of 2003. Yeah,
16    had to have been the fall of 2003.
17        Q. 2003 or 2002?
18        A. 2003. It was fairly recent.
19        Q. Tell me how your engagement came
20    about?
21        A. I got a cell phone call from
22    Mike Brautigam. I returned it and he
23    explained why he was calling. He wanted to
24    discuss with me the possibility of being an
25    expert witness in this case, but we needed to

Page 96

FUERMAN

1          FUERMAN
2    discuss it further to see whether I had the
3    proper qualifications and whether I was
4    interested.
5        So we had several conversations. I
6    sent him various documents in the fall of
7    2003.
8        Q. You've also today provided sort of a
9    summary of your time sheets?
10        A. That is correct.
11        Q. If you need to look at this feel
12    free. I'm just trying to get an estimate from
13    you for how much time you've devoted to the
14    engagement?
15        A. I could total up these numbers with
16    my calculator, but that seems kind of like a
17    waste of time.
18        Q. I'm looking for rough order of
19    magnitude.
20        A. All right. I'm simply counting
21    these numbers. I count 185 hours.
22        Q. I know that's an approximation.
23        A. Yeah, it's all there in black and
24    white. If I made a mathematical error that's
25    possible.

Page 97

FUERMAN

1          FUERMAN
2        Q. That's fine. How much have you been
3    paid to date?
4        A. About $27,000.
5        Q. What was the nature of the tasks as
6    was explained to you by Mr. Brautigam?
7        A. The nature of the task -- I cannot
8    remember exactly what was discussed in the
9    first few phone calls. The tasks varied. At
10    first the task was to familiarize myself with
11    the case sufficiently so that I could decide
12    whether I felt that it was appropriate that I
13    be an expert witness.
14        And he was doing the same for
15    himself, judging my knowledge and credentials
16    and seeing whether from his point of view it
17    would be appropriate. So some time was spent
18    on that, and then we both concluded that it
19    would be appropriate.
20        Then I began to just read massive
21    amounts of litigation documents. The case has
22    been going on since 2001. I think it's been
23    going on that long.
24        Q. Before that, but that's close
25    enough.

Page 98

FUERMAN

1
2    A.  No, you are right.  I think I read
3  somewhere it actually started with a pleading
4  requesting an injunction prior to the merger
5  closing or something.  So it's been going on
6  for quite a while.
7        So a fair amount of time was spent
8  on reading a fair number of these documents.
9  I saw on the PACER docket sheet that there are
10  400 docket entries.  So I hesitate to say that
11  I am familiar with all aspects of such a huge
12  case, but to the extent feasible I did just
13  that.
14        I tried to familiarize myself with
15  the case by reading documents filed by the
16  parties, as well as a couple judicial opinions
17  that have been put on Lexus Nexus.  Then I
18  began to write the expert opinion.  I think I
19  gave you a copy of the first draft that was
20  completed in December and then the final draft
21  was filed with the court January 22, 2004.
22        I spent a lot of time doing
23  research.  First of all, I did initial
24  research to determine, yes, I did feel
25  comfortable that I am an expert for purposes

Page 99

FUERMAN

1
2  of what I'm being asked to testify on.  But
3  then I read everything I could get my hands on
4  that would shed light on the matters in
5  controversy regarding materiality and
6  restatements and the nexus between them.
7        Q.  You indicated that from time to time
8  the tasks changed or shifted a little bit?
9        A.  That is correct.
10        Q.  Can you explain that?
11        A.  At one point the task was mainly to
12  write that initial expert report or expert
13  opinion, however you wish to phrase it, that
14  was filed January 22, 2004.  There were other
15  times when I was asked to assist counsel for
16  the plaintiffs in writing up a pleading,
17  something that might get incorporated in a
18  pleading and other times my view on a
19  deposition transcript or my view on an
20  upcoming deposition or something like that.
21        MR. BURKE:  Off the record for one
22  second.
23        (Discussion off the record.)
24        (Fuerman Exhibit 2, document, marked
25  for identification, as of this date.)

Page 100

FUERMAN

1
2        Q.  Professor Fuerman, let me show you a
3  document which has been marked as Fuerman
4  Deposition Exhibit 2.  This is entitled
5  "Exhibit 3 Accounting Expert
6  Report-Materiality."
7        In your prior testimony you were
8  talking about something you prepared in
9  January of '04.  Is this the document?
10        A.  Right.  I gave you an early draft, I
11  think December the 3, 2003 or something along
12  those lines.  I believe this was filed with
13  the court January 2, 2004.
14        Q.  In this document it was not signed
15  or dated.  Do you know why that was?
16        A.  No, I do not know.
17        Q.  You talked about being asked to
18  provide assistance in connection with
19  depositions.  Do you recall which depositions?
20        A.  One of them is the Joseph Stager
21  deposition, and I gave you a copy of a memo
22  that I wrote to Mike, my thoughts on that
23  deposition.
24        Q.  Did you meet personally with
25  Mr. Brautigam over the course of your duties?

Page 101

FUERMAN

1
2        A.  Last night was the first time.
3        Q.  Most of your dealings were
4  correspondence?
5        A.  By telephone, correspondence, fax.
6        Q.  In connection with your duties, did
7  you meet with anyone else associated with the
8  case personally?
9        A.  No.  I do not know the parties
10  involved, other than Dr. Stager.  He was the
11  president of the university when I was going
12  through the Ph.D. program at Cincinnati.
13        Q.  Do you know him personally?
14        A.  I do not even know what he looks
15  like.
16        Q.  You just know of him?
17        A.  That is correct.
18        Q.  Did you ever meet Mr. Mesh?
19        A.  No, I have not met Mr. Mesh.
20        Q.  Prior to this case have you ever
21  done any work for Mr. Mesh of the Mesh firm?
22        A.  No, I have not.
23        Q.  Prior to this case have you ever
24  done any work for Mr. Brautigam of any kind?
25        A.  No, I have not.

Page 102

FUERMAN

1      FUERMAN
2      Q.   Did Mr. Brautigam tell you how he
3  came to learn of you?
4      A.   He saw my article in Business Week.
5      Q.   That's the one you gave me earlier
6  today about auditing the auditors?
7      A.   Yes.
8      Q.   Was there any analysis that you
9  performed for purposes of your expert report
10 that's not included in the three reports that
11 you have submitted?
12     A.   No.
13     Q.   Is there any work that you were
14 asked to do that you did not do?
15     A.   No.
16     Q.   Mr. Brautigam is pointing you
17 towards something?
18     A.   I'm sorry, I'm contradicting myself.
19 I have prepared one thing here and I brought
20 this to the deposition. I showed this to you
21 perhaps two hours ago.
22     Q.   Right.
23     A.   It's just two pages long. I
24 prepared this especially for the deposition
25 because I anticipated it would be something

Page 103

1      FUERMAN
2  that would be discussed.
3      MR. BRAUTIGAM:  Can we mark this as
4      an exhibit.
5      MR. BURKE:  Sure. Let's make this
6  Fuerman Deposition Exhibit 3.
7      (Fuerman Exhibit 3, document, marked
8  for identification, as of this date.)
9      Q.   Tell me if you would,
10 Professor Fuerman, what Fuerman Deposition
11 Exhibit 3 is?
12     MR. BURKE:  For the record, this is
13     two pages. The first page is a page
14     selected from 75 or an excerpt from page
15     75 of the PFGI 10K, filed March 29, 2000.
16     Q.   The second page is a document you
17 prepared yourself?
18     A.   It is a document I prepared myself.
19 I prepared this because I assumed that I would
20 be asked questions about the Prowse report,
21 another expert witness in this case. I have a
22 response to Expert Witness Prowse's assertion
23 that I made an error in my analysis.
24     I believe that Mr. Prowse is the one
25 who made an error, and I thought about it and

Page 104

1      FUERMAN
2  I thought this is a little bit complicated, a
3  little bit technical and I need to create
4  something to be able to demonstrate this in
5  the deposition.
6      Q.   We will get into that later and
7  we'll talk about that at that point in time.
8  Is this project still ongoing?
9      A.   This, oh, it was done in an
10 afternoon, that's all.
11     Q.   It's not reflected in your report,
12 but this work is done?
13     A.   Right.  This is in reaction to my
14 receipt of the Prowse report, which I received
15 sometime after I completed my report.
16     Q.   And this deals with future earnings,
17 is that correct, projected future earnings?
18     A.   Is it Dr. Prowse or Mr. Prowse?
19     Q.   It's doctor.
20     A.   Dr. Prowse asserts that I made an
21 error, that I used the wrong earnings per
22 share numbers in one part of my expert report.
23 He feels that I should have used, so far as
24 earnings per share reported for 1998, I should
25 have used $2.56.  I believe Mr. Prowse is

Page 105

1      FUERMAN
2  incorrect.
3      I used the correct $2.48. I can get
4  into explaining that when we get to the Prowse
5  report.
6      Q.   That's fine.  We'll talk about that.
7  I understand also that you are going to be
8  reviewing depositions as we move forward?
9      A.   That's correct.
10     Q.   Other than reviewing depositions or
11 other documents created as we move forward,
12 are you performing any other analytical work
13 in connection with your expert testimony?
14     A.   No, but you could regard what I did
15 here as sort of an antilytic work. Something
16 at a deposition may strike me as requiring
17 some kind of antilytic response on my part,
18 but unless that happens, no, there would be no
19 further antilytic work.
20     Q.   I understand there may be things
21 that come up. I understand Fuerman Deposition
22 Exhibit 3. Other than that there's no
23 projects that you are working on currently?
24     A.   No.
25     Q.   How many, if any, individuals

27 (Pages 102 to 105)

Page 106

FUERMAN

1    FUERMAN
2    assisted you in this project, in connection
3    with your expert report?
4        A.    The only assistance I got was from
5    my graduate assistant, who helped me gather
6    copies of articles that were cited in my
7    reports, that I gave you a copy of first thing
8    this morning.  No substantive work has been
9    done on this by anybody other than me.
10        Q.    I take it you never prepared an
11    expert report prior to this case?
12        A.    That is correct.  And that may
13    explain why the initial one that I wrote in
14    December 2003 and filed in January 2004 may
15    vary with the format that you typically
16    expect.
17        Q.    You did review the drafts of your
18    reports with Mr. Brautigam?
19        A.    Yes.
20        Q.    Did he suggest changes to you?
21        A.    Sometimes, yes.
22        Q.    Did you make those changes?
23        A.    Sometimes, yes, sometimes, no.
24        Q.    Do you recall any changes that
25    Mr. Brautigam asked you to make that you

Page 107

FUERMAN

1    FUERMAN
2    elected not to make specifically?
3        A.    Usually they were clerical typo
4    changes.  Or sometimes he would perceive that
5    I made a clerical or typo error or spelling
6    error, syntax error and sometimes I would
7    disagree with him.  So there were sometimes
8    those back and forth.
9        It's my philosophy that you want to
10    be, in any kind of report, whether it's an
11    academe or in a law court, you want to be
12    sufficiently long enough to cover the subject,
13    but you don't want it to be so long a
14    disbursement of the people trying to read it.
15    Sometimes we may have had a difference of
16    opinion on what length the document should
17    have.
18        I'm trying to think what else.
19    There was one situation on the expert report
20    where there was the belief, and I thought it
21    was a mistake in belief, that I had made an
22    error on a certain point.  So I discussed it
23    with Mike and he agreed with my view, that
24    there was no error.
25        Q.    Do you have your report still in

