**EXHIBIT B-3**

**EXHIBIT B-3**

FUERMAN

1    FUERMAN
2    paragraph 12 talks about "retroactive"?
3        A.    Retroactive, that's easier to define
4    because that's what I have focused on.  They
5    first discuss, in paragraph 13 of APB 20, what
6    is the definition of the correction of an
7    error in previously issued financial
8    statements.  In another paragraph they
9    describe that that is supposed to be restated.
10       Q.    Well, let's just stay on APB
11   paragraph 13.  Nothing in there talks about
12   retroactive treatment, does it?
13       A.    I believe that's in paragraph 38.
14       Q.    To answer my question though,
15   paragraph 13 itself does not discuss
16   retroactive treatment?
17       A.    That's correct.
18       Q.    You indicated that paragraph 38
19   does?
20       A.    I believe.  Let me work through
21   this.
22       Q.    Okay.
23       A.    It says, "If a change or correction
24   has a material affect on income before
25   extraordinary items or on net income of the

FUERMAN

1    FUERMAN
2    current period before the effect of the
3    change, the treatments and disclosures
4    described in this opinion should be followed.
5        Q.    That talks about the current period,
6    correct?
7        A.    We have to go back actually to
8    paragraph 37, that's where this determines the
9    nature.  It says, "The nature of an error in
10   previously issued financial statements and the
11   affect of its correction on income before
12   extraordinary items, net become and the
13   related per share amounts should be disclosed
14   in the period in which the error was
15   discovered and corrected.  Financial
16   statements of subsequent periods need not
17   repeat the disclosures."
18       Q.    That doesn't talk about retroactive
19   application either, does it?
20       A.    It's understood.  It's also
21   mentioned paragraph 36.  "The board concludes
22   correction of an error of financial statements
23   of a prior period discovered subsequent to
24   their issuance, and in parens, I'm reading now
25   from subparagraph 36.

FUERMAN

1    FUERMAN
2        Q.    Yes.
3        A.    "The board concludes that correction
4    of an error in the financial statements of a
5    prior period discovered subsequent to their
6    issuance, and that refers back to paragraph
7    13," the correction of error paragraph,
8    "should be reported as a prior period
9    adjustment."  "Prior period adjustment" means
10   restatement.
11       Q.    You believe that "prior period
12   adjustment" and "restatement" are synonymous?
13       A.    Yes.
14       Q.    Based upon your review?
15       A.    Yes.
16       Q.    So 36 is the paragraph that talks
17   about retroactive treatment?
18       A.    Yes.
19       Q.    Is that your final answer?
20       A.    It's somewhat in artfully written,
21   APB 20.  You almost have to read together
22   paragraph 13, 36 and 37 and even 38, to get a
23   sense of what is supposed to be done.  It
24   would be a little tricky to figure it out just
25   looking at APB No. 20.

FUERMAN

1    FUERMAN
2        It's well accepted in the accounting
3    literature that errors are to be corrected
4    with a restatement of prior periods.
5        Q.    I don't see the word "restatement"
6    in APB 20.  Does it appear anywhere in there?
7        A.    You know, it does, but maybe not as
8    often as people would like.  Maybe because the
9    word just wasn't used as much in 1970 or 1971
10   than it is today.
11       Q.    Can you fine the word "restatement"
12   in APB 20?
13       A.    Prior period adjustment is
14   understood to many restatement.  The word
15   "restate" or "restating" occurs in paragraph
16   14, subparagraphs A, B, C and D, each of them.
17   They use the word "restating" over and over in
18   paragraph 14.  Why they don't use it so much
19   in the rest of APB No. 20, even though
20   everybody who reads this stuff understands
21   "prior period adjustment" means a restatement.
22       Q.    Page 7 of your --
23       A.    Although, sometimes you will see in
24   the literature they will refer also to the
25   cumulative -- reporting the cumulative effect

FUERMAN

1  of the change in this year's income statement,
2  they will sometimes put that down or think of
3  that as a "restatement."
4     Q.  Page 7, carryover paragraph of your
5  opinion, which is paragraph 13 of Plaintiffs'
6  Exhibit 115.  You make the statement that a
7  "restatement" is appropriate if and only if
8  the "correction has a material affect on
9  income before extraordinary items or on net
10 income," then there is an ellipse, "or a
11 material affect on the trend of earnings," and
12 you cite APB 20, paragraph 38?
13    A.  Correct.
14    Q.  Okay.  You left out quite a bit of
15 language in those ellipses?
16    A.  Let's read the entire thing then.
17    Q.  Okay.  If I'm going from the right
18 place, it says in the middle of APB 20,
19 paragraph 38, "If a change or correction has a
20 material affect," this is where we pick up
21 your quote, "has a material affect on income
22 before extraordinary items or on net income of
23 the current period."  Do you see that?
24    A.  Right.

FUERMAN

1     Q.  You left out the current period.  Is
2  there a reason why you did that?
3        MR. BRAUTIGAM:  Objection.  I just
4     want the record to reflect that there
5     were a lot of things left out of the
6     ellipse.
7        MR. BURKE:  I would agree with that.
8     A.  I felt that I captured the gist of
9  paragraph 38 in that short quote that I put in
10 there.
11    Q.  The actual language of paragraph 38
12 talks about whether or not the change or
13 correction has material affect on income
14 before extraordinary items or net income of
15 the current period, does it not?
16    A.  In using --
17    Q.  That's what it says?
18    A.  They are discussing two things in
19 paragraph 38.  There is a discussion -- no,
20 actually I think what they mean -- again,
21 these are accountants, not lawyers that wrote
22 these.
23    Q.  You are an accountant, aren't you?
24 You are a supposed expert accountant, aren't

FUERMAN

1  you?
2        MR. BRAUTIGAM:  Objection.  Please
3     let the witness finish his answer.
4     A.  What I mean is it's not terribly
5  artfully described.  When they say here
6  "current period," in the context of this they
7  are talking about that particular period that
8  got messed up.  That's what they mean.
9        It couldn't be the current period
10 logically, think of it.  If it were the
11 current period that the company was putting
12 the financial statements together on, as in
13 the spring, the early spring of 2003 PFGI was
14 putting together the current statements of
15 yearend 12/31/2002, there's no restating
16 that's going to happen to the 12/31/2002
17 financials that's the current period because
18 they have not been issued.
19       In the context of APB 20 it must
20 mean, when they use the word "current" here,
21 they are saying if it is 1998 got messed up
22 you need to restate 1998 earnings per share
23 and net income.  If it is '99 that got messed
24 up materially you've got to restate '99

FUERMAN

1  earnings per share and net income.
2     Q.  So your testimony is "current" means
3  past, is that your testimony?
4     A.  In the context of this paragraph,
5  yes.
6     Q.  So current period in --
7     A.  Think about it.  How could it be
8  interpreted any other way?  If it were
9  interpreted the way you think maybe it's
10 interpreted, then companies would never
11 restate because they are always going to
12 discover an error today and they could always
13 say, well, let's just have that reflected in
14 the most recent financial statements that
15 we're getting ready to issue.
16       Then there would never, ever, ever
17 be a restatement.
18    Q.  I disagree with you.  I think what
19 this says is if the cumulative affect of the
20 restatement is material to the current period
21 then you fix it.  If it was a $5 error that
22 related to 1999, that was discovered in 2003,
23 are you telling me they would go back and
24 restate that?

Page 202

FUERMAN

1    A. That would be turning all of
2  financial accounting on its head to make that
3  kind of interpretation. The fundamental
4  notion of accrual accounting -- ever since the
5  1940s I cite Payton and Littleton, they came
6  up with this -- is that it's really important
7  to have net income be in the right period.
8  You can't say, well, it doesn't matter so long
9  as it's sometime, some way, somehow reported.
10    It's the matching principle.
11  Revenues and expenses, revenues need to go in
12  the period where they are earned, expenses
13  need to match those revenues. The expense is
14  needed to generate the revenues. Because
15  people are going to rely on them at a
16  particular point in time.
17    Q. So in 2003 the current period went
18  back to 1997; is that your testimony?
19    A. My testimony is that the
20  interpretation that all accounting experts
21  have of APB No. 20 is that you restate the
22  periods that are materially misstated.
23    Q. Does this say -- where does this say
24  that?
25

Page 203

FUERMAN

1    MR. BRAUTIGAM: Objection.
2    Q. Where does APB 20 say what you just
3  said? Or can you point me to any place where
4  it says what you just said; when you have a
5  restatement you restate the periods that are
6  materially misstated, where does it say that?
7    MR. BRAUTIGAM: Objection.
8    A. It says -- that is the understanding
9  that all accounting experts had of paragraph
10  38.
11    Q. That's not my question. Where does
12  it say that in paragraph 38? Can you point me
13  to any line in paragraph 38 that says what you
14  just said? I don't care about understandings.
15  Where does it say that?
16    MR. BRAUTIGAM: Objection, compound.
17    A. It does not say what you think it
18  ought to say, in the words you think ought to
19  be used, but my interpretation is consistent
20  with all accounting experts. If you were to
21  read Wiley's GAAP guide or Miller's GAAP guide
22  or the other -- there's a reason these various
23  treaties exist, because some of the accounting
24  literature is difficult to understand. Unless
25

Page 204

FUERMAN

1  you look at what other people who have spent
2  time reading them and interpreting them, what
3  they mean.
4    Q. Regardless of interpretations, we
5  are in agreement that that language you just
6  gave me does not appear in paragraph 38,
7  correct?
8    MR. BRAUTIGAM: Objection.
9    A. "That language" meaning the language
10  that you think ought to appear to convey the
11  concept that I think is plainly understood by
12  all accounting and auditing experts, does not
13  appear. However, it's phrased in a different
14  way that is understood to mean that materially
15  misstated financials of 1998 in 2003, you
16  discover that, you need to restate 1998.
17    Q. Let's talk about the Provident
18  restatements. Your next paragraph, paragraph
19  14, you talk about the press release, dated
20  March 5, 2003. Do you see that?
21    A. Yes.
22    Q. What was the issue that was involved
23  in that press release or issues?
24    A. Let's get that in front of us. I
25

Page 205

FUERMAN

1  think that would be helpful in answering this
2  question.
3    Q. Is that one of the documents you
4  looked at?
5    A. Yes. It's an attachment to an AK.
6    Q. We will get to that. I'm looking on
7  page 2 through the materials you reviewed for
8  purposes of your testimony, and I realized
9  there were some additional things you talked
10  to me about. I do not see the March 5, 2003
11  press release listed here.
12    A. That's an oversight on my part then.
13    MR. BRAUTIGAM: It was attached to
14  the CAC, which is Exhibit B.
15    A. Oh, okay. In my item "P" I refer to
16  8Ks and PFGI from yearend 12/31/94 to the
17  quarter that ended 12/31/2004.
18    Q. If Mr. Brautigam has that document I
19  welcome him to give you to you to refresh your
20  recollection.
21    A. Actually it's not too terribly
22  important. What was said on March 5th is we
23  are restating 1997 through 2002. It showed
24  before restatement and after restatement for
25

52 (Pages 202 to 205)

