**EXHIBIT B-4**

**EXHIBIT B-4**

Page 290

FUERMAN

1   APB No. 20.  And by the way, if Dr. Prowse's
2   numbers were used, it's true that there's a
3   bit of an exaggeration.  I looked at how his
4   numbers would change things.
5         The graph, instead of looking the
6   way it does, would look approximately like
7   this.  This is the extent of my bias in my
8   analysis.  I frankly find it a bit much for
9   Dr. Prowse to call this bias.
10      Q.  Although you do concede it's an
11  unreasonable extrapolation?
12      A.  It's an unreasonable extrapolation
13  if one has sufficient data, to do the kind of
14  extrapolation that a professional would want
15  to do according to the standards of Bernstein
16  and Wild.
17      Q.  Which you did not have?
18      A.  I didn't have the data points to do
19  that kind of analysis.
20      Q.  Does APB 20 say anything in any of
21  its paragraphs that it relates to future EPS
22  expectations of shareholders, is there
23  anything in there that relates to that?
24      A.  The word "trends" is used.

Page 291

FUERMAN

1       Q.  That's not my question.  Does it say
2   anything in there about it is derived or
3   defines future EPS expectations of
4   shareholders?
5         MR. BRAUTIGAM:  Objection.
6       A.  To me, the use of the word "trends"
7   suggests doing a trend analysis which is what
8   I call this, or you could call it future
9   expectations analysis.  To me those are
10  substantively the same.
11      Q.  Is this based upon what you've come
12  across in your career, is this a generally
13  accepted trend analysis that you are referring
14  to, this figure one?
15      A.  I believe it's generally accepted in
16  a situation -- this is an unusual situation.
17  I've got a measly two data points.  If I had a
18  bunch of data points, say half a dozen, then I
19  could do something more sophisticated that
20  would take into account the variability of
21  earnings from year to year.
22      Q.  In addition to extrapolating out
23  continuously 24 percent, right, on your figure
24  one?

Page 292

FUERMAN

1       A.  Yes.
2       Q.  You also extrapolated out, without
3   modification the lower 8 percent?
4       A.  That is correct.
5       Q.  So you assumed that never changed
6   either?
7       A.  That is correct also.
8       Q.  If that did increase then that also
9   would bring your two data points closer
10  together, correct?
11      A.  That would, yeah.
12        MR. BURKE:  At this point in time,
13  Professor Fuerman, I thank you for your
14  time.  I have no further questions.
15      A.  Thank you.
16        MR. BURKE:  Obviously consistent
17  with what we talked about earlier, if
18  there's ongoing work that you do or
19  additional materials that you review, I'd
20  ask that you tell Mr. Brautigam, and we
21  may have the privilege of meeting again.
22      A.  By all means, I'd be happy to do so.
23        MR. BURKE:  Thank you.
24        MR. BRAUTIGAM:  Right, and we're

Page 293

FUERMAN

1   going to get you at least some of the
2   documents.  Are you sticking around for
3   my questioning?
4         MR. BURKE:  I don't know.  Start
5   asking, I'll decide if it's worth
6   sticking around for.
7         MR. BRAUTIGAM:  I appreciate that.
8   Your approval means so much to me.  I
9   take it you have no questions, sir?
10        MR. HILLER:  Not at this point.
11        MR. BRAUTIGAM:  So I can proceed?
12        MR. HILLER:  Yes.
13        MR. BURKE:  I do have a couple
14  additional questions, Mike, if you don't
15  mind?  I do apologize.
16        MR. BRAUTIGAM:  No problem.  No
17  apology is necessary.
18      Q.  One of the items you gave to me,
19  Dr. Fuerman, and we can have this marked, is
20  this article in Business Week?
21      A.  Yes.
22      Q.  Auditing the Auditors.  Apparently
23  it's an article by Robert Barker?
24      A.  That is correct.

74 (Pages 290 to 293)

Page 294

FUERMAN

1
2    Q.   And he is referring to a study you
3    came up with in terms of how to evaluate
4    auditors?
5    A.   Right.
6    Q.   Based upon certain criteria?
7    A.   Right.
8    Q.   Without getting into the technical
9    details.  It is noted in the article, as you
10   see, that certain of the auditors whom you
11   ranked indicated that they referred to the
12   study as unbelievable; is that correct?
13   A.   I think that may have been
14   Deloitte Tush.  They got the worse rating
15   among the big six at that time.
16   Q.   Do you recall also that the article
17   indicates other firms declined to comment
18   publicly, but some privately questioned
19   Fuerman's methods?
20   A.   It's to be expected whenever you
21   publish a controversial study that not
22   everybody will applaud.
23   Q.   You referred in your study to
24   gentleman by the name of Peter Mosier?
25   A.   Yes, I did cite him.

Page 295

FUERMAN

1
2    Q.   He is a University of Leeds
3    Accounting Professor?
4    A.   That is correct.
5    Q.   The article at least quotes
6    Peter Mosier who you've cited in your article
7    as referring to your approach as "very
8    cavalier"?
9    A.   I think the man has a lot of
10   jealousy.  It's not very many academics that
11   get this kind of national and international
12   recognition.  I got e-mails from all over the
13   world from investors, partners at C.P.A.
14   firms.
15       It's been a big joy to me and to my
16   school.  It's brought a lot of recognition to
17   Suffolk University.
18       MR. BURKE:  I appreciate that.  No
19   further questions, Mike.  Thanks for the
20   consideration there.
21       MR. BRAUTIGAM:  Not a problem.
22       (Fuerman Exhibit 7, document, marked
23   for identification, as of this date.)
24   EXAMINATION BY
25   MR. BRAUTIGAM:

Page 296

FUERMAN

1
2    Q.   Good afternoon, Dr. Fuerman.  My
3    name is Michael G. Brautigam and, as you know,
4    I represent the plaintiffs in this purported
5    class action.
6        Dr. Fuerman, I would like to hand
7    you the March 5, 2003 press release and ask
8    you to take a look about it.  I think you
9    misspoke previously with respect to the
10   amounts?
11   A.   Yes.  It was 70 million dollars
12   restated in March 5th, 44 million April 15th
13   of 2003.  I reversed those inadvertently.
14       MR. BURKE:  Move to strike as
15   leading.  You may answer.
16   Q.   Dr. Fuerman, we've been through your
17   resume and the articles you've published your
18   and background in some detail.  Do you
19   remember doing this this morning with
20   Mr. Burke?
21   A.   Yes.
22   Q.   Do you believe that your testimony
23   on the accounting and auditing issues that
24   you've been retained to opine on would assist
25   the trier of fact?

Page 297

FUERMAN

1
2    A.   Yes.
3        MR. BURKE:  Objection, legal
4    conclusion, leading.
5    A.   I believe that they would very much
6    assist the trier of fact because these issues
7    are in some respects clearcut, but in others
8    they are technical and complex.
9    Q.   Now, Dr. Fuerman, I would like to
10   suggest that you because between my question
11   and your answer, because it's just a wild
12   guess, but I think Mr. Burke might be
13   objecting.  So we'll have a clear record if
14   you do that.
15       Please describe, for the record,
16   what areas you intend to opine on are
17   relatively straight forward and what areas are
18   more complex?
19   A.   To me it is very straight forward,
20   notwithstanding the objections of defendants,
21   that when a company issues financial
22   statements and subsequently restates them, the
23   originally reported financial statements are
24   materially misstated.  That is in my
25   understanding among the accounting and

75 (Pages 294 to 297)

Page 298

```
1              FUERMAN
2    auditing experts in academe and practice
3    well-accepted.  It is not seriously in
4    dispute.
5          So long as it is the kind of
6    financial statement restatement that I've
7    talked about, that is not prompted by one of
8    the few exceptions in APB 20, such as a switch
9    from LIFO to FIFO or a pooling of interests
10   merger that occurs shortly after fiscal
11   yearend or a restatement prompted by a new
12   issuance of a standard by the FASB, the EITF,
13   the SAB or the SEC.
14        Q.  Dr. Fuerman, why do companies issue
15   financial statements?
16        A.  They issue them so that people
17   external to the company can have a good idea
18   on what is going on financially at the
19   company, on what the company's financial
20   performance has been and what its financial
21   company is as of the balance sheet date.
22        Q.  Dr. Fuerman, would you pick up what
23   has been marked as Fuerman 6, that's
24   APB No. 20.  Would you have that in front of
25   you, or you can use your own copy.
```

Page 299

```
1              FUERMAN
2          Do you believe that your
3    interpretation of APB No. 20 would assist the
4    trier of fact in understanding the concepts
5    involved in this case?
6          MR. BURKE:  Objection, leading,
7          legal conclusion.
8          A.  I believe it would assist the trier
9    of fact in understanding important aspects of
10   this case.  APB No. 20 although in some
11   respects clearcut, in others is a bit complex
12   to understand.  It's difficult to interpret
13   without having a good grasp of the overall
14   accounting and auditing literature.
15        Q.  Now, you mentioned earlier that it
16   was your view that APB 20 was not written by
17   English majors.  Do you remember that
18   testimony?
19        MR. BURKE:  Objection, leading.
20        A.  Yes.
21        Q.  Dr. Fuerman, why did you bother to
22   write an expert report when Mr. Burke seems to
23   suggest that you could sign your name and date
24   APB 20 and submit that?
25        MR. BURKE:  Objection, leading.
```

