# EXHIBIT E

# EXHIBIT E

Expert Report of Ross D. Fuerman, Ph.D, J.D., CPA (Ohio), CFE

On Behalf of Plaintiffs

In re: OHSL Financial Corp. Securities Litigation

Case No. C-1-00-793

Southern District of Ohio

Western Division

August 8, 2004

## Table of Contents

Glossary of Accounting Terms                                                    iii

I.      Qualifications                                                          1

II.     Assignment and Materials Reviewed                                       1

III.    Background                                                              3

IV.     The Issue and How it Must be Analyzed                                   4

V.      APB No. 20                                                              5

VI.     The Attitudes of the CFO, CEO and Audit Committee Toward
        APB No. 20                                                             9

VII.    Before and After Restatement Magnitude Analysis Under
        APB No. 20                                                             15

VIII.   Before and After Restatement Trend Analysis Under APB No. 20           17

IX.     Conclusion                                                             18

References                                                                     20

Exhibits
        Table 1: Analysis Based on Disclosures Mandated by APB No. 20
        Figure 1: PFGI EPS Trend: Reported vs. Restated 1998 & 1999 Projected to 2005
        Exhibit A: Resume of Ross D. Fuerman

## Glossary of Accounting Terms

Accounting Principles Board ("APB").  The immediate predecessor of the FASB.

APB. No. 20.  The accounting standard that defines the meaning of restated financial statements.

American Institute of Certified Public Accountants ("AICPA").  The accountants' professional or trade association.

Auditor.  Also called a CPA firm, public accounting firm, or independent accountant.  An auditor can perform three types of work on a company's financial statements.  By far, the most rigorous of these is called an audit.

Balance Sheet.  One of the four formal financial statements.  Contains Assets and Liabilities.  PFGI materially understated its Liabilities in its Balance Sheets.

Earnings Per Share ("EPS").  Net Income divided by the number of shares outstanding.  Diluted, or Fully Diluted EPS is more complex to calculate but believed to be more meaningful for users of a company's financial statements.  Thus, it is more common for Fully Diluted EPS to be presented in a company's press releases, and Fully Diluted EPS is required to be in a company's filings with the SEC.

Emerging Issues Task Force (EITF").  A group comprised of representatives of FASB, the SEC and other organizations.  It provides guidance on clarifying the implementation of GAAP.  Sometimes, at EITF meetings, the person representing the SEC, called the SEC Observer, announces the SEC staff's position in order to help clarify an area of GAAP.

Financial accounting.  Also called accounting.  Distinguished from managerial accounting or tax accounting.

Financial Accounting Standards Board ("FASB").  The organization that promulgates United States GAAP.

Generally Accepted Accounting Principles "GAAP").  The basic rules of financial accounting.

Income Statement.  One of the four formal financial statements.  Contains line items for Net Income, EPS and Fully Diluted EPS, believed in accounting theory to be among the most important line items in the four formal financial statements.  PFGI materially overstated all of these in its Income Statements.

Materially misstated.  This has two meanings: 1. Financial statements so badly misstated (compared to the financial statements had they conformed with GAAP) that they could influence a user of the financial statements in making a decision.  2.  The originally issued financial statements, after restated financial statements are subsequently issued, are, according to APB No. 20, materially misstated.

Restatement.  The issuance of restated financial statements.  If it is a very long restatement period, going back more than a year or two, then frequently only the items required by APB No. 20, par. 37, to be restated, will actually be restated: Net Income and EPS.

Securities and Exchange Commission ("SEC").  The SEC has the authority to promulgate or clarify GAAP.  It occasionally does so, but normally the SEC defers to the FASB.

## I.    Qualifications

1.    I am an Associate Professor of Accounting at the Sawyer School of Management of Suffolk University in Boston, Massachusetts, where I teach financial accounting, auditing, and fraud examination (also known as forensic accounting). I am a Certified Public Accountant (Ohio) and a Certified Fraud Examiner. During the past ten years, I have been the author or co-author of ten articles in the following journals: *Corporate Ownership & Control, Critical Perspectives on Accounting, Journal of Forensic Accounting, Research in Accounting Regulation, Journal of Legal Economics,* and *The CPA Journal.*

2.    As an expert on financial reporting-related securities fraud litigation, especially restatements, I have been cited by Beatty, et al. (2001), Brickey (2003), Palmrose and Scholz (2004), Perino (2003), and Raghunandan, et al. (2003).

3.    My resume is attached here as Exhibit A.

4.    I am being compensated at the rate of $150 per hour. My compensation is in no way contingent on the outcome of this litigation.

## II.  Assignment and Materials Reviewed

5.    I was asked to review and analyze the financial reporting by Provident Financial Group, Inc. ("PFGI"). Specifically, I was asked to review and analyze the originally issued financial statements of PFGI, which subsequently were restated by PFGI in March and April of 2003. I was asked to give an opinion, as an expert in financial accounting and auditing, on the materiality of these misstatements, to persons who may have relied on PFGI financial statements, to decide whether to agree to a merger which

would result in their exchanging their OHSL Financial Corp. ("OHSL") stock for PFGI stock. As an expert on financial accounting and auditing, I base my opinion solely on the facts as I understand them, and on the authorities of United States ("US") financial accounting and auditing. In conducting my review and analysis, I read documents and other materials including but not limited to the following:

a. Thiemann, et al. v. OHSL Financial Corp., et al. (Civil Action C-1-00-793)

b. Consolidated and Amended Class Action Complaint, filed December 31, 2003;

c. Transcript of the Deposition of Robert Hoverson, taken May 27, 2004;

d. Transcript of the Deposition of Jack Cook, taken May 24, 2004;

e. Transcript of the Deposition of Joseph Steger, taken January 16, 2002;

f. Transcript of the Deposition of Joseph Steger, taken May 7, 2004;

g. Minutes (redacted) of a Special Meeting of the Board of Directors of PFGI, held February 23, 2003;

h. Minutes (redacted) of a Special Meeting of the Audit Committee of the Board of Directors of PFGI, held February 25, 2003;

i. Minutes (redacted) of a Special Meeting of the Audit Committee of the Board of Directors of PFGI, held February 28, 2003;

j. Minutes (redacted) of a Special Meeting of the Board of Directors of PFGI, held March 3, 2003

k. Audit Committee of the Board of Directors of PFGI Agenda dated February 24, 2003;

l. Audit Committee Charter, PFGI;

m. 8 pages of handwritten notes.

