# Exhibit A
# Affidavit of Dr. Fuerman

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Walter W. Thiemann,  :
on behalf of himself and         Case No. C-1-00-793
of all others similarly situated,  :

                                                       Judge Sandra S. Beckwith

            Plaintiff,  :

                                                         Magistrate Judge Timothy S.
                                                         Hogan

vs.  :

OHSL Financial Corporation, et al.  :

                                                         AFFIDAVIT OF
                                                         ROSS D. FUERMAN,
             Defendants.  :  Ph.D. (Accounting), J.D.,
                                                        CPA (Ohio), CFE

---

STATE OF MASSACHUSETTS  :
                                       : SS:
COUNTY OF SUFFOLK  :

ROSS D. FUERMAN, being duly sworn, deposes and states as follows:

1. I was retained by Plaintiffs as an expert for a specific issue: whether originally issued financial statements are regarded as materially misstated if they subsequently are restated. This is a matter of understanding Accounting Principles Board Opinion No. 20 (1971) and its exegesis, as it has developed over the past 34 years in the Accounting community. I am one of the leading authorities in the United States on this issue. My CV is attached as Exhibit A. My opinion that the originally issued financial statements were materially misstated has not been questioned by a single person with expertise.[1]

---

[1] It should be noted that the October 27, 2004, ruling of the Court on restatements/materiality was based solely on the three year statute of repose in 15 U.S.C sec. 77m. My opinion was not questioned by the Court.

1

Out of the thousands of Accounting professors in the United States, counsel for Defendants James Burke could not locate a single one willing to question my opinion. Thus, he resorted to having his client Defendants make one of their employees sign an affidavit that disputed my opinion. I find that indicative that my opinion is indisputable.

2. On October 21, 2004, I was subjected to a 10 hour deposition in New York by Mr. Burke. I cooperated fully, coming just a couple days after he noticed me (I did not insist on a subpoena), with all the documents that he requested. He wasted my time by asking many questions that suggested an inadequate understanding of financial accounting, given his responsibility to represent a party to a financial accounting lawsuit. He seemed at the deposition to be confused regarding the difference between Accounting and Auditing, even though, as I patiently explained, my engagement in this litigation is solely about Accounting, not Auditing. He continues to appear confused. For example, he criticized me in his March 1st Response for my lack of experience in the performance of financial statement audits, when I **never** in this engagement opined as to the Auditing performed on the Provident financials, before, during or after my deposition. He wasted my time by asking many repetitive questions. He also wasted my time by baiting me into discussing every conceivable remotely tangential topic other than the relevant issue: whether originally issued financial statements are regarded as materially misstated if they subsequently are restated. Otherwise, this deposition would have been completed in a few hours. It would be terribly unfair to allow Mr. Burke to use the inordinate length of the deposition, for which he himself bears sole responsibility, as a rationale for taking action against me and in favor of himself. He, not I, skillfully controlled the deposition and did all he could to obfuscate and avoid discussing the fact that under these

2

circumstances, when a company restates, the originally issued financials were obviously materially misstated. He also prolonged the deposition to fatigue me into saying things that he could later use, out of context, against me. These "lawyer gotchas" that he trotted out in his Response that he filed on March 1st are extremely out of context with regard to the deposition as a whole and thus they are extremely misleading. At the end of the deposition, and now, I remain unshaken in my expert opinion: the originally issued financials were materially misstated.

