# Exhibit E
# Walker Transcript

Page 2

```
 1              APPEARANCES
 2   On behalf of the Plaintiffs:
 3      MICHAEL G. BRAUTIGAM, ESQ.
           Gene Mesh & Associates
 4         2605 Burnet Avenue
           Cincinnati, Ohio 45219
 5
     On behalf of the Defendants:
 6
 7      JAMES E. BURKE, ESQ.
           Keating, Muething & Klekamp
           1400 Provident Tower
 8         One East Fourth Street
           Cincinnati, Ohio 45202
 9
     On behalf of the Defendant,
10   Dinsmore & Shohl:
11      JOHN W. HUST, ESQ.
           Schroeder, Maundrell, Barbiere & Powers
12         110 Governor's Knoll
           11935 Mason Road
13         Cincinnati, Ohio 45249
14            - - -
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1            EXAMINATION INDEX
 2
     MICHAEL C. WALKER, PH.D.
 3      CROSS BY MR. BURKE . . . . .  6
        DIRECT BY MR. BRAUTIGAM . . . 131
 4
 5            EXHIBIT INDEX
 6                     MARKED
     Walker Deposition Exhibit
 7   1    Walker expert report        12
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              STIPULATIONS
 2        It is stipulated by and among counsel
 3   for the respective parties that the deposition of
 4   MICHAEL C. WALKER, PH.D., a witness herein, may be
 5   taken at this time by the Plaintiffs as upon cross-
 6   examination, pursuant to the Federal Rules of Civil
 7   Procedure and pursuant to Notice; that the
 8   deposition may be taken in stenotypy by the Notary
 9   Public and court reporter and transcribed by her
10   out of the presence of the witness; that the
11   deposition is to be submitted to the witness for
12   his/her examination and signature, and that
13   signature is not waived.
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1           MICHAEL C. WALKER, PH.D.,
 2   a witness herein, having been duly sworn, was
 3   examined and testified as follows:
 4             CROSS-EXAMINATION
 5   BY MR. BURKE:
 6      Q.    Good morning.  Would you state your name
 7   and spell your last name for the record, please.
 8      A.    Michael C. Walker, W-a-l-k-e-r.
 9      Q.    Do you go by Professor Walker,
10   Dr. Walker, Mr. Walker?  What do you prefer?
11      A.    I'm pretty neutral on that.
12      Q.    Mr. Walker, have you been deposed
13   before?
14      A.    Yes, I have.
15      Q.    We're, for the record, here to take your
16   deposition in the case pending in the U.S. District
17   Court for the Southern District of Ohio, Thiemann
18   versus OHSL Corporation.  You understand the way a
19   deposition works?
20      A.    Yes, I do.
21      Q.    If at any time you want to take a break,
22   just let me know.
23      A.    Let me make one announcement, I guess.
24   I wear hearing aids.  If the battery goes out, I'll
```

Williams & Oliver
(513)683-9626

Page 6

1   need to have a break to change it, whenever it
2   does.
3       Q.    You ask for a break anytime you care to.
4   That's fine for me. If any of my questions are
5   unclear or ambiguous, feel free to ask for
6   clarification. If you answer my questions, I will
7   assume you knew what I was asking.
8           You understand that you're here to
9   provide testimony in the capacity of an expert
10  witness?
11      A.    Yes, I do.
12      Q.    The purpose of my deposing you today is
13  to gain a full understanding of what you're going
14  to be testifying to at trial, to understand the
15  work you've done and the opinions you'll be
16  offering.
17          I've seen your report already, and we're
18  going to be going through that today. To the
19  extent after today you review any additional
20  materials, do any additional work, reach any
21  additional conclusions that you plan to offer at
22  trial, I will want to be notified of that so we'll
23  have the opportunity to talk to you again.
24          The purpose of your deposition is to

Page 7

1   make sure I understand the full scope of your
2   testimony at trial. So if you do that, if
3   additional things come to your mind -- and I
4   understand you may be looking at other
5   depositions -- please notify Mr. Brautigam of that
6   fact so he can alert me. And we may do this again
7   to the extent we need to go into those additional
8   opinions or additional efforts. All right?
9       A.    Yes.
10      Q.    What is your address, sir?
11      A.    11043 Toddtee, T-o-d-d-t-e-e, all one
12  word, Lane; Cincinnati, Ohio; 45242.
13      Q.    What is your business address?
14      A.    University of Cincinnati. I'm in the
15  College of Business. I can give you the Zip Code,
16  but there's no street address for the University.
17      Q.    On Auburn Avenue?
18      A.    Excuse me?
19      Q.    What street?
20      A.    There's no street address for the
21  University. It's just a Zip Code.
22      Q.    By whom are you presently employed?
23      A.    University of Cincinnati College of
24  Business Administration.

Page 8

1       Q.    What is your position there?
2       A.    I'm the associate dean for program
3   management in the Virgil M. Schwarm, S-c-h-w-a-r-m,
4   professor of finance and investments.
5       Q.    In your current position, describe how
6   much of your duties are administrative and how much
7   of your duties are still teaching academia related?
8       A.    Officially probably about a sixth of my
9   duties are teaching, and the rest is
10  administrative.
11      Q.    Generally, describe for me what your
12  duties and responsibilities are in your current
13  position.
14      A.    I am responsible for all of the
15  undergraduate and masters programs in terms of
16  curriculum, policies. I'm also the person in the
17  college in charge of our accreditation reporting to
18  the AECSB International, which is the primary
19  accredit agency for business schools, and whatever
20  else winds my way.
21      Q.    Tell me what you do as it relates to
22  accreditation issues.
23      A.    Basically, it's making sure that
24  curriculum and staffing are consistent with

Page 9

1   accreditation and preparing the reports that we
2   have to submit annually.
3       Q.    How often do you go through an
4   accreditation process?
5       A.    The accreditation process has changed
6   now where we do it on an annual review; and then at
7   the end of five to eight years, they can look back
8   at everything you filed and then come in and visit
9   you and see what discrepancies you've had. Used to
10  be you only did it every ten years, and you did
11  horrendous reports at that time; but luckily, that
12  changed.
13      Q.    At what point in that five- to eight-
14  year process is the University of Cincinnati
15  College of Business Administration?
16      A.    We're in the third year right now.
17  We've filed three reports since the last
18  accreditation and the change in rules.
19      Q.    What is the current status of UC College
20  of Business Administration?
21      A.    Fully accredited; no problems.
22      Q.    Is accreditation sort of a yes or no
23  type process; either your accredited or you're
24  not?

3 (Pages 6 to 9)

Page 10

1    A.    There's some intermediate steps.  You
2  can be put on probation.  If it's not too bad, you
3  can actually just be told they'll come back and
4  talk to you next year and clean this up.
5    Q.    You said about one-sixth of your time
6  deals with teaching?
7    A.    Right.
8    Q.    What about preparing articles, writing
9  in academic journals; do you do that still anymore?
10    A.    I haven't in the last couple of years
11  since I've been in this job.
12    Q.    With respect to the 16 percent of your
13  time devoted to teaching, what areas do you
14  instruct in currently?
15    A.    Right now I'm teaching strictly in the
16  corporate finance area.
17    Q.    Can you explain what that involves?
18    A.    Well, I teach two or three different
19  courses at different times.  One of them is called
20  long-term financial decision-making, which is an
21  MBA course.
22        In that, we look at the firm's capital
23  budgeting; we look at the firm's financing; and we
24  also look at corporate control, which includes

Page 11

1  mergers, acquisitions, board responsibilities,
2  everything in that general area.
3        I also teach a course which is called
4  valuation and financial analysis, which is
5  primarily focused on using firm financial
6  statements to make instruments of the value of the
7  firm.  Spend a lot of time in that course taking up
8  our accounting statements.
9    Q.    And I think you said there were two to
10  three courses --
11    A.    The third course I teach is just a
12  general financial management course, which is the
13  entire gamut of the financial side of the
14  corporation, starting off with the basic tenets of
15  what the goal of the firm is; how do you value a
16  firm; how do various decisions affect valuation;
17  and sometimes on basic financial theory.
18        MR. BURKE:  Let's mark this as Walker
19    Deposition Exhibit 1.
20        (Walker Deposition Exhibit No. 1 was
21    marked for identification.)
22  BY MR. BURKE:
23    Q.    Can you identify what Walker Deposition
24  Exhibit 1 is, please?

Page 12

1    A.    It is an expert report with a resume
2  attached.
3    Q.    That was my first question.  If you
4  would, take a look at the resume portion of your
5  report.  And that, obviously, is the report you
6  prepared for this case, correct?
7    A.    That's correct.
8    Q.    Is the resume attached to that report
9  accurate and correct as of today?
10    A.    Well, there are probably a couple of
11  committees I served on in the University that
12  aren't on here; but other than that, it's pretty
13  much accurate.
14    Q.    Essentially, it's accurate?
15    A.    Yes.
16    Q.    Your academic background is correctly
17  summarized -- or your educational background, I
18  should say, is accurately summarized on the first
19  page of your resume?
20    A.    That's correct.
21    Q.    And you received your MA in economics
22  from Ohio State University in 1966?
23    A.    That's correct.
24    Q.    And you received your Ph.D. from the

Page 13

1  University of Houston in 1971.
2    A.    That's correct.
3    Q.    Am I correct that your educational focus
4  in your masters and Ph.D. was all in economics?
5    A.    In the Ph.D. program, I had quite a bit
6  of finance.  I had an outside field in finance.
7    Q.    How would you distinguish economics --
8  the field of economics from the field of finance?
9    A.    Basically, finance is an applied
10  discipline which goes a step beyond economics and
11  takes risk and uncertainty in account, which is
12  generally not true in classic economic classes.
13    Q.    Other than the educational degrees you
14  received, have you received any professional
15  training or certifications?
16    A.    No certifications.
17    Q.    You're not a CFA?
18    A.    No, I'm not.
19    Q.    You're not a CPA?
20    A.    No, I'm not.
21    Q.    Have you studied accounting?
22    A.    Had accounting courses; taught
23  accounting.
24    Q.    Have you ever pursued accounting in any

