Page 90

1  quote, unanimously, closed quote, adopted a
2  Resolution Approving Agreement and Plan of Merger
3  with Provident Financial Group, Inc." Do you see
4  that?
5    A.   I see that.
6    Q.   What are you quoting in that section?
7    A.   Again, it's a combination of the amended
8  complaint and board minutes.
9    Q.   Where did you get the quote for
10  unanimously from?
11    A.   I'm not sure whether I provided that
12  myself or I took it directly out of the minutes. I
13  think it came out of the minutes, but I'm not sure.
14    Q.   The minutes of the August 2nd, 1999,
15  meeting?
16    A.   I believe that's correct.
17    Q.   Paragraph 21. This section that we are
18  now talking about deals with -- it's entitled
19  Failure to Carry Out Fiduciary Responsibilities?
20    A.   That's correct.
21    Q.   We have previously talked about the
22  basis for your opinion on fiduciary duty to the
23  extent it's based upon review of cases or statutes.
24  Is the same true of the fiduciary opinions you give

Page 91

1  in this section?
2        MR. BRAUTIGAM: Objection.
3    A.   It is not based on review of statutes.
4    Q.   And you are not qualified to render an
5  opinion of law?
6    A.   That's correct.
7    Q.   I just want to ask you one question, and
8  to the extent it deals with a legal concept, feel
9  free to tell me it's not something you know about.
10       Do you know the standard of proof that
11  must be met in order to establish that a director
12  failed to meet his or her fiduciary duties?
13       MR. BRAUTIGAM: Objection.
14    A.   No, I do not.
15    Q.   Do you know what the business judgment
16  rule is?
17    A.   Yes.
18    Q.   What is the business judgment rule?
19    A.   Basically, the directors or officers are
20  protected if they're exercising their best business
21  judgment.
22    Q.   Are there exceptions to when the
23  business judgment rule does not apply?
24    A.   That I really cannot answer.

Page 92

1    Q.   Paragraph 21. You state that the
2  clearest -- second sentence -- "The clearest and
3  most egregious single instance of such behavior is
4  that the board, even though it recognized the need
5  for and established a mandatory retirement policy
6  for board members, exempted the board members at
7  the time the policy was enacted." Do you see that
8  statement?
9    A.   Yes, I do.
10    Q.   You refer to the transcript of Norb
11  Brinker?
12    A.   Yes, I do.
13    Q.   Have you reviewed the board minutes that
14  deal with that?
15    A.   No, I have not.
16    Q.   Why is that particular instance, as you
17  opine here, an example of breach of fiduciary duty?
18    A.   They, themselves, recognized that an
19  elderly board probably would not or could not do
20  the type of job that was necessary. Why else would
21  they have approved a resolution to set a mandatory
22  retirement age, and then they turned around and
23  exempted themselves?
24    Q.   Do you have any information in terms of

Page 93

1  the mental capacity or ability of any of these
2  directors to perform their duties?
3    A.   Not directly, no.
4    Q.   Have you performed any kind of a study
5  or analysis to give you a basis for opining on
6  retirement policies of companies in general?
7    A.   No, I have not.
8    Q.   Do you know whether or not it is usual
9  or unusual when establishing a mandatory retirement
10  policy for board members to exempt themselves or
11  not?
12    A.   I do not know.
13    Q.   Is the establishment of a retirement
14  policy a business judgment?
15       MR. BRAUTIGAM: Objection. Are you
16  talking about a mandatory retirement policy?
17       MR. BURKE: Yes.
18  BY MR. BURKE:
19    Q.   The retirement policy you refer to here,
20  the adoption of this policy.
21    A.   I would think it falls in the area of
22  business judgment.
23    Q.   So this would be a protected decision by
24  the OHSL board?

24 (Pages 90 to 93)

Page 94

1    MR. BRAUTIGAM: Objection.
2    A.    Establishment of the policy would be,
3 yes.
4    Q.    Okay.
5    A.    But I'm not sure that I'm on firm legal
6 ground saying that.
7    Q.    That's not something you know about one
8 way or the other?
9    A.    Not legally, no.
10    Q.    The next sentence in that section, "This
11 action..." -- I assume we're still talking about
12 the retirement policy -- "...deprived the
13 shareholders of the type of leadership the board
14 itself recognized as being needed." What's the
15 basis of that?
16    A.    I'm talking about the exemption, not the
17 policy; exempting themselves from the policy. If
18 you read on there, I cite instances where I think
19 you can see that the leadership they needed wasn't
20 there.
21        Particularly the idea of bringing the
22 computer system up to date was one of the primary
23 pieces -- it was very clear from the testimony of
24 Brinker, in particular, he did not understand what

Page 95

1 was needed or how it worked.
2    Q.    Have you done anything to quantify or to
3 confirm empirically that the shareholders of the
4 OHSL Financial Corp., in fact, were deprived of
5 leadership by the board?
6    A.    The fact that the problems arose because
7 they didn't know what was going on, and also there
8 is testimony by Herron that Brinker really wasn't
9 doing the job, wasn't fulfilling his duties as
10 chairman.
11    Q.    Do you know what the basis for
12 Mr. Herron's conclusion was?
13    A.    He said he was not reading materials,
14 not keeping up with things as he should have.
15    Q.    And you know that Mr. Herron is
16 supporting the plaintiffs in this case; do you
17 know?
18        MR. BRAUTIGAM: Objection.
19    A.    I think he is.
20    Q.    Did any of the other directors verify
21 the testimony by Mr. Herron?
22    A.    Not that I know of.
23    Q.    Have you ever read the depositions of
24 counsel to OHSL, Dinsmore & Shohl?

Page 96

1    A.    No, I have not read any of the counsel
2 depositions.
3    Q.    Other than Mr. Herron, are you aware of
4 anything else that substantiates the view that
5 Mr. Brinker was not fulfilling his duties as
6 chairman of the board?
7    A.    Well, as I decided, the performance of
8 the board in dealing with this computer issue.
9    Q.    What is the duty of a board of
10 directors; what types of things do they get
11 involved with?
12        MR. BRAUTIGAM: Objection.
13    A.    Basically, the board of directors is
14 really kind of an oversight organization. Day-to-
15 day management is in the hands of the management
16 team. The board is supposed to set broad policy
17 guidelines.
18        Any major expenditures that come up are
19 probably going to be run by the board, and I would
20 presume that a computer system is a major
21 expenditure. Board makes decisions about dividends
22 being paid and other issues. It's basically broad
23 policy guidelines.
24    Q.    As opposed to the nitty gritty details

Page 97

1 of the day-to-day operations?
2    A.    That's correct.
3    Q.    Do you believe that it's appropriate for
4 a board of directors to understand the computer
5 technology of a savings and loan association?
6    A.    They don't have to understand the
7 technology. They have to understand the need for
8 the technology, how it's used, and what its
9 importance is.
10    Q.    In terms of the details of what's
11 involved in computer technology, the nuances of
12 implementation, those sorts of things, you wouldn't
13 expect any board to know that, would you?
14        MR. BRAUTIGAM: Objection.
15    A.    I don't think I can answer that
16 question. It depends on the particular board
17 members involved. All the board members need to
18 have some understanding of what is necessary -- not
19 details, but the broad scope of it, and recognize
20 that it needs to be implemented very effectively.
21    Q.    Have you done any study or any analysis
22 of the nature of the computer technology of
23 computer issues at OHSL other than reading
24 Mr. Brinker's deposition?

25 (Pages 94 to 97)

Page 98

1    A.    Nothing in particular.  I'm familiar
2  with the computer system needs of the financial
3  institution, but beyond that, no.
4    Q.    You're aware of that as a result of
5  what?
6    A.    I teach theory and financial
7  institutions and have done so for years, and I'm
8  aware that the computer is more or less the
9  backbone of the modern financial system as far as
10  transactions are concerned.
11    Q.    And in terms of the testimony of the
12  other directors as it relates to the computer
13  technology, do you recall what they had to say on
14  that topic?
15    A.    There was nothing particularly striking.
16    Q.    Paragraph 22.  We may have talked about
17  this in the past.  The statement here says,
18  "Testimony of the depositions of some board
19  members, particularly that of the chairman of the
20  board, Mr. Brinker, leaves the impression that the
21  board thought of shareholders almost as an
22  afterthought."  Is that the subject that we talked
23  about earlier?
24    A.    More or less, yes.

Page 99

1    Q.    What other board members did you review
2  to talk about this?
3    A.    That was the primary one that I looked
4  at since he was the chairman of the board.  I
5  really can't recall specifics.  It was just a tone
6  that I picked up that the board members saw
7  themselves almost as a club.
8    Q.    So this is not based upon specific
9  testimony as much as it's based upon the tone you
10  picked up?
11    A.    In Brinker's case, it's based on
12  specific testimonies; and for the other directors,
13  it's more of a tone.
14    Q.    Have you ever before opined in a court
15  case based upon the tone of testimony?
16    A.    I think I may have actually, yes.
17    Q.    Do you recall specifically when that
18  was?
19    A.    The bank case with the fiduciary
20  responsibility issue.  One of the things I had to
21  do was examine documents, see what the two sides
22  were seeing, and interpret them.
23        MR. BURKE:  Let me take five seconds.
24        (A brief break was taken.)

Page 100

1  BY MR. BURKE:
2    Q.    Paragraph 23.  In this case, you refer
3  to the, quote, apparent failure to have explored
4  other strategic alternatives such as remaining
5  independent, etc.  We've talked about your basis
6  for that --
7    A.    Yes.
8    Q.    -- previously, have we not?
9    A.    We did.
10    Q.    Is this based upon anything other than
11  what you've talked about already?
12    A.    No.
13    Q.    "Even in the merger decision itself..."
14  -- is the next sentence of paragraph 23 -- "...the
15  board seems to have been in such a hurry to
16  consummate a sale that it took the only offer on
17  the table without exploring other offers that may
18  have been forthcoming in the future."
19        What is the basis for your conclusion
20  that there may have been other offers forthcoming
21  in the future?
22    A.    That it was a pretty bad time to be
23  trying to do a merger and acquisition in this
24  particular period because of the Y2K problems

Page 101

1  coming up.  No one really knew what was going to
2  happen.  A lot of organizations were really focused
3  internally on how to deal with Y2K and probably
4  would not have been willing to consider taking on
5  somebody new.  I think once that was resolved,
6  there was a great chance there would be more
7  interest in it.
8    Q.    What empirical data are you basing your
9  decision that after Y2K, there would have been more
10  interest in acquiring OHSL?
11    A.    I have no empirical data.  That's just
12  simply my feel for what the market was at that
13  point in time; what the level of uncertainty was.
14  And the resolution of uncertainty certainly should
15  have increased interest on the part of some
16  parties.
17    Q.    You don't have any specific parties that
18  you knew would have been or would not have been
19  interested in OHSL either in 1999 or thereafter?
20    A.    Not specific parties, no.
21    Q.    Are you aware that people tried to
22  interest other banks and financial institutions in
23  OHSL?
24    A.    I assume they did, yes.

