# Exhibit F
# Preston Transcript

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                     SOUTHERN DISTRICT OF OHIO

4                          WESTERN DIVISION

5        ----------------------------X

6    WALTER W. THIEMANN, et al.,

7                   Plaintiffs,

8              vs.                    Case No. C-1-00-793

9    OHSL FINANCIAL CORP., et al.,

10             Defendants.

     ----------------------------X

11

12

13

14              DEPOSITION OF CANDACE L. PRESTON

15                   New York, New York

16                Friday, October 22, 2004

17

18

19

20

21

22

23   Reported by:

     Thomas R. Nichols, RPR

24   JOB NO. 165884

25

Page 2

1
2
3
4
5
6                    October 22, 2004
7                         9 a.m.
8
9           Deposition of CANDACE L. PRESTON,
10   held at the offices of Esquire
11   Deposition Services, 216 East 45th
12   Street, New York, New York, pursuant to
13   Notice, before Thomas R. Nichols, a
14   Registered Professional Reporter and a
15   Notary Public of the State of New York.
16
17
18
19
20
21
22
23
24
25

Page 3

1
2    A P P E A R A N C E S :
3
4    GENE MESH & ASSOCIATES
5    Attorneys for Plaintiffs
6         2605 Burnet Avenue
7         Cincinnati, Ohio 45219-2502
8    BY:   MICHAEL G. BRAUTIGAM, ESQ.
9
10   KEATING, MUETHING & KLEKAMP PPL
11   Attorneys for Defendants OHSL Financial
12   Corp. and Provident
13        1400 Provident Tower
14        One East Fourth Street
15        Cincinnati, Ohio 45202-3752
16   BY:   JAMES E. BURKE, ESQ.
17
18   SCHROEDER MAUNDRELL BABIERE & POWERS
19   Attorneys for Defendants Dinsmore & Shohl
20   and Clifford Roe
21        11935 Mason Road, Suite 110
22        Cincinatti, Ohio 45249
23   BY:   ROBERT S. HILLER, ESQ.
24
25

Page 4

1                    Preston
2          (Preston Exhibit 1, Notice,
3        premarked for identification, this date.)
4    C A N D A C E   P R E S T O N , having
5        been duly sworn by a Notary Public, was
6        examined and testified as follows:
7    EXAMINATION BY
8    MR. BURKE:
9        Q.   Good morning, Ms. Preston.  How are
10   you?
11       A.  Fine, thank you.
12       Q.   My name is Jim Burke.  I am
13   representing the Provident and OHSL defendants
14   in this matter and we're here in the case of
15   Thiemann versus OHSL Financial Corporation,
16   which is pending in the federal court in
17   Cincinnati, Ohio.
18           You've been deposed before, haven't
19   you?
20       A.  I have.
21       Q.   So I don't have to give you the
22   usual admonitions.  I will suggest to you that
23   as you know you're testifying as an expert
24   witness.
25           We have received a copy of your

Page 5

1                    Preston
2    expert report and we'll be talking about that
3    today.
4           To the extent after today you do any
5    more work, conduct additional review of
6    materials, reach any more conclusions, we want
7    to know about that, because the purpose of an
8    expert deposition is to understand precisely
9    what you're going to testify to at trial.
10          So to the extent you review
11   additional depositions of other experts or
12   other materials, please advise Mr. Brautigam
13   so he can tell us, and if necessary we may
14   want to depose you again on that additional
15   work.  Is that all right?
16       A.  I understand.
17       Q.   Will you do that, if you do
18   additional work, notify Mr. Brautigam?
19       A.  I will.
20       Q.   Let me show you what we have marked
21   as Preston Deposition Exhibit 1.  And this is
22   a notice of deposition that was served earlier
23   this week.
24           Did you get a chance to see that?
25       A.  I did.

Page 6

**Preston**

1
2    Q.  This is being taken by notice and
3  agreement.  There were some document requests
4  in there.  In discussions with Mr. Brautigam
5  though I made it clear that I wasn't looking
6  for you to regurgitate your whole file and
7  bring it here.
8        I was just looking to see whether or
9  not you had materials that either were not
10  depositions, pleadings or otherwise made part
11  of the public record in this case already that
12  related to your testimony.
13       Do you have any such materials?
14    A.  I do.
15    Q.  Would you at least show me what you
16  have?
17    A.  Sure.
18       MR. BRAUTIGAM:  Jim, for the record,
19  I want to point out that I believe this
20  notice in addition to being completely
21  unnecessary, is intentionally misleading
22  for the reasons that I stated yesterday.
23       MR. BURKE:  That's fine.
24    Q.  Do you want to generally describe
25  for me what this consists of?

Page 7

1              Preston
2    A.  This consists – if you don't mind,
3  I'm just going to open it and we'll go through
4  it so we're not –
5    Q.  Please do.
6    A.  This consists of articles regarding
7  OHSL, Provident, articles regarding investors
8  or directors leading or opposing mergers.
9       It's press releases regarding the
10  companies here.  Some of the academic articles
11  that I cited in my report are here.  Backup
12  data for a regression analysis I did is here.
13    Q.  That's great.  The articles
14  regarding investors or directors leading and
15  opposing mergers, is that information that was
16  cited in your report?
17    A.  There may be other articles beyond
18  which was cited.
19       MR. BURKE:  We might as well get
20  everything out of the way at once.  Let
21  me ask the reporter to mark that as
22  Preston 2, and this is Preston 3.
23       (Preston Exhibit 2, Preliminary
24  Expert Report of Candace L. Preston, CFA,
25  dated May 1, 2002, marked for

Page 8

1              Preston
2  identification, this date.)
3       (Preston Exhibit 3, Preliminary
4  Expert Report of Candace L. Preston, CFA,
5  dated August 30, 2004, marked for
6  identification, this date.)
7    Q.  Can you identify for me what Preston
8  Exhibit 2 is?
9    A.  Preston Exhibit 2 is a report that I
10  submitted in this matter in May of 2002.
11    Q.  What is Preston Exhibit 3?
12    A.  Preston Exhibit 3 is a report in
13  this matter that I submitted in August of this
14  year.
15    Q.  Am I correct that Preston Exhibit 3,
16  the August 30 report, supersedes Exhibit 2 and
17  contains the latest most up-to-date summary of
18  your opinions in this matter?
19    A.  That's correct.
20    Q.  Were there matters on which you
21  opined in Preston Exhibit 2 that you later
22  learned were no longer issues in this case?
23    A.  Yes.
24    Q.  For example, there was something
25  about the staleness of the fairness opinion.

Page 9

1              Preston
2  Do you remember that?
3    A.  I do.
4    Q.  Do you remember there was also an
5  issue regarding -- I'm blanking, excuse me --
6  change in control contracts?
7    A.  I don't recall.  Maybe.
8    Q.  Do you remember at some point in
9  time some of the opinions you expressed in
10  Preston Exhibit 2 were mooted by virtue of the
11  fact that claims relating to those factual
12  issues were dismissed?
13    A.  That's correct.
14    Q.  What is your home address, ma'am?
15    A.  152 Westcott Road, W-e-s-t-c-o-t-t,
16  Princeton, New Jersey.
17    Q.  And your business address is at FMA
18  on the card you gave us?
19    A.  It is, yes.
20    Q.  Just for the record, what is that
21  business address?
22    A.  600 Alexander Road, Princeton,
23  New Jersey.
24    Q.  You're presently employed by
25  Financial Markets Analysis, LLC?

3 (Pages 6 to 9)



Page 10

1       Preston
2       A.  Correct.
3       Q.  Can you give me a description of
4   what that company is and what it does?
5       A.  Financial Markets LLC is a valuation
6   company.  We do valuations regarding fairness
7   opinions, options that may be issued in
8   compensation or valuations prior to companies
9   going public and in litigation support such as
10  this.
11      Q.  How big a company is Financial
12  Markets in terms of the number of employees?
13      A.  Technically I suppose there's four
14  employees, but earlier you asked me if I was
15  employed by them.  I am not really.  I am an
16  owner, but I'm not employed by them.
17      So there are four employees, three
18  owners.  Seven professionals.
19      Q.  Do you work for them on sort of an
20  independent contractor basis?
21      A.  Correct.
22      Q.  Are you one of the founders of
23  Financial Markets?
24      A.  I am.
25      Q.  When did you found that company?

Page 11

1       Preston
2       A.  2000.
3       Q.  And who were the partners?  Who were
4   the other two owners?
5       A.  Michael Marek, M-a-r-e-k, and Bjorn,
6   B-j-o-r-n, Steinholt.  S-t-e-i-n-h-o-l-t.
7       Q.  How much of the business of
8   Financial Markets Analysis is in litigation
9   support as opposed to the other services you
10  talked about?
11      A.  Probably about 75 percent.
12      Q.  Do all seven of the individuals that
13  are involved with the company provide expert
14  testimony?
15      A.  No.
16      Q.  Do the three owners?
17      A.  Yes.
18      Q.  And the other four employees are
19  more of in a support role?
20      A.  Yes.
21      Q.  If you know, how much of the
22  litigation support done by Financial Markets
23  Analysis is on the plaintiff's side versus the
24  defense side?
25      A.  It varies from -- over time.

