Page 94

Preston

1
2  with Mr. Hanauer, when you're talking about
3  someone who is such a significant shareholder,
4  I think that -- comparability in size? No.
5  Comparability in business? No. Importance of
6  the directors? Every bit if not more so in
7  terms of OHSL.
8      Q.  Have you measured that in any way
9  for purposes of your analysis, that the
10  influence of the H-P directors would have been
11  comparable to the influence of certain of the
12  OHSL directors? Have you done any
13  quantitative analysis?
14     A.  I have not quantified it.
15     Q.  Do you believe that you have tried
16  to compare the influence on the closely knit
17  OHSL community of the Herron Hanauer position
18  as you described it compared to the position
19  of the other directors who are in favor of it,
20  that one would have been more influential than
21  the other?
22     MR. BRAUTIGAM: Objection.
23     A.  Well, I think that Mr. Hanauer
24  talked about it in his deposition. I think he
25  said clearly he was told very definitively

Page 95

Preston

1
2  that unanimity was important, that without
3  unanimity they didn't know if the deal would
4  get done.
5      Q.  Who told him that, if you remember?
6      A.  I don't believe that he remembered
7  who told him that. But I think that that --
8  he certainly remembered that, and I think that
9  was a very accurate statement on his part.
10     Q.  But you didn't attempt, getting back
11  to my question, to quantify the influence of
12  Herron and Hanauer on the OHSL shareholder
13  population as opposed to the influence of the
14  other OHSL directors; is that correct?
15     MR. BRAUTIGAM: Objection.
16     A.  What I did do was, say, when people
17  thought they acted with unanimity, the vote
18  passed by 2 percent. Had people realized that
19  there wasn't unanimity, it probably wouldn't
20  have passed at all.
21     Q.  What's the basis for that? What's
22  the quantitative basis for that?
23     MR. BRAUTIGAM: Objection.
24     A.  The kind of situation you saw in
25  Hewlett-Packard.

Page 96

Preston

1
2      Q.  Paragraph 21 you have a definition
3  of material.
4      A.  Um-hum.
5      Q.  What is the source of that?
6      A.  I think that that comes from
7  probably the securities laws as well as
8  finance literature.
9      Q.  The next section of your report
10  talks about the McDonald fairness opinion, OK?
11     A.  Yes.
12     Q.  If you turn over to paragraph 23,
13  page 10.
14     A.  OK.
15     Q.  You indicate that you have provided
16  fairness opinions in the past.
17     A.  I have.
18     Q.  Have you reviewed in this case what
19  McDonald & Company looked at?
20     A.  I have seen their fairness opinion.
21  I have not seen, I don't believe, the
22  underlying documents.
23     Q.  That's my question. Have you seen
24  any projections, forecasts or anything like
25  that that McDonald reviewed or relied upon?

Page 97

Preston

1
2      A.  No, I believe they said that they
3  reviewed and relied upon information prepared
4  by management and did not independently verify
5  it.
6      Q.  My question is, do you have any idea
7  what, if anything, they looked at along those
8  lines of forecast or projections?
9      A.  Not specifically.
10     Q.  Paragraph 23 states, "In light of
11  the fact that McDonald relied upon Provident's
12  materially misstated historical financials."
13     First of all, what's the basis for
14  your statement is that those financials were
15  materially misstated?
16     A.  That they were restated. In fact,
17  they were restated twice.
18     Q.  In your opinion that necessarily
19  means that every year to which the restatement
20  relates itself was materially misstated?
21     A.  I think that companies restate those
22  things which they need to restate and in fact
23  what we saw in the second restatement was that
24  '94, '95, and '96 were lumped together pretty
25  much.

25 (Pages 94 to 97)

Page 98

Preston

1
2      So that taken as a whole they were
3  at least materially misstated. I don't think
4  companies restate what they don't have to.
5      Q.  My question is is that -- I
6  understand that in the aggregate a restatement
7  may be material.
8      My question is are you opining, have
9  you analyzed whether or not the fact of the
10  restatement necessarily makes every single
11  year to which it relates materially misstated?
12      MR. BRAUTIGAM:  Objection.
13      A.  When I looked at the restatement,
14  and I think if you look at page 21 of my
15  report, or you can look at page 20, but in
16  either case what I'm looking at are numbers
17  that are for the time period we're considering
18  materially misstated.
19      Q.  1999, the numbers for 1999 are
20  four-year numbers, correct?
21      A.  Yes.
22      Q.  And we previously talked about how
23  you have not calculated how these numbers
24  would flow into or impact the three-month or
25  six-month numbers, correct?

Page 99

Preston

1
2      A.  No.  What I have said is that
3  forecasts are predicated on this method of
4  accounting, and in fact, the company
5  acknowledged as much when it made its
6  announcement regarding this restatement and
7  said, As a result of this restatement, by the
8  way, our earnings are going down in the
9  future.
10      So that whether these were
11  recorded --
12      Q.  Which restatement are you talking
13  about?
14      A.  The first restatement.  This would
15  affect our earnings in the future.
16      Q.  Your testimony is that the first
17  restatement indicated that the earnings in the
18  future would go down?
19      A.  Let's look at the first restatement.
20      Q.  OK.
21      MR. BURKE:  You can take a look at
22  that.  I am going to take a short break
23  while you do that.
24      THE WITNESS:  OK.
25      (A recess was taken.)

Page 100

Preston

1
2  BY MR. BURKE:
3      Q.  I think when we went off the record
4  we were talking about the first restatement
5  and you wanted to review it to address a
6  particular point.
7      A.  Correct.
8      Q.  OK.
9      A.  What I had said was the earnings
10  restatement that was announced in March in
11  fact was, um, had it been announced earlier in
12  1999 at the time of the proxy or what could
13  have been announced at that point would have
14  had a negative impact.  And it would have had
15  a negative impact because this earnings
16  announcement announces this change in
17  accounting which has negative impact going
18  forward.  This was done in March 5th of 2003.
19      "The Previous" -- and I'm quoting
20  from now the announcement.  "The previously
21  announced earnings per share outlook for 2003
22  was between $2.50 and $2.70.  As a result of
23  the evaluation of the estimated impact of the
24  auto lease financing transactions, the revised
25  earnings per share outlook is between $2.30

Page 101

Preston

1
2  and $2.50."
3      So a decline for 2003.
4      "The company's expectation is that
5  the impact of this matter will be
6  significantly less in 2004 and in future
7  years," but still negative.  I added the "but
8  still negative."  It's not there.
9      However, if one looks at the market
10  reaction to it and commentary on it, some of
11  which is also included in my paper, and I
12  would refer you to page 26, Professor Min Wu
13  says, "Earnings restatements rewrite a
14  company's history, generally in an
15  unflattering way.  When companies restate
16  earnings and particularly when that's
17  accompanied by a warning about future earnings
18  - as was the case with Provident - there are
19  usually reverberations."
20      This was not a benign, Oh, this
21  isn't going to change anything.  This changes
22  the fundamental way they were doing business
23  or the way the market perceived them doing
24  business.
25      Q.  Are you familiar with any of these

Page 102

```
1              Preston
2  individuals who are quoted on page 26?
3      A.  Min Wu?
4      Q.  Yes.
5      A.  A very respected, highly regarded
6  academic, yes.
7      Q.  Do you know whether or not any of
8  these individuals followed or were
9  knowledgeable about Provident or its business?
10     A.  Well, for example, let's look at Bob
11 Nameri there.  He manages $62 billion, which
12 included Provident shares.
13         I would say that anybody who is
14 managing that kind of money with their shares
15 probably was quite familiar.  I have not
16 spoken with him directly obviously.
17     Q.  That's my question.
18         Are any of these analysts'
19 statements admissions or statements on behalf
20 of the company?
21         MR. BRAUTIGAM:  Objection.
22     Q.  These are outside observers,
23 correct?
24         MR. BRAUTIGAM:  Objection.
25     A.  These are people who read the
```

Page 103

```
1              Preston
2  company's statement, which says, by the way,
3  it's going to lower earnings this year and it
4  will lower them in the future.
5      Q.  And do you know whether or not the
6  lowering of earnings related to the accounting
7  entries or the accounting theory --
8          MR. BRAUTIGAM:  Objection.
9      Q.  -- that was related in, that was
10 involved in the first restatement?
11         MR. BRAUTIGAM:  Objection.
12     A.  I would say that if you're trying to
13 contrast theory with entries, that the second
14 restatement was more theory and the first was
15 more entry.
16         I would say it was also a little --
17 one would think it was a systematic entry
18 problem.  It wasn't certainly a
19 straightforward entry problem.  It went, as
20 one of these people says, something goes
21 undetected for six years.  That has to be
22 reconciled with the cash flow statement is --
23 certainly strains credibility.
24         But if it was an entry problem the
25 way I think of a data entry problem, data
```

Page 104

```
1              Preston
2  entry problems don't cause continued problems.
3  This is something the company says is going to
4  cause continued problems.
5          So they're going to correct it, but
6  whatever exactly which I don't see revealed
7  was exactly the cause of this overstatement of
8  earnings is going to cause earnings now that
9  we've got that correction made to be lower
10 than you thought they were going to be in the
11 future too.
12         So this isn't, Oh, I put a wrong
13 number in.  This is this caused us to have to
14 reevaluate what our earning stream is going to
15 be.
16     Q.  And your testimony is you don't know
17 the source of those incorrect entries; is that
18 right?  Or why it was recurring?
19         MR. BRAUTIGAM:  Objection.
20     A.  My testimony is that it was nine
21 securitizations, and that what they said was
22 that, and then here again, we can just look at
23 the report and exactly what they said about
24 it.
25         The restatement of previously
```

Page 105

```
1              Preston
2  reported operating results is attributable to
3  errors in the accounting for nine auto lease
4  financing transactions originated between 1997
5  and 1999.  But that is a systematic error.
6  It's not a this occurred once.  We have got to
7  go back and relook at the whole stream of
8  income and its effect.
9          And you can see that those nine auto
10 leases originated in 1999, up from 1997
11 through '99, had much greater effects going on
12 forward.  So that this was not just like, Oh,
13 this just happened once.  This was not a
14 one-time kind of we're going to correct this
15 error if we had -- it had implications for
16 years out.
17     Q.  Were you aware that it was a data
18 entry error in a model that was used to
19 estimate income and expense?
20         MR. BRAUTIGAM:  Objection.
21     Q.  Estimated over the life of the
22 transactions?
23         MR. BRAUTIGAM:  Objection.
24     A.  I'm sure that's likely.
25     Q.  OK.  Did you read in the course of
```

27 (Pages 102 to 105)

Page 106

```
1                Preston
2    your work the PricewaterhouseCoopers report
3    that talks about their investigation of what
4    happened?
5        A.  I don't believe I've seen it.
6        Q.  Earlier you talked about the section
7    in the press release that talked about a 20
8    percent reduction in earnings estimates for
9    2003.
10       A.  20 cents, I believed, not 20
11   percent.
12       Q.  Did I say 20 percent?  I misspoke.
13   I meant to say 20 cents.
14       A.  Right.
15       Q.  Do you know how much of that 20 cent
16   reduction would have occurred had this been
17   discovered in 1999 prior to the OHSL Provident
18   merger?
19       MR. BRAUTIGAM:  Objection.
20       Q.  How would that number have compared?
21       MR. BRAUTIGAM:  Objection.
22       A.  Well, if they discovered it they
23   would have had different projections.  So how
24   would that number have compared in 2003?
25       Q.  No, in 1999.
```

Page 107

```
1                Preston
2        MR. BRAUTIGAM:  Objection.
3        A.  In 1999 the market is looking at
4    what's the future for this company based on
5    the business and the accounting methods that
6    we know they have, and there are projections
7    out there, and those are based on these same
8    numbers.  So that the projections would have
9    changed in the same manner.
10       Q.  How much?
11       MR. BRAUTIGAM:  Objection.
12       A.  By what the company says, by 20
13   cents in 2003.
14       Q.  So it's your testimony that the
15   projections in 1999 would have changed by 20
16   cents?
17       A.  It would have corrected it for that,
18   yes.  I mean, these are -- I'm just reading to
19   you from their statement:  The reported
20   operating results is attributed to errors in
21   the accounting for nine auto leases financing
22   transactions originated between 1997 and 1999.
23       So if they were originated then, we
24   don't have cumulative effects of more being
25   originated incorrectly later, that's the
```

Page 108

```
1                Preston
2    effect in 2003 of loans that were originated
3    in '97 through '99.
4        Q.  But my point is this.  You
5    understand from your review of the press
6    release that the adjustment reported in March
7    of '03 was a cumulative adjustment that
8    increased over time, do you not?
9        A.  I think you can look at my report on
10   page 20 or you can look at the company's
11   numbers, but you can see that the earnings are
12   restated every year.  So that the restatement
13   for 2003 or the change in 2003 is 20 cents.
14   It's 20 cents if you -- the change -- the
15   projection would be 20 cents different back in
16   1999 for 2003.
17       Q.  How did you calculate that or did
18   you calculate that?
19       MR. BRAUTIGAM:  Objection.
20       A.  That is straightforward logic.
21       Q.  You didn't see any of the materials
22   that McDonald relied upon including any
23   projections or forecasts, correct?
24       A.  Just that they said they had them,
25   yes.
```

Page 109

```
1                Preston
2        Q.  They said they had something.
3        A.  Yes.
4        Q.  What they had you don't know.
5        A.  They said they had the company's
6    projections and forecasts, yes.
7        Q.  You had indicated that the
8    McDonald's fairness opinion misled OHSL
9    shareholders in the last line of paragraph 23.
10       Paragraph 23, page 10.
11       A.  Thank you.
12       Q.  Do you see that?
13       A.  I do.
14       Q.  What's the basis for that?
15       A.  Well, it was based on false
16   financial information.
17       Q.  My question is, how do you know that
18   the McDonald opinion in particular misled OHSL
19   shareholders?
20       A.  I think I just answered that.
21       Q.  I guess my question is, how do you
22   know that any OHSL shareholders looked at,
23   relied upon or even read the McDonald fairness
24   opinion?
25       MR. BRAUTIGAM:  Objection.
```

28 (Pages 106 to 109)



Page 110

Preston

1   Preston
2   A. I don't know what an individual
3   shareholder did. I think that's actually one
4   of the purposes of the class action form of
5   litigation, is that it assumes that there is
6   in fact a body of shareholders and
7   knowledgeable market participants who actually
8   do this and their actions are reflected in
9   the purchase price of a particular security.
10  Q. And because you are familiar with
11  class actions I will ask you one further
12  question. If this is not something you can
13  answer, let me know.
14      The nature of class action
15  litigation is that the class is bound by the
16  evidence of the class representative, correct?
17      MR. BRAUTIGAM: Objection.
18  A. Boy, that I am not familiar with.
19  Q. Fair enough.
20      The next section talks about
21  Mr. Hanauer. And we've talked about
22  Mr. Hanauer a little bit.
23  A. Are we on page 11 now?
24  Q. Page 10 and 11, carrying over.
25  A. Right.