Page 108

FUERMAN

1    FUERMAN
2    front of you?
3        A.    Yes, I do.  The one dated August the
4    8th?
5        Q.    Yes, sir.  I think we talked about
6    this off the record, I'll make sure it's on
7    the record.
8        You have prepared Fuerman Deposition
9    Exhibit 2, which we talked about?
10        A.    That is correct.
11        MR. BURKE:  Mark that as 4.
12        (Fuerman Exhibit 4, document, marked
13    for identification, as of this date.)
14        Q.    Take a look at what we've now
15    correctly marked as Fuerman Deposition
16    Exhibit 4.  Can you identify the substituted
17    Fuerman Exhibit 4?
18        A.    Yes.  This is the document that was
19    filed with the court March 5, 2004.  It was
20    the second document I wrote for this case that
21    got filed with the court.
22        Q.    What were the circumstances under
23    which you prepared Fuerman Deposition
24    Exhibit 4?
25        A.    The circumstances were that first I

Page 109

FUERMAN

1    FUERMAN
2    submitted an expert report January 22, 2004.
3    Sometime after that Dr. Tafin Tuzin submitted
4    a document that there's been some confusion
5    about, but appeared to attempt to rebut my
6    report.  So this is in rebuttal to Dr. Tuzin's
7    document.
8        Q.    Then subsequently on August 8, 2004
9    you submitted Plaintiffs' Exhibit 115,
10    correct, which is in front of you?
11        A.    August.
12        Q.    August 8, 2004?
13        A.    Yes, but that wasn't filed with the
14    court I don't believe, or was it.
15        Q.    But that's the latest report you've
16    done?
17        A.    That's the latest report I've done.
18        Q.    Am I correct that Plaintiffs' 115
19    sets forth sort of the updated report and
20    opinions that you are prepared to give in this
21    case?
22        A.    That is correct.  I feel that it's a
23    standalone document.  It's the result of
24    additional, many hours of further research,
25    writing and reflection during the summer on

28 (Pages 106 to 109)

Page 110

FUERMAN

1
2 this case.
3     Q.   On page 2 of Plaintiffs' Exhibit
4 115, of your report, there's a list of
5 materials and documents that you looked at.
6     A.   I'm sorry.  Are we on?
7     Q.   Exhibit 115
8     A.   Page 2.
9     Q.   Roman Numeral two.
10     A.   Yes, I'm with you.
11     Q.   Is there a list of everything you
12 reviewed for purposes of your testimony in
13 this case?
14         MR. BRAUTIGAM:  Objection.  At what
15     point?
16         MR. BURKE:  At the point he wrote
17     this report.
18         MR. BRAUTIGAM:  Okay, because as we
19     indicated, he reviewed Carey's testimony
20     last night.
21     Q.   We understand it's a standing
22 clarification, Professor Fuerman, that there
23 are some additional things that you are
24 looking at or have looked at?
25     A.   That's correct.

Page 111

FUERMAN

1
2     Q.   You looked at Mr. Carey's
3 deposition, you looked at Dr. Prowse's report,
4 some other things that your counsel will
5 advise me in a more exhaustive list, of what
6 you've looked at in addition to what's listed
7 here.
8         My question is, as and at the time
9 you prepared Plaintiffs' Exhibit 115, does
10 page 2 of your report list the materials that
11 you looked at?
12     A.   There's much more that I looked at
13 than this.  For example, the accounting and
14 auditing literature, I don't think I mention
15 that in this list.  So far as pleadings in
16 this case, I think this list captures all of
17 them to that point, and deposition
18 transcripts, that kind of thing I think I may
19 have inadvertently omitted one or two things.
20     Q.   At least as you look at it, this is
21 a fair representation of the pleadings and the
22 deposition transcripts and PFGI OHSL documents
23 that you looked at specifically?
24     A.   That is correct.  I can't remember
25 when I wrote this exactly, but I'm not sure

Page 112

FUERMAN

1
2 why I did not list that I read the various
3 accounting and auditing standards.  Maybe I
4 didn't feel it was necessary.
5     Q.   I understand.  Who selected these
6 materials for you to review?
7     A.   They were sent to me by
8 Mike Brautigam, but we discussed on the phone
9 what documents I logically ought to look at.
10 I think I informed him my views and I think
11 there was no difference of opinion that
12 logically members of the audit committee,
13 members of the senior executives of the
14 company, those were important transcripts to
15 read.
16     Q.   Did you ever ask for additional
17 materials from Mr. Brautigam in addition to
18 those that are listed here?
19     A.   No, I don't think so.
20     Q.   Did you ever go on the PACER system
21 and pull other pleadings on your own?
22     A.   Yes.  What I did early in the case,
23 there was a judicial opinion and I found it on
24 PACER.  I can't remember if it's the former
25 judge of this case or perhaps Judge Siegel.

Page 113

FUERMAN

1
2 Isn't Judge Siegel the judge on another
3 Providence cases?
4     Q.   Spiegel, right.
5     A.   There was an additional opinion
6 perhaps by Judge Spiegel that just discussed
7 the case and what had been happening for the
8 last couple of years.  I read through that
9 carefully and it gave me just a sense of what
10 was happening.  I may have read a couple other
11 documents.
12     Q.   Do you recall what those are as you
13 sit here today?
14     A.   I remember in one of the pleadings
15 by the defendants there was something in an
16 attempt to rebut me about a case in Nebraska
17 or something.  I think I may have pulled that
18 up and look at it, and I may have looked at
19 some other cases around that time.  My general
20 -- I can't remember the names of these cases,
21 I don't know if I have a list of them even --
22 but my general impression was, as had been my
23 understanding, that it's rare to find this
24 issue discussed in Lexus Nexus because
25 typically if financial statements are

29 (Pages 110 to 113)

Page 114

FUERMAN

1
2  subsequently restated, the defense stipulates
3  that the originally issued financial
4  statements were materially misstate.
5      Q.  Have you ever worked on the defense
6  of a securities class action involving a
7  restatement?
8          MR. BRAUTIGAM:  Objection, asked and
9      answered.
10      A.  I have not worked on the defense of
11  a securities class action. I've worked on the
12  defense of direct actions when I was at the
13  small firm in Ohio.
14      Q.  Can you cite me to any cases in
15  which the defense, in your phrase, stipulated
16  to whatever the stipulation was that you just
17  described?
18          MR. BRAUTIGAM:  Objection to the
19      form.
20      A.  I can't cite a case, but in the
21  course of my research I speak with many
22  securities attorneys, both on plaintiffs side
23  and the defense side.  They informed me that
24  it's highly unusual for defense attorneys to
25  not agree to stipulate on this issue.

Page 115

FUERMAN

1
2  That's why it doesn't show up on
3  Lexus Nexus because it doesn't get litigated.
4      Q.  But you do agree with me that the
5  issue you are talking about of materiality of
6  restatements does not appear in Lexus Nexus,
7  at least in your research; is that right?
8          MR. BRAUTIGAM:  Objection.
9      A.  I agree it does not appear, but the
10  reason it does not appear is because it's
11  stipulated.  Only things that are litigated
12  appear in Lexus Nexus.
13      Q.  Your understanding is the only
14  things that ever appear in Lexus Nexus are
15  things that get litigated?
16      A.  In judicial opinions.
17      Q.  Would that involve motions?
18      A.  Judges are called to decide disputes
19  among the litigants as to what are the
20  relevant facts, well actually that's the trier
21  of fact that does that mainly, but to decide
22  what's the relevant law.  If there were
23  something that was very often in dispute I
24  would expect to find it in Lexus Nexus.
25          Various attorneys have told me that

Page 116

FUERMAN

1
2  it's just very unusual, the posture the
3  defendants are taking in this case, with
4  regard to the issue of whether the originally
5  issued financial statements were materially
6  misstated when subsequently they were
7  restated.
8      Q.  Who has told you that, what
9  securities practitioners are you referring to
10  specifically?
11      A.  I've been most recently I was told
12  that by -- first of all, I don't know that I
13  should answer because perhaps I might be
14  betraying a confidence having been advised
15  this by.
16      Q.  Is this part of your opinion, that
17  securities practitioners tell you this ought
18  to be stipulated to?  It's in your opinion.
19      A.  It is.
20      Q.  If this is one of your opinions I
21  want to know what the basis of it is?
22      A.  I'll tell you the person who told me
23  this was an attorney at Berman DeValerio.
24      Q.  What's the name of the attorney?
25      A.  Michael Mitrea.

Page 117

FUERMAN

1
2      Q.  Is he a Plaintiffs' counsel?
3      A.  He is a Plaintiffs' counsel.
4      Q.  Did he give you the names of any
5  cases in which materiality was stipulated in
6  the context of a restatement?
7      A.  I didn't ask him for the names of
8  cases.
9      Q.  Anybody other than Mr. Mitrea tell
10  you that?
11      A.  I've heard this from other people.
12  I can't remember their names, but I remember
13  hearing this also from a person who has served
14  as an expert witness.
15      Q.  Which expert witness, I'm sorry?
16      A.  He is with the McGladrey and Poland
17  C.P.A. firm.
18      Q.  Where are they based?
19      A.  I think they may be headquartered in
20  Minnesota, but they are all over the country.
21  He's in the Boston area, and he told me that
22  this is highly unusual in his experience, and
23  he's been involved in many litigations for
24  defense to not go ahead and stipulate that
25  materially -- that the originally issued

30 (Pages 114 to 117)

Page 118

FUERMAN

1
2 financials were materially misstated and
3 subsequently they are restated.
4    Q.  Did he give you any examples of
5 cases, specific cases where this stipulation
6 supposedly occurred?
7    A.  No, he did not.
8    Q.  Anyone else that you can think of
9 other than those two individuals?
10    A.  At this point I cannot think of
11 another person.
12    Q.  You know what a "motion for summary
13 judgment" is?
14    A.  Yes.
15    Q.  You are aware that from time to time
16 motions for summary judgment, whether they are
17 granted or denied, are reported in Lexus
18 Nexus?
19    A.  Sometimes, yes.
20    Q.  Are you aware or did your research
21 reveal any summary judgment decision involving
22 the kind of stipulation regarding materiality
23 that you've testified to?
24    A.  I've never seen any discussion of
25 the matter being stipulated among counsel, but

Page 119

FUERMAN

1
2 I would add that I can't remember seeing any
3 other judicial opinion that had any other
4 matter stipulated among counsel discussed in
5 the decision.  I mean typically that's just
6 not something you would find in any judicial
7 opinion.
8    Q.  Stipulations do not appear?
9    A.  Stipulations among counsel.  I
10 cannot recall sitting here today of a
11 stipulation among counsel being discussed in
12 any judicial opinion.
13    Q.  You've never seen a judicial
14 opinion, for example, summary judgment saying
15 a certain fact is not contested or not
16 disputed between the parties or the parties
17 agree on a certain fact; is that your
18 testimony?
19    A.  Usually it's phrased like the
20 essential facts are not in dispute, they will
21 go and talk, but it's not made clear whether
22 the parties have stipulated to this or this is
23 the judge's belief, that these are the
24 relevant facts despite what the counsel have
25 said to each other.