FUERMAN

1 net income and earnings per share for the
2 diluted.
3 MR. BRAUTIGAM: Jim, I do have it
4 so. Can I show it to him?
5 MR. BURKE: Absolutely.
6 A. That's the thing I focused on. It
7 also showed "reported" versus "restated" total
8 assets.
9 Q. What were the reasons for the
10 restatement, if you remember?
11 A. The reasons were that because of
12 mistakes in estimating and calculating the
13 leases, beginning 1997 -- this is what the
14 company felt the reason was and this is what
15 they said in the press release -- that they
16 had recognized too much net income too early
17 and so they needed to make that change. They
18 had misunderstood how to do the accounting for
19 their lease transactions.
20 Q. What lease transactions?
21 A. Auto lease transactions.
22 Q. So this was misstated financial
23 estimates in the expense or the income that
24 was being paid on the underlying leases; is

FUERMAN

1 that your understanding?
2 A. Not the cash payments made by the
3 underlying leases by the people who drove the
4 cars around, but when you have a lease
5 transaction, like Provident had, you have to
6 make -- unless it's a very simple lease, and
7 these were not simple leases, you have to do
8 some fairly complex estimates of what will be
9 the future revenue and expense associated with
10 these leases in the aggregate.
11 They miscalculated that. I mean
12 there are things they have to estimate, future
13 events, things like what is the market for the
14 cars going to be at some point in the future.
15 Are these cars that will be used cars X number
16 of years in the future.
17 You know, and how does that
18 impact -- this impacted the early buyout
19 option, that had an impact on that, although
20 that was the April 15, 2003 announcement that
21 discussed that.
22 Q. You thought the EBO, or early
23 bailout option, was indicated in the
24 April 15th announcement; is that your

FUERMAN

1 recollection?
2 A. That's what it says in the
3 deposition transcripts. I think it says that
4 in the PricewaterhouseCoopers report also.
5 Q. Your understanding as to the first
6 restatement on March 5th, did it involve any
7 accounting principle or any accounting
8 concepts?
9 A. Yes, it did.
10 Q. Which ones?
11 A. Well, it involved violations of the
12 timing of recognition of revenue and expense.
13 Q. Which ones?
14 A. As they are interpreted by FAS 13
15 and the subsequent regs that interpret that.
16 Q. The leases that involve these
17 estimates, how were these leases booked on
18 Provident's books prior to March 5, 2003, if
19 you know?
20 A. I don't know. I do not purport to
21 be an expert in lease accounting. It's a very
22 complex area.
23 Q. So in terms of the technical details
24 of exactly what the accounting was, as it

FUERMAN

1 relates to the first restatement, that's not
2 something that you are an expert in?
3 A. No. I have the threshold knowledge
4 in leases, but the kind of lease accounting
5 that was done at Provident and other banks
6 with securitizations is not an accounting area
7 that I'm an expert on.
8 Q. Other than what you've told me
9 already, do you have any further understanding
10 of what the issues were in connection with the
11 March 5, 2003 announcement?
12 A. That is really it. I mean I could
13 speculate as to different details.
14 Q. No, I'm just asking for your best
15 recollection.
16 A. No, that's it.
17 Q. Your paragraph 14 of your report,
18 the last full paragraph states, "The company
19 disclosed in its April 15, 2003 filings that
20 the amount of restatement was much larger,
21 that the accounting problems were of greater
22 depth and breath that the company initially
23 disclosed on March 5, 2003."
24 What does that mean?

53 (Pages 206 to 209)

Page 210

FUERMAN

1     FUERMAN
2    A. What it means is that the
3  restatement was felt to be 44 million I
4  believe, if my recollection is correct, 44
5  million on March 5th and then additional 70
6  million April the 15th, reduction in net
7  income I believe it was.
8       Then corresponding reduction in
9  earnings per share. So it was greater an
10  amount and greater in depth and breath in that
11  PricewaterhouseCoopers determined that the
12  problems went back to 1994. They didn't start
13  in 1997, they started in 1994.
14    Q. What was the specific accounting
15  issue that required the second announcement on
16  April 15, 2003; what was the technical
17  accounting issue?
18    A. The issue, again, I don't know all
19  the technical details, but it had something to
20  do with the residual value insurance. That
21  this had some impact on the accounting
22  treatment because it was not the kind of
23  residual value insurance that should have been
24  in hindsight, therefore, an accounting
25  treatment different than what was used was

Page 211

FUERMAN

1  used.
2      The company seemed to be confused
3  about how it should have handled the residual
4  value insurance, if it wanted to have the
5  accounting treatment that it wanted to have.
6  Or put another way, if they wanted to use that
7  particular residual value insurance they
8  should have had a different accounting
9  treatment.
10    Q. Beyond that general understanding,
11  do you have any knowledge of the specific
12  accounting issues involved?
13    A. This had some impact on the early
14  buyout option I believe, and.
15    Q. April 15th had something to do with
16  the early buyout option?
17    A. I seem to recall that from the
18  PricewaterhouseCoopers report.
19    Q. Beyond, again, what you already told
20  me, any further understanding of the specific
21  accounting issues involved on the April 15th
22  announcement?
23    A. No.
24    Q. Paragraph 15, the third line down in

Page 212

FUERMAN

1     FUERMAN
2  the middle of the sentence you are talking
3  about Provident here, and it says, "It had
4  unstated its lease liabilities, which should
5  have been placed on the balance sheet instead
6  of off the balance sheet." Do you see that?
7    A. Yes.
8    Q. What's the basis for that statement?
9    A. The basis is that in the press
10  release attached -- actually, maybe it's not
11  in the press release, maybe it's in the 10K --
12  it shows that their lease liabilities as
13  restated were greater than as reported, which
14  indicates that it should of had more
15  liabilities on the balance sheet than it had
16  originally reported.
17    Q. So you believe this was a balance
18  sheet issue, not an income statement issue?
19    A. It was an issue of both the income
20  statement and the balance sheet, however, the
21  income statement is the thing that I focus on
22  in my report, because that's what APB No. 20
23  seems to focus on.
24    Q. Is this balance sheet issue which
25  you refer to her a focus of your option; is

Page 213

FUERMAN

1     FUERMAN
2  that something you are opining on or is it
3  not?
4    A. I could have opined on it. As a
5  general principle financial statement
6  analysis, all things being equal, as the
7  company's liabilities increase certainly as
8  its debt equity ratio increases or other kinds
9  of leverage ratios, that's a negative for a
10  company's credit rating.
11    Q. I guess my question is, do you
12  understand the specifics in the details of
13  this on-balance sheet, off-balance sheet issue
14  you are referring to in this portion of your
15  report, what really was going on at Provident?
16    A. What was the underlying mistake in
17  the accounting?
18    Q. Or the accounting issue? Was it
19  just an accounting interpretation, was it a
20  mathematical error, was it a change in
21  accounting principle, what happened as you
22  understand it?
23     MR. BRAUTIGAM: I object to all of
24    those questions.
25    A. I think there's a little bit of

FUERMAN

2  both. There was some misestimating, some
3  miscalculating or misinterpreting what the
4  correct accounting treatment was. There's
5  some reference in a couple of the deposition
6  transcripts of Hoverson and Cooke, I believe,
7  that Ernst and Young was involved from the
8  beginning in structuring the transactions, to
9  obtain the proper accounting treatment.
10      Which if that is true, then you
11  could say, well, the transactions were not
12  structured properly, and there were
13  miscalculations, misestimates in doing the
14  transactions. Or you could say the accounting
15  treatment of these transactions as they were
16  structured was incorrect.
17      It's kind of a packaged deal. The
18  way the transactions were done and the way the
19  accounting for the transactions was done seems
20  to have been done concurrently. I mean at
21  least there seems to be some concurrent
22  activity.
23      Q.  I apologize if I'm missing you on
24  this. As to what accounting issues dealt with
25  on-balance sheet versus off-balance sheet

FUERMAN

2  versus something else, are you aware of the
3  specific accounting issues that were involved
4  as you refer to it here, on this sentence
5  which talks about whether lease liability
6  should have been on the balance sheet or off
7  the balance sheet?
8      MR. BRAUTIGAM:  Objection to the
9      form.
10      A.  Beyond what I've already said, that
11  FAS 13 as interpreted was not correctly
12  followed, no, I can't go into any greater
13  detail than that.
14      Q.  That's fair enough. I know that one
15  of your specialties that you've described
16  earlier today is when auditors get involved in
17  securities litigation.
18      A.  Certainly.
19      Q.  You are aware from a class action
20  complaint that Ernst and Young was a defendant
21  in this case?
22      A.  That is correct.
23      Q.  Or was named as a defendant?
24      A.  That is correct.
25      Q.  Do you know whether or not they are

FUERMAN

2  still a defendant?
3      A.  I'm not certain. I know there's
4  been a judicial opinion where there was a
5  dismissal. We talked about this before lunch,
6  whether it was a dismissal in whole or in
7  part, and if there is a pending appeal.
8      I frankly haven't paid much
9  attention to this. I'm focusing on the
10  accounting issues.
11      Q.  That's fine. That was we were
12  talking about the other restatement litigation
13  and that's the opinion.
14      Have you seen an opinion in the
15  Thiemann case in which Ernst and Young was
16  dismissed as a defendant?
17      A.  I probably saw it, but I can't
18  remember it in any detail. I mean, I don't
19  really know for sure. I know I've seen at
20  least one or two judicial opinions.
21      I can't even remember if they were
22  by Judge Beckwith or Judge Spiegel, for
23  example.
24      Q.  Next page, page 8 of your report.
25  The last sentence in that carryover section,

FUERMAN

2  section 15. "PFGI accounted for the 1994,
3  1995 and 1996 changes with a current approach
4  and not with a retroactive approach."
5      A.  That's correct.
6      Q.  Okay. Earlier we were talking about
7  APB 20 where it talked about current period.
8  I thought I understood you to say that if
9  there is a restatement the prior periods have
10  to be restated, you can't do it currently?
11      A.  Right.
12      Q.  Isn't this inconsistent with that?
13      A.  It is my opinion that there was not
14  a restatement of '94, '95 and '96 as
15  understood under APB No. 20. Now, in the
16  financial press and in at least one of the
17  PFGI press releases itself, I believe it may
18  have used the phrase that it was restating all
19  the way back to 1994.
20      That difference between the
21  financial press, how it uses the term and how
22  the accounting literature uses it is, well, it
23  is what it is. The accounting literature
24  would say that '94, '95 and '96 were not
25  restated, you know, an cumulative adjustment

55 (Pages 214 to 217)

Page 218

FUERMAN

1    FUERMAN
2    approach was used. "Retroactive" meaning a
3    restatement is what was used for '97, '98,
4    '99, 2000 and 2001.
5        Q.  Based upon your review of the
6    accounting literature your view is that 1994,
7    1995, 1996 were not restated?
8        A.  That is my view of the way the
9    accounting literature characterizes '94, '95,
10   '96.
11       Q.  Those were dealt with in the current
12   period which would have been 2002?
13       A.  Yes.
14       Q.  The next paragraph 16.  APB 20
15   defines the restatement by PFGI of its 1997,
16   1998, 1999, 2000 and 2001 financial statements
17   as a clear unequivocal, unambiguous,
18   incontrovertible and undeniable to assertion
19   by the management of PFGI that its 1997
20   financial statements when originally issued
21   were materially misstated.  It says the same
22   language for 1998, 1999, 2000 and 2001.
23       Do you see that?
24       A.  That is correct.
25       Q.  That is paragraph 16 of Plaintiffs'