Page 300

```
1              FUERMAN
2          A.  I wrote an expert opinion because
3    not everybody is able to sit down and absorb
4    and understand APB Opinion No. 20.  It really
5    requires some expertise, knowledge of the
6    surrounding accounting, auditing literature
7    and how it has been generally interpreted in
8    accounting and auditing academe and practice.
9          Q.  Do you believe that your report
10   would assist the trier of fact in
11   understanding those things you just talked
12   about?
13        MR. BURKE:  Objection, asked and
14        answered, leading.
15        A.  I believe that my testimony would be
16   very helpful in understanding.  For example,
17   there is some confusion I've noticed in
18   preparing these expert reports, between the
19   way "restatements" are understood in the
20   financial press, compared to the way they are
21   understood in the accounting and auditing
22   literature.
23          Therefore, simply relying on the
24   financial press could lead to a bad result
25   conceivably in this case.  It's important to
```

Page 301

```
1              FUERMAN
2    understand the accounting and auditing
3    literature, how it interprets APB No. 20.
4          Q.  Dr. Fuerman, at least some of the
5    confusion in this case extends to a CEO of
6    Provident, a CFO, and I believe they've
7    testified to two different things.  I believe
8    Mr. Hoverson has testified there were two
9    restatements and I believe Mr. Carrie has
10   testified there was one restatement
11   communicated via two announcements.
12          Are you familiar with this
13   discrepancy?
14        MR. BURKE:  Continuing objection to
15        leading.
16        A.  I'm familiar with some financial
17   press journalists.  Some parties to this
18   litigation have at times thought of there
19   having been one restatement, two announcements
20   and other times two restatements.  But there's
21   not, in my opinion, a substantive difference
22   between whether there was one restatement or
23   two restatements.  It's the same under the
24   accounting and auditing literature.
25        Q.  Dr. Fuerman, is APB 20 something
```

76 (Pages 298 to 301)

Page 302

FUERMAN

1  that you've memorized?
2  A.  It is not something I've memorized.
3  It's too much to attempt to memorize.  The
4  important thing is to understand it enough to
5  apply it in a given situation, which I feel I
6  have done.
7  Q.  Now, Dr. Fuerman, when Mr. Burke
8  questioned you earlier in the day about what
9  you first did when you were considering the
10 assignment, I believe you testified in
11 substance that you went back and reviewed very
12 carefully APB No. 20; is that correct?
13 A.  That is correct.
14 Q.  And why did you do that?
15 A.  Well, I read APB Opinion No. 20
16 years ago, certainly before I began my
17 restatements research, which is part of my
18 dissertation, back in 1994.  I've worked with
19 restatements ever since, wrestled with various
20 problems of restatements.
21     But, still, I wanted to make sure I
22 had a fairly good understanding of APB No. 20
23 and, most important, I wanted to understand
24 what this case is about and whether my

Page 303

FUERMAN

1  knowledge, my expertise would be appropriate
2  in this case.  So I needed to review
3  APB No. 20 and other materials in order to do
4  that.
5  Q.  Do you believe that is a good
6  practice?
7  A.  Oh, I think it's critical.  I just
8  got in my most recent Journal of Accountancy
9  that came in the mail a few days ago, an
10 article on expert witnesses by Larry Crumbly,
11 who urges anyone who considers becoming an
12 expert witness to do some research and think
13 and discuss with counsel whether they have the
14 appropriate expertise to be a true expert
15 witness in any particular court case.
16 Q.  So if another accounting and
17 auditing expert was considering rendering an
18 opinion with respect to issues that affected
19 APB No. 20, if he or she went back to
20 APB No. 20 and read it carefully as an initial
21 starting point, you wouldn't fault that
22 behavior, correct?
23 A.  No, of course not.
24 MR. BURKE:  Objection, leading.

Page 304

FUERMAN

1  Q.  Please continue.
2  MR. BURKE:  Wait a minute.
3  Objection, leading.
4  A.  I think it would be expected to go
5  back and review APB No. 20.
6  Q.  Now, Dr. Fuerman, you testified that
7  you are a certified fraud examiner and the
8  training that you received in some detail.  Do
9  you remember that testimony?
10 A.  Yes.
11 Q.  You believe that it's appropriate
12 for you to render an opinion with respect to
13 the honesty of some of the witnesses in this
14 case; is that correct?
15 A.  I believe that's correct.  I should
16 note that my rendering an opinion as to the
17 motivations of the statements of executives
18 and audit committee members of PFGI, with
19 regard to the restatements and APB No. 20,
20 that really is simply ancillary to my analysis
21 of restatements and materiality and the nexus
22 between the two.
23     It seems appropriate in this context
24 to render an opinion as to their opinion of

Page 305

FUERMAN

1  this issue.
2  Q.  Dr. Fuerman, please tell me when you
3  decided that you would accept this assignment?
4  A.  This probably was, I can't recall
5  exactly, I think it was in October of 2003.
6  I'm guessing it was October 2003 that we first
7  discussed and then we maybe had a subsequent
8  phone call or two, exchanged information.
9     I see from my time sheet that I
10 began -- it appears I began working sometime
11 in November, maybe late November on this.  So
12 I don't have a specific date, but my best
13 guess is mid to late October I decided to take
14 on this engagement.
15 Q.  Now, Dr. Fuerman, once you decided
16 to take on the engagement, was there anything
17 stated or expected where you would suspend
18 common sense?
19 MR. BURKE:  Objection, leading.
20 A.  No, certainly not.  I think any
21 expert witness needs to have common sense to
22 be able to translate his expertise into words
23 and phrases that layman will understand.
24 That's what I understand an important function

77 (Pages 302 to 305)

Page 306

FUERMAN

1    of an expert witness to be.
2
3        Q.   Now, Dr. Fuerman, you testified with
4    respect to what I think you've described as
5    deceptive verbal behaviors?
6        A.   Correct.
7        Q.   That you learned about in part from
8    your training as a certified fraud examiner;
9    is that correct?
10       A.   That's correct.
11           MR. BURKE:   Objection, leading.
12       A.   I learned about that from my studies
13   to become a certified fraud examiner, by my
14   continuing studies in developing and teaching
15   my fraud examination course at
16   Suffolk University.  I created that course at
17   Suffolk University.  I was one of the first
18   people in Boston to offer such a course.
19           I've continued with these studies by
20   further reading and by attending a workshop
21   put on by PricewaterhouseCoopers this summer.
22   This area of interviewing and interrogation,
23   as suggested by the committee on audit
24   effectiveness, when it came out with its
25   report in the year 2000, has become much

Page 307

FUERMAN

1
2    bigger in the audit practice of all the C.P.A.
3    firms.  It's getting much more emphasis.
4        There's much more recognition that
5    auditors need to be more than number jugglers.
6    They need to also have strong interviewing and
7    interrogation skills.
8        They need to understand things like
9    statement analysis, which is what I performed
10   when I read the depositions and tried to
11   determine whether statements made by
12   executives of Provident and audit committee
13   members of Provident, whether they were
14   correct or incorrect, and if they were
15   incorrect whether they were incorrect because
16   of mistake or intentionally incorrect.
17       Q.   Now, Dr. Fuerman, you talked about
18   PWC and a four-day conference in fraud
19   examination that you attended this summer.  Is
20   that the same PricewaterhouseCoopers that
21   performed the PWC report in this case?
22       A.   Yes, it is.  It's a C.P.A. firm that
23   I have a great deal of respect for, both in
24   terms of their professionalism and competence
25   and their public service, in helping the

Page 308

FUERMAN

1    accounting professors of the United States in
2    this way.
3        So if I have any bias it may be that
4    I'm biased towards PWC.  Almost our number one
5    most famous graduate of all is one of the top
6    executives of PWC, John O'Connor.
7        Q.   When you reviewed the deposition
8    transcripts where you rendered an opinion with
9    respect to the veracity of the witnesses, did
10   you note any conduct on behalf of the person
11   or persons defending the deposition that were
12   similar to my conduct here today?
13           MR. BURKE:   Objection, leading.
14       Q.   Perhaps I said that backwards.  Did
15   my conduct here today remind you of the
16   conduct of the attorneys who were defending
17   the depositions that you reviewed, where you
18   rendered an opinion with respect to the
19   veracity of the witnesses?
20           MR. BURKE:   Objection, leading.
21       A.   Well, there was a stark contrast
22   between the behavior of yourself and the
23   defense counsel, according to the deposition
24   transcripts that I read.  Part of it may have