n. Transcript of the Deposition of Christopher Carey, taken June 21, 2004;

o. Transcript of the Deposition of Thomas Grote, taken June 16, 2004;

p. SEC filings (Prospectus filed September 27, 1999, 10-K's, 10-Q's, and 8-K's) of PFGI from the year ended December 31, 1994, to the quarter ended March 31, 2004.

q. Report of PricewaterhouseCoopers dated July 7, 2003, addressed to Richard Alexander of Arnold & Porter, and James Burke of Keating, Muething & Klekamp, *Re: In the Matter of Provident Financial Group, Inc.* ("PWC Report")

6.    The review and analysis presented here is more comprehensive than what was presented in early 2004, because some of the above listed materials were unavailable to Plaintiffs and myself until very recently.  Should additional relevant materials become available, my review and analysis may be revised again.  I also reserve the right to create charts or other visual materials for use at trial.

## III. Background

7.    A majority of OHSL shareholders had to agree to the merger with PFGI for it to be consummated.  The Proxy Statement/Prospectus filed September 27, 1999, contained only selected interim financial data for the six months ended June 30, 1998 and 1999, and for the years ended December 31, 1994, 1995, 1996, 1997 and 1998.

8.    Users of a corporation's financial reporting attach greater credibility to a corporation's audited annual financial statements, because an audit is the highest form of assurance that a CPA firm can provide, that the corporation's annual financial statements are correct.  Specifically, an unqualified audit opinion should provide reasonable assurance that the financial statements are materially correct.  It is a violation of auditing standards to issue an unqualified audit opinion if the financial statements are materially misstated.  Conversely, an auditor who issues an unqualified audit opinion when the financial statements are immaterially misstated is in full compliance with auditing standards.

9.    Thus, with regard to financial reporting, the audited annual financial statements for the year ended December 31, 1998 (in the 10-K) were the most important financial statements for OHSL shareholders in evaluating the financial condition and

prospects of PFGI, as they were the most recent audited annual financial statements available prior to their having to make a decision on the merger. However, the unaudited quarterly financial statements for the quarters ended March 31, 1999, and June 30, 1999 (in the 10-Q's), also were very important, as they were the most recent financial statements available prior to their having to make a decision on the merger, at or before the October 25, 1999, Special Meeting of OHSL stockholders. Also, the unaudited quarterly financial statements for the quarter ended September 30, 1999, contained in the 10-Q filed November 15, 1999, were very important, as the merger closing occurred December 3, 1999. Had OHSL stockholders known, prior to December 3, 1999, that the financial statements for the quarter ended September 30, 1999, were materially misstated, then the December 3, 1999, closing would not have occurred. Either OHSL and PFGI would have mutually agreed under the circumstances not to close, or an injunction would have prevented the closing. Thus, the analysis of the materiality of the misstatements contained in the financial statements that subsequently were restated, focuses on 1998 and 1999, even though the restatement covered the years 1997, 1998, 1999, 2000 and 2001.

**IV. The Issue and How it Must be Analyzed**

10.     Are the PFGI restatements material? When answering questions concerning US financial accounting and auditing, one must rely on the authoritative literature detailed in Statements on Auditing Standards (SAS) No. 69 (AU 411).[1] One should place primary reliance on certain authorities, secondary reliance on other

---

[1] Similarly, when analyzing a question of federal law, one must rely, to the extent possible, on the relevant federal statute, the US Constitution, and the decisions of the US Supreme Court.

authorities, etc. This is known as the GAAP Hierarchy. Analysis of the financial accounting of an entity such as PFGI therefore should primarily rely on the SAS No. 69 "authoritative body pronouncements," which are the following:

- FASB *Statements and Interpretations*

- APB *Opinions* and

- AICPA *Accounting Research Bulletins*.

Of these three authoritative body pronouncements, there is only one on point: Accounting Principles Board ("APB") Opinion No. 20. With regard to the lesser authorities, there is on point, in the "other accounting literature" category, an additional genre of authority:

- Accounting textbooks, handbooks and articles.

Therefore, this expert report, in conformity with SAS No. 69, primarily discusses materiality with regard to APB No. 20, and secondarily with regard to accounting textbooks, handbooks and articles.

## V. APB No. 20

11.    The APB was the predecessor of today's Financial Accounting Standards Board ("FASB"). APB Opinion No. 20 is titled "Accounting Changes." Ideally, there should be no accounting changes from one year to the next because accounting changes impair consistency. Consistency is the ability to meaningfully compare the financial statements of a company from one year to the next. Users of financial statements value consistency because consistency makes it easier to determine whether the company is improving or deteriorating, with regard to its performance. Consistency also makes it

easier to determine whether the company is improving or deteriorating, with regard to its financial condition. Such trends, if any, suggest to financial statement users the nature of the future prospects for the company. Thus, consistency is desired as a fundamental objective (APB No. 20, par. 15).

12.    APB No. 20 addresses the need to sometimes make accounting changes, notwithstanding the preference for consistency in financial reporting. APB No. 20 describes three permissible methods to disclose material accounting changes. If an accounting change is *not* material, no disclosure should be made (APB No. 20, par. 38). These three methods are as follows:

- Current treatment of accounting changes requires reporting the cumulative effect of the accounting change in the current year's income statement as a special item. Prior period financial statements are not restated.