3. Some expert witnesses charge the same hourly fee for depositions/trials as they do for research and writing. Many experts, though, charge a higher fee for depositions/trials. Contrary to Mr. Burke's assertion, there is nothing unusual about this. This can be seen on page 9 of Babitsky, Babitsky and Mangraviti (2004), *National Guide to Expert Witness Fees and Billing Procedures*, published by SEAK, Inc. In Accounting, the average for in-court testimony is $320, the average for file review/preparation is $315, and the average for depositions is $320. This can be seen on page 42 of Babitsky, Babitsky and Mangraviti (2004). A copy of the cover page, page 9, and page 42, of Babitsky, Babitsky and Mangraviti (2004), is attached to this affidavit as Exhibit B. Thus, my deposition hourly fee of $300 clearly is reasonable; it is less than the national average. I waited in Penn Station until 3:15 a.m. for the next train home, feeling this to be fair and ethical, rather than imposing the cost of an additional night's hotel on the Defendants. I have repeatedly asked Mr. Burke to pay me in full the $3592.45 which I am owed. He has refused to pay anything. That is neither fair nor ethical. I insist that the full amount be paid, with prejudgment interest.

3

4. It is clear that the **deposing** attorney must pay the witness he **deposed**. This is stated on page 201 of Babitsky and Mangravity (1999), the authority on expert witnessing (attached as Exhibit C).

FURTHER AFFIANT SAYETH NAUGHT

*Ross D. Fuerman*
Ross D. Fuerman

Sworn to before me and subscribed in my presence this 8th day of March 2005.

*Robert Casciani*

ROBERT LORETO CASCIANI
Notary Public
Commonwealth of Massachusetts
My Commission Expires
January 26, 2012

**Exhibit A
of
Fuerman Affidavit**

Exhibit A

# ROSS D. FUERMAN
Department of Accounting
Sawyer School of Management
Suffolk University
Boston, MA 02108-2770
Office: (617) 573-8615
Home: (617) 969-6361
Http://www.suffolkacct.org/rfuerman/

**Academic Positions:**   Associate Professor, 2003 to present. Assistant Professor, 1997 to 2003. Suffolk University, Boston.
Instructor, 1995-1997. University of Cincinnati, Cincinnati.
Graduate Research and Teaching Assistant, 1991-1995. University of Cincinnati.

**Education:**   Ph.D. in Accounting, University of Cincinnati. 1996.
J.D., George Washington University, Washington, D.C. 1982.
M.A., Jewish Theological Seminary, New York. 1978.
B.A., University of Cincinnati, *cum laude* with High Honors. 1975.

**Licensure and Certification:**   Certified Fraud Examiner. 1999.
Certified Public Accountant, Ohio. 1987.
Bar, Ohio (1983) and the District of Columbia (1982).

**Research Interests:**   Cross-disciplinary research involving financial disclosure-related securities fraud, accounting, auditing, law and corporate governance. Robert Barker described my research in *BusinessWeek*, October 28, 2002, page 129, in The Barker Portfolio, "Auditing the Auditors." Posted at http://www.businessweek.com/magazine/content/02_43/b3805127.htm

**Article Publications:**   "Audit Quality Examined One Large CPA Firm at a Time: Mid-1990's Empirical Evidence of a Precursor of Arthur Andersen's Collapse," *Corporate Ownership & Control*, Fall 2004, Vol. 2, No. 1. Reprinted with permission in *The ICFAI Journal of Audit Practice*, July 2004, Vol. 1, No. 3.
"Accountable Accountants," *Critical Perspectives on Accounting*, Winter 2004, Vol. 15, No. 6-7.
"Fraudulent Audited Annual Financial Statements in Post-PSLRA Private Securities Class Actions: Determinants of Auditor Litigation," (with S. Freund and L. Shaw) *Journal of Forensic Accounting*, 2002, Vol. 3, No. 1. Posted at http://www.suffolkacct.org/rfuerman/Freund-Fuerman-Shaw.pdf
"Balkanized Auditor Liability Research," *Critical Perspectives on Accounting*, 2001, Vol. 12, No. 2.

"Auditors and the Post-Litigation Reform Act Environment," *Research in Accounting Regulation*, Vol. 14, ed. G.J. Previts, 2000. Greenwich, CT: JAI Press.

"The Role of Auditor Culpability in Naming Auditor Defendants in United States Securities Class Actions," *Critical Perspectives on Accounting*, 1999, Vol 10, No. 3.