Page 14

1  depth beyond teaching courses?
2      A.   I taught intermediate.
3      Q.   You're not a lawyer?
4      A.   No, I'm not.
5      Q.   Did you attend law school?
6      A.   No, I didn't.
7      Q.   Were you employed between the time --
8  or, while you were getting your Ph.D. at the
9  University of Houston?
10     A.   Yes.  The last year I was there, I was
11 an instructor.  Prior to that, I was an assistant,
12 which I wouldn't count as regular employment.
13     Q.   Okay.
14     A.   But I was an instructor in the finance
15 department my last year there.  Following the
16 University of Houston, I went to Georgia State
17 University as an assistant professor of finance and
18 stay there approximately five years.
19          Then I moved to the University of
20 Oklahoma as an associate professor of finance; and
21 while I was there, I became the director of the MBA
22 program for the last two years.
23          And from Oklahoma, I moved to what was
24 then North Texas State University -- now the

Page 15

1  University of North Texas -- as the head of the
2  Department of Finance, Insurance, and Real Estate
3  as an associate professor; promoted to full
4  professor two years later.
5      Q.   Let me stop you there.  Where's Georgia
6  State University located?
7      A.   Downtown Atlanta.
8      Q.   And you indicated there you were an
9  assistant professor of finance?
10     A.   I was an assistant professor of finance.
11     Q.   What does an assistant professor
12 signify?
13     A.   That's really the entry level when you
14 have a Ph.D.
15     Q.   That's not a tenured position?
16     A.   Is not a tenured position.
17     Q.   And you stayed at Georgia State how
18 long?
19     A.   Almost five years.
20     Q.   Did you obtain a tenured position at
21 Georgia State?
22     A.   No.  I left the year before I would have
23 been eligible for tenure.
24     Q.   Why did you go to the University of

Page 16

1  Oklahoma?
2      A.   A number of reasons.  One was money; one
3  was to be closer to family; and the third one was I
4  thought it was a better opportunity than what I was
5  in Georgia State, because the state of Georgia was
6  going through a pretty severe budget crisis, and
7  we'd had the second salary freeze in three years.
8      Q.   You indicated that Oklahoma was closer
9  to your family.  Where was your family?
10     A.   My mother was in Sherman, Texas, which
11 is about 150 miles away; and my wife's parents were
12 in Longview, Texas, which is about 250 miles away.
13     Q.   How long were you at the University of
14 Oklahoma?
15     A.   Three years.
16     Q.   There you were an associate professor of
17 finance.
18     A.   That's correct.
19     Q.   Is that a tenured position?
20     A.   Was not.
21     Q.   And did you apply for or were you
22 considered for tenure during your --
23     A.   I was considered and deferred because
24 they didn't think I'd been there long enough at the

Page 17

1  time.
2      Q.   And after three years, you went to North
3  Texas State?
4      A.   Yes, I did.
5      Q.   Why did you leave the University of
6  Oklahoma?
7      A.   Money, opportunity, and family again,
8  because Denton, Texas, is about 50 miles from
9  Sherman and about 150 miles from Longview.
10     Q.   Denton, Texas, is where North Texas
11 State is located?
12     A.   That's correct.
13     Q.   Your position there was the head of the
14 department of what?
15     A.   Finance, insurance, real estate, and
16 law.  It's called the FIRL Department.
17     Q.   In your prior two academic positions,
18 you had focused on finance; is that correct?
19     A.   No.
20     Q.   Tell me what your academic focus was
21 while you were at the State University?
22     A.   I'm sorry.  I misunderstood the
23 question.  I've always taught in finance.  I've
24 never had any other position except as a finance

Page 18

1 faculty member.
2    Q.    When you were at North Texas State, you
3 were the head of the department -- a head of a
4 department that included areas other than finance?
5    A.    That's correct.
6    Q.    But did your academic focus still remain
7 on finance?
8    A.    Yes, it did.
9    Q.    I take it you were not instructing at
10 North Texas State with respect to insurance, real
11 estate, or law?
12    A.    No, I was not.
13    Q.    How long did you stay at North Texas
14 State?
15    A.    Seven years.
16    Q.    And you became a full professor there?
17    A.    Yes.
18    Q.    And when did you become a full
19 professor?
20    A.    1980.
21    Q.    Give me an example of the kinds of
22 courses you taught there.
23    A.    Can I look back to refresh my memory?
24    Q.    Sure, or if you want to point me to

Page 19

1 where the resume hits that, that's fine.
2    A.    At North Texas, I taught undergraduate
3 basic course, principles of finance; evaluation;
4 planning and analysis, which was a little more
5 advanced general financial management course.
6 Evaluation and financial decisions was an
7 undergraduate theory course.
8        Most of my teaching, though, was at the
9 graduate level where I taught the first two MBA
10 courses. I taught both of those, which were the
11 general financial management courses. I taught an
12 advanced course in financial management, and I
13 taught the doctoral seminar on financial theory.
14    Q.    What you're reading from now is the
15 final page of your resume --
16    A.    That's correct.
17    Q.    -- which is entitled Courses Taught?
18    A.    That's correct.
19    Q.    And that's an accurate summary of the
20 courses that you have instructed in at your various
21 -- the various universities where you've worked?
22    A.    Yes, it is.
23    Q.    From North Texas State, I take it you
24 went to the University of Cincinnati?

Page 20

1    A.    Yes, I did.
2    Q.    When was that?
3    A.    1985.
4    Q.    What were the circumstances under which
5 you went to the University of Cincinnati?
6    A.    Well, at this point, it was primarily
7 money. The state of Texas was going into a
8 terrible recession because of the oil bust; and
9 after I left, they didn't have raises for five
10 years. I saw that coming and had the opportunity
11 to come to Cincinnati, and I did.
12    Q.    Did you know people in the faculty or in
13 the administration at the University of Cincinnati?
14    A.    I knew a couple of the finance faculty.
15    Q.    What were the circumstances under which
16 you chose the University of Cincinnati as opposed
17 to other institutions?
18    A.    I was interviewing for two or three jobs
19 at the time. I just happened to like the
20 combination of city, money, and opportunity within
21 the University a little better than the others.
22    Q.    Although your courses taught at the
23 University of Cincinnati listed on your resume on
24 the final page, generally describe for me what your

Page 21

1 academic focus has been at UC.
2    A.    When I first came, I wound up teaching
3 more in the financial institutions and markets area
4 because there was a shortage in the department, and
5 I had previously done a great deal of work in the
6 area.
7        Recently, I moved primarily back into
8 the corporate finance area. I still teach a course
9 in -- or, until two years ago, I was still teaching
10 a course in money and capital markets on a regular
11 basis; but mostly, I have been teaching graduate
12 corporate finance courses. And at one point, I
13 taught a doctoral seminar in institutions and
14 markets.
15    Q.    I take it your entire work career has
16 been in academics, correct?
17    A.    I had three years military prior to
18 starting college. I have a year working for AC
19 Spark Plug Division at General Motors as an
20 operations management person.
21    Q.    Was that in the finance area, or was
22 that more of a line-type position?
23    A.    This was a line-type, strictly
24 operations. At one point, I was in charge of all

Page 22

1   the steel slitters in the plant. We cut all the
2   steel for punch presses and so forth.
3       Q.    Since you received your Ph.D., you never
4   worked outside colleges or universities or the
5   academic field?
6       A.    Other than consulting and expert witness
7   work, no.
8       Q.    Have you developed an expertise in the
9   federal securities laws?
10      A.    I have a working knowledge. I wouldn't
11  say that I have an expertise. I'm certainly not a
12  lawyer.
13      Q.    You have not actively studied the
14  federal securities laws or the requirements of the
15  federal securities laws in depth?
16      A.    No.
17      Q.    Have you ever instructed with respect to
18  the federal securities laws or taught a course on
19  that?
20      A.    I've taught courses with elements of it
21  in there.
22      Q.    Have you ever been involved in the
23  writing or review of a proxy statement or
24  registration statement?

Page 23

1       A.    I've reviewed a couple.
2       Q.    For the issuers of those materials?
3       A.    Um...
4       Q.    My question may not be clear. Let me
5   ask --
6       A.    I understand your question. I'm trying
7   to think of the circumstances.
8       Q.    Okay.
9       A.    No, not for the issuers; for parties
10  that were involved in one way or another.
11      Q.    Maybe I'll ask it a little bit more
12  clearly. You have never been hired by any public
13  company to write/prepare securities filings or
14  disclosure documents?
15      A.    No, I have not.
16      Q.    Have you ever served on the board of
17  directors of a public company?
18      A.    No, I have not.
19      Q.    Have you ever served on the board of
20  directors of any company?
21      A.    No, I have not.
22      Q.    Have you ever participated in a board of
23  directors meeting in any capacity?
24      A.    Yes, I have.