26 (Pages 98 to 101)

Page 102

1    Q.    But you don't know the specifics of
2  that?
3    A.    I do not.
4    Q.    What is the basis for your statement
5  that the board was, quote, in such a hurry to
6  consummate a sale?
7    A.    That is my opinion based on everything
8  I've read; that they wanted to get this over and
9  done with.  They wanted to finish the sale.  They
10  didn't want to wait on additional offers.  They
11  wanted to finish it up.
12    Q.    If I asked you this, I apologize.  Do you
13  you know what the performance of the OHSL stock
14  price had been in the years prior to 1999 or in
15  1997?
16        MR. BRAUTIGAM:  Objection.
17    A.    I really can't tell you that exactly.
18    Q.    Have you evaluated from a financial
19  point of view the fairness of the Provident offer
20  to OHSL?
21    A.    No.  I was not asked to do that, so I
22  didn't do that.
23    Q.    That's not part of your testimony?
24    A.    Not part of my testimony.

Page 103

1    Q.    Paragraph 24.  You state, "Given
2  testimony by individual directors..." -- and you
3  refer to a couple of them, Mr. Zoellner and
4  Mr. Brinker -- "...there is serious doubt whether
5  the members of the board of directors actually
6  understood the terms of the merger."  What's the
7  basis for that?
8    A.    There seemed to be confusion about
9  exchange ratios, confusion about what happened
10  under certain circumstances, pretty vague.
11    Q.    And that was confusion, at least
12  according to the citations here, in 2001 and 2000?
13    A.    That's correct.
14    Q.    Do you have any basis for opining that
15  these directors, in fact, did not understand or
16  were confused about the terms of this merger in
17  1999 when they were immediately before them?
18    A.    Nothing other than the testimony that I
19  saw.
20    Q.    You are familiar with the circumstance
21  where someone may understand something when it is
22  immediately before them but may forget those
23  details subsequently?
24        MR. BRAUTIGAM:  Objection.

Page 104

1    A.    I understand there is such a situation,
2  but I think this was significant enough, if they
3  really understood it, it would have stayed with
4  them better than it did.
5    Q.    What's the basis for that?
6    A.    I think it's a significant event in the
7  life of the corporation and in theirs.
8    Q.    You're not a memory expert?
9    A.    No, I'm not a memory expert --
10        MR. BRAUTIGAM:  Objection.
11    A.    -- by any stretch of the imagination.
12    Q.    The last sentence in paragraph 24,
13  "Approving a merger which they did not understand
14  represents a serious failure to carry out fiduciary
15  responsibility."
16        Again, that's based upon your
17  interpretation of what they understood as of the
18  time of their deposition?
19        MR. BRAUTIGAM:  Objection.
20    A.    Yes.
21    Q.    You have no knowledge of what they did
22  or did not understand as of the time they approved
23  this merger in 1999?
24        MR. BRAUTIGAM:  Objection.

Page 105

1    A.    Only by inference.
2    Q.    Paragraph 25 on page 6.  You talk about
3  the board, quote, withheld material information
4  from the shareholders and misrepresented the vote
5  of the board in an apparent effort to ensure that
6  the merger would succeed.
7        What's the basis for your statement that
8  this was a, quote, apparent effort to ensure the
9  merger would succeed?
10    A.    Well, it's the only reason I can think
11  of that they would have misrepresented it.
12    Q.    Did you ever see any firsthand evidence
13  of any effort to do anything to make the merger
14  succeed?  Any documents talking about that they
15  were going to do this, any testimony, that sort of
16  thing?
17        MR. BRAUTIGAM:  Objection.
18    A.    No, not at all.
19    Q.    This is, again, an inference you're
20  drawing?
21    A.    This is an inference I'm drawing.
22    Q.    The next sentence on page 7, which is
23  still part of paragraph 25, talks about a
24  definition of material information.  Do you see

27 (Pages 102 to 105)

Page 106

1  that?
2      A.   Yes.
3      Q.   Where did you get that as the source of
4  that?
5      A.   I assume it's my own.
6      Q.   In paragraph 25, you have several
7  subsections.  Do you see those?
8      A.   Yes, I do.
9      Q.   Paragraph A, "The decision to explore
10  the merger was a narrow victory for those who were
11  in favor, four to three."  What's the source of
12  that?
13     A.   Board minutes, amended complaint.
14     Q.   And have you done anything to
15  substantiate any kind of study or analysis or
16  reliance on treatises or research whether the
17  disclosure of this four to three vote, as you're
18  referring to here, would have changed the board --
19  the vote of the shareholders?
20         MR. BRAUTIGAM:  Objection.
21     A.   Again, it's an inference.  And in
22  looking at the Hewlett Packard case, what happened
23  there when it came out that particular directors
24  were opposed to the proposed transaction; that the

Page 107

1  marketplace does want information, shareholders
2  want information.
3      Q.   Have you personally studied the Hewlett
4  Packard situation?
5      A.   I read about it.  That's the extent of
6  it.
7      Q.   You read about it in --
8      A.   General business press.
9      Q.   And you read about it in Candice
10  Preston's expert report?
11     A.   May have read about it there, but also
12  read about it in Business Week at the time it was
13  going on; Wall Street Journal.
14     Q.   Did the position of Mr. Hewlett change
15  the shareholder vote?
16         MR. BRAUTIGAM:  Objection.
17     A.   I really can't say that it did, but it
18  certainly stirred up a lot of interest in what's
19  going on here and why, which I think is really what
20  information is for, just to make people consider
21  what's going on.
22     Q.   The shareholders still approved the
23  Compaq-Hewlett Packard merger, did they not?
24     A.   I believe they did.

Page 108

1      Q.   They did not go along with what
2  Mr. Hewlett communicated as his opposition?
3          MR. BRAUTIGAM:  Objection.
4      A.   But they knew about it, which I think
5  was important in reaching the decision.
6      Q.   Did Mr. Hewlett's position change the
7  terms of the deal at all?
8      A.   I don't recall in enough detail to
9  answer that.
10     Q.   My original question was, I think, other
11  than reading about the Hewlett Packard situation in
12  the general business press, do you have any study,
13  analysis, any empirical data to indicate that had
14  this vote that you talk about here been disclosed,
15  the outcome of the shareholder vote would have been
16  different?
17         MR. BRAUTIGAM:  Objection.
18     A.   No, other than my own basic experience
19  that information can change decisions.
20     Q.   Again, that's one of your inferences
21  based upon your personal experience?
22     A.   Personal experience and observation.
23     Q.   Paragraph B, "The board failed to
24  disclose that the CEO, Mr. Hanauer, who was always

Page 109

1  opposed to the merger, that he abstained on the
2  vote to pursue it, and that he changed his vote
3  only after being promised a change of control
4  contract..."  Do you see that?
5      A.   Yes, I do.
6      Q.   What's your basis that Mr. Hanauer
7  changed his vote only after being promised a change
8  of control contract?
9      A.   I guess basically that he did change his
10  vote after he got the change of control contract.
11     Q.   Did Mr. Hanauer ever testify that was
12  the reason?
13         MR. BRAUTIGAM:  Objection.
14     A.   That, I don't recall.
15     Q.   Do you recall Mr. Hanauer testified that
16  that was not involved in his decision?
17     A.   I don't recall that.
18     Q.   Below that, you've got a parenthetical
19  where you talk about Mr. Hanauer's own lawyer.
20  That's the article supposedly referring to me that
21  we talked about earlier, correct?
22     A.   That's correct.
23     Q.   I'm reading a little further down in
24  that same Section B.  "Mr. Hanauer as CEO was the

1  board member most familiar with the operations and
2  status of OHSL." What is the basis for that?
3      A.    He is the chief executive officer. He's
4  the guy who runs the company on a day-to-day basis.
5  He should know more about it than anything else.
6      Q.    That's based upon your general
7  understanding of the role of the CEO?
8      A.    Yes.
9      Q.    Is that based on any facts or analysis
10  specific to Mr. Hanauer?
11      A.    No.
12      Q.    You indicate that Mr. Hanauer voted his
13  personal shares against the merger?
14      A.    That's correct.
15      Q.    Do you know when he decided to do that?
16      A.    No, I do not.
17      Q.    You indicate that at some point in time,
18  Mr. Hanauer talked about the merger not being in
19  the shareholder's best interest. Do you recall
20  that?
21      A.    (No response.)
22      Q.    Or do you not recall that?
23      A.    I believe he was opposed to it. He
24  thought they should stay independent. My belief is

1  he was basing that on his perception of what was in
2  the best interest of the shareholders.
3      Q.    But your conclusion is that he was
4  opposed to the merger because he wanted to remain
5  independent; that's what you're opining on?
6      A.    He would think that was in the best
7  interest of the shareholders, yes.
8      Q.    Did Mr. Hanauer, to your knowledge, ever
9  tell any of the other shareholders -- any of the
10  other directors or his counsel how he intended to
11  vote his personal shares?
12      A.    I have no knowledge of what he did in
13  that vein.
14      Q.    Did you read Mr. Hanauer's testimony as
15  to whether he felt that that was a fact that should
16  have been disclosed to anybody, how he intended to
17  vote his personal shares?
18      MR. BRAUTIGAM: Objection.
19      A.    I don't recall that.
20      Q.    Do you recall whether or not Mr. Hanauer
21  ever advised counsel for OHSL about his plans, if
22  any, to vote his personal shares?
23      A.    No, I do not.
24      Q.    Do you know when he decided or when he

1  did vote his personal shares?
2      A.    When he did vote his personal shares?
3      Q.    Yes, sir.
4      A.    During the voting period.
5      Q.    But you don't know specifically?
6      A.    I don't know the exact date.
7      Q.    Do you know whether he decided to vote
8  his personal shares in any way prior to the time
9  the proxy statement was prepared and transmitted to
10  OHSL shareholders?
11      MR. BRAUTIGAM: Objection.
12      A.    I have no way of knowing that. I can
13  make an inference. If he were opposed to it, he
14  probably decided early on he was going to. That's
15  only an inference.
16      Q.    You don't know that from any specific
17  facts?
18      A.    No, I don't.
19      Q.    Paragraph C. You talk here about
20  Mr. Herron's resignation. You do state that "Even
21  though his letter of resignation did not state
22  opposition to the merger as the basis of his
23  resignation..." -- do you see that portion of the
24  sentence?