Page 12

1       Preston
2   Recently It's probably been 60/65 percent for
3   plaintiffs, 35 to 40 percent for defendants.
4       Q.  35 to 40 percent?
5       A.  Yes, I think those add up.  Yes.
6       Q.  If you look at -- when I refer to
7   your report, I'll be referring to Preston
8   Exhibit 3, which I think is sort of the
9   current version of your testimony.
10      If you would, turn to your resume.
11      A.  Yes.
12      Q.  Which is I guess it's Exhibit A to
13  your report which is Preston 3.  As you sit
14  here today, to the best of your knowledge is
15  this accurate and complete?
16      A.  It is.
17      Q.  At the bottom it summarizes your
18  educational history.  Those accurately reflect
19  the degrees you have earned?
20      A.  That's true.
21      Q.  Have you received any training,
22  educational training, even though it didn't
23  result in a degree, subsequent to 1985?
24      A.  I got my charter subsequent to that.
25      Q.  That's down below, professional

Page 13

1       Preston
2   designations, "Chartered Financial Analyst"?
3       A.  Yes.
4       Q.  Tell me what that is.
5       A.  A chartered financial analyst is the
6   term used to refer to somebody who earns a
7   charter from what used to be the AIMR.  It's
8   recently -- that was the Association for
9   Investment Management and Research.  It's
10  changed its name to something easier, the
11  Institute of Chartered Financial Analysts now.
12      But it was, it's a, you achieve it
13  through a course of study of over three years
14  where you take three successively more
15  rigorous exams.  Having passed those, you
16  receive the designation of Chartered Financial
17  Analyst.
18      Q.  And in general, what does the course
19  of study for, to become a chartered financial
20  analyst focus on?
21      A.  Finance.
22      Q.  Does it deal with investment
23  management?
24      A.  Yes.
25      Q.  Investment advisory services?

4 (Pages 10 to 13)

Page 14

Preston

1
2    A.  Yes.
3    Q.  Have you ever performed professional
4    investment management or investment advisory
5    services?
6    A.  No.
7    Q.  What aspect of your professional
8    work does your CFA training relate to?
9    A.  All the valuation work I do.
10   Q.  I take it you're not an accountant
11   or a CPA.
12   A.  I am not.
13   Q.  Have you ever taken courses in that
14   area, you know, that were heading towards
15   obtaining a CPA --
16   A.  No.
17   Q.  -- designation?
18       MR. BRAUTIGAM:  Objection to the
19   form of the question.
20   Q.  You're not a lawyer?
21   A.  No.
22   Q.  Have you sat on the board or on the
23   audit committee of a public company?
24   A.  No.
25   Q.  Have you sat on the board of a

Page 15

Preston

1
2    privately owned company?
3    A.  I don't think so.
4        MR. BRAUTIGAM:  Off the record.
5        (Discussion off the record.)
6    Q.  Let's talk a little bit about your
7    employment history, starting with NewMarkets
8    in 1980.
9    A.  Yes.
10   Q.  Tell me a little bit about what
11   NewMarkets was.
12   A.  Well, it's summarized pretty much
13   right here.  It was a management consulting
14   firm.  We specialized in market and business
15   planning.  It was done for new ventures, some
16   turnaround.
17       We developed business plans,
18   projections and marketing plans for either
19   divisions of big companies, small companies.
20   Q.  What was your position at
21   NewMarkets?
22   A.  I was a senior consultant.
23   Q.  What specifically did your work
24   focus on?
25   A.  I didn't develop marketing plans.

Page 16

Preston

1
2    But I did all the valuation work and all the
3    business planning.
4    Q.  In connection with your valuation
5    work are there standard treatises, guidelines,
6    generally accepted methodologies that you rely
7    upon in performing valuation work?
8        MR. BRAUTIGAM:  Objection.
9    A.  Yes.
10   Q.  What would those be?
11   A.  Well, it would depend on what the
12   purpose one was performing such valuation work
13   for.
14   Q.  In general, what treatises do you
15   find authoritative?
16   A.  In general one would look at in
17   performing valuation work where you were doing
18   a bottoms-up valuation, one would do a
19   discounted cash flow.
20       Depending on the business, you might
21   be looking at certain multiples of, you know,
22   if it was a real estate business, it might be
23   rent.  It might be a lot of different things.
24   It would depend on the situation.
25   Q.  Frequently an investment banker

Page 17

Preston

1
2    analyses of transactions and mergers, you'll
3    have a discounted cash flow analysis.  You'll
4    have an asset analysis.
5        Are you familiar with those types of
6    valuations as well?
7    A.  Yes.
8    Q.  How big a company was NewMarkets?
9    A.  It was about eight people.
10   Q.  And why did you leave them in 1985?
11   A.  I had a great opportunity at
12   Princeton Venture Research.
13   Q.  Explain for me what Princeton
14   Venture Research was.
15   A.  Princeton Venture Research was a
16   small investment banking and consulting firm.
17   I started there as a senior analyst and became
18   executive vice president over that time
19   period.
20       And we did things very similar to
21   what I now do at Financial Markets Analysis.
22   Q.  Was this the first time you began to
23   do litigation support when you went to
24   Princeton Venture Research?
25   A.  It was.

5 (Pages 14 to 17)

Page 18

Preston

1
2    Q.  Were you one of the founders of
3    Princeton Venture Research?
4        A.  No.
5        Q.  How large a group was that in terms
6    of people?
7        A.  When I joined it it was probably
8    about five or six and it grew to about fifty.
9        Q.  What kind of litigation support work
10   did you do at Princeton Venture Research?
11       A.  We did work in securities class
12   action, bankruptcies, contract disputes.
13       Q.  What kind of analyses?
14       A.  It would depend on the individual
15   situation.
16       Q.  For example, with your securities
17   class actions, were you generally doing damage
18   type analysis or something different?
19       A.  Generally damage analysis.
20       Q.  Did you usually do it for the
21   plaintiff's side or for the defense side?
22       A.  Usually for the plaintiff's side.
23       Q.  I know we have got a list of your
24   cases back here and I don't want to, you know,
25   draw on your recollection too much or test

Page 19

Preston

1
2    your recollection too much, but while at
3    Princeton approximately how many securities
4    class actions were you involved in, rough
5    order magnitude?
6        A.  Hundreds.
7        Q.  Mostly on the plaintiff's side?
8        A.  Mostly.
9        Q.  Were you at Princeton Venture
10   Research when you did your work in connection
11   with the Antar actions?
12       A.  I was at Princeton Venture Research
13   when I worked on one of the Antar cases.
14   Subsequently to leaving Princeton Venture
15   Research, the SEC hired me to work on another
16   one of the cases.
17       Q.  You were at Princeton Venture
18   Research for thirteen years.
19       A.  Yes.
20       Q.  Why did you leave Princeton Venture
21   Research?
22       A.  I founded Triumph Partners.
23       Q.  What was Triumph Partners?
24       A.  Triumph Partners is again a very
25   similar consulting firm to Financial Markets

Page 20

Preston

1
2    Analysis.
3        Q.  What was the principal focus of your
4    work at Triumph Partners?
5        A.  Valuations.
6        Q.  How much was litigation support?
7            When you say valuations, do you
8    include your litigation support work?
9        A.  Yes.
10       Q.  OK.  How much of your work was in
11   the litigation support area while you were at
12   Triumph Partners from '98 to 2000?  Just '98,
13   I'm sorry.
14       A.  Well, that's when I was working with
15   the SEC.  So I would say the vast majority of
16   it.
17       Q.  Was there a reason why you left
18   Princeton Venture Research to go with Triumph
19   Partners?  Was it in connection with your SEC
20   engagement?
21       A.  No.
22       Q.  How many people were at Triumph
23   Partners?
24       A.  Two.
25       Q.  You and who else?

Page 21

Preston

1
2        A.  Michael Marek.
3        Q.  In general, what's Mr. Marek's area
4    of specialization?
5        A.  Valuations.
6        Q.  Similar to yours?
7        A.  Very similar.
8        Q.  Ms. Preston, I think you indicated
9    that while you were at Triumph Partners the
10   majority of your work was devoted to working
11   with the SEC on the Antar matter.
12       A.  Certainly that comprised a
13   significant portion of my time.  I don't know
14   as it was the majority of my time, but in
15   trying to be responsive to you, I looked at --
16   well, I know a spent a lot of time on that.
17   So taking that into account, the majority of
18   my time would have been on litigation matters.
19       Q.  Was this in connection with the SEC
20   enforcement action against that group of
21   companies?
22       A.  There was the -- yes, against the
23   family.
24       Q.  Did you testify in court in that
25   matter?