Page 111

1   Preston
2   Q. I am trying to short-cut this a
3   little bit. We talked a little bit about
4   Mr. Hanauer earlier in terms of dates for the
5   feelings he expressed and other things of that
6   sort and deposition testimony.
7   A. Right.
8   Q. In paragraph 25 you indicate that
9   the information you cite about Mr. Hanauer may
10  have caused the OHSL shareholders to form a
11  different opinion about the transaction with
12  Provident and in all likelihood would have
13  altered the outcome of the vote.
14  A. Correct.
15  Q. What's the nature of the analysis
16  that led you to that conclusion?
17  A. I think we have been over this
18  already.
19  Q. OK. If it's what you testified to
20  earlier, then that's fine.
21  A. Yeah, I think, you know, the fact of
22  Mr. Hanauer -- well, I will just kind of
23  summarize. It was the fact of Mr. Hanauer's
24  position within the company, his position in
25  Cincinnati in terms of it being a local

Page 112

1   Preston
2   business run by someone who had been there for
3   a long time, the fact that we have -- that I
4   did look at analogous situations, and I cited
5   the Hewlett-Packard one in my report and we
6   discussed that, would generally be the things
7   that I would state.
8   Q. Was Mr. Hanauer a homegrown OHSL
9   employee?
10      MR. BRAUTIGAM: Objection.
11  Q. If you know.
12  A. I don't know.
13  Q. He was not one of the founders of
14  OHSL, correct?
15      MR. BRAUTIGAM: Objection.
16  A. I don't recall his testimony on
17  that.
18  Q. Page 11, up at the top, you say "I
19  base this opinion on the fact that investors
20  are keenly interested in the opinions of
21  senior management, especially the most senior
22  member, the CEO."
23  A. Right.
24  Q. What's the foundation in literature,
25  in publications, in studies or treaties for

Page 113

1   Preston
2   that?
3       MR. BRAUTIGAM: Objection.
4   A. If you look at the next paragraph,
5   and there's a footnote about the AIMR
6   corporate disclosure survey, that's included
7   in my production here.
8   Q. So that survey is part of the
9   materials you produced.
10  A. It is.
11  Q. Thank you.
12  A. I mean, that survey is certainly,
13  one of them I think it confirms what would be
14  logical common sense. It's the reason why we
15  have CEOs, CFOs. They are the people who are
16  in charge. They are the people who speak in
17  general to the investment community and to the
18  public.
19  Q. And you believe that, I think you
20  refer in paragraph 26 to the fact that
21  investment professionals and financial
22  analysts opine on what they consider the most
23  important source of financial or corporate
24  information.
25  A. Correct.

Page 114

Preston

1
2  Q.  And you believe that investment
3  professionals' and financial analysts'
4  reliance upon the CEO or CFO would be
5  analogous to the position of the OHSL
6  shareholders; is that correct?
7      MR. BRAUTIGAM:  Objection.
8      Could you read that question back,
9  please.
10     (A portion of the record was read.)
11  A.  I think the investment professionals
12  and financial analysts often are stockholders
13  to begin with.
14      But more than that, I think that
15  this is a representative study that shows that
16  there are such people who -- it's a
17  quantification of something that is frankly
18  pretty obvious.
19      I mean, it is highly, would be
20  highly unusual for a junior accountant to
21  address the annual meeting on the financial
22  state of the company.  It would be highly
23  unlikely for the secretary in the shipping
24  department to address, um, to write a letter
25  to the background in the proxy statement.

Page 115

Preston

1
2      These people are generally expected
3  by the investment community, being investors,
4  being the -- whether they're investment
5  professionals or whether they're you and I or
6  financial analysts, you expect the
7  knowledgeable people to do the conveying of
8  the information.  And in fact, that's what's
9  happened in this company.
10  Q.  Were there any investment
11  professionals or financial analysts that were
12  tracking OHSL?
13  A.  McDonald's was I believe.
14  Q.  Anyone else that you can think of?
15  A.  Not offhand.  The analyst reports
16  that I have are in this package.
17  Q.  Did you obtain in the course of your
18  work any understanding of the type of
19  neighborhood or area Oak Hills is?
20      MR. BRAUTIGAM:  Objection.
21  Q.  Do you understand what I'm asking
22  you?  Is it Brooklyn or Westchester County?
23  Any sense of that?
24      MR. BRAUTIGAM:  Objection.
25  A.  I don't.

Page 116

Preston

1
2  Q.  Down later on page 11, in the middle
3  of that paragraph, paragraph 27, you state "My
4  analysis of the historical trading data for
5  OHSL common stock indicates that the shares
6  did not turn over quickly relative to the
7  total number of shares outstanding.  This
8  suggests that many of its investors were
9  committed, long-term owners of the stock."
10      Is there any other possibility that
11  would have explained the lack of trading?
12  A.  Yes.  Trading is subject to supply
13  and demand.  And therefore at the right price,
14  you know, if somebody had offered them a
15  hundred dollars a share, there might have been
16  more trading.  But given that there wasn't,
17  they obviously held their shares longer than
18  is customary.
19  Q.  Are you aware that the evidence is
20  that the market for OHSL stock was very
21  illiquid?
22      MR. BRAUTIGAM:  Objection.
23  A.  Explain to me what evidence you're
24  talking about.
25  Q.  Are you familiar with Mr. Thiemann's

Page 117

Preston

1
2  testimony about the liquidity of the stock or
3  the analysis in the proxy statement of the
4  liquidity of the OHSL stock?
5  A.  Yeah, I've looked at the trading
6  data and I've looked at the price movement in
7  the stock relative to it, as I think it -- it
8  was liquid enough to be efficient.
9  Q.  And what's the basis for that?
10  A.  Well, it reacts to information.
11  Q.  The next sentence indicates "the
12  stock was not actively followed by securities
13  analysts."  That's correct?
14  A.  Yes.
15  Q.  The next statement about
16  "Mr. Hanauer was a visible member of the
17  community," what's your basis for that?
18  A.  I think it's testimony.  I'm trying
19  to remember whose.  Certainly the fact that he
20  had been affiliated with the bank for twenty
21  years.  I live in a small community.  We have
22  a small community bank.  The people who are
23  affiliated with it are known throughout the
24  community.
25  Q.  What bank is that?

30 (Pages 114 to 117)

Page 118

Preston

1
2     A.  It is now PNC, but it began as
3  Princeton Bank.  So it went through eight
4  probably mergers, acquisitions and changes,
5  but the same people are there and everybody
6  knows Chris Lockhammer and other folks who are
7  affiliated with the bank and they're
8  well-known members of the community.
9     Q.  Paragraph 28, we have already talked
10  about Mr. Herron and his testimony.  You talk
11  about Mr. Zoellner.
12     A.  Uh-huh.
13     Q.  Did you read all of Mr. Zoellner's
14  testimony?
15     A.  Yes.
16     Q.  And did you read, just so I
17  understand, did you read his testimony in the
18  federal and the state court action, do you
19  remember?
20        MR. BRAUTIGAM:  Objection.  I don't
21     believe Mr. Zoellner was deposed in the
22     state court action.
23        MR. BURKE:  He might not have been.
24     I stand corrected.
25     A.  I have read so much testimony, I --

Page 119

Preston

1
2     Q.  OK.  You cite Mr. Cook.
3     A.  Yes.
4     Q.  Do you have any knowledge as to
5  whether Mr. Cook had any knowledge whatsoever
6  about Mr. Hanauer's position, firsthand
7  knowledge?
8     A.  I don't believe Mr. Cook was in the
9  board meetings, or whatever.  I believe
10  however that he definitely testified that he
11  believed opposition to the transaction was
12  material.  I think -- Mr. Podetta?  I think
13  that's his name.
14     Q.  Pedoto.
15     A.  Pedoto, also testified.
16     Q.  Mr. Thiemann, you cite his
17  testimony.  Do you recall reading the portion
18  of Mr. Thiemann's testimony where he talked
19  about his financial plan??
20     A.  No.
21     Q.  Do you recall what Mr. Thiemann in
22  fact did in terms of the sale of his OHSL
23  shares --
24        MR. BRAUTIGAM:  Objection.
25     Q.  -- in connection with the merger?

Page 120

Preston

1
2     A.  Well, I don't recall specifically
3  from his testimony based on my language here.
4  He obviously did not vote against it.
5     Q.  Right.  Do you recall whether or not
6  Mr. Thiemann indicated that he in fact had
7  read the proxy statement?
8     A.  I don't.
9     Q.  Paragraph 30, as we move through
10  this, to the extent your answer is what you've
11  testified to already, just let me know.
12        The first sentence states, "It is my
13  opinion that if shareholders had known that
14  the person on the board of directors with the
15  largest financial stake in the Company, and
16  the greatest ability to impact the vote by
17  virtue of share ownership, did not believe the
18  Merger was in the best interest of
19  shareholders, the outcome of the shareholder
20  vote would...likely have been different."
21        MR. BRAUTIGAM:  "Most likely."
22     Q.  I'm sorry, most likely would have
23  been different.
24        My first question deals with this
25  section that says that Mr. Hanauer, who I

Page 121

Preston

1
2  believe is being referred to here, did not
3  believe the merger was in the best interest of
4  shareholders.
5        Again, what is the time frame for
6  that belief, if you understand it?
7     A.  The time frame -- I don't know.  I
8  think you asked me when he came to that
9  belief.  I'm not sure of the time.  But, you
10  know, it's certainly the case that he came to
11  that belief before the transaction closed.
12     Q.  What's your basis for saying that?
13     A.  He voted against the -- his own
14  shares against it.  He certainly at some point
15  came to the belief that it was not the --
16  clearly the Kincaid (phon) lawyers thought he
17  should have advised them of it and that that
18  was a material fact.
19     Q.  Did you see the portion of
20  Mr. Hanauer's testimony where he testified
21  that the reason he voted against the
22  transaction was because he was not ready to
23  retire at age whatever he was at that time?
24        MR. BRAUTIGAM:  Objection.
25     Mischaracterization.

31 (Pages 118 to 121)

Page 122

Preston

1
2  A.  Yes.  I think it was 50 or
3  something.
4      Q.  50.  OK.
5      A.  He said he wasn't ready to retire.
6  I don't know as he said the reason he voted
7  against it was that, but he certainly said he
8  wasn't ready to retire at age 50.
9      Q.  Is it your testimony that this
10 belief that you referred to here, that
11 Mr. Hanauer reached that belief prior to the
12 preparation and transmittal of the proxy
13 statement?
14     A.  You know, I don't know when he
15 reached that belief.  I do know that in fact
16 if we look at the Hewlett-Packard situation,
17 we have a situation where Mr. Hewlett voted
18 for the -- as part of the board of directors,
19 voted for the transaction and then made his
20 personal views known.  Afterward he changed
21 his mind.
22     I think that whether, um, his
23 personal view was that it wasn't in the best
24 interest of the shareholders when he voted for
25 it, or that he was simply worn down, as he

Page 123

Preston

1
2  said, and gave up, and that would lead me to
3  believe that his personal belief by August 2nd
4  was that it wasn't in the best interest, but
5  he just gave up.
6      But even if it wasn't, if before the
7  vote is finalized, before his opinion has
8  changed that dramatically, that's an important
9  piece of information for shareholders.
10     But the fact is that his testimony
11 is that he simply gave up, I believe, are the
12 words that he uses.  That doesn't indicate to
13 me that that happened after the proxy
14 materials were published.
15     Q.  But you haven't seen anything
16 definitively one way or the other on that.
17     MR. BRAUTIGAM:  Objection.
18     Q.  When he reached that belief; is that
19 correct?
20     A.  I have not seen testimony from
21 Mr. Hanauer that says I came to this opinion
22 on July 21st.  In fact, I have seen testimony
23 and actions that indicate on July 22nd he was
24 of that opinion.  His actions say that.
25     And then on -- and people, he was

Page 124

Preston

1
2  known by board members to be against the
3  transaction.  And then I see that on
4  August 2nd he says he just gave up.  So it
5  would appear to me that he was always of that
6  opinion.
7      Q.  I think you answered this in the
8  beginning, but my question is, do you see
9  anything in Mr. Hanauer's testimony where he
10 said I did not believe what is stated in your
11 sentence as of a particular day or I came to
12 that belief as of a particular day?
13     MR. BRAUTIGAM:  Objection.
14     A.  I didn't see anything as of a
15 particular date.  Only we know that as of
16 August 2nd he just gave up.
17     Q.  And voted in favor of the
18 transaction that day, correct?
19     A.  And voted in favor.
20     Q.  Did you see in Mr. Hanauer's
21 testimony where he stated that he did not
22 believe that this was significant information
23 because it was his personal belief, not his
24 belief as an officer or director of the
25 corporation?

Page 125

Preston

1
2      MR. BRAUTIGAM:  Objection.
3      A.  I saw testimony -- or I've certainly
4  discussed that.  I don't recall.
5      Q.  Fair enough.
6      A.  The words in the testimony don't
7  come to me at this point.
8      Q.  That's fine.  Do you recall anything
9  in the testimony of Mr. Hanauer where he
10 indicated either to his counsel or to anyone
11 else at OHSL this belief that you are
12 referencing in this paragraph 30 of Preston
13 Exhibit 3?
14     A.  No, I recall counsel testifying that
15 if it was his belief, he should have made it
16 known, and it was -- should have been public.
17 But I don't recall him having made them aware.
18     Q.  This last sentence of that section,
19 "In fact, Mr. Hanauer had already voted his
20 shares against the transaction at the time of
21 the special meeting of shareholders."
22     What's the support for that if you
23 remember?
24     A.  I have seen documents talking about
25 when he voted.  I don't recall.