Page 120

FUERMAN

1
2    I just cannot remember a single
3 judicial opinion that clearly said this, well,
4 at one point it may have been disputed between
5 the parties, but now they've stipulated as to
6 it.  I can't think of a single judicial
7 opinion like that, but I'm here as an
8 accounting expert.
9    Q.  I understand.  My question though
10 is, you did undertake a search in Lexus Nexus
11 for whether or not a restatement evolved into
12 a stipulation among the parties as to the
13 materiality of the misstated financials; is
14 that correct?
15    A.  I did a search in Lexus Nexus to see
16 if there were other cases like this cited case
17 in Nebraska, whether it was a complete
18 anomaly.  From my research it appeared to be a
19 complete anomaly.
20    Q.  That's one decided case that does
21 deal with this issue, right?
22    A.  I believe it's in the Eighth
23 Circuit.
24    Q.  It goes the other way from what your
25 testimony is; is that correct?

Page 121

FUERMAN

1
2    A.  No.  I believe, again, that I don't
3 know it's even proper for me to opine on this,
4 but if I recall the judge may have been
5 chastising -- the context was the judge may
6 have been chastising plaintiffs for saying
7 that these financials are per se misstated
8 because there is a restatement.  She or he, I
9 can't remember if it was a male or female
10 judge, said something along the lines of I'm
11 the judge and I'll decide what the facts are
12 here.
13    I believe that that case, though it
14 was cited by defendants, really is not
15 terribly meaningful in this case.
16    Q.  But, of course, you are not opining
17 as a lawyer are you?
18    A.  But you've been asking my opinion on
19 this repeatedly.
20    Q.  I understand and I think some of
21 that does filter into your report, which is
22 how we sort of got to where we are?
23    A.  Some of what filters in my report.
24    Q.  We deal specifically with that.
25 Let's get back to the data upon which you

31 (Pages 118 to 121)

Page 122

FUERMAN

1    FUERMAN
2    reviewed, which is where I think we took this
3    sort of detour.  Other than the materials you
4    gave me that you looked at independently and
5    the accounting literature, this does indicate
6    on Plaintiffs' 2, of Exhibit 115, this does
7    generally indicate the materials that
8    Mr. Brautigam sent you to review?
9        A.   That is correct.
10       Q.   Following his discussions with you?
11       A.   Correct.
12       Q.   You never reviewed the depositions
13   of any of the class plaintiffs in this case,
14   correct?
15       A.   That is correct.
16       Q.   Is there a reason why you decided
17   that was not relevant?
18       A.   I didn't know that such depositions
19   were taken.
20       Q.   And Mr. Brautigam didn't mention
21   that to you?
22       A.   No, he did not.  I don't know that
23   that would be something that I would want to
24   study though.  I'd have to think about whether
25   that's important.  My initial reaction is I

Page 123

FUERMAN

1    FUERMAN
2    don't think it would have been important.
3        Q.   If two of the class plaintiffs
4    testified they never looked at any of the
5    financial information in the proxy statement,
6    would that be relevant to you?
7        A.   Are you asking my opinion of
8    interpreting the securities laws or as an
9    accounting expert?  Because it's well know the
10   fraud on the market theory says it's not
11   terribly important whether they looked at
12   those.
13       Q.   Do you believe the fraud of the
14   market theory is still viable in this case, do
15   you know?
16       A.   I'm gasping for breath at being
17   asked legal questions.  I don't --
18       Q.   My question is a real simple one.
19   You just talked about fraud in the market.  My
20   question is, do you know whether given the
21   current state of this case whether that's a
22   viable theory in this case, as things now
23   stand?
24       A.   I have not investigated that issue
25   at all.  I have been engaged to investigate,

Page 124

FUERMAN

1    FUERMAN
2    read everything I can get my hands on and form
3    an opinion on materiality or restatement or
4    nexus between the two.
5        Q.   What is your understanding of the
6    current status of the Thiemann litigation on
7    which you are providing this testimony if you
8    have one?
9        MR. BRAUTIGAM:  Objection.
10       A.   I'm confused by your question.
11       Q.   Is it a class action or not?
12       MR. BRAUTIGAM:  Objection.
13       A.   I believe it's a class action, but
14   maybe it's a direct action.  I have not even
15   paid attention to that to be honest.
16       Q.   Have you ever seen an order from
17   Judge Beckwith decertifying the class?
18       A.   Again, I have not focused on that
19   procedural aspect of the case.  Although those
20   are important questions it's not stuff that I
21   have focused my attention on.
22       Q.   So at least as you sit here today
23   you don't know if this is a class action or
24   not a class action?
25       MR. BRAUTIGAM:  Objection to the

Page 125

FUERMAN

1    FUERMAN
2    form.  I think you mean whether or not
3    it's certified as a class action at this
4    point in time.
5        MR. BURKE:  I'll stand corrected
6    with that.
7        A.   That's a good question.  I don't
8    know.  I assume, again, I only have so many
9    hours in the day.
10       I have not investigated this, but I
11   assume that the plaintiffs must have withstood
12   the motion to dismiss or we wouldn't be going
13   through depositions.  But maybe I'm incorrect
14   on that.  I don't know.
15       Q.   Did you ever see the original, the
16   decision on the original complaint, granting
17   in part and denying in part the motion to
18   dismiss that Judge Beckwith originally filed
19   in this case?
20       A.   I may have.  The only opinion that I
21   really remember fairly well is one, and I
22   can't remember if it was by Judge Beckwith or
23   Judge Spiegel, that discussed how the case had
24   been going for the last two years and a
25   decision to consolidate together a few cases,

32 (Pages 122 to 125)

Page 126

FUERMAN

1    it might have been by Judge Beckwith, because
2    of judicial efficiency. This was to bring
3    myself up to speed on what happened, but I
4    don't know the answer to your question.
5        Q. You talk about some PFGI minutes
6    among the documents that you looked at.
7        A. That's correct.
8        Q. That's on page 2 of your report.
9    Did you ever read any OHSL board minutes?
10       A. I think I did. I think I did, but I
11   didn't spend a lot of time on them. I know
12   that those are very important to -- let me
13   back up and explain myself.
14       My understanding of the general
15   theme of this case, you asked me maybe ten
16   minutes ago my understanding, is it began as
17   an allegation of breach of fiduciary duty,
18   with regard to the merger of OHSL into to
19   Provident. But later it evolved into also
20   having an accounting aspect to it, that's
21   where I got brought in.
22       I have minimally familiarized myself
23   with anything other than the accounting
24   aspect, because first of all, that's not my

Page 127

FUERMAN

1    expertise.
2        Q. To be honest with you, Dr. Fuerman,
3    Professor Fuerman, I'm not trying to do
4    anything today other than make sure I
5    understand where your area of expertise lies,
6    what your focus was and what you are going to
7    testify to, okay. To a certain extent I'm
8    trying to narrow the field and make sure I am
9    understand where you are going.
10       MR. BRAUTIGAM: Objection to the
11       speech.
12       MR. BURKE: That's fine.
13       Q. That's not a question.
14       A. I know that these are serious issues
15   and important issues, and I have maybe a
16   threshold knowledge and understanding of these
17   issues, but I don't hold myself out as an
18   expert in those breach of fiduciary duty
19   issues.
20       Q. You are aware that the accounting
21   issues of which you have opined relate to a
22   restatement analysis by Provident in March,
23   April of 2003, correct?
24       A. Correct.

Page 128

FUERMAN

1        Q. Are you aware that other than in
2    action other lawsuits have been filed in
3    connection with that restatement?
4        A. Yes, I am.
5        Q. Are you aware of the current status
6    of those actions?
7        A. I believe -- I have a thousand cases
8    in my database and Provident is one of them.
9    I think I probably have noticed a little bit
10   about it. I know Judge Spiegel issued a
11   judicial opinion.
12       I can't recall whether he dismissed
13   completely or dismissed in part claims of the
14   plaintiffs, and I don't know whether those are
15   being appealed. Again, my reading of the
16   various other documents is to learn everything
17   I can that will better my understanding of the
18   accounting matters.
19       Q. You are aware that Judge Spiegel
20   dismissed in one form or another the
21   allegations arising from the restatement
22   itself, are you not?
23       MR. BRAUTIGAM: Objection to the
24       form.

Page 129

FUERMAN

1        A. Again, I'm not aware of that.
2        Q. You don't recall reviewing that
3    opinion?
4        A. I'm pretty sure I remember reading
5    that opinion, but I can't remember whether he
6    dismissed in whole or in part exactly what
7    claims he dismissed.
8        Q. One of the documents you looked at,
9    item B on page 2, is the consolidated amended
10   class action complaint; am I correct?
11       A. That's right.
12       Q. Did you ever review any of the
13   motions to dismiss that were filed by the
14   defendants in response to that?
15       A. No, I did not.
16       Q. Is there a reason why you never
17   thought it appropriate to look at the defense
18   version of this case?
19       MR. BRAUTIGAM: Objection.
20       A. I felt that I got a sufficient
21   understanding of the defenses position by
22   reading the transcripts of the defendants, and
23   in conjunction with your objections you made
24   at these depositions at key points. I felt

33 (Pages 126 to 129)

Page 130

FUERMAN

1    FUERMAN
2    that, plus the expert reports of Dr. Prowse
3    and, if we call it an expert report of
4    Dr. Tuzin, that was what I needed to know.
5    There are 400 docket entries for this case,
6    that's a lot of stuff to go through. My
7    feeling was if I attempted to plow through too
8    much of this I would not get a good grasp of
9    the issues tightly related to materiality and
10   restatements.
11      Q.  But at least as you sit here today
12   you have no understanding of the legal
13   theories and the legal defenses asserted by
14   the defendants with respect to the
15   consolidated amended class action complaint?
16      MR. BRAUTIGAM:  Objection.
17      A.  I have a limited understanding that
18   the defense contends that it did not breach
19   its fiduciary duties, either the Oak Hill
20   board did not, that the Provident board did
21   not.  I mean it all comes out pretty clearly
22   in the deposition transcripts and in the
23   expert reports by Dr. Prowse and Dr. Tuzin.
24      Now, maybe there's some expert
25   reports on the fiduciary duties or something

Page 131

1    FUERMAN
2    that I have not looked at but, again, there's
3    a lot of stuff to agree with.
4      Q.  That I agree with.  You refer to a
5    number of deposition transcripts on this page.
6    Did you read those transcripts in full or just
7    excerpts?
8      A.  The whole thing.
9      Q.  Of all of them?
10      A.  Let me make sure.  I skimmed the
11   ones that are prior to the restatement, but I
12   read very carefully the ones after the
13   restatement.  For example, I skimmed the depo
14   of Joe Stager, January 16, 2002, but read very
15   carefully the May 7, 2004 deposition of
16   Joe Stager.
17      Q.  As you sit here today have you
18   prepared any demonstrative charts or diagrams
19   to demonstrate your opinion, other than the
20   ones attached to your report?
21      A.  I have not, but I specifically
22   reserved right to do so in my expert report.
23      Q.  Other than the background documents
24   we've talked about earlier today that you
25   brought with you, do you have any other

Page 132

1    FUERMAN
2    computer data, notes, analysis?
3      A.  No, no, I do not.
4      Q.  Did you ever conduct any research
5    into OHSL, its demographics, operations,
6    history, anything like that?
7      MR. BRAUTIGAM:  Objection.
8      Q.  OHSL is OHSL Financial Corporation,
9    one of the defendants.
10      A.  Minimal amount of research.  A
11   couple of press releases I found on Lexus.
12   I'm trying to remember if they even had a 10K
13   on Lexus.
14      It was not a real big company.  I'm
15   not sure if they had a 10K on Lexus.  It was a
16   fairly small amount of research.
17      Q.  Do you consider yourself an expert
18   on OHSL or what it was facing in either the
19   securities markets or the savings and loan
20   markets in Ohio in 1999?
21      MR. BRAUTIGAM:  Objection.
22      A.  I do not consider myself an expert
23   on that topic.  Other than just anyone who
24   reads the general financial press knows that
25   there has been a general consolidation in the

Page 133

1    FUERMAN
2    financial services industry; little banks
3    being merged into big banks over the past
4    generation.
5      MR. BURKE:  Let's go off the record
6    for a second.
7      (Discussion off the record.)
8      Q.  Professor Fuerman, other than the
9    APB 20 and the other specific materials you
10   cite in your report, were there any treatises,
11   generally accepted publications in your field
12   of expertise that were relevant to the work
13   you performed?
14      A.  Yes.
15      Q.  What were they?
16      A.  To refresh my memory I need to look
17   at the time sheet.  At the beginning of my
18   involvement in this case --
19      MR. BURKE:  Let's go off the record
20   for one second.
21      (Fuerman Exhibit 5, document, marked
22   for identification, as of this date.)
23      Q.  Take a look at Fuerman Exhibit 5 and
24   if you would identify that for the record,
25   Dr. Fuerman.