Page 219

FUERMAN

1    FUERMAN
2    Exhibit 115.  Show me where APB 20 says that?
3        A.  In the middle of paragraph 38 it
4    says, "If a change or correction has a
5    material affect on income before extraordinary
6    items or on net income of the current period
7    before the affect of the change, the
8    treatments and disclosures described in this
9    opinion should be followed."
10       That's the standard.  If it has a
11   material affect on income, well, I don't think
12   there was income before extraordinary items in
13   PFGI.  But if it has a material affect on net
14   income then you are to restate.
15       Q.  Okay.  Is there any language in that
16   intersection of APB No. 20, section 38, that
17   uses the words "clear, unequivocal and
18   unambiguous, incontrovertible and undeniable
19   assertion by management that financial
20   statements of each period to which a
21   restatement relates was materially misstated
22   when originally issued"?
23       A.  That is the philosophy of APB 20.
24   Those exact words are not used.
25       Q.  Okay, that's my question.  Are those

Page 220

FUERMAN

1    FUERMAN
2    exact words that appear in this paragraph used
3    anywhere in APB No. 20?
4        A.  Those exact words are not used, but
5    those exact couldn't concepts permeate APB 20.
6    That's how APB No. 20 is understood by all
7    people in accounting who have done research on
8    restatements, who have cited my work or who I
9    have cited.  There's just no dispute on this.
10       Q.  Can you show me anywhere in APB 20
11   that says if an error, an cumulative error, is
12   determined and that error relates to prior
13   periods and you restate those prior periods,
14   that by definition every single one of those
15   prior periods is materially misstated; can you
16   show me that in APB 20?
17       A.  That language is not there, but that
18   concept, that idea, that thought permeates APB
19   20 as interpreted by all the people in
20   accounting, in auditing who have written on
21   this subject.
22       Q.  But that language is not in there,
23   is it?
24       MR. BRAUTIGAM: Objection.
25       A.  That language is not in there.

Page 221

FUERMAN

1    FUERMAN
2        Q.  Thank you.  Paragraph 17.  You talk
3    about APB No. 20 requiring before and after
4    disclosure for each restated period?
5        A.  Yes.
6        Q.  We looked at it before, but where is
7    the before and after disclosure section of
8    APB No. 20?  You showed it to me earlier.
9        A.  I think it's paragraph 37, yes,
10   paragraph 37.
11       Q.  This also talks about being
12   disclosed in the period in which the error was
13   discovered and corrected, in other words,
14   should be disclosed in the period in which the
15   error was discovered and corrected.  Do you
16   see that?
17       A.  That is interpreted as the period to
18   which the error belongs.  I think it's
19   unartfully phrased.  An English major clearly
20   did not write this.  That's how it is
21   interpreted in all the accounting and auditing
22   leading authorities.
23       Q.  So the language disclosed in the
24   period in which the error was discovered and
25   corrected you say means in a prior period to

56 (Pages 218 to 221)

Page 222

FUERMAN

1  FUERMAN
2  which it relates?
3      A.  That is correct.
4      Q.  Page 9, you indicated that PFGI did
5  not provide the required disclosure for the
6  yearend December 31, 1997?
7      A.  That is right.
8      Q.  Okay.  What is the basis for your
9  opinion that there was requirement of
10 disclosure with respect to 1997?
11     A.  The extant accounting policy of PFGI
12 was to provide six years of prior data in its
13 selected financial data section of its 10K.
14 That was changed beginning with the yearend
15 12/31/2002 down to five years.  That way they
16 lopped off full disclosure of '97 after
17 restatement.
18         So we know we do have -- there is
19 full disclosure after restatement compared to
20 as originally reported for 12/31/98 and '99,
21 2000 and 2001, but not for '97.
22     Q.  Do you know what the 10K rules are,
23 for what periods need to be disclosed in
24 financials?
25     A.  The current year, plus four prior

Page 223

1  FUERMAN
2  years, total of five years.
3      Q.  Five years?
4      A.  Right.  It's voluntary to supply
5  even father back information, and PFGI changed
6  its prior accounting from the current year,
7  plus five years back for yearend 12/31/2001.
8  Suddenly in 12/31/2002 they shift to the prior
9  year, plus only four years prior.
10     Q.  Which is all that the 10K rules
11 require, right?
12     A.  That is all that 10K rules require,
13 but it leads any reasonable accounting expert
14 to ask the question why was the accounting
15 policy changed in such a propitious moment.
16     Q.  It's a voluntary disclosure to do it
17 beyond five years, correct, there's no
18 requirement to do it beyond five years; is
19 that right?
20         MR. BRAUTIGAM:  Objection.
21     A.  No, that's not right.  The general
22 requirement is full and fair disclosure to the
23 investor.  And that's what needed to be
24 provided by going five years back, not just
25 four years back in this situation.

Page 224

1  FUERMAN
2      Q.  What accounting principle requires
3  full and fair disclosure, or are we in the law
4  now?
5      A.  It's a crossover between the two.
6      Q.  I see.
7      A.  I mean, the SEC issues staff
8  accounting bulletins, for example.  Seriously,
9  the accounting literature has similar
10 sentiments in it.
11         If you look at the statements in
12 financial accounting concepts there's similar
13 sentiments to the SEC's mantra of full and
14 fair disclosure.  I can't come up with the
15 exact words right now but something similar.
16     Q.  You are not an SEC expert?
17     A.  I am not an SEC expert.
18     Q.  Paragraph 18.
19     A.  Yes.
20     Q.  Second sentence, and to the extent
21 I'm replowing old ground just tell me if your
22 answer to the prior questions are the same.
23         You sate here that "A restatement of
24 previously issued audited annual financial
25 statements constitutes an admission by the

Page 225

1  FUERMAN
2  management of the company that each and every
3  one of the previously issued audited financial
4  statements was material any misstated."
5          MR. BRAUTIGAM:  I object on the
6  grounds that that's not the second
7  sentence.
8          MR. BURKE:  That's the third
9  sentence.  I stand corrected.
10     Q.  Do you see where I am?
11     A.  Yes, I do see where you are.
12     Q.  What in the accounting literature
13 that you are familiar with is the basis for
14 that statement, if it's anything other than
15 what we talked about before?  If it's the same
16 that's fine.
17     A.  APB 20.
18     Q.  Paragraph 38.
19     A.  APB 20 has to be, you know -- it's
20 like kids, sometimes all they want to eat is
21 dessert.  You have to eat the vegetables and
22 meat too.  You have to look at the whole APB
23 20.
24     Q.  I mean, and take your time, find me
25 anywhere in APB 20 where the language that you

57 (Pages 222 to 225)

Page 226

FUERMAN

1       FUERMAN
2  use in this expert report, that "A restatement
3  constitutes an admission by management of the
4  company that each and every one of the
5  previously issued audited financial statements
6  was materially misstated;" show me where that
7  appears anywhere in that APB?
8       A.  In paragraph 14, it begins with
9  paragraph A and ends with paragraph D.  Over
10 and over again the authors of APB 20 say we
11 are in general opposed to restatements because
12 we believe consistency is such an important
13 value in financial reporting.  If you read
14 those four paragraphs, I could read them into
15 the record, but I don't see that serves a
16 purpose.
17      Q.  It will be attached to the exhibit.
18      A.  You read how the board approached
19 this general dilemma of they love consistency,
20 but they love correct financial reporting.
21 How do we resolve the problem of what do we do
22 when we discover an error that occurred two,
23 three, four years ago?
24      They come out on the side of in
25 general coming up with very few situations

Page 227

1       FUERMAN
2  where there should be restatement.  They say
3  only if there was an error, only in a couple
4  of other situations.  For example, paragraph
5  27 says you should apply retroactively the new
6  method in restatements of prior periods if
7  there is, A, a change from the LIFO method of
8  inventory pricing to another, L-I-F-O.
9       B, a change in the method of
10 accounting for long-term construction
11 contracts.  And C, a change to or from the
12 full cost method of accounting which is used
13 in the extracted industries.  Those are the
14 only thing non-correction of an error type of
15 accounting changes that they want to see
16 handled with restatement, indicating that you
17 should be very cautious against restatement.
18      And if you do, you are asserting
19 that the prior statements were materially
20 misstated, unless it falls into one of these
21 exceptions.  For example, changing from LIFO
22 FIFO, for example.  Now, those kinds of
23 changes, changing from LIFO to FIFO, nobody
24 reasonably regards that as indicative of the
25 original reporting, financial reporting being

Page 228

1       FUERMAN
2  materially misstated.
3       They give a couple other examples in
4  APB 20.  For example, if after the period,
5  after the fiscal period there was a pooling of
6  interest merger, -those have gone out of
7  existence now, but they used to be very
8  popular -- then there needs to be a
9  restatement.
10      Nobody regards that as indicative of
11 the originally issued financials being
12 materially misstated.  Also, nobody regards it
13 as a sin if the financials get restated
14 because a new pronouncement by the financial
15 accounting standards board comes out and
16 specifically says that you need to restate
17 prior to this particular FASB.
18      Sometimes they got out with that
19 specific language and instruction.  Also, if a
20 new statement of position is issued by the
21 emerging issues tasks force, nobody regards --
22 they rarely, people rarely regard that as
23 indicating that the originally issued
24 financials are materially misstated.
25      Perhaps a gray area, but a lot of

Page 229

1       FUERMAN
2  people don't regard it as indicative of the
3  originally issued financials being materially
4  misstated is if a new staff accounting
5  bulletin is put out by the SEC.  It's a little
6  bit of a gray area because some people say
7  that's not really a new GAAP pronounce.  It's
8  just the SEC emphasizing that this is what
9  GAAP has already been.
10      People argue about that.  But
11 clearly as in the case of Provident where
12 there's no -- there's no way you could claim
13 you are going from good GAAP to good GAAP.
14 You are going from incorrect violation of GAAP
15 to good GAAP when you make the announcement
16 March 5, 2003, April 15, 2003.
17      Definitely that is regarded as an
18 admission by management, the originally issued
19 financials were materially misstated.  Now
20 some people will go further and they will
21 argue, I've seen this, they will immediately
22 accuse the auditors of having conducted a
23 failed audit.
24      I don't take that position.  I think
25 I'm a very reasonable and middle of the road

58 (Pages 226 to 229)

Page 230

FUERMAN

1    in my interpretations of these things.
2        Q.   Okay.  My question is a simple one.
3    Can you point me to anywhere in any paragraph
4    of APB 20, I understand your interpretation
5    and philosophy, can you point me to anywhere
6    in APB 20 where it says a restatement of
7    previously issued audited financial statements
8    constitutes an admission by the management of
9    the company, each and every one of the
10   previously issued audited financial statements
11   was materially misstated?
12       MR. BRAUTIGAM:  Objection.
13       A.   Those words are not there because
14   this is that is not the intention of APB 20.
15   The intention of APB 20 is to tell companies
16   how they are supposed to do their accounting.
17       Q.   Those words do not appear?
18       A.   Those words do not appear.
19       Q.   Thank you.  Paragraph 19.
20       MR. BRAUTIGAM:  Jim, would this be a
21   convenient time for a break?
22       MR. BURKE:  Now is a fine time to
23   break.
24       (Recess taken.)