Page 309

FUERMAN

1
2    to do with differences in personality and
3    strategies, but also part of it has to do with
4    the problematic situation of Dr. Tuzin.  When
5    Dr. Tuzin was asked, I noticed on the
6    transcript frequently Dr. Tuzin would be asked
7    a question and he would be shielded from
8    answering by objections from defense counsel,
9    or especially related to conversations between
10   Dr. Tuzin and defense counsel that had been
11   previously held and this apparently was
12   purportedly privileged and, therefore, there
13   could not be a forcible disclosure at the
14   deposition.
15       This is in stark contrast to my own
16   deposition where I had no such privilege.
17   This strikes me as, and again, I am not a
18   practicing lawyer.  I cannot with correct
19   exactitude draw the distinction between a fact
20   witness and an expert witness, but it seems to
21   me to be fundamentally unfair just from a
22   layman's point of view.
23       To treat one expert witness one way
24   and another a different way that is
25   preferential to the one side, it seems to me

78 (Pages 306 to 309)

Page 310

FUERMAN

1    FUERMAN
2    just as a matter of just basic rough justice
3    that this is not right, that this has been
4    going on.
5         MR. BURKE: Objection. Move to
6    strike as speculation and nonresponsive.
7         Q.  Dr. Fuerman, are you familiar with
8    what lawyers sometimes refer to as "coaching
9    the witness?
10        MR. BURKE: Objection, speculation.
11   He already indicated this.
12        A.  I'm familiar with that. I think
13   that there may have been some coaching in this
14   case. I know that if I were an employee of a
15   company and somebody wanted me to hold myself
16   out as an expert witness, I know just from my
17   reading of articles in Journal of Accountancy,
18   by Larry Crumbly, that that just doesn't make
19   sense.
20        That you can be an expert witness on
21   the one hand and retain privilege by virtue of
22   being protect by that lawyer under some
23   attorney-client privilege on the other, it
24   just doesn't seem to me that it's right that
25   it's not gravy for the goose, gravy for the

Page 311

1    FUERMAN
2    gander, in terms of treating all the expert
3    witnesses as the same thing.
4         I don't think you get around that by
5    simply not using the word "expert" in
6    documents that you file with the court, that
7    have Dr. Tuzin's name attached to them.
8         MR. BURKE: Objection, move to
9    strike as speculation.
10        Q.  Dr. Fuerman, you are familiar with
11   the word "independence," and also the concept
12   of "independence" as accountants and auditors
13   use the word; is that correct?
14        A.  That's correct.
15        Q.  The word "independent" as in report
16   of the independent auditors appears in the
17   opinion letter; correct?
18        A.  That's correct. Now, the
19   independence of an expert witness is a bit
20   different than the independence required of a
21   financial statement auditor, under the ethics
22   rules of the AICPA. However, even an expert
23   witness under the AICPA rules is expected to
24   have a certain level of objectivity and
25   independence.

Page 312

1    FUERMAN
2         I as a member of the AICPA am bound
3    by those rules. Now, of course, not every
4    expert witness is a member of the AICPA and
5    bound by such rules.
6         It just stands to reason that one
7    expert witness be bound by such rules and
8    another not, when the whole subject matter is
9    of the impact of an accounting restatement,
10   which is clearly in the Bailiwick of
11   accounting and auditing, it just doesn't seem
12   to make sense.
13        MR. BURKE: Objection, move to
14   strike as speculation.
15        Q.  Now, Dr. Fuerman, when you were
16   considering whether or not to accept this
17   engagement, did you consider whether or not
18   you would be independent in this matter?
19        A.  Yes, I did. I concluded that I
20   would be independent. I base this on several
21   grounds.
22        My research, the articles that I've
23   written I believe are not overly favoring
24   either the plaintiffs or the defendants in the
25   matter of securities litigation. Over the

Page 313

1    FUERMAN
2    years I've been assisted by many attorneys,
3    both plaintiffs and defendants, in carrying
4    out my research and providing input and
5    providing documents.
6         In fact, my most recent research
7    which is not yet published but is a bit
8    similar to my most recently published
9    research, which is listed as the first article
10   in my resume, has been criticized by some as
11   being overly favoring the big four. I
12   conclude that the big four were significantly
13   higher quality auditors than Arthur Anderson.
14   Some people criticize that.
15        They say oh, there's really no
16   difference between the way Anderson was and
17   the other big four, but my research is based
18   on my own ideas and thoughts and opinions. I
19   am paid for my time as an expert witness and
20   as a university professor, but my judgment as
21   to what are the relevant -- what's the
22   relevant data and what are the conclusions I
23   should draw, those are my own.
24        Q.  Dr. Fuerman, were you able to reach
25   a conclusion as to whether or not the

79 (Pages 310 to 313)

Page 314

FUERMAN

1    FUERMAN
2    affidavits and, more recently, the expert
3    reports submitted by Dr. Tuzin is independent?
4        MR. BURKE:  Can you repeat that,
5    please.
6        (Record read.)
7        MR. BURKE:  Objection calls for
8    speculation.
9        A.    In my opinion, if Dr. Tuzin were a
10   member of the AICPA he would clearly be in
11   violation of the AICPA ethics code in holding
12   himself out as an expert witness in a case
13   where his company is a defendant.
14       Q.    Now, Dr. Tuzin is an economist; is
15   that right?
16       A.    That is correct.
17       Q.    You've reviewed the materials he
18   submitted; is that correct?
19       A.    That is correct.
20       Q.    Dr. Prowse is an economist; is that
21   correct?
22       A.    That's correct.
23       Q.    You've reviewed the materials he
24   submitted?
25       A.    I have reviewed the materials both

Page 315

FUERMAN

1    FUERMAN
2    these gentleman have submitted.  They appear
3    to be highly educated and intelligent people.
4    However, their knowledge of accounting and
5    auditing is very limited, especially in the
6    case of Dr. Tuzin.
7        To start with Dr. Tuzin, in addition
8    to his own admission that he only has one
9    semester of accounting, and I can tell you
10   what the level of knowledge is of a college
11   student after they have finished one semester
12   of accounting, it's not pretty.  In addition
13   to that problem, his motive analysis is
14   completely foreign to what is dictated by
15   APB No. 20, and also is completely foreign to
16   every kind of financial statement analysis
17   suggested by Bernstein and Wild or any other
18   authors who write on financial statement
19   analysis.
20       They consider, as I, it to be
21   important the variability of earnings from one
22   period to another.  The notion that the
23   variability of stock price from one day to
24   another has some importance in determining
25   whether the originally issued financials were

Page 316

FUERMAN

1    FUERMAN
2    materially misstated is ridiculous.
3        Insofar as Dr. Prowse, his testimony
4    has at least some rational basis.  He appears
5    to at least have read my report.  I'm not sure
6    Dr. Tuzin had, otherwise, he will not refer to
7    me as Mr. Ralph Fuerman.
8        But I believe that Dr. Prowse is on
9    a higher level.  Notwithstanding that
10   Dr. Prowse is on a higher level, his analysis
11   also completely violates the spirit and
12   teachings of APB No. 20, in that he is
13   using -- he alleges that I use the incorrect
14   earnings per share numbers in my computation,
15   but and should use instead the numbers that he
16   suggests.
17       His suggestion is completely
18   incorrect in terms of what APB No. 20
19   dictates.  His suggestion that we should look
20   at what the analysts were projecting for
21   earnings per share, as of December '99 or
22   December 2000, is also not supported by the
23   language or the interpretations of accounting
24   principles board Opinion No. 20.
25       MR. BURKE:  Objection, move to

Page 317

FUERMAN

1    FUERMAN
2    strike as speculation.
3        Q.    Now, Dr. Fuerman I want to break
4    this up.  It doesn't surprise you that
5    Dr. Tuzin doesn't understand APB No. 20
6    because he is not an accountant, correct?
7        MR. BURKE:  Objection, leading.
8        A.    He would be -- Dr. Tuzin would be
9    probably the first person in history to
10   understand -- to even know of the existence of
11   APB No. 20, let alone how to read and
12   understand it after one semester of college
13   accounting.  He has no knowledge at all of
14   accounting.
15       MR. BURKE:  Objection, move to
16   strike as speculation.  You may answer.
17       Q.    Dr. Fuerman, you've seen testimony
18   of others such as Tony Stahlings, Provident's
19   Chief Accounting Officer and Chris Carrie,
20   Provident's Chief Financial Officer saying
21   they never turned to Dr. Tuzin for accounting
22   advice, correct?
23       MR. BURKE:  Objection, leading.
24       A.    I've seen that company, but they
25   wouldn't need to testify to me about that.  I

Page 318

FUERMAN

1  know what my college kids know after one
2  semester of accounting, it's just not much.
3  By his own admission, he had just one semester
4  of accounting.
5      The thing that is also bizarre about
6  Dr. Tuzin is that he, by his own admission in
7  the various deposition transcripts, was one of
8  the people who made the erroneous estimates
9  and calculations used to come up with the
10  non-GAAP accounting used by Provident.
11     I hate to say it, his behavior now
12  in testifying that oh, don't worry, these
13  financials were not materially misstated, it
14  looks to me as an attempt to exculpate his own
15  mess-up. I will also note, for the record,
16  that he is completely out of the business now
17  of performing estimates and calculations for
18  things that will be used in the financial
19  statements of publicly held companies.
20     Now he is in another business, some
21  sort of equity valuation business.
22      MR. BURKE: Objection, move to
23  strike as speculation.
24      Q. With respect to your prior testimony