- Prospective treatment requires no restatement of prior period financial statements. Also, the cumulative effect of the accounting change is not shown in the current year's income statement. Only the current and future years' financial statements will reflect the effects of the accounting change.

- Retroactive treatment, requiring an adjustment to all current and prior period financial statements for the effect of the accounting correction. Prior period financial statements are restated and republished on a basis consistent with the correction.

13.    Retroactive treatment, or restatement, is what was done with the PFGI financial statements. Neither current treatment nor prospective treatment would be permissible in a case such as PFGI, where the company itself states that the accounting

was incorrect in the previously issued financial statements. A restatement is appropriate

if and only if the "correction has a material effect on income before extraordinary items

or on net income... [or] a material effect on the trend of earnings...." (APB No. 20, par.

38).

14.     PFGI's previously issued audited annual financial statements for the years

ended 1997, 1998, 1999, 2000 and 2001 were restated.[2] The restatement was first

disclosed to the public in an exhibit (press release) attached to a Form 8-K on March 5,

2003. Additional information about the restatement was disclosed in the company's

Form 10-K, on April 15, 2003, as well as in a Form 8-K, also filed on April 15, 2003.

The company disclosed, in its April 15, 2003, filings, that the amount of the restatement

was much larger and that the accounting problems were of greater depth and breadth than

the company initially disclosed on March 5, 2003.[3]

15.     PFGI's March and April 2003 restatement filings stated that, beginning in

1994, because it erroneously accounted for its automobile leasing and securitization

transactions, it had understated its lease liabilities, which should have been placed on the

balance sheet instead of off of the balance sheet. In addition, beginning in 1994, because

---

[2] PFGI announced "a restatement to its operating results for the years 1997 through 2002" (SEC Form 8-K filed March 5, 2003). However, this is accurate only in an informal sense. A restatement under APB No. 20 only can occur with regard to financial statements that were previously issued. The annual financial statements of a public company are not formally issued unless and until they are filed, with an audit report, with the SEC. Thus, the company's annual financial statements for 2002 were not formally restated. This kind of ambiguity in SEC filings and in the financial press is commonplace. Also, Christopher Carey, the CFO of PFGI, stated that he thought the first restatement year was 1998 (June 21, 2004 Deposition of Christopher Carey, p. 54). This is not correct. It is possible that Mr. Carey mistakenly assumed that since 1997 was restated only via an 8-K, on March 5, 2003, and not in the 10-K, on April 15, 2003, that no restatement of 1997 occurred. Although most restatements of previously issued audited annual financial statements are followed by the filing of an amended 10-K or S-1, some are not (Palmrose and Scholz 2004).
[3] The parties in this litigation sometimes have said there were two restatements. At other times they have said there was one restatement communicated via two announcements (for example, June 21, 2004 Deposition of Christopher Carey, pp. 366- 369). In US accounting and auditing there is no substantive difference between "one restatement" versus "two restatements."

PFGI erroneously accounted for its automobile leasing and securitization transactions, it had overstated its Net Income and Earnings Per Share ("EPS"). PFGI did not restate its 1994, 1995 or 1996 financial statements. PFGI accounted for the 1994, 1995 and 1996 changes with a current approach and not with a retroactive approach. Thus, PFGI did not restate its 1994, 1995 or 1996 financial statements.

16.     Conversely, PFGI *did* restate its 1997, 1998, 1999, 2000 and 2001 financial statements. APB No. 20 defines the restatement by PFGI of its 1997, 1998, 1999, 2000 and 2001 financial statements as a clear, unequivocal, unambiguous, incontrovertible, and undeniable assertion by the management of PFGI that its 1997 financial statements, when originally issued, were materially misstated; that its 1998 financial statements, when originally issued, were materially misstated; that its 1999 financial statements, when originally issued, were materially misstated; that its 2000 financial statements, when originally issued, were materially misstated; and that its 2001 financial statements, when originally issued, were materially misstated.

17.     APB No. 20 requires before-and-after-restatement disclosure for each restated period, with regard to EPS, Net Income, and (if any extraordinary items) income before extraordinary items (APB No. 20, par. 37). PFGI provided the disclosure mandated by APB No. 20 for the years 2000 and 2001 in its 10-K filed April 15, 2003, in Note 3 in the Notes to Consolidated Financial Statements. PFGI also provided the disclosure mandated by APB No. 20 for the years 1998 and 1999 in that 10-K's Selected

Financial Data. However, PFGI did not provide the required disclosure for the year ended December 31, 1997.[4]

18.    Normally, this would be the end of the story. The relevant facts and accounting standards have been discussed above. A restatement of previously issued audited annual financial statements constitutes an admission by the management of the company that each and every one of the previously issued audited annual financial statements was materially misstated. GAAP is very clear on this matter. Restatement of immaterially misstated financial statements is prohibited. Conversely, restatement of materially misstated financial statements is required. This is clear and easy. This is not subject to debate. Indeed, I was surprised, when first learning about this case, that the parties to this litigation had not already stipulated to this. In the course of many years of securities litigation research, preceded by years of private practice, preceded by working for the Ohio Division of Securities, I have found it to be almost unprecedented for anyone to question this axiom.