"The Effect of the Reform Act and *Central Bank* on Naming Auditor Defendants in Securities Class Actions," *Research in Accounting Regulation*, Vol. 12, ed. G.J. Previts, 1998. Greenwich, CT: JAI Press.

"Naming Auditor Defendants in Securities Class Actions," *Journal of Legal Economics*, Vol. 7 (1), Spring/Summer 1997.

"The Impact of *Central Bank of Denver*: Some Empirical Evidence," *Research in Accounting Regulation*, Vol. 11, ed. G.J. Previts, 1997. Greenwich, CT: JAI Press.

"The CPA's Responsibilities for Client Related Information," (with James D. Cashell), *The CPA Journal*, September, 1995.

"Accountants and the Client Fault Defense in Indiana," *The Indiana CPA*, July, 1993.

"The Accounting Profession's Litigation Crisis," *The Ohio CPA Journal*, October, 1992.

**Working Paper:**

"Differentiating Between Arthur Andersen Versus the Other Members of the Big Five on the Basis of Auditor Quality: An Empirical Investigation of the Decision to Criminally Prosecute Arthur Andersen."

**Refereed Conference Proceedings:**

"Audit Quality Examined One Large CPA Firm at a Time: Mid-1990's Empirical Evidence of a Precursor of Arthur Andersen's Collapse," Administrative Sciences Association of Canada Annual Conference, Quebec, 2004.

"Audit Quality Examined One Large CPA Firm at a Time: Mid-1990's Empirical Evidence of a Precursor of Arthur Andersen's Collapse," American Accounting Association MidAtlantic Regional Meeting, Arlington, 2004.

"Audit Quality Examined One Large CPA Firm at a Time: Mid-1990's Empirical Evidence of a Precursor of Arthur Andersen's Collapse," American Accounting Association Auditing Section Midyear Conference, Clearwater, 2004.

"Accountable Accountants," American Accounting Association Northeast Regional Meeting, Stamford, 2003.

"Accountable Accountants," American Accounting Association MidAtlantic Regional Meeting, Philadelphia, 2003.

"Accountable Accountants," American Accounting Association Southeast Regional Meeting, Charleston, 2003.

"The Role of Auditors in Post-Reform Act Private Securities Class Actions," American Accounting Association National Meeting, Philadelphia, 2000.

"The Effect of the Reform Act and *Central Bank* on Naming Auditor Defendants in Securities Class Actions," American Accounting Association National Meeting, New Orleans, 1998.

"The Effect of the Reform Act and *Central Bank* on Naming Auditor Defendants in Securities Class Actions," American Accounting Association Northeast Regional Meeting, Manchester, 1998.

" Differentiating Between Lawsuits With Auditors and Lawsuits Without Auditors: The Roles of Lawsuit Merits and Deep Pockets," American Accounting Association Northeast Regional Meeting, Binghamton, 1997.

"Contemporary Auditor Litigation Risk: An Empirical Investigation Based on Recent Data," American Accounting Association Auditing Section Midyear Conference, Jacksonville 1997.

"A Qualitative Analysis Establishing the Seminality of the *National Surety* Doctrine: The 1987 Texas Tort Reform and the Auditor's Use of the Comparative Fault Defense," American Accounting Association Ohio Regional Meeting, Columbus, 1994.

"Auditors and the Client Fault Defense in Comparative Negligence Jurisdictions," American Accounting Association Ohio Regional Meeting, Dayton, 1993.

**Editorial Boards**      *Journal of Forensic Accounting.*
*Research in Accounting Regulation.*

**Ad Hoc Referee**        *Advances in Accounting.*
*Critical Perspectives on Accounting.*

**Advisory Board:**       Member of the Advisory Board of AccountingMalpractice.com.

**Professional Presentations:**   "Accounting, Auditing, Audit Committees, Corporate Governance and Shareholder Access to the Ballot in the Post SOX Era." Boston Security Analysts Society, October 7, 2004.