Page 24

1       Q.    Can you tell me what that experience is?
2       A.    At least two cases. One where I worked
3   as an expert, I was invited to the board to discuss
4   what my findings were in the -- how would I put
5   it? It wasn't actually a legal case because it
6   never went to court. My findings relative to a
7   complaint that they thought was going to be filed
8   against them.
9       Q.    Can you describe the circumstances of
10  that particular engagement?
11      A.    Basically, it was a company that was
12  growing very rapidly; was not paying dividends.
13  They were being -- thought they were going to be
14  sued by a group of shareholders because they
15  weren't paying dividends.
16          And they wanted to know if they had a
17  reasonable basis for saying they were reinvesting
18  in the company and creating wealth, which is what I
19  did conclude because they were growing very
20  rapidly. Their earnings were rising.
21      Q.    Where was that company based?
22      A.    Lewisville, Texas. Let me look in my
23  resume, and I'll give you the exact name of the
24  company. Accelerated Christian Education. It's

Page 25

1   the fourth one from the bottom of the list of
2   expert witness and consulting engagements.
3       Q.    I see. That was done in 1979?
4       A.    Yes.
5       Q.    And that involved your presenting the
6   findings of your analysis to a board of directors?
7       A.    I sat through the whole board meeting,
8   but that was my role.
9       Q.    Other than that one time, have you ever
10  sat through a board meeting in any capacity?
11      A.    I sat through a board meeting with
12  non-profit organizations.
13      Q.    These are non-profit boards on which you
14  served?
15      A.    Did not serve; just simply sat through
16  the meetings.
17      Q.    Okay.
18      A.    And I've also been involved... I'm not
19  sure -- it was a board for the Oklahoma City
20  Ambulance Company that was eventually formed. On
21  my resume, there's no reference to that.
22          It talks about serving as a consultant
23  to the Mayor's EMS Advisory Committee in Oklahoma
24  City. That's probably the third -- the second item

7 (Pages 22 to 25)

Williams & Oliver
(513)683-9626

Page 26

1  from the bottom.
2      Q.    All right.
3      A.    And after the ambulance company was
4  formed, I did go to a couple of board meetings and
5  talk about what our recommendations had been and,
6  again, sat through the board meetings.
7      Q.    Have you ever participated in a board's
8  consideration of a merger proposal or an
9  acquisition proposal?
10     A.    No, I have not.
11     Q.    Have you ever taken courses or obtained
12  any academic training in the field of fiduciary
13  duty?
14     A.    Can't say that I ever have.
15     Q.    Have you ever taught a course, written
16  any papers with respect to fiduciary duty?
17     A.    I taught courses where that is an
18  element.
19     Q.    But have you ever taught a course that
20  focused on fiduciary duty?
21     A.    No, not strictly on fiduciary duty.
22     Q.    Have you ever attended a shareholders
23  meeting?
24     A.    Yes, I have.

Page 27

1      Q.    Can you give me the circumstances under
2  which you did that?
3      A.    Gateway Federal Savings & Loan
4  Association, when they first converted from a
5  mutual to a shareholder association. I had been a
6  depositor, became a shareholder, and attended at
7  least one meeting, if not two.
8      Q.    When was that, roughly?
9      A.    Sometime in the late 80s.
10     Q.    Any other circumstances, as you can
11  recall, attending a shareholders meeting?
12     A.    No, I can't think of any others.
13     Q.    I take it you've never run a
14  shareholders meeting?
15     A.    No, I have not.
16     Q.    Tell me when you began to serve or
17  provide expert testimony in litigation cases.
18     A.    Well, the Accelerated Christian
19  Education would have been the first one, had I
20  actually gone to court. After that, I started
21  doing a number of different types of things.
22     Q.    Okay.
23     A.    We're looking at starting somewhere
24  around 1980.

Page 28

1      Q.    How much of your time currently is
2  devoted to expert testimony engagements?
3      A.    This is the only engagement I've had in
4  the last two or three years.
5      Q.    Is there a reason why over the last two
6  or three years you've only done this one
7  engagement?
8      A.    Job responsibilities. I really don't
9  have the time unless it's something very
10  interesting.
11     Q.    The job responsibilities are the ones
12  you described as the associate dean of the College
13  of Business Administration?
14     A.    That's correct. And I might add one
15  other thing. As a faculty member, my time was
16  free. As an associate dean, if I have to do a
17  deposition or anything like that, I have to take
18  vacation days to do it.
19     Q.    So are you enjoying your vacation today?
20     A.    No, I'm not enjoying my vacation today,
21  but that's been a factor in limiting the work.
22     Q.    I understand. Have you ever worked with
23  or been engaged by investment bankers?
24     A.    No.

Page 29

1      Q.    Have you ever performed or been involved
2  with consulting in the field of financial analysis
3  as it relates to stocks? Let me rephrase that. It
4  wasn't very well put.
5          In your consulting life, have you ever
6  been involved in consulting with respect to
7  investments, stock valuations, things of that sort?
8          MR. BRAUTIGAM: Objection.
9      A.    I'm not quite sure how to answer that.
10  Let me take a second to think. No, I haven't.
11  I've been engaged to make -- give an opinion on
12  valuation methods used, but not actually value the
13  stocks myself.
14     Q.    Tell me, if you would, the engagements
15  that you have participated in dealing with
16  valuation methodologies.
17     A.    There's one with Graydon, Head & Ritchey
18  in 1994 where I gave the opinion on the validity of
19  a technique used to value preferred stock.
20     Q.    And generally describe what that
21  engagement entailed.
22     A.    I basically looked at a report that had
23  been prepared and determined if it was consistent
24  with valuation theory and techniques used and

8 (Pages 26 to 29)

Page 30

1  taught within the business schools. It was for an
2  IRS case.
3      Q.    Generally speaking, what are the
4  valuation techniques that are taught at the UC
5  College of Business Administration?
6      A.    Well, they're basically for financial
7  use, discounting cash flow as a base for valuation
8  in virtually everything except where we're using
9  the options pricing model, where we're trying to
10 bring into account options rather than actual cash
11 flows. And I have one case where I was asked to
12 evaluate the use of the options pricing model in
13 valuating executive stock options.
14     Q.    That's the Black-Sholes method?
15     A.    Yes, it is.
16     Q.    What was the nature of that engagement?
17     A.    Actually, it was a wrongful death suit,
18 and I was engaged by the defense to basically
19 respond to a report that had valued executive stock
20 options and comment on the use of the Black -- the
21 appropriateness of the use of the Black-Sholes
22 model to evaluate executive stock options. And
23 that was in 2000 -- in the year 2000 with Whitford,
24 Taylor & Preston.

Page 31

1      Q.    That also is an engagement that is
2  summarized on your resume, correct?
3      A.    Yes, it is.
4      Q.    Where are Whitford, Taylor & Preston
5  based?
6      A.    Baltimore.
7      Q.    You indicate that you previously worked
8  for the Mesh firm in 1999 to 2000?
9      A.    Was asked to render an opinion on
10 whether a merge offer was fair or not fair.
11     Q.    And what company was involved?
12     A.    Delta and Comair.
13     Q.    Did you actually prepare a report?
14     A.    Yes, I did.
15     Q.    What was the nature of your analysis?
16     A.    Basically, the conclusion was that the
17 offer initially had not been fair because it had
18 restrictions to prevent the shareholders
19 considering other offers; but once that restriction
20 was lifted, it was a fair offer.
21     Q.    What was the nature of the restriction
22 that you evaluated in that situation?
23     A.    Basically, I'm not sure if this is the
24 exact wording or anything, but basically, if they

Page 32

1  considered any other merger, the offer wasn't
2  valid.
3      Q.    Did you testify in that?
4      A.    Did not testify; written report.
5      Q.    You list a number of engagements here on
6  your resume as an expert witness.
7      A.    Yes.
8      Q.    How many times have you been actually
9  qualified by a court as an expert?
10     A.    Let's go through this. (Examining
11 document.) Starting with the city of Dallas in
12 1981, there I actually testified before a utility
13 commission which qualified me as an expert. In
14 basically the same case, I was subpoenaed by the
15 other side to testify in state court. I was
16 qualified in state district court in Texas there.
17     Q.    Was it on a financial analysis type of
18 subject?
19     A.    This was a valuation issue. The
20 contention in the case was that firms were
21 underpaying property taxes because they weren't
22 recognizing the increase in value as a result of
23 more than just inflation.
24         And my report -- my testimony basically

Page 33

1  was that that was the case, and I specified what I
2  thought was the appropriate method they should have
3  used; and obviously the other side liked it because
4  they subpoenaed me to testify on their side in
5  another hearing.
6      Q.    What other cases involved being
7  qualified by a court of the list on --
8      A.    I'm going up the list.
9      Q.    That's fine.
10     A.    One of the cases with Katz, Teller,
11 Brandt & Hild, I testified in Federal District
12 Court here in Cincinnati before Judge Spiegel.
13     Q.    Spiegel?
14     A.    I do not remember the style of the case.
15 I usually don't keep that record.
16     Q.    But you did testify in that case?
17     A.    I did testify in that case. And the one
18 where I list working for the Internal Revenue
19 Service, I testified in U.S. Tax Court.
20     Q.    Do you remember what lawyer you worked
21 with at Katz, Teller, Brandt & Hild?
22     A.    Worked with two different ones. I can't
23 think.
24     Q.    Bob Pitcairn?

9 (Pages 30 to 33)

Page 34

1    A.    Bob Pitcairn and a young lady, Cynthia
2  McDonald.
3    Q.    Gibson?
4    A.    Gibson, whatever it was.  I can't
5  remember.  I worked with Bob on three or four
6  cases, and Cynthia was involved in one or two of
7  them.
8    Q.    Let me just go off on a tangent for a
9  second.  This morning, Mr. Walker, you have brought
10  with you a file of the materials that you utilized
11  for purposes of your analysis in preparing your
12  report; am I correct?
13    A.    That's correct.
14    Q.    We've made a copy of those, and I will
15  keep them.  Other than the materials you have
16  produced here today, are there other materials that
17  you relied upon or utilized for purposes of your --
18    A.    Depositions in the case.
19    Q.    And you've listed those in your report?
20    A.    Yes, I have.
21    Q.    Is there anything not listed in your
22  report that you utilized for purposes of your
23  testimony?
24    A.    I don't think so.  Let me take a quick

Page 35

1  look to make sure.
2    Q.    Look at page...
3    A.    4.
4    Q.    ...4 of your report.
5    A.    Other than what's included here that's
6  not on this list, and there's one or two items
7  there that are not on the list.
8    Q.    All right.
9    A.    I think that's everything.
10    Q.    Before I mentioned that, we were talking
11  about your testimonial experience.
12    A.    The last time that I actually testified
13  was the IRS case with the tax court.
14    Q.    We've mentioned three matters on which
15  you actually testified and were qualified in the
16  court.  The one is the utilities case; the one is
17  the testimony before Judge Spiegel; and the third
18  is in the U.S. Tax Court?
19    A.    That's correct.
20    Q.    I take it in the other instances that
21  you've listed here, you were not actually qualified
22  by a court as an expert?
23    A.    No.  I was deposed in most of them.
24  Some cases it was just strictly a report; some

Page 36

1  cases it was just strictly as a consultant
2  responding to other expert reports.
3    Q.    I take it other than the three instances
4  you've given me, you've never testified in court in
5  those other engagements as well?
6    A.    That's correct.
7    Q.    Do you know what a Daubert motion is?
8    A.    No, I do not.
9    Q.    Sometimes in litigation, lawyers will
10  file motions challenging the qualifications of an
11  expert or challenging the opinions that are given,
12  whether or not there's a sound methodological basis
13  or analysis behind them.
14          Has any motion like that ever been filed
15  with respect to your work --
16    A.    No.
17    Q.    -- to your knowledge?
18    A.    No.
19    Q.    In any of the engagements that are
20  listed on your resume, have you ever been asked to
21  give testimony on the subject of fiduciary duty?
22    A.    In one instance.  It was the expert
23  witness in the lender liability case.
24    Q.    Which one is that?