1      A.    Yes, I do.
2      Q.    So you have seen the letter?
3      A.    I've seen the letter and I've also seen
4  his affidavit and testimony where he says that as
5  well.
6      Q.    Are you aware of the legal guidelines
7  for when or under what circumstances a director's
8  resignation needs to be disclosed?
9      A.    No, I am not.
10      MR. BRAUTIGAM: Objection.
11      Q.    You state that each of the remaining
12  directors was informed that Mr. Herron was
13  resigning in protest. Do you see that?
14      A.    Yes.
15      Q.    What's the basis for that?
16      A.    Mr. Herron's testimony and affidavit.
17      Q.    Did you see the portion of Mr. Herron's
18  testimony where initially he denied that he
19  resigned in protest?
20      MR. BRAUTIGAM: Objection.
21      A.    I don't recall seeing that, no.
22      Q.    Do you recall that he changed his
23  testimony the second time around in response to
24  questioning by Mr. Brautigam?

Page 114

1      MR. BRAUTIGAM: Objection.
2   A.   Again, I don't recall all the details.
3   Q.   What do the other directors say about
4   whether or not Mr. Herron told them he was
5   resigning in protest?
6      MR. BRAUTIGAM: Objection.
7   A.   I don't recall.
8   Q.   Do you recall testimony from the other
9   directors saying that Herron never told them
10  anything like that?
11     MR. BRAUTIGAM: Objection. That's a
12  blatant mischaracterization.
13  A.   I do not recall such.
14  Q.   Paragraph D referred to here the fact
15  that "the composition of the board of directors had
16  changed." Tell me what you mean by that?
17  A.   As far as the shareholders were
18  concerned, it was a different board voting than the
19  one that they had last been informed there was
20  prior to these proxy materials being prepared.
21  There's no effort to tell the shareholders that
22  they've gone from eight directors to seven
23  directors.
24  Q.   I'm going to show you a document that

Page 115

1   you looked at, Plaintiff's Exhibit 9, which I
2   believe are the notes to the proxy statement.
3      MR. BRAUTIGAM: Can we identify that
4   more accurately for the record? It's the
5   proxy materials in draft form with Hanauer's
6   annotations.
7      MR. BURKE: I've got a better idea.
8      (Off-the-record interruption.)
9   BY MR. BURKE:
10  Q.   When you reviewed the proxy statement,
11  or at least the copy with Mr. Hanauer's annotations
12  on it, did you review the page that I'm referring
13  you to now, which looks like it's page 63?
14  A.   Yes.
15  Q.   And you know that the document states,
16  quote, The following table sets forth as of
17  July 31, 1999, information with respect to the
18  beneficial ownership of OHSL common stock by each
19  person known by OHSL to be the beneficial owner of
20  more than 5 percent of the common stock by each
21  present director of OHSL and by certain executive
22  officers of OHSL?
23  A.   Yes.
24  Q.   And you understood that this table did

Page 116

1   set forth a listing of stock ownership by each
2   present director of OHSL?
3   A.   Yes.
4   Q.   And you know that Mr. Herron was not
5   listed on this list?
6   A.   Yes.
7   Q.   And you believe that that does not
8   disclose to people the fact that Mr. Herron is no
9   longer a director?
10  A.   It's certainly not affirmative
11  disclosure.
12  Q.   But it certainly does not list him as a
13  present director as of July 31, 1999?
14  A.   No, it does not, but the document
15  nowhere discloses he is no longer a director. And
16  I think for the typical shareholder reading that,
17  they're not going to catch that.
18  Q.   And what is your basis for making
19  conclusions as to what the typical shareholder will
20  or will not catch; what is your --
21  A.   35 years of dealing with students who
22  were probably above intelligence -- average
23  intelligence above the shareholders, and they don't
24  catch details like that. People don't read

Page 117

1   documents that closely.
2   Q.   So your basis for what a reasonable
3   shareholder would or would not catch in this is
4   based upon your experience with your students?
5   A.   Yes.
6      (Attorney Hust left the deposition.)
7      (Off-the-record discussion.)
8   BY MR. BURKE:
9   Q.   Paragraph E on page 7. "The board
10  misrepresented the vote of the remaining seven
11  board members as being unanimous when it was not.
12  One board member was absent, and the chairman of
13  the board did not vote, even though he had voted
14  for the merger on July 22nd, 1999."
15     Have you read the testimony where
16  Mr. McKiernan and Mr. Brinker clearly indicated
17  they were in favor of this merger?
18     MR. BRAUTIGAM: Objection.
19  A.   I may have, but they didn't vote for it;
20  and I'm not going on the basis of the vote.
21  Q.   Do you recall reading the portion of
22  Mr. Brinker's testimony where he testified about
23  what the practice of the chairman of the board at
24  OHSL was as it related to voting?

30 (Pages 114 to 117)

Page 118

1    A.    Yes.
2    Q.    And you know that he indicated that his
3  general practice was that if there was a tie to be
4  broken, he'd vote; if there wasn't, he would not?
5    A.    There seems to be a previous vote where
6  he did vote, so it's not a rule that's followed.
7    Q.    Do you have any firsthand knowledge
8  about whether or not that was or was not a practice
9  at OHSL?
10    A.    Obviously, if it was a practice, he
11  violated it, so it wasn't a practice that was
12  followed strictly.
13    Q.    Do you know whether or not that practice
14  is evidenced by or supported by Robert's Rules of
15  Order?
16    MR. BRAUTIGAM:  Objection.
17    A.    I don't have enough familiarity with
18  Robert's Rules to answer that question.
19    Q.    You know that Mr. McKiernan was very
20  much in favor of the transaction?
21    MR. BRAUTIGAM:  Objection.
22    A.    Appears to have been, yes.
23    Q.    Paragraph 26, second sentence.  At the
24  end of that page, "they," which I believe is the

Page 119

1  OHSL board of directors, "relied solely on the
2  attorneys involved to prepare the proxy materials
3  which contained both the omissions listed above and
4  some errors such as listing..." --
5    A.    Should be two.
6    Q.    -- "...two different amounts for the
7  value of the Provident shares..."
8    What is your basis for stating that the
9  board relied solely on the attorneys involved to
10  prepare the proxy materials?
11    A.    Basically, the testimony of the various
12  directors saying the lawyers did it, the bankers
13  did it.  They said that's who they relied on.
14    Q.    Have you seen the handwritten factual
15  summaries by the members of the ad hoc committee --
16    A.    No, I have not.
17    Q.    -- that were given to Mr. Roe to provide
18  the factual background for the transaction?
19    A.    I have seen no handwritten summaries.
20    Q.    Have you seen copies of the proxies that
21  were commented upon by OHSL management?
22    A.    No, I have not.
23    Q.    Do you understand the extent to which
24  OHSL management was involved in the proxy materials

Page 120

1  as opposed to the OHSL board?
2    A.    No, I don't, no.
3    Q.    Later on paragraph 8, I think in the
4  third to last sentence, you state, "In my opinion,
5  the proxy materials contained material
6  misstatements and material omissions."  Are those
7  the --
8    MR. BRAUTIGAM:  Where are you?  You said
9  paragraph 8.
10    MR. BURKE:  Page 8, paragraph 26, third
11  to the last sentence.
12    (Off-the-record discussion.)
13  BY MR. BURKE:
14    Q.    In paragraph 26, there's a statement "In
15  my opinion, the proxy materials contain material
16  misstatements and material omissions," correct?
17    A.    Correct.
18    Q.    Is that what we have talked about
19  already on the previous page 7?
20    A.    That's correct.
21    Q.    And nothing other than those various
22  items?
23    A.    No.
24    Q.    Paragraph 27.  "In addition to the board

Page 121

1  as a whole failing to carry out its fiduciary
2  responsibilities, individual directors also failed
3  to carry out their individual fiduciary
4  responsibilities."
5    Tell me what the difference is, for
6  purposes of your opinion, between the board as a
7  whole carrying out its fiduciary duty and
8  individual directors carrying out their fiduciary
9  responsibilities.
10    A.    Basically, what the board as a whole --
11  it goes beyond what these individuals -- these
12  individuals did certain things.  The board as a
13  whole did certain things.
14    And the board's primary failure was to
15  disclose the information.  And in the case of the
16  two directors, I'm saying that they failed to
17  exercise their responsibility as directors to voice
18  their opposition and make it known, essentially.
19  There's more than that to it, but that's the
20  nutshell.
21    Q.    Are you aware of any basis in academic
22  literature for the concept of fiduciary duty as a
23  whole as opposed to individual fiduciary duties?
24    A.    I can't say that I am.

31 (Pages 118 to 121)

Page 122

1    Q.    You talk about Mr. Hanauer, and you
2  state in the first line, "Mr. Kenneth Hanauer
3  believed that the merger was not in the best
4  interest of the shareholders."  What's the basis
5  for that?
6    A.    His desire to keep the association
7  independent -- or, excuse me -- no longer an
8  association.  Sorry about that.  To keep the
9  company independent.
10    Q.    But what is the basis for your statement
11  that he believed the merger was not in the best
12  interest of the shareholder?
13    A.    That he wanted to keep it independent.
14    Q.    Have you done any analysis as to whether
15  or not it would have been better for OHSL to have
16  remained independent as opposed to merging with --
17    A.    No, I did not.
18    Q.    So whether or not he was accurate,
19  correct, or incorrect in terms of believing that it
20  was better to remain independent, you don't know
21  one way or --
22    A.    I have no opinion.
23    Q.    In paragraph B, you talk about
24  Mr. Herron?

Page 123

1    A.    Yes.
2    Q.    And you do conclude that Mr. Herron
3  failed to carry out his fiduciary responsibilities?
4    A.    Yes, I do.
5    Q.    What's the basis for that?
6    A.    I believe he had a responsibility to
7  disclose to the shareholders why he was resigning
8  if he was resigning in protest as he says he was.
9    Q.    How would he have done that?
10    A.    One way to do it would have been in the
11  letter to the board.
12    Q.    And he did not disclose any such protest
13  in that letter?
14    A.    Not in the letter, no.
15    Q.    Do you know whether or not the decision
16  of OHSL and its counsel to not disclose
17  Mr. Herron's resignation was based on the content
18  of that letter?
19    A.    I do not know that.
20        MR. BRAUTIGAM:  Objection.
21    Q.    Did you see Mr. Herron's testimony where
22  he indicated that even after he saw the proxy
23  statement and saw that his resignation was not
24  disclosed as he thought it should have been, that

Page 124

1  he never called anybody and demanded that that be
2  rectified or corrected?
3    A.    I believe that's correct.
4    Q.    Did you see the portion of Mr. Herron's
5  testimony where he indicated that he never told
6  counsel for OHSL of his supposed protest or
7  insisted that any kind of a protest be registered
8  in the board minutes?
9    A.    I'm not sure on that one.
10    Q.    Paragraph 28.  You indicate that
11  "certain members of the board seem to have been
12  determined to sell OHSL Financial Corporation
13  whatever the obstacle..."  Who were you talking
14  about there?
15    A.    Members of the ad hoc committee, and
16  Mr. Brinker as well seems to have been very
17  determined to do this.
18    Q.    And the ad hoc committee members we
19  talked about earlier, correct?
20    A.    Yes.
21    Q.    And you did not review either Mr. Hucke
22  or Mr. McKiernan's deposition in detail?
23    A.    Not in detail, no.
24    Q.    So what they felt on that topic is not