6 (Pages 18 to 21)

```
1              Preston
2     A.  I did.
3     Q.  Where was that case pending?
4     A.  In northern -- I don't think it's
5  called the northern district of New Jersey.
6  If you look at my CV.  It might be too long
7  ago.  The New Jersey district court that sits
8  in Newark.
9     Q.  What was the focus of your testimony
10 for the SEC?  Was it damage analysis?
11    A.  Yes.  Well, it was the value of the
12 Crazy Eddie stock throughout a, I think it was
13 a three-year period or something like that.
14    Q.  And this was the value of the Crazy
15 Eddie stock at a time when it had been
16 inflated by the activities of the company?
17    A.  Yes.
18    Q.  What was the outcome of that
19 situation, the SEC action?
20    A.  It was heard by the judge, Judge
21 Ackerman, and he affirmed my valuation.
22    Q.  Why did you leave Triumph Partners?
23    A.  I had a great offer.  Actually, at
24 the time I took the job it was at Patricof
25 Capital.
```

```
1              Preston
2     Q.  Peppercof (phon)?
3     A.  Patricof, P-a-t-r-i-c-o-f.
4     Q.  What was the nature of the offer?
5     A.  To become a managing director there
6  in charge of valuations and special financial
7  services.
8     Q.  Your resume does not list Patricof.
9  Can you explain that?
10    A.  Patricof was Patricof for probably
11 about six months and then it was bought by the
12 Bank of New York.
13    Q.  After Patricof was acquired by the
14 Bank of New York what was your job title
15 there?
16    A.  The same thing, managing director.
17 The job did not change.
18    Q.  Generally speaking, what was the
19 focus of your duties and responsibilities
20 while at Bank of New York and Patricof?
21    A.  Providing fairness opinions,
22 valuations and mergers in acquisitions.  I
23 looked at executive compensation.  There was
24 some estate planning involved and some
25 litigation.
```

```
1              Preston
2     Q.  You continued to do some litigation
3  support while at Bank of New York?
4     A.  I did.
5     Q.  How much of your time was the
6  litigation support?
7     A.  Five to 10 percent.
8     Q.  The majority of your time was
9  devoted to the other tasks you've described?
10    A.  It was.
11    Q.  What was the nature of the
12 litigation support activities you did at Bank
13 of New York?
14    A.  It was damage analysis.
15    Q.  For plaintiff or defense?  If you
16 remember.
17    A.  I don't remember.
18    Q.  That's fine.  Why did you leave the
19 Bank of New York?
20    A.  It was a two-hour each way commute.
21    Q.  And after that you formed Financial
22 Markets Analysis with your other partners?
23    A.  I did.
24        So it was two hours each way.
25    Q.  I see.  I take it you've never
```

```
1              Preston
2  served in an internal accounting function in
3  any of the jobs you held, compiling internal
4  financial statements?
5     A.  I have not.
6     Q.  Have you ever held a job in internal
7  audit, any of that sort?
8     A.  No.
9     Q.  Have you ever been retained to
10 advise the board of directors of a company in
11 connection with merger acquisitions?
12    A.  At the Bank of New York we certainly
13 were.
14    Q.  Can you give me some examples of
15 boards of directors or transactions on which
16 you worked?
17    A.  I worked on the acquisition of Black
18 Entertainment Television, BET, by Viacom.
19 That would be probably the largest transaction
20 I worked on, was three billion dollars.
21        On the other end of the spectrum, I
22 worked on Electronic Retail Systems in a
23 potential sale of the company.
24    Q.  Were you retained, was Bank of New
25 York retained by the board of directors or by
```



Page 26

1            Preston
2  some other entity?
3      A.  Bank of New York was retained by the
4  board of directors in each of those
5  situations.
6      Q.  Did you personally work with the
7  boards in those cases?
8      A.  Yes.
9      Q.  In any of your jobs did you function
10  in the nature of an investment banker?
11      A.  Yes.  At Bank of New York I
12  certainly did.
13      Q.  In any of your prior work at the
14  various positions you've described have you
15  been involved in connection with a restatement
16  of public company financial statements?
17      THE WITNESS:  Would you read the
18      question back, please?
19      (A portion of the record was read.)
20      A.  Well, I've certainly in my
21  litigation-associated work worked with a lot
22  of different restatements.
23      Q.  Can you give me some examples?  I'm
24  not asking for a laundry list, just what you
25  can think of.

Page 27

1            Preston
2      A.  If I looked at the testimony it
3  might help.  Offhand, I'm involved in some
4  very large litigations right now that involve
5  improper financial statements.  WorldCom comes
6  to mind.
7      Q.  What's the nature of the services
8  you are providing in connection with the
9  WorldCom litigation?
10      A.  I'm a damage expert.  And in the
11  course of most of my damage testimony,
12  expertise, it encompasses materiality,
13  causation, efficiency, things like that.  So
14  all of those.
15      Q.  Materiality, causation.  What was
16  the third?
17      A.  Efficiency.
18      Q.  Efficient market analysis.
19      A.  Right.
20      Q.  Take a look, if we could, at the
21  summary of your litigation experience.
22      A.  Yes.
23      Q.  And I think I noticed that on
24  Preston Exhibit A there is a longer list that
25  goes back farther than what you listed on

Page 28

1            Preston
2  Preston Exhibit 3.
3      Are the cases, the additional cases
4  listed on Preston Exhibit 2 also cases in
5  which you testified similar to in the manner
6  you described?
7      A.  Yes.
8      Q.  OK.  That's just a fuller list.
9      A.  Yes, it obviously is, yes.
10      Q.  I don't want to go into a lot of
11  detail, but if we can start on the first page
12  of --
13      A.  Which one?
14      Q.  -- Exhibit B.  That the one that's
15  in front of you.
16      A.  Sure.
17      Q.  Tell me a little bit about what you
18  did in In Re:  Frontier Insurance Group.
19      A.  Frontier Insurance Group I did
20  damage testimony.
21      Q.  Is that a securities case?
22      A.  Yes.
23      Q.  And you did testify.  What kind of
24  hearing was it?
25      A.  It was a, um, it may have been a

Page 29

1            Preston
2  motion to dismiss.  It might have been -- I
3  don't know.  There was a motion to dismiss and
4  it also included a Daubert motion on my
5  testimony.
6      Q.  How was that Daubert motion
7  resolved?
8      A.  In favor of me.
9      Q.  How about the next case, In Re:
10  Sunglass Hut?
11      A.  That was a securities case.  I gave
12  damage testimony there.  And it involved a --
13  I'm not sure of the exact allegations in that
14  case and I'm not going to guess.
15      Q.  That's fine.  I don't want you to.
16      How about the next, In Re:  Real
17  Estate Associates Limited Partnership
18  Litigation?
19      A.  That's a -- that was a case where I
20  gave testimony regarding the fairness of a
21  fairness opinion.
22      Q.  In other words, you were asked to
23  evaluate whether the fairness opinion was
24  appropriately rendered?
25      A.  That's correct, and whether it

8 (Pages 26 to 29)

Page 30

Preston

1
2  included the proper disclosures, was it
3  misleading.
4      Q.   You did testify at trial in that
5  case?
6      A.  I did.
7      Q.   What was the outcome of the case, if
8  you remember?
9      A.  It was a verdict for the plaintiffs.
10     Q.   You were testifying for the
11  plaintiffs?
12     A.  I was.
13     Q.   Next case?
14     A.  Morgens Waterfall versus DLJ, that's
15  a securities case, but it was -- it was not a
16  class action.  And it was a case where I did
17  damage testimony -- or not -- deposition
18  testimony.
19     Q.   But it related to damages?
20     A.  It did.
21     Q.   What was the nature of the claim?
22  Was it a churning claim or something like
23  that?
24     A.  No, it was a claim that -- it was a
25  securities claim that had to do with the

Page 31

Preston

1
2  misrepresentation of a -- it involved the
3  company Ameriserv, and Ameriserv had a
4  contract to supply Burger King restaurants,
5  and when they issued bonds they neglected to
6  tell people that Burger King was walking away.
7      Q.   How about the next case?
8      A.  Jennifer Securities.  It's a
9  securities class action.  I gave damages
10  testimony.  I don't know what the -- I don't
11  remember the claims in it.
12     Q.   That's fine.  How about the next
13  case, Dennis Johnson?
14     A.  Dennis Johnson versus Garden Ridge,
15  that was a securities class action, a Section
16  XI case, regarding some nondisclosures in a
17  proxy.  I don't remember more than that.
18     Q.   OK.  Is that case still pending?
19     A.  No, it was settled.
20     Q.   How about the Jennifer case, is that
21  still pending?
22     A.  I think the trial had started.  I'm
23  not sure whether it had started, but it
24  settled either on the eve of or as the trial
25  started.

Page 32

Preston

1
2      Q.   Understand.  How about the next
3  case, In Re:  Alliance Pharmaceuticals?
4      A.  That is a securities class action
5  based on a takeover.
6      Q.   What was the nature of your
7  testimony?
8      A.  Damages.
9      Q.   The next case, In Re:  One Stop.
10     A.  This is not a securities action.
11  This is a contract claim.  And I worked for
12  the defendant in this case.
13         I don't know the disposition of it.
14  It was held in front of a judge, not a jury.
15  The judge ruled for the defendants, but then
16  there was an appeal and then One Stop Realtour
17  was bankrupt and then Allegiance was bankrupt,
18  and I don't know what ultimately happened to
19  it.
20     Q.   In Re:  SmarTalk?
21     A.  A securities class action, damage
22  testimony.  Still pending as far as I know.
23     Q.   OK.
24     A.  Oh, I need to correct that.  This
25  was not a class action.  It was a securities

Page 33

Preston

1
2  action.  But not a class action.  In this case
3  I was working for the plaintiff who was a
4  company that had sold itself and it was -- and
5  then the company who acquired it had a great
6  deal of problems.
7      Q.   I take it that on this first page
8  the only testimony in which you testified for
9  the defendants was the one you mentioned, In
10  Re:  One Stop?
11     A.  I believe that's true, yes.
12     Q.   Let's go over to the next page.  In
13  Re:  Comer Finance.
14     A.  Yes.
15     Q.   What was that?
16     A.  That is a securities class action
17  based on a pyramid scheme.
18     Q.   What was the nature of your
19  testimony?
20     A.  Valuation damages.
21     Q.   How about Cohen versus Berkshire
22  Hathaway?
23     A.  That was a class action regarding
24  the acquisition of MidAmerican Energy and the
25  inadequate price that was received for shares.