32 (Pages 122 to 125)

Preston

1
2    Q.  Fair enough.  The next section talks
3  about your analysis of the vote and what votes
4  would have been cast in opposition, and I'm
5  going to ask you your basis for that.  If
6  that's what you testified to already, that's
7  fine.
8        But your statement in particular
9  that I am referring to in the second sentence
10  on page 14, "The transaction was approved by a
11  slight majority of the shares, many of which I
12  believe would have been cast in opposition to
13  the transaction, had shareholders been
14  provided with accurate and non-misleading
15  information in the Proxy."
16        What's the basis for your belief?
17    A.  The change in the stock price of
18  Provident and the correct financial reporting,
19  the fact that Mr. Thiemann testified that he
20  would have voted his shares against the
21  transaction, and the fact that you would have
22  only needed 23,000 votes changing, and the
23  likelihood of that number of votes changing
24  based on other companies and what happens when
25  you have a director who is actively against a

Preston

1
2  merger is my basis.
3    Q.  That's Hewlett-Packard?
4    A.  That's Hewlett-Packard.
5    Q.  And part of your belief is based
6  upon what you believe the financial impact on
7  Provident stock price would have been.
8    A.  That's true.
9    Q.  Is that right?
10    A.  Yes.  The fact that Mr. Herron
11  resigned I think I just left out, but that's
12  certainly a very significant piece of
13  information as well.
14    Q.  The next statement states,
15  "Regardless of whether or not the outcome of
16  the vote would have been different, OHSL
17  shareholders were entitled to consider all
18  relevant information."  It continues from
19  there.
20        Why do you add "regardless of
21  whether or not the outcome of the vote would
22  have been different"?  Why is that thought in
23  there?
24    A.  Because it's true.  I think it goes
25  back to the original statement I had, which is

Preston

1
2  the purpose of the proxy statement itself, is
3  to provide accurate information so people can
4  make informed decisions.
5    Q.  There is at least the possibility or
6  in your mind though that the shareholder vote
7  may not have been affected by these matters.
8        MR. BRAUTIGAM:  Objection.
9    Q.  Is that correct?
10    A.  There is never certainty with
11  something that hasn't happened.  So –
12    Q.  I'm going to remember that line.
13    A.  So that there's some small chance,
14  very small I think, given the numbers we're
15  talking about.  Some small chance.
16    Q.  Page 15, carryover paragraph 32,
17  last sentence, "During the course of
18  negotiations in 1999 at least four of the
19  eight original Board members were not in favor
20  of continuing merger negotiations with
21  Provident and expressed their objections."
22        Can you describe for me what you're
23  referring to there?
24    A.  Well, you can look at the footnote.
25  And there we have Mr. Zoellner testifying that

Preston

1
2  as of June he, Mr. Hanauer, Mr. Herron and
3  Mr. Hillenbrand were not in favor of the sale.
4    Q.  And that obviously changed, correct?
5        MR. BRAUTIGAM:  Objection.
6    A.  For some of them.
7    Q.  I mean, if four of them, four of the
8  eight were opposed there would have been no
9  negotiations, correct?
10        MR. BRAUTIGAM:  Objection.
11    A.  I guess it might depend on how they
12  counted them.  They have a little different
13  counting than people usually do, so...
14    Q.  Did you read the background of the
15  transaction section of the proxy statement?
16    A.  I did.
17    Q.  You're aware it talked about how
18  possible sale of the company had been explored
19  prior to 1999 and the company decided not to
20  go that route; is that correct?
21    A.  Yes.
22    Q.  So it's a fact that the decision by
23  the OHSL board in prior years not to explore a
24  merger was disclosed.
25        MR. BRAUTIGAM:  Objection.

33 (Pages 126 to 129)

Page 130

Preston

1    A.  You know, I have not memorized it.
2    I would be glad to look at it again and make
3    sure that we've got everything.  Now, I know
4    they have looked at things previously.  They
5    didn't go forward.
6        Q.  In your experience with proxy
7    statements when in the background of a
8    transaction there is a description of what is
9    going on, is it your experience that every
10   vote of the board of directors is disclosed in
11   terms of whether it's a five to one vote or a
12   four to two vote as the discussion of a
13   transaction moves forward?
14       A.  Not necessarily.
15       Q.  Have you seen this situation where
16   when something is not unanimous the
17   description in the proxy statement will be
18   that the board of directors approved or the
19   board of directors disapproved?
20       A.  It in fact might be the case, yes.
21       Q.  In your experience if a statement is
22   that the board of directors approved or
23   disapproved something and it doesn't state
24   unanimously, that you would assume or that you

Page 131

Preston

1    would understand that the vote was not
2    unanimous.
3        MR. BRAUTIGAM:  Objection.
4        A.  I don't know as I would make an
5    inference one way or another on that.
6        Q.  Pages 16 through 19 deal with the
7    Hewlett-Packard issue that you talked about
8    previously.
9        A.  Right.
10       Q.  And obviously there is a fair amount
11   more detail than here than we talked about,
12   but my question is, have we covered in my
13   questions here today the essence of your
14   opinion why the Hewlett-Packard situation is
15   analogous to the Provident/OHSL situation?
16       MR. BRAUTIGAM:  Objection.
17       A.  I guess I would point you to
18   paragraph 37 there and the first quotation in
19   that.  This is where Mr. Hewlett has
20   determined that he is going to vote his shares
21   and those of his foundation against this deal.
22       And this quotation says:  "This is
23   quite a blow to the current management of
24   H-P," said Bruce Raabe, chief investment

Page 132

Preston

1    officer of Collins & Company, which owns
2    150,000 Hewlett-Packard shares.  "It signals
3    some doubt in Carly's management and judgment.
4    This will change how the vote shakes out."
5        I think that's exactly what we've
6    been talking about, that opposition can
7    change, and usually does, how a vote would
8    come out.
9        Q.  We also talked about earlier how it
10   did not change the outcome of this particular
11   merger, correct?
12       MR. BRAUTIGAM:  Objection.
13       A.  No.  You know, I'm not sure of that.
14   Are you?
15       Q.  The board of directors voted to
16   approve the transaction, correct?
17       MR. BRAUTIGAM:  Which transaction?
18       MR. BURKE:  The original merger
19   transaction.
20       MR. BRAUTIGAM:  H-P?
21       MR. BURKE:  Yes.
22       Q.  Isn't that right?
23       A.  That's true.
24       Q.  Mr. Hewlett voted in favor of it.

Page 133

Preston

1    A.  Yes.
2        Q.  And Mr. Hewlett came out in
3    opposition to it as you described.
4        A.  That's true.
5        Q.  Then it was put to a vote of the
6    shareholders.
7        A.  Correct.
8        Q.  And the shareholders approved the
9    transaction.
10       A.  Yes.
11       Q.  Were the transaction terms
12   renegotiated?
13       A.  In the Hewlett-Packard deal?
14       Q.  Yes.
15       A.  I don't believe so.  I don't recall.
16       Q.  So at least as to the best of your
17   recollection Mr. Hewlett's opposition did not
18   change the financial terms of the deal.
19       A.  I don't believe it did.
20       Q.  Page 19, paragraph 40.  Again, we're
21   talking here generally about Provident's loan
22   securitization activities.
23       And again, this deals with the
24   disclosures exclusively in the proxy

34 (Pages 130 to 133)

Page 134

1          Preston
2   statement, correct?
3       A.  Correct.
4       Q.  Paragraph 41 talks about in the
5   second sentence "Unless one assumes OHSL
6   shareholders were previously familiar with the
7   concept of loan securitization, and gain on
8   sale accounting, the risk disclosure section
9   did not adequately explain the very real
10  possibility that Provident's earnings could be
11  negatively impacted in the future."
12      MR. BRAUTIGAM:  Objection, it's not
13  the second sentence.
14      MR. BURKE:  OK, it's the third
15  sentence.  Shoot me for one.
16      Q.  Do you see where I'm referring to?
17      A.  Yes.
18      Q.  Loan securitizations and gain on
19  sale accounting are highly technical
20  accounting concepts, are they not?
21      A.  Yes, they're technical.
22      Q.  How does one in your experience go
23  about explaining such highly technical
24  accounting concepts to a shareholder base that
25  in this case consisted of former depositors in

Page 135

1          Preston
2   an S&L without overwhelming them with
3   information they are unable to understand?
4       MR. BRAUTIGAM:  Objection.
5       Q.  Do you understand what I'm asking?
6       A.  How do you describe what loan
7   securitization is and how dangerous it is?  I
8   don't think you have to have a geologist
9   define a cliff to know that if you fall off a
10  thousand foot cliff you can break your leg.
11  So I think that that is not -- you don't have
12  to describe the accounting entries that need
13  to be made.
14      What you do is you need to make sure
15  that people understand what a huge percentage
16  of your business it is, how your accounting
17  treatment could radically change the way
18  you're recognizing your revenue as a result of
19  it.  You could change your accounting
20  treatment, and that would have an unfavorable
21  impact on the way you're recognizing your
22  income.
23      I think that you could let people
24  know that it's, you know, these are -- our
25  accounting treatment is subject to change, and

Page 136

1          Preston
2   if we do change it, you know, our earnings are
3   going to go down.  And so that you don't need
4   to explain all the nuances in order to let
5   people know that this isn't an S & L and these
6   are much much riskier things than you're used
7   to.
8       Q.  You answered my question.  If I
9   understand you correctly, it's not the
10  technical details of those concepts.  It's the
11  risks associated with them that need to be
12  disclosed.
13      A.  The risks associated with them and
14  the impact that those, that these have.  We're
15  not talking about something that's 2 percent
16  of our income here.
17      Q.  Do you recall that in granting in
18  part and denying in part defendant's original
19  motion to dismiss that the court recognized
20  that the proxy materials adequately disclosed
21  the risks of securitizing loans?
22      MR. BRAUTIGAM:  Objection.
23      Q.  Do you remember that conclusion by
24  the court?
25      A.  I don't.

Page 137

1          Preston
2       Q.  Do you have any opinion one way or
3   the other on whether or not the percentage of
4   income or the extent of the securitizations as
5   it affected Provident's financial statements
6   were disclosed in other periodic filings other
7   than the proxy statement?
8       A.  I believe they were.
9       Q.  The next several pages from pages 20
10  through twenty -- beginning at the top of page
11  25 deal with the Provident earnings and the
12  impact of the restatement.
13      A.  Right.
14      Q.  We talked a little bit about the
15  chart at the bottom of page 20 already.
16      A.  Yes.
17      Q.  And I think we have already talked
18  about what the impact for the interim
19  financials in 1999 would or would not have
20  been, correct?
21      A.  We talked about what they would or
22  would not have been and what the -- knowing
23  that this kind of accounting was in use and
24  its impact if it were changed, how that would
25  have changed people's projections.

35 (Pages 134 to 137)

Page 138

1  **Preston**
2    Q.  OK.  In paragraph 42, in the middle
3  of that paragraph, the sentence begins
4  "After"?
5    A.  Yes.
6    Q.  And you referred to in the next
7  line, "the fact that Provident's reported
8  earnings and projections were relied upon, at
9  the time, by McDonald, in arriving at its
10  fairness opinion," OK?
11    A.  Yes.
12    Q.  We talked about earnings.  Do you
13  have any knowledge of what, if any,
14  projections were relied upon by McDonald or
15  what they showed?  Projections of what?
16    MR. BRAUTIGAM:  Objection.
17    A.  I think if we look at I think it's
18  Annex C of the proxy we can read exactly what
19  McDonald said.
20    Q.  This is a document previously
21  marked, we're not going to bother with this
22  for purposes of today, as Defendant's
23  Exhibit 1.  And I will attempt to direct your
24  attention.  Is that the document you referred
25  to?

Page 139

1  Preston
2    A.  It is.
3    (Pause to correct technical
4  difficulty.)
5    A.  (Continuing) In terms of what
6  McDonald's relied upon from Provident, —
7    Q.  Right.
8    A.  — they reviewed the historic
9  information that was contained in their annual
10  reports and 10-Ks, Qs.  They reviewed certain
11  other public and nonpublic information,
12  primarily financial in nature, relating to
13  their respective businesses, earnings, assets
14  and prospects of OHSL and PFGI provided to us
15  or publicly available.
16    That's little iii.
17    Q.  And prospects is what you're
18  referring to?
19    A.  Prospects there.
20    In iv, prepared in meetings and
21  telephone conferences with — I'm sorry,
22  "participated in meetings and telephone
23  conferences with members of senior management
24  of OHSL and PFGI concerning the financial
25  condition, business, assets, financial

Page 140

1  **Preston**
2  forecasts and prospects of the respective
3  companies as well as other matters we believed
4  relevant."
5    Then I think if you go to the
6  following page, in the paragraph under ix,
7  halfway through that paragraph, beginning at
8  the left-hand side of the page, "with respect
9  to financial forecasts used in our analysis we
10  have assumed that such forecasts have been
11  reasonably prepared by management of OHSL and
12  PFGI as the case may be on a basis reflecting
13  the best currently available estimates and
14  judgments of management of OHSL and PFGI as to
15  the future performance of OHSL, PFGI and OHSL
16  and PFGI combined as the case may be."
17    So based on this statement I would
18  say they had reviewed forecasts prepared by
19  management of Provident for their use.
20    Q.  But you don't know what the
21  forecasts related to, correct?
22    MR. BRAUTIGAM:  Objection.
23    A.  I think they related to Provident.
24  At least Provident.  And probably it was
25  Provident that prepared those that were for

Page 141

1  **Preston**
2  the Provident/OHSL combination.
3    Q.  Forecasts of what?
4    A.  Relevant financial information.
5    Q.  But you don't know what relevant
6  financial information was contained on the
7  forecast, right?
8    A.  I think we can assume that
9  McDonald's did a reasonable job here.  I
10  haven't heard anyone say that they did not do
11  a typical job.  If it was interest earned,
12  that would definitely be what we're talking
13  about here.  If it was revenues booked, that
14  would be what we're talking about here.
15    I have no reason to believe that
16  they didn't have adequate information, which
17  they say they believe they had.
18    Q.  I understand that, but you just
19  don't know what they did or what they looked
20  at, correct?
21    MR. BRAUTIGAM:  Objection.
22    Q.  We don't have a copy of what they
23  looked at, do we?
24    MR. BRAUTIGAM:  Objection.
25    A.  We don't with precision have any

36 (Pages 138 to 141)

Page 142

Preston

1
2  copy. However, we know what is standard
3  practice.
4      Q.  OK, page 3 that you just referred
5  to.
6      A.  Yes.
7      Q.  The language you were quoting.
8      A.  Yes.
9      Q.  Do you know what financial forecasts
10  actually were used in their analysis?
11      A.  It is ones prepared by management.
12      Q.  Does it say that?
13      A.  Yes.
14      Q.  It says with "respect to financial
15  forecasts used in our analysis."
16      Which of the forecasts they received
17  were actually used?
18      A.  It says up above, "We have relied
19  upon the accuracy and completeness of the
20  representations, warranties and covenants of
21  them contained in their agreement."
22      Q.  Right.
23      A.  Does it say that they used those
24  precisely?  No.  Does it say they used them as
25  a basis?  Yes.