34 (Pages 130 to 133)

Page 134

FUERMAN

1
2      A.  Okay.  This is a time sheet of my
3   time spent working on this case and billings
4   to Mesh and Associates.  I wanted to look at
5   this to see some of the things that I read.
6   There are two treatises, one the Miller GAAP
7   guide and the other the Wiley, W-I-L-E-Y, GAAP
8   guide, G-A-A-P.  I consolidated them to get a
9   better understanding of APB No. 20.
10      These treatises are important
11   because they will indicate whether an APB that
12   was issued is still in its original form,
13   good, a good accounting standard or whether
14   it's been modified in subsequent years.  The
15   bottom line is I determined that it's really
16   not been modified in any meaningful way that
17   has an impact on this case.
18      Q.  When you began your work on this
19   case, was it necessary -- I'm sorry.
20      A.  I'm sorry.  In doing this case there
21   is a specific way that accounting research is
22   performed, and I felt myself to be bound by
23   that.  First you look to see if there are any
24   FASB statements and interpretations.  There
25   were none that were on point.

Page 135

FUERMAN

1
2      Q.  Let me stop you.  We're going to get
3   into what's in your report.  My question right
4   now goes to treatises.
5      A.  Journal articles?
6      Q.  Journal articles or publications not
7   reflected in your report.
8      A.  Oh, not reflected in the report.
9      Q.  Yes, that were important.
10      A.  Probably what I've just related to
11   you on the time sheet is it, I think.
12      Q.  So at the start of your work on this
13   case you looked at a couple of GAAP guides to
14   discuss APB points?
15      A.  I'm sorry, I'm stepping on your
16   question.  I may have even asked a couple
17   other faculty what their understanding was.
18      Q.  I take it at the time you began your
19   work on this case you had not worked with APB
20   20 recently?
21      A.  Not as an expert witness, but I've
22   worked on it continuously since I began my
23   dissertation back in 1994.  APB No. 20, since
24   I was the first researcher who had to
25   interpret APB No. 20, how to implement it in

Page 136

FUERMAN

1
2   research, empirical research, I had to make a
3   lot of -- I had to develop the initial
4   conclusions about what is a restatement and
5   what is not for purposes of the academic
6   research, which is pretty much the same as the
7   understanding of what people in the financial
8   press say when they say what's a restatement.
9      Technically a restatement can cover
10   more situations than what the financial press
11   discusses.  I had to work that out in my
12   research.  I had to carefully determine that.
13      Q.  Notwithstanding I think what you
14   said is your continuing focus on APB 20 in
15   your career, you had to go back and check to
16   see whether it was even still authoritative
17   when you began your work; is that right?
18      MR. BRAUTIGAM:  Objection.
19      A.  Well, yes.  I mean, it is one of the
20   older accounting standards from 1970.  One of
21   the accounting bodies, I can't remember if
22   it's the Emerging Issues Tasks Force or
23   another one is holding discussions and have
24   circulated exposure drafts considering
25   revising it and replacing it with a new

Page 137

FUERMAN

1
2   standard.
3      Q.  Has any such revised standard been
4   adopted?
5      A.  No.
6      Q.  Other than the two sources you just
7   identified, is there anything else in terms of
8   treatises, journals, publications in your
9   field of expertise that were relevant to your
10   report other than what's already cited in your
11   report, which we'll get to?
12      A.  I don't think so, but just in the
13   last two minutes I've come up with two or
14   three things that I had not thought of.  For
15   example, the consideration of the possible
16   revision of APB No. 20 at some time in the
17   future, the Miller GAAP guide, the Wiley GAAP
18   guide.
19      Q.  That's fine.
20      A.  Maybe this afternoon I'll think of
21   additional things.
22      Q.  If you do that's fine.  Feel free to
23   supplement.
24      MR. BURKE:  Let's break now for
25   lunch and see you at one o'clock.

35 (Pages 134 to 137)

Page 138

FUERMAN

1    FUERMAN
2    A F T E R N O O N   S E S S I O N
3    (Time noted: 1:17 p.m.)
4    R O S S   F U E R M A N, resumed and testified
5    as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. BURKE:
8    Q.  Professor Fuerman, what I'd like to
9    do is take a look at Plaintiffs' Exhibit 115.
10   We've talked about that at various times
11   already today.  I'd like to go through that a
12   little bit, if I could and ask you some
13   questions about that.
14   A.  Please do.
15   MR. BURKE:  Off the record.
16   (Discussion off the record.)
17   Q.  Page 1 of your report, paragraph
18   two.
19   A.  Yes.
20   Q.  You say -- that sentence reads "As
21   an expert on financial reporting related to
22   securities fraud litigation, especially
23   restatements."  Do you see that language?
24   A.  Yes.
25   Q.  I'm correct, am I not, that you do

Page 139

FUERMAN

1    FUERMAN
2    not hold yourself out as an expert on
3    securities fraud litigation; is that correct?
4    A.   I do not hold myself out as an
5    expert on how to litigate these cases, but I
6    hold myself out as an expert in researching
7    these cases.
8    Q.  But in terms of how these cases are
9    handled, strategic decisions, legal issues as
10   it relates to litigation, you were not an
11   expert on that; is that right?
12   MR. BRAUTIGAM:  Objection.
13   A.  On the individual case I am not an
14   expert, but the nature of my research is to
15   look at very large numbers, hundreds of cases
16   in the aggregate and then draw inferences as
17   to the legal strategies of the parties, that's
18   one of the things that I discussed about in my
19   papers.
20   Q.  Maybe I just want to make sure we
21   nail this down.
22   A.  Certainly.
23   Q.  You've never tried a case on your
24   own of any kind?
25   A.  That's correct.

Page 140

FUERMAN

1    FUERMAN
2    Q.  You've never taken a deposition of
3    any kind, as a direct questioner?
4    A.  That is correct.
5    MR. BRAUTIGAM:  Objection, asked and
6    answered.
7    Q.  And you've never litigated a
8    securities fraud case?
9    MR. BRAUTIGAM:  Same objection.
10   Q.  As Plaintiffs' or defense counsel?
11   MR. BRAUTIGAM:  Objection.
12   A.  I've participated in the work to
13   litigate a securities fraud case.  I've never
14   been in charge of it, never had the number one
15   responsibility for such a case.
16   Q.  Maybe I'm misunderstanding.  I'm
17   trying to doubleback to a point you made
18   earlier when we were talking about fraud on
19   the market.  I thought, I may be wrong,
20   correct me if I am, you said I'm not an expert
21   in securities litigation?
22   A.  Let me phrase it this way.  There
23   are two meanings to the term "expert in
24   securities fraud litigation."  One is do I
25   consider myself competent to lead the defense

Page 141

FUERMAN

1    FUERMAN
2    or lead the Plaintiffs' side in such a
3    lawsuit, no, no way.  I would never take on
4    such responsibility.
5    Do I feel myself an expert in
6    writing about these cases in the aggregate, I
7    write about these cases in the aggregate, as
8    do other people who I cite here, and I feel
9    that I am an expert in that sense.
10   Q.  Because you read about cases and
11   write about them?
12   MR. BRAUTIGAM:  Objection.
13   A.  And because I read about them and I
14   write about them and I dig up data and run
15   statistical analysis on them, that's why I
16   feel myself to be an expert on, yes.
17   Q.  I also want to confirm one other
18   thing we talked about earlier.  You mentioned
19   two individuals who you spoke to, who told you
20   that in restatement cases the parties usually
21   stipulate to materiality?
22   A.  That is correct.
23   Q.  I take it that you never
24   independently confirmed, substantiated or
25   verified that statement as it relates to

36 (Pages 138 to 141)

Page 142

FUERMAN

1  specific cases?
2  MR. BRAUTIGAM: Objection.
3
4  A.  As to specific cases, no. I did not
5  ask them about specific cases. I asked them
6  or they may have even volunteered in passing
7  that the posture of defense in this case is
8  unusual from their experience.
9  Q.  But in terms of whether -- they
10  related that to you, but you have no
11  first-hand knowledge or experience one way or
12  the other with respect to that; is that
13  correct?
14  MR. BRAUTIGAM: Objection.
15  A.  I disagree with that. The opinions
16  of these two people, and there may have been
17  others that I can't remember at this point, is
18  not what made up my mind. It simply confirmed
19  what I already had come to believe from
20  reading APB No. 20, that the position of the
21  defendants with regard to materiality of the
22  financial that were subsequently restated is
23  unusual and certainly unsupported by
24  APB No. 20.
25  Q.  We're not talking about APB No. 20.