Page 231

FUERMAN

1        Q.   Paragraph 19.  Paragraph 19 is under
2    the heading "the Attitudes of the CFO, CEO and
3    Audit Committee Towards APB 20," correct?
4        A.   That is correct.
5        Q.   The second paragraph of paragraph 19
6    states, "The purpose of this discussion is to
7    develop insight into some of the people
8    responsible for the financial reporting of
9    PFGI," correct?
10       A.   Yes.
11       Q.   Other than reading the definitions
12   that are listed in your report, you have no
13   knowledge, never met, have no exposure to any
14   of these individuals, correct?
15       A.   The only one I'd even heard of was
16   Dr. Stager who was present at the University
17   of Cincinnati when I was a graduate student
18   there, and I never met him.
19       MR. BRAUTIGAM:  I have a point of
20   clarification.  When you say read in
21   deposition transcripts, do you include
22   things like PFGI board minutes or memos,
23   things like that or?
24       MR. BURKE:  What he's looked at?

Page 232

FUERMAN

1        Q.   You never met any of these people?
2        A.   No.
3        Q.   You have no knowledge of their
4    background other than is reflected in the
5    depositions?
6        A.   No, I do not.
7        Q.   Do you consider yourself an expert
8    on developing insight into people?
9        A.   Yes.
10       Q.   What's the basis for that?
11       A.   I'm a certified fraud examiner.
12       Q.   You've been a certified fraud
13   examiner since 1999?
14       A.   That's correct.
15       Q.   You've done one fraud?
16       A.   That's correct.
17       Q.   You believe that gives you the
18   ability to determine whether people are
19   telling the truth or not; is that correct?
20       A.   My total knowledge and experience of
21   fraud examination, in forensic accounting, I
22   believe gives me the ability to opine
23   meaningfully on insights from what people say
24   in interviews and in depositions, yes.

Page 233

FUERMAN

1        Q.   Are you aware of -- have you ever
2    been qualified as an expert to whether people
3    are telling the truth or not based upon what
4    you read in a deposition?
5        MR. BRAUTIGAM:  Objection.
6        A.   No.  As I state at the beginning of
7    the deposition, I have not been qualified as
8    an expert by any court.
9        Q.   Can you point me to any materials in
10   the curriculum or in the body of work of the
11   certified fraud examiners to say it's
12   permissible to read a deposition and determine
13   whether someone is lying or not lying?
14       A.   There are many pages devoted to this
15   topic in the fraud examiners' manual, which is
16   the main basis of the certified fraud
17   examiners' test that I passed in 1999 on
18   interviewing and interrogation techniques, and
19   how to gage the truthfulness of people being
20   interviewed or interrogated.
21       Most of the contexts that are
22   discussed, most of the examples, are of law
23   enforcement or security officials interviewing
24   people suspected of something.  But these same

59 (Pages 230 to 233)

Page 234

FUERMAN

1    principles I believe would carry over into a
2    deposition transcript. I've also taught since
3    year 2000 a chapter -- we devote one week each
4    semester to the discussion of interviews and
5    interrogations, and we view a video called
6    Beyond The Numbers, narrated by Joseph Wells
7    and produced by Associations of Certified
8    Fraud Examiners that gives instructions on how
9    to detect whether people are telling the truth
10   or not.
11       It's called statement analysis. I
12   also took a workshop this summer put on by
13   PricewaterhouseCoopers where they had experts
14   come in who are specially trained and
15   recognized as being experts in this, who have
16   worked as consultants not only for
17   PricewaterhouseCoopers, but also for the CIA
18   and the Army.
19       I learned additional techniques
20   about detection of deception. I will make a
21   caveat that I did not have a chance to observe
22   the body language and breathing patterns and
23   eye movements and things of that nature that
24   can be helpful, so I don't have a sense of the

Page 235

FUERMAN

1    non-verbal communication of the people who
2    were deposed, which I regard as kind of an
3    interview. But nonetheless, I feel I can make
4    some -- I can come up with some reasonably
5    based opinions based on reading of the
6    transcript.
7        Q.  The Fraud Examiners' Manual talks
8    about interviewing and interrogation
9    techniques?
10       A.  That is correct.
11       Q.  That's in person, correct?
12       A.  I think all of these materials,
13   whether it's materials by the Association of
14   Certified Fraud Examiners or
15   PricewaterhouseCoopers, acknowledges that one
16   can be more effective at this if one is able
17   to observe the non-verbal behavior of the
18   subject that you are interested in analyzing.
19   There's no question about that.
20       Q.  All those materials you talked about
21   dealt with personal interviews and personal
22   interrogations of individuals, did they not?
23       A.  That's true.
24       MR. BRAUTIGAM:  Objection.

Page 236

FUERMAN

1        Q.  Is that true?
2        A.  That is true, but these were not
3    just videos. There were also transcripts that
4    were studies as part of these courses too.
5    The transcripts are regarded as potentially
6    very valuable and very insightful.
7        Q.  Were you ever in the CIA?
8        A.  No.
9        Q.  Were you ever in the Army?
10       A.  No.
11       Q.  Did you ever interview or
12   interrogate anybody?
13       A.  No.
14       Q.  Were you ever in law enforcement?
15       MR. BRAUTIGAM:  Objection.
16       A.  No.
17       Q.  Were you ever a security official?
18       A.  No.
19       Q.  How long was your PWC Training
20   Program?
21       A.  Four days.
22       Q.  Where was that?
23       A.  It was in a small town near
24   Princeton, New Jersey. It was a workshop put

Page 237

FUERMAN

1    on by PricewaterhouseCoopers for about 350
2    accounting professors across the
3    United States.
4        Q.  In the Fraud Examiners' Manual or
5    any other material you've studied, is there a
6    chapter or something that deals with how you
7    read a transcript alone and determine the
8    truthfulness or lack of truthfulness of a
9    person you've never seen before?
10       MR. BRAUTIGAM:  Objection.
11       A.  There's not a chapter on that, and
12   there's also not a chapter on what to do if
13   they are wearing a blue shirt instead of a
14   white shirt. It's very clear in these courses
15   that these principles generally can be applied
16   to transcripts, though certainly not nearly as
17   effectively as if you had the chance to view
18   video of the person.
19       Q.  In all of your research into
20   securities litigation and securities class
21   actions, are you aware of any case in which
22   someone who claimed to be a certified fraud
23   examiner, testified as to whether or not a
24   deposition transcript was true or untrue based

60 (Pages 234 to 237)

FUERMAN

1    upon the reading of that transcript after the
2    fact?
3          MR. BRAUTIGAM: Objection.
4    A.   No, I'm not aware as to what other
5    expert witnesses have testified in prior court
6    proceedings. This is my first expert witness
7    assignment.
8    Q.   In your certified fraud examiner
9    training, did they ever give you any examples
10   of situations where that occurred?
11   A.   Where?
12   Q.   Someone was qualified as an expert
13   to walk in and read a deposition transcript
14   and determine credibility or lack of
15   credibility?
16         MR. BRAUTIGAM: Objection.
17   A.   There's the implicit acknowledgment
18   that that is feasible, and if you like I can
19   send you a copy of these materials by the
20   Association of Certified Fraud Examiners video
21   and workbook called "Beyond the Numbers."
22   Q.   That would be fine. If you would
23   supply that to Mr. Brautigam I would
24   appreciate that.
25

FUERMAN

1          MR. BRAUTIGAM: I'll write it down.
2    A.   Are you taking a note of that?
3    Thank you.
4    Q.   Paragraph 21. The middle of that
5    paragraph talks about the assertion by
6    management of material misstatement of each of
7    the restated periods. We covered that point
8    before?
9    A.   That is correct.
10   Q.   I take it you are not a
11   psychologist?
12   A.   No, I am not.
13   Q.   I'm not being facetious, but you are
14   not clairvoyant or a mind reader, are you
15   A.   I have a number of degrees, but not
16   in that field.
17   Q.   Not in mind reading?
18   A.   Yeah.
19   Q.   You state here that "In my opinion,
20   the CFO -- this is the last sentence of
21   paragraph 21, "intentionally misstated his
22   personal knowledge and belief about
23   restatements of materiality." What's the
24   basis for that?
25

FUERMAN

1    A.   The basis is circumstantial
2    evidence. I infer from his stating things
3    that are clearly incorrect, that clearly a
4    person of his knowledge and stature in
5    financial accounting, having been the CFO of a
6    major publicly held company, it's to me
7    inconceivable that his saying what he did was
8    a boo-boo. It just seems to me it was
9    intentional.
10   Q.   Are you saying he said what he did
11   was a "boo-boo"?
12   A.   We're being facetious here.
13         MR. BRAUTIGAM: Objection. You've
14   interrupted the witness. Please let him
15   finish.
16   A.   What he said, it seems inconceivable
17   that it could be inadvertent. That a person
18   of his knowledge and stature, who gives such a
19   blatantly incorrect interpretation of
20   APB No. 20, it just seems inconceivable that
21   that was an innocent mistake.
22   Q.   So you are opining on his intent and
23   you believe you are qualified to do that; is
24   that right?
25

FUERMAN

1          MR. BRAUTIGAM: Objection.
2    A.   I'm opining on -- well, yes, I am
3    opining on his intent. I mean, there are
4    three kinds of statements. There are true
5    statements, there are false statements due to
6    mistake and false statements that are
7    intentionally false.
8          I am not eager to say that about
9    this person, but it just seems obvious to me
10   from reading the deposition transcript.
11   Q.   Where do you come up with the basis
12   there are three types of statements?
13   A.   That just seems to me logical.
14   Q.   There's no basis for that in the
15   certified fraud examiner manual or anything
16   like that?
17   A.   That's just logic and common sense.
18   Q.   Your own subjective judgements?
19   A.   My own subjective judgment.
20   Q.   Obviously you've never been the CFO
21   of a public company?
22   A.   I have never been a CFO of a public
23   company.
24   Q.   The next page, page 11, there's a
25

61 (Pages 238 to 241)

Page 242

FUERMAN

1
2  description of the Wells Fargo situation.
3      A.  Yes.
4      Q.  What do you understand about the
5  Wells Fargo situation?
6          MR. BRAUTIGAM:  Objection,
7      overbroad.
8      A.  Well, what I understand about
9  Wells Fargo that seems relevant to the
10  question of whether the financials were
11  materially misstated, is that in response to
12  an announcement by the SEC observer, or put in
13  other words, in response to an action by the
14  SEC which is like the promulgation of a new
15  FASB or a new statement of position by the
16  emerging issuance task force, that is why
17  Wells Fargo restated.
18          It wasn't like Provident where
19  Provident clearly went from using accounting
20  that was in violation of GAAP to accounting
21  that conformed to GAAP.  Wells Fargo, you
22  could argue whether or not their original
23  accounting was good GAAP or in violation of
24  GAAP.
25          Whenever a new FASB comes out, a new