Page 319

FUERMAN

1  to Dr. Tuzin, in effect, was he opining on his
2  own work and concluded that he did nothing
3  wrong?
4      MR. BURKE: Objection, leading.
5      A. That's exactly what he was doing.
6  That's just so clearly obvious. I just think
7  that the Dr. Tuzin mess is something that
8  really should come to an end, that it's not
9  right that one expert witness be disadvantaged
10  relative to another.
11      MR. BURKE: Objection, move to
12  strike as speculation.
13      Q. Now, Dr. Fuerman, under what
14  standards would what we've discussed Dr. Tuzin
15  doing be appropriate, and you can include
16  common sense as a standard?
17      MR. BURKE: Objection, leading,
18  form.
19      A. Well, it would be perfectly
20  appropriate for him to work as an employee of
21  a company doing estimates and computations
22  that would be used for various purposes, but
23  not for him to hold himself out as an expert
24  witness in a court case. This is my

Page 320

FUERMAN

1  understanding from -- not from reading the
2  legal tomes, but just from the basic things
3  that are discussed in Larry Crumbly's Journal
4  of Accountancy article, in the most recent
5  issue.
6      Q. Let's talk about Dr. Prowse briefly.
7  I understand it's your opinion that Dr. Prowse
8  violated the letter in the spirit of APB 20;
9  is that fair?
10      MR. BURKE: Objection, leading.
11      A. That is fair. I would, however,
12  commend Dr. Prowse for doing a better job than
13  Dr. Tuzin, in that he seems to have at least
14  some understanding of financial statements,
15  not much, but at least a scintilla of
16  knowledge on the subject.
17      Q. Dr. Prowse appears to be independent
18  in the sense that, A, he never worked at
19  Provident and, B, he was never involved in
20  issues relating to the restatements, correct?
21      MR. BURKE: Objection, leading.
22      A. He appears to be independent in that
23  respect. To my knowledge, he's never been an
24  employee of Provident so I cannot fault him on

Page 321

FUERMAN

1  those grounds. Putting aside objections as to
2  the backgrounds of these two individuals, I
3  think just sticking to the arguments that they
4  made versus the ones that I made, mine are
5  entirely consistent and within the spirit of
6  APB No. 20, theirs are not.
7      MR. BURKE: Objection, move to
8  strike as speculation.
9      Q. Now, Dr. Fuerman, have you read any
10  expert reports produced by Provident where
11  they've hired a C.P.A., an expert in GAAP and
12  GAS, to directly rebut your report?
13      A. No, they have not. I find that very
14  perplexing. Perhaps Provident doesn't want to
15  win this case.
16      I assumed that if Provident wanted
17  to win this case they would have -- they would
18  have engaged expert witness that would
19  challenge me. The people I cite for their
20  restatements research and cite me for my
21  restatements research, some of those people
22  are very knowledgeable and distinguished and
23  could conceivably offer a serious challenge to
24  my testimony. Instead, both Dr. Tuzin and

81 (Pages 318 to 321)

Page 322

FUERMAN

1    FUERMAN
2    Dr. Prowse seem to have the notion that
3    obfuscation is a winning strategy in this
4    litigation. I don't understand that.
5        MR. BURKE: Move to strike as
6    ridiculous speculation.
7        Q.   Dr. Fuerman, you are familiar with
8    GAAP and GAS, correct?
9        A.   Yes.
10       Q.   And you are an expert in accounting
11   and auditing, correct?
12       A.   That is correct.
13       Q.   Please tell me in lowest terms, as
14   best you can, what is an "audit"?
15       MR. BURKE: Objection.
16       A.   An "audit" is a review or an
17   investigation on the historical financial
18   statements, usually the annual financial
19   statements of a company. It contrasts with a
20   review or compilation which are much less
21   rigorous, and the audit performs the function
22   of providing the highest level of assurance to
23   the users of the financial statements that the
24   financial statements can be relied upon.
25       Q.   Who are "users" of financial

Page 323

FUERMAN

1    FUERMAN
2    statements?
3        A.   The "users" of financial statements
4    according to the accounting auditing
5    literature are a diverse group. They include
6    shareholders of the corporation, potential
7    shareholders, bondholders, creditors, trade
8    creditors. They could even include
9    governments employees, in a broad sense those
10   are also stakeholders.
11       I think, first and foremost, the
12   intent of the financial accounting standards
13   is to look to the interests of the
14   shareholders of the company, in a sense the
15   owners of the company, although that is
16   debated among scholars as exactly who are the
17   owners of a corporation, nonetheless, there is
18   an acknowledgment that they are very, very
19   important users of the financial statements.
20       MR. BURKE: Move to strike as
21   nonresponsive and speculative.
22       Q.   Are audits required?
23       A.   Audits are required of publicly held
24   companies in the United States that file their
25   financials with the Securities Exchange

Page 324

FUERMAN

1    FUERMAN
2    Commission. They are not required of
3    privately held companies or companies -- there
4    may be some companies in some countries that,
5    even though publicly held, are not required to
6    have audited financial statements. That's
7    possible, I don't know.
8        Q.   In addition to being a requirement,
9    is there any benefit that the company derives
10   from having an independent audit performed?
11       A.   Oh, clearly. The history of
12   accounting and auditing shows that there was
13   even some kind of primitive accounting
14   auditing, as well as accounting, going on in
15   ancient times; in the time of the Pharaohs in
16   Egypt and in the Greek City States.
17       More recently, before the Securities
18   acts in 1993 and the Securities Exchange Act
19   in 1994, it was not required but, nonetheless,
20   there were many companies in the United States
21   that got audits because it was felt that this
22   would be of such great benefit to enhance the
23   credibility of the financial statements, that
24   this would instill investor confidence in
25   investing in their companies specifically.

Page 325

FUERMAN

1    FUERMAN
2        So clearly there is a huge value in
3    audits being performed on financial
4    statements.
5        MR. BURKE: Objection.
6        (Recess taken.)
7        MR. BRAUTIGAM: Could you read the
8    last question and answer back, please.
9        MR. BURKE: Mike, we talked off the
10   record and you indicated you were going
11   another hour or so with similar
12   questioning to what has been asked up to
13   this point in time. I indicated that I'm
14   not going it stay around for that.
15       I will note, for the record, given
16   the fact that I assume you will be
17   continuing in a similar line, a
18   continuing objection to leading and a
19   continuing objection to questions seeking
20   to elicit speculation about this witness
21   has no first-hand knowledge and go beyond
22   the expertise.
23       I'll note the continuing objection
24   to the examination based upon that. I
25   did indicate there's one or two questions

82 (Pages 322 to 325)

Page 326

FUERMAN

1        FUERMAN
2    I have before I leave and you kindly and
3    graciously agreed I could ask these two
4    questions, and then you could continue
5    with the with the of your examination.
6        MR. BRAUTIGAM:  Absolutely.
7    BY MR. BURKE:
8        Q.    Two brief points, Professor Fuerman.
9    You indicated you have some familiarity with
10   PWC or PricewaterhouseCoopers?
11       A.    That's correct.
12       Q.    You indicate that you have a great
13   deal of trust and confidence in the quality of
14   the work performed by that organization?
15       A.    I believe I said I have a lot of
16   respect for their competence, professionalism,
17   and also their public spiriting in helping the
18   Account Professors of the United States by
19   hosting a workshop for us in the summer.
20       Q.    You also realize that they provided
21   a report in this case?
22       A.    Yes.
23       Q.    Have you read that report?
24       A.    Yes.
25       Q.    Anything in there that you saw that

Page 327

FUERMAN

1        FUERMAN
2    caused you to change your view of the
3    competence, professionalism of
4    PricewaterhouseCoopers?
5        A.    No.
6        Q.    You indicated in answer to a number
7    of Mr. Brautigam's questions your view of how
8    expert witnesses, the rules governing them
9    should be interpreted or how you view that
10   they ought to be construed?
11       A.    Yes.
12       Q.    Before this case you've never been
13   an expert witness before, right?
14       A.    That is correct.
15       MR. BURKE:  That's it.  With that
16   I'll note the continuing objections I
17   noted earlier.  We'll see you in the
18   morning.
19       MR. BRAUTIGAM:  Mr. Hiller, I
20   understand you have no questions?
21       MR. HILLER:  No questions, but I'll
22   stay.
23   BY MR. BRAUTIGAM:
24       Q.    Dr. Fuerman, we talked earlier about
25   some information that has come to light since

Page 328

FUERMAN

1        FUERMAN
2    you rendered your expert report on August 8,
3    2004.  Do you remember that?
4        A.    Yes.
5        Q.    We talked about Mr. Carrie's
6    California deposition which you reviewed last
7    night?
8        A.    Yes, I reviewed it last night.
9        Q.    I think when Mr. Burke was here we
10   did not mention you also reviewed a Wall
11   Street Journal Article from, if memory serves,
12   September 22, 2004 that appeared on the front
13   page regarding "Lease Accounting"?
14       A.    That is correct.
15       Q.    As you sit here now do you recall
16   anything else that's come to your attention,
17   since you rendered your expert opinion on
18   August 8, 2004?
19       A.    Well, since then I have received and
20   read the reports of Dr. Prowse and the most
21   recent report of Dr. Tuzin and the deposition
22   transcripts of Dr. Tuzin and Mr. Stahlings.  I
23   reviewed, but not real carefully because it
24   did not seem terribly pertinent, the internal
25   control report of PricewaterhouseCoopers,