## VI. The Attitudes of the CFO, CEO and Audit Committee Toward APB No. 20

19.    This section discusses the attitudes of the PFGI CFO, CEO and members of the PFGI Audit Committee toward APB No. 20, restatements, and materiality. The purpose of this discussion is to develop insight into some of the people responsible for the financial reporting of PFGI. By ascertaining, to the extent possible, the integrity and

---

[4] This appears to be a deliberate decision by the management of PFGI. I was surprised to find only five years (1998, 1999, 2000, 2001 and 2002) of data in the Selected Financial Data section of the PFGI 10-K filed April 15, 2003, since PFGI provided six years (1996, 1997, 1998, 1999, 2000 and 2001) of data in the Selected Financial Data section of the PFGI 10-K filed March 27, 2002. Since PFGI did not include year 1997 in the Selected Financial Data section of the PFGI 10-K filed April 15, 2003, there was no public disclosure as to the final restatement amount or percentage decrease with regard to 1997 PFGI Net Income or EPS. PFGI has also not provided the 1997 information to the Plaintiffs.

knowledge of these people, one can better interpret their respective actions and assertions.

20.    The CFO of PFGI asserted that a restatement is required for "material periods" but "optional for periods where you may think it's not significant or not material" (June 21, 2004 Deposition of Christopher Carey, p. 52). The CFO further asserted that PFGI "ran out of time" and thus restated some periods that he thought were not materially misstated (June 21, 2004 Deposition of Christopher Carey, p. 367). The CFO describes himself as "very proficient with GAAP" (June 21, 2004 Deposition of Christopher Carey, p. 6).

21.    After reading the transcript of his deposition, I agree that the CFO is "very proficient with GAAP." However, any person "very proficient with GAAP" knows that restatement of immaterially misstated financial statements is prohibited; that restatement of materially misstated financial statements is required; and that restatement of previously issued annual financial statements constitutes an assertion by the management of the company that each and every one of the (1997, 1998, 1999, 2000 and 2001) previously issued annual financial statements was materially misstated when originally issued. The topics of APB No. 20 and restatements are covered in Intermediate Accounting, which is the first course taken by a college student who majors in Accounting (see Spiceland et al. 2001, Chapter 21, "Accounting Changes and Error Corrections"). In my opinion, the CFO intentionally misstated his personal knowledge and belief about restatements and materiality.

22.    The CFO of PFGI also cited, in support of his contention that the originally issued financial statements subsequently restated in March and April of 2003,

were not materially misstated, the Wells Fargo restatement (June 21, 2004 Deposition of

Christopher Carey, pp. 46-47, 52, 376).  This was an inapposite citation, as Wells Fargo

restated its quarterly financial statements for the quarter ended March 31, 2003, on

January 16, 2004, in response to an announcement by the SEC Observer on May 15,

2003, concerning lessors' application of paragraphs 5(j) and 7(d) of FASB Statement No.

13, *Accounting for Leases,* to arrangements involving third-party guarantees of the

expected residual value of leased property.  This was a technical matter and a mere

clarification of GAAP.  The PWC Report, p. 6, adds that the SEC staff stated that some

of the affected companies would need to restate, whereas others would not.  In other

words, it was not a situation of companies who had been clear GAAP violators to stop

and switch to proper GAAP.

      23.    The PFGI restatement is entirely different.  The PFGI restatement was not

prompted by the issuance of a new pronouncement by the FASB or a clarification by the

Emerging Issues Task Force or the SEC.  Instead, the PFGI restatement was caused by a

clear GAAP violation in the originally issued financial statements: "the provisions … as

well as the deductibles, precluded PFGI from meeting one of the requirements for direct

financing lease classification under GAAP….  Upon further analysis, PwC concluded,

with the concurrence of PFGI and E&Y, that the accounting methodology used by PFGI

and E&Y to classify and account for all of PFGI's auto leases classified as direct

financing was inconsistent with the requirements of GAAP" (PWC Report, p. 5).  I

believe the CFO intentionally misstated his personal knowledge and belief about the

nature of the Wells Fargo restatement and how it compares to the PFGI restatement.  It is

unlikely that the CFO of the second largest financial institution in the greater Cincinnati

Tristate area (prior to the National City Corp. merger) could make this kind of statement due to an inadvertent mistake.

24.    The CFO also asserted that present value analysis, though applicable to cash, is inapplicable to Net Income (June 21, 2004 Deposition of Christopher Carey, pp. 42-43). This is a lie by the CFO, who knows better. To say that the timing of Net Income is not critically important is substantively equivalent to saying that all of accrual accounting (Income Statement and Balance Sheet) is meaningless and companies should not bother filing at the SEC anything other than the Statement of Cash Flows. The primary purpose of financial accounting is to meaningfully measure, in a timely manner, the economic performance of corporations, via Net Income and EPS, in order to assess the future timing and magnitude of cash flows. Simply counting up current cash flow in order to assess the future timing and magnitude of cash flows is not nearly as effective at making this assessment (Paton and Littleton 1940; FASB 1978). Further, whether the timing of Net Income is accelerated via premature revenue recognition (Sunbeam) or by capitalization of costs that should have immediately been expensed (WorldCom), or by some other GAAP violation, it is well understood by accounting and finance professionals that this materially misstates the financial statements.

25.    The CEO of PFGI stated that he did not know whether restatement of immaterially misstated financial statements is prohibited (May 27, 2004 Deposition of Robert Hoverson, pp. 198-199). On the one hand, Mr. Hoverson is not a CPA. On the other hand, his knowledge of certain areas of GAAP related to operating leases, financing leases, and related issues, appears very extensive.

26.     Also, at the urging of counsel for the Defendants Mr. Burke, and counsel
for Ernst & Young Ms. Perry, Mr. Hoverson changed his answer to the question about
who put the lease accounting model together from the truth to a lie.  First he said,
consistent with Jack Cook (May 24, 2004 Deposition of Jack Cook, pp. 40, 271-273), that
both PFGI and EY put the model together.  Then, after two objections from Ms. Perry
and two objections from Mr. Burke, Mr. Hoverson took their cues and uttered a series of
weak denials and non sequiturs (May 27, 2004 Deposition of Robert Hoverson, pp. 38-
39).  Throughout his deposition, Mr. Hoverson chronically engaged in the kinds of
deceptive verbal behaviors (failure to answer the question, repeating the question, verbal
attacks directed at the interviewer, qualified responses, and selective memory)
emphasized in a recent Detection of Deception and Strategic Interviewing workshop
(Business Intelligence Advisors 2004; see also ACFE 1997).