Presentation to the Fraud! Detection and Prevention continuing professional education seminar, cosponsored by the Suffolk University Master of Science in Taxation Program, the Internal Revenue Service, and the Suffolk University Corporate Education Department, November 16, 1999.

                                                          "Keeping Internal Auditors' Reports on Environmental Problems Confidential: The Problem, Some Solutions, and a Legislative Update," Cincinnati chapter of the Institute of Internal Auditors, May 15, 1996.

**Grants, Honors and Awards:** Practising Law Institute Accountants' Liability After Enron Seminar Scholarship, 2002.
Sawyer School of Management Summer Research Grant, 2001
Practising Law Institute Financial Fraud in Public Companies Seminar Scholarship, 2000.
Kelly Siddall Grants, 1995 and 1996.
American Accounting Association Doctoral Consortium, 1993.
Indiana CPA Educational Foundation Doctoral Loan, 1992-1997.
University of Cincinnati Graduate Scholarship, 1991-1995.
University of Cincinnati Graduate Assistantship, 1991-1995.

**CPA Examination Review Course** Instructor, Becker CPA Review Course, 1987-1991. Taught Auditing, Law, Practice (financial and managerial accounting and federal income taxation) and Theory.

**Teaching Experience:** I have a decade of teaching experience in Auditing, entry level Financial Accounting, and entry level Managerial Accounting. I founded the Forensic Accounting course Spring 2000 at Suffolk University, and renamed it Fraud Examination Spring 2003.

**Pre-Academe Professional Work Experience:** Corporate Staff Assistant, Schottenstein Stores Corporation, Columbus, Ohio, 1989-1990. Financial liaison for corporate operations including leasing, purchasing, mortgaging, conveyancing, foreclosing, and factoring.
Syndication Specialist, Cardinal Industries, Inc., Columbus, Ohio, 1988-1989. Prepared text and projections for private placement memoranda and prospectuses for company's securities offerings.
Associate, Enz, Jones & LeGrand, Columbus, Ohio, 1985-1988. Wrote securities documents. Litigated securities fraud cases. Tax planning and tax return preparation.
Financial Institutions Examiner, Ohio Division of Securities, Columbus, Ohio, 1983-1985. Conducted financial statement analysis merit reviews of proposed public offerings.

**Organizational Memberships:** American Accounting Association.
American Institute of Certified Public Accountants.
Association of Certified Fraud Examiners.

**Exhibit B
of
Fuerman Affidavit**

Exhibit B

2004 SEAK, Inc.

# National Guide to Expert Witness Fees and Billing Procedures

**Alex Babitsky, MBA**
**Steven Babitsky, JD**
**James J. Mangraviti, Jr., JD**

SEAK, Inc.
**Excellence in Education Since 1980**

Falmouth, Massachusetts
www.seak.com

# Chapter 2  National Summary Data

## *All Experts*

**Responding Experts:** 1,030
**Years Testifying:** *High:* 75   *Low:* 1   *Average:* 15.6   *Median:* 15

**In-court Testimony (hourly):**   *High:* $7,500   *Low:* $75   *Average:* $385   *Median:* $300
**File Review/Prep (hourly):**   *High:* $1,000   *Low:* $0   *Average:* $254   *Median:* $240
**Depositions (hourly):**   *High:* $3,000   *Low:* $0   *Average:* $353   *Median:* $300

**Min. Charge for Depositions:** 58%   **Hours in Minimum:** *High:* 12   *Low:* 1   *Average:* 3.1   *Median:* 3

**Min. Charge for Trial:** 58%   **Hours in Minimum:** *High:* 20   *Low:* 1   *Average:* 4.2   *Median:* 4

**Cancellation Fee for Depositions or Trial:** 45%   **Deposition Payment in Advance:** 48%

**Up-front Retainer:** 73%   **Retainer Amount:** *High:* $15,000   *Low:* $150   *Average:* $1,967   *Median:* $1,500
**Type of Retainer:** *Refundable:* 54%   *Partially Refundable:* 2%   *Non-Refundable:* 44%
    *One Time:* 69%   *Replenishable:* 31%