Page 37

1    A.    That was with Porter, Wright, Morris &
2  Arthur, in 1992.
3    Q.    Can you generally describe for me what
4  that engagement involved?
5    A.    Basically looking at the
6  responsibilities of the lending officer to the bank
7  versus the customer.
8    Q.    What was the nature of the testimony you
9  provided in that case, or what was the subject upon
10  which you opined?
11    A.    Firm was claiming they'd gone bankrupt
12  because the bank had reneged on a loan commitment
13  without cause.  And basically, my testimony was
14  that given the responsibility to the depositors,
15  the bank had to take into account the information
16  they were given -- it would have been an egregious
17  breach of fiduciary responsibility to make the
18  loan, even though they had made the commitment.
19    Q.    The nature of your testimony was that
20  you did not believe, based upon your analysis, that
21  the bank had breached its duty to the customer,
22  correct?
23    A.    That's correct.
24    Q.    That analysis dealt with the duty of a

Williams & Oliver
(513)683-9626

Page 38

1  bank to its depositors and the duty of the bank to
2  its customers, correct?
3      A.    Yes.  Depositors and shareholders, I
4  should say.
5      Q.    That is the only instance in your
6  testimony and history where you've dealt with the
7  concept of fiduciary duty or testified on the
8  concept of fiduciary duty?
9      A.    Let me look at this list for a second
10  and think about that.  That's probably pretty
11  accurate.
12      Q.    And in that case, I take it you did not
13  testify, correct?
14      A.    Did not testify; just gave a deposition,
15  and the suit was dropped after my deposition.
16      Q.    And you were not qualified by a court in
17  that case?
18      A.    No, I was not.
19      Q.    In connection with the specific topic of
20  the fiduciary duty of the directors of a public
21  company, have you ever in any of these engagements
22  been retained as an expert to provide testimony on
23  that topic?
24      A.    Not in any prior engagement, no.

Page 39

1      Q.    And you've never done any expert
2  analysis on that topic before this case?
3      A.    Not as an expert witness.
4      Q.    And you've never been qualified, never
5  testified on that topic before?
6      A.    No, I have not.
7      Q.    Generally, with respect to your
8  testimonial experience, what is the breakdown, if
9  there is one, between plaintiffs' cases and
10  defendants' cases?
11      A.    It's probably fairly even, when you take
12  into account particularly the consulting where I've
13  reviewed other reports and then testimony.  It's a
14  fairly evenly split.
15      Q.    I take it you've never done any expert
16  work in connection with behavior of financial
17  markets or stock price movements?
18      A.    I've done expert work in behavior of
19  financial markets and how they operate, yes, I
20  have.
21      Q.    Can you highlight those for me, if you
22  would, please?
23      A.    The most recent one was Mann, Ungar,
24  Spector & Labovitz.  I was an expert on the nature

Page 40

1  of the market for corporate and municipal bonds.
2      Q.    What was the nature of that case,
3  generally?
4      A.    Basically, pointing out or showing how
5  the bond market worked; that there was a severe
6  lack of transparency; and that in this case, the
7  firm that Mann, Ungar, Spector & Labovitz was
8  representing was bringing a product to the market
9  which would make that transparency much greater.
10  And the suit was against Bloomberg and some other
11  associated firms for blocking that particular
12  effort.
13      Q.    Bloomberg --
14      A.    Michael --
15      Q.    -- the financial reporting --
16          (Off-the-record discussion.)
17      Q.    Are you talking about Bloomberg, the
18  internet and financial information service?
19      A.    Yes.
20      Q.    Where is Mann, Ungar; where is that law
21  firm based?
22      A.    They're a Philadelphia law firm.
23      Q.    Did you actually testify in that case?
24      A.    No.  I spent about nine hours being

Page 41

1  deposed but did not testify.
2      Q.    So you were not qualified as an expert
3  in that case?
4      A.    No, I was not.
5      Q.    In the course of your expert
6  engagements, have you ever performed an event
7  study?
8      A.    Not as an expert, but I published
9  several articles using event studies.
10      Q.    As it relates to your expert work and
11  your consulting work, you've never been engaged to
12  provide or prepare an event study?
13      A.    No, I have not.
14      Q.    Are you familiar with what one is?
15      A.    I've got several articles published that
16  use that methodology.
17      Q.    Generally describe for me what an event
18  study is.
19      A.    Basically what you're trying to do is
20  you find an event of some type, establish what date
21  that event occurred on; you look at how security
22  prices behaved prior to that versus after that.
23  And there are various techniques you can use to do
24  it.

11 (Pages 38 to 41)

Page 42

1    Q.    What is the purpose of an event study?
2    A.    To try to determine if this particular
3  event caused a change in valuation.
4    Q.    And when you're doing that analysis of
5  whether a particular event caused a change in
6  valuation, part of what you need to do is isolate
7  other potential causes; is that correct?
8    A.    Right.  The absolute minimum you're
9  going to do in such a study is take into account
10  what happens to the market in general at that
11  point.  So you use an adjusted return measure.
12    Q.    I'm going to ask you a couple clarifying
13  questions.  I don't mean to beat a dead horse,
14  because I think I understand your prior testimony,
15  but I just want to go to some specifics.
16        Have you ever, in any of your expert
17  engagements or your consulting engagements, been
18  selected to perform expert analysis on the actions
19  of a board of directors or voters of a board of
20  directors?
21        MR. BRAUTIGAM:  Objection.
22    A.    No, I haven't.
23    Q.    Have you ever conducted any kind of
24  surveys or studies of board of director voting

Page 43

1  patterns and the significance of that?
2    A.    No, I have not.
3    Q.    Have you ever done an analysis of the
4  impact of board votes on mergers and acquisitions?
5    A.    No, I have not.
6    Q.    Previously, you talked about the work
7  you did for Mr. Mesh's firm as it related to the
8  Delta Comair case?
9    A.    That's correct.
10    Q.    Other than the Delta Comair case, have
11  you ever worked with the Mesh firm with Mr. Mesh or
12  Mr. Brautigam?
13    A.    No, I have not.
14    Q.    You still have your report in front of
15  you?
16    A.    Yes.
17    Q.    Take a look at page 1 if you would.  For
18  the record, Walker Exhibit 1 is the expert report
19  of Michael C. Walker, Ph.D., dated August 30,
20  2004, correct?
21    A.    Correct.
22    Q.    Paragraph 4, down on the bottom about
23  midway down, the end of the line states, "My areas
24  of expertise..."  Do you see that?

Page 44

1    A.    Yes.
2    Q.    It states, "My areas of expertise are
3  corporate finance and financial markets."  Is that
4  an accurate statement of your areas of expertise?
5    A.    That's correct.
6    Q.    And the next statement in that sentence
7  is, "Most of my research has dealt with valuation
8  and how information influences value in the
9  market."  Is that also a correct statement of the
10  focus of your academic research?
11    A.    I wouldn't say it's the focus.  That's
12  what most of this worked in.  I have worked in a
13  lot of other areas as well, but I would say the
14  bulk of it's this.
15    Q.    Tell me what other areas your research
16  has focused upon in addition to that.
17    A.    I've published -- again, let me look at
18  the resume.  It makes it a lot easier.
19    Q.    Sure.
20    A.    There are a couple of articles dealing
21  with how firms make capital budgeting decisions;
22  and some dealing with use of insurance products and
23  how they affect value; some work in the financial
24  institutions area; early paper advocating the use

Page 45

1  of adjustable rate mortgages and savings and loans;
2  and a little bit of work in credit unions.
3    Q.    What was the last part?
4    A.    Credit unions.  But most of it focuses
5  on information on how it does affect markets.
6    Q.    I take it that your expertise has been
7  obtained through education and research as opposed
8  to practical experience?
9    A.    That's correct.
10    Q.    I take it you've never worked in the
11  capital markets or the financial markets that you
12  study academically?
13    A.    No, I have not.
14    Q.    Have you ever done any academic research
15  or any expert consulting work in the area of
16  shareholder behavior:  What influences shareholder
17  behavior; how they make decisions; how they vote;
18  things of that nature?
19        MR. BRAUTIGAM:  Objection.
20    A.    Let me think again here.  I don't think
21  I can say that I can -- that I did, rather.
22    Q.    Have you ever done any research or any
23  consulting work in the field of the market forces
24  impacting publicly held savings and loans in the

12 (Pages 42 to 45)

Page 46

1  1990s/2000 time frame?
2      MR. BRAUTIGAM: Objection.
3   A.  No.
4   Q.   You indicated you had some personal
5  experience with Gateway Savings & Loan when it
6  converted from a mutual to a stock?
7   A.  That's correct.
8   Q.   Did you remain a Gateway shareholder?
9   A.  No. I thought the value had peaked and
10  sold it. I have other savings and loan type
11  experience. I taught in a savings and loan school
12  for a number of years.
13   Q.   In particular, why don't you describe
14  for me sort of your areas of experience as it
15  relates to savings and loans.
16   A.  Basically, it's being a shareholder in
17  savings and loan; research that led me to be a
18  strong advocate of adjustable rate mortgages in the
19  mid 70s when it was pretty rare; and teaching in
20  the savings and loan schools at the University of
21  Oklahoma for three years.
22   Q.   Where was Gateway based?
23   A.  Gateway was a Cincinnati corporation.
24   Q.   My question is is whether or not you