Page 125

1  something that you have studied in any depth?
2    A.    Not in great depth, no.
3    Q.    Have you ever read the testimony or read
4  anything in the testimony of any of the directors,
5  such as Mr. Hucke, Mr. Brinker, Mr. McKiernan,
6  Mr. Tenoever, the others -- other than Mr. Herron
7  and Mr. Hanauer that you talked about -- in which
8  they state that they did not believe that this
9  merger was not in the best interest of the
10  shareholders?
11    A.    No, I have not.
12    Q.    In fact, every one of them stated that,
13  in their view, it was in the best interest of the
14  shareholders?
15    A.    I believe that's correct.
16    Q.    Is there a reason why you chose not to
17  believe that that was truly what they felt?
18        MR. BRAUTIGAM:  Objection.
19    A.    No, and I don't think I've testified to
20  that effect either.
21    Q.    Have you studied the OHSL-Provident
22  merger in sufficient detail to understand that
23  there were clear reasons why a merger with
24  Provident was in the best interest of OHSL

Williams & Oliver
(513)683-9626

Page 126

1  shareholders?
2       MR. BRAUTIGAM: Objection.
3       A.   I have not studied that aspect of it.
4  That's not my charge.
5       Q.   That's not part of your opinion?
6       A.   No.
7       Q.   Paragraph 29. Off the record.
8       (A brief break was taken.)
9  BY MR. BURKE:
10      Q.   Paragraph 29. In this sentence, you
11  refer to "hidden material information." Do you see
12  that phrase?
13      A.   Yes.
14      Q.   Again, that is the various pieces of
15  information that are identified on paragraph 7?
16      A.   Correct.
17      Q.   I said paragraph 7. I meant page 7.
18      A.   Page 7, whatever paragraph it is.
19      Q.   Paragraph 25.
20      A.   Okay.
21      Q.   You state that you "believe that had the
22  material information been available in and
23  misrepresentation of the board's vote removed from
24  the proxy material, the outcome of the shareholder

Page 128

1       A.   I honestly don't recall.
2       Q.   Other than what Mr. Thiemann said, have
3  you done any studies, analysis, any other kind of
4  research or surveys to substantiate your conclusion
5  that had certain material been disclosed, the
6  outcome of the shareholder vote would have been
7  different?
8       A.   Only thing I can say there is the
9  closeness of the vote made me believe that
10  additional information probably would have defeated
11  it.
12      Q.   But have you done anything else --
13      A.   Have I done any empirical study? No, I
14  have not. I have not polled the shareholders or
15  anything like that.
16      Q.   Have you, in your academic experience,
17  seen any studies or come across any studies where
18  the authors in a scientific manner have calculated
19  or attempted to analyze impacts on shareholder
20  votes or what would change shareholder votes?
21      A.   No, I have not.
22      Q.   And no such study is the basis for your
23  report?
24      A.   No.

Page 127

1  vote would have been different."
2       What is the basis for your statement
3  that "the outcome of the shareholder vote would
4  have been different"?
5       A.   We already have at least one shareholder
6  saying had he known this, it would have changed
7  40,000 votes, and I'm sure it would have raised
8  questions in the minds of many others.
9       Q.   You did not read the deposition of
10  Mr. Thiemann?
11      A.   Not in detail, no. I glanced at it.
12      Q.   Were you ever made aware in the course
13  of your work that Mr. Thiemann had a personal
14  financial plan to sell off OHSL Financial shares?
15      A.   No, I do not know that.
16      Q.   Did you understand that he utilized the
17  merger as the opportunity to actualize that plan?
18      MR. BRAUTIGAM: Objection.
19      A.   I do not know anything in that vein.
20      Q.   Other than what you talked about earlier
21  in looking at what Mr. Thiemann said, was that in
22  his deposition or was that in an affidavit?
23      MR. BRAUTIGAM: Objection.
24      Q.   If you know.

Page 129

1       Q.   Paragraph 31. You talk about, "In
2  summary, my conclusion is that the board of
3  directors of the OHSL Financial Corporation failed
4  to carry out its fiduciary responsibilities in the
5  handling of the merger of that entity with
6  Provident Financial Group, Incorporated."
7       In your testimony today, have we gone
8  over all the bases for that conclusion?
9       MR. BRAUTIGAM: Objection.
10      A.   To the best of my recollection at this
11  point.
12      Q.   That's fine. Were there any articles in
13  the field of economics of finance that you relied
14  upon or utilized in the purpose or in connection
15  with preparing your expert report?
16      A.   Nothing directly.
17      MR. BURKE: I believe, Mr. Walker, that
18  we are concluded. I appreciate your time and
19  your efforts today. Thank you so much. If
20  you come back, what time are you coming back?
21      MR. BRAUTIGAM: 1:30.
22      MR. BURKE: I probably will not be here.
23      (A break was taken for lunch.)
24

33 (Pages 126 to 129)

Page 130

1    AFTERNOON SESSION
2    (Attorney Burke not present. Jason
3    Cohen is present.)
4    DIRECT EXAMINATION
5    BY MR. BRAUTIGAM:
6    Q.    Good afternoon, Dr. Walker. As you
7    know, my name is Michael G. Brautigam, and I
8    represent Walter Thiemann, Gary and Lisa Meier, and
9    a putative class of OHSL shareholders.
10    Dr. Walker, do you believe that your
11    testimony would assist the trier of fact in
12    understanding the role of the board of directors in
13    a public company and your opinion that they
14    breached their fiduciary duties?
15    MR. COHEN: Objection, leading.
16    A.    Yes, I do.
17    Q.    Why do you believe that?
18    A.    Well, I think I can give a perspective
19    of what a board is supposed to do, what their
20    responsibilities are, what was expected of a board.
21    Q.    And do you believe that without your
22    testimony, the trier of fact, in this case the
23    jury, might find that to be confusing; in other
24    words, they might not have an inherent knowledge of

Page 131

1    the role of a board and what the board's fiduciary
2    duties are?
3    MR. COHEN: Objection, leading.
4    A.    I believe that to be true.
5    MR. COHEN: Foundation.
6    Q.    Dr. Walker, I also understand that you
7    have taught intermediate accounting at the college
8    level; is that correct?
9    A.    I taught in a training program for a
10    bank. It was a college level course, but it wasn't
11    actually taught within the university.
12    Q.    And you're familiar with GAAS and GAAP?
13    A.    I have a working knowledge. I don't
14    have a detailed knowledge.
15    Q.    And you're familiar with the phrase
16    restatement, correct?
17    A.    Yes, I am.
18    Q.    And you're familiar with the phrase
19    materiality as accountants use the term, correct?
20    A.    Yes, I am.
21    Q.    Dr. Walker, is it your opinion that GAAP
22    requires the restatement of materially misstated
23    financials?
24    MR. COHEN: Objection, leading.

Page 132

1    A.    Yes, it is.
2    Q.    Is it your opinion that GAAP prohibits
3    the restatement of immaterially misstated
4    financials?
5    MR. COHEN: Same objection.
6    A.    Yes, it is.
7    Q.    Dr. Walker, let me direct your attention
8    to the proxy materials. Provident provided
9    financial information on pages 6 and 7 --
10    MR. COHEN: Can we say what exhibit this
11    is, Mike?
12    MR. BRAUTIGAM: This is Exhibit 9.
13    BY MR. BRAUTIGAM:
14    Q.    Were OHSL shareholders expected to rely
15    in part on the financial information that Provident
16    provided in the proxy materials?
17    MR. COHEN: Objection, foundation.
18    A.    Yes, they were.
19    Q.    Do we now know that that information was
20    wrong?
21    MR. COHEN: Objection, foundation.
22    A.    Yes. They were restated.
23    Q.    My next question is: How do we know
24    that?

Page 133

1    A.    There was a restatement because of an
2    error in treatment of certain transactions.
3    Q.    Dr. Walker, you testified with respect
4    to Gateway. Do you remember that testimony from
5    this morning?
6    A.    Yes, I do.
7    Q.    And was the Gateway situation in some
8    ways similar to Oak Hills, at least in the sense
9    that it was a conversion from a mutual company to a
10    stock company?
11    A.    Yes. It was a conversion from mutual to
12    stock.
13    Q.    Did you draw in part upon your
14    familiarity with Gateway in rendering your opinions
15    here?
16    A.    Yes, I would say I did.
17    Q.    Now, Dr. Walker, I understand that you
18    taught at what you described as a savings and loan
19    school for a number of years?
20    A.    University of Oklahoma. When I was
21    there, I ran a resident school for savings and loan
22    officers. It was a program where they came in for
23    two weeks, I can't remember whether it was two or
24    three consecutive years, and they received a

34 (Pages 130 to 133)

Page 134

1   certificate at the end of that program.
2       Q.   What were some of the topics that were
3   taught at that savings and loan school?
4       A.   That was a wide range of topics. Some
5   accounting, some financial statement analysis, some
6   aspects of lending analysis, some aspects of ways
7   to raise deposits. Just generally running the
8   savings and loan association, which at that time,
9   almost all in that part of the company were
10  mutuals.
11      Q.   Dr. Walker, you testified that given
12  your other duties and responsibilities, that you
13  agreed to accept this expert assignment because you
14  felt in part that it was an interesting case?
15      A.   That's correct.
16      Q.   Could you please explain your answer
17  more fully.
18      A.   Well, there are two parts to the answer.
19  One, once I looked at the facts, I thought they
20  were pretty interesting to see what was going on.
21          The other is just -- a general interest
22  topic right now in academics and in the business
23  world is the role and responsibility of the board
24  and how they carry that out.