9 (Pages 30 to 33)



Page 34

Preston

1
2     Q.   How about the next, In Re:  Laidlaw?
3     A.   Laidlaw is a securities class action
4  and I gave damage testimony there.
5     Q.   Is that still pending?
6     A.   Settled.
7     Q.   The Berkshire Hathaway case, when
8  you say inadequate price, was that the nature
9  of your testimony, valuation and damages?
10    A.   Valuation and damages, yes.
11    Q.   All the engagements that you've
12 listed on this page and a third, you were at
13 FMA when you provided this testimony?
14    A.   Well, Frontier I wasn't.
15    Q.   Was that at Bank of New York or --
16    A.   It was at -- I was working for Bank
17 of New York then.
18    Q.   Right.
19    A.   The rest I was at FMA.
20    Q.   You have listed eleven cases in
21 which you've provided testimony in your role
22 at FMA from over the last three years or so.
23         In addition to these cases in which
24 you provided testimony, roughly speaking
25 approximately how many other cases have you

Page 35

Preston

1
2  worked on in the past two to three years at
3  FMA?
4         I am trying to get an understanding
5  of how many engagements you had going at a
6  time.
7     A.   At any given time we may have a
8  hundred engagements on which we're working or
9  have worked.  We probably aren't working on
10 them at that time.
11        As you can see, like something in
12 Frontier, I gave a deposition in November of
13 '98.  Two years passed and I didn't do
14 anything on it for two years.  But that's
15 still something that technically we're working
16 on.  So --
17    Q.   It would be an open file.
18    A.   It would be an open file, but it
19 wouldn't, you know, so I don't know -- I am
20 trying to be responsive, but I don't know if
21 that's --
22    Q.   That's perfect.
23    A.   OK.
24    Q.   Similar to lawyers.  At any one time
25 you may have as many as a hundred open files

Page 36

Preston

1
2  on litigation support issues, cases on which
3  you're working.
4     A.   That would be a reasonable estimate.
5     Q.   OK, thank you.
6         You are familiar with the phrase
7  "event study"?
8     A.   I just want to add something to
9  that.
10    Q.   Sure.
11    A.   When I gave you that number, that
12 was for the firm.  It wasn't for me.
13    Q.   OK.  And at any one time roughly
14 speaking how many open files will you have?
15    A.   We share our work, so it's very hard
16 for me to separate out exactly how many I
17 might have.
18    Q.   I take it you work full time at FMA?
19    A.   I do.
20    Q.   Are you familiar with the phrase
21 "event study"?
22    A.   Yes.
23    Q.   Tell me what an event study is.
24    A.   An event study is a statistical
25 measurement that involves a regression

Page 37

Preston

1
2  analysis.  I think I've described it in my
3  report probably more artfully than I can do it
4  off the top of my head, but it compares a
5  dependent variable, which in cases like this
6  tends to be a stock price or a security price,
7  with an independent variable, which would
8  represent the industry or peer group or
9  something like that that would be used to
10 measure the relationship between the movements
11 of the dependent and independent variable.
12        Having calculated that relationship
13 one can then apply the resultant formula to
14 time periods outside the estimation period
15 used for that to determine if certain
16 movements are statistically significant; that
17 is, are beyond what would be the expected
18 movement.
19    Q.   When performing an event study with
20 respect to stock price, for example, is it
21 fair to say that what you try to do is measure
22 one influence on that stock price and
23 eliminate other potential variables as
24 influencing the stock price or try to isolate
25 on a particular influence on the stock price?

Esquire Deposition Services
1-800-944-9454

Page 38

Preston

1
2     MR. BRAUTIGAM: Objection.
3     Q. Let me rephrase that. As an event
4  study relates to stock price, isn't it true
5  that you try to isolate stock price movement
6  attributable to one factor and eliminate
7  movement attributable to other factors at the
8  same time?
9     A. You try and understand what's
10  causing the movement in the price of a stock,
11  and by looking at it vis-a-vis an independent
12  variable, you hopefully take into account how
13  much of that movement is attributable to that
14  independent variable and then understand if
15  there is residual movement what causes that.
16     Q. Do you view yourself as an expert in
17  the financial markets, behavior of financial
18  markets?
19     A. Yes.
20     Q. Do you consider yourself an expert
21  in stock price movements?
22     A. Yes.
23     Q. What field of academic study governs
24  the rules and guidelines for conducting event
25  studies?

Page 39

Preston

1
2     A. I am not aware of a major in event
3  studies. I guess it would be statistics. But
4  it's an applied statistics. It's not a
5  pure -- it goes beyond just the statistics of
6  it.
7     Q. What in your background, I mean, is
8  it your finance background that led you to
9  become familiar with performing this type of
10  work?
11     A. Yes.
12     Q. Event studies are done by people in
13  the finance field?
14     A. Yes.
15     Q. What is the output generated when
16  one does an event study? What is the data
17  output?
18     MR. BRAUTIGAM: Objection.
19     A. The first data output is a
20  regression equation. So that would be the
21  mathematical output from doing the regression
22  analysis. You get a regression equation.
23  Then you apply the regression equation. So
24  those are the two mathematical.
25     Q. One of the things I heard you

Page 40

Preston

1
2  describe as being among the materials you
3  brought with you here today is the data that
4  you generated in connection with the event
5  study described in your report.
6     A. Correct.
7     Q. Is all that data in that stack of
8  materials?
9     A. Yes, I think that my -- well, the
10  regression equation is in the report.
11     Q. OK.
12     A. And the backup prices that I used
13  for the independent variable and the variable
14  are here.
15     Q. OK. We talked quite a bit about
16  your prior testimonial experience.
17     Have you ever been qualified as an
18  expert to provide testimony on the conduct and
19  the activities of boards of directors?
20     A. I don't recall.
21     Q. You don't recall being qualified as
22  such?
23     A. I don't recall.
24     Q. Have you ever been qualified as an
25  expert in connection with SEC disclosures,

Page 41

Preston

1
2  preparation of SEC documents?
3     A. I was certainly qualified when I
4  testified in Real Estate Associates to talk
5  about the fairness opinion, and actually I
6  talked about all of the registration materials
7  and all the information in the registration
8  materials. So I was qualified there.
9     Q. Have you ever provided testimony in
10  connection with a proxy statement?
11     A. Yes.
12     Q. On any of the matters that we have
13  just gone over, did any of those involve a
14  proxy statement?
15     A. Real Estate Associates did for sure.
16     Q. OK.
17     Have you ever been qualified as an
18  expert and provided testimony regarding
19  shareholder behavior?
20     A. In Real Estate Associates. May have
21  been other times, but I remember that one for
22  sure.
23     Q. Have you previously done expert
24  witness work for Mr. Brautigam?
25     A. No.

11 (Pages 38 to 41)

Preston

1
2    Q.  Do you know how much time she has
3    devoted to this?
4    A.  She has probably devoted more time
5    than I have, and I would guess therefore that
6    I've probably devoted somewhat less than a
7    hundred hours.
8    Q.  How much have you or your firm
9    billed plaintiffs in this matter?
10    A.  A little over $50,000.
11    Q.  And has that been paid?
12    A.  Yes.
13    Q.  Other than what is described in here
14    in terms of some of the materials you've
15    reviewed, which we'll get into, did you have
16    any other meetings or conferences in
17    connection with your engagement that helped
18    direct you in terms of what you were being
19    requested to do?
20    A.  Well, the request is pretty
21    straightforward.  So in terms of what I was
22    being requested to do, someplace following the
23    decision by the court that mooted several of
24    the claims, and I've certainly talked to
25    Mr. Brautigam and received the new complaint.

Preston

1
2    And so that certainly changed.  And I'm sure
3    we discussed that.
4         That would have to do -- the only
5    things that I can think of that would have to
6    do with what I was being asked to do.
7    Q.  As you sit here today, what is your
8    understanding of what you were asked to do?
9    A.  It's right here in the assignment.
10    Q.  OK.  Did you perform any
11    investigation or analysis that is not
12    contained in this report?
13    A.  I reviewed the things that are here
14    that's summarized in this.
15         I would have -- those are things I
16    printed out.  I may have looked at things
17    on-line.  I may have done things
18    electronically.  I certainly did drafts.  I
19    don't retain drafts.  So I don't have those.
20         Largely summarized here, yes.
21    Q.  So there's no major task that you
22    performed that was left out of your report.
23    I'm not talking about things that you did that
24    may not be reflected.
25         For example, did you do a damage

Preston

1
2    analysis that was cast aside?
3    A.  No.
4    Q.  That's what I'm looking at.
5    A.  No, not at all.
6    Q.  There was no major analytical work
7    that you did that was ultimately left out.
8    A.  No.  I was originally retained to do
9    this.  This was the scope of my original
10    retention.  That's all I have done.
11    Q.  Thank you.  Is there any work that
12    remains in process?
13    A.  I don't believe so.
14         THE WITNESS:  Let's take a brief
15    break here.
16         MR. BURKE:  That's wonderful.
17         (A recess was taken.)
18         MR. BRAUTIGAM:  Can we clarify
19    discovery is continuing and Ms. Preston
20    may be given further materials?
21         MR. BURKE:  That's fine.  No problem
22    at all.
23    By MR. BURKE:
24    Q.  To the extent you get further
25    materials, alters your opinions or you come up