Page 143

Preston

1
2      Q.  It says they used some, but we are
3  not sure of exactly what they used, are we?
4      A.  Well, we assume that they didn't do
5  anything that was out of line with what the
6  company was telling the rest of the world.
7  Otherwise they would have had a duty to
8  disclose that as well.
9      Provident was making public its
10  forecasts, and so therefore, if McDonald's was
11  doing something that was grossly different and
12  McDonald's felt that what Provident was doing
13  was not accurate, they had an obligation to
14  disclose that.
15      Q.  What is the basis for your
16  conclusion that as a result of the information
17  you're talking about here, MacDonald's would
18  have not rendered its fairness opinion or
19  would have changed its fairness opinion?
20      A.  What line are you on?  I'm sorry.
21      Q.  Maybe I -- let me ask you that
22  differently.  Is it your testimony that the
23  information and the financial data that you
24  have summarized in this section of your report
25  would have caused McDonald's not to render its

Page 144

Preston

1
2  fairness opinion or to have revised its
3  fairness opinion?
4      MR. BRAUTIGAM:  Objection.
5      A.  I think it would have had to revisit
6  its fairness opinion.
7      Q.  What does that mean?
8      A.  It means that given that it had
9  certain projections that it used in its
10  fairness opinion, it is beyond my
11  comprehension that those projections would not
12  have had to have been revisited given these
13  changes in finances, unless they were told by
14  the company that there wasn't, that their
15  financial statements were incorrect.
16      But if they had known the correct
17  information that would require a revisiting to
18  their process.
19      Q.  Are you able to testify or express
20  an opinion beyond that though whether or not
21  that revisiting in fact would have caused
22  McDonald not to render a fairness opinion or
23  to have changed its fairness opinion?
24      MR. BRAUTIGAM:  Objection.
25      A.  I think that they would have had to

Page 145

Preston

1
2  have revisited it.
3      Q.  Beyond that you can't say?
4      A.  I do not have the ability to say
5  they would have had to have changed it.
6      Q.  Page 21, paragraph 44, talks about
7  the second announcement on April 15, 2003.
8      A.  Uh-huh.
9      Q.  What was your understanding of that
10  second announcement and what it related to?
11  Again, I'm not trying to do a memory test.  If
12  you want to refer to the press release, feel
13  free.
14      A.  Well, let's do that, because it
15  talks about the fact that this short time
16  later, six weeks, they are revising their
17  numbers again, restating them, as a result of
18  a review by PWC, who came in and determined
19  that their accounting, they were accounting
20  for transactions as, um --
21      Q.  Direct finance leases?
22      A.  Thank you.  Direct finance leases,
23  that should have been accounted for as
24  operating leases.
25      Q.  Is that a concept, that accounting

Page 146

```
 1              Preston
 2  concept and the rules governing those two
 3  things, something that you're familiar with or
 4  an expert in?
 5      A.  I'm not an expert in it.
 6      Q.  But you're generally familiar with
 7  those concepts?
 8      A.  Yes.
 9      Q.  And do you recall what the substance
10  of the April 15th announcement was beyond what
11  you just said?
12      A.  Well, what the numbers were.  And I
13  believe they -- I believe the April 15th
14  announcement was one which said basically,
15  Look, this changes our numbers at this time,
16  but in the future we will see a positive
17  impact from it.
18      Q.  Do you recall that as a result of
19  the April 15th announcement the decision was
20  made at the instance of PricewaterhouseCoopers
21  that the Provident securitization, auto loan
22  securitizations, had to be accounted for as
23  operating leases?  Do you recall that being
24  the outcome of it?
25          MR. BRAUTIGAM:  Objection.
```

Page 147

```
 1              Preston
 2      A.  Well, wasn't it kind of the other
 3  way?  You had to account for them as operating
 4  leases and therefore we had to restate these
 5  previous years?
 6      Q.  My question is, at the end of the
 7  day on April 15th, do you recall that they
 8  were characterized as operating leases as
 9  opposed to direct finance leases?
10      A.  Going forward.
11      Q.  Yes.
12      A.  Yes.
13      Q.  Do you recall why?
14      A.  I think it had to do with the
15  insurance of the, um, and the way the
16  insurance kicked in and the residual value.
17      Q.  Do you recall that subsequent to the
18  Provident second announcement on April 15th
19  that the SEC merging issues task force came
20  out with a pronouncement relating to those
21  kinds of insurance policies?
22      A.  I don't recall that.
23      Q.  Do you recall anything along the
24  lines that other banks had similar issues as
25  to the one that PricewaterhouseCoopers
```

Page 148

```
 1              Preston
 2  identified at Provident and that spurred the
 3  SEC to take action?
 4          MR. BRAUTIGAM:  Objection.
 5      A.  Well, I recall some SEC action.  I
 6  recall some regulatory, you know, the Fed
 7  looking into these things as well.  So there
 8  was definitely interest in this accounting
 9  issue.
10      Q.  The second announcement on
11  April 15th again changed the accounting for
12  these auto lease securitizations and also
13  increased the amount of the total restatement,
14  correct?
15      A.  It did.
16      Q.  It clearly related to the same
17  issue, the auto lease securitizations and the
18  accounting for them, correct?
19          MR. BRAUTIGAM:  Objection.
20      A.  Well, that was part of it, yes.
21      Q.  It's true that the full story on the
22  accounting for the auto lease securitizations
23  and the size of the restatement was not fully
24  and finally disclosed until April 15, 2003,
25  correct?
```

Page 149

```
 1              Preston
 2      A.  I would say the total story was not
 3  out until then, that's true.
 4      Q.  What happened to the Provident stock
 5  price after the April 15, 2003 announcement?
 6      A.  I don't think there was a
 7  statistically significant movement.
 8      Q.  Did it go up or did it go down?
 9      A.  I think it went up a few cents.
10      Q.  How about in the days and weeks
11  following the April 15, 2003 announcement?
12      A.  I have a graph of the price.  You
13  can look at it if you want.
14      Q.  That's fine.  If you would like to
15  look at that, that's fine.
16      A.  Here we go.  This is the graph and
17  the supporting data on things.
18          OK, here we are, April 15th, 2003.
19  See this?  This is March.  This is the bank
20  index up here.  This is March.
21      Q.  Right.
22      A.  You can see following March
23  Provident pretty much then generally goes up
24  some, right?
25      Q.  Right.
```

38 (Pages 146 to 149)

Page 150

Preston

1
2    A.   Just about in lockstep with the –
3    and that's exactly you recall when we did the
4    regression analysis and we used this
5    preperiod.  What it finds is that except for
6    these exceptional events, Provident acts
7    pretty much like Midcap Bank, and it did in
8    fact go up, just like the rest of the other
9    things.
10        But with this one major deviation.
11   And it doesn't make up.  You don't see all of
12   a sudden, oh, it's back up here with these
13   guys.  No, it's the major deviation.
14       Q.   It wasn't up there with them before
15   the major deviation.
16       A.   No, but you can see just visually.
17   This is probably an inch and a quarter
18   difference.  Now we have got an inch and a
19   half, an inch and a half and an inch and a
20   half.  It's a major deviation.  It didn't make
21   up the difference.
22       Q.   My question is -- you're talking
23   about the deviation on March 5th.
24       A.   Right.
25       Q.   I am talking about after April 15th,

Page 151

Preston

1
2    2003, when all the information was in, the
3    Provident stock price rose thereafter.
4        A.   With the market.
5        Q.   OK.  And within 91 days after
6    April 15th, 91 trading days after April 15th,
7    it was in excess of that preannouncement price
8    on March 4th, correct?
9        A.   Let's look at that.  91 --
10       Q.   -- trading days.
11       A.   -- trading days.  So for a quarter.
12       Q.   Yes.
13       A.   So that would be April 15th --
14       Q.   Don't ask me to do math.
15       A.   -- to July 15th.  No, but you're
16   saying trading days.
17       Q.   So it would be a little longer than
18   that.
19       A.   Yeah, see, the law of course has to
20   do with calendar days as opposed to trading
21   days.
22       Q.   OK.
23       A.   So on April 15th the stock is at
24   $22.03.
25       Q.   And what did it do in the days after

Page 152

Preston

1
2    that, like the next day?
3        A.   April 15th, 22, it went down a few
4    cents just like it went up a few cents.  The
5    next day it's up a few cents.  I mean, it's
6    moving up right with the index.  There's no
7    question about the fact that it's moving up
8    with the index.
9        But I don't know what 91 trading
10   days are.
11       Q.   Don't worry about it.  Whatever it
12   is, it is.
13       A.   But it's clear that the upward
14   movement is an industrywide movement, not a
15   Provident specific movement.
16       Q.   What was the name of the index that
17   you used to track?
18       A.   The S&P Midcap Bank index.
19       Q.   Why did you use Midcap as opposed to
20   the S&P 500 bank index?
21       A.   I believe Provident identified it.
22       Q.   Do you know if Provident performed
23   in connection with the overall S&P 500 bank
24   index?
25       A.   Might have looked at it.  Didn't

Page 153

Preston

1
2    keep it.  Let me see.
3        No, I didn't keep it.
4        Q.   I will show you a document which is
5    attached to the affidavit of Tayfun Tuzun in
6    this case, which is Exhibit 3, which compares
7    the Provident stock price versus the S&P 500
8    bank index, which indicates that from the
9    period comparable to what you looked at,
10   April 2nd, 2003, through the end of the year
11   it outperformed the S&P 500 bank index.
12       Do you dispute that?
13       MR. BRAUTIGAM:  I would just caution
14   the witness to be extremely skeptical of
15   anything Dr. Tuzun submits in this case.
16       MR. BURKE:  I think she will be.
17       A.   I don't know whether his data are
18   accurate.
19       Q.   Fair enough.
20       MR. BURKE:  Off the record.
21       (A luncheon recess was taken at
22   12:25 p.m.)
23
24
25

39 (Pages 150 to 153)

Preston

1
2    A F T E R N O O N   S E S S I O N
3    (Time noted: 1:15 p.m.)
4    C A N D A C E   P R E S T O N , resumed
5    and testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. BURKE:
8    Q.    Page 22 of your report, which we've
9    marked as Preston Deposition Exhibit 3.
10    A.    Yes.
11    Q.    Paragraph 46.  You indicated you're
12    familiar with studies that have examined stock
13    price changes in response to earnings
14    restatements, and you list several of them.
15    A.    Correct.
16    Q.    Are those included in the materials
17    you brought with you today?
18    A.    They are.
19    Q.    The next statement is, "I have also
20    studied the price changes in Provident's stock
21    during the time period surrounding the
22    earnings restatement on March 5, 2003."
23    Did you also conduct a study of
24    changes, price changes in Provident stock
25    following the second announcement on

Preston

1
2    April 15th?
3    A.    Yes.
4    Q.    And is that, the April 15th price
5    change announcement, reflected somewhere in
6    the report?  I misspoke.  Hang on for a
7    second.
8    Is that analysis of the price
9    changes in Provident's stock following
10    April 15th reflected in your work, in your
11    report?
12    A.    I don't think it's specifically in
13    here, no.
14    Q.    So you did analyze it, but you
15    didn't address it in your report.
16    A.    That's correct.
17    Q.    Fair enough.  Do you recall reaching
18    any conclusions about the price changes in
19    Provident stock following the second
20    announcement on April 15, 2003?
21    A.    I don't believe the movement was
22    statistically significant.
23    Q.    For what period of time?
24    A.    I looked at a number of days
25    following it.  I don't think, you know, as I

Preston

1
2    think we talked about before lunch.  It was a
3    few cents up, a few cents down, but they
4    weren't statistically significant as I recall.
5    Q.    OK.  Did that mean anything to you,
6    that the announcement of the second
7    restatement did not produce a statistically
8    significant change in the price of Provident
9    stock?
10    A.    It meant by the time they got around
11    to announcing that I think that the market was
12    kind of borne out by disappointments from
13    Provident.  I think they're even notes that I
14    read to address questions indicated that and
15    the company said we know we've blown our
16    credibility basically.  We're going to be
17    working to restore it.  But --
18    Q.    Other than --
19    A.    The company said it wasn't going to
20    change their earnings going forward.
21    Q.    The earnings going forward were
22    going to increase, right?
23    A.    Well, actually what they said is
24    that earnings were going to be increased.  But
25    2003 is going to be the same.  So there was no

Preston

1
2    statistically significant change in the price
3    and that was it.
4    Q.    In your experience are future
5    earnings projections more important to
6    investors than historical earnings?
7    A.    Well, it depends.  Future earnings
8    projections are very important and I would
9    never deny that.  However, it also depends on
10    the basis.  I have seen companies announce
11    historic restatements and they say, But
12    everything is going to be OK in the future,
13    and because probably the historic restatements
14    were so drastic, people don't believe them
15    about the future.
16    So I can't quite parse out there
17    what's more important, but the credibility of
18    management is clearly a big issue in that kind
19    of situation.
20    Q.    All right.
21    A.    I guess the future earnings
22    projections are important if the past provides
23    adequate support for them to be reasonable.
24    Q.    OK.  Do you recall reaching any
25    conclusion as it relates to Provident about

40 (Pages 154 to 157)

Page 158

Preston

1
2  whether or not the past earnings were
3  sufficient to cause the future earnings
4  projections to be reasonable?
5      A.  At what point in time?
6      Q.  I don't know.  Whatever point in
7  time you were referring to in your prior
8  answer.
9      A.  Well, I was talking generally in my
10  prior answer, but in Provident I would say
11  that retrospectively the past earnings
12  projections or the past earnings were not
13  reasonable in terms of what the first
14  restatement proved to be the case.
15      That in fact the earnings that were
16  there weren't the actual earnings of the
17  company.  So that at any given time during the
18  restatement period, had someone been doing a
19  projection, they would have projected -- they
20  would have been way off.
21      Q.  Way off?
22      A.  Yes.
23      Q.  By how much?
24      A.  Well, let's look at the earnings
25  restatements, which are -- and we'll just talk

Page 159

Preston

1
2  about the March 5th.
3      Q.  OK.
4      A.  And if you see '97 you're off a
5  couple of cents.  '98 you're off four cents.
6  '99 you're off 23 cents.  It gets bigger.
7  It's 31 cents, then 40 and then 39, roughly
8  the same.  So way off.  You know, it's very
9  large numbers.
10      Q.  Then again, as we talked about, the
11  only numbers available to the OHSL
12  shareholders would have been '97, '98 and
13  partially your numbers for '99.
14      A.  Historic numbers, but not the only
15  projections.
16      Q.  What projections were provided in
17  the proxy statement to OHSL shareholders?
18      A.  I'm not aware of projections in the
19  proxy statement.
20      Q.  Page 22, second to last line, to
21  give you context, you state in the fourth line
22  from the bottom, "It is my opinion that had
23  Provident restated its earnings for 1997, 1998
24  and the first half of 1999, at the time the
25  Proxy was issued, it would have significantly