Page 143

FUERMAN

1
2  A.  But that is what I based my opinions
3  on. The discussions I had with a couple
4  individuals is simply chitchat, icing on the
5  cake.
6  Q.  Okay.
7  A.  I base my -- I never mention them in
8  the report. I base my report on publicly
9  available accounting and auditing standards,
10  journal articles, this kind of thing.
11  Q.  My point though is you never
12  verified, substantiated or confirmed the
13  validity or invalidity of that chitchat,
14  correct?
15  MR. BRAUTIGAM: Objection.
16  A.  No. But, also, I have been working
17  on researching since 1994. Hundreds, no let
18  me correct myself, thousands of securities
19  litigations, not all of them alleging fraud.
20  Some, yes, some no. Actually not all of them
21  private securities class action.
22  Some of them SEC enforcement actions
23  or justice department prosecutions. I would
24  think that since I have been working
25  diligently, especially in the restatements

Page 144

FUERMAN

1
2  area, that if it were the case that defendants
3  actually were protesting that the originally
4  issued financials were not materially
5  misstated I would have seen that. Because
6  I've seen many, many cases and talked with
7  hundreds of attorneys, both plaintiffs and
8  defense.
9  There's solid agreement among them,
10  the general notion that if you are a defense
11  counselor and you are defending a C.P.A. firm,
12  oh, my God the financials got restated. That
13  opens the door to greater legal liability for
14  the C.P.A. firm.
15  Q.  Okay.
16  A.  This is the nature of the research.
17  Q.  In all those cases, in all that
18  experience you just described, can you cite me
19  to one instance, one specific instance where
20  the parties stipulated to materiality? That's
21  my question.
22  MR. BRAUTIGAM: Objection.
23  Q.  Any instance, yes or no?
24  A.  I cannot do that. I would have to
25  go and look at my research database. If you

Page 145

FUERMAN

1
2  wish, I'm sure I can dig up a case or two.
3  Q.  As you sit here today you can't give
4  me any example of that; is that right?
5  MR. BRAUTIGAM: Objection.
6  A.  That's what I said.
7  MR. BRAUTIGAM: Jim, do we have
8  Jason on the phone or not?
9  MR. BURKE: Jason, are you on the
10  phone? Maybe not. Jason? He may be
11  here, he may not be here.
12  Q.  Okay. Back to page 1 of your
13  report, paragraph 4. You indicate you are
14  being compensated at the rate of $150 per
15  hour; that's still correct?
16  A.  That is correct for my research and
17  writing, but not for my deposition.
18  Q.  What is your rate for your
19  deposition?
20  A.  $300 per hour.
21  Q.  That is also your rate if you
22  testify at trial?
23  A.  Yes.
24  Q.  Paragraph five of your report, the
25  third sentence states, "I was asked to give an

FUERMAN

1
2  opinion as an expert in financial accounting
3  on the materiality of these misstatements to
4  persons who may have replied on the PFGI
5  financial statements." Do you see that?
6      A.  Yes.
7      Q.  Define for me, if you would, the
8  basis for who you define as persons who may
9  have relied on the PFGI financial statements?
10      MR. BRAUTIGAM:  Objection to the
11  form.
12      Q.  I'm trying to understand the meaning
13  of that phrase.
14      A.  The meaning of the phrase is
15  starting from the notion of whenever a company
16  issues financial statements, under financial
17  accounting not managerial accounting, under
18  financial accounting the whole reason is that
19  so people outside the company can read them
20  and rely on them to know what's going on
21  financially within the company.
22          That's what I meant.  I did not mean
23  to infer anything about specific reliance TO
24  specific people or fraud on the market or this
25  or that.  That's going beyond what was going

FUERMAN

1
2  through my head.
3      Q.  Okay.  That's my question.  I
4  appreciate the clarification.  So in terms of
5  individual's specific reliance on any of the
6  financial statements, that's not something
7  that you directly addressed in your opinion;
8  is that correct, am I understanding you
9  correctly?
10      A.  Let's say we were all shareholders,
11  whether this shareholder is relying, but this
12  one is not?
13      Q.  Yes, sir.
14      A.  No.  I mean it's just the general
15  concept that I'm talking about in paragraph
16  five, the general concept when financial
17  statements are issued the whole purpose is so
18  that people outside the company can read them,
19  use them, rely on them.  That's the concept.
20      Q.  Obviously the level of financial
21  sophistication varies widely between
22  individuals who may be shareholders in a
23  corporation, correct?
24      MR. BRAUTIGAM:  Objection.
25      Q.  Is that generally true?

FUERMAN

1
2      A.  The level of sophistication among
3  the different users of the financial
4  statements may vary?
5      Q.  Yes, sir.
6      A.  That's the basic axiom of the
7  financial accounting literature, is to try to
8  develop financial statements that meet the
9  needs of the diverse group of users of the
10  financial statements.
11      Q.  Okay.  Take a look at page 3 of your
12  report, if you would.  Paragraph eight states,
13  "Users of a corporation's financial reporting
14  attach greater credibility to a corporation's
15  audited annual financial statements because an
16  audit is the highest form of assurance that a
17  C.P.A. firm can provide that the corporation's
18  annual statements are correct."  Do you see
19  that?
20      A.  Yes, materially correct.
21      Q.  It doesn't say that, does it?
22      A.  Well, then I meant materially
23  correct.  Maybe I decided it was like the
24  Department of Redundancy department to use the
25  word "materially" in three sentences in a row.

FUERMAN

1
2      Q.  But your statement here states that
3  "An audit is the highest form of assurance
4  that a C.P.A. firm can provide that a
5  corporation's financial statements are
6  correct."  We admit that's not the standard,
7  do we not?
8      A.  Obviously very clearly it's GAAP
9  that they be materially correct.
10      Q.  So the word "materially" was left
11  out of that sentence?
12      A.  The word "materially" was
13  inadvertently left out of that sentence.
14      Q.  Is "materially correct" the
15  phraseology that is ordinarily used in audit
16  opinions?
17      A.  No, I'd have to review my auditing
18  textbook.  I think it's more along the lines
19  of the auditor gives an opinion, something
20  along the lines of, in our opinion our audits
21  provide reasonable assurance that the
22  financials are materially fairly stated or
23  something like that.  I'd have to go and
24  review my auditing textbook, but the word
25  "materially" is definitely in there, almost

38 (Pages 146 to 149)

FUERMAN

1  positive.
2
3      Q.   As you sit here today you don't even
4  recall what the exact terminology that's used
5  in audit opinions, as it relates to what the
6  opinion is on financial statements; is that
7  correct?
8      MR. BRAUTIGAM:  Objection.
9      A.   I used to have that memorized.  I
10  had to memorize that before I took and passed
11  the Ohio C.P.A. exam.  What is more important
12  I think is that I understand the general
13  concept, which is that the financials need to
14  be materially correct or materially stated,
15  fairly stated, and that I do.
16      Q.   The final sentence, pardon me, the
17  final two sentences of that paragraph eight,
18  the first one states, "It is a violation of
19  auditing standards to issue an unqualified
20  audited opinion if the financial statements
21  are materially misstated."
22      A.   Yes, I wrote that.
23      Q.   What is the basis for that, what's
24  your support for that?
25      A.   Volumes and volumes of auditing

FUERMAN

1
2  standards.  They all are based on that
3  assumption.  It's probably stated in several
4  of the standards.  Probably SAS number 58 if I
5  recall.
6      Q.   The first sentence we talked about
7  in paragraph eight, page 3 of Plaintiffs'
8  Exhibit 115, what's the basis for the support
9  for that statement, that "Users attach greater
10  credibility to annual financial statements"?
11  What's the empirical support for that?
12      MR. BRAUTIGAM: Objection.
13      A.   Again, it's an axiom of the
14  accounting and auditing literature that this
15  is true.  There probably are research papers
16  that have been focused on that topic.  None of
17  them come to mind.
18          You are asking questions about
19  things that are such fundamental axioms that
20  most researchers don't bother researching.
21  Because it's part of -- it would be like
22  asking in a course in Jewish law, you know,
23  what are the Ten Commandments.  Everybody
24  knows what they are.
25      Q.   I can give you a cite for that if

FUERMAN

1
2  you are looking for it.
3      A.   There are more complex things that
4  accountants and auditors argue about.  This is
5  just not one of them.
6      Q.   My question though is, have you ever
7  done any research or conducted any kind of a
8  study or an analysis that substantiates this
9  statement?
10      A.   Actually now that I think about it,
11  I have in this sense.  In my resume I cite an
12  article.  It's Exhibit A to this Plaintiffs'
13  Exhibit 115.  If you go to the second page,
14  the third article, the role of auditor
15  culpability.
16      Q.   This is the third page?
17      A.   No, excuse me.  The second page of
18  my resume, the third article listed from the
19  top.  The third is role of auditor
20  culpability.
21      Q.   Okay.
22      A.   In that article I showed evidence --
23      Q.   Hang on for one second.  I'm looking
24  at Plaintiffs' Exhibit 115, August 8, 2004.
25  Page 1 of Exhibit A ends up down at the bottom

FUERMAN

1
2  with HTTP?
3      MR. BRAUTIGAM:  Second page of
4      Exhibit A.
5      MR. BURKE:  I understand.
6      Q.   You are saying number three?
7      A.   Right.
8      Q.   The thing I'm looking at, it says
9  the effective reform act and central bank on
10  naming auditor defendants.
11      MR. BRAUTIGAM:  No, that's the
12  fourth one.
13      A.   It could be we are both right.  The
14  resume may have changed from one date to the
15  next.  Maybe I got an additional article
16  published.
17      MR. BURKE:  I think this is the one
18  you marked.
19      Q.   Is your's correct, the one you are
20  looking at correct?
21      A.   I think so.  I'm publishing new
22  articles all the time.  The most recent
23  publications are not reflected here.
24      Q.   Okay.
25      A.   Anyway, in the article that starts

FUERMAN

1  
2  off "The role of auditor culpability in naming
3  auditor defendants," in there I show that the
4  litigants, specifically the plaintiffs in
5  private securities class actions, regard the
6  restatement of audited -- previously issued
7  audited financial statements completely
8  differently than the restatement of previously
9  issued unaudited quarterly financial
10  statements in regard to naming the auditor
11  defendant.
12      There's a very strong relationship
13  naming the auditor defendant if it's audited
14  annual financial statements. There's no
15  relationship at all if it's just quarterlies.
16  This is kind of intuitive, but I was the first
17  one to show this among academic researchers.
18      Q.  You believe that substantiates your
19  statement here that corporation's financial
20  reporting creates greater credibility to an
21  audited annual statement than other
22  statements; is that correct?
23      A.  That's one. Another is there have
24  been a bunch of -- as we talk here other
25  papers come to mind. In the wake of the

FUERMAN

1  
2  Arthur Anderson meltdown a number of
3  researchers did studies that showed that in
4  the aggregate companies that were audited by
5  Arthur Anderson took a beating in the stock
6  market, compared to companies that were
7  audited by other members of the big four.
8      Because in the aggregate in
9  investors felt that the audit of Anderson
10  could not be trusted to enhance the
11  credibility of those companies financial
12  statements and those companies stocks, in turn
13  compared to PricewaterhouseCoopers, KPMG,
14  Ernst and Young, Deloitte and Tush.
15      Q.  That deals with one auditing firm
16  versus another?
17      A.  One auditing firm whose
18  representation for being a high quality
19  auditor had been impugned, the other firm
20  their reputation had not been impugned. That
21  shows that it matters to the investment
22  community the audit that's performed. It's
23  not just parts is parts.
24      It matters a lot. By extension,
25  audited annual financial statements are more

FUERMAN

1  
2  to be trusted than unaudited quarterly
3  financial statements.
4      Q.  Can you point me, other than what
5  you've told me about already, if this is so
6  axiomatic, to any accounting literature,
7  publication, article, treatises or anything
8  that says that?
9      A.  I can think of another one.
10      Q.  Can you think of any authoritative
11  treatises, standard, bulletin or anything else
12  that says that?
13      A.  In the words you use, no. But the
14  concepts you are expressing are support for
15  that notion that audited annual financials are
16  more important to users of financial
17  statements or more believable or more
18  credible.
19      That's about as -- there are many
20  articles that touch on that. The auditing
21  textbook I use I'm almost positive, by
22  William Messier, says that. The whole purpose
23  of audits is to enhance the credibility of
24  financial statements.
25      Q.  The last sentence in paragraph eight