Page 243

FUERMAN

1
2  statement of position, a new pronouncement by
3  the staff, a staff accounting bulletin, a new
4  announcement by the SEC observer, that throws
5  into question whether the prior financials
6  were materially misstated.  In fact, a lot of
7  reasonable people would say they clearly were
8  not materially misstated in that fact
9  paragraph.
10          You have a different fact paragraph
11  with Provident.  There was no such issuance of
12  a new FASB or SOP or anything.
13      Q.  Do you know if that emergence
14  issuance task force bulletin related to?
15      A.  It had to do with lease accounting.
16      Q.  What aspect of lease account does it
17  relate to?
18      A.  It doesn't matter whether it relates
19  to --
20      Q.  My question is did you know?
21          MR. BRAUTIGAM:  Objection.  You
22      should not interrupt the witness.
23      Dr. Fuerman, you can answer the question.
24      A.  I'll answer your question, but then
25  I'll continue.  I know little about the

Page 244

FUERMAN

1
2  substance of the SEC observer announcement,
3  other than it had to do with lessors
4  application in paragraphs 5J and 7D of FASB
5  statement number 13 of accounting for leases,
6  to arranging third-party guarantees with
7  respect to residual value of the lease
8  property.
9          But having said that, the point is
10  that whether we are talking about a
11  manufacturing company, a services company, a
12  bank, an insurance company, whatever kind of
13  company, when it restates in response to an
14  announcement by the SEC observer or the new
15  SOP or a new FASB or a new FAB, that makes the
16  original financial reporting maybe just fine,
17  maybe no problem.
18          But if you don't have that in the
19  fact pattern that clearly indicates the
20  original financial reporting did violate GAAP.
21      Q.  Did you understand that emerging
22  issues task force dealt with the precise RVI
23  issue that lead to Provident's second
24  restatement, did you know that?
25      A.  It's not important --

Page 245

FUERMAN

1
2      Q.  My question is did you know that?
3          MR. BRAUTIGAM:  Mr. Fuerman, you can
4      continue.  He should not interrupt you.
5      You can continue.
6      Q.  I'd like a yes or no if you can give
7  it to me.
8      A.  It's true both concerned the
9  residual value insurance, both Wells Fargo and
10  PFGI.  But the substantive difference is that
11  when the SEC observer comes out with an
12  announcement that's like a new SOP or a new
13  FASB -- and there was no such announcement
14  with PFGI.  PFGI on its own accord did a
15  restatement.
16      Q.  Do you understand -- did you read
17  the emerging task force bulletin?
18      A.  Yes, I did.
19      Q.  So you know it related to RVI
20  insurance?
21      A.  Yes.
22      Q.  Do you know that the source of that
23  task force bulletin was PricewaterhouseCoopers
24  and Provident, are you aware that's where it
25  came from?

62 (Pages 242 to 245)

Page 246

FUERMAN

2  MR. BRAUTIGAM: Objection.
3  A.  That may be, but it would not change
4  my answer.
5  Q.  Are you aware that because the SEC
6  realized that many, many financial
7  institutions in the publically reported had
8  precisely the same problem has Provident did,
9  that they issued that so they would not have
10  to restate?
11  MR. BRAUTIGAM: Objection. Jim, are
12  you representing you aware of what the
13  SEC realized and what the SEC's thought
14  process?
15  MR. BURKE: Yes.
16  Q.  Are you aware of that?
17  A.  I'm not sure to what extent what you
18  are saying is true.  I would want to check the
19  facts out for myself.
20  Q.  At least as you sit here today
21  that's news to you, isn't it, that the genesis
22  and the impetus for that merging issues task
23  force bulletin was the Provident RVI situation
24  and the PWC analysis?
25  MR. BRAUTIGAM: Objection.

Page 247

FUERMAN

2  A.  I was not aware of that.
3  Q.  Are you aware that the parties who
4  were subject to that, such as Wells Fargo,
5  were permitted to correct their RVI insurance
6  before the close of their next year, and if
7  they did so they would not have to restate?
8  A.  I don't remember that detail.
9  Q.  Are you aware that because Provident
10  had already restated they didn't get the
11  benefit of that?
12  MR. BRAUTIGAM: Objection.
13  A.  I'm not sure that is true.  That's
14  what has been alleged in some deposition
15  transcripts, that's all.
16  Q.  In paragraph 23 you have another
17  statement in there about the CFO intentionally
18  misstating his personal knowledge and belief.
19  That's based upon the same expertise you
20  talked about earlier, your certified --
21  A.  Which paragraph are you referring
22  to?
23  Q.  Paragraph 23, the third line from
24  the bottom.  "I believe the CFO intentionally
25  misstated his personal knowledge and belief

Page 248

FUERMAN

2  about the nature of the Wells Fargo
3  restatement and how it compares to PFGI
4  restatement"?
5  A.  I believe that he did, yes.
6  Q.  Even though you really don't know
7  the comparison of how Provident's situation
8  relates to Wells Fargo?
9  A.  Well, now I know it's more.  Let's
10  assume that it is true, as you allege, that
11  the impetus for the SEC observer's statement
12  came from PricewaterhouseCoopers, after it
13  cleaned up the accounting mess at Provident.
14  Still, that does not excuse what occurred at
15  Provident.
16  Q.  I understand that.
17  A.  What occurred at Provident is in
18  excusable.  Just because subsequently the SEC
19  moved to try to take care of a problem at
20  Wells Fargo, that bears some similarity to
21  Provident, you cannot say that -- you can't
22  get on a time machine and suddenly transport
23  PFGI's restatement subsequent to, you know,
24  the time when the SEC observer came out
25  May 15, 2003.

Page 249

FUERMAN

2  Q.  What is the basis for your statement
3  though that Mr. Carrie intentionally misstated
4  his personal knowledge and belief about the
5  nature of the Wells Fargo restatement?
6  A.  He has to know.  It's entirely
7  different.
8  Q.  It's the same issue about RVI
9  insurance, it's not entirely different.
10  MR. BRAUTIGAM: Objection,
11  argumentative and you don't have to
12  accept Mr. Burke's representations or
13  misrepresentations.
14  Q.  Do you understand that?
15  A.  The important distinction between
16  Wells Fargo and Provident is the SEC observer
17  makes an announcement, subsequent to that
18  Wells Fargo restates.  Prior to that Provident
19  restates.  It makes a large difference.
20  Q.  Based upon that you draw this
21  conclusion?
22  A.  Yeah.  I conclude that Mr. Carrie
23  must know and understand that difference also.
24  Q.  The basis for that is your own
25  subjective judgment, as you've described it

63 (Pages 246 to 249)

Page 250

FUERMAN

1
2  previously?
3     A.  No.  My judgment informed by my
4  studies to become a certified fraud examiner
5  and my further studies and research in
6  teaching fraud examination, and in attending
7  the PricewaterhouseCoopers workshop.
8     Q.  Paragraph twenty-four, page 12.
9        MR. COHEN:  Would this be a good
10    time to break?  It's about four.
11       MR. BURKE:  I'm going to wait.  I'm
12    going to try to ask a couple more
13    questions.
14    Q.  You state that the CFO asserted the
15  present value analysis to applicable to cash,
16  as applicable to net income.  You continue,
17  this is a lie by the CFO who knows better.
18    A.  How could he not know better?  I
19  think my Accounting 201 students, after they
20  have finished their semester with me, they are
21  not rocket scientists, they are just
22  sophomores in college, but they understand
23  it's very important, the timing of net income.
24    Q.  We're not talking about "timing."
25  We're talking about "present value analysis"?

Page 251

FUERMAN

1
2     A.  We're talking about present value
3  analysis in the context of timing.  Present
4  value analysis is the kind of timing analysis.
5     Q.  Present value analysis applies to
6  cash flows; is that true?
7     A.  Only in a very narrow sense if you
8  are talking about cash management.  If you are
9  talking about financial statement analysis,
10  the timing of net income is critically
11  important to any kind of equity valuation.
12    Q.  Take a look at page 14 of your
13  report, where you are talking about Mr. Cook.
14    A.  Yes.
15    Q.  You talk about FASB 1978, paragraph
16  25, and you quote --
17    A.  Where are you?
18    Q.  Paragraph 28, page 14.  I apologize.
19  You quote FASB 1978, paragraph 25.  It says,
20  "Potential users of financial information most
21  directly concerned with a particular business
22  enterprise are generally interested in its
23  ability to generate favorable cash flows
24  because their decisions relate to amounts
25  timing and certainties of expect cash flows."

Page 252

FUERMAN

1
2     A.  That's true.
3        MR. BRAUTIGAM:  Uncertainties.
4        MR. BURKE:  Uncertainties, right.
5     A.  But it's well established in the
6  accounting literature, going back to Payton
7  and Littleton, in 1940, that the way a
8  financial statement analysis should be
9  conducted to determine the likelihood of
10  future cash flow from a company is not by
11  studying the current cash flow, but by
12  studying the current earnings.
13       Those are regarded as far more
14  reliable.  They are not ironclad reliable, but
15  they are regarded as more reliable indicators
16  of the future cash flow than the current cash
17  flow is.
18    Q.  You understand obviously that
19  receipt of cash is not equal to recognition of
20  income?
21    A.  No, but it's well established in
22  financial statement analysis that a company
23  recognizing earnings per share now, it can be
24  extrapolated that there is a certain
25  likelihood of a certain amount of earnings per

Page 253

FUERMAN

1
2  share in the future, and then built on top of
3  that there's extrapolations as to what that
4  means for equity valuation.
5        MR. BURKE:  Why don't we take a
6     fifteen minute break.
7        (Recess taken.)
8        (Record read.)
9     Q.  Professor Fuerman, when Provident's
10  accounting for the leverage lease
11  transactions, that were the subject to the
12  restatement, are you aware that the underlying
13  cash flows did not change?
14    A.  Oh, yes, I'm very much aware of
15  that.
16    Q.  You've heard of "discounted cash
17  flow analysis"?
18    A.  Are we on a particular page,
19  particular paragraph sort of?
20    Q.  Not yet.  We're sort of on paragraph
21  24, where we were talking about cash flows.
22    A.  Okay.
23    Q.  You are aware of a "discounted cash
24  flow analysis," you've heard of that?
25    A.  Yes.