Page 329

FUERMAN

1        FUERMAN
2    which I think is dated, oh, I don't know, a
3    month later than the other
4    PricewaterhouseCoopers report.
5        Q.    More or less late July of 2003,
6    correct?
7        A.    Yes.
8        Q.    Dr. Fuerman, do you consider
9    yourself to be a fair man?
10       A.    Yes, I do.
11       Q.    Do you think that the research
12   you've conducted and the expert report you've
13   rendered are fair?
14       A.    I do believe that they are very
15   fair.
16       Q.    You talked about your work at
17   Cardinal Industries.  You mentioned that you
18   felt that the boiler plate was no longer
19   appropriate and you alerted people that it
20   needed to be changed and that some people were
21   not happy about that.  Can you explain that,
22   please.
23       A.    Specifically, when the president of
24   Cardinal Industries heard what I had done he
25   was furious with me.  This actually put an end

83 (Pages 326 to 329)

Page 330

FUERMAN

1    FUERMAN
2    to the real estate syndication that had been
3    going on at the company. But I knew that that
4    was likely to happen because once I spoke with
5    tax counsel they withdrew their opinions,
6    refused to provide any further opinions.
7         That was the end of any further real
8    estate syndications, but I felt that it was
9    the right thing to do. And I think later the
10   president of the company actually realized
11   that I had done the right thing too, because
12   had I not done that the Cardinal Industries,
13   Inc. would have been exposed to a lot greater
14   legal liability had we not acted to stop.
15        These are securities offerings.
16   These were private placements but,
17   nonetheless, they were securities offerings.
18   And to have continued them with tax opinions
19   that would have been misleading by them, that
20   would have been -- I think the president
21   realized that later that would have been
22   disastrous for the company, and I think he's
23   probably glad that I did what did I.
24        Q.   Dr. Fuerman, did you realize at the
25   time your actions would have immediate and

Page 331

FUERMAN

1    FUERMAN
2    dramatic consequences?
3         A.   Yes, I did.
4         Q.   Did you take those actions in part
5    to protect investors and future investors or
6    potential investors?
7         A.   Yes. I did not want to see any more
8    real estate limited partnership syndications
9    get sold to investors. That was part of my
10   motivation. It was also my motivation as an
11   attorney of Cardinal Industries, Inc. to try
12   to protect the company from unreasonable legal
13   liability.
14        Q.   Dr. Fuerman, you teach a variety of
15   students at Suffolk University, correct?
16        A.   That is correct.
17        Q.   You teach from very basic courses to
18   fairly advanced courses, correct?
19        A.   Yes, I do.
20        Q.   In teaching accounting you teach
21   future accountants and C.P.A.s that at times
22   they have to exercise judgment, correct?
23        A.   Oh, yes.
24        Q.   What does that mean as an accountant
25   or C.P.A., "to exercise judgment in the

Page 332

FUERMAN

1    FUERMAN
2    discharge of his or her duties"?
3         A.   That means that -- it means several
4    things. It means that an account or C.P.A. is
5    a professional and all professionals have to
6    exercise professional judgment because it's
7    not all written down what we're supposed to do
8    in a specific situation.
9         Q.   Now, Dr. Fuerman, you talked about
10   materiality being a concept. Do you remember
11   that testimony?
12        A.   That's one of the things that I
13   teach in my auditing course.
14        Q.   What do you mean by that?
15        A.   Well, the notion of materiality
16   being a concept is part of traditional
17   accounting and auditing literature for
18   probably a hundred years.
19        But it got greater emphasis with the
20   issuance of staff accounting bulletin number
21   1999, I believe it was the year 1998 or 1999,
22   which emphasized a number of different
23   situations where, even though it might seem
24   like a small adjustment, the auditor must
25   require the company make that adjustment

Page 333

FUERMAN

1    FUERMAN
2    because it would, in a particular situation,
3    be material.
4         Either making or not making the
5    adjustment will be the difference between a
6    company making its earnings estimate or a
7    company going from net income to net loss or a
8    company changing the trend of its earnings. A
9    number of other examples are given also.
10        The specific example is given of a
11   question and answer format of a hypothetical
12   company, with a auditor coming in and if the
13   adjustment is or is not made is going to have
14   a 4 percent impact on net income. It's asked
15   well, that's not material because it's less
16   than 5 percent.
17        There's some accountants and
18   auditors that have been under the impression
19   that 5 percent is the materiality threshold.
20   The response of the SEC was no, materiality
21   can be much less than that. It depends on the
22   situation.
23        Then it went on to give at least
24   half a dozen examples of situations where even
25   though it's a small percentage change in

84 (Pages 330 to 333)

Page 334

FUERMAN

1 materiality, it's regarded as material.
2    Q.  Dr. Fuerman, how would you define
3 "materiality"?
4    A.  "Materiality" is that which would
5 cause a reasonable investor to consider along
6 with the mix of other information available
7 changing his decision on, for example, whether
8 to buy or sell stock or make other, some other
9 decision that is typically influenced by
10 financial statements.
11    Q.  So this information wouldn't
12 necessarily affect the ultimate decision, but
13 it's something that a shareholder would want
14 to consider, correct?
15    A.  Exactly.  It would cause a
16 shareholder to consider making a change from
17 buying a stock, buy a stock or sell a stock or
18 agree to a merger or not agree to a merger
19 would make not necessarily the investor
20 actually change their decision, but consider
21 changing their decision.
22    Q.  Now, Dr. Fuerman, we're here today
23 because of proxy materials, correct?
24    A.  That is correct.

Page 335

FUERMAN

1    Q.  Is it your understanding that these
2 proxy materials were sent to the OHSL
3 shareholders with a recommendation from the
4 board of directors that they approve the
5 merger?
6    A.  That is my distinct understanding,
7 and that the proxy materials convey the
8 impression that the board of directors
9 unanimously supported voting for the merger
10 and urged the ranking file shareholders to do
11 so when, in fact, there was not a unanimous
12 support among the board of directors to
13 support the merger.
14    There was one director who
15 abstained, there was another director who was
16 on vacation and a third director who perhaps
17 because of the discomfort of the situation in
18 being one of the directors who was opposed to
19 the merger suddenly was off the board.
20    MR. HILLER:  Objection, move to
21 strike.
22    Q.  Now, it's not disputed that the
23 proxy materials contained financial
24 information that Provident submitted that went

Page 336

FUERMAN

1 back to 1994, correct?
2    A.  That is correct.
3    Q.  You believe that the financial
4 information Provident concluded upon by the
5 OHSL shareholders were to make their decision
6 in part was materially misstated, correct?
7    MR. HILLER:  Objection.
8    A.  I believe -- I've testified today
9 that I believe that the 1997, '98, '99
10 financial statements were materially
11 misstated.
12    Q.  What is your opinion, if any, with
13 respect to the financial information going
14 back to yearend 1994 that Provident provided
15 in the proxy materials?
16    A.  That information by the admission of
17 Provident management was incorrect, was
18 misstated.  But by their choosing not to
19 restate '94, '95 and '96, that constitutes an
20 assertion of management that those years were
21 not materially misstated.
22    MR. HILLER:  Objection.
23    Q.  Do you agree with that assertion or
24 do you have some other opinion?

Page 337

FUERMAN

1    A.  I would have to do further
2 investigation to opine on that.  I base my
3 comments on the general interpretation of
4 APB No. 20, that accounting and auditing
5 academics and practitioners have, which is
6 that the years that are restated are the ones
7 that are admittedly materially misstated,
8 omitted by the management of the company.
9    Q.  Is there any doubt in your mind that
10 the financial information concluded in the
11 proxy material from Provident, going back to
12 1994, is incorrect?
13    MR. HILLER:  Objection.
14    A.  There's no doubt in my mind that
15 it's incorrect, but I think it is important to
16 draw a distinction between '94, '95 and '96,
17 which though it may be incorrect is not
18 admittedly materially misstated in contrast to
19 years '97, '98, '99.
20    Those years as APB 20 is interpreted
21 by accounting and auditing academics and
22 professionals, those years are materially
23 misstated.
24    Q.  Do you believe that the wrong

85 (Pages 334 to 337)

Page 338

```
1           FUERMAN
2    financial information that Provident provided
3    to OHSL shareholders in the proxy materials,
4    between 1994 and 1997, is something that would
5    have been of interest to a reasonable
6    shareholder in making a decision as to how to
7    vote with respect to the merger in 1999?
8           MR. HILLER:  Objection.
9        A.  I think it would be of interest.
10       Q.  Why?
11       A.  Because it's believed in the
12   accounting auditing literature that one of the
13   things that users of the financial statements
14   want to do is not just look at the current
15   year financial statements, but also prior
16   years in order to establish, if they can,
17   trends in earnings and in various line items
18   of a company, so as to better predict the
19   likelihood of future financial performance.
20          MR. HILLER:  Move to strike.
21       Q.  Now, Dr. Fuerman, there's a
22   document, I think it's Plaintiffs' Exhibit 91,
23   it's a memo from Bob Hoverson to all Provident
24   employees, followed by three pages of Q and A
25   with respect to issues on the restatement, and
```