27.     The Chairman of the PFGI Audit Committee was asked, "Dr. Steger, do
you believe that restatements are by definition material?"  His response was "I guess so."
(May 7, 2004 Deposition of Joseph Steger, p. 16).  Later, Dr. Steger was asked, "do you
believe now, today, that Provident's financial statements were materially misstated
between 1997 and 2002?"  His response was the following: "Well, I – they – you may
read it that way."  (May 7, 2004 Deposition of Joseph Steger, p. 33).  These statements of
Dr. Steger sound weak.  Also, at other times during the deposition he contradicted
himself.  However, these are strong affirmations of Plaintiffs position on restatements and
materiality, given the context of the intense pressure (strategic interruptions with
extremely frequent and repetitious objections) exerted by three attorneys for the

Defendants (against one for the Plaintiffs) throughout the deposition to thwart Dr. Steger from making any meaningful statements on these issues.

28.     PFGI Audit Committee member Jack Cook asserted that the concept of present value should be ignored with regard to the PFGI recognition of Net Income many years prematurely.  This is wrong.  For example, one dollar received eight years from now, assuming an 8% annual compounding interest rate, is worth only $.54 today.  Mr. Cook appears unaware that "potential users of financial information most directly concerned with a particular business enterprise are generally interested in its ability to generate favorable cash flows because their decisions relate to amounts, *timing*, and uncertainties of expected cash flows" (FASB 1978, par. 25).

29.     Based on his ignoring present value, Mr. Cook argued that the originally issued PFGI financial statements were not materially misstated: "Well, the whole total problem of the restatement was more or less an accounting problem that, if you look at it in the whole period of time, kind of washed itself out."  Mr. Cook added that "I'm not a financial expert."  (May 24, 2004 Deposition of Jack Cook, pp. 9, 12).

30.     Sitting on the audit committee of a publicly traded company is a grave and serious task.  Members are responsible for reviewing the auditors' work and--ultimately--the integrity of a firm's financial statements. PFGI Audit Committee member Thomas Grote demonstrated throughout his deposition a lack of even threshold knowledge of auditing, financial reporting, or the duties of the members of an Audit Committee.  He did not seem to understand the concepts of "restatement" or "materiality."  His attitude

toward the fact that a subsequent restatement of previously issued financial statements is an admission that they were materially misstated?  Incomprehensiveness.[5]

31.    In my opinion, the CFO and the CEO lied during their depositions.  They understand that it's etched in stone that because they were subsequently restated, the originally issued 1997, 1998, 1999, 2000 and 2001 financial statements were materially misstated.  The Audit Committee Chair waffled a bit, but nonetheless substantively made the following admission: because they were subsequently restated, the originally issued 1997, 1998, 1999, 2000 and 2001 financial statements were materially misstated.  Audit Committee member Jack Cook strikes me as a person with integrity but who is mistaken on this matter.  Audit Committee member Thomas Grote is not financially literate.  He clearly lacks threshold knowledge in the areas of auditing, financial reporting, or the role of an Audit Committee member.[6]

## VII.  Before and After Restatement Magnitude Analysis Under APB No. 20

32.    In Table 1, some of the available quantitative data relevant to persons deciding on whether to vote for the merger, is presented (Net Income is in millions of dollars).  As indicated in the discussion above, as well as in Table 1, the full extent of the restatement to the previously issued financial statements for the year ended December 31, 1997, has not been publicly disclosed.

---

[5] The PFGI CFO stated that in his opinion Mr. Grote is financially literate (June 21, 2004 Deposition of Christopher Carey, pp. 371-372).  I believe that the CFO intentionally misstated his personal knowledge and belief about the financial literacy (whether in terms of the PFGI Audit Committee Charter, the new NASDAQ rules, the old NASDAQ rules, or the way the term is used in the financial press is irrelevant since the Mr. Grote lacks financial literacy under any of these standards) of Mr. Grote.
[6] Until Enron, populating Audit Committees with members who lacked financial literacy was commonplace (Revell 2002).  I am surprised that PFGI continued this practice through the first half of 2004.

33.    The full extent of the restatement to the year ended December 31, 1998, both with regard to Net Income and EPS, was a 4% decrease. The year ended December 31, 1998 was the last set of audited annual financial statements disclosed to OHSL stockholders who had to make a decision on the merger proposal, and thus were important in making that decision.

34.    The full extent of the restatement to the year ended December 31, 1999, both with regard to Net Income and EPS, was a 16% decrease. Although these audited annual financial statements were not disclosed to persons who had to make a decision on the merger, they are nonetheless important to analyze. The unaudited quarterly financial statements for the quarters ended March 31, 1999, and June 30, 1999 (in the 10-Q's) were the most recent financial statements available prior to the OHSL stockholders having to make a decision on the merger, at or before the October 25, 1999, Special Meeting. Also, the unaudited quarterly financial statements for the quarter ended September 30, 1999, contained in the 10-Q filed November 15, 1999, are very important to consider, as the merger closing occurred December 3, 1999. Had OHSL stockholders known, prior to December 3, 1999, that the financial statements for the quarter ended September 30, 1999, were materially misstated, then the December 3, 1999, closing would not have occurred. Either OHSL and PFGI would have mutually agreed under the circumstances not to close, or an injunction would have prevented the closing.    A first order approximation of the first three quarters' overstatement of Net Income and EPS is, logically, 16%. Since only annual financial statements were restated for 1999, this approximation is necessary for a meaningful quantitative analysis of materiality.[7]

---

[7] I would prefer to avoid this approximation and instead compare the originally issued financial statements for the first, second and third quarters of 1999 to the restated first, second and third quarters of 1999.