**Depositions That Exceed Paid-for Time:** *Get payment before proceeding:* 23%   *Proceed without immediate payment:* 77%

**Out-of-Pocket Expenses Marked Up:** 19%   **Markup Amount:** *High:* 40%   *Low:* 3%   *Average:* 14%   *Median:* 15%
**Out-of-Pockets Billed for:** *Mileage:* 68%   *Airline Tickets:* 83%   *Photocopies:* 44%   *Telephone Calls:* 38%   *Lab/Testing:* 41%   *Photos:* 45%   *Demonstrative Aids:* 48%   **Travel Billed Portal-to-Portal:** 86%   **First-class Airfare Required:** 10%

**Require Signed Written Fee Agreement:** 46%   **Terms Contained in Fee Agreement:** *Lawyer is responsible for fee, not lawyer's client:* 66%   *Interest for delinquent accounts:* 55%   *Out-of-court expense policies:* 78%   *Retainer/prepayment requirements:* 83%   *In-court testimony minimum fees:* 59%   *Retaining counsel will pay for all deposition charges:* 38%   *Fee schedules:* 82%   *Attorney's fees if forced to sue for collection:* 48%   *Portal-to-portal travel time:* 62%   *Deposition minimum fees:* 52%   *Payment for preparation time:* 65%   *First-class air travel:* 10%

**Majority of Work:** *Plaintiffs:* 23%   *Neither:* 57%   *Defendants:* 20%
**Type of Expert:** *Medical:* 45%   *Non-Medical:* 55%
**Retaining Counsel Failed to Pay in Last 5 Years:** 46%   **Opposing Counsel Failed to Pay in Last 5 Years:** 20%



Average Hourly Fees (All Experts)

### Accidents, Chemical
**Responding Experts:** *1*

| Hourly Fees: | In-court Testimony: | *High:* $250 | *Low:* $250 | *Average:* $250 | *Median:* $250 |
| | File Review/Prep: | *High:* $100 | *Low:* $100 | *Average:* $100 | *Median:* $100 |
| | Depositions: | *High:* $150 | *Low:* $150 | *Average:* $150 | *Median:* $150 |

Percent of Experts Having a Minimum Charge for Deps: 0%    Cancellation Fee for Deps or Trial: 0%
Deposition Payment in Advance: 100%    Markup of Out-of-Pocket Expenses: 0%

Up-front Retainer: 0%    Retainer Amount: *High:* N/A    *Low:* N/A    *Average:* N/A    *Median:* N/A
Travel Billed Portal-to-Portal: 100%    1st-class Airfare Required: 0%

Written Fee Agreement: 0%    Majority of Work: *Plaintiffs:* 0%    *Defendants:* 0%    *Neither:* 100%
Retaining Counsel Failed to Pay Last 5 Years: 0%        Opposing Counsel Failed to Pay Last 5 Years: 0

### Accidents, Industrial
**Responding Experts:** *1*

| Hourly Fees: | In-court Testimony: | *High:* $300 | *Low:* $300 | *Average:* $300 | *Median:* $300 |
| | File Review/Prep: | *High:* $300 | *Low:* $300 | *Average:* $300 | *Median:* $300 |
| | Depositions: | *High:* $300 | *Low:* $300 | *Average:* $300 | *Median:* $300 |

Percent of Experts Having a Minimum Charge for Deps: 0%    Cancellation Fee for Deps or Trial: 0%
Deposition Payment in Advance: 0%    Markup of Out-of-Pocket Expenses: 0%

Up-front Retainer: 100%    Retainer Amount: *High:* $1,000    *Low:* $1,000    *Average:* $1,000    *Median:* $1,000
Travel Billed Portal-to-Portal: 100%    1st-class Airfare Required: 100%

Written Fee Agreement: 0%    Majority of Work: *Plaintiffs:* 100%    *Defendants:* 0%    *Neither:* 0%
Retaining Counsel Failed to Pay Last 5 Years: 0%        Opposing Counsel Failed to Pay Last 5 Years: 0