Page 47

1  have, in your academic experience, ever done any
2  analysis or study of the kinds of market
3  conditions, risks, potential opportunities that
4  were confronting the board of directors of those
5  smaller publicly held savings and loans like
6  Gateway and OHSL in the 1990s, early 2000s?
7      MR. BRAUTIGAM: Objection.
8   A.  Nothing published.
9   Q.   Have you ever done any kind of analysis
10  that's unpublished?
11   A.  Within the classroom framework, taught
12  students about it. Here's what's going on; here's
13  the environment.
14   Q.   What was your knowledge of the
15  environment for publicly held smaller savings and
16  loans like a Gateway or an OHSL in the latter
17  1990s?
18      MR. BRAUTIGAM: Objection.
19   Q.   If you have any.
20   A.  The basic thing was they needed to grow.
21   Q.   What does that mean?
22   A.  In many cases, there should have been
23  acquisitions.
24   Q.   What do you mean by that; that some of

Page 48

1  the savings and loans too small --
2   A.  They were a little small.
3   Q.   -- to be viable?
4   A.  They were viable, but they weren't going
5  to be extremely profitable unless they did grow to
6  some extent.
7   Q.   If they were unable to grow, what was
8  the better course for them?
9   A.  That would depend on the particular
10  situation with the S&L.
11   Q.   You indicated that there needed to be
12  acquisitions, in a prior answer.
13   A.  For some of the smaller ones, yes.
14   Q.   What does that mean?
15   A.  Simply more offices; be able to spread
16  overhead costs over more deposits, over more loans.
17   Q.   Are you referring to smaller savings and
18  loans that needed to acquire other banks or that
19  they needed to be acquired?
20   A.  I think that the smaller savings and
21  loans -- and many of them did -- acquired other
22  institutions, and that's what I'm referring to
23  rather than being acquired.
24   Q.   Is that issue of smaller savings and

Page 49

1  loans, their viability, need for growth, a subject
2  on which you have ever opined as an expert?
3   A.  No, it's not.
4   Q.   And I think you indicated that has not
5  been a focus of your academic experience either?
6   A.  No, not a focus.
7   Q.   When were you engaged in this matter?
8   A.  I was teaching courses in money up until
9  about 2002 and this came up. Savings and loan
10  industry's always a major topic given their
11  fabulous history with the collapse in the mid 80s.
12   Q.   Are you talking about the savings and
13  loans down in your neck of the woods, in Texas and
14  Oklahoma?
15   A.  I'm talking about savings and loans all
16  over the country. I remember coming to Cincinnati
17  with Homestate.
18   Q.   I might not have been clear. When were
19  you retained to be an expert witness in this case?
20   A.  In this case?
21   Q.   Yes, sir.
22   A.  I was retained to be an expert witness
23  in this case earlier this year.
24   Q.   In 2004?

13 (Pages 46 to 49)

Page 50

1    A.    Yes.
2    Q.    Tell me how you came to be engaged.
3    A.    Mr. Brautigam contacted me; asked me was
4  I interested in an expert opportunity; gave me some
5  background.  I read some materials and said, "Okay,
6  yeah, I probably would be interested in doing
7  this."
8    Q.    Given your duties at the College of
9  Business Administration, why did you decide to take
10 time out for this engagement?
11   A.    I thought it was an interesting case,
12 particularly given all the things that are going on
13 now about corporate responsibility, ethics, and so
14 forth.
15   Q.    Have you ever taught courses in
16 corporate responsibility and ethics?
17   A.    Pieces of my courses include that.
18   Q.    Is that an area in which you were an
19 expert?
20       MR. BRAUTIGAM:  Objection.
21   A.    It depends on how you define expert.
22 It's an area which I follow, which I have studied,
23 which I've taught courses.
24   Q.    You defined your expertise in your

Page 51

1  expert report.  It did not include corporate
2  responsibility and ethics?
3    A.    I think that's a major piece of
4  corporate finance.
5    Q.    How many articles have you written in
6  corporate --
7    A.    I've written no articles in that area.
8    Q.    When Mr. Brautigam hired you, how did he
9  describe the engagement?
10   A.    To look at performance of the board of
11 directors in terms of had they met their
12 responsibilities to shareholders.
13   Q.    And I take it that was not an area that
14 you'd ever been retained as an expert on
15 previously?
16   A.    That's correct.
17   Q.    What is the compensation arrangement?
18   A.    $250 an hour.
19   Q.    How much have you billed to date?
20   A.    $8,000.
21   Q.    Have you been paid?
22   A.    Yes, I have.
23   Q.    Tell me what you did to carry out your
24 engagement and what you looked at for purposes of

Page 52

1  forming your opinions.
2    A.    Well, I read a number of depositions.  I
3  read the amended complaint.  I don't think I read
4  the original complaint, but I read the amended
5  complaint.  I looked at the proxy materials.
6        I've read the minutes of the board of
7  directors of OHSL.  I've looked at expert reports
8  from Drs. Fuerman and Lutz and Ms. Preston.  I've
9  looked at some newspaper articles, some affidavits.
10   Q.    The materials that are listed in your --
11   A.    Yes, and whatever, in addition, is in
12 that stack of materials there.
13   Q.    Did you have any meetings -- face-to-
14 face meetings with any people in the course of
15 performing your work?
16   A.    No, I did not.  Now, I should amend it.
17 I looked at some videos of a couple depositions.
18   Q.    Which of the videos did you look at?
19   A.    Brinker.  I didn't look at the entire
20 thing, just enough to get some flavor of what was
21 going on.
22   Q.    You list a number of depositions on
23 page 4 of your report.  Did you read all of the
24 depositions that you list or just portions of them?

Page 53

1    A.    I at least skimmed all of them.  Some of
2  them I read in great detail.  Brinker, Hanauer.
3  I've read in great detail Herron's.  The others, I
4  more or less skimmed.  Probably more attention to
5  Zoellner than to the other two.
6    Q.    In the course of your work, did your
7  project change?
8    A.    I'm not sure I understand the question.
9    Q.    For example, did the original project as
10 explained to you by Mr. Brautigam ever take a
11 different tack and change significantly?
12   A.    I don't think so.
13   Q.    The nature of what you were asked to do
14 stayed fundamentally the same?
15   A.    Stayed fundamentally the same.
16   Q.    Did you perform any investigation
17 analysis or reach any conclusions that are not
18 reflected in your report?
19   A.    No.
20   Q.    Is there any work that is currently in
21 process?
22   A.    No.
23   Q.    Were there any things that Mr. Brautigam
24 asked you to do that you did not do?

14 (Pages 50 to 53)

Williams & Oliver
(513)683-9626

Page 54

1    A.   I don't think so.  We may have discussed
2  some things "would I be interested in doing," but I
3  never asked to do them.
4    Q.   How much time did you devote to your
5  expert analysis?
6    A.   Around 30 hours, something like that.
7    Q.   When did you complete your work?
8    A.   Late August.
9    Q.   Did anyone work with you on the task?
10   A.   No, they did not.
11   Q.   Did you perform any research into the
12 laws of any states in connection with your work?
13   A.   No, I did not.  Wasn't asked to render a
14 legal opinion.
15   Q.   Did you discuss your report with
16 Mr. Brautigam?
17   A.   Yes.
18   Q.   Did he suggest changes?
19   A.   Wording in a couple of places.
20   Q.   Do you recall specifically what that
21 involved?
22   A.   They were pretty minor.  They weren't
23 significant changes.
24   Q.   Page 4 of your report, where you list

Page 55

1  the materials you looked at and consulted...
2    A.   Yes.
3    Q.   ...who decided that you would look at
4  these materials:  Was that Mr. Brautigam or was
5  that you?
6    A.   It was probably a joint decision.  I
7  asked for some things.  He started me off with the
8  complaint and the proxy materials and some of the
9  depositions.  I asked for other depositions.  I
10 asked for the minutes of the board and knew about
11 the career article, and I asked to see the other
12 expert reports as well.
13   Q.   To what extent did you rely upon the
14 expert reports that are listed on page 4 of your
15 report?
16   A.   I didn't really rely on them.
17   Q.   They're not part of the basis for your
18 opinion; it's just part of the material you
19 reviewed?
20   A.   They may be part of the basis, but
21 they're not a major piece of it.
22   Q.   What is your knowledge of the current
23 status of the action, the Thiemann action?
24   A.   I know that some of the original

Page 56

1  complaint has been disallowed, I guess is the word
2  I would use, and parts of it are still going on.
3  There obviously is still some uncertainty of
4  exactly what's going to happen.
5    Q.   What is your understanding about the
6  status of the case as a class action or certified
7  class action?
8    A.   I believe it's been decertified, but I'm
9  not positive of that.
10   Q.   So at least as we sit here today, you
11 understand that it's an individual action by
12 certain individuals, not a class action, as least
13 as --
14   A.   That's my understanding.
15       MR. BRAUTIGAM:  Objection.  I believe
16 that's a misrepresentation.  There's a
17 putative class.  It's been certified and
18 decertified.
19       We filed new motion for class
20 certification as well as a motion for
21 reconsideration.  So it's not an individual
22 action in that sense.
23 BY MR. BURKE:
24   Q.   You're aware of what has been referred

Page 57

1  to in the consolidated amended class action
2  complaint of allegations regarding the Provident
3  restatement in March and April of 2003?
4    A.   Yes, I am.
5    Q.   Is that a subject or a focus of your
6  expert analysis?
7    A.   No, it is not.
8    Q.   Have you been shown any of the motions
9  to dismiss that were filed on behalf of the
10 defendants in response to the consolidated amended
11 class action complaint?
12   A.   Not to my recollection.
13   Q.   Do you think it's -- I take it you did
14 -- for purposes of your understanding of the
15 background of the OHSL transaction, is the source
16 of that background the consolidated amended class
17 action complaint and the depositions?
18   A.   That and the other materials.  I looked
19 at the board minutes and things along that line,
20 yes.
21   Q.   Have you ever seen Mr. Herron's
22 resignation letter?
23   A.   I honestly do not recall.
24   Q.   You talked about the minutes of the

15 (Pages 54 to 57)

Page 58

1  meetings of the OHSL Financial board of directors
2  from February 25, 1999, through October 25th, 1999?
3      A.   Yes.
4      Q.   Did you read all of those minutes?
5      A.   Yes, I did.
6      Q.   Do you recall reading minutes dated
7  August 27, 1999?
8      A.   No, I don't.
9      Q.   You may have, but you don't recall?
10     A.   I've read them, but I don't recall
11  what's in them.  I don't recall specific dates.
12     Q.   Let's go back to page 1 of your report.
13  Paragraph 1, does that accurately state the subject
14  of the expert testimony on which you plan to opine
15  in this case?
16     A.   Let me read it.
17     Q.   Sure.
18     A.   (Examining document.)  It does.
19     Q.   So you do plan to provide expert
20  testimony on whether or not the OHSL Financial
21  Corporation board of directors fulfilled its
22  fiduciary responsibilities in the merger of OHSL
23  Financial Corporation with Provident Financial
24  Group, Incorporated?

Page 59

1      A.   Yes, I do.
2      Q.   Have you ever heard of the Securities
3  Litigation Uniform Standards Act?
4      A.   I've heard of it.  I'm not that familiar
5  with it.
6      Q.   Do you understand that it has something
7  to do with whether or not breech of fiduciary duty
8  claims can be asserted in securities cases?
9      A.   I'm not familiar enough to comment on
10  that.
11     Q.   Have you ever heard that that Act
12  preempts breech of fiduciary duty claims in certain
13  securities cases?
14     A.   Again, I'm not that familiar with it.
15     Q.   Take a look at page 2 of your report.
16     A.   Okay.
17     Q.   I should have asked you this earlier,
18  and I apologize.  What is the last article that you
19  authored in your field of expertise?
20     A.   Let me look at my resume again.  The
21  last article published in 2001?
22     Q.   If we go to the -- it looks like the
23  second page of your resume where it says
24  "Publications," I take it those publications are in

Page 60

1  reverse order with the most current listed first?
2      A.   That's correct.
3      Q.   Okay.  And so therefore, that article
4  that is listed there at the top of the list is the
5  most recent article you've prepared.
6      A.   That's correct, most recent article
7  published.
8      Q.   I think you indicated that due to your
9  duties at the College of Business Administration,
10  you're not actively publishing anymore; is that
11  correct?
12     A.   Well, there's nothing come out in the
13  last two or three years, put it that way.  I'm
14  still working on some things, but I'm not making
15  that much progress.
16     Q.   Paragraph 10 on page 2 of your report,
17  the first sentence states, "Throughout my academic
18  career, I have served as a consultant and an expert
19  witness on a limited basis."  What do you mean when
20  you say "a limited basis"?
21     A.   That it's just never been a major piece
22  of my activities.  I do a little bit here and
23  there; never have more than a few cases in a year
24  or two span.

Page 61

1      Q.   In your experience, how much of your
2  time during an average year or representative year
3  would you devote to expert testimony or expert
4  analysis?
5      A.   Anywhere from zero to, max, eight to ten
6  percent.
7      Q.   Eight to ten?
8      A.   At the absolute outside.  That's only
9  one case, probably.
10     Q.   At this point in your career, how much
11  of your time are you devoting -- since you've
12  become dean of the College of Business
13  Administration, how much of your time are you
14  devoting to expert engagements?
15     A.   This is the only case I've taken on
16  since I've took that position.
17     Q.   And over the past year when you've been
18  working on this case, how much of your time has
19  been devoted to it?
20     A.   I billed for 30 hours and probably a few
21  more hours in discussions leading up to it.
22     Q.   Paragraph 10, the next sentence states,
23  "I am listed as an academic affiliate on the
24  website of Nathan Associates, Inc., a major

16 (Pages 58 to 61)

Page 62

1  economic consulting firm." Who is Nathan
2  Associates?
3      A.   Nathan Associates is a Washington, D.C.
4  based economic consulting firm. And my connection
5  with them is the executive vice president and I
6  were in the economic Ph.D. program together.
7          At one point, I was asked to become an
8  academic affiliate along with about 12 or 13 other
9  people because they felt they didn't have the
10 in-house expertise to do certain things.
11     Q.   Who was the individual you knew from
12 Nathan --
13     A.   Gary French.
14     Q.   What's the name of the individual with
15 whom you worked?
16     A.   Gary French.
17     Q.   F-r-e-n-c-h?
18     A.   Yes.
19     Q.   Which of the engagements -- and I hate
20 to make you keep flipping back and forth in your --
21     A.   There are only two.
22     Q.   Which of the two did you work with
23 Nathan Associates?
24     A.   Whitford, Taylor & Preston; Mann, Ungar,

Page 63

1  Spector & Labovitz.
2      Q.   So the last two expert engagements you
3  received came through that firm?
4      A.   Well, the last two as they're listed
5  here, because I've got these things by initial
6  engagement. I think there are one or two others
7  that were -- I'm trying to look and see.
8      Q.   While we're on that page, what lawyer
9  did you work with at Porter, Wright, Morris &
10 Arthur, if you remember?
11     A.   I honestly don't remember. That's been
12 quite a while. As I recall, he's no longer with
13 them. He was a junior attorney, didn't make
14 partner.
15     Q.   Paragraph 11 of your expert report, you
16 say that you've been involved in the quasi-judicial
17 roles, and then you describe them. Tell me what
18 those activities were all about.
19     A.   The initial quasi-judicial activity was
20 serving as a federal land commissioner for the
21 Eastern District Federal Court in Texas.
22         And in that particular role, I was a
23 member of a three-person panel that heard cases
24 where the government had condemned land for Lakeway

Page 64

1  Roberts in north central Texas, and the issues,
2  obviously, were compensation.
3      Q.   When did you do that?
4      A.   Again, let me refer back here to get the
5  exact page. 1983 to 1985.
6      Q.   You also indicate in this section that
7  you were a, quote, public, closed quote, arbitrator
8  for the National Association of Security Dealers.
9  First of all, what's a public arbitrator?
10     A.   The NASD arbitration process is one that
11 uses three panel members to hear arbitrations. One
12 of the members is an industry representative; one
13 is usually a securities attorney; and the third is
14 a public arbitrator, meaning that I have no ties to
15 any of the brokerage firms or the industry that
16 would prohibit me from being totally independent.
17     Q.   How many times have you served as an
18 arbitrator; how many proceedings?
19     A.   Actual proceedings, probably three, but
20 I've been on a number of panels where things have
21 settled or disappeared in some way.
22     Q.   When was the last time you served as a
23 public arbitrator either in a case that went all
24 the way or a settled case?

Page 65

1      A.   Monday.
2      Q.   Monday of this week?
3      A.   Yes.
4      Q.   That one went away, or did that
5  actually --
6      A.   Actually, it was supposed to have been
7  Monday and Tuesday, but because neither of the
8  out-of-town attorneys could get a room in
9  Cincinnati due to Monday night football, they
10 agreed not to do oral closing arguments, and
11 they're doing them in writing.
12     Q.   How recent were the other two
13 proceedings where you actually sat as an
14 arbitrator?
15     A.   It's been about two years -- or, been at
16 least three years. This case has been dragging on
17 for almost three years.
18     Q.   The one you just heard on Monday?
19     A.   Right. I probably heard cases in 1998
20 and 2001 where I actually sat.
21     Q.   Page 3 in the middle of the page, you've
22 got a summary of your opinion.
23     A.   Yes.
24     Q.   And paragraph 13, the third sentence

17 (Pages 62 to 65)

Page 66

1  states, "It is my opinion that the board of
2  directors of OHSL Financial Corporation did not
3  meet its fiduciary responsibilities in the handling
4  of the merger of OHSL Financial Corporation with
5  Provident Financial Group, Incorporated." Do you
6  see that?
7      A.    Yes.
8      Q.    You know that the concept of fiduciary
9  responsibility and whether one meets one's
10 fiduciary duty is a legal concept?
11     A.    Probably, yes.
12         MR. BRAUTIGAM: Objection.
13     Q.    You also indicated to me that you did
14 not perform any survey in applicable law cases in
15 connection with your work?
16     A.    That's correct.
17     Q.    Did you read the Ohio statutes that
18 define the fiduciary duties of the director of an
19 Ohio corporation?
20     A.    No, I did not.
21     Q.    Do you even know what the citation is to
22 the Ohio statute that defines fiduciary duty?
23     A.    No, I don't.
24         MR. BRAUTIGAM: Are you representing

Page 67

1      that OHSL was an Ohio corporation?
2         MR. BURKE: No.
3      Q.    Did you read the statutes of any states?
4      A.    No.
5      Q.    Do you know what state OHSL was
6  incorporated in?
7      A.    Delaware, I believe.
8      Q.    Did you read any of the statutes of
9  Delaware?
10     A.    No, I didn't.
11     Q.    Given the fact that you did not perform
12 that analysis, and I think it's also true that
13 you've never served as a director of a public
14 corporation --
15     A.    That's correct.
16     Q.    -- what is the source or the basis for
17 your opinions as to fiduciary responsibility?
18     A.    I would say years of observation and
19 teaching and what the boards are expected to do.
20     Q.    And your years of observation dealt with
21 observation of what?
22     A.    Literature regarding board
23 responsibilities; the fact that the corporations
24 are built to serve the interest of the

Page 68

1  shareholders, not the directors; and as a result,
2  the shareholders have a responsibility to act --
3  excuse me -- the directors have a responsibility to
4  act for the shareholders.
5      Q.    Have you, in the course of your expert
6  analysis and in preparation of this expert report,
7  reviewed or relied upon any treatises, articles,
8  authoritative literature defining or providing
9  background for those topics you just talked about?
10     A.    Nothing in particular. Just 35 years of
11 observation and reading.
12     Q.    But there's no particular course book or
13 anything else that you looked at for purposes of
14 reaching the conclusions you've rendered in this
15 report?
16     A.    No.
17     Q.    All right. Have you ever served as a
18 fiduciary in any capacity?
19     A.    Probably not in the legal sense, no.
20     Q.    Paragraph 14 -- I'm reading from your
21 report -- "In this situation, the board of OHSL
22 specifically did not consider the full range of
23 strategic alternatives..." Do you see that?
24     A.    Yes, I do.

Page 69

1      Q.    What specifically are you referring to
2  there?
3      A.    I'm referring to -- at least in what I
4  read and saw, they decided to sell the S&L, and
5  they weren't exploring alternatives to stay
6  independent to acquire other S&L's.
7      Q.    What did you see that led you to that
8  conclusion?
9      A.    I saw absolutely no discussion of any
10 other alternatives among the board members. All I
11 saw was that they were looking to sell it.
12     Q.    Did you see any materials that were
13 relied upon or reviewed by the ad hoc committee?
14     A.    No, not to my knowledge.
15     Q.    Did you see any materials that were
16 presented to the board by McDonald & Company as it
17 related to the strategic alternatives?
18     A.    No.
19     Q.    Did you read the full proxy statement
20 where it dealt with the reasons why they felt it
21 was incumbent upon the board to merge with
22 Provident as opposed to other alternatives?
23     A.    Yes, I did read the proxy.
24     Q.    Did you look at any of the data or

18 (Pages 66 to 69)

Page 70

1   material that was supportive of or the basis for
2   that portion of the proxy statement?
3       A.   I did look at it.
4       Q.   What did you look at specifically?
5       A.   I would say I read the entire proxy
6   statement and looked through the various materials.
7   I guess my response to that is I viewed that more
8   as a selling piece than really laying out
9   legitimate alternatives.
10      Q.   A selling piece to whom?
11      A.   To the board; that the investment
12  banking firm was pushing the merger, and the board
13  didn't want to do anything else.
14      Q.   Did you study anything about the OHSL
15  stock price?
16      A.   I've looked at it, but I really haven't
17  paid that much attention to it. I know what it was
18  at the time.
19      Q.   Have you done any analysis of the
20  liquidity of the OHSL stock?
21      A.   No, I have not.
22      Q.   Have you performed any independent study
23  of what strategic alternatives were available to
24  OHSL at this time frame?

Page 71

1       A.   Not really.
2       Q.   Do you have any basis for stating that
3   McDonald & Company did not study that particular
4   area in more depth than you did?
5       A.   The one thing I would say is that I'm a
6   little concerned that they sold it at the
7   particular time they did; that that didn't seem to
8   make a lot of sense given what was going on with
9   Y2K and all this going on. It probably wasn't a
10  good time to sell it; that there was a lot of
11  uncertainty in the market, and people were probably
12  reluctant to bid.
13      Q.   Do you know what happened to the market
14  for publicly held savings and loans and their
15  ability to sell themselves to others in the years
16  following the OHSL merger?
17      A.   I have not --
18           MR. BRAUTIGAM: Objection.
19      A.   No.
20      Q.   Have you ever done an analysis or a
21  study of how many smaller S&L's were acquired
22  before OHSL in this market and how many were
23  acquired after?
24      A.   No, I have not.

Page 72

1       Q.   So in terms of whether or not it was a
2   good time to sell or a bad time to sell, that's
3   pretty much based just upon your subjective belief?
4       A.   I wouldn't call it subjective, but on my
5   knowledge of what was going on in the marketplace
6   in general at that point in time.
7       Q.   But in terms of the S&L market in
8   particular --
9       A.   Did I do a study of the S&L market? No,
10  I did not.
11      Q.   Still in paragraph 14. I read you half
12  of a sentence, so I'll pick up where that sentence
13  continues. You stated, "...and they failed to
14  disclose material information to the shareholders
15  which would have added to the total mix of
16  information that a reasonable shareholder would
17  want to consider before voting on the proposed
18  merger." Do you see that?
19      A.   Yes, I do.
20      Q.   Where did you come up with the phrase
21  "the total mix of information"?
22      A.   I have no idea.
23      Q.   That's a phrase that you're familiar
24  with?

Page 73

1       A.   Yeah.
2       Q.   What does it signify?
3       A.   Well, you want all the information you
4   can get, and it is -- the pieces don't stand alone.
5   I would almost use the term like gestalt or
6   something, like where all the pieces come together
7   to help one's decisions.
8       Q.   Do you know whether that's language you
9   chose or whether language that Mr. Brautigam
10  suggested?
11      A.   I have no idea. I'll claim authorship
12  since it's my report.
13      Q.   Is there legal significance to that
14  phrase "the total mix of information"?
15      A.   I don't think so.
16           MR. BRAUTIGAM: Objection.
17           (A brief break was taken.)
18  BY MR. BURKE:
19      Q.   Among the materials you reviewed, you
20  did not include the depositions of Mr. Thiemann or
21  Gary Meier, correct, the plaintiffs?
22      A.   That's correct.
23      Q.   Is there a reason why you did not think
24  it was necessary to review those?

19 (Pages 70 to 73)

Page 74

1    A.    I was looking strictly at the board and
2  the board's actions.
3    Q.    And in terms of what defendants'
4  position may be as it relates to the allegations
5  relating to the board, you have not seen any of the
6  motions filed by the defendants as it relates to
7  the board; is that correct?
8          MR. BRAUTIGAM: Objection.
9    A.    Not to the best of my knowledge.
10    Q.    For example, you haven't seen any of the
11  materials filed by the defendants as it relates to
12  the issue of unanimity, the unanimity of the board?
13    A.    I don't think I have, no.
14    Q.    You're familiar with Robert's Rules of
15  Order?
16    A.    Yes, I am.
17    Q.    Have you reviewed that in connection
18  with your expert testimony?
19    A.    No, I have not.
20    Q.    Are you aware of anything in Robert's
21  Rules of Order dealing with voting boards or
22  requirements or how votes are counted or anything
23  of that sort?
24    A.    Not in detail, no.

Page 75

1    Q.    Item C of the basis of your opinion
2  talks about the proxy materials with annotations by
3  Kenneth Hanauer.  Do you see that?
4    A.    Yes.
5    Q.    What is your understanding of what those
6  annotations were?
7    A.    To be honest with you, I didn't pay all
8  that much attention to them.
9    Q.    Why was that?
10    A.    I was just simply reading the proxy
11  materials.  I saw them.  I wasn't sure how to
12  interpret them, so I really didn't do anything with
13  them.
14    Q.    So that's not really a basis for your
15  opinion?
16    A.    No, it's not.
17    Q.    Item G, the Cincinnati Business Courier
18  article...
19    A.    Yes.
20    Q.    What is the significance of that to your
21  opinion?
22    A.    Basically, I believe it quotes you as
23  saying that Hanauer had already opposed the merger.
24    Q.    Did it quote me?

Page 76

1    A.    It wasn't direct quotes, no.  It stated
2  you said that.
3    Q.    Right.  Did Mr. Brautigam ever indicate
4  to you my position or what has been communicated in
5  some of these depositions in terms of whether or
6  not that was an accurate attribution to me?
7    A.    Yes, he did.
8    Q.    What did he indicate?
9    A.    That you said you didn't say it, but he
10  also showed me an affidavit from the reporter which
11  said that you did say it.
12    Q.    Affidavit from what reporter?
13    A.    Who wrote the article, apparently.
14    Q.    Did you use that affidavit?
15    A.    It made me question, you know, exactly
16  where to come down on this.  It said the article
17  was accurate.
18    Q.    Where is that affidavit?
19    A.    It's in the materials that you received.
20    Q.    Can you show me that?
21    A.    Yeah.
22    Q.    Dan Monk?
23    A.    Yes.
24    Q.    Where he states he has no independent

Page 77

1  recollection of his interview with me?
2          MR. BRAUTIGAM: Objection.  Is that a
3  question?
4    Q.    Yes.  Take a look at this affidavit.
5    A.    (Examining document.)
6    Q.    What item is that?  What paragraph is
7  that?
8    A.    Paragraph 1.
9    Q.    It goes 1, 1, 2, 3, 4, 1, 2, 3.
10    A.    That's 1 on that second page.
11    Q.    Do you understand what the numbering of
12  this means?
13    A.    No.
14    Q.    When did you get this?
15    A.    Last week, two weeks ago, something like
16  that.  Within the last two weeks.
17    Q.    This affidavit?
18    A.    Yes.
19    Q.    The third paragraph 1 which appears on
20  the second page, Mr. Monk states, "I have no
21  independent recollection of my interview with
22  attorney James E. Burke for this article.
23  Additionally, I currently have no notes of my
24  interviews for this story."

20 (Pages 74 to 77)

Page 78

1    A.    The second paragraph was the one that I
2   paid more attention to.
3    Q.    But you realize that Mr. Monk had no
4   independent recollection?
5    A.    I realize that.
6    Q.    And still you used this as a basis for
7   your opinion?
8    A.    Not when I originally formulated it, but
9   this was really to counter -- and I didn't know
10   that you denied it at the time that I formed the
11   opinion. So this was counter evidence against your
12   denial. Neither were actually used in formulating
13   the opinion.
14   Q.    I'm sorry. I didn't get the last part.
15   A.    Neither were actually used in
16   formulating the opinion that's written in the
17   report.
18   Q.    Neither the article nor the affidavit --
19   A.    Not the article. Your denial or the
20   affidavit. The article was used.
21   Q.    What was your understanding of
22   Mr. Herron's position on the Provident merger
23   from --
24   A.    Herron or Hanauer?

Page 79

1    Q.    I'm sorry. You're right. What was your
2   understanding of Mr. Hanauer's deposition testimony
3   relating to whether or not the Provident merger was
4   fair?
5       MR. BRAUTIGAM: Objection.
6    A.    I'm not sure that I understand that.
7   The testimony that I read basically was -- my
8   impression is that he was opposed to the merger.
9   He thought they should stay independent.
10   Q.    Was he opposed specifically to the
11   Provident merger or opposed to any merger?
12   A.    He was apparently opposed to any merger.
13   Q.    So his opposition was not specifically
14   with respect to the Provident merger; it was with
15   respect to any merger?
16      MR. BRAUTIGAM: Objection.
17   A.    He apparently voted against the
18   Provident merger, or at least in some of the
19   preliminary discussions he voted against it, later
20   abstained, and then finally switched over.
21   Q.    And voted in favor of it?
22   A.    But he also stated he'd just given up in
23   his testimony.
24   Q.    He didn't say he'd given up in the board

Page 80

1   minutes, did he?
2    A.    No.
3    Q.    He voted in favor of the Provident
4   merger as a board of directors member of OHSL on
5   August 2nd, 1999?
6    A.    Yes.
7    Q.    Are you aware that he also voted in
8   favor of that transaction subsequently?
9       MR. BRAUTIGAM: Objection.
10   A.    Not sure what you're referring to.
11   Q.    Are you aware that on August 27, 1999,
12   prior to the mailing of the proxy materials,
13   Mr. Hanauer and every other member of the OHSL
14   board of directors unanimously readopted
15   resolutions approving the transaction?
16      MR. BRAUTIGAM: Objection.
17   A.    I'm aware the statement is made. I
18   don't agree with that statement since there was not
19   a unanimous vote in my opinion.
20   Q.    I'm talking about a specific board
21   resolution that was unanimously approved by
22   everybody.
23   A.    The way the word unanimously has been
24   used in this, I'm not sure how much confidence I

Page 81

1   put in that.
2    Q.    Do you know what happened on August 27,
3   1999, or not?
4    A.    I'm not sure that I recall that.
5    Q.    Are you aware of a board resolution on
6   August 27, 1999, where all seven OHSL directors
7   readopted resolutions approving the transaction?
8    A.    I can't say that I am, that I can recall
9   it anyway.
10   Q.    Have you ever taught a course in what
11   constitutes unanimous or not unanimous vote?
12   A.    No, I have not.
13   Q.    Have you ever written an article on
14   that?
15   A.    No.
16   Q.    Have you ever been qualified as an
17   expert on that?
18   A.    No, I have not.
19   Q.    Let's go to page 4, the section of your
20   opinion entitled Background.
21   A.    Okay.
22   Q.    In this section, which carries over to
23   page 5, you've got a number of -- sort of a factual
24   or historical recitation of what occurred. And my

21 (Pages 78 to 81)

Page 82

1  question is what's the source of these facts?
2     A.    A combination of things: The complaint;
3  the minutes of the board; probably drew some of the
4  history in one of the -- the Preston expert report.
5  All those together pretty much -- I thought they
6  pretty much agreed.
7     Q.    Prior to 1999, are you aware that the
8  subject of OHSL being acquired had come up?
9     A.    In reading some of the depositions, I
10  saw references to talks of selling, talks of
11  acquisitions prior to 1999.
12     Q.    And what happened with respect to those
13  discussions, if you know?
14     A.    Apparently nothing happened at the time;
15  and in 1999, it became an active effort.
16     Q.    Why in the years prior to 1999 did
17  nothing come of those discussions?
18     A.    I really don't have enough background to
19  address that.
20     Q.    Why in 1999 was it decided to relook at
21  this issue again?
22     A.    I think you basically had a board that
23  was ready to sell the S&L.
24     Q.    Why?

Page 83

1     A.    I think some of it had something to do
2  with their age.
3     Q.    What is the basis for that; what can you
4  point to specifically that indicates this was tied
5  to the age of the directors?
6     A.    In general, they seemed to be rather
7  tired of dealing with it. If you read some of the
8  testimony, it's almost like they're meeting with
9  the boys. There doesn't seem to be a lot of
10  interest in representing the shareholders; and in
11  their testimony or the affidavit by Herron, that
12  Brinker really wasn't paying that much attention to
13  things. I think he was just kind of running on.
14     Q.    Do you know how many meetings Mr. Herron
15  missed during 1999?
16     A.    I've looked at the minutes. He was
17  there for some. I don't know what the exact ratio
18  was. I recall other directors missed meetings as
19  well.
20     Q.    Do you know who missed the most?
21     A.    No, I don't. I didn't study that.
22     Q.    What specific reference are you relying
23  upon as the basis for your statement that the OHSL
24  directors had no interest in representing the

Page 84

1  shareholders; what specific testimony?
2        MR. BRAUTIGAM:  Objection.
3  Mischaracterization.
4     A.    There was -- I won't say had no interest
5  in representing, but the shareholders didn't
6  necessarily come first. Testimony by Brinker where
7  we're talking about the election of directors, the
8  shareholders came in almost as an afterthought.
9  "Well, the board picks the directors." I didn't
10  see any real emphasis on shareholder interest at
11  all.
12     Q.    Based upon the questions that
13  Mr. Brautigam asked him?
14     A.    His response to them, yes.
15     Q.    You've never met Mr. Brinker?
16     A.    I've seen him in a video deposition, and
17  that's it.
18     Q.    Have you performed any background
19  analysis of him or his career?
20        MR. BRAUTIGAM:  Objection.
21     A.    No, I have not.
22     Q.    Have you ever attempted to perform any
23  kind of a study or an analysis of his relationship
24  with the OHSL shareholders?

Page 85

1        MR. BRAUTIGAM:  Objection.
2     A.    No, I have not. All I have to rely on
3  is materials that I've read.
4     Q.    Paragraph 17. Have you seen any
5  materials -- I apologize if I asked you this,
6  Mr. Walker -- any materials that specifically deal
7  with what the ad hoc committee did, who they heard
8  from, what they looked at, things of that sort?
9        MR. BRAUTIGAM:  Objection.
10     A.    The references in the board meetings and
11  the amended complaint. Beyond that, no.
12     Q.    Who was on the ad hoc committee?
13     A.    I'm trying to think. Hucke -- I assume
14  that's how you pronounce it -- Tenoever,
15  McKiernan. I can't remember who the fourth one was
16  off the top of my head.
17     Q.    Certainly, Mr. Hucke, Mr. McKiernan, and
18  Mr. Tenoever were on the ad hoc committee?
19     A.    I believe that's correct.
20     Q.    Of those two people, you didn't review
21  Mr. Hucke's deposition or Mr. McKiernan's
22  deposition?
23        MR. BRAUTIGAM:  Objection. You said two
24     people, and I think you meant to refer to

22 (Pages 82 to 85)

Page 86

1    three.
2    Q.    Let me start again. You know that
3  Mr. Hucke, Mr. McKiernan, and Mr. Tenoever were on
4  the ad hoc committee?
5    A.    Right.
6    Q.    You didn't review either the deposition
7  of Mr. Hucke or Mr. McKiernan?
8    A.    I glanced at them. I did not review
9  them in detail.
10    Q.    They are not listed in your material?
11    A.    I didn't include them because I didn't
12  look at them in detail.
13    Q.    Why did you elect not to even review the
14  depositions of two of the three members of the ad
15  hoc committee?
16    A.    After a quick glance, I didn't see
17  anything there that I thought was going to give me
18  more information than I already had.
19    Q.    In paragraph 17, you state, "On April
20  20, 1999, the ad hoc committee reported to the
21  board recommending that it explore the sale of the
22  company. A motion was made and passed -- four to
23  three -- to employ McDonald Investments, Inc., to
24  conduct a study that will bring us a negotiated

Page 87

1  offer."
2        What was the source of that information?
3    A.    A combination of board minutes and the
4  amended complaint.
5    Q.    And the four to three vote, was that
6  derived from the board minutes?
7    A.    I believe so. My recollection is not
8  that clear.
9    Q.    Have you ever conducted a study in your
10  academic research dealing with disclosures in
11  securities documents of board votes; how people do
12  it ordinarily and customarily?
13    A.    I have not done a study.
14    Q.    Are you aware that in the proxy
15  statement, from time to time, when they detailed
16  what was occurring in 1999, they will say things
17  like "the board approved" or "the board did
18  something"?
19    A.    Yes, I'm aware they would say that.
20    Q.    And in other places of the proxy
21  statement, there's a statement that the board
22  unanimously did certain things?
23    A.    Yes.
24    Q.    Do you understand, as you see those two

Page 88

1  concepts, that if the proxy indicates that the
2  board did something and does not state that it did
3  it unanimously, that that would indicate that the
4  vote was not unanimous?
5    A.    Not necessarily.
6        MR. BRAUTIGAM: Objection.
7    Q.    So you think everything was unanimous?
8        MR. BRAUTIGAM: Objection.
9    A.    No, I don't.
10    Q.    I guess what I'm trying to understand is
11  when you see in certain cases that it refers to a
12  unanimous action of the board and in other cases it
13  just refers to the action of a board, you do not
14  conclude that in the latter case that was a
15  non-unanimous action?
16        MR. BRAUTIGAM: Objection. Are you
17  limiting this to the proxy materials, not
18  board minutes?
19        MR. BURKE: Yes, I'm limiting it to the
20  proxy materials.
21        MR. BRAUTIGAM: Still have an objection.
22    A.    I really don't know.
23    Q.    You don't have an opinion one way or the
24  other?

Page 89

1    A.    I don't have an opinion one way or the
2  other.
3    Q.    Fair enough. What happened between
4  April 20, 1999, referred to in paragraph 17 of your
5  report, and paragraph 18, which refers to July
6  22nd, 1999?
7        MR. BRAUTIGAM: Objection.
8    A.    Apparently McDonald brought material to
9  the board showing their alternatives, which
10  apparently was just Provident; and then the board
11  at that point voted that -- or,McDonald sought
12  offers on the S&L and brought whatever they found
13  to the board. And then the board eventually
14  approved the Provident offer -- agreed to pursue
15  the Provident offer.
16    Q.    I apologize if I asked you this before:
17  Do you know what other strategic alternatives
18  McDonald & Company looked at?
19        MR. BRAUTIGAM: Objection.
20    A.    Not really.
21    Q.    In paragraph 19 on page 5 of your
22  report, you state that "On August 2nd, 1999, the
23  board of OHSL, quote, concluded that the Definitive
24  Agreement was satisfactory, closed quote, and,

23 (Pages 86 to 89)