Page 135

1           And I probably have a stronger interest
2   in that than a lot of people do because that was
3   the same Ph.D. program with Ken Lay, and my
4   daughter worked for Enron until September before
5   they went under. So I had a pretty good look at
6   what happens when things go astray.
7       Q.   Why did you think that the facts were
8   particularly interesting in this case?
9       A.   Well, I think the interesting aspect was
10  you had one of these transaction situations where
11  you had gone from a mutual to a stockholder-owned
12  entity. In my opinion, the board really didn't
13  make that type of transaction. They're still
14  thinking of it as their mutual association.
15      Q.   Dr. Walker, you also testified with
16  respect to corporate responsibility and ethics when
17  Mr. Burke was asking the questions this morning.
18  Do you remember that testimony?
19      A.   I remember the topic. I don't remember
20  exactly what was said.
21      Q.   Well, among other things, you said that
22  although you had not taught a course specifically
23  in corporate responsibility or in ethics, that they
24  were covered in your courses. I think you

Page 136

1   described it as being pieces of your courses. Does
2   that refresh your recollection?
3       A.   That's correct.
4       Q.   Can you amplify what it means when you
5   say corporate responsibility and ethics were pieces
6   of courses that you've taught?
7       A.   Well, obviously, one of the issues is
8   that we're trying to teach ethics to business
9   students. One of the places where we focus on,
10  particularly in the finance classes, is the ethical
11  responsibilities of the corporate directors to
12  represent the interest of the shareholders.
13      Q.   When you say you're trying to teach
14  ethics in the business school, why are you trying
15  to do that?
16      A.   Well, obviously, there has been a lot of
17  unethical behavior in business in recent years, and
18  huge amounts of publicity. And you'll find a
19  strong push among, certainly, all the accredited
20  business schools to increase the focus on ethical
21  behavior on the part of their students.
22          We've gone as far as -- even within our
23  MBA program, we now require that all students sign
24  an honor agreement that they will behave ethically

Page 137

1   within the program; trying to really drive the idea
2   home.
3       Q.   Do you make a distinction between
4   corporate responsibility and ethics?
5       A.   Well, there is -- the ethics tend to be
6   more individual and corporate responsibility is
7   institutional; but in order for the corporation to
8   be responsible, you have to have ethical behavior
9   by the individuals being involved. So they're
10  closely tied.
11      Q.   And you've taught both?
12      A.   Talked about both in my classes.
13      Q.   Dr. Walker, you're familiar with the
14  phrase fiduciary duty, correct?
15      A.   Yes.
16      Q.   Could you just give me a rough
17  definition of it, please?
18      A.   A very rough definition of a fiduciary
19  is someone who represents the interest of another;
20  puts their well-being or benefit first in making
21  decisions.
22      Q.   Can you frame your answer with respect
23  to the responsibility of a corporate board of a
24  public company?

35 (Pages 134 to 137)

Page 138

1    A.    A corporate board of a public company --
2   the board as a whole, the directors individually --
3   have a responsibility to represent shareholder
4   interest.
5    Q.    Now, Dr. Walker, you have an opinion
6   you've expressed in your expert report and in your
7   testimony today that the OHSL board collectively
8   and individually did not fulfill its fiduciary
9   obligations to the shareholders; is that correct?
10       MR. COHEN:  Objection, leading.
11   A.    That's correct.
12   Q.    And is that in part because of their
13  production of the proxy materials which you have a
14  version of in front of you, Plaintiff's Exhibit 9,
15  it's also Defendant's Exhibit 1 without
16  Mr. Hanauer's connotations?
17       MR. COHEN:  Objection, leading.
18   A.    It's based on the proxy materials --
19  partially based on the proxy materials.
20   Q.    What do you believe that the OHSL board
21  did wrong?  Can you please summarize that?
22   A.    Well, in terms of content of the proxy
23  material, it didn't disclose what I consider to be
24  material information; information that shareholders

Page 139

1   should have had in order to make a decision.
2        It did not disclose that the decision
3   had been discussed with negative ramifications,
4   that some of the directors initially opposed it.
5        The final vote was presented as
6   unanimous when it really was not.  You had those
7   voting for it, but you had other directors who did
8   not vote.  You also had a director who had resigned
9   who was in opposition to the merger, and that
10  resignation really was not disclosed.
11   Q.    Dr. Walker, you're familiar with the
12  word unanimously as it's used in common usage,
13  correct?
14   A.    Correct.
15   Q.    And do you believe that the use of the
16  word unanimously to refer both to the OHSL
17  directors' vote and their supposed unanimous belief
18  that the merger was in the best interest of OHSL
19  shareholders is incorrect?
20   A.    Yes, I do.
21       MR. COHEN:  Objection, leading.
22   Q.    Dr. Walker, when you agreed to accept
23  this expert assignment or any other expert
24  assignment, is there a requirement that you suspend

Page 140

1   common sense in forming your conclusions?
2    A.    Obviously not.
3    Q.    And you did not do so in this case,
4   correct?
5    A.    No.
6    Q.    You're not holding yourself out as an
7   expert in plain language, and you're not claiming
8   to have advised the SEC with respect to plain
9   language in proxy materials and other public
10  disclosures as Dr. Lutz has, correct?
11   A.    That's correct.
12   Q.    But you believe that, based on
13  everything you've testified to today, you're still
14  able to form an opinion that unanimously, as it's
15  used in the proxy materials and specifically on the
16  first page of the proxy materials, is used with the
17  intention of misleading the OHSL shareholders; is
18  that correct?
19       MR. COHEN:  Objection, leading,
20   foundation.
21   A.    I would have to say yes.
22   Q.    Dr. Walker, let me direct your attention
23  to this sentence, which I will read into the
24  record:  "Your board of directors unanimously

Page 141

1   approved the acquisition and believes that it is in
2   the best interest of OHSL stockholders."  Do you
3   see that?
4    A.    Yes, I do.
5    Q.    Do you believe that that sentence
6   embraces two different concepts?
7        MR. COHEN:  Objection, leading.
8    A.    In other words, you're really asking me
9   what unanimously modified.  I think it modifies
10  both approved and believes.
11   Q.    Do you believe that there's a
12  distinction between a transaction being fair and a
13  transaction being in the best interest of
14  shareholders?
15   A.    Yeah.  There's circumstances where it
16  could very definitely be a difference.
17   Q.    Can you explain your answer, please.
18   A.    Well, fair simply means it is a
19  transaction where both parties are getting
20  approaching what is market value in this particular
21  case.
22        And in the best interest, it would be
23  that it also -- that that holds in the future; in
24  other words, it might be in the best interest of

36 (Pages 138 to 141)

Page 142

1  the shareholders of Oak Hills to vote to remain
2  independent because of the potential increase in
3  the value even though it is a fair transaction.
4      Q.    Now, Dr. Walker, we talked a little bit
5  previously about the Cincinnati Business Courier
6  article, which has been previously marked as
7  Plaintiff's Exhibit 1.
8          Mr. Burke is quoted, without quotation
9  marks, as saying: "Burke's response, Hanauer
10 opposed the Provident takeover because he wanted
11 Oak Hills to remain independent," period, "but he
12 also believed the transaction was fair to
13 shareholders." You've seen that, correct?
14     A.    Yes, I have.
15     Q.    Does that embrace the two different
16 concepts that we were talking about?
17     A.    Yes, I think so.
18     Q.    Do you believe that Mr. Hanauer's
19 opposition to the merger should have been disclosed
20 to the shareholders even if he believed the
21 transaction was fair?
22         MR. COHEN:  Objection, speculation,
23     foundation, leading.
24     A.    Yes, I do believe that because I think

Page 143

1  the shareholders are entitled to know what the
2  views of a director are.  And I think it's
3  particularly pertinent in the case of Mr. Hanauer
4  since he was the CEO.
5          He was the only officer on the board.
6  He was the person most familiar with the operation
7  of OHSL.  He was probably the person that the
8  typical shareholder depositor looked to for
9  information and leadership.
10     Q.    Dr. Walker, your testimony with respect
11 to that question sounds very similar to
12 Ms. Preston's testimony, which you've reviewed,
13 correct?  Actually, her report.
14     A.    Her report, yes.
15     Q.    Do you disagree with any of
16 Ms. Preston's conclusions?
17     A.    Not that I can think of.
18     Q.    You also reviewed Dr. Lutz' report on
19 plain English, correct?
20     A.    Correct.
21     Q.    Do you disagree with any of Dr. Lutz'
22 conclusions?
23     A.    No.
24     Q.    Dr. Walker, I'd like to direct your

Page 144

1  attention to the July 22nd, 1999, OHSL shareholder
2  vote.  Let me refresh your recollection with
3  respect to some of the things that happened at that
4  vote.
5          (A), Mr. Hanauer abstained; (B),
6  Mr. Herron voted against continued negotiations
7  with Provident; and (C), Mr. Brinker affirmatively
8  voted in favor of the merger.  Are you with me?
9      A.    Yes.
10     Q.    Is that consistent with your
11 recollection of the events?
12     A.    Yes, it is.
13     Q.    Dr. Walker, do you believe that at this
14 July 22nd, 1999, OHSL special meeting of the board
15 that Mr. Hanauer violated his fiduciary duties to
16 the shareholders by abstaining?
17         MR. COHEN:  Objection, foundation,
18     leading.
19     A.    If, as he indicated himself, he was
20 opposed to the transaction, yes, he did.  He has a
21 duty to vote his belief on the effect on the
22 shareholders.
23     Q.    Dr. Walker, you've reviewed the
24 consolidated and amended complaint, correct?

Page 145

1      A.    Correct.
2      Q.    Do you remember seeing testimony very
3  similar to what you've just said from KMK attorneys
4  Mark Weiss and Tim Matthews in substance that if
5  Mr. Hanauer did not believe the merger was in the
6  best interest of OHSL shareholders, that he had an
7  affirmative fiduciary duty to vote against the
8  merger?
9      A.    Yes, I do recall that, and I completely
10 agree with it.
11     Q.    So Dr. Walker, as the plaintiff's
12 expert, you're actually agreeing with at least two
13 KMK transactional attorneys; is that right?
14         MR. COHEN:  Objection, leading.
15     A.    I would assume so.
16     Q.    Dr. Walker, is there any hint of dissent
17 in the proxy materials?
18     A.    Proxy materials present everything as
19 unanimous.
20     Q.    Dr. Walker, did you ever see in
21 Mr. Hanauer's testimony that at one time, at least,
22 he referred to the OHSL board as, quote, old,
23 tired, and scared?
24     A.    Yes, I did.

37 (Pages 142 to 145)

Page 146

1    Q.    In general, do you agree with
2  Mr. Hanauer's observation?
3          MR. COHEN:  Objection, foundation.
4    A.    I don't know whether I can comment on
5  the scared part, but it does look like the board
6  was old and tired and was not really doing what
7  they should do as a board to review transactions to
8  keep up with what was going on, particularly with
9  regard to this transaction, because I don't think
10 they really understood the merger.  And it's pretty
11 clear from testimony that they did not understand
12 that they were responsible for the content of the
13 proxy materials.
14    Q.    Do you believe that both those things --
15 understanding the merger, at least in broad
16 strokes, and understanding who was responsible for
17 the proxy materials -- are essential to fulfilling
18 the fiduciary duties of the board?
19    A.    Yes, I believe they are.
20    Q.    That's pretty basic stuff, correct?
21    A.    I think it's very basic.  I think any
22 director has an obligation to understand the
23 business, understand any transactions in which
24 they're involved.  How can they make a decision

Page 147

1  they don't understand?
2    Q.    Dr. Walker, you testified this morning
3  with respect to the business judgment rule.  Do you
4  remember that subject coming up generally?
5    A.    Yes, I do.
6    Q.    Dr. Walker, have you been retained or
7  are you offering an opinion with respect to whether
8  or not this is a good or a bad transaction for the
9  OHSL shareholders?
10    A.    I have not been asked to comment on
11 that.
12    Q.    Please explain the difference to the
13 trier of fact as to the difference between it being
14 a good transaction or a bad transaction and what
15 your opinion is really on.
16    A.    My opinion is, regardless of whether it
17 was a fair transaction or not, the board's conduct
18 violated their fiduciary responsibilities and that
19 they did not disclose information that a
20 shareholder would like to have had making a
21 decision.
22          They did not disclose the opposition;
23 they did not disclose resignation of the director;
24 they did not disclose -- that it really was not

Page 148

1  unanimous.
2    Q.    And do you believe that was required of
3  the board to fulfill their fiduciary duties?
4    A.    Yes, I do.
5    Q.    Why?
6    A.    At the interest of the shareholders, I
7  think -- and in putting things to a shareholder
8  vote, I think you have to provide the shareholders
9  with accurate information.
10    Q.    Is that view generally accepted in the
11 academic business community?
12    A.    Certainly in the academic business
13 community.
14    Q.    Is that view generally accepted among
15 corporate boards?
16    A.    I would say in general, certainly to the
17 lip service; and I think more and more, we're
18 seeing that direction being taken by corporate
19 boards.  They're making more efforts to be open,
20 transparent, and convey the information necessary,
21 if nothing else because of changes in the law.
22    Q.    Now, Dr. Walker, Mr. Burke often asked
23 you this morning with respect to various topics if
24 you had conducted a study or any analysis or

Page 149

1  research treatises, conducted research, or if you
2  had any empirical data, among other things, with
3  respect to some of the conclusions you've reached
4  such as your belief that the OHSL board of
5  directors violated their fiduciary duties.  Do you
6  remember that coming up?
7    A.    Yes, I do.
8    Q.    And generally speaking, you said that
9  you didn't do those things.  You didn't conduct
10 studies; you didn't do any quantitative analysis;
11 you didn't research treatises; you didn't perform
12 much research; and you don't have any empirical
13 data.  Do you remember that testimony?
14    A.    Yes, I do.
15    Q.    Why not?
16    A.    Well, basically, what I'm looking at
17 here in some ways is just common sense; and others,
18 it reflects things that I have studied, researched
19 for 35 years.
20          I'm relying on personal experience.  I'm
21 relying on broad reading in the area of business.
22 I continually read Wall Street Journal, Fortune,
23 Business Week.  You name it, whatever comes up in
24 that area.

38 (Pages 146 to 149)

Page 150

1    I follow the Financial Press very
2 carefully. I keep up with all the developments in
3 the academic area in which I teach, finance. And
4 these have been very hot topics in recent years.
5    Q.    So Dr. Walker, is it fair to say that,
6 in addition to your role in the ivory tower, if you
7 will, you step down and read everyday business
8 publications, such as the Wall Street Journal or
9 Business Week.
10    And you've consulted with corporate
11 boards; you've attended corporate board meetings.
12 So at least from time to time, you have a foot in
13 the business world as well as in the academic
14 world; is that correct?
15    MR. COHEN:  Objection, leading.
16    A.    That's correct.
17    Q.    Do you believe that is a good background
18 that prepares you to assist the trier of fact in
19 rendering your opinions?
20    MR. COHEN:  Objection, leading
21 foundation.  At this point, I am just going to
22 make a continuing objection to leading and
23 foundation, and I'm going to take off.
24    (Off-the-record discussion.)

Page 151

1    (Attorney Cohen left the deposition.)
2 BY MR. BRAUTIGAM:
3    Q.    Dr. Walker, can you please direct my
4 attention to where the date August 27th, 1999, is
5 in reference in the proxy materials?
6    A.    I don't think it's there anywhere.
7    Q.    It's not there, is it?
8    A.    No, it's not.
9    Q.    Mr. Burke this morning attempted to
10 suggest that the OHSL board had really unanimously
11 approved the merger on August 27th, 1999, as
12 opposed to the referenced date in the proxy
13 materials, August 2nd, 1999.
14    If that's true, do you believe that that
15 would be an adequate fulfillment of the fiduciary
16 duties of the OHSL board?
17    A.    No.
18    Q.    Why not?
19    A.    It's an after-the-fact, basically
20 irrelevant action, because they were proceeding
21 based on the August 2nd vote.  The only reason I
22 can see for the August 27th would be window
23 dressing to make things look a little better, like
24 it really was a unanimous vote.

Page 152

1    Q.    Dr. Walker, the merger agreement is
2 included in the proxy materials, correct?
3    A.    Yes, it is.
4    Q.    And that's signed by representatives of
5 OHSL and Provident, correct?
6    A.    Correct.
7    Q.    And the date of that signed merger
8 agreement is August 2nd, 1999, correct?
9    A.    Correct.
10    Q.    And the merger was announced on August
11 2nd or August 3rd, 1999, correct?
12    A.    Correct.
13    Q.    Under what circumstances would it be
14 appropriate for representatives of a company to
15 sign a merger agreement on August 2nd, announce it
16 to the investing public on August 2nd or 3rd, and
17 allegedly ratify the agreement unanimously 25 days
18 later?
19    A.    I go back to my previous answer, that
20 ratification is just pure window dressing to try to
21 make things look better because they had already
22 claimed it was a unanimous vote, and now they're
23 trying to put one on the record.
24    Q.    And when you say that "they already

Page 153

1 claimed that it's a unanimous vote," it's your
2 belief that this vote was, in fact, not unanimous,
3 correct?
4    A.    That's correct.
5    Q.    Dr. Walker, as part of your
6 administrative duties at the University of
7 Cincinnati as an associate dean, you often
8 participate in committee meetings, correct?
9    A.    Far more than I would like to.
10    Q.    And in fact, minutes are kept at some of
11 these committee meetings, correct?
12    A.    That's correct.
13    Q.    What constitutes a unanimous vote at
14 these committee meetings?
15    A.    It varies with the committee, but for
16 the -- probably the most prominent is those present
17 and voting.  By that, I mean those who -- everybody
18 there has to vote for it.  If anybody abstained,
19 then it's no longer unanimous.  If anybody votes
20 against it, obviously it's not unanimous.
21    Q.    If someone is not there, that would be
22 reflected in the minutes, correct?
23    A.    That would be reflected.
24    Q.    Now, the OHSL and Provident defendants

Page 154

1   have suggested in court filings that the vote on
2   August 2nd, 1999, really was unanimous because it
3   was five to nothing. Do you agree with that?
4      A.   Not when there were seven people
5   present.
6      Q.   Actually, Dr. Walker --
7      A.   Excuse me, six people present. Seven
8   directors. There were six people present. One was
9   not there, one did not vote, so it was not
10  unanimous.
11     Q.   Why?
12     A.   Everybody didn't vote for it. Unanimous
13  means as one. If you say the board votes
14  unanimously, you're saying every board member voted
15  for it.
16     Q.   Do you believe that that's information
17  that a reasonable shareholder would be interested
18  in having?
19     A.   Yes, I do.
20     Q.   Why?
21     A.   It tells them that at least some people
22  were not strongly enough in favor of the merger to
23  vote for it.
24     Q.   Do you have Mr. Brinker in mind?

Page 155

1      A.   I don't have anybody in mind who
2   actually did not vote. Mr. Brinker, if he
3   abstained, clearly I have him in mind.
4      Q.   Is it your understanding that
5   Mr. Brinker did abstain at the August 2nd, 1999,
6   vote?
7      A.   That's what I have read, yes.
8      Q.   And do you believe that that is a change
9   in vote from his affirmative vote in favor of on
10  July 22nd, 1999?
11     A.   It's definitely a change.
12     Q.   Do you believe that this information
13  should have been disclosed?
14     A.   I think it should have.
15     Q.   Why?
16     A.   Again, shareholders need to know how the
17  directors are voting. They need to know if there
18  really is unanimous support. Whether he changed
19  his mind or simply changed his vote is irrelevant.
20  The information should be disclosed.
21     Q.   Dr. Walker, this morning, you testified
22  with Mr. Burke a little bit about the HP-Compaq
23  merger. Do you remember that topic generally?
24     A.   Yes, I do.

Page 156

1      Q.   When you used that as an example, did
2   that come up spontaneously, or do you recall that
3   from Ms. Preston's expert report?
4      A.   I really can't say whether I recall it
5   from her report, but I do recall reading about it
6   in the press. I do know that it was quite the hot
7   topic for a while, and it may be that reading her
8   report triggered me to think about it again. I
9   can't really say that. I can't say that it didn't
10  either.
11     Q.   Do you believe that Mr. Hewlett's
12  opposition -- his active opposition to the merger
13  with Compaq -- had an affect on the shareholder
14  vote?
15     A.   It certainly caused some people to take
16  a second look and reassess their position. It may
17  not have affected the outcome. In fact, I don't
18  think it did. But it did cause some people to
19  reassess, and I'm sure some people did change their
20  vote.
21     Q.   So if it didn't affect the outcome, why
22  do you think it's relevant?
23     A.   Well, let me transfer this over to Oak
24  Hills. Oak Hills was a very narrow vote in support

Page 157

1   of the merger. It wouldn't take many votes being
2   changed to reverse it. And I think in the case of
3   HP, the vote was much closer than it originally
4   would have been without the opposition from
5   Hewlett.
6      Q.   Whether Mr. Hanauer's opposition and
7   other factors would have changed the terms of the
8   merger or affected the ultimate outcome of the
9   merger, do you believe that the shareholders were
10  entitled to full and complete information?
11     A.   Yes, I believe in complete transparency.
12     Q.   Why do you believe that?
13     A.   Shareholders make decisions based on
14  available information. The more information they
15  have, the better decision they can make.
16     Q.   Why isn't it okay to just deem all of
17  this stuff irrelevant if you believe that the
18  merger would have gone through anyway?
19     A.   Just in general principle, the issue of
20  disclosure is very important. You have to disclose
21  information to shareholders.
22          But to respond to your answer a little
23  differently, I don't really think that it is
24  irrelevant. I think had that information been

40 (Pages 154 to 157)

Page 158

1  known, it's quite likely that the outcome would
2  have been reversed.
3     Q.    Dr. Walker, how can you say that when
4  you didn't conduct a survey of the approximately
5  900 OHSL shareholders?
6     A.    Well, I've seen testimony of at least
7  one shareholder who would have voted 40,000 shares
8  differently; and negative information is clearly
9  going to influence some people. I can't tell you
10  exactly how many, but I think it would have been a
11  sizable number.
12     Q.    Dr. Walker, when you undertook this
13  assignment, why did you not attempt to contact some
14  or all of these 900 shareholders and take a poll or
15  do a study or do something?
16     A.    I did -- well, one, I really didn't view
17  that within the scope of what I was asked to do
18  because I was asked to comment on the conduct of
19  the directors, not on the outcome of the merger.
20           And for another perspective, just my
21  knowledge of how information affects valuation and
22  decisions and markets would make me think that it
23  would clearly have an effect on some people.
24           When you add in that you have at least

Page 159

1  one person saying "I would have voted my 40,000
2  shares differently," then I think the likelihood of
3  the outcome being reversed is quite high.
4     Q.    Dr. Walker, you testified with respect
5  to McDonald Investments earlier today. Do you
6  remember that subject coming up?
7     A.    Yes, I do.
8     Q.    And McDonald Investments served as the
9  investment banker for the transaction. Do you
10  remember that?
11     A.    That's correct.
12     Q.    Did McDonald Investments have an
13  incentive to have some type of merger go through?
14     A.    Certainly. Investment banking firms get
15  a fee for their studies, but they also get a piece
16  of the deal whenever it goes through, some
17  percentage or payment based on the consummation of
18  the merger. If it doesn't go through, they make
19  less.
20     Q.    In this case, they'd make a lot less,
21  correct?
22     A.    I don't know the exact figures, but it
23  was fairly substantial.
24     Q.    Their compensation was only fairly

Page 160

1  substantial if a merger went through, correct?
2     A.    The difference is fairly substantial
3  from what they would have gotten had it gone
4  through and had it not gone through.
5     Q.    Dr. Walker, you understand that
6  litigation was instituted against the merger in
7  state court in 1999, correct?
8     A.    Yes, I do.
9     Q.    And you understand that the plaintiffs
10  in that action had sought an injunction, correct?
11     A.    Correct.
12     Q.    And you further understand that the
13  injunction was denied, correct?
14     A.    That's correct.
15     Q.    Is it your belief that the injunction
16  was denied in part upon the oral argument made to
17  the court in opposition to the injunction?
18     A.    That's my understanding.
19     Q.    Is it also your understanding that
20  Mr. Burke represented to the state court that the
21  vote of the OHSL board of directors in favor of the
22  merger with Provident was unanimous?
23     A.    Yes, that's my understanding.
24     Q.    And it's your opinion that that is not a

Page 161

1  true statement, correct?
2     A.    That is not a true statement.
3     Q.    Is it also your understanding that
4  Mr. Burke represented to the state court judge that
5  McDonald Investments had solicited six offers, six
6  bids, and that Provident's was the highest?
7     A.    I heard that that's what was said, yes.
8     Q.    If that was said by Mr. Burke, was that
9  true?
10     A.    Not from what I've been able to gather
11  reading the testimony and the minutes. I believe
12  that Provident was the only actual offer.
13     Q.    So if Provident was the only actual
14  offer, it would be wrong to say that there were six
15  bids and that Provident's was the highest, correct?
16     A.    That's correct. It would be totally
17  wrong.
18     Q.    Why?
19     A.    Well, if there's only one bid, it can't
20  be the best of six.
21     Q.    Dr. Walker, let's go back to Robert's
22  Rules of Order. Do you understand that Robert's
23  Rules of Order generally talk about the chairman of
24  the board voting only in circumstances where a tie

41 (Pages 158 to 161)

Page 162

```
 1  needs to be broken?
 2    A.   My understanding.
 3    Q.   Do you know whether or not the OHSL and
 4  Provident defendants have cited to, I believe, the
 5  Tenth Edition, which was published in 2000, as
 6  somehow affecting this 1999 transaction?
 7    A.   Don't think that works.
 8    Q.   Let's talk about two votes:  July 22nd,
 9  1999, and August 2nd, 1999.  With respect to
10  Mr. Brinker's affirmative vote at the first
11  meeting, July 22nd, 1999, can you do the math --
12  did a tie need to be broken at that point?
13    A.   No.
14    Q.   But it's your understanding that
15  Mr. Brinker affirmatively voted, correct?
16    A.   Yes.
17    Q.   Does that suggest to you that the board
18  was not using Robert's Rules of Order, or at least
19  not using it consistently?
20    A.   That's correct.
21    Q.   Let's fast forward to the August 2nd,
22  1999, special meeting.  Is it your understanding
23  that Mr. Brinker did not vote?
24    A.   Yes.
```

Page 163

```
 1    Q.   Do you consider that to be an
 2  abstention?
 3    A.   I don't know whether you're calling it
 4  an abstention or just a not vote.  It depends on
 5  how it's set up.
 6    Q.   Is there any difference in your mind
 7  between a formal abstention and simply not voted?
 8    A.   In some circumstances, yes, because if
 9  you ask -- someone who doesn't want to vote will
10  ask to be recorded as an official abstention.
11    Q.   What about in these circumstances?
12    A.   I don't think that he did.  It looks to
13  me like it's a non-vote, but I'm not sure of that.
14    Q.   You're familiar with the background of
15  the acquisition as it appears in the proxy
16  materials, correct?
17    A.   Yes.
18    Q.   Let me direct your attention to one
19  specific section.  Would you read that paragraph to
20  yourself.  It's the paragraph on page 20 from July
21  22nd, 1999, to August 2nd, 1999.
22    A.   Yes.  (Examining document.)  Okay.
23    Q.   Do you see where that section refers to
24  the OHSL board?
```

Page 164

```
 1    A.   Yes.
 2         (A brief break was taken.)
 3  BY MR. BRAUTIGAM:
 4    Q.   Dr. Walker, have you had opportunity to
 5  read that paragraph to yourself?
 6    A.   Yes, I have.
 7    Q.   Did the composition of the OHSL board
 8  change in this period from July 22nd, 1999, to
 9  August 2nd, 1999?
10    A.   Yes, it did.  Tom Herron resigned prior
11  to the August 2, 1999, meeting.
12    Q.   Is that disclosed in that sentence, in
13  that paragraph, or anywhere else in the proxy
14  materials?
15    A.   It's not disclosed in that paragraph or
16  sentence.  It's not disclosed affirmatively
17  anywhere in the proxy materials.
18    Q.   Do you believe that in this context,
19  that's misleading?
20    A.   Yes, I do.
21    Q.   Why?
22    A.   Well, the implication here is that the
23  same board voted both times, but it usually refers
24  to the OHSL board.  It says nothing about "as
```

Page 165

```
 1  constituted at that particular point" or anything
 2  else.  It just says that the board voted on July
 3  22nd, and the board voted on August 2nd.
 4    Q.   And do you believe that the production
 5  and dissemination of proxy materials that don't
 6  disclose what you just said is a violation of the
 7  fiduciary duties of the OHSL directors?
 8    A.   Yes, I do.  I think it's relevant
 9  information, or if you prefer, material
10  information.  It could have had an affect on
11  shareholder votes.
12    Q.   Whether or not it had an affect on any
13  actual shareholder vote, is that something that you
14  believe a reasonable shareholder would want to
15  consider in arriving at his or her decision as to
16  how to vote on the merger?
17    A.   Certainly I believe they would want to
18  know that that happened and would like to explore
19  why that happened.
20    Q.   Mr. Burke asked you a question this
21  morning about the mental capacity of the directors,
22  and the thrust of his question was that you didn't
23  meet these directors in 1999, so you're unable to
24  form an opinion with respect to their mental state
```

42 (Pages 162 to 165)

Page 166

1   in 1999. Do you remember that testimony generally?
2     A.   Yes, I do.
3     Q.   Now, some of the depositions you
4   reviewed are from 2000, correct?
5     A.   That's correct.
6     Q.   And some of the depositions that you
7   reviewed are from 2004; is that correct?
8     A.   That's correct.
9     Q.   Without being an expert on mental
10  capacity and decline due to aging or other things,
11  do you have any reason to believe that these
12  directors were substantially more aware of what was
13  going on in 1999 than they were in 2000 and 2004?
14     A.   No, I don't.
15     Q.   Why not?
16     A.   Well, those in 2000 were fairly close to
17  the event, and not a lot of time had passed, and I
18  wouldn't think there had been significant
19  deterioration. 2004 is a little bit more
20  problematic, but still, there's nothing to indicate
21  to me that there was a substantial decline.
22     Q.   Dr. Walker, you talked about the OHSL
23  board functioning almost as a club. Do you
24  remember that testimony?

Page 167

1     A.   Yes, I do.
2     Q.   What did you mean by that?
3     A.   Some of the references were made
4  "getting together with the boys"; the apparent
5  heavy nepotism involving Brinker's children in the
6  situation.
7         They just seemed to think of themselves
8  as the old neutral association board, not as
9  directors of a public company. That's an issue
10  that happened frequently with these S&L
11  conversions.
12         The board that had been there when they
13  were mutual really didn't grasp the
14  responsibilities when they become public
15  corporations.
16     Q.   How do you know that?
17     A.   Well, I mentioned earlier that I was a
18  shareholder in Gateway after they converted, and I
19  did sell out fairly quickly, and that was one of
20  the reasons; and I observed other instances of this
21  as well.
22     Q.   Dr. Walker, do you know what it means
23  when someone is said to have left money on the
24  table?

Page 168

1     A.   Yes, I do.
2     Q.   What does that mean?
3     A.   Means there's money you could have
4  picked up in some way. Maybe you exercise a stock
5  option, maybe you sell something for a higher price
6  -- you could have sold it for a higher price -- you
7  can use it in a lot of different contexts.
8     Q.   I understand that as you sit here today,
9  you don't remember whether or not you saw
10  Mr. Herron's resignation letter; is that correct?
11     A.   I know what the context -- I don't know
12  if I saw it or read it. He said he was resigning
13  for travel reasons and otherwise.
14     Q.   Did Mr. Herron's resignation letter also
15  indicate that he was leaving money on the table?
16     A.   He said he was not going to exercise his
17  stock options, which is leaving money on the table.
18     Q.   And you have since read Mr. Herron's
19  2004 affidavit, correct?
20     A.   Correct.
21     Q.   And what did he say about his reasons
22  for leaving money on the table in his resignation
23  letter?
24     A.   The whole thing was -- he did not want

Page 169

1  to embarrass the board members because his father
2  had been a director for a number of years, and he'd
3  known these people for a number of years, and he
4  didn't feel he should profit from exercising these
5  options, and he left.
6     Q.   Do you believe that Mr. Herron's
7  decision to leave money on the table is somehow
8  significant to the opinions you're offering in this
9  case?
10     A.   Yes, I do.
11     Q.   Why?
12     A.   I think had he been resigning for the
13  reason he really said he was, he probably would
14  have exercised those options. And I think he left
15  because he was opposed to the merger and he didn't
16  want to benefit indirectly from it.
17         MR. BRAUTIGAM: Let's go off the record.
18  BY MR. BRAUTIGAM:
19     Q.   Dr. Walker, let's talk about
20  Mr. Herron's golden parachute. You know what that
21  phrase means?
22     A.   Herron's?
23     Q.   Excuse me. Mr. Hanauer's golden
24  parachute.

43 (Pages 166 to 169)

Page 170

1    A.   Yes, I do.
2    Q.   You know what that phrase means,
3  correct?
4    A.   Certainly. Get paid off if the
5  organization ceases to exist.
6    Q.   And that's sometimes referred to as a
7  change of control contract, correct?
8    A.   Correct.
9    Q.   Is it your understanding that
10 Mr. Hanauer's change of control contract calling
11 for the payment of $375,000 to him was finalized at
12 some point between July 22nd, 1999, and August 2nd,
13 1999?
14   A.   That's my understanding.
15   Q.   Is it also your understanding that
16 Mr. Hanauer testified that this had no affect, or
17 words to that effect, on his decision to change his
18 vote from abstain to in favor of?
19   A.   Yes, I am.
20   Q.   Is it your opinion that that testimony
21 should be taken with a grain of salt?
22   A.   Yes, I think it should be taken with a
23 grain of salt because $375,000 is a pretty good
24 reason to say, Yeah, I'll go along with it.

Page 172

1  "transparency."
2    Q.   What do you mean by that phrase?
3    A.   That nothing is hidden. Everything is
4  out in the open. The shareholders know what
5  information the board had and certainly how the
6  board voted. These are their representatives.
7  They'd like to know how they're being represented.
8    Q.   Dr. Walker, in your previous answer, you
9  used the phrases "nothing is hidden" and
10 "everything is out in the open."
11        How would you respond to the defendants
12 who suggested that the shareholders don't need to
13 get bogged down in minutiae; and in fact, if some
14 of these things were disclosed, for example
15 Mr. Herron's resignation, that it would only
16 confuse them?
17   A.   I don't buy it.
18   Q.   Can you amplify that answer?
19   A.   Well, it might confuse shareholders, but
20 that may be what's necessary in this case to make
21 them reconsider the issue; what's actually going
22 on.
23        Failure to disclose that information is
24 disguising what's actually happening, and I think

Page 171

1    Q.   Do you recall seeing in Mr. Hanauer's
2  testimony something about the ramification of
3  dissenting votes in the context of the merger
4  transaction?
5    A.   I can't say that I do.
6    Q.   Are you familiar with the general
7  concept of the ramifications of dissenting votes in
8  the M&A context?
9    A.   Yes, I am.
10   Q.   Please tell me what your understanding
11 of the ramification of dissenting votes is in this
12 context.
13   A.   Well, dissenting votes clearly indicate
14 that at least some voting members think there's a
15 reason not to do it.
16   Q.   Dr. Walker, let me stop you. That's
17 only true if the dissenting votes are disclosed,
18 correct?
19   A.   It won't have any affect if it's not
20 disclosed.
21   Q.   Please continue.
22   A.   It should be disclosed. Shareholders
23 need to know there is dissension. They need full
24 information. I'll use the phrase I've used before,

Page 173

1  the shareholders have the right to know how this
2  process proceeds.
3        It's not unusual to see opposition to a
4  merger or transaction change over time as the terms
5  of the merger change; but in this particular case,
6  there only seems to be just a change in vote and
7  nothing else.
8    Q.   Dr. Walker, do you believe that you're
9  qualified to be an expert in economic damages or in
10 valuation?
11   A.   Certainly.
12   Q.   And you weren't asked to do that in this
13 case, correct?
14   A.   No, I was not.
15   Q.   Dr. Walker, do you also believe that you
16 could opine on, generally, the meaning and purpose
17 of proxy materials?
18   A.   Yes, I think I can.
19   Q.   But you weren't asked to do that?
20   A.   No.
21   Q.   Please summarize again what you
22 understand your assignment was.
23   A.   Basically, I was to look at whether or
24 not the Oak Hills board of directors met their

44 (Pages 170 to 173)

Page 174

1  fiduciary responsibilities by properly representing
2  the interest of shareholders in this particular
3  transaction.
4    Q.   Was this a particularly difficult
5  assignment?
6    A.   No, I didn't think it was.
7    Q.   Why not?
8    A.   Because the paper trail in this case
9  pretty well indicates that they did not.
10    Q.   Do you believe that this is in any sense
11  a close call?
12    A.   No, I do not.
13    Q.   Why not?
14    A.   Just too much evidence that things were
15  covered up, things weren't disclosed; that
16  apparently, the directors really didn't even
17  understand their responsibilities in some cases; a
18  question of whether a number of them even actually
19  understood the terms of the merger.
20       They don't seem to have understood their
21  responsibility in preparing the proxy materials or
22  at least overseeing the preparation of the proxy
23  materials.
24    Q.   Do you believe in the fulfillment of

Page 175

1  their fiduciary duties, it was necessary for the
2  OHSL board to understand their responsibilities in
3  overseeing the publication and dissemination of the
4  proxy materials?
5    A.   Yes, I do. It goes out over the
6  signature of the chairman of the board. So
7  basically, the board is endorsing whatever goes
8  out. They should understand it. If they don't
9  understand it, they shouldn't endorse it.
10    Q.   Do you believe that Mr. Brinker's
11  signature on the first page of the proxy materials
12  constitutes an endorsement?
13    A.   Yes, I do.
14    Q.   Would you expect Mr. Brinker to either
15  have written that first page himself or to know how
16  it came to be created?
17    A.   He certainly should know how it came to
18  be created and know the content and agree with it.
19    Q.   Dr. Walker, have you seen one of
20  OHSL's public documents that were sent to the
21  shareholders from the time OHSL was a public
22  company from 1993 to 1999?
23    A.   I suggest I've seen some.
24    Q.   And the documents you've seen, did they

Page 176

1  both have Mr. Brinker's signature as chairman of
2  the board and Mr. Hanauer's signature as the chief
3  executive officer?
4    A.   Yes, they did. This is the only
5  document I've seen with only Mr. Brinker's
6  signature.
7    Q.   And is that true in the entire six-year
8  history of OHSL as a public company?
9    A.   I can't say for sure. The only ones I
10  have seen had both signatures.
11    Q.   Is that of any particular significance
12  to you?
13    A.   My understanding is that Mr. Hanauer
14  actually wanted his name taken off of it; that he
15  had originally signed it or was going to sign it,
16  and then did not want his name on it.
17    Q.   Actually, I think his signature was
18  initially electronically affixed.
19    A.   Electronically affixed. I assume that
20  Mr. Brinker's was as well.
21    Q.   Is Mr. Hanauer's decision to have his
22  signature removed from the proxy materials of any
23  particular importance to you in rendering your
24  opinions?

Page 177

1    A.   I think it is in light of the other
2  evidence that I've seen, particularly.
3    Q.   What do you mean by that?
4    A.   Well, he, himself, said that he was
5  opposed to it; his counsel said that he was opposed
6  to it; and he voted his shares against it. I think
7  it was just confirming he didn't want his name on
8  something he didn't support even though he had
9  voted for it.
10    Q.   Dr. Walker, do you believe that with
11  respect to Mr. Herron's participation on the OHSL
12  board and his leaving the board, that it was
13  obvious from the circumstances that he was against
14  the merger?
15    A.   I would say so. He had voted against
16  it, and he resigned just prior to the board
17  approving it. And in doing so, he cost himself
18  money by not exercising the option. And the reason
19  he offered for resignation, travel, was irrelevant.
20  If the OHSL board ceased to exist, there were no
21  meetings to attend.
22    Q.   Dr. Walker, do you believe that
23  Mr. Hanauer's opposition to the merger was obvious
24  at least to the OHSL board and to their counsel,

45 (Pages 174 to 177)

Page 178

```
1   Dinsmore & Shohl, from the circumstances?
2      A.    Yes, I do.
3      Q.    Why?
4      A.    Initial votes against it; statements
5   that --
6      Q.    Do you mean abstaining?
7      A.    No.  He voted against the initial study.
8   He was --
9      Q.    Oh, okay, but not specifically against
10  the OHSL-Provident merger?
11     A.    No.  His opposition was -- he basically
12  wanted to stay independent, and I think that
13  carried all the way through, which gave him
14  opposition to the particular merger as well as
15  just, in general, to not remaining independent.
16     Q.    Now, Dr. Walker, the OHSL and Provident
17  defendants collectively, and some of the individual
18  directors at Provident, have suggested that
19  Mr. Hanauer was torn between his fiduciary duties
20  as a board member and his personal belief that he
21  wasn't ready to retire at 50.  Do you have any
22  comment on that?
23     A.    I can see that there's a possibility.
24  Actually, there were three issues here.  He's a
```

Page 179

```
1   board member, he is a significant shareholder, and
2   he is an officer of the company.
3          And I can see that there should be some
4   differences, but his primary responsibility as a
5   board member is to represent the interest of the
6   shareholders.  And his indication, at least as far
7   as I can determine, was he didn't think it was the
8   thing the company should do.
9      Q.    Dr. Walker, you're aware that
10  Mr. Hanauer voted his 123,075 against the merger,
11  correct?
12     A.    Yes, I am.  At least as an individual
13  shareholder, he opposed it.
14     Q.    Do you believe that that vote should
15  have been disclosed to OHSL shareholders?
16     A.    I think he had a responsibility to the
17  shareholders to let them know that he did not
18  approve of the merger.  If that involves telling
19  them that he wasn't going to vote for it, yes.
20        MR. BRAUTIGAM:  No further questions.
21       (DEPOSITION CONCLUDED AT 2:37 P.M.)
22
23        _____
24          MICHAEL C. WALKER, Ph.D.
```

Page 180

```
1              CERTIFICATE
2   STATE OF OHIO       :
3                       : SS
4   COUNTY OF HAMILTON  :
5          I, Kelly Green, the undersigned, a duly
6   qualified and commissioned Notary Public within and
7   for the State of Ohio, do hereby certify that
8   before the giving of the aforesaid deposition, the
9   said MICHAEL C. WALKER, Ph.D., was by me first duly
10  sworn to tell the truth; that the foregoing is a
11  deposition given at said time and place by the said
12  MICHAEL C. WALKER, Ph.D.; that said deposition was
13  taken in all respects pursuant to Notice as to the
14  time and place; that said deposition was taken by
15  me in stenotype and transcribed by computer-aided
16  transcription under my supervision; and that
17  examination and signature to the transcribed
18  deposition is not waived.
19          I further certify that I am not a
20  relative, employee of, or attorney for any of the
21  parties in the above-captioned action; I am not a
22  relative or employee of an attorney of any of the
23  parties in the above-captioned action; I am not
24  financially interested in the action; I am not, nor
```

Page 181

```
1   is the court reporting firm with which I am
2   affiliated, under a contract as defined in Civil
3   Rule 28(D).
4          IN WITNESS WHEREOF, I hereunto set my
5   hand and official seal of office at Cincinnati,
6   Ohio, this 3rd day of February, 2005.
7
8
9   My commission expires:      Kelly Green
10  August 9, 2009      Notary Public/State of Ohio
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

46 (Pages 178 to 181)