Preston

1
2    with new opinions, just advise Mr. Brautigam.
3    But I do understand that discovery is ongoing.
4    A.  Right.
5    Q.  Paragraph 7 of your report, is it
6    correct that you have not authored any
7    publications within the past ten years?
8    A.  That's true.
9    Q.  A little lower in that same page,
10    which is page 3, Preston Exhibit 3, paragraph
11    9, does that accurately summarize the opinions
12    you're prepared to give in this case?
13    A.  Yes.
14    Q.  Your conclusions are based upon the
15    materials that you list on pages 4 and 5 as
16    the bases for your opinion, correct?
17    A.  As well as my experience.
18    Q.  OK.
19    A.  And I would also point to this stack
20    of documents that I've produced and things
21    like that.  So, you know, I've tried to be
22    inclusive of, and I will continue to try and
23    point out things if I overlook something.
24    Q.  That's fine.  Section iii in
25    paragraph 9 states:  "The Proxy contained

14 (Pages 50 to 53)

Page 54

Preston

1          Preston
2    inadequate disclosure of the inherent risk
3    associated with Provident's loan
4    securitization activities."
5         A.   Correct.
6         Q.   In addition to the proxy have you
7    reviewed any Provident periodic files?
8         A.   Yes.
9         Q.   Which periodic filings may be listed
10   there?
11        A.   I think they're listed.  They should
12   be.
13        Q.   OK.  You list the forms 10-K, 10-Q,
14   8-K and proxy statements filed during 1998
15   through 2003; is that correct?
16        A.   Yes.
17        Q.   Is your opinion limited to the proxy
18   statement?
19        A.   Uh-huh.
20        Q.   You're not opining on whether or not
21   the loan securitization activities were
22   adequately disclosed in other periodic
23   filings.
24        A.   That's correct.
25        Q.   Have you considered that issue?

Page 55

1          Preston
2         A.   Yes.
3         Q.   Do you have an opinion on whether or
4    not when one combines the proxy statement with
5    the other Provident periodic filings there is
6    adequate disclosure of the inherent risk
7    associated with Provident's loan
8    securitization activities?
9         MR. BRAUTIGAM:  Objection.
10        A.   My opinion relates to the proxy,
11   which I believe is the document that should
12   contain all the information that a shareholder
13   needs to make their decisions, and my opinion
14   is the proxy doesn't contain it.
15        Q.   OK.  I might have misunderstood you.
16   You aren't opining one way or the other on
17   whether or not the proxy combined with the
18   other periodic filings adequately discloses
19   the inherent risks, Provident loan
20   securitization activities; is that correct?
21        MR. BRAUTIGAM:  Objection.
22        A.   I have not opined on that.
23        Q.   Thank you.  Section ii of paragraph
24   9 states that "the Proxy contained material
25   misstatements and omissions regarding the

Page 56

1          Preston
2    actions and opinions of some members of OHSL's
3    board of directors and the background of the
4    transaction, which would have been important
5    to OHSL investors in determining whether or
6    not to vote in favor of the Merger."
7         A.   Right.
8         Q.   How did you decide or what was the
9    analytical framework in which you reached
10   conclusions about what was or was not
11   important to OHSL investors?
12        MR. BRAUTIGAM:  Objection.
13        A.   Well, when I knew what had happened,
14   what actually happened, number one, it's very
15   obvious that that is important to investors.
16   It was pretty obvious I thought to do KMK
17   transaction letters.  It was obvious to some
18   of the Provident directors.
19        So I guess I relied on my
20   experience, on information that I gleaned from
21   the case and on other people's opinions as
22   well.  I looked at what wasn't known, what
23   should have been known and I looked at
24   analogous situations.
25        Q.   You did not undertake any kind of

Page 57

1          Preston
2    analysis survey or anything else to measure or
3    quantify the demographics of the OHSL
4    investors, what they felt, what they looked
5    at, what they relied upon; is that correct?
6         MR. BRAUTIGAM:  Objection.
7         A.   Did I take a survey?  No, I did not.
8         Q.   Did you speak to any OHSL investors?
9         A.   No.
10        Q.   Have you ever heard of Janet Nolte?
11        A.   No.
12        Q.   Have you ever heard of Gary Meier?
13        A.   I don't believe so.
14        Q.   Do you know what either Mr. Meier or
15   Ms. Nolte indicated they looked at, relied
16   upon as it relates to the OHSL Provident
17   merger?
18        A.   No.
19        MR. BRAUTIGAM:  Objection.
20        Q.   I'm sorry?
21        A.   No, I don't.
22        Q.   Thank you.
23        You list various materials in
24   paragraph 10 that you looked at, and I note
25   this is supplemented by the preceding

15 (Pages 54 to 57)

Preston

1
2  paragraph as well with some of the materials
3  you referred to this morning.
4          But generally, with respect to the
5  materials that are listed in the separate
6  paragraphs in paragraph 10, who provided, who
7  selected this information?
8      A.  I suppose it was a cooperative
9  effort on the part of our office and
10  Mr. Brautigam. Cynthia Jones and I would
11  request things. I think Mr. Brautigam
12  originally sent us a number of things, and
13  then we would request things.
14      Q.  Of this list do you recall what were
15  the materials that you requested on a
16  supplemental basis?
17          I'm not asking you to take a memory
18  test, but if you can point to any, I would
19  appreciate it.
20      A.  I know Mr. Brautigam fairly
21  automatically supplied us with the legal
22  documents.
23      Q.  The pleadings?
24      A.  Yes. The motions, the, um, all
25  that. Some of it obviously, um, all the

Preston

1
2  public filings and things we got ourselves.
3  All the news articles.
4          You know, in terms of deposition
5  transcripts, he may have sent some. We may
6  have asked for all of them. I just don't
7  know.
8      Q.  All right, that's fine. Did you
9  read all the deposition transcripts?
10      A.  I don't recall having -- personally
11  I don't believe I read deposition transcripts
12  of the plaintiffs. I don't recall for sure.
13      Q.  How about deposition transcripts of
14  the defendants or the OHSL board members?
15      A.  Yes.
16      Q.  Did you read all of them or just
17  excerpts?
18      A.  I slogged through all of them.
19      Q.  What is your understanding of the
20  current status of the case as it relates to
21  the class certification status?
22      A.  I know there are a number of motions
23  outstanding. I guess I don't know what they
24  are.
25      Q.  Are you aware that the court

Preston

1
2  decertified the class? Did you ever see that
3  order?
4      A.  I don't recall. I don't think so.
5      Q.  You have seen the consolidated
6  amended complaint.
7      A.  I have.
8      Q.  Did anyone send to you copies of any
9  of the motions to dismiss that were filed in
10  response to that, to the consolidated amended
11  complaint?
12      A.  Well, here's the motion to
13  reconsider the order granting the class, the
14  motion to dismiss in 2000, the brief in
15  opposition of the motion in 2001.
16      Q.  Those deal with the original
17  complaint --
18      A.  Right.
19      Q.  -- in 2001. And my question is
20  directed at motions to dismiss the
21  consolidated amended complaint that would have
22  been filed in 2004.
23          MR. BRAUTIGAM:  December 31st, 2003.
24          MR. BURKE:  That's when your
25      complaint was filed. The motion to

Preston

1
2  dismiss was filed in 2004.
3      Q.  Do you remember seeing it?
4      A.  I don't remember seeing it, no.
5      Q.  Are you aware that the court has
6  granted two of the motions to dismiss?
7      A.  No.
8      Q.  You're unaware that the court
9  dismissed Ernst & Young and Keating, Muething
10  Klekamp; is that correct?
11      A.  Yes, I guess that is correct.
12      Q.  Were you ever provided with a copy
13  of the decision of the court in the class
14  actions filed in the wake of the Provident
15  restatement?
16          MR. BRAUTIGAM:  Objection.
17      A.  No.
18      Q.  You're not aware that the motion to
19  dismiss the securities class actions filed in
20  response to the Provident restatements was
21  granted at least in part?
22      A.  No.
23      Q.  The item number T on the second
24  page, you indicate that you have reviewed the
25  expert report of Ross D. Fuerman?

Esquire Deposition Services
1-800-944-9454

Page 62

Preston

1
2     A.   Correct.
3     Q.   Any other expert reports that you
4  have reviewed?
5     A.   Since doing this I have seen the
6  expert reports of the defendants.
7     Q.   Have you ever seen the expert report
8  of Irv Schoenblum?
9     A.   I have not.
10     Q.   Have you heard of Mr. Schoenblum?
11     A.   I have.
12     Q.   Do you understand that he is
13  supposedly providing the damages testimony in
14  this matter?
15     A.   I do.
16     Q.   And you have not reviewed his damage
17  analysis?
18     A.   No.
19     Q.   Is there a reason you have not
20  reviewed his damage analysis?
21     A.   Well, originally I wasn't hired to
22  do anything regarding damages.
23     Q.   I got you.
24     A.   I knew Mr. Schoenblum had been hired
25  to do them.  And I didn't rely on his damage

Page 63

Preston

1
2  analysis for anything.
3     Q.   Do you have any opinion on the
4  validity or invalidity of Mr. Schoenblum's
5  analysis as it would relate to damage analysis
6  you might perform?
7         MR. BRAUTIGAM:  Objection, she
8  hasn't seen it.
9         MR. BURKE:  Then she can say no.
10     A.   No, I have no opinion.
11         MR. BRAUTIGAM:  Objection.
12     Q.   I take it, without attempting to
13  tooting your horn too much, you have been
14  involved in litigation assignments for quite a
15  few years.
16     A.   I have.
17     Q.   You did read the affidavit of Ross
18  Fuerman.
19     A.   I did.
20     Q.   In your litigation experience have
21  you ever seen an expert accountant attempt to
22  opine on whether or not witnesses were lying
23  or telling the truth based upon reviewing a
24  deposition transcript?
25         MR. BRAUTIGAM:  Objection.

Page 64

Preston

1
2     A.   I don't recall.
3     Q.   Have you ever been or agreed to
4  serve as an expert witness on whether or not
5  based upon a deposition transcript someone was
6  lying or telling the truth?
7         MR. BRAUTIGAM:  Objection.
8     A.   Well, I guess there are probably
9  cases where I have opined that people were not
10  telling the truth, because they testified to
11  one thing and I had documentation as to
12  something else.
13     Q.   So you have testified as to that?
14     A.   I -- I expect that if somebody said
15  to me that the earnings were $45 and I had
16  documentation that they were $35, I would say
17  he was not telling the truth.
18     Q.   I see what you're saying.
19         Paragraph 12.  I'm sorry, paragraph
20  11 and 12 deals with history, some historical
21  facts regarding the activities of OHSL and the
22  OHSL board.
23         What is the source of the discussion
24  in these paragraphs if you remember?
25     A.   I think it's the proxy materials.

Page 65

Preston

1
2     Q.   OK.
3     A.   And there's probably deposition
4  testimony as well.
5     Q.   All right.  Paragraph 12, the last
6  full sentence on this page, "However, between
7  July 22 and August 2nd one of OHSL's board
8  members resigned, in part, in protest of the
9  transaction."
10         What is the source of that
11  statement?
12     A.   Oh, I think it is deposition
13  testimony.
14     Q.   Did Mr. Brautigam ever provide you
15  with a copy of Mr. Herron's resignation
16  letter?
17     A.   I don't believe I've seen it.
18     Q.   Are you aware that Mr. Herron's
19  formal resignation letter delivered to the
20  OHSL board says nothing about resigning in
21  protest and to the contrary indicated that he
22  didn't have time to devote to his activities
23  on OHSL?
24         MR. BRAUTIGAM:  Objection.
25     A.   I understand that, yes.

17 (Pages 62 to 65)

Page 66

Preston

1
2    Q.  Is there a reason why that piece of
3  information is not included in your
4  discussion?
5    A.  What information are you referring
6  to?
7    Q.  That Mr. Herron's resignation letter
8  said nothing about resigning in protest.
9    A.  I don't think that that was what
10  wasn't disclosed. I mean, what wasn't
11  disclosed was that he did resign in part in
12  protest.
13    Q.  And the basis for that is what?
14    A.  Mr. Herron's testimony, the fact
15  that he testified that he called all the other
16  board members and made certain that they were
17  aware that that was his reason, all that were
18  available, and I think it was Mr. Thiemann who
19  wasn't, and when he was available he made sure
20  he called him.
21    Q.  Did you read the testimony of the
22  other directors on that topic as well?
23    A.  I did.
24    Q.  And you're aware that they denied
25  that any such phone calls were made.

Page 67

Preston

1
2    MR. BRAUTIGAM:  Objection, that's a
3  blatant mischaracterization.
4    Q.  Are you aware of that?
5    A.  No.
6    MR. BRAUTIGAM:  Objection.
7    A.  No, I'm not aware of that.
8    Q.  Have you seen the sequence of
9  Mr. Herron's deposition in which initially
10  when asked if he resigned in protest he stated
11  that I don't know that protest characterizes
12  it and it was a very low profile kind of
13  thing?
14    MR. BRAUTIGAM:  Objection.
15    Q.  Have you seen that testimony?
16    A.  I have seen Mr. Herron's testimony
17  and -- now, if you have a copy of it and you
18  want to refer me to it, I'll be glad to look
19  at his exact words.
20    What I do recall is that Mr. Herron
21  was a second generation board member, that he
22  was very upset about this, that he resigned.
23  He didn't make any money, a lot of money that
24  he could have made on this deal because he was
25  so upset, and that he conveyed his unhappiness

Page 68

Preston

1
2  with this.  First as part of the board and
3  then he resigned in protest.
4    Q.  Are you aware whether or not
5  Mr. Herron ever communicated his supposed
6  protest to counsel for OHSL?
7    A.  I don't recall that.
8    Q.  Do you know whether he ever told
9  counsel for OHSL to include any such statement
10  or position in the minutes?
11    A.  I want to go back to your other
12  question first.  Did he convey his deep
13  concern about the deal that he was adamantly
14  opposed to it?  Yeah, he voted on July 22nd
15  against it.
16    So did counsel know that he was
17  against it? Yes, they knew he was against it.
18    Q.  That's not my question.  My question
19  is did he ever communicate to counsel that he
20  was supposedly resigning in protest.  Do you
21  know that?
22    MR. BRAUTIGAM:  Objection.
23    A.  I don't recall that.
24    Q.  Do you know whether Mr. Herron ever
25  told counsel or anyone else to include a

Page 69

Preston

1
2  statement of the supposed protest in the board
3  minutes relating to the July 22nd vote?
4    A.  I don't recall.
5    Q.  Are you aware of the 8-K rules with
6  respect to when a resignation needs to be
7  disclosed?
8    A.  Generally.
9    Q.  What is your understanding?
10    A.  That it needs to be disclosed when
11  the board member is adverse to an action the
12  board is taking.
13    I'm not a lawyer.  I couldn't --
14    Q.  That's why I asked you, if you're
15  not familiar.
16    A.  Yeah.
17    Q.  I mean, item 6 of form 8-K, are you
18  aware that item 6 of form 8-K requires
19  disclosure of a resignation of a director
20  because of a disagreement with a registrant
21  and only if the individual has furnished the
22  registrant with a letter describing the
23  disagreement and requesting that the matter be
24  disclosed?
25    A.  That sounds like you're reading

Esquire Deposition Services
1-800-944-9454

Page 70

```
1              Preston
2  directly from the law to me.  So --
3      Q.  You're not familiar with those
4  requirements.
5      A.  I'm not a lawyer.  I couldn't recite
6  them for you.
7      Q.  Fair enough.  Thank you.
8          OK, paragraph 14, "On October 25,
9  1999, OHSL's Chief Executive Officer and
10  director, Kenneth Hanauer conducted the
11  meeting of shareholders at which he
12  recommended the proposed Merger with
13  Provident."
14          What is the source of that?
15      A.  Information that I've read in the --
16  I believe it's in a press release.  I can't
17  cite the exact source of this now.
18      Q.  In particular, I'm concerned with
19  the statement that on October 25, 1999,
20  Mr. Hanauer recommended the proposed merger.
21          Do you recall any source for that?
22      A.  I would have to go through the
23  documents I've produced.
24      Q.  Fair enough.  The footnote on the
25  bottom of that page, you're talking about the
```

Page 72

```
1  or are you talking about in the proxy
2  statement?
3      A.  In the proxy statement.
4      Q.  You are familiar with the fact that
5  the proxy statement does list the current
6  directors at that time or as of I believe it's
7  August 1st?
8      A.  I think it's July 31st.
9      Q.  But you have seen that.
10      A.  Yes.
11      Q.  Of the seven, one was absent.  And
12  which director was that?  Mr. McKiernan?
13      A.  I don't recall.
14      Q.  Of the absent director do you recall
15  what his position was on the merger?
16          MR. BRAUTIGAM:  Objection.
17      Q.  From the other materials you looked
18  at.
19      A.  I believe previously he had voted in
20  favor of it.
21      Q.  Your footnote goes on, "On that day
22  Mr. Brinker abstained from casting a vote, so
23  only five directors voted to approve the
24  Merger."
25
```

Page 71

```
1              Preston
2  vote of the OHSL directors on August 2nd.
3          MR. BRAUTIGAM:  That's not --
4      A.  No.  It's -- it begins on August --
5  on July 2nd.
6      Q.  Right.
7      A.  All eight directors were present for
8  a vote on whether to continue negotiations
9  with Provident.
10      Q.  Right.
11      A.  Mr. Hanauer abstained.  Mr. Herron
12  voted against, and the other six directors
13  voted in favor.  Then on August 2nd --
14      Q.  That's what I'm referring to.  I
15  should have directed your attention to the
16  third sentence.
17      A.  OK.  And what about that?
18      Q.  It continues to describe the meeting
19  on August 2nd.  And it says, "After
20  August 2nd, the composition" or "on August 2nd
21  the composition of the board of directors had
22  changed - Mr. Herron resigned, leaving only
23  seven directors, untold to shareholders."
24      A.  Correct.
25      Q.  Untold to shareholders on August 2nd
```

Page 73

```
1              Preston
2          Is that a formal abstention by
3  Mr. Brinker?
4          MR. BRAUTIGAM:  Objection.
5      A.  I don't know whether it was a formal
6  abstention or not.  He didn't vote.
7      Q.  Did you read in the testimony what
8  Mr. Brinker's position was on the merger?
9          MR. BRAUTIGAM:  Objection.
10      A.  I read Mr. Brinker's testimony.  I
11  think that Mr. Brinker had voted in favor of
12  it in July.  He didn't vote in August.
13          And the fact is in my opinion, I
14  think in the opinion of any jury you're in
15  front of, unanimous means that everybody voted
16  in favor of it.
17      Q.  Did Mr. Brautigam provide you with
18  the portion of Mr. Brinker's testimony, I
19  believe in the state court action, where he
20  testified that had he voted that day he would
21  have voted in favor?
22          MR. BRAUTIGAM:  Objection.
23      A.  I don't recall having seen that.
24  Frankly he didn't vote.  You know, whether he
25  would have voted in favor, whether if it was
```

19 (Pages 70 to 73)

Page 74

Preston

1
2 Mr. McKiernan, for whom -- to the director who
3 was out of town, I apologize, I don't remember
4 his name. But he didn't vote either.
5        So, you know, what he would have
6 done and what they did is exactly the reason
7 that we have disclosures. And to disclose
8 something that I, you know, if they had said
9 had Mr. Brinker voted he would have voted yes,
10 well, that would have been a disclosure.
11        And I will accept for this statement
12 that your representation that it was
13 Mr. McKiernan who was out of town, if they had
14 said, had Mr. McKiernan been here, he would
15 have voted yes, that would have been a
16 disclosure.
17        Had they said, Aha, Mr. Herron
18 wasn't here because he resigned because he was
19 not in favor of that, that would have been a
20 disclosure. But what was said was not a
21 disclosure.
22     Q.   Have you seen the testimony where
23 Mr. Brinker talked about the practice of the
24 OHSL board that the only time he voted was
25 when there was a tie that needed to be broken?

Page 75

Preston

1
2     MR. BRAUTIGAM: Objection.
3     Q.   Are you aware of that testimony?
4     A.   I -- I -- I've either discussed it
5 with Cynthia or I have seen it, I don't know,
6 but I'm relatively aware of it, yes.
7     Q.   Are you familiar with Robert's Rules
8 of Order?
9     A.   Yes.
10     Q.   Are you familiar with the fact that
11 whether or not that kind of a practice is
12 consistent or inconsistent with Robert's Rules
13 of Order?
14     MR. BRAUTIGAM: Objection.
15     A.   It is consistent.
16     Q.   That the chairman of a board votes
17 to break a tie.
18     A.   Correct.
19     Q.   Have you seen the resolution on
20 August 27, 1999, where all the OHSL directors,
21 including Mr. Brinker and Mr. McKiernan,
22 unanimously readopted resolutions approving
23 the transaction?
24     MR. BRAUTIGAM: Objection.
25     A.   I don't believe so.

Page 76

Preston

1
2     Q.   Would that affect your opinion on
3 unanimity of the board if in fact with
4 everybody present on August 27 that they
5 unanimously readopted resolutions affirming
6 the transaction?
7     A.   If that were disclosed
8 appropriately, if in fact they had disclosed
9 exactly what had happened on August 2nd,
10 including Mr. Herron, and the fact that
11 Mr. Hanauer was not in favor of it, then,
12 regardless of how he voted, that he didn't
13 think it was in the best interest of the
14 shareholders, then I would say you would have
15 had full disclosure.
16     Q.   When is it your understanding that
17 Mr. Hanauer believed or concluded that the
18 transaction was not in the best interest of
19 the shareholders?
20     MR. BRAUTIGAM: Objection.
21     Q.   Is there any evidence that you have
22 as to when that realization supposedly came
23 in?
24     A.   Well, he testified that that was his
25 opinion. So I have to say that realization

Page 77

Preston

1
2 supposedly is. I don't think, um, that's not
3 a word that I would ever use in terms of what
4 he testified to.
5     Q.   Did he testify as to a date?
6     A.   I don't recall a date.
7     Q.   And whether it was August of '99,
8 subsequent to that, the day of his deposition,
9 you don't recall any date being associated
10 with that opinion, correct?
11     A.   I don't.
12     Q.   You indicate that Mr. Hanauer -- I
13 will refer you to the -- in paragraph 16 of
14 your report, the last sentence you talk about
15 the fact that Mr. Hanauer voted his personal
16 shares against the transaction.
17     A.   Uh-huh.
18     Q.   Do you know when he voted his
19 personal shares against the transaction, when
20 he cast his vote?
21     A.   I recall some discussion about,
22 concerning about the fact that he had cast
23 them against the, um, you know, I don't recall
24 the date.
25     Q.   Do you know whether it was before

20 (Pages 74 to 77)

Page 78

1          Preston
2    the proxy statement was prepared?
3          MR. BRAUTIGAM: Objection.
4      A. I don't recall.
5      Q. Do you recall that whether
6    Mr. Hanauer ever testified as to when he
7    decided how he was going to vote his personal
8    shares?
9      A. No.
10     Q. Do you recall Mr. Hanauer testifying
11   as to whether or not he told anyone else about
12   his decision as to how he was going to vote
13   his personal shares?
14     A. I don't recall.
15     Q. Take a look at paragraph 8.
16     A. Which paragraph?
17     Q. Page 8, the end of paragraph 17.
18         MR. BRAUTIGAM: You said paragraph 8.
19         MR. BURKE: I apologize.
20     Q. Page 8, paragraph 17. I just want
21   to confirm this maybe for the purpose of the
22   remainder of the report.
23         When, as you state here and you
24   stated previously, you talk about disclosures
25   regarding Provident securitization activities,

Page 79

1          Preston
2    consistent with what you said before you're
3    only talking about the proxy statement itself,
4    none of the periodic filings; is that correct?
5      A. That's correct.
6      Q. And that's consistent throughout
7    your --
8      A. That's correct.
9      Q. OK, thank you.
10         What is the basis for your
11   understanding of what you set forth in
12   paragraph 18?
13     A. Well, we'll start with the SEC
14   Regulation C. It's been my experience beyond
15   that in transactions on which I've worked that
16   that has been the goal in terms of informing
17   shareholders. So that the goal is put down by
18   the SEC and it is then followed.
19     Q. Earlier in questions regarding 8-K
20   you indicated that you were not lawyer. Do
21   you believe that you have sufficient
22   understanding even though you're not a lawyer
23   to opine on the requirements of Regulation C?
24     A. I believe I have sufficient
25   understanding and I have had sufficient

Page 80

1          Preston
2    experience to opine on the purpose of proxy
3    materials.
4      Q. And I apologize if I'm replowing old
5    ground. The basis for that experience would
6    have been your work in what capacity?
7          MR. BRAUTIGAM: Objection.
8      A. The last twenty years in securities
9    litigation and as an investment banker.
10     Q. I know you told me about your work
11   on proxy materials as an investment banker.
12         In your work as an expert witness
13   have you ever been qualified as an expert
14   regarding the purpose of proxy materials?
15     A. I think I was. The most recent time
16   was in the Real Estate Associates case, sure.
17     Q. I think you did mention that before,
18   OK. Paragraph 19 carrying over from page 8 to
19   page 9 of your report, what is the source of
20   the historical discussion in that paragraph?
21     A. Well, I mean, you can look at the
22   footnote. It's the acts themselves to begin
23   with. It's probably treatises I have read on
24   the acts. I think it's common sense.
25         Certainly there was a great deal of

Page 81

1          Preston
2    discussion regarding these precise things
3    around the Enron situation.
4      Q. OK. And your basis for familiarity
5    with these concepts is what you talked about
6    earlier about your familiarity with Reg C.
7      A. Yes, experience and research.
8      Q. OK. Paragraph 20. "In this case, I
9    believe the alleged misstatements and
10   omissions contained in the proxy materials
11   distributed to OHSL shareholders were
12   material, pertained to matters at the heart of
13   the transaction, and affected the ultimate
14   outcome of the shareholder vote."
15         Now, what I would like to focus on
16   is the phrase where you say "pertained to
17   matters at the heart of the transaction."
18   What does that mean?
19     A. They pertain to the financial
20   matters that were the basis of the
21   transaction. The currency that was going to
22   be used to pay the OHSL shareholders, and they
23   pertain to the opinions of the fiduciaries for
24   the OHSL shareholders as to whether this was a
25   good deal for them or not.

21 (Pages 78 to 81)

Page 82

Preston

1
2     Q.  Specifically, what financial matters
3  that you believe were not properly stated are
4  you referring to?
5     A.  Well, I think we can start with the
6  financial statements of Provident, which were
7  clearly misstated.  And I think then we can
8  talk about the lack of clarity and information
9  regarding the securitization issues.
10    Q.  For the reasons you testified
11  earlier as to the proxy statement alone.
12    A.  Yes.
13    Q.  What analysis have you done with
14  respect to the impact of the Provident
15  restatement on the financials as they were set
16  forth in the proxy statement distributed to
17  OHSL shareholders?
18    A.  Regarding the impact?
19    Q.  Yes.  Do you want me to rephrase
20  that?
21    A.  Yes.
22    Q.  Have you calculated or attempted to
23  calculate precisely how the restatement itself
24  would have impacted the numbers that were set
25  forth in the Provident OHSL proxy statement?

Page 83

Preston

1
2     A.  I have not calculated precisely.  I
3  believe they would have had a material and
4  significant quantity impact for certain.
5     Q.  But you have not calculated it.
6     A.  I have not calculated it.
7     Q.  And you're aware for 1999 there were
8  only interim quarterly numbers included in the
9  proxy statement, correct?
10    A.  That's correct.
11    Q.  Are you aware of Provident's
12  practices with respect to the auto lease
13  securitizations, when they were booked,
14  recorded and how that would have impacted
15  those quarterly numbers as were reflected in
16  the proxy statement?
17        MR. BRAUTIGAM:  Objection.
18    A.  Not specifically.
19    Q.  Do you understand that the Provident
20  restatement related to some auto lease
21  securitization transactions?
22    A.  Yes.
23    Q.  What is your understanding of what
24  that issue was?
25        MR. BRAUTIGAM:  Objection.

Page 84

Preston

1
2     A.  I'm going to talk about the first
3  restatement first, which is that there were
4  problems.  We can go to their press release
5  and see it better, but there were problems
6  with their accounting system which improperly
7  booked and recorded things, and that in fact
8  those problems extended at the time of the
9  announcement for over six years.
10    Q.  And were there other accounting
11  issues other than the recording of financial
12  entries that related to the first restatement?
13        MR. BRAUTIGAM:  Objection.
14    A.  I think the best thing to do is look
15  at the thing -- at the press release, but in
16  fact there were problems with, that were
17  discovered when they went to implement a new
18  system.  I saw nothing that would indicate
19  that those problems were not extant throughout
20  1999.
21    Q.  Are you aware that the issue arose
22  with respect to securitization transactions?
23    A.  Yes.
24    Q.  What are securitization transactions
25  in your experience, if you know?

Page 85

Preston

1
2     A.  Securitization transactions are the
3  assembling of, in this case, auto liens into a
4  security to be sold.
5     Q.  When that security is sold -- if you
6  have an experience, if you don't, that's fine,
7  just tell me.  When that security is sold what
8  happens to those assets as it reflects to the
9  balance sheet of the selling company?
10        MR. BRAUTIGAM:  Objection.
11    A.  That depends on the way the
12  particular structure of the securitization,
13  what happens to those.
14    Q.  What was your understanding of how
15  Provident did it back in 1999?  If you have
16  one.
17    A.  In 1999 Provident was treating those
18  as loans and I don't recall exactly what
19  happened on the balance sheet.
20    Q.  Did you understand that in 1999
21  Provident when it securitized its auto loans
22  it would sell them and take them off the
23  balance sheet?
24    A.  I think that's right, yes.
25    Q.  Do you understand that prior to a

Esquire Deposition Services
1-800-944-9454

Page 86

Preston

1
2  securitization transaction of that type, and
3  as such a sale, that those auto loans would
4  remain on the balance sheet?
5      A.  Correct.
6      Q.  Do you understand that the
7  accounting issues that arose dealt with
8  accounting for the securitization or
9  securitized transactions?
10     A.  Yes, they basically dealt with the
11 recourse that the purchaser of the securitized
12 loans would have and did that mean that they
13 actually, um, the liability for those or the
14 asset had been transferred.
15     Q.  Have you seen any testimony in this
16 case as to when Provident securitized the auto
17 loans in 1999?
18     A.  I don't believe so.
19     Q.  Has anyone ever indicated to you
20 that what happened was Provident securitized
21 those auto loans December 31, 1999?
22     A.  No.
23     Q.  Would that indicate to you that if
24 securitization transactions were not done
25 until the end of the year that interim

Page 87

Preston

1
2  financials would reflect to some extent the
3  actual loans in their original form?
4      MR. BRAUTIGAM:  Objection.
5      A.  It wouldn't reflect the intent. I
6  mean, the fact is stock prices are built on
7  two things.  They're built on the current
8  situation and the anticipation of the future,
9  which is exactly what happens when this is
10 ultimately announced.
11         It's announced that, Oh, by the way,
12 we have got to change this, and it's going to
13 affect the future as well.
14         So the fact that they hadn't done
15 the actual securitization, but they intended
16 to, is reflected in the anticipated earnings
17 of the company, which are in fact realized
18 because they do this improper accounting.
19         So the fact that it may have
20 occurred at the end of the year, if in fact
21 that was always their intent to do it and
22 that's what they told people, it affected the
23 stock price regardless of when it actually
24 took place.
25     Q.  So is it your testimony that the

Page 88

Preston

1
2  financials, the interim financials in March
3  and June of 1999 should have reflected what
4  Provident intended to do or should have
5  reflected what actually the historical results
6  were?
7      MR. BRAUTIGAM:  Objection.
8      A.  I think the purpose of the proxy
9  statement and the purpose of obtaining a
10 fairness opinion is to present a fair picture
11 of the company.
12         So if they had said, Oh, by the way,
13 we improperly booked these in 1998 and we're
14 going to improperly book them in 1999, then
15 the fact that the interim financials might not
16 include those improper bookings, but they
17 said, Oh, we're going to continue to do it, I
18 think would have been the equivalent of
19 correctly reflecting that information.
20     Q.  Is it your testimony that anyone at
21 Provident knew in 1998 or 1999 the problems
22 that ultimately were discovered?
23     MR. BRAUTIGAM:  Objection.
24     Q.  Do you know that?
25     A.  I don't have any opinion on that.

Page 89

Preston

1
2      Q.  We sort of got off on this tangent.
3  I apologize.  You have not gone back to
4  calculate precisely how the interim 1999
5  numbers would have been affected, if at all,
6  by the restatement activities; is that
7  correct?
8      MR. BRAUTIGAM:  Objection.  You just
9      asked that question.
10     A.  I surely would have liked Provident
11 to have supplied the information to do that.
12     Q.  We're on paragraph 20, page 9 of
13 your report.  The last concept is that, and
14 I'm paraphrasing here, the alleged
15 misstatements and omissions contained in the
16 proxy materials distributed to OHSL
17 shareholders affected the ultimate outcome of
18 the shareholder vote.
19     A.  Uh-huh.
20     Q.  What is the basis for that?
21     A.  Research I have done on the effects
22 of those, of that information.
23     Q.  How did you quantify or measure or
24 determine what the ultimate outcome of the
25 shareholder vote would have been had these

23 (Pages 86 to 89)

Page 90

Preston

1
2 matters been correctly stated in your opinion?
3     A.  I would say that if you look further
4 in my report you will see that it would in all
5 likelihood would have affected the exchange
6 ratio.  At the very least it might have
7 triggered the walkaway, that the information
8 regarding Mr. Herron and the shareholder or
9 the board of directors' vote and the other
10 information that was withheld would have --
11 they only needed a handful of votes to change
12 this.  In my opinion in all likelihood those
13 votes would have changed.
14     Q.  I understand that and I understand
15 how you would opine that those matters would
16 have affected the shareholder votes.
17     What you state here though is that
18 it affected, in other words, did affect.  So
19 my question is, how did you measure that, how
20 did you determine that it in fact affected the
21 shareholder vote?
22     A.  I look for analogous situations.  I
23 show the situation in my report regarding the
24 Hewlett-Packard situation, Hewlett-Packard a
25 fairly similar situation in that you have

Page 91

Preston

1
2 somebody who is very associated with the
3 company who is unhappy with the merger,
4 somebody who would have been in a relatively
5 similar position to that of Mr. Hanauer and
6 Mr. Herron.  Excuse me.
7     And that moved the stock price and
8 caused a great deal of turmoil in the stock as
9 a result.  I thought that that was a good
10 demonstration of how the vote could be
11 affected.
12     Q.  What else ultimately happened in the
13 Hewlett-Packard/Compaq vote?
14     A.  The deal went through.
15     Q.  And it didn't affect the vote, did
16 it?
17     MR. BRAUTIGAM:  Objection.
18     A.  Oh, it affected the price of the
19 stock tremendously.  The movement of that
20 stock price showed exactly how important the
21 opinions of people who are well know and
22 associated with the company, what a difference
23 that made.
24     Q.  But at the end of the day the
25 shareholders did not follow Mr. Hewlett's

Page 92

Preston

1
2 recommendation to disapprove the transaction,
3 correct?
4     MR. BRAUTIGAM:  Objection, blatant
5 mischaracterization.
6     Q.  Is that correct?
7     A.  You know, at the end of the day we
8 don't know what they would have done had he
9 just gone along with them.  What we do know is
10 how much the stock price moved as a result of
11 his involvement.
12     And that to me is an outstanding
13 example of it, and I think we have a number of
14 analysts who looked at it and said, you know,
15 this is going to be a whole different race in
16 terms of this vote than it would have been if
17 Mr. Hewlett had not voiced his objection.
18     So I think that's an outstanding
19 example of exactly what happens.  It was a
20 very, very tight race as a result of his
21 objection.  Did they pass it?  Yes.  But
22 everybody thought it would pass easily until
23 he objected.
24     Q.  That's my question.  Did the
25 shareholders ultimate pass it?  That's all I'm

Page 93

Preston

1
2 saying.
3     A.  Yes, but it wasn't like everybody
4 expected it to be a tight race before his
5 objection.  In this case we've got a hair's
6 breadth of a race with nobody knowing about
7 the objection.
8     Q.  At this point based upon your
9 experience as an investment banker and
10 evaluation consultant are you, do you believe
11 that Hewlett-Packard and OHSL are comparable
12 companies?
13     A.  I think that, comparable companies?
14 They're certainly -- they're in different
15 businesses.  They're different sizes.
16     It means that in many respects the
17 people who ran OHSL were much better known in
18 their community and to their shareholders than
19 Mr. Hewlett was to his shareholders.  People
20 knew these people on an individual basis.  So
21 their opinions probably carried more weight
22 than Hewlett's did.
23     Q.  Which individual are you talking
24 about?
25     A.  Hanover and Herron.  And especially

24 (Pages 90 to 93)