Page 160

Preston

1
2  altered the total mix of information."
3      What is the source of your
4  conclusion that that would have, quote,
5  significantly altered the total mix of
6  information?
7      A.  The numbers that would be restated.
8      Q.  How does one in your field of
9  expertise measure what would or would not
10  significantly alter the total mix of
11  information?
12      A.  One looks first of all at the
13  numbers themselves, but one also -- and I
14  think the SEC guidelines are pretty
15  comprehensive on this.  It isn't just a
16  numbers game.  It's what the underlying
17  information is.
18      So that if as you have suggested,
19  that these nine transactions weren't actually
20  booked as securitizations until the end of the
21  year, but in fact one knew that they were
22  going to be booked in the same improper manner
23  and that was included in projections, then the
24  fact that they were, that you were relying on
25  those to determine what the future value of

Page 161

Preston

1
2  the company would be, would be -- they would
3  be wrong.  Then therefore the basis is wrong.
4      So how do you decide what is
5  material?  You look at the numbers.  You look
6  what impacts it.  You say what am I going to
7  do and how am I going to do it.
8      Q.  Your question referred to
9  projections again.  And no projections were
10  given to the OHSL shareholders, correct?
11      A.  Not in the proxy statement.
12      Q.  Do you know the source of the phrase
13  "significantly altered the total mix of
14  information," where that comes from?
15      A.  Not off the top of my head, no.
16      Q.  Is that your language or did someone
17  give that to you?
18      A.  It's certainly language I've used
19  many times.  So I don't know whether someone
20  gave it to me, whether it came from a decision
21  at some point.  I don't recall.
22      Q.  Fair enough.
23      Paragraph 47, page 23.  You state
24  that "In addition, to the extent McDonald
25  relied upon Provident's historic financials

41 (Pages 158 to 161)

Page 162

Preston

1
2  and/or Provident's stock price, in arriving at
3  its fairness opinion and the prescribed
4  Exchange Ratio, I believe it is likely
5  McDonald would have reexamined that opinion
6  based on the restatement and its impact on
7  future earnings."
8      What do you mean by that?
9      A.  I believe that it would have had to
10 have gone back, recomputed a number of things.
11 It would have had to have decided at that
12 point did it still believe it was a fair deal.
13     Q.  Earlier you indicated that if
14 McDonald looked at certain things they would
15 have had to have revisited their opinion.
16     A.  Yes.
17     Q.  Is this a similar opinion?
18     A.  Yes.
19     Q.  You're not saying they would have
20 changed their opinion, but they certainly
21 would have reexamined it.
22     A.  Exactly.
23     Q.  OK.  Paragraph 49, page 23.  Did you
24 derive the information in this paragraph from
25 the Fuerman report?

Page 163

Preston

1
2      A.  Do you mean these numbers?
3      Q.  Yes.
4      A.  I think these numbers are right in
5  my table.
6      Q.  Which table are we referring to?
7  The one at the end, Exhibit F?
8      A.  No.  Right here in the body of the
9  report you can pretty much -- you can see on
10 page 21, for example, that if one were to
11 divide net income reported in '99 by 308, by
12 the -- I'm sorry, I will wait until you get
13 there.
14     Q.  I got you.
15     A.  You divide 308 by the 248 in 1999,
16 in 1998 that is 24 percent approximately.  Or
17 if you go down and instead divide -- I'm
18 sorry, we need to go to the other.  On page
19 21, the restated numbers, and divide 258 by
20 238, that's 8 percent growth.  So if that's
21 what you're talking about, that's...
22     Q.  That's where the number is coming
23 from?
24     A.  Yes, it's straightforward math.
25     Q.  Do you know if the reported earnings

Page 164

Preston

1
2  of Provident in 1998 in the proxy statement in
3  fact were $2.48 a share?
4      A.  There were some adjustments.  So
5  these numbers are the appropriate numbers.
6      Q.  I understand.
7          Given that one-year growth rate from
8  248 to 308 that you just talked about as a
9  financial analyst and given your area of
10 expertise, would it be reasonable to then
11 assume that Provident stock necessarily would
12 have increased 24 percent each year or
13 earnings would have increased 24 percent each
14 year from 1999 through 2005?
15         MR. BRAUTIGAM:  Objection.
16     A.  No, I think the forecasts were for
17 like 23 to 24 percent, were 20 percent the
18 next year, 18 to 20 percent thereafter.
19     Q.  So to merely extrapolate that 24
20 percent one-year earnings growth out till 2005
21 would not be a reasonable approach to value
22 the Provident stock price, Provident earnings,
23 correct?
24         MR. BRAUTIGAM:  Objection.
25     A.  Not if you had another basis.

Page 165

Preston

1
2      Q.  Page 24, paragraph 50, at the top.
3  "A change in the value of Provident's stock at
4  the time of the Merger would have, in all
5  likelihood, necessitated a revision to the
6  recommended Exchange Ratio of Provident shares
7  for each OHSL share."
8          What do you mean by that?
9      A.  Well, I think I provide a table here
10 of what would have happened if, depending.
11 Someplace in this report there's a table that
12 shows what happens when the stock price of
13 Provident changes.
14     Q.  Page 29.
15     A.  That's correct.
16     Q.  OK.
17     A.  So we see that if the Provident
18 stock price goes down 10 percent, the exchange
19 ratio changes.  If it goes down 15 percent,
20 there's no -- that's a walkaway situation, a
21 renegotiation situation, whatever, but the
22 exchange ratio...
23     Q.  OK, staying on that page 29,
24 paragraph 60, you do state that you have not
25 been asked to quantify the impact on Provident

42 (Pages 162 to 165)

Page 166

1              Preston
2  stock of a restatement at the time of the
3  merger, correct?
4      A.  That's correct.
5      Q.  And you have not done so.
6      A.  I have not done so.
7      Q.  So the stock price changes that are
8  reflected in your table are hypothetical.
9      A.  I believe it says hypothetical.
10     Q.  OK.
11     A.  It says hypothetical, but declines I
12  think could reasonably be anticipated.
13     Q.  The actual impact on Provident stock
14  in the restatement at the time of the merger,
15  that's not part of your opinion.
16     A.  That's not part of my opinion.
17     Q.  Thank you.
18         Page 24.  You're talking about the
19  nature of the restatement.
20     A.  Yes.
21     Q.  You talk about a number of
22  characteristics.
23     A.  Yes.
24     Q.  First is "is the restatement
25  voluntary?"

Page 167

1              Preston
2      A.  Correct.
3      Q.  Provident's was voluntary, correct?
4      A.  It was.
5      Q.  Number two, "did management
6  intentionally overstate earnings?"
7         Do you have any understanding one
8  way or the other about whether or not there
9  was anything intentional here?
10     A.  I have not seen anything that
11  indicated it was in the -- now, I guess it
12  depends on what, which restatement we're
13  talking about.  I haven't seen anything that
14  indicated the March 5th restatement was
15  intentional.
16         And the April restatement would not
17  fall into the category that, where I would
18  think intentional was negative.  It was a --
19  it wasn't, um --
20     Q.  Nobody did anything wrong.
21     A.  They followed the accountant's
22  advice.
23     Q.  Right.  The next characteristic is
24  "are the company's internal controls
25  vulnerable?"

Page 168

1              Preston
2         Did you reach any conclusions about
3  that as it relates to Provident's internal
4  controls overall?
5      A.  Yes.
6      Q.  What conclusion did you reach?
7      A.  That its internal -- not only did I
8  reach this conclusion, but all the commentary
9  I read about the March 5th restatement leads
10  to the conclusion that their -- there was
11  something seriously wrong with the internal
12  controls.
13     Q.  Do you know whether or not that
14  commentary that you read, those writers had
15  any firsthand knowledge regarding Provident's
16  internal controls?
17     A.  Those writers had the knowledge of
18  the restatement, what was said about the
19  restatement, and the fact that it had covered
20  six years.
21     Q.  My question is, do you know whether
22  they knew anything firsthand about existence
23  sufficiency or anything else of Provident's
24  internal controls, what they actually had in
25  place?

Page 169

1              Preston
2      A.  Well, they weren't sufficient.  I
3  mean, they certainly had -- they had the
4  absolute evidence that they weren't sufficient
5  because they had to restate it.
6      Q.  Is it your testimony that none of
7  the internal controls were sufficient or that
8  there was a failure in maybe one?
9      A.  They were inadequate.
10     Q.  All of them?
11     A.  All of them taken together did not
12  prevent this.  So whether they were all --
13  they all taken together did not prevent it.
14  Whether it was one that caused the problem,
15  the other ones didn't catch it.
16     Q.  So if I'm correct your conclusion
17  about the internal controls is based upon the
18  fact that it existed, the fact that this
19  occurred.
20         MR. BRAUTIGAM:  Objection.
21     A.  The fact that this occurred, the
22  fact that it occurred over six years.  This
23  was not a one-time kind of issue thing.  It
24  was something that went undetected for six
25  years.  The fact that market commentators

Esquire Deposition Services
1-800-944-9454

Page 170

Preston

1
2  commented on the problem with their internal
3  controls.
4      Q.  The next characteristic you talk
5  about is "will the restatement affect future
6  earnings?"
7      A.  Yes.
8      Q.  Now, with respect to the March 5,
9  2003, your conclusion was that at least for
10  the next succeeding period it would have some
11  impact, correct?
12      A.  And thereafter.
13      Q.  What about for the announcement on
14  April 15th?
15      A.  The announcement than April 15th was
16  that it would have impact as well.
17      Q.  And would that be a positive or
18  negative impact?
19      A.  The company said that it would be
20  positive.
21      Q.  Later in that paragraph 51
22  statement, four lines up from the bottom, the
23  sentence begins "Obviously."
24      A.  Yes.
25      Q.  "Obviously, intentional errors made

Page 171

Preston

1
2  by dishonest managers are the most egregious
3  and have the largest negative impact on stock
4  prices."
5      In your career you have seen
6  situations where that occurred, correct?
7      A.  I have.
8      Q.  Do you have any basis for claiming
9  that what had occurred at Provident was an
10  intentional error made by dishonest managers?
11      A.  No.
12      Q.  Page 25.  Up at the top in the first
13  sentence that begins on that page, "Second,
14  the amount of the earnings variance grew in
15  significance, year to year, and wiped out a
16  large percentage of reported earnings in the
17  latter years."
18      That deals with the March 5th, 2003
19  announcement, am I correct?
20      A.  Yes.  But you can look at, let's
21  look at the charts and just see.  You can see.
22  If we look on page 20, we can see that the,
23  here the variance is growing, and we talked
24  about it, 2 cents, 4 cents, 23 cents, 31
25  cents, 40 cents, 39 cents.

Page 172

Preston

1
2      The net income during this time
3  period on a per share basis, for example, in
4  2001, the reported was 45 cents.  40 cents
5  leaves it with net income of five cents.  So
6  it's a very -- it virtually wipes it out.
7      Q.  But the other years were
8  substantially smaller than that, correct?
9  That's the largest in fact --
10      A.  Yeah, I think that my sentence says
11  that.  It grew in significance.
12      Q.  Do you know why in 2001 Provident's
13  earnings were, its net income was
14  comparatively less than it was in the other
15  years on your chart?
16      A.  I think in 2001 it, um, I think if
17  we look on the stock price chart you will see
18  beginning in 2001 it had some negative
19  results, some of which was unexpected.
20      I remember in the third quarter
21  there was quite a bit of concern about the
22  fact that the results were unexpected below
23  what people expected.
24      In the fourth quarter nonperforming
25  assets and problems with loans caused the, um,

Page 173

Preston

1
2  I don't know.  If there were no earnings in
3  the fourth quarter, there were almost no
4  earnings at all.  So I think it went from --
5  the market had anticipated maybe 70 cents and
6  it went to two cents or something like that,
7  but there were very poor earnings.
8      Q.  And obviously -- do you have any
9  understanding as to whether or not any of
10  those factors were known or could have been
11  anticipated back in 1999?
12      A.  The fact that they reported 45 cents
13  would not have been anticipated.  The fact
14  that there was a 40 cent divergence could have
15  been anticipated.  Because remember, we're
16  talking about loans in '97, '98, and '99.
17      So we're not looking here at the
18  actual numbers in net income, but the
19  divergence could have been known.
20      Q.  Do you recall that Provident went
21  off gain on sale accounting?
22      A.  Yes.
23      Q.  In 2001 also?
24      MR. BRAUTIGAM:  Object.  I don't
25  believe it's accurate.

44 (Pages 170 to 173)

Page 174

Preston

1
2    A. No, I think it was in 2000. I think
3    it was August of 2000.
4    Q. And what period was that effective?
5    A. I think it may have been effective
6    in 2001, but the announcement came in 2000 and
7    the anticipated impact of it I believe was
8    announced in August of 2000.
9    Q. Right. But my question is, it was
10   first reflected in the numbers to the best of
11   your knowledge in 2000 and 2001.
12       MR. BRAUTIGAM: Objection.
13   Q. If you know.
14   A. It was first reflected in the
15   numbers probably in 2000 -- I'm trying to
16   remember the press release, which I have in my
17   file here, where they announced that they
18   anticipated the change. I think the date was
19   like August 22nd, or something like that, of
20   2000. And they announced that the stock drops
21   because the earnings, the projected earnings
22   going forward are going to be less. But they
23   did change.
24       But clearly, the big surprise in
25   2001, the fourth quarter where there were

Page 175

Preston

1
2    virtually no earnings was because of
3    nonperforming loans and a very upset stock
4    market about that. Specifically I remember
5    comments regarding the fact that much worse
6    than anybody expected, and they had expected
7    them to be in line with other banks and they
8    were not in line with other banks.
9    Q. The next sentence in paragraph 51,
10   page 25, "Finally, the change in accounting
11   was expected to be recurring and negatively
12   impact future earnings."
13       Again, that is the statement with
14   respect to the March 5, 2003 restatement
15   announcement, not the announcement on
16   April 15th.
17   A. Correct.
18   Q. The last sentence in that section
19   says, "Studies have shown that earnings
20   restatements based on accounting
21   irregularities, including revenue recognition
22   problems, are typically accompanied by stock
23   price declines in excess of 30 percent."
24       Do you see that?
25   A. Yes.

Page 176

Preston

1
2    Q. That didn't occur with Provident,
3    did it?
4    A. No.
5    Q. For either restatement announcement.
6    A. That's correct.
7    Q. Page 26, paragraph 55. You talk
8    about your event study.
9    A. Yes.
10   Q. I think you talked a little bit
11   earlier about how you do an event study and
12   how you did yours in this case, correct?
13   A. Correct.
14   Q. The first full sentence on page 27
15   states, "The calculation is done in order to
16   measure the price change caused by
17   company-specific information being released to
18   the market as opposed to factors that may
19   effect the market in general or the industry
20   in which the company participates."
21   A. Correct.
22   Q. That is what you were talking about
23   earlier when you were talking about dependent
24   variables?
25   A. Correct.

Page 177

Preston

1
2    Q. And you further indicated that you
3    used the S&P Midcap Banks index.
4    A. Yes.
5    Q. Did you run the event study with
6    respect to any other bank index, indices?
7    A. I may have. I don't recall.
8    Q. Would it be reflected in your work
9    papers or not?
10   A. Only things I saved are reflected in
11   there. So...
12   Q. Your event study was done for the
13   period January 2002 through December 2002.
14   A. Correct.
15   Q. Did you do any event study for the
16   year 1998?
17   A. No.
18   Q. Did you do one for 1999?
19   A. No.
20   Q. 2000?
21   A. I don't believe so.
22   Q. Or 2001.
23   A. No.
24       I can tell you, I will offer,
25   looking at just the graph I have, that I would

45 (Pages 174 to 177)

Page 178

```
 1           Preston
 2  be surprised if there wasn't a very strong
 3  relationship in any of these years, and I can
 4  show you here how.
 5        Except for company-specific
 6  deviation days, the relationship is quite
 7  remarkable. The R square on this in 2002 was
 8  over 50 percent. That's an extremely high
 9  relationship. And the graph bears it out. So
10  I would expect the relationship to be very
11  similar.
12     Q.  But you didn't do that study.
13     A.  Haven't done it.
14     Q.  In the middle of the page, page 27,
15  "using these results I observed that on
16  March 5, 2003, the day Provident announced it
17  was restating its financial results,
18  Provident's stock declined by approximately 20
19  percent in excess of market or industry
20  movement. This 20 percent one-day price
21  decline was statistically significant at the
22  99 percent level."
23     A.  Yes.
24     Q.  Did you do an event study for
25  Provident stock after April 15, 2003?
```

Page 179

```
 1           Preston
 2     A.  I think you asked me that before. I
 3  know we looked at it. Yes.
 4     Q.  It's not detailed in your report
 5  though.
 6     A.  No.
 7     Q.  We've talked earlier about why you
 8  believed that if the earnings had been or if
 9  the restatement had been made or had been in
10  effect at the time of the merger why it would
11  have been material, correct? We talked about
12  your views on that.
13     A.  Yes.
14     Q.  Page 28, number 59. You talk about
15  your analysis of the walk-away price, am I
16  correct?
17     A.  Right.
18     Q.  On page 29 up at the top you state,
19  "Assuming prior to close of the Merger,
20  Provident announced a restatement of earnings
21  for 1997, 1998 and the first half of 1999, and
22  also disclosed that future earnings would be
23  negatively impacted by the change in
24  accounting, it is my opinion that such a
25  disclosure would have caused a material
```

Page 180

```
 1           Preston
 2  decline in the price of Provident stock."
 3        I believe that you believe that
 4  would have happened, but you didn't calculate
 5  that.
 6        MR. BRAUTIGAM:  Objection.
 7     A.  I didn't quantify it.
 8     Q.  Didn't quantify it. And you didn't
 9  quantify precisely how earnings would have
10  been impacted in the first half of 1999 based
11  upon what was disclosed in the restatement.
12        MR. BRAUTIGAM:  Objection.
13     A.  And I have assumed that that
14  restatement was spread across the year.
15     Q.  You have assumed that.
16     A.  Yes.
17     Q.  And you don't know that to be the
18  fact.
19     A.  No. But as I said, and I've said
20  several times, that management, you know, the
21  expectation that the earnings would continue
22  was in the market at that point and therefore
23  it's, um, was a -- and management met the
24  expectations. So I don't think that there's a
25  question about whether it would have impacted
```

Page 181

```
 1           Preston
 2  it or not. It would have.
 3     Q.  When you did your event study and
 4  looked at the results with respect to what
 5  happened on March 5, 2003, and reached your
 6  conclusions about the impact on the Provident
 7  price, what you were looking at was the impact
 8  on the Provident stock price of the cumulative
 9  restatement number that was known as of that
10  day, correct?
11     A.  Well, that's one of the things that
12  would cause the impact, yes.
13     Q.  We know that had the restatement
14  occurred in 1999 that cumulative number would
15  have been substantially lower than what was
16  announced on March 5, 2003, don't we?
17     A.  Well, we know that those same
18  numbers, those same contracts would have been
19  in place. Just as they were still in place in
20  2003, right? And yet they were going to
21  continue to have, those same contracts would
22  continue to have a negative impact on
23  Provident stock going forward as shown in the
24  press release. It's not that, um -- so that
25  what they have said here is that the
```

Esquire Deposition Services
1-800-944-9454

Page 182

Preston

1      previously announced earnings per share
2      outlook for 2003.
3              This isn't for March of 2003 or
4      2002. This is 2003 and going forward we are
5      reducing our earnings.
6          Q. By 20 cents.
7          A. By 20 cents. The company's
8      expectation is that the impact of that matter
9      will be significantly less in 2004 and in
10      future years. So of course it will be less.
11      These are auto loans. Auto loans aren't for
12      twenty years.
13              I would imagine the securitizations
14      are either packaged by year. So we have got
15      the three-year loans in one securitization or
16      the four-year loans, or they're diversified,
17      but most auto loans are three to six years.
18      So of course if they are written in '97
19      through '99, the impact is going to be less.
20              Is it going to be less in '99 if you
21      announce it and you have done it for six
22      years? I don't think it's going to be a lot
23      different than it was.
24          Q. Even if you're calculating it

Page 183

Preston

1      correctly?
2          A. Well, that's what they're doing now,
3      isn't it? In 2003 they're starting to
4      calculate it correctly, and it's still going
5      to affect 2003 and future years, even though
6      they were written back in '97 through '99.
7          Q. My point though is, if you look at
8      the cumulative effect, I mean, you assessed on
9      March 5, 2003 the impact on the price through
10      your event study of the $77 million
11      restatement amount that was first announced.
12          A. Correct.
13              MR. BRAUTIGAM: Objection, 77
14      million?
15              MR. BURKE: Whatever, $70 million.
16          Q. Had the number been disclosed in
17      1999 -- excuse me. It would have been $2.9
18      million for the years 1997, 1998 and less than
19      $11 million for 1999, correct?
20              MR. BRAUTIGAM: Objection.
21          A. But the future would have been
22      different. See, the cumulative impact isn't
23      just what's happened. It's what is going to
24      happen in the future. So the cumulative

Page 184

Preston

1      impact is the same.
2          Q. Not if you get it right. Not if you
3      find the error and fix it.
4              MR. BRAUTIGAM: Objection.
5          A. They found the error and fixed it in
6      March of 2003.
7          Q. Correct?
8          A. Did the impact disappear? No. It
9      continued through the end of 2003 and was
10      expected to have less impact going forward
11      because, voila! Auto loans only last a
12      relatively short amount of time.
13          Q. If there was an error in estimating
14      income and expense, the error was detected in
15      '99 and the estimates were revised, is it your
16      testimony that the earnings would have
17      continued to be off in those years after that?
18              MR. BRAUTIGAM: Objection.
19          A. Not the earnings, but the future
20      estimate of earnings would change.
21          Q. So it's the forward looking
22      projections.
23          A. Yes. So that you would -- at that
24      point, any point in time where you caught

Page 185

Preston

1      this, you would have corrected the past. But
2      you would have had to change and let the world
3      know that you had changed and that was going
4      to affect the future as well. And it was
5      going to affect the future a large amount.
6          Q. I see what you're saying.
7              Page 29 at the bottom, "I believe
8      that, at a minimum, it" -- and I believe it's
9      the impact on the merger, "would have changed
10      the Exchange Ratio and likely would have
11      caused the OHSL shareholders to vote against
12      the Merger with Provident."
13              What's the basis for your statement
14      that it would likely would have caused the
15      OHSL shareholders to vote against the merger?
16      We talked about this a little bit before.
17              I take it you hadn't talked with any
18      OHSL shareholders or conducted any research
19      into them as to what they would have done.
20              MR. BRAUTIGAM: Objection.
21          Q. Is that true?
22          A. That's true. We have gone over this
23      for a large portion of today at this point.
24      But we're talking about at this point so many

Page 186

Preston

1
2  problems with this deal in terms of if the
3  proper disclosures had been made.  If we had
4  Provident on top of, number one, you have got
5  board members who don't want to vote for the
6  deal or don't think it's in the shareholders'
7  interest who resign, and they're doing it
8  based on wrong numbers to begin with.
9       You had board members who weren't in
10  favor of the deal, but voted for it.  Would
11  they have voted for it to begin with if they
12  had had the correct Provident numbers and
13  known that Provident's future was going to
14  look a whole lot different than what Provident
15  had been telling people?
16      You put that together with the fact
17  that Herron resigned because he didn't want
18  this merger to go through, that Mr. Hanauer
19  didn't believe it was in the best interests of
20  the shareholders.
21      Given the closeness of this vote and
22  the convergence of all those things being
23  disclosed, it is very, very difficult for me
24  to believe they wouldn't have gotten another
25  twenty-some thousand shares that changed the

Page 187

Preston

1
2  way they voted.
3      Q.  But that's not based upon any
4  research.
5      A.  Any math?
6      Q.  No, any research into the specifics
7  of the OHSL shareholder base.
8      A.  No, it's looking at other
9  shareholders and what other shareholders have
10  done.
11      Q.  And your conclusions as to
12  Mr. Hanauer, Mr. Herron, we've already talked
13  about those already today, have we not, in
14  terms of what that's based upon?
15      A.  Well, we've talked about the fact
16  that what Mr. Hanauer has testified to, we
17  talked about the fact that he didn't, you
18  know, as of the August 2nd meeting, he said
19  that he just gave in.  So we probably covered
20  pretty much what...
21      Q.  OK.
22      A.  Over lunch I did look at an
23  affidavit of Mr. Herron's, so that that merely
24  supported what I already believed.  That --
25      Q.  You did read Mr. Herron's testimony,

Page 188

Preston

1
2  didn't you?
3      A.  Yes.
4      Q.  Did you read the part where
5  Mr. Herron testified that when he read the
6  proxy he made no effort to contact anyone to
7  indicate that in fact his position was not
8  adequately disclosed?
9      A.  I don't recall.
10      Q.  Tell me about the mosaic theory.
11  It's a wonderful phrase.  Is that your phrase
12  or is that --
13      A.  Oh, no, it's a --
14      Q.  OK.
15      A.  It's a common finance literature
16  thing.  It's certainly -- I think it actually
17  grows out of legal doctrine, but I'm not
18  certain of the case from which it's taken.
19      But the idea is that information
20  isn't possessed in isolation, that all of us
21  look at the sum of things and therefore to say
22  is one thing material and ignore the
23  environment in which it is received would not
24  be the correct way to do it.
25      I think actually this goes right to

Page 189

Preston

1
2  the heart of the SEC opinion on materiality
3  and the fact that -- and that's one of the
4  reasons that one can't just say a rule of
5  thumb on what number is material.
6      Q.  How often in your experience do
7  projections in one year remain unchanged for
8  the entire period of those projections?
9      A.  If you mean unchanged completely
10  unchanged?  That doesn't happen very often.
11      Q.  Projections frequently get adjusted
12  from year to year, period to period, do they
13  not?
14      A.  Sure.
15      Q.  You wouldn't in reviewing any
16  company expect projections made in 1999 to
17  remain unchanged through 2003, would you?
18      A.  It would be unusual.
19      MR. BURKE:  I have no further
20  questions.
21  EXAMINATION BY
22  MR. HILLER:
23      Q.  My name is Robert Hiller.  I
24  represent Dinsmore & Shohl law firm and two of
25  the partners, Cliff Roe and Charles Hertlein.

48 (Pages 186 to 189)

Page 190

Preston

2  You don't hold yourself out as an
3  expert in legal malpractice, do you?
4      A. I do not.
5      Q. Were you asked to give expert
6  opinions concerning the law firm and the two
7  attorneys that I represent?
8      **A. I was asked to talk about**
9  **materiality and the things in my report. I**
10  **haven't addressed it to those issues.**
11      Q. So your opinions and comments as
12  well in this case have not been about the acts
13  or inactions of Dinsmore & Shohl or Mr. Roe or
14  Mr. Hertlein?
15      **A. My opinions are based on the**
16  **materiality of information that was not**
17  **disclosed. They are not -- have nothing to do**
18  **with the liability of people to disclose them.**
19  **So maybe a jury would find that your clients**
20  **are liable for those nondisclosures, but that**
21  **isn't my province.**
22      MR. HILLER: I don't have any other
23  questions.
24      MR. BRAUTIGAM: I will have some
25  questions. Let's take a short break.

Page 191

Preston

2      (A recess was taken.)
3      MR. BRAUTIGAM: Mark this as Preston
4  Exhibit 4.
5      (Preston Exhibit 4, 4-paged
6  document, Affidavit of Thomas M. Herron,
7  marked for identification, this date.)
8  EXAMINATION BY
9  MR. BRAUTIGAM:
10      Q. Good afternoon, Ms. Preston. As you
11  know, my name is Michael G. Brautigam and I
12  represent Walter Thiemann, Gary and Lisa Meier
13  and a putative class of OHSL shareholders.
14      Ms. Preston, I want to pick up with
15  the question that Mr. Burke asked at the end
16  of his examination. He asked if you would
17  expect projections to remain unchanged from
18  year to year going out for several years.
19      I think you said no; is that
20  correct?
21      **A. Yeah, I said that they -- not**
22  **exactly unchanged.**
23      Q. Would you expect the projections to
24  be reasonable when made?
25      **A. Yes.**

Page 192

**Preston**

2      Q. When you worked on fairness
3  opinions, including a fairness opinion for
4  a $3 billion transaction, was that your
5  expectation; that is to say, that the
6  projections that you were relying upon in
7  rendering the fairness opinion were reasonable
8  when made?
9      **A. Yes.**
10      Q. Is that how investment bankers
11  working on fairness opinions perform their
12  work?
13      **A. It should be.**
14      Q. Let's talk a little bit about your
15  background. Is it fair to say that you have
16  been doing work related to investment banking
17  and/or valuations for almost a quarter century
18  now?
19      MR. BURKE: Objection, leading.
20      **A. Yes.**
21      Q. And in the course of that time
22  you've been qualified as an expert witness in
23  federal and state courts throughout the
24  country, correct?
25      **A. Yes.**

Page 193

**Preston**

2      Q. And do you believe that your opinion
3  in this case would assist the jury, the trier
4  of fact, in understanding the purposes of
5  proxy materials?
6      MR. BURKE: Continuing objection,
7  leading.
8      **A. Yes.**
9      Q. Now, Ms. Preston, other than what is
10  in your report do you have a shorthand version
11  you can share with us today as to the function
12  of proxy materials?
13      MR. BURKE: Objection, speculation,
14  form.
15      **A. Other than what's in my report, I**
16  **don't know exactly the words I used in my**
17  **report, but the proxy materials are there to**
18  **inform shareholders, give them the best**
19  **complete idea of the true condition of a**
20  **company so they can make the most informed**
21  **decision.**
22      Q. Now, when you started your
23  deposition today you raised your right hand
24  and swore to tell the truth, the whole truth
25  and nothing but the truth.

49 (Pages 190 to 193)

Page 194

1  Preston
2     Do you remember that?
3  **A. Yes.**
4     Q.  Do you believe that in substance the
5  proxy materials should tell the truth, the
6  whole truth and nothing but the truth about
7  the merger at issue?
8        MR. BURKE:  Objection, speculation,
9     leading.
10 **A. Yes.**
11    Q.  Do you believe that these proxy
12 materials, Defendant's Exhibit 1 in front of
13 you, tell the truth, the whole truth and
14 nothing but the truth about the merger between
15 OHSL and Provident?
16       MR. BURKE:  Continuing objection to
17    leading and speculation.  You may answer.
18 **A. No.**
19    Q.  Why not?
20 **A.  I guess for all the reasons that are**
21 **in my report, the financials on which -- the**
22 **Provident financials are not accurate.  It**
23 **doesn't -- the proxy materials do not disclose**
24 **Mr. Herron's resignation, nor the reason for**
25 **it.  The proxy materials don't disclose the**

Page 195

1  **Preston**
2  **fact that Mr. Hanauer in opposition to his**
3  **belief that this was not a good transaction**
4  **for shareholders voted for it.**
5  **The proxy materials talk about the**
6  **unanimity of a vote by the board of directors,**
7  **and I don't see how anyone could conclude the**
8  **vote was unanimous.  The proxy materials do**
9  **talk about the unanimous vote of the board and**
10 **don't disclose that the board that voted**
11 **unanimously was not the board about which all**
12 **the other discussions in the background**
13 **relate.  It was minus Mr. Herron.**
14 **And the proxy materials are not full**
15 **and complete disclosure about the**
16 **securitization.**
17    Q.  With respect to the unanimous vote
18 that's reflected in Defendant's Exhibit 1, the
19 defendants have suggested at depositions and
20 also in court papers that the five to nothing
21 vote really was unanimous because no one voted
22 against the merger.
23       What do you have to say about that?
24       MR. BURKE:  Objection, leading,
25    argumentative, calls for speculation.

Page 196

1  Preston
2     Continuing objection on those bases,
3     please.
4  **A.  It's been my experience and I think**
5  **the experience of probably anybody who sits on**
6  **a jury that unanimous means everyone votes for**
7  **it.  If people don't vote for it, it's noted.**
8  **If it was unanimous by five directors, you**
9  **could say unanimous by five directors if there**
10 **were only five present.**
11 **If there were more than five**
12 **present, you could maybe say five voted for,**
13 **none no vote, if you didn't want to say**
14 **abstain.  But you could not say unanimous if**
15 **there were more than five present.**
16 **I think that Mr. Burke suggested**
17 **Robert's Rules of Order and the fact that**
18 **Mr. Brinker didn't vote because he was not**
19 **breaking -- he was breaking a -- would not**
20 **have been breaking a tie.  But Mr. Brinker**
21 **voted before when he wasn't breaking a tie.**
22 **So I don't -- it is very difficult**
23 **for me to understand, given all the**
24 **circumstances around this, how anyone could**
25 **possibly have thought it was unanimous.**

Page 197

1  Preston
2     Q.  Ms. Preston, based on two board
3  meetings it's possible to conclude, is it not,
4  that OHSL did not follow consistently Robert's
5  Rules of Order, correct?
6        MR. BURKE:  Objection.
7     Q.  And that's based on a July 22nd
8  board meeting and the August 2nd board
9  meeting.
10       MR. BURKE:  Continuing objection to
11    leading.
12 **A.  Well, it certainly would appear that**
13 **Mr. Brinker did two different things under the**
14 **same circumstances.**
15    Q.  About ten days apart, correct?
16 **A.  Correct.**
17    Q.  Would you please thumb through
18 Defendant's Exhibit 1 and find the merger
19 agreement which is included in the proxy
20 materials.
21       MR. BURKE:  As yesterday,
22    Mr. Brautigam, I need to run to the
23    airport to catch a flight.  And given the
24    nature of the testimony to date, I will
25    lodge a continuing objection to leading,

50 (Pages 194 to 197)



Page 198

Preston

1    Preston
2  to speculation, lack of foundation, and
3  to argumentative.
4      So thank you.  Have a safe trip
5  home, folks.
6      MR. BRAUTIGAM:  Likewise.
7    Q.  What is the date of the merger
8  agreement?
9    A.  I believe the date of the merger
10  agreement is -- I believe it's August 2nd.
11  There it is, August 2nd, 1999.
12    Q.  Now, do you remember Mr. Burke
13  suggesting the date of August 27th, 1999, when
14  he represented to you that the board, in his
15  terms, unanimously approved the merger because
16  everyone was in the room and everyone voted?
17      Do you remember questioning like
18  that?
19    A.  I do.
20    Q.  Is that consistent with your
21  understanding of the requirements of a board
22  of directors?
23    A.  Well, the requirements of the board
24  of directors is to vote on the merger at the
25  time.  I don't know of any requirement to

Page 199

Preston

1    Preston
2  affirm it later, but you vote on it at the
3  time.
4    Q.  Is there any reference that you
5  found to a board meeting on August 27th, 1999?
6    A.  No, I didn't see any record of that.
7    Q.  In fact, it wouldn't make sense from
8  a common sense point of view to approve a
9  transaction retroactively that has already
10  been signed and agreed to, correct?
11    A.  And announced, no.
12    Q.  And announced.  Do you remember in
13  your reading of Mr. Hanauer's testimony that
14  you said yes, I believe the intent of the
15  proxy materials is to refer to the August 2nd,
16  1999 vote throughout?
17    A.  I don't remember that clearly, but
18  I'm sure -- I don't remember it.
19    Q.  Ms. Preston, has your expert report
20  been informed by what you've referred to as
21  common sense and logic?
22    A.  Yes.
23    Q.  Throughout your professional life
24  when you have agreed to take on expert
25  assignments is there any requirement that you

Page 200

Preston

1    Preston
2  suspend common sense?
3    A.  No.
4    Q.  Would you please look at the first
5  page of the proxy materials and let me direct
6  your attention to the sentence which I will
7  read into the record.  "Your board of
8  directors unanimously approved the acquisition
9  and believes that it is in the best interest
10  of OHSL stockholders."
11      Do you see that?
12    A.  I do.
13    Q.  Did I read it correctly?
14    A.  You did.
15    Q.  Does that embrace two separate
16  concepts?
17    A.  Yes.
18    Q.  The first concept is that the board
19  of directors unanimously approved the
20  acquisition, correct?
21    A.  Correct.
22    Q.  And based on the things you've
23  testified to previously, we know that that's
24  not true, correct?
25    A.  It wasn't unanimous.

Page 201

Preston

1    Preston
2      MR. HILLER:  Objection.
3    Q.  The second concept refers to the
4  belief that the merger with Provident was in
5  the best interest of OHSL shareholders,
6  correct?
7    A.  Correct.
8    Q.  And we also know that that's not
9  true, correct?
10    A.  Correct.
11      MR. HILLER:  Objection.
12    Q.  We know that Mr. Hanauer did not
13  believe that the merger was in the best
14  interest of shareholders simply based on his
15  testimony, correct?
16    A.  Correct.
17      MR. HILLER:  Objection.
18    Q.  Additionally, we know that he did
19  not believe that the merger was in the best
20  interest of shareholders because Mr. Hanauer
21  was the largest shareholder by far and he
22  voted his personal shares and those he
23  controlled against the merger, correct?
24      MR. HILLER:  Objection.
25    A.  Correct.

51 (Pages 198 to 201)

Page 202

Preston

1
2    Q.  We also know that Mr. Herron was not
3  in favor of the merger and in fact resigned in
4  part in protest, correct?
5    A.  Correct.
6    Q.  Mr. Burke asked you if you were an
7  expert on the requirement of 8-Ks, correct?
8    A.  Correct.
9    Q.  Let me ask you this.  Do you believe
10  that it was obvious from the circumstances
11  that Mr. Hanauer was against the merger?
12       And when I say the circumstances,
13  I'm specifically directing your attention to
14  Mr. Herron's vote against continuing
15  negotiations with Provident on July 22nd,
16  1999.
17    A.  You used Mr. Hanauer in the first
18  part of that question and Mr. Herron in the
19  second.
20    Q.  I misspoke.  Let me correct that by
21  saying I meant to refer to Mr. Herron
22  throughout.
23    A.  OK.  Yes, I believe it was obvious.
24    Q.  Let me direct your attention to what
25  has now been marked as Preston Exhibit 4.  You

Page 203

Preston

1
2  have had the opportunity to review that,
3  correct?
4    A.  Yes.
5    Q.  Do you remember whether or not you
6  have previously seen this?
7    A.  I probably have.  I certainly am --
8  I was aware of it, the information.  For
9  example, I think I brought up earlier that
10  Mr. Herron had said that he would not accept
11  the -- he would not profit from this deal.  He
12  wouldn't exercise his options and profit.
13       So I was aware of the information
14  and I probably read it.  I don't remember it
15  specifically, but I probably have seen it.
16    Q.  Part of your answer suggested that
17  Mr. Herron left money on the table, correct?
18    A.  Right.
19    Q.  And he left money on the table by
20  not exercising stock options to which he would
21  have otherwise been entitled to, correct?
22    A.  Correct.
23    Q.  And do you read that just
24  independently as an unusual act that suggested
25  he was not in favor of the merger?

Page 204

Preston

1
2    A.  I think it's an extraordinary act.
3  I can't recall ever having seen somebody who
4  felt that strongly.
5    Q.  It's economically irrational,
6  correct?
7    A.  Yes.
8    Q.  Can I direct your attention to
9  paragraph 4.  It has the specific dates of
10  Mr. Herron's resignation, and its effective
11  date.
12       Can I at the same time direct your
13  attention to page 63 of the proxy materials.
14  There's a table of beneficial owners listed.
15    A.  Yes.
16    Q.  Would you look at the date on the
17  top of that page.
18    A.  Yes.
19    Q.  And what date is selected?
20    A.  July 31st, 1999.
21    Q.  Is that one day after Mr. Herron's
22  resignation became effective?
23    A.  It is.
24    Q.  Does that strike you as being a
25  particularly unusual date to choose?

Page 205

Preston

1
2    A.  It's uncanny coincidence.
3    Q.  Ms. Preston, have you ever been
4  involved in a merger transaction from any
5  point of view, even litigation support, where
6  a director resigned in part in protest so
7  close in time to the final vote where his
8  resignation and opposition was not disclosed?
9    A.  Not that I recall.
10    Q.  Let me direct your attention to
11  paragraph 5 of the Herron affidavit.  Do you
12  see that?
13    A.  Yes.
14    Q.  Do you feel that Mr. Herron in
15  calling each of his fellow directors
16  sufficiently communicated his opposition to
17  the merger to both the board and also to OHSL
18  because Mr. Hanauer was one of the OHSL
19  directors?
20       MR. HILLER:  Objection.
21    A.  I can't imagine that anyone who
22  received that call didn't understand that he
23  was resigning in protest.
24    Q.  You're familiar with the board vote
25  on July 22nd, 1999, correct?

52 (Pages 202 to 205)

Page 206

Preston

1  Preston
2  A. I am.
3  Q. And you read those board minutes,
4  correct?
5  A. Yes.
6  Q. And if memory serves, I believe that
7  board meeting took place at the offices of
8  Dinsmore & Shohl, Mr. Hiller's clients.
9     Did you happen to remember that the
10  board minutes indicated that Cliff Roe, one of
11  the defendants in the case and the managing
12  partner of Dinsmore, was actually in the room
13  when Mr. Herron voted against the merger?
14     MR. HILLER: Objection.
15  A. I didn't remember who was there. I
16  think I testified earlier when Mr. Burke
17  questioned me that there were lawyers present
18  at the meeting.
19  Q. Do you believe that with Dinsmore
20  lawyers being present at the meeting and
21  actually seeing Mr. Herron voting against the
22  merger, that they would have actual notice
23  that Mr. Herron opposed the merger?
24     MR. HILLER: Objection.
25  A. Yes.

Page 207

1  Preston
2  Q. That's the only inference that can
3  be drawn, correct?
4     MR. HILLER: Objection.
5  A. I can't think of another.
6  Q. May I direct your attention to
7  paragraph 7, please.
8  A. Yes.
9  Q. The first sentence of paragraph 7 of
10  the Herron affidavit reads as follows:
11     "I believe that my opposition to the
12  merger with PFGI was obvious to the OHSL
13  defendants."
14     Do you agree with that?
15  A. It was not only obvious, it was
16  stated, so yes.
17  Q. Let me direct your attention to the
18  first sentence of paragraph 8:
19     "I ultimately resigned in part in
20  protest because I did not want to be involved
21  in, and responsible for, a transaction with
22  which I deeply disagreed."
23     Do you see that?
24  A. Yes.
25  Q. Is that consistent with the other

Page 208

1  Preston
2  evidence that you've examined in the case with
3  respect to Mr. Herron's views?
4  A. Yes.
5  Q. Do you give any particular
6  significance to the disclosure or lack of
7  disclosure of Mr. Herron's resignation and
8  opposition given the history of family service
9  to OHSL both before and after it became a
10  public company?
11  A. Well, I think that we talked about
12  earlier, I talked with Mr. Burke, about the
13  fact that both Mr. Herron and Mr. Hanauer were
14  obviously strongly associated with the
15  company.
16     We talked about the fact that
17  Mr. Hanauer testified that he had been told
18  opposition to, um, any opposition to the deal
19  would very likely cause, have great
20  ramifications and scuttle the deal and that's
21  certainly true of Mr. Herron as well.
22  Q. Ms. Preston, let me direct your
23  attention to the first sentence of paragraph
24  9, which I will read into the record:
25     "Although my resignation letter was

Page 209

1  Preston
2  written in the spirit of diplomacy and did not
3  specifically cite any disagreement with the
4  company, there were reasons for expecting my
5  resignation to be disclosed in the Proxy
6  Materials, slash, Registration Statement, and
7  I was very surprised when it was not."
8     Do you agree that under these
9  circumstances Mr. Herron's resignation should
10  have been disclosed to the OHSL shareholders
11  even though he specifically did not cite a
12  disagreement with the company?
13     MR. HILLER: Objection.
14  A. Well, I think Mr. Herron's
15  resignation was a material piece of
16  information for shareholders to be able to
17  evaluate. So it should have been included.
18  Q. Mr. Herron talks about writing his
19  letter in the spirit of diplomacy. Do you see
20  that?
21  A. Yes.
22  Q. Do you fault Mr. Herron for the way
23  he resigned?
24  A. I haven't thought about that. I
25  mean, Mr. Herron, he clearly as he says wrote

53 (Pages 206 to 209)

Page 210

Preston

1 his letter in the spirit of diplomacy, but he
2 got on the telephone and he called every one
3 of them and he didn't take the money that he
4 could have made off of this deal.
5 I think it would be very hard for me
6 to say that it was inappropriate.
7 Q.   I think Mr. Herron picks up on that
8 theme in the second paragraph, excuse me, in
9 the second sentence, paragraph 12, which
10 begins on page 2 but goes over to page 3.
11 "I do not believe that there was any
12 other way that the OHSL defendants could have
13 interpreted it."  Meaning he's talking about
14 his resignation letter and the fact that he
15 was resigning in part in protest of the
16 OHSL/Provident merger.
17 Do you agree with that sentence?
18 A.   Yes, the fact that he was not —
19 that he had called them all, that he didn't
20 take the money he was entitled to from the
21 options, I can't imagine any other way it
22 could have been interpreted.
23 Q.   If you just flip to the first page
24 for a moment, paragraph 2 talks about making

Page 211

Preston

1 this affidavit "in further support of
2 Plaintiffs' Motion for Summary Judgment on
3 Unanimity Issues."  Do you see that?
4 A.   Yes.
5 Q.   In paragraph 14 there's a quote that
6 we've taken from the opposition to plaintiffs'
7 motion for summary judgment of the OHSL and
8 Provident defendants.  And the quote reads as
9 follows: "Herron admitted he never told his
10 counsel of any objection to or protest of the
11 merger, and never put it in the corporate
12 minutes."
13 Based on what you've seen, read and
14 understand in the case, do you agree with that
15 statement that the OHSL and PFGI defendants
16 put in a pleading?
17 MR. HILLER:  Objection.
18 A.   I haven't read the whole pleading
19 and I -- based on this, it seems like people
20 were on notice.  I would have to read the
21 whole pleading to have a full opinion on that.
22 Q.   Let me direct your attention to
23 paragraph 16.  There's also a quote from the
24 same brief, perhaps subject to the same

Page 212

Preston

1 limitations in your answer.  Let me read it
2 anyway.
3 "Second, there is no dispute that
4 Herron's departure from OHSL's Board was
5 disclosed," with "emphasis in original."
6 Do you agree with that sentence?
7 MR. HILLER:  Objection.
8 A.   I haven't seen anyplace where it was
9 disclosed.
10 Q.   Ms. Preston, have you read the
11 report submitted by Dr. William Lutz?
12 A.   Yes.
13 Q.   Is there anything that you disagree
14 with in the report?
15 A.   No.
16 Q.   You generally agree with it,
17 correct?
18 A.   Yes.
19 Q.   Let's put the affidavit aside for
20 the moment and talk about the proxy materials
21 in general.
22 What's the difference between proxy
23 materials and annual report?
24 A.   An annual report is something that

Page 213

Preston

1 the company does at the end of its fiscal year
2 when it is required by the SEC to put out a
3 report to its shareholders.  It comes once a
4 year and it is -- it's a disclosure of the
5 past year's activities, including previous
6 years' financial statements, a comparison of
7 year-over-year status of the company.
8 Proxy materials, and I guess it
9 depends on whether you're talking about a
10 special proxy such as this is or annually
11 there's a proxy which is the company puts out
12 to vote on its auditors, various issues like
13 that, but this special proxy is information
14 that is put out to elicit the vote of the
15 shareholders on the sale of the company.  It's
16 an entirely different situation.
17 Q.   Is it your understanding that this
18 document is also a registration statement?
19 A.   Yes.
20 Q.   What is being registered?
21 A.   In this case what is being
22 registered is the shares of Provident.
23 Q.   Newly issued Provident stock, right?
24 A.   Newly issued Provident stock.

54 (Pages 210 to 213)

Page 214

Preston

1
2    Q.   And that's because this transaction
3    was being paid for with Provident stock as the
4    currency, correct?
5        A.   Correct.
6        Q.   So in that sense, Provident's
7    business, its prospects, its future earnings,
8    were much more important than in a situation
9    where Provident would be buying OHSL with
10   cash, correct?
11       A.   OHSL would have no future interest
12   in Provident. So as long as they got the
13   cash, the deal was over for them.
14       Q.   Does Defendant's Exhibit 1 contain
15   financial information provided by Provident?
16       A.   Yes.
17       Q.   And that financial information,
18   which I believe you'll find on pages 6 and 7,
19   goes back to 1994, correct?
20       A.   Correct.
21       Q.   And without getting into technical
22   explanations about restatements and
23   materiality, is it fair to say that the
24   information contained in the proxy materials
25   from Provident is simply wrong?

Page 215

Preston

1
2        MR. HILLER: Objection.
3        A.   Yes.
4        Q.   Is it fair to say that this wrong
5    information was relied upon by McDonald quite
6    specifically in their fairness opinion?
7        MR. HILLER: Objection.
8        A.   Yes.
9        Q.   Is it also fair to say that the
10   expectation was that this would be sent to
11   OHSL's shareholders who would be able to rely
12   on the document in its entirety?
13       MR. HILLER: Objection.
14       A.   That's the whole purpose of the
15   document.
16       Q.   And we now know that their reliance
17   on the document was misplaced because at
18   minimum it contained false financial
19   information from Provident as well as material
20   misstatements, misrepresentation with respect
21   to unanimity and Herron's resignation among
22   other things, correct?
23       MR. HILLER: Objection.
24       A.   Yes.
25       Q.   Who does Defendant's Exhibit 1 come

Page 216

Preston

1
2    from?
3        A.   It comes from OHSL.
4        Q.   OHSL?
5        A.   Yes.
6        Q.   Does it also come from Provident in
7    some sense because it's a joint document?
8        A.   Oh, yes. Sure.
9        Q.   Would you expect the respective
10   boards of OHSL and Provident to have read the
11   document and have understood it at least in
12   broad strokes?
13       A.   It's been my experience that this is
14   a cooperative document that is generally put
15   together by the boards, by their lawyers with
16   the input from their investment bankers.
17       I personally have been involved in
18   making presentations to boards of directors
19   about the financial information that's
20   included in proxies. So I cannot imagine they
21   would not have been important.
22       Q.   Ms. Preston, have you opined in any
23   way or have you formed any conclusions with
24   respect to whether or not the OHSL board
25   fulfilled its fiduciary duties to the OHSL

Page 217

Preston

1
2    shareholders?
3        A.   I think your fiduciary duty is to
4    put out a reliable document, and I don't think
5    this is a reliable document. So they haven't
6    fulfilled it.
7        MR. HILLER: Objection.
8        Q.   Ms. Preston, in one of your
9    footnotes you mentioned something that you
10   were concerned that Mr. Zoellner did not seem
11   to know that the OHSL directors had any
12   responsibility for the document.
13       Why were you concerned about that?
14       A.   Well, it spoke to an incredible lack
15   of awareness of the responsibility of a
16   director or -- it was either lack of awareness
17   or the intentional obliviousness. I don't
18   know. I don't know what.
19       But certainly, a director had -- is
20   a fiduciary for his shareholders. It's hard
21   for me to understand how you could think you
22   didn't have responsibility for it.
23       Q.   Ms. Preston, let's talk about the
24   various hats that Mr. Hanauer wore.
25       The defendants have suggested that

55 (Pages 214 to 217)

Page 218

Preston

1
2  Mr. Hanauer may have believed that the merger
3  was not in the best interest of the
4  shareholders and therefore voted for it as a
5  director.  But because there were no voting
6  agreements, he didn't believe it was in his
7  personal best interest and therefore he voted
8  his personal shares against it, which he was
9  free to do.
10       What would you say to that?
11       A.  I would say that's not what
12  Mr. Hanauer testified.  Mr. Hanauer testified
13  that he didn't think it was in shareholders'
14  best interest.  And that the fact -- and I
15  think the fact that he didn't think it was in
16  shareholders' best interest, it was incumbent
17  upon him to make that known to the
18  shareholders and incumbent on the company to
19  make it known.
20       In fact, I think the KMK lawyers
21  testified, several of the lawyers who worked
22  on the transaction, testified that it was
23  important that he make it known, and some of
24  the Provident directors testified it was
25  material that it be known.

Page 219

Preston

1
2       So he may have had different
3  opinions.  It's hard though to understand how
4  one abrogates their fiduciary duty, but in any
5  case, at the very least he had to disclose
6  that.
7       Q.  Why do you believe that Mr. Hanauer
8  hadn't disclosed his opposition to the merger?
9  Why isn't he just like any other shareholder
10  who is free to vote however he feels like?
11       MR. HILLER:  Objection.
12       A.  Well, Mr. Hanauer isn't any other
13  shareholder.  Mr. Hanauer is the CEO of the
14  company.  He's the biggest shareholder.  And
15  by the way, the proxy materials say there was
16  unanimity on the board and there wasn't
17  unanimity.
18       Q.  Ms. Preston, you know that the law
19  firm of Keating, Muething & Klekamp was a
20  defendant in this case for a period of time,
21  correct?
22       A.  Yes.
23       Q.  You also known that the accounting
24  firm of Ernst & Young was a defendant in this
25  case for a period of time, correct?

Page 220

Preston

1
2       A.  Yes.
3       Q.  And you know that both Keating,
4  Muething & Klekamp and Ernst & Young have been
5  dismissed based largely on statute of
6  limitations grounds.
7       A.  Yes, that's what you have
8  represented to me.
9       Q.  Have you ever been involved in a
10  case where the law firm that is defending the
11  majority of the defendants in the case was
12  responsible in part for a large percent of
13  work on the merger itself?
14       A.  Not to my knowledge.
15       Q.  Are you familiar with the phrase
16  "conflict of interest"?
17       A.  Yes.
18       Q.  Do you think that this situation
19  might be a conflict of interest or a potential
20  conflict of interest?
21       A.  In my experience it would be a
22  reason to recuse oneself.
23       Q.  Ms. Preston, you've reviewed
24  plaintiffs' consolidated amended complaint,
25  correct?

Page 221

Preston

1
2       A.  I have.
3       Q.  And you specifically reviewed the
4  questions and answers that were asked of KMK
5  transactional attorneys that appear in
6  paragraph 30 of the consolidated amended
7  complaint, correct?
8       A.  I did.
9       Q.  Do you interpret that testimony of
10  Mr. Weiss and Mr. Matthews respectively as
11  being adverse or potentially adverse to
12  clients or a client, Mr. Hanauer, that KMK
13  currently represents?
14       A.  This really goes beyond the scope of
15  my testimony, and it's not something that I
16  really formed an opinion on.
17       Q.  But it is fair to say that you
18  generally agree with KMK transactional
19  attorneys that if Mr. Hanauer opposed the
20  merger, that he had a duty to disclose that,
21  correct?
22       A.  Yes.
23       MR. HILLER:  Objection.
24       MR. BRAUTIGAM:  Thank you very much
25  for your time and I have no further

Esquire Deposition Services
1-800-944-9454

Page 222

```
 1
 2   questions.
 3        MR. HILLER:  I don't have any other
 4   questions, thank you.
 5        (Time noted:  2:40 p.m.)
 6
 7
 8               CANDACE L. PRESTON
 9
10   Subscribed and sworn to before me
11   this ____ day of _____, 2004.
12
13   _____
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 224

```
 1
 2              *** ERRATA SHEET ***
                ESQUIRE DEPOSITION SERVICES
 3                216 EAST 45TH STREET
                  NEW YORK, NEW YORK 10017
 4                    (212) 687-8010
 5   NAME OF CASE:  THIEMANN VS. OHSL FINANCIAL
     DATE OF DEPOSITION:  October 22, 2004
 6   NAME OF WITNESS:  CANDACE L. PRESTON
     PAGE   LINE    FROM      TO
 7   ___|___|_____|_____
 8   ___|___|_____|_____
 9   ___|___|_____|_____
10   ___|___|_____|_____
11   ___|___|_____|_____
12   ___|___|_____|_____
13   ___|___|_____|_____
14   ___|___|_____|_____
15   ___|___|_____|_____
16   ___|___|_____|_____
17   ___|___|_____|_____
18   ___|___|_____|_____
19
20
21               CANDACE L. PRESTON
22   Subscribed and sworn to before me
23   this ____ day of _____, 2004.
24   _____
25   (Notary Public)      My Commission Expires:
```

Page 223

```
 1
 2            C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4                       : ss.
 5   COUNTY OF SUFFOLK   )
 6
 7        I, THOMAS R. NICHOLS, a Notary
 8   Public within and for the State of New
 9   York, do hereby certify:
10        That CANDACE L. PRESTON, the
11   witness whose deposition is hereinbefore
12   set forth, was duly sworn by me and that
13   such deposition is a true record of the
14   testimony given by the witness.
15        I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage, and that I
18   am in no way interested in the outcome of
19   this matter.
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 7th day of November,
22   2004.
23
24   _____
25            THOMAS R. NICHOLS
```

Page 225

```
 1                 INDEX
 2   WITNESS:        EXAMINATION BY:      PAGE:
 3   CANDACE L. PRESTON   MR. BURKE          4
                          MR. HILLER      189
 4                        MR. BRAUTIGAM       191
 5                        *****
     PRESTON EXHIBITS:              FOR ID:
 7      1, Notice              4
 8      2, Preliminary Expert Report of Candace L.    7
     Preston, CFA, dated May 1, 2002
 9
10      3, Preliminary Expert Report of Candace L.    8
     Preston, CFA, dated August 30, 2004
11      4, 4-paged document, Affidavit of Thomas M.   191
     Herron
12
13
14
15              *****
16
17
18
19
20
21
22
23
24
25
```

57 (Pages 222 to 225)