FUERMAN

1  
2  states that conversely an auditor who issues
3  an unqualified audit opinion when the
4  financial statements are immaterially
5  misstated is in full compliance with auditing
6  standards?
7      A.  That is correct.
8      Q.  What is immaterially misstated mean?
9      A.  It would be a misstatement that is
10  not regarded as material. The auditor is only
11  responsible for providing reasonable assurance
12  that financials are materially correct.
13  That's all. To do more would be an
14  unreasonable expectation to make of the
15  auditor.
16      Q.  Is it your testimony that an auditor
17  who issues an opinion when he knows the
18  financial statements are misstated is in full
19  compliance with auditing standards?
20      A.  If he knows or she knows they are
21  immaterially misstated he or she is in full
22  compliance, however, I must clarify that. How
23  this comes up in auditing is frequently
24  auditors when they are auditing the books of a
25  company, they find adjustments that

40 (Pages 154 to 157)

Page 158

FUERMAN

1    potentially ought to be made to the accounts
2    that underline the financial statements of the
3    company, and the question is, should it
4    require them to be made.
5        The auditing standards say no, not
6    unless they are material. The reason for this
7    is because, one, the auditor should not
8    attempt to go beyond assuring materially
9    correct financial statements. And the other
10   is the process of auditing is a spot check.
11       The auditor, much of the work of the
12   auditor is gathering relatively small samples
13   of very large numbers of transactions and
14   using inferential statistics to decide whether
15   those accounts, those line items are correct
16   or incorrect.
17       It can quite conceivably occur that
18   the auditor concludes from inferential
19   statistics that they are misstated and be
20   wrong, because I'm not sure -- am I speaking
21   too abstractly? Inferential statistics, what
22   that is, is when you don't look at the entire
23   population, but you take a small sample and
24   you estimate from that what the entire

*(lines renumbered)*

Page 159

FUERMAN

1    population looks like.
2        Gallop does that when it does polls
3    to see how it predicts how people will vote in
4    an election. The auditor does the same thing
5    during an audit. That's the other reason why
6    unless it really looks like the companies line
7    item is materially misstated the auditor
8    should not insist that an adjustment be made.
9        Q. You have never personally been
10   involved in that process that you just
11   described, because you never participated in
12   actual auditing of financial statements,
13   correct?
14       MR. BRAUTIGAM: Objection.
15       A. It is corrective, I've not
16   participated in an audit. I've participated
17   in teaching auditing students for the last ten
18   years though.
19       Q. But this whole analysis you just
20   talked about of testing and inferential
21   statistics and deciding whether the testing
22   indicates something or doesn't indicate,
23   you've never done that yourself, have you?
24       MR. BRAUTIGAM: Objection.

Page 160

FUERMAN

1        A. I've taught that to many students.
2        Q. That's not my question. You've
3    never done it?
4        MR. BRAUTIGAM: Objection.
5        A. I've never performed a financial
6    statement audit, that is correct.
7        Q. Paragraph nine. I think we were
8    talking in general about the proxy statement
9    prospectus, dated September 27, 1999; is that
10   correct?
11       MR. BRAUTIGAM: Actually I think
12       it's dated September 24th.
13       A. Where are we right now?
14       Q. Second line of paragraph 7 of your
15   report there. You refer to the proxy
16   statement prospectus filed September 27, 1999?
17       A. Yes.
18       Q. Is that correct or is Mr. Brautigam
19   right that it's September 24th?
20       A. I could be wrong on that. Sometimes
21   it's confusing. When you look at Lexus Nexus
22   sometimes the date you think is the date you
23   are looking at, the document date sometimes is
24   the date filed with the SEC.

Page 161

FUERMAN

1        Q. So Mr. Brautigam shouldn't of
2    interrupted and corrected me; is that right?
3    I'm being facetious. In any event, here in
4    these paragraphs we're talking about the proxy
5    statement for the OHSL Provident merger, are
6    we not?
7        A. Yes.
8        Q. Paragraph nine states that "Thus
9    with regard to financial reporting, the
10   audited annual financial statements for the
11   year December 1, 1998 (10K) were the most
12   important financial statements for OHSL
13   shareholders in evaluating the financial
14   condition of prospects of PFGI, as they were
15   the most recently audited financial statements
16   available prior to their having to make a
17   decision on the merger."
18       A. Yes, I wrote that.
19       Q. I think you indicated earlier you
20   did not undertake any analysis of specific
21   demographics of the OHSL shareholders, what
22   individual shareholders found most important,
23   least important or anything like that,
24   correct?

41 (Pages 158 to 161)

FUERMAN

1
2    A.  No, I did not call them up on the
3    phone and ask them what they felt was most
4    interesting or important.
5    Q.  So what's the basis for your
6    statement as to what the OHSL shareholders
7    found important, as you stated in this
8    paragraph?
9    A.  That the basis for my statements in
10   the general axiom of the accounting and
11   auditing literature, that audited annual
12   financial statements are more important than
13   quarterly unaudited financial statements.
14   Interestingly, there was a proposal at one
15   point many years ago that the SEC ought to
16   require all financial statements to be
17   audited.
18          There was the recognition that then
19   they would all be equally credible and
20   trustworthy, but it was decided on cost
21   benefit analysis basis not to require that.
22   So because of that only the annual financial
23   statements are audited.  Logically the annual
24   audited financial statements that are
25   available to people, blessed ones, that are

FUERMAN

1
2    available to people are the most important.
3    Q.  As to what any individual group,
4    subset of OHSL shareholders did or did not
5    find important, did or did not rely upon, you
6    don't know that specifically, do you?
7    MR. BRAUTIGAM:  Objection.
8    A.  I do not know that specifically.
9    Q.  You are relying on the axiom you
10   just described?
11   A.  I'm relying on the axiom that
12   shareholders of any company are going to
13   attach the greatest importance in some
14   respects to the most recent audited annual
15   financial statements.
16   Q.  That's independent of how they were
17   treated in this particular transaction, right?
18   MR. BRAUTIGAM:  Objection.
19   Q.  I guess what I'm driving at and I'm
20   not trying to argue with you, you didn't
21   undertake any analysis, any study, any polling
22   or anything else that allows you to conclude,
23   other than in general, based upon your general
24   axioms, what specifically was relied upon, was
25   important or anything else to the OHSL

FUERMAN

1
2    shareholders, did you?
3    MR. BRAUTIGAM:  Objection to the
4    form.
5    A.  I did study to prepare for this
6    expert testimony, the fact pattern of the OHSL
7    merger.  From that fact pattern I determined
8    that the two most important audited annual
9    financial statements to consider, so far as
10   materiality statements and the nexus between
11   them, are year end 1998 and year end 1999.
12   Q.  Let me ask the question again.  Did
13   you undertake any study, any analysis, any
14   survey of specifically what OHSL shareholders
15   did or did not find important or did or did
16   not rely upon?
17   MR. BRAUTIGAM:  Objection.
18   A.  I did specific analysis to determine
19   what was the date of the special -- what was
20   the date of the proxy that was set out; what
21   was the date of the shareholders meeting; what
22   said what at the special shareholders meeting;
23   what were the issues that arose around the
24   time of the shareholders meeting; what were
25   the issues that arose between then and the

FUERMAN

1
2    closing of the merger on December 3, 1999.
3    I looked at all these things in
4    determining what was most important for the
5    OHSL shareholders to consider.
6    Q.  Okay.  We'll keep going then.  What
7    OHSL shareholders did you ever talk to?
8    A.  I didn't talk to any OHSL
9    shareholders.
10   Q.  You didn't read Mr. Thiemann's
11   deposition, right?
12   MR. BRAUTIGAM:  Objection.
13   Q.  Is that right?
14   MR. BRAUTIGAM:  Objection.
15   A.  Yes.  I have told you previously I
16   did not read the depositions of the plaintiffs
17   because I felt it would not be worth spending
18   time on.
19   Q.  Did you poll any of the OHSL
20   shareholders and conduct any kind of a study
21   or analysis of what they looked at, what they
22   read or what they relied upon?
23   MR. BRAUTIGAM:  Objection.
24   A.  In my professional opinion it's not
25   necessary.

Page 166

FUERMAN

1      FUERMAN
2    Q.   Just a simple yes or no, either you
3  did or you didn't?
4       MR. BRAUTIGAM:  Objection.
5    Q.   I'm not trying to do anything other
6  than establish what you did.
7       MR. BRAUTIGAM:  Dr. Fuerman, you
8  have the right to complete your answers.
9  It's improper for him to interrupt, so
10  proceed accordingly.
11    Q.   Did you conduct any such poll,
12  sensus or any kind of a study of specifically
13  what the OHSL shareholders did or did not find
14  important and rely upon?
15       MR. BRAUTIGAM:  Objection.
16    A.   I did not conduct any poll because I
17  did not believe that that was the proper mode
18  of analysis on determining what financials are
19  most important to these shareholders.  Getting
20  back, again, to the basic axiom that financial
21  accounting is for the purpose of the meeting
22  the needs of a diverse group of potential
23  users of financial statements.
24       They are not specially created for
25  creditors versus equity holders versus trade

Page 167

FUERMAN

1      FUERMAN
2  creditors.  They are general purpose for
3  everybody external to the corporation.  And on
4  that basis I conclude that those are the two
5  most important audited annual financials to
6  consider in determining materiality.
7    Q.   I'm not disagreeing with you.  All I
8  want to do is establish whether that is based
9  upon your axioms as you've described them or
10  based upon any specific investigation and
11  specific analysis of specific OHSL
12  shareholders?
13       MR. BRAUTIGAM:  Objection.  It's not
14  a question, it's a speech.  This is asked
15  and answered.  You are harassing the
16  witness.
17    Q.   Go a head.
18       MR. BRAUTIGAM:  Wait for a question.
19       MR. BURKE:  You can read it back.
20       MR. BRAUTIGAM:  She can read it
21  back, but it won't reflect the question.
22       MR. BURKE:  I'll restate it.
23    Q.   Professor Fuerman, I understand what
24  you've just said.  My question is, are those
25  conclusions based upon your general axioms as

Page 168

FUERMAN

1      FUERMAN
2  you've described them or based upon specific
3  investigation, specific analysis of specific
4  OHSL shareholders?
5       MR. BRAUTIGAM:  Objection to form.
6    A.   The direct answer is neither.  It's
7  based on the axioms, the general postulants
8  and principles and standards of accounting,
9  plus specific investigation of the OHSL fact
10  pattern.  When was the proxy mailed out or
11  issued?  When was the special meeting of
12  shareholders held?  When was the merger
13  closing?
14    Q.   Where is that investigation?  I
15  mean, did you have a document that details
16  that investigation that you conducted?
17       MR. BRAUTIGAM:  Objection.
18    A.   It's reflected in this report.  It
19  is not committed to writing.
20    Q.   So the investigation you just talked
21  about is not written down anywhere?
22    A.   It's written into this report.  The
23  way I do my reports is I write them and I
24  think about them and then I do further
25  research.  It might be looking at things in

Page 169

FUERMAN

1      FUERMAN
2  various financial statements, reading through
3  deposition transcripts and then I go and I
4  revise the report.  So that's where the
5  research gets reflected.  There's not a
6  separate investigative report.
7    Q.   Page 4 of your report.  This is
8  still in paragraph nine.  The first full
9  sentence on that sentence says "However, the
10  unaudited quarterly financial statements for
11  the quarters ended March 31, 1999 and June 30,
12  1999.  The 10Qs also were very important, as
13  they were the most recent financial statements
14  available, prior to their having to make a
15  decision on the merger at or before the
16  October 25, 1999 special meeting of OHSL
17  stockholders."
18    A.   Correct, I did write that.
19    Q.   As you sit here today, do you know
20  specifically how the March 31, 1999 and the
21  June 30, 1999 PFGI annual financial statements
22  individually were impacted as a result of the
23  statement?
24       MR. BRAUTIGAM:  Objection.
25    A.   I do not know that, but that's not

43 (Pages 166 to 169)

Page 170

```
1          FUERMAN
2  what I said in this sentence, in this
3  paragraph. I said that these are the
4  quarterly financials that are most logically,
5  very important because they are very recent in
6  time, prior to the October 25, 1999 special
7  meeting of OHSL shareholders.
8      Q. But that's not my question, my
9  question is the one I asked you. Do you know
10 specifically how the March 31, 1999 and the
11 June 30, 1999 interim periodic financial
12 statements were impacted by the restatements?
13         MR. BRAUTIGAM: Objection.
14     A. No, I do not. I did read a
15 deposition transcript where counsel for
16 plaintiffs requested that information from one
17 of the defendants and the implication was it
18 was not going to be provided to the
19 plaintiffs.
20     Q. Was not going to be provided or
21 couldn't be provided?
22     A. Well, it was said that it couldn't
23 be provided. But the plaintiffs have no way
24 of knowing whether it could or could not be
25 provided. All the plaintiffs know is that it
```

Page 171

```
1          FUERMAN
2  was not provided and, therefore, I cannot base
3  my analysis of the restatement impact
4  comparing reported, originally reported versus
5  restated quarters because it wasn't the
6  quarters that were restated back then, it was
7  just the years.
8      Q. As it relates to 1999 the only
9  information in the proxy statement were
10 quarterly data, were they not?
11     A. There was an incorporation by
12 reference of the annual financial statements,
13 the most recent 10K.
14     Q. For 1998?
15     A. That is correct.
16     Q. So if I'm correct, the 1999 numbers
17 the only 1999 numbers included in the proxy
18 statement were quarterly numbers, were they
19 not?
20     A. Those are the only numbers included
21 in the proxy statement.
22     Q. The next sentence states, "Also the
23 unaudited quarterly financial statements for
24 the quarter ended September 30, 1999 contended
25 the 10Q, filed November 15, 1999 were very
```

Page 172

```
1          FUERMAN
2  important as the merger closing occurred
3  December 3, 1999." Do you see that?
4      A. I see that.
5      Q. Again, you are referring to the PFGI
6  10Q, right?
7      A. That's true.
8      Q. OHSL shareholders never would have
9  gotten 10Qs for PFGI for a date after the
10 proxy statement, would they?
11         MR. BRAUTIGAM: Objection.
12     A. That is correct.
13     Q. How were they supposed to figure
14 that out?
15     A. In doing the analysis of the
16 restatement impact it's necessary to use the
17 subsequently issued 1999 10K as a rough
18 approximation of how much restated those
19 quarters ended March 31, '99 and June 30, '99
20 and September 30, '99, how badly they were
21 restated. That's our only way to gain some
22 approximation as to how badly they were
23 restated.
24     Q. You don't know how restatement
25 affected any of those interim quarterly
```

Page 173

```
1          FUERMAN
2  statements, do you?
3      A. I know roughly, logically they would
4  have been restated in roughly the same
5  percentage as the 10K for years end 12/31/99.
6      Q. You know that or you assume that?
7      A. I think that's the only assumption
8  under the circumstances that any reasonable
9  expert could make, when that's the best
10 available information that I can use to do my
11 extrapolation.
12     Q. You don't know how the auto lease
13 securitizations were booked, when they were
14 booked, how they were closed or how they were
15 reflected on Provident's accounting system, do
16 you?
17         MR. BRAUTIGAM: Objection.
18     A. I know roughly how it worked.
19     Q. Tell me roughly how it worked as you
20 understand it?
21         MR. BRAUTIGAM: Objection.
22     A. Periodically estimates were made for
23 purposes of determining how much revenue, how
24 much expense, how much loss, how much gain
25 ought to be for every period, and sometime
```

44 (Pages 170 to 173)

Page 174

FUERMAN

1    FUERMAN
2  before the end of each period there would be
3  accruals made. Because the nature of the
4  lease accounting was not simple cash leases,
5  but sale leaseback of operating lease, at one
6  point and then later direct financing leases.
7    Q.  My question wasn't clear and I
8  apologize. In any particular year, 1999, for
9  example, do you know with any specificity how
10  and when the leasebacks were closed, booked,
11  when they were on the books, when they were
12  off the books, when they were reflected on the
13  books as auto leases or anything like that in
14  terms of timing within 1999?
15    MR. BRAUTIGAM: Objection.
16    A.  I do not know that because that
17  information has not been disclosed to the
18  plaintiffs.
19    Q.  Let me stop you right there.
20    A.  I can change my analysis.
21    Q.  Are you aware there's been testimony
22  in this case that deals with when those
23  securitizations were, in fact, closed?
24    A.  I've read the transcripts. I know
25  it's been said some of the accruals were made

Page 175

FUERMAN

1    FUERMAN
2  at yearend, but it's not been stated with any
3  specificity how much when, which. I have not
4  seen that, any detail anywhere in the
5  deposition transcripts by any of the Provident
6  executives.
7    Q.  So as you sit here today you don't
8  have any specificity and you don't have any
9  ability to opine as to what particular
10  quarters would or would not have been affected
11  by the restatement or in what amounts as it
12  relates to 1999, correct?
13    MR. BRAUTIGAM: Objection.
14    A.  You've asked two questions,
15  specificity and ability. Let me answer the
16  first question. Do I have all the specificity
17  I would like to have to make my analysis, no,
18  I do not.
19    Do I have any ability to make an
20  analysis, yes, I do. We do this all the time.
21  In academe, academic research and Provident
22  itself made estimates of how its leases were
23  going to work out.
24    Q.  Let's get back to the paragraph we
25  were talking about before. The Provident 10Q,

Page 176

FUERMAN

1    FUERMAN
2  dated November 15, 1999, did not even come out
3  until couple months after the proxy statement,
4  at about two or three weeks after the annual
5  shareholders meeting, correct?
6    A.  That is correct.
7    MR. BRAUTIGAM: Objection. I think
8  you meant special shareholder meeting.
9    MR. BURKE: Whatever.
10    Q.  Special shareholder meeting?
11    A.  That is correct.
12    Q.  So that could not have been
13  disclosed to PFGI or to OHSL shareholders
14  either in the proxy statement or the special
15  shareholders meeting, correct?
16    A.  That is correct, however, it could
17  have been disclosed prior to the merger
18  closing on December 3, 1999.
19    Q.  You said "Had OHSL shareholders
20  known prior to December 3, 1999 that the
21  financial statements for the quarter ending
22  September 30, 1999 were materially misstated
23  then the December 3, 1999 closing would not
24  have occurred," okay?
25    A.  Right.

Page 177

FUERMAN

1    FUERMAN
2    Q.  First of all, what is the basis for
3  your statement that the September 30, 1999
4  financial statements were materially
5  misstated? What's your empirical evidence on
6  that?
7    MR. BRAUTIGAM: Objection.
8    A.  My empirical evidence is that the
9  12/31/99 10K was materially misstated and the
10  12/31/98 10K was materially misstated. For
11  the in between quarters to not be materially
12  misstated would be mathematically impossible.
13    Q.  But you have not calculated the
14  precise misstatement in any of those in
15  between quarters, have you?
16    A.  I have not because the information
17  to enable me to do that has not been provided
18  to plaintiffs.
19    Q.  The next statement reads, "Either
20  OHSL and PFGI would have mutually agreed under
21  the circumstances not to close or an
22  injunction would have prevented the closing."
23  Do you see that?
24    A.  Yes, I do.
25    Q.  I think you told me previously that

45 (Pages 174 to 177)

FUERMAN

1
2  you never participated in a merger transaction
3  on behalf of the acquiring company or the
4  acquired company?
5      A.  That is correct.
6      Q.  What's the basis for your statement
7  that if this were the case as you described it
8  here these parties would not have closed?
9      A.  Well, I've just noticed this in my
10  thousands of securities litigations in my
11  database, that whenever there's an upsetting
12  event and a restatement close before a merger
13  closing of the acquiring corporation would
14  certainly qualify as an upsetting event.
15      That causes the deal to be scuttled
16  or renegotiated because it's just not any
17  longer -- it's no longer the deal that the
18  people who previously had agreed to had agreed
19  to.  The deal has changed.
20      Q.  Specifically what transactions are
21  you talking about?
22      A.  Well, in general if there's a change
23  to the financials for the worse that's going
24  to have a negative impact on the stock price
25  and this is a stock-for-stock transaction.

FUERMAN

1
2  Were the information disclosed then the deal
3  would need to have been renegotiated to
4  reflect the lower amount of stock, the lower
5  amount of consideration that the OHSL
6  shareholders would get unless the deal were
7  renegotiated.
8      Because suddenly they are being paid
9  in much less valuable stock than they had
10  agreed to at the special meeting of October
11  25, 1999.
12      Q.  I understand that subjectively you
13  believe that.  My question is, what specific
14  studies or analysis or situations can you
15  point me to where that happened?
16      A.  Is your question whether -- are you
17  questioning whether the shareholders care what
18  the financials look like in deciding to tender
19  their shares to purchaser corporation?
20      Q.  It's real simple.  What definitive
21  data support do you have for the statement
22  that "Under these circumstances OHSL and PFGI
23  would have mutually agreed under the
24  circumstances not to close"?  When did you see
25  that?  When did you study it?  Give me

FUERMAN

1
2  specifics to support that statement.
3      MR. BRAUTIGAM:  I object to all of
4      those questions.
5      A.  I'm not afraid to give you a site.
6  You can look at Bernstein and Wild Financial
7  Statement Analysis.  The most important thing
8  with respect to financial statement analysis,
9  with regard to these well-regarded authors,
10  this book is in their fifth edition, is
11  earnings per share.  If suddenly the earnings
12  per share of the acquiring corporation takes a
13  nose difficult in a stock-for-stock
14  transaction, the shareholders of the target
15  corporation would have to be retarded not to
16  demand an injunction and demand a
17  renegotiation for a higher, better price.
18      Q.  Can you give me an example of a
19  merger transaction where that occurred?  Give
20  me one.  You got one?  Did you assemble any
21  data like that for this case?
22      MR. BRAUTIGAM:  Objection, compound,
23  argumentative, badgering the witness.
24      Q.  Let me rephrase.  Can you give me a
25  single example of that occurring in a merger

FUERMAN

1
2  transaction, what you've just described?
3      A.  In my research I follow much, much,
4  much more closely the cases that allege
5  securities fraud in fraud on the market than I
6  do the cases that involve mergers and
7  acquisitions.  A lot of those cases I don't
8  follow as closely.
9      But in my research over ten years I
10  have never seen a single case, and I read
11  securities class action alert every single
12  week when it was publishing monthly and since
13  then I follow all the cases that come out with
14  institutional shareholders securities class
15  action tracking, I've never seen a single case
16  where there was a major upsetting corporate
17  event of the acquiring corporation, whether
18  it's restatement of financials of the
19  acquiring corporation or death of the CEO of
20  the acquiring corporation or any major
21  upsetting event where the deal went through as
22  it was originally scheduled, negotiated to go
23  through.
24      The target corporation would, the
25  shareholders would put up a very major fight

46 (Pages 178 to 181)

Page 182

FUERMAN

1　　　　　　FUERMAN
2 to prevent that.
3　　Q.  For instance, can you give me -- if
4 you can't that's fine, I'm just asking for a
5 specific instance?
6　　A.  I cannot remember a single case
7 where an upsetting major corporate event
8 occurred like that and the transaction went
9 through just the way it had been voted on two
10 months earlier.
11　　Q.  Give me an example when it didn't go
12 through?
13　　A.  I cannot do that.
14　　Q.  Thank you.  The next half of the
15 sentence talks about under these circumstances
16 an injunction would have prevented the
17 closing.  Do you see that?
18　　MR. BRAUTIGAM:  Objection.  You
19　　misread that.
20　　Q.  It says "Either OHSL and PFGI would
21 have agreed mutually under the circumstances
22 not to close, or an injunction would have
23 prevented the closing."  Did I read that
24 correctly?
25　　MR. BRAUTIGAM:  The second time,

Page 183

1　　　　　　FUERMAN
2　　yes.
3　　Q.  Have you ever been in involved in an
4 injunction proceeding in connection with a
5 merger transaction?
6　　A.  No, but I've read a lot about them.
7 As I indicated by reading securities class
8 action alert and securities class action
9 tracking and all the cases that get filed.
10　　Q.  How many times do you recall of an
11 injunction preventing the closing of a merger
12 transaction?
13　　A.  What percent of the time?  That's
14 hard to say whether it's 10 percent, 20
15 percent of the time.  My best estimate is that
16 it's a minority of the cases where an
17 injunction prevents the closing from going
18 through.
19　　Q.  Did you compile any kind of a study
20 of how many times in a circumstances like this
21 an injunction was issued to prevent a closing?
22　　A.  No, I did not.
23　　Q.  Let's turn to paragraph ten.  You
24 referred to a statement of auditing standards
25 or SAS number 69?

Page 184

1　　　　　　FUERMAN
2　　A.  That is correct.
3　　Q.  You then cite to a footnote that
4 says, "When analyzing the question of Federal
5 Law one must rely, to the extent possible, on
6 the relevant federal statute, the U.S.
7 Constitution and the decision of the U.S.
8 Supreme Court."
9　　A.  That is correct.
10　　Q.  What's the basis for that being the
11 way federal practitioners analyze questions of
12 federal law?
13　　A.  Just the general layman's
14 understanding of the most important things are
15 the onpoint Federal Statute, the U.S.
16 Constitution and the decisions of the U.S.
17 Supreme Court, and you cannot start by
18 ignoring those and looking to other things.
19　　You may well find that there is
20 nothing whatsoever onpoint so far as the
21 Federal Statute, the U.S. Constitution, the
22 decisions of the U.S. Supreme Court.  But at
23 least you have a hierarchy of things that are
24 regarded as most authoritative, that you look
25 at first in the law, and you have a similar

Page 185

1　　　　　　FUERMAN
2 hierarchy in accounting and auditing.
3　　Q.  You may have answered my question.
4 You indicated this is sort of a layman's view
5 of things, is that what this is intended to?
6　　A.  Right, I'm not opining on the way a
7 legal brief should be written.
8　　Q.  You will agree with me that
9 decisions of Circuit Courts of Appeals also
10 tend to be authoritative within the areas
11 affected by that?
12　　A.  Oh, highly authoritative.
13　　Q.  The next page you talk about APB or
14 Accounting Principles Board, Opinion
15 Number 20.
16　　A.  That's right.
17　　Q.  I think you indicate, in the middle
18 of that page, of the GAAP hierarchy, G-A-A-P
19 hierarchy as you've described it, the only
20 pronouncement that is onpoint with the issues
21 relevant to your opinion is APB 20; is that
22 correct?
23　　A.  That is correct.
24　　MR. BURKE:  We're up to the
25　　negligence exhibit here.

47 (Pages 182 to 185)

Page 186

1          FUERMAN
2          (Fuerman Exhibit 6, document, marked
3   for identification, as of this date.)
4          Q.   Take a look at that and see if you
5   can identify that as being a copy of APB 20.
6          A.   It is.  It's a lot easier to read.
7   The particular website you got this from, it
8   came out in a pretty tough format to follow.
9   I have my own copy of APB 20 that I'd like to
10  look at.
11         Q.   If you'd like to refer to yours
12  that's fine.  I would like to make sure when
13  you are referring to APB 20 I've got the right
14  document.
15         MR. BRAUTIGAM:  Would you like to
16  copy that?
17         MR. BURKE:  No.
18         Q.   If you want to make that part of the
19  record we can identify yours as APB 20 and
20  I'll just follow along with this.
21         A.   Okay.
22         Q.   So this does appear to be APB 20?
23         A.   That is correct.
24         Q.   Page 5 of your report, paragraph 11,
25  you begin to describe APB 20; is that correct?

Page 187

1          FUERMAN
2          A.   That is correct.
3          Q.   The second sentence there states,
4   "Ideally there should be no accounting changes
5   from one year to the next because accounting
6   changes impair consistency."
7          A.   Changes is used as a noun in that
8   sentence, that's why it's confusing.
9          Q.   When you worked, and we know you
10  have not been involved in public accounting,
11  but when you worked at the various corporate
12  positions you described, were your employers
13  the companies for whom you worked ever
14  involved with accounting changes?
15         A.   They may well have been.  APB Option
16  Number 20 covers a broad range of accounting
17  changes, including a number that are not
18  "restatements" of the sort that is thought of
19  as "restatements" in the financial press.
20         Q.   Do you know from your own first-hand
21  knowledge whether any of those companies were
22  involved with accounting changes or issues
23  under APB 20?
24         MR. BRAUTIGAM:  Ever?
25         MR. BURKE:  When he was there.

Page 188

1          FUERMAN
2          MR. BRAUTIGAM:  That's different
3   from ever.
4          A.   I'm just guesstimating.  I'd say
5   there's maybe a 30 or 40 percent chance one of
6   them was.  I didn't work in a lot of publicly
7   held companies.
8          I'm trying to remember other than
9   Cardinal Industries, Inc., who did I work for
10  that was a publicly held company.  Yeah, that
11  would be it.  I don't think during the couple
12  years I was there -- actually during the time
13  I was there I think they only issued one
14  financial statement and then they were going
15  downhill so badly they couldn't issue the
16  next.  So the answer is no.
17         Q.   The last full sentence of section
18  eleven there, "Users of financial statements
19  value consistency because consistency makes it
20  easier to determine whether the company is
21  improving or deteriorating with regard to its
22  performance."
23         A.   Yes.
24         Q.   What's the basis for that?
25         A.   That's a summarization of what you

Page 189

1          FUERMAN
2   find in APB 20 and a number of other places in
3   the accounting literature.
4          Q.   If you can, point me to where that
5   appears in APB 20.
6          A.   If you look at paragraph 14 of APB
7   20, it says in subparagraph A, "Accounting
8   principles should be applied consistently for
9   all periods presented in comparative financial
10  statements.  Using difficult accounting
11  principles for similar items in financial
12  statements presented for various periods may
13  result in misinterpretations of earnings
14  trends."
15         So and it continues with similar
16  kinds of sentiments in the next couple of
17  subparagraphs or even next three
18  subparagraphs.  The idea is that there's a
19  conflict between two fundamental goals of
20  financial accounting.  We would like the
21  accounting policy, the accounting treatment,
22  to be identical year after year after year.
23         That way a user of the financial
24  statements can look and see whether earnings
25  per share are really getting better or getting

48 (Pages 186 to 189)

Page 190

```
1              FUERMAN
2    worse and to what extent.  If you have
3    restatements then it confuses the issue of how
4    things are proceeding over time.  But that
5    conflicts with the goal in financial
6    accounting of, maybe not artfully stating
7    this, but let's account for things correctly.
8              If you discover at some point in the
9    past they were not accounted for correctly
10   maybe we ought to think about restating them.
11   So the general -- that general conflict
12   between the two goals, consistency versus
13   let's get it right, is resolved in APB 20 by
14   saying that in some situations we will
15   restate, but in others we will not, and then
16   they specifically go on.
17             Am I talking too long?
18        Q.  You've answered the question.  You
19   definitely answered the question and you will
20   find out, as Mr. Brautigam can tell you,
21   sometimes if you answer the question and wait
22   for the next one we'll get through this
23   quicker.  You answered my question.  I
24   appreciate your help.
25             Paragraph number 12 of your report,
```

Page 191

```
1              FUERMAN
2    Plaintiffs' Exhibit 115.  There you talk about
3    three methods to disclose accounting changes?
4        A.  Right.
5        Q.  The first bullet point refers to
6    current treatment of an accounting change?
7        A.  That is correct.
8        Q.  Now, this refers to APB paragraph
9    38; is that correct?  No, I'm sorry.  Tell me
10   where these three methods of treatment are
11   addressed in APB 20?
12       A.  Let's see.  They are not all talked
13   about in one place in APB 20.  You have to
14   pick and pull them out of different places.
15       Q.  Let's look at the first bullet
16   point.  It talks about current treatment of
17   accounting changes.  Where does that come
18   from?
19       A.  An example of the first bullet would
20   be paragraph 18 -- no, excuse me, paragraph
21   19, subparagraph B.  Where it says, "The
22   cumulative effect of changing to a new
23   accounting principal on the amount of retained
24   earnings at the beginning of the period in
25   which the change is made should be included in
```

Page 192

```
1              FUERMAN
2    net income of the period of the change."
3             That would be an example of current
4    treatment which causes the change to have an
5    impact or causes what happened in previous
6    years to have an impact only on the current
7    year's retained earnings.  So current
8    treatment there's no impact on prior year's
9    income statements.
10       Q.  Am I correct that the language that
11   appears in the first bullet point of paragraph
12   12 of your report is your summarization of APB
13   20, as opposed to language that appears in APB
14   20 verbatim?
15       A.  I can't say that.  This is a pretty
16   long -- if I had enough time to spend this
17   afternoon digging through here I might find
18   those exact words and phrases.
19       Q.  The bullet points do not have
20   citations to specific sections of APB 20?
21       A.  No, they don't.  If it's important
22   for the case for me to dig up specifics
23   citations I could do that, I believe.
24       Q.  I'm just trying to make sure I
25   understand what in here is your view, as
```

Page 193

```
1              FUERMAN
2    opposed to what literally is in the verbiage
3    of APB 20.  The second bullet point deals with
4    perspective treatment of accounting changes?
5        A.  Right.  These are changes that are
6    not regarded as terribly important by
7    APB No. 20 and what happened in prior years is
8    ignored.  The fact that in prior years this
9    new, different accounting policy is being
10   applied, we're just going to ignore the fact
11   that it was a different accounting policy, a
12   different kind of estimation or computation
13   than in prior years, we're just going to
14   ignore that.
15       Q.  Can you give me an example in APB 20
16   of that, in one of the sections?
17       A.  Let's see if I can find that.
18   Sometimes there are specific new FASBs that
19   are issued where they direct the companies to
20   just use prospective treatment, to just in
21   future financial statements use this new
22   accounting policy, this new way of estimating
23   and calculating.  I can't find it at this
24   point.
25       Q.  The third bullet point in
```

49 (Pages 190 to 193)