64 (Pages 250 to 253)

Page 254

FUERMAN

1            FUERMAN
2    Q.  Is that something that you are
3  familiar with performing?
4    A.  I must have done it in a finance
5  course. I had a finance course, or two, in my
6  Ph.D. program, but it's not something I do in
7  my work now.
8    Q.  That's my question. Have you ever
9  heard of a "discounted net income analysis,"
10  it's done by finance professionals?
11    A.  That exact term, no, I've not.
12    Q.  In paragraph 27 you render certain
13  opinions regarding the deposition of
14  Dr. Stager.
15    A.  Yes.
16    Q.  Again, that is based upon your
17  reading of his deposition?
18    A.  That is correct.
19    Q.  The last sentence on that page,
20  "However, these are strong affirmations of
21  plaintiffs' positions on restatements and
22  materiality, given the context of the intense
23  pressure (strategic interrupts with extremely
24  frequented repetitious objections exerted by
25  three attorneys for the defendants (against

Page 255

1            FUERMAN
2  one for the plaintiffs) throughout the
3  deposition to thwart Dr. Stager from making
4  any meaningful statement on these issues.
5    A.  Yes, what is your question?
6    Q.  What in your experience in your
7  experience or background gives you the
8  supposed expertise to opine on the nature of
9  how one behaves or conducts or defends a
10  deposition?
11    A.  I have not been deposed before
12  today, however, I have observed a number of
13  depositions when I was an associate at Enz
14  Jones LeGrand. I know that the behavior of
15  the attorneys in the room has a huge impact on
16  the testimony of the witnesses, and it was my
17  judgment in reading that transcript that that
18  was true in the Stager deposition transcript.
19    Q.  What authoritative treatises,
20  studies, data support do you have for making
21  judgements of how the conduct of attorneys
22  affects deposition testimony, are you aware of
23  any?
24    MR. BRAUTIGAM:  Objection.
25    A.  I think this is basic stuff. I'm

Page 256

1            FUERMAN
2  here as an expert witness on accounting and
3  auditing, but I have been exposed to the basic
4  level of what goes on at a deposition and
5  seen, you know, Irving Younger and others
6  discuss what goes on. It's just obvious to me
7  that Dr. Stager's replies to certain questions
8  were influenced by highly, you know, very
9  frequent strategic interruptions by three
10  defense counsel, yourself cloud.
11    Q.  I wasn't at Dr. Stager's deposition?
12    A.  Maybe it was -- I take that back.
13  There were three attorneys for the defendants.
14  I'm sorry if I did not recollect that you were
15  one of them.
16    Q.  Maybe you didn't read it as
17  carefully as thought.
18    MR. BRAUTIGAM:  Excuse me, Jim, are
19  you representing you were not at
20  Mr. Stager's first deposition?
21    MR. BURKE:  No. The second one, the
22  one he is referring to here.
23    MR. BRAUTIGAM:  How do you know he
24  is referring to that one?
25    MR. BURKE:  Because there weren't

Page 257

1            FUERMAN
2  three attorneys at his first deposition.
3    A.  The substance of my remarks about
4  page 13 is it doesn't matter about the
5  identity of the three attorneys, it's just
6  that their behavior had an impact, in my
7  opinion, of the response of Dr. Stager.
8    MR. BURKE:  I'll further note, for
9  the record, that he refers in paragraph
10  27 of his report to the May 7, 2004
11  deposition, which I didn't attend.
12    Q.  My question is this, and I'm
13  assuming for purposes of these questions,
14  Professor Fuerman, that although you are an
15  accounting materiality expert, you plan to
16  come to court and offer these opinions on who
17  is telling the truth and who is not telling
18  the truth that are contained in that report,
19  am I correct on that?
20    A.  Only incidental to the issues of
21  materiality restatements.
22    Q.  Do you intend to come into court and
23  talk about how Mr. Carrie was intentionally
24  lying and Mr. Hoverson's testimony and
25  Mr. Stager's testimony or not?

65 (Pages 254 to 257)

Page 258

FUERMAN

1
2     A.  I'm prepared to testify as to
3  anything that's contained in my expert report
4  or anything I say at this deposition.
5     Q.  That's fine.  To the extent you plan
6  to do that, then my next question is, and I
7  don't think I got an answer to this, what
8  treatises, what training, what objective data
9  are you relying upon, what studies in your
10  field of expertise do you believe support your
11  theory that conduct of the attorneys at this
12  deposition affected Dr. Stager's testimony?
13     MR. BRAUTIGAM:  Objection.
14     Q.  What authoritative studies are you
15  referring to that would support your
16  conclusions?
17     MR. BRAUTIGAM:  Objection.
18     Q.  If you know of any?
19     MR. BRAUTIGAM:  Objection.
20     A.  I believe I can reasonably
21  extrapolate from my studies of interviews and
22  interrogations in general to support the
23  opinions I express regarding Dr. Stager's
24  answers on his deposition transcript.
25     Q.  In the interview and interrogation

Page 259

FUERMAN

1
2  techniques that you referred to and that you
3  talked about previously, was the witness
4  represented by counsel?
5     A.  I believe that you can extend the
6  general notions that are expressed in these
7  courses on interviews and interrogation to a
8  deposition.  If this is not an interview and
9  interrogation I'd like to know what is.
10     Q.  My question is, are the interviews
11  and interrogations that you've studied, as you
12  described them earlier, where the people who
13  are being interviewed in those videos and
14  those courses, were they represented by
15  counsel or not?
16     A.  In these particular videos that I
17  saw they were not represented by counsel.
18     Q.  So there was nothing that you saw
19  that dealt with the extent to which counsel's
20  behavior affects the testimony of those being
21  interviewed; am I correct?
22     A.  That is correct.
23     Q.  How many depositions did you observe
24  in your legal career?  I apologize if I've
25  asked this before.  I know you told me you've

Page 260

FUERMAN

1
2  observed some, but I want to know what your
3  best approximation of how many?
4     A.  Perhaps half a dozen.
5     Q.  Six depositions?
6     A.  It's been many years since I've
7  practiced law, so I could be inaccurate.
8     Q.  Paragraph 30, page 14.  "Sitting on
9  the audit committee of a publicly traded
10  company is a great and serious task."
11     A.  Yes.
12     Q.  Have you ever sat on the audit
13  committee of a publicly traded company?
14     A.  No.
15     MR. BRAUTIGAM:  Objection.  That was
16  asked and answered.
17     MR. BURKE:  I apologize.
18     Q.  The next statement is "Members are
19  responsible for reviewing the auditor's work
20  and ultimately the integrity of a firm's
21  financial statements."
22     A.  Yes.
23     Q.  What's your basis for that?
24     A.  The SEC Rules, the New York Stock
25  Exchange and NASDAQ listing rules specific to

Page 261

FUERMAN

1
2  audit committees, journal articles that have
3  discussed this, one of the authors whose last
4  name is Braiotta, B-R-A-I-O-T-T-A,
5  Lou Braiotta.  This is something that has been
6  discussed many years.
7     The blue ribbon panel on audit
8  committees that, it's late 1990s, I can't
9  remember if that's an SEC thing or if that was
10  an AICPA thing or exactly.  All of this has
11  been brewing and peculating throughout
12  accounting and auditing for a number of years.
13     Q.  I know you told me you didn't sit on
14  an audit committee meeting.  Have you ever
15  attended an audit committee meeting?
16     A.  No.
17     MR. BRAUTIGAM:  Committee in that
18  prior question.
19     MR. BURKE:  I meant to say that if I
20  didn't.  What did I say?
21     MR. BRAUTIGAM:  Meeting.
22     Q.  Audit committee meeting, have you
23  ever attended an audit committee meeting?
24     A.  No, I have not.
25     Q.  The last sentence on page 14, you

66 (Pages 258 to 261)

Page 262

FUERMAN

1  were talking here about Mr. Grotti.
2     A.  Yes.
3     Q.  Begins on the bottom of page 14.
4  "His attitude toward the fact that his
5  subsequent restatement of previously issued
6  financial statements is an admission that they
7  were materially misstated, question mark, in
8  comprehensiveness period."
9     A.  Yes.
10    Q.  What does that mean?  I don't
11 understand that.
12    A.  Let me see if I can make you
13 understand.  Mr. Grotti did not have the
14 ability to understand the fundamental
15 financial statements of PFGI, and that's
16 actually the NASDAQ standard for audit
17 committee members, to have that level of
18 knowledge.
19       New York Stock Exchange uses the
20 phrase "financial literacy."  He didn't seem
21 to have an understanding of the fundamental
22 financials.  It's also in part of the rules of
23 both exchanges and the SEC that audit
24 committee members have some notion, some

Page 263

FUERMAN

1  understanding of what their duties are.
2       He just did not seem to be there.
3  He was a contrast to Dr. Stager and Mr. Cook,
4  who I would say had the ability to understand
5  financial statements.
6     Q.  You have no knowledge of
7  Mr. Grotti's business background or his
8  familiarity with financial statements and
9  financial concepts?
10    A.  Beyond what is contained in his
11 deposition transcript, no.
12    Q.  You have no knowledge of the extent
13 to which he does review financial statements
14 in the course of his business or even in the
15 course of Provident's business activities,
16 correct?
17    A.  It was elucidated pretty well what
18 his lack of knowledge of financial accounting
19 was in his transcript.  I think it was an
20 appalling lack of knowledge that he
21 demonstrated throughout his deposition.
22    Q.  That's based upon -- strike that.
23    A.  It's based upon my reading of the
24 deposition transcript of Mr. Grotti, my

Page 264

FUERMAN

1  understanding of the duties of an audit
2  committee member from the accounting and
3  auditing literature, from reading the SEC
4  Rules, the Stock Exchange rules.
5     Q.  The word "incomprehensiveness," I
6  don't understand what that means?
7     A.  It means somebody who does not even
8  begin to comprehend what is being asked.
9     Q.  Incomprehension?
10    A.  Yes.
11    Q.  What does that refer to or who does
12 that refer to?
13    A.  It refers to Mr. Grotti.
14    Q.  Okay.
15    A.  Who did not comprehend many things
16 about financial accounting and auditing and,
17 in particular, had no concept of what it means
18 so far as the original reported financial
19 statements when there subsequently is a
20 restatement.
21    Q.  Do you believe that a member of an
22 audit committee has to be conversant with the
23 details of generally accepted accounting
24 principles?

Page 265

FUERMAN

1     A.  No, he does not need to be
2  conversant with the details of the accounting
3  standards or GAAP.  He needs to have a
4  threshold knowledge of those know.
5     Q.  Do you believe that a member of an
6  audit committee has to have knowledge of
7  detailed concepts of generally accepted
8  auditing standards?
9     A.  No.  But, again, he has to have a
10 threshold knowledge of those because it's the
11 job of the audit committee to engage the
12 auditor, to supervise the auditor, to decide
13 whether it's appropriate for the auditor to do
14 this task or that task in addition to the
15 audit, because conceivably it could result in
16 an impairment of auditor quality.
17       It's the job of the audit committee
18 to decide whether to recommend the
19 reappointment of an auditor, to have some
20 ability to evaluate the quality of the
21 auditor?
22    Q.  So long as an audit committee
23 member, in your phraseology, has a threshold
24 knowledge of financial affairs, financial

67 (Pages 262 to 265)

Page 266

FUERMAN

1    FUERMAN
2    statements, accounting concepts, auditing
3    concepts, is that sufficient?
4        A.  Yes.
5            MR. BRAUTIGAM:  Objection.
6        Q.  For financial literacy?
7        A.  I don't know if I should use the
8    phrase "threshold knowledge" that you used.
9    The NASDAQ standard in PFGI, on NASDAQ, is
10   have a knowledge and understanding of
11   fundamental financial statements.
12       Q.  Just so I got it right, the NASDAQ
13   standard for financial literacy is a knowledge
14   and understanding of fundamental financial
15   statements?
16       A.  Something along those lines.
17       Q.  You wouldn't expect a member of the
18   audit committee to necessarily understand all
19   the detailed accounting issues and accounting
20   concepts involved in the Provident
21   restatements and the accounting issues
22   underlining, would you?
23       A.  What I would expect is overall for
24   the audit committee members to have maybe what
25   you term a threshold knowledge of accounting

Page 267

FUERMAN

1    FUERMAN
2    and auditing.  But when it comes up that a
3    company needs to consider whether to restate
4    or not, then I think in that situation it's
5    the duty of the audit committee members to
6    bring themselves to a higher level of
7    knowledge.
8            This is why the outside C.P.A. firm
9    is there, for them to provide this input to
10   the audit committee members and educate them,
11   if need be, that a certain situation has
12   occurred and you, the members of the audit
13   committee, need to know -- need to spend some
14   time learning more about this specific area of
15   GAAP.
16           That's what I would expect.
17       Q.  In that circumstance you would
18   expect an audit committee to bring in experts
19   to explain the issues to them and to try to
20   elevate their understanding of some of these
21   issues so they could make decisions about
22   them?
23       A.  Yes.  Anytime the audit committee
24   feels they don't understand something, it's
25   incumbent on them to get ahold of people who

Page 268

FUERMAN

1    can advise them, whether it's people internal
2    to the company or external to the company.
3        Q.  You would not expect a member of the
4    audit committee necessarily to be able to
5    define from an accounting standpoint the
6    difference between a "finance lease" and an
7    "operating lease," would you?
8        A.  I would expect them -- well.  I mean
9    it's expected that a member of an audit
10   committee should be more conversant about the
11   financial accounting that is critically
12   important to that particular company.  The
13   audit committee of a steel manufacturer, no, I
14   would not expect to know those kind of things.
15   But at Provident, they would know a bit more.
16       Q.  "A bit more"?
17       A.  A good bit more about the difference
18   between an "operating lease" and a "finance
19   lease" and a "sales lease," "back lease."
20       Q.  Your testimony and your opinion with
21   respect to Mr. Grotti's knowledge and
22   understanding of fundamental financial
23   statements is based solely upon your review of
24   this deposition; is that correct?

Page 269

FUERMAN

1    FUERMAN
2        A.  That is correct.  I've never met
3    him, I don't know what he looks like.
4        Q.  Paragraph 34 of your report.  We
5    talked a little bit about this before, but I
6    just want to go over it again.
7        A.  Certainly.
8        Q.  The first sentence states, "The full
9    extent of the restatement to the yearend
10   December 31, 1999, both with regard to net
11   income and EPS was a 16 percent decrease."
12       A.  Yes, I wrote that.
13       Q.  It's fair to say that all the facts
14   regarding the Provident restatements were not
15   fully known and fully understood and the full
16   financial extent of that was not communicated
17   until April 15, 2003?
18       A.  Absolutely correct.
19           MR. BRAUTIGAM:  Objection.
20       Q.  It's also a fact that from
21   April 15th forward, after that second
22   announcement occurred Provident's stock price
23   increased, correct?
24       A.  That is correct.  Are you implying
25   something from that?

68 (Pages 266 to 269)

Page 270

FUERMAN

1    FUERMAN
2        Q.  I'm not implying anything.  I'm just
3    asking questions and you are answering, and
4    you did.
5            You indicate -- the 16 percent
6    decrease which occurs on paragraph 64.
7        A.  Right.
8        Q.  Now, lower in the paragraph, the
9    second statement to last statement on the page
10   refers to, "A first order approximation of the
11   first three quarters overstatement of net
12   income in EPS is logically 16 percent."
13       A.  Yes.
14       Q.  What you do in those two sentences
15   is say that because the impact on net income
16   and EPS at December 31, 1999 was 16 percent,
17   necessarily the first three quarters must also
18   have been off by 16 percent?
19       A.  That's not what first order of
20   approximation means.
21       Q.  What does it mean?
22       A.  First order of approximation means
23   that roughly this is what I estimate the
24   overstatement of the first three quarters of
25   '99 was.

Page 271

FUERMAN

1    FUERMAN
2        Q.  But that's your estimate?
3        A.  That is my estimate.
4        Q.  Are you aware that the lease
5    accounting issue dealt with securitization
6    transactions?
7        A.  Yes.
8        Q.  Do you know what a "securitization
9    transaction" is?
10       A.  Roughly.
11       Q.  Tell me what your understanding is?
12       A.  Roughly, it means that instead of
13   simply Provident leasing a car to John Doe in
14   Indian Hill, or wherever, that Provident
15   gathers together very large numbers of leases
16   to various people, pools them together and
17   creates from that a security, which is sold to
18   investors who can make use of that security
19   for one reason or another, maybe for cash flow
20   reasons or for tax reasons.
21           That's what it did.  I'm aware that
22   perhaps some of the accruals would be made at
23   yearend on the securitization transactions.
24       Q.  When you look at the numbers for
25   March and June quarter ends 1999, do you know

Page 272

FUERMAN

1    FUERMAN
2    whether or not those include leases as
3    originally booked or those numbers reflect
4    securitization transactions?
5            MR. BRAUTIGAM:  Objection.
6        Q.  Of those leases?
7            MR. BRAUTIGAM:  Objection.
8        A.  To what extent, I don't know.  I do
9    know, remember reading in some transcript or
10   report somewhere, that there were periodically
11   securitizations that were done.  Exactly when,
12   what the timing is I don't know.
13       Q.  Since the error dealt with the
14   estimation of income and expense on the
15   securitization transactions, to the extent
16   what was reflected on those books was the
17   original leases in which they were not
18   estimating income and expense, the impact or
19   the restatement on those prior financials
20   would be uncertain, correct?
21           MR. BRAUTIGAM:  Objection.
22       A.  There is uncertainty as to how to
23   allocate this.  I think what you are trying to
24   get at, maybe I can speed this up, is that
25   there have been cases where there have been

Page 273

FUERMAN

1    FUERMAN
2    financial statement frauds where companies
3    would do things, like they would take some
4    quarterly financial statements and they would
5    take maybe one quarterly financial statement,
6    multiply it times four and say this is what we
7    have for the year or they would work the other
8    direction.
9            Obviously that is contrary to GAAP.
10   It's improper.  But in the context of this
11   report, I feel that given the dearth of
12   information that I had about the quarters and
13   how they would have been restated if there had
14   been a formal restatement, if that had been
15   disclosed to the public or disclosed to the
16   plaintiffs, I felt I had no reasonable better
17   alternative to do this analysis.
18       Q.  I understand that you made an
19   approximation.  I think you've also answered
20   my question that how it actually should have
21   been exactly reflected, you don't know?
22       A.  That's an open question.  There's no
23   doubt about that.
24       Q.  Paragraph 37 you talk about Chow,
25   et al?

69 (Pages 270 to 273)

Page 274

```
 1              FUERMAN
 2      A.  Yes.
 3      Q.  That's one of the documents that you
 4  produced this morning, correct?
 5      A.  Right, it's in there.  It's an
 6  article from Accounting Horizons, I believe.
 7      Q.  I'm not going to ask you from
 8  memory.  Do you recall the nature of the
 9  companies they looked at?
10      A.  They looked at companies in the
11  aggregate, thousands of companies.  Would you
12  like me to summarize the article?
13      Q.  No, I can read it.  That's fine.
14  What was the basis for determining average
15  stockholder materiality, if you remember that?
16      A.  It was an event study of some sort.
17  I guess I do need to summarize the article a
18  little bit.  Chow, et al., start off by
19  acknowledging, as I do, that materiality is a
20  concept.  It cannot be definitively reduced to
21  a numerical threshold.
22          However, they then go on to say that
23  throughout the history of accounting and
24  auditing this has been a problem because
25  accountants and auditors need to make
```

Page 275

```
 1              FUERMAN
 2  practical decisions on audits, and they need
 3  to, nonetheless, sometimes workup some notion
 4  of what is a numerical threshold materiality.
 5  They developed -- they reasoned what kind of
 6  methodology they would need to use, so far as
 7  stock market reaction to earnings releases and
 8  releases of other, releases of -- I can't
 9  remember quarterly or annual financial
10  statements, and then work backwards to see
11  does it appear is indicated by that, as to
12  what is materiality.
13          That's basically what they did.
14  This is an approach to coming up with a
15  tentative numerical materiality threshold,
16  notwithstanding their acknowledgment, as well
17  as my own, that materiality is a concept.
18      Q.  Chow, is that a man or woman?
19      A.  I can't remember at this point.  I
20  have no idea who these people are.  They
21  published in a good accounting journal, that's
22  all I know.
23      Q.  Is this the sort of analysis that
24  you are comfortable performing yourself?
25      A.  No, I don't do capital markets
```

Page 276

```
 1              FUERMAN
 2  research.
 3      Q.  That's my question.
 4      A.  This is capital markets research.
 5  Anytime you are showing or purporting to show
 6  something, some sort of relationship between
 7  stock market data and accounting information,
 8  that's capital markets research.
 9      Q.  Let's look at paragraph 38, page 18,
10  just to follow-up on that final point.  You,
11  therefore, cannot substantiate or confirm the
12  capital markets research that you are
13  referring to here, you are deciding this is a
14  study that does deal with that?
15      A.  I can affirm it to a limited extent.
16  We had capital markets Ph.D. seminars in our
17  Ph.D. program at the University of Cincinnati.
18  We all developed a threshold knowledge of the
19  literature and how to read these articles and
20  how to make a judgment as to whether they are
21  well written, well performed research or not.
22          It appeared to be fairly good
23  research.  It's a fairly tough journal to get
24  published in, also.
25      Q.  But you were not a capital markets
```

Page 277

```
 1              FUERMAN
 2  expert?
 3      A.  I am not a capital markets expert.
 4      Q.  Paragraph 38, page 18.  I think this
 5  deals with the subject you raised earlier
 6  about "reported earnings per share"?
 7      A.  That is correct.
 8      Q.  The 10K in the proxy showed reported
 9  earnings per share of $2.56; correct?
10      A.  That is correct.
11      Q.  You used a EPS of 248?
12      A.  That is correct.
13      Q.  Which of those two EPSs would the
14  OHSL shareholders have seen?
15      A.  They would have actually seen
16  printed on paper 256.
17      Q.  So the number that you have here is
18  adjusted based upon subsequent transactions to
19  the OHSL merger?
20      A.  That's right.  It flows out of the
21  requirements of APB No. 20 for the company,
22  when determining whether it should or should
23  not restate, look and see what will the
24  difference be between as originally reported
25  and as restated.
```

70 (Pages 274 to 277)

Page 278

FUERMAN

1    .    FUERMAN
2        Now, again, it does not cite a
3    numerical threshold. But what I do in
4    paragraph 38, page 18, of my report is I say
5    if we were to apply this to PFGI, we compare
6    248 increasing to 308 originally reported.
7    Now I could have said 256 -- do we want to
8    talk about this now or do we want to go over
9    the Prowse report and talk about it later?
10        Q. Let's talk about it now. We're not
11    going to go over the Prowse report.
12        A. I thought you did. This might be a
13    good time to talk about this. I gave you at
14    the beginning of the depo a two-paged paper
15    clipped thing.
16        It's been marked Fuerman 3. I was
17    concerned when I read Dr. Prowse's report, his
18    assertion that I made an error, in paragraph
19    38 here and in other places.
20        The requirements of APB No. 20
21    require the management to make a decision on
22    whether or not to restate based on its
23    evaluation of whether the affected periods are
24    materially different as originally reported
25    versus as they would be if the company decides

Page 279

FUERMAN

1        FUERMAN
2    to restate.
3        So now the confusion is, if you look
4    at the little spreadsheet I created, it's only
5    got four rows and four columns.
6        Q. Yes.
7        A. You can see that reported EPS '98
8    was as Mr. Prowse indicates, $2.56 in the
9    financials for the year ended 12/31/98 and,
10    again, for the annual financials for the year
11    ended 12/31/99. But then it dips down to
12    $2.48.
13        The reason it dipped down is because
14    of what happened during the year ended
15    12/31/99, or actually I should go back. It
16    didn't actually happen during the yearend
17    12/31/99, it happened shortly after the year
18    ended 12/31/99. There was a pooling of
19    interest merger.
20        Provident acquired Centennial Bank,
21    or the parent of Centennial Bank, and
22    according to APB 20 you need to do -- some
23    call it a statement, some use other
24    statements, but you need to retroactively
25    change what you've been saying was your

Page 280

FUERMAN

1        FUERMAN
2    earnings per share way back when.
3        So that's why it suddenly changed
4    from $2.56 down to $2.48 earnings per share
5    fully diluted for 1998, and from $3.29
6    earnings per share originally reported for
7    year ended 12/31/99, down to $3.08.
8        Those are the numbers that I use in
9    my analysis because APB No. 20 says look,
10    board of directors, management, you need to
11    decide whether to restate, based on how you
12    are changing what you've been reporting to
13    what you are going to report if you do
14    restate.
15        You are not supposed to go back and
16    look at the original number in this case this
17    was reported in the 10K filed 3/30/99 and the
18    10K filed 3/29/00. That's not what you are
19    supposed to do.
20        Now, Dr. Prowse, this bothered me
21    because Dr. Prowse, I think he may have even
22    used the word "biased" in describing my
23    report. If you crunch through these numbers
24    and use his numbers instead of mine, it does
25    make for a -- if you were to apply that to the

Page 281

FUERMAN

1        FUERMAN
2    chart that I created here, if we changed this
3    from 248 to 256, as he suggests that we should
4    do, what would the percentage decrease be? It
5    would not be 4 percent for the before and
6    after restatement affect, it would be 7
7    percent.
8        So if we go and do as Dr. Prowse
9    suggests, I think you actually weaken your own
10    client's case. Because you are saying that
11    actually there was a 7 percent decrease in net
12    income for 1998, not a 4 percent decrease. I
13    can show you how that computation is made.
14        Q. No, that's fine. Dr. Prowse
15    indicated that in the proxy statement and in
16    the 10K the earnings per share were 256?
17        A. That's correct.
18        Q. As of the time of the proxy
19    statement that the individuals looked at, for
20    1998?
21        A. That's what he indicated.
22        Q. That's what it showed?
23        A. That's what it showed, but the
24    proper analysis is to use my number $2.48, not
25    his 256. His number reflects lack of

ESQUIRE DEPOSITION SERVICES
1-800-944-9454

Page 282

1      FUERMAN
2   understanding of what APB No. 20 requires for
3   the proper analysis in this situation.
4       Q.   The 10K by your own second page
5   indicates the 10K filed 3/30/99 showed an
6   earnings per share of 256, for 1998, correct?
7   Look at the second page of your spreadsheet,
8   over to your left.  The 10K filed 3/30/99
9   reported 1998 earnings per share of 256?
10      A.   Correct.
11      Q.   The 10K filed 3/29/2000 for 1998
12  reflected an earnings per share of 256?
13      A.   Right.
14      Q.   It was not until the 10K filed
15  March 15, 2001 that the revised number you
16  used appeared, correct?
17      A.   That's correct, but that is the
18  number that APB No. 20 says you should use.
19      Q.   I understand.  OHSL shareholders
20  though, assuming they ever looked at earnings
21  per share numbers, at the time of this proxy
22  statement and even the year following the
23  proxy statement, all they would have seen is
24  the $2.56 earnings per share number for 1998?
25      A.   That's right.  Another thing, if we

Page 283

1      FUERMAN
2   we're going to use the original numbers, for
3   example, Dr. Prowse by his analysis suggests
4   that earnings per share originally reported
5   for 1999, what ought to be used is $3.29, not
6   the $3.08 that I use.
7       If we do that it causes the net
8   income decrease originally reported or, excuse
9   me, reported prior to March 5th and April 15,
10  2003.  It causes the before and after to
11  become a 21 percent decrease in net income.
12  Again, I think that this weakens your case
13  that we use Dr. Prowse's analysis rather than
14  my own.
15      Now, I was fully aware that it would
16  be possible to use the numbers Dr. Prowse used
17  in his analysis when I wrote my expert report,
18  but I didn't do that.  Then I think I really
19  would have been biased in my expert report
20  because I would have been showing a more
21  dramatic decrease in before versus after.
22      I would not be doing the analysis
23  according to the way APB No. 20 tells me to
24  do.  Frankly, I feel that my work should stand
25  on its own and be interpreted as independent

Page 284

1      FUERMAN
2   and objective as humanly possible.
3       Q.   Take a look at paragraph 39, this
4   refers to figure one in your report.  Page 18.
5   You claim that this chart, "Figure one depicts
6   the future EPS expectation of an OHSL
7   stockholder in the fall of 1999;" is that
8   correct?
9       A.   Right.  Dr. Prowse is correct there,
10  my motive --
11      Q.   I'm sorry, go head.
12      A.   No, I interrupted you.
13      Q.   You say, "The figure one depicts the
14  future EPS expectation of an OHSL stockholder
15  in the fall of 1999 is as reflected on figure
16  one?
17      A.   Correct.
18      Q.   Are you aware of any methodology,
19  techniques, authoritative treatises or
20  anything else that would substantiate
21  calculating the future EPS expectation of an
22  OHSL stockholder in this fashion?
23      A.   Yes.
24      Q.   What's that?
25      A.   Bernstein and Wild Financial

Page 285

1      FUERMAN
2   Statement Analysis, the starting point for
3   prognosticating what future earnings per share
4   are going to be is by looking at historical
5   earnings per share.
6       Q.   This is one year, correct?
7       A.   Correct.
8       Q.   Do you believe, therefore, it is
9   reasonable to say that because earnings per
10  share in one year, increased by 24 percent as
11  you calculated here, that it is reasonable to
12  assume that into the future will always
13  increase at 24 percent?
14      A.   No, that would be unreasonable.
15  I'll explain why I did the analysis the way I
16  did.  Bernstein Wild, and others who do this
17  kind of analysis, say it makes sense to look
18  at a string of earnings per share, if you are
19  just going to use annual financial statements,
20  look at several years into the past.
21      I couldn't go -- I mean it would
22  have been a better analysis had I been able to
23  go, say, five years in the past.  But I could
24  only do two years because only two years at
25  most, by any kind of extrapolation or

72 (Pages 282 to 285)

Page 286

FUERMAN

1 anything, then you show a difference between
2 reported EPS versus restated EPS.
3     That's why I confined myself just
4 to -- if you look at this chart, on the first
5 two data points are comparing originally
6 reported versus -- I mean prior to the
7 restatements of the spring of 2003, those
8 compared to how it was restated after the
9 spring of 2003.
10     What would be a better analysis is
11 if I had four or five data points instead of
12 just two data points, but that's all there
13 are.
14     Q.   But my question is, is it reasonable
15 based upon your Bernstein Wild analysis, which
16 you are citing, to extrapolate that because
17 for two data points earnings per share
18 increased by 24 percent, it would continue to
19 increase by 24 percent all the way through
20 2005?  Did Bernstein and Wild support that?
21     A.   They would support this given the
22 situation I'm in where I've got a measly two
23 data points.  They couldn't I think conceive
24 of me being in this situation.  If the fact

Page 287

FUERMAN

1 pattern were a little bit different, let's say
2 that the OHSL --
3     Q.   Before we go into hypotheticals, let
4 me keep asking questions.
5         MR. BRAUTIGAM:  I object to your
6 interrupting the witness.  You have the
7 right to finish the answer if you are not
8 finished.
9     Q.   Professor Fuerman, you know that 24
10 percent earnings per share growth was not
11 being projected by any of the analysts
12 following Provident at this point in time,
13 correct?
14     A.   That's another aspect of
15 Dr. Prowse's approach which I think is
16 improper and against the spirit and the
17 instructions of APB No. 20.  Those analysts,
18 in December of '99, January 2000, they didn't
19 have the knowledge of the restatements that
20 occurred in the spring of 2003.
21     What APB No. 20 is directed at is
22 what are the kinds of analysis that management
23 should make in determining whether to restate
24 when they are presented with this dramatic

Page 288

FUERMAN

1 situation in the spring of 2003.  They never
2 knew about that stuff.
3     All my analysis, my charts, my
4 graphs are geared towards the kind of analysis
5 that management is supposed to make in
6 determining materiality, whether they should
7 or should not restate in the spring of 2003.
8     I'm using that as a depiction of how
9 it would affect investors.  I'm not saying
10 that's exactly how it would affect investors.
11 I'm very limited in the data I have to work
12 with.
13     Q.   That's where I'm confused.  You
14 state that figure one depicts the future EPS
15 expectations of an OHSL stockholder in the
16 fall of 1999.
17     What's your basis for saying that
18 any OHSL shareholder had any such expectation?
19 What data to you rely upon to substantiate
20 that was the expectation of OHSL shareholders?
21     A.   The data I rely upon is the
22 originally reported versus restated data
23 points of year end '98, year end '99.  I
24 extrapolate from those.  I acknowledge that

Page 289

FUERMAN

1 it's an unreasonable extrapolation compared to
2 if I had more data points available.  This is
3 all the data points I have.
4     Q.   As before, it's true that you did
5 not do any kind of a survey, polling or
6 anything else to determine specifically what
7 EPS expectations of any OHSL stockholders
8 were?
9     A.   No, I do not.  What I'm depicting
10 here is dictated by APB No. 20, not by -- and
11 APB No. 20 doesn't say anything about
12 conducting an opinion poll of the shareholders
13 of the corporation.  It says management, you
14 should look and see what's the difference
15 between earnings per share reported, earnings
16 per share restated.
17     It doesn't say exactly how you
18 should look at that.  That's why I look at it
19 one way in this table, in terms of percentage
20 decrease, and I look at it in a chart a
21 different way, a trend analysis here.
22 APB No. 20 doesn't dictate either approach.
23     These are just approaches that seem
24 reasonable to me, that are in the spirit of

73 (Pages 286 to 289)