Page 339

```
1           FUERMAN
2    the date is April 15, 2003.
3        Q.  Do you recall seeing that document?
4        A.  Yes, I do.
5        Q.  Under what happened I believe
6    Mr. Hoverson says, and this is close to a
7    quote, but not putting it in quotation marks,
8    that Provident restated all the way back to
9    1994.
10          You disagree with that with respect
11   to the technical definition of "restatement;"
12   is that fair?
13       A.  Yes.  I do not hold -- I believe
14   Mr. Hoverson misspoke when he said restated
15   all the way back to 1994, but I certainly do
16   not hold that against him.  He is not a C.P.A.
17   and I would not necessarily expect him to, you
18   know, know the difference.
19          In the financial press the words
20   restatement get thrown around and confused and
21   used incorrectly sometimes.
22       Q.  But you don't necessarily disagree
23   with the concept behind Mr. Hoverson's
24   language that Provident's financial
25   information, going all the way back to 1994,
```

Page 340

```
1           FUERMAN
2    was wrong?
3        A.  There's no question.  He himself
4    admits in that press release that the
5    information going back to '94 is incorrect.
6        Q.  Now, Dr. Fuerman, you have no
7    experience with opinion polls, correct?
8        A.  No, I don't.  I find it to be
9    unreasonable to assume that that would be an
10   appropriate way of determining what is
11   material in the eyes of financial statement
12   users.
13          The financial accounting literature
14   emphasizes so strongly forever that financial
15   accounting is for the needs of a diverse group
16   of users.  Thus, it is counterproductive or
17   useless to pool individual users as to what
18   they think of the financial statements.
19       Q.  You've never work for Gallop,
20   correct?
21       A.  I have not worked for Gallop or
22   Zogby or any of the pollsters.
23       Q.  You've never worked for the Census,
24   correct?
25       A.  I've never worked for the U.S.
```

Page 341

```
1           FUERMAN
2    Census either.
3        Q.  Now, I believe it's fair that
4    Mr. Burke's questioning can be described as
5    suggesting that you should have took a poll or
6    conducted a census of the OHSL shareholders.
7    Do you believe that is a fair characterization
8    of some of your discussion with Mr. Burke this
9    morning and this afternoon?
10          MR. HILLER:  Objection.
11       A.  I think so.
12       Q.  You didn't do that, meaning you
13   didn't conduct a poll and you didn't take a
14   census of OHSL shareholders, correct?
15       A.  No, I did not poll them.  Even if I
16   would have considered doing this, which I
17   never would have, I don't know how I would
18   have been able to get the names and addresses
19   and phone numbers of these people.
20       Q.  Are you aware that OHSL had
21   approximately 900 shareholders in 1999?
22       A.  No, I did not.  It doesn't surprise
23   me.  It was a publicly held company and most
24   publicly held companies have a fair number of
25   shareholders.
```

86 (Pages 338 to 341)

Page 342

FUERMAN

1
2    Q.  Have you ever heard of an accepted
3    methodology in rendering opinions, such as the
4    opinions you have rendered, where polling the
5    shareholders is required?
6        A.  No.  That's contrary to the
7    financial accounting literature and to
8    APB No. 20 in particular.
9        Q.  It's contrary to the concept of a
10    class action, correct?
11        MR. HILLER:  Objection.
12        A.  Well, yes, in that "class actions"
13    by definition are lawsuits that involve large
14    numbers of people.  That's why the courts
15    created the class action mechanism, is because
16    large number of people are affected.
17        So it's just another way of saying
18    it's just not practical, not feasible to use
19    polling as any kind of a technique in
20    researching the views of users of OHSL
21    financial statements.
22        Q.  Now, Dr. Fuerman, you also talked
23    about an "event study" in your discussions
24    with Mr. Burke.  Do you remember that?
25        A.  Correct.

Page 343

FUERMAN

1
2        Q.  An "event study" is a concept that
3    economists use, correct?
4        A.  It's used by economists and also
5    finance professors.  A lot of people feel
6    finance is simply a branch of economics.  I
7    don't use them in my research.  They are
8    important studies, but I choose a different
9    mode of research, different areas to research
10    than that.
11        Q.  In fact, you are not qualified to
12    perform an event study, in the sense that an
13    economist or a finance professor might do an
14    event study, correct?
15        A.  No, I don't feel that I am.  I
16    received the basic knowledge on how to conduct
17    event studies through Ph.D. seminars at the
18    University of Cincinnati.  But, you know, you
19    need a lot more than that to be able to
20    competently carry out event studies.
21        Q.  We talked earlier about the opinion
22    letter that appears in the 10Ks and the annual
23    reports of public companies.  Do you remember
24    that testimony generally?
25        A.  Yes.

Page 344

FUERMAN

1
2        Q.  And it seemed at times you were
3    struggling to recall the exact magic words
4    that auditors sometimes use.  Has your
5    recollection been refreshed over the time?
6        A.  Yes.
7        Q.  What are those words you were
8    seeking before, as best you recall now?
9        A.  The auditor opines that the
10    financials -- that he is providing reasonable
11    assurance that the financials are materially,
12    fairly presented.  That they are -- I think
13    the phrase is something along the lines of
14    that they are fairly presented in all material
15    respects.
16        Q.  I think there's another line because
17    we've discussed this in the deposition of
18    Provident directors extensively, that the
19    opinion letter provides reasonable assurance
20    that the financial statements are free of
21    material misstatement.  Does that ring a bell?
22        A.  Yes, that's the same thing as saying
23    they are fairly presented in all material
24    respects and in conformance with generally
25    accepted accounting principles.  Those words

Page 345

FUERMAN

1
2    and phrases you will find in the auditors
3    report.
4        Q.  Have you reached a conclusion as to
5    whether or not Provident's financial
6    statements, from 2002 going back to 1997 and
7    perhaps 1994, were consistent with GAAP?
8        A.  They by the admission of the
9    company's management and board of directors
10    were in violation of the GAAP.  There's no
11    dispute over that.
12        Q.  Well, apparently --
13        MR. HILLER:  Objection.
14        Q.  There may be.  Is there any set of
15    circumstances that you can think of where a
16    company restates and says hey, this was really
17    optional, we were in compliance with GAAP even
18    though we did restate?
19        MR. HILLER:  Objection.
20        A.  That does not appear to have been
21    the testimony of the Provident executives from
22    the deposition transcripts that I read and
23    reviewed.  They seem to admit that they were
24    putting out financials that were contrary to
25    GAAP.  I don't remember that they argued that

87 (Pages 342 to 345)

Page 346

FUERMAN

1 point.
2
3    Q.   Okay.
4    A.   The only point they argued was as
5 to, some of them, as to materiality, but not
6 as to the fact that the originally issued
7 financials contradicted or violated GAAP.
8    Q.   Let's talk about the actual OHSL
9 Provident merger itself.  You testified
10 previously that this was a stock-for-stock
11 merger, correct?
12    A.   Correct.
13    Q.   You also talked about an "upsetting
14 event."  Do you remember that?
15    A.   Right.
16    Q.   Even though the restatement for
17 Provident did not happen in 1999, had it
18 happened in 1999, do you believe that it would
19 have been considered an "upsetting event"?
20    A.   Oh, yes, extremely upsetting.
21    Q.   Why?
22        MR. HILLER:  Objection, move to
23 strike.
24    A.   The financials would no longer be
25 regarded as credible and reliable, for one

Page 347

FUERMAN

1
2 thing.  The profitability of the company even
3 per the new restated downward numbers would be
4 lower, and it's the historical financials, in
5 particular, the historical earnings per share
6 that are extrapolated outward to try to
7 prognosticate what future earnings per share
8 are going to be.
9        That's the starting point in all
10 financial statement analysis.
11        MR. HILLER:  Move to strike.
12    Q.   Now, Dr. Fuerman, earlier you
13 testified, and I wrote this phrase down so I
14 think it's exact, "It's no longer the deal the
15 parties had agreed to."  Do you remember
16 saying that in words or substance?
17    A.   Yes.
18    Q.   Can you please explain this concept.
19    A.   Well, if the shareholders of a
20 company agree to give up their shares for
21 shares in another company that they have been
22 lead to believe are worth $50 a share, and
23 suddenly they are told they are giving up
24 shares in their own company for shares in a
25 company that is only worth 30 bucks a share,

Page 348

FUERMAN

1
2 $30 a share, they are not going to go along
3 with that.  They are just -- that is a sudden
4 change in the terms of the deal to their
5 disadvantage.
6        MR. HILLER:  Objection.
7    Q.   This is certainly something that a
8 reasonable shareholder would want to consider
9 in arriving at his or her decision as to how
10 to vote with respect to the OHSL Provident
11 merger, correct?
12    A.   Yes.
13        MR. HILLER:  Objection.
14    A.   I believe that, as Bernstein and
15 Wild do, the foundation of equity valuation is
16 earnings per share, what is the projected
17 earnings per share of the company.  The
18 starting point for trying to figure out what
19 the projected earnings per share for the
20 company is what are the historical earnings
21 per share of the company.
22        So if suddenly you drastically
23 downward revise the historical earnings per
24 share of the company, you follow the chain,
25 you are revising downward the equity

Page 349

FUERMAN

1
2 valuation, the valuation of the stocks of the
3 company.  That's fundamental stuff.  We can
4 argue about how much.
5        That's the province of economists,
6 and I know there have been economists retained
7 as expert witnesses on both sides of this
8 litigation, but there can't be any serious
9 dispute as to if it is a substantial earnings
10 per share downward revision, that's going to
11 be material.
12        MR. HILLER:  Move to strike the last
13 couple of sentences.
14    Q.   So reduced to lowest terms, this is
15 important information that reasonable
16 shareholders would want to consider, correct?
17        MR. HILLER:  Objection.
18    A.   Yes.
19    Q.   Now, with respect to the March 5,
20 2003 restatement, you testified in substance
21 that Provident had recognized too much net
22 income too early, and that they clearly
23 misunderstood how to do the accounting for
24 auto lease transactions.
25        First of all, is that entirely

88 (Pages 346 to 349)

Page 350

FUERMAN

1    FUERMAN
2    consistent with the PWC report?
3        MR. HILLER: Objection.
4        A. Yes.
5        Q. Secondly, does that mean Provident
6    presented to the investing company, including
7    OHSL shareholders, that their financial
8    position was better than it actually was?
9        MR. HILLER: Objection.
10       A. Yes.
11       Q. Is this information that a
12   reasonable shareholder would have wanted to
13   consider in 1999?
14       In other words, I understand it
15   wasn't available, but if it was available
16   would you expect reasonable shareholders to
17   consider that in informing their decision as
18   to vote for or against the merger?
19       MR. HILLER: Objection.
20       A. Yes, they would in my opinion
21   clearly want to know that information.
22       Q. Why?
23       A. Because as pointed out by Bernstein
24   and Wild and all the other financial analysis
25   statement textbooks, the historical earnings

Page 351

1    FUERMAN
2    are revised downwards, that leads usually to a
3    downward revision in projected future earnings
4    per share, which usually leads to a downward
5    revision in the expected stock price.
6        Q. In your expert report which we had
7    previously marked as Plaintiffs' Exhibit 115,
8    I'm directing your attention particularly to
9    paragraph 18, did you intend to quote
10   specifically APB No. 20?
11       A. No.
12       Q. And that's because you had to
13   explain and interpret it using your own
14   language for your intended audience; is that
15   correct?
16       MR. HILLER: Objection.
17       A. That's right. APB No. 20 is in
18   places straight forward, but in others
19   convoluted and I could not just quote snippets
20   of it. I had to put whole parts of it in my
21   own words to make it understandable in the
22   expert report.
23       Q. Do you remember this morning
24   Mr. Burke spend a great deal of time saying
25   show me where this word appears in APB 20, one

Page 352

FUERMAN

1    FUERMAN
2    of the words was "restatement." Do you
3    remember that?
4        A. Yes.
5        Q. In some instances you weren't able
6    to find the exact word. Do you remember that?
7        A. Right.
8        Q. If you can't find the exact word in
9    APB 20, please explain why your opinion
10   retains validity?
11       MR. HILLER: Objection.
12       A. Well, because there are some places
13   where the exact same concept of "restatement"
14   is expressed in APB 20 with the phrase "prior
15   period adjustment" or the phrase "retroactive
16   treatment." All three of those mean the same
17   thing.
18       It's natural that since they are
19   synonyms you are not going to have the word
20   "restatement" everywhere in every situation
21   where you might want it to be and be
22   explained, as to what it means in the context
23   of this or that or the next thing in
24   APB No. 20. It just won't be there.
25       Instead, you will have the phrase

Page 353

1    FUERMAN
2    "retroactive treatment" or "prior period
3    adjustment."
4        Q. So your report contains the spirit,
5    the intent, the flavor, if you will, of APB
6    20; is that correct?
7        A. Yes, that is my belief.
8        Q. And it's also your belief that the
9    methodology and the conclusions that you've
10   reached are consistent with other experts in
11   your field, correct?
12       A. Yes. The opinions I've expressed
13   today as to APB No. 20 are very mainstream,
14   within the accounting and auditing academic
15   and professional communities. I would be
16   shocked if any of the people who have cited me
17   on restatements research, or that I cite on
18   restatements research, if they would disagree
19   with me in any substantive way about my
20   testimony on APB No. 20.
21       Q. To some extent, although perhaps not
22   completely, the conclusions that you've
23   reached are consistent with the testimony of
24   the officers and directors of Provident,
25   correct?

89 (Pages 350 to 353)

Page 354

FUERMAN

1    FUERMAN
2    A.  Yes.  I mean, some of the officers
3    and directors of Provident have stated, in one
4    way or another, their belief that the
5    originally issued financials were materially
6    misstated.  Others have been, have expressed
7    different opinions in the deposition
8    transcripts.
9    Q.  Dr. Fuerman, I want to shift gears a
10   little bit back to your experience as a
11   certified fraud examiner.  Are you with me?
12   A.  Yes.
13   Q.  Mr. Burke asked you a series of
14   questions about whether you had worked for the
15   CIA or the Army.  Do you remember that
16   testimony generally?
17   A.  That's correct.
18   Q.  He seemed to suggest that you were
19   not able to evaluate the credibility of
20   witnesses.  Do you remember that testimony
21   generally?
22   A.  Yes, that seems to be a gist of what
23   he was implying by his questions.  But I
24   reject that contention.  I believe if you were
25   to be a skilled interviewer or interrogator

Page 355

FUERMAN

1    FUERMAN
2    you need to do lots of interviews and
3    interrogations.
4    But to be skilled at analyzing
5    transcripts of interviews, interrogations or
6    depositions that's not necessary.  I think
7    what's more important is your study and your
8    knowledge that you've obtained from books,
9    articles and workshops, as I have, and in your
10   teaching.
11   And, therefore, I feel very
12   comfortable making the statements that I've
13   made, with regard to the reactions stated by
14   the Provident executives and board members
15   towards the restatements.
16   Q.  Dr. Fuerman, these conclusions are
17   in a sense evaluating the credibility of
18   witnesses whom you haven't seen, but whose
19   transcripts you've evaluated, correct?
20   A.  Right, I've only evaluated the
21   transcripts.
22   Q.  Right.  With the exception of not
23   having seen the witnesses give the testimony,
24   either on videotape or in person, you were
25   doing exactly what a jury is charged to do,

Page 356

FUERMAN

1    FUERMAN
2    correct?
3    MR. HILLER:  Objection.
4    A.  That is correct, except that I would
5    not have the benefit of the body language and
6    non-verbal behaviors that could be observed by
7    a jury.  On the other hand, there is an
8    advantage to just doing the analysis based on
9    transcripts, and that is that perhaps I could
10   be biased in some way or another by the
11   physical appearance of somebody who was
12   deposed.
13   Q.  You are not as easily swayed by
14   flash or style, correct?
15   A.  Well, no, if you are just looking at
16   a transcript.  You are only analyzing the
17   verbal attempts at deception.
18   Q.  Okay.  Dr. Fuerman, you talked about
19   in one of your previous answers to a question
20   from Mr. Burke that you didn't have a time
21   machine.  Do you remember that testimony?
22   A.  That's correct.
23   Q.  So, in a sense, the report that you
24   have produced, including the charts,
25   represents rough justice because we don't have

Page 357

FUERMAN

1    FUERMAN
2    a time machine, correct?
3    A.  That is correct.  I think the "time
4    machine" remark was in the context of the SEC
5    observer came out with an announcement that
6    could be interpreted as the announcement of
7    new GAAP on lease accounting.  Subsequent to
8    that Wells Fargo restated.
9    That is completely different than
10   Provident restating prior to that announcement
11   by the SEC observer, because it becomes not a
12   matter of going from GAAP conformance to
13   another kind of a GAAP conformance, but in the
14   case of Provident GAAP non-conformance to GAAP
15   conformance.  That's completely different.
16   Under APB No. 20 that's an error and
17   it's not a technical or gray area of
18   restatement as Wells Fargo is.  It's a clear
19   unequivocal admission that the previously
20   issued financials were materially misstated
21   that Provident made when it restated on
22   April 15, 2003.
23   MR. HILLER:  Move to strike.
24   Q.  Dr. Fuerman, let's talk about
25   Provident's audit committee.

90 (Pages 354 to 357)

Page 358

FUERMAN

1
2    A.   Yes.
3    Q.   You agree that the members of
4    Provident's audit committee should be
5    financially literal, correct?
6    A.   Yes.
7    Q.   Do you also agree that the members
8    of Provident's board should be financially
9    literal?
10   A.   Well, ideally they should be, but I
11   really have more specific expertise on the
12   requirements of members of audit committees.
13   I've specifically studied that matter.  That's
14   what actually I opined on in my expert report,
15   is my evaluation of the three members of the
16   audit committee of Provident.
17      I didn't make comments about the
18   other members of the board of directors.  I
19   felt that two of them were, under the NASDAQ
20   listing standards, they were regarded as
21   sufficiently knowledgeable because they had
22   knowledge of fundamental financial statements
23   which is what NASDAQ requires, but the third
24   did not possess that.
25      I felt that Mr. Grotti was so

Page 359

FUERMAN

1
2    deficient in his knowledge and understanding
3    of accounting, auditing, financial statements
4    that he could not be regarded as being
5    sufficiently knowledgeable on the things that
6    an audit committee member is supposed to be
7    knowledgeable about, under the NASDAQ listing
8    standards.
9    Q.   Okay.  We'll come back to
10   Mr. Grotti.  I want to talk about another
11   member of Provident's board, Dr. Peerless, who
12   was a medical doctor on Provident's board for
13   27 years.  I asked Dr. Peerless if he was
14   familiar with GAAP, and he said, "the clothing
15   store?"  I said no, not the clothing store,
16   G-A-A-P, all caps.  He said he was not
17   familiar with GAAP, he was not familiar with
18   GAS.
19      Do you believe that that person
20   should be on any board of any public company
21   in the United States?
22      MR. HILLER:  Objection.
23   A.   I think it's certainly not advisable
24   that a person with su~°. a lack of knowledge of
25   accounting and auditing be on the board.

Page 360

FUERMAN

1
2    However, I must clarify that I am an expert on
3    audit committees, not on the rules governing
4    the boards as a whole.
5    Q.   Back to Tom Grotti.  You testified
6    that it's the job of the audit committee to
7    supervise the independent accountants,
8    correct?
9    A.   Correct.
10   Q.   To an extent it's also the job of
11   the audit committee to supervise the internal
12   auditors at Provident, for example, correct?
13   A.   Correct.
14   Q.   And an accountant once told me that
15   "accounting is the language of business," do
16   you agree with that?
17   A.   That's in all the accounting
18   textbooks, that's in the first chapter.  It's
19   always stated that that's true, and that's why
20   it's so important that business students,
21   regardless of what their major, study
22   accounting.
23   Q.   Do you believe that Tom Grotti spoke
24   and understood the language of business?
25   A.   Not sufficient to be regarded as a

Page 361

FUERMAN

1
2    proper audit committee member under the NASDAQ
3    listing rules, in my opinion.
4    Q.   Now, Mr. Burke seems to suggest to
5    you that if the audit committee trodded in
6    experts and they spewed forth opinions that
7    the audit committee was doing just fine, do
8    you agree with that?
9    MR. HILLER:  Objection.
10   A.   I don't agree that they cannot even
11   meet the listing standards under NASDAQ and be
12   proper audit committee members.
13      What I do agree with, if that's what
14   Mr. Burke was saying, is that in a given
15   situation that arises where a fairly strong
16   knowledge needs to be developed by members of
17   the audit committee to deal with a specific
18   situation, where they need to know at a higher
19   level than usual a specific accounting
20   standard, then they need to, if necessary,
21   they need to bring in people who can quickly
22   educate them and bring them up to speed on
23   that specific accounting standard.
24      I would have thought that facing a
25   restatement that would have been the occasion

91 (Pages 358 to 361)

Page 362

FUERMAN

1    for experts from Ernst and Young, for example,
2    to come in and bring the audit committee
3    members up to speed on exactly what is APB
4    Opinion No. 20 and what does it -- what does
5    it tell us so far as whether Provident should
6    restate or not, what years it should restate.
7        Q.  All right.  So if I can paraphrase.
8    If you grabbed a guy from an audit committee
9    from a steel company, which I think was your
10   example, and you said hey, do you know what
11   the difference is between an operating lease
12   and a finance lease, he may not know, but he
13   or she could certainly fulfill his duties as a
14   board member and as an audit committee member
15   in those circumstances, correct?
16       A.  Correct, but the industry specific
17   knowledge is important for audit committee
18   members.
19       Q.  But, would you expect a former audit
20   committee member on Provident's board, in
21   2004, to be able to explain intelligently the
22   difference between an operating lease and a
23   finance lease, given that they presumably
24   discussed this at board and audit committee

Page 363

FUERMAN

1    meetings and that they were presumably
2    educated by experts on these differences?
3        A.  I would expect that because that's
4    the bread and butter business of a bank like
5    Provident, to enter into leasing transactions
6    and then securitization of those leases.  It
7    just seems to be reasonable to expect a fairly
8    good knowledge of that from the audit
9    committee members at a bank like Provident.
10       Q.  Dr. Fuerman, one of the GAS
11   standards is planning the audit, correct?
12       A.  Correct.
13       Q.  A second GAS standard is
14   understanding the industry, correct?
15       A.  Correct.
16       Q.  Do you believe that audit committee
17   members should have some basic understanding
18   of both those things, not necessarily from the
19   perspective of the auditor, but from the
20   perspective of the audit committee of the
21   board?
22       A.  Oh, yeah.  They need to have
23   specific knowledge of the accounting and
24   auditing that relates to the company because

Page 364

FUERMAN

1    of being in the industry that it is.  The
2    Provident board, audit committee board, audit
3    committee members, their need to understand
4    lease accounting is much greater than the
5    audit committee of a steel company.
6        Q.  Dr. Fuerman, when you came here
7    today and you raised your right hand, the
8    first thing you did was to swear to tell the
9    truth, the whole truth and nothing but the
10   truth, correct?
11       A.  Correct.
12       Q.  You've seen the proxy materials at
13   issue with respect to this transaction,
14   correct?
15       A.  Yes.
16       Q.  You've reviewed them thoroughly,
17   correct?
18       A.  Yes.
19       Q.  While it was your -- while you were
20   retained to render an opinion with respect to
21   materiality and restatements, you also noticed
22   the unanimity issue you spoke to earlier
23   correct?
24       A.  Yes, I noticed that.  And I'm not a

Page 365

FUERMAN

1    language -- an expert on all the aspects of
2    what securities law expects to be in the proxy
3    statement, but it just seems against common
4    sense, from a layman's point of view, to
5    permit a proxy to state that the board of
6    directors unanimously recommended the ranking
7    file shareholders vote for this merger when
8    not all eight of the directors supported that.
9        MR. HILLER:  Move to strike.
10       Q.  Dr. Fuerman, do you believe that
11   proxy materials told the truth, the whole
12   truth and nothing but the truth with respect
13   to the OHSL Provident merger?
14       MR. HILLER:  Objection.
15       A.  No, I do not.
16       Q.  You mentioned the unanimity as being
17   one of the areas; is that correct?
18       A.  That is one of the areas.
19       Q.  And, also, in much greater detail
20   the testimony you've given about Provident's
21   financial information included in that
22   document being either materially misstated or
23   incorrect, right?
24       A.  Yes.

92 (Pages 362 to 365)

Page 366

1   FUERMAN

2   MR. HILLER: Objection, move to

3 strike.

4   Q. And because of these

5 representations, material or otherwise, the

6 deal that the OHSL shareholders got was not

7 the deal that they had agreed to, correct?

8   MR. HILLER: Objection.

9   A. That's very clear to me.

10   MR. BRAUTIGAM: Dr. Fuerman, I thank

11 you, very much, for your time.

12   A. Thank you.

13    -oOo-

14   (Whereupon, the deposition of

15 ROSS D. FUERMAN, PH.D., was concluded at

16 6:57 p.m.)

17

18

19   _____

20   ROSS D. FUERMAN

21

22 Subscribed and sworn to before me

23 this ___ day of _____, 2004.

24

25 _____

---

Page 367

1

2   C E R T I F I C A T E

3 STATE OF NEW YORK )

4    : ss.

5 COUNTY OF NEW YORK )

6

7   I, Toni Allegrucci, a Notary Public

8 within and for the State of New York, do

9 hereby certify:

10   That ROSS D. FUERMAN, PH.D., the

11 witness whose deposition is hereinbefore

12 set forth, was duly sworn by me and that

13 such deposition is a true record of the

14 testimony given by the witness.

15   I further certify that I am not

16 related to any of the parties to this

17 action by blood or marriage, and that I

18 am in no way interested in the outcome of

19 this matter.

20   IN WITNESS WHEREOF, I have hereunto

21 set my hand this 26th day of November,

22 2004.

23

24   _____

25   TONI ALLEGRUCCI

---

Page 368

1

2

3 ---------------- I N D E X ------------------

4

5 WITNESS  EXAMINATION BY   PAGE

6 ROSS FUERMAN MR. BURKE   6, 326

7    MR. BRAUTIGAM  296, 327

8

9 ---------- INFORMATION REQUESTS -------------

10

11 DIRECTIONS:

12 RULINGS:

13 TO BE FURNISHED:

14 REQUESTS: Page 238

15 MOTIONS:

16

17 ---------------- EXHIBITS ------------------

18

19 FUERMAN'S EXHIBITS 1 - 7 MARKED FOR ID.

20

21

22

23

24

25

---

93 (Pages 366 to 368)