35.    Obviously, the PFGI 1999 16% before versus after restatement decrease in Net Income and EPS is material to OHSL shareholders.  Is the 1998 4% before versus after restatement decrease in Net Income and EPS also material to OHSL shareholders?

36.    The authorities of US accounting and auditing do not stipulate quantitative thresholds for materiality.  Instead, they discuss materiality verbally or conceptually. According to SFAC No. 2, an immaterial misstatement is defined as one that has no effect on a typical or average user's decisions (FASB 1984).  For example, an immaterial misstatement, if known to a stockholder, is not expected to result in a stock price change. The SEC defines materiality similarly to SFAC No. 2.  Rule 1-102 describes a material misstatement as "…information… about which an average prudent user ought reasonably be informed."

37.    Cho et al. (2003), in order to determine what is material from a stockholder's point of view, empirically investigated three quantitative measures that stockholders consider important in assessing whether earnings are materially misstated. For each measure, they identified a materiality threshold where misstatements exceeding the threshold are material.  Cho et al. (2003) found the average stockholder's materiality threshold is between 0.1% and 0.2%, for Net Income Before Income Taxes; between .01% and .025% for Total Assets; and between .01% and .3% for Sales.  Thus, applying the Cho et al. (2003) benchmarks, the PFGI 1998 4% before versus after restatement decrease in Net Income and EPS is clearly material to OHSL shareholders.

## VIII. Before and After Restatement Trend Analysis Under APB No. 20

Plaintiffs have requested the restated first, second and third quarters of 1999 with regard to Net Income and EPS, but PFGI to date has not provided this data to the Plaintiffs (see, for example, June 21, 2004 Deposition of Christopher Carey, pp. 89-90).

38.    Another important aspect of the quantitative analysis concerns the restatement's impact on the PFGI earnings trend. PFGI originally reported EPS of $2.48 for 1998, increasing to $3.08 for 1999. This was a 24% annual increase in EPS. Upon restatement, PFGI reported EPS of $2.38 for 1998, increasing to $2.58 for 1999. This is an 8% annual increase in EPS. An analysis of stock valuation involves the application of a formula to expectations of future dividends, which are in turn based on the expectations of future growth in EPS, payout ratios, and many other factors.

39.    Figure 1 depicts the future EPS expectation of an OHSL stockholder in the fall of 1999, based on the quantitative data available to an OHSL stockholder at that time. Figure 1 is constructed using the originally reported and later restated EPS for 1998 and 1999 and then projecting into the future, assuming the same rate of increase. Figure 1 shows that the originally reported (24% annual increase trend) EPS expectation is much higher after a few years than the restated (8% annual increase trend) EPS expectation. As discussed above, trend analysis is required by APB No. 20, par 38, to determine materiality. The results of the trend analysis suggest that these accounting misstatements were material to the holders of OHSL stock in the fall of 1999, in deciding whether to accept PFGI stock in a merger transaction.

## IX. Conclusion

40.    PFGI restated each and every one of its annual financial statements for 1997, 1998, 1999, 2000 and 2001, in its SEC filings on March 5, 2003 and April 15, 2003. APB No. 20 requires restatement if and only if the company concludes that the misstatements in the originally issued financial statements are material with regard to

"net income… [or] the trend of earnings…" (APB No. 20, par. 38). PFGI's restatement of each and every one of these financial statements thus makes the misstatement in each and every one of these financial statement *per se* material.

41.    Quantitative magnitude analysis applying the Cho et al. (2003) benchmarks for materiality thresholds from an average stockholder's point of view suggests that the 1998 financial statements of PFGI were materially misstated. Application of the Cho et al. (2003) benchmarks for materiality also suggests that the 1999 financial statements of PFGI were materially misstated.

42.    Quantitative trend analysis, presented in a table and depicted in a figure, suggests that the 1998 financial statements of PFGI were materially misstated. The quantitative trend analysis, presented in a table and depicted in a figure, also suggests that the 1999 financial statements of PFGI were materially misstated.

43.    Thus, the previously issued and subsequently restated 1997, 1998, 1999, 2000 and 2001 financial statements of PFGI were materially misstated. They were materially misstated because under APB No. 20 restated financial statements are *per se* materially misstated if they are subsequently restated. The 1998 and 1999 financial statements were materially misstated because the magnitude of the change in numbers for 1998 and 1999 exceeded the Cho et al. (2003) materiality thresholds. The 1998 and 1999 financial statements were materially misstated because of the dramatic change in the EPS trend for 1998, 1999, and projecting forward, wrought by the restatement. **For all of these reasons, the PFGI 1998 and 1999 financial statements were clearly, unequivocally, unambiguously, and incontrovertibly materially misstated.**

Ross D. Fuerman

# REFERENCES

American Institute of Certified Public Accountants, Statement of Auditing Standards No. 69, "The Meaning of Present Fairly in Conformity with Generally Accepted Accounting Principles," *Professional Standards*, Vol. 1, AU sec. 411).

American Institute of Certified Public Accountants. 1971. *Opinions of the Accounting Principles Board No. 20: Accounting Changes* (New York, AICPA).

Association of Certified Fraud Examiners. 1997. *Beyond the Numbers: Professional Interviewing Techniques*. Austin, TX.

Beatty, R. P., Drake, P., and Hogan, C. E. 2001. The impact of the 1995 private securities litigation reform act on litigation risk and auditor compensation in the IPO market. Working paper presented at the 2002 AAA Auditing Section Midyear Meeting.

Brickey, K. F. 2003. Andersen's fall from grace. *Washington University Law Quarterly* 81 (4): 917-959.

Business Intelligence Advisors. 2004. Workshop held July 7th. Business Intelligence Advisors: Auditor Services webpage at http://biadvisors.com/auditorServices.htm.

Cho, S-Y., Hagerman, R. L., Nabar, S., and E. R. Patterson. 2003. *Accounting Horizons* 17 (Supp.): 63-76.

Financial Accounting Standards Board. 1976. *Accounting for Leases*. Statement of Financial Accounting Standards No. 13. Norwalk, CT, FASB.

Financial Accounting Standards Board. 1978. *Objectives of Financial Reporting by Business Enterprises*. Statement of Financial Accounting Concepts No. 1. Norwalk, CT, FASB.

Financial Accounting Standards Board. 1984. *Qualitative Characteristics of Accounting Information*. Statement of Financial Accounting Concepts No. 2. Norwalk, CT, FASB.

Palmrose, Z-V. and S. Scholz. 2004. The circumstances and legal consequences of non-GAAP reporting: Evidence from restatements. *Contemporary Accounting Research* 21 (1): 139-181.

Paton, W. A., and A. C. Littleton. 1940. *An Introduction to Corporate Accounting Standards*. (Sarasota, FL, American Accounting Association).

Perino, M. A. 2003. Did the private securities litigation reform act work. *University of Illinois Law Review* (4): 913-977.

Raghunandan, K., Read, W. J. and J. S. Whisenant. 2003. Initial evidence on the association between nonaudit fees and restated financial statements. *Accounting Horizons* 17 (3): 223-234.

Revell, J. 2002. O.J. Simpson, math whiz: Check out these accounting watchdogs. *Fortune* (April 15th), posted at http://www.fortune.com/fortune/subs/article/0,15114,372830,00.html.

Securities and Exchange Commission. 1999. SEC staff accounting bulletin: No. 99 – Materiality. Posted at http://www.sec.gov/interps/account/sab99.htm#body4.

Spiceland, J. D., Sepe, J. F., and L. A. Tomassini. 2001. *Intermediate Accounting*, 2nd ed. New York: McGraw-Hill.

Table 1: Analysis Based on Disclosures Mandated by APB No. 20

| Item | Year | Original Numbers | Preliminary Restatement | Final Restatement | Percent Decreased |
|---|---|---|---|---|---|
| Net Income | 1997 | 114.7 | 113.8 | Not Disclosed | Not Disclosed |
| EPS | 1997 | 2.38 | 2.36 | Not Disclosed | Not Disclosed |
| Net Income | 1998 | 122.4 | 120.4 | 118 | 4% |
| EPS | 1998 | 2.48 | 2.44 | 2.38 | 4% |
| Net Income | 1999 | 150.9 | 139.6 | 127 | 16% |
| EPS | 1999 | 3.08 | 2.85 | 2.58 | 16% |

| 1998 to 1999 Reported EPS Increase | 1998 to 1999 Restated EPS Increase |
|---|---|
| 24% | 8% |



Figure 1: PFGI EPS Trend: Reported vs. Restated 1998 & 1999 Projected to 2005

Exhibit A

**ROSS D. FUERMAN**
Department of Accounting
Sawyer School of Management
Suffolk University
Boston, MA  02108-2770
Office: (617) 573-8615
Home:  (617) 969-6361
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Http://www.suffolkacct.org/rfuerman/

**Academic Positions:**   Associate Professor, 2003 to present.  Assistant Professor, 1997 to 2003.  Suffolk University, Boston.
Instructor, 1995-1997.  University of Cincinnati, Cincinnati.
Graduate Research and Teaching Assistant, 1991-1995.  University of Cincinnati.

**Education:**   Ph.D. in Accounting, University of Cincinnati. 1996.
J.D., George Washington University, Washington, D.C. 1982.
M.A., Jewish Theological Seminary, New York.  1978.
B.A., University of Cincinnati, *cum laude* with High Honors. 1975.

**Licensure
and Certification:**   Certified Fraud Examiner.  1999.
Certified Public Accountant, Ohio.  1987.
Bar, Ohio (1983) and the District of Columbia (1982).

**Research
Interests:**   Cross-disciplinary research involving financial disclosure-related securities fraud, accounting, auditing, law and corporate governance.  Robert Barker described my research in *BusinessWeek*, October 28, 2002, page 129, in The Barker Portfolio, "Auditing the Auditors."  Posted at http://www.businessweek.com/magazine/content/02_43/b3805127.htm

**Article Publications:**   "Audit Quality Examined One Large CPA Firm at a Time: Mid-1990's Empirical Evidence of a Precursor of Arthur Andersen's Collapse," *Corporate Ownership & Control*, forthcoming.
"Accountable Accountants," *Critical Perspectives on Accounting*, 2004, Vol. 15.
"Fraudulent Audited Annual Financial Statements in Post-PSLRA Private Securities Class Actions: Determinants of Auditor Litigation," (with S. Freund and L. Shaw) *Journal of Forensic Accounting*, 2002, Vol 3, No. 1.  Posted at http://www.suffolkacct.org/rfuerman/Freund-Fuerman-Shaw.pdf

"Accountable Accountants," American Accounting Association
Southeast Regional Meeting, Charleston, 2003.
"The Role of Auditors in Post-Reform Act Private Securities Class
Actions," American Accounting Association National
Meeting, Philadelphia, 2000.

"The Effect of the Reform Act and *Central Bank* on Naming
Auditor Defendants in Securities Class Actions," American
Accounting Association National Meeting, New Orleans,
1998.
"The Effect of the Reform Act and *Central Bank* on Naming
Auditor Defendants in Securities Class Actions," American
Accounting Association Northeast Regional Meeting,
Manchester, 1998.
" Differentiating Between Lawsuits With Auditors and Lawsuits
Without Auditors: The Roles of Lawsuit Merits and Deep
Pockets," American Accounting Association Northeast
Regional Meeting, Binghamton, 1997.
"Contemporary Auditor Litigation Risk: An Empirical
Investigation Based on Recent Data," American
Accounting Association Auditing Section Midyear
Conference, Jacksonville 1997.
"A Qualitative Analysis Establishing the Seminality of the
*National Surety* Doctrine: The 1987 Texas Tort Reform
and the Auditor's Use of the Comparative Fault Defense,
"American Accounting Association Ohio Regional
Meeting, Columbus, 1994.
"Auditors and the Client Fault Defense in Comparative Negligence
Jurisdictions," American Accounting Association Ohio
Regional Meeting, Dayton, 1993.

| | |
|---|---|
| **Editorial Boards** | *Journal of Forensic Accounting.*<br>*Research in Accounting Regulation.* |
| **Ad Hoc Referee** | *Advances in Accounting.*<br>*Critical Perspectives on Accounting.* |
| **Advisory Board:** | Member of the Advisory Board of AccountingMalpractice.com. |
| **Presentations<br>to Professional<br>Practice:** | Presentation to the Fraud! Detection and Prevention continuing<br>professional education seminar, cosponsored by the Suffolk<br>University Master of Science in Taxation Program, the<br>Internal Revenue Service, and the Suffolk University<br>Corporate Education Department, November 16, 1999.<br>"Keeping Internal Auditors' Reports on Environmental Problems<br>Confidential: The Problem, Some Solutions, and a |

Legislative Update," Cincinnati chapter of the Institute of Internal Auditors, May 15, 1996.

**Grants, Honors and Awards:**

Practising Law Institute Accountants' Liability After Enron Seminar Scholarship, 2002.
Sawyer School of Management Summer Research Grant, 2001
Practising Law Institute Financial Fraud in Public Companies Seminar Scholarship, 2000.
Kelly Siddall Grants, 1995 and 1996.
American Accounting Association Doctoral Consortium, 1993.
Indiana CPA Educational Foundation Doctoral Loan, 1992-1997.
University of Cincinnati Graduate Scholarship, 1991-1995.
University of Cincinnati Graduate Assistantship, 1991-1995.

**CPA Examination Review Course**

Instructor, Becker CPA Review Course, 1987-1991. Taught Auditing, Law, Practice (financial and managerial accounting and federal income taxation) and Theory.

**Teaching Experience:**

I have a decade of teaching experience in Auditing, entry level Financial Accounting, and entry level Managerial Accounting. I founded the Forensic Accounting course Spring 2000 at Suffolk University, and renamed it Fraud Examination Spring 2003.

**Pre-Academe Professional Work Experience:**

Corporate Staff Assistant, Schottenstein Stores Corporation, Columbus, Ohio, 1989-1990. Financial liaison for corporate operations including leasing, purchasing, mortgaging, conveyancing, foreclosing, and factoring.
Syndication Specialist, Cardinal Industries, Inc., Columbus, Ohio, 1988-1989. Prepared text and projections for private placement memoranda and prospectuses for company's securities offerings.
Associate, Enz, Jones & LeGrand, Columbus, Ohio, 1985-1988. Wrote securities documents. Litigated securities fraud cases. Tax planning and tax return preparation.
Financial Institutions Examiner, Ohio Division of Securities, Columbus, Ohio, 1983-1985. Conducted financial statement analysis merit reviews of proposed public offerings.

**Organizational Memberships:**

American Accounting Association.
American Institute of Certified Public Accountants.
Association of Certified Fraud Examiners.

"Balkanized Auditor Liability Research," *Critical Perspectives on Accounting*, 2001, Vol. 12.

"Auditors and the Post-Litigation Reform Act Environment," *Research in Accounting Regulation*, Vol. 14, ed. G.J. Previts, 2000. Greenwich, CT: JAI Press.

"The Role of Auditor Culpability in Naming Auditor Defendants in United States Securities Class Actions," *Critical Perspectives on Accounting*, 1999, Vol 10.

"The Effect of the Reform Act and *Central Bank* on Naming Auditor Defendants in Securities Class Actions," *Research in Accounting Regulation*, Vol. 12, ed. G.J. Previts, 1998. Greenwich, CT: JAI Press.

"Naming Auditor Defendants in Securities Class Actions," *Journal of Legal Economics*, Vol. 7 (1), Spring/Summer 1997.

"The Impact of *Central Bank of Denver*: Some Empirical Evidence," *Research in Accounting Regulation*, Vol. 11, ed. G.J. Previts, 1997. Greenwich, CT: JAI Press.

"The CPA's Responsibilities for Client Related Information," (with James D. Cashell), *The CPA Journal*, September, 1995.

"Accountants and the Client Fault Defense in Indiana," *The Indiana CPA*, July, 1993.

"The Accounting Profession's Litigation Crisis," *The Ohio CPA Journal*, October, 1992.

**Working Paper:**                "Differentiating Between Arthur Andersen Versus the Other Members of the Big Five on the Basis of Auditor Quality: An Empirical Investigation of the Decision to Criminally Prosecute Arthur Andersen."

**Refereed Conference Proceedings:**       "Audit Quality Examined One Large CPA Firm at a Time: Mid-1990's Empirical Evidence of a Precursor of Arthur Andersen's Collapse," Administrative Sciences Association of Canada Annual Conference, Quebec, 2004.

"Audit Quality Examined One Large CPA Firm at a Time: Mid-1990's Empirical Evidence of a Precursor of Arthur Andersen's Collapse," American Accounting Association MidAtlantic Regional Meeting, Arlington, 2004.

"Audit Quality Examined One Large CPA Firm at a Time: Mid-1990's Empirical Evidence of a Precursor of Arthur Andersen's Collapse," American Accounting Association Auditing Section Midyear Conference, Clearwater, 2004.

"Accountable Accountants," American Accounting Association Northeast Regional Meeting, Stamford, 2003.

"Accountable Accountants," American Accounting Association MidAtlantic Regional Meeting, Philadelphia, 2003.