### Accounting
**Responding Experts:** *15*

| Hourly Fees: | In-court Testimony: | *High:* $675 | *Low:* $85 | *Average:* $320 | *Median:* $300 |
| | File Review/Prep: | *High:* $675 | *Low:* $85 | *Average:* $315 | *Median:* $300 |
| | Depositions: | *High:* $675 | *Low:* $85 | *Average:* $320 | *Median:* $300 |

Percent of Experts Having a Minimum Charge for Deps: 13%    Cancellation Fee for Deps or Trial: 0%
Deposition Payment in Advance: 21%    Markup of Out-of-Pocket Expenses: 7%

Up-front Retainer: 80%    Retainer Amount: *High:* $10,000    *Low:* $1,500    *Average:* $6,450    *Median:* $6,875
Travel Billed Portal-to-Portal: 93%    1st-class Airfare Required: 7%

Written Fee Agreement: 53%    Majority of Work: *Plaintiffs:* 27%    *Defendants:* 13%    *Neither:* 60%
Retaining Counsel Failed to Pay Last 5 Years: 53%        Opposing Counsel Failed to Pay Last 5 Years: 0%

### Actuary
**Responding Experts:** *1*

| Hourly Fees: | In-court Testimony: | *High:* $415 | *Low:* $415 | *Average:* $415 | *Median:* $415 |
| | File Review/Prep: | *High:* $415 | *Low:* $415 | *Average:* $415 | *Median:* $415 |
| | Depositions: | *High:* $425 | *Low:* $425 | *Average:* $425 | *Median:* $425 |

Percent of Experts Having a Minimum Charge for Deps: 0%    Cancellation Fee for Deps or Trial: 0%
Deposition Payment in Advance: 0%    Markup of Out-of-Pocket Expenses: 0%

Up-front Retainer: 0%    Retainer Amount: *High:* N/A    *Low:* N/A    *Average:* N/A    *Median:* N/A
Travel Billed Portal-to-Portal: 0%    1st-class Airfare Required: 0%

Written Fee Agreement: 0%    Majority of Work: *Plaintiffs:* 0%    *Defendants:* 0%    *Neither:* 100%
Retaining Counsel Failed to Pay Last 5 Years: 0%        Opposing Counsel Failed to Pay Last 5 Years: 0%

**Exhibit C
of
Fuerman Affidavit**

Exhibit C

# How to Excel During Depositions:
## Techniques for Experts That Work

**STEVEN BABITSKY, ESQ.**

**JAMES J. MANGRAVITI, Jr., ESQ.**

S·E·A·K, Inc.
**Legal and Medical Information Systems**

**Falmouth, Massachusetts**

# Chapter 7  Setting Your Fee, Billing, and Collecting

## 7.1 Your Fee

WHO IS RESPONSIBLE TO PAY YOUR FEE

Under the Federal Rules of Civil Procedure, the party seeking to depose you as an expert witness is liable for your fee.[1] The reasonable fee you can charge counsel may includes travel costs. What is a *reasonable* fee for being deposed? In the case of *Anthony v. Abbot Laboratories* 106 F.R.D. 461 (1985), the court utilized 10 factors to determine what was a reasonable fee.

1. the location of the deposition was chosen to suit the convenience of the witness;
2. a timely objection was made to the amount of the fee;
3. the credentials possessed by the witness;
4. whether the deposition was being obtained on very brief notice or with adequate lead time;
5. the going rates in the area where the deposition was being taken;
6. whether the witness was one of few persons with qualifications and expertise to testify on the matters in issue (in this case, the causative effects of diethylstilbestrol);

---

[1] Fed. R. Civ. Pro. 26(b)(4)(c) states:
Unless manifest injustice would result, (i) the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under this subdivision; and (ii) with respect to discovery obtained under subdivision (b)(4)(B) of this rule the court shall require the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert.